# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INVENSAS CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 11-448-GMS-CJB |
| | ) |
| RENESAS ELECTRONICS | ) |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM ORDER

Pending before the Court in this patent infringement action is Plaintiff Invensas

Corporation's ("Invensas" or "Plaintiff") letter motion seeking to compel discovery (the "Motion

to Compel") regarding certain of Defendant Renesas Electronics Corporation's ("Renesas" or

"Defendant") products that have not yet been specifically accused of infringement. For the

reasons discussed below, the Court GRANTS-IN-PART Plaintiff's motion, with the scope of the

compelled discovery to be limited as outlined below.

## I.    BACKGROUND

### A.    Procedural Posture

On May 23, 2011, Plaintiff filed its Complaint in this action, asserting that Defendant

infringes four of its patents: U.S. Patent No. 6,777,802 ("the '802 Patent"), entitled "Integrated

Circuit Package Substrate with Multiple Voltage Supplies;" U.S. Patent No. 6,825,554 ("the '554

Patent"), entitled "PBGA Electrical Noise Isolation of Signal Traces;" U.S. Patent No. 6,566,167

("the '167 Patent"), entitled "PBGA Electrical Noise Isolation of Signal Traces;" and U.S. Patent

No. 6,396,140 ("the '140 Patent"), entitled "Single Reference Plane Plastic Ball Grid Array

1

Package" (collectively, the "patents-in-suit"). (D.I. 1) Plaintiff alleges in the Complaint that

Defendant infringes each of the patents-in-suit "by, among other things, making, using, selling,

offering to sell, and/or importing infringing devices, including, by way of example and without

limitation, infringing semiconductor assemblies . . . ." (D.I. 1 at ¶¶ 7, 13, 19, 25)[1]  On October

28, 2011, Defendant filed its Answer and Counterclaims.  (D.I. 7)

## B. The Parties and the Technology-at-Issue

Plaintiff Invensas is a semiconductor technology company that, *inter alia*, has built a

patent portfolio covering inventions relating to electronics products, including the patents-in-suit.

(D.I. 38 at 3)  Defendant Renesas is a company that is one of the world's largest semiconductor

manufacturers, employing more than 13,000 people.  (D.I. 41 at 2; D.I. 42 at ¶ 2)  Over 600 of

those employees, located in eight different facilities throughout Japan, are involved in the

packaging and testing of semiconductor products.  (*Id.*)  Renesas came into being as the result of

a 2010 merger between Renesas Technology and NEC Electronics.  (D.I. 42 at ¶ 3)

The technology at issue in this action is that used to manufacture semiconductor

packages.  (D.I. 38 at 3)  A semiconductor package is a casing containing semiconductor chips;

these packages operate as the interface between the chips and the electronic products in which

the packages are incorporated (including cameras, computers, and phones).  (*Id.*)  The packages

also serve to protect the chips from contamination, damage and the effects of exposure to

extreme temperatures.  (*Id.*)  The claims of the respective patents are directed to the

characteristics of certain semiconductor packages and the substrate in such packages, as well as

---

[1]      The Complaint also alleges that Defendant has engaged in indirect infringement of the patents-in-suit.  (D.I. 1 at ¶¶ 7, 13, 19, 25)

2

to methods of fabricating semiconductor packages.  (D.I. 1, ex. A–D)[2]

## C.  Discovery Requests-at-Issue

On May 18, 2012, Plaintiff served its First Set of Interrogatories (Nos. 1–6) (the

"Interrogatories") and its First Set of Requests for Production of Documents, Electronically

Stored Information, and Things (Nos. 1–102) (the "Document Requests") on Defendant.  (D.I.

32, ex. B–C)  Both the Interrogatories and the Document Requests sought discovery with respect

to certain of Defendant's products, which Plaintiff referred to throughout the Interrogatories and

Document Requests as "Your Products."  The term "Your Products" was defined by Plaintiff to

mean:

> [A]ll of your electronic components, packages, or assemblies (including
> package-on-package modules and assemblies) made, used, sold, or offered
> for sale in the United States, or imported into the United States, since May
> 23, 2005, that are packaged in a ball grid array ("BGA") package, or which
> have a substrate containing a voltage supply plane, as well as any products,
> reference designs, modules, or circuit boards using any of these
> components or designed to be used with any of these components.

(D.I. 32, ex. C at 3)  The specific discovery requests at issue in Plaintiff's Motion to Compel,

each of which include reference to the "Your Products" term, are Interrogatories Nos. 1 and 2

and Document Requests Nos. 41–42, 44, 46–47, 49, 65–67, 72, and 76.[3]  (D.I. 32 at 1, 3)

---

[2]       The patents-in-suit are attached as Exhibits A–D to the Complaint.  (D.I. 1)
Hereafter they will be referred to in citation by their respective patent numbers.

[3]       More specifically, Interrogatory No. 1 seeks the identity, including by model
number, of Defendant's products meeting the definition of "Your Products."  (D.I. 32, ex. B)
Interrogatory No. 2 requests that Defendant identify the "Geometric Dimensions and Material
Properties" for these products.  (*Id.*)  Document Request No. 41 seeks all documents concerning
the design of the integrated circuit (or "IC") packaging of these products.  (*Id.*, ex. C)  Document
Request No. 42 seeks documents that identify these products by product name, product number,
part number, or other unique product designation.  (*Id.*)  Document Request No. 44 seeks
documents concerning the materials used in these products.  (*Id.*)  Document Requests Nos. 46

3

In its responses to the Interrogatories and Document Requests, served on June 18, 2012,

Defendant objected to the definition of "Your Products" generally as "overly broad, unduly

burdensome, oppressive, and/or irrelevant to the subject matter of [the] action." (D.I. 32, ex. D

at 4; *id*., ex. E at 4–5) Defendant further objected to this term "to the extent it purports to include

within the scope of discovery products which have not been accused of infringement." (*Id.*) To

the extent Defendant indicated that it would respond substantively to the Interrogatories and

Document Requests, it agreed to do so only with regard to "products specifically accused of

infringement." (D.I. 32, ex. D at 7–8; *id.*, ex. E)

Between June 19, 2012 and July 2, 2012, the parties exchanged several e-mails regarding

the definition of "Your Products" and the adequacy of Defendant's responses to the

Interrogatories and Document Requests. (D.I. 32, ex. H) In those exchanges, among other

things, Defendant noted that this Court's Default Standard for Discovery, Including Discovery of

