```
                           UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF DELAWARE


                                      .
ARBUTUS BIOPHARMA                     .
CORPORATION, et al,                   .  Case No. 1:22-cv-00252-MSG
                                      .
                   Plaintiffs,        .
                                      .
              vs.                     .  Courtroom 17-A
                                      .  601 Market Street
MODERNA, INC., et al,                 .  Philadelphia, Pennsylvania 19106
                                      .
                   Defendants.        .
. . . . . . . . . . . . . . .         .  Tuesday, March 26, 2024

              TRANSCRIPT OF TELEPHONIC CONFERENCE BEFORE THE
                    HONORABLE MITCHELL S. GOLDBERG
                 UNITED STATES DISTRICT COURT CHIEF JUDGE


APPEARANCES VIA TELEPHONE:

For the Plaintiffs:        Emily DiBenedetto, Esq.
                           SHAW KELLER, LLP
                           1105 North Market Street
                           12th Floor
                           Wilmington, Delaware 19801

                           Adam D. Harber, Esq.
                           David I. Berl, Esq.
                           WILLIAMS & CONNOLLY, LLP
                           680 Maine Avenue SW
                           Washington, D.C. 20024

                           Kira A. Davis, Esq.
                           MORRISON & FOERSTER, LLP
                           707 Wilshire Boulevard
                           Los Angeles, California 90017
(Appearances Continued)

Audio Operator:            Electronically Recorded
                           by Jimmy Cruz, ESR

Transcription Company:     RedDoor Legal Services, LLC
                           44 Valley Forge Road
                           Bordentown, N.J. 08505
                           (973)985-3668
                           www.reddoorlegalservices.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

APPEARANCES:  (Continued)

For the Plaintiffs:          Nate Tan, Esq.
                            MORRISON & FOERSTER, LLP
                            2100 L Street, NW, Suite 900
                            Washington, D.C., 20037

For the Defendants:          Travis J. Murray, Esq.
                            MORRIS, NICHOLS, ARSHT
                             & TUNNELL, LLP
                            1201 North Market Street
                            16th Floor
                            Wilmington, Delaware 19899

                            Marc C. McLennan, Esq.
                            Patricia A. Carson, Esq.
                            KIRKLAND & ELLIS, LLP
                            601 Lexington Avenue
                            New York, New York 10022

Also Appearing:             Elizabeth Howard
                            ARBUTUS BIOPHARMA SCIENCES

                            Peter Zorn
                            GENEVANT SCIENCES GMBGH

                            Lindsay Androski
                            MODERNA, INC.

<u>INDEX</u>

<u>Page</u>

<u>SCOPE OF ROIVANT SUBPOENA</u>                                    5

<u>DISCOVERY RE:  MODERNA LOBBYING/GOVERNMENT RELATIONS</u>    15

<u>EXPERT WITNESSES</u>                                          16

<u>MORRISON & FOERSTER</u>                                       25

```
 1              (Proceedings commence at 2:08 p.m.)

 2              THE COURT:  Okay.  This is Mitch Goldberg.  This is

 3    the Arbutus v. Moderna matter, it's a Delaware matter, 22-25

 4    [sic].

 5              I'm happy -- there's a lot of people on the call.

 6    I'm happy to hear everyone announce as to who's on the call,

 7    but I would appreciate just one person, at most two, speaking

 8    for each party.

 9              So let's start with plaintiff.

10              MS. DIBENEDETTO:  Good afternoon, Your Honor.  This

11    is Emily DiBenedetto from Shaw Keller for plaintiff.  Joining

12    me from Genevant is David Berl and Adam Harber, both from

13    Williams & Connolly, with Pete Zorn, client representative

14    for Genevant.  With me also is Kira Davis and Nate Tan from

15    Morris Foerster for Arbutus, with Elizabeth Howard, client

16    representative for Arbutus.

17              And David Berl from Williams & Connolly will be

18    speaking today.

