UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

ARBUTUS BIOPHARMA CORP., .      Case No. 1:22-cv-00252-MSG
et al,                       .
                             .
           Plaintiffs,       .      James A. Byrne U.S. Courthouse
     v.                      .      601 Market Street
                             .      Philadelphia, PA 19106
MODERNA, INC., et al,        .
                             .
           Defendants.       .
                             .      June 13,2024
. . . . . . . . . . . . . ..      11:10 a.m.

TRANSCRIPT OF DISCOVERY CONFERENCE HEARING

BEFORE HONORABLE MITCHELL S. GOLDBERG
UNITED STATES DISTRICT COURT CHIEF JUDGE

APPEARANCES:

For the Plaintiffs:        Shaw Keller LLP
                           By:  EMILY DiBENEDETTO, ESQ.
                           1105 N. Market Street, Ste 12th Floor
                           Wilmington, DE 19801

                           Morrison Foerster
                           By:  ADAM R. BRAUSA, ESQ.
                           425 Market Street
                           San Francisco, CA 94105

For Genevant Sciences      William & Connolly LLP
GmbH:                      By:  ADAM D. HARBER, ESQ.
                                SHAUN P. MAHAFFY, ESQ.
                                PHILIP N. HAUNSCHILD, ESQ.
                           725 Twelfth Street
                           Washington, DC 20005

For the Defendants:        Morris, Nichols, Arsht & Tunnell LLP
                           By:  BRIAN P. EGAN, ESQ.
                           1201 North Market Street
                           P.O. Box 1347
                           Wilmington, DE 19899

APPEARANCES: (cont'd)

For the Defendants:          Kirkland & Ellis LLP
                             By:  PATRICIA A. CARSON, ESQ.
                                  MARK C. McLENNAN, ESQ.
                                  MARA L. GREENBERG, ESQ.
                             601 Lexington Avenue
                             New York, NY 10022-4611

Audio Operator:              Jimmy Cruz

TRANSCRIBED BY:              **J&J COURT TRANSCRIBERS, INC.**
                             **268 Evergreen Avenue**
                             **Hamilton, NJ 08619**
                             **Office:    (609)586-2311**
                             **Fax:       (609)587-3599**
                             **E-Mail:    jjcourt@jjcourt.com**


            Proceedings recorded by electronic sound
      recording, transcript produced by transcription service.

                         - - -

1          THE COURT:  We good?  Okay.  Good morning.  This is

2     the matter Arbutus versus Moderna.  It's a Delaware matter

3     where I'm sitting on designation.  We're here to discuss, I

4     think it's a total of four, maybe five, discovery disputes.

5     I'll get the lawyers input.  I probably won't give you rulings

6     right here from the bench.  So who is here on behalf of the

7     plaintiff?

8          MS. DiBENEDETTO:  Good morning, Your Honor.  For

9     plaintiffs I'm Emily DiBenedetto from Shaw Keller.  With me

10    today are Adam Harber, Shaun Mahaffy and Phil Haunschild from

11    Williams and Connolly.  We also have Pete Zorn, president chief

12    legal officer of Genevant and Linsday Androski special counsel

13    for Genevant.  I'm also joined by Adam Brausa from Morrison

14    Foerster for Arbutus and Liz Howard who is dialing in today.

15    In house counsel for Arbutus.

16         THE COURT:  Okay.  Good morning everybody.  For

17    Moderna?

18         MR. EGAN:  Good morning, Your Honor.  Brian Egan from

19    Morris Nichols on behalf of the Moderna defendants.  Joining me

20    today at counsel table is Pat Carson and Mark McLennan from

21    Kirkland and Ellis.  We also have Mara Greenberg from Kirkland

22    and Ellis.  And we have a Kirkland summer associate joining us

23    today Heidi.

24         THE COURT:  Good morning again.  Just remind me when

25    you start talking -- just remind me of your name before you do

4

1  that.  So what I've done is -- what we've done is try to

2  categorize -- I know there's a lot of sub parts.  So what I'll

3  try to do is frame what I think the -- what I understand the

4  issue to be and then I think the first three are plaintiffs'

5  requests for additional discovery and the last one is Moderna.

6  But we'll start with plaintiffs request.

7          I'll frame what I think the issue is.  You can

8  certainly supplement or tell be if I incorrectly frame the

9  issue and then I'll hear first from the plaintiff and then I'll

10 hear the response and then we'll move on and we'll have

11 conversation.

12         So the first dispute as I understand it pertains to

13 more information sought from the CEO of Moderna.  You're going

14 to have to bear with me while I pause and look at some of my

15 notes.  So I did review the schedule that's in place and note

16 that, that discovery recently closed.  I think that's May 30.

17 So was -- how do pronounce the CEO's name?  Is it --

18         MS. CARSON:  It's Bancel.

19         THE COURT:  Okay.  Has he -- has he been deposed?

20         MS. CARSON:  He has not been deposed in this case,

21 no.

22         THE COURT:  Okay.  So let's -- why don't you tell me

23 what information you think is deficient and what more do you

24 need from CEO Bancel?

25         MR. HARBER:  Thank you, Your Honor.  Adam Harber of

1  Williams Connolly for plaintiff.  The issue here is -- and

2  we've highlight three specific areas where we feel like despite

3  the information that Moderna has produced, we're missing very

4  specific relevant information.  This is a case as you know that

5  involves the single most important first commercial product.

6         THE COURT:  What are the three specific areas of

7  information you think are deficient?

8         MR. HARBER:  The first is on direct licensing

9  communications that Mr. Bancel had with Arbutus and Genevant

10  and their predecessor at Tekmira.  Starting in 2013, there were

11  direct conversations that Mr. Bancel has one on one with both

12  the inventor of the patents in suit that are asserted in this

13  case and the CEO at the time of Arbutus' predecessor about

14  licensing the technology.  We do not have --

15         THE COURT:  That's you.

16         MR. HARBER:  Right.

17         THE COURT:  Why do you need discovery from him

18  pertaining to information that he -- or conversations he has

19  with you?

20         MR. HARBER:  Because is would bear on his -- we have

21  some direct e-mails back and forth which we've cited in our

22  brief.  What we don't have is what was he telling people

23  internally.  Does he have -- was he reporting conversations

24  that were had during those really critical meetings in the

25  case.  Are there business discussions.  Obviously there are

1  some legal communications he would have that are potentially

2  privileged.  But not if he's directly reporting on a

3  conversation.  Not if he's talking about a business

4  discussions.  And I think very critically they're -- he's

5  having scientific discussions with our CEO and our inventor.

6         One of Moderna's key themes that Your Honor has heard

7  that -- I think every time we've been in front of Your Honor is

8  -- we're mRNA company --  your patents in their view don't

9  discuss or don't enable your LNP technology with mNRA.  Now we

10 think that's absurd and it's belie by the fact that they tried

11 to negotiate a license with us for ten years.  But was he --

12 what was the scientific discussion that Mr. Bancel was having

13 internally with Moderna.  Those are critical discussions and

14 we've offered to be very targeted to negotiated specific search

15 turns.

16        THE COURT:  Critical discussions regarding

17 infringement in validity or damages?

18        MR. HARBER:  Validity.

19        THE COURT:  Okay.

20        MR. HARBER:  The specific -- obviously the -- I would

21 say it goes to both damages and validity.

22        THE COURT:  So you obviously have to concede you have

23 the information regarding discussions he had with your folks.

24 You want to know did he go back and -- and I'm sort of dumbing

25 this down -- but create an internal memo memorializing

1  discussions that he had with you folks or other non privileged

2  discussions he had with other people about in response to the

3  discussions he had with your folks.

4      MR. HARBER:  Exactly, Your Honor.

5      THE COURT:  Okay and tell me what -- I'm going to let

6  them speak obviously -- they said no to that because why?

7      MR. HARBER:  They said you other -- you know we've

8  given you the 30(b)(6) on licensing.  You've had -- you have

9  other witnesses or custodians who are involved in licensing as

10  well.  And we don't dispute any of that, but none of that has

11  address this specific information from Mr. Bancel.  So for

12  example the 30(b)(6) witness didn't talk to Mr. Bancel to

13  prepare for his deposition.  So the notion that, that was a

14  replacement for information directly from his files is not

15  accurate.

16      THE COURT:  I mean you're probably going to say yes

17  to this with a smile but, does all this get resolved if I would

18  order a very time constraint deposition of Mr. -- is it Pancel

19  or Bancel?

20      MR. HARBER:  Bancel.

21      THE COURT:  Bancel with a B.

22      MR. HARBER:  I --

23      THE COURT:  Bancel with -- with some very specific

24  topics that you want to cover that you think have -- are

25  deficient.

1          MR. HARBER:  We would welcome that opportunity.  I

2   think that's important.  I would say though, I do think even --

3   we're willing to do it narrowly.  We -- when Moderna raised the

4   issue of cost shifting, we reached out to them and said what's

5   your hit count?  What do you -- what did it cost?  And they

6   refused to engage with us.

7          But the -- I do think it's important not just to let

8   kind of a talented CEO testify about this stuff without us

9   being able to see anything in his documents.  Now again, we're

10  willing to -- we've been willing to negotiate very narrow

11  search terms, very targeted --

12          THE COURT:  Who's responding from Moderna on this?

13          MS. CARSON:  I am, Your Honor.

14          THE COURT:  Could you remind me your last name?  I'm

15  sorry.

16          MS. CARSON:  Pat Carson.

17          THE COURT:  There's so many lawyers.  I apologize.

18          MS. CARSON:  It's okay.  Pat Carson.

19          THE COURT:  Carson.  Okay.

20          MS. CARSON:  Like in Johnny.

21          THE COURT:  And you did say your name.  Say it again,

22  I'm sorry.

23          MR. HARBER:  Adam Harber.

24          THE COURT:  Harber.

25          MR. HARBER:  Yes.

1          THE COURT:  Is a clean way to resolve this -- and

2    you'll push back if you don't think so -- it's just to pick a

3    reasonable amount of time.  You produce your CEO.  They send to

4    me discreet areas that they want to cover and we just get it

5    done that way.  Why is that a bad idea, Ms. Carson?  Or may you

6    agree it's a good idea.  I don't know.

7          MS. CARSON:  I would never say that you have a bad

8    idea, Your Honor.

9          THE COURT:  Okay, I wouldn't mind.

10          MS. CARSON:  But I have to push back on --

11          THE COURT:  Yeah.

12          MS. CARSON:  -- even a short deposition of the CEO.

13          THE COURT:  Why?

14          MS. CARSON:  Because they have the information and

15    when they filed this motion --

16          THE COURT:  Right, so let's draw down -- and I'm glad

17    you didn't say because he's so very important, because that

18    wasn't going to swing.

19          MS. CARSON:  Okay.

20          THE COURT:  So they say that communications that he

21    had with persons internal to their shop.  They're -- obviously

22    they're not going to bother you or me with that.

23          MS. CARSON:  Right.

24          THE COURT:  But any type of memorialization of those

25    communications they don't have.  Accurate or not?

1          MS. CARSON:  They don't think that's accurate.

2          THE COURT:  Why?

3          MS. CARSON:  Because they're talking about a

4    conversation that happened at a cocktail party over ten years

5    ago during a conference with Ian McGlocklin (phonetic) and so

6    that's the conversation that they're --

7          THE COURT:  I didn't hear Mr. Harber say he wanted a

8    memorialization on the cocktail conversations.  So I'll ask you

9    -- you know, we can cut through some of this now.  Did your CEO

10   -- during what time period are we talking about?

11         MR. HARBER:  This is from 2013, 2014 -- or in

12   particular but it's continued.

13         THE COURT:  2013 through?

14         MR. HARBER:  I mean really through 2018.

15         THE COURT:  All right so, 2013 through 2018, did your

16   CEO memorialize any conversations, business conversations, that

17   are not privileged that he had with persons -- high level

18   persons at Arbutus?

