UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


                                    .
ARBUTUS BIOPHARMA.                  .
CORPORATION, et al,                 .Case No. 1:22-cv-00252-MSG
                                    .
              Plaintiffs,   .
                                    .
          vs.               . Courtroom 17-A
                            . 601 Market Street
MODERNA, INC., et al,       . Philadelphia, Pennsylvania 19106
                            .
          Defendants.       .
. . . . . . . . . . . . . . . Wednesday, May 7, 2025

              TRANSCRIPT OF STATUS CONFERENCE
        BEFORE THE HONORABLE MITCHELL S. GOLDBERG
         UNITED STATES DISTRICT COURT CHIEF JUDGE


APPEARANCES:

For the Plaintiffs:         Nathan Roger Hoeschen, Esq.
                            SHAW KELLER, LLP
                            1105 North Market Street
                            12th Floor
                            Wilmington, Delaware 19801

                            David I. Berl, Esq.
                            Adam D. Harber, Esq.
                            Shaun P. Mahaffy, Esq.
                            Matthew W. Lachman, Esq.
                            WILLIAMS & CONNOLLY, LLP
                            680 Maine Avenue SW
                            Washington, D.C. 20024


        (Appearances Continued)

        Audio Operator:             Electronically Recorded
                                    by Nelson Malave, Deputy Clerk/ESR

        Transcription Company:      RedDoor Legal Services, LLC
                                    44 Valley Forge Road
                                    Bordentown, N.J. 08505
                                    (973)985-3668
                                    www.reddoorlegalservices.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:  (Continued)

For the Plaintiffs:         Adam R. Brausa, Esq.
                            MORRISON & FOERSTER, LLP
                            425 Market Street
                            San Francisco, California 94105

For the Defendants:         Brian P. Egan, Esq.
                            Travis J. Murray, Esq.
                            MORRIS, NICHOLS, ARSHT
                             & TUNNELL, LLP
                            1201 North Market Street
                            16th Floor
                            Wilmington, Delaware 19899

                            Marc C. McLennan, Esq.
                            Patricia A. Carson, Esq.
                            Mara L. Greenberg, Esq.
                            Leslie M. Schmidt, Esq.
                            KIRKLAND & ELLIS, LLP
                            601 Lexington Avenue
                            New York, New York 10022

                            Yan-Xin Li, Esq.
                            KIRKLAND & ELLIS, LLP
                            555 California Street, 27th Floor
                            San Francisco, California 94104

Also Appearing:             Peter Zorn
                            Lindsay Androski
                            GENEVANT SCIENCES GMBGH

                            Kelli Powell
                            MODERNA, INC.

INDEX

                                                                    Page

MOTION TO COMPEL DISCOVERY RE:  EXPERT SCHUBERT          6

CONFERENCE RE:  DAUBERT MOTIONS, CLAIMS NARROWING       27
AND SUMMARY JUDGMENT MOTION PRACTICE

```
1          (Proceedings commence at 10:00 a.m.)

2          (Call to order of the Court)

3               THE COURT:  Good morning.  Have a seat, please.

4          (Participants confer)

5               THE COURT:  All right.  Good morning.  This is the

6     matter of Arbutus v. Moderna.  We're here to discuss the next

7     phase of the litigation.

8               And why don't we get counsel identified first.  We

9     can start with Arbutus.

10         (Court and court personnel confer)

11              THE COURT:  Go ahead.

12              MR. HOESCHEN:  Good morning, Your Honor.  Nathan

13    Hoeschen from Shaw Keller on behalf of the plaintiffs.

14              With me from Williams & Connolly on behalf of

15    Genevant, I have David Berl, Adam Harber --

16              MR. HARBER:  Hello, Your Honor.

17              MR. HOESCHEN:  -- Shaun Mahaffy, and Matthew

18    Lachman.  And then on behalf of Arbutus, from MoFo, we have

19    Adam Brausa, and also in the gallery from Genevant, we have

20    President and Chief Legal Officer Pete Zorn and special

21    counsel Lindsay Androski.

22              THE COURT:  Okay.  Who's going to be speaking for

23    your side?

24              MR. HOESCHEN:  Mr. Berl will be handling most of

25    it, Your Honor.
```

```
 1              THE COURT:  Mr. Berl, okay.  And who is Mr. Berl?

 2              MR. BERL:  That's me.

 3              THE COURT:  All right.  Good morning, Mr. Berl.

 4              MR. BERL:  Good morning.

 5              THE COURT:  And for Moderna.

 6              MR. EGAN:  Good morning, Your Honor.

 7              THE COURT:  Good morning.

 8              MR. EGAN:  Brian Egan from Morris Nichols --

 9              THE COURT:  Egan did you say?

10              MR. EGAN:  Yes, on behalf of the Moderna

11     Defendants.  Joining me at counsel table from Kirkland &

12     Ellis are Pat Carson --

13              DR. CARSON:  Good morning, Your Honor.

14              MR. EGAN:  -- Mark McLennan --

15              THE COURT:  You can stay seated.

16              MR. EGAN:  -- and Kaya Courseman (phonetic).  Also

17     joining us from Kirkland are Mara Greenberg, Yan-Xin Li, and

18     Leslie Schmidt.  We have in-house counsel for Moderna, Kelli

19     Powell --

20              THE COURT:  Welcome.

21              MR. EGAN:  -- as well as my colleague from Morris

22     Nichols Travis Murray.

23              THE COURT:  Okay.  Who's going to be doing most of

24     the speaking for Moderna?

25              MR. EGAN:  It will be a collection of us, Your
```

1    Honor.

2             THE COURT:  Okay.  All right.  Just remind me when

3    you talk.

4             So I think there's three topics that we can cover.

5    I'll probably mull most of these over and give you an order

6    on where I stand on it.

7             The first is a discovery dispute, and I'll let the

8    lawyers put the details on it.  But I understand that Moderna

9    is claiming that, during the deposition of an Arbutus expert

10   Dr. Schuster, they claim that he said, and they learned for

11   the first time that he had done some testing to inform his

12   opinion, and the testing was to develop the testing that

13   informed his opinion.  And Moderna is claiming extreme

14   prejudice.

15            I understand there was a lot of back-and-forth on

16   this, what I would consider to be a pretty routine discovery

17   dispute.  Sanctions were threatened by somebody, it's -- I

18   think it was a bit of an overreaction.

19            But in any event, why doesn't Moderna lay it out

20   for me?

21            MR. MCLENNAN:  Good morning, Your Honor.  Mark

22   McLennan for Moderna.

23            THE COURT:  Good morning.

24            MR. MCLENNAN:  As Your Honor noted, this is, again,

25   infringement evidence that Moderna has been seeking.  This is

1    for the -- just to orient Your Honor, this is for the ratio

2    patents.  So these patents claim specific amounts of

3    ingredients.  And the infringement evidence was put forward

4    by plaintiffs in order to claim that Moderna has ingredients

5    in its vaccine in certain amounts that fall within the

6    claims.

7            So, during the deposition, when we uncovered that

8    this additional testing had been done, we probed further

9    about it and learned that, not only was there additional

10   rounds of testing that weren't disclosed, but the expert used

11   that testing to come up with the testing that was in the

12   report.

13           THE COURT:  So I got it right, it's testing to

14   manufacture or come up with the testing --

15           MR. MCLENNAN:  Exactly.

16           THE COURT:  -- that renders the opinion.

17           MR. MCLENNAN:  Exactly.

18           Our issue is this expert submitted two reports, one

19   was his main expert report; he also submitted a separate

20   method development report, where he --

21           THE COURT:  Are you going to challenge the eventual

22   testing?

23           MR. MCLENNAN:  Not --

24           THE COURT:  Do you think that testing was done --

25   there was a flaw in that -- in the actual testing, not the

1      testing that led to the testing?

2              MR. MCLENNAN:  We have critiques about the actual

3      testing, and then we want to uncover what actually changed

4      with the testing because this expert put forward a separate

5      report --

6              THE COURT:  What are --

7              MR. MCLENNAN:  -- explaining --

8              THE COURT:  -- your critiques of the actual

9      testing?

10             MR. MCLENNAN:  Critiques of the actual testing

11     involve the process that this expert used to separate a

12     Moderna sample into many different parts was through a

13     centrifuge, which basically spins the samples at extremely

14     velocity that was spun millions of times.  And we're saying

15     you can't assume that that process did not change the sample,

16     and there was no control done for that.  There's no

17     measurement before and after of the property that they were

18     measuring to show that, in fact, it's not the spinning

19     process that's changing the liquid content.  That's our main

20     critique.  We have a little extra --

21             THE COURT:  And you have an expert who's going to

22     render that critique, right?

23             MR. MCLENNAN:  Yes, correct.

24             THE COURT:  Okay.  Okay.  Go ahead.

25             MR. MCLENNAN:  Our issue is this expert Dr.

1    Schuster also submitted a separate report, where he explained

2    how he came up with the methods, but he didn't reveal that,

3    actually, he had done prior rounds of testing before that

4    method development to come up with the one revealed in the

5    report.  It's not the case that it was just figuring out

6    which equipment to use.  This expert said that he changed

7    different parameters, and we have unrebutted declarations

8    from our experts that we submitted with our motion to compel,

9    where our experts explained it's not just setting up the

10   equipment; actually, how you set up the test can change the

11   amount of the ingredients that are being measured.  So that's

12   why it's significant for our expert to be able to challenge

13   it.

