## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARBUTUS BIOPHARMA CORPORATION
and GENEVANT SCIENCES GMBH

*Plaintiffs*,

v.

MODERNA, INC. and MODERNATX,
INC.,

*Defendants*.

**Redacted - Public Version**

C.A. No. 22-252-JDW

MODERNA, INC. and MODERNATX,
INC.,
*Counterclaim-Plaintiffs*,

v.

ARBUTUS BIOPHARMA CORPORATION
and GENEVANT SCIENCES GMBH,

*Counterclaim- Defendants*.

**JURY TRIAL DEMANDED**

## <u>DECLARATION OF MATTHEW W. LACHMAN, ESQ.</u>

I, Matthew W. Lachman, declare under penalty of perjury that the following is true and correct:

1.      I am an attorney practicing with the firm of Williams & Connolly LLP, representing Plaintiff Genevant Sciences GmbH ("Genevant"), in this action.  I am familiar with the authenticity of the documents attached and I submit this declaration in support of Plaintiffs' Opening Summary Judgment Brief, Opening Brief in Support of Motion to Exclude Certain Expert Testimony of Drs. Anderson and Prud'homme, and Plaintiffs' Statements of Uncontested

Facts in Support of Motion for Summary Judgment.  The Exhibits listed below are cited in the Briefs and Statements of Uncontested Facts.

2.      Attached as Exhibits 1 through 29 to this declaration are true copies of the following documents:

| Number | Description | ECF Title |
|---|---|---|
| 1 | Moderna's Identification of § 102/103 and § 112 Invalidity Defenses Pursuant to D.I. 475, dated June 9, 2025 | Moderna Invalidity Disclosures |
| 2 | Letter from M. McLennan to S. Mahaffy (Sept. 19, 2023) ("Sept. 19, 2023 Letter") | Sept. 19, 2023 Letter |
| 3 | Excerpt from Moderna's Final Invalidity Contentions, dated June 28, 2024 | Moderna's Final Invalidity Contentions |
| 4 | Excerpt from Opening Expert Report of Dr. Daniel Griffith Anderson | Anderson Opening Report |
| 5 | Excerpt from Responsive Expert Report of Dr. Niren Murthy Regarding Validity[*] | Murthy Validity Report |
| 6 | Excerpt from Reply Expert Report of Dr. Daniel Griffith Anderson[*] | Anderson Reply Report |
| 7 | Excerpt from Opening Expert Report of Dr. Robert Prud'homme, PhD | Prud'homme Opening Report |
| 8 | Excerpt from Expert Report of Dr. Pierre Meulien, Ph.D. | Meulien Opening Report |
| 9 | Excerpt from Reply Invalidity Expert Report of Dr. Robert Prud'homme, PhD[*] | Prud'homme Reply Report |
| 10 | Excerpt from Deposition Transcript of Dr. Robert Prud'homme, PhD, dated Apr. 16, 2025 | Prud'homme Dep. Tr. |
| 11 | Excerpt from Reply Report of Dr. Pierre Meulien, Ph.D. | Meulien Reply Report |
| 12 | Excerpt from Dr. Lorne Palmer Laboratory Notebook 0608, dated Nov. 29, 2013 (GENV-00070361) | Dr. Palmer 11/29/2013 Lab Notebook |
| 13 | Excerpt from Mr. Stephen Reid Laboratory Notebook 0123, dated Feb. 12, 2009 (GENV-00523502)[*] | Mr. Reid 2/12/2009 Lab Notebook |
| 14 | Excerpt from Deposition Transcript of Mr. Stephen Reid, dated May 28, 2024[*] | Reid Dep. Tr. |
| 15 | Andrew J. Geall et al., *Nonviral delivery of self-amplifying RNA vaccines*, 109 (36) PROC. NATL. ACAD. SCI. U.S.A. 14604-14609 (2012) ("Geall 2012") | Geall 2012 |

[*] Pursuant to confidentiality agreements, the names of certain third-party entities have been redacted from this exhibit.  These names are not relevant to Plaintiffs' motions, but Plaintiffs can file unredacted copies at the Court's request.

| 16 | Sedic et al., *Safety Evaluation of Lipid Nanoparticle-Formulated Modified mRNA in the Sprague-Dawley Rat and Cynomolgus Monkey*, 55 VETERINARY PATHOLOGY 341 (2018) ("Sedic 2018") | Sedic 2018 |
|----|----|----|
| 17 | Jerry Leung et al., *Genetically engineered transfusable platelets using mRNA lipid nanoparticles*, 9(48) SCIENCE ADVANCES 1–13 (2023) ("Leung 2023") and excerpt from supplemental figures | Leung 2023 |
| 18 | Excerpt from de Fougerolles et al. WO 2013/090648 ("WO 2013/090648") | WO 2013/090648 |
| 19 | Erika Check, *RNA to the rescue?*, 425 NATURE 10–12 (2003) ("Check 2003") | Check 2003 |
| 20 | Excerpt from Opening Expert Report of Dr. Michael Mitchell | Mitchell Opening Report |
| 21 | Non-Exclusive License Agreement by and between Acuitas Therapeutics Inc. and ModernaTX, Inc., dated Dec. 14, 2016 | December 2016 Acuitas Sublicense |
| 22 | Non-Exclusive License Agreement by and between Acuitas Therapeutics Inc. and ModernaTX, Inc., dated May 22, 2015 | May 2015 Acuitas Sublicense |
| 23 | Non-Exclusive License Agreement by and between Acuitas Therapeutics Inc. and ModernaTX, Inc., dated Oct. 12, 2016 | October 2016 Acuitas Sublicense |
| 24 | Non-Exclusive License Agreement by and between Acuitas Therapeutics Inc. and ModernaTX, Inc., dated Aug. 19, 2016 | August 2016 Acuitas Sublicense |
| 25 | Excerpt from Deposition Transcript of Dr. Sunny Himansu, dated Nov. 17, 2023 | Himansu Dep. Tr. |
| 26 | Excerpt of Arbutus Form 8-K, dated Feb. 22, 2018 | Arbutus 2018 8-K |
| 27 | Excerpt of bioRxiv Preprint of Corbett et al., *SARS-CoV-2 mRNA vaccine design enabled by prototype pathogen preparedness*, 586 NATURE 567 (2020), dated June 11, 2020 | Corbett 2020 Preprint |
| 28 | Excerpt of Corbett et al., *SARS-CoV-2 mRNA vaccine design enabled by prototype pathogen preparedness*, 586 NATURE 567 (2020) ("Corbett 2020") | Corbett 2020 |
| 29 | Excerpt from IPR2018-00739 U.S. Patent No. 9,364,435 Paper 28, Petitioner's Reply to Patent Owner Response ("Pet'r Reply") | Moderna 435 IPR Reply |

3.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed on: July 25, 2025

_____ /s *Matthew W. Lachman* ___
Matthew W. Lachman

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2025, this document was served on the persons listed

below in the manner indicated:

**BY EMAIL:**

Brian P. Egan
Travis J. Murray
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

Patricia A. Carson, Ph.D.
Jeanna M. Wacker
Mark C. McLennan
Nancy Kaye Horstman
Shaoyao Yu
Mara L. Greenberg
Leslie M. Schmidt, P.C.
Andrew Lee
Brad Deem
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
patricia.carson@kirkland.com
jeanna.wacker@kirkland.com
mark.mclennan@kirkland.com
kaye.horstman@kirkland.com
shaoyao.yu@kirkland.com
mara.greenberg@kirkland.com
leslie.schmidt@kirkland.com
andrew.lee@kirkland.com
brad.deem@kirkland.com

Alina Afinogenova
Noah Frank
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500
alina.afinogenova@kirkland.com
noah.frank@kirkland.com

James F. Hurst
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
james.hurst@kirkland.com

Yan-Xin Li
Hannah Suh
Laura Ashley Harris
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
(415) 439-1400
yanxin.li@kirkland.com
hannah.suh@kirkland.com
lauraashley.harris@kirkland.com

Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
jason.wilcox@kirkland.com

*/s/ Matthew W. Lachman*
Matthew W. Lachman

# EXHIBIT 17

SCIENCE ADVANCES | RESEARCH ARTICLE

# Genetically engineered transfusable platelets using mRNA lipid nanoparticles

Jerry Leung[1,2,3,4]†, Colton Strong[1,2,3]†, Katherine E. Badior[5]†, Madelaine Robertson[1,2,3,4], Xiaowu Wu[6], Michael A. Meledeo[6], Emma Kang[3,7], Manoj Paul[5], Yusuke Sato[8], Hideyoshi Harashima[8], Andrew P. Cap[6], Dana V. Devine[2,3,7,9], Eric Jan[2], Pieter R. Cullis[2,4], Christian J. Kastrup[1,2,3,5,10]*

Copyright © 2023 The Authors, some rights reserved; exclusive licensee American Association for the Advancement of Science. No claim to original U.S. Government Works. Distributed under a Creative Commons Attribution License 4.0 (CC BY).

Platelet transfusions are essential for managing bleeding and hemostatic dysfunction and could be expanded as a cell therapy due to the multifunctional role of platelets in various diseases. Creating these cell therapies will require modifying transfusable donor platelets to express therapeutic proteins. However, there are currently no appropriate methods for genetically modifying platelets collected from blood donors. Here, we describe an approach using platelet-optimized lipid nanoparticles containing mRNA (mRNA-LNP) to enable exogenous protein expression in human and rat platelets. Within the library of mRNA-LNP tested, exogenous protein expression did not require nor correlate with platelet activation. Transfected platelets retained hemostatic function and accumulated in regions of vascular damage after transfusion into rats with hemorrhagic shock. We expect this technology will expand the therapeutic potential of platelets.

## INTRODUCTION

Platelets are an integral component of hemostasis and are routinely transfused to restore hemostatic balance in thrombocytopenic or actively bleeding patients, with approximately 2 million platelet units transfused each year in the United States (1). Beyond these indications, platelets could be expanded as cell therapies for other diseases because they contribute to sepsis, inflammation and arthritis (2, 3), and cancer metastasis (4), along with targeting and retention at many diseased tissues (5). To create new platelet cell therapies, platelets will need to be genetically modified to express therapeutic proteins. However, a major barrier to developing new platelet cell therapies is that there are currently no methods to genetically modify donor platelets. Neither electroporation, viral vectors, lipid nanoparticles (LNP), nor commercial transfection agents have edited donor platelets to express exogenous proteins.

Indirect approaches exist that express exogenous protein in platelets or platelet-like particles by targeting platelet precursor stem cells with lentiviral vectors. Circulating platelets can be permanently modified through a bone marrow transplant of genetically modified megakaryocytes, for example, to correct hemophilia A (6–8). Platelet-like particles can be cultured from stem cells, which produce low quantities of cells that have been transfused into people (9, 10). In contrast, authentic platelets collected from blood donors and intended for transfusion are available in large quantities and retain important functions of circulating platelets (11). Functionally modifying these authentic, donor-derived platelets would be required for most applications of platelet cell therapies.

Platelets are challenging cells to genetically modify for several reasons. They are anucleate and thus unamenable to DNA-based transfection. Platelets have the cellular machinery to synthesize proteins from mRNA and are translationally active; however, they exhibit low rates of protein synthesis compared to nucleated mammalian cells (12). Platelets are also easily activated in response to stress, an often nonreversible cellular state promoting blood coagulation, accompanied by an increase in cell surface expression of CD62P (13). An ideal transfection agent for platelets would not activate them but would preserve platelet capacity to activate when exposed to agonists.

LNP represent a potentially ideal transfection agent, due to their ability to facilitate delivery and intracellular release of genetic material. Previous attempts to transfect platelets with LNP containing mRNA (mRNA-LNP) demonstrated that mRNA delivery into platelets is possible; however, protein expression was not observed (14). Advancements in LNP technology have substantially improved LNP potency and efficacy, as highlighted by the first US Food and Drug Administration (FDA)–approved RNA interference therapeutic for hereditary transthyretin amyloidosis (hATTR) (15), as well as the mRNA-based severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) vaccines that have been received by over 2.5 billion people (16).

Here, we report that mRNA-LNP are capable of directly transfecting donor platelets to express exogenous proteins under specific conditions. Platelets modified with mRNA-LNP maintained their function, including accumulating locally in wounds and contributing to hemostasis after transfusion into coagulopathic rats.

[1]Michael Smith Laboratories, University of British Columbia, Vancouver, V6T 1Z4, Canada. [2]Department of Biochemistry and Molecular Biology, University of British Columbia, Vancouver, V6T 1Z3, Canada. [3]Centre for Blood Research, University of British Columbia, Vancouver, V6T 1Z3, Canada. [4]NanoMedicines Research Group, University of British Columbia, Vancouver, V6T 1Z3, Canada. [5]Blood Research Institute, Versiti, Milwaukee, WI 53226, USA. [6]Blood and Shock Resuscitation Program, United States Army Institute of Surgical Research, JBSA-FT Sam Houston, San Antonio, TX 78234, USA. [7]Department of Pathology and Laboratory Medicine, University of British Columbia, Vancouver, V6T 2B5, Canada. [8]Laboratory for Molecular Design of Pharmaceutics, Faculty of Pharmaceutical Sciences, Hokkaido University, Hokkaido, 060-0812, Japan. [9]Centre for Innovation, Canadian Blood Services, Vancouver, V6T 1Z3, Canada. [10]Departments of Surgery, Biochemistry, Biomedical Engineering, and Pharmacology and Toxicology, Medical College of Wisconsin, Milwaukee, WI 53226, USA.
*Corresponding author. Email: ckastrup@versiti.org
†These authors contributed equally to this work.

Downloaded from https://www.science.org on January 08, 2025

GENV-01082620

SCIENCE ADVANCES | RESEARCH ARTICLE

## RESULTS

### LNP uniquely enable exogenous protein expression in platelets

To identify effective transfection methods for platelets, mRNA (5′ capped and polyadenylated) encoding the enzyme NanoLuc luciferase (NanoLuc) was delivered by several transfection agents, and the expression of NanoLuc was measured (Fig. 1A). NanoLuc was not detected in platelets treated with free mRNA without a transfection agent nor by using commercial mRNA delivery reagents RiboJuice and Lipofectamine MessengerMAX, although commercial reagents enabled large amounts of mRNA to be taken up into platelets (Fig. 1, B and C). NanoLuc expression was detected using an mRNA-LNP formulation resembling the small interfering RNA–LNP that is clinically approved to treat hATTR (17). It consists of DLin-MC3-DMA (ionizable lipid), 1,2-distearoyl-sn-glycero-3-phosphocholine (DSPC; a "structural protein" or "helper" lipid), cholesterol, and 1,2-dimyristoyl-rac-glycero-3-methoxypoly-ethylene glycol-2000 (DMG-PEG$_{2000}$; a "PEG lipid"), hereafter referred to as MC3 DSPC. While MC3 DSPC enabled NanoLuc expression, an LNP with optimized lipid components consisting of ALC-0315 as the ionizable lipid and 1,2-dioleoly-sn-glycero-3-phosphocholine (DOPC) as the helper lipid (optimized) enabled a fourfold increase in uptake of mRNA-LNP and ninefold higher NanoLuc expression. The global translation inhibitor cycloheximide inhibited NanoLuc expression but not mRNA uptake, consistent with de novo protein synthesis in the mRNA-LNP–transfected platelets (fig. S1). NanoLuc expression also did not correlate with the concentration of residual white blood cells in the platelet concentrate (PC) remaining after leukoreduction, demonstrating that any contaminating leukocytes do not account for the luminescence (fig. S2). The amount of platelet activation following mRNA-LNP transfection was comparable to untreated controls that were not stimulated with agonist, measured by surface CD62P levels, whereas platelets transfected with RiboJuice had substantially increased activation (Fig. 1D). As CD62P levels can sometimes fluctuate (18), we also assessed the extent of activation as measured by annexin V binding to exposed phosphatidylserine. Annexin V binding was not substantially changed by transfection with mRNA-LNP (fig. S3). When additional steps were taken to minimize platelet activation during centrifugation and washing, including using platelet inhibitor prostaglandin E1 (PGE1), platelets maintained the ability to express NanoLuc. NanoLuc expression was robust while just approximately 15 and 25% of platelets were positive for CD62P with and without PGE1, respectfully (fig. S4). While the largest contribution to platelet activation was from centrifuging and washing rather than mRNA-LNP, we compared platelets transfected without PGE1 to cold-stored platelets, which are an approved product for transfusion and resuscitation in bleeding patients. Compared to cold-stored platelets, mRNA-LNP platelets displayed less CD62P and comparable CD42b (figs. S5 and S6).

### Platelet-optimized mRNA-LNP enable maximal exogenous protein expression

To identify the mRNA-LNP formulation most suitable for transfecting platelets, we optimized three major mRNA-LNP lipid components: the ionizable lipid, the helper lipid, and the PEG lipid. The ionizable lipid can markedly affect the morphology and potency of the LNP (19). Ten ionizable and two permanently cationic lipids were screened including clinically approved lipids ALC-0315 (20) and SM-102 (21) used in SARS-CoV-2 vaccines; previously established ionizable lipids KC2 and DODMA) (22); a series of other ionizable lipids effective at transfecting many cell types (CL1D6, CL1H6, CL4H6, CL7H6, and CL15H6) (23); and permanently cationic lipids 1,2-di-O-octadecenyl-3-trimethylammonium propane

Downloaded from https://www.science.org on January 08, 2025



**Fig. 1. Platelets transfected with mRNA using LNP can express exogenous protein.** (**A**) Schematic describing the transfection of platelets using mRNA-LNP. (**B**) NanoLuc expression, measured as the relative luminescence units (RLU) per total protein, using various transfection agents (n = 3). (**C** and **D**) Representative flow cytometry plots and quantification of median fluorescence intensity (MFI) (bars, left y axis) and percentage of platelets (red circles, right y axis) positive for Cy5-labeled mRNA (C) and platelet activation marker CD62P (D). The vertical dashed lines represent the MFI, and the arrows (top) represent the gate for positive events (n = 3). P values were determined by one-tailed unpaired Student's or Welch's t test. Values are mean ± SEM. ns, not significant; *P < 0.05. A.U., arbitrary units.

GENV-01082621

(DOTMA) and 1,2-dioleoyl-3-trimethylammonium propane (DOTAP) (Fig. 2, A and B). Protein expression, mRNA uptake, and activation were measured and normalized to MC3 DSPC. The highest protein expression was achieved with lipids KC2, SM-102, and MC3 and intermediate expression with DODMA and CL4H6. Although lipids CL1H6, CL15H6, CL1D6, DOTMA, and DOTAP all yielded high levels of mRNA uptake (fig. S7), low protein expression and high platelet activation made these undesirable transfection reagents. ALC-0315, which is a potent ionizable LNP in most settings (24, 25), gave low expression. Apart from KC2, no ionizable lipid in combination with DSPC achieved higher protein expression than MC3, and only lipids with an acid dissociation constant (pKa) between 6.5 and 6.7 enabled NanoLuc expression when transfected at a pH of 6.5 (fig. S8). Unexpectedly, lipids supporting the greatest RNA uptake did not have the highest protein expression. While the highest protein expression occurred with KC2, lipid CL4H6 induced minimal platelet activation while still expressing protein synthesis.

Helper lipids are another component which can greatly affect the structure and stability of the final mRNA-LNP (19). Eight different helper lipids were screened, using MC3 as the constant ionizable lipid (Fig. 2, C and D). All helper lipids tested enabled NanoLuc expression, ranging from 0.75- [egg sphingomyelin (ES)] to 1.6- [1-palmitoyl-2-oleoyl-sn-glycero-3-phospho-(1′-rac-glycerol) (POPG)] fold differences when compared to MC3 DSPC. While there were variations in mRNA uptake and activation, these differences were more subtle than those in the ionizable lipid screen. Substituting DSPC with DOPE, POPC, DOPG, or ES did not notably increase NanoLuc expression levels when formulated with MC3. POPC was identified as an optimal helper lipid, as it yielded the second lowest increase in surface CD62P median fluorescence intensity (MFI) while enabling protein expression comparable to DSPC.

To determine whether combinations of ionizable and helper lipids would have a synergistic effect in enhancing protein expression while minimizing platelet activation, we examined the two FDA-approved ionizable lipids (ALC-0315 and SM-102), as well as KC2 and CL4H6, in a combinatorial screen with the best performing helper lipids (POPG, DOPC, and POPC) (Fig. 2, E and F). mRNA-LNP formulations ALC-0315 DOPC and CL4H6 POPC yielded high protein expression, with CL4H6 POPC leading to minimal platelet activation. Expression of NanoLuc using ALC-0315 DOPC was also detected as early as 2 hours and for up to 40 hours posttransfection (fig. S9) and did not appear to substantially affect the morphological structure of the platelets compared to washed platelets (WPs) alone when assessed by transmission electron microscopy (TEM) (Fig. 2G). When tested in the commonly used immortalized platelet precursor cell line, MEG-01, these formulations yielded low levels of NanoLuc expression, and there was no correlation in relative expression between all mRNA-LNP tested in platelets and MEG-01 cells (Pearson correlation coefficient, $r = 0.17$) (Fig. 2H and fig. S10). In addition, changing the molar percentage of DMG-PEG$_{2000}$, which is known to influence particle size and transfection potency (19), did not significantly influence NanoLuc expression but changed mRNA uptake and platelet activation in both ALC-0315 DOPC and CL4H6 POPC formulations (fig. S11 and table S1).

In addition to the lipid composition, mRNA elements can play a substantial role promoting efficient exogenous protein synthesis

(26). Modified mRNA bases, such as pseudouridine and 5-methoxyuridine (5moU), are frequently used in mRNA-based therapeutics, influencing both translation and immunogenicity (27). We examined the effects of these modified uridine bases on platelet translation and activation. Pseudouridine-containing mRNA (Ψ) significantly increased protein expression compared to unmodified uridine, while 5moU yielded less protein expression (Fig. 2I). Both modifications significantly reduced the extent of platelet activation compared to unmodified mRNA (Fig. 2J). The cumulative effects of optimizing LNP lipids and mRNA modifications enabled the expression of firefly luciferase (Fig. 2K). Thus, LNP containing helper lipids with a phosphocholine head, along with lipids containing branched or unsaturated tail groups, were most suited for transfecting platelets and driving higher expression levels. Of the RNA modifications tested, unmodified uridine or pseudouridine was optimal for enabling higher NanoLuc expression levels.

## Exogenous protein expression in platelets is not dependent on activation

Expression of endogenous platelet proteins can occur following activation (12, 28), and we initially expected that expression of exogenous proteins from transfected mRNA may also depend on activation. To determine whether the expression of NanoLuc depended on the degree of platelet activation or the amount of RNA delivered, a correlation matrix analysis on the library of mRNA-LNP tested was performed. NanoLuc expression did not correlate strongly with either surface platelet CD62P levels or mRNA uptake (Fig. 3, A and B). There was a mild positive correlation between the amount of RNA delivered and platelet activation (Pearson correlation coefficient, $r = 0.59$) (Fig. 3B), a weak negative correlation between NanoLuc expression and mRNA uptake ($r = −0.35$) (Fig. 3C), and no correlation between NanoLuc expression and surface platelet CD62P levels ($r = −0.07$) (Fig. 3D).

We next tested whether NanoLuc expression would be influenced when platelets are activated using agonists before or following mRNA-LNP transfection. Platelets stimulated with adenosine diphosphate (ADP), cross-linked collagen-related peptide (CRP-XL), or thrombin for 30 min before mRNA-LNP treatment had significantly less NanoLuc expression when assessed at 4 hours (fig. S12). Similarly, when platelets were first incubated with mRNA-LNP for 3.5 hours and then stimulated with ADP, CRP-XL, or thrombin for 30 min, platelets also did not have increased NanoLuc expression (fig. S13). Platelets undergo substantial rearrangement of their transcriptome and proteome when they are stimulated with agonists for up to 2 hours (29). We thus activated platelets for 2 hours with either ADP or thrombin following 2 hours of mRNA-LNP treatment. The luminescence of both the cell pellet and supernatant fraction were measured to account for any NanoLuc potentially released during activation. There was no significant change in the expression of NanoLuc when platelets were stimulated with ADP (Fig. 3, E and F). Conversely, thrombin led to an approximately threefold decrease in NanoLuc in both fractions. Together, and unexpectedly, these results showed that translation of the exogenous mRNA did not require platelet activation, the highest expressing mRNA-LNP are those that do not induce activation, and stimulation with a potent agonist may be detrimental to exogenous protein synthesis over a period of several hours.

Downloaded from https://www.science.org on January 08, 2025

GENV-01082622

SCIENCE ADVANCES | RESEARCH ARTICLE



Downloaded from https://www.science.org on January 08, 2025

**Fig. 2. Luciferase expression and platelet activation depend on lipid composition and mRNA base modifications. (A to F)** Relative NanoLuc expression and platelet activation, respectively, with (A and B) various ionizable lipids, (C and D) helper lipids, and (E and F) combinations of select ionizable and helper lipids (*n* = 3). **(G)** Transmission electron micrographs of washed platelets (WPs) without LNP (no LNP), treated with mRNA-LNP (ALC-0315 DOPC and CL4H6 POPC) and stored at 4°C (cold storage). Scale bars, 500 nm. **(H)** Correlation between the NanoLuc expression in MEG-01 cells and platelets. Colors represent screens of ionizable lipid (red), helper lipid (blue), combinations of ionizable and helper lipids (purple). **(I and J)** Relative NanoLuc expression (I) and platelet activation (J) with unmodified uridine base [uridine 5′-triphosphate (UTP)] or the uridine base modifications 5-methoxyuridine (5moU) or pseudouridine (Ψ) (*n* = 3). All values were normalized to MC3 DSPC (dashed line). **(K)** Relative firefly luciferase expression normalized to MC3 DSPC. *P* values were determined by one-tailed unpaired Student's *t* test. Values are mean ± SEM. \*\**P* < 0.01; \*\*\**P* < 0.001.

GENV-01082623

SCIENCE ADVANCES | RESEARCH ARTICLE



**Fig. 3. Expression of exogenous protein does not correlate with activation nor extent of mRNA uptake.** (**A** and **B**) Pearson correlation matrix between relative NanoLuc expression, mRNA uptake, and platelet activation (A) with corresponding three-dimensional plot (B). (**C** and **D**) The data from (A) and (B) are replotted in two-dimensional graphs. Correlation between NanoLuc expression and mRNA uptake (C) and platelet activation (D). The dashed lines represent MC3 DSPC. Colors represent screens of ionizable lipid (red), helper lipid (blue), combinations of ionizable and helper lipids (purple), and DMG-PEG$_{2000}$ content (green). (**E** and **F**) Relative NanoLuc expression in the platelet pellet (E) and supernatant (F) following stimulation with agonists of platelet activation. All values were normalized to CL4H6 POPC treated platelets without agonists, represented by the dashed line ($n = 3$). $P$ values were determined by one-way analysis of variance (ANOVA). Values are mean ± SEM. **$P < 0.01$; ****$P < 0.0001$.

## Platelets treated with mRNA-LNP maintain hemostatic function in vitro

Platelets are highly sensitive to their physical and chemical environments, which adds to the challenge of genetic modification. To determine whether platelets could still be activated following mRNA-LNP transfection, their activation state and response to physiological agonists ADP or thrombin were measured. Platelets transfected with LNP responded similarly to platelets that were not transfected (Fig. 4, A and B). Without agonists, there was no significant increase in the MFI but statistically significant increase in the percentage of platelets positive for CD62P. ADP mildly increased CD62P levels, while CRP-XL and thrombin substantially increased CD62P levels in platelets transfected with mRNA-LNP.

To test whether transfected platelets retained their ability to contribute to the firmness and rate of clot formation, we used rotational thromboelastometry (ROTEM) and an ex vivo model testing

platelet activity in whole blood (WB) (Fig. 4C). Diluted WB was used to model dilutional coagulopathy, a defect in hemostasis often occurring following trauma or severe bleeding with resuscitation, which increases mortality risk (*30*). Platelets were prepared in a "transfusion package" (TP), after transfecting them with LNP (ALC-0315 DOPC or CL4H6 POPC, without mRNA) and mixing with plasma and red blood cells at a clinical ratio of 1:1:1. This TP was then added to diluted WB to model transfusion into a patient with dilutional coagulopathy, and its impact on hemostasis was compared to normal WB without dilutional coagulopathy. Platelets transfected with LNP responded similarly to untreated platelets when coagulation was initiated via the intrinsic pathway of coagulation, although there was some reduction in coagulability when activated via the extrinsic pathway (Fig. 4, D to G, and tables S2 and S3). Platelets transfected with LNP significantly improved the maximum clot firmness and clot formation time of diluted WB

Downloaded from https://www.science.org on January 08, 2025

GENV-01082624



Downloaded from https://www.science.org on January 08, 2025

**Fig. 4. Platelets treated with LNP maintain their ability to activate and contribute to the growth and firmness of blood clots. (A and B)** Platelet activation without agonists or stimulation by ADP, CRP-XL, or thrombin, as measured by the MFI of surface CD62P levels (A) and percentage of platelets positive for surface CD62P (B). (**C**) Representative ROTEM curves, with clotting initiated by ellagic acid ($n = 3$). The red shaded region is the area between whole blood (WB) and diluted WB (DWB) without the additional transfusion package (TP) added. (**D to G**) Quantifying ROTEM clot formation time (s) and maximum clot firmness (mm), for clotting activated with ellagic acid via the intrinsic pathway (C and D) or thromboplastin via the extrinsic pathway (E and F). The dashed lines represent firmness of WB (dark red) and DWB (light gray). $P$ values were determined by one-way ANOVA. Values are mean ± SEM. *$P < 0.05$; **$P < 0.01$.

compared to diluted WB alone when coagulation was initiated through either the intrinsic and extrinsic pathways, highlighting that LNP do not adversely affect platelet coagulability in vitro.

