## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH<br><br>*Plaintiffs*,<br><br>v.<br><br>MODERNA, INC. and MODERNATX, INC.,<br><br>*Defendants*. | |
| MODERNA, INC. and MODERNATX, INC.,<br><br>*Counterclaim-Plaintiffs*,<br><br>v.<br><br>ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH,<br><br>*Counterclaim- Defendants.* | C.A. No. 22-252-JDW<br><br>**JURY TRIAL DEMANDED**<br><br>████████████████ |

## PLAINTIFFS' COUNTERSTATEMENT OF FACTS TO MODERNA'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court's Policies and Procedures for Civil Matters, Section 11, and the Court's Scheduling Order (D.I. 485), Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH submit (1) a Counterstatement of Facts to Moderna's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment (D.I. 502) and (2) Plaintiffs' additional statement of material facts in support of its opposition to Moderna's motion for summary judgment.

## <u>TABLE OF CONTENTS</u>

I.     GENERAL FACTS ................................................................................................ 1

II.    FACTS RELATED TO 28 U.S.C. § 1498 ........................................................... 2

    A.    U.S. Government Response to the COVID-19 Pandemic.................................. 2

    B.    C-100 Contract ............................................................................................... 12

    C.    Additional Benefits to the U.S. Government ................................................... 26

III.   FACTS RELATED TO PLAINTIFFS' DOE THEORY ............................................ 41

    A.    Prosecution History ........................................................................................ 41

    B.    Claim Construction Proceedings .................................................................... 55

    C.    Plaintiffs' DOE Theories.................................................................................. 58

        1.    "Cationic Lipid" Limitation ................................................................. 59

        2.    "Non-Cationic Lipid" Limitation ........................................................ 60

        3.    "Conjugated Lipid" Limitation ........................................................... 62

    D.    Scope of Prosecution Disclaimer .................................................................. 64

IV.   FACTS RELATED TO INDEFINITENESS OF "FULLY ENCAPSULATED" LIMITATION OF '651 PATENT............................................................................ 71

    A.    U.S. Patent No. 9,504,651 .............................................................................. 71

    B.    Inconsistent Definitions.................................................................................. 76

        1.    Genevant/Arbutus Witnesses ............................................................. 76

        2.    Moderna Witnesses ........................................................................... 87

    C.    Measurement Methods .................................................................................. 89

ADDITIONAL RESPONSIVE FACTS ........................................................................ 102

    A.    Additional Facts Related to 28 U.S.C. § 1498 .............................................. 102

        1.    Fact Issues Remain for the Jury Concerning Moderna's Fraudulent Inducement of Authorization and Consent.......................................... 102

    B.    Additional Facts Related to DOE.................................................................. 106

ii

C.    Additional Facts Related to Indefiniteness.......................................................111

      1.    The '651 patent defines fully encapsulated.........................................111

      2.    Distinguishing and measuring fully encapsulated mRNA ..................118

**COUNTERSTATEMENT OF FACTS**

## I.     GENERAL FACTS[1]

1.     *On February 28, 2022, Plaintiffs Arbutus and Genevant filed this lawsuit against Moderna, alleging Moderna's COVID vaccine infringes the '069 patent, '359 patent, '668 patent, '435 patent, '651 patent, and '378 patent. D.I. 1. Since filing this lawsuit, and in accordance with the Court's order narrowing patents and claims, D.I. 475, Plaintiffs have narrowed their infringement allegations to the following patents and claims[2]:*

- *Claims 7, 9, 11, 13, and 14 of the '651 patent*

- *Claims 7 and 12 of the '359 patent;*

- *Claims 7, 8, and 16 of the '435 patent;*

- *Claims 2, 7, 13, 18, and 19 of the '378 patent.*

*See [M.] Ex. 14 (June 3, 2025 Letter from F. Elenberg) at 1.*

**RESPONSE:**  Plaintiffs do not dispute this fact, but note that it omits necessary context. Plaintiffs continue to allege that Moderna infringes claims of each of the patents asserted in the Complaint and set forth above. M. Ex. 14 at 1.[3]  Plaintiffs' narrowing of the case for trial, including pursuant to the Court's order, did not indicate that Plaintiffs no longer contend or assert that the claims of the non-selected patents are infringed, or that those patents (including Moderna's knowledge and infringement thereof) are not relevant.  M. Ex. 14 at 1.  By way of example,

---

[1] This counter-statement reproduces the headings from Moderna's Statement of Undisputed Facts. Such reproduction is purely for the Court's convenience and Plaintiffs do not adopt or agree to any of the statements in the headings.

[2] Plaintiffs have not reproduced Moderna's footnotes.

[3] Unless otherwise noted, all emphasis is added, and internal citations and quotations are omitted. Exhibits to the Declarations of Matthew W. Lachman are referred to as "Ex".  Moderna's exhibits are referred to as "M. Ex."

Moderna filed a Petition for Inter Partes Review of the '069 patent, and the USPTO's Patent Trial and Appeal Board issued a Final Written Decision confirming that the challenged claims asserted in this matter are not invalid. *Moderna Therapeutics, Inc. v. Arbutus Biopharms Corp.*, 2020 WL 4237232 (P.T.A.B. July 23, 2020). That determination was affirmed on the merits by the United States Court of Appeals for the Federal Circuit. *ModernaTx, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1364 (Fed. Cir. 2021). The '069 patent IPR proceeding, the evidence from the '069 patent IPR proceeding, and the decisions of the PTAB and Federal Circuit in connection with the '069 patent IPR proceeding continue to be relevant to, *inter alia*, the issues of infringement, willful infringement, damages, the asserted patents' priority date, disclosures of the prior art, written description, and enablement, even though the '069 patent was not selected for assertion at trial. M. Ex. 14 at 1-2.

2. *Each of the asserted claims depend from claim 1 of each respective patent. See Ex. 4 ('651 patent) claims; Ex. 5 ('359 patent) claims; Ex. 6 ('435 patent) claims; Ex. 7 ('378 patent) claims.*

**RESPONSE:** Plaintiffs do not dispute this fact, with the clarification that the claims may depend either directly or indirectly from claim 1 of the respective patents.

## II. FACTS RELATED TO 28 U.S.C. § 1498

### A. U.S. Government Response to the COVID-19 Pandemic

3. *After detection of COVID-19 in the United States, the Secretary of Health and Human Services declared a public health emergency on January 31, 2020, under 42 U.S.C. § 247(d). [M.] Ex. 8 (MRNA-GEN-02657322) at 322.*

**RESPONSE:** Plaintiffs do not dispute the fact that the public health emergency was declared, but dispute the relevance of this fact to the application of 28 U.S.C. § 1498. The Federal

government frequently declares Public Health Emergencies.  Since 2005, there have been over 160 separate Public Health Emergencies, including with respect to the opioid crisis, wildfires, hurricanes, and diseases like monkeypox and the flu.  Administration for Strategic Preparedness & Response, *Declarations of a Public Health Emergency*.[4]  As this Court previously observed in refusing to apply section 1498, the U.S. Government funds numerous products to advance various policy goals, from "IV needles to fight HIV to cancer drugs to fight the war on cancer," and the law does not support Moderna's assertion that section 1498 applies in those instances.  D.I. 31 at 12-13; *see also id.* at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)).  This Court noted that application of section 1498 under this theory would be "particularly" inappropriate here, "where the race to develop a COVID-19 vaccine may have occurred even in the absence of Government involvement and was simply expedited by the national effort to hasten the process."  *Id.* at 13.

4.    *On March 13, 2020, the White House later declared that the COVID-19 outbreak in the United States constituted a national emergency, post-dating the start of the emergency to March 1, 2020. [M.] Ex. 8 (MRNA-GEN-02657322) at 323.*

**RESPONSE:**  Plaintiffs do not dispute the fact that the emergency was declared, but dispute its relevance to the application of 28 U.S.C. § 1498.  The Federal government frequently declares emergencies in different realms that affect numerous industries and transactions.  As of July 2020, there were 37 extant emergencies declared by the Federal Government, including in connection with "Information and Communications Technology and Services Supply Chain,"

---

[4] Administration for Strategic Preparedness & Response, *Declarations of a Public Health Emergency*, https://aspr.hhs.gov/legal/PHE/pages/default.aspx.

3

(Executive Order 13873), and "Regulation of the Anchorage and Movement of Vessels," (Presidential Proclamation 6867).[5]  Although the COVID-19 emergency is no longer extant, so far this calendar year, there have been eight new national emergency declarations, ranging from the production and exploitation of energy to imposing customs duties on various countries.[6]  As this Court previously observed in refusing to apply section 1498, U.S. Government funds numerous products to advance various policy goals, from "IV needles to fight HIV to cancer drugs to fight the war on cancer," and the law does not support Moderna's assertion that Section 1498 applies in those instances.  D.I. 31 at 12-13.  This Court noted that application of Section 1498 under this theory would be "particularly" inappropriate here, "where the race to develop a COVID-19 vaccine may have occurred even in the absence of Government involvement and was simply expedited by the national effort to hasten the process."  *Id.*

5.    *On April 16, 2020, Moderna entered into a grant agreement, the C-34 Contract, with the Biomedical Advanced Research and Development Authority ("BARDA") to support the clinical development of a COVID-19 vaccine. [M.] Ex. 9 (C-34 Contract).*

**RESPONSE:**  Plaintiffs do not dispute the fact that Moderna entered into this agreement, but dispute its relevance.  As this Court previously observed in denying Moderna's partial motion to dismiss concerning the application of section 1498, U.S. Government funds numerous products to advance various policy goals, from "IV needles to fight HIV to cancer drugs to fight the war on cancer," and the law does not support Moderna's assertion that section 1498 applies in those

---

[5] Congressional Research Service, *Declarations Under the National Emergencies Act in Effect* (July 31, 2020), https://www.congress.gov/crs_external_products/LSB/PDF/LSB10545/LSB10545.1.pdf.
[6] *See* Presidential Proclamation No. 10886, 90 FR 8327 (Jan. 20, 2025); Exec. Order No. 14156, 90 FR 8433 (Jan. 20, 2025);Exec. Order No. 14157, 90 FR 8439 (Jan. 20, 2025); Exec. Order No. 14194, 90 FR 9117 (Feb. 1, 2025); Exec. Order No. 14195, 90 FR 9121 (Feb. 1, 2025); Exec. Order No. 14203, 90 FR 9369 (Feb. 6, 2025); Exec. Order No. 14257, 90 FR 15041 (Apr. 2, 2025); Exec. Order No. 14323, 90 FR 37739 (July 30, 2025).

instances.  D.I. 31 at 12-13.  This Court noted that application of Section 1498 under this theory would be "particularly" inappropriate here, "where the race to develop a COVID-19 vaccine may have occurred even in the absence of Government involvement and was simply expedited by the national effort to hasten the process."  *Id.*  This fact is also irrelevant to the application of 28 U.S.C. § 1498 because entry into this contract, or activity under this contract, is not asserted to infringe Plaintiffs' patents or asserted as the basis for a defense under 28 U.S.C. § 1498.  *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

6.    *In the C-34 Contract, the U.S. Government acknowledged that "[d]eveloping and delivering a vaccine for highly transmissible, emerging diseases such as the SAR-CoV-2 [sic] virus requires breaking from traditional approaches." [M.] Ex. 9 (C-34 Contract) at 775. The U.S. Government further described the "critical" importance of domestic production of the COVID-19 vaccine, stating that "[d]omestic production of the vaccine is the only assurance that Americans will have access to the finished product." [M.] Ex. 9 (C-34 Contract) at 775.*

**RESPONSE:**  Plaintiffs do not dispute the fact that the quoted language appears in the contract, but dispute its relevance.  The C-34 Contract was intended to ensure that "Americans will have access" to a COVID-19 vaccine, with the development work described in the contracted intended to facilitate "widespread use under an Emergency Use Authorization (EUA) . . . if the conditions for an EUA are met."  M. Ex. 9 at 775, 777.  Additionally, the contractual language

Moderna cites is not relevant to, and does not support, application of 28 U.S.C. § 1498. *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

7.      *BARDA chose to partner with Moderna to develop the COVID-19 vaccine because "Moderna's mRNA-based vaccine platform has been used to rapidly prepare vaccine candidates against Cytomegalovirus, Zika, Respiratory Syncytial Virus, Influenza, Human Metapneumovirus and Parainfluenza virus." [M.] Ex. 9 (C-34 Contract) at 775.*

**RESPONSE:**  Plaintiffs do not dispute this fact, but it is not relevant to application of 28 U.S.C. § 1498. *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).  In addition, each of the prior vaccines BARDA referenced as using Moderna's "mRNA-based vaccine platform"—Cytomegalovirus (CMV), Zika, Respiratory Syncytial Virus, Influenza, Human Metapneumovirus and Parainfluenza virus—used Plaintiffs' patented LNP technology.  Ex 48 (Mitchell) ¶¶ 261, 265.  The C-34 Contract noted that the contemplated LNPs would be created via "a scaled version of the [LNP process] utilized for the Ph1 and Ph2 manufacturing campaigns," M. Ex. 9 at 779, which likewise used Plaintiffs' patented LNP technology.  Ex 48 (Mitchell) ¶ 392.

8.      *On May 15, 2020, the Trump Administration initiated Operation Warp Speed (led by the Departments of Health and Human Services and Defense), through which the U.S. Government and private companies worked together to develop and bring COVID-19 vaccines to the American public as quickly as possible. [M.] Ex. 10 (MRNA-GEN-02696526) at 527–530.*

**RESPONSE:** Plaintiffs do not dispute that the COVID-19 vaccines Moderna developed were for "the American public." Plaintiffs also do not dispute that Moderna sought to obtain approval for, and commercialize, its COVID-19 "as quickly as possible," including because other Operation Warp Speed candidates (such as Pfizer) were pursuing vaccine development efforts in parallel. M. Ex. 12 at 417. This fact otherwise is not relevant to application of 28 U.S.C. § 1498 and does not support its application. *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

9.      *The U.S. Government adopted a centralized distribution plan for vaccine doses manufactured in connection with Operation Warp Speed. [M.] Ex. 11 (MRNA-GEN-02676917) at 920.*

**RESPONSE:** Plaintiffs do not dispute that the U.S. Government was involved in distribution planning. However, for the doses purchased from Moderna under the C-100 contract, distribution primarily relied on state and local governments and private pharmacies. M. Ex. 63 (Pitts) ¶ 56 (citing HHS data). This effort leveraged "routine immunization infrastructure," and thus relied on "existing plans for vaccine distribution and administration" from "state, local and

7

tribal health departments" with whom the "CDC has worked for decades." M. Ex. 11 at -919. The Government confirmed these doses were not "for the Government." Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers). The recipients and direct beneficiaries of the vaccine were the American public, not the Federal Government. M. Ex. 63 (Pitts) ¶¶ 29-38; M. Ex. 62 (Brill) ¶¶ 40, 51, 65. This fact otherwise is not relevant to application of 28 U.S.C. § 1498 and does not support its application. *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

10. *Specifically, the U.S. Government exercised an option in a preexisting contract with McKesson to deliver specific amounts of vaccine to various locations across the country. [M.] Ex. 11 (MRNA-GEN-02676917) at 920.*

**RESPONSE:** Plaintiffs do not dispute that McKesson served as a government contractor. However, the C-100 doses were never physically possessed by the Government and instead were distributed by Moderna and another contractor, McKesson. Ex 32 (Johnson Tr.) 167:4-12. The recipients and direct beneficiaries of the vaccine were the American public, not the Federal government. M. Ex. 63 (Pitts) ¶¶ 29-38; M. Ex. 62 (Brill) ¶¶ 40, 51, 65; Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis

centers)..  This fact otherwise is not relevant to application of 28 U.S.C. § 1498 and does not support its application.  *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

11.    *"Centralized distribution allow[ed] the government full visibility, control, and ability to shift assets and use data to optimize vaccine uptake." [M.] Ex. 11 (MRNA-GEN-02676917) at 920.*

**RESPONSE:**  Plaintiffs do not dispute the fact that the quoted language appears in the document, but dispute its relevance.  Once it allocated doses to channels like pharmacies and local governments, the Government did not decide how the doses would be distributed within those channels.  Ex 32 (Johnson Tr.) 168:11-169:15.  Ordering and tracking was accomplished through HHS's Vaccine Tracking System, VTrckS.  M. Ex. 11 at 920.  This system pre-dated the pandemic and is used by the Vaccines for Children (VFC) program, which has provided over 70 billion doses of pediatric vaccines to American children.  M. Ex. 63 (Pitts) ¶¶ 46-49.  The Vaccines for Children program served as the model for COVID-19 vaccine distribution.  *Id.*; Ex. 50 (Celebrating 30 Years of VFC) at 15 ("The VFC Program's success in distributing vaccines directly to providers was instrumental in reaching this goal. The program served as a model for shipping COVID-19 vaccines from centralized distribution depots to providers.").  The recipients and direct beneficiaries of the vaccine were the American public, not the Federal Government.  M. Ex. 63 (Pitts) ¶¶ 29-38; M. Ex. 62 (Brill) ¶¶ 40, 51, 65; Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those

doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers). This fact otherwise is not relevant to application of 28 U.S.C. § 1498 and does not support its application. *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

12.     *The U.S. Government pledged that "no American will be charged for either the COVID-19 vaccine or its distribution." [M.] Ex. 11 (MRNA-GEN-02676917) at 923.*

**RESPONSE:**  Plaintiffs do not dispute the fact that the quoted language appears in the document, but dispute its relevance  Congress required private health insurers to cover COVID-19 vaccines, without cost-sharing.  "Section 3203 of the CARES Act (P.L. 116-136) require[d] health insurance issuers and plans to cover any ACIP-recommended COVID-19 preventive service, including vaccines, without cost-sharing within 15 days of such recommendation to the CDC. Once a licensed COVID-19 vaccine [was] recommended by ACIP, and the recommendation [was] adopted by the CDC Director, required coverage for vaccines as preventative services for Medicaid Early and Periodic Screening, Diagnostic and Treatment beneficiaries and the Affordable Care Act provisions for most private insurance coverage and for the Medicaid expansion populations [applied]."  M. Ex. 11 at 923.  Moreover, this fact is not relevant to Moderna's Section 1498 defense because this Court and others have held that payment for a product does not trigger application of 28 U.S.C. § 1498.  *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that

program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982). That is especially true here, where recipients and direct beneficiaries of the vaccine were the American public, not the Federal government. M. Ex. 63 (Pitts) ¶¶ 29-38; M. Ex. 62 (Brill) ¶¶ 40, 51, 65; Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers).

13.     *Moderna was one of a handful of companies selected to participate in Operation Warp Speed. [M.] Ex. 12 (MRNA-GEN-02676415) at 416–18; [M.] Ex. 13 (MRNA-GEN-02670803) at 803–04.*

**RESPONSE:**     Plaintiffs do not dispute that Moderna was selected to participate in Operation Warp Speed. Overall, Operation Warp Speed identified 14 vaccine candidates, which were then narrowed to seven candidates. M. Ex. 12 at 417. This fact is not relevant to application of 28 U.S.C. § 1498 and does not support its application. *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

11

### B.    C-100 Contract

14.    *On August 9, 2020, Moderna entered into a supply contract, the C-100 Contract, with the Army Contracting Command of the U.S. Department of Defense. Ex. 1 (C-100 Contract); [M.] Ex. 15 (Bennett Dep. Tr.) at 255:5–12.*

**RESPONSE**: Plaintiffs do not dispute this fact.

15.    *The first draft of the agreement that became the C-100 Contract, provided by the U.S. Government to Moderna, contained Federal Acquisition Regulation ("FAR") clause 52.227-1, providing the U.S. Government's authorization and consent. [M.] Ex. 16 (C-100 Contract Draft) at 626; see also [M.] Ex. 15 (Bennett Dep. Tr.) at 265:15–268:7 ("Q. This provision was included in the list of incorporated references in the first proposal that went over to Moderna, became the C0100 contract? A. Yes.").*

**RESPONSE:**    Plaintiffs do not dispute the inclusion of those clauses in the draft C-100 contract, but dispute the relevance of that fact to the disputed "for the Government" prong of 28 U.S.C. § 1498.  *See IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1362 (Fed. Cir. 2014) ("[S]tanding alone, a governmental grant of authorization or consent does not mean that the alleged use or manufacture is done 'for the United States' under § 1498(a). To qualify, the alleged use or manufacture must also be done 'for the benefit of the government.'").

16.    *The C-100 Contract provided that Moderna would supply at least 100 million doses that the U.S. Government would "own," to "be distributed and used as part of a COVID-19 vaccination campaign" coordinated by the U.S. Government and made "available to the American people at no cost." [M.] Ex. 1 (C-100 Contract) at 302; [M.] Ex. 13 (MRNA-GEN-02670803) at 803–04.*

**RESPONSE:**    Plaintiffs dispute this fact.  None of the Moderna's quotations appear in the C-100 contract.  Plaintiffs also dispute the relevance of that fact to Moderna's Section 1498 defense

because this Court and others have held that payment for a product does not trigger application of 28 U.S.C. § 1498. *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982). Moreover, the C-100 Contract further noted that it was part of an effort to develop a vaccine in order to "mitigat[e] the impact of COVID-19 on the nation and its people." M. Ex. 1 at 302.

17. *In evaluating Moderna's proposal for the supply contract, the U.S. Government stated that "Moderna is uniquely positioned to have an immediate impact on the United States' COVID-19 pandemic because it is one of the further along among COVID-19 vaccine candidates, having generated promising Phase I clinical data and existing development agreements with the United States Government." [M.] Ex. 17 (DOD_000003510) at 512.*

**RESPONSE:** Plaintiffs do not dispute the existence of the quoted material, but dispute the relevance to the application of 28 U.S.C. § 1498. *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

18.     *The C-100 Contract obligated Moderna to produce and supply 100 million doses of COVID-19 vaccine to the U.S. Government. [M.] Ex. 1 (C-100 Contract) at 302. The C-100 Contract gave the Government the option to purchase additional doses of COVID-19 vaccine. Id.*

**RESPONSE:**  This fact is not relevant to Moderna's Section 1498 defense because this Court and others have held that payment for a product does not trigger application of 28 U.S.C. § 1498.  *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).  That is especially true here, where recipients and direct beneficiaries of the vaccine were the American public, not the Federal government.  M. Ex. 63 (Pitts) ¶¶ 29-38; M. Ex. 62 (Brill) ¶¶ 40, 51, 65; Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers).

19.     *Moderna and the U.S. Government later executed three amendments in which the U.S. Government exercised options for additional doses provided under the C-100 contract. [M.] Ex. 18 (C-100 Contract, Option 1 Exercise); [M.] Ex. 19 (C-100 Contract, Option 2 Exercise); [M.] Ex. 20 (C-100 Contract, Options 3–4 Exercise).*

**RESPONSE**: Plaintiffs do not dispute this fact.

20.     *The C-100 Contract contains the following clause titled "A.1" ([M.] Ex. 1 at 285):*

14

**A.1**    The U.S. Army Contracting Command - Aberdeen Proving Ground (ACC-APG), Natick Division has a requirement for up to 500 million SARS-CoV-2 mRNA-1273 Vaccine doses (100 µg) in support of Joint Program Executive Office - Chemical Biological Radiological Nuclear Defense (JPEO-CBRND), the Assistant Secretary for Preparedness and Response (ASPR), and Biomedical Advanced Research and Development Authority (BARDA). All doses of mRNA-1273 Vaccine referenced herein are 100 µg doses. All doses will be delivered in a multi- dose vial with a volume sufficient for 10 doses per vial.

**RESPONSE:** Plaintiffs do not dispute this fact.

21.    *The C-100 Contract contains the following clause titled "C.1 Scope" ([M.] Ex. 1 at*

*302):*

**STATEMENT OF WORK**
**LARGE SCALE PRODUCTION OF SARS-CoV-2 VACCINE**

C.1    **SCOPE**. The Department of Defense and Health and Human Services (HHS) require large scale manufacturing of vaccine doses in support of the national emergency response to the Coronavirus Disease 2019 (COVID-19) for the United States Government (USG) and the US population.

C.1.1    Background. In December 2019, a novel coronavirus now known as SARS-CoV-2 was first detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the coronavirus disease COVID-19 that has now spread globally. The Secretary of Health and Human Service declared a public health emergency on January 31, 2020, under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID-19. On March 1, 2020, the President of the United States, pursuant to sections 01 and 301 of the National Emergencies Act (50 U.S.C. 1601 et seq.) and consistent with section 1135 of the Social Security Act (SSA), as amended (42 U.S.C. 1320b-5), proclaimed that the COVID-19 outbreak in the United States constitutes a national emergency.

C.1.1.1  Under Operation Warp Speed (OWS), the Department of Defense and HHS are leading a whole of nation effort to ensure development of promising vaccine, diagnostic and therapeutic candidates and ensure that these medical countermeasures are available in the quantities required to reduce SARS-CoV-2 transmission, identify prior and/or current infection, and improve patient care, thereby mitigating the impact of COVID-19 on the nation and its people. The DoD Joint Program Executive Office for Chemical, Biological, Radiological and Nuclear Defense (JPEO-CBRD) is providing expertise and contracting support to HHS, in compliance with PL 115-92 Authorization Letter for DoD Medical Priorities, through an Interagency Agreement, signed April 23, 2020. As OWS products progress to clinical trials to evaluate the safety and efficacy of vaccines and therapeutics, it is critical that, in parallel, the USG supports large scale manufacturing so that vaccine doses or therapeutic treatment courses are immediately available for nationwide access as soon as a positive efficacy signal is obtained and the medical countermeasures are authorized for widespread use.

C.1.2    Objective: The objective of this effort is to obtain the following:

  a.  Base Period: Large scale manufacturing of 100 million vaccine doses
  b.  Option Period 1: Large scale manufacturing of 100 million vaccine doses
  c.  Option Period 2: Large scale manufacturing of 100 million vaccine doses
  d.  Option Period 3: Large scale manufacturing of 100 million vaccine doses
  e.  Option Period 4: Large scale manufacturing of 100 million vaccine doses

The Base Period is 9 months, with overlapping options for a total of 20 months if all options are exercised.

**RESPONSE:**  Plaintiffs do not dispute this fact, but dispute its relevance to Moderna's

Section 1498 defense because this Court and others have held that payment for a product does not

15

trigger application of 28 U.S.C. § 1498.  *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).  That is especially true here, where the contract section above provides that the beneficiaries of the vaccine are the individuals receiving the vaccine, *see* D.I. 64 at 3 ("[C-100 contract] states that vaccine was to be developed to 'improve *patient care*,' thereby 'mitigating the impact of COVID-19 on the nation and its people.'"), as the Government confirmed under oath.  Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers).

22.    *The C-100 Contract contains two FAR clauses providing the U.S. Government's authorization and consent: FAR 52.227-1 and FAR 52.227-1, Alternate I. [M.] Ex. 1 (C-100 Contract) at 329.*

**RESPONSE:**  Plaintiffs do not dispute that the C-100 Contract contains FAR 52.227-1 and FAR 52.227-1, Alternate I.  However, the ultimate issue of Authorization and Consent remains disputed, including because of the considerable evidence of fraudulent inducement.  *See* Pl.'s Responsive Br. at § II.A.3.  This fact is also irrelevant to the disputed "for the government" prong of 28 U.S.C. § 1498.  *See IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1362 (Fed. Cir. 2014) ("[S]tanding alone, a governmental grant of authorization or consent does not mean that the alleged use or manufacture is done 'for the United States' under § 1498(a). To qualify, the alleged use or manufacture must also be done 'for the benefit of the government.'").  The contract further

16

provides that the beneficiaries of the vaccine are the individuals receiving the vaccine, *see* D.I. 64 at 3 "[C-100 contract] states that vaccine was to be developed to 'improve *patient care*,' thereby 'mitigating the impact of COVID-19 on the nation and its people,'" as the Government confirmed under oath, Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers).

23.    *FAR 52.227-1 states:*

(a) *The Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent—*

*(1) Embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract; or*

*(2) Used in machinery, tools, or methods whose use necessarily results from compliance by the Contractor or a subcontractor with (i) specifications or written provisions forming a part of this contract or (ii) specific written instructions given by the Contracting Officer directing the manner of performance. the entire liability to the Government for infringement of a United States patent shall be determined solely by the provisions of the indemnity clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract), and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.*

(b) *The Contractor shall include the substance of this clause, including this paragraph (b), in all subcontracts that are expected to exceed the simplified acquisition threshold, as defined in Federal Acquisition Regulation (FAR) 2.101 on the date of subcontract award. However, omission of this clause from any subcontract, including those at or below the simplified acquisition threshold, as defined in FAR 2.101 on the date of subcontract award, does not affect this authorization and consent.*

*48 CFR § 52.227-1.*

17

**RESPONSE**: Plaintiffs do not dispute the existence of this clause, but that fact is irrelevant to the disputed "for the government" prong of 28 U.S.C. § 1498. *See IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1362 (Fed. Cir. 2014) ("[S]tanding alone, a governmental grant of authorization or consent does not mean that the alleged use or manufacture is done 'for the United States' under § 1498(a). To qualify, the alleged use or manufacture must also be done 'for the benefit of the government.'").

