# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

------------------------------ x

ARBUTUS BIOPHARMA CORPORATION  :

and GENEVANT SCIENCES GmbH,    :

Plaintiffs    :

vs                    : Civil Action No.

MODERNA, INC. and              : 22-252

MODERNATX, INC.,               :

Defendants    :

------------------------------ x


HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY


Videotaped deposition of

GEORG SCHUSTER, Ph.D.


WASHINGTON, DC

FRIDAY, APRIL 11, 2025

9:07 a.m. EASTERN TIME



Job No.: 578165

Pages: 1 - 272

Reported by: Lisa V. Feissner, RDR, CRR, CLR

many times you've used AUC to characterize mRNA-containing LNPs?    09:47:47 09:47:50

A    Again, I give the same answer.  I don't know the number, the exact number.    09:47:51 09:47:53

Q    And you can't provide an estimate, correct?    09:47:55 09:47:57

A    I can't provide an exact estimate as we have a lot of projects, and I don't know if it has been five, ten times, which is the answer.  The work with my colleagues, I don't know every single project number.  We have hundreds of projects at our company.    09:47:59 09:48:02 09:48:07 09:48:15 09:48:17 09:48:21

Q    In the work you've previously done to characterize LNPs, did you measure lipid content of those LNPs?    09:48:22 09:48:25 09:48:31

MS. ELENBERG:  I caution the witness not to reveal any third-party confidential information.    09:48:35 09:48:36 09:48:38

A    Yes, I did measure lipid content several times on LNPs.    09:48:40 09:48:44

Q    And in terms of the experience that you have with AUC to characterize LNPs, was it used as a preparative technique in those instances?    09:48:48 09:48:54 09:48:59

A    I cannot say confidential information from projects, from clients.    09:49:09 09:49:11

Q    So I'm not asking about specifics.  I'm just trying to figure out how you've used AUC before.

So have you used it as a preparative technique to measure lipid content prior to this case?

A    We personally have not used it before, which doesn't mean that it cannot be applied.

Q    I understand.  But prior to this case, you have not used AUC as a preparative technique to measure lipid content of LNPs, correct?

A    AUC is not a preparative technique, you're talking about UC.

Q    My apologies.

Prior to this case, you have not used UC as a preparative technique to measure lipid content of LNPs, correct?

A    That is correct, because we didn't use it before for the LNP content.

Q    And prior to this case, had you used the technique called LC-CAD?

A    As my track record shows, I've used LC-CAD since -- my first publication, I think, 2011 already contains LC-CAD data.  I'm very familiar with this technique.

(Exhibit Schuster-2 marked for identification and attached to the transcript.)

BY MS. AFINOGENOVA:

Q   Dr. Schuster, you've been handed what's been marked as Exhibit 2, which is a copy of your opening expert report.

Do you see that?

A   Yes, I see that.  Thank you.

Q   And feel free, if you want to flip through it just to make sure.  But is this a true and accurate copy of your report?

A   From what I can see from the page number.  I didn't check every single value, but from that.

MS. ELENBERG:  And I would just like to note that this does not include appendices.

MS. AFINOGENOVA:  That's correct.

Q   So this is just a copy of your opening report itself.

Is that right?

A   That is just a copy, as far as I can see, from my opening report, with consecutive page numbers.

(Exhibit Schuster-3 marked for identification and attached to the transcript.)

anyone other than counsel in arriving at the opinions expressed in your reports?

A I was talking to my colleagues together who worked on the project with me, if that is what you mean.

Q Did you talk with -- I'm sorry, go ahead.

A No, I'm done.

Q Did you speak with anybody other than your colleagues and counsel in arriving at the opinions expressed in your reports?

A No.

Q You didn't speak with anybody at Arbutus?

A No.

Q You didn't speak with anybody at Genevant?

A No.

Q And you didn't speak to any of the other experts for plaintiffs in this case, right?

A I think I asked [sic] that before you asked me, right? I don't even know who the experts are.

Q You understand that this is a patent case, right?

A    I was told that this is a patent case.

Q    Have you seen the patents that are being asserted by plaintiffs in this case?

A    No.

Q    Do you know any of the claims in those patents?

A    No.

Q    And you're not giving any -- strike that.

You are not giving any opinions in this case on whether Moderna's COVID-19 vaccine infringes the patents being asserted in this case, right?

A    That is correct, as I don't even know --

Q    And you're not giving any opinions on whether the patents asserted in this case are valid, right?

A    As stated, I don't even know the patents.

Q    And you're not giving any opinions relating to damages for any alleged infringement, right?

A    No.  I only give results of -- or opinions on my sample testing, not related to the patent.

10:13:51
10:13:54
10:13:55
10:13:57
10:13:58
10:14:00
10:14:00
10:14:01
10:14:06
10:14:06
10:14:09
10:14:12
10:14:14
10:14:15
10:14:21
10:14:23
10:14:25
10:14:28
10:14:31
10:14:32
10:14:34
10:14:38
10:14:42
10:14:46
10:14:50

MS. AFINOGENOVA: I think we've been going a little over an hour. Is now a good time for a break?

THE WITNESS: We can take a break.

VIDEOGRAPHER: We're going off the record. The time on the video monitor is 10:15 a.m.

(Recess from 10:15 a.m. until 10:27 a.m.)

VIDEOGRAPHER: We're back on the record. The time on the video monitor is 10:27 a.m.

BY MS. AFINOGENOVA:

Q    Welcome back.

So before the break, we were talking about your opening and reply reports which were marked as Exhibits 2 and 3, right?

A    Correct.

Q    And do Exhibits 2 and 3 contain all the opinions that you've reached in this case?

A    Correct.

Q    How much time did you spend on the testing described in your opening report?

MS. ELENBERG: Objection, vague.

A    What do you mean by, how much time?

Q    You stated earlier that your opening

eight.

A    Ah, seven or eight.  I understood 17.

Q    No, that's totally fine.  Let's go with seven to keep it simple.

In terms of the seven people that were working on this project, were you the lead on the project and there were seven others working and you were supervising them?

A    Yes, I was the lead, and my colleagues -- I mean, we all have -- we discussed the data together.  But I was the coordinator, let's say, of the work.

Q    And what were you asked to do for this project?

MS. ELENBERG:  Objection, vague.

A    Can you specify?  I mean, I wrote it in the report.  I can read it again to tell you.

I was asked to do sample testing, report this sample testing, and then afterwards to write a reply report.

Q    And in terms of the sample testing that you were asked to do, the samples you were testing, those were samples of Moderna's COVID-19 vaccine, right?

A    As far as I can say, yes.  They are

outlined in the report.

Q    And who decided what techniques should be used in performing that sample testing?

A    We were asked to use exactly these techniques.

Q    So when you say "we," do you mean Coriolis?

A    Sorry, Coriolis, yes.

