# EXHIBIT L



## Planet Depos
*We Make It Happen*™

**CONFIDENTIAL**

# Transcript of Georg Schuster, Ph.D.

**Date:** August 6, 2025
**Case:** Arbutus Biopharma Corp., et al. -v- Moderna, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

------------------------------ x

ARBUTUS BIOPHARMA CORPORATION   :

and GENEVANT SCIENCES GmbH,     :

         Plaintiffs          :

    vs                          : Civil Action No.

MODERNA, INC. and               : 22-252-MSG

MODERNATX, INC.,                :

         Defendants          :

------------------------------ x

* CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER *

VIDEOTAPED DEPOSITION OF

GEORG SCHUSTER, Ph.D.

Wednesday, August 6, 2025

Job No.:  594954

Pages:  1 - 111

Stenographically Reported By:

Alison C. Webster, CSR, RPR, RMR, CRR, RDR

Videotaped deposition of GEORG SCHUSTER, Ph.D., produced as a witness at the instance of the Defendant, and dulysworn, was taken in the above-styled and numbered cause on Wednesday, August 6, 2025, from 8:02 a.m. to 11:17 a.m. Eastern Time, before Alison C. Webster, RPR, CRR, RMR, RDR, CSR-6266(Michigan); License No. 14559 (California); License No. 084.004953 (Illinois); CSR-12432 (Texas), reported by stenographic method, via videoconference, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFFS/COUNTER-DEFENDANTS

     FALICIA ELENBERG, ESQUIRE

     SHAUN P. MAHAFFY, ESQUIRE

     Williams & Connolly LLP

     680 Maine Avenue SW

     Washington, DC, 20024

     202.434.5989

     felenberg@wc.com

     smahaffy@wc.com


ON BEHALF OF THE DEFENDANTS/COUNTER-PLAINTIFFS

     MARK C. MCLENNAN, ESQUIRE

     N. KAYE HORSTMAN, ESQUIRE

     Kirkland & Ellis LLP

     601 Lexington Avenue

     New York, New York 10022

     212.909.3451

     mark.mclennan@kirkland.com

     kaye.horstman@kirkland.com




ALSO PRESENT:

Dylan Keisler, video technician

T A B L E    O F    C O N T E N T S


Witness                                        Page

GEORG SCHUSTER, Ph.D.


EXAMINATION

BY MR. McLENNAN:                               8

EXAMINATION

BY MS. ELENBERG:                               77

RE-EXAMINATION

BY MR. McLENNAN:                               101


E X H I B I T    I N D E X


Exhibit                                        Page

(Exhibits attached to transcript.)


EXHIBIT 1                                      9

Slides, ROCWoo2 WP1 Lipid Composition

Analysis of Fractionated LNP Samples

GENV-01102731 - 753

EXHIBIT 2                                      18

ROCWoo2 WP1 Lipid composition analysis

of fractionated LNP samples

GENV-01102754 - 787

EXHIBIT  INDEX  CONTINUED

EXHIBIT 3                                        63

Document, Docket: Sample fractionation

on Optima XPN-80 with SW60Ti rotor

EXHIBIT 4                                        69

Image,  GENV-01100490 and GENV-01100491

EXHIBIT 5                                        86

Excel,

20240719_ROCW001_WP3_Seq6_027J23a_F1_4

EXHIBIT 6                                        88

Document, Table of Contents

MRNA-GEN-00021725 - 802

EXHIBIT 7                                        93

Excel (no identifiers)

EXHIBIT 8                                        97

Screenshot of item from deposition

DEPOSITION OF GEORG SCHUSTER, Ph.D.

Wednesday, August 6, 2025


VIDEO TECHNICIAN:  Here begins Media Number 1 in the videotaped deposition of Dr. Georg Schuster in the matter of Arbutus Biopharma Corp, et al, v. Moderna Inc, et al, in the United States District Court for the District of Delaware, Case Number 22-252 (MSG).

Today's date is August 6th, 2025, and the time on the video monitor is 8:02 a.m. Eastern Standard Time.

The remote videographer today is Dylan Keisler, representing Planet Depos, and all parties of this video deposition are attending remotely.

Would counsel please voice-identify themselves and state whom they represent.

MR. McLENNAN:  Mark McLennan from Kirkland & Ellis for the Moderna defendants, and with me today is my colleague Kaye Horstman.

MS. ELENBERG:  Falicia Elenberg here with Williams & Connolly representing plaintiffs, with my colleague Shaun Mahaffy.

VIDEO TECHNICIAN:  The court reporter today is Alison Webster, representing Planet Depos.

And the witness will now be sworn.

STENOGRAPHER:  The attorneys participating in this deposition and the witness have verified that he is Georg Schuster, Ph.D.  In lieu of an oath administered in person, the witness will visually affirm his testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting or admissibility of the transcript.

If there are any objections to proceeding in this manner by any party, please state so now.

Hearing no objections, Dr. Schuster, would you please raise your right hand.

Do you swear or affirm the testimony you are about to give in this matter will be the truth, the whole truth, and nothing but the truth?

DR. SCHUSTER:  I swear.

STENOGRAPHER:  Thank you.

You may proceed.

MR. McLENNAN:  Good morning, Dr. Schuster.  Or good afternoon for you.

THE WITNESS:  Good morning.

GEORG SCHUSTER, Ph.D.,

was thereupon called as a witness herein, and after
having first been duly sworn to testify to the truth,
the whole truth and nothing but the truth, was
examined and testified as follows:                    08:03:33

EXAMINATION                    08:03:33

BY MR. McLENNAN:                    08:03:33

Q. Could you please state your full name for the record?    08:03:33

A. My full name is Georg Schuster.    08:03:36

Q. Is there any reason you can't give full and accurate
and truthful testimony today?    08:03:39 08:03:42

A. No.    08:03:45

Q. Who else is in the room with you there today?    08:03:45

A. Falicia Elenberg and Shaun Mahaffy.    08:03:50

Q. Anyone else?    08:03:53

A. No.    08:03:54

Q. And where are you located right now?    08:03:54

A. In Amsterdam, at the -- yeah.    08:03:57

Q. And do you have any materials in front of you?    08:04:05

A. I do have a printout of my opening report, reply
report, and Exhibit 7 and Exhibit J.  So Exhibit 7 of
the reply report and Exhibit J of the opening report.    08:04:08 08:04:15 08:04:20

Q. Okay.  And no other materials in front of you?    08:04:23

A. No.    08:04:27

Q. Okay.  You understand you're here today for a second
deposition in this case.  Right?    08:04:27 08:04:32

A. I do understand.

Q. And today's deposition is meant to address some of the materials that you produced since your last deposition; is that right?

A. That's correct.

Q. And those materials weren't produced with your opening reply report. Correct?

A. That's correct.

MR. McLENNAN: Can we please introduce tab 5, which is GENV-01102731, which I'll mark as Exhibit 1 to today's deposition.

MARKED FOR IDENTIFICATION:

EXHIBIT 1

8:05 a.m.

A. I can open it.

BY MR. McLENNAN:

Q. Yeah, my colleague's going to drop the exhibits in the Chat and then she's also going to display them, so if you need to open up the file, you're free to do so.

Do you see that displayed on the screen, Dr. Schuster?

A. I do. Thank you.

Q. Do you recognize Exhibit 1?

A. Yes.

Q. What is Exhibit 1?

A. Exhibit 1 is a data presentation, an internal data presentation that contains graphs from the method optimization for the --

Q. Okay. And --

A. -- LC-CAD.

Q. I'm sorry, I think I inadvertently cut you off. Were you saying the "method optimization for the LC-CAD"?

A. Exactly. As explained in my first deposition, after feasibility test we run the method -- yeah, we did some additional tests, I stated that in my first deposition, and then this method was used for the final sample testing that were stated in the opening report.

Q. And when you say "the final sample testing," you're referring to the test of the 67 lots of Moderna's COVID-19 vaccine?

A. Exactly. The one that we submitted with the opening report.

Q. Okay. And the date of this presentation in Exhibit 1 is 22nd of August 2024. Right?

A. That's correct.

Q. And you prepared this presentation?

A. I prepared this presentation.

Q. And who did you present the presentation to?

A. To counsel -- or to Falicia Elenberg and Shaun

Mahaffy.

Q.   Was anyone else present at the presentation?

A.   No.

          MR. McLENNAN:  If we could go to Slide 2,
please, of Exhibit 1.  I'm sorry, Slide 3.

          Oh, sorry, it's the following slide,
Slide 4.

BY MR. McLENNAN:

Q.   So at the bottom of this it describes "optimization of
[the] LC-CAD LNP separation and quantification
method."  Right?

A.   Exactly.

Q.   There's a project number given at the top, ROCW002.
What does that refer to?

A.   That refers to the, yeah, sample testing project.
So, as said, we had a feasibility study or a
feasibility run with a LC-CAD method parameters that
was run under ROCW001, and based on that initial
results, what you see here in this presentation, then
we transferred the method to a different system and
that was running under the Code 2.

Q.   Okay.  So just to be clear, the feasibility study was
the ROCW001 method; is that right?

A.   Exactly.

Q.   And in this presentation you're describing the 02

method in which you're making further optimizations; is that right?

A. Where we run that method from ROCW001 on different instrument and made further optimization.

Q. And what was the purpose of the further optimizations?

A. The purpose was mainly -- as mentioned during the first deposition, so when we did the feasibility test, which was basically a run to see if the method parameter that I set up, so to the best of my knowledge I basically designed the method parameters to test a sample, and it was run, and on -- and we saw that for the instrumentation we couldn't pass the SST criteria, as said, for the instrument, and had several, yeah, issues with the instrument with, I guess, injection volume failures, and so on.

And then the aim was that we cannot use that setting for any testing, so, for here, as stated in this presentation, then it was transferred to a different instrumentation, so on newer models which we assume can handle the robustness better or, in general, more robust systems to our testing.

And then since we did that and that looked good, we just did, as is common, yeah, to test some other conditions just to see -- yeah, just to have the most robust approach when we then go into actual

08:09:44
08:09:46
08:09:52
08:09:57
08:09:59
08:10:02
08:10:10
08:10:12
08:10:18
08:10:24
08:10:30
08:10:38
08:10:45
08:10:49
08:10:54
08:10:58
08:11:02
08:11:07
08:11:10
08:11:17
08:11:20
08:11:24
08:11:27
08:11:37
08:11:43

sample testing as we knew that we will test a lot of

samples so we need to create an environment for the

testing that is -- that we can trust, that is

suitable.  And that was the aim of this approach.

Q.  And when you say that you "designed the method

parameters" to test the samples, that was designing

the method parameters to test the samples of Moderna's

COVID-19 vaccine.  Right?

A.  You mean for the initial feasibility run?

Q.  Correct.

A.  Correct.

Q.  And the optimization for this report, for ROCW002,

that was also specifically customized for Moderna's

COVID-19 vaccine.  Right?

            MS. ELENBERG:  Objection.  Form.

A.  That's not fully customized for Moderna's vaccine.

That would work for any sample that contains the same

components.  Yeah.

BY MR. McLENNAN:

Q.  But the purpose of optimizing it was to test Moderna's

COVID-19 vaccine.  Correct?

A.  The purpose for optimization was to obtain a robust

method for sample testing.  Obviously the samples

that we were supposed to test were the COVID-19

vaccines.  This method would also work for any other

sample that contains, yeah, the same components.

Q. Okay. So thinking about the feasibility study you mentioned, which was the 01 project, approximately how long did that take to carry out?

A. I don't remember the exact time. A week maybe.

Q. And what about the 02 further optimizations that you made, how long did that take to carry out?

A. That is a bit difficult to -- I mean, there are two aspects to it. So maybe it took about four, five weeks, but we did not work on it constantly, so...

We are a CRO that works with a lot of different client projects and also involved in a lot of different client projects, so it was not full-time always working on it. So that's the usual -- like we usually run that kind of studies in, let's say, three to five weeks to six weeks, where we split then the work across --

[Simultaneous Speaking]

Q. And when you say there was two --

A. Sorry.

Q. Sorry, go ahead. I didn't mean to cut you off.

A. No, I just wanted to explain that if you would sum it up all by, you know, constant working on it maybe these experiments will take two weeks, a week, a week. But, as said, we spread them across some time.

Q. And when you say there were two different aspects to it, are you talking about the optimization of the LC-CAD method, the measuring lipid content, and then separately the method for separating the L&Ps? Is that right?

