# EXHIBIT M

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH<br><br>*Plaintiffs,*<br><br>v.<br><br>MODERNA, INC. and MODERNATX, INC.,<br><br>*Defendants.* | C.A. No. 22-252-MSG |
| MODERNA, INC. and MODERNATX, INC.,<br>*Counterclaim-Plaintiffs,*<br><br>v.<br><br>ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH<br><br>*Counterclaim-Defendants.* | **JURY TRIAL DEMANDED**<br><br>**CONTAINS INFORMATION MODERNA AND THIRD PARTIES DESIGNATED HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY** |

**REBUTTAL EXPERT REPORT OF PETER J. PITTS**

Dated: February 14, 2025

Peter J. Pitts

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

## Table of Contents

I.   BACKGROUND & QUALIFICATIONS ............................................................................1

II.  ASSIGNMENT AND LEGAL STANDARD ...................................................................3

III. SUMMARY OF OPINIONS ..........................................................................................4

IV.  THE GOVERNMENT'S PUBLIC HEALTH EFFORTS RESULT IN A PUBLIC GOOD, NOT A GOVERNMENT BENEFIT WITHIN THE MEANING OF SECTION 1498..............................................................................................................6

V.   THE GOVERNMENT'S RESPONSE TO THE COVID-19 PANDEMIC WAS NOT A NEW OR UNIQUE GOVERNMENTAL ROLE, DESPITE ITS LARGER SCALE AND SPECIFIC CIRCUMSTANCES...................................................9

VI.  APPLYING SECTION 1498 TO THE PURCHASE OF DRUGS FOR AMERICANS WOULD REPRESENT A DRAMATIC EXPANSION OF THE GOVERNMENT'S LIABILITY, BENEFITING INFRINGERS AT THE COST OF TAXPAYERS. .....................................................................................................22

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

**I.      BACKGROUND & QUALIFICATIONS**

1.      I currently serve as the President of the Center for Medicine in the Public Interest, an Honorary Professor at Sefako Makgatho Health Sciences University (Pretoria, South Africa), and a Research Fellow at the US-Israel Education Association.  I am also an Associate Editor of Therapeutic Innovation & Regulatory Science and a member of the Editorial Advisory Boards of the Journal of Commercial Biotechnology and The Patient Magazine.

2.      I am a Visiting Professor at the University of Paris Medical School's program on Value in Health, which conducts research into monetary incentives and their effect on high-value care.

3.      I have previously served as a Visiting Scholar at the New York University School of Medicine, Division of Medical Ethics

4.      I am a member of the Council for International Organizations of Medical Sciences (CIOMS) Expert Working Group to help advance patient involvement in the development and safe use of medicines. (CIOMS is an international, non-governmental, non-profit organization established jointly by WHO and UNESCO in 1949.)

5.      During the COVID-19 pandemic, I served as a member of the USA Today's Expert Vaccine Panel.

6.      My two most recent books, "The Next Normal" and "And Nothing But the Truth, address many of the public policy, scientific, and regulatory issues our nation faced (and continues to face) relative to the government's role in combatting COVID-19.

7.      I am working with the Reagan/Udall Foundation for FDA to develop a national grade school vaccine education program.

8.      I previously served as an Associate Commissioner of the US Food & Drug Administration from February 2003 - June 2004.  In that role, I was a senior policy adviser to the

1

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Commissioner. I also supervised FDA's Office of Public Affairs, Office of the Ombudsman, Office of Special Health Issues, Office of Executive Secretariat, and Advisory Committee Oversight and Management.

9.      I have served as an advisor to FDA's Advisory Committee on Risk Communications.

10.      As detailed in my curriculum vitae, attached as **Exhibit 1**, I am the author of many peer-reviewed articles appearing in publications including the Lancet, Health Affairs, Journal of the American Medical Association, NEJM Catalyst, Vaccines, Nature Biotechnology, Therapeutic Innovation and Regulatory, and the Journal of Commercial Biotechnology. My comments and commentaries regularly appear in publications including the New York Times, the Washington Post, the Washington Times, the Los Angeles Times, and the Chicago Tribune.

11.      My research and publications focus on advancing 21st century healthcare policies, with a specific focus on FDA regulatory issues including the role of patents and intellectual property facilitating medical innovation, vaccine-related topics and science communications.

12.      I received my Bachelor of Art degree in Political Science from McGill University.

13.      I have been retained in this matter by counsel for Genevant Sciences GmbH ("Genevant") to offers opinions on behalf of Genevant and Arbutus Biopharma Corporation ("Arbutus") related to the government's role in providing health care services.  I understand that Genevant and Arbutus are the named Plaintiffs in the above-captioned litigation.  I am being compensated at my usual and customary hourly rate of $750.00 in addition to reimbursement of reasonable business expenses such as travel and photocopying.  My compensation is in no way contingent upon the outcome of this litigation or the opinions I reach.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

## II.    ASSIGNMENT AND LEGAL STANDARD

14.    I understand that Plaintiffs Arbutus and Genevant have asserted that Defendants Moderna, Inc. and ModernaTX, Inc. (collectively, "Moderna")'s COVID-19 vaccine infringes certain patents.

15.    I understand that Moderna has asserted, as an affirmative defense, that a portion of the sales of its COVID-19 vaccine to the federal government meet the requirements under 28 U.S.C. § 1498(a) to shift any patent infringement liability for those doses to the government.  In support of that defense, I understand that Moderna has submitted the expert reports of Dr. George W. Rutherford and Dr. Christopher A. Vellturo.

16.    I understand that this defense has been asserted only with respect to the doses covered by contract no. W911QY20C0100 ("the C-100 contract"), which was executed on August 9, 2020.[1]

17.    I have been asked to respond to the expert report of Drs. Rutherford and Vellturo and opine with respect to whether the purchase of the COVID-19 vaccine was for the benefit of the government.

18.    I understand that Section 1498 is a World War I-era statute that originally helped ensure the government's ability to procure weapons.

19.    I understand that for Section 1498 to apply, two separate elements must be met. First, the government must have given its authorization and consent, which can be either express or implied.  And second, the infringement must be for the government's benefit.

---

[1] MRNA-GEN-01217762.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

20.    I understand that although the government need not be the sole beneficiary, an incidental benefit to the government is insufficient to make the use "for the government."  Nor is it enough that the government has an interest in the program or funds the program's costs.

21.    In arriving at the opinions offered in this report, I have relied upon my training and experience as well as the materials cited or referenced in this report or listed in **Exhibit 2**. My opinions are based on the information provided by Moderna as of the date of this report.  I reserve the right to provide additional opinions in response to additional information produced by Moderna, including additional documents and testimony.

22.    In response to any assertions made by any party or its experts in any submissions or during discovery, I expect to respond as appropriate or to provide additional evidence or testimony.

23.    If asked to testify, I may be required to explain the opinions and analyses described in this report.  I reserve the right to use demonstratives in support of my testimony.

III.    **SUMMARY OF OPINIONS**

24.    Drs. Rutherford and Vellturo's post-hoc analysis of the effects of COVID-19 vaccination does not establish that such vaccines were procured for the government's benefit. Instead, the factors they identify—things like the effectiveness of the vaccine, the infections avoided, the lives saved, and the growth of the overall economy—are benefits to the recipients of the vaccine in particular and the American public in general.  To the extent these positive effects on American citizens have a downstream benefit to the government, it is at most incidental.

25.    Millions of Americans receive health care as a result of spending by the U.S. federal government, which is the single largest purchaser of prescription drugs.  That includes providing vaccines, through efforts such as the long-standing Vaccines for Children program. The beneficiaries of those efforts are the people who received that health care, not the

4

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

government itself.  The same is true with respect to COVID-19 vaccinations—the beneficiaries were the millions of Americans who received the COVID-19 vaccine, not the government who facilitated procurement of the vaccine.

26.    In an effort to make Moderna's theory concerning the scope of Section 1498 appear more limited, Dr. Rutherford tries to distinguish the government's response to the COVID-19 pandemic from its other health care activities.  But he concedes that the response used the very same tools that the government has used both in prior epidemics, as well as for more routine health care, ranging from the research and development assistance of the NIH and BARDA, down to the CDC order system that was used to manage the logistics of vaccine distribution—the same order system used for the Vaccines for Children program.

27.    Just as government programs such as Vaccines for Children, Medicare, and Medicaid facilitate vaccination and other health care for the American public, the government's COVID-19 vaccine purchases were likewise designed to provide health care to the American public.  Indeed, virtually all of the doses purchased under the C-100 contract were provided to the public.

28.    Given the size of the federal government's role in health care in the U.S.—and the corresponding size of the associated expenditures—extending Moderna's theory about the scope of Section 1498 to its logical conclusion would have enormous consequences.  If the U.S. government is considered a beneficiary of the health care it provides to the public, the ability of the executive branch to authorize patent infringement by private parties at the taxpayer's expense would increase dramatically, without any need for additional Congressional action.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

**IV.    THE GOVERNMENT'S PUBLIC HEALTH EFFORTS RESULT IN A PUBLIC GOOD, NOT A GOVERNMENT BENEFIT WITHIN THE MEANING OF SECTION 1498.**

29.    Dr. Rutherford describes the significant role the federal government plays in ensuring public health and in providing health care.  I do not disagree that the government plays such a role, or that its role results in significant benefits.  But while providing health care may be a priority for the government, the resulting benefits accrue to the American public as a whole and in particular to the individual recipients of the provided health care, rather than being for the benefit of the government.

