# EXHIBIT T

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

------------------------------ x

ARBUTUS BIOPHARMA CORPORATION   :

and GENEVANT SCIENCES GmbH,     :

Plaintiffs          :

vs                  : Civil Action No.

MODERNA, INC. and               : 22-252-MSG

MODERNATX, INC.,                :

Defendants          :

------------------------------ x

HIGHLY CONFIDENTIAL

Videotaped deposition of

MICHAEL MITCHELL, Ph.D.

WASHINGTON, DC

WEDNESDAY, APRIL 30, 2025

9:12 a.m. EASTERN TIME

Job No.: 578205

Pages: 1 - 268

Reported by: Lisa V. Feissner, RDR, CRR, CLR

Q    Can you agree to listen to my questions carefully today, Dr. Mitchell?                                    09:34:45 09:34:47

A    I will listen to your questions carefully, yes.                                                           09:34:49 09:34:51

Q    Thank you.                                                                                                09:34:52

How much time did you spend preparing your opening report?                                                    09:34:59 09:35:00

A    Can you repeat the question?                                                                              09:36:04

Q    How much time did you spend preparing your opening report?                                                09:36:07 09:36:09

A    Can you be more specific as to the time frame?                                                            09:36:15 09:36:17

Q    Prior to signing your report, how much time did you spend preparing it?                                   09:36:19 09:36:21

A    Can you be more specific as to what you mean by "prepare"?                                                09:36:44 09:36:46

Q    Did you prepare your opening report?                                                                      09:36:48

A    Can you be more specific as to what you mean?  Are you talking about typing, reading documents?            09:36:52 09:36:54 09:36:58

Q    All of the above.                                                                                         09:36:58

MR. McLENNAN:  Could the reporter please mark the time on the transcript.                                      09:37:31 09:37:33

Q    For the record, you're flipping through your report.                                                     09:37:36 09:37:39

A    Can you repeat the question?

Q    I asked you how much time you spent preparing your opening report.  You asked me to clarify if you were talking about typing or reading documents.  And I said, all of the above.

A    I would say I've spent a substantial amount of time preparing this report.  It's hard to, off the top of my head, say a specific number of hours.

But I would say a substantial amount of time, at least a week's worth of effort preparing this report, at least.

Q    But no further specificity beyond a week, right?

MR. BERL:  Objection, misstates testimony.

A    So I will say, I spent a substantial amount of time on this report.  I've spent in total a week's worth of time or more preparing this report.

Q    So for your opening report, Exhibit 1, you have spent a week's worth of time or more preparing the report, right?

A    Can you point me to the exhibit you just mentioned?

Q   You're looking at it.

A   Yeah, I would say I spent a substantial amount of time preparing this report.  So by "a week," I mean at least 40 hours or more preparing this report.

Q   Okay.  How much time have you billed to Genevant for time spent working on this case to date?

And for the record, you're flipping through your report again, Exhibit 1.

A   So when you say "billed to Genevant," can you be more specific?

Q   You are being paid for your time, right?  We've already established that.

A   Yes.

Q   In dollars, approximately how much have you already submitted bills for or received funds for from Genevant for your time spent working on this case?

A   So as I mentioned, I spent substantial amount of time writing this report, at least 40 hours.  It's hard to put a specific number on how much, but I would say at least 40 hours at a rate of $1,000 per hour.

Q   Okay.  Sorry.  Let me clarify.  Now I'm

not just talking about your opening report.  I'm talking about all time since you were retained up until today.

Do you have an approximation of how much in dollars you have billed for your time on this case?

A    Again, you were asking me about the time I spent on the opening report.

Q    Sorry, Dr. Mitchell.  Just to clarify, I'm not limiting my answer [sic] to the opening report.  So I'm asking everything from when you were retained and you started your engagement up until today, so for all of your work.

A    So I would say, again, it's at least $40,000 in total, 40 hours at a thousand dollars per hour.  Do I remember the exact number above that?  I don't.  But I can tell you at least $40,000.

Q    And you understand this is talking about all your time, including preparing for the deposition, your other two reports?

A    Yes.

Q    You understand that, right?

A    Yes, I understand.  So it's above that number, I said.  I can give you definitively I

Q    I've asked you three or four times now.

There's no minimum number you can offer me, right, minimum number of particles per dose?

MR. BERL:  Objection, asked and answered.

A    I've said it many, many times.  I give you my view, as a scientist, for how we would measure direct infringement and how we would measure fractions of those particles.

