# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARBUTUS BIOPHARMA CORPORATION AND
GENEVANT SCIENCES GMBH,

  PLAINTIFFS,

V.

MODERNA, INC. AND MODERNATX, INC.,

  DEFENDANTS.

C.A. NO. 22-CV-00252-MSG

CONTAINS INFORMATION
DESIGNATED HIGHLY CONFIDENTIAL–
OUTSIDE COUNSEL EYES ONLY BY
PARTIES AND THIRD PARTIES

# REBUTTAL EXPERT REPORT OF CHRISTOPHER A. VELLTURO, PH.D.

- Conversations:
  - Dr. Robert Prud'homme ("Prud'homme Conversation");
  - Dr. Pierre Meulien ("Meulien Conversation");
  - Dr. Don Parsons, former VP of Delivery Science and Development for Moderna ("Parsons Conversation");
  - Ms. Hamilton Bennett, Executive Director of Global Health Security, R&D and Partnerships for Moderna ("Bennett Conversation");
- Expert reports:
  - Opening Expert Report of Robert Prud'homme, Ph.D., November 25, 2024 ("Prud'homme Opening Report");
  - Rebuttal Expert Report of Robert Prud'homme, Ph.D., February 14, 2025 ("Prud'homme Rebuttal Report");
  - Expert Report of Pierre Meulien, Ph.D., November 24, 2024 ("Meulien Opening Report");
  - Rebuttal Report of Pierre Meulien, Ph.D., February 12, 2025 ("Meulien Rebuttal Report");
- Court filings in this action, including pleadings; and
- Deposition testimony.

A complete list of the information I considered in forming my opinions can be found in Exhibit 2 to this report. The information I relied on to form my ultimate conclusions are cited in this report and the attached exhibits. My findings at this point are based on the information available to me. I may revise or supplement my opinions based on additional discovery and analyses. I may also provide additional analyses (including, but not limited to, additional expert reports) if I am called upon to do so, including a response to any opinions offered by experts on behalf of Plaintiffs.

## D. Exhibits

7. At trial, I may provide and rely on visual aids and/or demonstrative exhibits to demonstrate basic principles of economics, calculations of damages, in general and in this case, and my opinions expressed herein and the bases for them, and enlargements of documents considered in forming my opinions.

## E. Summary of Conclusions

8. There is no dispute that the appropriate measure of damages in the present matter is a reasonable royalty in the event there is infringement of a valid patent claim. The estimate of a reasonable royalty in the present matter is straightforward. In short, the facts of the case provide nearly ideal evidence for determining the likely reasonable royalty that Moderna would agree to pay

Genevant—and Genevant would agree to accept—in exchange for a license to the Patents-in-Suit (that these "Parties"[6] would agree to at the "Hypothetical Negotiation"). At a summary level, my analysis of this evidence leads me to the following findings.

9. There is a well-established marketplace for rights for Plaintiffs' intellectual properties (i.e., the "Plaintiffs' IP"), which include, but are not limited to, the Patents-in-Suit. These intellectual properties have been licensed in exchange for royalties on numerous occasions, including immediately before the Hypothetical Negotiation date. For example, Genevant licensed the development and commercialization of a U.S. mRNA COVID-19 vaccine (under the Plaintiffs' IP, including rights to the Patents-in-Suit) less than three weeks prior to Plaintiffs' assumed Hypothetical Negotiation date (the "Providence" agreement). The other historical licenses to these intellectual properties further reinforce the insight provided by the Providence agreement, as their royalties are similar to those in the Providence agreement and are concentrated in a relatively narrow range.

10. From this insightful starting point, the most significant remaining damages consideration is to isolate (i.e., apportion) the value of the Patents-in-Suit as distinct from the value from all the other elements the Plaintiffs' IP provided under Genevant's historical licenses—other elements, such as rights to other Genevant patents and technical know-how on how to manufacture the licensed LNP technologies, to which Moderna would not receive rights at the Hypothetical Negotiation. Therefore, my analysis isolates the value attributable to the Patents-in-Suit from the value attributable to the other elements that the previous licensees to the Patents-in-Suit received, but that Moderna would not receive (or want) at the Hypothetical Negotiation.

11. Thus, after properly accounting for this apportionment, Genevant's numerous historical licenses establish a narrow and consistent range of royalties that would serve as the key benchmarks for a royalty determination by the Parties at the Hypothetical Negotiation. In this case, these actual, real-world licenses to Plaintiffs' intellectual properties including the Patents-in-Suit are particularly useful because they reflect the key considerations of a proper damages analysis—provided for in the *Georgia-Pacific* Factors, which include:

---

[6] The "Parties" to the Hypothetical Negotiation would be Genevant and Moderna. *See* Section III.B, below.

- **The royalties received by the patentee for the licensing of the patent-in-suit**—the historical licenses granting rights to the Patents-in-Suit include the specific royalties that the patent holder agreed to accept in exchange for providing a license **(Factor 1)**;

- **The nature and scope of the licenses**—the historical licenses granting rights to the Patents-in-Suit specify payments for the same type of non-exclusive, U.S. rights that the Parties would negotiate over at the Hypothetical Negotiation **(Factor 3)**;

- **The licensor's established licensing policy with respect to the patents-in-suit**—the historical licenses granting rights to the Patents-in-Suit are, by definition, the product of the licensor's licensing policy (whether or not such policy is established), and therefore reflect its consideration **(Factor 4)**;

- **The commercial relationship between parties**—the Parties would assume the roles of inventor and promoter at the Hypothetical Negotiation, the same roles as the respective parties to the Historical Comparable Licenses **(Factor 5)**;

- **The duration of the license term**—the Parties would have realized that the term lengths of the historical licenses granting rights to the Patents-in-Suit are comparable to the term of the license that would result from the Hypothetical Negotiation. In particular, the Providence Agreement has almost the exact same term with respect to the Patents-in-Suit (with a difference of just weeks over a term of more than ten years from the executed date of the agreements) **(Factor 7)**;

- **The value of the inventions to the licensee**, including:

  o **Its profitability and the extent to which the infringer has made use of it**—most of the historical licenses to the Plaintiffs' IP (including the Patents-in-Suit) contemplate the potential for various levels of financial success (or failure), with both clinical and commercial milestone payments, and running royalty rates (as a percentage of net sales) that scale with the scope of the commercial opportunities inherent in the covered products **(Factors 8 and 11)**;

  o **The advantages of the patented inventions over prior technologies**—the historical licensees to the Plaintiffs' IP (which includes far more than just rights to the Patents-in-Suit) would realize (just as Moderna would at the Hypothetical Negotiation) that the Claimed Inventions, in terms of advantages for licensees, do not provide a direct means to commercialize an mRNA product (let alone a financially successful one). Indeed, among Genevant's historical licensees and Moderna, the only commercialized mRNA product that incorporates the Claimed Inventions (under the assumption of validity and infringement) is Moderna's Accused Product— and that the seminal driver of that success is the additional work done by Moderna. Furthermore, these factors reaffirm the importance of apportionment—as the Historical Comparable Licenses provided the respective licensees with far more than the bare, non-exclusive license to the Patents-in-Suit that Moderna would receive at the Hypothetical Negotiation. Moreover, to the extent there would be non-infringing alternatives available to Moderna (at the Hypothetical Negotiation), I understand those alternatives would be substantively the same as the alternatives available to the other licensees to the Plaintiffs' IP (including the Patents-in-Suit). Thus, the royalty terms of the historical licenses, once properly apportioned, would

have already taken into account whether there exist acceptable non-infringing alternatives to the Patents-in-Suit **(Factors 9 and 10)**;

o **The customary portion of the selling price that allows for the use of the patented inventions**—the "customary portions" are informed directly by the properly apportioned royalty rates provided in the historical licenses to the Plaintiffs' IP, which isolates the value of the Claimed Inventions as distinct from the value of everything else that Genevant provided under the historical licenses (i.e., the accounting for all the licensed properties that Moderna would not need or seek at the Hypothetical Negotiation). Thus, this factor reiterates the need for the apportionment I discussed above. **(Factors 12)**;

- The historical licenses granting rights to the Patents-in-Suit also provide concrete, real-world examples of what **Factor 15** calls for—i.e., "[t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement."

In sum, when contemplating the *Georgia-Pacific* Factors, the circumstances of the historical licenses granting rights to the Patents-in-Suit align with close symmetry to the circumstances of the Hypothetical Negotiation. Indeed, only one factor indicates a significant adjustment relative to the benchmark range of royalties provided by the historical licenses—Factor 13. Namely, Factor 13 contemplates the significant features and improvements of the Accused Product provided by Moderna—which the evidence overwhelmingly indicates was the root cause of the tremendous financial success of the Accused Product (as distinct from the other historical licensees who, despite having access to the Claimed Inventions, failed to attain the same levels of success)—and indicates a significant downward adjustment.

12. Thus, having properly apportioned the royalties called for in the historical licenses (based on commonly accepted apportionment methodologies) my consideration of the *Georgia-Pacific* Factors indicates reasonable royalties towards the lower end of the range of 0.67-1.26 percent of net sales—based on the range of implied apportioned royalty rates from the historical licenses (depicted in Figure 1 below):

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

**Figure 1: The Benchmark Range of Royalty Rates**



13.  Therefore, applying any percentage in this range to the $**14.0** billion of Accused Product sales from December 2020 through January 2024 results in a damages award within the range of approximately $**93.4** to $**176.0** million.  Any award amount within this range would represent significantly more royalties than the total amount of royalties Genevant claims it has received from all of the licenses that include, but are not limited to, the Patents-in-Suit to date (which totals approximately $69.0 million).[7]  Further, my consideration of the *Georgia-Pacific* Factors indicates a reasonable royalty rate (as a percentage of Accused Product net sales) towards the bottom of the benchmark range described above.  Therefore, it is my opinion that, in the event Moderna is found to infringe the Patents-in-Suit, the Parties would likely reach an agreement on a reasonable royalty in the lower half of the range of royalty rates identified above—or approximately two-thirds of one percent to one percent of net sales of the Accused Product (or $**93.4 to $140.1** million when applied to the above specified royalty base).  I further find that the Parties would likely gravitate towards the apportioned rate implied by the Providence agreement ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ given its symmetry to the license contemplated by the Hypothetical Negotiation, and its proximity thereto.  I summarize these metrics in Figure 2:

---

[7] I note that this amount also includes royalties owed for certain agreements that do not provide rights to the Patents-in-Suit, despite Genevant and Ms. Lawton's claims to the contrary.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

**Figure 2: Damages Benchmarks**

|  | Lower (⅔%) | Providence ▮ | Midpoint (1%) |
|---|---|---|---|
| **Vellturo Headline Base 1** (Removing C-100 and 271(f)) | $93.4 million | ▮▮▮▮ | $140.1 million |
| **Vellturo Headline Base 2** (Removing C-100) | $105.9 million | ▮▮▮▮ | $158.9 million |

14. To suggest, as Ms. Lawton does, that the Parties at the Hypothetical Negotiation would largely ignore all the historical licenses granting rights to the Patents-in-Suit (including the Providence agreement)[8] defies reason. Consequently, Ms. Lawton wades through mountains of inferior evidence and misguided analyses to try and synthesize the missing insight that is provided by the historical licenses granting rights to the Patents-in-Suit. Indeed, so much of the raw material that Ms. Lawton tries to analyze in her report is already neatly refined and clarified by the historical licenses granting rights to the Patents-in-Suit, thus rendering her work both unnecessary and non-probative.

15. Nevertheless, having disregarded the best indicators of a reasonable royalty (the historical licenses granting rights to the Patents-in-Suit) in her analysis of licensing (i.e., her Market Approach), Ms. Lawton carries on with her so-called "Analytical Method" and "Hypothetical Negotiation Approach."[9] These analyses contain many errors, misinterpretations, misstatements, misunderstandings, and mistakes on which I opine below (at a summary level).[10]

16. Ms. Lawton's purported Analytical Method is a nonsensical misinterpretation of an income-based method of analyzing damages—an approach that is neither necessary nor tractable in the present context. At its conceptual core, Ms. Lawton's purported Analytical Method demonstrates a fatal misunderstanding about the required setting for its proper use:

---

[8] Lawton Report, ¶ 908.

[9] Lawton Report, §§ VI.C, VI.D.

[10] I do not attempt to explicitly identify every single fault contained within Ms. Lawton's report, which runs to well over a thousand pages in length. Such an exhaustive enumeration of errors is unnecessary, given that a discussion of the Lawton Report's fundamental flaws—which I undertake in this report—already unambiguously demonstrates (many times over) that the damages estimates she arrives at are completely unreliable. Therefore, to the extent I do not specifically address various points made by Ms. Lawton in her report, such silence should not be interpreted as agreement or concession. Indeed, based on the vast array of egregious errors I have identified throughout the Lawton Report, my default position on any of her findings and/or statements is a high level of skepticism.

- Further in the licensing discussions between the Plaintiffs (and their predecessors) and Moderna, none of the terms exchanged contemplated a per-dose royalty, in direct contrast to what Ms. Lawton claims they would seek.

23.  Indeed, one reason for the prevalence of percentage of net sales running royalties in pharmaceutical licensing generally—uncertainties about eventual marketplace demand for covered products—is present to a substantial degree in the present circumstance: significant uncertainty about eventual pricing.  In this context of demand uncertainty, economic theory indicates that a royalty that includes a running royalty rate paid on a percentage of net sales is optimal for both parties' joint surplus[17] and assures a consistent split from the rewards of commercialization that scales with the magnitude of the commercial opportunity regardless of ultimate pricing (in contrast to a royalty that incorporates a fixed dollar-per-unit/dose royalty).[18]

24.  In sum, as a consequence of Ms. Lawton's many mistakes in her Hypothetical Negotiation Approach, she arrives at an unreliable royalty estimate that is multiple times the percentage-of-net-sales royalties called for in the comparable licenses granting rights to the Patents-in-Suit, despite the fact that the licensees to those agreements received far more from Genevant than Moderna would receive (in terms of licensed properties) at the Hypothetical Negotiation.

25.  More generally, Ms. Lawton's damages analysis breaks several fundamental tenets of a proper damages analysis, including:

- **A fundamental misunderstanding of economic bargaining dynamics and the footprint-of-the-invention concept:**
  - Ms. Lawton's entire analysis is predicted on the illogical assumption that Genevant would be able to extract a higher royalty **percentage** from Moderna—relative to previous licensees—because Moderna had done so much more to bring its product to commercialization (at the time of their respective negotiations);
  - To the contrary, all else being equal, when a party brings more to the negotiating table, that party should retain at least the same, if not a larger percentage portion, of the total surplus (i.e., value) from a deal;
  - Even in a setting where the only additional value brought to the table is the larger scale of the economic opportunity, the footprint of the invention scales proportionately with the size of the economic opportunity (i.e., the value of the deal).  Therefore, even if Moderna

---

[17] *See* Section II.D.

[18] Note, in terms of the overall royalty rate in comparable licenses, these rates do not necessarily reflect the proper apportionment as to specific patents that may be members of an entire portfolio of patents (such as the case with the Patents-in-Suit) (See Section III.C.1.e).

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY                                    16

pays the same royalty rate as other licensees, they will still generate more royalties for Genevant. Figure 3 below illustrates this concept, as the orange slice on the left is far larger than the orange slice on the right—even though the percentage occupied by the orange slice is the same for both respective circles:

**Figure 3: Illustration of "Footprint of the Invention"**



- o Thus, if, as Ms. Lawton posits, Moderna was actually bringing so more to the negotiation table (relative to Plaintiffs' other licensees), Moderna should receive at the least the same (if not greater) percentage piece of the value pie—by paying at most the same (if not a lower) royalty percentage (after apportionment) than the other licensees;

- o Indeed, under my own estimate of a reasonable royalty, in the event a valid claim is infringed, Moderna would end up paying far more in licensing fees than the total payments of all the other historical licensees combined.

- **Hold-up:** All of Ms. Lawton's damages estimates are based on a misguided and improper application of the "hold-up" concept:

- o Ms. Lawton's approach does not distill the value of the footprint of the invention (relative to the non-patented features in the Accused Product);

- o She instead seeks a trumped up "value" by assuming that Genevant would leverage a global health catastrophe as a bargaining tactic;

- o Such a threat has nothing to do with the specific footprint of the Claimed Inventions, and thus seeks unjust compensation by extracting the portion of profit clearly attributable to Moderna for bringing the product to commercialization (when so many others tried and failed);

- o More generally, Ms. Lawton's claim that Genevant would have been ready or inclined to impede the launch of the Accused Product in order to "dictate the terms of [an]

agreement" at the Hypothetical Negotiation is also unsupported by the objective position of Genevant at that negotiation;

o Genevant would have been clear-eyed about everything that it stood to gain from expeditiously concluding a successful licensing deal with Moderna, including the prospect of a massive monetary windfall as well as what Ms. Lawton herself calls "the opportunity to see its patented technology used in the pandemic response…and the recognition this would bring"—a rare and valuable opportunity;

o Similarly, Genevant would also have recognized that delaying or impeding Moderna's commercialization could have fundamental adverse impacts on the long term demand for LNP technologies (as a purported complement to mRNA vaccines), as Moderna's success (the first alleged user of the Claimed Inventions to make it to commercialization with an mRNA product) increases the overall value of Plaintiffs' IP (beyond just the value that Moderna generates directly with royalties);

o Genevant would also have recognized that delaying or impeding Moderna's commercialization of mRNA-1273 would likely have implications not only for Moderna, but also for the course of a worldwide public health emergency that was claiming thousands of lives daily;[19]

o Indeed, evidence indicates Genevant would have been unwilling to risk the public health implications of impeding Moderna's allegedly infringing COVID-19 vaccine launch;

- In an April 2021 email to Moderna, Genevant President Peter Zorn stated that the company's "priority remains for COVID-19 to be eradicated and our desire remains to find ways to apply our experience and expertise to facilitate the availability of a COVID-19 vaccine, not to obstruct or delay it;"[20]

- This is further evidenced by the fact that Genevant did not seek an injunction against Moderna or pursue any other action to "impede the sale, manufacture or distribution of mRNA-1273" when it filed this litigation.[21]

- **A failure to tie the claimed harm to Plaintiffs with Moderna's infringement as presently alleged:** Ms. Lawton ignores the requirement that damages be adequate to compensate for the specific alleged infringement: For example, Ms. Lawton considers what she claims is the long history of Moderna allegedly trying to avoid paying royalties—as a reason Moderna should have to pay more than previous licensees.[22]

---

[19] By the end of May 2020, over 100,000 people were estimated to have died from COVID-19 in the U.S. alone, with that toll surpassing 500,000 by February 2021 and 1 million by April 2022, *see* Vellturo Opening Report § II.B.1.  Had Genevant "stopped" Moderna "at the doorstep of commercialization" from sharing its COVID-19 vaccine with the global community—a profit-maximizing action that Ms. Lawton suggests Genevant would be able and willing to do—the number of fatalities would likely have been even larger.  *See, e.g.,* Lawton Report, ¶¶ 803, 810, 1437, 1443, 1484, 1530; Vellturo Opening Report, § III.

[20] Deposition of Peter Zorn, June 5, 2024 ("Zorn June 5, 2024 Deposition"), Exhibit 4 (GENV-0024481 at 481).

[21] https://www.genevant.com/genevans-sciences-and-arbutus-biopharma-file-patent-infringement-lawsuit-against-moderna

[22] Lawton Report, ¶¶ 832-833, 1437-1444.

and Roivant is currently Genevant's majority shareholder.[31]  Upon Genevant's launch, Arbutus licensed exclusive rights (outside of Hepatitis B applications) to its LNP delivery platform (among other technology) to Genevant,[32] which would subsequently claim to focus on "the discovery, development, and commercialization of a broad range of RNA-based therapeutics."[33]  Genevant's stated goal at the time was to "develop products in-house and pursue industry partnerships to build a diverse pipeline of therapeutics."[34]  I understand that in mid-2020, following a recapitalization from Roivant, Genevant shifted to a new business model focusing "on partnering, collaborating, [and] licensing its delivery technology with third parties."[35]  Genevant has since concluded agreements to license its intellectual property in various fields to several companies, including Takeda Pharmaceuticals, Novo Nordisk, Gritstone bio, and 76bio, among others.[36]

### 3.  Moderna

31.  Headquartered in Cambridge, Massachusetts, Moderna is a pharmaceutical company focused on developing mRNA medicines.[37]  Moderna was incorporated in 2010, starting operations shortly thereafter.[38]  Moderna operated as a private company during its first several years of existence until it began trading publicly in December 2018.[39]  Throughout, Moderna has invested heavily in the mRNA technology upon which its therapeutic and vaccine products (and candidates) are based, spending over $16.5 billion in research and development from 2016 through Q3 2024[40] and

---

[31] Zorn June 5, 2024 Deposition, p. 60.

[32] https://investor.arbutusbio.com/node/14201/pdf, p. 1 ("Arbutus will license exclusive rights to its LNP and ligand conjugate delivery platforms to Genevant for RNA-based applications outside of Hepatitis B virus.").

[33] https://investor.arbutusbio.com/node/14201/pdf, p. 1.

[34] https://investor.arbutusbio.com/node/14201/pdf, p. 1.

[35] Zorn June 5, 2024 Deposition, p. 230.

[36] *See, e.g.*, GENV-00023069; GENV-00072282; GENV-00062423; GENV-00022587; GENV-00022689; GENV-00023217.

[37] Moderna SEC Form 10-K (2023), p. 6 (available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/12d8720a-9f51-4695-b0e9-f2d45dff1c69.pdf); https://www.modernatx.com/en-US/about-us/our-story.

[38] Moderna SEC Form 10-K (2023), p. 6 (available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/12d8720a-9f51-4695-b0e9-f2d45dff1c69.pdf); https://www.modernatx.com/en-US/about-us/our-story.

[39] https://investors.modernatx.com/resources/investor-faqs/default.aspx

[40] Moderna's R&D expenditures since 2016: $0.27B (2016) + $0.41B (2017) + $0.45B (2018) + $0.50B (2019) + $1.37B (2020) + $1.99B (2021) +  $3.29B (2022) + $4.85B (2023) + $1.06B (2024 Q1) + $1.22B (2024 Q2) + $1.14B (2024 Q3) = $16.55B, *see* Moderna SEC Form 10-K (2018), p. 199 (available at https://s29.q4cdn.com/435878511/files/doc_financials/2018/ar/Chasen-Richter-Moderna-Annual-Report-2018.pdf); Moderna SEC Form 10-K (2020), p. 186 (available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/e5c3ab36-8ef0-4943-9d47-5eb4baeef930.pdf); MRNA-GEN-01352335; Moderna SEC Form 10-K (2023), p. 105 (available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/12d8720a-9f51-4695-b0e9-f2d45dff1c69.pdf ); Moderna SEC Form 10-Q (2024 Q1), p. 6 (available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/5017df71-1aeb-46e8-baad-3255e51d8c26.pdf); Moderna SEC Form 10-Q (2024 Q2), p. 6 (available at

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

employing approximately 5,600 full-time employees as of the end of 2023.[41] By the start of the COVID-19 pandemic in early 2020, Moderna had 12 programs in clinical trials and 24 development candidates, including its COVID-19 vaccine candidate.[42] On December 18, 2020, Moderna received Emergency Use Authorization ("EUA") from the U.S. Food and Drug Administration (FDA) for its first commercial product, the COVID-19 Vaccine. On January 31, 2022, Moderna received full FDA approval of its Biologic License Application for "SpikeVax."[43] As of Q3 2024, Moderna also sold mRESVIA, a respiratory syncytial virus (RSV) vaccine approved in May 2024.[44] I summarize Moderna's consolidated income statement information from December 18, 2020 through the third quarter of 2024 in Exhibit 3.

### B.  COVID-19

32.   COVID-19 is an infectious disease caused by the SARS-CoV-2 virus.[45] Symptoms of COVID-19 include fever, gastrointestinal distress, respiratory problems—such as coughing, difficulty breathing, and pneumonia—and neurological and cognitive symptoms, such as loss of taste and/or smell.[46] These and other symptoms may sometimes persist or even worsen following initial recovery from a COVID-19 infection—a condition colloquially known as "Long COVID."[47] Severe cases of COVID-19 infection can lead to death, especially amongst the elderly and those with comorbidities.[48]

33.   COVID-19 first emerged in late 2019 in Wuhan, China[49] and had begun spreading internationally by early 2020. On March 11, 2020, the World Health Organization (WHO) declared that COVID-

---

https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/699c8c2d-5041-4327-aab5-86f5c8bdf8ca.pdf); Moderna SEC Form 10-Q (2024 Q3), p. 6 (available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/d1985995-a6a0-405f-9b0d-a50634fd5174.pdf).

[41] Moderna SEC Form 10-K (2023), pp. 6, 34, 88-89 (available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/12d8720a-9f51-4695-b0e9-f2d45dff1c69.pdf); https://www.modernatx.com/en-US/about-us/our-story.

[42] Moderna SEC Form 10-K (2019), pp. 216-217 (available at https://s29.q4cdn.com/435878511/files/doc_financials/2019/ar/Chasen-Richter-Moderna-Annual-Report-2019.pdf).

[43] https://investors.modernatx.com/news/news-details/2022/Moderna-Receives-Full-U.S.-FDA-Approval-for-COVID-19-Vaccine-Spikevax/default.aspx

[44] Moderna SEC Form 10-Q (Q3 2024), p. 11 (available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/d1985995-a6a0-405f-9b0d-a50634fd5174.pdf).

[45] https://www.cdc.gov/museum/timeline/covid19.html

[46] https://www.cdc.gov/covid/signs-symptoms/index.html; https://academic.oup.com/brain/article/146/4/1648/6695387.

[47] https://www.ninds.nih.gov/current-research/coronavirus-and-ninds/covid-19-and-nervous-system

[48] https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-who-is-at-risk/art-20483301

[49] https://www.cdc.gov/museum/timeline/covid19.html

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

19 had become a pandemic.[50]  Two days later, on March 13, 2020, the United States declared a nationwide emergency.[51]  Enormous social and economic disruption ensued as individuals curbed their activity and governments around the world imposed lockdowns in order to slow the virus's spread, causing dramatic increases in unemployment and mental distress[52] and forcing massive government intervention in order to maintain economic stability.[53]

34.    The human toll of the COVID-19 pandemic was staggering, placing enormous strain on the medical system[54] and inflicting untold grief on thousands of families—indeed, by the end of May 2020, over 100,000 people were estimated to have died from COVID-19 in the U.S. alone, with that toll surpassing 500,000 by February 2021 and 1 million by April 2022.[55]  Following the successful rollout of COVID-19 vaccines starting in January 2021, lockdowns and other pandemic restriction measures in the United States were progressively lifted throughout 2021.[56]  The U.S. Government declared an end to the official COVID-19 public health emergency on May 11, 2023,[57] by which point over 1.13 million Americans had died from COVID-19,[58] with millions more still afflicted by "Long COVID" and other health impacts.[59]

### C.  COVID-19 Vaccines

35.    COVID-19 vaccines played a vital role in bringing the pandemic to an end by protecting vulnerable individuals and thereby facilitating the end of lockdowns, jumpstarting a rapid economic recovery.[60]  In the United States, four vaccines were approved for use at various points during the official COVID-19 public health emergency: the Pfizer-BioNTech vaccine, the Moderna vaccine, the Johnson & Johnson vaccine, and the Novavax vaccine.[61]  The Pfizer-

---

[50] https://www.cdc.gov/museum/timeline/covid19.html

[51] https://www.cdc.gov/museum/timeline/covid19.html

[52] *See, e.g.*, https://pmc.ncbi.nlm.nih.gov/articles/PMC8503720; https://crsreports.congress.gov/product/pdf/R/R46554/9, pp. 3-4; https://www.nature.com/articles/s41598-024-55879-9.

[53] https://cepr.org/voxeu/columns/how-us-coronavirus-aid-package-has-affected-household-spending

[54] https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789848

[55] https://covid.cdc.gov/covid-data-tracker/#trends_totaldeaths_select_00

[56] https://www.cdc.gov/museum/timeline/covid19.html; https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html.

[57] https://archive.cdc.gov/www_cdc_gov/coronavirus/2019-ncov/your-health/end-of-phe.html

[58] https://covid.cdc.gov/covid-data-tracker/#trends_weeklydeaths_select_00

[59] https://www.cidrap.umn.edu/covid-19/about-8-us-adults-have-ever-had-long-covid-survey-finds

[60] *See, e.g.*, https://news.un.org/en/story/2023/05/1136367; https://www.bbc.com/news/health-59569026; https://www.theatlantic.com/health/archive/2020/11/vaccines-end-covid-19-pandemic-sight/617141; *see generally* Vellturo Opening Report, § III.

[61] https://www.yalemedicine.org/news/covid-19-vaccine-comparison

BioNTech and Moderna vaccines, both of which use mRNA technology, made up the vast majority of COVID-19 vaccine doses administered in the United States.[62]  In this subsection, I discuss the technology underlying those mRNA vaccines and survey the sweeping international efforts to develop efficacious COVID-19 vaccines.

### 1.  mRNA Vaccine Technology

#### a.  mRNA

36.    Ribonucleic acid (RNA) is a single-stranded nucleic acid that performs a wide range of functions in the body, including "carrying biological information, providing structure, facilitating chemical reactions and regulating the functions of DNA and other RNA molecules."[63]  Messenger RNA (mRNA) is a type of RNA that carries instructions from DNA to ribosomes for protein production.[64]  mRNA was first discovered in the 1960s,[65] and by the 1990s further research had shown that "the direct injection of 'naked' mRNA" could result in "in vivo expression of the encoded protein."[66]  Subsequently, I understand that "[s]tudies led by Katalin Kariko and Drew Weismann on the use of modified mRNA in IVT mRNA in the mid-2000's overcame two of the major challenges associated with mRNA therapy generally and mRNA vaccination specifically: mRNA's general instability and the propensity of unmodified *in vitro* transcribed mRNA to trigger an innate immune response."[67]

37.    Vaccines generally work by introducing an "antigen" into the body; the antigen imitates infection, and the body then produces antibodies that attack that specific antigen, which subsequently confers immunity.[68]  Traditional vaccines introduce a weak or inactive virus into the body, triggering an immune response.  mRNA vaccines, by contrast, introduce synthetic mRNA, which prompts cells in the body itself to produce a viral protein.[69]  I understand that the choice of this

---

[62] https://ourworldindata.org/grapher/covid-vaccine-doses-by-manufacturer?country=~USA

[63] https://www.genome.gov/about-genomics/educational-resources/fact-sheets/ribonucleic-acid-fact-sheet

[64] https://medlineplus.gov/genetics/understanding/therapy/mrnavaccines; Moderna SEC Form 10-K (2023), p. 6 (available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/12d8720a-9f51-4695-b0e9-f2d45dff1c69.pdf); https://www.nature.com/scitable/topicpage/translation-dna-to-mrna-to-protein-393.

[65] https://publichealth.jhu.edu/2021/the-long-history-of-mrna-vaccines

[66] https://www.mdpi.com/2076-393X/9/2/81

[67] Meulien Rebuttal Report, ¶ 41.

[68] https://www.cdc.gov/vaccines/basics/explaining-how-vaccines-work.html

[69] https://www.genome.gov/about-genomics/fact-sheets/Understanding-COVID-19-mRNA-Vaccines; https://archive.cdc.gov/www_cdc_gov/coronavirus/2019-ncov/vaccines/different-vaccines/how-they-work.html; https://medlineplus.gov/genetics/understanding/therapy/mrnavaccines.

viral protein, known as the "target,"[70] is a critical decision in the "design process of mRNA vaccines"[71] because the target is the protein encoded in the mRNA delivered by the vaccine, against which the body's immune system subsequently mounts a response. Consequently, I understand that the goal of mRNA vaccine developers is to encode their synthetic mRNA for "a target that is both immunogenic and capable of eliciting a protective immune response."[72]

38. In the case of COVID-19, mRNA vaccines contain synthetic mRNA that enters into cells and directs them to produce SARS-CoV-2's identifying and highly antigenic spike protein.[73] The body's immune system then identifies the spike protein as foreign and produces antibodies against it that provide protection from future infection with COVID-19.[74] I note, however, that while most attention has been paid to mRNA vaccine candidates' effects on antibodies, mRNA vaccines can also induce T-cell responses, which complement the effects of antibody responses and may increase the persistence of vaccine immunity.[75]

39. From a development and production standpoint, mRNA vaccines have several benefits, including fast development, rapid manufacturing, cost-effective production, and the ability to be scaled up.[76] These benefits were particularly valuable during the COVID-19 pandemic[77] and are due in substantial part to the flexibility of the mRNA platform, which enables a single generic manufacturing process to be used "independent of the antigen coded by the vaccine."[78] Two

---

[70] *See, e.g.*, GENV-00021315 at 323, defining "target" as "(a) any naturally occurring human protein encoded by a specific gene locus, as identified by the applicable transcript identifier (i.e., NCBI Refseq transcript ID), gene identifier (i.e., NCBI Refseq Gene ID), gene name and synonyms and DNA sequence coordinates, together with all variants of such protein, including the wild type, naturally occurring variants, engineered variants wherein modifications to the native amino acid sequence have been introduced, and species homologs, orthologs thereof, provided however that any such naturally occurring variant, engineered variant, or species homolog or ortholog possesses substantially similar biological activity to the wild type; or (b) any protein that is not covered by subclause (a) above, together with any variants, mutated versions, derivatives or fragments of such protein, provided that any such variant, mutated version, derivative or fragment possess substantially similar biological activity as such protein."

[71] https://pmc.ncbi.nlm.nih.gov/articles/PMC7918810

[72] https://pmc.ncbi.nlm.nih.gov/articles/PMC7918810

[73] https://www.genome.gov/about-genomics/fact-sheets/Understanding-COVID-19-mRNA-Vaccines; https://archive.cdc.gov/www_cdc_gov/coronavirus/2019-ncov/vaccines/different-vaccines/how-they-work.html.

[74] https://archive.cdc.gov/www_cdc_gov/coronavirus/2019-ncov/vaccines/different-vaccines/how-they-work.html

[75] Knezevic, I., et al. "Development of mRNA Vaccines: Scientific and Regulatory Issues," *Vaccines*, Vol 9,2 (2021):81 (available at https://www.mdpi.com/2076-393X/9/2/81).

[76] Gote, V., et al. "A Comprehensive Review of mRNA Vaccines," *Int J Mol Sci*, Vol 24,3:2700 (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9917162); https://www.pennmedicine.org/mrna; Chaudhary, N., et al. "mRNA vaccines for infectious diseases: principles, delivery, and clinical translation," *Nat Rev Drug Discov,* Vol 20 (2021): 817-838 (available at https://www.nature.com/articles/s41573-021-00283-5).

[77] https://www.msm.edu/RSSFeedArticles/2023/October/BarneyGraham_MD.php

[78] https://www.mdpi.com/2076-393X/9/2/81

mRNA COVID-19 vaccines, Moderna's Spikevax and Pfizer's Comirnaty, have received FDA approval. Another mRNA vaccine, Moderna's mRESVIA, received FDA approval in May 2024 for the prevention of RSV.[79] In addition, mRNA vaccines for many other diseases, such as influenza and Zika virus, are currently in development.[80]

40. Other types of RNA have also been explored in drug development. RNA interference (RNAi) is a method of silencing gene expression by cleaving the target mRNA and "thereby disrupting protein synthesis of the target gene."[81] RNAi has been explored in the development of "therapies for the treatment of viral infection, dominant disorders, neurological disorders, and many types of cancers."[82] RNAi involves small interfering RNA (siRNA),[83] a type of RNA that "silenc[es] target genes to control gene expression"[84] and has been used in developing drugs that target organs such as the liver, eye, and skin.[85]

### b. LNP Technology

41. mRNA directly injected into the body (i.e., "naked" mRNA[86]) faces multiple barriers before it can reach target tissues and target cells. These barriers include mRNA's inability to pass through cell membranes on its own, the high likelihood of its degradation by blood and other physiological fluids, and the risk of its interception by the immune system's defenses.[87] As a result, mRNA vaccines were for many years deemed impractical, as there was no way to effectively introduce the mRNA "payload" into cells.[88] However, research dating back to the 1960s provided a means of

---

[79] https://investors.modernatx.com/news/news-details/2024/Moderna-Receives-U.S.-FDA-Approval-for-RSV-Vaccine-mRESVIAR/default.aspx

[80] Gote, V., et al. "A Comprehensive Review of mRNA Vaccines," *Int J Mol Sci*, Vol 24,3:2700 (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9917162).

[81] https://www.umassmed.edu/rti/biology/rna/how-rnai-works

[82] https://www.ncbi.nlm.nih.gov/probe/docs/techrnai

[83] https://www.umassmed.edu/rti/biology/rna/how-rnai-works

[84] https://www.creative-proteomics.com/nucleic-acid/analysis-of-mrna-and-sirna-molecules.html

[85] https://www.nature.com/articles/s12276-023-00998-y.

[86] https://pmc.ncbi.nlm.nih.gov/articles/PMC9410089

[87] Hou, X., et al. "Lipid nanoparticles for mRNA delivery," *Nat Rev Mater*, Vol. 6 (2021):1078-1094 (available at https://www.nature.com/articles/s41578-021-00358-0); Liu, Y., et al. "Development of mRNA Lipid Nanoparticles: Targeting and Therapeutic Aspects," *Int J Mol Sci*, Vol. 25,18(2024):10166 (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC11432440); Gote, V., et al. "A Comprehensive Review of mRNA Vaccines," *Int J Mol Sci*, Vol 24,3:2700 (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9917162); Chaudhary, N., et al. "mRNA vaccines for infectious diseases: principles, delivery, and clinical translation," *Nat Rev Drug Discov,* Vol 20 (2021): 817-838 (available at https://www.nature.com/articles/s41573-021-00283-5).

