# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------x

ARBUTUS BIOPHARMA CORPORATION　　　　:

AND GENEVANT SCIENCES GMBH,　　　　　:

　　　　　Plaintiffs,　　　　　　　　:

　v.　　　　　　　　　　　　　　　　　: C.A. No. 22-252-MSG

MODERNA, INC. AND MODERNATX, INC., :

　　　　　Defendants.　　　　　　　　:

------------------------------------x

MODERNA, INC. AND MODERNATX, INC., :

　　　　　Counterclaim-Plaintiffs, :

　v.　　　　　　　　　　　　　　　　　:

ARBUTUS BIOPHARMA CORPORATION　　　　:

AND GENEVANT SCIENCES GMBH,　　　　　:

　　　　　Counterclaim-Defendants. :

------------------------------------x

HIGHLY CONFIDENTIAL

Videotaped Deposition of ARBUTUS and GENEVANT

By and through their Designated Representative

PETER ZORN

Washington, D.C.

Wednesday, June 5, 2024

8:10 a.m.

Job No.: 535310
Pages: 1 - 273
Reported By: Christina S. Hotsko, CRR, RPR, CA CSR

HIGHLY CONFIDENTIAL

Transcript of Peter Zorn, Corporate Designee

Conducted on June 5, 2024                                    118

to 322.                                                       11:07:40

        (Zorn Deposition Exhibit 12 marked for                11:08:02

identification and attached to the transcript.)              11:08:02

BY MS. LI:                                                    11:08:02

    Q   Mr. Zorn, do you recognize this document?            11:08:03

    A   I do.                                                 11:08:04

    Q   And this is a continued e-mail exchange              11:08:05

between you and Neal Dahiya at Moderna, right?               11:08:08

    A   Yes.                                                  11:08:11

    Q   If I could ask you to look towards the               11:08:11

bottom of the first page in your e-mail to Neal              11:08:20

dated June 23rd, 2021, there's a second bullet.             11:08:21

        Do you see that?                                     11:08:23

    A   Yes.                                                  11:08:26

    Q   And so you write, In exchange, Moderna               11:08:27

would pay to Genevant with respect to every dose            11:08:29

of mRNA-1273 and/or any other COVID-19 vaccine              11:08:31

incorporating and/or utilizing LNP technology the           11:08:39

greater of, (1), $5 U.S. or, (2), 25 percent of             11:08:42

net sales.                                                   11:08:47

        Do you see that?                                     11:08:47

    A   I do.                                                 11:08:48

    Q   What is your basis for the exchange of $5            11:08:51

U.S. or 25 percent of net sales?                            11:08:54

        MR. HARBER:  Objection to form.  And that           11:08:58

PLANET DEPOS

888.433.3767 | WWW.PLANETDEPOS.COM

HIGHLY CONFIDENTIAL

Transcript of Peter Zorn, Corporate Designee

Conducted on June 5, 2024                                                                                          119

calls for privileged information, so I instruct the witness not to answer on the grounds of attorney-client privilege.

THE WITNESS:  I can't answer.

BY MS. LI:

Q  Okay.  And in having these discussions with Neal, was Genevant also taking into consideration statements about Moderna's finances as made available in, for example, 10-Ks or 10-Qs?

MR. HARBER:  Objection to form.  I -- the information that was considered in making a settlement offer is privileged and I instruct the witness not to answer on the grounds of attorney-client privilege.

THE WITNESS:  I can't answer.

BY MS. LI:

Q  Mr. Zorn, did you, yourself, in having these discussions with Neal, look at Moderna's financial statements?

MR. HARBER:  Objection to form.  And what Genevant's in-house lawyer consulted for the purpose of making a settlement offer is privileged, and I instruct the witness not to answer on the grounds of attorney-client privilege.

THE WITNESS:  I cannot answer.

BY MS. LI:

Q  Did you discuss the basis of your offer -- excuse me, strike that.

Besides this e-mail to Neal, did you have separate conversations with Neal about the terms that you identified in this e-mail?

A  I don't recall.  Somewhere in these -- the e-mail chains that you've forwarded -- that you've sent to me there's a reference to a discussion.  I believe we did talk on the phone at one point, but I don't recall specifically.

Q  And what was discussed when you had these phone calls with Neal?

A  I don't recall anything different than what's memorialized here.

Q  If you could go back to Exhibit 4, I believe.

In the fourth paragraph of your e-mail from April 5th -- it begins, "In any event."

Do you see that?

A  Yes.

Q  So you write, In any event, your offer does not recognize the substantial contributions of our patented technology and its inventors.

paragraph begins, "Thank you for your e-mail."

