# Exhibit 4

Case 1:22-cv-00252-JDW    Document 667-4    Filed 12/16/25    Page 2 of 21 PageID #: 50655

4/17/2025          Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al.     Christopher A. Vellturo, Ph.D.
Highly Confidential

Page 1

          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE


ARBUTUS BIOPHARMA CORPORATION AND
GENEVANT SCIENCES GMBH,

                                        CASE NO.
                Plaintiffs,             22-252(MSG)
        -against-


MODERNA, INC., AND MODERNATX, INC.,

            Defendants.

_____
MODERNA, INC., AND MODERNATX, INC.,

            Counterclaim-Plaintiffs,


    -against-


ARBUTUS BIOPHARMA CORPORATION AND
GENEVANT SCIENCES GMBH,
            Counterclaim-Defendants.
          *** HIGHLY CONFIDENTIAL ***
          VIDEO-RECORDED DEPOSITION OF
          CHRISTOPHER A. VELLTURO, PhD


             Kirkland & Ellis, LLP
              601 Lexington Avenue
            New York, New York  10022


                04/17/2025
               9:08 a.m. (EDT)
          REPORTED BY:  MONIQUE CABRERA

_____
            DIGITAL EVIDENCE GROUP
          1730 M Street, NW, Suite 812
            Washington, D.C. 20036
               (202) 232-0646

Page 62

components."  I mean, are you referring --

Q.    Technical benefits.

A.    Technical benefits.  I am not sure what that means.

Q.    Are you offering any opinions in this case about the technical benefits of the claimed technology or its use in Moderna's vaccine?

A.    I didn't independently investigate the science.

Q.    You're relying on others for that?

A.    Right.  To the extent I needed inputs as to the science, I would have relied upon technical experts with that scientific expertise.

Q.    Are there technical opinions you are offering here which you did not need input from the scientists?

A.    I would stick with science rather than technical.

Q.    Are there scientific opinions that you're offering here that are independently being

4/17/2025          Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al.    Christopher A. Vellturo, Ph.D.
Highly Confidential

Page 71

understanding of it is it's a form of LNP that, I

believe, the operative language is "fully

encapsulates the payload."

Q.    What is your understanding of the

importance of fully encapsulating the payload?

A.    I think you're getting beyond my

level of science with that one.

Q.    Was there an understanding you had

of the importance of that when forming your

opinions in the case?

A.    There may have been.  I'm just not

recalling it, as I sit here.

Q.    You've heard the term "standard

essential patents" before, right?

A.    Yes.

Q.    The -- the patents-in-suit are not

standard essential patents?

A.    I don't believe so.

Q.    And you've heard the term "FRAND"

before, correct?

A.    I'm familiar with FRAND.

Q.    The patents-in-suit are not subject

Page 136

the parties in particular.

There are some that are boilerplate, but there are a lot that are not.  But I didn't do that specifically with respect to these.

Q.    So to ask that again:  You don't know specifically why the parties to these agreements included any given term in the agreements?

A.    Yeah, I didn't have evidence nor could I obtain evidence on the particularities as to how each of these parties, as individual companies, approached these negotiations.

Q.    Well, Moderna could have subpoenaed these questions -- these companies during discovery and asked them questions, right?

MS. WACKER:  Objection to form.

A.    Maybe.

BY MR. HARBER:

Q.    Have you ever had that happen in one of your cases before?

A.    Where a party subpoenaed other licensees?

Page 141

Providence agreement that I saw, and I may have seen it for others.

I can't remember whether that had any specific discussion about why certain rates were being -- were being contemplated or at least proposed and why they were being adjusted.

Q.    But as you sit here today, you can't think of any?

A.    Yeah, I don't remember -- I don't remember that, as I sit here.

Q.    What is a tiered royalty rate structure?

A.    It varies.  There are typically two forms.  One would be that a royalty rate is owed -- actually, there are three forms.

One is a royalty rate is owed on a product, and that royalty rate is a function of the annual sales of the licensed product.  And as the licensed sales in a given year meets certain threshold numbers, the royalty changes. Sometimes it goes up; sometimes it goes down. And I'm going to finish.

Page 142

Of that kind of license, there are two flavors.  One of the flavors is that the royalty -- the new royalty applies to all the sales, including the sales that were below the threshold.  And in other instances, it's the royalty applies only to the incremental value above the threshold.  So those are two different flavors.

And then there's another flavor of tiered royalties, where the royalty changes based on the cumulative revenue of the product over its lifetime.  So those are -- those are different kinds of tiered royalties.  But basically, the royalty rate varies depending on whether certain threshold revenue numbers are reached.

Q.    What is the purpose of a tiered royalty rate structure?

A.    Well, from an economic standpoint, a tiered structure can represent an adjustment in the rate to reflect the amount of risk or investment associated with getting sales to various tiers.  That -- that can happen.

Page 143

Another one -- not relevant here, but I've seen it in other cases -- is that there can be what are called direct network effects where sales of a given product -- social networks are the classic example -- people's demand for a given product is a direct function of how many other people have adopted the product.  So in that case, the actual marginal value of -- of incremental customers is high because it -- it increases the value to the other customers you've already gotten.

