# Exhibit 5

Highly Confidential – Outside Attorneys' Eyes Only

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH, <br><br> Plaintiffs, <br><br> v. <br><br> MODERNA, INC. and MODERNATX, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) C. A. No. 22-252 (MSG) <br><br> **JURY TRIAL DEMANDED** |
| MODERNA, INC. and MODERNATX, INC., <br><br> Counterclaim-Plaintiffs, <br><br> v. <br><br> ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH, <br><br> Counterclaim-Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) |

**REPLY EXPERT REPORT OF CATHARINE M. LAWTON**

**March 21, 2025**

licensor and the licensee negotiate within the bargaining range, which is defined by the licensor's minimum willingness to accept [WTA] and the licensee's maximum willingness to pay [WTP]."[469]

(v) Moderna *Expected* That Any Delay Would Cause it to Lose Billions in Profits

159. Contrary to the foregoing, which shows that Dr. Vellturo has not identified any specific purported NIA, *assuming* Moderna did, in fact, have "potential alternatives" as of May 31, 2020, a key question is what was Moderna's *expectation* regarding the time and cost to develop and implement any such "potential alternative"? The evidence in this case establishes that under any "potential alternative," Moderna's launch of mRNA-1273 would have been delayed,[470] and in mid-May 2020, Moderna projected that a 3-month delay would result in it foregoing billions in profits.[471]

160. Dr. Vellturo, however, presents no analysis of Moderna's *actual* profits v. Moderna's *projected* profits with a purported "potential alternative." As a result, I have undertaken the analysis that Dr. Vellturo opted not to do, namely, "comparing the patented invention to its next-best available alternative(s) . . . [in order to] discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward[.]"[472]

161. My analysis is based on Moderna's expectations at the time of the May 31, 2020 hypothetical negotiation under the following three (3) scenarios:

---

[469] J. Gregory Sidak, "Bargaining Power and Patent Damages," *Stanford Technology Law Review*, Vol. 19, No. 1, 2015, p. 10, *available at* https://law.stanford.edu/wp-content/uploads/2017/10/19-1-1-sidak-bargaining-power-and-patent-damages_0.pdf.
[470] Lawton Opening Report, ¶¶ 681-682.
[471] Lawton Opening Report, ¶ 703b) ( *citing See, e.g.,* MRNA-GEN-02645641-677, at 660 (Hoge Deposition Exhibit No. 45 – "Board Discussion," *Moderna,* May 15, 2020, Slide 20 of 37). May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 411:1-412:4 ("Q. And so the conclusion here is that by delaying three months, you would have lost between 2 and $5 billion? A. 'By delaying three months, you would have lost between 2 and $ billion' . . . I think directionally we would expect what this analysis is doing in May of 2015, purely outside-in, says about what you said, which is $2 billion difference if you were not a – if you don't start making the vaccine for distribution. Q. 2 to $5 billion? A. I don't think that that's what it says. I don't think that it says 5. I think the 5 relates to the probability of success of execution. That's a technical and scientific assessment. It has nothing to – it's a probability scenario, nothing to do with when you started. So I don't believe it's accurate to say 2 to 5 related to timing. I think it is accurate to say the difference between 3.2 and 5.2 as relates to timing. Probability of success on execution, like actually can you solve the engineering problems, is independent of when you started the work. . . .").
[472] *Grain Processing Corp. v. Amer. Maize Prods. Co.,* 185 F.3d 1341, 1351 (Fed. Cir. 1999).

Highly Confidential – Outside Attorneys' Eyes Only

- **Scenario 1 – Moderna's 3-Month Delay Projection**: This scenario is based on Moderna's *expected* reduction ▮▮▮▮▮ based on an assumed 3-month delay—as reflected in its May 15, 2020 Board presentation.  In particular, Moderna's expected U.S. unit volume of 646 million (or 1 billion worldwide) doses ▮▮▮▮▮ is reduced to ▮▮▮▮▮ in the event of a 3-month delay.  Scenario 1 shows that as of May 31, 2020, Moderna expected a loss of revenue, gross profit and operating income of ▮▮▮▮▮ and $6.91 billion, respectively. Moderna's expected loss of operating income is shown in **Chart 3.3A**,[473] below.

- **Scenario 2 – Projection Based on a 2-month Delay Using J&J's U.S. Market Share as a Proxy**: Scenario 2 tests the reasonableness of Scenario 1 using J&J's *actual* U.S. market share as of April 2021—achieved with a launch that was 2 months later than Moderna's *actual* launch, and before the blood clotting issue caused J&J's administered doses to plummet in May 2021 and subsequent months.  Under a 2-month delay scenario, and assuming Moderna achieved J&J's 11.0% market share, Moderna's loss of revenue, gross profit and operating income is ▮▮▮▮▮ and $9.37 billion, respectively.  Moderna's expected loss of operating income is shown in **Chart 3.3B**,[474] below.

