# Exhibit 23

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


-----------------------------------x

ARBUTUS BIOPHARMA CORPORATION

and GENEVANT SCIENCES GMBH          Case No.

                    Plaintiffs,     22-252-MSG

     v.

MODERNA, INC. and MODERNATX, INC.,

                    Defendants.

-----------------------------------x

MODERNA, INC. and MODERNATX, INC.,

          Counterclaim-Plaintiffs,

     v.

ARBUTUS BIOPHARMA CORPORATION

and GENEVANT SCIENCES GMBH,

          Counterclaim-Defendants.

-----------------------------------x

HIGHLY CONFIDENTIAL


VIDEOTAPED DEPOSITION of

DANIEL G. ANDERSON, Ph.D.

Boston, Massachusetts


Reporter: Michael D. O'Connor, RMR, CRR, CRC


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

4/28/2025          Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
                                    Highly Confidential

Page 28

I'm just not quite sure.  I want to make sure I'm answering your question correctly.  Could you describe it more what you're...

Q.    Do you understand, for example, the Saravolac reference in this case uses detergent dialysis, right?

A.    Well, I have a section on the Saravolac reference in my report.  I'd be happy to go to that and refresh my memory.

Q.    I'm just wondering if you can remember -- and you can do that, feel free -- but whether you can remember any reference that uses detergent dialysis with mRNA?

A.    You said the Saravolac reference discusses detergent dialysis, and I would be happy to review that.  Remind me, maybe you can give me the reference and I could look at it.

Q.    Well, you understand the Saravolac reference doesn't use mRNA, right?

MS. CARSON:  Objection to form.

A.    What do you mean "doesn't use"?  In the examples?

Q.    Yeah.

A.    Well, you know, I was asked to review Saravolac through the lens of the '651

Page 29

in particular.  And it's my understanding, and I remember that the '651 did not use messenger RNA.

So, I mean, it kind of depends on your perspective what you mean by "doesn't use it."  I believe it does mention it.

Q.     I think it does mention mRNA; that's what you're saying?

A.     Yes.

Q.     No, I agree.  I'm just wondering if you know of any publications that actually use that method with mRNA, like as an example?

MS. CARSON:  Objection to form.

A.     So you're asking me is there a publication that references the '171 method of detergent dialysis?

Q.     That uses that method with mRNA.

MS. CARSON:  Objection to form.

A.     I mean, I don't -- I can't speak to all of the articles that have been published and what they reference.  So, you know, I'd have to do some more analysis to refresh my memory on what the detergent dialysis method is, and then look at these references with that in mind to answer your question.

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 30

Q.    You haven't done that analysis yet?

A.    I have not reviewed the detergent dialysis method of the '171, and then subsequently gone on to look for references that use that same method.

Q.    What about the Semple '278 method? You discuss it on, for example, Page 43 of your report.

So have you done any analysis to find any references that use that method with mRNA?

MS. CARSON:  Objection to the form.

A.    When you say "that method," what specifically are you referring to?

Q.    The ethenol drop method and Semple '278.

MS. CARSON:  Same objection.

A.    Well, I mean, again, I'd want to re-review Semple '278, the method in this, and then go and look for references to determine whether or not those use the exact same method, and I haven't yet done that analysis.

Q.    You haven't done the analysis to

Page 31

see whether the Semple '278 method has been used to encapsulate mRNA, correct?

MS. CARSON:  Objection to form.

A.      So what I was asked to do was look at these patents through the lens of the '651 with that standard in mind.  And so I've gone on to do an analysis of how -- when a person of skill in the art would interpret or learn from Semple '278 with that in mind.

And so, you know, this is all described in my report.

Q.      I understand.  I don't -- I'll ask you questions about that analysis.  I'm just making sure that you haven't done this exercise of actually finding a reference that uses the Semple method to encapsulate mRNA.  I don't think that's in your report, but I just want to make sure.

A.      Well, there are a lot of references cited in my report.  I'd want to refresh my memory on all of them.  I believe it's attached to the back.  This is a long report, and there's a lot of stuff.

Q.      There's a lot of stuff.

A.      And I did recall looking at these

Page 32

references and thinking about how they could, you know, be interpreted.

And so, you know, I guess I'd like to refresh my memory honestly.

Q.    Okay.  But without refreshing your memory about all the references in your report, you can't think of an instance where Semple '278 was used to encapsulate mRNA?

A.    Well, I mean, you know, the Semple reference -- why don't we pull it up so I can look at it, so I can refresh my memory.  I mean, there are a lot of details in that reference; and, you know, the question is, how are those details used or recited by others. I'd really want to look at that further.

If you could hand me that, the Semple '278.

Q.    We'll take a look at it.

A.    Okay.

Q.    But is it relevant to your opinions whether other literature have used the Semple or Saravolac methods to encapsulate mRNA?

MS. CARSON:  Objection to form.

A.    You know, I don't believe so.  You

Case 1:22-cv-00252-JDW    Document 667-23    Filed 12/16/25    Page 8 of 79 PageID #: 51059

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 33

know, first and foremost, in my opinion, as is written in my report, and we should go to that section with respect to the '651.  Sorry, it takes a while to sort through this.

Go to Section 489.  There are a number of references that, you know, these four references, in my opinion, anticipate or make obvious the '651, and I've done an analysis that's captured in my report, you know, of each of these.

Q.    Good.  We'll talk about that analysis.

A.    Okay.

Q.    Are you familiar with the 1.550 formulation that's used in Onpattro?

A.    The 1 point --

Q.    1.5 percent PEG, 50 percent cationic lipid.

A.    I have some familiarity with Onpattro, but I don't -- I guess I would need to understand what your question is.

Q.    I'm just wondering if you are familiar with the formulation of Onpattro.

A.    Well, I was not asked to consider that for this case, and, as a scientist, I have

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 52

A.    I believe that Saravolac anticipates the '651 patent, including this claim.

Q.    And you understand that Saravolac has to enable the POSA to practice the claim in order to anticipate it, correct?

A.    So, you know, the way in which I did my analysis is described in Paragraph 59. It's described here.

I was asked to analyze the prior art in light and through a lens of the '651. And so, I have not provided an opinion on enablement of the '651. But I've been asked to analyze the prior art through the lens of the '651; and in the case of encapsulation, I've done that here.

Q.    Okay.  So in that analysis, you understand that the prior art has to enable the POSA to practice the claims in order to anticipate them.  You understand that, right?

A.    Well, I'm not a lawyer, and I could go to the section on enablement that describes my understanding of the rules that I've applied.  That's in the front end here.

Q.    So Paragraph 23, for example?

Page 53

A.    Yes.

Q.    It says, "The prior art should enable one of skill in the art to practice the claimed invention," right?

A.    So, specifically what it says in the section is:  "I also understand that a prior art reference is enabling where it provides a similar disclosure to the specification of the patent at issue."

And so, what I've done is tried to understand the disclosure of the patent at issue, which in this case is the '651, and looked at the prior art in that way.

Q.    Okay.  So you have not independently assessed whether the POSA could actually practice the 90 percent encapsulation limitation just based on Saravolac?

A.    I told you, I have independently analyzed Saravolac in light of the '651, and specifically that this prior art reference provides a similar disclosure to the patent at issue, which in this case is the '651.

Q.    Okay.  So the basis for your opinion about enablement is that the disclosure is similar to the '651 patent; is that right?

Page 54

MS. CARSON:  Objection to form.

A.    Well, again, I'm not offering an opinion on enablement of the '651, but when I evaluate whether or not a prior art reference is relevant, I'm applying an analysis, or I look to see whether or not it provides a similar disclosure to the patent at issue.

Q.    You understand that the '651 patent discloses a different method than Saravolac, right?

MS. CARSON:  Objection to form.

A.    Well, we should go to the '651. Could you hand me the '651 patent?

Q.    We can take a look at the '651 patent.  But just at a high level, you understand that the disclosure of the methods are not the same?

