# Exhibit 29

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,<br><br>Plaintiffs,<br><br>v.<br><br>MODERNA, INC. and MODERNATX, INC.,<br><br>Defendants.<br><br>MODERNA, INC. and MODERNATX, INC.,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,<br><br>Counterclaim-Defendants. | C.A. No. 22-252-MSG<br><br>**CONTAINS INFORMATION DESIGNATED HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY BY PARTIES AND THIRD PARTIES** |

<u>**OPENING EXPERT REPORT OF ROBERT PRUD'HOMME, PHD**</u>

Dated: November 25, 2024

_____

**CONTENTS**

I.  **Introduction**............................................................................................................ 1

II.  **Qualifications**......................................................................................................... 2

   A.  Education and Professional Experience............................................... 2

   B.  Compensation and Prior Testimony...................................................... 4

III.  **Materials Considered**........................................................................................... 4

IV.  **Summary of Opinions**........................................................................................ 4

   A.  '651 Patent ............................................................................................ 4

   B.  Molar Ratio Patents.............................................................................. 6

V.  **Legal Standards** .................................................................................................. 8

   A.  Level of Ordinary Skill in the Art........................................................ 8

   B.  Patent Invalidity ................................................................................... 8

   C.  Written Description............................................................................... 9

   D.  Enablement .......................................................................................... 9

   E.  Indefiniteness .................................................................................... 10

   F.  Anticipation....................................................................................... 10

   G.  Obviousness ...................................................................................... 11

   H.  Derivation ......................................................................................... 11

   I.  Prior Use, Sale, Public Use, and Invention....................................... 11

VI.  **Claim Construction**........................................................................................... 12

VII.  **Technical Background and Tutorial**................................................................ 13

   A.  The Central Dogma............................................................................ 13

   B.  Nucleic Acids..................................................................................... 14

     1.  pDNA................................................................................... 17

  2.    siRNA ...................................................................................................... 18

  3.    mRNA ...................................................................................................... 19

  4.    Differences Across Nucleic Acids.......................................................... 20

VIII.  **Summary of Patents-in-Suit**.........................................................................**24**

  A.    '651 Patent ..................................................................................................... 25

    1.    Specification ........................................................................................... 25

    2.    Claims ..................................................................................................... 26

    3.    Priority Chain......................................................................................... 27

  B.    Molar Ratio Patents...................................................................................... 27

    1.    Specification ........................................................................................... 27

    2.    '069 Patent ............................................................................................. 28

    3.    '359 Patent ............................................................................................. 29

    4.    '668 Patent ............................................................................................. 30

    5.    '435 Patent ............................................................................................. 31

    6.    '378 Patent ............................................................................................. 32

IX.    **Background Relevant to the Patents-in-Suit** ................................................**33**

  A.    '651 Patent ..................................................................................................... 33

  B.    Molar Ratio Patents...................................................................................... 41

X.     **Indefiniteness, Written Description, and Enablement Opinions Regarding the '651 Patent**.........................................................................................**42**

  A.    "fully encapsulated"..................................................................................... 43

    1.    Indefiniteness ......................................................................................... 43

    2.    Written Description................................................................................ 53

    3.    Enablement ............................................................................................. 56

  B.    "at least 70% [or 80% or 90%] of the mRNA . . . is fully encapsulated"............. 68

    1.    Indefiniteness ......................................................................................... 68

2.     Written Description...................................................................... 69

3.     Enablement ................................................................................. 71

C.     "mRNA" ............................................................................................. 75

1.     Written Description...................................................................... 76

2.     Enablement ................................................................................. 79

D.     "lipid vesicle formulation" / "lipid-nucleic acid particle" .................................... 88

1.     Indefiniteness ............................................................................. 89

2.     Written Description...................................................................... 90

3.     Enablement ................................................................................. 92

XI.     **Indefiniteness, Written Description, and Enablement Opinions Regarding the Molar Ratio Patents.................................................................................. 93**

