# Exhibit 30

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH, <br><br> Plaintiffs, <br><br> v. <br><br> MODERNA, INC. and MODERNATX, INC., <br><br> Defendants. <br><br>───────────────── <br><br> MODERNA, INC. and MODERNATX, INC., <br><br> Counterclaim-Plaintiffs, <br><br> v. <br><br> ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH, <br><br> Counterclaim-Defendants. | C.A. No. 22-252-MSG <br><br> **CONTAINS INFORMATION DESIGNATED HIGHLY CONFIDENTIAL– OUTSIDE COUNSEL EYES ONLY BY PARTIES AND THIRD PARTIES** |

**<u>REPLY INVALIDITY EXPERT REPORT OF ROBERT PRUD'HOMME, PHD</u>**

Dated: March 21, 2025

_Robert K Prudhomme_

**TABLE OF CONTENTS**

I.      Introduction ................................................................................................. 1

II.     Qualifications, Compensation, and Prior Testimony ........................................ 2

III.    Materials Considered ...................................................................................... 2

IV.     Legal Standards ............................................................................................. 2

        A.      Copying ........................................................................................... 3

        B.      Unexpected Results .......................................................................... 3

        C.      Simultaneous Invention ..................................................................... 3

        D.      Nexus ............................................................................................... 4

V.      Response to Dr. Murthy's "Technical Background" and "Patents-in-Suit"
        Sections ......................................................................................................... 4

VI.     The Asserted Claims of the '651 Patent Are Invalid ......................................... 8

        A.      The Asserted Claims of the '651 Patent Are Indefinite, Lack Written
                Description, and/or Are Not Enabled .................................................. 9

                1.      "fully encapsulated" ............................................................... 9

                2.      "at least 70% [or 80% or 90%] of the mRNA . . . is fully
                        encapsulated" ...................................................................... 37

                3.      "mRNA" .............................................................................. 46

                4.      "lipid vesicle formulation" / "lipid-nucleic acid particle" ......... 51

        B.      Derivation .................................................................................... 57

VII.    The Asserted Claims of the Molar Ratio Patents Are Invalid ............................ 60

        A.      The Asserted Claims of the Molar Ratio Patents Are Indefinite, Lack
                Written Description, and/or Are Not Enabled ..................................... 60

                1.      "__ mol % the total lipid present in the particle" ..................... 61

                2.      "a nucleic acid" / "an RNA" / "mRNA" ................................. 67

                3.      "nucleic acid-lipid particle" ................................................ 70

                4.      "a cationic lipid" ................................................................. 72

5.     "consisting essentially of"................................................................ 74

6.     Less than 50 mol % Cationic Lipid.......................................... 74

7.     "contacting the cell with a nucleic acid-lipid particle" / "in vivo delivery of a nucleic acid" / "administering to a mammalian subject a nucleic acid-lipid article"............................................. 77

8.     Compositions of the Asserted Claims....................................... 80

B.    Prior Use, Sale, Public Use, and Invention........................................ 82

VIII.  **Dr. Murthy's Reliance on the Heyes Declarations**.................................... **91**

IX.   **Secondary Considerations**........................................................................ **97**

A.    The '651 Patent .................................................................................. 98

1.     Commercial Success and Licensing........................................ 98

2.     Copying.................................................................................. 103

3.     Unexpected Results.............................................................. 110

4.     Nexus .................................................................................... 112

B.    The Molar Ratio Patents ................................................................. 114

1.     Commercial Success and Licensing...................................... 114

2.     Copying.................................................................................. 115

3.     Unexpected Results.............................................................. 120

4.     Simultaneous Invention ....................................................... 123

5.     Nexus .................................................................................... 124

X.    **Supplementation** ......................................................................................... **132**

**A.**    **The Asserted Claims of the '651 Patent Are Indefinite, Lack Written Description, and/or Are Not Enabled**

29.    At least the below limitations of the '651 patent are indefinite, lack written description support, and/or are not enabled, for the reasons discussed in my Opening Report and herein. I disagree with Dr. Murthy's contrary opinions, as explained more fully below.

**1.    "fully encapsulated"**

30.    All claims of the '651 Patent include the limitation "wherein [a specified percentage] of the mRNA in the formulation is fully encapsulated in the lipid vesicles." *See* '651 patent, claim 1.

31.    As I stated in my Opening Report, these claims are indefinite, lack written description support, and are not enabled because the specification lacks disclosures regarding the meaning of full versus partial encapsulation, how to measure encapsulation such that partial can be distinguished from full encapsulation, and/or how to make and use lipid vesicles "fully encapsulating" mRNA. I disagree with Dr. Murthy's contrary opinions, as I explain below.

**a.    Indefiniteness**

32.    I incorporate by reference Section X.A.1 of my Opening Report herein.

33.    Dr. Murthy states that "[i]f the lipid vesicle formulation consists of liposomes or lipid particles with an outer lipid-coating (*e.g.*, LNPs) that are neither complexed to one another nor form a disordered lipid mixture, then the nucleic acid molecules inside the lipid vesicles would be expected to be *fully* contained inside the lipid vesicles (*i.e.*, fully encapsulated)." Murthy Reb. ¶502. I disagree that a POSA reading the specification and the claims of the '651 patent in 2002 would come to this conclusion.

34.    First, the '651 patent defines "lipid vesicle" as follows: "any lipid composition that can be used to deliver a compound including, but not limited to, liposomes, wherein an aqueous

9

volume is encapsulated by an amphipathic lipid bilayer; or wherein the lipids coat an interior comprising a large molecular component, such as a plasmid, with a reduced aqueous interior; or lipid aggregates or micelles, wherein the encapsulated component is contained within a relatively disordered lipid mixture." '651 patent at 5:30-37. There is no reference to LNPs or nanoparticles more generally anywhere in the specification. Dr. Murthy appears to suggest that a POSA would understand the clause "wherein the lipids coat an interior comprising a large molecular component, such as a plasmid, with a reduced aqueous interior" to refer to LNPs. I disagree, especially to the extent he contends this would refer to LNPs encapsulating mRNA, at least given the specific reference to encapsulation of a plasmid.

