## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH<br><br>*Plaintiffs,*<br><br>v.<br><br>MODERNA, INC. and MODERNATX, INC.,<br><br>*Defendants.* | C.A. No. 22-252-JDW |
| MODERNA, INC. and MODERNATX, INC.,<br>*Counterclaim-Plaintiffs,*<br><br>v.<br><br>ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH,<br><br>*Counterclaim- Defendants.* | **JURY TRIAL DEMANDED**<br><br>███████████████<br><br>Redacted - Public Version |

## PLAINTIFFS' RESPONSIVE BRIEF IN OPPOSITION TO MODERNA'S *DAUBERT* MOTION

## <u>TABLE OF CONTENTS</u>

I.    SUMMARY OF ARGUMENT AND NATURE AND STAGE OF PROCEEDINGS ...........................................................................................1

II.    MS. LAWTON'S DAMAGES OPINIONS SHOULD NOT BE EXCLUDED .................1

    A.    Ms. Lawton's Analytical Method Is Reliable and Proper........................................1

        1.    Ms. Lawton's Analytical Approach...........................................................2

        2.    The analytical method fits the facts of this case .......................................3

        3.    Ms. Lawton reliably applied the analytical method..................................5

    B.    Ms. Lawton's Hypothetical Negotiation Approach is Reliable and Proper............5

        1.    Ms. Lawton's analysis is properly apportioned ...........................................7

        2.    Ms. Lawton's profit split was based on reliable datapoints........................8

        3.    Ms. Lawton's profit split is not "arbitrary" ...............................................12

        4.    Using *expectations* instead of actual profits follows governing law .........13

    C.    Moderna Seeks to Exclude Relevant, Non-State-of-Mind Opinions....................15

    D.    Ms. Lawton's Remaining Opinions Constitute Proper Expert Testimony ...........17

III.    DR. SCHUSTER'S TESTING WAS RELIABLE AND IS ADMISSIBLE....................17

    A.    Factual Background ..............................................................................................17

    B.    Dr. Schuster's Testing Method Was Reliable.......................................................19

    C.    Dr. Schuster's Method Development Testing Did Not Yield Different Results.................................................................................................................21

    D.    Dr. Schuster Did Not "Cherry-Pick" a Testing Method to Bias His Results........22

IV.    DR. MITCHELL DOES NOT OFFER IMPROPER STATE OF MIND OPINIONS..................................................................................................................24

V.    MESSRS. PITTS & BRILL OFFER ADMISSIBLE REBUTTAL OPINIONS..............25

# TABLE OF AUTHORITIES[1]

## CASES

*10x Genomics, Inc. v. NanoString Techs.*,
690 F. Supp. 3d 449 (D. Del. 2023)..................................................................5

*Abbott Diabetes Care v. DexCom*,
2024 WL 6887335 (D. Del. Jan. 17, 2024)......................................................5

*Apotex, Inc. v. Cephalon, Inc.*,
2012 WL 1080148 (E.D. Pa. Mar. 28, 2012)....................................................22

*Aqua Shield v. Inter Pool Cover Team*,
774 F.3d 766 (Fed. Cir. 2014)..........................................................................14

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015).............................................................7, 15, 16

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*,
2018 WL 5729732 (D. Del. Nov. 2, 2018)......................................................13

*Bio-Rad Lab'ys v. 10X Genomics*,
967 F.3d 1353 (Fed. Cir. 2020)....................................................................9, 12

*Bombardier Rec. Prods. Inc. v. Arctic Cat Inc.*,
2017 WL 758335 (D. Minn. Feb. 24, 2017)....................................................25

*Brumfield v. IBG LLC*,
97 F.4th 854 (Fed. Cir. 2024) ............................................................................8

*Centripetal Net. v. Palo Alto Net., Inc.*,
2024 WL 380972 (E.D. Va. Jan. 30, 2024) .....................................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)..........................................................................................19

*DSM IP Assets v. Lallemand Specialties, Inc.*,
2018 WL 1950413 (W.D. Wis. Apr. 25, 2018) ...............................................12

*Eko Brands, LLC v. Adrian Rivera Maynez Enters.*,
946 F.3d 1367 (Fed. Cir. 2020)........................................................................16

---

[1] Unless otherwise noted, all emphasis is added, and internal citations, alterations, and quotations are omitted.  All highlighting in the exhibits has been added.

*Energy Transp. Grp., v. William Demant Holding A/S*,
    697 F.3d 1342 (Fed. Cir. 2012)........................................................................4

*ESCO Grp. LLC, v. Deere & Co.*,
    No. 20-cv-01679-WCB, D.I. 293 (D. Del. June 22, 2023) ....................................21

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*,
    879 F.3d 1332 (Fed. Cir. 2018)....................................................................8, 12

*Finjan, Inc. v. Secure Computing Corp.*,
    626 F.3d 1197 (Fed. Cir. 2010)....................................................................8, 11

*Genuine Enabling Tech. v. Sony Corp.*,
    2022 WL 17325656 (D. Del. Nov. 28, 2022) ....................................................13

*GREE, Inc. v. Supercell Oy*,
    2020 WL 4288350 (E.D. Tex. 2020) ................................................................25

*Hanson v. Alpine Valley Ski Area, Inc.*
    718 F.2d 1075 (Fed. Cir. 1983)......................................................................14

*I-Mab Biopharma v. Inhibrx*,
    2024 WL 4581539 (D. Del. Oct. 21, 2024) ......................................................15

*In Re Lipitor*,
    892 F.3d 624 (4th Cir. 2018) ........................................................................22

*In re Xerox Corp.*,
    746 F. Supp. 2d 402 (D. Conn. 2010)..............................................................21

*In re Zantac*,
    644 F. Supp. 3d 1075 (S.D. Fla. 2022) ......................................................19, 20

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001)......................................................................14

*Kaneka Corp. v. Designs for Health, Inc.*,
    760 F. Supp. 3d 152 (D. Del. 2024)............................................................20, 23

*King Drug Co. v. Cephaln, Inc.*,
    2015 WL 6750899 (E.D. Pa. Nov. 5, 2015) ......................................................22

*Lighting Def. Grp. v. Shanghai Sansi Elec. Eng'g Co.*,
    2024 WL 4837011 (D. Ariz. Nov. 24, 2024)......................................................11

*Lipocine Inc. v. Clarus Ther., Inc.*,
    2020 WL 4794576 (D. Del. Aug. 18, 2020) ......................................................25

*LKQ Corp. v. Gen. Motors*,
2024 WL 4093240 (N.D. Ill. May 17, 2024) ............................................................5

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ...........................................................1, 4, 13, 17

*M2M Sols. LLC v. Enfora, Inc.*,
2016 WL 767900 (D. Del. 2016) .........................................................................11

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007).................................................................25

*Metaswitch Nets. v. Genband*,
2016 WL 874737 (E.D. Tex. Mar. 5, 2016) ........................................................3, 4

*MHL Custom, Inc. v. Waydoo USA, Inc.*,
2023 WL 5748755 (D. Del. Sept. 6, 2023) ..........................................................10

*Microchip Tech, Inc. v. Aptiv Servs.*,
2020 WL 5203600 (D. Del. Sept. 1, 2020) ..........................................................17

*MiiCs & Partners, Inc. v. Funai Elec. Co.*,
2017 WL 6268072 (D. Del. Dec. 7, 2017)...........................................................11

*Nat'l Gypsum Co. v. Steel Sys. Int'l*,
1988 WL 105622 (D. Or. Oct. 5, 1988) ...............................................................4

*NetAirus Techs. v. Apple*,
2013 WL 11237200 (C.D. Cal. Oct. 23, 2013)......................................................5

*Novozymes v. Genencor Int'l.*,
474 F. Supp. 2d 592 (D. Del. 2007)....................................................................4

*On Track Innovations Ltd. v. T-Mobile USA, Inc.*,
106 F. Supp. 3d 369 (S.D.N.Y. 2015)................................................................14

*Oxford Gene Tech. v. Mergen*,
345 F. Supp. 2d 431 (D. Del. 2004)...................................................15, 16, 17, 24

