HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

effort to conceal the company's "learnings" from its years of use of Tekmira's LNP, as discussed above.

918.    In view of the foregoing and the circumstances at the time of the May 31, 2020 hypothetical negotiation, Genevant and Moderna would expect that the reasonable royalty adequate to compensate for Moderna's alleged use of the Patents-in-Suit, which I understand covers foundational LNP technology that enabled mRNA vaccines including mRNA-1273, would be significantly higher than what is set forth in Tekmira's May 29, 2013 term sheet. While there were a number of later proposals and counterproposals between Genevant and its predecessors and Moderna, it is my opinion that these proposals are not informative for a number of reasons. First, these later proposals were impacted by improper competition from AlCana/Acuitas that culminated in the July 4, 2014 Acuitas-Moderna agreement, and continued until the injunction was granted on February 7, 2017. Second, the later proposals were a continuation of the prior negotiations that were impacted by the improper competition and do not reflect either assumptions (*i.e.,* the Patents-in-Suit are valid, enforceable and infringed) or the circumstances at the time of the May 31, 2020 hypothetical negotiation. Third, even after the injunction, the evidence shows that Moderna continued to use Genevant's patented technology in all of its clinical trials until the Phase 2 CMV trial that started in October 2019—while using IPR proceedings to attempt to invalidate the Arbutus patents, which provided Moderna with leverage that it would not have had in the hypothetical negotiation.

### (2) Genevant and its Predecessor's License Agreements

919.    Genevant has entered into a number of license agreements, which set forth the terms under which Genevant is "agreeing to share value from the product in a particular way."[2393] In particular, Arbutus/Genevant and its predecessors have entered into 17 such license agreements related to the Patents-in-Suit with the following companies: including Gritstone Oncology, Inc., BioNTech RNA Pharmaceuticals GmbH, Providence Therapeutics COVID Inc., Sarepta Therapeutics, Inc., ████████████, Chulalongkorn University, Takeda Pharmaceuticals U.S.A., Inc., ST Pharm Co.,

---

[2393] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 269:10-269:16 ("A. The – we are providing a license to delivery technology, which forms a part of a product, and agreeing to share value from that product in a particular way. And typically, our counterparty is providing technology for the other part of the product, again, speaking in simplistic terms.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Ltd., bluebird bio, Inc., ███████████████████., Korro Bio, Inc., Novo Nordisk A/S, Tome Biosciences, Inc., Gritstone bio, Inc.,Repair BioTechnologies, Inc., and Editas Medicine, Inc. ,. The terms of these agreements are summarized in Schedules 6.2(a) and 6.2(b). The background regarding these agreements is set forth in Genevant's responses to interrogatories No. 3 and No. 5.

920.    Moderna's interrogatory responses also identify certain other agreements as "potentially relevant and informative to the determination of damages in this action."2394 These include



; a 2017 agreement between Arbutus and Gristone bio, Inc.2401; a 2017 agreement between Arbutus and Alexion Pharma Holding2402. Detailed descriptions of these agreements may be found in Schedule 6.2(b). It is my opinion that the economic terms, including the royalty rate in these agreements, are not indicative of the reasonable royalty that would result from the May 31, 2020 Genevant-Moderna hypothetical negotiation in this case. Key differences include the following:The relationship between the parties was not

---

2394 Defendants' Corrected Sixteenth Supplemental Objections And Responses to Plaintiffs' First Set Of Interrogatories (Nos. 1-10) dated July 15, 2024, No. 8, at p. 117-19.

2395 GENV-00832872-912 (Research Agreement between Lipex Pharmaceuticals Inc and The ███████████████ dated February 1, 1993)

2396 GENV-00832228-295 (Sponsored Research Agreement between Alnylam Pharmaceuticals, Inc., The University of British Columbia, and AlCana Technologies, Inc dated July 27, 2009).

2397 GENV-00040097

2398 ABUS-00000001 (November 12, 2012 – Settlement/General Release Agreement Involving Tekmira, Protiva, Alnylam, and AlCana); GENV-00062905 (November 12, 2012 – Cross License Agreement Involving Tekmira, Protiva, and Alnylam).

2399 GENV-00716720.

2400 GENV-00716974-717029 (November 16, 2024 Protiva, Tekmira, and ██████ License Agreement).

2401 GENV-00023476.

2402 GENV-0716638.

682

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

similar (e.g., the parties to these agreements, in some cases, were collaborators, with each party bringing know-how, intellectual property, and/or funding to the collaboration);

a) Neither Genevant nor Moderna were parties to these agreements;

b) Some of the agreements were negotiated during the period of overhang discussed above during which Acuitas attempted to sublicense Arbutus/Tekmira's technology;

c) The commercial opportunities were not similar, given the stage of product development (these agreements were not negotiated on "the doorstep of commercialization"), different disease targets, and economic landscape, among other things;

d) Some of these agreements are not bare patent licenses but rather research agreements that may (or may not) have culminated in any licensed intellectual property;

e) These agreements were negotiated well before (in some cases, decades before) the May 31, 2020 hypothetical negotiation and not under the circumstances of the pandemic; and

f) These agreements pre-date the clinical validation of Plaintiffs' technology associated with Onpattro®'s approval by FDA.

921.  I have divided the foregoing 17 Genevant agreements into the following three (3) categories:

- The Pre-2020 Agreements,
- The Post-2020 Non-COVID-19 Agreements, and
- The Post-2020 COVID-19 Agreements.

**(a)**  The Pre-2020 Agreement

922.  Prior to January 2020, Genevant entered into 1 license agreement that included the Patents-in-Suit.[2403]  The terms of the agreement are summarized on Schedule 6.2(b).

923.  It is my opinion that the economic terms including the royalty rates in this agreement are not indicative of the reasonable royalty that would result from the May 31, 2020 Genevant-Moderna hypothetical negotiation in this case.  The key differences between this agreement and the May 31, 2020 hypothetical negotiation include the following:

a) Not negotiated on "the doorstep of commercialization" (i.e., not negotiated at the same stage of development);

b) Negotiated approximately two (2) years before the May 31, 2020 hypothetical negotiation and not under the circumstances of the pandemic;

---

[2403] GENV-00022037 (July 4, 2018 - License and Co-Development Agreement by and between BioNTech RNA Pharmaceuticals GmbH and Genevant Sciences GmbH).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

c) Does not include COVID-19 and was not negotiated under circumstances similar to those for a COVID-19 vaccine,

d) The relationship between the parties was not similar (i.e., more than 8-year technology discussion between Genevant and its predecessors and Moderna that did not result in an agreement, Moderna's use of Plaintiffs' technology in their research and development prior to license negotiations, Moderna's Dr. Hoge discussed an upcoming meeting with Genevant in a December 2018 email with the subject header, "Frenemies"[2404]),

e) The commercial opportunity and the magnitude of the expected economic benefits was not similar,

f) Part of a broader collaboration and is not a naked patent license.

(i)  July 4, 2018 Genevant BioNTech RNA License and Development Agreement

924. On July 4, 2018, BioNTech RNA entered into a license and co-development agreement with Genevant, for the joint development of certain pharmaceutical products and the licensing of specified rights to Genevant's lipid nanoparticle delivery technology to BioNTech RNA.[2405] The terms of the agreement are summarized on Schedule 6.2(b).

925. In summary, BioNTech RNA and Genevant "agreed to collaborate to develop pharmaceutical products that contain any of five mRNA payloads created by BioNTech RNA encapsulated within a Genevant . . . LNP . . . for the treatment, prevention and diagnosis of liver diseases, excluding any oncology diseases. . . . In addition, BioNTech RNA obtained an exclusive, worldwide, royalty-bearing license or sublicense under Genevant's LNP delivery technology to . . . commercialize pharmaceutical products containing BioNTech mRNA payloads encapsulated within an LNP . . . for the treatment, prevention and diagnosis of illnesses in the field of oncology . . . ."[2406]

---

[2404] MRNA-GEN-01764293 (December 10, 2018 email from Stephen Hoge to John Mendlein, CC: Lisa Emanuello, Subject: Re: Frenemies).

[2405] GENV-00022037 (July 4, 2018 - License and Co-Development Agreement by and between BioNTech RNA Pharmaceuticals GmbH and Genevant Sciences GmbH).

[2406] BioNTech SE, Form F-1 (July 21, 2020), *available* at, https://www.sec.gov/Archives/edgar/data/1776985/000119312520195911/d939702df1.htm; GENV-00022037 (July 4, 2018 - License and Co-Development Agreement by and between BioNTech RNA Pharmaceuticals GmbH and Genevant Sciences GmbH); GENV-00522753 (July 10, 2018) (BioNTech and Genevant Sciences Sign Strategic mRNA-Focused Partnership in Rare Diseases).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

926.    This agreement is still in place.[2407]  Pursuant to the terms of this agreement, BioNTech RNA has made payments to Genevant totaling $1.0 million.[2408]

### (b)    The Post-2020 Non-COVID-19 Agreements

927.    During the period January 2020 to January 2024, Genevant entered into 10 license agreements that include the Patents-in-Suit that do *not* cover COVID-19.    The terms of these agreements are summarized on **Schedule 6.2(b).**

928.    It is my opinion that the economic terms including the royalty rates in this agreement are not indicative of the reasonable royalty that would result from the May 31, 2020 Genevant-Moderna hypothetical negotiation in this case.  The key differences between this agreement and the May 31, 2020 hypothetical negotiation include the following:

  a)  *Not* negotiated on "the doorstep of commercialization" (*i.e.,* not negotiated at the same stage of development);

  b)  Does *not* include COVID-19 and was not negotiated under circumstances similar to those for a COVID-19 vaccine,

  c)  The relationship between the parties was *not* similar (*i.e.,* more than 8-year technology discussion between Genevant and its predecessors and Moderna that did *not* result in an agreement, Moderna's use of Plaintiffs' technology in their research and development prior to license negotiations, Moderna's Dr. Hoge discussed an upcoming meeting with Genevant in a December 2018 email with the subject header, "Frenemies"[2409]),

  d)  The commercial opportunity and the magnitude of the expected economic benefits was *not* similar,

  e)   Part of a broader collaboration and is not a naked patent license.

---

[2407] June 5, 2024 Deposition of Pete Zorn (Genevant), 242:25-243:4.
[2408] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).
[2409] MRNA-GEN-01764293 (December 10, 2018 email from Stephen Hoge to John Mendlein, CC: Lisa Emanuello, Subject: Re: Frenemies).

685

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

>      (i)      **October 12, 2020 Research Collaboration and Option Agreement between Genevant Sciences GmbH and Sarepta Therapeutics, Inc.**

929.    On October 12, 2020, and Genevant Sciences entered into a research collaboration and option agreement with Sarepta Therapeutics,[2410] a global biotechnology company focused on genetic medicine for rare diseases that is headquartered in Cambridge, MA.[2411] The terms of the agreement are summarized on **Schedule 6.2(b)**.

930.    Sarepta describes itself as "commercial-stage biopharmaceutical company focused on helping patients through the discovery and development of unique RNA targeted therapeutics, gene therapy and other genetic therapeutic modalities for the treatment of rare diseases."[2412] As of the end of 2019, it had two commercial products, EXONDYS 51, an injection treatment for Duchenne muscular dystrophy ("DMD"), which as approved by the FDA in September 2016 and VYONDYS 53, an injection treatment for DMD, which was approved by the FDA in December 2019[2413] and approximately $381 million in annual revenue.[2414]

931.    In January 2020, Sarepta announced the research collaboration with Genevant was to explore lipid nanoparticle (LNP)-based gene editing therapies for neuromuscular diseases and the partnership aimed to use Sarepta's gene editing technologies alongside Genevant's LNP delivery system to

---

[2410] GENV-00022423 (October 12, 2020 Research Collaboration and Option Agreement between Genevant Sciences GmbH and Sarepta Therapeutics, Inc.).

[2411] *See, e.g.,* Sarepta Therapeutics website, *available at* https://www.sarepta.com/

[2412] Sarepta Therapeutics' 2020 10-K, *available at* https://investorrelations.sarepta.com/static-files/69461f78-a497-4ee9-9969-54013458622b.

[2413] Sarepta Therapeutics' 2020 10-K, p. 4, *available at* https://investorrelations.sarepta.com/static-files/69461f78-a497-4ee9-9969-54013458622b.

[2414] "Sarepta Therapeutics Announces Fourth Quarter and Full-Year 2019 Financial Results and Recent Corporate Developments," *Sarepta Therapeutics*, February 26, 2020, *available at* https://investorrelations.sarepta.com/news-releases/news-release-details/sarepta-therapeutics-announces-fourth-quarter-and-full-year-2019.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

target diseases such as Duchenne muscular dystrophy.[2415] Sarepta regarded Genevant's LNP technology as critical to the effective delivery of gene editing tools like CRISPR-Cas.[2416]

932.    Pursuant to this agreement, Sarepta has made payments to Genevant totaling ▮▮▮▮▮▮.[2417]

> (ii)    **October 15, 2020 Evaluation and Option Agreement between Genevant Sciences GmbH and Takeda Pharmaceuticals U.S.A., Inc.**

On October 15, 2020, Genevant and Takeda Pharmaceuticals, a global biopharmaceutical company,[2418] entered into an Evaluation and Option Agreement.[2419] The terms of the agreement are summarized on **Schedule 6.2(b)**.

933.    Takeda Pharmaceutical is a Japanese biopharmaceutical company that was founded in 1781 and Incorporated in 1925.[2420] In 2019, Takeda acquired Shire PPL to become a leading global R&D biopharmaceutical company with a footprint in over 80 countries and regions.[2421] By 2020, the Company had almost $29 billion in revenue and the business was focused on five key areas - Gastroenterology, Rare Diseases, Plasma-Derived Therapies, Oncology and Neuroscience.[2422]

---

[2415] "Sarepta Therapeutics and Genevant Sciences Announce Research Collaboration for Lipid Nanoparticle-Based Gene Editing Therapeutics," *Sarepta Therapeutics*, January 13, 2020, *available at* https://investorrelations.sarepta.com/news-releases/news-release-details/sarepta-therapeutics-and-genevant-sciences-announce-research.

[2416] "Sarepta Therapeutics and Genevant Sciences Announce Research Collaboration for Lipid Nanoparticle-Based Gene Editing Therapeutics," *Sarepta Therapeutics*, January 13, 2020, *available at* https://investorrelations.sarepta.com/news-releases/news-release-details/sarepta-therapeutics-and-genevant-sciences-announce-research.

[2417] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2418] Takeda Pharmaceutical Website, *available at* https://www.takeda.com/.

[2419] GENV-00468778 (October 15, 2020 Evaluation and Option Agreement by and between Takeda Pharmaceuticals U.S.A., Inc. and Genevant Sciences Corporation).

[2420] Takeda Pharmaceutical Website, *available at* https://www.takeda.com/about/our-company/

[2421] Takeda Pharmaceutical Website, *available at* https://www.takeda.com/about/our-company/history/.

[2422] "Takeda Delivers Resilient FY2020 Results with Strong Margins & Robust Cashflow; Underlying Revenue Growth Expected to Accelerate in FY2021," *Takeda News Release*, May 11. 2021, *available at* https://www.takeda.com/newsroom/newsreleases/2021/takeda-delivers-resilient-fy2020-results-with-strong-margins--robust-cashflow-underlying-revenue-growth-expected-to-accelerate-in-fy2021/.

687

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

934.    In summary, this agreement "grants to Takeda and its Affiliates a nonexclusive, nontransferable license [for] Takeda Payload(s) formulated with a Genevant LNP technology." [2423]  Under the terms of the agreement, Takeda would provide its expertise in "developing and commercializing pharmaceutical products" and Genevant would provide expertise and technology relating to "LNP delivery of nucleic acids (such as ribonucleic acid (RNA)) to HSCs and methods for manufacturing LNPs."[2424] The agreement focused on developing a treatment for liver fibrosis.[2425] For research expenses, Takeda provided Genevant a one-time payment of ▮▮▮▮▮ for, among other things, research expenses..[2426] This agreement also included potential terms for a Collaboration Agreement, with value up to ▮▮▮▮▮▮, along with ▮▮▮▮▮▮ on future product sales.[2427]

935.    Pursuant to this agreement, Takeda made payments to Genevant totaling ▮▮▮▮▮.[2428]

> **(iii)    October 19, 2020 Nonexclusive License and Service Agreement between Genevant Sciences GmbH and ▮▮▮▮**

936.    On October 19, 2020, Genevant and ▮▮▮ entered into a License and Services Agreement with ▮▮▮▮▮▮.[2429]  The terms of the agreement are summarized on **Schedule 6.2(b)**.

937.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[2430]

---

[2423] GENV-00468778, pp 4, 6 (October 19, 2020 Evaluation and Option Agreement Genevant Sciences GmbH and Takeda Pharmaceuticals U.S.A., Inc.).

[2424] GENV-00468778-814 at 778 (October 15, 2020 Evaluation and Option Agreement by and between Takeda Pharmaceuticals U.S.A., Inc. and Genevant Sciences Corporation).

[2425] GENV-00468778-814 at 780 (October 15, 2020 Evaluation and Option Agreement by and between Takeda Pharmaceuticals U.S.A., Inc. and Genevant Sciences Corporation).

[2426] GENV-00468778-814 at 785 (October 15, 2020 Evaluation and Option Agreement by and between Takeda Pharmaceuticals U.S.A., Inc. and Genevant Sciences Corporation).

[2427] GENV-00468778-814 at 812-813 (October 15, 2020 Evaluation and Option Agreement by and between Takeda Pharmaceuticals U.S.A., Inc. and Genevant Sciences Corporation).

[2428] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2429] GENV-00022525 (October 19, 2020 Nonexclusive License and Service Agreement between Genevant Sciences GmbH and ▮▮▮▮▮▮).

[2430] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

688

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

938.  In summary, pursuant to the October 2020 license and service agreement, Genevant was licensing its intellectual property regarding "lipid nanoparticle ("LNP") formulations for delivery of messenger ribonucleic acid ("mRNA") and methods for manufacturing LNPs"[2431] to ███ ███████. While the agreement does not include a commercial license, the "product being studied [by ███] was a COVID therapeutic."[2432] The licensed intellectual property could only be used by ████ to conduct a "Phase 1 clinical trial of a specific mRNA-LNP antibody product."[2433] The antibody product would be used to treat coronavirus. Specifically, the product candidate will contain "at least one mRNA that encodes at least one antibody elicited by SARS-CoV-2."[2434] For Genevant's research license and any Genevant equipment, ███ provided ████ in payments.[2435]

939.  Pursuant to this agreement, ███ has made payments to Genevant totaling ██████.[2436]

> **(iv)    October 20, 2020 Option and License and Development Agreement by and between Gritstone Oncology, Inc. and Genevant Sciences GmbH**

940.  On October 20, 2020, Gritstone Oncology entered into a License and Development Agreement with Genevant Sciences.[2437]  The terms of the agreement are summarized on **Schedule 6.2(b)**.

---

[2431] GENV-00022525 at p. 1 (October 19, 2020 Nonexclusive License and Service Agreement between Genevant Sciences GmbH and ████████████ ).

[2432] June 5, 2024 Deposition of Peter Zorn, 202:21-203:8 ("Q. Mr. Zorn, so if I look at Exhibit 26, for ████ there's a parenthetical comment that says, "No commercial license." What do you understand that to mean? A. Yeah. So again, that -- so this – the intended scope of this production was commercial licenses. We included a couple of agreements that didn't include a commercial license for one reason or another. This is one of them with ████. And the reason we included it was because the product being studied was a COVID therapeutic. It wasn't a vaccine; it was a COVID -- it was a COVID product.").

[2433] GENV-00022525 at p. 1 (October 19, 2020 Nonexclusive License and Service Agreement between Genevant Sciences GmbH and ████████████ ).

[2434] GENV-00022525 at p. 5 (October 19, 2020 Nonexclusive License and Service Agreement between Genevant Sciences GmbH and ████████████ ).

[2435] GENV-00022525 at p. 7 (October 19, 2020 Nonexclusive License and Service Agreement between Genevant Sciences GmbH and ████████████ ).

[2436] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2437] GENV-00023616 (October 20, 2020 Option and License and Development Agreement by and between Gritstone Oncology, Inc. and Genevant Sciences GmbH).

689

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

941.    Gritstone is a clinical-stage biotechnology company that focuses on developing the next generation of cancer immunotherapies,[2438] which filed for Chapter 11 bankruptcy in October 2024. The company was founded in August 2015 as Gritstone Oncology, Inc. and is now known as Gritstone bio, Inc. and based in Emeryville, California.[2439]

942.    In summary this agreement, Genevant granted Gritstone exclusive rights to its lipid nanoparticle (LNP) technology[2440]   The agreement explicitly excludes human illnesses in the field of oncology and the treatment or prevention of coronavirus-mediated disease (including COVID-19).[2441]   In exchange, Gritstone agreed to an initial payment of ███████, plus up to ██████████ ████████████████████████████████ milestones, along with ██████████████ royalties on net sales of products using the LNP technology.[2442]

943.    This Agreement also expands Gritstone's intellectual property rights related to LNP technology, which it had previously obtained through a 2017 agreement with Arbutus Biopharma and Protiva Biotherapeutics.[2443] Gritstone's Q1 2024 10-Q also stated that prior to this Agreement, Gritstone "licensed Arbutus' LNP technology for indications in the oncology space" and "the remainder of Arbutus' IP portfolio was transferred to Genevant in the spinoff."[2444]

944.    Additionally, the Agreement included options for Gritstone to expand the licensed field beyond the single indication (to include one or more of the infectious diseases, influenza (type A) virus (flu), mycobacterium tuberculosis (TB), and human papillomavirus (HPV)), with further payments

---

[2438] "Gritstone Oncology, Inc.," Annual Reports, available at https://www.annualreports.com/Company/gritstone-oncology-inc
[2439] "Our Unique Story," *Gritstone bio,* 2024, *available at* https://gritstonebio.com/about/#:~:text=Gritstone%20bio%20is%20headquartered%20in,under%20the%20ticker%20symbol%20GRTS.
[2440] Gritstone Oncology, Inc. Form 10-K, October 20, 2020, pg. 2, *available at* https://ir.gritstonebio.com/static-files/1c4d91ce-90dd-480b-b52e-d28fc3764080
[2441] GENV-00023616 (October 20, 2020 Option and License and Development Agreement by and between Gritstone Oncology, Inc. and Genevant Sciences GmbH).
[2442] Gritstone Oncology, Inc. Form 10-K, October 20, 2020, pg. 2, *available at* https://ir.gritstonebio.com/static-files/1c4d91ce-90dd-480b-b52e-d28fc3764080.
[2443] GENV-00023476 (October 16, 2017 License Agreement between Gritstone Oncology, Inc. and Arbutus Biopharma Corporation and Protiva Therapeutics Inc.).
[2444] Gritstone Oncology, Inc. Form 10-Q, March 31, 2024, available at https://ir.gritstonebio.com/static-files/1bc145e0-f241-4bf6-a625-e0ebea18f51a.

690

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

and royalties due if the options are exercised. Gritstone also granted Genevant a nonexclusive license to certain intellectual property developed under the prior Arbutus License.[2445]

945.    Pursuant to this agreement, Gritstone has made payments to Genevant totaling ▮▮▮▮▮▮▮.[2446]

### (v)    March 9, 2021 Collaboration and License Agreement between Genevant Sciences GmbH and Takeda Pharmaceuticals U.S.A., Inc.

946.    On March 9, 2021, Genevant Sciences entered into a global collaboration and license agreement with Takeda Pharmaceutical Company.[2447] This agreement follows the October 15, 2020 Evaluation and Option agreement between Genevant and Takeda discussed above.[2448] The terms of the agreement are summarized on **Schedule 6.2(b)**

947.    In summary, under this agreement, Takeda intended develop nucleic acid therapeutics using Genevant's lipid nanoparticle (LNP) technology to target liver fibrosis.[2449] Pete Lutwyche, Ph.D., president and chief executive officer, at Genevant stated "It is well established that activated hepatic stellate cells are implicated in the progression of fibrotic liver disease, but unfortunately access to these cells has been elusive. As longstanding leaders in nucleic acid delivery, Genevant has developed a novel hepatic stellate cell-directed LNP platform to meet this challenge and we are delighted to partner with Takeda to utilize this innovation to develop new treatments for patients suffering from liver fibrosis."[2450]

---

[2445] Gritstone Oncology, Inc. Form 10-K, October 20, 2020, pg. 2, *available at* https://ir.gritstonebio.com/static-files/1c4d91ce-90dd-480b-b52e-d28fc3764080

[2446] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2447] GENV-00022793 (March 9, 2021 Collaboration and License Agreement between Genevant Sciences GmbH and Takeda Pharmaceuticals U.S.A., Inc.).

[2448] GENV-00468778 (October 15, 2020 Evaluation and Option Agreement by and between Takeda Pharmaceuticals U.S.A., Inc. and Genevant Sciences Corporation).

[2449] GENV-00022793 at p. 11 (March 9, 2021 Collaboration and License Agreement between Genevant Sciences GmbH and Takeda Pharmaceuticals U.S.A., Inc.).

[2450] "Genevant Sciences Announces Global Collaboration and License Agreement with Takeda to Develop Novel Nucleic Acid Therapeutics for Liver Fibrosis," *Genevant*, March 15, 2021, *available at* https://www.genevant.com/genevant-sciences-announces-global-collaboration-and-license-agreement-with-takeda-to-develop-novel-nucleic-acid-therapeutics-for-liver-fibrosis

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

948.    Under the agreement, Genevant is eligible for up to ███████ in upfront and milestone payments, as well as royalties on future product sales.[2451] Takeda will have exclusive rights to Genevant's LNP technology for targeting specified hepatic stellate cell targets. [2452]

949.    Pursuant to this agreement, Takeda has made payments to Genevant totaling ███████.[2453]

**(vi)    August 2, 2021 Research and Option Agreement among Genevant Sciences Corporation, Genevant Sciences GmbH, and bluebird bio, Inc.**

950.    On August 2, 2021, Genevant and bluebird entered into a Research and Option Agreement.[2454] The terms of the agreement are summarized on **Schedule 6.2(b)**.

951.    bluebird bio, Inc. is a biotechnology company with late-stage clinical and research programs for the treatment of sickle cell disease ("SCD"), β-thalassemia and cerebral adrenoleukodystrophy ("CALD").[2455]

952.    In summary, under this agreement, bluebird intended to develop  treatments "of the genetic disorder caused by missing or defective human coagulation factor VIII and known as Hemophilia A."[2456] Genevant would provide the expertise regarding LNP technology and bluebird would provide the experience in "researching, developing, and commercializing potentially transformative gene therapies for severe genetic diseases and oncology."[2457] The agreement

---

[2451] GENV-00022793 at p. 33-36 (March 9, 2021 Collaboration and License Agreement between Genevant Sciences GmbH and Takeda Pharmaceuticals U.S.A., Inc.).

[2452] "Genevant Sciences Announces Global Collaboration and License Agreement with Takeda to Develop Novel Nucleic Acid Therapeutics for Liver Fibrosis," *Genevant*, March 15, 2021, *available at* https://www.genevant.com/genevant-sciences-announces-global-collaboration-and-license-agreement-with-takeda-to-develop-novel-nucleic-acid-therapeutics-for-liver-fibrosis

[2453] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2454] GENV-00022977 (Zorn Deposition Exhibit No. 23 - August 2, 2021 Research and Option Agreement among Genevant Sciences Corporation, Genevant Sciences GmbH, and bluebird bio, Inc.).

[2455] bluebird bio, Inc's 2021 10-K, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001293971/000129397122000016/blue-20211231.htm.

[2456] GENV-00022977 at p. 3 (Zorn Deposition Exhibit No. 23 - August 2, 2021 Research and Option Agreement among Genevant Sciences Corporation, Genevant Sciences GmbH, and bluebird bio, Inc.).

[2457] GENV-00022977 at p. 1 (Zorn Deposition Exhibit No. 23 - August 2, 2021 Research and Option Agreement among Genevant Sciences Corporation, Genevant Sciences GmbH, and bluebird bio, Inc.).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

includes a potential term sheet for a collaboration agreement in which Genevant could receive up to ▮▮▮▮▮▮▮ in milestone payments as well as ▮▮▮▮▮▮ royalties on future product sales.[2458]

953.    Later in 2021, bluebird completed a "tax-free spin-off of our oncology programs and portfolio to become a company focused on the pursuit of curative gene therapies for severe genetic diseases."[2459] The spin-off, 2seventy bio, obtained the rights to Genevant's lipid nanoparticle (LNP) delivery technology and would "use the delivery technology in an in vivo gene editing collaboration with Novo Nordisk."[2460]

954.    Pursuant to this agreement, bluebird bio has made payments to Genevant totaling ▮▮▮▮▮▮.[2461]

           (vii)    **August 21, 2021 Collaboration and License Agreement between Genevant Sciences GmbH and Takeda Pharmaceuticals U.S.A., Inc.**

955.    On August 21, 2020, Genevant Sciences entered into a global collaboration and license agreement with Takeda Pharmaceutical Company.[2462] This agreement follows the October 15, 2020 Evaluation and Option agreement[2463] and the March 9, 2021 global collaboration and license agreement between Genevant and Takeda Pharmaceutical Company.[2464] The terms of the agreement are summarized on **Schedule 6.2(b)**.

---

[2458] GENV-00022977 at p. 33 (Zorn Deposition Exhibit No. 23 - August 2, 2021 Research and Option Agreement among Genevant Sciences Corporation, Genevant Sciences GmbH, and bluebird bio, Inc.).

[2459] bluebird bio, Inc's 2021 10-K, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001293971/000129397122000016/blue-20211231.htm.

[2460] "2seventy brings in Genevant delivery tech for Novo Nordisk in vivo gene editing project," *Fierce Pharma*, January 10, 2022, *available at* https://www.fiercepharma.com/drug-delivery/2seventy-brings-genevant-delivery-tech-for-novo-nordisk-vivo-gene-editing-project.

[2461] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2462] GENV-00022793 (March 9, 2021 Collaboration and License Agreement between Genevant Sciences GmbH and Takeda Pharmaceuticals U.S.A., Inc.).

[2463] GENV-00468778 (October 15, 2020 Evaluation and Option Agreement by and between Takeda Pharmaceuticals U.S.A., Inc. and Genevant Sciences Corporation).

[2464] GENV-00022793 (March 9, 2021 Collaboration and License Agreement between Genevant Sciences GmbH and Takeda Pharmaceuticals U.S.A., Inc.).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

956.    In summary, this agreement was "for the development and commercialization of novel nonviral gene therapies to treat up to two undisclosed rare liver diseases."[2465]

957.    Pursuant to this agreement, Takeda has made payments to Genevant totaling ▮▮▮▮▮▮.[2466]

**(viii)    March 2, 2023 Collaboration and License Agreement by and between Korro Bio, Inc. and Genevant Sciences GmbH**

958.    On March 2, 2023, Korro Bio and Genevant Sciences entered a collaboration and license Agreement.[2467]  The terms of the agreement are summarized on **Schedule 6.2(b)**.

959.    Korro Bio is a biopharmaceutical company focused on genetic medicines based on editing RNA for the treatments of both rare and common diseases.[2468]  The company was founded in 2014 and is headquartered in Cambridge, Ma.[2469] As of the end of 2022, Korro Bio was still a clinical stage company with no revenue recognized for the year ended December 31, 2022.[2470]  In January 2022, Korro Bio announced it has secured $116 million in Series B financing to "enable Korro to advance its lead program in development for patients with Alpha-1 Antitrypsin Deficiency (AATD), an inherited genetic disorder leading to liver and lung disease, while expanding its pipeline to address prevalent diseases across multiple therapeutic areas."[2471]

---

[2465]"Genevant Sciences Announces Global Collaboration and License Agreement with Takeda to Develop Novel Nonviral Gene Therapies for Up to Two Rare Liver Diseases", *Genevant Company News Release*, August 23, 2021, *available at* https://www.genevant.com/genevant-sciences-announces-global-collaboration-and-license-agreement-with-takeda-to-develop-novel-nonviral-gene-therapies-for-up-to-two-rare-liver-diseases/.

[2466] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2467] GENV-00023337 (March 2, 2023 Collaboration and License Agreement by and between Korro Bio, Inc. and Genevant Sciences GmbH).   "Korro Bio and Genevant Sciences Enter into Collaboration Agreement to Develop RNA Editing Therapeutic for Alpha-1 Antitrypsin Deficiency," *Genevant*, March 7, 2023, *available at* https://www.genevant.com/korro-bio-and-genevant-sciences-enter-into-collaboration-agreement-to-develop-rna-editing-therapeutic-for-alpha-1-antitrypsin-deficiency/.

[2468] "Corporate Profile" *Korro Bio Company Website, available at* https://ir.korrobio.com/

[2469] Korro Bio's 2022 10-K, *available at* https://ir.korrobio.com/static-files/1a45c60f-ea46-4811-9853-49443117401f.

[2470] Korro Bio's 2022 10-K, *available at* https://ir.korrobio.com/static-files/1a45c60f-ea46-4811-9853-49443117401f.

[2471] "Korro Bio Completes $116M Series B Financing to Expand the Frontier of Genetic Medicine through its Pipeline of RNA Editing Programs," Korro Bio Press Release, January 5, 2022, available at https://ir.korrobio.com/news-releases/news-release-details/korro-bio-completes-116m-series-b-financing-expand-frontier.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

960.    In summary, this collaboration with Genevant was part of a continued strategy by combining Korro's RNA editing platform with Genevant's lipid nanoparticle (LNP) technology to develop a therapeutic for Alpha-1 Antitrypsin Deficiency (AATD), a genetic disease with significant unmet medical need.[2472] Under the terms of the new agreement, Genevant is eligible for up to ████████ ████████████████████████████, plus royalties on product sales.[2473] The partnership aims to address both liver and lung manifestations of AATD, using Korro's OPERA™ RNA editing platform, which offers targeted, reversible, and transient gene therapy.[2474] Genevant will contribute its advanced LNP delivery system, which has been pivotal in RNA-based therapeutics.[2475]

961.    Pursuant to this agreement, Korro Bio has made payments to Genevant totaling at ████████ as of May 2024..[2476]

> **(ix)    November 1, 2023 Collaboration and Nonexclusive License Agreement by and between Novo Nordisk A/S and Genevant Sciences GmbH**

962.    On November 1, 2023, Genevant Sciences entered a collaboration and nonexclusive license agreement with Novo Nordisk.[2477]  The terms of the agreement are summarized on **Schedule 6.2(b)**.

---

[2472] "Korro Bio and Genevant Sciences Enter into Collaboration Agreement to Develop RNA Editing Therapeutic for Alpha-1 Antitrypsin Deficiency," *Genevant*, March 7, 2023, *available at* https://www.genevant.com/korro-bio-and-genevant-sciences-enter-into-collaboration-agreement-to-develop-rna-editing-therapeutic-for-alpha-1-antitrypsin-deficiency/.

[2473] GENV-00023337 at p. 23-24 (March 2, 2023 Collaboration and License Agreement by and between Korro Bio, Inc. and Genevant Sciences GmbH).

[2474] "Korro Bio and Genevant Sciences Enter into Collaboration Agreement to Develop RNA Editing Therapeutic for Alpha-1 Antitrypsin Deficiency," *Genevant*, March 7, 2023, *available at* https://www.genevant.com/korro-bio-and-genevant-sciences-enter-into-collaboration-agreement-to-develop-rna-editing-therapeutic-for-alpha-1-antitrypsin-deficiency/.

[2475] "Korro Bio and Genevant Sciences Enter into Collaboration Agreement to Develop RNA Editing Therapeutic for Alpha-1 Antitrypsin Deficiency," *Genevant*, March 7, 2023, *available at* https://www.genevant.com/korro-bio-and-genevant-sciences-enter-into-collaboration-agreement-to-develop-rna-editing-therapeutic-for-alpha-1-antitrypsin-deficiency/.

[2476] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2477] GENV-00072282 (November 1, 2023 Collaboration and Nonexclusive License Agreement by and between Novo Nordisk A/S and Genevant Sciences GmbH).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

963.  Novo Nordisk is a global healthcare company that develops and manufactures medicines to treat chronic diseases such as diabetes and obesity.[2478]  The Company was founded in 1923 and is headquartered in Copenhagen, Denmark.[2479]  In 2023, it had over $23 billion dollars in sales.

964.  In summary, under this agreement Novo Nordisk intended to develop an in vivo gene editing treatment for hemophilia A.[2480]  The partnership combines Genevant's proprietary lipid nanoparticle (LNP) technology with Novo Nordisk's mRNA-based megaTAL technology, which is designed for gene editing.[2481]

965.  This agreement is based on two pre-existing collaborations: an existing Research and Development partnership between Novo Nordisk and 2seventy bio, with the current agreement arising from an option exercised under a prior arrangement between Genevant and 2seventy bio,[2482] and the August 2021 Research and Option Agreement between Genevant and bluebird bio (discussed above),[2483] 2seventy bio's predecessor.[2484]  The collaboration highlights the role of advanced LNP delivery technology in enabling RNA-based gene therapies.[2485]

---

[2478] "Company Profile – Novo Nordisk," Forbes, https://www.forbes.com/companies/novo-nordisk/.

[2479] "Who we are," *Novo Nordisk Company Website, available at* https://www.novonordisk.com/about/who-we-are.html.

[2480] GENV-00072282 at 288 (November 1, 2023 Collaboration and Nonexclusive License Agreement by and between Novo Nordisk A/S and Genevant Sciences GmbH).

[2481] "Genevant Sciences to Collaborate with Novo Nordisk to Develop Gene Editing Treatment for Hemophilia A," *Genevant*, November 6, 2023, *available at* https://www.genevant.com/genevant-sciences-to-collaborate-with-novo-nordisk-to-develop-gene-editing-treatment-for-hemophilia-a/.

[2482] "Genevant Sciences to Collaborate with Novo Nordisk to Develop Gene Editing Treatment for Hemophilia A," *Genevant*, November 6, 2023, *available at* https://www.genevant.com/genevant-sciences-to-collaborate-with-novo-nordisk-to-develop-gene-editing-treatment-for-hemophilia-a/.

[2483] GENV-00022977 (Zorn Deposition Exhibit No. 23 - August 2, 2021 Research and Option Agreement among Genevant Sciences Corporation, Genevant Sciences GmbH, and bluebird bio, Inc.).

[2484] June 5, 2024 Deposition of Peter Zorn, 196:13-196:22 ("A. So this agreement, this evaluation agreement, Bluebird -- this has been assigned twice. Bluebird, as a company, split into two companies. That was the first assignment to a company called 2seventy bio. 2seventy bio had reached a partnership arrangement with Novo Nordisk to be its commercial partner on the program, and assigned the agreement to Novo. The collaboration agreement that arises from this evaluation agreement is with Novo.").

[2485] "Genevant Sciences to Collaborate with Novo Nordisk to Develop Gene Editing Treatment for Hemophilia A," *Genevant*, November 6, 2023, *available at*

696

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

966.    Pursuant to this agreement, Novo Nordisk has made payments to Genevant totaling ███ ████.[2486]

> **(x)    January 12, 2024 Collaboration and Nonexclusive License Agreement by and between Tome Biosciences, Inc. and Genevant Sciences GmbH**

967.    On January 12, 2024, Genevant Sciences entered into a collaboration and nonexclusive license agreement with Tome Biosciences.[2487] The terms of the agreement are summarized on **Schedule 6.2(b)**.

968.    In December 2023, Tome Biosciences emerged as a startup biosciences company with $213 million in venture funding to develop new gene editing technologies.[2488] Tome's new gene editing technology was called "programable genomic integration," or PGI and was designed to allow large amounts of genetic material to be inserted anywhere in the genome without damaging or breaking DNA.[2489] Tome was first going to use the PGI technology to create treatments for liver disorders and autoimmune diseases.[2490] Shortly after its December 2023 launch, Tome entered into this collaboration and non-exclusive license agreement with Genevant.

---

https://www.genevant.com/genevant-sciences-to-collaborate-with-novo-nordisk-to-develop-gene-editing-treatment-for-hemophilia-a/.

[2486] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2487] GENV-00832976 at 996-997 (Zorn Deposition Exhibit No. 22 - January 12, 2024 Collaboration and Nonexclusive License Agreement by and between Tome Biosciences, Inc. and Genevant Sciences GmbH).

[2488] "Tome Biosciences debuts with $213M and a new way to edit the genome," *Biopharma Dive*, December 12, 2023, *available at* https://www.biopharmadive.com/news/tome-biosciences-gene-editing-startup-programmable/702092/.

[2489] "Tome Biosciences debuts with $213M and a new way to edit the genome," *Biopharma Dive*, December 12, 2023, *available at* https://www.biopharmadive.com/news/tome-biosciences-gene-editing-startup-programmable/702092/.

[2490] "Tome Biosciences debuts with $213M and a new way to edit the genome," *Biopharma Dive*, December 12, 2023, *available at* https://www.biopharmadive.com/news/tome-biosciences-gene-editing-startup-programmable/702092/.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

969. In summary, this agreement combined Genevant's proprietary lipid nanoparticle (LNP) technology with Tome's programmable genomic integration (PGI) technology.[2491] The aim is to develop an in vivo gene editing treatment for an undisclosed rare monogenic liver disorder.[2492]

970. The Agreement ███████████████████████  milestones for Genevant, with ███████████████████████████ on future product sales,[2493] ██████████████████████████████████ ████████████████ ███[2494] and Tome announced massive layoffs in August 2024.[2495] The layoffs are expected to take place in November 2024 and extend to all of the Company's 131 staff positions.[2496]

971. Pursuant to this agreement and a precursor Material Transfer Agreement, Tome has made payments to Genevant totaling ████████.[2497]

---

[2491] "Genevant Sciences to Collaborate with Tome Biosciences to Develop Gene Editing Therapeutic for Rare Liver Disorder," *Genevant*, January 16, 2024, *available at* https://www.genevant.com/genevant-sciences-to-collaborate-with-tome-biosciences-to-develop-gene-editing-therapeutic-for-rare-liver-disorder/.

[2492] GENV-00832976 at 084 (Zorn Deposition Exhibit No. 22 - January 12, 2024 Collaboration and Nonexclusive License Agreement by and between Tome Biosciences, Inc. and Genevant Sciences GmbH).

[2493] GENV-00832976 at 996-997 (Zorn Deposition Exhibit No. 22 - January 12, 2024 Collaboration and Nonexclusive License Agreement by and between Tome Biosciences, Inc. and Genevant Sciences GmbH).

[2494] June 5, 2024 Deposition of Peter Zorn, 191:7-191:13 ("Q. Do you know if any of the licensees have entered clinical -- like phase I, phase II clinical trials now? A .Yes. Well, we've talked about some already. Q But not Tome? A Not Tome.").

[2495] "Tome to Lay Off Almost All of Staff After Scaling Back Operations," *BioSpace*, August 26, 2024, *available at* https://www.biospace.com/business/tome-to-lay-off-almost-all-of-staff-after-scaling-back-operations.

[2496] "Tome to Lay Off Almost All of Staff After Scaling Back Operations," *BioSpace*, August 26, 2024, *available at* https://www.biospace.com/business/tome-to-lay-off-almost-all-of-staff-after-scaling-back-operations.

[2497] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

698

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

(xi)    **September 23, 2024 Collaboration and Nonexclusive License Agreement by and between Repair Biotechnologies, Inc. and Genevant Sciences GmbH**

972.    On September 23, 2024, Genevant Sciences entered into a collaboration and nonexclusive license agreement with Repair Biotechnologies, Inc.[2498] The terms of this agreement are summarized on **Schedule 6.1**.

973.    Repair Biotechnologies—founded in 2018[2499]—is a "biotechnology company developing first-in-class therapies capable of rapidly regressing atherosclerotic plaque."[2500]   The Repair Biotechnologies-Genevant agreement combines "Repair [Biotechnology's] Cholesterol Degrading Platform (CDP) mRNA technology with Genevant's proprietary LNP technology in the development of a potential novel treatment for atherosclerosis."[2501]

974.    Under the terms of the agreement, "Genevant is eligible to receive up to █████████████ milestone payments per product and █████████████████████ ████████"[2502] ranging from ████████ on future product sales.[2503]



---

[2498] GENV-00961576 (September 23, 20234 – Collaboration and Nonexclusive Agreement by and between Repair Biotechnologies, Inc. and Genevant Sciences GmbH).

[2499] *Repair Biotechnologies Closes Pre-Seed Round, Joins Grapeseed.bio Incubator* (September 15, 2018), https://www.repairbiotechnologies.com/repair-biotechnologies-closes-pre-seed-round-joins-grapeseed-bio-incubator/.

[2500] Press Release, *Repair Biotechnologies and Genevant Sciences to Collaborate to Develop mRNA-LNP Therapy with First-in-Class Potential to Turn Back Atherosclerosis* (dated Sept. 26, 2024), https://www.genevant.com/repair-biotechnologies-and-genevant-sciences-to-collaborate-to-develop-mrna-lnp-therapy-with-first-in-class-potential-to-turn-back-atherosclerosis/.

[2501] Press Release, *Repair Biotechnologies and Genevant Sciences to Collaborate to Develop mRNA-LNP Therapy with First-in-Class Potential to Turn Back Atherosclerosis* (dated Sept. 26, 2024), https://www.genevant.com/repair-biotechnologies-and-genevant-sciences-to-collaborate-to-develop-mrna-lnp-therapy-with-first-in-class-potential-to-turn-back-atherosclerosis/.

[2502] Press Release, *Repair Biotechnologies and Genevant Sciences to Collaborate to Develop mRNA-LNP Therapy with First-in-Class Potential to Turn Back Atherosclerosis* (dated Sept. 26, 2024), https://www.genevant.com/repair-biotechnologies-and-genevant-sciences-to-collaborate-to-develop-mrna-lnp-therapy-with-first-in-class-potential-to-turn-back-atherosclerosis/.

[2503] GENV-00961576 at 598 (September 23, 20234 – Collaboration and Nonexclusive Agreement by and between Repair Biotechnologies, Inc. and Genevant Sciences GmbH).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

> **(xii)** **October 21, 2024 Collaboration and Nonexclusive License Agreement between Genevant Sciences GmbH and Editas Medicine, Inc.**

975. On October 21, 2024, Genevant and Editas Medicine, Inc. ("Editas") entered into a research collaboration and nonexclusive license agreement. Editas describes itself as "a clinical-stage gene editing company . . . focused on translating the power and potential of the CRISPR/Cas12a and CRISPR/Cas9 genome editing systems into a robust pipeline of treatment for people living with serious diseases around the world."[2504] Editas "aims to discover, develop, manufacture, and commercialize transformative, durable, precision genomic medicines for a broad class of diseases."[2505]

976. Editas desired to collaborate with Genevant and (sub)license Genevant's LNP intellectual property to make, use, and sale products for the treatment or prevention of ██████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████[2506] In exchange for a license, Editas agreed to an ██████████,[2507] ████████████████,[2508] ████████████ ████, depending on annual net sales of any licensed product.[2509] Being a collaboration agreement, the parties also agreed to "prepare a research and development plan" describing what activities the parties would undertake as well as deliverables and an estimated timeframe for each assigned activity.[2510]

b) It is my opinion that the economic terms, including the royalty rates, in this agreement are not indicative of the reasonable royalty that would result from the May 31, 2020 Genevant-Moderna hypothetical negotiation in this case.

---

[2504] GENV-00961439-534, at -532.
[2505] Id.
[2506] *Id.* at -440, -446.
[2507] *Id.* at -448.
[2508] *Id.* at -464.
[2509] *Id.* -465.
[2510] *Id.* at -459.

700

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**(c)      The Post-2020 COVID-19 Agreements**

977.   During the period May 11, 2020 through February 18, 2022, Genevant entered into six (6) "collaborations for COVID-19,"[2511] which are discussed below. It should be noted that Genevant did seek a COVID-19 collaboration with Moderna in March 2021—which Moderna rejected, as discussed above.   Timing, however, was critical.   For example, on May 9, 2020, Moderna's Stéphane Bancel, CEO, underscored the importance of being first to commercial approval and stated: "Obviously, like always, in drug development, not every candidate is going to get to a finish line. And I could also anticipate that once a few vaccines are in late stage or commercially approved, a lot of the early project might just stop investing because we are deploying capital and talent for something that might have no commercial end. So I think while there is a lot of people on the stop lane [start line?], my sense is very few of them get to the finish line."[2512]   In June 2021, "Pfizer and Moderna vaccines produced using mRNA ha[d] taken the lead in the COVID-19 vaccine race."[2513]   In addition, as Mr. Bancel projected, few parties made it to the finish line.   Dr. Zaks testified:  "it was only us and them [Pfizer] that actually got to the finish line with a safe and effective vaccine."[2514]   Dr. Zaks further testified: "if you look at how many vaccines during that year [2020] were attempted and failed and how many collaborations between different parties were attempted and failed, I could rattle off about a dozen[.]"[2515]   As discussed above, *none* of Genevant's five (6) COVID-19 licensees "g[o]t [their COVID-19 vaccines] to the finish line."[2516]

---

[2511] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 75:21-76:3 ("THE WITNESS: I believe we had five collaborations for COVID-19.  The two I just mentioned were with companies called ST Pharm – a company called ST Pharm and a university in Thailand known as – shorthanded as Chula.  The other three, Providence Therapeutics, a Canadian company; ███████, the U.S. company; and Gritstone bio, a U.S. public company").

[2512] Q1 2020 Moderna Earnings Call transcript, *The Motley Fool*, May 9, 2020, *available at* https://www.fool.com/earnings/call-transcripts/2020/05/09/moderna-inc-mrna-q1-2020-earnings-call-transcript.aspx.

[2513] Baek Byung-yeul, Kim Yoo-chul, "ST Pharm in talks with Moderna over contract manufacturing of COVID-19 vaccine," *The Korea Times,* June 1, 2021, *available at* https://www.koreatimes.co.kr/www/tech/2024/04/129_309763.html.

[2514] MRNA-GEN-01734848-096, at 983 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (Pfizer), 136:12-136:14.).

[2515] MRNA-GEN-01734848-096, at 983 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (Pfizer), 136:7-136:12.).

[2516] Q1 2020 Moderna Earnings Call transcript, *The Motley Fool*, May 9, 2020, *available at* https://www.fool.com/earnings/call-transcripts/2020/05/09/moderna-inc-mrna-q1-2020-earnings-call-transcript.aspx.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

978.    While the following six (6) collaboration agreements include the Patents-in-Suit and do relate to COVID-19, it is my opinion that the economic terms including the royalty rates in this agreement are not indicative of the reasonable royalty that would result from the May 31, 2020 Genevant-Moderna hypothetical negotiation in this case.  The key differences between these agreements and the May 31, 2020 hypothetical negotiation include the following:

g)    *Not* negotiated on "the doorstep of commercialization" (*i.e.,* not negotiated at the same stage of development);

h)    They were not negotiated with a company that had already obtained positive interim phase 1 results for its COVID-19 vaccine,

i)    they were not negotiated with a company involved in the U.S. Government's Warp Speed COVID-19 program, and thus, none of these parties were similarly situated to Moderna at the time of the May 31, 2020 hypothetical license, which was discussed in detail above. *See* §II.E.4.,

j)    The relationship between the parties was *not* similar (*i.e.,* more than 8-year technology discussion between Genevant and its predecessors and Moderna that did *not* result in an agreement, Moderna's use of Plaintiffs' technology in their research and development prior to license negotiations, Moderna's Dr. Hoge discussed an upcoming meeting with Genevant in a December 2018 email with the subject header, "Frenemies"[2517]),

k)    the commercial opportunity was *not* analogous insofar as Moderna expected that mRNA-1273 would significantly accelerate its corporate development,

l)    except for the May 11, 2020 Genevant-Providence agreement, none of the agreements were negotiated at or around May 2020,

m)    some of the agreements do not include rights to the U.S. market.

**(i)    May 11, 2020 Genevant-Providence License and Development Agreement**

979.    Effective May 11, 2020, Genevant entered into an agreement with Providence Therapeutics Covid, Inc. ("Providence"),[2518] a "Private Canadian Biotech company based in Calgary, Canada, with

---

[2517] MRNA-GEN-01764293 (December 10, 2018 email from Stephen Hoge to John Mendlein, CC: Lisa Emanuello, Subject: Re: Frenemies).
[2518] GENV-00022307 (May 11, 2020 Genevant Sciences GmbH  and Providence Therapeutics Covid Inc. License and Development Agreement).

702

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

additional operations in Toronto"[2519] that was founded in 2015.[2520]   The terms of the Agreement are summarized in **Schedule 6.2(a)**.  There were five amendments to this Agreement:

- **July 31, 2020 Amendment No. 1**:  This amendment provided for a one-time payment of ███████████████████████████████, and extension to the project funding date. [2521]

- **October 15, 2020 Amendment No. 2**:  Pursuant to this amendment, Providence agreed to ██████████████████████████████████████████ ██████, and also provided for further extension to the project funding date. [2522]

- **November 10, 2020 Amendment No. 3**: This amendment included changes to certain terms relating to reimbursement of Genevant expenses towards R&D Support. [2523]

- **August 12, 2021 Amendment No. 4**: This amendment included changes to terms relating to Genevant's responsibilities in manufacturing the Providence product. [2524]

- **August 19, 2022 Amendment No. 5**: Pursuant to this amendment, Providence agreed to ██████████████████████████████████████████ ██████████████████████████████████████████ ██████. The remaining provisions of the fifth amendment were subject to a condition subsequent, which did not occur, and as such those provisions did not become effective. [2525]

980.    On May 6, 2024, Providence provided Genevant with a notice to terminate the License and Development Agreement.[2526]   At the time of Providence's May 2024 notice of termination,

[2519] Providence Therapeutics website, *available at* https://providencetherapeutics.com/about/providence-history.html.

[2520] "The Beginnings of Providence," *Providence Therapeutics,* 2024, *available at* https://providencetherapeutics.com/about/providence-history.html#:~:text=The%20Beginnings%20of%20Providence&text=The%20Company%20was%20co%2Dfounded,Scott%20Leary%2C%20MD.

[2521] GENV-00022422 (Genevant Sciences GmbH and Providence Therapeutics Covid Inc. First Amendment to the License and Development Agreement dated July 31, 2020).

[2522] GENV-00022299 (Genevant Sciences GmbH and Providence Therapeutics Covid Inc. Second Amendment to the License and Development Agreement dated October 15, 2020).

[2523] GENV-00022303-04 (Genevant Sciences GmbH and Providence Therapeutics Covid Inc. Third Amendment to the License and Development Agreement dated November 10, 2020).

[2524] GENV-00022305-06 (Genevant Sciences GmbH and Providence Therapeutics Covid Inc. Fourth Amendment to the License and Development Agreement dated August 12, 2021).

[2525] GENV-00022419-21 (Genevant Sciences GmbH and Providence Therapeutics Covid Inc. Fifth Amendment to the License and Development Agreement dated August 19, 2022).

[2526] GENV-00951122 ("Notice to Terminate the License and Development Agreement Under Section 9.3," *Providence*, May 6, 2024).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Providence still has not commercialized a COVID-19 mRNA product pursuant to its license agreement with Genevant. Pursuant to the terms of the Agreement, Providence made non-FTE payments to Genevant totaling ███████████.[2527]

### (a) Summary of Opinion

981. This agreement is, at best, *only minimally* economically comparable to the hypothetical license agreement for at least the following reasons:

   a) Providence was *not* part of the U.S. Government's Warp Speed program announced on May 15, 2020.[2528] In contrast, Moderna was one of the six (6) companies (*i.e.,* Pfizer/BioNTech, Moderna, AstraZeneca/Oxford Univ., Johnson & Johnson/Janssen, Novavax, and Sanofi/GSK[2529]) the U.S. Government selected to participate in the Warp Speed program.

   b) Providence was a start-up founded in 2015, that as of early-2020 had not yet started its first clinical trial. In contrast, Moderna was founded in 2010 and had been using Tekmira's LNP as its "standard LNP" since at least July 2014.

   c) Prior to its early-2020 pivot to COVID-19, it was focused on personal cancer vaccines, not infectious disease. In contrast, Moderna had established its infectious disease business in or about October 2014 and had conducted various clinical studies using its "standard LNP" (*i.e.,* Tekmira's LNP).

   d) Providence identified challenges related to both timing and funding. In contrast, based on its prior work and experience with Tekmira's LNP, Moderna was well-positioned to develop a COVID-19 vaccine. In addition, Moderna received substantial funding that included development grants and advance purchase payments together with NIH support for testing.

   e) Providence had not yet started clinical trials (and would not do so until the following year), whereas Moderna not only had begun its Phase 1 trial prior to May 31, 2020 hypothetical negotiation date, but had already announced positive interim results.

---

[2527] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2528] *See, e.g.,* David Vergun, "Army general to co-lead Operation Warp Speed for COVID-19 vaccine," *U.S. Army,* May 18, 2020, *available at* https://www.army.mil/article/235694/army_general_to_co_lead_operation_warp_speed_for_covid_19_vaccine ("President Donald J. Trump announced on Friday [May 15, 2020] that Army Gen. Gustave F. Perna, the commander of Army Materiel Command, will co-lead an effort, dubbed Operation Warp Speed, to find a vaccine for COVID-19 by January 2021.").

[2529] *See, e.g.,* "Operation Warp Speed Contracts for COVID-19 Vaccines and Ancillary Vaccination Materials," *Congressional Research Service,* March 1, 2021, pp. 1, 2, *available at* https://crsreports.congress.gov/product/pdf/IN/IN11560.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

f) Providence did not gain regulatory approval or launch a commercial product. Providence appears to have missed the critical window of opportunity that surrounded the development of a "first-generation" product for the prevention or treatment of COVID-19 as well as the development of the later booster products. In contrast, Moderna received Emergency Use Authorization for mRNA-1273 on December 18, 2020[2530] and shipped 16 million doses in December 2020.[2531]

g) The Providence agreement contemplates a collaboration with Genevant. In contrast, Moderna rejected Genevant's May 15, 2021 offer for a collaboration agreement.

h) The Providence agreement was negotiated in the context of an early COVID-19 license with a Canadian company that was seeking to develop a homegrown COVID-19 vaccine for Canada, that Genevant wanted to support.[2532]

i) The Providence agreement's financial terms were depressed due to the long-term effects of Acuitas' improper competition, Moderna's IPRs, as well as Providence's awareness that Moderna was freeriding on Genevant's Patents-in-Suit.[2533]

982. This license agreement highlights the critical importance of timing. This evidence shows that "timing was challenging" and delays in the start of Providence's clinical trials (*i.e.,* Phase 1 started in January 2021[2534] and the results of Phase 2 for the "Booster Vaccine – PTX-COVID19-B" were not published until October 22, 2022[2535]). This resulted in Providence missing the window of opportunity surrounding the first wave of vaccinations that began in early-2020 as well as the subsequent booster waves. By February 28, 2024, Providence had paused its COVID-19

---

[2530] *See, e.g.,* "Moderna Announces FDA Authorization of Moderna COVID-19 Vaccine in U.S.," *Moderna,* December 18, 2020, *available at* https://investors.modernatx.com/news/news-details/2020/Moderna-Announces-FDA-Authorization-of-Moderna-COVID-19-Vaccine-in-U.S/default.aspx.

[2531] "Moderna Announces Shipment of 100 Millionth Dose of its COVID-19 Vaccine to the U.S. Government," *Moderna,* March 29, 2021, *available at* https://investors.modernatx.com/news/news-details/2021/Moderna-Announces-Shipment-of-100-Millionth-Dose-of-its-COVID-19-Vaccine-to-the-U.S.-Government/default.aspx.

[2532] November 21, 2024 Interview with Pete Zorn.

[2533] November 21, 2024 Interview with Pete Zorn.

[2534] Michael Vlessides, "Canada Searches for 'Homegrown' COVID Vaccine Solutions," *Medscape Medical News,* March 3, 2021, *available at* https://www.medscape.com/viewarticle/946791?form=fpf.

[2535] *See, e.g.,* "Everest Medicines Announces Partner Providence Reports Positive Top-Line Data from Phase 2 Primary Immunization Trial for mRNA COVID-19 Vaccine Candidate in Adults," *BioSpace,* October 19, 2022, *available at* https://www.biospace.com/article/releases/everest-medicines-announces-partner-providence-reports-positive-top-line-data-from-phase-2-primary-immunization-trial-for-mrna-covid-19-vaccine-candidate-in-adults/.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

program.[2536] During this time, Providence was attempting to compete with Moderna who was using the Patents-in-Suit and not paying royalties for that use.[2537]

983.    This license agreement does provide evidence regarding the potential payment structure of the hypothetical license agreement. This agreement establishes that Genevant negotiated an agreement ███████████████████████████████████████████.

**(b)    Background**

984.    Providence Therapeutics ("Providence") is Providence was "[i]nitially founded as a cancer vaccines company in 2015[.]" "From its inception until the beginning of the COVID-19 pandemic in 2020, [Providence] was focused on developing personalized cancer vaccines for glioblastoma and ovarian cancer. The company was within months of launching its first phase 1 study in oncology when the pandemic hit."[2538]

985.    In September 2019, Providence was "an early stage biotechnology company that develops personalized mRNA-based vaccines against cancer. Our vaccines are designed for each individual patient, we identify a patient's specific tumor mutations and develop a therapeutic vaccine that will elicit an immune response against the tumor cells."[2539] As of September 4, 2019, "Providence's first clinical trial [was] scheduled for early 2020" and was described as "an open-label, dose-escalation, safety, tolerance, and pharmacodynamics study investigating PTX-101," a "personalized mRNA cancer vaccine, in women with advanced ovarian cancer."[2540]

---

[2536] "Pipeline," *Providence Therapeutics,* February 28, 2024 (archive), *available at* https://web.archive.org/web/20240228165436/https://providencetherapeutics.com/pipeline.html.
[2537] GENV-00262513-517 (Zorn Deposition Exhibit No. 13 – January 1, 2022 email from Pete Zorn to Brad Sorenson, BCC: Pete Zorn, Pete Lutwyche, Subject: RE: Exclusive v non-exclusive).
[2538] "Pipeline," *Providence Therapeutics,* 2024, *available at* https://providencetherapeutics.com/#timeline.
[2539] "Providence Therapeutics develops personalized mRNA cancer vaccines," *Providence Therapeutics,* September 4, 2019 (archive), *available* https://web.archive.org/web/20190904122124/https://www.providencetherapeutics.com/.
[2540] "Pipeline," *Providence Therapeutics,* September 4, 2019 (archive), *available at* https://web.archive.org/web/20190904122124/https://www.providencetherapeutics.com/#Pipeline_new.

706

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

In or about early-2020, "in response to a worldwide need for a COVID-19 vaccine, Providence expanded its focus beyond oncology therapies to develop an mRNA vaccine for COVID-19."[2541] In April 2020, Providence announced: "we created our first fully Made-in-Canada mRNA vaccine, PTX-COVID19-B . . . at the very beginning of the global pandemic."[2542] While Moderna began shipping its mRNA-1273 vaccine in **December 2020**, Providence did not complete its Phase 2 Human Clinical Trial until October 2022,[2543] nearly two years later.

986.    Providence experienced numerous challenges including that it missed the window of opportunity surrounding the pandemic because its vaccine was not ready "until Canada's vaccine schedule [was] over."[2544] On January 26, 2021, Providence described this timing challenge as follows:

> What's challenging is the timing. It appears the vaccine won't be ready until Canada's vaccination schedule is over – but for [Providence Therapeutics CEO, Brad] Sorenson, that simply means the company will be able to look to distribute globally. "Even if they vaccinated everybody in Canada, if there's still a problem in the world, that's going to affect Canada," Sorenson said. "That's going to affect our economy, our ability to travel, people's extended families. We need to find a solution that not only helps out Canada but helps out globally."[2545]

---

[2541] "Providence Therapeutics Announces New mRNA Rabies Vaccine Program and Achievement of Preclinical Proof-of-Concept Milestone," *Providence Therapeutics,* December 15, 2022, *available at* https://providencetherapeutics.com/press-details/providence-announces-new-nrna-rabies-vaccine-program.html.

[2542] "best-in-class aim, with high safety & Tolerability profile," *Providence Therapeutics,* 2024, *available at* https://providencetherapeutics.com/index.php?option=com_content&view=article&id=15.

[2543] "best-in-class aim, with high safety & Tolerability profile," *Providence Therapeutics,* 2024, *available at* https://providencetherapeutics.com/index.php?option=com_content&view=article&id=15.

[2544] Alesia Fieldberg, "Providence Therapeutics begins first clinical trial of Canadian-made COVID-19 vaccine," *CTV News,* January 26, 2021, *available at* https://calgary.ctvnews.ca/providence-therapeutics-begins-first-clinical-trials-of-canadian-made-covid-19-vaccine-1.5282398?cache=lyphoblxpdpmw%3FcontactForm%3Dtrue%3FautoPlay%3Dtrue.

[2545] Alesia Fieldberg, "Providence Therapeutics begins first clinical trial of Canadian-made COVID-19 vaccine," *CTV News,* January 26, 2021, *available at* https://calgary.ctvnews.ca/providence-therapeutics-begins-first-clinical-trials-of-canadian-made-covid-19-vaccine-1.5282398?cache=lyphoblxpdpmw%3FcontactForm%3Dtrue%3FautoPlay%3Dtrue.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

987. Providence also experienced funding challenges. For example, as of February 2, 2021, Providence was "seeking federal support for 'made-in-Canada' COVID-19 vaccine."[2546] On March 3, 2021, *Medscape Medical News* reported:

> Canada's challenges in procuring COVID-19 vaccines have led its researchers to look for homegrown alternatives to the Pfizer, Moderna, and, most recently, the Johnson & Johnson vaccines, which are in short supply across the country [Canada].
> . . .
> According to the Financial Times , more than 225 million COVID-19 vaccination doses had been administered worldwide as of February 27. The world leader in doses per 100 residents as of that date was Gibraltar, with 99% of its population having received at least one vaccination dose; Israel was second, at 87.5%. Canada ranked 64th on the list, with 4.5 doses per 100 residents, a fact that has spurred the country to begin exploring proprietary approaches to vaccination.
>
> One solution may come from Providence Therapeutics Inc, a small Canadian biotechnological firm. In late December, Providence received authorization from Health Canada to begin human clinical trials of its messenger RNA COVID-19 vaccine, PTX-COVID19-B. In preclinical studies at the University of Toronto, the vaccine proved highly effective at neutralizing the virus in multiple assays.
>
> Providence began its phase 1 human clinical trial in late January [2021]. That effort will ultimately include 60 volunteers, of whom 45 will receive the vaccine and 15 will receive placebo. The company plans on moving on to a combined phase 2/3 trial involving 2000 to 3000 patients some time in late spring.
>
> "We're hoping that if things go well, we'll have an approved vaccine by the end of this year [2021]," Piyush Patel, MD, chief medical officer at Providence Therapeutics, told Medscape Medical News.[2547]

988. In September 2021, Providence had completed its Phase 1 clinical trial and described the status of its COVID-19 vaccine program as follows:

> PTX-COVID19-B is an mRNA vaccine in Phase 2 development for the prevention of COVID-19, which is designed to encode the S protein of SARS-CoV-2 encapsulated in a lipid nanoparticle (LNP). Interim data from Providence's Phase 1 study showed that PTX-COVID19-B demonstrated strong virus neutralization capability and produced a level of antibodies in participants in the treatment arm

[2546] Mark Villani, "Providence Therapeutics seeking federal support for 'made-in-Canada' COVID-19 vaccine," *CTV News,* February 2, 2021, *available at* https://calgary.ctvnews.ca/providence-therapeutics-seeking-federal-support-for-made-in-canada-covid-19-vaccine-1.5292681?cache=ftdpqpcfvtwjihs%3FclipId%3D68597.
[2547] Michael Vlessides, "Canada Searches for 'Homegrown' COVID Vaccine Solutions," *Medscape Medical News,* March 3, 2021, *available at* https://www.medscape.com/viewarticle/946791?form=fpf.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

that compare favorably to those produced by other mRNA vaccines that have been approved for use against COVID-19. The treatment was generally safe and well tolerated.[2548]

989.    In September 2021, Providence entered into a "[d]eal worth as much as $500 million in upfront, future payments."[2549]  On September 13, 2021, Providence announced that it had executed "two separate definitive agreements . . . with Everest Medicines Limited . . ., to (i) license rights to Providence's mRNA COVID-19 vaccine candidates in emerging markets in Asia, including Greater China, Southeast Asia and Pakistan, and (ii) establish a broad, strategic partnership to develop mRNA products globally leveraging Providence's cutting-edge mRNA technology platform . . .  Under the terms of the transaction Agreements, Providence will receive the following considerations; For COVID-19 vaccines: US$50 million in initial upfront payment to be paid in cash; In China and Singapore, up to US$100 million in profit-sharing on COVID-19 vaccines, and once profit share has reached an aggregate amount of US$100 million, mid to high single-digit royalties, and in Everest Territories outside of China and Singapore, mid-teens royalties on COVID-19 vaccine sales."[2550]

990.    In or about October 22, 2021, Providence was planning "to seek $400m in funding" and was "aim[ing] to produce 1-1.5 billion doses of its coronavirus vaccines."[2551]  By the end of 2021, however, Providence did not have an approved COVID-19 vaccine as it had projected in January

---

[2548] Providence Therapeutics Enters into Comprehensive Agreements with Everest Medicines to Advance mRNA Vaccines and Therapies, including COVID-19 Vaccines, in Emerging Markets in Asia," *Providence Therapeutics,* September 13, 2021, *available at* https://providencetherapeutics.com/press-details/providence-therapeutics-enters-into-comprehensive-agreements-with-everest-medicines-to-advance-mrna-vaccines-and-therapies-including-covid-19-vaccines-in-emerging-markets-in-asia.html.

[2549] "Chinese Firm Buys Canada mRNA Vaccine Tech in $500 Million Deal," *Bloomberg,* September 13, 2021, *available at* https://www.bloomberg.com/news/articles/2021-09-13/chinese-firm-buys-canada-mrna-vaccine-tech-in-500-million-deal?embedded-checkout=true.

[2550] Providence Therapeutics Enters into Comprehensive Agreements with Everest Medicines to Advance mRNA Vaccines and Therapies, including COVID-19 Vaccines, in Emerging Markets in Asia," *Providence Therapeutics,* September 13, 2021, *available at* https://providencetherapeutics.com/press-details/providence-therapeutics-enters-into-comprehensive-agreements-with-everest-medicines-to-advance-mrna-vaccines-and-therapies-including-covid-19-vaccines-in-emerging-markets-in-asia.html.

[2551] "Providence's COVID-19 mRNA Vaccine Challenger Seen In Phase III In Q1 [2022]," *Providence Therapeutics,* October 22, 2021 (archive), *available at* https://web.archive.org/web/20211022070250/https://providencetherapeutics.com/media-details/providence-s-covid-19-mrna-vaccine-challenger-seen-in-phase-iii-in-q1.html.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

2021. On October 22, 2022, Providence published its Phase 2 Results for "Booster Vaccine – PTX-COVID19-B,"[2552] which were presented on November 29, 2022.[2553]

991. On or about March 2, 2023, "Chinese biotech Everest Medicines ha[d] opened the doors and started running test batches at its 900 million Chinese yuan ($130 million) mRNA vaccine manufacturing facility in Jiashan in Zhejiang Province. The facility is part of the company's efforts to dominate the mRNA arena in China in the wake of the COVID-19 pandemic. While much of the Western world turned to mRNA shots in response to the pandemic, China has mostly relied on traditional vaccine tech."[2554]

992. As of February 28, 2024, Providence's pipeline showed "Booster Vaccine – PTX-COVID19-B" program had been "paused."[2555]   Ten days earlier, on February 18, 2024,[2556] "Chinese biopharmaceutical company Everest Medicines [announced it] ha[d] ended its partnership with

---

[2552] *See, e.g.,* "Everest Medicines Announces Partner Providence Reports Positive Top-Line Data from Phase 2 Primary Immunization Trial for mRNA COVID-19 Vaccine Candidate in Adults," *BioSpace,* October 19, 2022, *available at* https://www.biospace.com/article/releases/everest-medicines-announces-partner-providence-reports-positive-top-line-data-from-phase-2-primary-immunization-trial-for-mrna-covid-19-vaccine-candidate-in-adults/.

[2553] "Providence Therapeutics Presents Phase 3 Data on its mRNA COVID-19 Vaccine Candidate PTX-COVID19-B at the 2022 World Vaccine & Immunotherapy Congress," *Providence Therapeutics,* November 28, 2022, *available at* https://providencetherapeutics.com/press-details/providence-presents-phase-2-data-at-the-2022-world-vaccine-and-immunotherapy-congress.html. *See also* Phalguni Deswal, "Everest ends Covid-19 mRNA vaccine deal with Providence – China-based Everest will pay $4m upon termination of its partnership agreement with Canada-based Providence," *Pharmaceutical Technology,* February 20, 2024, *available at* https://www.pharmaceutical-technology.com/news/everest-ends-covid-19-mrna-vaccine-deal-with-providence/?cf-view ("Everest and Providence's [] mRNA Covid-19 vaccine candidate, PTX-COVID19-B, had showed non-inferiority in a Phase II trial (NCT05175742) against Pfizer/BioNTech's mRNA Covid-19 vaccine Comirnaty. PTX-COVID19-B superiority as a booster vaccine is also being studied in a Phase III trial (NCT05534035) against AstraZeneca's Vaxzevria.").

[2554] Joseph Keenan, "Everest debuts $130M mRNA vaccine plant with aim at Chinese market dominance," *Fierce Pharma,* March 2, 2023, *available at* https://www.fiercepharma.com/manufacturing/everest-debuts-130m-mrna-vaccine-plant-aim-chinese-market-dominance.

[2555] "Pipeline," *Providence Therapeutics,* February 28, 2024 (archive), *available at* https://web.archive.org/web/20240228165436/https://providencetherapeutics.com/pipeline.html.

[2556] "Everest Medicines Announces Termination of Collaboration Agreements with Providence," *PR Newswire,* February 18, 2024, *available at* https://www.prnewswire.com/news-releases/everest-medicines-announces-termination-of-collaboration-agreements-with-providence-302064738.html.

710

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Canada's Providence Therapeutics on developing Covid-19 vaccines due to waning demand. . . . The two companies agreed to jointly develop Covid-19 mRNA shots and therapies in September 2021 in a deal that gave Everest the right to sell Providence's mRNA vaccine candidates in China, the Philippines, Singapore, and Thailand.  The global market for Covid-19 vaccines is shrinking.  Pfizer's sales of Comirnaty sank 70 percent to USD11.2 billion last year as the pandemic retreated, the US drugmaker said in an earnings report."[2557]

**(ii)    October 20, 2020 Genevant-Chulalongkorn Non-Exclusive License and Support Agreement**

993.  On October 20, 2020, Genevant entered into an agreement with Chulalongkorn University, ("Chulalongkorn"),[2558] a leading university in Thailand,[2559] acting through its Vaccine Research Center, Faculty of Medicine to develop ChulaCov19.  The terms of the Agreement are summarized in Schedule 6.2(a).  There were three amendments to this Agreement:

- **June 29, 2021 Amendment No. 1**: The amendment related to a change in the payload contained in the licensed product. [2560]

- **August 4, 2022 Amendment No. 2**: This amendment included a change in the payload contained in the licensed product.  Additionally, effective from the date of the amendment, the parties agreed to expand the territory covered under the agreement to now include ███████████████████████████████████. [2561]

- **November 22, 2022 Amendment No. 3**:  This amendment included a change in the payload contained in the licensed product. [2562]

---

[2557] Lin Zhiyin, "China's Everest Ends Covid-19 Vaccine Deal With Canada's Providence," *YiCai Global,* February 19, 2024, *available at* https://www.yicaiglobal.com/news/chinas-everest-ends-vaccine-deal-with-canadas-providence-as-covid-19-market-shrinks.

[2558] GENV-00023616 (Genevant Sciences GmbH and Chulalongkorn University Nonexclusive License and Support Agreement dated October 20, 2022).

[2559] *See, e.g.,* Chulalongkorn University website, *available at* https://www.chula.ac.th/en/.

[2560] GENV-00023616 (Genevant Sciences GmbH and Chulalongkorn University First Amendment to the Nonexclusive License and Support Agreement dated June 29, 2021).

[2561] GENV-00023670 (Genevant Sciences GmbH and Chulalongkorn University Second Amendment to the Nonexclusive License and Support Agreement dated August 4, 2022).

[2562] GENV-00023670 (Genevant Sciences GmbH and Chulalongkorn University Third Amendment to the Nonexclusive License and Support Agreement dated November 22, 2022).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

994.   To date, Chulalongkorn still has not commercialized a COVID-19 mRNA product pursuant to its license agreement with Genevant, and ███████████████████████████.[2563]  Pursuant to these agreements, Chulalongkorn has made non-FTE payments of ███████████ ███████████████ under the license agreement.[2564]

### (a)   Summary of Opinion

995.   This agreement is, at best, *only minimally* economically comparable to the hypothetical license agreement for at least the following reasons:

    a)   Chulalongkorn was *not* part of the U.S. Government's Warp Speed program announced on May 15, 2020.[2565]   In contrast, Moderna was one of the six (6) companies (*i.e.,* Pfizer/BioNTech, Moderna, AstraZeneca/Oxford Univ., Johnson & Johnson/Janssen, Novavax, and Sanofi/GSK[2566]) the U.S. Government selected to participate in the Warp Speed program.

    b)   Chulalongkorn and Moderna were targeting different commercial opportunities. Chulalongkorn's work "aims to build capacity in development, manufacturing, clinical testing and regulatory filing of mRNA vaccines for pandemic preparedness, and therefore enhance timely access to vaccines in LMICs [low- and middle-income countries], now and in the future."[2567]   "ChulaCov19 was designed in Thailand and manufactured in North

---

[2563] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2564] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2565] *See, e.g.,* David Vergun, "Army general to co-lead Operation Warp Speed for COVID-19 vaccine," *U.S. Army,* May 18, 2020, *available at* https://www.army.mil/article/235694/army_general_to_co_lead_operation_warp_speed_for_covid_19_vaccine ("President Donald J. Trump announced on Friday [May 15, 2020] that Army Gen. Gustave F. Perna, the commander of Army Materiel Command, will co-lead an effort, dubbed Operation Warp Speed, to find a vaccine for COVID-19 by January 2021.").

[2566] *See, e.g.,* "Operation Warp Speed Contracts for COVID-19 Vaccines and Ancillary Vaccination Materials," *Congressional Research Service,* March 1, 2021, pp. 1, 2, *available at* https://crsreports.congress.gov/product/pdf/IN/IN11560.

[2567] Thanyawee Puthanakit, Eakachai Prompetchara, Sivaporn Gatechompol, Chutitorn Ketloy, Arunee Thitithanyanont, Anan Jongkaewwattana, Supranee Buranapraditkun, Sasiwimol Ubolyam, Stephen J Kerr, Jiratchaya Sophonphan, Tanakorn Apornpong, Wonngarm Kittanamongkolchai, Sarawut Siwamogsatham, Somchai Sriplienchan, Kanitha Patarakul, Tuangtip Theerawit, Pathariya Promsena, Rapisa Nantanee, Siwaporn Manomaisantiphap, Sarun Chokyakorn, Lina Hong, Mijo Samija, David C Montefiori, Hongmei Gao, Amanda Eaton, Wassana Wijagkanalan, Mohamad-Gabriel Alameh, Drew Weissman, Kiat Ruxrungtham, "Phase II prefusion non-stabilized Covid-19 mRNA vaccine randomized study," *Nature – Scientific Reports,* January 29, 2024, p. 2, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC10825165/pdf/41598_2023_Article_49653.pdf.

712

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

America for early clinical trials, in parallel with large-scale production capacity development in Thailand."[2568]  In contrast, Moderna was focused on developed countries that would be willing to pay for mRNA-1273 based on its health value.

c)  The geographic territories are different.  Chulalongkorn's geographic territory is limited to





.  [2570]  In contrast, the territory of the hypothetical license includes the U.S. and other countries in the world to the extent an act of infringement occurs in the U.S.

d)  Chulalongkorn appears to have had challenges related to timing.  Chulalongkorn did not begin its Phase I trial until May 28, 2021,[2571] and did not begin its Phase II COVID clinical trial July 29, 2021.[2572]  In contrast, Moderna began its Phase I trial on March 17, 2020, and

---

[2568] Sivaporn Gatechompol, Wonngarm Kittanamongkolchai, Chutitorn Ketloy, Eakchai Prompetchara, Arunee Thitithanyanont, Anan Jongkaewwattana, Supranee Buranapraditkun, Mohamad-Gabriel Alameh, Sasiwimol Ubolyam, Jiratchaya Sophonphan, Tanakorn Apornpong, Stephen Kerr, Adeeba Kamarulzaman, Sarawut Siwamogsatham, Eugène Kroon, Thanyawee Puthanakit, Kanitha Patarakul, Tanapat Palaga, Wassana Wijagkanalan, Alexis Carpenter, Lina Hong, Drew Weissman, Kiat Ruxrungtham, "Safety and immunogenicity of a prefusion non-stabilized spike protein mRNA COVID-19 vaccine: a phase I trial," *Nature Microbiology,* November 14, 2020, pp. 1987-1995, at 1988, *available at* https://www.nature.com/articles/s41564-022-01271-0.pdf.
[2569] GENV-00023616, p. 12 (Genevant Sciences GmbH and Chulalongkorn University Nonexclusive License and Support Agreement dated October 20, 2022).
[2570] GENV-00023670 (Genevant Sciences GmbH and Chulalongkorn University Second Amendment to the Nonexclusive License and Support Agreement dated August 4, 2022).
[2571] Sivaporn Gatechompol, Wonngarm Kittanamongkolchai, Chutitorn Ketloy, Eakchai Prompetchara, Arunee Thitithanyanont, Anan Jongkaewwattana, Supranee Buranapraditkun, Mohamad-Gabriel Alameh, Sasiwimol Ubolyam, Jiratchaya Sophonphan, Tanakorn Apornpong, Stephen Kerr, Adeeba Kamarulzaman, Sarawut Siwamogsatham, Eugène Kroon, Thanyawee Puthanakit, Kanitha Patarakul, Tanapat Palaga, Wassana Wijagkanalan, Alexis Carpenter, Lina Hong, Drew Weissman, Kiat Ruxrungtham, "Safety and immunogenicity of a prefusion non-stabilized spike protein mRNA COVID-19 vaccine: a phase I trial," *Nature Microbiology,* November 14, 2020, pp. 1987-1995, at 1988, *available at* https://www.nature.com/articles/s41564-022-01271-0.pdf.
[2572] Thanyawee Puthanakit, Eakachai Prompetchara, Sivaporn Gatechompol, Chutitorn Ketloy, Arunee Thitithanyanont, Anan Jongkaewwattana, Supranee Buranapraditkun, Sasiwimol Ubolyam, Stephen J Kerr, Jiratchaya Sophonphan, Tanakorn Apornpong, Wonngarm Kittanamongkolchai, Sarawut Siwamogsatham, Somchai Sriplienchan, Kanitha Patarakul, Tuangtip Theerawit, Pathariya Promsena, Rapisa Nantanee, Siwaporn

713

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

began its Phase II trial on May 29, 2020—more than a year earlier than Chulalongkorn. In addition, Moderna not only had begun its Phase 1 trial prior to May 31, 2020 hypothetical negotiation date, but had already announced positive interim results.

e) Chulalongkorn and Moderna depended on different sources for funding. Chulalongkorn's work depended on support from the Thai government and donations. In contrast, Moderna received substantial funding that included development grants and advance purchase payments from the U.S. Government together with NIH support for testing.

f) As of November 5, 2024, the ChulaCov19 vaccine still had not been approved.[2573] Chulalongkorn missed the critical window of opportunity that surrounded the pandemic and the development of a "first-generation" product for the prevention or treatment of COVID-19 as well as the development of the later booster products.

g) The Chulalongkorn agreement's financial terms were depressed due to the long-term effects of Acuitas' improper competition, Moderna's IPRs, as well as the general awareness that Moderna was freeriding on Genevant's Patents-in-Suit.[2574]

h) The Chulalongkorn agreement contemplates a collaboration with Genevant. In contrast, Moderna rejected Genevant's May 15, 2021 offer for a collaboration agreement.

996. This license agreement highlights the critical importance of timing. This evidence shows that delays in the start of Chulalongkorn's clinical trials (*i.e.,* Phase I clinical trial began on May 28, 2021,[2575] Phase II clinical trial began on July 29, 2021[2576]) resulted in it missing the window of

---

Manomaisantiphap, Sarun Chokyakorn, Lina Hong, Mijo Samija, David C Montefiori, Hongmei Gao, Amanda Eaton, Wassana Wijagkanalan, Mohamad-Gabriel Alameh, Drew Weissman, Kiat Ruxrungtham, "Phase II prefusion non-stabilized Covid-19 mRNA vaccine randomized study," *Nature – Scientific Reports,* January 29, 2024, p. 3, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC10825165/pdf/41598_2023_Article_49653.pdf.

[2573] "Chulalongkorn university: ChulaCov19," *TrackVaccines.org,* 2024, *available at* https://covid19.trackvaccines.org/vaccines/65/.

[2574] November 21, 2024 Interview with Pete Zorn.

[2575] Sivaporn Gatechompol, Wonngarm Kittanamongkolchai, Chutitorn Ketloy, Eakchai Prompetchara, Arunee Thitithanyanont, Anan Jongkaewwattana, Supranee Buranapraditkun, Mohamad-Gabriel Alameh, Sasiwimol Ubolyam, Jiratchaya Sophonphan, Tanakorn Apornpong, Stephen Kerr, Adeeba Kamarulzaman, Sarawut Siwamogsatham, Eugène Kroon, Thanyawee Puthanakit, Kanitha Patarakul, Tanapat Palaga, Wassana Wijagkanalan, Alexis Carpenter, Lina Hong, Drew Weissman, Kiat Ruxrungtham, "Safety and immunogenicity of a prefusion non-stabilized spike protein mRNA COVID-19 vaccine: a phase I trial," *Nature Microbiology,* November 14, 2020, pp. 1987-1995, at 1988, *available at* https://www.nature.com/articles/s41564-022-01271-0.pdf.

[2576] Thanyawee Puthanakit, Eakachai Prompetchara, Sivaporn Gatechompol, Chutitorn Ketloy, Arunee Thitithanyanont, Anan Jongkaewwattana, Supranee Buranapraditkun, Sasiwimol

714

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

opportunity surrounding the pandemic and the first wave of vaccinations that began in early-2020 as well as the subsequent booster waves. As of November 5, 2024, Chulalongkorn's ChulaCov19 was still not approved.

997. This license agreement does provide evidence regarding the potential payment structure of the hypothetical license agreement. This agreement establishes that Genevant negotiated an agreement that ███████████████████████████.

### (b)    Background

998. "The ChulaCov19 mRNA vaccine (ChulaCov19) development program is an initiative of the Vaccine research Center, Chulalongkorn University which aims to build capacity in development, manufacturing, clinical testing and regulatory filing of mRNA vaccines for pandemic preparedness, and therefore enhance timely access to vaccines in LMICs [low- and middle-income countries], now and in the future. The program is supported by the Thai Government and public donations."[2577] Chulalongkorn described the demand for its product as follows: "As of 8 January 2023, more than thirteen billion doses of vaccine have been given globally. However, due to inequity in vaccine accessibility, only 25% of people in developing countries, in contrast to >70% in the developed world, have received at least one dose of vaccine. The ability to manufacture

---

Ubolyam, Stephen J Kerr, Jiratchaya Sophonphan, Tanakorn Apornpong, Wonngarm Kittanamongkolchai, Sarawut Siwamogsatham, Somchai Sriplienchan, Kanitha Patarakul, Tuangtip Theerawit, Pathariya Promsena, Rapisa Nantanee, Siwaporn Manomaisantiphap, Sarun Chokyakorn, Lina Hong, Mijo Samija, David C Montefiori, Hongmei Gao, Amanda Eaton, Wassana Wijagkanalan, Mohamad-Gabriel Alameh, Drew Weissman, Kiat Ruxrungtham, "Phase II prefusion non-stabilized Covid-19 mRNA vaccine randomized study," *Nature – Scientific Reports,* January 29, 2024, p. 3, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC10825165/pdf/41598_2023_Article_49653.pdf.

[2577] Thanyawee Puthanakit, Eakachai Prompetchara, Sivaporn Gatechompol, Chutitorn Ketloy, Arunee Thitithanyanont, Anan Jongkaewwattana, Supranee Buranapraditkun, Sasiwimol Ubolyam, Stephen J Kerr, Jiratchaya Sophonphan, Tanakorn Apornpong, Wonngarm Kittanamongkolchai, Sarawut Siwamogsatham, Somchai Sriplienchan, Kanitha Patarakul, Tuangtip Theerawit, Pathariya Promsena, Rapisa Nantanee, Siwaporn Manomaisantiphap, Sarun Chokyakorn, Lina Hong, Mijo Samija, David C Montefiori, Hongmei Gao, Amanda Eaton, Wassana Wijagkanalan, Mohamad-Gabriel Alameh, Drew Weissman, Kiat Ruxrungtham, "Phase II prefusion non-stabilized Covid-19 mRNA vaccine randomized study," *Nature – Scientific Reports,* January 29, 2024, p. 2, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC10825165/pdf/41598_2023_Article_49653.pdf.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

mRNA vaccines in low- and middle-income countries (LMICs) is important for this current, and future pandemics."[2578]

999.    Peter Zorn testified that while Chulalongkorn **"ha[d] phase II data on its COVID vaccine"** [2579] it ultimately "was unable to bring the product to market due to "commercial challenges as a result of the head start that Moderna and Pfizer had."[2580]

        **(iii)**        **January 15, 2021 Genevant-Gritstone Non-Exclusive License and Development Agreement**

1000.    On January 15, 2021, Genevant entered into a license and development agreement with Gritstone bio, Inc. (f/k/a Gritstone Oncology, Inc.),[2581] a company founded in August 2015 as Gritstone Oncology, Inc. and is based in Emeryville, California,[2582] to develop cancer immunotherapies.[2583] Prior to this agreement, on October 20, 2020, Genevant and Gritstone had entered into an agreement covering the HIV/AIDS field of use.[2584]

---

[2578] Thanyawee Puthanakit, Eakachai Prompetchara, Sivaporn Gatechompol, Chutitorn Ketloy, Arunee Thitithanyanont, Anan Jongkaewwattana, Supranee Buranapraditkun, Sasiwimol Ubolyam, Stephen J Kerr, Jiratchaya Sophonphan, Tanakorn Apornpong, Wonngarm Kittanamongkolchai, Sarawut Siwamogsatham, Somchai Sriplienchan, Kanitha Patarakul, Tuangtip Theerawit, Pathariya Promsena, Rapisa Nantanee, Siwaporn Manomaisantiphap, Sarun Chokyakorn, Lina Hong, Mijo Samija, David C Montefiori, Hongmei Gao, Amanda Eaton, Wassana Wijagkanalan, Mohamad-Gabriel Alameh, Drew Weissman, Kiat Ruxrungtham, "Phase II prefusion non-stabilized Covid-19 mRNA vaccine randomized study," *Nature – Scientific Reports,* January 29, 2024, p. 2, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC10825165/pdf/41598_2023_Article_49653.pdf.

[2579] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 201:7-8.

[2580] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 76:18-76:20.

[2581] GENV-00022689-792 (Zorn Deposition Exhibit No. 20 – January 15, 2021 Gritstone Oncology Inc. and Genevant Sciences GMBH Nonexclusive License and Development Agreement).

[2582] "Our Unique Story," *Gritstone bio,* 2024, *available at* https://gritstonebio.com/about/#:~:text=Gritstone%20bio%20is%20headquartered%20in,under%20the%20ticker%20symbol%20GRTS.

[2583] Delilaj Alvarado, "Gritstone wins 'Project NextGen' funding to run head-to-head COVID vaccine study," *BiopharmaDive,* September 28, 2023, *available at* https://www.biopharmadive.com/news/gritstone-covid-vaccine-trial-project-nextgen/695027/.

[2584] GENV-00022587(October 20, 2020 Gritstone Oncology Inc. and Genevant Sciences GMBH Option and License and Development Agreement).

716

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1001. Pursuant to this agreement, Gritstone has made payments to Genevant ████████████.[2585]

### (a)    Summary of Opinion

1002. This agreement is, at best, *only minimally* economically comparable to the hypothetical license agreement for at least the following reasons:

a) Gritstone was *not* part of the U.S. Government's Warp Speed program announced on May 15, 2020.[2586] In contrast, Moderna was one of the six (6) companies (*i.e.,* Pfizer/BioNTech, Moderna, AstraZeneca/Oxford Univ., Johnson & Johnson/Janssen, Novavax, and Sanofi/GSK[2587]) the U.S. Government selected to participate in the Warp Speed program.

b) Gritstone was a start-up founded in August 2015. In March 2019, Gritstone "announced that the first patient ha[d] been dosed with its personalized immunotherapy candidate targeting the patient's tumor-specific neoantigens, called GRANITE-001."[2588] In contrast, Moderna was founded in 2010 and had been using Tekmira's LNP as its "standard LNP" since 2011 or 2012.[2589]

c) Beginning in 2021, Gritstone stated that it "intend[ed] to expand the application of [its] immunotherapies beyond oncology and begin research and development of vaccines" for

---

[2585] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2586] *See, e.g.,* David Vergun, "Army general to co-lead Operation Warp Speed for COVID-19 vaccine," *U.S. Army,* May 18, 2020, *available at* https://www.army.mil/article/235694/army_general_to_co_lead_operation_warp_speed_for_covid_19_vaccine ("President Donald J. Trump announced on Friday [May 15, 2020] that Army Gen. Gustave F. Perna, the commander of Army Materiel Command, will co-lead an effort, dubbed Operation Warp Speed, to find a vaccine for COVID-19 by January 2021.").

[2587] *See, e.g.,* "Operation Warp Speed Contracts for COVID-19 Vaccines and Ancillary Vaccination Materials," *Congressional Research Service,* March 1, 2021, pp. 1, 2, *available at* https://crsreports.congress.gov/product/pdf/IN/IN11560.

[2588] "Gritstone Oncology Announces First Patient Dosed in a Clinical Study Evaluating its Personalized Immunotherapy, GRANITE-001," *Gritstone Oncology,* March 21, 2019, *available at* https://ir.gritstonebio.com/news-releases/news-release-details/gritstone-oncology-announces-first-patient-dosed-clinical-study.

[2589] MRNA-GEN-01725410-507 at 466 (December 1, 2023 30(b)(6) Deposition of Stephen G. Hoge, M.D. (*Moderna v. Pfizer*), 225:24-226:6.). *See also* 224:25-225:21 ("Q. . . . 2016, Moderna's MERS vaccine that's being tested in animals, mice and rabbits, as a lipid nanoparticle formulation, it has four components, and there are percentages of each of those four components. Do you understand that so far?  A. I do.  Q. Okay.  Were those four components in those same percentages the same as appearing in LNP formulations from 2012; yes or no? . . . Q. With a different payload.  A. I believe that our work in 2012, Moderna's work with LNPs – Q. 2016.  A. I'm answering your question.  You keep asking it very specifically. . . . Q. I don't understand.  I asked you about 2016. . . .").

717

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

"a second-generation vaccine against SARS-CoV-2[.]"[2590]   Prior to its early-2021 expansion beyond oncology, it was focused on personal cancer vaccines, not infectious disease.  In contrast, Moderna had established its infectious disease business in or about October 2014 and had conducted various clinical studies using its "standard LNP" (*i.e.,* Tekmira's LNP).

d) Gritstone and Moderna were targeting different commercial opportunities.  Gritstone focused on *second*-generation COVID-19 vaccines "designed to provide both prolonged protection and potency against Spike mutants."[2591]  In contrast, based on its prior work and experience with Tekmira's LNP, Moderna was well-positioned to develop a *first*-generation COVID-19 vaccine. In addition, Moderna received substantial funding that included development grants and advance purchase payments together with NIH support for testing for the *first*-generation vaccine.

e) Gritstone's second-generation COVID-19 has not yet received regulatory approval. Because Gritstone was targeting a second-generation product, it did not expect to expect to capitalize on the critical window of opportunity that surrounded the pandemic and the development of a "first-generation" product for the prevention or treatment of COVID-19 as well as the development of the later booster products.  In contrast, Moderna received Emergency Use Authorization for mRNA-1273 on December 18, 2020[2592] and shipped 16 million doses in December 2020.[2593]

f) The Gritstone agreement contemplates a collaboration with Genevant.   In contrast, Moderna rejected Genevant's May 15, 2021 offer for a collaboration agreement.

g) The Gritstone agreement's financial terms were depressed due to the long-term effects of Acuitas' improper competition, Moderna's IPRs, as well as Gritstone's  awareness that Moderna was freeriding on Genevant's Patents-in-Suit.[2594]

---

[2590] 2021 Gritstone Oncology, Inc. Annual Report, PDF p. 16 of 156, *available at* https://ir.gritstonebio.com/static-files/9b0eba54-b8b9-4f19-88eb-21f477e0b0cb.

[2591] 2021 Gritstone Oncology, Inc. Annual Report, PDF p. 16 of 156, *available at* https://ir.gritstonebio.com/static-files/9b0eba54-b8b9-4f19-88eb-21f477e0b0cb.

[2592] *See, e.g.,* "Moderna Announces FDA Authorization of Moderna COVID-19 Vaccine in U.S.," *Moderna,* December 18, 2020, *available at* https://investors.modernatx.com/news/news-details/2020/Moderna-Announces-FDA-Authorization-of-Moderna-COVID-19-Vaccine-in-U.S/default.aspx.

[2593] "Moderna Announces Shipment of 100 Millionth Dose of its COVID-19 Vaccine to the U.S. Government," *Moderna,* March 29, 2021, *available at* https://investors.modernatx.com/news/news-details/2021/Moderna-Announces-Shipment-of-100-Millionth-Dose-of-its-COVID-19-Vaccine-to-the-U.S.-Government/default.aspx.

[2594] November 21, 2024 Interview with Pete Zorn.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1003. This license agreement highlights how timing affects the commercial opportunity. While Gritstone was targeting the *second*-generation COVID-19 vaccine opportunity beginning in January 2021, as of October 2024, its programs had not yet advanced to Phase 2 clinical studies. As such, unlike Moderna, Gritstone was not positioned to capitalize on the window of opportunity surrounding the pandemic and the first wave of vaccinations that began in early-2020 as well as the subsequent booster waves.

1004. This license agreement does provide evidence regarding the potential payment structure of the hypothetical license agreement. This agreement establishes that Genevant negotiated an agreement that included ███████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████.

(b)    **Background**

1005. From the beginning, Gritstone was targeting a *second*-generation COVID-19 vaccine. In January 2021,[2595] Gritstone announced that it would work with NIH to develop a second-generation coronavirus vaccine.[2596] Gritstone's goal was to "develop[] vaccines candidates that have the potential to drive more potent and durable responses against SARS-CoV-2 and other common viral diseases" than "[f]irst generation COVID-19 vaccines."[2597]

1006. As of May 2024, Gritstone's SARS-CoV-2 (COVID-19) CORAL clinical program (in collaboration with BARDA) had completed Phase 1 and its "Anticipated Milestone[]" was

---

[2595] "Building a Pipeline of Immunotherapies," *Gritstone bio,* n.d., *available at* https://gritstonebio.com/our-pipeline/#prevention ("CORAL: SARS-CoV-2 Prevention[:] **The CORAL program was initiated in 2021 in response to emerging limitations of first-generation COVID-19 vaccines**, and today serves as proof-of-concept for our ability to drive more potent and durable responses than those of current vaccines in prophylactic applications. As seen among COVID-19 and other infectious diseases, immune responses can vary and viruses mutate and neutralizing antibodies wane, necessitating re-dosing (boosters). An approach capable of inducing potent, broad immune response could have utility across a variety of viral and infectious diseases. Across multiple Phase 1 trials within CORAL, early results have demonstrated the potential ability of our vaccines to elicit potent and durable neutralizing antibody responses, and potent cytotoxic cellular responses against Spike and other conserved targets regions of the virus. These results have also provided early signals of the potential benefits of self-amplifying mRNA (samRNA)." (emphasis added)).

[2596] Jonathan Gardner, "Cancer-focused biotech turns its tools to building a 2nd-generation coronavirus vaccine," *BiopharmaDive,* January 19, 2021, https://www.biopharmadive.com/news/gritstone-next-generation-coronavirus-vaccine/593581/.

[2597] Gritstone bio website, *available at* https://gritstonebio.com/.

719

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

"Initiate Randomized Ph 2b."[2598]   As of October 2024, Gritstone's COVID-19 programs with BARDA, CEPI and NIH still had not advanced beyond Phase 1, as shown in **Figure 4.9**,[2599] below.



**FIGURE 4.9**

          **(iv)**       **April 8, 2021 Genevant-ST Pharm Non-Exclusive License and Support Agreement**

1007.   On April 8, 2021, Genevant entered into an agreement with ST Pharm Co. Ltd. ("ST Pharm"),[2600] a South Korean company that develops and manufactures pharmaceutical products,[2601] including GMP or GMP-like LNP Manufacturing Services, including "manufacturing both ionizable and

---

[2598] "The Promise of Potent and Durable Immune Responses," *Gritstone bio, Inc.,* May 2024, Slide 5 of 39, *available at* https://ir.gritstonebio.com/static-files/15857056-7494-41ed-ace0-44026e604210.  *See also* Slides 27-35 ("Infectious Disease – Prophylactic: Self-amplifying mRNA Vaccines").

[2599] "The Promise of Potent and Durable Immune Responses," *Gritstone bio,* October 2024, Slide 28 of 36, *available at* https://ir.gritstonebio.com/static-files/15857056-7494-41ed-ace0-44026e604210.

[2600] GENV-00022924-976 (April 8, 2021 ST Pharm Genevant Sciences Nonexclusive License and Support Agreement).

[2601] *See, e.g.,* "ST Pharm," *Forbes,* n.d., *available at* https://www.forbes.com/companies/st-pharm/?sh=698c91447c28.

720

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

PEG-lipid, required for LNP formulation."[2602]  ST Pharm described the LNP technology that it in-licensed from Genevant as "Globally proven, unsurpassed and best LNP technology; Applied to COVID-19 mRNA vaccine development[.]"[2603]

1008. Pursuant to this agreement, ST Pharm has made non-FTE payments of ▮▮▮▮▮.[2604]

### (a) Summary of Opinion

1009. This agreement is, at best, *only minimally* economically comparable to the hypothetical license agreement for at least the following reasons:

    a) ST Pharm was *not* part of the U.S. Government's Warp Speed program announced on May 15, 2020.[2605]  In contrast, Moderna was one of the six (6) companies (*i.e.,* Pfizer/BioNTech, Moderna, AstraZeneca/Oxford Univ., Johnson & Johnson/Janssen, Novavax, and Sanofi/GSK[2606]) the U.S. Government selected to participate in the Warp Speed program.

    b) ST Pharm and Moderna were pursuing different business strategies.  ST Pharm's business strategy has changed over time.  For example, in early-June 2021, ST Pharm was pursuing a CMO strategy and was "in talks with Moderna to produce messenger RNA (mRNA) COVID-19 vaccines[.]"[2607]  In late-June, ST Pharm announced that it had launched an

---

[2602] "Expediting xRNA vaccine development strategy: Now and Future," *ST Pharm,* May 2022, Slide 9 of 12, *available at* https://www.stpharm.co.kr/en/ir/ir-materials/download/408/%E3%80%8C%EB%B0%98%EC%B6%9C%E3%80%8D22%2705%20STPHARM%20mRNA%20IR.pdf?download=1.

[2603] "Expediting xRNA vaccine development strategy: Now and Future," *ST Pharm,* May 2022, Slide 7 of 12, *available at* https://www.stpharm.co.kr/en/ir/ir-materials/download/408/%E3%80%8C%EB%B0%98%EC%B6%9C%E3%80%8D22%2705%20STPHARM%20mRNA%20IR.pdf?download=1.

[2604] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2605] *See, e.g.,* David Vergun, "Army general to co-lead Operation Warp Speed for COVID-19 vaccine," *U.S. Army,* May 18, 2020, *available at* https://www.army.mil/article/235694/army_general_to_co_lead_operation_warp_speed_for_covid_19_vaccine ("President Donald J. Trump announced on Friday [May 15, 2020] that Army Gen. Gustave F. Perna, the commander of Army Materiel Command, will co-lead an effort, dubbed Operation Warp Speed, to find a vaccine for COVID-19 by January 2021.").

[2606] *See, e.g.,* "Operation Warp Speed Contracts for COVID-19 Vaccines and Ancillary Vaccination Materials," *Congressional Research Service,* March 1, 2021, pp. 1, 2, *available at* https://crsreports.congress.gov/product/pdf/IN/IN11560.

[2607] Baek Byung-yeul, Kim Yoo-chul, "ST Pharm in talks with Moderna over contract manufacturing of COVID-19 vaccine," *The Korea Times,* June 1, 2021, *available at* https://www.koreatimes.co.kr/www/tech/2024/04/129_309763.html.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

mRNA vaccine consortium, set up by the Korean government,[2608] to produce a COVID-19 vaccine. By May 2022, ST Pharm strategy was to provide "seamless GMP manufacturing service from LNP-encapsulated mRNA to key materials of caps & lipids in LNP."[2609] On November 14, 2023, "ST Pharm . . . said it would voluntarily withdraw its investigational new drug (IND) application for STP2250, an mRNA-based Covid-19 prevention booster vaccine, for phase 1/2a clinical trials. The company made this decision due to two main factors: the challenge of recruiting domestic clinical patients amid the endemic phase of Covid-19 and the perceived lack of commercialization value."[2610] In contrast, beginning in January 2020, Moderna was focused developing, making, offering to sell and selling its mRNA-1273 COVID-19 vaccine.

c) The geographic territories are different. ST Pharm's geographic territory is limited to ████████████████████████████████████████████████████ ████████████████████████████████.[2611] In contrast, the territory of the hypothetical license is limited to the U.S and other countries in the world to the extent an act of infringement occurs in the U.S..

d) The ST Pharm agreement contemplates a collaboration with Genevant. In contrast, Moderna rejected Genevant's May 15, 2021 offer for a collaboration agreement.

e) The ST Pharm agreement's financial terms were depressed due to the long-term effects of Acuitas' improper competition, Moderna's IPRs, as well as the general awareness that Moderna was freeriding on Genevant's Patents-in-Suit.[2612]

1010. This license agreement highlights the critical importance of business strategy. The evidence shows that by July 2021 ST Pharm's CMO business opportunity was adversely impacted when Moderna and Pfizer made the decision to produce their respective COVID-19 vaccines in-house.

---

[2608] "Company Update – ST Pharm," *Samsung Securities,* July 22, 2021, p. 1 of 7, *available at* https://www.stpharm.co.kr/en/ir/ir-materials/download/404/%E3%80%8C%EB%B0%98%EC%B6%9C%E3%80%8DSTPharm_20210723095011.pdf?download=1 ("The Korean government set up the k-mRNA consortium to help Korean firm develop mRNA-based COVID-19 vaccines[.]").

[2609] "Expediting xRNA vaccine development strategy: Now and Future," *ST Pharm,* May 2022, Slide 11 of 12, *available at* https://www.stpharm.co.kr/en/ir/ir-materials/download/408/%E3%80%8C%EB%B0%98%EC%B6%9C%E3%80%8D22%2705%20STPHARM%20mRNA%20IR.pdf?download=1.

[2610] Kim Yoon-mi, "ST Pharm gives up mRNA Covid-19 vaccine development," *Korea Biomedical Review,* November 14, 2023, *available at* https://www.koreabiomed.com/news/articleView.html?idxno=22515.

[2611] GENV-00022924-976 at 936 (April 8, 2021 ST Pharm Genevant Sciences Nonexclusive License and Support Agreement).

[2612] November 21, 2024 Interview with Pete Zorn.

722

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1011.   This license agreement does provide evidence regarding the potential payment structure of the hypothetical license agreement.   This agreement establishes that Genevant negotiated an agreement that included ████████████████████████████████████ ██████████████████████████ .

**(b)     Background**

1012.   On April 15, 2021, *Korea Biomed* described ST Pharm's entry into the COVID-19 race as follows:

> ST Pharm, which used to manufacture oligonucleotide active pharmaceutical ingredient (API) in a contract manufacturing organization (CMO) deal, recently jumped into the development of the Covid-19 mRNA vaccine.
>
> On April 8, ST Pharm signed a non-exclusive licensing agreement with Swiss biotech firm Genevant Sciences to introduce lipid nanoparticle (LNP) technology. The Korean company aims to use the LNP technology to develop a Covid-19 mRNA vaccine in 12 Asian countries, excluding China.  ST Pharm is expanding its GMP plant in Ansan, Gyeonggi Province, to mass-produce mRNA vaccine.[2613]

1013.   In January 2021, "[d]uring the coronavirus pandemic, when the Korean government was having difficulty securing vaccines to inoculate the public, ST Pharm began developing a COVID-19 mRNA vaccine . . . based on the mRNA platform technology it had been researching since 2018."[2614]  By June 1, 2021, however, "Pfizer and Moderna vaccines produced using mRNA ha[d] taken the lead in the COVID-19 vaccine race."[2615]  On June 1, 2021, *The Korean Times* reported: "Korean biotechnology firm, ST Pharm, is in talks with Moderna to produce messenger RNA (mRNA) COVID-19 vaccines[.]"[2616]  On June 29, 2021, ST Pharm announced that it had launched an mRNA vaccine consortium, set up by the Korean government,[2617] which it described as follows:

---

[2613] "Korean companies work on RNA Covid-19 treatments, vaccines," *ST Pharm,* April 15, 2021, *available at* https://www.stpharm.co.kr/en/pr/media-focus/korean-companies-work-on-rna-covid-19-treatments-vaccines.

[2614] "ST Pharm, honored with two awards at the 'Korea Biopharma Excellence Awards 2024'," *ST Pharm,* August 19, 2024, *available at* https://www.stpharm.co.kr/en/pr/st-pharm-news/st-pharm-honored-with-two-awards-at-the-korea-biopharma-excellence-awards-2024.

[2615] Baek Byung-yeul, Kim Yoo-chul, "ST Pharm in talks with Moderna over contract manufacturing of COVID-19 vaccine," *The Korea Times,* June 1, 2021, *available at* https://www.koreatimes.co.kr/www/tech/2024/04/129_309763.html.

[2616] Baek Byung-yeul, Kim Yoo-chul, "ST Pharm in talks with Moderna over contract manufacturing of COVID-19 vaccine," *The Korea Times,* June 1, 2021, *available at* https://www.koreatimes.co.kr/www/tech/2024/04/129_309763.html.

[2617] "Company Update – ST Pharm," *Samsung Securities,* July 22, 2021, p. 1 of 7, *available at* https://www.stpharm.co.kr/en/ir/ir-

723

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

the "first goal is to secure the technology to produce a vaccine using synthetic messenger RNA, or mRNA. The Korean consortium aims to begin production of its COVID-19 vaccine next year [2022] to help the country overcome the ongoing pandemic. Its target is at least 100 million doses. The companies say they will work to expand their manufacturing capacity to 1 billion doses by 2023."[2618]

1014. A month later, by July 22, 2021, however, ST Pharm's prospects were adversely impacted by the Moderna and Pfizer's decisions to produce their respective COVID-19 vaccines in-house, which Samsung Securities described as follows:

> ST Pharm shares have remained weak of late because of efforts by Pfizer and Moderna to produce their respective COVID-19 vaccines in-house have lowered the chances of the Korean firm being chosen as the US firms' CMO. Another factor that has weighted on ST Pharm shares is that Pfizer's and Moderna's COVID-19 vaccine supply to Korea (170m does in 2H) will resume in July—which is likely to dampen investor interest in Korean vaccine development. Yet Korea is increasingly seeing the need to localize COVID-19 vaccine production, as Pfizer plans to raise its vaccine ASP from USD20/dose to USD150-175/dose.[2619]
>
> …
>
> We also believe ST Pharm's in-house developed mRNA-based COVID-19 vaccine will launch in Korea in 2Q22. We conservatively estimate the firm's 2022 sales of this vaccine at KRW50b. Given that the global supply of COVID-19 vaccines is now going smoothly, the private sector is likely to have but a limited interest in Korea-developed vaccines. We assume, however, that the [Korean] government will make advance purchase in 2022 given its determination to localize COVID-19 vaccine production.[2620]

materials/download/404/%E3%80%8C%EB%B0%98%EC%B6%9C%E3%80%8DSTPharm_20210723095011.pdf?download=1 ("The Korean government set up the k-mRNA consortium to help Korean firm develop mRNA-based COVID-19 vaccines[.]").

[2618] "Korea launches mRNA vaccine consortium," *ST Pharm,* June 29, 2021, *available at* https://www.stpharm.co.kr/en/pr/media-focus/korea-launches-mrna-vaccine-consortium. *See also* "ST PHARM, The First Company Developing mRNA-LNP Vaccine in South Korea," *ST Pharm,* June 1, 2021, *available at* https://www.stpharm.co.kr/en/pr/all/st-pharm-the-first-company-developing-mrna-lnp-vaccine-in-south-korea.

[2619] "Company Update – ST Pharm," *Samsung Securities,* July 22, 2021, p. 1 of 7, *available at* https://www.stpharm.co.kr/en/ir/ir-materials/download/404/%E3%80%8C%EB%B0%98%EC%B6%9C%E3%80%8DSTPharm_20210723095011.pdf?download=1 ("The Korean government set up the k-mRNA consortium to help Korean firm develop mRNA-based COVID-19 vaccines[.]").

[2620] "Company Update – ST Pharm," *Samsung Securities,* July 22, 2021, p. 2 of 7, *available at* https://www.stpharm.co.kr/en/ir/ir-materials/download/404/%E3%80%8C%EB%B0%98%EC%B6%9C%E3%80%8DSTPharm_20210723095011.pdf?download=1.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1015.    In May 2022, ST Pharm summarized its business as shown in **Figure 4.10**,[2621] below.



**FIGURE 4.10**

1016.    On November 14, 2023, "ST Pharm, an affiliate of Dong-A Socio Group, said it would voluntarily withdraw its investigational new drug (IND) application for STP2250, an mRNA-based Covid-19 prevention booster vaccine, for phase 1/2a clinical trials.  The company made this decision due to two main factors: the challenge of recruiting domestic clinical patients amid the endemic phase of Covid-19 and the perceived lack of commercialization value."[2622]

---

[2621] "Expediting xRNA vaccine development strategy: Now and Future," *ST Pharm,* May 2022, Slide 11 of 12, *available at* https://www.stpharm.co.kr/en/ir/ir-materials/download/408/%E3%80%8C%EB%B0%98%EC%B6%9C%E3%80%8D22%2705%20STPHARM%20mRNA%20IR.pdf?download=1.

[2622] Kim Yoon-mi, "ST Pharm gives up mRNA Covid-19 vaccine development," *Korea Biomedical Review,* November 14, 2023, *available at* https://www.koreabiomed.com/news/articleView.html?idxno=22515.

725

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

(v) **February 18, 2022 Genevant-████ Non-Exclusive License and Collaboration Agreement**

1017. On February 18, 2022, Genevant entered into an agreement with ████████ ("████"),[2623] founded in 2013 and based in ████████,[2624] whose "mission is to solve gene delivery."[2625]

1018. To date, ████ still has not commercialized a COVID-19 mRNA product pursuant to its license agreement with Genevant. Pursuant to this agreement, ████ has made non-FTE payments ████ ████.[2626]

(a)    **Summary of Opinion**

1019. This agreement is, at best, *only minimally* economically comparable to the hypothetical license agreement for at least the following reasons:

   a) ████ was *not* part of the U.S. Government's Warp Speed program announced on May 15, 2020.[2627] In contrast, Moderna was one of the six (6) companies (*i.e.,* Pfizer/BioNTech, Moderna, AstraZeneca/Oxford Univ., Johnson & Johnson/Janssen, Novavax, and Sanofi/GSK[2628]) the U.S. Government selected to participate in the Warp Speed program.

   b) The geographic territories are different. ████ geographic territory is limited to ████ ████████████ ████████.[2629] In contrast, the territory of the hypothetical license includes the U.S. and other countries in the world to the extent

---

[2623] GENV-00023278-336 (February 18, 2022 ████████ and Genevant Sciences Nonexclusive License and Collaboration Agreement).
[2624] ████████████████████
[2625] ████████████████████████████
[2626] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).
[2627] *See, e.g.,* David Vergun, "Army general to co-lead Operation Warp Speed for COVID-19 vaccine," *U.S. Army,* May 18, 2020, *available at* https://www.army.mil/article/235694/army_general_to_co_lead_operation_warp_speed_for_covi d_19_vaccine ("President Donald J. Trump announced on Friday [May 15, 2020] that Army Gen. Gustave F. Perna, the commander of Army Materiel Command, will co-lead an effort, dubbed Operation Warp Speed, to find a vaccine for COVID-19 by January 2021.").
[2628] *See, e.g.,* "Operation Warp Speed Contracts for COVID-19 Vaccines and Ancillary Vaccination Materials," *Congressional Research Service,* March 1, 2021, pp. 1, 2, *available at* https://crsreports.congress.gov/product/pdf/IN/IN11560.
[2629] GENV-00023278-336 (February 18, 2022 ████████ and Genevant Sciences Nonexclusive License and Collaboration Agreement).

726



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

an act of infringement occurs in the U.S. ▮▮ was a start-up founded in 2013. As of early-2020, ▮▮ had not yet received approval for its first clinical trial.[2630] In contrast, Moderna was founded in 2010 and had been using Tekmira's LNP as its "standard LNP" since 2011 or 2012.[2631] By the time of the hypothetical negotiation, Moderna had received positive interim Phase 1 results and had begun Phase 2 trials.

c) Until March 2020, Helix was focused on cancer therapies. "In March 2020, ▮▮ suspended their work on cancer vaccines in favor of working to develop a vaccine for SARS-CoV-2."[2632] Prior to ▮▮ pivot to a COVID-19 vaccine, it was focused on personal cancer vaccines, not infectious disease. In contrast, Moderna had established its infectious disease business in or about October 2014 and had conducted various clinical studies using its "standard LNP" (*i.e.,* Tekmira's LNP).

d) ▮▮ and Moderna were targeting different commercial opportunities. ▮▮ was focused on creating "a better, *second*-generation vaccine against the novel coronavirus."[2633] In contrast, based on its prior work with Tekmira's LNP, Moderna was well-positioned to develop a *first*-generation COVID-19 vaccine. In addition, Moderna received substantial funding that included development grants and advance purchase payments together with NIH support for testing for the *first*-generation vaccine.

e) ▮▮ clinical trials were years behind Moderna. ▮▮ second-generation COVID-19 vaccine started its Phase 1 clinical trial in April 2024. Because ▮▮ was targeting a second-generation product, it did not expect to expect to capitalize on the critical window of opportunity that surrounded the pandemic and the development of a "first-generation" product for the prevention or treatment of COVID-19 as well as the development of the later booster products. In contrast, Moderna received Emergency Use Authorization for

---

[2630] ▮▮

[2631] MRNA-GEN-01725410-507 at 466 (December 1, 2023 30(b)(6) Deposition of Stephen G. Hoge, M.D. (*Moderna v. Pfizer*), 225:24-226:6.). *See also* 224:25-225:21 ("Q. . . . 2016, Moderna's MERS vaccine that's being tested in animals, mice and rabbits, as a lipid nanoparticle formulation, it has four components, and there are percentages of each of those four components. Do you understand that so far? A. I do. Q. Okay. Were those four components in those same percentages the same as appearing in LNP formulations from 2012; yes or no? . . . Q. With a different payload. A. I believe that our work in 2012, Moderna's work with LNPs – Q. 2016. A. I'm answering your question. You keep asking it very specifically. . . . Q. I don't understand. I asked you about 2016. . . .").

[2632] ▮▮

[2633] ▮▮

727

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

mRNA-1273 on December 18, 2020[2634] and shipped 16 million doses in December 2020.[2635]

    f)   The ▮▮▮ agreement contemplates a collaboration with Genevant. In contrast, Moderna rejected Genevant's May 15, 2021 offer for a collaboration agreement.

    g)   The ▮▮▮ agreement's financial terms were depressed due to the long-term effects of Acuitas' improper competition, Moderna's IPRs, as well as the general awareness that Moderna was freeriding on Genevant's Patents-in-Suit.[2636]

1020. This license agreement highlights how timing affected the commercial opportunity. While ▮▮▮ was targeting the *second*-generation COVID-19 vaccine opportunity beginning in March 2020, as of April 2024, its program had just started its Phase 1 clinical study. As such, unlike Moderna, ▮▮▮ was not positioned to capitalize on the window of opportunity surrounding the pandemic and the first wave of vaccinations during the pandemic that began in early-2020 as well as the subsequent booster waves.

1021. This license agreement does provide evidence regarding the potential payment structure of the hypothetical license agreement. This agreement establishes that Genevant negotiated an agreement that included ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮.

### (b)      Background

1022. In early-2020, ▮▮▮ was a 6-person start-up company focused on cancer therapies.[2637] "In March 2020, ▮▮▮ suspended its work on cancer vaccines in favor of working to develop a vaccine for SARS-CoV-2."[2638]

---

[2634] *See, e.g.,* "Moderna Announces FDA Authorization of Moderna COVID-19 Vaccine in U.S.," *Moderna,* December 18, 2020, *available at* https://investors.modernatx.com/news/news-details/2020/Moderna-Announces-FDA-Authorization-of-Moderna-COVID-19-Vaccine-in-U.S/default.aspx.

[2635] "Moderna Announces Shipment of 100 Millionth Dose of its COVID-19 Vaccine to the U.S. Government," *Moderna,* March 29, 2021, *available at* https://investors.modernatx.com/news/news-details/2021/Moderna-Announces-Shipment-of-100-Millionth-Dose-of-its-COVID-19-Vaccine-to-the-U.S.-Government/default.aspx.

[2636] November 21, 2024 Interview with Pete Zorn.

[2637] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[2638] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

728

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1023. "In March [10 to 16[2639]] 2020, ███████████████████████████████ focus from cancer therapies to Covid-19 vaccines" and the ██████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████[2640]

1024. In or about March 2021, ████ was described as follows:



.[2641]

…



.[2642]

729

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1025. As of March 2021, ████ had nine employees and claimed that ████████████ ████████████████████████████████████████████████████████████ [2643] At that time, ████ was reported "still 95% on Covid, but are starting to spin the cancer work back up."[2644] ████, however, did not execute a license with Genevant until February 2022, nearly two years after its March 2020 pivot to mRNA COVID-19 development.

1026. In March 2024, three years after it claimed its new vaccine would go to clinical trials in 2021, ████ announced that it had finally received approval for its first clinical trial, a Phase 1 clinical of ████████, a second-generation COVID-19 mRNA vaccine candidate specifically designed to prevent COVID-19 immunosuppressed and immunocompromised populations. The first Phase 1 clinical trial participants are anticipated to be dosed in April 2024."[2645]

1027. Moreover, Moderna had a unique relationship with the United States Government, which none of Genevant's licensees had. These license agreements do, however, provide certain insights including the payment structure of the hypothetical license agreement (*e.g.,* non-exclusive license with profit splits and running royalty).



730

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

> **(vi)    August 10, 2023 Option and Nonexclusive License Agreement by and between Gritstone bio, Inc. (f/k/a Gritstone Oncology, Inc.), and Genevant Sciences GmbH**

1028.    On August 10, 2023, Genevant entered into an Option and Nonexclusive License Agreement[2646] with Gritstone. bio, Inc. (f/k/a Gritstone Oncology, Inc.),[2647] a company founded in August 2015 as Gritstone Oncology, Inc. and based in Emeryville, California—as Gritstone Oncology, Inc. to develop cancer immunotherapies.[2648]  As stated above, Gritstone's goal was to "develop[] vaccines candidates that have the potential to drive more potent and durable responses against SARS-CoV-2 and other common viral diseases" than "[f]irst generation COVID-19 vaccines."[2649]  The terms of the Agreement are summarized in Schedule 6.2(a)

1029.    Pursuant to this agreement, Gritstone has made payments to Genevant totaling at least ▮▮▮▮ as of May 2024.[2650]

> **(c)    Summary of Opinion**

1030.    This agreement is, at best, *only minimally* economically comparable to the hypothetical license agreement for at least the following reasons:

    a)    Gritstone was *not* part of the U.S. Government's Warp Speed program announced on May 15, 2020.[2651] In contrast, Moderna was one of the six (6) companies (*i.e.,* Pfizer/BioNTech,

---

[2646] GENV-00062423 (August 10, 2023 Option and Nonexclusive License Agreement by and between Gritstone bio, Inc. (f/k/a Gritstone Oncology, Inc.), and Genevant Sciences GmbH).

[2647] GENV-00022689-792 (Zorn Deposition Exhibit No. 20 – January 15, 2021 Gritstone Oncology Inc. and Genevant Sciences GMBH Nonexclusive License and Development Agreement).

[2648] "Our Unique Story," *Gritstone bio,* 2024, *available at* https://gritstonebio.com/about/#:~:text=Gritstone%20bio%20is%20headquartered%20in,under%20the%20ticker%20symbol%20GRTS.

[2649] Gritstone bio website, *available at* https://gritstonebio.com/.

[2650] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2651] *See, e.g.,* David Vergun, "Army general to co-lead Operation Warp Speed for COVID-19 vaccine," *U.S. Army,* May 18, 2020, *available at* https://www.army.mil/article/235694/army_general_to_co_lead_operation_warp_speed_for_covid_19_vaccine ("President Donald J. Trump announced on Friday [May 15, 2020] that Army Gen. Gustave F. Perna, the commander of Army Materiel Command, will co-lead an effort, dubbed Operation Warp Speed, to find a vaccine for COVID-19 by January 2021.").

731

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Moderna, AstraZeneca/Oxford Univ., Johnson & Johnson/Janssen, Novavax, and Sanofi/GSK[2652]) the U.S. Government selected to participate in the Warp Speed program.

b)  Gritstone was a start-up founded in August 2015. In March 2019, Gritstone "announced that the first patient ha[d] been dosed with its personalized immunotherapy candidate targeting the patient's tumor-specific neoantigens, called GRANITE-001."[2653]  In contrast, Moderna was founded in 2010 and had been using Tekmira's LNP as its "standard LNP" since 2011 or 2012.[2654]

c)  Beginning in 2021, Gritstone stated that it "intend[ed] to expand the application of [its] immunotherapies beyond oncology and begin research and development of vaccines" for "a second-generation vaccine against SARS-CoV-2[.]"[2655]  Prior to its early-2021 expansion beyond oncology, it was focused on personal cancer vaccines, not infectious disease.  In contrast, Moderna had established its infectious disease business in or about October 2014 and had conducted various clinical studies using its "standard LNP" (*i.e.,* Tekmira's LNP).

d)  Gritstone and Moderna were targeting different commercial opportunities.  Gritstone focused on coronaviruses more broadly (not just COVID-19).  In contrast, based on its prior work and experience with Tekmira's LNP, Moderna was well-positioned to develop a *first*-generation COVID-19 vaccine. In addition, Moderna received substantial funding that included development grants and advance purchase payments together with NIH support for testing for the *first*-generation vaccine.

---

[2652] *See, e.g.,* "Operation Warp Speed Contracts for COVID-19 Vaccines and Ancillary Vaccination Materials," *Congressional Research Service,* March 1, 2021, pp. 1, 2, *available at* https://crsreports.congress.gov/product/pdf/IN/IN11560.

[2653] "Gritstone Oncology Announces First Patient Dosed in a Clinical Study Evaluating its Personalized Immunotherapy, GRANITE-001," *Gritstone Oncology,* March 21, 2019, *available at* https://ir.gritstonebio.com/news-releases/news-release-details/gritstone-oncology-announces-first-patient-dosed-clinical-study

[2654] MRNA-GEN-01725410-507 at 466 (December 1, 2023 30(b)(6) Deposition of Stephen G. Hoge, M.D. (*Moderna v. Pfizer*), 225:24-226:6.). *See also* 224:25-225:21 ("Q. . . . 2016, Moderna's MERS vaccine that's being tested in animals, mice and rabbits, as a lipid nanoparticle formulation, it has four components, and there are percentages of each of those four components. Do you understand that so far?  A. I do.  Q. Okay.  Were those four components in those same percentages the same as appearing in LNP formulations from 2012; yes or no? . . . Q. With a different payload.  A. I believe that our work in 2012, Moderna's work with LNPs – Q. 2016.  A. I'm answering your question.  You keep asking it very specifically. . . . Q. I don't understand.  I asked you about 2016. . . .").

[2655] 2021 Gritstone Oncology, Inc. Annual Report, PDF p. 16 of 156, *available at* https://ir.gritstonebio.com/static-files/9b0eba54-b8b9-4f19-88eb-21f477e0b0cb.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

e) Gritstone's vaccine has not yet received regulatory approval. In contrast, Moderna received Emergency Use Authorization for mRNA-1273 on December 18, 2020[2656] and shipped 16 million doses in December 2020.[2657]

f) The Gritstone agreement contemplates a collaboration with Genevant. In contrast, Moderna rejected Genevant's May 15, 2021 offer for a collaboration agreement.

g) The Gritson agreement's financial terms were depressed due to the long-term effects of Acuitas' improper competition, Moderna's IPRs, as well as Gritstone's general awareness that Moderna was freeriding on Genevant's Patents-in-Suit.[2658]

1031. This license agreement highlights how timing affects the commercial opportunity. As of October 2024, its programs had not yet advanced to Phase 2 clinical studies. As such, unlike Moderna, Gritstone was not positioned to capitalize on the window of opportunity surrounding the pandemic and the first wave of vaccinations that began in early-2020 as well as the subsequent booster waves.

1032. This license agreement does provide evidence regarding the potential payment structure of the hypothetical license agreement. This agreement establishes that Genevant negotiated an agreement that included ██████████████████████████████████████████████████████████████████████████████████████████████████████████

(d)    **Background**

1033. From the beginning, Gritstone was targeting a *second*-generation COVID-19 vaccine. In January 2021,[2659] Gritstone announced that it would work with NIH to develop a second-generation

---

[2656] *See, e.g.,* "Moderna Announces FDA Authorization of Moderna COVID-19 Vaccine in U.S.," *Moderna,* December 18, 2020, *available at* https://investors.modernatx.com/news/news-details/2020/Moderna-Announces-FDA-Authorization-of-Moderna-COVID-19-Vaccine-in-U.S/default.aspx.

[2657] "Moderna Announces Shipment of 100 Millionth Dose of its COVID-19 Vaccine to the U.S. Government," *Moderna,* March 29, 2021, *available at* https://investors.modernatx.com/news/news-details/2021/Moderna-Announces-Shipment-of-100-Millionth-Dose-of-its-COVID-19-Vaccine-to-the-U.S.-Government/default.aspx.

[2658] November 21, 2024 Interview with Pete Zorn.

[2659] "Building a Pipeline of Immunotherapies," *Gritstone bio,* n.d., *available at* https://gritstonebio.com/our-pipeline/#prevention ("CORAL: SARS-CoV-2 Prevention[:] **The CORAL program was initiated in 2021 in response to emerging limitations of first-generation COVID-19 vaccines**, and today serves as proof-of-concept for our ability to drive more potent and durable responses than those of current vaccines in prophylactic applications. As seen among COVID-19 and other infectious diseases, immune responses can vary and viruses

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

coronavirus vaccine.[2660]   Gritstone's goal was to "develop[] vaccines candidates that have the potential to drive more potent and durable responses against SARS-CoV-2 and other common viral diseases" than "[f]irst generation COVID-19 vaccines."[2661]

1034.   As of 2023, Gritstone had two clinical stage infectious disease programs, one for an HIV vaccine and one for a COVID-19 vaccine.[2662] Both programs arose out of a collaboration with Genevant.[2663] Gritstone also "lists preclinical work in flu, human papillomavirus infection and a vaccine targeting multiple respiratory conditions." [2664]

1035.   Prior to this agreement, Genevant and Gritstone had entered into two other agreements. One agreement on October 20, 2020 that covered the HIV/AIDS field of use[2665] and resulted in █ ████████████ to Genevant.[2666] And a second agreement on January 15, 2021 (discussed in

_____

mutate and neutralizing antibodies wane, necessitating re-dosing (boosters). An approach capable of inducing potent, broad immune response could have utility across a variety of viral and infectious diseases. Across multiple Phase 1 trials within CORAL, early results have demonstrated the potential ability of our vaccines to elicit potent and durable neutralizing antibody responses, and potent cytotoxic cellular responses against Spike and other conserved targets regions of the virus. These results have also provided early signals of the potential benefits of self-amplifying mRNA (samRNA)." (emphasis added)).

[2660] Jonathan Gardner, "Cancer-focused biotech turns its tools to building a 2nd-generation coronavirus vaccine," *BiopharmaDive,* January 19, 2021, https://www.biopharmadive.com/news/gritstone-next-generation-coronavirus-vaccine/593581/.

[2661] Gritstone bio website, *available at* https://gritstonebio.com/.

[2662] "Gritstone goes back to Genevant to boost power of infectious disease vaccine programs," *Fierce Biotech*, August 15, 2023, *available at* https://www.fiercebiotech.com/biotech/gritstone-goes-back-genevant-boost-power-infectious-disease-vaccine-programs

[2663] "Gritstone goes back to Genevant to boost power of infectious disease vaccine programs," *Fierce Biotech*, August 15, 2023, *available at* https://www.fiercebiotech.com/biotech/gritstone-goes-back-genevant-boost-power-infectious-disease-vaccine-programs. *See also*, GENV-00022587 (October 20, 2020 Gritstone Oncology Inc. and Genevant Sciences GMBH Option and License and Development Agreement).

[2664] "Gritstone goes back to Genevant to boost power of infectious disease vaccine programs," *Fierce Biotech*, August 15, 2023, *available at* https://www.fiercebiotech.com/biotech/gritstone-goes-back-genevant-boost-power-infectious-disease-vaccine-programs

[2665] GENV-00022587 (October 20, 2020 Gritstone Oncology Inc. and Genevant Sciences GMBH Option and License and Development Agreement).

[2666] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

734

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

detail below) that covered the second-generation COVID-19 vaccine field of use [2667] and resulted ████████████████████ to Genevant. [2668]

1036. This deal provides Gritstone bio with non-exclusive access to Genevant's lipid nanoparticle (LNP) technology to develop and commercialize self-amplifying RNA (samRNA) vaccines for a wide range of infectious diseases. [2669] The agreement is a multi-year, multi-pathogen deal, with Genevant receiving option maintenance and exercise fees in the single-digit millions, up to $136 million in milestone payments per product, plus royalties on product sales. [2670] Important to note that any



████. [2671] ████████████████████████████████. [2672]

1037. Referring to the agreement, Fierce Biotech stated "As part of efforts to develop self-amplifying RNA-based vaccines against a range of infectious diseases, Gritstone bio has tapped regular collaborator Genevant Sciences to again use its lipid nanoparticle tech." [2673]

1038. Gritstone CEO Andrew Allen, M.D., Ph.D. commented "Our previous collaborations with Genevant have demonstrated the powerful potential of combining the strengths of two technology leaders, and we are pleased to expand our relationship with this new agreement." [2674]

---

[2667] GENV-00022689-792 (Zorn Deposition Exhibit No. 20 – January 15, 2021 Gritstone Oncology Inc. and Genevant Sciences GMBH Nonexclusive License and Development Agreement).

[2668] GENV-00961337 ("Genevant Sciences Consolidated License Revenue Cash Basis," *Genevant*, May 2024).

[2669] "Gritstone bio and Genevant Sciences Announce Option and License Agreement," Genevant, August 16, 2023, *available at* https://www.genevant.com/gritstone-bio-and-genevant-sciences-announce-option-and-license-agreement/.

[2670] "Gritstone bio and Genevant Sciences Announce Option and License Agreement," Genevant, August 16, 2023, *available at* https://www.genevant.com/gritstone-bio-and-genevant-sciences-announce-option-and-license-agreement/.

[2671] GENV-00062423 at 438, 459-460 (August 10, 2023 Option and Nonexclusive License Agreement by and between Gritstone bio, Inc. (f/k/a Gritstone Oncology, Inc.), and Genevant Sciences GmbH).

[2672] GENV-00062423 at 438 (August 10, 2023 Option and Nonexclusive License Agreement by and between Gritstone bio, Inc. (f/k/a Gritstone Oncology, Inc.), and Genevant Sciences GmbH).

[2673] "Gritstone goes back to Genevant to boost power of infectious disease vaccine programs," *Fierce Biotech*, August 15, 2023, *available at* https://www.fiercebiotech.com/biotech/gritstone-goes-back-genevant-boost-power-infectious-disease-vaccine-programs.

[2674] "Gritstone goes back to Genevant to boost power of infectious disease vaccine programs," *Fierce Biotech*, August 15, 2023, *available at* https://www.fiercebiotech.com/biotech/gritstone-goes-back-genevant-boost-power-infectious-disease-vaccine-programs

735

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1041. Moderna's second point simply cites, without *any* explanation, to ▮▮▮ potential acquisition offers" that Genevant "declined to proceed with" and one valuation. This contention is equally opaque. To start, Genevant did not find the terms of any of the acquisition offers acceptable.[2675] Moreover, Moderna's reliance on an email from December 2015 (GENV-00521389) concerning the alleged value of Arbutus's LNP estate is misplaced. The December 2015 email was sent several years before the formation of Genevant, several years before the FDA approved Onpattro (thereby clinically validating Plaintiffs' LNP technology), and nearly five years before the hypothetical negotiation. The Court in *Spectralytics* stated that a "proposed sale [at one point in time] provides weak evidence of how the parties would have valued [a patent at a different point in time] in the course of a hypothetical negotiation." 650 F.Supp. 2d 900, at 914. In addition, Moderna offers no explanation including what, if anything this contention "suggests about the outcome of the hypothetical negotiation on [May 31, 2020]." As such, I reserve the right to respond to this contention, to the extent that it is part of Moderna's damages rebuttal.

### (3) Moderna Agreements

1042. Moderna has produced several license agreements, including but not limited to in-licenses with ▮▮▮ Acuitas, Cellscript, NIAID, CytomX, LifeEdit, and Generation Bio, and out-licenses with Alexion, Merck, AstraZeneca, Vertex and Chiesi. The terms of these agreements are summarized in Schedule 6.3.

1043. Below, I discuss certain agreements that Moderna entered into with Merck and AstraZeneca that provide certain insights with respect to the hypothetical license agreement in this case. I also discuss the license agreements that Moderna has identified in its interrogatory answers "as potentially relevant and informative to the determination of damages": Cellscript, NIAID, and Acuitas. In my opinion, these agreements are *not* "informative to the determination of damages" in this case for the reasons that I explain.

---

[2675] *See* June 5, 2024 30(b)(6) Deposition Testimony of Pete Zorn, 218:25-219:2 ("Q.

).

737

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**(a)    June 2016 Merck Cancer Vaccine Collaborations**

1044.  Moderna and Merck's mRNA-based Personalized Cancer Vaccines ("PCV") collaboration dates back to June 2016.[2676]  mRNA-4157 was the initial product. In April 2018, the parties amended and expanded their cancer vaccine development collaboration; the changes included, among other things, the addition of mRNA-5671. In February 2022, Merck withdrew from the collaboration with respect to mRNA-5671, and Moderna has since continued its development without a partner.[2677]  Merck and Moderna continue to collaborate on mRNA-4157.[2678]

**(i)    Background**

1045.  The June 2016 PCV Collaboration and License Agreement ("2016 Moderna-Merck PCV Collaboration")[2679] sought to combine "Merck's established leadership in immuno-oncology with Moderna's pioneering mRNA vaccine technology and GMP manufacturing capabilities."[2680]

---

[2676] "Merck and Moderna Announce Strategic Collaboration to Advance Novel mRNA-Based Personalized Cancer Vaccines with KEYTRUDA® (pembrolizumab) for the Treatment of Multiple Types of Cancer," June 29, 2016, *available at* https://investors.modernatx.com/news/news-details/2016/Merck-and-Moderna-Announce-Strategic-Collaboration-to-Advance-Novel-mRNA-Based-Personalized-Cancer-Vaccines-with-KEYTRUDA-pembrolizumab-for-the-Treatment-of-Multiple-Types-of-Cancer/default.aspx.
[2677] Nick Paul Taylor, "Merck cuts ties to Moderna's early-phase KRAS vaccine, leaving mRNA specialist to mull next steps," *Fierce Biotech*, February 24, 2022, a*vailable at* https://www.fiercebiotech.com/biotech/merck-cuts-ties-modernas-early-phase-kras-vaccine-leaving-mrna-specialist-mull-next-steps.
[2678] "Second Quarter 2024 Financial Results, August 1, 2024," at Slide 35, Moderna presentation as part of its Q220204 earnings call, *available at* https://s29.q4cdn.com/435878511/files/doc_earnings/2024/q2/presentation/Moderna-2Q24-Earnings-Presentation-Final.pdf.
[2679] Merck and Moderna Announce Strategic Collaboration to Advance Novel mRNA-Based Personalized Cancer Vaccines with KEYTRUDA® (pembrolizumab) for the Treatment of Multiple Types of Cancer," June 29, 2016, *available at* https://investors.modernatx.com/news/news-details/2016/Merck-and-Moderna-Announce-Strategic-Collaboration-to-Advance-Novel-mRNA-Based-Personalized-Cancer-Vaccines-with-KEYTRUDA-pembrolizumab-for-the-Treatment-of-Multiple-Types-of-Cancer/default.aspx.
[2680] "Merck and Moderna Announce Strategic Collaboration to Advance Novel mRNA-Based Personalized Cancer Vaccines with KEYTRUDA® (pembrolizumab) for the Treatment of Multiple Types of Cancer," June 29, 2016, *available at* https://investors.modernatx.com/news/news-details/2016/Merck-and-Moderna-Announce-Strategic-Collaboration-to-Advance-Novel-mRNA-Based-Personalized-Cancer-Vaccines-with-KEYTRUDA-pembrolizumab-for-the-Treatment-of-Multiple-Types-of-Cancer/default.aspx. MRNA-GEN-00456830-7189 at 6832, ("Amended And Restated mRNA Cancer Vaccine Collaboration And License Agreement by and between ModernaTX, Inc. and Merck Sharp & Dohme Corp., April 17, 2018").

738

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Moderna was responsible for the initial research through proof of concept, for which Merck made an upfront payment of $200 million.[2681]

1046. During the January 2018 36th Annual J.P. Morgan Healthcare Conference, Moderna's CEO Stéphane Bancel announced several clinical advances, including two cancer vaccine candidates, one of which was already part of Moderna and Merck's collaboration, and the second was subsequently added.  In November 2017, Moderna began Phase 1 clinical trials with mRNA-4157, its PCV candidate from the Merck cancer vaccine collaboration, and on or before January 8, 2018, Moderna filed an investigational new drug ("IND") application for mRNA-5671, a KRAS cancer vaccine.[2682]

1047. In April 2018, Modera and Merck entered into the Amended and Restated mRNA Cancer vaccine Collaboration and License Agreement ("2018 Moderna-Merck PCV/SAV Collaboration"), which amended the earlier June 2016 collaboration.[2683]  Among other terms, the amendment expanded the collaboration to include Moderna's KRAS vaccine development candidate, mRNA-5671 (Joint SAV program).[2684]  Under the terms of the 2018 Moderna-Merck PCV/SAV Collaboration,

---

[2681] "Merck and Moderna Announce Strategic Collaboration to Advance Novel mRNA-Based Personalized Cancer Vaccines with KEYTRUDA® (pembrolizumab) for the Treatment of Multiple Types of Cancer," June 29, 2016, *available at* https://investors.modernatx.com/news/news-details/2016/Merck-and-Moderna-Announce-Strategic-Collaboration-to-Advance-Novel-mRNA-Based-Personalized-Cancer-Vaccines-with-KEYTRUDA-pembrolizumab-for-the-Treatment-of-Multiple-Types-of-Cancer/default.aspx.

[2682] "Moderna Announces an Array of Clinical Advances and Outlines 2018 Priorities; 19 Development Candidates, including 10 Clinical Programs, Highlight Productivity of mRNA Platform ," January 18, 2018, *available at* https://investors.modernatx.com/news/news-details/2018/Moderna-Announces-an-Array-of-Clinical-Advances-and-Outlines-2018-Priorities-19-Development-Candidates-including-10-Clinical-Programs-Highlight-Productivity-of-mRNA-Platform/default.aspx.  *See also* MRNA-GEN-00456830-7189, at 7003 (mRNA-4157 – the IND was submitted May 12, 2017; first patient was dosed November 13, 2017).

[2683] MRNA-GEN-00456830-7189 ("Amended And Restated mRNA Cancer Vaccine Collaboration And License Agreement by and between ModernaTX, Inc. and Merck Sharp & Dohme Corp., April 17, 2018").

[2684] "Expansion Includes the Joint Development of Moderna's KRAS Oncogene Program and Other Potential mRNA Cancer Vaccines; Merck to Make Equity Investment in Moderna," May 3, 2018, *available at* https://www.merck.com/news/moderna-and-merck-expand-mrna-cancer-vaccines-collaboration/.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Moderna was responsible for manufacturing mRNA-5671 (PCV Program) for clinical trials, while Merck was responsible for conducting Phase 1 and Phase 2 clinical trials.[2685]

1048.   Under the 2018 Moderna-Merck PCV/SAV Collaboration, both parties granted each other worldwide, exclusive licenses with respect to research and manufacturing.[2686]

1049.   The economic terms of this collaboration included the following:



[2691]

---

[2685] "Expansion Includes the Joint Development of Moderna's KRAS Oncogene Program and Other Potential mRNA Cancer Vaccines; Merck to Make Equity Investment in Moderna," May 3, 2018, *available at* https://www.merck.com/news/moderna-and-merck-expand-mrna-cancer-vaccines-collaboration/. *See also,* Moderna Form 10-K for the fiscal year ended December 31, 2018, p. 126 *available at* https://s29.q4cdn.com/435878511/files/doc_financials/2018/ar/Chasen-Richter-Moderna-Annual-Report-2018.pdf.

[2686] MRNA-GEN-00456830-7189 at 6956-59("Amended And Restated mRNA Cancer Vaccine Collaboration And License Agreement by and between ModernaTX, Inc. and Merck Sharp & Dohme Corp., April 17, 2018").

[2687] MRNA-GEN-00456830-7189, at 6952 ("Amended And Restated mRNA Cancer Vaccine Collaboration And License Agreement by and between ModernaTX, Inc. and Merck Sharp & Dohme Corp., April 17, 2018").

[2688] MRNA-GEN-00456830-7189, at 6953 ("Amended And Restated mRNA Cancer Vaccine Collaboration And License Agreement by and between ModernaTX, Inc. and Merck Sharp & Dohme Corp., April 17, 2018").

[2689] MRNA-GEN-00456830-7189, at 6953 ("Amended And Restated mRNA Cancer Vaccine Collaboration And License Agreement by and between ModernaTX, Inc. and Merck Sharp & Dohme Corp., April 17, 2018").

[2690] MRNA-GEN-00456830-7189, at 6953 ("Amended And Restated mRNA Cancer Vaccine Collaboration And License Agreement by and between ModernaTX, Inc. and Merck Sharp & Dohme Corp., April 17, 2018").

[2691] MRNA-GEN-00456830-7189, at 7046 ("Amended And Restated mRNA Cancer Vaccine Collaboration And License Agreement by and between ModernaTX, Inc. and Merck Sharp & Dohme Corp., April 17, 2018").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

- Merck made an equity investment of $125 million in Moderna.[2692]

1050.  In February 2022, Merck decided to end its participation with respect to mRNA-5671.[2693]  Later the same year, in September 2022, Merck exercised its option to participate in further development and commercialization of PCV mRNA-4157 and paid Moderna $250 million.[2694]

### (ii)    Technical Comparability

1051.  I understand that both the Merck cancer collaboration and the hypothetical license entail use of the same mRNA LNP.

1052.  I understand that both the Merck cancer collaboration and the hypothetical license entail use of the same mRNA LNP.[2695]  I understand that Genevant's technical expert, Dr. Mitchell, opined that "the cancer vaccine product whose development is the subject of this collaboration agreement is technically comparable to the Accused Product insofar as it relates to the delivery—via LNP technology—of the mRNA to the relevant target.  MRNA-GEN-00456830 at -7010.  In my opinion, the LNP technology performs the same general function in the products used to treat cancer, as contemplated by the agreement, as in a vaccine such as the Accused Product, and is technically comparable to the Patents-in-Suit." [2696]

1053.  I also understand that Dr. Mitchell opined about the patents licensed in the Merck cancer collaboration, concluding "that although Moderna's Background Patents are mostly directed to mRNA technology, there are a smaller number of patent applications directed to LNP technology, such as ███████████████████████████████████████ ███████████████████████████████████).  MRNA-GEN-00456830 at -985-

---

[2692] Moderna Form 10-K for the fiscal year ended December 31, 2018, p. 126 *available at* https://s29.q4cdn.com/435878511/files/doc_financials/2018/ar/Chasen-Richter-Moderna-Annual-Report-2018.pdf.

[2693] Nick Paul Taylor, "Merck cuts ties to Moderna's early-phase KRAS vaccine, leaving mRNA specialist to mull next steps," *Fierce Biotech*, February 24, 2022, a*vailable at* https://www.fiercebiotech.com/biotech/merck-cuts-ties-modernas-early-phase-kras-vaccine-leaving-mrna-specialist-mull-next-steps.

[2694] "Merck and Moderna Announce Exercise of Option by Merck for Joint Development and Commercialization of Investigational Personalized Cancer Vaccine," October 12, 2022, *available at* https://www.merck.com/news/merck-and-moderna-announce-exercise-of-option-by-merck-for-joint-development-and-commercialization-of-investigational-personalized-cancer-vaccine/.

[2695] Mitchell Report XIX.

[2696] Mitchell Report XIX.

741

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

986, -7145-146. For that reason, the portfolio of licensed technology as a whole is at least minimally technically comparable to the Patents-in-Suit." [2697]

1054. I also understand that Dr. Mitchell opined about the patents licensed in the Merck cancer collaboration, concluding "that although Moderna's Background Patents are mostly directed to mRNA technology, there are a smaller number of patent applications directed to LNP technology, such as ██████████████████████████████████████████████ ██████████████████████████████████ ). MRNA-GEN-00456830 at -985-986, -7145-146. For that reason, the portfolio of licensed technology as a whole is at least minimally technically comparable to the Patents-in-Suit."[2698]

### (iii)  Economic Comparability

1055. There are certain similarities and differences between the April 2018 Moderna-Merck PCV/SAV Collaboration Agreement and the hypothetical license in this case, which I have considered. The *similarities* include the following:

a) **Stage of Corporate Development**: At the time of the Moderna-Merck agreement in April 2018 and also at the time of May 31, 2020 hypothetical negotiation, Moderna was still a clinical development-stage company and did not yet have a commercial product.

b) **Stage of Technology Development:** By April 2015, Tekmira's LNP was recognized as the "gold standard" that enabled mRNA products. The April 2018 Moderna-Merck agreement was just months before the August 2018 FDA approval of Alnylam's Onpattro®. At the time of the May 31, 2020 hypothetical negotiation, Genevant/Arbutus LNP technology was recognized as "the gold standard" and was in use in a commercial product.

c) **Stage of Product Development:** While both products were in development as of the date of the respective agreements, mRNA-1273 was the subject of a very accelerated product development at the time of the May 31, 2020 hypothetical negotiation.

d) **Relationship between the parties**: The Moderna-Merck relationship is a collaboration. In contrast, the Genevant-Moderna hypothetical license would be a naked patent license. However, there are similarities insofar as Moderna, the licensor, was responsible for the mRNA technology while Merck was responsible for commercialization of the product. Similarly, in the hypothetical license, Arbutus would provide the LNP technology that Gevevant would use in the commercialization of the Accused Product.

1056. The *differences* include the following:

---

[2697] Mitchell Report XIX.
[2698] November 25, 2024 Expert Report of Dr. Michael Mitchell, Section XIX.

742

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

a) **Product Category**:  The April 2018 Moderna-Merck agreement relates to cancer products whereas the May 31, 2020 hypothetical license relates to mRNA-1273, an infectious disease product.  I understand that both products use LNP as the delivery technology.

### (iv)    Opinion

1057.   This agreement provides insight regarding the "value-split" in the hypothetical license.  Beginning in or about 2016, Moderna claimed that its mRNA technology was proven and as a result, it was no longer limited to royalties and instead could now command ▮▮▮▮▮▮▮▮▮▮▮ in its license agreements.  Mr. Francis testified that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[2699]  In the case of mRNA-4157, the Moderna-Merck agreement includes a ▮▮▮▮▮▮ ▮▮▮▮▮▮.

1058.   The April 2018 Moderna-Merck agreement shows Moderna did, in fact, negotiate a license agreement that included a ▮▮▮▮▮▮▮▮▮.  In view of the importance of Genevant's LNP technology, which by 2015 were recognized as proven technology and the "gold standard" in LNPs, and the importance of the Patents-in-Suit, the parties would consider a payment structure that would include profit sharing with the level of profit sharing adjusted to account for both the value of Genevant's technology and the absence of ongoing development work..

### (b)    January 2016 AstraZeneca Cancer Collaboration (IL-12)

1059.   In January 2016, Moderna and AstraZeneca entered into the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[2700]  Moderna reported that the collaboration related to "an immune-oncology program focused on the intratumoral delivery of a potential mRNA

---



[2699] MRNA-GEN-01726934-7000, at 972-973 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 156:10-157:1 ("Q. You would agree that it is standard practice in the pharmaceutical industry to license technology for royalties without profit sharing arrangements, correct? . . . A. Every deal is different.  Certain deals are structured as profit splits. As you see **in our history from 2016 onwards, a lot of our partnerships that we entered and license agreement that we entered were around** ▮▮▮▮▮▮▮.  Sometimes you can have a royalty that essentially is in lieu of a profit split that essentially inure to the same amount.  So different deals are different, but I wouldn't agree with the statement as you described it." (emphasis added)).

[2700] MRNA-GEN-00458197-388 at 8202 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

743

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

medicine to make the IL-12 protein."[2701]   In this collaboration, Moderna was to lead both preclinical and clinical development.[2702]   In August 2022, AstraZeneca terminated this collaboration.[2703]

**(i)     Background**

1060.  Under the 2016 Moderna-AZ Cancer Collaboration, Moderna was responsible for preclinical development and manufacturing for clinical development, and AstraZeneca was responsible for clinical development, with both parties funding the costs of the development.[2704]

1061.  [2705]

1062.  [2706]   The economic terms of the agreement included the following:

---

[2701] Moderna Form 10-K for the fiscal year ended December 31, 2018, p. 122 *available at* https://s29.q4cdn.com/435878511/files/doc_financials/2018/ar/Chasen-Richter-Moderna-Annual-Report-2018.pdf.

[2702] "AstraZeneca and Moderna Therapeutics announce new collaboration to co-develop and co-commercialise immuno-oncology mRNA therapeutics™," January 11, 2016, *available at* https://www.astrazeneca.com/media-centre/press-releases/2016/AstraZeneca-and-Moderna-Therapeutics-announce-new-collaboration-to-co-develop-and-co-commercialise-immuno-oncology-mRNA-therapeutics-11012016.html#.

[2703] Mark Terry, "Moderna Loses AstraZeneca's Support in IL-12 Program; Must Defend Arbutus Suit," *Fierce Biotech*, November 3, 2022, *available at* https://www.biospace.com/moderna-cuts-autoimmune-program-in-q3-announcement-astrazeneca-returns-cancer-program.

[2704] Moderna Form 10-K for the fiscal year ended December 31, 2018, p. 122 *available at* https://s29.q4cdn.com/435878511/files/doc_financials/2018/ar/Chasen-Richter-Moderna-Annual-Report-2018.pdf.

[2705] MRNA-GEN-00458197-388 at 8283-84 ("Strategic Drug Development Collaboration And License Agreement by and between Moderna Therapeutics, Inc. And AstraZeneca Pharmaceuticals Limited Partnership and AstraZeneca AB dated January 11, 2016").

[2706] MRNA-GEN-00458197-388 at 8264 ("Strategic Drug Development Collaboration And License Agreement by and between Moderna Therapeutics, Inc. And AstraZeneca Pharmaceuticals Limited Partnership and AstraZeneca AB dated January 11, 2016").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



### (ii)    Technical Comparability

1063. I understand that Genevant's technical expert, Dr. Mitchell, opined based on his review of the 2016 Moderna AZ Cancer Collaboration "that the cancer vaccine product whose development is the subject of this collaboration agreement is technically comparable to the Accused Product insofar as it relates to the delivery—via LNP technology—of the mRNA to relevant target. See MRNA-GEN-00458197 at -8330; -8333-334; -8343. In my opinion, the LNP technology performs the same general function in the products used to treat a range of cancers, as contemplated by the agreement, as in a vaccine such as the Accused Product and is technically comparable to the Patents-in-Suit."[2710]

### (iii)    Economic Comparability

1064. There are certain similarities and differences between the January 2016 Moderna-AZ Cancer Collaboration Agreement and the hypothetical license in this case, which I have considered. The *similarities* include the following:

   a) **Stage of Corporate Development**: At the time of the Moderna-AZ agreement in January 2016 and also at the time of May 31, 2020 hypothetical negotiation, Moderna was still a clinical development-stage company and did not yet have a commercial product.

   b) **Stage of Technology Development:** By April 2015, Tekmira's LNP was recognized as the "gold standard" that enabled mRNA products. The January 2016 Moderna-AZ

---

[2707] MRNA-GEN-00458197-388 at 8276 ("Strategic Drug Development Collaboration And License Agreement by and between Moderna Therapeutics, Inc. And AstraZeneca Pharmaceuticals Limited Partnership and AstraZeneca AB dated January 11, 2016").

[2708] MRNA-GEN-00458197-388 at 8274-75 ("Strategic Drug Development Collaboration And License Agreement by and between Moderna Therapeutics, Inc. And AstraZeneca Pharmaceuticals Limited Partnership and AstraZeneca AB dated January 11, 2016").

[2709] MRNA-GEN-00458197-388 at 8277 ("Strategic Drug Development Collaboration And License Agreement by and between Moderna Therapeutics, Inc. And AstraZeneca Pharmaceuticals Limited Partnership and AstraZeneca AB dated January 11, 2016").

[2710] November 25, 2024 Expert Report of Dr. Michael Mitchell, Section XIX.

745

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

agreement was more than two years before the August 2018 FDA approval of Alnylam's Onpattro®. At the time of the May 31, 2020 hypothetical negotiation, Genevant/Arbutus LNP technology was recognized as "the gold standard" and was in use in a commercial product.

c) **Stage of Product Development:** While both products were in development as of the date of the respective agreements, mRNA-1273 was the subject of a very accelerated product development at the time of the May 31, 2020 hypothetical negotiation.

d) **Relationship between the parties**: The Moderna-AZ relationship is a collaboration. In contrast, the Genevant-Moderna hypothetical license would be a naked patent license. However, there are similarities insofar as Moderna, the licensor, was responsible for the mRNA technology while AZ was responsible for clinical testing. Similarly, in the hypothetical license, Genevant would provide the LNP technology that Moderna would use in the commercialization of the Accused Product.

1065. The *differences* include the following:

a) **Product Category**: The January 2016 Moderna-AZ agreement relates to cancer products whereas the May 31, 2020 hypothetical license relates to mRNA-1273, an infectious disease product. I understand that both products use LNP as the delivery technology.

### (iv)    Opinion

1066. This agreement provides insight regarding the "value-split" in the hypothetical license. Beginning in or about 2016, Moderna claimed that its mRNA technology was proven and as a result, it was no longer limited to royalties and instead could now command ▮▮▮▮▮▮ terms in its license agreements. Mr. Francis testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ "[2711] In the case of IL-12, the Moderna-AZ agreement ▮▮▮▮▮▮▮▮▮▮ term for the U.S. market.

1067. The January 2016 Moderna-AZ agreement shows Moderna did, in fact, negotiate a license agreement that included a ▮▮▮▮▮▮ term for sales in the U.S. In view of the importance



---

[2711] MRNA-GEN-01726934-7000, at 972-973 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 156:10-157:1 ("Q. You would agree that it is standard practice in the pharmaceutical industry to license technology for royalties without profit sharing arrangements, correct? . . . A. Every deal is different. Certain deals are structured as profit splits. As you see **in our history from 2016 onwards, a lot of our partnerships that we entered and license agreement that we entered were around** ▮▮▮▮▮▮. Sometimes you can have a royalty that essentially is in lieu of a profit split that essentially inure to the same amount. So different deals are different, but I wouldn't agree with the statement as you described it." (emphasis added)).

746

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

of Genevant's LNP technology, which by 2015 were recognized as proven technology and the "gold standard" in LNPs, and the importance of the Patents-in-Suit, the parties would consider a payment structure that would include profit sharing, with the level of profit sharing adjusted to account for both the value of Genevant's technology and the absence of ongoing development work.. .

### (c) October 2017 AstraZeneca Systemic Secreted Therapeutics Collaboration (Relaxin)

1068. On October 31, 2017, Moderna and AstraZeneca entered into a ███████████ ████████████████████████████████████████████████████████ ████████████.[2712]  On November 1, 2017, Moderna announced its strategic collaboration with AstraZeneca for a "new Relaxin development candidate, AZD7970, toward the clinic as an investigational treatment for heart failure."[2713]  In December 2020, the parties mutually decided to terminate the agreement, with Moderna retaining rights to further development.[2714]  As of August 2024, Moderna's pipeline still included Relaxin.[2715]

### (i) Background

1069. The 2017 Moderna-AZ Relaxin Collaboration and the earlier 2016 Moderna-AZ Cancer Collaboration included certain terms, such as the development and commercialization responsibilities, that were similar.

---

[2712] MRNA-GEN-00457628-7810, at 7633 ████████████████████████████ ████████████████████████████████████████████████ ██████████████

[2713] "Moderna Announces New Collaboration with AstraZeneca to Co-Develop and Co-Commercialize Relaxin mRNA Therapeutic for Heart Failure," November 1, 2017, *available at* https://investors.modernatx.com/news/news-details/2017/Moderna-Announces-New-Collaboration-with-AstraZeneca-to-Co-Develop-and-Co-Commercialize-Relaxin-mRNA-Therapeutic-for-Heart-Failure/default.aspx.

[2714] Moderna Form 10-K for the fiscal year ended December 31, 2020, at p. 78, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/e5c3ab36-8ef0-4943-9d47-5eb4baeef930.pdf.

[2715] "Second Quarter 2024 Financial Results, August 1, 2024," at Slide 36, Moderna presentation as part of its Q220204 earnings call, *available at* https://s29.q4cdn.com/435878511/files/doc_earnings/2024/q2/presentation/Moderna-2Q24-Earnings-Presentation-Final.pdf.

747

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1070. Pursuant to the 2017 Moderna-AZ Relaxin Collaboration, in the U.S., Moderna and AstraZeneca would jointly commercialize and split operating profits or losses equally.[2716] In contrast, outside the U.S.,  .[2717]

.[2718]

### (ii)    Technical Comparability

1071. I understand that Genevant's technical expert, Dr. Mitchell, opined based on his review of the 2017 Moderna AZ Relaxin Collaboration concluded "that the heart failure treatment via relaxin whose development is the subject of this collaboration agreement is technically comparable to the Accused Product insofar as it relates to the delivery—via LNP technology—of the mRNA to relevant target.   MRNA-GEN-00457628 at -756-757.   In my opinion, the LNP technology performs the same general function in the products used to treat heart failure, as contemplated by the agreement, as in a vaccine such as the Accused Product and is technically comparable to the Patents-in-Suit."[2719]

### (iii)    Economic Comparability

1072. There are certain similarities and differences between the January 2016 Moderna-AZ Cancer Collaboration Agreement and the hypothetical license in this case, which I have considered.  The *similarities* include the following:

   a) **Stage of Corporate Development**: At the time of the Moderna-AZ agreement in October 2017 and also at the time of May 31, 2020 hypothetical negotiation, Moderna was still a clinical development-stage company but did not yet have a commercial product.

   b) **Stage of Technology Development:**  By April 2015, Tekmira's LNP was recognized as the "gold standard" that enabled mRNA products.  The October 2017 Moderna-AZ agreement was less than a year before the August 2018 FDA approval of Alnylam's



[2719] November 25, 2024 Expert Report of Dr. Michael Mitchell, Section XIX

748

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Onpattro®.  At the time of the May 31, 2020 hypothetical negotiation, Genevant/Arbutus LNP technology was recognized as "the gold standard" and was in use in a commercial product.

c) **Stage of Product Development:** While both products were in development as of the date of the respective agreements, mRNA-1273 was the subject of a very accelerated product development at the time of the May 31, 2020 hypothetical negotiation.

d) **Relationship between the parties**: The Moderna-AZ relationship is a collaboration.  In contrast, the Genevant-Moderna hypothetical license would be a naked patent license.  However, there are similarities insofar as Moderna, the licensor, was responsible for the mRNA technology while AZ was responsible for clinical testing.  Similarly, in the hypothetical license, Genevant would provide the LNP technology that Moderna would use in the commercialization of the Accused Product.

1073.  The *differences* include the following:

a) **Product Category**:  The October 2017 Moderna-AZ agreement relates treatments for cardiovascular disease whereas the May 31, 2020 hypothetical license relates to mRNA-1273, an infectious disease product.  I understand that both products use LNP as the delivery technology.

### (iv)    Opinion

1074.  This agreement provides insight regarding the "value-split" in the hypothetical license.  Beginning in or about 2016, Moderna claimed that its mRNA technology was proven and as a result, it was no longer limited to royalties and instead could now ███████████████ terms in its license agreements. Mr. Francis testified that ███████████████████████████████████████████████████████████████████ ████."[2720] In the case of Relaxin, the Moderna-AZ agreement ██████████████████ term for the U.S. market.

1075.  The October 2017 Moderna-AZ agreement shows Moderna did, in fact, negotiate a license agreement that included a ██████████████ term for sales in the U.S.  In view of the importance

---

[2720] MRNA-GEN-01726934-7000, at 972-973 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 156:10-157:1 ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ (emphasis added)).

749

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

of Genevant's LNP technology, which by 2015 was recognized as proven technology and the "gold standard" in LNPs, and the importance of the Patents-in-Suit, the parties would consider a payment structure that would include profit sharing, with the level of profit sharing adjusted to account for both the value of Genevant's technology and the absence of ongoing development work..

### (d)    June 2017 Cellscript -Moderna Sublicense Agreement

1076. On June 26, 2017, Moderna executed a Patent Sublicense Agreement with Cellscript ("2017 Cellscript-Moderna Sublicense") relating to "███████████████████████████████ ████████████████████████████████████."[2721]

1077. Moderna's interrogatory responses, identify the 2017 Cellscript-Moderna Sublicense as "potentially relevant and informative to the determination of damages in this action."[2722] It is my opinion that this agreement does not provide insight and is not informative to the determination of damages in this case because it is neither technically nor economically comparable.

### (i)    Background

1078. Moderna's 2018 10-K described the background of the agreement as follows:

> The Trustees of the University of Pennsylvania, or Penn, owns ten issued U.S. patents and three pending U.S. patent applications directed, in part, to nucleoside-modified mRNAs and their uses, or the Penn Modified mRNA Patents. mRNA RiboTherapeutics, Inc., or MRT, obtained an exclusive license to the Penn Modified mRNA Patents and granted its affiliate, Cellscript, LLC, or Cellscript, a sublicense to the Penn Modified mRNA Patents in certain fields of use.

> In June 2017, we entered into two sublicense agreements, one with Cellscript, and one with MRT, which agreements we collectively refer to as the Cellscript-MRT Agreements. Together, the Cellscript-MRT Agreements grant us a worldwide, sublicensable sublicense to the Penn Modified mRNA Patents to research, develop, make, and commercialize products covered by the Penn Modified mRNA Patents, or licensed products, for all in vivo uses in humans and animals, including therapeutic, prophylactic, and diagnostic applications. The Cellscript-MRT Agreements are non-exclusive, although Cellscript and MRT are subject to certain

---

[2721] MRNA-GEN-00457584-7627, at 7584 ███████████████████████ ████████████████.

[2722] Defendants' Corrected Sixteenth Supplemental Objections And Responses to Plaintiffs' First Set Of Interrogatories (Nos. 1-10) dated July 15, 2024, No. 8, at p. 113.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## V.    THE IMPACT OF MODERNA's ALLEGED INFRINGEMENT ON ARBUTUS AND GENEVANT

1118.    "In determining the *measure* by which infringement damages are to be assessed, it is necessary to first characterize the manner in which the plaintiff used its patent rights."[2781]    This requires evaluation of "the use made of his patent privilege by the plaintiff," and "the effect produced upon the value of such use by the wrongful acts of the defendant," as outlined in the following:

> Commercialization of a patented invention can be accomplished by the patentee either (1) itself making, using or selling an embodiment of the invention or (2) licensing others to do so.  Seymour, 57 U.S. (16 How.) at 489-90.  Calculation of actual 'damages' depended upon which of those two modes the patentee chose to secure the financial benefits from its invention.  See *McCormick v. Seymour*, 15 F.Cas. 1329, 1335 (No. 8727) (C.C.N.D.N.Y. 1854) (on remand).  'Hence the first point on which proof should be offered in reference to actual damages is the use made of his patent privilege by the plaintiff; the second is the effect produced upon the value of such use by the wrongful acts of the defendant.'  3 Robinson § 1054 at 324.  Evidence is not admissible of losses over the amount the patentee would have cleared by working or licensing the invention.  § 1061 at 339.  *Carter v. Baker*, 5 F.Cas. 195, 201-02 (No. 2,472) (C.C.D.Cal. 1871).  As stated in 3 Robinson § 898 at 56, respecting damages awards:
>
>> The interest of the patentee is represented by the emoluments which he could or does or might receive from the practice of the invention by himself or others.  Hence acts of infringement must attack the right of the patentee to those emoluments.[2782]

1119.    An operating company's patents fall into "one of three categories: (1) core patents [for creating a competitive advantage], (2) peripheral patents [for IP defensive purposes], and (3) orphan patents [as a vehicle for alternative value generation]."[2783]  "Core patents" are a company's "crown jewels" and may be the most valuable patents.

1120.    Technology companies must "receive [their] full fair value for the investment in innovation" which Joe Beyers, Hewlett-Packard's Vice President for IP Strategy stated as follows:

---

[2781] *Saf-Gard Products, Inc. v. Service Parts*, Inc., 491 F.Supp. 996, 1007 (D. Ariz. 1980).

[2782] *Rite-Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1564 (Fed. Cir. 1995).

[2783] Ronald J. Schutz, "It Takes More Than Being Right to Win a Patent Dispute," in Bruce Berman, Ed., *Making Innovation Pay, People Who Turn IP into Shareholder Value,* (Hoboken, NJ: John Wiley & Sons, Inc., 2006), p. 147, *available at* https://epdf.pub/making-innovation-pay-people-who-turn-ip-into-shareholder-value.html.  Joe Beyers, "Managing Innovation Assets as Business Assets," *in* Bruce Berman, Ed., *Making Innovation Pay, People Who Turn IP into Shareholder Value,* (Hoboken, NJ: John Wiley & Sons, Inc., 2006), p. 162, *available at* https://epdf.pub/making-innovation-pay-people-who-turn-ip-into-shareholder-value.html.

769

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

In today's competitive business environment, operating companies need to develop products and services that provide unique differentiating value. Businesses also need to defend against potential threats to their well-being. Innovation is essential to maintain a competitive advantage. Without it, most companies are doomed.

However, the investment required to create meaningful differentiation—billions of dollars annually for some large technology-based companies—is not sustainable if a business does not understand and receive its full fair value for the investment in innovation. Value comes first from the sale of its products and services, but also through licensing of its intellectual property to other companies, sometimes even competitors. Licensing IP can be achieved in two ways: either (1) by encouraging new use of this IP by other companies for an appropriate fee (so-called carrot licensing) or (2) by obtaining fair compensation from other companies for its unauthorized use (stick licensing).

Either way, it is a strategic imperative to properly protect the company's IP and to maximize its overall return on investment in innovation. Failure to do so is a failure of the management team and the board to execute their fiduciary responsibilities to the company's shareholders.[2784]

1121. Damages are "extremely important"[2785] and companies "need to be able to enforce [their] patents and get the proper remedies for [their] patents."[2786] During a May 4, 2009 FTC hearing, Earle Thompson explained why damages that are adequate to compensate for the infringement are necessary to protect innovation:

[If there are greater limits on damages] What you really will shut down is the entire innovation, because there is no reason to invest in the R&D. Become a free rider on somebody else's investment and just build the end product. But, otherwise, there's no reason for me to go spend the money. I'll go live off him over there.

And eventually when everybody lives off the next guy, nobody is inventing anything. And you will have the occasional one, just because they think it's a good

---

[2784] Joe Beyers, "Managing Innovation Assets as Business Assets," *in* Bruce Berman, Ed., *Making Innovation Pay, People Who Turn IP into Shareholder Value,* (Hoboken, NJ: John Wiley & Sons, Inc., 2006), p. 162, *available at* https://epdf.pub/making-innovation-pay-people-who-turn-ip-into-shareholder-value.html.

[2785] *See, e.g.,* "The Evolving IP Marketplace – The Operation of IP Markets," *Federal Trade Commission,* May 4, 2009 Tr., 81:7-81:8, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090504transcript.pdf (Earl (Eb) Bright, General Counsel and Vice President, Intellectual Property, ExploraMed).

[2786] *See, e.g.,* "Hearing On: The Evolving IP Marketplace," *Federal Trade Commission,* February 11, 2009 Tr., 178:11-178:12, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090211transcript.pdf (Gary H. Loeb, Vice President, Intellectual Property, Genentech).

770

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

idea, they'll go and invest in it, but then everybody steals their idea.  So it's not a very good thing to really put sharp limits [on damages].[2787]

### A.    "The Use Made of the Patent Privilege" by the Patentee

1122.  As noted above, "the first point on which proof should be offered . . . is the use made of his patent privilege by the plaintiff."[2788]  In this case, by the time of the hypothetical negotiation, Genevant primarily sought to exploit its patented technology in the mRNA market through licensing its technology to collaborators. As discussed above, in or about July 31, 2020, Genevant "set off on a different business model than [it] had been running previously,"[2789] and began "to focus on partnering, collaborating, licensing its delivery technology to third parties."[2790]

1123.  Through decades of work and investment, Genevant and Arbutus' management had positioned the companies to capitalize on this opportunity, however, Moderna's alleged infringement adversely impacted Plaintiffs' collaborators.  For example, Mr. Zorn testified: "some of our partners have experienced commercial challenges as a result of the head start that Moderna [] had,"[2791] which he described as follows: "Moderna's [] ability to use our technology allowed them to get to market more quickly than those companies that went through a process with us to secure licenses to our technology."[2792]  Mr. Zorn testified regarding the commercial challenges faced by its collaborators as follows:

> A couple of the part- -- collaborators that I just mentioned have concluded their COVID-19 programs, despite encouraging data, citing a couple of things: The change in the commercial environment, i.e., the demand in light of, you know, the head start that Moderna and Pfizer have had to reach those people, and then the challenges in doing clinical trials because of how many people have now been vaccinated worldwide, which increases the cost and time to do a clinical trial, which increases the cost of a program, which affects the commercial business case.[2793]

---

[2787] "The Evolving IP Marketplace – The Operation of IP Markets," *Federal Trade Commission,* May 4, 2009 Tr., 171:15-172:2, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090504transcript.pdf (Earle Thompson, Chief Intellectual Property Counsel at SanDisk).

[2788] *Rite-Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1564 (Fed. Cir. 1995).

[2789] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 229:15-229:17.

[2790] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 230:13-230:15.  November 21, 2024 Interview of Pete Zorn.

[2791] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 76:18-76:20.

[2792] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 77:22-78:1.

[2793] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 77:8-77:20.

771

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

. . .

[The number of people that had been vaccinated already] [m]akes it harder to find naïve patients and test your product.[2794]

1124. As discussed above, by 2019, Moderna recognized Genevant as a competitor in the mRNA industry. *See* II.E.2. In addition, years earlier, in April 2015, Moderna had advised its board that "Tekmira had a validated LNP formulation that are in the clinic that serve as the RNA industry gold standard."[2795] Moderna has acknowledged that its early work used the Tekmira "gold standard," and when it bet the company on the COVID-19 opportunity on an very accelerated development schedule, it again turned to Tekmira's "gold standard"—as evidenced by Moderna's repeated use of Plaintiffs' technology, as described above in Section II.A, and the disclosure in the June 10, 2020 Moderna-NIH pre-print,[2796] among other evidence.

---

[2794] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 78:13-78:14. *See also* 78:18-79:1 ("Q. Well, so you mentioned that it was difficult to have clinical trials because of how many people were already vaccinated worldwide. But I'm asking, is it a utility to have more people vaccinated for COVID-19 than not? A. I supposed it depends on your perspective. As a world citizen, yes. If I'm trying to develop a COVID-19 vaccine and need to do clinical trials, in that context, I guess I would say no.").

[2795] MRNA-GEN-01240180-198, at 190 (Francis Deposition Exhibit No. 27 – "Business Development Update – Moderna Investment Committee Discussion," *Moderna,* April 9, 2015, Slide 11 of 19) ("Tekmira – an RNA and LNP company") (emphasis added). *See also* 191 (Slide 12: "Tekmira ( -2014) – an RNA and LNP company . . . Tekmira's LNP Enable mRNA Products . . . mRNA require intracellular delivery for activity[;] LNP is the GOLD STANDARD for mRNA delivery" (emphasis in original)). May 22, 2024 30(b)(6) Deposition of Said E. Francis, 195:4-195:9 ("Q. You wrote in a slide [Slide 11 of 19] to a subcommittee of Moderna's board that Tekmira had a validated LNP formulation that are in the clinic that serve as the RNA industry gold standard, did you not? A. Those are the words on the slides.").

[2796] *See* Kizzmekia S. Corbett, Darin Edwards, Sarah R. Leist, Olubukola M. Abiona, Seyhan Boyoglu-Barnum, Rebecca A. Gillespie, Sunny Himansu, Alexander Schafer, Cynthia T. Ziwawo, Anthony T. DiPiazza, Kenneth H. Dinnon, Sayda M. Elbashir, Christine A. Shaw, Angela Woods, Ethan J. Fritch, David R. Martinez, Kevin W. Bock, Mahnaz Minai, Bianca M. Nagata, Geoggrey B. Hutchinson, Kapil Bahl, Dario Garci-Dominguez, LingZhi Ma, Isabella Renzi, Wing-Pui Kong, Stephen D. Schmidt, Lingshu Wang, Yi Zhang, Laura J. Stevens, Emily Phung, Lauren A. Chang, Rebecca J. Loomis, Nedim Emil Altaras, Elisabeth Narayanan, Mihir Metkar, Vlad Presnyak, Catherine Liu, Mark K. Louder, Wei Shi, Kwanyee Leung, Eun Sung Yang, Ande West, Kendra L. Gully, Nianshuang Wang, Daniel Wrapp, Nicole A. Doria-Rose, Guillaume Steward-Jones, Hamilton Bennett, Martha C. Nason, Tracy J. Ruckwardt, Jason S. McLellan, Mark R. Denison, James D. Chappell, Ian N. Moore, Kaitlyn M. Morabito, John R. Mascola, Ralph S. Baric, Andrea Carfi, Barney S. Graham, "SARS-CoV-2 mRNA Vaccine Development Enabled by Prototype Pathogen Preparedness," *bioRxiv* preprint, June 11, 2020, *available at* https://www.biorxiv.org/content/10.1101/2020.06.11.145920v1.full.pdf.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**B.    Moderna's** Alleged Use of the Patents-in-Suit

1125. Before May 31, 2020, Moderna had concluded that Genevant's patented formulation was "close to optimal for mRNA" and that LNP was the "gold standard" for mRNA.[2797]  In April 2021, Peter Zorn advised Moderna's Neal Dahiya, Moderna's SVP, Head of Litigation from January 2021 to July 2022,[2798] of the "substantial contributions of [Arbutus's] patented technology" and claimed that "enormous value [] ha[d] accrued to Moderna upon using the technology in those and other claims in its COVID-19 vaccine[.]"[2799]

1126. Plaintiffs allege that Moderna has made extensive use of the claimed invention of the Patents-in-Suit.  Mr. Zorn testified:

> From the time that I joined Genevant at the beginning of 2019, it was widely understood within the company that Moderna was working with our technology. My understanding of that was based on publications that Moderna had made.  And I think that also included patent applications or patents – I'm not sure which – showing the use of our technology.
>
> So that was the environment.  And then Moderna challenged three of our patents, which was – in IPR proceedings in the U.S., which seemed like a pretty good indicator that those patents were a problem for Moderna.
>
> And then there was the preprint [the June 11, 2020 Moderna-NIH preprint referenced in ¶ 45 of the Complaint[2800]] that you mentioned.

---

[2797] MRNA-GEN-01240180-198, at 190 (Francis Deposition Exhibit No. 27 – "Business Development Update – Moderna Investment Committee Discussion," *Moderna,* April 9, 2015, Slide 11 of 19) ("Tekmira – an RNA and LNP company") (emphasis added).  *See also* 191 (Slide 12: "Tekmira (  -2014) – an RNA and LNP company . . . Tekmira's LNP Enable mRNA Products . . . mRNA require intracellular delivery for activity[;] LNP is the GOLD STANDARD for mRNA delivery" (emphasis in original)).  May 22, 2024 30(b)(6) Deposition of Said E. Francis, 195:4-195:9 ("Q. You wrote in a slide [Slide 11 of 19] to a subcommittee of Moderna's board that Tekmira had a validated LNP formulation that are in the clinic that serve as the RNA industry gold standard, did you not?  A. Those are the words on the slides.").

[2798] "Neal Dahiya," *LinkedIn,* n.d., *available at* https://www.linkedin.com/in/neal-dahiya-640b2351/.

[2799] MRNA-GEN-1758810-813, at 811 (Francis Deposition Exhibit No. 37 – April 5, 2021 email from Pete Zorn to Neal Dahiya, Subject: RE: Follow Up).

[2800] *See* Kizzmekia S. Corbett, Darin Edwards, Sarah R. Leist, Olubukola M. Abiona, Seyhan Boyoglu-Barnum, Rebecca A. Gillespie, Sunny Himansu, Alexander Schafer, Cynthia T. Ziwawo, Anthony T. DiPiazza, Kenneth H. Dinnon, Sayda M. Elbashir, Christine A. Shaw, Angela Woods, Ethan J. Fritch, David R. Martinez, Kevin W. Bock, Mahnaz Minai, Bianca M. Nagata, Geoggrey B. Hutchinson, Kapil Bahl, Dario Garci-Dominguez, LingZhi Ma, Isabella Renzi, Wing-Pui Kong, Stephen D. Schmidt, Lingshu Wang, Yi Zhang, Laura J. Stevens, Emily

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

I think all of those things together were reasons.[2801]

1127. Moderna realized valuable benefits as a result of its alleged infringement, which include at least the following:

### 1. Moderna Gained a Head Start

1128. Because Moderna had not **"Fix[ed] backward risk balance . . . LNP/Abus . . ."**[2802] by obtaining a license from Arbutus earlier, however, it did not have access to the Patents-in-Suit.  Without

---

Phung, Lauren A. Chang, Rebecca J. Loomis, Nedim Emil Altaras, Elisabeth Narayanan, Mihir Metkar, Vlad Presnyak, Catherine Liu, Mark K. Louder, Wei Shi, Kwanyee Leung, Eun Sung Yang, Ande West, Kendra L. Gully, Nianshuang Wang, Daniel Wrapp, Nicole A. Doria-Rose, Guillaume Steward-Jones, Hamilton Bennett, Martha C. Nason, Tracy J. Ruckwardt, Jason S. McLellan, Mark R. Denison, James D. Chappell, Ian N. Moore, Kaitlyn M. Morabito, John R. Mascola, Ralph S. Baric, Andrea Carfi, Barney S. Graham, "SARS-CoV-2 mRNA Vaccine Development Enabled by Prototype Pathogen Preparedness," *bioRxiv* preprint, June 11, 2020, *available at* https://www.biorxiv.org/content/10.1101/2020.06.11.145920v1.full.pdf.

[2801] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 94:23-95:15.  *See also* 111:16-112:25 ("And how do you know that Moderna is using Genevant's LNP? . . . THE WITNESS: Yeah, I understand that question to be essentially asking the reasons why we filed the lawsuit, and I expressed them earlier.  I'm happy to express them again if you'd like. . . . Q. So is --  your understanding of the fact that Moderna is using Genevant's LNP is informed by public statements that you had discussed earlier that Moderna had made? . . . THE WITNESS: When I cam to Genevant, you know, we – as I said before, it was widely accepted that Moderna was using Genevant technology, based on different publications in various contexts.  And that, in combination with the IPRs and the motivation, the perceived motivation behind the IPRs, as well as the preprint that you referred me to earlier, all those things together would form the basis.").

[2802] MRNA-GEN-01503761 (Hoge Deposition Exhibit No. 31 – December 5, 2017 email from Stephen Hoge to Stephen Hoge) (emphasis added).  May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 320:19-322:18 ("Q. . . . [I]f we could look at number 4 [on Hoge Deposition Exhibit No. 31], it says, 'Fix backward risk balance.' Do you see that?  A. Right.  Q. And then 4.2 underneath that is, 'LNP/Abus.'  That's LNP Arbutus, I assume?  A. Mm-hmm.  Q. And how did you intend to fix the backward risk balance with respect to LNP Arbutus in 2017?  A. It would have to be in the context of our discussions with them, which I think there had been multiple in 2017.  I can't remember whether this is related to – where it is in relation to the litigation between Arbutus and Acuitas in time, but we were obviously aware of that litigation and, as you'd previously covered, had been in discussions with Tekmira that never went anywhere about the possibility of a direct license to some of the patents, intellectual property related to a couple of those products that in 2017 were still under development.  So -- . . . So that's what I would assume I meant by 4.2.  Q. What does it mean to fix the backward risk balance.  A. When I look at the five things underneath there, it's not entirely clear to me.  Reorganizing R&D, biodistribution, Alexion, LNP, UPenn, I mean, they're all very different things, so I'm not exact – it's hard for me to imagine how that covers all of them.  For instance, reorganizing R&D feels like a weird way to characterize, you know, a backward risk balance.  I

774

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

immediate access to the claimed inventions of the Patents-in-Suit, Moderna would lose its head start. Mr. Zorn generally described the factors that enabled Moderna's head start as having two components: a) the time to negotiate a license, which would likely be measured in months,[2803] and b) the more significant component: "the time it would take to develop one's own LNP technology, if one could even do that,"[2804] and explained as follows:

> I don't pretend to know all of the reasons why Moderna and Pfizer got to market when they did relative to other companies. But the ability to use our LNP technology.
>
> And – you know, Moderna had licensed its previously through Acuitas several years earlier, so they had some experience with the technology. That also enabled the head start.[2805]
>
> . . .
>
> I think the head start that I was referring to – I think the – is primarily related to comparing how quickly one could get to market using our technology versus how quickly one could get to market not using our technology, having to develop its own technology.[2806]
>
> . . .
>
> That [the time to negotiate a license agreement] is one piece of the equation. Certainly there is a time component to that. . . . I think the word "head start" is in two different ways, but the – the biggest difference is the difference in time that Moderna and Pfizer were able to get by using Genevant's technology versus if they were not able to use Genevant's technology.[2807]
>
> . . .
>
> But the biggest – the bigger head start, if you will, was the difference between using our LNP versus not using our LNP, not using our LNP not under license versus using our LNP under license, and the time it would have taken to negotiate a license. They're both head starts, but the biggest one is using our LNP versus not using our LNP.[2808]

don't actually know what is meant there. Q. Would filing an IPR fix a backward risk balance if it was successful? A. Possibly, but obviously reorganizing R&D wouldn't.").

[2803] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 101:11-102:14 ("Q. Typically, how long does it take to negotiate a license agreement with Genevant? . . . THE WITNESS: It's widely variable. . . . Q. So fair to say probably in the ballpark of months to finish executing a license agreement with – A. It depends on the complexity and all the things that go into one of those collaborations. But months – if the choice I was given were days, weeks, months, or years, I would say months.").

[2804] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 109:22-109:23.

[2805] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 101:3-101:9.

[2806] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 109:7-109:12.

[2807] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 110:4-110:14.

[2808] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 111:8-111:15.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1129. The testimony of Moderna's witnesses confirms that Moderna's use of Plaintiffs' LNP allowed Moderna to conduct the COVID-19 clinical studies on its accelerated timeline. For example, Don Parsons testified regarding the COVID-19 vaccine trials that:

> "So I mentioned previously that we used the infrastructure that we had developed for the [PCV] product, manufacturing infrastructure and composition, for all of our infectious disease phase 1s. That was the way that we could get rapidly into the clinic because the manufacturing process was highly abbreviated there."[2809]
>
> . . .
>
> "And the point that I was making is that that was our priority, right, pandemic response demanded us to move as quickly as possible into phase 1 studies. But of course we had this other manufacturing process that we expected to move to, we've talked some about that, and that was -- but that was not the priority, right. What we wanted to do was make phase 1 clinical supplies as rapidly as we could."[2810]
>
> "So the most important priority of the company at that time was to participate in pandemic response and keep our clinical trials going, so we made a very nuanced decision, considering the potential regulatory implications, to delay the addition of introduction of 2.5 percent PEG until a future date[]."[2811]

1130. Similarly, Kerry Benenato testified that "When COVID hit, at the time there was zero option for Moderna. SM-102 platform to be able to respond to the pandemic in speed that it did."[2812] In response to the question: "And so did having that clinically validated safe platform allow Moderna to more quickly deploy its COVID vaccine?" Dr. Benenato said: "I would say yes."[2813]

1131. Moreover, as discussed above, Moderna had obtained a benefit by relying on products which had the same molar ratio as the approved product, Onpattro. As discussed above, upon gaining access to Plaintiffs' LNP portfolio, Moderna's President, Dr. Stephen Hoge, said the following: "[A]s of today we have access to a formulation that is safe in Phase 3 in man!"[2814], which was a reference to Alnylam's Phase 3 clinical testing of Onpattro, that used MC3.[2815] The significance of Moderna having access to such a formulation at that time was "[i]t is a formulation that already is at least

---

[2809] June 7, 2024 Deposition of Don Parsons, 119:1-8.

[2810] June 7, 2024 Deposition of Don Parsons, 124:20-127:7, 165:20-166:22.

[2811] June 7, 2024 Deposition of Don Parsons, 448:6-16.

[2812] June 7, 2024 Deposition of Don Parsons 69:2-9.

[2813] June 7, 2024 Deposition of Don Parsons, 70:1-4.

[2814] MRNA-GEN-01754060-064, at 060 (Francis Deposition Exhibit No. 24 – July 3, 2014 email from Stephen Hoge to Executive Committee, cc: Said Francis; Shaun Ryan Orn Almarsson, Matt Stanton, Subject: FW: Acuitas Final Documents).

[2815] May 22, 2024 30(b)(6) Deposition of Said E. Francis, 181:14-182:3.

776

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

understood at the doses Alnylam administered with an RNAi payload[2816] that it is safe.  That's the significance."[2817]

1132. Moderna's extensive reliance on Plaintiffs' technology is described in greater detail above. *See* Section II.A.2.

### 2. Moderna's Head Start Was Extraordinarily Valuable

1133. As discussed above, head starts can be extraordinarily valuable.  *See* IV.B.1.a.1. and IV.B.2.a.2.

1134. Moderna, however, needed to use the claimed inventions of the Patents-in-Suit in order to monetize its valuable head start.

1135. In January 2020, a decade after its founding, Moderna was still an early-stage company,[2818] described as "a barely-known biotechnology company[2819] with an unproven approach.  It wanted to produce messenger RNA molecules to carry instructions into the body, teaching it to ward off disease.  Experts doubted the Boston-based company would meet success. . . . Moderna encountered such difficulties over the course of its eleven-year history that some executives worried it wouldn't survive."[2820]  Dr. Hoge testified that as of the second half of 2020, Moderna

---

[2816] Dr. Murray testified that "payload" is "a general word they use to talk about what we're encapsulating."  *See* May 30, 2024 30(b)(6) Deposition of Mark Murray, Ph.D., 30:24-30:25.

[2817] May 22, 2024 30(b)(6) Deposition of Said E. Francis, 184:2-184:9.

[2818] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 85:20-86:6 ("Q. Okay.  Now, in January 2020, Moderna was an early-stage development company, right?  A. I think that's fair.  Although, we like to characterize that as mid-stage because we had enrolled our first phase 2 study, which is the middle stage of clinical development.  But I think it's fair to say we were early-stage development company.").  *See also* 118:20-119:1 ("Q. This [the royalty terms in the **June 26, 2017** Cellscript-Moderna Patent Sublicense Agreement] is what Moderna agreed to when it was a not profitable, **early-stage development company**, correct?  A. So that is correct. . . ." (emphasis added)); 120:2-120:6 ("Q. At the time that Moderna entered into this deal [the June 26, 2017 Cellscript-Moderna Patent Sublicense Agreement], it did not have any products that it was launching imminently?  A. No.  2017, we were not imminently launching anything.").

[2819] *See also* Noah Higgins-Dunn, "Moderna lays plans for new Canadian mRNA vaccine manufacturing site—and more could be on the way," *Fierce Pharma,* August 10, 2021, *available at* https://www.fiercepharma.com/manufacturing/moderna-scouts-plans-for-new-canadian-mrna-vaccine-manufacturing-site-and-more-could ("Moderna, once a little-known mRNA biotech before its COVID-19 efforts launched it to pharma stardom, . . .").

[2820] Gregory Zuckerman, "The Inside Story of Two Young Scientists Who Helped Make Moderna's Covid Vaccine Possible," *Upworthy Science,* November 24, 2021, *available at* https://upworthyscience.com/moderna-covid-vaccine/.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

"had actually bet the entire company" on its mRNA-1273 vaccine.[2821]  Dr. Hoge further explained: "We had bet the company on a Covid-19 vaccine, but one misstep last year and Moderna and possibly mRNA vaccines were goners. . . .  We spent 10 years building the company for the moment, but we needed a lot of luck to survive the year."[2822]

1136.  Just a few months later, the success of mRNA-1273 transformed Moderna into a commercial company.  Stéphane Bancel underscored this point in his January 3, 2021 letter to shareholders and declared:

> "Moderna is now a commercial company.[2823]
>
> . . .
>
> Moderna is entering 2021 as a **commercial company**, with a **strong cash position, clear strategic priorities, and a team poised to continue advancing mRNA vaccine and therapeutics** into new areas of high unmet need.  I believe we have a very exciting journey ahead and we are pleased to have you with us.[2824]
>
> . . .

---

[2821] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 93:3-93:4.  *See also* 92:13-93:16 ("Q. Is there an amount of money that Moderna would not have been willing to pay I the second half of 2020 to be one of the first companies to commercialize a COVID vaccine?  A. In the second half of 2020, we were all focused on trying to do the best we could on the pandemic.  I mean, as we entered into that period of our lives, which were really stressful as a company, as individuals, we were just trying to do our part.  We were just trying to do everything we could to get lives back to normal.  We had actually bet the entire company on something that at that point had not yet been proven in a pivotal clinical trial, phase 3 clinical trial, which is that we could protect against a vaccine – or, sorry, a virus.  There were many that thought the mRNA approaches, ours and somebody else's, BioNTech and Pfizer's were not going to be successful and that other approaches were.  So I think we were deeply focused on trying to do our part in the science.  I couldn't even begin to know how to answer that question because money wasn't at all a consideration.").  *See also* Gregory Zuckerman, "How Moderna nearly lost the race to develop a Covid-19 vaccine," *STAT,* October 26, 2021, *available at* https://web.archive.org/web/20211026113555/https://www.statnews.com/2021/10/26/how-moderna-nearly-lost-the-race-to-develop-a-covid-19-vaccine/.

[2822] Gregory Zuckerman, "How Moderna nearly lost the race to develop a Covid-19 vaccine," *STAT,* October 26, 2021, *available at* https://web.archive.org/web/20211026113555/https://www.statnews.com/2021/10/26/how-moderna-nearly-lost-the-race-to-develop-a-covid-19-vaccine/.

[2823] Stéphane Bancel, "Moderna 2020 Shareholder Letter," *Moderna,* January 3, 2021, *available at* https://www.modernatx.com/en-US/media-center/all-media/blogs/moderna-2020-shareholder-letter.  Moderna, Inc. 2020 Annual Report, p. 5, *available at* https://s29.q4cdn.com/435878511/files/doc_financials/2020/ar/Chasen-Richter-Moderna-Annual-Report-2020.pdf.

[2824] Moderna, Inc. 2020 Annual Report, p. 8, *available at* https://s29.q4cdn.com/435878511/files/doc_financials/2020/ar/Chasen-Richter-Moderna-Annual-Report-2020.pdf.

778

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

During 2020, we built on this strong foundation to help secure our place **as the most advanced mRNA platform in the industry**.[2825]

. . .

**As I look to the end of 2021, I believe that if we successfully launch the Moderna COVID-19 Vaccine as a commercial product, we will emerge from the pandemic crisis as the strongest mRNA company in the world**.[2826]

1137. Moderna's immediate and dramatic change in market capitalization and investment returns are measures of the value of Moderna's head start that is attributable to mRNA-1273. Dr. Hoge agreed and testified that Moderna's market capitalization pre- and post- the mRNA vaccine: "I guess the most obvious estimate is, I guess, the current share price . . ." meaning that the value of Moderna's share price or the market capitalization compared to what the market capitalization was before COVID began in late 2019 "would be a simplistic way" to estimate the value Moderna derived from being able to be one of the first two companies to supply the COVID vaccine.[2827]

### j.    Market Cap: Moderna became "a pharmaceutical power"

1138. "Market capitalization (or market value) is the most commonly used method of measuring the size of a publicly traded company and is calculated by multiplying the current stock price by the number of share outstanding."[2828]  "The stock market classifies stocks into various categories:

- **Large Cap** – Companies with a market cap above $10 billion are classified as large-cap stocks.  Some examples would be Apple, Microsoft, IBM, Facebook, etc.

- **Mid Cap** – Companies whose market cap ranges from $1 billion to $10 billion.  Mid-cap stocks, in general, are more volatile than large-cap stocks and consist more of growth-oriented stocks.

- **Small Cap** – Companies with a market capitalization between $250 million to $1 billion.  They are high-risk and high-return stocks, as the companies are in the growth stage.  A large number of companies belong in the small-cap category.

- **Micro Cap –** They are the penny stocks that are relatively young.  The micro-cap companies' potential for growth and decline are of a similar nature.  They are not

---

[2825] Moderna, Inc. 2020 Annual Report, p. 18, *available at* https://s29.q4cdn.com/435878511/files/doc_financials/2020/ar/Chasen-Richter-Moderna-Annual-Report-2020.pdf (emphasis added).

[2826] Moderna, Inc. 2020 Annual Report, p. 21, *available at* https://s29.q4cdn.com/435878511/files/doc_financials/2020/ar/Chasen-Richter-Moderna-Annual-Report-2020.pdf (emphasis added).

[2827] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 90:9-91:20.

[2828] "Moderna Market Cap 2017-2024 | MRNA," *MacroTrends,* November 23, 2024, *available at* https://www.macrotrends.net/stocks/charts/MRNA/moderna/market-cap.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

considered to be the safest investment.  Hence, they require lots of research before investment.[2829]

1139.  On January 8, 2021, *SP Global* further reported: "Moderna's market cap has climbed to $45.54 billion as of Jan. 7 [2021], with shares trading at $115 each at market close. . . . '2020 was an incredible year … my head is still spinning,' Moderna CEO Stéphane Bancel said Jan 5. At the Goldman Sachs Healthcare CEOs Unscripted Conference. . . . [T]he CEO said Moderna ended the year with $5.25 billion in cash on hand.  With revenue now coming in from the vaccine, Bancel expects that number to go 'way north' over 2021.  That cash will likely be spent on the pipeline, building out programs in other vaccines, antibodies and cardiology, Bancel said."[2830]

1140.  In November 2021, journalist Gregory Zuckerman wrote: "Moderna is a pharmaceutical power thanks to its success developing an effective Covid-19 vaccine.  The company is worth $124 billion, more than giants including GlaxoSmithKline and Sanofi[.]"[2831]  Moderna's "COVID-19 efforts launched it to pharma stardom."[2832]

1141.  In addition, the meteoric rise of Moderna's market cap eclipsed the company's May 20, 2020 expectations as set forth in its "MRNA 5-yr accelerated plan," which   stated: ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████"[2833]  In fact, as shown in **Figure 5.1**,[2834] below, Moderna's

---

[2829] "Market Capitalization," *Corporate Finance Institute,* 2024, *available at* https://corporatefinanceinstitute.com/resources/valuation/what-is-market-capitalization/.

[2830] Annalee Armstrong, Jason Woleben, "Moderna shareholders enjoy 434% ROI as vaccine maker blows past peers in 2020," *available at* https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/moderna-shareholders-enjoy-434-roi-as-vaccine-maker-blows-past-peers-in-2020-62023392.

[2831] Gregory Zuckerman, "The Inside Story of Two Young Scientists Who Helped Make Moderna's Covid Vaccine Possible," *Upworthy Science,* November 24, 2021, *available at* https://upworthyscience.com/moderna-covid-vaccine/.

[2832] Noah Higgins-Dunn, "Moderna lays plans for new Canadian mRNA vaccine manufacturing site—and more could be on the way," *Fierce Pharma,* August 10, 2021, *available at* https://www.fiercepharma.com/manufacturing/moderna-scouts-plans-for-new-canadian-mrna-vaccine-manufacturing-site-and-more-could.

[2833] ████████████████████████████████████████████████ ████████████████████████████████████████████ (emphasis added).

[2834] "Moderna Market Cap 2017-2024 | MRNA," *MacroTrends,* November 23, 2024, *available at* https://www.macrotrends.net/stocks/charts/MRNA/moderna/market-cap.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

market cap first crossed the "$100Bn" target in **July 2021**—in about **1 year**, significantly faster than the 5 years Moderna had projected in May 2020.



**FIGURE 5.1**

1142. In August 2021, *Forbes* described the drivers of Moderna's stock price rally "from around $104 per share at the end of 2020, to about $485 as of Monday [August 16, 2021], an increase of over 4.5x. This compare[d] to the S&P 500 which is up by just about 20% over the same period," and noted "Moderna's highly lucrative Covid-19 vaccine revenues are likely to continue for the foreseeable future":

> The first leg of the rally that happened through the first half of this year was relatively steady and came as Moderna scaled-up production and distribution of its much sought after Covid-19 vaccine, signed new supply agreements, and reported

781

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

robust financials on its shot (net margins stood at an incredible 64% for the first half of 2021).

However, the big surge has come since mid-June, 2021, as the stock rallied from around $200 to levels of close to $500 currently. There are a couple of factors driving the recent surge.

Firstly, there is an increasing realization that Covid-19 will be more difficult to contain than initially thought, even in countries with high vaccination rates, due to the emergence of new virus variants. For example, the seven-day average of Covid-19 cases in the U.S. has risen from around 22k in early July to over 124k currently due to the highly infectious Delta variant of the virus. Cases in highly-inoculated Israel are also up by almost 10x over the last month. Research is also showing that protection provided by Covid-19 vaccines begins to wane after several months. These developments are making a real case for booster vaccinations and Moderna is perfectly poised to cater to this market with its mRNA technology which can be more quickly adapted to fight new variants. This could mean that Moderna's highly lucrative Covid-19 vaccine revenues are likely to continue for the foreseeable future (rather than just being a one-off pandemic product), likely causing investors to re-rate the stock higher.[2835]

1143. Moderna's executives closely tracked the company's stock price and the mRNA-1273 events that were driving it. For example, Moderna's September 2, 2020 LRP graphically showed how the COVID opportunity did, in fact, drive its stock price beginning in March 2020, as shown in **Figure 5.2**,[2836] below.  In addition, Moderna claimed that its share price increased 260% from December 31, 2019 to August 26, 2020, which it characterized as evidence of "External value recognition" that shows that the "Potential of mRNA in the broader vaccine space has been reflected in the market."[2837]

---

[2835] Trefis Team, "What Drove Moderna Stock From $100 To Near $500?" *Forbes,* August 20, 2021, *available at* https://www.forbes.com/sites/greatspeculations/2021/08/20/what-drove-moderna-stock-from-100-to-near-500/.

[2836] MRNA-GEN-01570975-1159, at 978 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 4 of 186) ("Our original vision is intact. . .2020 turned it into a reality in one of our core modalities").

[2837] MRNA-GEN-01570975-1159, at 1019 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 45 of 186) ("Potential of mRNA in the broader vaccine space has been reflected in the market").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 5.2**

1144. Based on its own analysis, Moderna concluded: "2020 stock price performance likely reflects investor believe in read-through of mRNA-1273 on rest of ID vaccines," as shown in **Figure 5.3,**[2838] below.

---

[2838] MRNA-GEN-01570975-1159, at 998 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 24 of 186) ("2020 stock price performance likely reflects investor belief in read-through of mRNA-1273 on rest of ID vaccines").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 5.3**

### k.    Stock Return: Moderna Became a "top performing stock among the largest pharmaceutical companies"

1145.   On January 8, 2021, five days after Mr. Bancel's letter to shareholders, *S&P Global* reported: "Moderna Inc. was a niche biotech, little known beyond pharmaceutical industry insiders and companies similarly striving to decode messenger RNA for a medical breakthrough at the end of 2019.  Enter 2020, when the coronavirus began dominating every facet of life and the economy— thrusting the upstart biotech into a position as the top performing stock among the largest pharmaceutical companies," with "a 434% return on investment," as shown in **Figure 5.4**,[2839] below.

---

[2839] Annalee Armstrong, Jason Woleben, "Moderna shareholders enjoy 434% ROI as vaccine maker blows past peers in 2020," *available at* https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/moderna-shareholders-enjoy-434-roi-as-vaccine-maker-blows-past-peers-in-2020-62023392.

784

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 5.4**

1146. Moderna's SEC filings show that the returns on its stock significantly outpaced benchmarks and were driven by the success of mRNA-1273. For example, Moderna's "Stock Performance Graph" in its 2020 Annual Report, in **Figure 5.5**,[2840] below, shows that the cumulative total return on Moderna's stock during period December 7, 2018 (date of IPO) and December 31, 2020, substantially outperformed both the NASDAQ Composite Index and the NASDAQ Biotechnology Index.

---

[2840] Moderna, Inc. 2020 Annual Report, p. 163, *available at* https://s29.q4cdn.com/435878511/files/doc_financials/2020/ar/Chasen-Richter-Moderna-Annual-Report-2020.pdf.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 5.5**

### 3. mRNA-1273 Accelerated Moderna's Development by 5-10 years and Transformed Moderna into a "Biotech powerhouse"

1147. Mr. Bancel testified that "COVID-19 was an opportunity for us to become a commercial company."[2841]   And, Mr. Bancel also recognized that "Moderna had a once-in-a-lifetime opportunity to save lives, and prove its technology worked."[2842]

1148. As discussed above (*see* II.E.4.d.(1)), by early-May 2020, Moderna advised analysts and investors that its "vaccine against SARS-CoV-2 virus, mRNA-1273, is **a major acceleration of our company's development**."[2843]   During Moderna's May 7, 2020 earnings call, Mr. Bancel predicted: "Moderna should be a commercial-stage company in 2021.  **That is two to three years**

---

[2841] June 28, 2024 Deposition of Stéphane Bancel, 149:5-149:7.

[2842] Peter Loftus, The Messenger: Moderna, the Vaccine and the Business Gamble That Changed the World, p. 11.

[2843] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, p. 4 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO).

786

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**ahead of our previous plans** [presented in February 2020], plans we outlined just months ago."[2844]

1149. The *actual* acceleration, however, was far greater than Mr. Bancel had predicted in May 2020. Dr. Hoge testified that "[i]t's certainly true that the COVID pandemic **dramatically accelerated the company's development and allowed us to accelerate our investment in our pipeline and science technology**. The medicines that we're now filing for approval [an RSV vaccine under review for approval in many geographies; successful phase 3 results for several other respiratory viruses; a cancer therapeutic in collaboration with our partner Merck which is in mid-stage studies; rare disease programs[2845]] are as a result of that, you know, **five, ten-year acceleration in our business plan**."[2846]

---

[2844] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript," *Seeking Alpha,* May 7, 2020, p. 4 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO) (emphasis added).

[2845] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 88:2-88:16 ("Q. What medicines are you referring to in that answer for which you're filing approval, for approval? A. So we have an RSV vaccine under review for approval in many geographies. We've had a successful phase 3 results for several other respiratory viruses. We have a cancer therapeutic in collaboration with our partner Merck which is in mid-stage studies, and there's a potential for an accelerated approval filing. And then we have rare disease programs that we're in discussions with regulators about what would be necessary for a submission.").

[2846] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 87:16-88:1 (emphasis added). *See also* 88:17-89:12 ("Q. And it's fair to say, and I think you just said this, that COVID dramatically accelerated the maturation of Moderna in those projects, correct? A. Absolutely. Q. And it provided Moderna access to capital, correct? A. Absolutely. Q. It expanded the scope of regulatory and safety development efforts, correct? A. Yes. Commercializing the COVID vaccine at that scale dramatically accelerated our clinical experience, our development experience, our safety experience, required us to dramatically accelerate our manufacturing capabilities, and **in all cases many years ahead of what we would have been doing under any plan prior to COVID.**" (emphasis added)); 89:21-90:8 ("Q. The company was transformed. It was transformative, you've heard that word used, in connection with COVID and Moderna, right? A. I think for the field of mRNA broadly, and Moderna for sure as a leader in it. Q. And being able to sell the COVID vaccine as one of the first companies on the market caused a major accretion in share price, cash, and capital sources for Moderna, right? A. Yes, it did."); 91:16-91:18 ("A. . . . So no doubt that COVID transformed the company, accelerated the company's development."); 92:2-92:12 ("A. . . . I think it's just fair to say, without question, the COVID response and our success in doing – in developing the vaccine, delivering it, manufacturing it, selling it did transform the company, accelerated us in many years, and created a, as you said a moment ago, huge access to capital for us, 10s of billions of dollars of sales, and that allowed us

787

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1150.    Dr. Hoge testified that mRNA-1273 transformed Moderna and "continues to accelerate and benefit the company" as follows:

> I think it's just fair to say, without question, the COVID response and our success in doing – in developing the vaccine, delivering it, manufacturing it, selling it did transform the company, accelerated us in many years, and created a, as you said a moment ago, huge access to capital for us, 10s of billions of dollars of sales, and that allowed us to continue investing in things, including our work in cancer, in a way that continues to accelerate and benefit the company.[2847]

1151.    In May 2020, Moderna projected that mRNA-1273 would generate "re-investable cash flows from pandemic response," that would fund the cash needs of both its "█████████████████ ██████████████████████████████████████████████████████████████

in **Figure 5.6**,[2848] below.

---

to continue investing in things, including our work in cancer, in a way that continues to accelerate and benefit the company.").

[2847] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 92:2-92:12.

[2848] ████████████████████████████████████████████████████████████

████████████████████

788

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 5.6**

1152. Gregory Zuckerman succinctly summarized the advantage that Moderna gained as follows: "It [Moderna] is using its full coffers and newfound clout to develop new mRNA-based vaccines and drugs and take on other diseases, suggesting more breakthroughs could be ahead."[2849]   This advantage is attributable to Moderna's alleged infringement of the Patents-in-Suit.

### 4. The Claimed Inventions of the Patents-in-Suit are a Foundational Element of Moderna's mRNA-1273

1153. As discussed above, based on a "months-long investigation," *Forbes* concluded: "Without Ian MacLachlan's innovative delivery system, Moderna and Pfizer couldn't safety get their mRNA

---

[2849] Gregory Zuckerman, "How Moderna nearly lost the race to develop a Covid-19 vaccine," *STAT,* October 26, 2021, *available at* https://web.archive.org/web/20211026113555/https://www.statnews.com/2021/10/26/how-moderna-nearly-lost-the-race-to-develop-a-covid-19-vaccine/.

789

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

vaccines into your cells."[2850] *Forbes* acknowledged Dr. MacLachlan's "seminal contributions" and called him the **"forgotten hero"** and characterized his role as **"what may be the most important medical advance in a century [that] has been all but erased by the biotech industry."**[2851]

1154. Without Genevant's patented "gold standard" LNP, which Moderna had concluded in August 2014 was "**close to optimal for mRNA**,"[2852] "there could be no [Moderna] mRNA vaccine."[2853]

### 5.    Moderna was a Freerider on Arbutus's Innovation

1155. Moderna has touted its purported achievement—while publicly denigrating the work of the Arbutus scientists that resulted in the "gold standard," which Mr. Bancel dismissed as "not very good" and "just okay."[2854]   In contrast, Mr. Francis testified:

---

[2850] No Bates No. (Bancel Deposition Exhibit No. 3 – Nathan Vardi, "Covid's Forgotten Hero: The Untold Story Of The Scientist Whose Breakthrough Made The Vaccines Possible," *Forbes,* August 17, 2021, *available at* https://www.forbes.com/sites/nathanvardi/2021/08/17/covids-forgotten-hero-the-untold-story-of-the-scientist-whose-breakthrough-made-the-vaccines-possible/).

[2851] No Bates No. (Bancel Deposition Exhibit No. 3 – Nathan Vardi, "Covid's Forgotten Hero: The Untold Story Of The Scientist Whose Breakthrough Made The Vaccines Possible," *Forbes,* August 17, 2021, *available at* https://www.forbes.com/sites/nathanvardi/2021/08/17/covids-forgotten-hero-the-untold-story-of-the-scientist-whose-breakthrough-made-the-vaccines-possible/) (emphasis added).

[2852] MRNA-GEN-02204816-901, at 868 ("Final progress report (IPR) for Moderna Grant W911 NF-13-1-0417*," August 14, 2014  (summarizing "the research data generated between October 2013 and the end of July 2014."), PDF p. 53 of 86 ("While the design space of MC3 formulations is still being evaluated and refined, both in terms of formulation and especially process conditions, initial indications are that a formulation similar to the quantitative composition of ALN-TTR-02 is close to optimal for mRNA. The main difference introduced by Moderna is use of higher concentrations of the nucleic acid, with a target of at least 2 mg/mL compared with <l mg/mL for the nucleic acids in siRNA formulations. It is important to note that the lipid concentration, scale proportionally with the nucleic acid content. The physical and chemical stability of formulations is under active study using the range of characterization technology available at Moderna: light scattering, gel electrophoresis, uPLC/CAD (lipid analysis), fluorescence, electron microscopy, etc.") (emphasis added).

[2853] Kate Silver, "Shot of a Lifetime: How Pfizer Developed its Own Raw Materials to Ensure a Steady Supply for the COVID-19 Vaccine," *Pfizer,* January 27, 2022, *available at* https://www.pfizer.com/news/articles/shot_of_a_lifetime_how_pfizer_developed_its_own_raw_materials_to_ensure_a_steady_supply_for_the_covid_19_vaccine.

[2854] Nathan Vardi, "Moderna's Mysterious Medicines," *Forbes,* December 14, 2016, *available at* https://www.forbes.com/sites/nathanvardi/2016/12/14/modernas-mysterious-medicines/#fc82927730ee.  *See also* No Bates No. (Murray Deposition Exhibit No. 3 – Matthew Herper, Nathan Vardi, "Moderna Can't Escape My Intellectual Property, Says Arbutus CEO,"

790

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

And lastly, it's recognition of the technology platform that we built and what it really brings to – and the insights it brings to mRNA medicines. . . .

So clearly we figured something out that really gets – allows you to get to market and that is what we expect people to recognize, is the fact that we define that journey and show that it works and we can get the recognition for it.[2855]

1156. Moderna chose to free ride on the work of Arbutus scientists to gain a valuable time-to-market advantage—and now claims that *it* "buil[t] the industry's leading mRNA platform,"[2856] and *it* "changed the future of medicine."[2857] The "Arbutus scientists spent more than a decade research and developing this nucleic acid-lipid delivery technology. Their efforts led to the first FDA-approved RNA-based therapeutic in the form of a drug called Onpattro®, to "treat[] patients with polyneuropathy caused by hATTR, a rare, debilitating and often fatal genetic disease characterized by the buildup of abnormal amyloid protein in peripheral nerves, the heart and other organ [through] small interfering ribonucleic acid (siRNA) treatment," [2858] developed by Alnylam

---

*Forbes,* May 16, 2017, p. 2 of 6) ("Moderna's chief executive, Stéphane Bancel, has been dismissive of the Arbutus technology. 'We knew it was not very good,' he told Forbes last year. 'It was just okay.'").

[2855] MRNA-GEN-01726934-7000, at 996 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 250:11-250:22.).

[2856] MRNA-GEN-01721302-310, at 309 (*Moderna v. Pfizer* Francis Deposition Exhibit No. 15 – "Hearing before the Senate Health, Education, Labor and Pensions Committee – Testimony of Stéphane Bancel, Chief Executive Officer, Moderna, Inc.," *Moderna,* March 22, 2023, p. 8.).

[2857] Transcript of March 22, 2023 Senate Health, Education, Labor and Pensions Committee Hearing, 23:14-23:15 (Stéphane Bancel), *available at* https://www.congress.gov/event/118th-congress/senate-event/333661/text.

[2858]"FDA approves first-of-its kind targeted RNA-based therapy to treat a rare disease" August 10, 2018, *available at* https://www.fda.gov/news-events/press-announcements/fda-approves-first-its-kind-targeted-rna-based-therapy-treat-rare-disease.

791

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Pharmaceuticals under and LNP license from Arbutus.[2859] Onpattro® received FDA approval in August 2018,[2860] and was launched in the "U.S. and EU, initially in Germany" in Q3 2018.[2861]

1157.  In contrast, according to Mr. Bancel, "[w]hen [Moderna] started operations in 2011, we had only about $2 million in funding—enough to get us through our first six months."[2862] "In Moderna's early days, cash was so tight it often struggled to keep the lights on for six months at a time."[2863] Furthermore, "Moderna was too underfunded and small to create its own delivery system," so it leveraged Arbutus' technology to develop what it claims is its platform, which *Forbes* described as follows:

> [At the time of] Moderna's 2011 start, [] Robert Langer, an MIT professor, Moderna board member[, Moderna academic co-founder,[2864]] and founder of

---

[2859] "Partnering - Arbutus Biopharma: Alnylam," *Arbutus BioPharma,* n.d., *available at* https://www.arbutusbio.com/partnering/#:~:text=Arbutus%20retained%20all%20rights%20to%20its%20LNP%20and,first%20FDA%20approved%20application%20of%20Arbutus%E2%80%99%20LNP%20technology. ("Arbutus entered into a license agreement with Alnylam that provides Arbutus with royalty entitlements to Alnylam's global net sales of ONPATTRO, the first FDA approved application of Arbutus' LNP technology. Under the terms of this license agreement, Arbutus is entitled to tiered royalty payments on global net sales. Arbutus has sold its royalty interest on future global net sales of ONPATTRO to the Ontario Municipal Employees Retirement System ("OMERS") under a Purchase and Sale Agreement. In addition to the royalty from the Alnylam License Agreement, the Company is also receiving a second, lower royalty interest on global net sales of ONPATTRO originating from a settlement agreement and subsequent license agreement with Acuitas Therapeutics, Inc. ("Acuitas")").
[2860] "FDA approves first-of-its kind targeted RNA-based therapy to treat a rare disease," *FDA,* August 10, 2018, *available at* https://www.fda.gov/news-events/press-announcements/fda-approves-first-its-kind-targeted-rna-based-therapy-treat-rare-disease ("Onpattro encases the siRNA into a lipid nanoparticle to deliver the drug directly into the liver, in an infusion treatment, to alter or halt the production of disease-causing proteins.").
[2861] "Alnylam Pharmaceutical Reports Third Quarter 2018 Financial Results and Highlights Recent Period Activity," *Alnylam,* November 7, 2018, *available at* https://www.sec.gov/Archives/edgar/data/1178670/000115752318002349/a51895307ex99_1.htm.
[2862] MRNA-GEN-01721302-310, at 303 (*Moderna v. Pfizer* Francis Deposition Exhibit No. 15 – "Hearing before the Senate Health, Education, Labor and Pensions Committee – Testimony of Stéphane Bancel, Chief Executive Officer, Moderna, Inc.," *Moderna,* March 22, 2023, p. 2.).
[2863] Jane Lewis, "Stéphane Bancel: Moderna's biotech whizz who changed the world," *MoneyWeek,* December 12, 2021, *available at* https://moneyweek.com/economy/people/604214/stephane-bancel-modernas-biotech-whizz-who-changed-the-world.
[2864] Moderna, Inc., Form S-1, Amendment No. 2, December 4, 2018, p. 6, *available at* https://www.sec.gov/Archives/edgar/data/1682852/000119312518341958/d611137ds1a.htm

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

dozens of biotech companies, told Bancel that Moderna was too underfunded and small to create its own delivery system.  So Moderna vetted over a dozen external delivery methods for mRNA and settled on at least three.  One belonged to Arbutus, but Moderna turned to tiny Acuitas [beginning in or about February 6, 2013[2865] and culminating in a July 3, 2014 agreement[2866]] to get access to it.[2867]

1158.  Between May 2015 and December 2016, Moderna entered into four Non-Exclusive License Agreements with Acuitas, each covering a different licensed target – Influenza A, Chikungunya, RSV, and Zika. The 2015-2016 Acuitas License Agreements specified development, regulatory and commercial milestone payments, and royalties of 3% of net sales, with respect to one or more valid claims, and 1.5% of net sales during the period of pending claims.[2868]

---

("Moderna was founded in 2010 by Flagship Pioneering to develop and commercialize a new category of medicines to treat human diseases. Our early platform technology was conceived and launched by Flagship Pioneering's VentureLabs (VL) innovation team, led by Dr. Noubar Afeyan (Moderna's founding and current Chairman) working together with academic co-founders Dr. Derrick Rossi (Harvard Medical School), Dr. Robert Langer (MIT), and Dr. Kenneth Chien (Harvard Medical School)."). *See also* Brian Sandalow, "Moderna Cofounder Robert Langer Recalls 'Inauspicious' Beginning to Distinguished Career," *Northwestern University McCormick School of Engineering,* April 22, 2022, *available at* https://www.mccormick.northwestern.edu/news/articles/2022/04/moderna-cofounder-robert-langer-recalls-inauspicious-beginning-to-distinguished-career/ ("With Moderna, Langer played a key role in the development of their COVID-19 vaccine, which built off his previous research on drug delivery.  Moderna, Langer said, had nine vaccines in clinical trials before the pandemic and built a large manufacturing plant for a cancer vaccine, and was positioned to pivot when needed.").

[2865] MRNA-GEN-01759820 (Hoge Deposition Exhibit No. 12 – February 6, 2013 email from Tony de Fougerolles to Stéphane Bancel, cc: Stephen Hoge, Susan Whoriskey, Subject: Re: AlCana and Tekmira update).  MRNA-GEN-01247585 (Bancel Deposition Exhibit No. 2/Francis Deposition Exhibit No. 3 – February 6, 2013 email from Tony de Fougerolles to Stéphane Bancel, cc: Stephen Hoge, Susan Whoriskey, Subject: Re: AlCana and Tekmira update).

[2866] MRNA-GEN-01754060-064, at 060 (Francis Deposition Exhibit No. 24 – July 3, 2014 email from Stephen Hoge to Executive Committee, cc: Said Francis; Shuan Ryan, Örn Almarsson, Matt Stanton, Subject: FW: Acuitas Final Documents).

[2867] Nathan Vardi, Matthew Herper, "Moderna's Mysterious Medicines," *Forbes,* December 14, 2016, *available at* https://www.forbes.com/sites/nathanvardi/2016/12/14/modernas-mysterious-medicines/?sh=4f0c94116ef6.

[2868] MRNA-GEN-00225679-790 (Acuitas Therapeutics Inc. and Moderna Therapeutics, Inc. Non-Exclusive License Agreement dated May 22, 2015); MRNA-GEN-00225906-020 (Acuitas Therapeutics Inc. and Moderna Therapeutics, Inc. Non-Exclusive License Agreement dated August 19, 2016); GENV-00021199-314 (Acuitas Therapeutics Inc. and ModernaTX, Inc. Non-Exclusive License Agreement dated October 12, 2016); MRNA-GEN-00225516-557 (Acuitas Therapeutics Inc. and ModernaTX, Inc. Non-Exclusive License Agreement dated December 14, 2016).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1159. While Moderna may have been "too underfunded" in 2011, as of December 2016, and using Arbutus's technology, Moderna had "raked in investor cash" from numerous sources and "Pitchbook put its valuation at $4.7 billion—more than any publicly traded biotech without a drug on the market."[2869]  Two years later, Moderna claimed that it had "raised over $2.6 billion in total funding from our strategic collaborators and investors."[2870]  On December 6, 2018 in connection with its initial public offering,[2871] Moderna priced its stock at $23 per share, indicating "a fully diluted market value of $8.1 billion, according to Renaissance Capital,"[2872] who predicted that "Moderna will be the biggest IPO in the biotech history[,]"[2873] by a wide margin as shown in **Figure 5.7**,[2874] below.

---

[2869] Nathan Vardi, Matthew Herper, "Moderna's Mysterious Medicines," *Forbes,* December 14, 2016, *available at* https://www.forbes.com/sites/nathanvardi/2016/12/14/modernas-mysterious-medicines/?sh=4f0c94116ef6.

[2870] Moderna, Inc., Form S-1, Amendment No. 2, December 4, 2018, p. 6, *available at* https://www.sec.gov/Archives/edgar/data/1682852/000119312518341958/d611137ds1a.htm.

[2871] *See* Moderna, Inc., Form S-1, Amendment No. 2, December 4, 2018, *available at* https://www.sec.gov/Archives/edgar/data/1682852/000119312518341958/d611137ds1a.htm.

[2872] Alison Gatlin, "Moderna Debuts Largest-Ever Biotech IPO – But Is It Overhyped?" *Investors Business Daily,* December 7, 2018, *available at* https://www.investors.com/news/technology/moderna-therapeutics-biotech-ipo/.  *See also* Lance Tupper, Joshua Franklin, "Moderna to raise $604 million in upsizes IPO, braving market jitters," *Reuters,* December 6, 2018, *available at* https://www.reuters.com/article/us-moderna-ipo-exclusive-idUSKBN1O526S.

[2873] *Id. See also* "Largest, Most Ambitious Biotech IPO Ever," *Renaissance Capital,* November 12, 2018, *available at* https://www.renaissancecapital.com/IPO-Center/News/60776/Largest-Most-Ambitious-Biotech-IPO-Ever (Founded in 2010, Moderna **(MRNA)** has raised $2.6 billion from Flagship Pioneering, AstraZeneca and others. Planning to raise $500 million, Moderna is the largest VC-backed biotech IPO ever. It already has 21 therapeutic programs, with ten in ongoing clinical trials for a broad range of diseases including influenza, cardiovascular and cancer. All of its therapies are based on its proprietary messenger RNA (mRNA) platform, which is designed to use mRNA to instruct a patient's own cells to produce proteins that treat or cure disease."  Includes chart showing the 21 programs, with only one in Phase 2).  "Moderna aims to top list of 5 largest biotech IPOs ever," *Renaissance Capital,* December 6, 2018, *available at* https://www.renaissancecapital.com/IPO-Center/News/61095/Moderna-aims-to-top-list-of-5-largest-biotech-IPOs-ever ("Moderna **(MRNA)** is scheduled to raise $500 million tonight at an $8.0 billion valuation. On both measures, that would make it the largest development-stage drug developer ever to go public.").

[2874] "Moderna aims to top list of 5 largest biotech IPOs ever," *Renaissance Capital,* December 6, 2018, *available at* https://www.renaissancecapital.com/IPO-Center/News/61095/Moderna-aims-to-top-list-of-5-largest-biotech-IPOs-ever.

794

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

| 5 Largest Biotech IPOs of All Time, by Deal Size | | | | | |
|---|---|---|---|---|---|
| Company | Deal Size | Market Cap at IPO | Trade Date | First Day Return | Return at 12/05 |
| Moderna (MRNA) | $500M | $8,016M | 12/07/18 | - | - |
| Allogene Therapeutics (ALLO) | $324M | $2,188M | 10/11/18 | 39% | 74% |
| Axovant Sciences (AXON) | $315M | $1,504M | 06/11/15 | 99% | -88% |
| Galapagos (GLPG) | $275M | $1,659M | 05/14/15 | 20% | 140% |
| Juno Therapeutics (JUNO) | $265M | $2,164M | 12/19/14 | 46% | 262%* |

Return from IPO to Jan 2018 acquisition

**FIGURE 5.7**

1160.  On December 6, 2018, Moderna reportedly set the record as the biggest biotech IPO in history.[2875] Moderna's ability to raise capital was due at least in part to its use of Arbutus's technology.

1161.  Moreover, as discussed above, Moderna engaged in substantial copying of Plaintiffs' innovations, including from its earliest non-clincial and clinical studies, to its use of PLaintiffs' technology in the COVID-19 vaccine.[2876]

### B.    The Impact of Moderna's Alleged Infringement on Arbutus/Genevant

1162.  Arbutus/Genevant's damages are "the detriments suffered by [Arbutus/Genevant] through the infringement."[2877]

1163.  Profiting from technological assets is important because it enables an enterprise to "reinvest, not just in commercialization, but in further invention and discovery."[2878]  "[A] firm's ability to appropriate rents from innovation determines its performance and continued survival."[2879]

1164.  Moderna's alleged infringement together with its business tactics related thereto have caused harm and continue to cause harm to Arbutus and Genevant,[2880] which Mr. Zorn summarized as follows:

---

[2875] Mark Terry, "Moderna Therapeutics Sets Records for Biggest Biotech IPO," *BioSpace,* December 7, 2018, *available at* https://www.biospace.com/article/moderna-therapeutics-biggest-ipo-in-biotech-history.

[2876] *Supra* Section II.A.

[2877] Livesay Window Company v. Livesay Industries, 251 F.2d 469 at 472 (5th Cir. 1958).

[2878] David J. Teece, "Reflections on 'Profiting from Innovation,'" *Research Policy,* 2006, pp. 1131-1146, at 1144, *available at* https://pdfs.semanticscholar.org/a2ef/6337a50af13b0bda3e2968a5fcf2c00d31d1.pdf.

[2879] Marco Ceccagnoli, Frank T. Rothaermel, "Chapter 1 – Appropriating the Returns from Innovation," in Technological Innovation:  Generating Economic Results; Advances in the Study of Entrepreneurship, Innovation and Economic Growth, (Elsevier Ltd., 2008), pp. 11-34, at 12, *available at* https://pdfs.semanticscholar.org/ad2d/dd8529ca7f2b9559d8f9e3538f67b5268540.pdf.

[2880] Amended Complaint, ¶ 68.

795

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

I think we end up with a very few number of players, that have again a chance in the 2021 timeframe to have an impact on this.  Obviously, like always, in drug development, not every candidate is going to get to the finish line.  And I could also anticipate that once a few vaccines are in late stage or commercially approved, a lot of the early project might just stop investing because we are deploying capital and talent for something that might have no commercial end.  So I think while there is a lot of people on the stop lane [sic – starting line], my sense is very few of them get to the finish line[.][2890]

### 3.    Moderna's Failure to Take a License Encouraged Others to Also Freeride

1169.  As discussed above, Moderna was dismissive of Tekmira's technology and its contribution to mRNA-1273.  In addition, Moderna's internal records show that Dr. Hoge instructed Moderna's scientists to "fib a bit," to erase and conceal the "learning" it gained from Tekmira.  As discussed above, on **November 15, 2019**, Dr. Benenato wrote: "Stephen [Hoge] does not want to see any revenues [sic – references] to us 'learning' from mc3.  This deck states that.  I know it is hard as a chemist but we have to fib a bit and not tell the whole structure story.  The slides look great,…but I think you need to take out the mc3 part of the story."[2891]  By "taking out the mc3 part of the story," Moderna played a role making the Protiva, Tekmira, Arbutus and Genevant scientists, including Dr. MacLachlan, into "forgotten hero[es]"[2892] in the COVID-19 vaccine development story.

1170.  Later, Moderna took further steps to attempt to conceal its use of Genevant's patented inventions by deleting references to Plaintiffs' technology and references to Plaintiffs' work in public presentations, regulatory documents, and papers.  For example, in February 2020 and June 2020, Moderna's Hamilton Bennett edited documents so as to ensure that the composition of Moderna's

---

[2890] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, pp. 29-30 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO).

[2891] MRNA-GEN-01430937 (Hoge Deposition Exhibit No. 51/Benenato Deposition Exhibit No. 2 – November 15, 2019 email from Kerry Benenato to Mark Cornebise, Subject: Re: MC3 vs. legacy).  May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 436:22-441:4.  May 17, 2024 30(b)(6) Deposition of Kerry Benenato, Ph.D., 21:1-33:3.

[2892] No Bates No. (Bancel Deposition Exhibit No. 3 – Nathan Vardi, "Covid's Forgotten Hero: The Untold Story Of The Scientist Whose Breakthrough Made The Vaccines Possible," *Forbes,* August 17, 2021, *available at* https://www.forbes.com/sites/nathanvardi/2021/08/17/covids-forgotten-hero-the-untold-story-of-the-scientist-whose-breakthrough-made-the-vaccines-possible/).

798

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

LNP was not posted publicly.[2893]  On April 1, 2021, just weeks after Moderna rejected Genevant's request for mRNA-1273 samples (on March 17, 2021),[2894] Dr. Edward Miracco, then a Moderna

---

[2893] *See* MRNA-GEN-01084500-570, at 528 (Bennett Deposition Exhibit No. 36 – Draft Protocol for "Phase I, Open-Label, Dose-Ranging Study of the Safety and Immunogenicity of 2019-nCov Vaccine (mRNA-1273) in Healthy Adults," *Moderna,* February 10, 2020, p. 29) ("Commented [HV17]: The composition of our LNP is proprietary information and should not be posted to clinicaltrails.gov"); May 20, 2024 Deposition of Hamilton Bennett, 294:1-300:11 ("Q. . . . There's a comment here [in Bennett Deposition Exhibit No. 36] from HB17.  Is that you?  A. Yes.  Q. And you say here, 'The composition of our LNP has proprietary information and should not be posted to cinicaltrials.gov.'  Do you see that?  A. Yes.  Q. What did you mean by the composition of the LNP?  A. What we talk about is the specifics of the LNP, the lipids that are contained in it, the specifics of the compositions of those LNPs, the LNP to the mRNA ratio, things like that.  Q. So it includes the lipid components and the molar ratio of those components? . . . THE WITNESS: Those would be characteristics of the LNP that you would consider.  BY MR. HARBER: Q. And at this time, February of 2020, Moderna considered that information to be proprietary to Moderna?  A. Yes, we did.  Q. How did you come to the view that that information was proprietary to Moderna?  A. We would have discussed that with our CMC and legal colleagues to understand what information we were comfortable putting in the public domain.  Q. Do you recall any conversations that you had about that specific issue?  A. I don't recall.  Q. Do you know if you talked to legal counsel about that?  A. I don't recall. . . . Q. This – the LNP that you're discussing here, this document is discussing, is the LNP that's used in the phase 1 clinical trial of Moderna's COVID vaccine, correct?  A. Yeah, this is – 1273, this section would have referred to the clinical trial material used in the phase 1.  Q. And was this your decision to redact or not disclose the LNP composition, or was this a decision of someone else at Moderna?  A. I don't recall whose decision it was.  We are generally in the habit of not putting that amount of detail in either the public domain or in documents that we think are going to be shared widely, and so there's a higher risk that that information might – we might lose control of that information.  So it could be that at this time, given what might be 12-hour turnaround time on some of these things, we were working off of decisions that were made previously and applying them to COVID without revisiting that for this specific program.  I'm not sure.  Q. You don't know one way or the other why you wanted to not disclose the composition?  A. I think that we don't typically disclose – at this point in time we didn't disclose the composition in the public domain.  I can't say whether that was asked and reanswered of our legal team specifically for this program at this time. . . . Q. And when I refer to composition of the LNP, did Moderna at this time in February of 2020 consider even the categories of the lipids used in the product and their molar ratio to be proprietary? . . . THE WITNESS: I would need to review the methods in more detail to say to what extent did we consider what information proprietary.  I don't recall."); MRNA-GEN-01115170-171, at 170 (Bennett Deposition Exhibit No. 37 – June 19, 2020 email from Hamilton Bennett to Chris Roberts, Subject: RE: Redacted Files – P101 Manuscript; Attachments: 20-0003_SAP_v1.0_Redacted.pdf; 20-0003_Protocola-v2.0_13Mar2020.eCTD__0_Redactedv2.pdf) (". . .we need to redact the formulation"); May 20, 2024 Deposition of Hamilton Bennett, 301:2-303:8 ("Q. And in the last-in-time e-mail here [in Bennett Deposition Exhibit No. 37] on June 19th, 2020, you say, 'Apologies, I missed one.  And

799

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Principal Scientist, Lead-in Release and Stability whose "Side hustle" was "External technical disclosure review,"[2895] directed Moderna's scientist, Dr. Kimberly Hassett, to not add the lipid molar ratio to a paper, stating "We don't want to publish the ratio"—notwithstanding the fact that a reviewer had specifically requested this information.[2896]

---

we need to redact the formulation.' Do you see that? A. Yes, I see that. Q. 'The formulation,' what are you referring to here? A. I would need to point to the specific edit. Is that in 38? A. Yeah, in 38, I believe it's on the page ending in Bates 5238. A. Okay. So what we – likely I think what this is – so I was incorrect in my previous statement where I said this was to support the review. If this is formally redacted rather than edited out, then it's likely that this was intended to be published to the journal's website, so it's a different use of the document. The goal of providing the protocol is to allow the reviewers to better understand the experimental design, the data collection methods, and what was being tested in the study. So if there is a question of whether we thing something is proprietary or sensitive or confidential, and it's not going to impact a reviewer's ability to review and draw conclusions on the study, then it's not uncommon for us to redact that. So here, thinking that the formulation is something that Moderna might find confidential or sensitive but it doesn't otherwise influence the reviewer's ability to interpret the results of the study, we would have requested that that information be redacted. Q. And were you the one who made this determination to redact this information? A. I probably made it in consultation with our CMC colleagues that are – and legal that are – were tracking more closely the type of information that was in the public domain at that point in time. Q. Do you recall any of those discussions? A. I don't recall those discussions. Q. Do you know if you talked to Moderna's legal counsel about this proposed redaction? A. I don't recall.").

[2894] GENV-00247481-483, at 482 (Zorn Deposition Exhibit No. 4 – March 17, 2021 email from Neal Dahiya to Pete Zorn, Subject: RE: Follow Up).

[2895] "Edward Miracco," *LinkedIn,* n.d., *available at* https://www.linkedin.com/in/edwardmiracco/details/experience/. *See also* "Questions & Answers with Ed Miracco," *Moderna,* April 29, 2022, *available at* https://www.modernatx.com/en-US/media-center/all-media/blogs/questions-and-answers-with-ed-miracco ("How did you end up in this role? I randomly met the CSO of Moderna in 2013 at the RNA Society conference and pestered him (and the rest of the company for a job. [In March 2014] [a]fter 8 months and a few polite declines, I started in the mRNA Process Sciences team [as 'Scientist, MRNA Process Development,' as an '[i]ndividual contributor then team lead in mRNA manufacturing process development, analytical development, and crazy ideas.'] and haven't looked back.").

[2896] MRNA-GEN-01602947-949, 948 (Hassett Deposition Exhibit No. 6 – April 1, 2021 email from Edward Miracco to Kimberly Hassett, cc: Jaclyn Higgins, Lisa Rice, and Rose Loughlin, Subject RE: Vaccine LNP size paper – reviewer comments) ( "We don't want to publish the ratio"). April 26, 2024 Deposition of Kimberly J. Hassett, Ph.D., 95:15-99:4 ("Q. And if you go to the top of the page [Hassett Deposition Exhibit No. ] with Bates ending 949, one of the reviewer comments is that 'The authors should report what exactly are the feed components.' Do you see that? A. Yes, I do see that comment. Q. And those would have been reviewers that were other scientists in the field, right? A. Yes. The reviewer would be somebody – another

800

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1171. Mr. Zorn testified: "we believe there were companies that didn't reach out because they felt like they didn't need to pay for a license when they could just do what others had done and just use it without a license."[2897]  Mr. Zorn further testified:



. . .

. . .

scientist in the field.  Q. And in response to that reviewer comment you say that 'Text was added to define the lipids used in the LNP,' and then it goes on to eventually give the ratio of 50:10:38.5:1.5.  Do you see that?  A. Yes, I do see that molar ratio is listed.  Q. Okay.  Then in the next e-mail, the reply from Ed Miracco [on April 1, 2021] at 9:58 a.m., he says, 'We don't want to publish the ratio.'  Do you see that?  A. I do see that.  Q. Do you have an understanding of why Ed did not want to publish the lipid molar ratio?  A. I don't know what Ed – why Ed would say that.  Q. You'd published lipid molar ratios in your previous publications, isn't that right?  A. Yes, the molar ratio was – which was cited in this particular publication in the Methods section did give the lipid ratio.  Q. Were there any other times when you were asked not to include lipid ratios in your publications?  A. Not that I remember.  Q. Did you find it surprising that Ed didn't want you to include this data that a reviewer had asked for in your paper?  A. I don't find it surprising that he asked us not to.  Q. Why not?  A. Because we defined the ratio in the paper that was cited.  Q. So do you think that Ed didn't want you to include the ratio because you had it in a different reference?  Is that your understanding?  A. I don't know what Ed was thinking when he wrote this e-mail.  Q. Do you know if Moderna has a policy concerning what data can and cannot be included in publications?  A. I don't know if Moderna has a policy about what can and cannot be included in publications.  Q. Why were you e-mailing Ed Miracco about changes to this paper?  A. At the time that we were looking to publish this work, Ed Miracco was one of the people that reviewed publications.  Q. For what purpose?  A. To – he reviewed them to kind of approve them internally for getting published.  Q. Do you know if anyone else that has been asked not to publish lipid molar ratios in the publications by Moderna?  A. I don't know anyone.  Q. Were you aware that in about July 2020 the patent office rejected Moderna's challenge to various patents covering lipid molar ratios?  A. I was not aware of that.  Q. But you have no idea why Ed Miracco would say that he didn't want to publish these ratios?  A. I do not know what Ed was thinking when he wrote this e-mail response.").

[2897] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 182:5-182:9.
[2898] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 183:5-183:10.
[2899] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 183:12-183:15.
[2900] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 185:12-185:15.

801

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1172. Communication between Moderna and Providence establishes that Moderna's failure to take a license was concerning to Providence.[2901]

### 4.    Arbutus and Its Scientists Have Been Denied the Recognition They Deserve

1173. By refusing to acknowledge Arbutus and Genevant's contributions to Moderna's mRNA-1273, it has deprived Arbutus and Genevant the "credit and celebration" they deserve – "Moderna cannot claim the vaccine's value for itself."[2902]

### l.    Moderna has Received Both "credit and celebration"

1174. Moderna has received both "credit and celebration," including "Enhanced brand capital across channels (public and private)[.]"[2903]   For example, as discussed above, mRNA-1273 made Moderna a household name.  Dr. Hoge testified: "[i]n 2020, my first time on 60 Minutes was in March of that year.  We were finding our name on the front page of newspapers globally, even

---

[2901]GENV-00262513-517 at 516 (Zorn Deposition Exhibit No. 13 – December 2, 2021 email from Brad Sorenson to Pete Lutwyche and Pete Zorn, Subject RE: Exclusive v. non-exclusive) ("I remind both of you that Providence asked for a non-exclusive license and that it was Genevant that pushed for an exclusive license during negotiations, and that Providence accommodated this with the understanding that it would assist Genevant in establishing value in it's potential claims with Moderna and others… It was Providence's position then and remains that if in fact Moderna and others are infringing on the IP that they should pay and we supported Genevant's rights to enforce, but we also expected that Genevant would defend the supposed "exclusive" nature of the IP").]

[2902] *See, e.g.,* Transcript of March 22, 2023 Senate Health, Education, Labor and Pensions Committee Hearing,147:5-147:10, *available at*, https://www.congress.gov/event/118th-congress/senate-event/333661/text ("DR. MORTEN: . . . To be clear, Moderna's scientists and engineers made many contributions of their own as did many academic scientists.  These people and their work deserve credit and celebration too.  But Moderna cannot claim the vaccine's value for itself.").

[2903] MRNA-GEN-01726298-481, at 304 (*Moderna v. Pfizer* Hoge Deposition Exhibit No. 11 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 7 of 184) ("Broad recognition of mRNA technology across the industry brings opportunities with an elevated level of competition").  MRNA-GEN-01725410-507 at 436 (December 1, 2023 30(b)(6) Deposition of Stephen G. Hoge, M.D. (*Moderna v. Pfizer*), 106:18-107:5 ("Q. And, in fact, that is what's referred to in the third bullet point under 'Positive Outcomes,' [on Slide 7 of Hoge Deposition Exhibit No. 11] right, 'Enhanced brand capital'?  A. Yeah, I assume so, yeah.  Q. Okay.  A. Well, not quite.  Yes, I think our progress in responding to the pandemic, I think what we were trying to say in this point, our progress in responding to the pandemic, and at this point we would have been enrolling the Phase 3 trial, drew new attention to our company.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## VI.   REASONABLE ROYALTY

### A.   Summary of Opinion

1205.   Arbutus/Genevant is entitled to damages based on a reasonable royalty.  Arbutus/Genevant's claim for reasonable royalty damages will include analyses based on both the Analytical Method and under the Hypothetical Negotiation Approach.  The Analytical Method and the Market Approach will be used to inform the Hypothetical Negotiation Approach and to test the reasonableness of the royalty calculations.

### B.   Reasonable Royalty Damages Principles

1206.   "When the evidence is inadequate to establish actual or nearly actual damages, a court may under Section 284 employ a 'reasonable royalty' as the floor below which a damage award may not fall."[2985]  A reasonable royalty is a measure of damages that is "intended to provide a just recovery to persons who for evidentiary or other reasons cannot prove lost profits or an established royalty."[2986]  The "reasonable royalty" is a measure of damages and "is not, in precise terminology, a royalty at all, but it is frequently spoken of as a 'reasonable royalty,' and this phrase is a convenient means of naming this particular kind of damage.'"[2987]  In establishing the reasonable royalty, "they [the jury] d[o] not make a contract for the parties, but f[ind] a measure of damages."[2988]  "Royalties are paid and payable on the use made of the invention, i.e., on *infringing* products and *infringing uses* of the claimed process."[2989]

---

[2985] Fromson v. Western Litho Plate & Supply Co., 853 F.2d 1568 (Fed. Cir. 1988); see also Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-180; SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161 (Fed. Cir. 1991).

[2986] *Hayhurst v. Rosen*, No. cv-91-4496, 1992 WL 123178 (E.D.N.Y. May 18, 1992); *see also* Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-159.

[2987] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, pp. 20-30 – 20-31.  U.S. Frumentum Co. v. Lauhoff, 216 F. 610, 16-17 (6th Cir. 1914).

[2988] Dowagiac Mfg. Co. v. Minn. Moline Plow Co., 235 U.S. 641, 649 (1915).

[2989] *Fromson v. Western Litho Plate & Supply Co*., 853 F.2d 1568 (Fed. Cir. 1988) (emphasis in original), overruled on other grounds, *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp*., 338 F.3d 1337 (Fed. Cir. 2004).

819

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1207. The calculation of the "reasonable royalty" "is not a mere academic exercise in setting some percentage figure as a royalty."[2990]  The determination remains one of damages to the injured party, and shall be adequate to compensate for the use made of the invention by the infringer.

1208. "Adequate to compensate" means equal to the injury, and "the injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed;"[2991] "full compensation for 'any damages' [the patent owner] suffered as a result of the infringement."[2992] "Thus, the language of the statute is expansive rather than limiting," and "in enacting § 284, Congress sought to 'ensure that the patent owner would in fact receive full compensation for 'any damages' [the patentee] suffered as a result of the infringement.' . . . [T]he Bill was intended to allow recovery of 'any damages the complainant can prove.'"[2993] "[W]hen considering the amount of a use-based reasonable royalty 'adequate to compensate for the infringement,' a jury may consider not only the benefit to the patentee in licensing the technology, but also the value of the benefit conferred to the infringer by use of the patented technology."[2994]  "[I]t is settled law that an infringer's net profit margin is not the ceiling by which a reasonable royalty is capped."[2995] "[D]amages to the patent holder cannot simply be calculated in all cases by determining 'the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred.'"[2996]

1209. "[T]he royalty due for patent infringement should be the 'value of what was taken'—the value of the use of the patented technology.' *Aqua Shield,* 774 F.3d at 770 (quoting *Dowagiac Mfg. Co. v. Minn. Moline Plow Co.,* 235 U.S. 641, 648, 35 S.Ct. 221, 59 L.Ed. 398 (1915) ('As the exclusive right conferred by the patent was property, and the infringement was a tortious taking of a part of that property, the normal measure of damages was the value of what was taken.')); *Ericsson,* 773

---

[2990] Howard A. Fromson v. Western Litho Plate and Supply Co. and Bemis Company, Inc., 853 F. 2d 1568 (Fed. Cir. 1988).

[2991] Howard A. Fromson v. Western Litho Plate and Supply Co. and Bemis Company, Inc., 853 F. 2d 1568 (Fed. Cir. 1988).

[2992] Grain Processing Corp. v. Amer. Maize Prods. Co., 185 F.3d 1341, 1349 (Fed. Cir. 1999).

[2993] *Rite-Hite Corporation, et al. v. Kelley Company, Inc*., 56 F.3d 1538, 1544-1545 (Fed. Cir. 1995) (citing *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, at 654-655 (S. Ct. 1983)).

[2994] *Powell v. Home Depot U.S.A*., Inc., 663 F.3d 1221, 1240 (Fed. Cir. 2011).  *Monsanto Company v. Homan McFarling*, 488 F.3d 973 (Fed. Cir. 2007).

[2995] *Powell v. Home Depot U.S.A*., Inc., 663 F.3d 1221, 1238-1239 (Fed. Cir. 2011).

[2996] *Powell v. Home Depot U.S.A*., Inc., 663 F.3d 1221, 1239 (Fed. Cir. 2011).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

F.3d at 1226 ('As a substantive matter, it is the 'value of what was taken' that measures a 'reasonable royalty' under 35 U.S.C. § 284.')."[2997]

1210. Any reasonable royalty analysis necessarily involves an element of approximation, and uncertainty.[2998]  For example, "Apportionment is inexact—and that's OK. . . . '[The Federal Circuit] ha[s] *never required absolute precision* in [assigning a value to a feature that may not have ever been individually sold]; on the contrary, it is well-understood that this process may involve some degree of *approximation and uncertainty*.' (emphasis added)[.]" [2999]

1211. "The Federal Circuit stated in *Lucent,* in 2009, that several approaches may be used to calculate a reasonable royalty, including: (1) the **analytical method**, which calculates damages based on the infringer's anticipated profit from sales of the infringing product; and (2) the 'more common' **hypothetical negotiation approach** contemplated in *Georgia-Pacific.*"[3000]  "Section 284 does not mandate any one means of valuation for damages in patent infringement cases, and so no statute mandates hypothetical negotiations."[3001]

---

[2997] *AstraZeneca AB v. Apotex Corp*., 782 F.3d 1324,1344 (Fed. Cir. 2015).

[2998] *i4i Limited Partnership v. Microsoft Corp.*, 598 F.3d 831, 857- 58 (Fed. Cir. 2010).  *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325, 1336 (Fed. Cir. 2009).

[2999] Danielle Williams, Chris Marchese, "Litigation Webinar Series – Patent Damages Theories," *Fish & Richardson,* December 1, 2016, Slide 5, *available at* https://web.archive.org/web/20170808035530/https://www.fr.com/wp-content/uploads/2016/12/FINAL_Patent_Damages_12_01.pdf.

[3000] "The Sedona Conference Commentary on Patent Damages & Remedies," *The Sedona Conference Journal,* Vol. 15, 2014, pp. 53-124, at 64, *available at* https://thesedonaconference.org/sites/default/files/publications/053-124%20Patent%20Damages_0.pdf (emphasis added).  *See also* Mark A. Glick, David G. Mangum, Ted Tatos, "The 'Book of Wisdom' Contains Little Wisdom and Creates Significant Risk of Bias," *Federal Circuit Bar Journal,* Vol. 27, No. 1, 2017, p. 1 of 44, *available at* https://parsons.azureedge.net/pdfs/fcbjbook.pdf ("The Federal Circuit has endorsed three methods for determining a reasonable royalty to compensate a patent owner for the infringer's use of the patented invention: (1) an established royalty rate, where present; (2) the analytical method, where a "normal" profit margin is deducted from the profit margin obtained by the infringer from the infringing sales; and (3) a hypothetical negotiation between a willing licensor and a willing licensee.").

[3001] Samuel Howard, "FRAND, RAND, & the Problem at Hand: Increasing Certainty in Infringement Damages for Standard-Essential Patents," *Boston University Journal of Science & Technology Law,* Vol. 27, pp. 204-236, at 231, May 30, 2021, *available at* https://www.bu.edu/jostl/files/2021/06/5-Howard.pdf.

821

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### C.    Reasonable Royalty Rate – Analytical Method

1212. The Analytical Method is appropriate to apply in view of the facts of this case, because it directly addresses "the split of the economics between the two parties."[3002]  By early-May 2020, Moderna's projections show that it expected mRNA-1273 would accelerate the company's transition to a commercial-stage business and drive growth.  During Moderna's May 7, 2020 earnings call, Stéphane Bancel, CEO, stated: "the momentum of Moderna is going to be extremely strong and extremely enabled by the SARS CoV-2 verifying process."[3003]  Moderna also recognized the window of opportunity and that "a very few number of players" would ultimately "get to the finish line" with a commercial product.  Mr. Bancel stated:

> So on the commercial landscape, as I briefly mentioned a few minutes ago, as you know, I mean there are 100-plus . . . vaccine candidates being worked on around the world.[3004]
> . . .
> I think we end up with a very few number of players, that have again a chance in the 2021 timeframe to have an impact on this.  Obviously, like always, in drug development, not every candidate is going to get to the finish line.  And I could also anticipate that once a few vaccines are in late stage or commercially approved, a lot of the early project might just stop investing because we are deploying capital and talent for something that might have no commercial end.  So I think while there is a lot of people on the stop lane [sic – starting line], my sense is very few of them get to the finish line[.][3005]

1213. As of May 31, 2020, Moderna expected that it would be one of the few players to get to the finish line with a commercial product and projected that it would achieve billions in revenue and profits.

[3002] 30(b)(6) Deposition of Peter Zorn, June 5, 2024, 270:17-270:18.
[3003] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript," *Seeking Alpha,* May 7, 2020, p. 22 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO). (emphasis added).
[3004] *Compare to* MRNA-GEN-01570975-1159, at 033, 134 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slides 59, 160 of 186) (Slide 59: "Choice: Over 250+ candidates in the global pipeline for COVID.  Dozens of vaccines could be available by end of 2021"; Slide 160: "Choice: Over 250+ vaccine candidates in the global pipeline for COVID-19" including 27 RNA candidates).
[3005] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript," *Seeking Alpha,* May 7, 2020, pp. 29-30 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### 1. Principles

1214. The Federal Circuit has stated that the "Analytical Method" is an accepted approach for calculating a reasonable royalty[3006] that is "an alternative to"[3007] and "entirely separate" from the Hypothetical

---

[3006] *See, e.g., Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) ("Litigants routinely adopt several approaches for calculating a reasonable royalty. The first, the analytical method, focuses on the infringer's projections of profit for the infringing product. *See TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 899 (Fed. Cir. 1986) . . ."). *Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*, 609 F.2d 1308, 1319 (Fed. Cir. 2010) ("A reasonable royalty can be calculated from an established royalty, the infringer's profit projections for infringing sales, or a hypothetical negotiation . . ."). *Oracle America, Inc. v. Google, Inc.,* Civil Action No. C-10-03561-WHA (DMR) (N.D. Cal.), Dkt. No. 295, Order Re Joint Discovery Letter of August 10, 2011 dated August 23, 2011, p. 1 ("The law recognizes multiple approaches for calculating a reasonable royalty. The analytical method 'focuses on the infringer's projections of profit for the infringing product.' *Id.* [*Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1324 (Fed. Cir. 2009)] (citation and quotation marks omitted) (describing analytical method as calculating damages based on infringer's own internal profit projections for infringing item at time infringement began and then apportioning projected profits between patent owner and infringer)."). *Metaswitch Networks Ltd. v. Genband US LLC, et al.,* Case No. 2:14-cv-744-JRG-RSP (E.D. Tex. Mar. 5, 2016), Dkt. No. 297, Memorandum Order, p. 8 ("The "analytical approach" has been accepted by the Federal Circuit as one way to calculate a reasonable royalty. *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986) . . ."). *Sprint Communications Company LP v. Charter Communications, Inc., et al.,* Civil Action No. 17-1734-RGA (D. Del.), Memorandum Order, March 16, 2021, p. 23 ("Plaintiff counters that Dr. Mangum's analytical approach is an alternative to the hypothetical negotiation and follows the approach described and approved by the Federal Circuit. (D.I. 497 at 37). I agree with Plaintiff. The Federal Circuit has affirmed use of the analytical approach where the infringer's usual net profit is subtracted from its anticipated net profit realized from sales of infringing products. *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986)."). *10X Genomics, Inc. and Prognosys Biosciences, Inc. v. Nanostring Technologies, Inc.,* Civil Action No. 21-cv-653-MFK (D. Del.), Memorandum Opinion and Order dated September 7, 2023, pp. 17, 21-22 ("Another approach is 'the analytical method,' which 'focuses on the infringer's projections of profit for the infringing product.' *Id.* [*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)]. . . ."). *See also* Thomas F. Cotter, John M. Golden, Oskar Liivak, Brian J. Love, Norman Siebrasse, "Reasonable Royalties" *in* Brad Biddle, Jorge L. Contreras, Brian J. Love, Norman V. Siebrasse, Eds., *Patent Remedies and Complex Products: Toward A Global Consensus,* (New York: Cambridge University Press, 2019), PDF pp. 12-14 of 104, *available at* https://scholar.smu.edu/cgi/viewcontent.cgi?article=1222&context=law_faculty ("**C. Principal approaches** . . . Another option under U.S. law is the so-called 'analytical approach,' which 'focuses on the infringer's projections of profit for the infringing product.' The leading case is *TWM Mfg. Co. v. Dura Corp.,* in which the Federal Circuit approved a damages award that involved subtracting 'the infringer's usual or accepted net profit from its anticipated net profit realized from sales of infringing devices.' . . .").

823

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Negotiation Approach.[3008]   In a September 2009 decision, the Federal Circuit described the "analytical method" as one of "several approaches for calculating a reasonable royalty."[3009]   In a December 2012 decision, the Federal Circuit described the "analytical method" as "an entirely separate analysis of a reasonable royalty."[3010]   In a September 2015 decision, the Federal Circuit identified "'the analytical method,' focusing on the infringer's projections of profit for the infringing product. *Lucent Techs.,* 580 F.3d at 1324[]" as a "reliable method for estimating a

---

[3007] *See, e.g., Sprint Communications Company LP v. Charter Communications, Inc., et al.,* Civil Action No. 17-1734-RGA (D. Del.), Memorandum Order, March 16, 2021, p. 23 ("Plaintiff counters that Dr. Mangum's **analytical approach is an alternative to the hypothetical negotiation** and follows the approach described and approved by the Federal Circuit. (D.I. 497 at 37). **I agree with Plaintiff.** The Federal Circuit has affirmed use of the analytical approach where the infringer's usual net profit is subtracted from its anticipated net profit realized from sales of infringing products. *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)." (emphasis added)).

[3008] *See, e.g., Energy Transportation Group, Inc., v. William Demant Holding A/S, et al.*, 697 F.3d 1342 (Fed. Cir. 2012) ("Mr. Musika further performed **an entirely separate analysis of a reasonable royalty using the method set forth in *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895 (Fed. Cir. 1986)**.  This analysis compared the average expected profit margin on the infringing products, as set forth in Defendants' expert reports, to the industry average expected profit margin." (emphasis added)).

[3009] *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) ("Litigants routinely adopt several approaches for calculating a reasonable royalty. The first, the analytical method, focuses on the infringer's projections of profit for the infringing product. *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986) (describing the analytical method as 'subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices'); *see also* John Skenyon et al., *Patent Damages Law Practice* § 3:4, at 3-9 to 3-10 (2008) (describing the analytical method as 'calculating damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then apportioning the projected profits between the patent owner and the infringer'). The second, more common approach, called the hypothetical negotiation or the 'willing licensor-willing licensee' approach, attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began. . . .").

[3010] *Energy Transportation Group, Inc., v. William Demant Holding A/S, et al.*, 697 F.3d 1342 (Fed. Cir. 2012) ("Mr. Musika further performed an entirely separate analysis of a reasonable royalty using the method set forth in *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895 (Fed. Cir. 1986).  This analysis compared the average expected profit margin on the infringing products, as set forth in Defendants' expert reports, to the industry average expected profit margin.").

824

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

reasonable royalty."[3011]   District Court decisions have also stated that the Analytical Method is an

accepted method to establish a reasonable royalty.[3012]

---

[3011] *Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("This court has
recognized that estimating a reasonable royalty is not an exact science. The record may support a
range of reasonable royalties, rather than a single value. Likewise, there may be more than one
reliable method for estimating a reasonable royalty. *Apple,* 757 F.3d at 1315. A party may use
the royalty rate from sufficiently comparable licenses, value the infringed features based upon
comparable features in the marketplace, or value the infringed features by comparing the accused
product to non-infringing alternatives. *Id.* A party may also use what this court has referred to as
'the analytical method,' focusing on the infringer's projections of profit for the infringing
product. *Lucent Techs.,* 580 F.3d at 1324.  All approaches have certain strengths and weaknesses,
and, depending upon the facts, one or all may produce admissible testimony in a particular case.
Because each case presents unique circumstances and facts, it is common for parties to choose
different, reliable approaches in a single case and, when they do, the relative strengths and
weaknesses of each approach may be exposed at trial or attacked during cross-examination. That
one approach may better account for one aspect of a royalty estimation does not make other
approaches inadmissible.").
[3012] *See, e.g., Sloan Valve Co. v. Zurn Industries, Inc.,* 33 F.Supp. 3d 984, 990 (N.D. Ill. Mar. 26,
2014) ("Several ways exist to calculate a reasonable royalty. One method is known as the
analytical method, which focuses on the infringer's projections of profit for the infringing
product. *Id.* (citing *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 899 (Fed.Cir.1986)). Another
method is to base the calculation on an established royalty, if there is one. *Versata Software, Inc.
v. SAP America, Inc.,* 717 F.3d 1255, 1267 (Fed.Cir.2013). If there is not an established royalty,
a reasonably royalty may be calculated based on the supposed result of hypothetical negotiations
between the plaintiff and defendant. *Id.* The hypothetical negotiation 'attempts to ascertain the
royalty upon which the parties would have agreed had they successfully negotiated an agreement
just before infringement began.' *Lucent,* 580 F.3d at 1324.").  *Linear Group Services, LLC v.
Attica Automation, Inc.,* Case No. 13-10108 (E.D. Mich. Aug. 25, 2014) ("The analytical method
focuses on the infringer's projections of profits or [sic – on] the infringing product, regardless of
what the parties might have hypothetically agreed to had they successfully negotiated before the
infringement began."). *Rensselaer Polytechnic Institute v. Apple Inc.,* No. 1:13-cv-0633 (DEP)
(N.D.N.Y., Jan. 6, 2016), Dkt. No. 274 (filed January 20, 2016), Decision and Order dated
January 6, 2016, pp. 27-28, 36, 37-38 ("In his report, Mr. Yerman offers his opinion concerning
a reasonable royalty under a license to the '798 Patent utilizing two distinct methods – an
analytical approach and a hypothetical negotiation approach.  Dkt. No. 211-3 at 39-108.  The
analytical approach, which has been endorsed by the Federal Circuit, 'attempts to place a
quantitative value on benefits derived from the use of the patented technology[.]'  Dkt No. 211-3
at 39; *see also Lucent Techs., Inc.,* 580 F.3d at 1324 ('[T]he analytical method[] focuses on the
infringer's projections of profit for the infringing product.')  Mr. Yerman has calculated
plaintiffs' damages, in the event a factfinder concludes Apple has infringed the '798 Patent,
utilizing the analytical model, to be $429 million.  Dkt. No. 211-3 at 42. . . . The methodologies
employed by Mr. Yerman to render his opinions concerning a reasonable royalty in this case are
well-established and widely accepted methods for making such analysis, and Apple does not

825

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

contend otherwise.  As was previously noted, Mr. Yerman applied both an analytical protocol that has been approved by the Federal Circuit and a firmly-entrenched hypothetical negotiation model, applying the well-established *Georgia-Pacific* factors. . . . In the end, it will be the jury's prerogative as to whether to accept or reject, in whole or in part, Mr. Yerman's opinions.  At this juncture, however, I find that Mr. Yerman used reliable methods for calculating damages, and I do not find the assumptions made by him in applying those methods to be so unreliable as to require either the striking of his opinion or the scheduling of a *Daubert* hearing.  Accordingly, Apple's request to exclude Mr. Yerman's testimony is denied.").  *See also Rensselaer Polytechnic Institute v. Apple Inc.,* No. 1:13-cv-0633 (DEP) (N.D.N.Y.), Dkt. No. 265 (filed July 20, 2015), Motion Hearing, Vol. 1, June 26, 2015, 52:1-52:9 ("THE COURT: I want to make sure I understand.  You're not challenging the methodology?  In other words, the two ways of demonstrating reasonable royalties that were utilized by Dr. Yerman, hypothetical negotiation and the analytical model?  MR. HADDEN: Sure.  In the abstract those are well accepted approaches.  I have no problem with that.  It is the facts and the details of how they're applied in this case that just are unsound and not based on fact."); 52:25-53:5 ("MR. HADDEN: . . . So it's not good enough for the Court to say, look, the analytical approach has been accepted by some courts, it's an acceptable way to calculate damages and leave it at that.  You have to look at the actual analysis that was performed and what facts were used.  And that's where the rubber meets the rug and the Court has to stop it.").  *Metaswitch Networks Ltd. v. Genband US LLC, et al.,* Case No. 2:14-cv-744-JRG-RSP (E.D. Tex. Mar. 5, 2016) ("The 'analytical approach' has been accepted by the Federal Circuit as one way to calculate a reasonable royalty. . . .").  *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.,* Civil Action No. C15-522-JPD (W.D. Wash. Mar. 28, 2018), pp. 8-9, 11 ("The Federal Circuit has acknowledged that there are many acceptable methods of calculating a reasonable royalty rate. *See Summit 6*, *LLC v. Samsung Elec. Co*., 802 F.3d 1283,  1296 (Fed. Cir. 2015) (noting that '[t]his court has recognized that estimating a reasonable royalty is not an exact science. The record may support a range of reasonable royalties, rather than a single value. Likewise, there may be more than one reliable method for estimating a reasonable royalty,' including 'what this court has referred to as 'the analytical method.''). Relevant to this case, the Federal Circuit has approved an 'analytical method' of calculating a reasonable royalty, which the court has typically described as 'focus[ing] on the infringer's projections of profit for the infringing product.' *Lucent Tech*, 580 F.3d at 1324 (citing *TWM Mfg*., 789 F.2d at 899 (describing the analytical method as 'subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from the sales of infringing devices')). This analytical method focuses on the infringer's own internal profit projections for the infringing item at the time the infringement began. *See Lucent Tech*, 580 F.3d at 1324. . . . Accordingly, the Court finds that Mr. Voth's application of a 17% royalty rate, based upon the analytical method, is based on sufficient facts and evidence to be presented to the jury.").  *Centripetal Networks, Inc. v. Cisco Systems, Inc.,* 492 F.Supp. 3d 495, 583 (E.D. Va. 2020) ("In determining this reasonable royalty, patentees have primarily used two distinct methods of calculation. 'The first, the analytical method, focuses on the infringer's projections of profit for the infringing product.' See id. (citing *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986) (describing the analytical method as 'subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices')). Here, there was insufficient evidence submitted to the Court based on the infringer's profit

826

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

projections and thus this method is inappropriate for calculating damages. 'The second, more common approach, called the hypothetical negotiation or the `willing licensor-willing licensee' approach, attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.' Id. The date used for the occurrence of the hypothetical negotiation is the date that infringement began. Wang Labs., Inc. v. Toshiba Corp., 993 F.2d 858, 870 (Fed. Cir. 1993). The evidence at trial supports a first infringement date of June 20, 2017. The Court FINDS the reasonable royalty method to be appropriate based on the evidence presented by both Centripetal and Cisco."). *Sprint Communications Company LP v. Charter Communications, Inc., et al.,* Civil Action No. 17-1734-RGA (D. Del.), Memorandum Order, March 16, 2021, pp. 23, 28-29 ("Plaintiff counters that Dr. Mangum's analytical approach is an alternative to the hypothetical negotiation and follows the approach described and approved by the Federal Circuit. (D.I. 497 at 37). I agree with Plaintiff. The Federal Circuit has affirmed use of the analytical approach where the infringer's usual net profit is subtracted from its anticipated net profit realized from sales of infringing products. *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Dr. Mangum did exactly that, as he subtracted the 'normal' industry profits from the expected VoIP profits, resulting in a VoIP profit premium. (D.I. 499-1, Exh. 1 at 75-83 of 1128). This analysis follows the approach affirmed by the Federal Circuit in *TWM. See TWM Mfg. Co.*, 789 F.2d at 899 (awarding a 30% royalty not an abuse of discretion when the difference between anticipated net profit and 'industry standard net profit' was about 30%). Whether it makes sense to award 100% to Plaintiff in these particular cases may be challenged by cross-examination and an opposing expert's opinion. . . . Defendants also argue that Dr. Mangum's analytical approach should be excluded as he failed to apportion cost savings attributable to technology Plaintiff did not invent and did not provide an explanation as to why all of the cost savings associated with VoIP are due to Plaintiff's asserted patents. (D.I. 468 at 47-49). Plaintiff counters that under Federal Circuit precedent there is no second apportionment step in the analytical approach, as the approach consists of subtracting the infringer's usual net profit from its anticipated net profit from the sales of the infringing product. (D.I. 497 at 37). I do not think Plaintiff is right here. '[A]pportionment is required even for non-royalty forms of damages.' *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Assume a new product comes in a basic form and a deluxe form, they both have the same infringing feature, but the deluxe form has a number of other innovative features, and the profit margin for the deluxe is twice that of the basic, would it make sense to attribute the double profit margin on the deluxe to the one infringing feature? I don't think so. Plaintiff further argues that even if there is a need for a second apportionment step, Dr. Mangum explains how his analytical approach apportions out unpatented VoIP technology. (D.I. 497 at 37). Dr. Mangum appropriately apportioned his analytical approach. Dr. Mangum's opinion includes an explanation of his apportionment, as he describes how the 'profit analysis compares margins on circuit-switched and VoIP services with comparable features, where one (i.e., VoIP) is cheaper to deploy.' (D.I. 499-1, Exh. 1 at 81-82 of 1128). The major difference between the two systems is that one, VoIP, is cheaper to deploy. (*Id.*). Dr. Mangum also opines that other differences in features, like the power source, are 'largely irrelevant…as apparent through industrywide acceptance.' (*Id.*, Exh. 4 at 428-29 of 1128). Therefore, the comparison between the two systems apportions out other differences, as the only meaningful

827

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

difference between the two compared systems is the profit margin of the VoIP system specifically, which Dr. Mangum is analyzing to determine a reasonable royalty for the asserted patents. (*See id.*, Exh. 1 at 81-83 of 1128). Dr. Mangum's analytical approach reasonable royalty analysis appropriately apportions the cost savings. . . .").  *Wonderland Switzerland AG v. Evenflo Company, Inc.,* 564 F. Supp. 3d 320, 342 (D. Del. 2021) ("Defendant itself makes the argument, 'To calculate a reasonable royalty under the analytical approach preferred by Mr. Schoettelkotte, the patentee must `calculate[] damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then apportion[] the projected profits between [itself] and the infringer.'' (D.I. 180 at 33) (citing *Lucent,* 580 F.3d at 1324) (internal quotations omitted).").  *Sprint Communications Company L.P. v. Cequel Communications, LLC d/b/a Suddenlink Communications and CSC Holdings, LLC d/b/a Optimum-Cablevision,* Civil Action No. 18-1752-RGA (D. Del.), Memorandum Opinion dated February 4, 2022, p. 12 ("Cablevision argues that Dr. Mangum's reasonable royalty opinions should be excluded because his analytical method is not tied to the facts of the case . . . In *Charter,* I allowed Dr. Mangum to proceed with his analytical method . . .").  *Sprint Communications Company L.P. v. Cequel Communications, LLC d/b/a Suddenlink Communications and CSC Holdings, LLC d/b/a Optimum-Cablevision,* Civil Action No. 18-1752-RGA (D. Del.), Memorandum Opinion dated June 2, 2022, pp. 1-2, 3 ("Dr. Mangum's reasonable royalty opinion follows the "analytical approach/method" described by the Federal Circuit in *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986) and *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Under this method, the patentee may be awarded the difference between an infringer's net profit from infringing sales and the infringer's usual net profit absent the infringement. *TWM*, 789 F.2d at 899. . . .  Plaintiff gives several reasons why Dr. Mangum's approach is nevertheless appropriate. For instance, Plaintiff argues, 'Dr. Mangum's analytical approach is based on real-world documents from the early 2000s, when the use of a VoIP-to-PSTN system was first becoming available, and thus apportions out the entire value of any later developments to make VoIP technology more efficient.' (D.I. 340 at 6-7). Further, even if there were improvements to technologies unrelated to the Sprint patents, Dr. Mangum's theory is that the value would be captured by the equipment manufacturer, not Sprint. (*See* D.I. 336 at 44:1-45:25). For these and other reasons, Plaintiff argues that Dr. Mangum's approach captures only the 'footprint of the patented technology.' (D.I. 340 at 1).  Dr. Mangum's theory appears to be supported using a reliable methodology and accounts for the facts of this case. I see no reason to exclude it under *Daubert*.").  *Board of Regents, The University of Texas System and Tissuegen, Inc. v. Boston Scientific Corp.,* Civil Action No. 18-392-GBW, Dkt No. 261, Memorandum Order filed December 12, 2022, p. 8 ("Lewis uses three methodologies to develop his proposed reasonable royalty: the 'Analytical Approach,' the 'Hypothetical Negotiation" Approach, and the Income Approach. D.I. 203-48 §§ 4.2, 6. In the Analytical Approach, Lewis first subtracted the sales price of the PRO MUS stents from that of the Accused Products to get the Accused Products' profit premium.  . . . (*10X Genomics, Inc. and Prognosys Biosciences, Inc. v. Nanostring Technologies, Inc.,* Civil Action No. 21-cv-653-MFK (D. Del.), Memorandum Opinion and Order dated September 7, 2023, pp. 17, 21-22 ("Another approach is 'the analytical method,' which 'focuses on the infringer's projections of profit for the infringing product.' *Id.* [*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)]. . . . NanoString also moves to exclude Ms. Davis's opinion

828

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

applying the analytical approach. As noted above, '[t]he analytical method[] focuses on the infringer's projections of profit for the infringing product.' *Lucent Techs.*, 580 F.3d at 1324. This method 'calculat[es] damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then apportion[s] the projected profits between the patent owner and the infringer.' *Id.* (quoting John Skenyon et al., Patent Damages Law & Practice § 3:4, at 3–9 to 3–10 (2008)). NanoString contends that Ms. Davis's opinion should be excluded because her calculation uses gross profit margins, rather than net profits. NanoString cites *TWM Manufacturing Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir.1986), for the proposition that net profits is specifically required. In *TWM Manufacturing*, the Federal Circuit described the 'analytical approach' as 'subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices.' *Id.* But the Federal Circuit did not hold that using net profits, as opposed to other profit figures, was required. As stated above, the Federal Circuit in *Lucent* summarized the approach without saying that particular type of profit margin was required. Ms. Davis explained in her reply report that she chose to use gross profit margins because 'the research and development expenses for both nCounter and GeoMx had already been incurred by the date of the hypothetical negotiation.' Dkt. no. 227-24 at 12. The Court concludes that Ms. Davis's use of gross profit margins does not render her methodology unreliable and is not a basis to exclude her opinion. *See Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, No. C15-522-JPD, 2018 WL 10687383, at p. 11 (W.D. Wash. Mar. 28, 2018) (holding that an expert's analytical method opinion using gross profit margins was 'based on sufficient facts and evidence to be presented to the jury'). Lastly, NanoString argues that Ms. Davis's opinion 'fails to account for the substantial differences between the nCounter and GeoMx platforms and differences in their lifecycles.' Def.'s Combined Opening and Resp. Br. at 26. But NanoString does not cite any authority for the proposition that this is a required step of the analytical approach nor explain what the purported 'differences' are. As Ms. Davis explains, differences between the products may be attributable to the fact that the GeoMx product 'is enabled by the patents-in-suit,' 'as compared to nCounter, which does not rely on this [ ] technology.' Dkt. no. 227-24 at 11. The only case NanoString cites, *Wonderland Switzerland AG v. Evenflo Co.*, 564 F. Supp. 3d 320, 341–42 (D. Del. 2021), relates to apportioning an expert's reasonable royalty rate calculated using the analytical approach to account for non-patented features. Because NanoString does not make an apportionment argument, this case is not relevant."). The Analytical Method has also been applied as a metric in the Hypothetical Negotiation Approach. *See, e.g., Novozymes v. Genencor Intern., Inc.,* 474 F.Supp. 2d 592 (D. Del. 2007) (Second, Ms. Davis applied a method that she called the "analytical method." *(Id.* at A15291:15-A15292:19.) *See TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 899-900 (Fed. Cir. 1986) (discussing use of the analytical method in determining a reasonable royalty). According to that method, the parties would compare the expected profit margin of the infringing product to the typical profit margin for the relevant business. *(Id.* at A15291:18-22.) The difference in those margins would be used to estimate an appropriate royalty. *(Id.)* Here, Ms. Davis compared the 71% margin on Spezyme Ethyl to the 44% margin on Spezyme Fred, which was taken to be a typical margin for alpha-amylases in the fuel ethanol industry. *(Id.* at A15292:4-19.) The difference between those margins is 27%. *(Id.* at A15292:17-19.).").

829

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1215.  Under the Analytical Method, the "reasonable royalty rate [is] calculated[.]"[3013]  The Analytical Method calculation "focuses on the infringer's projections of profit for the infringing product" at the time the infringement began and then "subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices."[3014]  For example, the "Analytical Method," as applied in *TWM Mfg. Co. v. Dura Corp.*[3015] focused on the infringer's projections of profit for the infringing product at the time the infringement began and subtracted the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices.[3016]

---

[3013] 10X Genomics, Inc. and Prognosys Biosciences, Inc. v. Nanostring Technologies, Inc., Civil Action No. 21-cv-653-MFK (D. Del.), Memorandum Opinion and Order dated September 7, 2023, p. 23.  See also Rensselaer Polytechnic Institute v. Apple Inc., No. 1:13-cv-0633 (DEP) (N.D.N.Y.), Dkt. No. 265 (filed July 20, 2015), Motion Hearing, Vol. 1, June 26, 2015, 79:22-79:24 ("MR. SKIERMONT: . . . Mr. Yerman for his analytic method, which is distinguished, it's not a hypothetical negotiation, it's a calculation. You understand.  . . .").

[3014] *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

[3015] *TWM Mfg. Co. v. Dura Corp.*, 789 F. 2d 895, at 899 (Fed. Cir. 1986).

[3016] *TWM Mfg. Co. v. Dura Corp.*, 789 F. 2d 895, at 899 (Fed. Cir. 1986) (describing the analytical method as 'subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices').").  *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) ("Litigants routinely adopt several approaches for calculating a reasonable royalty. The first, the analytical method, focuses on the infringer's projections of profit for the infringing product. *See TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 899 (Fed. Cir. 1986) (describing the analytical method as "subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices"); *see also* John Skenyon et al., *Patent Damages Law & Practice* § 3:4, at 3-9 to 3-10 (2008) (describing the analytical method as 'calculating damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then apportioning the projected profits between the patent owner and the infringer').").  *Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*, 609 F.2d 1308, 1319 (Fed. Cir. 2010) ("A reasonable royalty can be calculated from an established royalty, the infringer's profit projections for infringing sales, or a hypothetical negotiation . . .").  *Energy Transportation Group, Inc., v. William Demant Holding A/S, et al.*, 697 F.3d 1342 (Fed. Cir. 2012) ("Mr. Musika further performed an entirely separate analysis of a reasonable royalty using the method set forth in *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895 (Fed. Cir. 1986).  This analysis compared the average expected profit margin on the infringing products, as set forth in Defendants' expert reports, to the industry average expected profit margin.").  *Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("A party may also use what this court has referred to as 'the analytical method,' focusing on the infringer's projections of profit for the infringing product.  *Lucent Techs.,* 580 F.3d at 1324.").  *Linear Group Services, LLC v. Attica Automation, Inc.,* Case No. 13-10108 (E.D. Mich. Aug. 25, 2014) ("The analytical method

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1216. Commentators have referred to the "Analytical Method" is an excess returns analysis that quantifies "the extent [to which] the patented product generates an income advantage" as follows:

> Since no later than *TWM v. Dura,* the so-called analytical approach has advised a straightforward comparison to understand an accused infringer's willingness to pay for patent access. The approach involves comparison between the accused party's profit rate on sales of product embodying the patent property, on the one hand, and profit from product not embodying the patent, on the other. To the extent the patented product generates an income advantage, there is compelling evidence that the infringer would have been willing to pay an amount up to that incremental benefit for rights to the technology.[3017]

1217. Methodologies that focus on the calculation of the patented invention's "income advantage" have long been accepted as proof of the value attributable to the invention. For example, the 2d Cir.'s 1921 decision in *Metallic Rubber Tire Co. v. Hartford Rubber Works Co.* addressed a patent that "concerned an improved tire tread. The defendant manufactured both an infringing tire with the improved tread and the same tire without the tread. Using the difference in the defendant's profits on the two tires, the patentee was able to show (and recover) the amount of the defendant's profits that were attributable to the invention."[3018]

---

focuses on the infringer's projections of profits or [sic – on] the infringing product, regardless of what the parties might have hypothetically agreed to had they successfully negotiated before the infringement began."). *Metaswitch Networks Ltd. v. Genband US LLC, et al.,* Case No. 2:14-cv-744-JRG-RSP (E.D. Tex. Mar. 5, 2016) ("The 'analytical approach' has been accepted by the Federal Circuit as one way to calculate a reasonable royalty. *See TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 899 (Fed. Cir. 1986); *see also Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1296 (Fed. Cir. 2015). The analytical approach in *TWM* was applied by subtracting 'the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices.' *Id.* The difference between the standard profit an infringer can expect to obtain from the sale of non-patented articles and the profit it obtains from the sale of a patented article should, *ceteris paribus,* be equal to the profit attributable to the patented features. . . . So long as the comparison isolates the value of the patented features—and no more—it is immaterial whether the profitability of a specific product or of an industry is used.").

[3017] *See, e.g.,* Stevan Porter and Michelle Rakiec, "Comparison of Risk-Adjusted Returns On Investment In Reasonable Royalty Analysis," *Les Nouvelles,* September 2012, 184-187 at 184, *available at* http://lesnouvelles.lesi.org/lesnouvelles2012/lesNouvellesPDF09-12/Comparison-Of-Risk-Adjusted-Returns-On-Investment-In-Reasonable-Royalty-Analysis.pdf.pdf.

[3018] Eric E. Bensen and Danielle M. White, "Using Apportionment to Rein in the Georgia-Pacific Factors," *The Columbia Science and Technology Law Review,* February 19, 2008, PDF p. 18, fn 60, *available at* https://journals.library.columbia.edu/index.php/stlr/article/view/3814/1612 (*citing e.g.*, *Metallic Rubber Tire Co. v. Hartford Rubber Works Co.*, 275 F. 315, 322-23 (2d Cir. 1921)).

831

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1218. The calculation of the patented invention's "income advantage" has varied across cases and included subtractions for the "infringer's usual or acceptable net profit,"[3019] "the profitability of specific products,"[3020] and "industry average expected profit margin."[3021]   "So long as the comparison isolates the value of the patented features—and no more—it is immaterial whether the profitability of a specific product or of an industry is used."[3022]   While there is no "second

---

[3019] *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

[3020] *Metaswitch Networks Ltd. v. Genband US LLC, et al.,* Case No. 2:14-cv-744-JRG-RSP (E.D. Tex. Mar. 5, 2016), Dkt. No. 297, Memorandum Order, p. 10.  *See also Wonderland Switzerland AG v. Evenflo Company, Inc.,* 564 F. Supp. 3d 320, 342 (D. Del., 2021) ("Defendant itself makes the argument, 'To calculate a reasonable royalty under the analytical approach preferred by Mr. Schoettelkotte, the patentee must `calculate[] damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then apportion[] the projected profits between [itself] and the infringer.'' (D.I. 180 at 33) (citing *Lucent,* 580 F.3d at 1324) (internal quotations omitted). As this is precisely what Defendant itself did in the marketing brief that Mr. Schoettelkotte cites in his analysis (JTX-230), I will use as a starting point the 2017 comparison of expected EveryStage LX profits to actual Symphony profits, which indicates an expected increase in profitability of $5.28 per unit.  I agree with Defendant that there needs to be apportionment of that $5.28 figure to account for patented versus non-patented features in the EveryStage. Neither party has provided clear quantitative data to perform such an analysis. Based on the available evidence, Defendant did not preferentially market the patented harness storage or headrest/harness adjust features (Tr. at 742:4-10). Defendant does not dispute, however, that the marketed in-seat recline feature requires the headrest harness adjust feature to operate. (D.I. 182 at 19).  Given the little emphasis Defendant has put on marketing the patented features, I disagree with Plaintiff's assessment that the entire difference in profitability should be attributed to the patented features. Taking into consideration that the marketed in-seat recline feature requires the patented features to operate, however, an apportionment of sixty percent for the patented features and forty percent for the non-patented features seems reasonable. This brings the reasonable royalty rate to $3.17 per unit.").

[3021] *Energy Transportation Group, Inc., v. William Demant Holding A/S, et al.*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) ("Mr. Musika further performed an entirely separate analysis of a reasonable royalty using the method set forth in *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895 (Fed.Cir.1986). This analysis compared the average expected profit margin on the infringing products, as set forth in Defendants' expert reports, to the industry average expected profit margin. Mr. Musika testified this analysis showed the infringing products garnered a 6.4% increase in expected profit margin based on the technology in the ETG Patents. Mr. Musika's suggested reasonable royalty rates were thus tied to the benefit accorded by the patents at issue.").

[3022] *Metaswitch Networks Ltd. v. Genband US LLC, et al.,* Case No. 2:14-cv-744-JRG-RSP (E.D. Tex. Mar. 5, 2016), Dkt. No. 297, Memorandum Order, p. 10.

832

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

apportionment step"[3023] in the Analytical Method, when "'there are significant technological benefits . . . that have nothing to do with the patented inventions,'" the expert is "'required to isolate the incremental amount of any profit differential attributable to the patented inventions as opposed to other [non-patented attributes].'"[3024]  "[C]lear quantitative data to perform such an analysis" may not exist.[3025]  In such cases, I understand that all that is required is a reasonable approximation "based on the available evidence."[3026]  For example, in *Wonderland Switzerland AG v. Evenflo Company, Inc.,* following a bench trial, Judge Andrews concluded on the available evidence that "an apportionment of sixty percent for the patented features and forty percent for the non-patented features seems reasonable."[3027]  Similarly, in *Rensselaer Polytechnic Institute v. Apple Inc.,* at the *Daubert* stage, the damages expert's "divide by three" apportionment under the analytical method was not excluded.[3028]

---

[3023] *See, e.g., Sprint Communications Company LP v. Charter Communications, Inc., et al.,* Civil Action No. 17-1734-RGA (D. Del.), Memorandum Order, March 16, 2021, p. 28 ("Defendants also argue that Dr. Mangum's analytical approach should be excluded as he failed to apportion cost savings attributable to technology Plaintiff did not invent and did not provide an explanation as to why all of the cost savings associated with VoIP are due to Plaintiff's asserted patents. (D.I. 468 at 47-49). **Plaintiff counters that under Federal Circuit precedent there is no second apportionment step in the analytical approach**, as the approach consists of subtracting the infringer's usual net profit from its anticipated net profit from the sales of the infringing product. (D.I. 497 at 37). . . .  Plaintiff further argues that even if there is a need for a second apportionment step, Dr. Mangum explains how his analytical approach apportions out unpatented VoIP technology. (D.I. 497 at 37). . . ." (emphasis added)).

[3024] Sprint Communications Company L.P. v. Cequel Communications, LLC d/b/a Suddenlink Communications and CSC Holdings, LLC d/b/a Optimum-Cablevision, Civil Action No. 18-1752-RGA (D. Del.), Memorandum Opinion dated February 4, 2022, p. 13.

[3025] Wonderland Switzerland AG v. Evenflo Company, Inc., 564 F. Supp. 3d 320, 342 (D. Del. 2021).

[3026] Wonderland Switzerland AG v. Evenflo Company, Inc., 564 F. Supp. 3d 320, 342 (D. Del. 2021).

[3027] Wonderland Switzerland AG v. Evenflo Company, Inc., 564 F. Supp. 3d 320, 342 (D. Del. 2021).

[3028] *Rensselaer Polytechnic Institute v. Apple Inc.,* No. 1:13-cv-0633 (DEP) (N.D.N.Y., Jan. 6, 2016), Dkt. No. 274 (filed January 20, 2016), Decision and Order dated January 6, 2016, p. 32 ("Mr. Yerman next estimated the value of the '798 Patent technology to Siri as being one of the three main components, and therefore divided Apple's profits by three to reach his final opinion, utilizing the analytical approach, concluding that, in the event of a finding of infringement, plaintiffs should be entitled to recover 'approximately $429 million in damages.' *Id.* at 42.").

833

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### 2.    Analysis

1219. To calculate the reasonable royalty under the Analytical Method, I have focused on estimating the "income advantage" of the Patents-in-Suit, which I understand were critical to mRNA-1273's commercial success. The facts show that Moderna's use of Genevant's Patents-in-Suit, recognized as the "gold standard" LNP, was critical to its commercialization of mRNA-1273. Without Genevant's patented LNP, which Moderna had concluded in August 2014 was "**close to optimal for mRNA**,"[3029] "there could be no [Moderna] mRNA vaccine."[3030] A January 2022 Pfizer article highlighted the critical importance of the LNP in mRNA vaccines as follows:

> This tiny fat glob [the cationic lipid], known as a functional lipid, is actually one of four lipids that make up the lipid nanoparticles that go into the vaccine. Without these lipid nanoparticles, in fact, there could be no Pfizer-BioNTech mRNA vaccine. That's because mRNA, which is the genetic material that teaches our cells to make the protein that will help our immune systems produce antibodies that helps to protect us from COVID-19, is incredibly delicate. It needs structure and protection to do its job in the human body, and lipids provide that. The cationic lipid, in particular, is the one that does the protecting. "It's the primary component of the lipid nanoparticle, so it was needed in much larger quantities," says [Product Manager with Pfizer Global Supply, Melissa] French.[3031]

---

[3029] MRNA-GEN-02204816-901, at 868 ("Final progress report (IPR) for Moderna Grant W911 NF-13-1-0417*," August 14, 2014  (summarizing the research data generated between October 2013 and the end of July 2014.), PDF p. 53 of 86 ("While the design space of MC3 formulations is still being evaluated and refined, both in terms of formulation and especially process conditions, initial indications are that a formulation similar to the quantitative composition of ALN-TTR-02 is close to optimal for mRNA. The main difference introduced by Moderna is use of higher concentrations of the nucleic acid, with a target of at least 2 mg/mL compared with <l mg/mL for the nucleic acids in siRNA formulations. It is important to note that the lipid concentration, scale proportionally with the nucleic acid content. The physical and chemical stability of formulations is under active study using the range of characterization technology available at Moderna: light scattering, gel electrophoresis, uPLC/CAD (lipid analysis), fluorescence, electron microscopy, etc.") (emphasis added).

[3030] Kate Silver, "Shot of a Lifetime: How Pfizer Developed its Own Raw Materials to Ensure a Steady Supply for the COVID-19 Vaccine," *Pfizer,* January 27, 2022, *available at* https://www.pfizer.com/news/articles/shot_of_a_lifetime_how_pfizer_developed_its_own_raw_materials_to_ensure_a_steady_supply_for_the_covid_19_vaccine.

[3031] Kate Silver, "Shot of a Lifetime: How Pfizer Developed its Own Raw Materials to Ensure a Steady Supply for the COVID-19 Vaccine," *Pfizer,* January 27, 2022, *available at* https://www.pfizer.com/news/articles/shot_of_a_lifetime_how_pfizer_developed_its_own_raw_materials_to_ensure_a_steady_supply_for_the_covid_19_vaccine. *See also*, MRNA-GEN-02125366-97, at 91 (Statement of Moderna CSO Melissa Moore at May 17, 2022 Science & Technology Day) ("So the other thing about the lipid nanoparticles, they have this beautiful lipid

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1220. By May 31, 2020, Moderna expected it would launch mRNA-1273.  In fact, as discussed above, by the time of the May 31, 2020 hypothetical negotiation, Moderna had high confidence that its mRNA-1273 vaccine would be successful.  Dr. Tal Zaks testified:

> Remember for us in 2020, when the COVID started, we had successfully immunized – we had tried to immunize people, human beings, against eight different viruses by the beginning of 2020.  And our track record in the clinic was 8 out of 8.  For us, COVID was number 9.  **I had a high expectation and conviction that this would work.**[3032]
>
> . . .
>
> And the fact that it's a platform is manifest in the fact that once we did the first infectious disease vaccine for H10 in 2015 we put it in the clinic, then the next one also worked, and the one after that also worked, the one fact that also worked.  So vaccine after vaccine after vaccine kept working because they were all based on the same fundamental technology and platform.[3033]
>
> . . .
>
> So prior to 2020 and 2019, we actually had quite a significant experience [developing vaccines for infectious disease].  Not only that, our experience was the majority of the totality of experience in the world up until then.  We were the first to demonstrate and publish an mRNA and an LNP infectious disease vaccine in mankind.  We published that in 2016 or 2017.  I'm very proud to be an author on that paper.  And that was the first two vaccines against pandemic preparedness for respiratory viruses H10 and H5.  We then developed a vaccine for chikungunya.  We developed a vaccine for Zika.  We developed a vaccine for two respiratory viruses, HMPV and PIV3 given together.  And we developed  a vaccine for CMV.  We developed a vaccine for RSV.  In all of these cases, these vaccines in the clinic led to neutralizing antibodies.  So by the time COVID hit in the beginning of 2020, this was our ninth.  **And so we had a high – I had a high expectation that indeed this was going to work and would lead to neutralizing antibodies.**  And it became quickly apparent that we had a benchmark in terms of the neutralizing antibodies from the clinic, and so that's – **that was the foundational work for the**

---

bio-layer around the outside, right? So the mRNA is fully encapsulated within the lipid nanoparticle.  With lipoplexes, what happens is that the mRNA might be covered mostly with that lipid, but it can stick an elbow out. And if it sticks an elbow out, then there's a digestive enzyme that's going to clip it and then you're going to kill your RNA.  So the RNA is not -- even though you can deliver some fraction of it, it's not going to be nearly as efficient and it's not going to survive the digestive enzymes that are in the biological fluids.").

[3032] MRNA-GEN-01734848-096, at 920 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (*Moderna v. Pfizer*), 73:1-73:10)(emphasis added).

[3033] MRNA-GEN-01734848-096, at 045-046 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (*Moderna v. Pfizer*), 198:19-199:4).

835

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**success of our COVID vaccine it didn't come out of the blue suddenly in 2020**.[3034]

1221. Dr. Zaks testified that "the foundation for success"[3035] and "the basis for that [mRNA-1273 clinical trial] success was the preceding work that we had done since the time I joined Moderna,"[3036] which was work that used Genevant's LNP technology.  On May 1, 2020, *CNN* reported Dr. Tal Zaks comments at the time, which highlighted the importance of Moderna's prior "multiple phase one trials," as follows:

> Said Zaks: "We've demonstrated the utility to generate the right kind of immune response time and again in multiple phase one trials."[3037]
> . . .

---

[3034] MRNA-GEN-01734848-096, at 047-048 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (*Moderna v. Pfizer*), 200:6-201:14) (emphasis added).

[3035] MRNA-GEN-01734848-096, at 923-924 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (*Moderna v. Pfizer*), 76:20-77:1 ("A. . . . From my perspective as a clinical developer, as I said, the foundation for the success is the fact that we had demonstrated time and again the ability of our platform as we designed it to mediate a successful infectious disease vaccine.")).

[3036] MRNA-GEN-01734848-096, at 866, 919, 922 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (*Moderna v. Pfizer*), 19:1-19:11 ("Q. And you referred to 'demonstrating the utility and breadth of this platform.'  When you say 'this platform,' you mean the mRNA vaccine platform? A. No.  I mean the ability of the type of mRNA in the LNPs that we developed to lead to protein production in the human body that would have pharmacological effects.  And that's much more than infectious disease vaccines."); 72:21-72:25 ("A. Moderna's data stand on their own and ultimately it is this platform and the basis for that success was the preceding work that we had done since the time I joined Moderna [in April 2015]."); 75:1-75:5 ("A. . . . And to my understanding, that rests on our work on MERS a highly related Coronavirus that demonstrated the approach was expected to work.")).

[3037] *See also* MRNA-GEN-01734848-096, at 881-882, 893 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (*Moderna v. Pfizer*), 34:3-35:9 ("A. . . . When I joined Moderna in 2015, an infectious disease vaccine was the first thing we put in the clinic. . . . We had demonstrated – and we were the first to demonstrate the utility of this in infectious disease vaccine.  We published the data in 2016 or 2017. . . . We then went on to demonstrate with several additional infectious disease vaccine the utility. . . . And so by then [September 2019] we had shown time and again the ability to raise neutralizing antibodies against several different viruses.  So we were down at the NIH – that was in September 2019.  I remember that date because Stéphane [Bancel] and I were down at the NIH meeting with the team there.  And it was clear that we had demonstrated time and again the ability of our mRNA platform to generate neutralizing antibodies against a whole host of different viruses, including respiratory viruses. . . ."); 46:9-46:20 ("A. . . . [B]y then [2018], we had already demonstrated that our platform worked in the clinic and I think by then at least two viruses, if not three or four. . . As I've indicated before, we had already translated the ability to take what could be interesting mice data and actually prove that they worked in the clinic. . . .")).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

But Zaks says Moderna has delivered on its promises to US officials about its coronavirus vaccine, saying, "When our CEO said that we would get this fast into the clinic, we did."

That, he said, combined with the company's potential, is why "the US government stepped in and picked our platform as one of the major investments that Tony Fauci and the team are making in.  And I think if you stay in tuned, you should expect to see us be able to deliver on that."[3038]

1222.  By May 18, 2020, Moderna was confident that mRNA-1273 would be effective; Moderna advised investors that its "results signified that Modern's vaccine was likely to be effective against COVID-19.  [Moderna's chief Medical Officer, Tal Zaks stated:] 'The totality of the science tells us that this is the right antigen and we should be protective.'"[3039]  Dr. Zaks added:  **"So, we'll get there.  It's just – it's really a question of time."**[3040]  Moderna's September 2, 2020 LRP provides further evidence and stated: **"In light of the high likelihood of launch of mRNA-1273 in the pandemic, . . . ."**[3041]  At that time, Moderna also noted that it had already received "~$1Bn as

---

[3038] Robert Kuznia, Katie Polglase, Gianluca Mezzofiore, "In quest for vaccine, US makes 'big bet' on company with unproven technology," *CNN,* May 1, 2020, *available at* https://www.cnn.com/2020/05/01/us/coronavirus-moderna-vaccine-invs/index.html.

[3039] Michael Hiltzik, "Column: Moderna execs sold $29 million in stock after its early vaccine announcement," *Los Angeles Times,* May 26, 2020, *available at* https://www.latimes.com/business/story/2020-05-26/moderna-execs-stock-sales.  *See also* "Moderna, Inc. (MRNA) SARS-CoV-2 Vaccine (mRNA-1273) Interim Phase 1 Data Conference (Transcript)," *Seeking Alpha,* May 18, 2020, p. 10 of 30, *available at* https://seekingalpha.com/article/4348593-moderna-inc-mrna-sars-covminus-2-vaccine-mrnaminus-1273-interim-phase-1-data-conference ("Tals Zak, Moderna CMO: "I think the totality of science tells us that this is the right antigen and that we should be protective.").

[3040] "Moderna, Inc. (MRNA) SARS-CoV-2 Vaccine (mRNA-1273) Interim Phase 1 Data Conference (Transcript)," *Seeking Alpha,* May 18, 2020, p. 10 of 30, *available at* https://seekingalpha.com/article/4348593-moderna-inc-mrna-sars-covminus-2-vaccine-mrnaminus-1273-interim-phase-1-data-conference.

[3041] MRNA-GEN-01570975-1159, at 108 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 134 of 186) ("LRP 2020 – Capital formation & allocation – executive summary (1/2)").

837

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

BARDA grants and $0.6Bn as deposits from advance purchases of mRNA-1273,"[3042] which Moderna characterized as "**Government pre-sales** under advanced purchase agreements."[3043]

          **p.**      **The Facts Show that Moderna Expected to (and Did) Achieve Substantial Value as a Result of its Use of the Patents-in-Suit**

1223. As discussed above, the facts clearly show that by May 31, 2020, Moderna expected to (and did) achieve substantial value as a result of its use of the Patents-in-Suit, which included both billions in revenues and profits on sales of mRNA-1273 as well as the derivative and additional value that Moderna expected mRNA-1273 would drive:

          **(4)**      **By May 31, 2020, Moderna was Projecting that mRNA-1273 Would Generate Billions in Revenue and Profits**

1224. As discussed above, the facts show that by May 31, 2020, it was not a question of *whether* Moderna would achieve *any* mRNA-1273 revenue and profits, but rather, the only question was *how much*. *See* II.E.4.e.(1), above.

          **(5)**      **Moderna Expected that mRNA-1273 Would Drive Significant Derivative and Additional Value**

1225. As discussed above, the facts show that Moderna expected that mRNA-1273 would drive significant derivative and additional value that is causally connected to its use of Genevant's Patents-in-Suit. *See* II.E.4.e.(2), above.

          **q.**      **Applying the Analytical Method to the Facts of this Case: *Overview***

1226. My Analytical Method analysis, however, does not capture *any* of the foregoing additional derivative value and benefits that Moderna expected to realize as a result of its use of the claimed inventions of the Patents-in-Suit in the Accused Product, mRNA-1273. I do, however, consider

---

[3042] MRNA-GEN-01570975-1159, at 108 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 134 of 186) ("LRP 2020 – Capital formation & allocation – executive summary (1/2)").

[3043] MRNA-GEN-01570975-1159, at 1036 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 62 of 186) ("Our strategic priority is to respond to the pandemic in a manner that recognizes the value of our platform & infrastructure") (emphasis in original). *See also id.* 037 (Slide 63 of 186: "**We pursue government pre-sales** for supply mainly out of H1 2021 capacity for up to 265m doses (excluding USG option 1)" (emphasis added))

838

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

the foregoing expected additional derivative value and benefits in the Hypothetical Negotiation approach, which is addressed later.

1227.  Instead, my Analytical Method analysis calculates the "income advantage" associated with the Patents-in-Suit based only on the direct benefits associated with Moderna's mRNA-1273 projections around the time of the May 31, 2020 hypothetical negotiation relating to the COVID-19 **pandemic phase**.  However, substantial evidence supports the fact that the economics of mRNA-1273 during the *pandemic* phase are different than the economics during the *endemic* phase, and Moderna expected that both pricing and volume would be different, as shown in **Figure 6.1**,[3044] below.



**FIGURE 6.1**

---

[3044] MRNA-GEN-01642889-921, at 911 ("Town Hall," *Moderna,* August 5, 2020, Slide 23 of 33) ("Vaccine against COVID-10 (mRNA-1273) pricing strategy").

839

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1228.   Regarding pricing, Moderna stated: "During the pandemic period, pricing is below the value of an effective vaccine to ensure broad accessibility."[3045]   In contrast, during the endemic period, Moderna expected that pricing would be "[b]ased on value and market forces" and cited, *e.g.*, "[a]verage sales price/course for innovative vaccines (PREVNAR, GARDASIL): $230-$640" as a potential benchmark.[3046]   Moderna's June 15, 2020 "Recommended Pricing" shows that Moderna expected a *lower* price during the *pandemic* phase (*i.e.,* $30/dose)[3047] and a significantly

---

[3045] MRNA-GEN-01642889-921, at 910 ("Town Hall," *Moderna,* August 5, 2020, Slide 22 of 33) ("Approach to assigning value to a COVID-19 pandemic vaccine").

[3046] MRNA-GEN-01642889-921, at 911 ("Town Hall," *Moderna,* August 5, 2020, Slide 23 of 33) ("Vaccine against COVID-10 (mRNA-1273) pricing strategy").

[3047] *See* MRNA-GEN-02645690-752 at 691 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 2 of 64); May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 412:18-414:11 ("Q. . . . If we can look at page 2, Bates ending in 691 [of Hoge Deposition Exhibit No. 46], you see it says, 'Context for COVID vaccine Environment'? A. Mm-hmm. Q. And then in the middle it says, 'USG 100 million doses negotiation at $30 per dose have not concluded yet.' Do you see that? A. Mm-hmm. Q. So you're still offering $30 a dose, but negotiations have not concluded yet, right? A. Yeah, I actually think that they were essentially paused in June, and taken back up in August, as it says in the e-mail exchange we looked at before. So, yes, they had not been concluded. I don't even know that they were that active at that point. Q. It then says, 'We have had some early wins with' -- A. Yes. Q. And then it says, 'Switzerland (6 million doses, $30 a dose, $180 million).' Do you see that? A. Yes. Q. And so you had reached an agreement with Switzerland by that time to sell 6 million 1 doses at $30 a dose? A. Correct. Q. And by that time, June 15, 2020, you had reached an agreement with Singapore to provide 2 million doses at $30 per dose for a total of 60 million? A. That's correct. Q. And you were almost done concluding an agreement with Israel for 2 million doses, $30 a dose, for $60 million, is that right? A. That is correct."); MRNA-GEN-02645686-689, at 687 (June 7, 2020 Memorandum from Lori Henderson to Moderna Board of Directors; Moderna EX; Re: Summary of 6/4/20 COVID Committee Meeting," p. 2 of 4) ("Order Process and Update – *USG*: We have received a draft contract from the USG – DOD for purchase of up to 300M doses of mRNA-1273.  More details on this contract will be available early this week. . . . **Price: Initial price per dose of $30/dose expected** to be increased to $35/dose after release of the full Phase 1 data. . . ." (emphasis added)); MRNA-GEN-02651213-245, at 222 (June 25, 2020 Moderna "Manufacturing update" deck); MRNA-GEN-01570975-1159, at 030 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 56 of 186) ("Contractual considerations: Moderna's risk tolerance compared to big pharma limited initial competitiveness . . . **June – July initial position – Price[:] Price per dose ≥ 2-9x competitors . . .**" (emphasis added)); MRNA-GEN-01122003-088, at 009 (Bennett Deposition Exhibit No. 29 – "Volume II: Cost Proposal, Solicitation Number: W911QY20R0043," *Moderna,* July 10, 2020, PDF p. 7 of 88) (emphasis added); *see also id.* ("Given the anticipated USG investment in the advanced development of mRNA-1273 under BARDA contract 75A50120C00034, Moderna found it reasonable to further discount the MOU price.  Based on the revised scope of the development program, the expectation is that the contract cost will increase to a total value of $952M.  Furthermore, we estimate the value of the services of NIAID

840

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

*higher* price during the later *endemic* phase (*e.g.,* $115/dose).[3048] However, Moderna's documents appear to show that it had not yet developed a specific expectation regarding endemic phase profitability (*i.e.,* "what costs do we need to include and what margin structure do we need to have"[3049]) around the date of the May 31, 2020 hypothetical negotiation.[3050] For example, on July 2, 2020, Dr. Hoge stated:

during Phase 1-3 of the development of mRNA-1273 to equate to $55M.  Applying the total estimated USG financial support as a credit against CLIN 001 [sic], result in a price of $19.93 for CLIN 0001. **More specifically for CLIN 0001**: Starting with **comparable pricing under existing agreements for supply of mRNA-1273** of US$30/dose for ex-factory bulk drug product, *which we previously quoted to the USG,* Moderna deducted a discount of $10.07 ($1.007B/ 100M) resulting in a price of $19.93 per dose." (**bold** emphasis in original; *italics* underlined emphasis added)); HHS-0000828-830 (Bennett Deposition Exhibit No. 21 – May 31, 2020 letter from Stéphane Bancel to Dr. Moncel Slaoui (Warp Speed/HHS), General Gustave F. Perna (Warp Speed/HHS), Dr. Gary Disbrow (BARDA)); MRNA-GEN-01900098 (May 31, 2020 Email from Hamilton Bennett to Robert Johnson (HHS) Subject: mRNA-1273 Supply Agreement); Plaintiff Genevant Sciences GmbH's Eleventh Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (Nos. 1-7) dated June 7, 2024, p. 71 ("It is further an act of infringement for Moderna to offer to sell the Accused Product. Based on Plaintiffs understanding of discovery to date, Moderna first made an offer to sell the Accused Product to the United States Government on May 31, 2020."). MRNA-GEN-02645690-752 at 697-698 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slides 8-9 of 64).

[3048] MRNA-GEN-02645690-752 at 695 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 6 of 64).  *See also* Ned Pagliarulo, "Moderna sets high price in early coronavirus vaccine supply deals," *Biopharma Dive,* August 5, 2020, *available at* https://www.biopharmadive.com/news/moderna-coronavirus-vaccine-price-dose/582947/ ("Like other companies, including Pfizer, Moderna is considering two prices for its vaccine: one for during the pandemic, and another for when the immediate crisis subsides but the virus remains endemic.  At that point, Moderna would price the shot 'in-line' with other newly approved vaccines, Bancel said Wednesday. The company suggested the vaccine's value would correspond to between $300 and $725 per two-dose vaccine course, according to a cost-effectiveness model shared by Moderna.").

[3049] MRNA-GEN-01724826-968, at 911 (December 21, 2021 Deposition of Christoph Brackmann (*Moderna v. Pfizer*), 86:6-86:7).

[3050] See, e.g., MRNA-GEN-01251960-028, at 002 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," *Moderna*, n.d. (May 20, 2020), Slide 43 of 69) ("Pro forma for COVID: Operating cash flow statement, 2020-2024," uninformative re: endemic period 2022-2024 yet pointing "[t]o be refined as part of 2020 LRP"). *See also* MRNA-GEN-01725128-156, at 129, 140 (*Moderna v Pfizer* Brackmann Deposition Exhibit 11, Moderna - August 10, 2020 mRNA-1273 Lifecycle Management Deck, Slides 2, 13 of 29) "Endemic" "Scenario 3" "Price" "US" "$60"); MRNA-GEN-01570975-1159, at 992, 116 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna*, September 2, 2020) (Slide 18 of 186 - "Endemic" "Price per

841

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

> My 2 cents, **if we can generate meaningful FCF [free cash flow] from 1273**, we should reinvest some in Gen2 product that would be better commercially post pandemic (2H2021) and that would be 100% free and clear of BARDA and NIH and all the pain that goes with them.[3051]

1229. Regarding dose volume, while Moderna did not have "clarity on [mRNA-1273] endemic market" as of May 31, 2020, it appears to have recognized that "[p]andemic demand levels will not translate into endemic period."[3052]   Overall, Moderna expected significantly *higher* revenue and profits during the pandemic phase, and *lower* revenue and profits during the endemic phase, albeit at higher prices.[3053] As such, I have calculated two reasonable royalties: one that applies to sales during the *pandemic* phase, and a second one that applies to sales during the *endemic* phase. However, because Moderna does not appear to have developed an expectation regarding *endemic*

---

Dose" of $44 in "Upside" Scenario) and (Slide 142 of 186 - "Steady state volume (price)" of "$44/dose" in "Upside" Scenario, for 2022-2025).

[3051] MRNA-GEN-01724191-192, at 191 (*Moderna v. Pfizer* Brackmann Deposition Exhibit No. 10 – July 2, 2020 email from Stephen Hoge to Christoph Brackmann, Cc: David Meline, Subject: Re: 2nd generation) (emphasis added). MRNA-GEN-01724826-968, at 906-911 (December 21, 2021 Deposition of Christoph Brackmann (*Moderna v. Pfizer*), 81:15-86:3 (testimony regarding Brackmann Deposition Exhibit No. 10); 86:4-86:10 ("A. . . . And, again, I think this is probably part of a budget process where we thought about, you know, what costs do we need to include and what margin structure do we need to have with regards to our commercial product to be able to invest into, you know, whatever we would need to invest to keep the product on the market.").

[3052] MRNA-GEN-01570975-1159, at 064 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 90 of 186) ("Manufacturing footprint and resourcing will require careful assessment as we get closer to 2H 2021 and have more clarity on endemic market").  *See also* MRNA-GEN-02645641-677, at 645 (Hoge Deposition Exhibit No. 45 – "Board Discussion," *Moderna*, May 15, 2020, Slide 4 of 37) ("the value of a course of vaccine will decline precipitously from Ql '21, as the size of high risk populations decline (vaccine or infection), and many vaccines become available").

[3053] *See, e.g.,* MRNA-GEN-01570975-1159, at 999, 040 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slides 25, 66 of 186) (Slide 25: "Our plan has the potential to deliver a strong financial foundation in the near-term . . . *Base case outlook*: In 2021, we expect to generate



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

phase cost and margin structure as of May 31, 2020, I have *not* determined an *endemic* phase royalty rate measure based on the Analytical Method.

1230. My Analytical Method analysis to determine a *pandemic* royalty rate is based on Moderna's mRNA-1273 projections, its expected mRNA-1273 profit margin, and subtractions to arrive at Moderna's expected mRNA-1273 net profits. I then undertook a "second apportionment step" to "isolate the incremental amount of [the] profit differential attributable to the patented inventions" separate from the amount of the differential profit attributable to the payload. In particular, my analysis is based on the following four (4) elements:

a) **Moderna's mRNA-1273 projections** for "estimated supply and confirmed demand,"[3054] "Recommended Pricing"[3055] ($30 per dose), and "███████████ █████████") as set forth in Moderna's June 15, 2020 "CEO Update." These projections appear to reflect Moderna's expectations during the period from May 2020 through early-August 2020.[3057]

---

[3054] MRNA-GEN-02645690-752 at 696 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 7 of 64).

[3055] MRNA-GEN-02645690-752 at 695 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 6 of 64).

[3056] MRNA-GEN-02645690-752 at 697 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 8 of 64).

[3057] *See* MRNA-GEN-02645690-752 at 691, 697 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 2, 8 of 64); May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 412:18-414:11 ("Q. . . . If we can look at page 2, Bates ending in 691 [of Hoge Deposition Exhibit No. 46], you see it says, 'Context for COVID vaccine Environment'? A. Mm-hmm. Q. And then in the middle it says, 'USG 100 million doses negotiation at $30 per dose have not concluded yet.' Do you see that? A. Mm-hmm. Q. So you're still offering $30 a dose, but negotiations have not concluded yet, right? A. Yeah, I actually think that they were essentially paused in June, and taken back up in August, as it says in the e-mail exchange we looked at before. So, yes, they had not been concluded. I don't even know that they were that active at that point. Q. It then says, 'We have had some early wins with' -- A. Yes. Q. And then it says, 'Switzerland (6 million doses, $30 a dose, $180 million).' Do you see that? A. Yes. Q. And so you had reached an agreement with Switzerland by that time to sell 6 million 1 doses at $30 a dose? A. Correct. Q. And by that time, June 15, 2020, you had reached an agreement with Singapore to provide 2 million doses at $30 per dose for a total of 60 million? A. That's correct. Q. And you were almost done concluding an agreement with Israel for 2 million doses, $30 a dose, for $60 million, is that right? A. That is correct."); MRNA-GEN-02645686-689 at 687 (June 7, 2020 Memorandum from Lori Henderson to Moderna Board of Directors; Moderna EX; Re: Summary of 6/4/20 COVID Committee Meeting," p. 2 of 4) ("Order Process and Update – *USG*: We have received a draft contract from the USG – DOD for purchase of up to 300M doses of mRNA-1273. More details on this contract will be available early this week. . . . *Price*: **Initial price per dose of $30/dose expected** to be increased to

843

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

   b)  **Moderna's expected mRNA-1273 profit** of ████████████████████ ██████ This is based on ████████████████████████████ ████████████████████████████████████████ is reasonable and further supported by criteria outlined in DFARS 215.404-71."[3058]

   c)  **Subtractions** to account for other Moderna costs, other investments in technology related to mRNA-1273 and platform investments, and returns on investments.

   d)  **Apportionment** to "apportion out" unpatented features (*e.g.,* payload).

1231.  I will discuss each of the foregoing elements in the next section for the "*Pandemic* Phase."

---

$35/dose after release of the full Phase 1 data. . . ." (emphasis added)); MRNA-GEN-02651213-245, at 222 (June 25, 2020 Moderna "Manufacturing update" deck); MRNA-GEN-01570975-1159, at 030 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 56 of 186) ("Contractual considerations: Moderna's risk tolerance compared to big pharma limited initial competitiveness . . . **June – July initial position – Price[:] Price per dose ≥ 2-9x competitors . . .**" (emphasis added)); MRNA-GEN-01122003-088, at 009 (Bennett Deposition Exhibit No. 29 – "Volume II: Cost Proposal, Solicitation Number: W911QY20R0043," *Moderna,* July 10, 2020, PDF p. 7 of 88) ("Given the anticipated USG investment in the advanced development of mRNA-1273 under BARDA contract 75A50120C00034, Moderna found it reasonable to further discount the MOU price. Based on the revised scope of the development program, the expectation is that the contract cost will increase to a total value of $952M. Furthermore, we estimate the value of the services of NIAID during Phase 1-3 of the development of mRNA-1273 to equate to $55M. Applying the total estimated USG financial support as a credit against CLIN 001 [sic], result in a price of $19.93 for CLIN 0001. **More specifically for CLIN 0001**: Starting with **comparable pricing under existing agreements for supply of mRNA-1273** of US$30/dose for ex-factory bulk drug product, *which we previously quoted to the USG,* Moderna deducted a discount of $10.07 ($1.007B/ 100M) resulting in a price of $19.93 per dose." (**bold** emphasis in original; *italics* underlined emphasis added)); HHS-0000828-830 (Bennett Deposition Exhibit No. 21 – May 31, 2020 letter from Stéphane Bancel to Dr. Moncel Slaoui (Warp Speed/HHS), General Gustave F. Perna (Warp Speed/HHS), Dr. Gary Disbrow (BARDA)); MRNA-GEN-01900098 (May 31, 2020 Email from Hamilton Bennett to Robert Johnson (HHS) Subject: mRNA-1273 Supply Agreement); Plaintiff Genevant Sciences GmbH's Eleventh Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (Nos. 1-7) dated June 7, 2024, p. 71 ("It is further an act of infringement for Moderna to offer to sell the Accused Product. Based on Plaintiffs understanding of discovery to date, Moderna first made an offer to sell the Accused Product to the United States Government on May 31, 2020.").

[3058] MRNA-GEN-01122003-088, at 014 (Bennett Deposition Exhibit No. 29 – "Volume II: Cost Proposal, Solicitation Number: W911QY20R0043," *Moderna,* July 10, 2020, PDF pp. 8, 12 of 88).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

r.    **Applying the Analytical Method to the Facts of this Case:**
        *Pandemic* **Phase**

**(6) Moderna's mRNA-1273 Projections**

1232.   Moderna's public presentations and internal documents during the period May 2020 through early-August 2020 show that it expected to sell up to a billion doses of mRNA-1273 during the pandemic phase at $30 per dose and ████████████████████, as discussed in detail above.  *See* II.E.4.f.

**(h)    Background**

1233.   Moderna prepared various projections shortly before and shortly after May 31, 2020, the date of first alleged infringement. By early-May 2020, Moderna's publicly stated goal was "to build the leading mRNA company in the world"[3059] and was "readying the company to potentially file its first BLA for mRNA-1273," which it described as "a historic moment for the company."[3060] Moderna's goal was to produce 1 billion doses of mRNA-1273 per year.  During Moderna's May 7, 2020 earnings call, Dr. Tal Zaks stated that Moderna "announced a collaboration with Lonza to manufacture mRNA-1273 at scale, **with the goal of producing up to 1 billion doses a year.** . . . Technology transfer is expected to begin this June, and we anticipate the first batches of mRNA-1273 to be manufactured at Lonza's U.S. sites in July of this year."[3061]  Mr. Bancel added: "We not only have a fully integrated GMP site in Massachusetts, . . . but we've added a strategic partnership with Lonza that can enable us to [make] up to 1 billion doses annually for vaccine

[3059] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, p. 13 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO). (emphasis added).

[3060] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, p. 13 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO). (emphasis added).

[3061] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, p. 8 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Dr. Tal Zaks, Chief Medical Officer) (emphasis added).

845

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

against SARS-CoV-2, . . .[3062] We are already scaling up the organization to address the need to supply up to 2 billion doses for potentially first vaccine mRNA-1273."[3063]

1234.  As of May 31, 2020, Moderna expected that mRNA-1273 would generate billions in cash by year end 2021 that it otherwise would not have if mRNA-1273 failed.  In particular, Moderna's September 2, 2020 LRP shows that the cash delta between mRNA-1273 success (*i.e.,* BLA approval) v. "Failure" ranged from ███████████████████████████████ ████████████ as shown in **Figure 6.2**,[3064] below.

---

[3062] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, p. 13 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO). (emphasis added).

[3063] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, p. 14 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO). (emphasis added).

[3064] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████
██████████

846

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.2**

## II.    Projected mRNA-1273 Doses

1235.  Moderna's public statements and internal documents also show that as of May 31, 2020, Moderna's mRNA-1273 plan was to make up to 1 billion doses.[3065]  For example, during Moderna's May 7, 2020 earnings call, Dr. Tal Zaks stated that Moderna "announced a collaboration with Lonza to manufacture mRNA-1273 at scale, **with the goal of producing up to 1 billion doses a year.** . . . Technology transfer is expected to begin this June, and we anticipate the first batches of mRNA-1273 to be manufactured at Lonza's U.S. sites in July of this year."[3066]

---

[3065] *See, e.g.,* MRNA-GEN-01251960-028, at 974, 978  (emphasis added)).

[3066] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, p. 8 of 32, *available at*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Mr. Bancel added: "We not only have a fully integrated GMP site in Massachusetts, . . . but we've added a strategic partnership with Lonza **that can enable us to [make] up to 1 billion doses annually for vaccine against SARS-CoV-2**, . . .[3067] **We are already scaling up the organization to address the need to supply up to 2 billion doses for potentially first vaccine mRNA-1273**."[3068]

1236.   Moderna's draft meeting minutes of the May 7, 2020 Meeting of the COVID Committee of the Board of Directors stated: "Mr. Andres discussed the immediate funding needs to continue progressing the manufacturing scale up with the goal to meet the US Government's expected demand of up to 300 million doses of the Moderna vaccine."[3069]  Moderna's June 15, 2020 "CEO Update" provides more detail regarding these projections during the period Q4 2020 through Q4 2021 and stated: ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████ " in

**Figure 6.3**,[3070] below, which shows Moderna's ██████████████

████████████████████████████████████████

██████████████████████████████████ ).

---

https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Dr. Tal Zaks, Chief Medical Officer) (emphasis added).

[3067] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, p. 13 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO). (emphasis added).

[3068] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, p. 14 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO). (emphasis added).

[3069] MRNA-GEN-02645690-752 at 733 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 44 of 64).

[3070] MRNA-GEN-02645690-752 at 696 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna*, June 15, 2020, Slide 8 of 64).

848

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.3**

### III.    Expected mRNA-1273 Price Per Dose

1237.    As of May 31, 2020, Moderna's expected price per dose was $30. *See* §II.E.4.f for a discussion on Moderna's expectations on mRNA-1273 pricing. The June 15, 2020 "CEO Update" stated: "USG 100m doses negotiations at $30/dose have not concluded yet. They insist we price at COST+ and we are resisting and countering with value and market approach. We have some early wins with Switzerland (6m doses, $30/dose, $180m[;] Singapore (2m, $30/dose, $60m[:] Israel

849

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

almost done (2m doses, $30/dose, $60m)[.]"[3071]  Moderna's "Recommended Pricing" as shown in

**Figure 6.4**,[3072] below.

---

[3071] MRNA-GEN-02645690-752 at 691 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 2 of 64).  May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 412:18-414:11 ("Q. . . . If we can look at page 2, Bates ending in 691 [of Hoge Deposition Exhibit No. 46], you see it says, 'Context for COVID vaccine Environment'? A. Mm-hmm. Q. And then in the middle it says, 'USG 100 million doses negotiation at $30 per dose have not concluded yet.' Do you see that? A. Mm-hmm. Q. So you're still offering $30 a dose, but negotiations have not concluded yet, right? A. Yeah, I actually think that they were essentially paused in June, and taken back up in August, as it says in the e-mail exchange we looked at before. So, yes, they had not been concluded. I don't even know that they were that active at that point. Q. It then says, 'We have had some early wins with' -- A. Yes. Q. And then it says, 'Switzerland (6 million doses, $30 a dose, $180 million).' Do you see that? A. Yes. Q. And so you had reached an agreement with Switzerland by that time to sell 6 million 1 doses at $30 a dose? A. Correct. Q. And by that time, June 15, 2020, you had reached an agreement with Singapore to provide 2 million doses at $30 per dose for a total of 60 million? A. That's correct. Q. And you were almost done concluding an agreement with Israel for 2 million doses, $30 a dose, for $60 million, is that right? A. That is correct."). *See also* MRNA-GEN-02645686-689, at 687 (June 7, 2020 Memorandum from Lori Henderson to Moderna Board of Directors; Moderna EX; Re: Summary of 6/4/20 COVID Committee Meeting," p. 2 of 4) ("Order Process and Update – *USG*: We have received a draft contract from the USG – DOD for purchase of up to 300M doses of mRNA-1273.  More details on this contract will be available early this week. . . . ***Price*: Initial price per dose of $30/dose expected** to be increased to $35/dose after release of the full Phase 1 data. . . ." (emphasis added)); MRNA-GEN-02651213-245, at 222 (June 25, 2020 Moderna "Manufacturing update" deck).  MRNA-GEN-01570975-1159, at 030 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 56 of 186) ("Contractual considerations: Moderna's risk tolerance compared to big pharma limited initial competitiveness . . . **June – July initial position – Price[:] Price per dose ≥ 2-9x competitors . . .**" (emphasis added)).

[3072] MRNA-GEN-02645690-752 at 695 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 6 of 64) ("Recommended Pricing").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**FIGURE 6.4**

1238.  Moderna's internal documents show that it remained committed to "value-based pricing."  For example, Moderna's September 2, 2020 LRP stated "Our pricing strategy has tested the boundaries provided by the market and experts <u>but well below value-based pricing</u>,"[3073] however, it identified the **"Anchor price / dose"** of **"\$32 – 37."**[3074]

### IV.    Expected mRNA-1273 Revenue

---

[3073] MRNA-GEN-01570975-1159, at 055 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 81 of 186) ("Our pricing strategy has tested the boundaries provided by the market and experts but well below value-based pricing") (emphasis in original).

[3074] MRNA-GEN-01570975-1159, at 056 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 82 of 186) ("Pricing strategy has evolved over time to accommodate for committed order size, timing of delivery and counterparty type").

851

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1239. As of May 31, 2020, Moderna expected mRNA-1273 revenue in the range of $3 billion to $49 billion, based on Moderna's "Scenarios (price range and volume range) in the June 15, 2020 "CEO Update" as shown in **Figure 6.5**,[3075] below.

Board Meeting - CEO update

## Scenarios (price range and volume range)

| doses (mm) | Price/dose | | | |
|---|---|---|---|---|
| | $30 | $35 | $40 | $49 |
| 100 | $3,000 | $3,500 | $4,000 | $4,900 |
| 200 | $6,000 | $7,000 | $8,000 | $9,800 |
| 300 | $9,000 | $10,500 | $12,000 | $14,700 |
| 400 | $12,000 | $14,000 | $16,000 | $19,600 |
| 500 | $15,000 | $17,500 | $20,000 | $24,500 |
| 600 | $18,000 | $21,000 | $24,000 | $29,400 |
| 700 | $21,000 | $24,500 | $28,000 | $34,300 |
| 800 | $24,000 | $28,000 | $32,000 | $39,200 |
| 900 | $27,000 | $31,500 | $36,000 | $44,100 |
| 1000 | $30,000 | $35,000 | $40,000 | $49,000 |

Volume with Approved board Raw materials →

Strictly Confidential

9

moderna

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-02645698

**FIGURE 6.5**

## V.    Expected mRNA-1273 Cost per Dose

1240. In May 2020, Moderna's Expected mRNA-1273 Cost of Goods was ▮▮▮▮▮▮, and Moderna's expected Overhead and R&D allocation was an additional ▮▮▮▮▮▮, providing an estimate that accounts for some of Moderna's own investments in mRNA-1273.  Moderna's May 15, 2020

---

[3075] MRNA-GEN-02645690-752 at 698 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 9 of 64).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

"Board Update" estimated mRNA-1273's "Manufacturing incl. F/F" was ▮▮▮▮▮ and ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ including ▮▮▮▮▮▮▮▮ as shown in **Figure 6.6**,[3076] below.



**FIGURE 6.6**

1241.    Similarly, Moderna's June 15, 2020 "CEO Update" also reports a "Cost of good" ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ as shown in **Figure 6.7**,[3077] below:

---

[3076] MRNA-GEN-02645641-677, at 667 (Hoge Deposition Exhibit No. 45 – "Board Discussion," *Moderna,* May 15, 2020, Slide 27 of 37).
[3077] MRNA-GEN-02645690-752 at 696 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 7 of 64).

853

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.7**

### (7) Moderna's Expected mRNA-1273 Profit

1242. In this case, Moderna expressly identified its expected mRNA-1273 profit ███████████ in its July 10, 2020 "Volume II: Cost Proposal" to the U.S. Government ███████, as shown in **Figure 6.8**,[3078] below.

---

[3078] MRNA-GEN-01122003-088, at 010 (Bennett Deposition Exhibit No. 29 – "Volume II: Cost Proposal, Solicitation Number: W911QY20R0043," *Moderna,* July 10, 2020, PDF p. 8 of 88).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.8**

1243.    In its July 10, 2020 submission to the U.S. Government, Moderna expressly stated that the ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ reasonable and further supported by criteria outlined in DFARS 215.404-71."[3079]  While the date of this submission is shortly *after* the date of the hypothetical negotiation, it was submitted at a time when Moderna "Proposed Pricing for mRNA-1273" still generally conformed to its June 15, 2020 "Recommended

---

[3079] MRNA-GEN-01122003-088, at 010, 014 (Bennett Deposition Exhibit No. 29 – "Volume II: Cost Proposal, Solicitation Number: W911QY20R0043," *Moderna,* July 10, 2020, PDF pp. 8, 12 of 88).

855

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Pricing,"[3080] above, with a discount for "CLIN 0001" as shown in **Figure 6.9**,[3081] below, which explicitly referenced the May 31, 2020 offer for sale that is accused of infringement in this case (*i.e.,* Moderna stated that "for CLIN001" it was "[s]tarting with . . . **US$30/dose . . . which we previously quoted to the USG[.]"**[3082]).

**FIGURE 6.9**

---

[3080] MRNA-GEN-02645690-752 at 695 (Hoge Deposition Exhibit No. 46 - "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 6 of 64).

[3081] MRNA-GEN-01122003-088, at 007 (Bennett Deposition Exhibit No. 29 – "Volume II: Cost Proposal, Solicitation Number: W911QY20R0043," *Moderna,* July 10, 2020, PDF p. 5 of 88).

[3082] MRNA-GEN-01122003-088, at 009 (Bennett Deposition Exhibit No. 29 – "Volume II: Cost Proposal, Solicitation Number: W911QY20R0043," *Moderna,* July 10, 2020, PDF p. 7 of 88) ("Given the anticipated USG investment in the advanced development of mRNA-1273 under BARDA contract 75A50120C00034, Moderna found it reasonable to further discount the MOU price. Based on the revised scope of the development program, the expectation is that the contract cost will increase to a total value of $952M. Furthermore, we estimate the value of the services of NIAID during Phase 1-3 of the development of mRNA-1273 to equate to $55M. Applying the total estimated USG financial support as a credit against CLIN 001 [sic], result in a price of $19.93 for CLIN 0001. **More specifically for CLIN 0001**: Starting with **comparable pricing under existing agreements for supply of mRNA-1273** of US$30/dose for ex-factory bulk drug product, *which we previously quoted to the USG,* Moderna deducted a discount of $10.07 ($1.007B/ 100M) resulting in a price of $19.93 per dose." (**bold** emphasis in original; *italics* underlined emphasis added)).

856

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1244. Moderna's July 10, 2020 submission to the U.S. Government again reiterated: "it is our belief that we should move toward a more market-based 'commercial item' approach to pricing in alignment with the pricing proposed above in Table 2,"[3083] which was Moderna's **"initial position."**[3084] At the time of the May 31, 2020 hypothetical negotiation—and continuing through June and July 2020[3085]—Moderna was pursuing a "Commercial Item" approach[3086] in which an "**Initial price**

---

[3083] MRNA-GEN-01122003-088, at 007 (Bennett Deposition Exhibit No. 29 – "Volume II: Cost Proposal, Solicitation Number: W911QY20R0043," *Moderna,* July 10, 2020, PDF p. 5 of 88).

[3084] MRNA-GEN-01570975-1159, at 030 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 56 of 186) ("Contractual considerations: Moderna's risk tolerance compared to big pharma limited initial competitiveness . . . **June – July initial position – Price[:] Price per dose ≥ 2-9x competitors . . .**" (emphasis added)).

[3085] MRNA-GEN-01570975-1159, at 030 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 56 of 186) ("Contractual considerations: Moderna's risk tolerance compared to big pharma limited initial competitiveness . . . **June – July initial position – Price[:] Price per dose ≥ 2-9x competitors . . .**" (emphasis added)).

[3086] Moderna summarized its "Commercial Item Determination" in detail in its July 10, 2020 submission to the government. *See* MRNA-GEN-01122003-088, at 007-010 (Bennett Deposition Exhibit No. 29 – "Volume II: Cost Proposal, Solicitation Number: W911QY20R0043," *Moderna,* July 10, 2020, PDF pp. 5-8 of 88). *See also* MRNA-GEN-00773106-108, at 108 (Bennett Deposition Exhibit No. 26 – June 16, 2020 Letter from Hamilton B. Bennett to Camille B. Connell-Magaw) ("[W]e reiterate that mRNA-1273 will need to be treated like a commercial item or Moderna will need a waiver of certified cost or pricing date for the contract."); May 20, 2024 30(b)(6) Deposition of Hamilton B. Bennett, 251:6-252:10 ("Q. And on the page ending in Bates 22007 of [Bennett Deposition] Exhibit 29, there's a section here – the big section here is 'Basic Cost/Price Information.' Do you see that? A. Yes. Q. And underneath that there's a subsection called 'Commercial Item Determination'? A. Yes. Q. And it says here, 'It is the position of the company that the mRNA-1273 vaccine meets the definition of a commercial item, as defined by FAR Part 2.101.' Do you see that? A. Yes. Q. Why was that the position of Moderna? A. So I would have included this language at the guidance of our legal team that was helping draft this. My understanding of what this means in layperson terms is if you have a commercial item that has previously been sold, then that is a price that is able to be – or a cost base that allow you to have a price that is acceptable to the government and eliminates the need to do cost-based pricing."); 252:21-253:16 ("Q. And under 2 it says, 'Any item that evolved from an item described in paragraph (1) of this definition through advances in ; technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation.' Do you see that? A. Yes, I see that. Q. And that is – that part is emphasized, the last part that I read, is that right? A. Yes, that is written in bold. Q. And is that because it's Moderna's position that the COVID-19 vaccine meets this part of the definition of a commercial product? A. Yes."); 305:18-307:4 ("Q. So you were suggesting [in Bennett Deposition Exhibit No. 39] not providing COGS information to the government so that they

857

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**per dose of $30/dose [was] expected** to be increased to $35/dose after release of the full Phase 1 data. . . .," as stated in Lori Henderson's June 7, 2020 "Summary of 6/4/20 COVID Committee Meeting."[3087]

### (8) Subtractions

1245. To determine Moderna's expected mRNA-1273 net profit differential (before taxes), I subtracted the costs and investment returns that Moderna asserted at the time should be considered in determining a reasonable price for mRNA-1273. I have also included the cost of Moderna's use of NIAID's patented technology, which was not established until the December 14, 2022 NIAID-

---

weren't able to negotiate using that information? A. So this comes back to the e-mails that we reviewed previously on price versus cost-based analysis. And so the government methodology primarily uses a cost-based analysis which relies on cost of goods sold, which in an R&D contract is a little difficult, and so when BARDA comes in and says, This is the cost of the material that's being generated, it doesn't reflect the complexities of a commercial supply chain, and it is not the position that Moderna took when we said in our submission that we believed that we were a commercial product or would be at the time that the government was receiving our goods. Q. And specifically what you were suggesting here is, if we don't even provide the cost information to the government, they can't negotiate on that basis, right? . . . THE WITNESS: I think what I'm saying is that if we believe that we are a commercial product, then we should stand by the pricing that is based on us being a commercial product and pricing arguments rather than also supplying cost-based arguments."); 308:2-308:8 ("THE WITNESS: No. What I'm saying is I think that our argument on pricing to DoD should continue to be a commercial and price-based analysis, and that there were limitations with the BARDA analysis that were contributing to the government's understanding."). May 16, 2024 30(b)(6) Deposition of Christoph Brackmann, 46:22-47:11 ("A. . . . I think the U.S. Government, as well as, for example, the European Union were later than – I think Singapore, maybe Israel, maybe Switzerland were faster in deciding that they wanted to have access to a vaccine. **And we choose – chose the same sort of market access pricing option with those countries, as well, which established a point**. **And then we had additional discussion with the U.S. Government on the price of the vaccine.**" (emphasis added)).

[3087] MRNA-GEN-02645686-689 at 687 (June 7, 2020 Memorandum from Lori Henderson to Moderna Board of Directors; Moderna EX; Re: Summary of 6/4/20 COVID Committee Meeting," p. 2 of 4) ("Order Process and Update – *USG*: We have received a draft contract from the USG – DOD for purchase of up to 300M doses of mRNA-1273. More details on this contract will be available early this week. . . . ***Price***: **Initial price per dose of $30/dose expected** to be increased to $35/dose after release of the full Phase 1 data. . . ." (emphasis added))

858

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Moderna agreement,[3088] and settled the long-running dispute between the parties.[3089]  I note, however, that at the time of the May 31, 2020 hypothetical negotiation, Moderna had included S2P in mRNA-1273 and knew the patent on this technology was owned by the U.S. Government.[3090]

---

[3088] MRNA-GEN-01720811-844 (*Moderna v. Pfizer* Francis Deposition Exhibit No. 12 – December 14, 2022 NIH-Moderna Patent License-Non-Exclusive).  MRNA-GEN-01726934-7000, at 962 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 113:22-114:4 ("A. . . . this is in 2022, was when we entered the license, but the structure of it manages for the time domain and the pandemic that started in 2020 has been evolving and took different forms in different jurisdictions, so I disagree with your characterization that this is late in the pandemic.")).

[3089] *See, e.g.,* MRNA-GEN-01734848-096, at 882 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (*Moderna v. Pfizer*)), 35:14-35:22 ("Q. . . . [Y]ou talk about working with the NIH. That turned into a patent litigation, correct?  . . . A. I wouldn't know.  I was never involved in patent matters directly.  And I think whatever spat Moderna and the NIH had was after my time at Moderna.")).

[3090] *See, e.g.,* MRNA-GEN-01731771-2011, at 1801-02, 1818-19, 1829-33 (December 15, 2023 Deposition of Guillaume Stewart-Jones (Pfizer), 31:16-31:19 ("A. I think you will see that there was a patent application that is jointly applied – or jointly submitted by the NIH and Dartmouth University back in 2016 on coronaviruses."); 32:1-32:21 ("Q. Are you aware of the work being done at the NIH during your time there on proline-stabilizing mutation to spike protein?  A. Yes, I was aware of this.  Q. And are you are that Jason [McLellan], for example, is an author on the publications related to this work?  A. Yes, and he's a coinventor from the patent application.  Q. And you're aware that this work was published, at least as it relates to MERS, in 2017?  A. Yes, I was aware of that.  Q. And you say you were aware of that, you're referring to when you were at the NIH, correct, you were aware of this work?  A. Yes, at the NIH, yes.  Jason McLellan came in to present on one occasion as an invited speaker, and he discussed and described the work that had been done collaboratively on betacoronaviruses at that point.  I think that presentation might have been in 2018."); 48:23-49:3 ("A. . . . I think the 2P was designed and characterized by Jason McLellan's lab, but also in collaboration with the NIH and with Scripps Institute in California where they actually determined EM structures for various 2P coronavirus spike proteins in the soluble recombinant form."); 59:19-63:5 ("Q. . . . I'd like to just turn to the last sentence of your e-mail here.  (Reading)  The S2P mutation for coronavirus S was discovered by Nianshuang Wang in Jason McLellan's lab some years ago in SARS/MERS/PEVD, et cetera.  Do you see that?  A. Yes, yes, that's correct.  Q. Okay.  And you say: (Reading) It was developed by the NIH and US government holds the IP for this technology.  Do you see that?  A. Yeah.  I mean, specifically – so this was a patent application submitted in 2016, and it uses SARS, MERS, porcine epidemic.  I think this is PEVD or something, porcine epidemic diarrheal virus, and other – some things like HKU1, OC43, other betacoronaviruses that are described in the context of the 2P designs and characterized as recombinant protein structures and vaccines as the protein – in the protein form.  But I met Nianshuang Wang some months previous to this e-amil, and he told me, personal communication, that it was him who actually conceived the 2P design that was then developed into this patent application.  Q. Okay.  So just so I have this clear.  You are indicating here that the US government holds the IP, the

859

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

In particular, I subtracted the following seven (7) items in arriving at Moderna's expected mRNA-1273 net profit differential (before taxes) per dose:

> **VI.   Moderna's Past Investments in its mRNA Platform Technology Attributable to mRNA-1273**

1246. This subtraction accounts for Moderna's claimed cost of its past investments in mRNA Platform Technology attributable (allocated) to mRNA-1273.  In an effort to justify its mRNA-1273 price to the U.S. Government, Moderna highlighted its investment in mRNA technology over many years.  For example, Moderna's July 10, 2020 submission to the U.S. Government, Moderna

---

technology related to the S2P.  A. They were the – Q. Correct?  A. The NIH and the US government filed the IP.  Nianshuang Wang and Jason McLellan were both at Dartmouth University at the time, and so Dartmouth University was a collaborating organization and contributed to that or coinvented to that patent application.  And then as I mentioned, other people like, I think it was Daniel Rapp (phonetic) and Andrew Ward from Scripps Institute in La Jolla, California were also coinventors.  So it was a number of institutions contributing to this patent application, but it was filed by the US government through the Vaccine Research Center, and Barney Graham, I believe, is the first named inventor of that application.  Q. Okay.  So again, just so I have this clear, yes-no question, you're saying that the NIH and US – sorry, the US government hods the IP for this S2P technology, right?  A. Specifically S2P in the context of SARS, MERS, PEVD, OC43, HKU1, and maybe some others, but you'll have to refer to that application specifically.  And as I mentioned, the NIH – so who owns this IP, I actually don't know the answer to that because where there are multiple parties coinventing on an application, I don't know how the partitioning in terms of ownership or holding of the IP is.  But it seemed to me that the US government controls that IP.  That's sort of what I referred to by 'holding the IP.'  Q. Okay.  So the US government controls this IP to S2P; is that correct?  A. That would be my personal opinion, but again, I'm not a lawyer so I can't be specific about it.  Q. To your knowledge – to your knowledge at the time of this [February 3, 2020] email [Stewart-Jones Deposition Exhibit No. 5], the US government held the IP for this S2P technology? . . . THE WITNESS: Yeah, I've answered that question, and I said that the 2P mutations were codeveloped and coinvented as per the inventorship list on that intellectual property filing and surrounding specifically – specific examples around SARS-1, MERS, PEVD, and other betacoronavirus and was shared in terms, I think, of potentially ownership between several organizations as I've described.  But the US government filed this, and I think that they control principally how this intellectual property and application is prosecuted and managed.").  MRNA-GEN-01742355-356, at 355 (Stewart-Jones (*Moderna v. Pfizer*) Deposition Exhibit No. 5 – February 3, 2020 email from Guillaume Stewart-Jones to Hamilton Bennett, Andrea Carfi, Sunny Himansu, Subject: RE: mRNA-1273 Antigen Design).  MRNA-GEN-01734848-096, at 873-874 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (*Moderna v. Pfizer*), 26:24-27:6 ("Q. And there's nothing wrong with doing that [monitoring patents in the marketplace]?  . . . A. No. I don't think there's anything wrong with doing it.  It becomes wrong if you copy without a license things that other people are doing.  That's when it becomes wrong.")).

860

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

claimed that it "ha[d] invested billions of dollars to create and develop a novel platform for designing and manufacturing a new class of mRNA-based vaccines."[3091]  Moderna further stated: "Our ability to rapidly create, manufacture and clinically develop mRNA-1273 is a direct result of these investments."[3092]  In particular, Moderna claimed that during the period 2012 through mid-2020, its "GAAP OPEX" for "mRNA Platform Development Costs" totaled ████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ as shown in **Figure 6.10**,[3093] below.



**FIGURE 6.10**

---

[3091] MRNA-GEN-01122003-2088, at 006 (Bennett Deposition Exhibit No. 29 – July 10, 2020 Volume II: Cost Proposal for Solicitation Number: W911QY20R0043) at ████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████████████████████

[3092] MRNA-GEN-01122003-2088, at 013 (Bennett Deposition Exhibit No. 29 – July 10, 2020 Volume II: Cost Proposal for Solicitation Number: W911QY20R0043).

[3093] MRNA-GEN-01121935.xlsx (Tab = "MRNA Development - Vaccine").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1247. As shown in **Figure 6.10**,[3094] above, Moderna then allocated ████ of the "mRNA Development Costs Attributable to Vaccines Franchise"—including a ████████████████—to mRNA-1273 and claimed that the resulting cost per dose was ████, based on 300 million doses, of which ████████ is attributable to the claimed investment, and ████████ is attributed to the claimed ROI on that investment.[3095]

1248. In contrast, I recalculated the resulting cost per dose for "mRNA Development Costs Attributable to Vaccines Franchise" that are attributable to mRNA-1273 as $1.57 per dose—based on three adjustments. <u>First</u>, the calculation in **Figure 6.10**, above, applies an *additional average* allocation percentage of ████ to estimate the portion of the "mRNA Development Costs Attributable to Vaccines Franchise" of ████ whereas I did not; Instead, I recalculated it directly using the actual annual percentage allocation, which averages ████ over the period from 2012-2020. <u>Second</u>, to isolate the claimed past mRNA platform development <u>cost</u> from the claimed <u>return</u> on this investment, I *exclude* the ████████████ from this subtraction and instead account for it in the next subtraction. <u>Third</u>, I estimate the cost per dose for this subtraction based on Moderna's expected mRNA-1273 doses as of May 31, 2020, which was <u>1</u> billion.[3096]

### VII. Moderna Expected ████ ████ on Past Investments in Its mRNA Platform Technology Attributable to mRNA-1273

1249. This subtraction accounts for Moderna's claimed ████████████ on its cost of past investments in mRNA Platform Technology attributable (allocated) to mRNA-1273. As shown in **Figure 6.10**,[3097] above, Moderna claimed that its mRNA platform developments costs include an assumed ████████████. For example, Moderna's July 10, 2020 submission to the U.S. Government, Moderna claimed that during the period 2012 through mid-2020, the total cost of its mRNA platform development—including a "████████████████████████████

---

[3094] MRNA-GEN-01121935.xlsx (Tab = "MRNA Development - Vaccine").

[3095] ████████████████████████████

[3096] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[3097] MRNA-GEN-01121935.xlsx (Tab = "MRNA Development - Vaccine").

862

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



, which was comprised of the ████████

████████████████████████████████████████

████████████    Moderna allocated    ████    of the    ████████████

████████████████████████████

1250.  In contrast, I recalculated the resulting cost per dose for the claimed ████████ associated with the "mRNA Development Costs Attributable to Vaccines Franchise" that are attributable to mRNA-1273 as $2.66 per dose—based on two adjustments: first, I adjusted the allocation percentage as described previously, and second, I estimate the cost per dose for this subtraction based on Moderna's expected mRNA-1273 doses as of May 31, 2020, which was 1 billion.[3099]

### VIII.    Cost of Moderna's May 18, 2020 Capital Raise for Accelerated Working Capital Financing

1251.  This subtraction accounts for the estimated cost of Moderna's May 18, 2020 at-risk capital raise. As discussed above, on May 18, 2020, Moderna raised **$1.34 billion** of at-risk capital in the capital markets for mRNA-1273,[3100] in order to "accelerate [mRNA-1273] supply build and start delivery

---

[3098]

[3099]

[3100] *See, e.g.,* MRNA-GEN-01570975-1159, at 979 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 5 of 186) ("The COVID pandemic has accelerated our growth trajectory . . . May . . . $1.34Bn raised from capital markets . . .").

863

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

in Q4 2020"[3101] v. the "No investment today" option which would result in mRNA-1273 "purchase agreements in Q3 2020, and delivery supply to buyers in Q1 2021 (~9 mo lead time)."[3102]

1252. Moderna's May 15, 2020 "Board Discussion" stated that the weighted average cost of capital ("WACC") for this working capital was ███.[3103] As such, the estimated cost of the accelerated working capital financing is approximately ████████████████████████████ or approximately $0.33 per dose, at 1 billion doses.

## IX. BARDA and NIAID Support for mRNA-1273 Development

1253. This subtraction accounts for BARDA's and NIAID's support of the development of mRNA-1273, which reduced the development cost that Moderna had to provide. In addition, this subtraction reflects the proposed discount to the $30/dose price included in Moderna's May 31, 2020 offer to sell, which stated: "Moderna is prepared to enter discussions with the US Government to manufacture an initial supply of 100 million doses of mRNA-1273 at $30.00 per 100 microgram dose (sufficient to vaccinate 50 million people based on our current 2-dose assumption), delivered as a 10-dose multi-dose vial" and further stating that, "[t]o fully account for the US Government's partial support of the development of mRNA-1273, we would discount a fixed percentage from the price of each purchased dose to provide a dollar-for-dollar discount across this initial order of the total amount of funding provided to Moderna under our BARDA contract."[3104]

1254. Moderna's July 10, 2020 submission to the U.S. Government, quantified the discount for the "total estimated USG financial support" as **$1.007 billion,** based on "the anticipated USG investment in the advanced development of mRNA-1273 under BARDA contract 75A50120C00034" which was comprised of **$952 million** for the BARDA grants plus **$55 million** for "the value of the services

---

[3101] MRNA-GEN-02645641-677, at 661 (Hoge Deposition Exhibit No. 45 – "Board Discussion," *Moderna,* May 15, 2020, Slide 21 of 37) ("Even with significant headwinds, acceleration of investment in working capital would generate return").

[3102] MRNA-GEN-02645641-677, at 653 (Hoge Deposition Exhibit No. 45 – "Board Discussion," *Moderna,* May 15, 2020, Slide 13 of 37) ("Three Moderna supply scenarios to guide investment decision").

[3103] ████████████████████████████████████████

[3104] HHS-0000828-830 at 828-829 (Bennett Deposition Exhibit 21 – May 31, 2020 Letter Offer form Stéphane Bancel, Moderna CEO to Dr. Slaoui, General Perna, and Acting Director Disbrow attaching Appendix with Initial Assumptions and Purchase Terms).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

of NIAID during Phase 1-3 of the development of mRNA-1273."[3105]  As such, the estimated cost of the "anticipated USG investment in the advanced development of mRNA-1273" is approximately $1.01 per dose, at 1 billion doses.

## X.    Advance Payments and Payment Terms

1255.  This subtraction accounts for the working capital benefit (*i.e.,* reduced working capital requirement) associated with the ▮▮▮▮▮ advance payment that Moderna received on September 23, 2020[3106] and the "Payment Terms" listed in the Appendix to Moderna's May 31, 2020 offer to sell, which  provided for an up-front payment of ▮▮▮▮▮▮▮" on the initial 100 million doses.[3107]   In other words, based on the $30/dose mRNA-1273 price and Moderna's May 31, 2020 offer to sell, Moderna expected to receive a ▮▮▮▮▮▮▮ upon consummation of the contract.

1256.  I estimated the value of this expected working capital benefit using Moderna's assumed ▮▮▮ ▮▮▮ for working capital,[3108] with an assumed 12-month duration to account for the uncertainty around the timing of Moderna's shipment of the 100 million doses, which results in an estimated



[3107] HHS-0000828-830 at 830 (Bennett Deposition Exhibit 21 – May 31, 2020 Letter Offer form Stéphane Bancel, Moderna CEO to Dr. Slaoui, General Perna, and Acting Director Disbrow attaching Appendix with Initial Assumptions and Purchase Terms).
[3108] MRNA-GEN-02645641-677 at 660-661 (Hoge Deposition Exhibit 45 - May 15, 2020 Moderna Board Meeting Deck).

865

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

working capital benefit of ███████████████████████ As such, the value of the working capital benefit associated with the advance payment and payment terms is approximately $0.38 per dose, at 1 billion doses.

### XI.    No Additional Subtraction for Cellscript License Payments

1257.    The Cellscript license payments are *not* subtracted because they are already included in Moderna's projected cost of goods sold.  At the time of the May 31, 2020 Hypothetical Negotiation, Moderna's Cellscript license which was effective June 26, 2017,[3109] had been in place for approximately three (3) years.  Based on the terms of the Cellscript license and Moderna's royalty payment records, I estimated Moderna's upfront and milestone payments under the Cellscript license at ███████, and royalties ████████████████████, for a total of at least $1.42 billion.[3110] When asked about the amounts Moderna paid under the Cellscript license, Mr. Brackmann testified that the ████████████████████████████.[3111] As such, it is reasonable to assume that Moderna's projected cost of goods sold ██████████████) circa May 31, 2020 includes ████████████████████████.  As such, making an additional reduction to Moderna's expected profits associated with ███████████ ███████████████████████████████████) would result in an inappropriate double-counting of this cost).

### XII.    NIAID Settlement and License Payments

1258.    This subtraction accounts for the payments Moderna owed to NIAID based on shipments of mRNA-1273 for the use of NIAID's 2P patent pursuant to the terms of the 2022 settlement and license agreement. [3112]  As of the May 31, 2020 Hypothetical Negotiation, while Moderna would

---

[3109] MRNA-GEN-00457584-627, at 591-593 (Hoge Deposition Exhibit No. 10 – June 26, 2017 Cellscript Patent Sublicense Agreement).

[3110] ████████████████████████████████████████████ ████████████████████████████

[3111] May 16, 2024 30(b)(6) Deposition of Christoph Brackmann, 169:01-169:10 (testifying regarding MRNA-01372223 at tab "Cellscript Report" summarizing Moderna's outgoing royalty payments to Cellscript: "████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ (emphasis added)).

[3112] MRNA-GEN-00459173-206 (Bancel Deposition Exhibit No. 11 – November 1, 2022 NIAID Patent License Agreement). See also Schedule 6.5.

866

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

*not* have been aware of the terms of an agreement that had not yet been agreed, it was aware of the NIH patent and thus would have been aware of the potential liability.  As such, I have estimated that liability based on the terms of the later November 1, 2022 agreement.  Based on the terms of this agreement, Moderna paid NIAID ██████████████████ for Moderna's past sales through November 1, 2022 ██████████████ associated with C-0017 Contract notwithstanding their sale date) and beginning on November 1, 2022, paid a go forward royalty of ████ of revenues, which was adjusted downward to the minimum rate of ████ Moderna's royalty payment records report total payments associated with NIAID license of ████████.[3113] As such, the cost of the NIAID license payments is approximately $0.37 per dose based on Moderna's actual mRNA-1273 shipments.

### (9)     Summary Before Apportionment

1259.    Moderna's net profit differential (before taxes), starting with an expected price of $30/dose, and considering a fully loaded cost of ██████, and after considering the foregoing subtractions results in a profit of $7.59/dose.  The foregoing analyses, which are *before* apportionment, is summarized in **Chart 6.1**.

---

[3113] MRNA-GEN-00459173-206 (Bancel Deposition Exhibit No. 11 – November 1, 2022 NIAID Patent License Agreement).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**CHART 6.1**

### (10) Apportioning Out the Differential Profits Attributable to the mRNA Payload

1260. I understand that the Patents-in-Suit are critical enabling technology. For example, in 2021, Moderna characterized Genevant, with its delivery technology, as a "platform enabling company."[3114] I further understand that the Patents-in-Suit are critical delivery technologies that relate to LNP formulation and encapsulation which are blocking technology.[3115]

---

[3114] MRNA-GEN-02409289-312 at 292, ("mRNA Competitive landscape emerging post COVID-19," *Moderna*, April 2021, Slide 4 of 24)("Today – the 5 established pure plays").
[3115] MRNA-GEN-01240180-198, at 190 (Francis Deposition Exhibit No. 27 – "Business Development Update – Moderna Investment Committee Discussion," *Moderna,* April 9, 2015, Slide 11 of 19) ("Tekmira – an RNA and LNP company"). May 22, 2024 30(b)(6) Deposition of Said E. Francis, 195:4-195:9 ("Q. You wrote in a slide to a subcommittee of Moderna's board that Tekmira had a validated LNP formulation that are in the clinic that serve as the RNA industry gold standard, did you not? A. Those are the words on the slides.")

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1261. Indeed, I understand that Dr. Mitchell has opined that the Patents-in-Suit are fundamental and enabling technologies fomRNA delivery systems and Moderna's COVID-19 vaccine.[3116]

1262. I understand that mRNA-1273 is comprised of payload and delivery (*i.e.,* mRNA and LNP).[3117] Genevant's Mr. Zorn's testimony underscored this point:

> Q. Is an mRNA-based COVID-19 vaccine possible without the payload?
>
> . . .
>
> THE WITNESS: It's not possible without either the payload or the delivery vehicle.[3118]

### XIII.    mRNA-1273 has Two Key Elements

---

[3116] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XV.

[3117] November 21, 2024 Interview of Dr. Frederick Porter.  November 22, 2024 Interview of Michael Mitchell, Ph.D..  *See also* May 22, 2024 30(b)(6) Deposition of Said E. Francis, 42:7-42:17 ("A. . . . But at the end of the day, it's payload that ultimately expresses proteins in cells, and needs to be trafficked to different cells.  Now, different payloads have different features.  mRNA is a long oligo.  RNAi is short.  RNA is stable.  RNAi is stable, mRNA is not.  So you have different features you have to design for and manage for, so delivery is what do you want your delivery to be able to solve it, . . .").  Guy Raz, Casey Herman, Neva Grant, "Moderna and Flagship Pioneering: Noubar Afeyan," *NPR,* October 11, 2021, Audio at 53:12-53:23 of 1:07:52, *available at* https://www.npr.org/2021/10/08/1044644976/moderna-and-flagship-pioneering-noubar-afeyan# (Dr. Noubar Afeyan: "it's just a code molecule.  You just sequence, put the sequence in for the DNA, make the RNA in one step, you put it in an LNP in a second step and your done.  It's – I'm simplifying, but not by much.").

[3118] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 269:21-270:1.

869

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1263. Based on my investigation, substantial evidence also shows that mRNA-1273 has two key elements: **mRNA** and **LNPs**.[3119]  I understand that "[u]ltimately, the distribution of the mRNA is driven by the LNP components encapsulating the mRNA."[3120]

---

[3119] *See, e.g.,* MRNA-GEN-01570975-1159, at 080 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 106 of 186) ("We continue to invest in drivers of long-term value: pipeline productivity, platform science, and new technologies . . . LRP2020 priorities – Platform[:] Drive continuous improvement in **mRNA and delivery technologies that form the foundation of our current portfolio . . .**" (emphasis added)). MRNA-GEN-01734848-096, at 866 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (Pfizer), 19:1-19:11 ("Q. And you referred to 'demonstrating the utility and breadth of this platform.' **When you say 'this platform,' you mean the mRNA vaccine platform?  A. No.  I mean the ability of the type of mRNA in the LNPs that we developed to lead to protein production in the human body that would have pharmacological effects.**  And that's much more than infectious disease vaccines." (emphasis added)). MRNA-GEN-01742359-362, at 362 (Zaks (Pfizer) Deposition Exhibit No. 14 – March 22, 2021 email from Tal Zaks to Jacqueline Miller, Stephen Hoge, Steffen Wahler, Cc: Randy Hyer, Ray Jordan, Colleen Hussey, Subject: Re: Ugur Sahin) (". . . **we believe the critical factors for success actually have more to do with the LNP** and the process by which mRNA is made and put together with lipids…") (emphasis added)). MRNA-GEN-01570975-1159, at 1061 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 87 of 186) ("What is a 'kit'?'" highlighting: "mRNA," "eLNP," "fLNP," "10-15 batches / month," and "24/7 operation"). "Clinical Study Protocol – A Phase 1, Randomized, Placebo-Controlled, Dose-Ranging Study to Evaluate the Safety and Immunogenicity of VAL-181388 in Healthy Adults in a Non-Epidemic Chikungunya Region" (NCT03325075), *Moderna,* August 30, 2018, p. 28 of 106, *available at* https://cdn.clinicaltrials.gov/large-docs/75/NCT03325075/Prot_000.pdf ("VAL-181388 consists of an mRNA Drug Substance (CX-000314) coding for the structural polyprotein (capsid and envelope glycoproteins E3, E2, 6k, and E1) of CHIKV combined with LNP components. **Ultimately, the distribution of the mRNA is driven by the LNP components encapsulating the mRNA.** Thus, using the same matrix, with the same route of administration, distribution is anticipated to be identical for any comparably sized mRNAs." (emphasis added)). MRNA-GEN-01739421-425, at 422 (*Moderna v. Pfizer* de Fougerolles Deposition Exhibit No. 3 – Antonin de Fougerolles, "The early foundations of Moderna's mRNA technology and the back story to its now flourishing use in vaccines," *LinkedIn,* December 18, 2020, p. 2 of 5) (mRNA products "are composed of two essential components – the 'active ingredient' is an mRNA encoding . . ., and a lipid nanoparticle which acts as the delivery vehicle and ensures that the mRNA is expressed in the appropriate immune cells."); MRNA-GEN-01731538-597, at 554 (December 20, 2023 Deposition of Antonin de Fougerolles, Ph.D. (*Moderna v. Pfizer*), 65:24-66:6 ("A. Without lipid nanoparticle formulation, it's highly likely that the mRNA vaccines wouldn't work.  And without . . . introducing chemical modifications into an mRNA, you get a far inferior vaccine."); 130:1-130:7 ("A. You know, again, these were really trying to solve what at the time is a fundamental issue, is how do you enable mRNA to effectively, you know get inside cell. Because, obviously, an mRNA for it to be active needs to be inside the cell in order for it to be

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1264. Moderna's witnesses have emphasized the critical importance of the LNP. For example, an August 24, 2017 Moderna report stated: "Lipid nanoparticle (LNP) lipid composition has a profound effect upon the physical characteristics of a drug product."[3121] As between mRNA and LNPs, Moderna's Dr. Zaks stated the following in a March 2021 email: ". . . **we believe the critical factors for success actually have more to do with the LNP** and the process by which mRNA is made and put together with lipids…"[3122] Dr. Smith testified: "you can see [in Figure 2 of Smith Deposition Exhibit No. 3] the numbers, the quantitative numbers for encapsulation efficiency for each one of them is a function of composition."[3123] I understand this indicates that *qualitatively*, LNPs are relatively more important than mRNA. As such, this supports a conclusion that *quantitatively,* at least 50% should be attributed to LNP, which was confirmed by Drs. Mitchell and Porter.[3124]

1265. Other recent evidence supports both of the foregoing conclusions, namely: a) that there are two key elements, mRNA and LNP, and b) delivery is critical. For example, an October 2022 Moderna investor presentation identified LNP in its summary of "Advancements in mRNA science and technology enable a platform for precision medicine" slide shown in **Figure 6.11**,[3125] below, and

---

translated and to make protein. So, you know, what is key here is understanding how we can improve the platform to improve fundamentally how an mRNA can be delivered to a cell.")).

[3120] "Clinical Study Protocol – A Phase 1, Randomized, Placebo-Controlled, Dose-Ranging Study to Evaluate the Safety and Immunogenicity of VAL-181388 in Healthy Adults in a Non-Epidemic Chikungunya Region" (NCT03325075), *Moderna,* August 30, 2018, p. 28 of 106, *available at* https://cdn.clinicaltrials.gov/large-docs/75/NCT03325075/Prot_000.pdf.

[3121] MRNA-GEN-01551984-997, at 992 (Smith Deposition Exhibit No. 3 – Max Elkus, Mike Smith, "Report 2017_0102-03-7: Program Stability of Small Scale Lipid Compositions – Project: 10 Composition Design Space for Zika, hMPV-PIV, CMV, and ONK3," *Moderna,* August 24, 2017, p. 9).

[3122] MRNA-GEN-01742359-362, at 362 (Zaks (Pfizer) Deposition Exhibit No. 14 – March 22, 2021 email from Tal Zaks to Jacqueline Miller, Stephen Hoge, Steffen Wahler, Cc: Randy Hyer, Ray Jordan, Colleen Hussey, Subject: Re: Ugur Sahin).

[3123] May 14, 2024 Deposition of Michael Smith, Ph.D., 65:14-65:17. MRNA-GEN-01551984-997, at 988 (Smith Deposition Exhibit No. 3 – Max Elkus, Mike Smith, "Report 2017_0102-03-7: Program Stability of Small Scale Lipid Compositions – Project: 10 Composition Design Space for Zika, hMPV-PIV, CMV, and ONK3," *Moderna,* August 24, 2017, p. 5).

[3124] November 21, 2024 Interview of Dr. Frederick Porter. November 22, 2024 Interview of Michael Mitchell, Ph.D..

[3125] MRNA-GEN-01737571-600, at 943 (*Moderna v. Pfizer* Carfi Deposition Exhibit No. 8 – "mRNA Medicine Platform," *Moderna,* October 16, 2022, Slide 17 of 30) ("Advancements in mRNA science and technology enable a platform for precision medicine").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

stated "determining how that mRNA construct will be delivered is critical."[3126]



**FIGURE 6.11**

1266. In addition, I understand that with respect to delivery, no further apportionment is necessary or appropriate.[3127] For example, Dr. Mitchell has opined with respect to Moderna's purported improvements to the LNP delivery system that, at best, they "resulted in modest optimizations, if anything, as opposed to truly enabling technology like that of the Lipid Composition Patents and '651 patent."3128 Moreover, Moderna's investments in its vaccine platform, including with respect to delivery, are already accounted for as described above.

**XIV. Genevant's Patented Technology was Particularly Critical to Moderna as of May 31, 2020**

1267. For the reasons summarized in detail in this report, and in view of the circumstances and stakes as of May 31, 2020 together with Moderna's business decision to use the "optimal LNP" and pursue

---

[3126] MRNA-GEN-01737571-600, at 945 (*Moderna v. Pfizer* Carfi Deposition Exhibit No. 8 – "mRNA Medicine Platform," *Moderna,* October 16, 2022, Slide 19 of 30) ("Moderna combines mRNA engineering, delivery system discovery, and clinical manufacturing platforms in a single, fully-integrated organization").

[3127] November 22, 2024 Interview of Michael Mitchell, Ph.D..

[3128] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XV.

872

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

the "path of least risk," Genevant's patented technology was particularly critical to Moderna. This is because Moderna had built its mRNA vaccine platform on Genevant's patented technology without a license, and the only clinical testing data that Moderna had on May 31, 2020 was based on this platform. Furthermore, Moderna's stated intention at that time was to use its mRNA vaccine platform for all of its vaccines.

1268. This conclusion is supported by the following five (5) points:

> **(i)  Moderna's mRNA "vaccine platform"
> was developed using Genevant's patented
> LNP formulation**

1269. Moderna's mRNA "vaccine platform" was developed using Genevant's patented LNP formulation, which in July 2014 it stated "**is close to optimal for mRNA**."[3129] In a March 2017 article addressing its Zika virus studies, Moderna stated that its platform generated **"optimized lipid nanoparticles"**: "We developed a vaccine platform for generating optimized lipid nanoparticles that encapsulate modified mRNA for intramuscular delivery to induce high levels of protein expression in vivo[,]"[3130] which Moderna described as follows, highlighting Genevant's patented molar ratio:

> LNP formulations were prepared using a modified procedure of a method described for siRNA (Chen et al., 2016). Briefly, lipids were dissolved in ethanol at **molar ratios of 50:10:38.5:1.5 (ionizable lipid: DSPC: cholesterol: PEG-lipid).** The lipid mixture was combined with a 50 mm citrate buffer (pH 4.0) containing mRNA

---

[3129]MRNA-GEN-02204816-901, at 868 ("Final progress report (IPR) for Moderna Grant W911 NF-13-1-0417*," August 14, 2014  (summarizing "the research data generated between October 2013 and the end of July 2014."), PDF p. 53 of 86 ("While the design space of MC3 formulations is still being evaluated and refined, both in terms of formulation and especially process conditions, initial indications are that a formulation similar to the quantitative composition of ALN-TTR-02 is close to optimal for mRNA. The main difference introduced by Moderna is use of higher concentrations of the nucleic acid, with a target of at least 2 mg/mL compared with <l mg/mL for the nucleic acids in siRNA formulations. It is important to note that the lipid concentration, scale proportionally with the nucleic acid content. The physical and chemical stability of formulations is under active study using the range of characterization technology available at Moderna: light scattering, gel electrophoresis, uPLC/CAD (lipid analysis), fluorescence, electron microscopy, etc.") (emphasis added).

[3130] Justin M. Richner, Sunny Himansu, Kimberly A. Dowd, Scott L. Butler, Vaness Salazar, Julie M. Fox, Justin G. Julander, William W. Tang, Sujan Shresta, Theodore C. Pierson, Giuseppe Ciaramella, Michael S. Diamond, "Modified mRNA Vaccines Protect against Zika Virus Infection," *Cell,* March 9, 2017, pp. 1114-25, at 16, *available at* https://pdf.sciencedirectassets.com/272196/1-s2.0-S0092867416X00062/1-s2.0-S0092867417301952/mainext.pdf.

873

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

at a ratio of 3:1 (aqueous:ethanol) using a microfluidic mixer (Precision Nanosystems, Vancouver, BC). Formulations were dialyzed against PBS (pH 7.4) in dialysis cassettes for at least 18 hr. Formulations were concentrated using Amicon Ultra Centrifugal Filters (EMD Millipore, Billerica, MA), passed through a 0.22-mm filter and stored at 4°C until use. All formulations were tested for particle size, RNA encapsulation, and endotoxin and were found to be between 80 to 100 nm in size, with greater than 90% encapsulation and < 1 EU/ml of endotoxin.[3131]

1270.  Moderna's purported efforts to "optimize" LNPs were also based on Genevant's patented molar ratio.  Moderna summarized this work in an April 2019 paper title, "**Optimization of Lipid Nanoparticles** for Intramuscular Administration of mRNA Vaccines," which specifically cited Genevant's patented molar ratio and stated:

> LNPs are typically composed of an ionizable lipid, cholesterol, PEGylated lipid, and a helper lipid such as distearoylphosphatidylcholine (DSPC).  Early work with small interfering RNA (siRNA) identified the ionizable lipid as the primary driver of potency.  The most clinically advanced LNP contains the ionizable lipid MC3 and has been shown to be safe in humans after intravenous (IV) administration of siRNA.  Our own vaccine trials with MC3-based LNPs for influenza gave 100% seroconversion with a 100-µg dose of modified mRNA. . . . To date, the only LNPs evaluated for intramuscular (IM) mRNA vaccine delivery were originally optimized for IV delivery of siRNA to the liver.[3132]
>
> . . .
>
> The goal of the work described here was to identify a new ionizable lipid with improved tolerability and a potency equal or better than that of MC3. To do so, we screened 30 novel LNPs, each containing a different ionizable lipid in place of MC3. **Each LNP formulation maintained the same** lipid-nitrogen-to-phosphate

---

[3131] Justin M. Richner, Sunny Himansu, Kimberly A. Dowd, Scott L. Butler, Vaness Salazar, Julie M. Fox, Justin G. Julander, William W. Tang, Sujan Shresta, Theodore C. Pierson, Giuseppe Ciaramella, Michael S. Diamond, "Modified mRNA Vaccines Protect against Zika Virus Infection," *Cell,* March 9, 2017, pp. 1114-25, e1-e10, at e4, *available at* https://pdf.sciencedirectassets.com/272196/1-s2.0-S0092867416X00062/1-s2.0-S00928674417301952/mainext.pdf (emphasis added).

[3132] No Bates No. (Hassett Deposition Exhibit No. 4 – Kimberly J. Hassett, Kerry E. Benenato, Eric Jacquinet, Aisha Lee, Angela Woods, Olga Yuzhakov, Sunny Himansu, Jessica Deterling, Benjamin M. Geilich, Tatiana Ketova, Cosmin Mihai, Andy Lynn, Iain McFadyen, Melissa J. Moore, Joseph J. Senn, Matthew G. Stanton, Orn Almarsson, Giuseppe Ciaramella, Luis A. Brito, "Optimization of Lipid Nanoparticles for Intramuscular Administration of mRNA Vaccines," *Molecular Therapy: Nucleic Acid,* Vol. 15, April 2019, pp. 1-2 of 18, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC6383180/pdf/main.pdf.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

ratio (N:P) and **molar composition of lipid components (ionizable lipid, cholesterol, phospholipid, and polytheylene glycol [PEG] lipid)**. . . .[3133]

. . .

**LNP formulations** were prepared using a modified procedure of a method previously described. **Briefly, lipids were dissolved in ethanol at molar ratios of 50:10:38.5:1.5 (ionizable lipid:DSPC:cholesterol:PEG lipid). LNPs formulated with the ionizable lipid MC3 were used as a control throughout these studies and were produced as previously described.** . . .[3134]

|  | (ii) | **Moderna's mRNA "vaccine platform" (with Genevant's patented technology) was used in Moderna's clinical trials** |
|---|---|---|

1271.   As discussed above (*see* III.F.), to develop Moderna's mRNA vaccine platform, Moderna relied upon Genevant's patented technology, which was used in all of Moderna's clinical trials except the mRNA-1647 (CMV) Phase 2 trial that began in October 2019, and gave it "high expectation and conviction" that use of this same platform in mRNA-1273 would result in a successful drug product.  Moderna used its "standard LNP" in all of its clinical trials from 2015 through at least late-2019.  Dr. Zaks testified: "Remember for us in 2020, when the COVID started, we had successfully immunized – we had tried to immunize people, human beings, against eight different viruses by the beginning of 2020.  **And our track record in the clinic was 8 out of 8.  For us, COVID was number 9.  I had a high expectation and conviction that this would work.**"[3135]

---

[3133] No Bates No. (Hassett Deposition Exhibit No. 4 – Kimberly J. Hassett, Kerry E. Benenato, Eric Jacquinet, Aisha Lee, Angela Woods, Olga Yuzhakov, Sunny Himansu, Jessica Deterling, Benjamin M. Geilich, Tatiana Ketova, Cosmin Mihai, Andy Lynn, Iain McFadyen, Melissa J. Moore, Joseph J. Senn, Matthew G. Stanton, Orn Almarsson, Giuseppe Ciaramella, Luis A. Brito, "Optimization of Lipid Nanoparticles for Intramuscular Administration of mRNA Vaccines," *Molecular Therapy: Nucleic Acid,* Vol. 15, April 2019, p. 2 of 18, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC6383180/pdf/main.pdf (emphasis added).

[3134] No Bates No. (Hassett Deposition Exhibit No. 4 – Kimberly J. Hassett, Kerry E. Benenato, Eric Jacquinet, Aisha Lee, Angela Woods, Olga Yuzhakov, Sunny Himansu, Jessica Deterling, Benjamin M. Geilich, Tatiana Ketova, Cosmin Mihai, Andy Lynn, Iain McFadyen, Melissa J. Moore, Joseph J. Senn, Matthew G. Stanton, Orn Almarsson, Giuseppe Ciaramella, Luis A. Brito, "Optimization of Lipid Nanoparticles for Intramuscular Administration of mRNA Vaccines," *Molecular Therapy: Nucleic Acid,* Vol. 15, April 2019, p. 8 of 18, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC6383180/pdf/main.pdf (emphasis added).

[3135] MRNA-GEN-01734848-096, at 920 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (Pfizer), 73:1-73:10.).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

> **(iii)    The clinical testing that Moderna submitted to the FDA for mRNA-1273 was based on Moderna's mRNA "vaccine platform" (with Genevant's patented technology)**

1272.    As discussed above (*see* III.F.), the clinical testing that Moderna submitted to the FDA in an effort to expedite its mRNA-1273 clinical testing and achieve a head start on its competitors was based on Moderna's mRNA "vaccine platform" (with Genevant's patented technology). Furthermore, Moderna's witnesses have testified that this was Moderna's "standard LNP formulation"[3136] that it had used from at least 2011 or 2012[3137] through at least the mRNA-1273 clinical testing during the period March 2020 through July 2020.[3138]

---

[3136] *See, e.g.,* MRNA-GEN-01551984-997, at 986, 992 (Smith Deposition Exhibit No. 3 – Max Elkus, Mike Smith, "Report 2017_0102-03-7: Program Stability of Small Scale Lipid Compositions – Project: 10 Composition Design Space for Zika, hMPV-PIV, CMV, and ONK3," *Moderna,* August 24, 2017, pp. 3, 9) (At 992: "Four compositions surrounding the **current standard of 50% mol cationic lipid, 10 mol% DSPC, 38.5 mol% cholesterol, and 1.5 mol% PEG-DMG** were formulated at five distinct PEG levels . . ." (emphasis added)).

[3137] MRNA-GEN-01725410-507 at 466 (December 1, 2023 30(b)(6) Deposition of Stephen G. Hoge, M.D. (*Moderna v. Pfizer*), 225:24-226:6 ("A. We worked in 2012 and 2011 with lipid nanoparticles at Moderna with compositions that I believe were, in fact, probably the same as were used in 2016 in the MERS publication or the MERS patent in question, and therefore, it is true that we had probably had those same ratios and compositions in 2012.")). *See also* May 14, 2024 Deposition of Michael Smith, Ph.D., 141:9-141:21 ("Q. . . . approximately how long after January 7, 2013 did it take for Moderna to encapsulate mRNA in an LNP? . . . A. I'm not sure. I know that in this time period in 2013, over that year there were some exploratory formulations, LNPs, and other, you know, non-LNP formulations, but a lot of the activities exploring LNP formulation technology really started to get more momentum in 2014, and that's one of the reasons why I joined Moderna and to a role focused on LNPs."); 78:19-78:22 ("A. So Moderna started to perform research and development into broad lipid composition space, and specifically LNPs, in the 2013 to 2014 timeframe."); 88:6-89:7 ("A. So when Moderna starts looking at this very broad topic of LNPs, you would look at compositions in different ionizable lipid variations and just explore the space, and that's generally what Moderna was doing. Frankly, at Moderna, it wasn't clear whether, you know, what type of nanoparticle would be needed for delivery. So you'll actually see a lot of the exploration, including formulations that, you know, aren't LNPs as well. So there was a lot of work exploring the space. Q. And part of that exploration was looking at LNPs with MC3, correct? . . . A. I'm not sure what MC3 for specific timing came into the picture in a real sense. . . . I can say with certainty that MC3 came into discussion later when it came to the initial type of prototype programs.").

[3138] *See, e.g.,* May 14, 2024 Deposition of Michael Smith, Ph.D., 200:10-200:19 ("Q. And this [Smith Deposition Exhibit No. 8] was the formulation with lipid molar ratio of 1.5 percent PEG, 50 percent SM-102, and 10 percent DSPC, and 38.5 percent cholesterol. Do you see that? A.

876

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

> **(iv)** **The only FDA-approved product that used an LNP was Onpattro (with Genevant's patented technology)**

1273. Consistent with Moderna's decision to use the "optimum LNP" and pursue the path of "least risk," Moderna's mRNA vaccine platform used an LNP formulation that had already been approved by the FDA. As discussed above (*see* V.B.11.), as of May 31, 2020, the only FDA-approved product that used an LNP was Onpattro, which the FDA approved in August 2018, and used Tekmira's LNP formulation of the Patents-in-Suit.[3139]

> **(v)** **There were no acceptable, available, non-infringing alternatives to Genevant's Patents-in-Suit**

1274. As discussed in detail above (*see* III.F.), as of May 31, 2020, and given the time pressure associated with the pandemic and Moderna's strategy to be first to clinical trials, and decision to pursue the least-risk path, there were no available, acceptable non-infringing alternatives to the claimed inventions of the Patents-in-Suit.

## XV. Apportionment Between Delivery and Payload

1275. Based on the foregoing, I have apportioned the projected $13.90/dose profit (before subtractions) as between delivery and payload, as shown in **Table 6.1**,[3140] below.

| | Moderna Payload | Genevant Delivery | Total |
|---|---|---|---|
| **Anticipated Net Profit per Dose After Moderna Anticipated Fee/Profit, *less*:** | $    6.95 | $    6.95 | $    13.90 |
| Moderna's Past Investments/Costs Related to COVID Vaccine | $    2.97 | $    2.97 | $    5.94 |
| Moderna's Cost of Using NIAID Technology | $    0.37 | $ | $    0.37 |
| **Reasonable Royalty Profit Indication per Dose** | $    3.61 | $    3.98 | $    7.59 |

**TABLE 6.1**

1276. As discussed above, mRNA-1273 is comprised of two key elements, payload and delivery, and that *quantitatively,* at least <u>50%</u> should be attributed to LNP, which was confirmed by Drs. Mitchell

---

Yes. Q. And that was the formulation that was used to generate the Phase 1 materials for the COVID-19 vaccine right? A. Yes. I believe that is correct."). MRNA-GEN-01528848-852, at 848 (Smith Deposition Exhibit No. 8 – December 11, 2019 email from Mike Collier to Jack Kramarczyk, Chris Ladd, Michael Smith, Subject: RE: One More Request Please from EC).

[3139] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section VI.A. ("I note that Patisiran (sold under the brand name Onpattro by Alnylam) was the first marketed LNP product and used the 50:10:38.5:1.5 composition within the scope of the Lipid Composition Patents. It is my understanding that Onpattro was the only FDA-approved product that used an LNP prior to the release of the COVID-19 vaccines.")

[3140] Schedule 3.3.

877

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

and Porter.[3141]   As such, I have apportioned <u>50%</u> of the projected $13.90/dose profit to delivery which, after subtractions, results in <u>$3.98</u>/dose excess profit that is reasonably attributable to delivery.   I understand that substantially all of the excess profit associated with delivery is attributable to the Patents-in-Suit.[3142] Thus the excess profits associated with the Patents-in-Suit is <u>$3.98</u>/dose.

### XVI.   Opinion

1277.   Based on my investigation and analysis to date, it is my opinion under the Analytical Method, that the reasonable royalty adequate to compensate Genevant for Moderna's alleged infringement of the Patents-in-Suit for the *pandemic* phase is <u>$3.98</u>/dose.

### s.        Application of the Analytical Method to *Endemic* Phase

1278.   Theoretically, it is appropriate to apply the Analytical Method to the *endemic* phase.  However, as discussed above,  Moderna's documents appear to show that it had not yet developed a specific expectation regarding *endemic* phase profitability (*i.e.,* "what costs do we need to include and what margin structure do we need to have"[3143]) around the date of the May 31, 2020 hypothetical negotiation.[3144]   Because Moderna does not appear to have developed a specific expectation regarding *endemic* phase cost and margin structure as of May 31, 2020, I have *not* determined an

---

[3141] November 21, 2024 Interview of Dr. Frederick Porter.  November 22, 2024 Interview of Michael Mitchell, Ph.D..

[3142] November 22, 2024 Interview of Dr. Michael Mitchell.  I understand that Dr. Mitchell has opined that "that Moderna's purported improvements to its lipid nanoparticle technology are far less valuable than the technologies claimed in the Patents-in-Suit, which are fundamental to enabling successful mRNA delivery." November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XV.

[3143] December 21, 2021 Deposition of Christoph Brackmann (*Moderna v. Pfizer*), 86:6-86:7.

[3144] ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████  *See also* MRNA-GEN-01725128-156, at 129 and 140 (Brackmann Deposition Exhibit 11 [Moderna v Pfizer], Moderna - August 10, 2020 mRNA-1273 Lifecycle Management Deck, Slide 13 of 29)████████████████ ██████████████; MRNA-GEN-01570975-1159, at 992 and 116 ███████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████

878

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

*endemic* phase royalty rate measure based on the Analytical Method. Instead, I address the *endemic* phase royalty rate using the Hypothetical Negotiation Approach, which is discussed next.

**t.    Summary of Analytical Method Analysis: Pandemic Phase**

1279. My calculation of the excess profits (*i.e.,* income advantage) before apportionment is $7.59/dose, as shown in **Chart 6.2** and **Table 6.2**, below, of which $3.98/dose is attributable to the Patents-in-Suit.



**CHART 6.2**

879

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**TABLE 6.2**

1280.    **Table 6.2**, above, is based on:

- **Moderna's Projected mRNA-1273 Manufacturing Volume During the *Pandemic Phase*:** **1 billion**, based on Moderna's May 20, 2020 "mRNA 5-yr accelerated plan" which identifies Moderna's "Manufacturing Goal" as "A billion doses per year,"[3145] which is generally consistent with Moderna's reported (*i.e.,* actual) shipments of approximately during the pandemic phase 1.66 billion doses which continued into 2023. In contrast, Moderna's planning documents show various pandemic phase scenarios generally in the range of 200 million to 1.0 billion doses, based on the assumption that the pandemic phase would end earlier, in **2021**.[3146]

---

[3145] MRNA-GEN-01251960-028, at 974 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," *Moderna,* n.d. (May 20, 2020), Slide 15 of 69)

[3146] *See, e.g.,* MRNA-GEN-01251960-028, at 964 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," *Moderna,* n.d. (May 20, 2020), Slide 5 of 69)

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1281. **mRNA-1273 Price**: **$30/dose** in Moderna's May 31, 2020 offer to sell[3147] which reflected Moderna's approved pricing at the time for "pre-human data."[3148]

1282. During the *pandemic* phase, this analysis shows a Projected Operating Profit of ███████. After subtractions, the projected excess profit is **$7.59/dose**. Based on Moderna's May 20, 2020 "Manufacturing Goal" of 1 billion doses per year and the $30/dose price in Moderna's May 31, 2020 offer to sell which is accused of infringement in this case, the total calculated excess profits are **$7.59/dose**, of which **$3.98/dose** is attributable to delivery and the Patents-in-Suit. After the apportionment step the calculated reasonable royalty is **$3.98/dose**.

u.      **Moderna's Projections v. Actuals**

1283. I have compared Moderna's projections around May 31, 2020 to the actuals, as follows:



[3147] HHS-0000828-830 (Bennett Deposition Exhibit No. 21 – May 31, 2020 letter from Stéphane Bancel to Dr. Moncel Slaoui (Warp Speed/HHS), General Gustave F. Perna (Warp Speed/HHS), Dr. Gary Disbrow (BARDA)). MRNA-GEN-01900098 (May 31, 2020 Email from Hamilton Bennett to Robert Johnson (HHS) Subject: mRNA-1273 Supply Agreement). *See also* Plaintiff Genevant Sciences GmbH's Eleventh Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (Nos. 1-7) dated June 7, 2024, p. 71 ("It is further an act of infringement for Moderna to offer to sell the Accused Product. Based on Plaintiffs understanding of discovery to date, Moderna first made an offer to sell the Accused Product to the United States Government on May 31, 2020.").

[3148] MRNA-GEN-02645690-752 at 695 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 6 of 64) ("Recommended Pricing").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**(11)      mRNA-1273 Doses**

1284. As discussed above, my *pandemic* phase analysis is based on Moderna's mRNA-1273 "Manufacturing Goal" of "A billion doses per year,"[3149] and assumes that the subtractions are amortized over 1 billion doses, which is the consistent with Moderna's May 20, 2020 "Upside" projection of ███████████████████ ), as shown in **Figure 6.12**,[3150] below.

---

[3149] █████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████

[3150] █████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.12**

1285. In contrast, Moderna shipped approximately **1.66 billion** mRNA-1273 doses during the *pandemic* phase (*i.e.,* during the period December 2020 through August 2023, before Moderna launched its XBB1.5 Omicron vaccine variant). If the subtractions were instead amortized over **1.66 billion** doses (v. **1** billion doses), the calculated *pandemic* phase reasonable royalty rate under the Analytical Approach would increase to ███████████. *See* Schedule 3.5

1286. During the *endemic* phase, Moderna shipped approximately **50 million** mRNA-1273 doses.

1287. Moderna's total mRNA-1273 doses shipments during the period December 2020 through January 2024 (including the XBB1.5 Omicron vaccine variant) are approximately **1.71 billion**.

**(12)      mRNA-1273 Price**

1288. The **$30/dose** mRNA-1273 price in Moderna's May 31, 2020 offer for sale is *higher* than the weighted average price of Moderna's actual mRNA-1273 shipments of ███████████. *See* Schedule 3.6.

883

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### (13)    Cost

1289.  Moderna's projected mRNA-1273 COGS of ███████ and overhead ██████ose is reasonably consistent with Moderna's reported mRNA-1273 COGS███████ and overhead (███████).[3151] *See* Schedule 3.6.

### 3.    Opinion

1290.  Based on the foregoing analysis that applies the Analytical Method to the facts of this case, it is my opinion that a reasonable royalty based on the Analytical Method that would compensate Genevant for Moderna's use of the claimed inventions of the Patents-in-Suit during the *pandemic* phase—without consideration of the significant derivative benefits that Moderna realized that are directly connected to the allege infringement—is **$3.98/dose**.

## D.    Reasonable Royalty Rate – Hypothetical Negotiation Approach

1291.  I have also analyzed the reasonable royalty based on the Hypothetical Negotiation Approach. As noted above, Moderna expected *lower* per dose prices and profits during the pandemic phase, and *higher* per dose revenue and profits during the endemic phase.[3152] As such, I have calculated two royalty rates using the Hypothetical Negotiation Approach: one that applies to sales during the *pandemic* phase, and a second one that applies during the *endemic* phase.

### 1.    Principles

1292.  Under the Hypothetical Negotiation Approach, a reasonable royalty for use of the patented invention is defined as the amount which would have been agreed upon in an arm's length negotiation between a willing patent owner (the licensor) and a willing potential user (the licensee)

---

[3151] Schedule 3.6.

[3152] *See, e.g.,* MRNA-GEN-01570975-1159, at 999, 040 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slides 25, 66 of 186) (████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

as of the date when infringement began in fact and on the assumption that the patent was valid and entitled to respect.[3153]  "The hypothetical negotiation is hypothetical in the sense that the negotiation itself is imaginary, not in that it allows the parties to construct an entirely imaginary world that ignores the facts as they existed at the date of [first] infringement."[3154]  The hypothetical negotiation is deemed to be an arm's length transaction.[3155]  "The reasonable royalty analysis does not look to what would have happened absent the infringing product, but to what the parties would have agreed upon as a reasonable royalty on the sales made by the infringer."[3156]

1293.  The reasonable royalty analysis is different than the lost profits analysis insofar as lost profits entails "reconstruct[ing] the market 'as it would have developed absent the infringing product, to determine what the patentee would have made,'" whereas the reasonable royalty analysis focuses on what the parties would have negotiated for a license for the sales made by the infringer,[3157] which the Federal Circuit explained as follows:

> The reasonable royalty theory of damages, however, seeks to compensate the patentee not for the sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing.  In determining what such a reasonable royalty would be, the district court was required to assess Astra's injury not according to the number of sales Astra may have lost to Apotex, but according to what Astra would have insisted on as compensation for licensing its patents to Apotex as of the beginning of Apotex's infringement, in November 2003.[3158]

1294.  The Federal Circuit summarized the objective of the hypothetical negotiation analysis as follows:

> [T]he objective of the Court's concern has been two-fold: determining the correct

---

[3153] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-181.

[3154] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 501 (S.D.N.Y. 2013).

[3155] *Minks v. Polaris Industries, Inc.,* 546 F.3d 1364, 1373 (Fed. Cir. 2008) ("Courts should not, therefore, accept 'as conclusive the royalty arrangement between the patent owner and the single licensee, a close corporation owned by the inventor's family...' *Cheramie v. Oregon,* 434 F.2d 721, 727 (5th Cir. 1970)."  *Citing Rite-Hite Corp. v. Kelley Co.,* 774 F.Supp. 1514, 1535 (E.D.Wis. 1991), *aff'd in part, rev'd in part,* 56 F.3d 1538 (Fed. Cir. 1995) ("This court also places little weight upon the royalty rate that Mike White paid for Rite-Hite patents when Mike White bought Rite-Hite from his father.  Such an intra-family sales is too dissimilar from this hypothetical situation in which one competitor voluntarily grants a novel license to its primary competitor.").

[3156] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324,1345 n.3 (Fed. Cir. 2015).

[3157] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1345 n.3 (Fed. Cir. 2015).

[3158] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015) (internal citations omitted).

885

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

(or at least approximately correct) value of the patented invention, when it is but one part or feature among many, and ascertaining what the parties would have agreed to in the context of a patent license negotiation. Litigants must realize that the two objectives do not always meet at the same precise number. Furthermore, licensors of patented technology often license an invention for more or less than its true "economic value." Such is the inherent risk in licensing intangible assets that may have no established market value.[3159]

1295. While the hypothetical negotiation approach "simulates the terms that a willing licensor would have agreed upon with a willing licensee, it is possible that the patent owner would not have been willing to license the patent at all."[3160] "The setting of a reasonable royalty after infringement cannot be treated . . . as the equivalent of ordinary royalty negotiations among truly 'willing' patent owners and licensees. That view would constitute a pretense that the infringement never happened. It would also make an election to infringe a handy means for competitors to impose a 'compulsory license' policy upon every patent owner."[3161] In a 2019 article, Cotter, *et al.* underscored this issue and explained:

> While this approach [the 'hypothetical negotiation' approach] is now deeply entrenched, the leading cases emphasize that the goal of the hypothetical negotiation framework is not to replicate the bargain that actual willing parties would have arrived at; that would be "inaccurate, and even absurd," given that "[t]here is, of course, no actual willingness on either side, and no license to do anything, the infringer being normally enjoined ... from further manufacture, use, or sale of the patented product." The hypothetical negotiation is a "legal fiction," "employed by the court as a means of arriving at reasonable compensation," and it is to be "flexibly applied as a 'device in the aid of justice.'"

---

[3159] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009). *Avocent Redmond Corp. v. Rose Electronics,* No. C06-1711RSL, 2013 WL 1855847, at *2 (W.D. Wash. Apr. 29, 2013) ("The objective of the analysis is not to determine the value of the patented invention, but rather to ascertain what the parties to the hypothetical negotiation would have agreed to as a fair and reasonable royalty arrangement. Lucent Techs., 580 F.3d at 1337.").

[3160] Dmitry Karshtedt, "Damages for Indirect Patent Infringement," *Washington University Law Review,* Vol. 91, Issue 4, 2014, pp. 911-978, at 934, *available at* https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=6081&context=law_lawreview (*citing Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995 (en banc) ("The hypothetical negotiation is often referred to as a 'willing licensor/willing licensee' negotiation. However, this is an inaccurate, and even absurd, characterization when, as here, the patentee does not wish to grant a license.")).

[3161] Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152, 1158 (6th Cir. 1978).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

> We recommend that courts embrace this view of the hypothetical bargain framework as a tool – a proxy for the issues of how to split the surplus from the invention – rather than as a goal in and of itself.[3162]

1296. "The key element in setting a reasonable royalty . . . is the necessity for return to the date when the infringement began."[3163]

> Indeed, the basic question posed in a hypothetical negotiation is: if, on the eve of infringement, a willing licensor and licensee had entered into an agreement instead of allowing infringement of the patent to take place, what would that agreement be? This question cannot be meaningfully answered unless we also presume knowledge of the patent and of the infringement at the time the accused infringing conduct began.  Were we to permit a later notice date to serve as the hypothetical negotiation date, the damages analysis would be skewed because, as a legal construct, we seek to pin down how the prospective infringement might have been avoided via an out-of-court business solution.[3164]

1297. Establishing the date of the hypothetical negotiation date is particularly important in biotech cases in view of "the rapid development of biotechnological arts, a year can make a great difference in economic risks and rewards."[3165]

1298. "A key inquiry in the analysis is what it would have been worth to the defendant, as it saw things at the time, to obtain the authority to use the patented technology, considering the benefits it would expect to receive from using the technology and the alternatives it might have pursued."[3166]  In particular, the hypothetical negotiation focuses on the expected benefits of the license to the licensee and the costs of the license to the patentee.[3167]

---

[3162] Thomas F. Cotter, John M. Golden, Oskar Kiivak, Brian J. Love, Norman V. Siebrasse, Masabumi Suzuki, David O. Taylor, "Reasonable Royalties," pp. 6-49, at 22, *in* C. Bradford Biddle, Jorge L. Contreras, Brian J. Love, Norman V. Siebrasse, Eds., *Patent Remedies and Complex Products: Toward a Global Consensus,* (Cambridge University Press: July 2019), *available at* https://www.cambridge.org/core/services/aop-cambridge-core/content/view/F0ED1D77D32964618EF2EABD4E0E027A/9781108426756c1_6-49.pdf/reasonable_royalties.pdf.

[3163] *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, at 1158 (6th Cir. 1978).

[3164] LaserDynamics, Inc. v. Quanta Comput., Inc., 694 F.3d 51, 76 (Fed. Cir. 2012).

[3165] Integra LifeSciences I, Ltd. v. Merck KGaA, 331 F.3d 860, 870 (Fed. Cir. 2003).

[3166] Carnegie Mellon University v. Marvell Technology Group, Ltd, et al., 807 F.3d 1283, 1304 (Fed. Cir. 2015).

[3167] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015) ("As the district court explained in detail, **the benefits to Apotex, and the costs to Astra**, of a license to the formulation patents would have been considerable. For its part, Apotex stood to (and did) garner

887

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1299. The relevant profit measure is the profits the parties would have anticipated or predicted as of the date just prior to the infringer's commencement of infringing activity. [3168] It is expectations that govern—not actual results. [3169] "What an infringer's profits actually turned out to have been during the infringement period may be relevant, but only in an indirect and limited way—as some evidence bearing on a directly relevant inquiry into anticipated profits."[3170] Evidence of actual profits may be considered as an indication of the infringer's anticipated profits, [3171] "[h]owever not all future events are considered relevant. In particular, the Federal Circuit has been reluctant to 'look to the future' and reduce a damages royalty based on low actual profit margins for the infringer on the infringing product or process."[3172] "While either the infringer's or the patentee's

---

immense profits from selling its generic omeprazole product. The district court found that even after a 50 percent royalty payment to Astra, Apotex would be left with a profit margin of 36 percent, which was 'solidly in the range of 31 to 48% margins [Apotex] typically earned on its products at the time.' For Astra, on the other hand, a license would have entailed risks to both of its highly successful branded PPIs, Prilosec and Nexium. As the district court found, Astra would reasonably have expected that Apotex's entry into the market, armed with a license, 'would swiftly accelerate the decline in omeprazole prices and lead to the destruction of the remaining Prilosec market' as well as a decrease in Nexium sales or a forced increase in Nexium rebates to the TPPs. Under those circumstances, the district court was justified in concluding that a reasonable royalty rate of 50 percent would not overcompensate Astra for Apotex's infringement." (emphasis added)).

[3168] *Hanson v. Alpine Valley Ski Area, Inc.* 718 F.2d 1075, 1081 (Fed. Cir. 1983) ("The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations."). *See also* Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-222 (*Citing (among others) Hanson v. Alpine Valley Ski Area, Inc.* 718 F.2d 1075 (Fed. Cir. 1983)).

[3169] *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766 (Fed. Cir. 2014) ("That treatment [considering defendant's profits as a royalty cap] incorrectly replaces the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward looking inquiry into what turned out to have happened. *See Interactive Pictures,* 274 F.3d at 1385 (expectations govern, not actual results).").

[3170] Aqua Shield v. Inter Pool Cover Team, 774 F.3d 766 (Fed. Cir. 2014).

[3171] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, pp. 20-221- 20-222 (citing Trell v. Marlee Elecs. Corp., 912 F.2d 1143, at 1146 (Fed. Cir. 1990), citing Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552, 1568 (Fed. Cir. 1984)) ("Evidence of the infringer's actual profits generally is admissible as probative of his anticipated profits.").

[3172] "Methodologies for Determining Reasonable Royalty Damages," *Fish & Richardson,* 2022, *available at* https://www.fr.com/reasonableroyalty/. *See also Alden W. Hanson v. Alpine Valley*

888

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

profit expectation may be considered in the overall reasonable royalty analysis, neither is an absolute limit to the amount of the reasonable royalty that may be awarded upon a reasoned hypothetical negotiation analysis under the *Georgia-Pacific* factors."[3173]

1300.  In a licensing negotiation, the parties are "bargaining over how to split a pie" and "the parties must come to an agreement over how to split the pie."[3174]  Under the Hypothetical Negotiation Approach, the analysis focuses on how to estimate and "split the surplus from the invention,"[3175] which is directed to ascertaining "how the parties would have agreed, *ex ante,* to divide the value to be derived from the use of the patented invention, in comparison with alternatives."[3176]  At the

*Ski Area, Inc.,* 718 F.2d 1075, 1080-81 (Fed. Cir. 1983) ("The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations. 'Whether, as events unfurled thereafter, [Alpine Valley] would have made an actual profit, while paying the royalty determined as of [1972], is irrelevant.' *Panduit*, 575 F.2d at 1164, 197 USPQ at 736.").

[3173] *Powell v. Home Depot U.S.A., Inc.* 663 F.3d 1221, 1238-1239 (Fed. Cir. 2011).  *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766 (Fed. Cir. 2014) ("Thus, the royalty the particular infringer could profitably pay by going about its business in its particular way does not set the market value that the hypothetical negotiation aims to identify.").

[3174] Kalyan Dasgupta, David J. Teece, "Protecting Innovation in the Mobile Wireless Ecosystem: Understanding and Addressing 'Hold-Out," *Berkeley Technology Law Journal,* Vol. 38, 2023, pp. 313-348, at 316, *available at* https://btlj.org/wp-content/uploads/2023/11/0003-38-Haas-Dasgupta.pdf.

[3175] Thomas F. Cotter, John M. Golden, Oskar Kiivak, Brian J. Love, Norman V. Siebrasse, Masabumi Suzuki, David O. Taylor, "Reasonable Royalties," pp. 6-49, at 22, *in* C. Bradford Biddle, Jorge L. Contreras, Brian J. Love, Norman V. Siebrasse, Eds., *Patent Remedies and Complex Products: Toward a Global Consensus,* (Cambridge University Press: July 2019), *available at* https://www.cambridge.org/core/services/aop-cambridge-core/content/view/F0ED1D77D32964618EF2EABD4E0E027A/9781108426756c1_6-49.pdf/reasonable_royalties.pdf.

[3176] Thomas F. Cotter, John M. Golden, Oskar Kiivak, Brian J. Love, Norman V. Siebrasse, Masabumi Suzuki, David O. Taylor, "Reasonable Royalties," pp. 6-49, at 25, *in* C. Bradford Biddle, Jorge L. Contreras, Brian J. Love, Norman V. Siebrasse, Eds., *Patent Remedies and Complex Products: Toward a Global Consensus,* (Cambridge University Press: July 2019), *available at* https://www.cambridge.org/core/services/aop-cambridge-core/content/view/F0ED1D77D32964618EF2EABD4E0E027A/9781108426756c1_6-49.pdf/reasonable_royalties.pdf.  *See also See, e.g.,* Jonathan E. Kemmerer, CPA and Jiaqing Lu, Ph.D., CFA, "Profitability and Royalty Rates Across Industries:  Some Preliminary Evidence," 2008, p. 2, *available at* https://download.ssrn.com/13/02/19/ssrn_id2220954_code230071.pdf?response-content-disposition=inline&X-Amz-Security-

889

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

hypothetical negotiation, the parties would establish a royalty that would divide between them the predicted economic benefits to be realized by the licensee's adoption of the product or process.[3177] The actual division of profit between the patentee and the licensee will vary with the circumstances and with the customs of the industry in question.[3178]  In order to compensate the patentee for the infringement, a reasonable royalty must make the patentee a willing seller even if a rational infringer is not a willing buyer at that price.[3179]  Reasonable royalty determinations in litigation are not equivalent to ordinary royalty negotiations among truly "willing" patent owners and licensees.[3180]  "[W]hat an infringer would prefer to pay is not the test for damages."[3181]  How the incremental value from use of a patented invention is estimated and how it would be divided in the hypothetical negotiation are typically hotly contested issues.  *Cotter, et al.* explained this as follows:

> Both sides often can make a substantial claim to at least a portion of the incremental value – the patentee because this value results from use of the claimed invention, and the adjudged infringer because it made complementary or supplementary

---

Token=IQoJb3JpZ2luX2VjEGYaCXVzLWVhc3QtMSJHMEUCIAZON4Al%2Bo3mTm1Q9pq PG6UBXQLPr8MIm%2BxefXh0D7xQAiEApAfxpQI6lWaULviCwm7nxafNGoTAP2nvt5aqT0 mJ%("Royalty payments can be interpreted as a profit sharing mechanism.  In other words, by receiving royalty income, a technology licensor shares the profit streams generated from the licensee's efforts in commercializing the patented technology.  Royalty rates in a majority of license agreements are defined as a percentage of sales or a payment per unit.  However, the profitability of the products or services that incorporate the patented technology plays a dominant role in royalty determination.").  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1209 (Fed. Cir. 2010) ("Under this factor [*Georgia-Pacific* Factor No. 8], a wide profit margin for accused products supports a higher reasonable royalty.  *E.g., Lucent,* 580 F.3d at 1335.").  *See also* Danielle Williams, Chris Marchese, "Litigation Webinar Series – Patent Damages Theories," *Fish & Richardson,* December 1, 2016, Slides 31-45, *available at* https://web.archive.org/web/20170808035530/https://www.fr.com/wp-content/uploads/2016/12/FINAL_Patent_Damages_12_01.pdf (presentation section titled "Profit Splitting").

[3177] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-219.

[3178] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-219.

[3179] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-182.

[3180] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-187.  TWM Mfg. Co. v. Dura Corp., 789 F.2d 895, 900 (Fed. Cir. 1986), citing Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1158 (6th Cir. 1978).

[3181] *Powell v. Home Depot U.S.A., Inc.* 663 F.3d 1221, 1241 (Fed. Cir. 2011).

890

investments that resulted in a commercial embodiment of that invention. How then should the value be divided?

In theory, an invention can give rise to pure economic rents, reflecting the value of the invention over the best noninfringing alternative. If two parties, such as a patent owner and a licensee, must cooperate to realize those rents, there is no simple theoretical answer as to how the parties will split the rents between them, since even a very lopsided split, in either direction, would leave both parties better off as compared with using the noninfringing alternative.[3182]

1301. The incremental value attributable to the intellectual property will likely depend on many factors,[3183] which includes determining "[t]he portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer."[3184] When the intellectual property is paramount, and "the complementary assets and skills needed to commercialize the innovation are readily available from a variety of sources . . . the bargaining over sharing of the gains will favor the patent holder."[3185] In contrast, if the intellectual property is less important than other complementary assets and skills such as manufacturing, distribution or marketing, then the bargaining may favor the firm that supplies the complementary assets.[3186] In *Tights, Inc. v. Kayser-Roth Corp,* which involved a patented invention that "resulted in highly

---

[3182] Thomas F. Cotter, John M. Golden, Oskar Kiivak, Brian J. Love, Norman V. Siebrasse, Masabumi Suzuki, David O. Taylor, "Reasonable Royalties," pp. 6-49, at 23-24, *in* C. Bradford Biddle, Jorge L. Contreras, Brian J. Love, Norman V. Siebrasse, Eds., *Patent Remedies and Complex Products: Toward a Global Consensus,* (Cambridge University Press: July 2019), *available at* https://www.cambridge.org/core/services/aop-cambridge-core/content/view/F0ED1D77D32964618EF2EABD4E0E027A/9781108426756c1_6-49.pdf/reasonable_royalties.pdf.

[3183] David J. Teece, *Managing Intellectual Capital,* (New York: Oxford University Press, 2002), pp. 150-151.

[3184] *Georgia-Pacific Corp. v. U.S. Plywood Corp*., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). *See also* Thomas F. Cotter, John M. Golden, Oskar Kiivak, Brian J. Love, Norman V. Siebrasse, Masabumi Suzuki, David O. Taylor, "Reasonable Royalties," pp. 6-49, at 23-25, *in* C. Bradford Biddle, Jorge L. Contreras, Brian J. Love, Norman V. Siebrasse, Eds., *Patent Remedies and Complex Products: Toward a Global Consensus,* (Cambridge University Press: July 2019), *available at* https://www.cambridge.org/core/services/aop-cambridge-core/content/view/F0ED1D77D32964618EF2EABD4E0E027A/9781108426756c1_6-49.pdf/reasonable_royalties.pdf.

[3185] David J. Teece, *Managing Intellectual Capital,* (New York: Oxford University Press, 2002), pp. 150-151.

[3186] David J. Teece, *Managing Intellectual Capital,* (New York: Oxford University Press, 2002), pp. 150-151.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

significant reductions in the production costs of pantyhose,"[3187] the Court addressed this issue as follows:

> The Court finds, in the context of this case, that the patentee would have been reasonably entitled to receive 25% to 50% of the cost saving as reasonable royalties. This Court finds that 25% of the cost saving is a reasonable entitlement where the parties anticipate that the licensee will have to make substantial contributions to practical commercialization.  The Court finds that 50% of the cost saving is a reasonable entitlement where the parties anticipate that the licensee will have to make only routine creative contributions toward commercialization.[3188]

1302.  *Cotter, et al.* outlined the "evidence [that] should be used to establish that division [of the incremental profit]" as follows:

> [T]he second question is what evidence should be used to establish that division [of the incremental profit]. A few possibilities come to mind. First, comparables may shed light, either explicitly or implicitly, on how the parties would have agreed to divide the surplus. As discussed above, evidence also could reflect any ancillary services or risks that either the patent owner or the infringer, in fact, incurred, so as to adjust the royalty derived from the comparable license. Second, there may be evidence of what the parties would have agreed to based on their own prior negotiations, the patentee's course of dealing with other parties, or the custom of the industry. To illustrate, in *United States Frumentum Co. v. Lauhoff*, the U.S. Court of Appeals for the Sixth Circuit held that evidence was admissible as to what share of the profits or of the selling price "it may be customary in that or similar business to allow for the use of such an invention." (Of course, questions may arise as to just how similar a "similar business" must be.)[3189]

---

[3187] *Tights, Inc.  v. Kayser-Roth Corp.,* 442 F. Supp. 159, 163 (M.D.N.C. 1977).

[3188] *Tights, Inc.  v. Kayser-Roth Corp.,* 442 F. Supp. 159, 164 (M.D.N.C. 1977).  *See also* Thomas F. Cotter, John M. Golden, Oskar Kiivak, Brian J. Love, Norman V. Siebrasse, Masabumi Suzuki, David O. Taylor, "Reasonable Royalties," pp. 6-49, at 27, *in* C. Bradford Biddle, Jorge L. Contreras, Brian J. Love, Norman V. Siebrasse, Eds., *Patent Remedies and Complex Products: Toward a Global Consensus,* (Cambridge University Press: July 2019), *available at* https://www.cambridge.org/core/services/aop-cambridge-core/content/view/F0ED1D77D32964618EF2EABD4E0E027A/9781108426756c1_6-49.pdf/reasonable_royalties.pdf ("We therefore recommend that, when faced with the question of how to divide the incremental value derived from the use of the invention over the next best alternative, courts permit the parties to introduce any competent evidence on this issue – including, where necessary to estimate a royalty 'in aid of justice,' empirical findings that people in Western societies generally view a 50/50 split of benefits as fair, and that economists often use the Nash Bargaining Solution in modeling bargaining behavior.").

[3189] Thomas F. Cotter, John M. Golden, Oskar Kiivak, Brian J. Love, Norman V. Siebrasse, Masabumi Suzuki, David O. Taylor, "Reasonable Royalties," pp. 6-49, at 26, *in* C. Bradford Biddle, Jorge L. Contreras, Brian J. Love, Norman V. Siebrasse, Eds., *Patent Remedies and*

892

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1303.  "The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement."[3190]  In particular, the hypothetical negotiation should reflect what parties regularly do during "real-world" licensing negotiations.[3191]  "In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme."[3192]  "A running-royalty award is supportable only if it would have been reasonably foreseeable to the patentee."[3193]  The type of license the parties would or could have negotiated is generally a question of fact dependent on the circumstances.[3194]

1304.  "Calculation of a reasonable royalty[] . . . [r]equires determination of two separate quantities—a royalty base, or the revenue pool implicated by the infringement, and a royalty rate, the percentage of that pool 'adequate to compensate' the plaintiff for that infringement.  These quantities, though related, are distinct.  An over-inclusive royalty base including revenues from the sale of non-infringing components is not permissible simply because the royalty rate is adjustable."[3195]  "[W]here multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more. . . . The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product."[3196]

---

*Complex Products: Toward a Global Consensus,* (Cambridge University Press: July 2019), *available at* https://www.cambridge.org/core/services/aop-cambridge-core/content/view/F0ED1D77D32964618EF2EABD4E0E027A/9781108426756c1_6-49.pdf/reasonable_royalties.pdf.

[3190] *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).

[3191] *Lucent Tech., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1334 (Fed. Cir. 2009).

[3192] *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).

[3193] *Spectralytics, Inc. v. Cordis Corp.,* 650 F. Supp. 2d 900, 918 (D. Minn. 2009), *aff'd in part, vacated in part,* 649 F.3d 1336 (Fed. Cir. 2011).

[3194] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-182.

[3195] *Cornell Univ. v. Hewlett-Packard Co.*, 609 F.Supp.2d 279, 286 (N.D.N.Y. 2009).

[3196] *Ericsson Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

893

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1305.  In determining a reasonable royalty rate, the Court of necessity must make an informed estimate or approximation,[3197] based on a variety of factors or categories of evidence[3198] including the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp*.[3199]  The specific facts of the case often have a significant impact on the reasonable royalty negotiations including the following:

- Market power, if any, conferred by the patent,
- The availability of acceptable non-infringing substitutes,
- What each party brings to the table and the relative bargaining power of the relevant parties to the negotiation, and
- Timing of the negotiation.

### 2.      Analysis

1306.  To determine the reasonable royalty under the Hypothetical Negotiation Approach, I first established the date of the hypothetical negotiation and identified Moderna's projected profits at that time.  I then determined the value of Moderna's "use of the patented invention, in comparison

---

[3197] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-181.

[3198] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-181.

[3199] *Georgia-Pacific Corp. v. U.S. Plywood Corp*., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

894

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

with alternatives"[3200] and how that value would be divided between the parties by "recreat[ing] the *ex ante* licensing negotiation scenario and [] describe[ing] the resulting agreement."[3201]

1307.   The Hypothetical Negotiation Approach is an entirely separate analysis from the Analytical Method described above, although both approaches analyze (and rely upon) many of the same facts discussed throughout my report.  As discussed above, my Analytical Method *calculates* the reasonable royalty[3202] based on Moderna's projected mRNA-1273 excess profits.  In contrast, my Hypothetical Negotiation Approach does not use that as a starting point.  Instead, I begin with Moderna's May 20, 2020 projections for 2020 and 2021 (*i.e.*, "Pro forma for COVID: Operating

---

[3200] Thomas F. Cotter, John M. Golden, Oskar Kiivak, Brian J. Love, Norman V. Siebrasse, Masabumi Suzuki, David O. Taylor, "Reasonable Royalties," pp. 6-49, at 25, *in* C. Bradford Biddle, Jorge L. Contreras, Brian J. Love, Norman V. Siebrasse, Eds., *Patent Remedies and Complex Products: Toward a Global Consensus,* (Cambridge University Press: July 2019), *available at* https://www.cambridge.org/core/services/aop-cambridge-core/content/view/F0ED1D77D32964618EF2EABD4E0E027A/9781108426756c1_6-49.pdf/reasonable_royalties.pdf.  *See also See, e.g.,* Jonathan E. Kemmerer, CPA and Jiaqing Lu, Ph.D., CFA, "Profitability and Royalty Rates Across Industries:  Some Preliminary Evidence," 2008, p. 2, *available at* https://download.ssrn.com/13/02/19/ssrn_id2220954_code230071.pdf?response-content-disposition=inline&X-Amz-Security-Token=IQoJb3JpZ2luX2VjEGYaCXVzLWVhc3QtMSJHMEUCIAZON4Al%2Bo3mTm1Q9pq PG6UBXQLPr8MIm%2BxefXh0D7xQAiEApAfxpQI6lWaULviCwm7nxafNGoTAP2nvt5aqT0 mJ%("Royalty payments can be interpreted as a profit sharing mechanism.  In other words, by receiving royalty income, a technology licensor shares the profit streams generated from the licensee's efforts in commercializing the patented technology.  Royalty rates in a majority of license agreements are defined as a percentage of sales or a payment per unit.  However, the profitability of the products or services that incorporate the patented technology plays a dominant role in royalty determination.").  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1209 (Fed. Cir. 2010) ("Under this factor [*Georgia-Pacific* Factor No. 8], a wide profit margin for accused products supports a higher reasonable royalty.  *E.g., Lucent,* 580 F.3d at 1335.").  *See also* Danielle Williams, Chris Marchese, "Litigation Webinar Series – Patent Damages Theories," *Fish & Richardson,* December 1, 2016, Slides 31-45, *available at* https://web.archive.org/web/20170808035530/https://www.fr.com/wp-content/uploads/2016/12/FINAL_Patent_Damages_12_01.pdf (presentation section titled "Profit Splitting").

[3201] *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).

[3202] *Compare to Rensselaer Polytechnic Institute v. Apple Inc.,* No. 1:13-cv-0633 (DEP) (N.D.N.Y.), Dkt. No. 265 (filed July 20, 2015), Motion Hearing, Vol. 1, June 26, 2015, 79:22-79:24 ("MR. SKIERMONT: . . . Mr. Yerman for his analytic method, which is distinguished, it's not a hypothetical negotiation, it's a calculation.  You understand. . . .").

895

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

cash flow statement, 2020-2024"),[3203] adjusted to reflect Moderna's expectations as of May 31, 2020 for the *pandemic* period.[3204] In addition, for the *endemic* phase, I considered Moderna's May

---

[3203] MRNA-GEN-01251960-028, at 2002 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," *Moderna,* n.d. (May 20, 2020), Slide 43 of 69) ("Pro forma for COVID: Operating cash flow statement, 2020-2024").

[3204] *Compare to Rensselaer Polytechnic Institute v. Apple Inc.,* No. 1:13-cv-0633 (DEP) (N.D.N.Y.), Dkt. No. 265 (filed July 20, 2015), Motion Hearing, Vol. 1, June 26, 2015, 64:1-65:10 ("MR. SKIERMONT: . . . For example, on your screen I've summarized to draw out the differences between Mr. Yerman's analytical method and the *Georgia-Pacific* method. In the analytical method Mr. Yerman started by calculating excess profits from Siri-enabled iPhones and to calculate excess profit, he used as a proxy this $100 price differential, which I'll get into. And so that excess profit started with the $100 price difference. *Georgia-Pacific* number did not use that as a starting base, completely different number. In the *Georgia-Pacific* number Mr. Yerman calculated the total profits gross margin from Apple's Siri-enabled iPhones. So first point, completely different starting points from a base of dollars that are at issue. In step number two in the analytical method Mr. Yerman apportioned the excess profit among the new features in the 4S to Siri basically to get to Siri-attributed profit, Siri-attributed excess profit from the 4S. IN the *Georgia-Pacific* method step two is completely different, not same numbers, not same data, totally different outcome. And that is in step two of *Georgia-Pacific* Mr. Yerman apportioned the total profit gross margin of Siri-enabled iPhones to Siri. So both methods do a Siri-attributed profit calculation because we know that Siri creates profit for Apple, it's an admission and a fact. The step two exercise is how much profit is attributable to Siri but they're starting from two different points, the $100 price differential excess profit in the analytical method, the apportionment of the gross margin from Siri-enabled devices in the *Georgia-Pacific* method. And the final step in each one that is the only similarity between the two methodologies, not exactly the same on anything except step three, and in step three Mr. Yerman apportioned the Siri-attributed profit that he arrived at from his two different methods and then further apportioned to the value of the '798 technology specifically from Siri generally. So completely different methodologies. . . ."); 74:15-74:20 (further describing Mr. Yerman's *Georgia-Pacific* analysis: "MR. SKIERMONT: . . . Mr. Yerman's opinion is not and he did not try to establish that Siri is the sole reason [*i.e.,* EMVR] for purchasing decisions of the iPhone. Mr. Yerman's – because he didn't have to. Mr. Yerman's opinion starts with the premise that it's a substantial driver of customer demand."); 83:7-83:9 ("MR. SKIERMONT: . . . Here we have big feature and we're not even going after all the device profits. We've first cut those down to Siri-attributable profits. . . ."); 86:23-87:19 ("THE COURT: But the entire market value rule essentially would take the profit of the entire Siri and make it, use it to compute royalty base. But it seems, and plaintiff is certainly arguing, that Mr. Yerman went beyond that and then took that as a starting point and then tried to carve up that to determine how much of it was relative to Siri and how much of that in turn was relative or accountable to the '798 patent. MR. HADDEN: Right. . . . THE COURT: How else do you calculate royalty base when Siri is not sold stand-alone? MR. HADDEN: Sure. You may not be able to have a royalty base in that case. So then you come up with a reasonable royalty through some other way, comparable license agreements for other technology. . . .").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

20, 2020 projections,[3205] however, as discussed above the 2022-2024 data in this projection is not limited to COVID and appears to be a work in progress, given that it states that such projections were "[t]o be refined as part of the 2020 LRP" (*i.e.*, "COVID program P&L" projections through 2025).[3206]  The fact that Moderna's *endemic* phase profit projections were a work in progress as of May 31, 2020, is confirmed by other Moderna documents.[3207]  As such, as part of my Hypothetical Negotiation Approach analysis, I considered Moderna's projections shortly after May 31, 2020 that appear to more clearly reflect its profit expectations during the *endemic* phase.

### v.    Hypothetical Negotiation Date

1308.  The date of the hypothetical negotiation date is the date that the alleged infringements first began. "As the Federal Circuit explains, '[t]he hypothetical negotiation requires the court to envision the terms of a license agreement reached as the result of a supposed meeting between the patentee and the infringer *at the time infringement began.' Rite-Hite,* 56 F.3d at 1554 (emphasis supplied).  This framework is incompatible with [the Defendant's] suggestion that it should be assumed to have been pursuing non-infringing alternatives [years before the date of the hypothetical negotiation]."[3208]

1309.  The parties to the hypothetical negotiation are the relevant parties at the date of first infringement,[3209] namely, the patent owner (and/or exclusive licensee) and the accused infringer.

---

[3205] MRNA-GEN-01251960-028, at 2002 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," Moderna, n.d. (May 20, 2020), Slide 43 of 69) ("Pro forma for COVID: Operating cash flow statement, 2020-2024").

[3206] MRNA-GEN-01570975-1159, at 116 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," Moderna, September 2, 2020, Slide 142 of 186) ("COVID program P&L" projections through 2025).

[3207] *See, e.g.,* MRNA-GEN-01724191-192, at 191 (*Moderna v. Pfizer* Brackmann Deposition Exhibit No. 10 – July 2, 2020 email from Stephen Hoge to Christoph Brackmann, Cc: David Meline, Subject: Re: 2nd generation) (emphasis added).  December 21, 2021 Deposition of Christoph Brackmann (*Moderna v. Pfizer*), 81:15-86:10 (testimony regarding Brackmann Deposition Exhibit No. 10, at 86:4-86:10 ("A. . . . And, again, I think this is probably part of a budget process where we thought about, you know, what costs do we need to include and what margin structure do we need to have with regards to our commercial product to be able to invest into, you know, whatever we would need to invest to keep the product on the market.").

[3208] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 500-501 (S.D.N.Y. 2013).

[3209] *Applied Med. Res. Corp. v. U.S. Surgical Corporation*, 435 F.3d, 1356, 1361 (Fed. Cir. 2006) ("Consistent with our precedent, reasonable royalty damages are not calculated in a vacuum without consideration of the infringement being redressed. *Id.*  We are required to identify the infringement requiring compensation, and evaluate damages based on a hypothetical negotiation at the time that infringement began, not an earlier one.").

897

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

In some cases, a third party may also be properly seated at the hypothetical negotiation table,[3210] however, "a reasonable royalty is the amount of royalty that [the patentee, or its exclusive licensee, in this case] and [the accused infringer] would have agreed to in a hypothetical negotiation [on May 31, 2020], when the [Moderna submitted its offer to sell to the U.S. Government] and the alleged infringement began."[3211]  "In a hypothetical negotiation, a patent owner can be expected to account for the profits its affiliates and licensees earn on its patents.  *See Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.,* 425 F.3d 1366, 1378 (Fed. Cir. 2005), *overruled*

---

[3210] *Daedalus Blue LLC v. SZ DJI Technology Co., Ltd., DJI Europe B.V.,* Civil Action No. W-20-CV-00073-ADA (W.D. Tex.), Memorandum Opinion and Order dated March 24, 2022, p. 14 of 15 ("The single case that Daedalus cites in a footnote to refute this proposition is a far cry from the present case. *See Sealant Sys. Intl., Inc. v. TEK Glob. S.R.L.*, No. 5:11-CV-00774-PSG, 2014 WL 1008183 (N.D. Cal. Mar. 7, 2014), *rev'd on other grounds*, 616 F. App'x 987, 989 (Fed. Cir. 2015). In *Sealant Systems*, the dispute was whether it was permissible to consider a third party along with the two parties that were properly at the seat of the hypothetical table. *Id.* at *33. And in rejecting the JMOL challenge on sufficiency grounds, the *Sealant Systems* court found that the third party was actually *"properly seated at the negotiation table"* in light of Federal Circuit caselaw. *Id.* In contrast, Pellegrino's initial report in this case analyzed a negotiation that involved the wrong parties entirely.").  *Sealant Systems International, Inc. v. Tek Global S.R.L.,* Case No. 5:11-cv-00774-PSG (N.D. Cal. Mar. 7, 2014) ("The case law [n255 '*See Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.,* 425 F.3d 1366, 1377-78 (Fed. Cir. 2005) (district court properly admitted evidence of impact of infringer's sales on patentee's parent company when parent was direct competitor of infringer; 'any hypothetical negotiation with the holding company must necessarily include the reality that the economic impact on the [parent] would weigh heavily in all' decisions); *Synthes USA, LLC v. Spinal Kinetics, Inc.,* Case No. 5:09-cv-01201-RMW, 2012 WL 4483158, at *12 (N.D. Cal. Sept. 27, 2012) (agreeing that 'the party negotiating on behalf of Synthes USA would be the Synthes organization as a whole' reflecting 'economic reality: Synthes USA is a mere holding company and any negotiation on its behalf would be conducted by and for the benefit of its corporate parent, Synthes, Inc., which would undoubtedly have its potential lost sales and the lost sales of its subsidiaries' in mind) (internal quotation and citations omitted).'] confirms that AMI may consider the effect of the license on SSI at the hypothetical negotiation. It is of no moment that AMI and SSI are sister companies and do not stand in a parent-subsidiary posture.. . . *Poly-America* does not hold, as TEK argues, that sister companies cannot take each other's economic interests into account at a hypothetical negotiation.").

[3211] *Spectralytics, Inc. v. Cordis Corp.,* 6 649 F.3d 1336, 1345, 1346 (Fed. Cir. 2011) ("The jury was instructed that 'a reasonable royalty is the amount of royalty that Spectralytics and Norman Noble would have agreed to in a hypothetical negotiation in December 1998, when the '277 Patent issued and the alleged infringement began.' . . . There was also testimony that Cordis would have played a role in the hypothetical license negotiation in view of its agreement to indemnify Noble for patent infringement.").

898

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

*on other grounds,* 576 F.3d 1348 (Fed. Cir. 2009) ('[T]he holding company would not enter any negotiation without considering the competitive position of its corporate parent.').")[3212]

1310.   The hypothetical negotiation takes place "between the patentee and infringer . . . at the time infringement began."[3213]  "In both direct and indirect infringement cases, the courts repeatedly emphasize the need to 'go back in time' and approach the problem from the perspective of the parties in a manner that is as economically realistic as possible."[3214]  "[T]he fact finder must be guided by the evidence of what the parties would have done had they participated in a real-world negotiation."[3215]  "The correct determination of [the hypothetical negotiation date] is essential for properly assessing damages.  The value of a hypothetical license" can be "drastically different" depending on the hypothetical negotiation date.[3216]

1311.   "The key element in setting a reasonable royalty is the necessity for return to the date when infringement began."[3217]   "The hypothetical negotiation must be scheduled as of *the time infringement began.*"[3218]  "[T]he hypothetical negotiation framework . . . seeks to discern the value of the patented technology to the parties in the marketplace when infringement began."[3219] "[T]he basic question posed in a hypothetical negotiation is:  if, on the eve of infringement, a willing licensor and licensee had entered into an agreement instead of allowing infringement of the patent to take place, what would that agreement be? . . . Were we to permit a later notice date to serve as the hypothetical negotiation date, the damages analysis would be skewed because, as a legal construct, we seek to pin down how the prospective infringement might have been avoided via an

---

[3212] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 496 (S.D.N.Y. 2013).
[3213] *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed Cir. 1996).
[3214] Dmitry Karshtedt, "Damages for Indirect Patent Infringement," *Washington University Law Review,* Vol. 91, Issue 4, 2014, pp. 911-978, at 938, *available at* https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=6081&context=law_lawreview.
[3215] Dmitry Karshtedt, "Damages for Indirect Patent Infringement," *Washington University Law Review,* Vol. 91, Issue 4, 2014, pp. 911-978, at 937-938, *available at* https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=6081&context=law_lawreview.
[3216] Integra Lifesciences I, Ltd. v. Merck KGaA, 331 F.3d 860, 869 (Fed. Cir. 2003). *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012).
[3217] *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012) (citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983)).
[3218] *Oracle America, Inc. v. Google, Inc.*, 798 F. Supp. 2d 1111, 1116 (N.D. Cal. 2011) (emphasis in original) (internal citations omitted).  *See also LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012) ("[T]he hypothetical negotiation must focus on the 'date when the infringement began'" *Hanson,* 718 F.2d at 1079, …").
[3219] LaserDynamics, Inc. v. Quanta Comput., Inc., 694 F.3d 51, 76 (Fed. Cir. 2012).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

out-of-court business solution."[3220]    "[T]he hypothetical negotiation date may nevertheless be properly set before marking or notice begins."[3221]

1312.    In this case, as discussed in detail above, the date of the hypothetical negotiation between Moderna and Genevant is **May 31, 2020**.  I understand that the '378 patent issued after that date, but the parties would have nevertheless engaged in a single hypothetical negotiation, in light of Genevant's practice to license a portfolio of patents where the business terms are negotiated prior to selecting the specific patents in the portfolio.[3222] *See* II.D.

### w.    Situation as of May 31, 2020

1313.    The parties' expectations at the time of the hypothetical negotiation are shaped by the business situation at the time, which was described in detail above.  As noted above, "the fact finder must be guided by the evidence of what the parties would have done had they participated in a real-world negotiation."[3223]   While the hypothetical negotiation approach "simulates the terms that a willing licensor would have agreed upon with a willing licensee, it is possible that the patent owner would not have been willing to license the patent at all."[3224]  In such cases, "[t]he setting of a reasonable royalty after infringement cannot be treated . . . as the equivalent of ordinary royalty negotiations among truly 'willing' patent owners and licensees.  That view would constitute a pretense that the infringement never happened.  It would also make an election to infringe a handy means for competitors to impose a 'compulsory license' policy upon every patent owner."[3225]

1314.    The situation at the time of the hypothetical negotiation on May 31, 2020 was discussed in detail above.  *See* II.E. and VI.C.2.a.  In this case, "[b]oth sides [Genevant and Moderna] can make a substantial claim to at least a portion of the incremental value – the patentee because this value

---

[3220] LaserDynamics, Inc. v. Quanta Comput., Inc., 694 F.3d 51, 76 (Fed. Cir. 2012).

[3221] LaserDynamics, Inc. v. Quanta Comput., Inc., 694 F.3d 51, 75 (Fed. Cir. 2012).

[3222] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 128:3-21

[3223] Dmitry Karshtedt, "Damages for Indirect Patent Infringement," *Washington University Law Review,* Vol. 91, Issue 4, 2014, pp. 911-978, at 937-938, *available at* https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=6081&context=law_lawreview.

[3224] Dmitry Karshtedt, "Damages for Indirect Patent Infringement," *Washington University Law Review,* Vol. 91, Issue 4, 2014, pp. 911-978, at 934, *available at* https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=6081&context=law_lawreview (*citing Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995 (en banc) ("The hypothetical negotiation is often referred to as a 'willing licensor/willing licensee' negotiation. However, this is an inaccurate, and even absurd, characterization when, as here, the patentee does not wish to grant a license.")).

[3225] P*anduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1158 (6th Cir. 1978).

900

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

results from use of the claimed invention, and the adjudged infringer because it made complementary or supplementary investments that resulted in a commercial embodiment of that invention."[3226]

1315. The facts surrounding the hypothetical negotiation (*see* II.), the value of the Patents-in-Suit (*see* III., IV.) as well as the impact of Moderna's alleged infringement on Genevant and its predecessors, and the harm to Genevant and its predecessors (*see* V.) were discussed in detail above and will not be repeated again here. Briefly, the key drivers of bargaining power at the hypothetical negotiation include the following facts:

### (14)    Expected "Narrow window" of opportunity

1316. As discussed above, Moderna was seeking to capitalize on what it perceived to be a "narrow window" of opportunity to sell mRNA-1273. In particular, Moderna's May 15, 2020 "Board Update" stated that there were "[a]pproximately 1.3Bn eligible subjects across OECD markets"[3227] and projected that "[w]ith no attrition, supply constraints expected through Q2 '21, with 100% OECD coverage achieved by Q3 '21."[3228]

### (15)    Moderna had a valuable head start on its competitors

1317. As discussed above, as of May 31, 2020, Moderna had a head start on its better capitalized competitors, including Pfizer, and others, as shown in **Figure 6.13**,[3229] below (dated May 29, 2020), and would negotiate to preserve that head start advantage. This head start was particularly critical, because as Mr. Bancel stated during Moderna's May 7, 2020 earnings call, Moderna was

---

[3226] Thomas F. Cotter, John M. Golden, Oskar Kiivak, Brian J. Love, Norman V. Siebrasse, Masabumi Suzuki, David O. Taylor, "Reasonable Royalties," pp. 6-49, at 23-24, *in* C. Bradford Biddle, Jorge L. Contreras, Brian J. Love, Norman V. Siebrasse, Eds., *Patent Remedies and Complex Products: Toward a Global Consensus,* (Cambridge University Press: July 2019), *available at* https://www.cambridge.org/core/services/aop-cambridge-core/content/view/F0ED1D77D32964618EF2EABD4E0E027A/9781108426756c1_6-49.pdf/reasonable_royalties.pdf.

[3227] MRNA-GEN-02645641-677, at 646 (Hoge Deposition Exhibit No. 45 – "Board Discussion," *Moderna,* May 15, 2020, Slide 6 of 37).

[3228] MRNA-GEN-02645641-677, at 654 (Hoge Deposition Exhibit No. 45 – "Board Discussion," *Moderna,* May 15, 2020, Slide 14 of 37).

[3229] MRNA-GEN-02193029-122, at 031 ("mRNA-1273 pricing workstream," *Moderna,* May 29, 2020, Slide 3 of 94 ("Executive summary").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

in race in which "a very few number of players" would ultimately "get to the finish line" with a commercial product."[3230]

**FIGURE 6.13**

---

[3230] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, pp. 29-30 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO: "So on the commercial landscape, as I briefly mentioned a few minutes ago, as you know, I mean there are 100-plus . . . vaccine candidates being worked on around the world. . . . I think we end up with a very few number of players, that have again a chance in the 2021 timeframe to have an impact on this.  Obviously, like always, in drug development, not every candidate is going to get to the finish line.  And I could also anticipate that once a few vaccines are in late stage or commercially approved, a lot of the early project might just stop investing because we are deploying capital and talent for something that might have no commercial end.  So I think while there is a lot of people on the stop lane [sic – starting line], my sense is very few of them get to the finish line.").
*See also* MRNA-GEN-01570975-1159, at 033, 134 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slides 59, 160 of 186) (Slide 59: "Choice: Over 250+ candidates in the global pipeline for COVID.  Dozens of vaccines could be available by end of 2021"; Slide 160: "Choice: Over 250+ vaccine candidates in the global pipeline for COVID-19" including 27 RNA candidates).

902

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### (16)    No available, acceptable, non-infringing alternatives

1318. "Another key factor in [the May 31, 2020] licensing negotiation would have been the amount of potential revenue [Moderna] stood to lose by walking away from the negotiating table.  Because [Moderna] did not have a non-infringing alternative formulation [that had been clinically tested] ready . . ., any decision to forego a license would have necessitated a return to the drawing board, delay, and uncertainty.  Just how much of its profits . . . [Moderna] would have sacrificed by attempting to develop an alternative formulation is thus a key issue."[3231]  "Before engaging in detail with their arguments in this regard, it is worth noting that [Moderna] began working on a formulation of [LNP] as early as [2013], and by [early-2020] seven years later, had developed [and clinically tested] only an infringing product."[3232]  Furthermore, Moderna's internal documents show that it considered changing its LNP formulation and decided not to do so.  As discussed above, in October 2018, Moderna recognized the magnitude of the potential regulatory impact associated changing its LNP formulation, which Dr. Hoge characterized as **"getting CMC 'right' in 2019"**—which he estimated as **"a delay of 3-6 months (for feedback from FDA and a new tox study)."**[3233]  The "facts show that [Moderna] did not have a non-infringing alternative formulation [clinically tested,] ready and waiting.  That this was the situation in which [Moderna] found itself in [May 2020] is one of the most salient features of the negotiating dynamic in this case and may not now be ignored."[3234]

1319. In addition, there are other important business reasons that explain why Moderna would *not* have pursued an alternative LNP formulation in late-May 2020, namely, Moderna's mRNA-1273 business strategy which entailed using the "optimal LNP" following a "path of least risk" in view of the time pressures.  As Moderna's Dr. Stewart-Jones testified: "I was . . . pushing the program forward as rapidly as possible,"[3235] and "all optimal technologies were brought to bear on this

---

[3231] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 478 (S.D.N.Y. 2013).
[3232] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 478 (S.D.N.Y. 2013).
[3233] MRNA-GEN-01510948-950, at 948-949 (Parsons Deposition Exhibit No. 8 – October 7, 2018 email from Stephen Hoge to Don Parsons, Subject: Re: Composition of KRAS reload).
[3234] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 501 (S.D.N.Y. 2013).
[3235] December 15, 2023 Deposition of Guillaume Stewart-Jones (Pfizer), 104:7-104:9.

903

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

challenge.  **We needed to bring together the optimal LNPs**, . . ."[3236]  In addition, Moderna **"followed a path of least risk"**[3237] and "decided to not tinker" because "that might introduce additional risk into the vaccine's performance[.]"[3238] Moderna pursued "de-risking measure[s] because we didn't want to be caught in Phase II or in Phase III not getting the optimal immunogenicity, . . ."[3239]  As Dr. Zaks testified, Moderna was eight for eight (*i.e.,* batting 1000) in clinical trials that used its mRNA platform, which the evidence shows was based on Genevant's patented technology.  As of May 31, 2020, given the "narrow window" of opportunity and time pressures, as well as the commercial stakes and significant uncertainty associated with untested purported alternatives, Moderna did not, and would not, deviate from its "optimal LNP" and "path of least risk" strategy.  In summary, given that Moderna "bet the company" on mRNA-1273 and repeatedly told investors that mRNA-1273 was using the very same LNP as its prior clinical trials,[3240] it would not bench its proven LNP that Dr. Zaks claimed was 8 for 8 in clinical trials for an untested and unproven alternative.  As Dr. Hoge explained: "We had bet the company on a Covid-19 vaccine, but one misstep last year and Moderna and possibly mRNA vaccines were

---

[3236] December 15, 2023 Deposition of Guillaume Stewart-Jones (Pfizer), 194:13-194:16 (emphasis added).

[3237] December 15, 2023 Deposition of Guillaume Stewart-Jones (Pfizer), 79:6 (emphasis added). *See also* 79:2-79:11 ("A. . . . We needed to de-risk the design as much as possible at this stage given the emerging pandemic that was occurring, and so we needed to ensure that the decisions we made around the antigen design followed a path of least risk, and so we decided to include the 2P mutations going forward as a company.  Or at least my recommendation to the company was to do that.  [C]an't speak for the company.  And so it was generally accepted.").

[3238] December 15, 2023 Deposition of Guillaume Stewart-Jones (Pfizer), 166:4-166:6.

[3239] December 15, 2023 Deposition of Guillaume Stewart-Jones (Pfizer), 188:11-188:13.

[3240] *See, e.g.,* "Moderna, Inc. (MRNA) CEO Stephane Bancel at Morgan Stanley 18th Annual Global Healthcare Conference (Transcript)," *Seeking Alpha,* September 14, 2020, p. 4 of 16, (Stephane Bancel, CEO: "But we do want to go down into the pediatric, down to pretty low edge for people on the call that are not aware for **hMPV/PIV3 vaccine, we have already gone down to the pediatric setting**. So this is not news for Moderna, like other mRNA vaccine companies that are not on pediatric yet. **We have already done it with the same lipid system, same chemistry, same manufacturing process as what is in 1273.** So I don't see any reason why we should not, at the right time in terms of safety, going to the pediatric." (emphasis added)). "Corporate Presentation," *Moderna,* March 2020, Slide 22 of 37, *available at* https://static.seekingalpha.com/uploads/sa_presentations/157/53157/original.pdf ("Pediatric RSV vaccine (mRNA-1345) . . . mRNA-1345 will use the same LNP as our hMPV/PIV3 (mRNA-1653) and CMV (mRNA-1647) vaccines . . .").

904

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

goners. . . .  We spent 10 years building the company for the moment, but we needed a lot of luck to survive the year."[3241]

### (17) The Expected Commercial Benefits to Moderna were Massive

1320.  As discussed above, as of May 31, 2020, the expected commercial benefits to Moderna of taking a license were massive and included at least the following:

### (a) "Impending nosedive" averted

1321.  As discussed above, as of May 31, 2020, Moderna was a 10-year-old start-up that still did not have a commercial prospect on the horizon.  On May 1, 2020, *CNN* reported: "there were signs of an impending nosedive . . . For Moderna, it [COVID-19] arrived just in time. . . ."[3242]  *CNN* explained: "Moderna – which currently generates revenue primarily through investments by collaboration partners – ended 2019 with a $514 million net loss.  True to swashbuckling startup form, the nation's wealthiest biotech firm has incurred significant losses since its 2010 inception; at the close of 2019, its accumulated deficit was $1.5 billion, according to a year-end filing with the Securities and Exchange Commission."[3243]  While Moderna's internal documents do not acknowledge an "impending nosedive," they do acknowledge that mRNA-1273 "provided cover" for its "biggest shortcoming."  Moderna's September 2, 2020 LRP acknowledged that the **"diversification (in this case with mRNA-1273) has provided cover"** for "our biggest shortcoming since last year [] the failure to advance a Rare Disease program into FIH studies."[3244]

### (b) **"Major acceleration of [Moderna's] development"**

---

[3241] Gregory Zuckerman, "How Moderna nearly lost the race to develop a Covid-19 vaccine," *STAT,* October 26, 2021, *available at*
https://web.archive.org/web/20211026113555/https://www.statnews.com/2021/10/26/how-moderna-nearly-lost-the-race-to-develop-a-covid-19-vaccine/.
[3242] Robert Kuznia, Katie Polglase, Gianluca Mezzofiore, "In quest for vaccine, US makes 'big bet' on company with unproven technology," *CNN,* May 1, 2020, *available at*
https://www.cnn.com/2020/05/01/us/coronavirus-moderna-vaccine-invs/index.html.
[3243] Robert Kuznia, Katie Polglase, Gianluca Mezzofiore, "In quest for vaccine, US makes 'big bet' on company with unproven technology," *CNN,* May 1, 2020, *available at*
https://www.cnn.com/2020/05/01/us/coronavirus-moderna-vaccine-invs/index.html.
[3244] MRNA-GEN-01570975-1159, at 075 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 101 of 186) ("Our portfolio strategy and progress (2 of 2)").

905

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1322.  As discussed above, on May 7, 2020, Moderna advised analysts and investors that its "vaccine against SARS-CoV-2 virus, mRNA-1273, is **a major acceleration of our company's development**."[3245]   At that time, Mr. Bancel predicted: "Moderna should be a commercial-stage company in 2021.  **That is two to three years ahead of our previous plans** [presented in February 2020], plans we outlined just months ago."[3246]   Moderna's May 20, 2020 "mRNA 5-yr accelerated plan" shows that mRNA-1273 was **"a major acceleration"** of the company's development[3247] that would enable the **"transition to commercial on the back of COVID licensure"** that would **"transform"**[3248] the company and **"change [Moderna's] trajectory"**:

> We believe that our pandemic response to COVID will change our trajectory, as it could be the fastest and largest drug launch in history.
>
> - With success, there is potential to generate >$5Bn in post-tax cash flows by the end of 2021, providing us with an organic source of capital to be reinvested into our existing and future pipeline.[3249]

---

[3245] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, p. 4 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO).

[3246] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, p. 4 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO) (emphasis added).

[3247] *See, e.g.,* ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[3248] MRNA-GEN-01251960-028, at 961 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," *Moderna,* n.d. (May 20, 2020), Slide 2 of 69) ("Executive Summary . . . We could experience three major transformations in this horizon: transition to commercial on the back of COVID licensure . . .").

[3249] MRNA-GEN-01251960-028, at 961 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," *Moderna,* n.d. (May 20, 2020), Slide 2 of 69).  May 16, 2024 30(b)(6) Deposition of Christoph Brackmann, 74:15-75:20 ("Q. Is it fair to say that in May 2020, Moderna expected to be able to unlock about 65 billion in value for non-COVID programs, because it would now be able to make the capital investments that without COVID it would not have been able to make? . . . THE WITNESS: So I think from, you know, I mean, reading this, yeah, there was an expectation that the ability to respond to the pandemic would give us faster access to a commercial product than was the plan before the pandemic, and those funds or profits would – we would be able to reinvest into the pipeline.  I think what was always the case, as I mentioned before, as well, that we – you know, financial constraint was sort of the bottleneck for us, is currently still the bottleneck for us to create more value to patients, and basically a higher

906

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**(c)** ███████████████████████

███████████████████████████████████████████████████

months later, its prospects had improved dramatically.  Moderna's May 20, 2020 "mRNA 5-yr

accelerated plan" stated: ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████[3251]  At that time,

Moderna's "████████████████████████████████████████

████████████████████████████████████████████████████

████████,[3252]  which Moderna further described as follows: ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████,"[3253]

and added: ████████████████████████████████████████

████████[3254]  But as *Forbes* stated in August 2021, "Moderna's [mRNA-1273] vaccine cash

cow will give it the ability to fund its research pipelines in the years to come."[3255]



---

commercial revenue.  But that was the case back then and it's the case today and, yes, we – the
COVID response or, you know, being able to positively contribute a product to the market was
an accelerated path to a commercial revenue.").

[3250] Peter Loftus, *The Messenger: Moderna, the Vaccine and the Business Gamble That Changed
the World*, dust cover.  *See also* MRNA-GEN-01709216-221, at 220 (Brackmann Deposition
Exhibit No. 4 – "2019 Long Range Plan," *Moderna,* August 27-28, 2019, Slide 5 of 6) ("LRP
2019 – Executive summary (2/3)").  Gregory Zuckerman, "How Moderna nearly lost the race to
develop a Covid-19 vaccine," *STAT,* October 26, 2021, *available at*
https://web.archive.org/web/20211026113555/https://www.statnews.com/2021/10/26/how-
moderna-nearly-lost-the-race-to-develop-a-covid-19-vaccine/.

[3251] █████████████████████████████████████████████
████████████████████████████████████

[3252] ████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████

[3253] ████████████████████████████████████████████
███████████████████████████████

[3254] ████████████████████████████████████████████
████████████████████████).

[3255] Trefis Team, "What Drove Moderna Stock From $100 To Near $500?" *Forbes,* August 20,
2021, *available at* https://www.forbes.com/sites/greatspeculations/2021/08/20/what-drove-
moderna-stock-from-100-to-near-500/.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1324. The "Moderna Sum-of-the-parts valuation ($Bn)," in **Figure 6.14**,[3256] below, shows that Moderna expected to generate ▮▮▮▮▮▮▮▮ during the "5-year planning horizon" that was comprised of ▮▮▮▮ from "existing pipeline (excl. COVID); ▮▮▮▮ from "Identified Future Vaccine DCs [Seasonal flu, Varicella Zoster, Norovirus, HSV therapeutic, and Pertussis]; and ▮▮▮▮ from "Other Future DCs [Assumes 3 DCs /yr from 2022-2024]."



**FIGURE 6.14**

### (18) The Expected Commercial Costs to Genevant were Significant

1325. As discussed above, as of May 31, 2020, Genevant and its predecessors had been in discussions with Moderna for more than seven (7) years—since early-2013. During that time, Moderna

[3256] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

908

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

refused to take a license. Moderna's alleged infringement together with its business tactics related thereto have caused harm and continue to cause harm to Arbutus and Genevant,[3257] including at least the following:

a) Arbutus and Genevant did not receive the royalties that would have accelerated the growth of the company (*See* V.C.1.).  As noted above, Moderna expected to reinvest the ██████████████████████████████"[3258] from mRNA-1273 back into its pipeline to generate ████████████████████[3259]  While Genevant did not make a projection of the investment return it expected to obtain through the reinvestment of royalties paid on COVID-19 vaccines, it is reasonable to assume that the return would have been significant.

b) Moderna's head start created commercial obstacles for Arbutus and Genevant's collaborators (*See* V.C.2.).  When the two (2) companies developing mRNA products that were selected to participate in the U.S. Government's Warp Speed program refused to take a license to Genevant's Patents-in-Suit, the remaining COVID-19 licensing prospects available to Genevant presented far less valuable licensing opportunities that had a much lower probability of success.

c) Moderna's failure to take a license encouraged others to also freeride (*See* V.C.3).  Mr. Zorn testified: "we believe there were companies that didn't reach out because they felt

---

[3257] Amended Complaint, ¶ 68.

[3258]



[3259]

like they didn't need to pay for a license when they could just do what others had done and just use it without a license."[3260]

d) Arbutus and its scientists have been denied the recognition they deserve (*See* V.C.4). While Karikó and Weissman were awarded the Nobel Prize in October 2023 for their modified mRNA invention,[3261] the Plaintiffs' scientists who invented enabling technology for delivery that made the mRNA COVID vaccines possible have been described as "forgotten hero[s]."[3262] An August 2021 *Forbes* article acknowledged Dr. MacLachlan's contribution and called him the **"forgotten hero"** and characterized his role as **"what may be the most important medical advance in a century [that] has been all but erased by the biotech industry."**[3263] *Forbes* further stated:

> Without Ian MacLachlan's innovative delivery system, Moderna and Pfizer couldn't safely get their mRNA vaccines into your cells. So why does hardly anyone acknowledge the Canadian biochemist's seminal contribution—or pay a dime in royalties?[3264]

---

[3260] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 182:5-182:9. *See also,* GENV-00262513-517 (Zorn Deposition Exhibit No. 13 – January 1, 2022 Email From: Pete Zorn To: Brad Sorenson; BCC: Pete Zorn; Pete Lutwyche Subject: RE: Exclusive v non-exclusive).

[3261] *See, e.g.,* Tom Avril, Sarah Gantz, "Penn mRNA scientists Karikó and Weissman win Nobel Prize," *The Philadelphia Inquirer,* October 2, 2023, *available at* https://web.archive.org/web/20231007091846/https://www.inquirer.com/health/coronavirus/nobel-prize-medicine-penn-covid-mrna-katalin-kariko-drew-weissman-20231002.html. Sarah Gantz, Tom Avril, "Who is Penn Nobel prize winner Katalin Karikó?" *The Philadelphia Inquirer,* October 2, 2023, *available at* https://web.archive.org/web/20231007151353/https://www.inquirer.com/health/who-is-katalin-kariko-nobel-prize-medicine-2023-winner-20231002.html. Abraham Gutman, "Scientists' Nobel-winning vaccine research brought Penn prestige – and a whole lotta money; University of Pennsylvania received more licensing revenue than any other U.S. university in the past two years," *The Philadelphia Inquirer,* October 3, 2023, *available at* https://web.archive.org/web/20231007091832/https://www.inquirer.com/health/nobel-prize-covid-19-vaccine-mrna-moderna-pfizer-biotech-licensing-20231003.html.

[3262] No Bates No. (Bancel Deposition Exhibit No. 3 – Nathan Vardi, "Covid's Forgotten Hero: The Untold Story Of The Scientist Whose Breakthrough Made The Vaccines Possible," *Forbes,* August 17, 2021, *available at* https://www.forbes.com/sites/nathanvardi/2021/08/17/covids-forgotten-hero-the-untold-story-of-the-scientist-whose-breakthrough-made-the-vaccines-possible/).

[3263] No Bates No. (Bancel Deposition Exhibit No. 3 – Nathan Vardi, "Covid's Forgotten Hero: The Untold Story Of The Scientist Whose Breakthrough Made The Vaccines Possible," *Forbes,* August 17, 2021, *available at* https://www.forbes.com/sites/nathanvardi/2021/08/17/covids-forgotten-hero-the-untold-story-of-the-scientist-whose-breakthrough-made-the-vaccines-possible/).

[3264] No Bates No. (Bancel Deposition Exhibit No. 3 – Nathan Vardi, "Covid's Forgotten Hero: The Untold Story Of The Scientist Whose Breakthrough Made The Vaccines Possible," *Forbes,*

910

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**(19)      Expectations Related to Endemic as of May 31, 2020**

1326. By early-May 2020, Moderna expected that there would be a path dependency between the COVID-19 *pandemic* phase and the COVID-19 *endemic* phase. In other words, Moderna's ability to profit from the COVID-19 *endemic* phase, depended on its participating in the *pandemic* phase. As discussed above, Moderna expected that "very few of them [COVID-19 candidates would] get to the finish line," and that "once a few vaccines are in late stage or commercially approved . . . a lot of the early project might just stop investing" because their program "might have no commercial end."[3265] In other words, Moderna recognized that if it failed to "get to the finish line" in the *pandemic* phase, it is unlikely that it could participate in the *endemic* phase.

1327. As discussed above, Moderna's commercial strategy was to capitalize on the ███████████ "[3266] of opportunity for mRNA-1273. Moderna's May 15, 2020 "Board Update" stated that there were



"[3267] and projected that ███████████ ███████████ "[3268]

---

August 17, 2021, *available at* https://www.forbes.com/sites/nathanvardi/2021/08/17/covids-forgotten-hero-the-untold-story-of-the-scientist-whose-breakthrough-made-the-vaccines-possible/).

[3265] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, pp. 29-30 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO).



[3266] ████████████████████████████████████████████████ " (emphasis added)).
[3267] ████████████████████████████████
[3268] ████████████████████████████████████

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1328.  As of early-September 2020, Moderna expected the "Endemic market" to emerge "2022+"[3269] and would extend at least through 2025[3270] if not through 2030.[3271]  At that time, Moderna stated:



. . .,"[3272] which it expected would generate

"[3273]  However, the *pandemic* phase lasted longer than Moderna had expected as of May 2020.  For example, by Q1'2021, "

[3274]  Ultimately, however, the "closing out [of] the C-100 contract . . . [went] through Q2 of 2023[.]"[3275]



---

[3274] May 23, 2024 Deposition of Albert Thomas, 43:19-44:4.
[3275] May 23, 2024 Deposition of Albert Thomas, 45:12-45:14.

912

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### x.      Moderna's Projections as of May 31, 2020

1329.   As discussed above, the relevant profit measure is the profits the parties would have anticipated or predicted as of the date just prior to the infringer's commencement of infringing activity. [3276]  It is expectations that govern—not actual results.[3277]

1330.   As discussed above, substantial evidence supports the fact that the economics of mRNA-1273 during the *pandemic* phase are different than the economics during the *endemic* phase, and Moderna expected that both pricing and volume would be different, as shown in **Figure 6.15**,[3278] below.  Based on this fact, in applying the Hypothetical Negotiation Approach to the facts of this case, I have determined two royalty rates:  one that applies to the *pandemic* phase and one that applies to the *endemic* phase.

---

[3276] *Hanson v. Alpine Valley Ski Area, Inc.*  718 F.2d 1075, 1081 (Fed. Cir. 1983)  ("The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations.").  *See also* Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-222 (*Citing (among others) Hanson v. Alpine Valley Ski Area, Inc.*  718 F.2d 1075 (Fed. Cir. 1983)).

[3277] *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766 (Fed. Cir. 2014) ("That treatment [considering defendant's profits as a royalty cap] incorrectly replaces the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward looking inquiry into what turned out to have happened. *See Interactive Pictures,* 274 F.3d at 1385 (expectations govern, not actual results).").

[3278] MRNA-GEN-01642889-921, at 911 ("Town Hall," *Moderna,* August 5, 2020, Slide 23 of 33) ("Vaccine against COVID-10 (mRNA-1273) pricing strategy").

913

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.15**

### (20)    *Pandemic* Phase Projections

1331.  For the *pandemic* phase, my Hypothetical Negotiation Approach analysis is based on the same projection that I discussed above in the Analytical Method: Moderna's May 20, 2020 projection.

### XVII.  May 20, 2020 Projection

1332.  Moderna's May 20, 2020 "mRNA 5-yr accelerated plan" includes a "Pro forma for COVID: Operating cash flow statement, 2020-2024," as shown in **Figure 6.16**,[3279] below; 2020 and 2021 relate to the *pandemic* period.

---

[3279] MRNA-GEN-01251960-028, at 2002 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," *Moderna,* n.d. (May 20, 2020), Slide 43 of 69) ("Prof forma for COVID: Operating cash flow statement, 2020-2024").

914

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.16**

(a)    **Projected Net Profit per Dose**

1333. Next, I adjusted Moderna's May 20, 2020 COVID pro forma, which was based on a ▮▮▮▮▮▮
to Moderna's expected price per dose as of May 31, 2020 (*i.e.,* $30/dose during the pandemic
phase- *see* VI.C.2.h. above) to arrive at a May 31, 2020 COVID pro forma for the *pandemic* phase
(i.e., 2020-2021), which is shown in **Table 6.3**, below. This shows that a reasonable estimate of
Moderna's expected mRNA-1273 net profit/dose during the *pandemic* phase was **$19.07** —*before*
apportionment, which is discussed below.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**TABLE 6.3**

### (21)      *Endemic* **Phase Projections**

1334. As of May 31, 2020, Moderna's public presentations and internal documents establish that Moderna was committed to value-based pricing during the endemic phase—notwithstanding the fact that there was "a lack of clarity" around either the "post-pandemic global COVID vaccine market"[3280] or mRNA-1273 demand during the endemic phase.

### XVIII. Background

---

[3280]

916

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1335. Moderna's May 20, 2020 "mRNA 5-yr accelerated plan" generally described the endemic phase as follows: ██████████████████████ ███ ."[3281] Moderna's May 29, 2020 "mRNA-1273 pricing workstream" stated: "Pandemic playing ground for mRNA-1273 slowly crystallizing but still with assumptions; **Post-pandemic with many unknowns,**" as shown in **Figure 6.17**,[3282] below.



**FIGURE 6.17**

---

[3281] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

[3282] ████████████████████████████████████████████
████████████████████████████████████████



917

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1336. Moderna's May 29, 2020 "mRNA-1273 pricing workstream" establishes that it was analyzing *pandemic* pricing v. *post-pandemic* (*i.e.,* endemic) pricing, as shown in **Figure 6.18**,[3283] below, which summarizes "learnings" associated with "EUA for vax/tx" for "Post-pandemic pricing," as ████████████████████████████████████████ ████████████████████████ increase to Moderna's $30/dose *pandemic* phase price in the May 31, 2020 offer, results in an estimated *endemic* phase price in the range of $45 to $60 per dose.



**FIGURE 6.18**

1337. As discussed above, Moderna's documents appear to show that it had not yet developed a specific expectation regarding endemic phase profitability (*i.e.,* ████████████████████ ████████████████████████"[3284]) around the date of the May 31, 2020 hypothetical

---

[3283] ████████████████████████████████████ ████████████████████████████████████

[3284] December 21, 2021 Deposition of Christoph Brackmann (*Moderna v. Pfizer*), 86:6-86:7.

918

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

negotiation.[3285]  For example, in early-September 2020, Moderna was continuing to report there was a "lack of clarity" around post-pandemic [*i.e.,* endemic] global COVID vaccine market," as shown in **Figure 6.19**,[3286] below.



**FIGURE 6.19**

[3285] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[3286] ████████████████████████████████████████████████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### (a)    Projected Doses

1338.    Around the time of the May 31, 2020 hypothetical negotiation, Moderna did not estimate mRNA-1273 doses during the *endemic* phase.  For example, Moderna's May 15, 2020 "Board Discussion" focused on the short window of opportunity around the *pandemic* phase (*i.e.,* Q3'2020 through Q4'2021)[3287] and did not substantively address the *endemic* phase.  Moderna's May 20, 2020 "mRNA 5-yr accelerated plan" generally described the endemic phase as follows: "endemic seasonal-flu like business with ██████████████████████████████████,"[3288] but did *not* include a projection of mRNA-1273 doses during the *endemic* phase.

1339.    In contrast, Moderna's September 2, 2020 LRP projected that during the *endemic* phase, mRNA-1273 doses would be in the range of ██████████████████████████, as shown in **Figure 6.20**,[3289] below.



[3287] ███████████████████████████████████████████████████
██████████████████████████

[3288] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████

[3289] ████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████
███████████████████████

920

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.20**

**(b)    Projected Price Per Dose**

1340.    Moderna's documents around the time of the May 31, 2020 hypothetical negotiation all show that it expected to pursue value-based pricing during the *endemic* phase, and the mRNA-1273 price during the *endemic* phase would be significantly higher than the *pandemic* phase price based on **"willingness to pay and price elasticity."**[3290]   For example, Moderna's "Workplan-Define a pricing strategy for mRNA-1273" in the May 29, 2020 "mRNA-1273 pricing workstream" slide deck shows that it planned to work with McKinsey and CRA and during **"Week of 6/15"** to "Adapt to post pandemic pricing"; the "Deliverables" were: "Recommended pricing model for post-pandemic phase[,] Financial analysis of options."[3291]

---

[3290] MRNA-GEN-02193029-122, at 033 ("mRNA-1273 pricing workstream," *Moderna,* May 29, 2020, Slide 5 of 94) ("Pandemic playing ground for mRNA-1273 slowly crystalizing but still with assumptions; Post-pandemic with many unknowns").
[3291] MRNA-GEN-02193029-122, at 038 ("mRNA-1273 pricing workstream," *Moderna,* May 29, 2020, Slide 10 of 94) ("Workplan- Define a pricing strategy for mRNA-1273").  *See also*

921

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1341. On June 4, 2020, CRA's 7-page **"Value Points of Emphasis and Perspectives on Pricing"** memorandum to Moderna's Patrick Bergstedt[3292] provided CRA's "current thinking regarding potential target prices."[3293] CRA recommended that Moderna "push for prices at the high end of ranges informed by . . . relevant price benchmarks, perceptions of fairness, and existing price anchors."[3294] CRA's **"Early Guidance"** was as follows: **"Based on CRA expertise, a price range in the $100 to $175 range is expected to be perceived as acceptable by US private payers and providers."**[3295] CRA's "Summary of Conclusions" emphasized the goal of achieving "value-based pricing" in the "Post-EUA 'Commercial World'"[3296] and stated: "Moderna should make every effort to disconnect EUA pricing from commercial, post-approval pricing. Preserving an option for value-based pricing should be a high priority."[3297] CRA added:

MRNA-GEN-02180160-200, at 168 ("mRNA-1273 US Pricing Strategy – CRA Preliminary View Regarding US Stockpile Purchasing Opportunity," *Moderna,* May 28, 2020, Slide 8 of 41) ("Once EUA is lifted and mRNA-1273's BLA is approved, Moderna can likely sell to both private (and public) buyers at higher prices").

[3292] *See also* MRNA-GEN-01110064 (June 4, 2020 email from Rhett Johnson to Patrick Bergstedt, Cc: Rose Loughlin, Thomas Kuhlman, Michelle Smith, Eva Marchese, Ned Kitfield, Stephanie Donajue, Anish Aitharaju, Abhishek Kumar, Alessandro Rizzo, Kees Chamberlain, Hayley Droppert, Subject: Memorandum summarizing initial pricing perspectives

[3293] MRNA-GEN-01110065-071, at 065 (June 4, 2020 Memorandum from Rhett Johnson, Eva Marchese to Patrick Bergstedt, CC: Michelle Smith (Moderna), Rose Loughlin (Moderna), Thomas Kuhlman (Moderna), Ned Kitfield (CRA), Hayley Droppert (CRA), Abhishek Kumar (CRA), Anthony Barron (CRA), Anish Aitharaju (CRA), Tim Wilsdon (CRA), Alessandro Rizzo (CRA), Kees Chamberlain (CRA), Subject: Value Points Emphasis and Perspective on Pricing).

[3294] MRNA-GEN-01110065-071, at 065 (June 4, 2020 Memorandum from Rhett Johnson, Eva Marchese to Patrick Bergstedt, CC: Michelle Smith (Moderna), Rose Loughlin (Moderna), Thomas Kuhlman (Moderna), Ned Kitfield (CRA), Hayley Droppert (CRA), Abhishek Kumar (CRA), Anthony Barron (CRA), Anish Aitharaju (CRA), Tim Wilsdon (CRA), Alessandro Rizzo (CRA), Kees Chamberlain (CRA), Subject: Value Points Emphasis and Perspective on Pricing).

[3295] MRNA-GEN-01110065-071, at 070 (June 4, 2020 Memorandum from Rhett Johnson, Eva Marchese to Patrick Bergstedt, CC: Michelle Smith (Moderna), Rose Loughlin (Moderna), Thomas Kuhlman (Moderna), Ned Kitfield (CRA), Hayley Droppert (CRA), Abhishek Kumar (CRA), Anthony Barron (CRA), Anish Aitharaju (CRA), Tim Wilsdon (CRA), Alessandro Rizzo (CRA), Kees Chamberlain (CRA), Subject: Value Points Emphasis and Perspective on Pricing).

[3296] MRNA-GEN-02180160-200, at 167 ("mRNA-1273 US Pricing Strategy – CRA Preliminary View Regarding US Stockpile Purchasing Opportunity," *Moderna,* May 28, 2020, Slide 7 of 41) ("As more clinical data becomes available for mRNA-1273 and competitors, Moderna should pursue more value-based pricing").

[3297] MRNA-GEN-01110065-071, at 070 (June 4, 2020 Memorandum from Rhett Johnson, Eva Marchese to Patrick Bergstedt, CC: Michelle Smith (Moderna), Rose Loughlin (Moderna),

922

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

In addition, when setting prices in the EUA period, Moderna should seek opportunities to structure deals with features that make the resulting investment per dose difficult to interpret as a simple and fully transparent price. The goal is to maintain flexibility for pursuing a different price following approval, without being tied to prices negotiated during the EUA period.[3298]

1342. On June 15, 2020, Moderna's "CEO Update" included "Recommended Pricing."[3299] As discussed above, Moderna's June 15, 2020 "CEO Update" shows that its "Proposed Pricing" for the "Once ENDEMIC" was **$115/dose**[3300]—**3.8** times the **$30/dose** price during the *pandemic* phase.

1343. Moderna considered various benchmarks in establishing its value-based pricing. For example, as of May 29, 2020, Moderna's analysis included an "Overview of select EUAs / accelerated approvals of vaccines and therapeutics," as shown in **Figure 6.21**,[3301] below, which shows post-EUA pricing was higher than EUA pricing.

---

Thomas Kuhlman (Moderna), Ned Kitfield (CRA), Hayley Droppert (CRA), Abhishek Kumar (CRA), Anthony Barron (CRA), Anish Aitharaju (CRA), Tim Wilsdon (CRA), Alessandro Rizzo (CRA), Kees Chamberlain (CRA), Subject: Value Points Emphasis and Perspective on Pricing).

[3298] MRNA-GEN-01110065-071, at 071 (June 4, 2020 Memorandum from Rhett Johnson, Eva Marchese to Patrick Bergstedt, CC: Michelle Smith (Moderna), Rose Loughlin (Moderna), Thomas Kuhlman (Moderna), Ned Kitfield (CRA), Hayley Droppert (CRA), Abhishek Kumar (CRA), Anthony Barron (CRA), Anish Aitharaju (CRA), Tim Wilsdon (CRA), Alessandro Rizzo (CRA), Kees Chamberlain (CRA), Subject: Value Points Emphasis and Perspective on Pricing).

[3299] MRNA-GEN-02645690-752 at 695 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 6 of 64) ("Recommended Pricing").

[3300] MRNA-GEN-02645690-752 at 695 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 6 of 64) ("Recommended Pricing").

[3301] MRNA-GEN-02193029-122, at 041 ("mRNA-1273 pricing workstream," *Moderna,* May 29, 2020, Slide 13 of 94) ("Overview of select EUAs / accelerated approvals for vaccines and therapeutics").

923

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.21**

1344. By May 29, 2020, Moderna's "mRNA-1273 pricing workstream" presentation shows that Moderna was "[e]stablishing collaboration agreements" and "[c]urrently advancing analyses to establish the value of mRNA-1273," as shown in **Figure 6.22**,[3302] below, which further demonstrates that it was pursuing "value-based pricing."

---

[3302] MRNA-GEN-02193029-122, at 036 ("mRNA-1273 pricing workstream," *Moderna,* May 29, 2020, Slide 8 of 94) ("Currently advancing analyses to establish value of mRNA-1273").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.22**

1345. Various Moderna documents further establish that Moderna's *endemic* phase pricing was higher than the *pandemic* phase pricing. For example, Moderna's June 16, 2020 pricing letter to the U.S. Government referenced a "**commercial price of mRNA-1273 to be US\$49/dose**" which, while described as being for "during the pandemic phase" is at least somewhat indicative of *endemic* phase pricing because it being a commercial price.[3303]

1346. Moderna's July 20, 2020 "COVID-19 Preliminary Market Scenarios" presentation contained four (4) scenarios for endemic sales and pricing through 2030; Scenario 4 was of \$100/course (\$50/dose) for 2024, increasing to \$127/course (\$63.50/dose) in 2030.[3304]

1347. During Moderna's August 5, 2020 earnings call, Mr. Bancel gave a read-out on Moderna's pandemic/endemic pricing strategy, and stated: "In endemic period, pricing considerations will

---

[3303] MRNA-GEN-00773106-108, at 107 (Bennett Deposition Exhibit No. 26 – June 16, 2020 Letter from Hamilton B. Bennett to Camille B. Connell-Magaw)

[3304] MRNA-GEN-01303780- MRNA-GEN-01303797.001 at 787 to 791 ("COVID-19 Preliminary Market Scenarios," *Moderna*, July 20, 2020).

925

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

follow traditional dynamics and market forces including vaccine efficacy and the competitive landscape. We will look to price in line with other innovative commercial vaccines. We expect traditional approaches to vaccine purchases and distribution in the endemic phase,"[3305] as shown in **Figure 6.23**,[3306] below.



**FIGURE 6.23**

1348. Mr. Bancel's comments during Moderna's August 5, 2020 earnings call were summarized as follows:

> Like other companies, including Pfizer, Moderna is considering two prices for its vaccine: one for during the pandemic, and another for when the immediate crisis subsides but the virus remains endemic. At that point, Moderna would price the shot "in-line" with other newly approved vaccines, Bancel said Wednesday. The company suggested the vaccine's value would correspond to between $300 and

---

[3305] "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q2 2020 Results – Earnings Call Transcript," *Seeking Alpha,* August 5, 2020, p. 11 of 36, *available at* https://seekingalpha.com/article/4364866-moderna-inc-mrna-ceo-stephane-bancel-on-q2-2020-results-earnings-call-transcript (Stéphane Bancel, CEO).

[3306] "Business Updates and Second Quarter 2020 Financial Results," *Moderna,* August 5, 2020, Slide 26 of 34, *available at* https://static.seekingalpha.com/uploads/sa_presentations/674/58674/original.pdf ("Approach to delivering value during the COVID-19 pandemic").

926

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

$725 per two-dose vaccine course,[3307] according to a cost-effectiveness model shared by Moderna.[3308]

### (c)    Projected Revenue

1349.   As discussed above, while Moderna stated that there was a "lack of clarity" around post-pandemic [*i.e.,* endemic] global COVID vaccine market," in early-September 2020, it estimated that mRNA-1273's annual revenue during the *endemic* phase would be in the range of **$500 million** to **$1 billion**, as shown in **Figure 6.24**,[3309] below.

---

[3307] "Business Updates and Second Quarter 2020 Financial Results," *Moderna,* August 5, 2020, Slides 22-23 of 34, *available at* https://static.seekingalpha.com/uploads/sa_presentations/674/58674/original.pdf ("Approach to assigning value to a COVID-19 pandemic vaccine").

[3308] Ned Pagliarulo, "Moderna sets high price in early coronavirus vaccine supply deals," *Biopharma Dive,* August 5, 2020, *available at* https://www.biopharmadive.com/news/moderna-coronavirus-vaccine-price-dose/582947/.  *See also* "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q2 2020 Results – Earnings Call Transcript," *Seeking Alpha,* August 5, 2020, p. 11 of 36, *available at* https://seekingalpha.com/article/4364866-moderna-inc-mrna-ceo-stephane-bancel-on-q2-2020-results-earnings-call-transcript (Stéphane Bancel, CEO: "On slide 25, I want to share our approach to delivering value during the COVID-19 pandemic. During this pandemic and from the development process of a mRNA-1273, our promise to deliver for patients has never been clearer. We have a responsibility to do everything we can to develop a safe and effective vaccine. We have invested in manufacturing at risk, ahead of approval to ensure supply, if our COVID-19 vaccine candidate is approved. We are working with governments around the world and others to ensure the vaccine is accessible regardless of ability to pay. And we will be responsible on price, well below value during the pandemic.  Let me now turn to slide 26 and give you some more specifics. First, as we thought about responsible pricing, we concluded it is important to consider different time horizons. We are currently under a pandemic as defined by the WHO. At Moderna, like many public health experts, we believe that SARS-CoV-2 virus is not going away, and that there will be a need to vaccinate people or give them a boost for many years to come. So, we think about two time horizons, the pandemic period as defined by WHO, and the endemic period.  During the pandemic period, we are priced well below value with pre-approval supply agreements mostly to governments. To-date, smaller volume agreements have "been executed between $32 and $37 per dose. Larger volume agreements, under discussion, will be at a lower price for higher volumes. **In endemic period, pricing considerations will follow traditional dynamics and market forces including vaccine efficacy and the competitive landscape. We will look to price in line with other innovative commercial vaccines. We expect traditional approaches to vaccine purchases and distribution in the endemic phase.**" (emphasis added)).

[3309] ██████████████████████████████████████

927

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.24**

**(d)      September 2, 2020 Projections: 2022-2025**

1350.    As noted above, Moderna's May 20, 2020 projection[3310] for the *endemic* phase appears to be a work in progress and states that such projections were ███████████████████████████ ████████████████████████████.[3311] As such, I used the LRP to establish a reasonable estimate of Moderna's expectations for the *endemic* phase as of May 31, 2020.



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1351. In particular, I started with the "upside" scenario in the September 2020 LRP, shown in **Figure 6.25**,[3312] below, which was based on a $44/dose price for endemic or "steady-state" revenues (prices)  instead of the "low" and "base" cases because it was:

    a) closer to $115/dose endemic phase price reported in the June 15, 2020 CEO update;[3313]

    b) approximately 50% higher than the $30/dose pandemic price identified in a number of documents, consistent with the low end of the increases above observed pandemic prices for EUA/vaccine products from the May 29, 2020 "mRNA-1273 pricing workstream" slide deck;[3314] and,

    c) closer to the $60 per dose "Endemic" "Scenario 3" U.S. price forecast from the August 10, 2020 Lifecycle Management Deck.[3315]



929

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.25**

1352. Based on the "upside" scenario during the *endemic* period from 2022 to 2025, Moderna's projected total mRNA-1273 costs was approximately ███████, which includes ███████ ███████ as shown in **Table 6.4**, below.

**TABLE 6.4**

930

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## XIX.   Projected Net Profit per Dose

1353. Based on the foregoing, I have estimated Moderna's project net profit per dose during the *endemic* phase, as shown in **Table 6.5**, below, which shows the three prices per dose (*i.e.,* $115, $60 and $44), the cost per dose (*i.e.,* $17.03), and the NIAID royalty cost per dose (at 1.24% of revenue), and the resulting projected net profit per dose in the range of   **$26.43** and **$42.23**—*before* apportionment, which is discussed further below.

| | | [1] June 2020 - CEO Update | [2] Lifecycle Management | [3] Sept 2020 - LRP (Upside Case) |
|---|---|---|---|---|
| Price per Dose | [A] | $115.00 | $60.00 | $44.00 |
| [4] LRP Cost per Dose | [B] | | $17.03 | $17.03 |
| [5] NIAID License | [C] = [A] * 1.24% | | $0.74 | $0.55 |
| Expected Profit per Dose | [D] = [A] - [B] - [C] | | $42.23 | $26.43 |

*Notes and Sources:*
[1] MRNA-GEN-02645690-752, at 695 (Hoge Exhibit 46 - June 15, 2020 Moderna Board Meeting - CEO Update Deck).
[2] MRNA-GEN-01725128-156 (Brackmann Exhibit 11 - August 10, 2020 mRNA-1273 Lifecycle Management Deck).
[3] MRNA-GEN-01570975-1159, at 116 (Thomas Exhibit 24 - September 2, 2020 Long Range Plan Deck).
[4] Lawton Schedule 4.3.
[5] Lawton Schedule 6.5.

**TABLE 6.5**

### y.   Tekmira's May 29, 2013 Offer to Moderna Establishes a Floor for Reasonable Royalty

1354. Tekmira's May 29, 2013 offer to Moderna was discussed in detail above  (*See* II.E.3.b.(1) and IV.C.5.d.(1)), and establishes a floor for the reasonable royalty.  Moderna would not expect that Genevant would agree to accept a royalty any less than what Tekmira had offered seven (7) years earlier, which it did not accept but used as an internal benchmark.  In other words, Moderna would not expect to get a *better* deal "on the doorstep of commercialization" (and *after* it filed numerous IPRs seeking to invalidate Arbutus' patents) than it was offered when Moderna was in early stage development with no commercial prospects in sight.

1355. Briefly, on May 29, 2013, years *before* the events that gave rise to the Arbutus-Acuitas litigation that resulted in the January 26, 2017 injunction, before the period when Moderna filed multiple IPRs against Arbutus and Genevant's patents, and before Moderna was "on the doorstep of commercialization"—Tekmira's "Non-exclusive license with exclusivity option" proposal to

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Moderna included $30 million upfront, $52 million in development and commercial milestone payments and a royalty rate of 7%, as shown in **Figure 6.26**,[3316] below.

**Tekmira proposal to Moderna 05.29.13**
*Non-exclusive license with exclusivity option*

| Financial consideration of licensing fee | |
|---|---|
| Upfront: | Moderna will pay Tekmira $30 million upon execution of the License and Research Agreement. |
| Milestones: | For each Product developed by Moderna or its sublicensees, Moderna will pay to Tekmira the following milestones: |
| Start of Phase I | $5 million for first 2 Products, thereafter $3 million |
| Start of Phase II | $5 million |
| Start of Phase III | $7 million |
| NDA filing in first major market | $10 million |
| NDA approval in first major market | $15 million |
| Cum. Sales > $0.5 bn | $10 million |
| Exclusivity Fee: | For each mRNA Target nominated for exclusivity and accepted by Tekmira (up to 5): <br> • $5 million upon acceptance by Tekmira |

**Other terms:**
- **Research**: Tekmira responsible of formulation/ Moderna responsible for providing mRNA and conducting all studies
- **Manufacturing**: from GMP and GLP LNP formulated materials to Phase II studies at a pre-agreed rate
- **Guaranteed FTE funding**: 3-year minimum FTE funding of at least 3.3m per year
- **Other**: Tech transfer for Phase III of $1m

moderna

2/3/2016

Confidential and Proprietary • © 2014 Moderna Therapeutics

**FIGURE 6.26**

1356. In order to evaluate the economics of Tekmira's May 29, 2013 offer, I applied the terms to Moderna's reported (*i.e.,* actual) mRNA-1273 sales, both Worldwide and U.S. Nexus only as shown in **Table 6.6**, below.

---

[3316] MRNA-GEN-01719608-637, at 626-627 (Hoge Deposition Exhibit No. 13 – "Project Rodeo," *Moderna,* February 3, 2016, Slide 19 of 30) ("Tekmira proposal to Moderna 05.29.13 – Non-exclusive license with exclusivity option").

932

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**December 2020 - January 2024**

**Tekmira License**

| | | | | US Nexus | World Wide |
|---|---|---|---|---|---|
| [1] | Upfront Payment: | [a] | | | $30,000,000 |
| | **Milestones** | | | | |
| [1] | Start of Phase I | b1 | | | $5,000,000 |
| [1] | Start of Phase II | b2 | | | $5,000,000 |
| [1] | Start of Phase III | b3 | | | $7,000,000 |
| [1] | NDA filing in first major market | b4 | | | $10,000,000 |
| [1] | Cum. Sales > $0.5 bn | b5 | | | $15,000,000 |
| [1] | Exclusivity Fee | b6 | | | $10,000,000 |
| | Total Milestone | [b]=sum(b1:b6) | | | $52,000,000 |
| | **Actual Moderna Sales** | | | | |
| | *Moderna P&Ls* | | | | |
| [2] | Revenue | [c] | | | $42,797,714,073 |
| [2] | Operating Margin | [d] | | | $17,260,464,490 |
| | Operating Margin % | [d]%=[d]/[c] | | | 40.3% |
| | *Moderna Sales Data* | | | | |
| [3] | Revenue | [e] | | $24,077,543,795 | $41,165,650,361 |
| [3] | Doses Sold | [f] | | 1,113,852,185 | 1,714,029,353 |
| | Operating margin | [g]=[e]*[d]% | | $9,710,555,778 | $16,602,247,612 |
| | **Application of Tekmira License to Moderna Sales** | | | | |
| [1] | Royalty | [h]=[e]*7% | | $1,685,428,066 | $2,881,595,525 |
| | **Total Fees to Tekmira** | **[i]=[a]+[b]+[h]** | | **$1,767,428,066** | **$2,963,595,525** |
| | **Total Fees as % of Operating Margin** | **[j]=[i]/[g]** | | **18.2%** | **17.9%** |
| | **Per dose Royalty** | **[k]=[i]/[f]** | | **$1.59** | **$1.73** |

*Notes and Sources:*
[1] MRNA-GEN-01719608-637 at -626-627 (Hoge Exhibit 13 - February 3, 2016 Project Rodeo Deck).
[2] Lawton Schedule 7.3. Moderna P&L Operating Margin total for Jan 2020 - Jan 2024.
[3] Lawton Schedule 9.1.

**TABLE 6.6**

1357. **Table 6.6**, above, shows the following:

    a) **Tekmira May 29, 2013 Offer Applied to mRNA-1273 U.S. Nexus Sales**: Under the terms of this offer, Moderna would have paid Tekmira/Arbutus a total of ███████████, or approximately ██████████████████████████████ during the same period, comprised of: ██████████████████

933

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

██████████████████████████████████████████ during the period December 2020 through January 2024, which equates to a **$1.59/dose royalty**.

b) The Tekmira May 29, 2013 Offer Applied to mRNA-1273 U.S. Nexus Sales is also calculated separately for the Pandemic period (December 2020 through December 2021) and Endemic period (January 2022 through January 2024). See Schedules 4.1 and 4.2.

1358. At the hypothetical negotiation on May 31, 2020, the economics of this offer would establish an absolute floor for the negotiation for at least the following reasons:

a) The offer was made seven (7) years before the May 31, 2020 hypothetical negotiation—which was *not* "on the doorstep of commercialization" when Moderna would expect to pay a significantly higher royalty rate.

b) The offer was *not* made under the assumptions of validity and infringement and with all relevant knowledge known to both parties.

c) Moderna did not accept this licensing offer, and instead shopped around looking for a lower price. Competition from Acuitas depressed the price Genevant and its predecessors could command and created an overhang that adversely affected Genevant's licensing opportunities for years.

d) Moderna filed IPRs.

1359. Nonetheless, Moderna's documents show that it used Tekmira's May 29, 2013 offer as a benchmark, thus, Moderna apparently regarded this offer "as a marker of the value of licensing rights."[3317] In addition, as discussed in II.E.3.b.(1), Tekmira's May 29, 2013 offer was free of the overhangs caused by the later breach of contract litigation and Moderna's IPRs.

1360. For the reasons discussed above (*see* IV.C.3.d.(1)), at the time of the May 31, 2020 hypothetical negotiation, Genevant and Moderna would expect that the reasonable royalty adequate to compensate for Moderna's alleged use of the Patents-in-Suit, which I understand covers foundational LNP technology that enabled mRNA vaccines including mRNA-1273, would be significantly higher than what is set forth in Tekmira's May 29, 2013 term sheet. While there were a number of later proposals and counterproposals between Genevant and its predecessors and

---

[3317] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1345 n4 (Fed. Cir. 2015). *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 504 (S.D.N.Y. 2013) ("Even though these royalties were offered to settle litigation, including the claim that Andrx had infringed the Patents through prior manufacture of commercial quantities of omeprazole, they serve as a marker of the value of licensing rights.").

934

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Moderna, it is my opinion that these proposals are not informative for the reasons I explained above.  See II.E.3.

1361. Based on this analysis, Genevant and Moderna would expect that the absolute floor for the negotiation would be royalty rate in the following range:

- **$1.59/dose**: based on an application of the Tekmira offer to Moderna's actual U.S. sales which implies a Genevant|Moderna operating profit split of **18%|82%**.

- **$1.73/dose**: based on an application of the Tekmira offer to Moderna's actual worldwide sales which implies a Genevant|Moderna operating profit split of **18%|82%**.

### z.    Apportionment

1362. In evaluating the reasonable royalty that is adequate to compensate Genevant for Moderna's alleged infringement, reasonable royalty, I have also considered apportionment and the extent to which non-patented features of the Accused Product contributed materially and should be accounted for in either the royalty rate or the royalty rate or both.

### (1)    Principles

1363. I understand that a plaintiff's recovery "must reflect the value attributable to the infringing features of the patent, and no more."[3318]  The goal of apportionment is to identify the "benefit" attributable to the patent and ensure that the patentee's damages are proportional to the value the patent at issue contributed to the accused infringing product—and does not include value attributable to

---

[3318] *In re: Avaya Inc., et al.,* Case No. 17-10089 (SMB) (S.D.N.Y.), Memorandum Decision Estimating Claim No. 3533 by SAE Power Incorporated and SAE Power Company filed April 23, 2018, p. 17, *available at* http://www.nysb.uscourts.gov/sites/default/files/opinions/271837_1956_opinion.pdf (*citing Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *accord Garretson v. Clark*, 111 U.S. 120, 121 (1884) (plaintiff "must in every case give evidence tending to separate or apportion the defendant's profits and [plaintiff's] damages between the patented feature and the unpatented features"); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018) ("When the accused technology does not make up the whole of the accused product, apportionment is required."); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features."); see *Waymo LLC v. Uber Techs., Inc.* No. C 17-00939 WHA, 2017 WL 5148390, at *6 (N.D. Cal. Nov. 6, 2017) ("It will suffice to simply point out one glaring problem in Wagner's 'analysis,' namely that he made no attempt to apportion the alleged acceleration of Uber's development timeline between legitimate benefits and trade secret misappropriation.")).

935

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

unpatented components.[3319]  In some cases, this can be shown by comparing the profits of a product containing the patented improvement to the same or comparable product that did not include the improvement.[3320] The apportionment analysis has been described as follows:

> The price paid for the patented invention is the price received for the whole article, less what it would have brought in the open market had the patented invention been omitted.  Its cost is the difference between the expense of making the article with it and without it.  If the article is more expensive and brings a higher price when it includes the patented invention, the subtraction of the excess of cost from the excess of price will show whether a profit has been made and in what amount.  When the price remains the same as if the patented invention were not used, and the expense of manufacturing the article is lessened, the profit is the decrease in its cost.  If cost and price are unchanged by the introduction of the patented invention, or are increased or diminished in the same proportion, or the price decreases while the cost is still the same, there is no profit in the sale of any single article for which the plaintiff has a right to an account from the defendant, and whatever benefit exists must be occasioned by an increase in his sales. . . .
>
> [A]ll the profits on those articles, which would not have been sold had they not contained the patented invention, are due to the infringement.[3321]

1364.  In identifying the "benefit" attributable to the patent—the nature of the patented invention and the nature of its use are considered.  For example, in cases in which the benefit of the infringement arises from the *manufacture and sale of products that necessarily use the claimed invention*, the "benefit" is usually the profit attributable to the invention.[3322]

---

[3319] *See, e.g.*, Brian J. Love, *"Patentee Overcompensation and the Entire Market Value Rule,"* *Santa Clara Law Digital Commons*, October 2007, p. 268, *available at* https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=1545&context=facpubs.  Eric E. Bensen and Danielle M. White, "Using Apportionment to Rein in the Georgia-Pacific Factors," *The Columbia Science and Technology Law Review*, February 19, 2008, PDF pp. 19-20, *available at* https://journals.library.columbia.edu/index.php/stlr/article/view/3814/1612.

[3320] *See, e.g.*, Eric E. Bensen and Danielle M. White, "Using Apportionment to Rein in the Georgia-Pacific Factors," *The Columbia Science and Technology Law Review,* February 19, 2008, PDF p. 18, *available at* https://journals.library.columbia.edu/index.php/stlr/article/view/3814/1612 (*citing e.g.*, *Metallic Rubber Tire Co. v. Hartford Rubber Works Co.*, 275 F. 315, 322-23 (2d Cir. 1921)).

[3321] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-44.

[3322] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-45.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1365. When the patent at issue covers the entire product that is accused of infringement, the royalty base is usually the total sales or uses of the infringing product. This is typically the case for pharmaceutical products. For example, the Court in *AstraZeneca* explained this as follows:

> It is clear that the royalty in this case is properly calculated based on the value of Apotex's omeprazole capsule and not, as Apotex suggests, the "negligible" value of the subcoating itself. As an initial matter, there is little reason to import these rules for multi-component products like machines into the generic pharmaceutical context. Notably, Apotex has cited no precedent for doing so, and has submitted no evidence suggesting that the infringing subcoating is itself a "salable patent-practicing unit," *LaserDynamics,* 694 F.3d at 67, of its omeprazole product. It would therefore be improper to attempt to isolate its value as distinct from the value of the marketable capsules in determining a reasonable royalty.

> Even under the entire market value rule, while the subcoating did not of course create customer demand for omeprazole, it did "substantially create [ ] the value," *Uniloc,* 632 F.3d at 1318, of the drug as it was formulated by Apotex. While Apotex argues that the coating "had no noticeable benefit," this contention is belied by factual findings in the court's prior opinions. More specifically, several features of omeprazole made it notoriously difficult to formulate.

> Omeprazole is most effective when absorbed by the small intestine and yet is highly susceptible to degradation in the acidic environment of the stomach, meaning that scientists had to develop a formulation that would allow the drug to pass through the stomach and be absorbed by the small intestine, all the while ensuring adequate shelf life in a drug that is sensitive to heat, moisture, organic solvents, and light. *Omeprazole I,* 222 F.Supp.2d at 433–37. After years of effort, Astra scientists determined that a water soluble subcoat helped solve many of these problems and allowed them to formulate a commercially viable drug. *Id.* at 437. The court's factual account thus demonstrates that the subcoat was a crucial aspect of the process embodied in the '505 patent, and that Astra's prior formulations, which lacked a subcoat, were not commercially viable. *Id.*[3323]

1366. In contrast, when the patent at issue covers only a component of or an improvement to the product that is accused of infringement such as an electronic product, the royalty base includes only the value attributable to the patented component or improvement. That is, apportionment is generally required and the sales or uses must be apportioned between the patented invention and the remaining unpatented components.[3324]

---

[3323] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 490 (S.D.N.Y. 2013).
[3324] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20,, pp. 20-43, 20-44.

937

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1367. As the Federal Circuit recently held, "apportionment can be addressed in a variety of ways including 'by careful selection of the royalty base to reflect the value added by the patented feature [or] . . . by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof."[3325] In *Exmark*, the Federal Circuit confirmed that "so long as [patentee] adequately and reliably apportions between the improved and conventional features of the accused [product], using the [entire] accused [product] as a royalty base and apportioning through the royalty rate is an acceptable methodology."[3326] Depending on the facts of the case,

---

[3325] *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 897 F.3d 1332, 1348 (Fed. Cir. 2018); *VirnetX, Inc., et al. v. Cisco Systems, Inc. and Apple Inc.,* 767F.3d 1368 (Fed. Cir. 2014) ("Thus, when claims are drawn to an individual component of a multi-component product, it is the exception, not the rule, that damages may be based upon the value of the multi-component product. *LaserDynamics, Inc. v. Quanta Comput., Inc.,* 694 F.3d 51, 67–68 (Fed. Cir. 2012). These strict requirements limiting the entire market value exception ensure that a reasonable royalty "does not overreach and encompass components not covered by the patent." *LaserDynamics*, 694 F.3d at 70; *see also Garretson*, 111 U.S. at 121 ("[T]he patentee must show in what particulars his improvement has added to the usefulness of the machine or contrivance."). Thus, "[i]t is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential to the use of the [overall product]." *LaserDynamics*, 694 F.3d at 68. Instead, this court has consistently held that "a reasonable royalty analysis requires a court to . . . carefully tie proof of damages to the claimed invention's footprint in the market place." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010); *see also Cornell Univ. v. Hewlett-Packard Co.,* 609 F. Supp.2d 279, 285 (N.D.N.Y. 2009) ("The entire market value rule indeed permits damages on technology beyond the scope of the claimed invention, but only upon proof that damages on the un-patented components or technology is necessary to fully compensate for infringement of the patented invention."). …Moreover, the smallest salable unit approach was intended to produce a royalty base much more closely tied to the claimed invention than the entire market value of the accused products. Indeed, that language first arose in the Cornell case, where the district court noted that, rather than pursuing a "royalty base claim encompassing a product with significant non-infringing components," the patentee should have based its damages on "the smallest salable infringing unit with close relation to the claimed invention." 609 F. Supp. 2d at 287–88 (emphasis added). In other words, the requirement that a patentee identify damages associated with the smallest salable patent-practicing unit is simply a step toward meeting the requirement of apportionment. Where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature (as VirnetX claims it was here), the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology. To hold otherwise would permit the entire market value exception to swallow the rule of apportionment."). *See also* Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, pp. 20-43 – 20-44.

[3326] Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC, 897 F.3d 1332, 1348 (Fed. Cir. 2018).

938

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

apportionment may be appropriate in the rate, the base or both.[3327]  With respect to the base, "[t]he hypothetical license therefore must be tailored to the amount and type of alleged infringement that actually occurred."[3328]  With respect to the rate, the apportionment should reflect the portion of the defendant's profits that are attributable to the patented features versus the unpatented features.[3329]

1368.  Where the patent admittedly creates only a part of the profits, the patentee is only entitled to that part, and he must apportion the infringer's profits and show by reliable and satisfactory evidence either what part of the profits are attributable to his patent or that the entire value of the infringing article is attributable to his patent.[3330]

> Where the [patentee] shows that profits have been made by the use of his patent, but defendant proves that there were other elements contributing to the profits, it then devolves upon the plaintiff to apportion the amount of profits attributable to the use of his patent.[3331]

> [The burden of proof is shifted to the Defendant] after the plaintiff has proved the existence of profits attributable to his invention and demonstrated that they are impossible of accurate or approximate apportionment.  If then the burden of separation is cast on the defendant it is one which justly should be borne by him, as he wrought the confusion.[3332]

> If the plaintiff's patent covered only a part of the infringing machine and created only a part of the profits, he is required to take the initiative in presenting evidence looking to an apportionment.

> In an apportionment of profits mathematical exactness is not indispensable, reasonable approximation being what is required, and it usually may be attained through the testimony of experts and persons informed by observation and experience.[3333]

---

[3327] *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

[3328] *Oracle America, Inc. v. Google Inc.,* 798 F.Supp.2d 1111, 1117 (N.D. Cal. 2011).

[3329] *Ericsson, Inc. v. D-Link Systems, Inc*., 773 F.3d 1201, 1226 (Fed. Cir. 2014).

[3330] *Westinghouse Elec. Co. v. Wagner Elec. Co.,* 225 U.S. 604, at 605, 615 (S. Ct. 1912), citing *Garretson v. Clark,* 111 U.S. 120, 121 (S. Ct. 1884).

[3331] Westinghouse Elec. Co. v. Wagner Elec. Co., 225 U.S. 604, at 605 (S. Ct. 1912).

[3332] Westinghouse Elec. Co. v. Wagner Elec. Co., 225 U.S. 604, at 622 (S. Ct. 1912).

[3333] *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 646 (S. Ct. 1915).  See also, *Uniloc USA, Inc. and Uniloc Singapore Private Limited v. Microsoft Corporation*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) ("the patentee ... must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative, ...").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1369. The burden is on the patentee to address the issue of apportionment.[3334] "[I]t is well understood that this [apportionment] process may involve some degree of approximation and uncertainty."[3335] "Apportionment is inexact—and that's OK. … '[The Federal Circuit] ha[s] ***never required absolute precision*** in [assigning a value to a feature that may not have ever been individually sold]; on the contrary, it is well-understood that this process may involve some degree of ***approximation and uncertainty***.' (emphasis added)[.]"[3336]

### (2)    Analysis

1370. I have focused on the benefits attributable to the Patents-in-Suit, as described in Section III. above, and throughout the report, and considered and accounted for non-patented elements that are included in the Accused Products.

### (a) Profit Split Analysis

1371. Under the Hypothetical Negotiation Approach, the analysis focuses on how to estimate and "split the surplus from the invention,"[3337] which is directed to ascertaining "how the parties would have agreed, *ex ante,* to divide the value to be derived from the use of the patented invention, in comparison with alternatives."[3338]  At the hypothetical negotiation, the parties would establish a

---

[3334] Westinghouse Elec. Co. v. Wagner Elec. Co., 225 U.S. 604, 615 (S.Ct. 1912).

[3335] *VirnetX, Inc., et al. v. Cisco Systems, Inc. and Apple Inc.,* 767F.3d 1368 (Fed. Cir. 2014). *Ericsson Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1232 (Fed. Cir. 2014) (At footnote 9: "As we recognized in *VirnetX,* these tasks are not always easy and would be difficult to do with precision. We accept the fact that the jury should be told of its obligation to approximate the value added by the patented invention and that a degree of uncertainty in setting that value is permissible. *VirnetX,* 767 F.3d at 1328 (*citing Unisplay, S.A. v. Am. Elec. Sign Co.,* 69 F.3d 512, 517 (Fed. Cir. 1995)).").

[3336] Danielle Williams, Chris Marchese, "Litigation Webinar Series – Patent Damages Theories," *Fish & Richardson,* December 1, 2016, Slide 5, *available at* https://web.archive.org/web/20170808035530/https://www.fr.com/wp-content/uploads/2016/12/FINAL_Patent_Damages_12_01.pdf.

[3337] Thomas F. Cotter, John M. Golden, Oskar Kiivak, Brian J. Love, Norman V. Siebrasse, Masabumi Suzuki, David O. Taylor, "Reasonable Royalties," pp. 6-49, at 22, *in* C. Bradford Biddle, Jorge L. Contreras, Brian J. Love, Norman V. Siebrasse, Eds., *Patent Remedies and Complex Products: Toward a Global Consensus,* (Cambridge University Press: July 2019), *available at* https://www.cambridge.org/core/services/aop-cambridge-core/content/view/F0ED1D77D32964618EF2EABD4E0E027A/9781108426756c1_6-49.pdf/reasonable_royalties.pdf.

[3338] Thomas F. Cotter, John M. Golden, Oskar Kiivak, Brian J. Love, Norman V. Siebrasse, Masabumi Suzuki, David O. Taylor, "Reasonable Royalties," pp. 6-49, at 25, *in* C. Bradford Biddle, Jorge L. Contreras, Brian J. Love, Norman V. Siebrasse, Eds., *Patent Remedies and*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

royalty that would divide between them the predicted economic benefits to be realized by the licensee's adoption of the product or process.[3339]  The actual division of profit between the patentee and the licensee will vary with the circumstances and with the customs of the industry in question.[3340]  In order to compensate the patentee for the infringement, a reasonable royalty must make the patentee a willing seller even if a rational infringer is not a willing buyer at that price.[3341]  Reasonable royalty determinations in litigation are not equivalent to ordinary royalty negotiations among truly "willing" patent owners and licensees.[3342]  "[W]hat an infringer would prefer to pay

---

*Complex Products: Toward a Global Consensus,* (Cambridge University Press: July 2019), *available at* https://www.cambridge.org/core/services/aop-cambridge-core/content/view/F0ED1D77D32964618EF2EABD4E0E027A/9781108426756c1_6-49.pdf/reasonable_royalties.pdf.  *See also See, e.g.,* Jonathan E. Kemmerer, CPA and Jiaqing Lu, Ph.D., CFA, "Profitability and Royalty Rates Across Industries:  Some Preliminary Evidence," 2008, p. 2, *available at* https://download.ssrn.com/13/02/19/ssrn_id2220954_code230071.pdf?response-content-disposition=inline&X-Amz-Security-Token=IQoJb3JpZ2luX2VjEGYaCXVzLWVhc3QtMSJHMEUCIAZON4Al%2Bo3mTm1Q9pq PG6UBXQLPr8MIm%2BxefXh0D7xQAiEApAfxpQI6lWaULviCwm7nxafNGoTAP2nvt5aqT0 mJ%("Royalty payments can be interpreted as a profit sharing mechanism.  In other words, by receiving royalty income, a technology licensor shares the profit streams generated from the licensee's efforts in commercializing the patented technology.  Royalty rates in a majority of license agreements are defined as a percentage of sales or a payment per unit.  However, the profitability of the products or services that incorporate the patented technology plays a dominant role in royalty determination.").  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1209 (Fed. Cir. 2010) ("Under this factor [*Georgia-Pacific* Factor No. 8], a wide profit margin for accused products supports a higher reasonable royalty.  *E.g., Lucent,* 580 F.3d at 1335.").  *See also* Danielle Williams, Chris Marchese, "Litigation Webinar Series – Patent Damages Theories," *Fish & Richardson,* December 1, 2016, Slides 31-45, *available at* https://web.archive.org/web/20170808035530/https://www.fr.com/wp-content/uploads/2016/12/FINAL_Patent_Damages_12_01.pdf (presentation section titled "Profit Splitting").

[3339] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-219.

[3340] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-219.

[3341] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-182.

[3342] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-187.  TWM Mfg. Co. v. Dura Corp., 789 F.2d 895, 900 (Fed. Cir. 1986), citing Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1158 (6th Cir. 1978).

941

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

is not the test for damages."[3343]   How the incremental value from use of a patented invention is estimated and how it would be divided in the hypothetical negotiation are typically hotly contested issues.  The evidence in this case provides certain "marker[s] of value of licensing rights"[3344] as to how the parties would split the incremental value associated with the use of the Patents-in-Suit.

1372.   Genevant would expect and Moderna would agree to a per dose royalty rate that would split Moderna's projected net profit.  As Mr. Francis testified in *Moderna v. Pfizer,* Mr. Francis, Moderna's SVP, head of business development and corporate strategy since April 2019,[3345]

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████."[3346]  Mr.

Francis further testified that **"royalties are a form of sharing profits, whether it's a percentage of sales or percentage of profits."**[3347]   Similarly, Mr. Zorn testified, the issue regarding the

---

[3343] *Powell v. Home Depot U.S.A., Inc.* 663 F.3d 1221, 1241 (Fed. Cir. 2011).

[3344] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1345 n4 (Fed. Cir. 2015).  *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 504 (S.D.N.Y. 2013) ("Even though these royalties were offered to settle litigation, including the claim that Andrx had infringed the Patents through prior manufacture of commercial quantities of omeprazole, they serve as a marker of the value of licensing rights.").

[3345] MRNA-GEN-01726934-7000, at 9724 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 162:14-162:20 ("Q. So Mr. Francis, you became Moderna's head of business development and corporate strategy in 2019, correct?  A. That's right.  Q. So you had assumed that position before the pandemic, correct?  A. Yes.")).  "Said Francis," *LinkedIn,* n.d., *available at* https://www.linkedin.com/in/said-francis-54902210/details/experience/ (Moderna: Director, Corporate Development (June 2013-March 2015); Senior Director of Business Development (March 2015-October 2017); VP, Head of Business Development (April 2019-December 2023); General Manager, Individualized Neoantigen Therapy (INT) (December 2023-Present); Chief Business Officer (December 2023-Present)).

[3346] MRNA-GEN-01726934-7000, at 972-973 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 156:10-157:1 ("Q. You would agree that it is standard practice in the pharmaceutical industry to license technology for royalties without profit sharing arrangements, correct? . . . ████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[3347] MRNA-GEN-01726934-7000, at 973 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 157:8-157:10.  *See also* 157:2-157:23 ("Q. Okay.  Well, let me change the statement.  You would agree that it is common in the pharmaceutical industry to

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

damages in this case is "the split of the economics between the two parties.  The product is going to get to the patients equally as fast however it is we split it."[3348]

1373.    The profit splits the parties would consider as "marker[s] of value of licensing rights"[3349] that would guide the hypothetical negotiation, are shown in **Table 6.7**, below, and are as follows:

    a)  Tekmira's May 29, 2013 offer, as the absolute floor

    b)  the parties' license agreements (*See* IV.C.3.),

    c)  Moderna's 2017 deal structure document,[3350] and

---

license technology for royalties without profit sharing arrangements, correct?  . . . A. I disagree, again, because royalties are a form of sharing profits, whether it's a percentage of sales or percentage of profits.  So it is – profit is revenue minus certain costs.  It is ultimately a different – you're getting certain cash flows off the commercialization activities that are occurring.  So I generally can't tell you what common is because it is not – in our industry, if you look at the last ten years, there's been many co-development, co-commercialization activities.  Co-commercialization, they can take any form.  Again, you can have the formula as a profit split or royalty that essentially inures to a profit split, whatever the parties feel that they would – that they're putting forward is worth.")).

[3348] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 270:17-270:20.

[3349] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1345 n4 (Fed. Cir. 2015).  *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 504 (S.D.N.Y. 2013) ("Even though these royalties were offered to settle litigation, including the claim that Andrx had infringed the Patents through prior manufacture of commercial quantities of omeprazole, they serve as a marker of the value of licensing rights.").

[3350] MRNA-GEN-01470185-251, at 235 (Bancel Deposition Exhibit No. 13/Hoge Deposition Exhibit No. 11/Francis Deposition Exhibit No. 40 – "Partnering Committee Update," *Moderna,* March 25, 2020, Slide 48 of 64).

943

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

d) Ropes & Gray December 2019 biotech industry deal survey.[3351]



**TABLE 6.7**

1374. The foregoing "marker[s] of value of licensing rights"[3352] establishes a negotiation range of **$1.50/dose** to **$9.54/dose**., which reflects a Genevant|Moderna profit split that ranges from **11%|89%** to **50%|50%**.

### (i)    May 29, 2013 Tekmira-Moderna Offer

1375. Tekmira's May 29, 2013 offer to Moderna was discussed in detail above.  *See* II.E.3.b.(1), IV.C.5.d.(1), and VI.D.5.p.  As discussed above, the Genevant|Moderna profit split inherent in Tekmira's May 29, 2013 offer is **18%|82%**.  This profit split, and the associated of **$1.50/dose** (U.S. Nexus), reflects the absolute floor for the royalty rate.  At the May 31, 2020 hypothetical negotiation, Moderna would not expect that Genevant would offer a "better deal" than the May 29, 2013 offer, which it did not accept but used as a benchmark for years.

---

[3351] Megan R. Baca, Georgina Jones Suzuki, Adam M. Zuro, "Co-Commercialization Deals in Life Science Collaborations," *Bloomberg Law,* December 2019, *available at* https://www.bloomberglaw.com/external/document/X42IAKO0000000/ip-transactions-professional-perspective-co-commercialization-de.

[3352] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1345 n4 (Fed. Cir. 2015).  *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 504 (S.D.N.Y. 2013) ("Even though these royalties were offered to settle litigation, including the claim that Andrx had infringed the Patents through prior manufacture of commercial quantities of omeprazole, they serve as a marker of the value of licensing rights.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**(ii)    Genevant's License Agreements**

1376.    As discussed above, Genevant's Post-2020 COVID-19 License Agreements are, at best, minimally economically comparable given the cardinal differences between those agreements and the hypothetical negotiation. *See* IV.C.d.(2)(c).  In one of those agreements, ███████████ ██████████████████████ : the October 2020 Chulalongkorn Agreement[3353] discussed above. However, the other agreements are also informative, as they represent an implied profit split from Genevant's COVID-19 license agreements ranges from ██████████████ When applied to Moderna's projected mRNA-1273 profits, the resulting per dose royalty rate is in the range of $1.58/dose to $10.23/dose.

1377.    Although these Genevant's license agreements were collaboration agreements which licensed a broad portfolio of patents, rather than naked licenses to the Patents-in-Suit, they nevertheless provide insight into Genevant's position because the number of patents or how much IP was at issue "has not been an active consideration in [Genevant's] dealmaking historically."[3354]  Instead, it is Genevant's practice to first reach a deal on the "business termsand "then the patents that go with that scope are sort of the last thing that gets determined, as opposed to the first."[3355]  Moreover, Genevant received additional compensation for its contributions to the collaborations beyond intellectual property, which would not be received in the license from the hypothetical negotiation.[3356]  In addition, even to the extent the scope of the license or collaboration terms created additional value, it is more than offset by the substantial differences between these agreements and the hypothetical negotiation discussed above.

1378.    Genevant would demand no less than a **25%|75%** Genevant|Moderna profit split (or **$4.77/dose**). This agreement reflects Genevant's minimum acceptable profit split, ██████████████ ██████████████████, which had lower expectations than Genevant's other agreements,

---

[3353] GENV-00023616, p.17 (Genevant Sciences GmbH and Chulalongkorn University Nonexclusive License and Support Agreement dated October 20, 2022).
[3354] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 128:3-7.
[3355] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 128:8-21
[3356] GENV-00022689, at 724-725 (Gritstone Agreement); GENV-00023616, at 635 (Chulalongkorn)

945

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

because of the LMIC focus and the expectation of lower price and profit associated with LMIC countries (v. OECD countries).[3357]

### (iii)    Moderna's License Agreements

As discussed above, beginning in or about 2016, Moderna claimed that its mRNA technology was proven and as a result, it was no longer limited to royalties and instead could now command 50-50 profit sharing terms in its license agreements. Mr. Francis testified that "in our history from 2016 onwards, a lot of our partnerships that we entered and license agreement that we entered were

---

[3357] *See, e.g.,* Meekang Sung, Yangmu Huang, Yuqi Duan, Fangjing Liu, Yinzi Jin, Zhijie Zheng, "Pharmaceutical Industry's Engagement in the Global Equitable Distribution of COVID-19 Vaccines: Corporate Social Responsibility of EUL Vaccine Developers," *Vaccine,* October 15, 2021, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8539183/ ("The shortage of supplies for lower-income countries had been highly controversial worldwide. According to the United Nations press release, although more than 700 million vaccine doses have been administered globally, richer countries have received more than 87%, and low-income countries received just 0.2% [64]. Our results (Table 4) are consistent with the concerning reports. Most vaccine agreements of EUL COVID-19 developers are made with HICs (49.64%), whereas LMICs are not able to secure enough doses (18.97%), and LICs have barely succeeded in securing any vaccine shots (0.1%). This was especially highlighted in the cases of Pfizer/BioNTech and Moderna; most of their vaccines were secured by HICs (66.87% and 69.75%, respectively). . . . In an equitable pricing system, it is expected that prices would broadly increase as a buyer's ability to afford it increases. However, the data indicate that this may not be the case. There is not much of a price difference between HICs (USD 16.41) and UMICs (USD 15.02); AstraZeneca–Oxford had a higher average price for UMICs than HICs. Apparent price differentiation according to the nation's economic ability also could not be found."). Simar Singh Bajaj, Lwando Maki, Fatima Cody Stanford, "Vaccine apartheid: global cooperation and equity," *Lancet,* February 23, 2022, 1452-1453, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8865875/ ("Early in the pandemic, the COVID-19 Vaccines Global Access Facility (COVAX) promised equitable vaccine supplies for all countries. However, with insufficient funds and donations, COVAX has faltered, failing to meet even half of its 2021 target of delivering 2 billion doses.[1] An open letter to G20 leaders in October, 2021 highlighted how 133 doses per 100 people have been given in HICs compared with four doses per 100 people in LICs. The WHO Director-General has called the divide a 'vaccine apartheid', speaking beyond the phrase 'vaccine inequity' . . . The present challenge is the zero-sum nature of vaccination where, given limited supply, every booster shot HICs purchase is a lost first or second dose for LICs. Ashley M. Fox, Yongjin Choi, Leesa Lin, "Substantial Disparities In COVID-19 Vaccine Uptake And Unmet Immunization Demand In Low- And Middle-Income Countries," *Health Affairs,* Vol. 42, No. 12, *available at* https://www.healthaffairs.org/doi/10.1377/hlthaff.2023.00729 ("Yet low- and middle-income countries around the world have struggled with vaccine access, distribution, and uptake. The large gap in access to safe and effective COVID-19 vaccines between high- and low-income countries has been described as 'vaccine apartheid.'").

946

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

██████████████████."[3358] Moderna would negotiate for a profit split below 50% of net profits to account for the value of its payload technology and non-patented elements, manufacturing process, business risks, etc.

1379. Moderna would not agree to a Genevant|Moderna profit split arrangement ████████████ (or **$9.54/dose**).

### (iv) Moderna's 2017 Summary of Potential Deal Structures

1380. In February 2017, Moderna outlined a four (4) deal structures and the associated economic terms which showed profit (or value) splits in the range of ███████████████ As discussed above, see (*see* II.E.3.b.(1), IV.C.5.d.(1), and VI.D), these structures are not hypothetical, Moderna engaged in a series of collaborations that involved a profit split. The cited agreements all involved mRNA vaccines using an LNP delivery mechanism, which Dr. Mitchell has opined is technically comparable. Although those collaborations involved additional work beyond licensing beyond a naked patent license, Moderna also received ████████████████████████████.[3359] In addition, even to the extent the scope of the license or collaboration terms created additional value, it is more than offset by the substantial differences between these agreements and the hypothetical negotiation discussed above.

1381. The ████████████████████████████████████████████ ████████████████████████ as shown in **Figure 6.27**,[3360] below .

---

[3358] MRNA-GEN-01726934-7000, at 972-973 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 156:10-157:1 ("Q. You would agree that it is standard practice in the pharmaceutical industry to license technology for royalties without profit sharing arrangements, correct? . . . ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████ (emphasis added)).

[3359] ████████████████████████████████████████

[3360] ████████████████████████████████████████ ████████████████████████████████████████

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



FIGURE 6.27

1382. The illustration above shows that █████████ " to Moderna increasing from █████████ ████████████████████████████████████████. This provides a metric for assessing the magnitude of the increase between an early-stage deal (like the May 29, 2013 Tekmira offer) and a deal "on the doorstep of commercialization."

1383. Moderna would expect to negotiate a royalty rate based on a profit split in the range of 20%|80% to 50%|50%.

        (i)    **Ropes & Gray December 2019 Life Science Deal Survey**

1384. In December 2019, Ropes & Gray's "Survey of [35 agreements from 2015 to 2019] life science collaboration agreements . . . [showed] over a four-fold increase in the use of co-commercialization

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

arrangements from 2017 to 2019."[3361]   The authors described typical profit splits as follows: "Under a traditional co-commercialization scheme, the pharma and biotechnology companies will equally split the profit and loss of the co-commercialized product.  However, we have sometimes seen other ratios such as 80-20 with pharma companies receiving most of the profits.  We have also seen cases where profits were equally split, but commercialization costs were not."[3362]

1385.   As discussed above, Moderna's internal documents show similar deal structures.  For example, Moderna's February 27, 2017 "BD Update to Executive Committee" shows four (████████████ ████████████████████████████████████████ ████████████████████████████████████ as shown in **Figure 6.28A** and **Figure 6.28B**, below.

---

[3361] Megan R. Baca, Georgina Jones Suzuki, Adam M. Zuro, "Co-Commercialization Deals in Life Science Collaborations," *Bloomberg Law,* December 2019, *available at* https://www.bloomberglaw.com/external/document/X42IAKO0000000/ip-transactions-professional-perspective-co-commercialization-de.

[3362] Megan R. Baca, Georgina Jones Suzuki, Adam M. Zuro, "Co-Commercialization Deals in Life Science Collaborations," *Bloomberg Law,* December 2019, *available at* https://www.bloomberglaw.com/external/document/X42IAKO0000000/ip-transactions-professional-perspective-co-commercialization-de.

949

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.28A**

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.28B**

1386. The foregoing establishes that profit splits are common in the life sciences industry, and such profit splits are generally in the range of <u>20%|80%</u> to <u>50%|50%.</u> These same profit splits are shown in Moderna records, which therefore establishes that a profit split in this range would be consistent with industry agreements during the period 2015-2019, shortly before the May 31, 2020 hypothetical negotiation.

### (b) Reconciliation to the Analytical Method

1387. As discussed above, the reasonable royalty calculated under the Analytical Method is <u>$3.98</u>/dose. This reasonable royalty does not consider the significant derivative benefits that Moderna expected to realize as a result of its alleged infringement, as described above. These derivative benefits are considered in the hypothetical negotiation. As the Court in AstraZeneca explained:

> As Apotex explained . . . sales of omeprazole helped Apotex sell other products, since "customers tend to expand upon their current base of sales from current suppliers." In other litigation, an Apotex witness explained that "the presence of a

951

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

blockbuster in the product line is perhaps the single most effective way to increase sales across all product lines." Astra does not advance any definite figure for increased sales Apotex would have expected its other products to enjoy thanks to omeprazole, and Astra does not include this consideration in the profit calculations that support its reasonable royalty figure. Nevertheless, this effect does lend support for the idea that Apotex would have been willing to pay a substantial royalty for the right to sell omeprazole.[3363]

1388. Because the royalty rate determined under the Hypothetical Negotiation Approach does consider the derivative benefits that Moderna expected to realize as a result of its alleged infringement of the Patents-in-Suit, it will be greater than the royalty rate calculated under the Analytical Approach.

**(c) Consideration of Non-Patented Elements**

1389. My apportionment analysis also relies on the opinions of Genevant's technical experts, Dr. Michael Mitchell and Dr. Fred Porter. I understand that with respect to delivery, that Dr. Mitchell has opined that the Patents-in-Suit account for a significant majority of the value, explaining that he evaluated all of the purported delivery improvements identified by Moderna, but that "Moderna's purported improvements to its lipid nanoparticle technology are far less valuable than the technologies claimed in the Patents-in-Suit, which are fundamental to enabling successful mRNA delivery."[3364]

1390. Dr. Mitchell also compared the relative contribution of the delivery mechanism and payload, and concluded that "[g]iven the important role that delivery plays in nucleic acid pharmaceutical products generally and Moderna's COVID-19 vaccine specifically . . . it is my opinion that the delivery vehicle is at least valuable, if not more valuable, than the payload."[3365]

1391. Dr. Fred Porter, an expert in the development of viral vaccines and mRNA technologies, also analyzed the specific contributions Moderna asserts it made with respect to the mRNA payload and opined that the mRNA technology Moderna identified "made a *far less significant contribution* to the safety or efficacy of that vaccine than Plaintiffs' LNP technology in the Patents-in-Suit".[3366]

1392. Thus, independent of my profit split apportionment analysis, I understand that the contribution of the Patents-in-Suit to the Accused Product would conservatively be placed at 50%.

---

[3363] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 498 (S.D.N.Y. 2013).
[3364] November 25, 2024 Expert Report of Michael Mitchell, Ph.D., Section XV.
[3365] November 25, 2024 Expert Report of Michael Mitchell, Ph.D., Section XV.
[3366] See November 25, 2024 Opening Expert Report of Frederick W. Porter, Ph.D. Sec. V.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### (3)    Opinion

1393.  Based on currently available information and my investigation to date, it is my opinion that my analysis reflects a reasonable estimate of the profits attributed to the Patents-in-Suit, in the following range:

- *Pandemic* **Phase**: $1.50/dose to $9.54/dose
- *Endemic* **Phase**: $1.83 / dose to $13.21/dose

### aa.    Book of Wisdom

1394.  Because the hypothetical negotiation is based on the circumstances and expectations at the time of the hypothetical negotiation, use of the book of wisdom does not permit the boundless use of all *ex post* data.[3367] "In general, the cases establish that the only purpose of the book of wisdom is to permit consideration of ex post data that constitute inferential evidence of a particular value determined in the past. . . . Ex post data are admissible only to fill evidentiary 'gaps' about the parties' valuation of the patent at the time of the hypothetical negotiation; they may not be used to contradict pre-hypothetical negotiation evidence that illuminates how the parties would have valued the patent rights. As in the tax valuation context, the key distinction is 'between later-occurring events which *affect* … value as of the valuation date, and later-occurring events which may be taken into account as *evidence* of value as of the valuation date,' with only the latter being admissible. . . . For these reasons, the book of wisdom, which the Federal Circuit has cautioned

---

[3367] *See, e.g.,* "Reasonable Royalty Patent Damages: A Proper Reading of The Book of Wisdom," *Bloomberg Law,* April 17, 2014, *available at* https://news.bloomberglaw.com/ip-law/reasonable-royalty-patent-damages-a-proper-reading-of-the-book-of-wisdom ("[T]o the extent they suggest the book of wisdom permits consideration of any and all ex post data, they are inconsistent with case law and effectively would eliminate the hypothetical negotiation construct that has been a core part of patent jurisprudence for at least 75 years. . . .The cases demonstrate that admission of ex post data under the book of wisdom is not boundless. Many cases expressly *reject* certain ex post data, a fact that alone proves the fallacy of the "all in" view of the scope of the book of wisdom.").

953

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

may be consulted only 'in certain circumstances,' Lucent, 580 F.3d at 1333, is but a slim volume."[3368]

### (1)    Principles

1395. "The hypothetical negotiation analysis may consider a wide range of evidence, . . ." and "that evidence is not necessarily limited to facts predating the date of the hypothetical negotiation; in certain circumstances, 'factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation.'"[3369] "[T]he panoply of 'events and facts that occurred thereafter and that could not have been known [at the time of the hypothetical negotiation] to or predicted by the hypothesized negotiators,'" can also be considered.[3370]

1396. The hypothetical negotiation approach to reasonable royalty has been said to encompass both fantasy and flexibility—"fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothetical negotiators."[3371] Looking at the events and facts after the date of the hypothetical negotiation has been referred to as the "Book of Wisdom" and was described by the U.S. Supreme Court as follows:

> . . . At times the only evidence available may be that supplied by testimony of experts as to the state of the art, the character of the improvement, and the probable increase of efficiency or savings of expense. . . This will generally be the case if the trial follows quickly after the issue of the patent. But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.
>
> . . . To correct uncertain prophecies in such circumstances is not to charge the offender with elements of value non-existent at the time of his offense. It is to bring

---

[3368] "Reasonable Royalty Patent Damages: A Proper Reading of The Book of Wisdom," *Bloomberg Law,* April 17, 2014, *available at* https://news.bloomberglaw.com/ip-law/reasonable-royalty-patent-damages-a-proper-reading-of-the-book-of-wisdom.

[3369] Compensatory Damages Issues in Patent Infringement Cases: A Handbook for Federal District Court Judges, January 2010, pp. 4-5, *available at* https://www.law.berkeley.edu/files/bclt_PatentDamages_Ed.pdf. *See also Lucent Techs., Inc., et al. v. Gateway, Inc., et al.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009).

[3370] *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 872 (Fed. Cir. 2010).

[3371] Howard A. Fromson v. Western Litho Plate and Supply Co. and Bemis Company, Inc., 853 F.2d 1568 at 1575 (Fed. Cir. 1988), citing Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689 (1933).

954

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

out and expose to light the elements of value that were there from the beginning.

. . . An imaginary bid by an imaginary buyer, acting upon the information available at the moment of the breach, is not the limit of recovery where the subject of the bargain is an undeveloped patent. Information at such a time might be so scanty and imperfect that the offer would be nominal. The promise of the patent has less than fair compensation if the criterion of value is the price that he would have received if he had disposed of it at once, irrespective of the value that would have uncovered if he had kept it as his own. Formulas of measurement declared alio intuit may be misleading if wrested from their setting and applied to new conditions. [3372]

1397. The importance of actual experience in determining damages has been described as follows:

The infringement here was committed some time after the issuance of the patent, and the machine described in it had been for many years in use. Expert testimony to be of value must yield to or agree with actual experience of the patentee and other users of the patented device and the damage allowed to Horvath must find its premise in the use to which his machine has been put and the benefits ensuing to its users.[3373]

1398. Post-infringement evidence is probative in certain circumstances; the hypothetical negotiation analysis "permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators."[3374]

1399. The "Book of Wisdom" provides the parties to the hypothetical negotiation with knowledge of certain facts including the extent of the use of the invention and actual revenue and profit, but cannot be used to introduce facts based on confidential information from third parties that neither party to the negotiation would have any way of knowing.[3375]

### (2)    Analysis

1400. As discussed, the date of the hypothetical negotiation in this case is May 31, 2020. Moderna's expectations are established by the projections it made around the time of the hypothetical

---

[3372] Howard A. Fromson v. Western Litho Plate and Supply Co. and Bemis Company, Inc., 853 F.2d 1568 at 1575-76 (Fed. Cir. 1988). See also Lucent Technologies, Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1333 (Fed. Cir. 2009).

[3373] *Horvath v. McCord Radiator & Mfg. Co.*, 100 F.2d 326 at 336 (6th Cir. 1938).

[3374] Lucent Technologies, Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1333 (Fed. Cir. 2009).

[3375] William C. Rooklidge and Martha K. Gooding, "When Hypothetical Turns to Fantasy: The Patent Reasonable Royalty Hypothetical Negotiation," *AIPLA,* November 15, 2010, p. 8, *available at* www.aipla.org/learningcenter/library/papers/am/2010/Documents/Rooklidge_Paper.pdf.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

negotiation, as evidenced by its documents and contemporaneous public statements.  I rely on certain additional valuation evidence that is shortly after May 31, 2020, namely the October 20, 2020 Genevant-Chulalongkorn Non-Exclusive License and Support Agreement,[3376] ███████ ████████████████████████████████████████████████████, as well as Genevant's other COVID-19 license agreements. I also rely on Moderna planning documents that are shortly after the date of the hypothetical negotiation in order to establish Moderna's expectations during the *endemic* phase.

1401. Thus, for these reasons, it is appropriate to consider this later information to augment the available information with "experience is then available to correct uncertain prophecy" as it pertains to the foregoing information that sheds light on the value of the Patents-in-Suit at the time of the May 31, 2020 hypothetical negotiation.

### (3)    Opinion

1402. Based on the foregoing, it is my opinion that based on the facts of this case it is appropriate to make reference to the "Book of Wisdom" in order to give consideration to certain post-May 31, 2020 valuation information, including information informative to determining the royalty rate for the endemic phase, such as Moderna's September 2, 2020 LRP and other related documents, as noted at length above,  the October 20, 2020 Genevant-Chulalongkorn Non-Exclusive License and Support Agreement,[3377] and Genevant's other COVID-19 agreements.[3378]

---

[3376] GENV-00023616 (Genevant Sciences GmbH and Chulalongkorn University Nonexclusive License and Support Agreement dated October 20, 2022).

[3377] GENV-00023616 (Genevant Sciences GmbH and Chulalongkorn University Nonexclusive License and Support Agreement dated October 20, 2022).

[3378] GENV-00022307 (May 11, 2020 Genevant Sciences GmbH  and Providence Therapeutics Covid Inc. License and Development Agreement); GENV-00022689-792 (Zorn Deposition Exhibit No. 20 – January 15, 2021 Gritstone Oncology Inc. and Genevant Sciences GMBH Nonexclusive License and Development Agreement); GENV-00022924-976 (April 8, 2021 ST Pharm Genevant Sciences Nonexclusive License and Support Agreement); GENV-00023278-336 (February 18, 2022 ████████████████ and Genevant Sciences Nonexclusive License and Collaboration Agreement); GENV-00062423 (August 10, 2023 Option and Nonexclusive License Agreement by and between Gritstone bio, Inc. (f/k/a Gritstone Oncology, Inc.), and Genevant Sciences GmbH).

956

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### bb.    Payment Structure of the License Agreement

1403.    "The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement."[3379]  In particular, the hypothetical negotiation should reflect what parties regularly do during "real-world" licensing negotiations.[3380]  "In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme."[3381]  "A running-royalty award is supportable only if it would have been reasonably foreseeable to the patentee."[3382]  The type of license the parties would or could have negotiated is generally a question of fact dependent on the circumstances.[3383]

### (1)    Principles

1404.    The payment structure of the license agreement is an issue of fact that will depend on the circumstances of the case.[3384] "Lump sums are one species of the broader genus of reasonable royalties, running royalties being another."[3385] "Subsumed within [the second *Georgia-Pacific*] factor is the question of whether the licensor and licensee would have agreed to a lump-sum payment or instead to a running royalty based on ongoing sales or usage.  Significant differences exist between a running royalty license and a lump-sum license."[3386]  The payment structure can also impact the amount actually paid, as it may significantly impact risk sharing between the licensor and licensee.[3387]

1405.    The determination of "the appropriate royalty structure for rights to the patents in suit . . . [have to be] based on sufficient data or information."[3388]  The royalty structure "is supportable only if it

---

[3379] *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).

[3380] *Lucent Tech., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1334 (Fed. Cir. 2009).

[3381] *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).

[3382] *Spectralytics, Inc. v. Cordis Corp.,* 650 F. Supp. 2d 900, 918 (D. Minn. 2009), *aff'd in part, vacated in part,* 649 F.3d 1336 (Fed. Cir. 2011).

[3383] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-182.

[3384] *See, e.g.*, Chisum, pp. 20-181-20-182.

[3385] *HTC Corporation, et al., v. Technology Properties Limited*, et al., 5:08-cv-00882-PSG, (N.D. Cal., September 6, 2013, Grewal, M.J.), pp. 3-4.

[3386] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1326 (Fed. Cir. 2009).

[3387] *See, e.g.*, David J. Teece, *Managing Intellectual Capital*, (New York: Oxford University Press, 2002), p. 153.  *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, 580 F.3d 1301, 1326-27 (Fed. Cir. 2009).

[3388] *XpertUniverse, Inc. v. Cisco Sys., Inc.,* No. CIV.A. 09-157-RGA, 2013 WL 936449, at *3 (D. Del. Mar. 11, 2013).

957

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

would have been reasonably foreseeable to the patentee."[3389]  Licensing practices in the relevant industry matter.  For example, if use royalties are not utilized in the relevant industry, then a reasonable royalty based on such use royalties would not be foreseeable to the patentee and would lack sufficient facts.[3390]

1406.  In general, the three (3) most common payment structures in commercial license agreements are: a single, up-front lump-sum payment, a running royalty, or a combination of a lump-sum and running royalty.[3391]  Running royalties can be paid as a percentage of revenue, a percentage of profit, or on the number of units manufactured or sold.  "A per-unit royalty is a running royalty that scales with the number of units sold rather than per-unit price or profit.  It adds marginal cost for the licensee that does not depend on price."[3392]

1407.  The payment structure of the license entails different risk-sharing between the licensor and the licensee, which is as follows:

  a)  **Single, Up-Front Lump-Sum Payment:**  This form places all of the downside risk with the licensee, who must pay even if it makes no sales that use the claimed invention. However, this form also enables the licensee to retain all of the upside potential by capping its liability and giving it the ability, usually for remaining term of the patent, to actually use the patented technology in its own products without any further expenditure.  A lump-sum license benefits the patent holder in that it enables the company to raise a substantial amount of cash quickly.  Parties agreeing to a lump-sum agreement may, during the license negotiation, consider the expected or estimated usage or production of a given invention, assuming that proof is presented to support the expectation.  Lump-sum payments are useful for technology that licensors no longer need, or when a given technology falls outside the patentee's business, or when the patentee abandons activities relating to the subject technology, or there is a policy shift.[3393]

  b)  **Running Royalty:**  A running royalty based on use of the claimed invention allows the patentee and licensee to share the risk.  Poor performance by the licensee diminishes the royalties paid to the licensor; however, when the licensee's performance is better than anticipated, the licensor gains proportionally.  One of the attractive features of a running royalty based on a percentage of sales is that the licensee does not pay unless it is successful

---

[3389] *Spectralytics, Inc. v. Cordis Corp.,* 650 F. Supp. 2d 900, 918 (D. Minn. 2009), *aff'd in part, vacated in part,* 649 F.3d 1336 (Fed. Cir. 2011).

[3390] *Stickle v. Heublein, Inc.* 716 F.2d 1550, 1551 (Fed. Cir. 1983).

[3391] *See, e.g.*, Richard T. Rapp, and Phillip A. Beutel, "Patent Damages and the Law:  Rules on the Road to Economic Rationality," p. 8.

[3392] Dr. Eric M. Becker, "Royalty Structure," *Patent Damages Book,* March 21, 2017 (draft), *available at* https://www.patentdamagesbook.com/reasonable-royalty/structure.html.

[3393] *See, e.g.*, Robert Goldscheider, "The Negotiation of Royalties and Other Sources of Income from Licensing," *The Journal of Law and Technology,* 1995, p. 7.  *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301,1326-1327 (Fed. Cir. 2009).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

with the licensed technology. A running royalty based on a percentage of sales, however, generally disfavors the licensee because the royalty obligation continues (assuming it is not renegotiated) regardless of the licensee's future profits. In addition, running royalties tend to result in delayed cash payments (vis-à-vis lump sum royalties) and impose monitoring costs on the parties, as the royalty base may need to be audited to make sure the licensee is complying with the terms of the license.[3394]

c) **Combination of Lump-Sum and Running Royalty:** Combinations of lump-sums and running royalties is an alternative risk-sharing arrangement that provides the licensor with a minimum upfront royalty together with a royalty that reflects the licensee's use of the claimed invention. The lump sum enables the patentee to recoup some of its investment in the technology.

1408. When the licensee and licensor have divergent views regarding the licensee's expected sales, the structure of the license can be affected. For example, if the licensee's sales expectations are higher than the licensor's expectations regarding the licensee's sales, then the licensee might seek a lump sum license, or possibly a sliding scale royalty where the royalty rate diminishes after certain volume thresholds are met.[3395]

1409. Typically, some of the commercial factors that are relevant to whether a patentee would charge a running royalty or a fully paid up lump sum royalty include the prospective licensee's ability to pay, market conditions, product lifecycle and the licensed product's expected market life, and the status of competing products or processes and the potential for competing products or processes to erode the licensed product's target market or obsolete the licensed product or process.

### (2)    Analysis

1410. "[B]iotech is a licensing business. Start-ups seldom produce and sell drugs but license their intellectual property (IP) to large pharmaceutical companies. They also themselves license IP from universities, where the early inventions are made and protected through patent applications."[3396] In this case, however, Moderna's business strategy was unusual and did not conform to industry

---

[3394] *See, e.g.,* Robert Goldscheider, "The Negotiation of Royalties and Other Sources of Income from Licensing," *The Journal of Law and Technology,* 1995, p. 7. David J. Teece, *Managing Intellectual Capital,* (New York: Oxford University Press, 2002), p. 153. *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1326 (Fed. Cir. 2009).

[3395] *See, e.g.*, David J. Teece, *Managing Intellectual Capital,* (New York: Oxford University Press, 2002), pp. 153-154.

[3396] Herve Lebret, "The business of Biotech – Part 4: Licensing," *Startup-Book.com,* January 6, 2016, *available at* http://www.startup-book.com/2016/01/06/the-business-of-biotech-part-4-licensing/.

959

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

norms and practices in at least three (3) respects.  First, starting in 2013, Moderna was a start-up that *was* seeking to "produce and sell drugs" even though it did not have "a lot of capabilities." Mr. Bancel testified that Moderna was "new in the field of mRNA,"[3397] and "there was a lot of capabilities we didn't have, either it's on the science, on the manufacturing, on the clinical setting."[3398]  In fact, with **"no money and no expertise,"**[3399] by September 2013, Moderna's stated goal was to **"be the world leader in mRNA-based therapeutics[.]"**[3400]

1411.  Second, notwithstanding its stated goal, Moderna did *not* follow the typical biotech industry licensing practices.  Instead, they chose a high-risk strategy—namely to build the company *without* taking licenses to what it recognized from the outset was key technology (*i.e.,* mRNA and LNP). As discussed above, at the outset, Moderna *did* seek to obtain rights to Drs. Kariko and Weissman's modified mRNA invention owned by UPenn in 2010—but did *not* actually obtain a license until years later, in 2017.  Similarly, at the outset, Dr. Langer, "an MIT professor, Moderna board member[, Moderna academic co-founder,] and founder of dozens of biotech companies, told

---

[3397] June 28, 2024 Deposition of Stéphane Bancel, 36:9- 36:10.

[3398] June 28, 2024 Deposition of Stéphane Bancel, 26:9-26:22 ("A. . . . So if you go back in time for a bit of context, Moderna in 2013 is a company with, I think, 20 employees.  . . . And so having studied the biotech industry, given I've been in the field for a long time, but more from a pharmacological company side, **it was clear to us that there was a lot of capabilities we didn't have, either it's on the science, on the manufacturing, on the clinical setting**. . . ." (emphasis added)).

[3399] "Moderna CEO Stéphane Bancel In Conversation With Newsweek CEO Dev Pragad," *Newsweek,* June 22, 2021, 18:04-18:53 of 38:45, *available at* https://www.youtube.com/watch?v=ZPR_ksxiXag ("In the early days, because **we had no money and no expertise**, we partnered a lot.  And as the company has developed more and more, we partner less and less.  If you look at the company now, you know we have shown we can do successful Phase 3.  We have shown we can get the FDA to authorize our products; we have shown we can commercialize products at gigantic scale.  You know we're trying to make a billion dollars this year.  We know we have delivered a lot of doses to the US government and to many governments around the world.  And so we have a lot of cash now.  The company is sitting on, at the of Q1, $80 billion of cash.  So we have capital, we have teams, we have capabilities. So I think as you look forward we'll do, I think very focused partnerships when they make sense." (emphasis added)).

[3400] MRNA-GEN-01237261-286, at 281 (Almarsson Deposition Exhibit No. 20 – Örn Almarsson, "Formulations & Delivery Technologies (FDT) – 2014-2015 Roadmap," *Moderna,* September 12, 2013, Slide 21 of 26) ("FDT key deliverables").

960

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Bancel that Moderna was too underfunded and small to create its own delivery system."[3401]  While Moderna recognized that Tekmira's LNP was the "gold standard," Moderna continued discussions with Genevant and its predecessors (which Moderna's Dr. Hoge apparently regarded as a "Frenem[y]"[3402] (*i.e.,* "a person who is or pretends to be a friend but who is also in some ways an enemy or rival"[3403])), for years—but never took a license from Genevant or its predecessors.  In December 2018, Moderna apparently regarded Genevant as a competitor[3404]—insofar as both were pursuing rare diseases as of late-2018.  Dr. Hoge testified:

---

[3401] Nathan Vardi, Matthew Herper, "Moderna's Mysterious Medicines," *Forbes,* December 14, 2016, *available at* https://www.forbes.com/sites/nathanvardi/2016/12/14/modernas-mysterious-medicines/?sh=4f0c94116ef6.

[3402] MRNA-GEN-01764293 (December 10, 2018 email from Stephen Hoge to John Mendlein, CC: Lisa Emanuello, Subject: Re:  mies).

[3403] "fremeny," *Merriam-Webster Dictionary,* 2024, *available at* https://www.merriam-webster.com/dictionary/frenemy.  *See also* Mark Travers, Ph.D., "Psychologists Define What The Term 'Fremeny' Really Means," *Forbes,* April 12, 2023, *available at* https://www.forbes.com/sites/traversmark/2023/04/12/psychologists-define-what-the-term-frenemy-really-means/ ("They found that many of the interviewees shared similar feelings about frenemy relationships, leading the researchers to land on the following definition: 'Relationships, often negative, steeped in situational ties and shared social connections that outwardly appear friendly but are fraught with underlying competition, jealousy, or distrust.'  Unlike genuine friendships, the researchers found that frenemy relationships displayed three prominent characteristics:  1. **Competitiveness** (viewing the other more as a rival to outdo than a friend to support)[;] 2. **Jealousy** (either in terms of social connections or material possessions)[;] 3. **Distrust** (a lack of respect and care in the friendship) . . . The dynamic was described by some interviewees as 'hot and cold,' with the frenemy repeatedly giving mixed signals as they shifted between friend-like and foe-like mentalities." (emphasis in original), *citing* Jenna S. Abetz, Lynsey K. Romo, Chandler Marr, "Defining and Exploring Frenemy Relationships," *Southern Communication Journal,* Vol. 88, Issue 2, October 11, 2022, pp. 172-184, *available at* https://www.tandfonline.com/doi/full/10.1080/1041794X.2022.2131897?needAccess=true). Carol Bishop Mills, Panfeng Yu, Paul A. Mongeau, "Frenemies: Acting Like Friends But Feeling Like Enemies," *Western Journal of Communication,* Vol. 87, Issue 5, February 5, 2023, 795-815; Preprint, May 2022, p. 2, *available at* https://www.researchgate.net/publication/360872786_FRENEMIES_ACTING_LIKE_FRIENDS_BUT_FEELING_LIKE_ENEMIES ("The term frenemy can be traced to Walter Winchell, an American journalist and columnist who, in 1953, used the term to describe tense Cold-War interactions between Russia and the United States (Zimmer, 2019). The interpersonal usage of the term can be traced back to Jessica Mitford, an author and socialite who first used the term in a humorous newspaper column in the 1970s (Mitford, 1977). She used the term to discuss disliked others with whom people remain socially engaged.").

[3404] *See, e.g.,* "Arbutus and Roivant Launch Genevant Sciences with Industry-Leading Platform to Develop Broad Range of RNA Therapeutics for Genetic Diseases," *Arbutus,* April 11, 2018,

961

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

At the time Genevant was spun out [on April 11, 2018[3405]], they were focused on rare diseases in particular.  They had done a deal, I think, with Bio-NTech [sic] around that time, I can't remember whether it was a few months before or after, and that was their interest, is they wanted to position themselves as a rare disease company, gene editing, gene therapy, DNA, mRNA, even siRNA, built around a novel, improved delivery system.  That was our understanding, . . .[3406]

1412.    Third, while the evidence shows that from the beginning, Moderna recognized that Genevant's LNP was "close to optimal for mRNA"[3407] and it became the foundation of its mRNA platform, Moderna was dismissive.  For example, Dr. Hoge also testified that Modena "never got excited" about Genevant's technology,[3408] notwithstanding the fact that as of April 2018, the

---

*available at* https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-and-roivant-launch-genevant-sciences-industry-leading ("Arbutus will license exclusive rights to its LNP and ligand conjugate delivery platforms to Genevant for RNA-based applications outside of Hepatitis B virus. Through its expert team and dominant intellectual property in RNA delivery, Genevant plans to develop products in-house and pursue industry partnerships to build a diverse pipeline of therapeutics across multiple modalities, including RNAi, mRNA, and gene editing. . . . Through its proprietary delivery platforms, Genevant is able to pursue mRNA, RNAi, and gene editing modalities and select the optimal approach for any given disease. By 2020, Genevant aims to have 5 to 10 RNA programs in the clinic targeting a range of genetic disorders with limited or no treatment options.").

[3405] *See, e.g.,* Arbutus Biopharma Corporation Schedule 14A dated April 8, 2021, p. 51, *available at* https://investor.arbutusbio.com/static-files/df50afd1-58a0-4e35-8530-f1de65a4a87f ("On April 11, 2018, we [Arbutus] and Roivant entered into various agreements to launch Genevant Sciences Ltd. ('Genevant'), a jointly-owned company currently focused on partnering with other pharmaceutical or biotechnology companies to enable the development of nucleic acid therapeutics for unmet medical needs (the 'LNP Delivery Transaction'). . . .").

[3406] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 178:5-178:15.  MRNA-GEN-01764293 (December 10, 2018 email from Stephen Hoge to John Mendlein, CC: Lisa Emanuello, Subject: Re: Frenemies).

[3407] MRNA-GEN-02204816-901, at 820, 868 ("Final progress report (IPR) for Moderna Grant W911 NF-13-1-0417*," August 14, 2014  (summarizing "the research data generated between October 2013 and the end of July 2014."), PDF p. 5 and 53 of 86 ("The preferred formulations were identified based on size of particles (≤100 nm), polydispersity (<0.2 PDI), encapsulation efficiency (mRNA protection), as well as in vitro and in vivo expression of protein. The lipid ratio used in the ALN-TTR-02 product appears close to optimal for mRNA as well as siRNA. Precise process conditions may differ, and such evaluations are underway using the T-junction technology with Antibody mRNAs.") (emphasis added).

[3408] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 177:4-177:19 ("A. In this iteration [December 2018], I think if memory serves, we continued to express potential interest in new technologies that would not be the first, second generation.  In the early versions of the conversation that I had had, that I was part of, they suggested that they had made great progress

962

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Arbutus/Genevant technology was "[t]he industry-leading LNP platform" and was "the only clinically-validated LNP delivery technology with safety and efficacy evaluated in over 400 patients across multiple clinical programs" and was "the first and only LNP program to enable an approved therapy, and has enabled a second NDA filing . . . for the delivery of patisiran[.]"[3409] In addition, in November 2019, Dr. Hoge directed Moderna personnel to erase any reference to Genevant's technology.[3410]

1413. Since at least late-2016, Moderna has expressly claimed that it was *not* using Genevant's technology. For example:

    a) In December 2016, Moderna's claim that it was purportedly not using Genevant's technology was published in *Forbes*: "[Mr.] Bancel met with FORBES at a Brooklyn coffee shop . . . to dispel the implications of the [Arbutus-Acuitas] lawsuit. He is dismissive of Acuitas' technology. 'We knew it was not very good,' he says. 'It was just okay.'[3411] . . . **Bancel says Moderna has stopped using the Acuitas [*i.e.,* Genevant] tech for new drugs."**[3412]

    b) On July 27, 2020—when Hamilton Bennett told the U.S. Government that "[r]egarding the Arbutus patent, **the LNP formula used to manufacture mRAN-1273 [sic – mRNA-1273]**

---

and had lots of, you know, things they could show us that would get us excited. From memory, we never got excited. And I think similarly, and Said [Francis] could testify to this as the expert because I wasn't involved, I don't think we ever got to a substantive financial framework that felt like it represented what both parties wanted, so it never went anywhere like the two or three times before."). MRNA-GEN-01764293 (December 10, 2018 email from Stephen Hoge to John Mendlein, CC: Lisa Emanuello, Subject: Re: Frenemies).

[3409] "Arbutus and Roivant Launch Genevant Sciences with Industry-Leading Platform to Develop Broad Range of RNA Therapeutics for Genetic Diseases," *Arbutus,* April 11, 2018, *available at* https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-and-roivant-launch-genevant-sciences-industry-leading.

[3410] MRNA-GEN-01430937 (Hoge Deposition Exhibit No. 51/Benenato Deposition Exhibit No. 2 – November 15, 2019 email from Kerry Benenato to Mark Cornebise, Subject: Re: MC3 vs. legacy). May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 436:22-441:4. May 17, 2024 30(b)(6) Deposition of Kerry Benenato, Ph.D., 21:1-33:3.

[3411] Nathan Vardi, "Moderna's Mysterious Medicines," *Forbes,* December 14, 2016, *available at* https://www.forbes.com/sites/nathanvardi/2016/12/14/modernas-mysterious-medicines/#fc82927730ee. *See also* No Bates No. (Murray Deposition Exhibit No. 3 – Matthew Herper, Nathan Vardi, "Moderna Can't Escape My Intellectual Property, Says Arbutus CEO," *Forbes,* May 16, 2017, p. 2 of 6) ("Moderna's chief executive, Stéphane Bancel, has been dismissive of the Arbutus technology. 'We knew it was not very good,' he told Forbes last year. 'It was just okay.'").

[3412] Nathan Vardi, "Moderna's Mysterious Medicines," *Forbes,* December 14, 2016, *available at* https://www.forbes.com/sites/nathanvardi/2016/12/14/modernas-mysterious-medicines/#fc82927730ee.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**is not covered by the Arbutus patent.**  We are prepared to discuss this is in more detail with the [Department of Defense] as needed."[3413]

c) On June 30, 2021, nearly two years after Dr. Hoge had directed Moderna personnel (in November 2019) to erase any reference to Genevant's technology,[3414] Moderna's Neal Dahiya rejected Genevant's offer and stated we are not "in the same ballpark. . . . At bottom, I believe we have fundamentally different views of your patents.  **Our technology captured in our COVID-19 vaccine has advanced beyond what you have claimed, and in no way relied on your IP. . . .**"[3415]

1414.  Based on my investigation, however, the foregoing claims were *not* true.  In fact, as discussed above, Dr. Zaks touted Moderna's mRNA platform, which from the very beginning was based on Genevant's technology, and claimed that using it enabled Moderna to go 8 for 8 in clinical trials (*i.e.,* the 5 targets licensed from Acuitas + 3 "new drugs"). In addition, it was this clinical experience that was the foundation of Moderna's confidence that mRNA-1273 would work.

1415.  The foregoing facts and circumstances establish that Moderna has conformed to industry norms and practices and provide important context for the determination of the payment structure of the license. Because Moderna failed to take a license early, and repeatedly refused to take a license later, the amount of the reasonable royalty under the Hypothetical Negotiation Approach will be determined now at the time Moderna's alleged infringement began with Genevant presumed to know all relevant facts, which it would *not* and could not have known in a commercial license negotiation.

### (a)    Technology Licensing

1416.  The goal of strategic licensing is to "extract the maximum value from [a] technology" and is a "means of maximizing return on [a company's] R&D investments."[3416]  Out-licensing technology

---

[3414] MRNA-GEN-01430937 (Hoge Deposition Exhibit No. 51/Benenato Deposition Exhibit No. 2 – November 15, 2019 email from Kerry Benenato to Mark Cornebise, Subject: Re: MC3 vs. legacy).  May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 436:22-441:4.  May 17, 2024 30(b)(6) Deposition of Kerry Benenato, Ph.D., 21:1-33:3.

[3415] GENV-00247321-322, at 321 (Zorn Deposition Exhibit No. 12 – June 30, 2021 Email from Neal Dahiya to Pete Zorn, Subject: RE: Proposal) (emphasis added).

[3416] David Kline, "Sharing the Corporate Crown Jewels," *MIT Sloan Management Review,* Spring 2003, pp. 89-93, at 91, *available at* https://pdfs.semanticscholar.org/94c3/25f1a7a75833d69cf80bcf4278c59175bbc5.pdf?_ga=2.885 59199.538261563.1574531413-1323405733.1574531413.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

is one option to extract value, however, whether it is a value maximizing strategy depends importantly on the particular circumstances. Out-licensing may be an economically and strategically valuable option in certain circumstances including: in the face of increasing competition (*e.g.*, Microsoft and IBM[3417]), to diffuse the patentee's technology as an industry standard (*e.g.*, Ford, Toyota, Tesla), to spur investment in capital-intensive new markets (*e.g.*, Tesla), or to earn a return on R&D investment for technology that would otherwise remain "on the shelf" (*e.g.*, Procter & Gamble).

1417. In other instances, however, the out-licensing option would result in value-destruction—and is therefore rejected. It is widely recognized that strategic licensing is "not without risk" and has to be "undertaken only with the utmost care,"[3418] for the reasons that InteCap's Daniel M. McGavock explained further in a 2003 article by David Kline published in *MIT Sloan Management Review*:

> "It's a delicate balancing act in which the business case varies in each situation[.] . . . On the one hand, you don't want to abandon your patents' ability to exclude competitors from your market. But on the other hand, you could be talking about hundreds of millions of dollars in new revenue from strategic licensing, not to mention a host of strategic benefits. . . . Companies must have a rigorous process in place, . . . that enables them to evaluate quantifiably both the risks and costs as well as the potential benefit of any strategic-licensing initiative for the whole enterprise."
>
> . . .
>
> Companies must even be cautious about the way they present their strategic-licensing efforts to investors, shareholders and competitors. "You don't want to sound like you no longer care about enforcing or seeking fair value for your intellectual property rights, . . . Because if you ever do take a competitor to court for infringing on your technology, he may try to use that against you."[3419]

---

[3417] *See, e.g.,* Andrew Orlowski, "Microsoft aiming IBM-scale patent program at Linux?" *The Register,* December 8, 2003, *available at* https://www.theregister.co.uk/2003/12/08/microsoft_aiming_ibmscale_patent_program/; and Marshall Phelps, "Keynote Speech by Marshall Phelps," *OpenCanada.org,* October 21, 2011, *available at* https://www.opencanada.org/features/keynote-speech-by-marshall-phelps/.

[3418] David Kline, "Sharing the Corporate Crown Jewels," *MIT Sloan Management Review,* Spring 2003, pp. 89-93, at 90, 92 *available at* https://pdfs.semanticscholar.org/94c3/25f1a7a75833d69cf80bcf4278c59175bbc5.pdf?_ga=2.885 59199.538261563.1574531413-1323405733.1574531413.

[3419] David Kline, "Sharing the Corporate Crown Jewels," *MIT Sloan Management Review,* Spring 2003, pp. 89-93, at 92, *available at* https://pdfs.semanticscholar.org/94c3/25f1a7a75833d69cf80bcf4278c59175bbc5.pdf?_ga=2.885 59199.538261563.1574531413-1323405733.1574531413.

965

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1418. When a patentee chooses to license a competitor, a key factor in the analysis is the potential for competition to erode profits.[3420]  In *Intellectual Capital in Enterprise Success – Strategy Revisited,* published in 2008, the authors explained why patentees typically do not license a competitor:

> This option [licensing competitors] is often *not* even considered due to the perceived risk that there will be an inability to adequately share in an overall market at the same or greater level.  In many instances, this risk is compounded by the fear that the market may not be as large as originally thought **due to price erosion that inevitably follows with the competition created through licensing.**  Moreover, from a practical perspective, licensing competitors makes sales and marketing more difficult because the new product or technology no longer provides the all-important monopoly that can result in competitive advantage.

> From the perspective of IAM and the decision of when to license, the trick is to manage the intellectual asset so that you do not license too early or too late.  It is too early when there are no real alternatives to erode margins (e.g., blockbuster new drugs).  It may be too late if, due to your unwillingness to license others, competitors innovate and then lock into their own competitive technology.[3421]

1419. Another commentator put it more bluntly: "For most companies, licensing your core patents to a direct competitor simply to increase revenue is extremely dangerous and, in many cases, simply foolhardy. . . . [D]eliberately allowing your competitors the right to use your core inventions so that they can gain a competitive advantage against you is an economic trade-off that most companies would regret in short order."[3422]  Such is the case in the biotech and pharmaceutical industry as Marshall Phelps explained during the May 4, 2009 FTC hearing:

> If my whole business depends on that red pill surviving and not being copied, I am going to fight for as much terror as I can get into the [patent] system [via patent reform].  I truly am, because my whole business is at risk if I lose that.[3423]

---

[3420] *See*, Dr. Lindsay Moore, Lesley Craig, Esq., *Intellectual Capital in Enterprise Success – Strategy Revisited,* (Hoboken, NJ: John Wiley & Sons, Inc., 2008), p. 100; and Richard Cauley, "Licensing Competitors: A Knife in Your Rival's Hand or the Monopolist's Best Friend," *The Art of IP War,* August 17, 2006, *available at* http://patent-warrior.blogspot.com/2006/08/licensing-competitors-knife-in-your.html.

[3421] Dr. Lindsay Moore, Lesley Craig, Esq., *Intellectual Capital in Enterprise Success – Strategy Revisited,* (Hoboken, NJ: John Wiley & Sons, Inc., 2008), p. 100.

[3422] Richard Cauley, "Licensing Competitors: A Knife in Your Rival's Hand or the Monopolist's Best Friend," *The Art of IP War,* August 17, 2006, *available at* http://patent-warrior.blogspot.com/2006/08/licensing-competitors-knife-in-your.html.

[3423] "The Evolving IP Marketplace – The Operation of IP Markets," *Federal Trade Commission,* May 4, 2009 Tr., 265:7-265:10, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-

966

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1420. The decision to license a competitor is risky and requires careful consideration. Licensors that choose to license competitors consider the extent to which such licensing will create competition that will erode profits—and thereby destroy value. One way to control margin erosion is to establish economic terms (*i.e.*, upfront payments, milestones, royalties, or profit sharing) for use of the technology that are high enough to create a margin umbrella. The economic terms can create a margin umbrella because the required license payments are a cost to the competitor licensee (*i.e.*, cost penalty[3424]). This increases the competitor's product cost and thereby limits the competitor's price cutting, which can cause significant margin erosion.[3425] The economic terms of the license are a tool the patentee can use to insulate it from the margin erosion "that inevitably follows with the competition created through licensing."[3426] In contrast, when an infringer does not take a license, it can price more aggressively. This is because the infringer has avoided R&D costs and is "riding on the patentee's coattails" (*i.e.*, freeriding) by not paying the patentee for use of the patented invention. In addition, when a competitor infringes, it takes away the patentee's right to make the strategic decision of whether or not to license a competitor—and if it chooses to do so, the timing of any such license.

### (b)     Patent Hold-Out

---

marketplace/090504transcript.pdf (Marshall C. Phelps, Corporate Vice President for IP Policy and Strategy, Microsoft Corporation).

[3424] *See, e.g.,* Henry Fradkin, "Should You License Your Competition," *IPStrategy.com,* November 24, 2014, *available at* https://ipstrategy.com/2014/11/24/should-you-license-your-competition/ ("Everything being equal, your competitor has to pay more for the technology[.] Simply stated, the competitor has to pay a royalty for the right to use the technology. Assuming roughly equal manufacturing costs or purchase costs, then the royalty results in the competitor incurring a cost penalty.").

[3425] *See, e.g.,* Zachary Hiller, "Licensing IP Technology To A Competitor," *Zachary Hiller Law,* May 2, 2016, *available at* http://www.zhillerlaw.com/licensing-ip-technology-to-a-competitor/ ("Taxing the Competition – Allowing the competition to license their technology also places their competition at a slight disadvantage. Sure, they are able to compete in a crowded market with better tech, but the[y] have to pay a premium for the advantage. Not only does this create a revenue stream for the licensing company, all things being equal, it also makes it more expensive for your competitor to create a similar product.").

[3426] Dr. Lindsay Moore, Lesley Craig, Esq., *Intellectual Capital in Enterprise Success – Strategy Revisited,* (Hoboken, NJ: John Wiley & Sons, Inc., 2008), p. 100.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1421. As discussed above, "Patent 'hold-out' is the practice of companies routinely ignoring patents and resisting patent owner demands because the odds of getting caught are small."[3427]  The concept of patent "hold-out" has a nearly half century history in the Federal Circuit and its predecessor courts. For example, in 1978, the 6th Circuit's decision in *Panduit Corp. v. Stahlin Bros. Fibre Works,* summarized in detail the real-world impact of infringer hold-out on a patentee as follows:

> Though unable to prove the actual amount of lost profits or to establish a damage figure resulting from Stahlin's price cut, Panduit was clearly damaged by having been forced, against its will, to share sales of the patented product with Stahlin. Further, Panduit has been forced into thirteen years of expensive litigation, involving $400,000 in attorney fees, a trial, a contempt proceeding to enforce the court's injunction, a hearing on damages, and three appeals. For all this, the "damages adequate to compensate for the infringement," 35 U.S.C. § 284, have thus far been found to total $44,709.60.

> Having elected to continue the manufacture and sale of the patented duct after the patent issued, and having elected to manufacture and sell a second infringing product in the face of the court's injunction, Stahlin was able to make infringing sales, as found by the master, totaling $1,788,384.

> The setting of a reasonable royalty after infringement cannot be treated, as it was here, as the equivalent of ordinary royalty negotiations among truly "willing" patent owners and licensees. That view would constitute a pretense that the infringement never happened. It would also make an election to infringe a handy means for competitors to impose a "compulsory license" policy upon every patent owner.

> Except for the limited risk that the patent owner, over years of litigation, might meet the heavy burden of proving the four elements required for recovery of lost profits, the infringer would have nothing to lose, and everything to gain if he could count on paying only the normal, routine royalty non-infringers might have paid. As said by this court in another context, the infringer would be in a "heads-I-win, tails-you-lose" position. *Troxel Mfg. Co. v. Schwinn Bicycle Co.,* 465 F.2d 1253 at 1257, 175 USPQ 65 at 68 (6th Cir. 1972), *cert. denied,* 416 U.S. 939, 94 S.Ct. 1942, 40 L.Ed.2d 290 (1974).

> On the date a patent issues, a competitor which made no investment in research and development of the invention, has four options: (1) it can make and sell a non-infringing substitute product, and refrain from making, using, or selling a product incorporating the patented invention; (2) it can make and sell the patented product, if the patent owner be willing, negotiating a license and paying a reasonable (negotiated) royalty; (3) it can simply take the invention, running the risk that litigation will ensue and that the patent will be found valid and infringed, or (4) it can take a license under option (2) and thereafter repudiate its contract,

---

[3427] Colleen V. Chien, "Holding Up and Holding Out," *Michigan Telecommunications Technology Law Review,* Vol. 21, Issue 1, Fall 2014, p. 1, *available at* https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1197&context=mttlr.

968

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

challenging the validity of the patent.  Determination of a reasonable royalty, after election of option (3), cannot, without injustice, be treated as though the infringer had elected option (2) in the first place.

Determination of a "reasonable royalty" after infringement, like many devices in the law, rests on a legal fiction. Created in an effort to "compensate" when profits are not provable, the "reasonable royalty" device conjures a "willing" licensor and licensee, who like Ghosts of Christmas Past, are dimly seen as "negotiating" a "license." There is, of course, no actual willingness on either side, and no license to do anything, the infringer being normally enjoined, as is Stahlin, from further manufacture, use, or sale of the patented product.

The amount of a reasonable royalty after infringement turns on the facts of each case, as best they may be determined. Among the relevant facts are: "what plaintiff's property was, to what extent defendant has taken it, its usefulness and commercial value as shown by its advantages over other things and by the extent of its use," *United States Frumentum,* 216 F. at 617, and the commercial situation, *Egry,* 23 F.2d at 443.[3428]

1422.  Ten years later, the Federal Circuit's 1988 decision in *Fromson v. Western Litho Plate and Supply Co.,* again addressed the hold-out problem and its impact on the hypothetical negotiation, which it described as follows:

> Determining a fair and reasonable royalty is often, as it was here, a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge. Lacking adequate evidence of an established royalty, the court was left with the judge-created methodology described as "hypothetical negotiations between willing licensor and willing licensee."
>
> Historically, the methodology has been problematic as a mechanism for doing justice to individual, non-manufacturing patentees. Because courts routinely denied injunctions to such patentees, infringers could perceive nothing to fear but the possibility of a compulsory license at a reasonable royalty, resulting in some quarters in a lowered respect for the rights of such patentees and a failure to recognize the innovation-encouraging social purpose of the patent system.
>
> Thus a cold, "bottom line" logic would dictate to some a total disregard of the individual inventor's patent because: (1) ill-financed, he probably would not sue; (2) cost of counsel's opinion could await suit; (3) the patent may well be held invalid on one of many possible bases; (4) infringement may not be proven; (5) if the case be lost, a license can be compelled, probably at the same royalty that would have been paid if the patentee's rights had been respected at the outset. Though the methodology must on occasion be used for want of a better, it must be carefully applied to achieve a truly reasonable royalty, for the methodology risks creation of

---

[3428] *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 at 1158-59 (6th Cir. 1978).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

the perception that blatant, blind appropriation of inventions patented by individual, nonmanufacturing inventors is the profitable, can't-lose course.[3429]

1423.   More recently, economists[3430] and lawyers[3431] have also addressed the issue of patent hold-out. "[P]atent hold-out theory explains the timing of these demands—that patentholders must resort to *ex post* assertion because manufacturers ignore *ex ante* demands.  In many cases, manufacturers fail to take steps to clear products prior to their release even though they are arguably in the best position to determine whether any patents read on their plans. . . . [In such cases] a[] [licensor] is languishing, having repeatedly asked for a licensing agreement, and having repeatedly been rebuffed."[3432]  Ms. Chien further described the "hold-out" problem as follows:

> The phenomenon of companies ignoring high-tech patents is well documented. From a potential defendant's perspective, the concerns are practical—reading the patents of others results in a manufacturer knowing about a patent, and knowledge of a patent makes it easier for a court to enhance a damages award based on a defendant's knowing infringement.  Companies are often counseled not to respond to or accept unsolicited offers to license or buy patents, knowing that engaging with the patentholder can often result in legal or settlement costs. Since only 1–2% of all enforceable patents are actually litigated, it may be better for a potential infringer to take his chances.

> From the patentee's perspective, though, when companies resist patent demands, they shirk their responsibilities as willing participants in the patent economy. In accordance with one inventor's account: "[The cost of pursuing a patent case] makes such litigation almost impossible for the inventor and small businessperson. . . . [Large companies] recognized that inventors and small companies could not

---

[3429] Howard A. Fromson v. Western Litho Plate and Supply Co. and Bemis Company, Inc., 853 F.2d 1568 at 1574-75 (Fed. Cir. 1988).

[3430] *See, e.g.,* Kalyan Dasgupta, David J. Teece, "Protecting Innovation in the Mobile Wireless Ecosystem: Understanding and Addressing 'Hold-Out," *Berkeley Technology Law Journal,* Vol. 38, 2023, pp. 313-348, *available at* https://btlj.org/wp-content/uploads/2023/11/0003-38-Haas-Dasgupta.pdf (addressing patent "hold-out" in the SEP context; at p. 316: "This theory of hold-up always overlooked the non-self-enforcing nature of patents, and this oversight is particularly important given that injunctive relief is harder to obtain in today's policy and legal environment (perhaps particularly in the United States). In this context, hold-out—the ability of implementers to resist taking a license for a prolonged period of time, or only take a license on terms that might well constitute sub-FRAND terms—may be a significantly more likely problem than hold-up.").

[3431] *See, e.g.,* Colleen V. Chien, "Holding Up and Holding Out," *Michigan Telecommunications Technology Law Review,* Vol. 21, Issue 1, Fall 2014, pp. 1-41, *available at* https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1197&context=mttlr.

[3432] Colleen V. Chien, "Holding Up and Holding Out," *Michigan Telecommunications Technology Law Review,* Vol. 21, Issue 1, Fall 2014, p. 23, *available at* https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1197&context=mttlr.

970

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

afford to bring suit to enforce their patents, and so they did not respect their patents." From this perspective, the relative size of the infringer as compared to the patentee, not the merits of the claim, dictate the outcome—that companies, especially big companies, hold-out, and resist legitimate claims for compensation.
. . .
Hold-out theory also finds fault, not with patents themselves, but with the risks that are required to enforce them. When a patent is asserted, there is a risk it will be challenged and ultimately invalidated. A court can knock out a patent on a variety of statutory bases—that the invention does not claim protectable subject matter, the patent is not enabled by the specification, or that the patent disclosure fails to adequately describe the invention, for example. Even if the patent is valid, the patent may not be infringed—if the terms are not interpreted "just so," the contested behavior will not be covered.

The patentee can survive the battle and still lose the war. A patentee may spend millions of dollars enforcing a patent, only to have it invalidated by a challenge at the USPTO, such as inter partes review, which ironically is provoked by the litigation. Large jury verdicts are often reduced, and claims are re-interpreted on appeal against the plaintiff about a third of the time, and even more often with respect to high-tech patents. Even after a license agreement is secured, the licensee can challenge the patents.

It is for all of these reasons, some argue, that patentees need big wins: to make up for the failures. Indeed, patents are perceived as risky assets, heavily discounted in debt transactions.[3433]

1424. In some cases, such as at-risk launches in the pharmaceutical, biotech, and medical device industries, the alleged infringer's strategy is to "hold-out" and take their chances in litigation even though the hypothetical negotiation is on the eve of first infringement and all relevant knowledge is known to the patentee. In some cases, this decision is driven by the patentee's express refusal to grant a license. However, such is not the case here. The facts of this case show that Moderna repeatedly rebuffed Genevant's and its predecessors many offers over a decade. For example, Moderna rebuffed Tekmira's May 29, 2013 offer. One possible explanation is that taking a license would show that Mr. Bancel's clear and unequivocal statement, published by *Forbes* in December 2016, that Moderna was not using Arbutus' technology "for new products" was not true.

1425. In contrast, in cases where the patentee either explicitly refuses to grant a license or expected to refuse, accused infringers sometimes opt to take their chances in litigation. The calculus in such

---

[3433] Colleen V. Chien, "Holding Up and Holding Out," *Michigan Telecommunications Technology Law Review,* Vol. 21, Issue 1, Fall 2014, pp. 24-25, *available at* https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1197&context=mttlr.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

cases may be that the willing licensor/willing licensee framework of the hypothetical negotiation will be "favorable" and will at least provide access to technology that unavailable in the real world. In such cases, paying for access via a royalty determined in litigation after the fact (*i.e.,* following successful commercialization and after all challenges to the patent are exhausted), may still yield the highest economic return. This is likely to be the case when the access to the patent is required to sell product—such is typically the case in pharmaceutical, biotech, and medical device cases. Without a license, the alleged infringer achieves zero profits, whereas the at-risk launch offers the realistic prospect of spectacular profits now that may be reduced later, if and only if the patentee prevails in litigation.

### (c)      Biotech Industry Licensing Practices

1426. As stated above, "biotech is a licensing business. Start-ups seldom produce and sell drugs but license their intellectual property (IP) to large pharmaceutical companies. They also themselves license IP from universities, where the early inventions are made and protected through patent applications."[3434]

### (i)      Background

1427. Competitors in the biotech industry do not typically license key technology to each other.[3435] This is because when the patentee can efficiently supply all demand for the product, "[t]he patentee profits more by supplying the demand itself than by granting a license on terms which would allow the competitor to reasonably operate. In this situation, no reasonable royalty exists. Willing negotiators, assuming they both act in their own best interests, would not agree to any royalty. The value of exercising the right to exclude is greater than the value of any economically feasible royalty."[3436]

1428. Licensing in the biotech industry generally falls into three categories: partnering agreements (*e.g.,* Genentech/Eli Lilly Humilin® product license), tool or building block technology agreements (*e.g.,* Stanford's Cohen-Boyer patent), and litigation settlements (*e.g.,* AbbVie's Humira® litigation settlements).

---

[3434] Herve Lebret, "The business of Biotech – Part 4: Licensing," *Startup-Book.com,* January 6, 2016, *available at* http://www.startup-book.com/2016/01/06/the-business-of-biotech-part-4-licensing/.

[3435] See e.g., *Medtronic Sofamor Danek USA, Inc. et al.  v. Globus Medical, Inc.*, 637 F. Supp. 2d 290, 310 (E.D. Pa. July 16, 2009).

[3436] *King Instruments, Corp. v. Perego,* 65 F.3d 941, 950 (Fed. Cir. 1995).

972

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1429. Strategic patent licensing by fully integrated pharmaceutical companies ("FIPCOs") in the biotech industry is rare because biotech companies take a "protectionist approach" and typically do not choose to license their core patents, which are the "corporate crown jewels."[3437]  This is because such core patents protect the cash flow of blockbuster products, which FIPCOs depend on to fund ongoing R&D, as discussed in detail previously.  For example, Genevant and its predecessors licensed its technology on an mRNA target basis,[3438] and targets that would directly compete with Arbutus/Genevant were excluded from the agreement.[3439]

1430. The fact that biotech FIPCOs do not license strategic patents is confirmed by other evidence, including at least the following:

   a) In September 2017, Amgen's Dr. Daniel Billen, General Manager of the Nephrology business unit,[3440] testified: "Clearly, Amgen would not be interested in having a license from Hospira [sic – granting a license to Hospira] because we are not in the business to license competitors to compete with us in the market."[3441]

   b) In December 2019, Edward Dulac, vice president of business development and strategy[3442] who has negotiated "about 100 licenses"[3443] during his tenure at Celgene, "a cancer

---

[3437] David Kline, "Sharing the Corporate Crown Jewels," *MIT Sloan Management Review,* Spring 2003, pp. 89-93, at 90, *available at* https://pdfs.semanticscholar.org/94c3/25f1a7a75833d69cf80bcf4278c59175bbc5.pdf?_ga=2.885 59199.538261563.1574531413-1323405733.1574531413.

[3438] MRNA-GEN-01719608-637, at 626-627 (Hoge Deposition Exhibit No. 13 – "Project Rodeo," *Moderna,* February 3, 2016, Slide 19 of 30) ("Tekmira proposal to Moderna 05.29.13 – Non-exclusive license with exclusivity option").

[3439] *See, e.g.* GENV-00022689-792 (January 15, 2021 Nonexclusive License and Development Agreement between Genevant Sciences, GmbH and Gritstone Oncology, Inc.), GENV-00022924-977 (April 8, 2021 Nonexclusive License and Support Agreement between Genevant Sciences GmbH and ST Pharm Co.), GENV-00023278-337 (February 18, 2022 Nonexclusive License and Collaboration Agreement between Genevant Sciences and ▮▮▮▮▮▮▮▮▮▮▮, Inc.).  ]

[3440] *Amgen Inc., Amgen Manufacturing, Limited v. Hospira, Inc.,* Civil Action No. 15-839-RGA (D. Del.), Dkt. No. 328, September 18, 2017 Trial Tr. (Dr. Daniel Billen – Direct), 199:21-199:24;  210:2-210:5.

[3441] *Amgen Inc., Amgen Manufacturing, Limited v. Hospira, Inc.,* Civil Action No. 15-839-RGA (D. Del.), Dkt. No. 295, September 18, 2017 Trial Tr. (Dr. Daniel Billen – Direct), 208:2-208:6.

[3442] *Juno Therapeutics, Inc., et al. v. Kite Pharma, Inc.,* Civil Action No. 2:17-CV-7639-SJO (C.D. Cal.), Reporters Transcript of Proceedings, Jury Trial Volume IV, December 6, 2019 (Edward Dulac – Direct), 711:6-711:8.

[3443] *Juno Therapeutics, Inc., et al. v. Kite Pharma, Inc.,* Civil Action No. 2:17-CV-7639-SJO (C.D. Cal.), Reporters Transcript of Proceedings, Jury Trial Volume IV, December 6, 2019 (Edward Dulac – Direct), 711:22-711:24.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

company, and most of the products and [its] growth are associated with drugs that [it] sell[s] to patients with cancer,"[3444] testified: "Licensing discussions with a direct competitor would be pretty rare. If that were to be the case, that would prove to be in likelihood a very expensive license to undertake."[3445] Mr. Dulac testified that licensing-in "what we would consider a later-stage technology, you are typically talking, … a much more significant upfront payment as well as a significant royalty on the back end. And it wouldn't be uncommon in my experience to see a royalty rate in the range of 20, 30 percent."[3446]

    c) In May 2009, Amgen's Stuart Watt stated: "in biotechnology, in the therapeutic product business as a whole, we need the ability to enforce our patents and exclude[] competition for the life of the patents."[3447]

    d) In May 2009, Amgen's Stuart Watt stated "we license-in products. We're less and less likely to license-in basic technology. So we're looking for product opportunities, so we'll typically license product opportunities from a small biotech that may have gotten their initial technology from a university, so it may go through a couple of hits before it gets to us."[3448]

1431. The goal of strategic licensing is to "extract the maximum value from [a] technology" and is a "means of maximizing return on [a company's] R&D investments."[3449] Outlicensing technology

---

[3444] *Juno Therapeutics, Inc., et al. v. Kite Pharma, Inc.,* Civil Action No. 2:17-CV-7639-SJO (C.D. Cal.), Reporters Transcript of Proceedings, Jury Trial Volume IV, December 6, 2019 (Edward Dulac – Direct), 712:2-712:4.

[3445] *Juno Therapeutics, Inc., et al. v. Kite Pharma, Inc.,* Civil Action No. 2:17-CV-7639-SJO (C.D. Cal.), Reporters Transcript of Proceedings, Jury Trial Volume IV, December 6, 2019 (Edward Dulac – Direct), 713:2-713:5.

[3446] *Juno Therapeutics, Inc., et al. v. Kite Pharma, Inc.,* Civil Action No. 2:17-CV-7639-SJO (C.D. Cal.), Reporters Transcript of Proceedings, Jury Trial Volume IV, December 6, 2019 (Edward Dulac – Direct), 713:23-714:3.

[3447] "The Evolving IP Marketplace – The Operation of IP Markets," *Federal Trade Commission,* May 4, 2009 Tr., 74:15-74:18, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090504transcript.pdf.

[3448] "The Evolving IP Marketplace – The Operation of IP Markets," *Federal Trade Commission,* May 4, 2009 Tr., 27:14-27:19, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090504transcript.pdf. *See also* "The Evolving IP Marketplace – Aligning Patent Notice and Remedies with Competition," *Federal Trade Commission,* March 2011, p. 70, fn 104, *available at* https://www.ftc.gov/sites/default/files/documents/reports/evolving-ip-marketplace-aligning-patent-notice-and-remedies-competition-report-federal-trade/110307patentreport.pdf.

[3449] David Kline, "Sharing the Corporate Crown Jewels," *MIT Sloan Management Review,* Spring 2003, pp. 89-93, at 91, *available at*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

is one option to extract value, however, whether it is a value maximizing strategy depends importantly on the particular circumstances.  Outlicensing may be an economically and strategically valuable option in certain circumstances including: in the face of increasing competition (*e.g.,* Microsoft and IBM[3450]), to diffuse the patentee's technology as an industry standard (*e.g.,* Ford, Toyota, Tesla), to spur investment in capital-intensive new markets (*e.g.,* Tesla), or to earn a return on R&D investment for technology that would otherwise remain "on the shelf" (*e.g.,* Procter & Gamble).

1432. In other instances, however, the outlicensing option would result in value-destruction—and is therefore rejected.  It is widely recognized that strategic licensing is "not without risk" and has to be "undertaken only with the utmost care",[3451] and is a "delicate balancing act" that "varies in each situation."[3452]  When a patentee chooses to license a competitor, a key factor in the analysis is the potential for competition to erode profits.[3453]  In *Intellectual Capital in Enterprise Success –*

---

https://pdfs.semanticscholar.org/94c3/25f1a7a75833d69cf80bcf4278c59175bbc5.pdf?_ga=2.885 59199.538261563.1574531413-1323405733.1574531413.

[3450] *See, e.g.,* Andrew Orlowski, "Microsoft aiming IBM-scale patent program at Linux?" *The Register,* December 8, 2003, *available at* https://www.theregister.co.uk/2003/12/08/microsoft_aiming_ibmscale_patent_program/; and Marshall Phelps, "Keynote Speech by Marshall Phelps," *OpenCanada.org,* October 21, 2011, *available at* https://www.opencanada.org/features/keynote-speech-by-marshall-phelps/.

[3451] David Kline, "Sharing the Corporate Crown Jewels," *MIT Sloan Management Review,* Spring 2003, pp. 89-93, at 90, 92 *available at* https://pdfs.semanticscholar.org/94c3/25f1a7a75833d69cf80bcf4278c59175bbc5.pdf?_ga=2.885 59199.538261563.1574531413-1323405733.1574531413.

[3452] David Kline, "Sharing the Corporate Crown Jewels," *MIT Sloan Management Review,* Spring 2003, pp. 89-93, at 92, *available at* https://pdfs.semanticscholar.org/94c3/25f1a7a75833d69cf80bcf4278c59175bbc5.pdf?_ga=2.885 59199.538261563.1574531413-1323405733.1574531413. (InteCap's Daniel M. McGavock: " 'It's a delicate balancing act in which the business case varies in each situation[.] … On the one hand, you don't want to abandon your patents' ability to exclude competitors from your market.  But on the other hand, you could be talking about hundreds of millions of dollars in new revenue from strategic licensing, not to mention a host of strategic benefits. … Companies must have a rigorous process in place, … that enables them to evaluate quantifiably both the risks and costs as well as the potential benefit of any strategic-licensing initiative for the whole enterprise."… Companies must even be cautious about the way they present their strategic-licensing efforts to investors, shareholders and competitors.  "You don't want to sound like you no longer care about enforcing or seeking fair value for your intellectual property rights, … Because if you ever do take a competitor to court for infringing on your technology, he may try to use that against you.").

[3453] *See,* Dr. Lindsay Moore, Lesley Craig, Esq., *Intellectual Capital in Enterprise Success – Strategy Revisited,* (Hoboken, NJ: John Wiley & Sons, Inc., 2008), p. 100; and Richard Cauley, "Licensing Competitors: A Knife in Your Rival's Hand or the Monopolist's Best Friend," *The Art of IP War,* August 17, 2006, *available at* http://patent-warrior.blogspot.com/2006/08/licensing-competitors-knife-in-your.html.

975

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

*Strategy Revisited,* published in 2008, the authors explained why patentees typically do not license a competitor:

> This option [licensing competitors] is often *not* even considered due to the perceived risk that there will be an inability to adequately share in an overall market at the same or greater level.  In many instances, this risk is compounded by the fear that the market may not be as large as originally thought **due to price erosion that inevitably follows with the competition created through licensing.**  Moreover, from a practical perspective, licensing competitors makes sales and marketing more difficult because the new product or technology no longer provides the all-important monopoly that can result in competitive advantage.
>
> From the perspective of IAM and the decision of when to license, the trick is to manage the intellectual asset so that you do not license too early or too late.  It is too early when there are no real alternatives to erode margins (e.g., blockbuster new drugs).  It may be too late if, due to your unwillingness to license others, competitors innovate and then lock into their own competitive technology.[3454]

1433.  Another commentator put it more bluntly: "For most companies, licensing your core patents to a direct competitor simply to increase revenue is extremely dangerous and, in many cases, simply foolhardy. … [D]eliberately allowing your competitors the right to use your core inventions so that they can gain a competitive advantage against you is an economic trade-off that most companies would regret in short order."[3455]  Such is the case in the biotech and pharmaceutical industry.[3456]

1434.  The decision to license a competitor is risky and requires careful consideration. Licensors that choose to license competitors consider the extent to which such licensing will create competition that will erode profits—and thereby destroy value. One way to control margin erosion is to establish economic terms (*i.e.,* upfront payments, milestones, royalties or profit sharing) for use of

---

[3454] Dr. Lindsay Moore, Lesley Craig, Esq., *Intellectual Capital in Enterprise Success – Strategy Revisited,* (Hoboken, NJ: John Wiley & Sons, Inc., 2008), p. 100.

[3455] Richard Cauley, "Licensing Competitors: A Knife in Your Rival's Hand or the Monopolist's Best Friend," *The Art of IP War,* August 17, 2006, *available at* http://patent-warrior.blogspot.com/2006/08/licensing-competitors-knife-in-your.html.

[3456] "The Evolving IP Marketplace – The Operation of IP Markets," *Federal Trade Commission,* May 4, 2009 Tr., 265:7-265:10, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090504transcript.pdf (Marshall C. Phelps, Corporate Vice President for IP Policy and Strategy, Microsoft Corporation: "If my whole business depends on that red pill surviving and not being copies, I am going to fight for as much terror as I can get into the [patent] system [via patent reform].  I truly am, because my whole business is at risk if I lose that.").

976

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

the technology that are high enough to create a margin umbrella.  The economic terms can create a margin umbrella because the required license payments are a cost to the competitor licensee (*i.e.,* cost penalty[3457]).  This increases the competitor's product cost and thereby limits the competitor's price cutting, which can cause significant margin erosion.[3458]  The economic terms of the license are a tool the patentee can use to insulate it from the margin erosion "that inevitably follows with the competition created through licensing."[3459]  In contrast, when an infringer does not take a license, it can price more aggressively.  This is because the infringer has avoided R&D costs and is "riding on the patentee's coattails" (*i.e.,* freeriding) by not paying the patentee for use of the patented invention.  In addition, when a competitor infringes, it takes away the patentee's right to make the strategic decision of whether or not to license a competitor—and if it chooses to do so, the timing of any such license.

### (ii)    Typical License Payment Structures

1435.  "Downstream License Agreements" are between "biotechnology companies and either major pharmaceutical firms or other biotechnology firms as partners."[3460]  Like other industries, in biotech, "[o]ne of the best-guarded secrets is the terms of such licenses."[3461]  "True, <u>useful</u> comps are rare.  Critical info is often not public."[3462]  The early biotech companies, Genentech and Amgen, are credited with defining the structures that are commonly used in biotech partnering

---

[3457] *See, e.g.,* Henry Fradkin, "Should You License Your Competition," *IPStrategy.com,* November 24, 2014, *available at* https://ipstrategy.com/2014/11/24/should-you-license-your-competition/.

[3458] *See, e.g.,* Zachary Hiller, "Licensing IP Technology To A Competitor," *Zachary Hiller Law,* May 2, 2016, *available at* http://www.zhillerlaw.com/licensing-ip-technology-to-a-competitor/.

[3459] Dr. Lindsay Moore, Lesley Craig, Esq., *Intellectual Capital in Enterprise Success – Strategy Revisited,* (Hoboken, NJ: John Wiley & Sons, Inc., 2008), p. 100.

[3460] Mark G. Edwards, Fiona Murray, Robert Yu, "Value creation and sharing among universities, biotechnology and pharma," *Nature Biotechnology,* June 2003, pp. 618-624, at 618-619, *available at* http://fmurray.scripts.mit.edu/docs/Edwards.Murray.Yu2003.Nat.Biotech.pdf.

[3461] Herve Lebret, "The business of Biotech – Part 4: Licensing," *Startup-Book.com,* January 6, 2016, *available at* http://www.startup-book.com/2016/01/06/the-business-of-biotech-part-4-licensing/.

[3462] Joe Dillon, "Bio Advanced Business Development Course – Valuation and Deal Structuring," *Bio.org,* June 2015, Slide 28 of 114, *available at* https://www.bio.org/sites/default/files/Valuation%20and%20Deals%20Structuring%20Concepts%20and%20Trends_Joe%20Dilion.pdf (emphasis in original).

977

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

licensing agreements, which include upfront fees, milestones, and percentage of sales royalties.[3463]
The payment structures of biotech license agreements commonly include the following terms: "a license or signing fee; annual or other periodic fees; milestone payments; percentage royalties, which may include minimum annual amounts and the expenses of the patent prosecution program.[3464]  All of these are subject to negotiation, and it can't be said that any amount or rate is right or wrong as much depends, as it always does with business terms, on the relative bargaining power of the parties and their assessment of the potential value of the invention."[3465]

1436.  In the biotech industry, licenses are typically obtained in advance of development—which is often years and sometimes a decade or more before commercialization.  For this reason, biotech license agreements are structured to provide compensation to the patentee up-front (*i.e.,* license fee), during drug development (*i.e.,* development milestones), and commercialization (*i.e.,* commercialization milestones and running royalties as a percentage of sales).  At the time such agreements are negotiated, the future success, if any, of the drug candidate is not known.  Similarly, the timing of the future drug product launch, if any, and the price and profits of the product are also not known.  As such, the payment structure provides cash flow to the patentee during

---

[3463] Herve Lebret, "The business of Biotech – Part 4: Licensing," *Startup-Book.com,* January 6, 2016, *available at* http://www.startup-book.com/2016/01/06/the-business-of-biotech-part-4-licensing/ ("Royalties on sale are very much accepted because Genentech and Amgen defined the industry rules.").

[3464] *See also* Linda Pullan, Ph.D., "Successful Biotech Licensing Negotiations," *ShareVault.com,* September 2013, p. 8, *available at* https://cdn.ymaws.com/www.michbio.org/resource/resmgr/BioToolBox_-_BioResearch/Biotech-Licensing-Negotiatio.pdf.  Robert Thong, "Everything You Need to Know About Biotech Business Models," *Labiotech.eu,* January 24, 2018, *available at* https://www.labiotech.eu/features/young-biotech-business-models/ ("Once each asset is out-licensed, you will reap a hefty upfront fee, substantial milestone payments on completing specified clinical stages and regulatory approval, and significant double-digit royalties on future product sales."). Joe Dillon, "Bio Advanced Business Development Course – Valuation and Deal Structuring," *Bio.org,* June 2015, Slides 88-89 of 114, *available at* https://www.bio.org/sites/default/files/Valuation%20and%20Deals%20Structuring%20Concepts%20and%20Trends_Joe%20Dilion.pdf ("Deal Terms Examples").  *See generally* Vladimir Drozdoff, Daryl Fairbairn, "Licensing Biotech Intellectual Property in University-Industry Partnerships," *Cold Spring Harbor Perspectives in Medicine,* March 2015, p. 8, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4355252/pdf/cshperspectmed-IPM-a021014.pdf.

[3465] Jeffrey P. Somers, "Biotech Patent Licensing: Key Considerations in Deal Negotiations," *The Journal of Biolaw and Business,* January 15, 2003, p. 6 of 8, *available at* https://www.morse.law/uploads/1437/doc/Biotech_Patent_Licensing.pdf.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

development, and through the percentage of sales royalty term, the patentee shares in the profits of the drug product if it is eventually launches.  In contrast, in litigation, the price and profits are known, and in at least some cases, per-unit royalties have also been awarded in litigation.[3466]

### (d)      Application to the Facts of this Case

1437.   As discussed above, Moderna has *not* followed typical biotech industry licensing practices.  In addition, while biotech licenses are typically negotiated at an early stage, in this case, the hypothetical negotiation takes place "on the doorstep of commercialization." As such, such industry practices provide little, if any, insight into how these parties would negotiate in this unusual case.  While Moderna's damages contentions state that the reasonable royalty should be nominal and based on a running royalty of less than 1%,[3467] in view of the facts set forth in this report, Genevant would seek a **per dose royalty** for the following reasons:

### (i)      Moderna's History of Hold-Out

1438.   In the hypothetical negotiation, Genevant would consider Moderna's history of "hold-out" including its long-running denials that it was using the patented technology of others, including at least Genevant's patents and NIH/NIAID patents.  Genevant would seek a per dose royalty rate that reflects the important contribution of the Patents-in-Suit to mRNA-1273 and would provide recognition to the work of its scientists over many years.

### (ii)      Moderna Long History of Refusing to Take and Pay for a License

1439.   As of June 2024, Genevant and its predecessors had been in licensing discussions with Moderna for more than a decade.  Mr. Bancel testified that Moderna has been aware of Tekmira's LNP

---

[3466] *See, e.g., Innogenetics, N.V. v. Abbott Laboratories,* 512 F.3d 1363, 1380 (Fed. Cir. 2008) ("The jury's damage award . . . [included] a running royalty of 5 to 10 Euros per [Hepatitis C] test on the 190,000 tests Abbott had sold up to that point.").

[3467] Defendants' Corrected Sixteenth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1–10) dated July 15, 2024, p. 185. ("Moderna intends to show that with apportionment, adjustment based on value and technology unrelated to the Patents-in-Suit, and properly accounting for the actual footprint of Plaintiffs' purported patented technology, the royalty rate would be a fraction of what Plaintiffs contend applied to an appropriately apportioned royalty base (e.g., less than approximately 1% or approximately $0.50).")

979

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

technology since February 2013,[3468] and "Moderna has had discussions with Tekmira [regarding licensing] for ten years [.]"[3469]   While these offers did not have the benefit of all relevant knowledge that Genevant would know in the hypothetical negotiation, Genevant would seek terms (*i.e.,* a per dose royalty rate) that would ensure that Moderna would, in fact, pay a reasonable royalty that is adequate to compensate it for the alleged infringement.

**(iii)   Genevant Would Know that Moderna's
Prior Claims Regarding Use of the
Patents-in-Suit were Not True**

1440.   In the hypothetical negotiation, Genevant would know that Mr. Bancel's December 2016 statement that Moderna was not using Arbutus' technology "for new products" was not true—and in fact, Moderna had built its mRNA platform on Genevant's "gold standard" technology.   Genevant would also know that Moderna's clinical trials were all based on Genevant's technology—which Dr. Zaks described as the basis for Moderna's confidence that mRNA-1273 would work.   Finally, Genevant would know about Moderna's efforts to conceal its use.   In particular, Genevant would know that in or about November 2019, shortly before the date of the hypothetical negotiation, Dr. Hoge directed Moderna employees to erase reference to Genevant's technology, apparently in an attempt to conceal its use and the associated "learnings."

1441.   Finally, if permitted under the Book of Wisdom, Genevant would also know that *after* the date of the hypothetical negotiation, Moderna was still not being forthright about its use of Genevant's technology, including at least the following:

- Ms. Hamilton's July 27, 2020 statement to the government, that Moderna's mRNA-1273 purportedly was not using Arbutus' '069 Patent.[3470]

---

[3468] June 28, 2024 Deposition of Stéphane Bancel, 142:10-142:17 ("Q. Moderna has been aware of Tekmira's LNP technology since at least 2013, correct? . . . THE WITNESS: Moderna has been aware of Tekmira since 2013 and LNP technology.  That's what we've been aware of."). *See also* MRNA-GEN-01248933-954, at 934 (Almarsson Deposition Exhibit No. 1 – "Formulation brainstorm," *Moderna,* February 11, 2013, Slide 2 of 22) ("Current BD formulation opportunities . . . Cationic LNP . . . 1. Tekmira – negotiating for MTA/POC seeking additional forms . . .").

[3469] June 28, 2024 Deposition of Stéphane Bancel, 141:12-141:19 ("Q. . . . Moderna has been involved in trying to negotiate a license to Genevant, Arbutus, and Tekmira's IP for over ten years, correct? . . . THE WITNESS: Moderna has had discussion with Tekmira for ten years, that's correct, . . .").

[3470] May 20, 2024 30(b)(6) Deposition of Hamilton B. Bennett, 277:21-278:3. MRNA-GEN-01125789-790, at 789 (Bennett Deposition Exhibit No. 33 – July 27, 2020 email from Hamilton

980

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1442. Given this history of false claims, Genevant would seek a license with terms that Moderna could not attempt to manipulate to its advantage. For example, a percentage of net sales royalty would be subject to Moderna's definition of net sales. In contrast, a per unit royalty is fixed $ per dose, and would lock in the profit split based on Moderna's projected profits and expected derivative benefits as of May 31, 2020.

### (iv)    Given the Late Stage, Genevant Would be in the Driver's Seat

1443. Compared to *early* licensing that is typical in the biotech industry, the hypothetical negotiation in this case is very late. Indeed, on May 31, 2020, Moderna would be in the very unusual situation of seeking a license on the eve of Moderna's commercialization of its "bet the company" product, mRNA-1273, for which it had no available, acceptable, non-infringing alternative ready to go and that could be used without delay. Given these circumstances, Genevant would be "in the driver's seat in the negotiations and would have required [Moderna] to pay a hefty portion of its profits for a license"[3471] and would seek a per dose royalty that would increase the odds that Moderna would actually pay the amount that Genevant negotiated.

1444. In addition, unlike early stage license negotiations when product cash flow and potential re-investment opportunities would be far into the future with uncertain probabilities of success ("POS")—in the May 31, 2020 hypothetical negotiation, Genevant would know that Moderna expected to generate >$5Bn in free cash flow by the end of 2021, that it planned to parlay into $67 billion in equity value, as discussed above. Given the proximity to mRNA-1273's expected product launch and visibility into the expected profits, Genevant would seek a per dose royalty that would include consideration for the projected mRNA-1273 profits as well the significant derivative benefits that Moderna expected as of May 31, 2020.

---

Bennett to Camille Connell-Magaw, Subject: Moderna Negotiation (UNCLASSIFIED)). *See also* MRNA-GEN-01724969-024, at 999 (December 19, 2023 30(b)(6) Deposition of Hamilton Bennett (*Moderna v. Pfizer*), 121:13-121:16 ("Q. So the government was asking Moderna about this Arbutus patents; is that correct? A. They were asking about our attempts to avoid the Arbutus patent."); 122:16-122:19 ("Q. Okay. So you were telling the government that Moderna mRNA-1273 was not covered by the Arbutus patent, right? A. I seem to be conveying that, yes."); 123:8-123:11 ("A. Okay. And what you're telling the government is this patent exists, but Moderna, its product was not covered by the patents, right? A. That is what we're stating here.")).

[3471] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 502 (S.D.N.Y. 2013).

981

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### (3)    Opinion

1445. I understand that the claimed inventions of the Patents-in-Suit enabled Moderna's sales of Accused Product. In view of the foregoing facts, it is my opinion that the payment structure of the license would be a per dose royalty paid on either dose manufactured or doses shipped and sold.

### cc.    Royalty Rate

1446. The parties, strategies, projections, expectations, and situation at the time of the hypothetical negotiation were discussed in detail above.

### (22)    Principles

1447. A key element in setting a reasonable royalty is the necessity to return to the date when the infringement began.[3472] In general, the reasonable royalty analysis will focus primarily on the projected profits of the infringer and the patentee in contemporaneous records that existed at the time of the hypothetical negotiation, if they exist.[3473] As discussed above, the relevant measure is the profits attributable to the infringer's use of the invention the parties would have anticipated or predicted as of the date just prior to the infringer's commencement of infringing activity.[3474] It is

---

[3472] *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 at 1158 (6th Cir. 1978).

[3473] *See, e.g.*, Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., *Litigation Services Handbook: The Role of the Financial Expert*, (New York: John Wiley & Sons, Inc., 2001), p. 24-23.

[3474] *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766 (Fed. Cir. 2014) ("That treatment [considering defendant's profits as a royalty cap] incorrectly replaces the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward looking inquiry into what turned out to have happened. *See Interactive Pictures,* 274 F.3d at 1385 (expectations govern, not actual results)."). *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860 (Fed. Cir. 2003) ("Mr. Anderson [Integra's damages expert] preferred a hypothetical license figure based, in part, on Merck's 1995 expectations of obtaining FDA approval of a cyclic peptide therapeutic. As already noted, however, if the hypothetical negotiation occurred in 1994, Merck did not have that expectation. Thus, an earlier date will change the risks and expectations of the parties."). *Interactive Pictures v. Infinite Pictures,* 274 F.3d 1371, 1385 (Fed. Cir. 2001) ("*Lindemann* does not require that estimates of sales revenues, as referenced in a hypothetical negotiation at the time infringement began, must later bear a close relation to actual sales revenue. Such a proposition would essentially eviscerate the rule that recognizes sales expectations at the time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales."). *Hanson v. Alpine Valley Ski Area, Inc.* 718 F.2d 1075, 1081 (Fed. Cir. 1983) ("The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations.").

982

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

expectations that govern—not actual results.[3475] As such, the infringer's sunk costs including the development and other costs incurred prior to the date of first infringement are not part of the infringer's relevant anticipated profits.[3476] The reliability of the forecast should be assessed.[3477] If forecasts do not exist, actual results can be used as a proxy.[3478]

### (23)    Analysis

1448. My royalty rate analysis is based on the facts and analysis described above, which is briefly summarized here.

---

*Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116, 1122 (S.D.N.Y. 1970) ("[T]he Court [h]as taken into account the modifying effect of the facts developed subsequent to 1955 and has assessed them together with all other probative evidence so far as they bear upon the reasonableness of the assumptions and expectations of the parties in their hypothetical negotiations in 1955."). *See also* Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-222 (*Citing (among others) Hanson v. Alpine Valley Ski Area, Inc.* 718 F.2d 1075 (Fed. Cir. 1983)). *See also* J. Gregory Sidak, "How Relevant is Justice Cordozo's 'Book of Wisdom' to Patent Damages?" *The Columbia Science & Technology Law Review,* Spring 2016, pp. 246-291, at 247 ("The Federal Circuit has emphasized that courts should calculate a reasonable royalty on the basis of the parties' expectations at the time of the hypothetical negotiation. The Federal Circuit has allowed reliance on post-infringement data only when they are necessary to infer the parties' bargaining position at the time of the hypothetical negotiation. Outside this exception, there is no valid legal or economic justification to rely on post-infringement data when calculating a reasonable royalty."). See also, e.g., *Garretson v. Clark*, 111 U.S. 120, 121 (1884) (plaintiff "must in every case give evidence tending to separate or apportion the defendant's profits and [plaintiff's] damages between the patented feature and the unpatented features")

[3475] *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766 (Fed. Cir. 2014) ("That treatment [considering defendant's profits as a royalty cap] incorrectly replaces the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward looking inquiry into what turned out to have happened. *See Interactive Pictures,* 274 F.3d at 1385 (expectations govern, not actual results).").

[3476] *See, e.g.,* Denise W. DeFranco, "Patent Infringement Damages: A Brief Summary," *Federal Circuit Bar Journal,* 2000, *available at* http://www.finnegan.com/resources/articles/articlesdetail.aspx?news=140d86d1-9b54-4789-9562-ef18d15d0cb4.

[3477] *See, e.g.*, Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., *Litigation Services Handbook: The Role of the Financial Expert*, (New York: John Wiley & Sons, Inc., 2001), p. 24-23.

[3478] *See, e.g.*, Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., *Litigation Services Handbook: The Role of the Financial Expert*, (New York: John Wiley & Sons, Inc., 2001), pp. 24-23, 24-24.

983

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## XX.   *Georgia-Pacific* Factor Analysis

1449.   The context and background for the principles underlying a determination of a reasonable royalty and the use of the *Georgia-Pacific* factors is discussed above.  It is important to note that the substantive facts that form the basis for my reasonable royalty opinion have already been discussed in detail in this report.  As such, in this section, I will only *briefly* summarize some of the key facts and reference the section of the report where the subject matter is fully addressed, which is incorporated herein by reference.  The following is my *brief* summary of the thirteen (13) *Georgia-Pacific* Factors as they relate to the facts of this case; (*Georgia-Pacific* Factor No. 15 will be discussed in the next section):

(i)   **Specific and General Market Conditions in the Pertinent Industry – "*Georgia-Pacific* Rate Factors"**

1450.   This group of factors includes six (6) of the *Georgia-Pacific* Factors and points to the rate that the parties would have adopted within the range established by the second set of factors.[3479]   The factors in the first group are:

(a)   **Prior and Existing Licenses Under the Patent**

*(i)*   **Factor No. 1:  *The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty.***

1451.   This factor considers only past and present licenses to the actual patent and the actual claims in litigation.[3480]  The most influential factor in determining a reasonable royalty is that of prior and existing licenses negotiated under the patent-in-suit.[3481]   The theory is that the actual results reached by persons with conflicting economic interests constitute direct and reliable evidence of the fair market value of a license under the patent.[3482]   In circumstances where the royalties

---

[3479] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-195.

[3480] *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 869 (Fed. Cir. 2010).

[3481] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-181.

[3482] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-196, 199.

984

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

received under license agreements to the patent-in-suit do not constitute an established royalty, the existing license rate may tend to show an established license rate.[3483]  However, prior and existing license royalty rates are not conclusive because they may derive from conditions that deviate from those assumed by the willing buyer-willing seller rule.[3484]  A patent owner may recover as a reasonable royalty an amount greater than that of prior and existing license rates by, for example, demonstrating that those rates were depressed by widespread infringement and defiance of the patent or by the pressures to settle threatened or pending litigation.[3485]

Discussion of Factor No. 1:  As discussed previously, Arbutus/Genevant has licensed the Patents-in-Suit.  While these license agreements are not economically comparable to the hypothetical negotiation license, I have considered the similarities and differences and they do provide certain "markers of value for licensing rights."  In particular,



[3486]

, establishes a 25%|75% profit split and 25% of net profits as the minimum profit split for Genevant's technology.

1452.  Thus, *Georgia-Pacific* Factor No. 1 is ***neutral*** with respect to royalty rate, but instead points to a minimum profit split of 25%|75%.

    (b)  **Industry Custom and Licenses on Comparable Patents**

      (i)  Factor No. 12:  *The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the*

---

[3483] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-205.

[3484] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-199.

[3485] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-199.

[3486]

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

> *use of the invention or*
> *analogous inventions.*

1453. Factor No. 12 addresses industry customs.  The licensing customs in the industry are considered in determining both the royalty rate and royalty base for the reasonable royalty.[3487]  The theory is that a willing licensor and a willing licensee, negotiating from positions of uncertainty as to the future profitability of the patented invention, would be guided to some degree by customary practices in the industry, but this factor is rarely given decisive or even substantial effect due to the generally unique character of the patented inventions and of the circumstances under which they are developed and exploited.[3488]

1454. Industry royalty rates, however, do not necessarily establish a ceiling for the royalty that may be assessed after an infringement.[3489]

1455. Discussion of Factor No. 12:  Based currently available information and my investigation, there is no custom in the industry  regarding the "portion of the profit or of the selling price that [is] customary . . . to allow for the use of the invention or analogous inventions."[3490]  More generally, the royalty "is influenced by factors such as the stage of technology or therapeutic program development at licensing, exclusivity terms, and the essential nature of the collaboration technology to the drug development program."[3491]  Industry licensing was discussed above. *See* VI.D.5.s.(2)(c).

1456. Thus, *Georgia-Pacific* Factor No. 12 is **_neutral_** with respect to royalty rate, , but instead points to a profit split in the range of 20%|80% to 50%|50% Genevant|Moderna profit split.

---

[3487] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-208 – 209.

[3488] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-211.

[3489] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-212.

[3490] *Georgia Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970).

[3491] Jorge Conde, Becky Pferdehirt, "Anatomy of a Biotech Business Development Deal," *Andreessen Horowitz,* January 25, 2022, *available at* https://a16z.com/anatomy-of-a-biotech-business-development-deal/#:~:text=Royalty%20rates%20are%20rarely%20disclosed,know%20that%20pushback%20is%20likely. *See also* "Pharma Out-Licensing Process Essentials: Key Steps and Strategies," *Credevo,* August 15, 2023, *available at* https://credevo.com/articles/2023/08/15/pharma-out-licensing-process-essentials-key-steps-and-strategies/ ("Out-licensing later in development lowers risk and boosts value.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

> **(ii)** Factor No. 2: *The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.*

1457. Factor No. 2 addresses the licenses for comparable technology.  Actual licenses on comparable patents are considered in determining both the royalty rate and royalty base for the reasonable royalty.[3492]  The key issue here is whether the proffered license(s) are sufficiently comparable to the hypothetical license at issue.[3493]  Comparable licenses are negotiated between similarly situated parties, contain similar terms and conditions and involve technology of similar economic value,[3494] and arose from circumstances that are similar to those presumed to prevail in the hypothetical royalty negotiation.[3495]  "There must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case."[3496]  In *Georgia-Pacific,* the Court noted that more than a "simplistic discussion of the figures of royalty rates" in other licenses is required.

> The rudimentary principle of analysis has been largely disregarded by GP's simplistic discussion of the figures of royalty rates.  There is an absence of meaningful evidence about such obviously pertinent factors as the relative economic positions of the licensor and licensee at the time the particular royalty was negotiated, in terms of their respective bargaining strength and their competitive status inter se; the economics of the market for the particular product before and at the time the particular royalty was negotiated; the character of the particular product itself, as either new or commercially accepted, at the time the particular royalty was negotiated; the past performance of the licensed product in terms of profit-bearing and the degree of its commercial success; and many other similar features that would enable the Court to make a sound businesslike evaluation.  Without such evidence, bare data as to a royalty rate and cursory

---

[3492] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-208 – 209.

[3493] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1325 (Fed. Cir. 2009).

[3494] *See, e.g.*, Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., *Litigation Services Handbook:  The Role of the Financial Expert*, (New York:  John Wiley & Sons, Inc., 2001), p. 24-19.

[3495] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1329 (Fed. Cir. 2009).

[3496] Uniloc USA, Inc. and Uniloc Singapore Private Limited v. Microsoft Corporation, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

information as the nature of a particular license transaction are gravely deficient in probative value.  They lack the dimension of reality. . .[3497]

1458.   In *ResQNet.com*, the Court noted "This court has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies *other* than the patent in suit."[3498]

1459.   Subsumed within this factor is the question of the form of the license:  lump sum payment or running royalty based on ongoing sales or usage.[3499]

1460.   This factor is rarely given decisive or even substantial effect due to the generally unique character of the patented inventions and of the circumstances under which they are developed and exploited.[3500]  This issue has been summarized as follows:

> Because markets for know-how are often extremely thin, and transactions are often highly confidential, one cannot determine market values simply by interrogating a public database of identical or even roughly comparable transactions.  This leaves royalty rates to be determined by negotiation between parties, often without benchmarks to assist one in determining market price.  Even if comparable transactions for the same or similar technology and/or intellectual property could be located, license agreements can be structured in different ways, further complicating comparisons.[3501]

1461.   <u>Discussion of Factor No. 2:</u>   Based on currently available information and my investigation, and as discussed above, Moderna license agreements show that beginning in 2016 its collaboration agreements included profit sharing terms.  As discussed above, several of Moderna's collaboration agreements were at least minimally technically and economically comparable..  *See* IV.C.5.d.3.

---

[3497] Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116, 1140 (S.D.N.Y. 1970).

[3498] *ResQNet.com, Inc. v. Lansa, Inc.* 594 F.3d 860, 869 (Fed. Cir. 2010)  (Citing *Lucent Technologies, Inc., v. Gateway, Inc.*, "[A] lump-sum damages award [based on a reasonable royalty] cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers, one of which is arguably in the ballpark of the jury's award, particularly when it is doubtful that the technology of those license is in any way similar to the technology being litigated here.").

[3499] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1326 (Fed. Cir. 2009).

[3500] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-211.

[3501] David J. Teece, *Managing Intellectual Capital*, (New York: Oxford University Press, 2002), p. 149.

988

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

More generally, Moderna's license agreements establish that as of May 31, 2020, both running royalties and profit sharing terms would be foreseeable and potentially acceptable to Moderna.

1462. Thus, *Georgia-Pacific* Factor No. 2 is **_neutral,_** as it does not point to a particular rate or range of rates.

> *(iii)* Factor No. 3: *The nature and scope of the license, as exclusive or non-exclusive; or restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.*

1463. Factor No. 3 raises fact issues that address the nature and scope of the hypothetical license agreement. Non-exclusive and restricted licenses generally command lower royalties than exclusive and non-restricted licenses.[3502] Stated differently, typically, higher royalty rates are associated with license agreements that provide the licensee with exclusive rights to use the IP.[3503]

1464. Discussion of Factor No. 3: As is typical in litigation, the hypothetical agreement between Genevant and Moderna would be a non-exclusive license and unrestricted.

1465. Thus, *Georgia-Pacific* factor No. 3 is **_neutral_** with respect to the royalty rate, as it does not point to a particular rate or range or rates.

> (c)    **Patent Owner's Licensing Policy and the Relation Between the Parties**

> *(i)* Factor No. 4: *The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.*

1466. Factor No. 4 addresses the patent owner's or licensor's licensing policy with respect to the Patents-in-Suit.[3504] For example, the patent owner's or licensor's bargaining power, however, would be

---

[3502] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1335 (Fed. Cir. 2009).
[3503] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1335 (Fed. Cir. 2009).
[3504] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, pp. 20-212 – 213.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

greater if it followed a general policy of refusing to grant licenses.[3505]  This factor, however, does not easily translate into a specific quantitative difference in the reasonable royalty rate.[3506]

1467.  <u>Discussion of Factor No. 4:</u>  The licensing discussions between the parties were discussed in detail above.  Genevant and its predecessors consistently expressed its interest in granting a license to Moderna and made numerous offers during the period from at least early-2013 through September 2021.  Moderna rejected all of these offers.

1468.  Thus, *Georgia-Pacific* factor No. 4 is **_neutral,_** given that Genevant does not have a general policy of refusing to grant licenses.

> *(ii)*     Factor No. 5:  *The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor or promoter.*

1469.  Factor No. 5 addresses the relationship—competitive versus noncompetitive—between the parties.[3507]  The willing buyer-willing seller rule necessarily and hypothetically assumes that the patent owner or licensor would have been willing to grant a license at a rate that would have enabled the infringer to have utilized the patent invention.[3508]  The patent owner's or licensor's bargaining power, however, would be greater if it:  1) was a competitor of the infringer, 2) had the capacity to make the infringer's sales or production, and 3) followed a general policy of refusing to grant licenses.[3509]  This factor, however, does not easily translate into a specific quantitative difference in the reasonable royalty rate.[3510]

---

[3505] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-214.

[3506] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-214.

[3507] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, pp. 20-212 – 213.

[3508] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-213 – 214.

[3509] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-214.

[3510] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-214.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1470. In cases where the patent owner or licensor makes the patented article, the profitability of the owner's manufacture and sale may provide insight regarding the royalty that would be charged.[3511] The reasonable royalty rate to a manufacturing patentee (or exclusive licensee) would not exceed a lost profits award if the patentee (or exclusive licensee) and infringer have similar cost structures[3512] and business models. The patentee's lost profits, however, are not a cap on the reasonable royalty in cases in which the licensee's use of the claimed invention of the patent enables it to realize greater profits that are reasonably attributable to its use of the patent.[3513]

---

[3511] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-217.

[3512] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-217.

[3513] *Powell v. Home Depot U.S.A., Inc.* 663 F.3d 1221, 1238-39 (Fed. Cir. 2011) ("Rather, its [Home Depot's] argument is that Mr. Powell cannot recover more than his expected profits from selling saw guard units to Home Depot as a reasonable royalty. We disagree with Home Depot for two reasons. The evidence presented to the jury indicates that had Mr. Powell successfully negotiated a deal with Home Depot in 2004 — prior to receiving his patent — a conservative estimate of his expected profits from building and installing saw guards in each of Home Depot's stores was $2,180 per unit. Here, however, the reasonable royalty must be based on the 'terms of a [hypothetical] licensing agreement reached... between the patentee and the infringer at the time infringement began.' *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed.Cir.1995) (en banc); *see also Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1313 (Fed.Cir.2002) ('A reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment.'); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir.1978) (Markey, J., sitting by designation) ('The key element in setting a reasonable royalty after determination of validity and infringement is the necessity for return to the date when the infringement began.'). At the time the infringement began, in May 2006, Home Depot had the luxury of nearly two additional years after its initial negotiation with Mr. Powell to observe the effectiveness of the saw guard solution created by Industriaplex, which was based on his design. Thus, we are not persuaded that Mr. Powell's expected profit of $2,180 per unit in 2004 is a reliable approximation of the upper limit that the parties would have reached during a hypothetical negotiation in May 2006. Next, it is settled law that an infringer's net profit margin is not the ceiling by which a reasonable royalty is capped. *Golight*, 355 F.3d at 1338; *see also State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed.Cir.1989) ('The determination of a reasonable royalty, however, is based not on the infringer's profit margin, but on what a willing licensor and licensee would bargain for at hypothetical negotiations on the date infringement started.'). It is equally appropriate to impose that rule when, as here, the infringer argues that the patentee's profit expectation must be a cap on the reasonable royalty that the patentee may receive. While either the infringer's or the patentee's profit expectation may be considered in the overall reasonable royalty analysis, *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), neither is an absolute limit to the amount of the reasonable royalty that may be

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1471.  In cases where the patent owner or licensor does not manufacture the invention, the patent owner/licensor expects to make money principally, if not exclusively, from the royalty.[3514]  In such cases, "it is necessary to enter into the complex counterfactual process of approximating the royalty that would have been agreed on by the parties that did not agree on anything at all . . . ."[3515]

1472.  This factor, however, does not easily translate into a specific quantitative difference in the reasonable royalty rate.[3516]

1473.  Discussion of Factor No. 5:  The relationship between these parties has been discussed in detail throughout this report.  See, e.g., VI.D.2.g.(2).

1474.  As of May 31, 2020, Genevant and Moderna were competitors.  Dr. Hoge's testimony regarding the December 2018 "Frenemies" email described Genevant as follows:

> At the time Genevant was spun out [of Arbutus on April 11, 2018[3517]], they were focused on rare diseases in particular.  They had done a deal, I think, with Bio-NTech [sic] around that time, I can't remember whether it was a few months before or after, and that was their interest, is they wanted to position themselves as a rare disease company, gene editing, gene therapy, DNA, mRNA, even siRNA, built around a novel, improved delivery system.  That was our understanding,, . . .[3518]

---

awarded upon a reasoned hypothetical negotiation analysis under the Georgia-Pacific factors. *See Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed. Cir.1983) (rejecting the accused infringer's argument that the reasonable royalty is capped by the sales price of the patented product). Indeed, 'damages to the patent holder cannot simply be calculated in all cases by determining `the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred.'' *Id*. at 1560-61 (quoting *Yale Lock Mfg. Co. v. Sargent*,   117 U.S. 536, 552, 6 S.Ct. 934, 29 L.Ed. 954 (1885)).").

[3514] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-217.

[3515] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-217.

[3516] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-214.

[3517] *See, e.g.,* Arbutus Biopharma Corporation Schedule 14A dated April 8, 2021, p. 51, *available at* https://investor.arbutusbio.com/static-files/df50afd1-58a0-4e35-8530-f1de65a4a87f ("On April 11, 2018, we [Arbutus] and Roivant entered into various agreements to launch Genevant Sciences Ltd. ('Genevant'), a jointly-owned company currently focused on partnering with other pharmaceutical or biotechnology companies to enable the development of nucleic acid therapeutics for unmet medical needs (the 'LNP Delivery Transaction'). . . .").

[3518] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 178:5-178:15.  MRNA-GEN-01764293 (December 10, 2018 email from Stephen Hoge to John Mendlein, CC: Lisa Emanuello, Subject: Re: Frenemies).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1475. After the May 31, 2020 hypothetical negotiation (and after the July 23, 2020 PTAB decision), on July 31, 2020, Roivant recapitalized Genevant.[3519]  I understand that after the recapitalization, Genevant's business strategy shifted, which Mr. Zorn described as follows:

> [W]hen Genevant launched, it had a focus on building its own product portfolio, fully integrated product portfolio.  And the change in that 2020 time frame was to focus on partnering collaborating, licensing its delivery technology with third parties.[3520]

1476. Thus, *Georgia-Pacific* Factor No. 5 is **_neutral_** with respect to the royalty rate, but would impact the determination of the payment structure of the license (*i.e.,* per dose royalty) for the reasons discussed above.  *See* VI.D.2.g.

### (d)    Conclusion Regarding "*Georgia-Pacific* Rate Factors"

1477. In this case, of the six "*Georgia-Pacific* Rate Factors," indicate that the payment structure of the license would be a per dose royalty which would be based on a profit split in the general range of 20%|80% to 50%|50%.

### (ii)    The Anticipated Profitability of the Product or Process Made, Used or Sold by the Infringer and Covered by the Patent – "*Georgia-Pacific* Range Factors"

1478. This group of factors includes seven (7) of the *Georgia-Pacific* Factors and sets the range of feasible rates since a willing patent owner or licensor would demand a greater than minimum rate for a profitable invention and a willing user would concede no more than the expected amount of profit (adjusted for the uncertainty as to its realization).[3521]  "While either the infringer's or the patentee's profit expectation may be considered in the overall reasonable royalty analysis, neither is an absolute limit to the amount of the reasonable royalty that may be awarded upon a reasoned hypothetical negotiation analysis under the *Georgia-Pacific* factors."[3522]  The factors in the second group are:

---

[3519] *See, e.g.,* "Arbutus Reports Second Quarter 2020 Financial Results and Provides Corporate Update," *Arbutus,* August 7, 2020, https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-reports-second-quarter-2020-financial-results-and.

[3520] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 230:10-230:15.

[3521] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-195.

[3522] *Powell v. Home Depot U.S.A., Inc.* 663 F.3d 1221, 1238-1239 (Fed. Cir. 2011).

993

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

(a)    **Infringer's Anticipated Profits**

*(i)*    Factor No. 8: *The established profitability of the product made under the patent; its commercial success; and its current popularity.*

1479.    Factor No. 8 addresses both the established profitability and the actual state of development and commercialization of the product or process covered by the patent, and is directed at addressing the anticipated profits or cost savings that the infringer would derive from use of the patented product or process.[3523]  The theory is that a willing licensor and willing licensee in a hypothetical negotiation would have set a royalty rate that would divide between them the predicted economic benefits to be realized by the licensor's adoption of the product or process.[3524]  In general, patented products sold with a high profit margin will support a higher reasonable royalty rate than patented products sold with a low profit margin.[3525]

1480.    In determining a reasonable royalty, what is important is not the actual profit made by the infringer but the anticipated profit at the time of the hypothetical negotiations leading up to the license agreement.[3526]  The reasonable royalty measure does not guarantee an actual residual profit to the infringer, and there is no rule that a royalty be no higher than the infringer's actual net profit margin.[3527]  Considerable weight is given to the anticipated profits, cost savings or benefits that the infringer would derive from use of the patented product or process, as such amounts normally constitute the limit on the amount a willing user would agree to pay as a royalty.[3528]  In some circumstances, indirect benefits of the invention may have induced the infringer to agree to a

---

[3523] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-218.

[3524] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-218 – 219.

[3525] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1335 (Fed. Cir. 2009).

[3526] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-222.

[3527] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-222, 20-223.

[3528] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-181, 20-218.

994

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

royalty rate equal to or even in excess of the direct profits to be derived from adopting it.[3529]  The infringer's actual profit performance over the period of infringement is frequently considered,[3530] however, greater emphasis must be placed on anticipated profits based on the factors which were apparent at the time of the hypothetical negotiation.[3531]  This was reiterated by the *Lucent* court when it noted:  "The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical negotiations would have considered at the time of the negotiations."[3532]

▪ **Established Profitability:**  Profitability lies at the heart of market value.[3533]  A license becomes attractive to the licensee, therefore, if the technology can increase the licensor's profits over what they otherwise would have been.[3534]  Thus, one must measure not only the infringing product's profitability, but also calculate what the profitability might otherwise have been.[3535]  The analysis should primarily focus on the projected profits of the infringer and the patentee at the time of the hypothetical negotiation.[3536]  The "book of wisdom"—actual financial information after the date of the hypothetical negotiation—can be used when contemporaneous projections do not exist.[3537]  Furthermore, use of the "book

---

[3529] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-220 – 221.

[3530] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-221.

[3531] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-222.

[3532] *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983).

[3533] *See, e.g.*, Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., *Litigation Services Handbook:  The Role of the Financial Expert*, (New York:  John Wiley & Sons, Inc., 2001), p. 24-23.

[3534] *See, e.g.*, Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., *Litigation Services Handbook:  The Role of the Financial Expert*, (New York:  John Wiley & Sons, Inc., 2001), p. 24-23.

[3535] *See, e.g.*, Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., *Litigation Services Handbook:  The Role of the Financial Expert*, (New York:  John Wiley & Sons, Inc., 2001), p. 24-23.

[3536] *See, e.g.*, Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., *Litigation Services Handbook:  The Role of the Financial Expert,* (New York:  John Wiley & Sons, Inc., 2001), p. 24-23.

[3537] *See, e.g.*, Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., *Litigation Services Handbook:  The Role of the Financial Expert,* (New York:  John Wiley & Sons, 2001), p. 24-23.

995

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

of wisdom" is particularly helpful when the date of damages assessment occurs well after the date of first infringement.[3538]  In these circumstances, "experience is then available to correct uncertain prophecy . . . To correct uncertain prophecies in such circumstances is not to charge the offender with elements of value non-existent at the time of his offense.  It is to bring out and expose to light the elements of value that were there from the beginning."[3539]

- **State of Development and Commercialization:**  The state of development and commercialization affects both the estimated amount of economic benefit to the prospective licensee and the level of uncertainty as to its future realization.[3540]  The theory is that a willing licensee in a hypothetical negotiation at the time infringement began would have been more disposed to agree to a high royalty if the product or process was fully developed and commercially established.[3541]  In contrast, a willing licensee would be less disposed to agree to a high royalty if the product or process was paper technology and would require further investment in its development and commercialization.[3542]

1481.  <u>Discussion of Factor No. 8:</u>  Genevant's patented LNP was already established as the "optimal LNP" years before the May 31, 2020 hypothetical negotiation.  Moderna's documents show that it recognized this fact.  For example, in August 2014, Moderna stated: "[t]he lipid ratio used in ALN-TTR-02 [Alnylam's Onpattro] **appears close to optimal for mRNA as well as siRNA**"[3543];

---

[3538] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-256.

[3539] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-256.

[3540] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-244.

[3541] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-243 – 244.  Jonathan E. Kemmerer, CPA and Jiaqing Lu, Ph.D., CFA, "Profitability and Royalty Rates Across Industries:  Some Preliminary Evidence," 2008, p. 5, *available at* http://law.unh.edu/assets/images/uploads/pages/ipmanagement-royalty-rates.pdf.

[3542] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-244.  Jonathan E. Kemmerer, CPA and Jiaqing Lu, Ph.D., CFA, "Profitability and Royalty Rates Across Industries:  Some Preliminary Evidence," 2008, p. 5, *available at* http://law.unh.edu/assets/images/uploads/pages/ipmanagement-royalty-rates.pdf.

[3543] MRNA-GEN-02204816-901, at 820, 868 ("Final progress report (IPR) for Moderna Grant W911 NF-13-1-0417*," August 14, 2014  (summarizing "the research data generated between October 2013 and the end of July 2014."), PDF p. 5 and 53 of 86 ("The preferred formulations were identified based on size of particles (≤100 nm), polydispersity (<0.2 PDI), encapsulation efficiency (mRNA protection), as well as in vitro and in vivo expression of protein. The lipid ratio used in the ALN-TTR-02 product appears close to optimal for mRNA as well as siRNA. Precise process conditions may differ, and such evaluations are underway using the T-junction technology with Antibody mRNAs.") (emphasis added).

996

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

"initial indications are that a formulation similar to the quantitative composition of ALN-TTR-02 [Alnylam's Onpattro] **is close to optimal for mRNA.**"[3544]  Just a few months later, an April 2015 internal Moderna presentation stated **"Tekmira's LNP <u>Enable</u> mRNA Products . . . LNP is the GOLD STANDARD for <u>mRNA</u> delivery."**[3545]  In fact, Moderna's witnesses testified that Tekmira's LNP formulation  was the company's **"standard LNP"**[3546] from at least July 2014

---

[3544] MRNA-GEN-02204816-901, at 868 ("Final progress report (IPR) for Moderna Grant W911 NF-13-1-0417*," August 14, 2014  (summarizing "the research data generated between October 2013 and the end of July 2014."), PDF p. 53 of 86 ("While the design space of MC3 formulations is still being evaluated and refined, both in terms of formulation and especially process conditions, initial indications are that a formulation similar to the quantitative composition of ALN-TTR-02 is close to optimal for mRNA. The main difference introduced by Moderna is use of higher concentrations of the nucleic acid, with a target of at least 2 mg/mL compared with <l mg/mL for the nucleic acids in siRNA formulations. It is important to note that the lipid concentration, scale proportionally with the nucleic acid content. The physical and chemical stability of formulations is under active study using the range of characterization technology available at Moderna: light scattering, gel electrophoresis, uPLC/CAD (lipid analysis), fluorescence, electron microscopy, etc.") (emphasis added).

[3545] MRNA-GEN-01240180-198, at 190 (Francis Deposition Exhibit No. 27 – "Business Development Update – Moderna Investment Committee Discussion," *Moderna,* April 9, 2015, Slide 11 of 19) ("Tekmira – an RNA and LNP company") (emphasis added).  *See also* 191 (Slide 12: "Tekmira (  -2014) – an RNA and LNP company . . . Tekmira's LNP Enable mRNA Products . . . mRNA require intracellular delivery for activity[;] LNP is the GOLD STANDARD for mRNA delivery" (emphasis in original)).  May 22, 2024 30(b)(6) Deposition of Said E. Francis, 195:4-195:9 ("Q. You wrote in a slide [Slide 11 of 19] to a subcommittee of Moderna's board that Tekmira had a validated LNP formulation that are in the clinic that serve as the RNA industry gold standard, did you not?  A. Those are the words on the slides.").

[3546] *See, e.g.,* November 17, 2023 Deposition of Sunny Himansu (*Moderna v. Pfizer*), 200:15-201:20 ("Q. All right, let's go to column 41 [of the Moderna '600 patent].  You say, line 17 on column 41, 'The LNP used in the studies described herein has been used previously to delivery [sic] siRNA in various animal models as well as in humans.'  Do you see that?  A. Yes.  Q. So in your examples you were using the same LNP that had been previously used and published for siRNA? . . . **A. We had used LNPs – again, that Moderna was using at the time as a standard LNP and LNP composition for vaccines.**  Some of these lipids have been testified previously with siRNA, but for a completely different purpose. . . . Q. But you did use the same LNPs with the mRNA that had been used with the siRNA; right?  . . . A. Correct, because the only learnings from there would be the RNA charge that will be involved in formation of LNPs."); 202:2-202:8 ("Q. So, but you took the same lipid that had been used in siRNA, you applied it to the mRNA, and it encapsulated; right? . . . **A. I took the LNP that was given to me by Moderna as their standard platform technology and applied that. . . .**" (emphasis added); 203:6-203:23 ("Q. Okay, let's talk about the LNPs you actually described using.  Let's go to column 212 [of Moderna's '600 patent]: This is where we're getting into the betacoronavirus studies, column 212, line 47.  'In experiments where a lipid nanoparticle formulation is used, the

997

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

formulation may include a cationic lipid, non-cationic lipid, PEG lipid and structural lipid in the ratio of 50 to 10 to 1.5 to 38.5.' You go on to specify, 'The cationic lipid, the non-cationic lipid (DSPC), the PEG lipid, and the structural lipid is cholesterol.' Do you see that? A. Yes. Q. Is it your testimony that you or Moderna thought of this formulation? **A. Moderna was using MC3 lipid and the ratios of the composition as our standard LNPs to test vaccines at the time. That's what was accessible to me. That's what I used.** . . ." (emphasis added)); 204:2-204:23 ("A. . . . And for the record, I don't have any information of who came up with the idea. Q. But it certainly wasn't you to come up with the idea for the lipids in the LNP in your patent; right? A. Again, I was using the lipids and the LNP composition that was accessible to me and the ranges that were described to be functionally relevant. Q. But when you were claiming the LNP as part of your invention, did you check to see who came up with the LNP formulation? . . . Q. Who first came up with it? A. Again, it was – that was what was accessible to me. So, you know, the idea was to combine the modified mRNA with an LNP to elicit an immune response in the context of vaccines. Q. And when you carried out that idea, you picked the LNP that had been previously used with siRNA; right? A. That was accessible to me at that time."); 227:15-227:23 ("**A. . . . I picked this lipid because that was available to me at the time as a Moderna employee, because that was their standard lipid based on the experience on working with vaccines. Q. So who determined, to your knowledge, that the Moderna standard lipid would match the lipid from AlCana/Alnylam for siRNA? A. I do not know.**" (emphasis added)). December 20, 2023 Deposition of Giuseppe Ciaramella (Pfizer), 126:18-129:10 ("Q. But just to be clear, the actual formulation that is being used and described in Example 20 [in Moderna's '600 patent] is the same formulation that had been used in siRNA, correct? . . . **THE WITNESS: It is the same LNP that has been used for siRNA,** but I restate the fact that that is not what we have invented, is the idea of putting a messenger RNA in an LNP and then injecting it intramuscularly for a vaccine formulation that had never been tried before. **And so we use that as an expedient way of using an LNP for, you know, the initial test.** And then, as you know, Moderna has developed several others, but fundamentally, all of them have given us the opportunity for an immune response. . . . Q. If we look Examples 23 and 24 [in Moderna's '600 patent]. So Example 23 describes the immunogenicity study in mice and Example 24 describes the immunogenicity study in New Zealand in white rabbits, right? A. That's right. **Q. And if you look at the procedures in these sections, they don't describe the specific formulation that was used, right? A. It doesn't appear to do so, but I think I can certainly tell you that we use MC3 and that, you know, it's probably – you can infer from the – from the patent that's the LNP that you would use.** The key point here is that – it's the sheer fact that it is an LNP that is developed here. It is not necessarily the specific formulation. Q. Understood. So Example 23 and 24 [in Moderna's '600 patent], you use the formulation that was described in Example 20, right? **A. Yeah, it was MC3 in this case. Q. And the Example 20 formulation, that was the only LNP that you had tested in the animal studies for a MERS vaccine, correct? A. I can't recall, but I believe at that time – that would be at that time, but, yeah, again** . . . Q. And so if we look at Example 20, that's a specific ratio of the various lipids that have been tested, correct? Let me rephrase. That's – in Example 20, the LNP that's described has a specific ratio of various lipids, correct? **A. There is a particular ratio, and I think that, you know, would describe MC3, if I remember correctly.** Again, the important point here is, you know, if you essentially try the experiments, if you generated that LNP, you would be able

998

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

(when it concluded that "LNP will be the first format to enter the clinic with the antibody mRNA from Moderna."[3547]) through early-2017 (when Moderna "pivoted" to SM-102[3548], but continued to use Tekmira's LNP).    In or about October 2018, Moderna purported modified its "vaccine platform" formulation to 48%, but again continued to use Tekmira's LNP, including in

---

to generate an immune response.  But if you made other LNP formulations, it is our data that would show that you can still generate the immune response.  Some will work better than others. There are many things that you need to optimize for, as I mentioned, you know, before you actually develop the drug product.  But with the extent of the invention, this is an example of an LNP that if you were to use it to encapsulate mRNA, you will see an immune response to a betacoronavirus." (emphasis added)); 134:11-134:19 ("**Q. So just to be clear, though, the examples we just looked at, Example 20 to 24 [in Moderna's '600 patent], use one specific formulation of LNP, right?  A. For convenience sake, we have used in those examples MC3.** We have evidence across a variety of subsequent studies to suggest that as long as you generate an LNP that encapsulates messenger RNA and use it for intramuscular you can generate immune response." (emphasis added)); 135:8-135:14 ("**Q. And to be clear, with respect to the MERS vaccine, there's only one formulation that's disclosed, right?  A. As an example, we have used MC3 in that case.  We could have used other LNPs.  It was just a convenience selection on the basis of what was available at the time**." (emphasis added)).

[3547] MRNA-GEN-02204816-901, at 864 ( "Final progress report (IPR) for Moderna Grant W911 NF-13-1-0417*," August 14, 2014  (summarizing "the research data generated between October 2013 and the end of July 2014."), PDF p. 49 of 86 ("Due to the modest and somewhat variable performance of the poloxamine/buffer technology, and considering current lack of pharmaceutical use in current products (requirement for special tox studies), the evaluation has been deprioritized relative to LNP formulations.  **LNP will be the first format to enter the clinic with the antibody mRNA from Moderna**. . . .").

[3548] *See, e.g.,* May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 165:9-165:13 ("A. we had by 2017 moved away from MC3 as a delivery systems, and I think from 2017 forward all of our work, to my knowledge, was SM-102 as a delivery systems for vaccines, SM-86 for therapeutics, . . ."); 170:9-170:13 ("A. [B]y 2017 we had pivoted to SM-102 and our internally developed lipid nanoparticle technologies and had no longer been pursuing licensing of the Acuitas or Tekmira lipids.").

999

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

formulations with 50% cationic lipid.[3549] .[3550]    I understand from Dr. Mitchell that both formulations infringe the Patents-in-Suit.[3551]

1482.    As of May 31, 2020, Moderna had no clinical data regarding the purported modified "vaccine platform" formulation.  At that time, Moderna's mRNA-1647 (CMV) Phase 2 clinical trial with the new formulation was ongoing, however, it did not report the results until September 17, 2020—months after the hypothetical negotiation.  Applying the mRNA-1647 (CMV) results to mRNA-1273 would take additional time.  Mr. Kramarczyk testified: "We continue to verify any internal prior knowledge as we apply it to new programs every time to confirm conclusions in the context of new mRNA molecules."[3552]  In addition, *all* of Moderna's prior clinical studies were based on Genevant's patented technology.  As such, on May 31, 2020 Moderna would recognize that it could not maintain its lead over the competition without immediately obtaining a license from Genevant.

---

[3549] MRNA-GEN-01510948-950, at 948-949 (Parsons Deposition Exhibit No. 8 – October 7, 2018 email from Stephen Hoge to Don Parsons, Subject: Re: Composition of KRAS reload). *See also* MRNA-GEN-00601067-089, at 070, 075, 084, 087 (Kramarczyk Deposition Exhibit No. 12 – "Infectious Disease Vaccines: SM-102 LNP Platform Process, 2019 Process capabilities are listed, not operating targets," *Moderna,* March 14, 2019/Updated January 15, 2020, Slides 4, 8, 18, 21 of 24) (showing "Final Lipid Content" of 50:10:38.5:1.5 in Phase 1 of mRNA-1647 (CMV), mRNA-1893 (Zika), and mRNA 1653 (HMPV-PIV3), and mRNA-5671 (KRAS)).
[3550] MRNA-GEN-01510948-950, at 948-949 (Parsons Deposition Exhibit No. 8 – October 7, 2018 email from Stephen Hoge to Don Parsons, Subject: Re: Composition of KRAS reload). *See also* MRNA-GEN-00601067-089, at 070, 075, 084, 087 (Kramarczyk Deposition Exhibit No. 12 – "Infectious Disease Vaccines: SM-102 LNP Platform Process, 2019 Process capabilities are listed, not operating targets," *Moderna,* March 14, 2019/Updated January 15, 2020, Slides 4, 8, 18, 21 of 24) (showing "Final Lipid Content" of 50:10:38.5:1.5 in Phase 1 of mRNA-1647 (CMV), mRNA-1893 (Zika), and mRNA 1653 (HMPV-PIV3), and mRNA-5671 (KRAS)).
[3551] November 25, 2024 Expert Report of Michael Mitchell, Ph.D, Section XVI.
[3552] April 30, 2024 Deposition of John Kramarczyk, 145:14-145:17.  *See also* 146:13-146:22 ("Q. . . . My question was, you mentioned that you have to verify the learnings every time you carry over the results to a new program.  I am wondering if you're aware of any such results where you tested it on the COVID platform and it turned out different between the two programs? . . . A. I'm not sure, actually.  I didn't – I wasn't involved in the process characterization for mRNA-1273."); 147:6-147:17 ("Q. Do you think that the conclusions that you reached [re: mRNA-1647 (CMV)] related to PEG addition, for example, helped inform the formulation and design considerations for the COVID platform?  . . . A. I think the design considerations for our COVID vaccine were in the hands of the team developing the COVID vaccine.  Q. Okay.  A. And they may have had access to this report.  And I'm not sure if they used the conclusions or not.").

1000

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1483. As discussed above, Moderna was projecting substantial profits per dose. Moderna would recognize that all of its projected mRNA-1273 profits were at risk—along with the derivative benefits including but not limited to the ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████[3553]

1484. Given the foregoing and that Moderna had "bet the company" on mRNA-1273, Genevant would be "in the driver's seat in the negotiations and would have required [Moderna] to pay a hefty portion of its profits for a license."[3554]

1485. Thus, *Georgia-Pacific* Factor No. 8 indicates that Moderna would agree to pay a royalty based on a profit split up to 50%|50% of its projected profits, or $9.254/dose during the pandemic phase and $13.21/dose during the *endemic* phase.

>  **(ii)**     Factor No. 11: *The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.*

1486. Factor No. 11 addresses how much the patented invention has been used.[3555] Implicit in this factor is the premise that an invention used frequently is generally more valuable than a comparable invention used infrequently.[3556] Like the other factors in this group, Factor No. 11 provides information about how the parties would have valued the patented feature during the hypothetical negotiation.[3557]

1487. Consideration of evidence of usage after infringement started can, under appropriate circumstances, be helpful in assessing whether a royalty is reasonable.[3558] Usage or similar data may provide information that the parties would frequently have estimated during the negotiation.[3559] Depending on the case, usage data might come from sales projections based on past sales, consumer surveys, focus group testing, and other sources.[3560] Even though parties to a

---

[3553] MRNA-GEN-01251960-028, at 961 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," *Moderna,* n.d. (May 20, 2020), Slide 2 of 69) ("Executive Summary").
[3554] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 502 (S.D.N.Y. 2013).
[3555] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1333 (Fed. Cir. 2009).
[3556] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1333 (Fed. Cir. 2009).
[3557] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1333 (Fed. Cir. 2009).
[3558] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1333-34 (Fed. Cir. 2009).
[3559] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1333-34 (Fed. Cir. 2009).
[3560] *Lucent Techs., Inc., et al. v. Gateway, Inc.*, et al., 580 F.3d 1301, 1334 (Fed. Cir. 2009).

1001

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

license negotiation will usually not have precise data about future usage, they often have rough estimates as to the expected frequency of use.[3561] Consideration of usage data will be guided by what parties regularly do during real-world licensing negotiations.[3562]

1488. <u>Discussion of Factor No. 11</u>: Moderna's projections as of May 31, 2020 were discussed in detail above and show that Moderna expected to make and has made extensive use of the inventions disclosed in the Patents-in-Suit. *See* VI.D.3.c. These projections show that Moderna expected to sell 1 billion doses, which would generate billions in revenue and profits that it planned to reinvest in its existing and future drug pipeline to generate ███████ in equity value during the "5-year planning horizon" that was comprised of: ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████."[3563] In contrast, because Moderna refused to take a license, Genevant did not have the royalties that it could have plowed back into its pipeline during the past more than four years from 2020 to date. Given the emerging nature of the mRNA market, Genevant was deprived of making investments during a critical window of opportunity.

1489. Thus, *Georgia-Pacific* Factor No. 11 indicates that a royalty rate ***<u>at the higher end of the range</u>*** is appropriate in view of Moderna' extensive use.

(b)    **Comparative Utility and Non-Infringing Alternatives**

*(i)*    Factor No. 9: *The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.*

1490. Factor No. 9 addresses the comparative utility of the patented invention. In particular, the comparative analysis is based on the advantage(s) of the patented invention compared to the closest

---

[3561] *Lucent Techs., Inc., et al. v. Gateway, Inc.*, et al., 580 F.3d 1301, 1334 (Fed. Cir. 2009).

[3562] *Lucent Techs., Inc., et al. v. Gateway, Inc.*, et al., 580 F.3d 1301, 1334 (Fed. Cir. 2009).

[3563] ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████

1002

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

prior art.[3564]   The existence of non-infringing alternatives open to the infringer is also considered.[3565]  The theory is that a willing licensee in a hypothetical negotiation would have been less disposed to agree to a high royalty if it had available non-infringing alternatives that were equal or nearly equal in terms of cost and performance.[3566]

1491.   Discussion of Factor No. 9:  As discussed in detail above, as of May 31, 2020, Moderna had no available, acceptable, non-infringing alternative that was ready to go.  In addition, at that time, Moderna had no clinical data regarding the purported modified "vaccine platform" formulation.  At that time, Moderna's mRNA-1647 (CMV) Phase 2 clinical trial with the new formulation was ongoing, however, it did not report the results until September 17, 2020—months after the hypothetical negotiation.  As such, Moderna's only option would be to accept a license on terms that Genevant was "in the driver's seat" to demand.

1492.   Thus, *Georgia-Pacific* Factor No. 9 indicates a royalty rate ***at the higher end of the range*** in view of the importance of the claimed invention of the Patents-in-Suit to Moderna, and the lack of acceptable, available, non-infringing alternatives.

(c)   **Collateral Benefits and Convoyed Sales**

*(i)*   Factor No. 6:  *The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.*

1493.   Factor No. 6 addresses collateral benefits including convoyed sales of parts, supplies, accessories and related products that flow or would be expected to flow to the infringer from the right to

---

[3564] Lucent Technologies, Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1335 (Fed. Cir. 2009).

[3565] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-227.

[3566] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-227 – 229.

1003

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

manufacture, use, or sell the patented invention.[3567]  "Both the hypothetical licensor's expectant loss of collateral sales and the hypothetical licensee's expectation of profits on its collateral sales are relevant elements to be considered in determining a reasonable royalty."[3568]  The theory is that a willing licensee in a hypothetical negotiation to set a reasonable royalty would have been more disposed to agree to a high royalty if he or she could expect to derive such collateral benefits.[3569]  If "the patented invention generates valuable sales of products not covered by the patent," then "[t]his factor weighs in favor of a higher royalty rate."[3570]  This factor is based on the assessment of business practice and custom.[3571]  Convoyed sales affect the royalty determination in two ways.  First, it may affect the selection of the royalty rate.  Second, it may affect the royalty base.[3572]

1494.  <u>Discussion of Factor No. 6</u>:  Moderna's May 20, 2020 "MRNA 5-yr accelerated plan" shows that it expected to plow the expected cash flow from mRNA-1273 back into its pipeline to generate ██████ in equity value, which Moderna further described as follows: "█████████████████████████████████████████████ ████████," which it defined as ████████████████████ ████████,"[3573] and added: ███████████████████████ ████████████████"[3574]



---

[3567] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-234.

[3568] Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1132 (S.D.N.Y. 1970).

[3569] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, pp. 20-235 – 236.

[3570] Medtronic Sofamor Danek USA, Inc. et al. v. Globus Medical, Inc., 637 F. Supp. 2d 290 (E.D. Pa. 2009).

[3571] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-236.

[3572] *See, e.g.*, Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., *Litigation Services Handbook:  The Role of the Financial Expert*, (New York:  John Wiley & Sons, Inc., 2001), p. 24-22.

[3573] ████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████

[3574] ████████████████████████████████████████████ ████████████████████████████████████████████

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1495.	Thus, *Georgia-Pacific* Factor No. 6 indicates a royalty rate ***at the higher end of the range*** in view the substantial quantified derivative economic benefits that are causally connected to the alleged infringement in this case.

> (d)	**Improvements, Small Parts, and Apportionment**

> *(i)*	Factor No. 13:  The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the *manufacturing process, business risks, or significant features or improvements added by the infringer.*

1496.	Factor No. 13 addresses the relation between the claimed invention of the patent and the infringer's commercial product or process,[3575] and is aimed at elucidating how the parties would have valued the patented feature during the hypothetical negotiation.[3576]  The theory is that a willing licensee in a hypothetical negotiation with a willing licensor would have been less disposed to agree to a high royalty if the patented feature is a small or unimportant part, physically or economically of the licensee's product or process.[3577]  The relative contribution of the patented feature often is a difficult matter to determine.[3578]  Further, the weight properly accorded to this factor may vary greatly with the circumstances.[3579]  The amount of profit that can be properly attributed to the patented invention generally cannot be reduced to a simple mathematical computation but rather will depend on the balance between infringing and non-infringing features in the context of customer demand.[3580]

---

[3575] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-239.

[3576] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1332 (Fed. Cir. 2009).

[3577] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-239 – 240.

[3578] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-240.

[3579] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-240.

[3580] *Lucent Techs., Inc., et al. v. Gateway, Inc.*, et al., 580 F.3d 1301, 1332 – 1333 (Fed. Cir. 2009).

1005

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1497.   Discussion of Factor No. 13:  Apportionment was discussed in detail above.  *See* VI.D.3.e.

1498.   Thus, *Georgia-Pacific* factor No. 13 is ***neutral***, and does not indicate further adjustment to the royalty rate.

> (e)    **State of Development and Commercial Success**
>
> > *(i)*    Factor No. 10:  *The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.*

1499.   Factor No. 10 addresses the invention's advantages,[3581] and is also aimed at elucidating how the parties would have valued the patented feature during the hypothetical negotiation.[3582] Examination of the advantages includes whether the claimed invention provides distinguishing features to the product or process; whether the claimed invention has attributes that the company can use to promote the product or that customers demand; whether the claimed invention has been widely adopted by the infringer and consumers; and whether the claimed invention provides significant benefits to those that use it.[3583]  Utility and advantage influence the reasonable royalty rate only if they affect the product's market value.[3584]

1500.   Discussion of Factor No. 10:  The advantages and benefits of the inventions disclosed in the Patents-in-Suit were discussed in detail above.  The Patents-in-Suit enabled mRNA products generally, which includes Moderna's mRNA-1273.  Years before the May 31, 2020 hypothetical

---

[3581] *See, e.g.*, Peter B., Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., "Chapter 24 – Patent Infringement Damages," *Litigation Services Handbook:  The Role of the Financial Expert*, (New York:  John Wiley & Sons, Inc., 2001), p. 24-24.

[3582] Lucent Techs., Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1332 (Fed. Cir. 2009).

[3583] *See, e.g.*, Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., *Litigation Services Handbook:  The Role of the Financial Expert,* (New York:  John Wiley & Sons, Inc., 2001), p. 24-24.

[3584] *See, e.g.*, Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *in* Roman L. Weil, Michael J. Wagner, Peter B. Frank, Eds., *Litigation Services Handbook:  The Role of the Financial Expert*, (New York:  John Wiley & Sons, Inc., 2001), p. 24-25.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

negotiation, in an August 14, 2014 progress report to the U.S. Government, Moderna recognized that Genevant's LNP was "close to optimal for mRNA,"[3585] and less than a year later, in April 2015, a presentation to Moderna's Board of Director described included a slide that stated: "Tekmira's LNP <u>Enable</u> mRNA Products" and "mRNA require intracellular delivery for activity[;] LNP is the GOLD STANDARD for <u>mRNA</u> delivery[.]"[3586]

1501. Moderna's witnesses have testified that the patented formulation was Moderna's "standard LNP"[3587] which it continued to use for years—even after the January 26, 2017 injunction in the Arbutus-Acuitas litigation.    From at least December 2016 through June 2021, Moderna has repeatedly, and falsely, claimed that it is not using the Patents-in-Suit.

---

[3585] MRNA-GEN-02204816-901, at 868 ("Final progress report (IPR) for Moderna Grant W911 NF-13-1-0417*," August 14, 2014  (summarizing "the research data generated between October 2013 and the end of July 2014."), PDF p. 53 of 86 ("While the design space of MC3 formulations is still being evaluated and refined, both in terms of formulation and especially process conditions, initial indications are that a formulation similar to the quantitative composition of ALN-TTR-02 is close to optimal for mRNA. The main difference introduced by Moderna is use of higher concentrations of the nucleic acid, with a target of at least 2 mg/mL compared with <1 mg/mL for the nucleic acids in siRNA formulations. It is important to note that the lipid concentration, scale proportionally with the nucleic acid content. The physical and chemical stability of formulations is under active study using the range of characterization technology available at Moderna: light scattering, gel electrophoresis, uPLC/CAD (lipid analysis), fluorescence, electron microscopy, etc.").

[3586] MRNA-GEN-01240180-198, at 191 (Francis Deposition Exhibit No. 27 – "Business Development Update – Moderna Investment Committee Discussion," *Moderna,* April 9, 2015, Slide 12 of 19) ("Tekmira ( -2014) – an RNA and LNP company").  May 22, 2024 30(b)(6) Deposition of Said E. Francis, 195:18-196:7 ("Q. And you've selected to display here a slide that says, 'Tekmira's LNP Enable mRNA Products.'  Do you see that?  A. That's a screen shot of a Tekmira slide where they presented themselves as – with the title that you read.  So that's their presentation of themselves.  Q. And you decided to select that slide and include it in this presentation to a subcommittee of Moderna's board, correct?  A. As an update, yes.").

[3587] *See, e.g.,* November 17, 2023 Deposition of Sunny Himansu (*Moderna v. Pfizer*), 203:6-203:23 ("Q. Okay, let's talk about the LNPs you actually described using.  Let's go to column 212 [of Moderna's '600 patent]: This is where we're getting into the betacoronavirus studies, column 212, line 47.  'In experiments where a lipid nanoparticle formulation is used, the formulation may include a cationic lipid, non-cationic lipid, PEG lipid and structural lipid in the **ratio of 50 to 10 to 1.5 to 38.5.'**  You go on to specify, 'The cationic lipid, the non-cationic lipid (DSPC), the PEG lipid, and the structural lipid is cholesterol.'  Do you see that?  A. Yes.  Q. Is it your testimony that you or Moderna thought of this formulation?  **A. Moderna was using MC3 lipid and the ratios of the composition as our standard LNPs to test vaccines at the time. That's what was accessible to me.  That's what I used.** . . ." (emphasis added)).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1502.   Thus, *Georgia-Pacific* Factor No. 10 indicates a royalty rate ***at the higher end of the range*** in view of the importance of the claimed invention of the Patents-in-Suit to Moderna, and the lack of acceptable, available, non-infringing alternatives.

                                                                   (f)      **Duration of the Patent**

                                                                            ***(i)***      Factor No. 7:  *The duration of the patent and the term of the license.*

1503.   Factor No. 7 addresses the duration of the patent term that remained when the infringement began.[3588]  The theory is that a willing licensee in a hypothetical negotiation with a willing licensor would have been more disposed to agree to a high royalty the longer the remaining term of the patent.[3589]  A longer term would allow the licensee to establish strong customer relations that would persist after patent expiration, and would render the alternative of waiting until patent expiration less feasible.[3590]  This factor is rarely given decisive or even substantial effect.[3591]

1504.   <u>Discussion of Factor No. 7:</u>  I understand that the '651 Patent expired on June 30, 2023,[3592] and the molar ratio patents will expire on April 15, 2029.[3593] Thus, as of May 31, 2020, the remaining patent terms ranged from about three (3) years for the '651 patent, and nearly nine (9) years for the Lipid Composition Patents.  As such, waiting until the Patents-in-Suit expired was not an economically viable option given the urgency of the pandemic, the importance of time to market, and the perceived "narrow window" of opportunity.  In view of the circumstances, the remaining patent term of the Patents-in-Suit does not provide further insight regarding the royalty rate range.

1505.   Thus, *Georgia-Pacific* Factor No. 7 is ***neutral.***

---

[3588] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-244.
[3589] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-245.
[3590] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-245.
[3591] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-245.
[3592] U.S. Patent No. 9,504,651.
[3593] U.S. Patent No. 8,058,069, U.S. Patent No. 8,492,359, U.S. Patent No. 8,822,668, U.S. Patent No. 9,364,435.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

(g)      **Conclusion Regarding "*Georgia-Pacific* Range Factors"**

1506.  In this case, of the seven "*Georgia-Pacific* Range Factors," collectively, indicate a royalty rate at the higher end of the range.

(iii)      *Georgia-Pacific* **Factor No. 15 – Hypothetical Negotiation for the Patents-in-Suit**

1507.  *Georgia-Pacific* Factor No. 15 has been described as the "most important"[3594] aspect, the "theoretical underpinning,"[3595] and the "overarching consideration"[3596] of a *Georgia-Pacific* analysis.  As discussed above, *Georgia-Pacific* Factor No. 15 outlines the hypothetical negotiation and defines the reasonable royalty as:

> The amount that a licensor (such as the patentee) and the licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

1508.  The patent statute requires that the measure of damages be:

> adequate to compensate for the infringement but in no event less than a reasonable royalty, together with interest and costs fixed by the court.[3597]

1509.  A reasonable royalty represents the damages floor.[3598]

1510.  In this case, the reasonable royalty must be adequate to compensate Genevant for Moderna's alleged infringement of the Patents-in-Suit.  Furthermore, Moderna "would have taken into consideration all advantages which might accrue to it in determining a royalty which it would be

---

[3594] Amy L. Landers, "Let the Games Begin: Incentive to Innovation in the New Economy of Intellectual Property Law," *Santa Clara Law Review,* 2006, p. 327, fn 5.

[3595] Richard F. Cauley, *Winning the Patent Damages Case,* (Oxford:  Oxford University Press, 2008), p. 23, fn 47.

[3596] Thomas F. Cotter, "Four Principles for Calculating Reasonable Royalties in Patent Infringement Litigation," *Santa Clara Computer and High Technology Law Journal,* 2001, p. 729, fn 5.

[3597] 35 U.S.C. § 284.

[3598] *King Instruments Corporation v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995).

1009

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

willing to pay,"[3599] including the derivative advantages it expected to realize that are causally connected to the alleged infringement.

1511.   In determining a reasonable royalty, the economics of the patented technology and the accused product(s) are studied.  The outcome of the hypothetical negotiation depends on a number of factors including the market power conferred by the patent, the relative bargaining power of the parties to the hypothetical negotiation—in this case, Genevant and Moderna—at the time of the hypothetical negotiation on May 31, 2020, the availability of acceptable non-infringing substitutes, and the market situation at the time of the negotiation.  The *Georgia-Pacific* factors qualitatively address many of the factors that determine the respective bargaining positions of the parties to the hypothetical negotiation.

1512.   The bargaining position of the respective parties establishes the negotiation outcome in terms of where within the feasible range of royalty rates the parties would have agreed.

(a)    **Determinants of Bargaining Position and Bargaining Power**

1513.   At the time of the hypothetical negotiation on May 31, 2020, the key facts would have been known to both parties because the hypothetical negotiation "contemplate[s] marshaling of all the pertinent facts which, like cards dealt face up, are for all to see."[3600]  These facts were discussed in detail in this report and will not be repeated again here.

1514.   Based on the information and analysis set out in this report including the expert opinions of Genevant's other experts, Dr. Michael Mitchell, Dr. Frederick Porter, Kimberly Benton, and for the reasons stated in this report, Genevant would be "in the driver's seat in the negotiations and would have required [Moderna] to pay a hefty portion of its profits for a license"[3601]

(b)    **Summary of Bargaining Position and Bargaining Power**

1515.   In general, a licensor's bargaining position and power is increased when:  a) there are no acceptable, available, non-infringing alternatives, b) it is more costly and difficult for the infringing party to "invent around" the patented technology, c) the intellectual property is

---

[3599] Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116, 1132 (S.D.N.Y. 1970).

[3600] Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116, 1122 (S.D.N.Y. 1970).

[3601] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 502 (S.D.N.Y. 2013).

1010

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

paramount, and the complementary assets and skills needed to commercialize the innovation are readily available from a variety of sources,[3602] and d) the patent owner or licensor is a competitor of the infringer, had the capacity to make the infringer's sales or production, and followed a general policy of refusing to grant licenses.[3603]  "In this case, it is useful to approach this analysis by analyzing the basic negotiating positions of each party[,] . . . [which] necessarily takes into account almost all the *Georgia-Pacific* factors."[3604]

**(i)** Moderna's Position

1516.  "[M]oderna's negotiating position would have been shaped by one basic concern.  Because [Moderna] expected to (and did) make substantial profits from its sales of [mRNA-1273], it would be willing to pay a large share of those profits for the right to use the patents in [May 2020]."[3605]  In particular, Moderna would recognize that all of its projected mRNA-1273 profits were at risk— along with the derivative benefits including but not limited to the ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████ "[3606]  "In deciding how large a share of its profits it would pay, however, [Moderna] would have carefully evaluated the cost and delay associated with developing and obtaining approval for the sale of an alternative formulation that did not infringe the Patents."[3607]  Moderna would conclude that it had no alternatives in view of its "path of least risk" business strategy and the fact that no delay would be acceptable in view of the circumstances as of May 31, 2020.

1517.  Veteran reporter and author, Peter Loftus, described Moderna's situation in early 2020 as follows:

> At the start of 2020, Moderna was a biotech unicorn with dim prospects.  Yes, there was the promise of its disruptive innovation that could transform medicine by using something called mRNA, one of the body's building blocks of life, to combat disease.  But its stock was under water.  There were reports of a toxic work culture.

---

[3602] David J. Teece, *Managing Intellectual Capital*, (New York: Oxford University Press, 2002), p. 151.

[3603] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-214.

[3604] *AstraZeneca AB v. Apotex*, 985 F. Supp. 2d 452, 497 (S.D.N.Y. 2013).

[3605] *AstraZeneca AB v. Apotex*, 985 F. Supp. 2d 452, 497 (S.D.N.Y. 2013).

[3606] ████████████████████████████████████████████████ ████████████████████████████

[3607] *AstraZeneca AB v. Apotex*, 985 F. Supp. 2d 452, 497 (S.D.N.Y. 2013).

1011

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

> And despite ten years of work, the company was still years away from delivering its first product. Investors were getting antsy, or worse, skeptical.[3608]

1518. In addition, "there were signs of an impending nosedive . . ."[3609] following the failure "to enroll the first patient in [its] MMA [mRNA-3704] study in 2019,"[3610] which Mr. Bancel described as "our biggest execution disappointment of the year. We knew it was going to be difficult, as this is our first rare disease trial and the first MMA medicine to ever begin clinical testing."[3611] "For Moderna, it [COVID-19] arrived just in time. . . ."[3612]

1519. Facing serious headwinds, Moderna "bet the company" on mRNA-1273 knowing that it was just "one misstep" away from being a "goner." As Dr. Hoge stated: "We had bet the company on a Covid-19 vaccine, but one misstep last year and Moderna and possibly mRNA vaccines were goners[.]"[3613] On May 31, 2020, Moderna was facing what then looked like a potentially catastrophic "misstep." Moderna had built its mRNA platform on Genevant's patented LNP, which it had concluded years earlier (in August 2014) was "close to optimal for mRNA."[3614] In fact,

---

[3608] Peter Loftus, The Messenger: Moderna, the Vaccine and the Business Gamble That Changed the World, dust cover.

[3609] Robert Kuznia, Katie Polglase, Gianluca Mezzofiore, "In quest for vaccine, US makes 'big bet' on company with unproven technology," *CNN,* May 1, 2020, *available at* https://www.cnn.com/2020/05/01/us/coronavirus-moderna-vaccine-invs/index.html.

[3610] Stéphane Bancel, "Moderna 2019 Shareholder Letter," *Moderna,* January 3, 2020, *available at* https://www.modernatx.com/en-US/media-center/all-media/blogs/moderna-2019-shareholder-letter.

[3611] Stéphane Bancel, "Moderna 2019 Shareholder Letter," *Moderna,* January 3, 2020, *available at* https://www.modernatx.com/en-US/media-center/all-media/blogs/moderna-2019-shareholder-letter.

[3612] Robert Kuznia, Katie Polglase, Gianluca Mezzofiore, "In quest for vaccine, US makes 'big bet' on company with unproven technology," *CNN,* May 1, 2020, *available at* https://www.cnn.com/2020/05/01/us/coronavirus-moderna-vaccine-invs/index.html.

[3613] Gregory Zuckerman, "How Moderna nearly lost the race to develop a Covid-19 vaccine," *STAT,* October 26, 2021, *available at* https://web.archive.org/web/20211026113555/https://www.statnews.com/2021/10/26/how-moderna-nearly-lost-the-race-to-develop-a-covid-19-vaccine/.

[3614] MRNA-GEN-02204816-901, at 868 ("Final progress report (IPR) for Moderna Grant W911 NF-13-1-0417*," August 14, 2014 (summarizing "the research data generated between October 2013 and the end of July 2014."), PDF p. 53 of 86 ("While the design space of MC3 formulations is still being evaluated and refined, both in terms of formulation and especially process conditions, initial indications are that a formulation similar to the quantitative composition of ALN-TTR-02 is close to optimal for mRNA. The main difference introduced by Moderna is use of higher concentrations of the nucleic acid, with a target of at least 2 mg/mL

1012

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Genevant's LNP was Moderna's "standard LNP" which it continued to use even after the January 26, 2017 injunction in the Arbutus-Acuitas litigation. For example, Moderna used its "standard LNP" in all of its clinical trials from 2015 through at least late-2019. Dr. Zaks testified: "Remember for us in 2020, when the COVID started, we had successfully immunized – we had tried to immunize people, human beings, against eight different viruses by the beginning of 2020. **And our track record in the clinic was 8 out of 8. For us, COVID was number 9. I had a high expectation and conviction that this would work.**"[3615]

1520. But by mid-May 2020, Moderna was in a race with big pharma companies and was attempting to capitalize on what it viewed as a "narrow window" of opportunity. Moderna's strategy was to be first to clinical trials, and parlay that lead into a first to market advantage. And Moderna was not taking any chances. As Moderna's Dr. Stewart-Jones testified: "I was . . . pushing the program forward as rapidly as possible,"[3616] and "all optimal technologies were brought to bear on this challenge. **We needed to bring together the optimal LNPs**, . . ."[3617] In addition, Moderna **"followed a path of least risk"**[3618] and "decided to not tinker" because "that might introduce additional risk into the vaccine's performance[.]"[3619] Moderna pursued "de-risking measure[s

---

compared with <l mg/mL for the nucleic acids in siRNA formulations. It is important to note that the lipid concentration, scale proportionally with the nucleic acid content. The physical and chemical stability of formulations is under active study using the range of characterization technology available at Moderna: light scattering, gel electrophoresis, uPLC/CAD (lipid analysis), fluorescence, electron microscopy, etc.") (emphasis added).

[3615] MRNA-GEN-01734848-096, at 920 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (Pfizer), 73:1-73:10.).

[3616] December 15, 2023 Deposition of Guillaume Stewart-Jones (Pfizer), 104:7-104:9.

[3617] December 15, 2023 Deposition of Guillaume Stewart-Jones (Pfizer), 194:13-194:16 (emphasis added).

[3618] December 15, 2023 Deposition of Guillaume Stewart-Jones (*Moderna v. Pfizer*), 79:6 (emphasis added). *See also* 79:2-79:11 ("A. . . . We needed to de-risk the design as much as possible at this stage given the emerging pandemic that was occurring, and so we needed to ensure that the decisions we made around the antigen design followed a path of least risk, and so we decided to include the 2P mutations going forward as a company. Or at least my recommendation to the company was to do that. [C]an't speak for the company. And so it was generally accepted.").

[3619] December 15, 2023 Deposition of Guillaume Stewart-Jones (*Moderna v. Pfizer*), 166:4-166:6.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

because we didn't want to be caught in Phase II or in Phase III not getting the optimal immunogenicity, . . ."[3620]

1521. Given that Moderna "bet the company" on mRNA-1273 and repeatedly told investors that mRNA-1273 was using the very same LNP as its prior clinical trials,[3621] it would not bench its proven LNP that Dr. Zaks claimed was 8 for 8 in clinical trials[3622] for an untested and unproven alternative. While Moderna had manufactured a Lot of mRNA-1647 (CMV) with a different formulation, in June 2019—it did *not* choose this formulation for mRNA-1273. In addition, while mRNA-1647 (CMV) Phase 2 clinical testing was ongoing as of May 31, 2020—the results were both not available (and "First interim results" were not expected until 3Q2020[3623]) and even if they were, would be difficult to interpret because Moderna had made changes to *both* the LNP formulation *and* the mRNA in mRNA-1647 (CMV).[3624]

---

[3620] December 15, 2023 Deposition of Guillaume Stewart-Jones (*Moderna v. Pfizer*), 188:11-188:13.

[3621] *See, e.g.,* "Moderna, Inc. (MRNA) CEO Stephane Bancel at Morgan Stanley 18th Annual Global Healthcare Conference (Transcript)," *Seeking Alpha,* September 14, 2020, p. 4 of 16, (Stephane Bancel, CEO: "But we do want to go down into the pediatric, down to pretty low edge for people on the call that are not aware for **hMPV/PIV3 vaccine, we have already gone down to the pediatric setting**. So this is not news for Moderna, like other mRNA vaccine companies that are not on pediatric yet. **We have already done it with the same lipid system, same chemistry, same manufacturing process as what is in 1273.** So I don't see any reason why we should not, at the right time in terms of safety, going to the pediatric." (emphasis added)). "Corporate Presentation," *Moderna,* March 2020, Slide 22 of 37, *available at* https://static.seekingalpha.com/uploads/sa_presentations/157/53157/original.pdf ("Pediatric RSV vaccine (mRNA-1345) . . . mRNA-1345 will use the same LNP as our hMPV/PIV3 (mRNA-1653) and CMV (mRNA-1647) vaccines . . .").

[3622] MRNA-GEN-01734848-096, at 920 (January 5, 2024 Deposition of Tal Zaks, M.D., Ph.D. (*Moderna v. Pfizer*), 73:1-73:10.).

[3623] *See, e.g.,* "Corporate Presentation," *Moderna,* March 2020, Slide 17 of 37, *available at* https://static.seekingalpha.com/uploads/sa_presentations/157/53157/original.pdf.

[3624] April 30, 2024 Deposition of John Kramarczyk, 151:22-153:1 ("Q. . . . And do you know – are you aware of any differences in clinical endpoints between the earlier phases and Phase 202 or 301 [of mRNA-1647 (CMV)]? . . . A. The row behind the lipid content describes the mRNA ratios that changed between those two phases. And it was understood and expected that changing those mRNA ratios – and that's the ratio of the six mRNA amongst each other – could have impact on the amount of protein expression of the six proteins. And the immunogenicity would reflect that. And I don't recall well enough the immunogenicity data comparison between Phase 101 and Phase 202, so I can't be concrete other than to reflect that there were differences particularly at the lower dose levels. Q. Are those differences in the amount of mRNA in the LNPs or is that a readout of some sort? I'm just trying to understand what that mass percent

1014

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1522. Furthermore, the evidence shows that while Moderna apparently investigated purported alternatives to Genevant's patented formulation, it continued to its "standard LNP" in all of its clinical trials. For example, in June 2017, months after the January 26, 2017 injunction in the Arbutus-Acuitas litigation—Dr. Parsons testified that the LNP composition Moderna was used in its clinical trials at that time was **50% ionizable lipid**.[3625] Dr. Parsons testified: "Moderna had been evaluating formulations to optimize them for the purposes of messenger RNA for its history"[3626] and already "had a formulation that was in the clinic."[3627] In early-June 2017, Dr. Hoge directed Moderna personnel to "advance an alternative composition"—even though Moderna's objective was "to seek the optimum, whatever that optimum might be,"[3628] which presumably was the formula Moderna had in the clinic at the time. Dr. Hoge testified that he was "asking [Moderna] evaluate an alternative set of compositions for performance"[3629] and that he "was telling Örn [Almarsson] and Don [Parsons] in no uncertain terms that I wanted them to do that regardless of whether or not colleagues that they had from a different portion of the organization wouldn't like the delay."[3630] Dr. Hoge's June 9, 2017 email to Dr. Parsons stated: ". **. . I would like to reemphasize that there are incredibly strong business reasons why a**

---

section is that you just referenced. A. Similar to the lipid mole percentages, these mRNA mass ratios are a design basis of how the product was designed."). MRNA-GEN-00601067-089, at 070 (Kramarczyk Deposition Exhibit No. 12 – "Infectious Disease Vaccines: SM-102 LNP Platform Process, 2019 Process capabilities are listed, not operating targets," *Moderna,* March 14, 2019/Updated January 15, 2020, Slides 4 of 24) ("mRNA-1647, CMV LNP Process changes" showing "Final Lipid Content" of 50:10:38.5:1.5 in Phase 101, and 48:11:38.5:3.0 in Phase 202 and also showing changes to "mRNA Ratios" in Phase 202 and Phase 301).

[3625] June 7, 2024 Deposition of Donald M. Parsons, Ph.D., 40:6-40:21 ("Q. Okay. And then moving to the two paragraphs later [in Parsons Deposition Exhibit No. 1], in the paragraph after the one we just talked about, he says that he wants to be presented with options to advance alternative compositions to the standard composition. Do you see that? A. Yes. Q. What's the standard composition? A. I believe that he's using imprecise language there so I can't be sure exactly what he was referring to, but I presume that he was referring to the composition we were using clinically at that time. Q. And did that have 50 percent ionizable lipid in it? A. Yes, it did.").

[3626] June 7, 2024 Deposition of Donald M. Parsons, Ph.D., 43:22-44:2.

[3627] June 7, 2024 Deposition of Donald M. Parsons, Ph.D., 46:18. *See also* 48:20-48:22 ("Q. And that was the formulation [with 50% ionizable lipid] that you brought to the clinic? A. Initially.").

[3628] June 7, 2024 Deposition of Donald M. Parsons, Ph.D., 46:5-46:7.

[3629] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 312:21-312:22.

[3630] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 313:18-313:22.

1015

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**composition with 40 percent amino lipid is more attractive.**  I would be willing to contemplate a delay to identify such a composition for one of the rare disease programs or CHIKVab.  **I've tried to underscore that preference for the last few months so this is nothing new.**"[3631]  Dr. Hoge further testified that "avoiding that [the patents covering amino lipids that are 50% and higher] would be in our interest."[3632]  Nonetheless, Moderna continued to use its "standard LNP" in all of its nearly all its clinical studies from December 2015 through at least early-2020.  Only later, in late-April 2020 after the U.S. Government's BARDA COVID-19 money was already flowing in, did the "incredibly strong business reasons" for an alternative LNP formulation escalate to become a truly "hot button issue" for Dr. Hoge.[3633]

---

[3631] MRNA-GEN-02619870-871, at 870 (Hoge Deposition Exhibit No. 30 – June 9, 2017 email from Stephen Hoge to Donald Parson, cc: Örn Almarsson, Subject: Composition).  May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 309:6-309:8 ("Q. You meant what you wrote here [Hoge Deposition Exhibit No. 30], correct?  A. Yes."); 311:15-312:4 ("Q. Okay, you say below, the next paragraph [Hoge Deposition Exhibit No. 30], 'I've tried to underscore that preference for the last few months so this is nothing new.'  Do you see that? A. Yes.  Q. So you had expressed to your scientists working under your direction that you had this preference for 40 percent amino lipid for several months, correct?  A. That's what I said, and I believe that to be true.").

[3632] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 308:1-308:15.

[3633] MRNA-GEN-01269810-811, at 810 (Smith Deposition Exhibit No. 11 – April 28, 2020 email from Don Parsons to Michael Smith, Subject: FW: Agenda for the TDLT Meeting w/S. Hoge on May 1st) ("In the PHL discussion, can you please confirm for Stephen that we will adjust the SM ratio?  As you know that's a hot button issue for him.").  May 14, 2024 Deposition of Michael H. Smith, Ph.D., 246:3-248:5 ("Q. All right.  And Dr. Parsons writes, 'Afternoon Mike.  . . . I meant to confirm that this meeting topic was on your radar at our one-to-one this morning.'  And then Dr. Parsons continues, 'In the PHL discussion, can you please confirm for Stephen that we will adjust the SM ratio?  As you know that's a hot button topic for him.'  Do you see that? A. Yes.  Q. The Stephen there that's being referred to is Dr. Stephen Hoge; is that right?  A. So yeah, I think I would deduce that from the subject line, because it says 'Meeting with S. Hoge.'  And Stephen, yeah, I think that's the case.  Q. Okay.  What is your understanding of why that's a – why the issue of the SM ratio is a hot button for Dr. Hoge? . . . A. I'm not sure what that means, as he said it, like a hot button for him.  I don't recall getting any more information on like hot button.  I'm not sure.  I'm not sure why.  I know it was discussed that we had sort of changed composition, but I would only be speculating on why he would think it's a hot button issue.  Q. Did you have an understanding whether the cationic lipid ratio was a hot button for Dr. Hoge before receiving this e-mail from Dr. Parsons? . . . A. To be honest, it would just be speculating on my part, because I haven't had a conversation with Stephen about this or didn't clarify what the hot button issue is.  So I couldn't give you a factual answer.  I don't know why Don wrote 'confirm for Stephen,' specifically it's 'a hot button issue.'  I don't know.").

1016

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1523. Notwithstanding the foregoing, in early-2020, when Moderna needed the "optimal LNP" for mRNA-1273, it once again turned to its "standard LNP." This, however, was Genevant's patented LNP, which Moderna's scientists described as the "gold standard" in an April 2019 article"[3634]—even though it still did not have a license.

1524. As of May 2020, Moderna was under severe time pressures and would have been "eager[] to obtain a license from [Genevant]."[3635] By mid-May 2020, while Moderna had the lead in COVID-19 clinical trials, it had lost its "head start in development" and "had fallen back into that pack" of J&J, Pfizer, and AstraZeneca—as Moderna executives advised its board of directors:

> Large companies (J&J, Pfizer, AZ) are using their balance sheets to secure early deliveries in advance of orders. Despite having a head start in development, Moderna has fallen back into that pack as we have waited for external funding. Any further delays in investing risks losing a share of the most valuable early deliveries.[3636]

At this time, Moderna recognized that "payers (e.g., governments, CEPI) are starting procurement exercises,"[3637] and Moderna needed to participate. In response, Moderna elected to raise risk

---

[3634] No Bates No. (Benenato Deposition Exhibit No. 9 – Kimberly J. Hassett, Kerry E. Benenato, Eric Jacquinet, Aisha Lee, Angela Woods, Olga Yuzhakov, Sunny Himansu, Jessica Deterling, Benjamin M. Geilich, Tatiana Ketova, Cosmin Mihai, Andy Lynn, Iain McFadyen, Melissa J. Moore, Joseph J. Senn, Matthew G. Stanton, Örn Almarsson, Giuseppe Ciaramella, Luis A. Brito, "Optimization of Lipid Nanoparticles for Intramuscular Administration of mRNA Vaccines," *American Society of Gene & Cell Therapy,* Vol. 15, April 2019, p. 8, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6383180/pdf/main.pdf.) ("LNP formulations were prepared using a modified procedures of a method previously described. Briefly, lipids were dissolved in ethanol at molar ratios of 50:10:38.5:1.5 (ionizable lipid:DSPC: cholesterol:PEG lipid). LNPs formulated with the ionizable lipid MC3 were used as a control throughout these studies and were produced as previously described.").
[3635] "Moderna Announces Award from U.S. Government Agency BARDA for up to $483 Million to Accelerate Development of mRNA Vaccine (mRNA-1273) Against Novel Coronavirus," *Moderna,* April 16, 2020, *available at* https://investors.modernatx.com/news/news-details/2020/Moderna-Announces-Award-from-U.S.-Government-Agency-BARDA-for-up-to-483-Million-to-Accelerate-Development-of-mRNA-Vaccine-mRNA-1273-Against-Novel-Coronavirus/default.aspx.
[3636] MRNA-GEN-02645641-677, at 644 (Hoge Deposition Exhibit No. 45 – "Board Discussion," *Moderna,* May 15, 2020, Slide 4 of 37) ("HEOR Executive Summary").
[3637] MRNA-GEN-02645641-677, at 644 (Hoge Deposition Exhibit No. 45 – "Board Discussion," *Moderna,* May 15, 2020, Slide 4 of 37).

1017

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

capital which it expected would expand its commercial opportunity and generate billions in incremental profits that it would forego if it did not invest immediately.[3638]

1525. For Moderna, a 10-year old start-up with no commercial products, the COVID-19 opportunity was massive. Moderna recognized that that mRNA-1273 could provide **"a major acceleration"** of the company's development[3639] that would enable the **"transition to commercial on the back of COVID licensure"** that would **"transform"**[3640] the company and **"change [Moderna's] trajectory."**[3641] In fact, Moderna stated that mRNA-1273 "could be the fastest and largest drug

---

[3638] *See, e.g.,* MRNA-GEN-02645641-677, at 660 (Hoge Deposition Exhibit No. 45 – "Board Discussion," *Moderna,* May 15, 2020, Slide 20 of 37). May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 411:1-412:4 ("Q. And so the conclusion here is that by delaying three months, you would have lost between 2 and $5 billion? A. 'By delaying three months, you would have lost between 2 and $ billion' . . . I think directionally we would expect what this analysis is doing in May of 2015, purely outside-in, says about what you said, which is $2 billion difference if you were not a – if you don't start making the vaccine for distribution. Q. 2 to $5 billion? A. I don't think that that's what it says. I don't think that it says 5. I think the 5 relates to the probability of success of execution. That's a technical and scientific assessment. It has nothing to – it's a probability scenario, nothing to do with when you started. So I don't believe it's accurate to say 2 to 5 related to timing. I think it is accurate to say the difference between 3.2 and 5.2 as relates to timing. Probability of success on execution, like actually can you solve the engineering problems, is independent of when you started the work. . . .").

[3639] *See, e.g.,* ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

[3640] MRNA-GEN-01251960-028, at 961 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," *Moderna,* n.d. (May 20, 2020), Slide 2 of 69) ("Executive Summary . . . We could experience three major transformations in this horizon: transition to commercial on the back of COVID licensure . . .").

[3641] MRNA-GEN-01251960-028, at 961 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," *Moderna,* n.d. (May 20, 2020), Slide 2 of 69). May 16, 2024 30(b)(6) Deposition of Christoph Brackmann, 74:15-75:20 ("Q. Is it fair to say that in May 2020, Moderna expected to be able to unlock about 65 billion in value for non-COVID programs, because it would now be able to make the capital investments that without COVID it would not have been able to make? . . . THE WITNESS: So I think from, you know, I mean, reading this, yeah, there was an expectation that the ability to respond to the pandemic would give us faster access to a commercial product than was the plan before the pandemic, and those funds or profits would – we would be able to reinvest into the pipeline. I think what was always the case, as I mentioned before, as well, that we – you know, financial constrain was sort of the bottleneck for us, is currently still the bottleneck for us to create more value to patients, and basically a higher commercial revenue. But that was the case back then and it's the case today and, yes, we – the COVID response or, you know, being able to positively contribute a product to the market was an accelerated path to a commercial revenue.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

launch in history."[3642]  In addition, Moderna projected: "

█████████████████████████████████████████████████████████████

████████████████████████████ [3643]

1526.  But with no reasonable alternatives, Moderna's plan hinged on obtaining a license from Genevant. Moderna would recognize in this hypothetical negotiation that Genevant would be "driver's seat," whereas it would be in the unusual and untenable position of negotiating a license on the eve of commercialization.

**(ii)    Genevant's Position**

1527.  Genevant would know all of the foregoing facts and "[Moderna's] eagerness to obtain a license."[3644]  As of May 2020, Genevant recognized the COVID-19 opportunity and was seeking

---

[3642] MRNA-GEN-01251960-028, at 961 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," *Moderna,* n.d. (May 20, 2020), Slide 2 of 69).  May 16, 2024 30(b)(6) Deposition of Christoph Brackmann, 74:15-75:20 ("Q. Is it fair to say that in May 2020, Moderna expected to be able to unlock about 65 billion in value for non-COVID programs, because it would now be able to make the capital investments that without COVID it would not have been able to make? . . . THE WITNESS: So I think from, you know, I mean, reading this, yeah, there was an expectation that the ability to respond to the pandemic would give us faster access to a commercial product than was the plan before the pandemic, and those funds or profits would – we would be able to reinvest into the pipeline.  I think what was always the case, as I mentioned before, as well, that we – you know, financial constrain was sort of the bottleneck for us, is currently still the bottleneck for us to create more value to patients, and basically a higher commercial revenue.  But that was the case back then and it's the case today and, yes, we – the COVID response or, you know, being able to positively contribute a product to the market was an accelerated path to a commercial revenue.").

[3643] █████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████

[3644] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 497 (S.D.N.Y. 2013).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

collaborations.    Recognizing that Genevant's LNP was the "gold standard,"[3645] many parties approached Genevant for a license and executed agreements that covered the development of COVID-19 products.  In contrast, Moderna (and Pfizer) were the big licensing targets because they had been selected to participate in the U.S. Government's Warp Speed program—and had access to substantial funding that greatly accelerated their development, which greatly advantaged them vis-à-vis every other party that was in the race to develop a COVID-19 vaccine.  In addition, Moderna was selected to participate in Warp Speed, at least in part, due to its mRNA platform which was based on Genevant's Patents-in-Suit.[3646]

---

[3645] MRNA-GEN-01240180-198, at 190 (Francis Deposition Exhibit No. 27 – "Business Development Update – Moderna Investment Committee Discussion," *Moderna,* April 9, 2015, Slide 11 of 19) ("Tekmira – an RNA and LNP company") (emphasis added).  *See also* 191 (Slide 12: "Tekmira (  -2014) – an RNA and LNP company . . . Tekmira's LNP Enable mRNA Products . . . mRNA require intracellular delivery for activity[;] LNP is the GOLD STANDARD for mRNA delivery" (emphasis in original)).  May 22, 2024 30(b)(6) Deposition of Said E. Francis, 195:4-195:9 ("Q. You wrote in a slide [Slide 11 of 19] to a subcommittee of Moderna's board that Tekmira had a validated LNP formulation that are in the clinic that serve as the RNA industry gold standard, did you not?  A. Those are the words on the slides.").

[3646] December 15, 2023 Deposition of Guillaume Stewart-Jones (*Moderna v. Pfizer*), 35:7-35:16 ("A. . . . So we were very concerned about Nipah at the time.  But we used it as test case of how to collaborate between government and industry, **leveraging Moderna's mRNA vaccine platform** and our specific expertise in antigen design to allow for a working relationship to develop between the organization such that if and when such a disease X might emerge, we would be ready to rapidly collaborate and accelerate development of vaccine to either Nipah or disease X." (emphasis added)); 36:20-36:23 ("A. . . . For example, there were – there had been **previous clinical trials on CMV, on influenza, and other disease targets, so using the same platform technology**." (emphasis added)); 128:18-129:5 ("Q. And do you know what NIH and Moderna were collaborating on during that time, say, between the time of you started at NIH in 2013 and when you left?  A. Well, I was aware of a number of different areas of collaboration, including the fact that there was a collaboration on coronavirus particularly the MERS pathogen, and then subsequently, the Nipah candidate that I had worked on at NIH and was a coinventor of the design was being considered as a candidate for collaboration **because of the mRNA platform and the ability of rapid development as a prototype**. . . ." (emphasis added)); 167:4-168:1 ("Q. And you had been collaborating with them closely on moving forward with this vaccine preparedness project even before the pandemic, right?  A. There was certainly the Nipah program that was in flight at the time, and we were gearing up, in fact, to make GMP material for a Nipah Phase I clinical trial in December of 2019.  And I was party to some of those discussions.  And, in fact, we were repurposing some of the internal resources from what was called at the time PCV were we made personalized – that was – that stands for personalized cancer vaccine – where we were making very small Phase I batches.  **And we were discussing leveraging the platform to create a small batch of Phase I material for Nipah**.  As it

1020

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1528. Unlike the parties who came to Genevant for a license, Moderna was flush with U.S. Government cash, having received **$483 million** on April 16, 2020.[3647] Less than 2 weeks after this cash inflow,

---

happened, that whole program was advancing, and then suddenly came SARS-CoV-2 sequence, and we – it is my understanding that we repurposed that momentum that had been developed with the Nipah GMP to then substitute in the Design 2, as we call it here, into that process just to switch out Nipah for SARS-CoV-2." (emphasis added)); 168:11-168:18 ("Q. . . .A the time that you came up with the [SARS-CoV-2] sequence over the weekend in January 2020, leading up to that, you had – you had previously, you, Moderna, had previously collaborated with NIH on MERS and SARS-1; is that right?  A. **There was certainly a lot of data generated from MERS.**  I don't recall if there was any data generated for SARS-1." (emphasis added)); 169:3-169:16 ("Q. And you had been communicating with them regularly about antigen design for years, right?  A. Well, no, not necessarily communicating for years with Moderna.  What we were doing at the NIH was to internally develop the appropriate designs for certain viruses of pandemic interest or potential, and so that was a process that was totally internal to the NIH, but the product of which, in other words, **the designs that we had spent months and years identifying and developing, were then shared as the final fruit to Moderna to encode in their mRNA platform, and thus, to be able to evaluate in animals**." (emphasis added)); 187:19-188:10 ("THE WITNESS: I think when we're talking about the foundational work, you know, Moderna was in development since 2010 creating mRNAs for different protein expression, for different therapeutic applications, and as well for a number of infectious disease target antigens.  And all of that forms part of the **foundational work on the mRNA platform, which some have called a plug-and-play platform** or some people, even Stephane Bancel, talks about it as an information technology where you just switch in the new sequence and then you can create protein from the mRNAs that are encoded.  And so in this case, it wasn't too different where we switched out MERS for SARS-CoV-2 spike protein. . . ." (emphasis added)); 189:13-190:11 ("Q. . . . Why did VRC partner with Moderna? . . . THE WITNESS: What I understand is that VRC recognized the speed of the mRNA vaccine technology in terms of vaccine development, and this was highly appropriate to pandemic response as was a critical initiative at the Vaccine Research Center and part of the government's overall responsibility to its citizens and the world.  So the **VRC had identified at Moderna an extraordinarily unique technology, a company that had the know-how and the infrastructure to manufacture GMP material extremely fast**, particularly around the area of personalized cancer therapy whereby the goal was to create a small scale lot of GMP material within about 40 days.  And that was particularly attractive as a means to rapidly respond to an emerging pandemic.  **So recognizing this unique technology platform** that was completely absent from any function of the US government, the collaboration was developed and sustained and valued by the VRC." (emphasis added)).

[3647] "Moderna Announces Award from U.S. Government Agency BARDA for up to $483 Million to Accelerate Development of mRNA Vaccine (mRNA-1273) Against Novel Coronavirus," *Moderna,* April 16, 2020, *available at* https://investors.modernatx.com/news/news-details/2020/Moderna-Announces-Award-from-U.S.-Government-Agency-BARDA-for-up-to-483-Million-to-Accelerate-Development-of-mRNA-Vaccine-mRNA-1273-Against-Novel-Coronavirus/default.aspx.

1021

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

on April 28, 2020, "adjusting the SM ratio" had become "a hot button issue" for Dr. Hoge.[3648]  At this time, Dr. Hoge was apparently at least considering the possibility of a "hot swap" in which Moderna's "optimal LNP" that had been used in all 8 of its clinical trial and also in the Phase 1 mRNA-1273 (*i.e.,* the PVU formulation)—would be swapped out for a new allegedly non-infringing formulation that was the subject of an ongoing Phase 2 clinical trial for a different drug product, mRNA-1647 (CMV).  With no clinical data, however, such a "hot swap" would be highly risky.  This is confirmed by the fact that Moderna commenced the Phase 2 and Phase 3 mRNA-1273 clinical trials on May 29, 2020[3649] and July 27, 2020,[3650] respectively, and continued to use the "optimal LNP" in the PVU formulation.  In view of these facts, Genevant would conclude that Modera had no alternative that was ready to go, and given the expected "narrow window" of

---

[3648] MRNA-GEN-01269810-811, at 810 (Smith Deposition Exhibit No. 11 – April 28, 2020 email from Don Parsons to Michael Smith, Subject: FW: Agenda for the TDLT Meeting w/S. Hoge on May 1st) ("In the PHL discussion, can you please confirm for Stephen that we will adjust the SM ratio?  As you know that's a hot button issue for him.").  May 14, 2024 Deposition of Michael H. Smith, Ph.D., 246:3-248:5 ("Q. All right.  And Dr. Parsons writes, 'Afternoon Mike.  . . . I meant to confirm that this meeting topic was on your radar at our one-to-one this morning.'  And then Dr. Parsons continues, 'In the PHL discussion, can you please confirm for Stephen that we will adjust the SM ratio?  As you know that's a hot button topic for him.'  Do you see that?  A. Yes.  Q. The Stephen there that's being referred to is Dr. Stephen Hoge; is that right?  A. So yeah, I think I would deduce that from the subject line, because it says 'Meeting with S. Hoge.'  And Stephen, yeah, I think that's the case.  Q. Okay.  What is your understanding of why that's a – why the issue of the SM ratio is a hot button for Dr. Hoge? . . . A. I'm not sure what that means, as he said it, like a hot button for him.  I don't recall getting any more information on like hot button.  I'm not sure.  I'm not sure why.  I know it was discussed that we had sort of changed composition, but I would only be speculating on why he would think it's a hot button issue.  Q. Did you have an understanding whether the cationic lipid ratio was a hot button for Dr. Hoge before receiving this e-mail from Dr. Parsons? . . . A. To be honest, it would just be speculating on my part, because I haven't had a conversation with Stephen about this or didn't clarify what the hot button issue is.  So I couldn't give you a factual answer.  I don't know why Don wrote 'confirm for Stephen,' specifically it's 'a hot button issue.'  I don't know.").

[3649] *See, e.g.,* Moderna Announces First Participants in Each Age Cohort Dosed in Phase 2 Study of mRNA Vaccine (mRNA-1273) Against Novel Coronavirus," *Moderna,* May 29, 2020, *available at* https://news.modernatx.com/news/news-details/2020/Moderna-Announces-First-Participants-in-Each-Age-Cohort-Dosed-in-Phase-2-Study-of-mRNA-Vaccine-mRNA-1273-Against-Novel-Coronavirus/default.aspx.

[3650] *See, e.g.,* "Moderna Announces Phase 3 COVE Study of mRNA Vaccine Against COVID-19 (mRNA-1273) Begins," *Moderna,* July 27, 2020, *available at* https://news.modernatx.com/news/news-details/2020/Moderna-Announces-Phase-3-COVE-Study-of-mRNA-Vaccine-Against-COVID-19-mRNA-1273-Begins/default.aspx.

1022

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

opportunity, Moderna would readily agree to pay a per dose royalty that would share its expected mRNA-1273 profits with Genevant.

1529. Even the prospects of more cash did not prompt Moderna to implement the "hot swap." By May 29, 2020, Moderna was seeking advance payments from the U.S. Governments and other governments. While the receipt of the advance payments was conditioned on achieving certain readiness milestones, Moderna did in fact receive $600 million in advance payments from the U.S. Government September 2020. Genevant would consider the cash Moderna received from the U.S. Government as evidence of capital that was available to pay a royalty.

1530. At the May 31, 2020 negotiating table, Genevant would recognize that it was in the "driver's seat" and could dictate the terms of the agreement. Importantly, Genevant would value the opportunity to see its patented technology used in the pandemic response—and the recognition this would bring. However, this factor would *not* be a non-cash consideration that would reduce the reasonable royalty in this case because Moderna's alleged infringement denied Genevant this opportunity and the associated recognition, as described above. Genevant would also consider its long history with Moderna including the following facts:

    a) Moderna had strung Genevant and its predecessors along for years without taking a license;

    b) Moderna regarded Genevant as a "fremeny" that was competing with it in rare disease;

    c) Moderna had publicly denigrated Genevant's technology for years beginning in December 2016 when *Forbes* reported the following: "Moderna's chief executive, Stéphane Bancel, has been dismissive of the Arbutus technology. 'We knew it was not very good,' he told Forbes last year. 'It was just okay.' . . . Bancel says Moderna has stopped using the Acuitas tech for new drugs."[3651]

    d) Moderna had filed a series of IPRs beginning in February 2018, seeking invalidate Arbutus' patents.

    e) Because Moderna had falsely claimed that it had purportedly "stopped using the Acuitas [*i.e.,* Genevant] tech for new drugs," Genevant would seek a payment structure that would

---

[3651] Nathan Vardi, "Moderna's Mysterious Medicines," *Forbes,* December 14, 2016, *available at* https://www.forbes.com/sites/nathanvardi/2016/12/14/modernas-mysterious-medicines/#fc82927730ee. *See also* No Bates No. (Murray Deposition Exhibit No. 3 – Matthew Herper, Nathan Vardi, "Moderna Can't Escape My Intellectual Property, Says Arbutus CEO," *Forbes,* May 16, 2017, p. 2 of 6) ("Moderna's chief executive, Stéphane Bancel, has been dismissive of the Arbutus technology. 'We knew it was not very good,' he told Forbes last year. 'It was just okay.'").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

ensure that Moderna would actually pay a royalty on each mRNA-1273 dose, in the form of a per dose royalty.

1531. In view of the facts and circumstances of this case, Genevant would seek reasonable economic terms based on a profit split that was consistent with profits splits in the industry at the time, its own licensing practices, and Moderna's "Deal structures" which contemplated profit splits in the "Outright licensing" deal structure.   In particular, Genevant would demand and Moderna would agree to pay a profit split in the range of <u>20%</u> to <u>50%</u> of Moderna's mRNA-1273 projected operating profits paid as a per dose royalty.

1532. The "markers of value for licensing rights" that the parties would consider are summarized in **Table 6.8**, below, which shows the per dose royalty and implied profit split based on Moderna's projections as of May 31, 2020 (except the May 29, 2013 Tekmira-Moderna offer which, which reflects the absolute floor of the negotiation, based on Moderna's reported mRNA-1273 U.S. (and worldwide) sales).

| Moderna mRNA-1273 Projected Operating Profits as of May 31, 2020 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Value Metric | Date | Terms | | Pandemic ($30 per dose) (2020-2021) | | Endemic ($44 per dose) (2022-2024) | | |
| | | Profit Split | Revenue Percent | Genevant Profit Share | Per Dose Rate | Genevant Profit Share | Per Dose Rate | |
| 1 Industry avg: 50/50 Profit Split | 12/1/2019 | 50% | | 50% | $9.54 | 50.0% | $13.21 | |
| 2 Industry avg: 20/80 Profit Split | 12/1/2019 | 20% | | 20% | $3.81 | 20.0% | $5.29 | |
| 3 Moderna - Merck, Moderna - ▮ | 2016, 2018 | | | | | | | |
| 4 Moderna 2017 deal structure: ▮ | 2/23/2017 | | | | | | | |
| 5 Moderna 2017 deal structure: ▮ | 2/23/2017 | | | | | | | |
| 6 Genevant - Chulalongkorn | 10/20/2020 | | | | | | | |
| 7 Genevant - Gritstone (7.5% High) | 8/10/2023 | | | | | | | |
| 8 Genevant - Providence | 5/11/2020 | | | | | | | |
| 9 Genevant - ST Pharm | 4/8/2021 | | | | | | | |
| 10 Genevant ▮ | 2/18/2022 | | | | | | | |
| 11 Genevant - Gritstone (7.5%) | 1/15/2021 | | | | | | | |

| Moderna mRNA-1273 Actual Sales | | | | | | | |
|---|---|---|---|---|---|---|---|
| Value Metric | Date | Profit Split | Revenue Percent | Genevant Profit Share | Per Dose Rate | Genevant Profit Share | Per Dose Rate |
| 12 2013 Tekmira - Moderna Offer (US) | 5/29/2013 | | | 18.2% | $1.50 | 40% | $1.83 |

*Notes and Sources:*
[1]  For the 2013 Tekmira offer, the Per dose rate and profit share are calculated on the basis of Moderna's actual sales.
[2]  Pandemic calculations are based on May 2020 Proforma (Brackman 6). *See* Table 6.3. Endemic Calculations are based on $44 per dose from September LRP. *See* Table 6.5.
[3]  Francis Exhibit 35.
[4]  Schedule 6.1

**TABLE 6.8**

1533. The general range of the negotiation is as follows:

- **Pandemic Phase**: $2.25/dose (11.8%|88.2%) to $9.54/dose (50%|50%).
- **Endemic Phase**:  $3.30/dose (12.5%|87.5%) to $13.21/dose (50%|50%)

1024

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1534. Based on my investigation and analysis, and for the reasons summarized in this report, Genevant would demand and Moderna would agree to pay a per dose reasonable royalty based on a 25% profit split of Moderna's expected mRNA-1273 operating profits as of May 31, 2020. The 25% profit split is a reasonable estimate of the profits attributable to the Patents-in-Suit, whereas, the 75% share that Moderna would retain is a reasonable estimate of the profits attributable to the mRNA (*i.e.,* payload) and related technology (both Moderna-developed and licensed-in), as well as Moderna's other complementary assets, including but not limited to its manufacturing facilities and subcontractor and distributor relationships, non-patented elements, the manufacturing process, business risks, etc. The 25% profit split is ██████████████████████████████ ██████████████████████████ The substantial derivative benefits that Moderna expected to achieve would be expected to increase the per dose royalty. Instead of increasing the per dose royalty, however, I rely on the derivative benefits as further support for the reasonableness of a 25% profit split.

1535. Genevant would expect to receive significant royalties. As an illustration only: based on the terms of the May 29, 2013 Tekmira-Moderna *offer,* which Moderna did not accept but continued to use as a value benchmark for years, if applied to mRNA-1273 would have resulted in Moderna paying substantial royalties totaling approximately **$1.8 billion**. This offer, however, is not indicative of either the outcome of the hypothetical negotiation or a reasonable royalty adequate to compensate Genevant for the use Moderna made of the Patents-in-Suit for the reasons stated above. Briefly, the significant differences between the May 29, 2013 offer and the May 31, 2020 hypothetical negotiation include the following—the May 29, 2013 offer was:

   a) 7 years before the date of the hypothetical negotiation,

   b) at a time when Moderna was a start-up with little, if any, revenue,

   c) at a very early stage of mRNA drug product development—prior to any of Moderna's clinical testing,

   d) did not contemplate the COVID-19 commercial opportunity or a comparable commercial opportunity, and

   e) the circumstances surrounding the offer are not at all comparable to the circumstances that prevailed at the time of the hypothetical negotiation on May 31, 2020.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1536. In summary, it is my opinion that the royalty rate would be **$4.77/dose** during the pandemic phase and from $6.61/dose per dose to $10.56/dose during the endemic phase.

XXI. Summary of the *Georgia-Pacific* Factors for the Patents-in-Suit

1537. The following **Table 6.9** summarizes the *Georgia-Pacific* Factors and their impact on the reasonable royalty.

| REASONABLE ROYALTY FACTOR | FACTOR IMPACT |
|---|---|
| **Factor 1**: Royalties received by Genevant | Minimum profit split of 25%\|75%: **$4.77/dose** |
| **Factor 2**: Rates paid for comparable patents | Neutral |
| **Factor 3**: Nature and scope of the license | Neutral |
| **Factor 4**: Established policy to maintain monopoly | Neutral |
| **Factor 5**: Commercial relationship between Genevant and Defendant | Per dose royalty |
| **Factor 6**: Effect of selling the patented specialty in promoting sales of other products | Increase |
| **Factor 7**: Duration of the patents | Neural |
| **Factor 8**: Established profitability and success of the patented products | Maximum profit split of 50%\|50%: **Pandemic: $9.54/dose** **Endemic: $13.21** |
| **Factor 9**: Utility and advantage of the patent over old modes | Increase |
| **Factor 10**: Nature of the patented invention | Increase |
| **Factor 11**: Extent to which Defendant has made use of the invention | Increase |
| **Factor 12**: Portion of the profit or selling price that may be customary to allow for the use of the invention | Profit split range from 20%\|80% to 50%\|50% |
| **Factor 13**: Portion of the realized profit that should be credited to the invention | Neutral |
| **Factor 14**: The opinion of qualified experts | As set forth herein |
| **Factor 15**: The amount the parties would have agreed upon on May 30, 2021 | **Pandemic: $4.77/dose** **Endemic: $6.61 to $10.56/dose** |

**TABLE 6.9**

1026

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**(24)    Opinion**

1538. Based on currently available information and my investigation to date, the reasonable royalty that is adequate to compensate Genevant for Moderna's alleged infringement is:

- **$4.77/dose** during the pandemic phase (December 2020 to August 2023) and **$6.61/dose to $10.56/dose** during the endemic phase (September 2023 through the most updated data).

**E.    Royalty Base**

1539. As discussed above, "[c]alculation of a reasonable royalty[] … [r]equires determination of two separate quantities—a royalty base, … and a royalty rate[.]"[3652]The royalty rate was addressed above. This section addresses the royalty base.

**1.    Principles**

1540. "Calculation of a reasonable royalty requires determination of two separate and distinct amounts: 1) the royalty base, or the revenue pool implicated by the infringement; and 2) the royalty rate of the percentage of that pool 'adequate to compensate' the plaintiff for the infringement."[3653]  "The royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement as patent damages are limited to those 'adequate to compensate for the infringement.'35 U.S. C. § 284[.]"[3654]  The determination of the Royalty Base depends on the facts and circumstances of the case.

1541. In commercial licensing, the royalty base is usually set with an eye toward ease of monitoring and payment,[3655] and "are generally negotiated without consideration of EMVR."[3656] More inclusive royalty bases generally command lower royalty rates and vice versa.[3657]

1542. In litigation, however, the starting point for determining the royalty base is to consider the market most aligned with the claimed invention, and consider the smallest, salable, patent-practicing

---

[3653] *Fractus, SA v. Samsung Electronics Co., Ltd.*, 876 F. Supp. 2d 802, 806 (E.D. Tex. 2012) (citing *Cornell Univ., et al. v. Hewlett-Packard Co.*, 609 F.Supp.2d 279, 286 (N.D.N.Y. 2009)).
[3654] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015).
[3655] *See, e.g.*, David J. Teece, *Managing Intellectual Capital*, (New York:Oxford University Press, 2002), p. 154.
[3656] *Ericsson, Inc. v. D-Link Sys, Inc.*, 773 F.3d 1201, 1228 (Fed. Cir. 2014).
[3657] *See, e.g.*, David J. Teece, *Managing Intellectual Capital,* (New York:Oxford University Press, 2002), p. 154.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

unit.[3658]  In order for the royalty base to "encompass[] much more than the market most aligned with the claimed invention, it [the patentee] had to satisfy the requirements for application of the entire market value [rule] … ,"[3659] as discussed previously.

1543.  "[I]n a case involving a per unit royalty—the jury is asked to choose a royalty base as the starting point for calculating a reasonable royalty award."[3660]  In calculating the appropriate royalty base, I understand that patent laws allow for "damages adequate to compensate for the infringement."[3661] Thus, the royalty base may include (i) products that are made, used, offered for sell, or sold within the United States or imported into the United States under 35 U.S.C. § 271(a); (ii) products associated with the defendant induced infringement under 35 U.S.C. § 271(b); and (iii) products that are imported into the United States or offered for sale, sold, or used within the United States under 35 U.S.C. § 271(g).

a.    "[N]o deal is about the base. It's about what is the value, in that deal[.]"

1544.  As is typical in many industries, "no deal is about the base. It's about what is the value, in that deal, that two people can make a good business deal over, and the base will be chosen mostly out of convenience[,]"[3662] as Knobbe Martens Olson & Bear LLP Partner, Steve Jensen, stated in a March 18, 2009 FTC hearing. Mr. Jensen further explained:

> [T]he base has to do with the counting convenience once you've figured out what the value in the deal is and maybe you think it should be 10 percent of a particular

---

[3658] Cornell University, et al. v. Hewlett-Packard Company, 609 F.Supp.2d 279, 283, 287 (N.D.N.Y. 2009).

[3659] *Cornell University, et al. v. Hewlett-Packard Company,* 609 F.Supp.2d 279 (N.D.N.Y. 2009).*LaserDynamics, Inc. v. Quanta Comput., Inc.,* 694 F.3d 51, 67-68 (Fed. Cir. 2012) ("We reaffirm that in any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest salable patent-practicing unit, without showing that the demand for the entire product is attributable to the patented feature.").

[3660] *Ericsson, Inc. v. D-Link Sys, Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

[3661] 35 U.S.C. § 284.

[3662] "The Evolving IP Marketplace – The Operation of IP Markets," *Federal Trade Commission,* March 18, 2009 Tr., 273:19-273:24, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090318transcript.pdf (Steve Jensen, Partner, Knobbe Martens Olson & Bear LLP: "None of these deals – I've done many, many deals over my career, and no deal is about the base. It's about what is the value, in that deal, that two people can make a good business deal over, and the base will be chosen out of convenience in most of the deals I've done.").

1028

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

piece, but the base turns into the whole product, and the royalty moves down to half a percent, right, so they can't be talked about separately[.][3663]

…

MS. MICHEL: … One question, Steve Jensen: When you talked about the base being a matter of accounting convenience, is that true or does it vary depending on what the claim scope is?

MR. JENSEN: The claim scope of course defines the scope of protection, and as patent lawyers we will often try to do something with that claim scope to impact the royalty base. However, again it comes back to what the value is in that invention, right, and so the claim scope may define a particular piece. It might define the cap on this bottle but that's not sold separately.

The bottle is sold together so while the cap is worth two pennies and the bottle is worth another penny, we'll still, from an accounting standpoint, look at what is accounted for so the claim defines what the parties are talking about, but not at the end of the day how the royalty is actually calculated.

Sometimes it will, if that's already in the accounting systems for the licensor or the licensee, but if it's not easily accounted for in database systems for tracking, it will usually become something that is more convenient, but again scaled back to what the claims covered.[3664]

---

[3663] "The Evolving IP Marketplace – The Operation of IP Markets," *Federal Trade Commission,* March 18, 2009 Tr., 273:25-274:6, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090318transcript.pdf (Steve Jensen, Partner, Knobbe Martens Olson & Bear LLP).*See also* 274:8-274:9 ("MS. MICHEL: Steve, would you agree with that? MR. SINGER: Yes.").

[3664] "The Evolving IP Marketplace – The Operation of IP Markets," *Federal Trade Commission,* March 18, 2009 Tr., 274:10-275:8, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090318transcript.pdf (Steve Jensen, Partner, Knobbe Martens Olson & Bear LLP).*See also* "The Evolving IP Marketplace – The Operation of IP Markets," *Federal Trade Commission,* March 18, 2009 Tr., 182:18-183:6, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090318transcript.pdf (Carl Horton, Chief IP Counsel, GE: "We see where we in-license the most technology we have the greatest experience. In the healthcare space we have determined our royalty base under almost every different model you can imagine, and it typically comes down to how is it easiest to do the accounting? Is it easiest to do the accounting on some feature function of the software or is it easier to account on how many times we ship a product with that feature in it? And the royalty percentage is drastically different but the total package price is about the same, but we do what is most economically feasible, easiest to audit, easiest to track and account."); 183:7-184:4 ("MS. MICHEL: Do you determine the base first and then figure the royalty off of that? MR. HORTON: We typically decide what the value is to the parties. If we disagree, which is typically the case, on the value, we'll talk about a royalty based

1029

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

P&G's Steven W. Miller, Vice President & General Counsel, Intellectual Property, added: "the base and the royalty rate are the flexible numbers. It's what's the economic value that the invention brings."[3665]

### 2. Overview of Certain Moderna Production, Sales Data, and Infringement Information Produced in this Litigation

1545. Moderna produced certain mRNA-1273 production and sales documents which I have reviewed and analyzed to estimate the royalty bases,[3666] which include the following:

### a. mRNA-1273 Genealogy Data

1546. I understand that Moderna's mRNA-1273 manufacturing process is comprised of the following five (5) stages: █████████████████████████████████████

█████████████████████████████████████████),[3667] which will be discussed in more detail below.

1547. Moderna records certain data associated with the batches produced in each stage of the manufacturing process, which is referred to as "COVID Materials Genealogy" data ("Genealogy Data").███ ████████████████████

---

on some structure that we can agree upon. Again whatever is easiest to account for we'll base it off of that, and then we'll take one step further and say – usually they believe it's more valuable because they think it will drive our sales by a 50 percent increase. If we think we're going to see a 5 percent increase then we build that into the royalty structure. If it's a 5 percent increase as we think, the royalty rate is X .If it's 50 percent like you think then it's a sliding scale or some difference in royalty, so that we can account for the difference in what we think the actual value is, and then we let the market decide. The market will tell us what it's worth. They have to place some value on our ability to try to maximize whatever it is we're trying to take to market but otherwise it's the market that makes the final decision.").

[3665] "The Evolving IP Marketplace – The Operation of IP Markets," *Federal Trade Commission,* March 18, 2009 Tr., 186:21-186:22, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/evolving-ip-marketplace/090318transcript.pdf (Steven W. Miller, Vice President & General Counsel, Intellectual Property, The Procter & Gamble Company).

[3666] Plaintiff Genevant Sciences GmbH's Eleventh Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (Nos. 1-7) dated June 7, 2024, pp. 63-65, and 133-140.

[3667] MRNA-GEN-00038833-843 ████████████████████████████████████
███████████████████████

[3668] MRNA-GEN-01424228 (Boyer Deposition Exhibit No. 6 – "Covid Materials Genealogy.csv").MRNA-GEN-01711164 (Boyer Deposition Exhibit No. 10 – "Supplemental Genealogy Information.xlsx").MRNA-GEN-02645036 (Boyer Deposition Exhibit No. 11 –

1030

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



1548.  Counsel has requested that I use the Genealogy data to identify ██████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████ [3671] [3672] .

---

"Updated Supplemental Genealogy Information.xlsx").May 20, 2024 Deposition of Marcus Boyer, Ph.D., 114:8-114:15 ("Q. All right. And what is your understanding of the purpose of these spreadsheets in Exhibits 10 [MRNA-GEN-01711164, "Supplemental Genealogy Information.xlsx"]and 11 [MRNA-GEN-02645036, "Updated Supplemental Genealogy Information.xlsx"]? … THE WITNESS: My understanding is that these were generated subsequent to the larger spreadsheet that we looked at earlier [Boyer Deposition Exhibit No. 6] in order to examine specific lot questions.").

We used MRNA-GEN-01424228 file to populate dates of manufacture for the batches included in the -036 file. Each batch did not have a unique approval date. Therefore, when populating the approval dates for batches included in the -036 file, we used the latest approval date available for that batch in the -228 file. See Genealogy Data in Schedule 9.1.

[3669] May 20, 2024 Deposition of Marcus Boyer, Ph.D., 69:7-69:21 ("Q. Do you know whether in turning a UDP batch into an LDP batch, if it's a one-to-one correspondence? … THE WITNESS: Multiple LDP batches can come from a UDP batch, is my understanding. BY MR. SHEH: Q. Can multiple UDP batches go into an LDP batch? … THE WITNESS: I'm not sure if there's any prohibition on that. In principle, I can't think of a reason why you couldn't, if they're the same product, but I don't know for sure on that question."); and 70:2-71:15.

[3670] See Schedule 9.1

[3671] ████████████████████████████████

████████████████████████████████

[3672] There were also offers and sales of doses manufactured and used abroad, but for which the sale or offer occurred in the United States. Moderna refused to produce the necessary discovery for detailed analysis with respect to those doses and the Court denied Plaintiffs' motion to compel the production of that material. *See* D.I. 355.I reserve the right to amend my opinions to account for those doses if the necessary information is subsequently produced.

1031

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1549. I identify U.S. Nexus LDP Batches in Schedule 9.3, and U.S. Nexus ███ batches in Schedule 9.4.

### b.    mRNA-1273 Sales Data

1550. Moderna has provided certain records that summarize its mRNA-1273 commercial sales during the period December 2020 to January 2024. The principal sales datasets are briefly summarized below.

### a.    Net Recognized Unit Data ("NRU Data"):[3673]

1551. The NRU Data summarizes Moderna's mRNA-1273 U.S. and OUS (unit and revenue) sales by month during the period December 2020 through September 2023. The NRU Data is aggregated by month, and does not identify LDP batch numbers.

1552. The main source of NRU data is MRNA-GEN-01352334. This file reports Moderna's total COVID-19 vaccine sales for U.S. and OUS from December 2020 through September 2023, and is summarized below:[3674]



**TABLE 6.10**

---

[3673] ████████████████████████████████████████████████████████████████████████████████████████████████████

[3674] May 16, 2024 30(b)(6) Deposition of Christoph Brackmann, 142:13-156:21.

1032

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1553. Moderna provided three (3) additional NRU Data files that are limited to the U.S. Government sales pursuant to the four (4) contracts: C-100, C-34, and C-17/55 contracts.[3675] These files also provide sales data aggregated by month and includes both units and revenue. Two of these three files (MRNA-GEN-00467749 and MRNA-GEN-00467750) include the contract line-item number (CLIN) that is associated with each month's units and revenue.[3676] These additional files, "created for this litigation,"[3677] are as follows:

- **MRNA-GEN-00467748**:[3678] Reports mRNA-1273 sales under the BARDA C-34 contract during the period December 2020 through January 2021.[3679]

- **MRNA-GEN-00467749**:[3680] Reports mRNA-1273 sales under the C-100 contract, breaking during the period December 2020 through August 2023.[3681]

- **MRNA-GEN-00467750**:[3682] Reports mRNA-1273 sales under the C-17/C-55 contracts during the period August 2022 through September 2023.[3683]

---

[3675] The total units and revenue reported in these three supplemental files match the U.S. Government sales from MRNA-GEN-01352334 within 1% and 1.3%, respectively.

[3676] May 23, 2024 Deposition of Albert Thomas, 80:17-81:1 ("Q. And then finally column H [of MRNA-GEN-00467749], 'CLIN,' what is that? A. It is the contract line item number that that payment refers to. So the specific deliverable in the C-100 contract, that is the deliverable category that that payment is for."); and 95:6-95:13 ("Q. You'll notice this file [MRNA-GEN-00467748] doesn't have any contract line item number column. A. Correct. Q. Why is that? A. We'll have to look at the contract to see how the contract line item numbers were defined. I don't know a specific reason why they would have been excluded from this report.").

[3677] May 23, 2024 Deposition of Albert Thomas, 75:15-75:17; 92:9-92:11; and 95:14-19.

[3678] MRNA-GEN-00467748 (Thomas Deposition Exhibit No. 7 – "BARDA C-34 Contract.xlsx").

[3679] May 23, 2024 Deposition of Albert Thomas, 94:1-95:19.

[3680] MRNA-GEN-00467749 (Thomas Deposition Exhibit No. 3 – "C-100 Contract.xlsx").

[3681] May 23, 2024 Deposition of Albert Thomas, 77:6-81:22; and May 16, 2024 30(b)(6) Deposition of Christoph Brackmann, 159:2-159:16.

[3682] MRNA-GEN-00467750 (Thomas Deposition Exhibit No. 6 – "C-17,C-55 Contract.xlsx").

[3683] May 23, 2024 Deposition of Albert Thomas, 91:8-93:22.

1033

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**b.      mRNA-1273 LDP Batch Level Sales Data ("Batch Sales Data")**

1554.    The Batch Sales Data provides LDP batch level mRNA-1273 sales that Moderna admits as having a nexus to the U.S.[3684] For these LDP batches, I outline my methodology to estimate their associated revenue in the Methodology section below.

a)  **MRNA-GEN-01713148:**[3685]



b)  **MRNA-GEN-0093821:**[3686]

---

[3684] *See, e.g.,* THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10 (JUNE 10, 2024); CORRECTED, JULY 15, 2024, at p. 181 ("Moderna has produced documents and provided testimony concerning financial information, including the number of doses, corresponding to its COVID-19 vaccine product within the scope of Plaintiffs' 35 U.S.C. § 271(a) claim. See, e.g., MRNA-GEN-02615544, MRNA-GEN-00467748, MRNA-GEN-00467749, MRNA-GEN-00467750, MRNAGEN-02658018.")

[3685] MRNA-GEN-01713148 ("Moderna Doses Reconciliation 07262022_AP.xlsx").

[3686] MRNA-GEN-0093821 (Thomas Deposition Exhibit No. 8 – "US Distribution.xlsx").

[3687] May 23, 2024 Deposition of Albert Thomas, 116:2-116:14 ("Q. And this is only product shipped in the United States?A. Shipped from the United States, yes.Q. What about 2, does it include products shipped from the United States to outside of the United States?A. I don not believe so, but we would need to go through and verify. Q. What about products shipped outside the United States to the United States? A. A finished final release product? No.").

[3688] May 23, 2024 Deposition of Albert Thomas, 24:8-25:13 ("Q. When you say the U.S. distribution spreadsheet, you mean MRNA-GEN-00939821? A. Correct. Q. What did Mr. Mustafa tell you about that spreadsheet? A. The sources of the information and the fact that it was manually generated based on this request. Q. What request? A. The request to provide this information. Q. From whom? A. I'm assuming from our legal team. This spreadsheet was not a, let's say, a typical report that Moderna would be using or generating. Q. Your understanding was it was generated for the purposes of this litigation? A. Yes. Q. What did Mr. Mustafa tell you about the source of the data in the U.S. distribution sheet? A. It was manually compiled from information from first our SAP system, as well as information received from our third-party logistics provider McKesson RXC. Q. Any other sources? A. Not that I'm aware of.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



c) **MRNA-GEN-00459217:**[3690]

d) **MRNA-GEN-02615544:**[3693]

---

[3689] See MRNA-GEN-00467749 and MRNA-GEN-00467750.

[3690] MRNA-GEN-00459217 (Thomas Deposition Exhibit No. 10 – "DoseTrackingTemplate_Final_Moderna New 20230728.xlsx").

[3691] May 23, 2024 Deposition of Albert Thomas, 146:9-146:18 ("Q. Okay. Did you see two different versions of the C-100-specific dose tracking sheet in preparing for today's deposition. A. Yes, I did. Q. And what were the differences between those two? A. The one sheet seemed to contain more information. Q. It was later in time. A. Yes."). *See also* Letter to Mark C. McLennan, Re: Arbutus Biopharma Corporation and Genevant Sciences GmbH v. Moderna, Inc. and ModernaTX, Inc., Case 1:22-cv-00252-MSG (D. Del.), dated February 19, 2024, pp. 1-2 ("MRNA-GEN-00459217 (DoseTrackingTemplate_Final_Moderna New 20230728.xlsx), which Plaintiffs understand to be more up-to-date version of MRNA-GEN-00456087. Moderna states that MRNA-GEN-00459217 and MRNA-GEN-00456087 'list[] doses associated with Contract Nos. W911QY20C0100 and 75A50120C00034.'").

[3692] May 23, 2024 Deposition of Albert Thomas, 141:9-141:20.

[3693] MRNA-GEN-02615544 (Thomas Deposition Exhibit No. 14 – "IP Batch Mapping.xlsb") (summarizing Accused Product drug batches).

[3694] Defendants' Third Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories (Nos. 12-17): First Supplemental Response to Interrogatory No. 14, dated May 11, 2024, p. 22. *See also* May 23, 2024 Deposition of Albert Thomas, 169:17-169:20 ("Q. Are you familiar with this spreadsheet [Thomas Deposition Exhibit No. 14], Mr. Thomas? A. I believe this is the first time I'm seeing it."); 171:5-171:15 ("Q. … So you don't recall reviewing this spreadsheet in the course of preparing for your testimony today? A. Correct. It's the first time I've seen it. Q. Do you have any knowledge of this document of the data within the document? A. I have to look to see what's in here. Give me a moment or so. (Document review.) No. I'm not familiar with the information here.").

[3695] Defendants' Third Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories (Nos. 12-17): First Supplemental Response to Interrogatory No. 14, dated May 10, 2024, pp. 22-23.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



e) **MRNA-GEN-02658018**: ███████████████████

███████████████ .3696

1555. My use of these files is summarized in the chart below:



**TABLE 6.11**

---

[3696] Defendants' Corrected Sixteenth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1-10), dated July 15, 2024, pp. 182-184.

[3697] MPI is "mRNA product intermediate." See discussion Below.

[3698] Given the urgency of the pandemic, Moderna was building its foreign supply chain as quickly as possible in 2020 and 2021. Bennett 5/20/2024 Tr. 118:21-120:3. It thus lacked excess capacity to manufacture the components at issue outside the United States, meaning that the U.S. manufacture of those components "enable[d] otherwise-unavailable profits from conduct abroad." *Brumfield v. IBG LLC*, 97 F.4th 854, 877 (Fed. Cir. 2024).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### c.    Mitchell Appendix

1556.  I understand that Dr. Mitchell has opined regarding various theories of direct infringement.[3699] One theory is based on Moderna's own testing data, as reported in certificates of analysis ("COA") that correspond to each released drug product lot.[3700]  Additional theories are based on analysis of Plaintiffs' testing data on a part number and formulation (v1 or v2) basis.[3701]  Other theories of direct infringement are based on the doctrine of equivalents ("DOE"), using hypothetical claim limitations for the Asserted Claims with a cationic lipid mol % limitation; a non-cationic lipid mol % limitation; a conjugated lipid mol % limitation; and lastly applying the aforementioned hypothetical claims together for the Asserted Claims with a cationic lipid mol % limitation, a non-cationic lipid mol % limitation, and/or a conjugated lipid mol % limitation.[3702]

1557.  For the first of these theories of direct infringement, I understand that Dr. Mitchell considered COA data for both the final drug product and ▮▮▮▮▮▮.[3703]  I understand that Dr. Mitchell has opined that,



."[3704]  Dr. Mitchell has further opined that, in addition to the final drug product, the ▮▮▮▮▮▮

."[3705]

1558.  I understand that Dr. Mitchell has summarized his infringement analysis in a series of appendices, upon which I have utilized to calculating damages.  These appendices analyze the discrete bases for assessing infringement outlined above.  First, the appendices summarize Dr. Mitchell's analysis of the encapsulation data reported in Moderna's certificates of analysis ("COA") for LDP lots and identify those lots that infringe the '651 patent.[3706]  Second, the appendices contain Dr. Mitchell's calculations of mol % values for SM-102, cholesterol, DSPC, and PEG2000-DMG based on the

---

[3699] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XIII.F.

[3700] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XIII.F.1.

[3701] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XIII.F.1.

[3702] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XIII.F.2.

[3703] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XIII.F.1.

[3704] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XIII.F.1, ¶ 616.

[3705] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XIII.F.1, ¶ 615.

[3706] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section X.F.

1037

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

data found in Moderna's COAs.[3707]  Dr. Mitchell used this COA data to calculate the lipid molar ratio of Moderna's LDP and ███████████, and then identified on a claim-by-claim basis both those LDP lots that literally infringe the Lipid Composition Patents, and those lots of ███████ ███████████████████████████████████████████████████[3708]  Third, Dr. Mitchell analyzed Plaintiffs' testing data for infringement of the Lipid Composition Patents on a claim-by-claim and lot-by-lot basis, and then applied those results for the tested lots to assess untested lots.[3709]  Finally, Dr. Mitchell used Moderna's COA data to identify lots of Moderna's LDP and ████████████████████████████████████████████ ███████████) that infringe the Lipid Composition Patents based on hypothetical claims that include a lower limit on cationic lipid of 45 mol %, an upper limit of non-cationic lipid of 53 mol %, and/or an upper limit on conjugated lipid of 3 mol %.[3710]

1559. As explained by Dr. Mitchell, Plaintiffs are not relying on their own testing or DOE theories to establish infringement of the '651 patent because "the encapsulated mRNA in Moderna's Accused Product is fully contained inside the LNPs"; there is no evidence "from Moderna's documents or witnesses suggesting that any of its mRNA—much less a substantial fraction of its mRNA—is only partially encapsulated by its LNPs"; the encapsulation assay Moderna conducts "provides a quantitative measurement of the mRNA that is fully contained inside Moderna's LNPs"; Moderna's COAs report that "all of its batches have greater than 80% encapsulation"; and "[i]n its interrogatory response regarding infringement of the '651 patent, Moderna does not identify any evidence demonstrating that the mRNA in the Accused Product is not fully encapsulated or would otherwise not infringe" the encapsulation limitations recited in the '651 patent.[3711]

1560. As part of the Appendices to his Report, Dr. Mitchell produced a series of appendices that document the results of his infringement analysis. Two appendices (132 and 154) are inputs to my damages calculation:

[3707] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section X.E.
[3708] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XIII.F.
[3709] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XIII.F.
[3710] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XIII.F.
[3711] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XII.F, ¶¶ 518-23.

1038

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

a) **Appendix 132**: For each asserted claim and five infringement theories,[3712] Dr. Mitchell identifies LDP and LMX batches that infringe a given claim under a given theory. A batch's presence in this appendix indicates that it is infringing.[3713]

b) **Appendix 154**: For each asserted claim and the two testing infringement theories, Dr. Mitchell identifies the estimated percent[3714] of that LDP batch that infringes a given claim under a given theory.

1561. Using this batch level infringement information, alongside the Genealogy Data,[3715] I was able to identify which sales in the Batch Sales Data are infringing under each Infringement Theory and Claim. A summary of the Claim-by-Claim infringement in Schedule 2.1. This analysis is aggregated across claims in Schedule 2.2.

### 3. Analysis

1562. My royalty base analysis corresponds to the infringement that is alleged in this case. In particular, I have determined the number of mRNA-1273 doses that are accused of infringing the Patents-in-Suit during the period June 23, 2020, through January 31, 2024, and have a U.S. nexus.[3716] I perform this calculation for:

a) **Making**: I have estimated the equivalent number of mRNA-1273 doses for commercial use that Moderna made at each of the four (4) stages of the manufacturing process during the period June 2020 through January 2024.

b) **Selling:** I have calculated the number of mRNA-1273 doses sold with a U.S. Nexus that infringe at least one of the patents in suit, according to the calculations performed by Dr. Mitchell.

1563. The results of my analysis are summarized in **Table 6.12**, below.

---

[3712] Literal (COA), DOE-Cationic, DOE-Non-Cationic, DOE-Combined, and DOE-Conjugated Lipid.

[3713] Interview of Michael Mitchell, Ph.D, November 21, 2024.

[3714] See column "% Inf."

[3715] Schedule 9.1.

[3716] A dose has a U.S. nexus if the dose was either 1) sold in the U.S. or 2) had any step in its manufacturing process (LMX/MPI, fLNP, LDP, UDP) occur in the U.S. See discussion above.

1039

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**Notes and Sources**
[1] Lawton Table 6.13.
[2] Lawton Table 6.14.
[3] Lawton Table 6.15.
[4] Lawton Table 6.16.
[5] Schedule 9.2.

**TABLE 6.12**

    a.    **Making**

    (1)    **MPI**

1564.  MPI, the "mRNA product intermediate" refers to lots of CX-024414 mRNA, which I understand is the "mRNA intermediate that encodes for the pre-fusion stabilized Spike protein of SARS-CoV-2."[3717] It essentially is "the mRNA used in Moderna's COVID-19 vaccine" and lots of MPI / CX-024414 mRNA can be identified by a lot number that starts with a "4."[3718]

---

[3717] November 25, 2024 Expert Report of Dr. Michael Mitchell, Sec. X.A; MRNA-GEN-00141068-1140, at 076-77 (mRNA-1273 Manufacturing History Report).

[3718] May 20, 2024 Deposition of Marcus Boyer, Ph.D., 67:2-68:2 ("2 Q. And what does "MPI" stand for? A. Manufactured product intermediate. Q. And in the context of Column F, does that refer to the mRNA used in Moderna's COVID-19 vaccine? A. This Column F does contain lot numbers for the mRNA associated with the lots in Columns G, H, and I, as well as lot numbers that correspond to the LMX, which is another term for SM-102 LNP . . .[Q.] to distinguish between – in Column F, between lots for mRNA and lots for LMX or ▮▮▮▮▮▮, the way to distinguish them is whether they start with 4 or 5; right? A. That is the simplest way. Q. Right. So if the value starts with 4, it's mRNA, and if it starts with 5, it's for the21 LMX or ▮▮▮▮ ▮▮correct? A. Yes. In general, that is correct. I don't know if there are any exceptions. It's a very large spreadsheet.")

1040

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### (2)    LMX

1565. ███████████████████████████████████████████

███████████████████████████████████████████

███████." [3719]

1566. Moderna's LMX part numbers are a five-digit code that starts with 5 (i.e., PN 50097).[3720] The genealogy data reports that non-clinical LMX batches were manufactured from March 2020 to January 2024.[3721] During this period, Moderna made approximately ████████████ ██████ as shown in **Table 6.13**, below.

**TABLE 6.13**

1567. The equivalent doses of LMX were estimated by first calculating the estimated LMX nominal doses—both worldwide ("WW") and with a U.S. nexus—assuming 100% yield (in (a) and (b), respectively). Next, I eliminate LMX nominal doses associated with *unsold* LDP batches (in (c), below) in order to compare nominal doses to sold LDP doses. Finally, I adjust the estimated LMX nominal doses associated with *sold* LDP batches to equate it to Moderna's reported mRNA-1273 LDP doses sold (in (d), below) as follows:

#### (a)    "Total Nominal LMX Doses (WW)"

---

[3719] May 14, 2024 Deposition of Michael Smith, Ph.D., 145:8-145:13.
[3720] MRNA-GEN-02615390-436, at 390 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, pp. 14 of 47).
[3721] Schedule 9.1.

1041

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1568. Total Nominal LMX Doses (WW)" reflects an estimate of Moderna's total worldwide nominal LMX production in doses based on Moderna's batch records.[3722] Moderna's records refer to "Nominal Batch Scale" which reflects the stated amount of lipid in each LMX batch (*i.e.,* 4,800 g). Moderna's batch records show that a total of <u>1,599</u> LMX batches were produced during the period March 2020 to January 2024.[3723]

1569. To estimate the total number of equivalent LMX doses associated with these batches, I divide the total amount of <u>lipid in each batch</u> by <u>each amount of lipid in each dose</u> as follows:

    a) **Amount of lipid per LMX Batch**: Moderna reports the amount of lipid per LMX by "Part Number / Process," as shown in **Figure 6.29**,[3724] below, which shows that that the "B" scale commercial batches have a "Nominal Batch Scale" 4,800 g of lipid per batch:



**FIGURE 6.29**

    b) **Amount of lipid per dose**: The amount of lipid per dose varies based on the LDP/UDP formulation. There are two different formulations (*i.e.,* "V1" and "V2"), which Moderna has described as follows:

---

[3722] MRNA-GEN-02615390-436 at 403-404 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, pp. 14 of 47); MRNA-GEN-01000299-305 at 303-305 ("3.2.P.1 Description and Composition of the Drug Product," *Moderna*, Version 17.0, n.d.).

[3723] Schedule 9.1 Clinical batches were recognized by any part number starting with "8".[3723] Any clinical LMX batches or any LMX batches associated with clinical batches in the LMX, UDP, or LDP stage were excluded.

[3724] MRNA-GEN-02615390-436, at 403 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, p. 14 of 47).May 20, 2024 Deposition of Marcus Boyer, 22:12-22:18 ("A. This document [Boyer Deposition Exhibit No. 2, PVMP] is the document that, as far as I know, provides the most easily understandable tables for mRNA-1273.").

1042

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

- ▪ **V1 formulation**: 0.20 mg/ml. This formulation has either <u>1.93mg</u> or <u>0.97mg</u> of lipid per dose, as shown in **Figure 6.30**,[3725] below.



**FIGURE 6.30**

- ▪ **V2 formulation**: 0.10 mg/mL. This formulation has either <u>1.01mg</u> or <u>0.50mg</u> of mRNA per dose, as shown in **Figure 6.31**,[3726] below.

---

[3725] MRNA-GEN-01000299-305, at 303 ("3.2.P.1 Description and Composition of the Drug Product," *Moderna,* n.d., p. 5 of 7).



[3726] MRNA-GEN-01000299-305, at 304

1043

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.31**

- **V2 formulation**: The V2 formulation also includes a pediatric formula, 0.05 mg/mL. This formulation has 0.20mg of lipid per dose.



**FIGURE 6.32**

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1570.  Based on the foregoing, Moderna made approximately ███████████████████, as shown in **Table 6.13**, above, which is calculated by dividing the ███████████████ ████████████████████████

(b)    **"Nominal ████ Doses with U.S. Nexus"**

1571.  "██████████████████████████████████████ ████████████████████ that has a U.S. nexus as described above. ████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████

(c)    **"Nominal ████ Doses for ████ Batches associated with Sold LDP Batches"**

1572.  In this step, I account for the fact that Moderna's records show that not all of the "Nominal LMX Doses with U.S. Nexus" have been sold, by eliminating the ████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████ ██████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████

(d)    **"Nominal ████ Doses with U.S. Nexus Equated to Reported mRNA-1273 LDP Doses Sold"**

1573.  In this step, I account for the fact that there is a difference between Moderna's reported mRNA-1273 doses sold of **1.111 billion** based on its Batch Data (described above), and the mRNA-1273 nominal ████ doses based on batches sold in (c) above (assuming 100% production yield) of **1.896 billion**. This shows that the **1.896 billion** mRNA-1273 ████████████████████

---

[3727] Schedule 9.1.

1045

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

yielded **1.111 billion** mRNA-1273 *LDP doses sold.* Thus, the mRNA-1273 nominal ███████ ██████████████ mRNA-1273 *LDP doses sold* yield factor is approximately 58.6%.

(e)  **"Estimated** ███ **Doses with US Nexus"**

1574. In this final step, I calculate the ████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████ by the 58.6% yield factor (in (d), above).

(3)  **fLNP**

1575. ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████."[3729] Dr. Smith further described fLNP as follows:

> So the fLNP is a more concentrated bulk-filled product meaning filled into a larger volume bag. So that's not in the presentation needed for clinical distribution or commercial distribution. So that bag is stored, and then shipped or processed internally, either shipped to a contract manufacturing organization or processed internally. It is diluted, further filtered as part of sterility assurance, and then filled by automated filling machines into vials.[3730]

1576. Moderna's fLNP, also referred to as "mRNA-1273 LNP," part numbers are a five-digit code that starts with 5 (*i.e.,* PN 50068).[3731] I understand that fLNP is the first step included in the Genealogy Data that is accused of infringement.[3732]

1577. The Genealogy Data reports non-clinical fLNP batches were manufactured from April 2020 to December 2023.[3733] During this period, Moderna made approximately ███████████ equivalent doses of fLNP, as shown in **Table 6.14**, below.

---

[3728] May 14, 2024 Deposition of Michael Smith, Ph.D., 145:14-145:15. *See also* MRNA-GEN-02615390-436, at 399 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, p. 10 of 47) ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████

[3729] May 14, 2024 Deposition of Michael Smith, Ph.D., 146:13-146:14.
[3730] May 14, 2024 Deposition of Michael Smith, Ph.D., 146:20-147:9.
[3731] MRNA-GEN-02615390-436, at 390 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, pp. 1 of 47).
[3732] MRNA-GEN-02663285 at -288
[3733] Schedule 9.1.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**TABLE 6.14**

1578.  The equivalent doses of mRNA-1273 fLNP were estimated by first calculating the estimated mRNA-1273 fLNP nominal doses—both worldwide ("WW") and with a U.S. nexus—assuming 100% yield (in (a) and (b), respectively). Next, I eliminate the mRNA-1273 fLNP nominal doses associated with *unsold* LDP batches (in (c), below) in order to compare nominal doses to sold LDP doses. Finally, I adjust the estimated mRNA-1273 fLNP nominal doses associated with *sold* LDP batches to equate it to Moderna's reported mRNA-1273 LDP doses sold (in (d), below) as follows:

### (a)  "Total Nominal fLNP Doses (WW)"

1579.  "Total Nominal fLNP Doses (WW)" reflects an estimate of Moderna's total worldwide nominal mRNA-1273 fLNP production in doses based on Moderna's batch records.[3734] Moderna's records refer to "Nominal Batch Scale" which reflects the stated amount of mRNA in each mRNA-1273 fLNP batch (*i.e.,* 200 g) . Moderna's batch records show that a total of ▮▮▮ mRNA-1273 fLNP batches were produced during the period April 2020 to December 2023.[3735]  Clinical batches were

---

[3734] MRNA-GEN-02615390-436at 403-404(Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, pp. 14-15 of 47); MRNA-GEN-01000299-305 at 303-305 ("3.2.P.1 Description and Composition of the Drug Product," *Moderna*, Version 17.0, n.d.).
[3735] Schedule 9.1

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

recognized by any part number starting with "8".[3736] Any clinical fLNP batches or any fLNP batches associated with clinical batches in the LMX, UDP, or LDP stage were excluded.

1580. To estimate the total number of equivalent mRNA-1273 nominal fLNP doses associated with these batches, I divide the total amount of <u>mRNA in each batch</u> by the amount of <u>mRNA in each dose</u> as follows:

c)

**FIGURE 6.33**

d) **Amount of mRNA per dose**: The amount of mRNA per dose which varies based on the LDP/UDP formulation. There are two different formulations (*i.e.,* "V1" and "V2"), which Moderna has described as follows:

---

[3736] April 3, 2024 Letter from Kirkland & Ellis re Sample Production ("Likewise based on our reasonable investigation, fLNP part numbers, start with an "8" – such as 84216 and 84216 – correspond to small-scale manufacturing, and the DP lost manufactured with fLNP part numbers 84215 and 84216 were used in clinical trials.").

[3737] MRNA-GEN-02615390-436, at 403 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, p. 13 of 47).May 20, 2024 Deposition of Marcus Boyer, 22:12-22:18 ("A. This document [Boyer Deposition Exhibit No. 2, PVMP] is the document that, as far as I know, provides the most easily understandable tables for mRNA-1273.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

- **V1 formulation**: 0.20 mg/ml. This formulation has either <u>0.1mg</u> or <u>0.05mg</u> of mRNA per dose, as shown in **Figure 6.34**,[3738] below.



**FIGURE 6.34**

- **V2 formulation**: 0.10 mg/mL. This formulation has either <u>0.05mg</u> or <u>0.025mg</u> of mRNA per dose, as shown in **Figure 6.35**,[3739] below.



---

[3738] MRNA-GEN-01000299-305, at 303 █████████████

[3739] MRNA-GEN-01000299-305, at 304 █████████████

1049

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**FIGURE 6.35**

- **V2 formulation**: The V2 formulation also includes a pediatric formula, 0.05 mg/mL. This formulation has 0.01mg of mRNA per dose.



**FIGURE 6.36**

1581. Based on the foregoing, Moderna made approximately ████████ nominal fLNP doses, as shown in **Table 6.14**, above, which is calculated by dividing the **Amount of mRNA per fLNP Batch** by the **Amount of mRNA per dose.**

1050

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

(b)    **"Nominal fLNP Doses with U.S. Nexus"**

1582.    "Nominal fLNP Doses with U.S. Nexus" is a subset of "Total Nominal fLNP Doses (WW)" and reflects mRNA-1273 fLNP production that has a U.S. nexus as described above. Of the ███ worldwide mRNA-1273 fLNP batches ██████ nominal fLNP doses, as described above), ███ f these fLNP batches have a U.S. nexus. These ██ mRNA-1273 fLNP batches represent approximately ███ of the total worldwide mRNA-1273 fLNP batches, and based on the data described in (a), these 926 batches correspond to ████████ nominal fLNP doses, or ███ of "Total Nominal fLNP Doses (WW)."

(c)    **"Nominal fLNP Doses for fLNP Batches associated with Sold LDP Batches"**

1583.    In this step, I account for the fact that Moderna's records show that not all of the "Nominal fLNP Doses with U.S. Nexus" have been sold by eliminating the nominal fLNP doses associated with mRNA-1273 batches that have not been sold. In particular, "Nominal fLNP Doses with U.S. Nexus in fLNP Batches that were Sold" adjusts the ████████ "Nominal fLNP Doses with U.S. Nexus" in (b), above, to eliminate the doses associated with fLNP batches that have not been sold based on Moderna's Genealogy data (described above).[3740] Of the ███ "Nominal fLNP Batches with a U.S. Nexus," described above, only ████████ of these batches are reflected in Moderna's mRNA-1273 sales records. These ██ mRNA-1273 fLNP batches correspond with ████████ nominal mRNA-1273 fLNP doses. In other words, while Moderna's records show that it produced ████████ "Nominal fLNP Doses with U.S. Nexus" in b) above (which is based on an assumed 100% production yield), only ████████ of the ████████████ of the mRNA-1273 fLNP doses are reflected in Moderna's sales records.

(d)    **"Nominal fLNP Doses with U.S. Nexus Equated to Reported mRNA-1273 LDP Doses Sold"**

1584.    In this step, I account for the fact that there is a difference between Moderna's reported mRNA-1273 doses sold of ████████ based on its Batch Data (described above), and the mRNA-1273 nominal fLNP doses based on batches sold in (c) above (assuming 100% production yield) of ████████. This shows that the ████████ mRNA-1273 nominal *fLNP doses manufactured*

---

[3740] Schedule 9.1.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

yielded ███████ mRNA-1273 *LDP doses sold.* Thus, the mRNA-1273 nominal *fLNP doses manufactured* to mRNA-1273 *LDP doses sold* yield factor is approximately 72.2%.

(e) **"Estimated fLNP Doses with US Nexus"**

1585. In this final step, I calculate the "Estimated fLNP Doses with US Nexus" of approximately **1.586 billion** by multiplying the "Nominal fLNP doses with US Nexus" of approximately **2.198 billion** (in (b), above) by the 72.2% yield factor (in (d), above).

(4) **UDP**

1586. The fLNP "is then stored for a limited duration, and then it is further processed, diluted, filtered and filled into vials to generate the drug product."[3741] "'UDP' stands for unlabeled drug product. So that is the – that same lot after it is filled into vials or syringes but prior to being labeled and placed into cartons. That is the part number assigned to the intermediate – that intermediate item."[3742] Moderna's UDP part numbers are a five-digit code that starts with 6 (*i.e.,* PN 60039).[3743]

1587. The genealogy data reports that non-clinical UDP batches were manufactured from April 2020 to February 2024.[3744] During this time, Moderna made approximately ███████ equivalent doses of UDP that was used in mRNA-1273 as shown in **Table 6.15**, below.

[3741] MRNA-GEN-02615390-436, at 399 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, p. 10 of 47) ███████

[3743] MRNA-GEN-02615390-436, at 390-391 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, pp. 1-2 of 47).

[3744] Schedule 9.1.

1052

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**TABLE 6.15**

1588. The UDP analysis generally follows the same methodology summarized above for fLNP. The equivalent doses of mRNA-1273 UDP were estimated by first calculating the estimated mRNA-1273 UDP doses—both worldwide ("WW") and with a U.S. nexus—assuming 100% yield (in (a) and (b), respectively). Next, I eliminate the mRNA-1273 UDP doses associated with *unsold* UDP batches (in (c), below). Finally, I adjust the estimated mRNA-1273 UDP doses associated with *sold* UDP batches to equate it to Moderna's reported mRNA-1273 LDP doses sold (in (d), below) as follows:

(a)    **"Total Nominal UDP Doses (WW)"**

1589. "Total Nominal UDP Doses (WW)" reflects an estimate of Moderna's total worldwide mRNA nominal UDP production in doses based on Moderna's batch records.[3745] Moderna's records refer to "Nominal Batch Scale" which reflects the stated number of multi-dose vials in each UDP batch (*i.e.,* "Up to 61,000 Multiple Dose Vials"), as shown in **Figure 6.37**,[3746] below, which is an excerpt

---

[3745] MRNA-GEN-02615390-436 at 405-407, 418-421 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, pp. 16-18 and 29-32).
[3746] MRNA-GEN-02615390-436, at 405 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, p. 16 of 47).May 20, 2024 Deposition of Marcus Boyer, 22:12-22:18 ("A. This document [Boyer Deposition Exhibit No. 2, PVMP] is

1053

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

from Moderna's PVMP (UDP part numbers start with 6[3747]). Moderna's batch records show that a total of 3,031 mRNA-1273 nominal UDP batches were produced during the period April 2020 to February 2024.[3748]

FIGURE 6.37

1590. As shown in **Figure 6.37**, above, many of the "Nominal Batch Scales" are stated as "up to" (*e.g..,* "Up to 61,000 Multiple dose vials") or as a range (*e.g.,* "120,000 to 160,000 Multiple dose vials"). To calculate the mRNA nominal UDP batches, I use the number at low end of the stated range.[3749]

1591. Based on the foregoing, Moderna made approximately ▮▮▮▮▮▮ mRNA-1273 nominal UDP doses (WW), as shown in **Table 6.15**, above, which is calculated by multiplying each UDP batch by the applicable "Nominal Batch Scale" stated in the PVMP.

               (b)       **"Nominal UDP Doses with U.S. Nexus"**

---

the document that, as far as I know, provides the most easily understandable tables for mRNA-1273.").

[3747] MRNA-GEN-02615390-436, at 405-407 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, pp. 16-18 of 47).

[3748] Schedule 9.1

[3749] Using the low end or the high end of the stated dose range does not material affect the estimate. For example, using the high end of the range, the estimated nominal UDP doses are 1.417 billion, a difference of less than 1%, compared to using the low end of the range. In addition, this does not have a material impact on the analysis because the final step of the analysis is to equate the number of mRNA-1273 UDP doses to the mRNA-1273 LDP doses sold.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

"Nominal UDP Doses with U.S. Nexus" is a subset of "Total Nominal UDP Doses (WW)" and reflects mRNA-1273 UDP production that has a U.S. nexus as described above. Of the ███ worldwide mRNA-1273 UDP batches ██████████ nominal UDP doses, as described above), ████ of these UDP batches have a U.S. nexus. These ████ mRNA-1273 UDP batches represent approximately ████ of the total worldwide mRNA-1273 UDP batches, and based on the data described in (a), these ████ batches correspond to ██████████ nominal UDP doses, or ████ of "Total Nominal UDP Doses (WW)."

       **(c)**    **"Nominal UDP Doses for UDP batches associated with Sold LDP Batches"**

1592. In this step, I account for the fact that Moderna's records show that not all of the "Nominal UDP Doses with U.S. Nexus" have been sold by eliminating the nominal UDP doses associated with mRNA-1273 UDP batches that have not been sold. In particular, "Nominal UDP Doses with U.S. Nexus in UDP Batches that were Sold" adjusts the ██████████ "Nominal UDP Doses with U.S. Nexus" in (b), above, to eliminate the doses associated with UDP batches that have not been sold based on Batch Sales data and Genealogy Data.[3750] Of the ██████ "Nominal UDP Batches with a U.S. Nexus," described above, only ██████████ of these batches are reflected in Moderna's mRNA-1273 sales records. These ████ mRNA-1273 UDP batches correspond with ██████████ nominal mRNA-1273 UDP doses. In other words, while Moderna's records show that it produced ██████████ "Nominal UDP Doses with U.S. Nexus" in b) above (which is based on an assumed 100% production yield), only ██████████ of the ██████████████ of the mRNA-1273 UDP doses are reflected in Moderna's sales records.

       **(d)**    **"Nominal UDP Doses with U.S. Nexus Equated to Reported Actual US LDP Doses"**

1593. In this step, I account for the fact that there is a difference between Moderna's reported mRNA-1273 doses sold of ██████████ based on its Batch Data (described above), and the mRNA-1273 nominal UDP doses based on batches sold in (c) above (assuming 100% production yield) of ████ ██████. This shows that the ██████████ mRNA-1273 nominal *fLNP doses manufactured* yielded ██████████ mRNA-1273 *LDP doses sold*. Thus, the mRNA-1273 nominal *UDP doses manufactured* to mRNA-1273 *LDP doses sold* yield factor is approximately ██████

---

[3750] Schedule 9.1, Schedule 9.2

1055

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**(e)    "Estimated UDP Doses with U.S. Nexus"**

1594.    In this final step, I calculate the "Estimated UDP Doses with U.S. Nexus" of approximately ▮▮▮ ▮▮▮ by multiplying the "Nominal UDP doses with US Nexus" of approximately ▮▮▮ (in (b), above) by the ▮▮ yield factor (in (d), above).

**(5)    LDP**

1595.    "LDP" stands for "labeled drug product," a term that is "used interchangeably [with] FFP, or final finished product,"[3751] and is "the last manufacturing stage, in which case the product is labeled and packaged into cartons."[3752]

1596.    The genealogy data reports non-clinical LDP batches were manufactured from July 2020 to February 2024[3753]. During this period, Moderna made approximately ▮▮▮▮▮ mRNA-1273 LDP doses, as shown in **Table 6.16**, below.



**TABLE 6.16**

1597.    The LDP analysis generally follows the same methodology summarized above for fLNP and UDP. The equivalent doses of mRNA-1273 LDP were estimated by first calculating the estimated mRNA-1273 LDP doses—both worldwide ("WW") and with a U.S. nexus—assuming 100% yield (in (a) and (b), respectively). Next, I eliminate the mRNA-1273 LDP doses associated with *unsold*

---

[3751] May 23, 2024 Deposition of Albert Thomas, 103:13-103:16.
[3752] May 23, 2024 Deposition of Albert Thomas, 103:20-103:22.
[3753] Schedule 9.1

1056

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

LDP batches (in (c), below). Finally, I adjust the estimated mRNA-1273 LDP doses associated with *sold* LDP batches to equate it to Moderna's reported mRNA-1273 LDP doses sold (in (d), below) as follows:

### (a)    "Total Nominal LDP Doses (WW)"

1598.   "Total Nominal LDP Doses (WW)" reflects an estimate of Moderna's total worldwide mRNA nominal LDP production in doses based on Moderna's batch records.[3754] Moderna's records refer to "Nominal Batch Scale" which reflects the stated number of multi-dose vials in each LDP batch (*i.e.,* "Up to 61,000 Multiple Dose Vials"), as shown in **Figure 6.38**,[3755] below, which is an excerpt from Moderna's PVMP (LDP part numbers start with 7[3756]). Moderna's batch records show that a total of ▮▮▮ mRNA-1273 nominal LDP batches were produced during the period July 2020 to February 2024.[3757]

---

[3754] Schedule 9.1

[3755] MRNA-GEN-02615390-436, at 405 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, p. 16 of 47).May 20, 2024 Deposition of Marcus Boyer, 22:12-22:18 ("A. This document [Boyer Deposition Exhibit No. 2, PVMP] is the document that, as far as I know, provides the most easily understandable tables for mRNA-1273.").

[3756] MRNA-GEN-02615390-436, at 405-407 (Boyer Deposition Exhibit No. 2 – "PV-VAL-VMP-0001, Version 9.0, Process Validation Master Plan ['PVMP'] for mRNA-1273 / Modified mRNA-1273," *Moderna,* Approved Date: March 19, 2024, pp. 16-18 of 47).

[3757] Schedule 9.1

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**FIGURE 6.38**

1599. As shown in **Figure 6.38**, above, many of the "Nominal Batch Scales" for LDP are stated as "up to" (*e.g..,* "Up to 61,000 Multiple dose vials") or as a range (*e.g.,* "Up to 92,000 (6.3mL fill) multiple dose vials[;] Up to 162,000 (3.2mL) multiple dose vials"). To calculate the mRNA nominal LDP batches, I use the number at the low end of the stated range.[3758]

1600. Based on the foregoing, Moderna made approximately ▇▇▇▇▇▇ mRNA-1273 nominal LDP doses (WW), as shown in **Table 6.16** above, which is calculated by multiplying each LDP batch by the applicable "Nominal Batch Scale" stated in the PVMP

(b)    **"Nominal LDP Doses with U.S. Nexus"**

1601. "Nominal UDP Doses with U.S. Nexus" is a subset of "Total Nominal LDP Doses (WW)" and reflects mRNA-1273 UDP production that has a U.S. nexus as described above. Of the ▇▇▇▇ worldwide mRNA-1273 LDP batches ▇▇▇▇▇▇ nominal LDP doses, as described above), ▇▇▇▇ these LDP batches have a U.S. nexus. These ▇▇▇. mRNA-1273 LDP batches represent approximately ▇▇▇ of the total worldwide mRNA-1273 LDP batches, and based on the data described in (a), these ▇▇▇▇▇▇ correspond to ▇▇▇▇▇▇ nominal LDP doses, or ▇▇▇▇ of "Total Nominal LDP Doses (WW)."

(c)    **"Nominal LDP Doses with U.S. Nexus in LDP Batches that were Sold"**

1602. In this step, I account for the fact that Moderna's records show that not all of the "Nominal LDP Doses with U.S. Nexus" have been sold by eliminating the mRNA-1273 LDP batches that have not been sold. In particular, "Nominal LDP Doses with U.S. Nexus in LDP Batches that were Sold" adjusts the ▇▇▇▇▇▇ "Nominal LDP Doses with U.S. Nexus" in (b), above, to eliminate the doses associated with LDP batches that have not been sold based on Moderna's Genealogy Data and Batch-Level Sales Data.[3759] Of ▇ ▇▇▇▇ "Nominal LDP Batches with a U.S. Nexus," described above, only ▇▇▇▇▇▇ of these batches are reflected in Moderna's mRNA-1273

---

[3758] Using the low end or the high end of the stated dose range does not material affect the estimate. For example, using the high end of the range, the estimated nominal LDP doses are 1.400 billion, a difference of less than 2.5%, compared to using the low end of the range. In addition, this does not have a material impact on the analysis because the final step of the analysis is to equate the number of mRNA-1273 UDP doses to the mRNA-1273 LDP doses sold.

[3759] Schedule 9.1, Schedule 9.2

[3760] Schedule 9.1. This excludes 27 batches that were used for clinical trials. See MRNA-GEN-00467737 (Thomas Deposition Exhibit No. 9 – Clinical Trial Batches).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1603.    sales records.

1604.    These ▮▮▮▮ mRNA-1273 LDP batches correspond with ▮▮▮▮▮▮ nominal mRNA-1273 LDP doses. In other words, while Moderna's records show that it produced ▮▮▮▮▮ "Nominal LDP Doses with U.S. Nexus" in b) above (which is based on an assumed 100% production yield), only ▮▮▮▮▮ of the ▮▮▮▮▮ nominal doses (or ▮▮▮ are reflected in Moderna's sales records.

1605.    The remaining ▮▮▮ LDP batches ▮▮▮▮▮ appear to be unsold; the majority of which are concentrated in the period December 2021 through November 2023, as shown in **Chart 6.3,** below. Beginning in 2022, Moderna began reporting significant inventory write-offs. For example, on November 2, 2023, Moderna reported that it "took a $1.3 billion inventory write-down [in Q3'2023] attributed to 'excess and obsolete' COVID vaccine stock."[3761]

---

[3761] Zoey Becker, "Moderna takes hefty $1.3B COVID write-off, scales back manufacturing as sales shrink," *Fierce Pharma,* November 2, 2023, *available at* https://www.fiercepharma.com/pharma/moderna-tallies-hefty-covid-write-13b-sales-shrink.*See also* Moderna, Inc. 10-Q for the fiscal quarter ended September 30, 2023, p. 23, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/a8a51cb2-9ca9-450e-9bee-9cb6875871e0.pdf ("Inventory write-downs as a result of excess, obsolescence, scrap or other reasons, and losses on firm purchase commitments are recorded as a component of cost of sales in our condensed consolidated statements of operations. For the three and nine months ended September 30, 2023, inventory write-downs were $1.3 billion and $1.9 billion, respectively. For the three and nine months ended September 30, 2022, inventory write-downs were $333 million and $1.0 billion, respectively. ")."Moderna, Inc. (MRNA) Q3 2023 Earnings Call Transcript," *Seeking Alpha,* November 2, 2023, p. 5 ("… As a result, we are recording charges of $1.6 billion, $1.4 billion of which are in Q3 and an expected $0.2 billion in Q4. The $1.4 billion **charge in Q3 consists of inventory write-downs of $0.9 billion** and CMO wind-down costs and cancellation fees of $0.5 billion. … So, now coming back to my commentary on Q3. In addition to unit-driven manufacturing costs and the cost from this initiative, **we also incurred approximately $0.4 billion of inventory charges for excess and obsolete material, demand-related write-downs of our latest Spikevax product, and unutilized manufacturing capacity charges**." (emphasis added)( Jamey Mock, CFO)).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**CHART 6.3**

       **(d)**    **"Nominal LDP Doses with U.S. Nexus Equated to Reported Actual US LDP Doses"**

1606. In this step, I account for the fact that there is a difference between Moderna's reported mRNA-1273 doses sold of ▮▮▮▮ based on its Batch Data (described above), and the mRNA-1273 nominal LDP doses based on batches sold in (c) above (assuming 100% production yield) of ▮▮▮▮ ▮▮▮▮. This shows that the ▮▮▮▮ mRNA-1273 nominal *LDP doses manufactured* yielded ▮▮▮▮ mRNA-1273 *LDP doses sold*. Thus, the mRNA-1273 nominal *LDP doses manufactured* to mRNA-1273 *LDP doses sold* yield factor is approximately ▮▮▮▮

       **(e)**    **"Estimated LDP Doses with U.S. Nexus"**

1607. In this final step, I calculate the "Estimated LDP Doses with U.S. Nexus" of approximately ▮▮▮▮ ▮▮▮▮ by multiplying the "Nominal LDP doses with US Nexus" of approximately ▮▮▮▮ (in (b), above) by ▮▮▮▮ yield factor (in (d), above).

       **(f)**    **Infringement by Making**

1608. Dr. Mitchell's infringement analysis includes an evaluation of both sold and unsold batches of LDP. Of the ▮▮ unsold batches identified above, all ▮▮ infringe under the Testing-Version theory

1060

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

(among others).[3762] Furthermore, I understand that where an LDP lot infringes, the precursor manufacturing steps (UDP and fLNP) will also infringe, as the molar ratios should not change.[3763] Therefore the LDP is linked to its precursors in that way.

### b.    Selling

1609.  I have estimated the total number of mRNA-1273 doses with a U.S. nexus for commercial use that Moderna sold in the U.S. and OUS during the period December 2020 through September 2023 under the following two general scenarios, which assume:

- *All* such doses are found to infringe the Patents-in-Suit.

- *Infringement Finding that Results in Other Permutations and Combinations*

- *Infringement Finding that Includes Application of 28 U.S.C. § 1498*

### (1)    *All* mRNA-1273 Doses with a U.S. Nexus for Commercial Use that Moderna Sold Are found to Infringe the Patents-in-Suit

1610.  Under this first scenario, Moderna's total mRNA-1273 doses with a U.S. nexus for commercial use that Moderna sold in the U.S. and OUS during the period December 2020 through September 2023 is summarized in **Table 6.17**, below, based principally on Moderna's Batch Sales data, described above. The total mRNA-1273 doses in this royalty base is approximately **1.114 Billion**.

---

[3762] Mitchell Appendix 132, 154; Schedules 9.1, 9.2.

[3763] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section X.C.3 ("Based on Moderna's representations to the FDA, it is my understanding that the mRNA-LNPs used to manufacture the COVID-19 drug product do not change compositionally during the drug product manufacturing process, and in fact, Moderna's goal was that the composition be maintained throughout the drug product manufacturing process.")

1061

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

| Assumptions | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Patent Scenario | P1: All Patents In | | | | | | | |
| Infringement Theory | Testing-Version | | | | | | | |
| 1498 Scenario | § 1498 Does Not Apply | | | | | | | |

| | | Pandemic | | | | Endemic | | Total |
|---|---|---|---|---|---|---|---|---|
| | | 2020 | 2021 | 2022 | Jan-Aug 2023 | Sep-Dec 2023 | 2024 | Jan 2020-Jan 2024 |
| Sales in US | C-100 Units | 9,400,700 | 335,758,068 | 154,894,680 | - | | - | 500,053,448 |
| | Other US Government Contracts | 3,967,700 | - | 67,822,614 | 25,470 | | - | 71,815,784 |
| | US Private Sales | - | - | - | - | 26,242,496 | 1,005,894 | 27,248,390 |
| Other Sales with US Nexus | Infringing Product Made in US | - | 231,305,296 | 176,427,866 | 12,089,860 | 16,728,460 | - | 436,551,482 |
| | MPI/LMX Made in US [271(f)] | - | - | 67,858,677 | 10,312,714 | - | - | 78,171,391 |
| Total Doses | | | | | | | | 1,113,840,495 |

*Notes and Sources:*
[1] Schedule 9.1 and 9.2.
[2] Mitchell Appendices 132 and 154.

**TABLE 6.17**

1611. These sales are comprised of sales to the U.S. Government and Sales to Private Parties, as follows:

### (a)    Sales to the U.S. Government

1612. Between 2020 and 2022, Moderna entered into several contracts with the U.S. Government to supply Covid-19 vaccines. The contracts, which together reached a cumulative value of **$11.7 billion**, provided for the development, manufacture, and delivery of over <u>500</u> million mRNA-1273 doses.

1613. Moderna sales of mRNA-1273 to the U.S. Government were pursuant to four (4) contracts, C-34, C-100, C-17 and C-55, as shown in **Table 6.18**, below, which reports doses, revenue, and revenue per dose, as well as the Initial Value and Final Value associated with the contracts. The total mRNA-1273 doses sold to the U.S. Government is approximately **571.8 million**.

| | Batch-Level Sales Data | | | Contracts | |
|---|---|---|---|---|---|
| | Doses | Revenue | Revenue Per Dose | Initial Value | Final Value |
| C-34 | 3,967,700 | $14,151,702 | $3.57 | $430,298,520 | $1,706,601,343 |
| C-100 | 500,053,448 | $8,126,246,275 | $16.25 | $1,225,000,000 | $8,204,906,278 |
| C17/55 | 67,848,084 | $1,788,464,960 | $26.36 | $1,735,800,000 | $1,788,399,999 |
| Total | 571,869,232 | $9,928,862,937 | $17.36 | $3,391,098,520 | $11,699,907,620 |

*Notes and Sources:*
[1] C-34 Contract: MRNA-GEN-00456091, MRNA-GEN-00456257
[2] C-100 Contract: MRNA-GEN-00079284, MRNA-GEN-00457581
[3] C-17/C-55 Contract: MRNA-GEN-00079608, MRNA-GEN-00456316
[4] Batch-Level Sales Data. See Lawton Schedule 9.2

**TABLE 6.18**

1062

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1614.    The first contract between Moderna and the U.S. Government covering the Accused Product was Contract No. 75A50120C00034 ("C-34").  The C-34 contract between ModernaTX, Inc. and ASPR-BARDA, executed on April 16, 2020, had an initial value of **$430.3 million** and reached a final cumulative value of **$1.7 billion** through 20 modifications.   This initial contract was a development contract.  The contract was "to develop a mRNA vaccine to licensure for the prevention of COVID-19.  The project will entail pre-clinical and Phase 2 and Phase 3 clinical studies sufficient to demonstrate the safety and efficacy of the proposed vaccine(s); CMC development, scale-up, scale-out and validation of manufacturing capacities, including bulk drug substance and fill and finished drug product, with a capacity of 100 million doses by 2021 and all program management and regulatory activities necessary to achieve FDA licensure of the vaccine."[3764]

1615.    This included a **$3.2 million** in pre-award cost and **$427.1 million** "to develop a mRNA vaccine to licensure for the prevention of COVID-19."[3765]  The contract included a **$53 million** option for Domestic Manufacturing Scale-Out, which was exercised in the first modification on May 24, 2020, increasing the total value to **$483.3 million**.[3766]On July 25, 2020, an increased SOW added **$471.6 million** to contract value, bringing the total to **$954.9 million**.[3767] In the 7th, 8th, and 9th modifications, additional funding was provided for an adolescent study, a pediatric study, and a Phase 3 Pivotal Study.[3768]  This added a total of **$443.2 million** to the study.[3769] As of June 15, 2021, the cumulative contract value was **$1.4 billion**.[3770] To provide additional support for these studies, on March 23, 2022, an additional **$308.5 million** was provided.[3771] This was the last

[3764] MRNA-GEN-00456091-202, at 094 (75A50120C00034 Contract, April 16, 2020).

[3765] MRNA-GEN-00456091-202, at 094 (75A50120C00034 Contract, April 16, 2020).

[3766] MRNA-GEN-00456091-202 at 094 (75A50120C00034 Contract, April 16, 2020); MRNA-GEN-00456257-267 at 260 (75A50120C00034 Contract – Mod P00012, March 23, 2022)

[3767] MRNA-GEN-00456257-267 at 260 (75A50120C00034 Contract – Mod P00012, March 23, 2022)

[3768] MRNA-GEN-00456257-267 at 259 (75A50120C00034 Contract – Mod P00012, March 23, 2022)

[3769] MRNA-GEN-00456257-267 at 260 (75A50120C00034 Contract – Mod P00012, March 23, 2022)

[3770] MRNA-GEN-00456257-267 at 260 (75A50120C00034 Contract – Mod P00012, March 23, 2022)

[3771] MRNA-GEN-00456257-267 at 260 (75A50120C00034 Contract – Mod P00012, March 23, 2022)

1063

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

modification resulting in changes to contract value. There were 20 modifications to the original contract, the last modification was effective December 11, 2023.[3772] The total contract value was **$1.7 billion**.[3773]

1616.  Moderna classified the revenue from the C-34 contract as grant revenue in its financial statements.[3774]

1617.  On May 31, 2020, Moderna made an offer for sale to the U.S. Government for an initial volume of **100 million doses** at **$30/dose**.  Moderna's May 31, 2020 letter to the U.S. Government stated: "Moderna is prepared to enter discussions with the US Government to manufacture an initial supply of 100 million doses of mRNA-1273 at $30 per 100-microgram dose (sufficient to vaccinate 50 million people based on our current 2-dose assumption), delivered as a 10-dose multidose vial."[3775]

1618.  The May 31, 2020 offer resulted in Moderna signing a supply contract number W911QY20C0100 ("C-100 Contract"),with the U.S. Government for covid vaccines on August 9, 2020 - this was the first of the supply agreements "for the supply of 100 million doses of our COVID-19 vaccine."[3776] The C-100 Contract began with an initial award of **$1.225 billion** and ultimately grew to **$8.2 billion** through 31 modifications.[3777] The initial award covered 100 million doses at $12.25 per dose, with a $3 per dose incentive tied to Emergency Use Authorization (EUA) or Biologics License Application (BLA) approval by January 31, 2021, for a total price of $15.25. [3778] Following FDA emergency use authorization on December 18, 2020, Moderna received the full

---

[3772] MRNA-GEN-01352336-337 (75A50120C00034 Contract – Mod P00020, December 11, 2023)

[3773] MRNA-GEN-00456257-267 at 260 (75A50120C00034 Contract – Mod P00012, March 23, 2022)

[3774] Moderna, Inc. 10-K for the fiscal year ended December 31, 2020, p. 201, *available at* https://www.sec.gov/Archives/edgar/data/1682852/000168285221000006/mrna-20201231.htm.

[3775] HHS-0000828-830, at 828 (Bennett Deposition Exhibit No. 21 – May 31, 2020 letter from Stéphane Bancel to Dr. Moncel Slaoui (Warp Speed/HHS), General Gustave F. Perna (Warp Speed/HHS), Dr. Gary Disbrow (BARDA)).  May 20, 2024 30(b)(6) Deposition of Hamilton B. Bennett, 211:7-211:17.

[3776] Moderna, Inc. 10-K for the fiscal year ended December 31, 2020, p. 165, *available at* https://www.sec.gov/Archives/edgar/data/1682852/000168285221000006/mrna-20201231.htm.

[3777] MRNA-GEN-00079284-336 (Hoge Deposition Exhibit No. 49 - W911QY20C0100 Contract, August 9, 2020)

[3778] MRNA-GEN-00079284, at 286, 289 (Hoge Deposition Exhibit No. 49 - W911QY20C0100 Contract, August 9, 2020)

1064

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

$15.25 per dose.[3779] The contract included four options for additional 100-million-dose purchases at $16.50 per dose, all of which were exercised: the first on December 11, 2020, the second on February 11, 2021, and both the third and fourth on June 15, 2021. [3780] In the 22nd modification of the contract, 20 million of the vaccines ordered in the fourth option were allotted to support the 6-month to 6-year age group.[3781] In total, there were 31 modifications to the W911QY20C0100 contract, the last of which was executed on September 22, 2023.[3782] Including the vaccines ordered, incentives, and funding for storage and distribution, the total value of the contract was **$8.2 billion**.[3783] NRU data confirms delivery of 500,001,540 net recognized units matching the **$8.2 billion** revenue.

1619. The third U.S. governmental contract was W58P0522C0017 ("C-17 Contract").[3784]  The C-17 contract, which later became the C-55 contract, was ▮▮▮▮▮▮▮▮▮▮▮▮ when executed on July 28, 2022, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮



), were exercised on August 1, 2022. [3786]

1620. On October 1, 2022, the C-17 contract was transferred from the Department of Defense to Health and Human Services, becoming the C-55 contract. Under C-55, the options were revised to provide

---

[3779] "Statement from NIH and BARDA on the FDA Emergency Use Authorization of the Moderna COVID-19 Vaccine," December 18, 2020, available at https://www.nih.gov/news-events/news-releases/statement-nih-barda-fda-emergency-use-authorization-moderna-covid-19-vaccine.

[3780] MRNA-GEN-00079170-200 (W911QY20C0100 Contract – Mod P00003, December 11, 2020); MRNA-GEN-00079201-231 (W911QY20C0100 Contract – Mod P00007, June 15, 2021); MRNA-GEN-00079068-097 (W911QY20C0100 Contract – Mod P00004, February 11, 2021).

[3781] MRNA-GEN-00079379-383, at 380 (W911QY20C0100 Contract – Mod P00022, March 28, 2022).

[3782] MRNA-GEN-00457581-583 (W911QY20C0100 Contract – Mod P00031, September 22, 2023).

[3783] MRNA-GEN-00457581-583, at 582 (W911QY20C0100 Contract – Mod P00031, September 22, 2023).

[3784] MRNA-GEN-00079608-675, at 610, 612, 613 (W58P0522C0017 Contract, July 28, 2022).

[3785] MRNA-GEN-00079608-675, at 610, 612, 613 (W58P0522C0017 Contract, July 28, 2022).

[3786] MRNA-GEN-00079608-675 at 612, 613 (W58P0522C0017 Contract, July 28, 2022).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

██████████████████████    ██████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████. [3788]

### (b) U.S. Sales to Private Parties

1621. Moderna's also had commercial sales of mRNA-1273 to U.S. private parties, as shown in **Table 6.18**, above. The total mRNA-1273 doses sold to private parties is approximately ████████. I understand that Moderna has not produced its commercial contracts for the supply of Accused Products.

### (c) Other sales with US Nexus

1622. Moderna also had sales of sales of mRNA-1273 with a U.S. Manufacturing Nexus to other parties, including foreign governments, as shown in **Table 6.19**, below. The total mRNA-1273 doses sold to private parties is approximately ████████, and fall into two categories:

   a) **271(f) sales**: ████████████████████████████
   ████████████████. [3789]

   b) **Other Sales**: ████████████████████████████
   ████████████████████.

---

[3787] MRNA-GEN-00079599-603, at 600 (W58P0522C0017 Contract – P00002, October 1, 2022).

[3788] Table 6.18.

[3789] Given the urgency of the pandemic, Moderna was building its foreign supply chain as quickly as possible in 2020 and 2021.  Bennett 5/20/2024 Tr. 118:21-120:3.  It thus lacked excess capacity to manufacture the components at issue outside the United States, meaning that the U.S. manufacture of those components "enable[d] otherwise-unavailable profits from conduct abroad." *Brumfield v. IBG LLC*, 97 F.4th 854, 877 (Fed. Cir. 2024).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

| Assumptions | |
| --- | --- |
| Patent Scenario | P1: All Patents In |
| Infringement Theory | Testing-Version |
| 1498 Scenario | § 1498 Does Not Apply |

| | | Pandemic | | | | Endemic | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2020 | 2021 | 2022 | Jan-Aug 2023 | Sep-Dec 2023 | 2024 | Jan 2020-Jan 2024 |
| Other Sales with US Nexus | Infringing Product Made in US | - | 231,305,296 | 176,427,866 | 12,089,860 | 16,728,460 | - | 436,551,482 |
| | MPI/LMX Made in US [271(f)] | - | - | 67,858,677 | 10,312,714 | - | - | 78,171,391 |
| Total Doses | | | | | | | | 514,722,873 |

Notes and Sources:
[1] Schedule 9.1 and 9.2.
[2] Mitchell Appendices 132 and 154.

**TABLE 6.19**

1623.  ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████████

1624.  In June 2020, in a letter to the Contracting Officer, U.S. Army Contracting Command, Department of the Army, Moderna's Hamilton Bennett summarized ████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████
          ████████████████████████████████████     ██
          ████████████████████████████████████████████
          ████████████████████████████████████. [3792]

[3790] ████████████████████████████████████████████████████████
███████████████████████████████████

[3791] ██████████████████████████████████████████████████████████
██████████████████████████████████

[3792] ████████████████████████████████████████████████████████████
████████████████████████████████

1067

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1625.

1626. In its 10-K for the fiscal year ended December 31, 2020, Moderna reported: "As of December 31, 2020, we have signed supply agreements to deliver approximately 520 million doses of mRNA-1273 in 2021, for total contract consideration of $11.7 billion. We have confirmed the following supply agreements as of that date: United States: 200 million doses, with option for an additional 300 million doses; European Union: 160 million doses; Japan: 50 million doses; Canada: 40 million doses, with option for an additional 16 million doses; South Korea: 40 million doses; United Kingdom: 17 million doses; Switzerland: 7.5 million doses; Israel: 6 million doses. We also signed agreements with Qatar, Singapore, and other countries for which order amounts were not disclosed."[3794]

1627. Moderna further reported: "During 2021, and through the date of this Annual Report on Form 10-K, we have agreed to additional supply agreements, or received option exercises, for additional doses as follows: United States: 100 million doses, with an option remaining for 200 million doses; European Union: 150 million doses, with an option remaining for 150 million doses in 2022 (subject to final execution of the Purchase Agreement following the expiration of the opt out period for EU Member States); Canada: 4 million doses; Colombia: 10 million doses; and Taiwan: 5 million doses."[3795]

1628. Moderna produced MRNA-GEN-01706579 in response to an interrogatory from Genevant and identified it as a listing of "OUS Contracts."[3796]  The spreadsheet lists four fields, as shown below, but does not provide information on volume or pricing of doses:

- **Country/Distributor** - listing the name of the country the specific agreement relates to;

---

[3793] ████████████████████████████████████████████████████████████████████████

[3794] Moderna, Inc. 10-K for the fiscal year ended December 31, 2020, p. 28, *available at* https://www.sec.gov/Archives/edgar/data/1682852/000168285221000006/mrna-20201231.htm.
[3795] Moderna, Inc. 10-K for the fiscal year ended December 31, 2020, p. 28, *available at* https://www.sec.gov/Archives/edgar/data/1682852/000168285221000006/mrna-20201231.htm.
[3796] MRNA-GEN-01706579 (Moderna response to interrogatory no. 18 identified this file as relating to "OUS Contracts.").

1068

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

- **Contract** – title of the contract
- **Moderna Entity**
- **Date**

### (2)   Infringement Finding that Results in Other Permutations and Combinations

1629. In addition to the foregoing, I have also been asked to determine the mRNA-1273 royalty base assuming four (4) additional patent validity / infringement outcomes. These, along with my initial scenario that all patents are in, include the following:

| Patent Scenario | Patents Valid and Infringed | EP '651 | Lipid Composition Patents | | | | |
|---|---|---|---|---|---|---|---|
| | | | '069 | '359 | '668 | '435 | '378 |
| Patent Scenario #1 | All Patents In | X | X | X | X | X | X |
| Patent Scenario #2 | First Four Lipid Composition Patents | | X | X | X | X | |
| Patent Scenario #3 | All Lipid Composition | | X | X | X | X | X |
| Patent Scenario #4 | '651 Alone | X | | | | | |
| Patent Scenario #5 | '651 + First Four Lipid Composition | X | X | X | X | X | |

**TABLE 6.20**

1630. I calculate the royalty base for each of these using Dr. Mitchell's opinions regarding the foregoing infringement theories (*i.e.,* Fractionation Testing, Moderna's Certificates of Analysis, and DOE), which are set forth in Schedule 2.1.

1631. In the event the ultimate infringement determination differs from these scenarios, I can recalculate the royalty base based on an alternative infringement findings if requested to do so. In this case I would adjust Dr. Mitchell's Appendix 132 and 154 to remove claims no longer deemed valid and infringed, and then merge these revised claims back onto Moderna's sales data using Schedules 9.1 and 9.2.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**(3)    Infringement Finding that Includes Application of 28 U.S.C. § 1498**

1632. Finally, I have been asked to determine the royalty base assuming the Court finds that 28 U.S.C. § 1498 applies to some of Moderna's mRNA-1273 doses sold, which I refer to as the "§ 1498 Scenarios." I understand that Moderna claims that "Batches of the Accused Product manufactured and sold pursuant to the C0100 Contract are subject to Section 1498."[3797] As shown in **Table 6.18**, above, the mRNA-1273 doses associated with the C-100 contract total approximately **500 million** doses sold. Detail regarding the disposition of the mRNA-1273 doses sold under C-100 doses, however, is incomplete, and only covers **391.0 million** (78.2%) of the total C-100 doses of **500.0 million**, as shown in HHS-0000418, and discussed further below.

| Table 1 | CDC COVID-19 Vaccination Administration Partner | Moderna doses shipped for requested Lot#s *(descending order)* |
|---|---|---|
| | Jurisdictions | 152,744,720 |
| | Pharmacy | 142,753,200 |
| | Federal | 95,357,080 |
| | Dialysis Clinics | 193,280 |
| | Total doses | 391,048,280 |

**FIGURE 6.39**

1633. In view of the foregoing, although I understand that Moderna bears the burden of proof in establishing that 28 U.S.C. § 1498 applies, I have been asked at this stage to determine the mRNA-1273 royalty base under the following three (3) § 1498 Scenarios.

**(a)    § 1498 Does Not Apply to *Any* mRNA-1273 Doses Under the C-100 Contract**

1634. Under this scenario, because § 1498 does not apply to any mRNA-1273 doses, *no* mRNA-1273 doses are excluded from the royalty bases summarized above.

**(b)    § 1498 Applies to *Certain* mRNA-1273 Doses Under the C-100 Contract**

1635. Under this scenario, I assume that § 1498 applies to c*ertain* mRNA-1273 does under the C-100 contract, namely, doses that were potentially used for "Federal Purposes." The U.S. Department of Health and Human Services ("HHS") produced distribution data[3798] that shows the disposition of some but not all of the mRNA-1273 doses sold under the C-100 contract. In particular, the HHS

---

[3797] Defendants' Seventh Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (No. 3) dated January 19, 2024, at p. 42.

[3798] HHS-0000418.

1070

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

data shows how many doses were "ordered and administered" through "different entities or channels."[3799] Dr. Santoli described HHS's Administration Partners—Jurisdictions, Pharmacy, Federal, and Dialysis Clinics—as follows:

- **Jurisdictions**: "Jurisdictions represents 64 state, local, and/or territorial public health entities who are supported by CDC in its routine vaccination program."[3800]

- **Pharmacy**: The pharmacy channel was made up of 21 retail pharmacy chains who participated in the response to administer -- to order and administer vaccine through their sites.[3801]

- **Federal**: "The federal channel was made up of a number of federal agencies who ordered vaccine to their facilities to vaccinate either their beneficiaries or staff or both."[3802]

- **Dialysis Clinics**: "two dialysis chains that had a lot of locations and ordered vaccine to vaccinate their -- the patients and staff in those facilities."[3803]

1636.  mRNA-1273 doses sold under the C-100 contract associated with the Jurisdictions, Pharmacy, and Dialysis channels are not used by the U.S. Government. BARDA official Dr. Johnson testified as follows:

- **Jurisdictions**: "Q. So these jurisdictions are not the federal government; correct? A. Correct."[3804]

- **Pharmacy**: "Q. Those [Pharmacy] doses weren't for use by the federal government? A. The federal government did not administer those doses, correct."[3805]

- **Dialysis Clinics**: "Q. So these [Dialysis doses] -- because these are reflected separately from the federal channel, these are not doses for the federal government? A. I believe so. Q. You believe that's correct? A. I believe that is correct."[3806]

---

[3799] August 27, 2024 Deposition of Jeanne Santoli, M.D., 35:15-17. *See also*, August 27, 2024 Deposition of Jeanne Santoli, M.D., 28. ("This data comes from a "repository that was created for the COVID-19 vaccination program. It's a cloud-based repository that was set up to receive and store and process data, including vaccine ordering and shipment data, which is the subject of this tab that we're looking at.").

[3800] August 27, 2024 Deposition of Jeanne Santoli, M.D., 35:17-21.

[3801] August 27, 2024 Deposition of Jeanne Santoli, M.D.,35:22-36:3.

[3802] August 27, 2024 Deposition of Jeanne Santoli, M.D.,36:4-7.

[3803] August 27, 2024 Deposition of Jeanne Santoli, M.D.,36:8-11.

[3804] August 27, 2024 Deposition of Jeanne Santoli, M.D.,100:14-16.

[3805] September 10, 2024 Deposition of Robert Johnson, Ph.D.,104:7-10.

[3806] September 10, 2024 Deposition of Robert Johnson, Ph.D., 107:15-20.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1637.  I understand that the "Federal" doses were shipped various government agencies, including "Veterans Administration, Bureau of Prisons, Department of Defense, HRSA, Department of State, FEMA [and] HHS."[3807] While CDC official Dr. Santoli initially testified that this "Federal" category did not include foreign donations[3808], the U.S. government subsequently produced an Affidavit on November 11, 2024 that recants on this position:[3809]

> On August 27, 2024, I was deposed in this case and was asked whether the 95,357,080 doses listed for the "Federal" CDC COVID-19 Vaccination Administration Partner in HHS- 0000418 included doses that were donated to foreign governments. I testified that it did not. (Tr. 89:2-13.)

> I recently became aware that I was mistaken when I testified that the Federal partner doses did not include donations to foreign governments. In fact, a portion of the doses identified in the Federal partner category were coded as being donated to foreign governments.

1638.  Dr. Santoli Affidavit breaks down the 95 million "federal" doses by "CDC COVID-19 Vaccine Administration Partner."[3810]  This document shows that 77.5 million of these 95 million "Federal" doses were shipped abroad, and more doses were shipped to Federal agencies who may have distributed them to beneficiaries (including Indian Health Services, Department of Veteran Affairs, HRSA).

---

[3807] August 27, 2024 Deposition of Jeanne Santoli, M.D.,40:22-41:2.
[3808] August 27, 2024 Deposition of Jeanne Santoli, M.D., 89:2-13.
[3809] November 18, 2024 Affidavit of Jeanne Santoli, at p. 2.
[3810] November 18, 2024 Affidavit of Jeanne Santoli, at p. 2.

1072

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

9. The table below shows the number of doses coded as being shipped to each entity within the Federal partner category in the Excel spreadsheet produced by CDC at HHS-0000418:

| CDC COVID-19 Vaccine Administration Partner | Moderna doses shipped for requested Lot#s |
|---|---|
| Bureau of Prisons | 171,320 |
| Department of Defense | 5,773,540 |
| Department of State | 141,500 |
| Health and Human Services | 130,980 |
| Health Resources and Services Administration | 5,924,120 |
| Immigration and Customs Enforcement | 27,000 |
| International Donations | 77,592,520 |
| Indian Health Service | 1,493,120 |
| Department of Veterans Affairs | 4,102,980 |

**FIGURE 6.40**

1639. In view of the foregoing, for this scenario I have been asked to assume § 1498 applies only to *certain* doses of mRNA-1273 sold under the C-100 contract associated with the following government agencies:

    a) Bureau of Prisons

    b) Department of Defense

    c) Department of State

    d) Health and Human Services

    e) Immigration and Customs Enforcement

1640. These agencies together account for approximately **6.2 million** doses. Because HHS provided only summary level data, I cannot trace the Federal Doses back to Moderna's batch records. As such, I have removed these doses from the royalty bases as a percentage of the known C-100 doses from HHS-0000418, as shown in **Table 6.21**, below.

1073

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

| | | |
|---|---|---|
| [A1] | Bureau of Prisons | 171,320 |
| [A2] | Department of Defense | 5,773,540 |
| [A3] | Department of State | 141,500 |
| [A4] | Health and Human Services | 130,980 |
| [A5] | Immigration and Customs Enforcement | 27,000 |
| [B] = Sum([A1]:[A5]) | Total | 6,244,340 |
| [C] | C-100 Contract Doses (Known Vaccine Administration Partner) | 391,048,280 |
| [D] = [B] / [C] | Certain Federal Use as % of C-100 | 1.597% |

Notes and Sources:
[1] Santoli Affidavit at p. 2.
[2] HHS-0000418.

**TABLE 6.21**

1641. Assuming this § 1498 scenario applies, the mRNA-1273 royalty bases presented above have all been adjusted as shown in **Table 6.22**, below.

1642. The same approach can be taken if fewer, more, or different portions of the C-100 contract doses are determined to be subject to or not subject to 28 U.S.C. § 1498.

| Assumptions | |
|---|---|
| Patent Scenario | P1: All Patents In |
| Infringement Theory | Testing-Version |
| 1498 Scenario | § 1498 Applies to Certain C-100 Doses |

| | | Pandemic | | | | Endemic | | Total |
|---|---|---|---|---|---|---|---|---|
| | | 2020 | 2021 | 2022 | Jan.-Aug. 2023 | Sep.-Dec. 2023 | 2024 | Jan. 2020-Jan. 2024 |
| Sales in US | C-100 Units (Reduced by 1.6%) | 9,250,571 | 330,396,012 | 152,421,012 | - | - | - | 492,067,595 |
| | Other US Government Contracts | 3,967,700 | - | 67,822,614 | 25,470 | - | - | 71,815,784 |
| | US Private Sales | - | - | - | - | 26,242,496 | 1,005,894 | 27,248,390 |
| Other Sales with US Nexus | Infringing Product Made in US | - | 231,305,296 | 176,427,866 | 12,089,860 | 16,728,460 | - | 436,551,482 |
| | MPI/LMX Made in US [271(f)] | - | - | 67,858,677 | 10,312,714 | - | - | 78,171,391 |
| Total Doses | | | | | | | | 1,105,854,641 |

Notes and Sources:
[1] Schedule 9.1 and 9.2.
[2] Mitchell Appendices 132 and 154.
[3] Assumes §1498 applies to certain doses as outlined in HHS-0000418. I accordingly reduce the C-100 units by 1.597%. See Table 6.21.

**TABLE 6.22**

1074

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

(c)  § 1498 Applies to *All* mRNA-1273 Doses Under the C-100 Contract

1643.  Under this scenario, I assume that § 1498 Applies to *All* mRNA-1273 does under C-100 contract. Assuming this § 1498 scenario applies, the mRNA-1273 royalty bases presented above have all been adjusted as shown in **Table 6.23**, below.

| Assumptions | |
|---|---|
| Patent Scenario | P1: All Patents In |
| Infringement Theory | Testing-Version |
| 1498 Scenario | § 1498 Applies to All C-100 Doses |

| | | Pandemic | | | | Endemic | | Total |
|---|---|---|---|---|---|---|---|---|
| | | 2020 | 2021 | 2022 | Jan.-Aug. 2023 | Sep.-Dec. 2023 | 2024 | Jan. 2020-Jan. 2024 |
| Sales in US | C-100 Units (Not Included) | - | - | - | - | - | - | - |
| | Other US Government Contracts | 3,967,700 | - | 67,822,614 | 25,470 | - | - | 71,815,784 |
| | US Private Sales | - | - | - | - | 26,242,496 | 1,005,894 | 27,248,390 |
| Other Sales with US Nexus | Infringing Product Made in US | | 231,305,296 | 176,427,866 | 12,089,860 | 16,728,460 | - | 436,551,482 |
| | MPI/LMX Made in US [271(f)] | - | - | 67,858,677 | 10,312,714 | - | - | 78,171,391 |
| **Total Doses** | | | | | | | | 613,787,047 |

*Notes and Sources:*
[1] Schedule 9.1 and 9.2.
[2] Mitchell Appendices 132 and 154.

**TABLE 6.23**

F.  **Summary of Reasonable Royalty**

1644.  Based on my investigation and analysis, and for the reasons set forth in this report, it is my opinion that the reasonable royalty adequate to compensate Genevant for Moderna's use of the claimed inventions of the Patents-in-Suit would be reasonable royalty based on the Hypothetical Negotiation Approach, which includes royalty rates for both the *pandemic* phase and the *endemic* phase. I understand that "[t]he Lipid Composition Patents and the '651 patent work together to enable Moderna's COVID-19 vaccine to deliver its payload . . . the molar ratios found in the Lipid Composition Patents work in concert with the '651 patent to ensure optimal product performance."[3811] It is thus Dr. Mitchell's opinion that "even if individual Patents-in-Suit were no longer at issue, such as if they were found to be invalid, the overall value to Moderna from the LNP delivery system would not be diminished."[3812] Consequently, the reasonably royalty opinions

---

[3811] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XV.
[3812] November 25, 2024 Opening Expert Report of Dr. Michael Mitchell, Section XV.

1075

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

identified below would apply so long as any one claim of one Patent-in-Suit is valid and infringed. My reasonable royalty opinions are summarized as follows:

### 1. Hypothetical Negotiation Approach

1645. Based on the Hypothetical Negotiation Approach, the *pandemic* phase royalty rate is applied to *pandemic* phase mRNA-1273 doses during period from December 2020 through August 2023, and the *endemic* phase royalty rate is applied to *endemic* phase mRNA-1273 doses during period from September 2023[3813] to January 2024. Assuming all mRNA-1273 LDP doses with a U.S. Nexus are found to infringe, the associated reasonable royalty under the Hypothetical Negotiation Approach is shown in **Table 6.25**, below.[3814]

| Hypothetical Negotiation Approach | Pandemic | Endemic | | Total / Weighted Avg | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Rate per Dose | $4.77 | $6.61 | $10.56 | $4.84 | $5.00 |
| Doses Sold | 1,069,863,645 | 43,976,850 | 43,976,850 | 1,113,840,495 | 1,113,840,495 |
| **Reasonable Royalty** | **$5,101,569,034** | **$290,569,059** | **$464,295,207** | **$5,392,138,093** | **$5,565,864,241** |

*Notes:*

[1] Assumes all patents are in, and all US-Nexus doses infringe (*i.e.,* testing shows 100% infringement), and §1498 does not apply.

**TABLE 6.25**

1646. In the event that less than all of the mRNA-1273 doses with a U.S. Nexus are found to infringe, the number of infringing doses would be multiplied by the applicable (*i.e., pandemic* phase and/or *endemic* phase) royalty rate because the factors affecting the royalty rates discussed above remain unchanged even if some doses do not infringe. Schedule 4.1 summarizes the royalty bases that correspond to the above discussed patent scenarios, and the different infringement theories analyzed by Dr. Mitchell. In each case I have traced the infringing lots through Moderna's manufacturing and sales records to determine the total number of infringing doses at each stage of Moderna's production process and also based on Moderna's sales records.

---

[3813] This date corresponds to the timeframe when FDA approved Moderna's monovalent XBB.1.5 variant COVID-19 vaccine. This date also is more conservative than the date Moderna identified as the start of the endemic phase in its lawsuit against Pfizer. *See ModernaTX, Inc. et al. V. Pfizer Inc. et al.*, C.A. No. 1:22-cv-11378, Dkt. 1 at ¶ 23 (D. Mass. Aug. 26, 2022).

[3814] These calculations and all others provided in my report are based on the data provided to date. To the extent additional data becomes available or should the jury award ongoing royalties, I reserve the right to update my calculations and opinions accordingly.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## 2. Analytical Method

1647. Based on the Analytical Approach, the royalty rate calculated based on Moderna's projections for the *pandemic* phase is applied to total mRNA-1273 doses during *both* the *pandemic* phase and the endemic phase during the period from December 2020 through January 2024. This calculation reflects the best available evidence that can be utilized under the Analytical Method. This calculation is conservative because the *endemic* rate (if it could be calculated) would be *higher* than the *pandemic* phase royalty rate that is applied to all mRNA-1273 doses. Assuming all mRNA-1273 LDP doses with a U.S. Nexus are found to infringe, the associated reasonable royalty under the Analytical Method is shown in **Table 6.26**, below

| [1] | Analytical Approach | Pandemic | Endemic | Total / Weighted Avg |
|---|---|---|---|---|
| [2] | Rate per Dose | $3.98 | $3.98 | $3.98 |
| [3] | Doses Sold | 1,069,863,645 | 43,976,850 | 1,113,840,495 |
| | Reasonable Royalty | $4,258,649,992 | $175,052,225 | $4,433,702,218 |

*Sources:*
[1] Assumes all patents are in, LMX and LDP can be analyzed for infringment, and §1498 does not apply.
[2] Schedule 3.3.
[3] Schedules 9.1 and 9.2. *See also,* Mitchell Appendices 132 and 154.

**TABLE 6.26**

1648. In the event that less than all of the mRNA-1273 doses with a U.S. Nexus are found to infringe, the reasonable royalty would be determined based on the process and data set forth in the Hypothetical Negotiation Approach section, above, but using the rate identified through the analytical approach.

## 3. Alternative Reasonable Royalty Opinions

1649. My reasonable royalty opinions outlined above are based on the assumption that the Accused Products infringe the asserted claims of the Patents-in-Suit, including with respect to the PVU, v1 and v2 formulations. I have also been asked to determine the reasonable royalty in two alternative scenarios: one in which some, but not all, of all of the v1 formulation doses infringe, and a second in which none of the v1 or v2 formulation doses infringe.

1077

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### dd.      Infringement by some v1 doses

1650.  I understand that Dr. Mitchell has opined Moderna's own COAs demonstrate that some V1 lots literally infringe the Lipid Composition Patents.  Accordingly, even if some of the V1 lots do not infringe, I understand Dr. Mitchell has opined that, based on the COA data, Moderna could not have manufactured such non-infringing lots without also manufacturing infringing lots.

1651.  Moderna had strong reasons to manufacture doses in a way that assures that it would not infringe at all.  Their failure to do so is evidence of that Moderna did not have a viable and/or reliable way to manufacture without infringing on the required timeline.

1652.  Because Moderna did not have a way to manufacture non-infringing doses without also manufacturing infringing doses, the infringing doses "enable[] and [are] needed to enable otherwise-unavailable profits from" the non-infringing doses.  *Brumfield v. IBG LLC*, 97 F. 4th 854, 876–77 (Fed. Cir. 2024); *see also IPA Techs., Inc. v. Microsoft Corp.*, No. CV 18-1-RGA, 2024 WL 1962070, at *1 (D. Del. May 2, 2024) (denying motion to exclude damages opinion that included sales of a non-infringing product because "the infringing activity 'enables and is needed to enable otherwise-unavailable profits' from the non-infringing activity").  Thus, at the hypothetical negotiation, Moderna still would have agreed to the same reasonable royalty rate per dose for all v1 doses, including those that do not literally infringe.

1653.  In this scenario, the date of the hypothetical negotiation would still be May 31, 2020, which is the date of Moderna's first alleged infringement, and thus, the *Georgia-Pacific* Factor analysis would be the same.  Moderna could not rely on v2 as a purported non-infringing alternative because Moderna would not have been able change to it in time, for the reasons set forth in Section III.F.

### ee.      No v1 or v2 doses infringe

1654.  In the event that no v1 or v2 doses infringe, the parties would have reached a different bargain at the hypothetical negotiation based on the infringing offer made on May 31, 2020.

1655.  At the time of the infringing offer, Moderna's operative formulation was the PVU formulation, which I understand infringes the Patents-In-Suit.  I understand from Dr. Mitchell that:

a)  The Moderna's clinical testing up to that point was all based on the PVU formulation;

b)  The positive interim phase 1 data Moderna published on May 18, 2020, shortly before making the May 31, 2020 offer to the U.S. Government, was based on the PVU formulation;

c)  Moderna had not yet approved any other formulation internally; and

1078

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

   d) Moderna had not disclosed a different formulation to the U.S. Government and did not do so in the May 31, 2020 offer

1656. Moderna thus needed a license in order to make the May 31, 2020 offer. I understand that making that offer constituted infringement under Section 271(a), regardless of whether Moderna intended to later change to a non-infringing product. *See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1310–11 (Fed. Cir. 2010) (offer to sell infringing product constituted infringement even though ultimately a non-infringing version was delivered); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1358–59 (Fed. Cir. 2012) (hypothetical negotiation occurs at time of offer and is based on infringing product even if the ultimate delivery was non-infringing).

1657. In order to stay in the running to secure a contract with the U.S. Government, Moderna needed the ability to make the May 31, 2020 offer with respect to the infringing PVU formulation. While the time pressures were already severe, they intensified in the days leading up to Moderna's May 31, 2020 offer. On May 21, Operation Warp Speed announced that BARDA had awarded up to $1.2 billion to accelerate the development and manufacturing of AstraZeneca's vaccine to be available beginning in October 2020.[3815] On the same day, AstraZeneca announced that it had **"concluded the first agreements for at least 400 million doses and has secured total manufacturing capacity for one billion doses so far and will begin deliveries in September 2020,"** and its press release stated:

> The Company has concluded the first agreements for at least 400 million doses and has secured total manufacturing capacity for one billion doses so far and will begin first deliveries in September 2020. AstraZeneca aims to conclude further agreements supported by several parallel supply chains, which will expand capacity further over the next months to ensure the delivery of a globally accessible vaccine.

> AstraZeneca today received support of more than $1bn from the US Biomedical Advanced Research and Development Authority (BARDA) for the development, production and delivery of the vaccine, starting in the fall. The development programme includes a Phase III clinical trial with 30,000 participants and a paediatric trial.

---

[3815] "Trump Administration's Operation Warp Speed Accelerates AstraZeneca COVID-19 Vaccine to be Available Beginning in October," *U.S. Department of Defense,* May 21, 2020, https://www.defense.gov/News/Releases/Release/Article/2310834/trump-administrations-operation-warp-speed-accelerates-astrazeneca-covid-19-vac/.

1079

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

In addition, the Company is engaging with international organisations such as the Coalition for Epidemic Preparedness Innovations (CEPI), Gavi the Vaccine Alliance and the World Health Organisation (WHO), for the fair allocation and distribution of the vaccine around the world. AstraZeneca is also in discussions with governments around the world to increase access. Furthermore, AstraZeneca is in discussions with the Serum Institute of India and other potential partners to increase production and distribution.[3816]

1658. In order to ensure it would not be boxed out in the race for contracts with the U.S. Government, Moderna would and did respond immediately to the U.S. Government's May 30, 2020 request to submit an offer.[3817]   On May 30, 2020, Moderna received an email from Moncef Slaoui of Operation Warp Speed, which "formally ask[ed] that you submit" an offer for 100 million doses.[3818]   Gary Disbrow, of BARDA, replied, clarifying that there would be a formal solicitation through the Department of Defense, and that "it will be a very short turn around time for submission of your proposal."[3819]   Mr. Bancel told his team that Moderna should respond with an offer "given we got a formal ask," which resulted in the May 31, 2020 offer.[3820]   Based on the foregoing, Moderna would not delay the submission of its May 31, 2020 offer.

1659. Obtaining that contract was critical to Moderna's future, not just with respect to its view that most of the profit from the COVID-19 vaccine would come during the initial supply-constrained period, but also because it would be key to validating its technology and reputation and providing the capital necessary to fund its pipeline, as discussed above.  In particular:

 a) Moderna knew that timing was critical in obtaining that contract and it could not afford to fall behind its competitors.

 b) Without a license, Moderna would not have been able to make the offer when it was needed

 c) Moderna had not yet internally approved a change from the PVU formulation at the time of the offer.[3821]

---

[3816] "AstraZeneca advances response to global COVID-19 challenge as it receives first commitments for Oxford's potential new vaccine," *AstraZeneca,* May 21, 2020, *available at* https://www.astrazeneca.com/media-centre/press-releases/2020/astrazeneca-advances-response-to-global-covid-19-challenge-as-it-receives-first-commitments-for-oxfords-potential-new-vaccine.html#!

[3817] MRNA-GEN-01749419-21, at 21 (May 30, 2020 email from M. Slaoui to S. Bancel).

[3818] MRNA-GEN-01749419-21, at 21 (May 30, 2020 email from M. Slaoui to S. Bancel).

[3819] MRNA-GEN-01749419-21, at 20 (May 30, 2020 email from G. Disbrow to S. Bancel).

[3820] MRNA-GEN-01749419-21, at 20 (May 30, 2020 email from S. Bancel).

[3821] *See* MRNA-GEN-00547580-585 (Parsons Deposition Exhibit No. 15 – "Change to SM102 LNP Molar Targets," *Moderna,* Approved June 4, 2020).

1080

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

d) Even if Moderna could have done so prior to making the offer to the government, there was still significant risk of delay associated with changing the formulation from PVU.[3822] Without a license to Genevant's patents, Moderna risked being unable to live up to the May 31 offer, which would have been catastrophic for the company.

1660. The value of a license to Moderna reflected the strategic importance and value of enabling Moderna to get the U.S. Government contract in 2020, so it could realize all of its attendant benefits. Moderna had a maniacal focus on "de-risking"—and the 1-day turnaround reflects that focus. The value of that license is thus largely the same regardless of whether or not v1 infringes, because the license was needed to obtain a government contract even if it is assumed that v1 did not infringe.

1661. Because the value to Moderna, with respect to the doses contemplated as part of the May 31, 2020 offer, is similar whether or not v1 infringes, Moderna would have paid a similar amount for the license if v1 did not infringe. Because the offer to sell is a one-time event, the payment would have been structured as a commercialization milestone.[3823]

1662. The amount of the commercialization milestone would be based on the *pandemic* phase royalty rate of $4.77/dose applied to the 100 million doses in the offer, or $477 million. In order to avoid disrupting Moderna's activities, Genevant would agree to accept payment when Moderna received the $600 million advance payment which was tied to performance, but actually received in September 2000.

---

[3822] *See supra* Section III.F.

[3823] *See, e.g.*, GENV-00022689-792, at -713-720 (Zorn Deposition Exhibit No. 20 – January 15, 2021 Gritstone Oncology Inc. and Genevant Sciences GMBH Nonexclusive License and Development Agreement); MRNA-GEN-00457584-627, at -591-592 ("Cellscript, LLC Patent Sublicense Agreement, effective June 26, 2017").

1081

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## VII.   FACTS RELATED TO WILLFULLNESS

1663. I understand that Plaintiffs are asserting that Moderna's infringement was willful,[3824] and that a court may increase damages upon a finding of willful infringement.[3825]   I understand that to prove willful infringement of a patent claim, the patentee must prove that the alleged infringer knew of the asserted claim and deliberately or intentionally infringed it.[3826]  I understand that evidence that

---

[3824] Amended Complaint ¶¶ 88 ("Moderna has undertaken its infringing actions despite knowing that such actions infringe one or more claims of the '069 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the '069 Patent."), 109, 133, 159, 180.

[3825] 35 U.S.C. § 284.

[3826] *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93 (2016); *nCube Corp. v. Seachange Intern., Inc.*, 463 F.3d 1317, 1323-24 (Fed. Cir. 2006); *Eko Brands, LLC v. Adrian*

1082

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

the alleged infringer had knowledge of the patent at the time of infringement by itself is insufficient to establish willfulness.[3827]  I further understand that all facts surrounding the infringement should be considered in assessing whether the alleged infringer deliberately or intentionally infringed a claim, including whether the alleged infringer intentionally copied the patentee's patented technology in developing the accused product; whether the alleged infringer knew, or should have known, that its conduct involved an unreasonable risk of infringement; and whether the alleged infringer had a reasonable belief that, at the time of infringement, the accused product did not infringe the asserted claim or that the asserted claim was invalid.[3828]

1664.  I have been asked to provide opinions regarding certain facts relevant to whether Moderna's infringement was willful, that are within my area of expertise and that relate to the analysis I have performed in this case.

### A.    Moderna was aware of the Patents-in-Suit, knew that it needed a license, and was aware that it did not have one for the COVID-19 vaccine

1665.  As discussed above, Moderna has been aware of Plaintiffs' Patents-in-Suit for many years. Moderna was aware that it needed a license to use Plaintiffs' LNP technology, including the Patents-in-Suit.  And Moderna was aware that it did not have a license to use the patented technology in its COVID-19 vaccine.

1666.  Moderna became aware of the first Patents-in-Suit from the very beginning of its LNP program. As discussed above,[3829] Moderna's Chief Business Officer,[3830] Said Francis testified that beginning in or about the 2013, 2014 timeframe,[3831] he had at least 5 discussions with Moderna's lawyers

---

*RiveraMaynez Enterprises, Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020); *SRI International, Inc. v. Cisco Systems, Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021).
[3827] *See Halo*, 579 U.S. at 110-11 (Breyer, J., concurring).
[3828] *See WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 971 (Fed. Cir. 2018); *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017); *Trading Tech. Intern., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1357 (Fed. Cir. 2010); *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1342 (Fed. Cir. 2004) (*en banc*).
[3829] *Supra* Section I.F.
[3830] May 22, 2024 30(b)(6) Deposition of Said E. Francis, 31:1-31:2
[3831] May 22, 2024 30(b)(6) Deposition of Said E. Francis, 145:4-145:10 ("Q. When did those discussions [with Moderna legal counsel regarding Tekmira's LNP patents] first occur?  A. 20 – probably 2013, 2014, in that era.  Every time we engage in a new evaluation or technology discussion, you try to have the discussion as well with the broader diligence team.").

1083

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

"about Tekmira's LNP patents."[3832]  Mr. Francis further testified that Moderna first learned about the Patents-in-Suit from Tony de Fougerolles—"an early, early employee" at Moderna and its founding Chief Scientific Officer—who "was quite familiar with the [P]atents-in-[S]uit" from his prior work at Alnylam.[3833]  In fact, I understand Dr. Mitchell has pointed out that Moderna "references the '069 Patent and related applications during examinations of Moderna's own patents.  For example, Moderna's patent, U.S. Patent No. 9,271,966, filed on May 18, 2013, as U.S. application number 13/897,371 and issued on March 1, 2016, cited to the '069 Patent."[3834] Moderna continued discussing the Patents-in-Suit over time, and even challenged some of them in IPR proceedings.[3835]

1667.  Moderna was not just aware of the Patents-in-Suit, but also knew it needed a license to use the patented technology.  As discussed above, Moderna discussed with third parties the need to obtain a license to Plaintiffs' LNP technology, including, in certain instances, the specific Patents-in-Suit.[3836]  For example, on April 11, 2014, Moderna was advised that Tekmira (one of Plaintiffs' predecessors) was "the inventor of the original formulation with MC3 . . . they call it SNALP

---

[3832] May 22, 2024 30(b)(6) Deposition of Said E. Francis, 146:4-146:9 ("Q. Were there more than ten discussions that you had with Moderna's lawyers about Tekmira's LNP patents?  A. I do not recall the number.  Q. But it was at least five?  A. Yeah.").

[3833] May 22, 2024 30(b)(6) Deposition of Said E. Francis, 40:3-41:9, 63:18-64:16 ("Q. . . . Moderna had looked at Tekmira's portfolio about the LNP they had developed, as you say, for the siRNA world, correct?  A.  As I mentioned, our chief scientific officer, Tony [de Fougerolles], came from Alnylam, which had an active collaboration with Tekmira.  So he is aware – he should have – he must have been aware at that time of Tekmira's portfolios.").

[3834] November 25, 2024 Expert Report of Dr. M. Mitchell, at Section XVIII.A;

[3835] *Supra* Section II.A.3.b.

[3836] MRNA-GEN-01754010-412, at 411 (Francis Deposition Exhibit No. 19 – April 11, 2014 email from Torsten Woehr [Corden Pharma] to Said Francis, cc: Michael Middleditch, Subject: RE: Contact).  May 22, 2024 30(b)(6) Deposition of Said E. Francis, 138:18-140:1 ("Q. He goes on to say here, 'As indicated in my previous e-mail my day-to-day contact at Alnylam, David Watkins, thinks that you may have to talk also to Tekmira, the inventor of the original formulation with MC3 (I think they call it the SNALP technology).'  Do you see that? A. Mm-hmm.  Q. Had you heard the term 'SNALP' before it was used in this e-mail?  A. This is April 2014, SNALP was on Tekmira's website.  Q. And SNALP is what Tekmira called their LNP technology, correct?  A. Yes.  Q. And what Dr. Woehr is telling you is that Tekmira was the inventor of the original LNP formulation with MC3, correct? . . . A. He – that's the words in the e-mails he had.  He thinks that we have to talk to this person and he characterized it as such.  Torsten Woehr is head of sales and marketing, not subject matter expert in inventorship, and I don't think he's privy to the Alnylam/Tekmira agreement.  So just from – the e-mail – his line says that, but . . .").

1084

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

[stable-nucleic acid particles] technology."[3837]

1668. Moderna referred to the Tekmira's LNP as a "[v]alidated LNP formulation" and Tekmira "as the RNA industry gold standard."[3838]

1669. As I explain in more detail above, Moderna spent nearly ten years discussing a license to the Patents-in-Suit.[3839]  The first contact between Moderna and Tekmira, Arbutus's predecessor,[3840] was "2012, early 2013."[3841]  Since then, Moderna and Genevant (and its predecessors) "explor[ed]

---

[3837] MRNA-GEN-01754010-412, at 411 (Francis Deposition Exhibit No. 19 – April 11, 2014 email from Torsten Woehr [Corden Pharma] to Said Francis, cc: Michael Middleditch, Subject: RE: Contact).  May 22, 2024 30(b)(6) Deposition of Said E. Francis, 138:18-140:1 ("Q. He goes on to say here, 'As indicated in my previous e-mail my day-to-day contact at Alnylam, David Watkins, thinks that you may have to talk also to Tekmira, the inventor of the original formulation with MC3 (I think they call it the SNALP technology).'  Do you see that? A. Mm-hmm.  Q. Had you heard the term 'SNALP' before it was used in this e-mail? A. This is April 2014, SNALP was on Tekmira's website.  Q. And SNALP is what Tekmira called their LNP technology, correct?  A. Yes.  Q. And what Dr. Woehr is telling you is that Tekmira was the inventor of the original LNP formulation with MC3, correct? . . . A. He – that's the words in the e-mails he had.  He thinks that we have to talk to this person and he characterized it as such. Torsten Woehr is head of sales and marketing, not subject matter expert in inventorship, and I don't think he's privy to the Alnylam/Tekmira agreement.  So just from – the e-mail – his line says that . . . .").

[3838] MRNA-GEN-01240180-198, at 190 (Francis Deposition Exhibit No. 27 – "Business Development Update – Moderna Investment Committee Discussion," *Moderna,* April 9, 2015, Slide 11 of 19) ("Tekmira – an RNA and LNP company") (emphasis added).  *See also* 191 (Slide 12: "Tekmira (  -2014) – an RNA and LNP company . . . Tekmira's LNP Enable mRNA Products . . . mRNA require intracellular delivery for activity[;] LNP is the GOLD STANDARD for mRNA delivery" (emphasis in original)).  May 22, 2024 30(b)(6) Deposition of Said E. Francis, 195:4-195:9 ("Q. You wrote in a slide [Slide 11 of 19] to a subcommittee of Moderna's board that Tekmira had a validated LNP formulation that are in the clinic that serve as the RNA industry gold standard, did you not?  A. Those are the words on the slides.").

[3839] *See Supra* Section II.A.3; June 28, 2024 Deposition of Stéphane Bancel, 141:12-141:19 ("Q. . . . Moderna has been involved in trying to negotiate a license to Genevant, Arbutus, and Tekmira's IP for over ten years, correct? . . . THE WITNESS: Moderna has had discussion with Tekmira for ten years, that's correct, . . .").

[3840] *See, e.g.,* May 22, 2024 30(b)(6) Deposition of Said E. Francis, 48:13-48:15 ("Q. And he [Mark Murray] became the CEO of Arbutus after Tekmira became Arbutus?  A. That's right. . . .").

[3841] May 22, 2024 30(b)(6) Deposition of Said E. Francis, 46:12-46:16 ("Do you know when the first contact was between Moderna and Tekmira?  A. Specifically, I would – I don't know the exact date, but it would be late 2012 – sorry, 2012, early 2013.").

1085

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

collaborations, and that includes licensing."[3842]  Moderna previously attempted to acquire licenses to Plaintiffs' patents to develop and commercialize mRNA vaccines directed to therapeutic targets other than COVID-19.[3843]

1670.  Moreover, as I describe in more detail above, at the same time Moderna was having discussions with Genevant's predecessor, Tekmira, Moderna was also having discussions with AlCana, later known as Acuitas, which Dr. Tony de Fougerolles, Moderna's "founding CSO," described as "a useful alternative to dealing with Tekmira."[436]  Mr. Bancel testified: "Tony de Fougerolles was the one who, as we were looking at a lot of technology, mentioned lipid nanoparticles as a technology, and he's the one who carried that work.  He was the chief scientific officer.[437] . . . Tony de Fougerolles had the expertise in LNP.  I had none, and I didn't know anybody in the field of LNP[.]"[438]

1671.  In fact, as I discuss in more detail above, Moderna attempted to acquire rights to Arbutus's LNP through  a license agreement with Acuitas.[3844]  After learning of the Acuitas-Moderna sublicense agreement, Arbutus and Acuitas became embroiled in litigation.[3845]  "On February 7, 2017, Arbutus obtained an injunction preventing Acuitas from further providing Arbutus LNP technology to any third party."[3846]  The litigation ultimately ended in a settlement agreement,[3847] which provided that Acuitas no longer could use Arbutus's LNP technology, with the specific sublicenses to Moderna for vaccines targeting specific viruses remaining in effect.[3848]  COVID-19 was not one of surviving vaccine targets as a result of the settlement.[3849]

---

[3842] May 22, 2024 30(b)(6) Deposition of Said E. Francis, 47:7-47:22 ("A. There were discussions about exploring collaborations, and that includes licensing.  Q. And what was the subject of the collaborations that Moderna was exploring with Tekmira at that time? . . . A. Like we were also talking to other formulation companies.  We were essentially discussion what Tekmira wanted to discuss with us, the technology they had from the RNAi delivery days, and whether that could be suitable for mRNA.  Q. And what technology was that?  A. Tekmira had a portfolio of certain lipid nanoparticles.").

[3843] *See Supra* Section II.A.3; November 25, 2024 Expert Report of Dr. Mitchell at Section IX.A.

[3844] *See Supra* Section II.E.3.d.

[3845] *See Supra* Section II.E.3.d.

[3846] "Arbutus Settles Litigation, Terminating Acuitas' Rights to LNP Technology," *Arbutus,* February 22, 2018, *available at* https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-settles-litigation-terminating-acuitas-rights-lnp-0.

[3847] *See Supra* Section II.E.3.d.

[3848] *See Supra* Section II.E.3.d.

[3849] *See Supra* Section II.E.3.d.

1086

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1672. Following that settlement agreement, while Moderna's CEO, Stéphane Bancel publicly asserted that the injunction was "a moot point, because Moderna has developed its own LNPs that would not be covered by Arbutus' IP" and its partner, "Merck, also has LNP technology that dates back to its 2006 purchase of RNA-drug expert Sirna Therapeutics,"[319] its internal documents told a different story. For example, one of Moderna's "2017 Platform objectives" was: **"Fix backward risk balance . . . LNP/Abus . . ."[3850]** In fact, Moderna's objective—"Fix backward risk balance . . . LNP/ABUS"—came at a time after Moderna had undertaken its MERS program in 2016 (later in March 2020, Mr. Bancel "dropped the MERS data from S3" SEC filing[3851]) without a license from Arbutus.[3852] As I explain in more detail above, based on my investigation in this case,

---

[3850] MRNA-GEN-01503761 (Hoge Deposition Exhibit No. 31 – December 5, 2017 email from Stephen Hoge to Stephen Hoge) (emphasis added). May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 320:19-322:18 ("Q. . . . if we could look at number 4 [on Hoge Deposition Exhibit No. 31], it says, 'Fix backward risk balance.' Do you see that? A. Right. Q. And then 4.2 underneath that is, 'LNP/Abus.' That's LNP Arbutus, I assume? A. Mm-hmm. Q. And how did you intend to fix the backward risk balance with respect to LNP Arbutus in 2017? A. It would have to be in the context of our discussions with them, which I think there had been multiple in 2017. I can't remember whether this is related to – where it is in relation to the litigation between Arbutus and Acuitas in time, but we were obviously aware of that litigation and, as you'd previously covered, had been in discussions with Tekmira that never went anywhere about the possibility of a direct license to some of the patents, intellectual property related to a couple of those products that in 2017 were still under development. So -- . . . So that's what I would assume I meant by 4.2. Q. What does it mean to fix the backward risk balance. A. When I look at the five things underneath there, it's not entirely clear to me. Reorganizing R&D, biodistribution, Alexion, LNP, UPenn, I mean, they're all very different things, so I'm not exact – it's hard for me to imagine how that covers all of them. For instance, reorganizing R&D feels like a weird way to characterize, you know, a backward risk balance. I don't actually know what is meant there. Q. Would filing an IPR fix a backward risk balance if it was successful? A. Possibly, but obviously reorganizing R&D wouldn't.").
[3851] MRNA-GEN-01725263-264, at 263 (Moderna v. Pfizer Hoge Deposition Exhibit No. 18 – March 13, 2020 email from Stephane Bancel to Executive Committee, Said Francis, Subject: FW: [EXTERNAL] FW: Vaccines). MRNA-GEN-01725410-507 at 448 (December 1, 2023 30(b)(6) Deposition of Stephen G. Hoge, M.D. (Moderna v. Pfizer), 153:3-153:19 ("Q. And of course you see Mr. Bancel replies [in Moderna v. Pfizer Hoge Deposition Exhibit No. 18], 'Just public info.' True? A. Yes. And then he says, 'And dropped the MERS data from S3,' and that's the only think I'm not sure where that – I know what he means by 'MERS data.' I'm not sure what he means by 'from S3.'" Q. I think he means an SEC Form S3. A. Okay. Right. I was trying to figure out why we had an S3. That's correct. We had just done a follow-on filing, a follow-on capital raising. Thank you for reminding me. Now I understand why there was an S3 in March. So that would have been public at that point, to my knowledge, and therefore, yes, all public.").
[3852] *Supra* Section IV.

1087

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Moderna never did "Fix[] backward risk balance . . . LNP/ABUS," even though it received many invitations from Plaintiffs to do so. And, by 2017, the "backward risk balance" was significant. This is because Moderna marketed itself as a "platform" company—but its platform was built on Tekmira's delivery technology which it was not licensed to use.

1673. Without a broad license to Arbutus's LNP technology, Moderna then attempted to invalidate certain of the Asserted Patents via IPRs, further confirming that Moderna was aware the need to acquire a license to the Asserted Patents.[3853] As I explain above, I understand Moderna's efforts were largely unsuccessful, notwithstanding the resources, time, and money Moderna invested in these efforts.[3854]

1674. Moderna knew it did not have a license to the Patents-in-Suit for purposes of its COVID-19 vaccine.[3855]

### B. Moderna's "Platform" was built on copying Plaintiffs' Patented LNP Technology.

1675. As I explain above, and as I understand Dr. Mitchell has explained, Moderna's "entire 'platform' was built on its copying of the [Plaintiffs' claimed lipid composition] formulation, which it used in numerous successful clinical programs over the years."[3856] In addition, nearly all of Moderna's clinical testing was based on Tekmira's delivery technology—including the clinical testing that it cited to the U.S. Government to gain approval for human testing of mRNA-1273.[3857]

1676. As discussed above, Moderna presented data from its early NHP studies using Plaintiffs' LNP formulations to AstraZeneca in a February 2013 due diligence deck before securing a deal in which AstraZeneca agreed to pay Moderna $240 million upfront with the potential additional payment of $180 million for the achievement of three technical milestones.[3858]

---

[3853] *Supra* Section II.A.3.b.

[3854] *Supra* Section II.A.3.b.

[3855] Defendants' Fourteenth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1-10) dated June 10, 2024, p. 145 ("Plaintiffs do not dispute that the sublicenses that Acuitas provided Moderna were for specific targets that did not include COVID-19."). May 22, 2024 30(b)(6) Deposition of Said E. Francis, 235:4-235:14 ("Q. My question is not whether Moderna thought it needed a license. My question was, did Moderna understand it didn't have a license to use Tekmira and Arbutus technology in its COVID-19 vaccine? . . . A. I can tell you what the four sublicenses that we have were about, pathogen specific, and they were not SARS-CoV. That's the nature of the four sublicenses.").

[3856] November 25, 2024 Expert Report of Dr. Mitchell, at Section IX.A; *Supra* Section II.A.2.g.

[3857] *Supra* Section IV.

[3858] *Supra* Section II.A.2.g.

1088

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1677.  Moreover, as discussed above, I understand Dr. Mitchell points out that Moderna used Plaintiffs' LNP formulation as part of the clinical studies for the influenza virus published in June 2017—the publishes results of which constituted a "successful clinical trial" according to Moderna's President, Dr. Stephen Hoge.[3859]  As discussed above, I understand Moderna also used Plaintiffs' LNP technology in further clinical trials and studies for multiple Zika vaccines, the Chikungunya virus vaccines, RSV vaccine, and CMV vaccine.[3860]

1678.  Notably, Moderna began a phase 1 clinical study on Zika on December 21, 2016.[3861] But only about two weeks before then, on December 6, 2016, Moderna *verbally* offered $50 million in upfront cash and up to $23 million in development/regulatory milestones to Arbutus for a license agreement.[3862]  This further reflects Moderna's awareness of its need to acquire a license to the Patents-in-Suit at the time it was conducting its clinical studies.

1679.  Moreover, as I explain in more detail above, a Moderna October 4, 2018 development for the CMV vaccine shows that the "formulation that [Moderna] had in hand and that [it was] using" in Phase 1 had a 50% ionizable lipid that fell within the range claimed by Plaintiffs' patented LNP technology.[3863]  This presentation shows a change in molar ratio for "Phase 2," which was not planned to start until October 2019.[3864]  More specifically, Moderna identified the "Benefit" of "Phase 2" "SM0102 Content . . . 48% mole % (extra DSPC & PA PEG)" as "IP and Stability."[3865] In fact, when asked at his deposition about the "IP benefits" referenced in the presentation, Dr. Parsons testified that "we were generally aware that there were – there was intellectual property

---

[3859] May 22, 2024 Deposition of Stephen Hoge 37:15-38:14.

[3860] *Supra* Section II.A.2.g.

[3861] Safety, Tolerability, and Immunogenicity of mRNA-1325 in Healthy Adult Subjects, ModernaTX, Inc., *available* at https://clinicaltrials.gov/study/NCT03014089?rank=1.

[3862] MRNA-GEN-01470185-251, at 235 (Bancel Deposition Exhibit No. 13/Hoge Deposition Exhibit No. 11/Francis Deposition Exhibit No. 40 – "Partnering Committee Update," *Moderna,* March 25, 2020, Slide 48 of 64) ("Project Zurich – history…").

[3863] *Supra* Section II.F.3.

[3864] MRNA-GEN-00646561-582, at 563 (Parsons Deposition Exhibit No. 6 – Jack Kramarczyk, Don Parsons, Chris Knapp, Katie Martinick, Kari Paisley-Flango, Beth Lally, "CMV development plan – CMC strategy," *Moderna,* October 4, 2018, Slide 2 of 21) "Phase 2 Plan, mRNA-1647 – Start Phase 2 in October 2019 with two process options").

[3865] MRNA-GEN-00646561-582, at 574 (Parsons Deposition Exhibit No. 6 – Jack Kramarczyk, Don Parsons, Chris Knapp, Katie Martinick, Kari Paisley-Flango, Beth Lally, "CMV development plan – CMC strategy," *Moderna,* October 4, 2018, Slide 15 of 21) ("A. Baseline Process Option (Optimized PA-PEG DP process").

1089

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

out there which claimed 50 percent mol ratio of the ionizable lipid," and that Moderna was "working at the time to obtain . . . data" from the new—"48% mole%"—formulation which reflected the same quality attributes of those in the "50 percent mol ratio of the ionizable lipid."[3866] This further reflects Moderna's awareness of its need to acquire a license to the Patents-in-Suit.

1680. As Dr. Mitchell has explained, "Moderna's subsequent v1 and v2 Formulations are only minor modifications that still infringe the [lipid composition patents] and were intentionally designed to produce the same results as Plaintiffs' [claimed] formulation."[3867]

### C. Moderna knowingly and deliberately tried to hide its infringement of Plaintiffs' Patents-in-Suit, reflecting knowledge of its improper infringement

1681. As discussed above, while Moderna built its "platform" on Plaintiffs' patented technology, and used that technology in its COVID-19 vaccine, Moderna made repeated statements to the public dismissing Plaintiffs' technology, or claiming, incorrectly, that it did not use it.

1682. For example, as discussed above, in late 2016, Moderna's CEO told Forbes that Moderna had "stopped using" Plaintiffs' LNP technology,[3868] which Moderna obtained through a purported sublicense with Acuitas for four specific, non-COVID-19 viral targets.[3869] However, as I discussed above, Moderna did not stop in 2016; instead, Moderna continued using the "standard formulation" for years.[3870]

1683. At the same time Moderna was using Plaintiffs' LNP technology, Moderna deliberately tried to hide evidence of its use. For example, Moderna was editing documents to "take out the mc3 part of the story," and refer to Plaintiff's MC3 LNP as "legacy lipid."[3871] In November 2019, Moderna

---

[3866] June 7, 2024 Deposition of Donald M. Parsons, Ph.D., 90:18-91:9 ("Q. Do you see the benefits are IP and stability [on Parsons Deposition Exhibit No. 4, at 574]? A. Yes. Q. What IP benefits is this referring to? . . . THE WITNESS: So we were generally aware that there were – there as intellectual property out there which claimed 50 percent mol ratio of the ionizable lipid. I think Jack was referring to that."); 93:8-93:12 ("Q. So what data did Moderna have that showed that this changed formulation improved those [stability] quality attributes? A. We were working at that time to obtain that data.").

[3867] November 25, 2024 Expert Report of Dr. Mitchell, at Section IX.A.

[3868] *Supra* Section III.F.3; Nathan Vardi, "Moderna's Mysterious Medicines," Forbes, December 14, 2016, available at https://www.forbes.com/sites/nathanvardi/2016/12/14/modernas-mysterious-medicines/#fc82927730ee.

[3869] *Supra* Section III.F.3.

[3870] *Supra* Section III.F.3.

[3871] MRNA-GEN-01430937 (Hoge Deposition Exhibit No. 51/Benenato Deposition Exhibit No. 2 – November 15, 2019 email from Kerry Benenato to Mark Cornebise, Subject: Re: MC3 vs. legacy).

1090

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

scientist Mark Cornebise sent the following e-mail to Moderna's Kerry Benenato (a Moderna Senior Director[3872] who joined the company in September 2014 as a Principal Scientist[3873] "to help develop its delivery technology"[3874] and was Vice President, Platform Chemistry and Formulation Discovery in May 2021):

> I'm getting pushback for using "MC3" instead of "legacy lipid" in my slides.  For a chemistry discussion, it doesn't make a lot of sense considering "MC3" describes part of the structure.  Will people really get bent out of shape about it?[3875]

1684.    In response, Kerry Benenato stated:

> I hate to say it but yeah people may have a problem with it [using the term "MC3" instead of "legacy lipid"].  Stephen [Hoge] does not want to see any revenues [sic – references] to us "learning" from mc3.  This deck states that.  I know it is hard as a chemist but we have to fib a bit and not tell the whole structure story.  The slides look great . . . . but I think you need to take out the mc3 part of the story.[3876]

---

[3872] MRNA-GEN-01722116-118, at 118 (Moderna v. Pfizer Benenato Deposition Exhibit No. 2 – "Kerry Benenato," *LinkedIn,* December 11, 2023, *available at* https://www.linkedin.com/in/kerry-benenato-a513419/details/experience/ (**Moderna**:  Principal Scientist (September 2014-February 2016); Associate Director (February 2016-August 2017) Senior Director (September 2019-July 2020), Vice President, Platform Chemistry (July 2020-May 2021), Vice President, Platform Chemistry and Formulation Discovery (May 2021-October 2022); **76Bio, Inc.**: Chief Scientific Officer (October 2022-Present).).

[3873] MRNA-GEN-01722116-118, at 118 (Moderna v. Pfizer Benenato Deposition Exhibit No. 2 – "Kerry Benenato," *LinkedIn,* December 11, 2023, *available at* https://www.linkedin.com/in/kerry-benenato-a513419/details/experience/ (**Moderna**:  Principal Scientist (September 2014-February 2016); Associate Director (February 2016-August 2017) Senior Director (September 2019-July 2020), Vice President, Platform Chemistry (July 2020-May 2021), Vice President, Platform Chemistry and Formulation Discovery (May 2021-October 2022); **76Bio, Inc.**: Chief Scientific Officer (October 2022-Present).).

[3874] Gregory Zuckerman, "The Inside Story of Two Young Scientists Who Helped Make Moderna's Covid Vaccine Possible," *Upworthy Science,* November 24, 2021, *available at* https://upworthyscience.com/moderna-covid-vaccine/.

[3875] MRNA-GEN-01430937 (Hoge Deposition Exhibit No. 51/Benenato Deposition Exhibit No. 2 – November 15, 2019 email from Kerry Benenato to Mark Cornebise, Subject: Re: MC3 vs. legacy).

[3876] MRNA-GEN-01430937 (Hoge Deposition Exhibit No. 51/Benenato Deposition Exhibit No. 2 – November 15, 2019 email from Kerry Benenato to Mark Cornebise, Subject: Re: MC3 vs. legacy).  May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 436:22-441:4.  May 17, 2024 30(b)(6) Deposition of Kerry Benenato, Ph.D., 21:1-33:3 at 24:17-24:20 ("Q. And so Stephen's instructions to you is to refer to MC3 as legacy lipid?  A. The ask was on slides refer to MC3 as legacy lipid."); 184:22-185:2 ("Q. . . . [D]o you remember Stephen Hoge asked you to stop using MC3 and use something else?  A. Legacy lipid.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1685. Similarly, Moderna's Director of Vaccine Access and Partnerships, Hamilton Bennett, took efforts to remove references to language that could be perceived as crediting the contributions and inventions of others to Moderna's COVID-19 vaccine. When editing the investigator's Brochure for the Phase I clinical study for mRNA-1273, Ms. Bennett deleted a reference to the work that had been done by investigators at the Vaccine Research Center of the National Institutes of Health ("NIH"), which resulted in the encoding for the spike protein of the mRNA in Moderna's COVID-19 vaccine.[3877] She stated: "We want to avoid language that implies inventorship" on behalf of the NIH investigators.[3878] She also informed colleagues at the NIH that "we need to redact the formulation" before distributing them publicly.[3879]

1686. Similarly, in editing the phase 1 clinical protocol for Moderna's COVID-19 vaccine, Ms. Bennett again removed reference to the work that had been done by NIH scientists, instructing her colleagues at Moderna and NIH to "please avoid language that eludes to inventorship in the protocol."[3880]

1687. Moreover, Moderna made repeated statements to the Government claiming, incorrectly, that it did not use Plaintiffs' patented technology.[3881] For example, on July 27, 2020, Hamilton Bennett advised the U.S. Government that mRNA-1273 purportedly did *not* use "the Arbutus patent":

> Regarding the Arbutus patent, the LNP formula used to manufacture mRAN-1273 [sic – mRNA-1273] is not covered by the Arbutus patent.[3882]

---

[3877] MRNA-GEN-01722932-960 at -937. (Moderna v. Pfizer Deposition Exhibit No. 29 – February 12, 2020 email from Hamilton Bennett to Marjorie Hurley, Subject: RE: I'm going to come chat., attachments AutoRecovery save of Moderna mRNA-1273 Investigator Brochure_working copy_10Feb2020 HBdocx).

[3878] May 20, 2024 Deposition of Hamilton Bennett, 330:1-332:5.

[3879] MRNA-GEN-01115170-171 at-170 (June 19, 2020 Email, From: Hamilton Bennett; To: Chris Roberts (NIH)).

[3880] MRNA-GEN-01084500-570, 510 (Bennett Deposition Exhibit No. 36 – February 10, 2020 Draft Protocol 20-0003, Phase I Open-Label, Dose-Ranging tudy of the Safety and Immunogenicity of 2019 nCov Vaccine (mRNA-1273) in Healthy Adults); May 20, 2024 Deposition of Hamilton Bennett, 333:6-334:20.

[3881] *Supra* Section III.F.3.

[3882] May 20, 2024 30(b)(6) Deposition of Hamilton B. Bennett, 277:21-278:3. MRNA-GEN-01125789-790, at 789 (Bennett Deposition Exhibit No. 33 – July 27, 2020 email from Hamilton Bennett to Camille Connell-Magaw, Subject: Moderna Negotiation (UNCLASSIFIED)). *See also* MRNA-GEN-01724969-024, at 999 (December 19, 2023 30(b)(6) Deposition of Hamilton Bennett (Moderna v. Pfizer), 121:13-121:16 ("Q. So the government was asking Moderna about this Arbutus patents; is that correct? A. They were asking about our attempts to avoid the

1092

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1688. Moreover, in a draft report for the European Medicines Agency, Don Parsons commented on the portion of text with the molar ratio 48.5:38.9:11.1:1.5, stating "Remove if not publicly disclosed."[3883] It appears that the molar ratio as well as the statement that their ratio is "very similar to optimal ratios reported in the literature" were removed from the final report.[3884]

### D. Moderna tried and failed to design around the Lipid Composition Patents

1689. Moreover, as discussed above, Moderna was using Plaintiffs' patented LNP technology in June 2017—about six months after a court had granted a pre-trial injunction that prevented Acuitas from "entering into any further agreements purporting to sublicense Arbutus' technology from the date of the order to the date of trial or further order from the court."[3885] Specifically, Dr. Parsons testified that in June 2017, the LNP composition Moderna was using clinically was 50% ionizable lipid.[3886] At that time, Moderna's President, Dr. Hodge, was directing Moderna personnel to "advance an alternative composition."[3887] On June 9, 2017, Dr. Hodge was "asking [Moderna] evaluate an alternative set of composition for performance."[3888] In fact, he stated: "I would like to reemphasize that there are incredibly strong business reasons why a composition with 40 percent amino lipid is more attractive. . . . I've tried to underscore that preference for the last few months

---

Arbutus patent."); 122:16-122:19 ("Q. Okay. So you were telling the government that Moderna mRNA-1273 was not covered by the Arbutus patent, right? A. I seem to be conveying that, yes."); 123:8-123:11 ("A. Okay. And what you're telling the government is this patent exists, but Moderna, its product was not covered by the patents, right? A. That is what we're stating here.")).

[3883] MRNA-GEN-02407201 (Jan. 06, 2021, EMA Covid-19 Vaccine Moderna).

[3884] *Compare* MRNA-GEN-02407201 (Jan. 06, 2021, Draft EMA Covid-19 Vaccine), *with* MRNA-GEN-00680127 at -152 (Mar. 11, 2021 EMA Covid-19 Vaccine).

[3885] *Supra* Section III.F.3.a; "Arbutus Injunction Survives Attempted Appeal by Acuitas," *Arbutus,* April 13, 2017, *available at* https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-injunction-survives-attempted-appeal-acuitas.

[3886] June 7, 2024 Deposition of Donald M. Parsons, Ph.D., 40:6-40:21 ("Q. Okay. And then moving to the two paragraphs later [in Parsons Deposition Exhibit No. 1], in the paragraph after the one we just talked about, he says that he wants to be presented with options to advance alternative compositions to the standard composition. Do you see that? A. Yes. Q. What's the standard composition? A. I believe that he's using imprecise language there so I can't be sure exactly what he was referring to, but I presume that he was referring to the composition we were using clinically at that time. Q. And did that have 50 percent ionizable lipid in it? A. Yes, it did.").

[3887] June 7, 2024 Deposition of Donald M. Parsons, Ph.D., 46:5-46:7.

[3888] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 312:21-312:22.

1093

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

so this is nothing new."[3889]

1690. I understand Dr. Mitchell has opined that Dr. Hoge "directed his technical team to explore compositions having only ███████████████" because that "reflect[ed] what Moderna understood was needed to design around the Lipid Composition Patents."[3890]  Dr. Mitchell has further opined that "Moderna appears to later have shifted its goal to try to achieve a composition with target lipid ratio of ███████████████," and, that despite "experimentation with different lipid compositions," Moderna was "unable to obtain suitable compositions with either of those target lipid rations, . . . ultimately us[ing] the target v1 and v2 Formulations [which] hav[e] target cationic lipid ratios of 48.5 mol % and 48 mol %, respectively."[3891]  Ultimately, Dr. Mitchell opined that "Moderna failed to design around the Lipid Composition Patents."

**SIGNATURE**

Respectfully submitted this 25th day of November, 2024.

Catharine M. Lawton

---

[3889] MRNA-GEN-02619870-871, at 870 (Hoge Deposition Exhibit No. 30 – June 9, 2017 email from Stephen Hoge to Donald Parson, cc: Örn Almarsson, Subject: Composition).  May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 309:6-309:8 ("Q. You meant what you wrote here [Hoge Deposition Exhibit No. 30], correct?  A. Yes."); 311:15-312:4 ("Q. Okay, you say below, the next paragraph [Hoge Deposition Exhibit No. 30], 'I've tried to underscore that preference for the last few months so this is nothing new.'  Do you see that?  A. Yes.  Q. So you had expressed to your scientists working under your direction that you had this preference for 40 percent amino lipid for several months, correct?  A. That's what I said, and I believe that to be true.").

[3890] November 25, 2024 Expert Report of Dr. Mitchell, at Section XIII.C.

[3891] November 25, 2024 Expert Report of Dr. Mitchell, at Section XIII.C.

1094

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

**Genevant v. Moderna**
**Lawton Schedule 1.1**
**Hypothetical Negotiation Approach - Damages Summary**

| | Hypothetical Negotiation Approach | Pandemic | Endemic | | Total / Weighted Avg | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| [2] | Rate per Dose | $4.77 | $6.61 | $10.56 | $4.84 | $5.00 |
| [3] | Doses Sold | 1,069,863,645 | 43,976,850 | 43,976,850 | 1,113,840,495 | 1,113,840,495 |
| | Reasonable Royalty | $5,101,569,034 | $290,569,059 | $464,295,207 | $5,392,138,093 | $5,565,864,241 |

_**Notes and Sources:**_

[1] Assumes all patents are in, LMX and LDP can be analyzed for infringment, and §1498 does not apply.

[2] Table 6.9.

[3] Schedules 9.1 and 9.2. _See also,_ Mitchell Appendices 132 and 154.

HIGHLY CONFIDENTIAL #: 53202E COUNSEL'S EYES ONLY

Genevant v. Moderna
Lawton Schedule 1.2
Analytical Approach - Damages Summary

| [1] | Analytical Approach | Pandemic | Endemic | Total / Weighted Avg |
|---|---|---|---|---|
| [2] | Rate per Dose | $3.98 | $3.98 | $3.98 |
| [3] | Doses Sold | 1,069,863,645 | 43,976,850 | 1,113,840,495 |
| | Reasonable Royalty | $4,258,649,992 | $175,052,225 | $4,433,702,218 |

*Sources:*

[1] Assumes all patents are in, LMX and LDP can be analyzed for infringment, and §1498 does not apply.

[2] Schedule 3.3.

[3] Schedules 9.1 and 9.2. *See also,* Mitchell Appendices 132 and 154.

Page 1 of 1

HIGHLY CONFIDENTIAL: OUTSIDE COUNSEL'S EYES ONLY

**Genevant v. Moderna**
**Lawton Schedule 3.1**
**Analytical Approach - Pandemic: Calculation of Moderna Anticipated Profit per Dose circa May/June 2020**

| | | | | |
|---|---|---|---|---|
| Moderna Revenue Projections - 1 Bil. Doses | [a]=[b]*[c] | $ 30,000,000,000 | **Calculation of Profit % at:** |
| [1] Moderna Volume Projection - Doses | [b] | 1,000,000,000 | **$30 per Dose** |
| [1] Moderna Price Range Projections per Dose | [c] | | |
| [2] Moderna Anticipated Manufacturing Cost per Dose | [d] | | |
| Moderna Anticipated Gross Profit per Dose | [e]=[c]-[d] | | |
| [3] Moderna Anticipated Overhead R&D Allocation per Dose | [f] | | |
| Moderna Anticipated Operating Profit per Dose | [g]=[e]-[f] | | |
| [4] Moderna Anticipated Fee/Profit Rate as % of Price | 25.5%  [h]=25.5%/(1+25.5% | | |
| Moderna Anticipated Fee/Profit per Dose | [i]=[c]*[h] | | |
| Moderna Anticipated Profit per Dose | [j]=[g]-[i] | | |

*Sources:*
[1] MRNA-GEN-02645690-752 at -695 and 698 (Hoge Exhibit 46 - June 15, 2020 Moderna Board Meeting - CEO Update Deck). *See also,* MRNA-GEN-02645686-689 at -687
  (June 7, 2020 Memorandum) and MRNA-GEN-01122003-088, at 009 (Bennett Exhibit 29 - July 10, 2020 Cost Proposal).
[2] MRNA-GEN-02645690-752 at -696 (Hoge Exhibit 46 - June 15, 2020 Moderna Board Meeting - CEO Update Deck).
[3] MRNA-GEN-02645641-677 at -667 (Hoge Exhibit 45 - May 15, 2020 Moderna Board Meeting Deck).
[4] MRNA-GEN-01122003-088 at -010 (Bennett Exhibit 29 - July 10, 2020 Cost Proposal).

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

**Genevant v. Moderna**
**Lawton Schedule 3.2**
**Analytical Approach - Pandemic: Calculation of Anticipated Net Profit per Dose using <u>Anticipated</u> Profit per Dose After Moderna <u>Anticipated</u> Fee/Profit circa May/June 2020**



*Sources:*

[1]  Lawton Schedule 3.1. See also, MRNA-GEN-02645690-752 at -698 (Hoge Exhibit 46 - June 15, 2020 Moderna Board Meeting - CEO Update Deck).
[2]  Lawton Schedule 3.7.
[3]  Lawton Schedule 3.8.
[4]  MRNA-GEN-01122003-088 at -009 (Bennett Exhibit 29 - July 10, 2020 Cost Proposal).
[5]  Lawton Schedule 3.9.
[6]  Lawton Schedule 5.4.
[7]  A subtraction for Moderna's use of Cellscript's technology was not included because Moderna entered into its licence with Cellscript in early 2019 and therefore the costs of the associated milestone and royalties payments would have been known and accounted for in Moderna's 2020 projections.

Page 1 of 1

HIGHLY CONFIDENTIAL: OUTSIDE COUNSEL'S EYES ONLY

Genevant v. Moderna

Lawton Schedule 3.3

Analytical Approach - Pandemic: Reasonable Running Royalty Rate Based on <u>Anticipated</u> Profit per Dose circa May/June 2020 - 1B units @ $30/Dose

| | | Moderna Payload | Genevant Delivery | Total |
|---|---|---|---|---|
| [1] Anticipated Net Profit per Dose After Moderna Anticipated Fee/Profit, *less:* | | $ 6.95 | $ 6.95 | $ 13.90 |
| [2]   Moderna's Past Investments/Costs Related to COVID Vaccine | | $ 2.97 | $ 2.97 | $ 5.94 |
| [3]   Moderna's Cost of Using NIAID Technology | | $ 0.37 | | $ 0.37 |
| Reasonable Royalty Profit Indication per Dose | | $ 3.61 | $ 3.98 | $ 7.59 |
| | | | | |
| [4] Reasonable Royalty % of Price per Dose | $ 30.00 | 12.0% | 13.3% | |
| | | | | |
| Moderna/Genevant Estimated Profit Split | $ 7.59 | 47.5% | 52.5% | |

*Sources:*

[1] Lawton Schedule 3.2, line [k] divided by 2. Lawton Report Section VI.C.2.c.(5).C6(c).

[2] Lawton Schedule 3.2, sum of lines [l]:[p] divided by 2. Lawton Report Section VI.C.2.c.(5).C6(c).

[3] Lawton Schedule 3.2, sum of lines [q]:[r].

[4] Lawton Schedule 3.2, line [c] Scenario 1.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

**Genevant v. Moderna**
**Lawton Schedule 6.1**
**Plaintiff License Matrix - Covid Agreements**

*Financial terms only show upper bound of total potential payment

| | Parties | Date | Latest Date | Type Of Agreement | Amendments/ Related Agreements | Financial Terms | | | | | | | | Technical Comparability | | | Economic Comparability | | | | Territory |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Lump Sum | Annual Fees | Option Fees | Dev. Milestone | Reg. Milestone | Comm. Milestone | Royalties | Royalty Reduction | Patents-in-suit | Field Of Use | Tech. Area | Joint Dev. | Manuf. Assist | Reg. Assist | ▮ | |
| [1][a] | Genevant - Chulalongkorn | 10/20/2020 | 11/22/2022 | Nonexclusive License and Support Agreement | Amend. 1 - 3 | ▮ | | | | | | ▮ | | Gen LNP patents | Covid, incl. subvariants | LNP/mRNA | X | | | | ▮ |
| [2][b] | Genevant - Gritstone | 1/15/2021 | 1/29/2021 | Nonexclusive License and Development Agreement | Amend. 1 | ▮ | | | ▮ | ▮ | ▮ | ▮ | X | Not '378 | Covid | LNP/SAM/ChadV | X | X | X | | ▮ |
| [3][c][d] | Genevant - Providence | 5/11/2020 | 8/18/2022 | License and Development Agreement | Amend. 1 - 5 | ▮ | | | ▮ | ▮ | ▮ | ▮ | | Not '378 | Covid | LNP | X | X | X | X | ▮ |
| [4][e] | Genevant - ST Pharm | 4/8/2021 | | Nonexclusive License and Support Agreement | | ▮ | | | ▮ | | ▮ | ▮ | X | NO | Covid | LNP | X | X | X | | SE Asia |
| [5][e][f] | Genevant - ▮ | 2/18/2022 | | Nonexclusive License and Collaboration Agreement | | ▮ | | | ▮ | ▮ | ▮ | ▮ | X | NO | Covid | LNP | X | | | | ▮ |
| [6][g] | Genevant - Gritstone | 8/10/2023 | | Option/Non Exclusive License Agreement | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | X | All | Covid + Pathogen | LNP/SAM/ChadV | X | X | X | | ▮ |

*Notes:*
[a] "Genevant Patent" means any Patent Controlled by Genevant or any of its Affiliates that cover: (a) the composition of matter of LNPs; (b) the method of use of LNPs; (c) LNP formulations for delivery of mRNA; (d) the method of manufacturing LNPs; (e) the physical characteristics of LNPs, including the lipid or nonlipid components of LNPs, particle morphology or lipid ratios; or (f) Genevant Know-How
[b] '378 Patent issued 10/2021 (after the date of this agr.)
[c] ▮
[d] Territory excludes ▮
[e] Only Patents in Territory, and ▮
[f] Territory includes ▮
[g] ▮

*Sources:*
[1]    GENV-00023616, GENV-00023664, GENV-00023670, GENV-00023678.
[2]    GENV-00022689, GENV-00022686.
[3]    GENV-00022307, GENV-00022422, GENV-00022299, GENV-00022303, GENV-00022305, GENV-00022419, GENV-00022418, GENV-00022417.
[4]    GENV-00022924.
[5]    GENV-00023278.
[6]    GENV-00062423.

**HIGHLY CONFIDENTIAL: OUTSIDE COUNSEL'S EYES ONLY**

**Genevant v. Moderna**
**Lawton Schedule 7.3**
**ModernaTX Inc. Actual Monthly Reported Statements of Operations**
**January 2020 - January 2024**



*Notes and Sources:*
[1] MRNA-GEN-01352335, at tab "2020 MTD P&L."
[2] MRNA-GEN-01352335, at tab "2021 MTD P&L."
[3] MRNA-GEN-01352335, at tab "2022 MTD P&L."
[4] MRNA-GEN-01745038 at tabs "2023 MTD P&L."
[5] MRNA-GEN-01745038 at tabs "2024 MTD P&L."
[6] Moderna reported net income (loss) differs from calculated net income (loss) for Mar-Jun 2020, Sep-Oct 2020, Dec 2020, and May-Jun 2021.

**HIGHLY CONFIDENTIAL: OUTSIDE COUNSEL'S EYES ONLY**

**Genevant v. Moderna**
**Lawton Schedule 7.3**
**ModernaTX Inc. Actual Monthly Reported Statements of Operations**
**January 2020 - January 2024**



*Notes and Sources:*

[1] MRNA-GEN-01352335, at tab "2020 MTD P&L."
[2] MRNA-GEN-01352335, at tab "2021 MTD P&L."
[3] MRNA-GEN-01352335, at tab "2022 MTD P&L."
[4] MRNA-GEN-01745038 at tabs "2023 MTD P&L."
[5] MRNA-GEN-01745038 at tabs "2024 MTD P&L."
[6] Moderna reported net income (loss) differs from calculated net income (loss) for Mar-Jun 2020, Sep-Oct 2020, Dec 2020, and May-Jun 2021.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY**

**Genevant v. Moderna**
**Lawton Schedule 7.3**
**ModernaTX Inc. Actual Monthly Reported Statements of Operations**
**January 2020 - January 2024**



*Notes and Sources:*
[1] MRNA-GEN-01352335, at tab "2020 MTD P&L."
[2] MRNA-GEN-01352335, at tab "2021 MTD P&L."
[3] MRNA-GEN-01352335, at tab "2022 MTD P&L."
[4] MRNA-GEN-01745038 at tabs "2023 MTD P&L."
[5] MRNA-GEN-01745038 at tabs "2024 MTD P&L."
[6] Moderna reported net income (loss) differs from calculated net income (loss) for Mar-Jun 2020, Sep-Oct 2020, Dec 2020, and May-Jun 2021.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

**Genevant v. Moderna**
**Lawton Schedule 7.3**
**ModernaTX Inc. Actual Monthly Reported Statements of Operations**
**January 2020 - January 2024**



*Notes and Sources:*
[1] MRNA-GEN-01352335, at tab "2020 MTD P&L."
[2] MRNA-GEN-01352335, at tab "2021 MTD P&L."
[3] MRNA-GEN-01352335, at tab "2022 MTD P&L."
[4] MRNA-GEN-01745038 at tabs "2023 MTD P&L."
[5] MRNA-GEN-01745038 at tabs "2024 MTD P&L."
[6] Moderna reported net income (loss) differs from calculated net income (loss) for Mar-Jun 2020, Sep-Oct 2020, Dec 2020, and May-Jun 2021.