# EXHIBIT C

Highly Confidential – Outside Attorneys' Eyes Only

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| MODERNA, INC. and MODERNATX, INC., | ) ) | C. A. No. 22-252 (MSG) |
| Defendants. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| MODERNA, INC. and MODERNATX, INC., | ) ) | |
| Counterclaim-Plaintiffs, | ) ) | |
| v. | ) ) | |
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH, | ) ) ) | |
| Counterclaim-Defendants. | | |

**REPLY EXPERT REPORT OF CATHARINE M. LAWTON**

**March 21, 2025**

Highly Confidential – Outside Attorneys' Eyes Only

licensor and the licensee negotiate within the bargaining range, which is defined by the licensor's minimum willingness to accept [WTA] and the licensee's maximum willingness to pay [WTP].[469]

(v)    Moderna *Expected* That Any Delay Would Cause it to Lose Billions in Profits

159.    Contrary to the foregoing, which shows that Dr. Vellturo has not identified any specific purported NIA, *assuming* Moderna did, in fact, have "potential alternatives" as of May 31, 2020, a key question is what was Moderna's *expectation* regarding the time and cost to develop and implement any such "potential alternative"?  The evidence in this case establishes that under any "potential alternative," Moderna's launch of mRNA-1273 would have been delayed,[470] and in mid-May 2020, Moderna projected that a ███████████████████████████████[471]

160.    Dr. Vellturo, however, presents no analysis of Moderna's *actual* profits v. Moderna's *projected* profits with a purported "potential alternative."  As a result, I have undertaken the analysis that Dr. Vellturo opted not to do, namely, "comparing the patented invention to its next-best available alternative(s) . . . [in order to] discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward[.]"[472]

161.    My analysis is based on Moderna's expectations at the time of the May 31, 2020 hypothetical negotiation under the following three (3) scenarios:

---

[469] J. Gregory Sidak, "Bargaining Power and Patent Damages," *Stanford Technology Law Review,* Vol. 19, No. 1, 2015, p. 10, *available at* https://law.stanford.edu/wp-content/uploads/2017/10/19-1-1-sidak-bargaining-power-and-patent-damages_0.pdf.

[470] Lawton Opening Report, ¶¶ 681-682.

[471] Lawton Opening Report, ¶ 703b) ( *citing See, e.g.,* MRNA-GEN-02645641-677, at 660 (Hoge Deposition Exhibit No. 45 – "Board Discussion," *Moderna,* May 15, 2020, Slide 20 of 37). █████

████████████████████████████████████████████████████████████

[472] *Grain Processing Corp. v. Amer. Maize Prods. Co.,* 185 F.3d 1341, 1351 (Fed. Cir. 1999).

140

Highly Confidential – Outside Attorneys' Eyes Only

- **Scenario 1 – Moderna's** ▮▮▮▮▮▮▮ **Projection**: This scenario is based on Moderna's *expected* reduction in volume of ▮▮▮▮ based on an assumed ▮▮▮▮▮▮▮—as reflected in its May 15, 2020 Board presentation.  In particular, Moderna's expected U.S. unit volume of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮) doses (based on a ▮▮▮▮▮▮▮▮) is reduced to ▮▮▮▮▮▮▮▮▮▮▮▮) in the event of a ▮▮▮▮▮▮▮  Scenario 1 shows that as of May 31, 2020, Moderna expected a loss of revenue, gross profit and operating income of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, respectively.  Moderna's expected loss of operating income is shown in **Chart 3.3A**,[473] below.

- **Scenario 2 – Projection Based on a** ▮▮▮▮▮▮▮ **Using J&J's U.S. Market Share as a Proxy**:  Scenario 2 tests the reasonableness of Scenario 1 using J&J's *actual* U.S. market share as of April 2021—achieved with a launch that was 2 months later than Moderna's *actual* launch, and before the blood clotting issue caused J&J's administered doses to plummet in May 2021 and subsequent months.  Under a 2-month delay scenario, and assuming Moderna achieved J&J's ▮▮▮▮ market share, Moderna's loss of revenue, gross profit and operating income is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ respectively. Moderna's expected loss of operating income is shown in **Chart 3.3B**,[474] below.

- **Scenario 3 – Projection Based on an** ▮▮▮▮▮▮▮ **Using Novavax's U.S. Market Share as a Proxy**:  Scenario 3 also tests the reasonableness of Scenario 1 using Novavax's *actual* U.S. market share—achieved with a launch that was 18 months later than Moderna's *actual* launch.  Under an 18-month delay scenario, Moderna would not have been able to achieve any market share, and Moderna's loss of revenue, gross profit and operating income is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, respectively.  Moderna's expected loss of operating income is shown in **Chart 3.3C**,[475] below.

---

[473] Schedule 1.2-Reply.
[474] Schedule 1.3-Reply.
[475] Schedule 1.4-Reply.

Highly Confidential – Outside Attorneys' Eyes Only



**CHART 3.3A**

**CHART 3.3B**

Highly Confidential – Outside Attorneys' Eyes Only



**CHART 3.3C**

**(h)    Differences Based on the Stage of Development at the Time of License Negotiation**

162.    Dr. Vellturo also does *not* analyze the economic differences between the Moderna *hypothetical* license negotiated on the "doorstep of commercialization"[476] and the Genevant agreements (Providence and the other Historical Comparable Agreements) which were negotiated at an early stage of development.[477]  More than 20 years ago the Federal Circuit stated: "comparisons to other

---

[476] *See, e.g.,* Lawton Opening Report, ¶¶ 828 ("Patent "hold-out" can also be an effective strategy for biotech start-ups that are operating in the 35 U.S.C. § 271 (e)(1) safe harbor— because it allows the company to conserve cash.  While the start-up may avoid license fees and milestones for some period of time, if and when it arrives at the "doorstep of commercialization," the license fee will be much higher, assuming a license is available at all."); 835.

[477] *See, e.g.,* Lawton Opening Report, ¶ 835 ("<u>Second</u>, the circumstances of the hypothetical negotiation—in this highly unusual "on the doorstep of commercialization" scenario—are far different than the typical early-stage licensing in the biotech industry generally, which is consistent with Genevant's licensing agreements.").  *See also, e.g.*, *ModernaTX, Inc. and Moderna US, Inc. v. Pfizer Inc., BioNTech SE, BioNTech Manufacturing GmbH, BioNTech US Inc.*, Expert Report of James E. Malackowski dated February 23, 2024, p. 145 of 172 ("….early stage technologies [] typically have lower royalty rates than licenses entered just prior to or

Highly Confidential – Outside Attorneys' Eyes Only

"certain factual misrepresentations."[808]  These sections, however, do not establish that there are *any* "factual misrepresentations."  Instead, Dr. Vellturo simply disagrees with certain points which he apparently concluded are not material to my "ultimate royalty calculations."[809]

### 1.    IV.B. Purported "Factual Inaccuracies"

329.    Dr. Vellturo does *not* assert that any of the purported IV.B. "Factual Inaccuracies" undermine my reasonable royalty opinion.[810]  While Dr. Vellturo captions this section "Factual Inaccuracies," a review of this 9-page section shows: a) there are no actual "factual inaccuracies," b) instead, Dr. Vellturo claims that he purportedly does not understand the relevance of certain facts, and c) Dr. Vellturo attempts to argue that the situation at the time of the hypothetical negotiation "Involves Next to Nothing of How the Parties Would Have Actually Approached the Hypothetical Negotiation."[811]

### a)    Dr. Vellturo's Cites are Not Actual "factual inaccuracies"

330.    Dr. Vellturo's cites are not actual "factual inaccuracies."  For example, the first 2-paragraph sub-section is captioned **"Ms. Lawton's Inaccurate Characterization of Moderna as a Company,"**[812] cites two points—but does *not* assert that the statements are factually inaccurate.  With regard to the fact that "Moderna ''repurposed' other technology without regard for whether it was patented," Dr. Vellturo states: "[i]t is not clear how these assertions relate to Ms. Lawton's opinions[.]"[813]  This is among the facts that support my conclusion regarding Moderna's long history of hold-out, which as stated in the Lawton Opening Report, would be a material factor in the May 31, 2020 hypothetical negotiation.[814]

331.    Similarly, with regard to Moderna's decision to "enter[] into a license agreement with Acuitas

---

[808] Vellturo Rebuttal Report, ¶ 288.

[809] Vellturo Rebuttal Report, ¶ 296 ("It is not clear how, if at all, these assertions factor into Ms. Lawton's ultimate royalty calculations.").

[810] *See, e.g.,* Vellturo Rebuttal Report, ¶ 296 (p. 130) ("It is not clear how, if at all, these assertions factor into Ms. Lawton's ultimate royalty calculations.").

[811] Vellturo Rebuttal Report, ¶¶ 305-312 (pp. 134-138).

[812] Vellturo Rebuttal Report, ¶¶ 297-298 (pp. 130-131).

[813] Vellturo Rebuttal Report, ¶ 297 (p. 130).

[814] *See, e.g.,* Lawton Opening Report, ¶¶ 1403-1445 (pp. 957-982) (Payment Structure of the License Agreement); ¶¶ 816-836 (pp. 617-627) (Capability to Exploit the Patent through Licensing).

238

Highly Confidential – Outside Attorneys' Eyes Only

rather than Tekmira,"[815] Dr. Vellturo acknowledges this fact, and attempts to argue that Moderna purportedly had "a belief that AlCana/Acuitas was able to provide sublicenses for certain LNP intellectual property rights,"[816] without addressing Moderna's Said Francis' April 2, 2014 notes, shown in **Figure 4.1**,[817] below, that establish the opposite.



**FIGURE 4.1**

---

[815] Vellturo Rebuttal Report, ¶ 298 (pp. 130-131).

[816] Vellturo Rebuttal Report, ¶ 298 (p. 131).

[817] Lawton Opening Report, ¶ 157 (*citing* MRNA-GEN-00913738-819, at 817 (Francis Deposition Exhibit No. 18 – Said Francis notes dated April 2, 2014) (emphasis in original).  May 22, 2024 30(b)(6) Deposition of Said E. Francis, 131:11-131:17 ("Q. Exhibit 18 is another set of handwritten notes that appear to be yours. . . . A. Yes.").).

239

Highly Confidential – Outside Attorneys' Eyes Only

332. As stated in the Lawton Opening Report, on April 2, 2014—3 months *before* the July 3, 2014 Acuitas-Moderna agreement[818]—Said Francis' **"Acuitas: follow-up"** notes, in **Figure 4.1**, above, appear to show that



."[819]

333. As discussed in the Lawton Opening Report,[820] in February 2017 Arbutus obtained an injunction that prevented Acuitas from granting further sublicenses to Arbutus' LNP technology to third parties. While Moderna may have retained its original four sublicenses granted by Acuitas, the facts show that Moderna saw a need for Arbutus' LNP technology, wanted to obtain it at a discount through a third party despite being aware of potential risks, and in doing so, created improper competition that interfered with Arbutus's exclusive right, which depressed the price Arbutus was able to command for its LNP technology, causing an overhang.

334. Importantly, Dr. Vellturo does *not* acknowledge that Acuitas' breach of contract *benefited* Moderna economically (*i.e.,* Moderna gained access to "the exact same [Tekmira] IP" on "more favorable [*i.e.,* significantly lower cost] terms"—to the *detriment* of Tekmira, which was denied the exclusivity that patents are supposed to provide. Furthermore, Dr. Vellturo also does not acknowledge that Acuitas' breach of contract resulted in improper competition, which created an overhang that adversely affected the value Genevant and its predecessors could achieve in licensing negotiations. Instead, Dr. Vellturo alleges that "the sequence of Tekmira's offers undermines the alleged overhang effect"[821]—without acknowledging that Moderna had publicly denigrated Genevant's technology for years beginning in **December 2016** when *Forbes* reported the following: "Moderna's chief executive, Stéphane Bancel, has been dismissive of the Arbutus

---

[818] *See, e.g.,* Lawton Opening Report, ¶ 161 (*citing* MRNA-GEN-01754060-064, at 060 (Francis Deposition Exhibit No. 24 – July 3, 2014 email from Stephen Hoge to Executive Committee, cc: Said Francis; Shuan Ryan, Örn Almarsson, Matt Stanton, Subject: FW: Acuitas Final Documents).).

[819] Lawton Opening Report, ¶ 157 (*citing* MRNA-GEN-00913738-819, at 817 (Francis Deposition Exhibit No. 18 – Said Francis notes dated April 2, 2014) (emphasis in original). May 22, 2024 30(b)(6) Deposition of Said E. Francis, 131:11-131:17 ("Q. Exhibit 18 is another set of handwritten notes that appear to be yours. . . . A. Yes.").).

[820] Lawton Opening Report, ¶¶365-367.

[821] Vellturo Rebuttal Report, ¶ 308 (p. 136).

Highly Confidential – Outside Attorneys' Eyes Only

technology. 'We knew it was not very good,' he told Forbes last year. 'It was just okay.' . . . Bancel says Moderna has stopped using the Acuitas tech for new drugs."[822] Dr. Vellturo also does not acknowledge the impact of Moderna's false claims regarding its continued use of the Plaintiffs' Patents-in-Suit and the impact this had on Arbutus's offers at the time. For example, during the January 9, 2017 J.P. Morgan Healthcare Conference, Mr. Bancel's presentation *falsely* indicated that Moderna had stopped using Arbutus's technology, as shown in **Figure 4.2**,[823] below, which shows "Our Pipeline Today," with mRNA-1325 (Zika) as the last "In Licensed" Development Candidate.

---

[822] *See, e.g.,* Lawton Opening Report, ¶ 1530 (*citing* Nathan Vardi, "Moderna's Mysterious Medicines," *Forbes,* December 14, 2016, *available at* https://www.forbes.com/sites/nathanvardi/2016/12/14/modernas-mysterious-medicines/#fc82927730ee. *See also* No Bates No. (Murray Deposition Exhibit No. 3 – Matthew Herper, Nathan Vardi, "Moderna Can't Escape My Intellectual Property, Says Arbutus CEO," *Forbes,* May 16, 2017, p. 2 of 6) ("Moderna's chief executive, Stéphane Bancel, has been dismissive of the Arbutus technology. 'We knew it was not very good,' he told Forbes last year. 'It was just okay.'").).

[823] Lawton Opening Report, ¶ 110 (*citing* "35th Annual J.P. Morgan Healthcare Conference," *Moderna,* January 9, 2017, Slide 14 of 41, *available at* https://web.archive.org/web/20200715033036/https://www.modernatx.com/newsroom/events/events-1. *See also* MRNA-GEN-00514954-995-002, at 958 ("Roche-Moderna meeting – JPMorgan Conference 2017," *Moderna,* January 9, 2017, Slide 5 of 44) ("Our Pipeline Today") (same).).

Highly Confidential – Outside Attorneys' Eyes Only

**FIGURE 4.2**

335.  Dr. Vellturo also does not acknowledge that Moderna's actions created a continuous sequence of overhangs that adversely affected the Plaintiffs—and that just as the breach of contract overhang was ended, the IPR overhang started.  For example, Dr. Vellturo does not address the fact that while the injunction was granted in February 2017, the Arbutus-Acuitas litigation was not settled until February 18, 2018.  The settlement was announced in a press release dated **February 22, 2018**[824]—which was 1-day *after* Moderna filed its first IPR on February 21, 2018.[825]

---

[824] Lawton Opening Report, ¶ 372 (*citing* "Arbutus Settles Litigation, Terminating Acuitas' Rights to LNP Technology," *Arbutus,* February 22, 2018, *available at* https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-settles-litigation-terminating-acuitas-rights-lnp-0.).

[825] Lawton Opening Report, ¶ 232 (*citing* Amended Complaint, ¶ 35; Answer to Amended Complaint, p. 32.).  *See also* "IPR2018-00680 – Moderna Therapeutics Inc. v. Protiva Biotherapeutics Inc," *Unified Patents,* 2025, *available at* https://portal.unifiedpatents.com/ptab/case/IPR2018-00680 (reporting filing date: 2021-02-21).

Highly Confidential – Outside Attorneys' Eyes Only

be instrumental to achieving a significant economic opportunity. The resulting tiered royalty rates reflect an *ex ante* attempt to reward the patentee a higher royalty rate for larger economic opportunities, which supports the conclusion that larger economic opportunities do in fact support higher royalty rates, or per-unit royalty amounts.

358. The prevalence of such tiered royalty structures in the pharmaceutical field is evidence that this concept is not unique to Plaintiffs' technology.[878]

359. However, unlike the situation in Plaintiffs' "historical" licenses, and the situation confronting most licensees and licensors when entering into license agreements well before commercialization, here, the parties to the hypothetical negotiation had a clear view of the economic opportunity, and the importance of the patented technology to achieving that opportunity. Unlike early-stage license agreements, where the licensee does not yet know exactly which aspects of the licensed intellectual property will be embodied in an ultimately commercialized product, here for the hypothetical negotiation, the parties know that Moderna's Accused Product uses that patented delivery technology and that the Patents-in-Suit are valid. These factors (including the uniquely imminent and massive size of the economic opportunity that Moderna was seeking to monetize), all auger in favor of a higher royalty rate, or royalty per unit. Put in terms of Dr. Vellturo's Figure 3, they entitle Plaintiffs to a wider slice of the pie.

### D. "IV.E. Ms. Lawton's Discussion of the Alleged Impact of Moderna's Alleged Infringement on Plaintiffs (Lawton Report, § V)

360. In this 12-page section,[879] Dr. Vellturo claims section V of the Lawton Opening Report "repeats or expands on her background themes, which seemingly relate largely to liability issues, and provides extensive background and commentary on reasonable royalty damages analyses" which he incorrectly concludes "has no direct bearing on [my] damages assessment[.]"[880] This section of the Lawton Opening Report addresses key damages issues—namely the expected benefits to Moderna and the expected costs to the Plaintiffs.

---

[878] Approximately one third of pharmaceutical licenses include tiered royalties. *See* "Characteristics of pharmaceutical patent royalty rates," *IAM,* October 12 ,2016, *available at* https://www.iam-media.com/global-guide/iam-yearbook/2017/article/characteristics-of-pharmaceutical-patent-royalty-rates.

[879] Vellturo Rebuttal Report, ¶¶ 398-419 (pp. 176-187).

[880] Vellturo Rebuttal Report, ¶ 398.

255

Highly Confidential – Outside Attorneys' Eyes Only

1.    **II.A. Commercial Relationship Between the Parties (¶¶ 218-219)[945]**

384.    This section of the Lawton Opening Report establishes that the Tekmira-Moderna discussions began in early-2013,[946] (*before* the **December 3, 2013** Tekmira-Acuitas cross-license agreement[947]).  In contrast, in a footnote, Dr. Vellturo cites to Moderna's early interaction with Acuitas (without establishing that there is any evidence that Tekmira was aware of the Moderna-Acuitas interactions), which *pre-dates* the December 2013 Tekmira-Acuitas cross-license agreement, as follows:

> Notably, according to Ms. Lawton even the 2013 Tekmira Term Sheet offer, upon which Ms. Lawton relies, post-dates Moderna's interaction with Acuitas dating back to at least February 2013, *see* Lawton Report, ¶ 1157, noting "Moderna turned to tiny Acuitas [beginning in or about February 6, 2013]," and Lawton Report, ¶ 1375, noting that the 2013 Tekmira Term Sheet offer was sent on "May 29, 2013." I address similar inconsistencies in my assessment of Ms. Lawton's Market approach below.[948]

2.    **II.E. Situation at the time of the Hypothetical Negotiation[949]**

385.    This section of the Lawton Opening Report establishes key facts regarding the economic circumstances of the parties that provide relevant context for the hypothetical negotiation bargaining scenario and includes the following:

- that the May 29, 2013 Moderna-Tekmira Term Sheet was early, *before* ALN-TTR02 Phase I clinical trial results were published (and also before ONPATTRO®'s Phase II and Phase III clinical trial results were published) (*i.e.,* Tekmira's technology was at an early stage, which Dr. Vellturo does not address),

- Moderna's internal documents show that it considered the May 29, 2013 Tekmira-Moderna Term Sheet a licensing "precedent" (*i.e.,* a value marker, which Dr. Vellturo does not address),

- While Mr. Bancel claimed the injunction was purportedly "moot," Moderna's internal documents show it considered to evaluate options to access the Plaintiffs' patented technology *after* the injunction (*i.e.,* Mr. Bancel falsely claimed *publicly* that Moderna was *not* continuing to use the Patents-in-Suit while Moderna's *internal* "Project Mozart"

---

[945] Lawton Opening Report, ¶¶ 218-219.
[946] Lawton Opening Report, ¶¶ 218-219.
[947] Lawton Opening Report, ¶ 339.
[948] Vellturo Rebuttal Report, ¶ 446 fn 1029.
[949] Lawton Opening Report, ¶¶ 334-373.

Highly Confidential – Outside Attorneys' Eyes Only

documents show that it evaluating options to access the Arbutus technology, which Dr. Vellturo does not address).

386.    For example, Dr. Vellturo does not address the following:

> **(a)    The May 29, 2013 Tekmira-Moderna Term Sheet was a Moderna Licensing "Precedent" Not Colored by Acuitas's Improper Competition**

387.    Moderna's licensing "precedents" included both executed licenses and offers/counteroffers.  For example, in **May 2015**, Moderna's ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████ ██ ██ ███████████████████████████████████████████████ ██████████████"[951]

388.    This "precedent" (*i.e.,* the May 29, 2013 Tekmira-Moderna Term Sheet) **provides a baseline that is *not* colored by Acuitas's improper competition (*i.e.,* by improperly offering an alternative path to obtain a license to Tekmira's IP)**[952] and/or litigation and IPRs.

389.    In contrast, as noted above, Dr. Vellturo claims "Ms. Lawton's decision to give considerable weight to the royalty terms from an unaccepted [May 29, 2013 Tekmira-Moderna] offer . . . **is inexplicable**."[953]

---

[950] Lawton Opening Report, ¶ 335

[951] Lawton Opening Report, ¶ 335 (

[952] Lawton Opening Report, ¶ 336 (*citing See, e.g.,* May 30, 2024 30(b)(6) Deposition of Mark Murray, Ph.D., 196:20-197:8 ("Q. And the bottom row [Murray Deposition Exhibit No. 39, Slide 13], it says, Terminate Acuitas license, is the action, and then the objective is to, Disrupt competition.  Do you know what that's referring to?  A. Well, as I mentioned earlier, Acuitas was out representing that they had a right to license our technology and was interfering with our business possibilities.  Q. And the only entity that you understood Acuitas to have license to is Moderna; is that right?  A. But -- . . . THE WITNESS: They were actively talking to a lot of other people.").  GENV-00900097-107, at 107 (Murray Deposition Exhibit No. 39 – "Arbutus LNP Strategy," *Arbutus,* May 2016 – DRAFT, Slide 13 of 13) ("Key next steps/timeline").
[953] Vellturo Rebuttal Report, ¶ 230.

268

Highly Confidential – Outside Attorneys' Eyes Only

**(b)    The May 29, 2013 Licensing "Precedent" was Early, *before* Alnylam's Phase I Clinical Trial Results were Reported**

390.    Tekmira's May 29, 2013, offer was *early, before* the results of Alnylam's first-in-human phase 1 trial of ALN-TTR02, patisiran were published.  The phase 1 trial results were planned to "be presented at the 2013 Biennial Meeting of the Peripheral Nerve Society being held June 29 to July 1 [2013] in St. Malo, France,[954] and published in *The New England Journal of Medicine* on **August 29, 2013**,[955] and *years before* Alnylam's ONPATTRO® was approved by the FDA on **August 10,**

---

[954] Lawton Opening Report, ¶ 345 (*citing* "Tekmira Pharmaceuticals' CEO Discusses Q1 2013 Results – Earnings Call Transcript," *Seeking Alpha,* May 14, 2013, p. 6 of 16, *available at* https://seekingalpha.com/article/1434991-tekmira-pharmaceuticals-ceo-discusses-q1-2013-results-earnings-call-transcript (Mark Murray, President & CEO: As guided by Alnylam, we expect that the initial data from the Phase III, ALN-TTR02 trial will be presented at the 2013 Biennial Meeting of the Peripheral Nerve Society being held June 20 to July 1 in St. Malo, France.  By year end [2020], it is expected that ALN-TTR02 will enter a Phase III trial, triggering a $5 million milestone payment to Tekmira.").).

[955] Lawton Opening Report, ¶ 345 (*citing* Teresa Coelho, M.D., David Adams, M.D., Ph.D., Ana Silva, M.D., Pierre Lozeron, M.D., Philip N. Hawkins, Ph.D., F.Med.Sci., Timothy Mant, M.B., Javier Perez, M.D., Joseph Chiesa, M.D., Steve Warrington, M.D., Elizabeth Tranter, M.B., Malathy Munisamy, M.D., Rick Falzone, M.P.H., Jamie Harrop, B.A., Jeffrey Cehelsky, M.B.A., Brian R. Bettencourt, Ph.D., Mary Geissler, M.P.H., James S. Butler, Ph.D., Alfica Sehgal, Ph.D., Rachel E. Meyers, Ph.D., Qingmin Chen, Ph.D., Todd Borland, B.S., Renta M. Hutabarat, Ph.D., Valerie A. Clausen, Ph.D., Rene Alvarez, Ph.D., Kevin Fitzgerald, Ph.D., Christina Gamba Vitalo, Ph.D., Saraswathy V. Nochur, Ph.D., Akshay K.. Vaishnaw, M.D., Ph.D., Dinah W.Y. Sah, Ph.D., Jared A. Gollob, M.D., and Ole B. Suhr, M.D., "Safety and Efficacy of RNAi Therapy for Transthyretin Amyloidosis," *The New England Journal of Medicine,* Vol. 369, No. 9, August 29, 2013, *available at* https://www.nejm.org/doi/full/10.1056/NEJMoa1208760.).

269

Highly Confidential – Outside Attorneys' Eyes Only

**2018**,[956] and *before* Alnylam's ONPATTRO® Phase II and Phase III trial results were known.[957] In addition, as of June 2014—more than a year after the May 29, 2013 term sheet—Moderna's 2014 objective was an **"ALN-TTR02 like formulation for IV and IM."**[958]

### (c)    Moderna's History of "Hold-Out" was Marked by Low-Ball Offers

391.    Based on my investigation, if Moderna could not obtain a license **"essentially for nothing,"**[959] it simply continued to use the technology without a license.  Moderna's history of "hold-*out*" was marked by low-ball offers in patent licensing.  For example, "Flagship tried to bully Penn into licensing them the patent essentially for nothing," and "Flagship turned to [Cellscript's Gary] Dahl to sublicense the patent from him.  But Dahl said Flagship wasn't offering nearly enough, so he didn't bother to get into detailed discussions with [Flagship's VP of Intellectual Property, Gregory] Sieczkiewicz."[960]  Moderna also countered Tekmira's May 29, 2013 with a low ball counter-

---

[956] Lawton Opening Report, ¶ 345 (*citing* "ONPATTRO™ (patisiran) and Investigational ALN-TTRsc02 for the Treatment of ATTR Amyloidosis," *Alnylam,* September 11, 2018, Slide 11 of 32, *available at* https://capella.alnylam.com/wp-content/uploads/2018/09/RNAi-Roundtable_TTR_Slides_FINAL.pdf.  *See also* "Arbutus Biopharma's (ABUS) CEO Mark Murray on Q4 2017 Results – Earnings Call Transcript, *Seeking Alpha,* March 14, 2018, p. 4 of 20, *available at* https://seekingalpha.com/article/4156517-arbutus-biopharmas-abus-ceo-mark-murray-on-q4-2017-results-earnings-call-transcript (Dr. Mark Murray, CEO: "Last year, our LNP technology achieve a major clinical validation after the successful completion of Alnylam Phase 3 trial for its patisiran product, which is enabled by our LNP technology.  Alnylam has since completed regulatory filings required for approval of patisiran which could result in regulatory approval in the second half of this year.  Arbutus is owed a low-to-mid single digit royalties tiered based on global sales of patisiran and we could receive its – our first royalty payments late this year.  The company anticipates that this royalty could provide meaningful runway extending capital to fund our HBV development programs.").).

[957] Lawton Opening Report, ¶ 341.

[958] Lawton Opening Report, ¶ 342 (*citing* MRNA-GEN-01041970-991, at 990 (Hoge Deposition Exhibit No. 20/Almarsson Deposition Exhibit No. 10/Benenato Deposition Exhibit No. 26 – Örn Almarsson, Kerry Benenato, Charles Bowerman, "Designing Next-Generation Bio-Degradable Delivery Lipids for mRNA," *Moderna,* November 18, 2014, Slide 21 of 22) ("Biodegradability with Retention of Potency: Not Yet a Solved Problem").).

[959] Lawton Opening Report, ¶ 730 (*citing* MRNA-GEN-01744750-765, at 759 (*Moderna v. Pfizer* Schrum Deposition Exhibit No. 38 – David Heath, *Longshot – The Inside Story of the Race for a COVID-19 Vaccine,* (New York: Center Street Publishing, January 18, 2022), p. 115.).).

[960] Lawton Opening Report, ¶ 78 (*citing* MRNA-GEN-01744750-765, at 758-759 (*Moderna v. Pfizer* Schrum Deposition Exhibit No. 38 – David Heath, *Longshot – The Inside Story of the*

270

Highly Confidential – Outside Attorneys' Eyes Only

offer.[961]  The Moderna's November 2022 NIAID license is another example of Moderna's "hold-out."[962]

> **(d)    As of October 2013, Tekmira Expected that "positive clinical data" would improve "the economics of future deals"**

392.    The evidence in this case further underscores Mr. Brazier's opinion in *Moderna v. Pfizer* regarding "supply and demand"[963] and biotech **industry practice where patented technologies command higher royalty rates** . . . where the value of those technologies has been validated by advancing to clinical testing or commercialization."[964]  For example, in October 2013—before the July 3, 2014 Acuitas-Moderna agreement—Tekmira's Dr. Mark Murray, CEO, stated that "as this class of medicines **continues to generate positive clinical data and others are more interested in the LNP technology** that **we expect the economics of future deals to improve**."[965]

393.    As such, as stated in the Lawton Opening Report, the May 29, 2013 offer would require *upward* adjustment to reflect the circumstances at the time of the hypothetical negotiation on May 31, 2020—including the fact that at that time, the *only* FDA-approved LNP was Tekmira's LNP used in ONPATTRO®.[966]

---

*Race for a COVID-19 Vaccine,* (New York: Center Street Publishing, January 18, 2022), pp. 114-115.).).

[961] Lawton Opening Report, ¶ 342 (*citing* MRNA-GEN-01717733-758, at 755, 756 (Francis Deposition Exhibit No. 29 – "Potential Exclusive License Agreement," *Moderna,* May 2015, Slides 23-24 of 26) (("Comparison of Alnylam and Tekmira TS to Moderna (1/2)" and "Comparison of Alnylam and Tekmira TS to Moderna (2/2)").).

[962] *See, e.g.,* Lawton Opening Report, ¶ 832.

[963] MRNA-GEN-02615980-043, at 004 (February 23, 2024 Opening Expert Report of Graham Brazier (*Moderna v. Pfizer*), ¶ 80).

[964] MRNA-GEN-02615980-043, at 033 (February 23, 2024 Opening Expert Report of Graham Brazier (*Moderna v. Pfizer*), ¶ 165) (emphasis added).

[965] Lawton Opening Report, ¶ 345 (*citing* "PropThink Hosts Special Call and Interview with Tekmira Pharmaceuticals' CEO Dr. Mark Murray (Transcript)," *Seeking Alpha,* October 5, 2013, p. 3 of 10, *available at* https://seekingalpha.com/article/1730292-propthink-hosts-special-call-and-interview-with-tekmira-pharmaceuticals-ceo-dr-mark-murray-transcript (Dr. Mark Murray, CEO).).

[966] Lawton Opening Report, ¶ 345 (*citing See, e.g.,* May 30, 2024 30(b)(6) Deposition of Mark Murray, Ph.D., 35:22-36:3 ("Q. And so what role, if any, did Tekmira and/or Arbutus have in developing the Onpattro product?  A. Well – excuse me – we developed the LNP.  And we did the early formulations and manufactured the early clinical batches for Alnylam, as well as providing, you know, all of the regulatory submissions and so forth that they needed to do the clinical trial."); 36:10-36:18 ("Q. Do you know what role Tekmira or Arbutus had in developing

271

Highly Confidential – Outside Attorneys' Eyes Only

        **(e)**      **Acuitas's Sublicensing Undercut Tekmira**

394. Acuitas's sublicensing of Tekmira's technology provided what Moderna saw as an alternative path that was undercutting Arbutus. Dr. Murray testified "Acuitas was talking in meetings, talking to a bunch of other companies, asserting that they had the right to do this with our LNP. And that they could do it less expensively, for example."[967]

        **(f)**      **Moderna's Public Statements Regarding Tekmira's Technology Conflict with its Internal Documents**

395. Moderna's public statements regarding its need for Tekmira's technology conflict with its internal documents. "On February 7, 2017, Arbutus obtained an injunction preventing Acuitas from further providing Arbutus LNP technology to any third party."[968] While Moderna's CEO, Stéphane Bancel asserted that injunction was "a moot point, because Moderna has developed its own LNPs that would not be covered by Arbutus' IP" and its partner, "Merck, also has LNP technology that dates back to its 2006 purchase of RNA-drug expert Sirna Therapeutics,"[969] one of Moderna's "2017 Platform objectives" was: **"Fix backward risk balance . . . LNP/Abus . . ."**[970]

---

that LNP [used in Onpattro]? . . . THE WITNESS: Well, I think I just told you that we developed the LNP. We encapsulated their – the SI that they provided. We provided batches for them to do preclinical development, and we manufactured the first few or – numbers of clinical batches that they used in the clinical trials."). June 5, 2024 30(b)(6) Deposition of Peter Zorn, 233:15-233:22 ("A. . . . But the first nucleic acid LNP product to be approved by the FDA is ONPATTRO, which uses Genevant's LNP technology. So it predates Genevant, but there's a Genevant LNP approval. Q. Do you know what the payload is in ONPATTRO? A. It's an siRNA.").).

[967] Lawton Opening Report, ¶ 360 (*citing* May 30, 2024 30(b)(6) Deposition of Mark Murray, Ph.D., 104:23-105:4.).

[968] Lawton Opening Report, ¶ 366 (*citing* "Arbutus Settles Litigation, Terminating Acuitas' Rights to LNP Technology," *Arbutus,* February 22, 2018, *available at* https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-settles-litigation-terminating-acuitas-rights-lnp-0.

