# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

----------------------------- x

ARBUTUS BIOPHARMA CORPORATION   :

and GENEVANT SCIENCES GmbH,     :

            Plaintiffs      :

     vs                        : Civil Action No.

MODERNA, INC. and               : 22-252-MSG

MODERNATX, INC.,                :

           Defendants      :

----------------------------- x

CONFIDENTIAL

Videotaped Deposition of CATHARINE LAWTON

Conducted Virtually

Wednesday, April 30, 2025

9:07 a.m.

Job No.: 578204

Pages: 1 - 270

Reported Stenographically By: Anita M. Trombetta,

RMR, CRR, California CSR No. 14647

Q Is anyone in the room with you other than Mr. Harber and Mr. Lachman?

A No.

Q And can you agree not to communicate with them while we're on the record?

A Yes.

Q All right. And do you have -- in front of you do you have copies of your reports?

A Yes, I have them here.

Q Okay. Great. We'll mark them shortly. But after we do, you know, feel free to refer to the paper copies if you prefer, but I'll be putting them in the chat just so that we have them -- have it clear on the record. Is that fair?

A Yes.

Q Now, were you retained by -- by just Genevant in this case?

A Yes.

Q Do you have any agreement with Arbutus?

A I believe our engagement letter is with Williams & Connolly on behalf of Genevant, but I would have to check the engagement letter. But that's my -- that's my general recollection.

Q So sitting here, you don't believe that

you have any type of agreement with Arbutus?

A As I said, I would have to check the engagement letter.

Q And you were retained to offer opinions related to damages, secondary considerations, and willfulness in this case; is that right?

A Not with respect to willfulness. Damages and secondary considerations, as I state in my opening report. I have material that's relevant to the issue of willfulness that's within the -- my purview as an expert, but I'm not offering an opinion on willfulness.

Q Okay. So the -- the opinions you plan to offer are on damages and secondary considerations; is that right?

A Yes.

Q And you have a bachelor's degree -- strike that.

Do you have a bachelor's degree in -- in economics?

A In finance.

Q Do you have any other degrees?

A No. I have substantial coursework in economics as well, sufficient for a bachelor's degree, but I was short a couple of hours of a

second degree at U of I.

Q  Do you have any certifications?

A  No.

Q  Do you have a science background of any kind?

A  I do not, no.

Q  And, now, with respect to the -- the willfulness aspect of your report, did you take into account whether Moderna's infringement is willful in arriving at your damages opinions?

A  No.

Q  Does the analysis that you performed related to willfulness affect your damages opinions?

A  No.  I didn't perform an analysis per se with respect to willfulness.  What I set forth in my opening report, as I explain, are certain facts and information that's relevant to -- potentially relevant to the issue of willfulness that was part of the facts that are in the background of my report, set forth earlier in earlier sections to the report as well.

Q  So does the information that you relied on in the willfulness section of your report affect your damages opinions?

Mr. Harber said that Exhibit C was missing from your reply report. We never got an Exhibit C to your reply report. So if there is one, it's not a -- Exhibit C would be your considered list, right?

A Yeah. And it should be Exhibit C-Reply. It's referenced in the text of the report itself.

Q Yeah, I don't think we got one. It's -- if on a break or lunch, if you could just take a look and send it over, that would be great. But I just -- I don't think we got it.

So does that -- can you just check on a break or lunch?

A Sure.

Q Thank you. Great.

So let's talk about some of your opinions. So -- now, in your analytical method you quantify damages from Moderna's pandemic sales of the COVID vaccine, right?

A Yes.

Q And you don't have a separate per-unit rate for Moderna's endemic sales of its accused COVID vaccine, right, under your -- under your analytical -- let me ask -- I'll do it again.

Under your analytical approach, you don't

have a separate per-unit rate for Moderna's endemic sales of its accused COVID vaccine, correct?

A That's right. For the reasons stated in the opening report.

Q Under your hypothetical negotiation method, you -- you have a pandemic per-unit rate and also an endemic per-unit rate, right?

A Yes.

Q Now, is it your opinion that damages could be based on your pandemic per-unit rate under your analytical approach and your endemic per-unit rate under your hypothetical negotiation approach?

A That certainly was in the realm of possibility, yes.

Q Now, do the patents-in-suit provide different benefits depending on whether Moderna's accused COVID vaccine is sold during the pandemic or during the endemic phase?

A I don't think that there are different advantages per se. There's a different market condition with respect to the circumstances in the pandemic phase and the endemic phase, and that was an expectation of Moderna and other competitors in the marketplace at the time of the hypothetical

negotiation.  So the value derived from the vaccines was expected to be different in the endemic phase.

Q  So setting aside the market conditions, I guess are there different benefits that the patents-in-suit provide depending on whether the accused COVID vaccine is sold during the pandemic or during the endemic phase?

A  Oh, the patents-in-suit are key enabling technology for the vaccines in the first instance, and they are key enabling inventions, as I understand it from Dr. Mitchell, in the -- the pandemic phase as well as the endemic phase.  And there's a path dependency and an expected path dependency between having a vaccine in the pandemic phase and the ability to -- to capitalize on the endemic opportunity, and that was expected at the time of the hypothetical negotiation.

Q  Is the key enabling technology of the patents-in-suit different in a vaccine sold during the pandemic phase versus the endemic phase?

A  Well, as I understand it from Dr. Mitchell, the key enabling technology enabled the -- the vaccine to work.  And that would be true, as I understand it, in either the pandemic

09:51:48
09:51:55
09:52:00
09:52:06
09:52:20
09:52:22
09:52:27
09:52:30
09:52:33
09:52:37
09:52:40
09:52:43
09:52:52
09:52:55
09:53:00
09:53:02
09:53:09
09:53:14
09:53:26
09:53:29
09:53:34
09:53:41
09:53:46
09:53:49
09:53:53

phase or the endemic phase.

Q  Do the patents-in-suit contribute a different portion of the value of the accused products depending on whether the product is sold during the pandemic phase as opposed to the endemic phase?

A  Well, its key enabling technology with respect to both phases, that's not different.  So its key enabling characteristic is the same whether it's the pandemic phase or the endemic phase.

Q  So the patents-in-suit contribute the same portion of the value of the accused products whether they're sold during the pandemic phase or the endemic phase?

ATTORNEY HARBER:  Objection to form.

(Reporter clarification.)

A  Can you repeat the question?

Q  Sure.  So the patents-in-suit contribute the same portion of value of the accused products whether they're sold during the pandemic phase or the endemic phase?

ATTORNEY HARBER:  Same objection.

A  I would say generally speaking that's true, in view of the path dependency in

particular.

Q   Is the use made of the patents-in-suit different in the accused products depending on whether the product is sold during the pandemic phase versus the endemic phase?

A   Is the use that Moderna made of the patented invention different in the two phases?  I can't think of a difference between the two.  It was key enabling technology to have a functioning vaccine, as I understand it from Dr. Mitchell.

Q   Okay.  I'm going to ask you a little bit about your analytical approach, and so if you want to -- about some specific paragraphs.

So in paragraph 1215, I think is where I'll start, and that is on page 830.

A   Okay.

Q   And so in the -- the second sentence of paragraph 12 says, "The analytical method calculation focuses on the infringer's projections of profit for the infringing product at the time the infringement began, and then subtracting the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices."

So do you see that?

A  Yes, as applied in the TWM v. Dura case.

Q  And does what I just read, does that set out the framework that you used for your analytical approach in this case?

A  That's a fair summary of the approach that I'm applying in this case, reasonably fair summary.

Q  And if you go to the next paragraph, paragraph 1216, there is a block quote from an article in Le Nouvelle.

Do you see that?

A  Yes.

Q  And then in the -- in the second sentence of the block quote it says, in reference to the analytical approach, that it, "involves comparison between the accused parties' profit rate on sales of product embodying the patent property on the one hand, and profit from products not embodying the patent on the other."

Do you see that?

A  Yes.

Q  Okay.  Do you agree that that's an accurate reflection of the analytical method?

ATTORNEY HARBER:  Objection.  Calls for a legal conclusion.

A  Again, my understanding and experience over more than 40 years is that there are various ways in which the analytical method has been applied.  Based on the infringer's projections subtracting usual or accepted profit or industry standard profit is one method or one methodology, as set forth in the original TWM v. Dura case, and the product comparison with and without the patented technology is another -- another version of the analytical approach which is directed to isolating directly the value of the -- of the patented invention.

So there -- there are two different approaches that apply in different fact sets, and both have been accepted and both are used depending on the facts of the particular case.

Q  So the -- so based on your experience, there's a way to do the analytical method using the infringer's projections and subtracting industry profit, and another method of doing a product comparison whereby one product has the patented technology and the other doesn't; is that right?

A  Well, it's the same method.  It's the analytical approach.  And depending on the facts

09:59:40
09:59:42
09:59:48
09:59:51
09:59:57
10:00:00
10:00:06
10:00:11
10:00:14
10:00:20
10:00:23
10:00:27
10:00:29
10:00:33
10:00:37
10:00:41
10:00:44
10:00:49
10:00:52
10:00:56
10:01:05
10:01:09
10:01:11
10:01:11
10:01:13

of the particular case, under the original TWM v. Dura case that focuses on the infringer's projected projections for the accused infringing product, and then the subtraction is their usual or customary profit, acceptable profit, industry standard profit, all of those measures of subtractions for ordinary profit have been used in various cases.

The other -- the other branch of the analytical method, if you will, is the two-product comparison with and without -- with and without the patented invention. And both have been used. I've used both. They're generally accepted applications of the analytical method.

Q And, then, so the -- the branch of the analytical method where you do a product comparison, that is not something that you did in this case, right?

A That's right. The -- the circumstances in this case, the facts of this case don't give rise to the application of that branch of the analytical method.

Q And so, then, in this case, the branch of the analytical approach that you applied is to take the infringer 's projected profits and then

subtract their usual or customary profit or an industry standard profit; is that right?

A  Right.  As set forth in detail in my opening report, it focuses on Moderna's projections around the time of the hypothetical negotiation and accounts for all of the costs that Moderna identified as costs associated with the product, and then subtracts what Moderna itself identified to the U.S. government as an acceptable profit for this particular product, the accused infringing product.

Q  As part of your analytical approach, you did not rely on an industry standard profit margin; is that right?

A  I didn't rely on it in my analysis.  I do set forth in the earlier sections of my report estimates of what an industry standard profit is based on the largest life sciences companies, so I certainly have information with respect to what that level of -- of operating profit was.

But for purposes of this analysis, we had Moderna's own statement to the United States government as to what their -- their profit on this product was, and I viewed that as a more specific and more -- more directly connected

estimate than using something like an industry standard profit that would be subject to challenges to whether it's applicable to Moderna, that had no prior commercial products, was -- was a startup, pre-commercial stage.

So in my opinion, Moderna's own estimates of its acceptable product for this accused infringing product is the most reliable estimate for that subtraction.

Q  So I guess just to be clear, in your analytical method, you did not rely on an industry standard profit margin, correct?

A  Right.  So going back to paragraph 1215, subtracting the infringer's usual or acceptable net profit from its anticipated net profit realized from the sale of infringing devices.

So it can be an industry standard profit, it can be the infringer's usual or accepted net profit.  It -- the point is, it's a subtraction in various -- various concepts for that subtraction have been used in -- depending on the facts of a particular case.  And as I said, in my view, Moderna's own statement in July of 2020 as to what its acceptable profit was in a document submitted to the U.S. government is a reliable basis to

establish that -- that subtraction in this case.