Electronically Stored Information ("ESI") (the "Default Standard") imposes a burden on Plaintiff

to specifically identify Defendant's accused products within 30 days after the Rule 16

Conference, which in turn triggers a requirement that Defendant produce core technical

---

and 47 seek documents relating to the manufacture, structure, operation, and assembly of the IC
packaging of these products. (*Id.*) Document Request No. 49 seeks documents relating to these
products that are made available to customers or the public. (*Id.*) Document Request No. 65
seeks all documents concerning any simulation or electrical or signal performance analysis for
these products. (*Id.*) Document Request No. 66 seeks all documents concerning any models or
simulations of the IC packaging of these products or any third-party IC chip packages or their
components. (*Id.*) Document Request No. 67 seeks all documents concerning any finite
element, Moiré, or digital speckle analyses, models, studies, tests, or data for these products.
(*Id.*) Document Request No. 72 seeks all documents concerning the voltage supply levels in
these products. (*Id.*) Finally, Document Request No. 76 seeks all documents concerning any
processes or methods used to determine the layout of electrical connections used in these
products. (*Id.*)

4

documents regarding those products within the next 30 days. (*Id.* at 1–3) Defendant argued that these requirements underscored that, pursuant to the Default Standard, a defendant is not required to produce documents regarding a product unless that product has been specifically accused of infringement by a plaintiff. (*Id.*) Also in these exchanges, Plaintiff proposed a number of potential compromises regarding the dispute, including an offer to narrow the definition of "Your Products," and by asking whether Defendant would agree to produce "(1) schematics for each chip matching the 'Your Products' definition and/or (2) samples of each such product (parties to share cost)" in lieu of the information requested in the Interrogatories and Document Requests. (*Id.*)

Also on July 2, 2012, in accordance with Section 4(a) of the Default Standard, Plaintiff furnished Defendant with its Preliminary Identification of Accused Renesas Products and Asserted Patents. (D.I. 32, ex. A) Based on its investigation of certain of Defendant's products that it had commercially obtained, Plaintiff asserted that the patents-in-suit had been infringed by Defendant's manufacture, use, sale, offer for sale and/or importation of five specific semiconductor packages.[4] (*Id.*; D.I. 38 at 4–5) Plaintiff qualified its identification of these accused products, however, stating that the five models named are "in addition to all substantially similar chip models including but not limited to other members of the same package family." (D.I. 32, ex. A at 3-5) Plaintiff attributed its failure to specifically identify additional

---

[4]    The specifically accused models are as follows: NEC MC-10116 910EU075, accused of infringing the '140 patent; NEC 720200F1, accused of infringing the '167 and '554 patents; and NEC MC-10121, NEC D61335F1, and R8A77230, accused of infringing the '802 patent. (D.I. 32, ex. A at 3-5) Plaintiff states that it identified these particular models after "search[ing] for examples of Renesas packages by purchasing and disassembling third party electronics that Invensas believed might incorporate" Defendant's products. (D.I. 38 at 4)

5

models to the overwhelming burden of locating and reverse engineering all of Defendant's potentially infringing products, noting that it would be "far more efficient to obtain information about the full scope of infringement through targeted discovery." (*Id.* at 1)

## D. Plaintiff's Motion to Compel and the Parties' Arguments

On July 18, 2012, after the parties had failed to reach agreement on the issue, Plaintiff filed its Motion to Compel, seeking an order compelling Defendant to produce the items requested by the Interrogatories and Document Requests as to products meeting the "Your Products" definition. (D.I. 31, 32, 33) On July 20, 2012, the Court held a teleconference with the parties, during which it ordered additional briefing on the issue. Plaintiff and Defendant filed supplemental briefs on August 8, 2012 and August 27, 2012, respectively. (D.I. 38; D.I. 41)

In its supplemental brief, Plaintiff argues that without the requested discovery, it would be virtually impossible for it to obtain information about all of Defendant's potentially infringing products, because: (1) Defendant sells its semiconductor packages to third parties in widely disparate industries (i.e., electronics, healthcare, automotive and computing) who then integrate the technology into a vast assortment of products; (2) not all of Defendant's customers and the customers' end products are publicly named; (3) many of Defendant's products may no longer be available in any market; and (4) other such products may not contain indicia by which Plaintiff could readily link them to Defendant, or they may be used in applications (like automobiles or physical buildings) that are prohibitively expensive or difficult for Plaintiff to investigate. (D.I. 38 at 1–4) Plaintiff argues that it has done all it can to confirm infringement of the patents-in-suit and needs the requested discovery to paint a complete picture of Defendant's infringement of its patents. (*Id.*) It asserts that its Interrogatories and Document Requests are "narrowly tailored

6

to its claims," as it has now put forward a revised "Your Products" definition that largely

incorporates the relevant claim elements underlying this action as they relate to Defendant's

packages (unless those elements could not be incorporated into the definition without implicating

disputed issues of claim construction or technical interpretation). (*Id.* at 2, 14) Plaintiff's

proposed narrower definition of "Your Products" seeks discovery regarding semiconductor

packages containing:

> For the '140 patent . . . multiple solder balls, a semiconductor die mounted
> on a substrate containing at least four metal layers, and bonding wires that
> electrically connect the semiconductor die to the traces on the substrate,
> wherein one layer has at least some traces that are wider than at least some
> traces on another layer, and at least some traces are routed underneath the
> die.
>
> For the '802 patent . . . multiple solder balls, a substrate having multiple
> voltage supply connections on its surface, and a voltage supply plane that
> is separated into multiple segments and is located within the substrate.
>
> For the '554 and '167 patents . . . an array of solder balls containing
> multiple solder balls that are both adjacent to each other and are grounded,
> a grounded trace located partially or entirely between two signal traces,
> and a substrate with two metal layers and which has multiple signal traces
> on one layer.