19              THE COURT:  David Berl?

20              MS. DIBENEDETTO:  Berl.

21              THE COURT:  Yeah.

22              MS. DIBENEDETTO:  Yes, Your Honor.

23              THE COURT:  Okay.  And for Moderna?

24              MR. MURRAY:  Good afternoon, Your Honor.  This is

25    Travis Murray from Morris Nichols on behalf of the Moderna
```

1   Defendants.  Pat Carson and Marc McLennan from Kirkland &

2   Ellis are on the line and will be speaking this afternoon.

3           THE COURT:  Pat Carson.  And who is the second

4   person?

5           MR. MURRAY:  Marc McLennan, Your Honor.

6           THE COURT:  Okay.

7           MS. ANDROSKI:  Hi, Your Honor.  Sorry to interrupt.

8   This is Lindsay Androski from Genevant Sciences, I am also on

9   the line, and I did not hear my name called.

10          THE COURT:  Okay.  Anyone else whose name wasn't

11  announced want to identify themselves?

12      (No verbal response)

13          THE COURT:  Okay.  A couple -- I think there's

14  three items I want to talk about.

15          The first is I think that we may need more

16  information on the dispute between the subpoena issued by

17  Moderna to -- is it pronounced Roivant?  Am I pronouncing it

18  right?

19          DR. CARSON:  Your Honor, this is Pat Carson.

20          Yes, I believe you're pronouncing it correctly.

21          THE COURT:  Close enough.  Okay.

22          So -- and I understand that counsel for plaintiff

23  is going to -- is representing Roivant.  And I know that

24  you've done a pretty good job narrating all the disputes.

25  Now, as best as I can tell, we're still arguing or there's a

```
 1     disagreement about Moderna's request for Roivant regarding
 2     some type of lobbying information.
 3            But does -- I guess, Moderna's counsel, why don't
 4     you explain to me what you're looking for that you haven't
 5     received yet.
 6            DR. CARSON:  Your Honor, this is Pat Carson.
 7            So, in the motion to compel, Roivant has actually
 8     caved on four out of five categories, so, as you pointed out,
 9     there's only one that's outstanding.  And that is --
10            THE COURT:  All right.  You've got to -- you've got
11     to think of a better word than "caved."
12        (Laughter)
13            THE COURT:  They (indiscernible) were reasonable
14     and agreed to concede to your advocacy, and you convinced
15     them to --
16            DR. CARSON:  Okay.
17            THE COURT:  Okay.  Go ahead.  I'm just kidding.
18            DR. CARSON:  I'll accept that.
19            THE COURT:  Yeah.
20            DR. CARSON:  And then on the fifth category, the
21     outstanding one, is lobbying communications.
22            So what we're really looking for is any lobbying
23     that Roivant has done about Moderna.  And it's a
24     straightforward collection.  You know, we're -- we have --
25     Roivant hasn't even answered our question as to whether or
```

1    not it has been involved in lobbying in relation to this

2    lawsuit and Moderna, so that would be --

3              THE COURT:  Roivant --

4              DR. CARSON:  -- a threshold --

5              THE COURT:  Roivant is --

6              DR. CARSON:  -- question.

7              THE COURT:  Roivant is a parent of both plaintiffs

8    or one?

9              DR. CARSON:  Roivant, my understanding, is the

10   parent for Genevant.

11             THE COURT:  All right.

12             DR. CARSON:  I'll defer to plaintiffs' counsel on

13   that one.

14             THE COURT:  All right.  Well, I want to talk to you

15   first.  And then I understand they may own ten percent, so

16   they concede that they could be an interested party.

17             But what sort of vexes me is:  What does "lobbying"

18   mean?  I mean, I think I know it means you go to -- you hire

19   somebody and you to Congress and you try to convince a

20   legislator to be on your side about a certain piece of

21   legislation.  So what does that -- if that's the right sort

22   of easy definition, what does that have to do with an

23   infringement allegation between --

24             DR. CARSON:  It's --

25             THE COURT:  -- your --

1               DR. CARSON:  Well --

2               THE COURT:  -- between Arbutus and Moderna?

3               DR. CARSON:  Well, it's statements that they're

4      making to third parties, including to the Government, members

5      of Congress regarding Moderna.

6               As you know, there are issues about the Government

7      -- whether or not the Government was -- you know, we are

8      working with the Government to bring the vaccine into the

9      market, so that's one of the things that -- so it's basically

10     the 1498 defense under the U.S. Government contracts, talking

11     about the lawsuit, lobbying about those types of activities.

12              And I mean, maybe they're not even doing any of

13     this stuff, but they haven't answered the question as to

14     whether or not they have been involved in lobbying.  And that

15     could just short-circuit this whole thing.  If they say,

16     well, we have not been in lobbying in relationship to this

17     lawsuit and Moderna, then there wouldn't be anything to

18     collect.  And if they have been, they should have a lobbying

19     organization that's handling that for them, and it would be

20     easy to collect.  And so we're --

21              THE COURT:  (Indiscernible)

22              DR. CARSON:  -- being very targeted --

23              THE COURT:  You're concerned --

24              DR. CARSON:  -- about it.

25              THE COURT:  You're concerned that plaintiffs have