19         MS. CARSON:  I can -- I can't tell you what's in the

20   CEO's files.

21         THE COURT:  Okay.

22         MS. CARSON:  But what I can tell you --

23         THE COURT:  Well why shouldn't I order you to look?

24         MS. CARSON:  Because that would be incredibly

25   burdensome --

1        THE COURT:  Why?

2        MS. CARSON:  -- on top of --

3        THE COURT:  For one person's files.  I --

4        MS. CARSON:  It's one person's files.  It would have

5  to be reviewed with search terms that they proposed that were

6  never part of our search terms to begin with.

7        THE COURT:  Okay.  What are your search terms?

8        MR. HARBER:  They're in Attachment A to our --

9        THE COURT:  Just tell me.  What are they?  Hand them

10 up.

11        MR. HARBER:  To the specific issue of whether they're

12 additional search terms of what's proposed -- there, Your

13 Honor, this is my copy so I don't have it to look at, but --

14        THE COURT:  I'll give it back.  Is it what's

15 highlighted?

16        MR. HARBER:  Yes.

17        THE COURT:  Okay.

18        MR. HARBER:  We've proposed some additional terms to

19 try to narrow, not to broaden.  We've narrowed it from the

20 terms that were used with everyone else.

21        THE COURT:  Okay.  I'm not going to be able to digest

22 all of this right now.  So why are there search terms --

23        MS. CARSON:  Their search terms are broader and

24 different than what we negotiated for the entire case after

25 close to four months of negotiations.

1          THE COURT:  Mm-mm.

2          MS. CARSON:  So they want us to run those against our

3  CEO's files and produce documents so they have to be reviewed

4  for privilege, for relevancy and then produced and we have

5  already produced close to 50,000 e-mails.

6          THE COURT:  But not --  but not --

7          MS. CARSON:  But, Your --

8          THE COURT:  -- but not the documents that Mr. Harber

9  is talking about directly connected to your CEO.

10          MS. CARSON:  But, Your Honor --

11          THE COURT:  Right?

12          MS. CARSON:  -- that's -- those are documents --

13          THE COURT:  Before -- wait.  Before your say the but

14  --

15          MS. CARSON:  Okay.

16          THE COURT:  -- is what I said correct?

17          MS. CARSON:  They don't know those documents exist.

18          THE COURT:  Well.

19          MS. CARSON:  Okay.

20          THE COURT:  Okay.  That's not how discovery works.

21  They -- it's reasonable for them in my view to request internal

22  documents from such a high level.  The highest level person of

23  your client pertaining to discussions that they had with the

24  plaintiff in the case.  I mean you wouldn't dispute that,

25  right?

1          MS. CARSON:  I'm not disputing that, but what you see

2     in Mr. Bancel's files, is when he gets into something

3     substantive, in -- for this topic area and the other the other

4     two topics, okay.  He immediately involves his team.

5          THE COURT:  Mm-mm.

6          MS. CARSON:  And that's how we chose our custodians.

7     We chose the custodian that was responsible for the licensing

8     and all the negotiations and I have testimony from the

9     president of Moderna that basically says that Said Francis, who

10    is the vice president of licensing at Moderna, is the person

11    that was responsible for talking to their client during 2013,

12    2014, 2015, 2016.

13         They had Mr. Said's -- Mr. Francis' deposition.  He

14    was the 30(b)(6) witness.  They have all of his documents and

15    Mr. Bancel did not cut out his licensing person on substantive

16    discussions.  He forwards them all to Mr. Francis.  That's true

17    for every topic.

18         THE COURT:  So is your -- are you saying you're

19    prepared to represent here and now that you have done a

20    diligent search, as you're obligated to do, and you're aware of

21    what your CEO has produced in a writing or other form and if

22    you would -- if I ordered him to produce all that it would be

23    repetitive because it's already been produced through other

24    people?

25         MS. CARSON:  Your Honor, I can't stand here and say

1 that there's not going to be a e-mail or a note to file I had a

2 conversation with somebody.

3        THE COURT:  This is the CEO -- I -- this is the CEO

4 of the company.  This is -- it seems to me unless I'm missing

5 it, pursuit of information from him is the most important

6 pursuit that Arbutus would want to follow.

7        MR. CARSON:  All indications are it would be

8 completely duplicative of what they've already done.

9        THE COURT:  But yet you're not prepared to assure me

10 and Arbutus' counsel that it would -- that it is duplicative.

11        MS. CARSON:  I can not make that representation --

12        THE COURT:  Okay.

13        MS. CARSON:  -- that there's not a single piece of

14 paper out there that they don't have.  But what I can tell you

15 is that plaintiffs have done a masterful job of making this the

16 most burdensome, most expensive discovery that they possibly

17 can --

18        THE COURT:  Well, that --

19        MS. CARSON:  -- to impose maximum --

20        THE COURT:  Hold on, hold on, hold on.  So those

21 arguments probably are not going to sway me because -- because

22 I would predict that they were going to say the same thing

23 about you.  So, am I right?

24        MR. HARBER:  You're right, Your Honor.

25        THE COURT:  Okay, so I'm assuming there's been

1  incredibly robust discovery request.  Probably way more than

2  what's ever going to be needed at a trial by both sides, so --

3  okay.  I think you ought to tell your CEO that he's probably

4  going to be deposed and we're going to look at your search

5  terms and your objections to his search terms -- to his search

6  terms.  And we're going to try to pick a very discreet

7  reasonable area of search terms and you're going to go ahead

8  and maybe get his deposition.  And I really don't want to hear,

9  well we need this universe of documents first.

10         What you're going to do is, you're going to conduct

11  the deposition on these discrete search terms with the

12  documents available and then if you still think that there's

13  information that you don't have after a deposition.  If you

14  want, in good faith you can come back.  So we're going to look

15  at the search terms, okay.  So moving on --

16         MS. CARSON:  Thank you, Your Honor.

17         THE COURT:  -- we'll pick what we think is

18  reasonable.  And when I say search terms, I mean areas and

19  inquiry -- I'm using the wrong term.  We're going to set out

20  parameters on areas of inquiry.  Discreet areas of inquiry.

21  And we'll also pick a time limit.  So let me just look at my

22  notes for second.

23         All right, I mean, I'll hear more from both attorneys

24  but I think the resolution is going to be an order, as I said,

25  ordering the deposition of the CEO.  I'm going to layout areas

1  you can cover and I know all of the areas you think are

2  deficient as it relates to information from the CEO and I will

3  cover that in my order as to what you can ask him about what

4  you can't ask him about.

5          MR. HARBER:  Thank you, Your Honor.

6          THE COURT:  And regretting the day I'm saying this.

7  If you let me know the day of the deposition, I'll try to keep

8  my calender clear so if you ask questions that you think are

9  within the bounds of my order and there's direction not to

10 answer I can cut that knot and likewise if you think he's going

11 beyond my order I'll try to remain available to mediate that so

12 to speak.

13         MS. CARSON:  So, Your Honor, that goes right into my

14 question --

15         THE COURT:  Yeah.

16         MS. CARSON:  -- which is, this is going to be a time

17 limited deposition, correct?

18         THE COURT:  Yes.

19         MS. CARSON:  I will say, the plaintiffs have used up

20 the 85 hours that we agreed each side gets so they're out of

21 time.

22         THE COURT:  Okay.  If you think -- if you think --

23 okay.  Fair enough.  I'm going to give them more time, but I'd

24 extend the same courtesy to you.

25         MS. CARSON:  I'm just asking you that you keep it

1   very -- as short as humanly possible.

2           THE COURT:  Five minutes, is that good enough?

3                       (Laughter)

4           THE COURT:  It took six minutes to introduce all the

5   lawyers.  All right.  Agreed.

6           MS. CARSON:  Okay.

7           THE COURT:  Agreed.  Yeah.  It's -- yeah.  Yes.

8           MS. CARSON:  And just to make sure I understand --

9           THE COURT:  Mm-mm.

10          MS. CARSON:  Is the depositions going to happen.

11  They're going to ask about these topics at the deposition and

12  then if there's stuff that they think comes out that there are

13  documents, then we do the search.  Is that the proper order?

14          THE COURT:  Yeah.  You know, I'm a little muddled on

15  my thinking of that right now.  But my sense is -- and I'll

16  take Mr. Harber's push back on this if he wants.  You have

17  topics that you think are -- have information that are

18  deficient.  To me, the best way to cover that is for you to be

19  able to question the CEO about those topics.  I also think that

20  you have enormous amounts of information that -- documents that

21  you can use to prepare for this deposition.

22          So, I'd like it to be, deposition order, this amount

23  of time on this topic, so that's my order.  Without having to

24  then say, but before the deposition you get these additional

25  documents.

1          MR. HARBER:  That's fair, Your Honor.

2          THE COURT:  Okay.  And then if you want after having

3    reviewed the 50 truck loads of information you already have

4    plus his deposition, if you then think well there's really

5    something more I want to bother the judge about you can come

6    back.

7          MR. HARBER:  All right.  Appreciate that.

8          THE COURT:  Okay.  All right.  Okay?

9          MS. CARSON:  Thank you, Your Honor.

10         THE COURT:  Okay.  All right, so we'll draw down,

11   look at the topics.  Look at Moderna's objections and try to

12   tailor something that's matched, okay?

13         MR. HARBER:  Appreciate it.  Thank you, Your Honor.

14         THE COURT:  Okay.  So I think that, that meant --

15   that deals with Gen -- doesn't -- does that resolve the --

16   everything that relates to the CEO?  Yeah, okay.  Well, we --

17   you and I do something.

18         MS. CARSON:  Yeah.

19         THE COURT:  Okay.  So the next topic -- let me just

20   review my notes so I understand it.  I think that the issue is

21   that Arbutus is pressing that they want witnesses to explain

22   publications authored by Moderna scientists and there's seven

23   publications and Moderna's position is six of those

24   publications have nothing to do with the issues in this case

25   and this is burdensome.  And if I have that right, Mr. --

```
 1                 MR. HARBER:  Harber.

 2                 THE COURT:  Harber with a B not P.

 3                 MR. HARBER:  Yes, B, yeah.

 4                 THE COURT:  Harber.  How do I resolve this without

 5    having to try to read myself the seven publications which I

 6    probably wouldn't understand, you know, a lot.

 7                 MR. HARBER:  We have a proposal.  My colleague, Shaun

 8    Mahaffy, he's going to address --

 9                 THE COURT:  Yeah.  Sure.

10                 MR. HARBER:  The second topic is part of this.  I'll

11    address and I'll let him address that question.

12                 THE COURT:  Mm-mm.

13                 MR. MAHAFFY:  Thank you, Your Honor.  Shaun Mahaffy

14    from Williams Connolly.

15                 THE COURT:  Mahaffy?

16                 MR. MAHAFFY:  Mahaffy.  M-a-h-a-f-f-y.

17                 THE COURT:  M-a-h --

18                 MR. MAHAFFY:  -- a --

19                 THE COURT:  -- f-f-y.

20                 MR. MAHAFFY:  -- f-f-y.

21                 THE COURT:  Go ahead.

22                 MR. MAHAFFY:  So, Your Honor, we're going to try to

23    simplify things.  Hopefully this won't be too complicated.

24                 THE COURT:  Mm-mm.

25                 MR. MAHAFFY:  We've take the deposition of a number
```

1   of their witnesses and we're willing to withdraw this topic.  A

2   few things though.  So the compromise that we've proposed is

3   that we've like for the testimony of their president to be

4   designated on this topic.  He testified about some of these

5   articles and we'd like that to be designated as --

6               THE COURT:  Not the CEO.  Not the --

7               MR. MAHAFFY:  Not the CEO.  The president who has

8   already testified.