14         This is material counsel have at their fingertips.

15   During the deposition, they offered to produce some of it.

16   It's been several weeks now.  We've given all the concessions

17   that they wanted --

18         THE COURT:  During -- I'm sorry to interrupt.

19   During the deposition, when you learned of the testing to set

20   up the testing, did you inquire as to what was done?  I mean,

21   couldn't you have asked the witness, right then and there,

22   about the details of the testing to set up the testing?

23         MR. MCLENNAN:  We did.  But Your Honor, this is

24   like a months' long testing exercise.  Without actually

25   having the documents, we don't have a good opportunity to ask

1    questions.  And then, again, it's --

2              THE COURT:  Did you ask questions?

3              MR. MCLENNAN:  My colleague did.  I was at the

4    deposition.  My colleague did ask questions.  But this is,

5    again, highly technical, analytical chemistry.  We also

6    benefit from consulting with our experts.  We were deprived

7    of that opportunity because we have two attorneys in a

8    deposition learning about something for the first time,

9    trying to understand, without actually seeing the documents,

10   seeing what was done and understanding what was happened.

11             And we already had 300 pages of expert reports from

12   this guy to try and probe his opinions about --

13             THE COURT:  "This guy" --

14             MR. MCLENNAN:  -- and I realize --

15             THE COURT:  -- is Dr. Schuster?

16             MR. MCLENNAN:  Yes.

17             THE COURT:  Uh-huh.  So you had 300 pages, you were

18   in a deposition with him.  He said I did testing to do

19   testing.  You had an opportunity to question him.  And you're

20   saying that's not enough.

21             MR. MCLENNAN:  Yes.  And we're asking for very

22   limited depositions.  We're just asking for another four-hour

23   deposition of him to probe this additional testing.

24             There's also some issues with some other

25   documentation that he developed at the time.  As we've laid

1    out in our motion.  This -- they're very sensitive samples,

2    to changes in temperature, how they're handled.  He said at

3    the deposition that he took photos before and after the

4    testing.  If there's a change in the appearance of the

5    product, that's obviously going to be relevant to whether the

6    product is changing as a result of the testing, which is one

7    of our critiques that we didn't have the opportunity to

8    depose him about.

9            THE COURT:  Could you remind me?  I know it's in

10   the order.  So there's Schuster, he's an infringement expert.

11           MR. MCLENNAN:  He's their analytical chemist on

12   issues of infringement.  And then, on top of that, plaintiffs

13   have a different expert who reviewed and adopted his

14   infringement analysis and applied that to the claims --

15           THE COURT:  And --

16           MR. MCLENNAN:  -- and that was a separate report.

17           THE COURT:  -- your -- to the extent you can put it

18   in the same bucket or category, you have an expert in that

19   area, correct?

20           MR. MCLENNAN:  Correct.

21           THE COURT:  Okay.  And has Schuster filed a report

22   and a second report already?  How many reports do you have

23   from Schuster?

24           MR. MCLENNAN:  Two, Your Honor.

25           THE COURT:  And how many does your expert have, how

1    many reports?

2            MR. MCLENNAN:  We have two experts, we also have an

3    analytical chemist and a lipid nanoparticle expert.

4            THE COURT:  Okay.

5            MR. MCLENNAN:  Both of them have served --

6            THE COURT:  How many reports?

7            MR. MCLENNAN:  -- two main reports --

8            THE COURT:  Uh-huh.

9            MR. MCLENNAN:  -- and then limited surreplies.

10            THE COURT:  Uh-huh.

11            MR. MCLENNAN:  There was two additional ones after

12    the depositions.

13            THE COURT:  So is it fair for me to assume, if I

14    grant you this discovery, you're then going to ask for yet

15    another report to be filed by your experts, and then they're

16    going to ask to -- for another -- yet a third report from

17    Schuster?  Is that a fair assumption that's going to happen?

18            MR. MCLENNAN:  Part of the way there, Your Honor.

19    So part of our motion was yes, we did ask for additional

20    surreply, so that we can disclose whatever opinions our

21    experts form about this testing that they didn't have the

22    opportunity to beforehand.  Plaintiffs have made a request

23    for a deposition.  But our experts were deposed after we

24    uncovered this evidence.  They could have given us the

25    information before our experts were deposed.  We would have

```
 1    put those surreplies together in a matter of days and

 2    disclosed them.  They could have deposed them about it.

 3              THE COURT:  Uh-huh.

 4              MR. MCLENNAN:  So now a request for more

 5    depositions of our experts, first, to go through the time and

 6    expense of that, when they --

 7              THE COURT:  Yeah, you lost me.  I thought we were

 8    talking about your request to depose Schuster.

 9              MR. MCLENNAN:  Correct.

10              THE COURT:  Okay.

11              MR. MCLENNAN:  We have a request for that.  In

12    response, plaintiffs have said, if we submit surreplies on

13    this new testing evidence that hasn't been disclosed, they

14    want a chance to depose our experts.

15              THE COURT:  Uh-huh.

16              MR. MCLENNAN:  Our issue with that is they had the

17    opportunity to depose our experts.  They deposed them after

18    this evidence was uncovered, but they didn't produce it in

19    time.  So we -- it's still three or four weeks later, and we

20    still don't have the evidence.  It could have been avoided by

21    just producing it at the deposition or five months ago or at

22    least in the last two weeks when we've been asking for it --

23              THE COURT:  Uh-huh.

24              MR. MCLENNAN:  -- before our experts were deposed.

25              THE COURT:  What about the ...
```

1                (Pause in proceedings)

2                     THE COURT:  I just want to put my finger on a case

3        that I think applies here.  Just give me a second.

4                (Pause in proceedings)

5                     THE COURT:  Are you familiar with the ESCO v. Deere

6        case?

7                     MR. MCLENNAN:  Yes.  Yes, Your Honor, the ESCO

8        case.  So --

9                     THE COURT:  That's a Delaware case, right?

10                    MR. MCLENNAN:  It was.  It was --

11                    THE COURT:  It was.  And then it went up to the

12       Federal Circuit, right?  Judge --

13                    MR. MCLENNAN:  I believe --

14                    THE COURT:  I'm reading Judge Bryson.  Maybe he was

15       sitting by designation.  But that case says he compared

16       preliminary data to working notes or recordings and concluded

17       that they're not required to be produced.  How is this case

18       different?

19                    MR. MCLENNAN:  Okay.  So, first, putting that case

20       in context, that was a motion to strike the evidence; it

21       wasn't a motion to compel like what we're after.  In that

22       case, the evidence was already destroyed, the expert didn't

23       keep it.  In that case, it was a software tool that was being

24       used for finite element analysis, something that a piece of

25       software was calculating.  And these dry runs that were done

1    didn't lead to any meaningful results.

2          Here, we have plaintiffs eliciting redirect

3    testimony from their expert at the depositions, saying all

4    the results were consistent, even in the trial runs.  So the

5    earlier testing runs did produce meaningful results.  And

6    it's not the case in ESCO, as it is here, that the trial runs

7    are being used to adjust the parameters to actually come up

8    with the final testing protocol.

9          In our proceedings, plaintiffs have the position

10   that this is all standard testing, there's nothing to see

11   here, this is all standard, there's one way to do it, we're

12   doing it that way.  That's contested.  We contest the way

13   they're running the tests, that it's not a standard test,

14   it's not in the patent.  The way they've structured the test

15   and the way they've put it together, chose different

16   parameters, not only can affect the results, but it's also --

17   it's not in the patent, so we need to be able to probe how

18   they came up with the method.

19          THE COURT:  Understanding -- and I haven't made

20   this decision.  But understanding that it's likely that time

21   limits will be put on both sides regarding the jury trial, do

22   you think -- and I'm asking you to project -- do you think

23   cross-examination of Schuster regarding -- possible cross-

24   examination regarding Schuster regarding flaws in his testing

25   to set up the testing, given time limits, would be something

1    that would likely happen at a trial?

2              MR. MCLENNAN:  We do, Your Honor.  This

3    infringement --

4              THE COURT:  You do?

5              MR. MCLENNAN:  -- evidence is the crux of their

6    infringement case.  It's all they're relying on, essentially.

7    So we need to be able to probe what -- how they set up these

8    tests.  If there was nothing to see in any of the tests, they

9    would have produced them a few weeks ago.  I think we need to

10   be able to see what their expert has done.

11             THE COURT:  Okay.  Let me hear from Arbutus.

12             MR. BERL:  Good morning, Your Honor.

13             THE COURT:  Good morning.

14             MR. BERL:  David Berl on behalf of plaintiff.

15        I want to take a step back and make sure the Court

16   understands exactly what this testing was about.  Moderna's

17   vaccine has all of these particles, lipid nanoparticles, and

18   there are billions of them in each dose.  And what this

19   testing involves is spinning around fast in a centrifuge to

20   break those particles into fractions, pieces, ten fractions.

21   So you have one, two, three, four, five, all the way up to

22   ten.

23             As Your Honor may recall, Your Honor signed an

24   order requiring Moderna to give us samples of their COVID

25   vaccine.  We were arguing how many we get.  We got a bunch of

1      samples, we tested them.

2            Our expert developed a method to do this

3      fractionation and then interrogate, for each fraction, what

4      the molar ratio is, to see whether they infringe, ultimately.

5      We tested that using this method that he developed for 67

6      samples, multiple times per sample.  All of that data is in

7      his report.  All of the data was produced with his report.