### Rat platelets transfected with mRNA-LNP expressed NanoLuc, circulated and localized to wound sites after transfusion into coagulopathic rodents with polytrauma

We next examined whether mRNA-LNP–transfected platelets can contribute to hemostasis in vivo using an established rat model of polytrauma with bleeding from kidney injuries, which models acute traumatic coagulopathy with impaired platelet function (*31*). The time from injury to cessation of bleeding and the weight of blood

GENV-01082625

SCIENCE ADVANCES | RESEARCH ARTICLE

collected throughout bleeding were measured and used as readouts of platelet function. To account for variability in clotting between animals, baseline values for kidney bleeding time and blood loss were first collected from the left kidney of each rat. This was followed by polytrauma and sustained coagulopathy, as indicated by an increased prothrombin time (Fig. 5, A and B). The right kidney was then injured, and rats were resuscitated with platelets which were either untreated (normal platelets) or transfected with NanoLuc mRNA using a rat-optimized LNP (SM-102 and POPC) labeled with the lipophilic tracer 1,1′-dioctadecyl-3,3,3′,3′-tetramethylindocarbocyanine perchlorate (DiI; fig. S14). At the termination

of the experiment, blood was collected to assess the circulation time of transfected platelets by NanoLuc expression, and histology of the kidneys was assessed to determine whether transfected platelets accumulated within the injury and clot. Since NanoLuc expression was not expected to enhance nor diminish platelet function, this study specifically examined the effect of transfecting platelets with mRNA-LNP, with the expectation that there would be either decreased hemostasis or no effect on hemostasis.

NanoLuc was detected in rat platelets transfected with mRNA-LNP both before transfusion and after circulation (Fig. 5C). No loss of NanoLuc from the blood occurred within the 10 min between



**Fig. 5. Rat platelets transfected with mRNA-LNP and transfused into rats circulated, accumulated at damaged vasculature in wounds, and contributed to hemostasis.** (**A**) Overview of the transfusion procedure. Timeline not drawn to scale. (**B**) Prothrombin time in WB collected from rats receiving normal platelets before trauma (baseline) and posttrauma ($n = 3$). (**C**) NanoLuc expression in mRNA-LNP–treated platelets before transfusion and 10 min posttransfusion into rats ($n = 3$). The green dashed line represents the luminescence of the pretransfusion platelets after correcting for the predicted dilution factor of transfusing into the bloodstream. $P$ values were determined by one-tailed unpaired Student's $t$ test. Values are mean ± SEM. (**D** and **E**) Kidney bleeding times (D) and blood loss (E) of rats transfused with platelets transfected with mRNA-LNP (mRNA-LNP platelets, purple) and platelets not transfected (normal platelets, gray) ($n = 3$). (**F**) Representative histological images of lacerated kidneys. mRNA-LNP–treated platelets contained a fluorescent lipid in the LNP (DiI, yellow). Sections were stained with an antibody for platelet CD61 (red) and a nuclear stain [4′,6-diamidino-2-phenylindole (DAPI), blue]. Scale bars, 20 μm.

Downloaded from https://www.science.org on January 08, 2025

GENV-01082626

transfusion and blood collection. Luminescence was 3.6-fold higher in the pretransfusion platelets than in the blood after resuscitation and circulation, as the platelets were diluted by approximately 80% when transfused (*32*). Kidney bleeding time and blood volume were not statistically different between normal platelets and transfected platelets, indicating that platelets transfected with mRNA-LNP retained function in vivo (Fig. 5, D and E). Coagulation parameters and blood biochemistry were also equivalent between the two sets of resuscitated rats (fig. S15). In histological images, DiI was concentrated in the kidney wounds, indicating that transfected platelets localized to the injured tissue (Fig. 5F).

## DISCUSSION

Targeted delivery of molecules and cell therapies to damaged vasculature is a major challenge, yet platelets naturally perform this task. Despite the clinical relevance and untapped potential of platelet transfusions, genetically modifying donor platelets to enhance or "engineer" their function has not been successful. To overcome this problem, we developed platelet-optimized LNP and mRNA, resulting in successful protein expression while preserving platelet cellular function and local accumulation at damaged vasculature.

Platelet-optimized mRNA-LNP were cell specific and not optimal for transfecting the platelet precursor MEG-01 cell line. Differences in specificity between cells are largely determined by LNP characteristics such as the pKa of the ionizable lipid (*33*, *34*). A pKa below or approximately equal to the pH of the transfection buffer allows the mRNA-LNP to remain neutral before cellular uptake but adopt a greater positive charge within endosomes to enable release of mRNA into the cytoplasm (*15*). Platelet-optimized mRNA-LNP were transfected at pH 6.5, and only ionizable lipids with a pKa between 6.5 and 6.7 enabled detectable NanoLuc expression. Ionizable lipids with higher pKas lead to greater positive charge on the LNP surface, and these correlated to increased RNA uptake, increased platelet activation, and little to no protein expression. Platelets transfected with the permanently cationic lipids DOTAP and DOTMA resulted in highest Cy5 and surface CD62P intensities but no NanoLuc expression, possibly due to these cationic lipids disrupting the plasma membrane or endocytic pathways, caused by the positive surface charge of the LNP, and influencing platelet metabolic processes or inducing toxicity (*19*).

The mRNA was optimized using modified uridine bases, which enabled the expression of another reporter protein. As seen in multiple cell lines (*27*), Ψ-containing mRNA significantly increased protein expression compared to unmodified uridine. This may be from decreased immunogenicity by masking the detection from endogenous Toll-like receptors (*35*) therefore enabling higher mRNA translation. The combination of the modified mRNA and optimized LNP was used to express firefly luciferase, which has approximately 150-fold less luminescence than NanoLuc (*36*). While the levels of protein expression in platelets is lower than many other cell types, the level of expression may be sufficient to elicit a therapeutic effect in the context of an entire transfusion unit. The luciferase enzymes expressed here show that platelets can use exogenous mRNA to express enzymes that are properly folded and active. This supports that additional exogenous proteins can be expressed by platelets using the optimized mRNA-LNP. When platelets were activated by agonists it decreased subsequent NanoLuc expression, and thus, we expect that clinical applications of this technology would express the exogenous protein in platelets before transfusion, similarly to how the rat experiment was done in this study. In this manner, exogenous protein and enhanced platelet activity would be immediately present at the time of transfusion. In addition, while NanoLuc is expected to be expressed and remain in the cytoplasm, extending expression to other proteins that localize to granules or the platelet membrane is an area for future research.

Translation in platelets is both constitutive (*37*) and inducible (*12*) in response to agonists. Unexpectedly, in mRNA-LNP–transfected platelets, NanoLuc expression was not increased following platelet activation. In addition, protein expression did not correlate with surface CD62P presentation, and treatment with thrombin, CRP-XL, and ADP significantly decreased NanoLuc signal in the conditions tested here. Furthermore, when platelet activation was minimized using the inhibitor PGE1, NanoLuc expression was still robust. Platelet expression of NanoLuc may therefore be occurring from a constitutive pathway, which could explain why expression decreased following activation, as resources for protein expression could be reallocated during this state toward inducible pathways. Further investigating platelet activation and its effects on exogenous mRNA translation may be important for increasing protein expression in platelets in the future, especially under conditions where inducible expression is favorable.

Transfecting donor platelets with optimized mRNA-LNP not only preserved hemostatic function and the ability to respond to agonists in vitro but also induced a mild to moderate increase in CD62P surface expression. Although increased presentation of surface CD62P is associated with platelet storage lesion, exhaustion, and reduced function over time, moderate activation does not preclude platelets from transfusion (*38*). The hemostatic function of platelets, rather than circulation time, is most pertinent for platelets transfused to treat acute bleeding in surgery, emergency, and critical care (*39*). As observed in cold-stored platelets, moderate activation of platelets can act as a "primer" to enhance agonist response, clot strength, and clot stability (*40*). For example, cold storage of apheresis platelets results in 40 to 60% surface CD62P presentation and are transfused for resuscitation in bleeding patients (*41*, *42*). The CD62P levels of platelets transfected with mRNA-LNP were lower than that of cold-stored platelets, further suggesting that transfection will not preclude mRNA-LNP–treated platelets from transfusion. Further optimization of LNP and mRNA elements, in addition to the transfection process that currently includes washing platelets, is expected to further decrease CD62P presentation.

However, activation of platelets, such as through cold storage, also results in more rapid platelet clearance from circulation, reducing the utility of prophylactic platelet transfusions in nonbleeding, thrombocytopenic patients (*43*). In most studies, we chose not to use inhibitors of platelet activation during the processing or transfection, such as prostaglandin I$_2$, because these are not normally used in blood banking and transfusion processes. While platelets transfected with mRNA-LNP circulated for at least 10 min in rats, decreasing their activation may help extend circulation times. Furthermore, rat platelets transfected with mRNA-LNP were tolerated by recipient rats and localized to the kidney incision wound. Platelets maintained the exogenous protein during circulation. Together, this supports that the transfection methodology developed here is amenable to applications within and beyond acute bleeding. Determining the circulation time beyond 10 min would also help to further define the indications that would benefit from mRNA-

Downloaded from https://www.science.org on January 08, 2025

GENV-01082627

SCIENCE ADVANCES | RESEARCH ARTICLE

LNP–treated platelets. Platelets genetically modified through bone marrow transplant of platelet-precursor cells are being tested in wide-ranging preclinical and clinical applications such as for thrombolysis and bleeding disorders (7, 44). Donated platelets genetically engineered with mRNA-LNP may be useful for these applications in the future.

Achieving delivery of nucleic acids and exogenous translation using platelet-optimized mRNA-LNP is a considerable opportunity to broaden and engineer platelets for various clinical applications. We expect that donor platelets engineered with mRNA-LNP may be used to treat acute bleeding and can potentially be expanded for use in thrombolytics, bleeding disorders, and applications in oncology. Platelets transfected with optimized mRNA-LNP are functional, transfusable, and accumulate in damaged vasculature. Thus, we expect that further optimizing and expanding this technology can lead to more effective platelet therapies, from targeting bleeding in hematological disorders or crises to the large range of diseases that platelets modulate.

## MATERIALS AND METHODS
### Blood component production
Pooled PCs, packed red blood cells (pRBCs), and plasma were produced by the Canadian Blood Services Blood4Research Facility in Vancouver, Canada, from donors providing signed informed consent. PC was prepared using the buffy coat production method, where PCs are leukoreduced such that residual leukocyte are within the quality criteria standard defined by Canadian Blood Services, as previously described (45). PC was then stored for 1 day at 22°C under constant agitation (PC1200-Pro Platelet Incubator, Helmer Scientific, Noblesville, IN). pRBCs were stored at 4°C, and plasma was stored at −30°C. To produce cold-stored platelets resembling current cold-stored platelet products, industry standard Macopharma PC bags, made from polyvinyl chloride with the plasticizer butyryl trihexyl citrate (BTHC), were welded to fit 15 ml of platelets in plasma. PCs were then aliquoted into the bags and stored at 4°C without agitation for 24 hours before use. For some experiments, analogous platelet-poor plasma was obtained from platelet units by centrifugation at 2400g for 20 min at 22°C. WB used in the model of dilutional coagulopathy was collected in citrated Vacutainer tubes (Becton Dickinson, Franklin Lakes, NJ) from healthy donors. In some studies, presented in figs. S4 and S9, leukoreduced single-donor platelet units were used which were produced by apheresis (Trima Accel automated component collection system, Terumo BCT Inc., Lakewood, CO), from donors providing signed informed consent. Single-donor platelet units were purchased from Versiti Blood Center of Wisconsin and treated with mRNA-LNP on the same day as collection. This study was conducted in accordance with protocols approved by the University of British Columbia Ethics Committees (H21-01516 and H16-00773), the Canadian Blood Services Research Ethics Board (2021-007), and the Medical College of Wisconsin Institutional Review Board (PRO00043006).

### Platelet transfection preparation
WPs were prepared for transfection from PC units. PC was sampled through a coupling port (Fresenius Kabi, Bad Homburg, Germany) with a sterile Leur-Lok syringe (Becton Dickinson, Franklin Lakes, NJ). PC was centrifuged at 250g for 20 min at room temperature as described previously (14). The supernatant was removed, and the remaining platelet pellet was washed once in anticoagulant citrate dextrose solution, USP, Formula A (ACD-A) (Haemonetics, Boston, MA) and once in Tyrode's-Hepes buffer (pH 6.5) (134 mM NaCl, 2.9 mM KCl, 0.34 mM NaH$_2$PO$_4$, 10 mM Hepes, and 5 mM D-glucose) at 250g for 10 min at 22°C. WPs were suspended in Tyrode's-Hepes buffer (pH 6.5) and counted using a Sysmex XN-550 hematology analyzer (Sysmex Corporation, Kobe, Japan). For all experiments, three PC units were washed and transfected within 24 hours.

### Synthesizing mRNA in vitro
mRNA was synthesized in bulk by in vitro transcription. Briefly, DNA templates encoding a CleanCap AG bacteriophage T7 promoter site and NanoLuc or firefly luciferase coding sequence were linearized with Sap I. RNA was produced by in vitro transcription reactions containing CleanCap AG reagent and modified nucleotides (pseudouridine and 5moU) when indicated (TriLink BioTechnologies, San Diego, CA) and purified using a RNeasy Kit (Qiagen, Toronto, ON). RNA was enzymatically tailed using a posttranscriptional tailing kit (CELLSCRIPT, Madison, WI), before an additional purification. RNA purity, integrity, and tailing efficiency were monitored by agarose gel electrophoresis. CleanCap Cyanine-5 Fluc mRNA (5moU) was purchased from TriLink BioTechnologies (San Diego, CA).

### Preparing LNP containing mRNA
LNPs containing mRNA were formulated as previously described (46). Briefly, an ethanolic lipid mixture containing an ionizable lipid, helper lipid, cholesterol, and DMG-PEG$_{2000}$ (50:10:38.5:1.5 mol %) was mixed via a T-junction mixer at a 1:3 ratio with an aqueous solution of 25 mM sodium acetate pH 4 containing the desired mRNA at an amine-to-phosphate ratio of 6. The resulting mixture was dialyzed [Spectra/Por 2 Dialysis Tubing 12- to 14-kDa molecular weight cut-off (MWCO), Spectrum Labs, San Francisco, CA] 500-fold against 1× phosphate-buffered saline (PBS) and then sterile-filtered through an Acrodisc 0.2-μm syringe filter (Pall Corporation, Mississauga, ON). The formulations were concentrated in Amicon 10,000-kDa MWCO ultracentrifugation units (EMD Millipore Corporation, Billerica, MA), and the RNA content and encapsulation were determined using a Quant-it Ribogreen RNA Assay Kit (Thermo Fisher Scientific, Eugene, OR). Total lipid content was determined with the Cholesterol E kit (Fujifilm Wako Diagnostics, Mountain View, CA). Particle size and polydispersity index were measured via dynamic light scattering on the Malvern Zetasizer Nano (Malvern Panalytical, Worcestershire, England).

### Treating platelets with mRNA-LNP
WPs were treated with mRNA-LNP at an optimized ratio of 12 μg of mRNA per 40 × 10$^6$ platelets (fig. S16) at a concentration of 40 × 10$^6$ platelets ml$^{-1}$ in Tyrode's-Hepes buffer (pH 6.5) and incubated at 37°C for 4 hours before further downstream processing. When treating with the commercial reagents, Lipofectamine Messenger-MAX (Thermo Fisher Scientific, Carlsbad, CA) and RiboJuice (EMD Millipore Corporation, Burlington, MA), the platelets were treated with equivalent amounts of mRNA and according to the manufacturer's recommended protocols. Following transfection, exogenous protein expression (by enzymatic assay of NanoLuc

Downloaded from https://www.science.org on January 08, 2025

GENV-01082628

activity), mRNA uptake (by cyanine 5–conjugated mRNA), and platelet activation (by cell surface expression of CD62P) were assessed.

## Luciferase assay

Washed and treated platelets were pelleted by centrifugation at 300$g$ for 10 min at room temperature before lysing in 100 μl of Glo Lysis buffer (Promega Corporation, Madison, WI). Lysates were transferred to a 96-well flat white microplate and mixed with prepared NanoLuc substrate (Promega Corporation, Madison, WI) at a 1:1 ratio. Luminescence was recorded on the Tecan Spark Multimode Microplate Reader (Paramit Corporation, Morgan Hill, CA) with an integration time of 1000 ms and zero attenuation. The total protein content in each lysate was determined using the Pierce BCA Protein Assay Kit (Thermo Fisher Scientific, Rockford, IL) according to the manufacturer's protocol, with absorbance measured at 562 nm on the Tecan Spark Multimode Microplate Reader. NanoLuc expression was then reported as the relative luminescence units normalized to the total protein content.

## Flow cytometry

Washed and treated human platelets were incubated in Tyrode's-Hepes buffer (pH 6.5) at 20 × 10$^6$ platelets ml$^{-1}$ with fluorescein isothiocyanate (FITC)–conjugated mouse anti-human CD42b (HIP1, 11-0429-42, Invitrogen) and phycoerythrin (PE)–conjugated mouse anti-human CD62P (AC1.2, 550561, BD Pharmingen) antibodies for 30 min at room temperature, while rat platelets were incubated with PE-conjugated mouse anti-rat CD62P (RMP-1, 148306, BioLegend) antibody instead. For studies evaluating contaminating leukocytes, platelet-rich plasma (PRP) and leukodepleted PC were stained using PE-conjugated mouse anti-human CD45 (HI30, 12-0459-42, eBioscience). FITC-conjugated mouse immunoglobulin G (IgG1) κ (P3.6.2.8.1, 11-4714-82, Invitrogen), PE-conjugated mouse IgG1 κ (MOPC-21, 556650, BD Pharmingen), and PE-conjugated mouse IgG2a κ (MOPC-173, 400212, BioLegend) were used as isotype controls. All antibodies for human platelets were diluted at a ratio of 1:25, while those for rat platelets were diluted at a ratio of 1:50. For studies evaluating anionic phospholipid exposure, platelets were stained with PE-conjugated mouse anti-human CD62P, allophycocyanin (APC)–conjugated anti-human CD42b (HIPI, 17-0429-42, Invitrogen) and FITC-conjugated annexin V (560931, BD Pharmingen) in Hepes calcium buffer [10 mM Hepes, 145 mM NaCl, 5 mM KCl, 1 mM MgSO$_4$, and 2.5 mM CaCl$_2$ (pH 7.4)]. Threshold gates were set by staining in Hepes EDTA Buffer [10 mM Hepes, 145 mM NaCl, 5 mM KCl, 1 mM MgSO$_4$, and 5 mM Na$_2$EDTA dihydrate (pH 7.4)]. Samples were further diluted 10-fold in the corresponding staining buffer following incubation and analyzed on the CytoFLEX LX Flow Cytometer (Beckman Coulter, Indianapolis, IN) or BD Accuri C6 Plus Cytometer (BD Biosciences, San Jose, CA), using a consistent gating strategy (fig. S17) with approximately 10,000 to 25,000 total events collected. All flow cytometry data were analyzed using FlowJo v10.8.1 or BD CSampler Plus Software v1.0.34.1.

## Transmission electron microscopy

Approximately 300 × 10$^6$ WPs untreated or treated with mRNA-LNP, along with cold-stored platelets, were processed for TEM analysis and imaged as previously described (47). Briefly, the platelets were fixed with 2.5% glutaraldehyde (Ted Pella, Redding, CA) in

0.1 M phosphate buffer (pH 7.4) for about 14 min and washed three times with 0.1 M PBS. The platelets were then stained with 1% osmium tetroxide (Electron Microscopy Sciences, Hatfield, PA) in 0.1 M PBS (pH 7.4) for about 14 min, washed twice with distilled water, and stained en bloc using 2.5% (w/v) uranyl acetate for 30 min. Samples were then dehydrated by passing through a graded ethanol series (30, 50, 70, 90, and 100%) three times and twice with 100% acetone. The samples were then passed through a graded Epon resin and acetone series (25, 50, 75, and 100%) three times under vacuum and polymerized using 100% Epon resin for 24 hours in a 65°C oven chamber (Precision Systems). Sections of 70 nm were then cut using a Leica EM UC7 Ultramicrotome and mounted on formvar-coated copper slot grids. Mounted sections were stained with 2% uranyl acetate for 12 min followed by Reynolds' lead citrate for 6 min. Stained grids were imaged using a FEI Tecnai Spirit 120-kV TEM operating at an accelerating voltage of 80 kV and magnifications of ×13,000 and ×18500.

## Characterizing LNP-treated platelets by ROTEM

The effect of LNP treatment on the hemostatic profile of transfected platelets was assessed using ROTEM and a model of in vitro trauma transfusion as previously described (48). Diluted whole blood (DWB) was combined with a TP consisting of blood products combined at a ratio of 1 pRBC unit:1 plasma unit:1 platelet unit before addition into the ROTEM cup. WB was diluted to 20% hematocrit (L/L) using 0.9% (w/v) saline solution (pH 5.5) (Baxter Corporation, Deerfield, IL) to simulate dilutional coagulopathy before adding the TP. Platelet components used to make the TP include WPs that were untreated or treated with ALC-0315 DOPC or CL4H6 POPC LNP not containing mRNA. LNP were dosed at 500 μg lipid per 40 × 10$^6$ platelets, an equivalent lipid dosage to the mRNA-LNP used in composition screens. Untreated and LNP-treated platelets were normalized to a concentration of 300 × 10$^6$ platelets ml$^{-1}$ using Tyrode's-Hepes buffer (pH 6.5). Once prepared, TPs were spiked into hemodiluted WB at a ratio of 70% TP:30% hemodiluted WB, to model transfusion of the TP into coagulopathic patients with hemodiluted WB. The hemostatic profile was measured by ROTEM delta (Werfen, Bedford, MA). Samples composed of either WB, hemodiluted WB, or hemodiluted WB mixed with TPs were and were added to the ROTEM cup to a final volume of 300 μl. Both intrinsic pathway (INTEM) and extrinsic pathway (EXTEM) assays were performed for three biological replicates. STAR-TEM and INTEM or EXTEM reagents, at a volume of 20 μl each, were added automatically by the ROTEM machine. Reactions were allowed to run for 30 min. Key parameters of the ROTEM profile reported include clot formation time, maximum clot firmness, angle (measure of clotting kinetics), and clot firmness at 10 (A10) and 20 (A20) min.

## Evaluating platelet responsiveness to agonists

Platelets untreated or treated with mRNA-LNP were activated for either 30 min or 2 hours with 10 μM Chrono-Par ADP reagent (Chrono-Log, Havertown, PA), CRP-XL [5 μg ml$^{-1}$; synthesized as previously described (49)], thrombin from bovine plasma (0.1 U ml$^{-1}$; MilliporeSigma Canada Ltd., Oakville, ON), or a combination of ADP and thrombin in Tyrode's Solution (Modified II) (pH 7.4; Boston BioProducts, Ashland, MA). For studies evaluating their response to agonists, platelets were activated 3.5 hours post-LNP

Downloaded from https://www.science.org on January 08, 2025

GENV-01082629

SCIENCE ADVANCES | RESEARCH ARTICLE

treatment. For studies evaluating NanoLuc expression from activated platelets, platelets were stimulated with agonists either 30 min before or 2 hours post-LNP treatment. In all cases, after 4-hour LNP treatment, platelets were collected for flow cytometry, and the remaining sample was centrifuged at 250$g$ for 10 min, with the pellet and supernatant fractions collected for the luciferase assay.

**Preparing rat platelets for transfusion**

Rat donor platelets were isolated from WB, drawn by femoral artery cannulation of Sprague-Dawley rats anesthetized with 1 to 3% isoflurane. PRP was generated by centrifugation of the citrated WB at 150$g$ for 10 min at 22°C with no brake. $PGI_2$ and apyrase were then added to the PRP to a final concentration of 1 μM and 0.02 U ml$^{-1}$, respectively, and platelets were isolated by centrifugation at 1000$g$ for 20 min at 22°C with no brake. Platelets were resuspended to a concentration of $40 \times 10^6$ platelets ml$^{-1}$ in Tyrode's-Hepes buffer (pH 6.5) and transfected with DiI-labeled mRNA-LNP (SM-102 POPC) encoding NanoLuc at 12 μg of mRNA per $40 \times 10^6$ platelets. Platelets were incubated with mRNA-LNP for 15 min at 37°C, centrifuged at 1000$g$ for 20 min at 22°C with no brake, and resuspended in fresh rat plasma to a final concentration of $900$ to $1200 \times 10^6$ platelets ml$^{-1}$ for 3 hours at 37°C before transfusion. mRNA-LNP–treated platelets were mixed with additional untreated platelets in a ratio of 1:1 before transfusion to minimize the amount of mRNA needed.

**Rat model of polytrauma**

Recipient rats ($n = 3$ per group) underwent an established model of polytrauma and hemorrhage (*31*). Rats ($372 \pm 11$ g) were anesthetized with 1.5 to 3% isoflurane/100% oxygen through a nose cone. The left femoral artery and vein were cannulated to monitor arterial blood pressure and for PRP transfusion, respectively. A midline laparotomy was made followed by a controlled incision with a Surgicutt Bleeding Time Device (International Technidyne Corp., Edison, NJ) at the left kidney cortex to obtain baseline measurements of bleeding time and volume, determined by the amount of time from injury until the cessation of bleeding and by the difference in weight of preweighed filter paper used to collect blood, respectively. Polytrauma was then carried out comprising crush injury at liver lobes, small intestines, and leg skeletal muscle, as well as closed femur fracture. Controlled hemorrhage was carried out by continuously withdrawing blood to a lower mean arterial pressure (MAP) of 40 mmHg over at least 5 min. MAP was maintained at 40 mmHg by repeatedly withdrawing blood until 40% blood volume was removed (blood volume was estimated as 6% body weight + 0.77 ml) (*32*). Two hours after trauma, rats were resuscitated by transfusing prepared PRP units at 20% (v/v) blood volume (equivalent to approximately 2.7 to $5.15 \times 10^9$ total platelets and 1.35 to $2.57 \times 10^9$ transfected platelets) through venous cannula at a rate of 1 ml min$^{-1}$. Because of the splenic release of platelets during severe blood loss, estimation of the percentage of platelets transfused versus the percent of native platelets remaining in circulation is challenging. Ten minutes following PRP transfusion, a second incision was carried out at the right kidney cortex to measure bleeding time and volume. The terminal blood sample was then collected to measure coagulation properties (non-activated thromboelastometry, prothrombin time, and activated partial thromboplastin time), and the rats were then euthanized. The

heart rate and MAP of the rats were measured from baseline collection until the end of the second kidney bleed. Rat platelets were tested ex vivo for NanoLuc activity in a plate-based activity assay, as above. Samples were taken before transfection with mRNA-LNP, before transfusion, and following circulation in coagulopathic rodents. Platelets from the pre- and posttransfusion time points were isolated as above from collected WB before lysis to determine NanoLuc content. The animal study was approved by the Institutional Animal Care and Use Committee of the U.S. Army Institute of Surgical Research (protocol #A-21-018) and Medical College of Wisconsin (AUA0007763), conducted in compliance with the Animal Welfare Act, the implementing Animal Welfare Regulations, and the principles of the "Guide for the Care and Use of Laboratory Animals."

**Histology of kidney wounds**

Kidneys (left and right) were collected immediately after euthanasia. The kidney tissues were fixed in 4% paraformaldehyde overnight, followed by 20% sucrose for 24 hours. Following fixation, the kidney tissues were embedded in optimal cutting temperature compound (Tissue-Tek, Sakura Finetek USA, Torrance, CA) and frozen in liquid nitrogen for cryosectioning at 5-μm thickness. Tissue sections were probed with mouse monoclonal anti-rat CD61 (F11, 554951, BD Pharmingen) diluted at a ratio of 1:100, followed by Alexa Fluor 594–conjugated goat anti-mouse IgG secondary antibody (A-11032, Invitrogen) diluted at a ratio of 1:750. The sections were then costained with 4′,6-diamidino-2-phenylindole for nuclear staining. The sections were imaged and analyzed by fluorescence microscopy (KEYENCE, Itasca, IL).

**Statistical analysis**

All experiments consist of three biological replicates, with all values expressed as mean ± the SEM. Analyses between two groups was performed using either a one-way unpaired Student's or Welch's $t$ test, while grouped analyses were performed using a one-way analysis of variance (ANOVA) followed by a Bonferroni's post hoc correction. Assumptions on variance were determined using an F-test or Brown-Forsythe test as appropriate, while normality was assessed via a Shapiro-Wilks test. Statistical analysis and graphs were generated using GraphPad Prism v9.0. A $P$ value < 0.05, 95% confidence intervals, was considered significant.

**Supplementary Materials**

**This PDF file includes:**
Supplementary Text
Figs. S1 to S17
Tables S1 to S3

**REFERENCES AND NOTES**

1.  J. M. Jones, M. R. P. Sapiano, A. A. Savinkina, K. A. Haass, M. L. Baker, R. A. Henry, J. J. Berger, S. V. Basavaraju, Slowing decline in blood collection and transfusion in the United States – 2017. *Transfusion* **60**,Suppl 2, S1–S9 (2020).

2.  P. E. J. van der Meijden, J. W. M. Heemskerk, Platelet biology and functions: New concepts and clinical perspectives. *Nat. Rev. Cardiol.* **16**, 166–179 (2019).

3.  X. R. Xu, D. Zhang, B. E. Oswald, N. Carrim, X. Wang, Y. Hou, Q. Zhang, C. Lavalle, T. McKeown, A. H. Marshall, H. Ni, Platelets are versatile cells: New discoveries in hemostasis, thrombosis, immune responses, tumor metastasis and beyond. *Crit. Rev. Clin. Lab. Sci.* **53**, 409–430 (2016).

Downloaded from https://www.science.org on January 08, 2025

GENV-01082630

4.  L. J. Gay, B. Felding-Habermann,  Contribution of platelets to tumour metastasis. *Nat. Rev. Cancer* **11**, 123–134 (2011).