24.    *FAR 52.227-1, Alternate I states:*

(a) *The Government authorizes and consents to all use and manufacture of any invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier.*

(b) *The Contractor shall include the substance of this clause, including this paragraph (b), in all subcontracts that are expected to exceed the simplified acquisition threshold, as defined in Federal Acquisition Regulation (FAR) 2.101 on the date of subcontract award. However, omission of this clause from any subcontract, including those at or below the simplified acquisition threshold, as defined in FAR 2.101 on the date of subcontract award, does not affect this authorization and consent.*

*48 CFR § 52.227-1, Alt. I.*

**RESPONSE:** Plaintiffs do not dispute the existence of this clause, but that fact is irrelevant to the disputed "for the government" prong of 28 U.S.C. § 1498. *See IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1362 (Fed. Cir. 2014) ("[S]tanding alone, a governmental grant of authorization or consent does not mean that the alleged use or manufacture is done 'for the United

States' under § 1498(a). To qualify, the alleged use or manufacture must also be done 'for the benefit of the government.'").

25.    *Moderna received Emergency Use Authorization for its COVID-19 vaccine in the U.S. from the FDA on December 18, 2020. [M.] Ex. 23 (MRNA-GEN-02463357) at 358; D.I. 1 at 7.*

**RESPONSE**: This fact is not disputed but is irrelevant to application of 28 U.S.C. § 1498.

26.    *The Emergency Use Authorization allowed the vaccine to be distributed and administered as a medical countermeasure for COVID-19. [M.] Ex. 23 (MRNA-GEN-02463357) at 359; [M.] Ex. 24 (MRNA-GEN-02677440) at 440.*

**RESPONSE:**    The Emergency Use Authorization does not refer to the vaccine as a "medical countermeasure," but it does provide for the distribution of the vaccine and the administration to individuals ages 18 and older.  M. Ex. 23 at 359.  This fact is not otherwise disputed, but it is irrelevant to application of 28 U.S.C. § 1498.

27.    *The Emergency Use Authorization conditions specified that Moderna would supply the vaccine to be distributed "as directed by the U.S. government." [M.] Ex. 23 (MRNA-GEN-02463357) at 359.*

**RESPONSE:**    Plaintiffs do not dispute that the quoted language appears in the document, but note that Moderna omitted necessary context.  The Emergency Use Authorization ("EUA") provided the vaccine should be distributed to "public health agenc[ies] and [their] delegates," which it referred to as "emergency response stakeholder[s]," as directed by the U.S. Government. M. Ex. 23 at 359.  The EUA provided examples such as "a local health department" or "a pharmacy [that] is acting in an official capacity under the authority of the state health department to administer COVID-19 vaccines."  *Id.*  The FDA controls the scope of the distribution of "all non-

over-the-counter drugs" and similar restrictions on distribution can be found in other EUAs, including those predating the COVID-19 pandemic.  M. Ex. 63 (Pitts) ¶ 57.  Most C-100 doses were actually distributed by non-federal entities: Jurisdictions (e.g. state and local governments), Pharmacies (such as CVS or Walgreens), and dialysis centers.  Ex 32 (Johnson Tr.) 100:3-16.; M. Ex. 63 (Pitts) ¶ 51.  Once it allocated doses to these channels (like pharmacies and local governments), the Government did not decide how the doses would be distributed within those channels.  Ex 32 (Johnson Tr.) 168:11-169:15.  The Government confirmed these doses were not "for the Government."  *Id.* at 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers).

28.    *Under the C-100 Contract, "Moderna supplied vaccine to the CDC at one of two distribution depots in the United States. Once that product was delivered to the depots, the CDC took responsibility for allocating that product among the jurisdictions and distributing that to jurisdictions." [M.] Ex. 15 (Bennett Dep. Tr.) at 347:19–348:4; see also [M.] Ex. 25 (Thomas Dep. Tr.) at 32:19–22 ("Moderna would provide vaccine to the U.S. government distribution hubs. The U.S. government would then distribute to the vaccination sites.").*

**RESPONSE:**  Plaintiffs dispute this fact.  Notably, Moderna cuts off its excerpt of the Thomas Deposition, M. Ex. 25, at page 32, just before Mr. Thomas agrees that vaccination sites "were providing the vaccine to the ***American public.***"  Ex 51 (Thomas Tr.) 33:3-6.  Moderna's factual assertion is also incorrect because the U.S. Government's acceptance of delivery from Moderna occurred while the doses were still at a Moderna facility.  Ex 32 (Johnson Tr.) 90:12-92:1 ("Moderna would release a lot. We would accept that lot. That lot typically at time of acceptance was either at the Moderna manufacturing facility or at the Moderna VMI facility.").

The U.S. government "did not take physical possession. [The doses] would go from Moderna to [another contractor,] McKesson." Ex 32 (Johnson Tr.) 92:13-18. This fact is also irrelevant to application of 28 U.S.C. § 1498. *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

29.      *The C-100 Contract specified that lots of the COVID-19 vaccine would be accepted by the U.S. Government when Moderna produced a certificate of analysis confirming that the lot met the U.S. Government's technical requirements. [M.] Ex. 1 (C-100 Contract) at 308; [M.] Ex. 22 (Thomas Decl.) ¶ 6.*

**RESPONSE:**   Plaintiffs do not dispute that the contractual provision, but note that Moderna omitted necessary context.   The U.S. Government's acceptance of delivery from Moderna occurred while the doses were still at a Moderna facility.   Ex 32 (Johnson Tr.) 90:12-92:1 ("Moderna would release a lot. We would accept that lot. That lot typically at time of acceptance was either at the Moderna manufacturing facility or at the Moderna VMI facility."). The U.S. government "did not take physical possession. [The doses] would go from Moderna to [another contractor,] McKesson." Ex 32 (Johnson Tr.) 92:13-18. This fact is also irrelevant to application of 28 U.S.C. § 1498. The FDA requires Certificates of Analysis for all pharmaceutical manufacturing, Ex 52 (FDA, *Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients*)[7] at 11.40 ("Authentic certificates of analysis should be issued for

---

[7] Food and Drug Administration, *Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients* (Sept. 2016), https://www.fda.gov/media/71518/download

each batch of intermediate or [active pharmaceutical ingredient] on request."),  making that requirement here indistinct from any other vaccine or drug sold in the U.S.

30.    *The C-100 Contract specified that lots may be accepted by the U.S. Government while stored for the U.S. Government at Moderna's facilities or accepted upon delivery to a U.S.-designated location. [M.] Ex. 1 (C-100 Contract) at 303, 312–316; [M.] Ex. 25 (Thomas Dep. Tr.) at 125:1– 126:6. Not all doses that were sold under the C-100 Contract were ultimately directed by the U.S. Government to be shipped to U.S. Government-designated location. [M.] Ex. 25 (Thomas Dep. Tr.) at 147:21–153:15; [M.] Ex. 26 (Santoli Dep. Tr.) at 52:6–53:4; [M.] Ex. 27 (Johnson Dep. Tr.) at 92:2–18; [M.] Ex. 22 (Thomas Decl.) ¶¶ 4–7.*

**RESPONSE:**  Plaintiffs do not dispute this fact, but note that Moderna omitted necessary context.  Acceptance of delivery from Moderna occurred while the doses were still at a Moderna facility.  Johnson Tr. 90:12-92:1 ("Moderna would release a lot. We would accept that lot. That lot typically at time of acceptance was either at the Moderna manufacturing facility or at the Moderna VMI facility.").  The U.S. government "did not take physical possession.  [The doses] would go from Moderna to [another contractor,] McKesson."  Johnson Tr. 92:13-18.  The overwhelming majority of the doses were provided to the public, through non-federal entities like state and local governments and pharmacies.  *See* Ex 31 (HHS Distribution Data); M. Ex. 63 (Pitts) ¶¶ 50-56 (summarizing HHS data).  The Government confirmed these doses were not "for the Government."  Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers).  This fact is also irrelevant to application of 28 U.S.C. § 1498.  *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest

is too remote 'to make the government the program's beneficiary for the purposes underlying §

1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson*

*v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp.

581, 588 (S.D.N.Y. 1982).

31.    *The doses manufactured, released, sold and delivered to the U.S. Government-designed sites under the C-100 Contract were tracked in U.S. Government batch trackers. [M.] Ex. 40 (MRNA-GEN-00459217); [M.] Ex. 22 (Thomas Decl.) ¶¶ 4–7.*

**RESPONSE:**  Plaintiffs do not dispute this fact, but note that Moderna omitted necessary

context.  The dose tracking data obtained from the Department of Health and Human Services

confirms that the overwhelming majority of the doses were provided to the public, through non-

federal entities like state and local governments and pharmacies.  *See* Ex 31 (HHS Distribution

Data); M. Ex. 63 (Pitts) ¶¶ 50-56 (summarizing HHS data).  The Government confirmed these

doses were not "for the Government."  Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses,

once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."),

103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers).  The fact that spreadsheets were

used to track the distribution of vaccine doses is otherwise irrelevant to application of 28 U.S.C. §

1498.

32.    *The number of COVID-19 doses accepted by the U.S. Government and sold is*

*reflected in Moderna's sales data. [M.] Ex. 28 (C-100 Doses Spreadsheet). In total, Moderna sold*

*500,001,540 doses of COVID-19 vaccine to the U.S. Government under the C-100 Contract. [M.]*

*Ex. 28 (C-100 Doses Spreadsheet) at Column E (identifying doses shipped to Government under*

*C- 100 Contract); [M.] Ex. 25 (Thomas Dep. Tr.) at 74:19–77:20 (Moderna's 30(b)(6) witness*

*confirming that C-100 Doses Spreadsheet "contain[s] all of the sales to the U.S. government under*

*the C-100 contract"); [M.] Ex. 22 (Thomas Decl.) ¶ 8; [M.] Ex. 29 (Lawton Op. Rpt.) ¶ 1618*

*(Plaintiffs' damages expert agreeing that 500,001,540 doses were sold to Government pursuant to*

*C-100 Contract).*

**RESPONSE:**  Plaintiffs do not dispute this fact, but note that Moderna omitted necessary

context.  The overwhelming majority of the doses were provided to the public, through non-federal

entities like state and local governments and pharmacies.  *See* Ex 31 (HHS Distribution Data); M.

Ex. 63 (Pitts) ¶¶ 50-56 (summarizing HHS data).  The Government confirmed these doses were

not "for the Government."  Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they

went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-

104:10 (pharmacies), 106:20-107:20 (dialysis centers).  The fact of the Government's purchase of

the doses is not relevant to whether it is "for the Government" and the application of 28 U.S.C §

1498.  *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or

funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote

'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting

*Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*,

26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y.

1982).

33.    *In total, the U.S. Government spent $8,204,861,628 purchasing the C-100 doses*

*from Moderna. [M.] Ex. 28 (C-100 Doses Spreadsheet) at Column F (identifying revenue*

*associated with each shipment under the C-100 Contract); [M.] Ex. 22 (Thomas Decl.) ¶ 8.*

**Response:**  Plaintiffs do not dispute this fact, but dispute the relevance of this fact to

whether the infringement was "for the Government" and to the application of 28 U.S.C § 1498.

*See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds

or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

34.    *Amendment No. P00031 to the C-100 Contract, dated August 9, 2020, modified the total funded value of the C-100 Contract to $8,204,906,278.12. [M.] Ex. 21 (MRNA-GEN-00457581); [M.] Ex. 22 (Thomas Decl.) ¶ 9.*

**RESPONSE:**  Plaintiffs do not dispute this fact, but it is irrelevant to application of 28 U.S.C. § 1498.  *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

35.    *There were various exhibits and executed amendments to the C-100 Contract that Moderna and the U.S. Government produced during discovery. See, e.g. MRNA-GEN-00078981; MRNA-GEN-00079015;   MRNA-GEN-00079018;   MRNA-GEN-00937552;   MRNA-GEN-00079041;  MRNA-GEN-00079769;  MRNA-GEN-00079781;  MRNA-GEN-00078997;  MRNA-GEN-00079566;   MRNA-GEN-00078999;   MRNA-GEN-00079001;   MRNA-GEN-00079554; MRNA-GEN-00079066;   MRNA-GEN-00079013;   MRNA-GEN-00079122;   MRNA-GEN-00079540;  MRNA-GEN-00079351;  MRNA-GEN-00079514;  MRNA-GEN-00079367;  MRNA-GEN-00078969;   MRNA-GEN-00078953;   MRNA-GEN-00078957;   MRNA-GEN-00079245;*

MRNA-GEN-00079098;    MRNA-GEN-00079524;    MRNA-GEN-00079268;    MRNA-GEN-00079257;    MRNA-GEN-00079232;    MRNA-GEN-00079112;    MRNA-GEN-00079379;    MRNA-GEN-00079384;    MRNA-GEN-00079390;    MRNA-GEN-00079404;    MRNA-GEN-00079512;    MRNA-GEN-00079510;    MRNA-GEN-00079568;    MRNA-GEN-00456319;    MRNA-GEN-00456332;    MRNA-GEN-00457581.    Plaintiffs have not disclosed any factual contentions regarding the exhibits or amendments in connection with § 1498; therefore, Moderna did not attach them to this Motion for Summary Judgment._

**RESPONSE:**  Plaintiffs do not dispute that these documents were produced during discovery.  However, Moderna bears the burden of proof as to its affirmative defense under Section 1498, *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1381 (Fed. Cir. 2002), and must set forth sufficient evidence regardless of contentions disclosed or not disclosed by Plaintiffs.

### C.  Additional Benefits to the U.S. Government

36.  *The U.S. Government's mass vaccination campaign, conducted in part using doses purchased under the C-100 Contract, allowed the U.S. Government to facilitate the reopening and recovery of the country and the economy. [M.] Ex. 30-A (Rutherford Op. Rpt.) ¶¶ 62–90; [M.] Ex. 31-A (Vellturo Op. Rpt.) ¶¶ 35–52.*

**RESPONSE:**  Plaintiffs dispute that Moderna has cited evidence establishing the extent to which "reopening and recovery of the country and the economy" was facilitated by the mass vaccination campaign.   "[M]edical care is provided for the benefit of the patient, not the government."  D.I. 64 at 3 (quoting *Larson*, 26 Cl. Ct. at 369).  While it may have had indirect effects on the Government, the "reopening and recovery of the country and the economy" directly benefitted the American people.  M. Ex. 62 (Brill) ¶ 65.  None of Moderna's citations establish that these are "additional benefits to the U.S. Government."  This fact is therefore irrelevant to application of 28 U.S.C. § 1498.  The recipients and direct beneficiaries of the vaccine were the

American people, not the Government, as the C-100 contract reflects and the Government confirmed under oath in discovery. *See* D.I. 64 at 3 ("[C-100 contract] states that vaccine was to be developed to 'improve *patient care*,' thereby 'mitigating the impact of COVID-19 on the nation and its people.'"); Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers).

37.    *Both the Trump and Biden White Houses identified bringing a vaccine to the public as a key government objective, with the Biden White House stating that "[t]he health and economic security of our nation depend on it." E.g., [M.] Ex. 32 (MRNA-GEN-02673093) at 093; [M.] Ex. 10 (MRNA- GEN-02696526) at 527–28; [M.] Ex. 33 (Brill Dep. Ex. 3) at 2–4, 6, 8.*

**RESPONSE:**  Plaintiffs do not dispute that the Government wanted to "bring[] a vaccine to the **public.**"  That the recipients and direct beneficiaries of the vaccine were the public, rather than the Government, is reflected in the C-100 contract reflects and was confirmed by the Government under oath in discovery. *See* D.I. 64 at 3 ("[C-100 contract] states that vaccine was to be developed to 'improve *patient care*,' thereby 'mitigating the impact of COVID-19 on the nation and its people.'"); Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers).

38.    *Specifically, the U.S. Government's mass vaccination campaign resulted in reduced transmission of COVID-19, leading to a decrease in severe infections, hospitalizations, and deaths from COVID-19, as well as healthcare savings to the U.S. Government. [M.] Ex. 30-A (Rutherford Op. Rpt.) ¶¶ 74–75; [M.] Ex. 34 (MRNA-GEN-02657270) at 270 (estimating $2.95 trillion in healthcare savings as a result of COVID-19 vaccines).*

27

**RESPONSE:**  Plaintiffs dispute this fact.  The cited sources do not identify healthcare savings to the U.S. government.  Moderna's Exhibit 34 concerns an estimate of individuals' willingness to pay for "health benefits," but it does not state that there were "$2.95 trillion in healthcare savings as a result of COVID-19 vaccines."  M. Ex. 34 at 270.  Instead, it contains a range of valuations for the "health benefits of COVID-19 vaccination," which it calculates based on "the maximum amount of money an individual would willingly exchange to reduce one's risk of getting infected with COVID-19, being hospitalized with COVID-19 or dying of COVID-19." *Id.* at 270.  In other words, the cited study is calculating the benefits to "***individual[s]"***, not the Government, and estimates that individuals would have been willing to pay a collective $2.95 trillion for those benefits.  *Id.*  That figure thus does not represent "healthcare savings," and certainly not savings to the Government.  The high value of the individual health benefits is further evidence that the recipients and direct beneficiaries of the vaccine were the American public, not the Federal government.  M. Ex. 63 (Pitts) ¶¶ 29-38; M. Ex. 62 (Brill) ¶¶ 40, 51, 65; Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers).

39.    *Dr. Rutherford, a renowned public health expert with decades of experience in federal, state, and local public health departments, explained the federal government's longstanding role in safeguarding the public health. [M.] Ex. 30-A (Rutherford Op. Rpt.) ¶¶ 27–35. COVID-19 vaccines like Moderna's enabled the Government to achieve this objective by implementing a mass vaccination program, allowing society to reopen and recover. [M.] Ex. 30-A (Rutherford Op. Rpt.) ¶¶ 62–90; [M.] Ex. 31-A (Vellturo Op. Rpt.) ¶¶ 35–52.*

**RESPONSE:**  Plaintiffs dispute this fact.  Dr. Rutherford acknowledged that the direct

28

benefits of the vaccine accrue to the person who gets the shot, opining that "those who received the vaccine were less likely to develop asymptomatic infection, symptomatic infection, and severe infection." M. Ex. 30 (Rutherford) ¶ 71. While it may have had indirect effects to the Government, the "reopening and recovery of the country and the economy" directly benefit the American people. M. Ex. 62 (Brill) ¶ 65. None of Moderna's citations establish that these are "additional benefits to the U.S. Government." Moreover, whether the Government has an interest in public health is not relevant to the application of 28 U.S.C. § 1498. *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

40.    *By December 2021, the Government estimated that the vaccines were associated with 213,000 fewer deaths, 1.38 million fewer hospitalizations, and 25.32 million fewer cases. [M.] Ex. 34 (MRNA-GEN-02657270) at 270, 278–84.*

**RESPONSE**:  Plaintiffs do not dispute that COVID-19 vaccination resulted in fewer deaths, hospitalizations, and infections, but dispute the relevance of that fact to the application of 28 U.S.C. § 1498. Moderna's expert, Dr. Rutherford, confirmed that "those who received the vaccine were less likely to develop asymptomatic infection, symptomatic infection, and severe infection." M. Ex. 30 ¶ 71. As a result, these statistics reflect direct benefits of the vaccine to the individuals who did not die, or were not hospitalized, or avoided the infection. This is further evidence that the recipients and direct beneficiaries of the vaccine, including the doses at issue in the C-100 contract, were the American public, not the Federal government. M. Ex. 63 (Pitts)

¶¶ 29-38; M. Ex. 62 (Brill) ¶¶ 40, 51, 65; Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers).

41.    *The Government also estimated that COVID-19 vaccines saved approximately $2.95 trillion in healthcare and economic costs. [M.] Ex. 34 (MRNA-GEN-02657270) at 270, 285–86.*

**RESPONSE**:    Plaintiffs dispute this fact.   The Government did not "estimate[] that COVID-19 vaccines saved approximately $2.95 trillion in healthcare and economic costs," as the "$2.95 trillion" does not refer to "healthcare and economic costs."  M. Ex. 34 at 270.  Instead, it attempts to value the "health benefits of COVID-19 vaccination," which are calculated based on "the maximum amount of money an individual would willingly exchange to reduce one's risk of getting infected with COVID-19, being hospitalized with COVID-19 or dying of COVID-19."  *Id.* at 270.  In other words, estimates that individuals would have been willing to pay a collective $2.95 trillion for those benefits.  *Id.*  That figure does not represent "healthcare savings."  Nor is it a benefit to the Government—the study calculating the amount "***individual[s]*"** would pay to avoid the negative health consequences of COVID-19.  *Id.*

42.    *Dr. Vellturo, an economist, calculated that the C-100 Contract saved the Government approximately $8 billion in costs associated with COVID-19 hospitalizations in 2021 alone, covering the total cost of the contract to the Government. [M.] Ex. 31-A (Vellturo Op. Rpt.) 35–52.*

**RESPONSE**:    Plaintiffs dispute this fact.  Dr. Vellturo's analysis is one-sided, ignoring evidence that would reduce or eliminate his claimed savings.  Most significantly, Dr. Vellturo does not consider the impact of greater longevity on the federal budget.  M. Ex. 62 (Brill) ¶¶ 43-

49.  Analyses by the Congressional Budget Office and in academic research have found that most preventive care—while potentially valuable to individual patents—does not lead to cost savings.  *Id.* ¶¶ 45, 47, 51.  Living longer means "people may develop other ailments that increase lifetime health care costs" and can increase federal outlays in other programs, like Social Security.  *Id.*  This is why the Congressional Budget Office analyzes costs with the understanding that "preventive medical services may reduce costs initially (by averting disease) but increase costs over time (as longevity increases and patients develop unrelated medical conditions that require treatment)."  Ex 53 (Cong. Budget Off., *How CBO Analyzes Approaches to Improve Health Through Disease Prevention*) at 035.  Dr. Vellturo ignored the second half of this guidance, and even presuming the Government's financial benefit is relevant, failed to calculate benefits as the Government would.  Further, Dr. Vellturo ignores state cost-sharing for Medicaid; states paid 30.5% of Medicaid costs in 2021, reducing his calculated cost savings by $610 million.  M. Ex. 62 (Brill) ¶ 42.  Moreover, this fact is not relevant to Moderna's Section 1498 defense because this Court and others have held that the Government's interest in a program does not trigger application of 28 U.S.C. § 1498.  *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

43.  *One of the U.S. Government's strategies in entering the C-100 Contract was to "allow[] for consideration for international assistance if doses obtained exceed what is necessary for the US." [M.] Ex. 35 (HHS-0000414) at 415.*

31

**RESPONSE**:   Plaintiffs dispute this fact.   Moderna has not offered evidence that international assistance was a U.S. Government strategy "in entering the C-100 Contract."   The cited memorandum, M. Ex. 35, is from a different Administration than the one that signed the C-100 Contract, and is dated February 5, 2021—six months after the Government had entered C-100 Contract.   Moreover, this fact is not relevant to Moderna's Section 1498 defense because this Court and others have held that the Government's interest in a program does not trigger application of 28 U.S.C. § 1498.   *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

44.     *In addition to the immediate benefit of securing sufficient doses available for the Government to deploy across the United States, the Government's procurement of COVID-19 vaccine under the C-100 Contract allowed the Government to ship doses abroad. [M.] Ex. 30-A (Rutherford Op. Rpt.) ¶¶ 80–85.*

**RESPONSE**:   Plaintiffs dispute this fact.   The Government did donate doses abroad, but Moderna has not offered evidence establishing that the donation of COVID-19 doses advanced any U.S. interest, let alone that it was for the Government's benefit.   "The fact that the government has an interest in [a] program generally, or funds or reimburses all or part of its costs, is too remote to make the government the program's beneficiary for the purposes underlying § 1498."   *Larson v. United States*, 26 Cl. Ct. 365, 369 (1992).

45. *Discovery from the Government confirms its strategy in contracting for the doses was to "allow[] for consideration for international assistance if doses obtained exceed what is necessary for the US." [M.] Ex. 35 (HHS-0000414) at 415.*

**RESPONSE:** Plaintiffs dispute this fact. The cited memorandum does not reflect the Government's strategy when it "contract[ed] for the doses" in August 2020. The memorandum, M. Ex. 35, is from a different Administration than the one that signed the C-100 Contract, and is dated February 5, 2021—six months after the Government had entered C-100 Contract. Moreover, this fact is not relevant to Moderna's Section 1498 defense because this Court and others have held that the Government's interest in a program does not trigger application of 28 U.S.C. § 1498. *See* D.I. 31 at 9 ("Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" (quoting *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015)); *see also Larson v. United States*, 26 Cl. Ct. 365, 369 (1992); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

46. *The policy benefits of this strategy are twofold: the Government was able to use the COVID-19 vaccine as an important foreign policy tool while simultaneously safeguarding the United States and its people by reducing the global spread of COVID-19. [M.] Ex. 30-B (Rutherford Reply Rpt.) ¶¶ 41–42.*

**RESPONSE:** Plaintiffs dispute this fact. Moderna has not offered evidence that "the Government was able to use the COVID-19 vaccine as an important foreign policy tool" or that the donation of COVID-19 doses advanced any U.S. interest. Indeed, the United States affirmatively pledged *not* to use donated doses "to secure favors from other countries." Ex 54 (Global Vaccine Sharing Fact Sheet) at 627; M. Ex. 63 (Pitts) ¶ 53. And President Biden issued a

33

statement that the U.S. was not donating doses "to secure favors or extract concessions."  M. Ex. 39 at 630.  By Spring 2022, little leverage would have been available, with the Government recognizing that millions of doses of the Moderna vaccine were "expiring on the shelf, *especially given the lack of global demand even for donations.*"  Ex 55 (Apr. 2022 Funding Memo) at 394.  Moreover, "the fact that the government has an interest in [a] program generally, or funds or reimburses all or part of its costs, is too remote to make the government the program's beneficiary for the purposes underlying § 1498."  *Larson v. United States*, 26 Cl. Ct. 365, 369 (1992).

Nor does Moderna offer any evidence that the donated doses actually "reduc[ed] the global spread of COVID-19."  It cites only to Dr. Rutherford's speculation, but he conceded that he could not tie any benefits specifically to doses donated by the U.S.  Ex 56 (Rutherford Tr.) 138:6-139:15.

47.      *Acquiring excess doses of COVID-19 vaccine under the C-100 Contract allowed the U.S. Government to provide vaccine doses to developing countries, fulfilling foreign diplomacy objectives and slowing the global spread of COVID-19. [M.] Ex. 30-A (Rutherford Op. Rpt.) 80–85; [M.] Ex. 30-B (Rutherford Reply Rpt.) ¶¶ 41–42.*

**RESPONSE:**  Plaintiffs dispute this fact.  Moderna has not offered evidence that donations "fulfilled foreign diplomacy objectives" or that the donation of COVID-19 doses advanced any U.S. interest.  Indeed, the United States affirmatively pledged *not* to use donated doses "to secure favors from other countries."  Ex 54 (Global Vaccine Sharing Fact Sheet) at 627; M. Ex. 63 (Pitts) ¶ 53.  And President Biden issued a statement that the U.S. was not donating doses "to secure favors or extract concessions."  M. Ex. 39 at 630.  By Spring 2022, little leverage would have been available, with the Government recognizing that millions of doses of the Moderna vaccine were "expiring on the shelf, *especially given the lack of global demand even for donations.*"  Ex 55 (Apr. 2022 Funding Memo) at 394.  Moreover, "the fact that the government has an interest in [a]

program generally, or funds or reimburses all or part of its costs, is too remote to make the government the program's beneficiary for the purposes underlying § 1498." *Larson v. United States*, 26 Cl. Ct. 365, 369 (1992).

Nor does Moderna offer any evidence that the donated doses actually "slow[ed] the global spread of COVID-19." It cites only to Dr. Rutherford's speculation, but he conceded that he could not tie any benefits specifically to doses donated by the U.S. Ex 56 (Rutherford Tr.) 138:6-139:15.

48.     *The Government engaged in vaccine diplomacy by donating vaccines directly to developing countries and provided doses to international partners through programs like COVAX, the United Nations-sponsored program to bring COVID-19 vaccines to the world. [M.] Ex. 36 (MRNA- GEN-02669317).*

**RESPONSE:** Plaintiffs dispute this fact. Moderna has not offered evidence that the Government engaged in "vaccine diplomacy," or that the donation of COVID-19 doses advanced any U.S. interest. "The fact that the government has an interest in [a] program generally, or funds or reimburses all or part of its costs, is too remote to make the government the program's beneficiary for the purposes underlying § 1498." *Larson v. United States*, 26 Cl. Ct. 365, 369 (1992). Indeed, the United States affirmatively pledged not to use donated doses "to secure favors from other countries." Ex 54 (Global Vaccine Sharing Fact Sheet) at 627; M. Ex. 63 (Pitts) ¶ 53. And President Biden issued a statement that the U.S. was not donating doses "to secure favors or extract concessions." M. Ex. 39 at 630. Moreover, by Spring 2022, little leverage would have been available, with the Government recognizing that millions of doses of the Moderna vaccine were "expiring on the shelf, *especially given the lack of global demand even for donations.*" Ex 55 (Apr. 2022 Funding Memo) at 394.