Q    So counsel asked you to use the specific techniques that are described in your reports.

Is that correct?

A    That is correct.

Q    So it was not your choice to use ultracentrifugation to --

(Reporter interruption.)

Q    So it was not your choice to use ultracentrifugation as a preparative technique for lipid content testing, right?

A    As far as I remember, we proposed.  I don't remember exactly.  It's been a while when it started.  I think we proposed.  As far as I can recall.  I don't remember exactly.

Q    So --

A    But the techniques, as mentioned before, we have used before.  So we didn't question that.

Q   Well, you didn't use this technique before, right?  So let's take a step back.

Counsel asked you to use specific techniques to test samples of Moderna's drug product for the purposes of this case, right?

A   Correct.

Q   And one of those techniques was ultracentrifugation to fractionate the samples, right?

MS. ELENBERG:  Objection, mischaracterizes testimony.

A   I cannot answer if we were asked to use a UC or if we suggested.  I was not involved in that phase.

Q   Who would have been involved in that phase?

A   How projects come into Coriolis, it's business development.  So I don't remember.  And I don't know if we suggested or if we were asked.  I cannot answer this question.  I don't know.

Q   But at least as far as your work on this case --

A   Yes.

Q   -- you were told which techniques to use to characterize samples of Moderna's drug product,

10:38:21
10:38:23
10:38:26
10:38:31
10:38:36
10:38:43
10:38:44
10:38:47
10:38:51
10:38:51
10:38:53
10:39:06
10:39:09
10:39:16
10:39:17
10:39:19
10:39:27
10:39:32
10:39:39
10:39:43
10:39:45
10:39:48
10:39:49
10:39:49
10:39:53

correct?

A    For the analytical characterization, yes.  But if you ask me specifically about UC, I don't know if we were asked because it's the presample prep.  So I don't know.  Because you want to know if we suggested or if we were asked.  But I don't know.

Q    That's fair.  So maybe let's take a step back from UC.

You were told to fractionate the samples to analyze lipid content for this case, right?

A    I don't know.

MS. ELENBERG:  Objection.

I caution the witness not to reveal the content of conversations with lawyers.  But you may answer the question.

A    I don't know.  Projects come in after they are -- what is the English word -- after they are ordered.  Is that the word?  Then they come to the project team.  So I cannot tell you -- I don't have an answer because I don't know.

Q    Right.  And so I'm trying to understand, because you are the -- you're the expert in this case, right, for this testing?

A    Yes.

Q    And so did you personally select ultracentrifugation as a technique to fractionate the samples?

A    I personally did not.

Q    Did you personally suggest that samples of Moderna's drug product should be fractionated at all to measure lipid content testing?

A    I personally -- sorry, can you repeat?

Q    Did you personally suggest that samples of Moderna's drug product should be fractionated prior to measuring lipid content?

A    I did not.

Q    And nobody on your team suggested that samples of Moderna's drug product should be fractionated prior to measuring lipid content, right?

A    I cannot answer this question.  I don't know if one of my colleagues have been involved.

Q    So you have a team of seven people, of which you are the lead, right, for this project?

A    I think it's important again to go one step back.  Once the project is in, I have the appointment to be the lead and to characterize the samples.

        I was not involved in the ordering

10:41:43
10:41:53
10:41:57
10:41:58
10:42:04
10:42:09
10:42:11
10:42:18
10:42:23
10:42:26
10:42:30
10:42:32
10:42:41
10:42:45
10:42:47
10:42:49
10:42:55
10:42:58
10:43:03
10:43:07
10:43:16
10:43:18
10:43:27
10:43:32
10:43:34

process, so I don't know if team members of mine have been involved.  Because that is what you asked, right, if a team member has been involved.  And this is two different types.  So therefore, I cannot answer this one question.

Q   So it sounds like there's a BD process that happens first, and then if a project comes in, then it goes to a technical team.

Is that fair?

A   That is fair.  That is the right answer.

Q   So you can't speak to what happened at the BD phase, right?

A   If I'm involved in the BD process, I can speak.  I said, therefore, I don't know if my colleagues have been involved, yeah.

Q   Did you talk to any of your colleagues on the technical team to ask if they were involved in the BD phase?

A   No.

Q   So sitting here today, you're not aware of any of your technical colleagues being involved in the BD phase, right?

A   No.  It is a daily process.  It's common that we don't constantly talk, have you been involved in BD or are you -- no.  We usually don't

10:43:37
10:43:40
10:43:43
10:43:47
10:43:51
10:43:54
10:43:58
10:44:02
10:44:05
10:44:06
10:44:10
10:44:12
10:44:23
10:44:26
10:44:30
10:44:34
10:44:37
10:44:39
10:44:41
10:44:42
10:44:44
10:44:47
10:44:51
10:44:56
10:44:59

Your opening report included a number of
exhibits attached to it, including some Chromeleon
spreadsheets.

     Is that right?

A   That's right.

Q   And those spreadsheets would have a
created on date?

A   They had, yeah.

Q   Would that date be the date on which you
ran the testing?

A   Exactly.

Q   I'm sorry?

A   Yes.

Q   And did you run any testing before the
testing that would be reported in the Chromeleon
exhibits?

     MS. ELENBERG:  Objection, vague.

A   What do you mean by "testing"?

Q   What does "testing" mean to you?  What
testing did you conduct on Moderna's samples?

     MS. ELENBERG:  Objection, vague.

A   "Testing" means to me what we present in
this report, fractionation by UC, and then, you
know, as explained here, then going through the
different testing.  So DLS, NTA, LC-CAD, UV.

Q   Did you conduct any testing that is not included in your reports?

A   Sample testing as outlined in this report, no.

Q   Sorry, I'm not sure if I have the right answer.

Did you conduct any testing that you did not include in your report?

MS. ELENBERG:  Objection, vague.

A   What do you mean again by "testing"?

Q   Did Coriolis conduct any tests on samples of Moderna's drug product, the results of which are not included in your opening or reply report?

MS. ELENBERG:  Objection, vague.

A   I had a proof of concept test once, but not with these methods.

Q   What do you mean, you conducted proof of concept testing but not with the methods you describe?

A   It was just an initial test to see.

Q   To see what?

A   What we usually do to do a feasibility test, if we need further development, if the methods work for us --

Q    Is that the testing that you describe in Exhibit J?

MS. ELENBERG:  Counsel, I ask that you please allow the witness to finish his answers before you cut him off.

Q    I'm sorry, I thought you were done, Dr. Schuster.  Is there more you wanted to say?

A    Now I'm interrupted, sorry.  Yeah, as I stated, we commonly do this method development feasibility test, and based on that, decide on further adjustments, and then do actual testing.

Q    So you conducted method development testing using Moderna's drug product samples, and you did not report that testing in either of your reports or the exhibits thereto.

Is that your testimony today?