A. No. What I meant is there are two aspects to how you could say how long it took. So that's what I meant. There's the one aspect that the actual time, which I guess it was, as said, between three, five weeks because we work on several projects. That's one aspect.

The other, if you mean the overall time such an experiment would take, so if you pile it all up at once and have time. So that -- that's what I meant with the two aspects to it.

Q. Okay. And so when you say three to five weeks, are you referring to just the optimization of the LC-CAD method, not the optimization of the separation method?

A. Can you specify what you mean?

Q. So in this presentation that we're looking at now, it's describing the optimization of the lipid content measurement method. Right?

A. That's the LC-CAD method.

Q. Right. And this presentation is describing optimizing that. Correct?

A.  Correct.

Q.  And so when you say it took three to five weeks working on and off to optimize it, you're talking about optimizing the LC-CAD method.  Correct?

A.  Correct.

            MR. McLENNAN:  Can we go to Slide 5 of Exhibit 1, please?

BY MR. McLENNAN:

Q.  So Slide 5 provides an overview of the different parameters that you tried adjusting of the LC-CAD method.  Correct?

A.  Correct.

Q.  And that includes testing different column temperatures, different columns, different gradients.  Right?

A.  Yes.

Q.  And you tested it on different equipment as well.  Correct?

A.  Yes.

Q.  And you didn't describe any of this in your reports.  Correct?

A.  Correct.  The final method was described in the report which -- with every detail of the method, and also in the method qualification report all the details were described.

Q.    So what's your -- sorry.

MS. ELENBERG:  Sorry, please allow the witness time to finish answering his questions.

A.    So this was -- well, can you repeat the question?

BY MR. McLENNAN:

Q.    I just asked you -- I just asked you to confirm that you didn't describe any of the optimization work in your reports.

A.    No, because usually, I mean, we had -- so the aim was to test samples with the method, as we do with a lot of projects.  We are a CRO that is specialized in, yeah, also analytical services, so we provide analytical support for clients or sample measurements.  And in these measurements -- or in these reports that we submit to the clients that are also often submitted to authorities or the FDA, there we make a description of the method, so the method that is used for the actual sample testing, and then we state the results.

We, not on a usual base, have like that kind of data in the report, only if specifically asked.  But these are -- yeah, as said, there was just common tests and we usually don't report on that in a sample testing report.

MR. McLENNAN:  Okay, we can take down

Exhibit 1, and I'll introduce Exhibit 2, which is tab 6, GENV-01102754, please.

MARKED FOR IDENTIFICATION:

EXHIBIT 2

8:19 a.m.

BY MR. McLENNAN:

Q.   Dr. Schuster, do you recognize Exhibit 2?

A.   Yes, I recognize that.  I downloaded it --

Q.   All right.

A.   -- just to make sure.

Yes, that is the presentation where we tested our standard parameters for the centrifugation. I also mentioned that in the first deposition that we tested speed and concentration so I will understand the conditions that was tested here and then, yeah, they were just injected on the LC method.

Q.   Okay.  And you prepared Exhibit 2 as well.  Right?

A.   Yes.

Q.   And this was another presentation that you gave to Genevant's lawyers; is that right?

A.   Correct.

MR. McLENNAN:  Go to Slide 2 of Exhibit 2, please.

BY MR. McLENNAN:

Q.   Slide 2 describes that the samples of Spikevax were

08:19:33
08:19:37
08:19:43
08:19:43
08:20:10
08:20:10
08:20:10
08:20:12
08:20:22
08:20:23
08:20:57
08:21:04
08:21:09
08:21:11
08:21:17
08:21:24
08:21:26
08:21:33
08:21:33
08:21:45
08:21:46
08:21:47
08:21:49
08:21:50
08:21:50

property of Coriolis and that they were acquired
before contacting Williams & Connolly; is that right?

A.   That's correct.  I mentioned that already in the
first deposition.

Q.   And you still don't know how Coriolis obtained those
samples; is that right?

A.   Yes, that's correct.  I mean, we are a pharmaceutical
company with the license to order samples to buy.  I
was not involved in -- or I was not and I am not
involved in acquiring samples, so I don't know
exactly.  Yeah.

Q.   Sitting here today, do you know whether those samples
that Coriolis acquired were expired at the time that
Coriolis acquired them?

A.   They are -- they were expired in general, but I don't
know if they were expired the date that we acquired
them because, as said, I don't know exactly when we
acquired them.

Q.   But you're aware that they were expired at the time
that you tested them.  Correct?

A.   I was aware that they were expired, yes.

Q.   And did you know that they were expired at the time
that you tested them?

A.   I was aware that they were expired at the time of our
testing, but that to the process for the test that we

did for us was applicable because, I mean, as expected back then and as was also kind of shown throughout the whole project, we always saw the same trends and the same, yeah, profiles throughout any samples that we tested. So that was a fine and instilled to us a good model sample to do the feasibility that we did, and also we did not have any other sample available to do some of the initial tests, yeah.

Q. Okay. So Exhibit 2 describes the optimization of the fractionation method. Right?

A. It shows this small experiment that we did to -- where we tested two concentrations to run speed runs and the PBS, and the PBS was sucrose, which is around -- yeah. Like the standard that we do, it's a 20-hour experiment to do. So, yeah, this is what is shown in this presentation.

Q. And would you describe that as optimization of the method?

A. No, I would rather say that this is just testing if we see differences, which we didn't, and -- I mean, for me it was important because ultimately, right, we wanted to quantify, which was the goal, and to have like a separation. So just to see, yeah, if you can have higher concentration, because we always test

that, and to -- yeah, to see if it makes sense to maybe reduce the time for the person in the lab, which sometimes is nice but, as said, this is a standard set of these four experiments to do.

Q. Okay.

A. As said, it's not a full optimization. It's just four runs and then this takes 20 hours, so two days.

MR. McLENNAN: Could we go to Slide 4, please, of Exhibit 2?

BY MR. McLENNAN:

Q. On Slide 4 you're describing the optimization of the separation method?

A. It says "includes: updates for optimization of LC-CAD LNP separation and quantification method," but -- yeah, I mean, that's the wording. I don't know exactly.

Q. At least you described it as optimization of the separation method. Right?

A. I mean, this is a document that we wrote just writing down, and any -- I think it's a bit semantics. We are not natives and -- especially not at Coriolis working in Germany. Optimization to us means just if you do one experiment and you do a second, that can already be an optimization. Yeah.

Q. Okay.

MR. McLENNAN:  Can we go to Slide 6, please?

BY MR. McLENNAN:

Q.  So in Slide 6 and 7, do you see that there's four rotor sets described here?

A.  Yes, they were the experiments that I just mentioned and also I mentioned in the first deposition that we tested this -- exactly.  That we tested speed, two speeds and concentration and the PBS --

Q.  And so you --

[Simultaneous speaking]

A.  -- that before.

Q.  So you vary these parameters and you label them as rotor set 1, 2, 4 and 5 to differentiate which different parameters you're testing; is that right?

A.  Yeah, exactly.  As you can see, they have different runtime and speed and concentration, so this -- so the first one is six hours, then four hours, and then on Slide 7 it's again six and four hours.  And we do this combined approach in two days because you need to split, basically, the run times, obviously, and there's only -- yeah.

Q.  And one of the other parameters you changed was including 1 percent sucrose; is that right?

A.  Yeah, that was one additional -- I mean, that was one

of the standard parameters that we test just to have a control if that would do something; I mean, if our system would be changed. But as you could see and -- that it didn't anything. It's just as a control.

And then we stuck to our standard approach, which is the PBS 10,000 speed because you also saw that for -- actually then for me it's not so much time gain for four hours, but what was -- yeah, the assumption that high concentration is better for us because we needed to quantify, and therefore we used the standard condition that was already the same basically as during the feasibility but with a higher concentration.

Q. And in your expert reports you didn't mention testing different concentrations or including sucrose or different speeds or run times. Right?

A. That's correct. And as I just mentioned for the LC-CAD, which is the same approach, that it's -- the final parameters are mentioned in the report that is associated with the results and -- but I did mention this in my first deposition, that we tested that.

Q. And was it your decision --

[Simultaneous Speaking]

Q. Sorry.

MS. ELENBERG: Sorry, can you let the

witness finish answering the question?

BY MR. McLENNAN:

Q.   Sorry, Dr. Schuster.

A.   I forgot what I was about to say.  You can continue, so... I'm sorry.

Q.   And was it your decision not to include details about those other parameters that you tried in your expert reports?

          MS. ELENBERG:  Objection to the extent that your answer -- don't reveal the content of any communications that you've had with the attorneys.  So to the extent that your answer would reveal that, exclude that from your answer.  But otherwise, to the extent that -- I'll allow you to answer the question, just don't go above and beyond to reveal the substance of your communications with the attorneys.

A.   Yes.  As I said, this is standard for us to just have in sample testing reports the final parameters because we explain how we do the things and then we report the results.  So this is as we do for any clients, that we submit testing results, as said, either for the FDA or for other purposes, so...

BY MR. McLENNAN:

Q.   So it was your choice not to include those details in your report?

A. Yes.

Q. Now, looking at the different conditions that you tried here like speed, runtime, including PBS, also including sucrose in the concentration, did you come up with those parameters or did someone else on your team?

A. Me together with the team because, as said, this is what we usually test. So the speed, the concentrations just to have either further quantitation, more or less, just, you know, general -- more substance in. The speed, the 10,000 usual speed that we run because you can run it on any centrifuge, and if you think about why 14,000, because if you extend -- if you want to reduce the time in the lab from six to four hours, you need it at 14,000 because it applies the exact same force between 10,000 in six hours and 14,000 in four hours, so that's why it's stat. So that's for this set, the counterpart, and... that's all.

Q. So with the methods that you tried that are reported here in Exhibit 2, can you confirm which of the rotor sets you used as the final conditions for testing Moderna samples?

A. That's not on this slide. You need to go to Slide 7 because it's the standard condition. So the 10,000,

six hours, but I set it -- we used the higher
concentration of the LNPs just to have higher, yeah,
overall concentration for the quantitation. So
that's the same speed time and metrics as for the
feasibility testing.

Q. So of the different rotor set numbers, which rotor set
number was the final one?

A. It was rotor set 4.

Q. And it's rotor set 4 without the sucrose. Correct?

A. Correct.

Q. And when you mentioned this matches the standard
conditions, what are you referring to?

A. For what I mentioned also during the first
deposition, so to separate LNPs in the centrifuge. I
mentioned that it doesn't need to be ultracentrifuge,
so the 10,000 RPM any centrifuge can do, and to,
yeah, create a band of -- yeah, LNPs with different
compositions, and to take down fractions from that.

Q. So you mentioned that all the different conditions
essentially had the same results. So how did you make
a decision about which conditions to choose as the
final conditions?

A. So basically the one that is least interfering with
my analysis, which is plain PBS. Sucrose interferes
in LC-CAD analysis because it gives a disturbance,

especially when you have low concentrations, so I will -- that's why it's also the counter control not to have that for the analysis and set the speed and runtime because we didn't see any benefit in having four hours over six hours, and just to have the concentration which I wanted to see just a higher loading of the LNPs for me to quantify the lipids, and that was my decision, yeah.  I did choose that.

Q. And was that a decision that you made in discussions with your team at Coriolis or you just made the decision yourself?

A. That was my decision because ultimately I need to quantify, yeah, so...

Q. Did Genevant's lawyers have any input into that decision to use rotor set 4 without sucrose?

MS. ELENBERG:  Just a -- well, he already answered.

But just for any of these questions, just kind of a longstanding instruction to not reveal any substance of conversations with attorneys, but that answer was fine, your answer was fine.

A. No, because -- I said -- I decided, as I did not even talk to anybody there, so...

BY MR. McLENNAN:

Q. Okay.  And so you mentioned, I believe, that the

Q. testing that's described in this presentation took place over two days; is that right?

A. No, just the spinning. The testing was done afterwards.

Q. Okay. So the fractionation that's described in Exhibit 2 took place over two days, but then there was further tests after that?

A. There was an additional test of running down the fractions that were also mentioned in this, or are shown in this presentation later on, because obviously that, yeah, needs to run. So that was done on addition to that.

Q. Okay. So just so it's clear, how long did it take to run the fractionation part of the experiments that's described in Exhibit 2?

A. The fractionation here --

Q. Yes.

A. -- as said is -- so two days is the fractionation.

Q. Okay. And the test that you ran over those two days under these different rotor conditions, that was testing the same sample. Correct?