30.    The provision of health care is one of the most prominent examples of the American public, rather than the government, being the beneficiary of government expenditures. The government provides health care to millions of Americans through a number of different programs, including Medicare, Medicaid, the Affordable Care Act marketplaces, and the Children's Health Insurance Program.[2]  In fact, the federal government is "the largest purchaser of prescription drugs in the United States."[3]  The government's health care programs and expenditures create an obvious benefit for the recipients of the care—assuming the care is effective, these recipients will be healthier, will live longer, and have a greater quality of life.[4]

---

[2] Tax Policy Center, How Much Does the Federal Government Spend on Health Care?, https://taxpolicycenter.org/briefing-book/how-much-does-federal-government-spend-health-care.

[3] Cong. Budget Office, Prescription Drugs, https://www.cbo.gov/topics/health-care/prescription-drugs.

[4] *E.g.,* U.S. Dep't of Health & Hum. Servs., Off. of the Assistant Sec'y for Plan. & Evaluation, Medicaid: Health & Economic Benefits (Jan. 2022), https://aspe.hhs.gov/sites/default/files/documents/effbde36dd9852a49d10e66e4a4ee333 /medicaid-health-economic-benefits.pdf (finding that Medicaid eligibility "is associated with a significant improvement in health" and "significantly lower mortality in both childhood and adulthood"); Yeung et al., *Effect of new Medicare enrollment on health, healthcare utilization, and cost: A scoping review*, 69 J. Am. Geriatr. Soc. 2335–2343 (2021) (finding Medicare

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

31.     Neither Dr. Rutherford nor Dr. Vellturo offer any explanation or limiting principle as to when the government's involvement in health care is sufficient to result in liability under Section 1498.  As addressed below, given the government's large role in health care, this broad approach would significantly expand the taxpayer's liability without any Congressional action.  *See* Section VI, *infra.*

32.     Here, the federal government's primary role was funding the development of the vaccines and the purchase of hundreds of millions of doses for medical professionals to administer.  Specifically, the vast majority of vaccinations were generally provided through third parties, such as state and local governments, hospitals, and the pharmacists, doctors, and nurses who administered the vaccines to individual patients.[5]

33.     In my opinion, it was clear to both the federal government and Moderna, when they negotiated the purchase of the vaccine, that the beneficiary was the general population.  At the time of the negotiation of the C-100 contract, Moderna's submissions to the government asserted that the vaccine would be "customarily used by the general public or by nongovernmental entities for purposes other than Governmental purposes."[6]  One of Moderna's lead negotiators confirmed this was Moderna's "express position when negotiating the C0100 contract," explaining that Moderna's view was that it was "developing a vaccine that's intended to be administered to the general public, so that's beyond the internal use by the US Government only."[7]

---

enrollment "increase[d] self-reported health and healthcare utilization overall, as well as reduce[d] disparities across racial and socioeconomic strata").

[5] Santoli Dep. Ex. 2 (HHS-0000418) (indicating that most C-100 contract doses were distributed by non-federal government entities); *see also* Johnson Tr. 100:3–107:20; Sec. V, *infra*.

[6] MRNA-GEN-01122003, at -007–008.

[7] Bennett 5/20/2024 Tr. 252:11–254:14.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

34.    In its public statements, Moderna similarly described the goal of its agreement with the government as "securing early access to safe and effective COVID-19 vaccines *for the American people*."[8]

35.    The government's internal discussions concerning its contract with Moderna confirm that the purpose of purchasing the vaccine from Moderna was to "facilitat[e] the goal of making 330M treatment courses of a vaccine with EUA/BLA *available to the American population* as soon as possible."[9]  Likewise, the C-100 contract itself makes clear that the beneficiary of the vaccines doses is the public—it states that the ultimate goal of acquiring the vaccines is "mitigating the impact of COVID-19 *on the nation and its people*."[10]  Dr. Rutherford points to this language in the C-100 contract, noting that these benefits were "expressly contemplated" in the agreement.[11]  But the government's anticipation of these benefits does not somehow convert them into a benefit for the government.

36.    Dr. Rutherford's own description of the benefits of the vaccine also show that the recipients of the vaccine and the American public generally were the beneficiaries.  Dr. Rutherford highlights the effectiveness of the vaccine, the infections avoided, and the lives

---

[8] Moderna, Moderna Announces Supply Agreement with U.S. Government for Initial 100 Million Doses of mRNA Vaccine Against COVID-19 (mRNA-1273) (Aug. 11, 2020), https://investors.modernatx.com/news/news-details/2020/Moderna-Announces-Supply-Agreement-with-U.S.-Government-for-Initial-100-Million-Doses-of-mRNA-Vaccine-Against-COVID-19-mRNA-1273/default.aspx (emphasis added).

[9] HHS-0000388 at -389 (Nov. 20, 2020 Operation Warp Speed Procurement Memo) (emphasis added).

[10] C-100 Contract, MRNA-GEN-00079284 at 302 (emphasis added).

[11] Rutherford Report ¶ 67.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

saved, as well as the benefits to the overall economy.[12] These are all benefits to the vaccine recipients individually and to their families and communities via herd immunity.[13]

37.    Dr. Rutherford's attempt to link these benefits to the government demonstrates just how attenuated his theory is. For example, Dr. Rutherford says a benefit of vaccination was that it allowed "a return to normal access" for "routine care, such as childhood vaccination."[14] But he makes no attempt to explain how providing routine medical care is a benefit to *the government*, rather than the recipients of that care.

38.    The nature of the benefits from the vaccine, consistent with Moderna's position during the negotiations, and the statement in the contract itself, show that the beneficiary of the vaccine was the public, rather than the government. Although the government funded the purchase of the vaccines, any benefit to the government was incidental. The only clear beneficiary of these public health measures is the American public itself, and in particular the recipients of the healthcare.

## V.    THE GOVERNMENT'S RESPONSE TO THE COVID-19 PANDEMIC WAS NOT A NEW OR UNIQUE GOVERNMENTAL ROLE, DESPITE ITS LARGER SCALE AND SPECIFIC CIRCUMSTANCES

39.    The government is a regulator, payor, and partner of drug and vaccine development. The government facilitates investment in the development of new medical technologies through basic science grants to academic institutions (e.g., via the NIH), and by providing guidance in many aspects of the drug development process (i.e., via the FDA's advice and counsel on clinical trial development, good manufacturing practices, regulatory review, and

---

[12] Rutherford Report ¶¶ 69–71, 73–77.

[13] Cleveland Clinic, Herd Immunity, https://my.clevelandclinic.org/health/articles/22599-herd-immunity.

[14] Rutherford Report ¶ 66.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

post marketing surveillance).  As discussed above, the government is also a significant purchaser of these resulting medical technologies.

40.     The federal government's COVID-19 efforts were consistent with its broader role in the development, review, and distribution of medicines.  The federal government exercises choice and control over the approval, purchase, and provision of drugs, biologics, and vaccines provided through Medicare and Medicaid, as well as other agencies such as the Indian Health Service.[15]  Even for individuals with private insurance, the government, through the CDC's Advisory Committee on Immunization Practices,[16] determines which of these medical technologies are recommended for children and adults, and, consequently which vaccines and immunizations the government and private health insurer will pay for.[17]

---

[15] Laura A. Wreschnig, Cong. Research Serv., Report Title (Report No. R40611, 2023), https://crsreports.congress.gov/product/pdf/R/R40611 ("For a drug to be paid by Medicare's prescription drug benefit, it must be a drug that is covered under Part D and included in the formulary of an individual's Part D plan.").

[16] Ctrs. for Disease Control & Prevention, Role of ACIP in U.S. Vaccine Recommendations, CDC, https://www.cdc.gov/acip/about/role-in-vaccine-recommendations.html.

[17] *See* 29 C.F.R. § 2590.715-2713 ("[A] group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for and must not impose any cost-sharing requirements [for] . . . Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention . . . .").

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

41.     Major public health incidents are frequently referred to as "unprecedented"—outbreaks of diseases like dengue, chikungunya, Zika,[18] hepatitis A,[19] Ebola,[20] and SARS,[21] have all been called that.  Dr. Rutherford likewise characterizes the COVID-19 pandemic as an "unprecedented public health crisis."[22]  Similarly, Dr. Rutherford points to political rhetoric from 2021 about a "wartime" response,[23] without acknowledging that such rhetoric is frequently used to refer to coordinated government responses, rather than an actual war, as with the "war on drugs."[24]  To be sure, the COVID-19 pandemic was highly unusual in scope and scale, and should not be minimized.  Many of the countermeasures taken in response to COVID-19 were

---

[18] Roth et al., *Concurrent outbreaks of dengue, chikungunya and Zika virus infections – an unprecedented epidemic wave of mosquito-borne viruses in the Pacific 2012–2014*, 19(41) Euro Surveill. (2014).

[19] County of San Diego, San Diego Hepatitis A Outbreak (2017-18) After Action Report (2018), https://www.sandiegocounty.gov/content/dam/sdc/cosd/SanDiegoHepatitisAOutbreak-2017-18-AfterActionReport.pdf.

[20] Cangul et al., *Beating Back Ebola*, IMF Finance & Development at 54 (June 2017), https://www.imf.org/external/pubs/ft/fandd/2017/06/cangul.htm.

[21] Public Health Agency of Canada, Chapter 11: Viruses Without Borders—International Aspects of SARS, in Learning from SARS: Renewal of Public Health in Canada, at 199, https://www.canada.ca/en/public-health/services/reports-publications/learning-sars-renewal-public-health-canada/chapter-11-viruses-without-borders-international-aspects-sars.html.

[22] Rutherford Report Sec. VIII.B.

[23] Rutherford Report ¶ 58.