Q    You agree with me that you have not identified an experimental method that could isolate a single LNP and measure its lipid content, correct?

What section of the report are you in, Dr. Mitchell?

A    We are in plaintiffs fractionation testing data demonstrates infringement.  This is Exhibit 3, reply report, and I'm looking at paragraph 433.

And can you repeat the question one more time.

Q    You have not identified an experimental method that could isolate and measure the lipid content of a single LNP, correct?

A    I'll mention again, with Coriolis and

Schuster, the methods that they used are thorough. They cover all the essential parameters, linearity, specificity, accuracy, precision. These are standard methods in the field. They are experts at these methods.

This is how, when you have non-fractionated samples and you fraction them and how you determine the lipid molar ratios, everything they do is standard in the field.

Moderna does this as well. This is how you determine infringing particles.

And in fact, there's many examples here in everything I have in front of me that these ultracentrifugation results by Schuster indicate direct infringement with the fractions.

Q   What in your previous answer described an experimental method that could isolate a single LNP?

A   Again, how we do this in the field is we're looking at fractions of particles. This is something that everyone does. This is what Moderna does as well.

Q   Fractions are not single LNPs, right?

A   Fractions are not single LNPs. These are several LNPs. And some of these LNPs, I will

mention again and again and again, are at the

mean, and Prud'homme doesn't deny that.

Q    Okay.  I'm here to get your testimony,

not Dr. Prud'homme's.

So do you have an experimental method

that you can identify that can isolate a single

LNP, yes or no?

MR. BERL:  Objection to commentary

before the question.

A    Again, we've spent much time talking

about the standards in the field for looking at

heterogeneity in a sample.  You basically have

these methods where you can take non-fractionated

samples, and through ultracentrifugation, you

could determine if they infringe.  And there are

particles at the mean, we are measuring the mean,

and that indicates infringement.

Q    You keep on referring to infringement.

I'm just asking you, do you have an experimental

method that could isolate a single LNP.  I did not

mention infringement.

Do you understand my question?

A    Repeat the question one more time.

Q    You have not identified an experimental

method that could isolate a single LNP, correct?

MR. BERL: Objection, vague.

A    Yeah, I'm not sure what you mean by the question. Could you be a little bit more specific?

Q    Okay. I will just move on.

So talking in general about Coriolis's testing in this case, aside from Dr. Schuster, do you know the names of anyone in particular who conducted the testing that's reported in his report, which is Exhibit 13?

A    Okay. So we're still on Coriolis.

Q    I'll represent to you there's no names in the report of anyone else other than Dr. Schuster.

A    I can see here from paragraph 1 that, I, Georg Schuster, Ph.D. of Coriolis Pharma, submit the following report regarding various analytical measurements performed on samples of Spikevax produced in this case by defendants Moderna.

Q    Okay. You don't know how many Coriolis employees conducted the tests, though, correct?

Let me ask it another way, Dr. Mitchell.

Aside from looking through Dr. Schuster's report, sitting here today, can you recall the names of anyone else at Coriolis who

conducted testing on Moderna's COVID-19 vaccine in this case?

A    Can you point me to the portion of the report where we discuss it?

Q    This is why it's just circular again, Dr. Mitchell, because it's not in there.

So I'm saying, aside from what's in the report -- I have the printed report here.  Aside from the printed report, can you recall the names of anyone else at Coriolis who conducted the testing?

A    To the best of my knowledge, whatever I have in my report is what I have based on the Coriolis testing.

Q    Okay.  When you received Dr. Schuster's report, was it signed, or was it unsigned?

A    I believe it was signed.

Q    So you didn't provide any input into the methods that Dr. Schuster used to test Moderna's COVID-19 vaccine, right?

A    I did not provide any input.

As I mentioned, these are experts in the field.  They have high accuracy and precision. These methods are tried and true in the field. Moderna uses very similar methods, I'll mention as

16:30:54
16:31:06
16:31:06
16:31:08
16:31:09
16:31:12
16:31:13
16:31:15
16:31:19
16:31:22
16:31:24
16:31:26
16:31:28
16:31:31
16:31:31
16:31:37
16:31:47
16:31:49
16:31:52
16:31:54
16:31:56
16:31:59
16:32:01
16:32:04
16:32:07

well.

Q    One of the methods that Dr. Schuster used was preparative UC, right?

A    Can you point me to the section specifically where we're discussing the Coriolis UC?

Q    You don't remember him conducting UC?