[88] https://pmc.ncbi.nlm.nih.gov/articles/PMC9433349

circumventing these problems in the form of liposome nanoparticles.[89]  Since the late 1990s, in the nucleic acid context, the newer term, "lipid nanoparticles" or "LNPs," has referred to delivery vehicles composed of four components: "cationic (including ionizable cationic) lipids, cholesterol, PEGylated lipids, and phospholipids."[90,91]  LNP-mRNA formulations have since become the leading delivery system for mRNA.[92]  In LNP-mRNA formulations, LNPs wrap around mRNA "like a bubble," which protects the mRNA and facilitates its entry into cells.[93]  LNPs are now "the most successful, effective, and safe method of delivery of mRNA vaccines for human immunizations" and are the only drug delivery system for mRNA that has been approved for human use.[94]  As of June 2021, all COVID-19 mRNA vaccines approved or in development utilized LNPs.[95]

42.  I understand that Plaintiffs' Patents-in-Suit do not cover all forms of LNPs, but rather cover specific claimed formulations.  For instance, I understand from Dr. Prud'homme that the '651 patent did not reflect the invention of "all lipid compositions that achieve the claimed encapsulation efficiencies," evidenced by the existence of many other such lipid compositions

---

[89] As noted in my Statement of Assignment, I understand the Claimed Inventions relate to lipid formulation technologies. *See* https://pmc.ncbi.nlm.nih.gov/articles/PMC9433349; https://pmc.ncbi.nlm.nih.gov/articles/PMC11510967.
[89] https://pmc.ncbi.nlm.nih.gov/articles/PMC10636777.
[90] Tenchov, R. "Lipid Nanoparticles–From Liposomes to mRNA Vaccine Delivery, a Landscape of Research Diversity and Advancement," *ACS Nano*, Vol. 15,11 (2021): (available at https://pubs.acs.org/doi/10.1021/acsnano.1c04996); Hou, X., et al. "Lipid nanoparticles for mRNA delivery," *Nat Rev Mater*, Vol. 6 (2021):1078-1094 (available at https://www.nature.com/articles/s41578-021-00358-0).
[91] Meulien Opening Report, ¶ 117.  *See also* Chaudhary, N., et al. "mRNA vaccines for infectious diseases: principles, delivery, and clinical translation," *Nat Rev Drug Discov,* Vol 20 (2021): 817-838 (available at https://www.nature.com/articles/s41573-021-00283-5).
[92] Hou, X., et al. "Lipid nanoparticles for mRNA delivery," *Nat Rev Mater*, Vol. 6 (2021):1078-1094 (available at https://www.nature.com/articles/s41578-021-00358-0); https://www.nature.com/articles/s41573-021-00283-5.
[93] https://publichealth.jhu.edu/2021/the-long-history-of-mrna-vaccines; https://www.biontech.com/int/en/home/about/who-we-are/vision-and-mission.html; Knezevic, I., et al. "Development of mRNA Vaccines: Scientific and Regulatory Issues," *Vaccines*, Vol 9,2 (2021):81 (available at https://www.mdpi.com/2076-393X/9/2/81); Hou, X., et al. "Lipid nanoparticles for mRNA delivery," *Nat Rev Mater*, Vol. 6 (2021):1078-1094 (available at https://www.nature.com/articles/s41578-021-00358-0); Liu, Y., et al. "Development of mRNA Lipid Nanoparticles: Targeting and Therapeutic Aspects," *Int J Mol Sci*, Vol. 25,18(2024):10166 (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC11432440); Tenchov, R. "Lipid Nanoparticles–From Liposomes to mRNA Vaccine Delivery, a Landscape of Research Diversity and Advancement," *ACS Nano*, Vol. 15,11 (2021): (available at https://pubs.acs.org/doi/10.1021/acsnano.1c04996).
[94] Hou, X., et al. "Lipid nanoparticles for mRNA delivery," *Nat Rev Mater*, Vol. 6 (2021):1078-1094 (available at https://www.nature.com/articles/s41578-021-00358-0); Liu, Y., et al. "Development of mRNA Lipid Nanoparticles: Targeting and Therapeutic Aspects," *Int J Mol Sci*, Vol. 25,18(2024):10166 (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC11432440); Gote, V., et al. "A Comprehensive Review of mRNA Vaccines," *Int J Mol Sci*, Vol 24,3:2700 (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9917162).
[95] Chaudhary, N., et al. "mRNA vaccines for infectious diseases: principles, delivery, and clinical translation," *Nat Rev Drug Discov,* Vol 20 (2021): 817-838 (available at https://www.nature.com/articles/s41573-021-00283-5).

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

before the '651 patent.[96]  I also understand from Dr. Prud'homme that the '651 patent's scope is further limited by its application to a specific type of lipid vesicle (liposome) and specific type of nucleic acid (plasmid DNA, not mRNA), which offers poor applicability to the encapsulation of mRNA.[97]  Similarly, I understand that the Molar Ratio Patents are of limited applicability to the Accused Product because they describe a specific subset of four-component lipid systems in purportedly new ratios compared to other four-component lipid systems in the prior art.[98]  I further understand that the Molar Ratio Patents do not describe all lipid particles because all of the examples described therein concern encapsulation of a single type of nucleic acid—siRNA.[99]  During early stages of Moderna's development, Moderna had made use of "off-the-shelf lipids" before developing its own LNP technology.[100]

### 2.  Development Timeline Overview

43.  The onset of the COVID-19 pandemic "instigated a worldwide effort to develop a vaccine for COVID-19," as "[a]n efficacious vaccine [was] considered crucial to containing the COVID-19 pandemic."[101]  In conjunction with other containment efforts such as lockdowns and encouraging the use of facial coverings,[102] governments and international organizations, including the U.S. Government, the European Union (EU), and the Global Alliance for Vaccines and Immunization ("GAVI"), began working closely with vaccine developers to develop COVID-19 vaccines.[103]

44.  The United States took an aggressive "whole-of-government" approach to developing COVID-19 vaccines.[104]  On February 13, 2020, the U.S. Biomedical Advanced Research and Development Authority ("BARDA") publicly released its medical countermeasure COVID-19 strategy, which

---

[96] Prud'homme Opening Report, ¶ 112.

[97] Prud'homme Opening Report, ¶ 113; Prud'homme Rebuttal Report, ¶¶ 248, 250-254.

[98] Prud'homme Opening Report, ¶¶ 121-122; Prud'homme Rebuttal Report, ¶¶ 262-265.

[99] Prud'homme Opening Report, ¶ 122; Prud'homme Rebuttal Report, § IX.A.2.

[100] Deposition of Michael Smith, Ph.D., May 14, 2024 ("Smith May 14, 2024 Deposition"), pp. 85-89.

[101] https://pmc.ncbi.nlm.nih.gov/articles/PMC7283842

[102] *See, e.g.*, https://www.aljazeera.com/news/2020/8/17/which-countries-have-made-wearing-face-masks-compulsory; https://www.bbc.com/news/world-52103747.

[103] https://www.europarl.europa.eu/RegData/etudes/STUD/2023/740072/IPOL_STU(2023)740072_EN.pdf; https://www1.cgmh.org.tw/library_s/2020/paper/P-0428%20The%20COVID-19%20vaccine%20development%20landscape.pdf; *see, e.g.*, https://pmc.ncbi.nlm.nih.gov/articles/PMC9975718, ("After the pandemic began in early 2020, the US made historic financial investments in completing clinical trials and provided advance purchase guarantees for hundreds of millions of doses of vaccines…").

[104] https://www.defense.gov/News/News-Stories/Article/Article/2188680/army-general-to-co-lead-operation-warp-speed-for-covid-19-vaccine

included partnerships with private companies to develop a COVID-19 vaccine.[105]  On May 15, 2020, the U.S. government launched Operation Warp Speed, a collaboration between the Department of Health and Human Services ("HHS"), the Centers for Disease Control and Prevention ("CDC"), the FDA, the National Institutes of Health ("NIH"), the Biomedical Advanced Research and Development Authority, and the Department of Defense ("DoD") with the goal of accelerating vaccine development by providing U.S. Government support to promising vaccine candidates.[106]  Operation Warp Speed allowed steps in traditional development timelines to proceed simultaneously, such as "starting manufacturing of vaccines and therapeutics at industrial scale well before the demonstration of efficacy and safety as happens normally."[107]

45.  Further, the U.S. Government invested in clinical trials, vaccine development, and vaccine purchases upon the onset of the pandemic.[108]  Thanks in part to this funding, COVID-19 vaccines in the United States were "developed in a record-breaking time of less than a year"—an "unexpected rate" and "revolutionary speed" for vaccine development.[109]  Indeed, three separate COVID-19 vaccines had successfully received emergency use authorizations ("EUAs") from the FDA by February 2021: Pfizer-BioNTech's BNT162b2, Moderna's mRNA-1273, and Johnson & Johnson's COVID-19 vaccine, sold under the brand name Jcovden.[110]  Novavax's NVX-CoV2373 was approved approximately seventeen months later, in July 2022.[111]

46.  As noted above, the two primary COVID-19 vaccines in the U.S. by doses administered have been Moderna's mRNA-1273 and Pfizer-BioNTech's BNT162b2, both of which are mRNA vaccines.[112]

---

[105] https://medicalcountermeasures.gov/barda/barda-covid-19-response/timeline#event-46; https://www.hhs.gov/sites/default/files/nvac_feb2020_day1_johnson.pdf.

[106] https://www.defense.gov/News/Releases/Release/Article/2310750/trump-administration-announces-framework-and-leadership-for-operation-warp-speed; https://www.hhs.gov/sites/default/files/strategy-for-distributing-covid-19-vaccine.pdf;  https://www.europarl.europa.eu/RegData/etudes/STUD/2023/740072/IPOL_STU(2023)740072_EN.pdf.

[107] https://covid19.nihb.org/wp-content/uploads/2020/08/Fact-sheet-operation-warp-speed.pdf; https://www.hhs.gov/sites/default/files/strategy-for-distributing-covid-19-vaccine.pdf.

[108] https://pmc.ncbi.nlm.nih.gov/articles/PMC9975718.

[109] Gote, V., et al. "A Comprehensive Review of mRNA Vaccines," *Int J Mol Sci*, Vol 24,3:2700 (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9917162); Chaudhary, N., et al. "mRNA vaccines for infectious diseases: principles, delivery, and clinical translation," *Nat Rev Drug Discov,* Vol 20 (2021): 817-838 (available at https://www.nature.com/articles/s41573-021-00283-5).

[110] https://www.niaid.nih.gov/diseases-conditions/decades-making-mrna-covid-19-vaccines; https://www.cdc.gov/mmwr/volumes/71/wr/mm7103a4.htm.

[111] https://ir.novavax.com/press-releases/2022-07-13-U-S-FDA-Grants-Emergency-Use-Authorization-for-Novavax-COVID-19-Vaccine%2C-Adjuvanted-for-Individuals-Aged-18-and-Over

[112] https://ourworldindata.org/grapher/covid-vaccine-doses-by-manufacturer?country=~USA; https://www.cdc.gov/covid/vaccines/how-they-work.html.

Both Moderna and Pfizer-BioNTech began their vaccine development in January 2020, and clinical trials for their vaccine candidates began soon thereafter in the spring of 2020.[113]  The mRNA-1273 and BNT162b2 COVID-19 vaccines received Emergency Use Authorizations ("EUAs") in December 2020 (a week apart).[114]  The FDA granted full approval to the Pfizer-BioNTech BNT162b2 COVID-19 vaccine in August 2021 and to the Moderna mRNA-1273 COVID-19 vaccine in January 2022.[115]  Johnson & Johnson ("J&J") began vaccine development in January 2020 and received an EUA from the FDA in February 2021.[116]  In contrast to Moderna's and Pfizer-BioNTech's mRNA vaccines, J&J's vaccine is adenovirus-based.[117]

47.    The speed of COVID-19 vaccine development in both the United States and other countries was substantially dependent on past investment in research—the success of mRNA COVID-19 vaccines in particular has been described as "possible because of scientific ingenuity and biotechnological advances over the previous 30 years,"[118] as well as because of international cooperation and sharing of scientific knowledge.  For example, on January 11, 2020, Chinese scientists published the genetic sequence of SARS-CoV-2, which helped to accelerate vaccine research.[119]  Just three months later, on March 16, 2020, CanSino and the Academy of Military Medical Sciences in China launched the first COVID-19 vaccine clinical trial in the world,[120] and in August 2020, less than six months after the pandemic was declared, the Sputnik V vaccine became

---

[113] https://www.sec.gov/Archives/edgar/data/1682852/000119312520074867/d884510dex991.htm; https://investors.modernatx.com/news/news-details/2020/Moderna-Announces-First-Participant-Dosed-in-NIH-led-Phase-1-Study-of-mRNA-Vaccine-mRNA-1273-Against-Novel-Coronavirus/default.aspx; https://www.nature.com/articles/s41586-020-2639-4; https://www.nejm.org/doi/full/10.1056/NEJMoa2035389; https://www.pfizer.com/science/coronavirus/vaccine/about-our-landmark-trial.

[114] https://www.sec.gov/Archives/edgar/data/1682852/000119312520074867/d884510dex991.htm; https://www.nytimes.com/2020/11/10/business/biontech-covid-vaccine.html; https://www.niaid.nih.gov/diseases-conditions/decades-making-mrna-covid-19-vaccines.

[115] https://www.niaid.nih.gov/diseases-conditions/decades-making-mrna-covid-19-vaccines; https://investors.modernatx.com/news/news-details/2022/Moderna-Receives-Full-U.S.-FDA-Approval-for-COVID-19-Vaccine-Spikevax/default.aspx

[116] https://www.jnj.com/media-center/press-releases/johnson-johnson-launches-multi-pronged-response-to-coronavirus-global-public-health-threat; https://www.fda.gov/news-events/press-announcements/fda-issues-emergency-use-authorization-third-covid-19-vaccine.

[117] https://www.nytimes.com/interactive/2020/health/johnson-johnson-covid-19-vaccine.html

[118] https://www.niaid.nih.gov/diseases-conditions/decades-making-mrna-covid-19-vaccines; https://pmc.ncbi.nlm.nih.gov/articles/PMC9975718.

[119] https://www.science.org/content/article/chinese-researchers-reveal-draft-genome-virus-implicated-wuhan-pneumonia-outbreak; https://pmc.ncbi.nlm.nih.gov/articles/PMC7283842.

[120] https://pmc.ncbi.nlm.nih.gov/articles/PMC7989390

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

the first COVID-19 vaccine in the world to receive approval in Russia, although this approval was met with skepticism from many scientists.[121]

48.   Moderna in particular benefitted from its past investments in research and development, successfully finalizing its sequence for the mRNA-1273 vaccine on January 13, 2020, just two days after Chinese authorities had shared the genetic sequence of the novel coronavirus.[122]  This accomplishment was due in large part to Moderna's past heavy investment in its mRNA platform that "allows for speedier vaccine development," rooted in the fact that "Moderna ha[d] been working with mRNA technology 'since its inception in 2010.'"[123]

### 3.   COVID-19 mRNA Vaccine Supply

49.   As discussed in the section on vaccine development above, many companies have worked on a COVID-19 vaccine since the start of a pandemic.[124]  Of these companies, a smaller subset was working on developing mRNA covid vaccines for Unites States commercialization.[125]  Besides Moderna (discussed above), I provide basic background info on the suppliers and salient developers of mRNA COVID-19 vaccines intended for U.S. commercialization below.[126]

### a.   Pfizer/BioNTech

50.   BioNTech is an immunotherapy company headquartered in Germany[127] that began development of an mRNA-based COVID-19 vaccine in January 2020.[128]  On March 17, 2020, BioNTech announced a collaboration with Pfizer[129] to further develop its vaccine, later named Comirnaty.[130]  On December 11, 2020, the FDA issued the first EUA for a COVID-19 vaccine to Comirnaty for

---

[121] https://www.science.org/content/article/russia-s-approval-covid-19-vaccine-less-meets-press-release

[122] https://www.sec.gov/Archives/edgar/data/1682852/000119312520074867/d884510dex991.htm

[123] https://www.cnbc.com/2021/07/03/how-moderna-made-its-mrna-covid-vaccine-so-quickly-noubar-afeyan.html.; I note that Moderna's research and development efforts is discussed at length in various sections of this report, e.g., Sections III.D (Factor 13), IV.H.8 (assessment of Ms. Lawton's Factor 13).

[124] Deposition of Christoph Brackmann, May 16, 2024 ("Brackmann May 16, 2024 Deposition") Exhibit 6 (MRNA-GEN-01251960 at 977).  *See also* https://www.nytimes.com/interactive/2020/science/coronavirus-vaccine-tracker.html.

[125] https://www.nytimes.com/interactive/2020/science/coronavirus-vaccine-tracker.html

[126] This is not intended as an exhaustive discussion of all mRNA developers and is instead meant to provide basic background information on the suppliers and salient developers referenced in my ensuing damages analysis below.

[127] https://www.biontech.com/int/en/home/about/who-we-are/vision-and-mission.html; https://investors.biontech.de/static-files/9a85ed7f-5ca8-4e3b-a15a-32637049aafd.

[128] https://www.nytimes.com/2020/11/10/business/biontech-covid-vaccine.html

[129] Pfizer SEC Form 10-K (2024), p. 3 (available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000078003/1447e045-6320-4de3-a603-248c700cf342.pdf).

[130] Thron, C.R., et al. "The journey of a lifetime – development of Pfizer's COVID-19 vaccine," *Curr Opin Biotechnol*, Vol. 78: 102803 (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9433349).

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY                                        31

individuals 16 years of age and older.[131]  On August 23, 2021, the FDA granted full approval to Pfizer-BioNTech's COVID-19 vaccine for people 16 years of age and older.[132]

### b. Gritstone bio

51. Gritstone bio, formerly known as Gritstone Oncology Inc.,[133] ("Gritstone") is a pharmaceutical company based in Pleasanton, California focusing on the development of "next-generation vaccines for cancer and infectious disease."[134]  In January 2021, Gritstone launched a COVID-19 vaccine development program named "CORAL."[135]  CORAL, which Gritstone has framed as a "next-generation"[136] COVID-19 vaccine, aims to strengthen long-term immunity against COVID-19 compared to first-generation vaccines by combining an adenovirus-based vaccine with a self-amplifying RNA-based vaccine.[137]  CORAL has been supported by a license agreement and scientific data from the La Jolla Institute for Immunology, by a research grant from the Bill & Melinda Gates Foundation, and by clinical trial assistance from The National Institute of Allergy and Infectious Diseases ("NIAID").[138]  Gritstone reported positive results from three Phase 1 studies of CORAL in October 2023.[139]  In September 2023, Gritstone was awarded a contract with BARDA worth up to $433 million through Project NextGen, a U.S. Government effort to accelerate the development of next-generation COVID-19 vaccines and therapeutics.[140]  This

---

[131] https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19

[132] https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine

[133] https://web.archive.org/web/20210805214719/https://ir.gritstonebio.com/news-releases/news-release-details/gritstone-oncology-changes-its-name-gritstone-bio-reflect

[134] https://web.archive.org/web/20241210150142/https://gritstonebio.com/about

[135] https://www.globenewswire.com/news-release/2021/01/19/2160371/0/en/Gritstone-Advances-Second-Generation-COVID-19-Vaccine-CORAL-Program-with-Support-from-NIAID-Program-has-Potential-to-Protect-Against-Mutant-Variants-of-SARS-CoV-2.html

[136] https://web.archive.org/web/20241231114125/https://ir.gritstonebio.com/news-releases/news-release-details/gritstone-bio-awarded-barda-contract-conduct-comparative-phase

[137] https://web.archive.org/web/20241231114125/https://ir.gritstonebio.com/news-releases/news-release-details/gritstone-bio-awarded-barda-contract-conduct-comparative-phase

[138] Gritstone Bio SEC Form 10-K (2020), pp. 4-5 (available at https://www.sec.gov/Archives/edgar/data/1656634/000156459021012260/grts-10k_20201231.htm).

[139] https://web.archive.org/web/20241012020344/https://ir.gritstonebio.com/news-releases/news-release-details/gritstone-bio-announces-presentations-phase-1-studies-evaluating

[140] https://www.fiercebiotech.com/biotech/gritstone-line-433m-barda-funds-mrna-covid-19-shot-large-scale-trial; https://web.archive.org/web/20241231114125/https://ir.gritstonebio.com/news-releases/news-release-details/gritstone-bio-awarded-barda-contract-conduct-comparative-phase.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

contract was intended to support a Phase 2b study of CORAL,[141] but the study had not launched as of August 2024.[142] Gritstone currently does not market any pharmaceutical products.[143]

### c. Providence Therapeutics

52. Providence Therapeutics ("Providence") is an RNA medicines company based in Calgary, Canada.[144] Providence reported "promising data" on its COVID-19 vaccine candidate, PTX-COVID19-B, in March 2020, "only weeks after BioNTech and Moderna produced similarly encouraging early results for their mRNA-based vaccines."[145] Providence reported further positive preclinical data in August 2020[146] and submitted a Clinical Trial Application for PTX-COVID19-B in Canada in December 2020.[147] Phase 1 clinical trials for PTX-COVID19-B, the first coronavirus vaccine "designed and manufactured in Canada," began in January 2021.[148] In September 2021, Providence entered into two agreements with Everest Medicines to license PTX-COVID19-B in exchange for a $50 million upfront payment, a mix of profit sharing and single-digit to mid-teens royalties on sales, and up to $300 million in future milestone payments.[149] A Phase 2 clinical trial for PTX-COVID19-B was completed in March 2023.[150] In February 2024, Everest Medicines terminated its collaboration and license agreements with Providence,[151] and Providence's development of PTX-COVID19-B is currently paused.[152] Providence currently does not market any pharmaceutical products.[153]

---

[141] https://web.archive.org/web/20241231114125/https://ir.gritstonebio.com/news-releases/news-release-details/gritstone-bio-awarded-barda-contract-conduct-comparative-phase

[142] Gritstone Bio SEC Form 10-Q (2024 Q2), p. 6 (available at https://www.sec.gov/Archives/edgar/data/1656634/000095017024096211/grts-20240630.htm).

[143] Gritstone Bio SEC Form 10-Q (2024 Q2), p. 34 (available at https://www.sec.gov/Archives/edgar/data/1656634/000095017024096211/grts-20240630.htm).

[144] https://providencetherapeutics.com; https://providencetherapeutics.com/about/providence-history.

[145] https://www.cbc.ca/news/politics/providence-therapeutics-pulling-out-canada-1.6009068

[146] https://web.archive.org/web/20210920163209/https://providencetherapeutics.com/article-details/providence-therapeutics-reports-supportive-preclinical-data-for-its-covid-19-vaccine-candidate-ptx-covid19-b.html

[147] https://providencetherapeutics.com/press-details/providence-therapeutics-submits-clinical-trial-application-cta-to-health-canada-for-its-mrna-covid-vaccine.html

[148] https://www.cbc.ca/news/health/covid-19-vaccine-providence-1.5887613

[149] https://providencetherapeutics.com/press-details/providence-therapeutics-enters-into-comprehensive-agreements-with-everest-medicines-to-advance-mrna-vaccines-and-therapies-including-covid-19-vaccines-in-emerging-markets-in-asia.html

[150] https://clinicaltrials.gov/study/NCT05175742?term=PRO-CL-002&rank=1

[151] https://www.prnewswire.com/news-releases/everest-medicines-announces-termination-of-collaboration-agreements-with-providence-302064738.html

[152] https://providencetherapeutics.com/pipeline.html

[153] https://providencetherapeutics.com/pipeline.html

69.    In the subsections below, I provide an overview of the hypothetical negotiation framework.  I then proceed to an analysis of three common approaches to valuing intellectual property that provide insight into certain benchmarks that the Parties would consider at the Hypothetical Negotiation with respect to the Patents-in-Suit and their alleged use in Moderna's accused COVID-19 vaccine.

### B.  Initial Conditions and Parameters

70.    In the present matter, determining a reasonable royalty involves the consideration of a Hypothetical Negotiation between Genevant (as licensor) and Moderna (as licensee) for rights to the Patents-in-Suit at the date of first alleged infringement.[196]  The goal of the present Hypothetical Negotiation construct is to ascertain what the Parties would likely have agreed to as a reasonable royalty for Moderna's alleged use of the Claimed Inventions.  Within this framework, I commence my reasonable royalty assessment by setting forth the framework's initial conditions and parameters—based on my understanding of the hypothetical negotiation construct, the Patents-in-Suit, and other salient facts of this case.  These conditions and parameters are discussed in the subsections below.

#### 1.  Date of Hypothetical Negotiation

71.    A modestly different negotiation date (earlier or later) anywhere in the range of Plaintiffs' proposed dates of first infringement (ranging from May 2020 through October 2021)[197] would not substantively affect my findings, which, as explained below, are based on the historical licenses granting rights to the Patents-in-Suit—and which indicate a consistent range of values before, during, and after this time frame.  Therefore, since this timing does not substantively affect the outcome of my affirmative analysis, to narrow the scope of the disagreement and focus on the more substantive differences between our analyses, I assume the Hypothetical Negotiation occurs on May 31, 2020 for my affirmative analysis.[198]

---

[196] I understand that there is no dispute among the Parties that the Hypothetical Negotiation would be between Genevant (as licensor) and Moderna (as licensee).

[197] *See* Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), pp. 45-50 (noting that that Plaintiffs' Proposed October 2021 hypothetical negotiation date would be the date corresponding to the date of alleged first infringement for the '378 patent).

[198] Lawton Report, ¶ 1312.

#### 4.    Full Information, Reasonable Foresight, and Consistency of Forecasts

76.    In the hypothetical negotiation analysis, the parties are assumed to have had full information and reasonable foresight as to trends in the marketplace.  The assumption of full information does not imply that the parties to the hypothetical negotiation know the future with certainty, but rather that the parties "put their cards on the table," *i.e.*, they have access to the same information, so that neither can exploit an informational advantage over the other in the bargaining process.[202]

77.    Given full information and reasonable foresight, I assume that the Parties would have had common expectations regarding the demand for the Patents-in-Suit.  Without this assumption, the hypothetical negotiation construct could break down even though, given full information, reasonable foresight, and agreement that the patent in question is valid, enforceable, and infringed, the Parties would rationally have been able to negotiate a royalty, as they are required to do in a reasonable royalty damages assessment.

### C.  The Three Intellectual Property Valuation Approaches (Market, Income, Cost)

78.    In the sections below, I discuss three commonly applied methodologies for intellectual property valuation—the Market Approach, Income Approach, and Cost Approach.  These approaches are also frequently used in the context of a reasonable royalty assessment under a hypothetical negotiation framework.  I analyze these three methodologies and determine if and to what extent the factors considered under these approaches provide probative insight into the Hypothetical Negotiation.  In the following section, I utilize the insight garnered from my consideration of these three approaches within my analysis of the *Georgia-Pacific* Factors.

#### 1.    The Market Approach

79.    The Market Approach analyzes the appropriate damages by observing actual market transactions (or related interactions) for the patents-at-issue, or for comparable technologies.  In the sections below, I begin this analysis by providing overviews of agreements/transactions and related interactions in this matter (organized under several categories).[203]  For reference, I summarize the

---

[202] *See, e.g.*, Jonathan D. Putnam and Andrew B. Tepperman, "Bargaining and the Construction of Economically Consistent Hypothetical Negotiations."  *The Licensing Journal*, August 2004, pp. 8–15 at 12 (available at https://www.competitiondynamics.com/wp-content/uploads/Putnam-and-Tepperman-Bargaining.pdf).
[203] In my Market Approach analysis, I consider the historical licenses granting rights to the Patents-in-Suit (and related transactions) to third parties and the licenses identified by Moderna and/or considered by Plaintiffs' damages expert (Ms.

key terms of the agreements discussed in this section in Exhibits 4 (Plaintiff agreements) and 5 (Moderna agreements). I then analyze the probative value of these transactions for the purpose of assessing the appropriate quantum of damages.

80. My main findings are that most of the existing commercial licenses granting rights to the Patents-in-Suit are highly probative and establish a narrow benchmark range of effective percentage-of-net-sales royalty rates (which would guide the Parties at the Hypothetical Negotiation). I also find that the other agreements/transactions produced in this matter do not provide significant incremental probative insight beyond what is provided by the comparable Genevant licenses granting rights to the Patents-in-Suit.

### a. Licenses and Transactions Involving Rights to the Patents-in-Suit

81. In this section, I provide information about the historical licenses granting rights to the Patents-in-Suit, in the order they were executed.[204] My analysis of these (and all other) agreements is then provided later in the Market Approach Analysis subsection. My discussion here begins with several agreements that predate Genevant/Arbutus's control of the Patents-in-Suit, beginning with an agreement through which Protiva/Tekmira[205] licensed rights to the Patents-in-Suit as part of a multi-party settlement agreement. For reference, I provide a more detailed summary of the payment terms specified by many of these licenses in Exhibit 6.[206]



---

Lawton) as potentially relevant. *See* Lawton Report, Schedules 6.1-6.3; Lawton Report, ¶ 1043; Defendants' Fourteenth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (nos. 1–10), pp. 91-107.

[204] I note that depending of the timing of the agreement analyzed, certain members of the Patents-in-Suit may not be explicitly referred to by number in the text of the agreements; however, I note that these agreements generally contain provisions such that they licensed any provisional applications, divisionals, continuations, and continuations-in-part issuing from any of the patents licensed at the time of the agreement (or patents stemming from licensed applications). Thus, all of the agreements below contain references to either the Patents-in-Suit or their applications (explicitly or via references to divisionals, continuations, or continuations in part). *See, e.g.,* https://patentimages.storage.googleapis.com/f1/88/cf/0947e1e55e8474/US9504651.pdf, noting application number 13/684,066; https://patentimages.storage.googleapis.com/9a/c3/e8/631138608775fb/US8058069.pdf, noting provisional application number 61/045,228.

[205] Protiva and Tekmira were predecessor entities to Arbutus and Genevant, *see* Section II.A.1.

[206] In my Market Approach Analysis discussion below in Section III.C.1.e, I identify certain of these licenses as being most comparable to the license contemplated at the present Hypothetical Negotiation. These are the agreements included in Exhibit 6.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY                44

[REDACTED]



---

207 ABUS-00023263 at 266, 299; *see also* ABUS-00000052 at 057.
208 ABUS-00023263 at 275.
209 ABUS-00023263 at 273, 275, 334.

*See also* Section III.C.1.
211 ABUS-00023263 at 279-285.
212 ABUS-00023263 at 279-281.
213 ABUS-0023263 at 280.
214 ABUS-00023263 at 280-281.

███ ████████████████████████████████████████████████████

████████████████████████████████████████

### ii.    Acuitas–Moderna Agreements

86. ████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████, ███
███████████████████████████████████████████
███████████████████████████████████████, █
██████████████████████████████████████████
████████████████████

███ ████████████████████████████████████████
████████████████████████████████████████
████ ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████

88. Subsequently, on May 22, 2015, Moderna and Acuitas entered into a non-exclusive license
agreement in accordance with the option provisions set forth in the July 2014 development and
option agreement.[220]  Under this license agreement, Moderna obtained a non-exclusive right to
Acuitas intellectual properties—which included know-how and patent rights including rights to
the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in

---

[215] MRNA-GEN-00225558 at 561-562, ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████, *see* MRNA-
GEN-00225558 at 565.
[216] MRNA-GEN-00225558 at 561-566, 571-572, 580-581.
[217] MRNA-GEN-00225558 at 563, 565, 580-581.
[218] The specific terms of these services were subject to a work plan to be agreed upon by both parties at a later time, *see*
MRNA-GEN-00225558 at 566-568.
[219] MRNA-GEN-00225558 at 563, 576-577.
[220] GENV-00021315 at 318.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

this matter—to manufacture, develop, and commercialize therapeutic products that target an Influenza A virus protein target.[221]

89.    As part of the agreement, Moderna agreed to reimburse 100 percent of any royalty owed by Acuitas to third parties as a result of Acuitas's in-licenses with third parties for which rights were then sublicensed by Acuitas to Moderna (i.e., the "In-License Royalties" and "In-License Milestone Payments").[222]  Moderna also agreed to pay Acuitas $4.75 million in milestone payments that were conditional on Moderna achieving certain development and commercialization milestones—with the Moderna payments for In-License Milestone Payments for Acuitas's necessary in-licenses being creditable against these milestone payments made by Moderna to Acuitas.[223]  In addition, Moderna agreed to certain running royalties (beyond the In-License Royalties referenced above), according to the following provisions:

- (a) 3 percent of net sales of each covered product which is covered by at least one valid claim or subject to data exclusivity (on a country-by-country basis);[224]

- (b) In the event there are no valid patent claims, but there are pending patent claims, 1.5 percent of net sales (on a country-by-country basis);[225]

- (c) In the event there are no valid patent claims or pending patent claims, Moderna agreed to pay 1 percent of net sales for "know how" (on a country-by-country basis) covering a licensed product, for a period of 10 years after the first commercial sale of the product, stating further that in "no event will the royalties payable by Moderna to Acuitas for any Licensed Product be less than one percent (1%) as a result of any reductions under this License Agreement and/or the Development and Option Agreement";[226]

- The agreement further specifies that in the event no royalties are paid to Acuitas under conditions (a) through (c) above, but In-License Royalties are paid, then the royalty will be 1 percent of net sales (on a country-by-country basis).[227]

90.    The agreement also specifies reductions of 50 percent of the running royalty payments that Moderna makes to third parties (for necessary third-party intellectual property) on sales of covered

---

[221] GENV-00021315 at 320, 324, 348.

[222] GENV-00021315 at 326-327.

[223] GENV-00021315 at 326-328.

[224] GENV-00021315 at 320, 328.

[225] This royalty would only become payable if the pending claim covering the licensed product was fully issued as a valid claim, *see* GENV-00021315 at 328.

[226] GENV-00021315 at 328.

[227] GENV-00021315 at 328-329.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY                                                                                47

products—so long as the total reductions therefrom do not reduce the royalty payments to Acuitas below 50 percent of the original running royalty percentages described above.[228]

91.    Subsequently, there were several additional non-exclusive license agreements executed pursuant to the terms of the original development and option agreement that granted Moderna the rights to manufacture, develop, and commercialize products that directed at Chikungunya virus, respiratory syncytial virus, and Zika virus targets.[229]  The non-exclusive licensing provisions of these subsequent agreements contain substantively the same terms as described above; however, they differ in the specific target that is being licensed by Moderna.[230]

92.    I understand that there was a dispute between Acuitas and Arbutus about Acuitas's right to sub-license to Moderna.[231]  This culminated in a lawsuit between Arbutus and Acuitas in Canada, which resulted in a settlement where Acuitas was restrained from granting any further sublicenses, but the sublicenses that Acuitas granted to Moderna remained intact.[232]

### iii.    2017 Arbutus–Protiva–Gritstone Agreement

93.    On October 16, 2017, Arbutus (along with Protiva Biotherapeutics Inc.) and Gritstone Oncology, Inc. ("Gritstone") entered into a license agreement whereby Arbutus granted Gritstone a worldwide, exclusive license to certain Arbutus intellectual properties to research, develop, manufacture and commercialize covered products that include a RNA encoding for tumor-specific targets in the field of "treatment, prevention, palliation, and amelioration of human diseases."[233] The licensed intellectual properties included "know-how" and a portfolio of patent rights that

---

[228] GENV-00021315 at 329.

[229] *See* GENV-00021083 at 083-198; GENV-00021199 at 199-314; GENV-00021427 at 427-468.

[230] *See* GENV-00021083 at 116; GENV-00021199 at 233; GENV-00021427 at 460.  Certain other differences between licenses exist, such as the degree to which Moderna's In-License Milestone Payments are creditable against milestone payments to Acuitas, *see* GENV-00021315 at 328; GENV-00021083 at 096; GENV-00021199 at 212; GENV-00021427 at 440.

[231] Deposition of Mark Murray, Ph.D., May 30, 2024 ("Murray May 30, 2024 Deposition"), pp. 115-131 (Q: "So you wanted to continue to pressure Acuitas to terminate the cross-license that Arbutus had with Acuitas; is that right?"  A: "I assume so." Q: "Why did you want to do that in July of 2016?"  A: "Because as I mentioned earlier, Acuitas was out – to others, representing that they had the rights to use and license our technology.").

[232] Murray May 30, 2024 Deposition, pp. 110-113 (Q: "And so this litigation between Arbutus and Acuitas ultimately settled; is that right?"  A: "Yes, it did. . . . the settlement agreement terminates Acuitas's right to use or sublicense Arbutus's LNP technology going forward.  And it further stipulates that for nonexclusive viral vaccine sublicenses previously granted to Moderna will survive.").

[233] The exclusivity of these rights was subject to conditions from prior signed agreements, *see* GENV-00023476 at 480, 484, 491-494.

included rights to the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.[234]  Pursuant to the agreement, Arbutus agreed to provide Gritstone with certain precommercial support services, such as assisting with manufacturing of candidate formulations of licensed products and LNPs.[235]

94.    Under the agreement, Gritstone agreed to pay Arbutus a ▮▮▮▮▮ upfront fee and milestone payments that were conditional on Gritstone achieving certain development and commercialization milestones (e.g., for the first U.S. marketing authorization approval).[236]  The parties also agreed to running royalties of ▮▮▮▮▮▮▮▮▮▮▮ depending on whether the product was in a "Heterologous System" or a "Homologous System," and a clause for running royalty reductions equivalent to ▮▮▮▮▮ the royalty payments that Gritstone makes to third parties for third-party intellectual property necessary for commercializing the covered products—so long as the total reductions therefrom do not reduce the adjusted running royalty payments to Arbutus below ▮▮▮▮ of their original amounts (the ▮▮▮▮ percent referenced above).[237]  I am not aware of any products that have been commercialized under the terms of this agreement.[238]

### iv.    2018 Genevant–BioNTech Agreement

95.    On July 4, 2018, Genevant and BioNTech RNA Pharmaceuticals GmbH ("BioNTech") entered into a co-development and patent license agreement.[239]  Under the patent license agreement provisions, Genevant agreed to provide BioNTech with an exclusive, worldwide license to Genevant intellectual properties—with certain sublicensing rights—to develop, make, have made, use, distribute, sell, offer for sale, have sold, import, export and otherwise commercialize products

---

[234] GENV-00023476 at 487, 493-494.  This agreement also licensed any addition, divisional, continuation, or continuation-in-part issuing from any of the patents licensed at the time of the agreement, *see* GENV-00023476 at 490.

[235] The specific terms of these services were subject to a plan jointly agreed upon by both parties, *see* GENV-00023476 at 497-499.

[236] GENV-00023476 at 500-502; *see also* Exhibit 6.

[237] GENV-00023476 at 502-503.  As further explained below in Section III.C.1.a.ix, I understand Moderna's allegedly infringing formulations of its Accused Product would be considered "homologous" as the term is so defined in the Gritstone agreement. Prud'homme Conversation.

[238] https://web.archive.org/web/20241012014928/https://gritstonebio.com/our-pipeline/, last archived October 10, 2024.  Gritstone Bio declared bankruptcy in October 2024, *see* https://www.fiercebiotech.com/biotech/gritstone-files-bankruptcy-hope-keeping-cancer-vaccine-rd-afloat.

[239] GENV-00022037 at 037-296.

in the field of "treatment, prevention and diagnosis of illnesses in the field of oncology."[240,241]  The Genevant intellectual properties include "know-how" and a portfolio of patent rights that included the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.[242]

96.  The BioNTech agreement also specifies the terms of a significant co-development venture—contemplating development and commercialization of co-development products.[243]  For example, under the collaboration terms, Genevant was "solely responsible" for all manufacture of co-development products at preclinical, clinical, and commercial stages, and BioNTech was responsible for leading commercialization of several candidate co-development products.[244]

97.  Under the terms of the patent license agreement provisions, BioNTech agreed to make milestone payments, conditional on BioNTech achieving corresponding regulatory and commercial milestones.[245]  The agreement also specifies running royalties of ▮▮▮▮▮ of worldwide, licensed BioNTech product net sales.[246]  There is also a clause for running royalty reductions equivalent to ▮▮▮▮▮ of the royalty payments that BioNTech makes to third parties for the covered products—so long as the total reductions therefrom do not reduce the adjusted running royalty payments to Genevant below ▮▮▮▮▮ of the original amount (i.e., not to be reduced below ▮▮▮▮▮.[247]  The agreement also contains separate provisions for the profit- and cost-sharing related to the development and commercialization of any co-development products.[248]  According to a summary of Genevant's in-licensing revenues, Genevant has received ▮▮▮▮▮ total

---

[240] GENV-00022037 at 038, 052-055.