And this is the last sentence in the paragraph.

A   Yep.

Q   Do you see that?

So this e-mail is dated April 5th, 2021.

Are you aware if Moderna had already started selling its COVID-19 vaccine product at that point?

MR. HARBER:  Objection.  Outside the scope.

You can answer if you know.

THE WITNESS:  I don't have the timeline committed to memory, so I -- I can't answer.

BY MS. LI:

Q   Is your statement in Exhibit 4 accurate in that your and Genevant's desire/priority remains to eradicate COVID-19?

A   Yes.

Q   And your desire is not to obstruct or delay the availability of COVID-19 vaccines.

A   Yes.  At April 2021.

Q   Does Genevant have a general approach to out-licensing?

A   What do you mean by "approach"?

11:16:35
11:16:36
11:16:38
11:16:38
11:16:40
11:16:40
11:16:46
11:16:50
11:16:55
11:16:55
11:16:56
11:16:56
11:16:57
11:17:04
11:17:07
11:17:07
11:17:11
11:17:14
11:17:23
11:17:23
11:17:26
11:17:29
11:17:36
11:17:56
11:18:05

HIGHLY CONFIDENTIAL

Transcript of Peter Zorn, Corporate Designee

Conducted on June 5, 2024                                    125

Q  For example, you know, does Genevant have a preference for lump sum payments or milestones versus running royalty amounts.   11:18:07 11:18:10 11:18:14

Is there a general approach that Genevant has in licensing negotiations and getting a license agreement done with another company or entity?   11:18:16 11:18:19 11:18:25 11:18:28

A  So based on the explanation, I understand you to be asking about financial preferences?   11:18:29 11:18:31

Q  Or just other terms that Genevant wants in license agreements.   11:18:34 11:18:36

A  I mean, every agreement is individually negotiated and a function of the circumstances of that deal, so it sort of depends on the circumstances.   11:18:39 11:18:41 11:18:44 11:18:48

Q  Does Genevant have a preference for, say, milestones versus running royalties?   11:18:48 11:18:51

A  They're all -- every circumstance is different.  It's hard to say what we would have a preference for.  In any particular deal, it's a function of the terms of that deal and the counterparty and the scope of the license and what else we're doing, et cetera.   11:18:56 11:19:03 11:19:05 11:19:08 11:19:11 11:19:15

Q  Is there a circumstance where Genevant would prefer a percentage royalty instead of a   11:19:29 11:19:30

HIGHLY CONFIDENTIAL

Transcript of Peter Zorn, Corporate Designee

Conducted on June 5, 2024                                    126

lump sum or milestone payment?

A    I don't know.  I've never had the occasion to compare the two scenarios in my -- in negotiating our collaboration agreements.  It's not typically an option to receive a lump sum payment, so it's not something I've had occasion to consider.

Q    In instances where there is a running royalty, what factors does Genevant consider when determining a royalty rate?

████████████████████████████
████████████████████████████
█████████████████████████
████████████████████████████████
███████████████████████████████
████████████████████████
████████████

All of those things are considered when we look at any particular deal.  And then, obviously, it's negotiated.  So we can't dictate the answer; it's a -- it's a negotiated outcome.

Q    When you mentioned the strength of the counterparty, what do you mean by that?

A    Well, if I could refine my answer.  My answer was sort of a blend between our interest in

11:19:34
11:19:49
11:19:53
11:19:58
11:20:02
11:20:04
11:20:08
11:20:10
11:20:14
11:20:18
11:20:22
11:20:28
11:20:30
11:20:39
11:20:48
11:20:51
11:20:54
11:20:55
11:21:00
11:21:03
11:21:06
11:21:08
11:21:14
11:21:17
11:21:30

Transcript of Peter Zorn, Corporate Designee

Conducted on June 5, 2024                                    127

doing a deal in the first place and the terms of

any particular deal, which I sometimes conflate.

Q   Okay.  In your licensing negotiations, do

you consider the potential profitability of an end

product as a factor to determining royalty rate?

A   It's a -- circumstances are all different

in every different deal, so -- it's -- I can't --

there is no general answer to that question.

Q   Are there certain entities that Genevant

would not collaborate with, for example, because

it could impact Genevant's reputation?

A   That specific consideration, you know --

you know, I have not been faced with the question

of should we do a deal with someone that is

considered someone you don't want to be doing a

deal with.  It's a question I have not been called

upon to consider.

Q   Does the scope of the IP involved impact

the potential royalty rate in a negotiation of a

license agreement?

MR. HARBER:  Objection to form.