So there are a lot of things.  That typically doesn't relate to pharmaceuticals, but I've seen it in -- in other aspects.  So there are a variety of underlying economic motivations that can lead to a tiered system.

Q.    In the tiered royalty rate structures in the -- these 13 Genevant agreements, the royalty rates go up as sales increase, correct?

A.    I believe that's uniformly true.  I don't -- I don't have them memorized, but I

Page 144

believe that's true.

Q.    Why would that be the case?

A.    Well, one of the -- there can be -- again, there can be a variety of reasons.  One of the reasons is that -- that in the early phases of a pharmaceutical product's introduction into the market, there could be an enormous amount of market development and marketing effort that needs to be put in to generate the sales.

And, you know, the literature is not too well-established here, but there's a -- there's a decent amount of it that many pharmaceutical products, even ones that have substantial demand, sustain substantial losses in their first years of commercialization, leaving out the R&D piece because there's so much market development work to be done.

And so in those early years with those early sales, there tends to be a much lower marginal profit and therefore, much less to share in the context of a royalty.  As a product matures and develops, that profitability goes up,

4/17/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al.    Christopher A. Vellturo, Ph.D.
Highly Confidential

Page 145

and these rates can reflect that.

Q.    Do you know specifically why -- what the reason was behind the rates increasing as sales go up in any of these 13 Genevant agreements?

A.    I don't think so.

Q.    And you don't know specifically how the parties to any of these 13 agreements valued the -- put a relative value on the licensed patents in the agreements?

A.    As I recall, these were all licenses to the entire portfolio.  So there was no need to parse out the specifics of specific inventions. From a damages perspective, that's extremely important for me to do, and I did it.

But when you're negotiating these kinds of licenses that are basically freedom to operate licenses, you're -- you're typically focused on the entire set of IP.

Q.    Do you know whether the parties here were, in fact, focused on the entire set of IP?

A.    I don't recall seeing any documents

4/17/2025          Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al.     Christopher A. Vellturo, Ph.D.
Highly Confidential

Page 152

MS. WACKER:  Objection to form.

A.    I mean, I can't say they literally contributed nothing.  I mean, I may have learned something about their structure and how that would -- but in terms of the comparability for U.S. operations and having -- and granting rights to the patents-in-suit, these were the 13.

BY MR. HARBER:

Q.    In terms of coming up with a reasonable royalty rate, these are the 13 that you relied on?

A.    That's right.  I used 13.

Q.    And so for these 13 agreements, you don't know what any of the parties' projections or expectations were about the products that would be covered by these agreements, correct?

A.    Again, I think there was some of that with respect to the Providence agreement.  I don't remember seeing it for the others.

Q.    Do you agree that it's safe to assume that the parties to these agreements did not expect the covered products to be as

Page 153

commercially successful as Moderna's COVID
vaccine?

A.    I would not agree with that at all
because many of these have -- you don't negotiate
tiers that you believe there is no probability of
reaching those tiers.  That's just a waste of
everybody's time.  There are quite a number of
licenses in these 13 reports that have tier
structures that only get triggered at $2 billion
in annual sales, $4 billion in annual sales.  So
those are certainly -- it's contemplated those
could get to those kinds of levels.

Q.    In your view, that the tier
structure is based on the expectations for the
product covered by the agreement?

A.    Well, the tier structure is dictated
or influenced by at least potential outcomes that
need to be taken into consideration in the
negotiation and in the license.

Q.    For -- for the specific subject of
the license that's being contemplated, correct?

A.    Yes.  And the license covers what it

4/17/2025          Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al.     Christopher A. Vellturo, Ph.D.
Highly Confidential

Page 154

covers.

Q.    That wouldn't be the same with all licenses?

A.    "It" being the commercial opportunities, the potential?

Q.    The tier structure.

A.    The tier structures are not the same, but what I do know is that the effective royalties -- when you account for the tier structures, the effective royalties actually don't vary that much.

Q.    The -- the potential commercial opportunities affect the tier structure the parties will agree to; is that what you are saying?

A.    To some degree, yes.

Q.    And -- but other than what is in the tier structure in these agreements, you have no information about the projections or expectations of the parties to any of those agreements?

A.    Again, as I noted several answers ago, there is some information to that effect

4/17/2025          Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al.    Christopher A. Vellturo, Ph.D.
Highly Confidential

Page 157

this report, Exhibit 1, you had not looked at any information about Providence's profit or revenue expectations?

MS. WACKER:  Objection to form.

A.    I might have -- I might have seen them at that point.  I don't remember.

BY MR. HARBER:

Q.    You don't address them in this report, correct?

A.    Right.  Other than how they would be reflected in the terms of the agreement itself.

Q.    What do you mean by that?

A.    Well, that agreement has tiers.

Q.    Other than the numbers in the tiers, when forming your opinions in this report, Exhibit 1, you didn't have any information about Providence's profit or revenue expectations?

A.    Well, that -- that's not consistent with the answer I gave you.  I didn't -- I don't include any of that in this discussion in my report, but I may have seen it while I was doing my work.  It wasn't germane to what I was doing.