- **Scenario 3 – Projection Based on an 18-month Delay Using Novavax's U.S. Market Share as a Proxy**: Scenario 3 also tests the reasonableness of Scenario 1 using Novavax's *actual* U.S. market share—achieved with a launch that was 18 months later than Moderna's *actual* launch.  Under an 18-month delay scenario, Moderna would not have been able to achieve any market share, and Moderna's loss of revenue, gross profit and operating income is ▮▮▮▮▮ and $12.93 billion, respectively.  Moderna's expected loss of operating income is shown in **Chart 3.3C**,[475] below.

---

[473] Schedule 1.2-Reply.
[474] Schedule 1.3-Reply.
[475] Schedule 1.4-Reply.

141

Highly Confidential – Outside Attorneys' Eyes Only



**CHART 3.3A**



**CHART 3.3B**

142



**CHART 3.3C**

**(h) Differences Based on the Stage of Development at the Time of License Negotiation**

162. Dr. Vellturo also does *not* analyze the economic differences between the Moderna *hypothetical* license negotiated on the "doorstep of commercialization"[476] and the Genevant agreements (Providence and the other Historical Comparable Agreements) which were negotiated at an early stage of development.[477] More than 20 years ago the Federal Circuit stated: "comparisons to other

---

[476] *See, e.g.,* Lawton Opening Report, ¶¶ 828 ("Patent "hold-out" can also be an effective strategy for biotech start-ups that are operating in the 35 U.S.C. § 271 (e)(1) safe harbor— because it allows the company to conserve cash. While the start-up may avoid license fees and milestones for some period of time, if and when it arrives at the "doorstep of commercialization," the license fee will be much higher, assuming a license is available at all."); 835.

[477] *See, e.g.,* Lawton Opening Report, ¶ 835 ("Second, the circumstances of the hypothetical negotiation—in this highly unusual "on the doorstep of commercialization" scenario—are far different than the typical early-stage licensing in the biotech industry generally, which is consistent with Genevant's licensing agreements."). *See also, e.g.*, *ModernaTX, Inc. and Moderna US, Inc. v. Pfizer Inc., BioNTech SE, BioNTech Manufacturing GmbH, BioNTech US Inc.*, Expert Report of James E. Malackowski dated February 23, 2024, p. 145 of 172 ("….early stage technologies [] typically have lower royalty rates than licenses entered just prior to or

143

(see III.A.4.b)). In this section, I briefly outline the evidence that forms the basis of my effective royalty rate calculation.

### (a) Summary of Providence's Expectations as of May 11, 2020

191. Publicly available evidence demonstrates that in March 2020, Providence's plan was to develop a "made-in-Canada" COVID-19 vaccine for Canadians. It also establishes that Providence's expectations were modest. For example, as of May 2020, Providence had submitted a COVID-19 proposal to the Canadian Government requesting $35 million in connection with supplying 5 million doses by mid-2021 "for use in Canada."[527] In February 2021, Providence executed a contract with the province of Manitoba to supply its vaccine for $18/dose.[528] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[529] Providence's ▮▮▮▮▮ projection was comprised of ▮▮▮▮▮

---

[527] Mike Blanchfield, "Canadian company urges human trials after COVID-19 vaccine results in mice," *National Post*, August 5, 2020, *available at* https://nationalpost.com/pmn/news-pmn/canada-news-pmn/canadian-company-urges-human-trials-after-covid-19-vaccine-results-in-mice ("Providence Therapeutics says it needs federal funding to move forward, but it has not heard back from the Trudeau government since **May [2020], the month after submitting a $35-million proposal to conduct first-stage human trials. Providence has told the government it could deliver five million doses of its new vaccine by mid-2021** for use in Canada if it were able to successfully complete human testing, but it has heard nothing." (emphasis added)). *See also* Lawton Opening Report, ¶ 981h).

[528] Ian Froese, "Manitoba premier defends deal to buy Canadian-made vaccines that may not be ready this year, Brian Pallister says $18 per dose price better than the 'rumour' he heard about Ottawa's contracts," CBC News, February 17, 2021, available at https://www.cbc.ca/news/canada/manitoba/brian-pallister-covid19-news-conference-manitoba-1.5916931. See also Josh Aldrich, "Deal struck for Winnipeg facility to produce COVID-19 vaccine," The Winnipeg Sun, September 14, 2021, https://winnipegsun.com/news/news-news/deal-struck-for-winnipeg-facility-to-produce-covid-19-vaccine ("There was some early momentum for the prospect of a domestically produced vaccine option when the initial deal with Manitoba was announced, but the federal government was not interested and no other provinces bit.").