A.    Well, I mean, if you're asking me to compare methods, I'm happy to do that.  I think what I'd -- I'd like to have the '651 in front of me so I can make my point.

Q.    Okay.  We can look at the '651.

MR. MAHAFFY:  Mark the '651 patent as Exhibit 3.

(Document marked as Exhibit 3

Page 58

place to answer your question is around starting paragraphs 249, where we talk about -- and then, actually, moving on to 254, which is "Saravolac specifically describes encapsulation efficiency up to 80 percent, and also describes" -- "discloses that unencapsulated nucleic acid can be removed from the formulation, which would increase the percent nucleic acid above 80 percent."

Q.    Okay.  And so, just to confirm, your opinion is that the method in Saravolac, everything you say here, could be used to achieve 70 percent, 80 percent, 90 percent full encapsulation of mRNA?

MS. CARSON:  Objection to form. Mischaracterizes the witness' testimony, and asked and answered.

A.    So, again, first, in my analysis, I applied a standard that's described in my report where I use the patent at issue to understand the disclosure necessary, you know, the '651 also discloses that you can remove unencapsulated nucleic acid.

Saravolac also discloses that you can remove unencapsulated nucleic acid, and

Page 59

that's a way to increase encapsulation efficiency.

Q.    Okay.  Are encapsulation results obtained with plasmid DNA predictive of encapsulation results using mRNA?

MS. CARSON:  Objection to form.

A.    Well, again, for my analysis, I applied the same standards.  So I looked at the '651 patent to understand the disclosure.  The '651 patent mentions mRNA once in the specifications.

So, by that standard, Saravolac would.

Q.    Sorry.  Okay.  My question wasn't about Saravolac or legal standards.

A.    I'm sorry.

Q.    It's a scientific question.

A.    Okay.

Q.    I'm just asking scientifically, can results with plasmid DNA predict results of encapsulation with mRNA?

MS. CARSON:  Objection to form. Incomplete hypothetical.

A.    So you're asking me to not do my analysis, which is rather, as a scientist,

Page 70

MR. MAHAFFY:  I will withdraw my question.

Q.    Your counsel is right.  This paragraph is not about optimization.

You don't offer any opinions about how Dr. Heyes should have optimized his methods, right?

MS. CARSON:  Objection to form.

A.    Well, it depends on what you mean by "optimize."  I think one way to optimize your methods is to follow the recipe, and I don't feel that he followed the recipe.

Q.    Okay.  Can we go to Paragraph 62 of your report, of your reply report.

A.    Yeah.

Q.    Near the bottom.  It says "Additionally a POSA."

Do you see that?

A.    I do.

Q.    It says:

"Additionally a POSA knowing of these characteristics of mRNA prior to 2002 would have accounted for them in practicing the methods of the prior art."

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 71

Do you see that?

A.    I see that sentence.

Q.    How would a POSA have accounted for those differences in practicing the prior art?

A.    I've got to read the rest of the paragraph, at least.

Q.    Please do.

A.    Could you repeat your question, please?

Q.    How would the POSA have accounted for those characteristics of mRNA in practicing the methods of the prior art?

MS. CARSON:  Objection to form.

A.    Well, this is a -- I mean, the point of this paragraph is to say that the properties of mRNA and DNA have been studied for quite a while.  A POSA would understand as of 2002 that, you know, DNA and mRNA have certain properties, and would account for differences when they're working with them, if there were any.

Q.    How?

A.    It would depend on what they're trying to do.

4/28/2025                Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 72

Q.    You don't have an opinion about how the POSA would have changed their encapsulation technique to account for mRNA?

MS. CARSON:  Objection to form.

A.    My opinions are captured in the report.  So to the extent I have an opinion on it, it's in the report.

Q.    And if it's not in the report, you don't have an opinion on it?

A.    Well, my opinion is as of the date of the report.

I mean, again, I was doing my analysis through this lens of the '651, and, you know, applying that standard to my analysis of the prior art.

Q.    Okay.  But you can't identify even one way in which the POSA would have accounted for the characteristics of mRNA in practicing the methods of the prior art?

A.    I mean, again, I was using the lens of the '651.  You know, there are no examples with messenger RNA in that patent, and so I applied that same standard when I analyzed the prior art, as I was instructed to do so.

Q.    Okay.  Go to Paragraph 68 of your

Page 94

of encapsulation energy for different types of nucleic acid?

A.    No.

Q.    That's not a concept you've seen in the literature?

A.    Encapsulation energy?  I don't recall seeing that before.

Q.    Okay.  Is it your opinion that it would have been obvious for the POSA in 2002 to use mRNA?

MS. CARSON:  Objection to form.

A.    My opinions on obviousness are captured in the report.  I do have a section on mRNA we could go to.

Q.    That's fine.  If you need to go to your report to answer that question, you can.

A.    Well --

MS. CARSON:  Objection to form.

A.    -- again, I'm doing this analysis from a certain perspective with certain instructions, and those are captured in my report.  I do have a section on mRNA for the '651, and also for the molar ratio patents.  I'm happy to review if it's helpful.

Q.    If you need to review, you can to

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 95

answer my question.  My question is just whether in 2002 your opinion is that the POSA would have found it obvious to use mRNA?

MS. CARSON:  Objection to form, and asked and answered.

A.    Well, again, my task here is to perform an analysis of certain patents from the perspective of someone looking through the lens of the '651, so that's the analysis that I've done with respect to obviousness.

Q.    Okay.  So your analysis with respect to the obviousness of whether to use mRNA was through the lens of the '651 patent?

A.    Yes, and the molar ratio patents.

Q.    And how did those patents inform your obviousness analysis?

MS. CARSON:  Objection to form.

A.    Well, I mean, that's captured in my report.  I'm happy to go to the sections on obviousness and review them.

Q.    I don't know where to point you to answer my question about how those patents informed your opinions.

A.    Well, it seems like a very broad question, because you're asking about all of

Page 96

the patents and how it informed my opinions. And so, I'm asking you to kind of focus it to certain patents or opinion areas or claims, or whatever, so I can be more specific.

Q.   Well, I'm asking -- I asked you that question, because you said that the '651 patent was informing your obviousness opinions, so I'm trying to understand how.

But, ultimately, my question was simply whether the POSA in 2002 would have been motivated to pursue an mRNA lipid formulation?

A.   Whether a POSA in 2002 would have been motivated to pursue an mRNA formulation.

Yes.  I mean, people have been working on mRNA for quite a while, and it was an interesting potential therapeutic for quite a while.

Q.   In 2002, was the field focused on nucleic acids other than mRNA?

MS. CARSON:  Objection to form.

A.   When you say "the field," what do you mean?

Q.   Scientific field.

A.   So all scientists working in gene therapy?

Page 97

Q.    Let's talk about delivery of nucleic acids for therapeutic purposes.  Was that field focused on nucleic acids other than mRNA?

MS. CARSON:  Same objections.

A.    Well, you know, we have been working on a variety of nucleic acid payloads over the years, including in 2002.  So I think there are a variety of nucleic acid payloads that were of interest and are still of interest.

Q.    Is it more complicated to encapsulated mRNA as compared to siRNA or plasmid DNA?

MS. CARSON:  Objection to form.

A.    I mean, it really depends on what you're trying to do and, you know, are you talking about polymers or lipids?  Small scale?  Large scale?  You know, it kind of depends on the details, but there are challenges with these technologies certainly.

Q.    Okay.  I'm talking about lipids with the lens of the POSA that you applied.

A.    Okay.  So from the perspective of one analyzing the '651.

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 98

Q.    So do you want me to ask the question again?

A.    Yes, please.

Q.    From that perspective, is it more complicated to encapsulated mRNA than siRNA or plasmid DNA?

MS. CARSON:  Objection to form.