A.     "__ mol % the total lipid present in the particle"...................................... 94

1.     Indefiniteness ............................................................................. 94

2.     Written Description...................................................................... 97

3.     Enablement ................................................................................. 99

B.     "fully encapsulated".......................................................................... 115

1.     Indefiniteness ........................................................................... 116

2.     Written Description.................................................................... 119

3.     Enablement ............................................................................... 121

C.     "a nucleic acid" / "an RNA" / "mRNA".............................................. 122

1.     Written Description.................................................................... 124

2.     Enablement ............................................................................... 126

D.     "nucleic acid-lipid particle" .............................................................. 127

1.     Indefiniteness ........................................................................... 128

2.     Enablement ............................................................................... 129

E.     "a cationic lipid" .............................................................................. 131

1.    Indefiniteness ................................................................................... 131

2.    Written Description and Enablement .................................................. 132

F.    "consisting essentially of" .......................................................................... 132

1.    Indefiniteness ................................................................................... 132

G.    "the nucleic acid . . . is not substantially degraded after incubation of the particle in serum at 37° C. for 30 minutes" ........................................... 134

1.    Indefiniteness ................................................................................... 134

2.    Written Description ........................................................................... 135

3.    Enablement ...................................................................................... 136

H.    Less than 50 mol % Cationic Lipid ............................................................ 136

1.    Written Description ........................................................................... 137

2.    Enablement ...................................................................................... 139

I.    "contacting the cell with a nucleic acid-lipid particle" / "in vivo delivery of a nucleic acid" / "administering to a mammalian subject a nucleic acid-lipid particle" .............................................................................................. 140

1.    Written Description ........................................................................... 140

2.    Enablement ...................................................................................... 141

J.    Compositions of the Asserted Claims ........................................................ 142

XII.    **Derivation Opinion** ......................................................................................... 143

A.    Priority Date of the '651 Patent ................................................................. 144

B.    Prior Conception by Moderna .................................................................... 147

C.    Communication to Arbutus/Genevant and the Named Inventors ............... 149

XIII.    **Prior Use, Sale, Public Use, and Invention Opinion** ................................... 153

XIV.    **Supplementation** ........................................................................................... 156

purposes, I reserve the right to rely on any of the evidence discussed below in the context of any opinion I render on each of the below limitations. Further, to the extent I rely on different evidence in the context of my opinions on the '651 Patent versus the Molar Ratio Patents, I reserve the right to rely on that same evidence in the context of the other patent family as well.

### A.    "fully encapsulated"

126.    All claims of the '651 Patent include the limitation "wherein [a specified percentage] of the mRNA in the formulation is fully encapsulated in the lipid vesicles." *See* '651 Patent, claim 1. I understand the Court construed "fully encapsulated" to mean "fully, as distinct from partially, contained inside the lipid vesicles." D.I. 267 (Claim Construction Order) at 1. The Court's construction excludes "part-in-part-out" strands of mRNA from counting towards the percentage of fully encapsulated mRNA. D.I. 266 (Claim Construction Opinion) at 33, 37. This is consistent with the specification of the '651 Patent, which defines "lipid encapsulated" by stating that it "can refer to a lipid formulation which provides a compound with full encapsulation, partial encapsulation, or both." '651 Patent at 5:38–40. However, the '651 Patent lacks disclosures regarding the meaning of full versus partial encapsulation, how to measure encapsulation such that partial can be distinguished from full encapsulation, and/or how to make and use lipid vesicles "fully encapsulating" mRNA. The claims of the '651 Patent are thus indefinite, lack written description support, and are not enabled, as explained more fully below.

### 1.    Indefiniteness

127.    The term "fully encapsulated" is too poorly defined such that a POSA reading the claims in light of the specification and prosecution history would not be able to determine where the bounds of the claims lie.

128.    Per the patent and the Court's order, full encapsulation must be something distinct from partial encapsulation. The trouble is, however, that there is no well-understood or accepted

meaning of the concept of partial encapsulation, and even if there was, there is no reliable way to quantify any nucleic acid that falls within such a category. Although it is unclear what partial (and therefore full) encapsulation refers to, the patent does provide some clues as to what partial encapsulation *is not*. For example, looking at claim 1, the relevant claim language recites: "(b) messenger RNA (mRNA), wherein at least 70% of the mRNA in the formulation is fully encapsulated in the lipid vesicles." The fact that the claim refers to both "at least 70% of the mRNA" and that the mRNA is "fully encapsulated" indicates that "fully" cannot refer to the percentage of the mRNA that is encapsulated as that is already captured by the "at least 70%" portion of the claim. Based on the presence of both of these elements in a single claim, my reading of this language would be that because "at least 70%" of the mRNA must be referring to the proportion of the mRNA that is encapsulated, "fully encapsulated" must have a different meaning.[4]