35.    Second, as I discuss in both my Opening and Rebuttal reports, the specification of the '651 patent does not describe different processes used to generate different types of vesicles. Rather, the specification at best describes one process that it purports can be used to manufacture one type of vesicle: liposomes. Therefore, on the basis of Dr. Murthy's assertion that "[w]hich type of lipid composition is produced was known to be based on factors such as method of formulation and lipid composition," Murthy Reb. ¶502. there is no teaching in the specification on how to make LNPs, let alone LNPs that would encapsulate mRNA.

36.    Third, Dr. Murthy does not grapple with the Court's construction of the term "fully encapsulated." As I explained in my Opening Report, the Court construed "wherein at least 70% / at least 80% / about 90% of the mRNA in the formulation is fully encapsulated in the lipid vesicles" as "wherein at least 70% /at least 80% / about 90% of the mRNA in the formulation is fully, *as distinct from partially*, contained inside the lipid vesicles." Opening Rep. ¶46 (emphasis added). Dr. Murthy does not explain why, or on what basis, a POSA would expect that lipid vesicles would exclusively fully encapsulate mRNA, to the exclusion of any mRNA being partially encapsulated.

10

The material he cites provides no further support. In fact, the only reference that he cites in that paragraph that uses the term "fully encapsulated" is the statement made by Melissa Moore, which I address in detail in my Rebuttal Report. *See, e.g.*, Rebuttal Rep. ¶323-324.

37.     In its claim construction opinion, the Court stated the following: "However, even if it is true that encapsulation efficiency must be measured using the fluorescent dye method described in the specification, the disputed term is not 'encapsulation efficiency' as used in the specification, but rather 'fully encapsulated' as used in the claim." D.I. 266 at 37. It is therefore improper to equate "encapsulation efficiency" with the "fully encapsulated" claim limitation as Dr. Murthy appears to do here, and as Dr. Mitchell did in his Opening Report. The Court likewise found that "Plaintiff's position that 'fully encapsulated' means 'contained inside' fails to account for the words 'in the lipid vesicles,' which clearly identifies the location of the mRNA as inside the vesicle." D.I. 266 at 37. Thus, Dr. Murthy's (and previously Dr. Mitchell's) attempts to equate the claim limitation with statements about whether mRNA is contained "inside" or "within" are likewise improper.

38.     Dr. Murthy further states that "[t]he POSA would have recognized that it would be thermodynamically unstable for the hydrophilic nucleic acid to interact with the hydrophobic portion of the bilayer, as would be required for nucleic acid inside of a liposome or LNP to not be fully within the formed vesicle—as such, this sort of 'partial' encapsulation (where part of the nucleic acid is inside and part of the nucleic acid is outside the vesicle) is unlikely to occur in these lipid compositions, and certainly not to any appreciable extent." Murthy Reb. ¶505. But none of the alleged support Dr. Murthy cites for this proposition actually demonstrates that this state is "unlikely to occur," let alone whether it would occur "to any appreciable extent."

11

39.    In fact, Dr. Murthy's rebuttal evidences a large gap in his understanding of how the interactions governing the formation of these compositions. Dr. Murthy appears to be suggesting that the only relevant forces are electrostatic and hydrophobic / hydrophilic interactions. That is not accurate. In fact, he is neglecting to mention the effect of entropy on these compositions, which is arguably the most important force in how these composition pack or form. As originally presented by the Nobel Laureate P.G. deGennes, and as summarized in the text <u>Polymer Physics</u> by Colby and Rubenstein (Oxford Press, 2004, Section 3.2.3 (pages 110-111)) the adsorption of polymer chain (such as a nucleic acid) from a solution onto or into the core of an LNP depends on the free energy $F_{ads}$ driving localization versus the reduction in entropy of the chain ("…thereby losing conformational entropy.") Both scaling theory and the Flory theory of polymer free energy predict the same free energy required for localization: $F_{ads} = -kTN\delta^{5/2}$ , where $k$ is the Boltzmann constant, $T$ is the absolute temperature, $N$ is the number of statistical segments in the chain, and $\delta$ is the energy of interaction. This form of the equation is for "real" chains, which means chains with excluded volume interactions, which would be the case for nucleic acid chains. The interaction energy is determined by the energy difference between the nucleic acid chain in the aqueous media and the hydrophobic energy of the ion-paired ionizable lipid bound to the nucleic acid chain. The significant point missed by Drs. Mitchell and Murthy is that the energy for localization depends linearly on the number of statistical links in the chain, $N$. This number depends on the stiffness of the polymer chain. For very stiff chains, such as the pDNA double helix, the number of statistical segments is very low, even for high molecular weight plasmids, as I have noted in my initial report. It is also very low for low molecular weight double stranded nucleotides such as siRNA. This makes pDNA and siRNA quite easy to encapsulate in an LNP. However, it makes the much more flexible, and higher molecular weight, mRNA much harder to

encapsulate since the value of $N$ is much higher for mRNA, even at the same molecular weight as pDNA. The greater free energy required for confinement of an mRNA makes it much more likely that there are segments of the chain that are exposed on the surface of the LNP. In the deGennes theory, these are called "adsorption blobs."

40.    Further, Dr. Murthy's "cartoon graphic" in paragraph 504 of his report is inapplicable to the encapsulation of mRNA. The nucleic acid in the cartoon appears to be siRNA, as suggested by its linear and double-stranded nature. As I discuss in my Opening Report, mRNA is very different from siRNA in many ways, including that it is much longer than siRNA. As a result, the mRNA would not be expected to exist in the neat capsules Dr. Murthy has depicted in this cartoon. Rather the proposed structure of the composition inside mRNA-LNPs has been depicted as follows:



Artera et al., *Successful reprogramming of cellular protein production through mRNA delivered by functionalized lipid nanoparticles*, 118 PNAS E3351-E3360 (2017). *See also* MRNA-GEN-01257152 at 252-53 ("In the case of LNPs containing [siRNA], small angle x-ray scattering and cryo-electron microscopy (cryo-EM) data have been interpreted as evidence of a multilamellar

13

structure in which the siRNA molecule is sandwiched between bilayer lipid assemblies. [ ] However, the situation is less clear when LNPs containing the much larger mRNA molecule are also considered. . . . Despite significant efforts to pinpoint the nucleic acid payload, the precise location of mRNA molecules within LNPs has not heretofore been unambiguously identified via direct experimental methods.").