*Pavo Sols. LLC v. Kingston Tech. Co.*,
2019 WL 8138163 (C.D. Cal. Nov. 20, 2019)......................................................25

*Pelican Int'l, Inc. v. Hobie Cat Co.*,
655 F. Supp. 3d 1002 (S.D. Cal. 2023)...............................................................25

*Plastic Omnium Adv. Innov. & Rsch. v. Donghee Am.*,
387 F. Supp. 3d 404 (D. Del. 2018)...................................................................13

*ResQNet.com v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010)....................................................................9, 10

*RSB Spine, LLC v. DePuy Synthes Sales, Inc.*,
   2022 WL 17084156 (D. Del. Nov. 18, 2022) ...................................................10, 12

*SmartSky Nets. v. Gogo Bus. Aviation*,
   2025 WL 2972258 (D. Del. Oct. 21, 2025) ...........................................................8

*Sprint Commc'ns v. Cequel Commc'ns*,
   2022 WL 1801433 (D. Del. June 2, 2022)..............................................................5

*Sprint Commc'ns v. Charter Commc'ns*,
   2021 WL 982732 (D. Del. Mar. 16, 2021) .............................................................4

*St. Clair Intell. Prop. Consultants, Inc. v. Acer, Inc.*,
   935 F. Supp. 2d 779 (D. Del. 2013)..................................................................23, 24

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015)..................................................................5, 8, 15

*Takeda Pharm. Co. Ltd. v. Zydus Pharms.*,
   743 F.3d 1359 (Fed. Cir. 2014)...........................................................................22

*TWM Mfg. Co. v. Dura Corp.*,
   789 F.2d 895 (Fed. Cir. 1986)....................................................................1, 2, 4

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011)...........................................................................13

*VLSI Tech. v. Intel Corp.*,
   87 F.4th 1332 (Fed. Cir. 2023) ............................................................................8

*Whitserve, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012).......................................................................11, 13

## OTHER AUTHORITIES

Fed. R. Civ. P. 26.........................................................................................................21

Fed. R. Evid. 408.........................................................................................................12

## I.    SUMMARY OF ARGUMENT AND NATURE AND STAGE OF PROCEEDINGS

Now that uncountered testing and Moderna's internal documents have confirmed its infringement and decade-long effort to avoid licensing Plaintiffs' patents while using the patented technology, Moderna asks the Court for relief from the consequences of its own conduct. Moderna's motion forthrightly acknowledges its concern about how the jury will perceive its legally relevant actions.  But that is not a basis for exclusion under *Daubert*.  Moderna's motion is premised on widespread factual and legal mischaracterizations, and should be denied in full.

## II.    MS. LAWTON'S DAMAGES OPINIONS SHOULD NOT BE EXCLUDED

Ms. Lawton, with more than 40 years of experience assessing patent damages, Ex A ¶ 14, engages in a detailed analysis of the relevant facts, using two separate models to confirm that her damages calculation is reasonable and appropriate.  Moderna makes clear that its real complaint is with the award Plaintiffs seek, *see* Mot. 1, 5, 7—even though this case involves core technology required to deliver one of the most profitable drugs in history.  Moderna cannot mischaracterize Ms. Lawton's opinions to transform its disagreements into a basis for exclusion.

### A.    Ms. Lawton's Analytical Method Is Reliable and Proper

Moderna fundamentally misconstrues both the analytical method framework and Ms. Lawton's application of it.  The analytical method derives a reasonable royalty by "calculating damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then apportioning the projected profits between the patent owner and the infringer." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  The method "subtract[s] the infringer's usual *or acceptable* net profit from its anticipated net profit realized from sales of infringing devices." *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986).  Moderna rewrites that legal standard—replacing the "or" with an "and"—thus requiring an "acceptable net profit" to also be the infringer's "usual" profit.  But that is not the

law.  While demeaning Ms. Lawton's approach as "a mishmash of cherry-picked" profit figures, Mot. 6, Moderna itself cherry-picks and mischaracterizes her work.  Ms. Lawton applied the model using Moderna's own projections, and its criticisms are classic fodder for cross-examination.

### 1.    Ms. Lawton's Analytical Approach

In a detailed analysis, Ms. Lawton reliably isolates the value of Plaintiffs' invention to Moderna's vaccine using contemporaneous evidence *from Moderna*, such as cost projections provided to the Government, pricing projections prepared for its Board of Directors, and its own calculation of an acceptable profit *for the accused product*.  The result is precisely what the analytical model entails:  subtraction of Moderna's "*acceptable* net profit" from its "*anticipated* net profit" based on projections when infringement began.  *TWM*, 789 F.2d at 899.

***Calculating anticipated profits.***  Ms. Lawton calculated Moderna's anticipated profits of $20/dose using Moderna's ████████████████████████████████████ ████████████████  Her use of profits based on a ██████████ is supported by (i) its Board's approval of that price, Ex W at 695; (ii) its contracts with other nations, Ex X at 016-033; and (3) its $30/dose offer to the U.S. Government, Ex Y at 828; Ex A ¶ 1237.  At ████████, Moderna's ██████████████████████████████████████ and $20/dose profits.  Ex A Sched. 3.1; Ex Z at 667.

***Calculating acceptable net profit.***  For the second input, Ms. Lawton relied on what Moderna literally told the U.S. Government on that very subject.  Ex A ¶ 499.  Moderna submitted a "███████████████," which it claimed represented a "████████████████" for its vaccine.  Ex X at 006-007.  In it, Moderna specifically identified a "████████████████ ████████████████████████████████), which Ms. Lawton found was similar to average profit margins in the life sciences industry.  *Id.* at 010, 014; Ex A ¶¶ 499-500.  ███████████████ ████████████████████████████████████  Ex A ¶ 1237, Ms. Lawton calculated Moderna's acceptable profit to be $6.10/dose.  *Id.* at Sched. 3.1.

2

***Apportioning the value of the asserted patents.***  By subtracting the $6.10/dose acceptable profit from the $20/dose anticipated profit, Ms. Lawton calculated an excess profit of $13.90/dose. *Id.* at Sched. 3.1.[2]  Moderna argues this difference does not adequately "isolate the value of the patented technology."  Mot. 7.  But Ms. Lawton did not simply conclude Moderna owed the $13.90/dose as a royalty.  Instead, she made additional subtractions to account for contributions by Moderna and others, ensuring that she "isolate[d] the value of the patented features" from other contributing features.  *Metaswitch Nets. v. Genband*, 2016 WL 874737, at *5 (E.D. Tex. Mar. 5, 2016).  These subtractions rely on Moderna's statements to the Government about the value of contributions it and other third parties made, including R&D investments that it claimed facilitated its "ability to rapidly create, manufacture and clinically develop mRNA-1273."  Ex A ¶¶ 1245-1258; Ex X at 013.  Moderna ignores this additional subtraction step entirely.

Then, as an additional, conservative measure of apportionment, Ms. Lawton relied on technical expert opinions—which Moderna's motion does not challenge—to split the remaining excess profit between the vaccine's two components: the mRNA payload and the LNP delivery (the patented contribution).  Ex A ¶ 1276.  These subtraction and apportionment steps isolated $3.98/dose as the value contributed by the asserted patents, warranting a royalty of $3.98/dose.  *Id.*

## 2.    The analytical method fits the facts of this case

Moderna's contemporaneous profit projections together with its detailed accounting and valuation of its contributions map perfectly onto the analytical method.  This evidence provides the two inputs needed for the analysis—(1) "the infringer's usual or acceptable net profit" ($6.10/dose, based on what Moderna told the Government would be a reasonable profit) and (2)

---

[2] Because these figures are based on Moderna's projections, Ms. Lawton's schedules refer to them as "anticipated" profits.  Ex A sched. 3.1.  The schedule explains their calculations, and her report describes them in terminology consistent with the case law.  *E.g, id.* ¶¶ 499 (Moderna's requested 20.3% margin is its "Acceptable Profit Margin"), 1282 ("projected operating profit" is $20/dose).