[969] Lawton Opening Report, ¶ 366 (*citing* No Bates No. (Murray Deposition Exhibit No. 3 – Matthew Herper, Nathan Vardi, "Moderna Can't Escape My Intellectual Property, Says Arbutus CEO," *Forbes,* May 16, 2017, p. 3 of 6).

[970] Lawton Opening Report, ¶ 366 (*citing* MRNA-GEN-01503761 (Hoge Deposition Exhibit No. 31 – December 5, 2017 email from Stephen Hoge to Stephen Hoge) (emphasis added). May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 320:19-322:18 ("Q. . . . if we could look at number 4 [on Hoge Deposition Exhibit No. 31], it says, 'Fix backward risk balance.' Do you see that? A. Right. Q. And then 4.2 underneath that is, 'LNP/Abus.' That's LNP Arbutus, I assume? A. Mm-hmm. Q. And how did you intend to fix the backward risk balance with

Highly Confidential – Outside Attorneys' Eyes Only

396.    Other events, however, show that the injunction was *not* "moot," as Mr. Bancel had claimed.  First, during Moderna's February 23, 2017 Executive Committee meeting—two weeks after the injunction was granted—Moderna's ███████████████████████████████ ████████████ as shown in **Figure 4.3**,[971] below, which identifies that for ██████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████.[972]

---

respect to LNP Arbutus in 2017?  A. It would have to be in the context of our discussions with them, which I think there had been multiple in 2017.  I can't remember whether this is related to – where it is in relation to the litigation between Arbutus and Acuitas in time, but we were obviously aware of that litigation and, as you'd previously covered, had been in discussions with Tekmira that never went anywhere about the possibility of a direct license to some of the patents, intellectual property related to a couple of those products that in 2017 were still under development.  So -- . . . So that's what I would assume I meant by 4.2.  Q. What does it mean to fix the backward risk balance.  A. When I look at the five things underneath there, it's not entirely clear to me.  Reorganizing R&D, biodistribution, Alexion, LNP, UPenn, I mean, they're all very different things, so I'm not exact – it's hard for me to imagine how that covers all of them.  For instance, reorganizing R&D feels like a weird way to characterize, you know, a backward risk balance.  I don't actually know what is meant there.  Q. Would filing an IPR fix a backward risk balance if it was successful?  A. Possibly, but obviously reorganizing R&D wouldn't.").).

[971] Lawton Opening Report, ¶ 367 (*citing* MRNA-GEN-01708238-321, at 277 (Francis Deposition Exhibit No. 35 – "BD Update to Executive Committee," *Moderna,* February 27, 2017, Slide 7 of 86).).

[972] Lawton Opening Report, ¶ 367 (*citing* MRNA-GEN-01708238-321, at 277 (Francis Deposition Exhibit No. 35 – "BD Update to Executive Committee," *Moderna,* February 27, 2017, Slide 7 of 86).).

273

Highly Confidential – Outside Attorneys' Eyes Only



**FIGURE 4.3**

**(g)    The Arbutus-Acuitas Litigation Settlement Was Not Announced Until February 22, 2018**

397.    The Arbutus-Acuitas litigation settlement was not announced until February 22, 2018—the day *after* Moderna had filed its first IPR.  On February 22, 2018, Arbutus announced that it had settled the litigation with Acuitas, which terminated Acuitas' rights to LNP Technology.[973]  At that time, Arbutus stated: "The settlement stipulates that the four non-exclusive viral vaccine sublicenses previously granted to Moderna are the only sublicenses to survive. . . . Moderna has no other rights

---

[973] Lawton Opening Report, ¶ 372 (*citing* "Arbutus Settles Litigation, Terminating Acuitas' Rights to LNP Technology," *Arbutus,* February 22, 2018, *available at* https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-settles-litigation-terminating-acuitas-rights-lnp-0.

274

to Arbutus' broad suite of LNP intellectual property."[974]  As such, as the breach of contract dispute ended, the IPR proceedings, which Dr. Hoge described in a June 3, 2021 email to journalist Gregory Zuckerman as **"hitting them [Arbutus] where it hurts,"**[975] began—and created a new overhang.

### 3.    VI.D.   Reasonable   Royalty   Rate   –   Hypothetical Negotiation Approach[976]

398.   This section of the Lawton Opening Report explains why Tekmira's May 29, 2013 offer to Moderna establishes a floor for the Reasonable Royalty.  As to this section, Dr. Vellturo drops a footnote which states: "Ms. Lawton provides further analysis of the Tekmira negotiations with Moderna in her Hypothetical Negotiation approach.  I provide my response to those additional opinions in Section IV.H.4, below."[977]

### 4.    Dr. Vellturo's Figure 12 Confirms that he Failed to Consider the Full Basis Set Forth in the Lawton Opening Report

399.   Dr. Vellturo's failure to consider the full basis of my opinion as set forth in the Lawton Opening Report is underscored by his "Figure 12: Tekmira Offers Summary," show in **Figure 4.4**,[978] below, which clearly establishes that Tekmira's offers *declined* continuously during Acuitas's breach of contract—and clearly demonstrates the economic impact of the overhang that was exacerbated by

---

[974] Lawton Opening Report, ¶ 372 (*citing* "Arbutus Settles Litigation, Terminating Acuitas' Rights to LNP Technology," *Arbutus,* February 22, 2018, *available at* https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-settles-litigation-terminating-acuitas-rights-lnp-0.

[975] Lawton Opening Report, ¶ 212 (*citing* MRNA-GEN-01654918-922, at 919 (Hoge Deposition Exhibit No. 18 – June 3, 2021 email from Stephen Hoge to Gregory Zuckerman (WSJ), Subject: Re: quick question on this language in bold, thanx) [emphasis added].  May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 193:13-194:4 ("Q. So I want to talk about what you read a moment ago.  You said, 'it never really mattered to us.  We were just telling the bully to stop by hitting them where it hurts.'  Do you see that?  A. Mm-hmm.  Q. And where it hurts is by attacking their [Arbutus's] patents, right?  A. By asking the patent office to conduct a legal proceeding to review whether or not the patents are valid, and that is an objective legal process that we're allowed to go through if and where we think that those assertions are inaccurate, . . .").).

[976] Lawton Opening Report, ¶¶ 1354-1361.

[977] Vellturo Rebuttal Report, ¶ 430 fn 1003.

[978] Vellturo Rebuttal Report, ¶ 433 (p. 193).

275

Highly Confidential – Outside Attorneys' Eyes Only

Moderna's false claims that it was purportedly not using the Plaintiffs' patented technology when it in fact was.



**FIGURE 4.4**

400.    Dr. Vellturo, however, does not address the events that gave rise to the Tekmira-Acuitas dispute and the resulting overhang began on July 3, 2014, the date of the Acuitas-Moderna agreement.[979] The dispute formally began on August 29, 2016 when "Arbutus provided Acuitas with notice that Arbutus considered Acuitas to be in material breach of the companies' [December 3, 2013[980]]

---

[979] Lawton Opening Report, ¶ 151 (*citing* MRNA-GEN-00225558-678 (Hoge Deposition Exhibit No. 14 – July 3, 2014 Acuitas Therapeutics Inc.-Moderna Therapeutics, Inc. Development and Option Agreement).).

[980] Lawton Opening Report, ¶ 138 (*citing* Arbutus BioPharma Corporation 8-K dated April 13, 2017, Exhibit 99.1, *available at* https://www.sec.gov/Archives/edgar/data/1447028/000117184317002101/exh_991.htm ("Arbutus Injunction Survives Attempted Appeal by Acuitas," *Arbutus,* April 13, 2017) ("Consistent with the terms of the settlement agreement signed in November 2012, Arbutus finalized and entered a cross-license agreement with Acuitas in December 2013."). ABUS-00023263-430 (Murray Deposition Exhibit No. 10 – December 3, 2013 Acuitas Therapeutics Inc.-Tekmira Pharmaceuticals Corporation/Protiva Biotherapeutics Inc. Cross License Agreement, effective November 12, 2012). May 30, 2024 30(b)(6) Deposition of Mark Murray,

276

Highly Confidential – Outside Attorneys' Eyes Only

cross-license agreement, citing sublicenses with third party Moderna."[981]  The resulting litigation was not settled until February 18, 2018.[982]  In addition, Dr. Vellturo does not acknowledge that this history of continuous *declines* is contrary to "industry practice where patented technologies **command higher royalty rates** where they cover a therapeutic or vaccine product itself and **where the value of those technologies has been validated by advancing to clinical testing or commercialization**."[983]  While the results of Alnylam's clinical testing were announced following the May 29, 2013 Term Sheet—during the period July/August 2013 (Phase I)[984] through August 2018 (Phase III)—Tekmira's offers to Moderna *declined* whereas industry practice indicates they should have *increased.* Dr. Vellturo offers no other explanation for this occurrence, which demonstrates the impact of the overhang created by Acuitas's breach of contract.

Ph.D., 63:7-63:12 ███████████████████████████████████████████████████

[981] Lawton Opening Report, ¶ 361 (*citing* "Arbutus Injunction Survives Attempted Appeal by Acuitas," *Arbutus,* April 13, 2017, *available at* https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-injunction-survives-attempted-appeal-acuitas.).

[982] Lawton Opening Report, ¶ 372 (*citing* "Arbutus Settles Litigation, Terminating Acuitas' Rights to LNP Technology," *Arbutus,* February 22, 2018, *available at* https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-settles-litigation-terminating-acuitas-rights-lnp-0.).

[983] MRNA-GEN-02615980-043, at 033 (February 23, 2024 Opening Expert Report of Graham Brazier (*Moderna v. Pfizer*), ¶ 165).

[984] *See, e.g.,* Lawton Opening Report, ¶ 197 (*citing* Teresa Coelho, M.D., David Adams, M.D., Ph.D., Ana Silva, M.D., Pierre Lozeron, M.D., Philip N. Hawkins, Ph.D., F.Med.Sci., Timothy Mant, M.B., Javier Perez, M.D., Joseph Chiesa, M.D., Steve Warrington, M.D., Elizabeth Tranter, M.B., Malathy Munisamy, M.D., Rick Falzone, M.P.H., Jamie Harrop, B.A., Jeffrey Cehelsky, M.B.A., Brian R. Bettencourt, Ph.D., Mary Geissler, M.P.H., James S. Butler, Ph.D., Alfica Sehgal, Ph.D., Rachel E. Meyers, Ph.D., Qingmin Chen, Ph.D., Todd Borland, B.S., Renta M. Hutabarat, Ph.D., Valerie A. Clausen, Ph.D., Rene Alvarez, Ph.D., Kevin Fitzgerald, Ph.D., Christina Gamba Vitalo, Ph.D., Saraswathy V. Nochur, Ph.D., Akshay K.. Vaishnaw, M.D., Ph.D., Dinah W.Y. Sah, Ph.D., Jared A. Gollob, M.D., and Ole B. Suhr, M.D., "Safety and Efficacy of RNAi Therapy for Transthyretin Amyloidosis," *The New England Journal of Medicine,* Vol. 369, No. 9, August 29, 2013, *available at* https://www.nejm.org/doi/full/10.1056/NEJMoa1208760.).

Highly Confidential – Outside Attorneys' Eyes Only

Providence, a licensee seeking to monetize the license in Canada, "is not economically comparable to the U.S. system where the majority of insured residents are covered by private insurance," as he does when discussing the Chulalongkorn agreement .[992]

> **b)      Dr. Vellturo's Contention that the Overhangs Moderna Helped Create Did *Not* Affect the Terms of Genevant's License Agreements is Contrary to the Facts of this Case**

405.     Dr. Vellturo's second premise is that Acuitas' improper competition, Moderna's IPRs and Moderna's ongoing infringement, and this litigation purportedly did *not* adversely impact the terms of the Genevant's license agreements.  This premise is invalid because it is contrary to the facts— and relevant caselaw as addressed above.  *See* III.A.4.b)2.(f).  In short, Dr. Vellturo assumes that the overhangs that Moderna helped create (*i.e.,* the Acuitas breach of contract overhang, the Moderna IPR overhang, Moderna's ongoing infringement overhang, and the Genevant-Moderna litigation overhang) that spanned from 2013 to the present purportedly did *not* adversely affect Genevant's licensing.  Dr. Vellturo presents the following contentions in support of this opinion:

- **"More generally, there is no evidence to indicate that the Providence agreement financial terms were depressed."**[993]  As noted above, Dr. Vellturo *assumes* that the May 11, 2020 Genevant Providence agreement, that was negotiated against the backdrop of Moderna's long-running IPR challenges to the Plaintiffs' Patents-in-Suit, reflects a *de facto* Established Royalty.  I disagree for the reasons stated above.  *See* III.A.  Contrary to this assertion, Dr. Vellturo's "Figure 12: Tekmira Offers Summary,"[994] shows a continual decline in Tekmira's offers from 2013 through 2017.

- **Dr. Vellturo also asserts that effective royalty rates for the Historical Comparable Licenses purportedly also show that neither challenges to validity of the Patents-in-Suit nor Moderna's ongoing infringement had "a significant effect on the financial terms of the Providence license."**[995]  I disagree for the reasons stated above. *See* III.A.5.

---

[992] Vellturo Rebuttal Report, ¶ 472 (p. 221).

[993] Vellturo Rebuttal Report, ¶ 465 (p. 217).

[994] Vellturo Rebuttal Report, ¶ 433 (p. 193).

[995] Vellturo Rebuttal Report, ¶ 465 (pp. 217-218) ("Furthermore, the marketplace data provided by the Historical Comparable Licenses indicates that the effective royalty rates prior to the final IPR-related ruling (in December 2021) were not substantially below the effective royalty rates of the Historical Comparable Licenses that followed the final IPR-related ruling. This evidence indicates that the outstanding IPR did not have a significant effect on the financial terms of the Providence license.  Furthermore, the marketplace data provided by the Historical Comparable Licenses indicates that the effective royalty rates prior to Genevant filing suit against Moderna in

Highly Confidential – Outside Attorneys' Eyes Only

As discussed previously and in the Lawton Opening Report, the breach of contract and IPR overhangs ran from 2013 through July 2020, and as such there is no period for comparison where Genevant's licensing was not depressed by Moderna's actions. Further, Dr. Vellturo's contention depends on the invalid assumption that calculations based on license agreement tainted by challenges to validity and ongoing infringement have any relevance to the determination of a reasonable royalty or that such license agreements can be used without any attempt whatsoever to adjust for the impact of that taint.

### 4. "October 20, 2020 Genevant-Chulalongkorn Non-Exclusive License and Support Agreement"[996]

406. Dr. Vellturo principal challenge to my use of the Chulalongkorn agreement is that it does not include the Patents-in-Suit. Dr. Vellturo asserts: "Ms. Lawton's analysis of the Chula Agreement acknowledges that the territory excludes the U.S., . . . [T]o the extent Ms. Lawton expresses opinions that the Chula Agreement is a license to the Patents-in-Suit, such opinions are incorrect and improper."[997]

407. As in initial matter, with respect to technical comparability, I understand that Dr. Mitchell has opined that:

> Even if one were to accept Dr. Vellturo's conclusion concerning the scope of the agreements with Chulalongkorn University, ST Pharma Co., and Helix Nano Technologies, each of those agreements covers foreign patents and applications concerning the same technology disclosed by the Lipid Composition Patents and the '651 Patent. From a technical perspective—I offer no opinion as to economic comparability—those agreements are therefore highly comparable to the agreement between Moderna and Genevant contemplated in the hypothetical negotiation.[998]

408. As stated in the Lawton Opening Report, I am relying on the Chulalongkorn agreement for the limited purpose of the insight it provides regarding the profit split metric.[999] In particular, this agreement establishes that Genevant negotiated an agreement that included ███████████

---

2022 were not substantially below the effective royalty rates of the Historical Comparable Licenses that followed Genevant's lawsuit against Moderna. This evidence indicates that any notion that Moderna was "free-riding" did not have a significant effect on the financial terms of the Providence license.").

[996] Vellturo Rebuttal Report, ¶¶ 466-473 (pp. 218-223).

[997] Vellturo Rebuttal Report, ¶ 471.

[998] Reply Expert Report of Dr. Michael Mitchell, Sec. XXVIII.B.

[999] Lawton Opening Report, ¶ 997.

281

Highly Confidential – Outside Attorneys' Eyes Only

██████████.[1000]   Dr. Vellturo ████████████████████████████████ in the Chulalongkorn agreement without considering the context of this opinion.   In this case, the hypothetical negotiation occurs on the "doorstep of commercialization."   There are *no* licenses in the record of this case that were negotiated at this late stage of development.   Instead, all of the licenses were negotiated at an *early* stage—prior to clinical testing, which is consistent with licensing practices in the biotech industry.   Furthermore, like BioNTech, Genevant would have sought and obtained a profit sharing agreement with Moderna.   This is consistent with Mr. Brazier's opinion in *Moderna v. Pfizer.*   Mr. Brazier opined that in certain circumstances, a **"licensee might be required to agree to a profit share in order to 'win the deal'"**:

> [P]atent licensing in the pharmaceutical industry follows the rules of supply and demand.  **In situations where a therapeutic or vaccine is in high demand with no meaningful alternatives available, and the patents cover technologies that are critical to the success of that product, then the licensee might be required to agree to a profit share in order to "win the deal."**  Moreover, a licensor has more leverage to obtain a profit split where the therapeutic/vaccine program or the platform derived therefrom, has achieved meaningful validation, including having had success in clinical trials, which increases competitive interest by licensees.[1001]

409.   Dr. Vellturo conflates the expectations concerning the economic circumstances of the Chulalongkorn Agreement (given factors like the market at issue) with the effect of the stage of commercialization.[1002]   But this ignores the role of the greater certainty that is present— "meaningful validation," as Dr. Brazier puts it[1003] —on the doorstep of commercialization, separate and apart from other underlying economic factors for a given drug.   Genevant was in a situation that is reasonably analogous to the circumstances Mr. Brazier described above.   In this case, however, due to the overhangs that Moderna helped cause and that have tainted Genevant's licensing negotiations from 2013 to date, ████████████████████████████████ ████████████████████████████████████████   In view of the very unique facts of this case and my review of this record—it is my opinion that this agreement constitutes

---

[1000] Lawton Opening Report, ¶ 997.
[1001] MRNA-GEN-02615980-043, at 004 (February 23, 2024 Opening Expert Report of Graham Brazier (*Moderna v. Pfizer*), ¶ 80).
[1002] Vellturo Rebuttal Report, ¶ 373.
[1003] MRNA-GEN-02615980-043, at 004 (February 23, 2024 Opening Expert Report of Graham Brazier (*Moderna v. Pfizer*), ¶ 80).

Highly Confidential – Outside Attorneys' Eyes Only

the best available evidence regarding the profit split that Genevant would have sought during the May 31, 2020 hypothetical negotiation.

### F.    IV G. "Ms. Lawton's Analytical Method (Lawton Report, § VI.C)"

410.    In this 45-page section,[1004] Dr. Vellturo continues to assert his *affirmative* opinion that the Providence Agreement constitutes a *de facto* Established Royalty. I disagree with Dr. Vellturo's *affirmative* opinion for the reasons stated above. *See* III.

411.    The fundamental premise of Dr. Vellturo's criticism in this section is two-fold. First, "the present matter [purportedly] does not provide adequate data for its proper application."[1005] Second, "Ms. Lawton's Analytical Method Approach Is Not Necessary"[1006] and further asserts that "[t]here is little need to conduct an Analytical Method-type analysis when the Historical Comparable Licenses provide such strong evidence of the marketplace value of the Claimed Inventions[.]"[1007] Both of these contentions are invalid on the facts of this case. Dr. Vellturo "Assessment" includes two other contentions, which he captions: "Ms. Lawton's Unprincipled Selection of Inputs"[1008] and "Ms. Lawton's Flawed 50-50 Apportionment Finding."[1009] I also disagree with these contentions.

412.    In addition, I disagree with Dr. Vellturo's strident criticisms of my Analytical Method analysis. My analysis and conclusions are *not* "deeply misguided,"[1010] "not tractable in the present context,"[1011] "an ad hoc approach that is devoid of economic reasoning" that "is inconsistent with the analyses described in [the] cited economics sources and case law references,"[1012] "riddled with fundamental conceptional flaws, and errors including speculative assumptions"[1013] that "amounts to a nonsensical misinterpretation of an income-based method of analyzing damages—which ultimately generates unequivocally meaningless results,"[1014] "an unprincipled exercise in

---

[1004] Vellturo Rebuttal Report, ¶¶ 580-657 (pp. 277-321).
[1005] Vellturo Rebuttal Report, ¶ 580 (p. 277).
[1006] Vellturo Rebuttal Report, ¶ 656-657 (pp. 320-321).
[1007] Vellturo Rebuttal Report, ¶ 656.
[1008] Vellturo Rebuttal Report, ¶ 605-654 (pp. 293-315).
[1009] Vellturo Rebuttal Report, ¶ 647-655 (pp. 316-319).
[1010] Vellturo Rebuttal Report, ¶ 657.
[1011] Vellturo Rebuttal Report, ¶ 585.
[1012] Vellturo Rebuttal Report, ¶ 580 (p. 278).
[1013] Vellturo Rebuttal Report, ¶ 647.
[1014] Vellturo Rebuttal Report, ¶ 586.

283

Highly Confidential – Outside Attorneys' Eyes Only

selectively choosing speculative numbers favorable to Plaintiffs . . .”[1015] “that relies on arbitrary allocations lacking sufficient factual or economic justification”[1016] “a meaningless numerical slurry[.]”[1017]

413.    In this section, I address each of Dr. Vellturo's foregoing contentions.

### 1.    Adequate Data *Is* Available for the Proper Application of the Analytical Method

414.    In this 11-page section,[1018] Dr. Vellturo asserts that “the present data [purportedly] does not provide adequate data for [the] proper application [of the Analytical Method].”[1019] I disagree. Dr. Vellturo's contention is invalid because it is based on the straw man fallacy.[1020]

### a)    Dr. Vellturo's Criticism is Invalid Because it is Based on a Straw Man Fallacy

415.    Dr. Vellturo's criticism of my Analytical Method analysis is invalid because it is based on a straw man fallacy in which he attempts to improperly contort the Analytical Method in order to claim it cannot be used because it purportedly does not fit the facts of this case. This is improper and renders his criticism invalid.

---

[1015] Vellturo Rebuttal Report, ¶ 580 (p. 278).
[1016] Vellturo Rebuttal Report, ¶ 586.
[1017] Vellturo Rebuttal Report, ¶ 16 (p. 12).
[1018] Vellturo Rebuttal Report, ¶¶ 587-604 (pp. 282-292).
[1019] Vellturo Rebuttal Report, ¶ 580 (p. 277).
[1020] *See, e.g.,* David Ferrer, “15 Logical Fallacies You Should Know Before Getting Into a Debate,” *The Quad,* February 25, 2019, *available at* https://thebestschools.org/magazine/15-logical-fallacies-know/ (“It's much easier to defeat your opponent's argument when it's made of straw. The Strawman fallacy is aptly named after a harmless, lifeless, scarecrow. In the straw man fallacy, someone attacks a position the opponent doesn't really hold. Instead of contending with the actual argument, he or she instead attacks the equivalent of a lifeless bundle of straw, an easily defeated effigy, which the opponent never intended upon defending anyway. Straw man fallacies are a cheap and easy way to make one's position look stronger than it is. Using this fallacy, opposing views are characterized as 'non-starters,' lifeless, truthless, and wholly unreliable. By comparison, one's own position will look better for it. You can imagine how straw man fallacies and *ad hominems* can occur together, demonizing opponents and discrediting their views. This fallacy can be unethical if it's done on purpose, deliberately mischaracterizing the opponent's position for the sake of deceiving others. But often the straw man fallacy is accidental, because one doesn't realize he or she is oversimplifying a nuanced position, or misrepresenting a narrow, cautious claim as if it were broad and foolhardy.”).

Highly Confidential – Outside Attorneys' Eyes Only

1.    **Dr. Vellturo Falsely Claims that the Analytical Method Requires "two different Moderna products"**

416.    Dr. Vellturo's contention in the *text of the report* is based on the straw man fallacy—which Dr. Vellturo reveals as a straw man in *footnotes*.  In the *text* of the report, Dr. Vellturo first falsely asserts that the Analytical Method purportedly *requires* "**two different Moderna products** (or sets of products) to make this comparison (where one product allegedly infringes the Patents-in-Suit, while the other does not) or any suitable proxies thereof[.]"[1021]  Dr. Vellturo further states: "This calculation can be applied in a setting where **the infringer has at least two products**, . . ."[1022]  These statements, however, mischaracterize the Analytical Method—as demonstrated by ¶ 1215 of the Lawton Opening Report, which states:

> Under the Analytical Method, the "reasonable royalty rate [is] calculated[.]"[1023] The Analytical Method calculation **"focuses on the infringer's projections of profit for the infringing product"** at the time the infringement began and then **"subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices."**[1024]    For example, the "Analytical Method," as applied in *TWM Mfg. Co. v. Dura Corp.*[1025] focused on the infringer's projections of profit for the infringing product at the time the infringement began and subtracted the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices.[1026]

---

[1021] Vellturo Rebuttal Report, ¶ 580 (p. 277) (emphasis added).  *See also* ¶ 587 ("At its conceptual core, the income-based analysis Ms. Lawton claims to undertake involves comparing the difference in price/profit **between two products** (or sets of products), where the price/profit differential is assumed to be the result of the inclusion of the patented invention(s)." (emphasis added)).

[1022] Vellturo Rebuttal Report, ¶ 587 (emphasis added).

[1023] Lawton Opening Report, ¶ 1215 (*citing 10X Genomics, Inc. and Prognosys Biosciences, Inc. v. Nanostring Technologies, Inc.*, Civil Action No. 21-cv-653-MFK (D. Del.), Memorandum Opinion and Order dated September 7, 2023, p. 23.  *See also Rensselaer Polytechnic Institute v. Apple Inc.*, No. 1:13-cv-0633 (DEP) (N.D.N.Y.), Dkt. No. 265 (filed July 20, 2015), Motion Hearing, Vol. 1, June 26, 2015, 79:22-79:24 ("MR. SKIERMONT: . . . Mr. Yerman for his analytic method, which is distinguished, it's not a hypothetical negotiation, it's a calculation. You understand.  . . .").).

[1024] Lawton Opening Report, ¶ 1215 (*citing Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).). (emphasis added).

[1025] Lawton Opening Report, ¶ 1215 (*citing TWM Mfg. Co. v. Dura Corp.*, 789 F. 2d 895, at 899 (Fed. Cir. 1986).).

[1026] Lawton Opening Report, ¶ 1215 (*citing TWM Mfg. Co. v. Dura Corp.*, 789 F. 2d 895, at 899 (Fed. Cir. 1986) (describing the analytical method as 'subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices').").  *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) ("Litigants routinely

285

Highly Confidential – Outside Attorneys' Eyes Only

417.    My Analytical Method analysis is based on the foregoing methodology, which has been properly applied to the facts of this case.  For this reason, Dr. Vellturo's strident claims to the contrary are invalid because they are based on straw man fallacy.

> **2.    Dr. Vellturo Attempts to Improperly Contort the Analytical Method to Claim It Does Not Fit the Facts of this Case**

418.    Under the caption **"Appropriate Settings for Income-Based Methods of Analyzing Damages,"** Dr. Vellturo reveals the underpinning of his straw man in footnote 1462, which attempts to

---

adopt several approaches for calculating a reasonable royalty. The first, the analytical method, focuses on the infringer's projections of profit for the infringing product. *See TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 899 (Fed. Cir. 1986) (describing the analytical method as "subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices"); *see also* John Skenyon et al., *Patent Damages Law & Practice* § 3:4, at 3-9 to 3-10 (2008) (describing the analytical method as 'calculating damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then apportioning the projected profits between the patent owner and the infringer').").  *Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*, 609 F.2d 1308, 1319 (Fed. Cir. 2010) ("A reasonable royalty can be calculated from an established royalty, the infringer's profit projections for infringing sales, or a hypothetical negotiation . . .").  *Energy Transportation Group, Inc., v. William Demant Holding A/S, et al.*, 697 F.3d 1342 (Fed. Cir. 2012) ("Mr. Musika further performed an entirely separate analysis of a reasonable royalty using the method set forth in *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895 (Fed. Cir. 1986).  This analysis compared the average expected profit margin on the infringing products, as set forth in Defendants' expert reports, to the industry average expected profit margin.").  *Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("A party may also use what this court has referred to as 'the analytical method,' focusing on the infringer's projections of profit for the infringing product.  *Lucent Techs.,* 580 F.3d at 1324.").  *Linear Group Services, LLC v. Attica Automation, Inc.,* Case No. 13-10108 (E.D. Mich. Aug. 25, 2014) ("The analytical method focuses on the infringer's projections of profits or [sic – on] the infringing product, regardless of what the parties might have hypothetically agreed to had they successfully negotiated before the infringement began.").  *Metaswitch Networks Ltd. v. Genband US LLC, et al.,* Case No. 2:14-cv-744-JRG-RSP (E.D. Tex. Mar. 5, 2016) ("The 'analytical approach' has been accepted by the Federal Circuit as one way to calculate a reasonable royalty.  *See TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 899 (Fed. Cir. 1986); *see also Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1296 (Fed. Cir. 2015).  The analytical approach in *TWM* was applied by subtracting 'the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices.' *Id.*  The difference between the standard profit an infringer can expect to obtain from the sale of non-patented articles and the profit it obtains from the sale of a patented article should, *ceteris paribus,* be equal to the profit attributable to the patented features. . . . So long as the comparison isolates the value of the patented features—and no more—it is immaterial whether the profitability of a specific product or of an industry is used.").).

286

Highly Confidential – Outside Attorneys' Eyes Only

improperly contort the Analytical Method to claim it does not fit the facts of this case. Footnote 1462 is attached to the claim that "[t]his calculation can be applied in a setting where the infringer has at least two products[.]" Without any citation to authority, Dr. Vellturo asserts that "industry average profitability" is "a valid proxy" for the purportedly required "*second* product" as follows:

> [At footnote 1462:] In some circumstances, a valid proxy for a version of the infringer's product without the patented invention may be used, such as the industry average profitability, ideally in the case when the infringer competes in a competitive industry, and this industry average profitability serves as a reliable measure of the infringer's product without the patented invention. But no such circumstances presents itself in the present matter.[1027]

419.   Other footnotes in the Vellturo Rebuttal Report show that Dr. Vellturo is attempting to conform the well-established methodology in *TWM v. Dura*—which he later describes as **"the landmark case concerning the Analytical Approach"**[1028]—to his improper contortion of the Analytical Method:

> [At footnote 1465:] . . . [S]imilarly, Ms. Lawton cites case law that further describes the analytical method used in *Dura* as such: **"This analysis compared the average expected profit margin on the infringing products, as set forth in Defendants' expert reports, to the industry average expected profit margin"** (Lawton report, n. 3010)[1029]
>
> . . .
>
> [At footnote 1469[1030]:] I note that occasionally courts have supported the use of the Analytical Approach in using industry averages to the infringing firm's profit margin on other non-infringing products they sell (e.g., in *TWM Mfg. Co. v. Dura Corp.,* 789 F. 2d 895 (Fed. Cir. 1986) where the special master used an industry standard net profit.). **Such estimates effectively compare the profitability of the infringing product to an average profitability calculated across other non-infringing products.** . . .[1031]

420.   In footnote 1468, Dr. Vellturo falsely claims that "[a]ll of the cases Ms. Lawton cites" purportedly support his improper contortion of the Analytical Method as follows:

---

[1027] Vellturo Rebuttal Report, ¶ 587 fn 1462 (p. 282).

[1028] Vellturo Rebuttal Report, ¶ 709.

[1029] Vellturo Rebuttal Report, ¶ 589 fn 1465 (p. 283) (emphasis added).

[1030] Footnote 1469 is attached to the following sentence: "The ultimate consequence of Ms. Lawton's departure from accepted methods is that her purported Analytical Method is not an analytical method at all, but rather a fundamentally flawed exercise that lacks economic reasoning and produces an entirely meaningless result.").

[1031] Vellturo Rebuttal Report, ¶ 592 fn 1469 (p. 285) (emphasis added).

287

Highly Confidential – Outside Attorneys' Eyes Only

**All of the cases Ms. Lawton cites** in support of her Analytical Method approach either compare the price or profit differential between two products (or sets of products) where the difference is assumed to result from the inclusion of the patented invention(s) or are cases where the Analytical Method was not actually applied, but merely referenced as a possible approach. **(Lawton Report ¶¶ 1214-1218)**.[1032]

421.     As purported support for his attempted re-cast, Dr. Vellturo's footnote 1468 groups the <u>19</u> cited cases into two (2) categories.   The first category, which he characterizes as purportedly "compar[ing] the price or profit differential between two products (or sets of products) where the difference is assumed to result from the inclusion of the patented invention(s)[,]"[1033] and includes <u>13</u> cases.  Dr. Vellturo's description of <u>3</u> of the <u>13</u> cases highlights the *real* Analytical Method as first applied by the Federal Circuit in *TWM v. Dura*—in contrast to Dr. Vellturo's attempt at a re-cast molded to fit the facts of this case:

> *TWM Mfg. Co. v. Dura Corp.,* **789 F.2d 899 (Fed. Cir.1986)** (where the special master subtracted 'the industry standard net profit of 6.56% to 12.5% from the [infringer's] anticipated net profit range");
> . . .
> *Energy Transportation Group, Inc. v. William Demant Holding A/S*, **697 F.3d 1357 (Fed. Cir. 2012)** (which stated that "[t]his analysis compared the average expected profit margin on the infringing products, as set forth in Defendants' expert reports, to the industry average expected profit margin," and further that an expert's "suggested reasonable royalty rates were thus tied to the benefit accorded by the patents at issue.");
>
> *Linear Group Services, LLC v. Attica Automation, Inc.,* **No. 13-10108 (E.D. Mich. Aug. 25, 2014)** (where one party "alleges it intends to show that a 20% reasonable royalty is warranted by relying on evidence of Linear's projected gross profits prior to the initial infringement, less overhead, and the industry standard net profit"); . . .[1034]

422.     The second category, which Dr. Vellturo describes as "cases where the Analytical Method was not actually applied, but merely referenced as a possible approach," includes six (<u>6</u>) cases.  In fn 1468, Dr. Vellturo's description of these cases does *not* describe the Analytical Method, but instead only shows that the Analytical Method was not applied in the case.  These six (6) cases include three

---

[1032] Vellturo Rebuttal Report, ¶ 592 fn 1468 (p. 284) (emphasis added).
[1033] Vellturo Rebuttal Report, ¶ 592 fn 1468 (p. 284).
[1034] Vellturo Rebuttal Report, ¶ 592 fn 1468 (p. 284).