Q So in your analytical method, you relied on Moderna's own statement of its acceptable profit, not an industry standard profit, correct?

A Right. For the reasons that I just described.

Q So at the time of the hypothetical -- well, strike that.

In this case the hypothetical negotiation is end of May 2020, correct?

A May 31st of 2020, yes.

Q And at the time of the hypothetical negotiation, Moderna did not have a commercial product, correct?

A Moderna as a company was not then selling any commercial product. It was a pre-commercial stage company at that point in time. They had developed the mRNA-1273 product at that time and were -- offered it for sale to the U.S. government on May 31st of 2020, which is an indication of a commercial use.

So they -- they were on the doorstep, if you will, of commercialization at that point of the accused infringing product.

Q Right. So as of the date of the

hypothetical negotiation, Moderna did not have any revenues, right?

A Well, they had revenues to the extent that they were recording revenue received from various partnerships, revenue that they had -- money that they had received from the U.S. government in connection with this project where they weren't actually recognizing the revenue. There's cash that they had received in connection with the mRNA-1273 product.

So I would have to go back and look at what the revenue recognition was at the -- as of May 31st of 2020. But certainly they had received revenue in the form of grants and other -- other contributions in connection with the development work that had been ongoing since 2013, or the first date of their -- of their joint development agreements.

Q As of May 31st, 2020, Moderna did not have any revenues from commercial sales of any products, right?

A That's right, yes.

Q And as of May 31st, 2020, Moderna did not have any profits from commercial sales of any products, right?

A That's right.

Q Now, the profit that you use in your analytical approach is not Moderna's actual profits, correct?

A Right. As the -- as the analytical approach under this branch suggests, it's based on the accused infringer's projection for the accused product around the time of the hypothetical negotiation. So it is not based on actuals, nor should it be based on actuals.

Q So in your view, none of the profit information that is used under the analytical approach should be based on actuals; is that right?

ATTORNEY HARBER: Objection to form.

A Right. The analytical approach under this branch is based on the accused infringer's projections around the time of the hypothetical negotiation. It's an expectations-based analysis.

Q And so is every input into your analytical approach expectations as opposed to actuals-based?

ATTORNEY HARBER: Objection to form.

A Well, as set forth in the report, the details of each one of the -- the elements of the calculation are described in detail. The cost

subtractions are based on -- for example, cost of goods sold was based on some historical information that Moderna had, but based on their projection for what the cost of goods sold was going to be.

The subtractions for the investment platform, the return on investment on the platform, those were based on the -- the investment which, by definition, is a historical number. The other subtractions are based on a mix of historical and expected. The one that is -- that was expected at the time in terms of NIAID was not known at the time of the hypothetical negotiation, but there was a -- an expectation that based on the use of the -- the NIAID patents, that there could be a royalty associated with that.

And so the calculation there is derived from the actual license -- the settlement license agreement between the U.S. NIAID and Moderna that was in, I think, November of 2022, I want to say, after the date of the hypothetical negotiation, clearly.

Q  As of May 31st, 2020, did Moderna have any usual or acceptable profits from commercial sales

CONFIDENTIAL

Transcript of Catharine Lawton

Conducted on April 30, 2025                                46

of any products?

ATTORNEY HARBER:  Object to form.

A  Because they had no commercial products at that point, it's self-evident that they couldn't have a usual or customary element of profits in a recorded sense.  It's in a historical sense, in a reported sense, clearly.  But they very much had projected profits and expected profits based on the projections that they were making, the ████████████████████████████████████ ██████████████████████████.  There were certainly projections of profit that they were making at various points in time.

Q  And those projections that you're talking about, those are all related to the accused COVID vaccine, correct?

A  Yes.

Q  So as of May 31st, 2020, did Moderna have any usual or acceptable profits from commercial sales of any products other than those that are accused of infringement in this case?

A  Your question, I think, is -- I can't answer it in the form that you said.  Obviously there were no commercial -- other commercial products, and at the point in time of the

hypothetical negotiation, the -- Moderna had not yet received the EUA.  So there were no sales of accused infringing products at that point.

So there -- there wasn't information of that sort.  Moderna was a pre-commercial stage business at this point in time, with -- with projections that it was making and submitting to the government in connection with its efforts to obtain a contract under the Operations Warp Speed program.

(Reporter clarification.)

A   And I guess I would also add that this subject of Moderna's expected profitability, that was also the subject of various commentary by its CEO, Mr. Bancel, around the time of the hypothetical negotiation in the -- the podcast, Harvard or MIT, I can't remember, where he was discussing these things.  It obviously was an ongoing subject at the -- in the earnings calls.

And so there are various statements by Mr. Bancel at various points in time as to Moderna's general strategy with respect to profits.

Q   Do you have any information about what Moderna's expected profits would be from any

product other than the accused COVID vaccine?

A  I don't recall there being any other information that was provided in connection with discovery in this case as it relates to any of the other eight products that were in development that had advanced to clinical trials that were successful prior to COVID-19; so, for example, Zika and influenza and the other products that were the subject of development efforts or profitability information, expected profitability or market -- other market economic-related information for the -- the other development efforts that Moderna was engaged in with Merck and AstraZeneca and others, Alexion.

Q  But your analysis of Moderna's expected profits is based solely on as-expected profits from the accused COVID vaccine, correct?

ATTORNEY HARBER:  Objection to form.

A  The -- based on the document that Moderna submitted to the government that identified what the profit was that was incorporated into that material that were submitted to the government.

As I mentioned in a prior answer, there is information earlier in the report that relates to the 2019 analysis of the profitability of the

top -- top 15, top 20, whatever it was, life sciences companies, so there is other information with respect to profitability in the sector. But for purposes of my analysis in view of the unique facts of this case, and that Moderna is a pre-commercial company, in my view, Moderna's own statement with respect to its profits, as set forth in the document it submitted to the government for the accused product, is the most reliable figure to use for purposes of making the subtraction under the analytical approach as I've applied it in this case.

Q You do not use the 2019 analysis of the profitability of the top life sciences company to quantify damages in your analytical approach, correct?

A That's right. And those are the profits that are earned by the top life sciences companies that are commercial -- very large commercial stage biotech and pharmaceutical companies. That information is presented in my -- in the earlier sections in my report in discussing Moderna's expectations in detail.

But in my view, Moderna's own statement to the U.S. government in July of 2020 regarding

its -- its acceptable profit is the best estimate because it's both specific to Moderna, a pre-commercial stage company, and because it's specific to the accused infringing product at the time, around the time of the hypothetical negotiation.

Q   Right.  And so the -- the information from Moderna that you rely on for its expected profits is specific to the accused COVID vaccines, correct?

A   It's specific to the proposal, the offer to sell that was then on the table at that point in time.  So it's specific to what Moderna was offering to the government.  And it makes specific reference to that offer, that May 31st of 2020 offer, and the $30 per-unit sales price, and provides a variety of additional information with respect to expected future pricing and costs that should be accounted for or considered in evaluating the offer and so on.

Q   The information from Moderna that you rely on for its expected profits in your analytical approach is from an offer for sale to the government, and the product being offered for sale is the accused COVID vaccines, correct?

A  Well, the offer for sale is dated May 31st of 2020.  This was a further document in connection with that offer that's dated, I believe, July 10th of 2020.  So it's in the process of the -- the ongoing discussions with the U.S. government as it relates to that May 31st, 2020 offer, and provides additional information with respect to pricing as well as -- as well as for -- for volumes beyond the initial 100 million, which was the subject of the May 31st offer, as well as details with respect to cost and profit.

Q  In your analytical approach, the expected profits that you calculate are based on Moderna's projections or expectations for the accused products, correct?

A  As I understand it, it's the -- it's a submission that provides further detail with respect to cost and profit for the accused infringing products, yes, the mRNA-1273 that was the subject of the May 31st, 2020 offer for sale.

Q  And the -- and those -- and that -- strike that.

That further detail with respect to cost and profit is for the accused infringing products, not any other product, correct?

A   That's my understanding, is that what is set forth there is the -- the cost data, uncertified cost data, because Moderna was unable to provide certified cost data that was specific to the -- to the accused product that was the subject of the ongoing discussions surrounding the May 31st, 2020 offer for sale.

ATTORNEY SCHMIDT:  All right.  We've been going like an hour 20.  Do you want to take a break?

THE WITNESS:  Sure.

THE VIDEOGRAPHER:  We are going off the record.  The time is 10:27 P.M.

(Recess.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:39.

Q   Great.  Welcome back, Ms. Lawton.

A   Thank you.

Q   All right.  So we talked about this before the break, but I think the -- we agreed the hypothetical negotiation is May 31st, 2020; is that right?

A   Yes.

Q   And I think just a couple questions about that.  If you could go to paragraph 250 in your

10:26:54
10:26:58
10:27:05
10:27:08
10:27:14
10:27:22
10:27:27
10:27:32
10:27:33
10:27:36
10:27:36
10:27:38
10:27:41
10:27:44
10:39:47
10:39:54
10:39:58
10:40:01
10:40:02
10:40:11
10:40:13
10:40:18
10:40:18
10:40:26
10:40:28

report, which is on pages 193 to 194. I guess it spans pages 191 through 196, to be precise.

A  Yes.

Q  And in some of the sub-bullets in that paragraph 250 you mention Moderna agreements or negotiations with foreign governments; is that right?

A  Yes.

Q  And you say - and this is on a sentence that spans 194 through 195 - that, "This directly links Moderna's foreign sales to its initial U.S. offers to sell, and shows that Moderna attempted to leverage its foreign sales in furtherance of its U.S. infringement."

Do you see that?

A  Yes.

Q  And from -- based on that, is it your view that the contracts Moderna has with foreign governments are in fact acts of infringement in the U.S.?

A  Well, that's a question for -- it's a legal question, and as I understand the current posture of this case, that the focus for now is on the U.S., sales with a U.S. nexus.

But with respect to the facts and the

work and opinions of Dr. Mitchell, Dr. Benton, and Dr. Porter.

Q Now, we were talking about the -- Moderna's funding raise, and you have some information cited in your report related to the -- the specific timing of when Moderna announced the preliminary results compared to market close and compared to when it, you know, did its funding round.

And so based on that information, have you reached a conclusion about whether Moderna engaged in any improper conduct?

A No. I'm just setting forth the facts with respect to the timing of that and the notoriety that -- that funding raise received, which drew more of a spotlight on to Moderna and to the circumstances of what they had announced on May 18th.

And so it sort of -- the announcement was made; the importance of it was heightened by the capital raise; the circumstances surrounding that capital raise brought even more attention to it, where it was stories in the New York Times and Dr. Afeyan was addressing the point.

So this caused even more of a spotlight on

this particular issue than what it might otherwise have, had the announcement of the preliminary results, which was the catalyst, as it was described, for the -- for the funding raise, had the announcement of the preliminary results not been paired with the funding raise.

Q Do you think that Moderna was intending to manipulate its stock price based on the timing of the events that you describe in your report?

A I haven't reached any conclusions with respect to that. The facts are what they are.

Q Now, you also mention the fact that certain Moderna employees or officers sold some stocks around this time; is that right?

A Right. That was part and parcel to the -- the -- that was one of the things that was attracting the attention to Moderna and to that stock raise, was the fact that those executives were -- were selling stock at the time of that offering when the -- when the share price jumped substantially.