(*Id.* at 15–17)

In response, Defendant argues that, pursuant to this Court's Default Standard, the scope

of discovery in patent infringement actions does not extend to unaccused products. (D.I. 41 at 1)

Defendant asserts that because the Default Standard's provisions require the plaintiff in a patent

infringement action to "specifically identify the accused products," these initial disclosures set

the boundary for discovery: Defendant must then produce information relating only to those

specific accused products that Plaintiff is able to name in its initial disclosures and in

7

supplemental disclosures later in the case. (*Id.* at 1, 5)  The scope of Plaintiff's requested

discovery is improper here, Defendant argues, because it sweeps in hundreds or thousands of

Defendant's products that could not conceivably be accused to infringe the patents-in-suit. (*Id.* at

1-2, 12)  Moreover, Defendant claims that Plaintiff's revised "Your Products" definition amounts

to "simply quoting" the claim language of the patents-in-suit; Defendant states that this would

place the burden on it to, without the benefit of claim construction, identify its own products that

might potentially infringe the claims of the relevant patents. (*Id.* at 12)  Defendant notes that its

burden would be further increased due to the time-consuming, resource-intensive hunt that would

be required of it to identify such products. (*Id.* at 15)

In an attempt to resolve the dispute, Defendant proposes a compromise.  Defendant would

agree to furnish Plaintiff with samples of "all BGA packaged products that it currently sells into

the United States provided that Invensas follows Renesas's standard terms and conditions related

to the sales of products, including payment for the samples." (*Id.* at 19)  To the extent that

Plaintiff identifies additional accused products based upon its infringement analysis of these

samples, Defendant would then provide further discovery on these products. (*Id.*)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 37 applies to motions to compel discovery, providing

that "[o]n notice to other parties and all affected persons, a party may move for an order

compelling . . . discovery."  Fed. R. Civ. P. 37(a)(1).  While it is well-settled that the Federal

Rules of Civil Procedure permit broad discovery, a party's right to discovery is not without

limits. *Micro Motion, Inc. v. Kane Steel Co., Inc.,* 894 F.2d 1318, 1322 (Fed. Cir. 1990) (internal

citation omitted).

8

In *Micro Motion, Inc. v. Kane Steel Co., Inc.,* 894 F.2d 1318 (Fed. Cir. 1990), the Federal

Circuit noted that in determining the proper scope of discovery in a patent case, a court must first

establish whether or not the requested discovery is relevant. *Id.* at 1325–26. Federal Rule of

Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any

nonprivileged matter that is relevant to any party's claim or defense . . . ." This Rule further

states that "[r]elevant information need not be admissible at the trial if the discovery appears

reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

While the scope of "relevant information," as that phrase is used in Rule 26, will vary depending

on the type of case to which it is applied, the Federal Circuit has noted the existence of certain

outer boundaries.[5] On the one hand, discovery is "[c]learly" permitted "to flesh out a pattern of

facts already known to a party relating to an issue necessarily in the case." *Micro Motion,* 894

F.2d at 1326. "At the other extreme, requested information is not relevant . . . if the inquiry is

based on the party's mere suspicion or speculation." *Id.*

The threshold requirement of relevance is not the only issue that must be addressed in an

inquiry as to whether a party should obtain discovery. The Rules also require consideration of

other factors, including the extent to which the discovery requests will burden the producing

party (and how that burden compares to the likely benefit of the discovery), whether the party

seeking discovery has had ample opportunity to obtain the information, and the ease with which

---

[5]     As this discovery dispute relates to the relevance of discovery regarding
unaccused products in a patent case, a substantive patent law issue, the law of the Federal Circuit
applies. *In re Spalding Sports Worldwide, Inc.,* 203 F.3d 800, 803 (Fed. Cir. 2000) (stating that
"Federal Circuit law applies when deciding whether particular written or other materials are
discoverable in a patent case, because they relate to an issue of substantive law") (internal
citation omitted); *Brigham and Women's Hosp. Inc. v. Teva Pharm. USA, Inc.,* 707 F. Supp. 2d
463, 469 (D. Del. 2010).

that requesting party can obtain the information on its own. Fed. R. Civ. P. 26(b)(2)(C). On the

whole:

> The discovery rules are designed to assist a party to prove a claim it
> reasonably believes to be viable *without discovery*, not to find out if it has
> any basis for a claim. That the discovery might uncover evidence showing
> that a plaintiff has a legitimate claim does not justify the discovery request.

*Micro Motion*, 894 F.2d. at 1327 (citations omitted) (emphasis in original).

## III.   DISCUSSION

### A.   Applying the Federal Rules of Civil Procedure to Disputes Regarding Discovery of Unaccused Products

At the outset, in order for Plaintiff's discovery requests to be proper, they must seek

information that can be said to be "relevant to any party's claim or defense." Fed. R. Civ. P.

26(b)(1). In order to identify a framework for determining whether and when discovery as to

unidentified and unaccused products is relevant and should be permitted, it is instructive to

review the decisions of other district courts, as well as those of this Court.

In many such cases, whether this type of discovery is found to amount to "relevant

information" under Rule 26 depends on the level of specificity offered by the requesting party. If

the requesting party can articulate, in a focused, particularized manner, the characteristics or

components that the unaccused products must have in order to suggest that they may infringe the

patents-in-suit, the discovery-at-issue is more likely to be seen as relevant—as "relating to an

issue [the plaintiff's allegations of infringement] necessarily in the case." *Micro Motion*, 894

F.2d at 1326. Some courts have described this as a showing that the requested discovery relates

to products "reasonably similar" to those that have been specifically accused of infringement.

*Prism Techs., LLC v. Adobe Sys., Inc.*, No. 8:10CV220, 2011 WL 6210292, at *5 (D. Neb. Dec.

10

14, 2011); *Honeywell Int'l, Inc. v. Acer Am. Corp.*, 655 F. Supp. 2d 650, 656 (E.D. Tex. 2009).
If, on the other hand, the proffered basis for the discovery amounts to a broader, more
generalized argument as to how the unaccused products may be similar to the accused products,
the discovery request is more likely to be viewed as the product of "suspicion or
speculation"—one less likely to lead to relevant evidence and more likely to be denied. *Micro
Motion*, 894 F.2d at 1326. Two cases are exemplary.