```
 1    gone to Congress or somebody in government and done any

 2    lobbying.

 3              So what you -- is there a quick answer to that, Mr.

 4    Berl?

 5              MR. HARBER:  Your Honor, with your permission --

 6              MR. BERL:  Your Honor, Mr. Harber will speak on

 7    this issue on our behalf.

 8              THE COURT:  Mr. Harber.  Okay.  Go ahead, Mr.

 9    Harber.

10              MR. HARBER:  Yeah.  Good afternoon, Your Honor.

11    This is Adam Harber for Genevant, and I guess, in this

12    context, representing Roivant.

13              The -- so my understanding is that there has been

14    general efforts.  I don't believe, to my knowledge at least,

15    Roivant has been directly involved.

16              But I think your -- to step back briefly on this, I

17    think Your Honor put your finger on the fact that this is

18    incredibly far afield from anything that is relevant in the

19    case --

20              THE COURT:  Well, I didn't --

21              MR. HARBER:  -- because it --

22              THE COURT:  I didn't -- no, I didn't -- hold on.  I

23    didn't say it was far afield, I never said that.  I said I

24    have a general understanding of what "lobbying" is.

25              MR. HARBER:  Right.
```

1          And what we're talking about here, to be clear, are

2     the communications, not of a party to the lawsuit, not of

3     Genevant or Arbutus, but of a third party, Roivant.  And so I

4     think there are several layers of irrelevancy here.

5          And one important way to understand this and how

6     irrelevant these things are is that Moderna, who is a party

7     to this case and whose efforts to negotiate with the

8     Government about the contract that's at the heart of this

9     case, or one of the contracts that's at the heart of this

10    case and its efforts to coordinate with the Government on the

11    statement of interest, those things are squarely at issue

12    here in this case.

13         And as it stands today, Moderna has not agreed to

14    produce this category of documents as a party.

15              THE COURT:  Yeah, but --

16              MR. HARBER:  And so --

17              THE COURT:  Wait.  Hold on, hold on.

18         So Roivant, you agree, is a parent and owns ten

19    percent of Genevant?

20              MR. HARBER:  It is a majority owner of, among other

21    comp -- it owns a number of companies, Genevant is one of

22    those companies, it owns a --

23              THE COURT:  Right.

24              MR. HARBER:  -- majority shares, yes.

25              THE COURT:  So, if the parent company of one of the

1    plaintiffs made some type of statement about this lawsuit,

2    why wouldn't that be discoverable?

3         MR. HARBER:  Well, the question is not whether it's

4    discoverable.  The point of dispute specifically here is what

5    type of search does Roivant need to do for those

6    communications.

7         As it stands and as detailed in our letter, what we

8    have agreed to do is we are running searches for two

9    custodians, who we've identified.  We have not identified a

10   centralized repository of this information.  And what we've

11   told Moderna is, to the extent we come across communications,

12   whether they're with lobbyists or the Government or any other

13   third party, that are about Moderna or this lawsuit or the

14   accused product, we'll produce those.

15        THE COURT:  Yeah, but --

16        Moderna wasn't --

17        THE COURT:  -- (indiscernible) --

18        MR. HARBER:  -- satisfied --

19        THE COURT:  -- what your search terms are?

20        MR. HARBER:  I don't believe -- I don't know if we

21   have -- I believe we've either negotiated those with Moderna

22   or we're willing to do that.  But it doesn't seem -- my

23   understanding was their concern was not with the search terms

24   we'd be using, it was that they want us to go dig through

25   more custodians' documents.

1            THE COURT:  Okay.

2            MR. HARBER:  But we're willing to negotiate the

3    search terms on these.

4            THE COURT:  All right.  Well, have you determined -

5    - and I think I lost track of who was just talking.  Mr.

6    Harber, right?

7            MR. HARBER:  Yes, yes.

8            THE COURT:  Mr. Harber, have you determined whether

9    Roivant has any type of lobbyists that have made any comments

10   to government employees in the lobbyist, big lobbyist sense,

11   about issues relevant to this litigation?  Have you made that

12   determination in the first instance?

13           MR. HARBER:  I do not know if Roivant itself has

14   retained lobbyists who would have made those statements.

15           THE COURT:  Okay.  Well, that seems to be the -- I

16   mean, I -- Ms. Carson's suggesting to me is appealing because

17   it seems very, very general and like a simplistic way to

18   review this.

19           So, Mr. Harber, does it make sense here -- I'm

20   asking for input and it's not a, you know, hidden suggestion.

21   Does it make sense to you to go back -- I can -- we can table

22   this -- go back and try to agree on search terms with Ms.

23   Carson?  And then, if you can't, you can come back and then

24   say Judge, here are what we think are fair search terms, and

25   then Ms. Carson can say here's what I think are fair search

 1    terms, and then I can decide.  It just seems -- it seems it's

 2    not ripe yet for my intervention.  What do you think about

 3    that suggestion, Mr. Harber?

 4              MR. HARBER:  I think that's fine.  Again, we're --

 5    we are -- I think -- and I'll let Moderna, Ms. Carson, speak

 6    to this, or Dr. Carson.  I -- my belief is that it's not the

 7    search terms that they're taking issue with, but the -- that

 8    Roivant needs to search beyond the two custodians who we're

 9    already searching.  We're more than willing to work with them

10    on the search terms, but --

11              THE COURT:  Well, what are the --

12              MR. HARBER:  -- (indiscernible)

13              THE COURT:  What are the -- what are the results of

14    the search -- you agree on the search terms, and you've said

15    we're going to do two custodians.  What -- have you done

16    that?  What's the result of that?

17              MR. HARBER:  We're in the process of doing that

18    now.

19              THE COURT:  Okay.

20              DR. CARSON:  So --

21              THE COURT:  Well, Ms. Carson, do you want to wait

22    until they're done and see what's unearthed and then come

23    back to me if you -- first of all, is he right?  Is Mr.

24    Harber right that it's not -- you agree on the search terms;

25    the disagreement is on the number of custodians?  What's your