9               THE COURT:  He's already testified.

10              MR. MAHAFFY:  He's already testified.

11              THE COURT:  Okay.

12              MR. MAHAFFY:  And so there's some --

13              THE COURT:  You deposed him?

14              MR. MAHAFFY:  Yeah, we've already deposed him.  And

15  there's some existing testimony that we would like to be

16  designated as 30(b)(6) testimony under this topic.  We're

17  otherwise willing to withdraw this --

18              THE COURT:  What's the -- is that a -- so you took a

19  general deposition of that person?

20              MR. MAHAFFY:  Right.

21              THE COURT:  And the president.  What's his name?

22              MR. MAHAFFY:  Stephen Hoge.

23              THE COURT:  Last name again?

24              MR. MAHAFFY:  Hoge.  H-o-g-e.

25              THE COURT:  But your didn't designate Mr. Hoge as a

1  30(b), but you want to take some of the general deposition and

2  designate it as a 30(b)?

3         MR. MAHAFFY:  Yeah, so we --

4         THE COURT:  What's the -- why does that matter?  It's

5  a deposition.  It's information.

6         MR. MAHAFFY:  We just want to make sure that, that is

7  Moderna's actual position and they're not going to try to say

8  something different than that.

9         THE COURT:  This is the president.  This is the

10  president.

11         MR. MAHAFFY:  Fair.

12         THE COURT:  If we call him 30(b) or we call him a CEO

13  or we call him the president, are you worried that what he said

14  in the deposition that wasn't a 30(b) won't be binding on that?

15         MR. MAHAFFY:  I wouldn't expect that, but that's just

16  what we're trying to make sure of.

17         THE COURT:  Did he identify himself and did you

18  depose him?

19         MR. MAHAFFY:  I did not depose him.

20         THE COURT:  All right.  Did he identify himself as

21  president of Moderna?

22         MR. MAHAFFY:  I believe so.  I assume so.

23         THE COURT:  Can I gently and respectfully suggest to

24  you, you're worrying about something you don't need to worry

25  about.

1          MR. MAHAFFY:  Fair.

2          THE COURT:  And if you're worried about the testimony

3   that you want to designate being binding on Moderna.

4          MR. MAHAFFY:  It's a fair point, Your Honor.

5          THE COURT:  I wouldn't worry about that.

6          MR. MAHAFFY:  Okay.

7          THE COURT:  Okay.

8          MR. MAHAFFY:  So, the other aspect of this, is that

9   if we withdraw this, we just want to be sure that they're not

10  going to stand up at trial and give testimony on these

11  articles.  So we would just ask that, you know, they not be

12  allowed to give testimony about the, you know, details of --

13         THE COURT:  Got it.

14         MR. MAHAFFY:  -- these articles about this topic.

15         THE COURT:  Okay.

16         MR. MAHAFFY:  And so we've --

17         THE COURT:  Okay.

18         MR. MAHAFFY:  I will say we've proposed this

19  compromise to them a few days ago and they --

20         THE COURT:   Well let's propose it right now.

21         MR. MAHAFFY:  Okay.

22         THE COURT:  So as I understand it Mr. Mahaffy is on

23  the record withdrawing his request to have testimony about the

24  seven publications authored by Moderna scientists if Moderna

25  will represent now that they will not at trial attempt to

1 introduce any type of evidence related at all to these

2 publications.  Is that your proposal?

3        MR. MAHAFFY:  Yeah, the -- they won't offer testimony

4 that is within the scope of the topic that we proposed, yes,

5 which relates to the articles.

6        THE COURT:  It's very broad.  They won't  -- how

7 about they won't offer testimony through any witnesses or

8 documents that relate to any content within these publications.

9        MR. MAHAFFY:  Yeah.  I think that's fair -- or -- and

10 I would say, you know, we wouldn't want them to testify about

11 the things that are short of unknown in the articles, right.

12 So the articles might talk about, you know, some aspect of the

13 manufacturing method.

14        We don't want them to stand up and say, oh well, you

15 know, these articles were actually manufactured by these other

16 means that are not disclosed in this article.  We don't them

17 for them to get sort of extra testimony about the article that

18 we haven't had an opportunity to depose a witness on.

19        THE COURT:  I mean we're -- what we're really talking

20 about is unfair surprise and it's really --

21        MR. MAHAFFY:  Exactly.

22        THE COURT:  -- it's really a trial issue.  I mean you

23 could reserve this argument for trial and if they did it you

24 could say well we never got to depose them so sustain my

25 objection.  Let's hear what Moderna has to say.

1          MS. CARSON:  Your Honor, first of all, they -- there

2    was seven articles,  We offered a 30(b)(6) on the only article

3    that actually deals with the COVID-19 vaccine.  So they have

4    that testimony.  The other six articles --

5          THE COURT:  Did that person -- was that person

6    deposed on that one article.

7          MS. CARSON:  Yes.

8          MR. MAHAFFY :  Yeah, that's not an issue here.  Yes.

9          THE COURT:  We're talking about the six additional.

10         MS. CARSON:  On the remaining articles they ask

11   questions about four of the articles.  Two of the articles they

12   didn't even ask questions of any of our witnesses about.  They

13   have taken 14 depositions, close to 85 hours and I will make a

14   correction.  They're not out of time yet.  They still have four

15   hours left, but they designated it for a deposition of the

16   government, so that --

17         THE COURT:  The hidden message from Ms. Carson is the

18   CEO's deposition should be four hours.

19         MR. MAHAFFY:  We are fine with that, Your Honor.

20         MS. CARSON:  Well they have another deposition

21   they've already going to use the four hours for so.

22         THE COURT:  I was kidding.

23         MS. CARSON:  Choices.

24         THE COURT:  Go ahead.

25         MS. CARSON:  In any event, the point is, is that

1  they've had testimony on these articles.  If they want to

2  impeach our witnesses at trial to say, well you didn't know

3  this at your deposition, fine, that's what impeachment is for.

4  But this is not an issue that they can say you're precluded

5  from ever saying anything about the articles, particularly

6  since they asked questions about the majority of the articles.

7         THE COURT:  Yeah, that's -- I think she's right.  I

8  mean it's very -- I'm very uncomfortable making rulings now

9  that relate to a trial that's not going to happen for -- what's

10  that trial date, like a year right, so.

11         MS. CARSON:  2025.

12         THE COURT:  Yeah, so -- so let's -- let's do this,

13  Mr. Mahaffy.  You're withdrawing -- you've had a deposition on

14  one of the articles.  The other ones she says aren't related to

15  the virus at issue, right?

16         MR. MAHAFFY:  Right.

17         THE COURT:  Okay.  So -- I mean I just think that's

18  were it should stand, because I don't know what someone -- I

19  don't like making rulings on things that haven't happen or may

20  not happen at trial and you're just going to have to stand up

21  at trial if you feel like you've been ambushed and say

22  objection.  Remember, Judge, we withdrew this.  They're now

23  talking about the other six articles and we withdrew it, we

24  didn't have discovery on it and I'll just try to do the right

25  thing then.

1          But if you've had one deposition and she's saying,

2    well this was on the virus at issue and the other six are sort

3    of tangential and I don't hear you pushing back on that.

4    Certainly Moderna doesn't have to make any guarantees right

5    now.  You're just going to have to trust the process.

6               MR. MAHAFFY:  Okay.

7               THE COURT:  Okay?

8               MR. MAHAFFY:  Understood, Your Honor.

9               THE COURT:  Okay.

10              MR. MAHAFFY:  Okay.

11              THE COURT:  And thank you for being, you know, so

12   reasonable.  I understand why you're trying to be so careful

13   about but -- so we'll -- I'll put some of my ruminations in the

14   order so it's clear so you could pull it out of your pocket if

15   they go -- if they cross the line at trial --

16              MR. MAHAFFY:  Yeah.

17              THE COURT:  -- you think has been -- is an unfair

18   line, okay?

19              MR. MAHAFFY:  That's fair.  Thank you, Your Honor.

20              THE COURT:  I'll give you something to work with, all

21   right?

22              MR. MAHAFFY:  Okay.

23              THE COURT:  Okay.

24              MR. MAHAFFY:  Thank you.

25              THE COURT:  Okay.  Who is going to address for or

1  review this issue regarding Moderna's communications with the

2  government.

3          MR. MAHAFFY:  I will, Your Honor.

4          THE COURT:  Okay, so could you frame that for me

5  please?

6          MR. MAHAFFY:  So, Your Honor, this relates to Topic

7  50 in our 30(b)(6) notice and as Your Honor will surely recall,

8  Moderna is asserting that certain sales of it's product are

9  covered by government contractor defense in Section 1498.  And

10 after Your Honor decided the motion dismiss, the government

11 then belatedly filed a statement address regarding that issue.

12         And the scope of Topic 50 that Moderna has not agreed

13 to that's really in dispute is, we -- we want to be able to

14 take discovery about their communications with the government

15 and their involvement with that statement of interest, their

16 discussion of the application of 1498 to our case and any

17 involvement they have with drafting it.

18         THE COURT:  Drafting what?

19         MR. MAHAFFY:  Drafting the statement of interest to

20 the government client.

21         THE COURT:  And how would that be relevant to the

22 issues we're going to litigate at trial?

23         MR. MAHAFFY:  So, for two reasons, Your Honor.  One

24 is the Moderna is relying on that statement of interest as I

25 would dare say their primary piece of evidence in favor of the

1  application of 1498.  And so all we're saying is, we should be

2  entitled to take discovery of that to see if in fact they had a

3  role in manufacturing that piece of evidence, which I think

4  would be relevant to Your Honor and to the jury.

5          THE COURT:  Statement of interest?

6          MR. MAHAFFY:  The statement of interest and the

7  discussions that they had with the government about whether

8  1498 applies.  Whether theses doses that we're talking about

9  were actually for the government as opposed to for the American

10 people.  Those conversations on what Moderna was saying and

11 what the government was saying frankly in those communications

12 are directly relevant.

13          And the second thing I would say about that, Your

14 Honor, is it's hard for me that the one motion that Moderna

15 filed on -- relating to what they call lobbying communications.

16 I -- you know -- if you look at what they said there.  It's

17 hard to conceive of how they could still contest the relevance

18 of this testimony given what they said.  They said that our --

19 and what we're talking about there are our after the fact

20 lobbying documents to raise awareness of 1498.

21          They've said those statements made by plaintiff or

22 Roivant to members of Congress in an effort to tilt the

23 licensing positions more favorably toward plaintiffs are at

24 least relevant to Georgia Pacific Factors 10 and 11.  They're

25 also relevant to the extent they undercut plaintiffs' unfounded

1 assertions that Moderna improperly influenced the U.S.

2 government regarding the application of 28 U.S.C. 1498 and the

3 pricing of Moderna's COVID-19 vaccine.

4        THE COURT:  So they're talking about your lobbying

5 efforts there.

6        MR. MAHAFFY:  Right and --

7        THE COURT:  So what I -- sorry to interrupt -- but

8 what I'm very fuzzy on.  I'm going to turn it over to Moderna,

9 whoever wants to speak, is the -- so you can have a seat for a

10 second.

11        MR. MAHAFFY:  Okay.

12        THE COURT:  So the supply chain and how this -- how

13 this worked.  So as a person who received the vaccine.  I think

14 it was even Moderna's.  I showed up at a vaccination center and

15 I got the vaccine and since then with boosters -- I don't know

16 whose booster I got -- I showed up at a pharmacy.  So what I'm

17 very unclear about is, how did -- what was the supply chain?

18 How did this work?  From Moderna's production center to the --

19 to the arms.