8      Hundreds and hundreds of pages, more than 1,500 pages worth

9      of data, they received in connection with his report.

10           Now, with testing like this, you don't crawl out of

11     bed one day and develop a testing method and that's the only

12     one you use.  You develop parameters, the expert explained to

13     see whether the system works, to see whether the machine

14     works, to see whether you have to spin faster or slower, et

15     cetera.  That's invariably done in this process.

16           We served our report in November.  No response from

17     them that they wanted further testing, no response that they

18     wanted to know whether there were photographs associated with

19     the sample, none of that happened.

20           They then respond with two experts criticizing the

21     testing.  That's fine, they're permitted to do that.  But in

22     none of those responses did either of those experts say that

23     the information that they received from Dr. Schuster was

24     somehow inadequate, that they needed more information or

25     their photos, how did he develop his method, none of that was

1    in the reports.

2            Rather, they have two main criticisms, and they

3    were along the lines that my friend at the bar just

4    explained, that, somehow, the process of spinning those

5    particles destroyed the particles themselves.  And so what we

6    did, when they lodged that criticism against us, was that we

7    did more testing to interrogate that precise question:  Did

8    the spinning around, in fact, destroy the particles?  And so

9    we did two more tests to evaluate that question.  And in Dr.

10   Schuster's reply report, he explained that, contrary to their

11   criticism, the spinning was not destroying their samples.

12           Then, after that, for the first time, at his

13   deposition, when all their criticisms have been dealt with,

14   we hear now that somehow the discovery was inadequate.  Let's

15   be clear, they didn't learn about this --

16           THE COURT:  Well, they --

17           MR. BERL:  -- at the deposition.

18           THE COURT:  You missed a -- you missed a part,

19   according to them.  The part is that they discovered,

20   according to them, for the first time --

21           MR. BERL:  Yep.

22           THE COURT:  -- that Schuster had developed a

23   testing methodology to set up his testing.

24           MR. BERL:  Yes.  And the question is, though, if

25   you look at their questioning at the deposition, they knew

1    beforehand that these things could exist.  If you look at

2    Page 72, that's Exhibit D of our report, it appends portion

3    of Dr. Schuster's deposition, of our opposition, they asked

4    him do you have any photos or images, and he said yes, I do.

5            They asked him, on Page 85, how about testing

6    before you developed this method, did you do any testing like

7    that.

8            Pages 104 through 110, they say well, did you

9    change your parameters, did you change how fast you spin or

10   other parameters of the testing.  He said sure, I did,

11   because everyone does that in developing the testing.

12           Those are the questions they should have asked us

13   in November, when they received the report.  We could have

14   discussed it, produced whatever they needed.  If there had

15   been some dispute, we could have involved Your Honor in

16   resolving it, and that all would have been done.  But

17   instead, they waited, they asked these questions for the

18   first time at the deposition.

19           And now they want to disrupt the whole schedule by

20   having Dr. Schuster submit another report, having all these

21   documents produced, then having their witnesses provide

22   further surreply reports.  Just to be clear, I don't think

23   the answer --

24           THE COURT:  Well, suppose I would -- just

25   spitballing here.  Suppose I would limit the followup

1  deposition to two hours and say no one can file any more

2  reports.  Why would that be so traumatic for you, to

3  reproduce judge -- Judge Schuster -- Expert Schuster for two

4  hours?

5          MR. BERL:  I don't think that's dramatic or

6  "traumatic" to use your term.  I don't think it's warranted

7  or necessary, I don't think he did anything wrong.

8          THE COURT:  So why are you pushing back so far?

9  And why did you -- I'm not making a big deal out of this.

10  But is it -- why didn't you threaten sanctions --

11          MR. BERL:  Well --

12          THE COURT:  -- if they came to me and asked to talk

13  this through?

14          MR. BERL:  Well, because we were in the midst of

15  negotiating with them and discussing it with them.

16          THE COURT:  Uh-huh.

17          MR. BERL:  And in fact, they had filed -- they sent

18  us a letter that Friday morning, which was Good Friday.  We

19  were trying to get in touch Dr. Schuster to see, amongst all

20  of the materials that they were asking for, what he actually

21  had.  And then, instead of continuing to confer with us while

22  we were trying to inquire and reach some resolution on this,

23  they hauled off and filed an emergency --

24          THE COURT:  And you agree --

25          MR. MCLENNAN:  -- letter --

```
 1              THE COURT:  And obviously, push back if you don't
 2    agree.  Are you agreeing to a two-hour followup deposition
 3    with no further reports?
 4              MR. BERL:  Subject to the following because I think
 5    it depends on what documents they are asking for.  Their
 6    proposed order with respect to what documents are being
 7    produced is totally unworkable and unwarranted.  They have
 8    five categories.  This is in Appendix 8 of their letter.  I
 9    think Categories 1, 3, and 5 we don't have any problem with.
10              Category 2 is -- swallows the entire the universe.
11    They want all documents regarding any methods --
12              THE COURT:  What are the --
13              MR. BERL:  -- or results --
14              THE COURT:  What are the ones that swallow the
15    universe?  1, 3, and 5 you're okay with and --
16              MR. BERL:  Yeah, 2.  2 is -- 2 and 4, really, but 2
17    is the real --
18              THE COURT:  Can you give me a second so I can get
19    that in front of me?
20              MR. BERL:  Sure.
21          (Court and court personnel confer)
22              THE COURT:  I didn't bring that with me.  Sorry.
23    Thank you.  Just let me -- give me a second to eyeball this,
24    please.
25              MR. BERL:  Of course.
```

1          (Pause in proceedings)

2               THE COURT:  Is this -- so we're on the same page,

3     this is the one that says:

4               "All documents relating to ... including any

5               methods and results of sample" --

6               Is that the one?

7               MR. BERL:  Yes.

8               THE COURT:  Is that the one we're talking about?

9               MR. BERL:  That's exactly right, Your Honor.

10              THE COURT:  Let me just finish reading.

11              Okay.  Go ahead.

12              MR. BERL:  Sure.  So let me explain two ways in

13    which we think this is really problematic:

14              The first is it says "sample testing."  It's not

15    defined what a "sample" is.  It's not limited to the samples

16    that were produced by Moderna in this litigation pursuant to

17    Your Honor's order.  This could be any sample of anything

18    that was tested.

19              But equally importantly, it says:

20              "Sample testing of which Dr. Schuster/Coriolis is

21              aware of."

22              Dr. Schuster is an employee of a company called

23    Coriolis Pharma, which employs many scientists, and their

24    business is in testing materials.

25              THE COURT:  I agree with you that that's too

1    expansive to include the company.  What kind of company is

2    this?

3                MR. BERL:  It's a testing company.

4                THE COURT:  Yeah.

5                MR. BERL:  That's what they do.

6                THE COURT:  That's too broad.

7                MR. BERL:  It's literally every document in the

8    company.

9                THE COURT:  I agree, it's too broad.

10                MR. BERL:  And so, you know, we had offered what we

11    thought was a reasonable compromise with expansive categories

12    of materials beyond the thousands of pages they've already

13    received.  They have not explained why our proposed four

14    categories, which, by the way, were their proposed categories

15    in their April 14th letter to us --

16                THE COURT:  All right.  Your agreement is 1, 3, 5,

17    and what else?  You said four categories.

18                MR. BERL:  No.  So 1, 3, and 5, it's fine.

19                THE COURT:  Okay.

20                MR. BERL:  Again, all dockets in -- 4 I'm now

21    reading from.

22                "All dockets in which the work underlying the

23                testing was recorded by Coriolis personnel."

24                The "testing" is not -- is, again, not defined

25    here.  This, we assume, is the testing in the report.  But

```
 1    obviously, if Your Honor signs something, we need to comply

 2    with it --

 3                THE COURT:  Uh-huh.

 4                MR. BERL:  -- and understand it --

 5                THE COURT:  Right.

 6                MR. BERL:  -- to make sure that it's right.  So --

 7                THE COURT:  How would you wordsmith Number 4?

 8                MR. BERL:  Dockets -- all dockets in which the work

 9    underlying the testing set forth in Dr. Schuster's report was

10    recorded by Coriolis personnel.

11                THE COURT:  Okay.

12                MR. BERL:  And then we're fine with the rest,

13    subject to what I said about 2.

14                THE COURT:  So I want to make sure I understand

15    you.  You're agreeing to requested documents 1, 3, 4 as

16    you've just edited it, and 5.  You object, and I agree with

17    you, regarding 2.  And after you produce these, you're

18    agreeing to -- let me just posit in two hours just for sake

19    of discussion --

20                MR. BERL:  And no more reports.

21                THE COURT:  -- you're agreeing you'll produce him

22    and no more reports.

23                MR. BERL:  And no changes to the schedule.

24                THE COURT:  Okay.  Okay.  Thanks.

25                What's your reaction to that proposal, briefly?
```

1    MR. MCLENNAN:  Your Honor, I think we're very

2    close.  I think -- do you want me to come up there?  It's

3    fine.

4         THE COURT:  Wherever you're comfortable.  You can

5    stay there, if you want.

6         MR. MCLENNAN:  I think we're close, Your Honor.

7    With Category 2, our issue is it was limited to samples we

8    have produced in this case, that the expert revealed at his

9    deposition that he did the previous rounds of testing with

10   samples that that lab obtained on its own.  So as it was

11   proposed to be limited just now, it's not even clear we'd get

12   anything else because this expert did (indiscernible)

13        THE COURT:  Well, the way it's worded, it's the

14   entire company.