5.  J. Johnson, Y.-W. Wu, C. Blyth, G. Lichtfuss, H. Goubran, T. Burnouf,  Prospective therapeutic applications of platelet extracellular vesicles. *Trends Biotechnol.* **39**, 598–612 (2021).

6.  Q. Shi, E. L. Kuether, Y. Chen, J. A. Schroeder, S. A. Fahs, R. R. Montgomery,  Platelet gene therapy corrects the hemophilic phenotype in immunocompromised hemophilia A mice transplanted with genetically manipulated human cord blood stem cells. *Blood* **123**, 395–403 (2014).

7.  L. M. Du, P. Nurden, A. T. Nurden, T. C. Nichols, D. A. Bellinger, E. S. Jensen, S. L. Haberichter, E. Merricks, R. A. Raymer, J. Fang, S. B. Koukouritaki, P. M. Jacobi, T. B. Hawkins, K. Cornetta, Q. Shi, D. A. Wilcox,  Platelet-targeted gene therapy with human factor VIII establishes haemostasis in dogs with haemophilia A. *Nat. Commun.* **4**, 2773 (2013).

8.  Clinicaltrial.gov, 2022. Gene Therapy Trial for Platelet Derived Factor VIII Production in Hemophilia A (Identifier: NCT03818763). U.S National Library of Medicine, April 18, 2023. https://clinicaltrials.gov/ct2/show/study/NCT03818763.

9.  N. Sugimoto, S. Nakamura, S. Shimizu, A. Shigemasa, J. Kanda, N. Matsuyama, M. Tanaka, T. Hayashi, A. Fuchizaki, M. Nogawa, N. Watanabe, S. Okamoto, M. Handa, A. Sawaguchi, D. Momose, K.-R. Koh, Y. Tani, A. Takaori-Kondo, K. Eto,  Production and nonclinical evaluation of an autologous iPSC-derived platelet product for the iPLAT1 clinical trial. *Blood Adv.* **6**, 6056–6069 (2022).

10.  N. Sugimoto, J. Kanda, S. Nakamura, T. Kitano, M. Hishizawa, T. Kondo, S. Shimizu, A. Shigemasa, H. Hirai, Y. Arai, M. Minami, H. Tada, D. Momose, K.-R. Koh, M. Nogawa, N. Watanabe, S. Okamoto, M. Handa, A. Sawaguchi, N. Matsuyama, M. Tanaka, T. Hayashi, A. Fuchizaki, Y. Tani, A. Takaori-Kondo, K. Eto,  iPLAT1: The first-in-human clinical trial of iPSC-derived platelets as a phase 1 autologous transfusion study. *Blood* **140**, 2398–2402 (2022).

11.  W. W. Roeloffzen, H. C. Kluin-Nelemans, N. J. Veeger, L. Bosman, J. T. M. de Wolf,  Transfused stored platelets have the same haemostatic function as circulating native platelets. *Vox Sang.* **99**, 123–130 (2010).

12.  A. S. Weyrich, H. Schwertz, L. W. Kraiss, G. A. Zimmerman,  Protein synthesis by platelets: Historical and new perspectives. *J. Thromb. Haemost.* **7**, 241–246 (2009).

13.  H. M. Rinder, M. Murphy, J. G. Mitchell, J. Stocks, K. A. Ault, R. S. Hillman,  Progressive platelet activation with storage: Evidence for shortened survival of activated platelets after transfusion. *Transfusion* **31**, 409–414 (1991).

14.  S. Novakowski, K. Jiang, G. Prakash, C. Kastrup,  Delivery of mRNA to platelets using lipid nanoparticles. *Sci. Rep.* **9**, 552 (2019).

15.  A. Akinc, M. A. Maier, M. Manoharan, K. Fitzgerald, M. Jayaraman, S. Barros, S. Ansell, X. Du, M. J. Hope, T. D. Madden, B. L. Mui, S. C. Semple, Y. K. Tam, M. Ciufolini, D. Witzigmann, J. A. Kulkarni, R. van der Meel, P. R. Cullis,  The Onpattro story and the clinical translation of nanomedicines containing nucleic acid–based drugs. *Nat. Nanotechnol.* **14**, 1084–1087 (2019).

16.  H. R. E. Mathieu, L. Rodés-Guirao, C. Appel, D. Gavrilov, C. Giattino, J. Hasell, B. Macdonald, S. Dattani, D. Beltekian, E. Ortiz-Ospina, M. Roser, 2022. Coronavirus Pandemic (COVID-19). Our World in Data, April 18, 2023. https://ourworldindata.org/coronavirus#citation% 5Baccessed.

17.  D. Adams, A. Gonzalez-Duarte, W. D. O'Riordan, C. C. Yang, M. Ueda, A. V. Kristen, I. Tournev, H. H. Schmidt, T. Coelho, J. L. Berk, K. P. Lin, G. Vita, S. Attarian, V. Planté-Bordeneuve, M. M. Mezei, J. M. Campistol, J. Buades, T. H. Brannagan 3rd, B. J. Kim, J. Oh, Y. Parman, Y. Sekijima, P. N. Hawkins, S. D. Solomon, M. Polydefkis, P. J. Dyck, P. J. Gandhi, S. Goyal, J. Chen, A. L. Strahs, S. V. Nochur, M. T. Sweetser, P. P. Garg, A. K. Vaishnaw, J. A. Gollob, O. B. Suhr, Patisiran, an RNAi Therapeutic, for Hereditary Transthyretin Amyloidosis. *N. Engl. J. Med.* **379**, 11–21 (2018).

18.  H. Yang, S. Lang, Z. Zhai, L. Li, W. H. Kahr, P. Chen, J. Brkic, C. M. Spring, M. J. Flick, J. L. Degen, J. Freedman, H. Ni,  Fibrinogen is required for maintenance of platelet intracellular and cell-surface P-selectin expression. *Blood* **114**, 425–436 (2009).

19.  J. A. Kulkarni, P. R. Cullis, R. van der Meel,  Lipid nanoparticles enabling gene therapies: From concepts to clinical utility. *Nucleic Acid Ther.* **28**, 146–157 (2018).

20.  S. M. Ansell, X. Du, Lipids and lipid nanoparticle formulations for delivery of nucleic acids. US Patent US10166298B2. (2019).

21.  K. J. Hassett, K. E. Benenato, E. Jacquinet, A. Lee, A. Woods, O. Yuzhakov, S. Himansu, J. Deterling, B. M. Geilich, T. Ketova, C. Mihai, A. Lynn, I. McFadyen, M. J. Moore, J. J. Senn, M. G. Stanton, Ö. Almarsson, G. Ciaramella, L. A. Brito,  Optimization of lipid nanoparticles for intramuscular administration of mRNA vaccines. *Mol. Ther. Nucleic Acids* **15**, 1–11 (2019).

22.  S. C. Semple, A. Akinc, J. Chen, A. P. Sandhu, B. L. Mui, C. K. Cho, D. W. Sah, D. Stebbing, E. J. Crosley, E. Yaworski, I. M. Hafez, J. R. Dorkin, J. Qin, K. Lam, K. G. Rajeev, K. F. Wong, L. B. Jeffs, L. Nechev, M. L. Eisenhardt, M. Jayaraman, M. Kazem, M. A. Maier, M. Srinivasulu, M. J. Weinstein, Q. Chen, R. Alvarez, S. A. Barros, S. De, S. K. Klimuk, T. Borland, V. Kosovrasti, W. L. Cantley, Y. K. Tam, M. Manoharan, M. A. Ciufolini, M. A. Tracy, A. de Fougerolles,

I. MacLachlan, P. R. Cullis, T. D. Madden, M. J. Hope,  Rational design of cationic lipids for siRNA delivery. *Nat. Biotechnol.* **28**, 172–176 (2010).

23.  Y. Sato, K. Hashiba, K. Sasaki, M. Maeki, M. Tokeshi, H. Harashima,  Understanding structure-activity relationships of pH-sensitive cationic lipids facilitates the rational identification of promising lipid nanoparticles for delivering siRNAs in vivo. *J. Control. Release* **295**, 140–152 (2019).

24.  F. Ferraresso, A. W. Strilchuk, L. J. Juang, L. G. Poole, J. P. Luyendyk, C. J. Kastrup,  Comparison of DLin-MC3-DMA and ALC-0315 for siRNA delivery to hepatocytes and hepatic stellate cells. *Mol. Pharm.* **19**, 2175–2182 (2022).

25.  F. P. Polack, S. J. Thomas, N. Kitchin, J. Absalon, A. Gurtman, S. Lockhart, J. L. Perez, G. P. Marc, E. D. Moreira, C. Zerbini, R. Bailey, K. A. Swanson, S. Roychoudhury, K. Koury, P. Li, W. V. Kalina, D. Cooper, R. W. Frenck Jr., L. L. Hammitt, Ö. Türeci, H. Nell, A. Schaefer, S. Ünal, D. B. Tresnan, S. Mather, P. R. Dormitzer, U. Şahin, K. U. Jansen, W. C. Gruber; the C4591001 Clinical Trial Group,  Safety and efficacy of the BNT162b2 mRNA covid-19 vaccine. *N. Engl. J. Med.* **383**, 2603–2615 (2020).

26.  N. Pardi, M. J. Hogan, F. W. Porter, D. Weissman,  mRNA vaccines - a new era in vaccinology. *Nat. Rev. Drug Discov.* **17**, 261–279 (2018).

27.  K. Karikó, H. Muramatsu, F. A. Welsh, J. Ludwig, H. Kato, S. Akira, D. Weissman,  Incorporation of pseudouridine into mRNA yields superior nonimmunogenic vector with increased translational capacity and biological stability. *Mol. Ther.* **16**, 1833–1840 (2008).

28.  B. K. Manne, S. Bhatlekar, E. A. Middleton, A. S. Weyrich, O. Borst, M. T. Rondina,  Phospho-inositide-dependent kinase 1 regulates signal dependent translation in megakaryocytes and platelets. *J. Thromb. Haemost.* **18**, 1183–1196 (2020).

29.  G. Cimmino, R. Tarallo, G. Nassa, M. R. De Filippo, G. Giurato, M. Ravo, F. Rizzo, S. Conte, G. Pellegrino, P. Cirillo, P. Calabro, T. Öhman, T. A. Nyman, A. Weisz, P. Golino,  Activating stimuli induce platelet microRNA modulation and proteome reorganisation. *Thromb. Haemost.* **114**, 96–108 (2015).

30.  J. B. Holcomb, B. C. Tilley, S. Baraniuk, E. E. Fox, C. E. Wade, J. M. Podbielski, D. J. del Junco, K. J. Brasel, E. M. Bulger, R. A. Callcut, M. J. Cohen, B. A. Cotton, T. C. Fabian, K. Inaba, J. D. Kerby, P. Muskat, T. O'Keeffe, S. Rizoli, B. R. H. Robinson, T. M. Scalea, M. A. Schreiber, D. M. Stein, J. A. Weinberg, J. L. Callum, J. R. Hess, N. Matijevic, C. N. Miller, J.-F. Pittet, D. B. Hoyt, G. D. Pearson, B. Leroux, G. van Belle; for the PROPPR Study Group,  Transfusion of plasma, platelets, and red blood cells in a 1:1:1 vs a 1:1:2 ratio and mortality in patients with severe trauma. *JAMA* **313**, 471–482 (2015).

31.  X. Wu, D. N. Darlington, R. K. Montgomery, B. Liu, J. D. Keesee, M. R. Scherer, A. Benov, J. Chen, A. P. Cap,  Platelets derived from fresh and cold-stored whole blood participate in clot formation in rats with acute traumatic coagulopathy. *Br. J. Haematol.* **179**, 802–810 (2017).

32.  H. B. Lee, M. D. Blaufox,  Blood volume in the rat. *J. Nucl. Med.* **26**, 72–76 (1985).

33.  M. J. Carrasco, S. Alishetty, M. G. Alameh, H. Said, L. Wright, M. Paige, O. Soliman, D. Weissman, T. E. Cleveland, A. Grishaev, M. D. Buschmann,  Ionization and structural properties of mRNA lipid nanoparticles influence expression in intramuscular and intravascular administration. *Commun. Biol.* **4**, 956 (2021).

34.  Q. Cheng, T. Wei, L. Farbiak, L. T. Johnson, S. A. Dilliard, D. J. Siegwart,  Selective organ targeting (SORT) nanoparticles for tissue-specific mRNA delivery and CRISPR-Cas gene editing. *Nat. Nanotechnol.* **15**, 313–320 (2020).

35.  K. Hally, S. Fauteux-Daniel, H. Hamzeh-Cognasse, P. Larsen, F. Cognasse,  Revisiting Platelets and Toll-Like Receptors (TLRs): At the interface of vascular immunity and thrombosis. *Int. J. Mol. Sci.* **21**, (2020).

36.  M. P. Hall, J. Unch, B. F. Binkowski, M. P. Valley, B. L. Butler, M. G. Wood, P. Otto, K. Zimmerman, G. Vidugiris, T. Machleidt, M. B. Robers, H. A. Benink, C. T. Eggers, M. R. Slater, P. L. Meisenheimer, D. H. Klaubert, F. Fan, L. P. Encell, K. V. Wood,  Engineered luciferase reporter from a deep sea shrimp utilizing a novel imidazopyrazinone substrate. *ACS Chem. Biol.* **7**, 1848–1857 (2012).

37.  J. N. Thon, D. V. Devine,  Translation of glycoprotein IIIa in stored blood platelets. *Transfusion* **47**, 2260–2270 (2007).

38.  D. V. Devine, K. Serrano,  The platelet storage lesion. *Clin. Lab. Med.* **30**, 475–487 (2010).

39.  A. P. Cap,  Platelet storage: A license to chill! *Transfusion* **56**, 13–16 (2016).

40.  K. M. Reddoch, H. F. Pidcoke, R. K. Montgomery, C. G. Fedyk, J. K. Aden, A. K. Ramasubramanian, A. P. Cap,  Hemostatic activity of apheresis platelets stored at 4°C and 22°C. *Shock* **41**,Suppl 1,  54–61 (2014).

41.  H. Zhao, D. V. Devine,  The missing pieces to the cold-stored platelet puzzle. *Int. J. Mol. Sci.* **23**, (2022).

42.  L. Johnson, S. Vekariya, B. Wood, S. Tan, C. Roan, D. C. Marks,  Refrigeration of apheresis platelets in platelet additive solution (PAS-E) supports in vitro platelet quality to maximize the shelf-life. *Transfusion* **61**,Suppl 1,  S58–S67 (2021).

43.  E. C. Josefsson, H. H. Gebhard, T. P. Stossel, J. H. Hartwig, K. M. Hoffmeister,  The macrophage alphaMbeta2 integrin alphaM lectin domain mediates the phagocytosis of chilled platelets. *J. Biol. Chem.* **280**, 18025–18032 (2005).

Downloaded from https://www.science.org on January 08, 2025

GENV-01082631

44. D. Kufrin, D. E. Eslin, K. Bdeir, J.-C. Murciano, A. Kuo, M. A. Kowalska, J. L. Degen, B. S. Sachais, D. B. Cines, M. Poncz, Antithrombotic thrombocytes: Ectopic expression of urokinase-type plasminogen activator in platelets. *Blood* **102**, 926–933 (2003).

45. E. Levin, B. Culibrk, M. I. Gyöngyössy-Issa, S. Weiss, K. Scammell, W. LeFresne, C. Jenkins, D. V. Devine, Implementation of buffy coat platelet component production: Comparison to platelet-rich plasma platelet production. *Transfusion* **48**, 2331–2337 (2008).

46. J. A. Kulkarni, D. Witzigmann, J. Leung, R. van der Meel, J. Zaifman, M. M. Darjuan, H. M. Kirsch-Chan, B. Thony, Y. Y. C. Tam, P. R. Cullis, Fusion-dependent formation of lipid nanoparticles containing macromolecular payloads. *Nanoscale* **11**, 9023–9031 (2019).

47. K. Golla, M. Paul, T. C. Lengyell, E. M. Simpson, H. Falet, H. Kim, A novel association between platelet filamin A and soluble N-ethylmaleimide sensitive factor attachment proteins regulates granule secretion. *Res. Pract. Thromb Haemost.* **7**, 100019 (2023).

48. A. F. Arbaeen, P. Schubert, K. Serrano, C. J. Carter, B. Culibrk, D. V. Devine, Pathogen inactivation treatment of plasma and platelet concentrates and their predicted functionality in massive transfusion protocols. *Transfusion* **57**, 1208–1217 (2017).

49. L. F. Morton, P. G. Hargreaves, R. W. Farndale, R. D. Young, M. J. Barnes, Integrin α2β1-independent activation of platelets by simple collagen-like peptides: Collagen tertiary (triple-helical) and quaternary (polymeric) structures are sufficient alone for α2β1-independent platelet reactivity. *Biochem. J.* **306**(Pt 2), 337–344 (1995).

**Acknowledgments:** We would like to thank D. Witzigmann, J. Kulkarni, B. Culibrk, E. Levin, K. Serrano, W. Zhao, L. J. Juang, F. Ferraresso, M. H. Y. Cheng, E. Rowe, N. Pereyra, Z. Noronha, and F. Hong for helpful insights and discussions. We thank B. Liu for helping with the histology and immunohistology and T. Chance for supporting the animal experiments. We also thank M. Fujita and V. Pringle from the UBC Bioimaging Facility (RRID: SCR_021304) for completing TEM. We are grateful to Canadian Blood Services and donors for providing research samples for completion of this project. The reporting and interpretation of the research findings are the responsibilities of the authors, and the views expressed herein do not necessarily represent the views of Canadian Blood Services. **Funding:** This work was supported by U.S. Department of Defense Investigator-Initiated Research Award W81XWH202004 (C.J.K.), Frederick Banting and Charles Best Doctoral Award 6552 (J.L.), Four-Year Fellowships (4YF) For PhD Students Award 6456 (C.S.), Blood Research Institute Director's Fellowship Award (K.E.B.), Nanomedicine Innovation Network (NMIN) Graduate Award (M.R.), and Creative Research Institute and Special Education and Research Expense (Y.S. and H.H.). **Author contributions:** Conceptualization: J.L., C.S., K.E.B., and C.J.K. Methodology: J.L., C.S., K.E.B., E.K., M.P., X.W., M.A.M., and A.P.C. Investigation: J.L., C.S., and K.E.B. Visualization: J.L., C.S., and K.E.B. Supervision: D.V.D., E.J., P.R.C., and C.J.K. Writing—original draft: J.L., C.S., K.E.B., and C.J.K. Writing—review and editing: J.L., C.S., K.E.B., M.R., X.W., M.A.M., E.K., M.P., Y.S., H.H., A.P.C., D.V.D., E.J., P.R.C., and C.J.K. **Competing interests:** E.J., P.R.C., and C.J.K. are co-founders and hold equity in NanoVation Therapeutics Inc. K.E.B., P.R.C., and C.J. K. are co-founders and hold equity in SeraGene Therapeutics Inc. P.R.C. is co-founder and holds equity in Acuitas Therapeutics. All authors have submitted intellectual property on RNA-LNP. J. L., C.S., K.E.B., M.R., D.V.D., E.J., P.R.C., and C.J.K. have a filed a provisional patent application on LNP transfection of platelets (USPTO no. 63/344,247). These interests have been fully disclosed to each institution, and plans are in place for managing any potential conflicts arising from licensing these patents. The authors declare that they have no other competing interests. **Data and materials availability:** There are no major restrictions in the availability of materials, but some lipids may require material transfer agreements (MTAs). All data needed to evaluate the conclusions in the paper are present in the paper and/or the Supplementary Materials. Please contact C.J.K. (ckastrup@versiti.org) for any materials requests.

Submitted 19 April 2023
Accepted 31 October 2023
Published 1 December 2023
10.1126/sciadv.adi0508

Downloaded from https://www.science.org on January 08, 2025

GENV-01082632

| LNP Formulation | | | Mean Particle Diameter ± SEM (nm) | Mean PDI ± SEM | Encapsulation (%) |
|---|---|---|---|---|---|
| Ionizable Lipid | Helper Lipid | DMG-PEG$_{2000}$ (mol %) | | | |
| MC3 | DSPC | 1.5 | 38.73 ± 0.45 | 0.109 ± 0.010 | 93.02 |
| MC3 | DOPE | 1.5 | 45.11 ± 0.97 | 0.086 ± 0.009 | 89.36 |
| MC3 | DOPC | 1.5 | 42.32 ± 0.47 | 0.120 ± 0.009 | 89.72 |
| MC3 | DOPG | 1.5 | 43.86 ± 0.45 | 0.091 ± 0.006 | 85.14 |
| MC3 | POPE | 1.5 | 41.23 ± 1.15 | 0.147 ± 0.005 | 93.54 |
| MC3 | POPC | 1.5 | 40.79 ± 1.33 | 0.170 ± 0.006 | 92.43 |
| MC3 | POPG | 1.5 | 37.99 ± 1.13 | 0.153 ± 0.007 | 87.28 |
| MC3 | ES | 1.5 | 34.84 ± 0.63 | 0.132 ± 0.007 | 93.90 |
| KC2 | DSPC | 1.5 | 40.99 ± 1.07 | 0.071 ± 0.008 | 91.42 |
| KC2 | DOPC | 1.5 | 45.00 ± 1.28 | 0.097 ± 0.009 | 93.68 |
| KC2 | POPC | 1.5 | 44.67 ± 0.39 | 0.104 ± 0.008 | 90.82 |
| KC2 | POPG | 1.5 | 51.18 ± 0.97 | 0.069 ± 0.014 | 88.89 |
| DODMA | DSPC | 1.5 | 38.47 ± 1.01 | 0.098 ± 0.010 | 90.61 |
| ALC-0315 | DSPC | 1.5 | 47.15 ± 0.94 | 0.061 ± 0.008 | 85.10 |
| ALC-0315 | DOPC | 1.5 | 50.63 ± 0.42 | 0.094 ± 0.002 | 77.57 |
| ALC-0315 | DOPC | 1 | 63.79 ± 2.43 | 0.092 ± 0.012 | 81.45 |
| ALC-0315 | DOPC | 0.5 | 87.12 ± 1.92 | 0.159 ± 0.011 | 81.18 |
| ALC-0315 | POPC | 1.5 | 44.19 ± 0.37 | 0.078 ± 0.003 | 80.09 |
| ALC-0315 | POPG | 1.5 | 55.74 ± 1.96 | 0.081 ± 0.009 | 75.26 |
| SM-102 | DSPC | 1.5 | 45.52 ± 0.59 | 0.070 ± 0.006 | 90.59 |
| SM-102 | DOPC | 1.5 | 51.35 ± 0.37 | 0.092 ± 0.008 | 88.70 |
| SM-102 | POPC | 1.5 | 45.05 ± 0.73 | 0.096 ± 0.003 | 89.08 |
| SM-102 | POPG | 1.5 | 51.58 ± 1.01 | 0.068 ± 0.005 | 85.54 |
| CL1D6 | DSPC | 1.5 | 38.55 ± 1.02 | 0.180 ± 0.002 | 96.37 |
| CL1H6 | DSPC | 1.5 | 39.51 ± 0.48 | 0.149 ± 0.006 | 95.41 |
| CL4H6 | DSPC | 1.5 | 45.31 ± 0.86 | 0.072 ± 0.008 | 87.03 |
| CL4H6 | DOPC | 1.5 | 48.76 ± 1.22 | 0.104 ± 0.012 | 79.46 |
| CL4H6 | POPC | 1.5 | 46.32 ± 0.30 | 0.086 ± 0.002 | 84.20 |
| CL4H6 | POPC | 1 | 51.46 ± 1.35 | 0.106 ± 0.004 | 85.34 |
| CL4H6 | POPC | 0.5 | 82.86 ± 2.93 | 0.152 ± 0.008 | 83.21 |
| CL4H6 | POPG | 1.5 | 38.64 ± 0.99 | 0.108 ± 0.002 | 79.21 |
| CL7H6 | DSPC | 1.5 | 42.22 ± 0.34 | 0.061 ± 0.010 | 70.65 |
| CL15H6 | DSPC | 1.5 | 48.88 ± 1.14 | 0.074 ± 0.008 | 93.68 |

**Table S1.**

Mean particle diameter, polydispersity index (PDI), and percentage encapsulation for all the mRNA-LNP used in this study.

GENV-01082617

# EXHIBIT 18

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property Organization
International Bureau

(43) International Publication Date
20 June 2013 (20.06.2013)



WIPO | PCT

(10) International Publication Number
**WO 2013/090648 A1**

(51) International Patent Classification:
C07H 21/02 (2006.01)    A61K 48/00 (2006.01)

(21) International Application Number:
PCT/US2012/069610

(22) International Filing Date:
14 December 2012 (14.12.2012)

(25) Filing Language: English

(26) Publication Language: English

(30) Priority Data:
61/576,705    16 December 2011 (16.12.2011)    US
61/618,957    2 April 2012 (02.04.2012)    US
61/648,244    17 May 2012 (17.05.2012)    US
61/681,712    10 August 2012 (10.08.2012)    US
61/696,381    4 September 2012 (04.09.2012)    US
61/709,303    3 October 2012 (03.10.2012)    US
PCT/US2012/058519
             3 October 2012 (03.10.2012)    US
61/712,490    11 October 2012 (11.10.2012)    US

(71) Applicant: MODERNA THERAPEUTICS [US/US]; 161 First Street, First Floor, Cambridge, Massachusetts 02142 (US).

(72) Inventors: DE FOUGEROLLES, Antonin; 66 Summit Avenue, Brookline, Massachusetts 02446 (US). WOOD, Kristy M.; 501 Huron Ave, Unit 2, Cambridge, Massachusetts 02138 (US). ELBASHIR, Sayda M.; 149 Grove Street, Cambridge, Massachusetts 02138 (US). AFEYAN, Noubar B.; 1 Memorial Drive, 7th Floor, Cambridge, Massachusetts 02142 (US). VALENCIA, Pedro; 60 Wadsworth Street, Apt. 5G, Cambridge, Massachusetts 02142 (US). SCHRUM, Jason P.; 4601 Flat Rock Road, Apt. 417, Philadelphia, Pennsylvania 19127 (US).

(74) Agent: WARD, Donna T.; DT Ward, P.C., 142A Main Street, Groton, Massachusetts 01450 (US).

(81) Designated States (unless otherwise indicated, for every kind of national protection available): AE, AG, AL, AM, AO, AT, AU, AZ, BA, BB, BG, BH, BN, BR, BW, BY, BZ, CA, CH, CL, CN, CO, CR, CU, CZ, DE, DK, DM, DO, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT,

[Continued on next page]

(54) Title: MODIFIED NUCLEOSIDE, NUCLEOTIDE, AND NUCLEIC ACID COMPOSITIONS



Figure 2

(57) Abstract: The present disclosure provides, inter alia, formulation compositions comprising modified nucleic acid molecules which may encode a protein, a protein precursor, or a partially or fully processed form of the protein or a protein precursor. The formulation composition may further include a modified nucleic acid molecule and a delivery agent. The present invention further provides nucleic acids useful for encoding polypeptides capable of modulating a cell's function and/or activity.

WO 2013/090648 A1

# EXHIBIT 19

RIGHT: BSIP, CAVALLINI JAMES/SPL; MIDDLE RIGHT, K. BOLLER/SPL; FAR RIGHT, NIBSC/SPL

## news feature



# RNA to the rescue?

Disease therapies based on a technique for gene silencing called RNA interference are racing towards the clinic. Erika Check investigates molecular medicine's next big thing.

Medicine's molecular revolution is overdue. By now, enthusiasts led us to believe, gene therapy and related treatments should have transformed clinical practice. Diseases, they told us, would be cured at their genetic roots, by repairing defective human DNA or by disabling the genes of infectious microbes. But it has proved frustratingly difficult to make these methods work in the clinic — if you get sick, your doctor will probably still treat you with the pills and potions of old-fashioned medicinal chemistry.

Given this chastening experience, you would expect experts to be cautious about the prospects of molecular medicine's latest hope — a gene-silencing mechanism known as RNA interference, or RNAi. But instead, researchers can barely contain their enthusiasm. "Right now, everybody's excited," says Anastasia Khvorova, director of biology with Dharmacon in Lafayette, Colorado, a company that supplies RNAi technologies to researchers and companies that develop therapeutics.

The term RNAi was coined just five years ago, in a paper documenting the phenomenon in the nematode worm *Caenorhabditis elegans*[1]. Yet doctors and biotech executives are now talking about beginning human trials within the next two or three years — an astonishing rate of progress. Part of the excitement stems from the knowledge that, unlike techniques such as gene therapy, RNAi is a natural defence mechanism that is thought to have evolved to protect organisms from viral diseases.

### Dicey defence

Many viruses have a genetic blueprint made from RNA, rather than DNA. When they infect a cell, they make double-stranded copies of their genetic material. In response, the RNAi pathway strikes back. An enzyme known as Dicer first chops the double-stranded viral RNA into small segments of genetic code, each around 22 'letters' long. These segments, known as small interfering RNAs, or siRNAs, then separate into single strands and some bind to intact stretches of single-stranded viral RNA. Finally, proteins target this tagged viral RNA and destroy it[2]. As a result, RNAi shuts off key viral genes, potentially nipping infections in the bud.

Biologists are exploiting RNAi as an experimental tool to find out what genes do. When a gene is activated, its sequence is read to produce messenger RNA (mRNA), which contains the information necessary to manufacture a particular protein. So by using siRNAs or double-stranded RNAs that correspond to a specific mRNA sequence, researchers can trick a cell into destroying this mRNA and silencing the gene in question.

As soon as it became obvious that the phenomenon operates in mammals[3] as well as in lower organisms, clinicians pricked up their ears. In theory, RNAi could be used to treat any disease — forms of cancer, for instance — that is linked to an overactive gene or genes. But for the time being, most of the clinical interest lies in applying RNAi in its natural role: as a means of combating pathogenic viruses by disabling their RNA.