35

49.    *In 2021, the White House described the United States's provision of COVID-19 vaccines to the world as "American leadership on a global stage" and the "need to reassert America's leadership in the world in the fight against this and future public health threats." [M.] Ex. 37 (MRNA-GEN-02119128) at 155; [M.] Ex. 38 (MRNA-GEN-02670578) at 581.*

**RESPONSE:**  Plaintiffs do not dispute the appearance of the quoted language in the document but dispute whether the cited rhetoric is evidence that the donation of COVID-19 doses advanced any U.S. interest.  "The fact that the government has an interest in [a] program generally, or funds or reimburses all or part of its costs, is too remote to make the government the program's beneficiary for the purposes underlying § 1498."  *Larson v. United States*, 26 Cl. Ct. 365, 369 (1992).  Moreover, the United States affirmatively pledged not to use donated doses "to secure favors from other countries."  Ex 54 (Global Vaccine Sharing Fact Sheet) at 627; M. Ex. 63 (Pitts) ¶ 53.  And President Biden issued a statement that the U.S. was not donating doses "to secure favors or extract concessions."  M. Ex. 39 at 630.  Moreover, by Spring 2022, little leverage would have been available, with the Government recognizing that millions of doses of the Moderna vaccine were "expiring on the shelf, *especially given the lack of global demand even for donations*."  Ex 55 (Apr. 2022 Funding Memo) at 394.

50.    *The White House considered this strategy vital to national security because "ending this pandemic means ending it everywhere" and "[a]s long as this pandemic is raging anywhere in the world, the American people will still be vulnerable." [M.] Ex. 39 (GENV-01086629) at 629.*

**RESPONSE:**  Plaintiffs do not dispute the appearance of the quoted language in the document but dispute whether the cited rhetoric is evidence that the donation of COVID-19 doses advanced any U.S. interest.  "The fact that the government has an interest in [a] program generally, or funds or reimburses all or part of its costs, is too remote to make the government the program's

beneficiary for the purposes underlying § 1498." *Larson v. United States*, 26 Cl. Ct. 365, 369 (1992).  Providing vaccines to individuals in foreign countries benefited those individuals, not the U.S. Government.  That "[m]edical care is provided for the benefit of the patient, not the government," D.I. 64 at 3 (quoting *Larson*, 26 Cl. Ct. at 369), remains true when that individual is in another country.  Moreover, by Spring 2022, the Government recognized that millions of doses of the Moderna vaccine were "expiring on the shelf, *especially given the lack of global demand even for donations.*"  Ex 55 (Apr. 2022 Funding Memo) at 394.

51.    *Dr. Christopher Vellturo calculated that the C-100 Contract resulted in $8.13–8.21 billion in Medicare and Medicaid savings from estimated reductions in COVID-19 hospitalizations in calendar year 2021 alone. [M.] Ex. 31-A (Vellturo Op. Rpt.) ¶ 42; [M.] Ex. 31-B (Vellturo Reply Rpt.) ¶¶ 40–41.*

**RESPONSE:**  Plaintiffs dispute this fact.  Dr. Vellturo's analysis is one-sided, ignoring evidence that would reduce or eliminate his claimed savings.  Most significantly, Dr. Vellturo does not consider the impact of greater longevity on the federal budget.  M. Ex. 62 (Brill)  ¶¶ 43-49.  Analyses by the Congressional Budget Office and in academic research have found that most preventive care—while potentially valuable to individual patents—does not lead to cost savings. *Id.* ¶¶ 45, 47, 51.  Living longer means "people may develop other ailments that increase lifetime health care costs" and can increase federal outlays in other programs, like Social Security. *Id.*  This is why the Congressional Budget Office analyzes costs with the understanding that "preventive medical services may reduce costs initially (by averting disease) but increase costs over time (as longevity increases and patients develop unrelated medical conditions that require treatment)."  Ex 53 (Cong. Budget Off., *How CBO Analyzes Approaches to Improve Health Through Disease Prevention*) at 035.  Dr. Vellturo ignored the second half of this guidance, and

even presuming the Government's financial benefit is relevant, failed to calculate benefits as the Government would.  Further, Dr. Vellturo ignores state cost-sharing for Medicaid; states paid 30.5% of Medicaid costs in 2021, reducing his calculated cost savings by $610 million.  M. Ex. 62 (Brill) ¶ 42.  This fact is also irrelevant, because additional revenue as a "byproduct" of infringement does not establish that the infringement was "for the Government."  *Riles v. Amerada Hess Corp.*, 999 F. Supp. 938, 940 (S.D. Tex. 1998) (Government's receipt of a royalty from defendant's oil drilling using a patented drilling method did not make infringing use "for the Government").

52.    *The savings in 2021 alone approximately offset the total cost of the C-100 Contract, benefitting the U.S. Government. [M.] Ex. 31-A (Vellturo Op. Rpt.) ¶ 42; [M.] Ex. 31-B (Vellturo Reply Rpt.) ¶¶ 40–41.*

**RESPONSE:**  Plaintiffs dispute this fact.  Dr. Vellturo's analysis is one-sided, ignoring evidence that would reduce or eliminate his claimed savings.   Most significantly, Dr. Vellturo does not consider the impact of greater longevity on the federal budget.  M. Ex. 62 (Brill)  ¶¶ 43-49.  Analyses by the Congressional Budget Office and in academic research have found that most preventive care—while potentially valuable to individual patents—does not lead to cost savings.  *Id.* ¶¶ 45, 47, 51.  Living longer means "people may develop other ailments that increase lifetime health care costs" and can increase federal outlays in other programs, like Social Security.  *Id.*  This is why the Congressional Budget Office analyzes costs with the understanding that "preventive medical services may reduce costs initially (by averting disease) but increase costs over time (as longevity increases and patients develop unrelated medical conditions that require treatment)."  Ex 53 (Cong. Budget Off., *How CBO Analyzes Approaches to Improve Health Through Disease Prevention*) at 035.  Dr. Vellturo ignored the second half of this guidance, and

even presuming the Government's financial benefit is relevant, failed to calculate benefits as the Government would. Further, Dr. Vellturo's conclusion that the 2021 savings offset the cost of the C-100 contract ignores the 30.5% of Medicaid costs paid by states in 2021. M. Ex. 62 (Brill) ¶ 42. "That adjustment alone means the cost savings do not 'already approximately offset[] the cost of the C-100 Contract' as Dr. Vellturo asserts." *Id.* This fact is also irrelevant, because additional revenue as a "byproduct" of infringement does not establish that the infringement was "for the Government." *Riles v. Amerada Hess Corp.*, 999 F. Supp. 938, 940 (S.D. Tex. 1998) (Government's receipt of a royalty from defendant's oil drilling using a patented drilling method did not make infringing use "for the Government").

53.    *The mass vaccination campaign carried out by the U.S. Government resulted in an increase in income tax receipts of $32 billion in 2021 alone and an increase of $112 billion over a 3.5-year period. [M.] Ex. 31-A (Vellturo Op. Rpt.) ¶ 52.*

**RESPONSE:**  Plaintiffs dispute that Moderna has cited sufficient evidence establishing the extent to which the economic growth and resulting changes to tax revenue were the result of the mass vaccination campaign. M. Ex. 62 (Brill) ¶¶ 60-61. Moreover, if tax policy is held constant, any "economic growth will generally increase tax receipts, because income, capital gains, and some other tax bases are correlated to economic growth." M. Ex. 62 (Brill) ¶ 65. These estimates of increases in tax revenue are thus "simply pointing out the incidental effects of economic growth," which would result from any policies or other actions that increase growth. *Id.* This fact is also irrelevant, because additional revenue as a "byproduct" of infringement does not establish that the infringement was "for the Government." *Riles v. Amerada Hess Corp.*, 999 F. Supp. 938, 940 (S.D. Tex. 1998) (Government's receipt of a royalty from defendant's oil drilling using a patented drilling method did not make infringing use "for the Government").

54.     *Dr. Vellturo calculated Moderna's approximate share of the estimated increase in federal individual income tax receipts to be $41 billion over the 3.5-year period. [M.] Ex. 31-A (Vellturo Op. Rpt.) ¶ 52 n.160.*

**RESPONSE:**  Plaintiffs do not dispute that Dr. Vellturo made such a calculation, but dispute the relevance of the calculation, because additional revenue as a "byproduct" of infringement does not establish that the infringement was "for the Government."  *Riles v. Amerada Hess Corp.*, 999 F. Supp. 938, 940 (S.D. Tex. 1998).  (Government's receipt of a royalty from defendant's oil drilling using a patented drilling method did not make infringing use "for the Government").  Moreover, if tax policy is held constant, any "economic growth will generally increase tax receipts, because income, capital gains, and some other tax bases are correlated to economic growth."  M. Ex. 62 (Brill) ¶ 65.  These estimates of increases in tax revenue are thus "simply pointing out the incidental effects of economic growth," which would result from any policies or other actions that increase growth.  *Id.*

55.     *"The impact of the COVID-19 pandemic, one of the greatest public health challenges in modern history, would be immeasurably worse but for the rapid, widespread availability of cutting-edge mRNA-based vaccines like Moderna's." D.I. 1 at 1.*

**RESPONSE:**  Plaintiffs do not dispute that the quoted language appears in the Complaint. This fact speaks to the value of Moderna's use of Plaintiffs' patented technology but is not relevant to the whether that use was "for the Government."  Moderna's expert, Dr. Rutherford, confirmed that "those who received the vaccine were less likely to develop asymptomatic infection, symptomatic infection, and severe infection." M. Ex. 30 ¶ 71.  As a result, averting "immeasurably worse" outcomes simply reflects direct benefits of the vaccine to the individuals who avoided death or hospitalization.  This is further evidence that the recipients and direct beneficiaries of the

vaccine, including the doses at issue in the C-100 contract, were the American public, not the Federal government.  M. Ex. 63 (Pitts) ¶¶ 29-38; M. Ex. 62 (Brill) ¶¶ 40, 51, 65; Ex 32 (Johnson Tr.) 101:22-102:3 ("Q. But those doses, once they went to the jurisdictions, weren't used for the federal government; correct? A. Correct."), 103:16-104:10 (pharmacies), 106:20-107:20 (dialysis centers).

## III.    FACTS RELATED TO PLAINTIFFS' DOE THEORY

### A.    Prosecution History

56.    *The '069 patent's application was the first filed application in the Ratio Patent family. The '069 patent is the parent to all other Ratio Patents. E.g., [M.] Ex. 7 ('378 patent) Cover.*

**RESPONSE:** Plaintiffs do not dispute this fact, with the clarification that one patent cannot be a "parent" to another; each patent represents a distinct property right.  35 U.S.C. § 261; *see In re Katz Interactive Call Processing Patent*, 639 F.3d 1303, 1311-13 & n.6 (Fed. Cir. 2011).  All the Lipid Composition patents claim priority to the same application, directly or indirectly, and therefore have the same priority date, as Moderna acknowledges.

57.    *Prior to review by the Examiner, the applicants of the '069 patent submitted amended claims on November 12, 2009. [M.] Ex. 70 (Nov. 12, 2009 – '069 PH) (referred to herein as the "original claims" or "original-filed claims" of the '069 patent).*

**RESPONSE:** Plaintiffs do not dispute this fact.

58.    *Original claim 1 of the '069 patent recited:*

1.    (Previously presented)  A nucleic acid-lipid particle comprising:

(a) a nucleic acid;

(b) a cationic lipid comprising from about 50 mol % to about 65 mol % of the total lipid present in the particle;

(c) a non-cationic lipid comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the phospholipid comprises from about 4 mol % to about 10 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises from about 30 mol % to about 40 mol % of the total lipid present in the particle; and

(d) a conjugated lipid that inhibits aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

[M.] Ex. 70 (Nov. 12, 2009 – '069 PH) at 4; *see also* [M.] Ex. 71 (June 1, 2010 – '069 PH) at 2.

**RESPONSE:** Plaintiffs do not dispute this fact.

59.    *During prosecution, the applicants agreed that claim 1 of the '069 patent was illustrative of the pending claims. [M.] Ex. 72 (Jan. 31, 2011 – '069 PH) at 9.*

**RESPONSE:** Plaintiffs do not dispute this fact.

60.    *In July 2010, the Examiner rejected the pending claims as obvious and unpatentable in view of US2006/0008910 ("MacLachlan"). [M.] Ex. 73 (July 30, 2010 – '069 PH) at 3–7; Ex. 57 (MacLachlan).*

**RESPONSE:** Plaintiffs do not dispute this fact.

61.    *The Examiner found that "MacLachlan also teaches the SNALP wherein the cationic lipid is from about 2 mol % to about 60 mol % of the total lipid present in the particle (paragraph 85), the phospholipid is from about 5% to about 90% or from about 10% to about 85% of the total lipid present in the particle (paragraph 85), the cholesterol is from about 20% to about 55% of the total lipid present in the particle (paragraph 85, top of page 8), and the conjugated lipid is from about 1% to about 20% of the total lipid present in the particle (paragraph 85)." [M.] Ex. 73 (July 30, 2010 – '069 PH) at 4.*

**RESPONSE:** Plaintiffs do not dispute that the Examiner made this quoted statement, but

note that the Examiner did not assert that MacLachlan disclosed any particular value within the ranges set forth above, including the endpoints, either through its disclosure of ranges or particular embodiments.  M. Ex. 73 at 4.  This Court correctly described MacLachlan's ranges as "broader ranges."  D.I. 266 at 29; *see id.* at 19.

62.    *The Examiner concluded that "[i]t would have been obvious to one of skill in the art at the time the instant invention was made to make a nucleic acid lipid particle comprising an siRNA, a cationic lipid, a phospholipid, cholesterol, and a PEG-conjugate because MacLachlan teaches such a particle," and "[i]t further would have been obvious to formulate the particles with the instantly claimed amounts of the individual components because MacLachlan teaches particles formulated with ranges of amounts that overlap with the instantly claimed ranges and teaches that the proportions of the components can be varied by those of skill in the art." [M.] Ex. 73 (July 30, 2010 – '069 PH) at 4–5.*

**RESPONSE:** Plaintiffs do not dispute that the Examiner made this quoted statement. Plaintiffs did not, and do not, agree with the Examiner's statements about obviousness, as explained in Dr. Niren Murthy's responsive report on the non-obviousness of the Lipid Composition Patents.  *E.g.*, Ex 47 (Murthy) ¶¶ 840-929.  Plaintiffs further note that the Examiner did not assert that MacLachlan disclosed any particular value within the ranges set forth above, including the endpoints, either through its disclosure of ranges or particular embodiments.  M. Ex. 73 at 4-5.  This Court correctly described MacLachlan's ranges as "broader ranges."  D.I. 266 at 29; *see id.* at 19.

63.    *The applicants responded to the Examiner's rejection by "submit[ting] that the presently claimed SNALP formulations, which are referred to in the specification as '1:57*

SNALP,' have new and unexpected results." [M.] Ex. 72 (Jan. 31, 2011 – '069 PH) at 8; see also id. at 9-11.

**RESPONSE:**  Plaintiffs do not dispute that this quoted statement was part of applicants' comments during prosecution, but it is incomplete.  Plaintiffs distinguished the invention from prior art disclosures of 40 mol % cationic lipid or less in MacLachlan, including based on the "1:57" formulation which the claims encompassed (but were not limited to) and which the specification described.  M. Ex. 72 at 10 ("1:57 SNALP formulations were significantly more efficacious as compared to" the "2:30 SNALP"); *id.* ("1:57 SNALP formulations were substantially more effective … compared to" the "2:40 SNALP"); *see also* M. Ex. 75 at 10 ("SNALP formulations having <u>increased</u> amounts of cationic lipid such as, *e.g.*, the 1:57 SNALP formulation, provide unexpectedly superior advantages over previously exemplified SNALP formulations containing" "30 mol%, 40 mol %, and 15 mol % cationic lipid").

64.    The applicants explained that "Figure 3 of Example 4 demonstrates that 1:57 SNALP formulations were significantly ***more efficacious*** as compared to a nucleic acid-lipid particle previously described ('2:30 SNALP')," and "Figure 2 of Example 3 demonstrates that the 1:57 SNALP formulations were substantially ***more effective*** at silencing the expression of a target gene as compared to nucleic acid-lipid particles previously described ('2:40 SNALP,' wherein the cationic lipid is present in the formulation at about 40 mol %)." [M.] Ex. 72 (Jan. 31, 2011 – '069 PH) at 10 (emphasis in original).

**RESPONSE:**    Plaintiffs do not dispute that these quoted statements were part of applicants' comments during prosecution, but this is incomplete.  The applicants further stated: "It is noted that the 2:30 SNALP formulation is disclosed in the cited MacLachlan *et al*. reference, and that of all the SNALP formulations prepared and tested in the cited MacLachlan *et al.*

44

reference, the 2:30 SNALP formulation contains the greatest amount of cationic lipid (*i.e.*, 30 mol % cationic lipid)." M. Ex. 72 (Jan. 31, 2011 – '069 PH) at 10. Plaintiffs' arguments distinguished prior art disclosures of 40 mol % cationic lipid or less in MacLachlan, not any formulation within the scope of alleged equivalents in this case (which the prior art does not teach). M. Ex. 72 at 10 ("1:57 SNALP formulations were significantly more efficacious as compared to" the "2:30 SNALP"); *id.* ("1:57 SNALP formulations were substantially more effective … compared to" the "2:40 SNALP"); *see also* M. Ex. 75 at 10 ("SNALP formulations having <u>increased</u> amounts of cationic lipid such as, *e.g.*, the 1:57 SNALP formulation, provide unexpectedly superior advantages over previously exemplified SNALP formulations containing" "30 mol%, 40 mol %, and 15 mol % cationic lipid"). The "2:30 SNALP" formulation refers to a formulation with 2% conjugated lipid and 30% cationic lipid; the "2:40 SNALP" formulation refers to a formulation with 2% conjugated lipid and 40% cationic lipid. M. Ex. 72 at 10.

65.    *According to applicants, these "new and unexpected results [we]re more than sufficient to rebut a presumption of obviousness based on MacLachlan et al." [M.] Ex. 72 (Jan. 31, 2011 – '069 PH) at 11; [M.] Ex. 57 (MacLachlan).*

**RESPONSE:** Plaintiffs do not dispute this fact, with the clarification that the new and unexpected results were compared to formulations outside the scope of the alleged equivalents, including the 2:30 formulation. M. Ex. 72 at 10 ("1:57 SNALP formulations were significantly more efficacious as compared to" the "2:30 SNALP"); *id.* ("1:57 SNALP formulations were substantially more effective … compared to" the "2:40 SNALP"); *see also* M. Ex. 75 at 10 ("SNALP formulations having <u>increased</u> amounts of cationic lipid such as, *e.g.*, the 1:57 SNALP formulation, provide unexpectedly superior advantages over previously exemplified SNALP formulations containing" "30 mol%, 40 mol %, and 15 mol % cationic lipid").

66.    *In May 2011, the Examiner rejected the claims a second time[8]—this time the Examiner rejected the pending claims as anticipated by MacLachlan. [M.] Ex. 74 (May 12, 2011 – '069 PH) at 2–4 (claim 5 was still rejected as obvious in view of MacLachlan); [M.] Ex. 57 (MacLachlan).*

**RESPONSE:** Plaintiffs do not dispute this fact.

67.    *The Examiner stated that "[t]he claims are to a nucleic acid lipid particle comprising a nucleic acid, a cationic lipid, a non-cationic lipid mixture of phospholipid and cholesterol, and a conjugated lipid. The claims are further directed to the particle wherein the nucleic acid is a siRNA, the relative amounts of components read on a broad range of amounts because of the term 'comprising about'. The applicants do not provide a definition of the term in the specification. Thus, 'comprising about' could embrace an amount +/- 10, 20, 30 mol % of a lipid component." [M.] Ex. 74 (May 12, 2011 – '069 PH) at 2.*

**RESPONSE:** Plaintiffs do not dispute that the Examiner made the quoted statement. Importantly for the context, the Examiner's application of the term "comprising about" as embracing "+/- 10, 20, 30 mol % of a lipid component" was the basis for the anticipation rejection, as the broad disclosures of the ranges in MacLachlan, such as 2-60% cationic lipid, were asserted to anticipate the ranges of the then-pending claims applying that definition of "about" and the Federal Circuit's precedent in *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006); *see* M. Ex. 75 at 6.  Applying that precedent, the Examiner did not assert that any formulation within the scope of the asserted equivalents was disclosed in the prior art MacLachlan reference that was the basis for the rejection, and it is undisputed that MacLachlan does not disclose any specific formulation within the scope of the asserted equivalents. M. Ex. 74 at 4-9;

---

[8] The Examiner changed in between the first and second Non-Final Rejection. See Ex. 74 (May 12, 2011 – '069 PH) at 2.

M. Ex. 75 at 6.

68.    *The Examiner found that "MacLachlan also teaches the SNALP wherein the cationic lipid is from about 2 mol % to about 60 mol % of the total lipid present in the particle (paragraph 85), the phospholipid is from about 5% to about 90% or from about 10% to about 85% of the total lipid present in the particle (paragraph 85), the cholesterol is from about 20% to about 55% of the total lipid present in the particle (paragraph 85, top of page 8), and the conjugated lipid is from about 1% to about 20% of the total lipid present in the particle (paragraph 85)." [M.] Ex. 74 (May 12, 2011 – '069 PH) at 3.*

**RESPONSE:** Plaintiffs do not dispute that the Examiner made the quoted statement. Plaintiffs incorporate the relevant context set forth in the response to Paragraph 67 above.

69.    *The Examiner compared the pending mol % range limitations to the disclosures in paragraph [0085] of MacLachlan:*

| instant claims of '367 | pre-grant US publication (paragraph 0085) |
|---|---|
| 1) cationic lipid comprising from about 50-65 | 1) cationic lipid 2-60, 5-50, 10-45, 20-40, 30 |
| 2) phospholipid comprises from about 4-10 m | 2) phospholipid 5-90 mol% |
| 3) cholesterol comprising from about 30-40 m | 3) cholesterol 20-55 mol % |
| 4) conjugated lipid comprising from about 0.5-2 | 4) conjugated lipid 1-20 mol % |

*[M.] Ex. 74 (May 12, 2011 – '069 PH) at 3–4; [M.] Ex. 57 (MacLachlan).*

**RESPONSE:** Plaintiffs do not dispute that the Examiner made the quoted comparison. Plaintiffs incorporate the relevant context set forth in the response to Paragraph 67 above. Furthermore, for context, MacLachlan disclosed formulations with 40 mol % cationic lipid or less, not any formulation within the scope of alleged equivalents in this case (which the prior art does not teach). M. Ex. 72 at 10 ("1:57 SNALP formulations were significantly more efficacious as compared to" the "2:30 SNALP"); *id.* ("1:57 SNALP formulations were substantially more effective … compared to" the "2:40 SNALP"); *see also* M. Ex. 75 at 10 ("SNALP formulations

having <u>increased</u> amounts of cationic lipid such as, *e.g.*, the 1:57 SNALP formulation, provide unexpectedly superior advantages over previously exemplified SNALP formulations containing" "30 mol%, 40 mol %, and 15 mol % cationic lipid").

70.    *The Examiner stated that he "fully considered" applicant's January 31, 2011 arguments but found "they [we]re not persuasive." [M.] Ex. 74 (May 12, 2011 – '069 PH) at 6.*

**RESPONSE:** Plaintiffs do not dispute that the Examiner made the quoted statements.

71.    *The Examiner also responded to the applicants' statements that the claims were directed to a "1:57 SNALP formulation and their new and unexpected results": "[T]he argument is not found persuasive because while it is acknowledged that 1:57 shows a new and unexpected result, the product recited in the instant claims read on broad range of SNALP formulations, including 2:30 and 2:40 because of the term 'comprising from about'. The term is broad because the specification does not provide a definition of the term and the term could read on SNALP formulations other than 1:57, e.g., 2:30 and 2:40." [M.] Ex. 74 (May 12, 2011 – '069 PH) at 6.*

**RESPONSE:** Plaintiffs do not dispute that the Examiner made the quoted statements. Plaintiffs incorporate the relevant context set forth in the responses to Paragraphs 67 and 69 above.

72.    *In response, and after multiple interviews with the Examiner, the applicants amended the pending claims to remove "about" from the mol % range limitations. See [M.] Ex. 75 (Aug. 11, 2011 – '069 PH) at 2–9.*

**RESPONSE:**  Plaintiffs do not dispute that the applicants amended the pending claims to remove "about" from the mol % limitations.  For context, the Examiner recorded that, during the interview conducted July 6, 2011, the § 102 rejection of record was discussed, along with "MPEP 2131.03(II) and Atofina v. Great Lakes Chem. Corp. 441[] F.3d 991, 999, 78 USPQ2d 1417, 1423 (Fed. Cir. 2006)."  Ex 57 (July 14, 2011 – '069 PH) at 2.  That case, on the page cited by the

Examiner's interview summary, addresses the meaning of disclosures of broad ranges in the prior art and holds that the disclosure of such ranges does not disclose values within the ranges, including the endpoints of the range. 441 F.3d at 999. Prior art ranges only anticipate a claimed range if they describe the claimed range with sufficient specificity such that there is no reasonable difference in how the invention operates over the prior art and claimed ranges. *See id.* The Examiner further recorded that, during an interview conducted July 13, 2011, the "obviousness type double patenting rejections and 102 and 103 rejections of record" were discussed, and noted that "[r]ejections will be withdrawn when applicant's representative makes the arguments of record." Ex 58 (July 18, 2011 – '069 PH) at 2. The applicants summarized these interviews in their request for reconsideration submitted August 11, 2011:

> During the next telephonic interview conducted on July 6, 2011, Applicants' representatives discussed the rejection of record under 35 U.S.C. § 102(b), M.P.E.P. 2131.03 (II), and *Atofina v. Great Lakes Chem. Corp*, 441 F.3d 991, 999, 78 USPQ2d 1417, 1423 (Fed. Cir. 2006) with Examiner Whiteman and his supervisor, Examiner Calamita. During the interview, Applicants' representatives proposed amending the claims to delete the word "about" from the ranges of lipid components and argued that the claimed ranges were not anticipated by MacLachlan *et al.* (US 2006/0008910) because that reference failed to disclose the claimed ranges with sufficient specificity as required by M.P.E.P. 2131.03 (II) and *Atofina.* Examiners Whiteman and Calamita indicated that they would present the arguments to Examiner Bennett and notify Applicants' representatives of his decision. During a subsequent telephonic interview conducted on July 13, 2011, Examiner Whiteman indicated that Examiner Bennett found the arguments of Applicants' representatives to be persuasive. As a result, Examiner Whiteman agreed to withdraw both rejections under 35 U.S.C. § 102(b) and 35 U.S.C. § 103(a) when Applicants' representatives make the arguments of record.

M. Ex. 75 (Aug. 11, 2011 – '069 PH) at 6-7.

    73.   *Claim 1 of the '069 patent was amended as follows:*

1.    (Currently amended)  A nucleic acid-lipid particle comprising:

(a) a nucleic acid;

(b) a cationic lipid comprising from ~~about~~ 50 mol % to ~~about~~ 65 mol % of the total lipid present in the particle;

(c) a non-cationic lipid comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the phospholipid comprises from ~~about~~ 4 mol % to ~~about~~ 10 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises from ~~about~~ 30 mol % to ~~about~~ 40 mol % of the total lipid present in the particle; and

(d) a conjugated lipid that inhibits aggregation of particles comprising from ~~about~~ 0.5 mol % to ~~about~~ 2 mol % of the total lipid present in the particle.

*[M.] Ex. 75 (Aug. 11, 2011 – '069 PH) at 2.*

**RESPONSE:** Plaintiffs do not dispute this fact.  For context, the amendment was made in response to the Examiner's application of the term "comprising about" as embracing "+/- 10, 20, 30 mol % of a lipid component," as the broad disclosures of the ranges in MacLachlan, such as 2- 60% cationic lipid, were asserted to anticipate the ranges of the then-pending claims applying that definition of "about" and the Federal Circuit's precedent in *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006); *see* M. Ex. 75 at 6.  Plaintiffs incorporate the relevant context set forth in the responses to Paragraphs 67 and 69 above.