A    Can you please repeat?

Q    Yes.  You just testified that you conducted method development testing, right?

A    Yeah.

Q    Did you use Moderna's drug product samples to conduct that method development testing?

A    We tested on lipid samples on our own.

Q    When you say --

A    We also had our own, like, sample for the method development.

Q    When you say lipid samples of your own, samples of what?

A    What do you mean exactly?  Lipid samples.

Q    What are the lipid samples?  Are they Moderna's drug product, or are they something else?

A    We have lipid standards, as shown in the LC-CAD Exhibit J, also in my report.  And also in that report, we have Moderna sample that we had at Coriolis that we used for the method development.

Q    Okay.  So is the method development testing that you're talking about now, is that the testing that you describe in Exhibit J, or is there additional method development testing that is not described in your reports or the exhibits thereto?

A    Definitely method development testing is -- so the Exhibit J is the qualification report, right, that contains our own drugs samples with the final method, and then there was a feasibility test of samples.  But that is not -- I said, this is this pretest that we do.

possession of Moderna's COVID-19 vaccine?

MS. ELENBERG:  I caution the witness not to reveal third-party confidential information.

MS. AFINOGENOVA:  It's Moderna's samples, Counsel.  Whose confidential information is it?  It's ours.

MS. ELENBERG:  If the samples were not provided pursuant to litigation, I disagree that Moderna controls the confidentiality or lack thereof.

MS. AFINOGENOVA:  Okay.

Q    Do you have any idea where the samples of Moderna's COVID-19 vaccine came from that Coriolis had in its possession prior to this litigation?

A    No.  No.

Q    Do you know how many samples of Moderna's COVID-19 vaccine Coriolis has?

A    No.

Q    Do you know if it has more than the two lots that are described in Exhibit J to your opening report?

A    I don't know.

Q    Do you know if Coriolis could have obtained more samples of Moderna's COVID-19

vaccine other than those two lots?

A    I don't know.

Q    And the feasibility testing that you mentioned earlier that is not included in your reports, that was feasibility testing for the methods that you used to characterize samples of Moderna's drug product, right?

A    Yes.

Q    And what samples was that feasibility testing performed on?

A    Seven of the mentioned samples here, but I don't know the lot number now.

Q    But seven of -- strike that.

Seven samples of Moderna's drug product were used in the feasibility testing that is not reported in either of your reports, right?

A    Yes.

Q    And on that -- strike that.

The feasibility testing was performed to determine whether or not you could use these tests on Moderna's drug product, right?

MS. ELENBERG:  Objection, lacks foundation.

A    Can you repeat the question?

Q    Sure.  The feasibility testing that you

11:56:43
11:56:53
11:56:56
11:57:00
11:57:05
11:57:14
11:57:19
11:57:24
11:57:27
11:57:32
11:57:46
11:57:54
11:57:56
11:58:00
11:58:03
11:58:09
11:58:13
11:58:14
11:58:18
11:58:23
11:58:26
11:58:29
11:58:44
11:58:44
11:58:46

referred to was needed to determine whether or not

you could use these types of tests on Moderna's

drug product, right?

        MS. ELENBERG:  Objection, lacks

foundation.

    A   Feasibility test was used to see if the

HPLC method -- so we tested with the HPLC method

before going into, like, development.  That's what

we usually do.

    Q   Right.  You need to conduct that testing

as a first step, right?

    A   Yes.

    Q   Because that testing informs your

opinions as to whether or not this testing is

appropriate for the samples that are being tested,

right?

        MS. ELENBERG:  Objection, lacks

foundation.

    A   It was not so much if the general

approach is appropriate; if the system that we set

it up is appropriate.

    Q   Right.  The feasibility testing is

necessary for you to determine whether or not the

system that you've set up to test these samples is

appropriate to use on samples of Moderna's drug

product, right?

MS. ELENBERG:  Objection, lacks foundation.

A    I stated the feasibility was tested to see if the system used, in this case the LC, is appropriate.  Not say appropriate because we know it's appropriate, but if it is robust, which is the utmost importance for us as a contract research organization.

Q    Right.  So you looked to the results of this feasibility testing to determine whether the system that you've set up to test the samples is robust when applied to these samples specifically, right?

MS. ELENBERG:  Objection, lacks foundation.

A    Not specifically.  Didn't form -- doesn't really for me matter.  It was as said, a feasibility to see if the -- in this case, the LC method, if it is -- if it is robust to produce the -- I don't know -- to produce the sample testing later on, if this instrument can be used because, as you see, there has been a lot of samples tested, so we need to verify that this instrument doesn't break down or stop or...

Q    Right.  So the testing is used to verify that the system is going to work for the testing that you need to perform on these samples?

A    Yes.

Q    And you provided the results of that testing to counsel, right?

A    Yes.

Q    Did you have any discussions about the results of that testing with counsel?

MS. ELENBERG:  Objection.

I caution the witness not to reveal any privileged information.

Q    Just a yes or no question.

A    Can you repeat the question?  I forgot it already.

Q    Did you have any discussions about the results of the feasibility testing with counsel?

MS. ELENBERG:  Before -- sorry, let me object.

Objection, privileged.

Dr. Schuster, I instruct you not to answer the question --

(Cross-talk.)

MS. ELENBERG:  Can you please be respectful and not speak over me or interrupt me.

12:02:31
12:02:33
12:02:35
12:02:40
12:02:42
12:02:44
12:02:50
12:02:51
12:02:52
12:02:55
12:02:58
12:03:03
12:03:08
12:03:12
12:03:15
12:03:16
12:03:19
12:03:24
12:03:28
12:03:29
12:03:31
12:03:35
12:03:37
12:03:39
12:03:40

The witness is allowed to answer the question yes or no, but I instruct the witness not to answer beyond yes or no.

A    Yes.

Q    Did you have any discussions with anybody other than counsel about the results of the feasibility testing?

A    My colleagues.

Q    And did you make any changes to the protocols after the feasibility testing?

A    Yes.

Q    What were those changes?

A    We changed -- or I changed, it's my decision, right -- I changed the HPLC instrument to the one outlined in the Exhibit J because it's a more robust system.  That was the main part, to increase robustness.

And I did a bit more on the method development part.  So yeah, I said, to get this method robust, as we would do in any other project, and to be able to qualify and validate it, and this was then outlined, the qualification and validation, as shown in Exhibit J.