A. That is -- that was -- I would have to check. That was tested with, yeah, the samples that we have at Coriolis. I -- yeah.

Q. And so for each of these different experiments, you

were testing samples from the same lot.  Correct?

A.  Samples from the same lot.  I don't know if it's samples from the same vial, but I can honestly not say because I don't remember.  It's been a year.  Exactly.  So it was the same lot, then we did these two runs, or let's say four runs over two days, and then they were -- this was injected on the LC-CAD instrument, and it's a bit of a different setting because it was just to see if it's -- if there is a big change.

So we -- unlike for the final sample testing, just to put it in perspective, we measured each fraction several times here.  Each, like, fraction was injected once because we didn't need too much -- yeah, it was just to screen.

So the idea, basically, where I want to go to is, so we did these four tests, we had -- I had the preferred opinion on the higher concentration with the 10,000 RPM because that's like as I said, the best for the LC-CAD analysis, higher concentration, and the matrix is, yeah, very easy, basic, and then just measured each fraction once.

We can maybe also go to, I don't know, Slide 25 and 26.  Yeah.  So then I just plotted, basically, the molar ratios -- the molar ratios

because you remember that we tested different concentrations, so as concentrations can vary, I wanted to see the overall trend.

And if you do a relative comparison then, you know, they're all scaled to the same level. So what you can see and what I could see is they basically all follow the same trend. They look the same. As said, they are single injections. Some of them may or may not have been at LOQ or not LOQ. That was -- it didn't really matter that much at that point.

And you can see that the PEG, basically all fractions follow the same trend, and then for the cholesterol, you go up, go down, go up. And then when you go to the next slide, basically there we have DSPC and SM-102. I mean, the first and the last fraction is always a bit -- I mean the first -- actually, I think on this even marked that they're below LOQ. I don't remember.

But so also here the trend is the same and the SM-102, the same. So basically I just looked at this, and since there was no real difference, I took the one that I wanted in the first place, which is the higher concentration in our standard condition.

Q.   And, Dr. Schuster, just so the record's clear, for

your previous answer, we were looking at Slides 25 and 26 of Exhibit 2.  Correct?

A.  Correct.  Sorry.

Q.  And when you say that you just looked for trends in Slides 25 and 26, do you mean just looked by eye or did you perform some sort of like computer analysis to figure that out?

A.  What do you mean by "computer analysis"?

Q.  Well, let me just ask it a different way.

When you say you looked for whether there was a consistent trend in the molar ratios in Slides 25 and 26, were you just looking visually using your eye to see if there was a trend?

A.  I plotted that as what you can see here, and my eyes looked at it and it looked the same.

Q.  Okay.  But you didn't perform any further analysis.  Right?

A.  No, because that -- I mean, we did then the method qualification later on -- where you do on precision and so on.  So, I mean, this follows.  It was good enough for us.

Q.  Okay.

MR. McLENNAN:  Can we go to --

A.  It was a very quick test.  It was not long, elaborative test.

MR. McLENNAN: Can we go back to Slide 25, please, of Exhibit 2, and then if we could just zoom in on the PEG molar ratio at the top.

BY MR. McLENNAN:

Q. So this figure on Slide 25 of Exhibit 2 is comparing the eight different sets of conditions you tested. Correct?

A. Correct.

Q. And of these different conditions that you tested, the lighter orange one for PBS is the set of conditions that you ultimately chose to test Moderna samples. Correct?

A. What is it, 4, 10,000 RPM, high concentration PBS. Yes.

Q. And if you look at fraction F07_02, that's the seventh fraction, and the 02 refers to a different injection volume. Right?

A. That's correct. We tested 10, 15. Yeah.

Q. Okay. So for the seventh fraction that's labeled 02, do you see that the PEG with the light orange set of conditions is just below 2.5 molar percent?

A. Yeah, it's somewhere in that region, but -- yeah, I do -- I mean, if you ask me like this, yes. But I don't know if it's just below. Could be. I did not look that closely when I did the -- looking at that,

yeah.    08:46:12

Q.   And then do you see that each of the other seven conditions are above 2.5 molar percent PEG for that same fraction?

A.   Yeah, but when you look at the 10 microliter injection and -- it's the same level.  So -- sorry, I need to rephrase.

Where do I need to look?

Q.   So we're looking at the seventh fraction and the 02 version of it.  Do you see that?

A.   Yes.

Q.   There's eight different bars there representing the eight different sets of conditions.

A.   Yes.

Q.   And do you agree with me that, apart from the light orange one, which is the final method that you chose, each of the other seven conditions shows here that it measured above 2.5 molar percent PEG.  Correct?

A.   Yes.  But if you look at the other -- the 10 microliter injections, then we have some below, some above.  As said, each fraction was only injected once, so the -- unlike in the actual sample testing where we did replicate injections and you have a mean and a standard deviation, each bar that you see just is one data point without any statistics.

So you have -- when you have 50 microliters, some below and above, we're at 10 and the same at 15, so...

I... yeah. I mean, as said before, we just plotted it and looked if they follow the same picture going up and down, which they did, and that's how I looked at this graph.

Q. So for the -- still looking at the seventh fraction, the 02 version, the difference between the R4 without sucrose conditions in orange versus the R2 conditions without sucrose, you can't explain why, in the same fraction, there's a different molar percentage of PEG shown here?

MS. ELENBERG: Objection. Form.

A. Can you repeat your question? Sorry, I -- so can you -- sorry, can you repeat?

BY MR. McLENNAN:

Q. Sure. So we're still looking at the seventh fraction in the 02 version, and you see how the R4 conditions without sucrose in light orange are slightly below 2.5 molar percent PEG. Right?

A. Yes, that's what I said before.

Q. And the light green is the R2 set of conditions without sucrose too. Right?

A. Yes.

Q. And you can see that for the R2 without sucrose conditions, that same seventh fraction is showing about 2.8 molar percent PEG. Correct?

A. Correct.

Q. And you can't explain why a different method gives a different result for the amount of PEG in that fraction.

A. I mean, as said, I don't know the variability of that particular one injection. I told you that. It's -- I mean, if you look at all of them, right, so let's say you have analytical variability and we have eight times, below, above, higher, lower, and you take the average, maybe that shows the variability of these eight injections within this fraction.

But even that I don't know now because I don't know also if like -- I'll say it like this. In the sample testing, right, I saw each value, already checked that each injection passed, that their in the system, the criterias were passed, that we -- it's also already on top, so each number that is in the report was checked twice that it's correct.

This was an internal presentation just to look at the trends. Are these bars' heights different? Yes. Do I know -- have they been double-checked or three-times checked? I can honestly

say no.  If I look at all of these eight injections, is the mean in the middle?  Maybe.  I think it shows more the variability of the measurement.

And that's why you do each fraction in -- multiple times.  Like in the sample testing, right, we did each four times to get the center and the mean to have reliable -- I mean, they are still reliable because they've been analyzed since -- if you have them eight times, you have a value, but this is one value that I cannot tell you exact the standard deviation, but as for the report for each of these fractions, we have multiple injections plus standard deviations too.

Q.  And so when you say it could be the "variability of the measurement," can you tell me the analytical variability from the lipid content measurement that takes place afterwards?

A.  Sorry, can you repeat?

Q.  When you say the difference could be explained by the variability in the measurement, what are you referring to?

A.  I mean, each analytical method has a certain variability by the instrument, by the measurement. That's why you make multiple injections.  You have criterias like SST criterias that you say, okay, if I

inject my sample several times, then the value that I receive at that point should not defer more than, in this case, in the area by, I think in our method it's 5 percent.

So if it's bigger, then you would not accept this sample because it might be outside of the variability of the instrument and the assay.  I mean, there is -- you always have -- in any analytical method you have a certain -- you know, you have a value that is across mean with a standard deviation.  So that's what I mean by variability.

Q.  Okay.  And --

A.  For these samples they've only been analyzed, or these fractions have only been analyzed once.  And I also said I don't know because some of them have been injected -- so -- I mean, we did reduce or we used 10 microliters because some of them were outside of the linear range, they were too high concentrated, some were too low concentrated.

So, as said, these were just a quick test to see if the assumptions that we wanted, so that's the standard 10,000, six hours would be the higher concentration, as we saw from the feasibility that the lower concentration's maybe not so good.  Yeah.  Will perform or will give results, yeah.

Q. So the difference that we were just looking at for fraction 7 between the R4 and R2 set of conditions, it was the difference between around 2.5 molar percent PEG and 2.8 molar percent PEG. Correct?

MS. ELENBERG: Objection. Form. Mischaracterizes testimony.

A. Yeah, as said, what we looked at is a single injection of several fractions without any multiple replicates, without calculating like a mean and a standard deviation without rechecking. I don't even know if each of this value is hundred percent correct because this is an internal presentation that just looked at trends for me that I saw, okay, they look the same, and -- for me they look the same here.

And I cannot say -- as said, if there is -- each value is also double-checked, and so on, but that -- yeah, I think I said it before.

BY MR. McLENNAN:

Q. And when you say this was an internal presentation, you actually presented Exhibit 2 to Genevant's lawyers. Correct?

A. Yeah, we prepared that for us internally, and then we shortly presented what we did and what I'm going to use.

Q. And so you felt comfortable enough with the accuracy

08:54:29
08:54:32
08:54:39
08:54:45
08:54:49
08:54:50
08:54:57
08:55:03
08:55:09
08:55:13
08:55:16
08:55:22
08:55:24
08:55:28
08:55:32
08:55:42
08:55:47
08:55:50
08:55:50
08:55:53
08:55:58
08:55:59
08:56:05
08:56:12
08:56:12

of the data to present to Genevant's lawyers.  Right?

MS. ELENBERG:  Objection.  Form.

A.     That was not the aim of this study.  The aim was just to confirm that the centrifugation parameters, the standard that we have, works; that changing that, as said, by adding something, would not change it.

And, to me, looking at this was correct, and anything else is then -- so when you talk about accuracy, precision, reliability, and so on, that we -- therefore, we do method qualification.  So this was confident enough that we know that the method can be qualified and will show that it's robust and reliable and to then go into sample testing.

Because obviously they were our clients and we want to inform our clients that we will make a good sample testing, so in terms of, it will, you know, be to the best standards, and Coriolis is known in the field.  We are, you know, 16 years now or longer a renowned analytical service, yeah, lab, so this is standard that we do, just give information to clients on how we to -- how we proceed.

BY MR. McLENNAN:

Q.     So the difference we looked at from the seventh fraction, the 02 version between the R4 and R2 conditions, you don't know whether that difference is

due to analytical variability.  Right?  You did nothing to determine that.

MS. ELENBERG:  Objection.  Form.  And mischaracterizes testimony.

A.   What I said is that these were individual injections; that if you -- if you looked at the plot we didn't see anything, but it didn't also look inconsistent.

I mean, we did then in the end test 67 samples, which I think is a huge, like, population, and all of them showed the exact same trend, so there was no concern in robustness of the testing them.

I mean, it just basically confirmed our initial thoughts that this will run robust through sample testing, which was the -- you have robustness.

And during the method qualification, as mentioned, the method was qualified.  We did precision, accuracy, lineality testing that is standard in the field that any TRP or TMP lab does, and, as said, we supply a lot of data to the FDA and to that -- or to clients who then later on supply the data to the FDA.

So we have quite confidence in what we are doing because we do this for a long time.

BY MR. McLENNAN:

Q.   When you say you analyzed this data to look for

anything that was inconsistent, what would have inconsistent data looked like to you?

A. Didn't say "inconsistent" itself, at least I think. Maybe I used the wrong word. But what I said was that wanted just to confirm that our standard conditions work, and so by seeing that, you know, you have a trend on what goes up and then goes down again, that was -- that was tested. Or that was -- I wanted to look at. So it's not really an inconsistency.

Q. When you say that there was -- you're looking for a trend to see what goes up and what goes down, can you describe exactly what you were looking for?

A. What I said, I plotted as here these four plots, right, which is the molar ratios. I explained I used them because the concentrations as we loaded less, as to different fractions at different concentrations.

This is the normalest way, so basically we have it in one scale, and the trend, if you want, is like really as you may also would see it, that you start off lower, you go up from fraction to fraction.

It is the overall picture that the cholesterol looks like, you know, like a smiley, it starts up and goes down and goes up.

And the next two slides you will see a

different behavior for cholesterol and for DSPC and SM-102 just to show us that basically all the conditions separated the LNPs of different, yeah, composition.