[24] Richard Nixon Foundation, *Public Enemy Number One: A Pragmatic Approach to America's Drug Problem* (June 29, 2016), https://www.nixonfoundation.org/2016/06/26404/ ("At a press conference on June 17, 1971, President Nixon, with his newly appointed Drug authority at his side, declared drug abuse 'public enemy number one.' 'In order to fight and defeat this enemy,' he continued, 'it is necessary to wage a new, all-out offensive.'  With that statement, the 'war on drugs' began.").  Other examples include the "war on poverty" and the "war on cancer."  House Budget Comm., *60-Year Anniversary of the War on Poverty - Are We Winning or Losing?* (Jan. 24, 2024), https://budget.house.gov/press-release/60-year-anniversary-of-the-war-on-poverty_-are-we-winning-or-losing ("On January 8, 1964, President Lyndon B. Johnson declared before Congress an 'unconditional war on poverty in America.'"); Surh Y. J., *The 50-Year War on Cancer Revisited: Should We Continue to Fight the Enemy Within?*, 26(4) Journal of cancer Prevention 219–223 (2021).

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

larger and more aggressive than prior efforts, but at least with respect to the development and procurement of vaccines, the tools used in the response to the COVID-19 pandemic were not "unprecedented." Any approach to the application of Section 1498 that would turn on the use of the label "unprecedented," as Dr. Rutherford seems to suggest, would have far-reaching implications.

42. In confronting the COVID-19 pandemic, the government used the existing framework of agencies and programs to support the development and distribution of vaccines. Dr. Rutherford attempts to portray the government's vaccine efforts in response to the COVID-19 pandemic as unique to suggest that this effort was likewise a unique priority for the government, which he believes supports the implication of Moderna's position that the vaccine should be covered by Section 1498.[25] But Dr. Rutherford ultimately acknowledges that those efforts used existing government mechanisms and built upon existing agencies and efforts relating to aggressive measures aimed at public vaccination efforts.[26] The purchase of the COVID-19 vaccine in response to a pandemic was thus not a unique response and does not serve to limit future applications of Moderna's Section 1498 theory either.

43. Despite this acknowledgment, Dr. Rutherford makes several arguable attempts to distinguish the COVID-19 response, but the issues he identifies ultimately illustrate that the government used existing mechanisms to respond to the pandemic. For example, Dr. Rutherford highlights the role of Operation Warp Speed (OWS) as a method of coordinating different government agencies to accelerate vaccination and treatment efforts.[27] But that coordination of

---

[25] Rutherford Report Sec. IX.

[26] Rutherford Report ¶¶ 28-35

[27] Rutherford Report ¶ 40.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

efforts was built upon prior efforts of inter-agency coordination, such as the Cancer Moonshot,[28] the Office of AIDS Research,[29] and the government's efforts to combat SARS,[30] and has continued post-pandemic, as with M-Pox[31].

44.     Dr. Rutherford stresses the role of the military in Operation Warp Speed.[32]  Even if that were relevant, however, military assistance  in response to a public health emergency was not a new development or unique to COVID-19.  The National Disaster Medical System ("NDMS"), a partnership between the Department of Defense, HHS, and the VA, has existed since 1984, and has been further developed though both Congressional action and inter-agency memoranda of agreement since then.[33]  There are multiple avenues for activation of the NDMS, including through declaration of a public health emergency by the Secretary of HHS,[34] which as Dr. Rutherford notes, has occurred 43 times since 2005.[35]  But the NDMS is not limited to the

---

[28] National Cancer Institute, Cancer Moonshot Initiative, https://www.cancer.gov/research/key-initiatives/moonshot-cancer-initiative.

[29] Office of AIDS Research, NIH HIV Research Program: OAR's Role, https://oar.nih.gov/nih-hiv-research-program/oar-role.

[30] Li et al., *Needs, Challenges and Countermeasures of SARS-CoV-2 Surveillance in Cold-Chain Foods and Packaging to Prevent Possible COVID-19 Resurgence: A Perspective from Advanced Detections*, 15(1) *Viruses* 120 (2023).

[31] U.S. Dep't of Health & Hum. Servs., Mpox (Monkeypox), https://www.hhs.gov/programs/public-health-safety/mpox/index.html.

[32] Rutherford Report ¶ 42.

[33] *See* U.S. Dep't of Def. & U.S. Dep't of Homeland Sec., Memorandum of Agreement on Disaster Medical System (Oct. 24, 2005), https://www.jcs.mil/Portals/36/Documents/Doctrine/Interorganizational_Documents/dhs_moa_diaster_med_system2005.pdf.

[34] *Id.* at 2.

[35] Rutherford Report ¶ 35.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

declaration of such an emergency and has been used more than 300 times domestically, including in response to the H1N1 influenza pandemic in 2009.[36]

45.    While the federal government's overall efforts in response to the COVID-19 pandemic were certainly significant, the vaccine-related work, including to accelerate development of a COVID-19 vaccine, was not unprecedented or unusual in a way that would suggest that the application of Section 1498 is appropriate here or that distinguishes it from federal government's other efforts to provide the public with health care.  As Dr. Rutherford explains in his report, the "federal government has long taken an active interest in vaccination."[37] Since well before the pandemic, agencies including FDA, the CDC, the National Institute of Allergy and Infectious Diseases ("NIAID") and the Biomedical Advanced Research and Development Authority ("BARDA") have helped to conduct research and facilitate the development of vaccines.

46.    Likewise, the government's purchasing of the vaccines was not a new step.  As Dr. Rutherford concedes, the federal government has long been a major purchaser and distributor of vaccines through efforts like the Vaccines for Children Program ("VFC") and the Strategic National Stockpile.[38]  Indeed, over thirty years, the federal government purchased over 71.5 billion doses of pediatric vaccines through the VFC, and distributed those doses to more than 37,000 healthcare providers.[39]

---

[36] KFF, The National Disaster Medical System (NDMS) and the COVID-19 Pandemic (Mar. 1, 2021), https://www.kff.org/coronavirus-covid-19/issue-brief/the-national-disaster-medical-system-ndms-and-the-covid-19-pandemic/.

[37] Rutherford Report ¶ 28.

[38] Rutherford Report ¶¶ 32-33.

[39] Ctrs. for Disease Control & Prevention, Celebrating 30 Years of Vaccines for Children (VFC), https://www.cdc.gov/museum/online/vfc.html.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

47.     When the COVID-19 pandemic occurred, the government relied on this existing methodology, which "served as a model for shipping COVID-19 vaccines from centralized distribution depots to providers," with "OWS leverag[ing] vaccine ordering and distribution mechanisms used by the VFC program for routine distribution."[40]  While the scale of the purchases were larger, the government's pandemic vaccine effort used the same model the CDC developed 30 years earlier[41]:



Figure 1[42]

---

[40] Ctrs. for Disease Control & Prevention, Celebrating 30 Years of Vaccines for Children (VFC), https://www.cdc.gov/museum/online/vfc.html

[41] Ctrs. for Disease Control & Prevention, Celebrating 30 Years of Vaccines for Children (VFC), https://www.cdc.gov/museum/online/vfc.html

[42] Ctrs. for Disease Control & Prevention, Celebrating 30 Years of Vaccines for Children (VFC), https://www.cdc.gov/museum/online/vfc.html

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

48.    The VFC distribution infrastructure is just one example of the use of existing mechanisms to respond to COVID-19.  At least with respect to vaccines, each step of the response used such existing mechanisms, from the initial research by NIAID, to contracts with manufacturers by BARDA, to the approval via Emergency Use Authorizations by the FDA, and the subsequent recommendation to the public by the CDC's Advisory Committee on Immunization Practices ("ACIP").[43]

49.    Specifically with respect to the C-100 contract, the CDC used its existing vaccine order management system, VTrckS, as the mechanism to order and arrange for distribution of the C-100 contract doses.[44]  Actual distribution was handled by a private company, McKesson, with the government never taking physical possession prior to distribution.[45]  From there, almost all of the doses were distributed to non-federal entities, like state and local governments, and it was these non-federal jurisdictions who "then decided how to further distribute their allocated vaccine doses to authorized health care providers within their boundaries, including to pharmacies, health centers, local health departments, mass vaccination sites, hospitals, physician offices, and others."[46]

---

[43] Ctrs. for Disease Control & Prevention Advisory Committee on Immunization Practices, COVID-19 Moderna Vaccine, https://www.cdc.gov/acip/grade/covid-19-moderna-vaccine.html.

[44] Santoli Tr. 16:7–20; 18:9–18.

[45] Johnson Tr. 92:2–18.

[46] U.S. Gov't Accountability Off., COVID-19: Opportunities to Improve Federal Response and Recovery Efforts, GAO-22-105457, at 13 (2021), https://www.gao.gov/assets/d22104457.pdf.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

50.    The overwhelming majority of the vaccine doses purchased through the C-100 contract were distributed in this way to entities other than the federal government, like private pharmacies and state and local governments, as reflected in Figure 2:[47]

| Vaccine Recipient | C-100 Doses Shipped | Percent of Total Doses |
|---|---|---|
| *Federal* | *95,357,080* | *19.07%* |
| *Jurisdictions (e.g. state and local governments)* | *152,744,720* | *30.55%* |
| *Pharmacy (e.g., CVS or Walgreens)* | *142,753,200* | *28.55%* |
| *Dialysis Clinics* | *193,280* | *0.04%* |
| *Other* | *108,953,260* | *21.79%* |
| **Total doses** | **500,001,540** | **100%** |

Figure 2[48]

51.    Robert Johnson, Division of Influenza and Emerging Infectious Diseases for BARDA testified about each of these non-federal categories:

**Jurisdictions**

Q. The first category here is "Jurisdictions." What is your understanding of what that category is?
A. So from a public health perspective, we -- the U.S. is divided up into jurisdictions, for lack of a better word. And this is not my space, in terms of how it's divided up. But in general, the jurisdictions for the COVID-19 response were each state was a jurisdiction and certain territories were jurisdictions to receive product.
Q. So these jurisdictions are not the federal government; correct?
A. Correct.[49]

**Pharmacy**

---

[47] Johnson Tr. 100:3–107:20.