A    Of course, I remember UC.  But are we referring to a specific section?

Q    Page 19 of Exhibit 13.

A    I'm on page 19, Materials and Methods, Ultracentrifugation.

Q    Do you need the pending question again?

A    I'm sorry.  The question?

Q    Dr. Schuster and his colleagues at Coriolis performed preparative UC on samples of the Moderna COVID-19 vaccine, right?

A    Yes.  I'm reading, Coriolis has extensive experience in UC.  They have performed analytical ultracentrifugation in more than 200 client products [sic] investigating peptides, proteins, LNPs, viruses, nanoparticles, liposomal drug products over the past ten years.

They are experts in the space.

Q    Okay.  And as far as you know,

A    As I described in my opening report, UC is an established and reliable technique for fractionating LNPs.  As further described in my opening report, UC is well suited for fractionating LNPs as it is sensitive to the density differences among LNPs and is a gentle non-destructive technique.

I also refer to my opening report if you would like me to read that as well.

MR. McLENNAN:  Okay.  Marking as Exhibit 22 and 23.

(Exhibits Mitchell-22 and Mitchell-23 marked for identification and attached to the transcript.)

BY MR. McLENNAN:

Q    Exhibit 22 is an email from Shaoyao Yu of Kirkland & Ellis to Falicia Elenberg, Williams & Connolly.  And Exhibit 23 is a signed protective order executed by Dr. Michael Mitchell.

For now, I'll just give you Exhibit 22. I think we'll have to remark.

A    Okay.  Are we done with Schuster?

Q    If you just leave it open to that page, and we'll come back to it.  But if you go to Exhibit 22 in front of you.

Do you understand that in this case, you signed a protective order and you agreed to keep Moderna's information confidential?

A    Yes.  So who is Shaoyao Yu?

Q    She's one of my colleagues.

A    Okay.

Q    And if you look at the earliest email in Exhibit 22, do you see an email from Falicia, and she's alerting me and my colleagues to the fact that under the protective order, you're going to be an expert witness?

A    This is -- we're looking at the back of the first page, right?

Q    Yes.  Sorry.  It's the final page.

A    Oh, I'm sorry.  This is the very last email, then.  So this is an email that Falicia wrote.

Q    And I'm also handing you Exhibit 23. And if you look at the final page --

A    Okay.  Let me just finish.  I haven't seen this document, so...

Okay.  I've read this document.  And you said there was another document.

Q    Yeah.  So you've got Exhibit 23, which is the signed protective order.  If you look at

the last page, you've signed it November 3, 2024.
The last page is a separate document, and it's the
document you signed.  You can verify that for me.

A    On the last page, I see my signature,
and I see November 3rd, 2024.  Got it.

Q    And the page before that, page 31 of 32,
is titled, Agreement To Be Bound By Protective
Order.

Do you see that?

A    Okay.

Q    Do you recall signing that?

A    Let me just refresh my memory and take a
look at this document.

Q    This appears to be the protective order
that you signed, Dr. Mitchell?

A    So this is my signature, yes.  This is
my signature, my name, and it's dated here
November 3rd, 2024.

Q    Okay.  And you understand that this
protective order ensures that you'll treat
Moderna's documents confidentially, right, in
general terms?

A    In general terms, yes.

Q    And if you go back to Exhibit 22, do you
see there that we were sent a copy of that on

16:43:49
16:43:52
16:43:56
16:44:05
16:44:07
16:44:11
16:44:14
16:44:17
16:44:18
16:44:55
16:44:58
16:45:07
16:45:09
16:45:54
16:45:56
16:46:23
16:46:25
16:46:28
16:46:29
16:46:31
16:46:36
16:46:38
16:46:41
16:46:43
16:46:52

November 4th, 2024?

A   Are we talking about the last email?  I see Falicia Elenberg's email on November 4th, yes.

Q   And then do you see the first email in the chain, my colleague Shaoyao Yu confirmed on November 11th, 2024, that Moderna had no objection to you.

Do you see that?

A   Yes.  It says, Thanks Falicia.  Given this, we have no objection.

Q   So sometime after November 11, 2024, you would have been given access to Moderna confidential documents, correct?

MR. BERL:  Objection, lack of foundation.

A   I can't recall the exact date off the top of my head.  But I can definitely say -- if we go back to -- let's see -- the original report.

Q   It's on the face of your original report.  It's November 25th, 2024.  That's the date you signed it, right?

A   Yes.