[241] There were also separate provisions governing licenses for codeveloped products in the field of the "treatment, prevention and diagnosis of liver diseases (as defined by the FDA and/or the EMA), excluding any oncology diseases," *see* GENV-00022037 at 040, 054.

[242] GENV-00022037 at 045-046, 053.  This agreement also licensed any divisionals, reissues, continuations, and continuations-in-part issuing from any of the patents licensed at the time of the agreement, *see* GENV-00022037 at 045, 050.

[243] GENV-00022037 at 071-076.

[244] GENV-0022037 at 073, 075-076, 108-112.

[245] GENV-0022037 at 068-069.

[246] GENV-0022037 at 052, 069.

[247] GENV-0022037 at 069-070.

[248] GENV-0022037 at 074-076.

pursuant to this agreement as of June 2024—I understand that this is a result of non-running royalty payments as no products have been commercialized under this license.[249]

### v.    2020 Genevant–Providence Agreement

98.    On May 11, 2020, Genevant and Providence Therapeutics Covid Inc. ("Providence") entered into a license and development agreement whereby Genevant granted Providence a worldwide (with certain exclusions and limitations), exclusive (with an option to convert to non-exclusive) license to certain Genevant intellectual properties to research, develop, manufacture and commercialize mRNA COVID-19 vaccine products.[250] The licensed intellectual properties included "know-how" and a portfolio of patent rights that included rights to the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.[251] The covered products are defined as vaccine products "containing at least one mRNA that encodes at one or more antigens for SARS-CoV-2 formulated in, or comprising, a Genevant LNP; provided that, without limitation, no product that contains an mRNA that is self-replicating or part of a self-replicating RNA system is or shall be a Product."[252] Pursuant to the agreement, Genevant agreed to provide Providence with certain precommercial support services, such as assisting with manufacturing of candidate formulations of licensed products and LNPs.[253]

99.    Under the terms of the license agreement provisions, Providence agreed to pay an upfront payment, where the exact amount would depend on the amount of outside funding Providence would receive for development of a licensed product.[254] Providence also agreed to make milestone payments conditional on Providence achieving certain development and commercial goals.[255] In

---

[249] *See* Exhibit 4-A; GENV-00961337; *see also* Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn Deposition, Exhibit 25). Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535. Zorn June 5, 2024 Deposition, pp. 198-199.

[250] GENV-00022307 at 308, 314-315, 318, 320-322.

[251] GENV-00022307 at 315, 321-322. This agreement also licensed any addition, divisional, continuation, or continuation-in-part issuing from any of the patents licensed at the time of the agreement, *see* GENV-00022307 at 317.

[252] GENV-00022307 at 318.

[253] The specific terms of these services were subject to a plan jointly agreed upon by both parties, *see* GENV-00022307 at 324-325.

[254] Under the terms of the agreement, if Providence received ▇▇▇▇▇▇ more in funding, then the initial payment to Genevant was to be ▇▇▇▇▇▇; if Providence received less than ▇▇▇▇▇▇ in funding, then the initial payment would be calculated as [(total funding on or before July 31, 2020) / ▇▇▇▇▇▇▇▇▇), *see* GENV-00022307 at 314, 318-319.

[255] The amount of a given milestone payment was also dependent on whether the license had been converted from exclusive to non-exclusive prior to the given milestone being reached, *see* GENV-00022307 at 321, 326-328.

addition, the parties agreed to running royalties of █ percent of net sales for sales made under the exclusive license provisions, and ██ percent of net sales made under the non-exclusive license provisions (i.e., after the license was converted to non-exclusive).[256]  The parties also agreed to royalty reduction provisions, which could reduce the above stated running royalty percentages (on a country-by-country and product-by-product basis) by up to ████████ (in aggregate), including:

- Reductions equivalent to ████████ of the royalty payments that Providence makes to third parties for the covered products—so long as the total reductions therefrom do not reduce the adjusted running royalty payments to Genevant below 50 percent of the original amount;

- ███████ reductions while generic competition exists;

- ███████ reductions for royalties on products no longer covered by a valid claim of a Genevant patent or joint patent; and

- In the event that a Government Authority compels Providence to grant a compulsory sublicense to a third party, then reductions based on the rates paid by the compulsory sublicensee, so long as all aggregate royalty reductions do not reduce the running royalties paid by Providence to Genevant below ████████ of the original rates specified above.[257]

100. There were five amendments to the original agreement.[258]  The first four amendments do not substantively impact the terms summarized above.[259]  The fifth amendment specified that in the event of the execution of a future collaboration agreement, the terms of the original agreement would be changed.[260]  However, no such collaboration agreement was ever consummated.[261]  According to a summary of Genevant's in-licensing revenues, Genevant has received ████████ total pursuant to this agreement as of June 2024—I understand that this is a result of non-running royalty payments as no products have been commercialized under this license.[262]

---

[256] GENV-00022307 at 321, 328-329.

[257] GENV-00022307 at 329.

[258] GENV-00022422; GENV-00022299; GENV-00022303; GENV-00022305; GENV-00022419.

[259] GENV-00022422; GENV-00022299; GENV-00022303 at 303-304; GENV-00022305.

[260] GENV-00022419 at 420.  As of the execution date of the fifth amendment, Genevant had previously converted several non-U.S. territories to non-exclusive via letter notifications, *see* GENV-00022418, GENV-00022419 at 421, and GENV-00022417.

[261] Zorn June 5, 2024 Deposition, pp. 156-159.

[262] *See* Exhibit 4-A; GENV-00961337; *see also* Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn Deposition, Exhibit 25).  Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535.  Zorn June 5, 2024 Deposition, pp. 198-199.

### vi.    2020 Genevant–Sarepta Agreement

101.  On October 12, 2020 Genevant and Sarepta Therapeutics, Inc. ("Sarepta") entered into a research collaboration and option agreement whereby Genevant granted Sarepta certain rights to Genevant intellectual properties, including "know-how" and a portfolio of patent rights that include the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.[263]  These rights were contained within two main provisions, summarized as follows:

- (1) a non-exclusive, royalty-free, worldwide research (i.e., non-commercial) license to Genevant intellectual properties to pursue collaborative research with Genevant;[264] and,

- (2) the option to obtain a worldwide, exclusive license to certain Genevant intellectual properties to develop and commercialize certain products within four research indication fields.[265]

102.  Pursuant to the agreement, Genevant also agreed to provide Sarepta with certain precommercial support services, such assisting with manufacturing of candidate formulations of candidate products and LNPs.[266]

103.  Sarepta agreed to pay Genevant a ▮▮▮▮▮ upfront payment upon execution of the research collaboration and option agreement.[267]  As of the submission of this report, Genevant's licensing revenue record indicates that Sarepta has not executed its options and/or entered into a commercial license with Genevant.[268]  According to a summary of Genevant's in-licensing revenues, Genevant has received ▮▮▮▮▮ total pursuant to this agreement as of June 2024—I understand that this is a result of non-running royalty payments as no products have been commercialized under this license.[269]

---

[263] GENV-00022423 at 423, 429-431.
[264] GENV-00022423 at 437, 441.
[265] GENV-00022423 at 423, 441-442.  These optionable fields for license were defined as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," *see* GENV-00022423 at 433.
[266] The specific terms of these services were subject to a plan to be jointly agreed upon by both parties, *see* GENV-00022423 at 435-437.
[267] GENV-00022423 at 451.
[268] Zorn June 5, 2024 Deposition, Exhibit 25 (GENV-00062535).
[269] *See* Exhibit 4-A; GENV-00961337; *see also* Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn Deposition, Exhibit 25).  Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535.  Zorn June 5, 2024 Deposition, pp. 198-199.

### vii.    2020 Genevant– Agreement

104.    On October 19, 2020, Genevant and ███████████████ entered into an agreement whereby Genevant provided ███ a limited license to Genevant "know-how" and patents, including rights to the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter, for the purpose of conducting a single Phase 1 clinical trial (and producing the associated candidate compound for trial).[270]  Pursuant to the agreement, Genevant agreed to provide ███ with certain precommercial support services, such as supplying the necessary LNP "starting materials" and assisting with the manufacture of the trial candidate compound.[271]

105.    Genevant provided no commercialization rights to ███ under this agreement.[272]  According to a summary of Genevant's in-licensing revenues, Genevant has received ██████████ total pursuant to this agreement as of June 2024—I understand that this is a result of non-running royalty payments as no products have been commercialized under this license.[273]

### viii.    2020 Genevant–Gritstone Agreement

106.    On October 20, 2020, Genevant and Gritstone entered into a worldwide license agreement whereby Gritstone obtained exclusive rights to certain Arbutus intellectual properties to research, develop, manufacture and commercialize covered products in the field of HIV/AIDS, among others, that Genevant granted Gritstone the option to expand into.[274,275]  The licensed intellectual

---

[270] GENV-00022525 at 525-530.  This agreement also licensed any addition, divisional, continuation, or continuation-in-part issuing from any of the patents licensed at the time of the agreement, *see* GENV-00022525 at 528.

[271] GENV-00022525 at 530.

[272] GENV-00022525 at 525-530.

[273] *See* Exhibit 4-A; GENV-00961337; *see also* Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn Deposition, Exhibit 25).  Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535.  Zorn June 5, 2024 Deposition, pp. 198-199.

[274] GENV-00022587 at 588, 592, 595-596, 603-604, 641.

[275] The agreement defines the licensed field as "(a) the Initial Field; (b) any or all of the cure, treatment or prevention of an ID Indication for which Gritstone validly exercises an Option Right and which is accepted by Genevant in accordance with Section 2.7; and (c) any or all of the cure, treatment or prevention of Affiliated ID Indications with respect to each ID Indication in the Field; provided that the Field shall not include the Excluded Field" (GENV-00022587 at 592), where the "Initial Field" is defined as "(a) any or all of the cure, treatment or prevention of human immunodeficiency virus (HIV) and (b) any Affiliated ID Indication with respect to HIV, including for clarity acquired immunodeficiency syndrome (AIDS)" (GENV-00022587 at 596), and "ID Indications" are defined as "(a) human immunodeficiency virus (HIV) or (b) an infectious disease or associated pathogen set forth on Exhibit A attached hereto" (GENV-00022587 at 595).  I note that based on Genevant's out-license revenue summary, Gritstone has never paid the $1.5 million option exercise fee to expand

properties include "know-how" and a portfolio of patent rights including rights to the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.[276] Pursuant to the agreement, Genevant agreed to provide Gritstone with certain precommercial support services, such as manufacturing of candidate formulations of licensed products and LNPs.[277]

107. Under the agreement, Gritstone agreed to pay Genevant a ▮▮▮▮▮ upfront fee and milestone payments that were conditional on Gritstone achieving certain development and commercialization milestones (e.g., for the first U.S. Marketing Authorization approval).[278] The parties also agreed to running royalties of ▮▮▮▮ percent of net sales depending on whether the product was in a "Heterologous System" or a "Homologous System," and a clause for royalty reductions, including:

- ▮▮▮▮▮ of the royalty payments that Gritstone makes to third parties for commercializing the covered products—so long as the total reductions therefrom do not reduce the adjusted running royalty payments to Genevant below ▮▮▮▮ of their original amounts (the ▮▮▮▮ ▮▮▮▮ referenced above); and

- ▮▮▮▮ upon commencement of generic competition.[279]

108. According to a summary of Genevant's in-licensing revenues, Genevant has received ▮▮▮▮ total pursuant to this agreement as of June 2024—I understand that this is a result of non-running royalty payments as no products have been commercialized under this license.[280]

---

the field of this agreement, *see* GENV-00961337; *see also* Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn Deposition, Exhibit 25). Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535. Zorn June 5, 2024 Deposition, pp. 198-199.

[276] GENV-00022587 at 594, 596. This agreement also licensed any addition, divisional, continuation, or continuation-in-part issuing from any of the patents licensed at the time of the agreement, *see* GENV-00022587 at 600.

[277] The specific terms of these services were subject to a plan to be jointly agreed upon by both parties, *see* GENV-00022587 at 608-610.

[278] *See* Exhibit 6.

[279] GENV-00022587 at 613-614. There was one amendment to the 2020 Gritstone Agreement, *see* GENV-00022584.

[280] *See* Exhibit 4-A; GENV-00961337; *see also* Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn Deposition, Exhibit 25). Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535. Zorn June 5, 2024 Deposition, pp. 198-199.

### ix.    2021 Genevant–Gritstone Agreement

109.  On January 15, 2021, Genevant and Gritstone entered into a non-exclusive license and development agreement, whereby Genevant granted Gritstone a worldwide, non-exclusive, sub-licensable license to certain Genevant intellectual properties to research, develop, manufacture, have manufactured, and commercialize certain products to treat COVID-19.[281]  The licensed Genevant intellectual properties include "know-how" and a portfolio of patent rights that include the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.[282]  Pursuant to the agreement, Genevant agreed to provide Gritstone with certain precommercial support services to be specified in a R&D support plan to be agreed upon by both parties at a later time.[283]  Such precommercial support services contemplated by this agreement include assisting with the manufacturing of candidate formulations of licensed products and LNPs.[284]

110.  The parties agreed to royalty provisions for both (1) Gritstone acting as the direct licensee and/or (2) under a sub-licensing regime with Gritstone as the sub-licensor.[285]  Under the direct licensee terms of the agreement,[286] Gritstone agreed to make milestone payments conditional on Gritstone achieving corresponding regulatory and commercial milestones.[287]  Some of the development milestone payments depend on the contemporaneous number of approved, third-party COVID-19 mRNA treatments—with payment amounts decreasing (or remaining unchanged) as the number of approved, third-party COVID-19 mRNA treatments increases.[288]

111.  Gritstone also agreed to pay running royalties based on a percentage of annual net sales—with the royalty percentage of net sales varying depending based on the type of therapy (homologous or

---

[281] GENV-00022689 at 690, 694-696, 706-707.
[282] GENV-00022689 at 694-696, 755-792.  This agreement also licensed any addition, divisional, continuation, or continuation-in-part issuing from any of the patents licensed at the time of the agreement, *see* GENV-00022689 at 703.
[283] GENV-00022689 at 711-712.
[284] GENV-00022689 at 713.
[285] GENV-00022689 at 705-706, 715-721.
[286] There were separate terms for royalties associated with sub-licensing revenue, where royalties paid by Gritstone to Genevant would equal ▇▇▇▇ of the Sublicense Revenue received by Gritstone in connection with sales of products containing a Genevant LNP (*see* GENV-00022689 at 704, 720-721).
[287] GENV-00022689 at 714-720.
[288] GENV-00022689 at 704, 714-719.

heterologous)[289] and the contemporaneous number of approved, third-party COVID-19 mRNA treatments, such that:

- If there are no other FDA-approved COVID-19 mRNA treatments, the royalty rate is ▮ ▮▮▮ for a heterologous system and ▮ for a homologous system;

- If there is one other FDA-approved COVID-19 mRNA treatment, the royalty rate is ▮ ▮▮▮ for a heterologous system and ▮ for a homologous system;

- If there are two or more other FDA-approved COVID-19 mRNA treatments, the royalty rate is ▮▮▮ for a heterologous system and ▮ for a homologous system; and,

- If the product is marketed under FDA EUA rather than full FDA approval, the royalty rate is ▮▮▮ for a heterologous system and ▮ for a homologous system.[290]

112. I understand from Dr. Prud'homme that Moderna developed three versions of its COVID-19 mRNA vaccine: the PVU Formulation, v1 Formulation, and v2 Formulation.[291] I further understand that the PVU Formulation consisted of a 50:38.5:10:1.5 lipid molar ratio, that the v1 Formulation consisted of a 48.5:38.9:11.1:1.5 lipid molar ratio, and that the v2 Formulation consisted of a 48.0:38.5:11.0:2.5 lipid molar ratio.[292] It is my understanding from Dr. Prud'homme that the commercial formulations of Moderna's COVID-19 mRNA vaccine utilized the v1 and v2 Formulations.[293] I further understand from Dr. Prud'homme that the Moderna COVID-19 mRNA vaccine schedule was initially intended to be administered with two doses of a Moderna COVID-19 mRNA vaccine.[294] I understand that Genevant alleges that both v1 and v2 Formulations infringe the Patents-in-Suit, and that for the purposes of a hypothetical negotiation where infringement must be assumed, that the v1 and v2 Formulations would be considered "homologous" as the term is so defined in the Gritstone agreement.[295]

---

[289] The agreement defines a heterologous system as a "heterologous Prime-Boost treatment regimen in which a Genevant LNP is not used in the Prime and all of the Boost settings, such that there is at least one Prime or Boost that does not contain a Genevant LNP" (GENV-00022689 at 697-698). This means that a heterologous system is a set of vaccines received by an individual, where one of those vaccine doses, either an initial vaccine dose or a booster dose, does not contain a Genevant LNP. By contrast, the agreement defines a homologous system as "a homologous Prime-Boost treatment regimen in which a Genevant LNP is used in each and every one of the Prime and Boost doses" (GENV-00022689 at 698).

[290] GENV-00022689 at 720-721.

[291] Prud'homme Rebuttal Report, § VIII.B.

[292] Prud'homme Rebuttal Report, § VIII.B.

[293] Prud'homme Rebuttal Report, § VIII.B.

[294] Prud'homme Rebuttal Report, § VIII.B.

[295] Prud'homme Conversation.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

113. In addition, the agreement specifies two main sections on royalty reductions: Sections 4.6 (a) and 4.6 (b). Section 4.6 (a) of the original agreement was replaced by a subsequent amendment that inserts the following language:

> (i) The Royalty due and payable under Section 4.5 for a Calendar Quarter with respect to a Product shall be reduced, on a country-by-country basis, by an amount equal to ███ ███████████ of any payments (including upfront payments, royalties, milestones, amounts paid in settlement) made by Gritstone, its Affiliates or Sublicensees to Third Parties in such Calendar Quarter specifically in consideration for a license or other right to exploit such Necessary Third-Party IP with respect to such Product; and (ii) if during the Royalty Payment Term for a Product and country, the manufacture, use and sale of such Product becomes no longer Covered by at least one Valid Claim in such country, the Royalty due and payable under Section 4.5 in respect of such Product and country shall thereafter be reduced by ██████████████) during the remainder of the Royalty Payment Term for such Product and country; provided that, notwithstanding clauses (i) and (ii) above and notwithstanding Section 4.6(b), in no event will the Royalty payable by Gritstone to Genevant for any Calendar Quarter be less than ██████████████ of the Royalty otherwise due under Section 4.5.[296]

114. However, the amendment did not modify the second clause (Section 4.6(b), referred to in the amended language quoted above), which states:

> Upon commencement of Generic Competition with respect to a Product in a country, the Royalty due and payable under Section 4.5 in respect of such Product and country shall be reduced by ████████████ during the remainder of the Royalty Payment Term for such Product and country.[297]

115. According to a summary of Genevant's in-licensing revenues, Genevant has received $2.5 million total pursuant to this agreement as of June 2024—I understand that this is a result of non-running royalty payments as no products have been commercialized under this license.[298]

### x.    March 2021 Genevant–Takeda Agreement

116. On March 9, 2021, Genevant and Takeda entered into an agreement, under which Genevant granted Takeda a worldwide, exclusive, sub-licensable license to Genevant technology to research, develop, make and have made, manufacture, commercialize, import, use, sell, offer for sale or

---

[296] GENV-00022686 at 686.

[297] GENV-00022689 at 722.

[298] *See* Exhibit 4-A; GENV-00961337, *see also,* Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn June 5, 2024 Deposition, Exhibit 25). Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535. Zorn June 5, 2024 Deposition, pp. 198-199.

otherwise exploit licensed products in the field of liver fibrosis.[299]  The licensed Genevant technology includes "know-how" and a portfolio of patent rights that include the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.[300] Pursuant to the agreement, Genevant agreed to provide Takeda with certain precommercial support services, such as assisting with manufacturing of candidate formulations of licensed products and LNPs.[301]

117.    As part of the agreement, Takeda agreed to pay Genevant an upfront fee of ▮▮▮▮▮, a target fee of ▮▮▮▮▮ for each exercised target option,[302] and milestone payments conditional on Takeda achieving corresponding development and commercial milestones.[303]  Takeda also agreed to running royalty payments on covered products based on the following schedule of rates that depend on the total annual worldwide sales made under the license:

- ▮▮▮▮ on annual sales up to ▮▮▮▮▮
- ▮▮▮▮ on annual sales between ▮▮▮▮▮ and up to ▮▮▮▮ and
- ▮▮▮▮ on annual sales greater than or equal to ▮▮▮▮.[304]

118.    The agreement also specifies certain conditions that reduce the above stated running royalty percentages by up to ▮▮▮▮ (in aggregate), including:

- A reduction of ▮▮▮▮ of the royalties that Takeda would owe in a given country if there are no longer any valid claims surviving from the licensed patent rights;
- A reduction of ▮▮▮▮ of the royalties that Takeda would owe in a given country if there is generic entry against a licensed Takeda product; and
- Reductions equivalent to ▮▮▮▮ of the royalty payments that Takeda makes to third parties for the covered products—so long as the total reductions therefrom do not reduce the

---

[299] GENV-00022793 at 793, 803, 806-807, 827-828.  Prior to this license agreement, the parties entered into an Evaluation and Option Agreement on October 15, 2020, which provided Takeda the right to perform research using certain Genevant technologies pursuant to a jointly agreed-upon evaluation plan, but did not provide Takeda commercial rights, *see* GENV-00062536 at 536, 541-542.

[300] GENV-00022793 at 807.  This agreement also licensed any addition, division, continuation, or continuation-in-part issuing from any of the patents licensed at the time of the agreement, *see* GENV-00022793 at 810.

[301] The specific terms of these services were subject to a plan to be jointly agreed upon by both parties, *see* GENV-00022793 at 818-819, 822-823.

[302] A target is defined in the agreement as a gene in a human hepatic stellate cell that is relevant for treating liver fibrosis (see GENV-00022793 at 805, 813).  Under the terms of the agreement, Takeda has the option to nominate certain targets on which to pursue therapies for liver fibrosis, such that Takeda gets exclusive rights to pursue development for targets for a specified period (*see* GENV-00022793 at 815-817).

[303] GENV-00022793 at 829-831.

[304] GENV-00022793 at 813, 831.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY                    59

adjusted running royalty payments to Genevant below 50 percent of the original amounts specified above.[305]

However, the parties specified that in no event would the total royalty reductions resulting from all of the conditions described above reduce the running royalties below ▮▮▮▮▮▮ of the originally specified royalty rates.[306]

119. According to a summary of Genevant's in-licensing revenues, Genevant has received ▮▮▮▮▮ total pursuant to this agreement and the predecessor October 2020 option agreement as of June 2024—I understand that this is a result of non-running royalty payments as no products have been commercialized under this license.[307]

### xi.    2021 Genevant–Bluebird / Novo Nordisk Agreements

120. On August 2, 2021, Genevant and bluebird bio Inc. ("Bluebird") entered into a research and option agreement, whereby Genevant granted Bluebird a non-exclusive research license to Genevant intellectual properties to research potential treatments in the field of the treatment of the genetic disorder caused by missing or defective human coagulation factor VIII, known as Hemophilia A.[308]  The licensed Genevant intellectual properties included "know-how" and patent rights including those to the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.[309]  Pursuant to the agreement, Genevant agreed to provide Bluebird with certain precommercial support services, such as assisting with manufacturing of candidate formulations and LNPs.[310]

121. As part of this agreement, Bluebird agreed to pay Genevant ▮▮▮▮▮ up front for access to the licensed technology.[311]  The research and option agreement did not provide Bluebird any rights to commercialize products under the licensed Genevant intellectual properties, but instead provided

---

[305] GENV-00022793 at 831-833.
[306] GENV-00022793 at 831-833.
[307] See Exhibit 4-A; GENV-00961337 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  See also, Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn June 5, 2024 Deposition, Exhibit 25).  Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535.  Zorn June 5, 2024 Deposition, pp. 198-199.
[308] GENV-00022977 at 977, 979, 983.
[309] GENV-00022977 at 979, 983.
[310] GENV-00022977 at 001, 004.
[311] GENV-00022977 at 984.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY                                                        60

them with the option to negotiate a further collaboration and license agreement with Genevant in good faith.[312]

122.   On November 1, 2023, Novo Nordisk A/S ("Novo Nordisk") executed the above described options rights, which had been assigned from 2seventy bio, Inc. (via a previous assignment from Bluebird).[313]  Consequently, Genevant and Novo Nordisk entered into a collaboration and non-exclusive license agreement, whereby Genevant granted Novo Nordisk a worldwide, non-exclusive license to Genevant intellectual properties (including rights to the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter)[314] to commercialize products in the field of the "treatment of the genetic disorder caused by insufficient, missing or defective human coagulation factor VIII and known as Hemophilia A."[315]  Pursuant to this agreement, Genevant agreed to provide Novo Nordisk with certain precommercial support services, such as assisting with manufacturing of candidate formulations of licensed products and LNPs.[316]

123.   Under the terms of the 2023 agreement, Novo Nordisk was responsible for making a ▮▮▮▮▮ upfront payment to Genevant as well as milestone payments conditional on Novo Nordisk achieving corresponding development and commercial milestones.[317]  In addition, Novo Nordisk agreed to running royalty payments on covered products based on the following schedule of rates that depend on the total annual worldwide sales made under the license:

- ▮▮▮▮ on annual sales up to ▮▮▮▮;
- ▮▮▮▮ on annual sales between ▮▮▮▮ and ▮▮▮▮; and
- ▮▮▮▮ on annual sales greater than ▮▮▮▮.[318]

124.   The 2023 agreement also specified certain conditions that would reduce the above-stated running royalty percentages by up to ▮▮▮▮ (in aggregate), including:

---

[312] GENV-00022977 at 978, 983-984.
[313] GENV-00072282 at 282-283.
[314] GENV-00072282 at 298-299.  This agreement also licensed any addition, division, continuation, or continuation-in-part issuing from any of the patents licensed at the time of the agreement, *see* GENV-00072282 at 296.
[315] GENV-00072282 at 288.
[316] The specific terms of these services were subject to a plan to be jointly agreed upon by both parties, *see* GENV-00072282 at 303, 345-353.
[317] GENV-00072282 at 299, 307-310.
[318] GENV-00072282 at 310.

- A reduction of ▮▮▮▮▮ of the royalties that Novo Nordisk would owe in a given country if there are no longer any valid claims surviving from the licensed patent rights;

- A reduction of ▮▮▮▮▮ of the royalties that Novo Nordisk would owe in a given country if there is generic entry against a licensed Novo Nordisk product; and

- Reductions equivalent to ▮▮▮▮▮ of the royalty payments that Novo Nordisk makes to third parties for the covered products—so long as the total reductions therefrom do not reduce the adjusted running royalty payments to Genevant below ▮▮▮▮▮ of the original amounts specified above. [319]

However, the parties specified that in no event would the total royalty reductions resulting from all of the conditions described above reduced the running royalties below ▮▮▮▮▮ of the originally specified royalty rates.[320]

125.  According to a summary of Genevant's in-licensing revenues, Genevant has received ▮▮▮▮▮ total pursuant to these agreements (the original Bluebird agreement as well as the 2023 Novo Nordisk agreement) as of June 2024—I understand that this is a result of non-running royalty payments as no products have been commercialized under these agreements.[321]

### xii.  August 2021 Genevant–Takeda Agreement

126.  On August 21, 2021 Genevant and Takeda entered into a collaboration license agreement, under which Genevant granted Takeda a worldwide, exclusive, sub-licensable license to Genevant technology to research, develop, make and have made, manufacture, commercialize, import, use, sell, offer for sale or otherwise exploit licensed products incorporating a specified gene sequence "payload" in the field of the cure, diagnosis, treatment and prevention of Wilson's disease, a rare inherited disease that causes copper levels to build up in several organs.[322]  The licensed Genevant technology includes "know-how" and a portfolio of patent rights that include the Patents-in-Suit

---

[319] GENV-00072282 at 310-311.

[320] GENV-00072282 at 311.

[321] *See* Exhibit 4-A; GENV-00961337 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See also,* Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn June 5, 2024 Deposition, Exhibit 25).  Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535.  Zorn June 5, 2024 Deposition, pp. 198-199.

[322] GENV-00023069 at 081, 083-085, 102-104; https://www.mayoclinic.org/diseases-conditions/wilsons-disease/symptoms-causes/syc-20353251.  The agreement also contained options for rights to additional payloads and/or additional fields (*see* GENV-00023069 at 084, 093).  The optional additional fields were defined as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*see* GENV-00023069 at 144).

as well as other patented and non-patented intellectual property not at issue in this matter.[323] Pursuant to the agreement, Genevant agreed to provide Takeda with certain precommercial support services, such as assisting with manufacturing of candidate formulations of licensed products and LNPs.[324]

127. As part of the agreement, Takeda agreed to pay Genevant an upfront fee of ▓▓▓▓,[325] and milestone payments conditional on Takeda achieving corresponding development and commercial milestones.[326] Takeda also agreed to running royalty payments on covered products based on the following schedule of rates that depend on the total annual worldwide sales made under the license:

- ▓ percent on annual sales up to ▓▓▓▓▓
- ▓ percent on annual sales between ▓▓▓▓▓ and including ▓▓▓▓; and
- ▓ percent on annual sales greater than ▓▓▓▓.[327]

128. The agreement also specifies certain conditions that would reduce the above-stated running royalty percentages by up to ▓▓▓▓ (in aggregate), including:

- A reduction of ▓▓▓▓ of the royalties that Takeda would owe in a given country if there are no longer any valid claims surviving from the licensed patent rights;

- A reduction of ▓▓▓▓ of the royalties that Takeda would owe in a given country if there is generic entry against a licensed Takeda product; and

- Reductions equivalent to ▓▓▓▓ of the royalty payments that Takeda makes to third parties for the covered products—so long as the total reductions therefrom do not reduce the adjusted running royalty payments to Genevant below ▓▓▓▓ of the original amounts specified above.[328]

However, the parties specified that in no event would the total royalty reductions resulting from all of the conditions described above reduce the running royalties below ▓▓▓▓ of the originally specified royalty rates.[329]

---

[323] GENV-00023069 at 081, 083, 085, 102-104. This agreement also licensed any addition, division, continuation, or continuation-in-part issuing from any of the patents licensed at the time of the agreement, *see* GENV-00023069 at 088.
[324] The specific terms of these services were subject to a plan to be jointly agreed upon by both parties, *see* GENV-00022793 at 092-093, 096-098.
[325] Takeda could license additional payloads for ▓▓▓▓▓▓▓▓ (*see* GENV-00023069 at 105).
[326] GENV-00023069 at 105-106.
[327] GENV-00023069 at 091, 107.
[328] GENV-00023069 at 107-109.
[329] GENV-00023069 at 109.

129.  The agreement was subsequently terminated by letter notification from Takeda to Genevant on April 12, 2023.[330]  According to a summary of Genevant's in-licensing revenues, Genevant has received ███████████████████████████████████████████████████████ ██████████ running royalty payments as no products have been commercialized under this license.[331]

### xiii.  2022 Genevant–76Bio Agreement

130.  On February 9, 2022, Genevant and 76Bio, Inc. entered into an evaluation and option agreement, whereby Genevant granted 76Bio a research (i.e., non-commercial) license to certain Genevant intellectual properties, and the option to negotiate a commercial license to the same intellectual properties at a later date.[332]  The licensed Genevant intellectual properties included "know-how" and patent rights including those to the Patents-in-Suit, as well as other patented and non-patented intellectual property not at issue in this matter.[333]  Pursuant to the agreement, Genevant agreed to provide 76Bio with certain precommercial support services, such as manufacturing of candidate formulations of LNPs necessary for the research plan.[334]

131.  On February 25, 2023, 76Bio executed its option to enter into negotiations for a commercial license,[335] but those negotiations did not result in a commercial license.[336]  I am not aware of any products that have been commercialized under the terms of this agreement.[337]  I further note that it is unclear whether 76Bio remains operational.[338]

### xiv.  2023 Genevant–Korro Bio Agreement

132.  On March 2, 2023 Genevant and Korro Bio, Inc. ("Korro") entered into a collaboration and license agreement whereby Genevant granted Korro a worldwide, non-exclusive, sublicensable

---

[330] GENV-00023216.
[331] GENV-00961337; *see also,* Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn June 5, 2024 Deposition, Exhibit 25).  Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535.  Zorn June 5, 2024 Deposition, pp. 198-199.
[332] GENV-00023217 at 217, 221, 226, 230.
[333] GENV-00023217 at 219, 221.
[334] GENV-00023217 at 232-233.
[335] GENV-00023266 at 266-267.
[336] Zorn June 5, 2024 Deposition, pp. 183-186.
[337] Zorn June 5, 2024 Deposition, pp. 204-205.
[338] As of the submission of this report, 76bio.com, the cached version of 76Bio's website, is defunct.

license to Genevant intellectual properties to make, use, offer for sale, sell, export, import, or otherwise exploit, including to research, develop, manufacture, and commercialize products in the field of the treatment or prevention of Alpha-1 antitrypsin deficiency in humans.[339]  The licensed Genevant intellectual properties include "know-how" and patent rights including those to the Patents-in-Suit, as well as other patented and non-patented intellectual property not at issue in this matter.[340]  Pursuant to this agreement, Genevant agreed to provide Korro with certain precommercial support services, such as assisting with manufacturing of candidate formulations of licensed products and LNPs.[341]

133.  As part of the agreement, Korro agreed to pay Genevant an upfront fee of ██████,[342] reimbursement for certain Genevant costs incurred under the agreement,[343] and milestone payments that are conditional on Korro achieving corresponding development and commercial milestones.[344]  Korro also agreed to make running royalty payments to Genevant on covered products based on the following schedule of rates that depend on the total annual worldwide sales made under the license:

- █ percent on annual sales up to ████████

- █ percent on annual sales between ████████ and including ███████; and

- ██ percent on annual sales more than ███████.[345]

134.  The agreement also specifies certain conditions which reduce the above stated running royalty percentages by up to ████████ (in aggregate), including:

- A reduction of ████████ of the royalties that Korro would owe Genevant in a given country if the licensed product is no longer covered by a licensed Genevant patent, a joint patent, or a patent owned by Korro that claim a Korro payload with a Genevant LNP; and

- Reductions equivalent to ████████ of the royalty payments that Korro makes to third parties for the covered products—so long as the total reductions therefrom do not reduce the

---

[339] GENV-00023337 at 338, 342, 352-355.  The agreement also provides exclusive rights to any joint intellectual properties arising from development (*see* GENV-00023337 at 353).

[340] GENV-00023337 at 344-345.

[341] The specific terms of these services were subject to a plan to be jointly agreed upon by both parties, *see* GENV-00023337 at 357, 443-457.

[342] GENV-00023337 at 345, 359.

[343] GENV-00023337 at 359.

[344] GENV-00023337 at 360-361.

[345] GENV-00023337 at 361.

adjusted running royalty payments to Genevant below ████████ of the original, applicable percentages specified above.[346]

However, the parties specified that in no event would the total royalty reductions resulting from any or all of the conditions described above reduce the running royalties below ████████ of the original, specified royalty rates (i.e., ████████ of either ████████ percent).[347]

135. According to a summary of Genevant's in-licensing revenues, Genevant has received ████████ total pursuant to this agreement as of June 2024—I understand that this is a result of non-running royalty payments as no products have been commercialized under this license.[348]

### xv.    2023 Genevant–Gritstone Agreement

136. On August 10, 2023, Genevant and Gritstone[349] entered into a worldwide license agreement whereby Gritstone obtained options for non-exclusive rights to certain Genevant intellectual properties to research, develop, manufacture, and commercialize covered products used to treat a range of potential pathogens including COVID under certain limitations.[350,351] The licensed intellectual properties include "know-how" and a portfolio of patent rights including those to the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.[352] Pursuant to this agreement, Genevant agreed to transfer to Gritstone all the necessary Genevant know-how related to the manufacturing of products and LNPs.[353]

137. Under the option provisions of the agreement, Gritstone agreed to pay Genevant a ████████ upfront fee and successive annual payments, which increase over time (from ████████ in the

---

[346] GENV-00023337 at 361-362.

[347] GENV-00023337 at 362.

[348] *See* Exhibit 4-A; GENV-00961337, *see also,* Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn June 5, 2024 Deposition, Exhibit 25). Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535. Zorn June 5, 2024 Deposition, pp. 198-199.

[349] By the time of this agreement, Gritstone had changed its name to Gritstone Bio, Inc., *see* GENV-00062423 at 423; https://web.archive.org/web/20210805214719/https://ir.gritstonebio.com/news-releases/news-release-details/gritstone-oncology-changes-its-name-gritstone-bio-reflect.

[350] GENV-00062423 at 446-447.

[351] The agreement specifically excluded the pathogens HIV and Hepatitis B (*see* GENV-00062423 at 446, 530). The agreement covered products used to treat SARS-CoV-2, but only if the covered product also treated another pathogen—including other types of coronaviruses (*see* GENV-00062423 at 429, 434, 443-445). For any licensed product directed solely to the treatment of SARS-CoV-2, the terms of the 2021 Gritstone Agreement would apply (*see* GENV-00062423 at 440-441).

[352] GENV-00062423 at 431, 434, 446-447.

[353] GENV-00062423 at 449-450.

first two anniversaries to ▮▮▮▮ in the fifth and sixth anniversaries).[354]  Gritstone also agreed to pay an option exercise fee of ▮▮▮▮ for each optioned pathogen, except in the case of pancorona,[355] for which the exercise fee would be ▮▮▮▮ (with ▮▮▮▮ of this amount creditable against the following net annual payment described above).[356]

138.  Gritstone also agreed to milestone payments—on a product-by-product basis—that were conditional on Gritstone achieving certain development and commercialization milestones.[357]  The parties also agreed to running royalties on net sales of a covered product, based on the following schedule of rates that depend on the total annual worldwide sales made under the license:[358]

- ▮ percent on annual sales less than or equal to ▮▮▮▮ ;
- ▮ percent on annual sales greater than ▮▮▮▮ and less than or equal to ▮▮▮▮ ; and
- ▮ percent on annual sales greater than ▮▮▮▮ .[359]

139.  The agreement specifies clauses for royalty reductions:[360]

- A reduction of up to ▮ percent of the royalty payments that Gritstone makes to third parties for commercializing the covered products;
- A ▮ percent reduction of the running royalties that Gritstone would owe in a given country if there are no longer any valid claims surviving from the licensed patent rights;
- A ▮ percent reduction of the running royalties that Gritstone would owe in a given country upon the commencement of generic entry in that country; and
- A reduction in running royalties that Gritstone would owe in the United States proportional to the reduction in "the amount of the price payable by Medicare pursuant to the Inflation Reduction Act of 2022."

---

[354] GENV-00062423 at 450-451.  Reductions to these amounts apply under certain circumstances (*see* GENV-00062423 at 451).