THE WITNESS:  What do you mean by scope of

the IP?

BY MS. LI:

Q   Let's say Genevant has a patent portfolio.

HIGHLY CONFIDENTIAL

Transcript of Peter Zorn, Corporate Designee
Conducted on June 5, 2024                                      128

Maybe the licensee doesn't need or want to license all of the patented technology.

So does the scope of needing or wanting however many patents, however much IP is involved, impact the royalty rate?

███████████████████████████████████

████████████████████████████

██████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████████

A   Every deal is different.  And what has been done on any given deal, or even on many deals, wouldn't necessarily be indicative of what would happen with the next deal.

But with that as context, it is more typical to -- for Genevant to negotiate the scope of a license, to negotiate the business terms associated with that scope, and then the patents that go with that scope are sort of the last thing that gets determined, as opposed to the first.

Q   Does Genevant consider its know-how to be valuable in terms of licensing negotiations?

MR. HARBER:  Objection to form.

THE WITNESS:   ████████████████████

know-how in conjunction with our patents.  Yes.                    11:25:49

BY MS. LI:                                                         11:25:52

    Q    And what is involved in Genevant's                        11:25:53
know-how?  So it's not patents, but what are                       11:25:54
things that are considered Genevant's know-how?                    11:25:57

    A    We don't typically parse it out, so it                    11:26:00
would be sort of the classic consideration of                      11:26:06
know-how, which is basically unpatented technology                 11:26:08
and expertise.                                                     11:26:10

    Q    Would that include trade secrets?                         11:26:11

    A    In concept or as applied to Genevant?                     11:26:17

    Q    Would Genevant's know-how include any                     11:26:20
Genevant trade secrets?                                            11:26:23

    A    Yeah, I think a trade secret is a term of                 11:26:29
art, whether something is maintained as a trade                    11:26:31
secret, but I think -- I can't answer the                          11:26:33
question.                                                          11:26:37

███████████████████████████████████████████████                  11:26:37

███████████████████████████████████████████████                  11:26:53

███████████████████████████████████████████████                  11:26:57

███████████                                                        11:27:08

    A    What do you mean by ████████████████                      11:27:08

    Q    So for example, if Genevant was trying to                 11:27:10
███████████████████████████████████████████████                  11:27:13
███████████████████████████                                        11:27:17

HIGHLY CONFIDENTIAL

Transcript of Peter Zorn, Corporate Designee
Conducted on June 5, 2024                                    130

Does that ███████████ impact the contours of the licensing agreement?

MR. HARBER:  Objection to form.

THE WITNESS:  Every deal is different and it takes into account all the different circumstances that I mentioned earlier, and it's a function of what the two parties will agree to.

So if the question is, you know, do we ask ████████████████████████████████████ ████████████, I can't parse that out from all of the considerations that would go with any one negotiation.

BY MS. LI:

Q  Has the relative importance of Genevant's intellectual property changed with time?

A  Relative importance to whom?  And relative to what?

Q  How about the relative importance in terms of how much Genevant would be paid in terms of licensing its intellectual property?

A  Well, I mean, there is no one answer to that because every deal is individually negotiated, so I'm not sure what you're asking me.

Q  So the patents at suit in this case, some of the patents were granted maybe in 2011, earlier

HIGHLY CONFIDENTIAL

Transcript of Peter Zorn, Corporate Designee
Conducted on June 5, 2024

200

Q   Okay.  And what does Exhibit 26 show?    14:07:33

A   It shows the upfront payments or    14:07:38
technology access fees, or whatever you'd want to    14:07:50
call them, plus milestones that we've received    14:07:52
under these various agreements during the period    14:07:56
shown.    14:07:59

Q   And does Exhibit 26 show any royalty    14:07:59
payments from running royalties that Genevant has    14:08:06
received?    14:08:08

A   It does not.    14:08:09

Q   And is that because, presently, Genevant    14:08:10
has not received any royalties?    14:08:12

A   Correct.    14:08:16

Q   And have any of the licenses listed in    14:08:16
Exhibit 26 resulted in a commercially-approved    14:08:23
product?    14:08:29

A   Not yet.  But, as I mentioned earlier, all    14:08:32
of the agreements were struck at a preclinical    14:08:37
stage.  But not yet.    14:08:40

Q   Do you know, of the licenses that are    14:08:41
listed in Exhibit 26, which ones are in clinical    14:08:42
trials now?    14:08:47

A   I'm not sure I could distinguish between    14:08:57
an ongoing clinical trial and ongoing clinical    14:08:59
development.  But subject to that, yes, I do.    14:09:03