4/17/2025          Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al.    Christopher A. Vellturo, Ph.D.
Highly Confidential

Page 158

Q.    It's not something you considered in forming the opinions that you're expressing in this report?  Let me ask it a different way.

It's not something you relied on in forming the opinions expressed in this report?

A.    At the time I wrote this report, that's true.

Q.    At the time that each one of these 13 agreements was signed, no commercial product had been developed by the parties that used any of Genevant's patents; is that correct?

A.    I believe that's right.

Q.    And at the time these agreements were signed, there was no commercial product that had yet been developed that used the patents-in-suit, correct?

A.    By anybody?

Q.    By the parties to these 13 agreements.

A.    Oh.  I believe that's right.

Q.    And when these 13 agreements were signed, it was not known whether the licensor --

4/17/2025  Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al.  Christopher A. Vellturo, Ph.D.
Highly Confidential

Page 159

I'm sorry -- the licensee -- let me ask it again.

When these 13 agreements were signed, it was not known, by either the licensor or the licensee, whether there would be a commercial product developed that used the patents-in-suit?

A.  Right.  The terms of the agreement would apply in the event one were developed.

Q.  But at the time they signed these agreements, they didn't know that one way or another?

A.  Right.  The agreement applies if and once a commercial product is introduced.  But they didn't know that was certainly going to happen.

Q.  And they didn't know if the patents-in-suit would be used in any of those products if one was developed?

MS. WACKER:  Objection to form.

A.  I don't know that.

BY MR. HARBER:

Q.  One way or another, you don't know

Page 181

apportioned rates nor the effective rates are

actually in any of these 13 agreements, right?

A.    Those numbers don't appear in the

agreement, but the terms that generate those

numbers do.

Q.    And if you go -- flip back to

page 97.  I want to look at paragraph 217.  You

say here that you were calculating an effective

royalty rate "for a given level of covered

product success (such as the success experienced

by Moderna)."

A.    Yes.

Q.    What do you mean by that?

A.    Right.  So to compute an effective

royalty rate that has both a running royalty and

fixed components, one needs to project out an

expected royalty base and then perform the

exercises I did in my Exhibit 7.

And what I use there is I used how

that license and those terms, if applied to the

actual -- the actual sales of Moderna's product,

how that would have applied.

4/17/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al.    Christopher A. Vellturo, Ph.D.
Highly Confidential

Page 182

Q.    And when you say "fixed components," you're referring to the milestone payments that are in these agreements?

A.    Well, there are some milestone -- at least I believe there are some unconditional upfront payments, too.  So those aren't milestones.

Q.    So to get your effective royalty rates, you took the upfront payments and the milestones that were in each of those 13 agreements and you converted them to a percentage?

A.    Along with payments of the running royalty?

Q.    Correct.

A.    Right.

Q.    And in order to, as you said, convert those fixed payments into a percentage, you have to have a sales expectation, right?  You have to have a royalty base?

A.    That's right.

Q.    And the magnitude of the sales

Page 188

Q.    But for these licensees, you agree that we should use the best case scenario that's in the agreements?

MS. WACKER:  Objection to form.

A.    I -- who said anything about best? I didn't say --

BY MR. HARBER:

Q.    The highest tier in the -- in the agreement.

A.    Yeah, but that's not necessarily a best forecast.  I mean, a number of these licenses are for cancer therapies.  And while the number of units there would be much smaller, the -- the realized revenues would be wildly higher.

Q.    You don't have a single piece of evidence of what any of these licensees expected in terms of specific revenues other than what's on the face of the agreement?

A.    I don't have any actual data --

MS. WACKER:  Objection to the form.

A.    I don't have any actual data because

4/17/2025        Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al.    Christopher A. Vellturo, Ph.D.
Highly Confidential

Page 189

no one here was able to use these licenses to do anything in terms of commercial product.

BY MR. HARBER:

Q.    I'm talking about their expectations.

A.    I couldn't see their expectations.

Q.    And you didn't consider that?

A.    I couldn't see them.

Q.    I want to look at Exhibit 7.4.  So this is where you set out the -- what you have here as the calculation of the effective rate for the 2021 Gritstone agreement.

Do you see that?

A.    With Genevant, yes.

Q.    And the -- do you -- I can take you through this.

But do you recall that Ms. Lawton pointed out an error in the percentage rate that you're using for this agreement in this table?

A.    No.

Q.    All right.  The -- I want to take you to the royalty payment provision, which is

Page 265

can it do that?  It can.  It doesn't do that in my analysis because that's already baked into my assessment of the other licenses.

Q.    And you're relying on Dr. Prud'homme for that assessment of the non-infringing alternative for the other licensees?

A.    That sounds right.

Q.    But I'm asking you as a general matter.  All else being equal, will the absence of non-infringing alternatives increase the rate that a licensor is willing to -- licensee is willing to pay?

A.    No, not necessarily.

Q.    Why not?

A.    There can be instances where the -- the prospective licensee is really the only effective way to gain access to the market.  And so there, you've got a bilateral bargaining problem.  And there are just -- there are too many variables in that to determine what direction that goes in.

Q.    What if you have more than one