[529] GENV-00254324-348, at 337 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

162

███████████████████████, and ██████████████████████████████.[530] ██████████ ██████████ presentation also included projections of the following ████████████:

- ████████████████████████████████████████████████████
- ████████████████
- ████████████████████████████████████████████████████
- █████████████████████████████████████
- ████████████[531]

192. The ████████████████████████████████████████████████████████████████████ ██ May 11, 2020 Providence agreement.  For example Providence license § 4.3 "Development Milestone Payments" includes a ██████████ "Development Milestone" payable upon "Initiation of dosing of First Pivotal Study" "Prior to License Conversion, if any" and an ████████ "Development Milestone" payable upon "First Marketing Authorization Approval application submission in any Major Market other than the United States" "Prior to License Conversion, if any."[532]  The ████████████████ presentation projected that the █████████████ "Development Milestones" would be ████████████████████████████.[533]

193. The Providence license defines "████████████████████████████████████████ ████████████████████████████████████████████████████████."[534]  As such, these projected ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████, (*i.e.*, one

---

[530] GENV-00254324-348, at 337 ("mRNA Vaccines for COVID-19," Providence COVID-19 Vaccine Task Force (VTF), March 9, 2021, Slide 14 of 25) ("Plan for 2021 PTX-COVID-19-B"), see also at 327, 336, and 342 (Slides 4, 13, and 19 of 25)

[531] GENV-00254324-348, at 342 ("mRNA Vaccines for COVID-19," Providence COVID-19 Vaccine Task Force (VTF), March 9, 2021, Slide 19 of 25) ("2021 Program Budget (25 million doses & clinical trials)")

[532] GENV-00022307 (May 11, 2020 Genevant Sciences GmbH and Providence Therapeutics Covid Inc. License and Development Agreement), Clause 4.3, pp.20-21.

[533] GENV-00254324-348, at 342 ("mRNA Vaccines for COVID-19," Providence COVID-19 Vaccine Task Force (VTF), March 9, 2021, Slide 19 of 25) ("2021 Program Budget (25 million doses & clinical trials)")

[534] GENV-00022307 (May 11, 2020 Genevant Sciences GmbH and Providence Therapeutics Covid Inc. License and Development Agreement), Definitions, p.8 ("'Major Market' means each of Canada, France, Germany, Italy, Spain, the United Kingdom, the United States and Japan.").

163

Highly Confidential – Outside Attorneys' Eyes Only

"Major Market" other than the United States). Conversely, Providence's ▮▮▮▮ are *not* consistent with ▮▮▮▮ "Development Milestone" payable upon "First Marketing Authorization Approval in the United States." [535] In addition, this reflects Providence's plan from the beginning, which was to develop a "made-in-Canada" COVID-19 vaccine for Canadians, which was discussed in detail above (*see* III.A.4.b)).

### (b) Effective Royalty Rate Based on Providence's April 2020 Expectations: 5 million doses

194. This effective royalty rate calculation is based on Providence's ▮▮▮▮ Schedules 3.1-Reply and 3.2-Reply present my calculations of the effective royalty rate for the May 11, 2020 Genevant-Providence agreement based on:

- Providence's ▮▮▮▮

- Cost Projections in Providence's March 9, 2021 presentation, with manufacturing costs per dose scaled to the projected doses, assuming that other projected costs would be fixed in relation to the projected unit volume,

- I apply the ▮▮▮▮ (and related milestone payments) associated with the exclusive license terms,[536] and,

- Alternatively, I have performed the same calculations applying the ▮▮▮▮ (and related milestone payments) associated with the non-exclusive license terms.

195. To highlight the magnitude of the error in Dr. Vellturo's effective royalty rate calculation for Providence, I have prepared two (2) additional analyses that *apply* Providence's royalty rate to *Moderna's* expectations as of May 31. 2020.

- **Providence Effective Royalty Rate as a Percentage of Revenue**: Schedule 3.1-Reply also presents my further calculation that *applies* the *Providence* effective royalty rate as a percentage of Providence's projected revenues, to *Moderna*'s projected price of USD $30 per dose as of the May 31, 2020 hypothetical negotiation.

- **Providence Effective Royalty Rate as a Profit Split**: Schedule 3.2-Reply also presents my further calculation that *applies* the *Providence* effective royalty rate based on the profit split that is determined based on the Genevant licensing compensation as a percentage of

---

[535] GENV-00022307 (May 11, 2020 Genevant Sciences GmbH and Providence Therapeutics Covid Inc. License and Development Agreement), Clause 4.3, pp.20-21.

[536] I do *not* apply Dr. Vellturo's "no valid claims" adjustment because it was a term in a license agreement negotiated under Moderna's IPR overhang, Dr. Vellturo cites no evidence of the parties expectations related thereto, and for the reasons discussed in III.A.5.f.2.

164

Highly Confidential – Outside Attorneys' Eyes Only

Providence's projected gross profit and operating profits, applied to Moderna's projected gross profit and operating profit rates per dose as of the May 31, 2020 hypothetical negotiation.