A.    "More complicated."  So again, sort of the lens of the '651 to me takes a look at what was done in the '651, you know, how much mRNA work was done, how much DNA work was done.  And so, you know, there wasn't any mRNA work done in the '651.  So it's a little bit difficult to answer that generally.

But I think it really depends on what you're trying to do.

Q.    Okay.  Would you agree that in 2002, the POSA would have had little or no knowledge regarding encapsulation of mRNA?

A.    I don't know that I'd agree with that.

Q.    Why not?

A.    Well, there are even, you know, and I'd have to remember the dates, but people have been working with mRNA in encapsulated

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 99

states before 2000; and, you know, we all read a lot of papers, and my understanding is that a POSA has access to all of these materials.

Q.    But you would agree that as of 2002, the POSA would not have any understanding of how to encapsulated mRNA, fully encapsulated mRNA?

MS. CARSON:  Objection to form.

A.    Well, I'd have to review that issue.  I didn't look at -- look at all of the art.

As I said, there are even early polymeric examples with systems that I expect gave high encapsulation, but I can't recall the numbers off the top of my head.

Q.    Okay.  So, just so I'm clear, as part of your obviousness analysis and your anticipation analysis, you did not analyze whether the POSA as of 2002 would have an understanding of how to fully encapsulated mRNA?

MS. CARSON:  Objection to form.

A.    Well, so first, you know, as we were discussing, I would like to find that part.  You know, I'm not addressing the

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 100

definition of "fully encapsulated," and specifically, as I said in Paragraph 42 of my opening report, the term "fully encapsulated" doesn't have meaning for me exactly with the percent fully encapsulated.  But percent encapsulation does, and so I did my analysis from the perspective of someone looking at percent encapsulation as I understand it.

Q.    Okay.  So, let's put "fully encapsulated" to the side then, and make it easier so we're not talking about that.

A.    Okay.

Q.    As of 2002, would you agree that the POSA would have had no understanding of how to encapsulated mRNA?

MS. CARSON:  Objection to form.

A.    I would not agree with that. People had been working on messenger RNA prior to 2002.

Q.    Okay.  Paragraph 69 of your reply report.

A.    Okay.

Q.    So here you're talking about removal of unencapsulated nucleic acid, right?

A.    Opening report or reply report?

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 120

understand that it is possible to remove free
nucleic acid using a variety of methods, and
that's also described in the '651.

Q.    Different removal processes will
be more or less efficient in removing the free
nucleic acid?

A.    I'm sorry, what was your question?

Q.    Different removal processes will
be more or less efficient, is what you're
saying, of removing the free nucleic acid?

A.    Well, I'm just saying that the
methods applied can affect the outcome.

Q.    Okay.  Would a POSA have expected
the encapsulation process of the Semple article
to work with mRNA?

MS. CARSON:  Objection to form.

A.    So again, you know, I applied the
lens of the '651 and, looking at that level of
disclosure, used that level of disclosure for
my analysis of Semple.  And through that lens,
the answer is yes.

Q.    Okay.  But you wouldn't know that
but for the '651 patent?

MS. CARSON:  Objection to form.
Mischaracterizes the witness' testimony.

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 121

A.    So I did my analysis through that lens.  Now, I haven't tried to do a second analysis from a different perspective.

Q.    Okay.  So you haven't analyzed whether just standing alone the Semple article would have worked with mRNA?

A.    Well, I performed the analysis that I was asked to do, and that was through the lens of the '651.

Q.    And through the lens of the '651, that tells you that the Semple article will encapsulated mRNA at over 70 percent rates; is that right?

MS. CARSON:  Objection to form. Mischaracterizes the witness' testimony.

A.    You know, as I've said in my report, and, you know, maybe it's helpful to go to the section.  We have a whole section on the Semple article.

So starting at Page 74.  Here is where I do the analysis of the Semple article with respect to the claims of the '651 through the lens that I've described.  And, you know, in my opinion, the Semple article does anticipate, render obvious, the '651 doing that

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 122

analysis.

Q.    But you haven't done the analysis where you put the '651 patent to one side and just assess whether the Semple article itself, with the other art that exists at the time, would allow for high levels of mRNA encapsulation; that's not an analysis you did?

MS. CARSON:  Objection to form.

A.    So, again, I was asked to perform a certain task from a certain perspective, and that's what I did.

Q.    Okay.  In 2002, would it have been possible for the POSA to predict whether a given composition could encapsulated a given nucleic acid?

MS. CARSON:  Objection to form.

A.    Well, I mean, it really depends on what you're encapsulating and what you're using to encapsulate.

But again, in this case, I've applied a certain standard, which is this lens of the '651, to gauge the level of disclosure that would be needed for certain activities.

So, you know, I haven't -- I think you're asking kind of a broad question about

4/28/2025          Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 123

what someone in 2002 would, you know, be able to predict, and there are a lot of different things people had done in 2002.  It would really depend.  And, you know, the analysis here is really focused on the issues in my report.

Q.     So it would depend on the composition about whether you could predict whether a particular composition could encapsulate a particular nucleic acid?

MS. CARSON:  Objection to form.

A.     Well, encapsulation can be affected by the composition and the methods of encapsulation and temperature, and all kinds of other things.  The details can matter.  But in my analysis, I've applied a certain standard perspective.

Q.     Okay.  On page 158 of the Semple article, Figure 3, do you see that that is --

A.     I see that.

Q.     -- plotting -- and that's plotting the relationship between encapsulation and pH.

Do you see that?

A.     I do see that.

Q.     And so in 2002, would the POSA

Page 125

Q.    So in forming your opinions in your report, you didn't think through which parameters were routine to modify to improve encapsulation?

MS. CARSON:  Objection to form.

A.    Well, I thought about it from the perspective of someone looking through the '651, and a POSA of ordinary skill in the art.

Q.    Okay.

THE VIDEOGRAPHER:  That portion I didn't get his answer because of the mic, the ear mic.

MS. CARSON:  Sorry.

THE VIDEOGRAPHER:  If you could repeat.

A.    Could you ask it again?

Q.    My question was:  In forming your opinions in your report, you didn't think through which parameters were routine to modify to improve encapsulation?

MS. CARSON:  Objection to form.

A.    In forming my report, I analyzed the prior art through the lens of a POSA looking at the disclosure of the '651.  So that's the analysis that I did.

Page 127

is cholesterol, and the next would be the cationic lipid, and then the last would be the PEG.

Q.    So in 2008, so for the molar ratio patents, would that have been a reasonable starting point for the POSA to use for the further formulation work?

MS. CARSON:  Objection to form.

A.    Well, I think in 2008, a POSA had access to a number of references, and, you know, this is certainly one of them.

Q.    So would that formulation have been a starting point for the POSA in 2008?

A.    Well, I don't know that it would be a starting point, but it might be one on a list of things to consider doing.

Q.    Okay.  Can we go to Figure 2, which is back on page 157.

A.    Yes.

Q.    So the last sentence in that caption says, "The actual DODAP content in each sample was determined by HPLC."

Do you see that?

A.    Yes.

Q.    Are you familiar with the use of

Page 133

in vesicles or micelles, but it sound like they
needed to do some more analysis to...  They say
"probably exists," so it sounds like they were
going to do some more analysis to determine the
status.

Q.    Okay.  That's your complete
opinion about that section?

A.    Yeah.

Q.    Okay.  Can we go to Paragraph 61
of your reply.

A.    Sure.  Okay.

Q.    So you've got a table, this table
here, where you've got things highlighted in
red?

A.    Yes.

Q.    I want to make sure I understand
what you're conveying here.  The point you're
making here is that Saravolac '171, for
example, discloses mRNA, among other nucleic
acids; is that right?

A.    So as I said in Paragraph 61, it
says, "The table below shows mRNA/RNA
disclosures of the four patent/publications."

Q.    So would you say that the mRNA
disclosures are similar between Saravolac '171

Page 134

and the '651 patent?