129.    There is no generally accepted meaning of the term "partially" encapsulated. In fact, the testimony of both Plaintiffs' and Moderna's witnesses confirms that there is no well-understood or accepted meaning of the term "partially encapsulated," or sometimes even "fully encapsulated." *See, e.g.*, Reid Dep. Tr. at 58:3–21 ("Q. And as a scientist, what does the term 'partially encapsulated' mean? A: As it's – it's not a term we typically use in our work . . . I mean, 'partially' could mean different things, so it's vague what 'partially' could mean."); Judge Dep. Tr. 47:7–49:2 ("And would either of those techniques have determined whether or not the nucleic acid is partially encapsulated? . . . A. Yeah, I don't -- I don't know what you mean by partially encapsulated . . . So you have no understanding of what partial encapsulation of a nucleic acid

---

[4] This is also consistent with the Court's reasoning in construing the term. *See* D.I. 266 at 34 ("As such, 'at least 70% encapsulated in the lipid vesicle' informs a POSITA of the amount and location of mRNA without using the word 'fully.' As patent claims are read 'with an eye toward giving effect to all terms in the claim,' the claim should not, without good reason, be interpreted as having the same meaning as if the word 'fully' was not included.").

would be? . . . A. I can -- I can speculate."); Jeng Dep. Tr. 64:15–22 ("Q. . . . what does it mean to be fully encapsulated? A. I mean, I see the word 'fully' as an adjective of encapsulation. But in my technical view, I don't have a -- I don't distinguish encapsulation or fully encapsulation."). And those who did provide a definition were not consistent across the board. *See, e.g.*, Jeffs Dep. Tr. at 80:10–81:8 ("Q. So does the partial in partial encapsulation refer to a portion of the nucleic acid that is not encapsulated? [A.] In some contexts, you could say that."); MacLachlan Dep. Tr. at 30:10–19 ("the results of the dye exclusion assay studies were indicative of what I've just described as full encapsulation to differentiate from partial encapsulation, whereby one may have material that is on the outside or on the surface of a lipid vesicle."). Nor could anyone identify a way to test for partial encapsulation, or quantitatively measure full encapsulation. *See, e.g.*, Judge Dep. Tr. at 48:23–49:2 ("Can you think of any way that you would be able to test for partial encapsulation of nucleic acid? . . . A. That's -- I don't -- I -- I don't know."); Yaworski Dep. Tr. at 104:17–105:22 ("Can you use the nuclease degradation assay to quantify the amount of nucleic acid that is fully encapsulated within a particle? A . . . typically what I recall seeing is an output from the test is . . . a band relative to a control. So that alone tells us information about the material being encapsulated with or contain within the particle. Quantitatively, I'm not aware -- I haven't done the experiments myself where we can apply techniques like densitometry."); Jeffs Dep. Tr. at 75:11–76:9 ("Q. Can it be used to quantify the percentage encapsulated nucleic acid? A. . . . I don't know of any qualified method that could do what you're asking . . . to quantitate."); Heyes Dep. Tr. at 128:4–128:20 ("Q. Can nuclease degradation be used as a method to quantify percentage encapsulation? . . . [A.] Yeah, I don't know.").

130.     One possible meaning—though I reiterate that there is no general consensus on this, as far as I am aware—is that "full" versus "partial" encapsulation may refer to whether a particular

45

strand of mRNA is fully within the particle or not (i.e., a portion of the strand is inside and the rest is outside of the particle). In fact, Plaintiffs' own witnesses have admitted that this is a possibility. *See, e.g.,* Thompson Dep. Tr. at 136: 23–139:11 ("Q. And so for the state where the nucleic acid is partially poking outside the liposome and part of it is inside the liposome, part of the nucleic acid will be accessible to the fluorescent dye. Correct? A. In that six-legged individual example, then the part that is exposed will be dye-accessible. The other part that is not the part that somehow is entrapped, retained inside the membrane vesicle will be dye -- should be dye-inaccessible."); Thompson Dep. Tr. (IPR2018-00680, IPR2018-00739, Ex. 1019) at 126:25–127:6 ("if there's a dangling set of sequences outside the particle, that's exposure. That's not encapsulated, even though part of it may be."). However, as far as I am aware, and as Plaintiffs' witness seems to admit, there is no method that would allow one to systematically measure what percentage of the mRNA would be partially in versus partially outside the particle. *See, e.g.,* Heyes Dep. Tr. ('127 Patent IPR2018-00680, Ex. 1026) at 101: 8–14 ("So you said can something be inside or outside? I just -- so what I'm saying is I don't think you can really determine whether siRNA – it's an open question I think amongst formulators when you use the RiboGreen method are you looking at nucleic acid that's both inside and outside as you described or is it something that really is generally out -- completely outside.").