41.     Unlike the siRNA in Dr. Murthy's image, which does not have much entropy, the amount of entropy in mRNA will be much greater, i.e. these longer molecules will not want to, and will resist, being packing inside the core. It is therefore quite possible that one of more pieces of the mRNA will break through the outer shell, sticking outside of the particle. While Dr. Murthy acknowledges that electrostatic forces will "encourage" it to move back into the particle so as to avoid the disfavored interactions Dr. Murthy refers to, entropy will "encourage" the portion to remain disordered, which may include being outside the particle. I therefore disagree that this state will necessarily only exist transiently[2] or that necessarily only a negligible amount of mRNA would be found in this state.

42.     To further illustrate this concept, I have calculated the encapsulation energies for the three types of oligos: siRNA, dsDNS, and mRNA. Specifically, the difference in the free energy required to confine siRNA, dsDNA, and mRNA can be calculated from Eqn. 3.64 (shown in ¶39 above). That energy difference is proportional to $N$, the number of statistical segments in the nucleotide (polymer) chain. The number of statistical segments is given by the contour length, $L$, divided by the persistence length of the chain, $l_p$ : $N = L/l_p$ The persistence length is a measure of the stiffness of the chain. The values of $L$ and $l_p$ are known:

---

[2]     Further, even if Dr. Murthy is correct and this is a transient state from which mRNA moves in and out of based on the forces acting upon it, that only supports my conclusion of indefiniteness as it means that depending on when a measurement is taken, different results may be obtained.

- **siRNA**: siRNA with between 17 and 25 base pairs have contour lengths of $L$ =7.5 - 8.5 nm (*see* Schroeder, A., et al., *Lipid‑based nanotherapeutics for siRNA delivery*, 267 Journal of internal medicine 9-21 (2010)). The persistence length is $l_p$ = 70 nm (*see* Pärnaste, Ly, et al., *The formation of nanoparticles between small interfering RNA and amphipathic cell-penetrating peptides,* 7 Molecular Therapy Nucleic Acids 1-10 (2017)). Since the persistence length is longer than the contour length, the siRNA acts as a rigid rod, for which **N=1**.

- dsDNA: a 935 bp DNA has a contour length of $L$ =316 nm. The persistence length is $l_p$ = 50 nm (*see* Seol, Yeonee, et al., *Elasticity of short DNA molecules: theory and experiment for contour lengths of 0.6–7 μm*, 93 Biophysical journal, 4360-4373 (2007)). The number of statistical segments $N$ = **316 nm/50 nm = 6.3**.

- mRNA: a luciferase mRNA comprises 1922 nucleotides (nt). The contour length per nucleotide is given as 0.34 nm/nt to 0.59 nm/nt (*see* de Messieres, Michel, et al., *Single-molecule measurements of the CCR5 mRNA unfolding pathways*, 106 Biophysical Journal 244-252 (2014)). Using an intermediate value of 0.45 nm/nt, the contour length is $L$ = 864 nm. The persistence length of mRNA is $l_p$ = 22 nm (*see* Chen, Huimin, et al., *Ionic strength-dependent persistence lengths of single-stranded RNA and DNA,* 109 Proceedings of the National Academy of Sciences 799-804 (2012)). Therefore, the number of statistical segments $N$ = **864 nm/22 nm = 39**.

Therefore, this demonstrates that the entropy penalty, or free energy penalty, to confine a representative mRNA is 39 times higher than the free energy required to confine or encapsulate an siRNA. Likewise, it takes over 6 times the free energy to confine or encapsulate an mRNA compared to a DNA, even when the DNA and mRNA have essentially the same number of nucleotides (935 x 2 = 1870 nt compared to 1922 nt). This much higher entropy penalty is the reason that siRNA encapsulation was easier to achieve, and occurred early in the development of nucleotide therapies. DNA encapsulation was somewhat more difficult, and mRNA encapsulation is considerably more challenging. This likewise demonstrates why the teachings from siRNA encapsulation or DNA encapsulation do not directly translate to mRNA encapsulation.

43.    Dr. Murthy also states that "[e]ven if a few nucleic acid molecules (out of the millions or billions in a typical formulation) were to exist in such a state of partial encapsulation, the POSA would have recognized that this would be a transient, thermodynamically unstable orientation." Murthy Reb. ¶506. I have addressed why this argument is incorrect above. But in any

event, Dr. Murthy appears to suggest that because this would be a "transient, thermodynamically unstable orientation" it need not be considered. If that is true, then any transient compositions that form during the manufacture of LNPs likewise should not be considered, including in the context of infringement. Thus, under Dr. Murthy's apparent view, Plaintiffs' own infringement argument relating to a hypothetical in-process composition that may transiently form is improper.

44.     However, there is an even larger problem with Dr. Murthy's opinion. As I explained in my Opening Report, there is no well-understood or accepted meaning of the term "partially encapsulated," and that one *possible* meaning is the reference to nucleic acid a portion of which is inside, while a portion of it is outside, the particle. Dr. Murthy purports to reject this definition, arguing that this is thermodynamically improbable. With the confinement calculation given above, I do not believe it is thermodynamically improbable. Regardless, even if he were correct, that leaves open the question: what does "partial" encapsulation refer to? Dr. Murthy does not (and seemingly cannot) answer this question. But he cannot simply ignore the fact that the patent unequivocally states that "[a]s used herein, 'lipid encapsulated' can refer to a lipid formulation which provides a compound with full encapsulation, partial encapsulation, or both." '651 patent at 5:38-40. For this precise reason, the claims of the '651 patent are indefinite.

45.     For example, Dr. Murthy states that "in systems where nucleic acid is complexed to lipids, entrapped by lipid aggregates, or contained within a relatively disordered lipid mixture, the POSA would have understood that such nucleic acids are not fully encapsulated." Murthy Reb. ¶507. But he then admits that "nucleic acid outside of a lipid vesicle—including in a lipoplex composition—would be considered unencapsulated, rather than 'partially encapsulated.'" Murthy Reb. ¶508. This therefore does not provide any clarity on the term "partial" encapsulation.