"its anticipated net profit," ($20/dose based on Moderna's projections). *TWM*, 789 F.2d at 899. It also provides a basis to isolate the value of Plaintiffs' invention, *Metaswitch*, 2016 WL 874737, at *5, by subtracting Moderna's valuation of its own contributions and the contributions of others.

Moderna argues that Ms. Lawton cannot rely on the analytical method because the vaccine was its first commercial product, meaning there was no "usual or acceptable" profit to input for the analysis. Mot. 5. But the legal standard is disjunctive—"usual *or* acceptable." *TWM*, 789 F.2d at 899. The analysis permits either input, and Ms. Lawton used Moderna's *acceptable* net profit *for the accused product*, based on the extensive record on that issue. Ex A ¶¶ 499, 1242-44.

Moderna cites no case holding that the analytical method requires a "commercial track record" to be an appropriate "fit," Mot. 6, or a comparison between two commercial products— one infringing and one not, Mot. 5. Rather, the method requires no more than "the infringer's own internal profit projections for the infringing item at the time the infringement began, and then [an] apportion[ment of] the projected profits between the patent owner and the infringer." *Lucent*, 580 F.3d at 1324. Indeed, courts routinely reject efforts to narrow the analytical method to comparisons against an infringer's separate commercial product, holding that a "normal industry net profit" may be used because it is a form of "acceptable net profit." *Nat'l Gypsum Co. v. Steel Sys. Int'l*, 1988 WL 105622, at *3 (D. Or. Oct. 5, 1988); *Sprint Commc'ns v. Charter Commc'ns*, 2021 WL 982732, at *11 (D. Del. Mar. 16, 2021) (accepting use of "industry" profit); *Novozymes v. Genencor Int'l.*, 474 F. Supp. 2d 592, 606 (D. Del. 2007) (same); *Energy Transp. Grp., v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) (same).

Moderna would improperly bar the jury from hearing the most reliable evidence of actual value, simply because the COVID-19 vaccine was its first commercial product. The analytical method does not require that result. And the jury is entitled to consider this evidence of value,

whether labeled as the analytical method or not, as damages may be assessed by any "methodology [that] is reasonable and its data or evidence are sufficiently tied to the facts of the case." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

### 3.    Ms. Lawton reliably applied the analytical method

Ms. Lawton reliably applied the analytical method. ***First***, she used reliable data, including what Moderna *itself* told the Government was an acceptable profit, Ex A ¶¶ 1219-44; Ex C (Lawton R.) ¶¶ 430-44. Experts often rely on similar projections. *Sprint Commc'ns v. Cequel Commc'ns,* 2022 WL 1801433, at *2 (D. Del. June 2, 2022); *10x Genomics, Inc. v. NanoString Techs.*, 690 F. Supp. 3d 449, 464 (D. Del. 2023) (use of gross profit projections "does not render … methodology unreliable"). If Moderna wishes to challenge supposedly "cherry-picked datapoints," Mot. 6, cross-examination is the proper time to do so. *Summit 6*, 802 F.3d at 1299.

***Second***, Ms. Lawton's opinion does not implicate the issues leading to exclusion in Moderna's cases. Mot. 6. In *Abbott Diabetes Care v. DexCom*, exclusion was based on the effect of an asserted patent being found invalid. 2024 WL 6887335, at *2 (D. Del. Jan. 17, 2024). And in *NetAirus Techs. v. Apple*, the excluded analysis depended on another expert's consumer survey, which the court excluded separately. 2013 WL 11237200, at *4 (C.D. Cal. Oct. 23, 2013). Here, Moderna has not challenged the technical experts' apportionment on which Ms. Lawton relies.

***Finally***, Ms. Lawton's cited deposition testimony does not warrant exclusion. Mot. 7. She elsewhere clarified the inputs to her analysis, consistent with the schedules in her report. Ex D at 257:5-259:21; *see LKQ Corp. v. Gen. Motors*, 2024 WL 4093240, at *6 (N.D. Ill. May 17, 2024) (inconsistency between report and deposition is topic "for cross-examination … not a reason to exclude … testimony"). Ms. Lawton's analytical approach is reliable and should not be excluded.

### B.    Ms. Lawton's Hypothetical Negotiation Approach is Reliable and Proper

Moderna ignores large swaths of Ms. Lawton's hypothetical negotiation analysis and

mischaracterizes the remainder as a simple comparable license approach. But she concluded that a comparable license approach could *not* fully capture the unique situation at the May 2020 hypothetical negotiation. Moderna was about to commercialize its vaccine, which it expected to enable a "quantum leap" for the company. Ex A ¶¶ 448-465. Without non-infringing alternatives, it needed Plaintiffs' technology to achieve that goal. *Id.* ¶ 703. It had only a "narrow window," as it calculated that any delay would cost billions of dollars in profits. *Id.* ¶ 507; Ex C ¶¶ 159-161.

Thus, instead of starting with licenses entered under dramatically different circumstances, Ms. Lawton arrived at her reasonable royalty by apportioning Moderna's projected profit between the parties. This profit split was not based on "built-in" apportionment from prior licenses, but rather on the technical experts' apportionment of relative value—a major part of her analysis that Moderna ignores entirely. Specifically, she relied on both expert testimony and Moderna's own documents to conclude there are two key elements to Moderna's vaccine, payload (mRNA) and delivery (LNPs), and that *quantitatively*, at least <u>50%</u> should be attributed to LNP. Ex A (Lawton) ¶¶ 1389-92; Ex E (Mitchell) ¶ 791. Dr. Mitchell, an expert in lipid-based drug delivery platforms, opined that "the Patents-in-Suit are fundamental, enabling technology, without which Moderna's COVID-19 vaccine could not function," the patents "drive the value of the delivery component of the vaccine," and "the delivery vehicle is at least as valuable, if not more valuable, than the [mRNA] payload." Ex F (Mitchell R.) ¶¶ 840-842. And Dr. Porter, an expert in vaccine development and mRNA technology, opined that mRNA technology "made a far less significant contribution to the safety or efficacy of Moderna's COVID-19 vaccine than Plaintiffs' LNP technology in the Patents-in-Suit." Ex AA (Porter) ¶ 41. Moderna's documents support this conclusion, including a 2021 email from its Chief Medical Officer explaining that "the critical factors for [the vaccine's] success actually have more to do with the LNP and the process by which

mRNA is made and put together with lipids" than mRNA.  Ex A (Lawton) ¶ 1264; Ex BB at 360.

After accounting for the relative contributions, Ms. Lawton analyzed how the parties would negotiate a royalty.  She began by explaining the parties each had negotiated profit splits in the past and would do so in this case.  Ex A ¶ 1372.  Instead of "directly taking a rate from [prior] agreements," Ex C (Lawton R.) ¶ 482, she used them to help define the negotiation range of 20%-50%.  Ex A ¶ 1531.  In doing so, she considered the comparability of those agreements, including (*contra* Moderna, Mot. 10) by accounting for differences in the scope of the licensed patents.  Ex A (Lawton) ¶¶ 906, 1377.  Finally, she concluded that Plaintiffs would receive 25% of projected profits by assessing the *Georgia-Pacific* factors, balancing factors that favored Plaintiffs against Moderna's contributions to the vaccine.  *Id.* ¶¶ 1446-1538.  That analysis also served as a final form of apportionment, since the "standard *Georgia–Pacific* reasonable royalty analysis takes account of the importance of the inventive contribution in determining the royalty rate." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015).

These details about Ms. Lawton's *actual methodology* are not mentioned in Moderna's motion.  Instead, Moderna asserts that Ms. Lawton fails to apportion (without addressing her reliance on technical experts), that her licensing datapoints are not comparable (without acknowledging her comparability analysis), and that her profit split is arbitrary (without discussing her *Georgia-Pacific* analysis).  Finally, Moderna incorrectly argues that Ms. Lawton was wrong to use Moderna's projections as a starting point, even though that is what the law requires.

### 1.    Ms. Lawton's analysis is properly apportioned

Moderna asserts that Ms. Lawton's opinion suffers from a "failure to apportion," Mot. 8, only by deliberately ignoring both her extensive analysis of the asserted patents' specific contribution to the vaccine and her opinions accounting for differences in the licensing datapoints she uses.  Moderna's disagreement with her interpretation of those facts does not justify exclusion.