288

Highly Confidential – Outside Attorneys' Eyes Only

(3) Federal Circuit cases, which describe the *real* Analytical Method—*not* Dr. Vellturo's improper contortion molded to attempt to fit the facts of this case—as follows:

a) ***Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)** ("Litigants routinely adopt several approaches for calculating a reasonable royalty. The first, the analytical method, focuses on the infringer's projections of profit for the infringing product. *See TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 899 (Fed. Cir. 1986) . . .").[1035]

b) ***Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*, 609 F.2d 1308, 1319 (Fed. Cir. 2010)** ("A reasonable royalty can be calculated from an established royalty, the infringer's profit projections for infringing sales, or a hypothetical negotiation . . .").[1036]

c) ***Oracle America, Inc. v. Google, Inc.,* Civil Action No. C-10-03561-WHA (DMR) (N.D. Cal.)**, **Dkt. No. 295, Order Re Joint Discovery Letter of August 10, 2011 dated August 23, 2011**, p. 1 ("The law recognizes multiple approaches for calculating a reasonable royalty. The analytical method 'focuses on the infringer's projections of profit for the infringing product.' *Id.* [*Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1324 (Fed. Cir. 2009)] (citation and quotation marks omitted) (describing analytical method as calculating damages based on infringer's own internal profit projections for infringing item at time infringement began and then apportioning projected profits between patent owner and infringer").[1037]

d) ***Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1296 (Fed. Cir. 2015)** ("This court has recognized that estimating a reasonable royalty is not an exact science. The record may support a range of reasonable royalties, rather than a single value. Likewise, there may be more than one reliable method for estimating a reasonable royalty. *Apple,* 757 F.3d at 1315. A party may use the royalty rate from sufficiently comparable licenses, value the infringed features based upon comparable features in the marketplace, or value the infringed features by comparing the accused product to non-infringing alternatives. *Id.* A party may also use what this court has referred to as 'the analytical method,' focusing on the infringer's projections of profit for the infringing product. *Lucent Techs.,* 580 F.3d at 1324. All approaches have certain strengths and weaknesses, and, depending upon the facts, one or all may produce admissible testimony in a particular case. Because each case presents unique circumstances and facts, it is common for parties to choose different, reliable approaches in a single case and, when they do, the relative strengths and weaknesses of each approach may be exposed at trial or attacked during cross-examination. That one approach may better account for one aspect of a royalty estimation does not make other approaches inadmissible.").[1038]

e) ***Sloan Valve Co. v. Zurn Industries, Inc.,* 33 F.Supp. 3d 984, 990 (N.D. Ill. Mar. 26, 2014)** ("Several ways exist to calculate a reasonable royalty. One method is known as the analytical method, which focuses on the infringer's projections of profit for the infringing product. *Id.* (citing *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 899 (Fed.Cir.1986)). Another method is to base the calculation on an established royalty, if there is one. *Versata*

---

[1035] Lawton Opening Report, ¶ 1214 fn 3006.
[1036] Lawton Opening Report, ¶ 1214 fn 3006.
[1037] Lawton Opening Report, ¶ 1214 fn 3006.
[1038] Lawton Opening Report, ¶ 1214 fn 3011.

289

Highly Confidential – Outside Attorneys' Eyes Only

*Software, Inc. v. SAP America, Inc.,* 717 F.3d 1255, 1267 (Fed.Cir.2013). If there is not an established royalty, a reasonably royalty may be calculated based on the supposed result of hypothetical negotiations between the plaintiff and defendant. *Id.* The hypothetical negotiation 'attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.' *Lucent,* 580 F.3d at 1324.").[1039]

f) ***Centripetal Networks, Inc. v. Cisco Systems, Inc., 492 F.Supp. 3d 495, 583 (E.D. Va. 2020)*** ("In determining this reasonable royalty, patentees have primarily used two distinct methods of calculation. 'The first, the analytical method, focuses on the infringer's projections of profit for the infringing product.' See id. (citing *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986) (describing the analytical method as 'subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices')). Here, there was insufficient evidence submitted to the Court based on the infringer's profit projections and thus this method is inappropriate for calculating damages. 'The second, more common approach, called the hypothetical negotiation or the `willing licensor-willing licensee' approach, attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.' Id. The date used for the occurrence of the hypothetical negotiation is the date that infringement began. Wang Labs., Inc. v. Toshiba Corp., 993 F.2d 858, 870 (Fed. Cir. 1993). The evidence at trial supports a first infringement date of June 20, 2017. The Court FINDS the reasonable royalty method to be appropriate based on the evidence presented by both Centripetal and Cisco.").[1040]

423.    In addition, the cases Dr. Vellturo cites in footnote 1468,[1041] include only a very abbreviated synopsis of the more complete citations in the **"Lawton Report ¶¶ 1214-1218."** For example, Dr. Vellturo's purported synopsis of the recent September 7, 2023 decision in *10X Genomics, Inc. and Prognosys Biosciences, Inc. v. Nanostring Technologies, Inc.* is:

> *10X Genomics, Inc. and Prognosys Biosciences, Inc. v. Nanostring Technologies, Inc.,* No. 21-cv-653-MFK (D. Del. Sept. 7, 2023), p. 23 (where the expert explained that **"differences between the products may be attributable to the fact that the GeoMx product 'is enabled by the patents-in-suit,' as compared to nCounter, which does not rely on this [] technology.'"**);[1042]

424.    In contrast, the Lawton Opening Report cite (at fn 3012 on pp. 828-829) to this same case is as follows (the **bold** highlights the Court's statements regarding the *real* Analytical Method and the **bold** highlights what Dr. Vellturo cited):

---

[1039] Lawton Opening Report, ¶ 1214 fn 3012.

[1040] Lawton Opening Report, ¶ 1214 fn 3012.

[1041] Vellturo Rebuttal Report, ¶ 592 fn 1468 (pp. 284-285).

[1042] Vellturo Rebuttal Report, ¶ 592 fn 1468 (p. 284) (emphasis added).

Highly Confidential – Outside Attorneys' Eyes Only

**Another approach is 'the analytical method,' which 'focuses on the infringer's projections of profit for the infringing product.' *Id.* [*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)]**. . . .

. . .

NanoString also moves to exclude Ms. Davis's opinion applying the analytical approach. **As noted above, '[t]he analytical method[] focuses on the infringer's projections of profit for the infringing product.' *Lucent Techs.*, 580 F.3d at 1324. This method 'calculat[es] damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then apportion[s] the projected profits between the patent owner and the infringer.' *Id.*** (quoting John Skenyon et al., Patent Damages Law & Practice § 3:4, at 3–9 to 3–10 (2008)). NanoString contends that Ms. Davis's opinion should be excluded because her calculation uses gross profit margins, rather than net profits. NanoString cites *TWM Manufacturing Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir.1986), for the proposition that net profits is specifically required. **In *TWM Manufacturing*, the Federal Circuit described the 'analytical approach' as 'subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices.' *Id.* But the Federal Circuit did not hold that using net profits, as opposed to other profit figures, was required. As stated above, the Federal Circuit in *Lucent* summarized the approach without saying that particular type of profit margin was required. Ms. Davis explained in her reply report that she chose to use gross profit margins because 'the research and development expenses for both nCounter and GeoMx had already been incurred by the date of the hypothetical negotiation.' Dkt. no. 227-24 at 12. The Court concludes that Ms. Davis's use of gross profit margins does not render her methodology unreliable and is not a basis to exclude her opinion. *See Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, No. C15-522-JPD, 2018 WL 10687383, at p. 11 (W.D. Wash. Mar. 28, 2018) (holding that an expert's analytical method opinion using gross profit margins was 'based on sufficient facts and evidence to be presented to the jury').** Lastly, NanoString argues that Ms. Davis's opinion 'fails to account for the substantial differences between the nCounter and GeoMx platforms and differences in their lifecycles.' Def.'s Combined Opening and Resp. Br. at 26. But NanoString does not cite any authority for the proposition that this is a required step of the analytical approach nor explain what the purported 'differences' are. As Ms. Davis explains, <span style="color:red">differences between the products may be attributable to the fact that the GeoMx product 'is enabled by the patents-in-suit,' 'as compared to nCounter, which does not rely on this [ ] technology.'</span> Dkt. no. 227-24 at 11. The only case NanoString cites, *Wonderland Switzerland AG v. Evenflo Co.*, 564 F. Supp. 3d 320, 341–42 (D. Del. 2021), relates to apportioning an expert's reasonable royalty rate calculated using the analytical approach to account for non-patented features. Because NanoString does not make an apportionment argument, this case is not relevant.[1043]

---

[1043] Lawton Opening Report, ¶ 1214, fn 3012 (pp. 828-829).

Highly Confidential – Outside Attorneys' Eyes Only

### 3. Dr. Vellturo's Improper Contortion of the Analytical Method is the Premise of His Attack on My Analysis

425. Dr. Vellturo's improper contortion of the Analytical Method is the premise of his attack on my analysis, which he grossly mischaracterizes as follows:

> The present circumstances does not provide adequate data to conduct this method. After all, Moderna only sells one COVID product, the Accused Product, and Ms. Lawton has not identified any suitable proxy product (or proxy products) to compare to the Accused Product—i.e., a suitable proxy product(s) that lacks the Claimed Inventions that is otherwise similar to the Accused Product.[1044]

> Apparently undeterred by the realization that the present circumstances does not provide her with adequate data to use the Analytical Method, Ms. Lawton charges ahead anyway with her own ad hoc analysis where she compares two hypothetical measures of profit for the same product (the Accused Product)—in stark contrast to the accepted method she purports to rely on which compares the actual profitability of two different products (or sets of products). The ultimate consequence of Ms. Lawton's departure from accepted methods is that her purported Analytical Method is not an analytical method at all, but rather a fundamentally flawed exercise that lacks economic reasoning and produces an entirely meaningless result.[1045]

426. Dr. Vellturo's use of the straw man fallacy is improper and his criticism based on the straw man is invalid.

#### b) Adequate Moderna Forecast Data Around the Time of the May 31, 2020 Hypothetical Negotiation is Available

427. The Lawton Opening Report addressed the "Situation at the Time of the Hypothetical Negotiation" in detail, which included a detailed summary Moderna's projections around the time of the May 31, 2020 hypothetical negotiation.[1046] There is no serious dispute that Moderna forecasts around the time of the May 31, 2020 hypothetical exist. For example, Dr. Vellturo states: ". . . Moderna considered various scenarios, made forecasts, or developed models[.]"[1047] Instead, Dr. Vellturo asserts that my use of Moderna's forecasts is purportedly "unprincipled."[1048] I disagree, for the reasons I explain later in this section.

---

[1044] Vellturo Rebuttal Report, ¶ 591.
[1045] Vellturo Rebuttal Report, ¶ 592.
[1046] Lawton Opening Report, ¶¶ 440-516 (pp. 338-401).
[1047] Vellturo Rebuttal Report, ¶ 625.
[1048] Vellturo Rebuttal Report, ¶ 580 (p. 278).

Highly Confidential – Outside Attorneys' Eyes Only

### 2. Dr. Vellturo's Contention that the "Analytical Approach Method Is Not Necessary" is Invalid

428.   Dr. Vellturo's contention that the "Analytical Method Approach Is Not Necessary" is also invalid. In a 2-page sub-section, Dr. Vellturo claims "it is instructive to note that there is little need to conduct an Analytical Method-type analysis when the Historical Comparable Licenses provide such strong evidence of the marketplace value of the Claimed Inventions[.]"[1049] As noted above, Dr. Vellturo cites to the Federal Circuit's guidance that "[a]n established royalty is usually the best measure of a 'reasonable' royalty for a given use of an invention"[1050] to suggest that "whether, as a matter of law, Plaintiff's licensing history may or may not have defined an 'established royalty,' it has established a relatively narrow range of effective royalty rates for which Genevant has licensed portfolios of IP[.]"[1051] Dr. Vellturo then concludes that "the Analytical Method would contribute little to no incremental insight into the appropriate royalty in this case[.]"[1052] I disagree with Dr. Vellturo's contention. As noted above, it is an "entirely proper approach [] to create a reasonable royalty **from as many facts as possible**[.]"[1053] Dr. Vellturo, however, has *not* undertaken the analysis the Federal Circuit prescribed decades ago whereby: "'the necessarily speculative hypothetical negotiation is rendered less speculative by use of as many facts as can be gleaned from the evidence to create a reasonable royalty' . . . [and the] entirely proper approach was to create a reasonable royalty from as many facts as possible[.]"[1054] Instead, Dr. Vellturo simply continues to assert his *de facto* Established Royalty, which is "one-factor" shortcut.

---

[1049] Vellturo Rebuttal Report, ¶ 656.
[1050] Vellturo Rebuttal Report, ¶ 656.
[1051] Vellturo Rebuttal Report, ¶ 656.
[1052] Vellturo Rebuttal Report, ¶ 656.
[1053] *See, e.g., Studiengesellschaft Kohle, mbH v. Dart Industries,* 862 F. 2d 1564, 1572-73 (Fed. Cir. 1988) (emphasis added).
[1054] *See, e.g., Studiengesellschaft Kohle, mbH v. Dart Industries,* 862 F. 2d 1564, 1572-73 (Fed. Cir. 1988) ("SGK asserts that in *Devex,* in contrast to this case, 'there was no acceptable evidence of the defendant's projected profits (or savings) available to the parties at [the] hypothetical negotiations.' What SGK implies is that Judge Wright completely rejected any reliance on Dart's anticipated profits, but that is not what happened here. **The overarching theme of Judge Wright's opinion in this case is 'that the necessarily speculative hypothetical negotiation is rendered less speculative by use of as many facts as can be gleaned from the evidence to create a reasonable royalty.'** Even if we assume, which is not at all clear, that Bischel's 5% figure the master found 'credible' was based entirely on Dart's anticipated profits, Judge Wright did not reject that figure. Instead, he *accepted* that figure when he modified the master's report and adjusted it in light of the additional factors — the lowered

Highly Confidential – Outside Attorneys' Eyes Only

429.    As explained in the Lawton Opening Report,[1055] the facts of this case where, as of May 2020, Moderna had developed projections that detailed their expectations from mRNA-1273, and recognized there was a window of opportunity that they needed to capitalize on to "get to the finish line" with a commercialized product.  Moderna expected, and achieved not just financial success through billions of dollars of revenue and profits from sales of mRNA-1273, but also other derivative and additional value that were discussed in detail in the Lawton Opening Report,[1056] and will not be repeated.  The Analytical Method does not capture the additional derivative value Moderna realized as a result of their use of the claimed inventions of the Patents-in-Suit.  What it does capture is Moderna's projections, while subtracting out Moderna's expected profits, subtractions to account for other Moderna costs, other investments in technology related to mRNA-1273 and platform investments, and returns on investments.  The resulting excess profit is apportioned to isolate the profit reasonably attributable to the patented inventions.

### 3.    Dr. Vellturo's Purported "Unprincipled Selection of Inputs" Contention is Contrary to the Facts

430.    In this 23-page sub-section,[1057] Dr. Vellturo challenges only *certain* inputs to my Analytical Method analysis, namely the price per dose and the number of doses—but does *not* challenge either the "Expected mRNA Cost per Dose"[1058] the "Subtractions"[1059] from revenue, or "Moderna's Expected mRNA-1273 Profit."[1060]  Dr. Vellturo summarizes his assertion as follows: "Ms. Lawton further undermines her own analysis by inconsistently selectively choosing speculative price and volume numbers from a mix of business documents, public statements, forecasts, third-party commentary, actual sales, and estimates[.]"[1061]  The crux of Dr. Vellturo's criticism is stated as follows: "Ms. Lawton's approach lack critical context and conflates Moderna's stated goals and

---

floor and the *Phillips* settlement — which the master had mistakenly calculated and ignored, respectively. **Thus, Judge Wright's entirely proper approach was to create a reasonable royalty from as many facts as possible,** and he did not simply treat this case as some sort of replay of *Devex*." (emphasis added)).

[1055] Lawton Opening Report, ¶¶ 1212-1213.
[1056] Lawton Opening Report, II.E.4.e.(2).
[1057] Vellturo Rebuttal Report, ¶¶ 605-654 (pp. 293-315).
[1058] Lawton Opening Report, ¶¶ 1240-1241.
[1059] Lawton Opening Report, ¶¶ 1245-1258.
[1060] Lawton Opening Report, ¶¶ 1242-1244.
[1061] Vellturo Rebuttal Report, ¶ 586 (p. 282).

Highly Confidential – Outside Attorneys' Eyes Only

aspirations with its actual expectations."[1062] I disagree. Dr. Vellturo claims that my approach purportedly "lacks critical context"—even though the Vellturo Rebuttal Report does not substantively address the "context" set forth in II.E. Situation at the Time of the Hypothetical Negotiation in May 2020[1063] in the Lawton Opening Report. *See* Schedule 11-Reply. My analysis is based on Moderna's forecasts in business documents around the time of the May 31, 2020 hypothetical negotiation. In contrast, in this litigation, Dr. Vellturo attempts to re-define the forecasts in Moderna's business documents as "goals and aspirations"—which are purportedly different than what he refers to as Moderna's "actual expectations." Dr. Vellturo described his work to purportedly identify Moderna's "actual expectations" as follows:

> To inform my view of Moderna's expectations, I reviewed the documents available in the record and confirmed my understanding with Hamilton Bennett, Moderna's Executive Director for Global Health Security, R&D, and Partnerships.[1064]

431. Dr. Vellturo further asserts that my analysis is purportedly "based on critical assumptions about Moderna's expected price per dose and the expected number of doses sold—assumptions that are unsupported, incorrect, or both."[1065] I disagree.

### a) Moderna's Board of Director Documents Establish That Moderna's *Approved* Price was $30/Dose as of May 31, 2020

432. In this <u>13</u>-page sub-section,[1066] captioned "Ms. Lawton's Unsupported and Speculative $30 Per Dose Assumption," Dr. Vellturo contends that Moderna's Board-*approved* pricing *cannot* be used in the Analytical Method to determine a reasonable royalty in litigation, because according to him, it does not reflect what "Moderna truly *expected* to achieve."[1067] While Dr. Vellturo never states what price "Moderna truly *expected* to achieve,"[1068] he asserts: "Ms. Lawton claims [Moderna's May 31, 2020 offer to sell] reflected **Moderna's approved pricing** at the time for 'pre-human data.'' Ms. Lawton does not cite to any Moderna financial plan, model, or projection to substantiate her claim that the company expected to, or did, sell all doses at an average price of $30 per

---

[1062] Vellturo Rebuttal Report, ¶ 605.
[1063] Lawton Opening Report, ¶¶ 313-518 (pp. 232-402).
[1064] Vellturo Rebuttal Report, ¶ 605.
[1065] Vellturo Rebuttal Report, ¶ 605.
[1066] Vellturo Rebuttal Report, ¶¶ 606-629 (pp. 293-305).
[1067] Vellturo Rebuttal Report, ¶ 625.
[1068] Vellturo Rebuttal Report, ¶ 625.

Highly Confidential – Outside Attorneys' Eyes Only

dose."[1069] Dr. Vellturo further asserts: "there is no evidence to support Ms. Lawton's claim that Moderna truly *expected* to achieve an average price of $30 per dose across all pandemic doses it anticipated selling."[1070]   This is incorrect.   The evidence shows that Moderna prepared various forecasts around the time of the May 31, 2020 hypothetical negotiation, and it also shows that as of May 31, 2020 Moderna's Board of Directors had *approved* mRNA-1273 pricing.   Moderna's Board of Director documents establish that as of May 31, 2020, Moderna's ***approved*** **price** was, in fact, **$30/dose**.   For example, Moderna's June 15, 2020 "Board Meeting – CEO Update" slide deck reports Moderna's **"Recommended Pricing,"** in **Figure 4.5**,[1071] below, which shows that **$30/dose** was "**approved by covid committee** used for Singapore, Israel, Swiss, Japan (Takeda), FR and UK out of date now"—which had been replaced by **$35/dose** "**approved by covid committee** (valid until September)."[1072]

---

[1069] Vellturo Rebuttal Report, ¶ 606 (emphasis added).

[1070] Vellturo Rebuttal Report, ¶ 625.

[1071] Lawton Opening Report, ¶ 1237 (*citing* MRNA-GEN-02645690-752 at 695 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 6 of 64) ("Recommended Pricing").).

[1072] Lawton Opening Report, ¶ 1237 (*citing* MRNA-GEN-02645690-752 at 695 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 6 of 64) ("Recommended Pricing").) (emphasis added).

Highly Confidential – Outside Attorneys' Eyes Only

**FIGURE 4.5**

433.    Moderna's Hamilton Bennett testified with respect to Moderna's May 31, 2020 letter to the U.S. Government the that "we arrived at something around 30 to $40 a dose."[1073]    Other Moderna business documents also support that Moderna's *approved* price as of May 31, 2020 was *in fact* $30/dose price.  For example, a June 7, 2020 Memorandum from Lori Henderson to Moderna Board of Directors stated:

> Order Process and Update – *USG*: We have received a draft contract from the USG – DOD for purchase of up to 300M doses of mRNA-1273.  More details on this contract will be available early this week. . . . ***Price*: Initial price per dose of**

---

[1073] May 20, 2024 Deposition of Hamilton Bennett, 211:7-212:21 HHS-0000828-830 (Bennett Deposition Exhibit No. 21 – May 31, 2020 letter from Stéphane Bancel to Dr. Moncel Slaoui (Warp Speed/HHS), General Gustave F. Perna (Warp Speed/HHS), Dr. Gary Disbrow (BARDA)).

297

Highly Confidential – Outside Attorneys' Eyes Only

> **$30/dose expected to be increased to $35/dose after release of the full Phase 1 data**. . . .[1074]

434.    Other evidence also supports the $30/dose price.[1075]  For example:

    a)    On **June 16, 2020**, Moderna again offered mRNA-1273 to the U.S. Government at $30/dose.[1076]  Moderna claimed that its <u>$30.00</u>/dose price was "a fair and reasonable price" as required under its existing BARDA contract,[1077] that "has taken into account a range of factors including the following: <u>True value of mRNA-1273 to the US</u>. . . . <u>Comparable innovative vaccines</u>. . . . <u>Comparable pricing under existing agreements for supply of mRNA-1273</u>. . . . <u>Current pricing for mRNA-1273</u>. . . . <u>Commercial pricing for mRNA-1273</u>. . . ."[1078]

    b)    In a **July 10, 2020** submission to the U.S. Government, Moderna stated it was "[s]tarting with . . . **US$30/dose . . . which we previously quoted to the USG[.]**"[1079]

---

[1074] Lawton Opening Report, ¶ 1237 fn 3071 (*citing . . . See also* MRNA-GEN-02645686-689, at 687 (June 7, 2020 Memorandum from Lori Henderson to Moderna Board of Directors; Moderna EX; Re: Summary of 6/4/20 COVID Committee Meeting," p. 2 of 4) ("Order Process and Update – *USG*: We have received a draft contract from the USG – DOD for purchase of up to 300M doses of mRNA-1273.  More details on this contract will be available early this week. . . . ***Price*: Initial price per dose of $30/dose expected** to be increased to $35/dose after release of the full Phase 1 data. . . ." (emphasis added)) . . .)).

[1075] *See, e.g.,* Lawton Opening Report, ¶¶ 473-494.

[1076] Lawton Opening Report, ¶ 490 (*citing* MRNA-GEN-00773106-108, at 106 (Bennett Deposition Exhibit No. 26 – June 16, 2020 Letter from Hamilton B. Bennett to Camille B. Connell-Magaw).).

[1077] Lawton Opening Report, ¶ 476 (p. 371) (*citing* MRNA-GEN-00456091-202, at 095 (Bennett Deposition Exhibit No. 19 – April 16, 2020 ASPR-BARDA-ModernaTX, Inc. Contract No. 75A50120C00034) ("Although this contract does not cover the purchase of vaccine, Moderna shall negotiate in good faith along with fair and reasonable pricing that accounts for the Government's providing funds on this cost plus fixed fee contract.  At this time the government is not negotiating for any type of follow-on contract.").).

[1078] Lawton Opening Report, ¶ 476 (p. 371) (*citing* MRNA-GEN-00773106-108, at 106-107 (Bennett Deposition Exhibit No. 26 – June 16, 2020 Letter from Hamilton B. Bennett to Camille B. Connell-Magaw).).

[1079] Lawton Opening Report, ¶ 1243 (*citing* MRNA-GEN-01122003-088, at 009 (Bennett Deposition Exhibit No. 29 – "Volume II: Cost Proposal, Solicitation Number: W911QY20R0043," *Moderna,* July 10, 2020, PDF p. 7 of 88) ("Given the anticipated USG investment in the advanced development of mRNA-1273 under BARDA contract 75A50120C00034, Moderna found it reasonable to further discount the MOU price.  Based on the revised scope of the development program, the expectation is that the contract cost will increase to a total value of $952M.  Furthermore, we estimate the value of the services of NIAID during Phase 1-3 of the development of mRNA-1273 to equate to $55M.  Applying the total estimated USG financial support as a credit against CLIN 001 [sic], result in a price of $19.93

298

Highly Confidential – Outside Attorneys' Eyes Only

    c) In an **August 1, 2020** email to the U.S. Government, Dr. Hoge referenced a ███████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ "[1080]

435. In attempting to rebut the foregoing, Dr. Vellturo highlights the *range* of prices in various Moderna forecasts before and after May 31, 2020—which I both considered and addressed in detail in the Lawton Opening Report.[1081] For example, Dr. Vellturo's **"Figure 14: Moderna's Price per Dose Expectations,"** in **Figure 4.6**,[1082] below, (red box added for clarity) does *not* acknowledge that that as of May 31, 2020, Moderna's ***approved* price was $30/dose**. Instead, Dr. Vellturo characterizes Moderna's *approved* pricing as a purported "Aspirational Price"—a term that he apparently coined for this litigation, as it appears nowhere in the record of this case. In addition, Dr. Vellturo does not cite *higher* prices in Moderna's forecasts. For example, Dr. Vellturo's May 20, 2020 entry does *not* cite 976, which shows that Moderna was considering prices in the range of $30/course to $150/course (*i.e.,* $15/dose to $75/dose) [1083]—however, the **$50/dose** and **$75/dose** prices are *omitted* in Dr. Vellturo's Figure 14.

---

for CLIN 0001. **More specifically for CLIN 0001**: Starting with **comparable pricing under existing agreements for supply of mRNA-1273** of US$30/dose for ex-factory bulk drug product, *which we previously quoted to the USG,* Moderna deducted a discount of $10.07 ($1.007B/ 100M) resulting in a price of $19.93 per dose." (**bold** emphasis in original; *italics* underlined emphasis added)).).

[1080] Lawton Opening Report, ¶ 492 (*citing* MRNA-GEN-01928809-819, at 817 (Hoge Deposition Exhibit No. 42 – August 1, 2020 email from Stephen Hoge to Kenyata L. Wesley, Paul Hamilton Pardew, Subject: [Non-DoD Source] follow-up from today).).

[1081] Lawton Opening Report, ¶¶ 474-495

[1082] Vellturo Rebuttal Report, ¶ 625.

[1083] Lawton Opening Report, ¶ 482 (*citing* MRNA-GEN-01251960-028, at 976 (Brackmann Deposition Exhibit No. 6 – "MRNA 5-yr accelerated plan," *Moderna,* n.d. (May 20, 2020), Slide 17 of 69) ("mRNA-1273 could be the fastest and largest drug launch in history").).

299

Highly Confidential – Outside Attorneys' Eyes Only

### Figure 14: Moderna's Price per Dose Expectations

| Date | Forecast Price | Aspirational Price | Source |
|------|---------------|--------------------|--------|
| May 15, 2020 | $15 | | MRNA-GEN-02645641 at 660, 661 |
| May 20, 2020 | $15–$25 | | MRNA-GEN-01251960 at 964, 980 |
| May 28, 2020 | $20–$25 | | MRNA-GEN-02180160 at 163, 164, 171 |
| May 31, 2020 | | $30 | HHS-0000828 at 828 |
| June 15, 2020 | | $30-$49 | MRNA-GEN-02645690 at 695 |
| June 19, 2020 | $20–$23[1582] | | MRNA-GEN-02645753 at 767 |
| July 20, 2020 | $19 | | MRNA-GEN-01303780 at 781, 787-791 |
| August 10, 2020 | $24[1583] | | MRNA-GEN-02084955 at 964, 980 |
| August 11, 2020 | $22–$26[1584] | $37 | MRNA-GEN-01477419 at 423, 425 |
| August 13, 2020 | $20-$26 | | MRNA-GEN-01477431 at 433, 434 |
| September 2, 2020 | $15-$25 | $32-$49 | MRNA-GEN-01570975 at 040, 056 |
| January 3, 2021 | $19-$23 | | MRNA-GEN-01575181[1585] |

**FIGURE 4.6**

436.    Dr. Vellturo does not address the significance of Moderna's Board-*approved* pricing vis-à-vis the foregoing forecasts—or assert that *any* of the foregoing forecasts would or should trump Moderna's *approved* pricing. The facts are clear and unequivocal: as of May 31, 2020 Moderna's covid-19 committee had ***approved*** a **$30/dose price**. In addition, Moderna's May 31, 2020 offer to the U.S. Government reflects Moderna's covid-19 committee-*approved* price of $30/dose.[1084]

437.    Finally, while Dr. Vellturo purports to have a "*view* of Moderna's expectations,"[1085] he does not present an *opinion* on Moderna's expectations as of May 31, 2020, either generally or as it relates to the price per dose. In fact, Dr. Vellturo's *affirmative* opinion does not address this issue at all, as discussed above. *See* III.B  For example, Dr. Vellturo asserts: "Ms. Lawton does not account for any of the discounts that Moderna **anticipated** offering for bulk purchasing, doses delivered later in the pandemic, or doses delivered to low- and middle-income countries."[1086] Dr. Vellturo,

---

[1084] *See, e.g.,* Lawton Opening Report, ¶ 386 (*citing* HHS-0000828-830 (Bennett Deposition Exhibit No. 21 – May 31, 2020 letter from Stéphane Bancel to Dr. Moncel Slaoui (Warp Speed/HHS), General Gustave F. Perna (Warp Speed/HHS), Dr. Gary Disbrow (BARDA)).).
[1085] Vellturo Rebuttal Report, ¶ 605.
[1086] Vellturo Rebuttal Report, ¶ 641.

300

Highly Confidential – Outside Attorneys' Eyes Only

however, does not state, what, if any, *expectations* Moderna may have had about any of the foregoing **as of May 31, 2020**.

> **b)      Moderna's Internal Documents and Public Statements Show that Moderna's mRNA-1273 Plan was to Make Up to 1 Billion Doses per Year**

438.    In a 7-page subsection,[1087] captioned "Ms. Lawton's Unsupported and Speculative 1 Billion Doses Assumption," Dr. Vellturo does *not* dispute that there is, in fact, support for my 1 billion dose assumption.[1088]  Dr. Vellturo states:

> Ms. Lawton states that her estimate of Moderna's projected volume of "1 billion, [is] based on Moderna's May 20, 2020 'mRNA 5-year accelerated plan' which identifies Moderna's 'Manufacturing Goal' as 'A billion doses per year.'"[1089]
> . . .
> Ms. Lawton further claims that "Moderna's public statements and internal documents also show that as of May 31, 2020, Moderna's mRNA-1273 plan was to make up to 1 billion doses."[1090]

439.    Dr. Vellturo does not cite all of the evidence that supports Moderna's 1 billion dose projection. I cited other evidence that also demonstrates that Moderna's plan was to make up to 1 billion doses per year.  For example, Mr. Bancel testified before a U.S. Senate committee that in January 2020, he **"challenged Moderna's head of manufacturing to come up with a plan to produce a billion doses for distribution in 2021**, a daunting 10,000 times more doses than we had ever produced before."[1091]   By early-May 2020, Moderna's publicly announced plan was to produce up to 1

---

[1087] Vellturo Rebuttal Report, ¶¶ 630-639 (pp. 305-311).
[1088] *See, e.g.,* Lawton Opening Report, ¶¶ 471-472, 1235-1236.
[1089] Vellturo Rebuttal Report, ¶ 631.
[1090] Vellturo Rebuttal Report, ¶ 632.
[1091] Lawton Opening Report, ¶ 471 (*citing* MRNA-GEN-01721302-310, at 306 (*Moderna v. Pfizer* Francis Deposition Exhibit No. 15 – "Hearing before the Senate Health, Education, Labor and Pensions Committee – Testimony of Stéphane Bancel, Chief Executive Officer, Moderna, Inc.," *Moderna,* March 22, 2023, p. 5.).).

301

Highly Confidential – Outside Attorneys' Eyes Only

billion mRNA-1273 doses[1092]—and its goal as deliver 1 billion doses by the end of 2021.[1093]  The

1 billion dose forecast is also supported by Moderna's June 15, 2020 "Board Meeting – CEO

---

[1092] Lawton Opening Report, ¶ 471 (*citing See, e.g.,* "Moderna and Lonza Announce Worldwide Strategic Collaboration to Manufacture Moderna's Vaccine (mRNA-1273) Against Novel Cornonavirus," *Moderna,* May 1, 2020, *available at* https://investors.modernatx.com/news/news-details/2020/Moderna-and-Lonza-Announce-Worldwide-Strategic-Collaboration-to-Manufacture-Modernas-Vaccine-mRNA-1273-Against-Novel-Coronavirus/default.aspx ("Under the terms of the agreement, the companies plan to establish manufacturing suites at Lonza's facilities in the United States and Switzerland for the manufacture of mRNA-1273 at both sites. Technology transfer is expected to begin in June 2020, and the companies intend to manufacture the first batches of mRNA-1273 at Lonza U.S. in July 2020. Over time, the parties intend to establish additional production suites across Lonza's worldwide facilities, ultimately allowing for the manufacture of material equivalent to **up to 1 billion doses of mRNA-1273 per year for use worldwide assuming the currently expected dose of 50 μg.** The manufacturing facilities at Lonza complement Moderna's ongoing U.S. manufacturing efforts, which continue to ramp up to prepare for the further clinical development and commercialization of mRNA-1273. . . .." (emphasis added)).  John Miller, "Exclusive: Lonza sets new goal to make Moderna COVID-19 vaccine ingredients," *Reuters,* June 2, 2020, *available at* https://www.reuters.com/article/world/exclusive-lonza-sets-new-goal-to-make-moderna-covid-19-vaccine-ingredients-idUSKBN2392BS/ ("Moderna, flush with $483 million from the U.S. Government and $1 billion-plus in fresh capital, is paying for the first U.S. production line, and up to three more at Lonza facilities in Portsmouth and Visp, Baehny said. Combined capacity could produce ingredients for 600 million to 1 billion vaccine doses annually, he said, depending on the size of the dose needed.").