Q Is the fact that certain executives and Moderna employees were selling stock at a particular time relevant to your quantification of damages in this case?

A   Well, again, it goes to the overall facts as it pertains to the potential to implement a non-infringing alternative in view of what had transpired at this point, and what they had announced and the greater attention that they attracted to themselves as a result of the decision to raise capital at that time and the decision of its executives to sell stock, which created quite a stir in the investment community, as evidenced by the documents that I cite in my report.

Q   If you could not reference that certain Moderna executives and employees were selling stock, would that change your analytical or hypothetical negotiation approaches?

ATTORNEY HARBER:  Objection to form.

A   Well, again, it goes to this question of the facts and the pressure that Moderna would have been under with respect to at the time of the hypothetical negotiation, in -- in being able to suggest that one of the alternatives that they could pursue would be to implement, you know, a potential heretofore not identified non-infringing alternative.

(Reporter clarification.)

A   Non-infringing alternative.  Sorry.                    11:05:49

ATTORNEY HARBER:  You said heretofore                    11:05:55
unidentified...                    11:05:56

A  Non-infringing alternative.                    11:05:58

Q   And so if you could not reference the fact                    11:06:00
that certain Moderna executives and employees were                    11:06:05
selling stock, your analytical and hypothetical                    11:06:08
negotiation approaches would change?                    11:06:11

A  Well, it -- it's just part of the facts                    11:06:13
set.  So -- so we have -- the stock raise was a                    11:06:20
catalyst.  The preliminary results were a catalyst                    11:06:24
for the stock raise.  They did the stock raise.                    11:06:28
The fact that they did the stock raise at the time                    11:06:33
when they announced that brought further attention                    11:06:36
to Moderna beyond what they otherwise would have                    11:06:38
experienced had they simply announced their --                    11:06:45
their preliminary results.  And then further, you                    11:06:48
know, complication is the fact that you had                    11:06:53
executives selling stock.                    11:06:55

So it all goes to the central issue of,                    11:06:57
not only did they announce these preliminary                    11:06:59
results and state that this product looks like                    11:07:02
it's going to be efficacious, and it's just a                    11:07:04
matter of time before they seemingly get                    11:07:06
approval - which is the substance of what Dr. Zaks                    11:07:10

communicated in the morning call - but they're adding to it. They're drawing more attention to Moderna and what was happening at that time based on what transpired with the stock price. And obviously it heightened it further with the executives selling stocks.

So the key point is, it wasn't just that they announced these preliminary results and they said, oh, we think that this is efficacious and it's just a matter of time now. It's that more attention was brought as a result of these other events.

Q Okay. So am I correct, then, that the fact that certain executives sold stock is irrelevant, in your opinion, as to whether Moderna could implement a non-infringing alternative?

A It goes to their -- their bargaining position and the extent to which they could credibly say that a potential heretofore unidentified non-infringing alternative was an avenue available to them at the time of the hypothetical negotiation that would not short circuit their plan to get to market as soon as possible.

The idea that after they have announced

preliminary results based on PDU, and it was surrounded by this other ruckus that ensued as a result of the capital raise and the executives selling stock, it would make it much more problematic for them to then say two weeks later, oh, we're going to change course now.  You know, we're going to go on another development loop to -- you know, to try and do something else, to -- to implement a different LNP, and whatever that might mean in terms of the work that would be necessary, the market's reaction to it, the market's response to it.

Q  Okay.  So how -- so strike that.

Would you have to redo your analytical and hypothetical negotiation approaches if you could not reference the fact that certain Moderna executives sold stock?

A  This is just one of the many facts that is -- is surrounding part of the circumstances and the situation around the time of this hypothetical negotiation.  So it's just one of many facts. There is a wide array of circumstances and facts and expert opinions that I'm relying on in reaching my opinions.  This is just one of them.

And, as I say, the -- the point is really

twofold.  It's the announcement of the preliminary results, and what Dr. Zaks said in the context of the pairing it with the capital raise and the things that ensued as a result of that time.

Q  Right.  I understand it's one of many facts, but I'm trying to understand how important it is to your opinion.  And so would you have to redo your opinions if you couldn't reference the clinical trial study release or the funding raise or the stock sales, or would you still stand by your analytical approach and hypothetical negotiation approach?

A  I don't think that my opinion would change necessarily whether those facts are in or out. The whole idea that Moderna even has the -- the possibility of a non-infringing alternative is so amorphous in this case.  I've never seen a circumstance in a case like this where the damages expert says, "Well, if there's a non-infringing alternative, then," in the rhetorical sense.

In most instances the damages expert, you know, takes it to the mat and shows what the non-infringing alternative would be and what the impact of implementing that non-infringing alternative would be on the economics.  And that

is something that Dr. Vellturo has not done in this case.

So this -- we're talking a lot about what -- this whole series of events has an influence with respect to Moderna's ability to credibly say that they could implement a non-infringing alternative, and there's really no real credible evidence that Moderna has offered through its experts or as evidenced in their documents or through their fact witnesses that they could have implemented a non-infringing alternative. And to that end, Dr. Parsons testified that, you know, well, there may have been these other things, but the development timelines are uncertain.

And so given the uncertainty of the development timelines, as Dr. Parsons stated during the discovery of this case, we have no further -- that hasn't been nailed down or taken to the mat, as I said before, to demonstrate what -- what would have been the upshot of this, assuming that there was some NIA and assuming that Moderna could have implemented it, and what that -- the timetable would have been and so on and so forth.

of $6.10, as shown in chart 6.1 on page 868.

Q  Right.  You're not telling me right now that subtracting ███ from $30 is the same as subtracting ███ from $30, right?

A  I'm telling you it is the same in percentage terms.  We're talking about a ████████ profit rate, so it is the same in percentage terms.  It ends up in a different dollar amount, but it ends up -- it's the same profit rate.  It's a ████████ profit rate applied to a $30 per dose price.

Q  So this is a very simple question, and I'm not asking you about percentages or percent rates. You are not telling me that $30 minus ███ equals the same thing as $30 minus ███ right?

A  It's a -- that's a non sequitur.  The ███ doesn't have application to the analytical approach, because we're talking about Moderna's expectations at $30 per dose.

And so we're applying their expected profit rate of ████████ to the expected price, which results in the $6.10, which is the exact same profit rate that they're talking about in the July 10th submission to the government.

Q  Okay.  So it is your testimony that the

95

$30 minus ███ is the same as $30 minus ███ ? Do I have that right?

A  No, that's a -- that's -- as I said, that's a non sequitur.  The profit rate that we're talking about is a ███ profit rate that -- applying a ███████ profit rate to a ███ price results in a ████ per dose profit amount. Applying that same ████████ profit rate to a $30 per dose price results in a $6.10 profit amount.

Q  Okay.  So, I mean, maybe -- I mean, I know I'm wasting my time on this, but, like, I am curious.  So $30 minus ███ is, what, ████ ? No.  █████ , right?

A  Yes.

Q  Okay.  And then $30 minus ███ is █████ , right?

A  But -- that's the math, but the math is not applicable.  What's -- the analytical approach is based on the expectations of 30 -- of a $30 per dose price and a billion doses, and applying the profit rate that Moderna reported to the government in that July 10th proposal.  So you wouldn't port in a dollar amount to the analytical approach, you would port in the profit rate to the

11:53:43
11:53:50
11:53:51
11:53:54
11:53:59
11:54:02
11:54:07
11:54:12
11:54:16
11:54:21
11:54:25
11:54:30
11:54:33
11:54:44
11:54:48
11:54:48
11:55:01
11:55:03
11:55:06
11:55:09
11:55:15
11:55:20
11:55:24
11:55:27
11:55:31

CONFIDENTIAL

Transcript of Catharine Lawton
Conducted on April 30, 2025

96

analytical approach, as I've done.

Q   Mm-hmm.  Right.  And just to be clear about the way you arrived at your $6.10, that was -- you used a ratio of the ███████ over the ███████ and then solved for X over $30, right?

A   I mean, it's simpler than that.  You're not solving for anything.  It's ████████████ ████████████████████████ is -- whoops.

ATTORNEY HARBER:  Let the record reflect she has an old school calculator.

A   Right.  Which is -- which is the ████████████ profit rate that we're talking about here.  And then that profit rate, the ████████ profit rate, you can see it printed right there in chart 6.1, on page 868, is the ████████, is the $6.10.

Q   And that $6.10, that's based on a calculation that you did, not a calculation that Moderna did, right?

A   Well, it's just math on the numbers that Moderna presented to the government, and it's basic -- it's basic accounting, right?  You have a profit amount divided by a price equals a profit rate, and that profit rate then is applied to the expected price of $30 per dose.

CONFIDENTIAL

Transcript of Catharine Lawton
Conducted on April 30, 2025                    97

So there is not -- there is not some magic here.  This is standard accounting, standard finance.  This is very basic.

Q   But what analysis did you do -- well, strike that.

I guess other than just doing this math, did you do any other analysis to confirm that whether Moderna was charging ███████ or $30 per dose, that its profit would be about ██████████?

A   Well, this is the -- this is the math of what they were requesting.  This is what they submitted to the government as -- in response to the government's request for this information.

So certainly this is -- the math is the math on what they submitted, and applying it to the -- the $30 per dose expectation at a billion doses results in a somewhat higher, obviously, per-dose amount.  So it's just a scale transformation based on ██████ based on this cost analysis, and applying it to the actual expectations.

Q   But why would costs for the same product scale up based on the price that is charged?

A   I don't understand that question.  The profit is going to scale up because it's a profit

expectations in this May through late July timeframe that the -- Moderna's expectation was that a $30 price per dose was -- was very reasonable in view of its foreign contracts and other arguments that it made to the government.

Q And in the time period where Moderna was -- well, strike that.

In the May 2020 time period when Moderna was making its offer to the government, was there any market data in the U.S. on per-dose prices for COVID vaccines?

A I would have to go back and look at what the date of the first contract was, the first U.S. government contract with one of the Warp Speed participants. I can't remember what that date was. I want to say it was June 5th or something like that. But the document says -- it's a Moderna summary that lists the contract dates for all of the various Warp Speed participants.

But that doesn't really address the question, as Mr. Bancel pointed out, that there were a number of participants who were pricing at no profit or very low profit. And so those -- those entities that were -- that had those low prices were not prices that -- that Moderna was --

CONFIDENTIAL

Transcript of Catharine Lawton

Conducted on April 30, 2025

122

was entertaining.  And they were quite definitive about it, that they were not and could not price at no profit or low profit in view of their circumstance.  It would be unfair to their shareholders, and the other arguments that they made at the time and their witnesses testified to.

Q  Right.  But Moderna ended up agreeing to sell COVID vaccines to the government for about ▇ percent less than that $30 per dose offer, right?

A  Based on what transpired with the U.S. government negotiations subsequent to late July, July 23rd or whenever the Pfizer price was announced, they did agree to a lower price than what they had initially offered to the U.S. government in a May -- in the May 31st, 2020 offer for sale, and which was -- their starting point of the negotiation was the -- notwithstanding the Pfizer price, their starting point for the negotiation was still $30 per dose in early August of 2020.

But ultimately the contract prices -- the terms, the price terms, are set forth in the C-100 contract of the price plus the ▇, and if they delivered by a date certain, as set forth in the

contract. I don't remember what the date was.