In *Tesseron, Ltd. v. R.R. Donnelley & Sons Co.*, No. 1:06 CV 2909, 2007 WL 2034286
(N.D. Ohio July 10, 2007), plaintiff Tesseron accused defendant Donnelley, a printing company,
of infringing certain of plaintiff's method patents relating to "variable data printing systems and
services." 2007 WL 2034286, at *1. During the course of litigation, Tesseron specifically
identified two printing systems that it alleged Donnelley used or had used to infringe. *Id.*
Believing that the defendant used additional infringing printing systems, which plaintiff could
not simply identify, buy on the open market and analyze, plaintiff sought discovery on all of the
defendant's "variable data printing systems." *Id.* at *2. The *Tesseron* Court first held that a
plaintiff could obtain discovery of unidentified and unaccused products under certain
circumstances, rejecting Donnelley's position that such discovery could never be relevant. *Id.* at
*1, *3. It noted that while obtaining such discovery is possible under Rule 26(b)(1), "certain
threshold requirements must be satisfied to permit such discovery to go forward," explaining:

> Specifically, the party seeking such discovery must first identify with
> requisite specificity the type of product or system at issue. Second, the
> party must also identify with specificity the component, characteristic, or
> element of the product or system that the claimant[] believes will render the
> product or system infringing.

*Id.* at *3. The *Tesseron* Court found that in cases where these threshold requirements are not

satisfied, "the discovery request will fail to be sufficiently relevant to a pending claim or defense and the burden and expense of producing the discovery may well outweigh its likely benefit." *Id.* at \*4 (citing Fed. R. Civ. P. 26(b)(1) and 26(b)(2)(C)).

Ultimately, the *Tesseron* Court denied the plaintiff's discovery requests, finding that its definition of "variable data printing systems" swept in "a broad spectrum of technology" and "include[d] many systems that cannot conceivably infringe on any of Tesseron's patents." *Id.* at \*5. Important to the decision was that Tesseron's all-inclusive request for discovery relating to all such printing systems stemmed from its "assumption" that Donnelley could not produce the products that it sold without infringing the patents-in-suit. *Id.* This the *Tesseron* Court found was an insufficient showing that the requested discovery was relevant, and that its relevance outweighed the burden of production. *Id.* at \*4–5. Instead, the Court required Tesseron to further specify with regard to "unidentified and unaccused systems" at issue "the component, characteristic, or element of the system that must, in its view, exist for infringement to occur," if it wished to obtain future discovery of unaccused products. *Id.* at \*5.[6]

Similarly, in *Kellogg v. Nike, Inc.*, No. 8:07CV70, 2007 WL 4570871 (D. Neb. Dec. 26, 2007), the plaintiff's complaint accused defendants Nike, Inc. and Nike U.S.A., Inc.'s ("Nike")

---

[6]     *See also Caliper Techs. Corp. v. Molecular Devices Corp.*, 213 F.R.D. 555, 558 (N.D. Cal. 2003) (denying plaintiff's motion to compel discovery seeking information on all of defendant's enzyme assay technology products that did not "use antibodies or radioactive isotopes," where plaintiff had specifically accused only defendant's IMAP product, because plaintiff "offer[ed] no explanation why 'all assays that don't use antibodies or radioactive isotopes' are relevant to any claim or defense") (cited in *Tesseron*, 2007 WL 2034286, at \*4–5); *see also Samsung SDI Co., Ltd. v. Matsushita Elec. Indus. Co., Ltd.*, No. CV 05-8493-AG(SHx), 2007 WL 4302701, at \*1, \*3 (C.D. Cal. June 27, 2007) (denying motion to compel in part because "[d]efendants have not persuaded the Court that they have a reasonable basis to suspect that additional products allegedly infringe the patents-in-issue," such that the defendants' "speculat[ive]" requests amounted to a "fishing expedition").

"DRI-FIT Featherlite Cap" of infringing his patent, which covered a particular "four-vent" design

for a baseball cap. 2007 WL 4570871, at *1, *8. In discovery, the plaintiff sought copies of the

defendant's product catalogs, because he intended to accuse as infringing every cap similar to the

DRI-FIT Featherlite Cap or with a design derived from a particular Nike patent, but could not

identify such products based solely on publicly-available data. *Id.* at *7. The plaintiff argued

that the catalogs would simply enable him to identify such caps and obtain their style numbers.

*Id.* Nike countered by asserting that documents related to unaccused products were irrelevant to

the case. *Id.* The *Kellogg* Court, citing the Federal Circuit's decision in *Micro Motion*, rejected

Nike's argument. *Id.* In doing so, it stated:

> The evidence in this matter shows the plaintiff does not seek the catalogs to
> determine ***whether*** the defendants have an infringing product, but to
> identify ***which products*** match a particular description—caps made, used
> and sold by the defendants which incorporate the accused four-vent design.
> This is not the "unmoored and trolling" expedition denounced in ***Micro
> Motion***, but an attempt by the plaintiff to identify specific caps after the
> plaintiff made a reasonable inquiry into the defendants' products and has
> shown more than a mere suspicion of infringement.

*Id.* at *8 (emphasis in original).

While cases like *Tesseron* and *Kellogg* help set the boundaries of the relevance inquiry,

other cases in this area turn on factors discussed in Rule 26(b)(2)(C), including: (1) whether the

information sought could reasonably have been obtained by the plaintiff prior to litigation; and

(2) the relative nature of the burden on the defendant in identifying and producing the requested

discovery. One factor that courts often look to in this regard is whether the unaccused products-

at-issue are easily obtained by the plaintiff in the open market, or, conversely, whether vital

information about the products rests largely or solely with the party withholding discovery.

13

One such case from our Court is *Honeywell Int'l Inc. v. Audiovox Commc'ns Corp.*, Nos.

04-1337-KAJ, 04-1338-KAJ, 04-1536-KAJ, 2005 WL 3988905 (D. Del. Oct. 7, 2005). In

*Honeywell*, plaintiffs Honeywell International, Inc. and Honeywell Intellectual Properties, Inc.