```
 1    view --
 2                DR. CARSON:  I --
 3                THE COURT:  -- Ms. Carson?
 4                DR. CARSON:  I think -- because we have found
 5    specific lobbying disclosures online that name Roivant and
 6    Genevant in healthcare.  And so our concern is that we want
 7    them to ask the person who works with the lobbyists, you
 8    know, about communications.  So it could potentially involve
 9    another custodian, and that's really where we're going.
10                Maybe, among the custodians, that is the person
11    that works with the lobbyists, but we're in the dark as to
12    who at Roivant works with the lobbyist that's being named in
13    these specific lobbying disclosures that name Roivant.
14                THE COURT:  Okay.  So are you okay with -- it
15    sounds to me like you agree on the search terms, Mr. Harber
16    agrees on the two custodians, they're in the process of
17    running that information.  Are you okay with, Ms. Carson,
18    waiting to see the results and tabling this discussion until
19    you get the results?  Are you okay with that?
20                DR. CARSON:  Yes, Your Honor.  We can --
21                THE COURT:  All right.
22                DR. CARSON:  We can live with that.
23                THE COURT:  That's fine.  Let's do that.  I won't
24    forget about it.  And I'm not going to get into the weeds
25    right now, Mr. Harber.  Just, you know, put that on the front
```

1    burning.  Get what you're doing to Ms. Carson.

2         And Ms. Carson, if you're not satisfied, you're

3    invited to bring that back to my attention.  Okay?

4         MR. HARBER:  I appreciate that, Your Honor.

5         If I may, one -- make one request.  And I know --

6    I'm trying to avoid having to burden Your Honor with

7    additional paper here.  As I mentioned before, Genevant has

8    made the same request that you're hearing now, and Your Honor

9    just ordered us to comply with, to Moderna, and Moderna is

10   not agreeing to provide these materials.  And we think it's

11   only fair that, if it applies to a third party, it should

12   apply -- Moderna should also be searching for and producing

13   these communications and documents regarding its lobbying or

14   government relations efforts.

15        THE COURT:  And so let me think.  Okay.  I mean,

16   Ms. Carson, what's your response?

17        DR. CARSON:  Your Honor, I'm not even sure that

18   that's true because we did agree to produce some

19   communications, so I think that we can discuss that with them

20   at the same time as we're --

21        THE COURT:  All right.

22        DR. CARSON:  -- talking about the search terms.

23        THE COURT:  Let's do that because, if you don't

24   even know -- when you say I don't know if that's true, if

25   you're not even sure whether that request has been made, then