20        MR. McLENNAN:  Good morning, Your Honor.  Mark

21 McLennan for Moderna.  So --

22        THE COURT:  McLennan?

23        MR. McLENNAN:  McLennan.

24        THE COURT:  Yeah.  Spell that.

25        MR. McLENNAN:  M-c-L-e-n-n-a-n.

1          THE COURT:  Do you -- are you pretty clear, Mr.

2   McLennan, what I want you to explain to me?

3          MR. McLENNAN:  Yeah, sure.  So let's start with the

4   pandemic here.  The government and several departments, the

5   Department of Defense, the NAH contracted with multiple

6   companies to rapidly produce and manufacture vaccines and scale

7   up to be able to supply by the end of the year.  Moderna was

8   one of those companies.  They entered into that supply

9   contract.  As part of that supply contract there was the back

10  and forth about 1498, which I'll come back to.

11         THE COURT:  Contract between?

12         MR. McLENNAN:  Moderna and the government.

13         THE COURT:  Okay.

14         MR. McLENNAN:  With the Department of Defense.

15         THE COURT:  Okay.

16         MR. McLENNAN:  That was the supply agreement that

17  contained the indemnity provision that we've been speaking

18  about.  But to answer your question about the supply chain,

19  Moderna then supplied the vaccine to the government.  It was

20  supplied to central distribution centers and then the

21  government decided under emergency use authorization, because

22  it's not approved at the time.  The government is using it as a

23  counter measure to a pandemic.  The government then directed

24  that to sites around the county.  So --

25         THE COURT:  To what?

1          MR. McLENNAN:  To sites, like as in pharmacies,

2 military sites --

3          THE COURT:  Right.

4          MR. McLENNAN:  Anyone who would administer the

5 vaccine.

6          THE COURT:  So the actual vaccine is delivered to

7 some government owned --

8          MR. McLENNAN:  Owned or operated.

9          THE COURT:  -- property.

10         MR. McLENNAN:  Owned or operated.  Like the --

11         THE COURT:  Owned or operated.

12         MR. McLENNAN:  -- specific pharmaceutical

13 distributors that --

14         THE COURT:  Okay.

15         MR. McLENNAN: -- are specialist in this.

16         THE COURT:  And it's either -- it's either

17 administered there -- the first doses were either administer

18 there or some dosage administration site close to that.

19         MR. McLENNAN:  More so like there's the distributors

20 that the government was controlling and then went out from

21 there.  Obviously there are probably tens of thousands of

22 places from there.  Like CVSs, schools -- any -- you know --

23 there's vaccination sites.

24         THE COURT:  Right.

25         MR. McLENNAN:  But it was all coordinated by the

1  government.

2         THE COURT:  So from you to the government to we'll

3  call them, you know, private entities like CVS.

4         MR. McLENNAN:  Yeah, but that's all under one

5  contract though.  At some point it did turn -- there was

6  another contract after that.

7         THE COURT:  Mm-mm.

8         MR. McLENNAN:  And now there's different supply

9  arrangements, but we're talking about the early period of the

10 pandemic.

11        THE COURT:  So for the first contract, whose the --

12 who paid for all those vaccines?

13        MR. McLENNAN:  The Department of Defense.

14        THE COURT:  Okay.  And did the Department of Defense

15 ever seek reimbursement.  Let's say just -- because we're

16 talking in very generalities from let's say CVS.  So CVS didn't

17 administer it so CVS is out of the picture at that point,

18 right?

19        MR. McLENNAN:  My understanding is I would've

20 checked, but my understanding is that the government was buying

21 those vaccines and supplying it to the public.

22        THE COURT:  Okay.  Okay.  All right.  That's sort of

23 what I thought, but that's changed, you know, as time went on

24 and there was direct supplies from your client to entities

25 using my example of CVS, right, and the government was taken

33

1  out of -- eventually taken out of the loop.  Is that right?

2          MR. McLENNAN:  Essentially that's right.

3          THE COURT:  Okay.  All right.  So thank you.  I'll go

4  back to you now Mr. Harber.  So where were you?

5          MR. HARBER:  So the -- Your Honor, I was reading

6  portions from the motion that Moderna filed saying that somehow

7  our -- things that our company said about 1498 after all the

8  relevant facts had occurred.  Those are somehow relevant, but

9  what they're trying to do is shield both testimony and

10 documents about what they were saying and discussion they were

11 having about 1498 at the time in the room when the decisions

12 were being made.  And --

13         THE COURT:  With?

14         MR. HARBER:  With the government.  With the

15 Department of Justice with the government and that -- we think

16 that's incredibly improper given their reliance on --

17         THE COURT:  Give me an example.  If you get to do

18 this additional discovery, give me an example of something that

19 you would be -- you think would have very high evidentiary

20 value for your client in this patent case.

21         MR. HARBER:  So two things, Your Honor.  One is,

22 let's say there was a dispute and a disagreement between the

23 government and Moderna about whether 1498 applies.  And what

24 the government said in that context, before the statement of

25 interest was filed is identical to the arguments that we are

1  making that we made a response to the motion to dismiss or did

2  we make in response to what I'm sure will be a summary judgment

3  motion.  It's incredibly valuable for us to be able to point

4  out that, that was the governments position before whatever

5  influence that Moderna had.

6          THE COURT:  Who do you think was the highest level

7  government official to have these discussions with Moderna?

8          MR. HARBER:  We don't.  I think on the statement of

9  interest in particular, it was some -- my assumption would be

10 it's somebody with the Department of Justice.  But right now

11 Moderna -- it is a -- it has been a stone wall for us to --

12         THE COURT:  All right, let's pick -- let's use the

13 term official from the Department of Justice.

14         MR. HARBER:  Right.

15         THE COURT:  And you think there could be information

16 out there that the official from the Department of Justice said

17 something like, this really isn't for the government, this is

18 for the citizens and that to you would be a smoking gun that

19 they're affirmative defenses is not worth anything, right?

20         MR. HARBER:  I think we're talking in sort of

21 hyperbolically about what --

22         THE COURT:  Of course we are.

23         MR. HARBER:  -- the document would be.

24         THE COURT:  Yes, we are definitely doing that.

25         MR. HARBER:  So I don't -- I'm not pollyannaish

1  enough to believe that, that exact document is there, but there

2  could've been discussions back and forth about whether or not

3  this legal theory applies.

4          THE COURT:  Okay,  so let's say you have that

5  statement, whatever it is.  You think it's valuable, right?

6          MR. HARBER:  Yes.

7          THE COURT:  Okay, so I would -- I would just sort of

8  in discussion with you say, you know, not glibly, respectfully,

9  but so what.  So I made the decision as to whether the 1498

10  applies and whether it fit -- the evidence fits under was it

11  for the government and with authorization and consent of the

12  government and a statement by the highest level official.  That

13  doesn't mean that it's true.  I have to decide that based on

14  that evidence.

15          MR. HARBER:  And I appreciate that and I hope that

16  that's Your Honor position and I think that's the right

17  position, but I -- it's not clear to me that this won't for

18  example be an issue where there's a fact dispute that gets to a

19  jury.  And I think that the jury would want to know.  It

20  shouldn't just be Moderna waving around the statement of

21  interest and saying, look, here's what the government said.

22          THE COURT:  Mm-mm.

23          MR. HARBER:  And us not being able to point out, well

24  look you see the sentence on Page 3 that they told the jury

25  about.  It turns our Moderna was the one who wrote that.

1          THE COURT:  You're looking at it sort of like as an

2   admission.  Not -- I see it more where you're saying there's

3   more -- are there any admissions as opposed to, well some high

4   level official said if members of the jury are judged so

5   therefore it must be true.  It's sort of like -- you know --

6   that's just an opinion of someone else.  The clock stop here, I

7   think.  Have you gone to the government and asked them?

8          MR. HARBER:  They have refused to give us anything.

9   Their position is Moderna is the party in the case and so if

10  you want our discovery about our communication with Moderna you

11  have to get it from them, which is not --

12         THE COURT:  Well did you --

13         MR. HARBER:  -- completely unfounded.  And we're

14  trying.

15         THE COURT:  I'm not nearly as immersed in this as you

16  but did you hit the government with a subpoena?

17         MR. HARBER:  We have.  We're negotiating that.

18         THE COURT:  And what did they say?

19         MR. HARBER:  Their position has been consistently and

20  it's supported some law that if -- you should not burden a

21  third party with a discovery request of something you can get

22  from a party and that's what we're talking about.

23         THE COURT:  How do you want to get this discovery,

24  which I'm now better understanding to be any communications

25  regarding statute 1498, right.  The 1498 that Moderna had with

1   any government official.  Is that a good --

2           MR. HARBER:  That and the statement of interest which

3   I think probably would be subsumed within the first category,

4   but yes.

5           THE COURT:  All right.

6           MR. HARBER:  And so we -- there's two pending

7   requests before Your Honor.  One is this -- we're asking for

8   30(b)(6) testimony.  The other is we've asked for the documents

9   about this.  And so -- and again, they've shared no information

10  with us on the scope.  They haven't given us the privilege log.

11  They haven't -- I don't know whether we're talking about

12  hundred of documents, ten documents or what, because they

13  haven't given us that information.  The -- I will say --

14          THE COURT:  Suppose -- didn't the statement of

15  interest come after I denied their motion and then the

16  statement of interest --

17          MR. HARBER:  Correct.

18          THE COURT:  -- and then I wrote a supplemental paper.

19          MR. HARBER:  That's correct.

20          THE COURT:  Okay.  So suppose counsel -- if there

21  were communications with the government after my initial

22  opinion, don't you think those communications would've been

23  between lawyers?  They probably would've been.

24          MR. HARBER:  Well they would've been, but this is

25  where -- their argument is basically we had a common interest

1 privilege with the U.S. government even though we won't produce

2 to you the common interest agreement.  We won't produce to you

3 any other evidence about it and we won't -- they've now --

4 we've had several briefs on this issue to the Court and they

5 haven't cited a single legal case justifying that this is a

6 protectable common legal interest.

7        The issue is, Your Honor understands from ruling on

8 motions dismissed.  The entire legal issue for 1498 is there

9 are two parties.  Moderna and the U.S. government and which one

10 has to pay the damages for Moderna's patent infringement.

11 Either the government or Moderna.  The notion that there's a

12 common legal interest on that where the -- the interest of the

13 -- the legal interest of the parties are polar opposites.  It

14 defies logic and it defies that case law to the point where

15 they won't even -- there's been no attempt to defend that

16 there's a common interest over that.

17        THE COURT:  Mr. McLenahan -- McLennan?

18        MR. McLENNAN:  McLennan.

19        THE COURT:  McLennan.  Are you addressing this issue?

20        MR. McLENNAN:  Yes, Your Honor.

21        THE COURT:  Okay, what evidence if any understanding

22 we're far away from trial, but what evidence if any do you

23 intend to put in front of the jury or let's just say the fact

24 finder regarding the government's view on were the vaccines for

25 the government with their authorization.

 1              MR. McLENNAN:  Okay, so something that wasn't

 2    mentioned at all in that previous argument was the supply

 3    contract that I mentioned earlier, Your Honor.  We call it the

 4    C100 Contract.  That was entered into years before the lawsuit

 5    was filed in August 2020.  That contract was what formed the

 6    basis for Moderna's motion to dismiss.  Your Honor might recall

 7    it was a redacted --

 8              THE COURT:  I do.

 9              MR. McLENNAN: -- contract.  And Your Honor found

10    that, well I need more information about whether the

11    government's decision to include a specific clause in there.

12    An authorization and consent clause was actually consent

13    because there wasn't enough information available.