15        MR. MCLENNAN:  So it -- maybe there's a way we

16   could limit it to in connection with this litigation, in --

17   related to the testing in this litigation.

18        THE COURT:  Well, why don't we just --

19        MR. MCLENNAN:  But --

20        THE COURT:  Why don't we just delete the word --

21   how do you pronounce the company?

22        MR. MCLENNAN:  Coriolis.

23        I think that the issue with that is, Your Honor,

24   this expert is just one of many employees there that worked

25   on the testing conducted for this case.  He said that there

1    were seven unnamed colleagues.  He wasn't even familiar with

2    some of the testing that was --

3              THE COURT:  Yes, but you have to -- you have to

4    remember the context and where we're in, which is the end of

5    discovery.

6              MR. MCLENNAN:  Yes.

7              THE COURT:  Discovery is over.  All right?

8              MR. MCLENNAN:  Yes, Your Honor.  We'll be fine, as

9    long as it's -- part of our justification here, which we

10   included in this appendix, was that we also understand the

11   methods that they used.  So it's -- do I understand that the

12   methods is still part of Number 2?

13             THE COURT:  I want to think about that.  Okay.

14             MR. MCLENNAN:  Your Honor?

15             THE COURT:  Go ahead.

16             MR. MCLENNAN:  Just one more point --

17             THE COURT:  Yes.

18             MR. MCLENNAN:  -- on your proposal for the

19   deposition.  I understand that, Your Honor, it sounds like

20   you're not inclined to order additional surreplies.

21             THE COURT:  I haven't made -- I haven't made my

22   mind up about this.

23             MR. MCLENNAN:  We would just ask that our experts

24   be --

25             THE COURT:  I'm -- if you want to know what I'm

1    inclined to do, I'm inclined to say discovery is closed.

2              MR. MCLENNAN:  Okay.

3              THE COURT:  But go ahead.

4              MR. MCLENNAN:  Understood, Your Honor.

5              THE COURT:  Out of courtesy, I'm listening to what

6    you have to say.

7              MR. MCLENNAN:  We would just ask that our experts

8    be able to opine about the additional testing, whatever is

9    produced, at trial.

10             THE COURT:  Is that another way of saying you want

11   to file another report?

12             MR. MCLENNAN:  We do, Your Honor.

13             THE COURT:  Okay.  Okay.  I'm going to think about

14   this.  This matter is -- the discovery matter is held under

15   advisement.

16             All right.  So the next topic is I want to talk

17   about -- I want to -- I guess I want to go to Dauberts.  And

18   I don't know whether there has been something filed yet.  So

19   I first want to understand, starting with plaintiff.

20             Could you tell me the name of the expert -- and I

21   want to go through all of them -- name of the expert,

22   categorize what their testimony is going to be, not a

23   recitation of their opinion, just a category, how many

24   reports that they have issued, and the approximate number of

25   pages of each report?

 1              MR. BERL:  Your Honor, I assume you mean our

 2     experts.

 3              THE COURT:  Yes.

 4              MR. BERL:  Is that what you're asking me for?

 5              THE COURT:  Yes.  Uh-huh.

 6              MR. BERL:  Okay.  And so I don't have at least the

 7     last part available -- I can get it -- in terms of the length

 8     --

 9              THE COURT:  Just ballpark.

10              MR. BERL:  -- of their reports.

11              THE COURT:  Yeah, we can ballpark it.

12              MR. BERL:  I will try to ballpark it.

13              THE COURT:  Yeah, okay.

14              MR. BERL:  I think the total number pages for all -

15     -

16              THE COURT:  Well, can we go through your experts

17     first?

18              MR. BERL:  Sure, happy to.

19              THE COURT:  Uh-huh.

20              MR. BERL:  So you've already heard about Dr.

21     Schuster.

22              THE COURT:  Let's -- yeah.  So --

23              MR. BERL:  He's --

24              THE COURT:  -- let's start with him.  And could you

25     give me the category again?

1          MR. BERL:  Infringement.  He did testing of

2     Moderna's product.

3          THE COURT:  So infringement.  And that's as concise

4     as I'd like it.

5          And two reports.

6          MR. BERL:  Yeah.

7          THE COURT:  Approximately how many pages total?

8          MR. BERL:  Two hundred fifty maybe.

9          THE COURT:  Total?

10          MR. BERL:  That's a guess.

11          THE COURT:  Okay.

12          MR. BERL:  I think -- maybe 350.  That's a guess.

13          THE COURT:  I'm not going to hold you to it.

14          MR. BERL:  Okay.  Please don't.

15          THE COURT:  Understood it's a guess.  Go ahead.

16          MR. BERL:  Dr. Mitchell --

17          THE COURT:  Uh-huh.

18          MR. BERL:  -- on infringement, also two reports, an

19     initial report and then the reply report.

20          THE COURT:  Okay.

21          MR. BERL:  I'd guess 1,500 pages.

22          THE COURT:  I'm just going to put down 1,000.

23          Go ahead.

24          MR. BERL:  What's 500 pages between friends, right?

25          Dr. Murthy is our invalidity expert --

```
 1                    THE COURT:  Okay.

 2                    MR. BERL:  -- on the prior art.

 3                    THE COURT:  Two -- and I'm going to assume everyone

 4          has filed two reports.

 5                    MR. BERL:  No, that's actually not right.  One

 6          report for him --

 7                    THE COURT:  Got it.

 8                    MR. BERL:  -- because he was -- they bear the

 9          burden of proof on invalidity, so we got one report on

10          invalidity; they got two.

11                    THE COURT:  Understood.

12                    MR. BERL:  Then we have --

13                    THE COURT:  Pages of the report?

14                    MR. BERL:  Eight hundred maybe.

15                    THE COURT:  Go ahead.

16                    MR. BERL:  Then we have Ms. Laughton (phonetic),

17          she's our primary damages expert.

18                    THE COURT:  Okay.  How many reports are we looking

19          at?

20                    MR. BERL:  Two reports.

21                    THE COURT:  Two.  Go ahead.

22                    MR. BERL:  And I'll guess 1,500 pages, but again,

23          that's a guess.

24                    THE COURT:  Okay.

25                    MR. BERL:  Then Kim Benton.
```

1           THE COURT:  Bentley?

2           MR. BERL:  Benton, B-e-n-t-o-n.

3           THE COURT:  Got it.

4           MR. BERL:  An expert on FDA processes and

5    procedures.

6           THE COURT:  Okay.

7           MR. BERL:  Her -- she filed two reports, probably a

8    total of 50 pages.

9           THE COURT:  All right.

10          MR. BERL:  We have -- there are two experts we put

11   in, in opposition on the 1498 issue:  Brill is one of them,

12   Dr. Brill, and Dr. Pitts -- or Mr. Pitts.  I think their

13   total expert reports are probably around a hundred pages.

14          And then we have one witness, Dr. Porter, who's an

15   mRNA expert witness, and he put in I believe 3 reports -- 2

16   reports, and I would guess, again, in the range of one to 200

17   pages total.

18          THE COURT:  Okay.  Thank you.

19          MR. BERL:  I believe that's all.

20          THE COURT:  Great.

21          DR. CARSON:  Your Honor, Pat Carson --

22          THE COURT:  Good morning.

23          DR. CARSON:  -- for Moderna.  Good morning.  We had

24   a little time to confer.

25          So, on -- for our experts, we had Dr. Anderson, who

```
 1    has about 250 pages total.

 2              THE COURT:  What's the category?

 3              DR. CARSON:  And his category is obviousness

 4    anticipation.

 5              THE COURT:  Uh-huh.

 6              DR. CARSON:  Dr. Prud'homme, which is about 700 --

 7              THE COURT:  Could you spell that?  Best as you can.

 8              DR. CARSON:  Oh, P-r-u-d, and then there's like a

 9    little hyphen [sic], and then h-o-m-m-e.  He has about 700

10    pages total.  He opines on non-infringement, 112, and prior

11    use type defenses.

12              We have Dr. Meulien, —e-u-l-i-e-n, and he has about

13    350 pages total, and he addresses 112 defenses.

14              Dr. Fenton has about 250 pages total, and he's our

15    analytical chemist who is rebutting the Schuster that you've

16    heard about.

17              Mr. Del Toro (phonetic) is our damages expert, and

18    he put in a brief report rebutting on 1498, and he also put

19    in a report on damages.  His is about 500 -- he has a total

20    of 4 reports, 500 pages plus appendices.  I just want to

21    point out he's our damages expert and their damages expert

22    has about 2,000 pages of reports.

23              We also have Dr. Rutherford, who is about 60 pages,

24    he's on 1498.

25              I already mentioned Dr. Del Toro's report on 1498.
```

1     And we have doctor -- Mr. Godchyk (phonetic), who

2     is an FDA expert, and it relates to doctrine of equivalence

3     infringement, and he's about 40 pages.

4          THE COURT:  Great.  Okay.  Thank you.  Thank you,

5     Counsel, that will help inform the next discussion, which is

6     -- I mean, I haven't taken out the calculator, but 10,000 --

7     in excess of 10,000 pages of expert reports.  So, for

8     discussion, my view is, I mean, that's -- none of -- a very

9     small portion of that is ever going to get before a fact-

10    finder, a very, very small portion of it, so suggesting that

11    maybe it makes sense to order both sides to go through the

12    thousands and thousands of pages of expert reports and

13    identify, since the next phase of this, after summary

14    judgment, if we're going to have that, and Dauberts is an

15    actual trial, and identify for these experts what part of

16    their voluminous reports are actually going to be presented

17    to a jury.