One of the obvious targets is HIV — a virus for which there is no cure and no vaccine. Last year, for instance, molecular virologist Bryan Cullen of Duke University Medical Center in Durham, North Carolina, introduced siRNAs against two HIV genes into the human immune cells that are destroyed by the virus. The siRNAs allowed these cells to resist viral replication better than those that had not been triggered to undergo RNAi

© 2003 Nature Publishing Group

GENV-01082161

**news feature**



(ref. 4). Meanwhile, other researchers have shown that, in cultures of human cells, RNAi can similarly combat viruses as diverse as respiratory syncitial virus[5], and those that cause influenza[6] and polio[7].

RNAi may work like a charm in petri dishes — but what about in live animals? Mark Kay, a geneticist at Stanford University in California, addressed this question by fusing a genetic sequence from the hepatitis C virus to a gene for the enzyme luciferase, which stimulates a reaction that emits light. When Kay injected the fused gene into mouse livers, he could track its location by detecting the glow. And when the mice were treated with siRNAs targeted against the hepatitis C gene, this glow dimmed dramatically[8]. Hepatitis C doesn't make mice sick, but Kay and his colleagues have since gone on to show that RNAi can drastically reduce signs of infection by hepatitis B (ref. 9), which can damage the animals' livers.

### Firm plans

Results such as these are attracting intense commercial interest. In August, Kay announced that he has licensed his work on hepatitis C to a company called Avocel in Sunnyvale, California, which aims to develop RNAi therapies against the disease. Other RNA pioneers are lining up with their own start-up biotech firms. For instance, Phillip Sharp of the Massachusetts Institute of Technology in Cambridge, who shared the Nobel Prize in Physiology or Medicine for his earlier work on RNA splicing, is one of the co-founders of Alnylam Pharmaceuticals, also based in Cambridge.

**Combating the incurable: researchers are testing the idea that the RNAi pathway, which shuts down the genes of invading viruses, can block the replication of hepatitis C virus (far left, RNA shown in yellow) and HIV (left and middle left).**

In June, this company merged with Ribopharma of Kulmbach in Germany.

Both Avocel and Alnylam are planning to begin clinical trials as early as 2005. And hot on their heels is Sirna Therapeutics of Boulder, Colorado, which has already raised US$43 million from investors. Sirna aims to develop therapies for hepatitis C and an eye condition called macular degeneration. For now, these companies are maintaining amicable relations. But the situation could get messier as RNAi moves towards the clinic, because patent offices around the world have not yet decided who owns the rights to some key RNAi-based technologies.

Before worrying about the ownership of key intellectual property, however, scientists must figure out how to make RNAi therapies work. They are facing some formidable technical barriers, chief among which is the problem of getting siRNAs into the right cells. This is not a trivial issue, because RNA is rapidly broken down in the bloodstream, and our cells don't readily absorb it through their membranes. And even when RNA gets into its target cell, scavenger proteins quickly chew it up. "The major hurdle right now is delivery, delivery, delivery," says Sharp.

Researchers are exploring a variety of ways to combat the problem. Some involve techniques developed to facilitate an older technology known as 'antisense'. The idea behind antisense is to muffle a cell's single-stranded mRNA — the 'sense' strand — using a piece of antisense RNA with a 'complementary'

sequence that binds tightly to the mRNA. This, the theory goes, should prevent the mRNA from being translated into protein. Scientists tried a variety of ways to get the antisense RNAs into cells — for example, they packed the RNA inside fatty globules, called liposomes, which can cross cell membranes. But antisense has not performed well in clinical trials, partly because these delivery systems were not particularly effective. Khvorova believes that the medical benefits of RNAi will be huge if the delivery issues can be resolved. "But we've looked at a lot of the delivery methods that have been used for antisense, and so far I haven't been impressed," she says.

### Harmless HIV

Another option is to use a harmless virus as a vector to ferry RNAi-triggering genes into their target cells. Molecular biologist John Rossi of the Beckman Research Institute of the City of Hope Medical Center in Duarte, California, is experimenting with one such vector, based on a version of HIV from which the disease-causing genes have been stripped. Together with colleagues led by Ramesh Akkina of Colorado State University in Fort Collins, Rossi engineered this vector to contain sequences encoding siRNAs targeted against HIV genes. The researchers used their vector to infect the human stem cells that develop into immune cells. Next, they either grew the cells into mature cells in the lab, or injected them into mice from a special strain that accepts human transplants. In both cases, the mature immune cells fought off HIV when researchers tried to infect them with disease-causing HIV in culture dishes[10].

Rossi hopes that a similar technique could work in human patients with HIV. Doctors



REF. 8

**In mice containing a glowing version of a hepatitis C gene (left), a small interfering RNA (siRNA) against the gene reduces liver fluorescence (middle), but an unrelated copy of the siRNA (right) does not.**

© 2003 Nature Publishing Group
**11**

GENV-01082162

### news feature

would extract stem cells from a patient's bone marrow, infect them with the RNAi-triggering vector, and then put them back into the patient. Rossi is now working to perfect this technique in mice, and is also beginning tests in rhesus monkeys to ensure that the treatment has no unwanted side effects. He hopes to convince the US Food and Drug Administration to authorize a clinical trial in the next two or three years. "I think when we get all this data compiled we'll have a fairly free road into a stem-cell trial," Rossi predicts.

This may be so, but there are nagging safety concerns about vectors made from viruses in the same family as HIV, which are called retroviruses. This is due to the fact that retroviruses work by forcing their way into a cell's own DNA. If the vector lands in the wrong place it can damage important genes and even cause cancer. These concerns were borne out last year's revelation that a retroviral vector had triggered leukaemia in some children in a gene-therapy trial[11]. Because of these concerns, Rossi says that he will not use stem cells in his first clinical trial. Instead, he will initially treat mature immune cells, because these cells are less likely to grow out of control.

#### Safe delivery

Kay, meanwhile, is pinning his hopes for an RNAi vector on a virus known as adeno-associated virus, or AAV. He has already used AAV-based vectors in clinical trials of gene therapy against haemophilia[12]. AAV does not cause disease in people, and so far there has been no cause for any serious safety concern — even though AAV can also integrate into a cell's own DNA.

Another important question mark hanging over RNAi is its specificity. Before regulators give the go-ahead for a clinical trial, scientists need to prove that that RNAi will not shut down vital human genes as well as the target viral sequences.

Some studies on specificity have yielded encouraging results. In May this year, for instance, researchers led by Patrick Brown of Stanford University reported on experiments in which they engineered human kidney cells to produce a fluorescent protein. They shut down the gene for this glowing protein by using RNAi, and then used DNA microarrays to monitor some 20,000 other genes — none of which seemed to be affected by the treatment[13].

But just a couple of weeks later, researchers with Rosetta Inpharmatics in Kirkland, Washington, cast a shadow over this rosy picture. The Rosetta team, led by Aimee Jackson and Steven Bartz, used a range of different siRNAs to target two genes in cultured human cells. Disturbingly, the treatment caused changes in the expression of dozens of other genes. Depending on the precise sequence of the siRNA concerned, a different range of 'off-target' genes seemed to be affected[14].



Little helpers: Mark Kay hopes to use harmless viruses to deliver RNAi therapy to patients.

Jackson and Bartz are not sure why their results were so different from those obtained by Brown's team, but one possible explanation is that they used larger doses of siRNA. The Rosetta researchers also tested for off-target effects sooner after beginning their experiment than other groups have in their studies. But whatever the explanation, the findings have shaken up the RNAi camp. "We've had some really lively discussions," says Bartz.

New data from a group at Case Western Reserve University in Cleveland, Ohio, seem to support the Rosetta findings[15]. Last week, Bryan Williams and his colleagues reported that when they introduced siRNAs into cells, certain genes that are part of the interferon



Going to market: Phillip Sharp is one of several RNAi researchers to form start-up biotech firms.

system were activated, a mechanism by which cells shut themselves down in response to invading germs. The siRNAs activated genes that act early in the interferon pathway, and Williams' group did not measure whether the activated genes stopped working. But the team says that its findings provide a warning that off-target effects are perhaps more common than scientists have realized.

Researchers argue that these hints of off-target RNAi effects highlight the need for a deeper understanding of how, exactly, the system works. For instance, we still don't know for sure how many proteins work together to shut down a target mRNA. It's also unclear why some siRNAs are incredibly effective, whereas others, targeted at a different region of the same gene, don't work as well. Given these unknowns, some researchers urge caution before rushing into clinical trials. "Before you know what you could perturb, you have to know what's there," says Tom Tuschl, a biochemist and RNAi pioneer at Rockefeller University in New York.

Even some of the scientists working in the commercial sector, where excitement about the clinical prospects of RNAi is most intense, agree that a great deal of groundwork remains to be done. "For real clinical development, this has to be done right," says Khvorova. "Investing a little more time on the basic steps will pay back in years of time saved later on."

But despite all of these caveats, most researchers working in this fast-moving field have high hopes that RNAi will deliver on its therapeutic promise. "This is the honeymoon period; things are looking great," says Kay. "We will encounter technological issues along the way, but our goal is to solve these problems and get it to work." ∎

Erika Check is *Nature's* Washington biomedical correspondent.

1. Fire, A. *et al. Nature* **391,** 806–811 (1998).
2. Hannon, G. J. *Nature* **418,** 244–251 (2002).
3. Elbashir, S. M. *et al. Nature* **411,** 494–498 (2001).
4. Coburn, G. A. & Cullen, B. R. *J. Virol.* **76,** 9225–9231 (2002).
5. Bitko, V. & Barik, S. *BMC Microbiol.* **1,** 34 (2001).
6. Ge, Q. *et al. Proc. Natl Acad. Sci. USA* **100,** 2718–2723 (2003).
7. Gitlin, L., Karelsky, S. & Andino, R. *Nature* **418,** 430–434 (2002).
8. McCaffrey, A. P. *et al. Nature* **418,** 38–39 (2002).
9. McCaffrey, A. P. *et al. Nature Biotechnol.* **21,** 639–644 (2003).
10. Banerjea, A. *et al. Mol. Ther.* **8,** 62–71 (2003).
11. Check, E. *Nature* **420,** 116–118 (2002).
12. Manno, C. S. *et al. Blood* **101,** 2963–2972 (2003).
13. Chi, J.-T. *et al. Proc. Natl Acad. Sci. USA* **100,** 6343–6346 (2003).
14. Jackson, A. L. *et al. Nature Biotechnol.* **21,** 635–637 (2003).
15. Sledz, C. A., Holko, M., de Veer, M. J., Silverman, R. H. & Williams, B. R. G. *Nature Cell Biol.* doi:10.1038/ncb1038 (2003).

Dharmacon
➧ www.dharmacon.com
Avocel
➧ www.avocel.com
Alnylam Pharmaceuticals
➧ www.alnylam.com
Sirna Therapeutics
➧ www.sirna.com
*Nature* RNA Insight
➧ www.nature.com/nature/insights/6894.html

© 2003 Nature Publishing Group

GENV-01082163

# EXHIBIT 20

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH<br><br>*Plaintiffs*,<br><br>v.<br><br>MODERNA, INC. and MODERNATX, INC.,<br><br>*Defendants.* | C.A. No. 22-252-MSG |
| MODERNA, INC. and MODERNATX, INC.,<br>*Counterclaim-Plaintiffs*,<br><br>v.<br><br>ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH<br><br>*Counterclaim-Defendants.* | **JURY TRIAL DEMANDED**<br><br>**CONTAINS INFORMATION MODERNA, ALNYLAM, AND PLAINTIFFS DESIGNATED HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY** |

**OPENING EXPERT REPORT OF DR. MICHAEL MITCHELL**

Dated: November 25, 2024

_____
Michael Mitchell, Ph.D.

1

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

75.     The challenge that Plaintiffs faced in solving key challenges in the field of lipid-based delivery that so many others could not is exemplified by the effort and money that they dedicated to this work.  As Dr. Haussecker put it, "[I]t took Tekmira 500 person-years and over US$200M to turn a single technology, SNALP, into the prolific drug development engine it is today."  Haussecker 2012 at 8; *see also* Kille 5/21/2024 Tr. 42:18-43:3 ("my estimation is it was approximately $200 million invested in R&D expenses over that time frame"); GENV-00233655 at ¶ 17 (complaint in *Tekmira Pharms. Corp., et al. v. Alnylam Pharms. Inc., et al.*, Civil Action No. 11-1010-BLS2 (Mar. 16, 2011)).

**B.     Lipid Nanoparticles**

76.     The LNPs at issue in this case differ from predecessor lipid-based delivery systems, including cationic lipoplexes, and are generally comprised of three or four lipid components: (1) "cationic" (or "ionizable" lipids or "aminolipids") that are neutral or uncharged at physiological pH (approximately pH 7) but which become positively charged at low pH due to the presence of nitrogen- or amine-bearing chemical groups; (2) cholesterol and (3) phospholipids, which are "structural" lipids that maintain the LNP structure; and (4) conjugated lipids that contain a lipid "anchor" attached (or "conjugated") to a hydrophilic component, generally polyethylene glycol or "PEG."  The hydrophilic nature of PEG reduces the propensity of LNPs to aggregate or fuse during manufacture and also "shields" them from being rapidly cleared in the bloodstream.  However, PEG-lipids can also can interfere with the ability of LNPs to fuse with cell membranes.  As explained in greater detail below, the ratio of the four components in the claimed LNPs is important to their desirable properties.

77.     The LNPs at issue in this case generally are formed by the self-assembly of the lipids and the nucleic acids into particles.  When lipids dissolved in an organic solution are introduced into or mixed with an aqueous solution, the lipids self-associate to minimize their

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

a.    **Moderna's Testing Data Demonstrate Infringement**

1)    **Drug Product**

609.    As explained above, I understand that Moderna has reported lipid content testing for lots of Moderna's drug product in COAs that correspond to each released drug product lot. *See supra* Section X.E.1.  I understand that Moderna's COAs report the concentration of each lipid component, which, as explained above, can be converted into molar ratios.  *See supra* Section X.A.  Moderna's release testing for lipid content measures the concentrations of SM-102, cholesterol, DSPC, and PEG2000-DMG on the basis of bulk, unfractionated samples of the lots tested, and reports the results in its COAs.  As I explain above, *supra* Section VI.C, ¶¶ 90-92, such testing still informs whether nucleic acid-lipid particles satisfy the recited lipid content limitations are present in the lots.  That is because: (1) the measurement ascertains the average lipid content across the very large number of particles that would be present; (2) the lipid content of those particles would be distributed around an average value for each lipid; and (3) at least some of the particles in that distribution would fall at or very close to the measured average values.  *Supra* Section VI.C; ¶¶ 90-92.  Moderna's witnesses further agreed that the lipid molar ratio of the Accused Product can be determined from the lipid content measurements reported in Moderna's COAs, and it is appropriate to use Moderna's COAs to assess infringement.  *See, e.g.*, Parsons 6/7/2024 Tr. 133:12-134:3; Kramarcyzk 4/30/2024 Tr. 73:6-9.

610.    I understand that Moderna has also produced limited sets of "raw data" related to its lipid content measurements.  The analysis in the present report relies on the lipid content data reported in Moderna's COAs, rather than these raw data, for several reasons.  First, Moderna and its witnesses have taken the position that infringement can be determined from Moderna's COAs.  *See, e.g.*, D.I. 183 at 1 (Letter to the Honorable Mitchell S. Goldberg in Opposition to Plaintiffs' Motion to Compel Samples); Parsons 6/7/2024 Tr. 133:12-134:3.  Second, it is my

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

understanding that Moderna has not produced a complete set of raw data upon which I could conduct the analysis—in particular, I understand that Moderna has not produced raw data from at least some third-party manufacturers.  Third, it is my understanding that Moderna has not produced information that identifies the nature of each test in its raw data spreadsheets (for example, whether it is a release test, a stability test, or a different type of test).  Fourth, as I explain above, *supra* Section X.E.1, Moderna submitted its COA data to the FDA, not the raw data itself, and the accuracy and precision of the data that it reported ██████████████████ ████████████████████████████████████████  *See, e.g.*, MRNA-GEN-00038383 at -390; *see also supra* ¶ 460.  I reserve the right to rely on Moderna's "raw data" in the future, including if Moderna should take the position—which it has not yet taken in this litigation to my knowledge and is contrary to the evidence above, including its statements to FDA—that its COAs are insufficiently reliable to use to calculate lipid molar percentages.

611.    Based on the COAs that Moderna has produced, I have calculated the lipid molar ratio of Moderna's labeled drug product lots to determine whether they meet the lipid content limitations of the foregoing claims.  For each claim, I have provided a listing of the lots that fall within the claimed ranges in accordance with the Court's claim construction of "___ mol % of the total lipid present in the particle" as following the standard rules of rounding based on significant figures; the concentrations for SM-102, cholesterol, DSPC, and PEG2000-DMG reported by Moderna (or its third-party manufacturer); and the calculated lipid molar ratio.  The following table summarizes the numerical limits that I have applied for each claim and the corresponding Appendix where the listing of lots infringing that claim can be found.  For this and all similar tables in this report, I have only listed the claims that recite lipid compositions;

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

however, the same lots would likewise infringe the asserted claims that depend from the listed claims.

| Drug Product | | | |
|---|---|---|---|
| **Patent Claim** | **Lipid Molar Ratio Range (%)** | | **LDP Lot #** |
| '069 Patent, Claim 1 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 3 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 3.5 | ≤ DSPC < | 10.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '069 Patent, Claim 15 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 4 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 3.5 | ≤ DSPC < | 10.5 | |
| | 0.5 | ≤ PEG2K-DMG < | 2.5 | |
| '069 Patent, Claim 20 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 5 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 4.5 | ≤ DSPC < | 9.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '069 Patent, Claim 21 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 6 |
| | 31.5 | ≤ Cholesterol < | 36.5 | |
| | 3.5 | ≤ DSPC < | 10.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 1 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 7 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 7 | 49.5 | ≤ SM-102 < | 60.5 | Appendix 8 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 9 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 9 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 3.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 10 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 10 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 3.5 | ≤ DSPC < | 12.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 11 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 11 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 4.5 | ≤ DSPC < | 12.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

| Drug Product | | | |
|---|---|---|---|
| **Patent Claim** | **Lipid Molar Ratio Range (%)** | | **LDP Lot #** |
| '359 Patent, Claim 12 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 12 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 5.5 | ≤ DSPC < | 12.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 13 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 13 |
| | 29.5 | ≤ Cholesterol < | 35.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 18 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 14 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.5 | ≤ PEG2K-DMG < | 2.5 | |
| '668 Patent, Claim 1 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 15 |
| | N/A | ≤ Non-Cationic < | 49.55 | |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | N/A | ≤ DSPC < | N/A | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '668 Patent, Claim 8 | 49.5 | ≤ SM-102 < | 60.5 | Appendix 16 |
| | N/A | ≤ Non-Cationic < | 49.55 | |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | N/A | ≤ DSPC < | N/A | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '668 Patent, Claim 10 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 17 |
| | N/A | ≤ Non-Cationic < | 49.55 | |
| | 29.5 | ≤ Cholesterol < | 35.5 | |
| | N/A | ≤ DSPC < | N/A | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '668 Patent, Claim 15 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 18 |
| | N/A | ≤ Non-Cationic < | 49.55 | |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | N/A | ≤ DSPC < | N/A | |
| | 0.5 | ≤ PEG2K-DMG < | 2.5 | |
| '435 Patent, Claim 7 | 49.5 | ≤ SM-102 < | 85.5 | Appendix 19 |
| | 12.5 | ≤ Non-Cationic < | 49.55 | |
| | N/A | ≤ Cholesterol < | N/A | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '435 Patent, Claim 8 | 49.5 | ≤ SM-102 < | 85.5 | Appendix 20 |
| | 12.5 | ≤ Non-Cationic < | 49.55 | |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | N/A | ≤ DSPC < | N/A | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

| Drug Product | | | |
|---|---|---|---|
| **Patent Claim** | **Lipid Molar Ratio Range (%)** | | **LDP Lot #** |
| '378 Patent, Claim 1 | N/A | ≤ SM-102 < | N/A | Appendix 21 |
| | 29.5 | ≤ Non-Cationic < | 55.5 | |
| | N/A | ≤ Cholesterol < | N/A | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.05 | ≤ PEG2K-DMG < | 2.5 | |
| '378 Patent, Claims 2 and 13 | N/A | ≤ SM-102 < | N/A | Appendix 22 |
| | 29.5 | ≤ Non-Cationic < | 55.5 | |
| | 24.5 | ≤ Cholesterol < | 45.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.05 | ≤ PEG2K-DMG < | 2.5 | |
| '378 Patent, Claims 7, 18, and 24 | N/A | ≤ SM-102 < | N/A | Appendix 23 |
| | 29.5 | ≤ Non-Cationic < | 55.5 | |
| | 34.5 | ≤ Cholesterol < | 45.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.05 | ≤ PEG2K-DMG < | 2.5 | |
| '378 Patent, Claim 25 | N/A | ≤ SM-102 < | N/A | Appendix 24 |
| | 29.5 | ≤ Non-Cationic < | 55.5 | |
| | 34.5 | ≤ Cholesterol < | 45.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |

612.    Moderna's COAs and the lipid content testing data they report do not account for the variation in lipid content between particles that would be present in the drug product.  That is because Moderna's technique for analyzing lipid content relies on unfractionated, bulk samples of the drug product.  However, such variation is undoubtedly present, as confirmed by ████████████████████████ discussed above, the well-accepted understanding in the field, and Moderna's statements to tribunals in connection with its challenges to certain of the patents asserted in this case.  *See supra* Sections VI.C.3, IX.E, X.E.2; *see also, e.g.*, Moderna '435 IPR CAFC Appeal Reply Brief at 42 (explaining that "in formulated particles, one would expect a bell curve for the lipid percentages"), 43 (discussing "resulting particle variation from the input percentages," emphasizing Dr. Thompson's testimony that "[i]n a population of particles . . . there's likely to be . . . a range of compositions on a particle-by-particle basis");

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

'435 IPR CAFC Opinion at 1363-64 (agreeing with the PTAB that "there would be some variation in the final compositions of the lipid particles fabricated").

613. ██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████ As I explain above, *supra* Section VI.C.3, in measuring the lipid content of a fraction (or even a bulk formulation), the composition of some particles within the fraction would reflect the measured mean value, with other particles distributed around that mean—a point that Moderna has acknowledged before the Federal Circuit, *see* Moderna '435 IPR CAFC Appeal Reply Brief at

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

48 ("Moderna is pointing out that the industry, prior art, '435 patent and both experts expect the particle formulation to reflect a point in the resulting particle distribution.").



**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

616.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

| Patent Claim | Lipid Molar Ratio Range (%) | | | |
|---|---|---|---|---|
| '378 Patent, Claim 1 | N/A | ≤ SM-102 < | N/A | Appendix 39 |
| | 29.5 | ≤ Non-Cationic < | 55.5 | |
| | N/A | ≤ Cholesterol < | N/A | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.05 | ≤ PEG2K-DMG < | 2.5 | |
| '378 Patent, Claims 2 and 13 | N/A | ≤ SM-102 < | N/A | Appendix 40 |
| | 29.5 | ≤ Non-Cationic < | 55.5 | |
| | 24.5 | ≤ Cholesterol < | 45.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.05 | ≤ PEG2K-DMG < | 2.5 | |
| '378 Patent, Claims 7, 18, and 24 | N/A | ≤ SM-102 < | N/A | Appendix 41 |
| | 29.5 | ≤ Non-Cationic < | 55.5 | |
| | 34.5 | ≤ Cholesterol < | 45.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.05 | ≤ PEG2K-DMG < | 2.5 | |
| '378 Patent, Claim 25 | N/A | ≤ SM-102 < | N/A | Appendix 42 |
| | 29.5 | ≤ Non-Cationic < | 55.5 | |
| | 34.5 | ≤ Cholesterol < | 45.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |

**b.    Plaintiffs' Fractionation Testing Data Demonstrate Infringement**

618.    The ultracentrifugation fractionation testing conducted by Dr. Schuster and his colleagues at Coriolis further establishes that Moderna's Accused Product infringes the lipid content limitations set forth in the claims of the Lipid Composition Patents above. *See supra* Section XI.

619.    As discussed throughout this report, ultracentrifugation ("UC") is an established and reliable technique for fractionating LNPs. *See supra* Sections VI.C.3, IX.E., X.E.2. UC is well-suited for fractionating LNPs, as it is sensitive to the density differences among LNPs and is a gentle, "non-destructive" technique. Vaidya 2024 at 5571. These advantages are the reason why, in my lab, we use UC to analyze polydispersity in LNP batches and to isolate and analyze subpopulations of particles.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

620.    As I have explained, *see supra* Section VI.C.3, the identification of a fraction with an infringing composition demonstrates that particles within the fraction also have an infringing composition, because the measured composition of the fraction (with respect to the mol% of each lipid) reflects the measured mean value of all the particles that are distributed normally about this mean.  Given the very large number of particles that are present, there would exist particles at or essentially at the mean.  *See also* Moderna '435 IPR CAFC Appeal Reply Brief at 48 ("Moderna is pointing out that the industry, prior art, '435 patent and both experts expect the particle formulation to reflect a point in the resulting particle distribution.");

621.    For each claim, I have provided a listing of the fractions (and corresponding lots) that fall within the claimed ranges in accordance with the Court's claim construction of "___ mol

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

% of the total lipid present in the particle," following the standard rules of rounding based on significant figures, per Claim Construction Opinion at 24-25, in view of the lipid molar ratios determined by Dr. Schuster. The following table summarizes the numerical limits that I have applied for each claim and the corresponding Appendix where the listing of fractions infringing that claim can be found. In my analysis, I did not include any fractions for which the optical density (O.D.) of mRNA was below the limit of quantification (reported by Dr. Schuster as "< LQ"), the lipid concentration was below the limit of quantification (reported by Dr. Schuster as "< LQ"), or any system acceptability testing criteria was not met (reported as "SAT failed"), such that I am confident that only trustworthy, accurate, and precise measurements of mRNA-LNP fractions were included. For clarity, that does not mean that those other fractions are non-infringing, but simply that I did not rely on them in my analysis below.

| Drug Product | | | |
|---|---|---|---|
| **Patent Claim** | **Lipid Molar Ratio Range (%)** | | **Infringing Fractions** |
| '069 Patent, Claim 1 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 133 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 3.5 | ≤ DSPC < | 10.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '069 Patent, Claim 15 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 134 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 3.5 | ≤ DSPC < | 10.5 | |
| | 0.5 | ≤ PEG2K-DMG < | 2.5 | |
| '069 Patent, Claim 21 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 135 |
| | 31.5 | ≤ Cholesterol < | 36.5 | |
| | 3.5 | ≤ DSPC < | 10.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 1 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 136 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 7 | 49.5 | ≤ SM-102 < | 60.5 | Appendix 137 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

| Drug Product | | | |
|---|---|---|---|
| **Patent Claim** | **Lipid Molar Ratio Range (%)** | | **Infringing Fractions** |
| '359 Patent, Claim 9 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 138 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 3.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 10 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 139 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 3.5 | ≤ DSPC < | 12.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 11 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 140 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 4.5 | ≤ DSPC < | 12.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 12 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 141 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 5.5 | ≤ DSPC < | 12.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 13 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 142 |
| | 29.5 | ≤ Cholesterol < | 35.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '359 Patent, Claim 18 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 143 |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.5 | ≤ PEG2K-DMG < | 2.5 | |
| '668 Patent, Claim 1 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 144 |
| | N/A | ≤ Non-Cationic < | 49.55 | |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | N/A | ≤ DSPC < | N/A | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '668 Patent, Claim 8 | 49.5 | ≤ SM-102 < | 60.5 | Appendix 145 |
| | N/A | ≤ Non-Cationic < | 49.55 | |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | N/A | ≤ DSPC < | N/A | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '668 Patent, Claim 10 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 146 |
| | N/A | ≤ Non-Cationic < | 49.55 | |
| | 29.5 | ≤ Cholesterol < | 35.5 | |
| | N/A | ≤ DSPC < | N/A | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

| Drug Product | | | |
|---|---|---|---|
| **Patent Claim** | **Lipid Molar Ratio Range (%)** | | **Infringing Fractions** |
| '668 Patent, Claim 15 | 49.5 | ≤ SM-102 < | 65.5 | Appendix 147 |
| | N/A | ≤ Non-Cationic < | 49.55 | |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | N/A | ≤ DSPC < | N/A | |
| | 0.5 | ≤ PEG2K-DMG < | 2.5 | |
| '435 Patent, Claim 7 | 49.5 | ≤ SM-102 < | 85.5 | Appendix 148 |
| | 12.5 | ≤ Non-Cationic < | 49.55 | |
| | N/A | ≤ Cholesterol < | N/A | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '435 Patent, Claim 8 | 49.5 | ≤ SM-102 < | 85.5 | Appendix 149 |
| | 12.5 | ≤ Non-Cationic < | 49.55 | |
| | 29.5 | ≤ Cholesterol < | 40.5 | |
| | N/A | ≤ DSPC < | N/A | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |
| '378 Patent, Claim 1 | N/A | ≤ SM-102 < | N/A | Appendix 150 |
| | 29.5 | ≤ Non-Cationic < | 55.5 | |
| | N/A | ≤ Cholesterol < | N/A | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.05 | ≤ PEG2K-DMG < | 2.5 | |
| '378 Patent, Claims 2 and 13 | N/A | ≤ SM-102 < | N/A | Appendix 151 |
| | 29.5 | ≤ Non-Cationic < | 55.5 | |
| | 24.5 | ≤ Cholesterol < | 45.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.05 | ≤ PEG2K-DMG < | 2.5 | |
| '378 Patent, Claims 7, 18, and 24 | N/A | ≤ SM-102 < | N/A | Appendix 152 |
| | 29.5 | ≤ Non-Cationic < | 55.5 | |
| | 34.5 | ≤ Cholesterol < | 45.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.05 | ≤ PEG2K-DMG < | 2.5 | |
| '378 Patent, Claim 25 | N/A | ≤ SM-102 < | N/A | Appendix 153 |
| | 29.5 | ≤ Non-Cationic < | 55.5 | |
| | 34.5 | ≤ Cholesterol < | 45.5 | |
| | 2.5 | ≤ DSPC < | 15.5 | |
| | 0.45 | ≤ PEG2K-DMG < | 2.5 | |

622.    I understand that Moderna may rely on its own lipid content testing to dispute testing data produced by Plaintiffs, but I am not aware of any Moderna fractionation data of the Accused Product that would inform whether particles satisfying the lipid content limitations of the Lipid Composition Patents are present, ███████████████████████

# EXHIBIT 21

*Execution Version*

Non-Exclusive License Agreement

by and between

Acuitas Therapeutics Inc.

and

ModernaTX, Inc.