74.    *The applicants submitted remarks with the claim amendments, stating that "[i]n making both [the anticipation and obviousness] rejections, the Examiner alleges that the term 'comprising from about' recited in the instant claims embraces a broad range of lipid components. In an earnest effort to expedite prosecution, but without acquiescing on the merits of the rejection, Applicants have amended the claims to delete 'about' from the ranges of lipid components recited therein." [M.] Ex. 75 (Aug. 11, 2011 – '069 PH) at 7.*

**RESPONSE:**  Plaintiffs do not dispute that the applicants made the quoted statement as part of their comments during prosecution, but it lacks important context.   The applicants further observed that M.P.E.P. 2131.03 (II), which was the subject of discussion with the Examiner, states:

> When the prior art discloses a range which touches or overlaps the claimed range, but no specific examples falling within the claimed range are disclosed, a case by case determination must be made as to anticipation.  In order to anticipate the claims, the claimed subject matter must be disclosed in the reference with "sufficient specificity to constitute an anticipation under the statute."   What constitutes a "sufficient specificity" is fact dependent. If the claims are directed to a narrow range, and the reference teaches a broad range, depending on the other facts of the case, it may be reasonable to conclude that the narrow range is not disclosed with "sufficient specificity" to constitute an anticipation of the claims. See, e.g., *Atofina v. Great Lakes Chem. Corp,* 441 F.3d 991, 999, 78 USPQ2d 1417, 1423 (Fed. Cir. 2006) wherein the court held that a reference temperature range of 100-500 degrees C did not describe the claimed range of 330-450 degrees C with sufficient specificity to be anticipatory.  Further, while there was a slight overlap between the reference's preferred range (150-350 degrees C) and the claimed range, that overlap was not sufficient for anticipation. "[T]he disclosure of a range is no more a disclosure of the end points of the range than it is each of the intermediate points." *Id.* at 1000, 78 USPQ2d at 1424.   Any evidence of unexpected results within the narrow range may also render the claims unobvious. The question of "sufficient specificity" is similar to that of "clearly envisaging" a species from a generic teaching. See MPEP § 2131.02.   A 35 U.S.C. 102/103 combination rejection is permitted if it is unclear if the reference teaches the range with "sufficient specificity." The examiner must, in this case, provide reasons for anticipation as well as a []reasoned[] statement regarding obviousness. *Ex parte Lee,* 31 USPQ2d 1105 (Bd. Pat. App. & Inter. 1993) (expanded Board). For a discussion of the obviousness of ranges see MPEP § 2144.05.

M. Ex. 75 (Aug. 11, 2011 – '069 PH) at 7-8.  Furthermore, Plaintiffs incorporate the responses to Paragraphs 67 and 69 above.

75.    *"Applicants provide[d] a comparison of the ranges of lipid components between claim 1 of the '069 patent application as amended and the lipid ranges of MacLachlan":*

| Lipid Component | Claim 1 as Amended | US 2006/0008910* |
|---|---|---|
| Cationic Lipid | 50-65 mol % | "2-60, 5-50, 10-45, 20-40, 30 mol%" |
| Phospholipid | 4-10 mol % | "5-90 mol%" |
| Cholesterol | 30-40 mol % | "20-55 mol %" |
| Conjugated Lipid | 0.5-2 mol % | "1-20 mol %" |

*The ranges set forth in this column are reproduced from page 4 of the Office Action mailed May 12, 2011.

*[M.] Ex. 75 (Aug. 11, 2011 – '069 PH) at 8; Ex. 57 (MacLachlan).*

**RESPONSE:** Plaintiffs do not dispute that the applicants made the quoted statement as part of their comments during prosecution, but it lacks important context. The Court considered this table (D.I. 266 at 19) and concluded that "[w]hen Plaintiff removed the phrase 'comprising about,' it only clearly disclaimed" the "broader ranges" arising from the examiner's understanding of the term "about." *Id.* at 21-22 ("[T]he examiner believed that the term 'comprising about' added before the mol % ranges 'read on a broad range of amounts' and 'could embrace an amount +/- 10, 20, 30 mol % of a lipid component.'").

76.     *"Applicants respectfully point[ed] out that claim 1 as presently amended recites narrow ranges for each of the lipid components compared to the substantially broader ranges taught by MacLachlan et al." [M.] Ex. 75 (Aug. 11, 2011 – '069 PH) at 8.*

**RESPONSE:** Plaintiffs do not dispute that the applicants made the quoted statement as part of their comments during prosecution, but it is incomplete. The applicants further stated:

> Thus, per M.P.E.P. 2131.03 (II), it is reasonable to conclude that the claimed narrow ranges are <u>not</u> disclosed with 'sufficient specificity' to constitute an anticipation of claim 1 and its dependent claims. *See, e.g.*, *Atofina*, wherein the Federal Circuit held: (1) a reference temperature range of 100-500°C did not describe the claimed range of 330-450°C with sufficient specificity to be anticipatory; and (2) while there was a slight overlap between the reference's preferred temperature range of 150-350°C and the claimed range of 330-450°C, that overlap was <u>not</u> sufficient for anticipation.

52

M. Ex. 75 (Aug. 11, 2011 – '069 PH) at 8-9.  Plaintiffs incorporate the responses to graphs 67 and 69 above.

77.    *The applicants stated: "SNALP formulations having underlined increased amounts of cationic lipid such as, e.g., the 1:57 SNALP formulation, provide* **unexpectedly superior advantages** *over previously exemplified SNALP formulations containing lower amounts of cationic lipid." [M.] Ex. 75 (Aug. 11, 2011 – '069 PH) at 10 (emphasis in original); see also id. at 9.*

**RESPONSE:**  Plaintiffs do not dispute that the applicants made the quoted statement as part of their comments during prosecution, but it is incomplete.  Plaintiffs' arguments distinguished prior art MacLachlan's disclosures of lower amounts of cationic lipid—40 mol % cationic lipid or less—not any formulation within the scope of alleged equivalents in this case (which the prior art does not teach).  M. Ex. 72 at 10 ("1:57 SNALP formulations were significantly more efficacious as compared to" the "2:30 SNALP"); *id.* ("1:57 SNALP formulations were substantially more effective … compared to" the "2:40 SNALP"); *see also* M. Ex. 75 at 10 ("SNALP formulations having increased amounts of cationic lipid such as, *e.g.*, the 1:57 SNALP formulation, provide unexpectedly superior advantages over previously exemplified SNALP formulations containing" "30 mol%, 40 mol %, and 15 mol % cationic lipid").

78.    *The applicants stated: "Figure 3 of Example 4 demonstrates that 1:57 SNALP formulations were significantly* **more efficacious** *as compared to a nucleic acid-lipid particle previously described ('2:30 SNALP')," and "Figure 2 of Example 3 demonstrates that the 1:57 SNALP formulations were substantially* **more effective** *at silencing the expression of a target gene as compared to nucleic acid-lipid particles previously described ('2:40 SNALP,' wherein the cationic lipid is present in the formulation at 40 mol %)." [M.] Ex. 75 (Aug. 11, 2011 – '069 PH) at 9- 10 (emphasis in original).*

**RESPONSE**:  Plaintiffs do not dispute that the applicants made the quoted statement as part of their comments during prosecution.  The applicants further noted "that the cited references disclose the preparation and testing of SNALP formulations such as the 2:30, 2:40, and 10:15 SNALP formulations as exemplified formulations containing the greatest amount of cationic lipid (*i.e.*, 30 mol %, 40 mol %, and 15 mol % cationic lipid, respectively)."  M. Ex. 75 (Aug. 11, 2011 – '069 PH) at 10.  Plaintiffs' arguments distinguished prior art MacLachlan's disclosures of lower amounts of cationic lipid—40 mol % cationic lipid or less, not any formulation within the scope of alleged equivalents in this case (which the prior art does not teach).  M. Ex. 72 at 10 ("1:57 SNALP formulations were significantly more efficacious as compared to" the "2:30 SNALP"); *id.* ("1:57 SNALP formulations were substantially more effective … compared to" the "2:40 SNALP"); *see also* M. Ex. 75 at 10 ("SNALP formulations having <u>increased</u> amounts of cationic lipid such as, *e.g.*, the 1:57 SNALP formulation, provide unexpectedly superior advantages over previously exemplified SNALP formulations containing" "30 mol%, 40 mol %, and 15 mol % cationic lipid").

79.    *After the '069 patent issued, the applicants filed the four other Ratio Patents that were asserted in this case. Each of the Ratio Patents has claims with mol % range limitations. See [M.] Ex. 5 ('359 patent); [M.] Ex. 3 ('668 patent); [M.] Ex. 6 ('435 patent); [M.] Ex. 7 ('378 patent).*

**RESPONSE:** Plaintiffs do not dispute that the Lipid Composition Patents (which Moderna calls the Ratio Patents) each have claims related to lipid molar ratios.  The '378 patent claims do not recite a limitation on the range of cationic lipid, and this Court rejected Moderna's attempt to interpret the claims to include a cationic lipid range on the basis of disclaimer during prosecution. D.I. 266 at 28-31.

80.    *The original-filed claims of the '359 patent contained the word "about" in the mol % range limitations, but the applicants amended those claims and removed the word "about." Compare [M.] Ex. 76 (Oct. 5, 2011 – '359 PH) at 114 (claim 1 reciting "a cationic lipid comprising from **about** 50 mol % to **about** 85 mol %" and "a conjugated lipid . . . comprising from **about** 0.5 mol % to **about** 2 mol %" (emphasis added)), with [M.] Ex. 77 (Mar. 28, 2012 – '359 PH) at 4 (cancelling claim 1 and adding claim 47 that recites "a cationic lipid comprising from 50 mol % to 65 mol %" and "a conjugated lipid . . . comprising from 0.5 mol % to 2 mol %" without "about").*

    **RESPONSE:** Plaintiffs do not dispute that the applicants prosecuted claims without the word "about."

81.    *The original-filed claims of the '435 patent contained the word "about" in the mol % range limitations, but applicants amended these claims by removing the word "about." Compare [M.] Ex. 78 (Aug. 18, 2014 – '435 PH) at 114 (claim 1 reciting "a cationic lipid comprising from **about** 50 mol % to **about** 85 mol %," "a non-cationic lipid comprising from **about** 13 mol % to **about** 49.5 mol %," and "a conjugated lipid . . . comprising form **about** 0.5 mol % to **about** 2 mol %" (emphasis added)), with [M.] Ex. 79 (Feb. 26, 2015 – '435 PH) at 2 (cancelling claim 1 and adding claim 47 that recites "a cationic lipid comprising from 50 mol % to 85 mol %," "a non-cationic lipid comprising from 13 mol % to 49.5 mol %," and "a conjugated lipid . . . comprising form 0.5 mol % to 2 mol %" without "about").*

    **RESPONSE:** Plaintiffs do not dispute that the applicants prosecuted claims without the word "about."

## B.    Claim Construction Proceedings

82.    *This Court and Plaintiffs acknowledged during claim construction that removing "about" from the pending claims during prosecution resulted in a disclaimer. See D.I. 266 at 18*

*("[T]he presence of the word 'about' in the specification without its similar inclusion in the claim language could support a construction that eliminates a broader range of approximation, but it does not preclude application of the scientific convention of rounding."); id. at 21 ("Plaintiffs contend that during prosecution, they only disclaimed the broader variability that was encompassed by the term 'about.'"); id. at 21–22; [M.] Ex. 41 (2024-02-08 Markman Tr.) at 35–44.*

**RESPONSE:** Plaintiffs dispute this fact. During claim construction, Moderna argued that Plaintiffs disclaimed any degree of variability for the molar ratios recited in the claims of the Lipid Composition Patents when they removed the word "about" during prosecution. D.I. 170 at 17-20, 44.

The Court rejected that argument and found that "[w]hen Plaintiff removed the phrase 'comprising about,' it only clearly disclaimed these broader ranges . . . . [T]he removal of 'comprising about' was consistent with the examiner's concern that the previous language 'read on a broad range of amounts.'" D.I. 266 at 21-22. The Court thereby found that ranges to +/- 10, 20, or 30 mol% (the Examiner's definition of "about") were disclaimed, not the narrower values closer to the ranges recited in the claims. *Id.* The alleged equivalents are not within what the Court found disclaimed, in rejecting Moderna's argument and adopting Plaintiffs' argument during claim construction. *Id.* The removal of these broader ranges, rather than the values closer to the recited ranges, was the reason for the amendment overcoming the rejection over MacLachlan. *Id.*; *E.g.*, M. Ex. 72 at 10; M. Ex. 75 at 6-7, 10. Plaintiffs incorporate the responses to Paragraphs 67, 69, and 72 above.

83.    *Under Plaintiffs' application of the Court's claim construction, the mol % range limitations were expanded as follows (using claim 1 of the '069 patent as an example):*

| Lipid Component | Mol % Range Claimed | Plaintiffs' Application of the Court's Claim Construction |
|---|---|---|

| Cationic Lipid | 50 – 65 mol % | 49.5 – 65.499 mol % |
|---|---|---|
| Phospholipid | 4 – 10 mol % | 3.5 – 10.499 mol % |
| Cholesterol | 30 – 40 mol % | 29.5 – 40.499 mol % |
| Conjugated Lipid | 0.5 – 2 mol% | 0.45– 2.499 mol % |

**RESPONSE:** Plaintiffs dispute Moderna's characterizations, which do not correctly describe the literal range of the claims and also incorrectly suggest that those literal ranges are disputed. The Court's claim construction decision determined the literal scope of the mol% ranges. The complete set of those ranges are set forth, for example, in Plaintiffs' expert's infringement report. Ex 48 (Mitchell) ¶ 611. Moderna's experts have not disputed that those are the correct ranges as determined by the Court's decision. Those ranges are not "Plaintiffs' application of the Court's Claim Construction"; they are the Court's claim construction. D.I. 266 at 24-25.

Plaintiffs further note that the claims, as issued and construed, recite ranges that overlap with the ranges recited by MacLachlan. *See* D.I. 266 at 19, 24-25. Put another way, the purpose of the amendment was not to eliminate overlap between the claimed ranges and the ranges identified by the Examiner in MacLachlan. Rather, as set forth above and interpreted correctly by this Court's Claim Construction Order, the amendment removed the broad ranges that were the basis for the Examiner's rejection under *Atofina*, and were not made to remove, and did not disclaim, values closer to the ranges recited in the claims. *E.g.*, D.I. 266 at 21-22; M. Ex. 72 at 10; M. Ex. 75 at 6-7, 10; Response to Paragraph 72, *supra*. The Court emphasized that "[i]ndeed, the removal of the word 'about' appears to have been done only to satisfy the examiner's concern that the claim language 'read on a broad range of amounts' and 'could embrace an amount +/- 10, 20, 30 mol % of a lipid component.'" D.I. 266 at 24. The accused equivalents (i.e., Moderna COVID-19 vaccine compositions down to 45 mol % cationic lipid; up to 53 mol % non-cationic lipid; up

57

to 3 mol % conjugated lipid) are values closer to the ranges recited in the claims than to the broad ranges disclosed in MacLachlan.  Ex 48 (Mitchell) ¶¶ 680-681, 708-709, 738-739; D.I. 266 at 21-22.

84.     *Plaintiffs stated that with this construction, to show infringement, they "would need to show . . . that Moderna's product, when they make it or they sell it, has particles -- the Claim is directed to nucleic acid particles -- has particles between 49.5 and 65.49 percent cationic lipid." [M.] Ex. 41 (2024-02-08 Markman Tr.) at 39:24–40:6 (using the cationic lipid limitation of the '069 patent as an example); see also id. at 40:16–41:6; id. at 44:2–3.*

**RESPONSE:**  Plaintiffs dispute this fact.  Plaintiffs' statement was directed to literal infringement, which is also asserted in this case.  Plaintiffs' statement was not directed to assessment of infringement under the doctrine of equivalents.  The *Markman* hearing involved the meaning and literal scope of the claim, and Plaintiffs therefore addressed, in that context, what Plaintiffs would need to show to establish infringement under the literal scope of the claim for the cationic lipid limitation of claim 1 of the '069 patent. M. Ex. 41 (2024-02-08 *Markman* Tr.) 39:22-41:10.  Plaintiffs consistently have asserted that Moderna infringes under the doctrine of equivalents as well, *E.g.*, Ex 59 (Apr. 23, 2023 Infringement Contentions) at 2-4 ('069 patent), 2-4 ('359 patent), 4-5 ('435 patent), which by definition involves an assertion of infringement beyond the literal scope of the claims.  *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607 (1950).

### C.     Plaintiffs' DOE Theories

85.     *Plaintiffs' DOE theories implicate the "mol% range limitations" in the Ratio Patents—i.e., the mol % range of cationic lipid, non-cationic lipid, and conjugated lipid in the total lipid present in the claimed nucleic acid-lipid particle. [M.] Ex. 42 (2024-11-25 Mitchell Rep.) at 456, 538–546.*

**RESPONSE:** Plaintiffs do not dispute that they have asserted doctrine of equivalents based on these limitations. Not all of the asserted claims of the Lipid Composition Patents recite each of these limitations. By way of example, the claims of the '378 patent do not recite a limitation on the mol% of cationic lipid, and the Court construed the claims accordingly. D.I. 266 at 29-31.

### 1. "Cationic Lipid" Limitation

86. *Plaintiffs' first DOE theory relates to the cationic lipid mol % range limitations in the '359 and '435 patents. See [M.] Ex. 42 (2024-11-25 Mitchell Rep.) at 481–86. The following is a table of the asserted claims with a cationic lipid mol % range limitation in the '359 and '435 patents:*

| Patent and Claims | Claim Language |
|---|---|
| '359 Patent, claim 7 | "the cationic lipid comprises from *50 mol % to 60 mol %* of the total lipid present in the particle" |
| '359 Patent, claim 12 (extrapolated from claim 1) | "a cationic lipid comprising from *50 mol % to 65 mol %* of the total lipid present in the particle" |
| '435 Patent, claims 7, 8, and 16 (extrapolated from claim 1) | "a cationic lipid comprising from *50 mol % to 85 mol %* of the total lipid present in the particle" |

**RESPONSE:** Plaintiffs do not dispute that they have asserted doctrine of equivalents based on the cationic lipid limitations of these patents.

87. *Each of the asserted claims with a cationic lipid mol % range limitation have a lower limit of 50 mol %. See [M.] Ex. 5 ('359 patent) claims 1, 7, 12; [M.] Ex. 6 ('435 patent) claims 1, 7, 8, 16.*

**RESPONSE:** Plaintiffs do not dispute that 50 mol % is the recited lower limit of the literal cationic lipid range for the '359 and '435 patent claims. However, the Court construed the claims to include traditional rules of rounding. D.I. 266 at 24-25.

88.   *Plaintiffs allege that 44.5 mol %, 45 mol %, 46 mol %, 47 mol %, 48 mol %, 48.5 mol %, and 49 mol % are equivalent to 50 mol % cationic lipid in the mol % range limitations. See [M.] Ex. 42 (2024-11-25 Mitchell Rep.) at 456, 481–86.*

**RESPONSE:**  Plaintiffs dispute this fact.  Plaintiffs assert that particular lots of Moderna's COVID-19 vaccine, identified by its experts, infringe under the doctrine of equivalents.  *E.g.*, Ex 48 (Mitchell) ¶¶ 655-666.  The values set forth above are not assertions of infringement.   In response to Moderna's affirmative defense of ensnarement, Plaintiffs advanced "hypothetical claims" with cationic lipid amounts of 45 mol%, 46 mol%, 47 mol%, 48 mol%, 48.5 mol%, and 49 mol% that do not ensnare the prior art.  Ex 48 (Mitchell) ¶¶ 679-681.  Hypothetical claims are not actual claims, are not relevant outside the context of ensnarement (which is not at issue in either party's summary judgment motion), and are not assertions of infringement under the doctrine of equivalents.  Actual claims, not hypothetical claims, are infringed under the doctrine of equivalents.  Plaintiffs' expert used a cutoff of "44.5 mol%" to determine infringement of the 45 mol% hypothetical claim in view of the Court's claim construction ruling on rounding.  Ex 48 (Mitchell) ¶ 680.

### 2.   "Non-Cationic Lipid" Limitation

89.   *Plaintiffs' second DOE theory relates to the non-cationic lipid mol % range limitations in the '435 patent. See [M.] Ex. 42 (2024-11-25 Mitchell Rep.) at 486, 511–513.*

**RESPONSE:** Plaintiffs do not dispute that they have asserted doctrine of equivalents based on the non-cationic lipid limitations of these patents.

90.   *"Phospholipid" and "cholesterol" are both "non-cationic lipids." The amount of "phospholipid" and "cholesterol" in a nucleic acid-lipid particle is equivalent to the recited total amount of "non-cationic lipid" in the particle.*

**RESPONSE:** With respect to the Lipid Composition Patents, Plaintiffs do not dispute that

phospholipid and cholesterol are non-cationic lipids, and Plaintiffs do not dispute that those are the two non-cationic lipids in Moderna's COVID-19 vaccine.

91.    *Plaintiffs' second DOE theory applies to the "non-cationic lipid" component in claim 1 of the '435 patent and is incorporated into the dependent claims of the '435 patent. See [M.] Ex. 42 (2024-11-25 Mitchell Rep.) at 486 n.139.*

**RESPONSE:** Plaintiffs do not dispute that they have asserted doctrine of equivalents based on the non-cationic lipid limitation.

92.    *The following is a table of the asserted claims with a non-cationic lipid mol % range limitation in the '435 patent:*

| Patent and Claims | Claim Language |
| --- | --- |
| '435 Patent, claims 7, 8, and 16 (extrapolated from claim 1) | "a non-cationic lipid comprising from *13 mol % to 49.5 mol %* of the total lipid present in the particle" |

**RESPONSE:** Plaintiffs do not dispute the relevant claim language.

93.    *Each of the asserted claims of the '435 patent with a non-cationic lipid mol % range limitation have an upper limit of 49.5 mol %. See [M.] Ex. 6 ('435 patent) claims 1, 7, 8, 16.*

**RESPONSE:**   Plaintiffs do not dispute that 49.5 mol % is the recited upper limit of the literal non-cationic lipid range for the '435 patent claims. However, the Court construed the claims to include traditional rules of rounding.  D.I. 266 at 24-25.

94.    *Plaintiffs allege that 53.5 mol %, 53 mol %, 52 mol %, 51 mol %, and 50 mol % are equivalent to 49.5 mol % non-cationic lipid in the mol % range limitations. See [M.] Ex. 42 (2024- 11-25 Mitchell Rep.) at 486, 511–13.*

**RESPONSE:** Plaintiffs dispute this fact.  Plaintiffs assert that particular lots of Moderna's COVID-19 vaccine, identified by its experts, infringe under the doctrine of equivalents.  *E.g.*, Ex 48 (Mitchell) ¶¶ 682-694.  The values set forth above are not assertions of infringement.  In

response to Moderna's affirmative defense of ensnarement, Plaintiffs advanced "hypothetical claims" with non-cationic lipid amounts of 53 mol%, 52 mol%, 51 mol%, and 50 mol%.  Ex 48 (Mitchell) ¶¶ 708-709.  Hypothetical claims are not actual claims, are not relevant outside the context of ensnarement (which is not at issue in either party's summary judgment motion), and are not assertions of infringement under the doctrine of equivalents.  Actual claims, not hypothetical claims, are infringed under the doctrine of equivalents.  Plaintiffs' expert used a cutoff of "53.5 mol%" to determine infringement of the 53 mol% hypothetical claim in view of the Court's claim construction ruling on rounding.  Ex 48 (Mitchell) ¶ 708.

### 3.   "Conjugated Lipid" Limitation

95.     *Plaintiffs' third DOE theory relates to the "conjugated lipid" mol % range limitations in the '359, '435, and '378 patents. See [M.] Ex. 42 (2024-11-25 Mitchell Rep.) at 514, 538–42.*

**RESPONSE:** Plaintiffs do not dispute that they have asserted doctrine of equivalents based on the conjugated lipid limitations.

96.     *The following is a table of the asserted claims with a "conjugated lipid" mol % range limitation in the '359, '435, and '378 patents:*

| Patent and Claims | Claim Language |
|---|---|
| '359 Patent, claim 7, 12 (extrapolated from claim 1) | "a conjugated lipid . . . comprising from *0.5 mol % to 2 mol %* of the total lipid present in the particle" |
| '435 Patent, claims 7, 8, and 16 (extrapolated from claim 1) | "a conjugated lipid . . . comprising from *0.5 mol % to 2 mol %* of the total lipid present in the particle" |
| '378 Patent, claims 2, 7, 13, 18, and 19 | "polyethyleneglycol (PEG)-lipid conjugate consisting of from *0.1 mol % to 2 mol %* of the total lipid present in the particle" |

**RESPONSE:** Plaintiffs do not dispute the relevant claim language.

97.     *The '069, '359, and '435 patent claims recite a "conjugated lipid," and the '378 patent recites "a polyethyleneglycol (PEG)-lipid conjugate." See [M.] Ex. 2 ('069 patent) claim*

*1; [M.] Ex. 5 ('359 patent) claims 1, 7, 12; [M.] Ex. 6 ('435 patent) claims 1, 7, 8, 16; [M.] Ex. 7 ('378 patent) claims 1, 2, 7, 13, 18, 19.*

**RESPONSE:** Plaintiffs do not dispute the relevant claim language.

98.     *In the context of the Ratio Patents, a "PEG-lipid conjugate" is a "conjugated lipid." E.g., [M.] Ex. 7 ('378 patent), 11:62–64 ("SNALP and SPLP typically contain a cationic lipid, a non- cationic lipid, and* **a lipid conjugate (e.g., a PEG-lipid conjugate)***.").*

**RESPONSE:** Plaintiffs do not dispute that, in the context of the Lipid Composition Patents (which Moderna refers to as the Ratio patents), a PEG-lipid conjugate is a conjugated lipid.

99.     *Each of the asserted claims with a "conjugated lipid" mol % range limitation have an upper limit of 2 mol %. See [M.] Ex. 5 ('359 patent) claims 1, 7, 12; [M.] Ex. 6 ('435 patent) claims 1, 7, 8, 16; [M.] Ex. 7 ('378 patent) claims 1, 2, 7, 13, 18, 19.*

**RESPONSE:**  Plaintiffs do not dispute that 2 mol % is the recited upper limit of the literal conjugated lipid or PEG-lipid conjugate range for the '359, '435, and '378 patent claims. However, the Court construed the claims to include traditional rules of rounding.  D.I. 266 at 24-25.

100.     *Plaintiffs allege that 3.5 mol %, 3 mol %, and 2.5 mol % are equivalent to 2 mol % "conjugated lipid" in the asserted mol % range limitations. See [M.] Ex. 42 (2024-11-25 Mitchell Rep.) at 513, 538–42.*

**RESPONSE:** Plaintiffs dispute this fact.  Plaintiffs assert that particular lots of Moderna's COVID-19 vaccine, identified by its experts, infringe under the doctrine of equivalents.  *E.g.*, Ex 48 (Mitchell) ¶¶ 710-727.  The values set forth above are not assertions of infringement.  In response to Moderna's affirmative defense of ensnarement, Plaintiffs advanced "hypothetical claims" with conjugated lipid amounts of 3 mol% and 2.5 mol%.  Ex 48 (Mitchell) ¶¶ 738-739.

Hypothetical claims are not actual claims, are not relevant outside the context of ensnarement (which is not at issue in either party's summary judgment motion), and are not assertions of infringement under the doctrine of equivalents. Actual claims, not hypothetical claims, are infringed under the doctrine of equivalents. Plaintiffs' expert used a cutoff of "3.5 mol%" to determine infringement of the 3 mol% hypothetical claim in view of the Court's claim construction ruling on rounding. Ex 48 (Mitchell) ¶ 738.

### D.    Scope of Prosecution Disclaimer

101.    *The Examiner defined "about" as "+/- 10, 20, 30 mol % of a lipid component" during prosecution of the '069 patent. [M.] Ex. 74 (May 12, 2011 – '069 PH) at 2. The applicants did not offer an alternative definition of "about" during prosecution of the Ratio Patents.*

**RESPONSE:** Plaintiffs do not dispute this fact, with the clarification that in connection with the Amendment and associated remarks and prosecution, the applicants applied the Examiner's definition of "about." M. Ex. 75 at 7.