Q    Did counsel provide any input on the feasibility testing and the results thereof?  And

it's just a yes or no question.                     12:05:32

A    No.                                            12:05:49

Q    But you had a discussion with counsel          12:05:51
about the feasibility testing, right?  Again, just  12:05:53
yes or no question.                                 12:05:57

A    Yes.                                            12:05:59

Q    Other than the feasibility testing, is         12:06:00
there any other testing that you conducted for      12:06:02
this project that is not reported in either of      12:06:04
your reports?                                       12:06:08

A    No.                                            12:06:09

Q    And you mentioned there were seven             12:06:12
people on the team working on this project, right?  12:06:14

A    I said roughly, yeah.                           12:06:18

Q    Did you select those seven people?            12:06:20

A    Yes.                                            12:06:26

Q    Do they all have Ph.D.s?                       12:06:27

A    I don't know if every single one has a         12:06:40
Ph.D.  But at least four out of the seven have,     12:06:43
yes, which I'm sure.                                12:06:49

Q    Did you observe all the testing                12:06:56
conducted by everyone on your team for this         12:06:58
project?                                            12:07:01

A    Can you specify what you mean by,              12:07:04
observe every testing?                              12:07:07

Q    Did you see the other team members perform any testing that's reported in your reports?

A    Do you mean -- can you please specify again?

Q    Did you observe the work of your team members, specifically the work that they performed for this project, in terms of testing samples of Moderna's drug product?

A    But what do you mean by "observe"?

Q    Did you see it?

A    Still, can you please specify.  What do you mean by that?

Q    What is your confusion there?

A    Do you mean every single sample analysis in this report, or do you mean if I have been present with them doing testing, checking the data?

Q    I mean every single test.  Did you see them do it, any test that was not performed by you?

A    I was present when the team did the tests, but it is impossible to be present at every single test conducted from this sample measurement.

Q   So you did not observe every test, the results of which are reported in your reports, be performed, right?

MS. ELENBERG:  Objection, asked and answered.

A   I said I reviewed all the data in the report after it was handed to me.  I was present during the testing to a certain degree, you know. I followed the team members.  I was coordinating, but I cannot be -- especially as there is a time constraint with these sample measurements once it's fractionated, I cannot separate myself into four to be present with every team member conducting the experiment throughout all time.

Q   Right.  So if I understand you correctly, you did not observe every test, the results of which are recorded in your opening and reply reports, correct?

MS. ELENBERG:  Objection, asked and answered.

A   I said, I reviewed all the results handed to me, which is the result of every single testing.

I reviewed the -- the sample acceptance criteria that we write in this report -- I write

in the report is -- were fulfilled.

I was present during testing at some point with the colleagues, but I was not present at every time with all the colleagues because it's impossible to do that.

Q    Did Coriolis have a standing protocol for fractionation prior to your work on this case?

A    What do you mean by, standard?

Q    Did you have a protocol for fractionation prior to your work on this case?

MS. ELENBERG:  Objection, vague.

A    I said I don't know the "standard" protocol.  But we applied the protocol.

Q    So did you design a fractionation protocol for this case, or did you apply a protocol that Coriolis already had?

A    We applied a fractionation protocol that, after reviewing literature and after discussing internally in the team, which has been used before to conduct the fractionation.

Q    When you say it has been used before, has it been used before by Coriolis?

A    This particular protocol not, but this is a standard protocol.  I mean, this is just a standard sample preparation procedure.

Q   I understand.  But this protocol for fractionation that you applied to Moderna's drug product, that is not a protocol that Coriolis has used before, right?

MS. ELENBERG:  Objection, asked and answered.

A   I just said, this is a standard protocol, that these conditions have been used before, and we decided to use that, yes.

Q   You're not answering my question, Dr. Schuster.  I'm asking about Coriolis specifically.

Do you understand that?

A   Yeah, but I just answered that --

Q   There's no question pending.  You said yes.  Okay.

MS. ELENBERG:  Please treat the witness with respect.  They have taken time out of their day to come and answer your questions, Counsel.

MS. AFINOGENOVA:  Thank you, Counsel, and I would appreciate it if you would stop with the coaching objections that are wasting time on the record.

Q   Dr. Schuster, is the UC protocol that you applied for this case, is that a protocol that

Coriolis has used previously?

A    This is a standard protocol that has been used.

Q    By Coriolis?

A    Yes.

Q    Did counsel provide any input into the design of the fractionation protocol?  Just a yes or no question.

A    No.

Q    Did you alter any parameters of the fractionation protocol in designing this protocol?

MS. ELENBERG:  Objection, vague.

A    We applied the same force by increasing the -- increasing the speed but reducing the runtime that we tested.  There was no impact, or it looks the same.

And we reduced the -- or we tested different D2O concentrations to increase the concentration after -- I mean, in the UC, so we reduced that, as outlined here in the report. Yeah, as far as I remember.

Q    Did you test the effects of changing those parameters?

MS. ELENBERG:  Objection, vague.

A    Yeah, as far as I remember.  It's been a

while, that's why.

Q    I'm sorry, I don't think I understood your answer.

A    I said, as far as I remember, we did. And it has been a while since we did that, that's why I need to think about my answer to remember correctly.

Q    So do you -- strike that.

So in modifying the protocol for this project, you conducted certain testing when changing those parameters?  Is that what you just said?  I'm just trying to understand.

A    Yes.

Q    And where are the results of that testing in your report?

A    That's not in this report because it's not --

Q    So there's testing that -- I'm sorry, go ahead.

A    It's not related to the sample testing.

Q    Well, it's -- these are changes that you made to the parameters of the fractionation protocol that you used on samples of Moderna's drug product.

Am I understanding that correctly?

A    These were tests that we did at the beginning, similar to what I said with the LC-CAD.

Q    So is that part of the feasibility study that you were referring to?

A    Yeah.  I don't know if we did it on Moderna sample or not.

Q    But there's testing that you conducted in varying the parameters of the fractionation protocol for this project, right?

A    Yes.

Q    Did you provide the results of that testing to counsel?

MS. ELENBERG:  I will allow the witness to answer the question yes or no, but I instruct the witness not to answer beyond yes or no for privilege purposes.

A    Yes.

MS. AFINOGENOVA:  And Counsel, same request.  That has not been provided to us.  It's not in any of these reports.  But we can continue this discussion over the break.  But for the record, we ask that it be produced.  And it is extremely untimely.

MS. ELENBERG:  And for the record, the expert has already testified that all testing

fractionation protocol based on that testing, right?

A    As just explained, yes, to increase the concentration in the fractions so that we can use them to quantify the lipids in the LC-CAD later on.

Q    Right.  So the changes that you made to the parameters, they affected the results that you were seeing for the tests?

A    No.

Q    Then why would you change parameters?

A    Because from what we could see before, looks the same.  I don't know what to look for. You know, I was advised -- not advised.  I was asked -- sorry, it's the wrong word.  I was asked -- or Coriolis was asked to do a sample testing on samples.

So my aim, as a project leader and as a scientist, is to make sure that I can use the samples, to use a sample prep; that in the end, I can use the sample to actually analyze something.

I stated before that I don't know what to look for.  I don't, frankly speaking, care what to look for.  I just want to make sure that I can analyze the samples.