They stayed constant throughout that, if you want to call them eight conditions, and that's what I said before and what I repeat, that's what I looked at and that's why I said the initial condition that we had for the feasibility testing is feasible but it is better to have higher concentration of the lipids because then we can just quantify better.

I really did just look at it like that.

Q. And still looking at the same figure on Slide 25, looking at the molar ratios -- or the molar percentages of PEG, comparing the R4 and R2 conditions both without sucrose, can you just confirm for me that in at least nine of the fractions, the R4 condition always results in lower PEG content?

MS. ELENBERG: Objection. Foundation.

A. I mean, if you look at the one with sucrose, you also have some that are below if you add the sucrose, so -- or are they on the same level?

So, I mean, if you just look at what one thing that you want to see, then yes; but if you look at all of them, then there are some higher, some

lower.

BY MR. McLENNAN:

Q.    Okay.  So for the two conditions I called out, though, the R4 and R2 both without sucrose, you would agree with me that in nine fractions, the PEG content is lower in the R4 conditions compared to the R2 conditions without sucrose.  Correct?

                MS. ELENBERG:  Objection.  Asked and answered.  Foundation.

A.    It's difficult to say.  In fraction 9, they are on par.  On fraction 10, there are other -- the R2 is lower.  In fraction 1, which is not really quantifiable, fraction 2 which is not really quantifiable, it's maybe on par.  Fraction 6, we injected 10 microliter.  Both of them are not there.  Don't know why.  On fraction 7, the same, so I cannot give an answer to that.

                So there are some that are higher, some that are lower, and that I can say.

BY MR. McLENNAN:

Q.    Okay.  So it's -- there's eight fractions where the R4 conditions are lower than the R2 conditions for PEG.  There's one, fraction 9, you've identified where they're almost the same, and then fraction 10, the PEG content is higher with R4 conditions; is that right?

MS. ELENBERG:  Objection.  Foundation.

A.    I mean, that's what I said, I agreed with what I can see, but I said also that if you look at the one with sucrose, then you also have lower fractions of 10 on par with 9.  So it is a bit of cherry-picking now to say that only this one is lower.  If we look at all eight of them, some are higher, some are lower.

MS. ELENBERG:  Mark, we've been going for about an hour now.  Is this a good time for a break?

MR. McLENNAN:  Yeah, we can take a break now.

MS. ELENBERG:  All right.  What time do you want to reconvene?

MR. McLENNAN:  Ten minutes good for everyone?

MS. ELENBERG:  Yeah, that works.  So we'll circle back around 9:15, 9:16.

MR. McLENNAN:  Thanks.

VIDEO TECHNICIAN:  We are going off the record.  The time is 9:06.

(Off the record at 9:06 a.m.)

(Back on the record at 9:18 a.m.)

VIDEO TECHNICIAN:  We are back on the record.  The time is 9:18.

BY MR. McLENNAN:

Q.   Dr. Schuster, we were looking at Exhibit 2 before we took a break.

          MR. McLENNAN:  Will you just put Exhibit 2 back up, please?  And if we could look at Slide 26 of Exhibit 2, please.

BY MR. McLENNAN:

Q.   So the bottom figure is showing the molar percent of SM-102 lipid.  Correct?

A.   Correct.

Q.   Across the eight different conditions you were testing?

A.   Across the different conditions, yes.

Q.   And if we look again at the same fraction, the seventh fraction in the 02 version, which is the 15 microliter, do you see that fraction there?

A.   Yes.

Q.   The R4 condition without sucrose is higher than the R2 condition without sucrose.  Correct?

          MS. ELENBERG:  Objection.  Foundation.

A.   The R4 without sucrose is the same as R2... lower -- yes.  At the same speed it's the same height, so the R5 with the same speed but low concentration is the same height.

BY MR. McLENNAN:

Q.   And for the R4 condition without sucrose, it appears

as though the seventh fraction has around 50 molar percent SM-102. Correct?

MS. ELENBERG: Objection. Foundation.

A. Again, yes. So there is, on this plot, around 50 molar percent for these 50 microliter injections which -- as said, which were not even the final injection volumes, yes. But in this plot with single injections of -- without precision, as said, right, and I don't know exactly if all of them were within linear range, nonlinear range.

Again, I didn't interpret that data to that close extent that you're looking at it now as for me only the trend was important. And since some molar ratios also are interconnected, so I don't know. But if you want to hear that the one is higher than the other on this bar chart, yes.

BY MR. McLENNAN:

Q. And the R2 condition without sucrose for that same seventh fraction is less than 50 molar percent SM-102. Correct?

MS. ELENBERG: Objection. Foundation.

A. The same as the R5, which is the same condition just with a lower loading of the LNPs, yes. But also R5 without sucrose is also below, so... yeah. Hence, again, how you want to look at this, I did not look

to that extent to each every bar of this and --

chart.  We will have this for several, I guess.

BY MR. McLENNAN:

Q.  So, Dr. Schuster, just so your testimony is clear, for the seventh fraction that we've been looking at, the R2 condition without sucrose is showing here as having less than 50 molar percent SM-102.  Correct?

MS. ELENBERG:  Objection.  Asked and answered.

A.  As said, on this graph it is on par of the R2 low concentration, which is also without sucrose, so both are -- 5 and 2 are on the same par, they look lower than the others.  I can only repeat that I would not look, especially on this graph which has no repeatability on its measurements to each and every bar, but if you want to hear that in this bar plot it is lower, then I can say yes.

BY MR. McLENNAN:

Q.  And you don't know the level of analytical variability that would apply to the lipid content measurements shown in this plot.  Correct?

A.  As I said, this was single injections.  I don't know if all of these fractions were even within the linear range, if they were above the highest standards or not.  So the aim of this plot was not to look into

variability of the method, just to get a visual broad graph of a trend, and by that means just as it overall when you look at it from afar, does it look similar or not, and that was the aim of this.

So no variability measurements or repeat measurements were taken. Nothing of this was also repeated, so this dataset is based on a one-time injection, different injection volumes where we are looking at is not even the ones that we used in the end, so... yes.

Q. Okay.

MR. McLENNAN: Could we go to Slide 27, please?

BY MR. McLENNAN:

Q. So in Slide 27 through to Slide 32, you'd agree with me that you're displaying the molar ratio of different fractions under the eight different conditions and comparing them?

A. That's the value set, basically. Basically it's the same as the graph. This is just numerical values of the graph. So these -- this was used to make the graph, so it's the same representation.

Q. And if we just scroll through Slides 27 to 32, each of these slides are displaying molar ratios at the different fractions for those same samples. Correct?

MS. ELENBERG: Objection. Foundation. Asked and answered.

A. They display the numerical values of the graphs seen in Slide 25 and 26 and were the values used to plot, so it's the same representation of the bar charts and the tables. It's the same representation.

BY MR. McLENNAN:

Q. And you considered this information in deciding which final parameters to choose for testing the samples of Moderna's vaccine. Right?

A. Sorry, I didn't understand the beginning of the question.

Q. You considered this information in these slides, 27 to 32, in deciding which final parameters to select to test Moderna's COVID-19 vaccine. Right?

MS. ELENBERG: Objection. Foundation.

A. I mentioned at the beginning that -- I mean, the standard conditions that we have. So to go back to the beginning, right, why did we do that? Just to confirm that this -- this is also -- that nothing changes.

So did we use that -- we used the graphs that I told you, that we talked about, to look at that, that nothing changes, so to stay with, anyway, our parameters that we have, which is the 10,000 RPM,

the six hours, and the PBS.  So these slide stacks
were not used to -- it was just to confirm that what
we have and what we usually use is applicable.

So they did not -- did not change any
consideration that we had.  Yeah.

BY MR. McLENNAN:

Q.   When you say that there was -- you observed that
nothing changes when you change the parameters, what's
the criteria that you are applying to determine if
nothing changes or not?

A.   What we just talked about now and before the break,
for them -- this is just a mean to then analyze
samples after method qualification and the LC-CAD
method, so this was just to see speed, PBS, and
concentration.  Basically they are the same.  So we
stick to what we use with higher concentration and
then have the method qualified, which is the LC-CAD
method, and then run the sample testing, so...

Did I answer?

Q.   No.  So I'm -- you said a few times that you observed
that nothing changes, so I'm trying to figure out, did
you have some sort of quantifiable limit on how much
change would be acceptable before you determined that
something in fact did change between the different
parameters in terms of the results?

MS. ELENBERG: Objection. Form.

A. As said, these were the trends that we observed in the graphs, and then -- which stayed the same, which was then reconfirmed by measuring multiple samples, 67, with multiple injections where they all showed the same trend as being shown in this graph.

If you drew a graph of that, it would give you the same overall pattern that you've seen on these four slides. I believe it's, when done, would look similar way than what you have seen here, and the variability of the method is then based on the method qualification and then, yeah, as said, we did sample testing.

Nevertheless, the trend is the same. Everything has a variability of the mean. We're talking about multiple measurements. So is each and every single bar, does it always need to be at the exact same position? By doing it a lot of times, you will -- or it's verified that it is.

The aim of the centrifugation is just to have portions of LNPs with different characteristics, right, and -- which in their characteristics by themselves center around a mean where the majority of single particles contain exact that composition and there will be other particles that may or may not have

a bit more or a bit less, but, again, you will have thousands of single particles that show exactly that composition even -- even with -- if you want to point me down or pinpoint me that what do you mean by variations in the different --

You see conditions. I mean, as said, the trend looks the same. If there are absolute values in left or right, that is possible. Running it then multiple times it confirms, basically, that the approach works, and it's also not -- I mean, the aim was not to always have -- we talk very --

So fraction 7 always is fraction 7, but, you know, as said, the majority of the -- of the particles will be then having this composition, but there can be some that are different. We're talking about thousands of particles in these vaccines.

BY MR. McLENNAN:

Q. And so do I understand your last answer correctly that when you compared whether the different parameters affected the results and changed them, you were comparing visually by looking for trends; is that right?

MS. ELENBERG: Objection. Mischaracterizes testimony.

A. You always use the word "change." I don't call it

change because we don't change anything.  We don't change the product itself.  We basically spread the product across a band, I guess like you -- don't want to simplify too much.

It's spread across a band, then from this band portions are taken off and then these portions are measured.  Then from each of these portion, the lipid is quantified.  We talked about it last time, it's always centered around the mean, so the majority of the particles in this portion would be -- they'll have the compositions that -- with these concentrations here.

What -- so basically what the ASC does, what the centrifugation, it spreads the product across a band, so with the same composition, and it doesn't change anything.  The product stays the same.  So I don't understand what you imply by changing.  The product doesn't change.  We don't do anything with the product.

BY MR. McLENNAN:

Q.   Okay.  So earlier you were talking about the -- you were observing whether there was a consistent trend between different parameters.  Right?

A.   I said globally, overall.  I mean, what would be an inconsistent trend is if all of a sudden you would

09:33:39
09:33:41
09:33:46
09:33:55
09:33:56
09:33:58
09:34:00
09:34:07
09:34:11
09:34:15
09:34:20
09:34:29
09:34:30
09:34:34
09:34:40
09:34:46
09:34:50
09:34:55
09:34:56
09:34:59
09:34:59
09:35:02
09:35:06
09:35:11
09:35:14

only have one -- no, there is not even an inconsistent trend.

I mean, I said that we just tested our standard conditions, which are very limited, as said, to make it shorter once you have more concentration, and then have the PBS, two PBS types. And the trend is basically, as said, these two graphs that are looked at and we measure values from these. I think we start to repeat ourselves.

I think I answered that question several times before.

Q. Okay. And every time you talk about observing a trend, that's just visually observing the trend. Correct?

A. For this -- I mean, you're talking here about a small feasibility study where we did a very, very limited test that we use a standard approach to centrifuge LNPs, we separate them across a band, we analyze it. You put a lot of emphasis on this very limited body of data where this was only used to have done the method verification, qualification, and the sample testing.

So there was no need to -- yeah, as said, we did the visual comparison as to numerical verification, and if you look at the trends -- I mean,

I didn't -- I don't look at each and every value in this particular case, but I think you would also come to the conclusion that if you -- that the trend -- the trend is always the same, and if you add then also the data from the sample testing, you would also see the same trend along.

So throughout the things that we did, we always saw the same distributions, trends, as we expected early from the beginning on that -- just using the standard conditions.  That's that.

Q. And you keep on referring to Coriolis having a standard set of parameters for ultracentrifugation. Are you saying that Coriolis's standard set of parameters for ultracentrifugation is the one that you ultimately chose?