[48] The total number of doses in Figure 2 is based on Moderna's records of doses sold under the C-100 contract. *See* MRNA-GEN-00467749; Vellturo Rep. ¶ 34. I understand HHS produced data in this litigation concerning the number of C-100 doses received by federal agencies, as well as the other enumerated categories of recipients. *See* Santoli Dep. Ex. 2 (HHS-0000418). However, the government data only accounts for approximately 391 million out of approximately 500 million C-100 doses. To my knowledge, neither Moderna nor Drs. Rutherford and Vellturo have identified any evidence that the remaining 109 million doses went to federal agencies.

[49] Johnson Tr. 100:3–16.

17

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Q. The next category on this chart is "Pharmacy." What does that mean?

A. So we had the jurisdictional channel, I just explained. The second channel was the pharmacy channel. And so that was pharmacy chains, just like it sounds.

Q. Those are private pharmacy chains, like CVS or Walgreens?

A. Correct.

Q. Those doses that went to the pharmacies were given to members of the American public; correct?

A. Correct.

Q. Those doses weren't for use by the federal government?

A. The federal government did not administer those doses, correct.[50]

**Dialysis Clinics**

Q. Are those federal government dialysis clinics or private dialysis clinics?

A. I don't know. I believe they were private. Because if it was a federal dialysis, it would have been done through the federal channel.

Q. So these -- because these are reflected separately from the federal channel, these are not doses for the federal government?

A. I believe so.

Q. You believe that's correct?

A. I believe that is correct.[51]

52.     Even with respect to the C-100 doses in the "federal" category, only a very small percentage (less than 2%, as described below) was actually used by the federal government.  *See*

Figure 3:

---

[50] Johnson Tr. 103:16–104:10.

[51] Johnson Tr. 107:10–107:20.  Information published by the CDC confirms Dr. Johnson's testimony about the private nature of these dialysis clinics, almost all of which were operated by just two companies: DaVita Inc. and Fresenius Medical Care North America. *See* Ctrs. for Disease Control & Prevention, COVID-19 Vaccination Planning for Dialysis Partners and Jurisdictions, https://archive.cdc.gov/#/details?archive_url=https://archive.cdc.gov /www_cdc_gov/vaccines/covid-19/planning/dialysis-partners-jurisdictions.html.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

| Vaccine Recipient | C-100 Doses Shipped | Percent of Total Doses |
|---|---|---|
| **Federal** | **95,357,080** | **100.00%** |
| - *International Donations* | *77,592,520* | *81.37%* |
| - *Health Resources and Services Administration* | *5,924,120* | *6.21%* |
| - *Department of Defense* | *5,773,540* | *6.05%* |
| - *Department of Veterans Affairs* | *4,102,980* | *4.30%* |
| - *Indian Health Service* | *1,493,120* | *1.57%* |
| - *Bureau of Prisons* | *171,320* | *0.18%* |
| - *Department of State* | *141,500* | *0.15%* |
| - *Health and Human Services* | *130,980* | *0.14%* |
| - *Immigration and Customs Enforcement* | *27,000* | *0.03%* |

**Figure 3[52]**

53. More than 80% of the "federal doses" were donated to foreign governments. Dr. Rutherford speculates that these donations were "an important foreign policy tool for the U.S. government."[53] To my knowledge, Dr. Rutherford does not have any background in foreign policy or other experience that would give him insight into the foreign policy uses of the donated doses. However, Dr. Rutherford's conclusions are contrary to public statements made at the time by President Biden. President Biden pledged *not* to leverage donations of COVID-19 vaccines for strategic U.S. gains. On June 3, 2021, Biden pledged not to use donated doses "to secure favors from other countries."[54] Nor would those donations have been likely to obtain such

---

[52] Santoli Affidavit (Nov. 18, 2024).

[53] Rutherford Rep. ¶ 85.

[54] The White House, Fact Sheet: Biden-Harris Administration Unveils Strategy for Global Vaccine Sharing, Announcing Allocation Plan for the First 25 Million Doses to Be Shared Globally (June 3, 2021), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2021/06/03/fact-sheet-biden-harris-administration-unveils-strategy-for-global-vaccine-sharing-announcing-allocation-plan-for-the-first-25-million-doses-to-be-shared-globally/; *see also* The White House, Statement by President Joe Biden on Global Vaccine Distribution (June 3, 2021), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2021/06/03/statement-by-president-joe-biden-on-global-vaccine-distribution/ ("We are sharing these doses not to secure favors or extract concessions.").

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

concessions in any event—by Spring 2022, government procurement memos were noting that millions of doses of the Moderna vaccine acquired by the government were "expiring on the shelf, ***especially given the lack of global demand even for donations***."[55]  Indeed, Dr. Rutherford does not identify with any specificity how this effort advanced U.S. foreign policy interests; he merely speculates about the incidental effect of the donations.  The beneficiaries of the U.S. government's charity were the recipients of those doses in foreign nations.  Any positive effect on the U.S.—let alone the U.S. government—was remote and incidental.

54.    Within the "federal doses," the next largest category after international donations are doses distributed to the Health Resources and Services Administration ("HRSA").  HRSA funds community health centers, and those health centers administered nearly 15.3 million COVID-19 vaccine doses,[56] of which the data in Figure 3 indicates up to 5.9 million came from the C-100 contract.  HRSA community health centers are not federal government entities— although they receive federal grants, most are operated by non-profits, with a small number operated by local governments, public hospitals, and universities.[57]

55.    Another approximately 6% of the "federal doses" were doses distributed to the Indian Health Service and the Department of Veterans Affairs ("VA").  These doses were used for vaccinations at VA health centers,[58] as well as for vaccinations at health centers operated by

---

[55] HHS-0000391 at -394 (Apr. 12, 2022 HHS Procurement Memo) (emphasis added).

[56] Health Res. & Servs. Admin., COVID-19 Information for Health Centers & Partners: FAQs, https://web.archive.org/web/20240301200906/https://bphc.hrsa.gov/initiatives/covid-19-information-health-centers-partners/faq.

[57] Kishore et al., *Characteristics of Public vs. Private Federally Qualified Health Centers*, 37(4) Journal of General Internal Medicine 987–989 (2021).

[58] U.S. Dep't of Veterans Affs., VA Announces Initial Plans for COVID-19 Vaccine Distribution (Dec. 1, 2020), https://news.va.gov/press-room/va-announces-initial-plans-for-covid-19-vaccine-distribution/.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

both the Indian Health Service as well as individual tribes.[59]  These doses were thus another avenue for vaccinating the American public, albeit one focusing on specific sub-populations (here, veterans and members of Native American tribes).

56.    Taken together, the international donations, HRSA, Indian Health Service, and VA doses mean that even for the "federal" C-100 doses, 93% of the recipients were the general public—and not even just the American public, but individuals around the world.[60]  For the C-100 contract overall, over 98% of the doses were for the public.[61]

57.    Dr. Rutherford notes that FDA's Emergency Use Authorization ("EUA") for Moderna's COVID-19 vaccine contained restrictions on the scope of the authorization specifying that its distribution be directed by the federal government.[62]  But that does not distinguish the COVID-19 vaccine from other prescription pharmaceuticals.  As an initial matter, all prescription medications can only be supplied as the government directs.  Federal law governs who is entitled to issue a prescription, and thus controls the supply of non-over-the-counter drugs.[63]  Moreover, similar restrictions to the EUA scope restriction Dr. Rutherford points to were included in EUAs prior to the pandemic.  For example, the scope of the authorization in

---

[59] U.S. Dep't of Health & Hum. Servs. Off. of Inspector Gen., Audit Report: NIH's Oversight of COVID-19 Research Funding, A-07-21-04125 (2021), https://oig.hhs.gov/documents/audit/9115/A-07-21-04125-Complete%20Report.pdf.

[60] The donated, HRSA, Indian Health Service, and VA doses total 89,112,740, which is 93.45% of the 95,357,080 federal doses identified by HHS.  *See* Santoli Affidavit (Nov. 18, 2024).

[61] 95,357,080 [the federal doses identified in Santoli Dep. Ex. 2] - 89,112,740 [the donated, HRSA, Indian Health Service, and VA doses] = 6,244,340.  500,001,540 [the total C-100 doses identified in MRNA-GEN-00467749] - 6,244,340  = 493,757,200.  493,757,200 / 500,001,540 = **98.75%**.  Even if the 391 million doses from the HHS spreadsheet were used as the denominator, instead of the total C-100 doses, the number still exceeds 98%:  391,048,280 - 6,244,340 = 384,803,940.  384,803,940 / 391,048,280 = **98.40%.**

[62] Rutherford Report ¶¶ 48–49.

[63] 12 C.F.R. § 1306.03 ("Persons entitled to issue prescriptions").

21

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

prior EUAs for Ebola tests were limited to "laboratories designated by" the CDC or the Department of Defense.[64]  Similarly, the EUA for an Atropine Auto-Injector, used to treat poisoning by nerve agents, was limited to use authorized by CDC, the Department of Defense, and local emergency responders authorized through the CDC.[65]

58.    In short, the distinction that Moderna tries to draw between the COVID-19 vaccine purchase, distribution, and use, and other health technologies in which the government has had involvement in an attempt to limit the sweeping implications of its argument does not hold.  As discussed below, applying Section 1498 to the purchase of the COVID-19 vaccine would thus have significant ramifications, dramatically expanding the scope of the statute.