Q   So that timing sounds about right, that you would have been given access to the documents November 11th, 2024, and you signed your report

Transcript of Michael Mitchell, Ph.D.
Conducted on April 30, 2025                    239

November 24th, 2024, right?

A   I definitely signed it on November 3rd, 2024, yes.  I can't remember the exact date that I received the Moderna documents.

Q   Okay.

A   But, of course, they are held confidential.

Q   Okay.  But you have no reason to expect you would have been given access to them earlier than when Moderna confirmed they had no objection, right?

MR. BERL:  Objection, lack of foundation.

A   Can you say that again and be more specific?

Q   You have no reason to believe that you were given access to the documents earlier than when Moderna confirmed it had no objection, right?

MR. BERL:  Objection.  You mean Moderna confidential documents?

MR. McLENNAN:  Yes.

MR. BERL:  That's not what you asked.

MR. McLENNAN:  Thank you.  So let me ask again.  Thank you.

Q   You have no reason to believe that you

were given access to Moderna confidential documents before November 11th, right?

A    To the best of my knowledge, I don't believe I received them before that date.

Q    Okay.  And in November 2024, were you teaching at University of Pennsylvania?  Did you have teaching commitments?

A    November 2024.  During that fall semester, which also takes place in November, at the University of Pennsylvania, I teach my graduate biomaterials course, BE512.

Q    And that course would have been taking place all throughout November 2024, right?

MR. BERL:  Objection.

A    Actually, generally, with a graduate course -- I can't remember the exact date, but it usually ends a little bit earlier in November due to the presence of, rather than having a formal final exam, which Penn typically has in late December, we have final projects instead.  And that allows us typically to finish the course earlier, because if you have these final projects, it doesn't require a final exam.

MR. McLENNAN:  I'm going to mark another native exhibit.  This is Mitchell Exhibit 24.

Counsel, do you have the one that Alina sent over?

MS. ELENBERG: Yeah.

(Exhibit Mitchell-24 marked for identification and attached to the transcript.)

BY MR. McLENNAN:

Q   So Dr. Mitchell, this is the documents cited in your opening report. Do you remember we looked at your materials considered list earlier today?

A   I'm sorry. We're keeping this, right?

Q   Sure, yeah.

A   Okay.

Q   Do you remember we looked at your materials considered list earlier today?

A   Are you talking about Appendix 1 that we looked at earlier on this screen?

Q   No. Sorry. It's Appendix A in hard copy. Do you remember you flicked through, you were looking at the production numbers at the very start of the deposition?

A   That was in the --

Q   Opening report, Exhibit 1.

A   Opening report, Exhibit 1. Let me just --

Q    Apologies.  Exhibit B.  Appendix B.  No, no, sorry.  I give up.

Exhibit B to Exhibit 1.

A    Okay.  It was over here, I believe. We're talking about Exhibit B.

Q    Yeah.

A    Okay.

Q    So you see here there's a list of production Bates numbers, right?

A    Yes.  I remember this morning we were looking through these Bates numbers, yes.

Q    Okay.  So in Exhibit 24, this is what -- you can see it on the screen now.  I've got each of the documents cited, and then we've got a page count for each of those.

And will you just verify for me, there are 474 rows in this sheet of Moderna documents, right?

MR. BERL:  Objection.

Let me just note for the record -- if you give me a moment, Dr. Mitchell -- this is a document that was not produced to us.  We've had no opportunity to review this document, to compare it to Dr. Mitchell's materials considered list, to analyze whether these documents, for example, are

duplicative, what they contain, whether the page numbers that appear to be recited in column B are correct, whether there are blank pages, or any of this.

This is why, generally speaking, one produces documents before the deposition rather than during the deposition, so the other side has an opportunity to examine the exhibits and their veracity before the witness is examined on them.

So we'll preserve any and all objections to the use of this exhibit, either now or at trial.

MR. McLENNAN: Thank you for that extended speaking objection.

MR. BERL: It was not a speaking objection. It was preserving our objection.

Q    You're familiar with Excel formulas, right? You had thousands of them in those other exhibits we looked at, right?

A    Yes. We went over Excel formulas later -- earlier today, yes.

Q    And this one is a pretty basic one, right?

A    Yes. So we're looking at B-1 all the way to B-474 here.

Q    So for all these Moderna documents, the total page count is 22,934 pages, right?

A    Again, I haven't seen this document.  We could go through all 474.  We can come back for another deposition to go over all -- every single one of these if you want.