[355] Pancorona is defined by the Genevant–2023 Gritstone License as "any or all Pathogens, regardless of the number, that are coronaviruses, are collectively nominated by Gritstone as a single Nominated Pathogen, are each an Available Pathogen (provided, for clarity, that to the extent any such Pathogen is an Unavailable Pathogen at the time of Genevant's receipt of the applicable Option Exercise Notice, such Nominated Pathogen shall be deemed to exclude such Unavailable Pathogen), and become collectively (or in any subset of two or more such Pathogens) a single Licensed Pathogen in accordance with Article II. For clarity, no individual coronavirus shall itself be Pancorona," *see* GENV-00062423 at 438.

[356] GENV-00062423 at 451.

[357] GENV-00062423 at 452-456.

[358] I understand from Dr. Prud'homme that the Moderna vaccine is considered homologous.  Prud'homme Conversation.

[359] GENV-00062423 at 425, 443, 456-457.

[360] GENV-00062423 at 457.

140. However, the parties specified that in no event will the total reductions therefrom reduce the adjusted running royalty payments to Genevant below ██ percent of their original amounts (referenced above).[361]

141. According to a summary of Genevant's in-licensing revenues, Genevant has received ██████ total pursuant to this agreement as of June 2024—I understand that this is a result of non-running royalty payments as no products have been commercialized under this license.[362]

### xvi. 2024 Genevant–Tome Agreement

142. On January 12, 2024 Genevant and Tome Biosciences Inc. ("Tome") entered into a collaboration and license agreement, whereby Genevant granted Tome a worldwide, non-exclusive, sublicensable license to certain Genevant intellectual properties to make, use, offer for sale, sell, export, import, or otherwise exploit, including to research, develop, manufacture, and commercialize products in the field of treatment for an undisclosed rare monogenic liver disorder.[363] The licensed Genevant intellectual properties include "know-how" and patent rights including those to the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.[364] Pursuant to this agreement, Genevant agreed to provide Tome with certain precommercial support services, such as assisting with manufacturing of candidate formulations of licensed products and LNPs.[365] Additionally, Genevant agreed to transfer to Tome all the necessary Genevant know-how related to the manufacturing of products and LNPs.[366]

143. As part of the agreement, Tome agreed to pay Genevant an upfront fee of ██████,[367] reimbursement for certain Genevant costs incurred under the agreement,[368] and milestone

---

[361] GENV-00062423 at 457.

[362] *See* Exhibit 4-A; GENV-00961337, *see also,* Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn June 5, 2024 Deposition, Exhibit 25). Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535. Zorn June 5, 2024 Deposition, pp. 198-199.

[363] GENV-00832976 at 977, 981, 989, 991-993; https://www.genevant.com/genevant-sciences-to-collaborate-with-tome-biosciences-to-develop-gene-editing-therapeutic-for-rare-liver-disorder.

[364] GENV-00832976 at 982-984.

[365] The specific terms of these services were subject to a plan to be jointly agreed upon by both parties, *see* GENV-00832976 at 993-994, 068-071.

[366] GENV-00832976 at 994-995, 069.

[367] This amount is the "positive difference between (a) ██████████████████████) and (b) the Credit Amount," where the "Credit Amount" is ██████, *see* GENV-00832976 at 980, 983, 995.

[368] GENV-00832976 at 995.

payments conditional on Tome achieving corresponding development and commercial milestones.[369]  Tome also agreed to make running royalty payments to Genevant on covered products based on the following schedule of rates that depend on the total annual worldwide sales made under the license:

- ▮ percent on annual net sales up to ▮▮▮▮▮;
- ▮ percent on annual net sales between ▮▮▮▮▮ and including ▮▮▮▮▮
- ▮ percent on annual net sales between ▮▮▮▮▮ and including ▮▮▮▮▮ and
- ▮ percent on annual sales more than ▮▮▮▮▮.[370]

144. The agreement also specifies certain conditions which reduce the above stated running royalty percentages by up to ▮▮▮▮▮ (in aggregate), including:

- A reduction of ▮▮▮▮▮ of the royalties that Tome would owe Genevant in a given country if the licensed product is no longer covered by a licensed Genevant patent or a patent owned by Tome that claim a Tome payload with a Genevant LNP; and

- Reductions equivalent to ▮▮▮▮▮ of the royalty payments that Tome makes to third parties for the covered products—so long as the total reductions therefrom do not reduce the adjusted running royalty payments to Genevant below ▮▮▮▮▮ of the original amounts specified above. [371]

However, the parties specified that in no event would the total royalty reductions resulting from all of the conditions described above reduced the running royalties below ▮▮▮▮▮ of the originally specified royalty rates.[372]

145. According to a summary of Genevant's in-licensing revenues, Genevant has received ▮▮▮▮▮ total pursuant to this agreement as of June 2024—I understand that this is a result of non-running royalty payments as no products have been commercialized under this license.[373]

---

[369] GENV-00832976 at 995-997.

[370] GENV-00832976 at 997.

[371] GENV-00832976 at 997-998.

[372] GENV-00832976 at 998.

[373] *See* Exhibit 4-A; GENV-00961337, *see also,* Zorn June 5, 2024 Deposition, pp. 198-205; Plaintiff Genevant Sciences GmbH's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc.'s First Set of Interrogatories (no. 5), p. 30, citing GENV-00062535 (Zorn June 5, 2024 Deposition, Exhibit 25).  Mr. Zorn testified GENV-00961337 to be an updated version of GENV-00062535.  Zorn June 5, 2024 Deposition, pp. 198-199.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

### xvii. 2024 Genevant–Repair Biotechnologies Agreement

146. On September 23, 2024, Genevant and Repair Biotechnologies, Inc. ("Repair") entered into a collaboration and licensing agreement, whereby Genevant granted Repair a non-exclusive, sublicensable, worldwide license to certain Genevant intellectual properties to make, use, sell, offer to sell, and import products in the field of atherosclerosis.[374] The licensed Genevant intellectual properties include "know-how" and patent rights including those to the Patents-in-Suit, as well as other patented and non-patented intellectual property not at issue in this matter.[375] Pursuant to this agreement, Genevant agreed to provide Repair with certain precommercial support services, such as assisting with manufacturing of candidate formulations of licensed products and LNPs.[376] Additionally, Genevant agreed to transfer to Repair all the necessary Genevant know-how related to the manufacturing of products and LNPs.[377]

147. As part of the agreement, Repair agreed to pay Genevant an upfront fee of ██████████;[378] reimbursement for certain costs incurred by Genevant under the agreement; and milestone payments conditional on Repair achieving corresponding development and commercial milestones.[379] Repair also agreed to make running royalty payments to Genevant on covered products based on the following schedule of rates that depend on the total annual worldwide sales made under the license:

- █ percent on annual net sales up to ███████;
- █ percent on annual net sales between ██████ and including ███████;
- █ percent on annual net sales between ██████ and including ███████; and
- ██ percent on annual sales more than ███████.[380]

148. The agreement also specifies certain conditions that reduce the above stated running royalty percentages by up to ██ percent (in aggregate), including:

---

[374] GENV-00961576 at 581-585, 591-593.

[375] GENV-00961576 at 582-585, 591-592.

[376] The specific terms of these services were subject to a plan to be jointly agreed upon by both parties, *see* GENV-00961576 at 594, 670-676.

[377] GENV-00961576 at 595.

[378] This amount is the "positive difference between ████████████████████) and the Credit Amount," where the "Credit Amount" is ██████, *see* GENV-00961576 at 581, 583, 596.

[379] GENV-00961576 at 596-598.

[380] GENV-00961576 at 598.

- A reduction of ███████ of the royalties that Repair would owe Genevant in a given country if the licensed product is no longer covered by a valid claim of a licensed Genevant patent;

- A reduction of ███████ "after the first commercial sale of the first Biosimilar Product with respect to such Licensed Product in such country and for so long as the aggregate market share of all Biosimilar Products (calculated on the basis of revenue) during any two consecutive Calendar Quarters is at least forty percent (40%) of the aggregate market share of such Licensed Product and its corresponding Biosimilar Products in such Calendar Quarter (based on data from a mutually acceptable source"; and

- A reduction of ███████ of the payments Repair pays to third parties in consideration of third-party intellectual property necessary to commercialize a licensed product.[381]

However, the parties specified that in no event would the total royalty reductions resulting from any or all of the conditions described above reduce the running royalties below ███████ of the originally specified royalty rates.[382]

149. I am not aware of any products that have been commercialized under the terms of this agreement.[383]  This agreement postdates the summaries of Genevant received royalties provided by Genevant.[384]  I note the agreement specifies an upfront payment of ███████.[385]

### xviii. 2024 Genevant–Editas Agreement

150. On October 21, 2024, Genevant and Editas Medicine, Inc. ("Editas") entered into a collaboration and licensing agreement whereby Genevant granted Editas a non-exclusive, sublicensable, worldwide license to certain Genevant intellectual properties to make, use, sell, offer to sell, and import products in the field of the treatment or prevention of atherosclerosis and associated disorders and diseases, or glycogen storage disease.[386]  The licensed Genevant intellectual properties include "know-how" and patent rights including those to the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.[387]  Pursuant to this agreement, Genevant agreed to provide Editas with certain precommercial support services,

---

[381] GENV-00961576 at 599.
[382] GENV-00961576 at 599.
[383] https://www.repairbiotechnologies.com/pipeline
[384] GENV-00961337.
[385] This amount is "positive difference between ███████████████████████) and the Credit Amount," *see* GENV-00961576 at 581, 583, 596.  *See also* Exhibit 4-A.
[386] GENV-00961439 at 440, 446, 455-457.
[387] GENV-00961439 at 447-449.  *See also* GENV-00961535 (Exhibit A to the 2024 Genevant–Editas Agreement listing all Licensed Patents).

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

such as assisting with manufacturing of candidate formulations of licensed products and LNPs.[388] Additionally, Genevant agreed to transfer to Editas all the necessary Genevant know-how related to the manufacturing of products and LNPs.[389]

151.   As part of the agreement, Editas agreed to pay Genevant an upfront fee of ▮▮▮▮▮;[390] reimburse Genevant for certain costs incurred under the agreement;[391] and milestone payments conditional on Editas achieving corresponding development and commercial milestones.[392]  Editas also agreed to make running royalty payments to Genevant on covered products based on the following schedule of rates that depend on the total annual worldwide sales made under the license:

- ▮ percent on annual net sales up to ▮▮▮▮▮
- ▮ percent on annual net sales between ▮▮▮▮▮ and including ▮▮▮▮▮;
- ▮ percent on annual net sales between ▮▮▮▮▮ and including ▮▮▮▮▮; and
- ▮ percent on annual sales more than ▮▮▮▮▮.[393]

152.   The agreement also specifies certain conditions that reduce the above stated running royalty percentages by up to ▮▮▮▮▮ (in aggregate), including:

- (a) A reduction of ▮▮▮▮▮ of the royalties that Editas would owe Genevant in a given country if the licensed product is no longer covered by a licensed Genevant patent;

- (b) Reductions up to ▮▮▮▮▮ of the royalty payments that Editas makes to third parties for the licensed Editas products;

- (c) A reduction of ▮▮▮▮▮ of the royalties that Editas would owe Genevant in a given country if the licensed product is no longer covered by a valid claim of a licensed Genevant patent "beginning on the date on which Biosimilar Product Competition is established with respect to such Licensed Product in such country."[394]

However, the parties specified that in no event would the total royalty reductions resulting from any or all of the conditions described above reduce the running royalties below ▮▮▮▮▮ of the

---

[388] The specific terms of these services were subject to a plan to be jointly agreed upon by both parties, *see* GENV-00961439 at 459-460, 502-515.

[389] GENV-00961439 at 461-462.

[390] This amount is "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see* GENV-00961439 at 445, 448, 462.

[391] GENV-00961439 at 462.

[392] GENV-00961439 at 462-465.

[393] GENV-00961439 at 450-452, 455, 465.

[394] GENV-00961439 at 465-466.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

originally specified royalty rates, unless (a) and (b) above apply in the same calendar quarter, in which case the maximum potential reduction is no more than ████████.[395]

153. I am not aware of any products that have been commercialized under the terms of this agreement.[396] This agreement postdates the summaries of Genevant received royalties provided by Genevant.[397] I note the agreement specifies an upfront payment of ████████.[398]

### xix. 2024 Genevant–Epitopea Agreement

154. On December 12, 2024, Genevant and Epitopea, Inc. ("Epitopea") entered into a collaboration and licensing agreement whereby Genevant granted Editas a non-exclusive, sublicensable, worldwide license to certain Genevant intellectual properties to make, use, sell, offer to sell, and import products in the field of ovarian cancer.[399] The licensed Genevant intellectual properties include "know-how" and patent rights including those to the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.[400] Pursuant to this agreement, Genevant agreed to provide Epitopea with certain precommercial support services, such as assisting with manufacturing of candidate formulations of licensed products and LNPs.[401] Additionally, Genevant agreed to transfer to Epitopea all the necessary Genevant know-how related to the manufacturing of products and LNPs.[402]

155. As part of the agreement, Epitopea agreed to pay Genevant an upfront fee of ████████;[403] reimburse Genevant for certain costs incurred under the agreement;[404] and milestone payments conditional on Epitopea achieving corresponding precommercial and commercial milestones.[405] Epitopea also agreed to make running royalty payments to Genevant on covered products based

---

[395] GENV-00961439 at 465-466.

[396] https://www.editasmedicine.com/gene-editing-pipeline

[397] GENV-00961337.

[398] This amount is "████████████████████) *minus* the Credit Amount," *see* GENV-00961439 at 445, 448. *See also,* Exhibit 4-A.

[399] GENV-01077683 at 684, 689, 691, 698-701.

[400] GENV-01077683 at 692, 695-696, 698, 738-779.

[401] The specific terms of these services were subject to a plan to be jointly agreed upon by both parties, *see* GENV-01077683 at 703, 783-787.

[402] GENV-001077683 at 704.

[403] This amount is the "positive difference between (a) ████████████████████) and (b) the Credit Amount," where the "Credit Amount" is ████████, *see* GENV-01077683 at 688, 691, 704.

[404] GENV-01077683 at 704-705.

[405] GENV-01077683 at 705-708.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

on the following schedule of rates that depend on the total annual worldwide sales made under the license:

- ██████ on annual net sales up to and including ██████;
- ██████ on annual net sales greater than ██████ but not more than ██████; and
- ██████ on annual sales more than ██████.[406]

156. The agreement also specifies certain conditions that reduce the above-stated running royalty percentages by up to █ percent (in aggregate), including:

- A reduction of █ percent of the royalties that Epitopea would owe Genevant in a given country if the licensed product is no longer covered by a licensed Genevant patent;

- Reductions up to █ percent of the royalty payments that Epitopea makes to third parties for the licensed Epitopea products; and

- A reduction of █ percent of the royalties that Epitopea would owe Genevant in a given country "upon the first date there is Biosimilar Product for such Licensed Product in such country."[407]

However, the parties specified that in no event would the total royalty reductions resulting from any or all of the conditions described above reduce the running royalties below █ percent of the originally specified royalty rates.[408]

157. I am not aware of any products that have been commercialized under the terms of this agreement.[409] This agreement postdates the summaries of Genevant received royalties provided by Genevant.[410] I note the agreement specifies an upfront payment of ██████.[411]

### b. Other Genevant Agreements

158. Several agreements produced in this matter where Genevant is the licensor do not provide commercial rights to the Patents-in-Suit.[412] Some of these agreements involve territories outside

---

[406] GENV-01077683 at 693-695, 698 708.

[407] GENV-01077683 at 708.

[408] GENV-01077683 at 708.

[409] https://www.epitopea.com/platform

[410] GENV-00961337.

[411] This amount is the "██████████████████████████████████████████████," *see* GENV-01077683 at 691, 704. *See also,* Exhibit 4-A.

[412] This includes the Chula Agreement (*see* GENV-00023616 at 621-623, 627-629, noting that "Patent" is limited to those "in the Territory," and the "Territory" does not include the U.S), the ST Pharm agreement (*see* definition of "Genevant Patent" (GENV-00022924 at 930) as being restricted to only patents in the "Territory," which does not include the U.S. (GENV-

the United States (and specifically carve out rights to U.S. patents), including: licenses to Chulalongkorn University (i.e., the "Chula Agreement"),[413] ST Pharm Co.,[414] and ████████ █████████.[415]

159. Similarly, on July 2, 2019, Arbutus and OCM IP Healthcare Portfolio ("OCM") entered into a purchase and sale agreement whereby OCM acquired Arbutus's right, title, and interest in royalties due (or to become due) by Alnylam Pharmaceuticals, Inc. ("Alnylam") (to Arbutus) pursuant to a November 2012 cross-license agreement between Arbutus and Alnylam.[416] This agreement did not transfer any rights to the license other than the payment streams.[417]

160. Moreover, I note that two agreements with ████████████████████ and Alexion Pharma Holding and Genevant's predecessors (Tekmira and Arbutus, respectively) at one time provided certain rights to the Patents-in-Suit, but were terminated years prior to the date of the Hypothetical Negotiation.[418] I provide an overview of the details of those agreements in Exhibit 4.

### c. Moderna Licenses to Third Party Technologies used in The Accused Product

161. In the following subsections, I summarize the terms of the produced agreements that cover the Accused Product where Moderna is the licensee. My analysis of these (and all other) agreements is provided later in the Market Approach Analysis subsection.

### i. 2017 Moderna–Cellscript Agreement

162. On June 26, 2017, Moderna and Cellscript, LLC. ("Cellscript") entered into a patent sublicense agreement whereby ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████[419] I understand that the licensed patented technology

---

00022924 at 935)), and the Helix agreement (*see* definition of "Genevant Patent" (GENV-00023278 at 284) as being restricted to only patents in the "Territory," which does not include the U.S. (GENV-00023278 at 290)).

[413] GENV-00023616 at 627-628.
[414] GENV-00022924 at 930, 935.
[415] GENV-00023278 at 284, 290.
[416] ABUS-00000052 at 056, 061, 143.
[417] ABUS-00000052 at 061, 066.
[418] Exhibit 4.
[419] MRNA-GEN-00457584 at 584. The license provides rights to both U.S. and non-U.S. patent rights (*see* MRNA-GEN-00457584 at 623-624).

██████████████████████████████████████████████████████████████

████████████ [420]

163.  As part of the agreement, Moderna agreed to pay Cellscript ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ .[421]  Moderna also agreed to pay Cellscript ████████████████████████████████████ .[422]  The agreement specifies a provision for ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ . [423]

### ii.   2022 Moderna–NIAID Agreement

164.  On December 14, 2022 Moderna and NIAID entered into a ████████████████████████ , effective November 1, 2022, whereby NIAID granted Moderna a ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ I understand that the licensed patented technology ████████████████████████████████████████ [425]

165.  As part of the agreement, Moderna agreed to pay NIAID ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ Moderna would also pay a ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[420] Meulien Rebuttal Report, § VII.B.
[421] MRNA-GEN-00457584 at 591-592.
[422] ████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ (*see* MRNA-GEN-00457584 at 586, 593).
[423] MRNA-GEN-00457584 at 593.
[424] MRNA-GEN-00459173 at 173-177, 179, 194. ████████████████████████████████
(MRNA-GEN-00459173 at 176, 193).
[425] Meulien Rebuttal Report, § VII.C; Meulien Conversation.
[426] MRNA-GEN-00459173 at 195-198.

███████████████████████.[427]  Moderna also agreed to pay NIAID ████████████
████████████████████████     The agreement specifies a provision for ████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████

### d. Moderna's Other In-Licenses

166. In the following subsections, I provide the details of the produced agreements for which Moderna was the licensor that have been considered as potentially relevant by the Parties and/or by Ms. Lawton (in the general order discussed by Ms. Lawton).[430]  My analysis of these (and all other) agreements is then provided later in the Market Approach Analysis subsection.

### i. 2018 Moderna–Merck Collaboration and License Agreement

167. On April 17, 2018, Moderna and Merck Sharp & Dohme Corp. ("Merck") entered into an amended and restated[431] collaboration and license agreement whereby the two parties stipulated the ████████████████████████████████████████████.[432]  Pursuant to these ████████████ terms, Moderna's contemplated responsibilities included items such as:

- ████████████████████████████████████████████████████
  ████████████████████

█ ████████████████████████████████████████████████████
  █████████████████████████████

---

[427] MRNA-GEN-00459173 at 181. ████████████████████████████████████
███████.

[428] MRNA-GEN-00459173 at 195-196.

[429] MRNA-GEN-00459173 at 195-196. ███████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████. MRNA-GEN-00459173 at 196-197.
███████████████████████████████████████████████████████████
██████. MRNA-GEN-00459173 at 197-198.

[430] Lawton Report, ¶¶ 1042-1110.

[431] ███████████████████████████████████████████████████████████
████████. *See* MRNA-GEN-00456832 at 832. ████████████████████████
██████, *see* MRNA-GEN-00457212.

[432] MRNA-GEN-00456830 at 832, 872-874.

[433] MRNA-GEN-00456830 at 902-903.

[434] MRNA-GEN-00456830 at 003-004, 007, *see also* https://clinicaltrials.gov/study/NCT03313778?intr=mrna-4157&aggFilters=phase:1&rank=1.

-

168. Merck's responsibilities under the terms of this collaboration agreement included items such as:

-

169. Moderna and Merck also specified cost-sharing and profit-sharing terms, such as:

-

170. As part of this agreement, both parties provided each other ██████████ ████████████████████████████████████ laid out in the ████████ terms.[445] Additionally, Moderna provided Merck ████████████████████ ████████████████████████████████████ ████████████████.[446]

---

[435] MRNA-GEN-00456830 at 888-889.
[436] MRNA-GEN-00456830 at 863-864, 902-903.
[437] MRNA-GEN-00456830 at 948, 952.
[438] MRNA-GEN-00456830 at 949-950.
[439] MRNA-GEN-00456830 at 902-903.
[440] MRNA-GEN-00456830 at 007-009.
[441] MRNA-GEN-00456830 at 914.
[442] MRNA-GEN-00456830 at 946-948.
[443] MRNA-GEN-00456830 at 953-954.
[444] MRNA-GEN-00456830 at 033-035.
[445] MRNA-GEN-00456830 at 956-960.
[446] MRNA-GEN-00456830 at 956-957.

171. Additionally, this agreement was entered ██████████████████████████████ ██████████████████████████████████████████.[447]

### ii.    2016 Moderna–AstraZeneca Collaboration and License Agreement

172. On January 11, 2016, Moderna and AstraZeneca Pharmaceutical Limited Partnership together with AstraZeneca AB (collectively "AstraZeneca") entered into a development, collaboration and licensing agreement, whereby the two parties stipulated the ████████████████████ ████████████████████████████████[48] Pursuant to these ███████████ terms, Moderna's contemplated responsibilities included items such as:

- ████████████████████████████████
- ████████████████████████████████████
- ██████████████████████████
- ████████████████████████████
- ██████████████████████████████████

173. AstraZeneca's responsibilities under the terms of this collaboration agreement included items such as:

- ████████████████████████████████████████
- ██████████████████████████████████████████████
- ████████████████████████████████████.[456]

174. Moderna and AstraZeneca also specified cost-sharing and profit-sharing terms, such as:

- ██████████████████████████████████,[457]

---

[447] MRNA-GEN-00456830 at 842, 955, 999; https://www.merck.com/news/moderna-and-merck-expand-mrna-cancer-vaccines-collaboration.
[448] MRNA-GEN-00458197 at 202, 234.
[449] MRNA-GEN-00458197 at 234-235.
[450] MRNA-GEN-00458197 at 234-236.
[451] MRNA-GEN-00458197 at 236-237.
[452] MRNA-GEN-00458197 at 261-263.
[453] MRNA-GEN-00458197 at 261-263.
[454] MRNA-GEN-00458197 at 239, 248.
[455] MRNA-GEN-00458197 at 248-250.
[456] MRNA-GEN-00458197 at 261-265.
[457] MRNA-GEN-00458197 at 252-253.

- ██████████████████████████████████████████ [458]

175. As part of this agreement, both parties provided each other ████████████████ ████████████████████████████████ laid out in the ███████ terms.[459] Additionally, Moderna provided AstraZeneca █████████████████████████ ████████████████████████████████████████████████ ████████████████████████████.[460] This agreement required AstraZeneca to ████████████████████████████████████ ██████████████████.[461]

176. Additionally, if Moderna ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████ ██████████████████████████████████████ ████████████████████████████████████.[463]

### iii.    2017 Moderna–AstraZeneca Collaboration and License Agreement

177. On October 31, 2017, Moderna and AstraZeneca entered into a development, collaboration and licensing agreement, whereby the two parties stipulated the ████████████████████ ████████████████████████████.[464]  Pursuant to these ████████████ terms, Moderna's contemplated responsibilities included items such as:

- ██████████████████████████████████████████████ █ ██████████████████████████████████████████ ████████████████████████

---

458 MRNA-GEN-00458197 at 276-277.
459 MRNA-GEN-00458197 at 283.
460 MRNA-GEN-00458197 at 283-284.
461 MRNA-GEN-00458197 at 274-275.
462 MRNA-GEN-00458197 at 260, 277-278. ████████████████████ ████████████████████ MRNA-GEN-00458197 at 260.
463 MRNA-GEN-00458197 at 241-242. ██████████████████████████████████████,
see MRNA-GEN-00458197 at 279-280.
464 MRNA-GEN-00457628 at 633, 662.
465 MRNA-GEN-00457628 at 663.
466 MRNA-GEN-00457628 at 663, 673.

- ███████████████████████████████████████████████████
███████

| ███████████████████████████████████

| ████████████████████████████████████████████ [469]

178. AstraZeneca's responsibilities under the terms of this collaboration agreement included items such as:



- ███████████████████████████████████████████████████

| ███████████████████████████████████████████████

| ████████████████████████████████████████████████

| ████████████████████████████████ [473].

179. Moderna and AstraZeneca also specified cost-sharing and profit-sharing terms, such as:



- █████████████████████████████████████████████

| ████████████████████ [475]

180. As part of this agreement, both parties provided each other ████████████████ ████████████████████████████████████████████████████ Additionally, Moderna provided AstraZeneca █████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████ ████████████████

[467] MRNA-GEN-00457628 at 665-666.
[468] MRNA-GEN-00457628 at 686-689.
[469] MRNA-GEN-00457628 at 687-689.
[470] MRNA-GEN-00457628 at 662-663.
[471] MRNA-GEN-00457628 at 666-668.
[472] MRNA-GEN-00457628 at 673.
[473] MRNA-GEN-00457628 at 691.
[474] MRNA-GEN-00457628 at 677-678, 767-770.
[475] MRNA-GEN-00457628 at 704, 767-770.
[476] MRNA-GEN-00457628 at 710-714.
[477] MRNA-GEN-00457628 at 710-714.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY



478

181. Additionally, if Moderna

480.

### iv.    Other Moderna Agreements

182. The terms of other Moderna agreements that have been identified as potentially relevant by Moderna or Ms. Lawton in this matter, and in which Moderna is the licensee, are summarized along with the agreements discussed above in Exhibit 5.  These include agreements with Axolabs GmbH ("Axolabs"),[481] Vertex Pharmaceuticals Incorporated ("Vertex"),[482] CytomX Therapeutics,[483] Alexion Pharma Holding ("Alexion"),[484] Chiesi Farmaceutici S.p.A. ("Chiesi"),[485] Life Edit Therapeutics, Inc. et. al ("Life Edit"),[486] and Generation Bio Co.[487]   As mentioned in my analysis section below, I am not aware of any evidence or opinions indicating that these agreements are sufficiently economically or technically comparable to provide incremental insight into the likely outcome of the Hypothetical Negotiation.[488]

### e.    Market Approach Analysis

183. In the subsections below, I consider the comparability of the agreements/transactions described above.  At a high level, I conclude that the existing commercial licenses that provided rights to a portfolio of the Plaintiffs' IP, which includes but is not limited to, rights to the Patents-in-Suit,

---

[478] MRNA-GEN-00457628 at 701-702, 710-714.
[479] MRNA-GEN-00457628 at 686, 704.                                    MRNA-GEN-00457628 at 704.
[480] MRNA-GEN-00457628 at 669, 712.
[481] MRNA-GEN-01237004.
[482] MRNA-GEN-00458927.
[483] MRNA-GEN-00459066 at 094.
[484] MRNA-GEN-00457811 at 822-824.
[485] MRNA-GEN-00457979 at 019.
[486] MRNA-GEN-00458590 at 637.
[487] MRNA-GEN-02654081.
[488] *See* Section III.C.1.e.ii.2.)d.).

provide significant insight into a relatively narrow range of effective royalty rates for these assets—which in addition to the Patents-in-Suit, include other patented and non-patented intellectual property not at issue in this matter. Furthermore, with suitable adjustments to account for these additional assets (other assets which are not at issue in the present matter), it is possible to determine a comparable market rate value for the Patents-in-Suit.

184. As part of this analysis, I discuss how none of the other licenses/transactions provide incremental insight into the likely outcome of the Hypothetical Negotiation—beyond certain limited instances where the body of other agreements provide further affirmation of findings drawn from the historical licenses to the Patent-in-Suit, such as the proper form of the royalty payment being a percentage of net sales. I explain the bases for these conclusions, for each category of agreement, in the corresponding sections below.

### i.    Analysis of the Genevant Agreements

#### 1.) Licenses Granting Rights to the Patents-in-Suit

185. The historical licenses that grant rights to the Patents-in-Suit, among other patented and non-patented intellectual property not at issue in this matter, provide numerous data points for consideration in the present Hypothetical Negotiation analysis. Of these, the agreements that provided U.S. commercialization rights (with certain exceptions discussed below) are the most comparable—due to the considerations I discuss below. This set of agreements includes the following: 1) 2017 Gritstone; 2) Providence; 3) 2020 Gritstone; 4) 2021 Gritstone; 5) March 2021 Takeda; 6) August 2021 Takeda; 7) Bluebird/Novo Nordisk; 8) Korro; 9) 2023 Gritstone; 10) Tome; 11) Repair; 12) Editas; and 13) Epitopea—which I refer to in this report as the "Historical Comparable Licenses."[489] As explained below, the Historical Comparable Licenses, once properly apportioned to account for all the other intellectual properties (both patented and non-patented) those agreements provided, have a high degree of comparability, and taken as a set, provide strong evidence for the purpose of assessing the likely royalty to which the Parties to the Hypothetical Negotiation would agree.

---

[489] *See* Exhibit 6.

186.  As an initial (and general) matter, historical licenses that include asserted patents are widely recognized as a starting point for a patent damages analysis.  This is a non-controversial view, as Ms. Lawton herself introduces her discussion of *Georgia-Pacific* Factor 1 by noting that the "most influential factor in determining a reasonable royalty is that of prior and existing licenses negotiated under the patent-in-suit."[490]  Indeed, in the first sentence of her discussion on Patent Valuation Methodologies, Ms. Lawton also states that "Market value 'remains the logical basis for this first, "primary" criterion of damages."[491]  Here, Ms. Lawton is directly quoting case law referring to historical licenses to asserted patents, which in expanded form (as provided in her footnote) reads (**emphasis** mine),

> it appears that the **use of a license fee** as the measure of damages in a patent case is only adopting the ordinary rule of **market value** universally applied as to other property; and, though this thought is not often repeated, it **remains the logical basis for this first, 'primary' criterion** of damages.[492]

Similarly, another source relied upon by Ms. Lawton states,

> Where there is a good base of information about the sales of properties that are similar to the subject, the market approach can be the strongest indicator of value.[493]

187.  Moreover, I understand the Federal Circuit has held that "[a]ctual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace."[494]

188.  The reason such deference should be afforded to the historical licenses granting rights to the Patents-in-Suit is straightforward.  These agreements provide real-world examples of what willing licensees agreed to pay to Genevant (and Genevant agreed to accept as compensation) for a license to use an entire portfolio of assets (patented and non-patented, including but not limited to the Patents-in-Suit) to commercialize pharmaceutical products—thus providing a high baseline level of both technical and economic comparability.

---

[490] Lawton Report, ¶ 1451.
[491] Lawton Report, ¶ 837.  *See also*, Lawton Report, ¶ 1451.
[492] Lawton Report, ¶ 837, n. 2212, citing *United States Frumentum Co. v. Lauhoff, et al.,* 261 F. 610, 619-621 (6th Cir. 1914).
[493] Lawton Report, ¶ 884, citing Gordon V. Smith, Russell L. Parr, *Valuation of Intellectual Property and Intangible Assets,* (New York: John Wiley & Sons, Inc., 2000), Third Edition, p. 170.
[494] *Laserdynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012).

189.  From this insightful starting point, the most significant remaining damages consideration is to isolate (i.e., apportion) the value of the Patents-in-Suit as distinct from the value from all the other elements the Plaintiffs' IP provided under the Historical Comparable Licenses —other elements, such as rights to other Genevant patents and technical know-how on how to manufacture the licensed LNP technologies, to which Moderna would not receive rights at the Hypothetical Negotiation.[495]  Therefore, my apportionment analysis—undertaken in the following subsection— isolates the value attributable to the Patents-in-Suit from the value attributable to the other elements that the previous licensees to the Patents-in-Suit received, but that Moderna would not receive (or want) at the Hypothetical Negotiation.[496]

190.  Thus, after properly accounting for this apportionment, the Historical Comparable Licenses establish a narrow and consistent range of royalties that would serve as the key benchmarks for a royalty determination by the Parties at the Hypothetical Negotiation.  In this case, these actual, real-world historical licenses to Plaintiffs' intellectual properties (including the Patents-in-Suit) are particularly useful because they reflect the key considerations of a proper damages analysis— provided for in the *Georgia-Pacific* Factors, which include:

- **The royalties received by the patentee for the licensing of the patent-in-suit**—the historical licenses granting rights to the Patents-in-Suit include the specific royalties that the patent holder agreed to accept in exchange for providing a license (**Factor 1**);

- **The nature and scope of the licenses**—the historical licenses granting rights to the Patents-in-Suit specify payments for the same type of non-exclusive, U.S. rights that the Parties would negotiate over at the Hypothetical Negotiation **(Factor 3)**;

- **The licensor's established licensing policy with respect to the patents-in-suit**—the historical licenses granting rights to the Patents-in-Suit are, by definition, the product of the licensor's licensing policy, and therefore reflect its consideration **(Factor 4)**;

- **The commercial relationship between parties**—the Parties would assume the roles of inventor and promoter at the Hypothetical Negotiation, the same roles as the respective parties to the historical comparable licenses **(Factor 5)**;

- **The duration of the license term**—the term lengths of the historical licenses granting rights to the Patents-in-Suit are comparable to the term of the license that would result from the Hypothetical Negotiation.  In particular, the Providence Agreement has almost the exact same term with respect to the Patents-in-Suit (with a difference of just weeks over a term of more than ten years from the executed date of the agreements) **(Factor 7)**;

---

[495] *See* applicable provisions of the Historical Comparable Licenses in Section III.C.1.a.
[496] *See* Section IV.D.1.a for further discussion about the importance of such apportionment considerations.

- **The value of the inventions to the licensee**, including:

  o Its profitability and the extent to which the infringer has made use of it—most of the historical licenses to the Plaintiffs' IP (including the Patents-in-Suit) contemplate the potential for various levels of financial success (or failure), with both clinical and commercial milestone payments, and running royalty rates (as a percentage of net sales), that scale with the scope of the commercial opportunities inherent in the covered products **(Factors 8 and 11)**;

  o The advantages of the patented inventions over prior technologies—the historical licensees to the Plaintiffs' IP (which includes far more than just rights to the Patents-in-Suit) would realize (just as Moderna would at the Hypothetical Negotiation) that the Claimed Inventions, in terms of advantages for licensees, do not provide a direct means to commercialize a mRNA product (let alone a financially successful one). Indeed, among Genevant's historical licensees and Moderna, the only commercialized mRNA product that incorporates the Claimed Inventions (under the assumption of validity and infringement) is Moderna's Accused Product—and the seminal driver of that success is the additional work done by Moderna. Furthermore, these factors reaffirm the importance of apportionment—as the Historical Comparable Licenses provided the respective licensees with far more than the bare, non-exclusive license to the Patents-in-Suit that Moderna would receive at the Hypothetical Negotiation. Moreover, to the extent there would be non-infringing alternatives available to Moderna (at the Hypothetical Negotiation), I understand those alternatives would be substantively the same as the alternatives available to the other licensees to the Plaintiffs' IP (including the Patents-in-Suit). Thus, the royalty terms of the historical licenses, once properly apportioned, would have already taken into account whether there exist acceptable non-infringing alternatives to the Patents-in-Suit **(Factors 9 and 10)**;

  o The customary portion of the selling price that allows for the use of the patented inventions—the "customary portions" are informed directly by the properly apportioned royalty rates provided in the historical licenses to the Plaintiffs' IP, which isolates the value of the Claimed Inventions as distinct from the value of everything else that Genevant provided under the historical licenses (i.e., the accounting for all the licensed properties that Moderna would not need or seek at the Hypothetical Negotiation). Thus, this factor reiterates the need for the apportionment which I discussed above. **(Factors 12)**;

- The historical licenses granting rights to the Patents-in-Suit also provide concrete, real-world examples of what **Factor 15** calls for—i.e., "[t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement."

191. In sum, when contemplating the *Georgia-Pacific* Factors, the circumstances surrounding the Historical Comparable Licenses align with close symmetry to the circumstances of the Hypothetical Negotiation. Indeed, only one factor indicates a significant adjustment relative to the benchmark range of royalties provided by the historical licenses—Factor 13, which contemplates the significant features and improvements of the Accused Product provided by Moderna. Under

Factor 13, the overwhelming evidence indicates that these improvements were the seminal cause of the tremendous financial success of the Accused Product—as distinct from the other historical licensees to the Historical Comparable Licenses who, despite having access to the Claimed Inventions, failed to attain the same levels of success.[497]

192.  In terms of the probative power of the Historical Comparable Licenses, it is important to observe that the varying circumstances (of the numerous licenses to the Plaintiffs' IP that included the Patents-in-Suit) all nonetheless resulted in agreements with substantially similar payment terms.[498] These resulting similar terms establish that Genevant and its licensees all agreed to royalty payment terms within a fairly narrow range of effective running royalty rates (i.e., the "going rate") for an entire portfolio of the Plaintiffs' IP (that included, among other properties, the Patents-in-Suit).[499]

193.  Thus, after proper apportionment to account for the elements of the Plaintiffs' IP that Moderna would not receive at the Hypothetical Negotiation, the relatively narrow range of apportioned effective rates provided by the Historical Comparable Licenses indicates that the outcome of the Hypothetical Negotiation can be narrowly and precisely circumscribed—in that the resulting payment terms from the Hypothetical Negotiation will likely comport with the properly apportioned payment terms of the Historical Comparable Licenses.  Put differently, had the various Historical Comparable Licenses resulted in drastically different royalties (contrary to fact in the present matter), such data could indicate that the outcome of the Hypothetical Negotiation is less predictable, and more dependent on idiosyncratic circumstances of the parties to a particular negotiation.