196. Whereas Dr. Vellturo concluded that the Providence effective royalty rate (before apportionment)—based on Moderna's $14.2 billion *actual* mRNA-1273 sales with a U.S. nexus—was ▇,[537] my analysis (based on Providence's ▇▇▇, before apportionment) shows that the Providence effective royalty rate—based on Providence's ▇ ▇▇▇.[538] This highlights the magnitude of the error (*i.e.*, roughly a 3.7X to 11.2X difference) in Dr. Vellturo's effective royalty rate calculations - before consideration of other required adjustments including at least the following: (1) an *upward* "certainty adjustment" to account for the assumption of validity and infringement in the Hypothetical Negotiation paradigm (to account for real world uncertainty relating to validity and infringement), (2) an *upward* adjustment to account for the overhang of widespread infringement that depressed Plaintiffs' licensing rates, and (3) an *upward* adjustment to reflect the differential pharmaceutical stage of development and the fact that Moderna was on the "doorstep of commercialization" as of May 2020 whereas Providence was at a pre-clinical stage.

        (c)    **Effective Royalty Rate Based on Providence's March 2021 Expectations: 25 million doses**

197. This effective royalty rate calculation is based on Providence's March 2021 expectation of 25 million doses. This analysis is the same as the 5 million dose scenario described above, adjusted to reflect the higher dose volume, and is set forth in Schedules 4.1-Reply and 4.2-Reply.

198. The magnitude of the error in Dr. Vellturo's effective royalty rate calculation under the 25 million dose scenario is also material. Whereas Dr. Vellturo concluded that the Providence effective royalty rate (before apportionment)—based on Moderna's $14.2 billion *actual* mRNA-1273 sales with a U.S. nexus—was ▇,[539] my analysis shows that the Providence effective royalty rate (based on ▇▇▇, before apportionment)—based on Providence's March 2021 expectations—ranges from ▇▇.[540] This highlights the magnitude of the error (*i.e.*, a

---

[537] *See e.g.*, Vellturo Exhibit 7.2.
[538] Schedules 3.1-Reply and 3.2-Reply.
[539] *See e.g.*, Vellturo Exhibit 7.2.
[540] Schedules 4.1-Reply and 4.2-Reply.

Highly Confidential – Outside Attorneys' Eyes Only

roughly 2.6X to 5.6X difference) in Dr. Vellturo's effective royalty rate calculations—before consideration of other required adjustments including at least the following: (1) an *upward* "certainty adjustment" to account for the assumption of validity and infringement in the Hypothetical Negotiation paradigm (to account for real world uncertainty relating to validity and infringement), (2) an *upward* adjustment to account for the overhang of widespread infringement that depressed Plaintiffs' licensing rates, and (3) an *upward* adjustment to reflect the differential pharmaceutical stage of development and the fact that Moderna was on the "doorstep of commercialization" as of May 2020 whereas Providence was at a pre-clinical stage.

### (d) Conclusion based on Alternative Recalculations of Providence License Implied Royalty Rates

199. As can be seen, the above recalculations support implied running royalty rates ranging from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[541] – far higher than the implied royalties rate ranges calculated by Dr. Vellturo associated with the Providence license (i.e., ▮▮▮▮ ▮▮▮ before and after Dr. Vellturo applied his forward citation based adjustment)[542] – even without accounting for (1) an *upward* "certainty adjustment" to account for the assumption of validity and infringement in the Hypothetical Negotiation paradigm (to account for real world uncertainty relating to validity and infringement), (2) an *upward* adjustment to account for the overhang of widespread infringement that depressed Plaintiffs' licensing rates, and (3) an *upward* adjustment to reflect the differential pharmaceutical stage of development and the fact that Moderna was on the "doorstep of commercialization" as of May 2020 whereas Providence was at a pre-clinical stage.

200. Even without these required upward adjustments (that Dr. Vellturo does not account for) my recalculations based on Providence's expectations clearly demonstrate the extent to which Dr. Vellturo's methods of calculating effective royalty rates are unsound and fatally flawed.

201. I next discuss Dr. Vellturo's apportionment adjustments.

### c) Dr. Vellturo's Apportionment Adjustments

202. Dr. Vellturo's apportionment analysis starts with so-called "Benchmark Royalty Rates" that are both methodologically flawed and not reliably applied to the facts of this case, as described above.

---

[541] Schedules 3.1-Reply, 3.2-Reply, 4.1-Reply, and 4.2-Reply.
[542] Vellturo Rebuttal Report, Exhibit 7.2 (Dr. Vellturo's Providence License Unpack) and Exhibit 10 (Dr. Vellturo's "Historical Comparable Licenses PCA ‐ Apportioned Effective Royalty Rates).

166