A.    Well, I mean, it depends on what you mean.  They both, you know, I think I've tried to capture the sections of all of these articles and where they mention RNA different types, including messenger RNA.

Q.    Saravolac, your opinion is that it discloses mRNA sufficient to anticipate the '651 patent?

MS. CARSON:  Objection to form.

A.    Again, I've looked at Saravolac through the lens of the disclosure of the '651.  So I think if you have the disclosure of the '651 specification, then you have the disclosure of the Saravolac specification.  You can see certain similarities, but -- in terms of the amount of disclosure.  But this was the lens through which I did my analysis.

Q.    And through that lens, your opinion is that Saravolac sufficiently discloses mRNA to anticipate the '651 patent?

A.    Yes.

Q.    Okay.  And the disclosure in Saravolac is similar to the disclosure in the '651 patent; that's the point you're making

Page 135

here?

A.    Well, with respect to the discussion of messenger RNA, they both mention it in the specification.

Q.    Okay.  The Semple article does not specifically mention mRNA, correct?

A.    Well, it says RNA repeatedly, and probably the most widely known version of RNA is mRNA.  A POSA would know that.

Q.    Okay.  So when these documents talk about RNA, the POSA would understand that -- would sort of see mRNA as part of that disclosure?

MS. CARSON:  Objection to form.

A.    Well, my view of a POSA is that they would know what mRNA is.  And so if you saw in general a description of RNA, you would, in general, think of the mRNAs that people were aware of at the time, or a POSA was aware of at the time, and mRNA was one of them.

Q.    Okay.  You've talked about -- I think you've answered this question.

You said a few times that you used the '651 patent as the lens through which to evaluate anticipation and obviousness in these

Page 136

references, right?

A.    In Paragraph 59 of my opening report, I talk about the use of how I do my analysis.

Q.    Okay.  And so for your analysis, for all of your anticipation and obviousness opinions, it's through the lens of the '651 patent; is that right?

MS. CARSON:  Objection to form.

A.    So when I was analyzing the '651 for anticipation and obviousness, I considered the disclosures of the '651 to analyze the prior art.

Q.    And "the disclosures," you're referring to the specification and the claims?

A.    I guess I was referring, in particular, to the specifications, but I did consider the claims.

Q.    Okay.  One of the references that you cite with respect to the '651 patent is Bischoff, right?

A.    Yes.

Q.    And I can point you to where you talk about it in your report, if that would be helpful.  But you don't cite any evidence that

Page 141

Q.    Okay.

A.    So, "Given the number of references that taught the removal of free nucleic acid and the number of references that taught the desirability of high encapsulation, a POSA would have been motivated to use the tools and methods available combined with the disclosures in Bischoff to achieve the lipid vesicle formulations of the '651 patent claims."

Q.    Okay.  How would the POSA have used Bischoff to achieve 70 percent encapsulation?

A.    Well, let me refresh my memory on Bischoff.  I'm now looking at my opening report on lipid vesicles, just because it's referenced here.

Q.    Okay.  What paragraph?

A.    Paragraph 60.  Just on the definition of "lipid vesicles."  As I say here in 91, "Bischoff discloses and claims 'a method for preparing homogeneous suspension of stable lipid nucleic acid complexes or particles.'"

Q.    Where are you reading from?

A.    I'm sorry.  I'm back on Paragraph

Case 1:22-cv-00252-JDW    Document 667-23    Filed 12/16/25    Page 35 of 79 PageID #: 51086

4/28/2025          Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 142

91 of my reply report.

Q.    What are you trying to answer right now?

A.    Well, I'm still trying to refresh my memory on Bischoff, and so I'm just trying to find the correct -- it's a big report.  I'm just trying to make sure that I have the right section.

Q.    So we've looked at the "Background" section on Bischoff and looked at your reply on Bischoff.  Do you want to look at the opening report section on Bischoff obviousness?

A.    Yes.  So, for example, claim Element 1[c].  It's in Paragraph 437.

Q.    Amphipathic lipid?

A.    Yes.  So Bischoff discloses this claim element.

Q.    I think the more relevant place would be like Paragraph 449 or Paragraph 448.

A.    Yeah, but I just wanted to point out that we have a lot of discussion about Bischoff in these different claim elements. I'm happy to go through them with you if it's helpful.

Page 143

Q.    My question was about encapsulation.

A.    Okay.  So in Paragraph 447, "To the extent the disclosure of the '651 patent sufficiently described and enables lipid vesicles with 'fully encapsulation,'" blah, blah, blah, "In my opinion Bischoff discloses this claim element."

Then on 448, "Bischoff discloses recovery of nucleic acids in complexes."

Q.    So is it your understanding that that evidence in 448 is an encapsulation measure?

A.    So in 448, we're referencing Bischoff, Column 3 lines 50 to 55.  So I'm now going to Bischoff.

Q.    Dr. Anderson, these are talking about yields, aren't they, not encapsulations?

A.    Yeah, I'm just refreshing my memory on what we wrote.  There were a lot of materials, and I just want to make sure I'm giving you the right answer.

Q.    When you say "we wrote," who are you referring to?

A.    Well, I mean, this is my report,

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 144

and I wrote it in collaboration with the lawyers who helped me with certain references and formatting issues, et cetera, and legal instruction.

Q.    What are you reviewing now?

A.    I'm reading Paragraph 448, and then transitioning to 449, "Achieving the claim level of encapsulation."

Q.    My question is just whether the evidence that you cite from Bischoff discloses encapsulation?  Does it or does it just disclose yield?

MS. CARSON:  Objection to form.

A.    Well, I mean, my argument is that Bischoff, like many of these other references, provides instructive material that make this claim obvious.  I'm sorry, this -- well, this claim, but also the '651.  So, are you asking me specifically with respect to Figure 2?

Q.    I'm asking you scientifically whether Bischoff discloses encapsulation percentages or does it just disclose yields?  Do you know the difference between those two things?

A.    Well, it would depend on the

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 145

context.  Certainly "encapsulation efficiency" is one of the claim terms in the '651, and "yield" could refer to a variety of things, depending on the context.

Q.    Okay.  And so does Bischoff disclose "encapsulation efficiencies"?

A.    Well, I just want to refresh my memory on the patent.

Q.    I'm not asking about the patent. So what do you have to refresh your recollection about in the patent?

A.    Well, the patent that -- Bischoff patent.

Q.    Oh, the Bischoff patent, okay.  I think Figure 2 is what you cited.

A.    Yes.  But again, I looked at a lot of materials, and I just want to review this.

So there is -- I recall also discussing, I believe, Figure 6.

Q.    Figure 6 discloses particle sizes, right?

A.    Yes.

Q.    That's not encapsulation efficiencies?

A.    No.  But it gets to encapsulation,

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 146

but, I mean, it gets to particles.  I just wanted to...

Q.    Figure 2 discloses yields, right?

A.    Right.

Q.    That's not encapsulation efficiency?

A.    Well, I didn't say that.  I just wanted to review Figure 2.  Well, Figure 2 says "Percent Yield."  What I'm trying to determine is sometimes assays for encapsulation efficiency require analysis of material, so I just wanted to review Figure 2 in particular.

So, in this case, it looks like we're looking at, "Percent yield is shown as a function of the molar percentage of" the formulation "and the charge ratio of the complex."

Q.    Is that an encapsulation efficiency?

A.    I don't think I would measure encapsulation efficiency this way.

Q.    Okay.

MR. MAHAFFY:  We can take a break.

THE VIDEOGRAPHER:  The time is now 1:14.  We're off the record.

Case 1:22-cv-00252-JDW    Document 667-23    Filed 12/16/25    Page 40 of 79 PageID #: 51091

4/28/2025          Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
                                Highly Confidential

Page 159

unpredictable?

MS. CARSON:  Objection to form, and to the extent it calls for a legal conclusion.

A.    Well, your question was the percent encapsulation unpredictable?

Q.    Mm-hmm.  The effect of changing lipid components on encapsulation.

MS. CARSON:  Same objections.