131.    Further, Moderna itself has investigated this potential phenomenon, *see, e.g.*:

46



MRNA-GEN-00646046 at 048. And despite spending time and resources on this question, Moderna has not been able to find a way to analytically and quantitatively differentiate between these states. *See* § X.A.3. Notably, Moderna has found that Ribogreen, for example, would be not able to identify partially encapsulated material, as shown in the figure above.

132.    Further, the range of encapsulation states may be even more complicated: Even beyond the "part-in / part-out" scenario, there may be other encapsulation "states." In fact, even today, there is no clear understanding of all of the different states of encapsulation, nor is there a way to measure all of them. *See, e.g.*, MRNA-GEN-01257152; Thompson Dep. Tr. (IPR2018-00680, IPR2018-00739, Ex. 1019) at 136:13–20 ("Q. As one of skill in the art, would you consider something that's exposed to nucleus activity outside of the particle to be encapsulated? A. So actually it -- again, it depends."); Thompson Dep. Tr., 133:5–17 ("'Fully encapsulated' is very clear: The nucleic acid is within a lipid vesicle. If it's not in that state, it can be any number of different states."). For example, Moderna's own work illustrates that the range of encapsulation states of mRNA is quite complex. This is different from the encapsulation of siRNA (or pDNA),

47

which are smaller and have more consistent structures. For example, Moderna's research has shown that there are at least five different encapsulation states of mRNA:



**Potential mRNA Encapsulation states**

1. **Well Encapsulated RNA**
   I.   Well protected in particle
   II.  Excluded from Ribogreen Dye
2. **Surface bound RNA with "Lipid Bleb"**
   I.   Less protected RNA
   II.  Excluded from Ribogreen Dye
3. **Free RNA with no significant lipids**
   I.   Completely unprotected
   II.  Full detected by Ribogreen (subject to assay interference from nanoparticle dispersion)
4. **Loosely associated surface RNA**
   I.   Partially protected
   II.  Partially available to the Ribogreen Dye
5. **Free RNA with bound lipids**
   I.   Completely unprotected
   II.  Partially available to the Ribogreen Dye

Cholesterol
Cationic lipid
mRNA/ASO
Phospholipid
PEG

MRNA-GEN-01626268 at 283. It is not clear, nor do the patents or file histories help explain, which, if any, of these states would be referred to as "partially encapsulated" or "fully encapsulated." For example, the above refers to "partially available" mRNA. A POSA would not necessarily understand that to be analogous to "partially encapsulated." The differences between the two can be illustrated by considering possible results of dye binding or nuclease digestion assays. For example, looking at item (5) above, "free RNA with bound lipids" may be entirely unprotected, but only partially available to Ribogreen, indicating that two different assays may give a researcher two different results as to whether that RNA is encapsulated or not. As another example, "loosely associated surface RNA" is not <u>within</u> the particle, but may nonetheless be partially protected and partially available to Ribogreen.

133.    To understand this disconnect, it is necessary to understand how these measures of encapsulation work. Most measures of encapsulation require some form of dye binding to the

48

nucleic acid that is accessible to the dye (which often means it is not shielded by a lipid layer that the dye cannot penetrate) or digestion of nucleic acid that is not protected by the lipid particles. In the case of the dye-binding assay, because it is known how much nucleic acid is added to the formulation, it is possible to determine what proportion of that nucleic acid is bound to the dye and therefore (presumably) outside the lipid particle (the converse of which would be the proportion that is not accessible to the dye and therefore presumed to be within the lipid particle). Likewise for the digestion assays, a similar process can be undertaken to calculate the proportion of nucleic acid that is not accessible to the enzyme, for example, and that proportion is therefore presumed to be encapsulated. I say "presumed" because none of these measurements are perfect systems. For example, nucleic acid may be outside the LNP, but sterically shielded from a digestion enzyme by virtue of "hiding behind" a PEG molecule that protrudes from the surface of the LNP. In this case, that nucleic acid may not be digested (or dye-bound) and therefore would be considered as "encapsulated" according to the assay, despite in reality being outside the LNP.