46.    Dr. Murthy attempts to avoid this issue entirely by stating that "[r]egardless of whether the nucleic acid molecules in a lipoplex composition are partially encapsulated or unencapsulated is not relevant to my opinions concerning the definiteness of the claims of the '651 patent, since the claims only require that the POSA be able to determine with reasonable certainty that the claimed amount of mRNA 'is fully encapsulated.'" Murthy Reb. ¶509. *See also, e.g.,* Murthy Reb. ¶¶519, 527, 534[3]. However, while the claims do not use the term "partially encapsulated," as the Court noted in its claim construction opinion, "[t]he inventors' decision to refer to 'full' and 'partial' as alternatives confirms that when they used only the word 'fully,' they intended to exclude the word 'partially.'" D.I. 266 at 35. Therefore, by definition, to determine the percentage of nucleic acid that is "fully encapsulated" as required by the claims, it is necessary to exclude any nucleic acid that is "partially encapsulated."[4] Here, a POSA would not know how to do so as the patent provides no guidance and there is no well-understood or accepted meaning of the term. Dr. Murthy therefore cannot simply ignore the need to understand and measure "partial" encapsulation to determine the scope of the claims.

47.    Dr. Murthy states that "[u]se of these analytical methods to confirm, where necessary or desired, the structure and type of lipid vesicle composition was well known at the time of the invention." Murthy Reb. ¶511. But this misses the point ███████████

---

[3]    Dr. Murthy appears to be suggesting that dye exclusion assays can distinguish between fully and partially encapsulated mRNA. Murthy Reb. ¶534. As I explain in my Opening Report, I disagree.

[4]    Dr. Murthy's critique of my comment that "'it is unclear' what full encapsulation refers to," Murthy Reb. ¶517, ignores this point and the Court's construction. While I agree with the Court that a "POSITA would only count those strands that are fully contained inside the vesicle," Murthy Reb. ¶518 (citing Claim Construction Opinion at 36), the issue remains that the patent provides no guidance to a POSA—nor would a POSA have known—how to determine how many of the strands are indeed "fully encapsulated." For this reason, the claims are indefinite.

17

48.    I note that Dr. Murthy, however, does not stay consistent through this section of his report. For example, despite admitting that "nucleic acid outside of a lipid vesicle—including in a lipoplex composition—would be considered unencapsulated, rather than 'partially encapsulated,'" Murthy Reb. ¶508, later in the very same section he states "[t]he POSA would have recognized that 'full encapsulation' as used in the '651 patent refers to nucleic acid that is fully, as distinct from partially, contained inside the lipid vesicles such as in a system akin to lipid vesicles which have a 'lipid bilayer' or a 'lipid[] coat[ing]' encapsulating an aqueous interior, in contrast to aggregates where the encapsulated component is part of a 'disordered mixture.'" Murthy Reb. ¶513. He seems to be suggesting that "aggregates where the encapsulated component is part of a 'disordered mixture' are an example of "partial encapsulation." This is directly contrary to what he states earlier in his report and to the Court's claim construction opinion, where the Court states "[Plaintiffs] analogize partially encapsulated mRNA as spaghetti (mRNA) in between meatballs (lipid vesicles). However, the claim reads 'fully encapsulated in the lipid vesicle.' If it is true that 'partially' means outside the lipid vesicles and 'fully' means inside the lipid vesicles, then the use of 'fully' is superfluous to 'in the lipid vesicles.'"

49.    His citations to the prosecution history of the '651 patent fare no better. For example, Dr. Murthy points to the Applicant contrasting 'the encapsulated mRNA present within the lipid vesicles of the present invention,' which 'will be protected from nuclease degradation upon systemic administration,' with 'nucleic acid that is merely associated with the surface of a

---

[5]    Likewise, I disagree that "the POSA would generally have known whether he or she had formulated a fully-encapsulated composition." Murthy Reb. ¶510. Again, Dr. Murthy ignores that the term "fully encapsulated" must exclude any "partially encapsulated" nucleic acid.

preformed liposome (such as the DNA of the lipoplexes of Unger et al.),' which 'will be more readily degraded by serum nucleases.'" Murthy Reb. ¶514. But the Court previously rejected this position, stating "Plaintiff's position that 'fully encapsulated' means 'contained inside' fails to account for the words 'in the lipid vesicles,' which clearly identifies the location of the mRNA as inside the vesicle." D.I. 266 at 37. His citation to WO 01/05374 fails for at least the same reason.[6]

50.    Dr. Murthy states that "[o]ver the decades, scientists' understanding of the term 'fully encapsulated' has remained consistent." Murthy Reb. ¶515. He provides no support for this contention. I do not agree with his position. In fact, Plaintiffs' Molar Ratio Patents define "fully encapsulated" differently than the '651 patent. *Compare* '651 patent at 5:38-40 ("As used herein, 'lipid encapsulated' can refer to a lipid formulation which provides a compound with full encapsulation, partial encapsulation, or both.") *with* '069 patent at 22:63-23:14 ("The term 'fully encapsulated' indicates that the active agent or therapeutic agent in the lipid particle is not significantly degraded after exposure to serum or a nuclease or protease assay that would significantly degrade free DNA, RNA, or protein.").

51.    Dr. Murthy also provides no support or explanation as to how "[t]he POSA's ability to precisely define and distinguish various types of not-fully encapsulated nucleic acids—which are not claimed by the '651 patent—such as partially encapsulated nucleic acid or unencapsulated nucleic acid, would not undermine the POSA's ability to ascertain the scope of the claims," Murthy Reb. ¶519, when the scope of the claims is determined by the percentage of the mRNA that is "fully, as distinct from partially, encapsulated." Nor does he explain how the "construction does

---

[6]    I also note that Dr. Murthy appears to be attempting to use language from a ***different***, unrelated patent application (WO 01/05374) to define "fully encapsulated" in the '651 Patent. Dr. Murthy merely references that it was "produced in full in the '651 File History," but provides no basis upon which it could properly be used to define a term used in the '651 patent—let alone in a manner contrary to the Court's claim construction and corresponding order.

not impose any requirement about the quantification of partially encapsulated nucleic acid, or necessitate distinguishing between partially and unencapsulated mRNA," Murthy Reb. ¶520, where the Court explicitly found that "[t]he inventors' decision to refer to 'full' and 'partial' as alternatives confirms that when they used only the word 'fully,' they intended to exclude the word 'partially.'" D.I. 266 at 35. Dr. Murthy's arguments do not properly take into account the Court's construction. Likewise, Dr. Murthy's citations to deposition testimony and documents (including Moderna's own documents)[7] that refer to mRNA as being "inside," "internalized," or "within" the particle (or other similar descriptors) do no more than advance the same, previously-rejected argument.