"[A]pportionment can be addressed in a variety of ways," *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1348 (Fed. Cir. 2018), so long as the "the bottom-line royalty [is] apportion[ed]." *Brumfield v. IBG LLC*, 97 F.4th 854, 877 (Fed. Cir. 2024). Ms. Lawton's reliance on technical experts and other record evidence complies with this requirement, because it provides a means for her to "measure the value of the patented technology ... by separating out and excluding other value in economic products or practices." *VLSI Tech. v. Intel Corp.*, 87 F.4th 1332, 1345 (Fed. Cir. 2023). The Federal Circuit repeatedly endorses apportionment methods—like Ms. Lawton's—estimating the "respective shares of the economic benefit" from infringement, *Summit 6*, 802 F.3d at 1298; *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1210-11 (Fed. Cir. 2010) (affirming profit split that considered "the importance of the patented technology"). Ms. Lawton's evidence easily distinguishes Moderna's cited cases, Mot. 8-13, which involved nothing approaching her extensive apportionment exercise. *E.g.*, *SmartSky Nets. v. Gogo Bus. Aviation*, 2025 WL 2972258, at *10 (D. Del. Oct. 21, 2025) (expert did "not take any of [the non-patented aspects] into account in his analysis").

### 2. Ms. Lawton's profit split was based on reliable datapoints

Moderna next attacks the reliability of the inputs to Ms. Lawton's royalty. Mot. 9. But this argument rests on the mistaken premise that Ms. Lawton relied solely on "four unreliable and unapportioned datapoints" to reach her profit-split opinion. *Id.* That is incorrect. Instead, given the unique circumstances of the hypothetical negotiation, Ms. Lawton used licensing evidence, together with other evidence of the patents' value, to establish a negotiation range of 20-50% of projected operating profits. Ex A ¶¶ 906-908, 1531.

Moderna's primary complaint is that Ms. Lawton supposedly failed to address the value of the licensing datapoints she uses, which include non-asserted patents and other IP. Mot. 10-11. Not only does this ignore the detailed apportionment step described above, it also dismisses Ms.

Lawton's qualitative assessment of these specific differences as "lip service," *id.*, suggesting that a quantitative adjustment is needed. But "there is no blanket rule of *quantitative* apportionment in every comparable license case." *Bio-Rad Lab'ys v. 10X Genomics*, 967 F.3d 1353, 1376 (Fed. Cir. 2020). *Bio-Rad* approved an expert's qualitative assessment, based "on the reports, testimony, and conclusions of other witnesses," that no adjustment to the rate in the comparable licenses was required, even though those licenses encompassed hundreds of patents. *Id.* at 1375-77.

Ms. Lawton likewise qualitatively apportioned, considering similar evidence to assess the economic differences in the prior licensing datapoints she cited, which led her to identify a series of factors that depressed the value of those datapoints as compared to the hypothetical negotiation. Ex A ¶ 906. For example, with respect to Plaintiffs' prior licenses, her analysis found not only that the prior licenses concerned research-stage product candidates, rather than being negotiated "on the doorstep of commercialization" or with the economic "immediacy of the pandemic," *id.* ¶ 835, but she also concluded that the agreements were negotiated under overhangs created by improper competition from Acuitas (who claimed for some time to have rights to sublicense the asserted patents, undercutting Plaintiffs), *id.* ¶¶ 359-364, and Moderna's repeated public allegations that Plaintiffs' patents were invalid, in its IPR petitions, subsequent appeals, and this lawsuit, *id.* ¶ 374. By contrast, the hypothetical negotiation would not result in "a diminished royalty rate [that the] patentee may have been forced to accept by the disrepute of his patent and the open defiance of his rights." *ResQNet.com v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010).

Ms. Lawton also expressly accounted for the number of patents in the agreements. *See id.* ¶ 1377. This assessment relied on testimony from Genevant's lead license negotiator, Peter Zorn, that the extent of the patent rights in the licenses "has not been an active consideration in [Genevant's] dealmaking historically," because "it is Genevant's practice to first reach a deal on

the business terms," with the scope of the specific patents being "the last thing that gets determined, as opposed to the first." *Id.* Where fact testimony establishes that the inclusion of additional patents "was not ... a value metric that affected th[e] agreement," no additional "'apportionment' of non-asserted patents" is required. *Centripetal Net. v. Palo Alto Net., Inc.*, 2024 WL 380972, at *5 (E.D. Va. Jan. 30, 2024); *MHL Custom, Inc. v. Waydoo USA, Inc.*, 2023 WL 5748755, at *11 (D. Del. Sept. 6, 2023). Nonetheless, "to the extent the scope of the license or collaboration terms created additional value," Ms. Lawton concluded, based on her extensive analysis of circumstances of the hypothetical negotiation, that such value "is more than offset by the substantial differences between these agreements and the hypothetical negotiation" here. Ex A ¶ 1377. Critiques of that analysis are a matter for the jury, not grounds for exclusion. *See RSB Spine, LLC v. DePuy Synthes Sales, Inc.*, 2022 WL 17084156, at *2 (D. Del. Nov. 18, 2022) (refusing to exclude for lack of apportionment because expert "provide[d] reasoning for why he does not think [additional licensed patents] impact his overall calculation").

Ms. Lawton also "account[ed] for … distinguishing facts," Mot. 10, concerning Moderna's collaboration agreements. She concluded, based on the agreements, that "the parties would consider a payment structure ███████████████████████ *adjusted* to account for both the value of Genevant's technology and the absence of ongoing development work." Ex A ¶¶ 1058, 1067, 1075. Ms. Lawton made that adjustment through her *Georgia-Pacific* analysis, which reaches a 25%|75% split, ███████████████████████ ████████████████. *Id.* ¶ 1537. Incredibly, despite criticizing her use of profit-split agreements to support a naked patent license, Moderna's own expert in copending litigation against Pfizer ████████████████████████████████████████, opining that Moderna should be entitled to ████ of the profits from Pfizer's COVID-19 vaccine. Ex CC at 723-724.

In addition to apportionment, Moderna resorts to a grab bag of issues it suggests renders these datapoints unreliable. It argues it was improper for Ms. Lawton to rely on a survey of typical profit splits in recent agreements in the life sciences industry, Mot. 9, even though "custom in the industry" is an appropriate factor in assessing a profit split, *Finjan*, 626 F.3d at 1210-11. Moderna's cases do not suggest otherwise. *M2M Solutions* excluded a *consumer* survey, not an industry-customs survey, 2016 WL 767900, at *5, and *Lighting Defense Group* simply deemed a single company's licensing program insufficient to show "*industry* practice," 2024 WL 4837011, at *8. Moderna questions the use of the Chulalongkorn agreement because it does not include the asserted patents, Mot. 11, but never mentions Dr. Mitchell's unchallenged opinion that the subject matter of that license is technically "***highly comparable*** to the Patents-in-Suit." Ex F (Mitchell R.) ¶ 924. And Moderna objects to Ms. Lawton's conclusion that Plaintiffs' May 2013 offer to Moderna would be a floor for the hypothetical negotiation. Mot. 11. But Moderna is wrong about the use of unaccepted offers, which "have some value for determining a reasonable royalty," so long as the patentee did not "artificially inflate" the rate with "outrageous offers." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 29-30 (Fed. Cir. 2012). The cases Moderna cites, Mot. 12, are not to the contrary. The offer in *MiiCs & Partners, Inc. v. Funai Elec. Co.*, 2017 WL 6268072, at *4 (D. Del. Dec. 7, 2017), was unreliable because it was made on the eve of litigation. And the offers in *In re ChanBond* and *TC Tech* involved unrelated third parties. Here, not only was the offer made to Moderna by Plaintiffs' predecessor, but its ongoing relevance is confirmed by Moderna's continued subsequent internal references to it as a precedent. Ex A ¶ 336. Far from being "outrageous," Ms. Lawton concluded based on her qualitative assessment that the 2013 offer was lower than the outcome of the hypothetical negotiation, as it came when Moderna was a start-up with little revenue, at a very early stage of product development, and did not contemplate a

commercial opportunity anywhere near the scale of the COVID-19 pandemic, *id.* ¶¶ 1358, 1535.[3]

"[P]rior licenses ... are almost never perfectly analogous to the infringement action," but are still appropriately used in a royalty analysis "if accompanied by testimony accounting for the distinguishing facts." *Bio-Rad*, 967 F.3d at 1377. Ms. Lawton "provides reasoning" for the effect of these different circumstances; no more is required. *RSB Spine*, 2022 WL 17084156, at *2.