[1093] Lawton Opening Report, ¶ 471 (*citing See, e.g.,* Leah Rosenbaum, "Fueled By $500 Million In Federal Cash, Moderna Races To Make A Billion Doses Of An Unproven Cure," *Forbes,* May 8, 2020, *available at* https://web.archive.org/web/20200508185931/https://www.forbes.com/sites/leahrosenbaum/2020/05/08/fueled-by-500-million-in-federal-cash-moderna-races-to-make-1-billion-doses-of-an-unproven-cure/ ("Moderna's phase three clinical trial is expected to start early this summer, but Bancel is already preparing to scale up. On May 1, 2020, the company announced a new partnership with Swiss manufacturing company Lonza to produce up to 1 billion doses of the new coronavirus vaccine per year**.** Manufacturing is supposed to start in July, well before any vaccine would be approved by the FDA, which probably won't happen until sometime next year." "Moderna's path to vaccine innovation: A talk with CEO Stéphane Bancel," *McKinsey & Co.,* August 2021, pp. 2-3 of 6, *available at* https://www.mckinsey.com/~/media/mckinsey/industries/life%20sciences/our%20insights/modernas%20path%20to%20vaccine%20innovation%20a%20talk%20with%20ceo%20stephane%20bancel/modernas-path-to-vaccine-innovation-a-talk-with-ceo-stephane-bancel-vf.pdf (". . . Stéphane Bancel: By March 2020, the World Health Organization [WHO] declared COVID-19 a pandemic, and we were racing against the virus every day . . . To deliver on our goal of 100 million doses of COVID-19 vaccines within 12 months and **a billion doses by the end of 2021**, . . ." (emphasis added)).

302

Highly Confidential – Outside Attorneys' Eyes Only

Update" slide deck;  The "Scenarios (price range and volume range)" slide in **Figure 4.7**,[1094] below,  shows **"Volume with Approved board Raw materials" up to <u>1</u> billion doses**.  Contrary to Dr. Vellturo's argument that the goal of producing up to 1 billion doses "was predicated on a 50 microgram dose implying that at best this was a goal to potentially achieve the ability to produce 500 million 100 microgram doses," Moderna maintained this 1 billion dose goal in its June 15, 2020 board presentation, which was weeks after Dr. Vellturo concluded "Moderna was clearly aware that it would likely have to use a 100 microgram dose of vaccine."[1095]

Board Meeting - CEO update

## Scenarios (price range and volume range)

| | Price/dose | | | |
|---|---|---|---|---|
| doses (mm) | $30 | $35 | $40 | $49 |
| 100 | $3,000 | $3,500 | $4,000 | $4,900 |
| 200 | $6,000 | $7,000 | $8,000 | $9,800 |
| 300 | $9,000 | $10,500 | $12,000 | $14,700 |
| 400 | $12,000 | $14,000 | $16,000 | $19,600 |
| **500** | **$15,000** | **$17,500** | **$20,000** | **$24,500** |
| 600 | $18,000 | $21,000 | $24,000 | $29,400 |
| 700 | $21,000 | $24,500 | $28,000 | $34,300 |
| 800 | $24,000 | $28,000 | $32,000 | $39,200 |
| 900 | $27,000 | $31,500 | $36,000 | $44,100 |
| 1000 | $30,000 | $35,000 | $40,000 | $49,000 |

Volume with Approved board Raw materials →

moderna

Strictly Confidential

9

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-02645698

**FIGURE 4.7**

---

[1094] Lawton Opening Report, ¶ 472 (*citing* MRNA-GEN-02645690-752 at 698 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 9 of 64) ("Recommended Pricing").) (emphasis added).
[1095] Vellturo Rebuttal Report, ¶ 632.

303

Highly Confidential – Outside Attorneys' Eyes Only

440.    Moderna's May 15, 2020 Board presentation also includes a 1 billion dose projection, as shown in **Figure 4.8** below, for the "Invest Now & Flawless Execution," an "upside scenario" which projected 513 million Moderna Treatment courses (*i.e.,* 1.026 billion doses).[1096]



**FIGURE 4.8**

441.    Finally, in *Moderna v. Pfizer,* Said Francis testified "I know we had the capacity to do over a billion doses a year."[1097]

---

[1096] MRNA-GEN-02645641-677, at 658 (Hoge Deposition Exhibit No. 45 – "Board Discussion," Moderna, May 15, 2020, Slide 18 of 37) Invest Now & Flawless Execution "upside scenario" projected Treatment courses (M) 45+114+173+93+88 = 513 Million courses x 2 doses per course = 1,026 Million doses, i.e., more than a Billion doses.

[1097] Lawton Opening Report, ¶ 471 (*citing* MRNA-GEN-01726934-7000, at 956 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 91:19-91:21. *See also* 91:15-92:20 ("Q. Has Moderna ever made a billion doses of vaccine in a year? . . . A. Again, I cannot confirm, but I know we had the capacity to do over a billion doses a year. Q. Okay. A. We definitely had the capacity. Q. How do you have – what is the basis for your understanding? A.

Highly Confidential – Outside Attorneys' Eyes Only

442.    As noted above, Dr. Vellturo does not actually dispute that there *is,* in fact, evidence to support the 1 billion doses, which is set forth in the Lawton Opening Report.[1098]  Instead, Dr. Vellturo injects certain qualifiers and states: "Ms. Lawton provides no source that supports her underlying assumption **that when conducting any profit projections**, **Moderna would have anticipated** selling 1 billion vaccine doses."[1099]

### c)    Dr. Vellturo's Criticism Regarding "$30 Per Dose across 1 Billion Doses" is Cumulative

443.    In a 2-page subsection[1100] captioned "Ms. Lawton's Unsupported and Speculative $30 Per Dose across 1 Billion Doses Assumption" is cumulative and again claims "in making these assumptions about both expected units and expected price, Ms. Lawton repeatedly conflates goals, hopes, and aspirations with expectations, forecasts, and projections."  I disagree for the reasons explained above.

444.    As explained above, the best evidence of Moderna's expectations as of May 31, 2020 regarding the price was $30/dose[1101] which Moderna's COVIDcommittee had approved and was the price in Moderna's May 31, 2020 offer to the U.S. Government—and it was a price that Moderna continued to quote to the U.S. Government in subsequent months.  Similarly, the best evidence of Moderna's expectations as of May 31, 2020 regarding the number of doses it was expecting to make and sell was 1 billion (or more) doses.[1102]  Therefore, in determining Moderna's expected profit at the time, I first calculated the expected revenue by multiplying the expected doses by the price per dose. During the period early-May 2020 through September 2020, Moderna prepared various estimates

---

My basis of my understanding is because we were essentially working through our network of manufacturers, as well as building our own capacity.  So we had the site and then we started working with Lonza, our partner.  And as we enabled suites and bought equipment to put them in these suites, that's new capacity being made available to make doses, to receive orders, to be able to supply that, so discussions with Lonza.  Then there as the fill-finish partners.  As we enabled more and more fill-finish multidose vials, contract manufacturers to work for us to make the product, those were discussions that I was in the —in the – not necessarily heeding, but I was in the middle of.  Some actually I was involved in creating those relationships and whatnot.  And then the CMC organization goes and does their diligence.  But a lot of that was based on how to essentially enable a capacity over the billion.")).

[1098] Lawton Opening Report, ¶¶ 1235-1236.

[1099] Vellturo Rebuttal Report, ¶ 630.

[1100] Vellturo Rebuttal Report, ¶¶ 640-643.

[1101] Lawton Opening Report, ¶¶ 1237-1238.  *See also,* Lawton Opening Report, II.E.4.f.

[1102] Lawton Opening Report, ¶¶ 1235-1236.

305

Highly Confidential – Outside Attorneys' Eyes Only

and forecasts. Based on my investigation and review of the record in this case, it is my opinion that the best evidence of Moderna's expectations as of May 31, 2020 is Moderna's approved price and volume, which I have confirmed to other sources in the records, as described above and in the Lawton Opening Report. Indeed, as reflected in the July cost proposal, Moderna expected the price to *increase* for additional volumes beyond 100 million. The second 100 million doses was priced at $37 per dose, and the third 100 million at $49 per dose.[1103]

### d)    Accounting for the NIAID Royalty

445.    In a footnote, Dr. Vellturo challenges my subtraction for the NIAID royalty and stated: "I note that despite Ms. Lawton's claimed 50-50 apportionment, Ms. Lawton's actual apportionment method does not apply a 50-50 split of her calculated 'excess profits.' Instead, Ms. Lawton assumes that all of the costs associated with Moderna's use of NIAID technology are only borne by Moderna, implying that Moderna would not have considered these costs when projecting its anticipated profit on May 31, 2020."[1104] Dr. Vellturo's critique is both nonsensical and wrong. As explained in detail in the Lawton Opening Report,[1105] I subtracted the royalties Moderna owed to NIAID for use of NIAID's 2P technology. While the NIAID agreement was entered into in November 2022, and Moderna would not have been aware of the terms of the agreement at the time of the hypothetical negotiation on May 31, 2020, Modera would have been aware of a potential liability. By subtracting the NIAID royalty, my Analytical Approach analysis is conservative, as it *reduces* the excess profit available that are then apportioned to calculate Genevant's compensation for the alleged infringement of the Patents-in-Suit.

### e)    Dr. Vellturo's Reliance on Hindsight is Improper

446.    In a 3-page subsection captioned "Ms. Lawton's Assumptions of Moderna's Projections vs. Actuals," Dr. Vellturo contends: "Ms. Lawton does not appear to consider whether such a discrepancy [between Moderna's expected v. actual price per dose] should prompt her to reassess the validity of her assumptions."[1106] This contention suggests that hindsight should be determinative. I disagree with this contention, because the reasonable royalty is to be determined based on *expectations,* not actual results. This was reiterated by the *Lucent* court when it noted:

---

[1103] MRNA-GEN-01122003-088 at -004 (July 10, 2020 Cost Proposal).
[1104] Vellturo Rebuttal Report, ¶ 585 fn 1461 (p. 281).
[1105] Lawton Opening Report, ¶1258.
[1106] Vellturo Rebuttal Report, ¶ 644.

306

Highly Confidential – Outside Attorneys' Eyes Only

"The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical negotiations would have considered at the time of the negotiations."[1107]

447.   I discussed the appropriate use of the Book of Wisdom in the Lawton Opening Report.[1108]

### 4.     Dr. Vellturo's "Flawed 50-50 Apportionment Finding" is Unsupported

448.   In this 4-page sub-section,[1109] captioned "Ms. Lawton's Flawed 50-50 Apportionment Finding," Dr. Vellturo summarizes his assertion as follows: "Ms. Lawton introduces additional flaws into her analysis applying an apportionment that relies on arbitrary allocations lacking sufficient or economic justification."[1110]  Dr. Vellturo contends that my 50% apportionment "is incorrect" as a "technical matter" based on Dr. Meulien's opinion that "the mRNA payload and its modifications in general are more important to the success of the Spikevax vaccine than the LNP delivery vehicle."[1111]  I understand that Dr. Porter has considered the opinions of Dr. Meulien, and has examined the elements of the mRNA payload cited by Moderna in its damages contentions and expert reports, and concluded that "the value provided by the LNP technology provided by the Patents-in-Suit is far more important than the value of the mRNA technology discussed by Dr. Meulien."[1112]

449.    My analysis is conservative because I only rely on the value the Patents-in-Suit contribute to delivery.  In reality, I understand from Dr. Mitchell that "while the Patents-in-Suit are critical to the delivery of the vaccine payload, their value ***is not limited to the delivery component***," but also contributes to the overall efficacy of the vaccine through "'increased activity of the encapsulated nucleic acid,' 'improved tolerability of the formulations in vivo,' and 'a significant increase in the therapeutic index as compared to nucleic acid-lipid particle compositions.'"[1113]  Moderna's representations to the FDA confirm that the Patents-in-Suit's contributions were not limited to delivery, explaining:

---

[1107] Lawton Opening Report, ¶ 1480 (*citing Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983).).
[1108] Lawton Opening Report, ¶ 1394.
[1109] Vellturo Rebuttal Report, ¶¶ 647-655 (pp. 316-319).
[1110] Vellturo Rebuttal Report, ¶ 586 (p. 282).
[1111] Vellturo Rebuttal Report, ¶ 650.
[1112] Reply Expert Report of Dr. Frederick W. Porter, Secs. IV-VI.
[1113] Reply Expert Report of Dr. Michael Mitchell Sec. XVII.

307

Highly Confidential – Outside Attorneys' Eyes Only

> mRNA that is not encapsulated in lipid nanoparticles is subject to rapid degradation by RNases in the body. RNA Encapsulation of mRNA in LNPs *is required for cellular uptake and functionality*
>
> ….
>
> Individual and total lipid content is an important determinant of biological performance. Lipids must be present at expected levels in order to assure the correct structural organization of the mRNA-containing LNP in subsequent downstream manufacturing steps and the resultant biological performance of the final DP.[1114]

450. As the Lawton Opening Report explained,[1115] I only apportion 50% of the value to the Patents-in-Suit, which is conservative, given that Dr. Porter concluded that the "mRNA technology Moderna has identified, including in the Cellscript Agreement, the NIAID Agreement, and Moderna's own patents, made a far less significant contribution to the safety or efficacy of Moderna's COVID-19 vaccine than Plaintiffs' LNP technology in the Patents-in-Suit."[1116] Dr. Mitchell likewise opined that "the delivery vehicle is at least valuable, *if not more valuable*, than the payload."[1117]

### 5. Dr. Vellturo's Exhibit 15 "Alternative Parameters" Analysis is Fundamentally Flawed and Biased

451. At a high level, Dr. Vellturo describes his Exhibit 15 "Alternative Parameters" Analysis "[a]s a simple demonstration of the inherent unreliability of Ms. Lawton's Analytical Method, I show that correcting a single parameter (to any of a handful of more reasonable settings) causes Ms. Lawton's Analytical Method damages model to implode."[1118]

452. The Vellturo Rebuttal Report text references his Exhibit 15 "Alternative Parameters" Analysis seven (7) times[1119] – highlighting among other things how the results of his "Alternative Parameters" analysis *e.g.*, lead to "a negative value for the Patents-In-Suit," "negative estimate of value for the Patents in Suit," "negative reasonable royalty estimate(s)," "damages estimates are substantially reduced or even negative," "negative expected profits," "her damages become

---

[1114] MRNA-GEN-00039116-168 at -120, -152 (Justification of Specification Section of Moderna's BLA).

[1115] Lawton Opening Report, ¶¶ 1260-1277 (Analytical Method); ¶¶ 1362-1393 (Hypothetical Negotiation Approach).

[1116] Lawton Opening Report, ¶ 1391. Opening Expert Report of Dr. Frederick W. Porter ¶ 41; *see also* Reply Expert Report of Dr. Frederick W. Porter Sec. VI.

[1117] Lawton Opening Report, ¶ 1390. Opening Expert Report of Dr. Michael Mitchell ¶ 791.

[1118] Vellturo Rebuttal Report, ¶ 580

[1119] Vellturo Rebuttal Report, ¶¶ 580 (fn1438), 639 (fn 1633), 643, 646, 655 (fn1670), 676 (fn 1730), and 680.

Highly Confidential – Outside Attorneys' Eyes Only

negative," and "her calculations would have resulted in a reasonable royalty of [a negative number]."[1120]

453.    While Dr. Vellturo purports to demonstrate the unreliability of my Analytical Method by "correcting a single parameter (to any of a handful of more reasonable settings)," in reality, what Dr. Vellturo's Exhibit 15 is simply an "Alternative Parameters" analysis based on a multiplicity of unreasonable revenue assumptions, namely, thirteen (13) alternative assumptions. Dr. Vellturo's "Alternative Parameters" calculations defy the dual realities of Moderna's ███████ ███████████████ at the time of the May 31, 2020 hypothetical negotiation (as described at length above) which is confirmed by the reality check based on Moderna's *actual* revenues— which are even higher, ████████████, in an attempt to wrongly impugn the reliability of my calculations and approach.

454.    There are a number of defects in Dr. Vellturo's "Alternative Parameters" work.  First, all – every single one – of Dr. Vellturo's thirteen (13) "Alternative Parameters" assumes mRNA-1273 revenue that is *lower than* Moderna's ██████████████████ at the time of the hypothetical negotiation.[1121]  Dr. Vellturo's thirteen (13) alternate revenue parameters range from ██████ (the lowest) in his Scenario [6] to ██████ (the highest) in his Scenario [7]— which at the high end is █████████████████████████████, which █████ ████████.  So while Dr. Vellturo *claims* that his thirteen (13)  "Alternative Parameters" are purportedly "more reasonable settings," the basis for this contention is not stated and appears to be *ipse dixit*.

455.    Second, my Analytical Method analysis is fundamentally a profit attribution and sharing exercise – which when based on the scale of Moderna's ████████████████ at the time of the hypothetical negotiation - attributes to Moderna, its investors, and the U.S. government approximately ███████████████ In contrast, Dr. Vellturo's "Alternative Parameters" calculations assumed that the █████████████████ attributed to Moderna, its investors, and the U.S. government would be *fixed*, whereas the share of the expected profit attributed to NIAID and Genevant would be *variable*. This leads to Dr. Vellturo's non-sensical result of a *negative share* attributed to Genevant when his model is crediting the other contributors with

---

[1120] Vellturo Rebuttal Report, ¶¶ 580 (fn1438), 639 (fn 1633), 643, 646, 655 (fn1670), 676 (fn 1730), and 680.

[1121] Vellturo Rebuttal Report, Exhibit 15.

309

Highly Confidential – Outside Attorneys' Eyes Only

approximately ███████. In fact, Dr. Vellturo's model results that yield negative expected net profit per dose implies that his analysis would attribute more than all of Moderna's projected profits to Moderna, its investors, and the U.S. government. This demonstrates that Dr. Vellturo's "Alternative Parameters" model is biased and does not provide reasonable or reliable results.

### 6. Dr. Vellturo's Straw Man Criticism Regarding the Comparison of Two Offers is Invalid

456. Dr. Vellturo's purported "two offers" criticism is another example of Dr. Vellturo's use of the straw man fallacy to attempt to further criticize my Analytical Method analysis. In this example, Dr. Vellturo claims that I attempt "to infer the value of intellectual property from two distinct offers made at different stages of an ongoing negotiation" based on "Moderna's May 31, 2020 opening negotiation offer to the U.S. Government of $30 per dose of vaccine for 100 million doses and Moderna's subsequent July 10, 2020, cost proposal to the U.S. government containing a ████████████ cost for up to 300 million doses."[1122] Dr. Vellturo further notes that, "although the difference between these two dose estimates is ████, Ms. Lawton analysis comparing these two estimates results in $7.59 of 'excess profits' per dose, see Lawton Report, Chart 6.1."[1123] The straw man in this example is Dr. Vellturo's unfounded assertion that the Analytical Method analysis "compar[es] these two estimates" (*i.e.,* $30/dose and ████████).

457. Based on the foregoing unfounded assertion, Dr. Vellturo mischaracterizes my analysis by claiming that I am trying "attempt to infer the value of the Patents-in-Suit by implicitly comparing two offers for the exact same product at different points in a negotiation" and further asserts that I am assuming "that the implicit differences between these two offers must be entirely driven by the value provided by the intellectual property of the Accused Product" in an attempt to "transform[] the ████ price difference between Moderna's $30 opening offer and its subsequent ██████ ████████ into an estimate of $7.59 in "excess profits."[1124]

458. Dr. Vellturo's criticisms are disproved by the very document upon which he relies. The July 10 cost proposal was not a new offer, as Dr. Vellturo asserts,[1125] but rather provided supporting information for the May 31, 2020 offer, which it expressly referenced. In the July 10 cost proposal,

---

[1122] Vellturo Rebuttal Report, ¶596.
[1123] Vellturo Rebuttal Report, fn 1484.
[1124] Vellturo Rebuttal Report, ¶604.
[1125] Vellturo Rebuttal Report, ¶¶ 596-604.

310

Highly Confidential – Outside Attorneys' Eyes Only

Moderna stated that, after accounting for moneys already received from the government, it was proposing the same price it previously had for the first 100 million doses ("CLIN 001"): "US$30/dose for ex-factory bulk drug product, which we previously quoted to the USG."[1126] The proposal then increased the price for subsequent doses—the second 100 million doses was priced at $37 per dose, and the third 100 million at $49 per dose.[1127] Thus for 300 million doses, the average price was $38.67 per dose.[1128] I conservatively used $30 per dose, consistent with the May 31, 2020 offer.

459. After setting up the above "straw man" statements mischaracterizing the basis for my Analytical Method analysis, Dr. Vellturo then discusses evidence about Moderna volume discounts[1129] in an attempt improperly criticize opinions I have not offered. As such, Dr. Vellturo's criticisms are invalid.

### G.    IV H. "Ms. Lawton's Hypothetical Negotiation Approach (Lawton Report, § VI.D)"

460. In this 77-page section,[1130] Dr. Vellturo continues to assert his *affirmative* opinion that the Providence Agreement constitutes a *de facto* Established Royalty.[1131] I disagree with Dr. Vellturo's *affirmative* opinion for the reasons stated above. *See* III.

461. The fundamental premise of Dr. Vellturo's criticisms in this section are based on his contention that my analysis is purportedly "deeply flawed throughout" and is purportedly "driven almost

---

[1126] MRNA-GEN-01122003-088 at -009 (July 10, 2020 Cost Proposal).

[1127] MRNA-GEN-01122003-088 at -004 (July 10, 2020 Cost Proposal).

[1128] The average of the $30, $37, and $49 prices.

[1129] Vellturo Rebuttal Report, ¶¶ 596-604 (pp. 288-292).

[1130] Vellturo Rebuttal Report, ¶¶ 658-822 (pp. 321-397).

[1131] *See, e.g.,* Vellturo Rebuttal Report, ¶ 661 ("Thus, Ms. Lawton's circuitous analysis generates an effective percentage-of-sales running royalty far greater than those specified in numerous licenses under which various parties agreed to pay Plaintiffs (just 7.5-8.0% per Ms. Lawton's accounting) for Genevant's *entire portfolio* of patents and IP (including, but far broader than, the present Patents-in-Suit)—both before, contemporaneously with, and after the Hypothetical Negotiation."); ¶ 669 ("As applied to the fact so the present case, therefore, the lofty expectations highlighted by Ms. Lawton have little impact on a proper hypothetical negotiation as detailed in Section III, above. **There, I recognize that there exists a well-established licensing history of the Patents-in-Suit by Genevant—including licenses before and close to the date of the present Hypothetical Negotiation.**" (emphasis added)).

Highly Confidential – Outside Attorneys' Eyes Only

entirely by . . . unfounded assumptions, all which serve to inflate [the] reasonable royalty rate to an enormous degree."[1132]  I disagree.

### 1.    Dr. Vellturo's Criticisms are Based Almost Entirely on Improper *After-the-Fact, Hindsight*-based Contentions

462.    Dr. Vellturo does not dispute that Moderna had "lofty expectations . . . in early 2020," but instead asserts that "it is unclear why such expectations should have a meaningful impact on the reasonable royalty *rate* agreed to by the parties in the present case"[1133] and further asserts that "the lofty expectations highlighted by Ms. Lawton have little impact on a proper hypothetical negotiation exercise[,]"[1134] based on his improper *de facto* Established Royalty theory.  In other words, Dr. Vellturo contends that his improper *de facto* Established Royalty theory trumps the Hypothetical Negotiation paradigm—and further establishes that his *Georgia-Pacific* Factor analysis is window dressing, as stated above.  *See* II.A.2.b) and III.A.2.b)3.

### a)    Dr. Vellturo's Reliance on *Hindsight* is Improper

463.    Dr. Vellturo's criticisms ignore Moderna's "lofty expectations" as of May 31, 2020, and instead, are based almost entirely on improper *after-the-fact, hindsight*-based contentions. As such, Dr. Vellturo's criticisms are fundamentally inconsistent with the Hypothetical Negotiation paradigm—which requires a *forward-looking, expectations*-based analysis, which Dr. Vellturo did *not* undertake.  As the Lawton Opening Report stated, the relevant measure is the profits attributable to the infringer's use of the invention the parties would have anticipated or predicted as of the date just prior to the infringer's commencement of infringing activity.[1135]  As the Federal

---

[1132] Vellturo Rebuttal Report, ¶ 660.

[1133] Vellturo Rebuttal Report, ¶ 668.

[1134] Vellturo Rebuttal Report, ¶ 669.

[1135] Lawton Opening Report, ¶ 1447 (*citing Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766 (Fed. Cir. 2014) ("That treatment [considering defendant's profits as a royalty cap] incorrectly replaces the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward looking inquiry into what turned out to have happened. *See Interactive Pictures,* 274 F.3d at 1385 (expectations govern, not actual results)."). *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860 (Fed. Cir. 2003) ("Mr. Anderson [Integra's damages expert] preferred a hypothetical license figure based, in part, on Merck's 1995 expectations of obtaining FDA approval of a cyclic peptide therapeutic.  As already noted, however, if the hypothetical negotiation occurred in 1994, Merck did not have that expectation.  Thus, an earlier date will change the risks and expectations of the parties."). *Interactive Pictures v. Infinite Pictures,* 274 F.3d 1371, 1385 (Fed. Cir. 2001) ("*Lindemann* does not require that estimates of sales revenues, as referenced in a hypothetical negotiation at the time infringement

312

Highly Confidential – Outside Attorneys' Eyes Only

Circuit has stated, "expectations govern, not actual results[,]"[1136] noting "The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations[,]"[1137] and further stated that the hypothetical negotiation paradigm "does not require that estimates of sales revenues, as referenced in a hypothetical negotiation at the time infringement began, must later bear a close relation to actual sales revenue. Such a proposition would essentially eviscerate the rule that recognizes sales expectations at the

---

began, must later bear a close relation to actual sales revenue. Such a proposition would essentially eviscerate the rule that recognizes sales expectations at the time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales."). *Hanson v. Alpine Valley Ski Area, Inc.* 718 F.2d 1075, 1081 (Fed. Cir. 1983) ("The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations."). *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116, 1122 (S.D.N.Y. 1970) ("[T]he Court [h]as taken into account the modifying effect of the facts developed subsequent to 1955 and has assessed them together with all other probative evidence so far as they bear upon the reasonableness of the assumptions and expectations of the parties in their hypothetical negotiations in 1955."). *See also* Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-222 (*Citing (among others) Hanson v. Alpine Valley Ski Area, Inc.* 718 F.2d 1075 (Fed. Cir. 1983)). *See also* J. Gregory Sidak, "How Relevant is Justice Cordozo's 'Book of Wisdom' to Patent Damages?" *The Columbia Science & Technology Law Review,* Spring 2016, pp. 246-291, at 247 ("The Federal Circuit has emphasized that courts should calculate a reasonable royalty on the basis of the parties' expectations at the time of the hypothetical negotiation. The Federal Circuit has allowed reliance on post-infringement data only when they are necessary to infer the parties' bargaining position at the time of the hypothetical negotiation. Outside this exception, there is no valid legal or economic justification to rely on post-infringement data when calculating a reasonable royalty."). *See also, e.g., Garretson v. Clark*, 111 U.S. 120, 121 (1884) (plaintiff "must in every case give evidence tending to separate or apportion the defendant's profits and [plaintiff's] damages between the patented feature and the unpatented features").

[1136] *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014) ("That treatment [considering defendant's profits as a royalty cap] incorrectly replaces the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward looking inquiry into what turned out to have happened. *See Interactive Pictures,* 274 F.3d at 1385 (expectations govern, not actual results).").

[1137] *Hanson v. Alpine Valley Ski Area, Inc.* 718 F.2d 1075, 1081 (Fed. Cir. 1983) ("The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations.").

313

Highly Confidential – Outside Attorneys' Eyes Only

time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales."[1138]

> ### b) Dr. Vellturo Attempts to Sidestep the Requirement that "expectations govern, not actual results"

464.    Dr. Vellturo attempts to sidestep the foregoing fundamental principles by citing to the Federal Circuit's 2014 decision in *Aqua Shield v. Inter Pool Cover Team,* which described the **"core economic question"** as "**what the infringer, in a hypothetical pre-infringement negotiation under hypothetical conditions, would have *anticipated* the profit-making potential of use of the patented technology to be, compared to using non-infringing alternatives"**—an analysis that Dr. Vellturo did *not* undertake in this case—as follows:

> **What an infringer's profits actually turned out to have been during the infringement period may be relevant, but only in an indirect and limited way— as some evidence bearing on a <u>directly relevant inquiry into anticipated profits</u>**. Thus, when the infringer is a profit-making enterprise, a "reasonable royalty is the amount that 'a person, desiring to manufacture[, use, or] sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make[, use, or] sell the patented article, in the market, at a reasonable profit.'" *Id.* (bracketed changes in original; quoting earlier authority). **In hypothetical-negotiation terms, the core economic question is what the infringer, in a hypothetical pre-infringement negotiation under hypothetical conditions, would have *anticipated* the profit-making potential of use of the patented technology to be, compared to using non-infringing alternatives. <u>If a potential user of the patented technology would expect to earn X profits in the future without using the patented technology, and X + Y profits by using the patented technology, it would seem, as a prima facie matter, economically irrational to pay more than Y as a royalty—paying more would produce a loss compared to forgoing use of the patented technology.</u>** *See Riles v. Shell Exploration & Prod. Co.,* 298 F.3d 1302, 1312 (Fed.Cir.2002) ("The economic relationship between the patented method and non-infringing alternative methods, of necessity, would limit the hypothetical negotiation."); *Dowagiac,* 235 U.S. at 648, 35 S.Ct. 221 (it is "permissible to show the value [of using the patented technology] by proving what would have been a reasonable royalty, considering the nature of the invention, *its utility and advantages,* and the extent of the use

---

[1138] *Interactive Pictures v. Infinite Pictures,* 274 F.3d 1371, 1385 (Fed. Cir. 2001) ("*Lindemann* does not require that estimates of sales revenues, as referenced in a hypothetical negotiation at the time infringement began, must later bear a close relation to actual sales revenue. Such a proposition would essentially eviscerate the rule that recognizes sales expectations at the time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales.").

Highly Confidential – Outside Attorneys' Eyes Only

involved" (emphasis added)); *Suffolk Co. v. Hayden,* 70 U.S. 315, 319-20, 3 Wall. 315, 18 L.Ed. 76 (1865).[1139]

. . .

We deal here only with a challenge to the soundness of the district court's particular use of IPC's [Defendant's actual] profits in its rationale. For purposes of Aqua Shield's challenge, two points are key. **First, <u>anticipated incremental profits under the hypothesized conditions are conceptually central to constraining the royalty negotiation</u>, as recognized in *Trans-World Mfg.*, 750 F.2d at 1568.** Second, "[e]vidence of the infringer's actual profits generally is admissible as probative of his anticipated profits." *Id.; see Interactive Pictures Corp. v. Infinite Pictures, Inc.,* 274 F.3d 1371, 1385 (Fed.Cir.2001); *see also Sinclair Ref. Co. v. Jenkins Petrol. Process Co.,* 289 U.S. 689, 698, 53 S.Ct. 736, 77 L.Ed. 1449 (1933) (post-infringement evidence can be a relevant "book of wisdom"); *Lucent,* 580 F.3d at 1333.

Contrary to Aqua Shield's broader contention, therefore, the district court did not err in considering IPC's profits. **But it did err in treating the profits IPC actually earned during the period of infringement as a royalty cap. That treatment incorrectly replaces the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward-looking inquiry into what turned out to have happened.** *See Interactive Pictures,* 274 F.3d at 1385 (expectations govern, not actual results).

**The district court's analysis also incorrectly replaces the inquiry into the parties' anticipation of what profits would be earned *if a royalty (of amounts being negotiated) were to be paid* with an inquiry into what profits were earned *when IPC was charging prices without accounting for any royalty.*** Thus, the district court seems to have simply assumed that any royalty paid by IPC would have directly reduced its profits, dollar for dollar. But that would not be true, in general, if IPC could have raised its prices (over what it actually charged for infringing sales) to account (fully or partly) for a royalty payment. The district court did not find, and IPC has not argued here, that IPC was selling in a perfectly competitive market in which it was forced to act as a pure price-taker. **We have not been shown proof that this case is different from the typical one in which pricing might be adjusted to account for a royalty based on sales price.** Indeed, IPC has not pointed to any evidence supporting the district court's conclusion that a royalty should be a percentage of profits rather than sales revenues.

In *Douglas Dynamics, LLC v. Buyers Prod. Co.,* 717 F.3d 1336, 1346 (Fed.Cir. 2013), this court explained: **"The infringer's selling price can be raised if necessary to accommodate a higher royalty rate, and indeed, requiring the infringer to do so may be the only way to adequately compensate the patentee for the use of its technology."** The court held, for that reason, that "the district court clearly erred by ensuring the ongoing royalty rate it awarded would 'leave some room for profit' by [the infringer] at its current prices." *Id.* **On the record**

---

[1139] *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770-771 (Fed. Cir. 2014).

**before us, we conclude that the district court committed the same error in the present case.**

**We vacate the district court's royalty calculation and remand for redetermination in a manner consistent with this opinion. <u>On remand, the court should consider all relevant record evidence, including the advantages of the patented product, the ease and cost of designing around the claimed invention, and the relevance of IPC's actual profits to what IPC's expectations would have been in a hypothetical negotiation</u>. Our correction of <u>the erroneous focus on the net profits IPC *actually* earned</u> may require reconsideration of aspects of the district court's analysis we have not specifically discussed.** For example, in rejecting the testimony of Mr. Brooks, the court relied in part on its focus on IPC's actual profits, which we hold to be erroneous. *Initial Damages Op.* at 26. The district court also should reconsider the relevance of Aqua Shield's evidence regarding IPC's gross profits now that the inquiry is not constrained by the erroneous focus on IPC's net profits.