Q Now, if we're looking at your analytical approach -- and you can let me know which -- if you want to look at the same chart that we were looking at before with your bar charts that show the subtractions, I've got some questions. So I don't know if you have a preferred figure to look at or I can --

A It depends on what the questions are. The details of how the subtractions are calculated are set forth in -- in the report and in the schedules.

(Reporter clarification.)

A The schedules.

Q All right. Well, for your analytical approach you start with the $30 per dose, correct?

A That is the -- the expected price as of May 31st of 2020, yes.

Q And then you subtract $6.10 from that $30, correct?

A Well, you're going -- you're going backwards. The -- we start by subtracting the -- the cost. So the expected -- starting on page 852, the first subtraction is the expected mRNA-1273 cost per dose. And we show the -- we

Transcript of Catharine Lawton
Conducted on April 30, 2025                                124

cite to the documents that -- that support that,                13:23:50

which continues on to page 854.                                 13:24:04

Q  All right.  So in -- I mean, we can, I                       13:24:23

guess, subtract in either order.  So you start                  13:24:28

with the $30 per dose and then you subtract what                13:24:31

ends up being ██ for the fully loaded costs; is                 13:24:37

that right?                                                     13:24:40

A  Yeah.                                                        13:24:41

Q  And then after that you subtract the $6.10                   13:24:41

profit per dose, right?                                         13:24:56

A  Yeah, I think we -- we go through a series                   13:25:00

of -- this discussion through page --                           13:25:28

paragraph 1242 to -- 1244 doesn't -- doesn't get                13:25:36

to the $6.10.  That comes later.  But we're                     13:25:42

starting with the -- with the initial price and                 13:25:45

expected profit, and then we make our                           13:25:57

subtractions.                                                   13:26:00

Q  Well, maybe -- why don't we take -- can we                   13:26:00

look at your schedules?                                         13:26:02

A  Sure.                                                        13:26:04

Q  So the schedule we marked as Exhibit 2,                      13:26:04

but you can look at your paper copy if that's                   13:26:09

easier.  And if we go to schedule 3.1.                          13:26:12

A  Schedule 2.1 in terms of the...                             13:26:29

Q  Schedule 3.1.                                                13:26:32

CONFIDENTIAL

Transcript of Catharine Lawton
Conducted on April 30, 2025

125

A   Oh, sorry.  Why are we looking at the royalty date?  Okay.

Q   Okay.  So you start with the $30 per dose, correct?

A   Yeah.  Yeah.

Q   And then you subtract ███ in manufacturing costs and overhead R&D, correct?

A   Right.  The manufacturing cost per dose and the overhead R&D allocation per dose, yes.

Q   Okay.  And then you subtract $6.10 in profit per dose, correct?

A   Yes.

Q   And then after you subtract those costs and the profit per dose, you then arrive at a ███ profit per dose, correct?

A   Right.  Before the next round of subtractions.

Q   And so -- okay.  And then with the $13.90 -- hang on.  Sorry.

With the ███, you then apportion that ███ between the Moderna payload and Genevant delivery; is that right?

A   Yes.

Q   Okay.  What is included in the Moderna payload?

A   That is the payload related -- starting with the notion, based on Dr. Mitchell and Dr. Porter, that the -- that they're -- as reflected also in many Moderna documents, that there are two attributes to this product, the payload side and the -- the delivery side.  That this is reflecting that division as between the two -- the two elements of the product.  So the payload side is the mRNA side, the delivery side is the LNP side.

Q   All right.  So you just divided between mRNA and LNP, right?

ATTORNEY HARBER:  Object to the form.

A   Based on the documents and based on the technical experts' opinion, both Dr. Mitchell and Dr. Porter, that the delivery side is at least ▇▇▇▇▇ of the -- of the value.  Contributes ▇ ▇▇▇▇▇ of the value.

Q   And then with respect to the Genevant delivery, is that related to Genevant's -- well, strike that.

Is the -- is what you call Genevant delivery here, is that specific to the asserted patents in this case?

A   That's specific to delivery and it's

CONFIDENTIAL

Transcript of Catharine Lawton

Conducted on April 30, 2025

131

actually I didn't read, which is accounted for                      13:38:18

separately on line 3 of schedule 3.3.                               13:38:22

    Q   Right.  So I'm just going to ask again.                     13:38:25

        So when we're talking about the ████ that                  13:38:28

you subtract from Moderna and Genevant, to get to                   13:38:33

that ████████████ , you add up the Moderna's                       13:38:38

anticipated return, return to investors, the USG                    13:38:52

financial support, and the USG working capital,                     13:39:00

correct?                                                            13:39:05

    A   And the Moderna past investments in                        13:39:05

platform technology per the July 10th, 2020 cost                    13:39:08

proposal.                                                           13:39:11

    Q   Got it.  And then -- and you split those                   13:39:12

amounts equally between Moderna and Genevant,                       13:39:19

right?                                                              13:39:22

    A   Yes.                                                        13:39:23

    Q   Okay.  And then you make a further                         13:39:27

deduction on the Moderna side for the NIAID                          13:39:29

technology at ████ , right?                                         13:39:34

    A   Yes.                                                        13:39:35

    Q   But you don't made that adjustment on the                  13:39:35

Genevant side, right?                                               13:39:38

    A   Right.  Because it's an mRNA-related                       13:39:38

expense.  It relates to the mRNA side.                              13:39:43

    Q   And so, then, this ████ that you get,                      13:39:47

that is what you call the excess profit reasonably attributable to delivery, correct?

A   Yes.

Q   And every penny of that is attributable to the patents-in-suit, correct?

A   Yes, based on my analysis and based on the opinions of the technical experts.

Q   And if we could just go back to schedule 3.1.  Are you there?

A   Oh, yes.  Just went back.

Q   Okay.  And so the costs -- well, strike that.

The manufacturing costs, the overhead R&D, and the profit that you deduct in schedule 3.1, those are all anticipated costs or profits, correct?

A   Right.  This is an expectation-based analysis based on Moderna's expectations in their -- as evidenced in their various documents cited in my report.

Q   Which of these subtractions is for Moderna's usual or acceptable net profit?

A   The $6.10.

Q   Okay.  So even though it says -- so that's -- that -- your view of the $6.10 is that

CONFIDENTIAL

Transcript of Catharine Lawton
Conducted on April 30, 2025

133

that's Moderna's usual -- strike that.

So $6.10 is Moderna's usual or acceptable net profit; is that right?

A    Right.  In this case, to describe it with more particularity, it's what Moderna reported to the federal government in connection with the -- the ongoing discussions surrounding the May 31st, 2020 offer for sale.  So this is what they listed in their -- their submission to the government.

And, you know, clearly, in terms of the other subtractions that we're doing, and in that submission that Moderna made to the government, when they're asking for a ██████████ return on investment, you know, that's an element of return. It's an element of profit.  So when we get to our later subtractions, and as shown in the Moderna submission -- July 10th, 2020 submission to the government, you know, they had other elements of profit or cost of capital or however you want to consider it, but it's a return in terms of a ██████████ you know, return to investors based on that investment that they're treating as a cost that they need to recover in the price.  And so that's accounted for in those other subtractions that we talked about that -- that gets to the

13:43:03
13:43:09
13:43:12
13:43:14
13:43:18
13:43:21
13:43:25
13:43:30
13:43:34
13:43:39
13:43:40
13:43:45
13:43:47
13:43:50
13:43:53
13:43:56
13:44:00
13:44:03
13:44:07
13:44:11
13:44:16
13:44:22
13:44:24
13:44:27
13:44:30

CONFIDENTIAL

Transcript of Catharine Lawton
Conducted on April 30, 2025

134

████

Q   And so what is Moderna's anticipated net profit from sales of the accused COVID vaccine?

A   The anticipated profit that is -- that is -- that is used in the analytical approach analysis is the $6.10.  But as I said before, there's other elements of return or profit-like numbers that are in there, namely that ████ return on investment that was submitted to the government and is incorporated in those other subtractions.

So -- but the direct estimate of Moderna's reasonable return is the $6.10 per dose.

Q   Is the $6.10 per dose both Moderna's anticipated net profit and its usual or acceptable net profit?

A   It's a reasonable proxy for both in terms of what their expected net profit was.  It's slightly later in time than the May 31st offer, but it's the evidence we have and it's what they submitted to the government, was the return that they were expecting in arriving at the cost-driven analysis that was submitted to the government pursuant to the government's request.  So it's the best available insight we have about what

Moderna -- based on what Moderna submitted to the government.

Q  So -- oh, I guess I was going to mark a different document, but since I'm about to mark a document, I will do your Exhibit C first.  So let me just drop this in the chat.

(Lawton Exhibit 10, Exhibit C to Reply Report, marked for identification.)

Q  So you should have in the chat what's been marked Exhibit 10, which should be Exhibit C to your reply report.

A  Yes, it appears to be the document.

Q  Okay.  Great.

All right.

ATTORNEY SCHMIDT:  So, Mr. Harber, do you have the box of documents?

ATTORNEY HARBER:  Yeah, we've got it.

ATTORNEY SCHMIDT:  All right.  I don't know how they're labeled, if they have Bates numbers on them or tab numbers.  Would you be able to just let me know and then I can direct you.

ATTORNEY HARBER:  Tab numbers.

ATTORNEY SCHMIDT:  Tab numbers?

ATTORNEY HARBER:  Yeah.

ATTORNEY SCHMIDT:  Okay.  Thanks.  And I'm

just getting a tab number.

Q  So would you mind grabbing Tab 34, please, and that should end in Bates numbers 003.

So do you have the document?

A  I do.

Q  Sorry, I was trying to label it with the right exhibit number in Adobe, but the document was open.  So just give me one second and I will put it in the chat.

(Lawton Exhibit 11, Volume II Cost Proposal Bearing Bates Numbers MRNA-GEN-01122003 Through 088, marked for identification.)

So you should have in front of you, Ms. Lawton, what we're marking as Exhibit 11, which has Bates numbers MRNA-GEN-01122003 through 088.

A  Yes.

Q  And this is Moderna's Volume II cost proposal dated July 10th, 2020; is that right?

A  Yes.

Q  And this is one of the documents you looked at and cited in preparing your report, correct?

A  Yes.

Q  And this -- and in particular from this

patents-in-suit in terms of whether it includes the patents are not. But I guess my point was, with respect to each of the patents, each of the patents -- or each of the license agreements was negotiated based on the negotiation between those two parties, and it has the terms that were arrived at and the grant that was arrived at pursuant to that negotiation.

Q Right. And so each of the agreements includes a joint development provision, right?

A Yes. All of the COVID license agreements were joint development agreements.

Q And as part of the joint development, Genevant would be responsible for lipid chemistry and LNP formulations, right?

A Well, again, however it's defined with respect to the -- the individual license agreements and the terms of those agreements and the nature of the compensation for those -- those other services that -- that are incorporated into those agreements.

Q Okay. So I'm going to ask you about the Chulalongkorn license. I'll drop it in the chat and also get you the tab number in a second.

(Lawton Exhibit 12, Chulalongkorn

Agreement With Bates Numbers GENV-00023616 Through 663, marked for identification.)

Q So it should be Tab 23, if you don't mind grabbing that.

All right. So I put in the chat what will be Exhibit 12, I hope.

And, Ms. Lawton, you should have in front of you a document with Bates numbers GENV-00023616 through 663. Is that right?

A Yes.

Q Okay. And this is the Chulalongkorn agreement that we were talking about, right?

A Yes.

Q And if you go to the -- I guess page 15, which ends in 631. Just let me -- are you there?