("Honeywell") sued 35 defendants, alleging that certain Liquid Crystal Display ("LCD") modules

incorporated into consumer electronics products infringed a Honeywell patent. 2005 WL

3988905, at *1. These defendants included some that were retailers of products that incorporated

LCD modules and some that were consumer device manufacturers that only acquired LCD

modules from other manufacturers, rather than being manufacturers of the modules themselves

(the "non-manufacturer defendants"). *Id.* The *Honeywell* Court, noting that "'large-scale

litigation like this requires the business and strategic legal interests of the plaintiff to cede some

ground to case management imperatives,'" issued certain orders to manage the discovery sought

from the non-manufacturer defendants. *Id.* In issuing one such order, this Court referred back to

a prior order it had issued during a conference with counsel:

> *I said in the order that I put out last May that Honeywell was required to specifically identify accused products. And that's what I meant. Not that Honeywell was entitled to say [that] we think all your cellular phones infringe so we want you to tell us everything about all your cellular phones. What I mean is if you've got a basis for believing that a manufacturer's cellular phones are infringing, and I mean you can say we've done this tear-down on these specific products and these things appear to us to infringe, well, then you are absolutely entitled to conduct additional discovery with respect to those products* [and prior and future generations of those products].
>
> But what you are not entitled to do is say you manufacture 15 different kinds of cell phones. We tore down three. Tell us about your other 12. Because I agree with the defendants that now what you are doing is you are telling manufactures, you know what? You got one or two things that are bad. *We want you to do an analysis of everything you make and tell us whether you are guilty on those fronts, too; and that is not what the law*

14

> *requires, and it's not what I'm going to require them to do.*
>
> If you want to go out, you want to buy them, you want to do the tear-downs, you want to get information that prompts you to be able to say "now I know that this specific model also infringes," then you can certainly do that. And then you would be in an area where you could be requiring additional discovery from them. But to ask them to come forward in the first instance, which is what it really comes down to, is not right.

*Id.* at *1 n.2 (emphasis added).

The Court does not read this portion of the *Honeywell* decision, as Defendant does, to stand for the bright-line proposition that, in all cases, "a plaintiff cannot take discovery on products it has not accused of infringement."[7] (D.I. 41 at 6) Instead, as were the courts in *Tesseron* and *Kellogg*, the *Honeywell* Court appears to have been focused on whether plaintiffs "had a basis for believing that [certain unaccused products] are infringing" before allowing plaintiffs to obtain broad discovery of those products. *Honeywell*, 2005 WL 3988905, at *1 n.2. The Court reads *Honeywell* as a case where plaintiffs had not articulated that basis with any real particularity. Moreover, the *Honeywell* Court appears to have cabined the plaintiffs' ability to

---

[7]     There are few other published cases from this Court relating to whether (and to what degree) discovery into unaccused products should be permitted. In at least one other case, our Court adopted a Special Master's Report and Recommendation that sanctioned some such discovery. *L.G. Philips LCD Co., Ltd. v. Tatung Co.*, No. 04-343-JJF, 2007 U.S. Dist. LEXIS 45417 (D. Del. June 22, 2007), *adopting* Special Master Report and Recommendation, (D.I. 611), slip op. at 8-9 (permitting discovery of "technical or other information" of unaccused products "to enable a plaintiff to identify any additional products it wishes to accuse of infringement" but denying request for discovery of non-technical information regarding such products). In at least two other non-published cases, this Court has taken different approaches to this question. *Compare Tessera Inc. v. Sony Elecs., Inc.*, No. 10-0838-RMB-KMW, (D.I. 169) (D. Del. Aug. 8, 2012) (declining to limit discovery to the products accused in plaintiff's preliminary infringement contentions), *and id.* (D.I. 196) (D. Del. Nov. 15, 2012) (permitting some such discovery), *with Adobe Sys. Inc. v. Macromedia, Inc.*, No. 00-743-JJF, (D.I. 158), slip. op. at 4 (D. Del. Nov. 9, 2001) (cited in D.I. 44, ex. 2) (refusing to permit discovery as to certain software products that were not specifically named in the complaints in the case).

15

take such discovery particularly because, in that case, the unaccused products being discussed were cell phones that plaintiffs could have readily purchased, torn down, and analyzed to determine whether they contained allegedly infringing components. In addition, the nature of the burden that might have been placed upon the significant number of defendants in that "large-scale litigation"—were a vast scope of such discovery to be permitted—appears to have also concerned the Court. *Id.* at *1.[8]

Such considerations, which relate in part to factors referenced in Rule 26(b)(2), are often considered by courts in evaluating this issue. *See also Itex, Inc. v. Westex, Inc.*, Nos. 05 CV 6110, 08 CV 1224, 2011 WL 856583, at *5 (N.D. Ill. Mar. 9, 2011) (denying discovery into unaccused fabrics manufactured and sold by defendants, when plaintiffs "have not explained why the [defendants] should bear the burden of responding to" such requests, in light of fact that plaintiffs could easily have purchased the fabrics-at-issue and tested them to determine infringement). However, in cases on the opposite end of the spectrum to *Honeywell*—where a plaintiff was previously unable to obtain information about whether unaccused products

---

[8] It is notable, however, that in a further order, the *Honeywell* Court appears to have permitted limited discovery into certain LCD modules that plaintiffs had not been able to specifically identify by make or model number, so long as plaintiffs were able to identify the products of the non-manufacturer defendants that allegedly contained those "unknown" LCD modules. *Honeywell*, 2005 WL 3988905, at *1. Moreover, it permitted discovery into "other versions of the [non-manufacturer defendants'] identified products that include other LCD modules with substantially the same structure as the LCD module or modules contained in the specifically identified products, if any." *Id.* In a similar ruling, this Court has ordered discovery into certain of a defendant's unidentified "future products," where that discovery was found to be reasonably likely to lead to discoverable evidence relevant to a plaintiff's existing infringement claims. *BigBand Networks, Inc. v. Imagine Commc'ns, Inc.*, No. 07-351-JJF, 2010 WL 2898288, at *1 (D. Del. July 20, 2010).

16

infringe—courts have considered that fact favorably in deciding to permit such discovery.[9]

Ultimately, in almost none of the cases cited by the parties has a court clearly held that—no matter what the circumstances—a plaintiff can never obtain discovery regarding unaccused products. The Court believes that the better approach is (as these cases counsel) to examine each such request on a case-by-case basis, with a focus on, *inter alia*: (1) as to relevance, the specificity with which the plaintiff has articulated how the unaccused products are relevant to its existing claims of infringement (and how they are thus "reasonably similar" to the accused products at issue in those claims); (2) whether the plaintiff had the ability to identify such products via publicly available information prior to the request and (3) the nature of the burden on defendant(s) to produce the type of discovery sought. *See, e.g., Prism Techs.*, 2011 WL 6210292, at *5.

### B. The Impact of the Default Standard on the Scope of Permissible Discovery of Unaccused Products

As noted above, Defendant also argues that discovery into unaccused products is impermissible in light of the Default Standard. However, the Court does not believe that this standard is meant to have the limiting force that Defendant ascribes to it.