```
 1    let's table all of those.  Do some work.
 2              DR. CARSON:  Okay.
 3              THE COURT:  (Indiscernible) come back to me if you
 4    can't work it out.  Okay?
 5              DR. CARSON:  Okay.  Thank you, Your Honor.
 6              THE COURT:  All right.  And we're putting this in
 7    the lobbying bucket.
 8              Okay.  So next topic I wanted to discuss is -- I
 9    see -- I'm looking at the latest schedule.  And fact
10    discovery, it looks like it ends at the end of May, and then
11    we're going to get into reports, starting in July, expert
12    reports.  And we have opening, rebuttal, reply, and I need --
13    then you all get to do some depositions.
14              And what I wanted to raise with everybody is -- I'm
15    not holding anyone to this, I just want to tee it up as a
16    discussion point.  But whoever wants to answer to answer this
17    question for the plaintiffs, how many experts, ballpark, do
18    you think you're going to have?
19              MR. BERL:  Ballpark, Your Honor?  This is David
20    Berl from Williams & Connolly.  I think it's -- well, if by
21    "experts," you mean total experts --
22              THE COURT:  Yeah.
23              MR. BERL:  -- in both the first round and the
24    responsive round, I would estimate a ballpark number of five
25    for plaintiffs.
```

1          THE COURT:  Okay.  And when I say "experts," I mean

2    separate -- not reports, separate individuals.

3          MR. BERL:  Yeah.

4          THE COURT:  Five individuals.

5          MR. BERL:  That's what I -- that's what I

6    understood, Your Honor.

7          THE COURT:  Got it.

8          And for Moderna, what do you estimate?

9          DR. CARSON:  Your Honor, I'm just going to estimate

10   five to six, so we're in --

11         THE COURT:  Okay.

12         DR. CARSON:  We're in the same ballpark.

13         THE COURT:  All right.  So let's just say 11

14   experts.

15         So my stance in these type of cases is the reports

16   are just hugely voluminous and touch on just, you know, rough

17   conversation, what I've seen, maybe (indiscernible) patent

18   cases -- I mean, I'm not saying I'm the most experienced

19   person on the call with these -- but they're hugely

20   voluminous.  And maybe ten percent of one report which

21   contain therein is actually used at trial, and then, you

22   know, the rest of it just like a -- you know, a book on

23   things that create unnecessary Daubert litigation.

24         And so I'm trying to think of a way -- and I'm

25   happy to take your input.  I want to see -- and I haven't

1      done any research on this.  But I think I could limit your

2      experts' reports, you know, to a certain page number, with a

3      -- with an instruction that, you know, it's got to be a good

4      faith effort to have the report be somehow connected to

5      something that you're actually going to put in front of a

6      jury or a fact-finder.

7                 Now I understand you're probably thinking well,

8      we're, you know, halfway through discovery and we really

9      don't know exactly what we're going to litigate or not.  But

10     you know, as important as this case is, the issues are -- I

11     think they're pretty, you know, straightforward, as

12     straightforward as a (indiscernible) infringement case could

13     be.

14                So I really want to avoid 700 pages of expert

15     report where really only 10 percent of those pages are going

16     to be admissible and used by the trial lawyers at trial.  So

17     any comments on that concern from the plaintiffs first?

18                MR. BERL:  Sure, Your Honor.  This is David Berl.

19                I think that's a salutary goal.  A someone who