14              THE COURT:  I reread it this morning so go ahead.

15              MR. McLENNAN:  Okay.  What Mr. Harber also didn't

16    mention was, he deposed the lead person of Moderna who was

17    responsible for negotiating that contract.  He took the

18    deposition.  I defended it.  The witness went through many,

19    many e-mail and we produced where Mr. Harber was able to see

20    all the back and forth with the government about, here's a

21    draft contract, I propose this clause, we would like this in

22    there, all the back and forth.  They have all that.  That is

23    Moderna's basis for --

24              THE COURT:  But you haven't answered my question.

25              MR. McLENNAN:  I think Your Honor asked about what

1 evidence we'd rely on.

2 THE COURT: What evidence are you going to produce

3 understanding I'm not holding you to this.

4 MR. McLENNAN: Yeah.

5 THE COURT: Just a brainstorm with you. What

6 evidence do you intend to produce at trial regarding your

7 affirmative defense under 1498 that the -- or maybe it's not a

8 trial, because if I agree with you it has to shift to another

9 court, right.

10 MR. McLENNAN: Yeah, you --

11 THE COURT: So what evidence are you going to produce

12 in summary judgment would be a prominent better question that

13 the vaccines were for the government with their authorization.

14 MR. McLENNAN: So on that authorization consent

15 point, it is the contract. The case has recognized that

16 including that specific FAR clause in the clause in the

17 contract is authorization and consent. That's why I brought

18 you to the contract.

19 THE COURT: That's it. That's all you're going to

20 come to me and say.

21 MR. McLENNAN: We've also got -- I'm sorry, Your

22 Honor. I didn't mean to cut you off.

23 THE COURT: I interrupted.

24 MR. McLENNAN: We've also got a ton of e-mails back

25 and forth with the government showing that they knew this

41

1  clause was in there, how it got in there, things like that.  We

2  produced those.  Witnesses have been deposed about it.  They

3  understand that.  We'll rely on those.

4         THE COURT:  My question though -- but my question is,

5  what evidence are you going to produce at summary judgment to

6  convince me that this case should go to the claims court, that

7  the vaccines were for the government with the authorization?

8         MR. McLENNAN:  So the -- I've already addressed the

9  authorization and consent.  It's the --

10         THE COURT:  The contract.

11         MR. McLENNAN:  -- the contract.

12         THE COURT:  You said that.

13         MR. McLENNAN:  Yes.

14         THE COURT:  What else?

15         MR. McLENNAN:  And then the statement of interest

16  that Mr. Harber referred to.  The statement of interest just

17  recognizes -- as the government said -- in that contract we

18  gave authorization and consent.

19         THE COURT:  Are you going to call a witness from the

20  -- from the -- are you going to introduce a deposition or an

21  affidavit from some high level government official at --

22         MR. McLENNAN:  No.

23         THE COURT:  -- the Department of Justice?

24         MR. McLENNAN:  No, we've not subpoenaed the

25  government, Your Honor.  Because the -- our position is, it's

1  clear in the face of the contract.  All the statement of

2  interest did was just refer back to it and say yes that is in

3  the contract.  We do provide authorization and consent.  And

4  for the other prong --

5          THE COURT:  It sounds like you're saying to me in

6  support of your affirmative defense, you're just going to offer

7  the contract.

8          MR. McLENNAN:  Sorry, for the benefit prong, Your

9  Honor, is separate.  Where again, we've produced a mountain of

10 evidence about that.  A number of people have been deposed.

11         THE COURT:  Can you tell me how much you produced and

12 I want to look at this in --

13         MR. McLENNAN:  Okay.

14         THE COURT:  -- terms of what is going to happen at

15 the trial.  Because if you're just going to rely on the

16 contract or the motion for summary judgment part of the case.

17 However we decide this affirmative defense.  It seems to me --

18 maybe I should backtrack -- it seems to be that needs to be

19 decided in the first instance, because then it goes to a

20 different court if I agree with you.  Is that right?

21         MR. McLENNAN:  I'm not sure on the specifics.

22         THE COURT:  You don't want it in a district court.

23         MR. McLENNAN:  I don't have the -- I don't have the

24 -- I'm not sure about the appeal procedure.

25         THE COURT:  I thought --

1          MR. McLENNAN:  Is that -- sorry is that what --

2          THE COURT:  -- the whole premise of this is, if I

3 decide -- let's back up because I'm getting myself confused.

4 You came to me and said send this to the claims court.

5          MR. McLENNAN:  Part of the case.

6          THE COURT:  Okay.  And I said it's premature because

7 discovery has to be developed.  So we've developed the

8 discovery and then you're going to come to me, I presume, with

9 a summary judgment motion saying, look we've developed the

10 discovery.  You said we're are the pleading stage.

11          MR. McLENNAN:  Yeah.

12          THE COURT:  We're now -- have a developed record.

13 This part of the case, big part of the case I presume, goes to

14 a different court, right?  Am I right so far?

15          MR. McLENNAN:  Correct.

16          THE COURT:  Okay.  So my question is, as clear as I

17 can state it, what evidence are you going to put before me to

18 convince me that that's what should occur.  And the reason I'm

19 asking that is, I think that, that informs my decision on how

20 much discovery should be allowed.

21          MR. McLENNAN:  Understood, Your Honor.

22          THE COURT:  Okay.

23          MR. McLENNAN:  I think aside from what I've already

24 said for the benefit prong we'll be relying on specific

25 evidence.  It will be specific.  Evidence we'll produce that

44

1 shows the vaccine that Moderna produced and sold to the

2 government actually was given to the government.  So getting

3 good due received is a benefit.  There's also a lot of

4 testimony and documents --

5    THE COURT:  Well how are you going to -- how are you

6 going to -- what evidence are you going to present in the

7 summary judgment record if that's the right motion to show

8 that?

9    MR. McLENNAN:  So we've produced other witnesses who

10 testified about batch tracking records showing that specific

11 batches, these specific doses went to the government.  They

12 deposed witness about them.  They understand these spread

13 sheets now.  I think they also got similar spreadsheets from

14 the government.

15    THE COURT:  Evidence has already have been developed

16 in the running.

17    MR. McLENNAN:  Correct.

18    THE COURT:  And Mr. Harber knows about it.

19    MR. McLENNAN:  Correct.

20    THE COURT:  Okay.

21    MR. McLENNAN:  And then other evidence just about the

22 benefit to the government in general.  Like having a vaccine

23 out there that helped prevent the spread -- helped the

24 government --

25    THE COURT:  And is this other evidence been produced

1    yet?

2              MR. McLENNAN:  Yes.  It has, Your Honor.

3              THE COURT:  Okay.  All right.  So the contract --

4    you're answer is -- and I'm not trying to put words in your

5    mouth -- the answer is, the contract, which everyone knows and

6    everyone has a redacted version of it I guess, right?

7              MR. McLENNAN:  Unredacted.  Unredacted.

8              THE COURT:  Unredacted.

9              MR. McLENNAN:  Yes.

10             THE COURT:  Okay.  And evidence has already been

11   developed and is in the running, right?

12             MR. McLENNAN:  Right.

13             THE COURT:  And I'm not going to produce an affidavit

14   from a high level person from the Department of Justice that

15   Mr. Harber gets -- hasn't deposed yet, right?  You're not going

16   to do that, right?

17             MR. McLENNAN:  No, I mean --

18             THE COURT:  Okay.

19             MR. McLENNAN:  -- they're going depose someone from

20   the government.  I don't know what topics are going to come up

21   but we'll have equal opportunity to depose that person.  That's

22   --

23             THE COURT:  When you're ready to go --

24             MR. McLENNAN:  We're not holding anything back.

25             THE COURT:  You're ready to convince me now on the

1  record as it stands that this is produced for the government

2  with their authorization consent, right?

3          MR. McLENNAN:  The only -- out of fact discovery --

4  yeah that's right, Your Honor.

5          THE COURT:  So I'm going to hold all of this under

6  advisement, but I'll give -- thank you -- I'll ask Mr. Harber

7  if he can have the last word on this.  He's been very clear

8  about what he's going to rely on so why do I open the door to

9  more?

10         MR. HARBER:  So two reason's, Your Honor.  It is --

11 it's all well and good what Moderna wants to rely on, but we

12 get to put a defense up as well.  And one of the things that

13 Mr. McLennan said was --

14         THE COURT:  Mr. McLennan, you can have a seat.

15         MR. HARBER:  One of the things Mr. McLennan said was,

16 we're going to rely on the statement of interest.  And that's

17 our point.  They don't need an affidavit from the government,

18 because what they're going to say is here's the governments

19 position and it's not just -- I think we're conflating two

20 issues there.  There are two prongs to 1498.  There's the

21 authorization to consent and then there's whether it was for

22 the government.

23         We don't dispute that the authorization of consent

24 clause was in that first contract.  That's not a point of

25 dispute in the case.  The point of dispute is for the

1  government prong.  That was for some reason address in the

2  government statement of interest.  We would like to take

3  discovery about how that came to be.  What was Moderna saying?

4  What was the discussion about?  Whether that was in fact for

5  the government and there could be useful admissions that we

6  would use as evidence regardless of what Moderna is going to

7  use in evidence.  That's what we're seeking.

8          THE COURT:  I understand your position.  Okay.  I

9  want to think about it a little bit.

10          MR. HARBER:  All right.  Thank you.

11          MR. McLENNAN:  Your Honor, would I be able to just

12  address the statement of interest a little bit more.

13          THE COURT:  Sure.

14          MR. McLENNAN:  I think there is -- you know, where

15  this started out is after Your Honor denied that the government

16  put in the statement of interest, there was a series of, you

17  know, conspiracy theories about, well maybe Moderna offered

18  something or gave something in exchange for the statement of

19  interest.

20          THE COURT:  Where were these conspiracy theories

21  offered?

22          MR. McLENNAN:  In a brief before the second decision.

23  And so Your Honor said, we need discovery.  We've had

24  discovery.  Mr. Harber deposed a witness on it.  The business

25  people at Moderna confirmed there was nothing offered in

1  exchange for it.  We -- we've given them the discovery on this.

2  It wasn't something that Moderna solicited.  But to ask for

3  counsel's e-mails to collect Kirkland and Ellis' e-mails.  To

4  collect in house counsel's e-mails for the Department of

5  Justice is something that I think that as Your Honor recognizes

6  is clearly privileged and covered by common interest.

7          THE COURT:  Well I didn't say that.

8          MR. McLENNAN:  It's -- after the suit has been filed

9  neither of the parties required to log those communications, so

10 I just want to make it clear any suggestion we haven't provided

11 a log for something that we should have.  It's just not

12 correct.

13         THE COURT:  Okay.

14         MR. McLENNAN:  This is counsel's communications with

15 a party that we have an -- an interest with in defending a loss

16 of our patent infringement.

17         THE COURT:  I understand everyone's position on this.

18 I want to move on to the next topic.

19         MR. McLENNAN:  Okay.  Thank you, Your Honor.

20         THE COURT:  And just give me a moment to check my

21 notes here.  All right, I'll give whoever wants to speak from

22 Arbutus time to talk about the foreign sales issue.

23         MR. HARBER:  Thanks, Your Honor.  Hello again.  The

24  -- so, Your Honor, I won't belabor the history of this which

25 is we've been asking for this discovery for some time.  Your

1   Honor said serve an interrogatory attempting to narrow this.

2   If you have a basis to pursue further discovery, ask for the

3   document and come back to me if there's a dispute and that's

4   where we are.

5        The -- there are sort of two categories of

6   information we're requesting here.  One is for the pre June

7   2021 contract that Moderna has entered into.  It is clear that

8   -- we believe those are U.S. sales, but we at least have a

9   basis to take discovery and pursue the argument.  And there are

10  details about the later contracts that Moderna's interrogatory

11  response was too vague for us to understand.  And so we're

12  asking for those two things.