18         I'm not sure why 10,000 pages of expert reports is

19    necessary.  I understand the magnitude of the case, but,

20    again, highly doubt much of it will ever be presented in

21    front of a jury.  It would be impossible.  So suggesting for

22    your input an order which requires you to, for each expert,

23    give a brief paragraph, at the most, summary of what you're

24    actually going to present to a jury, both sides do that.  And

25    then both sides are informed now, at this point in the

```
 1    litigation -- since it looks like it's going to trial, it's
 2    time to put cards on the table.  And then, once you see that,
 3    you're better informed to say I want to expend resources and
 4    judicial resources making a legitimate Daubert challenge, as
 5    opposed to going through 10,000 pages of reports and filing
 6    Dauberts on things that probably won't ever get before a
 7    jury.
 8                Reaction?
 9                MR. BERL:  If I could be heard?
10                THE COURT:  Sure.
11                MR. BERL:  So we are all in favor of trying to
12    narrow this case and do it quickly, so that we don't have to
13    waste our time and Your Honor's time with --
14                THE COURT:  But I'm asking --
15                MR. BERL:  -- Daubert motions --
16                THE COURT:  -- you for your --
17                MR. BERL:  -- and summary judgment.
18                THE COURT:  -- view on my proposal.
19                MR. BERL:  My view, respectfully, Your Honor, is
20    that it might be more efficient to narrow the number of
21    claims and defenses in the case --
22                THE COURT:  Well, we're --
23                MR. BERL:  -- rather than --
24                THE COURT:  -- going to do that, too.
25                MR. BERL:  Okay.  Well, I think --
```

1              THE COURT:  Agreed.

2              MR. BERL:  I think that may solve a lot of the

3     problem.  We have 66 --

4              THE COURT:  I don't --

5              MR. BERL:  -- patent claims now.

6              THE COURT:  I don't think it will.  How does it

7     solve the -- I'm going to pick a number; and, if you want,

8     I'll add all these numbers up.  I'm going to pick 10,000.

9              MR. BERL:  All right.

10             THE COURT:  How does it solve the Daubert problem

11    when you still have 10,000 pages of expert reports?

12             MR. BERL:  Because, for example, we have 66 claims,

13    so a lot of the 10,000 pages, let's say on infringement

14    reports, are taken up analyzing infringement with respect to

15    those claims.  If we slash a lot of those claims -- and we're

16    prepared, Friday, to slash more than half of our 66 claims --

17    a lot of that duplication is gone.

18             If they slash their defenses -- and right now, they

19    have 33 Section 112 defenses, each of which requires

20    different evidence to rebut.  So, if they, for example, slash

21    -- and this is our proposal that we put in our letter -- 6

22    112 defenses per claim, once we've slashed claims, they

23    identify 6, then, rather than having to respond to 33 112

24    arguments as to a claim, we have many fewer.  That would, I

25    would submit, take about half of the validity pages right out

1    the window, probably three-quarters would be gone with a --

2            THE COURT:  Use my --

3            MR. BERL:  -- snap of --

4            THE COURT:  Use my --

5            MR. BERL:  -- Your Honor's wand.

6            THE COURT:  -- pulled-it-out-of-the-air number of

7    10,000 pages of expert reports.  What does that narrow it

8    down to as it relates to studying the reports and saying we

9    have to make a Daubert challenge on what's remaining?

10           MR. BERL:  I would guess that if our narrowing --

11   interim narrowing proposal were adopted, I would guess -- and

12   now I'm just talking about validity and infringement -- I

13   would guess two-thirds of it would be gone.

14           THE COURT:  Two-thirds of the expert reports.

15           MR. BERL:  Yeah.

16           THE COURT:  I'm wondering if the general counsel or

17   litigation counsel in the room are wondering why they paid

18   all this money for all this --

19           MR. BERL:  And this is -- yeah.

20           THE COURT:  -- tens of thousands of reports, but --

21           MR. BERL:  I mean -- yeah.

22           THE COURT:  -- none of my business.

23           MR. BERL:  I wish they --

24           THE COURT:  But why --

25           MR. BERL:  I which there were --

```
 1            THE COURT:  Why are you resisting -- why are you
 2    resisting to put your cards on the table and say I'm going to
 3    call -- I've listed to these witnesses and here's -- I'm
 4    going to call them and I know there's going to be time
 5    constraints, we haven't talked about what they are, and here
 6    are the three most important things this expert is going to
 7    say?  Why are you resisting that?
 8            MR. BERL:  The reason is that I think what our
 9    expert says will depend on what they're planning to say in
10    response.  In other words, if -- they may level ten
11    criticisms.
12            THE COURT:  Well, what's your -- you have burdens -
13    -
14            MR. BERL:  Certainly.
15            THE COURT:  -- in this case.
16            MR. BERL:  And we -- and that we would discharge
17    and say this is what he's going to testify about.  But then
18    he also, of course, has to testify in response to what --
19    their criticisms.  For example, let's stay with Dr. Schuster,
20    since we've been talking about him.
21            THE COURT:  Uh-huh.
22            MR. BERL:  Let's say they lodge 20 criticisms of
23    his testing -- that's an underestimate.  What we say about
24    his testing has to be responsive in some ways to those
25    criticisms.  If they have 20 criticisms, he's got to explain
```

1    why, in all 20 of those ways, his testing was reliable and

2    robust and legitimate.

3              THE COURT:  Uh-huh.

4              MR. BERL:  If they have three, then he only has to

5    respond to three of those, and his testimony becomes much

6    shorter.

7              THE COURT:  We all know, under my proposal -- which

8    I'm not saying I'm going to adopt.  But you'll know because

9    Moderna is going to have lay out what their experts are going

10   to say, too.

11             MR. BERL:  Right.

12             THE COURT:  So all the cards are on the table.

13             MR. BERL:  Yeah.  I think, as long as there's some

14   sequential opportunity to say okay, they're going to

15   criticize this aspect of his testing, therefore, he's going

16   to repond by saying X and responding to that because we can't

17   otherwise be in a Russian roulette position of saying okay,

18   this is all he's going to testify, and then, all of a sudden,

19   we don't address issue X --

20             THE COURT:  Yeah.

21             MR. BERL:  -- and they criticize it because there's

22   --

23             THE COURT:  Well, we could -- I'm not trying this

24   case, you are.  But I would be primarily focused on what my

25   expert is going to say on their direct examination to support

1     your burdens, as opposed to being so worried about well, and

2     now let's go through what I think Moderna's expert is going

3     to say and what do you think about that.  I mean, there -- I

4     understand there has to be some back and forth --

5               MR. BERL:  Yeah, there -- yeah.

6               THE COURT:  -- and I get it.  Okay.

7               MR. BERL:  Right.  And I think --

8               THE COURT:  All right.

9               MR. BERL:  -- yeah, the distinction is not so clear

10    when what they're doing is --

11              THE COURT:  Right.

12              MR. BERL:  -- criticizing his techniques.

13              THE COURT:  Right.

14              MR. BERL:  And so I think, as long as there's some

15    opportunity to do that, again, I think claim narrowing would

16    accomplish --

17              THE COURT:  Uh-huh.

18              MR. BERL:  -- this, largely, and defense narrowing,

19    especially as to 112 issues and prior art combinations.

20              And I have to be honest, I worry about whether the

21    exercise of sort of cutting the number of pages will actually

22    be productive with respect --

23              THE COURT:  No, I'm not --

24              MR. BERL:  -- you know --

25              THE COURT:  I'm not suggesting cutting the number

1    of pages.

2              MR. BERL:  Well --

3              THE COURT:  I'm suggesting -- I mean, I think I was

4    clear, but I'm suggesting idetifying, of the reports, what

5    you're actually going to attempt to, assuming it's

6    admissible, present to a fact-finder under limited time

7    constraints.  And that way -- and then, once you see, using

8    Moderna, if you get -- once you get their outline, then you

9    can say oh, they're going to say that, this is a legitimate

10   Dauber, which, by the way, stating, you know, the obvious, is

11   a very high bar --

12             MR. BERL:  Understood.

13             THE COURT:  -- to get exclusion.

14             MR. BERL:  Understood.  I mean, I think -- and I'm

15   just speaking extemporaneously here because I never heard

16   your proposal until five minutes ago.