December 14, 2016

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225516

## Table of Contents

Page

1.    Definitions...........................................................................................1

2.    Development and Commercialization.................................................6

3.    License Grants. ...................................................................................7

4.    Applicable In-Licenses ......................................................................8

5.    Payments and Royalties. ....................................................................9

6.    Ownership and Inventorship of IP...................................................14

7.    Patent Prosecution and Maintenance. ..............................................14

8.    Patent Enforcement and Defense. ....................................................16

9.    Confidentiality..................................................................................18

10.   Warranties; Limitations of Liability; Indemnification. ...................19

11.   Term and Termination.......................................................................24

12.   General Provisions............................................................................26

16198433

## List of Appendices

Appendix A    Licensed Target

Appendix B    Applicable In-Licenses

Appendix C    Certain Patents within the Licensed Technology
as of the License Agreement Effective Date

Schedule 9.2    Exceptions to Acuitas' Representations and Warranties

16198433

## Non-Exclusive License Agreement

This Non-Exclusive License Agreement (this "<u>License Agreement</u>"), dated as of December 14, 2016 (the "<u>License Agreement Effective Date</u>"), is made by and between Acuitas Therapeutics Inc., a British Columbia corporation ("<u>Acuitas</u>"), and ModernaTX, Inc. (formerly known as Moderna Therapeutics, Inc.), a Delaware Corporation ("<u>Moderna</u>"). Each of Acuitas and Moderna may be referred to herein as a "<u>Party</u>" or together as the "<u>Parties</u>."

**WHEREAS,** Acuitas has proprietary LNP Technology;

**WHEREAS,** Moderna has proprietary messenger RNA ("<u>mRNA</u>") technologies; and

**WHEREAS,** Acuitas and Moderna are parties to that certain Development and Option Agreement (dated July 3, 2014) (the "<u>Development and Option Agreement</u>") pursuant to which Moderna has an option to take a license under Licensed Technology (as defined below) with respect to certain mRNA products;

**WHEREAS,** pursuant to the terms of the Development and Option Agreement, Moderna has exercised an option with respect to a Reserved Target and the Parties are now entering into a non-exclusive licensing arrangement whereby Moderna will have a non-exclusive license under the Licensed Technology to develop and commercialize Licensed Products, all on the terms and conditions set forth here.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the amount and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## 1.  Definitions.

The following terms and their correlatives will have the meanings set forth below. Capitalized terms used, but not defined, herein will have the meanings ascribed to such terms in the Development and Option Agreement.

1.1    "<u>Acuitas Milestone Product</u>" means ███████████████████████████████████████████████████████████████████

1.2    "<u>Applicable In-Licenses</u>" means all LNP In-Licenses that Moderna has elected to list on <u>Appendix B</u> as of the License Agreement Effective Date, plus any other LNP In-Licenses that Moderna has elects to include as an Applicable In-License pursuant to Section 4.1.

1.3    "<u>Combination Product</u>" means a Licensed Product that includes at least one additional active ingredient other than an mRNA Construct. Drug delivery vehicles, adjuvants, and excipients shall not be deemed to be "active ingredients", except in the case where such delivery vehicle, adjuvant, or excipient is recognized as an active ingredient in accordance with 21 C.F.R. 210.3(b)(7), provided however, ██████████████████████████████████████████████████



1.4    "<u>Commercialization</u>" means any and all activities directed to the Manufacturing, marketing, detailing, promotion and securing of reimbursement of a product after Regulatory Approval has been obtained (including making, having made, using, importing, selling and

1

16198433

offering for sale such product), and will include post-approval clinical studies, post-launch marketing, promoting, detailing, marketing research, distributing, customer service, administering and commercially selling such product, importing, exporting or transporting such product for commercial sale, and all regulatory compliance with respect to the foregoing.

1.5    "Commercially Reasonable Efforts"



1.6    "Contract Year" means the period beginning on the License Agreement Effective Date and ending on the first anniversary of the License Agreement Effective Date, and each consecutive twelve (12) month period thereafter during the Term.

1.7    "Control" or "Controlled" means, with respect to any Know-How or Patent, the possession (whether by ownership or license, other than by a license or sublicense granted pursuant to this License Agreement) by a Party or its Affiliates of the ability to grant to the other Party a license or access as provided herein to such item, without violating the terms of any agreement or other arrangement with any Third Party.

1.8    "Covers", with reference to (a) a Patent, means that the making, using, selling, offering for sale or importing of a product or practice of a method would infringe a Valid Claim or Pending Claim of such Patent in the country in which such activity occurs, and (b) Know-How, means that the Manufacture, Development or Commercialization of a product incorporates or embodies such Know-How.

1.9    "Cross License Agreement" means the Cross License Agreement dated November 12, 2012 by and between Acuitas and Tekmira Pharmaceuticals Corporation (on behalf of itself and its wholly owned Affiliate Protiva Biotherapeutics Inc.) ("Tekmira").

1.10   "Development" means preclinical and clinical drug research and development activities, including: test method development and stability testing, toxicology, formulation, process development, qualification and validation, Manufacture scale-up, development-stage Manufacturing, quality assurance/quality control, clinical studies, statistical analysis and report writing, the preparation and submission of applications for Regulatory Approval, regulatory affairs with respect to the foregoing and all other activities necessary or useful or otherwise requested or required by a Regulatory Authority as a condition or in support of obtaining or maintaining a Regulatory Approval.

1.11   "Field of Use" means all fields.

1.12   "First Commercial Sale" means the first sale for use or consumption of any Licensed Product in a country after all required Regulatory Approvals for commercial sale of such Licensed Product have been obtained in such country.

1.13   "Generic Product" means, with respect to a Licensed Product in a given country, any generic or biosimilar product sold by a Third Party not licensed or otherwise authorized by or on

2

16198433

behalf of Moderna or any of its Affiliates or Sublicensees (a) that is approved for administration to humans under 351(k) of the PHSA referencing Licensee's Regulatory Filings; or (b) foreign equivalents that have received equivalent Regulatory Approval from the applicable Regulatory Authority by referencing Acuitas' Regulatory Filings (and data therein) of such Licensed Product. Notwithstanding anything to the contrary set forth above, in no event will a product sold by or under authority of Tekmira pursuant to the Cross License Agreement be a "Generic Product" for the purposes of this.

1.14    "In-License Payments" means any amounts paid or payable by Acuitas or its Affiliates under any Applicable In-License that arise solely as a result of the grant of a sublicense thereunder to Moderna and its Affiliates and Sublicensees that are royalties on sales of Licensed Products or milestone payments achieved with respect to License Products.  For the avoidance of doubt, "In-License Payments" shall include only royalties and milestone payments payable under the Applicable In-License and shall not include any annual maintenance fees, license fees, payments resulting from Acuitas' breach of an Applicable In-License or any other payment thereunder.

1.15    "Know-How" means all commercial, technical, scientific and other know-how and information, trade secrets, knowledge, technology, methods, processes, practices, formulae, instructions, skills, techniques, procedures, experiences, ideas, technical assistance, designs, drawings, assembly procedures, computer programs, specifications, data and results (including biological, chemical, pharmacological, toxicological, pharmaceutical, physical and analytical, preclinical, clinical, safety, manufacturing and quality control data and know-how, including study designs and protocols), in all cases, (a) to the extent Confidential Information of Acuitas, (b) whether or not patentable, and (c) provided by Acuitas to Moderna pursuant to the Development and Option Agreement.

1.16    "Licensed Product" means any product (a) that includes one (1) or more mRNA Constructs coding for  the Licensed Target and (b) the Manufacture, use, sale, offer for sale or importation of which in or into a particular country is Covered by the Licensed Technology, as determined on a product-by-product and country-by-country basis.

1.17    "Licensed Proprietary Technology" means all Know-How, Patents and Materials and that (a) Cover LNP Technology (including the manufacture or use thereof), and (b) are owned by Acuitas or any of its Affiliates at the relevant point in time, and (c) that may be necessary or useful to Develop and Commercialize Licensed Products.

1.18    "Licensed Target" means the Target identified on Appendix A hereto.

1.19    "Licensed Technology" means the Licensed Proprietary Technology and Licensed Third Party Technology.

1.20    "Licensed Third Party Technology" means any and all Know-How, Patents and Materials that (a) Cover LNP Technology (including the manufacture or use thereof), (b) that are in-licensed by Acuitas or its Affiliates pursuant to the Applicable In-Licenses (including any extensions or expansions of the scope thereof), and (c) are Controlled at the applicable time by Acuitas or any of its Affiliates and (d) that may be necessary or useful to Develop and Commercialize Licensed Products..

1.21    "LNP In-Licenses" means all agreements entered into prior to the License Agreement Effective Date or at any time during the Term between Acuitas or its Affiliates and a Third Party

3

16196433

MRNA-GEN-00225521

pursuant to which Acuitas or its Affiliates is granted a license or other rights to LNP Technology that may be necessary or useful to Develop and Commercialize Licensed Products.

1.22    "LNP Technology"



1.23    "Manufacturing" means the production, manufacture, processing, filling, finishing, packaging, labeling, shipping and holding of product or any intermediate thereof, including process development, process qualification and validation, scale-up, commercial manufacture and analytic development, product characterization, stability testing, quality assurance and quality control.

1.24    "mRNA Construct"

1.25    "Net Sales" means, with respect to any Licensed Product,

(a)

(b)

(c)

(d)



4

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                    MRNA-GEN-00225522

1.26    "Patent" means the rights and interests in and to all issued patents and pending patent applications in any country, including, without limitation, all provisional applications, substitutions, continuations, continuations-in-part, divisions, and renewals, all letters patent granted thereon, and all patents-of-addition, reissues, reexaminations and extensions or restorations by existing or future extension or restoration mechanisms, including, without limitation Supplementary Protection Certificates or the equivalent thereof.

1.27    "Patent Costs" means the reasonable, documented, out-of-pocket costs and expenses paid to outside legal counsel, and filing and maintenance expenses, actually and reasonably incurred by a Party in prosecuting and maintaining Patents and enforcing and defending them.

1.28    "Pending Claim" means, with respect to a particular country, any claim of a pending Patent application in such country that (a) has not been held revoked, unenforceable or invalid by a decision of a court or governmental agency of competent jurisdiction from which no further appeal is possible (other than to the United States Supreme Court), (b) has not been abandoned, disclaimed, denied or admitted to be invalid or unenforceable through reissue or disclaimer or otherwise in such country, and (c) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1.29    "Phase 1 Study" means a human clinical trial of a Licensed Product in any country, the primary purpose of which is the determination of safety and which may include the determination of pharmacokinetic and/or pharmacodynamic profiles in healthy individuals or patients.

1.30    "Phase 2 Study" means a human clinical trial of a Licensed Product in any country, and which is: (a) a study of dose exploration, dose response, duration of effect, kinetics or preliminary efficacy and safety study of a product in the target patient population, (b) a controlled dose-ranging clinical trial to evaluate further the efficacy and safety of such product in the target population and to define the optimal dosing regimen or (c) a clinical trial that Moderna refers to in a press release as a Phase II (or IIa or IIb) clinical trial or study.

1.31    "Phase 3 Study" means a human clinical trial of a Licensed Product in any country, and which is: (a) a controlled study of a product in patients of the efficacy and safety of such product which is prospectively designed to demonstrate statistically whether such product is effective and safe for use in a particular indication in a manner sufficient to obtain Regulatory Approval to market such product or (b) a clinical trial that Moderna refers to in a press release as a Phase III or registration clinical trial or pivotal study.

1.32    "Regulatory Approval" means, with respect to a country or extra-national territory, any and all approvals (including BLAs and MAAs), licenses, registrations or authorizations of any Regulatory Authority necessary in order to commercially distribute, sell or market a product in such country or some or all of such extra-national territory, excluding any pricing or reimbursement approvals.

1.33    "Regulatory Authority" means any national (e.g., the FDA), supra-national (e.g., the EMA), regional, state or local regulatory agency, department, bureau, commission, council or other governmental authority, in any jurisdiction in the world, involved in the granting of Regulatory Approval.

5

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                    MRNA-GEN-00225523

1.34   "Sublicensee" means any Third Party that is granted a sublicense as permitted by Section 3.5, either directly by Moderna or its Affiliates or indirectly by any other Sublicensee hereunder.

1.35   "Target" means either:



1.36   "Territory" means worldwide.

1.37   "Valid Claim" means, with respect to a particular country, any claim of an issued and unexpired Patent in such country that

Definitions for each of the following terms are found in the body of this License Agreement as indicated below:

| Defined Terms | Location |
|---|---|
| Acuitas Indemnitees | Section 10.6(a) |
| Competitive Infringement | Section 8.1 |
| Indemnification Claim Notice | Section 10.6(c) |
| Indemnified Party | Section 10.6(c) |
| In-License Milestone Payments | Section 5.1 |
| In-License Royalties | Section 5.1 |
| Losses | Section 10.6(a) |
| Acuitas Milestone Event | Section 5.1 |
| Acuitas Milestone Payment | Section 5.1 |
| Moderna Indemnitees | Section 10.6(b) |
| Solely Owned IP | Section 6.1 |
| Term | Section 11.1 |
| Third Party Claims | Section 10.6(a) |

## 2.   Development and Commercialization.

6

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225524

2.1    Development. Moderna shall have sole responsibility for, and shall bear all its costs of conducting, all Development and Commercialization of Licensed Products (including filing for and obtaining all required Regulatory Approvals). As between the Parties, all such Regulatory Approvals shall be obtained by and in the name of Moderna (or its Affiliates or Sublicensees).

## 3.    License Grants.

3.1    Licenses by Acuitas.

(a)    *Licensed Technology.* Subject to the terms and conditions of this License Agreement, Acuitas and its Affiliates hereby grant to Moderna and its Affiliates (a) a non-exclusive, non-transferrable (other than pursuant to Section 12.11) license, with the right to sublicense only as permitted by Section 3.5(b), under the Licensed Technology, to Develop and Commercialize Licensed Products in the Field of Use in the Territory.

3.2    No Obligation to Provide Know-How. The Parties acknowledge and agree that neither Acuitas nor any of its Affiliates is obligated hereunder to, or will, absent prior written agreement by the Parties, transfer to Moderna or its Affiliates any Know-How or materials.

3.3    Updates to Appendix C.    Acuitas shall notify Moderna at least once every █████ of Patents that are added to the Licensed Technology following the Effective Date or any Patents that have been abandoned or discontinued in accordance with the terms of this License Agreement. Appendix C shall be automatically updated to include any such added Patents provided that, with written notice to Acuitas, Moderna may elect to exclude any particular Patents from the Licensed Technology. Following any such notice by Moderna, the applicable Patents that Moderna identifies for exclusion from this License Agreement will no longer be licensed to Moderna hereunder, and Moderna shall not have any obligations hereunder with respect to such Patent.

3.4    Tekmira Agreement.



3.5    Sublicensing Rights.

7

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225525

(a)    *Transfer*.  The licenses granted in Sections 3.1 are transferable only upon a permitted assignment of this License Agreement in accordance with Section 12.11.

(b)    *Moderna Sublicenses*.  The licenses granted in Section 3.1 may be sublicensed, in full or in part, by Moderna or its Affiliates or Sublicensees by a written agreement to Third Parties (with the right to sublicense through multiple tiers), provided, that:

(i)    Each sublicense will be in writing and on terms consistent with and subject to the terms of this Agreement,

(ii)    Moderna will provide Acuitas with a copy of any sublicense agreement with a Sublicensee within ███████████████████████████████ of execution thereof, which sublicense agreement may be redacted as necessary to protect commercially sensitive information and shall be treated as Moderna Confidential Information hereunder;

(iii)    Moderna will be responsible for any and all obligations of such Sublicensee as if such Sublicensee were "Moderna" hereunder; and

(iv)    Any sublicense granted by Moderna to any rights licensed to it hereunder shall terminate immediately upon the termination of the license from Acuitas to Moderna and its Affiliates with respect to such rights, provided that such sublicensed rights shall not terminate if, as of the effective date of such termination pursuant to Sections 11.2, 11.3(a) or 11.4, a Sublicensee is not in material default of its obligations under its sublicense agreement, and within ████████ days of such termination the Sublicensee agrees in writing to be bound directly to Acuitas under a license agreement substantially similar to this License Agreement with respect to the rights sublicensed hereunder, substituting such Sublicensee for Moderna.

3.6    <u>License Limitations</u>.  No licenses or other rights are granted by Acuitas hereunder to use any trademark, trade name, trade dress or service mark owned or otherwise Controlled by Acuitas or any of its Affiliates.  All licenses and other rights are or shall be granted only as expressly provided in this License Agreement, and no other licenses or other rights is or shall be created or granted by either Party hereunder by implication, estoppel or otherwise.

## 4.    <u>Applicable In-Licenses</u>.

4.1    <u>Applicable In-Licenses</u>.  The Applicable In-Licenses as of the License Agreement Effective Date are listed in <u>Appendix B</u>.  If during the Term Acuitas or its Affiliates enters into any Third Party In-License pursuant to which Acuitas or its Affiliates in-licenses any Patents or Know-How Covering LNP Technology that is Controlled by Acuitas or its Affiliates, Acuitas will promptly ██████████████████████████████ notify Moderna of same and provide Moderna with a copy of such Third Party In-License (which may be redacted as necessary to protect commercially sensitive information of Acuitas that is not relevant to the grant of a sublicense to Moderna).  Moderna shall have the option of including any such Third Party In-License within the scope of this License Agreement by providing Acuitas with notice of same, provided that (a) such notice is provided to Acuitas within ████████████ of Moderna's receipt of notice from Acuitas, or (b) if such notice is provided to Acuitas later than ████████████ Moderna's receipt of notice from Acuitas, the LNP Technology that is in-licensed by Acuitas or its Affiliates pursuant to the Third Party In-License is still Controlled by Acuitas or its Affiliates for the purposes of granting a sublicense to Moderna hereunder.  <u>Appendix B</u> will automatically be updated to include such Third Party In-License added in accordance with subsections (a) or (b) above and the provisions of

8

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225526

this License Agreement applicable to Applicable In-Licenses, including Section 5.1, will apply with respect to such Third Party In-License.

4.2    Maintenance of Applicable In-Licenses. Acuitas (a) will duly perform and observe all of its obligations under the Applicable In-Licenses in all material respects (and in all respects if the failure to do so would give rise to a right of termination on the part of the licensor) and maintain in full force and effect the Applicable In-Licenses, and (b)



4.3    Applicable In-License Requirements. Moderna will abide, and will cause all its Affiliates and applicable Sublicensees to abide, by all requirements of each Applicable In-License in all material respects, to the extent applicable to sublicensees thereunder and to the extent disclosed by Acuitas to Moderna.



5.    **Payments and Royalties.**



16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225527



5.2    Milestone Payments for Licensed Proprietary Technology. Subject to ██████ ████████████████████████████, Moderna will make milestone payments (each, an "Acuitas Milestone Payment") to Acuitas upon ██████████ ██████████████████████████ Moderna will notify Acuitas of the achievement of each Acuitas Milestone Event within ████ Business Days of such achievement. Each Acuitas Milestone Payment will be payable to Acuitas by Moderna within

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225528

16198433



**5.3    Milestone Payment Credits.**

**5.4    Royalties.**

11

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                    MRNA-GEN-00225529



5.5    Third Party Royalty Payments; Other Royalty and Acuitas Milestone Provisions

5.6    Payment Terms.

(a)    *Manner of Payment.* All payments to be made by Moderna hereunder will be made in U.S. dollars by wire transfer to such bank account as Acuitas may designate.

12

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                    MRNA-GEN-00225530

(b)     *Records and Audits.* Moderna shall keep, and shall cause each of its Affiliates and Sublicensees, as applicable, to keep adequate books and records of accounting for the purpose of calculating all royalties payable to Acuitas hereunder.  For the ▆▆▆▆▆▆ next following the end of the calendar year to which each shall pertain, such books and records of accounting (including those of Moderna's Affiliates and Sublicensees, as applicable) shall be kept at each of their principal place of business and shall be open for inspection at reasonable times and upon reasonable notice by an independent certified accountant selected by Acuitas, and which is reasonably acceptable to Moderna, for the sole purpose of inspecting the royalties due to Acuitas under this License Agreement.  In no event shall such inspections be conducted hereunder more frequently than once ▆▆▆▆▆▆▆   Such accountant must have executed and delivered to Moderna and its Affiliates or Sublicensees, as applicable, a confidentiality agreement as reasonably requested by Moderna, which shall include provisions limiting such accountant's disclosure to Acuitas to only the results and basis for such results of such inspection.  The results of such inspection, if any, shall be binding on both Parties.  Any underpayments shall be paid by Moderna within ▆▆▆▆▆▆ of notification of the results of such inspection.   Any overpayments shall be fully creditable against amounts payable in subsequent payment periods.  Acuitas shall pay for such inspections, except that in the event there is any upward adjustment in aggregate royalties payable for any calendar year shown by such inspection of more than ▆▆ ▆▆▆▆▆ of the amount paid, Moderna shall reimburse Acuitas for any reasonable out-of-pocket costs of such accountant.

(c)     *Reports and Royalty Payments.*  For as long as royalties are due under Section 5.1 or 5.4, Moderna shall furnish to Acuitas a written report for each Calendar Quarter, showing the amount of Net Sales of Licensed Products and royalty due for such Calendar Quarter.  Reports shall be provided within ▆▆▆▆▆▆ of the end of the quarter for Net Sales generated by Moderna and its Affiliates, and within ▆▆▆▆▆▆ of the end of the quarter for Net Sales generated by Sublicensees.  Royalty payments for each Calendar Quarter shall be due at the same time as such written report for the Calendar Quarter.



All such reports shall be treated as Confidential Information of Moderna but may be disclosed by Acuitas as required under the Applicable In-Licenses.

(d)     *Currency Exchange.*  With respect to Net Sales invoiced in U.S. dollars, the Net Sales and the amounts due to Acuitas hereunder will be expressed in U.S. dollars.  With respect to Net Sales invoiced in a currency other than U.S. dollars, payments will be calculated based on standard methodologies employed by Moderna or its Affiliates or Sublicensees for consolidation purposes for the Calendar Quarter for which remittance is made for royalties.

13

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                    MRNA-GEN-00225531

(e)    *Taxes.* Moderna may withhold from payments due to Acuitas amounts for payment of any withholding tax that is required by Law to be paid to any taxing authority with respect to such payments. Moderna will provide Acuitas all relevant documents and correspondence, and will also provide to Acuitas any other cooperation or assistance on a reasonable basis as may be necessary to enable Acuitas to claim exemption from such withholding taxes and to receive a refund of such withholding tax or claim a foreign tax credit. Moderna will give proper evidence from time to time as to the payment of any such tax. The Parties will cooperate with each other in seeking deductions under any double taxation or other similar treaty or agreement from time to time in force. Such cooperation may include Moderna making payments from a single source in the U.S., where possible. Apart from any such permitted withholding and those deductions expressly included in the definition of Net Sales, the amounts payable by Moderna to Acuitas hereunder will not be reduced on account of any taxes, charges, duties or other levies.

(f)    *Blocked Payments.* In the event that, by reason of applicable Law in any country, it becomes impossible or illegal for Moderna or its Affiliates or Sublicensees to transfer, or have transferred on its behalf, payments owed to Acuitas hereunder, Moderna will promptly notify Acuitas of the conditions preventing such transfer and such payments will be deposited in local currency in the relevant country to the credit of Acuitas in a recognized banking institution designated by Acuitas or, if none is designated by Acuitas within a period of ███ days, in a recognized banking institution selected by Moderna or its Affiliate or Sublicensee, as the case may be, and identified in a written notice given to Acuitas.

(g)    *Interest Due.* If any payment due to Acuitas under this License Agreement is overdue (and is not subject to a good faith dispute), then Acuitas will pay interest thereon (before and after any judgment) at an annual rate (but with interest accruing on a daily basis) of the lesser of ███████████████████████████████████████████████████████

(h)    *Mutual Convenience of the Parties.* The royalty and other payment obligations set forth hereunder have been agreed to by the Parties for the purpose of reflecting and advancing their mutual convenience, including the ease of calculating and paying royalties and other amounts to Acuitas.

## 6.    Ownership and Inventorship of IP.

6.1    Solely-Owned IP. As between the Parties, each Party will own and retain all right, title and interest in and to any and all Know-How and Patents arising therefrom that are discovered, created, conceived, developed or reduced to practice solely by or on behalf of such Party under or in connection with this License Agreement ("Solely Owned IP"). Subject to the licenses hereunder and the other terms and conditions of this License Agreement, each Party will be solely responsible for the Prosecution and Maintenance, and the enforcement and defense, of any Patents within its Solely Owned IP.

## 7.    Patent Prosecution and Maintenance.

7.1    Generally. As between the Parties, Acuitas will have the sole right to prosecute and maintain Patents within the Licensed Proprietary Technology. Acuitas will regularly provide Moderna with copies of all applications for Patents within the Licensed Proprietary Technology, and all other material submissions and correspondence with any Patent authorities regarding such

14

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY    MRNA-GEN-00225532

Patents, in sufficient time to allow for review and comment by Moderna. In addition, Acuitas will provide Moderna and its counsel with an opportunity to consult with Acuitas and its counsel regarding prosecution and maintenance of any such Patents, and Acuitas will consider in good faith all reasonable comments timely made by Moderna and its counsel.

7.2    Election Not to Prosecute or Maintain or Pay Patent Costs. If Acuitas elects not (i) to prosecute or maintain any Patents within the Licensed Proprietary Technology in any particular country before the applicable filing deadline or continue such activities once filed in a particular country, or (ii) to pay the Patent Costs associated with prosecution or maintenance of any Patents within the Licensed Proprietary Technology then in each such case Acuitas will so notify Moderna, promptly in writing and in good time to enable Acuitas to meet any deadlines by which an action must be taken to preserve such Patent in such country, if Moderna so requests. Upon receipt of each such notice by Acuitas, Moderna will have the right, but not the obligation, to notify Acuitas in writing on a timely basis that Acuitas should continue the prosecution or maintenance of such Patent, at Moderna's expense and thereafter, ██████████████████ ████████████████████████████████████████████████████████████████

7.3    Third Party Rights. To the extent that a Third Party licensor of Acuitas has provided Acuitas or its Affiliates with rights to prosecute or maintain and/or defend any Patent within the Licensed Third Party Technology licensed to Moderna hereunder, or to review or comment with respect to any such maintenance or prosecution activities, Acuitas will provide Moderna with the opportunity to consult with Acuitas and its counsel in connection therewith and will consider in good faith Moderna's comments to the extent permitted under such Applicable In-License.

7.4    Patent Extensions. If any election for Patent term restoration or extension, supplemental protection certificate or any of their equivalents may be made with respect to any Patent within the Licensed Proprietary Technology, after consultation with Moderna, the Parties will discuss and seek to reach mutual agreement whether or not to take such action. If the Parties are not able to reach mutual agreement, (a) Moderna will have the sole right to make the final decision whether or not to seek such Patent term restoration or extension, supplemental protection certificate or any of their equivalents with respect to Patents within the Licensed Proprietary Technology that cover Licensed Product and no product licensed to any other licensee of Acuitas or Commercialized by Acuitas, and (b) Acuitas will have the sole right to make the final decision whether or not to seek such Patent term restoration or extension, supplemental protection certificate or any of their equivalents with respect to all other Patents within the Licensed Proprietary Technology that claim Licensed Products and other products licensed by Acuitas or Commercialized by Acuitas.

7.5    Regulatory Exclusivity Periods. With respect to any Patent listings required for any regulatory exclusivity periods for Licensed Products the Parties will mutually agree on which Patents within the Licensed Technology to list, provided that if the Parties are not able to agree, Moderna will have the right to make the final decision with respect to Patents within the Licensed Proprietary Technology that cover Licensed Product and no product licensed to any other licensee of Acuitas or Commercialized by Acuitas, and provided further that the exercise of such right by Moderna will not increase or otherwise change the rights or obligations of the Parties hereunder.

7.6    Cooperation. Each Party will reasonably cooperate with the other Party in the prosecution and maintenance of Patents within the Licensed Technology. Such cooperation

15

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY    MRNA-GEN-00225533

includes promptly executing all documents, or requiring inventors, subcontractors, employees and consultants and agents of Moderna and Acuitas and their respective Affiliates and Sublicensees to execute all documents, as reasonable and appropriate so as to enable the prosecution and maintenance of any such Patents in any country.

## 8. Patent Enforcement and Defense.

8.1    Notice. Each Party will promptly notify, in writing, the other Party upon learning of any actual or suspected Competitive Infringement of any Patents within the Licensed Technology by a Third Party, or of any claim of invalidity, unenforceability, or non-infringement of any Patents within the Licensed Technology, and will, along with such notice, supply the other Party with any evidence in its possession pertaining thereto. For purposes of this License Agreement, "Competitive Infringement" means ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8.2    Enforcement and Defense.