102.    *Plaintiffs agreed during claim construction that the Examiner had defined "about" to mean "+/- 10, 20, 30 mol % of a lipid component." D.I. 170 at 14, 37–38; [M.] Ex. 43 (2024-02-08 Plaintiffs' Markman Demonstratives) at 32–36; [M.] Ex. 41 (2024-02-08 Markman Tr.) at 36:4–8, 37:15–20, 38:7–10, 41:18–22.*

**RESPONSE:** Plaintiffs do not dispute this fact.

103.    *The Court agreed during claim construction that the Examiner had defined "about" to mean "+/- 10, 20, 30 mol % of a lipid component." D.I. 266 at 21–22.*

**RESPONSE:** Plaintiffs do not dispute this fact.

104.    *The applicants deleted "about" from the original-filed claims of the '069 patent to overcome the Examiners' rejection based on anticipation and obviousness over MacLachlan. See, e.g., [M.] Ex. 41 (2024-02-08 Markman Tr.) at 35:21–22 ("The Examiner rejected the Claims*

*over a prior art reference called [MacLachlan]."); id. at 35:23–36:3, 36:17–20, 42:14–17, 43:15-17; D.I. 170 at 51.*

**RESPONSE:** Plaintiffs do not dispute this fact, but note that it omits necessary context. Plaintiffs incorporate the responses to Paragraphs 69 and 72 above.

105.    *The mol % ranges of the four lipid components in the original-filed claims of the '069 patent overlapped with ranges of the four lipid components taught in MacLachlan. See, e.g., [M.] Ex. 41 (2024-02-08 Markman Tr.) at 35:23–36:3 ("[MacLachlan] disclosed a range for this cationic lipid of 2 to 60. So [MacLachlan] has a wide range of 2 to 60. And what the Examiner said in rejecting over [MacLachlan] is that the Claims as then presented . . . were all so broad, like [MacLachlan]. And these broad Claims overlapped with each other."); id. at 36:17–20, 42:14–17, 43:15-17; D.I. 170 at 51; [M.] Ex. 73 (July 30, 2010 – '069 PH) at 4–5; [M.] Ex. 57 (MacLachlan).*

**RESPONSE:** Plaintiffs do not dispute that certain of the lipid mol% ranges in the original claims containing "about," as interpreted by the Examiner, overlap with some of the lipid ranges recited in MacLachlan.  Plaintiffs dispute that MacLachlan discloses a phospholipid range that overlaps with the ranges in the Lipid Composition Patents.  M. Ex. 57 ¶ 85.  Plaintiffs incorporate the relevant context set forth in the response to Paragraph 83 above.

106.    *A comparison of the original claims of the '069 patent (with about) to the disclosures in MacLachlan show that each of the lipid component elements in the patent application almost entirely overlaps with MacLachlan:*

| Lipid Component | Original Claim 1 of the '069 Patent (with "about") | Prior-Art Reference MacLachlan |
|---|---|---|
| Cationic Lipid | 20 – 95 mol % | 2 – 60 mol % |
| Phospholipid (non-cationic lipid) | 0 – 40 mol % | 5 – 90 mol % |

| Cholesterol (non-cationic lipid) | 0 – 70 mol % | 20 – 55 mol % |
|---|---|---|
| Conjugated Lipid | 0 – 32 mol % | 1 – 20 mol % |

**RESPONSE:** Plaintiffs dispute Moderna's characterization that the lipid components in the original claims of the '069 patent "almost entirely overlap" with MacLachlan, but agree that there is a degree of overlap that prompted the Examiner's anticipation and obviousness rejections. Plaintiffs dispute that MacLachlan discloses a phospholipid range that overlaps with the ranges in the Lipid Composition Patents. M. Ex. 57 ¶ 85.

107.  *Plaintiffs agreed that they narrowed the claims during prosecution and to determine the scope of the narrower claims that "you get rid of 'about' and you narrow [the claim]," and that means "you get rid of that plus-or minus 10, 20, 30 [percent]." [M.] Ex. 41 (2024-02-08* Markman *Tr.) at 42:9–17; [M.] Ex. 43 (2024-02-08 Plaintiffs' Markman Demonstratives) at 36.*

**RESPONSE:** Plaintiffs do not dispute that the quoted statements were made during the *Markman* hearing. Plaintiffs incorporate the relevant context set forth in Paragraph 83 above.

108.  *Thus, the original and amended scope of each asserted Ratio Patent (for the lipid components alleged to have equivalents under Plaintiffs' DOE theories) are as follows:*

**'359 Patent**

| Lipid Component | Original Claim 1 (with "about") | Amended Claim 1 (without "about") |
|---|---|---|
| Cationic Lipid | 20 – 95 mol % | 49.5 – 65.49 mol % |
| Conjugated Lipid | 0 – 32 mol % | 0.45 – 2.49 mol % |

**'435 Patent**

| Lipid Component | Original Claim 1 (with "about") | Amended Claim 1 (without "about") |
|---|---|---|
| Cationic Lipid | 20 – 100 mol % | 49.5 – 85.49 mol % |
| Non-Cationic Lipid | 0 – 79.5 mol % | 12.5 – 49.549 mol % |
| Conjugated Lipid | 0 – 32 mol % | 0.45 – 2.49 mol % |

### '378 Patent

| Lipid Component | Original Claim 1 (with "about") | Amended Claim 1 (without "about") |
|---|---|---|
| Conjugated Lipid | 0 – 32 mol % | 0.05 – 2.49 mol % |

**RESPONSE:**  Plaintiffs dispute Moderna's characterization of the claimed ranges of the Lipid Composition Patents.  The complete set of those ranges are set forth, for example, in Plaintiffs' expert's infringement report. Ex 48 (Mitchell) ¶ 611.  Plaintiffs incorporate the relevant context set forth in the response to Paragraph 83 above.

109.    *The difference between the original claims and the amended claims are as follows:*

### '359 Patent

| Lipid Component | Original Claim 1 (with "about") | Amended Claim 1 (without "about") | Difference between Original and Amended Claims |
|---|---|---|---|
| Cationic Lipid | 20 – 95 mol % | 49.5 – 65.49 mol % | 20 – 49.499 and 65.5 – 95 mol % |
| Conjugated Lipid | 0 – 32 mol % | 0.45 – 2.49 mol % | 0 – 0.449 and 2.5 –32 mol % |

### '435 Patent

| Lipid Component | Original Claim 1 (with "about") | Amended Claim 1 (without "about") | Difference between Original and Amended Claims |
|---|---|---|---|
| Cationic Lipid | 20 – 100 mol % | 49.5 – 85.49 mol % | 20 – 49.499 and 85.5 – 95 mol % |
| Non-Cationic Lipid | 0 – 79.5 mol % | 12.5 – 49.549 mol % | 0 – 12.499 and 49.55 – 79.5 mol % |
| Conjugated Lipid | 0 – 32 mol % | 0.45 – 2.49 mol % | 0 – 0.449 and 2.5 –32 mol % |

**'378 Patent**

| Lipid Component | Original Claim 1 (with "about") | Amended Claim 1 (without "about") | Difference between Original and Amended Claims |
|---|---|---|---|
| Conjugated Lipid | 0 – 32 mol % | 0.05 – 2.49 mol % | 0 – 0.049 and 2.5 – 32 mol % |

**RESPONSE:** Plaintiffs dispute Moderna's characterization of the claimed ranges of the Lipid Composition Patents. Plaintiffs incorporate the relevant context set forth in the response to Paragraph 83 above.

110. *The table below shows a comparison of (1) the difference between the original and amended claims ("disclaimed territory") relevant to Plaintiffs' DOE theories; (2) Plaintiffs' alleged equivalent for each lipid component; and (3) the disclosure in MacLachlan for each lipid component. [M.] Ex. 75 (Aug. 11, 2011 – '069 PH) at 8.*

| Lipid Component | Disclaimed Territory (relevant to DOE) | Plaintiffs' Alleged Equivalent | Prior Art MacLachlan Disclosure |
|---|---|---|---|
| Cationic Lipid | 20 – 49.499 mol % | 44.5 – 49 mol % | 2 – 60 mol % |
| Non-Cationic Lipid | 49.55 – 79.5 mol % | 50 – 53.5 mol % | 25 – 100 mol % |
| Conjugated Lipid | 2.5 – 32 mol % | 2.5 – 3.5 mol % | 1 – 20 mol % |

**RESPONSE:** Plaintiffs dispute Moderna's characterization of the claimed ranges of the Lipid Composition Patents. Plaintiffs dispute that they disclaimed the territory between the original and amended claims and incorporate the relevant context set forth in the response to Paragraph 83 above. Moderna's characterization of Plaintiffs' disclaimer is a question of law and not an undisputed fact.

111. *For the cationic lipid mol % range limitation, the range that Plaintiffs seek to capture through DOE (i.e., 44.5–50 mol %) was encompassed within the literal scope of the*

*original-filed '069 claim reciting the limitation mol % range limitation with "about." See [M.] Ex. 42 (2024-11-25 Mitchell Rep.) at 456, 481–86.*

**RESPONSE:** Plaintiffs dispute Moderna's characterization of the claimed ranges of the Lipid Composition Patents. Plaintiffs refer to their previous response to Paragraph 88 concerning the asserted cationic lipid equivalents. Plaintiffs further incorporate the relevant context set forth in the response to Paragraph 83 above.

112. *For the non-cationic lipid mol % range limitation, the range that Plaintiffs seek to capture through DOE (i.e., 49.5–53.5 mol %) was encompassed within the literal scope of the original-filed '435 patent claims reciting the limitation mol % range limitation with "about." See [M.] Ex. 42 (2024-11-25 Mitchell Rep.) at 481–486, 510–13.*

**RESPONSE:** Plaintiffs dispute Moderna's characterization of the claimed ranges of the Lipid Composition Patents. Plaintiffs refer to their previous response concerning the asserted non-cationic lipid equivalents set forth in Paragraph 94 above. Plaintiffs further incorporate the relevant context set forth in the response to Paragraph 83 above.

113. *For the conjugated lipid mol % range limitation, the range that Plaintiffs seek to capture through DOE (i.e., 2.0–3.5 mol %) was encompassed within the literal scope of the original-filed '069 claim reciting the limitation mol % range limitation with "about." See [M.] Ex. 42 (2024-11-25 Mitchell Rep.) at 513, 538–42.*

**RESPONSE:** Plaintiffs dispute Moderna's characterization of the claimed ranges of the Lipid Composition Patents. Plaintiffs refer to their previous response concerning the asserted conjugated lipid equivalents set forth in Paragraph 100 above. Plaintiffs further incorporate the relevant context set forth in the response to Paragraph 83 above.

114. *Each of the ranges of lipids Plaintiffs seek to capture through DOE (i.e., 2.5–3.5 mol % PEG, 44.5–50 mol % cationic lipid, and 49.5–53.5 mol % non-cationic) were encompassed in the ranges taught by prior art MacLachlan. See ¶¶ 88, 94, 100 supra.*

**RESPONSE:**  To the extent that Moderna is contending that MacLachlan taught the use of or disclosed Plaintiffs' asserted equivalents, Plaintiffs dispute that fact, and the evidence Moderna has cited does not establish that fact.  Plaintiffs further incorporate the responses to Paragraphs 88, 94, and 100 above.

115. *Plaintiffs agreed during claim construction that to show infringement they "would need to show . . . that Moderna's product . . . has particles between 49.5 and 65.49 mol percent cationic lipid" based on the removal of "about" from in the amended claims. [M.] Ex. 41 (2024-02-08 Markman Tr.) at 39:22–40:9 (using claim 1 of the '069 patent as an example).*

**RESPONSE:**  Plaintiffs dispute this fact.  Plaintiffs' statement was not made in the context of assessing what would be necessary to show infringement under the doctrine of equivalents, and instead reflects what Plaintiffs would need to show to establish infringement under the literal scope of the claim for the cationic lipid limitation of claim 1 of the '069 patent.  M. Ex. 41 (2024-02-08 *Markman* Tr.) at 39:22-41:10.  Plaintiffs incorporate the response to Paragraph 83 above.

116. *Plaintiffs have only argued that the "tangential relationship" exception applies to rebut the presumption of prosecution history estoppel. [M.] Ex. 44 (2024-06-07 Genevant Resp. Rog. 10) at 85; [M.] Ex. 45 (2024-06-07 Arbutus Resp. Rog. No. 10) at 85.*

**RESPONSE:**  Plaintiffs do not dispute that they contend that the reason for the amendment bears no more than a tangential relationship to the asserted equivalents.

IV.    **FACTS RELATED TO INDEFINITENESS OF "FULLY ENCAPSULATED" LIMITATION OF '651 PATENT**

A.    **U.S. Patent No. 9,504,651**

117.    *The Court construed the term from the '651 patent claims 1, 13, and 14, "wherein at least 70% / at least 80% / about 90% of the mRNA in the formulation is fully encapsulated in the lipid vesicles" as "wherein at least 70% /at least 80% / about 90% of the mRNA in the formulation is fully, as distinct from partially, contained inside the lipid vesicles." D.I. 267; D.I. 266 at 37.*

**RESPONSE:** Plaintiffs do not dispute this fact.

118.    *The '651 patent defines "lipid encapsulated" to "refer to a lipid formulation which provides a compound with full encapsulation, partial encapsulation, or both." [M.] Ex. 4 ('651 patent) at 5:38–40; D.I. 266 at 35.*

**RESPONSE:**    Plaintiffs do not dispute that the '651 patent includes the quoted language. Plaintiffs provide additional context below.  *Infra* Additional Resp. Fact Paragraphs 178-181.

119.    *The term "partial encapsulation" only appears in the '651 patent in one place. [M.] Ex. 4 ('651 patent) at 5:38–40. "Partially" encapsulated nucleic acid is not defined in the '651 patent— expressly or impliedly.*

**RESPONSE**:  Plaintiffs do not dispute that the term "partial encapsulation" only appears in the '651 patent in one place at 5:38–40.  Plaintiffs dispute that "partially" encapsulated is not defined in the '651 patent.  The definition of "lipid encapsulated" which "refer[s] to a lipid formulation which provides a compound with full encapsulation, partial encapsulation, or both," implies that partially encapsulated nucleic acid is encapsulated nucleic acid that is not fully encapsulated.  M. Ex. 4 ('651 patent) at 5:38–40.

As described below, the '651 patent also defines the term "lipid vesicle" by describing

various lipid compositions, including "lipid aggregates or micelles, wherein the encapsulated component is contained within a relatively disordered lipid mixture." *Infra* Additional Resp. Fact Paragraph 178. Dr. Murthy opined that this definition helps elucidate the patent's definition of partial encapsulation. *Infra* Additional Resp. Fact Paragraph 180. In addition, as described below, the file history also clarifies and defines partial encapsulation. The file history described systems where nucleic acid is complexed to lipids and "little, if any, of the [nucleic acid] payload is encapsulated within" enclosed particles. *Infra* Additional Resp. Fact Paragraph 177. In addition, Patent Application WO 01/05374, which is produced in full in the '651 file history, notes that "fully encapsulated [is] distinct from particles in which a therapeutic agent is complexed (for example by ionic interaction) with the exterior of the particle, or from particles in which the therapeutic agent is partially embedded in the lipid and partially exposed to the exterior medium." *Infra* Additional Resp. Fact Paragraph 181.

Finally, Dr. Murthy opined that "in a system capable of achieving high levels of full encapsulation (such as in LNPs or liposomes), the POSA would not have expected [partial encapsulation] to occur," Ex 47 ¶ 518, and cites evidence supporting that this was the understanding at the time of the patent, *infra* Additional Resp. Fact Paragraphs 183-184.

120.    *The term "full encapsulation" only appears in the '651 patent in one place. [M.] Ex. 4 ('651 patent) at 5:38–40. "Fully" encapsulated nucleic acid is not defined in the '651 patent— expressly or impliedly.*

**RESPONSE:** Plaintiffs do not dispute that the term "full encapsulation" only appears in the '651 patent in one place at 5:38–40. Plaintiffs dispute that "fully" encapsulated is not defined in the '651 patent. The definition of "lipid encapsulated" which "refer[s] to a lipid formulation which provides a compound with full encapsulation, partial encapsulation, or both," connotes that

fully encapsulated nucleic acid is distinct from partially and unencapsulated nucleic acid.  M. Ex. 4 ('651 patent) at 5:38–40

In addition, as described below, the patent defines "lipid vesicle" to include compositions comprised of particles wherein "***lipids coat an interior***," and the patent further defines "SPLP" as being a type of particle that falls within this category.  *Infra* Additional Resp. Fact Paragraph 178.  Dr. Murthy opined that these definitions further provide meaning to fully encapsulated because it was known in the field at the time of the invention that "SPLPs are fully encapsulated" particles.  *Infra* Additional Resp. Fact Paragraph 183 (citing U.S. Patent 6,841,538, whose application was filed in 1999).  Moderna's own obviousness expert, Dr. Anderson, opined similarly, explaining that the prior art discloses "fully encapsulated" nucleic acid particles, citing to a disclosure about SPLPs.  *Infra* Additional Resp. Fact Paragraph 182.  Dr. Murthy opined that based on the patent's definition of "lipid encapsulated," "lipid vesicle," and "SPLP," "[t]he POSA would have recognized that 'full encapsulation' as used in the '651 patent refers to nucleic acid that is fully, as distinct from partially, contained inside the lipid vesicles such as in a system akin to lipid vesicles which have a 'lipid bilayer' or a 'lipid[] coat[ing]' encapsulating an aqueous interior, in contrast to aggregates where the encapsulated component is part of a 'disordered mixture.'"  Ex 47 (Murthy) ¶ 513.

As Dr. Murthy explains, this understanding is consistent with other portions of the '651 patent specification, Ex 47 (Murthy) ¶ 513, as well as the file history and the art's understanding of the term fully encapsulated at the time of the patent,  *Infra* Additional Resp. Fact Paragraph 181.  For example, Dr. Murthy cited to a patent application, fully reproduced in the prosecution history of the '651 patent, which expressly defines the term "fully encapsulated" as "refer[ring] to lipid particles in which the therapeutic agent is contained in the lumen [i.e., interior] of a lipid

vesicle such as a liposome or embedded within a bilayer of a lipid particle such that no part of the therapeutic agent is directly accessible to the external medium surrounding the lipid particle," and contrasts this to nucleic acid where at least a portion is exposed to the external medium.  Ex 47 (Murthy) ¶ 514 (quoting '651 File History, WO 01/05374 at 5:21-28).

Dr. Murthy opined that "[r]oughly twenty-two years after WO01/05374 was filed, Moderna's former CSO Melissa Moore provided a similar description of 'fully encapsulated' nucleic acid."  Ex 47 (Murthy) ¶ 514 (citing statement made by former Moderna CSO at a "Moderna Inc Science & Technology Day," on May 17, 2022, that "lipid nanoparticles [] have this beautiful lipid bio-layer around the outside []. So the mRNA is fully encapsulated within the lipid nanoparticle.  With lipoplexes, what happens is that the mRNA might be covered mostly with that lipid, but can stick an elbow out.  And if it sticks an elbow out, then there's a digestive enzyme that's going to clip it."); Ex 70 (Moderna Sci. & Tech. Day) at -391.

During claim construction, citing to the specification of the '651 patent, the Court explained the purpose of the invention and used this information to interpret the meaning of the term fully encapsulated: "A POSITA would only count those strands that are fully contained inside the vesicle, as it is only if those strands achieve the claimed percentage that the invention provides a novel benefit."  D.I. 266 at 36; *infra* Additional Resp. Fact Paragraph 185.

Finally, as described below, Dr. Prud'homme admitted that in a patent application for which he an inventor, there is "very similar" language to the '651 patent describing full encapsulation, and Dr. Prud'homme confirmed that he "understood" the language.  *Infra* Additional Resp. Fact Paragraph 190.

121.    *Plaintiffs "admit[ted] that mRNA can be partially encapsulated in lipid vesicles where the lipid vesicles are lipid aggregates or micelles where the encapsulated mRNA is*

*contained within a relatively disordered lipid mixture.*" [M.] Ex. 68 (2024-06-07 Arbutus Resp. to RFAs) at 37–38; [M.] Ex. 69 (2024-06-07 Genevant Resp. to RFAs) at 37–38.

**RESPONSE:** Plaintiffs do not dispute that the patent's reference to "lipid aggregates or micelles, wherein the encapsulated component is contained within a relatively disordered lipid mixture," could relate to "partial encapsulation," but Plaintiffs dispute that there is any evidence that there would exist partially encapsulated mRNA in lipid vesicle formulations capable of achieving the claimed levels of encapsulation, much less that there would be non-negligible amounts of such hypothetical partially encapsulated mRNA. As described below, *infra* Response to Paragraph 135, this type of nucleic acid is therefore irrelevant to indefiniteness.

Dr. Murthy opined that "in systems where nucleic acid is complexed to lipids, entrapped by lipid aggregates, or contained within a relatively disordered lipid mixture, the POSA would have understood that such nucleic acids are not fully encapsulated." Ex 47 (Murthy) ¶ 507 (citing statement from file history that "little, if any, of the [nucleic acid] payload is encapsulated within" enclosed particles in such systems).

Dr. Murthy further explained that "[r]egardless of whether the nucleic acid molecules in a lipoplex composition are partially encapsulated or unencapsulated is not relevant to my opinions concerning the definiteness of the claims of the '651 patent," because the claims are directed to fully encapsulated nucleic acid. Ex 47 (Murthy) ¶ 509. As Dr. Murthy further explained, citing extensive evidence, "in a composition characterized by high levels of full encapsulation (*e.g.*, a liposomal- or LNP-like composition, where the vesicle includes an outer lipid shell) there will be no (or at most a negligible amount) nucleic acid that is partially inside and partially outside the vesicle." *Id.* ¶ 506; *infra* Additional Resp. Fact Paragraphs 172-177, 191-197.

Dr. Prud'homme has not cited to any evidence-based (*i.e.*, non-cartoon or hypothetical)

example of a formulation with partially encapsulated nucleic acid.  Ex 47 (Murthy) ¶¶ 536-537;

Ex 99 (Murthy Sur-Reply) ¶¶ 32-33.  Dr. Prud'homme testified, "I don't believe there's any

evidence" that mRNA "is or is not" half-in and half-out of LNPs.  Ex 46 (Prud'homme Tr.) at

191:13-21.

### B.    Inconsistent Definitions[9]

#### 1.    Genevant/Arbutus Witnesses

122.    *Ian MacLachlan testified that the difference between "fully" and "partially"*
*encapsulated is that one has material on the outside of the surface of a lipid vesicle. [M.] Ex. 47*
*(MacLachlan Dep. Tr.) at 30:10–19 ("That approach . . . was able to confirm that the results of the*
*dye exclusion assay studies were indicative of what I've just described as full encapsulation to*
*differentiate from partial encapsulation, whereby one may have material that is on the outside or*
*on the surface of a lipid vesicle.").*

**RESPONSE:**  Plaintiffs do not dispute that the quoted language appears in the transcript,

but dispute the relevance and admissibility of this testimony to the understanding of the claims of

the '651 patent, as construed by the Court.  The above quote is a small excerpt of Dr. MacLachlan's

response to the question "So you said that the work that Protiva did was developing a

manufacturing methodology that allowed for highly efficient full encapsulation of nucleic acids.

What do you mean by 'full encapsulation?'"  Ex 60 (MacLachlan Tr.) at 27:22-28:1.  Dr.

MacLachlan was asked what *he* meant by the term "full encapsulation;" he was not asked what

"fully encapsulated" as claimed, "when read in light of the specification delineating the patent and

prosecution history" means, thereby making his cited testimony irrelevant to the indefiniteness

standard articulated in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  The

---

[9] Plaintiffs recite Moderna's headers for purposes of clarity and dispute that Plaintiffs' witnesses provided "inconsistent definitions," as set forth in the responses to the numbered paragraphs.

Federal Circuit has made clear that it is erroneous to use "inventor testimony, obtained in the context of litigation . . . to invalidate issued claims" on the basis of indefiniteness. *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1380 (Fed. Cir. 2000); *see also 10X Genomics, Inc. v. Parse Biosciences, Inc.*, 2025 WL 470468 at *11 (D. Del. 2025) ("[A]n inventor's subjective belief cannot be used to invalidate a patent under § 112(b)."). Moderna is improperly trying to prove indefiniteness with testimony about the subjective belief of an inventor, untethered to an interpretation of the claims when read in light of the patent; the testimony is therefore inadmissible.

Regardless, Moderna's citation is cherry-picked. Dr. MacLachlan described the ways in which "full encapsulation" can be measured and can be distinguished from nucleic acid that is not fully encapsulated:

> The state-of-the-art methodology at the time for measuring this property was the use of fluorescent dye exclusion assay methodology which had the ability to confirm that -- and/or measure the extent to which nucleic acid may be on the outside of the vesicle and differentiate from that nucleic acid which was fully encapsulated and internalized by the lipid vesicle.
>
> That approach, in combination with orthogonal methodology, including the use of nuclease protection assays and electron microscopy, for example, was able to confirm that the results of the dye exclusion assay studies were indicative of what I've just described as full encapsulation to differentiate from partial encapsulation, whereby one may have material that is on the outside or on the surface of a lipid vesicle.

Ex 60 (MacLachlan Tr.) at 30:2-19. *See also* Ex 47 (Murthy) ¶¶ 525-526.

Dr. MacLachlan's testimony is consistent with Dr. Murthy's opinion "that dye-exclusion assays could be used to measure full encapsulation," along with "orthogonal assays [that] may be used to confirm the dye assay's measurement was not including any (or any significant amount) of partially encapsulated nucleic acid, if desired," Ex 47 (Murthy) ¶ 531, as well as his opinion that "to the extent the nucleic acid were able to exist in such a [part-in-part-out] state (which, again, Dr. Prud'homme provides no evidence for), it is likely that standard fluorescent dyes would

likewise be able to enter the lipid vesicle (presumably through the same pore through which the nucleic acid has traversed), and thus the nucleic acid strand would be quantified as unencapsulated (and not fully encapsulated)," *id.* at ¶ 535.

123. *Lloyd Jeffs testified that in "some contexts" "the partial in partial encapsulation refer to a portion of the nucleic acid that is not encapsulated." [M.] Ex. 48 (Jeffs Dep. Tr.) at 81:5–8 ("Q. So does the partial in partial encapsulation refer to a portion of the nucleic acid that is not encapsulated? A. In some contexts, you could say that.").*

**RESPONSE:**  Plaintiffs do not dispute that the quoted language appears in the transcript, but dispute the relevance and admissibility of this testimony to the understanding of the claims of the '651 patent, as construed by the Court.  Dr. Lloyd Jeffs testified, when asked about a potential definition of the term "partial encapsulation" without reference to any particular context, let alone the '651 patent, that "[i]n *some contexts*, you *could* say that."  Ex 61 (Jeffs Tr.) at 81:5-8.  Dr. Jeffs did not testify that this definition applies in the context of the claims, specification, or file history of the '651 patent.  As described above, Dr. Jeffs' testimony is therefore irrelevant to indefiniteness under the *Nautilus* standard.  *Supra* Response to Paragraph 122.  In addition, Dr. Jeffs was testifying about his subjective belief.  Ex 61 (Jeffs Tr.) at 80:13-81:8 (explaining how "I would use" partially encapsulated).  Moderna is improperly trying to prove indefiniteness with testimony about the subjective belief of an inventor, untethered to an interpretation of the claims when read in light of the patent; the testimony is therefore inadmissible.  *Nautilus,* 572 U.S. at 901; *Solomon*, 216 F.3d at 1380; *10X Genomics,* 2025 WL 470468 at *11 (D. Del. 2025).

Regardless, Dr. Jeffs did not testify that, in lipid compositions capable of achieving the claimed encapsulation levels (*e.g.*, LNPs), mRNA will be partially encapsulated.

124.    *Adam Judge testified that he did not know what "partially encapsulated" meant and could "speculate," but did not know a way to test for partial encapsulation. See, e.g., [M.] Ex. 49 (Judge Dep. Tr.) at 47:11–12 ("I don't know what you mean by partially encapsulated."), 47:20–23 (Q. "So you have no understanding of what partial encapsulation of a nucleic acid would be? A. I can -- I can speculate."), 48:23–49:2 ("Can you think of any way that you would be able to test for partial encapsulation of nucleic acid? A. That's -- I don't -- I -- I don't know.") (objection omitted), 46:20–49:13.*

**RESPONSE:** Plaintiffs do not dispute that the quoted language appears in the transcript, but dispute the relevance and admissibility of this testimony to the understanding of the claims of the '651 patent, as construed by the Court.  Moderna makes no attempt to establish that Dr. Judge is a POSA.  The Federal Circuit has long made clear that "[t]o offer expert testimony from the perspective of a skilled artisan in a patent case—like for claim construction, validity, or infringement—a witness must at least have ordinary skill in the art," and that "[w]ithout that skill, the witness' opinions are neither relevant nor reliable." *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1376-77 (Fed. Cir. 2022).  Because Moderna improperly uses Dr. Judge's testimony to try to demonstrate the POSA's understanding or lack thereof of a claim term for its invalidity arguments, this testimony is inadmissible.