So therefore, yes, we adapted the protocol after feasibility to have higher concentration in the fractions.

Q   So just to break that down just so I understand the sequence of events, okay.

So Coriolis was asked by Genevant or by Williams & Connolly to do a sample testing initially, right?

A   To do sample testing, yes.

Q   The feasibility testing?

A   No.  This comes along, right.

Q   So you said a little bit earlier, I was asked or Coriolis was asked to do a sample testing on samples.

Do you recall saying that a moment ago?

A   I recall I presented a sample testing. But before one -- and this is everybody would do that -- before you can ensure the results for sample testing you submit, you do a feasibility and see if this works.

And then if it doesn't, you adjust your parameters, which is a common practice to do, to be able to see -- to use the samples.  What -- if we had only fractions that we cannot analyze, then our assignment to analyze this would not be

feasible.

Q    So you needed to do this initial feasibility testing to make sure that you could actually perform the testing on Moderna's drug product and you could rely on those results?

MS. ELENBERG:  Objection, mischaracterizes testimony.

A    Can you repeat the question?

Q    I'll withdraw the question.  We can move on.

We've talked about UC a number of times today.  UC stands for ultracentrifugation.

Is that right?

A    That's correct.

Q    Why is it ultracentrifugation as opposed to just centrifugation?

MS. ELENBERG:  Objection, scope.

A    Because it spins fast.  But I don't have a full definition for you now.

Q    So is it -- I mean, a centrifuge spins as well, right?

A    Exactly.

Q    So an ultracentrifugation, you go really fast as compared to centrifugation.

Is that fair?

RPM, right?

A    Let me verify.

Yes, as stated on page 24.

Q    RPM is rotations per minute, correct?

A    Yes.

Q    So the samples were spun at 10,000 rotations per minute, right?

A    They were spun at the speed here, as it's commonly done --

Q    Right.

A    -- for samples, yeah.  It's a common speed.

Q    In the protocol you followed, the samples were spun at 10,000 rotations per minute, right?

MS. ELENBERG:  Objection, asked and answered.

A    Yes, as written on my opening report, page 24, the speed stated there is 10,000 RPM, and that's the speed we used.

Q    And the samples were centrifuged for six hours, right?

A    Samples were centrifuged for six hours, correct, as is the time that you would need, yes.

Q    Six hours is 360 minutes?

A    Yes.

Q    So each sample was spun 3 million and 600 times in your method, right?

A    I would need to fully calculate, but yeah, I just don't know exactly the question or what you are saying.

Q    Sure.  We established that your protocol included centrifuging the samples for 360 minutes, right?

A    Which is a common, I said, time frame to do that, yes.

Q    And during that six hours, they were spun at 10,000 rotations per minute, right?

A    Correct, as stated on page 24 of my opening report, yes.

Q    And so over the span of the centrifugation process, the samples were spun 3 million and 600 times -- strike that.

Over the span of the centrifugation process, the samples were spun 3,600,000 times, right?

A    Yes.

Q    And when we think about a centrifuge, it's sort of like your clothes moving around in a washing machine, right?

12:28:49
12:28:51
12:28:57
12:29:00
12:29:03
12:29:11
12:29:12
12:29:16
12:29:20
12:29:20
12:29:24
12:29:24
12:29:28
12:29:32
12:29:35
12:29:36
12:29:40
12:29:44
12:29:47
12:29:49
12:29:55
12:29:57
12:29:59
12:30:02
12:30:06

A    Well, it's not --

MS. ELENBERG:  Objection.

Dr. Schuster, please allow me time to object.

Objection, lacks foundation.

A    I don't know if you can compare it with a washing machine.  Washing machine is very uncontrolled.  But it is spun.  That's why it's centrifugation.

Q    So what would you compare it to if not a washing machine?

A    To a centrifuge.

Q    There's nothing else you can compare it to?

A    I would compare a centrifuge to a centrifuge.  I'm very sorry for that.

Q    No other comparison?  After your decade-plus in the field, nothing -- no analogy you can think of?

MS. ELENBERG:  Objection, asked and answered.

A    A centrifuge is centrifuging samples.

Q    I just wanted to make sure that in the ten-plus years you've been doing it, you haven't thought of any.  That's fine.

before and after ultracentrifugation?

A    Yes, somewhere, yeah.

Q    You have records of those images?

A    I don't know if we have for every single sample.  They are -- would need to see -- it's not relevant exactly for my opening report, is it, because I used the UC to separate something, but not as the final analytical technique.  The samples are then analyzed with the methods as described here.

So it's the sample preparation, and then the analysis, yeah.

Q    Did you provide those samples to counsel?

A    What --

Q    I'm sorry.  Strike that.

Did you provide images of the samples before and after centrifugation to counsel?

A    No.

Q    Why not?

A    As stated, I didn't find it important to have these pictures as it is our sample preparation.  The analysis is afterwards.

MS. AFINOGENOVA:  Again, for the record, we ask that these images be produced.  Sounds like

they have not been already.    12:34:31

Q    Did you measure the -- strike that.    12:34:32

After centrifugation, someone had to go    12:34:35
in and pipette out ten fractions, correct?    12:34:38

A    Correct.    12:34:43

Q    And you personally did not observe    12:34:44
somebody doing that manual process each time,    12:34:46
right?    12:34:49

A    As answered before, it is impossible to    12:34:51
supervise every single step in the sample testing.    12:34:54
But I was present several times when it was done.    12:35:00

Q    Did you measure the density of each of    12:35:05
those fractions?    12:35:09

A    No, but it's not necessary.    12:35:11

Q    Ultracentrifugation separates material    12:35:28
by density, right?    12:35:31

A    Yes, as stated.    12:35:35

Q    It doesn't separate material by lipid    12:35:39
content, for example, right?    12:35:41

MS. ELENBERG:  Objection, lacks    12:35:44
foundation.    12:35:49

A    What do you mean, it doesn't separate by    12:35:49
lipid content?    12:35:52

Q    Does ultracentrifugation separate    12:35:53
material based on its lipid content?    12:35:57

A   I think, as we showed in the report of the sample testing, the separation that is happening, and after fractionation, and after testing, they do have different lipid contents, yes.  But these are the particles that have different compositions and by then different properties, densities to separate.

So...

Q   Right.  So you're separating the particles by density, not by the amount of each lipid that it has, for example?

MS. ELENBERG:  Objection, asked and answered.

A   I just said that, right, that as shown in all of this data, we separate the particles. They have different properties, densities.  And one of the things that can be observed is that these different particles that would be separated across the liquid column in the UC then are comprised of different lipid compositions, yes.

Q   And each of the fractions still has a lot of particles, right?

A   Each of the fractions still has particles, yes.

Q   Does it have millions of particles?

A     Has a lot of particles.

Q     Do you know if it has millions of particles?