A. This -- yeah.  I mean, this is -- 10,000 RPM, six hours is the standard parameter for ultracentrifugation.  And it's even -- I mean, you don't even need an ultracentrifuge for this rate, so you can do this in any centrifuge.  I should mention that also.

Q. And when you say Coriolis has a standard ultracentrifugation set of parameters, are you saying specifically for testing mRNA LNP vaccines or for something else?

A.  For both.  So for something else, it's not just limited to LNPs.  You can use this approach also for other -- other samples.

What is standard for this is as LNPs float up and dump sediment, you do a bottom loading which is standard for LNPs, not just at Coriolis, because they're lighter than the medium so they float up, whereas some other samples, they float down, so -- because they're denser.  So it -- but the speed and the time for these kind of preparative scale separations is standard.

Q.  And is that documented in some sort of Coriolis manual?

A.  I don't know if we have an official manual.  I mean, as said, we do this for years.  We -- our company's long time there, so we have standard implemented parameters that work for us.  So I don't know if we have a written booklet/manual on standard parameters, but people use the parameters, and then we do exactly that, so we do a test, see, okay, they work, and then we do, as said, qualification and do sample testing.  We don't have a fixed manual for everything.

Q.  So when you first started performing ultracentrifugation for this litigation matter, where exactly did you get the parameters from at your

company?

A. I mean, I said it in the first deposition, right, that together with the team which is very experienced in that field, we have -- the project had a lot of analytical techniques, right? I cannot do all alone. And they use that as a standard. So, you know, we also have suggestions internally. We just use what we always used, and that's where the parameters came from.

Q. And you can't point to anyone specific that came up with the parameters?

A. From our AUC team in conjunction with me. 10,000 is also what we use a lot for other sample prep approaches where we're just going to set in small scale, so it's a very common speed.

Q. And you can't recall who on the AUC team came up with the specific parameters that you used that you're calling standard?

A. I don't know if someone specific came up because in the team Cinthya and I worked together, so I don't know who came up with the exact value. It's generally standard values in the company. I don't know who then eventually came up. I don't know.

MR. McLENNAN: Could we go back to an earlier slide in this presentation, Exhibit 2, back to

Slide 2, please.

BY MR. McLENNAN:

Q.   So I asked this before about the earlier presentation, Exhibit 1, but just so the record's clear, for the samples that you used in the fractionation studies that are shown in this Exhibit 2, those were also expired at the time that you conducted the fractionation experiments.  Correct?

A.   The samples that are shown in this exhibit are the same samples, so I mentioned that before, yeah.

Q.   And they were expired at the time that you conducted the fractionation experiments.  Correct?

MS. ELENBERG:  Objection.  Asked and answered.

A.   They were expired, as I answered before, but this did not have any -- I mean, we were not considered -- or not concerned, let's say, about that because we have worked with samples like this before and, the trends, they always look the same.  So as a model compound to do a feasibility testing, we were not concerned that this does anything, which was later on, yeah, also confirmed that throughout the sample testing, all of the lots that we tested looked similar.

BY MR. McLENNAN:

Q.   Okay.

MR. McLENNAN: Could we go to Slide 5, please, of Exhibit 2.

BY MR. McLENNAN:

Q. Now, if you look at the last bullet, it's describing that you analyzed whether you would calculate the amount of PEG lipid based on either peak area or peak height. Do you see that?

A. I do see that, yes.

Q. And in your expert reports you didn't disclose that you tried analyzing the amount of PEG using two different forms of measurement. Correct?

MS. ELENBERG: Objection. Form.

A. Correct. I did not write that.

I also told you before that in the opening report, which is a sample measurement report, we describe the final method, but I'm happy to explain what I did here because for -- I mean, going back to how to quantify, like, lipids, you create a calibration curve.

So you create standards, weigh in a certain amount of analyte, right, and then you dilute them to a specific concentration, so increasing in concentration, and then you inject these concentrations or these samples, and then you will get chromatograms with different heights for

visualization.  This can be seen on Slide 9.

And it is common -- so you can have two approaches on how to quantify, so they're called calibration by height or calibration by area, which are the two acceptable -- two acceptable ranges, or -- "range" is the wrong word in English.  Two acceptable ways on how to do it, and we showed in the opening report, but you can also see it on Slide 8, maybe this will also have some visualization, if you want to go to Slide 8.

But there is, basically, the PEG peak and we defined how we integrated it, so basically this was mentioned in the opening report.  I'll open it...

BY MR. McLENNAN:

Q.  Dr. Schuster, my question was just whether you mentioned the two different forms of --

A.  No, but it is important because it is -- sorry to interrupt, but it is important because I said I didn't mention it because it only states the final parameters, but I want to explain why I did it here, and it's related to one of the reports, to my opening report, because here it was in question why we use a defined integration range, which is a perfectly fine, acceptable way to do, and we did confirm or I did confirm beginning -- because obviously you also

confirm things when you do it first.

So for this peak, as it is the only one that has those defined ranges, we did it once with the ranges and then only by height, which basically is the way to just use peak height and not the range, as both are applicable.

We could have done it for all the peaks, but we just wanted to see if our ranges actually make a difference to the calibration, and therefore we calibrated once per height, which takes the apex of the peak at the -- at the retention time, so in this case the apex of the PEG peak, and then by area, which takes the orange shaded area as such, which is also the final way how we integrate it, and then we created the calibration curves for both integration range, which is important to do it just by that peak because this is the only peak where, in this case, we did these ranges and if it has an impact on the calibration, and it -- yeah.

But what we showed here, that it didn't, so it confirmed just using our standard -- or using the standard approach in the field, which is area, because it's more precise than peak height because peak height is actually biased by nonperfect Gaussian peaks, that there is no impact in creating a calibration curve

based on area or peak height.

And to further confirm or to answer this, which is also kind of related to why we did it, in the reply report, because as mentioned exactly this was mentioned why we took the ranges, we did the same experiment by using the full peak, so without the peak splits, which is -- I'll just go through my reply report because it is exactly the same experiment that we did here before to verify that our approach is correct.

It is on page, I think, 42 to 47 of my reply report where we integrated either the full PEG peak or used a split, and also this gave the same results. This is more appropriate because it even compared it for the exact same sample, so we could see that only, like, the third digit after the decimal place changed.

So that's why I did it once with peak height and peak area to verify that the approach we use is correct, and that's why I continued or kept it, yeah.

Q. Dr. Schuster, I'll just ask you to listen carefully to my questions because, as you know, it's a time-limited deposition. I've only got two hours. Your last answer was six minutes. So please just listen

carefully.  I just asked whether it was in your report or not.

But we'll move on in the interest of time.

Can we get tab 13, please?

MS. ELENBERG:  Also, Mark, for the record, his answer did relate to the question that you asked.

BY MR. McLENNAN:

Q.  Dr. Schuster, exhibit --

MR. McLENNAN:  I'm going to mark this Exhibit 3, which is GENV-01102152.

MARKED FOR IDENTIFICATION:

EXHIBIT 3

9:51 a.m.

BY MR. McLENNAN:

Q.  This is one of the docket reports from Coriolis. Correct?

A.  Correct.

Q.  And these describe the protocols of the experiments that Coriolis followed for the experiments.  Correct?

A.  Correct.

Q.  And for this particular set of docket reports, you see it has the number RW -- I'm sorry, ROCW002.  Correct?

A.  Yes.  That's the sample measurement.  That's one of the dockets for the sample.

Q.  So this was the final sample measurement when you were

09:51:05
09:51:07
09:51:08
09:51:10
09:51:15
09:51:18
09:51:39
09:51:39
09:51:40
09:51:42
09:51:50
09:51:50
09:51:51
09:51:51
09:51:51
09:51:55
09:51:56
09:51:57
09:52:00
09:52:06
09:52:07
09:52:16
09:52:26
09:52:31
09:52:34

measuring the donors -- the samples that the donor provided. Correct?

A. Let me just check on the date. It's October. That seems correct.

Q. Okay. Did you have a role in designing this protocol?

A. Which protocol do you mean? There are -- what do you mean by "protocol"?

Q. So the --

[Simultaneous Speaking]

Q. Let's look at page 3, please, in Exhibit 3.

A. Uh-huh.

Q. So this part of the protocol is describing the ultracentrifugation. Correct?

A. Correct.

Q. And did you draft this document?

A. That is drafted together with my colleagues, yes.

Q. And it was drafted specifically for this project. Correct?

A. We draft every docket specifically for each document, like a docket is created for a project, so if you want -- so this document was specifically written for the project, but we write every single docket for each client new.

Q. Okay.

A. Yeah. Given the same standard parameters.

Q. And you were involved in drafting this particular document. Correct?

MS. ELENBERG: Objection. Asked and answered.

A. Correct, as said.

BY MR. McLENNAN:

Q. If we look at page 4 of Exhibit 3, do you see the heading Fractionation, Roman Numeral V?

A. Yes.

Q. And these steps 1 to 8 take place after the samples have been run through the centrifuge. Correct?

A. Correct.

Q. And step 4 of the post centrifuge steps describe placing the tubes in a rack and using a dark background to observe the distribution of LNPs in the ultracentrifuge tube are for turbidity; is that right?

A. Correct.

Q. Why did you include a specific step to observe the samples for turbidity?

A. Because the drug product itself is a off-white turbid solution, so this is a verification that we actually loaded the sample into the tube and that the operator did not centrifuge an empty tube.

So if it -- if it's missing, there's no turbidity, which is bad, because that means there is

no drug product in, as the product itself is turbid, and that's why it's in.  So it's verification, yeah.

Q.  And were the people carrying out the experiment monitoring to see if the turbidity increased or decreased before and after the centrifugation?

A.  No.  So basically the sample is loaded at the bottom, right, so the majority of the sample were -- the homogenized samples at the bottom, turbid, and then that's the first verification, and second is that across then the centrifugation, which is the aim to differentiate different populations of LNP particles in the whole population, that it's just a -- yeah, it's still turbid because the product is still in, so it's a second verification that it's in and that not everything is at the bottom, but distributed across.

Q.  And when you said earlier that the drug product itself is off-white solution, where did you get that information from?

A.  That's common.  I mean, just LNP vaccines, drug products generally are dispersions, emulsions that are of that color.  The COA, it states the same, that they are off-white to emulsions, dispersions -- "emulsions" is the wrong word.  Dispersions and packaging material.  Any LNPs are usually this off-white dispersion drug product.

Q. So are you saying that any LNP composition is an off-white dispersion?

A. I don't know if every single one existing is of that, but the majority that I have seen, yes.

Q. Do you know whether you've ever observed a sample of Moderna's COVID-19 vaccine before it's expired?

A. Yes, because we had samples that were not expired.

Q. And did you personally observe whether there was any turbidity in their composition?

A. They are all turbid because if something is white, it's already turbid. I mean, it's not clear. It's every product.

Q. And you personally --

A. So --

Q. -- inspected and observed the unexpired samples of Moderna's COVID-19 vaccine, is that your testimony?

A. I did not inspect every single vial of the vaccines, that I could not have done by myself. But the ones I have seen looked as common as the products looked like. I have worked with a lot of LNP vaccines already and they all looked similar, the same, so they -- you would not be able, by dispersion, to see directly if they expired or not.

Q. But I'm asking specifically if you can recall observing Moderna's unexpired samples.

MS. ELENBERG: Objection. Asked and answered.

A. As said, they -- the ones that I have seen, and I have not overviewed every single one that we tested, I have looked at unexpired, they looked the same as expired ones. From a human eye, I think it's difficult to see that directly if you don't use specific pharmacopeial methods.

BY MR. McLENNAN:

Q. And pharmacopeial methods to analyze turbidity would be nephelometry; is that right?

A. That is one way you can see turbidity also as scattering in UV, which is basically nephelometry does similar. It uses a certain UV wavelength and uses that to -- I mean, there are different approaches. It's either using laser ablation, so where the laser is, like, dispersed, but nephelometry, yeah, is one of the methods.

Q. And UV and nephelometry could quantify the degree of turbidity in a sample. Correct?

MS. ELENBERG: Objection. Scope.

A. I mean, I would need to look more into the exact differences, but if they see the exact same thing, I cannot answer. I need to -- I cannot opine now. I need to look into it more.

BY MR. McLENNAN:

Q. Okay.

MR. McLENNAN: Can we get tab 7, please?

And I'll mark that as Exhibit 8 [sic]. It is a side-by-side comparison of GENV-01100491 and 490.