**VI.    APPLYING SECTION 1498 TO THE PURCHASE OF DRUGS FOR AMERICANS WOULD REPRESENT A DRAMATIC EXPANSION OF THE GOVERNMENT'S LIABILITY, BENEFITING INFRINGERS AT THE COST OF TAXPAYERS.**

59.    The federal government is "the largest purchaser of prescription drugs in the United States," most significantly through programs like Medicare and Medicaid.[66]  Indeed, the federal government accounts for approximately 41%—over $150 billion per year—of all prescription drug expenditures in the United States.[67]  Moderna's novel application of Section 1498 on the theory it advances in this case would therefore dramatically expand the potential liability of the federal government for patent infringement by private parties.

---

[64] U.S. Food & Drug Admin., Emergency Use Authorization for *Ebola Zaire* (*Target 1*) Real-Time PCR (TaqMan®) (EZ1 rRT-PCR) Assay, https://www.fda.gov/media/89984/download.

[65] U.S. Food & Drug Admin., Emergency Use Authorization for Rafa Laboratories Ltd. Atropine Auto-Injector, https://www.fda.gov/media/104550/download.

[66] Cong. Budget Office, Prescription Drugs, https://www.cbo.gov/topics/health-care/prescription-drugs.

[67] Office of Inspector Gen., U.S. Dep't of Health & Human Servs., Drug Spending, https://oig.hhs.gov/reports-and-publications/featured-topics/drug-spending/.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

60.     In particular, the attempt by Drs. Rutherford and Vellturo to portray the government, rather than individual Americans, as the beneficiary of COVID-19 vaccine to support Moderna's Section 1498 defense would have enormous impacts if taken to its logical conclusion.  If Moderna's position regarding the interpretation of Section 1498 were correct, it would dramatically expand (without any additional congressional authorization) the ability of the executive branch of the federal government to authorize the infringement of private patents at the government's expense. These broader consequences illustrate the flaws in the conclusions reached by Drs. Rutherford and Vellturo.

61.     Indeed, some have advocated for the approach taken by the government to acquire COVID vaccine doses to be a model for future prescription drug acquisitions by the federal government, such as for Medicare.[68]  And certain political leaders, like Senator Elizabeth Warren, have expressly called for the federal government to use Section 1498 to engage in compulsory licensing "in the interim" before Congress "develop[s] and pass[es] drug pricing legislation.[69]

62.     The cost-benefit calculations Drs. Rutherford and Vellturo rely upon in asserting that the government "benefited" from the purchase of Moderna's COVID-19 vaccine do not serve to limit the application of this theory.  Neither Dr. Rutherford nor Dr. Vellturo explain

---

[68] *E.g.*, Socal & Anderson, *The Role of Advance Purchasing Commitments in Government Drug Price Negotiations: Lessons From the COVID-19 Response*, 111(4) American Journal of Public Health 652–657 (2021).

[69] Office of Sen. Elizabeth Warren, Warren, Klobuchar, Doggett Urge HHS to Utilize Administrative Authorities to Lower Drug Prices (August 2, 2021), https://www.warren.senate.gov/oversight/letters/warren-klobuchar-doggett-urge-hhs-to-utilize-administrative-authorities-to-lower-drug-prices; Office of Sen. Elizabeth Warren, Letter to President Joseph R. Biden (April 25, 2022), https://www.warren.senate.gov/oversight/letters/warren-urges-biden-administration-to-lower-prescription-drug-prices-using-existing-executive-authority.

23

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

when a cost-benefit analysis would be sufficient to trigger Section 1498. And there are many instances where the government's decision to fund certain treatments for the public at large could result in at least a short-term net savings to the government.

63.     For example, over the last decade, far more effective methods of treating Hepatitis C have been developed, using expensive direct acting antivirals like Sovaldi.[70] Despite the high cost for these drugs—which can run into the tens of thousands of dollars for a course of treatment—the government might save significant money if it made the treatments widely available. A CBO analysis found that over ten years, a 100% increase in these new treatments for Hepatitis C would cost $4 billion but would save $7 billion.[71]

64.     As a result, the proposed FY2025 budget for the Centers for Medicare & Medicaid Services included a program "whereby the Federal Government purchases and distributes these [Hepatitis C] drugs to eligible individuals—including, but not limited to, Medicaid enrollees who reside in States that elect to participate in the model."[72]

65.     Another example is a program to reduce government expenditures by preventing HIV/AIDS. There are proposals for a national program where the federal government would provide Pre-Exposure Prophylaxis (PrEP) medication to individuals at risk for HIV. Because PrEP medications are highly effective at preventing acquisition of HIV (which is expensive to

---

[70] Peter J. Pitts, *Why 'Pricey' Drugs Save Money – and Lives*, N.Y. Post (July 20, 2014), https://nypost.com/2014/07/20/why-pricey-drugs-save-money-and-lives/; Cong. Budget Office, Budgetary Effects of Policies that Would Increase Hepatitis C Treatment (June 2024), https://www.cbo.gov/publication/60237.

[71] Cong. Budget Office, Budgetary Effects of Policies that Would Increase Hepatitis C Treatment (June 2024), https://www.cbo.gov/publication/60237.

[72] Ctrs. for Medicare & Medicaid Servs., Estimated Impacts of the Proposed National Hepatitis C Elimination Program in Medicaid and Medicare (2022), https://www.cms.gov/files/document/estimated-impacts-proposed-national-hepatitis-c-elimination-program-medicaid-and-medicare.pdf.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

treat), researchers estimate that federal government expenditures providing PrEP would more than pay for themselves, at least in the short-run.[73]

66.    There are many other examples.[74]  While many preventive care efforts may not necessarily save the government money overall, the Congressional Budget Office has estimated that 20 percent of preventive medical services reduced costs on net, which demonstrates that Moderna's theory could apply broadly.[75]  This is particularly true because the analyses by Drs. Rutherford and Vellturo ignore the long-run costs associated with increased longevity that more rigorous studies consider[76] and instead focus only on short-term cost savings, like reduced COVID-19 hospitalizations.

---

[73] Killelea et al., , *Financing and Delivering Pre-Exposure Prophylaxis (PrEP) to End the HIV Epidemic*, 50(S1) The Journal of Law, Medicine & Ethics 8–23 (2022).

[74] For example, the CBO estimated that a provision in the Affordable Care Act to cover "tobacco cessation services for pregnant women under Medicaid would reduce federal spending for that program by $100 million" over ten years.  Cong. Budget Office, How CBO Analyzes Approaches to Improve Health Through Disease Prevention (2020), https://www.cbo.gov /publication/56413.

[75] Cong. Budget Office, How CBO Analyzes Approaches to Improve Health Through Disease Prevention (2020), https://www.cbo.gov/publication/56413.

[76] Goodell et al., *Cost savings and cost-effectiveness of clinical preventive care*, The Synthesis Project, Policy Brief No. 18 (2009).

# Exhibit 1

# Peter J. Pitts

54 Riverside Drive, Suite 5D  New York, NY  10024
(212) 729-3618 ppitts@cmpi.org

**President, Center for Medicine in the Public Interest**
**Visiting Professor, University of Paris School of Medicine**
**Honorary Professor, Sefako Makgatho University, Pretoria, South Africa**
**Former Associate Commissioner, US Food and Drug Administration**
**United States Senior Executive Service (Retired)**

- **Associate Editor, Therapeutic Innovation & Regulatory Science (official DIA journal)**
- **Editorial Advisory Board, Food and Drug Policy Forum**
- **Advisory Board, Journal of Commercial Biotechnology**
- **Editorial Advisory Board, The Patient Magazine**
- **Council for International Organizations of Medical Sciences (CIOMS) Expert Working Group to help advance patient involvement in the development and safe use of medicines**

Peter Pitts is President of the Center for Medicine in the Public Interest, a Visiting Professor at the University of Paris Medical School, an Honorary Professor at Sefako Makgatho Health Sciences University (Pretoria, South Africa), and a Research Fellow at the US-Israel Education Association. He is a former member of the United States Senior Executive Service and Associate Commissioner of the US Food & Drug Administration.

Pitts is a member of the Council for International Organizations of Medical Sciences (CIOMS) Expert Working Group to help advance patient involvement in the development and safe use of medicines. (CIOMS is an international, non-governmental, non-profit organization established jointly by WHO and UNESCO in 1949.)

He is the author of many peer-reviewed articles appearing in publications including the Lancet, Health Affairs, Journal of the American Medical Association, NEJM Catalyst, Vaccines, Nature Biotechnology, Therapeutic Innovation and Regulatory, and the Journal of Commercial Biotechnology. He is an Associate Editor of Therapeutic Innovation & Regulatory Science (the official DIA journal), a member of the Editorial Advisory Board Journal of Commercial Biotechnology and The Patient Magazine. Pitts lives in New York City.

His comments and commentaries on health care policy issues regularly appear in The New York Times, The Los Angeles Times, The Washington Post, The Wall Street Journal, The Financial Times, Health Affairs, Time, Newsweek, The Boston Globe, The Washington Times, The Chicago Tribune, The San Francisco Examiner, Investor's Business Daily, The Baltimore Sun, The Economist, The Lancet, Nature Biotechnology, BioCentury, The Journal of Commercial Biotechnology, the BBC World Service, Fox News, CNBC, Bloomberg, The PBS NewsHour, NBC Dateline, Sky News, La Stampa. L'Opinion, The Daily Show with John Stewart, among others.

He has given healthcare policy presentations throughout Europe, Canada, and the United States, as well as in Russia, China, Hong Kong, Taiwan, India, the Philippines, Malaysia, Saudi

Arabia, Lebanon, Oman, Israel, Turkey, The United Arab Emirates, Kuwait, Qatar, Jordan, Kenya, South Africa, Egypt, Algeria, Ukraine, Thailand, Japan, Brazil, Mexico, Vietnam, Indonesia, Singapore, Panama, Costa Rica, Argentina, and Colombia.