But I do see the number, the total here, 22,934.  So we can go over these.

MR. BERL:  Just to be clear, that was not an offer, and that's not --

MR. McLENNAN:  That sounded like an offer.  I might take you up on that.

Q    So is it your testimony that between -- before opening -- let me start again.

Before signing your opening report on November 24 [sic], 2024, you reviewed each of these documents cited in your materials considered list?

MR. BERL:  Objection.

A    I'm sorry.  Can you comment on the specific date period here?

Q    Front of your reports.  24th -- sorry. November 25th, 2024, before signing that report, you reviewed each of the documents listed in your materials exhibit list, right?

A    So as I mentioned, in November 2024 -- and part of November 2024, I was teaching my biomaterials course, BE512.  But as I mentioned earlier, we have final projects.  Sometimes these courses end much earlier in November because of the final projects that the students work on during that time.

So I dedicated a significant amount of time to review the reports in Exhibit B.

Q    Okay.  And the other documents that are listed, there are also 83 documents with a Genevant Bates stamp.

Do you see that here?

A    I see the Genevant stamp, yes.  I have not seen this specific report, though, this Excel sheet.

Q    Okay.  And there are five Alnylam documents also cited, right?

A    Let me just check the number here.

Q    They're right at the start, at the bottom of that page you're on.

A    Yeah, let me just confirm.  I promise I won't do it with the other ones.

I see those five documents that are there, yes, that are also listed in Exhibit B.

16:54:50
16:54:54
16:54:57
16:55:01
16:55:03
16:55:05
16:55:07
16:55:08
16:55:11
16:55:15
16:55:18
16:55:23
16:55:26
16:55:31
16:55:33
16:55:36
16:55:36
16:55:45
16:55:53
16:55:56
16:55:58
16:55:59
16:56:02
16:56:10
16:56:12

Q    So for all documents -- now I'm looking on the All Documents tab of native Exhibit 24 -- we have a grand total of 36,000 pages, 100 -- sorry -- 36,113 pages.

You have no reason to doubt that that's the number of pages in the documents you reviewed before signing your opening report, right?

MR. BERL:  Objection, lack of foundation.

A    Again, I have not seen this document. As I was reading these documents and spending a lot of time on them, I did not track every single number and page on a sheet of paper.

MR. McLENNAN:  Should we take one more short break before the last segment?

MR. BERL:  Do you want it?

THE WITNESS:  Sure.  Take a short break.

VIDEOGRAPHER:  We are going off the record.  The time is 16:57.

(Recess from 4:57 p.m. until 5:16 p.m.)

VIDEOGRAPHER:  We are going back on the record.  The time is 17:16.

BY MR. McLENNAN:

Q    Dr. Mitchell, during any of the breaks today, have you discussed the substance of your

16:56:14
16:56:17
16:56:20
16:56:24
16:56:27
16:56:30
16:56:31
16:56:33
16:56:34
16:56:38
16:56:41
16:56:43
16:56:46
16:56:52
16:56:53
16:56:57
16:56:59
16:57:01
16:57:03
17:15:46
17:15:46
17:16:04
17:16:07
17:16:08
17:16:10

testimony with counsel?                                    17:16:12

A    No.                                                   17:16:13

Q    You've never communicated with any                   17:16:15
Genevant or Arbutus employees in connection with           17:16:16
this case, right?                                          17:16:18

A    With connections to this case, you said,             17:16:34
right?                                                     17:16:38

Q    In connection with this case.                        17:16:39

A    To the best of my knowledge, no.                     17:16:51

Q    Okay.  And in terms of Genevant and                  17:16:52
Arbutus's other employees, is the only expert              17:16:57
you've spoken to Kathy Lawton, the damages expert?         17:17:00

A    Yes.  We have spoken to Kathy Lawton,                17:17:06
yes.                                                       17:17:09

Q    Okay.  Have you spoken to any other                  17:17:09
experts in this case?                                      17:17:11

MR. BERL:  Objection.                                     17:17:16

A    I've spoken to Kathy Lawton, yes.                    17:17:24

Q    No one else you can identify?                        17:17:26

A    To the best of my knowledge, no.  I've               17:17:33
spoken to Kathy, yes.                                      17:17:35

Q    And you're not giving your own opinions              17:17:36
with respect to plaintiffs' alleged damages in             17:17:38
this case, right?                                          17:17:40

MR. BERL:  Objection, vague.                              17:17:43