194.  The relatively consistent range of agreement terms, and in particular the dynamic of agreed-upon rates over time, also indicates that concerns about validity did not have a significant effect on royalty rates.  For example, the range of effective rates received by later licensees (after Moderna

---

[497] *See* Section III.D.
[498] Zorn June 5, 2024 Deposition, pp. 126-128.  *See also* Sections III.C.1.e.iii.4.), III.C.4 and III.D below.
[499] An "effective rate" considers the overall financial terms (such as upfront, milestone, and running percentage royalties) and simplifies those total payments down to a single effective royalty rate (paid as a percentage of covered product net sales).  *See* Section III.C.1.e.iii.1.) below for my analysis of effective rates.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

lost its final *inter partes* review ("IPR") appeal against the Patents in-Suit in December 2021[500]) was not significantly higher than the range implied by the earlier licenses.[501] Indeed, more generally, there does not appear to be a significant positive time-effective rate relationship.[502]

195. In addition, the observation of such consistent payment terms across the various licenses is consistent with my understanding that the relative "footprint"[503] of the Claimed Inventions, which I understand do not provide a standalone ability to treat any condition/disease, and that they relate to certain forms of delivery options, and not to the actual therapeutic payload, and that this basic functional aspect of the Claimed Inventions similarly applies across the various fields provided for in the Historical Comparable Licenses.[504] Thus, even the Historical Comparable Licenses that do not provide licenses to develop treatments for COVID-19—and instead cover other treatment areas—still, once properly apportioned, provide significant insight into the likely outcome of the Hypothetical Negotiation. In this sense, the Historical Comparable Licenses all reinforce each other in terms of their usefulness.

196. In addition to providing strong insight into the amount of royalties (once properly apportioned), the Historical Comparable Licenses also clearly indicate that the form of the royalty stemming from the Hypothetical Negotiation would be a running royalty—assessed as a percentage of net sales of the Accused Product.[505] Indeed, all of the Historical Comparable Licenses contain running royalty provisions that are paid based on a percentage(s) of net sales.[506] Moreover, this finding is further supported by the observation that none of the agreements analyzed by Ms. Lawton contain running royalties paid on a dollar-per-unit basis.[507] Indeed, one reason for the prevalence of percentage of net sales running royalties in pharmaceutical licensing generally—uncertainties about eventual marketplace demand for covered products—is true to a substantial

---

[500] The U.S. Court of Appeals for the Federal Circuit ("CAFC") upheld the validity of the '069 patent and the '435 patent in December of 2021, closing Moderna's IPR appeals against both patents, *see* https://cafc.uscourts.gov/opinions-orders/20-1184.OPINION.12-1-2021_1872445.pdf, pp. 2-3; https://cafc.uscourts.gov/opinions-orders/20-2329.OPINION.12-1-2021_1872458.pdf, p. 2. *See also,* https://ptacts.uspto.gov/ptacts/ui/public-search, search "Moderna" in the "Party Name" field.
[501] *See* Exhibit 10.
[502] *See* Figure 1.
[503] *See* Section IV.D.1.a, below.
[504] Prud'homme Rebuttal Report, § IX.A; Prud'homme Conversation; *see also* Mitchell Report, ¶¶ 834, 838.
[505] *See, e.g.,* Sections II.D and IV.H.7.
[506] *See* Exhibit 6.
[507] Lawton Report, Schedules 6.1, 6.2(a), 6.2(b), 6.3.

degree in the present circumstance: significant uncertainty about eventual pricing.[508]  In this context of demand uncertainty, economic theory indicates that a royalty that includes a running royalty rate paid on a percentage of net sales is optimal for both parties' joint surplus[509] and assures a consistent split from the rewards of commercialization that scales with the magnitude of the commercial opportunity regardless of what eventual price(s) is/are realized (in contrast to a royalty that incorporates a fixed dollar-per-unit/dose royalty).

197.  In contrast to the Historical Comparable Licenses, there are two sets of agreements (introduced above) that provided U.S. commercialization rights to the Patents-in-Suit, but with terms and circumstances that render them significantly less comparable than the Historical Comparable Licenses.  These include:

- The November 2012 Tekmira–Protiva–Acuitas settlement, the resulting Cross License Agreement (which resulted in licensing rights to the Patents-in-Suit to Acuitas),[510] and the Acuitas-Moderna agreements that followed are complicated by the multiparty settlement dynamic, and the eventual sublicense from Acuitas to Moderna[511]—for which there was litigation about the nature of Acuitas's right to sublicense.[512]  Such complexities render the 2012 Tekmira–Protiva–Acuitas Cross License Agreement, and the Acuitas–Moderna Agreements significantly less comparable when set against the backdrop of so many other comparable agreements that are unencumbered by these complications; and

- The 2018 BioNTech agreement included provisions for significant collaboration in relation to potential co-developed products in the future.[513]  The inclusion of such significant provisions for the co-development of future products—with cost and profit sharing[514]—renders the royalty terms of the agreement significantly less comparable than the Historical Comparable Licenses, which were substantively one-sided licensing arrangements.

198.  As mentioned in Section III.C.1.a above, several of the historical licenses granting rights to the Patents-in-Suit provided only non-commercial research rights.  These agreements include: Sarepta,[515] Duke,[516] and 76Bio.[517]  In contrast to the Historical Comparable Licenses, the terms of

---

[508] For detailed discussions about the dynamic uncertainties about the pricing of the Accused Product around the time of the Hypothetical Negotiation, see Sections IV.G.2 and IV.H.3.e, below.

[509] See Section II.D, above.

[510] Murray Deposition, Exhibit 10 (ABUS-00023263 at 266-267, 271, 273, 275, 316-361).

[511] See, e.g., MRNA-GEN-00225679.

[512] https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-settles-litigation-terminating-acuitas-rights-lnp-0; Murray May 30, 2024 Deposition, Exhibit 22, p. 3 (GENV-00519947 at 949).

[513] GENV-00022037 at 054-057, 071-075.

[514] GENV-00022037 at 071-076.

[515] See Section III.C.1.a.vi.

[516] See Section III.C.1.a.vii.

[517] See Section III.C.1.a.xiii.

these research agreements do not provide significant insight into the likely outcome of a commercial license negotiation between willing parties (such as those sitting at the Hypothetical Negotiation). The expected economic rents from a non-commercial usage are generally fundamentally different from the expected economic rents generated by a commercial endeavor as, for example, successful commercial endeavors will generate ongoing sales upon which running royalty rates can be applied (as a way of sharing economic gains)—in contrast to non-commercial endeavors.[518]

### 2.) Other Genevant Agreements or Related Transactions

199. The other Genevant agreements, transactions, and negotiations (not discussed above) do not provide any incremental probative insight into the likely outcome of the Hypothetical Negotiation, and these include:

- The Master Asset Purchase agreement (and related transactions between Genevant, Arbutus, and Roivant),[519] which do not provide insight into the outcome of the Hypothetical Negotiation. There are several features that render this transaction non-probative in terms of determining a market rate for the Patents-in-Suit, including:
  - The agreement was not an arm's-length transaction—the parties to the agreement had overlapping ownership interests in each other, as well as the firm created by the transaction;[520]
  - The agreement provided for the transfer of a collection of assets—far more than what would be sought by Moderna at the Hypothetical Negotiation, which is a non-exclusive license to the Patents-in-Suit;[521]
  - Due to the complicated nature of the transaction, there is no way to isolate an effective royalty amount owed for rights to the Patents-in-Suit such that it is capable of providing significant incremental insight into the likely outcome of the Hypothetical Negotiation;
- The Genevant agreements that do not provide U.S patent rights do not provide incremental probative insight into the likely outcome of the Hypothetical Negotiation—these agreements include provisions that specifically exclude rights to the Patents-in-Suit and restrict the rights to commercialization activities to geographic areas outside of the United States.[522] As a

---

[518] *See* discussion of licensing in Section II.D, above.

[519] *See* GENV-00021679.

[520] Roivant had a significant ownership stake in Arbutus when it created Genevant as a joint venture, *see* Section II.A.

[521] These assets included trademarks, domain names, office furniture/personal property, and numerous other forms of property, *see* GENV-00021679 at 692-693.

[522] This includes the Chula Agreement (*see* GENV-00023616 at 621-623, 627-629, noting that "Patent" is limited to those "in the Territory," and the "Territory" does not include the U.S), the ST Pharm agreement (*see* definition of "Genevant Patent" (GENV-00022924 at 930-931) as being restricted to only patents in the "Territory," which does not include the U.S.

general matter, commercialization rights that are specifically restricted to outside of the U.S. are significantly less comparable than U.S. commercialization rights, and in some instances, fundamentally non-comparable. For example, the Chula Agreement provided rights to a university in Thailand—a country that operates under a universal healthcare system[523] in contrast to the U.S. system, a difference that further impedes economic comparability.

- The Tekmira / Moderna negotiations discussed in Section IV.F.2 below (in my assessment of Ms. Lawton's Market Approach) do not provide significant incremental probative insight into the outcome of the Hypothetical Negotiation. These negotiations did relate to intellectual property rights that included those to the Patents-in-Suit, and they provide some insight into what the licensor was willing to accept and/or Moderna was not willing to accept in terms of royalties for a license at certain points in time; however, these offers did not result in a consummated agreement, and therefore do not provide significant incremental insight into the likely outcome of the Hypothetical Negotiation beyond what is already provided by the Historical Comparable Licenses. Nevertheless, as explained below, the properly apportioned terms of the offers from these negotiations are consistent with the properly apportioned terms of the Historical Comparable Licenses.[524]

- In addition, I understand there were three offers to purchase/acquire Genevant. On this point, a Genevant interrogatory response states the following:

  Beginning in 2019, Genevant was engaged in a process to evaluate the possibility of combining with another company to advance the development of the company's product pipeline and its supporting assets. As a result of this process, Genevant received multiple offers to acquire the company. An offer from one counterparty valued the company at ███████ n. An offer from a separate counterparty valued the company at ██████████ Genevant declined to proceed with either offer. In 2021, Genevant received an unsolicited non-binding term sheet from a third-party in January 2021 for the acquisition of Genevant Sciences. This term sheet included a payment of up to $██ ██████ Genevant declined to proceed with this offer.[525]

  o Relatedly, Mr. Pete Zorn, Genevant's President and Chief Legal Officer, testified that Genevant's internal valuations priced the company at approximately "████████████ ██████████████████████████████████████████████████████████"

  o Similarly, a 2015 communication between Arbutus and Alnylam indicates that Arbutus was interested in selling its LNP intellectual property—with carve-outs for rights for hepatitis B ("HBV") and previously out-licensed fields—to Alnylam for ██████████.[527]

---

(GENV-00022924 at 935-936)), and the ██████ agreement (*see* definition of "Genevant Patent" (GENV-00023278 at 284-285) as being restricted to only patents in the "Territory," which does not include the U.S. (GENV-00023278 at 290-291)).
[523] https://pmc.ncbi.nlm.nih.gov/articles/PMC6560367; https://sgp.fas.org/crs/misc/IF10830.pdf, p. 1; https://www.census.gov/library/publications/2024/demo/p60-284.html.
[524] For further discussion of these negotiations, see Section IV.F.2 below.
[525] Plaintiff Genevant Sciences GmbH's Responses and Objections to Defendants Moderna, Inc. and ModernaTx, Inc's Fifth Set of Interrogatories, pp. 8-9.
[526] Zorn June 5, 2024 Deposition, pp. 224-225. ████████████████████████████████████.
[527] GENV-00521389.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY                     91

o   None of these offers and/or valuations led directly to consummated licenses or executed sales of the Patents-in-Suit; therefore, they do not provide significant incremental insight into the likely outcome of the Hypothetical Negotiation.

### ii.    Analysis of the Moderna Agreements

200.   In this section, I consider the extent to which the agreements involving Moderna may provide probative insight into the likely outcome of the Hypothetical Negotiation.  At a summary level, I find that none of the licenses where Moderna was the licensor or licensee provide incremental probative insight relative to that provided by the Historical Comparable Licenses.

### 1.)   Moderna In-Licenses on the Accused Product

201.   As discussed above, Moderna pays royalties for the Accused Product ███████████████████) under two agreements: Cellscript and NIAID.[528]  As explained below, the terms of these agreements do not provide significant incremental probative insight into the likely outcome of the Hypothetical Negotiation.

202.   With respect to the Cellscript agreement (discussed above), I understand that the technology licensed under this agreement relates to ██████████████████████████████████ (i.e., the "Cellscript Technology").[529]  I further understand that the Cellscript Technology is not technologically comparable to the Claimed Inventions ██████████████████████ ████████████████████████████████ from the narrow LNP technology claimed by the Patents-in-Suit.[530]  In particular, I understand from Dr. Meulien that the Cellscript Technology is significantly more important in relation to the provision of therapeutic benefits by the Accused Product than the Claimed Inventions.[531]

203.   With respect to the NIAID agreement (discussed above), I understand that the technology licensed under this agreement relates to ███████████████████████████ ██████████ (i.e., the "NIAID Technology").  I further understand that the NIAID Technology is not technologically comparable to the Claimed Inventions █████████████████ ████████████████████████████████████████████

---

[528] *See* Section III.C.1.c.
[529] *See* Section III.C.1.c.
[530] Meulien Rebuttal Report, § VII.B; Meulien Conversation.
[531] Meulien Rebuttal Report, § VII.B; Meulien Conversation.

███████████████████ from the LNP technology claimed by the Patents-in-Suit.[532]  In particular, I understand from Dr. Meulien that the NIAID Technology is more important in relation to the provision of therapeutic benefits by the Accused Product than the Claimed Inventions.[533]

### 2.)  Other Moderna Agreements

204.  In this section, I address the other Moderna agreements produced in this matter that I discussed above.  As explained below, none of these agreements are sufficiently technically and/or economically comparable to provide significant incremental insight into the likely outcome of the Hypothetical Negotiation.[534]

### a.)    2018 Merck Collaboration Agreement

205.  With respect to the Merck 2018 Collaboration Agreement, I understand that the technology licensed by Merck under this agreement ██████████████████████ (i.e., the "Moderna–Merck Technology").[535]  I further understand that the Moderna–Merck Technology is not technologically comparable to the Claimed Inventions as it relates to fundamentally different technologies.[536]  In particular, I understand from Dr. Prud'homme that the Moderna–Merck Technology is more important ████████████████████████████████████████████ ███████████ under the 2018 Merck Agreement.[537]  Therefore, even setting aside the economic non-comparability of this agreement, the 2018 Merck collaboration agreement is technologically non-comparable to a license to the Patents-in-Suit, and therefore does not provide any insight into the outcome of the Hypothetical Negotiation.  Therefore, this agreement is not technologically comparable to the agreement stemming from the Hypothetical Negotiation.

206.  Furthermore, independent of technological comparability, from an economic standpoint, the 2018 Merck Collaboration agreement does not provide incremental insight into the likely outcome of the Hypothetical Negotiation because █████████████████████████████.  As explained above, █████████████████████████████████████████████████████ ████████████████████████████████████████████████

---

[532] Meulien Rebuttal Report, § VII.C; Meulien Conversation.
[533] Meulien Rebuttal Report, § VII.C; Meulien Conversation.
[534] Prud'homme Rebuttal Report § XIII; Prud'homme Conversation.
[535] MRNA-GEN-00456830 at 832.
[536] Prud'homme Rebuttal Report § XIII.A.1; Prud'homme Conversation.
[537] Prud'homme Rebuttal Report § XIII.A.1; Prud'homme Conversation.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████ from the relationship that would be effectuated at the Hypothetical Negotiation, where Moderna would not work with Genevant on the development of new products together (and Genevant would bear none of the associated risks of such development). Moreover, at the Hypothetical Negotiation, Moderna would not receive any ongoing development support/assistance from Genevant, nor any assistance with commercialization activities, including ongoing cost sharing, distribution, and/or sales services. At the Hypothetical Negotiation, Moderna would receive a bare patent license to the Claimed Inventions, there would be no ongoing development relationship between the Parties, and Genevant would not be assisting with the commercialization of the Accused Product (including distribution and sales).[540] Therefore, this agreement is not economically comparable to the agreement stemming from the Hypothetical Negotiation.

### b.)    2016 AstraZeneca Agreement

208. With respect to the 2016 AstraZeneca Collaboration Agreement, I understand that the technology licensed by AstraZeneca under this agreement ████████████████████████████ ████████████████████ (i.e., the "Moderna–2016 AstraZeneca Technology").[541] I further understand that the Moderna–2016 AstraZeneca Technology is not technologically comparable to the Claimed Inventions as it relates to fundamentally different technologies.[542] In particular, I understand from Dr. Prud'homme that the Moderna–2016 AstraZeneca Technology is more ████████████████████████████████████████████████████████████ under the 2016 AstraZeneca agreement.[543] Therefore, this agreement is not technologically comparable to the agreement stemming from the Hypothetical Negotiation.

---

[538] *See* Section III.C.1.d.i.
[539] *See* Section III.C.1.d.i.
[540] *See* Section III.D.
[541] MRNA-GEN-00458197 at 202.
[542] Prud'homme Rebuttal Report, § XIII.A.2; Prud'homme Conversation.
[543] Prud'homme Rebuttal Report, § XIII.A.2; Prud'homme Conversation.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

209.    Furthermore, independent of technological comparability, from an economic standpoint, the 2016 AstraZeneca agreement does not provide incremental insight into the likely outcome of the Hypothetical Negotiation because ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████ ████████████████████████████ from the relationship that would be effectuated at the Hypothetical Negotiation, where Moderna would not work with Genevant on the development of new products together (and Genevant would bear none of the associated risks of such development).  Moreover, Moderna would not receive any ongoing development support/assistance from Genevant, nor any assistance with commercialization activities, including ongoing cost sharing, distribution, and/or sales services.  At the Hypothetical Negotiation, Moderna would receive a bare patent license to the Claimed Inventions, there would be no ongoing development relationship between the Parties, and Genevant would not be assisting with the commercialization of the Accused Product (including distribution and sales).[546]  Therefore, this agreement is not economically comparable to the agreement stemming from the Hypothetical Negotiation.

### c.)    2017 AstraZeneca Agreement

211.    With respect to the 2017 AstraZeneca Collaboration Agreement, I understand that the technology licensed by AstraZeneca under this agreement ████████████████████████████ ████████████████████████ (i.e., the "Moderna–2017 AstraZeneca Technology").[547]  I further understand that the Moderna–2017 AstraZeneca Technology is not technologically comparable to the Claimed Inventions as it relates to fundamentally different technologies.[548]  In particular, I understand from Dr. Prud'homme that the Moderna–2017 AstraZeneca Technology

---

[544] *See* Section III.C.1.d.ii.
[545] *See* Section III.C.1.d.ii.
[546] *See* Section III.D.
[547] Prud'homme Rebuttal Report, § XIII.A.3; Prud'homme Conversation.
[548] Prud'homme Rebuttal Report, § XIII.A.3; Prud'homme Conversation.

is most valuable ███████████████████████████████████████████████████ under the 2017 AstraZeneca agreement.[549]  Therefore, this agreement is not technologically comparable to the agreement stemming from the Hypothetical Negotiation.

212. Furthermore, independent of technological comparability, from an economic standpoint, the 2017 AstraZeneca agreement does not provide incremental insight into the likely outcome of the Hypothetical Negotiation because █████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████[551].

213. █████████████████████████████████ from the relationship that would be effectuated at the Hypothetical Negotiation, where Moderna would not work with Genevant on the development of new products together (and Genevant would bear none of the associated risks of such development).  Moreover, Moderna would not receive any ongoing development support/assistance from Genevant, nor any assistance with commercialization activities, including ongoing cost sharing, distribution, and/or sales services.  At the Hypothetical Negotiation, Moderna would receive a bare patent license to the Claimed Inventions, there would be no ongoing development relationship between the Parties, and Genevant would not be assisting with the commercialization of the Accused Product (including distribution and sales).[552]  Therefore, this agreement is not economically comparable to the agreement stemming from the Hypothetical Negotiation.

### d.)    Other Agreements

214. As noted above, the terms of other Moderna agreements that have been produced in this matter, and in which Moderna is the licensee, are summarized in Exhibit 5.  I am not aware of any evidence or opinions indicating that these agreements are sufficiently economically or technically

---

[549] Prud'homme Rebuttal Report, § XIII.A.3; Prud'homme Conversation.
[550] *See* Section III.C.1.d.iii.
[551] *See* Section III.C.1.d.iii.
[552] *See* Section III.D.

comparable to provide incremental insight into the likely outcome of the Hypothetical Negotiation relative to the insight provided by the Historical Comparable Licenses.

### iii.    Market Approach Conclusion

215.    As discussed above, I find that the Historical Comparable Licenses provide significant probative insight: they reflect market-based transactions for rights that include the Claimed Inventions as well as other patented and non-patented intellectual property not at issue in this matter.  As such, they should—when properly considered—form a central consideration in a reasonable royalty assessment (as is often the case for agreements that include rights to asserted patents in a patent damages context).

216.    Proper consideration of these agreements requires (1) determining the effective rates implied by each agreement, and (2) apportioning the total value of each agreement down to the isolated value attributable to the Patents-in-Suit.  I describe the effective rates calculation and apportionment exercise in the following subsections.  As explained therein, these apportionment analyses provide me with a relatively narrow benchmark range of rates for the Patents-in-Suit based on the Historical Comparable Licenses (the "Benchmark Range of Rates").[553]

### 1.)    Effective Rate Calculations and Accounting for Non-Patented IP

217.    For each Historical Comparable License, I conduct an effective rate calculation that provides me with the "Unapportioned Genevant Patent Portfolio Effective Royalty Rate" for each agreement, which I detail in Exhibits 7.1-7.13.[554]  Calculating these rates helps show how the overall financial terms from one agreement compare to those of another, by determining the total royalty payments under each agreement, for a non-exclusive license to the entire portfolio of Plaintiffs' patented intellectual properties (which includes but is not limited to, the Patents-in-Suit), and for a given level of covered product success (such as the success experienced by Moderna).  This calculation synthesizes these considerations and computes a single royalty rate (paid as a percentage of covered product net sales).  These calculations also help ensure that the comparable rate taken from each agreement reflects both the agreement's running royalty payments, as well as non-

---

[553] *See* Figure 1; Exhibit 10.

[554] I note that Ms. Lawton performs a similar calculation to derive an unapportioned effective running royalty (albeit in an improper per-unit form) from the royalty terms offered (but not accepted) by Tekmira to Moderna in 2013.  *See* Lawton Report, Schedules 4.1, 4.2.

running royalty payments (e.g., upfront and milestone payments). Lastly, several of the agreements provide for different royalty rates depending on the amount of covered sales—the effective rate calculation takes this into consideration by determining the overall average royalty rate for a given level of covered product success.

218.    With this in mind, my determination of Unapportioned Genevant Patent Portfolio Effective Royalty Rates begins with the royalty terms associated with the entire suite of Genevant intellectual properties (a suite that includes far more than just the rights to the Patents-in-Suit that would have been the subject of Moderna and Genevant's interactions at the Hypothetical Negotiation) licensed under each agreement—and proceeds as follows for each "agreement" in the set of Historical Comparable Licenses:[555]

- (1) I aggregate the total amount of Accused Product net sales in each quarter;[556]

- (2) I determine the applicable running royalty rate(s) from the terms of the agreement;[557]

- (3) Where necessary, I adjust the running royalty rates of exclusive licenses by the ratio ██████████ ), which is the ratio of the Providence agreement's running royalty rate for non-exclusive rights to the IP portfolio including the Patents-in-Suit vs. the Providence agreement's running royalty rate for exclusive rights to the IP portfolio including the Patents-in-Suit (I discuss this apportionment step further below);[558]

- (4) To parse out the value associated with the patented IP (as distinct from the non-patented IP that is provided under these agreements) inherent in the non-exclusive running royalty rate, I apply, where applicable, the running royalty reduction specified in the agreement for when covered products are no longer covered by a valid claim of a licensed patent (I discuss this apportionment step further below)—this provides me with a Running Rate Component for the Genevant Patent Portfolio;[559]

- (5) In each quarter, I apply the Running Rate Component for Plaintiffs' Patent Portfolio to the given amount of Accused Product net sales in the period, as specified by the terms of the agreement;[560]

---

[555] *See* Exhibits 7.1-7.13.

[556] *See* Exhibits 12, 12-A, and 12-B.

[557] Note for some of the Historical Comparable Licenses, the appropriate running royalty rate is an array of rates, where each rate corresponds to different annual net sales band totals ██████████ ), and in some cases, other technical or marketplace dynamics. Exhibits 6 and 7.1-7.13.

[558] Section III.B.2; GENV-00022307 at 321-322, 328-329.

[559] *See* Exhibit 6; Section III.C.1. Note, for some of the Historical Comparable Licenses, the Running Rate Component for the Genevant Patent Portfolio is an array of rates, where each rate corresponds to, for example, different annual net sales band totals ( ██████████ )

[560] This step involves applying the appropriate rate from the array of rates in the Running Rate Component for the Genevant Patent Portfolio to the corresponding net sales bands achieved in each quarter. I note that many of the Historical

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

- (6) In each quarter, I apply any applicable non-running royalty payments (e.g., upfront payments, pre-commercial milestones, and commercial milestones) based on the terms of the agreement;[561]

- (7) I discount the quarterly sums of the applicable running royalty payments and non-running royalty payments back to the Hypothetical Negotiation Date to arrive at the Discounted Total Unapportioned Effective Royalty Payments;

- (8) I discount the quarterly total Accused Product net sales back to the Hypothetical Negotiation Date to arrive at the Discounted Total Accused Product Net Sales;

- (9) I divide the Discounted Total Unapportioned Effective Royalty Payments (including both running royalty payments and non-running royalty payments) by the Discounted Total Accused Product Net Sales to derive the "Unapportioned Genevant Patent Portfolio Effective Royalty Rate."[562]

219.  As outlined above, one of the first steps required for making sure the Unapportioned Genevant Patent Portfolio Effective Royalty Rate is an "apples to apples" calculation for each agreement is to make sure that it reflects the rate for non-exclusive rights under each agreement (as opposed to exclusive rights—which Moderna would not receive at the Hypothetical Negotiation).  Therefore, to account for the fact that the license contemplated at the Hypothetical Negotiation would grant non-exclusive rights, whereas several of the Historical Comparable Licenses grant exclusive rights to IP portfolios including the Patents-in-Suit, I adjust the running royalty rates of exclusive licenses by multiplying them by the ratio (███████ which is the ratio created from dividing the Providence agreement's running royalty rate for non-exclusive rights by the corresponding rate for exclusive rights.[563]

220.  I note that as part of the calculation above, I need to control for the fact that, as analyzed above, various parties have agreed to pay for licenses to a portfolio of Genevant Intellectual Properties—a portfolio that includes the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter.  Thus, a proper reasonable royalty assessment in this action for the Patents-in-Suit requires that I isolate their value as distinct from the other technologies

---

Comparable Licenses specify that running royalty payments accrued based on net sales achieved in a quarter will be paid in the subsequent quarter, *see* Exhibit 6.

[561] *See* Exhibit 6; Section III.C.1.

[562] *See* Exhibits 7.1-7.13.

[563] Section III.B.2; GENV-00022307 at 321-322, 328-329; Exhibit 10.  I use the Providence agreement for this adjustment because it specifies rates for both exclusive and non-exclusive rights.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

licensed under historical licenses to IP portfolios that include the Patents-in-Suit before any further apportionment.

221. Therefore, the next step requires isolating the value associated with all the patented rights in each agreement, as distinct from the non-patented elements, which Moderna would not receive at the Hypothetical Negotiation—such as the know-how including Genevant's provision of certain precommercial support services (including precommercial manufacturing of candidate formulations).[564]  Here the specific license terms of the Historical Comparable Licenses provide insight into the proper apportionment of these non-patented elements.  Indeed, all of those agreements but the 2017 Gritstone agreement provide a clause for a percentage royalty reduction in the event that no "valid claim" covering a licensed product remains.[565]  For example, under the terms of the Providence agreement, running royalties are reduced by ▮▮▮▮▮ when no valid claim is left covering a licensed Providence product—indicating that ▮▮▮▮▮ of the running royalty is for the patented elements while ▮▮▮▮▮ is for the non-patented elements.[566] Therefore, using the corresponding reduction clause for each of the Historical Comparable Licenses, where applicable, I adjust the effective rate calculations described above accordingly to determine the appropriate Running Rate Component (as described above).

222. As outlined above, I am then able to take the Running Rate Component for the Genevant Patent Portfolio applied to the net sales of the Accused Product to determine total running royalties in each quarter.  I add these quarterly running royalty payments to any non-running royalty payments paid in the same quarter, and then discount these quarterly amounts (back to the Hypothetical Negotiation date) and sum them.  I take these Discounted Total Royalty Payments and divide them by the Discounted Total Accused Product Net Sales to arrive at the Unapportioned Genevant Patent Portfolio Effective Royalty Rates.

223. The result of the steps described above (for each Historical Comparable License) is a narrow range of Unapportioned Genevant Patent Portfolio Effective Royalty Rates—rates that are attributable

---

[564] *See* background on the Historical Comparable Licenses above in Section III.C.1.a.
[565] *See* background on the Historical Comparable Licenses above in Section III.C.1.a. I do not apply these adjustments to the 2017 Gritstone agreement.  I also note that the apportioned effective royalty rates for this agreement are consistent with the apportioned effective rates for the other agreements (*see* Figure 1)—which indicates my adjustment here is accurately distilling the value of patent rights.
[566] *See* my discussion of the terms of Providence agreement above in Section III.C.1.a.  *See also* Exhibit 6.

to the entire portfolio of all of the patented technologies licensed under each agreement (patented technologies that include the Patents-in-Suit as well as other patents not at issue in this matter). Therefore, to isolate the value of the Patents-in-Suit, I must further control for the value of all the other Genevant patents licensed under the Historical Comparable Licenses that are not at issue in this matter, and for which Moderna would not need a license at the Hypothetical Negotiation.

224. To isolate this value, I apply a well-accepted methodology that is used by economists to value patents—known in the relevant literature as forward patent citation analysis ("Patent Citation Analysis"), which I describe at length in the following subsection. Thus, I apply Patent Citation Analysis to provide an assessment of how value assigned to the historical licenses granting rights to the Patents-in-Suit (i.e., the Unapportioned Genevant Patent Portfolio Effective Royalty Rates) would be apportioned to the individual patents licensed therein. Once completed, this apportioned range of rates provides a useful "Benchmark Range of Rates" for further consideration.

### 2.) Apportionment of the Royalties Paid in The Pertinent Licenses Granting Rights to the Patents-in-Suit: Patent Citation Analysis

225. In this section, I describe my use of Patent Citation Analysis, a form of analysis that is well accepted in the literature—and particularly well-suited to the facts in this case. In particular, I use Patent Citation Analysis to apportion the value implicit in royalty terms of the Historical Comparable Licenses that is owed for all of the patented intellectual property licensed under the agreements (patented intellectual property which includes the Patents-in-Suit as well as other patented intellectual property not at issue in this matter)—i.e., the "Unapportioned Genevant Patent Portfolio Effective Royalty Rates" derived in the previous section. As mentioned above, this allocation of value to specific patented intellectual property allows me to then further isolate the specific footprint of the Claimed Inventions as distinct from the other, non-asserted patented intellectual property licensed under the historical licenses granting rights to Patents-in-Suit—thus removing the value associated with the non-asserted patented intellectual properties, which consist of other patent rights that Moderna would not receive under the hypothetical negotiation framework. This method contrasts with an approach that simply applies the rates from these agreements without further accounting for the non-asserted patents, which improperly includes in the reasonable royalty payments rights that Moderna would not receive at the Hypothetical

Negotiation (and, I understand, should not be compensable under a damages consideration).[567] I begin by noting that in descriptions of the analysis below, I refer to all of the Genevant patents licensed under historical licenses granting rights to the Patents-in-Suit as the "Genevant Patent Portfolio."

226. The foundations of Patent Citation Analysis are the observations of each patent's number of "forward citations"—the number of times each patent has been referenced by subsequently issued patents.[568] Each U.S. patent contains references to previously issued patents under the patent's "References Cited" as a way to identify any relevant patented inventions in the prior art.[569] The compilations of these "backward citations" for each patent are a collaborative effort made by the patent applicant, counsel for the applicant, and the patent examiner.[570] Each of these backward citations represents a forward citation—i.e., a backward citation from a newer patent to an older patent is a forward citation from the older patent to the newer patent.[571]

227. The basic rationale for using forward citation counts as a proxy for economic value is that patents with relatively high values tend to generate more forward citations than relatively less valuable patents—all else being equal.[572] The logic underpinning this intuition is that relatively valuable patented technology will encourage new (related) innovations, which will increase the number of citations back to the prior patented technology (thereby increasing its forward citation count).[573] Using this basic economic framework, one can estimate the relative economic value of patents by

---

[567] *See* Section IV.D.1.a for further discussion on the importance of apportionment.

[568] *See, e.g.*, Dr. Peter A. Malaspina, *Patent Citation Analysis and Patent Damages*, 18 Chi.-Kent J. Intell. Prop. 232 (2019) (available at: https://scholarship.kentlaw.iit.edu/ckjip/vol18/iss1/8).

[569] Trajtenberg, Manuel, "A Penny for Your Quotes: Patent Citations and the Value of Innovations." *RAND Journal of Economics*, Vol. 21, No. 1, Spring 1990, pp. 173-174; Dr. Peter A. Malaspina, *Patent Citation Analysis and Patent Damages*, 18 Chi.-Kent J. Intell. Prop. 232 (2019), pp. 233-234 (available at: https://scholarship.kentlaw.iit.edu/ckjip/vol18/iss1/8); Schankerman, M., "How Valuable is Patent Protection? Estimates by Technology Field," RAND Journal of Economics, 1998, Vol. 29, No. 1, 77-107 ("Schankerman (1998)"). *See also* Robert L. Vigil and Xiao Zhang, *Apportioning Value In Patent Portfolio License And Sale Agreements,* 4 *Les Nouvelles – Journal Of The Licensing Executives Society* 241, 259 (Dec. 2020) (noting that "for a given technology, patent value distributions have been relatively stable over time and may not be materially different across countries").

[570] Trajtenberg, Manuel, "A Penny for Your Quotes: Patent Citations and the Value of Innovations." *RAND Journal of Economics*, Vol. 21, No. 1, Spring 1990, p. 174; Schankerman (1998).

[571] Dr. Peter A. Malaspina, *Patent Citation Analysis and Patent Damages*, 18 Chi.-Kent J. Intell. Prop. 232 (2019), p. 234 (available at https://scholarship.kentlaw.iit.edu/ckjip/vol18/iss1/8).

[572] Trajtenberg, Manuel, "A Penny for Your Quotes: Patent Citations and the Value of Innovations." *RAND Journal of Economics*, Vol. 21, No. 1, Spring 1990, pp. 173-174, 179-181, 184.

[573] Trajtenberg, Manuel, "A Penny for Your Quotes: Patent Citations and the Value of Innovations." *RAND Journal of Economics*, Vol. 21, No. 1, Spring 1990, p. 174.

comparing forward citation counts across a sample of comparable patents, so long as suitable controls are put in place.[574]

228.  In order to ensure the comparisons of forward citations across patents are valid, the analysis first accounts for two potential factors that can affect the number of citations a given patent receives: (1) a patent's age and (2) a patent's field of technology.  Left unaccounted for, a patent's age (time since issuance) can bias its forward citation count because, as the time since issuance increases, there are simply more opportunities for the patent to accumulate forward citations from subsequently issuing patents.[575]  Therefore, to account for this phenomenon, my analysis employs a widely used method of age-adjustment that effectively isolates and controls for the number of citations from each patent that are attributable to its age as opposed to its relative value.

229.  A patent's field of technology can also present another potential factor that affects patent citation frequency, as patents from different areas of technology may accumulate citations at fundamentally different rates.  Therefore, comparisons of forward citations across different patents should include patents from similar or related fields where possible.[576]  In order to ensure that my analysis includes patents in similar or related fields, I rely on patent classes as defined in the Cooperative Patent Classification System, which is a system for organizing patent documents and other technical documents into relatively small collections based on common subject matter.[577]

230.  I take as the starting point for my analysis the Genevant Patent Portfolio as licensed under the Providence agreement, as this is the agreement that was consummated closest to the Hypothetical Negotiation date, and, as I establish above, its terms are highly comparable to those that would have resulted from the Hypothetical Negotiation.  Furthermore, the patents licensed therein are

---

[574] *See, e.g.,* Dr. Peter A. Malaspina, *Patent Citation Analysis and Patent Damages*, 18 Chi.-Kent J. Intell. Prop. 232 (2019) (available at: https://scholarship.kentlaw.iit.edu/ckjip/vol18/iss1/8); Schankerman (1998).

[575] Hall, Bronwyn, A. Jaffe, and M. Trajtenberg. 2001. "The NBER Patent Citations Data File: Lessons, Insights and Methodological Tools," pp. 25-28 (available at https://www.nber.org/papers/w8498).

[576] Hall, Bronwyn, A. Jaffe, and M. Trajtenberg. 2001. "The NBER Patent Citations Data File: Lessons, Insights and Methodological Tools," pp. 25-30 (available at https://www.nber.org/papers/w8498).

[577] https://www.uspto.gov/sites/default/files/patents/resources/classification/overview.pdf.  According to the USPTO, "Patent classification is a system for organizing all U.S. patent documents and other technical documents into specific technology groupings based on common subject matter.  On January 1, 2013, the USPTO moved from using the United States Patent Classification (USPC) system to the Cooperative Patent Classification (CPC) system, a jointly developed system with the European Patent Office (EPO).  CPC has now been adopted by many countries throughout the world." *See* https://www.uspto.gov/patents/search/classification-standards-and-development.

reflective of the Genevant Patent Portfolio as it existed around the time of the Hypothetical Negotiation, in contrast to the Genevant Patent Portfolio as licensed in earlier and later Historical Comparable Licenses.[578]

231.  In my analysis here, I note that the 42 patents in the Genevant Patent Portfolio as provided for in the Providence agreement,[579] are commonly classified under the Cooperative Patent Classification Groups ("Patent Classes") in classes A61K31, A61K9, A61K47, C12N15, and A61P35.[580] Therefore, for the purposes of comparing forward citation counts, I compare the patents mentioned above to all of the U.S. patents classified under the Patent Classes A61K31, A61K47, A61K9, C12N15, and A61P35 that have been issued since December 29, 2009 through January 26, 2025 (the "Genevant Combined Patent Class Sample").

### 3.)  Estimation Procedure[581]

232.  I then estimate the age-adjusted citations for each patent I analyze to ensure that I am accurately comparing citation counts across patents that are issued at different points in time.[582]  To make the age adjustment for the patents in the Genevant Combined Patent Class Sample, I perform a logistic regression of forward citation counts on time (Days), using the patents in the Genevant Combined Patent Class Sample.

233.  Restricting the analysis to the patents in the Genevant Combined Patent Class Sample to make the age-adjustment ensures that the age-adjustment uses only patents related to similar technologies as the technologies underlying the Genevant Patent Portfolio as licensed under the Providence agreement.  The underlying concept is that patents from unrelated fields may accumulate citations at different rates over time, and the logistic functional form captures the notion that a patent will accumulate citations relatively quickly early on, but at a decreasing rate as time progresses.[583]  Since the age adjustment model predicts the expected number of citations for an average valued patent for a given age, I am able to rescale observed forward citations for each patent by the ratio of

---

[578] Exhibits 8 and 9.

[579] *See* Exhibits 8 and 9.