A.    I mean, it depends on the context, you know, in some contexts where we have an understanding of different components, it allows us greater confidence that we can predict what happens when things change.  In other contexts, you know, it may be more difficult to predict.  It kind of depends on the details.

Q.    So through the lens of the '651 patent that you've talked about a lot, through that lens, is the effect of changing lipid components on encapsulation unpredictable?

MS. CARSON:  Objection to form, and to the extent it calls for a legal conclusion.

A.    I mean, through the lens of the

Page 160

'651, when I'm evaluating the prior art, I feel like there's quite a bit of specific examples -- sorry, there's specific instruction where, just for example, we get high percent encapsulation with different lipid formulations.

And so, you know, to the extent there's instruction or background when I consider the disclosure of the '651, I feel that this prior art does provide enough to make obvious or anticipate, you know, the percentage claims in the '651, you know.

If you asking the question more generally, it really depends on the specifics. So in some systems, there can be enough information, and others, there may not, depending on the details.

Q.    Okay.  So through the lens of the '651 patent in the prior art, do you think the encapsulation is predictable?

MS. CARSON:  Objection to form.

A.    Well, I haven't said that.  What I said was that through the lens of the '651, the claims of the '651 are anticipated or obvious in light of the prior art and the understanding

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 167

the other.

Q.    Do you have a rough sense of how many lipid particle formulations had been disclosed by 2008?

MS. CARSON:  Objection to form.

A.    Well, I mean, it really depends on what you mean, because there's explicit sort of examples and papers and patents that people have done, and then there are, you know, ranges where people are talking about things.

And so, it depends, you know, what you mean.

Q.    I mean, specific formulations, do you have a rough sense?  Is it more than ten or 15 by 2008?

A.    It would be more than ten or 15 for sure.

Q.    More than 50, do you think?

A.    Yes, I think so, sure.

Q.    Not more than a hundred?

A.    I wouldn't say not more.  I don't -- I don't know the -- you know, I haven't done a tally.  I'm just kind of keeping my sense as of 2008 of all of the things people had done.

Q.    Okay.  And so in 2008, how would a

Page 168

POSA have decided what formulation to start with of those 100 plus lipid particle formulations?

A.    Well, I mean, it would depend on what the POSA was trying to do, you know.  So a POSA, as I've defined in my report, has a certain level of understanding and access to a library with all of the prior art, and so it depends on what that POSA was trying to do.

Q.    What would your POSA have been trying to do in 2008?

A.    My POSA for what?

Q.    For the lipid molar ratio patents. What were they trying to accomplish?

A.    Well, I mean, I was not given the task of making a POSA do something, but rather, interpreting the lipid molar ratio patents in light of, you know, sort of through a lens of their disclosure.

And when I apply that standard to my analysis, I come to the conclusions I come to.  So I have a variety of areas where I talk about my analysis.  We can go to that if it's helpful.

Q.    So how did you select -- so you

Page 169

talked about various lipid molar ratio formulations in your patent, in your report?

A.    Yeah.

Q.    How did you select the lipid molar ratio formulations you discuss in your report?

MS. CARSON:  Objection to form.

A.    Well, again, I -- my task was to analyze the prior art as a POSA through the lens of the molar ratio patents, and, you know, that's how I looked at the prior art and did my analysis.

Q.    So did you select the prior art that you relied on through the lens of the molar ratio patents?

MS. CARSON:  Objection to form.

A.    Well, so the POSA sort of has this access to everything; right?  But the materials that I talk about in this report are those that I felt were relevant to the analysis that was needed.

Q.    So I'm looking at like 514 of your opening report, for example.  Did you want to make it a little less abstract?

A.    Sure.  Okay.

Q.    So these are your references that

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 172

is where we discuss, for example, the Chen reference, making obvious asserted claims of the '378, and that's where we lay out -- and that's where I lay out my analysis.  I'm happy to go there.

Q.    So is it your opinion that a POSA would have been motivated to start with all of the formulations of Chen '554?

A.    Well, I mean, there's sort of important elements described here of how a POSA would look at Chen '554, and I'm happy to go through that with you.  And then we also have a description at the back, I believe, on routine experimentation.

But it's -- I guess I would need your question to be more specific.

Q.    Which formulations of Chen '554 would a POSA have started with?

A.    Well, I wasn't asked to decide would a POSA look at the prior art, and of everything out there this is the first thing they do.  I was asked to analyze the prior art through a lens, and whether or not it made obvious or anticipated these claims.

And, you know, a POSA would have

4/28/2025          Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 173

had access to this information and using their own knowledge been able to make obvious these elements.

Q.    So, for example, of the formulations on Page 184, which of those formulations would the POSA have started with or used as part of their formulation process?

MS. CARSON:  Objection to form.

A.    I have some of this discussion in the patent -- I'm sorry, in the report.  So, for example, in Paragraph 617, which is next to this, I talk about how a POSA would have -- it would have been obvious to decrease phospholipid in L051, L054 or L109.

So that's an example of some specific formulations that the POSA would have looked at and would have been obvious to make some modifications.

Q.    Okay.  And my question, though, there's a whole list of formulations here.  Can you explain to me why the POSA would have looked at some of these formulations and not looked at others, or is it your opinion that a POSA would have considered all of these formulations?

4/28/2025        Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 174

A.    Well, first, it's my understanding that the POSA would have had access to all of this information, and not even just in paper, but, you know, Chen by itself does alone make this obvious.  So a POSA trying to figure out how to make nanoparticles would learn from all of these formulations.

Q.    When a POSA is formulating lipid particles in 2008, do they start with one particular formulation?  Do they use a formulation as a starting point?

MS. CARSON:  Objection to form.  Incomplete hypothetical.

A.    So, I mean, it depends what a POSA is trying to do.

Q.    Again, sorry.  I apologize for interrupting.  I'm always talking about your POSA for the molar ratio patents here.  Just so you know that.

A.    Okay.

Q.    Now you can answer the question.  I can reask it if you want.  Sorry to interrupt you.

A.    Yes, please.  That would be helpful.

Page 175

Q.    So when a POSA is formulating particles, your POSA, do they start with one particular formulation or is that not how it works?

MS. CARSON:  Objection to form.

A.    Well, I'm sorry I'm laughing because we often try to make formulations in parallel, you know, a POSA would, you know, design a plan, and it wouldn't necessarily have one, it could have several or many, depending on what they were trying to do.

But again, in my report, I've mapped out how a POSA could look at some of these formulations and make modifications.

Q.    Did you ever conduct formulation studies based on the formulations in Chen?

MS. CARSON:  Objection to form.

A.    So when you mean "studies," do you mean mixing chemicals together?  Not reviewing or analyzing?

Q.    I'm not talking about your obviousness analysis.  I'm talking about you, Dr. Anderson, in your lab.

A.    Okay.

Q.    So have you ever done formulation

Page 177

MS. CARSON:  Objection to form.

A.    Well, in my lab, we don't normally take a patent and just because it's fun try to reproduce it, you know, we look at patents and papers and try to learn from them, and I can't recall if I had looked at this way back when or not, you know, but we didn't take a patent and try to reproduce all of the experiments. That's just not what we do.

Q.    Okay.  So you can't remember if you ever looked at Chen, but you think that the POSA would have done so; is that right?

A.    Well, I have reviewed Chen, and it's my understanding that from my analysis, I understand that a POSA has access to Chen.  And so, when I look at Chen, I see a number of formulations that would make obvious the claims of the molar ratio patents.

So the fact that I did not in my lab have Chen in front of me and try to reproduce all the results, I guess I'm not sure I understand the question.

Q.    Do you agree that L053 was more potent than L054?

MS. CARSON:  Objection to form.

Page 187

you pick up your top binder, it's right there.