134.    Even within a single "type" of encapsulation test (e.g., dye-binding assays), different dyes may produce different results. For example, Plaintiffs' internal documents demonstrate they themselves observed this phenomenon. *See, e.g.*, GENV-00079261 at 261.

135.    Another option for trying to determine encapsulation is the use of a fluorescent assay. These too are not without faults. For example, fluorescent RNA measurements are sensitive to the polarity of the media, and therefore, do not conclusively distinguish RNA that may be close to, but not inside the LNP. Moreover, the polarity of the PEG layer is different from the polarity of the nanoparticle core and the polarity of the media. Therefore, the fluorescence signals from dyes in the PEG layer are different than fluorescence signals outside the PEG layer, which is further evidence that fluorescence assays would not distinguish "partially encapsulated" mRNA.

49

Chen et al., *Investigation of the Local Environment of Hydrophobic End Groups on Polyethylene Glycol (PEG) Brushes Using Fluorometry: Relationship to Click Chemistry Conjugation Reactions on PEG-Protected Nanoparticles*, 4 ACS Macro Letters, 521–25 (2015).

136.    Further, it has been shown that different measures of encapsulation can (and do) lead to different results. For example, Blenke et al. explain that "the most commonly applied method, the dye binding assay, may -without adaptations- not be suitable for short oligonucleotides like siRNAs." Blenke et al., *Critical evaluation of quantification methods for oligonucleotides formulated in lipid nanoparticles*, 548 International J. Pharms. 793–802, 793 (2018) ("Blenke"); *id.* at 794 ("Each method will have its benefits and limitations under certain conditions and there is probably no gold standard, but the high heterogeneity in quantification protocols or the total lack thereof contributes to the low reproducibility of current scientific literature and the lack of clinical translation"); *id.* at 799 ("More importantly, we demonstrate that there are substantial differences between routinely used detection methods for oligonucleotides, which makes comparison very difficult. . . . this work illustrates the importance of method validation and brings to light one of the possible causes of the low reproducibility of, and the discrepancies between reports from different labs."). It is also known that certain methods (e.g., Ribogreen) overestimate the percentage of encapsulated nucleic acid in a formulation. *See, e.g.*, MRNA-GEN-00760542 at 548 ("Unfortunately, Ribogreen suffers from several challenges including the inability to detect accessible mRNA, likely overestimating the functional encapsulation of some drug product lots. To address this and other challenges associated with Ribogreen, Moderna has and continues to develop alternative encapsulation assays for detecting accessible mRNA."); Blenke at 798 ("Despite the remarkable differences in absolute values between methods, it is not possible to say which one of them is the most accurate, although it could be said that in this case the Ribogreen®

50

assay gives the biggest variations and is far away from the other values. Possibly, the Ribogreen®

reagent is sensitive to 'environmental influences', such as temperature, light, time of incubation.

This makes it suitable for determining encapsulation efficiencies (when samples are measured in

the same assay) but less suitable for comparing samples from different experiments or on different

dates."); MacLachlan Dep. Tr. at 117:25–119:23 ("Q. Of the methods that overestimate

encapsulation efficiency, what methods are you thinking of? A. I'm referring to methods that either

utilize chromatographic methods of determining encapsulation efficiency, such as the use of size-

exclusion chromatography or DEAE or other anion exchange-based methods to determine the

association of nucleic acids with lipid nanoparticles and make the false assumption that the nucleic

acid that [co-elutes] from these type of systems is actually fully encapsulated by the system as a

whole."). To illustrate this, I have reproduced Figure 4 from the Blenke et al. publication below:



As shown in this figure, depending on the test used, the measure of encapsulation may be different

(including in some instances statistically significantly different based on the error bars).

137.    I understand that throughout the litigation, Plaintiffs have attempted to argue that

"partial" encapsulation refers to mRNA that is bound to the surface or is otherwise protected by

51

lipid particles, but not within the particles (I understand that Plaintiffs' claim construction expert Dr. Thompson referred to this as the "spaghetti and meatball" arrangement). D.I. 171, Ex. 7 (Thompson Decl.), ¶ 19. I disagree with this interpretation. If the mRNA is on the surface, it is by definition not <u>within</u> the particle and therefore not encapsulated. The same is true of mRNA that is outside the lipid particle but "shielded" by virtue of being surrounded by particles and/or lipids protruding from the surface. In any event, even if such a scenario could be referred to as "partial encapsulation," a POSA would understand that one would get variable results if trying to quantify said nucleic acid depending on the encapsulation assay used. *See, e.g.*, MRNA-GEN-01626268 at 283 (discussed above). Further, a POSA would recognize that perturbation of the formulation, for example, would result in mRNA moving in and out of this "state," so not only would the results achieved depend on the test used to measure encapsulation, but even if the ***same*** test were used over the course of several experiments, a POSA would nonetheless obtain different results. I understand that these are hallmarks of indefiniteness.