52.     Dr. Murthy further states that "[t]o the extent there existed lipid compositions in which the nucleic acid could exist in a "half-in-half-out" state . . . the POSA would likely have been able to assess such compositions with various analytical measurements." Murthy Reb. ¶535. I disagree and further note that none of the material he cites as purported support for this statement identifies any methodology that would be expected to distinguish between full versus partial encapsulation. The literature likewise explains that the methods Dr. Murthy points to, e.g., cryo-EM, cannot pinpoint the exact location of the mRNA. *See, e.g.*, MRNA-GEN-01257152 at 153 ("Despite significant efforts to pinpoint the nucleic acid payload, the precise location of mRNA molecules within LNPs has not heretofore been unambiguously identified via direct experimental methods."); *id.* ("One difficulty with the analysis of LNPs is that many bio-physical techniques produce a globally averaged signal or have limited selectivity for the RNA molecule within the

---

[7]     As I explained in my Rebuttal Report (*see, e.g.*, ¶¶325-329), Moderna's method for determining encapsulation efficiency does not distinguish between fully and partially encapsulated mRNA, making it insufficient to determine infringement.

solid particle. Although cryo-EM is a powerful tool for visualizing LNPs, the mass density contrast alone is not distinctive enough to unambiguously resolve RNA from lipidic components.")

53.    In fact, only one of the documents he cites appears to use the term "fully encapsulated"—and none use the term partially encapsulated—in the language Dr. Murthy selectively quotes. I have reproduced the slide that Dr. Murthy relies on below:

MRNA-GEN-00531946 at -960. But I see no indication that as used on this slide, "fully encapsulated" is meant to refer to "fully, as distinct from partially, encapsulated" as required by the Court's claim construction. Dr. Murthy further claims that "to the extent the nucleic acid were able to exist in such a state (which, again, Dr. Prud'homme provides no evidence for), it is likely that standard fluorescent dyes would likewise be able to enter the lipid vesicle (presumably through

the same pore through which the nucleic acid has traversed), and thus the nucleic acid strand would be quantified as unencapsulated (and not fully encapsulated)." Murthy Reb. ¶535. I find it difficult to follow Dr. Murthy's hypothetical here, but based on my experience ██████████████████████

████████████████████████████████████████████

████████████████████████

54.    Dr. Murthy states that "Moderna documents describing how to discuss encapsulation to regulators also makes no mention of mRNA partially inside and partially outside of vesicle." Murthy Reb. ¶538. I do not disagree. It is customary in the field to distinguish between encapsulated and non-encapsulated mRNA. However, that is not what is described or claimed in the patent. The claims of the patent could have required that a certain percentage of the mRNA be encapsulated. But that is not the language the drafters chose. Instead, the claims require that a certain percentage be *fully* encapsulated. I agree with Dr. Murthy that Moderna's tests are not engineered to make that distinction. I likewise do not see anything in Moderna's documents that "contradicts" my "speculation" as Dr. Murthy suggests. Murthy Reb. ¶545. Dr. Murthy, just like Dr. Mitchell in his Opening Report, repeatedly ignores the fact that the question relevant to Moderna's specification as to encapsulation efficiency is *not* the same question as is before us in the context of validity. As the Court stated in its claim construction opinion: "the disputed term is not 'encapsulation efficiency' as used in the specification, but rather 'fully encapsulated' as used in the claim." D.I. 266 at 37. There is therefore no inconsistency between my opinions on this issue and Moderna's statements to the FDA—the two are simply directed to two different questions.

55.    Dr. Murthy states that "[i]f a significant amount of mRNA could exist partially inside and partially outside a vesicle, I would expect Moderna to discuss this with the FDA, given the potential impact it would have on *in vivo* efficacy." Murthy Reb. ¶539. Dr. Murthy cites no

22

support or basis for this expectation. I disagree with his statement. Moderna's tests have been shown to ensure that the level of efficacy observed in clinical trials is maintained. The goal of these tests is not to pick apart different encapsulation states, nor do these methods "indicate that [Moderna's] encapsulated nucleic acid is fully encapsulated," at least because Moderna's methods do not distinguish between full and partial encapsulation as those terms are used in the context of the '651 Patent.

56.    In discussing MRNA-GEN-01257152, a 2021 publication by Brader et al., Dr. Murthy notes that "the article does not discuss encapsulation states other than free and fully encapsulated nucleic acid." Murthy Reb. ¶541. That is simply false. Rather, the article states, for example: "It is now apparent that mRNA may exist fully encapsulated within the spherical particle [ ] or dissocitated within a large bleb in the highly nonspherical particle [ ] or, alternatively, may be in an intermediate state. . . . it is apparent that varying degrees of particle nonsphericity can also be viewed in the context of a continuum of states involving differing degrees of mRNA-lipid association." MRNA-GEN-01257152 at 155.

57.    Dr. Murthy also states that I "speculate" that "mRNA could be 'sterically shielded' by 'hiding behind a PEG molecule,' and therefore be counted as 'encapsulated' by the dye assay 'despite in reality being outside the LNP.'" Murthy Reb. ¶545 (citing my Opening Report ¶133). *See also* Murthy Reb. ¶566. First, I note that the paragraph of my Opening Report that Dr. Murthy purports to cite to is not limited to dye-based assays, but rather states, in relevant part: "For example, nucleic acid may be outside the LNP, but sterically shielded from a digestion enzyme by virtue of 'hiding behind' a PEG molecule that protrudes from the surface of the LNP. In this case, that nucleic acid may not be digested (or dye-bound) and therefore would be considered as 'encapsulated' according to the assay, despite in reality being outside the LNP" lipid surface.