### 3.    Ms. Lawton's profit split is not "arbitrary"

Ms. Lawton's report explains how she determined the royalty would take the form of a per-unit profit split, the basis for her conclusion about the negotiation range of that split, and how she arrived at a 25%|75% split by applying the *Georgia-Pacific* factors.[4] Grasping for a basis to exclude, Moderna claims the royalty was "plucked ... out of nowhere," citing *Exmark*, 879 F.3d at 1349. Mot. 13. That is wrong. As described above, her royalty is grounded in technical expert testimony and Moderna's licensing practices. Ex A ¶¶ 1446-1538. As another court explained in rejecting such an inapt comparison, "[u]nlike here, the expert in [*Exmark*] provided no starting point from which she then adjusted the rate to reflect the *Georgia Pacific* factors. In contrast, ███ ████████████ with a 50/50 split tied to the facts of the case and then adjusted that split downward to reflect [certain] factors." *DSM IP Assets v. Lallemand Specs.*, 2018 WL 1950413, at *7 (W.D. Wis. Apr. 25, 2018). Moderna "may cross-examine [Ms. Lawton] as to how and why [s]he arrived at" that adjustment, "but this criticism does not render [her] testimony unreliable." *Id.*

Moderna's real grievance appears to be that Ms. Lawton does not arrive at a final royalty number through a quantitative calculation. But arriving at a reasonable royalty does not require "mathematical precision"; what is needed is "some explanation of both why and generally to what

---

[3] Moderna asserts Ms. Lawton violated Rule 408 by relying on settlement discussions from 2018-21, Mot. 12, but she concludes these discussions are "not informative" of her analysis, Ex A ¶ 918.

[4] Moderna suggests, without support, that Ms. Lawton's royalty is actually a 50/50 split. Mot. 13. Not so—her royalty of $4.77/dose is 25% of Moderna's projected $19.07/dose profit, Ex A ¶ 1333.

extent the particular factor impacts the royalty calculation." *Whitserve*, 694 F.3d at 31. This "necessarily involves an element of approximation and uncertainty." *Lucent Techs.*, 580 F.3d at 1325. "Licensors and licensees are not doing [rigorous scientific analyses] to decide the royalty rate. They negotiate it based on their perception of the value being contributed—based on a lot of qualitative information typically." *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 2018 WL 5729732, at *2 n.1 (D. Del. Nov. 2, 2018).

Nor is the 25% profit split based on a "rule of thumb," as Moderna claims in citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011). A rule of thumb is an "arbitrary, general rule, unrelated to the facts of [the] case." *Id.* Here, the 25% is within (and at the conservative end of) the negotiating range Ms. Lawton identified based on extensive analysis of the data and circumstances, including technical experts' opinion of value and Moderna's licensing practices. Ex A ¶ 1531. ████████████████████████████████ in a license agreement that Dr. Mitchell opined was "highly comparable" technically to the Patents-in-Suit. Ex F (Mitchell R.) ¶ 924. Ms. Lawton ultimately arrived at the 25% split after considering and discussing hundreds of pages of relevant underlying facts, *e.g.*, Ex A ¶¶ 313-518, 558-728, 1118-1161, and then applying her *Georgia-Pacific* analysis, which walked through a series of negotiating considerations, *see id.* ¶¶ 1446-1538. This "use[] [of] the *Georgia-Pacific* factors" to "tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue" is not a "rule of thumb." *Genuine Enabling Tech. v. Sony Corp.*, 2022 WL 17325656, at *14 (D. Del. Nov. 28, 2022). A holistic analysis of those factors, which "explain[s] when a factor might contribute to a higher royalty rate," is an "acceptable methodology" to arrive at a reasonable royalty. *Plastic Omnium Adv. Innov. & Rsch. v. Donghee Am.*, 387 F. Supp. 3d 404, 414 (D. Del. 2018).

### 4. Using *expectations* instead of actual profits follows governing law

At the hypothetical negotiation, "the core economic question is what the infringer ... would

have *anticipated* the profit-making potential of use of the patented technology to be, compared to using non-infringing alternatives." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014). That "profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations." *Hanson v. Alpine Valley Ski Area, Inc.* 718 F.2d 1075, 1081 (Fed. Cir. 1983). Moderna inverts this principle, arguing that Ms. Lawton's analysis should be excluded because she used Moderna's "projections, as opposed to Moderna's actuals." Mot. 14. But "expectations govern, not actual results," *Aqua Shield*, 774 F.3d at 772, and the two cases Moderna cites (Mot. 15) do not suggest otherwise. Nor do the differences between Moderna's projections and subsequent actual profits preclude their use: "[s]uch a proposition would essentially eviscerate the rule that recognizes sales expectations at the time when infringement begins" as the key inquiry. *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001). The law does not require replacing expectations with "a backward-looking inquiry into what turned out to have happened." *Aqua Shield*, 774 F.3d at 772. Contrary to Moderna's argument, it cannot be excused "from the deal [it] would have struck in a reasonable negotiation without knowledge that the product would ultimately not meet projections." *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 410 (S.D.N.Y. 2015).

Here, direct evidence of Moderna's expectations obviates the need to rely on actual profits. *See Aqua Shield*, 774 F.3d at 770. Ms. Lawton's report analyzes Moderna's contemporaneous projections, presented to its Board of Directors, explaining which projections she used and why. Ex A (Lawton) ¶¶ 1233-1241, 1330-1353. She describes how she selected the endemic pricing scenarios Moderna criticizes, which are supported by a ███████████████████████

███████████████████████████████████████████████

███  *Id.* ¶ 1351 & n.3314.  Moderna is free to cross-examine Ms. Lawton about her use of its projections, but whether those "data[] or factual assumptions have flaws ... go[es] to the weight of the evidence, not to its admissibility."  *Summit 6*, 802 F.3d at 1299.

### C.    Moderna Seeks to Exclude Relevant, Non-State-of-Mind Opinions

Moderna's challenge to Ms. Lawton's so-called "state-of-mind" opinions mischaracterizes her opinions, elides their relevance, and ignores the special expertise she will offer the jury.  While generally true that "expert witnesses are not permitted to opine on a person's intent, motive, or state of mind," "experts ***are*** permitted to opine regarding the underlying facts that may show a person's state of mind," *I-Mab Biopharma v. Inhibrx*, 2024 WL 4581539, at *2 (D. Del. Oct. 21, 2024), especially when an expert has "specialized knowledge … helpful to the trier of fact to determine a fact in issue." *Oxford Gene Tech. v. Mergen*, 345 F. Supp. 2d 431, 443 (D. Del. 2004).

Ms. Lawton's opinions comply with these standards.  She will not offer opinions as to Moderna's state of mind, having testified that "[i]t's for somebody else to decide with respect to intent," Ex D 250:23-24, and whether Moderna "has undertaken concealment," *id.* at 251:10-12.  Instead, what Moderna challenges is the discussion of underlying facts relevant to damages. ***First***, several paragraphs that Moderna objects to for saying that it "made false statements," Mot. 16, merely catalogue Moderna's statements about its efforts to move away from Plaintiffs' technology, Ex A ¶¶ 366-67; Ex C ¶ 334, 385, 512.  They do not opine on Moderna's state of mind, but provide facts supporting her opinions regarding the "overhang" that affected negotiations with Plaintiffs' prior licensees.  Ex A ¶ 359.  With her experience assessing patent damages, she offers specialized knowledge to aid the jury in understanding how Moderna's failed effort to avoid Plaintiffs' technology (showing an absence of non-infringing alternatives) and Moderna's longstanding licensing practices would impact the hypothetical negotiation.  *AstraZeneca*, 782 F.3d at 1334-35.