465.    Notwithstanding the foregoing which clearly underscores that the reasonable royalty analysis is directed to an infringer's *anticipated* profits—and expressly stated that "focus on the net profits [the Defendant] *actually* earned" was "erroneous"—in this case, Dr. Vellturo has committed the very same error.  Dr. Vellturo, however, does not cite *Aqua Shield* for the holding cited above. Instead, Dr. Vellturo cited *Aqua Shield* for a *different* proposition—namely *Aqua Shield's* citation to the Federal Circuit's 2001 decision in *Interactive Pictures v. Infinite Pictures,* which distinguished the Federal Circuit's 1990 decision in *Lindemann Maschinenfabrik GmbH v. Am. Hoist Derrick Co.*—a case in which the Plaintiff was granted "'nominal' damages of $10,000"[1140] because it "failed to adduce evidence dictating a particular amount" citing "the paucity of Lindemann's evidence."[1141]  Dr. Vellturo, however, does not cite *Lindemann* directly—which, in fact, underscores that the reasonable royalty is to be determined based on *expected* profits:

> The record created at trial convinces us that the magistrate correctly evaluated the evidence as totally insufficient to support a royalty rate yielding more than $10,000 for AmHoist's sale of the two machines with infringing rams. Lindemann admits that it "presented its evidence on damages solely" through its one witness, patent attorney Enlow. **Mr. Enlow gave his opinion that a reasonable royalty would be <u>20%-25% of the sale price of the entire machine</u>**. Lindemann implies but does not, as it cannot, argue that the magistrate was bound to accept that opinion. **Indeed, the record reflects fully adequate bases for the magistrate's rejection of that opinion. As brought out on cross-examination, Enlow's opinion was based on**

---

[1140] *Lindemann Maschinenfabrik GmbH v. Am. Hoist Derrick Co.*, 895 F.2d 1403, 1404 (Fed. Cir. 1990).

[1141] *Lindemann Maschinenfabrik GmbH v. Am. Hoist Derrick Co.*, 895 F.2d 1403, 1406 (Fed. Cir. 1990).

316

Highly Confidential – Outside Attorneys' Eyes Only

**a nonexistent or at best woefully incomplete understanding of the market and on an estimate of anticipated profits that bore no relation to <u>actual profits, Enlow having no knowledge of the latter.</u>** Enlow stated that courts do not consider actual net profits "in these [hypothetical negotiation] situations." That was said in disregard of *Trans-World Mfg. Co. v. Al Nyman Sons, Inc.*, 750 F.2d 1552, 1568, 224 USPQ 259, 269 (Fed. Cir. 1984). Enlow's calculation began with a 30% anticipated gross profit (though **Lindemann's brief admits at one point that <u>AmHoist's anticipated net profit was 15%</u>**). *See Radio Steel Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1557, 229 USPQ 431, 433 (Fed. Cir. 1986) (<u>**approving royalty based on expected net profit**</u>). Enlow's opinion that AmHoist "<u>**would agree to pay a royalty in excess of what it expected to make in [net] profit**</u>" was, in light of all the evidence in this case, absurd. *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081, 219 USPQ 679, 684-85 (Fed. Cir. 1983) (approving royalty that would leave reasonable profit). In view of the sparse and totally inadequate record Lindemann created at trial, we cannot say that Lindemann proved entitlement to an award greater than $10,000.[1142]

466.    Finally, Dr. Vellturo's citation to *Interactive Pictures* (as cited in *Aqua Shield v. Inter Pool Cover Team*), below, fails to cite the very next sentence in *Interactive Pictures* (in <span style="color:red">red</span>, below), cited in the Lawton Opening Report:

> [Dr. Vellturo's fn 1725] *. . . Interactive Pictures v. Infinite Pictures,* 274 F.3d 1371 (Fed. Cir. 2001) ("Interactive argues that *Lindemann Maschinenfabrik GmbH v. Am. Hoist Derrick Co.,* 895 F.2d 1403, 13 USPQ2d 1871 (Fed. Cir. 1990), compels a contrary result. We disagree. In that case we affirmed a district court's award of damages in derogation of the patentee's expert's testimony, which was based on estimates of the infringer's anticipated profits 'that bore no relation to actual profits.' *Id.* At 1407, 13 USPQ2d at 1875. *Lindemann* therefore supports the proposition that an actual infringer's profit margin can be relevant to the determination of a royalty rate in a hypothetical negotiation. *Id.* At 1407-08, 13 USPQ2d at 1875 (citing *Trans-World Mfg. Corp. v. Al Nyman Sons., Inc.,* 750 F.2d 1552, 1568, 224 USPQ 259, 269 (Fed. Cir. 1984))."). [1143]
>
> * * *
>
> [*Interactive Pictures*] Interactive argues that *Lindemann Maschinenfabrik GmbH v. Am. Hoist Derrick Co.,* 895 F.2d 1403, 13 USPQ2d 1871 (Fed. Cir. 1990), compels a contrary result. We disagree. In that case we affirmed a district court's award of damages in derogation of the patentee's expert's testimony, which was based on estimates of the infringer's anticipated profits "that bore no relation to actual profits." *Id.* at 1407, 13 USPQ2d at 1875. *Lindemann* therefore supports the proposition that an actual infringer's profit margin can be relevant to the determination of a royalty rate in a hypothetical negotiation. *Id.* at 1407-08, 13 USPQ2d at 1875 (citing *Trans-World Mfg. Corp. v. Al Nyman Sons, Inc.,* 750 F.2d

---

[1142] *Lindemann Maschinenfabrik GmbH v. Am. Hoist Derrick Co.*, 895 F.2d 1403, 1407-1408 (Fed. Cir. 1990).

[1143] Vellturo Rebuttal Report, ¶ 674 fn 1725 (pp. 329-330).

317

Highly Confidential – Outside Attorneys' Eyes Only

1552, 1568, 224 USPQ 259, 269 (Fed. Cir. 1984)). **However, *Lindemann* does not require that estimates of sales revenues, as referenced in a hypothetical negotiation at the time infringement began, must later bear a close relation to actual sales revenue. Such a proposition would essentially eviscerate the rule that recognizes sales expectations at the time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales.**[1144]

### c) Dr. Velluro's Criticisms are Rooted in his Improper *Hindsight-Based* Assessment

467.     In direct contravention to the foregoing fundamental principles, Dr. Vellturo repeatedly underscores that his criticisms are rooted in his methodologically improper *after-the-fact, hindsight*-based assessment—citing Moderna's "actual-world profits" and forecasts months *after* the May 31, 2020 hypothetical negotiation.  For example, Dr. Vellturo appears to concede that the outcome of the hypothetical negotiation in this case is, in fact, "sensitive to . . . [the] hypothetical negotiation date."[1145]  In addition, while Dr. Vellturo purports to accept the May 31, 2020 hypothetical negotiation date "as a simplifying assumption (here, and in my affirmative assessment in Section III, above)[,]"[1146] his criticisms are *not* based on Moderna's *expectations* as of May 31, 2020.  Instead, Dr. Vellturo makes clear that his criticisms are based on an *after-the-fact,* hindsight-based assessment when he states: "Ms. Lawton's . . . royalty rates are wildly inflated.  This can be made clear by **computing the effective revenue-percentage and profit-split royalties such rates would impose on Moderna <u>in the actual world</u>**."[1147]  Dr. Vellturo's improper reliance on Moderna's "*actual* world" results instead Moderna's *expectations* at the time of the May 31, 2020 hypothetical negotiation*,* as the Hypothetical Negotiation paradigm and methodology require, include the following:

   a)  "Perhaps even more strikingly, Ms. Lawton's $4.77 per dose rate for the pandemic phase translates to an effective 50% claim on **Moderna's <u>actual-world profits</u>** . . ."[1148]

---

[1144] *Interactive Pictures v. Infinite Pictures,* 274 F.3d 1371, 1385 (Fed. Cir. 2001).
[1145] Vellturo Rebuttal Report, ¶ 664.
[1146] Vellturo Rebuttal Report, ¶ 663.
[1147] Vellturo Rebuttal Report, ¶ 661 (emphasis added).
[1148] Vellturo Rebuttal Report, ¶ 662 (emphasis added).

318

Highly Confidential – Outside Attorneys' Eyes Only

b) "Ms. Lawton['s] . . . *dollars-per-dose* royalty amount [is] based on an improperly computed measure of Moderna's expected profit that **proved to be double what Moderna ultimately realized <u>in the actual world</u>**."[1149]

c) "Ms. Lawton's pandemic phase reasonable royalty rate of $4.77 per dose translates into a revenue-percentage rate of 23.5% **imposed on Moderna's <u>actual-world revenues</u> from infringing doses**."[1150]

d) "Indeed, as discussed in Section IV.G.2.b.i, <u>**between the time of the Hypothetical Negotiation and first recoded [sic – recorded] sale**</u> of the Accused Product, the reasonable estimates of the price Moderna would have expected . . . are variable, yet all still significantly below what Ms. Lawton claims—as demonstrated by the contemporaneous Moderna forecasting. Moreover, **these variations in contemporaneously forecasted price begin to <u>converge towards the actual prices</u> received for the accused units as time moves closer to the date of first recorded sale (December 2020)**."[1151]

e) "Indeed, has Ms. Lawton used the ████████████████████████████ **Moderna forecasted for its base case in its <u>September 2, 2020 Long Range Plan</u>** . . . as Moderna's expected price, this change alone would reduce Ms. Lawton's damages by more than 50 percent."[1152]

f) "**Moderna's lofty expectations** [in early 2020], to the extent they bore out, **<u>have to date been left largely unfulfilled</u>** as Moderna's market capitalization has fallen back to levels seen around the time of the Hypothetical Negotiation."[1153]

g) "Ms. Lawton's estimates of what Moderna would have expected . . . are ultimately demonstrated to be grossly excessive in light of the **<u>actual per-dose profits</u> Moderna has generated from its sales of COVID-19 vaccine to date**."[1154]

h) "Ms. Lawton's purported estimates are extremely aggressive—both with respect to what contemporaneous Moderna documents themselves imply, and also with respect to the **<u>actual profitability</u> ultimately realized by Moderna for those time periods**, . . ."[1155]

i) **"[I]nstead of applying her (flawed) 25% 'profit split' to the <u>actual profits Moderna generated via its alleged infringement (i.e., $9.53 per dose)</u>** . . . she applies this 25%

---

[1149] Vellturo Rebuttal Report, ¶ 660 (pp. 322-323) (emphasis added).
[1150] Vellturo Rebuttal Report, ¶ 661 (emphasis added).
[1151] Vellturo Rebuttal Report, ¶ 664 (emphasis added).
[1152] Vellturo Rebuttal Report, ¶ 664 (emphasis added).
[1153] Vellturo Rebuttal Report, ¶ 668 (emphasis added).
[1154] Vellturo Rebuttal Report, ¶ 674 (emphasis added).
[1155] Vellturo Rebuttal Report, ¶ 675 (emphasis added).

Highly Confidential – Outside Attorneys' Eyes Only

split to her contrived measure of Moderna's *expected* profits (i.e., $19.07 per dose), which **Moderna never realized—and arguably never expected—in the actual world**."[1156]

j) "Thus, at minimum, if Ms. Lawton believed a 25% profit split should be the reasonable royalty rate, **she should have simply applied it to Moderna's actual profits**."[1157]

### 2. Dr. Vellturo Mischaracterizes the Economic Significance of the COVID-19 "Window of Opportunity"

468. Dr. Vellturo mischaracterizes the economic significance of the COVID-19 "window of opportunity" based on Moderna's expectations at the time of the May 31, 2020 hypothetical negotiation. Dr. Vellturo asserts: "Ms. Lawton's conception of a 'window of opportunity' that implies more claimed value of a given patented invention boils down to the presence or absence of a commercial product on which the licensor is able to generate royalty revenues."[1158] Dr. Vellturo's contention is incorrect. This is because the evidence in this case clearly establishes that the "narrow window" of opportunity negated Moderna's potential to use *any* alternative. In fact, Moderna's projections in mid-May 2020 show that it *expected* that *any* delay (including one associated with attempting to implement an alternative) would have resulted in the loss of billions in profits—which establishes Moderna's willingness to pay ("WTP") (as the *Aqua Shield* court noted), another issue that Dr. Vellturo did not analyze. *See* III.C.5.

469. As the Federal Circuit has stated, a measure of the value of a patented invention is the difference between the infringer's *expected* profits using the claimed invention of the Patents-in-Suit v. the infringer's *expected* profits using its next best alternative ("NIA"), if any.[1159] As discussed above, Dr. Vellturo, does not identify *any* purported NIA or analyze the economic impact *assuming* Moderna would have (or could have) implemented *any* NIA, including the time and cost—and the profits Moderna would have lost—as a result of attempting to do so. In addition, Dr. Vellturo ignores Moderna's own forecasts *prior to* the May 31, 2020 hypothetical negotiation, which show

---

[1156] Vellturo Rebuttal Report, ¶ 741 (emphasis added).

[1157] Vellturo Rebuttal Report, ¶ 761.

[1158] Vellturo Rebuttal Report, ¶ 665 (emphasis added).

[1159] *Grain Processing Corp. v. Amer. Maize Prods. Co.*, 185 F.3d 1341, 1351 (Fed. Cir. 1999) ("[O]nly by comparing the patented invention to its next-best available alternative(s) . . . can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward[.]").

Highly Confidential – Outside Attorneys' Eyes Only

that Moderna did, in fact, *expect* that a ███████████████████ ██████—as discussed in the Lawton Opening Report:[1160]

> Moderna recognized the risk associated with *any* delay. Moderna recognized that there would be a "narrow window" of opportunity.[1161] As such, any delay was likely to be costly. For example, in mid-May 2020, Moderna projected that a █ ████████████████████████████████████████.[1162] In addition, Moderna understood this risk given its prior experience with both MERS and Zika where the epidemics fizzled out before the company had a product that was ready to commercialize. Ms. Bennett underscored the risk surrounding COVID-19 vaccine development at the time and testified: "I think a lot of people in public health had negative experiences from pandemic influenza in the past, where no matter how quickly you moved, you missed the epidemic, which meant you weren't able to have an impact on public health,"[1163] or achieve any revenue or return on investment.

---

[1160] Lawton Opening Report, ¶ 613.

[1161] Lawton Opening Report, ¶ 613 (*citing See, e.g.,* ███████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

[1162] Lawton Opening Report, ¶ 613 (*citing See, e.g.,* ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

[1163] Lawton Opening Report, ¶ 613 (*citing* MRNA-GEN-01724969-024, at 981 (December 19, 2023 30(b)(6) Deposition of Hamilton Bennett (*Moderna v. Pfizer*), 50:9-50:14.).).

321

Highly Confidential – Outside Attorneys' Eyes Only

470. Dr. Vellturo also ignores Dr. Benenato's testimony in this case that "[w]hen COVID hit," Moderna had "zero option . . . to be able to respond to the pandemic in the speed that it did."[1164]

471. Instead, Dr. Vellturo ignores the foregoing evidence and attempts to shift the focus of the analysis *from* **Moderna's profit expectations** by *infringing* v. its profit expectations by adopting a purported NIA (as required under the hypothetical negotiation paradigm) *to* the nebulous reference to "the presence or absence of a commercial product on which the **licensor** [Genevant] is able to generate royalty revenues," which appears to suggest but does *not* directly address the infringer's NIA calculus. Instead, Dr. Vellturo continues to assert—without any analysis of the economic impact (*i.e.,* profits lost) from *actually* adopting any purported NIA—that "based on my understanding from Dr. Prud'homme, non-infringing alternatives in the form of molar ratios different than those of Moderna's v1 and v2 formulations were available at least as early as September 2017 as well as in 2019."[1165] While Dr. Vellturo continues to assert that NIAs were purportedly available, he does *not* analyze the profits Moderna would have lost in attempting to actually develop and implement *any* alleged NIA as of May 31, 2020—or acknowledge the fact that Moderna did *not* have any alleged NIA ready to go on May 31, 2020.

472. Dr. Vellturo also asserts that "Moderna should have offsetting leverage over Plaintiffs because Moderna could threaten to disrupt Plaintiffs' best opportunity for a large monetization of their claimed invention."[1166] This contention appears to ignore that all relevant information would be known to both parties to the May 31, 2020 hypothetical negotiation—which means that Genevant would *know* that Moderna expected that a ███████████████████████████████. As such, as the hypothetical negotiation requires, Genevant would consider the value of the claimed invention of the Patents-in-Suit to *Moderna* at that time v. any purported NIA—and would negotiate based on the *expected* value to Moderna. This is in contrast to Dr. Vellturo's unsupported assertion that "according to Ms. Lawton, Plaintiffs would fearlessly (and unscrupulously) lever the claimed urgency of a global health catastrophe in order to extract more in royalties (from Moderna) than would be reflected in the actual 'footprint' of the Plaintiffs' claimed inventions."[1167] No party is trying to "lever the claimed urgency of the global health catastrophe" to extract anything; the

---

[1164] Lawton Opening Report, ¶ 614 (*citing* May 17, 2024 30(b)(6) Deposition of Kerry Benenato, Ph.D., 69:6-69:7.).

[1165] Vellturo Rebuttal Report, ¶ 667.

[1166] Vellturo Rebuttal Report, ¶ 666.

[1167] Vellturo Rebuttal Report, ¶ 666.

Highly Confidential – Outside Attorneys' Eyes Only

entire exercise here is determining how the parties would have agreed to split the expected profit at the time. Surely, Dr. Vellturo is not suggesting that Moderna should itself be allowed to "lever the claimed urgency of the global health catastrophe" to keep almost all of the profits itself for technology that was taken without a license, yet that is the implication of his opinions.

### 3. Dr. Vellturo Disagrees with My Opinion Regarding Moderna's Expectations as of May 31, 2020

473. Dr. Vellturo acknowledges that Moderna's . . . expectations on and around the date of the Hypothetical Negotiation" were "widely variable and rapidly evolving."[1168] Dr. Vellturo then spends nine (9) pages[1169] attempting to argue that I purportedly "concoct[ed] unrealistic 'expectations' that Moderna never held" and my analysis of Moderna's expectations "consists of an amalgamation of *aspirational* pricing and Ms. Lawton's own incorrect profitability computations."[1170] Dr. Vellturo further asserts that I purportedly "compute[] ad hoc and economically unmeaningful 'estimates' of what per-dose profits Moderna would have purportedly expected as of the Hypothetical Negotiation, and entirely ignores evidence—both from contemporaneous documents and as corroborated from subsequent actual data—that her purported 'expectations' are massively overstated."[1171] I disagree.

474. In this section, Dr. Vellturo repeats his prior criticisms in Section IV.G.—and presents "Figure 15: Lawton Pandemic Phase Per-Dose Profit Benchmarks" which includes only "Forecast" as of "May 20 [2020] Pro Forma" and "Actuals."[1172] However, neither of these are reflective of Moderna's *expectations* as of *May 31, 2020,* in view of the fact that Moderna's *pandemic* expectations were **"rapidly evolving."**[1173] As discussed above, my pandemic pricing expectation is based on Moderna's *approved* mRNA-1273 pricing. *See* IV.D.3.a)

475. With respect to Moderna's *endemic* profit expectations, Dr. Vellturo appears to agree that "Moderna's projections for the endemic phase were still a work in progress at the time [of the May

---

[1168] Vellturo Rebuttal Report, ¶ 671.
[1169] Vellturo Rebuttal Report, ¶¶ 671-685 (pp. 328-336).
[1170] Vellturo Rebuttal Report, ¶ 685.
[1171] Vellturo Rebuttal Report, ¶ 673.
[1172] Vellturo Rebuttal Report, ¶ 677.
[1173] Vellturo Rebuttal Report, ¶ 671.

Highly Confidential – Outside Attorneys' Eyes Only

31, 2020 hypothetical negotiation]."[1174]   However, Dr. Vellturo asserts: "Ms. Lawton fails to acknowledge that all she is doing here is comparing one 'upside' scenario price to another, or to explain how this selectively culled price provides meaningful insight into what prices Moderna would have *realistically* expected to receive for its endemic phase doses.[1175] . . . Thus, Ms. Lawton assumes that when forecasting its profitability per endemic phase dose as part of a hypothetical per-unit royalty consideration, Moderna would rely exclusively on its most optimistic upside forecasts.  This assumption defies economic logic."[1176]   I disagree and note that Dr. Vellturo is mischaracterizing my analysis.  In both the text and in a footnote, Dr. Vellturo addresses the evidence that I cite in support of my endemic pricing.[1177]   Dr. Vellturo, however, fails to acknowledge the context and the fact that the evidence cited in the Lawton Opening Report clearly establishes that *from the beginning*, Moderna expected to achieve a significantly *higher* per dose price during the endemic phase.  In fact, this evidence shows that Moderna's May 31, 2020 *endemic* pricing *expectations* were significantly *higher* than the $44 to $60/dose endemic price[1178] used in my reasonable royalty analysis.  For example:

### a) Moderna's Endemic Pricing Expectations as of <u>May 29, 2020</u> was in the range of $45 to $60/dose

476.  Moderna's May 29, 2020 "mRNA-1273 pricing workstream" establishes that it was analyzing *pandemic* pricing v. *post-pandemic* (*i.e.,* endemic) pricing, as shown in **Figure 4.9**,[1179] below, which summarizes "learnings" associated with "EUA for vax/tx" for "Post-pandemic pricing," as **"Increases of ~50%-100% above pandemic prices observed, including government contracts."**  Applying a 50% to 100% price increase to Moderna's $30/dose *pandemic* phase price in the May 31, 2020 offer, results in an estimated *endemic* phase price in the range of $45 to $60 per dose.

---

[1174] Vellturo Rebuttal Report, ¶ 682.

[1175] Vellturo Rebuttal Report, ¶ 681.

[1176] Vellturo Rebuttal Report, ¶ 682.

[1177] Vellturo Rebuttal Report, ¶ 681, fn 1749.

[1178] Lawton Opening Report, ¶ 1353.

[1179] Lawton Opening Report, ¶ 1336 (*citing* MRNA-GEN-02193029-122, at 039 ("mRNA-1273 pricing workstream," *Moderna,* May 29, 2020, Slide 11 of 94) ("Learnings from study of the COVID 19 landscape and relevant comparables will be used to set 'guard rails' for our pricing strategy").).

324

Highly Confidential – Outside Attorneys' Eyes Only

Objective **2**

## Learnings from study of the COVID19 landscape and relevant comparables[1] will be used to set 'guard rails' for our pricing strategy

| | Pandemic-phase pricing | Post-pandemic pricing | Examples | Implications |
|---|---|---|---|---|
| **EUA for dx** | Diagnostics priced in line with non-pandemic portfolio | TBD | Roche, Abbot SARS-CoV2 Dx | *Discount for pandemic use vs. licensed products not observed* |
| **EUA for vax/tx** | Base price set during EUA, often accompanied by a limited volume of donated doses | Increases of ~50%-100% above pandemic prices observed, including government contracts | Rapivab, Hydroxychloroquine | *Post-EUA pricing increases have been observed* |
| **Pandemic flu vax** | Pandemic flu vaccines priced similarly to seasonal flu | N/A | Sanofi, GSK 2009 H1N1 Vax | *Seasonal flu appears to have set a benchmark for pandemic flu pricing* |
| **Seasonal flu vax** | N/A | Prices increased with improvements (e.g. high dose) in markets that support premium pricing | Fluad, Fluzone | *Improvements in efficacy can drive price increases in some markets, e.g. US* |
| **Innovative vax** | N/A | Price at launch set near US cost-effective price with gradual increases observed over time | Prevnar, Gardasil | *Prices at launch appear to be set with the goal of achieving ACIP recommendation and then increased over time* |

1) Summary of considered comparables can be found in the following slides with additional details found in the appendix

11

SENSITIVE CONTENT – DO NOT DISTRIBUTE
Confidential and Proprietary

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

MRNA-GEN-02193039

**FIGURE 4.9**

325

Highly Confidential – Outside Attorneys' Eyes Only

### b)    Moderna's Endemic Pricing Expectations as of <u>June 15, 2020</u> was $115/dose

477.    Moderna's June 15, 2020 "Recommended Pricing" shows that Moderna expected a *lower* price during the *pandemic* phase (*i.e.,* $30/dose)[1180] and a significantly *higher* price during the later *endemic* phase (*e.g.,* $115/dose).[1181]

---

[1180] Lawton Opening Report, ¶ 1228 (*citing See* MRNA-GEN-02645690-752 at 691 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 2 of 64); May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 412:18-414:11 ("Q. . . . If we can look at page 2, Bates ending in 691 [of Hoge Deposition Exhibit No. 46], you see it says, 'Context for COVID vaccine Environment'? A. Mm-hmm. Q. And then in the middle it says, 'USG 100 million doses negotiation at $30 per dose have not concluded yet.' Do you see that? A. Mm-hmm. Q. So you're still offering $30 a dose, but negotiations have not concluded yet, right? A. Yeah, I actually think that they were essentially paused in June, and taken back up in August, as it says in the e-mail exchange we looked at before. So, yes, they had not been concluded. I don't even know that they were that active at that point. Q. It then says, 'We have had some early wins with' -- A. Yes. Q. And then it says, ████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████ MRNA-GEN-02645686-689, at 687 (June 7, 2020 Memorandum from Lori Henderson to Moderna Board of Directors; Moderna EX; Re: Summary of 6/4/20 COVID Committee Meeting," p. 2 of 4) ("Order Process and Update – *USG*: We have received a draft contract from the USG – DOD for purchase of up to 300M doses of mRNA-1273.  More details on this contract will be available early this week. . . . *Price*: **Initial price per dose of $30/dose expected** to be increased to $35/dose after release of the full Phase 1 data. . . ." (emphasis added)); MRNA-GEN-02651213-245, at 222 (June 25, 2020 Moderna "Manufacturing update" deck); MRNA-GEN-01570975-1159, at 030 (Thomas Deposition Exhibit No. 24 – "2020 Long Range Plan," *Moderna,* September 2, 2020, Slide 56 of 186) ("Contractual considerations: Moderna's risk tolerance compared to big pharma limited initial competitiveness . . . **June – July initial position – Price[:] Price per dose ≥ 2-9x competitors . . .**" (emphasis added));  MRNA-GEN-01122003-088, at 009 (Bennett Deposition Exhibit No. 29 – "Volume II: Cost Proposal, Solicitation Number: W911QY20R0043," *Moderna,* July 10, 2020, PDF p. 7 of 88) (emphasis added); *see also id.* ("Given the anticipated USG investment in the advanced development of mRNA-1273 under BARDA contract 75A50120C00034, Moderna found it reasonable to further discount the MOU price.  Based on the revised scope of the development program, the expectation is that the contract cost will increase to a total value of $952M.  Furthermore, we estimate the value of the services of NIAID during Phase 1-3 of the development of mRNA-1273 to equate to $55M.  Applying the total estimated USG financial support as a credit against CLIN 001 [sic], result in a price of $19.93 for CLIN 0001.  **More specifically for CLIN 0001**: Starting with **comparable pricing under existing agreements for supply of mRNA-1273** of US$30/dose for ex-factory bulk drug product, *which we previously quoted to the USG,* Moderna

Highly Confidential – Outside Attorneys' Eyes Only

c)      **Moderna's *Public Statements* Regarding Endemic Pricing as of** **August 5, 2020** **was "in line with other innovative commercial** **vaccines"**

478.    On August 5, 2020, Moderna stated: "Approach to <u>delivering</u> value during the COVID-19 pandemic" was to "Price well below vaccine value during the pandemic,"[1182] which was "$32-37 / dose" for "smaller volume agreements" and **"Price in-line with other innovative vaccines"** **during the Endemic phase.**[1183]    During Moderna's August 5, 2020 earnings call, Mr. Bancel outlined its pandemic and endemic pricing strategy for analysts and investors as follows:

> **In endemic period**, pricing considerations will follow traditional dynamics and market forces including vaccine efficacy and the competitive landscape. **We will** **look to price in line with <u>other innovative commercial vaccines</u>.** We expect

---

deducted a discount of $10.07 ($1.007B/ 100M) resulting in a price of $19.93 per dose." (**bold** emphasis in original; *italics* underlined emphasis added)); HHS-0000828-830 (Bennett Deposition Exhibit No. 21 – May 31, 2020 letter from Stéphane Bancel to Dr. Moncel Slaoui (Warp Speed/HHS), General Gustave F. Perna (Warp Speed/HHS), Dr. Gary Disbrow (BARDA));  MRNA-GEN-01900098 (May 31, 2020 Email from Hamilton Bennett to Robert Johnson (HHS) Subject: mRNA-1273 Supply Agreement); Plaintiff Genevant Sciences GmbH's Eleventh Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (Nos. 1-7) dated June 7, 2024, p. 71 ("It is further an act of infringement for Moderna to offer to sell the Accused Product. Based on Plaintiffs understanding of discovery to date, Moderna first made an offer to sell the Accused Product to the United States Government on May 31, 2020."). MRNA-GEN-02645690-752 at 697-698 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slides 8-9 of 64).).

[1181] Lawton Opening Report, ¶ 1228 (*citing* MRNA-GEN-02645690-752 at 695 (Hoge Deposition Exhibit No. 46 – "Board Meeting – CEO Update," *Moderna,* June 15, 2020, Slide 6 of 64).  *See also* Ned Pagliarulo, "Moderna sets high price in early coronavirus vaccine supply deals," *Biopharma Dive,* August 5, 2020, *available at* https://www.biopharmadive.com/news/moderna-coronavirus-vaccine-price-dose/582947/ ("Like other companies, including Pfizer, Moderna is considering two prices for its vaccine: one for during the pandemic, and another for when the immediate crisis subsides but the virus remains endemic.  At that point, Moderna would price the shot 'in-line' with other newly approved vaccines, Bancel said Wednesday. The company suggested the vaccine's value would correspond to between $300 and $725 per two-dose vaccine course, according to a cost-effectiveness model shared by Moderna.").).

[1182] Lawton Opening Report, ¶ 494 (*citing* "Business Updates and Second Quarter 2020 Financial Results," *Moderna,* August 5, 2020, Slide 25 of 34, *available at* https://static.seekingalpha.com/uploads/sa_presentations/674/58674/original.pdf.).

[1183] Lawton Opening Report, ¶ 494 (*citing* "Business Updates and Second Quarter 2020 Financial Results," *Moderna,* August 5, 2020, Slide 26 of 34, *available at* https://static.seekingalpha.com/uploads/sa_presentations/674/58674/original.pdf.).

Highly Confidential – Outside Attorneys' Eyes Only

traditional approaches to vaccine purchases and distribution in the endemic phase.[1184]

. . .

The other dimension of course is duration of protection, which obviously will take time for all the vaccine manufacturers to really understand at large scale in the clinical setting. Because you heard us say, we believe as many of the health experts believe virus is not going away. We believe there's going to be an endemic market once the pandemic is declared over by the WHO. Duration would be an important factor. As you can appreciate, if vaccine provides one year protection, versus six months, versus two years, versus three years, that will all play into the equation. So, those are some of the factors that we will carefully think about, again, both in the pandemic setting where we said, we will make sure that we price a product at a big discount to value, and **in the endemic setting, when we look at all this different product performance, and market forces to determine what we believe is the most optimal price for the product.**[1185]

---

[1184] Lawton Opening Report, ¶ 872 (*citing* "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q2 2020 Results – Earnings Call Transcript," *Seeking Alpha,* August 5, 2020, p. 11 of 36, *available at* https://seekingalpha.com/article/4364866-moderna-inc-mrna-ceo-stephane-bancel-on-q2-2020-results-earnings-call-transcript (Stéphane Bancel, CEO).) (emphasis added).

[1185] Lawton Opening Report, ¶ 872 (*citing* "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q2 2020 Results – Earnings Call Transcript," *Seeking Alpha,* August 5, 2020, pp. 27-28 of 36, *available at* https://seekingalpha.com/article/4364866-moderna-inc-mrna-ceo-stephane-bancel-on-q2-2020-results-earnings-call-transcript (Stéphane Bancel, CEO).) (emphasis added). *See also* ¶ 1348 (*citing* "Business Updates and Second Quarter 2020 Financial Results," *Moderna,* August 5, 2020, Slides 22-23 of 34, *available at* https://static.seekingalpha.com/uploads/sa_presentations/674/58674/original.pdf ("Approach to assigning value to a COVID-19 pandemic vaccine"); Ned Pagliarulo, "Moderna sets high price in early coronavirus vaccine supply deals," *Biopharma Dive,* August 5, 2020, *available at* https://www.biopharmadive.com/news/moderna-coronavirus-vaccine-price-dose/582947/. *See also* "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q2 2020 Results – Earnings Call Transcript," *Seeking Alpha,* August 5, 2020, p. 11 of 36, *available at* https://seekingalpha.com/article/4364866-moderna-inc-mrna-ceo-stephane-bancel-on-q2-2020-results-earnings-call-transcript (Stéphane Bancel, CEO: "On slide 25, I want to share our approach to delivering value during the COVID-19 pandemic. During this pandemic and from the development process of a mRNA-1273, our promise to deliver for patients has never been clearer. We have a responsibility to do everything we can to develop a safe and effective vaccine. We have invested in manufacturing at risk, ahead of approval to ensure supply, if our COVID-19 vaccine candidate is approved. We are working with governments around the world and others to ensure the vaccine is accessible regardless of ability to pay. And we will be responsible on price, well below value during the pandemic. Let me now turn to slide 26 and give you some more specifics. First, as we thought about responsible pricing, we concluded it is important to consider different time horizons. We are currently under a pandemic as defined by the WHO. At Moderna, like many public health experts, we believe that SARS-CoV-2 virus is not going away, and that there will be a need to vaccinate people or give them a boost for many years to come.

328

Highly Confidential – Outside Attorneys' Eyes Only

> **d)** **Moderna's Endemic Pricing Expectations as of <u>August 5, 2020</u> was \$230-\$640/dose (*i.e.,* "in line with other innovative commercial vaccines")**

479. On the same day (August 5, 2020), Moderna summarized its "Vaccine against COVID-19 (mRNA-1273) pricing strategy" in **Figure 4.10,**[1186] below, from an internal presentation which shows that "Average sales price/course for **innovative vaccines (PREVNAR, GARDASIL): \$230-\$640**[.]"[1187]

---

So, we think about two time horizons, the pandemic period as defined by WHO, and the endemic period. During the pandemic period, we are priced well below value with pre-approval supply agreements mostly to governments. To-date, smaller volume agreements have "been executed between \$32 and \$37 per dose. Larger volume agreements, under discussion, will be at a lower price for higher volumes. **In endemic period, pricing considerations will follow traditional dynamics and market forces including vaccine efficacy and the competitive landscape. We will look to price in line with other innovative commercial vaccines. We expect traditional approaches to vaccine purchases and distribution in the endemic phase.**" (emphasis added)).).

[1186] Lawton Opening Report, ¶ 1227 (*citing* MRNA-GEN-01642889-921, at 911 ("Town Hall," *Moderna,* August 5, 2020, Slide 23 of 33) ("Vaccine against COVID-10 (mRNA-1273) pricing strategy").).