A Yes.

Q Okay. And in Section 3.3 it refers to development, correct?

A Yes.

Q And in Subsection B it says, "Unless and to the extent expressly provided otherwise in, and subject to the R&D support plan, Genevant shall," and then it lists various items that Genevant shall be responsible for, right?

A Yes. I through IV. So four, four items.

CONFIDENTIAL
Transcript of Catharine Lawton
Conducted on April 30, 2025

185

Q   And one of the items that Genevant is responsible for is the lipid chemistry and LNP formulation and characterization work, correct?

A   Yes.

Q   And then the other items relate to consulting support and support related to regulatory issues, right?

A   Yes.

Q   And part of what Chulalongkorn paid for or agreed to pay for in this license agreement was the lipid chemistry and LNP formulation and characterization work that Genevant agreed to provide, right?

A   There are payments that are in the financial provisions in terms of the payments for the R&D support plan, technology transfer, and regulatory support.

Q   Right.  Well, but also -- I mean, I guess is it your view that the ███████████ that Chulalongkorn agreed to, does that also reflect consideration for the lipid characterization and LNP-related work that Genevant agreed to provide?

A   The ████████████████████████ ███████████████████.  So there would have to be commercial activity or other activity that

CONFIDENTIAL

Transcript of Catharine Lawton

Conducted on April 30, 2025

186

would give rise to ▮▮▮▮▮▮▮▮ whereas the

financial provisions also include the -- what's on

page 16 in terms of the FTA -- "FTE retainer;

payments for R&D support, technology transfer, and

regulatory support."

So Genevant is being paid, pursuant to

these terms, amounts that are, you know, capped

as -- pursuant to 4.3 in connection with these

certain activities that they're -- that are

covered by the financial provisions under 4.2.

Q  So is it -- is it your view that the

development work under Section 3.3B, the value of

that is ▮▮▮▮▮▮▮▮, as provided in

Section 4.3?

A  Well, the 4.3, it's ▮▮▮▮▮▮▮▮▮

▮▮▮▮  There's -- it's -- it's excluding costs

in respect of regulatory support pursuant to 5.3

or 5.5 collectively in an amount -- well, let me

step back.

The sections that it refers to are the 4.2

sections together with 5.3 and 5.5.  And it

describes the cap, and it then it goes on to say

the contingent provisions.  So there are, you

know, contingencies there.  And I'm obviously not

a lawyer, but that would enable potentially there

15:38:56
15:39:01
15:39:05
15:39:10
15:39:14
15:39:16
15:39:22
15:39:30
15:39:38
15:39:39
15:39:43
15:39:59
15:40:04
15:40:08
15:40:27
15:40:40
15:40:47
15:40:52
15:40:57
15:40:57
15:41:00
15:41:05
15:41:10
15:41:16
15:41:19

to be -- for the cap to be exceeded if the licensee, for example, were to consent.  So it's not an absolute cap.

Q  Mm-hmm.  Right.  And so I guess my question, though, I think is maybe simpler.  But the payments that are reflected in this Section 4.1, 4.2, and 4.4, those are all consideration for the rights and the joint development and -- that Chulalongkorn would be getting and Genevant would be providing under this agreement, right?

A  Well, the financial provisions relate to the costs associated with the R&D period in terms of the R&D support plan, technology transfer, and regulatory support.  So you first have the R&D period, and then when we're talking about ███

████████████████████████

███████████████████████

████

So when we're talking about these -- these early periods during the development period, there's costs incurred to develop the product, and Genevant is to be paid for the various activities that are set forth here in connection with the -- the payment terms as they're stated under the

CONFIDENTIAL

Transcript of Catharine Lawton

Conducted on April 30, 2025

188

financial -- Article 4, financial provisions.

Q  Right.  But the value of what Genevant is providing, it's not simply the ███████ and then the FTEs, right?  Like, the idea is that Genevant would be compensated under ██████████████, in part for the technology and know-how and, like, joint development work that it would be providing, right?

A  Well, Genevant in the first place is receiving the ███████ fully earned, nonrefundable, noncreditable payment as the initial payment.  The FTE retainer, payments for R&D support plan, technology transfer, regulatory support, those are compensated activities that -- that Genevant is agreeing to undertake in exchange for compensation as it's described in these various provisions.  And then ████████████████ ██████████████████████, if there are net profits.

Q  Right.  And if there are net profits -- well, I guess let me ask it this way.  Is the upfront payment, is it your view that that is full compensation and the full value of all of the joint development and lipid chemistry that Genevant would bring to the table as part of this

agreement, or was the idea that ████████████ would likewise -- I mean, if there were sales, that would also be a way to compensate Genevant for the value of what it brought to this agreement?

A  Again, I can't -- I don't recall any more specifics about the -- this agreement beyond what's stated in the report.  But obviously, as Mr. Zorn testified and the Moderna witnesses testified with respect to their agreements, each agreement is specifically tailored to the particular opportunity and the objectives that the parties are pursuing.

So this one on page 9, net profits is defined as follows:  And with correlative, meaning net losses, means net sales of products for the field in the territory less allowable expenses, which then is a further defined term.

So the grant is for development of products that then are -- for which then there is a profit sharing and allowable expenses then sets forth the -- on page 1 and 2, all the things that are incorporated therein.  That's a pretty long block in terms of the definition.

Q  So you don't think that the ██████████

15:44:52
15:44:55
15:44:59
15:45:02
15:45:05
15:45:07
15:45:11
15:45:19
15:45:23
15:45:30
15:45:31
15:45:34
15:45:36
15:45:38
15:45:42
15:45:47
15:45:50
15:45:54
15:45:56
15:46:03
15:46:09
15:46:13
15:46:17
15:46:26
15:46:28

Transcript of Catharine Lawton
Conducted on April 30, 2025

190

has anything to do with the value of the
technology and joint development that Genevant was
providing to Chulalongkorn under this agreement?

A   Well, the totality of the compensation
is -- is the compensation for the totality of the
grant.  So in this case it's the ███████ initial
payment together with all of the reimbursable
expenses that Genevant is entitled to to be paid
for.  So the development attributes related to
Genevant's commitment in this development
agreement are compensated in accordance with the
terms here.

So the ████████ is for what arises
from this agreement in which Genevant's
participation in terms of the development
activities that they're doing appears to be
largely compensated pursuant to the -- the terms
here, the financial provision terms there.

Q   So in your view, the upfront payment and
the FTE payments, that suffices to compensate
Genevant for the technology that it licensed to
Chulalongkorn under this agreement?

A   Again, I haven't -- I haven't come to
those types of opinions.  These agreements are --
are the agreements that we had that were

Transcript of Catharine Lawton
Conducted on April 30, 2025                                        191

negotiated under all of those various overhangs.                15:48:06

But you can see that this isn't the case where,                 15:48:08

you know, there's -- the only thing that's here                 15:48:10

is a ▮▮▮▮▮▮▮.   What's here is an upfront                         15:48:13

payment plus the compensation for the development               15:48:17

activities that Genevant agreed to provide.                     15:48:19

        So it's not a development type agreement                15:48:22

where the two partners are sharing costs in a                   15:48:25

"Throw your money in the kitty and we'll true up                15:48:30

in the end."  It's not that kind of development                 15:48:33

agreement.  There's very specific activities that               15:48:35

Genevant is agreeing to undertake in exchange for               15:48:37

the compensation that's set forth here.                         15:48:42

    Q   And you have reached no opinion as to                   15:48:50

whether the ▮▮▮▮▮▮▮ has any relationship to                      15:48:52

the -- the activities and technology that Genevant              15:48:57

is providing to Chulalongkorn under this                        15:49:01

agreement?                                                      15:49:04

        ATTORNEY HARBER:  Objection to form.                    15:49:05

    A   No, that's not what I'm saying.  I'm                    15:49:06

saying that we have a totality of the terms here,               15:49:08

and -- in exchange for the grant.  And it's like                15:49:12

every license agreement.  There's a totality of                 15:49:15

the terms.                                                      15:49:18

        And so it's -- particularly in a                        15:49:18

circumstance like this, where there's no commercial product that has emerged yet such that you could look at the accounting and see what kind of costs have been incurred, and profits, and what Chulalongkorn is reporting in terms of their allowable expenses and those types of things. We don't have anything like that to do a -- to do a further review to better understand exactly how these terms should be broken out.

But you're asking for granularity, like can you connect this particular piece of IP to this term or that term or the other term. It's not -- we have the totality of the terms here and it's in exchange for the grant, and the support activities that Genevant agreed to provide have specific compensation terms that are associated with them. Which shows that -- that Genevant is receiving compensation separate and apart from the profit share that they're entitled to, if and only if this product results in a commercial product for which ███████████████████████████████ .

Q   Right. Under this the agreement, then, if I'm understanding you correctly, that the support that Genevant provides related to the lipids and the LNPs, that's fully compensated by the upfront

entitled to a ████████ if this results in a commercial product that has -- that has net ████████████████████████

Q   Do you have any view as to whether the ████████ that is in this license agreement reflects the value of the licensed patents or any joint development work that Genevant provided?

A   Well, again, this seems to be the same question over and over again.  What we know is that Genevant agreed to undertake certain development-related activities during the development period, which necessarily means prior to commercialization.  They also negotiated to be paid for that.

Whether there is some uncompensated aspect or attributes of the development support that Genevant is providing, I don't recall seeing any information in the record that would provide greater clarity on that.  I don't remember Mr. Zorn or anyone else at Genevant being asked these questions as to how do you line up these things, and, you know, is there anything in the -- the -- ████████████████████████ that is directed to actually compensating them for development activities.

Transcript of Catharine Lawton
Conducted on April 30, 2025                                    195

You're asking questions that we don't have records that would shed light on it.  All we have is contract terms that -- that describe the arrangement between the parties.  And how that actually played out in terms of boots on the ground, I'm not aware of any information with respect to that, and I don't believe Moderna asked the Genevant witnesses questions that were directed to those -- that type of granularity.

Q   I guess, so, then, do you have any understanding one way or the other as to whether the ██████████ includes the value of the licensed patents or any other technology that was licensed or provided to Chulalongkorn under this agreement?

ATTORNEY HARBER:  Objection to form.

A   Again, the terms are the terms.  There's a scope that's in the grant and there are financial provisions and there's all the other terms that surround it.  So you can see what the license grant is, the sublicensing rights, the retained rights, the contractors, the cross license, all of that stuff is in here.

How this agreement has played out in terms of its operation and the activities thereunder and

CONFIDENTIAL
Transcript of Catharine Lawton
Conducted on April 30, 2025                        196

payments received, I just don't recall any          15:55:13

questions that were directed to the Genevant        15:55:19

witnesses that were directed to getting at this     15:55:22

question that you're asking, about, is there        15:55:24

something that isn't compensated under the          15:55:28

development activities that then by definition,     15:55:31

because it wasn't paid, then therefore sweeps into  15:55:33

the ███████████    for a product that, you know,    15:55:37

may never emerge, right?                            15:55:39

        Genevant is negotiating to provide          15:55:41

development support and to be paid as they go.      15:55:43

And in addition to that, in the event that there    15:55:47

is a successful product that generates net          15:55:49

profits, that there's a -- ████████████████         15:55:53

████████████████████████████████.                  15:55:56

    Q  So am I right, then, that because            15:56:01

Chulalongkorn -- sorry, strike that.                15:56:04

        Am I right, then, that because              15:56:07

Chulalongkorn did not commercialize a product or    15:56:08

provide information about certain of the expenses   15:56:13

in the license, that you were unable to reach a     15:56:17

determination as to whether the ██████████          15:56:24

includes the value of the licensed patents or       15:56:27

other technology that was licensed under the        15:56:30

agreement?                                          15:56:33

ATTORNEY HARBER:  Objection to form.