---

[9] *See, e.g., Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products, LLC*, No. 1:09-CV-1685, 2011 WL 4738110, at *1, *5 (M.D. Pa. Oct. 6, 2011) (granting plaintiff's motion to compel certain limited discovery about defendants' unaccused adult incontinence products and baby diapers that plaintiff believed infringed its patents, in order to help plaintiff "determine which of First Quality's products infringe," in part because plaintiff "reasonably requires additional information that First Quality—and only First Quality—can provide in order to facilitate K-C's infringement analysis"); *Phillip M. Adams & Assocs., L.L.C. v. Dell, Inc.*, No. 1:05-CV-64 TS, 2008 WL 201136, at *1–2 (D. Utah Jan. 22, 2008) (granting plaintiff's motion to compel discovery as to unaccused products, as the third-party defendant was "familiar with the universe" of those products, as to do otherwise would "force the patent holder to undertake Herculean investigation to find all the alleged infringer's products on the open market").

This Court's decision in a related case, *Tessera Inc. v. Sony Elecs., Inc.*, No. 10-0838-RMB-KMW, (D.I. 169), slip op. at 7–8 (D. Del. Aug. 8, 2012) (hereinafter "the *Tessera* Action") is instructive. Similar issues to those presently before the Court were argued before Magistrate Judge Karen M. Williams in that action—a case involving a plaintiff (Tessera Inc.) that shares a corporate parent with Invensas, and two defendants, one of which was Renesas.[10] While the current Default Standard was not in force at the beginning of discovery in the *Tessera* Action, the discovery schedule in that action did require plaintiff to "provide to Defendants their preliminary infringement contentions [including] claim charts identifying patent claims and accused product(s) . . . ." *Id.*, slip op. at 3. Thus, the preliminary infringement contentions required in the *Tessera* Action operated much like the initial disclosures mandated by the Default Standard, as both required the patentee to identify specifically accused products (although the Default Standard does not require production of a claim chart until after the patentee has received "core technical documents related to the accused product(s)" from the defendant). Default Standard §§ 4(b) & (c). In the *Tessera* Action— where, like here, the plaintiff thereafter served discovery requests seeking information about defendants' unaccused products—Renesas argued that it was only required to produce discovery on products that the plaintiff had specifically accused of infringement in the preliminary infringement contentions. *Id.*, slip op. at 3.

The *Tessera* Court disagreed, holding that the preliminary infringement contentions required there "serve as a mechanism to facilitate discovery during the initial stages of the litigation," but that "limiting discovery to the products accused in [those contentions] is contrary

---

[10]     The *Tessera* Action was referred to Judge Williams by Judge Renee Marie Bumb, who was sitting by designation in lieu of the then-vacant judgeship in this Court.

18

to the broad and liberal policy of discovery" set out by the Federal Rules of Civil Procedure. *Id.*, slip op. at 8 (internal quotation marks and citation omitted). The *Tessera* Court concluded that were it to hold otherwise, "the inherent purpose of discovery would be stymied by limiting all discovery requests to the infringement known by the patent holder during the early stages of litigation." *Id.*

In line with the spirit of the decision in *Tessera*, the Court does not believe that the Default Standard was meant to categorically limit discovery only to those products that a plaintiff specifically accuses of infringement in its initial disclosures (or specifically accuses via supplementation thereafter). The Default Standard itself notes that its parameters relate only to "[i]nitial [d]iscovery" in patent infringement actions, reiterating that its provisions are meant to serve as an important starting point in the discovery process. Default Standard § 4(a) n.3 ("as these disclosures are 'initial,' each party shall be permitted to supplement"). While the Default Standard acts to jump-start the discovery process in such cases, the determination as to whether discovery should be permitted beyond the products specifically accused in those disclosures should ultimately be governed by the dictates of the Federal Rules of Civil Procedure. *See, e.g.*, *Epicrealm, Licensing, LLC v. Autoflex Leasing, Inc.*, Nos. 2:05-CV-163-DF-CMC, 2:05-CV-356-DF-CMC, 2007 WL 2580969, at *3 (E.D. Tex. Aug. 27, 2007) (refusing to limit discovery only as to products specifically named in infringement contentions required by the jurisdiction's Local Patent Rules, and finding that "the scope of discovery may include products and services . . . reasonably similar to those accused in the [contentions]"); *see also EPOS Techs. v. Pegasus Techs.*, 842 F. Supp. 2d 31, 33 (D.D.C. 2012). Indeed, as those Rules do not require that a party's claims be conclusively defined at the outset of litigation, *see O2 Micro Int'l Ltd. v.*

19

*Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366 (Fed. Cir. 2006), it may be that targeted discovery regarding unaccused products can provide a party with the additional information it needs to diligently supplement its infringement contentions later in a case. *See, e.g., Acer*, 655 F. Supp. 2d at 655; *Epicrealm*, 2007 WL 2580969, at *3.

### C. The Discovery Requests-at-issue

The Court now turns to the specific discovery requests-at-issue. In doing so, it will apply the legal principles discussed above.

First, the Court finds that Plaintiff has not articulated with great specificity how the discovery it seeks as to unaccused products is related to its existing infringement allegations—such that the unaccused products can be said to be "reasonably similar" to the accused products. In a prior teleconference with the parties, the Court requested that Plaintiff provide a more concrete explanation as to why the discovery it seeks would be relevant in this way:

> In other words, [the Court would like to] get a better understanding of . . . the process that you have gone through to determine that the description of the types of products you are seeking discovery on, or at least the components that such products would have to include, aren't just [the product of] speculation, but instead . . . are the product of some reasonable inquiry and an understandable calculation that products with these components, in your view, likely infringe the patents at issue.

Transcript of July 20, 2012 Teleconference at 12–13; *see also* (D.I. 38 at 1).

In response, however, Plaintiff has offered a revised definition of the "Your Products" term that, to a great degree, reprints portions of claim language at issue in the patents-in-suit. By way of example, with respect to unaccused products that Plaintiff believes are likely to infringe

the '140 Patent, Plaintiff seeks documents regarding semiconductor packages containing:

> [M]ultiple solder balls, a semiconductor die mounted on a substrate
> containing at least four metal layers, and bonding wires that electrically
> connect the semiconductor die to the traces on the substrate, wherein one
> layer has at least some traces that are wider than at least some traces on
> another layer, and at least some traces are routed underneath the die.