20     spends a lot of time working on those reports, I appreciate

21     efforts to limit it and conserve the parties' resources.

22                I suppose my initial instinct on hearing your

23     thoughts, Your Honor, is that this may be best served by

24     imposing some certainty on the other deadline in Your Honor's

25     order on final infringement and validity contention because,

1       in my experience with these, Your Honor, what ends up

2       happening -- and this generally happens with validity more

3       than infringement in my experience -- is that a challenger to

4       a patent will assert innumerable defenses in an expert

5       report.

6               But like the expert report that let's say has 20

7       invalidity defenses, you know, the patentee at that point

8       needs to respond fulsomely to each of them because the

9       patentee doesn't really know which of those 20 will matter at

10      trial and which of them will just be dropped before trial.

11      And so -- and it takes more time and space to respond to an

12      argument than it does to advance an argument.

13              There's an old saying -- and when I say this, I

14      don't cast any aspersions on Moderna or anyone else, just --

15      it's just an adage -- that a fool can raise more questions in

16      an hour than a wise man can answer in a week.  And there's

17      some of that often at play in these reports, that there are a

18      bunch of arguments that really aren't that strong and you

19      have to deal with each of them in response.

20              So one idea for narrowing the cases, which I've

21      seen done in various cases, including by certain judges in

22      Delaware who have handled some of these big pharmaceutical

23      patent litigations, is to try to limit, at some point in the

24      process, the number of claims that are being asserted, on the

25      one hand, by the patentee and the number of defenses being

1    asserted, on the other hand, by the challenger.

2            And by "defenses," for example, I mean combinations

3    of various references.  In this case, there -- you know,

4    there is some estoppel, so that the prior art case will be

5    less than what would be typically found in a pharmaceutical

6    patent case.  But particularly (indiscernible) 12 defenses,

7    et cetera.

8            And so that, rather than having the multiplicity of

9    claims and defenses as we move into expert reports, one

10   option, I suppose, after fact discovery is done, after we

11   have the Markman decision in hand and we can digest

12   everything, is for both parties to cut that down, so that the

13   issues being addressed in the report are narrower and more

14   geared to what actually will be presented to the jury at

15   trial.

16           THE COURT:  Yeah, I've done that --

17           MR. BERL:  So it's an --

18           THE COURT:  I've done that.  My thought process was

19   -- I'm just not sure, so I want to talk it through with you.

20   And obviously, if you have some -- Moderna's counsel

21   (indiscernible) we -- I've done that, certainly where -- you

22   know, the last patent jury trial we had, we narrowed the

23   claims and defenses just because it would be overwhelming for

24   the jury.

25           But my thought was the narrowing occurred just

```
 1        before or in the order of things --

 2                    MR. BERL:  Yeah.

 3                    THE COURT:  -- heard before trial.  And I'm unsure

 4        of my authority --

 5                    MR. BERL:  (Indiscernible)

 6                    THE COURT:  -- to say all right, well, Moderna,

 7        you're only allowed, you know, to raise 12 defenses at this

 8        point in the case.  I mean, I don't know if any authority to

 9        do that.