13       And I want to start with the pre June 2021 contracts.

14  The issue here -- I think to try to cut through everything,

15  Moderna's response to our brief reads as if we are arguing a

16  Rule 59 motion and we are not.  We are arguing a discovery

17  motion.  And the notion that there is not a basis for at least

18  us to pursue limited discovery that these are U.S. sales is

19  just groundless.  The contract -- this is from what Moderna --

20  either from testimony we've taken or from what Moderna said in

21  their interrogatory response.

22       The contracts were negotiated by Moderna entirely

23  from the United States, because they had no one abroad.  The

24  purchase orders were received and processed for these early

25  contracts in the United States.  The contracts were executed by

1  U.S. employees in the United States for Moderna.  There are in

2  many of these contracts what are called contingent actions.  In

3  other words, if Moderna for some of them that we've cited in

4  the brief -- if Moderna doesn't get U.S. FDA approval then the

5  purchaser can back out of the contract.  Those under the case

6  law, that's called a contingent action that is based on a U.S.

7  event.

8        There are specific orders that were negotiated from

9  the United States.  Because for the time period we're talking

10  about, Moderna had no employees abroad.  The marketing

11  activities all occurred from the United States during the early

12  time period, because Moderna had no one abroad.  And all of the

13  design and clinical testing work for the products was done in

14  the United States, not abroad.

15        The notion that having shown all that based on the

16  limited discovery we have that we shouldn't be permitted to get

17  the contract, get the financial information and get any

18  technical or sample information on these contracts is baseless.

19  And I would turn -- you know the argument here is really

20  dispatched very well in a -- in the case that Moderna relied on

21  the last time we were before Your Honor on this.  This is their

22  cited case.

23        Magistrate Judge Burke says, "The question is not

24  whether defendant has some facts on its side that it can later

25  use to argue the ultimate issue, nor is the question here

1   whether plaintiff can now definitely prove that these sales are

2   U.S. based sales.  The question rather is whether plaintiff has

3   made a sufficient record to demonstrate relevance."  And, Your

4   Honor, there's no question that we have on this.  These are --

5              THE COURT:  Okay.  Go ahead.

6          MR. HARBER:  We again, we tried to be targeted.

7   We've said in our motion the discovery we're seeking we've

8   tried to negotiate with Moderna if there's some scope of that

9   they flatly refused.  They've made a big deal out of, well we

10  can't give you all the negotiation documents so stipulate the

11  negotiations were in the United States and we don't have to

12  take that discovery.  But if they're going to contest that then

13  we should get to take discovery on it.

14         The -- Moderna's responses -- the one thing that I

15  would say in addition to they tried to mischaracterize the law

16  again.  The mischaracterized arguments that we've made in our

17  motion or what the factors are.  One example is -- well the

18  factor in the federal circuit's case law is where the purchase

19  orders were received and Moderna's motion says well they were

20  sent from abroad.  That's not the test.  By definition they

21  were sent from abroad, because you're always --

22         THE COURT:  I'll figure out what the -- I'm familiar

23  with the Halo factor, sir.  I'll figure it out.

24         MR. HARBER:  The last point I want to address, just

25  briefly is, Moderna has now made the argument that, well we

1  have indemnity obligations to these foreign governments and it

2  may -- this may result in there being a bunch of foreign

3  governments who are entering appearances in the case.  And as I

4  said , Your Honor, that's complete red herring.

5          Moderna has been on notice of our position for quite

6  some time.  In the infringement allegations we've already made

7  there are batches that were manufactured in the U.S. and

8  provide to these governments that we've accused and there are

9  batches where components were made in the U.S. and exported

10  abroad.

11          Moderna has never said they -- none of those third

12  parties have come into the case and tried to assert themselves

13  or defend the case.  So the notion that all of a sudden Moderna

14  is now going to do it, I think it would be untimely under Rule

15  14, but it is not a realistic thing that we're dealing with

16  here.

17          THE COURT:  Okay.  Who is going to respond?  Jagger,

18  could you come here for a second.  Good afternoon.

19          MR. EGAN:  Good afternoon, Your Honor.

20          THE COURT:  Remind me your name.

21          MR. EGAN:  Brian Egan.

22          THE COURT:  Okay, Mr. Egan, response?

23          MR. EGAN:  Yes, Your Honor.  I want to start by

24  taking issue with this assertion that Moderna is flatly

25  refusing discovery.  Your Honor, we discussed this issue at

1  length at the February 22nd hearing.

2          THE COURT:  The extent to which you didn't or did

3  compromise or what he offered.  I'm not going to make my

4  decision based on that.

5          MR. EGAN:  Yeah and I --

6          THE COURT:  So move on to a substantive one.

7          MR. EGAN:  Yeah, I'm not going to offer what --

8          THE COURT:  Yeah.

9          MR. EGAN:  -- you know, discuss what compromised

10  positions were.

11          THE COURT:  It's impossible for a judge to figure out

12  who's -- you know, unless I had, you know, three days to do and

13  I could depose all of you and so what's you're substantive for

14  me?

15          MR. EGAN:  Understood, Your Honor.  In addition to

16  the lengthy interrogatory response that we provided, which we

17  think the interrogatory questions went well beyond just

18  threshold issues related to Halo.  They effectively asked for

19  everything under the sun related to foreign sales and foreign

20  distribution.  We provided  reasonable response.  We did an

21  extensive inquiry.  We started by providing them an Excel

22  spreadsheet with every --  an identification of every contract

23  dealing with OUS sales and distribution.

24          Everyone of those contract is not with a Moderna U.S.

25  entity.  It's with primarily with Moderna Switzerland.  There's

1  also some agreements with Moderna Singapore and other Moderna

2  entities.   But what you'll find in <u>Halo</u> and all the other

3  federal circuit decisions is that the inquiries, where was the

4  contract ultimately consummated.  It's consummated by foreign

5  entities of Moderna.  All of the sales.  All of the

6  distributions were done abroad.

7          And what they keep trying to point out to Your Honor

8  and what they keep trying to rely on is everything that lead up

9  to the contract and that's what <u>Halo</u> tells you is not enough to

10 establish a sale under 271(a) and so this is really a

11 quintessential situation where, you know, you give plaintiffs

12 an inch and they're trying to take a mile.

13         THE COURT:  Excuse me one second.  Hey, Jagger.

14 Okay.

15         MR. EGAN:  Okay.  In addition to not only providing

16 them with an identification of every agreement of OUS sales.

17 Earlier this week -- it's not cited as an exhibit because it

18 was produced after the briefing, but I can provide Your Honor a

19 copy.  We spent three months and I don't think anybody is going

20 to have a magnifying glass to go through all these pages.

21         But what we've shown in -- and for the record it's

22 mRNA Gen Document 2658257 -- we've provided them an

23 identification of every sale abroad, tied it to the OUS

24 contracts and show that all of those were manufactured outside

25 the United States, stored outside the United States and

1   distributed outside the United States.

2         None of those materials made their way back into the

3   United States and so where we're at in this argument is them

4   perpetually harping on well there was a person in the United

5   States that was involved in the contract negotiations.  Or

6   there was a person in the United States that signed the

7   agreements.  Well the agreements were signed on behalf of

8   Moderna Switzerland or on behalf of the other Moderna foreign

9   entities.  They weren't signed on behalf of Modern U.S. or

10  Moderna Texas.

11        And so all they have is this information that <u>Halo</u>

12  and other federal circuit precedent tells you is not enough to

13  even meet the threshold for 271(a) for sale infringement.  And

14  the fact that we've gone to the lengths that we already have to

15  effectively prove the negative.  We believe we've gone above

16  and beyond what Your Honor even required based on your order on

17  February 27th, where at the close of fact discovery.  And the

18  fact that they say that, you know, issues like the

19  indemnification provisions or red herring.  It's absolutely not

20  a red herring.

21        We have even in the agreements that are attached to

22  exhibits to their motion, it's Exhibit 7 through 11.  You'll

23  find provisions number one, that we have to step through a

24  procedure with each foreign government to even disclose these

25  agreements.  And second, there's full recited indemnification

1   provisions with each of these foreign governments.  And what

2   that means is that, if plaintiffs are going to sweep these

3   allegations into the case now with the close of fact discovery,

4   we have to deal with those provisions and whether or not those

5   foreign governments are going to step in and basically take a

6   position in this case based on those indemnifications

7   provisions.

8           And so, you know, we certainly take issue with any of

9   that being a red herring.  It's basically blowing open

10  discovery after fact discovery already closed.  It's going to

11  take months to work through all those provisions and simply

12  it's too late at this time to reopen discovery on these issues.

13          THE COURT:  Where is Moderna, Incorporated, Delaware?

14          MR. EGAN:  Yes, sir.

15          THE COURT:  Okay.  And -- I was just curious.

16          MR. EGAN:  Moderna U.S.

17          THE COURT:  Yeah, okay.  All right, thank you.  And I

18  think there's one other -- who is addressing Moderna's request

19  for more information, which I think pertains to lobbying

20  materials for Arbutus.

21          MR. McLENNAN:  I am, Your Honor.  Mark McLennan.

22          THE COURT:   All right, let me just review my notes

23  for a second.

24          MR. McLENNAN:  Sure.

25          THE COURT:  All right, I think your request pertains

1  to lobbying materials -- I think that's a term you used -- with

2  Congress on the part of Arbutus and Roivant.  You probably have

3  to remind me how Roivant fits.

4           MR. McLENNAN:  So --

5           THE COURT:  And then -- you know, I would just

6  observe -- I mean -- lobbying material -- lobbying -- if I

7  asked you to define lobbying it would -- go ahead define.

8  What's lobbying?  What is it?

9           MR. McLENNAN:  Lobbying, pressing members of Congress

10  to advocate for certain legislative action to be taken.

11          THE COURT:  Yeah, good -- good definition.  Okay.  So

12  how would that be relevant in a patent case.

13          MR. McLENNAN:  So, Your Honor, both sides have

14  actually agreed to produce documents about lobbying.  I think

15  the only hold up is plaintiffs aren't willing to provide their

16  lobbying materials until Moderna produces its --

17          THE COURT:  How would that be relevant to a patent

18  case?

19          MR. McLENNAN:  In this particular case, one of the --

20  I don't want to go into plaintiffs' confidential information,

21  but one of the exhibits to our motion shows that the way

22  plaintiffs have use lobbying is as a licensing tactic.  I don't

23  know, I probably shouldn't go into further detail about that

24  without revealing anything, but essentially that's what we've

25  raised in our motion is that it's relevant to damages, because

1  both parties --

2          THE COURT:  How does -- so based on your definition

3  -- I'm having a disconnect.  Because your definition, which I

4  thought was really good.  I probably be able to repeat it back

5  as well as you said it, but it's persuading a member of

6  Congress regarding a pertinent piece of legislation that is of

7  interest to the client of the lobbyist.  How does that fit with

8  licensing which -- you know, when you say licensing then I

9  start to tune in a go, okay now we're talking about a patent

10  case.

11          MR. McLENNAN:  Yeah.

12          THE COURT:  So there -- explain that to me.  There's

13  lobbyist that go to members of Congress and advocate about

14  legislation regarding licensing?

15          MR. McLENNAN:  Would we be able to do a sidebar?  Is

16  that possible?  I just don't step into plaintiffs' confidential

17  information.  Is that possible or I could just confer quickly

18  to see if he's have an objection with --

19          THE COURT:  Yeah, why don't you confer.

20          MR. McLENNAN:  So just to keep it high level again,

21  just as attached to our brief --

22          THE COURT:  Sure.

23          MR. McLENNAN:  -- but what we've attached is over a

24  number year plaintiffs have used either PR campaigns or

25  lobbying activities in part to sway public opinion to be able

1  to bring Moderna to the negotiation table to obtain all of

2  there patent license to plaintiffs' technology.

3       THE COURT:  No, I thought your definition was to sway

4  members of Congress as it relates to legislation.