17             THE COURT:  Yeah.

18             MR. BERL:  But I think that actually may work

19   better if we do claim narrowing and --

20             THE COURT:  Could be.

21             MR. BERL:  -- defense narrowing first.

22             THE COURT:  Yeah.

23             MR. BERL:  And then we have -- you know, otherwise,

24   we're talking about what they're going to -- what we're going

25   to put on.

```
 1              THE COURT:  Uh-huh.

 2              MR. BERL:  And it's --

 3              THE COURT:  It's a fair point.  Okay.

 4              MR. BERL:  -- about things that aren't going to

 5     actually going to be part of the claims --

 6              THE COURT:  Okay.

 7              MR. BERL:  -- and defenses --

 8              THE COURT:  So your --

 9              MR. BERL:  -- at trial.

10              THE COURT:  So your main takeaway is follow our

11     narrowing proposal first, maybe see where we are, and then we

12     can maybe revisit your -- Judge, your proposal after that.

13              MR. BERL:  Yes, Your Honor.

14              THE COURT:  Okay.  All right.  What do you folks

15     have to say?

16              DR. CARSON:  Your Honor, it's a creative approach,

17     and I think it could be doable.  Before we came before Your

18     Honor this morning, we did discuss with the other side

19     definitely negotiating to limit our prior art combinations

20     identified and that sort of thing.  And in terms of the 33

21     112 defenses that were thrown out there, it is a question of

22     exactly how you count them.  But I do think that your

23     proposal to avoid unnecessary Dauberts would be something

24     that we could confer with the client about implementing.

25              But one thing I would point out is, under your
```

 1      standing order, you know, Dauberts based on improper

 2      application of legal standard, that's not an appropriate

 3      Daubert, and we agree with you.  But Dauberts on methodology

 4      are appropriate.  And for the Laughton report, which is the

 5      2,000 pages of damages report that they've provided to us,

 6      much is -- much of which has nothing to do with damages --

 7      it's a bunch of history and talking about the stock market

 8      and that sort of thing -- I think that that report we need to

 9      address through a Daubert now or as soon as possible.

10      Otherwise --

11                  THE COURT:  Well, that sort of amplifies my point,

12      if there's -- how many pages is Laughton?

13                  DR. CARSON:  It's a total of like 2,000 --

14                  THE COURT:  Yeah.

15                  DR. CARSON:  -- pages --

16                  THE COURT:  I mean, how --

17                  DR. CARSON:  -- that she's put in.

18                  THE COURT:  How would that possibly ever get before

19      a fact-finder.

20                  DR. CARSON:  And we don't think any of it should

21      get before the Court, and we have very good reasons for

22      saying that.  And we do believe that it's appropriate to

23      Daubert that expert in its entirety.

24                  But in terms of your proposal, you know, subject

25      to, you know, a little more guidance as to what you're

1    looking for -- you talked about a paragraph, and the amount

2    of detail that would need to go in there, I think that we

3    could probably do something.  I would want to confer with my

4    client.  And also, we'd want to know what the timing would be

5    on that.

6             THE COURT:  Of course, of course, of course.  This

7    is just a discussion that we're having.

8             DR. CARSON:  I'm going to --

9             THE COURT:  Okay.

10            DR. CARSON:  -- have a seat, unless you have

11   questions.

12            MR. BERL:  If I may respond briefly, Your Honor?

13            THE COURT:  Okay.  Go ahead.

14            MR. BERL:  Just to clarify two things.

15            Counsel is correct that we tried to confer before

16   the hearing today about narrowing.  The problem is that

17   Moderna refuses to narrow anything until right before trial,

18   and so that doesn't help us in preparing for summary judgment

19   or Daubert.  We'd like there to be some narrowing now,

20   substantial narrowing now, and we think that could actually

21   profit the parties.

22            In terms of how to count 112 defenses, we were

23   counting 112 defenses in the exact same way that Chief Judge

24   Connolly explained how to do it in the Natera case that we

25   cited.  And by that counting, they have 33 112 defenses.

1    That was the first thing I asked their expert and went

2    through and confirmed with me that he thinks there are 33

3    separate reasons our patents aren't valid under 112.

4            We can't -- you know, a lot of our Daubert and

5    summary judgment motions are because we think those are

6    scurrilous grounds.  And so, if we actually narrow it before,

7    I think we could maybe limit both Daubert --

8            THE COURT:  Okay.

9            MR. BERL:  -- and summary judgment.

10           THE COURT:  Understood.  I understand where you

11   stand.

12           All right.  So, shifting to the issue of summary

13   judgments, let me just review my notes on that.

14       (Pause in proceedings)

15           THE COURT:  All right.  So what I've -- I've looked

16   at your proposals on summary judgment, and I haven't done a

17   very detailed dive into them.  I find, in patent cases,

18   sometimes it's counterproductive to expend a lot of energy

19   trying to figure out whether something is summary judgment

20   worthy or not, and I found myself putting days into making

21   that decision.  And then I think well, I ought to just decide

22   the summary judgment.

23           So what I'll ask counsel to do is to concisely --

24   and I'll give each side, you know, ten minutes to, you know,

25   highlight why you think certain issues are worthy of allowing

1    me to -- are worthy of convincing me to allow you to file a

2    summary judgment, and if you could emphasize what you think

3    the most obvious summary judgment issues are.

4           And please keep in mind, when you talk about Judge,

5    you can decide this as a matter of law on summary judgment --

6    and I'm not going to get into a back-and-forth, although I

7    may -- are there facts.  Would -- Arbutus is going to go

8    first.  Think about if Moderna would stand up and I say well,

9    what facts do you have to refute that, maybe it's not worthy

10   of a summary judgment.

11          So I'll give each side ten minutes to highlight

12   what you want to file on summary judgment.  Go ahead.

13          MR. BERL:  Thank you, Your Honor.

14          So the first issue that we would raise for summary

15   judgment relates to their prior art defenses.  And as Your

16   Honor is aware, two of the patents that are asserted in this

17   case were challenged by Moderna in an IPR, that's the 069

18   patent and the 435 patent.  As to all the claims asserted,

19   they lost at the final written decision by the Patent

20   Trademark [sic] Appeal Board.  They then appealed both of

21   those decisions to the Federal Circuit.

22          As to the 069 patent, the Federal Circuit affirmed,

23   and so they don't have written prior art offenses as to the

24   069 patent, that's statutory estoppel, which is 35 U.S.C. --

25          THE COURT:  So that --

46

1                      MR. BERL:  -- 315(b).

2                      THE COURT:  What number was that?

3                      MR. BERL:  The 068 patent -- or the statute, do you

4          want --

5                      THE COURT:  No.

6                      MR. BERL:  -- or the patent?

7                      THE COURT:  The patent.

8                      MR. BERL:  069.

9                      THE COURT:  Well --

10                     MR. BERL:  So --

11                     THE COURT:  -- doesn't that preclude any litigation

12         at all about the 069 patent if the Federal Circuit affirmed?

13                     MR. BERL:  No.

14                     THE COURT:  No?

15                     MR. BERL:  It's any defense that they raise or

16         could have raised is what the statutory estoppel is.  So they

17         filed an IPR --

18                     THE COURT:  Right.

19                     MR. BERL:  -- which means that they couldn't have

20         filed Section 112 defenses against the --

21                     THE COURT:  Okay.

22                     MR. BERL:  -- IPR, so those --

23                     THE COURT:  This is a they should have raised

24         argument.

25                     MR. BERL:  They -- well, so, on the prior art, they

1    raised or could have raised everything, and they're not even

2    trying on prior art --

3              THE COURT:  Uh-huh.

4              MR. BERL:  -- on the 069.

5              THE COURT:  Uh-huh.

6              MR. BERL:  But their 112 defenses, they could have

7    raised those during the IPR because IPRs are limited to --

8              THE COURT:  Uh-huh.

9              MR. BERL:  -- permitted prior art.

10             But the 435 patent is also the subject of a final

11   written decision, and those claims were affirmed.  On appeal,

12   the Federal Circuit dismissed the appeal for lack of subject

13   matter jurisdiction.

14             Moderna has taken the position, and we think it's

15   absolutely incorrect on the face of the statute, that,

16   because the PTAB's decision, the appeal from that decision

17   was dismissed, rather than affirmed, somehow IPR estoppel

18   does not apply.

19             The language of Section 315(e) of the Patent Act is

20   abundantly clear, it says nothing about Federal Circuit

21   affirmances or dismissals or dispositions.  It says, as long

22   as there's a final written decision by the Patent Trial and

23   Appeal Board, that estoppel is triggered, and there was on

24   the 435 patent.  So that's a very simple legal issue of does

25   estoppel apply to the 435 patent or, all of a sudden, does it

1    magically disappear because the Federal Circuit dismissed

2    Moderna's appeal, rather than affirming on the merits.

3    That's part of the issue.

4              Another part of the issue --

5              THE COURT:  Could you tell me again?  I'm sorry, I

6    didn't write this down.  That pertains to which two patents,

7    069 and what was the other one?

8              MR. BERL:  The 435.  The 069, I think they agree

9    estoppel applies.

10             THE COURT:  Okay.

11             MR. BERL:  The 435 is where they don't, and we

12   think it does.

13             THE COURT:  Got it.

14             MR. BERL:  Now there's another issue, though, that

15   sort of goes to the question Your Honor raised two minutes

16   ago, is why can they really do anything.  And we think, in

17   many respects, they can't as a result of the PTAB's findings

18   and the Federal Circuit's affirmances.  We think that

19   traditional norms of estoppel and issue preclusion prevent

20   Moderna, at trial, from challenging factual findings that the

21   PTAB made and the Federal Circuit affirmed.

22             So, if the Federal Circuit, for example, said it is

23   not routine experimentation to find molar ratios -- and the

24   molar ratios are what our patents claim -- they can't come

25   into court, having lost that on a more generous standard of

1    preponderance of the evidence, rather than the one Your Honor

2    will instruct the jury on, clear and convincing evidence of

3    invalidity, they can't come in and re-litigate that.  That's

4    a second bite at the apple.  They had their chance before the

5    PTAB to argue that it was routine, they lost, the Federal

6    Circuit affirmed, and that's done.

7         And so our position is that, as to factual findings

8    from the PTAB and the Federal Circuit on what the prior art

9    teaches, for example, what's routine and what's not, what the

10   person of ordinary skill would have understood, those are

11   closed.  Those are, to use a vernacular, law of the case, or

12   precluded from re-litigating.  And so that's the other

13   subject of that summary judgment motion on estoppel; again, I

14   think a pretty clean legal issue that doesn't really go to

15   any factual disputes.