(a)    *Patents within the Licensed Technology and Competitive Infringement.*

(i)    As between the Parties, Acuitas will have the first right, but not the obligation, to seek to abate any Competitive Infringement of the Patents within the Licensed Proprietary Technology by a Third Party, or to file suit against any such Third Party for such Competitive Infringement of Acuitas-Owned Technology, and, if permitted pursuant to an Applicable In-License, Licensed Third Party Technology. If Acuitas does not take steps to abate such Competitive Infringement, or file suit to enforce the Patents within the Licensed Technology against such Third Party with respect to such Competitive Infringement, within a commercially reasonably time, Moderna will have the right (but not the obligation) to take action to enforce the Patents within the Licensed Proprietary Technology that cover Licensed Product and no product licensed to any other licensee of Acuitas or Commercialized by Acuitas against such Third Party for such Competitive Infringement. The controlling Party will pay all its Patent Costs incurred for such enforcement.

(ii)    Neither Party will exercise any of its enforcement rights under this Section 8.2(a) without first consulting with the other Party, provided that this consultation requirement will not limit either Party's rights under this Section 8.2(a).

(b)    *Defense.* As between the Parties, Acuitas will have the first right, but not the obligation, to defend against a declaratory judgment action or other action challenging any Patents within the Licensed Proprietary Technology, other than with respect to any action or counter claims by a Third Party in response to an enforcement action brought by Moderna alleging infringement of any Patents within the Licensed Technology, which defense will be controlled by the Party controlling such enforcement action. If Acuitas does not take steps to defend within a commercially reasonably time, or elects not to continue any such defense (in which case it will promptly provide notice thereof to Moderna), then Moderna will have the right (but not the obligation) to defend any such Patent within the Licensed Proprietary Technology that cover Licensed Product and no product licensed to any other licensee of Acuitas or Commercialized by Acuitas.

(c)    *Withdrawal, Cooperation and Participation.* With respect to any infringement or defensive action identified above in this Section 8.2:

16

16198433

(i)     If the controlling Party ceases to pursue or withdraws from such action, it will promptly notify the other Party (in good time to enable the other Party to meet any deadlines by which any action must be taken to preserve any rights in such infringement or defensive action) and such other Party may substitute itself for the withdrawing Party and proceed under the terms and conditions of this Section 8.2.

(ii)     The non-controlling Party will cooperate with the Party controlling any such action (as may be reasonably requested by the controlling Party), including (A) providing access to relevant documents and other evidence, (B) making its and its Affiliates and licensees and Sublicensees and all of their respective employees, subcontractors, consultants and agents available at reasonable business hours and for reasonable periods of time, but only to the extent relevant to such action, and (C) if necessary, by being joined as a party, subject for this clause (C) to the controlling Party agreeing to indemnify such non-controlling Party for its involvement as a named party in such action and paying those Patent Costs incurred by such Party in connection with such joinder. The Party controlling any such action will keep the other Party updated with respect to any such action, including providing copies of all documents received or filed in connection with any such action.

(iii)     Each Party will have the right to participate or otherwise be involved in any such action controlled by the other Party, in each case at the participating Party's sole cost and expense. If a Party elects to so participate or be involved, the controlling Party will provide the participating Party and its counsel with an opportunity to consult with the controlling Party and its counsel regarding the prosecution of such action (including reviewing the contents of any correspondence, legal papers or other documents related thereto), and the controlling Party will take into account reasonable requests of the participating Party regarding such enforcement or defense.

(d)     *Settlement.* Neither Party will settle or consent to an adverse judgment in any action described in this Section 8.2 and controlled by such Party, including any judgment which affects the scope, validity or enforcement of any Patents within the Licensed Technology involved therewith, without the prior written consent of the other Party (such consent not to be unreasonably withheld or delayed).

(e)     *Damages.* Unless otherwise agreed by the Parties, all monies recovered upon the final judgment or settlement of any action described in Section 8.2(a) or any action described in Section 8.2(b) controlled by Moderna will be used first to reimburse each of the Parties, for each of their out-of-pocket costs and expenses relating to the action, with the balance of any such recovery to be divided as follows:



such lost

8.3     <u>No Challenge.</u>

17

16198433

MRNA-GEN-00225535



## 9. Confidentiality.

9.1    Confidential Information.  Each Party ("Disclosing Party") may disclose to the other Party ("Receiving Party"), and Receiving Party may acquire during the course and conduct of activities under this License Agreement, certain proprietary or confidential information of Disclosing Party in connection with this License Agreement.  The term "Confidential Information" means (i) all Materials and (ii) all ideas and information of any kind, whether in written, oral, graphical, machine-readable or other form, whether or not marked as confidential or proprietary, which are disclosed or made available by or on behalf of the Disclosing Party to the Receiving Party, including any of the foregoing of Third Parties.

9.2    Restrictions.  During the Term and for ████ ████ thereafter, Receiving Party will keep all Disclosing Party's Confidential Information in confidence with the same degree of care with which Receiving Party holds its own confidential information, but in no event less than reasonable care.  Receiving Party will not use Disclosing Party's Confidential Information except for in connection with the performance of its obligations and exercise of its rights under this License Agreement.  Receiving Party has the right to disclose Disclosing Party's Confidential Information without Disclosing Party's prior written consent to Receiving Party's Affiliates, Approved Partners, and each of their employees, subcontractors, consultants or agents who have a need to know such Confidential Information in order to perform its obligations and exercise its rights under this License Agreement and who are required to comply with the restrictions on use and disclosure that are no less restrictive than those set forth in this Section 9.2.  Receiving Party assumes responsibility for those entities and persons maintaining Disclosing Party's Confidential Information in confidence and using same only for the purposes described herein.

9.3    Exceptions.  Receiving Party's obligation of nondisclosure and the limitations upon the right to use the Disclosing Party's Confidential Information will not apply to the extent that Receiving Party can demonstrate that the Disclosing Party's Confidential Information: (i) was known to Receiving Party or any of its Affiliates prior to the time of disclosure by the Disclosing Party; (ii) is or becomes public knowledge through no fault or omission of Receiving Party or any of its Affiliates; (iii) is obtained on a non-confidential basis by Receiving Party or any of its Affiliates from a Third Party who to Receiving Party's knowledge is lawfully in possession thereof and under no obligation of confidentiality to Disclosing Party; or (iv) has been independently developed by or on behalf of Receiving Party or any of its Affiliates without the aid, application or use of Disclosing Party's Confidential Information.

18

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                    MRNA-GEN-00225536

9.4    Permitted Disclosures. Receiving Party may disclose Disclosing Party's Confidential Information to the extent (and only to the extent) such disclosure is reasonably necessary in the following instances:

(a)    in order to comply with applicable Law (including any securities Law or regulation or the rules of a securities exchange) or with a legal or administrative proceeding;

(b)    in connection with prosecuting or defending litigation, regulatory approvals and other regulatory filings and communications, and filing, prosecuting and enforcing Patents in connection with Receiving Party's rights and obligations pursuant to this License Agreement; and

(c)    in connection with exercising its rights hereunder, to its Affiliates; permitted acquirers or assignees; investment bankers, investors and lender; and in the case of Moderna, to its Approved Partners;.

provided that (1) with respect to Sections 9.4(a) or 9.4(b), where reasonably possible, Receiving Party will notify Disclosing Party of Receiving Party's intent to make any disclosure pursuant thereto sufficiently prior to making such disclosure so as to allow Disclosing Party adequate time to take whatever action it may deem appropriate to protect the confidentiality of the information to be disclosed, and (2) with respect to Section 9.4(c), each of those named people and entities are required to comply with the restrictions on use and disclosure in Section 9.2 (other than investment bankers, investors and lenders, which must be bound prior to disclosure by commercially reasonable obligations of confidentiality).

9.5    Terms of this License Agreement; Publicity. The Parties agree that the existence and terms of this License Agreement will be treated as Confidential Information of both Parties, and thus may be disclosed only as permitted by Section 9.4. Except as required by Law, each Party agrees not to issue any press release or public statement disclosing information relating to the existence of this License Agreement or the transactions contemplated hereby or the terms hereof without the prior written consent of the other Part.

## 10.    Warranties; Limitations of Liability; Indemnification.

10.1    Representations and Warranties. Each Party represents and warrants to the other as of the License Agreement Effective Date that it has the legal right and power to enter into this License Agreement, to extend the rights and licenses granted or to be granted to the other in this License Agreement, and to fully perform its obligations hereunder.

10.2    Additional Representations and Warranties of Acuitas. Except as set forth in Schedule 10.2, Acuitas represents and warrants to Moderna that, as of the License Agreement Effective Date:

(a)    *Licensed Technology.* Appendix C sets forth a complete and accurate list of all Patents included in the Licensed Technology, indicating the owner, licensor and/or co-owner(s), if applicable. Acuitas Controls the Patents listed on Appendix C and the Know-How within the Licensed Technology, and is entitled to grant the licenses specified herein.   To Acuitas' knowledge, the Patents listed on Appendix C have been procured or are being procured from the respective Patent offices in accordance with applicable Law. None of the Patents included in the Licensed Technology is or has been involved in any opposition, cancellation, interference, reissue or reexamination proceeding, and to Acuitas' knowledge no Licensed Technology is the subject of

19

16198433

    MRNA-GEN-00225537

any judicial, administrative or arbitral order, award, decree, injunction, lawsuit, proceeding or stipulation. Neither Acuitas nor any of its Affiliates has received any notice alleging that the Patents in the Licensed Technology are invalid or unenforceable, or challenging Acuitas' ownership of or right to use any such rights. In the event that Acuitas or its Affiliates directly or indirectly, grants, assign, licenses, sublicenses, encumbers or otherwise transfers (each, a "Transfer") to any Third Party any right, title or interest in or to the Licensed Proprietary Technology, such Transfer will be subject to the rights and licenses granted to Moderna and its Affiliates herein.

(b)     *Third Party Agreements.* The Applicable In-Licenses are valid and binding obligations of Acuitas and, to the knowledge of Acuitas, the applicable licensor, enforceable against Acuitas and, to the Knowledge of Acuitas, the applicable licensor, in accordance with their terms, except as may be limited by general principles of equity (regardless of whether considered in a proceeding at law or in equity) and by applicable bankruptcy, insolvency, moratorium and other similar Laws of general application relating to or affecting creditors' rights generally.



(c)     *Patents.* To Acuitas' knowledge, the Patents listed on Appendix C have been procured or are being procured from the respective patent offices in accordance with applicable Law. None of the Patents included in the Licensed Technology is or has been involved in any opposition, cancellation, interference, reissue or reexamination proceeding, and no Licensed Technology is the subject of any judicial, administrative or arbitral order, award, decree, injunction, lawsuit, proceeding or stipulation. Neither Acuitas nor any of its Affiliates has received any notice alleging that the Patents in the Licensed Technology are invalid or unenforceable, or challenging Acuitas' ownership of or right to use any such rights.

(d)     *Encumbrances.* Except for the Third Party In-Licenses, Acuitas and its Affiliates are not subject to any payment obligations to Third Parties as a result of the execution or performance of this License Agreement. Neither Acuitas nor any of its Affiliates has granted any liens or security interests on the Licensed Technology and the Licensed Technology is to Acuitas' knowledge free and clear of any mortgage, pledge, claim, security interest, covenant, easement,

20

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY     MRNA-GEN-00225538

encumbrance, lien or charge of any kind. The foregoing shall not apply to any option or license agreement entered into by Acuitas prior to the Effective Date.

(e)    *No Conflicts.* The execution, delivery and performance by Acuitas of this License Agreement and the consummation of the transactions contemplated hereby will not result in any violation of, conflict with, result in a breach of or constitute a default under any understanding, contract or agreement to which Acuitas is a party or by which it is bound.

(f)    *No Proceedings.* There is no action, suit, proceeding or investigation pending or, to the knowledge of Acuitas, currently threatened in writing against or affecting Acuitas that questions the validity of this License Agreement or the right of Acuitas to enter into this License Agreement or consummate the transactions contemplated hereby.

(g)    *Infringement.* Neither Acuitas nor any of its Affiliates has received any notice of any claim that any Patent, Know-How or other intellectual property owned or controlled by a Third Party would be infringed or misappropriated by the Licensed Technology in the production, use, research, development, manufacture or commercialization of Licensed Product.

10.3    Disclaimers. Without limiting the respective rights and obligations of the Parties expressly set forth herein, each Party specifically disclaims any guarantee that any Licensed Product will be successful, in whole or in part. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS LICENSE AGREEMENT, THE PARTIES MAKE NO REPRESENTATIONS AND EXTEND NO WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED.

10.4    No Consequential Damages.    NOTWITHSTANDING ANYTHING IN THIS AGREEMENT OR OTHERWISE, NEITHER PARTY WILL BE LIABLE TO THE OTHER OR ANY THIRD PARTY WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT FOR ANY INDIRECT, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, EVEN IF SUCH PARTY HAS BEEN INFORMED OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES; PROVIDED THAT THIS SECTION 10.4 WILL NOT APPLY TO BREACHES OF A PARTY'S CONFIDENTIALITY OBLIGATIONS OR THE PARTIES' INDEMNIFICATION RIGHTS AND OBLIGATIONS UNDER SECTION 10.6.

10.5    Performance by Others. The Parties recognize that each Party may perform some or all of its obligations under this License Agreement through Affiliates and permitted subcontractors provided, however, that each Party will remain responsible and liable for the performance by its Affiliates and permitted subcontractors and will cause its Affiliates and permitted subcontractors to comply with the provisions of this License Agreement in connection therewith.

10.6    Indemnification.

(a)    *Indemnification by Moderna.* Moderna will indemnify Acuitas, its Affiliates and their respective directors, officers, employees, Third Party licensors and agents, and their respective successors, heirs and assigns (collectively, "Acuitas Indemnitees"), and defend and save each of them harmless, from and against any and all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses) (collectively, "Losses") in connection with any and all suits, investigations, claims or demands of Third Parties (collectively, "Third Party Claims") against the Acuitas Indemnitees arising from or occurring as a result of: (i) the material breach by Moderna of any term of this License Agreement; (ii) any gross negligence

21

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY    MRNA-GEN-00225539

or willful misconduct on the part of Moderna in performing its obligations under this License Agreement; or (iii) the Development or Commercialization by or on behalf of Moderna or any of its Affiliates or Sublicensees of Licensed Product, except in each case for those Losses for which Acuitas has an obligation to indemnify Moderna pursuant to Section 10.6(b), as to which Losses each Party will indemnify the other to the extent of their respective liability; provided, however, that Moderna will not be obligated to indemnify Acuitas Indemnitees for any Losses to the extent that such Losses arise as a result of gross negligence or willful misconduct on the part of an Acuitas Indemnitee.

(b)    *Indemnification by Acuitas.*  Acuitas will



(c)    *Notice of Claim.*  All indemnification claims provided for in Sections 10.6(a) and 10.6(b) will be

(d)    *Defense, Settlement, Cooperation and Expenses.*

(i)    *Control of Defense.*

22

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225540



(ii)     *Right to Participate in Defense.*

(iii)     *Settlement.*

(iv)     *Cooperation.*

23

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225541



(Y)    *Costs and Expenses.*

10.7    Insurance. Each Party will maintain at its sole cost and expense, an adequate liability insurance or self-insurance program (including product liability insurance) to protect against potential liabilities and risk arising out of activities to be performed under this License Agreement, and any agreement related hereto and upon such terms (including coverages, deductible limits and self-insured retentions) as are customary in the U.S. pharmaceutical industry for the activities to be conducted by such Party under this License Agreement. Subject to the preceding sentence, such liability insurance or self-insurance program will insure against all types of liability, including personal injury, physical injury or property damage arising out of the manufacture, sale, use, distribution or marketing of Licensed Product. The coverage limits set forth herein will not create any limitation on a Party's liability to the other under this License Agreement.

**11.    Term and Termination.**

11.1    Term. This License Agreement will commence as of the License Agreement Effective Date and, unless sooner terminated in accordance with the terms hereof or by mutual written consent, will continue on a country-by-country basis, until there are no more payments owed Acuitas on Licensed Product in such country (the longest such period of time for any Licensed Product hereunder, the "Term"). Upon there being no more such payments hereunder for any such Licensed Product in such country, the licenses contained in Section 3.1 for such Licensed Product will become fully paid up and will remain non-exclusive and in effect with respect to such Licensed Product in such country.

11.2    Termination by Acuitas.

(a)    *Breach.* Acuitas will have the right to terminate this License Agreement in full upon delivery of written notice to Moderna in the event of any material breach by Moderna of any terms and conditions of this License Agreement, provided that such termination will not be effective if such breach, has been cured within ▮▮ days after written notice thereof is given by Acuitas to Moderna specifying the nature of the alleged breach.

11.3    Termination by Moderna.

(a)    *Breach.* Moderna will have the right to terminate this License Agreement in full upon delivery of written notice to Acuitas in the event of any material breach by Acuitas of any terms and conditions of this License Agreement, provided that such termination will not be effective if such breach has been cured within ▮ days after written notice thereof is given by Moderna to Acuitas specifying the nature of the alleged breach.

24

16198433

(b)    *Discretionary Termination.* Moderna will have the right to terminate this License Agreement in full at its discretion for any reason by delivering written notice to Acuitas, such termination to be effective ▮▮▮▮ days following the date of such notice.

(c)    *Alternative to Termination Under Section* 11.3(a). If Moderna has the right to terminate this License Agreement under Section 11.3(a) as a result of a material breach by Acuitas (including following expiration of all applicable cure periods thereunder) that fundamentally impairs the value of Moderna's rights hereunder with respect to the Licensed Target, then Moderna may, in lieu of exercising such termination right, elect by written notice to Acuitas before the end of such applicable cure period to have this License Agreement continue in full force and effect for the Term, provided that the following will apply:



11.4    Termination Upon Bankruptcy.

(a)    *Termination Right.* Either Party may terminate this License Agreement if, at any time, the other Party will file in any court or agency pursuant to any statute or regulation of any state, country or jurisdiction, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the appointment of a receiver or trustee of that Party or of its assets, or if the other Party proposes a written agreement of composition or extension of its debts, or if the other Party will be served with an involuntary petition against it, filed in any insolvency proceeding, and such petition will not be dismissed within ▮▮▮▮ days after the filing thereof, or if the other Party will propose or be a Party to any dissolution or liquidation, or if the other Party will make an assignment for the benefit of its creditors.

(b)    *Consequences of Bankruptcy.* All rights and licenses granted under or pursuant to this License Agreement by Acuitas or its Affiliates are, and will otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code, licenses of right to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code. The Parties agree that Moderna and its Affiliates and Sublicensees, as licensees of such rights under this License Agreement, will retain and may fully exercise all of their rights and elections under the U.S. Bankruptcy Code and any foreign counterparts thereto subject to the payment of amounts provided for herein.

25

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                    MRNA-GEN-00225543

11.5    Effects of Termination. Upon termination (but not expiration pursuant to Section 11.1) of this License Agreement for any reason:

(a)    *Cessation of Rights.* Except as otherwise expressly provided herein, all rights and licenses granted by Acuitas to Moderna in Section 3.1 will terminate, and Moderna and its Affiliates and Sublicensees will cease all use of Licensed Technology.

(b)    *Country Termination.* If this License Agreement is terminated only with respect to a specific country or a specific Licensed Product pursuant to Section 11.2(a), the provisions of this Section 11.5 will apply only with respect to such terminated country and such Licensed Product.

11.6    Survival. In addition to the termination consequences set forth in Section 11.5, the following provisions will survive termination or expiration of this License Agreement: Sections 1, 3.2, 3.5(b)(iv), 6, 9, 10.6, 11.5, 11.6 and 12. Termination or expiration of this License Agreement will not relieve the Parties of any liability or obligation which accrued hereunder prior to the effective date of such termination or expiration nor preclude either Party from pursuing all rights and remedies it may have hereunder or at law or in equity with respect to any breach of this License Agreement nor prejudice either Party's right to obtain performance of any obligation. All other rights and obligations will terminate upon expiration of this License Agreement.

## 12.    General Provisions.

### 12.1    Dispute Resolution.

(a)    *Disputes.* Disputes arising under or in connection with this License Agreement will be resolved pursuant to this Section 12.1; provided, however, that in the event a dispute cannot be resolved without an adjudication of the rights or obligations of a Third Party (other than any Moderna Indemnitees or Acuitas Indemnitees identified in Section 10.6), the dispute procedures set forth Sections 12.1(c) and 12.1(c) will be inapplicable as to such dispute.

(b)    *Dispute Escalation.* In the event of a dispute between the Parties, the Parties will first attempt in good faith to resolve such dispute by negotiation and consultation between themselves. In the event that such dispute is not resolved on an informal basis within ▮▮▮ days, any Party may, by written notice to the other, have such dispute referred to each Party's ▮▮▮▮▮▮ who will attempt in good faith to resolve such dispute by negotiation and consultation for a ▮▮▮▮ day period following receipt of such written notice

(c)    *Dispute Resolution.* In the event the ▮▮▮▮▮▮▮ of the Parties are not able to resolve such dispute as set forth above, the ▮▮▮▮▮▮ will together elect whether to submit the dispute to moderation, litigation or arbitration. In the absence of such an agreement, either party may elect to initiate litigation.

(d)    *Injunctive Relief.* Notwithstanding the dispute resolution procedures set forth in this Section 12.1, in the event of an actual or threatened breach hereunder, the aggrieved Party may seek equitable relief (including restraining orders, specific performance or other injunctive relief) in any court or other forum, without first submitting to any dispute resolution procedures hereunder.

(e)    *Tolling.* The Parties agree that all applicable statutes of limitation and time-based defenses (such as estoppel and laches) will be tolled while the dispute resolution procedures set forth in this Section 12.1 are pending, and the Parties will cooperate in taking all actions

26

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY    MRNA-GEN-00225544

reasonably necessary to achieve such a result.

(f)  *Prevailing Party.*  The prevailing Party in any arbitration under Section 12.1(c) or any other suit related to this License Agreement will be entitled to recover from the losing Party all out-of-pocket fees, costs and expenses (including those of attorneys, professionals and accountants and all those arising from appeals and investigations) incurred by the prevailing Party in connection with such arbitration or suit.

12.2    Cumulative Remedies and Irreparable Harm.  All rights and remedies of the Parties hereunder will be cumulative and in addition to all other rights and remedies provided hereunder or available by agreement, at Law or otherwise.  Each Party acknowledges and agrees that breach of any of the terms or conditions of this License Agreement may cause irreparable harm and damage to the other and that such damage may not be ascertainable in money damages and that as a result thereof the non-breaching Party may be entitled to seek from a court equitable or injunctive relief restraining any breach or future violation of the terms contained herein by the breaching Party without the necessity of proving actual damages or posting bond.  Such right to equitable relief is in addition to whatever remedies either Party may be entitled to as a matter of Law or equity, including money damages.

12.3    Relationship of Parties.  Nothing in this License Agreement is intended or will be deemed to constitute a partnership, agency, employer-employee or joint venture relationship between the Parties.  No Party will incur any debts or make any commitments for the other, except to the extent, if at all, specifically provided therein.  Except as may be required by the Applicable In-Licenses, there are no express or implied third party beneficiaries hereunder (except for Moderna Indemnitees and Acuitas Indemnitees for purposes of Section 10.6).  For clarity, Moderna does not grant to Acuitas any rights or licensed under this License Agreement to any Moderna technology or intellectual property rights.

12.4    Compliance with Law.  Each Party will perform or cause to be performed any and all of its obligations or the exercise of any and all of its rights hereunder in good scientific manner and in compliance with all applicable Law.

12.5    Governing Law.  This License Agreement will be governed by and construed in accordance with the Laws of the State of New York, without respect to its conflict of Laws rules, provided that any dispute relating to the scope, validity, enforceability or infringement of any Patents or Know-How will be governed by, and construed and enforced in accordance with, the substantive Laws of the jurisdiction in which such Patents or Know-How apply.

12.6    Counterparts; Facsimiles.  This License Agreement may be executed in one or more counterparts, each of which will be deemed an original, and all of which together will be deemed to be one and the same instrument.  Facsimile or PDF execution and delivery of this License Agreement by either Party will constitute a legal, valid and binding execution and delivery of this License Agreement by such Party

12.7    Headings.  All headings in this License Agreement are for convenience only and will not affect the meaning of any provision hereof.

12.8    Waiver of Rule of Construction.  Each Party has had the opportunity to consult with counsel in connection with the review, drafting and negotiation of this License Agreement.  Accordingly, the rule of construction that any ambiguity in this License Agreement will be construed against the drafting party will not apply.

27

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                    MRNA-GEN-00225545

12.9    Interpretation.  Whenever any provision of this License Agreement uses the term "including" (or "includes"), such term will be deemed to mean "including without limitation" (or "includes without limitations").    "Herein," "hereby," "hereunder," "hereof" and other equivalent words refer to this License Agreement as an entirety and not solely to the particular portion of this License Agreement in which any such word is used.  All definitions set forth herein will be deemed applicable whether the words defined are used herein in the singular or the plural.  Unless otherwise provided, all references to Sections and Exhibits in this License Agreement are to Sections and Exhibits of this License Agreement.  References to any Sections include Sections and subsections that are part of the related Section (e.g., a section numbered "Section 2.1" would be part of "Section 2" and references to "Section 2" would also refer to material contained in the subsection described as "Section 2.1(a).")

12.10    Binding Effect.  This License Agreement will inure to the benefit of and be binding upon the Parties, their Affiliates, and their respective lawful successors and assigns.

12.11    Assignment.  This License Agreement may not be assigned by either Party, nor may either Party delegate its obligations or otherwise transfer licenses or other rights created by this License Agreement, except as expressly permitted hereunder or otherwise without the prior written consent of the other Party, which consent will not be unreasonably withheld; provided that either Party may assign this License Agreement to an Affiliate or to its successor in connection with sale of all or substantially all of its assets or business or that portion of its business pertaining to the subject matter of this License Agreement (whether by merger, consolidation or otherwise).

12.12    Notices.  All notices, requests, demands and other communications required or permitted to be given pursuant to this License Agreement will be in writing and will be deemed to have been duly given upon the date of receipt if delivered by hand, recognized international overnight courier, confirmed facsimile transmission, or registered or certified mail, return receipt requested, postage prepaid to the following addresses or facsimile numbers:

| | |
|---|---|
| If to Moderna: | ModernaTX, Inc.<br>200 Technology Square<br>Cambridge, MA 02139<br>Attention: ▮▮ ▮▮▮ |
| With a copy to: | ModernaTX, Inc.<br>320 Bent Street<br>Cambridge, MA 02139<br>Attention: ▮▮▮▮▮ |
| If to Acuitas: | Acuitas Therapeutics Inc.<br>2714 West 31rst Avenue<br>Vancouver, B.C.<br>Canada V6L 2A1<br>Attention: ▮▮▮▮▮ |
| With a copy to: | McCarthy Tetrault LLP<br>Suite 1300 777 Dunsmuir Street<br>Vancouver, B.C.<br>Canada V6B 1N3<br>Attention: ▮▮▮▮▮ |

28

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY    MRNA-GEN-00225546

Either Party may change its designated address and facsimile number by notice to the other Party in the manner provided in this Section 12.12.

      12.13 <u>Amendment and Waiver</u>.  This License Agreement may be amended, supplemented, or otherwise modified only by means of a written instrument signed by both Parties; provided that any unilateral undertaking or waiver made by one Party in favor of the other will be enforceable if undertaken in a writing signed by the Party to be charged with the undertaking or waiver.  Any waiver of any rights or failure to act in a specific instance will relate only to such instance and will not be construed as an agreement to waive any rights or fail to act in any other instance, whether or not similar.

      12.14 <u>Severability</u>.  In the event that any provision of this License Agreement will, for any reason, be held to be invalid or unenforceable in any respect, such invalidity or unenforceability will not affect any other provision hereof, and the Parties will negotiate in good faith to modify the License Agreement to preserve (to the extent possible) their original intent.

      12.15 <u>Entire License Agreement</u>.  This License Agreement together with the Development and Option Agreement any other License Agreements entered into during the Term are the sole agreement with respect to the subject matter and supersedes all other agreements and understandings between the Parties with respect to same.

      12.16 <u>Force Majeure</u>.  Neither Acuitas nor Moderna will be liable for failure of or delay in performing obligations set forth in this License Agreement (other than any obligation to pay monies when due), and neither will be deemed in breach of such obligations, if such failure or delay is due to natural disasters or any causes reasonably beyond the control of Acuitas or Moderna; provided that the Party affected will promptly notify the other of the force majeure condition and will exert reasonable efforts to eliminate, cure or overcome any such causes and to resume performance of its obligations as soon as possible.

[<em>Remainder of this Page Intentionally Left Blank</em>]

29

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

WITNESS WHEREOF, the Parties have caused this License Agreement to be executed by their respective duly authorized officers as of the License Agreement Effective Date.

ACUITAS THERAPEUTICS INC.

By:

Name:

Title:

Date: _DECEMBER 16TH 2016_

MODERNATX, INC.

By:

Name:

Title:

Date: _12/14/16_

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225548

## Appendix A

### Licensed Target

"Licensed Target" 



16190433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225549

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                    MRNA-GEN-00225550

## Appendix B
### Applicable In-Licenses

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225551

## Appendix C

**Certain Patents within the Licensed Technology
as of the License Agreement Effective Date**

16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225552

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225553



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225554



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225555

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



N/A = not applicable

5200820_1.docx

MRNA-GEN-00225556

## Schedule 10.2

**Exceptions to Acuitas' Representations and Warranties in Section 10.2**



16198433

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

# EXHIBIT 22

*Execution Copy*

Non-Exclusive License Agreement

by and between

Acuitas Therapeutics Inc.

and

Moderna Therapeutics, Inc.