Additionally, Moderna omits that in response to both the question before and the question after Moderna's quoted testimony, Dr. Judge clarified that this area is outside of his expertise, as he is "not an analytical chemist" and "not a formulation chemist."  Ex 62 (Judge Tr.) 46:20-47:12, 49:3-8.  In addition, Dr. Judge did not testify that this definition applies in the context of the claims, specification, or file history of the '651 patent.  In fact, just prior to Moderna's quoted section of the transcript, the questioner asked whether Dr. Judge was familiar with the '651 patent, to which

Dr. Judge responded, "I'm not familiar with the contents of the patent." Ex 62 (Judge Tr.) 45:9-25. In addition, Dr. Judge was testifying about his subjective belief, Ex 62 (Judge Tr.) 46:13-49:13 (explaining how "I would view th[e] term" encapsulation). Moderna is improperly trying to prove indefiniteness with testimony about the subjective belief of Plaintiffs' fact witness, untethered from an interpretation of the claims when read in light of the patent; the testimony is therefore inadmissible. *Nautilus*, 572 U.S. at 901; *Solomon*, 216 F.3d at 1380; *10X Genomics*, 2025 WL 470468 at *11 (D. Del. 2025).

Regardless, when viewed as a whole, Dr. Judge's testimony is consistent with that of Plaintiffs' expert. Dr. Judge was additionally asked "And what is your understanding of 'fully encapsulate the oligonucleotide payload'?," to which he testified "I think scientifically I would say it means that the payload is inside the particle and protected . . . From my perspective it means it would be inside and [] functional." Ex 62 (Judge Tr.) 94:20–95:8. As Dr. Murthy opined, this testimony "reflect[s] Dr. Judge's understanding of 'fully encapsulated,' which is consistent with the Court's construction and the POSA's understanding of the term." Ex 47 (Murthy) ¶ 523. Moderna omits Dr. Judge's testimony that there were in fact confirmatory assays a POSA could use to confirm the encapsulation state of mRNA. Ex 47 (Murthy) ¶ 528 (Dr. Judge stated that one could use "nuclease protection to see whether the nucleic acid was protected from degradation" (quoting Judge Tr. 46:24-47:6)).

125. *Stephen Reid testified that "partially encapsulated" was not a term typically used in their work and that "partially" was vague and could mean different things. See, e.g., [M.] Ex. 50 (Reid Dep. Tr.) at 58:3–7 ("Q. And as a scientist, what does the term 'partially encapsulated' mean? A. As it's – it's not a term we typically use in our work."), 58:13–21 ("Q. But I'm asking for your understanding as a scientist. Is there a scientific meaning to the term 'partially*

*encapsulated'? THE WITNESS: I mean, 'partially' could mean different things, so it's vague what*

*'partially' could mean.") (objection omitted).*

**RESPONSE:** Plaintiffs do not dispute that the quoted language appears in the transcript,

but dispute the relevance and admissibility of this testimony to the understanding of the claims of

the '651 patent, as construed by the Court.  As Dr. Murthy opined:

> To my knowledge, Mr. Reid works with LNP systems, which—as explained
> above—would not include mRNA that is partially inside and partially outside of
> the lipid vesicle. Furthermore, Mr. Reid did not consider the meaning of any claim
> terms based on the specification or file history of the '651 patent. The fact that Mr.
> Reid, in his personal capacity as a fact witness, noted that "'partially' could mean
> different things" when asked for the "scientific meaning" of the term is irrelevant
> to the question of whether the actual claim language, as construed by the Court,
> could have been reasonably understood by the POSA.

Ex 47 (Murthy) ¶ 522; *see also id.* ¶ 521.

Mr. Reid did not testify that this definition applies in the context of the claims,

specification, or file history of the '651 patent.  In fact, Moderna did not hand Mr. Reid a copy of

the '651 patent until after the cited portion of the deposition transcript.  Ex 63 (Reid Tr.) 81:16-

20.  In addition, Mr. Reid was testifying about his subjective belief.  As Moderna's citations show,

he was asked about his personal understanding as a scientist.  *See also* Ex 63 (Reid Tr.) 81:16-21,

86:8-9 (questioning attorney clarifying that "I'm not asking you to interpret what's covered by the

patent or not").  Moderna is improperly trying to prove indefiniteness with testimony about the

subjective belief of Plaintiffs' fact witness, untethered to an interpretation of the claims when read

in light of the patent; the testimony is therefore inadmissible.  *Nautilus,* 572 U.S. at 901; *Solomon*,

216 F.3d at 1380; *10X Genomics,* 2025 WL 470468 at *11 (D. Del. 2025).

Further, Moderna omits testimony consistent with Dr. Murthy's opinions.  For example,

Mr. Reid testified that the term "fully encapsulated" means "the nucleic acid is fully inside the

LNP."  Ex 63 (Reid Tr.) 57:19-24.

126.    *Sunny Jeng testified that he does not distinguish between "encapsulation" and "fully encapsulation." [M.] Ex. 51 (Jeng Dep. Tr.) at 64:15–22 ("Q. what does it mean to be fully encapsulated? A. I mean, I see the word 'fully' as an adjective of encapsulation. But in my technical view, I don't have a -- I don't distinguish encapsulation or fully encapsulation.").*

**RESPONSE:** Plaintiffs do not dispute that the quoted language appears in the transcript, but dispute the relevance and admissibility of this testimony to the understanding of the claims of the '651 patent, as construed by the Court.  Moderna makes no attempt to establish that Dr. Jeng is a POSA.  Because Moderna improperly uses Dr. Jeng's testimony to try to demonstrate the POSA's understanding of a claim term for purposes of invalidity, this testimony is inadmissible. *Kyocera*, 22 F.4th at 1376-77.

In addition, Dr. Jeng did not testify that this definition applies in the context of the claims, specification, or file history of the '651 patent.  In fact, earlier in the deposition Dr. Jeng testified that he is "very unfamiliar" with the patents, including the '651 patent.  Ex 64 (Jeng Tr.) 27:16-28:20.  In addition, Dr. Jeng was testifying about his subjective belief, Ex 64 (Jeng Tr.) 64:15-22 ("in my technical view . . . I don't distinguish . . . ).  Moderna is improperly trying to prove indefiniteness with testimony about the subjective belief of Plaintiffs' fact witness, untethered to an interpretation of the claims when read in light of the patent; the testimony is therefore inadmissible.  *Nautilus,* 572 U.S. at 901; *Solomon*, 216 F.3d at 1380; *10X Genomics,* 2025 WL 470468 at *11 (D. Del. 2025).

Regardless, Dr. Murthy opined that, "[i]f anything, Dr. Jeng's testimony that he doesn't distinguish between 'encapsulation' and 'full encapsulation' further supports the definiteness of the claims, in view of the repeated references to 'encapsulation efficiency' throughout the specification and file history, which the POSA would have understood to be a reference to the

extent of full encapsulation." Ex 47 (Murthy) ¶ 524.

127.     *James Heyes testified that "it's an open question . . . amongst formulators"*
*whether the nucleic acid is something that's both inside and outside the lipid particle. [M.] Ex.*
*52 (Heyes Dep. Tr. IPR2018-00680, Ex. 1026) at 101: 8–14 ("So you said can something be*
*inside or outside? I just -- so what I'm saying is I don't think you can really determine whether*
*siRNA – it's an open question I think amongst formulators when you use the RiboGreen method*
*are you looking at nucleic acid that's both inside and outside as you described or is it something*
*that really is generally out -- completely outside.").*

**RESPONSE:**  Plaintiffs do not dispute that the quoted language appears in the transcript,
but dispute the relevance and admissibility of this testimony to the understanding of the claims of
the '651 patent, as construed by the Court.  Immediately prior to the cited testimony, Dr. Heyes
was asked about the '069 patent, and the cited testimony was still within that context, not the
context of the '651 patent. Ex 65 (Heyes Tr. IPR2018-00680, Ex. 1026) 98:18-101:14.  Moderna
is improperly trying to prove indefiniteness with testimony that is untethered to an interpretation
of the claims when read in light of the patent; the testimony is therefore inadmissible.  *Nautilus,*
572 U.S. at 901.

Dr. Heyes also testified that "most of the nucleic acid is inside the lipid particles, yes."  *Id.*
at 101:20-23.  Finally, Dr. Heyes made clear that the portion of his cited testimony is about a
hypothetical, as he clarified the examining attorney's question as stating, "is it an siRNA that
*maybe* it's half inside and then half outside," and the examiner affirmed "[t]hat was my question,
yeah."  *Id*. at 101:4-7 (emphasis added).

Dr. Heyes testified that he has not seen forms of partially encapsulated nucleic acid akin
to a part-in, part-out strand.  Ex 66 (Heyes Tr.) at 171:10-20.  Dr. Heyes further clarified his

understanding of the term fully encapsulated, stating that "Fully encapsulated means the payload is inside the particle." *Id.* at 169:22-170:14.  Dr. Heyes further testified that dye exclusion assays such as RiboGreen could, in fact, measure if the mRNA is "truly encapsulated." *Id.* at 128:4-15 ("Q. And how does one determine whether something is truly encapsulated?  A. So typically we would use a fluorescent dye, like RiboGreen, to establish whether a payload is encapsulated or not. There are other things you can use to establish whether something is truly encapsulated. For example, you can use -- you can look at nuclease digestion. You know, if the nucleic acid is stable to a nuclease that's present, it's likely protected on -- and truly encapsulated on the inside.").

128.    *Dr. Georg Schuster did not have a definition of "partially encapsulated mRNA." See, e.g., [M.] Ex. 53 (Schuster Dep. Tr.) at 169:8–20 ("Q. So sitting here today, you can't define or explain what 'partially encapsulated mRNA' is, right? . . . A. I would not -- I don't have now a definition on 'partially encapsulated.' Q. Do you have a definition of 'fully encapsulated mRNA' as a scientist in the field? A. As I said, I was not asked to work on encapsulation, what it fully means to be partially or fully encapsulated." (objections omitted)).*

**RESPONSE:** Plaintiffs do not dispute that the quoted language appears in the transcript, but dispute the relevance and admissibility of this testimony to the understanding of the claims of the '651 patent, as construed by the Court.  Dr. Schuster did not testify that this definition applies in the context of the claims, specification, or file history of the '651 patent.  Dr. Schuster made it clear that he has not seen the patents in suit and is not familiar with the claims in those patents. *See, e.g.*, Ex 67 (Schuster Tr.) 48:2-7 ("Q. Have you seen the patents that are being asserted by plaintiffs in this case? A. No. Q. Do you know any of the claims in those patents? A. No."). Moderna is improperly trying to prove indefiniteness with irrelevant testimony untethered to an

interpretation of the claims when read in light of the patent; the testimony is therefore inadmissible. *Nautilus,* 572 U.S. at 901.

Dr. Schuster, one of Plaintiffs' infringement experts, does not offer any opinions on the '651 patent, much less whether the term "fully encapsulated," as construed by the Court, is definite. The testimony Moderna quotes was preceded by a long line of questions where Dr. Schuster made clear he "was not asked" to consider the term "partially encapsulated mRNA," and that he did not have, in the moment, "a full definition of that" term. Ex 67 (Schuster Tr.) at 168:5-169:7 ("Q. Are you familiar with the term 'partially encapsulated mRNA'? A. I was not asked. Q. I am asking you now. Are you familiar with the term 'partially encapsulated mRNA'? A. Familiar with the term. I answered. I'm familiar with the term. Q. What is partially encapsulated mRNA? A. I don't have now a full definition of that. Q. You can't provide a definition of 'partially encapsulated mRNA'? A. I just said, I don't have now a textbook definition of 'partially encapsulated mRNA.' Q. . . . As a scientist in the field, what is your understanding of the term 'partially encapsulated mRNA'? A. I would need to think about it more. I don't have now a definition for that."). Dr. Schuster was plainly testifying about his subjective belief, which as described above cannot be used to invalidate a patent as indefinite. *Supra* Response to Paragraph 122. This testimony is therefore not admissible.

129.    *Dr. David Thompson testified that surface-adhered nucleic acid could not be considered "partially" encapsulated nucleic acid. [M.] Ex. 54 (Thompson Dep. Tr.) at 136:13–19 ("Q. Would a surface-adhered nucleic acid be considered 'partially encapsulated nucleic acid'? A. No. Q. Would it be considered "unencapsulated nucleic acid"? A. I wouldn't consider it unencapsulated, simply physisorbed to the surface.").*

**RESPONSE:** Plaintiffs do not dispute that the quoted language appears in the transcript

but note that the testimony is cherry-picked.  For example, Dr. Thompson also testified that the
term "fully encapsulated" "is very clear:  The nucleic acid is within a lipid vesicle.  If it's not in
that state, it can be any number of different states."  Ex 68 (Thompson Tr.) 132:25-133:8.  Dr.
Thompson's later testimony "emphasiz[es] that nucleic acid would *not* exist in a partially
in/partially out state in a standard liposome, with Dr. Thompson calling this a 'six-legged
individual example,' and 'an absurd model.'"  Ex 47 (Murthy) ¶ 533 (citing Ex 68 (Thompson Tr.)
136:23-139:11).  Dr. Murthy notes that this "opinion appears to be consistent with my own, that
the POSA would not have expected to obtain 'half-in-half-out' nucleic acid in a fully encapsulated
system."  *Id.*

130.    *Dr. Niren Murthy's definition of "fully encapsulated" simply repeats the claim
construction. [M.] Ex. 55 (Murthy Reb. Rep.) ¶ 501.*

**RESPONSE:**  Plaintiffs do not dispute that Dr. Murthy interprets the terms of the '651
patent pursuant to the Court's construction.   The Court has construed the term "fully
encapsulated," and the parties and their experts are required to apply that construction at this
juncture of the case.

Dr. Murthy also opines at length about the POSA's understanding of the term "fully
encapsulated," including as contrasted with "partially encapsulated."  Ex. 47 (Murthy) ¶¶ 501-526.
As explained below, *infra* Additional Resp. Fact Paragraphs 172-184, Dr. Murthy provides ample
testimony and evidence about how a POSA would have understood the term fully encapsulated in
light of the patent's specification and knowledge of one skilled in the art at the time of the
invention.  Dr. Murthy's definition of fully encapsulated not only aligns with definition of the
claim as construed by the court, but Dr. Murthy also explained how his definition of the term aligns
with how the term was defined in the file history of the '651 patent and was defined in the art at

that time.  *Id.*

### 2.    Moderna Witnesses

131.    *Dr. Robert Prud'homme testified that there is "no real definition of fully encapsulated or how to measure it or what that term means," that "[t]here is no accepted definition in the field as to what partially encapsulated means," and that "'partial' is also unclear as to its explicit definition and certainly unclear on whether one could measure it or not." [M.] Ex. 56 (Prud'homme Dep. Tr.) at 180:21–182:21.*

**RESPONSE:**  Plaintiffs dispute that Dr. Prud'homme's conclusory testimony—which does not, for example, provide any example of how nucleic acid could exist in a particle in such a way that the POSA would not know whether it was fully encapsulated—is relevant to the indefiniteness inquiry.  "Conclusory expert assertions cannot raise triable issues of material fact on summary judgment."  *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013).

In addition, as described below, Dr. Prud'homme's testimony that there is "no real definition of fully encapsulated" or "partially encapsulated" directly contradicts (i) the specification and file history of the '651 patent, (ii) literature references pre-dating the invention, (iii) the Court's claim construction Order, (iv) Dr. Prud'homme's own testimony from his reports and deposition describing his agreement with, and understanding of, the Court's construction of the claim, and (v) Dr. Prud'homme's testimony that he "understood" the use of the terms full encapsulation and partial encapsulation when they were used in his own patent application.  *Infra* Additional Resp. Fact Paragraphs 178-190; Ex 47 (Murthy) ¶ 517.

Moreover, Dr. Prud'homme's testimony that there is no real definition of how to measure fully encapsulated nucleic acid is contradicted by Dr. Murthy's ample testimony and evidence that "[a]t the priority date of the '651 patent, the POSA reading the specification and using their

knowledge in the field would have known that full encapsulation can be measured using a dye-exclusion assay," and that "orthogonal assays may be used to confirm the dye assay's measurement was not including any (or any significant amount) of partially encapsulated nucleic acid, if desired." *Infra* Additional Resp. Fact Paragraphs 192-193. Dr. Prud'homme's testimony ignores evidence cited by Dr. Murthy that this approach was used to identify, characterize, and measure full encapsulation in the prior art. *Infra* Additional Resp. Fact Paragraphs 192-193 Dr. Prud'homme's testimony also ignores evidence in Moderna's own documents in which their researchers describe using dye exclusion assays and orthogonal assays to measure "fully encapsulated" mRNA. *Infra* Additional Resp. Fact Paragraphs 194-195.

Finally, Dr. Prud'homme's testimony regarding the ability to measure partially encapsulated nucleic acid is irrelevant in light of the claim limitations requiring certain percentages of fully encapsulated mRNA. *Infra* Additional Resp. Fact Paragraphs 201-205.

132. *Dr. Pierre Meulien testified that he did not know the difference between "fully encapsulated" and "partially" encapsulated nucleic acid and that he was not sure what either "fully encapsulated" or "partially" encapsulated meant. [M.] Ex. 58 (Meulien Dep. Tr.) at 43:17–44:3.*

**RESPONSE:** Plaintiffs dispute that Dr. Meulien's conclusory testimony—which does not, for example, provide any example of how nucleic acid could exist in a particle in such a way that the POSA would not know whether it was fully encapsulated—is relevant to the indefiniteness inquiry. "Conclusory expert assertions cannot raise triable issues of material fact on summary judgment." *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013).

Moreover, to support his opinions regarding the validity of the '651 patent, Dr. Meulien cited evidence of "full encapsulation," demonstrating that he did understand that term; indeed, Dr.

Meulien's expert reports do not even set forth any opinions on indefiniteness. *E.g.*, Ex 71 (Meulien) ¶¶ 25 ("In forming my opinions, I have applied the constructions set forth in the Court's Memorandum Order regarding Claim Construction (D.I. 266)."), 143 ("Dr. Heyes, on behalf of Plaintiffs, carried out experiments using prior art methods and showed that a prior art method could fully encapsulate pDNA at a rate of about 90%. The same prior art method applied to mRNA, however, led to ***full encapsulation*** percentages in the low 40's." (citations omitted)).

As described below, Moderna's other expert Dr. Anderson likewise had no difficulty in defining and distinguishing fully encapsulated compositions. *Infra* Additional Resp. Fact Paragraph 182. Dr. Murthy noted this in his report, but Dr. Prud'homme did not address this opinion or evidence. *Id*.

### C. Measurement Methods

133. *Plaintiffs have not identified an analytical technique that measures the percentage of "partially" encapsulated nucleic acid such as mRNA in a given formulation, as that term is understood in the '651 Patent.*

**RESPONSE:** Plaintiffs dispute this fact and its relevance to the definiteness inquiry. The claims of the '651 patent are not directed to a quantity of partially encapsulated nucleic acid—only "fully encapsulated" is recited in the claim in a manner that requires quantification. *Infra* Additional Resp. Fact Paragraphs 201-205. That is especially the case given the extensive evidence, set forth below, *infra* Additional Resp. Fact Paragraphs 172-177, 183-184, 195-197, that "partially encapsulated" mRNA does not exist at all, or to any relevant extent, in the claimed system or in Moderna's product. *E.g.*, Ex 72 (Murthy Dep. Tr.) 121:14-16 ("[i]n lipid nanoparticle systems, the nucleic acids are fully encapsulated. There is no partial encapsulation").

Moreover, Plaintiffs' expert provided extensive testimony about techniques to identify and characterize "partially" encapsulated nucleic acid in a given formulation. *Infra* Additional Resp.

Fact Paragraphs 191-195.  Dr. Murthy testified as follows:

> [B]oth Plaintiffs' and Moderna's witnesses testified that dye-exclusion assays
> could be used to measure full encapsulation, with some noting that orthogonal
> assays may be used to confirm the dye assay's measurement was not including
> any (or any significant amount) of partially encapsulated nucleic acid, if desired.

Ex 47 (Murthy) ¶ 531.  Dr. Murthy cited testimony and evidence describing orthogonal assays such as microscopy and nuclease digestion that may be optionally used to identify and characterize partially encapsulated nucleic acid.  *Id*.; *infra* Additional Resp. Fact Paragraphs 191-195.  As described below, Moderna itself used orthogonal assays including microscopy to confirm that the mRNA is "fully encapsulated" (i.e., confirm the absence of partially encapsulated mRNA).  *Infra* Additional Resp. Fact Paragraphs 194-196.  Dr. Murthy also described numerous examples of references pre-dating the invention, such as Saravolac '171, in which orthogonal assays were used to identify and characterize nucleic acid that is not fully encapsulated (e.g., nucleic acid "complexed" with lipids).  Ex 47 (Murthy) ¶ 45.  Dr. Prud'homme does not address this opinion nor cite to these portions of the references.  For example, Dr. Prud'homme's only reference to Saravolac '171 is in the context of discussing Dr. Murthy's opinions about the Lipid Composition Patents.  Ex 45 (Prud'homme Reply) ¶ 21.

Dr. Prud'homme provides no opinion or evidence as to why an orthogonal assay such as a nuclease digestion assay could not be used to identify or characterize partially encapsulated nucleic acid.  Ex 45 (Prud'homme Reply) ¶ 52.

134.    *Plaintiffs "state[d] that membrane-impermeable dye exclusion assays using dyes that bind to nucleic acids (e.g., Ribogreen) can be used to measure the percentage of nucleic acid in lipid vesicle formulations that is fully encapsulated in the lipid vesicles in accordance with the '651 patent, which can be confirmed when necessary with orthogonal analyses " [M.] Ex. 80 (2024-06-07 Arbutus Rog Resp.) at 24; [M.] Ex. 81 (2024-06-07 Genevant Rog Resp.) at 20.*

**RESPONSE:** Plaintiffs do not dispute this fact.

135.    *Dr. Murthy agreed that "partially encapsulated" mRNA is a possible state of mRNA encapsulation, and although he said any "partially" encapsulated" would be negligible, he could not define what that meant. [M.] Ex. 59 (Murthy Dep. Tr.) at 117:8–118:9.*

**RESPONSE:** Plaintiffs dispute this characterization of Dr. Murthy's testimony. Plaintiffs describe Dr. Murthy's opinions about the lack of partially encapsulated mRNA in lipid vesicle systems falling within the scope of the claims below. *Infra* Additional Resp. Fact Paragraphs 172-184, 194-196.

Dr. Murthy testified that "[i]n lipid nanoparticle systems, the nucleic acids are fully encapsulated. There is no partial encapsulation." Ex 72 (Murthy Dep. Tr.) 121:14-16. Dr. Murthy explained why nucleic acid molecules in a "lipid vesicle formulation consist[ing] of liposomes or lipid particles with an outer lipid-coating (*e.g.*, LNPs) that are neither complexed to one another nor form a disordered lipid mixture . . . would be expected to be *fully* contained inside the lipid vesicles (*i.e.*, fully encapsulated)." Ex 47 (Murthy) ¶¶ 502-505.

Dr. Murthy further opined as follows:

> Even if a few nucleic acid molecules (out of the millions or billions in a typical formulation) were to exist in such a state of partial encapsulation, the POSA would have recognized that this would be a transient, thermodynamically unstable orientation. The POSA would have recognized and expected that any such nucleic acid molecules would be almost immediately pushed out of, or pulled into, the vesicle to achieve a more thermodynamically favored, stable orientation. For that reason, it is my opinion that—in a composition characterized by high levels of full encapsulation (*e.g.*, a liposomal- or LNP-like composition, where the vesicle includes an outer lipid shell) there will be no (or at most a negligible amount) nucleic acid that is partially inside and partially outside the vesicle.

Ex 47 (Murthy) ¶ 506. Dr. Murthy did not quantify the "negligible amount" of nucleic acid that could exist in a "partially encapsulated" state because his opinion was that the nucleic acid in a "lipid vesicle formulation consist[ing] of liposomes or lipid particles with an outer lipid-coating

(*e.g.*, LNPs) that are neither complexed to one another nor form a disordered lipid mixture . . . would be expected to be *fully* contained inside the lipid vesicles (*i.e.*, fully encapsulated)." Ex 47 (Murthy) ¶ 502.

The term "negligible" also has a plain English definition. "Negligible." Oxford English Dictionary,[10] (defining negligible as "[o]f a thing . . . so small or insignificant as not to be worth considering"). Dr. Murthy's opinions relate to the broader legal framework, in which partially encapsulated nucleic would need to exist in compositions capable of falling within the scope of the claims in an amount sufficient to impact encapsulation measurements to a degree that is "outcome-determinative in the infringement analysis," in order to be potentially relevant to indefiniteness. *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc*., 743 F.3d 1359, 1366-67 (Fed. Cir. 2014). While Dr. Murthy cites evidence to support his opinion about lack of partially encapsulated nucleic acid, *infra* Additional Resp. Fact Paragraphs 172-184, 194-196, Dr. Prud'homme cites no such evidence for its existence, Ex 47 (Murthy) ¶¶ 536-537.

136. *Dr. Murthy could not name any analytical technique to measure the percentage of "partially" encapsulated nucleic acid such as mRNA in a lipid formulation. [M.] Ex. 59 (Murthy Dep. Tr.) 124:4–125:21.*

**RESPONSE:** Plaintiffs dispute this fact and its relevance to the definiteness inquiry. The claims of the '651 patent are not directed to a quantity of partially encapsulated nucleic acid—only "fully encapsulated" is recited in the claim in a manner that requires quantification. *Infra* Additional Resp. Fact Paragraphs 201-205. That is especially the case given the extensive evidence, set forth below, *infra* Additional Resp. Fact Paragraphs 172-177, 183-184, 195-197, that "partially encapsulated" mRNA does not exist at all, or to any relevant extent, in the claimed

---

[10] Oxford UP, 2003, www.oed.com/dictionary/negligible_adj?tab=meaning_and_use#35080031. Accessed 18 Aug. 2025.

system or in Moderna's product.  *E.g.*, Ex 72 (Murthy Dep. Tr.) 121:14-16 ("[i]n lipid nanoparticle systems, the nucleic acids are fully encapsulated.  There is no partial encapsulation").

Moreover, Plaintiffs' expert provided extensive testimony about techniques to identify and characterize "partially" encapsulated nucleic acid in a given formulation.  *Infra* Additional Resp. Fact Paragraphs 191-195.  Dr. Murthy testified as follows:

> [B]oth Plaintiffs' and Moderna's witnesses testified that dye-exclusion assays could be used to measure full encapsulation, with some noting that orthogonal assays may be used to confirm the dye assay's measurement was not including any (or any significant amount) of partially encapsulated nucleic acid, if desired.

Ex 47 (Murthy) ¶ 531.  Dr. Murthy cited testimony and evidence describing orthogonal assays such as microscopy and nuclease digestion that may be optionally used to identify and characterize partially encapsulated nucleic acid.  *Id*; *infra* Additional Resp. Fact Paragraphs 191-195.  As described below, Moderna itself used orthogonal assays including microscopy to confirm that the mRNA is "fully encapsulated" (i.e., confirm the absence of partially encapsulated mRNA).  *Infra* Additional Resp. Fact Paragraphs 194-196.  Dr. Murthy also described numerous examples of references pre-dating the invention, such as Saravolac '171, in which orthogonal assays were used to identify and characterize nucleic acid that is not fully encapsulated (e.g., nucleic acid "complexed" with lipids).  Ex 47 (Murthy) ¶ 45.  Dr. Prud'homme does not address this opinion nor cite to these portions of the references.  For example, Dr. Prud'homme's only reference to Saravolac '171 is in the context of discussing Dr. Murthy's opinions about the Lipid Composition Patents.  Ex 45 (Prud'homme Reply) ¶ 21.

Dr. Prud'homme provides no opinion or evidence as to why an orthogonal assay such as a nuclease digestion assay could not be used to identify or characterize partially encapsulated nucleic acid.  Ex 45 (Prud'homme Reply) ¶ 52.

137.    *Dr. Murthy opined that "[e]ncapsulation efficiency is a long-standing and standard analytical technique used to measure the total percent of nucleic acid that is fully encapsulated by lipid vesicles." [M.] Ex. 55 (Murthy Reb. Rep.) ¶ 107.*

**RESPONSE:**  Plaintiffs do not dispute that Dr. Murthy offered this testimony.  To provide additional context, Dr. Murthy testified that "*[i]n those fully encapsulated compositions*, such as lipid vesicle formulations comprising SPLPs as described in the patent, the POSA would recognize that percent encapsulation, as measured by standard encapsulation efficiency techniques, corresponds to the percentage of mRNA that is fully contained inside the lipid vesicles (*i.e.*, the amount that is fully encapsulated)."  Ex 47 (Murthy) ¶ 583; *see also id.* ¶ 611 ("[A]t the time of the invention, the POSA would have known that dye-exclusion assays were the standard and most prominently used method for quantifying encapsulation of nucleic acids in lipid vesicle formulations, and there also existed orthogonal assays that could have been used to confirm the fully encapsulated nature of the lipid vesicles in the formulation.").