A     In that range.  I would need to go through every report to rely on a very unreliable way of quantitation.  But yes, in that range.

Q     And the unreliable way of quantitation that you're referring to, that's the NTA analysis?

A     Yes.

Q     And at least based on that information, each fraction still has somewhere in the range of millions of particles, right?

A     Yes.

Q     And the starting samples of Moderna's drug product, those contain millions if not billions of particles, right?

A     Yes.

Q     So when you obtained the fractions of the samples, did you test the efficacy of those particles?

MS. ELENBERG:  Objection, vague.

A     Yeah, what do you mean by "efficacy"?

Q     You can't just administer a fraction that you obtained to a person, right?

MS. ELENBERG:  Objection, calls for

speculation.

A    I cannot answer this question.

Q    Well, you know that Moderna's COVID-19 vaccine is administered to people, right?

A    But this is not part of what I was doing here.  I was testing sample.  I cannot answer on any medical or pharmacological aspect of such a sample.

Q    But generally, you know that Moderna's COVID-19 vaccine is administered to people, right?

A    Generally --

MS. ELENBERG:  Objection.

Sorry, Dr. Schuster.  Please give me time to object.

Objection, asked and answered.

A    As I said, generally, yes, I know the COVID vaccine is administered to people, humans.

I have no medical degree.  I have a degree in analytical chemistry and separation science.  I cannot answer to this question because I'm not a doctor.

Q    Right.  So you don't know if you can just take one of these fractions and administer it to someone, right?

MS. ELENBERG:  Objection, calls for

Q    Well, it's milligrams per mL.  So that considers the volume because it's per mL, right?

A    This is an apparent concentration that needs to be corrected.

(Reporter interruption.)

Q    This is a concentration for SM-102 in Fraction 5 of Sample No. A-1 that you're reporting in your opening report, right?

MS. ELENBERG:  Objection, asked and answered.

A    As just answered, this is the amount related to the injection volume.  It's also specified later on to get them to the full milligram per milliliter of this fraction, which is lower because of the injection volume.  It needs to be corrected for the injection volume, so divided by three.

Q    Where is that in your opening report? Is it in there?

A    It is stated how much we inject and how much the standard is injected.  So it is in the report.  It is, in this case, not necessary because the information and also the Excel sheets that were presented have this information.  It is explained.  Again, I can guide you.

Q    That's all right.  Thank you, though. Let's stick with page 76 for now, okay?

A    Yes.

Q    I'm not sure why this is becoming a very controversial question.

A    No, I'm just --

Q    So 0.298 is the average amount in milligrams per mL that you're reporting for SM-102 in Fraction 5, right?

MS. ELENBERG:  Objection, asked and answered.

A    I did answer what it is.  It is the concentration related to the injection volume divided by three is then the concentration in the sample.  This is for the injected volume.

Q    Right.  And if we look at the next chart, that's the Tabulated results of molar ratios by LC-CAD, right?

A    Correct.

Q    So if we look at Fraction 5 here, the mole percent you report for SM-102 is 52.022, right?

A    That's correct.

Q    And that -- just to make this easier, can I refer to it as 52 for now?

A    For now?

Q    Okay.  That's fine.  We can refer to it as 52.022.

So the molar ratio percentages that you're reporting for Fraction 5 here, that's for the entire sample that's loaded into the autosampler, right?

MS. ELENBERG:  Objection, vague.

A    I asked this question before.  What do you mean by "entire sample"?

Q    So you said earlier, you take Fraction 5 --

A    Yeah.

Q    -- you load it into the autosampler, right?

A    I said part of Fraction 5 is placed into a vial.  That vial is placed into an autosampler.  And from this autosampler, as described in the report and also in the appendix, a specific volume, in this case 50 microliters, is injected.

So from that, yes, which is the average molar ratio, which is a relative value to cholesterol, DSPC, and PEG in SM-102, and this was SM-102 in this fraction.

Q    Right.  And the average -- strike that.

for these samples with all kinds of protein, LNP
stability samples.

So I was sure that it doesn't.  I just
wanted to verify here for counsel that it doesn't.

Q    And just so that I understand, what is
the truncation that you're referring to?  Is that
essentially something in the system that cuts out
part of the data as part of the data analysis?

A    In the software.

Q    Okay.  So there's a software that you
use to analyze this data, and it cuts out some of
the data, and that's how the initial analysis was
performed; and then this reanalysis is, you're
removing that step, and so there is -- essentially
you're analyzing all of the data, versus the data
in your reply report, there might have been some
data taken out as a function of that software?

MS. ELENBERG:  Objection, vague.

A    I said that -- so the software acquires
raw data.  This is unchangeable.  That is as it
is.

And then -- well, not the software; the
instrument with the software.

So that's raw data.

And then obviously you need to process

16:31:16
16:31:21
16:31:22
16:31:25
16:31:28
16:31:31
16:31:33
16:31:37
16:31:40
16:31:42
16:31:44
16:31:48
16:31:51
16:31:54
16:31:57
16:32:00
16:32:03
16:32:09
16:32:15
16:32:20
16:32:23
16:32:24
16:32:28
16:32:29
16:32:31

raw data to obtain a value.  And this processing method that we have -- or that's our standard processing method.

As I said, for all our stability studies and our product measurements, there is -- you can have, like, boundaries.  But they are set very big so that big particles and everything are still in, because, I mean, that's our business at Coriolis. We are founded from particle measurement, so this is one of our standard techniques.  And this is -- DLS is a key technique in I think almost all of our client projects.

So these parameters are always set.  So I know that they show, and I just wanted to show by just taking this parameter out, you can do that, but it doesn't have an effect on our data.

Q    So the only difference between the analysis you present in your reply report and the analysis shown in Schuster Exhibit 11 is the removal of that truncation parameter.  Is that fair?

A    Because it was stated that maybe a truncation in our data analysis skewed -- I don't remember the word that was used -- our data, and that it cannot be as good that we have both times

16:32:36
16:32:41
16:32:47
16:32:49
16:32:51
16:32:57
16:33:01
16:33:04
16:33:07
16:33:10
16:33:14
16:33:18
16:33:19
16:33:22
16:33:26
16:33:30
16:33:35
16:33:37
16:33:42
16:33:45
16:33:48
16:33:49
16:33:53
16:33:58
16:34:01

the same PDI, and to size.

And yeah, doing -- removing all of this, which I mean, as I said, we have a standard parameter. It's always used. It just shows that, yeah, it gives the same, I mean, the values -- I subtracted both, well, the values -- and we are talking about something of 0.7 to 0.2. The PDIs don't change at all. They're 0.00. They're the same.

So that this doesn't have an effect -- as I said, an effect of 0.2 or 3 to the overall difference.

So yeah, that's what I wanted to show, that -- yeah, as I said, it's our standard parameters. We know that it doesn't do that. But because there was this question, and -- I mean, I just wanted to verify to you that this is not the case.