MARKED FOR IDENTIFICATION:

EXHIBIT 4

10:02 a.m.

MR. McLENNAN: Sorry, Exhibit 4, I'll mark that as.

BY MR. McLENNAN:

Q. Do you recognize these images, Dr. Schuster?

A. Yes, this is before and after centrifugation. That is to confirm that the product is in the vials when we filled it and then when we centrifuged it. So this is part of the protocol to confirm that, like, completely loaded the samples.

Q. So if you took a photo before the centrifuge process to confirm that you actually loaded the drug product, why would you need to test it -- why would you need to take a photo again afterwards?

A. Just to have good quality in our work. I mean, if -- that we see that it didn't open, that it didn't crack. I mean, this is just to be as good standard procedure. We could have done only the one before or

only the one after.  There is no big rationale.  It's like a double -- looking with two eyes at the same thing.

Q.  Did you personally observe each of the photographs of the samples, before and after they were centrifuged?

A.  No, I did not personally look at each and every single photograph.  I need to trust also the team.

Q.  Who on your team was responsible for reviewing all the photographs pre and post centrifuge in this case?

A.  That, I guess, was Cinthya.

Q.  What's Cinthya's last name?

A.  I think Tapia.  I'm really bad with names.

Q.  Okay.  And there's no document describing that Cinthya actually observed and reviewed each of the photographs of the samples.  Right?

A.  No, because this is -- was not -- not -- sorry.  This was not requested.  Yeah.

Q.  Okay.  And you didn't have any conversations with her confirming that she reviewed every one of the photographs of the samples before and after the centrifuge.  Correct?

A.  No.  As said, I need to trust also my team members that if something completely different would be observed, that she comes to me, so I need to be able to trust my employees.  It was not requested, let's

say, by me.

Q. And for these photographs that are on the slide now, this is Sample 38 before and after the centrifuge process, do you see, on the post centrifuge photograph, there is a thick white layer at the top of the centrifuge tube?

MS. ELENBERG: Objection. Form.

A. Yes, that is what we always observed. So this is basically -- I mean, you need to see the full tube as the product, right, so if you look also into the bottom loading you see something looks whiter and then something -- when you look at the photograph on the right, you see like a distribution of that, so you see some whiter parts and some less white parts.

And the top part is part of the emulsion -- or dispersion, let's say. That is the lightest one, so it's floating to the top. And that is a combination -- basically it's like we take them from the top, right, so the fractions are -- so the full sample -- the full tube is then sampled and then it's -- when we take from the top to the bottom, this top layer is part of fraction 1 and 10 because it's a bit -- yeah, it's just from the fractionation process, but this is how it always looked like after centrifugation. So it's, yeah, the lightest part of

the LNPs.

BY MR. McLENNAN:

Q.   And so what specifically is your explanation for why that layer at the top is white?

          MS. ELENBERG:  Objection.  Form.

A.   I don't have full explanation now, but these, as said, is the lightest -- lightest LNPs that all went to the top and they build a band, whereas the others are more spread.  It's nothing unusual for a dispersion or emulsion to have something like that.

          So even if you look at the vaccine itself, if you let it stand and not homogenize, you have a part that is whiter and a part that is lighter, so it is... yeah.

BY MR. McLENNAN:

Q.   And when you say that the team took fractions from that top layer, how do you know whether or not they actually withdrew part of that top white layer when they were taking a sample of the -- I believe you said it was the 10th fraction?

A.   It's been dipping in-between the 1 and the 10.  That I believe why did -- that they did it because I were -- I was not present for 67 samples.  I was present occasionally during the fractionation process to see that the full sample is taken because, yeah, as said,

I need to trust my team but I also need to supervise,
on a bigger level the, whole project.

So I saw it by my eyes that the full tube
was sampled and also looking at 67 measurements,
fractionations, and I cannot suspect that this layer
was not taken from the vials -- from the -- from the
tube.

Q. And so when the team removed the sample from the tube,
they're doing it with a pipet. Right?

A. That is standard in the field when you do
centrifugation in these tubes, you can do it from the
top or from the bottom. Standard is from the top as
also --

Q. And so when you said you observed some of the
pipetting of the 67 samples, how many did you actually
observe when your team was withdrawing samples from
the tube with a pipet?

A. I cannot recall the exact number. 10, 15, 20 times,
like a third.

Q. And your testimony under oath is that you saw your
team withdraw the thick white layer from the top as
part of the first fraction; is that right?

A. That's -- the top is a combination because we have
also I think even a picture of the fraction 10 where
you can see that it is at the bottom, so it's a

combination of fraction 1 and 10, but, yes, I did see that.

Q.   If there were aggregates in the composition, where would they be in the post centrifuge tube in terms of the fraction?

          MS. ELENBERG:  Objection.  Foundation.

A.   What do you mean by "aggregates"?

BY MR. McLENNAN:

Q.   Are you familiar with the formation of aggregates in LNP compositions?

A.   But there are different types of aggregates, so what do you mean exactly?

Q.   What types are you aware of?

A.   That -- of bigger size?  Of multiple LNPs together?  Aggregates can be extrinsic, can be dirt, can... there's multiple aggregates.  So it depends what you mean.  I mean, if they're lighter then they would go up because they float.

          In this particular case, if they -- it's a bit difficult to say at this position where you would expect them, right?  They can scatter light so they can get a position where it's a bit more turbid, but then scattering is -- light scattering is not just a function of size but also a function of overall, like, concentration.

So I would now not dare to say exactly where to expect aggregates, and I think it's very difficult to say that because then you have refractive index, which is just breaking of the light, which can create bands of lighter or darker shades, so aggregation, as said, is a very complex, yeah, mechanism.

Q. The type of aggregates you mentioned where two LNPs or two or more might join together, those would have a larger particle size than a nonaggregated LNP. Right?

MS. ELENBERG: Objection. Scope. And also I just want to note you have about a minute left.

A. Yes. Could be bigger, but...

BY MR. McLENNAN:

Q. And you didn't do any testing to determine whether the turbidity or the thick white layer of precipitant observed in, for example, Exhibit 4, was as a result of aggregates in the composition. Correct?

A. We did --

MS. ELENBERG: Objection. Lacks foundation.

A. We did test hundred percent of the fractions, as said. We did test NTA, DLS, and UV, and DLS is a measure to also see aggregates. So we did test that and we don't have an assumption on aggregates because

we do have DLS data that shows that even if they are maybe bigger in size, because they are -- like the hydrodynamic radius is bigger, but the PDI and the correlation curve of the DLS data does not suspect any -- yeah, any different -- different shape compositions, so the ones that we see, they have the same shape.

MS. ELENBERG: Can we have the time on the record?

VIDEO TECHNICIAN: Yes, we just hit two hours and one minute.

MR. McLENNAN: Okay. Pending any questions from plaintiffs' counsel, we've got no further questions here.

MS. ELENBERG: All right. We're going to go -- can we go off the record, and then we'll return on the record, likely, to ask additional questions.

VIDEO TECHNICIAN: Okay. We are going off the record. The time is 10:15.

(Off the record at 10:15 a.m.)

(Back on the record at 10:26 a.m.)

VIDEO TECHNICIAN: We are back on the record. The time is 10:26.

MS. ELENBERG: Plaintiffs will be asking some questions of Dr. Schuster at this time.

Dr. Schuster, are you ready?

THE WITNESS:  I'm ready.

MS. ELENBERG:  Okay.  Great.

EXAMINATION

BY MS. ELENBERG:

Q.   So let's -- if we could go back for a moment to Exhibit 1.  I can -- I can share my screen.  Just give me one moment.

Okay.  Share...

MS. ELENBERG:  Can you guys see the PowerPoint okay?

MR. McLENNAN:  Uh-huh.

A.   Yes.

BY MS. ELENBERG:

Q.   My apologies, I meant to go to Exhibit 2, so just give me one more moment.

So you can see Exhibit 2?

A.   Yes.

Q.   Great.  In his report, Dr. Prud'homme opined -- in reference to this slide of Exhibit 2 that we're currently looking at, Dr. Prud'homme opines that [as read]:  In rotor set 4 without sucrose the fraction with the lowest SM-102 measured 39.006 molar percent, whereas for rotor set 5 without 1% sucrose, the fraction with the lowest SM-102 measured 34.886 molar

percent, a difference of approximately 4 molar percent.

Do you agree with this analysis and opinion by Dr. Prud'homme?

MR. McLENNAN: Objection. Outside the scope of cross, and the Court did not permit plaintiffs to file a surreply report on this. I didn't introduce Dr. Prud'homme's reply report, and we'll object to any attempt to backfill with new opinions that you aren't permitted to offer.

MS. ELENBERG: Counsel's objection is noted.

You may proceed, Dr. Schuster.

A. That would be the fraction without sucrose. So in this case the fraction 1 on the left and the fraction 1 on the right, I would not consider them at all because they are marked that they're below the lowest standard, so I would not consider them for quantitation at all.

And I think the fraction 1 was also the ones that we never really were able to quantify and never reported any value in the sample testing, so they were always below the quantitation limits so -- and no quantitation could be done.

BY MS. ELENBERG:

Q. And this relates back to counsel from Moderna's earlier questions today where various, you know, fractions in this PowerPoint were compared without knowing necessarily the molar percentages were within or outside of LOQ or had passed SSTs, et cetera. Correct?

MR. McLENNAN: Objection. Leading. Outside the scope of cross and outside the scope of the Court's order.

A. Yes. So... sorry, your objection confused me. I forgot the question.

BY MS. ELENBERG:

Q. That's okay. Withdrawn.

In Dr. Prud'homme's report, he opines that you chose the method that created the most infringing fractions, and during today's deposition opposing counsel suggested that certain selected parameters more often led to higher or lower molar percentages of a given type of lipid.

When you selected your parameters, did you at all consider the molar percent of a particular type of lipid or consider infringement or any related considerations along those lines?

MR. McLENNAN: Objection. Form. Leading. Foundation. Outside the scope of cross and the

Court's order.

A.   No, I did not look at any particular molar percentages.  As said, I was just looking at the overall graphs and I was -- in the first deposition, I mean, I stated that I don't even know the patent, so... yeah, so I was not looking at any particular number, as said.

BY MS. ELENBERG:

Q.   Dr. Prud'homme opines in his report that the LC-CAD method you used during development testing as described in document with Bates number GENV-01102754, which is Exhibit 2 that we're currently looking at, Dr. Prud'homme opines that the calibration curve is optimized around 0.5 milligram per millimeter for SM-102, which deviates significantly if the sample has a concentration above 1.2 milligram per milliliter, and he additionally notes that the concentration of SM-102 in the Moderna product is 2 milligram per milliliter.

        Do you agree with this opinion?

        MR. McLENNAN:  Objection.  Leading. Foundation.  Form.  Outside the scope of cross and outside the scope of the Court's order.

A.   I don't agree with that.  It was not optimized around a certain concentration.  The product itself, when

you say it has a high lipid concentration, I mean, it's diluted anyways to be in a operational range, and therefore you -- you have the calibration curve, and any samples that you measure need to lay within that curve, otherwise the software -- or if you do it manually -- that you cannot even calculate a concentration.

So I don't opine that it's optimized to a certain concentration and for a sample set have higher concentration standard calibration curve.  They are, anyways, diluted to fit into the calibration curve as -- as also done by Moderna and anybody who analyzed it.

BY MS. ELENBERG:

Q.   Dr. Prud'homme opines that you disabled some of the calibration ranges that were originally generated during method development and that enabling or disabling some of the calibration ranges is likely to impact the final reported results.

Do you agree with this opinion?

MR. McLENNAN:  Objection.  Leading. Foundation.  Form.  Outside the scope of the Court's order and cross.

And, Counsel, I'll note I didn't even bring up these specific opinions, so this is pretty

egregious to try and back-door opinions through a deposition.

MS. ELENBERG: Your objection is noted.

BY MS. ELENBERG:

Q. Dr. Schuster, please proceed with your answer.

A. The opinion that disabling would affect the concentration. So in the -- in the sample testing, all of the samples have been tested in the same calibration range. So we had two samples that were marked as standards but not in the calibration range, but that was for all single samples.

That's because the lowest standard is the LOQ confirmed standard so that you see that all the instruments actually see the lowest, like, peak that is just at the quantitation level defined in the report, in the qualification report, as it is also outlined in the qualification report, and the highest standard is for seeing that we don't saturate.

But all samples have been measured in the same calibration range with the same calibration standards. All have been measured comparable.