His new book, "And Nothing but the Truth" focuses on the need to stand firm on the urgency of sound science. He is also the author of The Next Normal, an examination of post-pandemic healthcare policy, The Value Equation: A. Journey Through the Innovation Ecosystem in the Time of COVID, Common-Sense Healthcare for Common Sense Americans, and Become Strategic or Die, widely recognized as a cutting- edge study of how leadership, in order to be successful over the long term, must be combined with strategic vision and ethical practice. He is the editor of Coincidence or Crisis, a discussion of global prescription medicine counterfeiting and Physician Disempowerment: A Transatlantic Malaise.

A graduate of McGill University, he is married to Jane Mogel and has two sons.

**June 2004 – Present**

**_Center for Medicine in the Public Interest_ President/Director**

Founded the well-respected Center for Medicine in the Public Interest ([www.cmpi.org](http://www.cmpi.org)), a non-profit profit, science-based organization promoting ideas, research and partnership producing innovations in health care technology, communication, regulations and consumer choice that make medicine more preventive, predictive and personalized.

**March 2009 – July 2011**

**_Porter Novelli_ Partner/Director Global Regulatory and Health Policy**

Global lead for senior level consulting on food/pharmaceutical/device/diagnostics regulatory issues and health policy development/health reform initiatives on the US,EU, MENA levels. Lead for Omnicom's global "healthcare marketing reform" initiative.

**July 2004 – March 2009**

**_Manning, Selvage & Lee_ Senior Vice President, Director of Global Health Affairs**

Serves as MS&L's lead advisor and counselor on global health care and related public policy issues.  Manages global policy practice (based in Washington, DC with hub offices in New York, London, Brussels, and Shanghai.

**March 2002 – June 2004**

**_Food & Drug Administration_ Presidential Appointment, Associate Commissioner for External Relations, USFDA**

Senior policy adviser to the Commissioner. Supervised FDA's Office of Public Affairs, Office of the Ombudsman, Office of Special Health Issues, Office of Executive Secretariat, and Advisory Committee Oversight and Management.  Served on the agency's obesity working group and counterfeit drug taskforce. Member, United States Senior Executive Service.

**July 1996 – February 2002**

*WIRED WORLD COMMUNICATIONS* **Managing Partner**

Wired World provides *strategic public awareness* for clients who are aggressively committed to an ambitious rise in profitability, visibility, and influence.  Clients include Roche Diagnostics, Columbia Health Care System, Cardinal Health System, Novation, Golden Rule Insurance, Dynegy, CertainTeed, The Indiana Secretary of State, The United Way, Eaton Corporation, Mission Foods, The Indiana Pacers,

**April 1994 - June 1996**

*HUDSON INSTITUTE*  **Vice President**

*Duties:*  Manage all global policy initiatives, government relations, public affairs, marketing/fundraising, publication and promotional activities for one of the nation's foremost public policy institutes.  Develop and execute plans to maximize awareness of institute activities to government, media (traditional and internet-based), foundation community and private sector.  Work with President and Trustees on development of policy initiatives and strategic planning.  Headed project team for Health Care 2020 program.

**January 1991 - April 1994**

*THE WASHINGTON TIMES*  **Director of Marketing**

*Duties:*  Direct all advertising sales support, research, circulation promotion/marketing and public affairs activities. Develop and execute television, radio, print and outdoor advertising strategy for both *The Washington Times* and *Insight Magazine*.  Work with senior business and editorial management to develop strategies for short and long term growth, acquisitions and product development.

**July 1989 - October 1990**

*THE NEW YORK POST*  **Director of Marketing & Promotion**

*Duties:*  Direct all marketing and sales service operations (promotions, research, merchandising, print and video presentations).  Supervise consumer and trade advertising developed through outside advertising agencies.  Speech writing for President and Publisher. Develop and implement marketing strategies to increase paid circulation and advertising revenue.

**May 1988 - July 1989**

*McCALL'S MAGAZINE*  **Director of Creative Services**

*Duties:*  Direct all marketing activities for *McCall's* advertising division.  Responsible for developing special sections, direct marketing and value added programs and "Big Ideas."

**August 1984 - May 1988**

*READER'S DIGEST*  **Associate Creative Director**

*Duties:*  Develop and supervise the creation of advertising projects for domestic and international editions of *Reader's Digest* for major clients such as Seagram's Kodak, Bayer, Proctor & Gamble, and Prudential.  **Responsible for the creation and sales of over a dozen million-dollar ideas.**   Create category newsletters, direct mail programs, video presentations, brochures and sales materials.  Supervise staff of 5.

**May 1982 - June 1984**

*CABLE HEALTH NETWORK/LIFETIME*  **Promotion Manager**

*Duties*:  Create sales, affiliate and corporate advertising/promotion materials.  Develop media strategies for consumer and trade campaigns.  Publicity writing.

**June 1981 - April 1982**

*LOIS, PITTS, GERSHON ADVERTISING*  **Account Executive**

*Duties:*  Client services for the Dreyfus Corporation, MTV, Beefsteak Charlie's restaurants. New product development for Clairol test products.

**Education**

McGill University, Montreal, Canada.  BA, Political Science/French Literature.


**Selected Publications**

**Addressing vaccine misinformation: The critical need for complete product information disclosure, Vaccines, January 2025**

**Battling Healthcare Misinformation Through Personal Agency, Update Magazine, Fall 2024**

**Outcomes or Experiences — What Do Patients Value More When Evaluating Medical Teams?, NEJM Catalyst, June 2024**

**Advancing 21st Century Regulatory Science via AI and HI, Update Magazine, Summer 2024**

**Addressing Vaccine Hesitancy: Learning from the Successes and Failures of the COVID-19 Pandemic, Vaccines, April 2024**

**Misleading cost-based pricing (commentary), Journal of the American Medical Association (Diabetes and Endocrinology), April 8, 2024**

**Bashing accelerated approval isn't supported by the data, STAT News, April 23, 2024**

Female Problems: Women's Health Mustn't be Ghettoized in the Uterus, Pharmaceutical Medicine, February 2024

Measuring Value of Telemonitoring in Obstructive Sleep Apnea Patient Pathway Optimization in Hospital: A Spanish Example, European Respiratory Journal, October 2023

Regulatory Innovation: Where You Stand Depends on Where You Sit, Update Magazine, Winter 2023

Reality-Based Healthcare Reform, Update Magazine, Fall 2023

Trust and Science: Public Health's Home Field Advantage in Addressing Vaccine Hesitancy and Improving Immunization Rates, Vaccines,  August 2023

The Pogo-ization of Post-Pandemic Vaccine Policy, The Patient, April 2023

Establishing an FDA office in the Middle East/North Africa: An Abraham Accords Initiative, Update Magazine, Spring 2023

What is the Value of the Interchangeability Designation for a Biosimilar?, American Journal of Managed Care, November 2022

Regulating Between the Notes: The US FDA and the Evolution of the Patient Voice Through Twenty-First Century Regulatory Science, The Patient, September 2022

340B and the Warped Rhetoric of Healthcare Compassion, Update Magazine, Fall 2022

Patient involvement in the development, regulation and safe use of medicines, CIOMS Working Group XI, September 2022

Twenty-First Century Global ADR Management: A Need for Clarification, Redesign, and Coordinated Action, Therapeutic Innovation and Regulatory Science, August 2022

Analysis of Drug Formulary Exclusions from the Patient's Perspective, Health Science Journal, May 2022

Rejuvenating American Healthcare, Journal of Commercial Biotechnology, May 2022

A Part D Pay-It-Forward Proposal, Update Magazine, Spring 2022

Should We Rethink the FDA Commissionership?, Health Affairs, December 2021

Vaccine Hesitancy: When Political Miscommunication Replaces Scientific Benefit/Risk Assessment, Journal of Commercial Biotechnology, December 2021

Value over Volume: Maximizing Resources by Prioritizing Value: The Dubai Healthcare Experience, Journal of Commercial Biotechnology, December 2021

FDA Needs a Competitiveness Czar, Health Affairs, October 2021

Biosimilar Strength vs. Potency: Avoiding a Regulatory Hobson's Choice, Outlook Magazine (Food and Drug Law Institute) Fall 2021

Waiving COVID-19 Vaccine Patents: A Bad Idea and a Dangerous Precedent, Journal of Commercial Biotechnology, September 2021

Health Literacy: The Common Denominator of Healthcare Progress, The Patient, July 2021

Remdesivir And Federal March-In Rights, Health Affairs, April 2021

Too Fast Or Too Slow: Is The FDA Moving At The Right Speed?, Health Affairs, March 2021

The Question of Mitigating Patient Mortality: Comparing Gilead's ACTT-1 and the WHO's Solidarity Trials, Outlook Magazine (Food and Drug Law Institute), December 2020

The Healthcare Pilgrim's Progress, Journal of Commercial Biotechnology, December 2020

Patient Contribution to the Development and Safe Use of Medicines During the COVID-19 Pandemic, Therapeutic Innovation & Regulatory Science, Winter 2020

The Spreading Cancer of Counterfeit Drugs, Journal of Commercial Biotechnology, October 2020

Impact of Real-World Data on Market Authorization, Reimbursement & Price Negotiation, Therapeutic Innovation & Regulatory Science, August 2020

The Case for Methodological Pluralism in Medical Science, American Journal of Bioethics September 2020

Regulatory Centaurs, Nature Biotechnology, July 2020

Our Most Powerful Weapon to Fight COVID-19: Patient Involvement, The Patient, April 2020

Can We Talk? Rethinking FDA Communications with Drug Developers, Health Affairs, December 2019

Towards Meaningful Engagement for the Patient Voice, The Patient, June 2019

The need for distinct nomenclature for originator and biosimilar products, Generics and Biosimilar Initiative Journal (GaBi), January 2019