[580] *See* Exhibits 8 and 9.

[581] For more technical details on the estimation procedure, *see* Exhibits 8 and 9.

[582] *See*, *e.g.*, Dr. Peter A. Malaspina, *Patent Citation Analysis and Patent Damages*, 18 Chi.-Kent J. Intell. Prop. 232 (2019) (available at: https://scholarship.kentlaw.iit.edu/ckjip/vol18/iss1/8).

[583] *See*, *e.g.*, Dr. Peter A. Malaspina, *Patent Citation Analysis and Patent Damages*, 18 Chi.-Kent J. Intell. Prop. 232 (2019) (available at: https://scholarship.kentlaw.iit.edu/ckjip/vol18/iss1/8); Schankerman (1998).

average forward citations of the Genevant Combined Patent Class Sample to the patent's expected forward citations as a function of time, resulting in a set of "Age-Adjusted Forward Citation Counts."[584]

234. I then determine a percentile rank for each patent in the Genevant Combined Patent Class Sample using the ordinal ranking of each patent based on its Age-Adjusted Forward Citation Count, and I use this set of percentile ranks to match the percentile ranks of each of the patents in the Genevant Combined Patent Class Sample to various simulations of patent value. To perform such a matching process, I turn to estimates of patent values by percentile reported in Schankerman (1998) and rely on the pharmaceuticals Schankerman fit since it is the most comparable patent technology field to the Genevant patents licensed under the Providence agreement.[585] I then specify a lognormal distribution of patent values that fits the reported 95th and 99th percentiles of the Schankerman distribution and simulate approximately 179,000 observations to create a set of simulated patent values.[586] This process ensures that my relative valuations of each patent reflect the fact that patent values tend to be lognormally distributed.[587] I note that courts have repeatedly approved of this methodology for determining patent value.[588]

235. I then percentile rank these simulated values from lowest to highest and use these rankings to assign a relative valuation to each patent in the Genevant Patent Portfolio as licensed under the Providence agreement, matching the percentile rank of Age-Adjusted Forward Citation Counts for each patent in the Genevant Patent Portfolio as licensed under the Providence agreement to the corresponding percentile rank of simulated value in the set of simulated values.[589] Next, I calculate a relative proportional value for each patent in Genevant Patent Portfolio as licensed under the Providence agreement by dividing the corresponding simulated patent value by the total simulated

---

[584] This adjustment is isomorphic to calculating the Age-Adjusted Forward Citation Count for each patent as the residual from the age-adjustment regression for each patent in the Genevant Combined Patent Class Sample (for the purposes of constructing an ordinal ranking, as I describe below) as it preserves ordinality.

[585] I refer to this distribution of values as the "Schankerman distribution."

[586] I base the sample size of the simulated patent values on the number of patents in the Genevant Combined Patent Class Sample, which includes approximately 179,000 patents. *See* "PCA Analysis.do."

[587] Exhibits 8 and 9; *see also* Schankerman (1998), p. 88.

[588] *See, e.g., USAA v. PNC*, 2:20-cv-00319-JRG-RSP, Dkt. 600 at *9-10 (E.D. Tex. April 24, 2022); *Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*, 2019 WL 4198194, *2-3 (D. Del. Sept. 4, 2019); *Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at *12 & n. 15 (S.D. Cal. Sept. 14, 2016); *Packet Intel. LLC v. NetScout Sys., Inc.*, 2017 WL 11631146, at *3 (E.D. Tex. Sept. 29, 2017); *Better Mouse Co. v. SteelSeries ApS*, 2016 WL 3611528, at *3 (E.D. Tex. Jan. 5, 2016); *In re Innovatio IP Ventures, LLC Patent Litig.*, 2013 WL 5593609, at *43 (N.D. Ill. Oct. 3, 2013).

[589] *See* "PCA Analysis.do" and Schankerman (1998).

patent value among all patents in the Genevant Patent Portfolio as licensed under the Providence agreement. The resulting relative proportional value apportioned to each patent in Genevant Patent Portfolio as licensed under the Providence agreement is such that the total sum of all value estimates for each patent equals 100 percent.[590]

### 4.) Results and Benchmarks

236. I provide the results of my Patent Citation Analysis in Exhibits 8 and 9. As shown in Exhibit 8, my analysis indicates that the Patents-in-Suit account for approximately 15.4 percent of the total value of the Genevant Patent Portfolio as licensed under the Providence agreement. To further incorporate conservative principles into this analysis, I conduct a "Patent Family Adjustment"[591] whereby I conservatively assign the additional value of the other patents in the same patent families as the Patents-in-Suit to the value apportionment for the Patents-in-Suit. This additional assignment step is strictly conservative because it can only apportion additional value to the Patents-in-Suit (from other unasserted patents that are in the same patent family as the Patents-in-Suit) and cannot not take any value away that would otherwise be attributed to the Patents-in-Suit alone.

237. Based on this approach, I find that the Patents-in-Suit families collectively account for no more than 25.4 percent of the total value of the Genevant Patent Portfolio as licensed around the time of the Hypothetical Negotiation.[592] I note that 25.4 percent of the total Genevant Patent Portfolio value estimated for the Patents-in-Suit indicates that, on an average percentage basis, the 6 Patents-in-Suit are on average somewhat more valuable than the 36 U.S. patents from the Genevant Patent Portfolio as licensed in the Providence agreement that are not asserted.[593] As shown in Exhibit 10, when applied to the unapportioned effective rates for the Historical

---

[590] *See* "PCA Analysis.do" and Schankerman (1998).

[591] By including all of the patents in the same families as the Patents-in-Suit, I am conservatively apportioning value to the Patents-in-Suit from closely related technologies that are nevertheless outside the specific footprint of the Claimed Inventions.

[592] To take into consideration the total value of the Genevant Patent Portfolio around the time of the Hypothetical Negotiation, I used the portfolio patents as defined under the terms of the Providence Agreement (*see* Exhibit 9).

[593] Another way to observe this result is to recognize that the six Patents-in-Suit are estimated to represent 25.4 percent of the total value of the Genevant Patent Portfolio as licensed under the Providence agreement, while only representing 14 percent of the total number of U.S. patents (42) included in the Genevant Patent Portfolio as licensed under the Providence agreement (i.e., 14 percent = 6/42).

Comparable Licenses, my analysis here conservatively indicates a properly apportioned Benchmark Range of Rates of ███████████████.[594]

### 2. The Income Approach

238. In patent damages contexts, the Income Approach seeks to identify, capture, and quantify the incremental financial gain or income generated by an asserted patented invention. In the appropriate setting, this type of analysis can distill the portion of profitability owed to the specific footprint of the patented invention. However, as explained below, the facts of the case specific to the present matter are ill-suited for an income-based approach to analyzing damages.

239. As a general matter, income-based methods of apportionment require sufficient data to analyze how the incorporation of the patented feature(s) affect the profitability of the accused product. For example, in certain circumstances, such an inquiry proceeds by comparing the profitability data of the accused product (or set of accused products) to an analog product (or set of analog products) that is substantially similar to the accused product—except for the key distinction that the analog product does not practice the asserted patented invention(s). In such a setting, where the only difference between products is the incorporation of the patented invention, the portion of profitability that is owed to the incorporation of the asserted invention can be isolated by calculating the difference in the per-unit profitability of the accused and analog products. This isolated incremental profit can then be bargained over (i.e., split) between the parties to the hypothetical negotiation.

240. However, the present circumstance does not afford sufficient data to conduct such an exercise. Moderna does not sell a different version of the Accused Product that is not accused of infringement. Further, there is no analog product (or products, sold by a third party or parties) that is substantially similar to the Accused Product, such that it might serve as a suitable proxy for the Accused Product without the Claimed Inventions. More generally, such comparisons of product profitability—in an effort to isolate value attributable to the patented invention(s)—are not feasible when the accused product represents the culmination of myriad different technologies, which hampers attempts at undertaking a profitability comparison. This issue is particularly problematic in the present matter, where the Accused Product is a cutting-edge

---

[594] Exhibit 10. I also conduct certain robustness checks to further bolster my findings, *see* Exhibits 8 and 9.

technology that embodies a multitude of patented and non-patented features, including those developed and patented by Moderna and several other third parties.[595]

### 3. The Cost Approach

241. Under the Cost Approach, the value of an invention is assessed by considering any cost advantages the invention may confer over non-infringing alternative technologies that could be used to achieve similar end results. I understand that beyond Moderna's position that the Accused Product does not infringe in the first place, that assuming infringement, other non-infringing alternatives were available to Moderna around the time of the Hypothetical Negotiation. For instance, I understand that Moderna had years of study and data on alternative lipid formulations outside of Spikevax® v1 and v2 Formulations, which I understand would constitute non-infringing alternatives based on varying molar ratios of lipid components.[596]

242. However, it is important to note that to the extent potential alternatives did exist around the time of the Hypothetical Negotiation, those same potential alternatives would have likely been accessible to the other licensees either before/after the Hypothetical Negotiation and, thus, substantially the same set of potential alternatives would likely have been considered by the parties to the Historical Comparable Licenses at the times of their respective signing (and thus informed the outcomes of the Historical Comparable Licenses).[597] In this way, the Historical Comparable Licenses capture (and implicitly control for) the existence of potential non-infringing alternatives to the Molar Ratio Patents that Genevant and Moderna would consider at the Hypothetical Negotiation.[598] Therefore, the Cost Approach does not provide any additional insight beyond what is already provided by the Historical Comparable Licenses under the Market Approach.

### 4. Conclusion of the Three Approaches

243. My above analysis of the three approaches indicates that the Market Approach provides significant insight into the likely outcome of the Hypothetical Negotiation, while the Cost and Income approaches do not provide significant incremental insight (beyond what is provided by the Market

---

[595] *See* Section III.C.1.c, above, discussing the Cellscript agreement and NIAID agreement . For further discussion about how the present matter does not provide a suitable setting to conduct these types of analysis, refer to my assessment of Ms. Lawton's income-based "Analytical Method" provided in Section IV.G.2.
[596] Prud'homme Rebuttal Report, §§ X.D, XI.
[597] Prud'homme Conversation*; See also* Section IV.C.7 below.
[598] Prud'homme Conversation.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

Approach). Furthermore, as indicated by my Market Approach assessment, I find that a measure of the value of the financial terms of the Historical Comparable Licenses, suitably apportioned to the Patents-in-Suit, provides a Benchmark Range of Rates that can be used in the remainder of my reasonable royalty analysis.

244. Thus, for my *Georgia-Pacific* analysis, I consider each factor below and determine to what extent the insight afforded from the Benchmark Range of Rates derived from the Historical Comparable Licenses already reflect the key considerations called for under each *Georgia-Pacific* factor—noting cases where that consideration indicates further adjustment to the Benchmark Range of Rates determined under the Market Approach.[599]

### D. Consideration of the *Georgia-Pacific* Factors

**Factor 1: The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty.**

245. As discussed above, I considered the historical licenses granting rights to the Patents-in-Suit in my Market Approach above. Using the terms of these agreements, I isolated the apportioned effective royalties from the royalty rates that Genevant agreed to receive and that third parties were willing to pay in exchange for licenses to the entire set of Plaintiffs' IP (IP which included, but was not limited to the Patents-in-Suit, among other patented and non-patented intellectual property). I summarize these apportioned effective rates in Figure 1 (as included above and reproduced here)

---

[599] Note, my discussion under each factor below is sufficient for my affirmative findings; however, I also consider the *Georgia-Pacific* Factors in my assessment of Ms. Lawon's analysis—where I provide further discussion of the Factors (that is further supportive of my findings in my affirmative analysis). I note further that due to the fact that Ms. Lawton's *Georgia-Pacific* analysis is tethered to many non-comparable reference points, Ms. Lawton's *Georgia-Pacific* analysis must, at the very least, explicitly consider myriad non-comparability issues and address them. In contrast, my own affirmative *Georgia-Pacific* analysis avoids most of these non-comparability issues through the use of far more comparable reference points (i.e., the Historical Comparable Licenses). For these reasons, my assessment of Ms. Lawton's *Georgia-Pacific* analysis will necessarily criticize her for failing to consider certain evidence that my own affirmative *Georgia-Pacific* analysis does not explicitly need to consider (because my better reference points do so inherently). Therefore, for the reasons stated above, to the extent I discuss certain evidence in my assessment of Ms. Lawton's *Georgia-Pacific* analysis—that I do not explicitly discuss in my own *Georgia-Pacific* analysis below—I incorporate that analysis and evidence in my assessment of Ms. Lawton's *Georgia-Pacific* analysis by reference here.

263. As an initial matter, as discussed under Factor 8 above, the historical licensees to the Plaintiffs' IP (which includes far more than just rights to the Patents-in-Suit) would have realized (just as Moderna would at the Hypothetical Negotiation) that none of the other licensees to the Claimed Inventions have successfully commercialized an mRNA product (in any field).[616] As with Factor 8, these same types of considerations under Factors 9 and 10 would already be captured by the Historical Comparable Licenses (as the rights granted under those licenses would include, but not be limited to, the Patents-in-Suit), and thus do not indicate further adjustments are warranted to the Benchmark Range of Rates.

264. Moreover, these factors reaffirm the importance of the apportionment exercise I conducted under my Market Approach—as the Historical Comparable Licenses provided the respective licensees with far more than the bare, non-exclusive license to the Patents-in-Suit that Moderna would receive at the Hypothetical Negotiation.[617] Indeed, the licensees to the Historical Comparable Licenses received significant patented and non-patented properties that Moderna would not receive at the Hypothetical Negotiation.[618] Therefore, my accounting for the value associated with these additional properties in my Market Approach assures me that the remaining value I have isolated is consistent with what should be considered under Factors 9 and 10. In other words, without the appointment exercise undertaken in my Market Approach, the unapportioned rates from the Historical Comparable Licenses would necessarily need to be significantly adjusted downwards under these factors.

265. Furthermore, as discussed under my consideration of the Cost Approach, to the extent potential alternatives did exist around the time of the Hypothetical Negotiation, those same potential alternatives would have likely been accessible to the other licensees either before/after the Hypothetical Negotiation, and thus the substantially the same set of potential alternatives would likely have been considered by the parties to the Historical Comparable Licenses at the times of their respective signing (and thus informed the outcomes of the Historical Comparable Licenses).[619] In this way, the Historical Comparable Licenses capture (and implicitly control for) the existence of potential non-infringing alternatives that the Genevant and Moderna would

---

[616] *See* Section III.C.1.a.
[617] *See* Section III.C.1.e.i.
[618] *See* applicable provisions of the Historical Comparable Licenses in Section III.C.1.a.
[619] *See* Section III.C.3, above.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

consider at the Hypothetical Negotiation.  Moreover, with the Historical Comparable Licenses in hand, any consideration of the time to implement these same alternatives, as it relates to any time pressure with respect to the Hypothetical Negotiation date, is irrelevant because it reflects a notion of hold-up,[620] as opposed to the proper isolation of the value associated with the Claimed Invention.  Therefore, this element of these factors indicates no further adjustment.

266.  For the reasons expressed above, no adjustment to the Benchmark Range of Rates is indicated under these factors.

> **Factor 11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.**

267.  The Historical Comparable Licenses contemplate the potential for various levels of financial success (or failure), with both clinical and commercial milestone payments, and running royalty rates (as a percentage of net sales) that scale with the scope of the commercial opportunities inherent in the covered products.[621]

268.  Therefore, no adjustment to the Benchmark Range of Rates is indicated under this factor.

> **Factor 12: The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

269.  I considered the other license agreements produced in this matter—beyond the licenses granting rights to the Patents-in-Suit (Factor 1) and the Moderna in-licenses (Factor 2)—under the Market Approach and determined they did not provide significant incremental insight into the outcome of the Hypothetical Negotiation.[622]  I also determined that the Income Approach and Cost Approach did not provide incremental probative insight into the outcome of the Hypothetical Negotiation.[623]

270.  As explained above, the Historical Comparable Licenses provide a clear indication of the portion of the selling price that is customary to allow for the use of the Claimed Inventions.  Therefore, no adjustment to the Benchmark Range of Rates is indicated under this factor.

---

[620] For further discussion of the hold-up concept, see Sections IV.D.1, IV.B.3, and IV.F.3.c-IV.F.3.d below.
[621] *See* Exhibit 6.
[622] *See* Section III.C.1.e.
[623] *See* Sections III.C.2, III.C.3.

Moderna invested approximately $161 million, out of a modality-specific budget of $463 million, in developing the infectious disease vaccines modality, the largest share of any of its modalities.[644] The fruit of these investments included the entry into clinical trials of six vaccine programs, targeting diseases such as influenza, RSV, Zika, and Chikungunya virus,[645] as well as a MERS-CoV coronavirus vaccine candidate, developed in collaboration with the NIH, that later "provided significant insights"[646] for Spikevax. Thus, by the time the COVID-19 pandemic began, Moderna had developed a robust mRNA platform and associated infectious disease vaccine modality that could succeed in clinical trials, and the robustness of this platform was further improved by Moderna's investments in manufacturing. For example, in 2018 Moderna opened an in-house manufacturing facility in Norwood, Massachusetts at a cost of approximately $110 million.[647] Between 2018 and 2020, Moderna produced over 100 clinical batches at this facility, supporting the company's clinical development programs and helping to accelerate improvements in its platform.[648]

277. In the context of the COVID-19 pandemic, however, having a template for a robust and efficacious vaccine was not enough—as I noted in Section II, time was of the essence, as companies raced to be the first to market in order to slow the spread of the pandemic and meet the massive demand for a vaccine. The speed with which Moderna was able to design and move mRNA-1273 into clinical trials and onto the market was in part the result of Moderna's investments in digital infrastructure/AI, which it integrated across its various modalities at every stage of the production process.[649] In a 2020 white paper, Moderna highlighted that it had invested over $100 million in "digital technologies, robotics/automation, analytics, data science

---

[644] Moderna 2019 10-K, p. 216 (available at https://s29.q4cdn.com/435878511/files/doc_financials/2019/ar/Chasen-Richter-Moderna-Annual-Report-2019.pdf); Moderna 2018 10-K, p. 204 (available at https://s29.q4cdn.com/435878511/files/doc_financials/2018/ar/Chasen-Richter-Moderna-Annual-Report-2018.pdf).
[645] Moderna 2019 10-K, pp. 27-28 (available at https://s29.q4cdn.com/435878511/files/doc_financials/2019/ar/Chasen-Richter-Moderna-Annual-Report-2019.pdf).
[646] https://www.sec.gov/Archives/edgar/data/1682852/000119312520074867/d884510dex991.htm
[647] https://www.pharmaceutical-technology.com/projects/moderna-manufacturing-facility-norwood
[648] https://www.modernatx.com/en-US/media-center/all-media/blogs/moderna-manufacturing-why-norwood; https://www.modernatx.com/en-US/media-center/all-media/blogs/celebrating-a-year-of-progress-at-norwood.
[649] Moderna 2019 10-K, pp. 24-25 (available at https://s29.q4cdn.com/435878511/files/doc_financials/2019/ar/Chasen-Richter-Moderna-Annual-Report-2019.pdf).

and AI."[650]  The results of this investment included Moderna's Drug Design Studio, a suite of tools enabling researchers to automatically design optimized mRNA sequences with the help of embedded AI algorithms trained on public data as well as Moderna's proprietary data;[651] neural networks to analyze and model protein sequences;[652] and digital inventory, study design, and experiment management tools to streamline workflows.[653]  Moderna's investments in automation and AI also fed back into its manufacturing processes; at its Norwood production facility, for example, all production and quality control processes have been automated, ensuring rapid and high-quality manufacturing of mRNA product.[654]

278.  Moderna's mutually reinforcing investments in its mRNA platform and its infectious disease vaccine modality, in its manufacturing, and in automation/AI together enabled Moderna to promptly design a vaccine targeting COVID-19 shortly after the disease's genetic sequence was published, thereby putting Moderna in pole position to develop, test, and commercialize a COVID-19 vaccine ahead of its would-be rivals.  Indeed, as I noted above in Section II.C.2, Moderna designed the antigen for mRNA-1273 within just 48 hours of scientists' publication of the COVID-19 genome, and Moderna moved the vaccine into Phase 1 clinical trials less than two months later,[655] becoming the first COVID-19 vaccine to start clinical trials in the U.S.[656]  This rapid turnaround was a crucial part of mRNA-1273's success and would not have been possible without Moderna's many investments in the months and years prior to the COVID-19 pandemic. All told, Moderna invested well north of $1.6 billion in research and development expenses between 2016 and 2019 alone in its quest to make mRNA medicine a practical reality, investments

---

[650] https://assets.ctfassets.net/87hacmv3x18u/1OUQZKc6OICHogQ5uxfVSC/335cda7362a13fa1689b953338603bfd/Moderna_Digital_WhitePaper_Digital_biotech.pdf, p. 2.  *See also* Moderna 10Ks, under "Technical development and unallocated manufacturing expenses."

[651] https://assets.ctfassets.net/87hacmv3x18u/1OUQZKc6OICHogQ5uxfVSC/335cda7362a13fa1689b953338603bfd/Moderna_Digital_WhitePaper_Digital_biotech.pdf, p. 3.

[652] Moderna 2019 10-K, p. 130 (available at https://s29.q4cdn.com/435878511/files/doc_financials/2019/ar/Chasen-Richter-Moderna-Annual-Report-2019.pdf).

[653] Moderna 2019 10-K, p. 130 (available at https://s29.q4cdn.com/435878511/files/doc_financials/2019/ar/Chasen-Richter-Moderna-Annual-Report-2019.pdf).

[654] https://assets.ctfassets.net/87hacmv3x18u/1OUQZKc6OICHogQ5uxfVSC/335cda7362a13fa1689b953338603bfd/Moderna_Digital_WhitePaper_Digital_biotech.pdf, pp. 6-7.

[655] https://www.cnbc.com/2021/07/03/how-moderna-made-its-mrna-covid-vaccine-so-quickly-noubar-afeyan.html

[656] https://www.clinicaltrialsarena.com/news/first-us-covid-19-vaccine-trial-moderna/?cf-view

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY                    121

often undertaken at great risk and with uncertain odds of success.[657]  As Stéphane Bancel, Moderna's CEO, wrote in a letter to shareholders accompanying Moderna's 2020 annual report, "[i]t took several billion dollars of capital to get to this point. We could not have built this version of Moderna on a billion dollars or less."[658]

279.  Thus, at the time of the Hypothetical Negotiation, Moderna would be bringing far more to the negotiating table than previous licensees to the Patents-in-Suit (including Providence), as none of those licenses have yet resulted in a successfully commercialized mRNA product, much less one that has had the success of mRNA-1273.[659]  Indeed, to date, Genevant has only received ███ ████ in total revenues relating to licenses granting rights to the Patents-in-Suit—approximately ███████ of Ms. Lawton's total damages estimate.[660]  The fact that Moderna was bringing so much more of its own work to the Hypothetical Negotiation table, relative to what previous licensees had brought to their respective negotiations, indicates that Moderna should retain a larger portion of its net sales revenue than the other historical licensees to the Patents-in-Suit (all else being equal).  This factor therefore indicates a significant downward adjustment to the Benchmark Range of Rates.

### Factor 14: The opinion testimony of qualified experts.

280.  I have considered the expert opinions of Drs. Prud'homme and Meulien, which I have incorporated throughout my analysis and discussion.  They give no rise to an additional consideration or adjustment under this factor.

---

[657] Moderna 2019 10-K, p. 212 (available at https://s29.q4cdn.com/435878511/files/doc_financials/2019/ar/Chasen-Richter-Moderna-Annual-Report-2019.pdf), where $496.3 million + $454.1 million + $410.5 million + $274.7 million = $1.64 billion.
[658] Moderna 2020 Annual Report, p. 23 (available at https://s29.q4cdn.com/435878511/files/doc_financials/2020/ar/Chasen-Richter-Moderna-Annual-Report-2020.pdf).
[659] Zorn June 5, 2024 Deposition, pp. 190-191.
[660] Exhibit 4-A.  *See also,* Zorn June 5, 2024 Deposition, pp. 198-205.  ███████████████████████ ████████████████████ *see* Lawton Report, Table 1.1.  I note that this amount also includes royalties owed for certain agreements that do not provide rights to the Patents-in-Suit, despite Genevant and Ms. Lawton's claims to the contrary.  Removing those amounts reduces the total received ████ (see Section III.C.1.b; Exhibits 4 and 4-A).

283. In sum, it is my opinion that, in the event Moderna is found to infringe the Patents-in-Suit, the Parties would likely reach an agreement on a reasonable royalty in the lower half of the range of royalty rates identified above—or approximately two-thirds of one percent to one percent of net sales of the Accused Product (or ███████████ ████ when applied to the above specified royalty base).[662] I further find that the Parties would likely gravitate towards the apportioned rate implied by the Providence agreement ████ yielding ███████████ in damages), given its symmetry to the license contemplated by the Hypothetical Negotiation, and its proximity thereto.

### E. Damages Calculations

#### 1. Royalty Base

284. As discussed below in Section IV.I, I largely adopt Ms. Lawton's royalty base compilations (with certain corrections) conditional on any assumed permutation of claim liability, infringement theory, and infringement scope. Notably, Ms. Lawton provides Schedules 2.2 and 2.3 that lay out her royalty base calculations with respect to units only. Because my reasonable royalty is expressed as a revenue-percentage rate rather than a dollars-per-unit rate, I provide my own exhibits that both make certain minor corrections to Ms. Lawton's compilations,[663] and also report corresponding net sales (dollar) amounts. I also apply Ms. Lawton's general principle that the reasonable royalty rate should be applied to the units/net sales corresponding to the volumes that Moderna actually sold. This approach is consistent with the use of "net sales" as a royalty base in the Historical Comparable Licenses, on which my ultimate apportioned royalty rate is based.

285. For sake of comparison, as noted, I provide summary-level royalty base compilation exhibits analogous to those provided by Ms. Lawton. In particular, I provide as Exhibits 11-A, 11-B, and 11-C tables corresponding to Ms. Lawton's Schedules 2.1, 2.2, and 2.3, respectively. As discussed in the following subsection, I have been asked to provide associated damages exhibits

---

[662] *See* Exhibit 12-A.

[663] Notably, in patent infringement scenarios corresponding to the '651 patent (which expired in 2023) only, Ms. Lawton includes in her royalty base certain units that she identifies as being manufactured prior to expiry but sold thereafter. For such permutations, I exclude units and net sales associated with doses that Ms. Lawton identifies as having been manufactured prior to the expiry of the '651 patent but sold thereafter. This is an appropriate exclusion as an economic matter, since my reasonable royalty rate is derived from Genevant's historical licenses that assess a running royalty only on net sales made during the license term. Should the finder of fact determine that my reasonable royalty rate as constructed should apply to these incremental units/sales as well, I have provided the required parameters to do so in my Exhibit 11-A.

Further, she does not explain how these documents, especially those after May 31, 2020, specifically evidence this first alleged infringement as an "offer to sell."

304. Ms. Lawton also appears to offer opinions as to first alleged infringement under "first making" and "first sale," but it is unclear if she is advancing these as separate theories or different hypothetical negotiation dates.[721] As I mentioned, I have assumed a hypothetical negotiation date of May 31, 2020, for the purposes of my affirmative analysis. I reserve the right to supplement, amend, and/or provide further opinion based on any belatedly disclosed or newly disclosed opinions from Ms. Lawton.

### 3. Ms. Lawton's Discussion Involves Next to Nothing of How the Parties Would Have Actually Approached the Hypothetical Negotiation

305. Ms. Lawton begins her discussion of the background on the "situation" at the time of the hypothetical negotiation by suggesting that Moderna's businessperson testimony on the royalties for licenses to the "clinical and commercial use of delivery technology" is contradicted by a thirty-five percent rate used by Moderna's damages expert in a separate litigation.[722] However, Ms. Lawton makes this comparison without any understanding or analysis as to whether the rate derived by Moderna's expert in the other litigation reflects comparable technological or economic circumstances, and thus her comparisons here are completely unsupported. Indeed, a review of the basic facts of that matter reveal that Moderna's damages analysis relates to a different company's technology (Moderna's), asserted against a direct competitor who was selling a COVID vaccine (Pfizer), and that resulted in alleged damages in the form of lost profits. Further, Moderna had agreed to a patent pledge, which meant that Pfizer units for which damages might otherwise be owed were royalty free (which would thus lower the effective royalty rate over the sum of allegedly infringing units)—circumstances that are all entirely different from the present matter.[723]

306. Ms. Lawton then dives into a discussion of the developmental history of LNP and mRNA technology, implying that Plaintiffs' technology represented the "state of the art" as "leader[s] in

---

[721] Lawton Report, ¶¶ 307-312.
[722] Lawton Report, § II.E, ¶¶ 319-320.
[723] MRNA-GEN-02616560 at 566-568, 599, 602-603; I understand the report (and some underlying materials related thereto) from the Pfizer matter (cited by Ms. Lawton) are redacted for reasons related to third-party confidentiality, and thus constrain any attempt at a full assessment of the circumstances of the Pfizer matter.

LNP technology."[724]   However, whether Plaintiffs' technology may be part of the "foundational science" in siRNA LNP delivery systems does not automatically warrant high valuation of Plaintiffs' patented technology at issue in this case.[725]   Specifically, I understand from Dr. Prud'homme that prior to Moderna's founding, there was no approved mRNA-based product and no LNP "*specifically designed for mRNA delivery.*"[726]   In addition, I understand from Dr. Prud'homme that Moderna and others in the field had to commit significant resources to additional development and research before reaching a commercial mRNA-based product, and none of Plaintiffs' licensees to the Patents-in-Suit have successfully developed an mRNA product beyond Phase III clinical trials.[727]   Both of these points run counter to Ms. Lawton's suggestion that Plaintiffs were dominant pioneers that developed valuable technology in the relevant technical space.   I discuss in further detail the importance of focusing on the *incremental* value of the Patents-in-Suit—a proposition that Ms. Lawton likewise purports to adopt—below in Section IV.D.

307.   Ms. Lawton then spends a large amount of time detailing the pre-litigation offers exchanged amongst Tekmira/Arbutus, Alnylam, and Moderna.[728]   Her account of these licensing offers continues to characterize Tekmira's LNP platform as a "best in class delivery" and a foundational "enabling technology," which I understand from Dr. Prud'homme to be statements inflating the relevance and value of Plaintiffs' technology as they pertain to Moderna.[729]   Such overinflation is further evidenced by Ms. Lawton's claim that, based on the fact that the Tekmira 2013 offer predated subsequent development and approval of Onpattro, the "[Tekmira 2013] offer would require *upward* adjustment to reflect the circumstances at the time of the hypothetical negotiation."[730]   I understand from Dr. Prud'homme that because Onpattro relates to the encapsulation of siRNA rather than mRNA (as done in Moderna's COVID-19 vaccine), Moderna had to conduct significant additional developmental efforts to implement existing LNP and encapsulation technology.[731]   I further understand from Dr. Prud'homme that Plaintiffs only allege

---

[724] Lawton Report, ¶¶ 321-329.
[725] Lawton Report, ¶ 326.
[726] Prud'homme Rebuttal Report, ¶ 67 (*emphasis* added).
[727] Prud'homme Rebuttal Report, § VIII.A, IX.D, XII.A-C.
[728] Lawton Report, ¶¶ 331-381.
[729] Lawton Report, ¶ 338; Prud'homme Rebuttal Report, § XII.A-C; Prud'homme Conversation.
[730] Lawton Report, ¶ 345.
[731] Prud'homme Rebuttal Report, §§ VIII.A., XII.A.

that Onpattro is covered by the Molar Ratio Patents (which Dr. Prud'homme disputes), and not the '651 Encapsulation Patent.[732]

308.   Ms. Lawton discusses in detail the alleged "overhang" caused by Acuitas's breach-of-contract litigation and Moderna's IPR between August 2016 and July 2020.[733]  However, Ms. Lawton fails to recognize that the sequence of Tekmira's offers undermines the alleged overhang effect, especially in light of Tekmira's June 2017 offer featuring lower commercial milestones and running royalty rates than an offer made in December 2016—several months *before* the injunction.[734] Notably, the Tekmira December 2016 offer itself featured more favorable royalty terms for Moderna than the 2013 Term Sheet between Tekmira and Moderna.[735]  As I detail below in Sections IV.F.2.b.and IV.H.4, these early licensing offers and negotiations do not provide significant incremental insight into the Hypothetical Negotiation relative to the Historical Comparable Licenses for a number of reasons, including that such offers never led to any *executed license agreements*.

309.   Ms. Lawton discusses at length how the "context" surrounding the hypothetical negotiation underscores the high value of the Patents-in-Suit because Moderna would have taken the license at the cusp of commercializing its COVID-19 vaccine in the beginning of the pandemic era.[736] Throughout this discussion, Ms. Lawton implies that Moderna would have been willing to pay Plaintiffs a large amount for the right to practice the Patents-in-Suit by nature of the sudden nature of the COVID-19 pandemic that "changed everything."[737]  This implication is further predicated on the view that Moderna would be taking a license to "foundational technology," and that "access to this technology was important to investors and others."[738]

310.   However, as previously discussed, I understand that these assumptions about Plaintiffs' patented technology overstate the value of such technology as applied to Moderna and the COVID-19

---

[732] Prud'homme Rebuttal Report, § IX.D, X.D.
[733] Lawton Report, ¶¶ 356-381.
[734] MRNA-GEN-01450347 at 369.
[735] Lawton Report, ¶ 1358.  *See* Section IV.F.2.b.
[736] Lawton Report, ¶¶ 384-415.
[737] Lawton Report, ¶ 385 (citing to Moderna testimony that "the development and approval of Moderna's COVID-19 vaccine, its first commercial product, was 'a major inflection point for the company'"), ¶389 (describing Moderna's "uncertain future" until the COVID-19 pandemic).
[738] Lawton Report, ¶ 395.

vaccine.[739] Ms. Lawton recognizes Moderna's position that "not all aspects of technologies or [] patents are going to be equal in importance to the product."[740] Ms. Lawton also points to the development of Moderna's licensing and collaboration practices, which demonstrate a trend that as Moderna "de-risk[s]" and "reduces the development time" required for its development partners, Moderna expected greater profit shares.[741] This trend only further underscores that, over time, Moderna developed its own technologies that held value in collaboration settings, which correspondingly would limit the relative importance and value of Plaintiffs' technology. Ms. Lawton mischaracterizes Moderna's statements about the company in early 2020 by alleging that "[a]s of January 2020, Moderna was an early-stage company."[742] Looking more closely at the testimony cited by Ms. Lawton, Dr. Stephen Hoge states that Moderna "like[s] to characterize that as *mid-stage* because [it] had enrolled [its] first phase 2 study, which is the middle stage of clinical development."[743] Overall, Ms. Lawton's focus on the timing of the hypothetical negotiation—being on the cusp of a major public health crisis for which Moderna rose to the occasion—precisely targets the type of patent hold-up windfall that runs counter to the goal of evaluating the incremental, apportioned value of the Patents-in-Suit (as discussed further in Section IV.D).

311. Ms. Lawton similarly discusses at length how Moderna "[e]xpected to (and did) achieve substantial value as a result of its use of the Patents-in-Suit."[744] Ms. Lawton emphasizes that achieving any of these profits and revenues would have "required Moderna to successfully develop and launch its product on a very aggressive timeline" by using "'optimal LNP,' which used Genevant's Patents-in-Suit."[745] However, as Ms. Lawton concedes, "Moderna's Phase 1 clinical trials (and [] the later Phase 2 and Phase 3 clinical trials)" are "*not* accused of infringement because it is in the safe harbor."[746] Similarly, Ms. Lawton's claim that mRNA-1273 drove "significant derivative and additional value that is causally connected to its use of Genevant's Patents-in-Suit" disregards key aspects of Moderna's development of the COVID-19 vaccine.[747] Namely, I understand that such

---

[739] Prud'homme Rebuttal Report, §§ VIII.A., XII.B-C.
[740] Lawton Report, ¶ 408.
[741] Lawton Report, ¶¶ 409-413.
[742] Lawton Report, ¶ 417.
[743] Hoge May 22, 2024 Deposition, pp. 85-86.
[744] Lawton Report, ¶¶ 440-466.
[745] Lawton Report, ¶ 445.
[746] Lawton Report, ¶ 446 (*emphasis* in original).
[747] Lawton Report, ¶ 448.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

early use of claimed compositions led Moderna to the realization that it needed to develop its own proprietary composition, which required significant resources and time.[748]

312. Ms. Lawton details various Moderna documents and emails that allegedly support the claim that as of May 31, 2020 Moderna expected a ▮▮▮▮▮▮▮▮▮▮▮ for mRNA-1273, an estimated cost ▮ ▮▮▮▮▮, and expected ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮.[749] As detailed in Section IV.G.2, I understand from my conversation with Hamilton Bennett and my review of Moderna documents that Moderna used $30 per dose as an initial negotiation figure with the U.S. government, and that Moderna's expectation of the average price per dose it would receive for all doses sold during the pandemic period around the May 31, 2020 Hypothetical Negotiation date was substantially lower than $▮ per dose. As I discuss in further detail below in Section IV.G, Ms. Lawton's discussion and use of these expected inputs are based on unsupported and speculative assumptions, in particular concerning the expected per-dose price for mRNA-1273.



### C. Ms. Lawton's Understanding of Arbutus Patents

313. As an initial matter, I understand that Ms. Lawton generally characterizes MC3 and the 50:38.5:10:1.5 ratio as "Tekmira's" and/or "Genevant's" technology.[750] However, I understand from Dr. Prud'homme that the 50:38.5:10:1.5 ratio was actually developed by Alnylam,[751] and that the MC3 lipid was developed through a collaboration between Alnylam, AlCana, and The University of British Columbia.[752] Further, I understand that neither are specifically disclosed in the Patents-in-Suit.[753]

314. Ms. Lawton claims that "Moderna's *internal* documents show that early on it recognized the value of Arbutus's patented technology."[754] However, Ms. Lawton continues to disregard that Moderna had recognized issues with the Tekmira LNP technology. For example, Ms. Lawton claims "[i]n or about 2014, Moderna's Dr. Hoge reportedly recognized Arbutus's work" and cites as support an article quoting Dr. Hoge as saying: "There's no way the only innovations in LNP are going to

---

[748] Prud'homme Rebuttal Report, §§ VIII.A, XII.B.
[749] Lawton Report, ¶¶ 467-516.
[750] *See. e.g.,* Lawton Report, § III.
[751] Prud'homme Rebuttal Report, § IX.B.1; Prud'homme Conversation.
[752] Prud'homme Rebuttal Report, § IX.B.2; Prud'homme Conversation.
[753] Prud'homme Rebuttal Report, § IX.B; Prud'homme Conversation.
[754] Lawton Report, ¶ 522 (*emphasis* in original).

Lawton's "income approach" (as largely relegated to her "analytical method" discussion) for my separate response in Section IV.G.