A.    Okay.  The Table 4.

Q.    Do you see Chen discloses various three-component formulations; like L061, for example?

A.    I'm looking at the table -- oh, I see.  There it is.  Yes, I see that.  That has three components.

Q.    Would that have been a desirable starting point for optimization?

A.    Would L061 have been a desirable starting point for optimization?  I guess I would want to review L061 in the context of the '554 to make sure I had a complete understanding of the discussion about it.

Is that here?

Q.    I don't think you talk about L061 too much.

A.    Okay.  Go ahead.

Q.    My question is whether -- how did you -- how would the POSA have decided which of these formulations were desirable starting points for optimization; what would have been the criteria?

A.    Well, it depends on what they're

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 188

trying to achieve.

Q.    It's your POSA.  Do you remember? Whatever your POSA is trying to achieve.

A.    Right.  Well, an example would be, you know, and I think we discuss this in the report.  So, for example, in 142 that you pointed out, the prior art taught that the 2:40 formulation had been used in primates, and that's not required for instructing a POSA, but that is a data point the POSA would consider. Prior art also taught that further work may be needed for the formulation.  So the POSA would be motivated to optimize.

So that's an example of information that can be helpful, not required, to motivate a POSA.

Q.    So in conducting your analysis, did you try to determine whether these three-component formulations would be desirable starting points for optimization?

A.    I looked at all of them, as I recall.  Some of them have less information than others.

Q.    Did you determine that the three-component formulations would be a

Page 190

A.    Correct.

Q.    So your opinion is that those bolded ranges in Paragraph 974 create a presumption of obviousness; is that right?

A.    Well, I'm pointing out here that Chen '554 further discloses embodiments with various ranges of the four lipid components, and then the bolded ranges show these ranges. And again, I'm doing my analysis through the lens of the patents at issue.

So that's how I looked at these things, and I felt the ranges were relevant, given that the patent at issue also talks about ranges.

Q.    Okay.  So these bolded ranges give rise to a presumption of obviousness?

A.    Well, I guess I felt it was important to mention them, along with the other materials in this section of the report, that they were all helpful in my analysis.

Q.    I'm not sure why this is a difficult question.  I just want to understand. So you have a section titled "Overlapping Ranges Creates a Presumption of Obviousness." Are you opining that these ranges creates a

Page 192

there a section of your report where you do an analysis that does not presume the claims obvious based on these ranges?

MS. CARSON:  Objection to form.

A.    Are you asking have I done a separate analysis where I exclude this, but only consider everything else?  I'm not sure what the question is.

Q.    So my understanding, which I guess I'm still a little unclear about, is that you think that these ranges creates a presumption of obviousness.

And I'm wondering if you conducted an analysis where you did not presume the claims were obvious based on these ranges?

A.    Could you say the last part one more time?

Q.    I'm wondering whether you did an analysis where you did not presume that the claims were obvious based on these ranges?

MS. CARSON:  Objection to form.

A.    Well, what was the page again?

Q.    285.

A.    Just to be clear, I didn't presume the claims were obvious.  I did an analysis

4/28/2025          Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 193

that led to a conclusion of obviousness.  These overlapping ranges are relevant to my obvious analysis given that they overlap with the claimed ranges.  So that's why they're included in my analysis.

Q.    So in Paragraph 972, you talk about your legal understanding, and you talk about how an overlap creates a presumption of obviousness.

Do you see that?

A.    I do.

Q.    Do you think that that presumption applies in this case?

A.    Well, I mean, it's included in my report, because I felt it was relevant.  I think the general -- my understanding is, you know, if you have the exact same range with the exact same formulation, it does make obvious if it happens again, and, you know, if that same range overlaps most or part, it is also relevant to obvious analysis.

So this is why I looked at these ranges with respect to the molar ratio patents.

Q.    Is it your opinion that the POSA would have experimented across the entirety of

Page 194

these ranges that you bolded?

A.    Well, a POSA would have access to this material about the ranges.  They would have access to specific examples as well from this reference, and from others.

So I haven't said that a POSA would necessarily test every single one, but a POSA would seek guidance from ranges like this and consider it.

Q.    You agree that Chen does not teach a phospholipid range that overlaps with the claimed range, right?

A.    I would have to look at Chen again.

Q.    So you reproduced Chen here.  I think you have Chen.

A.    I do.

Q.    But it talks about a neutral lipid component from 5 percent to 90 percent.

Do you see that?

A.    I do see that.

Q.    So the neutral lipid can include both phospholipid and cholesterol.  Do you understand that?

A.    I think you're right, but I just

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 195

want to check that.  Yeah.

Q.    So you agree that Chen doesn't teach a phospholipid range that overlaps with the claimed range?

A.    Well, I don't agree with that.  I mean, if a neutral lipid could be a phospholipid, then that's an example of a phospholipid range.

Q.    Do you have the same opinion about MacLachlan '189, which is Paragraph 981 of your report, which discusses a non-cationic lipid from 5 percent to 90 percent?

A.    Paragraph 981?

Q.    Mm-hmm.

A.    Yeah, okay.  I'm there.  Let me refresh my memory real quick.  Let me read this.

I see that.  Okay.  What was your question?

Q.    The same question is with respect to Chen.  So you understand that non-cationic lipid includes both phospholipid and cholesterol and other lipids actually?

A.    Well, I would want to just double-check MacLachlan '189 just to make sure

Page 196

every patent can define these things -- I think you're right, but I just want to confirm that. If you could hand me that reference.

Q.    I'll represent to you that it does.  We can look at it in a second.  And if I'm wrong, then I'm wrong.

A.    Okay.  I understand.

Q.    I'll represent to you that it includes both phospholipid and cholesterol.

A.    Okay.

Q.    So do you agree or disagree that MacLachlan '189 discloses a phospholipid range that overlaps with the claimed range?

A.    Well, again, I'd want to review MacLachlan just to be sure myself.  You represented that a non-cationic lipid can be a phospholipid, and since it can be a phospholipid, there's a range.

Q.    Okay.  Back to 974 with the Chen ranges.

A.    Okay.

Q.    Would it have been routine experimentation to test the lipid ranges disclosed in that paragraph?

MS. CARSON:  Objection to form.

Page 197

A.    I mean, I have a section on routine experimentation with respect to the molar ratio patents I just want to review again.  Okay.  282.

Q.    I think we're in that section.

A.    Right.  But in the front is where it discusses the routine experimentation, and I just wanted to refresh my memory on my analysis.  Okay.

Q.    And so would it have been routine experimentation to test the lipid ranges disclosed in Paragraph 974?

A.    Well, I think as I describe here, it would have been routine experimentation for the POSA to arrive at the claimed molar ranges, and some of these ranges, the POSA wouldn't need to do to do that.

But I think it is routine for a POSA to test a variety of formulations in a routine manner, and certainly they would be instructed by some of these ranges to look at those ranges, along with other prior art, to make some determinations on which formulations to make.

Q.    Okay.  Do you see right above, we

Page 200

reconvening at 3:13 p.m.)

THE VIDEOGRAPHER:  The time is now 3:13, and we're on the record.

BY MR. MAHAFFY:

Q.    Welcome back, Dr. Anderson.

A.    Thank you.

Q.    Can we go to Paragraph 618 of your opening report.

A.    Okay.

Q.    In the first sentence you say -- actually, no.  That towards the bottom of that paragraph, you discuss the 2:40 formulation.

Do you see that?

A.    I see the reference to the 2:40 formulation.

Q.    Just to orient you, this is in the section of your report about the Chen reference.  Do you understand that?  So Page 179, do you see that the section that we're in is about --

A.    Page 179?

Q.    I'm trying to sort of make sure you understand kind of what's going on in this section of your report.  So this is the section on Chen obviousness.

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 201

Do you see that?

A.    I see on 179 Chen obviousness.

Q.    Okay.  And then so if we go to 618, Paragraph 618, you discuss the 2:40 formulation.

Do you see that?