138.    I also note that the Molar Ratio Patents define the term "fully encapsulated" as follows:

> The term "fully encapsulated" indicates that the active agent or therapeutic agent in the lipid particle is not significantly degraded after exposure to serum or a nuclease or protease assay that would significantly degrade free DNA, RNA, or protein. In a fully encapsulated system, preferably less than about 25% of the active agent or therapeutic agent in the particle is degraded in a treatment that would normally degrade 100% of free active agent or therapeutic agent, more preferably less than about 10%, and most preferably less than about 5% of the active agent or therapeutic agent in the particle is degraded. In the context of nucleic acid therapeutic agents, full encapsulation may be determined by an Oligreen® assay. Oligreen® is an ultra-sensitive fluorescent nucleic acid stain for quantitating oligonucleotides and single-stranded DNA or RNA in solution (available from Invitrogen Corporation; Carlsbad, Calif.). "Fully encapsulated" also indicates that the lipid particles

> are serum-stable, that is, that they do not rapidly decompose into their component parts upon in vivo administration.

'069 Patent at 22:63–23:14. While I understand that the definition in the Molar Ratio Patents does not govern here (i.e., with respect to the '651 Patent) and that it is from a different point in time, it is illustrative of the lack of well-understood meaning of this term. I am not aware of any advancements in the field in the intervening six years between the purported priority dates of the two families that would have clarified the meaning of the term to a POSA. As discussed in the "fully encapsulated" section relating to the Molar Ratio Patents below (I incorporate that discussion by reference herein), the Molar Ratio Patent specification defines the phrase by using other similarly vague language, like "not significantly degraded" or "serum-stable," which provide no further clarity to a POSA.

139.    For at least these reasons, the claims, when read in light of the specification and prosecution history, would not reasonably inform those skilled in the art about the scope of the purported invention, at least with respect to the "fully encapsulated" limitation.

### 2.    Written Description

140.    A POSA reading the disclosures of the '651 Patent would not have understood the named inventors to be in possession of compositions with "fully encapsulated" nucleic acid, including mRNA, as distinct from partially encapsulated nucleic acid.

141.    Although the specification of the '651 Patent differentiates "full encapsulation" from "partial encapsulation" in a single instance, '651 Patent at 5:38–40, and the Court's construction makes clear that "full encapsulation" must be something distinct from "partial encapsulation," the experimental results and other disclosures in the '651 Patent refer only to "encapsulation." *See, e.g.*, '651 Patent, Figs. 5–8. For instance, Figures 5–8 of the patent are graphs reporting "DNA Encapsulation (%)" as a function of various parameters:

53

'preformed vesicle method', or formulation #1 clearly has a much lower encapsulation efficiency than the other two formulations that were made with film hydration methods").

185.    For at least these reasons, the full scope of the claims is not enabled.

186.    Further, as relevant to the dependent claims requiring at least 80% or 90% of the mRNA to be fully encapsulated, I note that Plaintiffs' method is described as producing 77% to 90% DNA encapsulation depending on the DNA to lipid ratio used in manufacture. *See, e.g.*, '651 Patent, Example 2. Yet the specification provides no guidance as to what lipid or their ratios to use to achieve the higher levels of encapsulation, let alone how those ratios would need to be altered when a different nucleic acid is used. A POSA therefore would not be able to make the compositions claimed in at least dependent claims 13 and 14 on the basis of the information in the specification, in light of the knowledge of a POSA. For this additional reason, at least the dependent claims requiring higher levels of encapsulation are not enabled.

187.    Further, focusing on the dependent claims requiring at least 90% of the mRNA to be fully encapsulated, I note that none of the examples in the '651 Patent disclose this level of encapsulation. In fact, Example 7 reports that "the SPLP formed according to the processes of the present invention had ***85% DNA encapsulation***." *See, e.g.*, '651 Patent, Example 7. Thus, Plaintiffs claimed a further improvement that they themselves had not achieved and would in fact take undue experimentation to achieve—as shown by the experimentation necessary for Plaintiff to increase the level of encapsulation of mRNA years later. For this additional reason, this dependent claim is not enabled.