23

Opening Rep. ¶133. I therefore understand that Dr. Murthy is not disputing that this phenomenon is observed with respect to at least the digestion-based assays. Second, it is well understood in the field that the LNP particle has a corona or brush of PEG molecules at the LNP lipid surface that controls particle aggregation and controls the size of the LNP made during precipitation. This PEG layer prevents protein adsorption or interactions on the LNP surface prior to *in vivo* application. We have demonstrated that a dense PEG layer prevents protein adsorption on NP surfaces. *See, e.g.*, Pagels, Robert F., et al. *Controlling and predicting nanoparticle formation by block copolymer directed rapid precipitations*, 18.2 Nano Letters, 1139-1144 (2018). This "stealth" PEG layer prevents or greatly reduces nuclease (a protein) access to the LNP surface. Therefore, the layer would prevent or greatly reduce the nuclease degradation of mRNA that resides at the surface of the LNP. This understanding of PEG shielding of NP surfaces is widely known and defined as "stealth" coatings. *See, e.g.*, Amoozgar & Yoon *Recent advances in stealth coating of nanoparticle drug delivery systems*, 4 Wiley Interdisciplinary Reviews: Nanomedicine and Nanobiotechnology, 219-233 (2012); Zalba et al. *Stealth nanoparticles in oncology: Facing the PEG dilemma,* 351 J. Controlled Release 22-36 (2022); Fang, Chao, et al., *In vivo tumor targeting of tumor necrosis factor-α-loaded stealth nanoparticles: Effect of MePEG molecular weight and particle size*. 27 European J. Pharmaceutical Sciences 27-36 (2006). In fact, I would expect this shielding effect to be more pronounced in Moderna's COVID-19 vaccine due to the increased mol% PEG.

58. Dr. Murthy states that I do "not explain how different dyes potentially reporting different total RNA concentrations, which is not what the claims are directed to, is relevant to a POSA being able to ascertain the claim scope with reasonable certainty." Murthy Reb. ¶547. I understand that where different methods produce different results and the specification does not

24

identify which method should be used to determine infringement, that can support a finding of indefiniteness. It is not clear to me on what basis Dr. Murthy is ignoring this principle.

59.     Further, my group has studied several techniques to compute encapsulation efficiency (EE): fluorescence, size exclusion chromatography and gel electrophoresis. *See* Bizmark, Navid, et al. *Ribogreen fluorescent assay kinetics to measure ribonucleic acid loading into lipid nanoparticle carriers.*, 11 Advanced Materials Interfaces (2024). We reported that size exclusion chromatography gave an encapsulation efficiency of 74%, whereas the fluorescence assay gave an encapsulation efficiency of 85%. The inherent differences in the techniques and the principles they rely upon causes differences of this magnitude. There are several variables that control the reproducibility and accuracy of the fluorescence measurements. For example, in the above paper we showed that the measurements had a kinetic dependence over a period of 80 minutes, and that the addition of the surfactant Triton X100, which is used to disrupt the LNP structure and release RNA changes those kinetics. Thus, for example, measurements of encapsulation efficiency and RNA content that are not reported with the precise timing of the measurements can lead to significant variability.

60.     Likewise, the fundamental patent in the field of fluorescent dye synthesis for RNA and DNA measurements is U.S. Patent No. 5,658,751 (Aug 19, 1997). Haugland was the founder of Molecular Probes, which was later purchased by ThermoFisher. ThermoFisher is the current source of the Ribogreen dye widely used for RNA EE studies. The patent highlights many of the limitations/concerns when using fluorescence quantification: including, for example, photobleaching (*see, e.g.*, 16:23-29), permeability of the dyes across membranes, which would alter the entry of the dye into the lipid core of an LNP (*see, e.g.*, 38:51-57, 39:37-47)), nucleotide sequence sensitivity (*see, e.g.*, Table 12, 44:20-28), and single versus double strandedness of the

nucleic acid, which would cause differences in readout between double stranded sections of RNA versus linear sections, and between RNA and dsDNA (*see, e.g.*, 44:20-28, 46:30-38).

61.    Dr. Murthy further states that "[i]f it is true that under standard conditions, fluorescent assays such as Ribogreen could not distinguish mRNA that is outside of the vesicles, from mRNA that is inside the vesicles, there would be little reason to use these methods to measure encapsulation, as Moderna does, and relied on in discussions with the FDA." Murthy Reb. ¶551. Dr. Murthy missed the point. Again, the question is not whether Ribogreen or any other assay can distinguish between mRNA outside the vesicles from mRNA inside the vesicles. This reading of the claims was already advanced by Plaintiffs during claim construction and rejected by the Court. The relevant question is whether any of these assays can distinguish between fully, as distinct from partially, encapsulated mRNA. In my view, they do not, and I see nothing in Dr. Murthy's report to the contrary.[8]

62.    Dr. Murthy states that it is his view that "in 2002, the POSA would have understood that dye exclusion is the technique that should be used." Murthy Reb. ¶557. But he cites no support for this assertion. Moreover, the Molar Ratio Patents define "fully encapsulated" to require a degradation assay, as Plaintiffs agreed during the IPRs. *See, e.g.*, IPR2018-00739, Paper 24 ("In contrast to the '554 publication, the '435 patent provides a definition, an assay for encapsulation, and reports encapsulation values. *See, e.g.*, EX1001, 22:55-62 ('In preferred embodiments, a SNALP comprising a nucleic acid such as an interfering RNA (e.g., siRNA) is fully encapsulated

---

[8]    Dr. Murthy also states that "Moderna's own representations to the FDA undermines Dr. Prud'homme's suggestions that fluorescent dyes are unreliable, and that opinion is also inconsistent with the widespread use of such dyes to assess full encapsulation, now and at the priority date." Murthy Reb. ¶552. I have already addressed Dr. Murthy's reference to the FDA statements above, but note that despite now using the term "full encapsulation," Dr. Murthy presents no evidence that fluorescent dye assays can identify full, as distinct from partial, encapsulation. Dr. Murthy's use of the term "full encapsulation" synonymously with "encapsulation" throughout his report generally highlights a major flaw in his opinion.

within the lipid portion of the particle, thereby protecting the nucleic acid from nuclease degradation. In certain instances, the nucleic acid in the SNALP is not substantially degraded after exposure of the particle to a nuclease at 37°C. for at least about 20, 30, 45, or 60 minutes.') . . . . That is, a nucleic acid is encapsulated when it is inside the lipid particle and protected from nuclease degradation."). It is entirely possible that a degradation assay could lead to a different measure of encapsulation than a dye exclusion assay, as I explained in my Opening Report. Also, the protection of siRNA from nuclease degradation does not necessarily carry over to how this assay would apply to mRNA. As noted above, the greater ease of encapsulation of siRNA would likely cause it to have less susceptibility to nuclease degradation. The greater free energy required for mRNA encapsulation would indicate that more mRNA might not be "fully encapsulated" or might be more susceptible to nuclease degradation. Yet, none of Plaintiffs' experts even attempted to demonstrate that Moderna's COVID-19 vaccine would infringe the '651 patent based on this definition.