***Second***, Moderna identifies paragraphs quoting public sources or Moderna's documents.

*E.g.*, Ex A ¶¶ 117-20, 147; Ex C ¶ 334.  Again, Ms. Lawton is merely setting out information about the circumstances at the time of the hypothetical negotiation, which is key to the reasonable royalty analysis.  *Oxford Gene*, 345 F. Supp. 2d at 443.  **Third**, Moderna points to the section headers in her reports as improper opinions, Mot. 16, but she explained that the headers do not reflect opinions she intends to offer, Ex D 245:3-5, 248:21-25.  **Fourth**, Moderna points to her discussion about the motivations for Moderna's decision to transition from MC3 to SM-102.  Ex A ¶ 180.  That rebuts Moderna's arguments about the value of SM-102 and its effect on apportionment.  *Id.*  Ms. Lawton relies on Dr. Mitchell for those opinions, which are addressed below. *Id.* ¶ 180 & n.501; *infra* IV.  **Finally**, Moderna seeks to exclude assertions "that Moderna's executives manipulated its stock price."  Mot. 16.  But those are Moderna's words, not Ms. Lawton's.  She simply details a May 2020 stock offering, from mere days before the hypothetical negotiation, which forms one "subtraction" for her analytical method.  Ex A ¶¶ 266-302, 1251.

This evidence, and the evidence Moderna does not bother to quote in its motion, is thus not relevant *only* to willfulness.  Mot. 16.  Ms. Lawton is clear that the opinions in her "Facts Related to Willfulness" section also are discussed elsewhere in connection with damages and are relevant to both issues.  Ex A ¶¶ 1663-90.  For example, the parties would consider Moderna's disregard for others' intellectual property rights (e.g., by copying and by concealing its use of Plaintiffs' technology) in deciding the amount and form of the reasonable royalty.  *AstraZeneca*, 782 F.3d at 1334-35.  It is also relevant to willfulness.  *Eko Brands, LLC v. Adrian Rivera Maynez Enters.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020).  On both issues, Ms. Lawton uses her expertise assessing patent damages and licenses to offer helpful opinions about how Moderna's prior actions would alter the bargaining dynamic at the hypothetical negotiation, which also happens to be a helpful explanation of non-self-explanatory facts about Moderna's business conduct relevant to a finding

of willfulness.  There is nothing improper about that testimony.  *Oxford Gene*, 345 F. Supp at 443.

### D.    Ms. Lawton's Remaining Opinions Constitute Proper Expert Testimony

Because the Court should deny Moderna's request to exclude Ms. Lawton's damages methodologies, it also should reject Moderna's final argument—that her remaining opinions are untied to any methodology.  Mot. 17.  The details of Moderna's sales, costs, and estimated value of its vaccine are relevant to determining a reasonable royalty.  *See Lucent*, 580 F.3d at 1333-34.  The motion *in limine* ruling in *Microchip*, Mot. 17, is not to the contrary, as the court there excluded references to a product's profitability only *after* the court had excluded those figures at *Daubert* based on the Entire Market Value rule.  2020 WL 5203600, at *6 (D. Del. Sept. 1, 2020).

## III.    DR. SCHUSTER'S TESTING WAS RELIABLE AND IS ADMISSIBLE

Dr. Schuster—who has a PhD in analytical chemistry and over 10 years of pharmaceutical testing experience—oversaw the testing of Moderna's vaccine.  Consistent with Moderna's pre-litigation testing, Dr. Schuster's tests confirmed that *every* sample contained infringing particles.  Ex F (Mitchell R.) ¶ 358.  Moderna advanced *no testing whatsoever* to dispute its clear infringement.  Instead, it desperately seeks to exclude the entirety of Dr. Schuster's tests through mischaracterizations and malignment.  Moderna first argues that the testing is unreliable, but it identifies no methodological problem with the testing method or its extensive validation; rather, it criticizes the reliability of method development data, the very point of which is to assess the suitability of various parameters and *then* to select the optimally reliable ones.  Second, Moderna advances spurious allegations that Dr. Schuster "cherry-picked" his method to bias the results, but the evidence regarding his method development (ignored by Moderna) clearly shows otherwise.

### A.    Factual Background

The particles in Moderna's vaccine are heterogenous, with non-identical compositions.  Ex E (Mitchell) ¶ 85.  Dr. Schuster "fractionated" the vaccine into sub-populations of particles using

17

ultracentrifugation (UC), a standard, non-disruptive technique frequently used by his company, including for regulatory submissions. Ex G (Schuster) ¶¶ 22-24, 36. He then used HPLC-CAD, also a ubiquitous method, *id.* ¶¶ 17, 45, to measure lipid composition. He was not asked to evaluate infringement and testified that he did not "even know the patents." Ex H (Tr. I), 48:2-25.

Consistent with standard practice, Dr. Schuster conducted initial, feasibility testing to assess his method's suitability for testing Moderna's vaccine. Ex H (Tr. I), 86:11-87:11, 94:25-96:25. The fractionation worked, and *all samples had infringing fractions*. Ex EE (Feasibility) (*e.g.*, F05); D.I. 612 at 95-96. But the data did not meet Dr. Schuster's stringent, pre-set standards for reliability due to unoptimized conditions, so he developed the method "to increase robustness," Ex H (Tr. I) 94:25-99:2, 246:11-25, as is common in the field, *id.* at 87:6-11, 95:6-9, 110:16-23; Ex FF (Moderna Dev.) at 12-20. Dr. Schuster assessed and validated the accuracy and precision of the final method, Ex G (Schuster) ¶¶ 48, 63; Ex L (Tr. II) 39:3-21, which he then used to test 67 vaccine samples. Dr. Mitchell's analysis found that all 67 infringed. Ex F (Mitchell R.) ¶ 358.

Following Dr. Schuster's report, neither Moderna nor its experts requested information about method development, even though it is standard and he stated clearly that "[t]he methods described in this report were developed and optimized." Ex G (Schuster) § VI.B, n.20. Dr. Schuster testified that he did not rely on development testing—which used different parameters from his final method—in opining about the vaccine's composition. D.I. 454 at 1-2. Plaintiffs nevertheless offered to produce method development data once Moderna sought them (*i.e.*, at the deposition), if Moderna agreed to reciprocal discovery, but they repeatedly refused the offer. *Id.*

After the deposition, Moderna broadened its requests, seeking Dr. Schuster's *employer's* testing, regardless of whether it related to this litigation, in an apparent effort to delay the case due to its dwindling cash. D.I. 454 at 3; D.I. 464, 18:18-19:23. Moderna refused Plaintiffs' numerous

offers to produce development data and filed a motion to compel during ongoing negotiations. D.I. 464, 20:14-23. Judge Goldberg expressed skepticism about the relevance of "testing to set up … testing," agreed that Moderna's request was "too broad," and was "inclined to say discovery is closed," but accepted Plaintiffs' offer of the development data with an additional short deposition, acknowledging the goal of not "chang[ing] [] the schedule." *Id*. at 14:5-16:1, 22:12-27:1.

### B.    Dr. Schuster's Testing Method Was Reliable

Moderna deems Dr. Schuster's method "textbook unreliable," Mot. 18, but, astonishingly, ignores all relevant data. Across 103 pages, Dr. Schuster described his use of industry guidelines to meticulously validate the accuracy and precision of his final method. Ex GG (Validation); Ex G (Schuster) ¶¶ 55-63. He also used checks during testing to verify the method operated properly (system suitability testing) and the reliability of each datapoint (sample acceptance testing). Ex G (Schuster) ¶¶ 86-96, 117. Dr. Mitchell confirmed the "measurement[s] met stringent standards of accuracy and precision," were "very consistent," and had low standard deviations. Ex E (Mitchell) ¶¶ 501, 627-640. Dr. Schuster's low "rate of error" and "maintenance of standards controlling the technique's operation" are hallmarks of a reliable method under *Daubert*, 509 U.S. 579, 594 (1993), in contrast to Moderna's inapt *In re Zantac* case, where the expert "proffered no rates of error" or evidence of reliability, 644 F. Supp. 3d 1075, 1121 (S.D. Fla. 2022). Moderna urges exclusion without acknowledging, much less critiquing, these reliability assessments and checks.