[1187] Lawton Opening Report, ¶ 1227 (*citing* MRNA-GEN-01642889-921, at 911 ("Town Hall," *Moderna,* August 5, 2020, Slide 23 of 33) ("Vaccine against COVID-10 (mRNA-1273) pricing strategy").).

Highly Confidential – Outside Attorneys' Eyes Only



**FIGURE 4.10**

**4.      Dr. Vellturo Disagrees with My Opinion that the May 29, 2013 Tekmira Term Sheet Establishes a Floor for the Hypothetical Negotiation**

480.    In this 7-page sub-section,[1188] Dr. Vellturo refers back to his prior discussion in the Market Approach section[1189]—which I addressed above.  *See* IV.C.2.a).  Dr. Vellturo also refers to his discussion of "Ms. Lawton's patent valuation principles"[1190]—which I also addressed above.  *See* IV.C.

481.    With respect to my opinion that the "[May 29,] 2013 Tekmira Term Sheet would serve as an 'absolute lower bound' on the reasonable royalty resulting from the Hypothetical Negotiation does not withstand elementary scrutiny.  It strains credulity to assume that Moderna would view an offer that they rejected as representing a floor on royalties—indeed the fact that Moderna rejected

---

[1188] Vellturo Rebuttal Report, ¶¶ 686-704 (pp. 336-342).

[1189] Vellturo Rebuttal Report, ¶ 690 (*citing* "*See* Section IV.F.2, above."); ¶ 692 (*citing* "*See* Section IV.F.2, above.").

[1190] Vellturo Rebuttal Report, ¶ 696 (*citing* "*See* Section IV.D.1.b, above").

Highly Confidential – Outside Attorneys' Eyes Only

the offer is sufficient proof that they viewed the royalties as 'too high' at the time."[1191] I disagree. Dr. Vellturo's contention does not have merit because it fails to recognize that Moderna was only able to "reject[] the offer" because of Acuitas' breach of contract. *But-for* Acuitas' breach of contract, Moderna could *not* "reject[] the offer." As discussed above, Dr. Vellturo ignores the series of overhangs that it helped to create—that adversely impacted Genevant's licensing.

### 5. Dr. Vellturo Disagrees with My Apportionment Analysis

482. In this 16-page sub-section,[1192] Dr. Vellturo asserts again urges his *de facto* Established Royalty and argues: "Ms. Lawton assembles multiple misguided threads in hopes of supporting her extraordinary, dollar-per-unit reasonable royalty rate based on a 'profit split' between Plaintiffs and Moderna in lieu of a revenue-percentage royalty observed throughout Plaintiffs' licensing history of the Patents-in-Suit."[1193] Dr. Vellturo further claims that "the reasonable royalty exercise should be driven [] by the narrow band of royalties established by Plaintiffs' historical licenses granting rights to the Patents-in-Suit[.]"[1194] Dr. Vellturo continues to propound his view that Genevant's purportedly "Historical Comparable Licenses" reflect benchmarks—without acknowledging that Moderna's long-standing challenges to validity and infringement of the Patents-in-Suit and the resulting overhangs render these agreements tainted and *not* probative in the determination of the reasonable royalty in this case—together with the fact that *none* of the agreements are economically comparable to the May 31, 2020 hypothetical negotiation. By contrast, my approach is consistent with these differences in economic circumstances, looking to those agreements as background to understanding how the parties would reach a profit split, but not directly taking a rate from agreements reached under fundamentally different economic circumstances.

483. Dr. Vellturo again urges his *de facto* Established Royalty theory when he asserts that given "the presence of extensive revenue-percentage licensing history by the patentee of the patents-in-suit" "profit splitting" should not be "the default approach to the hypothetical negotiation exercise" in this case.[1195] In making this argument, Dr. Vellturo ignores the fact that every license agreement

---

[1191] Vellturo Rebuttal Report, ¶ 692.
[1192] Vellturo Rebuttal Report, ¶¶ 705-737 (pp. 342-357).
[1193] Vellturo Rebuttal Report, ¶ 705.
[1194] Vellturo Rebuttal Report, ¶ 707.
[1195] Vellturo Rebuttal Report, ¶ 709.

331

Highly Confidential – Outside Attorneys' Eyes Only

entails a sharing of the anticipated profits (*i.e.,* a profit split)—whether expressed as a percentage of revenue *or* an amount per unit.  For example, Mr. Francis testified: **"[R]oyalties . . . [are] a sharing of profit"**[1196] and further testified: **"royalties are a form of sharing profits, whether it's a percentage of sales or percentage of profits."**[1197]  Dr. Vellturo incorrectly contends that a "percentage-of-sales royalty" and a "profit split" are mutually exclusive and attempts to impugn the routine conversion of "revenue-percentage terms specified therein to implied 'profit share' amounts" as a "needlessly circuitous path" which he claims results in "inflated so-called 'markers of value.'"[1198]  I disagree with Dr. Vellturo's contentions.

484.  Dr. Vellturo asserts that my apportionment analysis is "incorrect both as a matter of economics" and "as a technical matter."[1199]  I disagree.  As a technical matter, I have relied on the assessment of Plaintiffs' technical experts to estimate the value attributable to the Patents-in-Suit.  I understand that in reaching their conclusions on the value of the Patents-in-Suit and apportionment, Dr. Mitchell and Dr. Porter considered the value of the non-patented elements, including all of the elements (such as alleged contributions by Moderna) identified in Moderna's damages contentions and expert reports.[1200]  I have then applied their technical conclusions about the relative value of

---

[1196] Lawton Opening Report, ¶ 407 (*citing* MRNA-GEN-01726934-7000, at 973 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 158:14-158:23.).).

[1197] Lawton Opening Report, ¶ 406 (*citing* MRNA-GEN-01726934-7000, at 973 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 157:8-157:10.  *See also* 157:2-157:23 ("Q. Okay.  Well, let me change the statement.  You would agree that it is common in the pharmaceutical industry to license technology for royalties without profit sharing arrangements, correct?  . . . A. I disagree, again, because royalties are a form of sharing profits, whether it's a percentage of sales or percentage of profits.  So it is – profit is revenue minus certain costs.  It is ultimately a different – you're getting certain cash flows off the commercialization activities that are occurring.  So I generally can't tell you what common is because it is not – in our industry, if you look at the last ten years, there's been many co-development, co-commercialization activities.  Co-commercialization, they can take any form.  Again, you can have the formula as a profit split or royalty that essentially inures to a profit split, whatever the parties feel that they would – that they're putting forward is worth."))).).

[1198] Vellturo Rebuttal Report, ¶ 712 ("At the same time, when determining her reasonable royalty form, Ms. Lawton ignores the *numerous* instances (listed in her Table 6.7 or otherwise) where Plaintiffs licensed the actual Patents-in-Suit for a percentage-of-sales royalty amount rather than a profit split.").

[1199] Vellturo Rebuttal Report, ¶ 732.

[1200] *See* Opening Export Report of Dr. Michael Mitchell Sec. XV; Reply Expert Report of Dr. Michael Mitchel Sec. XVII; Opening Expert Report of Dr. Frederick W. Porter Sec. V; Reply Report of Dr. Frederick W. Porter Secs. IV-VI.

Highly Confidential – Outside Attorneys' Eyes Only

the Patents-in-Suit to my economic analysis as part of my consideration of the outcome of the hypothetical negotiation.

485.  Dr. Vellturo's criticism of my apportionment of the value with respect to delivery is based on the opinion of Dr. Prud'homme that "the Patents-in-Suit provided little advantage in solving for effective mRNA delivery."[1201]  I understand that Dr. Mitchell disagrees, and that Dr. Mitchell has opined that the "Patents-in-Suit drive the value of the delivery component of the vaccine."  I understand Dr. Mitchell has also opined that by contrast, "the other delivery concepts identified by Drs. Prud'homme and Meulien *do not meaningfully add to the value of the delivery component.*"  This directly supports my apportionment approach.

486.  My analysis is conservative because I only rely on the value the Patents-in-Suit contribute to delivery.  In reality, I understand from Dr. Mitchell that "while the Patents-in-Suit are critical to the delivery of the vaccine payload, their value *is not limited to the delivery component*," but also contributes to the overall efficacy of the vaccine through "'increased activity of the encapsulated nucleic acid,' 'improved tolerability of the formulations in vivo,' and 'a significant increase in the therapeutic index as compared to nucleic acid-lipid particle compositions.'"[1202]  Moderna's representations to the FDA confirm that the Patents-in-Suit's contributions were not limited to delivery, explaining:

> mRNA that is not encapsulated in lipid nanoparticles is subject to rapid degradation by RNases in the body.  RNA Encapsulation of mRNA in LNPs *is required for cellular uptake and functionality*
>
> ….
>
> Individual and total lipid content is an important determinant of biological performance.  Lipids must be present at expected levels in order to assure the correct structural organization of the mRNA-containing LNP in subsequent downstream manufacturing steps and the resultant biological performance of the final DP.[1203]

487.  I also conservatively only apportion 50% of the value to the Patents-in-Suit, even though Dr. Porter concluded that the "mRNA technology Moderna has identified, including in the Cellscript Agreement, the NIAID Agreement, and Moderna's own patents, made a far less significant

---

[1201] Vellturo Rebuttal Report, ¶ 733.
[1202] Reply Expert Report of Dr. Michael Mitchell Sec. XVII.
[1203] MRNA-GEN-00039116-168 at -120, -152 (Justification of Specification Section of Moderna's BLA).

333

Highly Confidential – Outside Attorneys' Eyes Only

contribution to the safety or efficacy of Moderna's COVID-19 vaccine than Plaintiffs' LNP technology in the Patents-in-Suit."[1204]  Dr. Mitchell likewise opined that "the delivery vehicle is at least valuable, *if not more valuable*, than the payload."[1205]

488.  The ultimate output of my analysis is a profit split, which serves as an additional layer of apportionment.  Moderna only owes its share of a royalty on proceeds after costs are accounted for, which means the value associated with those costs has been excluded from the reasonably royalty.  Those costs would cover the non-inventive components of the product.

489.  Dr. Vellturo suggests that my apportionment analysis is "inconsistent" with my review of other licenses, because some have "implied 'profit splits' of just 11-13%."[1206]  But that simply repeats the same error of analysis that infects his own damages model—looking to the rates used in so-called "historical" licenses without regard to circumstances like the stage of development, field of use, negotiating positions of the parties, and a host of other relevant factors that I discuss in my opening report,[1207] as well as in addressing Dr. Vellturo's model above.  See III.A.4.

490.  The need to consider those factors is also one of the flaws in Dr. Vellturo's next critique, wherein he contends that it was inappropriate to derive rates from agreements that he says involved assets with "far broader value than the Patents-in-Suit."[1208]  Dr. Vellturo fails to account for the lack of the assumption of infringement and validity in these other agreements, which is a counter-balancing factor for the broader scope.  He also ignores provisions in the license agreements that expressly concern the compensation for know-how and other non-patent assets, as discuss above.  See III.A.5.f.2.  Dr. Vellturo ignored the individual factors affecting those agreements, as well as the factors that would affect the hypothetical agreement between Genevant and Moderna.  By

---

[1204] Opening Expert Report of Dr. Frederick W. Porter ¶ 41; *see also* Reply Expert Report of Dr. Frederick W. Porter Sec. VI.

[1205] Opening Expert Report of Dr. Michael Mitchell ¶ 791.

[1206] Vellturo Rebuttal Report, ¶ 734.

[1207] Lawton Opening Report Sec. IV.C.3.

[1208] Vellturo Rebuttal Report, ¶ 736.  Dr. Vellturo also accuses me of using metrics that "are not related to the Patents-in-Suit whatsoever."  *Id.*  He does not expound on his meaning, which I understand to be a reference to agreements that include foreign counterparts to the Patents-in-Suit, but may not grant rights to the Patents-in-Suit themselves.  However, I understand that Dr. Mitchell has opined that the foreign patents licensed in these agreements are technically "highly comparable" to the Patents-in-Suit.  *See* Reply Expert Report of Dr. Michael Mitchell Sec. XVIII.B.

334

Highly Confidential – Outside Attorneys' Eyes Only

contrast, my approach considered those factors, and assessed "the value of Moderna's 'use of the patented invention, in comparison with alternatives' and how that value would be divided between the parties by 'recreat[ing] the *ex ante* licensing negotiation scenario and [] describe[ing] the resulting agreement.'"[1209]  Moreover, Dr. Vellturo's critique about the value of the Genevant IP other than the Patents-in-Suit is incorrect for the reasons I describe above.  See III.A.5.f.3.

491.    Dr. Vellturo claims that I have failed to consider the IP assets that Moderna owned and would have brought to the hypothetical negotiation, which he characterizes as "far greater/broader assets . . . relative to Genevant's other historical licensees.[1210]  First, I did consider what Moderna was bringing to the hypothetical negotiation—both in my reliance on technical experts, who considered the IP assets Moderna identified in its interrogatory response and expert reports, and in my resulting profit split, which assigns the majority of the profit to Moderna.  Moreover, Dr. Vellturo offers no evidence in support of his claim that Moderna's assets were "far greater/broader" than other licensees, which included prominent pharmaceutical companies like Takeda Pharmaceuticals, which was twice Moderna's size at the time of the hypothetical negotiation.[1211]  Moreover, I understand from Drs. Mitchell and Porter that the Moderna patents identified in Moderna's contentions and expert reports do not have significant value over the prior art.[1212]  I also understand that the Patent Trial and Appeal Board of the United States Patent and Trademark Office recently held all challenged claims of two of Moderna's patents which Dr. Meulien had identified as valuable—U.S. Patent Nos. 10,702,600 and 10,933,127—to be unpatentable as obvious.[1213]

492.    Dr. Vellturo also suggests that Moderna's "other investments in development & commercialization," discussed in his consideration of *Georgia-Pacific* Factor 13, must be considered as part of the apportionment analysis.[1214]  In particular, Dr. Vellturo points to

---

[1209] Lawton Opening Report, ¶ 1306.

[1210] Vellturo Rebuttal Report, ¶ 736.

[1211] As of May 31, 2020, Takeda had a market cap of $53.3 billion, https://companiesmarketcap.com/takeda-pharmaceutical/marketcap/, and Moderna had a market cap of $22.8 billion, https://companiesmarketcap.com/moderna/marketcap/.

[1212] *See* Opening Expert Report of Dr. Frederick W. Porter ¶¶ 60-66; Opening Expert Report of Dr. Michael Mitchell ¶ 793.

[1213] IPR2023-01358; IPR2023-01359.

[1214] Vellturo Rebuttal Report, ¶¶ 736, 806-807.

335

Highly Confidential – Outside Attorneys' Eyes Only

"approximately $1.6 billion" in R&D investments made by Moderna by the time of the hypothetical negotiation, which he says "put Moderna in a position to respond quickly and effectively to the COVID-19, becoming the first company to begin clinical trials for a COVID-19 vaccine in the United States."[1215]  First, I did consider Moderna's investments. For example,my reasonable royalty opinion based on the Analytical Method is a profit split based *excess profits*, which is only calculated after *all* of Moderna's costs (including Moderna's investments *and* a return on those investments)—*and* Moderna's expected profits (based on Moderna's July 2020 submission to the U.S. Government)—have been accounted for (*i.e.,* subtracted from revenue), and which thereby credits Moderna with a significant share of the profits.  My hypothetical negotiation approach analysis also accounts for Moderna's R&D (and SG&A) in calculating Moderna's expected Adjusted Profit /Dose as of May 31, 2020 of $19.07/dose.[1216] As such, *both* of my reasonable royalty rate calculations (*i.e.,* under the Analytical Method and the Hypothetical Negotiation Approach) account for Moderna's investment.  Dr. Vellturo's argument that Moderna's investment—which is already accounted for in *both* of my royalty rates calculation--is a justification for an even greater share is both inappropriate for two reasons.  First, Dr. Vellturo is attempting to get *double* credit for Moderna's R&D, which has already been accounted for in my reasonable royalty rate calculations.  Second, it would give Moderna a windfall based on investments largely made by the taxpayer, not Moderna.  As discussed in my opening report, the U.S. government, through agencies including  BARDA, invested over $1.7 billion to accelerate Moderna's development of mRNA-1273.[1217]  And, that was on top of over $60 million in U.S. Government grants Moderna received during the period from 2016 through 2019.[1218]  Indeed, Moderna witness Hamilton Bennett has said that Moderna "never would have done it without BARDA."[1219]  Dr. Vellturo's suggestion that it was this investment that allowed Moderna to

---

[1215] Vellturo Rebuttal Report, ¶ 807

[1216] Lawton Opening Report, ¶ 1333, Table 6.3.

[1217] Lawton Opening Report, ¶ 858.

[1218] Lawton Opening Report, ¶ 853.

[1219] Lawton Opening Report, ¶ 420 (citing MRNA-GEN-01724969-024, at 007, 014 (December 19, 2023 30(b)(6) Deposition of Hamilton Bennett (Moderna v. Pfizer),154:10-154:22 ("Q. And then in the top email you indicate . . .on the next day, February 3rd, 2022, to Ruben Donis, you say 'Hi. We never would have done it without BARDA.' Do you see that? A. Yes. Q. And that was in reference to getting Spikevax approved and on the market, right? A. Yeah. And the role that – specifically that BARDA funding played in our ability to move the program forward at

Highly Confidential – Outside Attorneys' Eyes Only

respond quickly also ignores the significant evidence, addressed in my opening report, that it was Moderna's use of the Patents-in-Suit that allowed it to respond so quickly.[1220]

493.    Based on my investigation and the facts of this case, and for the reasons explained in the Lawton Opening Report[1221] and as further explained in this report, it is my opinion that the payment structure of the license agreement would be a per unit profit split.  The fact that the outcome of the hypothetical negotiation would result in a profit split is supported by the evidence in this case.  For example, the Lawton Opening Report stated the following:

> Genevant would expect and Moderna would agree to a per dose royalty rate that would split Moderna's projected net profit.  As Mr. Francis testified in *Moderna v. Pfizer,* Mr. Francis, Moderna's SVP, head of business development and corporate strategy since April 2019,[1222] "[c]ertain deals are structured as profit splits," "a lot of our partnerships that we entered and **license agreement that we entered were around** ▮▮▮▮▮▮▮▮▮," and "[s]ometimes you can have a royalty that essentially is in lieu of a profit split that essentially inure to the same amount."[1223]

---

that time of uncertainty in 2020."); 182:18-183:4 ("Q. And Moderna could not have developed Spikevax without the U.S. Government's assistance, correct? . . . A. We partnered with the government because they allowed us to offset the financial cost of the program at a time when we didn't know whether the virus was going to continue to circulate and whether it was going to need a vaccine, and when we were a small company that hadn't yet built the infrastructure required to take on that risk without external funding.")).  MRNA-GEN-01724046-052, at 046 (*Moderna v. Pfizer* Bennett Deposition Exhibit No. 31 – February 3, 2022 email from Hamilton Bennett to Ruben Donis, Subject: RE: flu vaccine program)).

[1220] Lawton Opening Report Sec. V.B.

[1221] Lawton Opening Report, ¶¶ 1403-1445 (pp. 957-982).

[1222] Lawton Opening Report, ¶ 1372 (*citing* MRNA-GEN-01726934-7000, at 9724 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 162:14-162:20 ("Q. So Mr. Francis, you became Moderna's head of business development and corporate strategy in 2019, correct?  A. That's right.  Q. So you had assumed that position before the pandemic, correct?  A. Yes.")).  "Said Francis," *LinkedIn,* n.d., *available at* https://www.linkedin.com/in/said-francis-54902210/details/experience/ (Moderna: Director, Corporate Development (June 2013-March 2015); Senior Director of Business Development (March 2015-October 2017); VP, Head of Business Development (April 2019-December 2023); General Manager, Individualized Neoantigen Therapy (INT) (December 2023-Present); Chief Business Officer (December 2023-Present)).).

[1223] Lawton Opening Report, ¶ 1372 (*citing* MRNA-GEN-01726934-7000, at 972-973 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 156:10-157:1 ("Q. You would agree that it is standard practice in the pharmaceutical industry to license technology for royalties without profit sharing arrangements, correct? . . . A. Every deal is different.  Certain deals are structured as profit splits.  As you see in our history from 2016 onwards, a lot of our partnerships that we entered and license agreement that we entered were around ▮▮▮▮▮▮ ▮▮▮  Sometimes you can have a royalty that essentially is in lieu of a profit split that essentially

337

Highly Confidential – Outside Attorneys' Eyes Only

Mr. Francis further testified that **"royalties are a form of sharing profits, whether it's a percentage of sales or percentage of profits."**[1224]  Similarly, Mr. Zorn testified, the issue regarding the damages in this case is "the split of the economics between the two parties.  The product is going to get to the patients equally as fast however it is we split it."[1225]

494.  In addition, my opinion is consistent with the opinion of Moderna's IP licensing expert in *Moderna v. Pfizer,* Mr. Brazier, who stated:

> In situations where a therapeutic or vaccine is in high demand with no meaningful alternatives available, and the patents cover technologies that are critical to the success of that product, then the licensee might be required to agree to a profit share in order to "win the deal."[1226]

495.  The fact that Moderna profited from its infringement and a share of the Accused Product profits is reasonably attributed to the Patents-in-Suit is not seriously disputed.  In fact, Dr. Vellturo stated that based on the "extensive evidence and discussion" in the Lawton Opening Report, it is an "**undisputed point**—that Moderna benefitted financially from its COVID-19 vaccine along a number of dimensions"[1227] and "Moderna generated considerable revenues and profits from its vaccine as well."[1228]  Dr. Vellturo's affirmative opinion, however, does *not* analyze (or even mention) Moderna's benefits "along a number of dimensions"—or acknowledge that Moderna's

---

inure to the same amount.  So different deals are different, but I wouldn't agree with the statement as you described it.").).

[1224] Lawton Opening Report, ¶ 1372 (*citing* MRNA-GEN-01726934-7000, at 973 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 157:8-157:10.  *See also* 157:2-157:23 ("Q. Okay.  Well, let me change the statement.  You would agree that it is common in the pharmaceutical industry to license technology for royalties without profit sharing arrangements, correct? . . . A. I disagree, again, because royalties are a form of sharing profits, whether it's a percentage of sales or percentage of profits.  So it is – profit is revenue minus certain costs.  It is ultimately a different – you're getting certain cash flows off the commercialization activities that are occurring.  So I generally can't tell you what common is because it is not – in our industry, if you look at the last ten years, there's been many co-development, co-commercialization activities.  Co-commercialization, they can take any form.  Again, you can have the formula as a profit split or royalty that essentially inures to a profit split, whatever the parties feel that they would – that they're putting forward is worth.")).).

[1225] Lawton Opening Report, ¶ 1372 (*citing* June 5, 2024 30(b)(6) Deposition of Peter Zorn, 270:17-270:20.).

[1226] MRNA-GEN-02615980-043, at 004 (February 23, 2024 Opening Expert Report of Graham Brazier (*Moderna v. Pfizer*), ¶ 80).

[1227] Vellturo Rebuttal Report, ¶ 402.

[1228] Vellturo Rebuttal Report, ¶ 403.

Highly Confidential – Outside Attorneys' Eyes Only

expected mRNA-1273 profits were in the billions and would transform Moderna into a "Biotech powerhouse." This is fact is demonstrated in both Moderna's business records and the public statements of Moderna's executives. For example, on May 20, 2020 Moderna's business plan stated that it was on an "███████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████"[1229] On May 20, 2020, Moderna expected to reinvest the ███████████████████████████████[1230] from mRNA-1273 back into its pipeline to generate ██████████ in equity value.[1231] Other evidence confirms that Moderna expected that the Accused Product would accelerate its corporate development. For example, by early-May 2020, Moderna advised analysts and investors that its "vaccine against SARS-CoV-2 virus, mRNA-1273, is **a major acceleration of our company's development**."[1232] During Moderna's May 7, 2020 earnings call, Mr. Bancel predicted: "Moderna should be a



[1229] Lawton Opening Report, ¶ 1483 (*citing* ███████████████████████████ █████████████████████████████████████████████████████████

[1230] Lawton Opening Report, ¶ 1325 (*citing* ███████████████████████████

[1231] Lawton Opening Report, ¶ 1325 (*citing* ██████████████

[1232] Lawton Opening Report, ¶ 1149 (*citing* "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript, *Seeking Alpha,* May 7, 2020, p. 4 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO).).

Highly Confidential – Outside Attorneys' Eyes Only

commercial-stage company in 2021. **That is two to three years ahead of our previous plans** [presented in February 2020], plans we outlined just months ago."[1233]

496.    The book of wisdom confirms the reasonableness of what Dr. Vellturo describes as Moderna's **"lofty expectations"** at the time of the May 31, 2020 hypothetical negotiation. For example, Dr. Hoge testified that mRNA-1273 transformed Moderna and "continues to accelerate and benefit the company" as follows:

> I think it's just fair to say, without question, the COVID response and our success in doing – in developing the vaccine, delivering it, manufacturing it, selling it did transform the company, accelerated us in many years, and created a, as you said a moment ago, huge access to capital for us, 10s of billions of dollars of sales, and that allowed us to continue investing in things, including our work in cancer, in a way that continues to accelerate and benefit the company.[1234]

497.    In fact, the *actual* acceleration was far greater than Mr. Bancel had predicted in May 2020. Dr. Hoge testified that "[i]t's certainly true that the COVID pandemic **dramatically accelerated the company's development and allowed us to accelerate our investment in our pipeline and science technology**. The medicines that we're now filing for approval [an RSV vaccine under review for approval in many geographies; successful phase 3 results for several other respiratory viruses; a cancer therapeutic in collaboration with our partner Merck which is in mid-stage studies;

---

[1233] Lawton Opening Report, ¶ 1149 (*citing* "Moderna, Inc. (MRNA) CEO Stéphane Bancel on Q1 2020 Results – Earnings Call Transcript," *Seeking Alpha,* May 7, 2020, p. 4 of 32, *available at* https://seekingalpha.com/article/4344414-moderna-inc-mrna-ceo-stephane-bancel-on-q1-2020-results-earnings-call-transcript (Stéphane Bancel, CEO) (emphasis added).).
[1234] Lawton Opening Report, ¶ 1150 (*citing* May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 92:2-92:12.).

Highly Confidential – Outside Attorneys' Eyes Only

rare disease programs[1235]] are as a result of that, you know, **five, ten-year acceleration in our business plan**."[1236]

498.  In contrast, Dr. Vellturo's *only* theory is his improper *de facto* Established Royalty based on the Providence agreement—which is *not* economically comparable and is afflicted by the "circularity problem" that embeds the taint that *Moderna* created through the series of long-running overhangs (*i.e.,* Acuitas breach of contract, Moderna IPRs, Moderna's ongoing infringement, and this litigation) that have depressed the market price for the Plaintiffs' technology since 2013.

499.  While my profit split theory and calculations are both reasonable and fully supported by the evidence in this case, Dr. Vellturo disagrees and claims that both are purportedly "undermined by

---

[1235] Lawton Opening Report, ¶ 1149 (*citing* May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 88:2-88:16 ("Q. What medicines are you referring to in that answer for which you're filing approval, for approval?  A. So we have an RSV vaccine under review for approval in many geographies.  We've had a successful phase 3 results for several other respiratory viruses.  We have a cancer therapeutic in collaboration with our partner Merck which is in mid-stage studies, and there's a potential for an accelerated approval filing.  And then we have rare disease programs that we're in discussions with regulators about what would be necessary for a submission.").).

[1236] Lawton Opening Report, ¶ 1149 (*citing* May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 87:16-88:1 (emphasis added).  *See also* 88:17-89:12 ("Q. And it's fair to say, and I think you just said this, that COVID dramatically accelerated the maturation of Moderna in those projects, correct?  A. Absolutely.  Q. And it provided Moderna access to capital, correct?  A. Absolutely.  Q. It expanded the scope of regulatory and safety development efforts, correct?  A. Yes.  Commercializing the COVID vaccine at that scale dramatically accelerated our clinical experience, our development experience, our safety experience, required us to dramatically accelerate our manufacturing capabilities, and **in all cases many years ahead of what we would have been doing under any plan prior to COVID.**" (emphasis added)); 89:21-90:8 ("Q. The company was transformed.  It was transformative, you've heard that word used, in connection with COVID and Moderna, right?  A. I think for the field of mRNA broadly, and Moderna for sure as a leader in it.  Q. And being able to sell the COVID vaccine as one of the first companies on the market caused a major accretion in share price, cash, and capital sources for Moderna, right?  A. Yes, it did."); 91:16-91:18 ("A. . . . So no doubt that COVID transformed the company, accelerated the company's development."); 92:2-92:12 ("A. . . . I think it's just fair to say, without question, the COVID response and our success in doing – in developing the vaccine, delivering it, manufacturing it, selling it did transform the company, accelerated us in many years, and created a, as you said a moment ago, huge access to capital for us, 10s of billions of dollars of sales, and that allowed us to continue investing in things, including our work in cancer, in a way that continues to accelerate and benefit the company.").).

Highly Confidential – Outside Attorneys' Eyes Only

[my] own assertions and a review of the agreements and averages underlying [my] analysis"[1237] as follows:

- ▪ **"May 29, 2013 Tekmira-Moderna Offer":** incorrectly claiming that I purportedly "double count[ed] [] the upfront and milestone payments" in Schedules 4.1 and 4.2 to the Lawton Opening Report.[1238]

- ▪ **"Genevant's License Agreements"[1239]:** mischaracterizing my reliance on the Chulalongkorn ▮▮▮▮ and asserting "Ms. Lawton appears to have mixed up her own logic" and alleging that the "reasonable royalty terms in the present case should reflect the *lower* profit splits implied by Genevant's ▮▮▮▮ licenses,"[1240] and mischaracterizes my profit split analysis claiming that my analysis that is fully supported by the record "is

---

[1237] Vellturo Rebuttal Report, ¶ 714.

[1238] Vellturo Rebuttal Report, ¶¶ 715-716. Dr. Vellturo failed to apprehend that: (1) my analyses in Schedules 4.1 and 4.2 are two separate stand-alone analyses evaluating the 2013 Tekmira-Moderna offer – covering two different time periods – pandemic and endemic – they are not additive analyses, *e.g., compare to* Table 6.6 which performs the same analysis over *the combined* time period; (2) even if the analyses covering two different time periods were conceptually additive (which they are not), only the latter of the two periods analyzed – not both – could be arguably claimed to be double-counting and, notably, only with respect to the ▮ ▮▮▮▮▮▮ identified in the 2013 Tekmira-Moderna offer because the various milestones under the 2013 Tekmira-Moderna offer were to be paid with respect to *each Product* hitting those milestones and therefore would *not* necessarily have been "one-time occurrences" as improperly suggested by Dr. Vellturo; and (3) indeed my calculations in Table 6.6, and Schedules 4.1 and 4.2 are conservative because they inherently assumed (for the purposes of the calculation of a floor) that (for each separate stand-alone analysis) the ▮▮▮▮▮▮▮ ▮▮▮ under the 2013 Tekmira-Moderna offer occurred only once, despite the fact that Moderna's COVID-19 vaccines over the time period being measuredcomprised different product variants such as Moderna's original COVID-19 vaccine (introduced in December 2020), Moderna's bivalent booster (FDA Approved August 31, 2022), Moderna's monovalent XBB1.5 Omicron vaccine variant (launched September 2023). *See, e.g.,* Katella, Kathy, "Comparing the COVID-19 Vaccines: How Are They Different," Yale Medicine News webpage, November 22, 2024, *available at* https://www.yalemedicine.org/news/covid-19-vaccine-comparison ("Status: Moderna's vaccine has been updated over time to target new virus variants. First introduced in December 2020, the original COVID mRNA vaccines from both Pfizer and Moderna protected against the original SARS-CoV-2 virus. They have been replaced three times since then with shots targeting different iterations of the Omicron strain. In 2022, "bivalent" vaccines targeted both the original virus and Omicron variants BA.4 and BA.5; in 2023, a monovalent shot targeted the XBB lineage of the Omicron variant; and in 2024, a new updated shot aims to protect against KP.2, which circulated in the U.S. earlier in the year. The previous vaccines are no longer in use.").

[1239] Vellturo Rebuttal Report, ¶¶ 717-723.

[1240] Vellturo Rebuttal Report, ¶ 723.

Highly Confidential – Outside Attorneys' Eyes Only

plainly false."[1241] As discussed above, this critique conflates expectations based on circumstances, like the target market, with the effect of the greater certainty provide by being on the doorstep of commercialization. My reliance on the Chulalongkorn Agreement also demonstrates Genevant's use of profit-split agreements, just as Moderna does.

- **"Moderna Agreements (AstraZeneca, Merck)"**[1242]: asserting again that these agreements purportedly "provide no insight into the outcome of the Hypothetical Negotiation . . . as these agreements are neither sufficiently technical or economically comparable[.]"[1243] The AstraZeneca and Merck agreements are highly relevant for the reasons explained in the Lawton Opening Report, namely, the confirm Said Francis' deposition testimony regarding Moderna's increasing royalty compensation as its products moved through the stages of pharmaceutical development culminating in a profit split— and shows the range of profit splits in *Moderna's* license agreements. My opinion on these agreements is consistent with the opinion of Moderna's IP licensing expert in *Moderna v. Pfizer,* Mr. Brazier—whereas Dr. Vellturo's opinion is wholly *inconsistent* with Mr. Brazier's opinion. I also understand that Dr. Mitchell has confirmed the technical comparability of the Moderna collaboration agreements cited in my opening report.[1244] Dr. Vellturo is also incorrect to criticize my approach as failing to consider apportionment in connection with these agreements. The Moderna collaboration agreements use a ███████ ████████; the lower profit split I reach thus accounts for the differences in contributions as part of these agreements.

---

[1241] Vellturo Rebuttal Report, ¶ 718. Dr. Vellturo does not actually dispute the range of profit splits in the Genevant COVID-19 license agreements—rather he disagrees with my opinion (*i.e.,* where I "land"), which is demonstrated by the following: "One of the central flaws of Ms. Lawton's assessment is her complete disregard for Genevant's license to IP portfolios including the Patents-in-Suit in favor of one, the ████████████████████████, that does not include such rights. In this quoted passage, Ms. Lawton seems to assert that this step is okay because even 'the other agreements . . . **represent an implied profit split from Genevant's COVID-19 license agreements ranging from** ████████████████ This is plainly false. Even under Ms. Lawton's own computation of so-called 'profit splits' corresponding to the *other* Plaintiff licenses' *percentage-royalty* rates, this range is actually just 11%-13%--or half of the 'profit split' on which Ms. Lawton ultimately lands. By (incorrectly) attempting to frame these other agreements as reflecting a 'profit split range' that is consistent with her ultimate 25% 'profit split,' Ms. Lawton appears to recognize their importance."). Dr. Vellturo does not offer a profit split opinion—however, the implied profit split of his opinion is **0.62%|99.38%** (Genevant|Moderna)).