A   Again, what we have are the terms of the agreement, and the terms of the agreement provide that Genevant is entitled to compensation for the development support that they provide in connection with this development agreement.  And insofar as ▮▮▮▮▮ is concerned, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

So it isn't your typical arrangement where both parties are sharing in whatever ends up, positive or negative.  This is a circumstance where it's a one-way street, where Genevant gets paid for the development activities, and ▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮.

So this -- while it's termed a development -- nonexclusive license and support agreement, the terms are such that Genevant is providing certain services for compensation, and they get to share in the upside if there is any.

Q   And so does that ▮▮▮▮▮ then reflect the value of at least licensed patents?

A   It reflects what these parties negotiated,

right?  It reflects the scope of what they agreed to.  So the idea is to develop a COVID product for lesser developed countries.  That's what this agreement was for.  And if they're successful and a product results, then ████████████████████ ████████████████████████ ██████████████████████████ ████████████████

        (Reporter clarification.)

    Q  All right.  So I want to ask you about your hypothetical negotiation calculation.  And I think to start, why don't we go to Table 69 in your report -- or, sorry, Table 6.9 in your report.

        ATTORNEY HARBER:  What page is that on, Leslie?

        ATTORNEY SCHMIDT:  I'm checking.

        THE WITNESS:  6.9 is on page 1026.

        ATTORNEY SCHMIDT:  That was faster than a PDF search.

        THE WITNESS:  Yeah, it usually is.

    Q  All right.  Up at the top of Table 6.9 you have the $4.70 per dose based on your 25 percent-70 percent profit split, correct?

    A  The minimum profit split, right.

Q  And you have that in the box for factor 1, correct?

A  Yes.  And this subsumes, obviously, the whole analysis that leads up to this, where I have the discussion of the payment structure of the license agreement, the circumstances at the time, the valuation analysis, and so on and so forth.

So I conclude that based on the facts of this case, for the reasons set forth in my report, that the payment structure of the license agreement would be a profit split for all the reasons that I describe in my report and all of the evidence that points to that structure as being the -- the nature of the structure that the parties would agree to.

Q  And what you -- so you put in your table here, in your box for factor 1, your minimum profit split of $4.77 per dose, right?

A  Yes.

Q  And factor 1 is royalties received by Genevant, correct?

A  Yes.

Q  And Genevant received no -- no royalties at $4.77 per dose or -- and/or any running royalty amount, correct?

█████████ agreement.  So we have one example in terms of the Chulalongkorn, and that's why the Chulalongkorn agreement is here.  And so it gives us a -- a metric to compare to all these other things that we're talking about, the industry averages, Moderna's, the deal structure document, and so on.

But the math of -- and I thought that's what your question was.  The math of this is to determine the royalty based on the profit split applied to Moderna's expected profits.  That's the math of this table.  We're not going back and trying to figure out what the profits -- you know, what the expected profits were in the Chulalongkorn agreement, for which there is no commercial product to look to.

Q  Yeah, that was not -- my question was not about your table.  My question was, very simply, in the Chulalongkorn agreement, it ████████ ████████████████████████████████ ███████████████████████ right?

A  No.  It applies a ██████████ to whatever the ███████████ are based on the definition of net sales and allowable expenses as set forth in the definitions in that agreement.

Q  That's fine.  That was more responsive than the last answer.

So the other items you list in your Table 6.8, you mention an industry average 50-50 profit split, correct?

A  Yes.

Q  And an industry average 20-80 profit split, correct?

A  Yes.

Q  Okay.  And in your view, do both the 50-50 profit split and 20-80 profit split reliably reflect the value of the asserted patents to Moderna's accused COVID vaccine?

ATTORNEY HARBER:  Object to form.

A  Well, again, you're driving to the ultimate conclusion.  What this chart is intended to do is to set forth value metrics that these parties would look to that would establish the range that they would consider in arriving at what the per-dose royalty would be, understanding that each one of these lines has a number that corresponds to it that's stated based on the terms that correspond with it.

Q  Right.  But your range of the negotiation as set out under Table 6.8 ranges from an 11.88 to

88.2 profit split to a 50-50 profit split, correct? And that's for the pandemic phase.

A Right. So in paragraph 1533 it sets out the pandemic phase range of the negotiation, which is what this is directed to establishing, the profit split range and the associated royalty per dose.

Q And is anything in that range, between an 11.88/88.2 to 50-50 profit split, reflective of the value of the asserted patents in Moderna's accused COVID vaccine?

A That -- this is the general range of the negotiation, as it says here. And so with consideration of all of the other facts and the other Georgia Pacific factors, I arrived at a conclusion as to what these parties would agree to.

So first you have to set what is the range of the negotiation, and then you can analyze where the parties would -- would end up. But without having a range of a negotiation, what -- you don't really have a starting point to -- to frame how this negotiation would proceed. And so that's what this table does and that's what this range is.

Q  But your opinion is that a 25-75 profit split is the minimum, right?

A  Right.

Q  Okay.  And so the profit split could in fact go up to 50-50, right?

A  No, it's not my opinion that the profit split would go up to 50-50.

Q  Okay.  So how high could the profit split go?

A  At a minimum it would be the -- the 25-75 profit split.  That would be somewhat above the low end of the range and would be reflective of Moderna maintaining, retaining the substantial majority of the profits, of the expected profits.

Q  What about, would 30 -- a 30-70 profit split be reasonable?

A  Well, again, it's my judgment, based on my extensive investigation and all of the facts of this case, that the parties would agree to a 25-75 split as being reasonable and conservative in view of all of the circumstances as set forth in detail in my report.

Could somebody look at these facts and say, Genevant should get a little more?  Perhaps.  But it's my opinion that these parties would agree

CONFIDENTIAL

Transcript of Catharine Lawton

Conducted on April 30, 2025                              214

to no less than the -- a 25 percent share of the

expected profits to Genevant, for all the reasons

that are stated in my report.

Q  In your -- in Table 6.8, in your industry

average 50-50 or 20-80 profit splits, none of

those are based on a COVID vaccine, right?

A  Right.  This is a 2019 study, so this is

shortly before the date of the hypothetical

negotiation.  It's a life sciences survey that --

that surveyed the industry and provides additional

backdrop that is -- that is shortly before the

date of the hypothetical negotiation and fully

consistent with all of the other evidence in this

case.

You can see that Moderna also has ███████

██████████████  so it's fully consistent with the

other evidence that we have, and also consistent

with Mr. Brajir's opinion and Said Francis's

testimony.

Q  Are the industry averages based in any way

on the asserted patents in this case?

A  No.  The industry averages are a survey

that provides additional information from industry

in terms of the -- the industry circumstances

under the Georgia Pacific factor number 12.  And

is, as I said, fully confirmatory of what I saw in the Moderna documents, Said Francis's testimony, and Mr. Brajir's report.

Q  Now, the Moderna-Merck and Moderna-AstraZeneca agreements, are the scope of rights exchanged under those agreements commensurate with the scope of rights that would be granted to Moderna under the hypothetical negotiation?

A  Again, those were agreements that have been well described in the record in terms of what they pertain to.  Dr. Mitchell has given his opinion with respect to those agreements and their -- their technical comparability for purposes of this case.  They have certain attributes, certain similarities and differences that I explain in my report and which I accounted for in arriving at my opinion.

Q  Neither the Moderna-Merck nor the Moderna-AstraZeneca agreements are bare patent licenses, right?

A  That's right.  They're development agreements.

Q  And the hypothetical negotiation is not a development agreement, right?

A That's right. The hypothetical negotiation is a presumed -- a hypothetical negotiation for a nonexclusive bare patent license agreement.

These agreements, however, I would note, are the same agreements that Mr. Brajir relied on in his opinion and Moderna's damages expert relied on in his opinion in arriving at the reasonable royalty rate in the Moderna v. Pfizer case.

So all of this same evidence is the same evidence that was considered by Moderna in claiming a royalty in the Moderna v. Pfizer case for the bare patent license under a hypothetical negotiation.

Q And have you reviewed -- Mr. Brajir's and Moderna's damages expert in Pfizer, have you reviewed their entire reports from that case?

A Well, I've reviewed their entire reports insofar as they were produced by Moderna to the plaintiffs in this litigation. So those documents are on my documents considered list and are cited extensively in my various reports. So they're redacted, as you know.

Q Mm-hmm. And is it your view that because Moderna relied on the AstraZeneca and Merck

agreement in a different case, that you have no duty to ensure that those agreements are in fact comparable for purposes of the hypothetical negotiation in this case?

A  Well, again, those agreements were agreements that -- that Mr. Brajir reviewed and analyzed in connection with evaluating his personal experience as a licensing -- IP licensing negotiator in the pharmaceutical space, and were confirmatory of what he observed that as products move through the clinical trial0 stage and reach FDA authorization, that the -- the value that the patentee can derive increases.

So he was using those same documents, just as Said Francis explained in his deposition, to show that once your platform advances to a certain point, you can command profit -- profit splits. So that was the basis for Mr. Brajir's reliance on those documents, was as a demonstration that as platforms proceed through clinical trials, that the ability to command a profit split increases.

And this goes to the issue of the negotiating on the doorstep of commercialization point, that, as Said Francis said, if you join the journey after we're pretty far down a piece,

you're going to have to pay more.  And that's exactly the circumstance that Moderna finds themselves in.

So the Genevant license agreements that are preclinical in any instance, years in advance of any product that may ultimately result, are not comparable insofar as they're not at the doorstep of commercialization, which is the circumstance in this case.

Q   So is it your view, then, that ▮▮▮▮▮ ▮▮▮▮▮▮ in the Moderna-Merck and Moderna-AstraZeneca agreement is in fact apportioned for the value of the asserted patents in this case?

A   No.  Again, ▮▮▮▮▮▮▮▮▮▮ is consistent with a circumstance of after a patentee's technology has advanced to a point at which -- through clinical trials, through to and in the case here of an a approved -- an FDA-approved product, that the share of value that the patentee can command increases.

And that's -- that was Mr. Francis's testimony, that's what the point that Mr. Brajir makes in his expert report, and that's wholly consistent with -- with my experience in prior

cases and the circumstances as we have them in this case, and also the circumstances as they were in the Moderna v. Pfizer case with the -- the hypothetical negotiation being in that case after the product had already launched.

Q   Mm-hmm.  Okay.  So --

A   Further along than the doorstep of commercialization that we have in this case.

Q   Right.  So it's not your testimony that the Merck-Moderna or Merck-AstraZeneca agreements -- strike that.

So it's not your testimony that ▮▮▮▮ ▮▮▮▮ in the Merck-Moderna or Moderna-AstraZeneca agreements is apportioned for the value of the asserted patents, correct?

A   Again, it provides a -- a range, general range of negotiation, which is what the purpose of this is.  In arriving at what the reasonable royalty is in this case, I've considered and established a range of negotiation based on what the parties would look to based on actual market value markers.

So these agreements would have to be tailored to the particular facts of this case, including the assumption of validity and

infringement and all of the other facts that are

set forth in my opening report as well as my reply

report, which are factors that Dr. Vellturo did

not address in any way.