(D.I. 38 at 15) This description closely tracks the language of most of the relevant portions of

Claim 1 of the '140 Patent.[11] The portions of the claim's language that are not represented in

Plaintiff's proposed definition include certain aspects where Plaintiff believed Defendant may

"dispute the construction or application of those terms, [such that] using them to define the scope

of discovery could create numerous problems."[12] (D.I. 38 at 16)

On the one hand, putting forward a proposed definition of unaccused products that tracks

the language of the key claims of the patents-in-suit can help insulate a plaintiff from the charge

that its proposed definition sweeps in too many products that cannot be said to infringe the

---

[11]     For example, as to the limitation regarding "multiple solder balls," Claim 1 notes
that the semiconductor package-at-issue is comprised of a substrate with "solder balls thereon."
('140 Patent, col. 3:25) As to the reference to "a semiconductor die mounted on a substrate
containing at least four metal layers," the claim recites a substrate within the semiconductor
package comprising "first, second, third and fourth metal layers." (*Id.*, col. 3:27) With regard to
the reference to "bonding wires that electrically connect the semiconductor die to the traces on
the substrate," Claim 1 states that the semiconductor package is comprised of "bonding wires
that electrically connect the semiconductor die to the traces on the top surface of the substrate."
(*Id.*, col. 3:36-37) As to the reference "wherein one layer has at least some traces that are wider
than at least some traces on another layer," the claim notes that in the substrate "traces on the
third metal layer are wider than traces on the first metal layer." (*Id.*, col. 3:28-29) And as to the
reference that "at least some traces are routed underneath the die," the claim recites that, as to the
substrate, "the traces comprising the first metal layer are routed underneath the die." (*Id.*, col.
4:1-2)

[12]     Defendant does not appear to agree that Plaintiff's proposed definition will not
involve disputed issues regarding claim construction, noting that Plaintiff's definition forces it to
"use claim language that has not yet been construed." (D.I. 41 at 12)

21

patents. In that sense, documents falling within the definition can be said to be relevant to the plaintiff's infringement claims, at least in a general way. The difficulty with such a definition, however, is that the more it simply tracks the broad outlines of the key asserted claims, the less it tells a defendant (and the Court) about how the defendant's unaccused products are alleged to be "reasonably similar" to the accused products at issue in the case, according to Plaintiff's infringement theory. At the extreme, such a request can appear less directed to fleshing out an infringement claim already known to the plaintiff, and more like a broad request for information that *might* result in favorable discovery, no matter what plaintiff's infringement theory is.

Here, more specifically, Plaintiff's proposed "Your Products" definition and its briefing does not further explain how its investigation of the product that is alleged to infringe the '140 Patent (Renesas' NEC MC-10116 910EU075 model) can help the Court understand how the limitations in its definition will lead to products "reasonably similar" to the accused product. Similarly, Plaintiff does not attempt to meaningfully further identify "the component, characteristic, or element of the product or system that [it] believes will render the product or system infringing"—the kind of guidance that the *Tesseron* Court required of the patentee. *Tesseron*, 2007 WL 2034286, at *3.[13] Of course, by nature of the bare allegation that the NEC

_____

[13]     *See also Acer*, 655 F. Supp 2d at 657 (permitting discovery into products containing unaccused Driver Integrated Circuits, where plaintiff had sufficiently explained, "element by element" how the two Driver Integrated Circuits it had accused of infringement were "structurally identical and operate in a manner consistent with the infringement theory in its [preliminary infringement contentions]," such that the Court could assume that all Driver Integrated Circuits in defendant's products operate in a manner reasonably similar to plaintiff's infringement theory); *IP Innovation L.L.C. v. Sharp Corp.*, 219 F.R.D. 427, 429 (N.D. Ill. 2003) (allowing discovery into defendant's product models not yet accused of infringement that contained certain chips, because plaintiff had identified those chips as integral to its infringement claim and "believe[d] that all of the [defendant's] models which use the chips . . . infringe the

22

MC-10116 910EU075 model infringes the '140 Patent, the Court can assume that Plaintiff

believes that this model meets the limitations in certain asserted claims of the patent. But what

further information can Plaintiff provide to explain *why* the product meets these limitations?

How can Defendant manageably search its unaccused BGA products to determine whether they

too are constructed in a way that, according to Plaintiff's theory of the case, will infringe the '140

Patent? As to these questions, Plaintiff's submissions are largely silent.

One factor that does redound in Plaintiffs' favor here is that Defendants' products-at-

issue are not much like the cellular phones at issue in *Honeywell*—Plaintiff cannot simply go into

a store, easily locate Defendants' semiconductor packages, purchase them, tear them down and

analyze them.[14] The packages are primarily sold by Defendant to third parties who then utilize

them as sub-components in a vast assortment of products. (D.I. 38 at 1) Plaintiff notes that

while Defendant's website lists package codes for some of its semiconductor package products,

the website "does not supply sufficient relevant information about the way in which the package

is internally configured to evaluate infringement" and "an indeterminate number of Renesas's

relevant products are not referenced on Renesas's website at all."[15] (D.I. 38 at 4) Were Plaintiff

to try to seek out Defendant's semiconductor packages by purchasing third-party products that

_____

asserted patents").

[14]     In its briefing, Defendant at least partially acknowledges this fact. (D.I. 41 at 16)
("Renesas's BGA chips are not standard off-the-shelf goods like the cell phones in *Honeywell*.")

[15]     Defendant, for its part, asserts that "public information is available from which
Invensas can identify accused products" and "[*m*]*any* of Renesas's products are described in great
detail on Renesas's website." (D.I. 33 at 2 n.2) (emphasis added) At a minimum, Defendant's
comments seem to confirm that some categories of information about Defendant's relevant
products are not referenced publicly.

23

contain them, it would be (and has been) stymied in doing so by the fact that the end products containing the packages (and the producers of those packages) are not publicly identified by Defendant. (*Id.* at 1 n.2 & 4)  Moreover, Plaintiff asserts that:

> [M]any Renesas packages may no longer be available in *any* products on the open market, others may not contain indicia by which Invensas could link them to Renesas, and others may be used in applications (like automobiles or physical buildings) that are prohibitively expensive or difficult for Invensas to procure or investigate.