10                    I think I certainly have the authority to say well,

11        plaintiff, you can only, you know, allege four -- I'm just

12        making this number up -- you can only allege, you know, four

13        claims that are infringed at trial just because, you know, it

14        will just be too much for the fact-finder.  But it seemed --

15                    MR. BERL:  (Indiscernible)

16                    THE COURT:  -- early on to do that.  So I hear you

17        saying hold everyone to the deadline for final infringement

18        contentions and then maybe we get on the phone then and talk

19        about what the expert reports look like.  Is that, more or

20        less, what you're saying?

21                    MR. BERL:  Yes, Your Honor.  I think the In Re Katz

22        case speaks to Your Honor's authority in that regard.  And I

23        think, obviously, as long as the parties agree to it, then,

24        of course, the Court can certainly have authority at that

25        point.  But that is what I'm saying.
```

1          And if necessary, I agree, Your Honor, that the

2     claim narrowing often happens later, after expert discovery,

3     before the trial.  But I've also seen it happen where there's

4     sort of a staged process, so the ultimately narrowing happens

5     before trial, but there is some, you know, first set of

6     narrowing that happens on the -- in the validity, five, and

7     the number of claims down to four.

8          THE COURT:  And what's the name of the case you

9     cited?

10         MR. BERL:  In Re Katz.  It speaks to the authority

11    under the Fifth Amendment for courts requiring narrowing.

12         THE COURT:  And if --

13         MR. BERL:  (Indiscernible)

14         THE COURT:  If you don't have the cite handy, is

15    that with a C or K?

16         MR. BERL:  K, K-a-t-z.

17         THE COURT:  Okay.  All right.  And is it a -- is it

18    a federal circuit case?

19         MR. BERL:  Yes, it is, Your Honor.

20         THE COURT:  Okay.  All right.  I'm shocked that

21    none of the 19 brilliant lawyers on the phone haven't come up

22    with the cite yet, but we'll -- I'll -- my law clerk and I

23    will dig it up.

24         DR. CARSON:  Your Honor --

25         THE COURT:  Okay

1           DR. CARSON:  -- this is Pat Carson --

2           THE COURT:  Yes.

3           DR. CARSON:  -- for Moderna.

4           And yeah, I hear the wisdom of what you're saying

5     and I agree that it's a very good idea.

6           Right now, we're faced with more than -- it's about

7     a hundred claims that are being asserted against us.  So I

8     think that, really, narrowing the number of claims is going

9     to necessarily reduce the issues in the case and could even

10    reduce the number of experts that are required in the first

11    instance.

12          So I think that instituting some sort of limit on

13    the number of claims, even before we get to the point of

14    where we have to put our invalidity defenses, could go a long

15    way to accomplishing what you --

16          THE COURT:  Yeah.

17          DR. CARSON:  -- Your Honor is talking about.

18          THE COURT:  Well, I'm looking at the current

19    scheduling order.  It sounds to me like you're both

20    suggesting that the narrowing of claims should come after the

21    deadline for final infringement and validity contentions, but

22    before opening reports are do.  Agree, Ms. Carson?

23          DR. CARSON:  Well, I mean, if there is a way to get

24    less claims with the final infringement contentions, then

25    that could eliminate some of their invalidity defenses just

```
 1      by virtue of the fact that the claims are no longer in the

 2      case.

 3              THE COURT:  Okay.  So you're suggesting, after fact

 4      discovery cut date, which is May 30th, but before the

 5      contentions, which is June 21, I amend the order to order the

 6      parties to meet and confer and narrow claims and defenses.

 7      Is that your recommendation?

 8              DR. CARSON:  I think that would be a good idea, and

 9      it would --

10              THE COURT:  Okay.

11              DR. CARSON:  -- cut down on --

12              THE COURT:  Yeah (indiscernible)

13              DR. CARSON:  -- the volume.

14              THE COURT:  I forgot who was talking, Mr. Berl or

15      Mr. Harber.

16              MR. BERL:  Yeah.

17              THE COURT:  Is that -- do you agree with that

18      chronology?