5       MR. McLENNAN:  It was, Your Honor.  So with 1498 in

6  particular with -- you know, there's been deposition testimony

7  about some efforts that are taking place.  There's been a lot

8  of recent public articles that plaintiff is relying on now by

9  members of Congress.  Putting out articles about Moderna and,

10  you know, why 1498 should apply.  Things like that.  The more

11  challenging they can make it for Moderna in court of public or

12  about, you know, application of 1498, that is a tough licensing

13  tactic in other words.

14       THE COURT:  I was with up until the -- well I

15  understood what you were saying up until that last part.  I'm

16  still unclear how any of that becomes relevant in a patent

17  trial, but we need to make some tough regarding licensing.

18       MR. McLENNAN:  So if the, you know, if the I guess

19  litigation becomes more challenging or if there's public

20  pressure in terms of like media articles, things like that.

21  That may bring Moderna to the negotiating table and these are

22  words from some -- I mean I don't want to quote from

23  plaintiffs' documents, but this is some of the information

24  that's come out.

25       THE COURT:  It's fascinating.  So you think or you

1  have information and you all agree to exchange this

2  information.  Lobbyist are hired by pharma companies to go to

3  influential legislators to disparage competitors and that makes

4  it harder to get licenses.

5          MR. McLENNAN:  Essentially and --

6          THE COURT:  This happens?  Go ahead.

7          MR. McLENNAN:  -- and, Your Honor, both parties have

8  agreed to give that category of lobbying documents.  Both

9  parties agreed.

10          THE COURT:  Yeah.

11          MR. McLENNAN:  We just haven't got plaintiffs yet,

12  because --

13          THE COURT:  I know.  I know.  Say that both parties

14  agree though.

15          MR. McLENNAN:  Yeah.

16          THE COURT:  I want to understand -- what I'm trying

17  to do, maybe unsuccessfully is just understand how all of this

18  fits into a patent trial where there's three issues.

19  Infringement, invalidity and damages and -- I just don't under

20  -- you -- you're all smarter than me in this area so -- or you

21  know a lot more about than I do.  I just don't understand how

22  disparaging to legislatures has any relevance to the trial

23  we're going to have.

24          MR. McLENNAN:  So, Your Honor --

25          THE COURT:  Whether you agreed or not.

1                MR. McLENNAN:  You mentioned damages.  So part of the

2    damages analysis is there -- if Moderna is found liable,,

3    there's a hypothetical negotiation between Moderna and

4    plaintiffs.  What you heard from plaintiffs earlier this

5    morning, well we need to delve into Moderna's discussions with

6    plaintiffs ten, 12 years ago, because that might be relevant to

7    how this hypothetical negotiation would go down.

8                THE COURT:  Okay.

9                MR. McLENNAN:  Discussion between plaintiffs and

10   Moderna.  If somehow these other activities like PR campaigns

11   are part of the licensing tactics during potential licensing

12   negotiations --

13               THE COURT:  Yeah.

14               MR. McLENNAN:  -- between the parties.  These are

15   actual things that have happened.  That is also relevant to the

16   hypothetical negotiation, because it's facts about how that

17   negotiation would take place.

18               THE COURT:  And how are you going to prove that.  So

19   let's say you have an article that was generated through

20   lobbying efforts that completely disparages your client.  How

21   is that introduces at trial?

22               MR. McLENNAN:  Seeing position -- so --

23               THE COURT:  An expert?

24               MR. McLENNAN:  Possibly and expert.  Maybe fact --

25               THE COURT:  And is this is what I relied on?

1          MR. McLENNAN:  -- fact witness testimony too.

2    Essentially in those communications too, we're expecting there

3    are going to be statements about plaintiffs technology too.

4          THE COURT:  Mm-mm.

5          MR. McLENNAN:  And why, you know, they think Moderna

6    stole it.  Why it's valuable.  Everything like that.  One of

7    the factors is valuable technology.

8          THE COURT:  I'm happy to show my ignorance.  And is

9    there any lawyer in this room who has been part of a trial

10   where a article generated by a lobbyist has been introduced

11   regarding damages?  Raise your hand.

12                    (No audible response)

13         THE COURT:  Okay.  It just seems so attenuated to me,

14   but anyway.  I'm trying just to understand, you know, what

15   happens.  So thank you.  That's informative.  And you want

16   getting -- I'm trying to refocus myself in my thinking here.

17   You want what from them that you haven't received.

18         MR. McLENNAN:  So with both parties -- at the hearing

19   a couple months ago we had a discussion with Your Honor by

20   phone.  We spoke about this category.  You said go and work out

21   search terms.  The parameters of lobbying.

22         THE COURT:  I understand.

23         MR. McLENNAN:  Sorry?

24         THE COURT:  I understand.

25         MR. McLENNAN:  Oh no, no, no, sorry.  You said go

1   back and discuss search terms and, you know, the categories of

2   lobbying discovery that we provided.

3          THE COURT:  Okay.

4          MR. McLENNAN:  So we went back and did that.  We've

5   reached agreement.

6          THE COURT:  Mm-mm.

7          MR. McLENNAN:  The hold is plaintiffs have said, well

8   we're not going to give you our lobbying materials until you

9   give us, not lobbying, but communications about application of

10  1498.  So not even lobbying, so it would encompass the same

11  communication we heard about earlier say for example if there

12  were communications between Moderna's outside counsel and the

13  Department of Justice about 1498.  We have to hand over all of

14  those privilege communications --

15         THE COURT:  Mm-mm.

16         MR. McLENNAN:  In order to get this separate category

17  of lobbying materials that both parties have agreed to what

18  we've termed reciprocal information.  That's essentially where

19  we're at.

20         THE COURT:  Okay.  Understood.  I mean maybe the

21  lawyers have got to rethink their mutual agreement and to say

22  whether it's really worth fighting over and whether it's really

23  going to matter in the ultimate outcome of this case, which is

24  again infringement in validity and damages.  Who is going to

25  responds for Arbutus?  Thank you.

1          MR. HARBER:  Thank you, Your Honor.  A couple of

2   points.  One is I want to start by addressing what I think is a

3   complete misrepresentation of the facts and what the documents

4   show about what lobbying Arbutus or plaintiffs were doing.  The

5   exhibit that's attached to the discovery letter by Moderna is a

6   proposal that was sent years ago to Arbutus about a quote,

7   unquote, "pressure campaign" as they call it.  No one ever

8   retained that firm.  No one ever did anything there.  Moderna

9   took the testimony from a 30(b)(6) testimony from a witness

10  from Arbutus who confirmed that.

11         THE COURT:  What's a pressure campaign?

12         MR. HARBER:  I don't even know.  It's a -- Moderna

13  has raised this and introduced this term.  It's not -- that's

14  not what -- no one was engaged in that in the exhibit Moderna

15  put in there.  Now what we're discussing here are on the one

16  hand, what Moderna wants is any efforts to raise public

17  awareness of 1498 after the complaint was filed.  So this is

18  not at a time -- it doesn't effect the hypothetical

19  negotiation.  It's all later.  It's all after the lawsuit.  And

20  they've set out a bunch of arguments, both in their argument

21  here and in their brief about why think that's relevant.

22         They think it's relevant to -- it undercuts our

23  position about that there was some influence by Moderna on the

24  government.  That's the same quote that I raised before.  What

25  they won't agree to produce and what is actually relevant here

1   and is not attenuated is what are the conversations they were

2   having with the government about 1498 and a statement of

3   interest.

4           THE COURT:  Yeah, we covered it.  We had a long -- we

5   just had a long conversation on it.

6           MR. HARBER:  But this is about documents.  That was

7   about the testimony and the -- and I would say the -- one of

8   the last things that counsel said there was it would implicated

9   Kirkland's e-mail with the government.  Your Honor, what

10  Moderna is asking to do is stand and either before Your Honor

11  -- and I understand and I take your point that you won't be

12  swayed by it.

13          But potentially in front of the jury and say here's

14  this statement of interest that the government filed and you

15  should believe what the government is saying in this and you

16  should decided this government according to what the government

17  said and they've admitted that their own lawyers --

18          THE COURT:  If they said that in their opening let's

19  say.  What would you do?

20          MR. HARBER:  We would say --

21          THE COURT:  You'd say what?  Objection.  And I would

22  say sustained.

23          MR. HARBER:  If Your Honor's ruling is that the can't

24  use --

25          THE COURT:  No it's not my ruling.

1          MR. HARBER:  -- a statement of interest then, but --

2          THE COURT:  It's not my ruling.  I'm saying I think

3    that you folks are worried -- it sort of a little bit spinning

4    out of control.  Your discovery request for lobbying materials

5    and we want discovery to prevent that from doing something that

6    everyone in the room who's -- who you've taken a trial class

7    101 in law schools knows would never be admissible.

8          MR. HARBER:  It's not hypothetical because they've

9    already relied -- they've already briefed to Your Honor the

10   statement of interest and they've admitted in court today that

11   their own lawyers were communicating with the government about

12   it.  That's -- respectfully they can say like -- if they want

13   to give us the communications and then they can say later --

14   that's in a trial admissibility decision.  They can say that's

15   not relevant for whatever reason and Your Honor will rule at

16   the time.  But to say we can't have the discovery about --

17         THE COURT:  You know I'm gonna sort of disagree with

18   I think with you on, I think you're saying, we get to look at

19   everything and the admissibility at trial is, you know, a whole

20   different kettle of fish.  You know I can't manage this case

21   like that, because it's enormous.  So it has to be some

22   connection to what's actually going to be in the trial.

23         MR. HARBER:  And if Your Honor is saying they can't

24   rely on the statement of interest --

25         THE COURT:  I'm not saying anything.

1            MR. HARBER:  -- but if that's going to be --

2            THE COURT:  You'll know what I'm saying when see my

3  work.

4            MR. HARBER:  Understood.

5            THE COURT:  Okay.

6            MR. HARBER:  And the last point I would just address

7  is this common interest point that --

8            THE COURT:  Mm-mm.

9            MR. HARBER:  -- again it -- there is no common

10 interest.  Moderna has made zero -- zero attempt to defend --

11 they haven't cited a single case.  They haven't cited a common

12 interest agreement.  They haven't cited a declaration from

13 anyone.  There is -- it's their burden to establish that by

14 discussing this with the third party of the government that

15 they haven't waived any attorney/client privilege over that.

16 They have done nothing, zero to establish that and so that --

17 that is -- we're at the end of fact discovery and it's too late

18 for them to that now.

19            THE COURT:  Okay.  Jen you want to talk about

20 something?  Thank you.

21            MR. HARBER:  Thank you.

22            THE COURT:  You good?

23            COURT CLERK:  Mm-mm.

24            THE COURT:  Okay, I think that's the last issue.

25 This has been a very helpful discussion.  Good to see

1  everybody.  All this is held under advisement and we'll try to

2  turn this around as quick as possible.  Is there something else

3  you want to talk about?

4          MR. MAHAFFY:  So --

5          THE COURT:  Yeah, go ahead.

6          MR. MAHAFFY:  So, Your Honor, there was an issue that

7  came up at a deposition just two days ago that related directly

8  to infringement.

9          THE COURT:  Okay.

10          MR. MAHAFFY:  Infringement reports are due and --

11          THE COURT:  You want me to weigh in on this now?

12          MR. MAHAFFY:  Well, it's sort of time sensitive given

13  that infringement reports are --

14          THE COURT:  Who is the deponent?  Who is being

15  deposed?

16          MR. MAHAFFY:  So it's Dr. Lee, an analytical chemist.

17          THE COURT:  You're going to have to give me

18  background on that.