16        Now both sides want to ask for summary judgment

17   about Section 1498.  That, as Your Honor may recall, is the

18   government contractor defense that was the subject of

19   multiple motions to dismiss  at the beginning of the case.

20   The parties have proposed a process that both sides can move,

21   but only four briefs will be filed, rather than six briefs.

22   So Moderna would go first since they bear the burden on that

23   affirmative defense, we would go second, they would go third,

24   we would go fourth, as opposed to both filing summary

25   judgment motions on that, and then Your Honor would have six

1    briefs, rather than four.

2         I should mention, also, we talked before about

3    trying to limit the summary judgment, at least the volume of

4    summary judgment papers Your Honor is receiving, and the

5    parties had agreed between themselves, subject to Your

6    Honor's input, that they would limit their summary judgment

7    briefs to a total of 60 pages opening and 60 pages in

8    opposition to summary judgment, for their total briefing in

9    all of the summary judgment motions that are filed.

10        The next issue is -- that we raised with respect to

11   summary judgment is the issue of indefiniteness.  And

12   indefiniteness has two parts, in a sense:

13        The first question is what is the scope of the

14   claim.  And they run all sorts of indefinite arguments.  But

15   to take one example, they run it on a claim term in the 651

16   patent that Your Honor construed in his Markman opinion,

17   which was fully encapsulated, and they say that's indefinite.

18        And there are two parts of the claim construction

19   indefinite issue:

20        One, what does the claim mean?  Are the bounds of

21   the claim clear, such that someone would know what does the

22   claim cover and what does the claim not cover?

23        The second thing that they raise with respect to

24   indefiniteness is could a competitor, could a person of

25   ordinary skill understand whether he or she infringes the

1    claim.  Were tests available that would reveal to a

2    competitor in the field I'm infringing or I'm not infringing?

3    And those are two distinct questions.

4         And the problem with their indefiniteness position

5    is that they only really address the second.  Their experts

6    come in and say in their reports we know what the scope of

7    the claim is, that, if it looks like this, it's out, if it

8    looks like that, it's in.  Their criticism is the tests were

9    not available to determine what's in and what's out.

10        And the law is quite clear that, as long as the

11   scope of the claim is clear, that indefiniteness argument

12   cannot stand.  And so they can't have a viable indefiniteness

13   defense if the scope of the claim is clear.  And Your Honor

14   construed it and people used that term and it's clear what's

15   counted in and what's counted out.

16        They really have a non-infringement defense.  What

17   they really have a defense that says the testing can't really

18   reveal whether you're in the claim.  That's not an

19   indefiniteness defense.  An indefiniteness defense is I don't

20   know what the scope of the claim is.  And so that's the third

21   bucket of summary judgment.

22        The last two -- the last two buckets relate to

23   defenses that, to be perfectly honest with you, I very much

24   doubt that they're going to run at trial, which is part of

25   why I think we have sort of a chicken-and-egg problem with

1    respect to claim narrowing and summary judgment.

2         They have an on sale defense, that our product was

3    on sale more than a year before the relevant priority date.

4    They cite no actual sales that took place more than a year

5    before that.  They only cite transfers of material that

6    happened after that one-year bar.  They've hypothesized that

7    something might have happened before.  They have zero

8    evidence of it at all.  And so we think that should be

9    disposed of at summary judgment, if it's not just disposed of

10   by claim narrowing, which we think it probably will be, if

11   Your Honor limits them to a reasonable number of defenses

12   before summary judgment.

13        And likewise, they have some derivation argument

14   that, somehow, one of our patents -- this is the 651 patent

15   about fully encapsulated -- was derived from Moderna.  This

16   defense doesn't work legally.  Our patent was filed about ten

17   years before the so-called prior art they say is the subject

18   of their derivation defense.  That can't work, especially

19   because everyone agrees that we reduced the invention to

20   practice in actual physical form years before their purported

21   derivation.

22        So we think that that argument sort of falls apart

23   legally and doesn't hold water.  But again, it's sort of a

24   tertiary, catenary [sic] argument that I assume will fall

25   apart and fall away before trial if there's claim narrowing,

```
1    and so I would hope we don't have to waste the resources of

2    ourselves and the Court in disposing of those defenses if

3    they just narrow them now.

4              THE COURT:  So I wrote down your points, which you

5    made in your letter.  Is that the priority in the order that

6    you presented them?  If I said just one, would it be

7    estoppel?

8              MR. BERL:  Yes.

9              THE COURT:  Okay.  And just to be sure I'm

10   following your thinking, you're suggesting, as I hear you, do

11   claim narrowing first and then see -- and then maybe revisit,

12   not only what to file with summary judgment, but then also

13   the Daubert discussion we had.  Are we -- am I hearing you

14   correctly?

15             MR. BERL:  That's correct.

16             THE COURT:  Okay.

17             MR. BERL:  That's correct.  And --

18             THE COURT:  All right.

19             MR. BERL:  I should add there was also an

20   enablement summary judgment, I can discuss that for one

21   minute, if you'd like.  It's set forth --

22             THE COURT:  No, that's okay.

23             MR. BERL:  -- on the bottom on Page 1.

24             THE COURT:  I got it.  You laid that out in the

25   letter.  And so we -- is our trial date September, end of
```

1  September?

2      MR. BERL:  September 29th.

3      THE COURT:  Yeah, I don't -- I -- in the spirit of

4  having other lawyers in the room have a more enjoyable

5  summer, I highly doubt we're going to be keeping that date,

6  that's -- with all this work to be done, I highly doubt it.

7      MR. BERL:  Well, just to be clear, we very much

8  want to keep that date.

9      THE COURT:  I know.  I know you do, I know you do.

10      MR. BERL:  And virtually -- yeah.

11      THE COURT:  Yeah.

12      MR. BERL:  So --

13      THE COURT:  Yeah.

14      MR. BERL:  We will be ready to try this case --

15      THE COURT:  I know --

16      MR. BERL:  -- on September 29th.

17      THE COURT:  I know the plaintiff always wants to go

18  to trial, but I doubt all of this work can be done in that

19  time, so I understand your position.

20      Okay.  Ten minutes on what you want me to -- go

21  ahead.

22      DR. CARSON:  Your Honor, do you want us to respond

23  to --

24      THE COURT:  Whatever.

25      DR. CARSON:  I'm sorry.  Do you want --

1          THE COURT:  You can say --

2          DR. CARSON:  -- us to respond to --

3          THE COURT:  -- whatever you like.

4          DR. CARSON:  -- Mr. Berl's or --

5          THE COURT:  Whatever you want to say.  It's -- the

6    topic is summary judgments.

7          DR. CARSON:  The topic is summary judgments.  Okay.

8    All right.  So you want to know what we're moving on,

9    correct?  Okay.

10          THE COURT:  I want to give you the opportunity to

11   say whatever you want to say about summary judgment

12   litigation in this case.

13          DR. CARSON:  So we are agreed that we want to go

14   both move on 1498 --

15          THE COURT:  Yeah

16          DR. CARSON:  -- and that that's appropriate.

17          THE COURT:  Okay.

18          DR. CARSON:  And I think --

19          THE COURT:  I think that that --

20          DR. CARSON:  -- that mister --

21          THE COURT:  You should assume we're going to have

22   summary judgment litigation on that.  And that sort of

23   appeals to my common sense.  That does seem like as a matter

24   of law type of decision.

25          DR. CARSON:  And if you only give us one, that

 1   won't be the one, right?

 2                THE COURT:  That would be or wouldn't be?

 3                DR. CARSON:  That would not be the one.

 4                THE COURT:  I don't know.

 5                DR. CARSON:  We'd get one on top of that?

 6                THE COURT:  You're not going to pin me down.

 7                DR. CARSON:  Okay.

 8                THE COURT:  But good try.

 9                DR. CARSON:  Just checking.

10           Okay.  So we only had two other summary judgment

11   motions that we were talking about that we mentioned in our

12   letter, and one would be on the doctrine of equivalence.  And

13   our basis there is -- and we -- in the motion itself, we will

14   rely heavily on many of the statements that Your Honor made

15   in the claim construction.

16           What happened with these molar ratio patents is

17   they had claims that were directed to about these different

18   ratios.  And during the claim construction, we were trying

19   say that about also precluded them from significant figures.

20   Now Your Honor disagreed and said no, they get a certain

21   amount of play on either side of the ratios, and that's what

22   we're living with.

23           But now what plaintiffs want is even more play, and

24   they want it -- they want play based on doctrine of

25   equivalence.  And we believe that it's very clear from what

1    happened in the prosecution history -- and we walked through

2    it, in part, when we were at the claim construction, that

3    they narrowed their claims to avoid the prior art and are,

4    thus, barred from the doctrine of equivalence of trying to

5    reclaim that territory.

6          And so that's the basis of our doctrine of

7    equivalence summary judgment.  It's something that is a

8    matter of law, to be decided by Your Honor.  It's going to

9    have to be decided at some point by Your Honor, and whether

10   or not prosecution history estoppel applies.  And it would

11   significantly reduce many of the issues that were -- that

12   we're looking at, at trial.