May 22, 2015

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225679

## Table of Contents

Page

1.    Definitions.................................................................................................1

2.    Development and Commercialization........................................................6

3.    License Grants. ........................................................................................7

4.    Applicable In-Licenses ............................................................................8

5.    Payments and Royalties. ..........................................................................9

6.    Ownership and Inventorship of IP..........................................................14

7.    Patent Prosecution and Maintenance. ....................................................14

8.    Patent Enforcement and Defense. ..........................................................16

9.    Confidentiality........................................................................................18

10.   Warranties; Limitations of Liability; Indemnification............................19

11.   Term and Termination............................................................................24

12.   General Provisions..................................................................................26

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

## List of Appendices

Appendix A    Licensed Target

Appendix B    Applicable In-Licenses

Appendix C    Certain Patents within the Licensed Technology
as of the License Agreement Effective Date

Schedule 9.2   Exceptions to Acuitas' Representations and Warranties

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

## Non-Exclusive License Agreement

This Non-Exclusive License Agreement (this "<u>License Agreement</u>"), dated as of May 22, 2015 (the "<u>License Agreement Effective Date</u>"), is made by and between Acuitas Therapeutics Inc., a British Columbia corporation ("<u>Acuitas</u>"), and Moderna Therapeutics, Inc., a Delaware Corporation ("<u>Moderna</u>"). Each of Acuitas and Moderna may be referred to herein as a "<u>Party</u>" or together as the "<u>Parties</u>."

**WHEREAS,** Acuitas has proprietary LNP Technology;

**WHEREAS,** Moderna has proprietary messenger RNA ("<u>mRNA</u>") technologies; and

**WHEREAS,** Acuitas and Moderna are parties to that certain Development and Option Agreement (dated July 3, 2014) (the "<u>Development and Option Agreement</u>") pursuant to which Moderna has an option to take a license under Licensed Technology (as defined below) with respect to certain mRNA products;

**WHEREAS,** pursuant to the terms of the Development and Option Agreement, Moderna has exercised an option with respect to a Reserved Target and the Parties are now entering into a non-exclusive licensing arrangement whereby Moderna will have a non-exclusive license under the Licensed Technology to develop and commercialize Licensed Products, all on the terms and conditions set forth here.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the amount and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## 1.    Definitions.

The following terms and their correlatives will have the meanings set forth below. Capitalized terms used, but not defined, herein will have the meanings ascribed to such terms in the Development and Option Agreement.

1.1    "<u>Acuitas Milestone Product</u>" means ▮



1.2    "<u>Applicable In-Licenses</u>" means all LNP In-Licenses that Moderna has elected to list on <u>Appendix B</u> as of the License Agreement Effective Date, plus any other LNP In-Licenses that Moderna has elects to include as an Applicable In-License pursuant to Section 4.1.

1.3    "<u>Combination Product</u>" means a Licensed Product that includes at least one additional active ingredient other than an mRNA Construct. Drug delivery vehicles, adjuvants, and excipients shall not be deemed to be "active ingredients", except in the case where such delivery vehicle, adjuvant, or excipient is recognized as an active ingredient in accordance with 21 C.F.R. 210.3(b)(7), provided however, ▮

1.4    "<u>Commercialization</u>" means any and all activities directed to the Manufacturing, marketing, detailing, promotion and securing of reimbursement of a product after Regulatory Approval has been obtained (including making, having made, using, importing, selling and

1

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

offering for sale such product), and will include post-approval clinical studies, post-launch marketing, promoting, detailing, marketing research, distributing, customer service, administering and commercially selling such product, importing, exporting or transporting such product for commercial sale, and all regulatory compliance with respect to the foregoing.

1.5     "Commercially Reasonable Efforts"



1.6     "Contract Year" means the period beginning on the License Agreement Effective Date and ending on the first anniversary of the License Agreement Effective Date, and each consecutive twelve (12) month period thereafter during the Term.

1.7     "Control" or "Controlled" means, with respect to any Know-How or Patent, the possession (whether by ownership or license, other than by a license or sublicense granted pursuant to this License Agreement) by a Party or its Affiliates of the ability to grant to the other Party a license or access as provided herein to such item, without violating the terms of any agreement or other arrangement with any Third Party.

1.8     "Covers", with reference to (a) a Patent, means that the making, using, selling, offering for sale or importing of a product or practice of a method would infringe a Valid Claim or Pending Claim of such Patent in the country in which such activity occurs, and (b) Know-How, means that the Manufacture, Development or Commercialization of a product incorporates or embodies such Know-How.

1.9     "Cross License Agreement" means the Cross License Agreement dated November 12, 2012 by and between Acuitas and Tekmira Pharmaceuticals Corporation (on behalf of itself and its wholly owned Affiliate Protiva Biotherapeutics Inc.) ("Tekmira").

1.10     "Development" means preclinical and clinical drug research and development activities, including: test method development and stability testing, toxicology, formulation, process development, qualification and validation, Manufacture scale-up, development-stage Manufacturing, quality assurance/quality control, clinical studies, statistical analysis and report writing, the preparation and submission of applications for Regulatory Approval, regulatory affairs with respect to the foregoing and all other activities necessary or useful or otherwise requested or required by a Regulatory Authority as a condition or in support of obtaining or maintaining a Regulatory Approval.

1.11     "Field of Use" means all fields.

1.12     "First Commercial Sale" means the first sale for use or consumption of any Licensed Product in a country after all required Regulatory Approvals for commercial sale of such Licensed Product have been obtained in such country.

1.13     "Generic Product" means, with respect to a Licensed Product in a given country, any generic or biosimilar product sold by a Third Party not licensed or otherwise authorized by or on

2

behalf of Moderna or any of its Affiliates or Sublicensees (a) that is approved for administration to humans under 351(k) of the PHSA referencing Licensee's Regulatory Filings; or (b) foreign equivalents that have received equivalent Regulatory Approval from the applicable Regulatory Authority by referencing Acuitas' Regulatory Filings (and data therein) of such Licensed Product. Notwithstanding anything to the contrary set forth above, in no event will a product sold by or under authority of Tekmira pursuant to the Cross License Agreement be a "Generic Product" for the purposes of this.

1.14    "In-License Payments" means any amounts paid or payable by Acuitas or its Affiliates under any Applicable In-License that arise solely as a result of the grant of a sublicense thereunder to Moderna and its Affiliates and Sublicensees that are royalties on sales of Licensed Products or milestone payments achieved with respect to License Products. For the avoidance of doubt, "In-License Payments" shall include only royalties and milestone payments payable under the Applicable In-License and shall not include any annual maintenance fees, license fees, payments resulting from Acuitas' breach of an Applicable In-License or any other payment thereunder.

1.15    "Know-How" means all commercial, technical, scientific and other know-how and information, trade secrets, knowledge, technology, methods, processes, practices, formulae, instructions, skills, techniques, procedures, experiences, ideas, technical assistance, designs, drawings, assembly procedures, computer programs, specifications, data and results (including biological, chemical, pharmacological, toxicological, pharmaceutical, physical and analytical, preclinical, clinical, safety, manufacturing and quality control data and know-how, including study designs and protocols), in all cases, (a) to the extent Confidential Information of Acuitas, (b) whether or not patentable, and (c) provided by Acuitas to Moderna pursuant to the Development and Option Agreement.

1.16    "Licensed Product" means any product (a) that includes one (1) or more mRNA Constructs coding for  the Licensed Target and (b) the Manufacture, use, sale, offer for sale or importation of which in or into a particular country is Covered by the Licensed Technology, as determined on a product-by-product and country-by-country basis.

1.17    "Licensed Proprietary Technology" means all Know-How, Patents and Materials and that (a) Cover LNP Technology (including the manufacture or use thereof), and (b) are owned by Acuitas or any of its Affiliates at the relevant point in time, and (c) that may be necessary or useful to Develop and Commercialize Licensed Products.

1.18    "Licensed Target" means the Target identified on Appendix A hereto.

1.19    "Licensed Technology" means the Licensed Proprietary Technology and Licensed Third Party Technology.

1.20    "Licensed Third Party Technology" means any and all Know-How, Patents and Materials that (a) Cover LNP Technology (including the manufacture or use thereof), and (b) that are in-licensed by Acuitas or its Affiliates pursuant to the Applicable In-Licenses (including any extensions or expansions of the scope thereof), and (c) are Controlled at the applicable time by Acuitas or any of its Affiliates and (d) that may be necessary or useful to Develop and Commercialize Licensed Products..

1.21    "LNP In-Licenses" means all agreements entered into prior to the License Agreement Effective Date or at any time during the Term between Acuitas or its Affiliates and a Third Party

3

pursuant to which Acuitas or its Affiliates is granted a license or other rights to LNP Technology that may be necessary or useful to Develop and Commercialize Licensed Products.

1.22    "LNP Technology"



1.23    "Manufacturing" means the production, manufacture, processing, filling, finishing, packaging, labeling, shipping and holding of product or any intermediate thereof, including process development, process qualification and validation, scale-up, commercial manufacture and analytic development, product characterization, stability testing, quality assurance and quality control.

1.24    "mRNA Construct"

1.25    "Net Sales" means, with respect to any Licensed Product,



4

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

███████████████████████████████████████████████

1.26    "Patent" means the rights and interests in and to all issued patents and pending patent applications in any country, including, without limitation, all provisional applications, substitutions, continuations, continuations-in-part, divisions, and renewals, all letters patent granted thereon, and all patents-of-addition, reissues, reexaminations and extensions or restorations by existing or future extension or restoration mechanisms, including, without limitation Supplementary Protection Certificates or the equivalent thereof.

1.27    "Patent Costs" means the reasonable, documented, out-of-pocket costs and expenses paid to outside legal counsel, and filing and maintenance expenses, actually and reasonably incurred by a Party in prosecuting and maintaining Patents and enforcing and defending them.

1.28    "Pending Claim" means, with respect to a particular country, any claim of a pending Patent application in such country that (a) has not been held revoked, unenforceable or invalid by a decision of a court or governmental agency of competent jurisdiction from which no further appeal is possible (other than to the United States Supreme Court), (b) has not been abandoned, disclaimed, denied or admitted to be invalid or unenforceable through reissue or disclaimer or otherwise in such country, and (c) ███████████████████████████████████████

1.29    "Phase 1 Study" means a human clinical trial of a Licensed Product in any country, the primary purpose of which is the determination of safety and which may include the determination of pharmacokinetic and/or pharmacodynamic profiles in healthy individuals or patients.

1.30    "Phase 2 Study" means a human clinical trial of a Licensed Product in any country, and which is: (a) a study of dose exploration, dose response, duration of effect, kinetics or preliminary efficacy and safety study of a product in the target patient population, (b) a controlled dose-ranging clinical trial to evaluate further the efficacy and safety of such product in the target population and to define the optimal dosing regimen or (c) a clinical trial that Moderna refers to in a press release as a Phase II (or IIa or IIb) clinical trial or study.

1.31    "Phase 3 Study" means a human clinical trial of a Licensed Product in any country, and which is: (a) a controlled study of a product in patients of the efficacy and safety of such product which is prospectively designed to demonstrate statistically whether such product is effective and safe for use in a particular indication in a manner sufficient to obtain Regulatory Approval to market such product or (b) a clinical trial that Moderna refers to in a press release as a Phase III or registration clinical trial or pivotal study.

1.32    "Regulatory Approval" means, with respect to a country or extra-national territory, any and all approvals (including BLAs and MAAs), licenses, registrations or authorizations of any Regulatory Authority necessary in order to commercially distribute, sell or market a product in such country or some or all of such extra-national territory, excluding any pricing or reimbursement approvals.

1.33    "Regulatory Authority" means any national (e.g., the FDA), supra-national (e.g., the EMA), regional, state or local regulatory agency, department, bureau, commission, council or other governmental authority, in any jurisdiction in the world, involved in the granting of Regulatory Approval.

5

1.34    "Sublicensee" means any Third Party that is granted a sublicense as permitted by Section 3.5, either directly by Moderna or its Affiliates or indirectly by any other Sublicensee hereunder.

1.35    "Target" means either:



1.36    "Territory" means worldwide.

1.37    "Valid Claim" means, with respect to a particular country, any claim of an issued and unexpired Patent in such country that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Definitions for each of the following terms are found in the body of this License Agreement as indicated below:

| Defined Terms | Location |
|---|---|
| Acuitas Indemnitees | Section 10.6(a) |
| Competitive Infringement | Section 8.1 |
| Indemnification Claim Notice | Section 10.6(c) |
| Indemnified Party | Section 10.6(c) |
| In-License Milestone Payments | Section 5.1 |
| In-License Royalties | Section 5.1 |
| Losses | Section 10.6(a) |
| Acuitas Milestone Event | Section 5.1 |
| Acuitas Milestone Payment | Section 5.1 |
| Moderna Indemnitees | Section 10.6(b) |
| Solely Owned IP | Section 6.1 |
| Term | Section 11.1 |
| Third Party Claims | Section 10.6(a) |

## 2.    Development and Commercialization.

6

2.1    Development.  Moderna shall have sole responsibility for, and shall bear all its costs of conducting, all Development and Commercialization of Licensed Products (including filing for and obtaining all required Regulatory Approvals).  As between the Parties, all such Regulatory Approvals shall be obtained by and in the name of Moderna (or its Affiliates or Sublicensees).

3.    **License Grants.**

3.1    Licenses by Acuitas.

(a)    *Licensed Technology.*  Subject to the terms and conditions of this License Agreement, Acuitas and its Affiliates hereby grant to Moderna and its Affiliates (a) a non-exclusive, non-transferrable (other than pursuant to Section 12.11) license, with the right to sublicense only as permitted by Section 3.5(b), under the Licensed Technology, to Develop and Commercialize Licensed Products in the Field of Use in the Territory.

3.2    No Obligation to Provide Know-How.  The Parties acknowledge and agree that neither Acuitas nor any of its Affiliates is obligated hereunder to, or will, absent prior written agreement by the Parties, transfer to Moderna or its Affiliates any Know-How or materials.

3.3    Updates to Appendix C.  Acuitas shall notify Moderna at least once every ▮▮▮▮▮ of Patents that are added to the Licensed Technology following the Effective Date or any Patents that have been abandoned or discontinued in accordance with the terms of this License Agreement.  Appendix C shall be automatically updated to include any such added Patents provided that, with written notice to Acuitas, Moderna may elect to exclude any particular Patents from the Licensed Technology.  Following any such notice by Moderna, the applicable Patents that Moderna identifies for exclusion from this License Agreement will no longer be licensed to Moderna hereunder, and Moderna shall not have any obligations hereunder with respect to such Patent.

3.4    Tekmira Agreement.



3.5    Sublicensing Rights.

(a)    *Transfer.*  The licenses granted in Sections 3.1 are transferable only upon a permitted assignment of this License Agreement in accordance with Section 12.11.

7

    MRNA-GEN-00225688

(b)     *Moderna Sublicenses.* The licenses granted in Section 3.1 may be sublicensed, in full or in part, by Moderna or its Affiliates or Sublicensees by a written agreement to Third Parties (with the right to sublicense through multiple tiers), provided, that:

(i)     Each sublicense will be in writing and on terms consistent with and subject to the terms of this Agreement,

(ii)     Moderna will provide Acuitas with a copy of any sublicense agreement with a Sublicensee within ████████████████████████ of execution thereof, which sublicense agreement may be redacted as necessary to protect commercially sensitive information and shall be treated as Moderna Confidential Information hereunder;

(iii)     Moderna will be responsible for any and all obligations of such Sublicensee as if such Sublicensee were "Moderna" hereunder; and

(iv)     Any sublicense granted by Moderna to any rights licensed to it hereunder shall terminate immediately upon the termination of the license from Acuitas to Moderna and its Affiliates with respect to such rights, provided that such sublicensed rights shall not terminate if, as of the effective date of such termination pursuant to Sections 11.2, 11.3(a) or 11.4, a Sublicensee is not in material default of its obligations under its sublicense agreement, and within ████████ days of such termination the Sublicensee agrees in writing to be bound directly to Acuitas under a license agreement substantially similar to this License Agreement with respect to the rights sublicensed hereunder, substituting such Sublicensee for Moderna.

3.6     License Limitations. No licenses or other rights are granted by Acuitas hereunder to use any trademark, trade name, trade dress or service mark owned or otherwise Controlled by Acuitas or any of its Affiliates. All licenses and other rights are or shall be granted only as expressly provided in this License Agreement, and no other licenses or other rights is or shall be created or granted by either Party hereunder by implication, estoppel or otherwise.

## 4.     Applicable In-Licenses.

4.1     Applicable In-Licenses. The Applicable In-Licenses as of the License Agreement Effective Date are listed in Appendix B. If during the Term Acuitas or its Affiliates enters into any Third Party In-License pursuant to which Acuitas or its Affiliates in-licenses any Patents or Know-How Covering LNP Technology that is Controlled by Acuitas or its Affiliates, Acuitas will promptly ████████████████████ notify Moderna of same and provide Moderna with a copy of such Third Party In-License (which may be redacted as necessary to protect commercially sensitive information of Acuitas that is not relevant to the grant of a sublicense to Moderna). Moderna shall have the option of including any such Third Party In-License within the scope of this License Agreement by providing Acuitas with notice of same, provided that (a) such notice is provided to Acuitas within ████████████ of Moderna's receipt of notice from Acuitas, or (b) if such notice is provided to Acuitas later than ████████████ of Moderna's receipt of notice from Acuitas, the LNP Technology that is in-licensed by Acuitas or its Affiliates pursuant to the Third Party In-License is still Controlled by Acuitas or its Affiliates for the purposes of granting a sublicense to Moderna hereunder. Appendix B will automatically be updated to include such Third Party In-License added in accordance with subsections (a) or (b) above and the provisions of this License Agreement applicable to Applicable In-Licenses, including Section 5.1, will apply with respect to such Third Party In-License.

8

4.2    <u>Maintenance of Applicable In-Licenses</u>. Acuitas (a) will duly perform and observe all of its obligations under the Applicable In-Licenses in all material respects (and in all respects if the failure to do so would give rise to a right of termination on the part of the licensor) and maintain in full force and effect the Applicable In-Licenses, and (b)



4.3    <u>Applicable In-License Requirements</u>. Moderna will abide, and will cause all its Affiliates and applicable Sublicensees to abide, by all requirements of each Applicable In-License in all material respects, to the extent applicable to sublicensees thereunder and to the extent disclosed by Acuitas to Moderna.



**5.    <u>Payments and Royalties</u>.**



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY    MRNA-GEN-00225690



5.2    Milestone Payments for Licensed Proprietary Technology. Subject to t███████████████████████████████████, Moderna will make milestone payments (each, an "Acuitas Milestone Payment") to Acuitas upon ████████████████████████████████, Moderna will notify Acuitas of the achievement of each Acuitas Milestone Event within █████████ Business Days of such achievement. Each Acuitas Milestone Payment will be payable to Acuitas by Moderna within

10

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



5.3     Milestone Payment Credits.

5.4     Royalties.

11



5.5     Third Party Royalty Payments; Other Royalty and Acuitas Milestone Provisions

5.6     Payment Terms.

(a)     *Manner of Payment.* All payments to be made by Moderna hereunder will be made in U.S. dollars by wire transfer to such bank account as Acuitas may designate.

12

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225693

(b)     *Records and Audits.* Moderna shall keep, and shall cause each of its Affiliates and Sublicensees, as applicable, to keep adequate books and records of accounting for the purpose of calculating all royalties payable to Acuitas hereunder.  For the ███████████ next following the end of the calendar year to which each shall pertain, such books and records of accounting (including those of Moderna's Affiliates and Sublicensees, as applicable) shall be kept at each of their principal place of business and shall be open for inspection at reasonable times and upon reasonable notice by an independent certified accountant selected by Acuitas, and which is reasonably acceptable to Moderna, for the sole purpose of inspecting the royalties due to Acuitas under this License Agreement.  In no event shall such inspections be conducted hereunder more frequently than once ███████████████.  Such accountant must have executed and delivered to Moderna and its Affiliates or Sublicensees, as applicable, a confidentiality agreement as reasonably requested by Moderna, which shall include provisions limiting such accountant's disclosure to Acuitas to only the results and basis for such results of such inspection.  The results of such inspection, if any, shall be binding on both Parties.  Any underpayments shall be paid by Moderna within ███████████ of notification of the results of such inspection.   Any overpayments shall be fully creditable against amounts payable in subsequent payment periods. Acuitas shall pay for such inspections, except that in the event there is any upward adjustment in aggregate royalties payable for any calendar year shown by such inspection of more than ██ ██████ of the amount paid, Moderna shall reimburse Acuitas for any reasonable out-of-pocket costs of such accountant.

(c)     *Reports and Royalty Payments.*  For as long as royalties are due under Section 5.1 or 5.4, Moderna shall furnish to Acuitas a written report for each Calendar Quarter, showing the amount of Net Sales of Licensed Products and royalty due for such Calendar Quarter.  Reports shall be provided within █████████████ of the end of the quarter for Net Sales generated by Moderna and its Affiliates, and within ███████████ of the end of the quarter for Net Sales generated by Sublicensees.  Royalty payments for each Calendar Quarter shall be due at the same time as such written report for the Calendar Quarter.

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████  All such reports shall be treated as Confidential Information of Moderna but may be disclosed by Acuitas as required under the Applicable In-Licenses.

(d)     *Currency Exchange.*  With respect to Net Sales invoiced in U.S. dollars, the Net Sales and the amounts due to Acuitas hereunder will be expressed in U.S. dollars.  With respect to Net Sales invoiced in a currency other than U.S. dollars, payments will be calculated based on standard methodologies employed by Moderna or its Affiliates or Sublicensees for consolidation purposes for the Calendar Quarter for which remittance is made for royalties.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                    MRNA-GEN-00225694

(e)    *Taxes*. Moderna may withhold from payments due to Acuitas amounts for payment of any withholding tax that is required by Law to be paid to any taxing authority with respect to such payments. Moderna will provide Acuitas all relevant documents and correspondence, and will also provide to Acuitas any other cooperation or assistance on a reasonable basis as may be necessary to enable Acuitas to claim exemption from such withholding taxes and to receive a refund of such withholding tax or claim a foreign tax credit. Moderna will give proper evidence from time to time as to the payment of any such tax. The Parties will cooperate with each other in seeking deductions under any double taxation or other similar treaty or agreement from time to time in force. Such cooperation may include Moderna making payments from a single source in the U.S., where possible. Apart from any such permitted withholding and those deductions expressly included in the definition of Net Sales, the amounts payable by Moderna to Acuitas hereunder will not be reduced on account of any taxes, charges, duties or other levies.

(f)    *Blocked Payments*. In the event that, by reason of applicable Law in any country, it becomes impossible or illegal for Moderna or its Affiliates or Sublicensees to transfer, or have transferred on its behalf, payments owed to Acuitas hereunder, Moderna will promptly notify Acuitas of the conditions preventing such transfer and such payments will be deposited in local currency in the relevant country to the credit of Acuitas in a recognized banking institution designated by Acuitas or, if none is designated by Acuitas within a period of ▮▮▮▮▮▮▮▮▮▮▮, in a recognized banking institution selected by Moderna or its Affiliate or Sublicensee, as the case may be, and identified in a written notice given to Acuitas.

(g)    *Interest Due*. If any payment due to Acuitas under this License Agreement is overdue (and is not subject to a good faith dispute), then Acuitas will pay interest thereon (before and after any judgment) at an annual rate (but with interest accruing on a daily basis) of the lesser

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(h)    *Mutual Convenience of the Parties*. The royalty and other payment obligations set forth hereunder have been agreed to by the Parties for the purpose of reflecting and advancing their mutual convenience, including the ease of calculating and paying royalties and other amounts to Acuitas.

## 6.    Ownership and Inventorship of IP.

6.1    Solely-Owned IP. As between the Parties, each Party will own and retain all right, title and interest in and to any and all Know-How and Patents arising therefrom that are discovered, created, conceived, developed or reduced to practice solely by or on behalf of such Party under or in connection with this License Agreement ("Solely Owned IP"). Subject to the licenses hereunder and the other terms and conditions of this License Agreement, each Party will be solely responsible for the Prosecution and Maintenance, and the enforcement and defense, of any Patents within its Solely Owned IP.

## 7.    Patent Prosecution and Maintenance.

7.1    Generally. As between the Parties, Acuitas will have the sole right to prosecute and maintain Patents within the Licensed Proprietary Technology. Acuitas will regularly provide Moderna with copies of all applications for Patents within the Licensed Proprietary Technology, and all other material submissions and correspondence with any Patent authorities regarding such

14

    MRNA-GEN-00225695

Patents, in sufficient time to allow for review and comment by Moderna. In addition, Acuitas will provide Moderna and its counsel with an opportunity to consult with Acuitas and its counsel regarding prosecution and maintenance of any such Patents, and Acuitas will consider in good faith all reasonable comments timely made by Moderna and its counsel.

7.2    Election Not to Prosecute or Maintain or Pay Patent Costs.  If Acuitas elects not (i) to prosecute or maintain any Patents within the Licensed Proprietary Technology in any particular country before the applicable filing deadline or continue such activities once filed in a particular country, or (ii) to pay the Patent Costs associated with prosecution or maintenance of any Patents within the Licensed Proprietary Technology then in each such case Acuitas will so notify Moderna, promptly in writing and in good time to enable Acuitas to meet any deadlines by which an action must be taken to preserve such Patent in such country, if Moderna so requests. Upon receipt of each such notice by Acuitas, Moderna will have the right, but not the obligation, to notify Acuitas in writing on a timely basis that Acuitas should continue the prosecution or maintenance of such Patent, at Moderna's expense and thereafter, ████████████████████████████████ ████████████████████████████

7.3    Third Party Rights.  To the extent that a Third Party licensor of Acuitas has provided Acuitas or its Affiliates with rights to prosecute or maintain and/or defend any Patent within the Licensed Third Party Technology licensed to Moderna hereunder, or to review or comment with respect to any such maintenance or prosecution activities, Acuitas will provide Moderna with the opportunity to consult with Acuitas and its counsel in connection therewith and will consider in good faith Moderna's comments to the extent permitted under such Applicable In-License.

7.4    Patent Extensions.  If any election for Patent term restoration or extension, supplemental protection certificate or any of their equivalents may be made with respect to any Patent within the Licensed Proprietary Technology, after consultation with Moderna, the Parties will discuss and seek to reach mutual agreement whether or not to take such action. If the Parties are not able to reach mutual agreement, (a) Moderna will have the sole right to make the final decision whether or not to seek such Patent term restoration or extension, supplemental protection certificate or any of their equivalents with respect to Patents within the Licensed Proprietary Technology that cover Licensed Product and no product licensed to any other licensee of Acuitas or Commercialized by Acuitas, and (b) Acuitas will have the sole right to make the final decision whether or not to seek such Patent term restoration or extension, supplemental protection certificate or any of their equivalents with respect to all other Patents within the Licensed Proprietary Technology that claim Licensed Products and other products licensed by Acuitas or Commercialized by Acuitas.

7.5    Regulatory Exclusivity Periods.  With respect to any Patent listings required for any regulatory exclusivity periods for Licensed Products the Parties will mutually agree on which Patents within the Licensed Technology to list, provided that if the Parties are not able to agree, Moderna will have the right to make the final decision with respect to Patents within the Licensed Proprietary Technology that cover Licensed Product and no product licensed to any other licensee of Acuitas or Commercialized by Acuitas, and provided further that the exercise of such right by Moderna will not increase or otherwise change the rights or obligations of the Parties hereunder.

7.6    Cooperation.  Each Party will reasonably cooperate with the other Party in the prosecution and maintenance of Patents within the Licensed Technology. Such cooperation

15

includes promptly executing all documents, or requiring inventors, subcontractors, employees and consultants and agents of Moderna and Acuitas and their respective Affiliates and Sublicensees to execute all documents, as reasonable and appropriate so as to enable the prosecution and maintenance of any such Patents in any country.

## 8.    Patent Enforcement and Defense.

8.1    Notice.    Each Party will promptly notify, in writing, the other Party upon learning of any actual or suspected Competitive Infringement of any Patents within the Licensed Technology by a Third Party, or of any claim of invalidity, unenforceability, or non-infringement of any Patents within the Licensed Technology, and will, along with such notice, supply the other Party with any evidence in its possession pertaining thereto.    For purposes of this License Agreement, "Competitive Infringement" means 

8.2    Enforcement and Defense.

(a)    *Patents within the Licensed Technology and Competitive Infringement.*

(i)    As between the Parties, Acuitas will have the first right, but not the obligation, to seek to abate any Competitive Infringement of the Patents within the Licensed Proprietary Technology by a Third Party, or to file suit against any such Third Party for such Competitive Infringement of Acuitas-Owned Technology, and, if permitted pursuant to an Applicable In-License, Licensed Third Party Technology.    If Acuitas does not take steps to abate such Competitive Infringement, or file suit to enforce the Patents within the Licensed Technology against such Third Party with respect to such Competitive Infringement, within a commercially reasonably time, Moderna will have the right (but not the obligation) to take action to enforce the Patents within the Licensed Proprietary Technology that cover Licensed Product and no product licensed to any other licensee of Acuitas or Commercialized by Acuitas against such Third Party for such Competitive Infringement.    The controlling Party will pay all its Patent Costs incurred for such enforcement.

(ii)    Neither Party will exercise any of its enforcement rights under this Section 8.2(a) without first consulting with the other Party, provided that this consultation requirement will not limit either Party's rights under this Section 8.2(a).

(b)    *Defense.*    As between the Parties, Acuitas will have the first right, but not the obligation, to defend against a declaratory judgment action or other action challenging any Patents within the Licensed Proprietary Technology, other than with respect to any action or counter claims by a Third Party in response to an enforcement action brought by Moderna alleging infringement of any Patents within the Licensed Technology, which defense will be controlled by the Party controlling such enforcement action.    If Acuitas does not take steps to defend within a commercially reasonably time, or elects not to continue any such defense (in which case it will promptly provide notice thereof to Moderna), then Moderna will have the right (but not the obligation) to defend any such Patent within the Licensed Proprietary Technology that cover Licensed Product and no product licensed to any other licensee of Acuitas or Commercialized by Acuitas.