Moderna's own documents confirm this.  For example, Moderna researchers have described developing a digestion-based orthogonal assay in order to "measure[] the fraction of mRNA that is both intact and fully encapsulated,'" and the researchers found that this assay yielded "comparable mRNA encapsulation levels" with the company's dye exclusion assay that they use to report encapsulation efficiency. Ex 47 (Murthy) ¶ 532.  Moderna has made numerous comments to the FDA likewise suggesting that their measurement of encapsulation efficiency corresponds to fully encapsulated nucleic acid.  *Id*. ¶ 539.

138.    *Blenke was available online on December 21, 2017. [M.] Ex. 60 (Blenke, Murthy Dep. Ex. 25) at 793.*

**RESPONSE:**  Plaintiffs do not dispute this fact but do dispute its relevance to the

definiteness inquiry.  The '651 patent has a priority date of June 28, 2002, and was issued on November 29, 2016, both before Blenke was available online.  M. Ex. 4 ('651 patent), cover. "[T]he definiteness inquiry trains on the understanding of a skilled artisan **at the time of the patent application**, not that of a court viewing matters *post hoc*."  *Nautilus*, 572 U.S. at 911 (emphasis added); *see also* Ex 47 (Murthy) ¶ 557.

139.    *Blenke disclosed a systematic evaluation of "seven different methods for quantification of short oligonucleotides that are commonly used in the field of drug delivery." [M.] Ex. 60 (Blenke) at 797. Blenke disclosed that there is "a very large heterogeneity in the methods that are used for analyzing oligonucleotide load, encapsulation efficiency and oligonucleotide release." [M.] Ex. 60 (Blenke) at Abstract. mRNA is an example of an oligonucleotide. [M.] Ex. 4 ('651 patent) at 27:40–43, 28:3–5.*

**RESPONSE:**  Plaintiffs do not dispute that Blenke contains the quoted language, but do dispute that it is relevant to the definiteness of the '651 patent claim and dispute its characterization.  In particular, **mRNA** is ***not*** an example of a "short oligonucleotide," *i.e.*, the type of nucleic acid featured in Blenke, as is confirmed by the '651 patent, Blenke, and Moderna's experts.  M. Ex. 4 ('651 patent) 3:66-4:3 ("RNA may be in the form of oligonucleotide RNA" or "mRNA (messenger RNA)"); M. Ex. 60 (Blenke) at 798 (distinguishing the "the short length of the oligonucleotides used here" with "mRNA"); Ex 45 (Prud'homme Reply) at ¶ 63 (agreeing with Dr. Murthy's statement that Blenke is about "short oligonucleotides like siRNAs" as opposed to mRNA); Ex 71 (Meulien) ¶ 87 (describing "[a]ntisense oligonucleotides" as "short segments of RNA" that bind to, but are not the same as, mRNA).  Moderna's citations to the '651 patent offer no support for Moderna's proposition that "mRNA is an example of an oligonucleotide."  In fact, the authors of Blenke attribute variances in the results to the nature of their use of short

oligonucleotides as compared to mRNA.  Ex 47 (Murthy) ¶ 558.

Blenke did not describe any of the non-dye-exclusion encapsulation measurement methods tested as common for use on mRNA, nor did Blenke comment on the historical use of the encapsulation methods, including their use in 2002.  M. Ex. 60 (Blenke) at 797.  Blenke refers to dye-exclusion assays as the "most commonly applied."  *Id.* at 793.

140.    *Blenke disclosed that results of encapsulation quantification methods differ across seven different and commonly used methods:*

| Table 2 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Encapsulation efficiencies of the three different formulation methods as measured with the seven different quantification methods. | | | | | | | |
| | Nanodrop | Ribogreen* | UPLC (UV) | UPLC (FLR) | Platereader | qPCR (probe) | qPCR (SYBR green) |
| Formulation #1 | 29% | 26% | 28% | 47% | 50% | 11% | 13% |
| Formulation #2 | 95% | 95% | 97% | 76% | 80% | 103% | 97% |
| Formulation #3 | 93% | 98% | 101% | 88% | 73% | 91% | 96% |

[M.] Ex. 60 (Blenke) at 796 Table 2.

**RESPONSE:**  Plaintiffs do not dispute that the reproduced table appears in Blenke, but dispute that it is relevant to the definiteness of the '651 patent claims.  *See supra* Responses to Paragraphs 138-139.  The reflected results were obtained for formulations encapsulating siRNA, not mRNA.  M. Ex. 60 (Blenke) at 794; Ex 47 (Murthy) ¶ 560.  Also, save for the Ribogreen assay, none of the methods disclosed in Table 2 "would have been considered standard by the POSA in 2002."  *Id.*; *see id.* ¶¶ 553-555, 561-562, 572-574.  Citing to data and statements from Blenke, Dr. Murthy describes the downsides of each non-dye exclusion assay cited in Blenke, and how the various results in this study are described as potentially aberrant or unreliable.  *Id.* ¶¶ 559, 562.  Dr. Prud'homme does not dispute this testimony.  Ex 45 (Prud'homme Reply) ¶ 64.

141.    *Blenke concludes that "Remarkably, when measuring the same sample using different quantification methods, in the most extreme cases differences of up to four times higher than other methods were found," which makes "the comparison between for example, . . .*

*encapsulation efficiency impossible … if different measurement methods are used." [M.] Ex. 60 (Blenke) at 796.*

**RESPONSE:**  Plaintiffs do not dispute that Blenke contains the quoted language, but do dispute that it is relevant to the definiteness of the '651 patent claims.  *See supra* Responses to Paragraphs 138-140.

In addition, the authors of Blenke themselves describe how two of the assays used in the study, UPLC (UV) and plate reader, "were quite far away from the values obtained with other methods," but that this could be caused by the extrapolation steps in those methods "not produc[ing] reliable results for encapsulation efficiency."  Ex 47 (Murthy) ¶ 562 (citing Blenke). Differences resulting from aberrant, non-standard testing cannot establish indefiniteness.  *Janssen Pharm., Inc. v. Teva Pharm. USA, Inc*. 97 F.4th 915, 937 (Fed. Cir. 2024).  Using information and data from Blenke, Dr. Murthy describes how the other methods may have also produced unreliable results.  Ex 47 (Murthy) ¶ 562.

142.  *Figure 4 of Blenke illustrates that depending on the test used, the percentage of nucleic acid encapsulated may be as high as 75 % or as low as 50 %. [M.] Ex. 60 (Blenke) at 796 Figure 4 (using sample 4 in the chart as an example).*

**RESPONSE:** Plaintiffs dispute Moderna's characterization of these data, and Plaintiffs dispute that Blenke is relevant to the definiteness of the '651 patent claims.  *See supra* Responses to Paragraphs 138-140.  "Figure 4 relates to the absolute concentration of siRNA, not percentage of fully encapsulated mRNA"—or fully encapsulated siRNA.  Ex 47 (Murthy) ¶ 560; M. Ex. 60 (Blenke) at 796 figure 4 ("Absolute values from the six siRNA samples, as obtained by different quantification methods in mean ± SD.").  Dr. Prud'homme does not dispute that Blenke figure 4 is about the concentration (i.e., amount) of nucleic acid, not encapsulation.  Ex 45 (Prud'homme

Reply) ¶ 64.

Plaintiffs also dispute that any single formulation in Blenke was measured as having both 50% and 75% encapsulation efficiency. Instead, as Dr. Prud'homme describes, each encapsulation measurement for Formulation #1 in Blenke were less than 50%, each encapsulation measurement for Formulation #2 in Blenke were greater than 76%, and each encapsulation measurement for Formulation #3 in Blenke were greater than 73%. Ex 45 (Prud'homme Reply) ¶ 64. Thus, none of the measurement differences reported in Blenke would have been outcome determinative for infringement for claim 1 of the '651 patent (and therefore would not have been outcome determinative for dependent asserted claims 7, 9, or 11 of the '651 patent). Blenke explains that the three formulations were distinct, each made with "[t]hree different preparation methods." M. Ex. 60 (Blenke) at 793.

143.   *Dr. Murthy testified that the seven methods for measuring percentage encapsulated nucleic acids in a given formulation that are disclosed in the Blenke publication were publicly disclosed by 2002. [M.] Ex. 59 (Murthy Dep. Tr.) at 146:4–147:14.*

**RESPONSE:** Plaintiffs dispute Moderna's characterization of this testimony. Dr. Murthy was asked whether he "investigated when each of [these seven methods] was first publicly disclosed." Ex 72 (Murthy Tr.) 147:4-7. Dr. Murthy sought clarification whether "publicly disclosed" as used in the deposition question referred to "publicly disclosed for the quantification of nucleic acids," to which the examining attorney clarified "just publicly disclosed at all. You are not saying they were publicly disclosed by 2002, right?" *Id.* at 147:4-13. With that clarification, Dr. Murthy agreed that the methods "were publicly disclosed by 2002." *Id.* at 147:14, but notably, Dr. Murthy never testified that these methods were publicly disclosed *to measure encapsulation* by 2002.

Dr. Murthy also opined that, except for the Ribogreen assay (which is a dye-exclusion assay), none of the seven methods "would have been considered standard by the POSA in 2002." Ex 47 (Murthy) ¶ 560; *id.* ¶ 562 (explaining why other methods would not have been considered standard by the POSA in 2002); Ex 72 (Murthy Dep. Tr.) 144:13-146:3. Dr. Prud'homme does not dispute this testimony. Ex 45 (Prud'homme Reply) ¶ 64. Dr. Prud'homme did not opine or cite evidence that the specific methods used in Blenke were used prior to 2002. Ex. 45 (Prud'homme Reply) ¶¶ 64, 92. Although Dr. Prud'homme cited a handful of methods (not featured in Blenke) that may have been available in 2002, he did not opine that any of those assays would yield different results, nor did he opine that these assays were common or standard ways of measuring encapsulation in 2002. Ex 44 (Prud'homme) ¶¶ 133-136; Ex. 45 (Prud'homme Reply) ¶¶ 64, 92.

Other than the dye exclusion assay (Ribogreen®), Blenke makes no comment as to whether the methods used in the study are used for mRNA encapsulation measurements, and Blenke's disclosure indicates that at least some of them are not. *See, e.g.*, M. Ex. 60 (Blenke) at 797 (describing use of "seven different methods *for quantification of short oligonucleotides*"). Blenke makes no comment as to whether the methods described in the study were historically used to measure encapsulation. Blenke describes "dye binding assay[s]" as the "most commonly applied method." *Id.* at 793.

144.    *Citing the Blenke publication, Dr. Prud'homme explained that "different measures of encapsulation can (and do) lead to different results." [M.] Ex. 61-A (Prud'homme Op. Rep.) ¶ 136.*

**RESPONSE:** Plaintiffs do not dispute that Dr. Prud'homme provided the quoted testimony, but Plaintiffs dispute Blenke's relevance to the indefiniteness inquiry. As described

99

above, Dr. Prud'homme himself disavowed Blenke's relevance to the claimed invention.  *Supra* Response to Paragraph 139.  The Blenke study was not conducted on mRNA (the type of nucleic acid that is claimed) and Blenke attributed certain variances in its data to the use of non-mRNA nucleic acid.  *See supra* Responses to Paragraph 139.  Blenke therefore cannot demonstrate "outcome-determinative [differences] in the infringement analysis."  *Takeda*, 743 F.3d at 1367 n. In addition, neither Moderna nor Blenke establish that its methods (other than dye exclusion) are used or standard for measuring mRNA encapsulation nor do Moderna or Blenke establish that its methods (other than dye exclusion) were used or standard at the priority date.  *See supra* Responses to Paragraphs 138, 140.  The analysis of Blenke is thus irrelevant to indefiniteness, which is analyzed through the lens of the POSA "at the time of the patent application," not *post hoc*. *Nautilus*, 572 U.S. at 911.  Blenke postulates that it received "not [] reliable" results for its two methods that it describes as "quite far away," due to their reliance on extrapolation, and Dr. Murthy describes other indications of Blenke's unreliable data.  *See supra* Responses to Paragraph 141. Challengers must "present evidence that different measurement techniques would typically yield different" results, and aberrant data such as that obtained from "outlier[s]" or "defective desvice[s]" does not suffice.  *Janssen*, 97 F.4th at 937.

As described above, Dr. Prud'homme does not dispute that other than dye-exclusion, "none of the[] techniques" described in Blenke "would have been considered standard by the POSA in 2002," Ex 45 (Prud'homme Reply) ¶ 64, nor does Dr. Prud'homme dispute Dr. Murthy's characterization of Blenke's own statement and data about the unreliability and potential aberrant results from the assays used therein.

None of the (albeit irrelevant) measurement differences reported in Blenke are outcome determinative for infringement for asserted claims 7, 9, or 11 of the '651 patent.  *Supra* Response

100

to Paragraph 142.

In contrast to Blenke, Dr. Murthy cites evidence of encapsulation testing done on mRNA that showed consistent results across different assay types.  For example, Dr. Murthy cites Moderna documents detailing "close alignment" between various dye-binding encapsulation assays.  Ex. 47 (Murthy) ¶ 563; *see id.* ¶¶ 546-549, 556, 563.  Dr. Murthy also cites to a Moderna document that found "comparable mRNA encapsulation levels" between its digestion assay and dye exclusion assay.  *Id.* ¶ 532.  Dr. Prud'homme does not provide any evidence that different measures of encapsulation can lead to outcome determinative differences in results in the context of the '651 patent.  Dr. Prud'homme does not provide any evidence that different measures of encapsulation can lead to outcome determinative differences in results in the context of the '651 patent.

## ADDITIONAL RESPONSIVE FACTS

### A.    Additional Facts Related to 28 U.S.C. § 1498

145.    Plaintiffs incorporate by reference their affirmative statement of facts in support of their motion for summary judgment on 35 U.S.C. § 1498.  *See* Plaintiffs' Affirmative Statement of Facts § I.

### 1.    Fact Issues Remain for the Jury Concerning Moderna's Fraudulent Inducement of Authorization and Consent

146.    On July 23, 2020, a few weeks prior to the execution of the C-100 contract, the U.S. Patent Trial and Appeal Board rejected Moderna's challenge to one of the Lipid Composition Patents.  *Moderna Therapeutics, Inc. v. Arbutus Biopharma Corp.*, 2020 WL 4237232, at *13 (P.T.A.B. July 23, 2020).  Senior leadership at Operation Warp Speed (OWS), including its head, General Perna, were notified of the PTAB's decision, Ex 73 (OWS Email, HHS-0000710), because the potential inclusion of an authorization and consent clause in the C-100 contract meant the Government was following this specific PTAB proceedings, Ex 32 (Johnson Tr.) 121:4-9.

147.    The day after the decision issued, an OWS contracting officer wrote to Moderna, advising that as part of contract negotiations, "Moderna should be prepared to discuss the effect of Moderna's attempt to void the Arbutus Patent, if any."  Ex 74 (OWS-Moderna Email, MRNA-GEN-01125789).  Moderna responded that "the LNP formula used to manufacture mRAN-1273 [sic—mRNA-1273] is not covered by the Arbutus patent."  *Id.*; Ex 75 (Bennett Tr.) 277:19-278:7.

148.    Almost immediately after Moderna's representation, the Government held a meeting regarding the Moderna contract, which included a discussion of the PTAB decision.  Ex 76 (Meeting Invite, HHS-0001655).  Then on August 7—two days before executing the contract—OWS held a conference call on "IP rights" with Moderna, including with Moderna's legal counsel, Shaun Ryan.  Ex 77 (Meeting Invite, Bennett Ex 34).  The Government's witness, Dr. Johnson,

testified that the Government did not engage in any independent analysis of Arbutus's patents beyond the assurance it received from Moderna.  Ex 32 (Johnson Tr.) 23:14-24:21.

149.    Moderna's FDA submissions, Plaintiffs' independent testing and Moderna's own testing, shows clearly that Moderna infringes the Lipid Composition Patents.  Ex 48 (Mitchell) ¶¶ 453-476, 497-502, 609-621.

150.    Moderna has known about Plaintiffs' patents for many years, including that it covered the key 50% cationic lipid formulation.  Ex 78 (Kramarczyk Tr.) at 60:4-8 ("At the time I understood that 50 mole percent cationic lipid was covered under a granted patent, not by Moderna.  And I think the goal of avoiding licensing a patented formulation is clear."); Ex 79 (Francis Tr.) at 63:18-64:6 ("As I mentioned, our chief scientific officer, Tony [de Fougerolles], came from Alnylam, which had an active collaboration with [Plaintiffs' predecessor] Tekmira.  So he is aware – he should have – he must have been aware at that time of Tekmira's [LNP] portfolios."); *id.* at 40:3-41:9.

151.    Moderna used the 50% cationic lipid formulation as its "standard LNP."  Ex 25 (Himansu Tr.) at 200:21-201:12; Ex 48 (Mitchell) ¶ 238.

152.    "Moderna's documents make clear that Moderna did not develop [the infringing] formulation itself, but rather copied it from Plaintiffs' work."  Ex 48 (Mitchell) ¶ 824.

153.    Moderna knew the 50% cationic lipid formulation was Plaintiffs' formulation—in a 2013 email about a presentation Moderna was going to send to Plaintiffs' predecessor, a Moderna scientist told CEO Stéphane Bancel that she "blinded[] delivery vehicle[] slide 15[] as it will just make them mad/turned off to us otherwise" and that "[t]his way we can . . . leave them wondering if it is theirs."  Ex 80 (MRNA-GEN-01759821).  In another email, Bancel commented on

Moderna's "monkey data with his . . . LNP," referencing a Tekmira executive. Ex 81 (MRNA-GEN-01674430).

154.    Moderna previously sought a sublicense to the patents through another company, Acuitas. Ex 82 (Lawton) ¶ 1671; Exs 21-24 (Acuitas Sublicenses). Acuitas's rights to the patents were disputed, and following a 2017 settlement, Moderna no longer could rely on Acuitas for a license to Plaintiffs' patents for most viruses, including COVID-19. Ex 82 (Lawton) ¶ 1671.

155.    After it lost the ability to license Plaintiffs' patents for future products through Acuitas, Moderna understood that its products would infringe Plaintiffs' (Arbutus's) patents, setting a 2017 "platform objective[]" to "[f]ix backward risk balance . . . LNP/Abus," Ex 83 (2017 "Platform objectives", MRNA-GEN-01503761), and to "avoid licensing (intellectual property regarding 50 mole percent cationic lipid)," Ex 84 (2018 presentation, MRNA-GEN-01747429) at -431.

156.    Moderna understood what it needed to do to avoid infringing the patents, with Moderna president Stephen Hoge, instructing Moderna's head of Drug Product Sciences that "there are **_incredibly strong business reasons_** why a composition with 40% amino lipid is more attractive," and that he "would be willing to contemplate a delay to identify such a composition." Ex 85 (June 2017 Hoge Email, MRNA-GEN-02619870) at -870.

157.    Moderna's experiments with ███ formulations failed repeatedly, Ex 48 (Mitchell) ¶ 313, and it opted to use infringing formulations in its COVID-19 vaccine, making no changes beyond a "slight" adjustment to its target lipid content to try to "reduce the mole% of SM-102 to below 50% **_for IP purposes_**." Ex 91 (2020 Specification Comm. Min.); Ex 48 (Mitchell) ¶ 463.

158.    Moderna also knew it was infringing based on its own test results. It submitted a certificate of analysis to the FDA for each lot it manufactured and these certificates showed it was

infringing the Asserted Patents.  Ex 48 (Mitchell) ¶¶ 453-460, 611.  Moderna even performed a fractionation study on its COVID-19 vaccine—the same type of testing Plaintiffs have performed in this case—which showed "infringing fractions having greater than 50 mol% ionizable lipid in each batch tested."  Ex 48 (Mitchell) ¶ 825.  Moderna only conducted one fractionation study of its COVID-19 vaccine.  Ex 48 (Mitchell) ¶¶ 463-464.  Moderna refused to conduct other proposed experiments of the same type.  *Id.*  Moderna's VP of Early Technical Development and LNP Process Development, Dr. Don Parsons, wrote that such experiments could "pose uncomfortable questions" about "what we hope will soon be a commercial product."  Ex 86 (October 2020 Parsons Email); Ex 48 (Mitchell) ¶ 463.

159.    Moderna also instructed its scientists to hide evidence of their infringement from publications.  In one instance, Moderna's Associate Director, Formulation Science Dr. Kimberly Hassett was told "we don't want to publish the ratio" and instructed to remove the target lipid molar ratio from one of her papers.  Ex 87 (April 2021 E. Miracco Email) at -948.  In another instance, Moderna's Vice President of Platform Chemistry and Formulation Discovery, Dr. Kerry Benenato, told another scientist Mark Cornebise to remove references to the role of the MC3 lipid (which Moderna had used in conjunction with the patented formulations, *see* Ex 48 (Mitchell) ¶ 243) from scientific presentations: "I know it is hard as a chemist but ***we have to fib a bit*** and not tell the whole structure story.  The slides look great, . . . but I think you need to take out the mc3 part of the story."  Ex 88 (Nov. 2019 Benenato Email).

160.    In response to the Court's order finding no common interest privilege "as to communications with the U.S. Government regarding Section 1498 and the Government's Statement of Interest," D.I. 378 at 2, Moderna disclosed details of its communications with the Government concerning the application of Section 1498.  *See* Ex 89 (Moderna's 8th Supp. Resp.

to Interrogatory No. 1) at 53-54.  None of those communications informed the Government about the evidence of Moderna's willful infringement, and Moderna has not identified any other communications suggesting that the Government has been so informed.  *See id.*

B.    **Additional Facts Related to DOE**

161.    The MacLachlan reference considered during prosecution (*e.g.*, M. Ex. 73 (July 30, 2010 – '069 PH) at 3-7; M. Ex. 57 (MacLachlan)) discloses broad ranges of lipid components and formulations containing 10, 15, 20, 30, and 40% cationic lipid, but does not disclose any formulation that falls within the literal scope of the asserted claims or the asserted equivalents (*e.g.*, 45% or more cationic lipid with the other recited components).  *E.g.*, M. Ex. 57 ¶¶ 247, 299, 318, 339, 341, 345, 348, 350, 352; *see* D.I. 266 at 29 (referring to MacLachlan's ranges as "broader ranges"); *see also id.* at 19.  Furthermore, MacLachlan does not describe a range of phospholipid. *Id.* ¶ 85 ("The non-cationic lipid typically comprises from about 5% to about 90%.").

162.    The Examiner entered anticipation claims rejections, and the Examiner's application of the claim term "comprising about" as embracing "+/- 10, 20, 30 mol % of a lipid component" was the basis for the anticipation rejection, as the broad disclosures of the ranges in MacLachlan, such as 2-60% cationic lipid, were asserted to anticipate the ranges of the then-pending claims applying that definition of "about" and the Federal Circuit's precedent in *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006); see M. Ex. 75 at 6.  For example, the Examiner recorded that, during the interview conducted July 6, 2011, the § 102 rejection of record was discussed, along with "MPEP 2131.03(II) and Atofina v. Great Lakes Chem. Corp. 441[] F.3d 991, 999, 78 USPQ2d 1417, 1423 (Fed. Cir. 2006)."  Ex 57 (July 14, 2011 – '069 PH) at 2.  The Examiner further recorded that, during an interview conducted July 13, 2011, the "obviousness type double patenting rejections and 102 and 103 rejections of record" were

discussed, and noted that "[r]ejections will be withdrawn when applicant's representative makes the arguments of record."  Ex 58 (July 18, 2011 – '069 PH) at 2.

163.    The applicants summarized these interviews in their request for reconsideration submitted August 11, 2011:

> During the next telephonic interview conducted on July 6, 2011, Applicants' representatives discussed the rejection of record under 35 U.S.C. § 102(b), M.P.E.P. 2131.03 (II), and *Atofina v. Great Lakes Chem. Corp*, 441 F.3d 991, 999, 78 USPQ2d 1417, 1423 (Fed. Cir. 2006) with Examiner Whiteman and his supervisor, Examiner Calamita.  During the interview, Applicants' representatives proposed amending the claims to delete the word "about" from the ranges of lipid components and argued that the claimed ranges were not anticipated by MacLachlan *et al.* (US 2006/0008910) because that reference failed to disclose the claimed ranges with sufficient specificity as required by M.P .E.P. 2131.03 (II) and *Atofina*.  Examiners Whiteman and Calamita indicated that they would present the arguments to Examiner Bennett and notify Applicants' representatives of his decision.  During a subsequent telephonic interview conducted on July 13, 2011, Examiner Whiteman indicated that Examiner Bennett found the arguments of Applicants' representatives to be persuasive.  As a result, Examiner Whiteman agreed to withdraw both rejections under 35 U.S.C. § 102(b) and 35 U.S.C. § 103(a) when Applicants' representatives make the arguments of record.

M. Ex. 75 (Aug. 11, 2011 – '069 PH) at 6-7.  The applicants applied the Examiner's definition of "about."  M. Ex. 75 at 7.

164.    The applicants further observed that M.P.E.P. 2131.03 (II), which was the subject of discussion with the Examiner, states:

> When the prior art discloses a range which touches or overlaps the claimed range, but no specific examples falling within the claimed range are disclosed, a case by case determination must be made as to anticipation.  In order to anticipate the claims, the claimed subject matter must be disclosed in the reference with "sufficient specificity to constitute an anticipation under the statute."  What constitutes a "sufficient specificity" is fact dependent. If the claims are directed to a narrow range, and the reference teaches a broad range, depending on the other facts of the case, it may be reasonable to conclude that the narrow range is not disclosed with "sufficient specificity" to constitute an anticipation of the claims. See, e.g., *Atofina v. Great Lakes Chem. Corp,* 441 F.3d 991, 999, 78 USPQ2d 1417, 1423 (Fed. Cir. 2006) wherein the court held that a reference temperature range of 100-500 degrees C did not describe the claimed range of 330-450 degrees C with sufficient specificity to be anticipatory.  Further, while there was a slight overlap between the reference's preferred range (150-350 degrees C) and the claimed range,

107

that overlap was not sufficient for anticipation. "[T]he disclosure of a range is no more a disclosure of the end points of the range than it is each of the intermediate points." *Id.* at 1000, 78 USPQ2d at 1424. Any evidence of unexpected results within the narrow range may also render the claims unobvious. The question of "sufficient specificity" is similar to that of "clearly envisaging" a species from a generic teaching. See MPEP § 2131.02. A 35 U.S.C. 102/103 combination rejection is permitted if it is unclear if the reference teaches the range with "sufficient specificity." The examiner must, in this case, provide reasons for anticipation as well as a []reasoned[] statement regarding obviousness. *Ex parte Lee,* 31 USPQ2d 1105 (Bd. Pat. App. & Inter. 1993) (expanded Board). For a discussion of the obviousness of ranges see MPEP § 2144.05.

M. Ex. 75 (Aug. 11, 2011 – '069 PH) at 7-8.

165.    The applicants further stated:

Thus, per M.P.E.P. 2131.03 (II), it is reasonable to conclude that the claimed narrow ranges are <u>not</u> disclosed with 'sufficient specificity' to constitute an anticipation of claim 1 and its dependent claims. *See, e.g.*, *Atofina*, wherein the Federal Circuit held: (1) a reference temperature range of 100-500°C did not describe the claimed range of 330-450°C with sufficient specificity to be anticipatory; and (2) while there was a slight overlap between the reference's preferred temperature range of 150-350°C and the claimed range of 330-450°C, that overlap was <u>not</u> sufficient for anticipation.

M. Ex. 75 (Aug. 11, 2011 – '069 PH) at 8-9.

166.    During prosecution, Plaintiffs distinguished the invention from prior art disclosures of 40 mol % cationic lipid or less in MacLachlan. M. Ex. 72 at 10 ("1:57 SNALP formulations were significantly more efficacious as compared to" the "2:30 SNALP"); *id.* ("1:57 SNALP formulations were substantially more effective … compared to" the "2:40 SNALP"); M. Ex. 75 at 10 ("SNALP formulations having <u>increased</u> amounts of cationic lipid such as, *e.g.*, the 1:57 SNALP formulation, provide unexpectedly superior advantages over previously exemplified SNALP formulations containing" "30 mol%, 40 mol %, and 15 mol % cationic lipid"); *see also* Ex 90 (IPR2019-554, Paper 7) at 13. The applicants further stated: "It is noted that the 2:30 SNALP formulation is disclosed in the cited MacLachlan *et al.* reference, and that of all the SNALP formulations prepared and tested in the cited MacLachlan *et al.* reference, the 2:30

SNALP formulation contains the greatest amount of cationic lipid (*i.e.*, 30 mol % cationic lipid)." M. Ex. 72 (Jan. 31, 2011 – '069 PH) at 10.  The "2:30 SNALP" formulation refers to a formulation with 2% conjugated lipid and 30% cationic lipid; the "2:40 SNALP" formulation refers to a formulation with 2% conjugated lipid and 40% cationic lipid.   M. Ex. 72 at 10.

167.    During claim construction, Moderna argued that Plaintiffs disclaimed any degree of variability for the molar ratios recited in the claims of the Lipid Composition Patents when they removed the word "about" during prosecution.  D.I. 170 at 17-20, 44.  The Court rejected that argument.  D.I. 266 at 21-22.  In its *Markman* Order, the Court observed that MacLachlan "taught ranges for the four lipid components that overlapped with the claimed ranges as follows:"

| Lipid Component | Claim 1 as Amended | US 2006/0008910* |
| --- | --- | --- |
| Cationic Lipid | 50-65 mol % | "2-60, 5-50, 10-45, 20-40, 30 mol%" |
| Phospholipid | 4-10 mol % | "5-90 mol%" |
| Cholesterol | 30-40 mol % | "20-55 mol %" |
| Conjugated Lipid | 0.5-2 mol % | "1-20 mol %" |

D.I. 266 at 19.  The Court further explained that "the examiner believed that the term 'comprising about' added before the mol % ranges 'read on a broad range of amounts' and 'could embrace an amount +/- 10, 20, 30 mol % of a lipid component.'  Thus, a claimed range of 'about' 50–65 mol % could potentially encompass a range as small as 40–75 mol % and as large as 20–95 mol %." *Id.* at 21 (citation omitted); *see* M. Ex. 74 (May 12, 2011 – '069 PH) at 2.  In the Examiner's view, the broad disclosures of ranges in MacLachlan were asserted to anticipate the ranges of the then-pending claims applying that definition of "about" and the Federal Circuit's precedent in *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006); *see* M. Ex. 75 at 6; D.I. 266 at 21-22.  The Court emphasized that "[i]ndeed, the removal of the word 'about' appears to have been done only to satisfy the examiner's concern that the claim language 'read on a broad range

of amounts' and 'could embrace an amount +/- 10, 20, 30 mol % of a lipid component.'" D.I. 266 at 24. This Court correctly described MacLachlan's ranges as "broader ranges." D.I. 266 at 29; *see id.* at 19. The Court ultimately found "no clear prosecution history disclaimer regarding the rules of rounding" and concluded that traditional rules of rounding applied. D.I. 266 at 22, 24-25.

168.    The claims, as issued, recite ranges that overlap with the ranges recited by MacLachlan. *See* D.I. 266 at 19, 24-25. As set forth in the Court's Claim Construction Order, the amendment was "done only to satisfy the examiner's concern that the claim language 'read on a broad range of amounts' and 'could embrace an amount +/- 10, 20, 30 mol % of a lipid component'" and removed the broad ranges that were the basis for the Examiner's rejection under *Atofina*. D.I. 266 at 24; *see, e.g.*, D.I. 266 at 21-22; M. Ex. 72 at 10; M. Ex. 75 at 6-7, 10; Response to Paragraph 72, *supra*.

169.    The Court also rejected Moderna's argument that "Plaintiffs made a clear and unmistakable disclaimer of nucleic lipid-acid particles with less than 50% cationic lipid." D.I. 266 at 28. The Court observed that "the language in the '378 patent differs from the parent patents," including because the '378 patent's claims do not recite a limitation on the range of cationic lipid, but rather recite "a cationic lipid having a protonatable tertiary amine." *Id.* at 30. Thus, "[b]ecause the claims do not relate to the same subject matter, settled law precludes [the Court] from reading limitations from a parent application into the '378 patent claims." *Id.*

170.    Moderna's President Dr. Stephen Hoge wrote in a pre-litigation email "that there are incredibly strong business reasons why a composition with ***40% amino [i.e., cationic] lipid*** is more attractive." Ex 85 (MRNA-GEN-02619870) at -870.

C.    **Additional Facts Related to Indefiniteness**

171.    Plaintiffs incorporate by reference their contemporaneously filed affirmative statement of facts in support of their motion for summary judgment on indefiniteness.  *See* Plaintiffs' Affirmative Statement of Facts § II.

1.    **The '651 patent defines fully encapsulated**

172.    Dr. Murthy explained that two of the lipid components claimed in the '651 patent—cationic lipids and amphipathic lipids—contain "hydrophobic (water-hating) tails and hydrophilic (water-loving) heads."  Ex 47 (Murthy) ¶ 503 (citing '651 patent, 4:34–37).  Dr. Murthy also explained that a third lipid component claimed by the '651 patent, cholesterol, is hydrophobic (water-hating).  *Id*.  Dr. Prud'homme does not dispute this.  Ex 45 (Prud'homme Reply) ¶ 39.

173.    Dr. Murthy further explained that "[l]iposomes possess an outer bilayer of lipids that are arranged such that the hydrophilic [water-loving] portions of the lipids (depicted in pink) in the outer-most layer are facing towards the outside environment and in the inner layer are facing towards the inner compartment of the lipid vesicle, whereas the hydrophobic [water-hating] portions of the lipids (depicted in purple) in both layers are oriented towards the inner portion of the bilayer," and depicted the below graphic[11] cross-section of a liposome:

---

[11] Graphic excised and adapted from Advantages of Liposomal Technology: How It Works, VITAL.LY EDUCATION (2022), www.vital.ly/blog/Advantages-of-liposomal-technology-How-itworks/post=280/.



Ex 47 (Murthy) ¶ 503 (citing '651 patent, 5:32–33).  Dr. Prud'homme does not dispute this.  Ex 45 (Prud'homme Reply) ¶ 39.

174.    Dr. Murthy further explained that "[s]imilarly, in a formed lipid vesicle wherein the lipids coat an interior, such as with LNPs, the lipids in the outer-most lipid shell orient themselves such that the hydrophilic [water-loving] portion of the lipids (depicted in pink) face the external environment and the hydrophobic [water-hating] portion of the lipids (depicted in purple) orient towards the interior of the particle," and depicted the following graphic[12] of a cross-sectioned LNP:

---

[12]    Image excised from Wyatt Technology, *Advanced Characterization of LNP-mRNA Therapeutics via FFF-MALS and DLS Techniques*, NEWS MEDICAL LIFE SCIENCES (Nov. 20, 2024).



Ex 47 (Murthy) ¶ 504.  Dr. Prud'homme does not dispute this.  Ex 45 (Prud'homme Reply) ¶ 39.

175.    Dr. Murthy explained that "[i]n order for a nucleic acid to be partially inside of, and partially outside of, a liposome or a formed vesicle with a lipid coating (*e.g.*, LNP), the nucleic acid would need to cross through the hydrophobic [water-hating] region (purple) of the tightly packed outer lipid layer(s)."  Ex 47 (Murthy) ¶ 505.  Dr. Murthy further explained that "nucleic acid," such as mRNA, "has a negative[] charge[] . . . meaning that nucleic acid is hydrophilic [water-loving]."  *Id*. (citing '651 patent, deposition testimony, and Moderna's experts).  Dr. Prud'homme does not dispute this.  Ex 45 (Prud'homme Reply) ¶ 39.

176.    Dr. Murthy explained that "[t]he POSA would have recognized that it would be thermodynamically unstable for the hydrophilic nucleic acid to interact with the hydrophobic portion of the bilayer, as would be required for nucleic acid inside of a liposome or LNP to not be fully within the formed vesicle."  Ex 47 (Murthy) ¶¶ 505 (citing testimony, Moderna's expert, and literature references from before the priority date), 533.  Dr. Prud'homme does not dispute this.  Ex 45 (Prud'homme Reply) ¶ 39.  Dr. Murthy therefore opined that "as such, this sort of 'partial'

encapsulation (where part of the nucleic acid is inside and part of the nucleic acid is outside the vesicle) is unlikely to occur in these lipid compositions, and certainly not to any appreciable extent." Ex 47 (Murthy) ¶¶ 505-506.

177.    Dr. Murthy further opined that "[i]n contrast, in systems where nucleic acid is complexed to lipids, entrapped by lipid aggregates, or contained within a relatively disordered lipid mixture, the POSA would have understood that such nucleic acids are not fully encapsulated." *Id*. ¶ 507 (citing statement in file history that in such compositions "little, if any, of the [nucleic acid] payload is encapsulated within" enclosed particles). Dr. Prud'homme does not dispute that the nucleic acid in such systems is not fully encapsulated. Ex 45 (Prud'homme Reply) ¶¶ 45-46, 48-49. Dr. Murthy opined that whether the nucleic acid in these types of systems is "partially encapsulated or unencapsulated is not relevant to my opinions concerning the definiteness of the claims of the '651 patent," which are directed to fully encapsulated nucleic acid. Ex 47 (Murthy) ¶¶ 508-509, 516.

178.    The '651 patent describes lipid vesicles as follows:

"Lipid vesicle" refers to any lipid composition that can be used to deliver a compound including, but not limited to, liposomes, wherein an aqueous volume is ***encapsulated by an amphipathic lipid bilayer***; or wherein the ***lipids coat an interior*** comprising a large molecular component, such as a plasmid, with a reduced aqueous interior; or lipid aggregates or micelles, wherein the encapsulated component is contained within a relatively disordered lipid mixture.

Ex 4 at 5:30-37 (emphasis added). The '651 patent defines the term "SPLP" as follows:

"SPLP" refers to a stable plasmid lipid particle. A SPLP represents a vesicle of ***lipids coating an interior*** comprising a nucleic acid such as a plasmid with a reduced aqueous interior.

*Id*. at 5:41-44 (emphasis added).

179.    Immediately following the definition of "lipid vesicle" and prior to the definition of "SPLP" the '651 patent states: "'lipid encapsulated' can refer to a lipid formulation which provides a compound with full encapsulation, partial encapsulation, or both." Ex 4 at 5:38-40.

180.    Dr. Murthy opined that, based on the '651 patent definitions of lipid vesicle, lipid encapsulated, and SPLPs, as well as other descriptions of the particles in the specification, "[t]he POSA would have recognized that 'full encapsulation' as used in the '651 patent refers to nucleic acid that is fully, as distinct from partially, contained inside the lipid vesicles such as in a system akin to lipid vesicles which have a 'lipid bilayer' or a 'lipid[] coat[ing]' encapsulating an aqueous interior, in contrast to aggregates where the encapsulated component is part of a 'disordered mixture.'" Ex 47 (Murthy) ¶ 513.  Dr. Murthy opined that the '651 patent "would have provided the POSA with the ability to understand the meaning of 'fully encapsulated' as written in the claims, and as interpreted by the Court, with reasonable certainty."  *Id*. ¶ 512; *see also id*. ¶ 501.

181.    Dr. Murthy opined that the file history of the '651 patent confirms this understanding of "what fully, as distinct from partially, contained inside the lipid vesicles means, such that the POSA would have understood the claim scope." Ex 47 (Murthy) ¶ 514 (citing file history which contrasted "the encapsulated mRNA present within the lipid vesicles of the present invention" that will be protected from nuclease degradation to nucleic acid in the prior art that would be exposed to degradation).  Patent Application WO 01/05374, which is produced in full in the '651 file history and was filed by researchers at INEX Pharmaceuticals in July 2000 (published in January 2001) describes the term "fully encapsulated" as follows:

> ***fully encapsulated*** refers to lipid particles in which the therapeutic agent is contained in the lumen [*i.e.*, interior] of a lipid vesicle such as a liposome or embedded within a bilayer of a lipid particle such that no part of the therapeutic agent is directly accessible to the external medium surrounding the lipid particle, such that no part of the therapeutic agent is directly accessible to the external medium surrounding the lipid particle. Lipid particles in which the therapeutic

> agent is fully encapsulated are distinct from particles in which a therapeutic agent
> is complexed (for example by ionic interaction) with the exterior of the particle, or
> from particles in which the therapeutic agent is partially embedded in the lipid and
> partially exposed to the exterior medium.

Ex 47 (Murthy) ¶ 514 (citing '651 File History, WO 01/05374 at 5:21-28).

182.   Dr. Murthy opined that "[t]he types of particles described in the examples and
figures of the '651 patent, including figures 5–8," which feature SPLPs, "would have been
understood to fully encapsulate nucleic acid by virtue of the presence of an enclosed outer lipid
layer." Ex 47 (Murthy) ¶ 505.  Dr. Anderson, Moderna's obviousness expert, opined similarly
explaining that the prior art discloses "fully encapsulated" nucleic acid particles that encapsulate
nucleic acids quoting the following language from a reference referred to as Wheeler 1999:
"[SPLPs] fully protect the encapsulated plasmid from digestion by serum nucleases." Ex 47
(Murthy) ¶ 582 (citing Dr. Anderson's report).  Dr Murthy opined "I agree with Dr. Anderson that
the POSA would have recognized SPLPs as a fully encapsulated system, including based on the
disclosures of Wheeler 1999," Ex 47 (Murthy) ¶ 582 (citing Dr. Anderson's report), and noted that
"Dr. Prud'homme did not consider that reference in forming his opinions," *id*.  Dr. Prud'homme
does not cite or address Wheeler 1999, or Dr. Anderon or Murthy's opinions about Wheeler 1999,
in his reply report.  Ex 45 (Prud'homme Reply) Exhibit A.

183.   U.S. Patent 6,841,538, which was issued from U.S. application no. 09/295,925 filed
in April 1999, states that "***SPLPs are fully encapsulated lipid-plasmid particles*** that are resistant
to nuclease degradation . . . ." Ex 47 (Murthy) ¶ 581 (emphasis added).  In his reply, Dr.
Prud'homme does not mention this patent cited by Dr. Murthy.  Ex 45 (Prud'homme Reply)
Exhibit A.

184.   Dr. Murthy opined that "[o]ver the decades, scientists' understanding of the term
'fully encapsulated' has remained consistent."  Ex 47 (Murthy) ¶¶ 514-515.  Dr. Murthy cites to

Moderna's former CSO's description of "fully encapsulated" mRNA within an LNP that has a "lipid bio-layer around the outside," which she contrasted with lipoplexes where mRNA "can stick an elbow out" in which case "a digestive enzyme" such as a nuclease is "going to clip" and deactivate the mRNA.  Ex 47 (Murthy) ¶¶ 514-515.

185.    During claim construction, the Court cited to the specification of the '651 patent and noted the purpose of the invention was to protect nucleic acid from degradation so that a functional version of the nucleic acid could be delivered to the cell.  D.I. 266 at 36.  The Court further explained that "degradation of even a small section of the nucleic acid would likely result in a completely ineffective strand, thereby frustrating the purpose of the invention." *Id*.  The Court therefore concluded, unequivocally, that "***A POSITA would only count those strands that are fully contained inside the vesicle***, as it is only if those strands achieve the claimed percentage that the invention provides a novel benefit." *Id*.

186.    The Court held that "[i]n view of the plain meaning of the terms, the specification, and the purpose of the invention, I construe this claim term as: **"wherein at least 70% /at least 80% / about 90% of the mRNA in the formulation is fully, as distinct from partially, contained inside the lipid vesicles."**  D.I. 266 at 37.

187.    In his reply report, Dr. Prud'homme stated that he "agree[d] with the Court that a 'POSITA would only count those strands that are fully contained inside the vesicle.'"  Ex 45 (Prud'homme Reply) ¶ 46 n.4.

188.    Dr. Prud'homme testified that "the percent fully encapsulated refers to the percent of the mRNA that is in strands that are completely contained within the vesicle as opposed to strands that are partially inside the vesicle and partially outside the vesicle" and "mRNA that's completely outside the vesicle."  Ex 46 (Prud'homme Tr.) at 178:1-20.

117

189.    Dr. Prud'homme was also able to articulate his interpretation of partially and unencapsulated mRNA as distinct from fully encapsulated mRNA, under the Court's construction, stating:

> MRNA which is -- my understanding is that the Court has had partial, but it means it has to be connected to the LNP particle in some way. So if you want to say, well, define partial by those things not associated at all with the mRNA and those things which are somehow partially encapsulated and put that in one bin, that's fine. And then there is another bin which is that which is fully encapsulated . . . That is my understanding of the Cour's construction that I've just described.

Ex 46 (Prud'homme Tr. 179:8-22).

190.    Dr. Prud'homme is listed as inventor on a patent application defining "lipid encapsulated" to "refer to a lipid formulation which provides a therapeutic product with full encapsulation, partial encapsulation, or both." Ex 49 (Prud'homme Ex. 20) ¶ 56.  As part of the patent application filing, Dr. Prud'homme submitted a sworn declaration attesting that he "ha[d] reviewed and underst[oo]d the contents of the . . . application," and that "[a]ll statements made [in the application] are true . . . and further that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and may jeopardize the validity of the application or any patent issuing thereon." Ex 69 (Prud'homme Ex. 21) at 5-6.  When asked whether the language in his patent is "almost exactly the same language as the '651 patent," Dr. Prud'homme testified that "[i]t's very similar," and Dr. Prud'homme further confirmed that he "understood" the language.  Ex 46 (Prud'homme Tr.) at 219:3-11.

## 2.    Distinguishing and measuring fully encapsulated mRNA

191.    Dr. Murthy opined that, at the time of the invention, the POSA "would have known that he or she could have used [a variety of] analytical methods" to "confirm what type of lipid vesicle composition had been made," in other words "whether he or she had formulated a fully-

encapsulated composition (*e.g.*, a liposome or an LNP) or a composition that does not exhibit full encapsulation (*e.g.*, a lipoplex)." Ex 47 (Murthy) ¶¶ 510-511 (citing statements and references in the file history as well as a 2002 PowerPoint by Plaintiffs presenting microscopy data of SPLP), 518, 527, 535 (describing various references that pre-date the invention, including Saravolac '171 in which samples were exposed to digestion enzyme, and analyzed to find that nucleic acid that was encapsulated in particles "remained intact" whereas unencapsulated nucleic acid and the nucleic acid in lipid "complexes" were cleaved). Dr. Prud'homme does not dispute that at the time of the patent, known analytical techniques could confirm the type of lipid vesicle composition that had been made. Ex 45 (Prud'homme Reply) ¶ 35.

192.    Dr. Murthy opined that "[a]t the priority date of the '651 patent, the POSA reading the specification and using their knowledge in the field would have known that full encapsulation can be measured using a dye-exclusion assay," Ex 47 (Murthy) ¶ 574 (citing testimony, references from before the priority date, and Moderna documents), and that "orthogonal assays may be used to confirm the dye assay's measurement was not including any (or any significant amount) of partially encapsulated nucleic acid, if desired," *id*. ¶ 531 (citing testimony by Plaintiffs' and Moderna's witnesses). *See also id*. ¶ 535 (describing various orthogonal techniques used in references pre-dating the invention to identify and characterize nucleic acid that was fully encapsulated versus nucleic acid that was exposed to the external environment).

193.    Dr. Murthy further opined that "at the time of the invention, dye-exclusion assays were the standard method for quantifying full encapsulation of nucleic acids in lipid vesicle formulations." Ex 47 (Murthy) ¶ 573 (citing testimony and literature that pre and post-dates the priority date of the patent); *see also id*. at ¶¶ 536, 553-555. Although he opines that other analytical techniques to characterize encapsulation existed at the time of the invention, Dr. Prud'homme does

not dispute that dye-exclusion assays were the standard method for measuring encapsulation at that time.  Ex 45 (Prud'homme Reply) ¶¶ 64, 92.

194.    Dr. Murthy opined that "Moderna's own documents 'identify a way to . . . quantitatively measure full encapsulation,'" citing to Moderna's use and characterization of dye exclusion and orthogonal assays.  Ex 47 (Murthy) ¶ 532.

195.    Dr. Murthy explained that using dye exclusion assays and orthogonal techniques, Moderna researchers have confirmed that the mRNA in fully encapsulated systems (*e.g.*, LNPs), is in fact fully, as distinct from partially, encapsulated and can be quantified using dye exclusion assays.  For example, Dr. Murthy cites a Moderna document describing a digestion-based orthogonal assay developed by the company to "measure[] the fraction of mRNA that is both intact and fully encapsulated,'" that yielded "comparable mRNA encapsulation levels" with the company's dye exclusion assay.  Ex 47 (Murthy) ¶ 532.  Dr. Murthy additionally cites Moderna documents in which it used orthogonal techniques such as electron microscopy to confirm that "mRNA [is] unambiguously pinpointed inside LNP" and that "mRNA is Fully Encapsulated Within the LNP, Not Bound to the LNP Surface." *Id*. ¶ 538; *see also id*. ¶ 534.

196.    Dr. Murthy notes that in documents submitted to the FDA, "Moderna defined encapsulation in a manner that would indicate that their encapsulated nucleic acid is fully encapsulated, relying on dye exclusion assays ████████████████████████████ ████████████ as well as orthogonal [microscopy] imaging." *Id*. ¶ 539; *see also id*. at ¶ 564.

197.    Dr. Murthy opined that "despite extensive work to try to find additional encapsulation states in their mRNA-LNPs, Moderna has only found fully encapsulated versus not encapsulated mRNA."  Ex 47 (Murthy) ¶ 540.

198.    Mr. Schariter, Moderna's Directors of Analytical Sciences, answered "no" when he was asked if he had "ever seen any evidence that any of Moderna's mRNA pokes through the LNP?"  Ex 95 (Schariter Tr.) at 162:2-12.  Testimony by an additional analytical chemist at Moderna is in accord, as she was asked whether she was "aware of any mRNA that is systematically not reported by Moderna's ▇▇▇▇▇ [dye exclusion assay]," and she answered that the mRNA is either "encapsulated or it's not encapsulated." *Id.* ¶ 540.

199.    Moderna's former chief scientific officer, at a "Moderna Inc Science & Technology Day," on May 17, 2022, stated that "lipid nanoparticles [] have this beautiful lipid bio-layer around the outside []. So the mRNA is fully encapsulated within the lipid nanoparticle."  Ex 47 (Murthy) ¶ 502 (quoting MRNA-GEN-02125366 at -391).

200.    Dr. Prud'homme has not cited to any evidence-based (*i.e.*, non-cartoon or non-hypothetical) example of a formulation with partially encapsulated nucleic acid.  Ex 47 (Murthy) ¶¶ 536-537; *see also id.* ¶¶ 541-544, 565; Ex 99 (Murthy sur-reply) ¶¶ 32-33.  Dr. Prud'homme testified "I don't believe anyone has seen" part-in-part-out mRNA in an LNP and "I have never seen any Moderna data indicating that" Moderna's mRNA pokes through the LNP.  Ex 46 (Prud'homme Tr.) at 189:14-191:12.  Dr. Prud'homme further testified, "I don't believe there's any evidence" that mRNA "is or is not" half-in and half-out of LNPs.  *Id.* at 191:13-21.  When asked about a reference called de Gennes that Dr. Prud'homme cites to when posing the hypothetical of mRNA poking through formed particles, Dr. Prud'homme admitted the reference "wasn't about poking" through.  Ex 46 (Prud'homme Tr.) at 225:4-18; *see also* Ex 99 (Murthy sur-reply) ¶¶ 30-31.

201.    Despite the claims of the '651 patent being directed to fully encapsulated mRNA, and despite no evidence of partially encapsulated mRNA in systems capable of falling within the

claim scope, numerous of Dr. Prud'homme's opinions regarding the indefiniteness of the '651 patent pertain to his belief that the POSA could not identify or measure partially encapsulated mRNA. *See, e.g.*, Ex 44 (Prud'homme) ¶¶ 128 ("[T]here is no well-understood or accepted meaning of the concept of ***partial encapsulation***, and even if there was, there is no reliable way to quantify any nucleic acid that falls within such a category."); 130 ("[T]here is no method that would allow one to systematically measure what percentage of the mRNA would be ***partially in versus partially outside*** the particle.").

202.    In addition to describing the orthogonal techniques that could be used to identify partially encapsulated nucleic acid, if any exists within a formulation, Dr. Murthy, noted that the claims are directed to claimed percentages of fully, not partially, encapsulated mRNA. For example, Dr. Murthy stated:

> Dr. Prud'homme spends considerable time in his report describing that "there is no well-understood or accepted meaning of the concept of partial encapsulation," Prud'homme Rep. ¶ 128; not only do I disagree with this assertion, but I am unsure of its relevance to the definiteness inquiry. The claims of '651 patent require a particular percentage of "fully encapsulated" mRNA—so as long as the POSA can understand the meaning of "fully encapsulated" mRNA with reasonable certainty, then the POSA would understand the claim scope. The POSA's ability to precisely define and distinguish various types of not-fully encapsulated nucleic acids—which are not claimed by the '651 patent—such as partially encapsulated nucleic acid or unencapsulated nucleic acid, would not undermine the POSA's ability to ascertain the scope of the claims.

Ex 47 (Murthy) ¶ 519.

203.    Dr. Murthy further stated:

> Along similar lines, Dr. Prud'homme asserts that "there is no reliable way to quantify any nucleic acid" that is partially encapsulated. Prud'homme Rep. ¶ 128. However, the claims of the '651 patent are not directed at a quantity of *partially encapsulated* nucleic acid. As such, it is not necessary that the POSA be able to quantify "partially encapsulated" nucleic acid (to the extent any such nucleic acid existed in a composition) or distinguish nucleic acid in that hypothetical state from unencapsulated nucleic acid. The Court's construction of the term—"fully, as distinct from partially encapsulated"—emphasizes that partially encapsulated nucleic acid is not fully encapsulated, and that the claim is directed only to fully

> encapsulated nucleic acid. Claim Construction Opinion at 37. This construction does not impose any requirement about the quantification of partially encapsulated nucleic acid, or necessitate distinguishing between partially and unencapsulated mRNA.

Ex 47 (Murthy) ¶ 520.

204.    In reply, Dr. Prud'homme continued to focus his indefiniteness opinions on partially encapsulated mRNA without evidence of its existence. *See, e.g.*, Ex 45 (Prud'homme Reply) ¶ 46.

205.    During his deposition, Dr. Prud'homme confirmed that it was his opinion that the '651 patent is indefinite because partially encapsulated nucleic acid is, in his opinion, undefined and immeasurable. Ex 46 (Prud'homme Tr.) 180:21-182:21 (testifying, when asked about his '651 patent indefiniteness opinions, that "the word 'partial' is also unclear as to its explicit definition and certainly unclear on whether one could measure it or not").

206.    As described in Plaintiffs' affirmative statement of facts in support of their motion for summary judgment, *see* Plaintiffs' Affirmative Statement of Facts, § II.B.3, Blenke is not relevant to the indefiniteness inquiry, including because it does not demonstrate that different encapsulation assays would have been used by the POSA at the priority date, and it does not demonstrate that different encapsulation assays would yield differences in mRNA encapsulation results (including outcome-determinative differences).

<br>

|                          | */s/ Nathan R. Hoeschen*            |
|--------------------------|-------------------------------------|
|                          | John W. Shaw (No. 3362)             |
|                          | Karen E. Keller (No. 4489)          |
| OF COUNSEL:              | Nathan R. Hoeschen (No. 6232)       |
| David I. Berl            | SHAW KELLER LLP                     |
| Adam D. Harber           | I.M. Pei Building                   |
| Thomas S. Fletcher       | 1105 North Market Street, 12th Floor|
| Shaun P. Mahaffy         | Wilmington, DE 19801                |

Andrew L. Hoffman
Matthew W. Lachman
Ricardo Leyva
Arthur J. Argall III
Falicia Elenberg
Kathryn Larkin
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
(202) 434-5000

Andrei Iancu
Jeffrey B. Wall
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Suite 700
Washington, DC 20006
(202) 956-7500

*Attorneys for Plaintiff Genevant*
*Sciences GmbH*

(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Plaintiffs*

Daralyn J. Durie
Adam R. Brausa
Eric C. Wiener
Annie A. Lee
Shaelyn K. Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
(415) 268-6080

Kira A. Davis
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017-3543
(213) 892-5200

David N. Tan
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC 20037
(202) 887-1500

*Attorneys for Plaintiff Arbutus*
*Biopharma Corporation*

Dated: August 29, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2025, this document was served on the persons listed

below in the manner indicated:

**BY EMAIL:**

Brian P. Egan
Travis J. Murray
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

Patricia A. Carson, Ph.D.
Jeanna M. Wacker
Mark C. McLennan
Nancy Kaye Horstman
Shaoyao Yu
Mara L. Greenberg
Leslie M. Schmidt, P.C.
Andrew Lee
Brad Deem
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
patricia.carson@kirkland.com
jeanna.wacker@kirkland.com
mark.mclennan@kirkland.com
kaye.horstman@kirkland.com
shaoyao.yu@kirkland.com
mara.greenberg@kirkland.com
leslie.schmidt@kirkland.com
andrew.lee@kirkland.com
brad.deem@kirkland.com

Alina Afinogenova
Noah Frank
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500
alina.afinogenova@kirkland.com
noah.frank@kirkland.com

James F. Hurst
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
james.hurst@kirkland.com

Yan-Xin Li
Hannah Suh
Laura Ashley Harris
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
(415) 439-1400
yanxin.li@kirkland.com
hannah.suh@kirkland.com
lauraashley.harris@kirkland.com

Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
jason.wilcox@kirkland.com

*/s/ Matthew W. Lachman*
Matthew W. Lachman