Q    Understood. That's helpful to understand.

MS. AFINOGENOVA:  So I think maybe it makes sense to take a break. We've been going for about an hour. But before we do that, I think we wanted to revisit the discussion between counsel.

MR. McLENNAN:  So earlier you mentioned

16:34:06
16:34:10
16:34:14
16:34:17
16:34:20
16:34:24
16:34:28
16:34:36
16:34:42
16:34:45
16:34:48
16:34:55
16:34:56
16:35:01
16:35:03
16:35:06
16:35:08
16:35:11
16:35:11
16:35:13
16:35:14
16:35:15
16:35:17
16:35:21
16:35:24

that you wanted to make sure there was no waiver. So we agree that it's not a waiver to produce the files withheld today. But we still reserve all rights to argue waiver based on your expert considering these files in the course of forming his opinions.

You also tried to condition compliance with Rule 26 on concessions from us, like us agreeing to some standard about what files Moderna would have to produce. We are complying with Rule 26. We don't think you have because your expert has testified that he conducted an earlier round of testing that was never closed to us, and then he used that testing to inform the later testing in his report.

So we don't think it was appropriate for that to be withheld. We only found out about it today during the course of the deposition.

So we've already made clear we're going to comply with Rule 26. Again, we don't think you have.

Are we going to get production today?

MS. ELENBERG: As we've stated numerous times today, including before the lunch break, we are of the full belief that we have complied with

The three pages that follow contain a table that states which Moderna lot number samples were received from on which dates, and then provides some temperature logger data, correct?

A    Yes, yes.

Q    And in fact, according to this table in Exhibit 10, which is Exhibit C to your opening report, it states that there were 27 lots of Moderna's drug product from which Coriolis received samples in July of 2024, correct?

A    Yes.

Q    Why were none of these samples tested until October 2024?

A    I stated that before, right, that the LC-CAD method was developed for robustness and then we did the method qualification.  We had it also with the date.  That was in September.

So we had the method, development of the method.  And then -- and then September, to verify --

Q    That's all right.  Let me withdraw that question.

A    I just wanted to be precise.

Q    When were the proof of concept studies conducted?

A    That was -- I don't know the exact date, but somewhere -- summer or so.  I don't remember the exact date.

Q    Do you remember what month?

A    No.  I don't remember the exact month. I'm sorry.

Q    Were the proof of concept studies the first studies conducted for your work on this case?

A    Yes.

Q    And then after that -- strike that.

After the proof of concept studies, what was the next set of studies or tests that were conducted?

A    As explained, because of the instrument robustness problems, changed the instrument.  And then we had a method test on a different system. And then, yeah, this method -- the LC method adjustments that I did so that the samples measurements will be robust.  So to get this process robust.

And then I performed a method qualification of the method.  And then the sample testing started with the data that you received.

All that is in the opening report.

So there is the usual -- takes a while to get these methods robust, right.  So...

Q    And we spoke earlier about when you were -- or strike that.

When were you first contacted by counsel for Genevant?

A    I don't know.

Q    Do you remember if it was before May 2024?

A    As stated, I answered this question before how the process is and how in Coriolis projects come in.

So I don't know the exact time.

Q    Do you recall if you personally knew about or got involved in this case prior to May of 2024?

A    I don't recall.

Q    So if you take a look at the third page of the table in Exhibit 10.

A    Yes, that first page.

Q    The first sample listed on that page is from Moderna lot number 7036623016, correct?

A    Correct.

Q    And samples from that lot were received by Coriolis on July 3rd, 2024, correct?

Q    Right.  And you've been in this field for more than ten years, right?

A    Correct.

Q    And sitting here today, are you aware of a way to isolate a single LNP from a formulation?

MS. ELENBERG:  Objection, asked and answered.

A    As I said, I would need to go through -- it's a very hypothetical question.  So I would need to, as answered, spend more time, consider, look through more methodologies.  I was not asked to do this.

Q    Sitting here today, you cannot identify a methodology that can be used to isolate a single LNP from a formulation, right?

MS. ELENBERG:  Objection, asked and answered twice.

A    My answer again, I would need to consider more time looking into everything to extract a single LNP from a formulation.  Which also, this question by itself is very general.

Q    Can you measure the composition of a single LNP?

A    This is the same answer I just gave, because it would answer the exact same question

that you just asked me before.

Q    So as a self-proclaimed expert in analytical chemistry, including in the field of separation methodologies, sitting here today, you cannot identify a method by which one could measure the composition of a single LNP, right?

MS. ELENBERG:  Objection, asked and answered.

A    As I said, I would need to look more into it, and this question as you ask is very general.

Q    So sitting here today, you cannot provide an answer to my question, which is, can you measure the lipid content of a single LNP, right?

MS. ELENBERG:  Objection, asked and answered numerous times.

A    Again, I haven't thought about this.  I need to consider.  I wasn't asked to do this.

So this is the answer.

Q    Do you know how much the work performed by Coriolis on this case has added up to in terms of the compensation Coriolis receives?

MS. ELENBERG:  Objection, vague.

Q    Let me withdraw it and rephrase.

Do you know how much money Coriolis has received or has billed for in terms of its work on this case?

A    I don't know the exact -- the exact amount because I'm not in the -- it's, again, separated, right, from my work.  I don't know the exact amount, no.

Q    Have you been involved in any discussions where amounts were discussed?

A    Just roughly.  So I don't know the exact amount.  As I said, something -- I don't know. Seven millions.

Q    Seven million is the rough amount that you've heard discussed as the compensation that Coriolis has or will receive for its work for Genevant in this litigation, correct?

A    I said roughly.  I'm not involved in anything that is related to this kind of tasks with the company, yeah.

Q    Right.  So roughly seven million is the amount that you've heard as -- or strike that. Let me just clarify.

7 million U.S. dollars or euros?

A    Euros, roughly.  I said roughly.  I don't know.

Q   So roughly seven million euros is the amount that you've heard discussed as the compensation that Coriolis has or will receive for its work for Genevant in this litigation, correct?

A   For the work that we do on a sample testing with that volume as you see, which is just -- yeah, the fee that Coriolis charges.  I don't know the exact euro number, no.

Q   When was the last time you heard that amount?

A   I don't know.  I mean, I don't know the -- as I said, this is a rough estimate that I just do know because I'm not involved in the payment scheme -- or in the billing scheme of the company.  I'm in the operational part that conducts experiments.  This is separated.

Q   And aside from your salary, do you get paid bonuses?

A   Can you specify "bonuses"?

Q   Aside from a set salary that you receive, do you receive additional compensation for the work that you do?

A   Can you specify again?

Q   Are you familiar with the concept of a bonus when you work for a company?

A    Yeah.  We have a small bonus system.

Q    Do you receive bonuses for specific projects that you work on?

A    No.  Everybody receives the same amount company-wide, everyone.

Q    How much was your bonus last year?

A    1,400 euro.

Q    Have you ever heard of someone named Ian MacLachlan?

A    Can you respell or re-pronounce the name?

Q    Ian MacLachlan, have you ever heard of someone with that name before?

A    I don't recall.

Q    Have you tested any siRNA LNP products in your work at Coriolis?

A    I don't know if it was siRNA, and I don't know if this actually goes into confidentiality of my company.

Q    You're not an expert in LNPs, right?

MS. ELENBERG:  Objection, vague.

A    Again, what do you mean by "expert"?

Q    Well, you said that you're an expert in analytical chemistry, in your report, right?

A    Yes.  And by that means I have analyzed

several products -- LNP products, and characterized the same way as here. So by that, I have expertise in the analysis of LNP-containing samples formulations.

Q Have you ever designed a vaccine for use in humans?

MS. ELENBERG: Objection, vague.

A I have -- I don't know if I can answer this question due to confidentiality of our company. But personally, you mean me as a person?

Q Yes, you personally. Have you ever designed a vaccine for use in humans?

A No, because I'm an analytical chemist who characterizes and analyzes vaccines that other people produce. It's not my task.

I don't understand this question.

MS. AFINOGENOVA: So I have no further questions at this time.

But again, A, there might be further questions from counsel, in which case we reserve the right to ask additional questions now.

And as stated on the record previously, we are holding this deposition open, given the failure to produce documents that Dr. Schuster has discussed today and has relied on in reaching the

opinions expressed in his report.                18:37:36

MS. ELENBERG:  We can go off the record.         18:37:41

COURT REPORTER:  Is there anything else          18:37:50
for the record?                                  18:37:51

MS. ELENBERG:  We're going to meet, and          18:37:52
we'll let you know.                              18:37:53

VIDEOGRAPHER:  We're going off the               18:37:55
record.  The time on the video monitor is        18:37:57
6:37 p.m.                                         18:38:00

(Recess from 6:37 p.m. until 7:08 p.m.)          18:38:01

VIDEOGRAPHER:  We're back on the record.         19:08:20
The time on the video monitor is 7:08 p.m.       19:08:26

MS. ELENBERG:  I will be asking                  19:08:31
Dr. Schuster some questions at this time.        19:08:33

                  EXAMINATION                    19:08:35

BY MS. ELENBERG:                                 19:08:35

    Q    Dr. Schuster, are all of the facts and  19:08:45
data considered by you in forming your opinions  19:08:47
disclosed in your report?                        19:08:49

        MS. AFINOGENOVA:  Objection, form,        19:08:51
leading.                                         19:08:52

    A    Yes.                                     19:08:54

    Q    Dr. Schuster, are there any facts or     19:08:55
data considered by you in forming your opinions  19:08:59
that are not disclosed in your report?           19:09:01

MS. AFINOGENOVA:  Objection, form, leading.

A    No.  Everything is considered.

Q    Dr. Schuster, during today's deposition, you mentioned proof of concept feasibility testing.

Do you recall that?

A    Yes, I did recall.

Q    Was this proof of concept feasibility testing considered by you in forming your opinions?

A    No, did not.

Q    Why not?

MS. AFINOGENOVA:  Objection, form.

A    As stated before, this was to see whether or not this the instrument setup works and to then decide if I need to optimize the system settings.

Q    Dr. Schuster, was the method used by you for that testing the method that you used for sample testing as disclosed in your report?

MS. AFINOGENOVA:  Objection, form.

A    No.

Q    Dr. Schuster, pursuant to good research practices --

(Reporter interruption.)                    19:13:34

VIDEOGRAPHER:  We're going off the           19:13:34
record.  The time on the video monitor is 7:10   19:13:34
p.m.                                         19:13:34

(Recess from 7:10 p.m. until 7:14 p.m.)      19:14:11

VIDEOGRAPHER:  We're back on the record.     19:14:11
The time on the video monitor is 7:14 p.m.   19:14:31

BY MS. ELENBERG:                             19:14:35

Q    Dr. Schuster, pursuant to Coriolis's    19:14:37
good research practices, would you have reported  19:14:38
the data from your feasibility proof of concept   19:14:41
study?                                       19:14:45

MS. AFINOGENOVA:  Objection, form.           19:14:46

A    Never.  It failed all the criterias.  I  19:14:52
would not report this data.                  19:14:54

Q    Could you explain that a bit more?  What  19:14:57
criteria did it fail?                        19:14:59

A    So as explained in the opening report as  19:15:03
in general, you have system suitability tests,    19:15:06
acceptance tests, that are used to check if a     19:15:10
system -- that's not about the samples, but it's  19:15:16
about the system -- is applicable for these kind  19:15:20
of testings.                                 19:15:25

And with the feasibility, when we used       19:15:27
the different instrument, these tests failed in   19:15:30

99 percent, or I don't know the exact percentage. But therefore, we couldn't -- we wouldn't be able to use any of the data. And we would not -- definitely I would not put it in a report and sit here to testify on such data.

Q    Dr. Schuster, did you -- strike that.

Earlier today, Dr. Schuster -- well, throughout the day, you've talked about how, following the feasibility proof of concept testing, you adjusted the instrument and whatnot in order to improve robustness.

Were there any other reasons that you changed anything about your testing methodology other than robustness?

MS. AFINOGENOVA:  Objection, form.

A    No.  So for me to present reliable data, accurate data, the key utmost importance is robustness.  And that was what was addressed after this short feasibility, which we common do.

So...

Q    Dr. Schuster, was any of the data from your proof of concept feasibility test or any other test discussed today inconsistent with the sample testing data disclosed in your report?

MS. AFINOGENOVA:  Objection, form.

A    No, not that I know of.    19:17:14

Q    Dr. Schuster, a little while ago, you were discussing docket entries.    19:17:24 19:17:27

Do you recall that?    19:17:30

A    Yes.    19:17:32

Q    The docket entries that you discussed are reflected in the data submitted in your report.    19:17:33 19:17:37 19:17:39

Is that correct?    19:17:39

A    Correct.    19:17:43

MS. AFINOGENOVA:  Objection, form.    19:17:43

A    Correct.    19:17:46

Q    Dr. Schuster, vials of Moderna's Spikevax drug product contain an aluminum cap.    19:17:51 19:17:54

Is that correct?    19:17:58

A    Sorry.  Can you repeat?    19:17:59

Q    Dr. Schuster, vials of Moderna's Spikevax drug product vials contain an aluminum cap.    19:18:00 19:18:05 19:18:09

Is that correct?    19:18:10

A    That's correct.    19:18:10

Q    With a plastic flip-off cap.    19:18:10

Is that correct?    19:18:13

A    On top.    19:18:13

Q    Would the aluminum and plastic need to    19:18:15