Q. All right, I am now going to flip back to Exhibit 1. This is document with Bates numbers GENV-01102731. And I will flip to slide -- yeah, Slide 21.

Dr. Prud'homme -- sorry. Yeah.

Dr. Prud'homme notes that you tested different evaporation temperatures and eventually selected a temperature of 35 degrees Celsius which indicates that you, quote, chose the method that resulted in the highest SM-102 peaks.

Is this an accurate characterization?

MR. McLENNAN: Objection. Leading. Foundation. And this is another egregious violation of the Court's order. You weren't permitted to offer a surreply report from Dr. Schuster and it's highly inappropriate that you're attempting to do so now through this deposition when I didn't even touch on these topics when I was questioning Dr. Schuster.

BY MS. ELENBERG:

Q. Dr. Schuster, you may proceed with your answer. If you need me to repeat the question, let me know.

A. Yes, please repeat the question.

Q. Dr. Prud'homme notes that you tested different evaporation temperatures and eventually selected a temperature of 35 degrees Celsius which, according to him, indicates that you, quote, chose the method that resulted in the highest SM-102 peaks.

Do you agree with this characterization?

MR. McLENNAN: Same objections.

A. No. We chose -- basically we chose the 35 degree,

order.  Objection.  Leading.  Foundation.  And form.    10:39:22

BY MS. ELENBERG:    10:39:31

Q.  And, again, if you need me to repeat the question, let    10:39:32
me know, Dr. Schuster.    10:39:34

A.  Yes, please.    10:39:35

Q.  Dr. Prud'homme states that based on Slide 6 of the    10:39:38
document we're currently looking at, it appears that    10:39:41
oxidized SM-102 and DSPC elute at the same location    10:39:44
and that this would likely skew your results upwards    10:39:48
when determining the amount of SM-102.    10:39:51

Do you agree with this opinion?    10:39:53

MR. McLENNAN:  Same objections.    10:39:56

A.  No.  In this case, basically what this graph shows --    10:39:57
this is a misinterpretation that he has.  But what it    10:40:07
shows is that an impurity from oxidized SM-102 and    10:40:10
from DSPC, so not the DSPC, is eluting aside.  So    10:40:14
this is the peak 3 index which, as said, impurity    10:40:19
from oxidized SM-102 and DSPC elutes next to DSPC and    10:40:22
next to SM-102 separated from them, so it's actually    10:40:28
showing that potential degradation is not within the    10:40:31
peaks, yeah.    10:40:36

BY MS. ELENBERG:    10:40:41

Q.  And is the method that's displayed on this slide the    10:40:42
method that was used to test samples?    10:40:45

A.  No.    10:40:46

MR. McLENNAN: Objection to form. Lacks foundation. Outside the scope. And violates the Court's order.

A. No. This is, as said, the first, like, test when we did from the feasibility to the different instruments that were switched from the Ultimate to the [indiscernible]. It's not the final method -- or not the method that was used for sample testing.

BY MS. ELENBERG:

Q. Okay. Great.

MS. ELENBERG: I'm going to drop Exhibit 5 into the Chat, hopefully. I apologize in advance, my WiFi is a little bit slow, so hopefully everyone can receive it, but...

MR. McLENNAN: And we're objecting to the introduction of any new exhibits that weren't used earlier in the deposition.

MS. ELENBERG: Noted.

MARKED FOR IDENTIFICATION:

EXHIBIT 5

10:41 a.m.

MS. ELENBERG: If you just give me a moment while my computer loads.

BY MS. ELENBERG:

Q. Dr. Schuster, let me know when you have Exhibit 5

open.

MS. ELENBERG: And for the record, Exhibit 5 is an Excel sheet with Bates number GENV-01102696.

A. I have it open.

BY MS. ELENBERG:

Q. Okay. Great. Dr. Prud'homme opines that document GENV-01102696 is a spreadsheet that contains testing of samples, quote, addressed in your report and that contains additional and inconsistent test results that were not disclosed in the opening report.

Do you agree with this opinion?

MR. McLENNAN: Objection. Outside the scope of cross. Leading. Foundation. Form. And outside the scope of the Court's order which did not permit plaintiffs a surreply report.

BY MS. ELENBERG:

Q. Dr. Schuster, if you need me to repeat the question, just let me know.

A. So this is the spreadsheet of the -- this one feasibility test with the samples that was mentioned in the first deposition and was discussed today.

The -- I cannot say that the data is inconsistent because it showed the overall same trend, however this was -- while we don't relate -- relate to

them and why it was not reported, right, was, as said, because we had instrument problems that sometimes were -- that in the SSTs the calibration curves didn't pass, so we had to assume that the injection system didn't perform so that the quantitation -- it's difficult to judge based on these failed SSTs, and that's why we don't use this or we didn't use the data.

And where we addressed that this -- we should change. We addressed the change to a different system and got that malfunctioning into all of them. But inconsistent, I mean, it showed -- if you would plot them, it shows the same trends of the fractions, I guess, so...

But also, I -- I mean, this is not fully reviewed every single data point in this, and this is not reporting anything.

Q. Okay.

MS. ELENBERG: I will now be dropping a new exhibit into the Zoom link. And, again, please bear with me for a moment with my WiFi.

All right, I'm currently sending Exhibit 6 into the Chat with Bates number MRNA-GEN-00021725.

MARKED FOR IDENTIFICATION:

EXHIBIT 6

10:45 a.m.

BY MS. ELENBERG:

Q. And, Dr. Schuster, let me know when you have this document open.

A. I have it open.

Q. Okay. And I will share my screen again.

And I'm going to the 14th page of the document. And, Dr. Schuster, if you need a moment to read the paragraph that starts with "CQA determination," feel free, but my question is, how does this document relate to either in support of or in contrast to the deposition testimony you gave earlier today regarding the turbidity of mRNA LNP samples?

MR. McLENNAN: Objection to the new exhibit which was not used on cross earlier in the deposition. Objection to the leading question. Form. Foundation. And outside the scope of the Court's order which did not permit plaintiffs a surreply report.

A. I would need to read through this now before I can say anything.

So, okay, basically it describes which is also described in the COA from when I look at the white to off-white dispersion, so the appearance of the product and the large aggregates or precipitates

may indicate incorrect storage, which, as said, we didn't observe.

That "phase separation [which] is expected in lipid nanoparticles dispersions," I said that, and that's also what we saw, right, that once it's not homogenized you can have, like, either in the tube or in the vial, different phases or more concentrated or less. But after -- and which is expected. Actually, I mean, the dispersion is exactly doing that, you disperse something in the system.

That "visible partic[les] do not impact quality or safety," we did not assess.

Visible particles can only be assessed by pharmacopeial methods, which I mentioned.

And that the product itself is turbid, but I said that before.

Yeah, I think it just describes how the vial looks like, so dispersion, like LNPs, what I said.

Yeah, so it just confirms what I said, how the drug product or LNP drug product looks like as it is also written in the COA.

BY MS. ELENBERG:

Q. And I'm going to re-pull up one of the exhibits from today, it's Exhibit 4, which is the side-by-side

centrifugation images that we looked at earlier.

Dr. Schuster, can you see Exhibit 4?

A.   I can see Exhibit 4.

Q.   Dr. Prud'homme opines that after centrifugation, the diffused turbid band is located above the black line, but that the fluid at the bottom of the test tube and in the top half of the test tube is clear, which is in direct conflict with the trends reported by Dr. Schuster in his opening report.

And then he proceeds to use a Rayleigh theory-based equation in support of this opinion that he offers.

Do you agree with Dr. Prud'homme's opinion and analysis?

MR. McLENNAN:   Objection to form. Foundation.  Leading.  Outside the scope of the Court's order and outside the scope of earlier questioning.

A.   Can you repeat your question?

BY MS. ELENBERG:

Q.   Dr. Prud'homme opines that after centrifugation the diffused turbid band is located above the black line, but that the fluid at the top of the test tube and in the bottom half of the test tube -- sorry.  That the bottom of the test tube and that the top half of the

test tube is clear, which is, quote, in direct conflict with the trends reported by Schuster in his opening report.

He then proceeds to use an equation labeled 1.1 that he associates with the Rayleigh theory to support this opinion that he offers.

Do you agree with Dr. Prud'homme's opinion and subsequent analysis?

MR. McLENNAN: Objection to form. Foundation. Leading. Outside the scope of the Court's order and outside the scope of earlier questioning.

A. I don't agree. I mean, so we did measure like the whole tube, right? So turbidity was also kind of assessed by scattering, so in UV for the fractions, that can be an indication for turbidity.

And, also, in DLS, we have the, like, intensities, so that, with the Rayleigh theory, I think it doesn't apply to this setting because the -- it applies to rather smaller particle sizes, and our instrument has a laser, so you need to have the particles smaller than the laser to apply that, but our laser, it's -- so like -- like a tenth smaller than the laser size, which we have 830 nanometers.

So usually, for us, we cannot assume that

if it's like below 80, we say usually 50, and the

instrument itself would not zoom, so the instrument

can also switch between Rayleigh and Mie theory.

Mie theory is the other, it's M-i-e, which

is a more complex theory for larger particles, and

that would be maybe the more appropriate way to

discuss for that size range because we were above

100 nanometers, so our laser would not be able -- or

the theory wouldn't fit to our laser setting.

BY MS. ELENBERG:

Q.   Okay.  And I'm going to drop Exhibit 7 into the Chat

in just a moment.

MS. ELENBERG:  Exhibit 7 is an Excel with

Bates number GENV-01103119, that was included in the

latest production of documents pursuant to the Court

order.

MARKED FOR IDENTIFICATION:

EXHIBIT 7

10:54 a.m.

BY MS. ELENBERG:

Q.   Let me know, Dr. Schuster, when you have it opened.

MR. McLENNAN:  I don't see that in the

Chat.

MS. ELENBERG:  That could be because of my

WiFi, but hopefully it will show up in the Chat at any

10:53:07
10:53:13
10:53:17
10:53:20
10:53:23
10:53:29
10:53:38
10:53:43
10:53:47
10:53:50
10:53:50
10:53:59
10:54:10
10:54:13
10:54:21
10:54:24
10:54:25
10:54:25
10:54:26
10:54:26
10:54:26
10:54:35
10:54:36
10:54:37
10:54:39

moment maybe.

THE WITNESS:  I had it because I clicked download it.

MS. ELENBERG:  Is it still not showing up in the Chat, Mark?

MR. McLENNAN:  Yeah, it still hasn't shown up yet.

MR. MAHAFFY:  This is Exhibit 7?

MS. ELENBERG:  Uh-huh.

MR. MAHAFFY:  I see it too.

MR. McLENNAN:  Oh, sorry, Exhibit 7.  I thought we were up to 8.  Apologies.

MS. ELENBERG:  No worries at all.

BY MS. ELENBERG:

Q.    Dr. Schuster, let me know when you have Exhibit 7 opened up.  Okay.

A.    It's opening now.

Q.    Dr. Schuster, my understanding is that Exhibit 7 contains DLS data from the sample testing included in your opening report; is that correct?

MR. McLENNAN:  Objection.  Leading. Foundation.  And outside the scope of direct and in violation of the Court's order.

A.    That is correct.

BY MS. ELENBERG:

Q.   And, Dr. Schuster, a moment ago you were explaining that, I believe, DLS light scattering data aligned with the -- or that it relates to the turbidity of the sample in some way.  Could you explain that opinion for us?

A.   Yes, so...

MR. McLENNAN:  Objection.  Leading.

A.   Basically.  I mean we have just seen the tube picture, right, so it was clear, turbid, less clear, and -- I mean, the top is like this fraction 10 which is bottom-top mixed.  But as we said, we characterized the whole tube, so either by UV or by DLS.  What you could do is just use the --

BY MS. ELENBERG:

Q.   Do you know -- sorry.  If you're looking and referring to it, if you want to share your screen.

A.   Okay.  Sorry.

Q.   No, no.

A.   I don't know if you see the Excel.  Sorry.

So, yeah, basically this is the raw data, right.  We have the raw data and then the diameter, the PI, the normalized intensity.

So that's the data from the report.  So what I would do maybe -- because the scattering, it's related to size, but the normalized intensities,

which is a mean of how much is scattered, may have reduced that. So, as said, we characterize each fraction and we have then -- there's a tab diameter, normalized intensity, and, I mean, what --

Let me do this. Do you still see it?

Q. No.

A. Sorry. I had to click on it --

Q. No worries.

A. -- and then it stopped doing it. I think you could just do this.

So we have the fractions here, right, and the normalized intensities, which is the count. It is a fraction of size but also overall concentration.

Maybe just plot something like this, which basically would be a matter of -- so this would be top of the tube, right? I mean, we just think a band is here because it's set as mixture, and then you would see that from the top to the bottom of the tube you have low scattering, so low turbidity, because this is a direct measurement, right, which calls in the Mie theory also.

And then you see more scattering at fraction 8, which is the highest one, and then it goes down again, and this actually, if you flip it next to the tube, this would kind of reflect quite how the

turbidity in the tube, like, goes along.  I think you could do this also with UV data because we use scattering as well.  We -- because we actually account for scattering, right, in UV, so I think a plot like this could be done in scattering as well.

So you could use that data.

MR. McLENNAN:  And we'll object to this -- you know, the whole answer, but also you having your expert literally make new graphs on the spot during a deposition when you weren't permitted a surreply.  It's beyond inappropriate.  You know this is way beyond the Court's order and we'll be objecting to all of this.

You've been going for about 45 minutes now with several new exhibits.  You're even having your expert live make new graphs.  It's completely indefensible.

MS. ELENBERG:  Noted.

I have taken a screen graph [sic] of the graph and I included it in the Chat as Exhibit 8.

And then we just have a couple of final questions, so we'll be wrapping up shortly.

MARKED FOR IDENTIFICATION:

EXHIBIT 8

11:00 a.m.

BY MS. ELENBERG:

Q.   In Dr. Prud'homme's report he opines that several documents documenting experimentation methods and protocol mention a, quote, failed sequence or spikes for some samples that added minor deviation to overall area under the curve.

Can you explain what Dr. Prud'homme is referring to and how or whether this impacts the accuracy or precision of your testing analysis?

MR. McLENNAN:  Objection to form.  Leading. Outside the scope of cross and in violation of the Court's order yet again.

A.   So I guess what he's referring to is our documentation in general when we -- like the -- when you test samples for SST criterias and you check if these SST criterias pass, like any other lab does when you submit sample testing, when they fail, then this data is not shared.

For instance, we had some fractions that didn't pass the relative standard deviation between the four injections so they don't pass their acceptance criteria and this data was not taken for consideration.  That, for instance, can be SST failure, or maybe before we run any samples we test the calibration, so the linearity, because this is --

this is the utmost important one to quantify later on, so no samples are prepared or injected before this calibration is passed.

And I think we had two or three sequences where before any samples were prepared or injected, these failed, so this is a common approach to note it down, then the analysis is stopped, the system is reprepared, pumps reprimed, and this is repeated, which is a common approach in the field to have exactly that -- these systems and stability tests.

But I think from tapping two times that instrument, that calibration didn't pass, but no samples were rejected as far as I can remember.

BY MS. ELENBERG:

Q.   Okay.  And then Dr. Prud'homme opines that for a number of SST reports, at least one fraction fails due to the percent relative standard deviation, but that he is not aware of this being reported in Dr. Schuster's expert reports which further calls into question the reliability of the data.

Is this true and can you explain this phenomenon?

MR. McLENNAN:  Objection to form. Foundation.  Outside the scope of cross and in violation of the Court's order.

A.   So, basically, in the report, anything that is below the quantitation level limit, whether or not it passed any criteria or not, is clearly marked as below QL because it means if it doesn't reach the level of accurate and precise quantitation, it's -- you don't report it.  It's standard in the field.

And if they were above that, they were indicated that the acceptance criteria, so the 5 percent deviation of the area -- I think it was 5 -- didn't pass.

So basically QL overruled standard.  Even if the sample would pass it or not pass it, below QL is always the higher-named indications, so nothing is reported.  If it's -- if a system acceptance criteria was written, means that they were above, but the precision of the four injections were not done, so it was clearly indicated.

I think we also supported or supplied all the Excel sheets where it's also -- all the individual numbers are in, so... yeah.  So I don't fully agree with that.

MS. ELENBERG:  And with that, plaintiffs have no further questions.

MR. McLENNAN:  We just have some follow-up questions about some of those exhibits.

temperatures.  Correct?

A.   That is shown here, yes.

Q.   And are the three temperatures on this slide, 25, 30, and 35 degrees Celsius, the 35 degree Celsius condition has the highest peak, the SM-102.  Correct?

A.   That has the highest sensitivity for all of them. Also for cholesterol, DSPC, SM-102, and PEG which shows that this is -- temperature results in more sensitive peak signal across all lipids.

Q.   And specifically for the SM-102, the highest peak is under the 35 degree Celsius condition.  Correct?

MS. ELENBERG:  Objection.  Asked and answered.

A.   As said, it's for all, which also doesn't really matter because later on you calibrate by using calibration standard with a known amount throughout each temperature -- I mean, so at a fixed temperature, so this is really a matter of overall sensitivity, but it's not an indication -- no -- yeah, because you calibrate it against a known number so it doesn't really matter.  It's for sensitivity purposes.

BY MR. McLENNAN:

Q.   And you were also asked about Exhibit 6, which was a -- I'm sorry, Exhibit 5.  Do you recall that?

A.    That was the -- I need to open it again.                    11:08:42

Which one was Exhibit 5?                    11:08:46

Ah, yeah, okay.  Uh-huh.  That was the --                    11:08:47
this one, Exhibit 5, from our feasibility run.                    11:09:06

Q.    Yes.  And looking at the sheet labeled "Molar Ratio %                    11:09:12
Table for report."                    11:09:17

MR. McLENNAN:  And if we could scroll up to                    11:09:18
the top, please.                    11:09:19

BY MR. McLENNAN:                    11:09:24

Q.    You agree that in the first and second table on the                    11:09:24
left-hand side you're testing the same lot, but you've                    11:09:27
done one series of tests and then a backup series of                    11:09:32
fractions; is that right?                    11:09:36

MS. ELENBERG:  Objection.  Form.                    11:09:40

A.    Yes, that was when, as said, the feasibility runs                    11:09:42
where we failed the SSTs, so this lot -- or this vial                    11:09:49
was then run twice.  I don't know which ones failed                    11:09:52
because out of the seven sequences I think six                    11:09:59
failed, so all of them failed.                    11:10:05

BY MR. McLENNAN:                    11:10:08

Q.    Okay.  And you didn't test a series of backup                    11:10:08
fractions for those 67 samples you tested in the final                    11:10:13
series of tests.  Correct?                    11:10:17

MS. ELENBERG:  Objection.  Form.                    11:10:19
Foundation.                    11:10:21

A.   Correct, I didn't, because each vial that -- for the sample testing was tested once.

BY MR. McLENNAN:

Q.   Okay.

A.   Overall, it was 67, so...

Q.   And you disagree with Dr. Prud'homme that --

MS. ELENBERG:  Counsel, can you just -- there's been a couple of times where you've cut off the end of Dr. Schuster's answer, so if you just -- I need you to allow the witness time to finish answering his complete answer.

MR. McLENNAN:  Sure.

BY MR. McLENNAN:

Q.   Dr. Schuster, did you have anything to add to that last answer?

A.   I forgot what I wanted to add.

Q.   My question was about whether you tested a series of backup fractions in the testing of the 67 samples of Moderna's COVID-19 vaccine.

A.   No.

Q.   And Dr. Prud'homme opined that you presented testing for this specific Lot Number 010L21A in your expert report but you didn't include these results.  You don't disagree with him that those results shown in Exhibit 5 were not reported in your expert reports.

Correct?

A. That's correct. That's what I mentioned already in the first deposition, that we had a feasibility run where we tested, I think I said seven lots, I don't remember exactly, and that this was a feasibility run and they were not reported because, as said, we had the instrumentation failures where we couldn't get the calibration curve to pass the SST criteria, and that's why it would be, yeah, unreliable because of these instrument problems that we had to even consider them for sending them out to our clients as official testing results, and that's why we told our clients we need to move to a different instrument and change it because this will not work.

Q. Okay. Do you recall being shown photos of the UC tubes by Ms. Elenberg and then being asked about a series of calculations by Dr. Prud'homme?

A. No.

Q. You weren't asked about a Rayleigh calculation? Do you recall that?

A. The instruments perform Rayleigh or Mie calculations.

Q. Do you recall being asked about calculations by Dr. Prud'homme?

A. Just now, she asked me that.

Q. Yes.

A.   Now, when we --

Q.   Yes, now.

A.   Yes.

Q.   You do recall that?

A.   During the last hour that we are talking now?

Q.   Yes.

A.   Yes.  She asked me just before, when I said that the Rayleigh theory would not apply to our laser because it's too big -- well, the particles are too big, so...

Q.   Okay.  And you don't dispute the calculations that Dr. Prud'homme did.  Correct?  You don't identify any mistakes?

          MS. ELENBERG:  Objection.  Lacks foundation.  Mischaracterizes testimony.

A.   If he applies the Rayleigh theory to a particle that's bigger than the 10 profile laser size, I say they are wrong.  Need to look more into it, but the -- alone from the size to our instrument, the Mie theory is the one that applies to that size range.

          So personally I would rather look at the scheduling of the view or the direct measurement in the DLS than -- because also, you know, these equations have a lot of assumptions.

          You need to assume that the reflective

index is the same, only then it works because also the particles can have different reflective index, so it's very simplified to just use such an assumption.

BY MR. McLENNAN:

Q. Do I understand it correctly that you claim that the calculations he performed are inapplicable, but you don't actually identify any mistakes with the way he calculated those numbers. Correct?

MS. ELENBERG: Objection. Lacks foundation.

A. I would need to look at the exact numbers for that again, but... so what the Rayleigh theory does over the Mie theory is to overcompensate, so it uses a different radius or power to the radius, whereas the Mie theory has a lower one, so that can apply -- I mean, that can change and would not be applicable if you don't use the wrong equation to do this.

What I just said is that our instrument has a laser that, from the size that we measured, the Rayleigh theory would not be applicable to these compounds, so...

BY MR. McLENNAN:

Q. But you haven't identified any mistakes with the calculations themselves. Correct?

MS. ELENBERG: Objection. Asked and

answered.

A.   I did say that the -- the theory would not apply, and that using direct measurements as we provide with the UV scattering or with the DLS, I would rather look at that than assume certain parameters, yeah.

MR. McLENNAN:  Okay.  Subject to any further questions by plaintiffs' counsel, Moderna has no further questions at this time.

MS. ELENBERG:  Plaintiffs have no further questions at this time, and we thank Dr. Schuster for taking the time out of his day to make himself available for this second deposition.

MR. MAHAFFY:  We'll read and sign.

MS. ELENBERG:  And we will read and sign the deposition transcript.

MR. McLENNAN:  Okay.  Thank you, Dr. Schuster.

And Moderna will designate the transcript confidential in accordance with the protective order.

MR. MAHAFFY:  To be clear, that's confidential, not highly confidential.  Right?

MR. McLENNAN:  Correct.  And then we'll review it and change it if we need to.

MR. MAHAFFY:  Okay.  But can we share the transcript with people that can see confidential

information?

MR. McLENNAN:  Can you give me a couple of hours after the deposition, Shaun?

MR. MAHAFFY:  Yeah.  Can you just email us when you're good on that?

MR. McLENNAN:  Yeah.

MR. MAHAFFY:  Thank you.

MR. McLENNAN:  Thank you.

VIDEO TECHNICIAN:  Then this will mark the end of the deposition of Dr. Georg Schuster.  We are going off the record.  The time is 11:17.

(Proceedings concluded at 11:17 a.m.)

CERTIFICATE OF NOTARY

STATE OF MICHIGAN    )

                     ) SS

COUNTY OF OAKLAND    )


            I, ALISON WEBSTER, certify that the

deposition of GEORG SCHUSTER, Ph.D. was taken

before me via videoconference on the date

hereinbefore set forth; that the foregoing

questions and answers were recorded by me

stenographically and reduced to computer

transcription; that this is a true, full, and

correct transcript of my stenographic notes so

taken; and that I am not related to, nor of counsel

to, either party nor interested in the event of

this cause.




_____

ALISON C. WEBSTER, CSR-6266, RPR, RMR, CRR, RDR

Notary Public, Oakland County, Michigan

My commission expires:  May 1, 2029

ACKNOWLEDGMENT OF DEPONENT


I, GEORG SCHUSTER, Ph.D., do hereby acknowledge that I have read and examined the foregoing testimony and the same is a true, correct, and complete transcription of the testimony given by me and any corrections appear on the attached errata sheet signed by me.


_____       _____
    (SIGNATURE)                     (DATE)