21st-Century Oncology Drug Safety via New-Age Regulatory Standards and Practices, Therapeutic innovation & Regulatory Science, November 2018

Medicines Regulation in the Middle East and the importance of the World Health Organization's INN Proposal of the Biological Qualifier, Generics and Biosimilar Initiative Journal (GaBi), November 2018

Biosimilars Report Card: Is The FDA On Track To Get An A?, Health Affairs, September 2018

Safe Harbor Sunshine And Flat Fees: Vital Steps Towards Smarter Drug Spending, Health Affairs, August 2018

From the Valley of Death to the Crossroads of Opportunity: A Discussion of Evolving Benefit/Risk Evaluation Standards, Therapeutic innovation & Regulatory Science, May 2018

Advancing Drug Safety Through Prospective Pharmacovigilance, Therapeutic Innovation & Regulatory Science, April 2018

Can there be value-based medicine without … values?, Journal of Commercial Biotechnology, January 2018

Commissioner Scott Gottlieb's Predictable Imaginarium, Therapeutic Innovation & Regulatory Science, November, 2017

Advancing Pharmaceuticals and Patient Safety in Saudi Arabia: A 2030 Vision Initiative, Saudi Pharmaceutical Journal, October 2017

Implications of CRISPR-Based Germline Engineering for Cancer Survivors, *Therapeutic Innovation and Regulatory Science*, *September 2017*

21st Century Pharmacovigilance: Intuition, Science, and the Role of Artificial Intelligence, *Journal of Commercial Biotechnology*, *January 2017*

Using Off-Label Communications to Responsibly Advance the Public Health, *Therapeutic Innovation and Regulatory Science*, *January 2017*

21st Century Pharmacovigilance: Efforts, Roles, and Responsibilities, *The Lancet Oncology*, *November 2016*

FDA and Abuse Deterrent Opioids: Don't Fix the Blame, Fix the Problem, *Journal of Opioid Management*, *September/October 2016*

The Patient Voice: At the Intersection of a US Regulatory Revolution, *The Patient*, *August 2016*

Of Pens, Pizzas, and Pharmaceuticals, *Journal of Commercial Biotechnology*, *August 2016*

Undermining Patient Values: The ASCO Value in Cancer Care Task Force Framework, *Journal of Commercial Biotechnology*, *December 2015*

Price vs. Value: The Story and the Rest of the Story, *Food and Drug Policy Forum (FDLI)*, *Volume 5, Issue 10, November 2015*

Towards a More Intramural Approach to Biomarker Development, *Therapeutic Innovation & Regulatory Science*, October 2015

A Qualitative Exploration of the Major Challenges Facing Pharmacovigilance in Saudi Arabia, *Saudi Medical Journal*, 2015, Vol. 36 (9)

FDA's Quality Revolution, *Therapeutic Innovation & Regulatory Science, July 2015*

Is Off-Label on the Table?, *Journal of Commercial Biotechnology, July 2015*

The Globetrotting Regulator, *Therapeutic Innovation & Regulatory Science*, May 2015

Labeling, Lawyers, & Logic, *Journal of Commercial Biotechnology*, April 2015

Peggy Hamburg: FDA's 21st Century Commissioner, *Therapeutic Innovation & Regulatory Science*, February 2015

Access to Innovation, *Journal of Commercial Biotechnology*, January 2015

openFDA: An Open Question, *Therapeutic Innovation & Regulatory Science*, January 2015

Are All Men Created Equivalent?, *Therapeutic Innovation & Regulatory Science*, December 2014

My Regulatory Grand Tour, *Therapeutic Innovation & Regulatory Science*, November 2014

The Jordan Food & Drug Administration: A Culture of Quality and Continuous Improvement, *Journal of Commercial Biotechnology*, October 2014

Biosimilar Nomenclature: Can We Achieve the Truth, the Whole Truth, & Nothing but the Truth?, *Food and Drug Law Institute Policy Forum*, August 2014

Expanded Access and States Rights, *BioCentury*, July 14, 2014

Who Lost Opioids?, *Journal of Commercial Biotechnology*, July 2014

A Social Media Manifesto, *Journal of Commercial Biotechnology*, January 2014

Measuring Responsibility, *Therapeutic Innovation & Regulatory Science*, May 2013

Should the HHS Decision to Overrule FDA on Plan B Be Reversed?, *Food and Drug Law Institute Policy Forum*, April 2013

The Other Side of Innovation, *Journal of Commercial Biotechnology*, January 2013

In Praise of a BRAT, *Drug Information Journal*, November *2012*

The Tao of Biosimilars, *Drug Information Journal*, July 2012

Government Detailing, *Drug Information Journal*, May 2012

PEEKABOO—ETASU!, *Drug Information Journal, March 2012*

Fewer Drugs, Shorter Lives, Less Prosperity: The Impact of Comparative Effectiveness Research on Health and Wealth, *Drug Information Journal*, November 2011

The Danger of Shorting Drug Shortages, *Drug Information Journal*, November 2011

Expediting Patient Access to New Medicines: A Call to Action, *Drug Information Journal*, July 2011

Innovation Nation, *Drug Information Journal*, May 2011

Why Data Exclusivity is the New Patent Protection, *Journal of Commercial Biotechnology*, September 2009

A New Model for Communications Risk Information in Direct-to-Consumer Print Advertisements, *Drug Information Journal*, January 2007

Settling for Second Best, Nature Biotechnology, July 2007

FDA Decision Making, Health Affairs, May/June 2004

Turning Point or Tipping Point:  The FDA Draft Guidances and the Future of DTC Advertising, *Health Affairs*, April 2004

*Selected National Media Articles*

- Seizing Intellectual Property for Medicines Is Not a Path to Prosperity, American Enterprise Institute Ideas, February 5, 2025
- Rebuilding trust in FDA through labeling clarity and transparency, BioCentury, February 3, 2025
- The biggest challenge facing the FDA's new Rare Disease Innovation Hub, STAT, October 17, 2024
- RFK, Jr. and Big Pharma, Wall Street Journal, September 16, 2024
- Democrats Can't Say They Weren't Warned About Drug Price Controls, Wall Street Journal, August 20, 2024
- The Supreme Court's 'Hubris' to Do Its Own Job, Wall Street Journal, July 5, 2024
- Bashing accelerated approval isn't supported by the data, STAT News, April 23, 2024
- The elliptical billiard balls of FDA policy, Bio Century, February 5, 2024
- Science and Sanity. New York Times, July 20, 2023
- The Aduhelm Operetta, STAT News, January 1, 2023
- Decelerating the hyperbole over accelerated approval, BioCentury, September 13, 2022
- Political rhetoric doesn't lower drug costs, Wall Street Journal, August 3, 2022
- Beyond baby formula: advancing best practices in FDA's efforts to prevent shortages, STAT News, June 2, 2022
- The Baby Formula Shortage: What Can Be Done? New York Times, May 18, 2022
- The Second Covid Booster and the FDA's 'Emergency' -- What level of vaccination provides adequate protection? Wall Street Journal, April 6, 2022

- Creating a promising pathway for faster access to new drugs, STAT News, February 14, 2022
- Medicare Presses Pause on Alzheimer's Drug, Wall Street Journal, January 28, 2022
- Should We Suspend Patents on Covid Vaccines? New York Times, May 7, 2021
- FDA is Smashing the Status Quo for Regulatory Science, STAT News, October 14, 2019, 2022
- The White House's about-face on drug rebates is a loss for public health, STAT News, July 11, 2019
- Are Generic Drugs Safe? The New York Times, May 22, 2019
- It's time to get serious about the economics of expanded access, STAT News, January 30, 2019
- Drug Rebates Help Many, but Not Patients, Wall Street Journal, September 24, 2018
- Trumps FDA Pick is Speeding Up New Drug Approvals, Newsweek, February 2, 2018
- A Flawed Study Depicts Drug Companies as Profiteers, Wall Street Journal, October 10, 2017
- Blaming the Wrong Parties For the Opioid Epidemic, Wall Street Journal, August 4, 2017
- How Other Countries Freeload on U.S. Drug Research, Wall Street Journal, February 22, 2017
- Keep the feds out of drug pricing, USA Today, December 16, 2016
- There Is a Sure Cure, but It's Not Covered by Your Health Insurance Plan, Newsweek, September 17, 2016
- Obamacare's slippery slope to single-payer system, CNBC editorial, December 3, 2015
- Patent Death Squads vs. Innovation, The Wall Street Journal, June 10, 2015
- Stopping Painkiller Overdoses, *The New York Times*, April 15, 2014
- What to do about Drug Shortages, *The New York Times*, February 17, 2014
- Equitable Healthcare, *The New York Times*, March 21, 2012
- Warning Labels on Drugs, *The New York Times*, June 10, 2011
- Doctors' Prescription Records, *The New York Times, May 3, 2011*
- Lowering Drug Prices, *The New York Times*, April 29, 2009
- Cost of Living – Who Gets New Drugs?, *The New York Times*, December 3, 2008
- Health Care and Reality, *The New York Times*, August 14, 2008
- Let the Doctors Decide, *The Washington Post*, December 15, 2007
- Medicare's Doughnut Hole, *The New York Times*, November 30, 2007
- Testing New Drugs, *The New York Times*, October 25, 2007
- A Test of Bad Health, *The New York Times*, October 18, 2007
- Settling for Second Best, *Nature Biotechnology*, July 2007
- Price Controls on Medicare Drugs, *The Los Angeles Times*, April 15, 2007
- Even Safety Needs Limits, *Barron's*, February 17, 2007
- Power to the Patients, *The Wall Street Journal (Europe)*, April 12, 2006
- Gauging the Strength Of F.D.A. Regulation, *The New York Times*, July 6, 2003

Depostions and Testimony

**May 2021**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**In re: RANBAXY GENERIC DRUG**
**APPLICATION ANTITRUST LITIGATION**
**MDL No. 2878**
**Master File No.**
**19-md-02878-NMG**

# Exhibit 2

## <u>Materials Considered</u>

**Production Documents**

- MRNA-GEN-00079284

- MRNA-GEN-00467749

- MRNA-GEN-01122003

- MRNA-GEN-01217762

- HHS-0000418 (Santoli Dep. Ex. 2)

- HHS-0000388

- HHS-0000391

**Public Documents**

- Tax Policy Center, How Much Does the Federal Government Spend on Health Care?, https://taxpolicycenter.org/briefing-book/how-much-does-federal-government-spend-health-care

- Cong. Budget Office, Prescription Drugs, https://www.cbo.gov/topics/health-care/prescription-drugs

- U.S. Dep't of Health & Hum. Servs., Off. of the Assistant Sec'y for Plan. & Evaluation, Medicaid: Health & Economic Benefits (Jan. 2022), https://aspe.hhs.gov/sites/default/files/documents/effbde36dd9852a49d10e66e4a4ee333/medicaid-health-economic-benefits.pdf

- Yeung et al., *Effect of new Medicare enrollment on health, healthcare utilization, and cost: A scoping review*, 69 J. Am. Geriatr. Soc. 2335–2343 (2021)

- Moderna, Moderna Announces Supply Agreement with U.S. Government for Initial 100 Million Doses of mRNA Vaccine Against COVID-19 (mRNA-1273) (Aug. 11, 2020), https://investors.modernatx.com/news/news-details/2020/Moderna-Announces-Supply-Agreement-with-U.S.-Government-for-Initial-100-Million-Doses-of-mRNA-Vaccine-Against-COVID-19-mRNA-1273/default.aspx

- Cleveland Clinic, Herd Immunity, https://my.clevelandclinic.org/health/articles/22599-herd-immunity

- Laura A. Wreschnig, Cong. Research Serv., Report Title (Report No. R40611, 2023), https://crsreports.congress.gov/product/pdf/R/R40611

- Ctrs. for Disease Control & Prevention, Role of ACIP in U.S. Vaccine Recommendations, CDC, https://www.cdc.gov/acip/about/role-in-vaccine-recommendations.html

- Roth et al., *Concurrent outbreaks of dengue, chikungunya and Zika virus infections – an unprecedented epidemic wave of mosquito-borne viruses in the Pacific 2012–2014*, 19(41) Euro Surveill. (2014).

- County of San Diego, San Diego Hepatitis A Outbreak (2017-18) After Action Report (2018), https://www.sandiegocounty.gov/content/dam/sdc/cosd/SanDiegoHepatitisAOutbreak-2017-18-AfterActionReport.pdf

- Cangul et al., *Beating Back Ebola*, IMF Finance & Development (June 2017), https://www.imf.org/external/pubs/ft/fandd/2017/06/cangul.htm

- Public Health Agency of Canada, Chapter 11: Viruses Without Borders—International Aspects of SARS, in Learning from SARS: Renewal of Public Health in Canada, at 199, https://www.canada.ca/en/public-health/services/reports-publications/learning-sars-renewal-public-health-canada/chapter-11-viruses-without-borders-international-aspects-sars.html

- Richard Nixon Foundation, *Public Enemy Number One: A Pragmatic Approach to America's Drug Problem* (June 29, 2016), https://www.nixonfoundation.org/2016/06/26404

- House Budget Comm., *60-Year Anniversary of the War on Poverty - Are We Winning or Losing?* (Jan. 24, 2024), https://budget.house.gov/press-release/60-year-anniversary-of-the-war-on-poverty_-are-we-winning-or-losing

- Surh Y. J., *The 50-Year War on Cancer Revisited: Should We Continue to Fight the Enemy Within?*, 26(4) Journal of cancer Prevention 219–223 (2021)

- National Cancer Institute, Cancer Moonshot Initiative, https://www.cancer.gov/research/key-initiatives/moonshot-cancer-initiative

- Office of AIDS Research, NIH HIV Research Program: OAR's Role, https://oar.nih.gov/nih-hiv-research-program/oar-role

- Li et al., *Needs, Challenges and Countermeasures of SARS-CoV-2 Surveillance in Cold-Chain Foods and Packaging to Prevent Possible COVID-19 Resurgence: A Perspective from Advanced Detections*, 15(1) *Viruses* 120 (2023)

- U.S. Dep't of Health & Hum. Servs., Mpox (Monkeypox), https://www.hhs.gov/programs/public-health-safety/mpox/index.html

- U.S. Dep't of Def. & U.S. Dep't of Homeland Sec., Memorandum of Agreement on Disaster Medical System (Oct. 24, 2005), https://www.jcs.mil/Portals/36/Documents/Doctrine/Interorganizational_Documents/dhs_moa_diaster_med_system2005.pdf

- KFF, The National Disaster Medical System (NDMS) and the COVID-19 Pandemic (Mar. 1, 2021), https://www.kff.org/coronavirus-covid-19/issue-brief/the-national-disaster-medical-system-ndms-and-the-covid-19-pandemic/

- Ctrs. for Disease Control & Prevention, Celebrating 30 Years of Vaccines for Children (VFC), https://www.cdc.gov/museum/online/vfc.html

- Ctrs. for Disease Control & Prevention Advisory Committee on Immunization Practices, COVID-19 Moderna Vaccine, https://www.cdc.gov/acip/grade/covid-19-moderna-vaccine.html

- U.S. Gov't Accountability Off., COVID-19: Opportunities to Improve Federal Response and Recovery Efforts, GAO-22-105457 (2021), https://www.gao.gov/assets/d22104457.pdf

- The White House, Fact Sheet: Biden-Harris Administration Unveils Strategy for Global Vaccine Sharing, Announcing Allocation Plan for the First 25 Million Doses to Be Shared Globally (June 3, 2021), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2021/06/03/fact-sheet-biden-harris-administration-unveils-strategy-for-global-vaccine-sharing-announcing-allocation-plan-for-the-first-25-million-doses-to-be-shared-globally/

- The White House, Statement by President Joe Biden on Global Vaccine Distribution (June 3, 2021), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2021/06/03/statement-by-president-joe-biden-on-global-vaccine-distribution/

- Kishore et al., *Characteristics of Public vs. Private Federally Qualified Health Centers*, 37(4) Journal of General Internal Medicine 987–989 (2021)

- U.S. Dep't of Veterans Affs., VA Announces Initial Plans for COVID-19 Vaccine Distribution (Dec. 1, 2020), https://news.va.gov/press-room/va-announces-initial-plans-for-covid-19-vaccine-distribution/

- U.S. Dep't of Health & Hum. Servs. Off. of Inspector Gen., Audit Report: NIH's Oversight of COVID-19 Research Funding, A-07-21-04125 (2021), https://oig.hhs.gov/documents/audit/9115/A-07-21-04125-Complete%20Report.pdf

- U.S. Food & Drug Admin., Emergency Use Authorization of Medical Products and Related Authorities, https://www.fda.gov/media/89984/download

- U.S. Food & Drug Admin., Emergency Use Authorization for Vaccines to Prevent COVID-19, https://www.fda.gov/media/104550/download

- Socal & Anderson, *The Role of Advance Purchasing Commitments in Government Drug Price Negotiations: Lessons From the COVID-19 Response*, 111(4) American Journal of Public Health 652–657 (2021)

- Office of Sen. Elizabeth Warren, Warrant, Klobuchar, Doggett Urge HHS to Utilize Administrative Authorities to Lower Drug Prices, (August 2, 2021), https://www.warren.senate.gov/oversight/letters/warren-klobuchar-doggett-urge-hhs-to-utilize-administrative-authorities-to-lower-drug-prices

- Office of Sen. Elizabeth Warren, Letter to President Joseph R. Biden (April 25, 2022), https://www.warren.senate.gov/oversight/letters/warren-urges-biden-administration-to-lower-prescription-drug-prices-using-existing-executive-authority

3

- Peter J. Pitts, *Why 'Pricey' Drugs Save Money – and Lives*, N.Y. Post (July 20, 2014), https://nypost.com/2014/07/20/why-pricey-drugs-save-money-and-lives/

- Cong. Budget Office, Budgetary Effects of Policies that Would Increase Hepatitis C Treatment (June 2024), https://www.cbo.gov/publication/60237

- Ctrs. for Medicare & Medicaid Servs., Estimated Impacts of the Proposed National Hepatitis C Elimination Program in Medicaid and Medicare (2022), https://www.cms.gov/files/document/estimated-impacts-proposed-national-hepatitis-c-elimination-program-medicaid-and-medicare.pdf

- Killelea et al., , *Financing and Delivering Pre-Exposure Prophylaxis (PrEP) to End the HIV Epidemic*, 50(S1) The Journal of Law, Medicine & Ethics 8–23 (2022).

- Cong. Budget Office, How CBO Analyzes Approaches to Improve Health Through Disease Prevention (2020), https://www.cbo.gov/publication/56413

- Goodell et al., *Cost savings and cost-effectiveness of clinical preventive care*, The Synthesis Project, Policy Brief No. 18 (2009)

**Deposition Transcripts**

- Robert Johnson 9/10/2024 Deposition Transcript

- Hamilton Bennett 5/20/2024 Deposition Transcript

- Jeanne Santoli 8/27/2024 Deposition Transcript

**Litigation Documents**

- Expert Report of Dr. George W. Rutherford

- Expert Report of Christopher A. Vellturo, Ph.D.

- Jeanne Santoli Affidavit (Nov. 18, 2024)

**Statutes and Regulations**

- 28 U.S.C. § 1498

- 12 C.F.R. § 1306.03

- 29 C.F.R. § 2590.715-2713