### 1. Background and "Profiting from Innovation" (Lawton Report, §§ IV.A, IV.B)

342. In essence, Ms. Lawton provides nearly 80 pages of discussion concerning background on patent valuation analysis. Throughout, Ms. Lawton's narrative and subsection structure can be difficult to follow, but she includes a wide-ranging discussion of topics, prior research, and prior commentary regarding purported valuation principles and techniques. Notably, certain components of her discussion are extremely thoroughly discussed and cited, even though the proposition at issue is relatively uncontroversial and well accepted. Such discussion is often followed by blanket statements about patent valuation that are *not* well accepted—but constitute key supporting propositions on which Ms. Lawton's damages assessment is based—and for which Ms. Lawton provides little or no support.

343. In this subsection, I focus on Ms. Lawton's key themes that appear to be most informative of the remainder of her damages assessment, including:

- Timing is important to the "value" of patents;
- Many approaches to patent valuation pose challenges for various reasons.

344. To motivate my discussion, I first provide background on the patent damages concept of the so-called "footprint of the invention in the market place," as oft referenced by the Federal Circuit. I then discuss Ms. Lawton's misunderstanding of the role of timing in patent damages purposes, and address certain mischaracterizations she applies to patent valuation techniques as they relate to the hypothetical negotiation exercise.

### a. The "Footprint" of the Invention

345. Ms. Lawton begins her background discussion with one of the uncontroversial, well-accepted propositions referenced above—that the "incremental benefit associated with the patented invention should be the focus of the valuation analysis" in a hypothetical negotiation context.[850] As support, Ms. Lawton cites the Federal Circuit, which, in a 2014 Opinion, held that "the patent holder should <u>only</u> be compensated for the approximate incremental benefit derived from his

---

[850] Lawton Report, ¶ 734.

invention" (emphasis added).[851]  In the cited case, which concerned "standard essential" patents ("SEPs"),[852] the Federal Circuit cautioned that "SEPs pose two potential problems that could inhibit widespread adoption of the standard: patent hold-up and royalty stacking. Patent hold-up exists when the holder of a SEP demands excessive royalties after companies are locked into using a standard."[853]  Put simply, I understand from counsel that here the Federal Circuit meant to ensure that reasonable royalty analyses in SEP damages contexts reflect the *incremental benefit* of the patented invention *rather than* any purported value associated with the patentee's ability to "hold up" the alleged infringer at the hypothetical negotiation because the alleged infringer was locked into using the claimed invention via its product's adoption of the relevant standard.

346.  As noted, the Federal Circuit's statement quoted above was made in the context of standard essential patent considerations.  However, I understand that the general principle that reasonable royalty damages are meant to reflect the "footprint of the patent in the marketplace" carries over to patent damages more generally.  Indeed, one of the sources cited by Ms. Lawton herself, an FTC hearing on "The Evolving IP Marketplace," explains this concept in patent damages contexts in multiple ways:

> One ingredient of that might be a rule that says that what you get in a reasonable royalty damages award is the technological value of the patents, and by that of course I mean the value of the patent as against its next best alternative, its next best non infringing substitute, *and that reasonable royalty damages should never include the hold-up value of the patent*.[854]
>
> …
>
> It's true in the standard setting. It's true in non-standard-setting contexts too.  *If you look to the wrong time frame*, if you look after the time that switching costs rose…*you will not have*

---

[851] *See Ericsson, Inc. v. DLink Sys., Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014).

[852] Standard essential patents are patents "that protect[] an invention essential to the implementation of a particular technology standard," examples of which include Wi-Fi, USB, and 4G LTE cell networks, *see* https://www.wipo.int/en/web/patents/topics/sep. Typically, in order for a patented technology to be incorporated into a technological standard, SEP owners agree to license their patents on Fair, Reasonable and Non-Discriminatory ("FRAND") terms in order to "strike a balance between [their] interests in recouping research and development investments, on the one hand, and [ensuring] access to standardized technologies by implementers, on the other," *see* https://www.wipo.int/en/web/patents/topics/sep; https://www.haynesboone.com/news/publications/what-are-standard-essential-patents.

[853] *Ericsson, Inc. v. DLink Sys., Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014).

[854] https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090211transcript.pdf, pp. 37-38 (*emphasis* added).

> *a reasonable royalty award that's tailored to the technological advance represented by the patent, the economic value of the patent.*[855]
>
> …
>
> What we want the hypothetical negotiation framework to focus on, make it more rational and more predictable, is to ask: *What is the projected economic value to the defendant of using this technology* in light of the other possible alternatives they could have used *before the incurred the switching costs?*[856]

347. I also note that Ms. Lawton makes a reference to the footprint of the invention concept under her discussion of the Hypothetical Negotiation Approach,[857] where she quotes the Federal Circuit as having consistently held that "reasonable royalty analysis requires a court to . . . carefully tie proof of damages to the claimed invention's footprint in the market place."[858]

348. In the present case, as discussed at length in my affirmative assessment, Plaintiffs have a relatively narrow range of effective royalty rates associated with their IP portfolio, which includes the Patents-in-Suit. Further, the most comparable licenses granted by Plaintiffs would have implicitly contemplated the "footprint" question (including the contribution of the entire license IP portfolios, and the licensees' alternative options other than licensing from Plaintiffs). Indeed, the Federal Circuit has held that "[a]ctual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace."[859]

349. Further, I also understand that the Federal Circuit has held that where a comparable license is a portfolio license that includes, but is not limited to, rights to the patent(s)-in-suit (among other patents), that the proper apportionment of the overall portfolio royalty down to the patent(s)-in-suit must still be addressed.[860] In this sense, when a comparable license agreement includes the patent(s)-in-suit but also includes other patents that are not in-suit, full apportionment to the specific patent(s)-in-suit cannot be assumed to be "built in" (or "baked in") to the specified royalty

---

[855] https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090211transcript.pdf, p. 74 (*emphasis* added).

[856] https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090211transcript.pdf, p. 83 (*emphasis* added).

[857] Lawton Report, § VI.D at n. 3325.

[858] *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

[859] *Laserdynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012).

[860] *Omega Patents, LLC v. CalAmp Corp,* No. 20-1793 (Fed. Cir. 2021), pp. 26-32; *Apple, Inc. v. Wi-LAN Inc.*, No. 20-2011 (Fed. Cir. 2022)*,* pp. 17-21.

terms that are owed for rights to the entire portfolio (as specified in the comparable agreement).[861] Therefore, in light of these Federal Circuit opinions, the properly apportioned royalty rates I derive from the Historical Comparable Licenses—which I utilize in my affirmative analysis— reflect the proper "footprint" of the Claimed Inventions of the Patents-in-Suit that would manifest, under the assumptions of validity and infringement, in Moderna's Accused Product.

350.   In this context, I recognize that this footprint, if viewed as the absolute amount of dollars paid as a royalty in compensation for a commercial opportunity, can (and will) vary depending on scale of the commercial opportunity the royalty rate is being applied to—this is indeed what a percentage-of-net-sales (or "ad-valorem") royalty rate does by design. However, it should also be recognized that this same variability in the absolute amount of royalties paid, while increasing in **absolute** terms with the increasing scale of the commercial opportunity, does not increase in **relative** terms compared to the overall scale of the commercial opportunity. Thus, in the parlance of a patent damages analysis, an increase in a commercial opportunity dictates an increase in the royalty *base* and not an increase in the royalty *rate* (all else being equal). In the same way a salesperson, who is paid a percentage-of-sales commission, can significantly increase their earnings by increasing their sales, even while their percentage commission (rate) stays the same—so too can a licensor earn greater royalties as the royalty base increases even while the percentage royalty rate stays the same.

351.   As another example, if an invention contributes 1 percent to the value of an overall product, and 10 units of that product are sold for $10 each, then the invention's absolute footprint is known to be $1, or a 1 percent footprint *relative* to the overall commercial opportunity ($100):

$$\$1\ (Total\ Royalty)\ = 1\% * \$10 * 10\ units = 1\%\ (relative\ footprint) * \$100$$

However, then suppose the commercial opportunity grows to 1,000 units sold. Observe that the absolute footprint grows while the relative footprint still says the same:

---

[861] *Omega Patents, LLC v. CalAmp Corp*, No. 20-1793 (Fed. Cir. 2021), pp. 26-32, which also references the Federal Circuit opinion in *Vectura*, where I understand the Federal Circuit held that when applying terms of comparable licenses in a given damages context, that "[b]uilt-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent." *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1041 (Fed. Cir. 2020) (further noting that "As the district court noted, a party relying on a sufficiently comparable license can adopt the comparable license's royalty rate and royalty base without further apportionment and without proving that the infringing feature was responsible for the entire market value of the accused product."). *See also Apple, Inc. v. Wi-LAN Inc.*, No. 20-2011 (Fed. Cir. 2022), pp. 17-21.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY                153

$$\$100\ (Total\ Royalty)\ = 1\% * \$10 * 1,000\ units = 1\% \ (relative\ footprint) * \$10,000$$

352. I depict this commercial opportunity scaling concept in Figure 3 below. As shown, the "footprint" of the invention in terms of amount of royalties collected by the licensor (depicted as the orange "slices" of the "pies") can indeed vary tremendously when generated by licenses covering products with significantly different royalty bases (i.e., different commercial opportunities with different levels of revenues)—even if the associated *royalty rate* applied to each opportunity is held constant. Thus, in Figure 3, I observe the much larger commercial opportunity (royalty base) on the left corresponds to a much larger orange slice (royalties), compared to the smaller commercial opportunity on the right corresponding to a much smaller orange slice of royalties— yet at the same time, the relative size of the orange slice on the left compared to the commercial opportunity (circle) on the left is the exact same as the relative size of the orange slice on the right compared to the commercial opportunity on the right.

**Figure 3 (Reproduced): Illustration of "Footprint of the Invention"**



353. At this point, it is worth pointing out that Ms. Lawton's analysis appears to disregard this concept at every possible opportunity—to the point where she seems to believe that, regardless of the value of the underlying invention, if the royalty base (i.e. commercial opportunity) grows, so too

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

must the royalty rate.[862]  Hence, Ms. Lawton's ultimate damages figures imply royalty rates that are far beyond what even the entirely unapportioned rates from the Historical Comparable Licenses specify.[863]

354. In contrast, a proper handling of this footprint concept manifests in the present context via my previous analysis of the Historical Comparable Licenses, discussed in Section III.C.1, above.  As I explained there, once I account for upfront fees, milestone payments, and running royalty components of Plaintiffs' various Historical Comparable Licenses and suitably apportion the amounts down to the value of the Patents-in-Suit—as distinct from everything else that the licensees to those agreements received beyond just the Patents-in-Suit—the Historical Comparable Licenses define a relatively narrow range of Benchmark Royalty Rates corresponding to the Patents-in-Suit.  Notably, this consistency is observed across multiple licensees, over multiple fields of use, and over time.  Here, I reproduce my Figure 1, introduced above, for reference.

---

[862] Ms. Lawton appears at odds with herself on this issue, when in one of her analyses of the Chulalongkorn Agreement, she opines that the percentage profit split arrangement of the Chula Agreement was based on an awareness that the revenues/profits associated with the covered products for that agreement would be lower than Plaintiffs' other licensing opportunities—yet at the same time, the royalty rate Ms. Lawton derives for the Chulalongkorn Agreement is greater than the rate she assigns to any of the other Genevant licenses in her Table 6.7 (see Section IV.H.5.b.ii).

[863] Lawton Report, Table 6.7.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

**Figure 1 (Reproduced): The Benchmark Range of Royalty Rates**



### b.  The Role of Timing with Respect to the Reasonable Royalty Inquiry

355.  As noted, in the introduction and background discussions of the Lawton Report, § IV, Ms. Lawton restates much of her prior discussion of Moderna's alleged conduct in the years leading up to the Hypothetical Negotiation (i.e., from Lawton Report, §§ II, III).  However, she does introduce at least one new soundbite—her assertion that "Moderna was negotiating a license at the worst possible time: '**at the doorstep of the commercialization.**'"[864]  She concludes that "while Plaintiffs granted licenses to other parties which included the Patents-in-Suit, these other parties did not derive the same level of value from the use of the claimed inventions of the Patents-in-Suit—largely due to timing and circumstances."[865]  However, throughout her discussion, Ms. Lawton fails to draw the important distinction between a patent's "value" being driven by the scale of the commercial opportunity (i.e., the circumstances) and the *relative value* of the invention vis-à-vis the covered product.  Put differently, Ms. Lawton fails to distinguish between the licensor's

---

[864] Lawton Report, ¶ 732, citing "The Evolving IP Marketplace – The Operation of IP Markets," *Federal Trade Commission*, May 4, 2009 Tr., 41:18-42:9.
[865] Lawton Report, ¶ 738.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY                    156

ability to generate more royalty revenue as a fixed percentage of the product revenues associated with the opportunity and the *relative value* of the invention vis-à-vis the covered product.

356. Ms. Lawton spends several pages of narrative and footnotes describing a simple proposition—that a patented invention could come either too early or too late vis-à-vis the corresponding market "window of opportunity." For example, Ms. Lawton states:

- "'Timing is important because the economic value of a patented invention is not static. Rather, 'inventions change in value a huge amount during their lifetime,' and 'depending on when the infringement is, that value can change.'"[866]

- "**'Timing is everything. Too early can be as bad as too late**.' This is especially so in terms of profiting from innovation. This is because the innovator's patent term must overlap with market opportunities to commercialize the patented technology—which reflects the patentee's market '**window of opportunity**.'"[867]

- "'You can have a significant technological invention that is way before its time and is not used until after the patent expires. It ends up garnering for the patentee nothing.' In other instances, the invention is used towards the end of the patent term, when 'a good chunk of the patent life is already gone,' but the patentee garners at least something."[868]

What Ms. Lawton fails to recognize is that the clear corollary to her concept of the "window of opportunity" is the presence of a commercial product (and the magnitude of that product's commercial sales) that the patentee can either develop and sell itself, or can generate royalty revenues from under a license of the patent.

357. In this context, Ms. Lawton lays out several examples of inventions that she claims were "too early," simply because there were no significant corresponding products or commercial sales close to the time of the invention.

- "For example, Drs. Kariko and Weissman started a company based on their Nobel Prize winning invention—but it was too early"[869] (because there was not yet a commercial opportunity);

- "In the case of gene splicing, the invention was 'too early' and was made years before the commercial 'window of opportunity' opened"[870] (referring to products not existing yet, where "at the time it [gene splicing] was invented, it wasn't commercially valuable");[871]

---

[866] Lawton Report, ¶ 781 (note omitted).
[867] Lawton Report, ¶ 785 (notes omitted, **emphasis** in original).
[868] Lawton Report, ¶ 789 (notes omitted).
[869] Lawton Report, ¶ 781.
[870] Lawton Report, ¶ 790.
[871] Lawton Report, ¶ 790.

- Ms. Lawton includes as Figure 4.4 to her report a chart showing that the so-called "profit period" of a pharmaceutical product only begins after the product's launch,[872] which is, again, a function of the presence of a commercial product;

- "perpendicular magnetic recording ('PMR')" was invented in 1955 and ultimately used in "hard disk drive ('HDD') industry" when commercialized in 2005.[873]

358. Ms. Lawton's examples provide no support for her contention that an invention becomes more valuable *relative to the product* as the product nears launch or success.  Rather, she simply establishes the undisputed proposition that in order to generate profitability from a patent (be it through direct product commercialization or via running royalties generated by product sales), one requires a commercialized product.  She also provides examples of inventions that came "too late" and therefore were not valuable[874]—again referring to the lack of the ability to generate sales & profits from the patented product because new technologies/products displaced them.

359. In these examples, every time Ms. Lawton characterizes the purported "value" of an invention as varying over time based on the "window of opportunity," her assertion could be restated as the following (where I have replaced components of Ms. Lawton's above-referenced quote in brackets):

> **'Timing is everything. Too early can be as bad as too late**.' This is especially so in terms of profiting from innovation. This is because the innovator's patent term must overlap with [commercial sales of products utilizing] the patented technology—which reflects the patentee's market '**window of opportunity**' [to generate profits or royalty revenues].[875]

360. Put differently, Ms. Lawton conflates a patent's value due to the patentee's potential to extract profits or royalty revenues generated by commercial sales with relative value of the patented invention vs. other contributors to a product's success.  The former, of course, often scales proportionately with the size of the commercial opportunity and practicing product's success.  The latter often does not.  This is most simply shown in my Figure 3, above, which depicts the "footprint" of the invention in the marketplace growing proportionately with the size of the opportunity, but not relative to the scale of the commercial opportunity (the size of the pie).

---

[872] Lawton Report, ¶ 791.

[873] Lawton Report, ¶ 792.

[874] Lawton Report, ¶ 794 (note omitted) ("Johnson & Johnson's Phil Johnson, Chief Patent Counsel, explained how 'inventions lose value' when 'the next new thing comes along' and 'eclipses' a patented invention").

[875] Lawton Report, ¶ 785 (notes omitted, **emphasis** in original).

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

Indeed, all the references in Ms. Lawton's extensive discussion of historical inventions being either too early or too late refer to the size of the pie (i.e., the commercial sales) shifting over time, not to the relative size of the slice.

361. In a separate thread, in which Ms. Lawton appears to contend that the value of a static invention is more *relatively* valuable on the so-called "doorstep of commercialization," Ms. Lawton states:

> The circumstances of the hypothetical negotiation—in this highly unusual "on the doorstep of commercialization" scenario—are far different than the typical early-stage licensing in the biotech industry generally, which is consistent with Genevant's licensing agreements. Because neither Plaintiffs nor Moderna has negotiated a patent license "on the doorstep of commercialization," empirical evidence to estimate the profit split delta is not available. As Mr. Francis testified, a licensor's share of the profits would increase, but the extent of the increase cannot be estimated based on empirical evidence.[876]

Here, Ms. Lawton appears to omit key details about the material about which Mr. Francis was testifying, and to misinterpret Mr. Francis' testimony itself.

362. In the testimony Ms. Lawton cites, Mr. Francis was asked to explain the difference between the running royalty rates specified in two iterations of a ███████████████████████ ████████" between Vertex Pharmaceuticals Inc. ("Vertex") and Moderna—one from 2016 and one from 2020.[877] In the 2016 Moderna-Vertex agreement, Moderna and Vertex ███████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████.[878] The 2020 Moderna-Vertex agreement ████████████████████████ ███████████████████████████████████████ ████████."[879] I note that Ms. Lawton makes no representation that the technology involved in these agreements was in any way comparable to the present claimed inventions.

---

[876] Lawton Report, ¶ 835 (notes omitted).

[877] Francis May 22, 2024 Deposition, p. 339 (where Mr. Francis was asked, "What is the reason for the differences between these rates, the increase in the 2020 agreement versus the 2016 agreement?").

[878] Francis May 22, 2024 Deposition, Exhibit 44, pp. 3, 6, 111-118 (MRNA-GEN-00458927 at 929, 932, 037-044).

[879] Francis May 22, 2024 Deposition, Exhibit 45, pp. 14, 121-126 (MRNA-GEN-00457429 at 442, 549-554). *See also,* Francis May 22, 2024 Deposition, pp. 339-340.

363. As part of my consideration of Ms. Lawton's contention, I first observe that the differences in the ███████████████████████████████████ was modest (as shown in Figure 7, ████████ ███████████████████████████). Thus, even under Ms. Lawton's misguided belief that these rate increases indicate an increase in the relative value of the licensed inventions due to the later stage of the *product*, her cited example clearly demonstrates that any such increase would be limited when expressed as a royalty rate.

**Figure 7: Moderna-Vertex** ████████████████████████████ **Comparison**

*Sources: Francis May 22, 2024 Deposition Exhibits 44 (MRNA-GEN-00458927 at 991) and 45 (MRNA-GEN-00457429 at 497)*

| Annual Sales Tier | 2016 Rate | 2020 Rate | Ratio |
|---|---|---|---|
| ███████████ | ████ | ████ | ████ |
| ██████████████ | ████ | ████ | ████ |
| ██████████████ | ████ | ████ | ████ |
| ██████████████ | ████ | ████ | ████ |

364. What's more, Ms. Lawton appears to misinterpret Mr. Francis's testimony as to the primary reasons for the rate change. Mr. Francis caveats his answer █████████████████████████ ██████ by stating that "there are many considerations that goes (*sic*) into it."[880] However, he proceeds to explain that █████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████"[881] Thus, Mr. Francis appears to believe the state of ██████████████████████████████████████ Indeed, a review of ███████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[880] Francis May 22, 2024 Deposition, p. 339.
[881] Francis May 22, 2024 Deposition, pp. 339-340.



███████████████████████████ [883]

365. Thus, the differences in the licensing scenarios faced by Moderna and Vertex in negotiating the 2016 and 2020 versions of their ████████████████████████ are not reflective of differences in the licensing scenarios faced by Plaintiffs in their real-world licensing negotiations and that faced by the present Parties at the Hypothetical Negotiation. As Ms. Lawton's Chart 4.2 (reproduced as Figure 8, below, for reference) shows, five of the six Patents-in-Suit would have been issued for years by the time of the present Hypothetical Negotiation. Moreover, many of Plaintiffs' historical licenses granting rights to the Patents-in-Suit were executed either at the same approximate time as—or subsequent to—the present Hypothetical Negotiation. Thus, Plaintiffs' historical licenses granting rights to the Patents-in-Suit reflect the fully developed state of Plaintiffs' Claimed Inventions as they would have existed at the time of the Hypothetical Negotiation.

---

[882] *Compare* Francis May 22, 2024 Deposition Exhibits 44 (MRNA-GEN-00458927 at 047-053) and 45 (MRNA-GEN-00457429 at 557-568). ████████████████████████████████████

████████████████████████████████████ *see, e.g.,* Francis May 22, 2024 Deposition, pp. 339-340.

[883] ████████████████████████████████████ *see* Francis May 22, 2024 Deposition, Exhibit 45 (MRNA-GEN-00457429 at 557-568); Francis May 22, 2024 Deposition, Exhibit 44 (MRNA-GEN-00458927 at 929).

**Figure 8: Lawton Report Chart 4.2**

*Source: Lawton Report, p. 607*



CHART 4.2

366. Perversely, Ms. Lawton attempts to attribute purported incremental value of the Plaintiffs' Claimed Inventions on Moderna's "doorstep of commercialization" that was driven by all the developments and investments that *Moderna* made during the window between the issuance of the first five Patents-in-Suit and the Hypothetical Negotiation. Indeed, as discussed under my affirmative consideration of *Georgia-Pacific* Factor 13 (Section III.D, above), from its founding in 2010 until the Hypothetical Negotiation in 2020, Moderna invested heavily in its proprietary mRNA platform, which it integrated at great expense with its expansive digital and manufacturing infrastructure. Moderna's investments, which totaled well over $1 billion, put it in a position to respond successfully to the COVID-19 pandemic with the urgency required and therefore substantially increased the size of the "pie" depicted in Figure 3, above. Meanwhile, five of Plaintiffs' six Claimed Inventions sat static, while the sixth would have been in the same state (or less developed) at the Hypothetical Negotiation than it would have been in at Plaintiffs' real-world licensing negotiations disregarded by Ms. Lawton.

367. By Ms. Lawton's reasoning, a party that has undertaken massive amounts of work—and taken on massive amounts of risk (here, Moderna)—should owe more in terms of a royalty *rate* for the same claimed inventions than a party just getting started on such work. On the contrary, as explained under my affirmative consideration of *Georgia-Pacific* Factor 13, Moderna's substantial investments

and risk-taking put *downward* pressure on the reasonable royalty rate the Parties would have agreed to at the present Hypothetical Negotiation.

368. Returning to Ms. Lawton's "window of opportunity" theme, Plaintiffs' Claimed Inventions—at minimum—would not have contributed any more *relative* value to Moderna's COVID-19 vaccine product at the time of the Hypothetical Negotiation than they would have at the time of each patent's respective issuance. Rather, it was *Moderna's* contributions that drove the increased overall value of its product and increased size of the "pie." This, unlike Ms. Lawton's misguided analysis, is consistent with Mr. Francis's testimony, discussed above, which explains that Moderna's

369. Conversely, as the *licensee* at the present Hypothetical Negotiation, Moderna's generation of the large scale of the commercial opportunity associated with its COVID-19 vaccine does not indicate Plaintiffs' claimed inventions contributed any *greater* relative value to Moderna's COVID-19 vaccine product on the "doorstep of commercialization." Rather, Moderna's technological, clinical, and commercial efforts would have increased the size of the pie from which Plaintiffs' slice would be substantially larger—consistent with the various sources Ms. Lawton details that tie the value of a patented invention to the "window of opportunity" where there is a commercial product—and rendered Plaintiffs' Claimed Inventions relatively *less* important. In this context, it becomes clear that Ms. Lawton's only support for substantially inflating the reasonable royalty *rate* because the Hypothetical Negotiation was on the "doorstep of commercialization" is the idea that Plaintiffs could have allegedly prevented Moderna's launch of its vaccine and used that as leverage at the Hypothetical Negotiation—as explained above, the concept of economic "hold-up."[884,885]

370. Elsewhere in her discussion, Ms. Lawton similarly misunderstands the extent to which the potential for a patent's value to vary across different infringers applies to the present case. For

---

[884] Specifically, Ms. Lawton notes that "[b]y failing to negotiate a license with Genevant or its predecessors at an earlier stage, Moderna elected accept the risk that it could be 'stopped at the doorstep of commercialization' and the resulting financial consequences." Lawton Report, ¶ 810.
[885] For a discussion of economic hold-up, *see* Lemley, Mark A. and Shapiro, Carl, "Patent Holdup and Royalty Stacking," 85 *Texas Law Review* 1991 (2007), Stanford Law and Economics Olin Working Paper No. 324 (available at https://ssrn.com/abstract=923468).

example, Ms. Lawton cites a portion of a portion of a 2017 paper authored by two attorneys, which I excerpt here with additional context:

> In any event, the most relevant and reliable evidence available to the district court indicated that Cisco and CSIRO valued the contribution of the patented technology at somewhere in the range of $0.90 to $1.90 per end product. If the Federal Circuit had adopted a bright-line rule, consideration of this relevant, real-world evidence of the incremental value added to the accused end products would be precluded in favor of a singular focus on the price of the Wi-Fi chips incorporated into the accused end products. An infringer that recoups substantial value from the incorporation of a Wi-Fi chip into its end products should not necessarily be subject to the same royalty as an infringer that recoups little to no value from the same chip added to its end products.[886]

371.   Here, the authors appear to contend that courts should not discount helpful evidence of the relevant parties' view of the contribution of the patented invention at issue to the end product simply because there is a smallest salable patent-practicing unit ("SSPPU") issue.[887]  They also point out that the contribution of a given patented invention could vary considerably across infringers with different products that depend on that invention to different degrees.  Neither of these issues are present in the present case.  Under Ms. Lawton's own damages framework, the relevant contributors of value of Moderna's accused COVID-19 Vaccine—the so-called "payload" and "delivery mechanism"—are the same for Moderna as they are for the licensees in the comparable licenses discussed in Section III.C.1 (either for other COVID-19 Vaccines, or other products).  Thus, these attorney authors' discussion of an unrelated example provides no insight into the relevant inquiry before us in the present case.

372.   Ms. Lawton's logic is further muddled by the seemingly contradictory position taken later in her report.  Namely, as detailed below in Section IV.H, Ms. Lawton considers Genevant's historical out-licenses of its various patents and other IP, including the Patents-in-Suit.  When discussing the Chula Agreement—the only example of Genevant licensing its IP (here, not including the Patents-

---

[886] Douglas A. Cawley, Lindsay Leavitt, "The Federal Circuit Disavows Mandatory Smallest Salable Patent-Practicing Unit 'Rule,'" *The Review of Litigation – The Brief*, 2017, pp. 52-62 at p. 61 (as cited in Lawton Report, ¶ 737).
[887] *See, e.g.*, https://www.whitecase.com/insight-our-thinking/ongoing-appeals-may-shape-how-juries-and-courts-determine-patent-royalties, explaining that "in many instances, courts require patent holders to prove reasonable royalties using the revenue associated with a patent-practicing sub-component of the end product—e.g., the SSPPU or an even smaller sub-component."  The excerpt from the 2017 paper cited by Ms. Lawton that I quote above appears to be arguing that the SSPPU doctrine is not a "bright-line rule" that should be taken to categorically prevent the use of "relevant, real-world evidence," such as the extent to which "Cisco and CSIRO valued the contribution of the patented technology."

in-Suit) for a "profit split" royalty form rather than revenue-percentage running royalties less generous to Genevant—Ms. Lawton states the following:

> Genevant would demand no less than a **25%|75%** Genevant|Moderna profit split (or **$4.77/dose**). This agreement reflects Genevant's minimum acceptable profit split, ██ ████████████████ (*sic*) Chulalongkorn agreement, which had lower expectations than Genevant's other agreements, because of the LMIC focus and the expectation of lower price and profit associated with LMIC countries (v. OECD countries).[888]

373. Inexplicably, Ms. Lawton appears to take the position here that the *lower* expectations with respect to price and profit generated a *greater royalty* (as expressed as a profit split) than Genevant's other agreements.[889]  By this logic, the Parties' substantial expectations for the scale of the commercial opportunity for the Accused Product on the so-called "doorstep of commercialization" should put *downward* pressure on a running royalty component of the present reasonable royalty exercise—consistent with the logic laid out above.

374. In sum, throughout her extensive discussion, Ms. Lawton confuses multiple related, but distinct, concepts.  First, she believes that Plaintiffs' inventions *increased in value* on the so-called "doorstep" of Moderna's commercialization.  But she fails to recognize that this increase in value is driven by the increasing size of the associated commercial opportunity (generated by Moderna's extensive investments), not by a change in the *relative* contribution of Plaintiffs' claimed inventions.  Indeed, if anything, Moderna's extensive investments *dilute* the relative contribution of Plaintiffs' claimed inventions.  Second, Ms. Lawton conflates additional willingness to pay for a license to the Patents-in-Suit on Moderna's part due to its limited time in which to pursue a design-around—a measure of economic "hold-up"—with the value of the claimed inventions themselves.  Both of these misunderstandings lead Ms. Lawton to wildly overstate the "footprint" of the claimed inventions in the marketplace throughout her damages assessment.

---

[888] Lawton Report, ¶ 1378 (notes omitted).  "LMIC" stands for "low- and middle-income countries," *see* https://qesclimatejustice.info.yorku.ca/resources/eligible-countries.

[889] Indeed, Ms. Lawton's own Table 6.7 of value benchmarks is consistent with this interpretation, as the value (per dose) assigned by Ms. Lawton to the Chulalongkorn Agreement in that table is greater than the value assigned to any of the other Genevant licenses.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

IV.C.3), but that Ms. Lawton has also failed to establish that Moderna was allegedly using what she refers to as the "gold standard" (see Section IV.C.7).

### 4. Damages Considerations (Lawton Report, §§ V.C, V.D)

420. In the final subsections of her discussion of the impact of Moderna's alleged infringement on Plaintiffs, Ms. Lawton opines on certain principles underlying her damages assessment. In many cases, this discussion consists of unremarkable quotes from case law (or commentary thereabout). Her main conclusion is that she determines that damages in this case should be based on a reasonable royalty[978]—a conclusion with which I agree. Here, I make an observation about one of the cases that Ms. Lawton cites.

421. Ms. Lawton states that the "determination regarding which damages measure is appropriate in any particular case depends on the facts of the case" and cites the following findings of fact and conclusions of law from a 1980 case in the District of Arizona:

> In determining the measure by which infringement damages are to be assessed, it is necessary to first characterize the manner in which the plaintiff used its patent rights. If the plaintiff was in the business of granting royalty bearing licenses under its patent, then the damage sustained is the loss of royalty income occasioned by the defendant's infringement. If the plaintiff has chosen to manufacture the patented product and to exclude all others from doing so, then the damage sustained is the loss of profits occasioned by the defendant's infringement. In cases where the plaintiff has neither manufactured the patented product nor licensed others at an established royalty rate, the court must hypothesize "a reasonable royalty" upon which the parties would have agreed prior to commencement of the infringement.[979]

422. Here, I note that Ms. Lawton and I appear to agree that in lieu of lost profits sustained by Plaintiffs or an "established royalty," we are left to "hypothesize" a reasonable royalty to which present Parties would have agreed at the Hypothetical Negotiation. Whether, as a matter of law, Plaintiffs' licensing history may or may not have defined an "established royalty," it has established a relatively narrow range of effective royalty rates for which Genevant has licensed portfolios of IP, which include the Patents-in-Suit as well as other patented and non-patented intellectual property not at issue in this matter. As I discuss under my affirmative assessment, Ms. Lawton

---

[978] Lawton Report, ¶ 1204.
[979] Lawton Report, ¶ 1299, citing *Saf-Gard Products, Inc. v. Service Parts, Inc.*, 491 F.Supp. 996, 1007 (D. Ariz. 1980).

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

fails to recognize this narrow range constitutes the natural central focus of the present Hypothetical Negotiation exercise.

### F. Ms. Lawton's Market Approach (Lawton Report, § IV.C.3)

423. In this section, I provide my assessment of Ms. Lawton's Market Approach analysis. At a high level, Ms. Lawton provides her overview of the details of many of the agreements produced in this matter and her findings about the extent to which those agreements provide any insight into a determination of a reasonable royalty. As detailed below, Ms. Lawton's Market Approach analysis incorporates significant errors, which, at a high level, include:

- The application of inconsistent standards for assessing economic comparability across various categories of license agreements:
  - For example, Ms. Lawton constructs new criteria to assess the Moderna collaboration agreements that she ultimately incorporates as benchmarks for her royalty determination;
  - However, when compared against her previous criteria that she uses to assess (and generally impugn) the comparability of other agreements, the Moderna collaboration agreements Ms. Lawton relies upon effectively fail to meet any of the criterion of her previously stated criteria (see Exhibit 13).

- The incorporation of numerous self-contradictions:
  - For example, Ms. Lawton claims that the ▮▮▮ Agreement is at best "minimally economically comparable,"[980] and that the "economic terms including the royalty rates in this agreement are not indicative of the reasonable royalty."[981] Nevertheless, Ms. Lawton explicitly relies upon the payment terms of this agreement as a key benchmark–and ultimately the exact basis–for her pandemic era royalty rate determination.

- A failure to consider and/or properly address key issues:
  - Ms. Lawton fails to address and/or properly consider apportionment with respect to the agreements that she uses as benchmarks for her reasonable royalty determination; this issue is particularly egregious with respect to the Moderna collaboration agreements with Merck and AstraZeneca where, setting the other significant issues related to comparability, the apportionment issues presented are so severe that it prevents any attempt to isolate a royalty amount owed for any patented intellectual property (let alone one that is comparable to the Patents-in-Suit);[982]
  - A failure to properly account for the increased value of exclusive rights over non-exclusive rights;[983]

---

[980] Lawton Report, ¶ 995.
[981] Lawton Report, ¶¶ 905, 908, 978, 1110.
[982] I note that Ms. Lawton eventually acknowledges this issue in her consideration of the *Georgia-Pacific* Factors, but she fails to properly account for it in her findings. *See* Section IV.H.8 below.
[983] Lawton Report, ¶ 1485, Table 6.8.

to the costs in Moderna's July 10 cost proposal would result in ██████████████ ██████████████████████████████████[1481].

#### ii.    Ms. Lawton's Comparison of Two Offers Within a Negotiation

596.    Ms. Lawton's methodology contains significant conceptual errors, as outlined above, stemming from her assumption and subsequent comparison of differing costs for the same product. Moreover, her implied comparison is further flawed in its attempt to infer the value of intellectual property from two distinct offers made at different stages of an ongoing negotiation. That is, Ms. Lawton's execution of the purported Analytical Method implicitly assumes that the difference between Moderna's May 31, 2020 opening negotiation offer to the U.S. Government of $30 per dose of vaccine for 100 million doses[1482] and Moderna's subsequent July 10, 2020, cost proposal to the U.S. government containing a ██████ per-dose cost for up to 300 million doses[1483] provides insight into the value associated with the Patents-in-Suit.[1484] This is an economically meaningless calculation, as it is unequivocally incapable of measuring what Ms. Lawton claims it measures.

---



[1481] I calculate these ███████████████████████████████████████████ *See* MRNA-GEN01122003 at 010, 012, 013, 040.

*See* MRNA-GEN01122003 at 010, 013.                                              *See* MRNA-GEN01122003 at 010.                    *See* Lawton Report, Schedule 3.1; MRNA-GEN01122003 at 010.

awton Report, ¶ 1245) and further stating that "[a]s of the May 31, 2020 Hypothetical Negotiation, while Moderna would not have been aware of the terms of an agreement that had not yet been agreed, ███████████ (Lawton Report, ¶ 1258).  Instead, following Ms. Lawton's actual approach would result in ███████████████████████████████ *See* Lawton Report, Schedules 3.2, 3.3.

*See also* Lawton Report ¶¶ 1235-56, Table 6.2, Schedules 3.1, 3.2, 3.3, MRNA-GEN-01122003 at 010, 012, 013, 040.
[1482] "Moderna is prepared to enter discussions with the US Government to manufacture and initial supply of 100 million doses of MRNA-1273 at $30.00 per 100 microgram dose."  HHS-0000828 at 828.  Cited in Lawton Report, ¶¶ 1280-1281 (stating that Table 6.2 "is based on" "mRNA-1273 Price: $30/dose in Moderna's May 31, 2020 offer to sell").
[1483] "Summary of Proposed Cost Per Dose of mRNA-1273" (MRNA-GEN-01122003 at 003, 010, 013).
[1484] I note that although the difference between these two dose estimates is ██████████████████ ██████████████████████, *see* Lawton Report, Chart 6.1.

597. Ms. Lawton provides no evidence that the difference between these two offers is related in any way to the benefits provided by, or the value of the Patents-in-Suit. Instead, Ms. Lawton appears to ignore evidence of other factors that could have led to Moderna's subsequent lower offer. Ms. Lawton fails to recognize, or consider, that it is commonplace in a negotiation for subsequent offers to include more favorable terms for the counterparty than those in an initial offer.[1485] Indeed, Hamilton Bennett, Moderna's Executive Director for Global Health Security, R&D, and Partnerships, who was the main point of contact for negotiations between Moderna and the U.S. government[1486] testified that the $30 price was the price "that we started and we kind of opened the discussions with here."[1487]

598. Moreover, it is clear that Moderna did not expect to receive $30 per dose from the U.S. government that it proposed in its opening negotiation offer.[1488] A May 28, 2020, presentation entitled █████████████████████████████████████ ██████████████████"—dated three days before Moderna's opening offer—states that a █████████████████████████████████████[1489] That same presentation includes █████████████████████████████████████ █████████████████████████████████████)."[1490] Further, this presentation █████████████████████████████████████ █████████████████."[1491] This presentation provides direct evidence that prior to submitting its opening negotiation offer to the U.S. government, Moderna did not anticipate receiving the initial $30 per dose price that they initially offered.[1492]

---

[1485] For example, as discussed above, Tekmira's offer to Moderna in June 2017 had more favorable commercial milestones and running royalty rates for Moderna than Tekmira's previous offer made in December 2016 and both offers were more favorable (for Moderna) than the royalty provisions provided in Tekmira's 2013 term sheet. *See* Section IV.B.3.

[1486] https://www.linkedin.com/in/hamilton-bennett-58877983; Deposition of Hamilton Bennett, May 20, 2024 ("Bennett May 20, 2024 Deposition"), pp. 177, 182, 190, 203-205, 225.

[1487] Bennett May 20, 2024 Deposition, p. 213.

[1488] Further, as shown in Figure 4 of my Opening Report, Moderna ended up receiving ██████████████████████ █████████████████████████t. Indeed Ms. Lawton is directly aware of this fact as she states about her royalty base methodology that for the initial Moderna U.S. Government contract, she ████████████████████ ██████████████████████████████████" Lawton Report, ¶ 1554.

[1489] MRNA-GEN-02180160 at 160, 163.

[1490] MRNA-GEN-02180160 at 164.

[1491] MRNA-GEN-02180160 at 165.

[1492] As discussed further in the following subsection, I discussed Moderna's expectations and perspective during this time frame with Hamilton Bennett, who confirmed that $█ per dose did not reflect Moderna's true expectation as of May 2020. Bennett Conversation.

599. Moreover, multiple external factors influenced Moderna's negotiations, including competition from other potential vaccine developers.  Ms. Bennett testified that the presence of additional vaccine competitors influenced negotiations between Moderna and the U.S. government, stating that "[a]t the time that we were negotiating our supply agreement with the government, Operation Warp Speed had six vaccines that were prioritized in that portfolio."[1493]  Further Ms. Bennett noted with respect to a vaccine competitor that "as we were in discussions with the government, their price became known."[1494]  Ms. Bennett also noted that "our negotiations with the government took into account the fact that th[e] other developer had not received R&D funding from the government, they had developed it solely at their own expense, while we had developed it partially at government expense."[1495]  Additionally, "there were other companies that had committed to making product available at not-for-profit pricing"[1496] which would constrain Moderna's ability to receive/negotiate a higher price on these government contracts.[1497]

600. Ms. Bennett also explained, in response to why there were differences between Moderna's pricing to the U.S. government and some other governments, that "part of it is the volume that the US Government was ordering and the commitments and the upfront payments that they were willing to make so that we could fund the supply and the scaleup of the vaccine, it was the recognition that they were supporting the R&D and allowed us to de-risk that."[1498]  Additionally, Ms. Bennett noted that Moderna was negotiating with the "US Government and they're a fairly skilled negotiator when it comes to large-scale vaccine procurement and pricing."[1499]

601. Further, Moderna had additional considerations that can explain a lower subsequent offer to the U.S. government.  First, it is often common practice across a range of industries for a firm to offer a lower per-unit cost/price for larger volume purchases as compared to smaller purchases, as

---

[1493] Bennett May 20, 2024 Deposition, p. 349.
[1494] Bennett May 20, 2024 Deposition, p. 214.
[1495] Bennett May 20, 2024 Deposition, p. 214.
[1496] Bennett May 20, 2024 Deposition, pp. 234-235.
[1497] Indeed, in the June 15, 2020 CEO Update presentation, Moderna states that "Big Pharma is creating increasing pressure on us," noting that they were now expecting both AstraZeneca and Johnson and Johnson to be pricing their vaccines "at cost."  MRNA-GEN-02645690 at 691.
[1498] Bennett May 20, 2024 Deposition p. 264.  For example, ███████████████████████████████████████████████████ signed agreements with Moderna for ██ ███████████████████ doses respectively.  MRNA-GEN-02645690 at 691.
[1499] Bennett May 20, 2024 Deposition, p. 264.  I note that Ms. Bennett has previous experience as the program manager and main point of contract on Moderna's BARDA contract for its Zika program.  Bennett May 20, 2024 Deposition, pp. 16-17.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

many companies offer volume discounts to purchasers. Ms. Lawton neglects to note that Moderna's opening negotiation offer to the U.S. government of $30 per dose of vaccine was based on "100 million doses,"[1500] while Moderna's subsequent July 10 cost proposal was based, on an "allocation for 300M doses."[1501] As Ms. Bennett testified, differences between the prices that different governments paid "reflected a difference in the volume that was being ordered as well."[1502] Ms. Bennett also noted that higher volumes allow Moderna to "distribute [their] fixed costs over a larger pool, and so it removes some of the uncertainty in the product."[1503]

602. Moderna's business documents support the idea that Moderna offered volume discounts, reducing the per-dose price associated with larger purchase volumes. In Moderna's "2020 Long Range Plan" presentation, a slide on ████████████████████████████████████ ███████████████████████████."[1504] That volume-based pricing ██████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████ discussed in the two Moderna communications to the U.S. government that Ms. Lawton uses in her analysis.[1505] That is, the entire difference between the two prices that are the foundation of Ms. Lawton's Analytical Method is consistent with Moderna's standard volume discount on an increased order size, providing further evidence that this difference has no relationship with the value of any intellectual property related to the Patents-in-Suit or otherwise.

---

[1500] HHS-0000828 at 828.
[1501] MRNA-GEN-01122003 at 013.
[1502] Bennett May 20, 2024 Deposition, pp. 263-264. ████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████ MRNA-GEN-02645690 at 691). Furthermore, I understand from Ms. Bennett that many of these ████████████████████████████████████████████████████████████ Bennett Conversation. For example, ██████████████████████████████████████ ███████████████████████████████████████████████████." MRNA-GEIN-01122003 at 016, 018. ████████████████████████████████████████████████ MRNA-GEN-01122003 at 029, 031.
[1503] Bennett May 20, 2024 Deposition, p. 243.
[1504] MRNA-GEN-01570975 at 136.
[1505] MRNA-GEN-01570975 at 136. ████████████████████████████████████████ ██████████████████████████████████████

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

603. Second, Moderna had additional incentives to consider in offering the U.S. government a lower price. In Moderna's June 15, 2020 CEO update presentation, scheduled for between Moderna's May 31st and July 10th communications with the U.S. government, in the section titled ███████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████[1506] The slide additionally includes that the ████████████████████████████████████████████████████████████ ██████████████████████████████   ███████████████████████████.[1507] This presentation indicates ██████████████████████████████████████████████ ████████████████████████████████████, and yields further evidence that any price (or implied profit) difference between Moderna's May 31st and July 10th communications with the U.S. government provides no insight into the value of any intellectual property, related to the Patents-in-Suit or otherwise.

604. Ms. Lawton's attempt to infer the value of the Patents-in-Suit by implicitly comparing two offers for the exact same product at different points in a negotiation is fundamentally flawed. The product under consideration by the U.S. Government in both Moderna's opening offer on May 31 and Moderna's cost proposal on July 10 was exactly the same, with no difference in technology, intellectual property, or patent contributions. As discussed above, the entirety of the price difference between these two communications can be fully explained by well-documented negotiation dynamics, competitive pressures, volume-based pricing, and strategic considerations— none of which have any connection to the Patents-in-Suit. Undeterred, Ms. Lawton assumes that the implicit differences between these two offers must be entirely driven by the value provided by the intellectual property of the Accused Product. Furthermore, rather than these various factors serving to temper the extent to which any price difference is driven by the intellectual property of the Accused Product, Ms. Lawton's misguided methodology instead transforms the ███████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████

---

[1506] MRNA-GEN-02645690 at 690, 700, 705.
[1507] MRNA-GEN-02645690 at 705 (**emphasis** in original).



.”[1527] An additional slide listing ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ ”[1528] This presentation ███████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████.[1529] Further, the presentation included a slide █████████████████████████████████████████████████████████.”[1530] These slides, from just 3 days before May 31, 2020, provide clear evidence that Moderna was told to anticipate receiving a price much lower than the initial offer of $30 per dose at the conclusion of the negotiations with the U.S. Government.[1531]

### 4.)    May 31, 2020, Moderna Letter to U.S. Government (HHS-0000828)

611.  As discussed above, this letter from Moderna to the U.S. Government informed it that "Moderna is prepared to enter discussions with the US government to manufacture an initial supply of 100 million doses of mRNA-1273 at $30.00 per 100 microgram dose." [1532]  Hamilton Bennett testified that this was an offer to the U.S. government that Moderna "started and we kind of opened the discussions with."[1533]  This letter is one of the primary sources that Ms. Lawton relies on in assuming that Moderna anticipated selling all of its pandemic-phase doses at an average price of $██ per dose.[1534]  However, at best, this opening offer would represent the *maximum* that Moderna could expect to receive from the U.S. government for those 100 million doses.[1535]  This offer to "enter discussions," in conjunction with the pricing strategy presentation, discussed above, from 3 days earlier, provides substantial support that as of May 31, 2020, Moderna did not anticipate

---

[1527] MRNA-GEN-02180160 at 171. ████████████████████████████████████████ ████████████████████████████████████████████████████████████████

[1528] MRNA-GEN-02180160 at 174.
[1529] Lawton Report, ¶¶ 469, 477.
[1530] MRNA-GEN-02180160 at 165.
[1531] This interpretation is consistent with Ms. Bennett's characterization of Moderna's perspective at the time.  Bennett Conversation.
[1532] HHS-0000828 at 828.
[1533] Bennett May 20, 2024 Deposition, pp. 211-213.
[1534] "Table 6.2, above, is based on: … ███████████████████████████████████████  Lawton Report ¶¶ 1280, 1281, Table 6.2, citing HHS-0000828-830.
[1535] A firm does not typically start a sales negotiation by initially offering a product at a lower price than it subsequently hopes to achieve.

receiving $██ per dose for the 100 million doses offered to the U.S. Government, let alone
receiving $██ per dose for all doses it would expect to sell in the pandemic.[1536]

### 5.) June 15, 2020, CEO Update (MRNA-GEN-02645690)

612. In Moderna's June 15, 2020 CEO update presentation, which occurred 15 days after May 31, 2020
(the date of first infringement), Moderna noted that ███████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████[1537] This slide provides further evidence that
Moderna anticipated alternative vaccine suppliers to potentially serve as competitive constraints on
Moderna's pricing ability (in addition to volume expectations). Additionally, the presentation
mentions that the ████████████████████████████████████," providing
further evidence that Moderna expected negotiations to continue.[1538] Additionally, Moderna noted
that for ████████████████████████████████████████████████
████████████████████████████████████████.[1539] As discussed
above, Moderna's "price expectations" included that there would likely be "volume discounts" for
large purchases.[1540] Indeed, as I noted previously, Ms. Bennett testified that differences between
the prices that different governments paid "reflected a difference in the volume that was being
ordered as well."[1541] Ms. Bennett also stated that higher volumes allow Moderna to "distribute
[their] fixed costs over a larger pool, and so it removes some of the uncertainty in the product."[1542]

613. The presentation includes a subsequent slide ██████████████████████████
████████████████████.[1543] I note this presentation does not include any financial
model or projection that indicates Moderna's expectation about what average price per dose it

---

[1536] This interpretation is consistent with Ms. Bennett's characterization of Moderna's perspective at the time. Bennett
Conversation.
[1537] MRNA-GEN-02645690 at 691.
[1538] MRNA-GEN-02645690 at 691.
[1539] MRNA-GEN-02645690 at 691. I understand from Ms. Bennett that ████████████████████
████████████████████████████████████████████████████████████████
████████████████████ MRNA-GEN-01122003 at 018. Also "████████████████████
████████████████ MRNA-GEN-01122003 at 031.
[1540] MRNA-GEN-02180160 at 171.
[1541] Bennett May 20, 2024 Deposition, pp. 263-264. *See also* Section IV.G.2.a.ii.
[1542] Bennett May 20, 2024 Deposition, pp. 243-244.
[1543] MRNA-GEN-02645690 at 695.

███████████████████████████████████████

████████████████████████ a document Ms. Lawton herself uses as support for her

endemic phase price assumptions[1703]) as Moderna's expected price, this change alone would reduce

Ms. Lawton's damages by more than 50 percent.[1704]

### b. The "Situation" Surrounding the Hypothetical Negotiation (¶¶ 1316-1319)

665.    Ms. Lawton begins her discussion of the "situation as of May 31, 2020"[1705] by repeating her prior

claims that Moderna was facing a "narrow window of opportunity"[1706] and that it had achieved a

"valuable head start on its competitors."[1707]  I previously addressed these points in detail above in

Sections IV.D and IV.E.  As I explained there, Ms. Lawton's conception of a "window of

opportunity" that implies more claimed value of a given patented invention boils down to the

presence or absence of a commercial product on which the licensor is able to generate royalty

revenues.[1708]  The proximity of Moderna's "window of opportunity"—or the launch of its

product—would not have increased the "footprint" of the inventions claimed by the Patents-in-

Suit in relative terms.[1709]  Further, both Ms. Lawton's measurement of the purported value of

Moderna's "head start" and her analysis of how any such consideration would impact the

Hypothetical Negotiation are significantly flawed.[1710]

666.    Moreover, Ms. Lawton's analysis is not even internally consistent, as it entirely fails to recognize or

acknowledge that Plaintiffs too were facing a "narrow window of opportunity" to monetize their

---



[1702] MRNA-GEN-01570975 at 112, 113, 116. █████████████████████████████
██████████████████████████████████████████████████████████████

*See* MRNA-GEN-01570975 at 112. ████

██████████████████████████████████████

[1703] Lawton Report ¶¶ 1350-51.  I note that Ms. Lawton chooses to base her endemic phase assumptions of Moderna's
expectations on the "upside" scenario ████████████████████████████████████████.  See Section IV.H.3.e.ii
below for a more detailed discussion.  █████████████████████████████████████████
████████████████████████████
████████     MRNA-GEN-01570975 at 112.
[1704] Ms. Lawton derives her pandemic phase Hypothetical Negotiation approach damages from her "██████████████
████ in her Table 6.3. ████████████████████████████████████████
██████████████████████████████████████

[1705] Lawton Report, p. 900.
[1706] Lawton Report, p. 901.
[1707] Lawton Report, p. 901.
[1708] *See* Section IV.D.1.b.
[1709] *See* Section IV.D.1.b.
[1710] *See* Section IV.E.

claimed inventions with respect to potential COVID applications.  As noted above, Plaintiffs have generated just $69.0 million[1711] over the entirety of Genevant's existence (and across all fields) in revenues stemming from their entire IP portfolio to date.  However, Ms. Lawton's analysis effectively ignores this reality, by claiming that Plaintiffs would operate without any fear of losing the opportunity to reach a deal that could earn them more than all of their previously generated royalty revenues.  Instead, according to Ms. Lawton, Plaintiffs would fearlessly (and unscrupulously) leverage the claimed urgency of a global health catastrophe in order to extract more in royalties (from Moderna) than would be reflected in the actual "footprint" of the Plaintiffs' claimed inventions.  Indeed, Ms. Lawton fails to recognize that, had Plaintiffs taken this approach at the Hypothetical Negotiation, they too would have risked losing out on a considerable payday.  Thus, even by Ms. Lawton's logic, Moderna should have offsetting leverage over Plaintiffs because Moderna could threaten to disrupt Plaintiffs' best opportunity for a large monetization of their claimed inventions.

667.  Ms. Lawton also repeats her contention that Moderna would have had access to "[n]o available, acceptable, non-infringing alternatives."[1712]  As I explained in Section IV.C, based on my understanding from Dr. Prud'homme, non-infringing alternatives in the form of molar ratios different than those in Moderna's v1 and v2 formulations were available at least as early as September 2017 as well as in 2019.  Therefore, Ms. Lawton's opinion that Moderna did not have a non-infringing alternative available on May 31, 2020 is incorrect, as is her opinion that Moderna "did not have the time" to develop a non-infringing alternative.[1713]  Moreover, as was the case with Ms. Lawton's consideration of Moderna's "head start" as discussed immediately above, such considerations would have impacted Plaintiffs' historical negotiations with its other licensees.  Thus, my affirmative assessment has already accounted for it.

---

[1711] Exhibit 4-A.  *See also,* Zorn June 5, 2024 Deposition, pp. 198-205; I note that this amount also includes royalties owed for certain agreements that do not provide rights to the Patents-in-Suit, despite Genevant and Ms. Lawton's claims to the contrary.  Removing those amounts reduces the total received to $62.5 (see Section III.C.1.b; Exhibits 4 and 4-A).
[1712] Lawton Report, p. 903.
[1713] Lawton Report, ¶¶ 611-614.

report."[1894]  Thus, Ms. Lawton explains, she only briefly discusses the individual *Georgia-Pacific* Factors, and references back to the prior sections of her background or Hypothetical Negotiation discussions where needed.  I follow a similar structure.  Where Ms. Lawton cites back to claimed support or relevant discussion from a prior section of her report, I refer back to the prior sections of my own report in which I addressed her relevant discussion.  Here, I focus my own discussion on new points or opinions raised by Ms. Lawton in her *Georgia-Pacific* analysis.

767.  Ms. Lawton organizes her analysis of the *Georgia-Pacific* Factors into three categories: the so-called "*Georgia-Pacific* Rate Factors" (Factors 1, 12, 2, 3, 4, 5), the so-called "*Georgia-Pacific* Range Factors" (Factors 8, 11, 9, 6, 13, 10, 7), and, finally, *Georgia-Pacific* Factor 15, which covers the Hypothetical Negotiation.[1895]  Ms. Lawton claims that the *Georgia-Pacific* Range Factors "set[] the range of feasible rates,"[1896] while the "*Georgia-Pacific* Rate Factors" should then be used to point "to the rate that the parties would have adopted within the range established"[1897] by the Range Factors.

768.  However, Ms. Lawton proceeds to analyze the first two categories in reverse order and to draw conclusions for each that were meant for the other.  Specifically, Ms. Lawton begins by analyzing the Rate Factors, rather than the Range Factors, and uses those Rate Factors to establish a range.  Specifically, she finds that the Rate Factors "indicate that the payment structure of the license would be a per dose royalty which would be based on a profit split in the general range of 20%|80% to 50%|50%."[1898]  She then analyzes the Range Factors, concluding that they "indicate a royalty rate at the higher end of the range,"[1899] even though drawing such a conclusion should have been the aim of her Rate Factors (as she had earlier described them).  The apparent difference between Ms. Lawton's stated and actual organization notwithstanding, I address Ms. Lawton's individual *Georgia-Pacific* factor considerations following in the ordering in her report.

769.  As discussed, I find that Ms. Lawton's *Georgia-Pacific* analysis is riddled with flaws and contradictions that undermine its reliability.  At a high level, and among numerous others, these flaws include:

---

[1894] Lawton Report, ¶ 1449.
[1895] Lawton Report, ¶¶ 1450, 1478, 1507.
[1896] Lawton Report, ¶ 1478.
[1897] Lawton Report, ¶ 1450.
[1898] Lawton Report, ¶ 1477.
[1899] Lawton Report, ¶ 1506.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY                    373

- Ms. Lawton's use of the ████████ Agreement, which does not provide a license to the Patents-in-Suit and which Ms. Lawton herself described in her Market Approach as being "at best, only minimally comparable" to the Hypothetical Negotiation license,[1900] as the anchor for her *Georgia-Pacific* analysis;

- Along similar lines, under certain other *Georgia-Pacific* Factors, Ms. Lawton's revival of several agreements she had initially discarded as non-comparable in her Market Approach;

- Ms. Lawton's inconsistent definition of a "neutral" *Georgia-Pacific* factor, which she at times claims points to a specific range or number and at other times claims does not;

- Ms. Lawton's inclusion, under various *Georgia-Pacific* Factors, of irrelevant or otherwise inappropriate information—or, alternatively, her failure to include highly relevant and impactful information, in either case undermining the pertinent factors' intended aims;

I address each of these flaws as they arise in the following discussion. However, I note, as a preliminary matter, that due to the fact that Ms. Lawton's *Georgia-Pacific* analysis is tethered to many non-comparable reference points, her *Georgia-Pacific* analysis must, at the very least, explicitly consider myriad non-comparability issues and address them. In contrast, my own affirmative *Georgia-Pacific* analysis avoids most of these non-comparability issues through the use of far more comparable reference points (i.e., the Historical Comparable Licenses).

770.    For these reasons, my assessment of Ms. Lawton's *Georgia-Pacific* analysis will necessarily criticize her for failing to consider certain evidence that my own *Georgia-Pacific* analysis does not explicitly need to consider (because my better reference points do so inherently). For example, Ms. Lawton finds that Factor 9 (which requires consideration of the utility and advantages of the Patents-in-Suit) indicates an upward adjustment to her purported "general range" of royalty rates.[1901] However, Ms. Lawton reaches this finding without any reference to (or comparison of) the underlying information that she uses to arrive at her "general range"—and further inspection of this underlying information indicates that it is entirely founded in non-comparable benchmarks.[1902] In contrast, my own analysis of Factor 9 avoids this comparability issue entirely, because it is analyzed relative to the Historical Comparable Licenses (which include, but are not limited to, rights to the Patents-in-Suit).

---

[1900] Lawton Report, ¶ 995. Elsewhere in her report, Ms. Lawton says the "economic terms" of this agreement (and other agreements) "are not indicative of the reasonable royalty that would result from the May 31, 2020 Genevant-Moderna hypothetical negotiation in this case" (see Lawton Report, ¶¶ 905, 978, 1110).
[1901] *See* my assessment of Ms. Lawton's Factor 9 analysis below.
[1902] *See* my assessment of Ms. Lawton's Factor 9 analysis below.

"general range" derived from her purported "rate factors."[1949] Ms. Lawton fails to make this comparison despite ultimately concluding that this factor "indicates that a royalty rate at the higher end of the range is appropriate."[1950] Therefore, without any consideration of information underpinning her "general range" her conclusion that this factor "indicates that a royalty rate at the higher end of the range is appropriate" is invalidated because it is devoid of the essential comparison required to reach a conclusion.

794. Further, if Ms. Lawton had undertaken this relative comparison, she would have realized that the licensed-based information she relies on to create her "general range" is based on profits splits that inherently scale with the size of the commercial opportunities (even when setting aside the fact that the information she relies upon is fundamentally non-comparable for the reasons discussed throughout this report). After all, Ms. Lawton's own assumption about Factor 11 is that it is based on the premise "that an invention used frequently is generally more valuable than a comparable invention used infrequently."[1951] Consequently, Ms. Lawton should have realized that her "general range" already scales for this frequency of use (as profits increase with increasing use/sales). Thus, given that this inherent use scaling is already captured in her "general range" (setting aside its other flaws), there is no logical way in which Ms. Lawton can conclude Factor 11 indicates anything other than no further adjustment.[1952]

> **Factor 9: The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.**

795. As an initial matter, in her treatment of this factor, Ms. Lawton claims that as Moderna purportedly had "no available, acceptable, non-infringing alternative that was ready to go[,]" Moderna's "only option would be to accept a license on terms that Genevant was 'in the driver's seat' to demand."[1953] As I have already addressed in Section IV.C.7, I understand that Plaintiffs' position that Moderna had no acceptable non-infringing alternative options is incorrect. Further, as I have already addressed above in Section IV.H.7.b (and elsewhere) and address at greater

---

[1949] Lawton Report, ¶¶ 1486-1489.
[1950] Lawton Report, ¶ 1489.
[1951] Lawton Report, ¶ 1486.
[1952] Put differently, for example, if Ms. Lawton had arrived at Factor 11 with a benchmark that was a fixed payment associated with less (or more) economic use, then she could have used Factor 11 to indicate a downward (or upward) adjustment relative to the fixed payment.
[1953] Lawton Report, ¶ 1491.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

length in Factor 15 below, Ms. Lawton's contention that Genevant would have been "in the driver's seat" is greatly exaggerated and does not accurately reflect a consideration of the footprint of the actual Claimed Inventions or the dynamics that would prevail between the Parties at the Hypothetical Negotiation.

796. More generally, this factor (along with her Factor 10) highlights one of the most profound infirmities in Ms. Lawton's Hypothetical Negotiation analysis. As explained below, an examination of the facts that Ms. Lawton fails to consider under Factor 9 vividly demonstrates how Ms. Lawton's entire Hypothetical Negotiation analysis is misguided by a comparison to improper benchmarks—while also completely undermining the validity of her Factor 9 findings (as a standalone consideration).

797. To this point, as was the case in Factor 11 discussed above, it is instructive to note that Ms. Lawton mistakenly analyzes Factor 9 in the abstract—in that she ostensibly discusses what she considers to be the "advantages" and "utility" of the Claimed Inventions without any reference to (or comparison of) the underlying information that she uses to arrive at her "general range." Indeed, Ms. Lawton fails to make this comparison despite ultimately concluding that "the importance of the claimed invention[s]" considered under this factor "indicates a royalty rate at the higher end of the range."[1954] Therefore, without any consideration of the information underpinning her "general range" her relative conclusion that this factor "indicates a royalty rate at the higher end of the range" is invalidated because it is devoid of the essential comparison required to reach a conclusion.

798. Further, Ms. Lawton's failure to make the essential comparison referred to above obscures an even more fundamental problem with the comparability of information underpinning her "general range." To this point, it is important to consider that Ms. Lawton's "general range" is informed by Ms. Lawton's previous "*Georgia-Pacific* Rate Factors," which she claims indicate profit splits of a range between 20 to 50 percent of Moderna's profits.[1955] After tracking down the information Ms.

---

[1954] Lawton Report, ¶ 1492, *see also* Section IV.H.5.b above.
[1955] Lawon Report, ¶ 1477.

Lawton relies upon to create this range, it is apparent that this "general range" is based on the same three flawed categories of sources as I discussed in Section IV.H.5.b above:[1956]

- Industry profit splits taken from an online news article;[1957]

- Moderna's summary of potential deal structures;[1958]

- Moderna's collaboration agreements with Merck and AstraZeneca.[1959]

799. Indeed, it is perhaps not surprising that Ms. Lawton failed to make the required comparisons here, because had she done so, she would have immediately recognized some very serious problems with her comparators, including:

- With respect to the profit splits Ms. Lawton derives from an online news article entitled "Co-Commercialization Deals in Life Science Collaborations:"[1960]
  - This source provides no basis for Ms. Lawton to conduct the comparison called for under Factor 9—that is, a comparison of the "advantages" and "utility" of the Claimed Inventions compared to what is licensed under those industry profit splits taken from an online news article.[1961] Nowhere does Ms. Lawton make this comparison, and that is because the information she is relying on is an amalgamated mishmash of 35 different collaboration agreements incorporating unknown technologies.[1962] This deficiency alone condemns Ms. Lawton's reliance on this point of comparison. As such, a proper analysis of Factor 9 should have caused Ms. Lawton to entirely abandon her use of this news article in her determination of a "general range" for her *Georgia-Pacific* analysis and as a "'marker[] of value'"[1963]—if for no other reason than the fact that establishing sufficient technological comparability without any underlying details about these agreements is impossible.[1964]

---

[1956] I note that at this point Ms. Lawton appears to have forgotten certain conclusions that she herself, elsewhere in her report, has drawn, such as 1) that the Tekmira offer serves as a "floor for the royalty rate" (Lawton Report, ¶ 1375), 2) that the Genevant Licenses purportedly indicate a profit split of 10 percent going to Genevant (*see* Lawton Report, ¶ 1376), and 3) that Genevant would demand no less that 25 percent—based on the non-comparable agreement between Genevant and Chulalongkorn, which she mistakenly identifies a being a license to the Patents-in-Suit (*see* Lawton Report, ¶ 1378). *See also* my assessment of Ms. Lawton's Market Approach above with respect to the Chulalongkorn Agreement in Section IV.F.3.d.iv.

[1957] *See* Lawton Report, ¶¶ 1373, 1477. *See also* https://www.bloomberglaw.com/external/document/X42IAKO0000000/ip-transactionsprofessional-perspective-co-commercialization-de.

[1958] *See* Lawton Report, ¶¶ 1373, 1380-1383, 1477. *See also* Francis May 22, 2024 Deposition, Exhibit 35 (MRNA-GEN-01708236 at 278-279, 282).

[1959] *See* Lawton Report, ¶¶ 1378-1379, 1477.

[1960] Lawton Report, ¶¶ 1373, 1384-1386, 1477.

[1961] https://www.bloomberglaw.com/external/document/X42IAKO0000000/ip-transactionsprofessional-perspective-co-commercialization-de. *See also* Section IV.H.8.

[1962] https://www.bloomberglaw.com/external/document/X42IAKO0000000/ip-transactionsprofessional-perspective-co-commercialization-de

[1963] *See* Lawton Report, ¶ 1373.

[1964] *See* Section IV.H.5.b.v.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

- The second two groups of sources Ms. Lawton relies upon for her "general range" are "Moderna's 2017 Summary of Potential Deal Structures" and Moderna's collaboration agreements with Merck and AstraZeneca, which share a similar fatal flaw with her first source.[1965] With these she is admittedly relying on non-comparable profit split terms from actual (and hypothesized) collaboration agreements.[1966] It is important to be clear here that under Factor 9, Ms. Lawton is holding up non-exclusive rights to the "advantages" and "utility" in the Claimed Inventions (related to the 6 Patents-in-Suit) against the entire value found in each of the collaboration agreements for Moderna. Recall, these collaborations agreements include elements of value for Moderna such as:

  o ████████████████████████████
    - ████████████
    - ██████████████████████████
    - ████████████████
    - ██████████████████████████████████
    - ████████████████████████[1967]

- In short, holding these points of comparison up to the light provided by Factor 9 makes it clear that these collaboration agreements cannot be comparable—which elsewhere in her report, even Ms. Lawton seems to acknowledge.[1968] Yet Ms. Lawton takes her misguided analysis a step further by saying that Factor 9 calls for an upward adjustment.[1969] This finding is inexplicable. At the very least, even if she believes she can ascertain technical comparability from the web of intellectual properties woven into these collaboration agreements,[1970] she cannot (and does not) account for the value of everything else (non-patented) provided to Moderna under those agreements—taking that into consideration, Ms. Lawton should have at least considered Factor 9 indicates a severe downward adjustment.

800. Last, with respect to the specific issue of the availability of potential non-infringing alternatives, the same problem with the comparators underpinning Ms. Lawton's "general range" discussed above, apply with similar force to this issue. In particular, Ms. Lawton undertakes no comparison on the relative existence (or lack of) non-infringing alternatives for the licensed technologies provided for in the comparators underpinning her "general range" (setting aside the fact Ms.

---

[1965] Lawton Report, ¶¶ 1380-1383, 1477, Table 6.7.

[1966] Lawton Report, ¶¶ 1380-1383; as I discuss in Section IV.F above, in her Market Approach analysis, Ms. Lawton notes that she does not find any of the Moderna licenses informative to the royalty terms of the Hypothetical Negotiation license, nevertheless, Ms. Lawton leans on these collaboration agreements to support the ██████████████████████ ████████ her "general range." See also Sections IV.H.5.b.iii and IV.H.5.b.iv.

[1967] *See* Vellturo Report, Section III.C.1.d.i.

[1968] Elsewhere in her report, Ms. Lawton impugns the comparability of certain agreements because she claims they are collaborations agreements. *See, e.g.,* Lawton Report, ¶ 923. *See also* Section IV.F.

[1969] Lawton Report, ¶ 1492.

[1970] See Sections IV.F.4.a.ii IV.F.4.b.ii IV.F.4.c.ii.

Lawton does not even attempt to adequately isolate the value attributable to any particular patented technology licensed within those comparators).[1971]  Indeed, such comparisons become impossible when Ms. Lawton does not even know what the specific technologies being licensed are (as would be the case with her averages derived from the online article discussed above).[1972]

801.    In contrast to Ms. Lawton's analysis, as I noted above in my affirmative analysis of Factor 9, the Historical Comparable Licenses granting rights to the Patents-in-Suit (among other things of value)—which is what Ms. Lawton notes is the "most influential factor in determining a reasonable royalty"[1973]—already incorporate and reflect in their payment terms the (non-)existence of any such non-infringing alternatives.[1974]  Thus, the Historical Comparable Licenses, which serve as the foundation of my affirmative damages approach, already inherently account for the potential for non-infringing alternatives (in accordance with Factor 9).

> **Factor 6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.**

802.    At the outset, I note that, as is the case with several factors above, Ms. Lawton conducts her Factor 6 analysis in the abstract—in that she fails to make any relative comparison to (or discussion of) the information underpinning her "general range" derived from her purported "rate factors."[1975]  Ms. Lawton fails to make this comparison despite ultimately concluding that this factor "indicates a royalty rate at the higher end of the range."[1976]  Therefore, without any consideration of information underpinning her "general range," her conclusion that this factor "indicates a royalty at the higher end of the range" is invalidated because it is devoid of the essential comparison required to reach a conclusion.

803.    Furthermore, Ms. Lawton's treatment of this factor is yet another instance in which she fails to respond to the actual factor as intended and instead substitutes her own interpretation for well-established practice.  The wording of Factor 6 is quite clear: it aims to uncover the extent to which

---

[1971] Lawton Report, ¶¶ 1490-1492.
[1972] Lawton Report, ¶¶ 1384-1386; https://www.bloomberglaw.com/external/document/X42IAKO0000000/ip-transactionsprofessional-perspective-co-commercialization-de.
[1973] Lawton Report, ¶ 1451.
[1974] *See* Section III.D.
[1975] Lawton Report, ¶ 1495.
[1976] Lawton Report, ¶ 1495.

factor "indicates a royalty at the higher end of the range."[1990] Therefore, without any consideration of the information underpinning her "general range" her relative conclusion that this factor "indicates a royalty at the higher end of the range"[1991] is invalidated because it is devoid of the essential comparison required to reach a conclusion.

809. Furthermore, as was the case with Ms. Lawton's analysis of Factor 9, Ms. Lawton's failure to make the essential comparison under Factor 10 (referred to above) obscures an even more fundamental problem with the comparability of information underpinning her "general range." Indeed, whereas Ms. Lawton considers the "advantages" and "utility" of the Claimed Inventions under Factor 9, she likewise considers essentially the same by considering the "advantages and benefits" under Factor 10. Therefore, the required comparisons for Ms. Lawton under Factor 9 are effectively the same for Ms. Lawton under Factor 10 (under Ms. Lawton's own view of what needs to be considered under the respective *Georgia-Pacific* factors). Thus, the same criticisms (and implications thereof) I apply in my assessment of Ms. Lawton's Factor 9 analysis above apply with equal force to her analysis of Factor 10.

810. Moreover, under Factor 10, Ms. Lawton repeats the same refrains she invokes throughout her report and her *Georgia-Pacific* discussion—that Genevant's LNP was "close to optimal for mRNA"[1992] (addressed in Section IV.C.7) that "LNP is the GOLD STANDARD for mRNA delivery"[1993] (addressed in Section IV.C.3) and that Moderna had a "lack of acceptable, available, non-infringing alternatives"[1994] (addressed in Section IV.C.7). She summarily concludes that, therefore, Factor 10 "indicates a royalty rate ***at the higher end of the range***."[1995] As noted, I have addressed Ms. Lawton's premises above in this rebuttal report and find or understand them all to be incorrect.

811. As a side point, I also note that Ms. Lawton addresses Factor 10 separately from other factors in which she considers the same elements. The most salient example of this is that Ms. Lawton considers Factor 9 and 10 separately (despite the fact they are commonly considered jointly given

---

[1990] Lawton Report, ¶ 1502.
[1991] Lawton Report, ¶ 1502.
[1992] Lawton Report, ¶ 1500, citing to MRNA-GEN-02204816-901, at 868.
[1993] Lawton Report, ¶ 1500, citing to MRNA-GEN-01240180-198, at 191.
[1994] Lawton Report, ¶ 1502.
[1995] Lawton Report, ¶ 1502.

their overlapping considerations).  By doing so, Ms. Lawton yields two separate (and incorrect) "increase" impacts in her ultimate *Georgia-Pacific* analysis (Lawton Report, Table 6.9), thereby compounding her substantial errors in technical understandings and economic reasoning.

**Factor 7: The duration of the patent and the term of the license.**

812.  In Ms. Lawton's treatment of this factor, she notes her understand that "the '651 Patent expired on June 30, 2023, and the molar ratio patents will expire on April 15, 2029."[1996]  She further asserts that "a willing licensee in a hypothetical negotiation with a willing licensor would have been more disposed to agree to a high royalty the longer the remaining term of the patent."[1997]  However, this is not always the case.  For instance, the long term of a patent license may generate incremental incentive for the licensee to "design around" the claimed invention, putting downward pressure on a royalty consideration.  However, in any event, and in seeming contradiction to her opening assertion, Ms. Lawton deems this Factor "neutral" at the Hypothetical Negotiation.[1998]  Thus, her unclear reasoning aside, Ms. Lawton and I agree in that respect.  As I noted above in my affirmative analysis of Factor 7 (see Section III.D), the duration of the Patents-in-Suit would have been similarly considered by Genevant's other licensees—and especially Providence, which executed its initial license with Genevant the same month as the Hypothetical Negotiation—such that my effective rate calculations take Factor 7 into account, leaving no reason for incremental adjustment here.

> **Factor 15: The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee–- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention–- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

813.  Ms. Lawton's discussion of *Georgia-Pacific* Factor 15 pulls largely from her previous discussions, thereby inheriting their flaws.  I have discussed those flaws throughout this section and my report

---

[1996] Lawton Report, ¶ 1504.
[1997] Lawton Report, ¶ 1503.
[1998] Lawton Report, ¶ 1505.

enable otherwise-unavailable profits from' the non-infringing doses."[2039]  Ms. Lawton therefore concludes that at this alternative hypothetical negotiation, "Moderna still would have agreed to the same reasonable royalty rate per dose for all v1 doses, including those that do not literally infringe."[2040]

837.  Of course, Ms. Lawton's analysis here inherits the many flaws of her baseline analysis as I detail throughout Section IV of this report.  Moreover, when presented with a scenario corresponding to what I understand is strictly *less* infringement, Ms. Lawton arrives at precisely the same total damages quantum.  Indeed, she appears to reduce neither her royalty base *nor* her royalty rate.  She fails to do this despite the numerous places throughout her own reasonable royalty assessment in which she asserts that carefully considering the scope of the defendant's infringement is important (even though she fails to adequately do so herself).  These include her discussion of the central role of identifying the incremental benefit of the patented invention, applying proper apportionment, accounting for the extent to which the infringer has made use of the patented invention, and considering the benefits to those who have used the invention.[2041]  Ms. Lawton summarily dismisses all these dynamics—that presumably change under the alternate scenario she is analyzing—without further consideration.

838.  I also understand from counsel that under this scenario, Plaintiffs may allege that for the doses that Ms. Lawton appears to assume do not constitute literal infringement, there may still be so-called "transitory" infringement that occurs for a limited time during the manufacturing process—but would not manifest in the final commercial product.  In such alleged cases, I understand from Dr. Prud'homme that any such infringement would exist, at most, for a matter of *seconds* during the manufacturing process—where the manufacturing process takes hundreds of hours over the course of more than a week to complete.[2042]  Thus, to the extent Ms. Lawton assumes that the units not accused of literal infringement under this scenario are indeed accused of such transitory infringement, she has similarly failed to make any adjustment to her reasonable royalty rate to reflect the more limited use of the Claimed Inventions by Moderna.

---

[2039] Lawton Report, ¶ 1652, citing *Brumfield v. IBG LLC*, 97 F. 4th 854, 876–77 (Fed. Cir. 2024).
[2040] Lawton Report, ¶ 1652.
[2041] I respond to each of these in my assessment of Ms. Lawton's report, *see* Section IV.
[2042] Prud'homme Rebuttal Report, § X.D.7.

HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY

February 14, 2025

Christopher A. Vellturo, Ph.D.