A.    Well, we're talking about Semple now.

Q.    So Semple is in the first sentence, yes.  And then in the second sentence, you discuss the 2:40 formulation?

A.    Yes.

Q.    Why would the POSA have been motivated to combine Chen with the 2:40 formulation?

A.    I just want to review.  My recollection is that the 2:40 formulation is in a number of references.

Q.    So it's in the Zimmermann reference, you cite, for example, and Thomas?

A.    Yes.

Q.    So it's disclosed in those references.  And my question is, why the POSA would have combined Chen and that 2:40 formulation?

Page 202

A.    Well, what we said here was the 2:40 formulation was a "four-component lipid nucleic acid particle used in non-human primates," and it included the molar ratios that are listed.

So, you know, the POSA has access to a lot of prior art, as is described in the report.  And when you're looking at the formulations for their teachings, you can use various metrics to decide whether or not they're of value.

In this case, we're talking about the fact that it had been used in non-human primates.

Q.    So why would the POSA have taken that fact, and then combined that 2:40 formulation that had been used in primates, combined that with Chen?

A.    Well, so the POSA is considering all of the prior art, and this is part of the prior art.  I mean, Chen by itself makes obvious this claim, and the POSA would also be aware of the 2:40 formulation, which is an example of a formulation used in primates.

And so, it's, again, instructive

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 203

and analysis of obviousness.

Q.    Is it your opinion that the POSA would have arrived at the claimed inventions through routine optimization using the 2:40 formulation as a starting point?

A.    Well, I mean, I do have a section on routine optimization here back on Page 282.

So, as I say here, "A POSA with normal creativity or common sense would have been motivated by scientific curiosity and interest, to explore different formulations."

So as I discuss below, the product disclosed certain known categories of lipid compounds and lipid particles, and a POSA would consider all of this, and through routine optimization, could arrive at the claimed invention.

Q.    You understand that the PTAB, the Patent Trial and Appeal Board in the Federal Circuit have both considered the Chen and the 2:40 formulations, right?

A.    There is a section on the PTAB in my report, I believe, so I'm happy to go to that.

Q.    I don't know if you sort of talk

Page 220

Incomplete hypothetical.

A.    I'm sorry, your question was how could changing the N-to-P ratio affect the -- sorry.

Q.    How important is the N-to-P ratio as compared to the molar ratio of the lipids?

A.    I see.

MS. CARSON:  Objection to form. Incomplete hypothetical.

A.    Well, I mean, it depends on what you're looking at.  Within some ranges, these N-to-P ratios can be important, and with others, they may not be.

I think there has been quite a bit of experimentation on different N-to-P ratios, and a POSA would have had some familiarity with changing that.

I don't know that I could speak in a general way to the relative importance of the N-to-P ratios compared to the molar ratios of the lipids, because it would depend on all of the details.

Q.    Okay.  You've mentioned your routine optimization section a few times.

A.    Yes.

Page 221

Q.    So just to make sure I understand, your opinion is that it would have been routine in 2008 for the POSA to optimize the four lipid components of a lipid particle, right?

A.    Well, why don't I go to my section to be clear about what I talked about.

So, for example, in Paragraph 968 I talk about what, "A POSA with normal creativity or common sense would have been motivated by scientific curiosity and interest, to explore different formulations of lipid-based nucleic acid delivery systems to generate different physiochemical properties." I mean, I could continue to read.

So the prior art discloses certain known categories of the components, "and varying these components in order to generate lipid-nucleic acid particle formulations optimized according to desired performance."

So there are, of course, some routine aspects to this.

Q.    Is identifying the lipid molar ratios one of those routine aspects?

MS. CARSON:  Objection to form.

A.    Well, I mean, what I say in the

Page 222

next paragraph is, "The prior art teaches optimizing amounts of lipids in order to achieve desired features of resulting particles and their effects."

So there is various examples of that.  So, as I've said in my report, prior art teaches you can optimize the amounts of lipids.

Q.     And that would have been routine?

A.     It can be.

Q.     You discuss, for example, in Paragraph 151 of your reply a POSA running a formulation screening study.

Do you see that?

A.     I'm looking at 151.

Q.     And there you say that, "Optimizing a lipid formulation was routine as of 2008," right?

A.     Yes.

Q.     Is that still your opinion?

A.     Yeah.

Q.     So your opinion is that the POSA would run a formulation screening study, right?

MS. CARSON:  Objection to form.

A.     Well, what I've written here is that, "A POSA could simply run a formulation

Page 223

screening study by choosing the parameters to optimize, such as encapsulation or stability or in vitro or in vivo outcomes."

Q.    In your report, you don't identify the formulations that would have been part of that screening study, do you?

A.    The formulations that would have been -- I mean, I discuss a variety of formulations from the prior art.

Q.    Right.  But the prior art wouldn't be the formulations in the screening study, would it?

A.    Well, the prior art formulations would instruct a POSA and provide guidance onto to which additional formulations to make.

Q.    You don't opine in your report what those additional formulations would have been?  That would have been part of that formulation screening study, right?

A.    Let me just take a look.  I mean, for example, what I say in Paragraph 617 of my opening report is that "it would have been obvious to decrease the phospholipid in the L051, L054 ... and increase the cholesterol at the expense of the phospholipid."

Page 224

So this is the type of variation you could do from a prior art formulation, if that's what you mean by a screen.

Q.    My question is pretty precise.  Do you actually identify the formulations a POSA would have used in the formulation screening study?

A.    Well, I don't think I needed to do that.  What I needed to do was look at the prior art, and in particular, through the lens, as I've mentioned, of the molar ratio patents, and then, you know, understand if the details there made obvious the claims.  And there are a variety of example formulations and protocols and discussions of encapsulation.

And so, I didn't feel it was necessary to sort of act as a hypothetical POSA and map out a hypothetical research plan for the POSA.

Q.    You don't opine about how many formulations the POSA would have made as part of that research plan, do you?

A.    Well, I don't specifically say a POSA would have done X number of formulations. I do point out that it was routine to do

Page 225

optimization, and also, you know, at least our

lab, for example, we've done many, many, and

even in one of the papers cited we looked at

quite a few.

So I haven't provided a specific

number, but...

Q.    Are you talking about the Akinc

[Uh-kin] or Akinc [uh-kinch]?  How do you say

his name?

A.    Akin Akinc.  Akin is his first

name.

Q.    So, you're talking about the Akinc

paper 2009 paper that you cite in Paragraph

251?  You just mentioned a formulation study.

I think that's the one you're talking about.

A.    Well, I was also talking about

Akinc 2008, I believe --

Q.    Ah, yes.

A.    -- which is another one.  There

are a lot of these types of papers.

I mean, and it's not just us.  Of

course, there are examples of different

formulations that people have looked at.

Q.    So in this Akinc 2009 paper, the

PEG lipid was varied between 5 and 10 percent?

Page 234

you say that it would motivate them to try it exclusively.

Q.    You understand that Regelin used a two-component formulation; is that right?

A.    I'd have to refresh my memory on Regelin.  If you have a copy, I'm happy to look at it.

Q.    That's okay if you don't remember. Can we go to Paragraph 986 of your opening report.  Are you there?

A.    I am.

Q.    This lists two formulations that you came up with that I assume you're saying are obvious; is that right?

A.    Well, I think what I'm saying is that a POSA would have found it obvious to consider two different formulations, and, you know, taking guidance from both, make some combinations.

Q.    Okay.  How did you come up with those combinations?

A.    How did I come up with the combinations listed here?

Q.    Yeah.  Like the 48:10:40:2, how did you come up with that?

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 235

A.    Well, I mean, these are lipid ratios of relevance and that had been discussed previously.  I can't recall exactly where that specific ratio came from.  It looks like, you know, for example, where I'm looking at in Paragraph 984 the formulation disclosed in Zimmermann or MacLachlan.

Q.    You understand that that 48:10:40:2 is a combination of a Chen reference and a MacLachlan reference, right?  The formulations in those two references?

A.    It certainly could be.  I'd have to just confirm that.

Q.    Can you remember how you came up with that 48:10:40:2 formulation as opposed to the other potential formulations that are combinations of those prior art formulations?

MS. CARSON:  Objection to form.

A.    I mean, again, there is a lot of material here and a lot of references.  I was reviewing all of these; and in the process of my review, felt that those specific formulations were relevant, which is why they're listed here.

Now, unfortunately, I can't

Page 236

remember the thought processes while I was writing all of this, but I still feel it's relevant to, you know, talk about the combination of these formulations.

Q.    Did you come up with those formulations or did the lawyers come up with them?

MS. CARSON:  Objection to form.

A.    I mean, as I said, this is my report and contains my opinions.

Q.    Is your opinion that that 48 percent formulation would render obvious the claims that recite 50 percent cationic lipid?

A.    Well, I mean, my opinions on obviousness are captured in the report, and they certainly don't -- they aren't dependent on this single formulation ratio.

So, again, I'm happy to take you through my obviousness arguments.

Q.    I'm asking you about one of those obviousness arguments.  So I'm trying to understand why you included this 48:10:40:2 and whether it's your opinion that that hypothetical formulation would render obvious the claims that recite 50 percent cationic

Page 288

a combination reference -- I understand you think it's relevant.  I'm not actually disagreeing with that at this moment.  I just want to understand whether this is one of the combination references that you're using, because I need to know what combinations you're going to run.

So if it's not, you can just tell me it's not one of the combination references you're relying on, but I need to know your combinations?

MS. CARSON:  Objection to form.

A.    Well, you know, as I said in my first report, I more clearly articulate the combinations that I'm using with respect to obviousness, and, you know, to the extent there's a discussion of methods of how nanoparticles are made, this is a useful reference as well.  I'm also considering this reference, you know, when I think about manufacture of nanoparticles.

However, as I mention, those methods of manufacture aren't actually in the claims.  So I don't really feel it's necessary to talk about that in my analysis, which is why

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 290

Q.    Okay.  So the POSA would have used those prior art methods, like the method in Saravolac, that's what the POSA would have used to achieve 70 percent mRNA encapsulation?

A.    I'm saying the prior art contains a variety of methods, including, as is pointed out here, a T-junction method, and a POSA would have had access to and known about all of these.  And my opinion is that you can use a variety of methods to get high encapsulation when I do my analysis.

Q.    So including the method in Saravolac, for example?

A.    Well, again, I analyze Saravolac in light of the '651.  So it's my opinion that Saravolac does make obvious and anticipated the claims of the '651, and that includes encapsulation of 70 percent.

Q.    Do you have somewhere in here in either of these reports where you say this is the method a POSA would have used to achieve 70 percent mRNA encapsulation; if they had done detergent dialysis with this pH?  Where does it actually say what method they would have used?

MS. CARSON:  Objection to form.

Page 291

A.    Well, I think, as I've talked about in my reports, there are a variety of methods people used to get high encapsulation, and I don't think a POSA necessarily would have been limited by one method.  They would have received instruction from the art.

Q.    Okay.  Can you point me to where you say in your report the method -- any one method that the POSA actually would have used that could have achieved 70 percent encapsulation?

MS. CARSON:  Objection to form.

Q.    Where do you spell out that method?

MS. CARSON:  Same objection.

A.    I want to go back to my report where we talk about 70 percent encapsulation.

Q.    Yeah.  What paragraph are you on?

A.    I was just looking at the table of contents.

Q.    Okay.  Just so I understand, you can't answer that question without looking at your report, right?  You have to look at your report to say what method a POSA would have used to achieve 70 percent encapsulation?

Page 292

A.    As I mentioned, these are long reports and there's a lot of art, and I just want to make sure I'm giving you the right answer.

Q.    It seems like you can't answer without looking at your report, and that's fine.  You can look at it.  I just need to know you can't answer without looking at the report?

A.    Well, I'm not saying that.  I'm saying I want to give you a correct answer, and so I want to look at my report to be accurate.

Q.    Please do.

A.    For example, Paragraph 250, it says, "For example, Saravolac '171 discloses that the method of encapsulation can be adjusted to use dialysis buffer of an ionic strength that is adjusted for the cationic lipid concentration such that encapsulation of 40 to 80 percent of the nucleic acid is achieved."

Q.    Okay.

A.    So I'm specifically talking about the methods of Saravolac.

Q.    Okay.  And the POSA would have expected this method that you have laid out in

4/28/2025         Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 293

Paragraph 250 to achieve 70 percent encapsulation of mRNA?

MS. CARSON:  Objection to form.

A.    So, I mean, it's my opinion that this claim element is anticipated and made obvious by Saravolac '171, and, you know, that analysis is provided in the report.

Q.    Okay.  Can you not answer the question I asked?

A.    Well, I think I just did.

Q.    Did you?

A.    Well, I'm trying.  Maybe if you could read back the question.

Q.    The question is whether the POSA could have used the Saravolac method that you've laid out in 250 with mRNA to achieve 70 percent encapsulation?

MS. CARSON:  Objection to form.

A.    Yeah, again, what I'm saying is that I'm talking about Saravolac as a whole, and not just limited to the portions that I've talked about in 250.

Q.    Okay.

A.    But it is my opinion that Saravolac, when viewed through the lens of the

Page 294

'651, make obvious or anticipated -- and

anticipated -- encapsulation of 70 percent, at

least 70 percent.

Q.    Okay.  So if a POSA sat down at

the bench and tried to use the Saravolac

method, they would have achieved 70 percent

mRNA encapsulation; that's your testimony?

MS. CARSON:  Objection to form.

Asked and answered.

A.    I think I already answered your

question.

Q.    Is the answer yes?

MS. CARSON:  Objection to form.

Asked and answered.

Q.    So you can't answer yes to that

question?

MS. CARSON:  There's no reason why

he needs to give you a yes or no answer.

MR. MAHAFFY:  He doesn't seem to

be able to answer the question.

MS. CARSON:  And I've given you a

lot of leeway, Mr. Mahaffy.  You haven't

been nice to the witness.  But I think

that it's time to back off.

MR. MAHAFFY:  Your coaching is

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 295

enough.

Q.    Can you answer?

A.    I feel that I have answered your question.

Q.    Okay.  So if a scientist sat down at a lab bench, they would be able to achieve 70 percent mRNA encapsulation with a Saravolac method?

MS. CARSON:  Objection to form. Asked and answered.

A.    Again, I feel I've answered your question.

Q.    What's the best evidence you have that the POSA would actually be able to achieve that level of encapsulation?

MS. CARSON:  Objection to form.

Q.    What evidence are you going to point to at trial?

A.    Well, I mean, that evidence is contained in the report in a variety of sections.  We talk about 70 percent, 80 percent, 90 percent encapsulation, and there are a variety of arguments listed here.

Q.    That's what you're going to say?

A.    No.  I would go through the

4/28/2025    Arbutus Biopharma Corp., et al. v. Moderna, Inc. et al. Daniel G. Anderson, Ph.D.
Highly Confidential

Page 296

specific arguments.

Q.    What's the best argument?

MS. CARSON:  Objection to form.

A.    Well, I don't know that I've characterized the best argument.  I feel there are a number of arguments, and those are captured in the report.

Q.    Can you explain one?

MS. CARSON:  Objection.

Q.    What's one piece of evidence you have that Saravolac could have achieved 70 percent encapsulation?

MS. CARSON:  Objection to form.

A.    It's captured in this portion of the report.

Q.    Okay.  But you can't explain that?

A.    Well, I don't feel I need to.  I feel that the words in this part of the report explain it.

Q.    Okay.  Can you go to Paragraph 146 of your reply report.

A.    Okay.

Q.    So here you talk about a formulation study from Semple '278, right?

A.    I see that we're talking about