188.    Finally, as I discuss in Section X.D, based on my review of the specification, the '651 Patent discloses a method of making vesicles with certain properties. Despite this, I understand that Plaintiffs suggest the claims of the '651 Patent cover vesicles, including LNPs,

74

that are manufactured using the "post-hoc loading" technique. This refers to "loading" the mRNA into an empty LNP after the LNP has already formed whereas traditionally, the lipid components and nucleic acids would be mixed together to form the LNPs. The latter was considered to be the better approach as the charge interaction between the negatively charged nucleic acid and the positive charge on the cationic lipid were considered to be fundamental to the ability to form such vesicles encapsulating nucleic acids. I note that this "post-hoc loading" technique is not disclosed in the specification, let alone any working examples implementing this approach.

189.    This lack of disclosure is consistent with Plaintiffs' internal documents. For example, based on my review of Plaintiffs' documents, it appears that Plaintiffs could not achieve the requisite "at least 70% [or 80% or 90%] of the mRNA" being "fully encapsulated" in LNPs manufactured by mixing nucleic acid with empty LNPs at least as of 2018. *See, e.g.*, GENV-00450951 (Plaintiffs' internal email communication stating that Plaintiffs tried to "ph load 13B42 empty LNP with mRNA," but only achieved "<50% encapsulation (even worse after neutralization) and large particles."). If Plaintiffs themselves could not achieve this level of encapsulation using a "post-hoc loading" technique more than a decade after the priority date, they certainly could not have enabled one of skill in the art to make and use their purported invention using this technique. I also note that the "post-hoc loading" technique is distinct from the "processes . . . taught" in the '651 Patent, where "encapsulation of [the] therapeutic agent in the formed liposome [happens] substantially coincident with liposome formation." '651 Patent at 8:5-11. Thus, at least to the extent Plaintiffs contend that the claims encompass compositions made by this type of process, the claims are not enabled for these additional reasons.

C.    **"mRNA"**

190.    All claims of the '651 Patent include the limitation "[a] lipid vesicle formulation comprising . . . messenger RNA (mRNA)." *See* '651 Patent, claim 1. The '651 Patent only

75

226. At least the below limitations of the Molar Ratio Patents are indefinite, lack written description support, and/or are not enabled. Although I use subheadings for organizational purposes, I reserve the right to rely on any of the evidence discussed below in the context of any opinion I render on each of the below limitations. Further, to the extent I rely on different evidence in the context of my opinions on the '651 Patent versus the Molar Ratio Patents, I reserve the right to rely on that same evidence in the context of the other patent family as well.

### A. "__ mol % the total lipid present in the particle"

227. All claims of the Molar Ratio Patents include the limitation a "nucleic acid-lipid particle" comprising or consisting essentially of certain lipids at specified mol % "of the total lipid present in the particle." *See, e.g.*, '069 Patent, claim 1. Arbutus has argued that the claims of the Molar Ratio Patents "are directed to completed lipid particles of [the claimed] composition[s]." *See ModernaTX, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1352, 1363 (Fed. Cir. 2020). However, the specification of the Molar Ratio Patents refers only to the lipid mol % of the starting materials used to make the nucleic acid-lipid particles, not the lipid content of the nucleic acid-lipid particles themselves. *See, e.g.*, '069 Patent at Table 2; ███████████████████████ ███████████████████████████████████████████ ████████████████ The claims of the Molar Ratio Patents are thus indefinite, lack written description support, and are not enabled, as explained more fully below.

### 1. Indefiniteness

228. The term a "nucleic acid-lipid particle" comprising or consisting essentially of certain lipids at specified mol % "of the total lipid present in the particle" is too poorly defined, at least under Plaintiffs' reading of the limitation, such that a POSA reading the claims in light of the specification and prosecution history would not be able to determine where the bounds of the claims lie.

94

229.

230. First, at a high level, an LNP is about 1000 times smaller than a grain of sand. While perhaps not technically impossible ████████████████████████████. Second, as discussed in ¶ 258 below, the method typically used to measure the lipid content of LNPs is high-performance liquid chromatography (HPLC) or some derivation thereof. However, to be able to run this method, you need a sufficient input quantity. A single LNP is not sufficient to run such an assay. While I can surmise that there are many research groups working on experimental methods that are aimed at evaluating the compositions of increasingly smaller and smaller quantities of materials, I am not aware of any methods that have been validated and/or generally accepted within the scientific community to be able to measure the composition of a single LNP.

231. I also understand that Plaintiffs have suggested that measurements of the lipid content of subpopulations of LNPs within a composition are somehow relevant to the lipid molar ratios within a single LNP. As I discuss below in the context of enablement (¶¶ 260–262), which I incorporate herein by reference, the measure of lipid content of a subpopulation is still an aggregate measure, it is not the measure of the lipid content of a single LNP. Therefore, to the extent Plaintiffs contend that the claims are directed to the molar ratios of individual LNPs, measuring the lipid content of a subpopulation would not allow a POSA to determine whether they are inside or outside the claims for individual LNPs in that population. Further, as I again discuss below in the context of enablement, I am not aware of a method by which a formulation can be subdivided into subpopulations of LNPs according to lipid molar ratios. This means that another

property must be used to first divide the population into subpopulations. But as far as I am aware, there is no other property that could reasonably serve as a proxy for lipid content. For example, a formulation may be subdivided based on particle size or zeta potential. However, neither of these would be a proxy for lipid content and may lead to different conclusions. As a result, depending on how a formulation is subdivided, a POSA may see different results. For at least these reasons— under Plaintiffs' understanding that studying subpopulations is somehow relevant here, a position I do not agree with—the claims would be indefinite.

232.    I also understand that in construing the claims, the Court declined to limit this term to "finished" particles, concluding that the claims could extend to cover compositions comprising particles that undergo further processing. I understand the construction and have applied it in my analysis.

233.    I understand that Plaintiffs have also argued that the claims cover in-process compositions, i.e., ephemeral particles that may or may not exist for some infinitesimally short period of time during the manufacturing process. If Plaintiffs are correct, the claims are indefinite for the additional reason that a POSA is likely to get different results each time this ephemeral, in-process composition is tested. This is because any particles in these in-process compositions are continuously rearranging, until, for example, some further step is taken that brings them into a more stable state. The composition of a single particle in such a state—even if that were possible to measure—would therefore change with every fraction of a second.[9] For reference, assembly of

---

[9] To be clear, in my view, there is a difference between these ephemeral, in-process particles and the scenario discussed in the specification of the Molar Ratio Patents that Plaintiffs' expert had pointed to during claim construction. *See, e.g.*, Thompson Claim Construction Decl., ¶ 42. I understand that it is possible to form particles, i.e., the particles reach some final form, and then that final form is further modified. This is not the same as trying to capture a static picture of a formulation comprising in-process particles.

the approximately 80–100 nm mRNA LNP during precipitation occurs in approximately 50 milliseconds from the time of initial mixing until the final population is established. R.F. Pagels et al., *Controlling and Predicting Nanoparticle Formation by Block Copolymer Directed Rapid Precipitations*, Nano Letters, vol. 18, no. 2, pp. 1139–44 (2018). The blink of an eye takes 100 milliseconds. Therefore, the entire assembly process occurs in half the time of aa blink. To assert that the composition of individual particles could be measured or ascertained during this ultra-rapid conversion process is clearly unrealistic and unattainable. The dynamics of assembly involves complex coalescence events between particles with widely differing sizes and compositions. There is no single composition that defines any single particle during this assembly. Therefore, to the extent this claim, as construed, includes those "in-process particles," the claim is indefinite as, in theory, ███████████████ I would expect that one would get different results from every measurement taken due to the natural instability of these compositions.

### 2. Written Description

234. A POSA reading the disclosures of the Molar Ratio Patents would not have understood the named inventors to be in possession of nucleic acid-lipid particles comprising or consisting essentially of the claimed mol % because the specification does not disclose any data showing the lipid content of the nucleic acid-lipid particle, nor does the specification disclose how to measure the lipid content of the nucleic acid-lipid particle.

235. Moreover, the Molar Ratio Patents specifically note that the formulations reported therein are "target formulations, and that the amount of lipid (both cationic and non-cationic) present and the amount of lipid conjugate present in the SNALP formulations may vary." '069 Patent at 24:64–67; *see also id.* at 68:35–48. The specification provides no guidance of the degree of variance in lipid concentration, nor does it specify for which formulations variance should be