63.    Dr. Murthy states that "the Blenke article is about "short oligonucleotides like siRNAs," and its findings and methods are based on such short oligonucleotides rather than mRNA, to which the claims are directed." Murthy Reb. ¶558. I understand him to be saying that a POSA would not perceive findings relating to siRNA to be generally applicable to mRNA. I agree with this statement, and the same logic would apply to vesicles incorporating pDNA, the findings related to which would not necessarily translate to vesicles comprising mRNA, let alone mRNA LNPs.

64.    Dr. Murthy further states that "Figure 4 relates to the absolute concentration of siRNA, not percentage of fully encapsulated mRNA. Table 2 from Blenke 2018, which Dr. Prud'homme did not include in his report, does describe different encapsulation percentages, and

27

is reproduced below." Murthy Reb. ¶560. Despite Dr. Murthy's attempt to suggest that Table 2 of the Blencke 2018 article reports "percentage of *fully encapsulated* mRNA," the Table, as reproduced in Dr. Murthy's report, is explicitly labeled "*Encapsulation efficiencies* of the three different formulation methods as measured with the seven different quantification methods." The two are plainly not the same. As I explain above, the Court explicitly noted that "the disputed term is not 'encapsulation efficiency' . . . but rather 'fully encapsulated' as used in the claim." D.I. 266 at 37. Further, while Dr. Murthy acknowledges that there is "some variability," he appears to be trying to downplay the differences. For example, the encapsulation efficiency for Formulation #1 was reported to be somewhere between 11% and 50% depending on the quantification method used, Formulation #2 was reported to be somewhere between 76% and 103% depending on the quantification method used, and Formulation #3 was reported to be somewhere between 73% and 101% depending on the quantification method used. It is not clear what Dr. Murthy means by a technique being considered "standard by the POSA," but to the extent these other techniques were available—which he does not appear to dispute—a POSA could have used any one of them to measure encapsulation efficiency.

### b.      Written Description

65.      I incorporate by reference Section X.A.2 of my Opening Report herein.

66.      Dr. Murthy's opinions regarding written description of the "fully encapsulated" limitation are very similar to his indefiniteness opinions on the same limitation. I thus incorporate by reference my opinions with respect to indefiniteness herein.

67.      Dr. Murthy opines that a POSA would have read "encapsulation" in the specification of the '651 patent to refer to the "fully encapsulated" limitation of the asserted claims of the '651 patent. Murthy Reb. ¶585. I disagree. As I noted in my Opening Report, the specification distinguishes "full encapsulation" from "partial encapsulation." '651 patent at 5:38-

meaningfully different results," I note that in fact Dr. Murthy has identified *no* method that could measure full, as distinct from partial, encapsulation, and therefore it is entirely unclear what methods he is purporting to be comparing here.

92.     Dr. Murthy seems to suggest that dye exclusion techniques would be the only approach a POSA would consider in measuring encapsulation efficiency. I disagree. In fact, there were many alternate assays available, including before 2002. *See, e.g.*, Monnard et al., *Entrapment of nucleic acids in liposomes*, 1329 Biochimica et Biophysica Acta 39–50 (1997) (describing the use of circular dichroism, UV absorbance, gel electrophoresis, and scintillation counting to assess encapsulation). Dr. Murthy further states that "[t]o this day, dye exclusion assays are still viewed at the standard technique in the field for quantitatively measuring encapsulation, including in fully encapsulated systems such as LNPs." Murthy Reb. ¶573. Regardless of whether it is viewed "at [sic] the standard," there can be no dispute that other techniques are also used. For example, Moderna's method relies on absorbance, not fluorescence.

93.     As in his preceding section on "full encapsulation," Dr. Murthy again appears to use "full encapsulation" synonymously with "encapsulation." *See, e.g.*, Murthy Reb. ¶574. As I explained in detail in Section VI.A.1.a above, that is improper at least because it is not consistent with the Court's claim construction in this case. None of the purported evidence he cites for his contention that a POSA "would have known that full encapsulation can be measured using a dye-exclusion assay" actually supports this statement when "full encapsulation" is properly read as full, as distinct from partial, encapsulation.

### b.     Written Description

94.     I incorporate by reference Section X.B.2 of my Opening Report herein.

95.     Dr. Murthy repeats that he considers the specification to "disclose lipid vesicle compositions that fully encapsulate the claimed percentages of nucleic acid" because the

39

### 1.    "__ mol % the total lipid present in the particle"

147.    All claims of the Molar Ratio Patents include the limitation a "nucleic acid-lipid particle" comprising or consisting essentially of certain lipids at specified mol % "of the total lipid present in the particle." *See, e.g.*, '069 patent, claim 1.

148.    As I stated in my Opening Report, these claims are indefinite, lack written description support, and are not enabled at least because there is no disclosure in the specification of the composition of individual particles, let alone any teachings as to how a POSA could arrive at or measure the lipid molar ratios of individual particles in said compositions. I disagree with Dr. Murthy's contrary opinions, as I explain below.

### a.    Indefiniteness

149.    I incorporate by reference Section XI.A.1 of my Opening Report herein.

150.    Dr. Murthy unequivocally states that "The POSA would have had no doubt about the meaning of [the] term—it is referring to a single particle." Murthy Reb. ¶1206. But as I explain in my Opening Report, there is no accepted methodology for reliably measuring the composition of a single particle. Dr. Murthy seemingly attempts to ignore this issue, alleging that because "there does not appear to [be] any disagreement about the scope of the claims," a "POSA would have understood with reasonable certainty . . . the scope of the claims." Murthy Reb. ¶1211. Dr. Murthy misses the point.

151.    Dr. Murthy states that "the measurement of the aggregate lipid content of a sample does provide substantial information about the composition of the individual lipid particles in that sample." Murthy Reb. ¶1214. I disagree. While it may be true that the aggregate measure provides some information about the composition of the particles in the sample being measured, it does not

inform a POSA as to the specific compositions of individual particles within that sample. Yet, that is the measure that Dr. Murthy contends is required by the claims by virtue of them being directed to the composition of "a single particle."

152.    Dr. Murthy seems to suggest that "the POSA would have been confident that an aggregate lipid composition measurement would be informative about the composition of the individual lipid particles themselves [ ] because of the sheer number of lipid particles in a typical LNP composition, which would typically be on the order of billions, if not trillions, of particles." Murthy Reb. ¶1215. I do not see the logic in that. Simply because there are many particles does not mean that an aggregate measure of lipid content would be informative of the composition of a single one of those billions or trillions of particles. Dr. Murthy likewise points to Moderna's reliance on "a *hypothetical* Gaussian distribution of lipid compositions." Murthy Reb. ¶1215-1216. But the graphic is just that—a hypothetical spread of particles.

153.    Dr. Murthy does not seem to contend otherwise, stating only that "the POSA would understand that an aggregate lipid composition measurement of a sample is informative about the composition of individual lipid particles, inasmuch as the sample will virtually certainly contain individual particles that correspond *closely* to that aggregate lipid composition measurement." Murthy Reb. ¶1216. Notably, Dr. Murthy does not state (nor can he with a reasonable degree of confidence) that the composition of any single particle will equal precisely the aggregate mean of the particles in the composition, nor does he define what variation "closely" allows for. Thus, Dr. Murthy does not seem to dispute that the mean is not an exact measure of the lipid molar ratio of

any single particle in that composition and Dr. Murthy provides no other basis by which to deduce the composition of any single particle.

154.    Further, Dr. Murthy states that "the reason for measuring the lipid composition of an LNP sample is to determine the lipid composition of the LNPs themselves." Murthy Reb. ¶1214. While I do not disagree that the goal is to measure the concentration of the lipids in the LNPs in a formulation, it does not then follow that the "reason for measuring the lipid composition" of a sample is to ascertain the lipid concentration of LNPs on an individual or LNP-by-LNP basis. That simply is not how a POSA would think about the lipid concentration, in the 2008-2009 timeframe or today.

155.    Dr. Murthy also contends that fractionation would allow a POSA to "glean more information about the underlying *distribution* of compositions of the lipid particles themselves, within the sample." Murthy Reb. ¶1217. I disagree. As I discussed in both my Opening and Rebuttal Reports, lipid content measures derived from fractions are nonetheless aggregate measures, and therefore suffer from the same flaws as I describe above—they still do not inform a POSA as to the composition of any single particle in the composition.

156.    Dr. Murthy states that "it would have been well known to the POSA that physical properties such as density would likely correlate with the composition of the particle" and that "it had been demonstrated well before the priority date that empty vesicles could be separated via density centrifugation." Murthy Reb. ¶1219. I do not disagree that it would be possible to separate filled vesicles from empty vesicles based on density. But Dr. Murthy points to no evidence that any fractionation approach would be capable of separating vesicles based on their respective lipid molar ratios, particularly without altering said compositions in the process.

63

157.    I further addressed Plaintiffs' reliance on Moderna's "fractionation techniques" in Section X.D.2 of my Rebuttal Report and I incorporate that discussion herein. I note that none of those techniques are referenced in the specification of the Molar Ratio Patents.

158.    Dr. Murthy states that "it is my understanding that Plaintiffs have accused an intermediate particle—which exists for a (not infinitesimal) period of time during Moderna's manufacturing process—of infringement" and "[t]hat is an 'in-process' particle in the sense that it exists during the manufacturing process; it is not a particle in the process of forming." Murthy Reb. ¶1220. First, I note that Dr. Murthy cites no support for his suggestion that the in-process composition Plaintiffs have accused of infringement exists for a "not infinitesimal" amount of time. Nor is that suggestion supported by Moderna's BLA. Further, the distinction that Dr. Murthy attempts to draw—stating that "it exists during the manufacturing process; it is not a particle in the process of forming"—is a red herring. The point is that the composition, to the extent it exists at all, is not in a stable state and therefore continues to rearrange, including with respect to its lipid components, throughout the manufacturing process until the later steps are taken. And this is also precisely why, to the extent Plaintiffs contend this ephemeral composition would infringe, such an argument likewise makes the claims indefinite, because, as I explain in my Opening Report, depending on the precise moment in time when a hypothetical measurement is taken, the composition of any single particle in that composition will be different and therefore a POSA would not know whether a given composition falls within or outside the claims. Dr. Murthy identifies no method of determining the lipid content of such a transitory particle, let alone any methods described in the Molar Ratio Patents. In fact, he entirely ignores the principle that particle compositions will vary depending on other variables, including for example pH. Thus, even if there was a method by which to measure such compositions, depending on the point in the process

at which the measurement is taken, a POSA would expect to see different results depending on the pH and the presence of any lyo protectants, among other factors.

### b.     Written Description

159.    I incorporate by reference Section XI.A.2 of my Opening Report herein.

160.    Dr. Murthy opines that the specification of the Molar Ratio Patents would have demonstrated to a POSA as of the priority date that the named inventors were in possession of individual lipid particles comprising the claimed lipid molar ratios. Murthy Reb. ¶¶1222-1224. For the reasons discussed above in the context of indefiniteness and in my Opening Report, I disagree that the disclosures of the Molar Ratio Patents would have indicated that the named inventors were in possession of the claimed individual particles. Rather, the specification solely discloses aggregate measurements, which are not equivalent to measurements of an individual particle.

161.    Dr. Murthy discusses the variance in the mol % of lipids resulting from synthesis of the 1:57 formulation, which the specification reports as 57 mol % ± 5 mol % of the cationic lipid and 1.5 mol % ± 0.5 mol % of the lipid conjugate, with the balance being made up of non-cationic lipid. Murthy Reb. ¶1224 (citing '069 patent at 24:13-26). Although Dr. Murthy states this variance refers to "the approximate range of lipid particle content expected from using the 1:57 target formulation," Murthy Reb. ¶1224, I do not read the specification this way. Rather, the variance refers to the difference in mol % expected from the aggregate measurement each time this particular formulation is made. Indeed, the specification later states that "the 1:57 formulation and 1:62 formulation are target formulations, and that the amount of lipid (both cationic and non-cationic) present and the amount of lipid conjugate present in the formulation may vary." '069 patent at 68:35-39.

### c.     Enablement

162.    I incorporate by reference Section XI.A.3 of my Opening Report herein.