Moderna also criticizes Dr. Schuster's method as not reliable because "it was not possible to determine whether the method itself was changing the particles" and he "did not … understand ... the effect his methods had on lipid mol%." Mot. 19. But Moderna omits that, in response to the same speculation from its experts, Dr. Schuster conducted *additional* tests measuring particle properties (size, heterogeneity, and count) before and after UC, and demonstrated that the particles were "unchanged." Ex U (Schuster R.) ¶¶ 18, 110-117; Ex H (Tr. I) 200:15-201:19. The results

accord with final sample testing data (evincing no change) and the literature describing UC as "not destructive" of particles.  Ex F ¶¶ 444-448, 494-500.  Moderna disclosed no contrary testing.  This distinguishes *Zantac*, where the challenger proffered evidence that the technique could alter the test substance, and the expert's only response was "ipse dixit."  644 F. Supp. 3d at 1121-23.

Moderna also asserts—without explanation—that "there was nothing 'standard' about [Dr. Schuster's] tests."  Mot. 18.  Even if true, this critique "does not suggest that the … results are inaccurate or insufficient … [to establish] infringement."  *Kaneka Corp. v. Designs for Health, Inc.*, 760 F. Supp. 3d 152, 168 (D. Del. 2024).  But it is false.  Dr. Schuster cited peer-reviewed publications about lipid particles and Moderna documents to show that his UC and HPLC-CAD parameters were, in fact, standard.  Ex G (Schuster) ¶¶ 39, 43 n.28-n.29, 44; Ex U (Schuster R.) ¶¶ 13, 17-18, 25-31, 37-43, 65-70; Ex H (Tr. I), 102:14-104:9.

Moderna's documents also refute its critiques.  ███████████████████████████████

████████████████████████████████████████████████████████████████████████████

████  Ex F (Mitchell R.) ¶¶ 391; Ex HH (BARDA); Ex E (Mitchell) § IX.E.  Consistent with Dr. Schuster's data, Moderna fractionated its COVID vaccine and showed infringement.  Ex E (Mitchell) ¶¶ 464-476 (citing Ex DD).  Moderna now rubbishes its fractionation studies, calling them "not quantitative[]" and stating "it was not possible to determine whether the method itself was changing the particles."  Mot. 19.  Moderna and its experts principally rely on the depositions of Dr. Parsons and Mr. Schariter, *id.*, its scientists who oversaw reports describing "fractionation" (including UC) followed by "lipid content" measurements as a "comprehensive" analysis, Ex II at 1, 11, and "sensitive analytical" test, Ex JJ at 6-7, 42; Ex F (Mitchell R.) ¶¶ 376-391.  Mr. Schariter asked to "run a comprehensive study on the [COVID vaccine's] compositional heterogeneity," using fractionation (including UC) and lipid composition measurements—precisely the techniques

Dr. Schuster used—but Dr. Parsons (his boss) declined because they could "pose uncomfortable questions." Ex KK. Moderna does appear to find its infringing results (Ex DD) "uncomfortable." Moderna's post-hoc characterizations (including that its studies were not quantitative) contradict the contemporaneous record. Ex E (Mitchell) ¶ 331 (citing Ex FF at slide 31-32) (showing mol% of fractions with small error bars and decimal points); Ex F (Mitchell R.) ¶ 384 (citing Ex II at 6-7) (discussing fractionation-derived "heterogeneity scoring" "to *quantitatively* assess LNP heterogeneity"). Moderna's newfound skepticism cannot obscure the reliability of fractionation.

### C.    Dr. Schuster's Method Development Testing Did Not Yield Different Results

Unable to attack Dr. Schuster's actual sample testing, Moderna criticizes his development work, contending that it shows "different results" for the "same sample when using the same test parameters." Mot. 18-19. Moderna cites *no* testimony from its experts on this issue, *id.*, and its attorney argument is inapt. The work Moderna cites used parameters that ***differed*** from the final, validated method.[5] Production of development data is not mandated by Rule 26, let alone relevant enough to support exclusion. *ESCO Grp. LLC, v. Deere & Co.*, No. 20-cv-01679-WCB, D.I. 293 (D. Del. June 22, 2023), Ex LL at 7-8 ("initial" method development "runs" are not discoverable); *In re Xerox Corp.*, 746 F. Supp. 2d 402, 414 (D. Conn. 2010). Moderna chose to obfuscate that it is attacking a non-final method, Mot. 18-19, and cites no precedent of exclusion on this basis.

Even were the cited data relevant, Moderna mischaracterizes the experiments. ***First***, the cited comparisons did *not* use "the same parameters"; they used different injection volumes (10 vs. 15 µl), as Moderna concedes. Mot. 19; Ex Q at 28. Dr. Schuster ultimately selected 10 µl for the high concentration fractions for reliability. Ex U (Schuster R.) ¶ 43; Ex L, 37:13-19. ***Second***, Moderna is wrong that any difference was "dispositive of infringing versus not infringing." Mot.

---

[5] The development and final method used different calibration curve ranges and injection volumes (for fractions 6-8). *Compare* Ex Q at 28, *with* Ex G ¶¶ 49, 51; Ex L (Tr. II), 46:4-48:10.

19. ***Every condition Dr. Schuster tested showed infringing fractions***.  Ex Q at 27-32 (F05).  That distinguishes *King Drug*, which also involved *extreme* variability in the *final* method compared to the ~0.2 mol% difference Moderna cites in the development data.  2015 WL 6750899, at \*11, \*13 (E.D. Pa. Nov. 5, 2015) (noting variability greater "than 200 μm"); *Apotex, Inc. v. Cephalon, Inc*., 2012 WL 1080148, at \*12 (E.D. Pa. Mar. 28, 2012) (showing *King Drug* data ranged from 100.4 to 354.2 μm).  The Federal Circuit accepts normal analytical variability, *Takeda Pharm. Co. Ltd. v. Zydus Pharms.*, 743 F.3d 1359, 1367 n.3 (Fed. Cir. 2014), and Dr. Schuster's final results, which Moderna ignores, were "consistent" and had low standard deviations, Ex E (Mitchell) ¶¶ 631, 634.

### D.    Dr. Schuster Did Not "Cherry-Pick" a Testing Method to Bias His Results

Moderna accuses Dr. Schuster of "cherry-picking" testing parameters to "obtain the results that most favored Plaintiffs," Mot. 19-20, yet he did not "even know the [asserted] patents" or "claims." Ex H (Tr. I), 48:2-25.  Dr. Schuster testified that he, not counsel, selected the parameters and did so solely based on "robustness" and accuracy.  *Id*. at 96:4-99:2, 246:15-25, 261:7-19.

Moderna's argument is especially absurd because ***every condition*** Dr. Schuster tested, with ***every sample***—during feasibility, development, and final testing—shows infringing fractions.  Ex Q at 27-32 (F05) (Development); Ex EE (F05) (Feasibility); Ex F (Mitchell R.) ¶ 358.  Indeed, his first feasibility test exhibited the same (sometimes *more*) infringing fractions and *higher* SM-102 mol % than the final test.  D.I. 612 at 95-96; *compare* Ex EE (lot AR5186C), *with* Ex G (Schuster) at 107.  Had Dr. Schuster wanted to "cherry-pick" a method to favor infringement, he would have used his initial protocol.  Instead, he engaged in development to ensure his method was reliable.  Ex H (Tr. I) 246:7-25.  That distinguishes Moderna's *Lipitor* case, where the expert changed calculations to yield statistically significant results (without explanation) and omitted the harmful analysis.  892 F.3d 624, 634 (4th Cir. 2018).  Moderna and Dr. Schuster's tests show infringement across fractionation techniques and parameters; if Moderna believed certain parameters would

yield non-infringement, it should have tested them, rather than baselessly calumny Dr. Schuster.

Moderna also accuses Dr. Schuster of "disingenuously labelling" the UC method as "standard," Mot. 20, but aside from using a higher concentration (for reliability), the final method used the original UC settings, which are standard in his company and the field, Ex L (Tr. II), 22:25-23:13, 30:20-24; *compare* Ex Q at 6 (rotor-set 1), *with* Ex G (Schuster) ¶ 43-44. Moderna does not cite any non-standard parameter, Mot. 20, nor is that dispositive of reliability, *Kaneka*, 760 F. Supp. 3d at 168. Moderna also accuses Dr. Schuster of selecting a biased UC method and failing to determine if it "alter[ed]" the particles' mol% (calling his opinion "say-so"), Mot. 21, but the data (not say-so) shows the method did *not* change the particles, which exhibited the *same* mol% trends across UC parameters, *supra* III.B; Ex Q at 25-32; Ex L (Tr. II) 29:2-38:17, 49:13-52:16. Moderna's critiques that "variability" of *unselected* methods was not tested and data in informal slides may not be "[100%] correct," Mot. 20-21, likewise do not evince "methodological flaws."

In another desperate attack, Moderna argues that Dr. Schuster concealed his "actual testing method[]" until Moderna "moved to compel" it. Mot. 20; *id.* at 19 ("secret rounds of pre-testing"), 20 ("secret[] customiz[ation]"). This is false and inappropriate. Dr. Schuster set forth his "actual testing methodology" in his report and disclosed that he "developed and optimized" the method. Ex G §VI.B n.20; Ex H (Tr. I) 105:14-20, 246:15-25; 258:17-259:3. At deposition, Dr. Schuster answered Moderna's questions fully, and Plaintiffs repeatedly offered to produce the development data despite the untimeliness and baselessness of the request. The Court should deny Moderna's motion and not permit Moderna to mislead the jury with fabrications about Dr. Schuster's motives.

Taken together, Moderna's fanciful arguments about Dr. Schuster's method development work come nowhere close to showing that his sample testing was "so fundamentally flawed as to be unreliable and unhelpful to the factfinder." *St. Clair Intell. Prop. Consultants, Inc. v. Acer,*

*Inc.*, 935 F. Supp. 2d 779, 781-782 (D. Del. 2013). Moderna's critiques "may all be adequately addressed through cross-examination." *Id.* (denying exclusion despite indications of unreliability).

## IV.  DR. MITCHELL DOES NOT OFFER IMPROPER STATE OF MIND OPINIONS

Moderna regurgitates in passing its groundless accusations that Dr. Mitchell serves as nothing more than counsel's mouthpiece. Mot. 21. The record shows otherwise: as Plaintiffs explained, Dr. Mitchell's reports reflect his independent opinions. D.I. 611 at 12-20.

As with its attack on Ms. Lawton, what Moderna identifies as Dr. Mitchell's state-of-mind opinions largely quote Moderna's documents and testimony that form the basis for his opinions:

| Dr. Mitchell's statement | Moderna's underlying document/testimony |
|---|---|
| "Moderna wanted to abandon MC3." Ex E (Mitchell) ¶ 289. | "transition to a preferred, proprietary amino lipid … *to replace MC3*," Ex MM at 626 |
| "substantial evidence that Moderna transitioned to SM-102 at least in part because of a desire for a proprietary ionizable lipid and a desire to not pay royalties," Ex F (Mitchell R.) ¶161.<br><br>"Moderna's leadership, including [] Hoge" wanted to "avoid paying to license Plaintiffs' patents." Ex F (Mitchell R.) ¶ 173. | Moderna witness agreeing "one of [Moderna's] goals was to develop a *proprietary lipid of Moderna's own*," Ex NN at 207:3-5, 211:12-16<br><br>"*transition to a preferred, proprietary amino lipid* … to replace MC3," Ex MM at 626<br><br>Moderna "development goal" is to "*Avoid licensing* (intellectual property regarding 50 mole percent cationic lipid)," Ex OO at 431 |
| "Moderna's documents and its testimony make clear that it was aware" of the Patents-in-Suit. Ex E (Mitchell) ¶ 821. | Moderna's 30(b)(6) on "first awareness" of the Patents-in-Suit testified Moderna "was aware of the patents" by 2013, Ex PP 39:14-40:20 |

As an expert with "specialized knowledge," Dr. Mitchell's explanation of the materials Moderna cites will be "helpful to the trier of fact to determine a fact in issue." *Oxford Gene*, 345 F. Supp. 2d at 443. He will not simply "summarize what the jury independently" can understand, *contra* Mot. 21. For example, his discussion of Moderna's stated objective to replace MC3 will aid the jury in considering whether SM-102 has technological benefit—a disputed fact with respect to damages. Ex E ¶ 289; Ex F ¶¶ 161, 173. Moderna also takes issue with his discussion of testing that Moderna did not run for fear of "uncomfortable questions," but he offers helpful technical expertise as to what those tests might have shown. Ex E ¶ 463, 769. So too will his indirect

infringement opinions aid the jury, as his technical expertise allows him to explain that Moderna's marketing materials, like product labels, direct users to infringe. *Id.* ¶¶ 765-767. Other courts permit similar opinions. *GREE, Inc. v. Supercell Oy*, 2020 WL 4288350, at *2-3 (E.D. Tex. 2020).

Dr. Mitchell's opinions relating to the facts underlying willfulness also properly apply his technical expertise.[6] Even when courts exclude opinions "that provide *conclusions* as to the alleged degree of willfulness," they allow testimony that "identifies facts that could support an inference of willfulness, drawing upon [the expert's] technical infringement analysis." *Pavo Sols. LLC v. Kingston Tech. Co.*, 2019 WL 8138163, at *13 (C.D. Cal. Nov. 20, 2019). Dr. Mitchell's expertise will assist the jury in assessing technical evidence showing that Moderna (1) engaged in an aborted design around, (2) conducted testing showing infringement, and (3) copied the Asserted Patents. *E.g.*, Ex E ¶¶ 823-825. Courts consistently allow such opinions. *Bombardier Rec. Prods. Inc. v. Arctic Cat Inc.*, 2017 WL 758335, at *4 (D. Minn. Feb. 24, 2017) (expert opinion would "help the jury understand the technical evidence and provide relevant context … to determine if copying occurred"); *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1029 (S.D. Cal. 2023) (similar). The Court should not exclude Dr. Mitchell's testimony.

## V.    MESSRS. PITTS & BRILL OFFER ADMISSIBLE REBUTTAL OPINIONS

Moderna—not Plaintiffs—first disclosed expert opinions about whether its infringement was for the Government's benefit. If it is "improper for [Plaintiffs'] experts to expound on [that topic], the same would be true of [Moderna's] experts." *Lipocine Inc. v. Clarus Ther., Inc.*, 2020 WL 4794576, at *10 (D. Del. Aug. 18, 2020). Moderna cannot "have it both ways, i.e., to allow its own expert to testify [about Government benefit], but to exclude [Plaintiffs'] rebuttal expert" from doing so. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 673 (S.D.N.Y. 2007).

---

[6] Plaintiffs do not intend to introduce Dr. Mitchell's ultimate opinions that Moderna willfully infringed Plaintiffs' patents or had the intent to cause others to infringe. *E.g.*, Ex E ¶¶ 764, 777.

OF COUNSEL:
David I. Berl
Adam D. Harber
Thomas S. Fletcher
Shaun P. Mahaffy
Andrew L. Hoffman
Matthew W. Lachman
Ricardo Leyva
Arthur J. Argall III
Falicia Elenberg
Kathryn Larkin
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
(202) 434-5000

Andrei Iancu
Jeffrey B. Wall
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Suite 700
Washington, DC 20006
(202) 956-7500

*Attorneys for Plaintiff Genevant
Sciences GmbH*

Daralyn J. Durie
Adam R. Brausa
Eric C. Wiener
Annie A. Lee
Shaelyn K. Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
(415) 268-6080

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Plaintiffs*

26

Kira A. Davis
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017-3543
(213) 892-5200

David N. Tan
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC 20037
(202) 887-1500

*Attorneys for Plaintiff Arbutus
Biopharma Corporation*

Dated: December 16, 2025