[1242] Vellturo Rebuttal Report, ¶ 724.

[1243] Vellturo Rebuttal Report, ¶ 724.

[1244] Reply Expert Report of Dr. Michael Mitchell, Sec. XVIII.A.

343

Highly Confidential – Outside Attorneys' Eyes Only

- **"Moderna Deal Structures"**[1245]:    asserting that deal structures of *Moderna's* "collaboration agreements with Merck and AstraZeneca provide no insight into the outcome of the Hypothetical Negotiation"[1246]—while at the same time asserting that Genevant's "collaboration agreements" are *de facto* Established Royalties.  Dr. Vellturo's criticism here is vague – it is not clear what his references to ""deal structures" [] never agreed to in an arm's length transaction(s)," or "hypothesized deal terms" mean, especially since he does not cite to any documents as support.[1247]  Furthermore, Mr. Brazier relies on the deal structures in the Merck and AstraZeneca agreements to provide an opinion on what would be a naked patent license.  So here again, Dr. Vellturo's opinion in this case is inconsistent with the opinion of Moderna's IP licensing expert in *Moderna v. Pfizer.*

- **"Ropes & Gray December 2019 Life Science Deal Survey"**[1248]: asserting that the Ropes & Gray survey is purportedly too general—notwithstanding the fact that other evidence in this case confirms the profit split range in the survey (*i.e.,* between 50%|50% to 20%|80%), including the Moderna ███████████████████████████ cited in the Lawton Opening Report[1249] and the BioNTech COVID-19 profit split evidence (*i.e.,* 50|50 and 35|65) cited in the Brazier Report,[1250] as discussed above. Further, the timing of the Ropes & Gray survey from December 2019, just a few months *before* the hypothetical negotiation, provides contemporaneous survey results on the prevalence of profit splits in life science collaborations that provides further industry context for the party-specific data in this case including the ███████████████ in the October 2020 Chulalongkorn agreement—which was before any COVID-19 product was approved.  In addition, Dr. Vellturo assertion that "to use industry norms for 'profit splits' . . . is economically baseless" is *inconsistent* with Mr. Brazier's opinion that "the licensee might be required to agree to a profit share in order to 'win the deal.'  Moreover, a licensor has more leverage to obtain a profit split where the therapeutic/vaccine program or the platform derived therefrom, has achieved meaningful validation, including having had success in clinical trials, which increases competitive interest by licensees,"[1251] discussed above.

500.    Dr. Vellturo concludes by stating: "I find that she has actually failed to perform any meaningful apportionment step among the many that are called for in the present case."[1252]  I disagree, , for

---

[1245] Vellturo Rebuttal Report, ¶¶ 725-727.
[1246] Vellturo Rebuttal Report, ¶ 725.
[1247] Vellturo Rebuttal Report, ¶ 726.
[1248] Vellturo Rebuttal Report, ¶¶ 728-731.
[1249] Lawton Opening Report, ¶¶ 406-413.
[1250] MRNA-GEN-02615980-043, at 009 (February 23, 2024 Opening Expert Report of Graham Brazier (*Moderna v. Pfizer*), ¶ 90).
[1251] MRNA-GEN-02615980-043, at 004 (February 23, 2024 Opening Expert Report of Graham Brazier (*Moderna v. Pfizer*), ¶ 80).
[1252] Vellturo Rebuttal Report, ¶ 737.

Highly Confidential – Outside Attorneys' Eyes Only

the reasons stated in Section IV.F.4. In addition, I note that Dr. Vellturo does not address my discussion of "Reconciliation to the Analytical Method" or dispute that the reasonable royalty determined under the Hypothetical Negotiation Approach—which does not consider the derivative benefits that Moderna expected to realize as a result of its alleged infringement of the Patents-in-Suit—will be *greater* than the $3.98/dose calculated under the Analytical Method.[1253]

### 6. Dr. Vellturo Contends that My Use of the Book of Wisdom "benefits Plaintiffs"

501.    In this 2-paragraph sub-section,[1254] Dr. Vellturo does not substantively dispute my use of the Book of Wisdom, given his heavy reliance on the purported "Historical Comparable Licenses"—of which 11 of 13 were entered into *after* the May 31, 2020 hypothetical negotiation. Instead, he contends that my use of the Book of Wisdom is purportedly selective and applied "in a manner that benefits Plaintiffs."[1255] I disagree. My use of the Book of Wisdom fits the unique facts of this case—in view of the fact that there is no historical licensing precedent in this record that is analogous to the May 31, 2020 hypothetical negotiation on the "doorstep of commercialization" that is further exacerbated by Moderna's long-running challenges to the validity and infringement of the Patents-in-Suit which renders the purportedly Historical Comparable Licenses (both before and after the date of the hypothetical negotiation) of little, if any, probative value in determining the reasonable royalty in this case.

### 7. Dr. Vellturo Disagrees with My Payment Structure of the License Agreement Opinion

502.    In this 15-page sub-section,[1256] Dr. Vellturo asserts: "Ms. Lawton's contention that Plaintiffs would demand a dollars-per-dose royalty is untenable"[1257] and concludes "Absent certain exceptional situations that are not present here, the present Parties would not have agreed to a dollars-per-unit royalty."[1258] Dr. Vellturo further asserts: "It is difficult to overstate the extent to which this single, seemingly mundane, step in Ms. Lawton's overall analysis contributes to her wild overstatement of damages."[1259] The fundamental premise of Dr. Vellturo's criticism in this

---

[1253] Lawton Opening Report, ¶¶ 1387-1388.
[1254] Vellturo Rebuttal Report, ¶¶ 738-739.
[1255] Vellturo Rebuttal Report, ¶ 739.
[1256] Vellturo Rebuttal Report, ¶¶ 740-765 (pp. 358-372).
[1257] Vellturo Rebuttal Report, ¶ 761.
[1258] Vellturo Rebuttal Report, ¶ 764.
[1259] Vellturo Rebuttal Report, ¶ 740.

Highly Confidential – Outside Attorneys' Eyes Only

sub-section is two-fold. First, Dr. Vellturo asserts: "Ms. Lawton disregards both widely acknowledged industry practices and the licensing history of the plaintiffs and their predecessors (including in negotiations and discussions with Moderna), opining instead that the parties would have agreed to a dollars-per-unit royalty simply because it would be more difficult for Moderna to cheat on its royalty obligations to Plaintiffs."[1260] Second, Dr. Vellturo again asserts his improper *hindsight*-based argument and asserts: "Ms. Lawton takes the flawed 25% 'profit split' measure . . . and performs a remarkable transformation of her reasonable royalty rate" by applying it to "her contrived measure of Moderna's purportedly *expected* profit" rather than "the actual profits Moderna generated via its alleged infringement[.]"[1261] I disagree.

### a)    Dr. Vellturo Attempts Claim that the Facts of this Case Would Not Impact the Hypothetical Negotiation

503.    As explained in detail in the Lawton Opening Report, it is my opinion that the facts of this case and the situation at the time of the May 31, 2020 hypothetical negotiation in this case would result in a per unit royalty. Dr. Vellturo does not substantively dispute the facts that I cite in support of my opinion. For example, Dr. Vellturo does *not* dispute that Moderna's business strategy was unusual or that Moderna failed to conform to industry norms and practices.[1262] Instead, Dr. Vellturo attempts to re-frame the discussion in the Lawton Opening Report,[1263] which supports the following conclusion:

> The foregoing facts and circumstances establish that Moderna has [*not*] conformed to industry norms and practices and provide important context for the determination of the payment structure of the license. Because Moderna failed to take a license early, and repeatedly refused to take a license later, the amount of the reasonable royalty under the Hypothetical Negotiation Approach will be determined now at the time Moderna's alleged infringement began with Genevant presumed to know all relevant facts, which it would *not* and could not have known in a commercial license negotiation.[1264]

504.    Dr. Vellturo claims to address the three (3) points set forth in the Lawton Opening Report—but instead, attempts to reframe each of the three points in a limited way. For example, as to the first point, Dr. Vellturo asserts that that Moderna "was a startup that was nonetheless looking to

---

[1260] Vellturo Rebuttal Report, ¶ 740.

[1261] Vellturo Rebuttal Report, ¶ 740.

[1262] Vellturo Rebuttal Report, ¶¶ 745-746. *Compare to* Lawton Opening Report ¶¶ 1410-1415.

[1263] Lawton Opening Report ¶¶ 1410-1415.

[1264] Lawton Opening Report ¶ 1415 (typo corrected).

346

Highly Confidential – Outside Attorneys' Eyes Only

commercialize its own products (rather than out-license its IP)"[1265] which he claims purportedly "has little bearing on Moderna's posture at the Hypothetical Negotiation as a *licensee* of the Patents-in-Suit rather than a *licensor* of unrelated technology."[1266] This is a non sequitur and attempts to reframe the discussion without addressing the facts set forth in ¶ 1410 of the Lawton Opening Report. In particular, ¶ 1410 establishes that Moderna had **"no money and no expertise"**[1267] and its stated goal by September 2013 (*after* the May 29, 2013 Tekmira-Moderna Term Sheet) was to **"be the world leader in mRNA-based therapeutics[.]"**[1268] As discussed ¶ 1411 (and also earlier in the Lawton Opening Report), in 2011, Dr. Langer reportedly advised Mr. Bancel "that Moderna was too underfunded and small to create its own delivery system."[1269] Moderna, however, elected *not* to obtain a license directly from Tekmira (or its successors) at any time. Because Moderna opted *not* to negotiate a license in the pre-clinical stage (or any later time), it chose a high-risk strategy which is addressed in the second point.

---

[1265] Vellturo Rebuttal Report, ¶ 745.

[1266] Vellturo Rebuttal Report, ¶ 746.

[1267] Lawton Opening Report ¶ 1410 (*citing* "Moderna CEO Stéphane Bancel In Conversation With Newsweek CEO Dev Pragad," *Newsweek,* June 22, 2021, 18:04-18:53 of 38:45, *available at* https://www.youtube.com/watch?v=ZPR_ksxiXag ("In the early days, because **we had no money and no expertise**, we partnered a lot. And as the company has developed more and more, we partner less and less. If you look at the company now, you know we have shown we can do successful Phase 3. We have shown we can get the FDA to authorize our products; we have shown we can commercialize products at gigantic scale. You know we're trying to make a billion dollars this year. We know we have delivered a lot of doses to the US government and to many governments around the world. And so we have a lot of cash now. The company is sitting on, at the of Q1, $80 billion of cash. So we have capital, we have teams, we have capabilities. So I think as you look forward we'll do, I think very focused partnerships when they make sense." (emphasis added)).).

[1268] Lawton Opening Report ¶ 1410 (*citing* MRNA-GEN-01237261-286, at 281 (Almarsson Deposition Exhibit No. 20 – Örn Almarsson, "Formulations & Delivery Technologies (FDT) – 2014-2015 Roadmap," *Moderna,* September 12, 2013, Slide 21 of 26) ("FDT key deliverables").).

[1269] Lawton Opening Report, ¶ 1157 (*citing* Nathan Vardi, Matthew Herper, "Moderna's Mysterious Medicines," *Forbes,* December 14, 2016, *available at* https://www.forbes.com/sites/nathanvardi/2016/12/14/modernas-mysterious-medicines/?sh=4f0c94116ef6.).

347

Highly Confidential – Outside Attorneys' Eyes Only

505.    Similarly, Dr. Vellturo attempts to reframe the <u>second</u> point as follows: Moderna "did not in-license certain IP early in its company life[.]"[1270]  In contrast, the second point begins by stating the following:

> <u>Second</u>, notwithstanding its stated goal, Moderna did *not* follow the typical biotech industry licensing practices.  Instead, they chose a high-risk strategy—namely to build the company *without* taking licenses to what it recognized from the outset was key technology (*i.e.,* mRNA and LNP).  As discussed above, at the outset, Moderna *did* seek to obtain rights to Drs. Kariko and Weissman's modified mRNA invention owned by UPenn in 2010—but did *not* actually obtain a license until years later, in 2017. Similarly, at the outset, Dr. Langer, "an MIT professor, Moderna board member[, Moderna academic co-founder,] and founder of dozens of biotech companies, told Bancel that Moderna was too underfunded and small to create its own delivery system."[1271]  While Moderna recognized that Tekmira's LNP was the "gold standard," Moderna continued discussions with Genevant and its predecessors (which Moderna's Dr. Hoge apparently regarded as a "Frenem[y]"[1272] (*i.e.,* "a person who is or pretends to be a friend but who is also in some ways an enemy or rival"[1273])), for years—but never took a license from Genevant or its

---

[1270] Vellturo Rebuttal Report, ¶ 745.

[1271] Lawton Opening Report ¶ 1411 (*citing* Nathan Vardi, Matthew Herper, "Moderna's Mysterious Medicines," *Forbes,* December 14, 2016, *available at* https://www.forbes.com/sites/nathanvardi/2016/12/14/modernas-mysterious-medicines/?sh=4f0c94116ef6.).

[1272] Lawton Opening Report ¶ 1411 (*citing* MRNA-GEN-01764293 (December 10, 2018 email from Stephen Hoge to John Mendlein, CC: Lisa Emanuello, Subject: Re:  frenemies).).

[1273] Lawton Opening Report ¶ 1411 (*citing* "fremeny," *Merriam-Webster Dictionary,* 2024, *available at* https://www.merriam-webster.com/dictionary/frenemy.  *See also* Mark Travers, Ph.D., "Psychologists Define What The Term 'Fremeny' Really Means," *Forbes,* April 12, 2023, *available at* https://www.forbes.com/sites/traversmark/2023/04/12/psychologists-define-what-the-term-frenemy-really-means/ ("They found that many of the interviewees shared similar feelings about frenemy relationships, leading the researchers to land on the following definition: 'Relationships, often negative, steeped in situational ties and shared social connections that outwardly appear friendly but are fraught with underlying competition, jealousy, or distrust.' Unlike genuine friendships, the researchers found that frenemy relationships displayed three prominent characteristics:  1. **Competitiveness** (viewing the other more as a rival to outdo than a friend to support)[;] 2. **Jealousy** (either in terms of social connections or material possessions)[;] 3. **Distrust** (a lack of respect and care in the friendship) . . . The dynamic was described by some interviewees as 'hot and cold,' with the frenemy repeatedly giving mixed signals as they shifted between friend-like and foe-like mentalities." (emphasis in original), *citing* Jenna S. Abetz, Lynsey K. Romo, Chandler Marr, "Defining and Exploring Frenemy Relationships," *Southern Communication Journal,* Vol. 88, Issue 2, October 11, 2022, pp. 172-184, *available at* https://www.tandfonline.com/doi/full/10.1080/1041794X.2022.2131897?needAccess=true). Carol Bishop Mills, Panfeng Yu, Paul A. Mongeau, "Frenemies: Acting Like Friends But Feeling Like Enemies," *Western Journal of Communication,* Vol. 87, Issue 5, February 5, 2023,

348

Highly Confidential – Outside Attorneys' Eyes Only

predecessors.  In December 2018, Moderna apparently regarded Genevant as a competitor[1274]—insofar as both were pursuing rare diseases as of late-2018. . . .[1275]

506.    Dr. Vellturo, however, does not substantively address the foregoing. In addition, as the Lawton Opening Report discusses in detail—and contrary to industry practice—Moderna's IP strategy from the beginning was to attempt to avoid paying patent royalties by claiming that it was *not* using the Plaintiffs' technology and employing various other strategies.[1276]  In addition, Moderna never did **"Fix backward risk balance . . . LNP/Abus . ."** that Dr. Hoge stated in a December 2017 email to himself.[1277]  This historical relationship between the parties is a relevant difference

---

795-815; Preprint, May 2022, p. 2, *available at* https://www.researchgate.net/publication/360872786_FRENEMIES_ACTING_LIKE_FRIENDS_BUT_FEELING_LIKE_ENEMIES ("The term frenemy can be traced to Walter Winchell, an American journalist and columnist who, in 1953, used the term to describe tense Cold-War interactions between Russia and the United States (Zimmer, 2019). The interpersonal usage of the term can be traced back to Jessica Mitford, an author and socialite who first used the term in a humorous newspaper column in the 1970s (Mitford, 1977). She used the term to discuss disliked others with whom people remain socially engaged.").).

[1274] Lawton Opening Report ¶ 1411 (*citing See, e.g.,* "Arbutus and Roivant Launch Genevant Sciences with Industry-Leading Platform to Develop Broad Range of RNA Therapeutics for Genetic Diseases," *Arbutus,* April 11, 2018, *available at* https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-and-roivant-launch-genevant-sciences-industry-leading ("Arbutus will license exclusive rights to its LNP and ligand conjugate delivery platforms to Genevant for RNA-based applications outside of Hepatitis B virus. Through its expert team and dominant intellectual property in RNA delivery, Genevant plans to develop products in-house and pursue industry partnerships to build a diverse pipeline of therapeutics across multiple modalities, including RNAi, mRNA, and gene editing. . . . Through its proprietary delivery platforms, Genevant is able to pursue mRNA, RNAi, and gene editing modalities and select the optimal approach for any given disease. By 2020, Genevant aims to have 5 to 10 RNA programs in the clinic targeting a range of genetic disorders with limited or no treatment options.").).

[1275] Lawton Opening Report, ¶ 1411.

[1276] Lawton Opening Report, ¶¶ 729-732.

[1277] Lawton Opening Report, ¶¶ 731 (*citing* MRNA-GEN-01503761 (Hoge Deposition Exhibit No. 31 – December 5, 2017 email from Stephen Hoge to Stephen Hoge) (emphasis added).  May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 320:19-322:18 ("Q. . . . [I]f we could look at number 4 [on Hoge Deposition Exhibit No. 31], it says, 'Fix backward risk balance.' Do you see that?  A. Right.  Q. And then 4.2 underneath that is, 'LNP/Abus.'  That's LNP Arbutus, I assume?  A. Mm-hmm.  Q. And how did you intend to fix the backward risk balance with respect to LNP Arbutus in 2017?  A. It would have to be in the context of our discussions with them, which I think there had been multiple in 2017.  I can't remember whether this is related to – where it is in relation to the litigation between Arbutus and Acuitas in time, but we were obviously aware of that litigation and, as you'd previously covered, had been in discussions with

349

Highly Confidential – Outside Attorneys' Eyes Only

with respect to the hypothetical negotiation with Moderna as compared to and Genevant's other licensees—it is not, as Dr. Vellturo remarks, a question of whether the parties "like[d] each other;"[1278] instead, the parties prior relationship informs their knowledge about each other, about the technology, and as a result, about their negotiating positions.

507.    As stated in ¶ 1411, Moderna chose a high-risk strategy—namely to build the company *without* taking licenses to what it recognized from the outset was key technology (*i.e.,* mRNA and LNP). In fact, Moderna recognized and accepted the risks associated with its decision to continue to use the Plaintiffs' technology for years without a license.[1279]  For example, Moderna's November 9, 2018 S-1—18 months *before* the hypothetical negotiation—underscores that Moderna's ability to launch its pipeline (and "generate revenue sufficient to sustain [its] operations") was riding on winning the then pending-IPRs, which included the IPRs it had filed against Genevant—and stated:

> [I]f any third-party patents were held by a court of competent jurisdiction to cover aspects of our formulations, processes for manufacture or methods of use, including combination therapy, the holders of any such patents may be able to block our ability to develop and commercialize the applicable investigational medicine unless we obtained a license or until such patent expires. In either case, such a license may not be available on commercially reasonable terms or at all. **For example, if we are unsuccessful in invalidating certain of the third-party patents that we are currently challenging, those third parties may attempt to assert those patents against us should certain of our investigational medicines obtain regulatory approval.**
>
> Defense of infringement and other claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from our business. **In the event of a successful claim of infringement against us, we may have to pay substantial damages, including treble damages**

Tekmira that never went anywhere about the possibility of a direct license to some of the patents, intellectual property related to a couple of those products that in 2017 were still under development.  So -- . . . So that's what I would assume I meant by 4.2.  Q. What does it mean to fix the backward risk balance.  A. When I look at the five things underneath there, it's not entirely clear to me.  Reorganizing R&D, biodistribution, Alexion, LNP, UPenn, I mean, they're all very different things, so I'm not exact – it's hard for me to imagine how that covers all of them.  For instance, reorganizing R&D feels like a weird way to characterize, you know, a backward risk balance.  I don't actually know what is meant there.  Q. Would filing an IPR fix a backward risk balance if it was successful?  A. Possibly, but obviously reorganizing R&D wouldn't.").).

[1278] Vellturo Rebuttal Report, ¶ 455 (p. 205)
[1279] Lawton Opening Report, ¶ 689.

350

Highly Confidential – Outside Attorneys' Eyes Only

**and attorneys' fees for willful infringement, pay royalties, redesign our infringing products, <u>or obtain one or more licenses from third parties, which may not be made available on commercially favorable terms, if at all, or may require substantial time and expense.</u>**

In addition, such licenses are likely to be non-exclusive and, therefore, our competitors may have access to the same technology licensed to us. **<u>If we fail to obtain a required license and are unable to design around a patent, we may be unable to effectively market some of our technology and products, which could limit our ability to generate revenues or achieve profitability and possibly prevent us from generating revenue sufficient to sustain our operations.</u>**[1280]

508.   Dr. Vellturo also attempts to reframe the <u>third</u> point as follows: Moderna "'recognized that Genevant LNP was 'close to optimal for mRNA[']' but still dismissed it."[1281]  In contrast, the third point begins as follows:

> <u>Third</u>, while the evidence shows that from the beginning, Moderna recognized that Genevant's LNP was "close to optimal for mRNA"[1282] **and it became the foundation of its mRNA platform, Moderna was dismissive**. . . .[1283]

509.   Critically, Dr. Vellturo does *not* address either the foregoing or the facts set forth in ¶ 1413 which show that since at least late-2016, Moderna has expressly claimed that it was *not* using Genevant's technology, which was evidenced by three (3) examples.[1284]  In addition, the record in this case shows that, in fact, *all* of Moderna's <u>8</u> clinical trials used the Plaintiffs' patented technology.[1285]  As Dr. Zaks testified, Moderna was eight for eight (*i.e.,* batting 1000) in clinical trials that used its

---

[1280] Lawton Opening Report, ¶ 689 (*citing* Moderna, Inc. Form S-1 Registration Statement dated November 9, 2018, pp. 47-48, *available at* https://www.sec.gov/Archives/edgar/data/1682852/000119312518323562/d577473ds1.htm (emphasis added).).

[1281] Vellturo Rebuttal Report, ¶ 745.

[1282] Lawton Opening Report, ¶ 1412 (*citing* MRNA-GEN-02204816-901, at 820, 868 ("Final progress report (IPR) for Moderna Grant W911 NF-13-1-0417*," August 14, 2014 (summarizing "the research data generated between October 2013 and the end of July 2014."), PDF p. 5 and 53 of 86 ("The preferred formulations were identified based on size of particles (≤100 nm), polydispersity (<0.2 PDI), encapsulation efficiency (mRNA protection), as well as in vitro and in vivo expression of protein. The lipid ratio used in the ALN-TTR-02 product appears close to optimal for mRNA as well as siRNA. Precise process conditions may differ, and such evaluations are underway using the T-junction technology with Antibody mRNAs.") (emphasis added).).

[1283] Lawton Opening Report, ¶ 1412 (emphasis added).

[1284] Lawton Opening Report, ¶ 1413.

[1285] Lawton Opening Report, ¶ 1319.

mRNA platform, which the evidence shows was based on Genevant's patented technology.[1286] While Dr. Vellturo attempts to challenge my opinion that Genevant would be "in the drivers seat" at the May 31, 2020 hypothetical negotiation,[1287] the facts of this case clearly show that Moderna had *no* next best alternative and opted to move forward with the "optimal LNP"[1288] in a strategy directed maximizing the probability that its COVID-19 vaccine would be first (or at least early) to market.

510.   Notwithstanding Dr. Vellturo's attempts to reframe the discussion in the Lawton Opening Report, Dr. Vellturo appears to accept key facts, namely, that Moderna "did not in-license certain IP early in its company life" and that Moderna "'recognized that Genevant's LNP was 'close to optimal for mRNA' but still dismissed it"[1289]—facts that he describes as **"Moderna's purported misrepresentations."**[1290]  In addition, Dr. Vellturo also appears to recognize that a "dollars-per-unit royalty . . . would be more difficult for Moderna to cheat on its royalty obligations to Plaintiffs."[1291]  Notwithstanding Plaintiffs' motivation to limit Moderna's potential "to cheat" in view of Moderna's long history of making "misrepresentations" to Plaintiffs was justified based on the facts—Dr. Vellturo contends that my opinion is purportedly "nothing other than [a] set up . . . that a reasonable royalty rate in this case should take the form of a dollars-per-dose royalty[.]"[1292]  I disagree.  As Dr. Vellturo's discussion makes clear, my per-dose royalty payment structure of the license is both justified and appropriate based on the facts of this case.

511.   Dr. Vellturo then spends 8 pages[1293] attempting to argue various points which he claims purportedly undercut my opinion including the foregoing:

   a)  "[T]ypical pharmaceutical industry practice is to license for revenue-percentage running royalty rates rather than dollars-per-unit rates."[1294]  The May 31, 2021 hypothetical negotiation, however, is not a "typical pharmaceutical industry" negotiation—which typically occurs during the pre-clinical phase when the timing of any FDA-approved

---

[1286] Lawton Opening Report, ¶ 1319.
[1287] Vellturo Rebuttal Report, ¶¶ 755-758.
[1288] Lawton Opening Report, ¶ 445 (*citing* December 15, 2023 Deposition of Guillaume Stewart-Jones (*Moderna v. Pfizer*), 194:13-194:16 (emphasis added).).
[1289] Vellturo Rebuttal Report, ¶ 745.
[1290] Vellturo Rebuttal Report, ¶ 746.
[1291] Vellturo Rebuttal Report, ¶ 741.
[1292] Vellturo Rebuttal Report, ¶ 746.
[1293] Vellturo Rebuttal Report, ¶¶ 749-758 (pp. 362-369).
[1294] Vellturo Rebuttal Report, ¶ 749.

Highly Confidential – Outside Attorneys' Eyes Only

product is far into the future—and the economics, including market entry order, are not known.

b) "[A]ll of the Historical Comparable Licenses contain revenue-percentage running royalty components."[1295] As discussed above, the Genevant licenses are *not* a reasonable proxy for Moderna. *See* III.A.4. All of the Genenvant licenses were negotiated at the *pre-clinical* stage—*not* assuming validity and infringement, and *without* the benefit of *all relevant facts,* including the licensee's projections. In contrast, the May 31, 2020 hypothetical negotiation is on "the doorstep of commercialization" based on the assumption of validity and infringement, informed by *all relevant facts* including Moderna's projections at the time and long history of misrepresentations regarding its use of the Plaintiffs' technology.

c) Dr. Vellturo attempts to argue that a license agreement between Genevant and Moderna could include terms (*i.e.,* definition of net sales and audit rights) that he asserts would adequately protect Genevant from Moderna's established track record of "cheating."[1296] This, however, is irrelevant to the reasonable royalty determination. Dr. Vellturo ignores the fact that the "reasonable royalty is a measure of damages"[1297] and "they [the jury] d[o] not make a contract for the parties, but f[ind] a measure of damages."[1298]

d) Dr. Vellturo mischaracterizes my opinion that the parties would agree to a per unit royalty (based on the unique facts of this case)—and because the May 31, 2020 hypothetical negotiation occurs on "the doorstep of commercialization" the royalty rate would be *higher* than it would have been had the negotiation occurred pre-commercialization. In contrast, Dr. Vellturo asserts: "Unsurprisingly, Ms. Lawton fails to provide any support for her assumption that general biotech parties' views of the suitable royalty payment *form* (rather than the magnitude of the royalty) would change on the "doorstep of commercialization."[1299] Dr. Vellturo does not dispute that per-unit royalties have been awarded in biotech patent litigation,[1300] and does not appear to dispute that per unit (including per dose) royalties have been paid in the biotech industry.[1301]

---

[1295] Vellturo Rebuttal Report, ¶ 749.

[1296] Vellturo Rebuttal Report, ¶¶ 751-754.

[1297] Lawton Opening Report, ¶ 1206 (*citing Hayhurst v. Rosen*, No. cv-91-4496, 1992 WL 123178 (E.D.N.Y. May 18, 1992); *see also* Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-159.).

[1298] Lawton Opening Report, ¶ 1206 (*citing Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*, 235 U.S. 641, 649 (1915).).

[1299] Vellturo Rebuttal Report, ¶ 750.

[1300] Vellturo Rebuttal Report, ¶ 750.

[1301] *See, e.g.,* PhaseBio Pharmaceuticals, Inc. S-1 dated April 9, 2019, *available at* https://www.sec.gov/Archives/edgar/data/1169245/000119312519101668/d730739ds1.htm. April 1, 2019 Wacker Biotech GmbH-PhaseBio Pharmaceuticals, Inc. License Agreement

Highly Confidential – Outside Attorneys' Eyes Only

(Exhibit 10,16), *available at* https://www.sec.gov/Archives/edgar/data/1169245/000119312519101668/d730739dex1016.htm (license entered into after Phase 1 clinical trial of PB2452; "Section 3.1[:] For and in consideration of the rights granted under Sections 2.1 and 2.2 PhaseBio shall pay to Wacker Biotech during the term of the Royalty Period: (a) subject to Section 3.5, a per-unit (*i.e.,* Distributed Dose) royalty (quota license) in an amount of [***] per Distributed Dose (the '**Running Royalty'**); and . . ." (emphasis in original)). "Wacker Biotech and PhaseBio Sign License Agreement for ESETEC®-Based Production of Antibody Fragment PB2452," *Wacker,* April 23, 2019, *available at* https://www.wacker.com/cms/en-us/press-and-media/press/press-releases/2019/detail-102403.html ("'Our license agreement with PhaseBio underscores the fact that our ESETEC® platform is a key technology for making antibody fragments and developing successful biopharmaceuticals,' says Dr. Susanne Leonhartsberger, managing director of Wacker Biotech GmbH, a WACKER subsidiary based in Jena (Germany). ESETEC® is a patented technology developed by WACKER for the highly efficient synthesis of pharmaceutical proteins. It has already proven itself in the production of antibody fragments. The effectiveness of the system was highlighted, for example, through WACKER's collaboration with MedImmune, the global biologics R&D arm of AstraZeneca. Within just a few weeks of receiving the corresponding genes, WACKER successfully produced the antibody fragment, or Fab (antigen-binding fragment). The license agreement covers both the use of the strain developed and the manufacturing process, which produces the Fab fragment in superior yields. PhaseBio received the rights to develop PB2452 in 2017 – and has now approached WACKER. PB2452 is an Fab antibody fragment that serves as a 'reversal agent' for ticagrelor, a drug that inhibits platelet aggregation. Marketed by AstraZeneca under the trade names Brilique and Brilinta, ticagrelor is a blood thinner for treatment of patients with Acute Coronary Syndrome or a history of myocardial infarction. PB2452 demonstrated immediate and sustained reversal of the antiplatelet activity of ticagrelor in a clinical phase 1 trial. Wacker Chemie has now licensed its manufacturing process for this antibody fragment to PhaseBio. Under the agreement, PhaseBio gains direct access to WACKER's ESETEC® technology and to WACKER's E.coli strain for producing PB2452. ESETEC®, a patented technology developed by WACKER, is based on an E.coli strain which secretes the desired proteins into the culture broth in the correct folding conformation during fermentation. Secretion facilitates purification of the target protein, since there is no longer any need for complicated process steps such as homogenization and refolding. This makes the entire manufacturing process significantly more efficient and cost-effective. A number of biopharmaceuticals manufactured with ESETEC® are already being evaluated in preclinical and clinical trials. 'Thanks to our ESETEC® technology, we achieved the development breakthrough for antibody fragment PB2452, which needs to be produced as cost-efficiently as possible,' says Leonhartsberger. Jonathan Mow, CEO of PhaseBio, notes that 'the ESETEC® system was our choice because it offers significant productivity and time benefits for manufacture of PB2452. This technology outperforms conventional expression and secretion systems using mammalian cells.' Today, Wacker Biotech produces the GMP (Good Manufacturing Practice) batches ordered by PhaseBio at its Amsterdam site, which became part of the WACKER Group in 2018. 'A highlight of integrating the new site was that the process transfer between Jena and Amsterdam went so smoothly,' stresses Dr. Susanne Leonhartsberger. Furthermore, Wacker Biotech will continue to optimize the production process for PhaseBio.").

354

Highly Confidential – Outside Attorneys' Eyes Only

b)      **My Payment Structure of the License Agreement Does *Not* "contradict[] . . . guiding principles"**

512.    Dr. Vellturo's 4-page discussion of "Ms. Lawton's Payment Structure Background"[1302] asserts that I purportedly "contradict[] [the Federal Circuit's] guiding principles" that: a) "The hypothetical negotiation tries, as best as possible, to create the *ex ante* licensing negotiation scenario and to describe the resulting agreement[,]" and b) "In particular, the hypothetical negotiation should reflect what parties regularly do during 'real-world' licensing negotiations."[1303]  Dr. Vellturo continues to challenge the "dollars-per-unit royalty figure" and now asserts "that Moderna never would have agreed to [it] in the actual world . . ., and that [it] is entirely *unreflective* of what parties (be it Plaintiffs or parties in the industry more broadly) regularly do during real-world licensing negotiations (i.e., specific revenue-percentage running royalty rates)."[1304]  I disagree.  As the discussion above (together with the discussion of the facts in the Lawton Opening Report) shows, which Dr. Vellturo does not dispute, my opinion is based on the unique facts of this case. The facts clearly establish that Moderna did *not* conform to industry practices and in view of Moderna's long history of "misrepresentations," Genevant would seek a payment structure that would make it less likely that Moderna could "cheat" on its royalty obligation to Plaintiffs.

---

[1302] Vellturo Rebuttal Report, ¶¶ 743-749 (pp. 359-362).

[1303] Vellturo Rebuttal Report, ¶ 750 fn 1871.  *See also Innogenetics, N.V. v. Abbott Laboratories,* 512 F.3d 1363, 1380 (Fed. Cir. 2008) ("The jury's damage award . . . [included] a running royalty of 5 to 10 Euros per test on the 190,000 tests Abbott had sold up to that point. . . . **Having used Innogenetics' licensing agreement with Roche as a template for his calculations for this case**, . . ."). *Innogenetics, N.V. v. Abbott Laboratories,* 578 F. Supp. 2d 1079, 32 (W.D. Wis. 2007) ("It knew that **plaintiff had an ongoing license agreement with Bayer that required Bayer to pay plaintiff 15 euros for each test**, making it unlikely that plaintiff would agree to a license agreement that would enable defendant to gain a competitive advantage over Bayer by being able to sell its own kits at a lower price than Bayer. . . . The record belies defendant's assertion that **plaintiff's expert relied exclusively on the Roche license that plaintiff negotiated for the HCV assays when he determined the hypothetical negotiation price. Plaintiff's expert testified that he looked closely at the Roche license because of the similarities between it and the negotiation at issue, but that he did not limit himself to that license. He considered the Bayer royalty because he knew defendant would be competing directly with Bayer**; defendant had an incentive to keep selling its assays because Roche was not yet in the market and defendant could gain market share while Roche was developing a competing product; . . ." (emphasis added)).

[1304] Vellturo Rebuttal Report, ¶ 743.

355

Highly Confidential – Outside Attorneys' Eyes Only

c)      **Dr. Vellturo's Contentions Regarding "technology licensing" and "patent hold-out" is Another Example of Straw Man Fallacy**

513.    Dr. Vellturo asserts that "my discussion about 'technology licensing' and 'patent hold-out'" does *not* "appear to inform her reasonable royalty assessment in any meaningful way."[1305]  I disagree; this another example of Dr. Vellturo's attempt to use Straw Man Fallacy.  Dr. Vellturo claims that I purportedly "fail[] to explain how it [patent hold out] informs her present assessment,"[1306] while ignoring express statements to the contrary.  For example, the Lawton Opening Report expressly states:

> . . . in view of the facts set forth in this report, Genevant would seek a per dose royalty for the following reasons:
>
> **(i) Moderna's History of Hold-Out**
>
> In the hypothetical negotiation, Genevant would consider Moderna's history of "hold-out" including its long-running denials that it was using the patented technology of others, including at least [Plaintiffs'] patents and NIH/NIAID patents. . . .[1307]

514.    In addition, the Lawton Opening Report stated that "Moderna engaged in 'Hold Out'" in this case—and has a history of hold out (*i.e.,* with UPenn (until 2017) and NIAID (until 2022)), which highlights Moderna's "'steal-what-you want' approach to business."[1308]  The Lawton Opening Report also establishes that Moderna's "hold out" created information and financial asymmetries that were severe at the time of the May 31, 2020 hypothetical negotiation.[1309]

8.      **Dr. Vellturo Disagrees with My *Georgia-Pacific* Factor Analysis**

515.    In this 26-page sub-section[1310] captioned "Ms. Lawton's *Georgia-Pacific* Analysis," Dr. Vellturo asserts: "I find that Ms. Lawton's *Georgia-Pacific* analysis is riddled with flaws and contradictions

---

[1305] Vellturo Rebuttal Report, ¶ 747.

[1306] Vellturo Rebuttal Report, ¶ 747.

[1307] Lawton Opening Report, ¶¶ 1437-1438.  *Compare to* Vellturo Rebuttal Report, ¶ 747 ("Thus, I assume Ms. Lawton provides this discussion as some form of claimed support for why Plaintiffs would seek a dollars-per-dose royalty structure from Moderna at the Hypothetical Negotiation.").

[1308] Lawton Opening Report, ¶ 832.

[1309] Lawton Opening Report, ¶ 833.

[1310] Vellturo Rebuttal Report, ¶¶ 766-822 (pp. 372-397).

Highly Confidential – Outside Attorneys' Eyes Only

that undermine its reliability."[1311]  I disagree.  Once again, Dr. Vellturo asserts his *de facto* Established Royalty theory and states: "In contrast, my own affirmative *Georgia-Pacific* analysis avoids most of these non-comparability issues through the use of far more comparable reference points (i.e., the Historical Comparable Licenses)."[1312]  Schedule 13 provides a detailed reasoning and impact of each *Georgia-Pacific* Factor as laid out in my opening report, contrasting it with Dr. Vellturo's affirmative analysis, his critique of my analysis.

### H.    IV I. "Ms. Lawton's Royalty Base Calculations"

516.    In this 6-page section,[1313] Dr. Vellturo states that he "adopts [my] royalty base calculations—for any given set up assumptions underlying each permutation, many of which I understand Moderna contests—with the one exception described therein."[1314]

### 1.    Dr. Vellturo's Exclusion of Units Manufactured *Before* Patent Expiry aand Sold *After* is Incorrect

517.    Dr. Vellturo states that he excludes "units and net sales associated with doses that Ms. Lawton identifies has having been manufactured prior to the expiry of the '651 patent but sold thereafter," which he says is reasonable based on provisions in "Genevant's historical licenses that assess a running royalty only on net sales made during the license term."[1315]  This exclusion is counter to Genevant's entitlement to damages for the alleged infringement and misinterprets the license agreements on which it is based.

518.    I understand that manufacturing is an act of infringement.  Plaintiffs are entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty."[1316]  By excluding doses that Dr. Vellturo must assume infringed through their manufacture, Dr. Vellturo's royalty calculations deny Plaintiffs the full measure of damages to which they are entitled.

519.    Even setting that primary deficiency aside, Dr. Vellturo is wrong to conclude that the license agreements on which he relies would not require payment of a royalty for the doses manufactured

---

[1311] Vellturo Rebuttal Report, ¶ 769.
[1312] Vellturo Rebuttal Report, ¶ 769.
[1313] Vellturo Rebuttal Report, ¶¶ 823-834 (pp. 397-402).
[1314] Lawton Opening Report, ¶ 834.
[1315] Vellturo Rebuttal Report, ¶ 284 n.663.
[1316] 35 U.S.C. § 284

357

Highly Confidential – Outside Attorneys' Eyes Only

prior to expiry but sold after.  Dr. Vellturo relies on the "net sales" provision in the agreements, which, in the 2020 Providence Agreement, for example, defines "net sales" as "the gross amount invoiced by Providence, its Affiliates or Sublicensees on  sales or other dispositions in the Territory of a Product **during a Royalty Payment Term**."[1317]  But he ignores the definition of "Royalty Payment Term":

> Royalty Payment Term" means, on a Product-by-Product and a country-by-country basis, the  term beginning on the First Commercial Sale of such Product in such country and ***ending on the later of***: (a) the date of the last to expire Valid Claim in such country that would be infringed by the making,  using, offering for sale or selling of such Product in such country absent the license grants in this Agreement; and (b) ***twelve (12) years from the date of First Commercial Sale of such Product in such country.***[1318]

520.    Twelve years after the first commercial sale of Moderna's COVID-19 vaccine would not be until 2032.  Thus, under Dr. Vellturo's analysis, not only should the doses manufactured prior to expiry of the '651 Patent be subject to a reasonable royalty, but ***all*** doses infringing the '651 Patent and sold through 2032 should be included in the royalty base.

### 2.    Dr. Vellturo's Contentions Regarding the Start of the Endemic Period

521.    Dr. Vellturo states that I have used "different definitions of the endemic phase in different components of [my] analysis,."[1319]  This relates to an endemic start date of January 2022 for the hypothetical negotiation, and September 2023 for the royalty base calculations.  As the Lawton Opening Report explained, contemporaneous documents at the time of the hypothetical negotiation contained projections that ran through 2021 Q4.  The start of the endemic date was based on Moderna's expectations in May 2020.  However, in reality, the pandemic period ran longer than expected.  For the royalty base which is an accounting exercise and not based on *expectations*, I relied on actual information to determine the start date of the endemic.  As explained in my opening report, this was based on FDA approval date of Moderna's monovalent XBB.1.5 variant COVID-19 vaccine.[1320] However, if I were to use the same start date as Dr. Vellturo suggests, estimated

---

[1317] 2020 Providence Agreement § 1.1, GENV-00022307; *see e.g.*, 2021 Gritstone Agreement § 1.1, GENV-00022689.
[1318] 2020 Providence Agreement § 1.1, GENV-00022307
[1319] Vellturo Rebuttal Report, ¶ 684.
[1320] Lawton Opening Report, FN 3813.

damages would be higher on account of an earlier cut-over to the endemic period which has a higher royalty rate.

### 3.    Correction to the Patent Expiration Date

522.    Finally, Dr. Vellturo uses a patent expiration date of June 30, 2023 for the '651 Patent, in place of the July 15, 2023 date that I used in the Lawton Opening Report. I have recalculated the royalty base using the June 30, 2023 date that I understand to be the correct date.  The correction does not have an impact on my top-line royalty base numbers.  In certain other scenarios where certain patents fall out or certain theories are not applicable, the impact is at most 4.5 million doses, which accounts for approximately 0.4% of total LDP lots of 1,113,840,495.  See Schedules 2.1-Reply – 2.3-Reply.

### 4.    Dr. Prud'Homme's Critique Regarding Indirect Infringement

523.    Dr. Prud'homme opines that "to the extent Dr. Mitchell is relying on any 'use' by patients or healthcare providers as the allegedly infringing act" for indirect infringement, "Dr. Mitchell has not shown which lots, let alone which doses, of Moderna's COVID-19 vaccine were ultimately used."[1321]  I understand that Dr. Mitchell has opined that Moderna's acts constitute indirect infringement as to all doses of its COVID-19 vaccine, at least because "Moderna encouraged healthcare professionals to administer the COVID-19 vaccine by way of the labeling on its COVID-19 vaccine, and Moderna encouraged the public to use Moderna's COVID-19 vaccine through its marketing campaigns" including, as Dr. Prud'homme acknowledges, "Moderna 'encourage[d] individuals to use and administer' Moderna's . . . COVID-19 vaccine," by way of Moderna's package insert.[1322]  Based on considering the opinions of Dr. Mitchell's critique of Dr. Prud'homme, I do not believe that any adjustment to my royalty base is necessary as a result of Dr. Prud'homme's critique.  Nevertheless, I have calculated an alternative scenario based on the percentage of doses administered, should that prove relevant with respect to those claims that recite a method of administration., which I understand to be claims 18 and 19 of the '668 Patent, and claim 16 of the '435 Patent.[1323]  *See* Schedules 10.1-Reply.

---

[1321] Prud'homme Rebuttal Rep. ¶ 873.
[1322] Reply expert Report of Dr. Michael Mitchell, Sec. XII-III; Prud'homme Rebuttal Rep. ¶ 872
[1323] Reply Expert Report of Dr. Michael Mitchell, Sec.XII.

359

Highly Confidential – Outside Attorneys' Eyes Only

## I.   IV J. "Ms. Lawton's Alternative Reasonable Royalty Opinions (v1 vs. v2 formulations)"

524. In this 4-page section,[1324] Dr. Vellturo addresses my two alternative infringement scenarios.  As I explained in my Opening Report, I was asked to determine the reasonable royalty in two alternative scenarios: one in which some, but not all, of the v1 formulation doses infringe, and a second in which none of the v1 or v2 formulation doses infringe.[1325]  I address Dr. Vellturo's rebuttal as to each of these scenarios.

### a)   Infringement by some v1 doses

525. Dr. Vellturo states that I was "unclear as to specifically which v1 doses [I] assume[] are infringing and which are not."[1326]  However, as the Lawton Opening report explained, "even if some of the V1 lots do not infringe, I understand Dr. Mitchell has opined that, based on the COA data, Moderna could not have manufactured such non-infringing lots without also manufacturing infringing lots."[1327]

526. Dr. Vellturo states that "when presented with a scenario corresponding to what [he] understand[s] is strictly *less* infringement, [I] arrive[] at precisely the same total damages quantum."[1328]  He also states that I "appear[ed] to reduce neither [my] royalty base nor [my] royalty rate," and opines that I dismissed dynamics that are important in "considering the scope of [a party's] infringement."[1329]  I disagree.  As the Lawton Opening Report explained: "Because Moderna did not have a way to manufacture non-infringing doses without also manufacturing infringing doses, the infringing doses 'enable[] and [are] needed] to enable otherwise-unavailable profits from' the non-infringing doses."[1330]  I understand that Dr. Mitchell has likewise opined that he has "seen no evidence suggesting that Moderna is or ever was capable of producing the COVID-19 vaccine without infringing the Patents-in-Suit," and that the evidence cited in his opening and reply reports

---

[1324] Vellturo Rebuttal Report, ¶¶ 835-841 (pp. 402-405).
[1325] Lawton Opening Report, ¶¶ 1649–1662.
[1326] Vellturo Rebuttal Report, ¶ 836.
[1327] Lawton Opening Report, ¶ 1650.
[1328] Vellturo Rebuttal Report, ¶ 837.
[1329] Vellturo Rebuttal Report, ¶ 837.
[1330] Lawton Opening Report, ¶ 1652 (citing *Brumfield v. IBG LLC*, 97 4th 854, 876–77 (Fed. Cir. 2024); *IPA Techs., Inc. v. Microsoft Corp.*, No. CV-18-1-RGA, 2024 WL 19962070, at *1 (D. Del. May 2, 2024).

360

Highly Confidential – Outside Attorneys' Eyes Only

"demonstrates that they were not."[1331]  Accordingly, as the Lawton Opening Report stated, "at the hypothetical negotiation, Moderna still would have agreed to the same reasonable royalty rate per dose for *all* v1 doses, including those that do not literally infringe."[1332]  Dr. Vellturo fails to squarely address that opinion.

527.   Dr. Vellturo also states that "Plaintiffs may allege that for the doses that [I] appear[] to assume do not constitute literal infringement, there may still be so-called 'transitory' infringement that occurs for a limited time during the manufacturing process."[1333]  To support his assertion, Dr. Vellturo states that he understands from Dr. Prud'homme "that any such infringement would exist, at most, for a matter of *seconds* during the manufacturing process."[1334]  Again, as I explained above, Dr. Vellturo fails to address my opinion which is that Moderna would have agreed to same reasonable royalty rate per dose for all v1 doses, including those that do not literally infringe, because Moderna did not have a way to manufacture non-infringing doses without also manufacturing infringing doses.  Dr. Vellturo's point about "transitory" infringement is beside the point. Moreover, based on my understanding from Dr. Mitchell, I understand that Dr. Prud'homme's opinions concerning "transitory" infringement are incorrect.[1335]

### b)    No v1 or v2 doses infringe

528.   As the Lawton Opening Report explained, in the event that neither the v1 or v2 doses infringe, "the parties would have reached a different bargain at the hypothetical negotiation."[1336]  More specifically, I opined that "[t]he amount of the commercialization milestone would be based on the *pandemic* phase royalty rate of $4.77/dose applies to the 100 million doses in the offer" to the U.S. Government, "or $477 million."[1337]  Dr. Vellturo seemingly criticizes my opinion because this commercialization milestone "would be based on [sic] same $4.77 per-dose pandemic royalty rate that [I] claim[] represents a 25% profit split."[1338]  But Dr. Vellturo offers no reason why the per-dose pandemic royalty have to be different in the scenarios I discussed.[1339]

---

[1331] Reply Expert Report of Dr. Michael Mitchell, Sec. XVII.A.
[1332] Lawton Opening Report, ¶ 1652.
[1333] Vellturo Rebuttal Report, ¶ 838.
[1334] Vellturo Rebuttal Report, ¶ 838.
[1335] *See* Reply Expert Report of Dr. Michael Mitchell, Secs. XI.A, XVII.A.
[1336] Lawton Opening Report, ¶ 1654.
[1337] Lawton Opening Report, ¶ 1662.
[1338] Vellturo Rebuttal Report, ¶ 839.
[1339] Vellturo Rebuttal Report, ¶¶ 839–841.

361

Highly Confidential – Outside Attorneys' Eyes Only

529.    Instead, Dr. Vellturo opines that my analysis "inherits the many flaws of [my] baseline analysis" that he addressed in Section IV of his Rebuttal Report.[1340]  But, as I discuss earlier in this section, Dr. Vellturo is wrong.  Dr. Vellturo also opines that I "significantly compound one key flaw"— namely, my "clear reliance on economic holdup."[1341]  As I explain in Section IV.E.1.b, I disagree with Dr. Vellturo's assertion.  At bottom, Dr. Vellturo cannot dispute the fact that at the time of Moderna's May 31, 2020 offer to the U.S. Government, Moderna has not yet approved a change from the PVU formulation.[1342]  I understand that Dr. Mitchell has also opined that even if Moderna's v1 and v2 formulations were not infringing (although I understand Dr. Mitchell concludes they are infringing), neither of those formulations were available and acceptable as of May 31, 2020.[1343]  Dr. Vellturo also fails to address that my assertion that Moderna, "[i]n order to stay in the running to secure a contract with the U.S. Government, . . . needed the ability to make the May 31, 2020 offer with respect to the infringing PVU formulation."[1344]  He likewise fails to address the time pressures intensifying in the days leading up to Moderna's May 31, 2020 offer.

### J.    IV K. "Ms. Lawton's Opinions on Willfulness"

530.    In this 4-page section,[1345] Dr. Vellturo has offered an analysis of my opinions related to willfulness.  Dr. Vellturo opines that "it is surprising that Ms. Lawton has offered an opinion as to willfulness."[1346]  Here again, Dr. Vellturo mischaracterizes my opinion.  Contrary to his assertion, I am "provid[ing] opinions regarding certain facts relevant to whether Moderna's infringement was willful, that are within my areas of expertise and that relate to the analysis I have performed in this case."[1347]

531.    Dr. Vellturo states that he does not interpret an email from Torsten Woehr at Corden Pharma as evidence that Moderna "knew that it needed a license."[1348]  To support his assertion, Dr. Vellturo cites Mr. Francis's testimony that he believed Mr. Woehr "was not 'privy to the Alnylam/Tekmira

---

[1340] Vellturo Rebuttal Report, ¶ 840.
[1341] Vellturo Rebuttal Report, ¶ 840.
[1342] Lawton Opening Report, ¶¶ 1654-1662.
[1343] Reply Expert Report of Dr. Michael Mitchell, Sec. XV.
[1344] Lawton Opening Report, ¶ 1657.
[1345] Vellturo Rebuttal Report, ¶¶ 842-851 (pp. 405-408).
[1346] Vellturo Rebuttal Report, ¶ 843.
[1347] Lawton Opening Report, ¶ 1664.
[1348] Vellturo Rebuttal Report, ¶ 844.

362

Highly Confidential – Outside Attorneys' Eyes Only

agreement.'"[1349]  But Dr. Vellturo fails to explain how Mr. Francis has any personal knowledge to address whether Mr. Woehr was aware of the ownership of the "SNALP [table-nucleic acid particles] technology" referenced in his April 11, 20214 email to Moderna.[1350]  Dr. Vellturo also cites additional testimony from Mr. Francis in which he stated that Moderna was in discussions "to figure out . . . how we define the right collaboration if we work with different players."[1351]  Even if Moderna was considering different types of agreements and/or collaborators at that time does not mean that Moderna reasonably believed it could forego obtaining a license to Plaintiffs' LNP technology.

532.   Dr. Vellturo opines that Dr. Tony de Fougerolles's "having discussions with Tekmira at the same time as AlCana . . . seems consistent with Mr. Francis's testimony that Moderna was seeking 'many different types of partnerships' and 'it wasn't one flavor of engagement.'"[1352]  As an initial matter, Dr. Vellturo is relying on Mr. Francis's self-serving testimony to downplay the fact that Mr. de Fougerolles, in a contemporaneous email, described AlCana as a "useful alternative to dealing with Tekmira."[1353]  Moreover, Dr. Vellturo does not address the fact that Mr. Francis testified that Moderna first learned about the Patents-in-Suit from Tony de Fougerolles who "was

---

[1349] Vellturo Rebuttal Report, ¶ 844.

[1350] MRNA-GEN-01754010-412, at 411 (Francis Deposition Exhibit No. 19 – April 11, 2014 email from Torsten Woehr [Corden Pharma] to Said Francis, cc: Michael Middleditch, Subject: RE: Contact). May 22, 2024 30(b)(6) Deposition of Said E. Francis, 138:18-140:1 ("Q. He goes on to say here, 'As indicated in my previous e-mail my day-to-day contact at Alnylam, David Watkins, thinks that you may have to talk also to Tekmira, the inventor of the original formulation with MC3 (I think they call it the SNALP technology).' Do you see that? A. Mmhmm. Q. Had you heard the term 'SNALP' before it was used in this e-mail? A. This is April 2014, SNALP was on Tekmira's website. Q. And SNALP is what Tekmira called their LNP technology, correct? A. Yes. Q. And what Dr. Woehr is telling you is that Tekmira was the inventor of the original LNP formulation with MC3, correct? . . . A. He – that's the words in the e-mails he had. He thinks that we have to talk to this person and he characterized it as such. Torsten Woehr is head of sales and marketing, not subject matter expert in inventorship, and I don't think he's privy to the Alnylam/Tekmira agreement. So just from – the e-mail – his line says that, but . . .").

[1351] Vellturo Rebuttal Report, ¶ 844.

[1352] Vellturo Rebuttal Report, ¶ 845.

[1353] MRNA-GEN-01759820 (Hoge Deposition Exhibit No. 12 – February 6, 2013 email from Tony de Fougerolles to Stéphane Bancel, cc: Stephen Hoge, Susan Whoriskey, Subject: Re: AlCana and Tekmira update). MRNA-GEN-01247585 (Bancel Deposition Exhibit No. 2/Francis Deposition Exhibit No. 3 – February 6, 2013 email from Tony de Fougerolles to Stéphane Bancel, cc: Stephen Hoge, Susan Whoriskey, Subject: Re: AlCana and Tekmira update).

Highly Confidential – Outside Attorneys' Eyes Only

quite familiar with the patents-in-suit" from his prior work at Alnylam.[1354]   Indeed, Mr. Bancel testified that he "first became aware of LNP technology in 2013 or 2012," when Dr. de Fougerolles mentioned it to him.[1355]   Accordingly, Moderna has been aware of the Patents-in-Suit since at least then[1356]—another fact Dr. Vellturo fails to address.

533.    Dr. Vellturo states that, although he "understand[s] Arbutus sued Acuitas, the sublicenses Acuitas granted to Moderna were nevertheless left intact despite the termination of the cross-license between Arbutus and Acuitas, which Ms. Lawton concedes."[1357]   But nowhere does Dr. Vellturo address the fact that COVID-19 was *not* one of the four viral targets that Acuitas could sublicense to Moderna, and that Moderna knew that.[1358]

534.    Dr. Vellturo opines that he "do[es] not understand disclosure of a reference during prosecution of a patent application to suggest awareness to support willfulness."[1359]   I disagree with Dr. Vellturo to the extent he is opining that the Moderna did not have knowledge of the Patents-in-Suit multiple years before the date of the hypothetical negotiation in 2020.   As I explained in my Opening Report, Moderna was aware of the Patents-in-Suit, knew that it needed a license, and was aware that it did not have one for the COVID-19 vaccine.[1360]

---

[1354] May 22, 2024 30(b)(6) Deposition of Said E. Francis, 40:3-41:9, 63:18-64:16 ("Q. . . . Moderna had looked at Tekmira's portfolio about the LNP they had developed, as you say, for the siRNA world, correct? A. As I mentioned, our chief scientific officer, Tony [de Fougerolles], came from Alnylam, which had an active collaboration with Tekmira. So he is aware – he should have – he must have been aware at that time of Tekmira's portfolios.").

[1355] June 28, 2024 Deposition of Stéphane Bancel, 19:19-20:1 ("Q. Do you recall how you became aware of the technology? A. Yes. It's our chief scientific officer, Tony de Fougerolles, who mentioned the technology. I was not familiar with it before.").

[1356] June 28, 2024 Deposition of Stéphane Bancel, 141:12-141:19 ("Q. . . . Moderna has been involved in trying to negotiate a license to Genevant, Arbutus, and Tekmira's IP for over ten years, correct? . . . THE WITNESS: Moderna has had discussion with Tekmira for ten years, that's correct, . . .").

[1357] Vellturo Rebuttal Report, ¶ 846.

[1358] *See* MRNA-GEN-00225558; Said Francis 05/22/2024 Tr. 235:4-14; Moderna's Objections & Responses to Plaintiffs' First Set of Interrogatories (June 10, 2024) at 145.

[1359] Vellturo Rebuttal Report, ¶ 846.

[1360] *See* Lawton Opening Report, Section VII.A.

535.    In my Opening Report, I noted that Moderna's internal documents showed that one of its objectives was: "Fix backward risk balance . . . LNP/Abus."[1361]   I further stated that based on my investigation, Moderna never did "Fix[] backward risk balance . . . LNP/Abus." Opening Rep. Section VII.  In response to that, Dr. Vellturo states that I "ha[ve] not offered what . . . personal investigation [I] conducted to confirm one way or the other whether Moderna fixed said 'backward risk balance.'"[1362]   I disagree.  As I explain in my Opening Report, I chronicled in great detail Moderna's efforts and decision to bypass obtaining a licensing agreement from Plaintiffs to their LNP technology.   Moreover, as I explain in my Opening Report, I understand that Dr. Mitchell has pointed out that Moderna continued using Plaintiffs' LNP formulation after the date of this presentation up through phase 1 trials for COVID.[1363]   I also noted Dr. Mitchell's opinion that Dr. Hoge "directed his technical team to explore compositions having only ███████████████ because that "reflect[ed] what Moderna understood what was needed to design around the Lipid Composition Patents."[1364]   Dr. Mitchell further opined that "Moderna appears to later have shifted

---

[1361] *See* Lawton Opening Report, Section VII; MRNA-GEN-01503761 (Hoge Deposition Exhibit No. 31 – December 5, 2017 email from Stephen Hoge to Stephen Hoge) (emphasis added). May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 320:19-322:18 ("Q. . . . if we could look at number 4 [on Hoge Deposition Exhibit No. 31], it says, 'Fix backward risk balance.' Do you see that? A. Right. Q. And then 4.2 underneath that is, 'LNP/Abus.' That's LNP Arbutus, I assume? A. Mm-hmm. Q. And how did you intend to fix the backward risk balance with respect to LNP Arbutus in 2017? A. It would have to be in the context of our discussions with them, which I think there had been multiple in 2017. I can't remember whether this is related to – where it is in relation to the litigation between Arbutus and Acuitas in time, but we were obviously aware of that litigation and, as you'd previously covered, had been in discussions with Tekmira that never went anywhere about the possibility of a direct license to some of the patents, intellectual property related to a couple of those products that in 2017 were still under development. So -- . . . So that's what I would assume I meant by 4.2. Q. What does it mean to fix the backward risk balance. A. When I look at the five things underneath there, it's not entirely clear to me. Reorganizing R&D, biodistribution, Alexion, LNP, UPenn, I mean, they're all very different things, so I'm not exact – it's hard for me to imagine how that covers all of them. For instance, reorganizing R&D feels like a weird way to characterize, you know, a backward risk balance. I don't actually know what is meant there. Q. Would filing an IPR fix a backward risk balance if it was successful? A. Possibly, but obviously reorganizing R&D wouldn't.").
[1362] Vellturo Rep. ¶ 847.
[1363] *See* Lawton Opening Report, Section VII.
[1364] *See* Lawton Opening Report, Section VII; Mitchell Opening Report, Section XIII.C; MRNA-GEN-0261987 (email from Stephen Hoge encouraging scientists to explore LNPs with only █ ████████████████ noting the "incredibly strong business reasons why [such a composition] is more attractive").

365

Highly Confidential – Outside Attorneys' Eyes Only

its goal to try to achieve a composition with target lipid ratio of ███████████████," and, that despite "experimentation with different lipid compositions," Moderna was "unable to obtain suitable compositions with either of those target lipid rations, . . . ultimately us[ing] the target v1 and v2 Formulations [which] hav[e] target cationic lipid ratios of 48.5 mol % and 48 mol %, respectively."[1365]

536.  Dr. Vellturo states that, based on his understanding from Dr. Prud'homme, Dr. Mitchell's opinion that Moderna's platform was built on copying Plaintiffs' patented LNP technology is incorrect.[1366] However, I understand from Dr. Mitchell that Moderna's platform was indeed built on copying Plaintiffs' patented LNP technology and that he disagrees with Dr. Prud'homme's opinions to the contrary.[1367]  Contrary to Dr. Vellturo's assertion,[1368] for this reason and for the reasons set out in my Opening Report, in my opinion, Moderna was aware that it needed to acquire a license to the Patents-in-Suit.[1369]

537.  Dr. Vellturo attempts to undermine my reliance on correspondence involving Kerry Benenato in which she stated that "we have to fib a bit and not tell the whole structure story."[1370]  Contrary to Dr. Vellturo's opinion, this and other evidence I set forth in my Opening Report shows that Moderna was "deliberately tr[ying] to hide evidence of its use [of Plaintiffs' Patents-in-Suit]."[1371] Dr. Vellturo attempts to undermine my reliance on this email by noting that, according to Dr. Prud'homme, "MC3 only describes a cationic lipid, and therefore describes part of the structure of an entire LNP-based formulation."[1372]    But as I explain in my Opening Report,[1373] Moderna employees, in various contexts, have used the moniker "MC3" to refer to both the specific cationic lipid Moderna used, which Moderna associated with Tekmira, along with the "MC3-LNP,"[1374]

---

[1365] *See* Lawton Opening Report, Section VII; Mitchell Opening Report, Section XIII.C.
[1366] Vellturo Rebuttal Report, ¶ 848.
[1367] *See* Mitchell Opening Report, Section XVIII.C; Mitchell Reply Section XVI.
[1368] Vellturo Rebuttal Report, ¶ 848.
[1369] *See* Lawton Opening Report, Section VII.
[1370] Vellturo Rebuttal Report, ¶ 849.
[1371] Opening Rebuttal Report, Section XVII.
[1372] Vellturo Rebuttal Report, ¶ 849.
[1373] *See, e.g.*, Lawton Opening Report, ¶ 524.
[1374] See, e.g., MRNA-GEN-01067716-763, at 752 (Benenato Deposition Exhibit No. 28 – "Chemistry Update – R&D Meeting," Moderna, July 17, 2015, Slide 37 of 48) ("Tekmira compounds" showing MC3); MRNA-GEN-01290882-893, at 887 ("MC3 ownership overview," Moderna, June 26, 2014, Slide 6 of 12); MRNA-GEN-01061710-720, at 714-17 (Benenato

366

Highly Confidential – Outside Attorneys' Eyes Only

which is an LNP with a lipid molar ratio of 50:38.5:10:1.5.[1375]  Dr. Vellturo fails to address Ms. Benenanto's email in the context of that evidence.

538.   Dr. Vellturo states that my opinion that Hamilton Bennett "took efforts to remove references to language that could be perceived as crediting the contributions and inventions of others to Moderna's COVID-19 vaccine" "seems inconsistent."  Vellturo Rep. ¶ 850.  I disagree.  As I explain in my Opening Report, Ms. Bennett informed her colleagues at the NIH that "we need to redact the formulation" before distributing them publicly.[1376]  Nowhere does Dr. Vellturo address this evidence.  Moreover, without providing any explanation, Dr. Vellturo states that he does not understand how my "references to 'NIH investigators' has any relationship as to willfulness of the Patents-in-Suit."[1377]  However, I explain that in detail in my Opening Report.[1378]  Finally, I cited Ms. Bennett's email to the U.S. Government, in which she stated that mRNA-1273 purportedly did not use the "Arbutus patent."[1379]  Dr. Vellturo states that this statement "omits contextual testimony," and that it "was informed by privileged discussions and understandings from

---

Deposition Exhibit No. 18 – Benenato notes article: Michael J. Hope (Acuitas), "Enhancing siRNA delivery by employing lipid nanoparticles," Therapeutic Delivery, 2014, pp. 663-673).

[1375] May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 45:9-47:1; May 22, 2024 30(b)(6) Deposition of Said E. Francis,99:11-107:17 ("Q. MC3, as you said, is a cationic lipid, correct? A. Yes. Q. And the bullet is about accessing an LNP that's already in the clinic, correct? A. Those are the words before it, yes. Q. Does this mean an LNP contains MC3 in it is what you were trying to get access to? A. The intent here I presume was essentially an LNP where the cationic lipid is MC3."); 139:11-140:1 ("Q. And what Dr. Woehr [Corden] is telling you is that Tekmira was the inventor of the original LNP formulation with MC3, correct? A. He – that's the words in the emails he had. He thinks that we have to talk to this person and he characterized it as such. Torstein Woehr is head sales and marketing, not subject matter expert in inventorship, and I don't think he's privy to the Alnylam/Tekmira Agreement. So just from – the email – his line says that . . ."); MRNA-GEN-01754010-012, at 011 (Francis Deposition Exhibit No. 19 – April 11, 2014 email from Torsten Woehr [Corden Pharma] to Said Francis, cc: Michael Middleditch, Subject: RE: Contact) ("you may have to talk also to Tekmira, the inventor of the original formulation with MC3 (I think they call it the SNALP technology).").

[1376] Lawton Opening Report, Section VII; MRNA-GEN-01115170-171 at-170 (June 19, 2020 Email, From: Hamilton Bennett; To: Chris Roberts (NIH)).

[1377] Vellturo Rebuttal Report, ¶ 850.

[1378] See Lawton Opening Report, Section VII.

[1379] Lawton Opening Report, ¶ 1687.

Highly Confidential – Outside Attorneys' Eyes Only

Moderna's in-house lawyers."[1380]  But Dr. Vellturo only cites Ms. Bennett's self-serving testimony to support his assertion and I understand that Moderna is not asserting an advice-of-counsel defense and has not waived privilege over those discussions.  Moreover, based on my understanding from Dr. Mitchell, mRNA-1273 is indeed covered by the "Arbutus patent"—i.e., the Patents-in-Suit.[1381]

539.    Dr. Vellturo states that, based on his understanding from Dr. Prud'homme, "Moderna did design around and thus did not willfully infringe the Patents-in-Suit."[1382]  However, I understand from Dr. Mitchell that Moderna failed to design around the Patents-in-Suit.[1383]


**<u>SIGNATURE</u>**

Respectfully submitted this 21st day of March, 2025.


Catharine M. Lawton

---

[1380] Vellturo Rebuttal Report, ¶ 850.
[1381] *See, e.g.*, Mitchell Opening Report, Sections XII, XIII, XIV.
[1382] Vellturo Rebuttal Report, ¶ 851.
[1383] *See* Mitchell Opening Report, Section XVIII; Mitchell Reply Report, Section XVI.