Q  Mm-hmm.  Now, back to your Table 6.8, you

list two different Moderna deal structures, █

██████████████████████████████████, correct?

A  Yes.

Q  Okay.  Neither of those were arrived at

based on the value of the asserted patents to the

accused COVID vaccines, correct?

A  Well, obviously this was Moderna in 2017,

pre-COVID.  These were deal structures in a

Said Francis slide deck showing -- that provide

context, significant context, through the lens --

of the lens through which Moderna looks at these

things in terms of licensing.  They were highly

informative in terms of how they approach

licensing, and they show exactly what Said Francis

testified about in terms of the idea of a ████

███████████████████████████████████████

████████████████████████████

Q  So then is the ███████████████████

█████████████████████████  apportioned for

the value of the asserted patents in the accused

CONFIDENTIAL

Transcript of Catharine Lawton
Conducted on April 30, 2025                          221

COVID vaccines?

    ATTORNEY HARBER:  Object to form.

  A  Well, again, ███████████████ the many metrics here in terms of the -- in terms of the -- the economics on the general range of the negotiation.  ██████████████ ██████████████████████ ██████████████████  The 25 percent is in the range of the 20 percent to -- a 20 percent split to a 50 percent split is the general range of what the profit split would be that's adequate to compensate for the patented invention of -- in view of it's key enabling technology.

    (Reporter clarification.)

    ATTORNEY SCHMIDT:  Key enabling technology.

    ATTORNEY HARBER:  Were you done with that answer?

    THE WITNESS:  No.

  A  So it's my view that a 25-75 split on the -- the expected profits is a reasonable estimate of the value that's attributable to the claimed inventions of the patents-in-suit and Moderna's use thereof, including all of the collateral benefits that they expected to enjoy,

objective was to get to something like Onpattro.

So there's lots of evidence in my report that points in the direction of -- of copying, but, as I say, it's ultimately Dr. Mitchell's opinion that they copied.

Q Right. But you yourself have an opinion that Moderna copied, right? That's what you just described for the last five minutes, right?

A I have -- during the course of my investigation, I identified information that is suggestive of copying, and some of which I just stated.

Q And you did not do any comparison of the asserted claims in this case to Moderna's product or Onpattro or any other product, right?

A Right. No, that is a scientific and engineering endeavor that's beyond the scope of my expertise and experience. I'm looking at this from a business standpoint and what the major shareholders were directing in terms of business direction, business strategy, and objectives. And that's clearly within the scope of my expertise and experience.

Q Right. But you -- you opine in your report that Moderna's platform was built on

copying plaintiffs' patented LNP technology, correct?

A   Well, that's not an opinion, that's a statement with respect to a header which then I summarize evidence.

So as I said before, it's Dr. Mitchell who is giving the opinion with respect to copying.  I have, during the course of my investigation, uncovered certain evidence which is -- which is very suggestive of copying --

Q   But you --

A   -- some of which I just stated and more of which is set forth here.

Q   But you cannot tie that evidence of copying to the patents in this case?

ATTORNEY HARBER:  Objection to form.

A   I am not a -- a technical witness.  What I'm saying is, was there -- is there business information that is suggestive of copying.  And that's the realm with which I'm dealing with this subject matter.

Q   But where do you tie this business evidence to the claims of the patents in this case?

ATTORNEY HARBER:  Objection.  Asked --

Leslie, she said five times she's relied on
Dr. Mitchell.  So you can keep being frustrated
that she's not answering your question, but she's
answered it five times.

ATTORNEY SCHMIDT:  You can stop coaching
the witness --

ATTORNEY HARBER:  I'm not coaching her.
Read the transcript, she said it five times
already.

ATTORNEY SCHMIDT:  She hasn't, actually.
She plans -- so I'm not going to argue with you.
Okay.

ATTORNEY HARBER:  (Multiple speakers;
unintelligible.)

ATTORNEY SCHMIDT:  Okay.  You can stop
interrupting.  I'm going to keep trying to ask my
questions, and if you don't like them, that's
fine.  You can object.

Q  So, Ms. Lawton, I'm going to ask you
again, where do you tie your business evidence
related to copying to the claims of the patents in
this case?

A  You're taking it to the next step, which
is not within the realm of my expertise and
experience, which is the realm of Dr. Mitchell and

which is the -- the opinion that Dr. Mitchell is providing. I am providing the business background and the -- the additional background and contextual evidence that is highly suggestive of the circumstances within Moderna at the time and the -- the circumstances that gave rise to the conduct that we observe. It's a -- it's looking at this through a business lens.

Q Now, in your report you also say that, "Moderna knowingly and deliberately tried to hide its infringement of plaintiffs' patents-in-suit, reflecting knowledge of its improper infringement," correct?

A I believe that's another header. It's on page 1090.

Q Mm-hmm.

A Yes.

Q Okay. And so that is your view, that Moderna knowingly and deliberately tried to hide its infringement of plaintiffs' patents-in-suit, reflecting knowledge of its improper infringement?

A Again, Dr. Mitchell is providing the opinion with respect to copying. This is part of copying. In terms of the business evidence that is further suggestive of that, we are already

Transcript of Catharine Lawton
Conducted on April 30, 2025                      248

talked about the S3 in March of 2020, the removal
of MERS.  We have
the sometimes-you-have-to-fib-a-little-bit
document from Dr. Benenato in terms of the
decision to remove the reference to MC3 and
replace it with legacy LNPs.

There's a variety of evidence that
suggests that Moderna was taking steps to attempt
to conceal.  There's another document I think
cited in Dr. Mitchell's report about a document
from ▇▇▇▇ and something that they blanked
out.

So there's -- there's many, many
documents, some that are cited in my report, many
that are cited in Dr. Mitchell's report, that go
to this particular issue.

Q  Right.  But I just -- you wrote in your
report that Moderna knowingly and deliberately
tried to hide its infringement.  And so is that
your opinion in this case?

A  Well, again, you're -- you're trying to
make headers in text now becomes an opinion.  And
these are facts that relate to the subject of
willfulness for which Dr. Mitchell is offering the
opinion with respect to copying and these other

17:30:36
17:30:40
17:30:44
17:30:44
17:30:47
17:30:52
17:30:55
17:30:59
17:31:03
17:31:05
17:31:10
17:31:12
17:31:13
17:31:16
17:31:18
17:31:22
17:31:26
17:31:28
17:31:30
17:31:34
17:31:36
17:31:39
17:31:44
17:31:49
17:31:54

matters that are -- that are derivative of the copying -- of the copying.

Q Okay. So -- and I'm not trying to turn your headers into anything. I mean, they're your headers, and I'm just trying to understand what scope of opinions you're offering.

And so you are not offering an opinion that Moderna knowingly and deliberately tried to hide its infringement of plaintiffs' patents-in-suit?

A Again, I think it's quite clear at the outset of this section, in paragraph 1664, "I've been asked to provide opinions regarding certain facts relevant to whether Moderna's infringement was willful that are within my expertise and relate to the analysis I have performed in this case."

So what I'm doing here is -- is presenting the facts that relate to -- that relate to issues for which other experts are presenting ultimate opinions that provide the business context that is, in my opinion, relevant to -- to these various issues.

Q And based on the facts that you have set out here, based on the business context, you

believe that Moderna did in fact engage in
activities in which it attempted to conceal its
infringement or that reflect an intent to
infringe; is that fair?

A  Well, I think the header that you're
referring to here is "Knowingly and deliberately
tried to hide its infringement of plaintiffs'
patents-in-suit, reflecting knowledge of its
improper infringement."

And we've talked about some of the facts.
There's more facts that are listed here with
respect to the -- the -- the legacy lipids, the
removal of certain information from journals
regarding the disclosure of the formulation of the
LNP that occurred later.  I mean, there's many,
many instances of -- of Moderna taking steps to
conceal information that are set forth in my
report and more extensively in Dr. Mitchell's
report.

Q  And you think those facts that you set out
in your willfulness section are indicative of
Moderna's intent; is that right?

A  Well, it's for somebody else to decide
with respect to intent.  They're suggestive of the
actions that they took, and others will decide

whether that rises to the level of intent.  These are facts that show business context and conduct which are relevant, as I understand it, to the general subject of willfulness.

Q  Right.  But based on the facts that you set out in your willfulness section and elsewhere in your report, you reached opinions as to Moderna's intentions regarding at least its concealment of its infringement, correct?

A  Well, again, you're saying I reached an opinion that Moderna has undertaken concealment.  This is for the finder of fact to decide.

I have, during the course of my investigation, under -- discovered a range of activities in the context and on a timeline that I think provide important context to understanding and evaluating for the fact finder to understand and evaluate this issue.  I'm not the one who is going to give an opinion on this.

I certainly have, during the course of my investigation, uncovered what I believe is relevant information, relevant facts, from a business context, regarding things that -- that Moderna actually did, as evidenced by their documents and statements in the context that's set

forth here.

Q  Now, I guess just briefly on your report, how much have you billed for the preparation of your report in this case?

A  Well, I haven't billed anything.  The BRG, my firm, prepares bills and sends out bills. That's not part of my workflow.  Our accounting department undertakes those activities.  So I -- I don't know what the total billings have been.

Q  Do you have a ballpark?

A  Not without consulting with the accounting department.

Q  How many -- and that's something you can do, right?  Ask the accounting department how much you -- Berkeley has billed in this case, right?

A  Yes.

Q  Do you have a ballpark of how many hours that you've spent on this case?

A  No, not without consulting records.

Q  Okay.  How many people in your Berkeley group -- Berkeley Research Group team have worked on this case?

A  I don't know the full roster, but it's a -- it was a significant assignment.  So I...

Q  I mean, more than 10 people?

So -- so Moderna's activities with respect to Genevant as they manifest themselves in those past investments is being credited to the delivery side.

Q   And where -- can you show where that's --

A   Yeah, that's the ███ that's being subtracted from the ███.

Q   And is that ███ something that you calculated or something that comes from Moderna?

A   That's something that we calculated based on data from Moderna in terms of what their past investments were, all of those costs that we talked about that are set forth in detail on Schedule 3.2.

Q   And is that -- would you say that's a conservative approach or a moderate approach, or how would you characterize it?

A   I think it's quite conservative because it includes everything that Moderna said applies to all -- all of their vaccine development, all of their past investments that attribute to vaccine development and all of the portion of the vaccine development that they credit to COVID, together with the return on investment on that investment.

So that is -- is quite conservative in

terms of giving Moderna credit for the -- the part

of their platform investment that relates to

delivery based on this distribution as between

payload and delivery.

Q  Now, if you could turn to Schedule 3.1,

I'm going to ask you some questions about that.

You were asked by counsel for Moderna, is

the $6.10 per dose both Moderna's anticipated net

profit and its usual or acceptable net profit.

And I believe you said "yes."  I want to make sure

there's no confusion on these numbers.

In this chart, what number is the

acceptable net profit that you're using for

Moderna?

ATTORNEY SCHMIDT:  Objection.  Form.

A  The acceptable expected profit, as

evidenced by Moderna's submission to the

U.S. government, is the ▮▮▮▮▮▮▮▮.  So they

were expecting, in the submission that they made

to the government because they hadn't made

anything commercially yet, that this is the

economics that were -- that were anticipated as --

based on their summary to the government.

And so that ▮▮▮▮▮▮ profit rate

results in a -- in the -- the submission to the

U.S. government results in that $6.10 expected
profit.

Q  Okay.

A  Per dose.

Q  What is the ▮▮▮▮ figure at the end of
this column?

A  That is Moderna's anticipated profit per
dose after you consider the -- the expected
manufacturing cost per dose and the expected
overhead R&D allocation per dose, and the
expected profit per dose of the $6.10.

So when you subtract those three line
items from the $30 per dose, you end up with a --
an expected profit per dose, before our next round
of subtractions, of ▮▮▮▮ .

Q  What is the difference between the ▮▮▮▮
number here and the $6.10 number, in terms of your
analysis?

A  The -- the anticipated profit per dose of
6.10 is intended to give Moderna credit for the --
what they bring to the table, so in terms of -- I
think it's been described as a manufacturer's
profit or something that gives them credit for the
fact that they actually did the work.  So that's
the $6.10.

17:44:55
17:45:01
17:45:02
17:45:02
17:45:03
17:45:09
17:45:10
17:45:13
17:45:18
17:45:21
17:45:29
17:45:33
17:45:35
17:45:39
17:45:42
17:45:44
17:45:48
17:45:55
17:45:56
17:46:03
17:46:07
17:46:11
17:46:14
17:46:17
17:46:20

CONFIDENTIAL

Transcript of Catharine Lawton
Conducted on April 30, 2025

259

And the ████ is the residual or remaining profit after that, or the excess profit as it's termed in the analytical approach, before we make the next round of subtractions.

Q   And so when the analytical approach refers to an acceptable or ordinary net profit, what number in this chart responds to that, in your opinion?

A   The ordinary or acceptable net profit is the $6.10.

Q   Right.  And is that the same as the anticipated profit per dose of ████ ?

A   No, those are completely separate numbers. The anticipated profit per dose is the excess profits after you account for the direct costs, the costs of goods sold overhead, and giving Moderna its manufacturer's profit.  There's an excess profit that's left over before we do our next round of subtractions, as we're on our way to the residual that then is -- is the reasonable royalty.

Q   And the type of evidence that you relied on here for Moderna's acceptable net profit, how does that compare to what you have normally seen in -- in cases you've done or for this case?

A  It's quite unusual to have information like this, where the party is presenting to a governmental entity what profit they -- they are claiming to the government is a reasonable profit for purposes of the product that they're -- that they're talking to the government about in terms of the contracting exercise.  So having that type of information is -- is quite unique, in my experience.

And secondly, it's particularly unique in this circumstance where we have a -- a pre-commercial stage company that -- for which we don't have economic evidence as to past conduct or -- or other products or history, historical commercial evidence.  So to have this information in a submission to the government in connection with the accused product is -- is extraordinarily unique, in my experience.

ATTORNEY HARBER:  Okay.  No further questions.  Thank you.

ATTORNEY SCHMIDT:  I have a couple follow-ups based on that.

EXAMINATION BY

ATTORNEY SCHMIDT:

Q  Now, Ms. Lawton, just so I understand,

CONFIDENTIAL

Transcript of Catharine Lawton
Conducted on April 30, 2025

261

you're -- what you're telling me now is that the

customary -- the ordinary or customary profit for

Moderna is the $6.10, correct?

A  Yes.  And I think I told you that before.

Q  All right.  But the -- I just want to make

sure I understand.  The $6.10 is -- what you're

telling me now is that it's not Moderna's

anticipated net profit, correct?

ATTORNEY HARBER:  Objection to form.

A  It's -- it's their expected reasonable

profit as submitted to the government, as set

forth in that July 10th cost proposal that we

looked at before.  So when you're looking at the

analytical approach, the final subtraction after

you have accounted for all the costs, is, okay,

now give them their manufacturer's profit, give

them some profit that's reasonable for purposes of

they actually did the work.

And so Moderna told us what's reasonable

for them in terms of the profit for, we're going

to do the work.  And what they told us was a

█████████  profit rate, which translates to a

$6.10 manufacturer's profit in the -- in the

context of an analytical-type approach.

And we account for that, and we account

17:48:58
17:49:02
17:49:06
17:49:09
17:49:13
17:49:20
17:49:25
17:49:28
17:49:32
17:49:33
17:49:36
17:49:38
17:49:42
17:49:44
17:49:48
17:49:51
17:49:52
17:49:57
17:49:58
17:50:02
17:50:05
17:50:08
17:50:12
17:50:15
17:50:18

for a whole raft of other expenses that Moderna claims are costs that were in connection with the -- the -- the mRNA-1273 product that are scheduled out on Schedule 3.2, which are costs that are both in the proposal, the cost proposal that Moderna submitted to the government, as well as additional subtractions that I made associated with other facts. The return on the May 18th, 2020 capital raise, that wasn't something that was in the cost proposal, so there was an additional subtraction for that.

So there's many additional subtractions in arriving at the -- the bottom line royalty as set forth on Schedule 3.3.

Q Okay. So in your Schedule 3.1 you arrive at Moderna's anticipated net profit after subtracting its usual or acceptable net profit from its per-dose price projection, correct?

A No. This is one step in the process that then gets to Schedule 3.3. It's the input for Schedule 3.3, which then has further subtractions, which I explained before and explained again now, in terms of all of these other additional costs that -- for other contributions that Moderna claims are connected to the -- the Spikevax

vaccine.  Those are accounted for on 3.3, together

with the ██████████████ , in arriving at the

split of the excess profits as between Moderna for

the payload and Genevant for the delivery.

Q  Okay.  So --

A  Shown on Schedule 3.3.

Q  So Moderna -- in your view, Moderna's

usual or acceptable net profit is the $6.10,

correct?

A  Correct.

Q  Okay.  And Moderna's anticipated net

profit is the ████ , correct?

A  No.

Q  Okay.  What is their anticipated net

profit?

A  Their anticipated net profit would have to

account for all of the other costs, which are all

of these other costs that we're talking about on

Schedule 3.2.  So this is just one step in the

process to get to the -- to account for the direct

cost, to account for Moderna's manufacturing

profit, and then all of the other costs get

accounted for in the next step which occurs -- the

details are on Schedule 3.2 and the summary is on

Schedule 3.3.

17:52:19
17:52:23
17:52:27
17:52:32
17:52:38
17:52:39
17:52:41
17:52:44
17:52:47
17:52:48
17:52:49
17:52:53
17:52:57
17:52:57
17:53:00
17:53:03
17:53:05
17:53:07
17:53:13
17:53:16
17:53:21
17:53:24
17:53:27
17:53:33
17:53:36

264

Q  So Moderna's anticipated net profit from sales of the accused COVID devices is -- point me to the number on Schedule 3.2.

ATTORNEY HARBER:  Leslie, we're over time, but I'll let you finish out this.

ATTORNEY SCHMIDT:  Well, since she changed her testimony, yes.

ATTORNEY HARBER:  She didn't change her testimony, you confused her before.

A  So I think this -- this schedule is quite clear in terms of what's happening here.  And so if you look at Schedule 3.2, the -- it starts at the top with the projection of doses, the price per dose; it has in the middle all of the anticipated other contributions.  So then we start with the -- the end -- where we ended on Schedule 3.1 picks up on the -- what's listed as line 1 for bracket 1 on Schedule 3.2.

And then it proceeds to the further subtractions, getting to the -- the ultimate -- after all of the subtractions, the ultimate expected or anticipated profit per dose is ██████ which then is divided as between the delivery piece and the payload piece, once you go through all of the costs and all of the subtractions,

17:53:37
17:53:40
17:53:47
17:53:53
17:53:55
17:53:56
17:53:57
17:53:58
17:54:00
17:54:03
17:54:08
17:54:13
17:54:18
17:54:22
17:54:24
17:54:29
17:54:36
17:54:42
17:54:46
17:54:49
17:54:55
17:54:58
17:55:03
17:55:06
17:55:09

CONFIDENTIAL

Transcript of Catharine Lawton
Conducted on April 30, 2025

265

giving credit to the $6.10 manufacturing profit that has already been accounted for.

So here what we have are the excess profits after accounting for all the costs, ███ that's divided as between payload and delivery.

Q  Okay.  So the anticipated net profit is the ███ correct?

A  No.  That's -- the excess profits after accounting for all of the costs is what then is the reasonable royalty profit indication per dose. So we're taking the total excess profits after we subtracted all the costs under the sun.  We have an excess profit, a residual profit after giving Moderna its $6.10 manufacturing profit, we have ███ per dose left over, of which that then is shared as between delivery and payload in the proportions shown, the ███ to Genevant and the ███ to Moderna for payload.

So the analytical approach is an excess profit analysis that attributes the excess profits to the -- the -- the patented invention.  And in this case we're -- we're allocating it as between payload and delivery.  The excess profits of ███ is allocated as between payload and delivery in arriving at the reasonable royalty under the

analytical approach.

Q  So Moderna's anticipated net profit, is that the ▌▌▌ on Schedule 3.3?

A  No, that's -- that's part of the ▌▌▌ which only accounts for three things.  It accounts for the direct cost of goods sold, it accounts for the overhead, and it accounts for Moderna's manufacturing profit.  Then we have to make the next round of subtractions, which goes on in line 2.

So you have to go through the whole process in order to get to the bottom line, which is the excess profits, which is the ▌▌▌ per dose.

Q  So do you have -- so I guess strike that.

What is Moderna's anticipated net profit from sales of its accused COVID vaccines?

A  Well, its expected net profit based on what it submitted to the government was $6.10, and that's already been accounted for.  That's already a subtraction in terms of the ▌▌▌.  We give them that as their manufacturer's profit under the -- the methodology of the analytical approach.  So that --

Q  Is there --

CONFIDENTIAL
Transcript of Catharine Lawton
Conducted on April 30, 2025                              267

A   That's already credited.

Q   Is there a difference in your view between Moderna's usual or acceptable net profit and its anticipated net profit from sales of the accused COVID vaccines?

A   The idea of usual and customary net profit, when you talk about a pre-commercial company, doesn't really have a meaning because there's no -- usual and customary means that they have some commercial track record over the last 10 years and you can see they generally make this kind of money selling these kind of products.

When you have a circumstance like this with Moderna, who is a pre-commercial stage company, has never sold a commercial product even though the company had been operating for 10 years, that were relying on what Moderna told the government was the profit that was acceptable to it, which was the ███████ profit rate.

And in the context of this case, with a pre-commercial stage company, it -- this is particularly unique that we have insight at the time -- around the time of the hypothetical negotiation, where Moderna is telling the U.S. government, hey, this profit is okay for me.

Transcript of Catharine Lawton
Conducted on April 30, 2025                                    268

A ███████ rate, I'm good.

ATTORNEY SCHMIDT:  Okay.  All right.  I pass the witness.

ATTORNEY HARBER:  No further questions.

ATTORNEY SCHMIDT:  Okay.  Do we need to mark this as...I don't know.

ATTORNEY HARBER:  If you want to -- let's do confidential, I guess, since we didn't get into much.

ATTORNEY SCHMIDT:  That's fine.

THE VIDEOGRAPHER:  If there are no further questions, then this will mark the end of the deposition of Catharine Lawton.

We are going off the record.  The time is 5:59 P.M.

(Time Noted: 5:59 P.M.)

ACKNOWLEDGMENT OF DEPONENT

I, CATHARINE LAWTON, do hereby acknowledge that I have read and examined the foregoing testimony and the same is a true, correct, and complete transcription of the testimony given by me and any corrections appear on the attached errata sheet signed by me.


_____    _____

       (SIGNATURE)                  (DATE)