(*Id.* at 2)  Although Plaintiff, through a process of "trial and error," was able to locate a few of Defendant's semiconductor packages on the open market—resulting in the identification of the five products it has accused of infringement—this was a laborious and uncertain process. (*Id.* at 1-4)

It thus clearly appears that Plaintiff is in a far worse position that Defendant to obtain access to Defendant's potentially infringing products.  This explains why it can be fair for Plaintiff to ask Defendant to search for and provide certain discovery into unaccused products, before Plaintiff supplements its infringement contentions.  However, it cannot lead to a ruling that would shift the burden from Plaintiff to Defendant to be the party responsible for articulating why certain of those products *do in fact* infringe Plaintiff's patents.

Another factor weighing against the grant of Plaintiff's motion in its entirety is the expensive, time-consuming process Defendant would face in identifying discovery regarding unaccused products matching Plaintiff's proffered definition.  (D.I. 41 at 15–19; D.I. 42; D.I. 43) Plaintiff's proposed new "Your Products" definition seeks discovery regarding semiconductor packages containing particular substrates, but Defendant asserts that it does not track its parts

24

based upon the substrates they contain. (D.I. 41 at 15) Compounding the difficulty is the fact that, in light of the 2010 merger of two prior companies that produced Renesas, Defendant's products are "tracked across a complex web of archives including various databases" and contain different part numbers. (*Id.* (citing D.I. 42 at ¶ 4); *see also id.* at 17) In order to locate particular substrate drawings or other core technical documents regarding such products, Defendant would be required to manually conduct "a difficult search of multiple databases" and conduct numerous "engineer interviews." (*Id.* at 15 (citing D.I. 42 at ¶¶ 5-10); *see also id.* at 18) Even were Defendant to identify a particular semiconductor package, it asserts that in order to identify whether the product may contain a substrate of the type referenced in Plaintiff's definitions, it would be required to "tear down a product itself or conduct a laborious search for particularized documents." (*Id.* at 17 (citing D.I. 42 at ¶ 9)) Lastly, Defendant states that it has 1,626 different BGA products, and that even though Plaintiff's revised "Your Products" definition may not implicate all of those products, it would be required to "do an infringement analysis under a slightly broader reading of the claims [than provided by the relevant claim limitations] and then provide full discovery on those products which [it] determines fall within the slightly broadened claims." (*Id.* at 18) Although the Court cannot know the precise level of effort that would be required for Defendant to produce all of the requested discovery, based on the representations made by Defendant, it appears that the burden involved in that production would be significant.

Ultimately, discovery into certain unaccused products can be warranted, particularly as here where Defendant is in a far better position that Plaintiff to know of and gain access to those products. However, in light of the failure of Plaintiff to articulate with greater specificity how its requests are targeted toward its existing infringement allegations, and in light of the significant

burden Defendant would suffer in complying with the scope of the requests-at-issue, the Court declines to order the full scope of Plaintiff's requested discovery.

In it its briefing, Defendant proposed a compromise to Plaintiff's request: that Defendant would "provide Invensas with a sample of all BGA packaged products that it currently sells into the United States[16] provided that Invensas follows Renesas's standard terms and conditions related to the sales of products, including payment for the samples." (D.I. 41 at 19; *see also id.* at 13, 15) Defendant suggests that it will significantly less burdensome for it to produce this subset of its products. (D.I. 41 at 19) This proposal narrows one previously made by Plaintiff, wherein Defendant would have produced samples of each product matching the "Your Products" definition, with the parties sharing costs of that production. (D.I. 32, ex. H at 3)

The Court believes that, in light of the strength of the parties' respective presentations, Defendant's proposal comes far closer (as compared to Plaintiff's discovery requests) to balancing the competing interests set forth in the law as to discovery of unaccused products. As a result, the Court will order that Defendant shall produce to Plaintiff samples of each of its BGA packaged products that it currently "makes, uses, offers to sell, or sells . . . within the United States or imports into the United States." 35 U.S.C. § 271. If any such samples are subject to confidentiality agreements, Defendant must attempt to get third party consent to produce them to Plaintiff.

Finally, as to who should bear the burden of the cost of this production, Plaintiff has previously offered to share costs, while Defendant proposes that Plaintiff pay market price for the

---

[16] Defendant had, among other things, objected to Plaintiff's proposal on the grounds that it encompassed products that were sold outside the United States. (D.I. 41 at 1)

samples. In similar cases, some amount of cost-shifting to the requesting party has occurred. *See, e.g., Brandeis Univ. v. East Side Ovens Inc.*, No. 1:12-cv-01508, (D.I. 264), slip op. at 2 (N.D. Ill. Apr. 28, 2012) (cited in D.I. 38, ex. G at 2) (granting plaintiffs' motion to compel discovery regarding unaccused products but ordering plaintiffs to reimburse defendants for any costs incurred in testing products necessary to respond to the discovery requests); *Caliper Techs. Corp. v. Molecular Devices Corp.*, 213 F.R.D. 555, 558 (N.D. Cal. 2003) (granting plaintiff's discovery request for samples of defendants' infringing products but requiring plaintiff to pay a reasonable price for those samples, because while "[n]ormally the producing party bears the cost of production . . . . [t]he court sees no justification to order Caliper to pay the retail cost of the kits but at the same time MDC is being deprived of its profit for each kit"). However, the Court does not have enough information at this time to make an informed ruling on this question. Accordingly, within 21 days from the date of this order, Defendant shall submit to the Court both the market price for each sample included in the scope of the Court's Order, and the cost to Defendant to produce each sample. The Court will consider these factors in deciding whether and how cost should be apportioned.

## IV. CONCLUSION

For the reasons outlined above, it is hereby ORDERED that Plaintiff's motion for the requested discovery is GRANTED-IN-PART. By no later than **December 21, 2012 or a reasonable time otherwise jointly agreed to by the parties**, Defendant shall provide to Plaintiff samples of all of its BGA packaged products that it currently makes, uses, offers to sell or sells within the United States or imports into the United States. If any such samples are subject to confidentiality agreements, Defendant should attempt to gain third-party consent to

27

produce them to Plaintiff. Finally, Defendant shall provide to the Court, **by no later than December 12, 2012**, a submission stating both the market price for each sample and the Defendant's cost to produce each sample, which the Court will consider in deciding how costs for this discovery should be fairly allocated.

If additional disputes arise that the parties cannot resolve regarding compliance with this Order, or regarding any subsequent further requests with respect to currently unaccused products, the parties should resort to the Court's procedures regarding such discovery disputes. (D.I. 17 at ¶ 3(g))

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **December 3, 2012** for review by the Court. The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: November 21, 2012

_Christopher J. Burke_

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

28