19              MR. BERL:  Yes, Your Honor.  That would be

20      productive, potentially.

21              THE COURT:  Okay.  All right.  Got it.  Okay.  And

22      we'll look at that case and I think we can do that.

23              And then I think we all agree, once we start

24      narrowing things, it narrows the reports; and, if it narrows

25      the reports, it narrows the Dauberts; and then, you know, it
```

1    becomes a more manageable thing to actually try, if that's,

2    you know, the direction we're heading.  Okay.

3         MR. BERL:  Your Honor, just so you have it, the

4    citation for the In Re Katz case is 693 F.3d 1303.

5         THE COURT:  Thank you.

6         I'm going to put you on hold one quick second, I

7    want to confer with Ms. Hart (phonetic).

8       (Pause in proceedings)

9         THE COURT:  Okay.  I had one more thing to raise.

10   And then, you know, if there's something else, since we're on

11   the phone, we can talk it out.

12        There is a gentleman by the name of J.D. Husband,

13   who works for Morrison & Foerster.  He's in their New York

14   office.  He does M&A work, he does no patent work at all, and

15   he is now engaged to my daughter.  So I wanted to disclose

16   that.

17        I don't foresee any problem whatsoever.  I,

18   obviously -- he knows I have this case and I haven't really

19   talked to him much about it.  Actually, I haven't talked to

20   him about it at all, except, you know, what's public.  But I

21   thought I should disclose that, since he just became a member

22   of my family.

23        So, if anyone wants to raise, you know, an issue,

24   feel free, I won't be offended.  I don't think it's a problem

25   at all.  And I will -- have and continue to (indiscernible)

1    him off of anything that has to do with the case.  All right?

2            And I am -- I'm embarrassed to say -- and I'm on

3    the record now, so everyone has to protect me.  I don't -- I

4    just know him as "J.D."  I don't ...

5        (Laughter)

6            THE COURT:  I thin it's John David, but -- my

7    daughter will kill me if everyone -- anyone (indiscernible)

8    discloses, but he's always been known to everyone as "J.D."

9    I've never really (indiscernible) know what the "J.D." stands

10   for.  And you're fine.  I mean, he's in your New York office.

11   He does M&A work.  Okay?  So that's on the record and

12   disclosed.

13           And does anyone want to chat about anything else?

14   Mr. Harber or Mr. Berl, anything?

15           MR. BERL:  Not at this time, Your Honor.

16           THE COURT:  Okay.  Ms. Carson?

17           DR. CARSON:  Your Honor, I don't have anything.  I

18   just want to see if Mr. McLennan has something.

19           THE COURT:  Okay.

20           DR. CARSON:  Okay.  No.  He says no.  Okay.

21           THE COURT:  Okay.  So I'm going to look at that

22   case.  I probably will -- the Katz case.  I probably will

23   amend the schedule.

24           You're going to work on the lobbying issue; and

25   then, if you can't work it out, you're going to get back to

1    me with -- in a short letter, just defining what you agree on

2    and what you don't agree on and we'll get back on the phone.

3    Okay?

4              DR. CARSON:  Thank you, Your Honor.

5              THE COURT:  All right.

6              MR. BERL:  Thank you.

7              THE COURT:  Thanks for your time.  Thank you.

8              DR. CARSON:  All right.  Thank you.  Bye bye.

9         (Proceedings concluded at 2:37 p.m.)

10                         *****

1  <u>CERTIFICATION</u>

2          I certify that the foregoing is a correct

3  transcript from the electronic sound recording of the

4  proceedings in the above-entitled matter to the best of my

5  knowledge and ability.

6

7

8

9

10

11  _____          March 28, 2024

12  Coleen Rand, AAERT Cert. No. 341

13  Certified Court Transcriptionist

14  For RedDoor Legal Services, LLC

15

16

17

18

19

20

21

22

23

24

25