19          MR. MAHAFFY:  What?

20          THE COURT:  Background.

21          MR. MAHAFFY:  So Dr. -- so it's about --it's about a

22  deposition for Dr. Lee --

23          THE COURT:  Yeah.

24          MR. MAHAFFY:  -- who is one of Moderna's --

25          THE COURT:  And I'm asking who is he and where does

1 | he fit.

2 |       MR. MAHAFFY:  It's one of Moderna's analytical -- can

3 | I give you some background on the --

4 |       THE COURT:  Yeah, that's what I'm asking you to do.

5 |       MR. MAHAFFY:  Okay, thank you.  I will say this.  You

6 | know to the extent that I don't think this implicates any

7 | highly confidential information but -- so I'll try to keep it

8 | at a high level --

9 |       THE COURT:  Okay.

10 |       MR. MAHAFFY:  -- but if Moderna feels differently.

11 | So just to provide your -- a little bit of context for Your

12 | Honor and you may remember this.  Plaintiffs have requested

13 | certificates of analysis in this case, because they report the

14 | lipid content of the nano particles in Moderna's vaccine.  And

15 | Moderna has agreed to give these certificates of analysis for

16 | all of it's batches, including the batches that it has analyzed

17 | as well as the batches that third party contractor

18 | manufacturers have analyzed.

19 |       We've also requested the raw data underlying the

20 | those certificates of analysis, because they are more precise

21 | than the certificates of analysis in themselves.  They have

22 | more significant digits as we've talked about before.  And

23 | Moderna has said that they'll produce the raw data for their

24 | own certificates of analysis, but they're not going to produce

25 | the raw data for those third party contract manufacturers.

1          And that was a -- that was a few months ago that they

2   told us that and what they explained was that, they went to

3   those third party contract manufacturers and it turned out that

4   it was very difficult to collect those data.  And they argued

5   to us that it wasn't proportional to make that collection,

6   because they had already given us these certificates of

7   analysis.

8          THE COURT:  Who create the raw date for the third

9   parties?

10          MR. MAHAFFY:  Our understanding is that the third

11   parties created that data.

12          THE COURT:  Okay so --

13          MR. MAHAFFY:  And they --

14          THE COURT:  -- can you -- I'm probably out ahead and

15   I should let you continue, but can't you just subpoena that

16   information?

17          MR. MAHAFFY:  Well -- so our understanding is that,

18   you know, this is -- Moderna -- these are Moderna's contract

19   research organizations.  They've already produced their --

20   they've already produced their certificates of analysis for

21   example and Moderna clearly is in communication with those

22   third parties about the data.  And so --

23          THE COURT:  Can you subpoena those third parties?

24          MR. MAHAFFY:  I mean it is probably too late in this

25   case to --

1          THE COURT:  Well not if I allow you to do it.  But go

2     ahead.

3          MR. MAHAFFY:  So perhaps that's a possibility.  So

4     the issue -- so Moderna has always relied on those certificates

5     of analysis and they've always pointed frankly to Your Honor to

6     those certificates of analysis and to us about their importance

7     to the infringement analysis in this case.

8          At the deposition two days ago with Moderna's sort of

9     -- one of their top analytical chemist that oversees the

10    testing of the vaccine.  She testified that she thought that it

11    would be unreliable to use those certificates of analysis to

12    calculate what the molar ratios, because of the very few

13    significant digits.  And so -- and this obviously is a concern

14    for us.  This is the first time that we've ever heard anyone

15    from Moderna say that those certificate of analysis which are

16    submitted to the FDA.  Which Moderna has relied on to Your

17    Honor as well as to us that they might be unreliable in some

18    way.

19         And so we've reached out to Moderna and we basically

20    said, you know, either tell us that you're not going to --

21    you're not going to, you know, cast dispersions on you own

22    certificates of analysis or you need to give us the raw data --

23    you need to give use the raw data from these third party

24    contract manufacturers.  They shouldn't have it both ways.  If

25    they're going to say that the certificates of analysis are

1    unreliable they should have to produce the actual raw data.

2            THE COURT:  Could we go back to something you said a

3    second ago, which is --

4            MR. MAHAFFY:  Yeah.

5            THE COURT:  I'm a little bit lost on, in what

6    scenario at trial Moderna would say, our certificates of

7    analysis which we use -- I guess what is that, like a quality

8    control thing?

9            MR. MAHAFFY:  Yes, exactly.  So we --

10           THE COURT:  Are unreliable.  That sound counter

11   intuitive to me.

12           MR. MAHAFFY:  We didn't think that they would ever

13   make this argument until two days ago.

14           THE COURT:  Well just because he said doesn't mean

15   they're going to make it.

16           MR. MAHAFFY:  And so that's what we asked Moderna.

17   We've said -- so we went to Moderna and we said, please just

18   tell us that you're not going to make this argument and we'll

19   be okay and they refused to give us that confirmation.

20           THE COURT:  So what is it you want?

21           MR. MAHAFFY:  So we either want them to say that

22   they're not going to make this argument about the certificates

23   of analysis being unreliable or they have to go back and they

24   have to do this I guess burdensome exercise to collect the

25   actual raw data --

1          THE COURT:  Mm-mm.

2          MR. MAHAFFY:  -- which presumably they may think is

3    more reliable.

4          THE COURT:  Okay, who is going to respond.

5          MR. McLENNAN:  Your Honor, Mark McLennan, so what Mr.

6    Mahaffy mentioned was we did let them know this three months

7    ago.  We didn't hear back.  They never said can you try harder

8    to get this information from the third parties.

9          THE COURT:  What did you let him know?  I'm sorry.

10         MR. McLENNAN:  Sorry?

11         THE COURT:  What did you let him know?

12         MR. McLENNAN:  We let him know -- you know we had

13   been trying with these third parties to collect the data as a

14   courtesy because it's outside of our possession, custody and

15   control.

16         THE COURT:  Right.

17         MR. McLENNAN:  They eventually said it's just not

18   possible.  We can't do it.  We let them know up front.  We said

19   they just won't give it to us.

20         THE COURT:  How many third parties are we talking

21   about?

22         MR. McLENNAN:  Estimating about four -- four.

23         THE COURT:  Go ahead.

24         MR. McLENNAN:  Then didn't hear anything.  Our

25   witness is deposed.  Dr. Lee, she's a regulatory person, the

1  rule followers she's asked over and over again about, you know,

2  do you do this type of calculation as a regulatory person.

3  She's talking about -- she was designated to talk about the

4  procedures that Moderna has in written procedures.  She's

5  saying we don't do that -- we don't do that.  It's not in the

6  procedure.  They just kept badgering her to answer it and then

7  she said, we just don't do that.

8           Now we get these e-mails saying, you can't say this

9  at trial, your experts can't do this, whatever else.

10          THE COURT:  What did she say that -- did she say that

11 it was unreliable?

12          MR. McLENNAN:  She said -- so after she said there's

13 no procedure for it, she said she wouldn't do it.  So they have

14 one witness saying that and they're trying to limit positions

15 that we can take a trial of what our experts will say about

16 these things when they've had access to this information for

17 months.  They've never said anything.  It's not like we've

18 withheld any information, we've ambushed them.  They've had

19 equal access to this information the whole time since we've

20 produced it.

21          THE COURT:  What's your last name again.  I'm sorry?

22          MR. MAHAFFY:  Mahaffy.

23          THE COURT:  Mahaffy.

24          MR. MAHAFFY:  Yeah.

25          THE COURT:  How does obtaining the four certificates

1  -- I'm very reluctant as you've seen to make rulings about what

2  people can do at trial a year before trial starts.  I think

3  that's unwise.  So your fallback position is, well discovery is

4  closed, let us get these certificate -- let us the raw data of

5  these certificates that they tried -- forced them to get these

6  for third parties they contract with to get us the raw data.

7  Is that what you want?

8          MR. MAHAFFY:  I mean, we -- if they're not going to

9  represent that they won't make this argument then we want the

10  raw data.

11          THE COURT:  Well I don't want to -- every time I've

12  made a ruling about what can happen at trial a year before the

13  trial, I've regretted it.  I'm not doing it.  So what's your

14  Plan B?

15          MR. MAHAFFY:  Plan B is that they clearly -- these

16  are their contract manufacturers.

17          THE COURT:  Right.

18          MR. MAHAFFY:  They hired them to make the vaccine.

19  They do the testing at their direction.

20          THE COURT:  Mr. McLennan said he's given it a good

21  faith effort, so what's your Plan C?

22          MR. MAHAFFY:  I think that they would need to do this

23  more burdensome collection from the third parties.

24          THE COURT:  How about if I authorize you to subpoena

25  these four people -- these four entities and get the raw data.

1          MR. MAHAFFY:  I would take that as a backup.  I think

2   it would frankly be much easier for Moderna to do that and

3   they're clearly in communication with these people.  They work

4   with them all the time.

5          THE COURT:  Well he's a standup guy.  He's told me

6   he's given it a good faith and that he's banging his head

7   against the wall.  That's what he told me, so.  I'll take him

8   at his word.  I'm going to allow you to issue a subpoenas

9   outside of -- I guess the discovery -- fact discovery is

10  closed.  So you know who the four are?  You know what you're

11  going to ask for?  Do I have to oversee that?  You can issue

12  subpoenas.  I'm going to authorize that.  Tell Ms. Hart, we'll

13  put this in our comprehensive order who the entities are and

14  exactly what you want, okay?

15         MR. MAHAFFY:  Okay.  I don't have those entities at

16  my fingertips.

17         THE COURT:  You can call her.

18         MR. MAHAFFY:  Okay.  We'll --

19         THE COURT:  Yeah.

20         MR. MAHAFFY:  Okay

21         THE COURT:  Okay.

22         MR. MAHAFFY:  Sounds good, Judge.

23         THE COURT:  All right.

24         MR. MAHAFFY:  Okay.

25         MR. McLENNAN:  Your Honor, could I just make one

1  other issue --

2          THE COURT:  Sure.

3          MR. McLENNAN:  -- to do with privilege log.

4          THE COURT:  Yes.

5          MR. McLENNAN:  So we've reached agreement we believe

6  so plaintiffs' logs had about 37,000 e-mails and documents on

7  them.  We had an issue where common interest --

8          THE COURT:  Wait the 37,000 was not a -- that's not a

9  number of identified documents.  That's a number of privilege

10 objections withheld documents, 37,000.

11         MR. McLENNAN:  So it could include -- I think it

12 could more than if it's family members, but that's number of

13 entries and we had an issue that we weren't able to figure out

14 who was a third party on that.

15         THE COURT:  Mm-mm.

16         MR. McLENNAN:  Because they've agreed to supplement

17 their log.

18         THE COURT:  Okay.

19         MR. McLENNAN:  But we just wanted to inform that

20 Court incase, you know, there's any over discovery necessitated

21 from that, but we've reached agreement so we're hoping --

22         THE COURT:  Okay great.

23         MR. McLENNAN:  -- it doesn't have to back to with

24 Your Honor.

25         THE COURT:  I thought you were going to tell me I had

78

1  to -- I had to look at all these documents on 37,000 privilege

2  objections and then look at all at it in camera and figure it

3  out.  You weren't going to say that, right?

4          MR. McLENNAN:  No.  No, Your Honor.  Thank you.

5          THE COURT:  Okay, so you're just -- that's by way of

6  a heads up.  I'm kidding.

7          MR. McLENNAN:  Correct, Your Honor.  Thank you.

8          THE COURT:  Understood.  Okay.  Nice to see everyone.

9  We'll turn this around as quickly as possible.  Thank you.

10          MS. CARSON:  Thank you, Your Honor.

11          MR. MAHAFFY:  Thank you, Your Honor.

12                        *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

## **C E R T I F I C A T I O N**

       I, SUE DiPIERRO, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Sue DiPierro
SUE DiPIERRO

J&J COURT TRANSCRIBERS, INC.       DATE:  June 17, 2024