13         I actually have notes on how much of the expert

14   reports it would take out, but I believe it's about 200 pages

15   of Dr. Mitchell's expert report, the 600 pages that Dr.

16   Mitchell put in, about 200 pages of that is relating to

17   doctrine of equivalence, so it would cut things down.

18   Certainly, it would simplify things for -- in terms of the

19   evidence that would be presented at trial to take out

20   doctrine of equivalence, so that's something that we would

21   very much like the opportunity to move on summary judgment

22   on.

23         The other is we also feel that summary judgment of

24   indefiniteness on the fully encapsulated aspect of -- there's

25   two sets of patents in this case:  There's what we call the

1    mobile ratio, which is the subject of the doctrine of

2    equivalence, the prosecution history estoppel summary

3    judgment, and then there's what we call the encapsulation

4    patent family, the 651.  And there, Your Honor construed what

5    was meant by "fully encapsulated," fully, not partially.

6            Well, we now have their witnesses, our witnesses,

7    there seems to be a consensus that, partially, nobody knows

8    what "partially" is.  And so our argument really has three

9    bases for indefiniteness:

10           The meaning of "fully," as opposed to "partially,"

11   encapsulated is unclear.

12           We also are arguing that there is no method to

13   accurately quantify whether or not a nucleic acid --

14           THE COURT:  The meaning of what is unclear?  I'm

15   sorry.

16           DR. CARSON:  "Fully," as opposed to "partially"?

17           THE COURT:  And that's summary judgment, not

18   additional claim construction, because?

19           DR. CARSON:  It's really not because --

20           THE COURT:  It's really not which?

21           DR. CARSON:  It's not --

22           THE COURT:  Summary judgment or claim construction?

23           DR. CARSON:  It's summary judgment.

24           THE COURT:  Okay.

25           DR. CARSON:  It's summary judgment because we --

1    it's summary judgment on indefiniteness.

2                THE COURT:  Uh-huh.

3                DR. CARSON:  And now that Your Honor has construed

4    the claim --

5                THE COURT:  Got it.

6                DR. CARSON:  -- now the question is, is can

7    somebody figure out, a personal of reasonable skill, ordinary

8    skill in the art, could they figure out what are the metes

9    and the bounds of the claims.  And we're saying that they

10   can't, and we really have three bases for saying that:

11               One is the meaning of "fully," as distinct from

12   "partially," encapsulated is unclear;

13               That there's no known method to figure out whether

14   or not something is partially encapsulated.

15               And even if you had that type of a method, it gives

16   all different types of results.

17               So that's the -- at a high level, what we would be

18   arguing in the summary judgment for indefiniteness, and that

19   is all of the motions that we wanted to raise on the summary

20   judgment.

21               THE COURT:  Thank you.

22               DR. CARSON:  Understanding that 1498 is going to be

23   in there.

24               THE COURT:  Understood.

25               DR. CARSON:  Does my colleague have anything to add

1    on 1498?

2        (Participants confer)

3        THE COURT:  Again, I think 1498 seems -- I want to

4    look at the other ones, but that's a likely --

5        DR. CARSON:  Thank you, Your Honor.

6        THE COURT:  Yes.  Thank you.

7        Yes?

8        MR. BERL:  Your Honor, if I may just reiterate, we

9    are happy to limit summary judgment substantially, as long as

10   it's bilateral, or even shorten the duration of the briefing,

11   if Your Honor would like, in order to try to preserve the

12   trial date.  That is, again --

13       THE COURT:  Yeah.  I mean, I'm not --

14       MR. BERL:  -- our top priority.

15       THE COURT:  Okay.  I understand.  And having a firm

16   trial date on the thing is very, very important if you want

17   to -- if the -- both parties, after this discussion, want to

18   narrow their summary judgment requests, you can, you know,

19   send me a letter, real quick, and let me know, you know, how

20   you want to narrow it.  I'm happy to consider -- I'll

21   consider any narrowing of summary judgment requests before I

22   make a decision.

23       And I'm not going to spring a you got a new trial

24   date, you know, at the last minute on you.  I just -- there's

25   a lot of work to do and I got a whistle-blower case I'm --

1    well, you guys are counsel, I think.  Isn't your firm counsel

2    on that?  Yeah, that's -- I have a lot to do in between now

3    and September, so we'll be in touch.  We're going to be in

4    touch a lot more on this case, I know we're getting to the

5    end of it.  Okay?

6            All right.  Well, thank you, everyone, for your

7    input.  This was very helpful.  Is there anything else, while

8    we're all here, you want to talk about?

9            MR. MCLENNAN:  Your Honor, we did have one issue.

10           THE COURT:  Plaintiff always goes first.

11           MR. MCLENNAN:  Oh, I'm sorry.

12           MR. BERL:  Not at this time, Your Honor.  Thank you

13   for your time.

14           THE COURT:  All right.  Go ahead.

15           MR. MCLENNAN:  Your Honor, we did have one issue,

16   it's of a sensitive nature, if it would be okay to approach

17   with counsel.

18           THE COURT:  Do you want to go to sidebar?

19           MR. MCLENNAN:  Is that possible?

20           THE COURT:  Okay.  Sure.  I think there is a -- we

21   don't need all the lawyers.  Two lawyers from -- one lawyer

22   from each side, one lawyer from -- one lawyer from each side,

23   and I think there's a -- pick your lawyer.  Are we good with

24   these two?

25           (Laughter)

```
 1                    THE COURT:  Okay.

 2            (At sidebar)

 3                    MR. MCLENNAN:  Your Honor, is it possible to go off

 4       the record, if I can just --

 5                    THE COURT:  Yeah.

 6                    MR. MCLENNAN:  -- explain what the issue is and

 7       then you can.

 8                    THE COURT:  Off the record.

 9            (Off the record at 11:05 a.m.)

10            (Proceedings resume at 11:09 a.m.)

11                    THE COURT:  All right.  Anything else anyone else

12       wants to talk about?

13                    DR. CARSON:  Your Honor, my colleagues pointed out

14       to me there's -- it's not clear on case narrowing because

15       what we put into our letter was --

16                    THE COURT:  Everyone can sit down.

17                    DR. CARSON:  -- was in accordance with what Your

18       Honor asked for, which was the -- which was the obviousness

19       on the prior art combinations.  We haven't addressed 112.

20       I'd ask that you give us a chance to meet and confer with the

21       other side about something --

22                    THE COURT:  Okay.

23                    DR. CARSON:  -- to do with 112 --

24                    THE COURT:  So why don't --

25                    DR. CARSON:  -- and then --
```

```
 1              THE COURT:  -- we do this?  Do you mean -- is this

 2     on the summary judgment topic?

 3              DR. CARSON:  This is on narrowing --

 4              THE COURT:  The narrowing.

 5              DR. CARSON:  -- the issues for the case.

 6              THE COURT:  All right.  I have your narrowing

 7     suggestions.

 8              DR. CARSON:  Well, but you --

 9              THE COURT:  I don't think --

10              DR. CARSON:  -- don't have --

11              THE COURT:  -- they're that --

12              DR. CARSON:  -- ours on --

13              THE COURT:  -- far apart.

14              DR. CARSON:  -- 112.

15              THE COURT:  I'm sorry?

16              DR. CARSON:  Well, you don't have one from us on

17     112.

18              THE COURT:  So why don't we do this?  Why don't we

19     -- since we've had a good discussion, why don't we -- within

20     a week, I'll issue an order to this effect.  Why don't you --

21     since we've had a discussion and you sort of have some

22     information about my thinking on things, within a week, why

23     don't you resubmit your submissions regarding the narrowing

24     and summary judgment topics.

25              DR. CARSON:  Okay.
```

```
 1              THE COURT:  Okay?

 2              DR. CARSON:  All right.  That sounds --

 3              THE COURT:  You look like you're not understanding.

 4              MR. BERL:  I'm just wondering if it can be done

 5    sooner because we have an 8:30 deadline for filing summary

 6    judgment.  I think the earlier that the case is narrowed,

 7    from perspective, the better.

 8              THE COURT:  Well, sooner than a week?  Okay?

 9    Tomorrow?

10         (Participants confer)

11              THE COURT:  A week is a pretty short deadline.

12              DR. CARSON:  A week sounds reasonable to us.

13              THE COURT:  Yeah.  I'll do it within a week.

14              And this is an important, big case.  Don't worry

15    about -- if you come to me -- everyone has been pretty

16    reasonable so far.  If I'm -- if you feel squeezed, I don't

17    want, you know, people to pull all-nighters for a week.  If

18    you feel squeezed and you need a little relief on the summary

19    judgment deadline, tell me, I'll give you -- I'll give you

20    some leeway there.  It's better it's being done right, not

21    under a lot of pressure.  Okay?

22              So we'll issue that order, resubmit your summary

23    judgment asks and your narrowing requests, and we'll go from

24    there.  Okay?  All right.  Thank you, everyone.

25              THE COURT OFFICER:  All rise.
```

1      (Proceedings concluded at 11:11 a.m.)

2                          * * * * *

3                       <u>CERTIFICATION</u>

4           I certify that the foregoing is a correct

5      transcript from the electronic sound recording of the

6      proceedings in the above-entitled matter to the best of my

7      knowledge and ability.

8

9

10

11

12

13      _____        May 8, 2025

14      Coleen Rand, AAERT Cert. No. 341

15      Certified Court Transcriptionist

16      For RedDoor Legal Services, LLC

17

18

19

20

21

22

23

24

25