(c)    *Withdrawal, Cooperation and Participation.*    With respect to any infringement or defensive action identified above in this Section 8.2:

16

(i)     If the controlling Party ceases to pursue or withdraws from such action, it will promptly notify the other Party (in good time to enable the other Party to meet any deadlines by which any action must be taken to preserve any rights in such infringement or defensive action) and such other Party may substitute itself for the withdrawing Party and proceed under the terms and conditions of this Section 8.2.

(ii)     The non-controlling Party will cooperate with the Party controlling any such action (as may be reasonably requested by the controlling Party), including (A) providing access to relevant documents and other evidence, (B) making its and its Affiliates and licensees and Sublicensees and all of their respective employees, subcontractors, consultants and agents available at reasonable business hours and for reasonable periods of time, but only to the extent relevant to such action, and (C) if necessary, by being joined as a party, subject for this clause (C) to the controlling Party agreeing to indemnify such non-controlling Party for its involvement as a named party in such action and paying those Patent Costs incurred by such Party in connection with such joinder. The Party controlling any such action will keep the other Party updated with respect to any such action, including providing copies of all documents received or filed in connection with any such action.

(iii)     Each Party will have the right to participate or otherwise be involved in any such action controlled by the other Party, in each case at the participating Party's sole cost and expense. If a Party elects to so participate or be involved, the controlling Party will provide the participating Party and its counsel with an opportunity to consult with the controlling Party and its counsel regarding the prosecution of such action (including reviewing the contents of any correspondence, legal papers or other documents related thereto), and the controlling Party will take into account reasonable requests of the participating Party regarding such enforcement or defense.

(d)     *Settlement*. Neither Party will settle or consent to an adverse judgment in any action described in this Section 8.2 and controlled by such Party, including any judgment which affects the scope, validity or enforcement of any Patents within the Licensed Technology involved therewith, without the prior written consent of the other Party (such consent not to be unreasonably withheld or delayed).

(e)     *Damages*. Unless otherwise agreed by the Parties, all monies recovered upon the final judgment or settlement of any action described in Section 8.2(a) or any action described in Section 8.2(b) controlled by Moderna will be used first to reimburse each of the Parties, for each of their out-of-pocket costs and expenses relating to the action, with the balance of any such recovery to be divided as follows:



8.3     No Challenge.

17



## 9.   Confidentiality.

9.1    Confidential Information.  Each Party ("Disclosing Party") may disclose to the other Party ("Receiving Party"), and Receiving Party may acquire during the course and conduct of activities under this License Agreement, certain proprietary or confidential information of Disclosing Party in connection with this License Agreement. The term "Confidential Information" means (i) all Materials and (ii) all ideas and information of any kind, whether in written, oral, graphical, machine-readable or other form, whether or not marked as confidential or proprietary, which are disclosed or made available by or on behalf of the Disclosing Party to the Receiving Party, including any of the foregoing of Third Parties.

9.2    Restrictions.  During the Term and for ███ ███ ███ thereafter, Receiving Party will keep all Disclosing Party's Confidential Information in confidence with the same degree of care with which Receiving Party holds its own confidential information, but in no event less than reasonable care. Receiving Party will not use Disclosing Party's Confidential Information except for in connection with the performance of its obligations and exercise of its rights under this License Agreement.  Receiving Party has the right to disclose Disclosing Party's Confidential Information without Disclosing Party's prior written consent to Receiving Party's Affiliates, Approved Partners, and each of their employees, subcontractors, consultants or agents who have a need to know such Confidential Information in order to perform its obligations and exercise its rights under this License Agreement and who are required to comply with the restrictions on use and disclosure that are no less restrictive than those set forth in this Section 9.2.  Receiving Party assumes responsibility for those entities and persons maintaining Disclosing Party's Confidential Information in confidence and using same only for the purposes described herein.

9.3    Exceptions.  Receiving Party's obligation of nondisclosure and the limitations upon the right to use the Disclosing Party's Confidential Information will not apply to the extent that Receiving Party can demonstrate that the Disclosing Party's Confidential Information: (i) was known to Receiving Party or any of its Affiliates prior to the time of disclosure by the Disclosing Party; (ii) is or becomes public knowledge through no fault or omission of Receiving Party or any of its Affiliates; (iii) is obtained on a non-confidential basis by Receiving Party or any of its Affiliates from a Third Party who to Receiving Party's knowledge is lawfully in possession thereof and under no obligation of confidentiality to Disclosing Party; or (iv) has been independently developed by or on behalf of Receiving Party or any of its Affiliates without the aid, application or use of Disclosing Party's Confidential Information.

18

9.4    Permitted Disclosures. Receiving Party may disclose Disclosing Party's Confidential Information to the extent (and only to the extent) such disclosure is reasonably necessary in the following instances:

(a)    in order to comply with applicable Law (including any securities Law or regulation or the rules of a securities exchange) or with a legal or administrative proceeding;

(b)    in connection with prosecuting or defending litigation, regulatory approvals and other regulatory filings and communications, and filing, prosecuting and enforcing Patents in connection with Receiving Party's rights and obligations pursuant to this License Agreement; and

(c)    in connection with exercising its rights hereunder, to its Affiliates; permitted acquirers or assignees; investment bankers, investors and lender; and in the case of Moderna, to its Approved Partners;.

provided that (1) with respect to Sections 9.4(a) or 9.4(b), where reasonably possible, Receiving Party will notify Disclosing Party of Receiving Party's intent to make any disclosure pursuant thereto sufficiently prior to making such disclosure so as to allow Disclosing Party adequate time to take whatever action it may deem appropriate to protect the confidentiality of the information to be disclosed, and (2) with respect to Section 9.4(c), each of those named people and entities are required to comply with the restrictions on use and disclosure in Section 9.2 (other than investment bankers, investors and lenders, which must be bound prior to disclosure by commercially reasonable obligations of confidentiality).

9.5    Terms of this License Agreement; Publicity. The Parties agree that the existence and terms of this License Agreement will be treated as Confidential Information of both Parties, and thus may be disclosed only as permitted by Section 9.4. Except as required by Law, each Party agrees not to issue any press release or public statement disclosing information relating to the existence of this License Agreement or the transactions contemplated hereby or the terms hereof without the prior written consent of the other Part.

## 10.    Warranties; Limitations of Liability; Indemnification.

10.1    Representations and Warranties. Each Party represents and warrants to the other as of the License Agreement Effective Date that it has the legal right and power to enter into this License Agreement, to extend the rights and licenses granted or to be granted to the other in this License Agreement, and to fully perform its obligations hereunder.

10.2    Additional Representations and Warranties of Acuitas. Except as set forth in Schedule 9.2, Acuitas represents and warrants to Moderna that, as of the License Agreement Effective Date:

(a)    *Licensed Technology.*  Appendix C sets forth a complete and accurate list of all Patents included in the Licensed Technology, indicating the owner, licensor and/or co-owner(s), if applicable. Acuitas Controls the Patents listed on Appendix C and the Know-How within the Licensed Technology, and is entitled to grant the licenses specified herein. To Acuitas' knowledge, the Patents listed on Appendix C have been procured or are being procured from the respective Patent offices in accordance with applicable Law. None of the Patents included in the Licensed Technology is or has been involved in any opposition, cancellation, interference, reissue or reexamination proceeding, and to Acuitas' knowledge no Licensed Technology is the subject of any judicial, administrative or arbitral order, award, decree, injunction, lawsuit, proceeding or

19

stipulation. Neither Acuitas nor any of its Affiliates has received any notice alleging that the Patents in the Licensed Technology are invalid or unenforceable, or challenging Acuitas' ownership of or right to use any such rights. In the event that Acuitas or its Affiliates directly or indirectly, grants, assign, licenses, sublicenses, encumbers or otherwise transfers (each, a "Transfer") to any Third Party any right, title or interest in or to the Licensed Proprietary Technology, such Transfer will be subject to the rights and licenses granted to Moderna and its Affiliates herein.

(b)     *Third Party Agreements.*  The Applicable In-Licenses are valid and binding obligations of Acuitas and, to the knowledge of Acuitas, the applicable licensor, enforceable against Acuitas and, to the Knowledge of Acuitas, the applicable licensor, in accordance with their terms, except as may be limited by general principles of equity (regardless of whether considered in a proceeding at law or in equity) and by applicable bankruptcy, insolvency, moratorium and other similar Laws of general application relating to or affecting creditors' rights generally.



(c)     *Patents.*  To Acuitas' knowledge, the Patents listed on <u>Appendix C</u> have been procured or are being procured from the respective patent offices in accordance with applicable Law. None of the Patents included in the Licensed Technology is or has been involved in any opposition, cancellation, interference, reissue or reexamination proceeding, and no Licensed Technology is the subject of any judicial, administrative or arbitral order, award, decree, injunction, lawsuit, proceeding or stipulation. Neither Acuitas nor any of its Affiliates has received any notice alleging that the Patents in the Licensed Technology are invalid or unenforceable, or challenging Acuitas' ownership of or right to use any such rights.

(d)     *Encumbrances.*  Except for the Third Party In-Licenses, Acuitas and its Affiliates are not subject to any payment obligations to Third Parties as a result of the execution and performance of this License Agreement. Neither Acuitas nor any of its Affiliates has granted any liens or security interests on the Licensed Technology and the Licensed Technology is to Acuitas' knowledge free and clear of any mortgage, pledge, claim, security interest, covenant, easement,

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY
MRNA-GEN-00225701

encumbrance, lien or charge of any kind. The foregoing shall not apply to any option or license agreement entered into by Acuitas prior to the Effective Date.

(e)    *No Conflicts.* The execution, delivery and performance by Acuitas of this License Agreement and the consummation of the transactions contemplated hereby will not result in any violation of, conflict with, result in a breach of or constitute a default under any understanding, contract or agreement to which Acuitas is a party or by which it is bound.

(f)    *No Proceedings.* There is no action, suit, proceeding or investigation pending or, to the knowledge of Acuitas, currently threatened in writing against or affecting Acuitas that questions the validity of this License Agreement or the right of Acuitas to enter into this License Agreement or consummate the transactions contemplated hereby.

(g)    *Infringement.* Neither Acuitas nor any of its Affiliates has received any notice of any claim that any Patent, Know-How or other intellectual property owned or controlled by a Third Party would be infringed or misappropriated by the Licensed Technology in the production, use, research, development, manufacture or commercialization of Licensed Product.

10.3    Disclaimers.  Without limiting the respective rights and obligations of the Parties expressly set forth herein, each Party specifically disclaims any guarantee that any Licensed Product will be successful, in whole or in part. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS LICENSE AGREEMENT, THE PARTIES MAKE NO REPRESENTATIONS AND EXTEND NO WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED.

10.4    No Consequential Damages.    NOTWITHSTANDING ANYTHING IN THIS AGREEMENT OR OTHERWISE, NEITHER PARTY WILL BE LIABLE TO THE OTHER OR ANY THIRD PARTY WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT FOR ANY INDIRECT, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, EVEN IF SUCH PARTY HAS BEEN INFORMED OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES; PROVIDED THAT THIS SECTION 10.4 WILL NOT APPLY TO BREACHES OF A PARTY'S CONFIDENTIALITY OBLIGATIONS OR THE PARTIES' INDEMNIFICATION RIGHTS AND OBLIGATIONS UNDER SECTION 10.6.

10.5    Performance by Others.  The Parties recognize that each Party may perform some or all of its obligations under this License Agreement through Affiliates and permitted subcontractors provided, however, that each Party will remain responsible and liable for the performance by its Affiliates and permitted subcontractors and will cause its Affiliates and permitted subcontractors to comply with the provisions of this License Agreement in connection therewith.

10.6    Indemnification.

(a)    *Indemnification by Moderna.*  Moderna will indemnify Acuitas, its Affiliates and their respective directors, officers, employees, Third Party licensors and agents, and their respective successors, heirs and assigns (collectively, "Acuitas Indemnitees"), and defend and save each of them harmless, from and against any and all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses) (collectively, "Losses") in connection with any and all suits, investigations, claims or demands of Third Parties (collectively, "Third Party Claims") against the Acuitas Indemnitees arising from or occurring as a result of: (i) the material breach by Moderna of any term of this License Agreement; (ii) any gross negligence or willful misconduct on the part of Moderna in performing its obligations under this License Agreement;

21

or (iii) the Development or Commercialization by or on behalf of Moderna or any of its Affiliates or Sublicensees of Licensed Product, except in each case for those Losses for which Acuitas has an obligation to indemnify Moderna pursuant to Section 10.6(b), as to which Losses each Party will indemnify the other to the extent of their respective liability; provided, however, that Moderna will not be obligated to indemnify Acuitas Indemnitees for any Losses to the extent that such Losses arise as a result of gross negligence or willful misconduct on the part of an Acuitas Indemnitee.

(b)     *Indemnification by Acuitas.* Acuitas will



(c)     *Notice of Claim.* All indemnification claims provided for in Sections 10.6(a) and 10.6(b) will be



(d)     *Defense, Settlement, Cooperation and Expenses.*

(i)     *Control of Defense.*



22

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225703



(ii)  *Right to Participate in Defense.*

(iii)  *Settlement.*

(iv)  *Cooperation.*

23

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



10.7   Insurance. Each Party will maintain at its sole cost and expense, an adequate liability insurance or self-insurance program (including product liability insurance) to protect against potential liabilities and risk arising out of activities to be performed under this License Agreement, and any agreement related hereto and upon such terms (including coverages, deductible limits and self-insured retentions) as are customary in the U.S. pharmaceutical industry for the activities to be conducted by such Party under this License Agreement. Subject to the preceding sentence, such liability insurance or self-insurance program will insure against all types of liability, including personal injury, physical injury or property damage arising out of the manufacture, sale, use, distribution or marketing of Licensed Product. The coverage limits set forth herein will not create any limitation on a Party's liability to the other under this License Agreement.

## 11.   Term and Termination.

11.1   Term. This License Agreement will commence as of the License Agreement Effective Date and, unless sooner terminated in accordance with the terms hereof or by mutual written consent, will continue on a country-by-country basis, until there are no more payments owed Acuitas on Licensed Product in such country (the longest such period of time for any Licensed Product hereunder, the "Term"). Upon there being no more such payments hereunder for any such Licensed Product in such country, the licenses contained in Section 3.1 for such Licensed Product will become fully paid up and will remain non-exclusive and in effect with respect to such Licensed Product in such country.

11.2   Termination by Acuitas.

(a)   Breach. Acuitas will have the right to terminate this License Agreement in full upon delivery of written notice to Moderna in the event of any material breach by Moderna of any terms and conditions of this License Agreement, provided that such termination will not be effective if such breach, has been cured within ▮▮▮▮ days after written notice thereof is given by Acuitas to Moderna specifying the nature of the alleged breach.

11.3   Termination by Moderna.

(a)   Breach. Moderna will have the right to terminate this License Agreement in full upon delivery of written notice to Acuitas in the event of any material breach by Acuitas of any terms and conditions of this License Agreement, provided that such termination will not be effective if such breach has been cured within ▮▮▮▮ days after written notice thereof is given by Moderna to Acuitas specifying the nature of the alleged breach.

(b)   Discretionary Termination. Moderna will have the right to terminate this License Agreement in full at its discretion for any reason by delivering written notice to Acuitas, such termination to be effective ▮▮▮▮ days following the date of such notice.

24

(c)  *Alternative to Termination Under Section 11.3(a).* If Moderna has the right to terminate this License Agreement under Section 11.3(a) as a result of a material breach by Acuitas (including following expiration of all applicable cure periods thereunder) that fundamentally impairs the value of Moderna's rights hereunder with respect to the Licensed Target, then Moderna may, in lieu of exercising such termination right, elect by written notice to Acuitas before the end of such applicable cure period to have this License Agreement continue in full force and effect for the Term, provided that the following will apply:



11.4    Termination Upon Bankruptcy.

(a)  *Termination Right.* Either Party may terminate this License Agreement if, at any time, the other Party will file in any court or agency pursuant to any statute or regulation of any state, country or jurisdiction, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the appointment of a receiver or trustee of that Party or of its assets, or if the other Party proposes a written agreement of composition or extension of its debts, or if the other Party will be served with an involuntary petition against it, filed in any insolvency proceeding, and such petition will not be dismissed within ▮▮▮▮▮ days after the filing thereof, or if the other Party will propose or be a Party to any dissolution or liquidation, or if the other Party will make an assignment for the benefit of its creditors.

(b)  *Consequences of Bankruptcy.* All rights and licenses granted under or pursuant to this License Agreement by Acuitas or its Affiliates are, and will otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code, licenses of right to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code. The Parties agree that Moderna and its Affiliates and Sublicensees, as licensees of such rights under this License Agreement, will retain and may fully exercise all of their rights and elections under the U.S. Bankruptcy Code and any foreign counterparts thereto subject to the payment of amounts provided for herein.

11.5    Effects of Termination. Upon termination (but not expiration pursuant to Section 11.1) of this License Agreement for any reason:

25

(a)    *Cessation of Rights.* Except as otherwise expressly provided herein, all rights and licenses granted by Acuitas to Moderna in Section 3.1 will terminate, and Moderna and its Affiliates and Sublicensees will cease all use of Licensed Technology.

(b)    *Country Termination.* If this License Agreement is terminated only with respect to a specific country or a specific Licensed Product pursuant to Section 11.2(a), the provisions of this Section 11.5 will apply only with respect to such terminated country and such Licensed Product.

11.6    <u>Survival</u>.  In addition to the termination consequences set forth in Section 11.5, the following provisions will survive termination or expiration of this License Agreement: Sections 1, 3.2, 3.5(b)(iv), 6, 9, 10.6, 11.5, 11.6 and 12.  Termination or expiration of this License Agreement will not relieve the Parties of any liability or obligation which accrued hereunder prior to the effective date of such termination or expiration nor preclude either Party from pursuing all rights and remedies it may have hereunder or at law or in equity with respect to any breach of this License Agreement nor prejudice either Party's right to obtain performance of any obligation.  All other rights and obligations will terminate upon expiration of this License Agreement.

## 12.    <u>**General Provisions**</u>.

12.1    <u>Dispute Resolution</u>.

(a)    *Disputes.* Disputes arising under or in connection with this License Agreement will be resolved pursuant to this Section 12.1; provided, however, that in the event a dispute cannot be resolved without an adjudication of the rights or obligations of a Third Party (other than any Moderna Indemnitees or Acuitas Indemnitees identified in Section 10.6), the dispute procedures set forth Sections 12.1(c) and 12.1(c) will be inapplicable as to such dispute.

(b)    *Dispute Escalation.* In the event of a dispute between the Parties, the Parties will first attempt in good faith to resolve such dispute by negotiation and consultation between themselves.  In the event that such dispute is not resolved on an informal basis within ███████ days, any Party may, by written notice to the other, have such dispute referred to each Party's ████████████████████████████████ ██ ████████████████, who will attempt in good faith to resolve such dispute by negotiation and consultation for a ███████ day period following receipt of such written notice

(c)    *Dispute Resolution.* In the event the ████████████████████ of the Parties are not able to resolve such dispute as set forth above, the ██████████████ will together elect whether to submit the dispute to moderation, litigation or arbitration.  In the absence of such an agreement, either party may elect to initiate litigation.

(d)    *Injunctive Relief.* Notwithstanding the dispute resolution procedures set forth in this Section 12.1, in the event of an actual or threatened breach hereunder, the aggrieved Party may seek equitable relief (including restraining orders, specific performance or other injunctive relief) in any court or other forum, without first submitting to any dispute resolution procedures hereunder.

(e)    *Tolling.* The Parties agree that all applicable statutes of limitation and time-based defenses (such as estoppel and laches) will be tolled while the dispute resolution procedures set forth in this Section 12.1 are pending, and the Parties will cooperate in taking all actions reasonably necessary to achieve such a result.

(f)    *Prevailing Party.* The prevailing Party in any arbitration under Section 12.1(c) or

26

any other suit related to this License Agreement will be entitled to recover from the losing Party all out-of-pocket fees, costs and expenses (including those of attorneys, professionals and accountants and all those arising from appeals and investigations) incurred by the prevailing Party in connection with such arbitration or suit.

     12.2    <u>Cumulative Remedies and Irreparable Harm</u>. All rights and remedies of the Parties hereunder will be cumulative and in addition to all other rights and remedies provided hereunder or available by agreement, at Law or otherwise. Each Party acknowledges and agrees that breach of any of the terms or conditions of this License Agreement may cause irreparable harm and damage to the other and that such damage may not be ascertainable in money damages and that as a result thereof the non-breaching Party may be entitled to seek from a court equitable or injunctive relief restraining any breach or future violation of the terms contained herein by the breaching Party without the necessity of proving actual damages or posting bond. Such right to equitable relief is in addition to whatever remedies either Party may be entitled to as a matter of Law or equity, including money damages.

     12.3    <u>Relationship of Parties</u>. Nothing in this License Agreement is intended or will be deemed to constitute a partnership, agency, employer-employee or joint venture relationship between the Parties. No Party will incur any debts or make any commitments for the other, except to the extent, if at all, specifically provided therein. Except as may be required by the Applicable In-Licenses, there are no express or implied third party beneficiaries hereunder (except for Moderna Indemnitees and Acuitas Indemnitees for purposes of Section 10.6). For clarity, Moderna does not grant to Acuitas any rights or licensed under this License Agreement to any Moderna technology or intellectual property rights.

     12.4    <u>Compliance with Law</u>. Each Party will perform or cause to be performed any and all of its obligations or the exercise of any and all of its rights hereunder in good scientific manner and in compliance with all applicable Law.

     12.5    <u>Governing Law</u>. This License Agreement will be governed by and construed in accordance with the Laws of the State of New York, without respect to its conflict of Laws rules, provided that any dispute relating to the scope, validity, enforceability or infringement of any Patents or Know-How will be governed by, and construed and enforced in accordance with, the substantive Laws of the jurisdiction in which such Patents or Know-How apply.

     12.6    <u>Counterparts; Facsimiles</u>. This License Agreement may be executed in one or more counterparts, each of which will be deemed an original, and all of which together will be deemed to be one and the same instrument. Facsimile or PDF execution and delivery of this License Agreement by either Party will constitute a legal, valid and binding execution and delivery of this License Agreement by such Party

     12.7    <u>Headings</u>. All headings in this License Agreement are for convenience only and will not affect the meaning of any provision hereof.

     12.8    <u>Waiver of Rule of Construction</u>. Each Party has had the opportunity to consult with counsel in connection with the review, drafting and negotiation of this License Agreement. Accordingly, the rule of construction that any ambiguity in this License Agreement will be construed against the drafting party will not apply.

     12.9    <u>Interpretation</u>. Whenever any provision of this License Agreement uses the term "including" (or "includes"), such term will be deemed to mean "including without limitation"

27

MRNA-GEN-00225708

(or "includes without limitations"). "Herein," "hereby," "hereunder," "hereof" and other equivalent words refer to this License Agreement as an entirety and not solely to the particular portion of this License Agreement in which any such word is used. All definitions set forth herein will be deemed applicable whether the words defined are used herein in the singular or the plural. Unless otherwise provided, all references to Sections and Exhibits in this License Agreement are to Sections and Exhibits of this License Agreement. References to any Sections include Sections and subsections that are part of the related Section (e.g., a section numbered "Section 2.1" would be part of "Section 2" and references to "Section 2" would also refer to material contained in the subsection described as "Section 2.1(a).")

12.10   Binding Effect.  This License Agreement will inure to the benefit of and be binding upon the Parties, their Affiliates, and their respective lawful successors and assigns.

12.11   Assignment.  This License Agreement may not be assigned by either Party, nor may either Party delegate its obligations or otherwise transfer licenses or other rights created by this License Agreement, except as expressly permitted hereunder or otherwise without the prior written consent of the other Party, which consent will not be unreasonably withheld; provided that either Party may assign this License Agreement to an Affiliate or to its successor in connection with sale of all or substantially all of its assets or business or that portion of its business pertaining to the subject matter of this License Agreement (whether by merger, consolidation or otherwise).

12.12   Notices.  All notices, requests, demands and other communications required or permitted to be given pursuant to this License Agreement will be in writing and will be deemed to have been duly given upon the date of receipt if delivered by hand, recognized international overnight courier, confirmed facsimile transmission, or registered or certified mail, return receipt requested, postage prepaid to the following addresses or facsimile numbers:

| | |
|---|---|
| If to Moderna: | Moderna Therapeutics, Inc.<br>200 Technology Square<br>Cambridge, MA 02139<br>Attention: ███████████ |
| With a copy to: | Moderna Therapeutics, Inc.<br>320 Bent Street<br>Cambridge, MA 02139<br>Attention: ███████████ |
| If to Acuitas: | Acuitas Therapeutics Inc.<br>2714 West 31rst Avenue<br>Vancouver, B.C.<br>Canada V6L 2A1<br>Attention: ████████ ████████ |
| With a copy to: | McCarthy Tetrault LLP<br>Suite 1300 777 Dunsmuir Street<br>Vancouver, B.C.<br>Canada V6B 1N3<br>Attention: ███████████ |

Either Party may change its designated address and facsimile number by notice to the other Party in the manner provided in this Section 12.12.

28

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

12.13   Amendment and Waiver.   This License Agreement may be amended, supplemented, or otherwise modified only by means of a written instrument signed by both Parties; provided that any unilateral undertaking or waiver made by one Party in favor of the other will be enforceable if undertaken in a writing signed by the Party to be charged with the undertaking or waiver. Any waiver of any rights or failure to act in a specific instance will relate only to such instance and will not be construed as an agreement to waive any rights or fail to act in any other instance, whether or not similar.

12.14   Severability.   In the event that any provision of this License Agreement will, for any reason, be held to be invalid or unenforceable in any respect, such invalidity or unenforceability will not affect any other provision hereof, and the Parties will negotiate in good faith to modify the License Agreement to preserve (to the extent possible) their original intent.

12.15   Entire License Agreement.   This License Agreement together with the Development and Option Agreement any other License Agreements entered into during the Term are the sole agreement with respect to the subject matter and supersedes all other agreements and understandings between the Parties with respect to same.

12.16   Force Majeure.   Neither Acuitas nor Moderna will be liable for failure of or delay in performing obligations set forth in this License Agreement (other than any obligation to pay monies when due), and neither will be deemed in breach of such obligations, if such failure or delay is due to natural disasters or any causes reasonably beyond the control of Acuitas or Moderna; provided that the Party affected will promptly notify the other of the force majeure condition and will exert reasonable efforts to eliminate, cure or overcome any such causes and to resume performance of its obligations as soon as possible.

*[Remainder of this Page Intentionally Left Blank]*

29

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                    MRNA-GEN-00225710

WITNESS WHEREOF, the Parties have caused this License Agreement to be executed by their respective duly authorized officers as of the License Agreement Effective Date.

ACUITAS THERAPEUTICS INC.

By:

Name:

Title:

Date:  _MAY 22ND 2015_

MODERNA THERAPEUTICS, INC.

By:

Name:

Title:

Date:  _May 22, 2015_

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

## Appendix A

### Licensed Target

"Licensed Target" 



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225712

## Appendix B

### Applicable In-Licenses

<u>Appendix C</u>

**Certain Patents within the Licensed Technology
as of the License Agreement Effective Date**

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225714

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-0025715

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-0225716

Status Report — Protiva Biotherapeutics, Inc.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225717

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225718

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225719

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225720

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

CONFIDENTIAL

MRNA-GEN-00225721

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225722

Status Report – Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225723

Status Report – Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225724

Status Report — Protiva Biotherapeutics, Inc.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225725

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225726

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225727

Status Report – Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225728

Status Report — Protiva Biotherapeutics, Inc.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225729

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225730

Status Report — Protiva Biotherapeutics, Inc.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225731

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225732

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225733

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

Status Report — Protiva Biotherapeutics, Inc.



MRNA-GEN-00225734

Status Report — Protiva Biotherapeutics, Inc.





HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225735

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225736

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225737

Status Report — Protiva Biotherapeutics, Inc.

CONFIDENTIAL

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225738

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225739

Status Report — Protiva Biotherapeutics, Inc.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-0025740

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225741

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-0022574

Status Report — Protiva Biotherapeutics, Inc.



CONFIDENTIAL

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225743

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225744

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225745

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-0225746

CONFIDENTIAL

Status Report — Protiva Biotherapeutics, Inc.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225747

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225748

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-0025749

CONFIDENTIAL

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225750

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225751

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

Status Report — Protiva Biotherapeutics, Inc.



CONFIDENTIAL

MRNA-GEN-00225752

Status Report — Protiva Biotherapeutics, Inc.



CONFIDENTIAL

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225753

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-0225754

Status Report – Protiva Biotherapeutics, Inc.



CONFIDENTIAL

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225755

Status Report — Protiva Biotherapeutics, Inc.

Page 42

CONFIDENTIAL

May 2015

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225756

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225757

Status Report — Protiva Biotherapeutics, Inc.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225758

Status Report — Protiva Biotherapeutics, Inc.



CONFIDENTIAL

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225759

Status Report — Protiva Biotherapeutics, Inc.



CONFIDENTIAL

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225760

Status Report — Protiva Biotherapeutics, Inc.



67250126V.1

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225761

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225762

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225763

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225764



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225767

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225768



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225769



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225770

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-0025771

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225772

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225773

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225774

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225775



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225776

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225777



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225778



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-0025779



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225780



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225781



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225783

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225784



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225785

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY



MRNA-GEN-00225786



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225787



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-00225788



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

Schedule 9.2

**Exceptions to Acuitas' Representations and Warranties in Section 9.2**



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY