# EXHIBIT F

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH *Plaintiffs*, v. MODERNA, INC. and MODERNATX, INC., *Defendants*. | C.A. No. 22-252-MSG |
| MODERNA, INC. and MODERNATX, INC., *Counterclaim-Plaintiffs*, v. ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH *Counterclaim-Defendants*. | **JURY TRIAL DEMANDED** **CONTAINS INFORMATION MODERNA, ALNYLAM, AND PLAINTIFFS DESIGNATED HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY** |

<u>**REPLY EXPERT REPORT OF DR. MICHAEL MITCHELL**</u>

Dated: March 21, 2025

_____
Michael Mitchell, Ph.D.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

burden to prove that the scope of equivalency in a hypothetical claim would not ensnare the prior art. However, I understand that the defendant still maintains the burden to first present prior art which it alleges shows that the asserted range of equivalence would ensnare the prior art.

## IV.    MODERNA'S RESEARCH AND DEVELOPMENT

### A.    Moderna's Early Success with the Claimed Compositions

18.    In my Opening Report, I describe at length the work that Moderna did using a target lipid molar ratio (50:38.5:10:1.5, ionizable lipid:cholesterol:phospholipid:PEG-lipid) within the scope of the claims of the Lipid Composition Patents. Opening Rep. Section IX.A. As I describe in that section of my Opening Report, Moderna repeatedly used that formulation to successfully deliver mRNA-LNPs across a wide variety of programs, including in numerous clinical trials.

19.    Dr. Prud'homme purports to respond to my opinions on this issue in a section of his report titled "Early Stages of mRNA Technology Development." Prud'homme Rep. ¶¶ 66-90. I address those opinions below.

20.    Dr. Prud'homme emphasizes the undeveloped state of the mRNA field in the early 2010s, as well as the purported challenges of mRNA delivery, referring back to his earlier report. Prud'homme Rep. ¶¶ 66-67. I understand that a different expert has offered opinions regarding Dr. Prud'homme's previous report. To the extent Dr. Prud'homme is correct about the difficulty of working with mRNA—for example, due to its "inherent instability and large size"—in my opinion that underscores the remarkable nature of the inventions described in the Patents-in-Suit, which readily facilitated mRNA encapsulation and delivery, as demonstrated by the experiments of Moderna and others. Absent the inventions described in the Patents-in-Suit, it is not clear to me that Moderna would have been able to overcome the alleged difficulties of working with mRNA and bring a product to market. For example, as I describe at length in my

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Opening Report, Moderna used lipid molar ratios that it does not assert it invented—which fall literally within the scope of the Lipid Composition Patents—as a starting point, and Moderna continued to use those lipid molar ratios successfully for years.  Despite exploring target formulations substantially outside the scope of the Lipid Composition Patents, Moderna ultimately opted to use target ratios that were extremely close (or literally within) the scope of the claims of those patents, with the express goal of creating a product that was the same as the original composition.  I have seen no evidence that—absent the innovations of the inventors set forth in the Lipid Composition Patents—Moderna would have been able to come up with its own lipid particle formulation for mRNA, and Moderna's unsuccessful efforts to design around those patents, ███████████████████████████████████████████████████ suggest that it might well not have succeeded at that venture.

21.     Dr. Prud'homme opines that "Moderna began its mRNA research by [sic] proof-of-concept studies with then-existing technology" "to understand basics such as what works and does not work for mRNA."  Prud'homme Rep. ¶ 68.  The documents that Dr. Prud'homme cites further confirm that Moderna viewed the LNP work conducted with siRNA, including work disclosed in the Patents-in-Suit, to be enabling technology for mRNA that it intended to exploit.  *E.g.*, MRNA-GEN-00810611 at -617 ("It is clear that formulation advances, developed over the past 10 years in the oligonucleotide and RNAi fields, hold promise for enabling dramatic improvements in delivery of mRNA.  We propose use of lipid nanoparticle (LNP) formulations to enable systemic delivery of modified RNA.  These LNP formulations are all well described and have been successfully used with other nucleic acid delivery payloads in repeat dose human clinical trials.").  Unsurprisingly, this Moderna research proposal cited the Semple 2010 paper, MRNA-GEN-00810611 at -626, which I discussed in my Opening Report and was among the

11

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

first publications of the 1:57 formulation disclosed in the Lipid Composition Patents, Opening Rep. ¶ 73.

22.     Dr. Prud'homme quotes Mr. Bancel as stating that "Moderna 'started to work on mRNA formulation in water' and tried out 'thousands of different technology from different labs.'"  Prud'homme Rep. ¶ 68 (quoting Bancel Dep. Tr. 20:2-21:8).  I agree with Dr. Prud'homme that Moderna explored many different technologies for mRNA delivery.  Opening Rep.  ¶ 237.  Mr. Bancel's testimony suggests that Moderna explored many additional technologies beyond those I discussed in my Opening Report.  In my opinion, Mr. Bancel's testimony underscores the importance of the technology described in the Patents-in-Suit.  Out of thousands of different delivery technologies, Moderna selected lipid nanoparticles, and specifically LNPs with characteristics embodying Plaintiffs' innovations.  As I explained in my Opening Report, Moderna was able to make LNPs encapsulating mRNA using the disclosures of the Patents-in-Suit quickly and without difficulty, even at this early juncture.  Dr. Prud'homme does not contend that any non-LNP delivery options could have been viable alternatives to Moderna's COVID-19 vaccine.  Prud'homme Rep. ¶¶ 922-938.

23.     Dr. Prud'homme quotes from Dr. Almarsson's deposition regarding Moderna's flu vaccine study.  Prud'homme Rep. ¶ 69.  It is not clear to me what opinions, if any, Dr. Prud'homme is offering based on that testimony, which I find to be vague.  For example, Dr. Prud'homme quotes Dr. Almarsson as stating that the "'1.5:50 formulation was a formulation that met the criteria' as a delivery vehicle."  Prud'homme Rep. ¶ 69 (quoting Almarsson Dep. Tr. 62:12-18).  Dr. Prud'homme goes on to opine that the 1.5:50 formulation was "not selected for its size and encapsulation profile," Prud'homme Rep. ¶ 69, but Dr. Almarsson explained that the 1.5:50 formulation (in addition to other, unspecified formulations) *did* satisfy those criteria,

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

which were among the "many" performance criteria met by the 1.5:50 formulation.   Almarsson Dep. Tr. 62:1-18.  If anything, I take Dr. Almarsson's testimony to be praise of the 1.5:50 formulation.  In addition to "performance criteria," Dr. Almarsson also noted that the MC3 1.5:50 formulation's use in clinical trials was a factor in the decision to use that formulation.  Almarsson Dep. Tr. 63:5-22.  Those clinical trials, of course, were the siRNA Onpattro clinical trials, which further confirms that Moderna did believe that precedence in siRNA *was* relevant for LNPs in the mRNA context.  Nothing in Dr. Almarsson's testimony quoted by Dr. Prud'homme undermines any of the opinions I have offered concerning Moderna's flu vaccine trial, which used the 1.5:50 formulation and was a success.  Opening Rep. ¶¶ 246-249.  Dr. Prud'homme does not assert otherwise.

24.     Dr. Prud'homme discusses the interactions between Moderna and Plaintiffs' predecessor, Tekmira, and opines that "Moderna's witnesses explained that Tekmira's science 'wasn't great' and was not effective for Moderna's purposes of developing mRNA delivery." Prud'homme Rep. ¶ 70.  As an initial matter, I disagree with Dr. Prud'homme's characterization of the cited testimony from Moderna's witnesses.  While several of the quotes, particularly from Dr. Hoge, emphasize that Moderna was interested in "next generation" delivery technologies, the citations Dr. Prud'homme includes do not describe any particular problems with the technology described in the Patents-in-Suit, much less any indication that (for example) the molar ratios of the Lipid Composition Patents are ineffective for delivering mRNA.  On the contrary, Moderna used the molar ratios of the Lipid Composition Patents in numerous of its programs, including its COVID-19 vaccine program, as I explained in my Opening Report.  Moreover, I note that the evidence that Dr. Prud'homme cites on this issue consists of deposition testimony (much of it from Moderna's current President, Stephen Hoge), and one email from Stephen Hoge to a

13

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

reporter in 2021. I note that Dr. Hoge made approximately $500 million from his Moderna compensation since the pandemic. Hoge Dep. Tr. 17:2-18:1. In my opinion, the more reliable evidence about whether Plaintiffs' technology was "effective for . . . developing mRNA delivery" is the contemporaneous data from the time, including the scientific literature that Moderna published concerning mRNA delivery using Plaintiffs' technology, such as the lipid molar ratios covered by the Lipid Composition Patents. Opening Rep. ¶¶ 238-265. Indeed, even Dr. Hoge agreed that the flu vaccine trial, using Plaintiffs' lipid molar ratios, was a "successful clinical study," Hoge 5/22/2024 Tr. 37:15-38:14, and other Moderna scientists agreed, Opening Rep. ¶ 247. I therefore disagree that Dr. Prud'homme has established that the technology claimed in the Patents-in-Suit was "was not effective for Moderna's purposes of developing mRNA delivery." Prud'homme Rep. ¶ 70. The evidence I describe here and in my Opening Report shows just the opposite; Moderna successfully used both the fully encapsulated LNPs of the '651 patent claims and the molar ratios claimed in the Lipid Composition Patents. Dr. Prud'homme is correct (Prud'homme Rep. ¶ 70) that Moderna did not partner with Plaintiffs or their predecessors; Moderna instead attempted to obtain rights to practice the technology through a third party (Acuitas) and, when that failed, *infra* ¶ 804, sought to invalidate the claims of two of the Patents-in-Suit and, when that failed too, proceeded to use the patented technology without payment.

25.    Dr. Prud'homme opines that "Tekmira documents indicate that was [sic] not transparent about the state of its technology when communicating with Moderna." Prud'homme Rep. ¶ 71. In particular, Dr. Prud'homme cites a 2013 presentation from Tekmira to Moderna concerning mRNA delivery, focusing specifically on an expression comparison between Tekmira's LNPs and the expression achieved by Dr. Karikó and colleagues with a TransIT

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

the field, such as Acuitas and Alnylam, rather than Plaintiffs." Prud'homme Rep. ¶ 79. I disagree with this characterization, and I describe the collaborative relationship between Alnylam and Plaintiffs' predecessors in more detail in my Responsive Report. Resp. Rep. ¶¶ 43-51. In any event, Dr. Prud'homme does not dispute that the 50:38.5:10:1.5 ratio falls within the Asserted Claims of the Lipid Composition Patents.

30.     Dr. Prud'homme opines that the work I described in my Opening Report "is limited to preclinical or early clinical development of Moderna's pipeline products, is legally irrelevant as activity protected by a statutory 'safe harbor' that is not subject to infringement allegations." Prud'homme Rep. ¶ 79. I am not an attorney, and I did not (and do not) offer an opinion about whether infringement liability attaches to the preclinical or early clinical development of Moderna's pipeline products. In any event, the opinions I offer in Section IX.A of my Opening Report demonstrate (among other things) Moderna's longstanding copying of the 1.5:50 target formulation, as well as the success that Moderna experienced with that formulation. The compositions Moderna was using in those activities were within the scope of the Asserted Claims of the Patents-in-Suit—an opinion I do not understand Dr. Prud'homme to dispute. Those opinions I have offered do not depend on whether Moderna would be liable for infringement based on the activities I describe.

31.     Dr. Prud'homme opines that "Moderna's work with a formulation that was available at the time [the 50:38.5:10:1.5], does not in my opinion mean that it was suitable for Moderna's COVID-19 vaccine." Prud'homme Rep. ¶ 80. Dr. Prud'homme does not cite any evidence to suggest that those lipid molar ratios would have been unsuitable for the COVID-19 vaccine. Indeed, I would be quite surprised by any such evidence, given that Moderna *did* use those target ratios in clinical trials for its COVID-19 vaccine (*i.e.*, the PVU Formulation),

17

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Opening Rep. Section X.D.1, those trials were successful, *e.g.*, Jackson 2020[1] at 1; Moderna Press Release (May 18, 2020),[2] and the slightly different target molar ratios Moderna subsequently used were—according to Moderna's internal communications and statements to regulatory authorities—not meaningfully different from the 50:38.5:10:1.5 target molar ratios used in its prior vaccines, including for COVID-19, Opening Rep. XIII.F.2.

32.    In my Opening Report, I described various early successful mouse and primate studies that Moderna conducted using the 1.5:50 target molar ratio ███████████ ███████████, including ITR Study #30668.  Opening Rep. ¶¶ 221-227.  Moderna widely presented the results of those studies to investors, which ultimately resulted in a $240 million investment from AstraZeneca.  Opening Rep. ¶¶ 228-230.  These studies demonstrate the very early success that Moderna achieved with the 1.5:50 molar ratio, as well as the importance of that composition to its business.

33.    Dr. Prud'homme objects that the "goal of the 2012 study was to 'explore dose-dependent production of secreted proteins in response to mRNA'" and that the presentation Dr. Prud'homme cites "describing the study does not suggest that the study was examining the suitability of LNPs (for example, by comparing different delivery vehicles)."  Prud'homme Rep. ¶ 81. Dr. Prud'homme's opinions miss the point.  I do not disagree that the study was measuring mRNA expression.  The key point is that Moderna was able to use a delivery vehicle copied from Plaintiffs' and their collaborators' work, rather than develop their own.  Indeed, that point

---

[1] L.A. Jackson et al., *An mRNA Vaccine Against SARS-COV-2 – Preliminary Report*, 383 N. ENGL. J. MED. 1920 (2020), GENV-00962482.

[2] *Moderna Announces Positive Interim Phase 1 Data for its mRNA Vaccine (mRNA-1273) Against Novel Coronavirus* (May 18, 2020), https://investors.modernatx.com/news/news-details/2020/Moderna-Announces-Positive-Interim-Phase-1-Data-for-its-mRNA-Vaccine-mRNA-1273-Against-Novel-Coronavirus/default.aspx.

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

is reinforced by Dr. Prud'homme's observation that the study was not "comparing different delivery vehicles." Prud'homme Rep. ¶ 81. Moderna was able to circumvent the difficult process of actually developing a delivery vehicle—which is one of the most critical and difficult challenges of nucleic acid delivery, Opening Rep. Section VI.A—and simply use LNPs within the scope of the Lipid Composition Patents.

34.     As I described in my Opening Report, Moderna appears to have been confused about the actual target molar ratio used in ITR Study #30668, and it has modified its response to an interrogatory on this issue during this litigation. Opening Rep. ¶ 222. The documents that I cite in my Opening Report make clear that Moderna did, in fact, use the 1.5:50 target formulation in ITR Study #30668, which is precisely what Moderna itself originally represented in its interrogatory response. Opening Rep. ¶ 222. Apparently in response to my opinions on this topic, Dr. Prud'homme states the following: "Moderna formulated NPA-030-2 and NPA-060-1 'with a final lipid molar ratio of 50:10:38.5:1.5' by the time it filed a patent in 2019 and only clarified that it was 'unable to confirm the lipid molar ratios of the lipid nanoparticles NPA-060-1 (EPO) and NPA-0302 (G-CSF) *used in Study ITR30668*." Prud'homme Rep. ¶ 81. I find Dr. Prud'homme's opinions on this issue to be incomprehensible. The patent that he is referring to (U.S. Patent No. 10,577,403), which I cite in my Opening Report, Opening Rep. ¶ 222, makes clear that the formulations used in the ITR study #30668 (NPA-030-2 and NPA-060-1), used the 1.5:50 target molar ratios. Opening Rep. ¶ 222; U.S. Patent No. 10,577,403 at 328:33-50. Dr. Prud'homme mentions the 2019 filing date of that patent application, Prud'homme Rep. ¶ 81, but I understand that the patent claims priority to a provisional application in 2012 that includes this disclosure, *see* Provisional Application No. 61/737,174 at 402, which is entirely consistent with the timeframe I discussed in my Opening Report as to when this work occurred, Opening Rep. ¶

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

221.  At bottom, Dr. Prud'homme presents no opinion or evidence that ITR Study #30668 used anything other than the 1.5:50 target molar ratios, much less address the substantial evidence that I presented in my Opening Report that Moderna did, in fact, use those ratios.  That Moderna has not been able to confirm that simple fact, despite all the evidence above, does not suggest that the fact is not true.  Dr. Prud'homme also opines that the "study presentation notes that the LNP formulation used a KC2 cationic lipid ███████████," but this just provides further confirmation that the formulation in the patent corresponds to the formulation in ITR study #30668.  *See* U.S. Patent No. 10,577,403 at 328:35-36 ("final lipid molar ratio of 50:10:38.5:1.5 (DLin-KC2-DMA:DSPC:Cholesterol:PEG-c-DOMG").  KC2, like MC3 and SM-102 and other cationic lipids, is within the "cationic lipid" limitation of the Asserted Claims of the Lipid Composition Patents.

35.    As I described in my Opening Report, various internal emails from Moderna further confirm that Moderna was using Plaintiffs' formulations and, in fact, attempted to conceal that fact from Tekmira.  Opening Rep. ¶ 224.  Dr. Prud'homme cites a sentence from Susan Whoriskey's email about also removing "optimized sequences."  Prud'homme Rep. ¶ 82 (citing MRNA-GEN-01759821).  Dr. Prud'homme opines that this additional evidence shows that "Moderna had to pursue additional R&D work to enable successful applications in mRNA."  Prud'homme Rep. ¶ 82.  I disagree that Susan Whoriskey's deletion of mRNA sequences from a presentation to Tekmira somehow demonstrates the value of those sequences.  My opinions about Moderna's mRNA work are set forth in more detail in Section XV of my Opening Report, and I understand that another expert (Dr. Frederick Porter) has offered additional opinions on this issue.  Opening Rep. ¶ 794.  In any event, Dr. Prud'homme's observation on this topic is not responsive to my opinion, which is that the email further confirms that Moderna was using

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Plaintiffs' lipid molar ratios, and Moderna was attempting to conceal that fact from Tekmira.

36.     Dr. Prud'homme also cites an email from Stéphane Bancel in which Mr. Bancel states the following (where "him" is Tekmira's Paul Brennan, from MRNA-GEN-01674430 at 430):

| From: | Stephane Bancel [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=030FD5ED505346C1BB4B91DBAD58875B-STEPHANE BA] |
|---|---|
| Sent: | 10/15/2014 11:28:37 AM |
| To: | Said Francis [said.francis@modernatx.com]; Stephen Hoge [stephen.hoge@modernatx.com] |
| Subject: | Re: Moderna-Tekmira framework (DRAFT) |

we can show him our monkey data with his :superior" LNP :-)

37.     Dr. Prud'homme interprets this email to mean that Mr. Bancel "did not view Tekmira's compositions as successful." Prud'homme Rep. ¶ 82. Whether Mr. Bancel viewed Tekmira's LNPs as "successful" is difficult for me to interpret from this email and, in any event, not particularly relevant to my opinions. As I described in my Opening Report, there is ample evidence of actual scientists at Moderna following and praising the work of Plaintiffs' scientists. *See*, *e.g.*, Opening Rep. Sections IX.A, XVIII. My takeaway from this email, as I describe in my Opening Report, is that Moderna was, in fact, using Plaintiffs' lipid molar ratios. Opening Rep. ¶ 224. Regardless of the opinion of Moderna's CEO about Tekmira and its management, Moderna's scientists continued to use those lipid molar ratios for years, including in its COVID-19 clinical studies.

38.     As I explained in my Opening Report, Moderna's internal documents indicate that "'[t]he LNPs Moderna has used to date were previously optimized for the RNAi field'" and that "'[t]here has been no effort put into optimizing LNP formulations for mRNA therapeutics to date.'" Opening Rep. ¶ 225; MRNA-GEN-01247736 at -736, -740. I have no reason to believe that Moderna's scientists were not being truthful and accurate in their statements at the time. Dr.

21

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

Prud'homme opines that Moderna's "recognition of the need for significant development on top of existing LNP formulations was also captured in therapeutic mRNA briefing documents cited by Dr. Mitchell." Prud'homme Rep. ¶ 83. Again, Dr. Prud'homme misses the point. The document in question, MRNA-GEN-01247736, confirms that Moderna was able to achieve successful mRNA delivery without *any* "optimizations" for mRNA. *See* MRNA-GEN-01247736 at -736 ("There has been no effort put into optimizing LNP formulations for mRNA therapeutics to date, *however some of the early results show potential*." (emphasis added)), -737 ("LNP IV (KC2) shows very high protein expression across species," citing "mouse, rate, primate" expression data that is "well above therapeutic levels needed in man"). As such, although Dr. Prud'homme opines at length about the theoretical difficulty of moving from siRNA to mRNA, *see, e.g.*, Prud'homme Rep. ¶¶ 74-76, the reality is that Moderna was able to take the technology developed by Plaintiffs and their collaborators and successfully use it to express mRNA, including in primates, with "no effort put into optimizing LNP formulations." MRNA-GEN-01247736 at -736.

39.    Dr. Prud'homme cites a line in the above-mentioned document that "'[f]urther development of LNPs for mRNA therapeutics should start by going back-to-basics rather than simply porting the experiences and chemistries used in RNAi.'" Prud'homme Rep. ¶ 83 (quoting MRNA-GEN-01247736 at -740) (emphasis omitted). As an initial matter, Moderna's plan for going "back to basics" was to reach out to "partners with deep expertise in LNPs (Tekmira)." MRNA-GEN-01247736 at -736, -741 ("Given the lack of internal LNP expertise or focus, Moderna has initiated discussions with partners with deep expertise in LNP (Tekmira) to begin to optimize the platform and confirm its suitability for mRNA therapeutics."). Dr. Prud'homme ignores these lines of the document. In any event, it is not clear to me what

22

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Moderna meant with its aspirational statement that it intended to go "back to basics."  To the extent going "back to basics" meant designing new lipid molar ratios, Moderna was unable to do so despite repeated attempts—it continued using the 1.5:50 formulation for years, and eventually only deviated by a slight amount to avoid changing the properties of its LNPs.  Dr. Prud'homme also cites a line from the same document saying that the "LNPs Moderna has used to date . . . are known to induce innate immune activation" which "would be deleterious for mRNA."  MRNA-GEN-01247736 at -740.  It is not clear to me what aspect of the LNP Moderna is suggesting causes that "innate immune activation," but clearly Moderna did not believe that the 1.5:50 lipid molar ratios posed a safety risk, as it continued to use those ratios, including in multiple clinical trials.

40.    As I describe above and in my Opening Report, Moderna viewed the results from the ITR study #30668 positively.  Opening Rep. ¶ 227.  Dr. Prud'homme does not disagree with that conclusion or dispute any of the evidence that I cite.  Rather, he cites a line from the study report stating, ███████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

. . . ."  MRNA-GEN-00788543 at -593; Prud'homme Rep. ¶ 84.  I note that these results only appear to have occurred as part of "Treatment 2," which was a dose escalation condition that was added to the study when there were no safety signals in the original treatment condition.  MRNA-GEN-00788543 at -592 ("Although originally conceived as a single treatment study, the absence of safety findings after Treatment 1 suggested that Treatment 2 and further dose exploration could be added safely.").  Dr. Prud'homme does not suggest that this result indicated that the study had failed.  Nor could he, given that Moderna widely advertised the results of the

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

study to many potential partners, and eventually secured a deal with AstraZeneca using the data. Opening Rep. ¶¶ 228-230.  Dr. Prud'homme also does not suggest that any safety finding of the study was the result of the lipid molar ratio used.  Again, it is sensible that Dr. Prud'homme does not offer such an opinion, given that Moderna continued to use that target lipid molar ratio in numerous future studies, which exhibited positive safety profiles, including for its COVID-19 vaccine.  Opening Rep. ¶¶ 247-265.

41.     Dr. Prud'homme also cites a 2013 presentation to Sanofi to opine that Moderna needed "18 months of development effort to '[r]educe[] to practice sufficiently to enable broad target class as well as specific target claims.'"  Prud'homme Rep. ¶ 84 (quoting MRNA-GEN-00510199 at -209).  However, this statement is referring to Moderna's intellectual property strategy, in which it operated secretly to attempt to obtain an advantage in its patent position. MRNA-GEN-00510199 at -209 ("We used 18 months in stealth [mode] to create a broad and exclusive IP footprint.").  That presentation, which features the ITR study #30668 efficacy data, MRNA-GEN-00510199 at -206, does not mention any safety problems, which is consistent with my opinions that Moderna viewed that study as a success and that it was a success.

42.     Dr. Prud'homme also cites several aspirational statements, including in a 2013 presentation to AstraZeneca stating that "[f]urther work is needed . . . to optimize the LNP platform and determine its suitability for mRNA therapeutics."  Prud'homme Rep. ¶ 84 (quoting MRNA-GEN-01247648 at -715) (emphasis omitted).  As an initial matter, I would note that Dr. Prud'homme has omitted, in the previous quote, the phrase "with appropriate partners." MRNA-GEN-01247648 at -715 ("Further work is needed – with appropriate partners – to optimize the LNP platform and determine its suitability for mRNA therapeutics.").  Presumably the reason he omitted that phrase is because Tekmira is listed as one of the "world experts" that

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Moderna intended to partner with.  MRNA-GEN-01247648 at -707 ("Leverage the world experts" "Aggressive BD & partner-lead POC (Tekmira, Bind, PhaseRx, InCellArt, 3M)"), -719 (listing Tekmira as the only entity with expertise in "IV LNP").  In any event, I disagree that the listing of such broad goals somehow suggests that the technology in the Patents-in-Suit had not already enabled Moderna to experience substantial success with mRNA-LNP delivery. Moreover, to the extent Moderna "optimize[d] the LNP platform" following its 2013 presentation, that did not involve finding any lipid molar ratios that were superior to the 1.5:50 target formulation.  In fact, Moderna's repeated efforts to do so failed, as explained at length in my Opening Report.  As I have stated repeatedly, Moderna continued using those lipid molar ratios for years to come.

43.    Dr. Prud'homme disagrees with the opinion from my Opening Report that Moderna "simply used the same components and target ratios developed by Plaintiffs' predecessors and the companies with whom Plaintiffs collaborated, without modification," Opening Rep. ¶ 241, and accuses me of having "tunnel vision[]," Prud'homme Rep. ¶ 84. However, Dr. Prud'homme does not point to any changes in any components or target ratios that Moderna made that I overlooked in my Opening Report.  Indeed, I find it telling that Dr. Prud'homme relies heavily on aspirational statements from Moderna about its intent to "optimize the LNP platform," MRNA-GEN-01247648 at -715, and that "development of LNPs for mRNA therapeutics should start by going back-to-basics," MRNA-GEN-01247736 at -740, rather than actual evidence of Moderna modifying (for example) its lipid molar ratios.  Moderna may have thought that it could design an improved LNP for mRNA, but—at least with respect to lipid composition—Moderna's efforts were unsuccessful.  Opening Rep. Section IX.C.  Indeed, in my Opening Report, I provided the target molar ratios used in numerous of Moderna's clinical trials

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

00153542 at -542). Generalizing from this result, Dr. Prud'homme suggests that Plaintiffs' siRNA work did not translate to mRNA, and Moderna "could not simply copy learnings from siRNA to the mRNA space." Prud'homme Rep. ¶ 85. I disagree. As I explain in more detail below, Plaintiffs were able to quickly and easily adapt their formulations and methods to work with mRNA. *Infra* Section V. Moreover, as I explain above and in my Opening Report, Moderna was likewise able to successfully deliver mRNA with "no effort put into optimizing LNP formulations." MRNA-GEN-01247736 at -736; *supra* ¶ 38.

47.     Dr. Prud'homme opines that I "assign[ed] an inflated amount of credit to the non-human primate (NHP) proof-of-concept study." Prud'homme Rep. ¶ 86. Dr. Prud'homme appears to not understand my opinions—the "Non-human primate proof of concept" study, which allowed Moderna to "Establish Credibility" and secure the "AstraZeneca deal," as the slide states, MRNA-GEN-01237261 at -262, was the ITR Study #30668 that I discuss at length above (and which Dr. Prud'homme spent numerous paragraphs opining about). Dr. Prud'homme dismisses that study as "somehow a study related to LNPs." Prud'homme Rep. ¶ 86. As I explain above, however, the key point was that Moderna did *not* need to conduct any LNP studies to develop a delivery vehicle for ITR Study #30668—it simply copied an existing formulation within the scope of the Lipid Composition Patents.

48.     Dr. Prud'homme cites to other portions of the slide that I cite, Opening Rep. ¶ 230, which he opines are "distinct from the NHP proof-of-concept study," such as "'[b]uild[ing] [a] distinctive technology platform'" and "'[p]ivotal drug trials,'" which Dr. Prud'homme opines required Moderna to "invest in the '[o]ptimization of the Moderna Technology Platform' and develop a 'foundation for mRNAs,'" Prud'homme Rep. ¶ 86. Dr. Prud'homme's citation of these aspirational generalities are both irrelevant and not responsive to my opinions. To the

28

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

MRNA-GEN-00940901 alone with greater than 70% encapsulation—suggests that Plaintiffs' technology was not translatable to mRNA.

50.     As I explain at length in my Opening Report, Moderna used the 1.5:50 target formulation, with MC3, in its successful clinical flu studies. Opening Rep. ¶¶ 247-252. Dr. Prud'homme does not dispute that those trials were successful, nor does he dispute that they used LNPs within the scope of the Lipid Composition Patents. Rather, he states that my "discussion of Bahl 2017 omits the key conclusion that 'the full data-set from the trial will need to be evaluated in order to confirm this interim analysis,' and that '[t]he completion of these and additional clinical trials is needed to confirm whether mRNA vaccines will become an effective vaccine platform.'" Prud'homme Rep. ¶ 87 (quoting GENV-00961863 at -869) (emphasis omitted). I disagree that these statement in Bahl 2017 undermine the data it reports or its conclusion that "Initial data from the first-in-human trial appear to confirm a robust immune response with a safe and well-tolerated profile." Bahl 2017 at 1322. I find Dr. Prud'homme's opinion on this issue particularly confusing because he does not seem to dispute that the mRNA-LNPs in Bahl 2017, using the target 1.5:50 formulation, were safe and effective. In any event, Dr. Prud'homme's concerns about the interim nature of Bahl 2017 should be allayed by the Feldman 2019 paper—which I also discussed in my Opening Report, Opening Rep. ¶ 250—which presented the full dataset from Moderna's flu trials and reported that "[t]hese phase 1 studies demonstrate both safety and robust immune responses to mRNA vaccines against H10N8 and H7N9 influenza viruses." Feldman 2019 at 3333. Plainly, Moderna was able to achieve safe and effective delivery of mRNA using LNPs with Plaintiffs' patented lipid molar ratios.

51.     Dr. Prud'homme also opines that the Bahl 2017 study "does not describe experiments specifically directed to the LNP or the lipid molar ratio, such as a comparison

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

between different ratios." Prud'homme Rep. ¶ 87. I agree with Dr. Prud'homme—Moderna did not need to experiment with different lipid molar ratios as part of its development work for Bahl 2017, because it was able to simply copy lipid molar ratios developed by Plaintiffs and their collaborators and thereby undertake a successful clinical study.

52.    Dr. Prud'homme opines that "Moderna's success with influenza vaccines stemmed from an 'iterative process innovation strategy' that required 'incremental scientific discovery' rather than 'opportunistically repurpos[ing]' as suggested by Dr. Mitchell." Prud'homme Rep. ¶ 87 (citing MRNA-GEN-01530997 at 998). As an initial matter, Dr. Prud'homme does not explain what "innovation strategy" or "scientific discovery" he is referring to that is embodied in Moderna's influenza vaccines. Indeed, the presentation that Dr. Prud'homme cites, from 2020, long post-dates Moderna's influenza vaccine work, as well as many of the other clinical studies in which Moderna used the 1.5:50 MC3 formulation. That presentation discusses Moderna's purported process innovations, such as ███████████ and ███████████████ MRNA-GEN-01530997 at -998 ████████████████████████████ ████████████████ As I stated in my Opening Report (and Dr. Prud'homme does not dispute), Moderna's influenza vaccine did *not* incorporate those process changes. Opening Rep. ¶ 246. It likewise used MC3, and thus did not incorporate Moderna's SM-102 lipid. As such, I disagree that Dr. Prud'homme has pointed to any LNP-related "innovations" that Moderna implemented in its influenza vaccine; as observed above, Moderna's contemporaneous documents refute Dr. Prud'homme's assertion. Despite not using SM-102, ███████████████████████ Moderna's influenza vaccine proved safe, effective, and successful, while using the 1.5:50 target formulation within the Asserted Claims.

53.    In my Opening Report, I cited a Moderna presentation discussing negotiations

31

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

with Arbutus, which listed as a "rationale for pursuing Arbutus . . . technology" its

"Accumulated clinical safety & efficacy expertise" and "proven manufacturing know-how."

MRNA-GEN-01719608 at -614; Opening Rep. ¶ 251.  Dr. Prud'homme does not dispute that

Moderna viewed these features as advantages of Plaintiffs' LNPs, but instead points to other

financial considerations related to the potential deal.  Prud'homme Rep. ¶ 87.  I disagree that

these additional considerations undercut the value that Moderna plainly recognized in Plaintiffs'

expertise.  Dr. Prud'homme also suggests that Moderna would conduct all the research studies as

part of the deal, Prud'homme Rep. ¶ 87, but this mischaracterizes the document, which makes

clear that Tekmira would be responsible for LNP formulations, MRNA-GEN-01719608 at -626

("Research: Tekmira responsible of [sic] formulation/ Moderna responsible for providing mRNA

and conducting all studies").

54.      Dr. Prud'homme opines that the "scale of necessary additional development to

transition from existing siRNA technology to mRNA is demonstrated in full by Plaintiffs'

internal statements and documents that confirm the vast scope of work conducted to attempt to

encapsulate mRNA."  Prud'homme Rep. ¶ 88.  I disagree.  Plaintiffs were quickly and easily able

to formulate mRNA-LNPs, which I discuss in more detail below but incorporate in connection

with this incorrect assertion by Dr. Prud'homme.  *Infra* Section V.

55.      Dr. Prud'homme cites to several documents related to Moderna's work with PEG,

including the amount of PEG in the LNPs and the use of ███████████.  Prud'homme Rep.

¶ 89.  I find Dr. Prud'homme's opinions on this issue inapt and not responsive to my opinions.

The studies I discuss in Section IX.A of my Opening Report pre-date Moderna's use of 2.5

mol% PEG-lipid and, instead, largely use the 1.5:50 target formulation.  With respect to ███

███████ I discuss that at length in my Opening Report and below.  However, as I note in

32

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

my Opening Report, numerous of Moderna's successful clinical studies did not use ▮▮▮▮▮

▮▮▮▮▮.  Opening Rep. ¶¶ 246, 254.  Moreover, the use of ▮▮▮▮▮▮▮ is not relevant to

whether the asserted claims of the Lipid Composition Patents are practiced and infringed, as

those claims are not limited to any particular process used to prepare particles or the location of

the lipids in the particles.  The comparison of compositions made with and without ▮▮▮▮▮

▮▮▮▮ is simply a comparison between two embodiments of the claims.

56.    Dr. Prud'homme opines that "as detailed above, and supported by the Moderna's

documents, Moderna had to undertake significant research and development to achieve its

COVID-19 vaccine."  Prud'homme Rep. ¶ 89.  Dr. Prud'homme's opinion is not responsive to

the opinions I offered, which concerned the reasons why some of Moderna's other programs

(such as influenza) were not brought to market.  Opening Rep. ¶ 265.  Dr. Prud'homme does not

address those opinions in my Opening Report, much less dispute them.  In any event, with

respect to Dr. Prud'homme's opinion about the COVID-19 vaccine, Moderna's own documents

acknowledge that its Phase 1 trials in other programs, using the 1.5:50 target formulation,

contributed to the development of the COVID-19 vaccine.  Opening Rep. ¶ 265.

57.    Dr. Prud'homme opines that "Moderna was ahead of Tekmira in mRNA

delivery."  Prud'homme Rep. ¶ 90.  I address this opinion above.  *Supra* ¶ 45.  Moreover, as I

explain above and in my Opening Report, Moderna almost exclusively used the 1.5:50 target

formulation in its early mRNA delivery work.  *E.g.*, Opening Rep. ¶¶ 222-245.  As such, to the

extent Moderna was "ahead of Tekmira in mRNA delivery," it appears to have gotten there by

copying Tekmira's LNP technology.

**B.    Moderna's Purported LNP Development Projects**

58.    In paragraphs 91-93 of his report, Dr. Prud'homme cites various documents and

excerpts of testimony purportedly describing Moderna's LNP research.  Dr. Prud'homme has not

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

research resulted in innovations that made a tangible difference to the quality of its COVID-19 vaccine.  Nor did those innovations, such as they were, result in LNPs falling outside the scope of the Asserted Claims.  Indeed, with respect to one of the most relevant areas of research to the Patents-in-Suit—the lipid molar ratios of the LNPs—I agree that Moderna expended significant resources attempting to identify new lipid molar ratios, but ultimately failed to identify molar ratios that were superior to the lipid molar ratios within the scope of the Lipid Composition Patents, and so instead opted to make minor adjustments to create a composition that contained particles within the literal scope of the Asserted Claims of the Lipid Composition Patents and was insubstantially different from compositions within the literal scope of the Lipid Composition Patents.  Opening Rep. Sections IX.C, X.D.

62.     Additionally, while Dr. Prud'homme characterizes Moderna's research as leading to "innovations across all aspects of LNPs," I note that much of Moderna's research appears to have been aimed at designing around intellectual property, rather than improving product quality. I discuss this at length in the context of Moderna's lipid molar ratio work, Opening Rep. ¶ 304, and Moderna's cationic lipid design work, Opening Rep. ¶ 289.  I note that Moderna likewise originally used ▮▮▮▮▮▮ mixing (which I understand Plaintiffs have intellectual property related to), but transitioned to other mixer configurations, with the goal of maintaining comparability to the material produced via ▮▮▮▮▮ mixing.  Opening Rep. ¶¶ 370-372.  As such, given Moderna's practice of conducting research in order to develop similar methods and products with fewer potential intellectual property constraints, it is important that every purported Moderna "innovation" be carefully evaluated to determine whether it actually produces a measurable benefit.  Dr. Prud'homme has not, as far as I can tell, conducted that exercise, and I have seen no evidence that numerous of the "innovations" that he cites in

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

paragraph 93 of his report confer any benefits on Moderna's COVID-19 vaccine.

63.     Dr. Prud'homme relies on numerous excerpts from depositions of Moderna's employees, largely praising their own work, to opine about Moderna's innovations.  I disagree that those excerpts establish that any of Moderna's research yielded innovations that were truly novel or that substantially improved the properties of the COVID-19 vaccine.  For example, Dr. Prud'homme quotes Dr. Hassett as discussing various "challenges" in developing a vaccine.  Prud'homme Rep. ¶ 93 (quoting Hassett Dep. Tr. at 21:6-22:6).  The quote that Dr. Prud'homme cites does not include any details about those supposed challenges, and I note that much of Dr. Hassett's work appears to have been related to trying and failing to develop alternative lipid molar ratios that were superior (or even equivalent) to the molar ratios claimed in the Lipid Composition Patents.  Opening Rep. Section IX.C.

64.     Dr. Prud'homme also cites substantial portions of testimony from Dr. Smith.  Prud'homme Rep. ¶ 93.  Much of that testimony concerns the specific manufacturing issues— ███████████████████████████████████—that I discuss elsewhere and are not relevant to infringement of the Asserted Claims.  *Infra* Section IV.C.  Other parts of his testimony simply list features of LNPs formulations, without suggesting that Moderna made any fundamental innovations in those areas (much less identifying them with specificity).  *E.g.*, Smith Dep. Tr. at 44:22-45:3 ("And then on top of that, there's also other components in these formulations, like the ███████████████████████████.").  Dr. Prud'homme cites an excerpt from Dr. Smith referring to a "proprietary methodology of careful charge control," Smith Dep. Tr. at 104:11-105:19, but fails to provide any details about that supposed method.  Indeed, Dr. Smith explains that that method was used "for an IV therapeutic LNP," Smith Dep. Tr. at 104:11-105:19, which would not apply to the COVID-19 vaccine at issue in this case.  Dr. Prud'homme

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

that that is referring to ████████████ as Moderna understands that process. *E.g.*, MRNA-

GEN-00718006 at -007.  Moreover, I note that Moderna's documents explicitly state that ████

████████ was introduced in 2019, not 2015 or 2016.  MRNA-GEN-00541656 at -657.  In any

event, the broader point is that ██████████████████████ is plainly not

"groundbreaking," as Dr. Prud'homme asserts—Dr. Prud'homme concedes that others in the

field ████████████████████████████████████████████████

████████████████████████████████████████████.  Indeed, the

'651 patent itself, which describes that its invention is applicable to various nucleic acids

including mRNA, ██████████████████.  *See* '651 patent, 6:16-19 ("[T]hose of skill in the

art will realize that the processes and apparatus of the present invention are equally applicable to

active entrapment or loading of the liposomes after formation of the vesicle.").

73.    I note that the patent office shares my view about Moderna's ████████████

process.  Dr. Prud'homme cites a patent application Moderna filed related to that process.

Prud'homme Rep. ¶ 97 (citing U.S. Patent Publication No. 2023/0285297).  The PTO rejected

that patent application as obvious on February 13, 2025, in view of the patent application I cited

in my Opening Report (WO 2018/089801).  *See* Feb. 13, 2025 Office Action (17/792,554) at 2-3

(rejecting claims as obvious in view of prior art teaching "A process of encapsulating messenger

RNA (mRNA) in lipid nanoparticles comprising the steps of forming lipids into pre-formed lipid

nanoparticles . . . and then combining the pre-formed lipid nanoparticles with mRNA."

(emphasis omitted)); Opening Rep. ¶ 319.  To the best of my knowledge, Moderna has not

obtained a patent on the purportedly groundbreaking ████████████ process.

74.    As I described in my Opening Report, Moderna appears to have opted to use ████

████████ due to its ease of manufacturability at scale and cost savings, rather than to change

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

the properties of the particles themselves.  Opening Rep. ¶¶ 316-317.  Dr. Prud'homme's

opinions on this issue are largely in accord.  *See* Prud'homme Rep. ¶¶ 105-106.  Dr.

Prud'homme does opine that using ██████████ eads to a more "consistent, controllable,

and scalable process."  Prud'homme Rep. ¶ 105.  Dr. Prud'homme's only support for this

statement is, again, testimony from Dr. Smith—he does not cite any comparative data showing

improved consistency of any quality characteristics with ██████████ versus other methods.

(The document Dr. Prud'homme cites in this paragraph of his report is addressed below, in

paragraph 76.)

75.    Dr. Prud'homme opines that ██████████ "further results in better product

attributes, such as increased purity, reduced heterogeneity, higher encapsulation efficiency, and

more consistent physicochemical properties."  Prud'homme Rep. ¶ 107.  To support this

statement, Dr. Prud'homme cites to two PowerPoint presentations, without indicating which

pages support his contention.  It is not clear to me what data in those presentations, if any,

demonstrate that ██████████ has the various benefits that Dr. Prud'homme lists, much less

that any observed differences would translate into substantially improved product quality

attributes for Moderna's COVID-19 vaccine.  To the contrary, another presentation that Dr.

Prud'homme cites in paragraph 104 indicates that ██████████ yields similar

physicochemical properties as Moderna's existing process.  MRNA-GEN-00718006 at -019

██████████ -020 ("Comparable Particle Size"), -021 ("No

significant difference in physicochemical properties," "No significant difference between

Control ██████████ Drug Product Performance").  These data and conclusions are

inconsistent with Dr. Prud'homme's opinion that ██████████ leads to improved product

attributes.  I recognize that one slide that Dr. Prud'homme cites states "Comparable or Higher

47

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

did not use ███████████, including programs involving successful clinical trials.

78.    Dr. Prud'homme opines that ██████████ helps solve the challenges associated with mRNA diffusion and heterogeneity." Prud'homme Rep. ¶ 108. Dr. Prud'homme does not explain what facet of LNP "heterogeneity" is improved by ████ ████. Moreover, Dr. Prud'homme's only support for this proposition appears to be testimony from Stephen Hoge, rather than any actual data on heterogeneity. Indeed, as I explained in my Opening Report, Moderna has specifically avoided studying the heterogeneity in its COVID-19 product, with the exception of certain experiments that confirmed that its product is indeed heterogeneous. *E.g.*, Opening Rep. ¶¶ 463-476, 672.

79.    Dr. Prud'homme opines that ██████████ also allows Moderna to explore a wider range of lipid formulations." Prud'homme Rep. ¶ 109. Even if this is true (and the only support again comes from Dr. Hoge's testimony, rather than contemporaneous evidence or data), this is irrelevant to the quality attributes of the COVID-19 vaccine, which uses the formulations discussed at length in this report and my Opening Report. Making Moderna's research more efficient is not the same as improving the properties of the COVID-19 vaccine product.

80.    Dr. Prud'homme opines that ██████████ is an improvement over the traditional processing approach where █████████████████ ████ which could result in fouling, aggregation, and pressure fluctuation, especially during scale-up," and that "[w]ith its proprietary ██████████ process, Moderna was able to streamline its operations and achieve unprecedently high yield in manufacturing, which was particularly valuable during the pandemic and allowed Moderna to abate the pandemic in a rapid speed." Prud'homme Rep. ¶ 110. As an initial matter, it is unclear to me what Dr. Prud'homme means when he says that Moderna has a "proprietary ██████████ process," as it is my

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

understanding that Moderna's patent application on this process has thus far been rejected as being not distinct compared to a process invented by another company. *Supra* ¶ 73. In any event, again, Dr. Prud'homme's only support for his assertion is Dr. Smith's testimony, rather than any actual data.

81. However, even to the extent that some or all of the alleged benefits that Dr. Prud'homme discusses with respect to ▓▓▓▓▓▓ were accurate and actually supported by data (rather than just the testimony of Moderna employees), it would not change my opinion that the ▓▓▓▓▓▓ at bottom, principally aimed at improving manufacturability, as Dr. Parsons himself testified. Opening Rep. ¶ 316. That sort of manufacturing optimization is much less significant than the technology that is claimed in the Patents-in-Suit, which enables successful LNP delivery. Opening Rep. ¶¶ 785-790.

82. As I explained in my Opening Report, and as Moderna's witnesses conceded repeatedly, the ▓▓▓▓▓▓ technique does not improve either the safety or efficacy of Moderna's COVID-19 vaccine. Opening Rep. ¶ 316. Dr. Prud'homme does not dispute that conclusion, instead opining that "safety or efficacy is one aspect of the product attributes," referring back to his prior discussion that "▓▓▓▓▓▓ results in better product attributes including, such as, increased purity, reduced heterogeneity, higher encapsulation efficiency, and more consistent physicochemical properties." Prud'homme Rep. ¶ 112. I address those supposed improvements above—Dr. Prud'homme cites no evidence demonstrating that ▓▓▓▓▓▓ improves the physicochemical properties of the COVID-19 vaccine, but even if it did lead to some marginal improvement in (for example) the "consistency" of the product's properties, that would constitute a much less significant contribution than the technology claimed in the Patents-in-Suit.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

innovation over the traditional process." Prud'homme Rep. ¶ 124. I disagree, for the reasons I explain above.

92.     Dr. Prud'homme "disagree[s]" with my opinion that "'Moderna's primary motivation for using ████████████ was related to costs.'" Prud'homme Rep. ¶ 125 (quoting Opening Rep. ¶ 396). The evidence discussed above supports my opinion. In addition, an internal Moderna report about the ████████ process (which I quoted in paragraph 396 of my Opening Report) states, "The process was switched to ████████████ drug product manufacturing process *to improve cost of goods for late stage development.*" MRNA-GEN-00842047 at -062 (emphasis added). I note that Dr. Prud'homme does not cite or address this document in his report, and it is not on his list of materials considered. Rather than addressing my opinions or evidence, Dr. Prud'homme simply opines that "Moderna's innovation with respect to its manufacturing process, including the development of ████ made significant improvements in the process as well as the homogeneity of the product." Prud'homme Rep. ¶ 125. I have already addressed similar opinions multiple times, both in my Opening Report and above in this report. I do not know what Dr. Prud'homme means that it improved "the process." Neither do I know what Dr. Prud'homme means by the "homogeneity of the product" — Dr. Prud'homme does not discuss evidence to that effect, and I note that Moderna has purposefully avoided investigating the heterogeneity of its COVID-19 vaccine, with certain exceptions addressed in my reports that are not supportive of Dr. Prud'homme's opinion. *Supra* ¶ 78; Opening Rep. Section X.E.2.

    **2.**    ████████████

93.     I discussed Moderna's ████████ step in my Opening Report. Opening Rep. ¶¶ 321-328.

94.     Dr. Prud'homme opines that, "[c]ompared to the traditional process where all

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

demonstrating that the properties themselves were comparable. *Supra* ¶ 86.

105.    Dr. Prud'homme opines that one of the documents I cite on this issue (MRNA-GEN-00615856) "demonstrate[s] that compositions with two different molar ratios were compared, and based on this data, the document stated 'it is recommended to acknowledge and mitigate potential differences with Moderna's existing infection [sic] disease vaccine candidates.'" Prud'homme Rep. ¶ 144 (quoting MRNA-GEN-00615856 at -856). As an initial matter, I disagree that the vague statement that Dr. Prud'homme quotes—that ███████████

████████████████████████████████████████████████████████████

█████████," MRNA-GEN-00615856 at -856—suggests any meaningful difference between the formulations being compared. Moreover, Dr. Prud'homme notably omits the first part of that sentence, which reads in full: "████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ MRNA-GEN-00615856 at -856. That sentence is consistent with my opinion (addressed at length in my Opening Report and below) that Moderna did not view the changes under discussion, including the target formulation changes and the use of █████████████, to be significant.

106.    In paragraph 146, Dr. Prud'homme opines that, "to the extent LNPs with different molar ratios are formed, it is just as likely that other lipid compositions are formed entirely, includes ones that cannot (and will not as the manufacturing process proceeds) encapsulate nucleic acid, let alone mRNA." Prud'homme Rep. ¶ 146. Dr. Prud'homme puts forward no evidence for his speculation about "other lipid compositions"—by contrast, the extensive evidence I discuss below regarding Moderna's lipid molar ratio testing and fractionation experiments confirms that Moderna's LNPs are, in fact, heterogenous with respect to lipid

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

content, consistent with the common understanding in the field (shared by Moderna).  I discuss these issues more below regarding infringement and incorporate those opinions here.

### D.    Moderna's Search for Alternative Lipid Compositions

107.    In my Opening Report, I described the extensive work that Moderna conducted to try to find acceptable lipid molar ratios that would not infringe the Lipid Composition Patents. Opening Rep. Section IX.C.  Their experiments repeatedly showed that making substantial changes to the lipid molar ratios within the scope of the Lipid Composition Patents yielded worse performance.  As such, despite pressure from Moderna's President to use a composition with 40 mol % cationic lipid, and despite substantial experimentation with target lipid molar ratios that differed substantially from the Lipid Composition Patents (and that would not have yielded particles within the scope of those patents), Moderna ultimately opted to use a target formulation for its COVID-19 vaccine that differed as little as possible from the 1.5:50 target formulation, which it had used successfully for years across many programs.  Opening Rep. Sections IX.A, X.D.

108.    In paragraphs 147 through 187, Dr. Prud'homme purports to give his own account of Moderna's development work with lipid molar ratios, much of which I have already addressed in my Opening Report, and which does not change my opinions.  I respond to those opinions in this section.

109.    Dr. Prud'homme opines that, "In the earlier days when Moderna had just started working on mRNA delivery, Moderna used LNPs with various different molar compositions, including LNPs with a molar composition of cationic lipid:cholesterol:DSPC:PEG lipid in 50:38.5:10:1.5 for early preclinical and clinical studies."  Prud'homme Rep. ¶ 148.  Dr. Prud'homme's description ignores the fact that Moderna relied on the target 1.5:50 molar ratios as its lead formulation for years, across many programs, including in its clinical studies for the

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

COVID-19 vaccine in 2020.  *Supra* Section IV.A.

110.    Dr. Prud'homme opines "that the molar composition described [*i.e.*, the 1.5:50] was inferior and unsuitable for mRNA delivery."  Prud'homme Rep. ¶ 149.  For support, Dr. Prud'homme cites to an instance in August 2018 when Moderna's mRNA-1443 product (for CMV) failed to meet an "internal quality control specification[] for visual inspection after one year of storage."  Prud'homme Rep. ¶ 149 (quoting MRNA-GEN-01266205 at -241).  I address this contention in my Opening Report, Opening Rep. ¶¶ 266-267, and below, *infra* ¶ 634.  In short, Dr. Prud'homme cites no documentary evidence to suggest that the specification failure of mRNA-1443 was related to the lipid composition.  Indeed, the fact that Moderna continued to use the same target 1.5:50 ratio, including in Moderna's other CMV trial (for mRNA-1647) that was occurring in parallel and for its COVID-19 vaccine clinical trials, indicates that Moderna did *not* believe that the specification failure was due to the lipid molar ratio and (unlike its expert Dr. Prud'homme) did not believe that the target 1.5:50 formulation was "inferior or unsuitable for mRNA delivery."  I do not believe that Moderna would have supplied, to healthy human subjects, a product that it considered "inferior" or "unsuitable."  Plaintiffs' FDA expert, Dr. Kimberly Benton, shares my opinion.  As she explains, "[f]rom FDA's perspective, it would be inappropriate for Moderna to inject a vaccine into humans during clinical trials using a formulation that Moderna viewed as 'unsuitable.'  Moderna had an obligation to inform FDA if it believed the 1.5:50 formulation was 'unsuitable for mRNA delivery,' and had Moderna done so, FDA would not have permitted Moderna to continue clinical trials using that formulation. The fact that Moderna did not do so, and in fact continued using the 1.5:50 ratio in human trials, suggests that Moderna did not in fact find that formulation 'inferior and unsuitable for mRNA delivery.'"  Benton Reply Rep. ¶ 19.

64

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

111.    Dr. Prud'homme cites to testimony from Dr. Parsons about reasons why the "composition with 50 mol% of cationic lipid was unsuccessful."  Prud'homme Rep. ¶ 150. Again, Dr. Prud'homme does not cite any contemporaneous evidence confirming Dr. Parsons' testimony, and Dr. Parsons himself does not provide specifics about the supposed "challenges" that Moderna encountered when using 50 mol % cationic lipid.  Indeed, as I explained in my Opening Report, Dr. Parsons and his team were unable, in July 2020, to come up with *any* "positive rationale" for the change from the PVU Formulation (which used a target of 50 mol % cationic lipid) to the v1 Formulation (which used a target of 48.5 mol % cationic lipid), despite multiple entreaties to do so, ultimately simply telling the FDA that it had "no impact."  Opening Rep. ¶¶ 405-416.  Dr. Parsons himself admitted that he did "not have data to support this [*i.e.*, stability] as a justification" for the change to the v1 Formulation.  Opening Rep. ¶ 415.  This contemporaneous evidence undercuts Dr. Parsons' (and Dr. Prud'homme's) unsupported testimony about the failure of the 1.5:50 formulation.

112.    Dr. Prud'homme cites documents and testimony related to purported "drug product stability problems" with Moderna's "hMPV vaccine with 50 mol % cationic lipid." Prud'homme Rep. ¶ 151.  For support, he cites only to a February 2017 PowerPoint, stating that the hMPV program is "[e]xpect[ed] to face challenges with Chemical &Physical Stability." MRNA-GEN-00633693 at -695.  Dr. Prud'homme does not cite any evidence that any such problems arose in the hMPV (*i.e.*, mRNA-1653) program.  To the contrary—as I previously explained—Moderna reported that the product was effective and "generally well tolerated." Opening Rep. ¶ 265.  Dr. Prud'homme does not dispute that evidence.

113.    Dr. Prud'homme also cites a reference in the aforementioned document to "lipid aggregates and cholesterol crystals."  Prud'homme Rep. ¶ 151 (quoting MRNA-GEN-00633693

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

at -694).  Again, Dr. Prud'homme cites no evidence suggesting that such aggregates are attributable to the 1.5:50 formulation or were "solved" by Moderna's formulation modifications. Indeed, I note that the target molar ratio for cholesterol *increased* when Moderna switched from the PVU (38.5 mol %) to the v1 Formulation (38.9 mol %), and then reverted back for the v2 Formulation (38.5 mol %).  Opening Rep. ¶ 392.  Dr. Parsons appears to have misunderstood the direction of the cholesterol concentration change when he was advocating for a "stability"-related rationale for the change to the v1 Formulation.  Opening Rep. ¶ 415.  I disagree that any of the evidence Dr. Prud'homme has cited demonstrates that any of Moderna's supposed stability issues were related to the formulation.

114.    Dr. Prud'homme opines that "[t]o solve the stability problem associated with the earlier formulation, Moderna conducted extensive studies exploring a wide variety of different lipid ratios and reformulated the molar compositions to achieve LNPs with better biophysical stability and other attributes."  Prud'homme Rep. ¶ 152.  Most of the evidence that Dr. Prud'homme cites is testimony from Moderna's own witnesses.  I do not dispute that Moderna did, in fact, conduct various lipid composition studies, which I discuss at length in my Opening Report.  However, as I also explain, I disagree that the target lipid molar ratios that Moderna ultimately implemented in its v1 and v2 Formulations led to any substantial effect on product attributes.  Opening Rep. Sections X.D, XIII.F.2.  Rather, those studies demonstrated that formulations with target molar ratios substantially outside the 50-65 mol% cationic lipid range recited in many of the Asserted Claims (which would not produce particles that infringe those Asserted Claims) produced inferior results.  However, formulations with target molar ratios only slightly outside the 50-65 mol% cationic lipid range (which *did* produce particles within that range) had similar properties.  Opening Report X.D, XI, XIII.F.  That is why, despite repeated

66

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

efforts by Moderna to use a formulation with a 40 mol% cationic lipid target for "incredibly strong business reasons," Opening Rep. ¶ 302 (quoting MRNA-GEN-02619870 at -870), ████████████████████ and ultimately chose to use much higher target percentages (48.5 and 48.0 mol% cationic lipid) in its COVID-19 vaccine, which were insubstantially different from the 1.5:50 target formulation used in its initial clinical COVID-19 vaccine studies. Opening Rep. XIII.F.2.

115.    In conjunction with the opinions discussed in the previous paragraph, Dr. Prud'homme cites a number of Moderna documents. Prud'homme Rep. ¶ 152. He provides no testimony or opinions about those studies, and it is not clear to me why he believes they are significant, other than to illustrate that Moderna was, in fact, conducting experiments with different lipid molar ratios. I note that I discuss numerous of those experiments in my Opening Report, and in my opinion they generally show that the formulation changes that Moderna made to its COVID-19 vaccine, from PVU to v1 to v2, had no substantial effect. Moreover, some of the experiments that Dr. Prud'homme cites, *e.g.*, MRNA-GEN-00533651 at -662, discuss lipid compositions that Moderna tested but did not use in any of its COVID-19 formulation. These experiments provide further confirmation of the opinions that I offered in my Opening Report, that Moderna searched extensively for formulations substantially outside the scope of the Lipid Composition Patents and failed to identify an adequate substitute.

116.    Dr. Prud'homme cites a 2017 study by Dr. Smith varying lipid content levels. Prud'homme Rep. ¶ 153 (citing MRNA-GEN-01551984 and MRNA-GEN-00709782). Dr. Prud'homme does not actually discuss the experiments in that study, and the full set of data are not included, making it difficult to parse. However, the relevant documents do include the experimental design, which makes clear that target lipid content (other than the PEG-lipid) was

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

varied in increments of 10 mol %. *See* MRNA-GEN-01551984 at -986, -993 ("The nine compositions surrounding the standard were selected by altering each of the lipids by 10 mol% in each direction . . . ."). This is consistent with the description I offered in my Opening Report—many of Moderna's earlier lipid content studies were examining ██████████████ ████████████████████████████████████████████████ *see* MRNA-GEN-01551984 at -986). That contrasts with the minor changes that Moderna actually made to its COVID-19 vaccine, which were intended to maintain comparability with the 1.5:50 formulation. For example, Dr. Prud'homme cites a quote that ████████████████████ ███████████ Prud'homme Rep. ¶ 153, but the actual data makes clear that this effect was occurring at much higher levels than are used in Moderna's COVID-19 vaccine, *see* MRNA-GEN-00709782 ██████████████████████████████ Plainly, Moderna opted not to pursue a formulation with ████████ DSPC, notwithstanding this result. Another result that Dr. Prud'homme highlights from the above study is the purported finding that ████████ PEG improved stability. Prud'homme Rep. ¶ 153. It is not clear to me whether this result would necessarily apply to Moderna's COVID-19 vaccine. For example, I do not believe that the aforementioned 2017 study used ████████████████, which (as discussed above) Dr. Prud'homme asserts affects stability. I discuss Moderna's later PEG-lipid studies in detail in my Opening Report, *e.g.*, Opening Rep. ¶¶ 438-449, which demonstrate little, if any, benefit from moving from 1.5 mol % to 2.5 mol % PEG-lipid. Moreover, as I explain in the context of the doctrine of equivalents, ████████████████████████ PEG-lipid is literally within the scope of the claims of the Lipid Composition Patents. As such, even if Moderna did observe a small improvement in particle size stability when moving from ████████████████████ PEG-lipid, that simply reflects another positive attribute of formulations within the scope of the Asserted Claims

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

of the Lipid Composition Patents.  It does not mean that there is a substantial difference between the claims (████████████████████████) and batches of the Accused Product with higher amounts of PEG-lipid.[4]  Indeed, as I explain in my Opening Report, the evidence demonstrates that there is no such difference.  Opening Rep. ¶¶ 723-727.  As such, I do not believe that any of the data in these studies demonstrate that Moderna's COVID-19 formulation changes (from PVU to v1 to v2) would have had a substantial effect on any product quality attribute.

117.    Dr. Prud'homme cites to an *in vitro* study using a "composition with ████████ of SM-102," which Dr. Prud'homme asserts was "three times more ponent [sic] than the control composition."  Prud'homme Rep. ¶ 154.  I discuss this experiment in my Opening Report and below, and I disagree with Dr. Prud'homme's characterization of the experiment.  Opening Rep. ¶¶ 311, 803; *infra* ¶¶ 137, 552.  In any event, if he is correct (*i.e.*, that ████████ SM-102 to a ████████ target truly improves efficacy), presumably Moderna would have pursued that formulation, rather than target formulations with ████████ cationic lipid.  Moderna's failure to pursue this supposedly more potent formulation, despite requests from the top tiers of management to use a cationic lipid target of ████████ is strong evidence that they did not, in fact, consider it to be superior to the 1.5:50 formulation.

118.    Dr. Prud'homme cites a 2017 document and Dr. Parsons' testimony to opine that Moderna tested up to ████████ PEG and saw "good control above ████████ percent."  Prud'homme Rep. ¶ 155 (quoting Parsons Dep. Tr. 431:1-432:21).  With respect to the document (MRNA-GEN-00635648 at -750), I address that below, *infra* ¶ 632, and I disagree that it

---

[4] As I explain in my Opening Report and below, all batches of Moderna's COVID-19 vaccine have particles within the scope of the Asserted Claims, including the limitations reciting, for example, 0.5-2 mol% conjugated/PEG-lipid.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

provides any data suggesting any stability benefits to using PEG-lipid at ███████ Moreover, Dr. Prud'homme ignores the cited portion of the testimony from Dr. Parsons acknowledging that Moderna did *not*, in fact, see any stability benefits over ████████ *see* Parsons Dep. Tr. 431:20-432:4; *see also* Opening Rep. ¶ 725.  Additionally, Dr. Parsons' testimony about ████████ PEG was simply that there was no detrimental effect on potency up to that point, not that this level of PEG was better.  Parsons Dep. Tr. 432:3-21 ("[W]e could ██████ PEG further without – at least modestly further without a detrimental impact on potency . . . .  From a potency perspective, my recollection is that we saw good control ████████████████.").  As such, it appears to me that—despite testing ██████ levels of PEG-lipid—Moderna ultimately failed to find any evidence of benefits of using amounts ██████ than the PEG-lipid ranges claimed in the Lipid Composition Patents.

119.    Dr. Prud'homme offers opinions about the benefit of using the ████████████ process.  Prud'homme Rep. ¶ 156.  I address those issues above, *supra* Section IV.C.2, and in my Opening Report.

120.    Dr. Prud'homme opines that "[a]s a result of its extensive research and development efforts, Moderna achieved an innovative SM-102 LNP platform, and in 2018, arrived at the molar composition of 48 mol % SM-102, 11 mol % of DSPC, 38.5 mol % of cholesterol, and 2.5 mol % of PEG-DMG."  Prud'homme Rep. ¶ 157.  As an initial matter, Dr. Prud'homme fails to mention the v1 Formulation as part of his narrative, which I presume means that he does not view it as equally innovative as the v2 Formulation.  In any event, I do agree that Moderna's lipid composition research leading to these target molar ratios was extensive.  However, that extensive work involved Moderna's repeated and failed attempts to use target molar ratios that were substantially different than the ranges recited in the Lipid Composition

70

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Patents.  And at the end of that extensive search for new lipid molar ratios—which involved substantially higher and lower lipid concentrations—Moderna ultimately chose to use a target formulation with 2 mol % less cationic lipid, 1 mol % more phospholipid, the same amount of cholesterol, and 1 mol % more PEG-lipid than the 1.5:50 formulation.  None of the documents that Dr. Prud'homme cites, Prud'homme Rep. ¶ 157, demonstrate that these minor changes yield a substantial difference compared to the 1.5:50 formulation, much less from the claims themselves (which extend up to 2.49999 mol % PEG-lipid and down to 49.5000% cationic lipid), and the evidence I cite in my Opening Report indicates that there is no such substantial difference.  *E.g.*, Opening Rep. Section XIII.F.2.  Moderna's decision to keep its target molar ratios so close to the claimed lipid molar ratios of the Lipid Composition Patents underscores the excellent properties of those ratios.  Like AstraZeneca, Opening Rep. ¶ 312, Moderna clearly found those ratios "very difficult to beat."

121.    Dr. Prud'homme opines that, "Compared to the prior formulations, Moderna's new lipid composition results in more stable LNPs and enabled Moderna to progress towards product commercialization and eventually allowed the company to respond to the pandemic with rapid speed."  Prud'homme Rep. ¶ 158.  I agree that using the 1.5:50 target formulation—and, eventually, formulations that were equivalent to that formulation and that included particles within the literal scope of the Asserted Claims—allowed Moderna to launch its COVID-19 vaccine on a much faster timeline.  Opening Rep. ¶ 398.  I disagree with Dr. Prud'homme's assertion that it resulted in "more stable LNPs," and I find it notable that Dr. Prud'homme only cites to Dr. Parsons' deposition testimony for this point, which is contrary to Moderna's contemporaneous representations to the FDA.  *E.g.*, Opening Rep. ¶ 724; MRNA-GEN-00089027 at -027 (stating that "characterization of DP stability related to PEG2000-DMG

71

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

content was executed by bracketing the range of 1.5 mol% to 3.0 mol% PEG2000-DMG for mRNA-1273 DP at 0.20 mg/mL [v1 Formulation]. No appreciable effect on mRNA purity, mean particle size, or encapsulation was observed across this range. Freeze thaw studies for DP PN 70094 [v2 Formulation] confirmed the lack of impact on the biophysical characteristics including mean particle size and encapsulation.").

122.    Dr. Prud'homme cites testimony from a Genevant employee, Mr. Stephen Reid, related to experiments that Genevant has conducted on PEG-lipid content. Prud'homme Rep. ¶ 159. Dr. Prud'homme does not actually cite to the experiments or publication that Mr. Reid appears to be testifying about. In any event, Mr. Reid makes clear in his testimony that the modifications to the amount of PEG-lipid that he was discussing led to "longer circulation" for "IV administration for delivery to the liver." Reid Dep. Tr. 159:21-160:2, 163:7-9. As Dr. Prud'homme repeatedly emphasizes, the COVID-19 vaccine is delivered intramuscularly. *E.g.*, Prud'homme Rep. ¶ 627. Dr. Prud'homme does not suggest that the experimental data that Mr. Reid was referring to regarding "longer circulation" would apply to Moderna's COVID-19 vaccine, and the evidence I discuss in my Opening Report makes plain that Moderna's modifications to the mol % of PEG-lipid did not improve efficacy. Opening Rep. ¶¶ 719-721.

123.    Responding to my opinions from my Opening Report, Dr. Prud'homme opines that "As I discuss above, the 50:10:38.5:1.5 ratio exhibited stability issues, and Moderna explored a wide range of molar compositions and found that higher PEG and lower cationic lipid increase product stability." Prud'homme Rep. ¶ 161. Dr. Prud'homme offers no further rationale, and I disagree with this opinion, including for the reasons discussed above and in my Opening Report.

124.    In my Opening Report, I discussed a very early formulation study that Moderna

72

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

conducted, in 2013, where it experimented with different lipid content concentrations.  Opening Rep. ¶ 293 (citing MRNA-GEN-01338809).  Dr. Prud'homme attempts to distinguish the results of that study in various ways, including by pointing out that it did not use 2.5 mol% PEG-lipid and it used the cationic lipid DODMA.  Prud'homme Rep. ¶¶ 163-164.  Dr. Prud'homme's responses miss the point.  That presentation is one of numerous examples of Moderna experimenting with target formulations outside the scope of the claims, including with ███ cationic lipid.  If such formulations were as good or better than the 1.5:50 formulation—which was Moderna's "current" formulation in 2013, MRNA-GEN-01338809 at -812—Moderna had ample opportunity and incredibly strong business reasons (*e.g.*, avoiding infringement of the Asserted Claims) to switch to such a formulation; Moderna did not do so.  I note also, consistent with this conclusion, that that presentation lists "Tekmira" as the top "LNP Option[]" for "External Formulation Technologies."  MRNA-GEN-01338809 at -831.

125.    Dr. Prud'homme points to one of the presentations I cite with the line "to optimize the process and product for mRNA payload."  Prud'homme Rep. ¶ 165 (MRNA-GEN-00741030 at -044).  It is not clear to me what about the "process and product" Moderna was still intending to "optimize," but it was plainly not the lipid molar ratios, which Moderna had already selected at that point for its first clinical study.  MRNA-GEN-00741030 at -044 ("Formulation DOE supports use of the same lipid composition used in the Alnylam Phase 3 TTR IV product.").  Indeed, even if Dr. Prud'homme were right—that is, even if Moderna still hoped to "optimize those ratios"—they plainly did not do so, as their first clinical study *did* use the 1.5:50 target formulation.  Opening Rep. ¶ 246.  As such, it continues to be my opinion that this presentation—and other presentations in this same timeframe—demonstrate that Moderna was experimenting with different lipid compositions, but ultimately concluded that the 1.5:50 target

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

formulation was the best choice.

126.    In my Opening Report, I discussed a Moderna study finding that ███████

target cationic lipid ████████████████████████ which concluded that the

1.5:50 target formulation was the preferred composition for IM delivery.  Opening Rep. ¶ 298.

Dr. Prud'homme observes that this study used ████████████████████████████

████████    Prud'homme Rep. ¶ 167.  This misses the point—Moderna's study

demonstrates that it experimented with ████ amounts of cationic lipid and found them to be

inferior to the claimed amounts of cationic lipid, which explains why Moderna used targets of 48

and 48.5 mol % cationic lipid, instead of the ██████ target that its President urged.  Opening

Rep. ¶ 302.  In any event, Dr. Prud'homme's apparent speculation—that using 2.5 mol % PEG-

lipid would somehow improve performance—runs counter to Moderna's own data showing that

such a change does not improve immunogenicity.  Opening Rep. ¶¶ 719-721.

127.    Dr. Prud'homme also criticizes the data I cite as having "large variability."

Prud'homme Rep. ¶ 167.  But Moderna itself concluded that "[██████ mol% of ████ to ██

█████████████████████████████████  MRNA-GEN-00501644 at -

660.  Moreover, it appears that *every* data point for the target 1.5:50 "Standard Formulation" is

higher than every data point for the target ██████ cationic lipid conditions, for IM delivery.

Opening Rep. ¶ 298.

128.    With respect to a study that I discuss in paragraphs 300 and 301 of my Opening

Report—in which Moderna concluded that the 1.5:50 formulation gave the "highest expression

in vivo and thus is recommended for future SM-102 formulations," MRNA-GEN-00502449 at -

468—Dr. Prud'homme opines that the study is irrelevant because it involved IV administration,

whereas SM-102 was being developed for IM injection.  Prud'homme Rep. ¶¶ 168-169.  The

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

presentation, however, did not indicate that the 1.5:50 selection only applied to IV administration—rather, it was recommended "for future SM-102 formulations" without such a limitation. MRNA-GEN-00502449 at -468. Moreover, Dr. Prud'homme's attempt to distinguish this study makes little sense given that Moderna did, in fact, continue using the 1.5:50 formulation, including for IM delivery, such as in the Hassett 2019 paper and in its COVID-19 studies. *Infra* ¶ 587.

129.    Dr. Prud'homme cites SM-102 expression data compared to other lipids, including MC3. MRNA-GEN-00502449 at -454. Prud'homme Rep. ¶ 170. I discuss similar data, which did not translate to improved immunogenicity in primates, in my Opening Report and below. *Infra* Section IV.E. My conclusions in this regard are incorporated here and are responsive to Dr. Prud'homme's opinions on this issue.

130.    In my Opening Report, I offered opinions about an email Stephen Hoge—the President of Moderna—sent to Donald Parsons, stating that he would "like to reemphasize that there are incredibly strong business reasons why a composition with 40% amino lipid is more attractive," and that he "would be willing to contemplate a delay to identify such a composition for one of the rare disease programs or CHIKVab." MRNA-GEN-02619870 at -870; *see* Opening Rep. ¶ 302. Dr. Prud'homme opines that I "interpret this email out of context," citing deposition testimony from Dr. Hoge and Dr. Parsons. Prud'homme Rep. ¶¶ 171-173. I disagree that I took the quote out of context. Dr. Hoge himself acknowledged that the business reasons included avoiding the Lipid Composition Patents. Hoge Dep. Tr. 304:22-305:8 (business reasons include "awareness of compositions that would be outside of those that were in the siRNA field" and mentioning finding "an amino lipid composition ███████████ As such, it continues to be my opinion that Moderna was motivated in 2017 (among other times) to

75

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

decrease the amount of cationic lipid to 40 mol% for business reasons; its scientists and business leaders did explore compositions with that target amount of cationic lipid; but they ultimately opted to use formulations with targets of 48.5 mol% and 48 mol% SM-102, not ▮▮▮▮▮▮ for the COVID-19 vaccine.  Opening Rep. ¶ 302.

131.    Dr. Prud'homme opines that my characterization of Moderna's experiments with alternative lipid molar ratios, and ultimate decision to use 48/48.5 mol% cationic lipid, is "not accurate" because I "merged multiple events occurring in different time frames and circumstances" and because I "overlooked many of the studies Moderna has conducted since 2017 that demonstrate why the 48:11:38.5:2.5 (SM-102:DSPC:cholesterol:PEG) formulation is the optimized formulation."  Prud'homme Rep. ¶¶ 174-175.  Dr. Prud'homme does not provide any further elaboration of the events that I "merged," or how my account is otherwise inaccurate. I also disagree that I "overlooked" Moderna's studies about the v2 Formulation.  To the contrary, I discuss those studies extensively in my Opening Report, *e.g.*, Opening Rep. Section X.D.3, and in this report.  I also find it notable that Dr. Prud'homme again ignores and offers no opinions in this regard about the v1 Formulation, presumably because there is no data whatsoever suggesting that that formulation provided any benefits as compared to the 1.5:50 formulation.  *See, e.g.*, Opening Rep. X.D.

132.    Dr. Prud'homme quotes Dr. Parsons' description of the "multifactorial" experimentation that Moderna did with lipid molar ratios.  Prud'homme Rep. ¶ 176.  I do not disagree that searching for new lipid molar ratios with improved delivery characteristics is a complex and unpredictable process, and it is my opinion that Moderna was unable to identify molar ratios with improved delivery characteristics that would avoid infringement of the Asserted Claims of the Lipid Composition Patents, despite almost a decade of working on the

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

subject.

133.    Dr. Prud'homme again quotes Dr. Parsons for his testimony that Moderna selected the v2 Formulation because it had the optimum safety and efficacy profile, as well as to "avoid[] . . . infringement of others' intellectual property." Prud'homme Rep. ¶ 177 (quoting Parsons Dep. Tr. 56:18-57:8, 58:15-59:2). Moderna's documents and witness testimony confirm that its goal was to use ███ than ████████ cationic lipid, for intellectual property reasons, but that goal was contingent on meeting (as it did with its target 1.5:50 formulation) its other technical objectives, such as safety and efficacy. Opening Rep. ¶ 304. Ultimately, despite experimenting with a broad range of lipid molar ratios, Moderna found that it could only modify the target 1.5:50 formulation by 1.5 or 2 mol% with respect to cationic lipid, and less for the other lipids. The target v1 and v2 Formulations that it arrived at, moreover, were insubstantially different from the target 1.5:50 formulation, and neither Dr. Prud'homme nor Dr. Parsons point to any evidence that Moderna's v1 and v2 Formulations are safer or more effective than the 1.5:50 formulation. Moderna contemporaneously represented otherwise to FDA. *See* Opening Rep. Section XIII.F.2.

134.    As I explained in my Opening Report, several months after Dr. Hoge's email about the business reasons to pursue a composition with 40 mol % cationic lipid, Moderna initiated a mouse study, #2259, which investigated ████████████████. Opening Rep. ¶¶ 303, 305. In an adjacent bullet point, there is a statement to "Reduce SM-102 lipid mol% for better tolerability/IP." MRNA-GEN-00482454 at -457. As I explained in my Opening Report, I have not seen any contemporaneous documents suggesting any tolerability problems with 50 mol % SM-102. Opening Rep. ¶ 303. As such, the logical conclusion is that Moderna initiated study #2259, in large part, for intellectual property ("IP") reasons (and following the directive of Dr.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Hoge).  Dr. Prud'homme apparently disagrees with me, Prud'homme Rep. ¶ 178, and criticizes me for assuming that the two adjacent bullets are related.  His reasoning is that "tolerability and immunogenicity are two separate product attributes."  Prud'homme Rep. ¶ 179.  I disagree, and I do not think that Dr. Prud'homme's interpretation of the slide is sensible.  In any event, Dr. Prud'homme's criticism is beside the point—regardless of the exact motivation for the particular mouse study, the slide makes clear (consistent with other contemporaneous documents addressed in my Opening Report) that Moderna was exploring lower levels of SM-102 for intellectual property reasons (and the mouse study does, in fact, explore lower levels of SM-102).  Moreover, Dr. Prud'homme does not address my observation that none of Moderna's contemporaneous data indicated any tolerability issues with 50 mol % SM-102, much less cite any such data.

135.    In my Opening Report, I discussed a slide where Moderna included a bullet stating " ███████████  and I opined that the most reasonable interpretation of that slide was that Moderna was attempting to identify alternative LNP compositions that contained ███ than ███ SM-102.  Opening Rep. ¶ 304.  On the next slide, there is a note that "don [*sic*] will set up discussions with IP," Opening Rep. ¶ 304, which, as I explained, likely indicated that the "███████ ███████ bullet related to avoiding the Lipid Composition Patents, which would be consistent with numerous other documents I discuss in my Opening Report.  Dr. Prud'homme spends several pages of his report disputing my characterization of those two slides.  Prud'homme Rep. ¶¶ 180-184.  Notwithstanding his disagreement with me, Dr. Prud'homme does not offer any alternative explanation for what the lines from those slides meant.  The opinions that Dr. Prud'homme offers on these issues—for example, that Moderna was also exploring other process changes at the same time—are not responsive to my opinions.  My point is that—as of the date

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

of this slide, in June ████████████████████████████████████████████████████

██████████████████████████████████. Neither Dr. Prud'homme nor Dr.

Parsons offers any coherent alternative explanation for the ████████████████████

████████████████████████████████████████████████████████

Moderna was not successful in accomplishing that goal, for the reasons explained in my Opening

Report and above, and accordingly chose to use target SM-102 amounts of 48/48.5 mol %.

Moderna knew how to avoid infringement of the Lipid Composition Patents; it did not do it; and,

as a result, its COVID-19 vaccine contains infringing particles.  Opening Rep. Section XI.

136.    In my Opening Report, I discuss various additional studies where Moderna

explored ██████ levels of SM-102, which confirmed Moderna's earlier findings that target

formulations with 50 mol % target cationic lipid were superior to (for example) those with ███

██████████ target cationic lipid.  Opening Rep. ¶¶ 305-308.  Dr. Prud'homme does not

dispute my interpretation of the data, but instead simply opines that "SM-102 is only one lipid

component of Moderna's LNPs and is one component that might impact immunogenicity;

immunogenicity is also merely one of the product attributes for evaluating LNPs for vaccines."

Prud'homme Rep. ¶ 185.  Dr. Prud'homme's opinions are not responsive to mine, and his

opinions are too vague for me to offer a response.  There does not appear to be a dispute between

me and Dr. Prud'homme that this testing by Moderna demonstrates that the formulations it

explored that would not infringe the Lipid Composition Patent claims reciting 50-65 mol%

cationic lipid (for example) were inferior to those that do infringe the claims.

137.    In my Opening Report, I discussed a study where Moderna appears to have found

that a ██████ amount of ████████████████████ potency *in vitro*.  Opening Rep. ¶ 311.  Dr.

Prud'homme opines that I did not dispute that result, but merely "question[ed] if the *in vitro*

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

improvements fully translates to *in vivo* environment." Prud'homme Rep. ¶ 186. I do not understand the import of Dr. Prud'homme's criticism, as he does not cite to any data suggesting that the *in vitro* experiment he cites does translate *in vivo*, ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████ MRNA-GEN-00547431 at -443; Opening Rep. ¶ 310. Moderna thus does not appear to agree with Dr. Prud'homme about the importance of those *in vitro* data, which Dr. Prud'homme cites repeatedly. Prud'homme Rep. ¶¶ 154, 465, 486, 536, 555, 676, 692, 932. I discuss those opinions elsewhere. *E.g.*, *supra* ¶ 117; *infra* ¶ 552. To the best of my knowledge, Moderna never pursued any formulation with a ████████████ cationic lipid mol% target as a potential product candidate.

138.    In my Opening Report, I cited a statement from AstraZeneca that the 1.5:50 formulation was "very difficult to beat – so far we have not succeeded!" MRNA-GEN-00741123 at -164; Opening Rep. ¶ 312. In my opinion, this statement recognizes the excellent qualities of the claimed subject matter of the Lipid Composition Patents and the difficulty of finding a superior formulation. Dr. Prud'homme does not dispute my interpretation of that evidence, but merely states that it is "irrelevant to Moderna's success," opining that "Moderna successfully innovated all aspects of LNP formulation and processing and incorporated the optimizations into its COVID-19 Vaccine." Prud'homme Rep. ¶ 187. I disagree, and I find it noteworthy that Dr. Prud'homme fails to cite a single piece of specific evidence demonstrating that the lipid molar ratios in the COVID-19 vaccine are improvements over the 1.5:50 formulation.

**E.    Moderna's Development of SM-102**

139.    In my Opening Report, I discussed Moderna's development of its proprietary

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

lipid, SM-102. Opening Rep. ¶¶ 268-291. As I describe throughout that section, SM-102 did not provide an improvement in primate immunogenicity; there is no evidence that it led to any improvements in vaccine efficacy; and its principal touted benefit (of improved tolerability) appears marginal at best and was inconsistent across experiments. Dr. Prud'homme provides his own narrative regarding the development of SM-102, and he addresses some of the opinions that I offered on that topic. Prud'homme Rep. ¶¶ 188-208. Although I will not repeat them all, my opinions on this topic have not changed based on the opinions offered by Dr. Prud'homme. As with other issues he addresses, Moderna's use of SM-102 does not undermine its infringement of the Asserted Claims. *Infra* VII.A.

140.    Dr. Prud'homme opines that "[w]hile Moderna used pre-existing cationic lipids such as MC3 early in the evaluation of LNPs as a delivery system for mRNA vaccines, Moderna quickly determined that it needed to develop its own proprietary ionizable lipid for better expression and tolerability, specifically for intramuscular delivery of vaccines." Prud'homme Rep. ¶ 188. Dr. Prud'homme's opinion on this issue ignores that Moderna conducted many successful clinical trials with MC3. Opening Rep. Section IX.A. Moreover, the evidence I cite in my Opening Report demonstrates that the proprietary nature of SM-102 was a major driving factor in Moderna's development of that lipid. Opening Rep. ¶¶ 289-290.

141.    Dr. Prud'homme quotes Dr. Benenato as stating that "'MC3 is not part of the story of how SM-102 was discovered.'" Prud'homme Rep. ¶ 188 (quoting Benenato Dep. Tr. 29:5-16). However, Moderna's internal documents indicate that Dr. Benenato instructed her colleagues to modify presentations to obscure the role that MC3 played in the development of SM-102, telling a colleague that sometimes chemists have to "fib a bit and not tell the whole structure story." MRNA-GEN-01430937; Opening Rep. ¶ 826. Dr. Prud'homme has no

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

explanation for this contemporaneous document, other than to cite to Dr. Benenato's own

testimony about MC3 not being "part of the story." Prud'homme Rep. ¶ 915. Based on the

comment regarding the need to "fib a bit," it appears to me that Moderna was attempting to

minimize the importance of the MC3 lipid, as compared to the SM-102 lipid.

142.    Dr. Prud'homme states that "[b]ecause mRNA is a very different molecule than

other nucleic acids, with a very different structure, and there was little information about mRNA

delivery at the time, Dr. Kerry Benenato, a former Moderna scientist, started broadly exploring

and testing various hypotheses and developing compounds with very different properties and

structures, to learn what structures and functionalities work the best for mRNA delivery."

Prud'homme Rep. ¶ 189. Dr. Prud'homme cites numerous documents to support this point, but

he does not explain any of them, and it is not clear to me what, if anything, in those documents

Dr. Prud'homme believes actually suggests that the existing body of knowledge concerning

nucleic acid delivery was somehow inapplicable to mRNA. To the contrary, as I explained in

my Opening Report, numerous Moderna documents make clear that it simply used the

technology that had been developed by Plaintiffs' predecessors and others—including the molar

ratios in the Lipid Composition Patents—in the context of mRNA, and it worked well. Opening

Rep. ¶¶ 220-267; MRNA-GEN-01042034 at -035 ("opportunistically repurpose technologies");

MRNA-GEN-00473016 at -018 (presentation by Kerry Benenato, stating "siRNA lipid

nanoparticle technology has enabled mRNA delivery," depicting MC3 and citing Plaintiffs'

publications); Stanton 2017[5] at 3 (article by Moderna scientists Matthew G. Stanton and Kerry E.

Murphy-Benenato, stating: "Early discovery efforts in the development of mRNA based

---

[5] Matthew G. Stanton & Kerry E. Murphy-Benenato, *Messenger RNA as a Novel Therapeutic Approach*, TOPICS IN MEDICINAL CHEMISTRY (2017) ("Stanton 2017"), MRNA-GEN-01293260.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

internal information Moderna did not provide or publish.  That multiple Moderna scientists who coauthored the paper were unable to provide testimony regarding the experiments at issue reinforces that conclusion.

152.    In my Opening Report, I discussed an internal . Opening Rep. ¶¶ 275-276.  Dr. Prud'homme states that he "disagree[s]" with my opinions, but he does not dispute that the presentation concluded that the SM-102 and MC3 LNP conditions did not exhibit any tolerability differences.  Prud'homme Rep. ¶¶ 202-203.  Rather, Dr. Prud'homme suggests that the comparison in the presentation is inapt because the "mRNA concentration used in the MC3 dose" was "lower than the mRNA concentration in the SM-102 dose," which could lead to a different "immune response."  Prud'homme Rep. ¶ 203.  But Dr. Prud'homme provides no evidence that the difference he points to could have affected the tolerability results.  In any event, the document itself concludes that there was "no significant improvement seen" with the SM-102 LNP.  MRNA-GEN-00491032 at -036.  Dr. Prud'homme's speculative is particularly inappropriate given that Moderna's own corporate representative on this topic was not aware of the study and could not testify about it.  Opening Rep. ¶ 276.

153.    Dr. Prud'homme also opines that "in the Hassett publication, all LNP's 'contained mRNA at a volume ratio of 3:1 (aqueous:ethanol) using a microfluidic mixer.'"  Prud'homme Rep. ¶ 203.  Dr. Prud'homme does not explain the significance of this observation, and I find it irrelevant to the issue of SM-102 tolerability.

154.    Dr. Prud'homme attempts to dismiss a study where MC3 and SM-102 exhibited

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

similar performance █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████

155.     As I explained at length in my Opening Report, Moderna had a substantial amount of data showing no differences in the immunogenicity or tolerability between SM-102 and MC3.  Opening Rep. ¶¶ 275-281.  Dr. Prud'homme explains that "there are countless experiments and data produced that do not make it into the published paper for various reasons, as it is simply not possible for all study data ever generated to be included in a published paper." Prud'homme Rep. ¶ 205.  I do not disagree with Dr. Prud'homme as a general matter—scientists do not publish every experiment they run.  However, what is problematic in this case is that Moderna appears to have been in possession of data that contradicted a key conclusion of the Hassett 2019 paper about the improved tolerability of SM-102.  Moreover, at least some of those data were generated in parallel with the data that were included in the paper—as I explain in my Opening Report, Moderna appears to have excluded inconsistent data from a poster that contained other data that *were* included in Hassett 2019.  Opening Rep. ¶¶ 279-280.  Moreover, these are studies that relate to the safety of potential pharmaceutical products.  Moderna itself cited the Hassett 2019 tolerability results to the FDA in explaining the composition of its LNPs. MRNA-GEN-00018601 at -603 ("ModernaTX, Inc. screened LNPs specifically for IM delivery of vaccines as reported in Hassett et al. (2019). . . .  SM-102 was also selected as the lead

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

including MC3.

160.    Dr. Prud'homme cites a paper, Ioannou 2022[6], for the proposition that Moderna's COVID-19 vaccine yielded lower infection rates than Pfizer's COVID-19 vaccine.  Prud'homme Rep. ¶ 206.  It is unclear to me why Dr. Prud'homme believes that to be relevant to any issue in this case.  Dr. Prud'homme himself cites a statement from this paper that attributes the difference in efficacy of the vaccines to the much higher dose in the Moderna COVID-19 vaccine. Prud'homme Rep. ¶ 206 ("'[e]ach dose of mRNA-1273 contains >3times the dose of mRNA than BNT162b2 (100ug versus 30 ug), which may elicit greater or longer-lasting immune responses'" (quoting Ioannou 2022)).  Dr. Prud'homme does not suggest that SM-102 contributes to any improvement in efficacy for Moderna's COVID-19 vaccine.  Nor could he, given the testimony of Moderna's corporate witness that she was unaware of evidence indicating that SM-102 was more efficacious than MC3 for any vaccine.  Opening Rep. ¶ 270.

161.    As I described in my Opening Report, there is substantial evidence that Moderna transitioned to SM-102 at least in part because of a desire for a *proprietary* ionizable lipid and a desire to not pay royalties.  Opening Rep. ¶¶ 289-290.  Dr. Prud'homme does not address any of the evidence I discuss on this topic, nor does he dispute that Moderna was motivated by intellectual property considerations in designing SM-102.  Instead, Dr. Prud'homme opines that "Moderna had several priorities for its lipid programs, including biodegradability, multi-dosing, routes, biodistribution, in addition to being novel."  Prud'homme Rep. ¶ 207.  I do not disagree that Moderna-generated PowerPoint presentations, such as the one Dr. Prud'homme cites in

---

[6] Ioannou et al., *Comparison of Moderna versus Pfizer-BioNTech COVID-19 vaccine outcomes: A target trial emulation study in the U.S. Veterans Affairs healthcare system*, 13 EClinicalMedicine. 13 (2022) ("Ioannou 2022").

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

paragraph 207, list out various aspirations in designing new lipids.[7]  Ultimately, though, as I describe above and in my Opening Report, the lipid Moderna settled on did not exhibit any notable vaccine efficacy improvement, and any potential tolerability improvement was marginal and inconsistent across experiments.  As such, it appears to me that a principal reason why Moderna switched from MC3 to SM-102 was for financial/IP reasons.  I am not offering any opinion about whether Moderna should or should not have made that business decision.  But, from a scientific point of view, the evidence that I have reviewed suggests that SM-102 contributes relatively little, if at all, to the product quality of Moderna's COVID-19 vaccine, as compared to other available ionizable lipids, such as the ones I discuss in paragraph 291 of my Opening Report.

162.    Dr. Prud'homme finally opines that the "above evidence confirms that the SM-102 ionizable lipid was shown by Moderna to be the ideal lipid for its infection disease platform based on its safety and efficacy, which go hand in hand with scalability and stability." Prud'homme Rep. ¶ 208.  I have no idea what it means for "scalability and stability" to "go hand in hand" with "safety and efficacy."  The deposition excerpt that Dr. Prud'homme cites (Parsons 6/7/2024 Tr. 57:1-8) lists vague generalizations about the "safety and efficacy" of the "SM-102 LNP Platform," while conceding that Moderna was attempting to avoid intellectual property.  In any event, Dr. Prud'homme fails to cite any actual data demonstrating that the selection of SM-

---

[7] Dr. Prud'homme cites an email at MRNA-GEN-02619870, where Stephen Hoge stated that he wanted "the best product across all dimensions, with highest priority on efficacy and safety." Prud'homme Rep. ¶ 207.  However, that email (from 2017) is not about selecting SM-102. Rather, it is an email in which Stephen Hoge encourages his scientists to explore LNPs with only 40 mol% cationic lipid.  MRNA-GEN-02619870 ("there are incredibly strong business reasons why a composition with 40% amino lipid is more attractive").  As I describe in my Opening Report and again in this report, Moderna could not find an LNP formulation with ███ cationic lipid with the requisite efficacy and safety, and so it instead attempted to copy a formulation within the scope of the Lipid Composition Patents.  Opening Rep. ¶ 823.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

102 improved the safety, efficacy, stability, or "scalability" of its COVID-19 vaccine.

163.    Dr. Prud'homme includes a single-paragraph section in his report titled "Moderna's SM-102 LNP Platform." Prud'homme Rep. ¶ 209. He opines that "Moderna scientists undertook research into many other aspects of the LNP formulation specifically for its SM-102 LNP platform for intramuscular delivery of vaccines," citing Report DPAD-00823. Prud'homme Rep. ¶ 209. It is not clear what, if any, opinion Dr. Prud'homme is providing in this section—it is vague and not addressed to any issue I understand to be disputed. I discuss the report Dr. Prud'homme cites at length in my Opening Report. *E.g.*, Opening Rep. ¶ 422. I note that in paragraph 209 of his report, Dr. Prud'homme does not identify any research into the "SM-102 LNP platform" that improved (for example) the safety or efficacy of the COVID-19 vaccine.

164.    Dr. Prud'homme also opines that "Moderna's SM-102 LNP platform is one of various platforms that Moderna has developed for different therapeutic areas. For example, Moderna scientists also developed the SM-86 platform for intravenous delivery, which uses a different ionizable lipid SM-86, among other changes." Prud'homme Rep. ¶ 209. Dr. Prud'homme does not explain how a different "platform" not used by the COVID-19 vaccine is relevant to any issue in this case or responsive to any opinion I offered in my Opening Report. I do not believe that it refutes any of my opinions.

F.    **Moderna's COVID-19 Vaccine**

165.    In paragraphs 210 through 214 of his Opening Report, Dr. Prud'homme discusses the PVU Formulation, which used the 1.5:50 lipid molar ratios, and which was the formulation that Moderna initially used for its COVID-19 clinical trials. Prud'homme Rep. ¶¶ 210-214. I discuss Moderna's selection of that formulation in my Opening Report, including in paragraphs 394 through 399. I note that, in discussing Moderna's decision to conduct human clinical trials with the 1.5:50 target molar ratios, Dr. Prud'homme does not suggest that that "molar

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

composition . . . was inferior and unsuitable for mRNA delivery," Prud'homme Rep. ¶ 149, which is the opinion he offers elsewhere in his report. That formulation is plainly not inferior or unsuitable, which is why Moderna administered it repeatedly to healthy human subjects, including for its COVID-19 vaccine. As I explain in my Opening Report, the contemporaneous documents make clear that Moderna believed the 1.5:50 molar ratios to be comparable to the eventual v1 and v2 Formulations' molar ratios. *E.g.*, Opening Rep. ¶ 396; MRNA-GEN-00615856 at -856-857 ("differences in formulation and quality attributes are minor").

166.   Dr. Prud'homme suggests that, by using the 1.5:50 target molar ratios in the PVU Formulation, Moderna was able to more quickly launch its COVID-19 vaccine. Prud'homme Rep. ¶ 212. I agree with that assessment. Opening Rep. ¶ 398. The documents and testimony that I discuss in my Opening Report indicate that Moderna would have not have been able to launch its COVID-19 vaccine as quickly as it did without the benefit of using the target 1.5:50 formulation, which is within the scope of the Lipid Composition Patents. Moreover, both of Moderna's subsequent target formulations, the v1 and v2 Formulations, only differ from the 1.5:50 target formulation by a few mol% and were plainly based on the 1.5:50 target formulation. I have seen no evidence that Moderna *ever* would have been able to launch a COVID-19 vaccine product without the benefit of the lipid molar ratios claimed in the Lipid Composition Patents.

167.   Dr. Prud'homme opines, based on testimony from various of its witnesses, that Moderna's intention was always to use the v2 Formulation, rather than the PVU Formulation or the v1 Formulation, the latter of which Dr. Prud'homme refers to as an "interim step." Prud'homme Rep. ¶¶ 214-215. Whether "interim" or not, the v1 product was manufactured, sold, and used in large quantities. Moderna never informed the FDA about its purported

96

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

intentions to modify its formulation in the future.  Parsons Dep. Tr. 194:12-195:10 ("Q. Did you tell the FDA that you intended to make a subsequent change to the product?" "We do not communicate intention with the FDA.  We provide them with data as to the changes that have been made and our rationale for those changes." "Q. So you didn't tell FDA that – about this two-step process that you've alluded to?" "It's not our practice nor common practice to speculate about events which may occur in the future in communication with healthcare authorities."). Likewise, to the best of my knowledge, Moderna never communicated to the FDA that it considered its PVU or v1 Formulations—which were administered to millions of Americans—to be unsafe, unstable, unsuitable, or otherwise inferior to the formulation that it someday hoped to launch.

168.    Dr. Prud'homme opines that, "While Moderna had already arrived at a reformulated composition using 2.5 mol % of PEG-lipid for its SM-102 LNP platform, it did not increase the PEG-lipid in the v1 Formulation but rather implemented the change at a later date to ensure it could both adopt the optimal formulation while continuing clinical development without interruption."  Prud'homme Rep. ¶ 216.  I discuss Moderna's decision to implement the v1 Formulation at length in my Opening Report, Opening Rep. ¶¶ 400-435, and Dr. Prud'homme ignores most of the evidence I cite.  For example, Dr. Prud'homme fails to mention that Dr. Parsons (whose deposition testimony Dr. Prud'homme cites at length) admitted that Moderna did not have any data to support moving to 2.5 mol % PEG-lipid.  Opening Rep. ¶¶ 429-434; MRNA-GEN-00657193 at -193 ("[i]f we had a data set, either that suggested a liability at -40 or that additional PEG would actually help, I'd be (respectfully) jumping up and down; but obviously we do not").  I do agree with Dr. Prud'homme that Moderna's highest priority was launching its vaccine as quickly as possible.  Parsons Dep. Tr. 448:6-19 ("the most important

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

priority of the company at that time was to participate in pandemic response"). As I explain at length in my Opening Report, I have seen no evidence that the v1 Formulation was implemented to improve any quality attribute—the goal of that formulation was to be as similar as possible to the PVU Formulation. Opening Rep. ¶¶ 400-435; MRNA-GEN-00081323 at -326 ("the content of DSPC and cholesterol were adjusted upward[,] and the content of SM-102 was adjusted downward, to the extent possible without affecting the product attributes").

169.    Dr. Prud'homme opines that Moderna eventually implemented the v2 Formulation, with 2.5 mol% PEG-lipid, to improve the stability of the particles as compared to the 1.5 mol% PEG-lipid formulation. Prud'homme Rep. ¶¶ 217-219. I discuss this issue at length in my Opening Report. Opening Rep. ¶¶ 436-452. For example, both of the quotes that Dr. Prud'homme cites in paragraph 218 of his report further cite study PD-0716, which I discuss in my Opening Report, Opening Rep. ¶¶ 439-440, 725, and which concluded that ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████    MRNA-GEN-02615528 at -531.

At most, that study demonstrated a small increase in particle size at the ████████ PEG-lipid condition, but Dr. Parsons confirmed that there were no differences between the ████████████

████ PEG-lipid conditions. Opening Rep. ¶ 440.

170.    Dr. Prud'homme cites a report (PD-REP-0653) that discusses an "Interfacial Stress Tolerance Study" of Moderna's COVID-19 vaccine, using different mRNA concentrations, as well as target PEG-lipid levels of 1.5 mol % and 2.5 mol %. Prud'homme Rep. ¶ 219 (citing MRNA-GEN-01552012). Other than citing a conclusory sentence from this report—that an ████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

███████████████████████████████████████████████████████

██████████████████████████████████████ MRNA-GEN-

00967986 at -991. █████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Opening Rep. ¶¶ 439-440.  As such, I disagree with Dr. Prud'homme's assertions in paragraph

220 about the relationship between PEG-lipid mol% and particle growth.

      172.    Dr. Prud'homme opines that Moderna "was one of the first companies to receive

Emergency Use Authorizations under the Federal Food, Drug, and Cosmetic Act."  Prud'homme

Rep. ¶ 221.  As I explained in my Opening Report and above, Moderna would not have been

able to achieve this feat without using the particles claimed in the Lipid Composition Patents,

including both in its clinical trials and its marketed vaccine.  *E.g.*, *supra* ¶ 166.

      173.    Dr. Prud'homme opines that "Multiple scientists of Moderna also testified about

the urgent and dedicated atmosphere at Moderna and Moderna's goal of serving the world during

the development of the COVID-19 Vaccine, which required enormous effort."  Prud'homme

Rep. ¶ 222.  I do not disagree that many Moderna scientists likely worked very hard to help

launch the COVID-19 vaccine.  Unfortunately, it appears to me that Moderna's leadership,

including Stephen Hoge, directed those scientists to spend substantial time and energy

conducting experiments to try to find compositions that would perform as well as the target

1.5:50 formulation but that had less than 50 mol% cationic lipid, in order avoid paying to license

Plaintiffs' patents.  *E.g.*, Opening Rep. ¶ 304.  That decision appears to have worked out well for

Dr. Hoge, who testified that he has made "about 500 million" dollars since the pandemic began.

Hoge Dep. Tr. 17:19-18:1.  However, as I have explained, notwithstanding substantial efforts by

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

its scientists, Moderna was unable to find acceptable target lipid molar ratios that were substantially different from the molar ratios claimed in the Lipid Composition Patents or that would not contain particles that fall within the molar ratios claimed in the Lipid Composition Patents, which resulted in the extensive infringement that I discuss in my Opening Report. Opening Rep. XIII.  To their credit, several Moderna scientists did endeavor to investigate the heterogeneity of the particles in Moderna's COVID-19 product, but—with the exception of the experiments conducted by Mihir Oke (which confirmed that Moderna's vaccine did, in fact, infringe, Opening Rep. ¶ 476)—Moderna leadership did not permit that testing to go forward. Opening Rep. ¶¶ 462-463.

174.    Dr. Prud'homme disputes my characterization of why Moderna opted to use the PVU Formulation initially for its COVID-19 vaccine.  Prud'homme Rep. ¶ 224.  However, even Dr. Prud'homme acknowledges (in his quotation of Dr. Parsons' testimony) that the v2 Formulation was not ready when COVID-19 arrived.  Prud'homme Rep. ¶ 224 ("[W]hile Moderna had already had a reformulated composition of 48:11:38.5:2.5, it 'had not yet had an opportunity to carry that new vaccine platform to all aspects, to every product.'" (quoting Parsons Dep. Tr. 445:10-446:13)).  I do not believe there is any dispute that Moderna could not have launched its COVID-19 vaccine when it did without the target 1.5:50 formulation.  *Supra* ¶ 166.  Moreover, I note that—as late as February 2021—Moderna was still using the target 1.5:50 formulation.  MRNA-GEN-01602601 at -602 (Feb. 25, 2021 presentation stating██████████

████████████████████████████████████████████

█████████████████████████

175.    Dr. Prud'homme states that, "[w]hile [the PVU Formulation] was used initially when Covid-19 emerged in late 2019, early 2020 to manufacture batches for preclinical studies,

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

asserted that the change from the PVU Formulation to the v1 Formulation was minor and did not impact product qualities.  Opening Rep. ¶¶ 400-435.  In response, Dr. Prud'homme largely ignores the contemporaneous evidence—from Moderna itself—that confirms my opinion and merely states that, "as I discuss above in Section VIII.A.4, Moderna's changes to its lipid molar ratio were made to improve the properties of the LNPs."  Prud'homme Rep. ¶ 227.  I find it notable that Dr. Prud'homme does not cite a single piece of evidence demonstrating that its switch from the PVU to v1 Formulation had any impact on any property of Moderna's COVID-19 vaccine.  I address Dr. Prud'homme's opinions about his cross-referenced section above, *supra* Section IV.D, but I disagree that he has offered any opinions in that section (or anywhere else) demonstrating that Moderna's switch to the v1 Formulation had any impact on the product.

179.    In response to my citation to Moderna's specifications, Dr. Prud'homme opines that "the specification is not meant to characterize the product, but rather to ensure that the manufacturing run proceeds as expected."  Prud'homme Rep. ¶ 228.  As I explain in more detail below, I disagree that Moderna's analytical testing of its COVID-19 vaccine (including the lipid content therein) is not intended to characterize and determine the contents of the vaccine product. *Infra* ¶¶ 340-341.

180.    As I explained in my Opening Report, the change from the PVU to v1 Formulation did not impact the immunogenicity of Moderna's COVID-19 vaccine.  Dr. Prud'homme agrees.  Prud'homme Rep. ¶ 229 ("Moderna was able to make these changes without affecting immunogenicity").  Although Dr. Prud'homme insists that "clinical equivalency or comparability is different from chemical equivalency," he fails to cite to or substantiate any substantial "chemical" difference between the PVU and v1 Formulations.  *Infra* ¶ 549.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

181.    As I explained in my Opening Report, the v1 Formulation did not "harmonize" the COVID-19 vaccine with other products, as the v1 Formulation had never previously been used by Moderna.  Opening Rep. ¶ 423.  Dr. Prud'homme does not disagree.  Prud'homme Rep. ¶ 230 ("is not surprising that Moderna did not use the v1 Formulation for other products").  Rather, he simply repeats his opinions about the v1 Formulation being an "interim step."  Prud'homme Rep. ¶ 230.  I address that opinion above.  *Supra* ¶ 167.

182.    In my Opening Report, I discussed evidence demonstrating that Moderna's changes to its target formulation were driven by IP concerns, and that Moderna was not attempting to improve the pharmacological properties of its product.  Opening Rep. ¶ 423; MRNA-GEN-01747429 at -431 (listing as "DP development goals": "avoid licensing (intellectual property regarding 50 mole percent cationic lipid)"; "We are not setting out to create a more immunogenic product"; "We are not setting out to increase tolerability").  Dr. Prud'homme does not disagree with my interpretation of the evidence (and he ignores my opinions and Moderna's statements about IP concerns entirely).  Prud'homme Rep. ¶ 231.  Rather, he opines that the aforementioned presentation "does not concern Moderna's COVID-19 vaccine."  Prud'homme Rep. ¶ 231.  But as Dr. Prud'homme acknowledges elsewhere in his report, the v2 Formulation was originally developed for the CMV vaccine, Prud'homme Rep. ¶ 937, and Moderna relied on its CMV data for its COVID-19 program, *e.g.*, Opening Rep. ¶ 664.  Dr. Prud'homme points out other "goals" in the presentation related to the manufacturing process (*e.g.*, "Process robustness"; "Process scalability").  Prud'homme Rep. ¶ 231.  But this misses the point—even if Moderna was also trying to scale-up its manufacturing process, the presentation I cited makes clear that the *composition* changes it was contemplating were for IP reasons, not to make an improved product.

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

183.    In my Opening Report, I cited several emails from 2020 in which Dr. Parsons

expressed his belief about potential benefits of using increased PEG-lipid in the COVID-19

vaccine, but had to admit that he did not have data to support those benefits, and ultimately the

decision was made to use 1.5 mol % PEG-lipid.  Opening Rep. ¶¶ 429-434.  Dr. Prud'homme's

only comment about that exchange is that "this email was sent at an early stage of Moderna's

COVID-19 vaccine development."  Prud'homme Rep. ¶ 232.  However, according to Dr.

Prud'homme himself, "*in 2018*, [Moderna] arrived at the molar composition of 48 mol % SM-

102, 11 mol % of DSPC, 38.5 mol % of cholesterol, and 2.5 mol % of PEG-DMG."

Prud'homme Rep. ¶ 157 (emphasis added).  In other words, according to Dr. Prud'homme,

Moderna selected the target formulation with 2.5 mol% PEG-lipid *two years before* Dr. Parsons'

2020 emails that I discussed in my Opening Report, and yet Dr. Parsons could not provide his

colleagues with any data to demonstrate the benefits of 2.5 mol% PEG-lipid, and a target of 1.5

mol % PEG-lipid was used.  Opening Rep. ¶ 432; MRNA-GEN-00657193 at -193 ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████  This supports my opinion that

the v2 Formulation, with 2.5 mol% PEG-lipid, does not confer any substantial benefits and is not

substantially different than the 1.5:50 formulation.

184.    Dr. Prud'homme repeats his opinion about 2.5 mol% improving stability in

paragraph 233 of his report.  Prud'homme Rep. ¶ 233.  I address those same data multiple times

elsewhere in this report and in my Opening Report.  *Supra* ¶ 169; *infra* ¶ 605.

185.    Dr. Prud'homme disagrees with my opinion that Moderna's formulation changes

were motivated by IP reasons, citing only to testimony from Dr. Parsons and opining that the

PVU to v1 change was "harmonization to Moderna's SM-102 LNP platform that achieves

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

multiple optimization objectives such as safety, efficacy, scalability, and stability." Prud'homme
Rep. ¶ 234. Dr. Prud'homme's testimony simply ignores the multiple contemporaneous
statements in Moderna's own documents about IP concerns. *E.g.*, MRNA-GEN-00657578 at -
578 ("the lipid content of this product is being adjusted slightly to reduce the mole% of SM-102
to below 50% for IP purposes"); MRNA-GEN-01747429 at -431 ("[a]void licensing (intellectual
property regarding 50 mole percent cationic lipid)"); Opening Rep. ¶ 423. I note that the first of
those documents (MRNA-GEN-00657578), which I quoted in my Opening Report, is not even
on Dr. Prud'homme's "Materials Considered" list. Moreover, I disagree that the v1 Formulation
led to any "harmonization," Opening Rep. ¶¶ 407, 426, and Dr. Prud'homme concedes that the
v1 Formulation had never been used previously by Moderna, Prud'homme Rep. ¶ 230. I also
disagree that either the v1 or v2 Formulation improved the "safety, efficacy, scalability, and
stability" of Moderna's COVID-19 vaccine—unsurprisingly, Dr. Prud'homme includes no
citation to support this statement, because it is not correct. Prud'homme Rep. ¶ 234. On the
contrary, as I have explained, Moderna's repeatedly stated goal was *not* to change the attributes
of the product in effecting these changes.

186.    Dr. Prud'homme says that he disagrees with my statement about a lack of data
regarding the benefits of the v2 Formulation, on the basis that Dr. Parsons testified that Moderna
"had a lot of freeze-thaw stability data . . . for the selection of the PEG level." Prud'homme Rep.
¶ 235 (quoting Parsons Dep. Tr. 171:19-172:3). For support, he cites to several Moderna
PowerPoints, with no explanation of any of the data therein. Prud'homme Rep. ¶ 236. I discuss
those documents in the subsequent paragraphs.

187.    Dr. Prud'homme cites MRNA-GEN-00530699 at -701, -713. Prud'homme Rep.
¶ 236. Neither of those pages relate to freeze-thaw studies. The freeze-thaw data that is in that

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

GEN-00530699 at -701-702). I do not understand what Dr. Prud'homme is implying by this statement, as he has not cited to any evidence that any of the other changes that Moderna made to its target formulation—such as decreasing SM-102 by 2 mol%—had any effect on the stability of the product, either alone or in conjunction with changes to the mol% of other lipids. *E.g.*, Opening Rep. ¶ 666; MRNA-GEN-01802160 at -165 ███████████████████

███████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

█████████████████████████

199.    As I discussed in my Opening Report, Moderna relied on its v1 Formulation freeze-thaw studies to assert that there would be "no impact" on freeze-thaw performance when moving to v2. Opening Rep. ¶ 446. Moderna had in hand the data and presentations Dr. Prud'homme cites when it made this representation to FDA. Moderna also represented to the FDA that it had conducted a freeze-thaw experiment and found that there was no effect of moving from ██████ PEG-lipid to ██████ PEG-lipid. Opening Rep. ¶ 447. These representations are consistent with the data I discuss above and in my Opening Report. Nevertheless, Dr. Prud'homme "disagree[s]" with my opinions on this issue. Prud'homme Rep. ¶ 243. He does not appear to dispute my interpretation of the data or of Moderna's representations to the FDA—instead, he relies on Dr. Parsons' testimony that the "results referenced in the response were specific to the particular study conducted," but that "outside of this particular study," ████████████████████████████████

████ Prud'homme Rep. ¶ 243. I do not find Dr. Prud'homme criticisms persuasive, and I do not find Dr. Parsons' general statements—unsupported by any data—credible, including in view

112

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

of Moderna's repeated contemporaneous statements in its internal documents and regulatory filings. Neither Dr. Prud'homme nor Dr. Parsons cite any additional freeze-thaw studies that demonstrate an improvement. Moreover, I assume that Moderna was being honest with the FDA and that Moderna would not have described experimental results to the FDA that were contradicted by other, internal data. Indeed, if Moderna concluded that its target formulation change actually did improve freeze-thaw stability, Moderna would have informed the FDA of this fact and submitted supportive data, rather than representing to the FDA that it had no effect.

200.    Finally, Dr. Prud'homme again relies on a quote from MRNA-GEN-00044173 at -173 about improved stability. Prud'homme Rep. ¶ 243. As I have discussed before, that quote is referring to PD-REP-0716, which I discuss above and below (and in my Opening Report), and which does not relate to freeze-thaw stability. *Supra* ¶¶ 169, 193; *infra* ¶ 605.

201.    In paragraph 244, Dr. Prud'homme offers opinions about the differences between "clinical equivalency" and "chemical equivalency" and about the purpose of specification testing. I address those opinions elsewhere, and my opinions apply here. *Infra* ¶¶ 340-341, 549.

202.    As I explained in my Opening Report, it appears to me that Moderna was motivated, at least in part, by intellectual property considerations in increasing the amount of PEG-lipid up to 2.5 mol%. Opening Rep. ¶ 451. Dr. Prud'homme opines that I "cherry-pick[]" statements from Dr. Hoge's email "out of context," Prud'homme Rep. ¶ 245, but Dr. Prud'homme has cited no contemporaneous evidence that Dr. Hoge was referring to anything other than intellectual property considerations when he and Dr. Parsons were discussing the "incredibly strong business reasons" for modifying Moderna's formulation. Opening Rep. ¶ 451. Dr. Prud'homme also opines that there were stability-related reasons for moving the amount of PEG-lipid to 2.5 mol%, Prud'homme Rep. ¶ 246, but the only evidence Dr. Prud'homme cites is

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Dr. Parsons' testimony. He has not cited any evidence that moving to 2.5 mol% PEG-lipid produces any clear benefits for Moderna's COVID-19 vaccine. Moreover, as discussed above, it appears to me that Dr. Parsons felt strongly about increasing the amount of PEG-lipid in the product, despite (by his own admission) not having any data to support such a change. Opening Rep. ¶ 432. In my opinion, this is further evidence that the change to the amount of PEG-lipid was at least partially driven by intellectual property concerns.

## V.    PLAINTIFFS' RESEARCH AND DEVELOPMENT

203.    In my Opening Report, I described the Patents-in-Suit and discussed some of Plaintiffs' research and development leading to the Patents-in-Suit. I incorporate those sections by reference here. *See* Opening Rep. Sections VII-VIII.

### A.    The '651 Patent

204.    Dr. Prud'homme characterizes Plaintiffs' innovations claimed in the '651 patent as "limited in scope." Prud'homme Rep. ¶ 248. In so doing, Dr. Prud'homme misrepresents the scope of the claims and trivializes significant advances attributable to Plaintiffs' research.

205.    Dr. Prud'homme opines that as of 2002, four-component lipid systems "were known in the art." Prud'homme Report. ¶ 249. He cites an Inex Pharmaceuticals' patent (U.S. Patent No. 6,287,591) and compositions described in Wheeler 1999 and Semple 2001. Prud'homme Rep. ¶¶ 249-250. I do not disagree that some four-component lipid systems had been described. But the prior art also described three- and two-component systems. *See*, *e.g.*, Saravolac 2000 at 434. More specifically, prior art references describing encapsulation of mRNA used two-component lipid delivery systems. *See* Meulien '831 at 10:22-28; Martinon 1993 at 1719.

206.    Regardless, no formulation in the prior art achieved comparable levels of full encapsulation of mRNA, which is the nucleic acid recited in the claims of the '651 patent. Dr.

114

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

to expand their intellectual property portfolio. Prud'homme Rep. ¶¶ 267-268.

227. I disagree that Plaintiffs' intellectual property position was the primary motivation for reformulating SNALPs, for reasons explained below and in my Opening Report. *See, e.g.*, Opening Rep. ¶ 101. However, it is also my opinion that a company can be motivated by a desire to develop a patentable invention and still discover valuable and useful technology—the two are not mutually exclusive.

228. I agree with Dr. Prud'homme that the inventors of the Lipid Composition Patents understood that the 2:40 formulation was active. However, as noted in one of the presentations Dr. Prud'homme selectively quotes, the inventors were motivated to develop a composition that could target "different cell and tissue targets (e.g., oncology)." GENV-00888812 at -816; *see also* GENV-00057931 at -933 (stating goals of "Improve SNALP Storage Stability" and "Improve SNALP Therapeutic Index (Activity:Toxicity)"). The inventors considered various options for obtaining improved formulations. *See, e.g.*, GENV-00058468 at -479. Far from "merely . . . halving the weight amounts of PEG-lipid, phospholipid, and cholesterol from the prior-art 2:40 formulation, while maintaining the cationic lipid weight amount constant" to arrive at the 1:57 formulation, Prud'homme Rep. ¶ 268, the inventors conceived of a set of experiments to vary the lipid molar ratios and designed various target formulations based on the results of those experiments, including the 1:57 formulation. *See, e.g.*, GENV-00063812; GENV-00063813; GENV-00063814; GENV-00063815; GENV-00063773 at -783; GENV-00049551 at -638-69 (lab notebook preparing a composition with a target formulation of 1:57:7:34 (PEG-CDMA: DLinDMA:DPPC:Cholesterol)).

229. The inventors and their colleagues discovered that the 1:57 formulation "has superior activity and stability," GENV-00057931 at -947, and that the 1:57 formulation is more tolerable than the 2:40 formulation, as assessed by body weight loss and elevated liver enzymes, *see* GENV-

128

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

00055290 at -297, -299.  The inventors and their colleagues discovered other benefits of the 1:57 formulation over the 2:40 formulation.  *See, e.g.*, GENV-00055290 at -300 ("1:57 is more potent and better-tolerated than 2:40 SNALP containing DPPC"); GENV-00057846 at -866 ("1:57 SNALP demonstrate clear anti-tumor effects by histology"; "1:57 SNALP appear to have enhanced potency based on histology compared to 2:40 SNALP"); GENV-00084380 at -383 (showing that the 1:57 formulation demonstrates similar activity to the 2:40 formulation at a ten-times lower dose, and concluding that the "[n]ew SNALP are between 5x and 10x as good as old 2:40s").  It is clear from these (and other) research efforts and findings that Plaintiffs were motivated to search for superior formulations.

### C.    Plaintiffs' Relationship with Alnylam and Other Third Parties

230.    As I discuss in my Opening Report and above, Moderna successfully deployed formulations with target 1.5:50 molar ratios in numerous of its clinical products and relied on that as its standard formulation for years.  *See* Opening Rep. Section IX.A.  In my Responsive Report, I discussed the origins of the 1.5:50 molar ratios, which were developed as part of a collaboration between Plaintiffs' predecessors and Alnylam after Plaintiffs' predecessors made a "level III" disclosure—which included (among other things) information about the 1:57 formulation—to Alnylam.  Resp. Rep. ¶¶ 43-51.  Alnylam's ONPATTRO product uses the 1.5:50 formulation, has listed several of the Lipid Composition Patents in the FDA's Orange Book as covering ONPATTRO, and has indicated in the present litigation that it does not dispute inventorship (naming Plaintiffs' scientists and no Alnylam scientists) of the Lipid Composition Patents, Resp. Rep. ¶¶ 31-32, 51, which Dr. Prud'homme concedes encompass the molar ratios of the 1.5:50 formulation.  Prud'homme Rep. ¶ 271.

231.    Dr. Prud'homme opines that neither the 1.5:50 composition or the cationic lipid MC3 "was an advancement or innovation that came out of Arbutus, Genevant, or its

129

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

my opinion that the claims reciting a "cationic lipid" are not limited to particular cationic lipids and would include, for example, both MC3 and SM-102. *E.g. infra* Section VII.A.

243.    Dr. Prud'homme opines that Plaintiffs have not made "any effort to correct inventorship" on a patent covering MC3 and that he "would expect Arbutus or its predecessors to do so if they felt that someone at Tekmira should have been listed as an inventor." Prud'homme Rep. ¶ 274. I am not an attorney, and I do not have an opinion about when and how the inventorship of a patent may be corrected. However, as I noted above, it is my understanding that the patent in question was assigned to Arbutus, which I understand to mean that Arbutus owned it, irrespective of what inventors were named.

244.    Dr. Prud'homme cites deposition testimony describing a conversation with Moderna CEO Stéphane Bancel in which Mr. Bancel asks whether Alnylam's patent portfolio "include[s] MC3." Prud'homme Rep. ¶ 278. This appears to be an attempt to suggest that Moderna's real interest was with the MC3 lipid, rather than with LNP formulations. However, I understand that Mr. Francis testified that Moderna used the term "MC3" to refer not only to the specific cationic lipid, but also more broadly as a shorthand for LNPs that contained MC3. Francis Dep. Tr. 105:5-17. Dr. Prud'homme's blockquote concerning the interest in MC3, Prud'homme Rep. ¶ 278, omits the next few lines, which clarify that when Mr. Bancel asked about MC3, he was referring to complete LNPs, rather than just the particular lipid:

> Q. Why was Mr. Bancel interested in that?
> A. It is one of the ***LNPs*** that was out there in addition to other LNPs
> from Merck, Alnylam ███████ .

Francis Dep. Tr. 120:9-14 (emphasis added)

245.    Dr. Prud'homme also cites Mr. Francis's opinion that "Moderna had 'learned that none of the LNPs existed at the time were suitable for mRNA.'" Prud'homme Rep. ¶ 279 (citing

136

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

Francis Dep. Tr. 101:7-101:14). I do not understand that to be accurate, notwithstanding Mr. Francis's testimony. I understand that Mr. Francis worked for Moderna in a business development role, rather than as one of the scientists conducting research and development on LNPs. Indeed, Dr. Prud'homme again omits key context for the quotation from Mr. Francis's deposition—immediately prior to the testimony quoted in Dr. Prud'homme's report, Mr. Francis caveated his response by saying that the question was better suited "for [his] R&D colleagues." Francis Dep. Tr. 101:2-6. Contemporaneous evidence shows that by 2014 (the time period being discussed in Mr. Francis's testimony), those R&D colleagues had reached a different conclusion, finding that the lipid ratio used in what would become ONPATTRO appeared "potent in the delivery of mRNA as well as for siRNA," and in fact was "close to optimal for mRNA." MRNA-GEN-02204816, at -868 ("The lipid ratio used in the ALN-TTR-02 product appears potent in delivery of mRNA as well as for siRNA. Precise process conditions may differ, and such evaluations are underway using the ▇▇▇▇▇technology with Antibody mRNAs. While the design space of MC3 formulations is still being evaluated and refined, both in terms of formulation and especially process conditions, initial indications are that a formulation similar to the quantitative composition of ALN-TTR-02 is close to optimal for mRNA.").

246.    In paragraph 280, Dr. Prud'homme discusses Moderna's work related to SM-102. I discuss this above and in my Opening Report. *Supra* Section IV.E.

247.    I understand that Dr. Prud'homme correctly identifies the four targets for which Moderna entered into sublicense agreements with Acuitas—Influenza A, Chikungunya, respiratory syncytial virus, and Zika virus. Prud'homme Rep. ¶ 281. Dr. Prud'homme suggests that Plaintiffs benefited from these agreements through the receipt of payments from Acuitas, Prud'homme Rep. ¶ 282, which ignores the effect these sublicenses may have had on Plaintiffs'

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

and demonstrated positive safety and efficacy data in a Phase 1 trial.  Palmer 2023[11] at 1

("Neutralizing antibody titers against ancestral Spike and variants of concern were boosted or

induced by GRT-R910 and, contrasting to authorized vaccines, persisted through at least 6

months after the booster dose.").  The Providence product that Dr. Prud'homme also discusses,

Prud'homme Rep. ¶ 293, likewise exhibited positive safety and efficacy results.  Martin-Orozco

2023[12] at 1 ("All tested doses of PTX-COVID19-B were safe, well-tolerated, and provided a

strong immunogenicity response.").  The Chula product, which Dr. Prud'homme mentions in

passing, Prud'homme Rep. ¶ 291, has also exhibited good safety and efficacy results in Phase II

trials.  Puthanakit 2024[13] at 1 ("ChulaCov19 50 μg is well tolerated and elicited high neutralizing

antibodies and strong T-cell responses in healthy adults.").  In my opinion, these consistently

positive results provide further confirmation that the patented technology *does* enable successful

nucleic acid delivery, including mRNA delivery for a variety of COVID-19 vaccines, and

provides substantial value in the nucleic acid delivery space.

261.    As noted above, Dr. Prud'homme opines that the lack of a marketed product

arising out of these collaborations indicates that they have been "unsuccessful."  Prud'homme

Rep. ¶ 294.  However, Dr. Prud'homme does not offer any opinions about the reason why these

various products have not yet resulted in a marketed product.  Dr. Heyes testified about this topic

and explained that many of the programs have been discontinued due to lack of demand for

---

[11] Palmer et al., *GRT-R910: A Self-Amplifying mRNA SARS-CoV-2 Vaccine Boosts Immunity for ≥6 Months in Previously-Vaccinated Older Adults*, 14 NATURE COMMUNICATIONS 3274 (2023).

[12] Martin-Orozco, *Phase I Randomized, Observer-Blinded, Placebo-Controlled Study of a SARS-CoV-2 mRNA Vaccine PTX-COVID19-B*, 13 SCIENTIFIC REPORTS 8557 (2023).

[13] Puthanakit et al., *Phase II Prefusion Non-Stabilised Covid-19 mRNA Vaccine Randomised Study*, 14 SCIENTIFIC REPORTS 2373 (2024).

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

COVID-19 vaccines. Heyes Dep. Tr. 194:19-196:16 ("ST Pharm withdrew their IND in the face of perceived lack of demand for COVID vaccine and commercial opportunity."; "Duke . . . I think they shelved the project because that wasn't a vaccine. It was an IV-administered LNP that would encode an antibody. And I believe their antibody, as the virus mutated, became less relevant. So they – they shelved that."; "Providence . . . shelved the project in the face of just lack of demand for COVID-19 vaccines now."). This is similar to the reason why Moderna shelved many of its own pandemic-related products. Opening Rep. ¶ 259. Moreover, I understand that Genevant's COVID-19 collaborators may have experienced particular commercial difficulties in view of Moderna's unauthorized use of the technology in the Patents-in-Suit, which provided them with a "head start." Zorn Dep. Tr. 76:13-78:1 ("A couple of the . . . collaborators that I just mentioned have concluded their COVID-19 programs, despite encouraging data, citing a couple of things: The change in the commercial environment, i.e., the demand in light of, you know, the head start that Moderna and Pfizer have had to reach those people, and then the challenges in doing clinical trials because of how many people have now been vaccinated worldwide, which increases the cost and time to do a clinical trial . . . ." "Moderna's and Pfizer's ability to use our technology allowed them to get to market more quickly than those companies that went through a process with us to secure licenses to our technology."). Dr. Prud'homme does not discuss any of that evidence, and I have not seen any evidence that any of the Genevant collaboration projects that Dr. Prud'homme mentions were discontinued due to problems related to the LNP generally or the lipid molar ratios specifically.

262. Dr. Prud'homme opines that the "lipid molar ratio used is only a minor aspect of the significant work required to successfully develop a COVID-19 mRNA vaccine, as shown by Plaintiffs' unsuccessful research and development and product licensing efforts." Prud'homme

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

299.    Dr. Prud'homme also opines that, to the extent I intended to rely on "use" of the vaccine as evidence of indirect infringement, I failed to identify which doses were actually used by patients and healthcare providers.  Prud'homme Rep. ¶ 342.  The evidence does demonstrate that Moderna's COVID-19 vaccine has been used, and I address this issue below in the context of the Lipid Composition Patents.  *Infra* Section XII.  That discussion applies here as well.

## VII.    MODERNA'S LITERAL INFRINGEMENT OF THE LIPID COMPOSITION PATENTS

300.    As I described in my Opening Report, including in Section XIII and in the claim charts in Section XX, the Accused Product infringes the asserted claims of the Lipid Composition Patents.  Dr. Prud'homme's opinions have not changed the opinions that I offered in my Opening Report on this topic.

301.    I note that Dr. Prud'homme does not dispute infringement of many of the limitations and claims of the Lipid Composition Patents.  For example, as far as I can tell, Dr. Prud'homme does not dispute that Moderna's Accused Product contains nucleic acid-lipid particles (Section XIII.A), that Moderna's Accused Product contains nucleic acid/mRNA (Section XIII.B), or that Moderna's Accused Product includes a pharmaceutically acceptable carrier (Section XIII.I).  Dr. Prud'homme also does not dispute the various calculations that I set forth in my Opening Report concerning lipid molar ratios.  To the extent that Dr. Prud'homme has not addressed my opinions from my Opening Report, I understand them to be undisputed and will not repeat them here.

302.    Dr. Prud'homme opines that "all of the Asserted Claims are invalid" and "Moderna's COVID-19 vaccine does not infringe the Asserted Claims at least because an invalid claim cannot be infringed."  Prud'homme Rep. ¶ 313.  I have not been asked to form an opinion about the validity of the claims of the Lipid Composition Patents, and I do not have such an

170

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

opines that "the two target formulations at issue are: 48.5:38.9:11.1:1.5 (v1) and 48.0:38.5:11.0:2.5 (v2)," and so "[t]here can be no dispute that on their face, the mol% of the cationic lipid in these two target formulations—48.5 and 48, respectively—do not literally infringe the claims of the '069, '359, '668, and '435 patents." Prud'homme Rep. ¶ 437. I agree that Dr. Prud'homme has correctly recited the purported target lipid molar ratios for Moderna's so-called v1 and v2 Formulations, as I set forth in my Opening Report. Opening Rep. ¶ 343. However, I find his statement—that the "cationic lipid in these two target formulations . . . do not literally infringe" the relevant claims—to be inapt. I believe that Dr. Prud'homme and I agree that the ratios he recited are *target* or *input* lipid molar ratios. *See* Opening Rep. ¶¶ 343-344; Prud'homme Rep. ¶ 437 ("*target* formulations" (emphasis added)). As such, the lipid ratios that Dr. Prud'homme recites are not a "nucleic acid-lipid particle," as recited by the claims of the Lipid Composition Patents. I therefore disagree that it is sensible to discuss whether or not those target formulations "literally infringe" the claims of the Lipid Composition Patents, which are directed to a particle, not to an input formulation. I do not understand Dr. Prud'homme to dispute that the claims cover a *particle*, not an input formulation.

330.    Indeed, as I discussed in my Opening Report, Moderna itself argued that the claims only covered a "finished lipid particle." Opening Rep. ¶ 60. I understand that the Court rejected that construction, holding that the lipid particles could undergo further processing steps. Opening Rep. ¶ 60. But neither Moderna nor Dr. Prud'homme suggest that the claims cover lipid inputs or targets, rather than a particle.

331.    Dr. Prud'homme opines that "the v.1 and v.2 target formulations listed above are for the 'formed particles' and not the 'lipid stock solution,'" opining that "[a]ll steps of Moderna's manufacturing process are tightly controlled—including not only the initial lipid

186

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

weights, but also the ████████████████████████████████████████████████

██████████████████████████████████  Prud'homme Rep. ¶ 438.  I find Dr.

Prud'homme's opinion on this issue somewhat confusing.  I believe he may be drawing a

distinction between the "███████████████████████████████████████████████

████████████████████████████, *see* Opening Rep. ¶¶ 347, 374, ███████████████

█████████████████████████████████████████████████████████, *see*

Opening Rep. ¶ 384.  I do not believe that Dr. Prud'homme and I disagree about what the v1 and

v2 Formulations are—again, as I explain in my Opening Report, the lipid ratios of the v1 and v2

Formulations recite the input/target lipid molar ratios for the final COVID-19 vaccine drug

product, ████████████████████████████████████.  Opening Rep. ¶¶ 343, 344, 392.

332.    Where Dr. Prud'homme and I do disagree is with respect to his statement that

"input values are the best evidence of the composition of the resulting particles in Moderna's

COVID-19 vaccine."  Prud'homme Rep. ¶ 439; *see also* Fenton Rep. ¶ 38 ("However, it is

common practice in the field that the target formulation or the inputs into the manufacturing

process are generally considered the best evidence of the composition of LNPs in a

formulation.").  Neither Dr. Prud'homme nor Dr. Fenton provide any evidence or support for

these statements, and I disagree with them.  While target/input lipid molar ratios are convenient,

rough proxies for the compositions made from a lipid formulation, they are *not* superior to

measurements of the actual compositions themselves, which contain the formed lipid particles.

As I have repeatedly explained, and as the Lipid Composition Patents acknowledge, the makeup

of a lipid composition (and the particles therein) can (and typically do) differ from the

input/target lipid ratios.  *Supra* ¶¶ 320, 325-327; Opening Rep. ¶¶ 601-606.

333.    As I explained in my Opening Report, Moderna itself investigated the differences

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

lipids" to mean the mass of the inputs. Prud'homme Rep. ¶ 444. Plainly, though, Mr. Kramarczyk is saying that Moderna measured the mass of the lipids in the batches (as Moderna ultimately did for every batch of its COVID-19 vaccine product), and the scientists used that information to calculate the mole percent (which is the value actually plotted in the graph). Mr. Kramarczyk never suggests that any of the measurements being discussed were of inputs.

335.    In any event, the PowerPoint discussing these data that I cited in my Opening Report, *see* MRNA-GEN-00648789 at -796; Opening Rep. ¶ 604, makes explicit that the above analysis comes from lipid concentrations reported in certificates of analysis, MRNA-GEN-00648789 at -791 ("Mol % Lipids Calculated from CofA Lipid Concentrations"); *see also* MRNA-GEN-00648789 at -794 (comparing "Lipid Stock IPC Results" with "Product Average"). As I discuss at length in my Opening Report, Moderna's certificates of analysis report lipid composition measurements of the batch itself (not inputs), which use HPLC. Opening Rep. ¶¶ 453-455; *see*, *e.g.*, MRNA-GEN-01424191 (SOP-1001 "Determination of Lipid Content, Purity, and Identity by UHPLC-CAD for SM102/PEG Formulations"). I am not aware of Moderna ever reporting lipid inputs on its certificates of analysis, and in my experience that would be highly unusual. As such, it is my opinion that—when Moderna wanted to investigate the distribution of mol % values that it was obtaining—it looked to the lipid composition measurements of actual batches, as reported in its certificates of analysis, and it then calculated mol percentages based on the values in those certificates. Indeed, that is exactly what Moderna's corporate representative suggested doing to determine the amount of cationic lipid in a batch. Parsons 6/7/2024 Tr. 133:12-134:3 ("Q. Okay. Do you have any understanding of whether a target ratio of 48.5 percent would yield batches with greater than 50 percent cationic lipid?" "A. . . . [W]e, of course, have certificates of analysis of all of those batches . . . . [T]hat would be my source of

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

information to gather that data."). He did not testify that the amount of cationic lipid in a batch would or could be determined by the target or input amount.

336. Moreover, I note that Moderna conducted the above-recited analysis specifically in connection with an analysis of infringement of the Lipid Composition Patents. Parsons 6/7/2024 Tr. 105:21-106:6 ("Q. Why did Moderna do this analysis in this slide?" "A. So as I mentioned previously, one of the things that we were aware of was that there was intellectual property associated with the molar ratio. We wanted to understand where we sat with respect to that based on historical production.").[15] In other words, Moderna understood that infringement of the Lipid Composition Patents depends on measurement and calculation of mol percentages of the formed particles, not the input or target ratios. That is the analysis that I conducted in my Opening Report. Opening Rep. ¶ 606.

337. Dr. Prud'homme also notes that the above analysis "was for Moderna's CMV vaccine, not the COVID-19 Vaccine." Prud'homme Rep. ¶ 444. Actually, the analysis relates to a wide variety of Moderna's product candidates. MRNA-GEN-00648789 at -790 (listing batches for H7N9, ChikV, Zika, and CMV, among others). Regardless, Dr. Prud'homme's incorrect observation misses the point. This analysis demonstrates that the lipid composition of an output is not the same as the input/target lipid molar ratios (and that Moderna knew of this fact). Moreover, it shows that when Moderna itself wanted to assess the lipid composition of its batches for purposes of assessing infringement of the Lipid Composition Patents, it recognized (as I recognized in my analysis but Dr. Prud'homme disputes) that HPLC measurements of formed particles, rather than simply target ratios or inputs, are determinative.

---

[15] As explained further below, the graph does not reflect any actual data regarding the standard deviations and distribution for the batches of the COVID-19 vaccine product Moderna sold.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

341.    Moreover, Moderna's own BLA submission to the FDA makes clear that the purpose of the lipid content measurement that it performs (which I relied on) is to ensure that the LNP has the intended properties.  *See* MRNA-GEN-00021725 at -729 (discussing the "Lipid Content" critical quality attribute justification, stating "Control of the levels of individual constituent lipids ensures that the optimal formulation is present to maximize the encapsulation of mRNA, to provide biophysical stability to the formulated LNPs, to enable circulation *in vivo*, and finally to allow uptake as well as endosomal release."), -769 (discussing the "Lipid Content and Purity by HPLC-CAD" assay, stating: "Lipid content and purity are [critical quality attributes] for the [drug product].  Individual and total lipid content is an important determinant of biological performance.  Consequently, lipids must be present at expected levels in order to assure the correct structural organization of the mRNA-containing LNP in subsequent downstream manufacturing steps and resultant biological performance of the final [drug product].  The toxicity/local tolerability profile depends mainly on the lipids, particularly the amino-lipid SM-102.").  In other words, Moderna is informing the FDA that lipid content affects the biological performance of the vaccine, and Moderna has proposed to assess that critical quality attribute via an HPLC-CAD assay.  Moderna conducted extensive validation studies to demonstrate that the HPLC method it uses accurately measures the lipid content in its product. MRNA-GEN-02613854 at -901-907; Fenton Rep. ¶¶ 56 ("Moderna has spent significant time and resources to create a high-performing protocol for its commercial product."), 64 (noting that "Moderna's [HPLC-CAD] protocol . . . was optimized and validated and subsequently reviewed and accepted by the FDA as part of the BLA for Spikevax"); MRNA-GEN-02634802 at -863 (Moderna's method for determining lipid content via HPLC-CAD "was shown to be specific, accurate, precise, and linear for each of the lipid components.").  To my knowledge, Moderna

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

has never suggested to the FDA that its HPLC method is not accurately quantifying the lipids in its product (or that Moderna was in possession of additional data about lipid inputs that were actually more accurate than the lipid composition data it submitted to the FDA).

342.    Moreover, to my knowledge, Moderna has never suggested to the FDA that Moderna should submit its input lipid values (such as those in the spreadsheet that Dr. Prud'homme relies on at MRNA-GEN-02656542) instead of actual HPLC lipid content measurements.  Likewise, to my knowledge, Moderna never informed the FDA of Dr. Prud'homme's opinion that "looking to the inputs is a much better measure of the composition of Moderna's product" than the lipid content values reported to the FDA in the certificates of analysis.  Prud'homme Rep. ¶ 450.  Rather, Moderna relied on actual measurements of the lipid content of its batches.  Those are the data it submitted to the FDA, and I relied on those data in my infringement analysis.

343.    Moderna's practice—of actually measuring lipid composition, rather than relying on input amounts—aligns with industry practice.  For example, the United States Pharmacopeia (or "USP") is a widely-followed compendium with guidance about appropriate standards and techniques to use in analyzing pharmaceutical products.  In the draft guidelines for "Analytical Procedures for Quality of mRNA Vaccines and Therapeutics," the USP recommends measuring lipid content in the mRNA Drug Product using HPLC-CAD.  *See* USP Draft Guidelines 2024[16] at 9.  I see no indication in that document that a drug product manufacturer could instead rely on lipid input values, as Dr. Prud'homme and Dr. Fenton suggest is standard practice.  Moreover,

---

[16] UNITED STATES PHARMACOPEIA (USP), ANALYTICAL PROCEDURES FOR QUALITY OF mRNA VACCINES AND THERAPEUTICS: DRAFT GUIDELINES 3RD EDITION (2024) ("USP Draft Guidelines 2024"), GENV-01085006.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

plainly referring to the measurement of the mass of the lipids *in the batch*, not in the inputs, and a PowerPoint about those same data is explicit that the relevant measurements are, in fact, coming from certificates of analysis (which do, in fact, report output values in mg/mL, Opening Rep. ¶¶ 455-456, consistent with Mr. Kramarczyk's testimony). *Supra* ¶¶ 333-336.

352.    Interpreting Mr. Kramarczyk's testimony, Dr. Prud'homme opines that "Moderna does not calculate the mol% directly of any batches after the manufacturing run is complete; instead, Moderna measures the mass of the input lipids and that is what defines the composition." Prud'homme Rep. ¶ 445. I disagree. I discuss multiple instances above where Moderna did use lipid content measurements (rather than the lipid inputs) to calculate mol%. *Supra* ¶ 335. Indeed, as I opined in my Opening Report, *see* Opening Rep. ¶ 345, Moderna's analytical method for determining lipid content via UHPLC-CAD includes a procedure for calculating mol% based on the measured lipid content concentrations, MRNA-GEN-00485781 at -794. Dr. Prud'homme does not dispute or address my opinion on this, and the aforementioned document (which is cited and excerpted in my Opening Report) is not on Dr. Prud'homme's list of Materials Considered. Additional Moderna documents confirm that it has, in fact, calculated mol% using those HPLC measurements. *See*, *e.g.*, MRNA-GEN-00487228; MRNA-GEN-00540968 at -969.

353.    As I explained in my Opening Report, the patents themselves acknowledge that the "amount of lipid . . . present in the formulation may vary," which is consistent with my discussion, above and in my Opening Report, that lipid inputs will not necessarily reflect lipid outputs. Dr. Prud'homme does not dispute this physical reality, but instead opines that "the specification provides no other method by which a POSA could have measured the composition in the formulation." Prud'homme Rep. ¶ 446. However, as I explained in my Opening Report,

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

HPLC testing was, and is, a widely accepted method for measuring lipid content.  Opening Rep. ¶ 80.  The inventors themselves used HPLC testing to measure lipid content, which showed that the lipid content did, in fact, vary from the input lipid amounts.  *Supra* ¶¶ 325-327.  Moderna's lipid content testing shows the same thing.  Opening Rep. ¶ 606.  There would have been no need for the inventors to specify how to conduct these standard assays.  Dr. Prud'homme's opinion that "input compositions" are "the ***best*** evidence we have—and also the only evidence consistent with the specification of the Molar Ratio Patents—of the composition of the particles in Moderna's COVID-19 vaccine" is willfully blind to the fact that Moderna itself repeatedly measured the lipid content of its COVID-19 vaccine and submitted those data to the FDA.  Prud'homme Rep. ¶ 446.  Dr. Prud'homme provides no rationale, much less any evidence, that the lipid inputs would better reflect the content of the particles in the composition than actual lipid measurements.

354.    Dr. Prud'homme opines that I "attempt[] to draw a distinction between the measurements reported in the COAs and Dr. Schuster's fractionation testing."  Prud'homme Rep. ¶ 447 n.38.  Dr. Prud'homme's opinion on this issue is not clear, and I believe he has misunderstood my testimony.  I do not dispute that the lipid measurement technique that Dr. Schuster used (HPLC) is assessing an aggregate value in each fractionated subpopulation (and, where tested, the bulk sample as a whole).  My point, in the paragraphs that Dr. Prud'homme quotes, is that Moderna's certificates of analysis report a single lipid content value for an entire batch.  However, it is (and was) well understood in the field that lipid particles are heterogenous.  Although the lipid content value in Moderna's certificate of analysis do reflect the lipid content of many of the particles in the batch (which is why I conducted part of my infringement analysis using data from those certificates), there will be additional particles in the batch with lipid

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

358.    Dr. Prud'homme opines that "even if it were proper to rely on [aggregate measurements in the certificates of analysis], . . . it shows that at least with respect to the asserted claims of the '069, '359, '668, and '435 patents, the vast majority of the lots do not infringe the required mol% cationic lipid limitation.  This supports the fact that Moderna effectively designed around Plaintiffs' claims, as discussed in Section VIII above."  Prud'homme Rep. ¶ 448.  I disagree.  Even based on Moderna's certificates of analysis, dozens of Moderna's batches literally infringe those patents, and hundreds literally infringe the claims of the '378 patent.  Opening Rep. ¶ 611, Appendices 3-24.  Additionally, testing has revealed that, in fact, all of Moderna's batches infringe various of the claims of the Lipid Composition Patents, Opening Rep. ¶¶ 650-651, which is not surprising given how close Moderna set its targets to the claims of those patents.  I therefore disagree that Moderna "effectively designed around" the claims of the Lipid Composition Patents, despite the "incredibly strong business reasons" to do so.  Opening Rep. ¶ 302.

359.    Dr. Prud'homme "incorporate[s] [his] discussion of Dr. Schuster's fractionation testing."  Prud'homme Rep. ¶ 449.  I address that below.  *Infra* VII.C.2.

360.    Dr. Prud'homme opines that testing for the purposes of specification is not meant to "characterize" a product.  Prud'homme Rep. ¶ 450.  I disagree, and I address that above.  *Supra* ¶ 340.

361.    In my Opening Report, I set forth a detailed calculation showing that the lipid content specifications for the different versions of Moderna's COVID-19 vaccine overlap.  Opening Rep. ¶¶ 362-363.  Dr. Prud'homme does not disagree with any of my calculations.  Instead, he opines again that a "specification is not meant to characterize the product."  Prud'homme Rep. ¶ 451.  Dr. Prud'homme acknowledges, however, that specifications are

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

chosen to "ensur[e] the safety and efficacy of the product."  Prud'homme Rep. ¶ 450 n.39

(quoting GENV-00962451 at -453).  The overlap in specifications is therefore further evidence

of the equivalence (including with respect to safety and efficacy) of the PVU, v1, and v2

Formulations.  Dr. Prud'homme does not dispute that Shaun Ryan's declaration carried out a

similar analysis.  Prud'homme Rep. ¶ 453.

362.    Dr. Prud'homme repeats his opinion that "the best way to determine the

composition of a resulting particle is to look to the lipid inputs."  Prud'homme Rep. ¶ 451.  He

again cites no evidence to support this assertion, which contradicts how Moderna and the

industry characterize lipid content.  It is additionally undermined by Dr. Prud'homme's

characterization of HPLC lipid content assays as "a measure of the lipid content of the overall

composition of the LNPs."  Prud'homme Rep. ¶ 431.

363.    Dr. Prud'homme opines that "[w]hile rounding to one decimal place interferes

with one's ability to back-calculate molar ratios in the product, there is no such issue where the

relevant question is whether the measured lipid content of the product falls within a prespecified

range to ensure that nothing out of the ordinary had occurred during manufacture."  Prud'homme

Rep. ¶ 452.  Dr. Prud'homme provides no citation or evidence for this opinion.  As I explained in

my Opening Report, I have used the values with the numerical precision that Moderna found

appropriate to submit to the FDA.  Opening Rep. ¶ 460.  Dr. Prud'homme offers no reason to

believe those values are inaccurate due to the number of significant figures used, nor does he

opine that the number of significant figures affected the infringement analysis.  It is not clear to

me why he believes that the number of significant figures in Moderna's certificates of analysis

could "interfere[]" with the infringement analysis, but not Moderna's own analysis of whether or

not the batch met its own specifications.  Moreover, as I explain above, Moderna itself has relied

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

on lipid content data in certificates of analysis to analyze infringement.  *Supra* ¶¶ 350-351.  If anything, the certificates of analysis *underestimate* the scope of Moderna's infringement, because they do not account for the particle-to-particle heterogeneity in lipid content in the Accused Product.  As Dr. Schuster's analysis demonstrates, when one accounts for that heterogeneity, all of Moderna's batches infringe the Lipid Composition Patents.

364.    As I explained in my Opening Report, Moderna itself has represented to the Court in this litigation—when resisting sending to Plaintiffs the samples that Dr. Schuster tested that confirmed infringement—that the certificates of analysis are relevant for determining infringement.  Opening Rep. ¶ 454.  Dr. Prud'homme states that he disagrees with my opinion on this, citing several paragraphs from Moderna's filing.  Prud'homme Rep. ¶ 454.  Notwithstanding his lengthy discussion on this topic, Dr. Prud'homme does not explain why he thinks that Moderna did not, in fact, suggest that the certificates of analysis are relevant to the infringement analysis, which Moderna plainly did.  D.I. 183 at 1 ("Although *Plaintiffs have all information necessary to assess infringement—including certificates of analysis ("CoAs") reporting lipid content* and underlying data for every accused batch, Moderna has further agreed to provide a substantial number of samples as discussed below." (emphasis added)).  Moderna did not assert, as Dr. Prud'homme does here, that the information needed to assess infringement was limited to the input values for the batches, or that those were the proper measure of lipid content of the batches.

365.    Still discussing Moderna's submission to the Court, Dr. Prud'homme opines that "I understand from the above that despite initially contending that Moderna's testing—which generates aggregate values—is highly relevant, Plaintiffs chose to change course during discovery, arguing that the claims turn on whether an individual particle would infringe the

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

each lipid) reflects the measured mean value of all the particles that are distributed normally about this mean. Given the very large number of particles that are present, there would exist particles at or essentially at the mean." Opening Rep. ¶ 620.

376.    Dr. Fenton opines that "a global issue with using fractionation as a quantitative metric," is "that the process(es) used to separate the material at issue into fractions *may* alter the composition itself in the process." Fenton Rep. ¶ 66 (emphasis added). Dr. Fenton solely relies on conjecture-based testimony from Mr. Schariter and Dr. Parsons to support this opinion. For example, Dr. Fenton cites to a quote from Mr. Schariter's deposition in which he states that it's "very *possible* [that] you're [] changing [the particle]. Fenton Rep. ¶ 66 (citing Schariter Dep. Tr. 39:9-20 (emphasis added)). Dr Fenton further cites to a quote from Dr. Parsons' deposition in which he states that "the fractionation methodology itself *may* have an effect on the fractions," and that "there will be reason to *suspect* that [chromatography] could have an impact." Fenton Rep. ¶ 66 (citing Parsons Dep. Tr. at 283:7-284:19 (emphasis added)). Dr. Prud'homme opines similarly and cites the same testimony by Mr. Schariter. Prud'homme Rep. ¶ 413. I disagree with Dr. Prud'homme and Dr. Fenton's opinions. The widespread use of fractionation as a preparative and analytical technique, including in the field and by Moderna, *see* Opening Rep. Section VI.C.4, IX.E, X.E.2, demonstrates the understanding and accepted premise that fractionation does not change the particles of the formulation or render them unrepresentative of the starting material. Moderna itself has described how "fractionation techniques 'based of [sic] charge or particle size distribution' have been 'enabling techniques' for 'the detailed characterization of the heterogeneity of several of [their] drug platforms.'" Opening Rep. ¶ 90 (citing MRNA-GEN-00896095 at -095) This statement would make little sense if researchers at Moderna believed that fractionation likely altered the composition of the particles themselves, as

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Drs. Fenton and Prud'homme opine; fractionation would only provide detailed characterization of heterogeneity of Moderna's drug platform, as Moderna acknowledged that it did, if the fractionated samples were representative of the starting material. In addition, the testimony cited by Dr. Fenton and Dr. Prud'homme relates to SEC fractionation specifically, yet Dr. Fenton ignores the SEC literature cited in my report, including a citation to Grabielle-Madelmont 2003 in which the authors describe that because "[the SEC] technique is not destructive for the [liposome] samples, fractions after collection can be essayed [sic] for various complementary analyses." Opening Rep. ¶ 87. Moreover, none of the testimony cited by Drs. Fenton or Prud'homme relates to fractionation via ultracentrifugation. In fact, the two fact witnesses that Dr. Prud'homme and Dr. Fenton most heavily rely on to provide support for their opinions regarding fractionation perturbation, ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███ MRNA-GEN-00736476 at -480-81, -517. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ " MRNA-GEN-00736476 at -480-82, suggesting that neither Mr. Schariter nor Dr. Parsons had viewed these methods as perturbing or resulting in unrepresentative particles.

377.    Dr. Fenton asserts that "there is no mention of fractionation testing in the [Lipid Composition] Patents." Fenton Rep. ¶ 69; *see also* Prud'homme Rep. ¶¶ 430-433. However, as

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

described in my Opening Report, [t]he concept that ultracentrifugation can be used to assay and fractionate subpopulations of lipid-based delivery systems has been known since at least 1989," Opening Rep. ¶ 89, and it has long been used to assay distributions of lipids across fractions. *See, e.g.*, Wheeler 1999 at 274; *see also* GENV-00007023 ('651 Patent File History) at -7208-09 (WO 99/18933 at 6:19-7:3) (using centrifugation to fractionate a lipid vesicle formulation to assay the "[d]istribution of lipid and DNA" with $^3$H-labelled DNA and $^{14}$C-labelled lipid), 7270 (WO 99/18933, fig. 13); Saravolac 2000[20] at 430 ("The lipid composition of the isolated SPLP was determined by quantitative HPLC. It was found to be similar to the initial lipid composition used with may be a slight enrichment in the DODAC content of approximately 2%."). Dr. Fenton does not refute or address my assertion that "POSAs in the field [] understood that the population of formed lipid nanoparticles will be heterogeneous with respect to (among other things) the molar ratio of the component lipids, which will have a Gaussian distribution around a mean for each lipid component." Opening Rep. ¶ 144. As discussed above, *supra* ¶ 328, I note that the inventors did disclose information about compositional heterogeneity, which includes particle-to-particle variation, in embodiments of the claimed invention. *See* '069 patent, 23:61-24:23 ("In another specific embodiment of the invention, the SNALP comprises: . . . (b) a cationic lipid comprising from about 52 mol % to about 62 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising from about 36 mol % to about 47 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from about 1 mol % to about 2 mol % of the total lipid in the particle."), 68:35-43 ("It should be understood that the 1:57 formulation and 1:62 formulation are target formulations,

---

[20] E. G. Saravolac et al., *Encapsulation of Plasmid DNA in Stabilized Plasmid – Lipid Particles Composed of Different Cationic Lipid Concentration for Optimal Transfection Activity*, 7(6) J. DRUG TARGETING 423-437 (2000) ("Saravolac 2000"), MRNA-GEN-00222421.

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

and that the amount of lipid (both cationic and non-cationic) present and the amount of lipid conjugate present in the formulation may vary. Typically, in the 1:57 formulation, the amount of cationic lipid will be 57 mol %±5 mol %, and the amount of lipid conjugate will be 1.5 mol %±0.5 mol %, with the balance of the 1:57 formulation being made up of non-cationic lipid (e.g., phospholipid, cholesterol, or a mixture of the two).")  I disagree that Dr. Prud'homme's observations about the inventors' experience with fractionation are either correct or relevant to the infringement inquiry, as I discuss above.  *See* Prud'homme Rep. ¶¶ 431-433.  Nevertheless, I observe that the inventors *did* conduct fractionation experiments, using centrifugation, before the priority date.  *See* Opening Rep. ¶ 89 (citing GENV-00091060 at -062 and GENV-00016929 at -7125 ("Sucrose Gradient Fractionation of [] SPLP," noting that "most of [the] DNA [is] in fractions 4, 5, and 6")).

### 1.     Moderna's Use of Fractionation to Quantitatively Assess Lipid Composition

378.     As described in my Opening Report, "Moderna has employed several [fractionation] techniques to examine the heterogeneity and polydispersity of its LNP compositions."  Opening Rep. ¶ 329.  As further described in my Opening report, "[c]onsistent with the understanding in the field, in these [fractionation] experiments, Moderna uniformly observed that its LNPs exhibited lipid compositional polydispersity."  Opening Rep. ¶ 329.

379.     As described in my Opening Report, prior to the development of the COVID-19 vaccine, ███████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████     Opening Rep. ¶¶ 330, (███████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



380.   Dr. Prud'homme and Dr. Fenton rely on deposition testimony to opine that ▮

but that testimony contradicts statements in the documents themselves. For example, Dr. Prud'homme opines that

Prud'homme Rep. ¶ 358.  Dr. Fenton similarly opines that

," and he cites a quote from Mr. Schariter suggesting that

. Fenton Rep. ¶ 68.  This retrospective characterization of Moderna's fractionation studies conflicts with the contemporaneous evidence cited throughout my Opening Report, in which

. For example, in my Opening Report I excerpted slides from a Moderna PowerPoint, in which the authors of the PowerPoint described the study as "

Opening Rep. ¶ 331 (citing MRNA-GEN-02644934 at -964-65).

Opening Rep. ¶ 331.  I further note that the

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

graphs displayed in the excerpted slides included error bars and mole percentages reported to two

decimal places, a quantitative analysis.  Opening Rep. ¶ 331.  Various other contemporaneous

Moderna documents undermine Mr. Schariter's characterization of the company's fractionation

studies.  *See, e.g.*, Opening Rep. ¶¶ 330 (citing MRNA-GEN-00698545 at -579) ███████

████████████████████████████████████████████████████████

332 (citing MRNA-GEN-00736872 at -875) ██████████████████████████████

██████████████████████████████████.'' (emphasis added)).  Mr.

Schariter's own request to ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████.  *See* Opening Rep. ¶ 462.

Regardless, the intent of Moderna's researchers in conducting fractionation testing has no

bearing on the relevance of these studies in showing that ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  In addition, Moderna's purpose for

conducting its fractionation studies has no bearing on the accuracy, precision, or results of the

fractionation testing, and neither Dr. Prud'homme nor Dr. Fenton provide evidence that

Moderna's fractionation testing was inaccurate, imprecise, or otherwise skewed, or that the

fractionation changed the particles.  In fact, ████████████████████████████

████████████████████████████████████, *e.g.*, Opening Rep. ¶

331, indicate that the technique was precise.

381.    As stated in my Opening Report at paragraph 334, ████████████████

████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

█████████████████████████████████████████████  Dr. Prud'homme disagrees with this opinion, stating that "a study to assess how much lipid composition variation in a particular process has never been conducted, because there is no easy way to validate a fractionation method for decision-making."  Prud'homme Rep. ¶ 360.  This statement is incompressible.  To begin with, I cite to numerous fractionation studies conducted by researchers in the field, as well as Moderna, that "assess . . . lipid composition variation."  *See* Opening Rep. Sections VI.C.4, IX.E, X.E.2.  Additionally, a method does not need to be validated, including validated "for decision-making," in order to provide information about lipid composition heterogeneity.

████████████████████████████████████████████████████████

██████████████████████████████████████████  *See*, *e.g.*, Opening Rep. ¶¶ 330 ████████████████████████████████████████████████ ██████████."  (citing MRNA-GEN-00698545 at -579)), 332 ███████████████ ███████████████████████████████████████████████  (citing MRNA-GEN-00736872 at -875)); Opening Rep. Sections IX.E, X.E.2.  In█████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████  MRNA-GEN-00949251 at -420 (emphasis added).  Dr. Prud'homme does not explain why Moderna would provide data and information and conclusions that are unreliable to BARDA, a federal agency.  Moreover, when Mr. Schariter requested to run a comprehensive study on the compositional heterogeneity of several mRNA-1273 batches, his email did not indicate that his ability to run such a heterogeneity study was dependent on an undisclosed, forthcoming method validation.  MRNA-GEN-01274243 at -243.  I therefore disagree with Dr. Prud'homme's opinion that "a study to assess how much lipid composition variation in a particular process has never been

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

conducted." Prud'homme Rep. ¶ 360.

382.    Dr. Prud'homme opines that "[i]t is not accurate to conclude from a fractionation

study that there is particle heterogeneity (or a certain level of heterogeneity) because the

fractionation process itself is likely inducing particle heterogeneity." Prud'homme Rep. ¶ 361.

Dr. Fenton opines similarly. Fenton Rep. ¶ 66. I disagree and note that, yet again, Moderna's

contemporaneous documents about its fractionation studies directly contradict Dr. Prud'homme

and Dr. Fenton's opinions regarding fractionation's alteration of particles. *See supra* ¶ 381. For

example, in a Q4 2019 Whitepaper, Moderna describes that "[a]n *intact* separation was

developed using hydrophobic interaction chromatography (HIC), with the goal of distinguishing

LNP populations . . ." MRNA-GEN-00896095 at -107 (emphasis added), -108 ("2D HPLC

analysis . . . demonstrated both the selectivity of the separation . . . and *integrity of the particle*

after binding and eluting in the HIC mode with consistent DLS particle size." (emphasis added)).

383.    ████████████████████████████

████████████████████████████

████████████████████████

████████████████████████████

████████████████████████

████████████████████████

████████████████████████████

████████████████████████

██████████████████████

██████████████████████

████████████████████████

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

████████████████████████████████████████████████████████

████████  MRNA-GEN-00736476 at -481-82 (document entitled, "Heightened Characterization of mRNA-1273 LNP Process Development Activities from Phase I to Phase III," describing use of HIC chromatography to assay surface hydrophobicity heterogeneity and use of density gradient ultracentrifugation to assay density heterogeneity, and characterizing these and other techniques as "sensitive analytical methods"); *supra* ¶ 219.

384.    Dr Prud'homme's opinions that "[i]t is not accurate to conclude from a fractionation study that there is particle heterogeneity (or a certain level of heterogeneity)," Prud'homme Rep. ¶ 361, and that "a study to assess how much lipid composition variation in a particular process has never been conducted," Prud'homme Rep. ¶ 360, are particularly unconvincing given that Moderna has used lipid composition analysis from SEC fractionation to create "heterogeneity scores" of its MMA[21] mRNA LNP batches.  MRNA-GEN-00896095 at -100 (2019 Q4 Process and Product Consistency Whitepaper) ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

385.    Literature cited in my Opening Report further undermines Dr. Prud'homme's opinions regarding the likelihood that fractionation itself induces heterogeneity.  *See, e.g.*, Vaidya 2024 at 5571 (describing UC as a non-destructive technique); Grabielle-Madelmont 2003

---

[21] MMA batches refer to Moderna's Methylmalonic Acidemia mRNA LNPs.  *See* MRNA-GEN-00525742 at -744.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

at 190 (calling SEC a "not destructive" technique for the fractionation of liposomes), 213 (stating that "a major interest of this [SEC fractionation] technique is its ability to separate liposomes from solutes and to fractionate heterogeneous suspensions into monodisperse subpopulations. Provided the elution buffer is isoosmotic with the aqueous medium of the liposomes, the analysis practically presents no stress for the liposome structure."); Zhang 2012 at 402 ("The data [] confirm that the size and chemical composition distribution results in Figure 3 are representative of the overall LNP populations.").

386.    Both Dr. Prud'homme and Dr. Fenton cite Mr. Schariter's deposition testimony to support their opinion regarding the purported inability to use fractionation to conclude that there is particle heterogeneity, Prud'homme Rep. ¶ 361, Fenton Rep. ¶ 66, yet Mr. Schariter's own contemporaneous documents suggest that he did view fractionation as a useful technique for assessing lipid composition heterogeneity within Moderna's formulations of mRNA-LNPs. *See, e.g.*, MRNA-GEN-01276326 at -326 (Email from Mr. Schariter regarding SEC fractionation data, stating "[i]t was great to see some compositional heterogeneity on the mRNA-1273."); MRNA-GEN-01274243 at -243-244 (Email from Mr. Schariter proposing to fractionate samples and to subsequently analyze lipid content heterogeneity); Schariter 5/8/2024 Tr. 112:20–113:6 ████████████████████████████████████████████████). Dr. Prud'homme and Dr. Fenton's sole reliance on retrospective testimony by Mr. Schariter and Dr. Parsons, rather than citations to the literature or Moderna's contemporaneous documents, is unconvincing.

387.    Dr. Prud'homme and Dr. Fenton both point to a purported inconsistency in the results obtained by Moderna from a parallel SEC and HIC fractionation study of mRNA-1273 to conclude that these fractionation techniques are generally "not reliable." *See* Prud'homme Rep.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

¶¶ 362-63, 388; Fenton Rep. ¶ 68.  The mechanism of action underlying SEC fractionation is separation of particles based on size, whereas HIC fractionation has a different mechanism of action, which entails separation based on hydrophobicity of the particles.  *See, e.g.*, MRNA-GEN-01276328 at -343, -351.006. █████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

MRNA-GEN-01276326.

388.    Dr. Prud'homme opines that SEC and HIC fractionation "should not be used in isolation to draw conclusions about compositional variability" due to "their potential for method-induced variability."  Prud'homme Rep. ¶ 363.  Dr. Prudhomme relies on deposition transcripts for this opinion, and does not cite to any Moderna documents to show this purported "method-induced variability."  To the contrary, ████████████████████████████████ ███████████████████████████"  *See supra* ¶¶ 381-382.

389.    Dr. Prud'homme opines that "Plaintiffs' own witnesses do not use field-flow fractionation alone to measure lipid content."  Prud'homme Rep. ¶ 363.  I do not see how this opinion is relevant to any issues pertaining to infringement or any remark made in my Opening Report.

390.    Although Dr. Prud'homme relies almost entirely on retrospective and speculative testimony to opine that the fractionated particles have been altered by Moderna's fractionation techniques, there is one article that Dr. Prud'homme cites for this proposition, though I disagree that it provides support for Dr. Prud'homme's opinion.  Prud'homme Rep. ¶ 366.  The

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

publication cited by Dr. Prudhomme, Graewert 2023,[22] does not include any actual data or evidence that SEC modifies LNPs, including, because the article is not about SEC as a preparative technique nor is it an article about lipid particles.  Rather, the Graewert 2023 is about "[o]btaining information on size distribution profiles and size-dependent parameters," of materials, and the publication discusses drawbacks of using various methods (including SEC) to obtain the size information.   Graewert 2023 at 1.  Although the authors of Graewert 2023 describe some general drawbacks of SEC for size analysis as compared to A4F, including "[p]ressure issues," "unfavorable shear forces," weak-binding complexes," and "limitations in the choice of buffer," Graewert 2023 at 7-8, the authors never state that SEC is destructive of LNPs or analogous particles, nor do the authors state that SEC is an inappropriate preparative tool for lipid particles.  Moreover, the quote from Graewert 2023 that Dr. Prud'homme cites, stating that SEC is able to "provide only semi-quantitative profiles, which depend in a complex manner on parameters such as size-dependent scattering intensities . . .," Prud'homme Rep. ¶ 366, is clearly about the use of SEC in the context of obtaining size distribution profiles and bears no relevance to the use of SEC as a preparative technique for downstream analysis of lipid content.  In contrast, Dr Prud'homme ignores the literature cited in my Opening Report containing specific assertions regarding SEC fractionation as an appropriate tool for lipid particles.  *See, e.g.*, Grabielle-Madelmont 2003 at 190 (calling SEC a not destructive technique for the fractionation of liposomes); Zhang 2012 at 402 ("[The] majority of the LNPs could be quantitatively separated and recovered by the column. The data also confirm that the size and chemical composition distribution results in Figure 3 are representative of the overall LNP

---

[22] Melissa Graewert et al., Quantitative size-resolved characterization of mRNA nanoparticles by in-line coupling of asymmetrical-flow field-flow fractionation with small angle X-ray scattering, 13:15764 Nature Scientific Reports ("2023) ("Graewert 2023").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

populations.").

391.    Dr. Prud'homme opines that I "neglect[] to mention that fractionation studies are a research tool in the early stages of development and used for qualitative analysis, not quantitative analysis." Prud'homme Rep. ¶ 366. I disagree. As I have already described at length, SEC fractionation has long been used for the quantitative analysis of lipid composition heterogeneity, ███ in the literature ███████████. *See generally* Zhang 2012; *see supra* ¶¶ 380-385. Dr. Prud'homme's opinion that fractionation studies are not used for quantitative analysis is particularly unconvincing because, as mentioned above, ███████████

███████████████████████████████████████████

███████████. *See supra* ¶ 384. I also disagree that "fractionation studies are a research tool in the early stages of development." As noted earlier, Mr. Schariter conducted an SEC fractionation of siRNA-LNPs in 2013. *See supra* ¶ 379. ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████

392.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████    Prud'homme Rep. ¶ 367. As stated in my Opening Report, and which Dr. Fenton and Dr. Prud'homme do not dispute, "LNPs [] are known to exhibit heterogeneity as a result of the self-assembly process." Opening Rep. ¶ 85. The same self-assembly process exists both in the context of siRNA LNPs and mRNA LNPs. *See, e.g.,*

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

MRNA-GEN-01746082 at -085 (describing use of ███████ for Moderna's mRNA-LNPs

because it has precedence including for the scale-up production of siRNA LNPs).  It is therefore

irrelevant whether some of Moderna's fractionation studies were conducted on siRNA LNPs.

Notably, Dr. Prud'homme does not opine that the level of lipid composition heterogeneity is

different between siRNA LNPs and mRNA LNPs, nor does he opine that different techniques

would have to be used to assess lipid content heterogeneity depending on the type of nucleic acid

payload.  Moreover, Dr. Prud'homme is incorrect that Moderna's 2016 SEC fractionation study

uses siRNA.  Dr. Prud'homme appears to be confused by the fact that the PowerPoint begins by

displaying Mr. Schariter's 2013 siRNA LNP fractionation work; however, the slides describing

the 2016 SEC fractionation study make clear that mRNA was the nucleic acid payload used.

*See, e.g.,* MRNA-GEN-02644934 at -966.

393.    Dr. Prud'homme opines that



" Prud'homme Rep. ¶ 367.  Dr. Prud'homme yet again bases his opinion on

retrospective testimony provided by Moderna's witnesses rather than the underlying Moderna

document.  As is clear from the PowerPoint,

*See e.g.*, MRNA-GEN-02644934 at -948.

MRNA-GEN-02644934 at -964-65,

MRNA-GEN-02644934 at -

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

968, ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

MRNA-GEN-02644934 at -964-65.  Dr. Prud'homme provides no evidence that any of the results actually were, or were perceived to be, inaccurate or imprecise.

394.    In my Opening Report, I describe an ████████████ study Moderna conducted on its ████████ and presented in a July 2019 PowerPoint, and I note that "notwithstanding the SM-102 target of ████ all three of the samples tested include fractions with more than ████ SM-102," and that "all three of the samples tested contained fractions with less than ████ PEG (the PEG target was ████  Opening Rep. ¶ 332.  Dr. Prud'homme's only response to this is his opinion that "the ████████ study was only used qualitatively, to compare an outlier to controls," and he relies solely on retrospective testimony provided by Mr. Schariter to support his opinion.  Prud'homme Rep. ¶ 368.  I disagree with Dr. Prudhomme's opinion, and Moderna's internal document presenting the results of the CMV fractionation study, which Dr. Prud'homme does not cite to in this paragraph, directly undermines his opinion.  Evidence that the fractionation study was used to assay lipid composition heterogeneity within a formulation, rather than just to compare formulations to an outlier (as Dr. Prud'homme suggests), can be found in Moderna's conclusion that "[c]omposition varies across fractions, with SM-102 and Cholesterol compositions varying the most dramatically."  MRNA-GEN-00736872 at -875.  Regardless, as explained above, I do not understand Moderna's intention regarding whether the assay was intended to be used qualitatively versus quantitatively to be relevant; what is relevant is that the ████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



. MRNA-GEN-00736872 at -872,

-875.

395.    Dr. Prud'homme notes that Moderna's fractionation study in its May 2019

PowerPoint presented to the CMC Advisory Board used MC3, rather than SM-102.

Prud'homme Rep. ¶ 369.  This opinion appears to be of no relevance, especially given that Dr.

Prud'homme has not asserted that LNPs formulated with different ionizable lipids exhibit

different levels or patterns of heterogeneity or require different analytical techniques to ascertain

lipid composition heterogeneity.  As stated in my Opening Report,

as at least some of its data

was presented to its funding agency (BARDA) and its CMC advisors."  Opening Rep. ¶ 334.  Dr.

Prud'homme disputes this opinion, noting that the PowerPoint for BARDA describes "novel

analytical tools, either established or in development," that "will be introduced as [the] methods

are refined and safety efficacy correlations are made.'" Prud'homme Rep. ¶ 369.

Regardless, if the method was not performing well, it

seems unlikely that Moderna would have presented it as an analytical tool to BARDA or its

CMC Board.  Moreover, if Moderna researchers understood the fractionation data to be

inaccurate, unrepresentative of the lipid composition heterogeneity within its samples (*e.g.*, due

to SEC disruption of the particles), or otherwise misleading, it is my opinion that Moderna would

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

October 2020, Mr. Schariter asked Dr. Parsons to "run a comprehensive study on the

compositional heterogeneity of several mRNA-1273 batches" via "Semi-Prep Size Exchange

Chromatography."   MRNA-GEN-01274243 at -243.  It would not make sense for Mr. Schariter

to ask to run an assay that "was not very good" as part of a comprehensive study.  Mr.

Schariter's testimony that "SEC was not very good" and Dr. Prud'homme's characterization of

SEC as "not reliable" based on this testimony by Mr. Schariter is therefore unconvincing.



398.    As described in my Opening Report, ████████████████

████████████████████████████████████████████████

███████████████    Opening Rep. ¶ 461.  Neither Dr. Prud'homme nor Dr. Fenton dispute this

statement.  Nor do Dr. Prud'homme or Dr. Fenton opine that there is a mistake in the values that

I report observing in Moderna's fractionation study, ███████████████████████

████████████████████████    *See supra* ¶ 394.  Instead, Dr. Prud'homme

provides various unsubstantiated opinions based on testimony by Mr. Schariter that directly

contradicts the underlying documents that he was providing testimony about, which I have

addressed throughout this section of my report.  In addition, Dr. Prud'homme mischaracterizes

Mr. Schariter as "Dr." throughout his Report, which is notable insomuch as Dr. Prud'homme

appears to frequently rely on Mr. Schariter for "expertise" rather than solely in his capacity as a

fact witness.

399.    ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

███████████████████████████████████████████████

███████████████████████████████████████████████

      a.     **Moderna's Use of Fractionation to Quantitatively Assess Lipid
Composition of mRNA-1273 LNPs**

400.    As described in my Opening Report, in an October 2020 email to Dr. Parsons, Mr. Schariter requested to "run a 'comprehensive study on the compositional heterogeneity of several mRNA-1273 batches,'" including via fractionation of the samples and subsequent lipid content analysis. Opening Rep. ¶ 462. Dr. Parsons responded that, while he "appreciate[d] the scientific motivation for the study," the results could "pose uncomfortable questions," so he requested a meeting with Mr. Schariter, after which it appears Mr. Schariter did not move forward with the fractionation study. Opening Rep. ¶ 463. Dr. Prud'homme opines that "[e]xperiments on the research side are performed to further the science and often employ unvalidated or exploratory techniques, the results of which cannot be submitted to the FDA without proper vetting . . . [i]t is therefore not at all surprising that one would not want to run an exploratory technique on a commercial product, particularly where that technique is not validated." Prud'homme Rep. ¶ 428. I do not consider this to be a reasonable explanation, given that Mr. Schariter never suggested or indicated that the results of his proposed heterogeneity study were to be submitted to the FDA or any other regulatory agency. Nor was this technique "exploratory"—as discussed above, it had been used repeatedly by Moderna, with results sufficiently reliable to report to a government agency. And as discussed above, ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████.

MRNA-GEN-00736476 at -479-82 (Document meta-data dated August 2020). Dr. Prud'homme opines that "if a fractionation study is run on a commercial product and the results do not align

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

with the results obtained by validated methodology upon release, that may lead to a flurry of questions." Prud'homme Rep. ¶ 428. Again, I do not understand Dr. Prud'homme's opinions to be a reasonable explanation of the evidence. To begin with, I have seen no indication that Moderna's fractionation studies up until that point had demonstrated any inconsistencies with any other measurements—such as with the bulk lipid content measurements—so it is unclear what hypothetical inconsistencies Dr. Prud'homme is referring to. In addition, Dr. Prud'homme does not specify who would be asking a "flurry of questions" or provide any other discernable details about this opinion. To the extent a proposed experiment might reveal a problem with an existing analytical assay on a marketed product being administered to millions of Americans, I would have expected Moderna to be interested in pursuing that inconsistency and resolving the issue. I reiterate that "I am not aware of any scientific rationale that would justify Moderna's decision not to perform such studies," Opening Rep. ¶ 463, and Dr. Prud'homme's opinions and citations fail to provide any such rationale. In my opinion, the most reasonable explanation of Dr. Parsons' message about "uncomfortable questions" is that he wanted to avoid generating data about the lipid content of the particles in Moderna's COVID-19 vaccine, which could (and, when Dr. Schuster performed the testing on the samples Moderna eventually produced, did) confirm that the vaccine contained particles that infringed the Lipid Composition Patents. For Moderna, the uncomfortable questions predictably had uncomfortable answers.

401.    As further described in my Opening Report, "[n]otwithstanding Dr. Parsons' apparent reluctance to study the compositional heterogeneity of Moderna's COVID-19 vaccine, I am aware of one such study that Moderna performed on the Accused Product." Opening Rep. ¶ 464. ████████████████████████████████████████████

████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

███████████████████████████████████████████████████████████████

████████████████████████." Prud'homme Rep. ¶ 373. Dr. Fenton opines similarly. Fenton

Rep. ¶ 67. However, I never characterized Mihir Oke as an "undergraduate student working at

Moderna through an internship program," as this characterization is incorrect. At the time of the

study, Mihir Oke was participating in Moderna's co-op program in the LNP Process

Development group and he was entering his second year of his Master's (graduate) degree in

Pharmaceutical Sciences. *See* Mihir Oke LinkedIn;[23] MRNA-GEN-01276328 at -329. Mr. Oke

received an award from Moderna for his co-op work, before it became the subject of interest in

this case, and he currently works as a senior research associate at one of Flagship Pioneering's

ventures called Mirai Bio. *See* Mihir Oke LinkedIn. I further understand that Mr. Oke

conducted the Covid-19 vaccine heterogeneity study "[u]nder the guidance of Meredith Packer,"

MRNA-GEN-01276328 at -328, who was a full-time process and analytical development

scientist at Moderna at the time, *see* Meredith Packer LinkedIn.[24] Mr. Oke also appears to have

worked on his presentation with the Process Development Team at Moderna, which was

comprised of at least 6 employees. See MRNA-GEN-01276328 at – 351.008.

402.    Dr. Prud'homme opines that "it appears that the purpose of this work was to

investigate the potential utility of a new technique for identifying ███████████ in a composition

to allow for their removal." Prud'homme Rep. ¶ 374. I do not understand why Dr. Prudhomme

conjectured about what the purpose of Mr. Oke's study was, when the goal of the study is clearly

stated in the presentation's title: "Introducing semi-preparative HIC as a new tool for

characterizing compositional heterogeneity of LNPs." MRNA-GEN-01276328 at -328. Dr.

---

[23] Mihir Oke, LinkedIn Profile, available at https://www.linkedin.com/in/mihir-oke/.

[24] Meredith Packer, LinkedIn Profile, available at https://www.linkedin.com/in/meredith-packer-40261662/.

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

Prud'homme opines that the purpose of the study "was not, as Dr. Mitchell attempts to suggest, to study any purported 'variability in lipid composition across fractions,' nor can such conclusions be drawn from this data." Prud'homme Rep. ¶ 374 (citations omitted). Dr. Prud'homme yet again relies on retrospective testimony rather than the underlying document. Dr. Prud'homme's opinion is not only directly contrary to the title of Mr. Oke's study, but also contradicts one of the slides featured in the PowerPoint (depicted below), which describes the goal of "[c]haracterizing the heterogeneity" of the COVID-19 vaccine via "Semi-preparative fractionation" and downstream "Compositional . . . studies."



MRNA-GEN-01276328 at -343.

   403.   Dr. Prud'homme and Dr. Fenton opine that "none of the[] [lots]" used in the

235

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

mRNA-1273 heterogeneity study "would have been representative of the commercial COVID-19 vaccine." Prud'homme Rep. ¶ 375; Fenton Rep. ¶ 67. I disagree. To begin with, Dr. Prud'homme opines that lots DHM-55782 and DHM-56119 are not representative because "development lots cannot be sold commercially, or otherwise used by patients, since they are manufactured by the technical development team, and not in a GMP facility, following GMP protocols." Prud'homme Rep. ¶ 375. As described in my Opening Report, "DHM-55782 and DHM-56119 were lots made by 'forward processing' mRNA-1273 LNP lots 5007320002 and 5007320004, respectively," which "were mRNA-1273 LNP lots that were subsequently used to manufacture unlabeled drug product lot 6007320005 (corresponding to labeled drug product lot 7006520005) that Moderna subsequently sold for use in patients in the United States." Opening Rep. ¶ 465 (citations omitted). Neither Dr. Prudhomme nor Dr. Fenton dispute this assertion. Instead, Dr. Prud'homme opines that the fact that commercial drug product lots "may have been generated from the same mRNA-1273 LNP lots . . . is inapposite," because "these development lots were not manufactured through the standard channels and therefore would not be considered representative of the commercial product." Prud'homme Rep. ¶ 375. Dr. Prud'homme does not cite any source for this opinion, and Dr. Prud'homme fails to specify a single difference in the "standard channels" that would undermine the development lots' representativeness of the COVID-19 drug product, including drug product that was made using the *same* mRNA-1273 LNP lot as a commercially sold lot. In addition, development lots demarcated "DHM" are frequently used by Moderna in its BLA comparability studies and are specifically described as "Representative," as can be seen in the example BLA excerpt below.

236

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Table 8:    Additional Representative DP Lots Used for Statistical Analysis

| Lot | Scale | Status | Date of Manufacture | References |
|---|---|---|---|---|
| DHM-47516 | 2.2 g | Development | 01 Apr 2020 | QC-OTH-0181 |
| DHM-47519 | 2.2 g | Development | 01 Apr 2020 | QC-OTH-0181 |
| 6007520007 | 15 g | GMP Ph 3 | 09 Jul 2020 | COA-0475 |

Abbreviations: DP = drug product; GMP = good manufacturing practice

MRNA-GEN-00018626 at -645 (BLA Section 3.2.P.2 Pharmaceutical Development {Comparability}); *see also, e.g.*, MRNA-GEN-02667504 at -509 (BLA Section 3.2.S.7.1 Stability Summary and Conclusions {mRNA-1273 LNP}). Dr. Prud'homme provides no explanation as to why development lots used by Mr. Oke—lots which are typically considered as "representative" of the commercial COVID-19 vaccine drug product for purposes of comparability studies submitted as part of Moderna's BLA—are no longer representative in this specific scenario.

404.    As described in my Opening Report, "the main steps involved in manufacturing Moderna's mRNA-1273 LNP drug substance into drug product include: ███████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ Opening Rep. ¶ 388. ████████████ ████████████████████████████ I see no reason how a lack of "GMP protocols" or a difference in "standard channels" would undermine representativeness.

405.    Dr. Prud'homme further opines that the third lot used in Mr. Oke's mRNA-1273 heterogeneity study, "[t]he Catalent sublot," "is also not representative of the commercial product" because "the [filter] fouling that occurred during the manufacture of this lot changed the properties of the LNPs themselves, including their size distribution." Prud'homme Rep. ¶ 376. Dr. Prud'homme further opines that the "changed [] properties" of the Catalent lot "is likely to be accompanied by changed [sic] to the lipid composition more broadly." Prud'homme Rep. ¶ 376. I disagree. As Dr. Fenton describes, ███████████████████████████

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

MRNA-GEN-01276328 at -347.  Dr. Prud'homme provides no evidence of, or explanation why,

the filter fouling would be "accompanied by changed [sic] to the lipid composition more

broadly," nor does Dr. Prud'homme cite to any supportive documents for this assertion.  In fact,

in Moderna's explanation for aborting Catalent sub-lot 3, it merely cites to low yield and length

238

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

of time at room temperature; Dr. Prud'homme fails to explain how either of these issues would

cause substantial compositional change, including of the main population of LNPs.  *See*

Prud'homme Rep. ¶ 377 (citing MRNA-GEN-02658277 at 367).

406.    Dr. Prud'homme cites to a report written for Catalent lot 029K20 which lists

"three '*potential* causes for the observed filter behavior and sedimentation with considerations

for analytical testing.'"  Prud'homme Rep. ¶ 379 (citing MRNA-GEN-02658437 at -440-42

(emphasis added)).  Dr. Prud'homme does not address the first potential cause, "███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████  Prud'homme Rep. ¶ 379 (citing MRNA-GEN-02658437 at -440

(emphasis added)).  Dr. Prud'homme provides no explanation as to how the speculated existence

of a greater amount of sub-visible particles would affect the lipid composition of the main

population of LNPs.  Moreover, SEC fractionation separates particles by size, such that these

unrepresentative sub-visible particles would be expected to be separated away from the main

population of particles during lipid composition analysis, thereby preventing them from skewing

results.  *See infra* ¶ 482.  For this same reason, I disagree that A4F-MALS data that shows "a

heterogeneous, larger-than-target distribution [of particles] resolved to the right of the *main*

*particle distribution*" is evidence of lack of representativeness of the lots used by Mr. Oke.  *See*

Prud'homme Rep. ¶ 381 (citing MRNA-GEN-02658268 at -269 (emphasis added)).  If anything,

the quote cited by Dr. Prud'homme regarding the A4F-MALS analysis demonstrates that the

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

composition of the LNPs within the "main particle distribution" is not changing.  The third potential cause of filter fouling that the report describes is raw material contamination (*e.g.*, metal ions, consumable leachables, silicone oil, or surfactants).  Prud'homme Rep. ¶ 379 (citing MRNA-GEN-02658437 at -442).  Dr. Prud'homme does not specifically assert or provide any evidence that such contaminants would impact LNP composition.  Dr. Prud'homme opines that "[a]ll of these possible causes would be likely to affect the composition" which "further [] supports [his] conclusion that any information drawn from this lot would not be generalizable to other lots, let alone the commercial product as a whole."  Prud'homme Rep. ¶ 379.  I disagree. As described above, Dr. Prud'homme provides no evidence demonstrating that any of the three potential causes of filter fouling generally cause compositional changes or caused compositional changes in this specific instance, nor does Dr. Prud'homme explain how any of the three potential causes would cause a composition change, especially of the main population of LNPs.

407.    Dr. Prud'homme cites further documents in which Moderna speculates about additional causes of the filter fouling, including extended storage at room temperature leading to phase separation.  Prud'homme Rep. ¶ 380.  Yet again, Dr. Prud'homme provides no evidence or explanation of why this purported phase separation would mean that the LNPs within a formulation are changing composition.  Dr. Prud'homme ultimately opines that "[r]egardless of what cause [sic] the fouling, this lot had failed and therefore would not be representative of Moderna's commercial product."  Prud'homme Rep. ¶ 380.  I disagree that the failure of a lot, in and of itself, demonstrates that the lot is not representative of Moderna's commercial product, especially where the lot has undergone extensive review without any conclusion that it is compositionally different than those of other lots.  Dr. Parsons' vague and general testimony stating that he doesn't "recall the disposition and ultimate determination of that [Catalent] lot,

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

but it certainly had characteristics that were different than we expected," Prud'homme Rep. ¶
380 (citing Parsons 6/7/2024 Tr. 277:11-278:5 (emphasis omitted)), provides no support for an
assertion that the LNPs in sublot 029K20-3 (and in particular the main population of LNPs in
this sublot) are compositionally different than LNPs of Moderna's COVID-19 drug product.

408.    Dr. Prud'homme cites an additional Moderna document that shows lower yield,
lower adjustment pressure (PSI), and lower loading prior to adjustment (g/m2) for the Catalent
lot tested by Mr. Oke, and opines that this "show[s] that lot 029K20 was an outlier more
generally." Prud'homme Rep. ¶ 382. Dr. Prud'homme again provides no evidence that the
differences he cites would be expected to result in compositional changes, nor does Dr.
Prud'homme explain what these characteristics are or how they would be expected to even relate
to compositional changes in the LNPs of the 029K20 lot.

409.    Dr. Prud'homme further opines that "the methods utilized for [Mr. Oke's] study
are (1) not meant to yield results that would be used quantitatively, as Dr. Mitchell attempts to do
and (2) may be affecting or altering the composition of the particles being tested, which further
precludes any use of the results quantitatively." Prud'homme Rep. ¶ 383. I disagree with both
of these points, as will be described in detail below.

410.    I disagree that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ techniques and ▮▮▮▮▮▮▮▮▮▮
testing used for the ▮▮▮▮▮▮▮ heterogeneity study were "not meant to yield results that would
be used quantitatively," Prud'homme Rep. ¶ 383, as described above, *see supra* ¶¶ 377-380. Dr.
Prud'homme relies on Mr. Schariter's testimony, which again directly contradicts the underlying
contemporaneous Moderna document describing the fractionation study that Dr. Prud'homme
does not cite to support his opinion. Prud'homme Rep. ¶ 383. For example, Dr. Prud'homme
cites Mr. Schariter testifying that "this is more of a formulation technique, less of an analytical

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

technique," Prud'homme Rep. ¶ 383 (citing Schariter 5/8/2024 Tr.144:16-17). However, the

Moderna PowerPoint specifically describes conducting "2D analysis of the fractions" collected

from ██████ fractionation, ████████████████████████████████████████████

undermining Dr. Prud'homme's opinion about how the results of the mRNA-1273 study were

intended to be used. MRNA-GEN-01276328 at -338, -343. Mr. Oke's presentation on his

mRNA-1273 heterogeneity study never mentions fractionation as a "formulation technique," but

the presentation does describe use of fractionation with downstream testing as an analytical

technique on multiple occasions. *See, e.g.,* ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████

411.    Dr. Prud'homme further cites Mr. Schariter's testimony to opine that "no

conclusions could be drawn from this experiment relating to SM-102." Prud'homme Rep. ¶ 383.

To begin with, this is a mischaracterization of Mr. Schariter's testimony, in which Mr. Schariter

states that "there's no conclusions [sic] *I* would make, at least with the SM-102," Prud'homme

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

Rep. ¶ 383 (citing 5/8/2024 Schariter Tr.140:1-142:6 (emphasis added)). In my opinion, others

in the field could and would have drawn conclusions from the study, including from the slide

excerpted below. As described in my Opening Report, each lot follows the same trend of



MRNA-GEN-01276328 at -351.

412. Dr. Prud'homme repeats his earlier opinion that "[e]ven more broadly, as Dr.

Parsons explained, these results cannot be generalized to the commercial product for the

additional reason that the 'fractionation methodology itself *may* have an effect on the fractions.'"

Prud'homme Rep. ¶ 384 (emphasis added). Rather than cite any Moderna documents, literature,

or data, Dr. Prud'homme rests his opinion on Dr. Parsons' retrospective, speculative testimony.

For example, Dr. Prud'homme cites Dr. Parsons' testimony in which he states that "I *think* there

will be reason to *suspect* that that" introduction of the samples to a column, "*could* have an

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

impact." Prud'homme Rep. ¶ 384 (citing Parsons 6/7/2024 Tr. 283:7-284:19 (emphasis added)). The rest of the testimony cited by Dr. Prud'homme is similarly speculative. *See*, *e.g.*, Parsons 6/7/2024 Tr. 286:10-21 ("There was a measurement attempted on these fractions, but the accuracy of that measurement I *think* is a matter of further scientific study." (emphasis added)), 288:14-20 ("[H]ow confident can we be that the -- that either the PEG or the particle size has not been altered by the conditions of the separation? *I think that's a matter of scientific speculation*." (emphasis added)), 291:9-17, 293:1-3. However, as described earlier, Dr. Prud'homme ignores the literature cited in my Opening Report, in which the authors describe the non-destructiveness and representativeness of samples post-SEC fractionation. *See supra* ¶ 390 (citing Grabielle-Madelmont 2003 at 190; Zhang 2012 at 402).



413.    As further described earlier, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *see supra* ¶¶ 379-384, 391-395, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓. In addition, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See*, *e.g.*, MRNA-GEN-02644934 at -964-65 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓); MRNA-GEN-00698545 at -579 ▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ MRNA-GEN-00736872 at -875 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓."); MRNA-GEN-00896095 at -100 (2019 Q4 Process and Product

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Consistency Whitepaper) ███████████████████████████████████████

██████████████████████████ ] . . . The variation of the composition across the SEC

profile was assessed with the % Standard Deviation calculation that is outlined in the

Heterogeneity Score section."); MRNA-GEN-01276326 at -326 (Email from Mr. Schariter

regarding SEC fractionation data, "It was great to see some compositional heterogeneity on the

mRNA-1273."); *supra* ¶¶ 380-386, 392-395.

     414.    Dr. Prud'homme opines that "HIC would be one of the most, if not the most,

disruptive characterization technique that could have been employed," and that "[t]he

hydrophobic interaction contacts between the mRNA LNP and the HIC packing is quite likely to

result in the transfer of lipid components out of the LNP, thus changing composition."

Prud'homme Rep. ¶ 385.  I disagree.  Dr. Prud'homme does not provide any citation—to

testimony, documents, literature, or otherwise—that directly supports this opinion.  Rather, Dr.

Prud'homme's sole citation in this paragraph is to a book chapter about HIC that Dr.

Prud'homme cites to describe the mechanism of action of HIC generally.  *See* Prud'homme Rep.

¶ 385 (citing Tomaz 2017[25]).  Dr. Prud'homme analogizes HIC to endosomal escape, opining

that "[t]his is exactly the way that the LNP, once internalized into an endosome, escapes from the

endosome. The LNP hydrophobically and electrostatically interacts with the endosome

membrane, fuses with that membrane and discharges the mRNA contents."  Prud'homme Rep. ¶

385.  Dr. Prud'homme's analogy makes little sense, including because endosomes are acidic,

such that the cationic lipids in an LNP will be positively charged, helping to drive endosomal

escape via interactions with the negatively charged head groups of the phospholipids.  In

---

[25]   Candida   Tomaz,  *Hydrophobic  interaction  chromatography*,  Chapter  7  LIQUID
CHROMATOGRAPHY (MRNA-GEN-02686717).

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

contrast, HIC is often conducted under neutral conditions, where the bulk of cationic lipids would be expected to be in a neutral state. *See e.g.*, Tomaz 2017 at 179 ("[T]he choice of a pH close to neutral has been the usual procedure for most proteins."). Dr. Prud'homme also cites nothing to suggest that the stationary phase in HIC is comparable, electrostatically or otherwise, to an endosomal membrane. As discussed above, ███████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████

415.    Dr. Prud'homme also cites Tomaz 2017 at 176, in which the authors state that HIC packing "may promote strong irreversible adsorption of the proteins or denaturation," and based on this statement, Dr. Prud'homme opines that if "the interaction is strong enough to cause a protein to denature[,] [that] would indicate that the interaction would be strong enough to disrupt the structure and composition of an LNP." Prud'homme Rep. ¶ 385. Notably, Dr. Prud'homme cuts off the full quote from Tomaz 2017, which reads in its entirety: "*In some cases*, [] hydrophobic ligands of commercially available stationary phases *may* promote strong irreversible adsorption of the proteins or denaturation during the elution *with harsh conditions* . . . Therefore, ligands with intermediate hydrophobic character . . . were used." Tomaz 2017 at 176 (emphasis added). Tomaz 2017 does not suggest that proteins are generally at risk of denaturing, nor do its statements suggest that LNPs would likely be disrupted; rather the article provides warnings about use of harsh conditions. Dr. Prud'homme ignores Moderna's

246

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

documents that discuss HIC, including that Moderna itself has described that HIC fractionation can be used as an "*intact* separation" methodology and that "2D HPLC analysis . . . demonstrated both the selectivity of the separation . . . and *integrity* of the particle after binding and eluting in the HIC mode with consistent DLS particle size." *See supra* ¶ 382 (citing MRNA-GEN-00896095 at -107 (emphasis added)).

416. Dr. Prud'homme further opines that HIC involves the use of "'harsh conditions,' . . . i.e. salts," which he opines can lead to bleb formation, which he further opines is a "substantial alteration of LNP structure." Prud'homme Rep. ¶ 386. From this, Dr. Prud'homme concludes that "the use of a salt gradient in HIC would be problematic if HIC is used to characterize samples of LNPs." Prud'homme Rep. ¶ 386. To begin with, I note that bleb formation is a structural change rather than compositional change, and Moderna's LNPs typically exhibit blebbing such that this state would not be unrepresentative. *See supra* ¶ 289. Notably, Dr. Prud'homme does not cite to Mr. Oke's presentation, in which he specifically examined the "stability of [the] final drug product" in the mobile phase, and found that the "LNPs are stable in 0.4M Ammonium sulfate for about 1 month." MRNA-GEN-01276328 at -334, -336. I therefore disagree that there was anything "problematic" about the mobile phase conditions used by Mr. Oke in his study.

417. Dr. Prud'homme provides no evidence that the particles in Mr. Oke's mRNA-1273 heterogeneity study were compositionally altered during fractionation or are in any other way unrepresentative of the starting material. Furthermore, Dr. Prud'homme's conjecture, which he bases on general statements in the literature and retrospective testimony from Moderna fact witnesses that contradict underlying Moderna documents, is unconvincing. Researchers in the field and ███████████ who used ███████████ to fractionate LNPs have found the methods to be

247

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

non-perturbing.  *See supra* ¶¶ 388, 412-413.  Moreover, ███████████████████

████████████████████████████████████████████████████

███████████████              *See* MRNA-GEN-01276328 at -342, -351.006.  Dr. Prud'homme

states that he disagrees with my observation that "each sample exhibited variability in lipid

composition across fractions," and instead opines that "a scientist reviewing the data would

recognize that it is not possible to draw the types of definitive conclusions that Dr. Mitchell

attempts to draw from this data, based on all of the limitations Moderna's scientists and I have

described."  Prud'homme Rep. ¶ 387.  The PowerPoint presentation reporting Mr. Oke's

fractionation data directly contradicts this opinion.███████████████████████

██████████████████ were observed, as depicted below:

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

MRNA-GEN-01276328 at -349.  In fact, the authors of the PowerPoint state that "A

compositional heterogeneity profile was established for the ███ product using ███████████

███████████  MRNA-GEN-01276328 at -351.006.  In addition, the authors of the PowerPoint

noted various trends ██████████████████████████████████████████

██████████████████████████████████████████████

MRNA-GEN-01276328 at -351.006.  These stated conclusions in the PowerPoint undermine Dr.

Prud'homme's opinion regarding the inability to draw conclusions regarding heterogeneity from

Mr. Oke's study.

418.    As described in my Opening Report, Mr. Oke received praise for his PowerPoint

presentation on the mRNA-1273 heterogeneity study, rather than a response (along the lines of

Dr. Prud'homme in his report) that the study was flawed or that the presentation drew

conclusions improperly.  Opening Rep. ¶ 465.  For example, in response to being sent the

presentation, Mr. Schariter stated, "[v]ery good presentation.  It was great to see some

compositional heterogeneity on the mRNA-1273," and he asked Mr. Oke to send the

presentation to Dr. Parsons. MRNA-GEN-01276326 at -326.  As further described in my

Opening Report, Mr. Schariter himself had proposed conducting a similar heterogeneity

fractionation study, confirming that he understood that it *is* possible to draw conclusions

regarding lipid composition heterogeneity from such a study.  Opening Rep. ¶ 471.

419.    In my Opening Report, I opined that "I have not seen any evidence that anyone at

Moderna expressed any contemporaneous skepticism about Mr. Oke's testing, or Moderna's

fractionation testing generally."  Opening Rep. ¶ 472.  Dr. Prud'homme responds by stating that

"[he] do[es] not disagree that the presentation itself may be well put together for an

undergraduate student, the issue is the types of conclusions that Dr. Mitchell is now trying to

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

draw from what the presentation reports." Prud'homme Rep. ¶ 390, n.29. Dr. Prud'homme's

patronizing description of Mr. Oke and his presentation is incorrect. As described above, Mr.

Oke was entering his second year of his Master's degree in Pharmaceutical Sciences. *See supra*

¶ 401. Further, as described above, not only did Mr. Schariter praise the presentation, but he sent

it to Dr. Parsons, Vice President of LNP Process Development at Moderna, *see supra* ¶ 418, and

it appears that Mr. Oke won an award for the work he performed while a co-op with Moderna,

*see supra* ¶ 401. In addition, as discussed above, the "type[]" of conclusion that I draw from the

presentation is the exact type of conclusion that the presentation about "characterizing

compositional heterogeneity of LNPs" was intended to elicit, and is the "type[]" of conclusion

that the presentation itself arrives at. *See supra* ¶ 417; MRNA-GEN-01276328 at -328.

420.    Dr. Prud'homme does not address or dispute these opinions. In addition, I opined

that "Moderna's witnesses' recent criticisms of Moderna's lipid compositional testing are not

driven by concerns regarding the scientific significance of the results obtained," Opening Rep. ¶

472, an opinion which Dr. Prud'homme does not address or dispute.

421.    Dr. Prud'homme opines that Mr. Oke's presentation "contains inconsistent results

from different techniques," Prud'homme Rep. ¶ 388. As explained above, I disagree that there is

inconsistency in the results obtained by Mr. Oke. *See supra* ¶ 387. I am not aware of any

concerns regarding "inconsistent data" raised in the PowerPoint or any other contemporaneous

document, including Mr. Schariter's email about the presentation.

422.    In my Opening Report I opine that that "Dr. Parsons was unable to identify any

particular mistakes made by Mr. Oke in conducting these analyses." Opening Rep. ¶ 472. Dr.

Prud'homme opines that this statement is "not fully accurate" and that "[e]ven if Mr. Oke did not

make an obvious mistake per se, the results he obtained evidence the exploratory, and perhaps

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

questionable, nature of the methods he employs." Prud'homme Rep. ¶ 389. I disagree. That Dr.

Prud'homme and Moderna's fact witnesses express retrospective skepticism about the methods

and results of Mr. Oke's presentation does not negate Dr. Parsons' inability to identify any

particular mistakes made by Mr. Oke and his testimony stating "I don't have any reason, as I

said, to suggest that Mihir's [Mr. Oke's] results were incorrect." Opening Rep. ¶ 472 (citing

Parsons 6/7/2024 Tr. 291:1-17, 293:4-294:21). In addition, other than the above-discussed

purported "inconsistency," Dr. Prud'homme points to nothing in the results of Mr. Oke's study

that "evidence the exploratory, and perhaps questionable, nature of the methods he employs."

To the contrary, the data obtained by Mr. Oke is generally consistent and repeatable across lots,

demonstrating the robustness of the methods he employed. *See* MRNA-GEN-01276328 at -351.

423.    Dr. Prud'homme opines that "the approach Dr. Schuster employs as well as that

which is described in Mr. Oke's presentation, have the potential to alter the composition of the

particles in the composition being tested." Prud'homme Rep. ¶ 390. I disagree. As I have

described at length in this Section and in Section VII.C.2.c of this report, the methods used by

Mr. Oke and Dr. Schuster are generally non-destructive, and the data from both studies provide

evidence of a lack of change in particle composition in the context of the respective studies.

Because Dr. Prud'homme's premise regarding particle change is incorrect, I also disagree with

his conclusion that "the results obtained cannot be reasonably applied to the commercial product,

or generally the composition prior to processing." Prud'homme Rep. ¶ 390.

424.    Dr. Prud'homme further reiterates his opinion that "the purpose of [Mr. Oke's]

experiment was never to quantify heterogeneity across different subsets of a lot." Prud'homme

Rep. ¶ 390. I disagree, including because (a) the stated purpose of Mr. Oke's work was to

"[c]haracteriz[e] the heterogeneity of the ███ product of mRNA-1273," and to do so using 2D

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

compositional analysis, and (b) Mr. Oke's presentation analyzed and drew conclusions regarding heterogeneity of formulation based on mol % across different subsets of the lot. Regardless, the intent or purpose of the presentation is not relevant to the question of what the results of Mr. Oke's analysis demonstrate.

425.    As described in my Opening Report, "Plaintiffs requested various documents related to the [] fractionation study by Mr. Oke, including raw lipid content data, but Moderna has not provided any documents or native / raw data (Excel) files containing the underlying values plotted in the lipid composition graphs." Opening Rep. ¶ 473. Dr. Prud'homme does not dispute this. Because I lacked the lipid composition data underlying Mr. Oke's fractionation study, "I . . . estimated the values using digital software to measure the distance between the data points and the set gridline values," and displayed the estimated values in my Opening Report ¶¶ 473-476. Neither Dr. Prud'homme nor Dr. Fenton opine or provide specific evidence of any error in the methodology or results of Mr. Oke's study, nor do Dr. Prud'homme or Dr. Fenton assert that there was any error in the way in which I obtained the estimated mol % values from the graphs displayed in Mr. Oke's presentation.

426.    Dr. Prud'homme reiterates his speculation that the particles in the study conducted by Mr. Oke's may have changed, which I disagree with for many reasons, including because Mr. Oke's own chromatography results suggest otherwise. *See supra* ¶¶ 376, 385, 390, 412, 417, 423; MRNA-GEN-01276328 at -342, -351.006. Dr. Prud'homme further reiterates his critique that "the processing techniques employed by Mr. Oke [were not] validated" Prud'homme Rep. ¶ 390. The purpose of validation is to demonstrate that a method is fit for its intended use; lack of validation does not mean that a method is inaccurate, imprecise, or otherwise unfit; rather it simply means that the method has not undergone a specific suite of

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

tests, which are often used for a submission to a regulatory agency.  In addition, as described

above, Moderna used the ██████████ fractionation techniques employed by Mr. Oke prior to

his study and demonstrated trust in the methods *e.g.*, by using ████ fractionation to set

"heterogeneity scores" for one of its products and presenting its ████ method to Moderna's

advisory board as well as BARDA and labeling the method as "Developed."  *See supra* ¶¶ 380,

382, 395.  I therefore disagree that the "underlying data" in Mr. Oke's presentation "is not

sufficiently robust to run" an analysis in which I estimate the mol % values obtained across the

various regions (*i.e.*, pooled fractions).  Prud'homme Rep. ¶ 390.

427.    Dr. Prud'homme additionally opines that neither Dr. Schuster nor I "have []

shown that the methods used, let alone the data obtained, are robust enough or representative of

any lot of Moderna's COVID-19 vaccine prior to the fractionation process."  Prud'homme Rep. ¶

390.  I disagree for the reasons described at length in this Section and in Section VII.C.2 of this

report.

428.    Dr. Prud'homme opines that "Moderna['s] use[] [of] an experimental, non-

validated analytical tool to investigate the failed [Catalent] lot is unsurprising," and that "Arbutus

also used ████ fractionation to test failed lots."  Prud'homme Rep. ¶ 391.  Dr. Prud'homme

ignores that Mr. Oke tested two lots that were not "failed" or aborted.  In addition, as I explain at

length above, the failure of a given lot does not equate to compositional changes, especially for

the main population of LNPs.  *See supra* ¶¶ 403-408.  In addition, Dr. Prud'homme's assertion

ignores that Moderna conducted fractionation on numerous occasions and presented ████

fractionation as part of a suite of useful analytical techniques to BARDA, *see supra* ¶¶ 380, 382,

395, 426, as well as described ████ as a part of a suite of "sensitive analytical methods" when

using it to measure biophysical parameters to assess comparability of Phase II/III to Phase I

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

mRNA-1273 formulations, *see supra* ¶¶ 376, 383, 414. Moreover, Arbutus's use of SEC

fractionation to study vial rings does not evidence a perceived deficiency in the method, GENV-

00545993 at -995, GENV-00545996 at -022; rather, its use for such a study demonstrates the

perceived utility of the method. Plaintiffs also used SEC fractionation to study SNALP-protein

interactions, *see* GENV-01073823 (2010 study by Tekmira on 1:57 SNALP binding ApoA4

protein), and cited SEC fractionation to confirm that "a 1:1 siRNA ratio is maintained throughout

the distribution of particle sizes" in its pre-IND questions, *see* GENV-00167565 at -565.

429.    Dr. Prud'homme opines that "none of the other fractionation studies Dr. Mitchell

points to elsewhere in his report are informative of the infringement inquiry for all the reasons I

discuss above and the additional reason that ███████████████████████████████

████████████████████████████ Prud'homme Rep. ¶ 392. I disagree with Dr.

Prud'homme that Moderna's other fractionation studies are irrelevant to the infringement

inquiry. For example, Moderna conducted a fractionation████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *See supra* ¶ 394. In

addition, Dr. Prud'homme never asserts or demonstrates that different LNPs (*e.g.*, LNPs made

with different mRNA payloads, different nucleic acid payloads (siRNA vs mRNA), different

lipid components (MC3 vs SM-102), etc.) exhibit differences in their compositional

heterogeneity or how they should be tested for compositional heterogeneity. At a minimum,

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

████████████████████████████████████████████

███████████████████████

### 2.    Plaintiffs' Fractionation Testing Data Demonstrate Infringement.

430.    As stated in my Opening Report, I understand that "Dr. Schuster and his team at Coriolis Pharma ['Coriolis'] performed ultracentrifugation fractionation studies on samples produced by Moderna" and "subsequently measured the lipid content of both the fractions and unfractionated samples produced [] using LC-CAD to determine their lipid molar ratios." Opening Rep. ¶ 500.  As further stated in my Opening Report, Dr. Schuster and his team at Coriolis "performed other orthogonal characterization including DLS, [] UV nanodrop and NTA to confirm the presence of mRNA-LNPs in each of the fractions."  Opening Rep. ¶ 500.  I reiterate that "I have reviewed the methodologies used by Dr. Schuster and Coriolis to test the samples" as well as [Dr. Schuster's] "LC-CAD method qualification," and I conclude that "[t]he methods employed by Dr. Schuster and Coriolis are highly suitable for the sample testing that was performed."  Opening Rep. ¶ 623.

431.    Dr. Schuster and his team at Coriolis established "system suitability testing ('SST') criteria, which had to be satisfied in order for the data produced from a given LC-CAD run to be considered," and they further "established sample acceptance testing ('SAT') criteria to determine if each sample (native sample and fractionated samples) measurement met stringent standards of accuracy and precision."  Opening Rep. ¶ 500.  This has provided me with "confiden[ce] that only trustworthy, accurate, and precise measurements of mRNA LNP fractions were included" in the reported results.  Opening Rep. ¶ 621.  As stated in my Opening Report, "[t]he ultracentrifugation fractionation testing conducted by Dr. Schuster and his colleagues at Coriolis [] establishes that Moderna's Accused Product infringes the lipid content limitations set forth in the [asserted] claims of the Lipid Composition Patents."  Opening Rep. ¶

255

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

618.

432.    I have reviewed the Reply Report submitted by Dr. Schuster (on behalf of the team he leads at Coriolis) and his accompanying exhibits that addresses various of the critiques raised by Dr. Fenton.  In this section, I will address certain critiques raised by Dr. Fenton and certain others by Dr. Prud'homme.

433.    I understand that Moderna received Dr. Schuster's Opening Report disclosing the methodologies and results of Coriolis's fractionation testing on November 25th, 2024, and that Dr. Fenton and Dr. Prud'homme's responsive reports were submitted to Plaintiffs on February 14, 2025.  In other words, there were roughly 81 days in between when Moderna received Dr. Schuster's Opening Report and when Moderna responded to Dr. Schuster's Opening Report.  I further understand that neither Dr. Fenton nor Dr. Prud'homme, nor any other expert for Moderna, submitted *any* data for sample testing conducted in order to refute the results and findings of the fractionation study or to otherwise support their critiques of Dr. Schuster's sample handling and preparation, methodologies, or results.  As described in Dr. Schuster's report, the entirety of the fractionation testing process can be completed in *four days*.  *See* Schuster Opening Rep. ¶ 44 ("Ultracentrifugation fractionation runs were initiated and completed within a single day (day 0); sample analysis was initiated the day after ultracentrifugation (day 1) and was completed on the same day (day 1) for UV, DLS, and NTA or within three days for LC-CAD (day 3).").  If Moderna wanted to test only a portion of the methodology (*e.g.*, impact of buffer), this could have been done in even less time.  I also understand that Moderna possesses an ultracentrifuge and additionally appears to possess a "spinning bucket" rotor, MRNA-GEN-00842047 at -061, which can be used for preparative centrifugation.  Moderna additionally possesses the equipment required to run LC-CAD, NTA,

256

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

DLS, and UV spectroscopy, among other orthogonal assays. MRNA-GEN-00177803 at -805-06 (Elucidation of Structure). I understand that Moderna also possessed the samples at issue, as Moderna appears to have retained an equivalent number of vials of the samples produced to Plaintiffs. *See*, *e.g.*, 8/14/2024 Ltr. from Noah Frank. Moderna could have easily tested the materials, preparation, methodologies, and results obtained by Dr. Schuster, in order to assess the reliability of his results or the veracity of its experts' criticisms of Dr. Schuster's methods and results. But they failed to do so (or they did run such tests and declined to disclose the results thereof), instead relying entirely on speculative (and incorrect) criticisms about Dr. Schuster's methods.

434. As described in my Opening Report, "[i]t is my understanding that [lot 7016222004] was not tested because the sample testing methodology and qualification used by Dr. Schuster and his team [] were optimized for suitability to the standard 0.10 mg/mL and 0.20 mg/mL unit formulas." Opening Rep. ¶ 498, n.110. As further described in my Opening Report, "the produced samples of 7058823034 had a fill volume of only 0.25 mL per vial," as opposed to the "standard fill volume of 0.50 mL per vial," and that Dr. Schuster did not test this lot because he had an insufficient amount of sample for the "volumes that were required by [Dr. Schuster's] methodologies." Opening Rep. ¶ 498, n.109. Dr. Fenton disagrees that "there are generally two commercial versions of the SPIKEVAX samples," with target mRNA concentrations of 0.2 mg/mL and 0.1 mg/mL, noting that the BLA does include a description of drug product with a target MRNA concentration of 0.05 mg/mL. Fenton Rep. ¶ 81; Prud'homme Rep. ¶ 399. Dr. Fenton therefore opines that he "see[s] no reason why Dr. Schuster did not (or could not have) likewise developed a protocol for testing the 0.05 mg/mL samples." Fenton Rep. ¶ 81; Prud'homme Rep. ¶ 399. As described in my Opening Report, "the 0.05 mg/mL formula []

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

corresponds to the 6 months to 5 years pediatric booster vaccine," Opening Rep. ¶ 498, n.110, and is not the concentration "generally" used. *See also* SPIKEVAX Prescribing Instructions[26] at 1 ("SPIKEVAX is administered as a single 0.5 mL dose."). This is further evidenced by the fact that 67 out of the 69 stipulation lots did not have the reduced target concentration and/or reduced target volume of lots 7016222004 and 7058823034. It would have made little practical sense for Dr. Schuster and his colleagues to develop and qualify a modified version of the testing methodology for just two samples. Additionally, as I opine in my Opening Report, "the mol % distribution" within lots 7016222004 and 7058823034 are "substantially the same as the other lots" within their respective part numbers, Opening Rep. ¶ 498, n.109-10, an assertion which neither Dr. Fenton nor Dr. Prud'homme dispute.

### a.    The Methodologies Used by Dr. Schuster were Proper.

### 1)    Sample Preparation and Handling

435.    Dr. Fenton opines that "the temperature conditions that Dr. Schuster and his colleagues subjected the samples to during sample preparation and testing *could* also affect their composition." Fenton Rep. ¶ 84 (emphasis added). Dr. Fenton provides no evidence (such as testing) for his conjecture that the compositions of the LNPs have been changed due to sample preparation and testing. In addition, as described below, prior to LC-CAD, UV-spectroscopy, DLS, and NTA testing, samples were subjected to room temperature and refrigerated temperature conditions within the amount of time allowed by the SPIKEVAX Prescribing Instructions. *See infra* ¶ 485. In addition, Moderna's documents and witness testimony describe that storage of mRNA-1273 drug product for "for up to 72 hours is acceptable." Opening Rep.

---

[26]    *Highlights of Prescribing Information*, SPIKEVAX, FDA, available at https://www.fda.gov/media/155675/download ("SPIKEVAX Prescribing Instructions"), MRNA-GEN-02689834.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

¶¶ 495-496; Parsons 6/7/2024 Tr. 384:11-19.

436. Dr. Fenton opines that "[i]t is not clear that Dr. Schuster's approach of storing the material at 8°C to 25°C for more than 7 hours and subsequently storing them at 2°C to 8°C at least overnight aligns with the prescribed storage instructions." Fenton Rep. ¶ 84. However, there is nothing in the SPIKEVAX Prescribing Instructions to suggest that refrigeration after room-temperature thaw is improper. In fact, despite repeated instructions not to freeze SPIKEVAX samples after they are thawed, there is no such instruction for refrigeration of SPIKEVAX samples. *See, e.g.*, SPIKEVAX Prescribing Instructions at 2, 43. The SPIKEVAX Prescribing Instructions instruct that thawed syringes be transported at 2°C to 8°C, but do not specify whether the samples had to have been previously thawed in the refrigerator (at 2°C to 8°C) or thawed at room temperature (15°C to 25°C), both of which are allowable thawing conditions. SPIKEVAX Prescribing Instructions at 2, 43. This suggests that it is allowable to refrigerate SPIKEVAX samples at 2°C to 8°C after the samples have already reached room temperature.

437. Dr. Fenton additionally opines that "samples were sometimes mishandled or certain data points were not obtained due to failed experiments," which "calls into question Dr. Schuster's results and conclusions." Fenton Rep. ¶ 121. I disagree. The purported mishandlings and failures Dr. Fenton cites to are highly tenuous, including that the third replicate of the UV spectra for two fractions of one sample and one fraction of a second sample were excluded "due to an implausible result," or occasional glitches in the LC-CAD machine. Dr. Schuster and his colleagues at Coriolis tested roughly 737 samples (10 fractions and one native for 67 lots), with a total of roughly 6,901 LC-CAD injections (samples, standards, and blanks), and roughly 2,211 UV spectra (3 replicates per sample), in addition to other tests performed. Schuster Reply Rep. ¶

259

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

at 20°C using a Beckman ultracentrifuge with a SW41 Ti rotor, *i.e.*, a swinging-bucket rotor[27]).

439.    Dr. Fenton opines that he "do[es] not agree that [UC] is a technique routinely used for the application that Dr. Schuster uses it for in this case."  Fenton Rep. ¶ 69.  However, as described in my Opening Report, "[t]he concept that ultracentrifugation can be used to assay and fractionate subpopulations of lipid-based delivery systems has been known since at least 1989," Opening Rep. ¶ 89, and as Dr. Schuster notes, numerous ultracentrifugation techniques have been used to specifically assess LNP composition.  *See* Schuster Reply Rep. ¶ 13; *see also* Saravolac 2000 at 430 ("The lipid composition of the isolated SPLP was determined by quantitative HPLC.); MRNA-GEN-00842047 at -058.

440.    Dr. Fenton opines that "Dr. Schuster does not explain how separating materials, including particles, by density can be expected to separate them according to their lipid composition," and that "many of the literature references that Dr. Schuster relies on demonstrate either that density correlates factors *other* than lipid composition, or even that there is no correlation between density and lipid composition."  Fenton Rep. ¶ 70; *see also* Fenton Rep. ¶ 71; Prud'homme Rep. ¶ 420 ("[T]he fact that there is no linear correlation between any property tested by Dr. Schuster and fraction number suggests to me that the density separation is not uniquely related to composition.").  I disagree, and statements in Moderna's documents directly contradict this opinion.  For example, in a 2019 document regarding the rationale for selection of the ████████ process, it states that "[a]nother way to characterize the compositional heterogeneity of lipid nanoparticles is to use ultracentrifugation with a density gradient to isolate compositionally different subpopulations."  MRNA-GEN-00842047 at -058.  Moreover, as Dr.

---

[27] *SW 41 Ti Swinging-Bucket Rotor*, BECKMAN COULTER LIFE SCIENCES, available at https://www.beckman.com/centrifuges/rotors/swinging-bucket/331362

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Schuster describes, the literature he cites demonstrates a relationship between LNP composition and density. *See* Schuster Reply Rep. ¶¶ 15-17. In addition, as described in my Opening Report, the results of Dr. Schuster's testing themselves "demonstrate clear trends that repeatably relate density (*i.e.*, fraction number) to lipid content." Opening Rep. ¶ 634. Dr. Fenton disagrees, stating that "looking at the results for the properties Dr. Schuster tested—including, lipid content, lipid molar ratios, particle size, mRNA, and particle count—none of these appear to have a relationship with density." Fenton Rep. ¶ 72. The graphs displayed in my Opening Report speak for themselves and depict clear trends with regard to fraction number and lipid composition. Opening Rep. ¶ 634. For example, it is apparent that SM-102 mol % is generally highest for fractions 4-6 and decreases as the fraction numbers get higher. Opening Rep. ¶ 634. Neither Dr. Prud'homme nor Dr. Fenton opine that the lipid composition is generally the same across all fractions, nor could they. Finally, that other characteristics (*e.g.*, nucleic acid load, size, etc.) can contribute to the variation in particles' density is not relevant to the utility of UC as a technique to fractionate particles for assessment of their lipid composition. That understanding simply would permit use of UC to assess different aspects polydispersity of LNPs.

441.    Dr. Prud'homme opines that "the fact that there is no linear correlation between any property tested by Dr. Schuster and fraction number suggests to me that the density separation is not uniquely related to composition and that differences across LNP properties aside from lipid content in the centrifuged samples has the effect of skewing the aggregate measurement." Prud'homme Rep. ¶ 420. Dr. Prud'homme does not provide any evidence of a "skew[]" in the data, nor does he explain how or in what direction the lipid composition would be skewed as a result of other aspects of the LNPs also being correlated with density. Dr. Prud'homme further opines that "the run-time and speed used are 'on the low end' . . . which

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

likely results it [sic] insufficient resolution." Prud'homme Rep. ¶ 420.  As explained in the previous paragraph, to the extent that I can understand this opinion, I disagree that there is "insufficient resolution" in the data.  Regardless, as stated in my Opening Report, "[t]he reliability and accuracy of Coriolis's test results are further supported by the agreement between the levels of heterogeneity reported by Coriolis and levels of heterogeneity that others in the field have found when conducting fractionation, including Moderna."  Opening Rep. ¶ 641.  Dr. Prud'homme does not address or dispute my opinion regarding the agreement between the levels of heterogeneity found by Coriolis and found by others in the field, including Moderna.

442.    I disagree with Dr. Prud'homme's opinion that "[h]ad there been a true correlation between any of [the measured] properties and density," there would have been "a linear relationship between [] these properties and fraction number."  Prud'homme Rep. ¶ 425.  Dr. Prud'homme further opines that "there is often somewhat of a 'U' shaped pattern to the graphs he presents, as opposed to the expected linear relationship."  Prud'homme Rep. ¶ 426.  As is well known among scientists and mathematicians alike, in addition to linear relationships, there are also non-linear relationships including ones that could be described using a quadratic or more complex polynomial regression.  *See*, *e.g.*, MRNA-GEN-00090607 at -642 (Validation of Analytical Procedures) ("Linearity was demonstrated using a 2nd-order polynomial regression.").  Dr. Prud'homme provides no explanation for why one would "expect" there to be a first order linear relationship between, for example, size and density, rather than a polynomial relationship.  Had there not been a true relationship between lipid composition (as well as size and mRNA concentration) and density, then the plotted graphs of the data would have appeared random.  Using an excerpted example from my Opening Report, lipid composition plainly relates to density and the data are not randomly scattered:

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**





Opening Rep. ¶ 634.  Dr. Prud'homme opines that I "exclude[] fractions 1-3 and fraction 10 in

an attempt to show a cleaner trend."  Prud'homme Rep. ¶ 426.  Dr. Prud'homme blatantly

264

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

ignores my explanation for the exclusion of data from the graphs—"I omitted Fractions 1-3 from these graphs, as those fractions were typically below LOQ.  I have also excluded fraction 10, as this fraction likely contains the meniscus from the UC tube, and is therefore possibly a mix of the most and least dense particles," Opening Rep. ¶ 634—in a meritless attempt to attack the integrity of my data analysis.  To the extent he believes it would have been appropriate to include those data—including data below the limit of quantification—Dr. Prud'homme was more than capable of plotting the test results himself and then providing opinions based on an analysis of his own graphs, but declined to do so.  I note that neither Dr. Prud'homme nor Dr. Fenton assert that there are any errors in the graphs, tables, or calculations used in my Opening Report to analyze Coriolis's testing data.

443.    Dr. Prud'homme opines that "Vaidya specifically notes that the fractionation protocol used did not separate out the LNPs by lipid content," and "[t]hus, even to the extent Dr. Schuster's protocol was comparable to Vaidya's, which it is not, this procedure has been reported not to be appropriate for the specific use for which Dr. Schuster now attempts to employ it for."  Prud'homme Rep. ¶ 417 (emphasis omitted).  Dr. Fenton opines similarly.  Fenton Rep. ¶¶ 70-71.  As Dr. Schuster points out, although the source of lack of statistical significance is unclear (*e.g.*, high SD values), "the graph presented in Figure 5B, D of Vaidya 2024 . . . does appear to visually show differences in the weight percentages of the lipid components when comparing the fractions to one another."  Schuster Reply Rep. ¶ 16.  As Dr. Schuster further notes, "the authors of Vaidya 2024 discuss the relationship of the different 'proportion[s]' of PEG, ionizable lipid, helper lipid, and cholesterol across the parent and fractions on mRNA expression levels," Schuster Reply Rep. ¶ 16, indicating that the authors of Vaidya 2024 recognize the fractions do vary in terms of lipid content.

## HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

444.    Dr. Fenton also critiques the lack of UC sample preparation replicates, opining

that it is "improper" that Dr. Schuster and his colleagues did not "repeat[] [fractionation

processing] more than once for each sample," that "[i]t is generally accepted that one cannot

draw any conclusions from results obtained from an n=1." Fenton Rep. ¶ 53.  Dr. Fenton further

opines that "it [] remains *possible* that something *could* go wrong in a single centrifugation or

mixing run." Fenton Rep. ¶ 53 (emphasis added).  Moderna and/or its experts easily could have

conducted testing to substantiate this criticism.  They either did not do so or did so and did not

include the results of the testing in their reports.  In any event, I disagree with Dr. Fenton's

concerns and agree with Dr. Schuster that it was proper to fractionate one preparation per sample

where there is a total sample size of 67 (n=67).  *See* Schuster Reply Rep. ¶ 11 (citing Blainey

2014[28] at 879-880).  I further disagree with Dr. Fenton that there is a risk that something went

"wrong in a single centrifugation or mixing run" where, as described in my Opening Report,

"[t]he consistency of the trends in the data for each fraction across all of the [67] samples—

including for LC-CAD, UV, DLS, and NTA—strongly suggest that the Spikevax samples tested

were successfully and consistently fractionated . . . in a repeatable manner."  Opening Rep. ¶

633.  Dr. Prud'homme himself concedes that Coriolis's "results are internally consistent."

Prud'homme Rep. ¶¶ 423, 427.

445.    Dr. Fenton and Dr. Prud'homme critique the citation to Vaidya 2024 for the

assertion that UC is a non-destructive technique because Dr. Vaidya and his colleagues used a

different UC methodology than Dr. Schuster and because, unlike Dr. Schuster, they measured the

*in vivo* activity of fractionated samples.  Fenton Rep. ¶ 73; Prud'homme Rep. ¶¶ 415-416.

---

[28] P Blainey et al., *Points of significance: replication* 11(9) NAT METHODS 879-80 (2014)
("Blainey 2014").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

However, as Dr. Schuster notes, the statements in Vaidya 2024 about non-destructiveness are in regard to the UC technique generally, not about the specific method used in the study.  *See* Schuster Reply Rep. ¶ 18.  Moreover, as described below, researchers in the field who have used UC methods very similar to that of Dr. Schuster (including use of $D_2O$ and PBS) often state conclusions that reflect an understanding that the centrifuged LNPs are representative of the starting material.  *See infra* ¶ 448.  In addition, as will be described below, the orthogonal data and ultracentrifugation study data collected by Dr. Schuster and his colleagues and disclosed in Dr. Schuster's Opening Report and Reply Report respectively, provide evidence that the ultracentrifugation is not disturbing or changing the composition of the mRNA-1273 LNPs, which aligns with the field's understanding of ultracentrifugation as a non-destructive technique. *Infra* Section VII.C.2.c.

446.    Dr. Prud'homme opines that "Plaintiffs themselves have internally discussed the effects of processing on particle composition," Prud'homme Rep. ¶ 412, but again, Dr. Prud'homme's generalized statements regarding "processing" are not relevant to the question of whether the testing done by Coriolis changed the composition of the particles, which I maintain it did not, as will be described in further detail below, *see infra* Section VII.C.2.c.  For example, Dr. Prud'homme cites to an email noting that SNALP products are sensitive to vortexing, Prud'homme Rep. ¶ 412 (citing GENV-01030245 at 245), which is an entirely different (and more turbulent) technique than ultracentrifugation.  In addition, the cited document does not discuss composition change.  To the contrary, when discussing ultracentrifugation, Plaintiffs' internal documents demonstrate an understanding that it is a non-destructive method.  *See, e.g.*, GENV-00167565 at -567 (2008 Pre-IND questions, stating that changes in sedimentation during analytical ultracentrifugation between empty and filled SNALPs were "discernable down to 5%

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

empty spike levels.").

447.    Dr. Fenton and Dr. Prud'homme take issue with the solvents used in Dr.

Schuster's UC method, including PBS and $D_2O$, with Dr. Fenton opining that they "*can* change

the composition of LNPs," Fenton Rep. ¶¶ 52 (emphasis added), 82, and Dr. Prud'homme

opining that "the gradient itself will change the density of the LNPs," Prud'homme Rep. ¶ 416.  I

agree with Dr. Schuster's opinion that Dr. Fenton provides no evidence that any of the solvents

used by Dr. Schuster, including $D_2O$ and PBS, are changing the composition of the LNPs and

instead bases his opinion on conjecture.  Schuster Reply Rep. ¶¶ 8-9, 65, 67-68.  I also agree

with Dr. Schuster's opinion that Dr. Prud'homme cites no evidence that $D_2O$ changes the internal

structure, and therefore density, of the LNPs, nor does Dr. Prud'homme assert or provide

evidence that this purported change in density would change the composition of the LNPs or the

results one would obtain from fractionation.  Schuster Reply Rep. ¶ 66.

448.    Moderna's experts could have tested whether $D_2O$ and PBS alter the compositions

of mRNA-1273 LNPs, but it appears that they elected not to do so or did so and did not include

the results of the testing in their expert reports.  As Dr. Schuster explains, many researchers in

the field, ███████████████ have used PBS and $D_2O$ to study LNP systems, including LNP

composition and morphology.  *See* Schuster Reply Rep. ¶¶ 9-10, 18-19, 65.  As Dr. Schuster

further explains, researchers in the field who conduct analyses on LNPs that have been

centrifuged in $D_2O$ and PBS often state conclusions that reflect an understanding that the

centrifuged LNPs are representative of the starting material.  *See* Schuster Reply Rep. ¶¶ 15, 65;

*see*, *e.g.*, Henrickson 2021 at 5071-5072 (noting that their UC method, which utilized $D_2O$ and

PBS, "can be used to provide high-resolution composition information for LNP formulations,"

and "can be used for routine validation of LNP formulations used for important therapeutic

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

applications such as vaccines and gene therapy."); Bepperling 2023 at 393-94 (describing their
AUC method, which used $D_2O$ and PBS, as "exquisitely suited to fulfill [the] role" of providing
"a rigorous characterization of the final product regarding mRNA loading ratio and the absence
of free mRNA.").  Dr. Fenton and Dr. Prud'homme's critiques of the use of PBS are particularly
unconvincing given that PBS is a buffer component that has been used to store Pfizer's
Comirnaty mRNA-LNP vaccines.  *See* Schuster Reply Rep. ¶ 9 (citing Henderson 2021 at I).  It
is implausible that Pfizer would select a buffer that changes the composition of LNPs as the
storage buffer for its vaccine, and the stability of Pfizer's vaccine further suggests that PBS does
not change the composition of the LNPs.  *See*, *e.g.*, Comirnaty Package Leaflet 2023[29] at 5, 13.
Dr. Fenton and Dr. Prudhomme's critiques of the use of $D_2O$ are likewise particularly
unconvincing in light of Moderna's use of $D_2O$ to study its LNPs, including to "Determine [the]
Location of DSPC in LNPs," which would make little sense if the D2O was compositionally
changing the LNPs.  Schuster Reply Rep. ¶ 18.  Further as Dr. Schuster notes, Moderna's data
█████████████████████████████████████████ suggests that its LNPs diluted in $D_2O$
are representative of the starting material.  Schuster Reply Rep. ¶ 18.

449.    Dr. Fenton also critiques the "dilution volumes" and "amount of $D_2O$" that Dr.
Schuster uses, asserting that "$D_2O$ *can* change the properties of the materials being studied," and
that "adding too much [$D_2O$] . . . *can* sacrifice precision."  Fenton Rep. ¶¶ 82-83 (emphasis
added).  Dr. Fenton again provides no evidence, including testing results, for his conjecture that
the amount of PBS or $D_2O$ used by Dr. Schuster altered the composition of the LNPs within the
samples or otherwise impacted the test results.  Moreover, as Dr. Schuster notes, a wide range of

---

[29] *Pfizer-BioNTech/Comirnaty 30 micrograms/dose concentrate for dispersion for injection
COVID-19 mRNA Vaccine (nucleoside modified) tozinameran*, Package leaflet (2023), available
at https://labeling.pfizer.com/ShowLabeling.aspx?id=15502 ("Comirnaty Package Leaflet 2023").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

dilution volumes are used in the literature, *see* Schuster Reply Rep. ¶ 65, and there is nothing inconsistent or improper about the dilution volume used by Dr. Schuster. As it pertains to the amount of $D_2O$ used, I agree with Dr. Schuster that his team's use of 25% v/v $D_2O$ (prior to further UC dilution in PBS) aligns with the approach taken by other researchers. *See* Schuster Reply Rep. ¶ 65. In addition, Dr. Fenton's citations regarding $D_2O$ and precision are irrelevant, as the cited quotes are about a specific type of analysis that is not used by Dr. Schuster (density-matching experiments). *See* Schuster Reply Rep. ¶ 69.

450.    An additional aspect of Dr. Schuster's method that Dr. Fenton critiques are the "temperature conditions that Dr. Schuster and his colleagues subjected the samples to during sample preparation and testing," opining that these temperature conditions "*could* affect their composition." Fenton Rep. ¶ 84 (emphasis added). Dr. Fenton again provides no evidence, including no testing results, to support his conjecture. Moreover, as Dr. Schuster notes, samples were at room temperature for sample preparation and UC for *at most* ten hours, which is less than the twelve hours allowed at room temperature permitted in the Prescribing Information. Schuster Reply Rep. ¶ 70. In addition, the samples were stored at 2-8 °C for three days, which is significantly less than the 60 days allowed for in the Prescribing Information, and there is nothing in the Prescribing Information to suggest that samples cannot be refrigerated after thaw (rather, samples merely are prohibited from being re-frozen). Schuster Reply Rep. ¶ 70. Dr. Prud'homme opines that "the prescribing information for Moderna's COVID-19 vaccine does not allow for storage at room temperature for hours, followed by refrigeration, and then back to room temperature," Prud'homme Rep. ¶ 408, yet he does not point to any language in the prescribing information that indicates this supposed restriction. If anything, the prescribing instructions that samples are to be transported at 2°C to 8°C if thawed—without specifying that

270

## HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

the samples had to have been thawed at the allowed refrigerator (2°C-8°C) thaw conditions rather than the allowed room temperature (15°C-25°C) thaw conditions—indicates that, contrary to Dr. Prud'homme's opinion, samples can in fact be refrigerated after being at room-temperature, and then later can be brought to room temperature again. SPIKEVAX Prescribing Information at 2, 43. Finally, as Dr. Schuster notes, and as I describe in my own Opening Report, it is common in the field to conduct UC at room temperature. Schuster Reply Rep. ¶ 65; Opening Rep. ¶ 624. Neither Dr. Fenton nor Dr. Prud'homme refute this statement.

### 3)    LC-CAD

451.    As described in my Opening Report, "[t]he most commonly used method in the field for measuring lipid composition is liquid chromatography." Opening Rep. ¶ 80. As further explained in my Opening Report, liquid chromatography "was a well-established technique for measuring the composition of LNPs at the time of the inventions and remains a well-established technique to this day," Opening Rep. ¶ 80, an assertion which Dr. Prud'homme does not dispute. As Dr. Prud'homme notes, "in Tekmira's regulatory filings, they used HPLC-based methods to perform clinical trial testing of their lipid content of ONPATTRO." Prud'homme Rep. ¶ 431.

452.    As explained in my Opening Report, "LC-CAD methods vary in the precise mobile phases and other parameters used, as each method needs to be optimized for the sample type, equipment, etc., but methods with different mobile phases and parameters can be equivalently precise and accurate, so long as the method passes appropriate qualification testing." Opening Rep. ¶ 629; *see also, e.g.*, USP Draft Guidelines 2024[30] at 39 (method parameters for "Content Determination of Lipids by RP-UPLC-CAD" of mRNA Vaccines,

---

[30] United States Pharmacopeia (USP), *Analytical Procedures for Quality of mRNA Vaccines and Therapeutics*, Draft Guidelines 3rd Edition (2024) ("USP Draft Guidelines").

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

stating, "NOTE—Alternative method settings can be applied, if justified and validated for intended use."); *see also* ICH Q2(R2) Guideline 2023[31] at 2 ("If successfully executed, the analytical procedure validation strategy will demonstrate that the analytical procedure is fit for the intended purpose."); Chaudhary 2023[32] at 529 ("HPLC-CAD is more rapid and precise than conventional analytical techniques, and it is also exceptionally compatible with a wide range of mobile phases and columns."). In fact, ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████. *Compare* MRNA-GEN-01424191 (SOP-1001), *with* Chem-Method-45.[33] That does not indicate that either method was unreliable; on the contrary, both validated methods are reliable, despite using different parameters.

453.    Dr. Fenton and Dr. Prud'homme do not address or dispute my assertion regarding different methods and parameters being capable of producing equivalently precise and accurate results if properly qualified, Opening Rep. ¶ 629. Nevertheless, Dr. Fenton and Dr. Prud'homme inexplicably opine that "the differences in Dr. Schuster's protocol," as compared to Moderna's LC-CAD protocol, "render [Dr. Schuster's] analysis deficient," Fenton Rep. ¶ 55; *see also* Prud'homme Rep. ¶ 422. Neither Dr. Prud'homme nor Dr. Fenton provide any actual evidence of an alleged deficiency in Dr. Schuster's LC-CAD method. To the contrary, as I described in my Opening Report, "Coriolis's qualification of its method was thorough and covered all

---

[31] Opening Rep. ¶¶ 453-455 (describing Moderna's shift to SOP-1001 in October 2020, which was used to create the underlying data for COAs submitted to the FDA).

[32] Chaudhary et al., *Application of HPLC-CAD in Pharmaceutical Analysis*, 13(6) INT'L J. FOR ADVANCED RSCH IN SCI. & TECH. 527-538 (2023) ("Chaudhary 2023").

[33] Chem-Method 45, *Identification and Quantitation of PEG 2000 DMG, Cholesterol, SM-102 and DSPC in Moderna Vaccine*, v2 AUSTRALIAN GOVERNMENT DEPARTMENT OF HEALTH AND AGED CARE THERAPEUTIC GOODS ADMINISTRATION (2021) ("Chem-Method-45").

essential parameters, including linearity, specificity, accuracy, and precision. The method qualification assays produced results, including $R^2$, S/N, RSD%, and %difference values that fit well within acceptance criteria used in the field. This demonstrates that Coriolis's method accurately and reliably can determine the amount of lipid in Moderna's samples." Opening Rep. ¶ 629. I therefore disagree with Dr. Fenton that the differences between Dr. Schuster's LC-CAD method and Moderna's LC-CAD method (SOP-1001) "renders [Dr. Schuster's] analysis deficient."

454.     Dr. Fenton critiques the various differences between Moderna's SOP-1001 and the LC-CAD method described in Dr. Schuster's Opening Report, *see* Fenton Rep. ¶¶ 56-64, and notes that the differences "*may* impact the accuracy of results," and that "[t]he sheer number of differences . . . makes it all the more *likely* that some skew of the data is occurring." Fenton Rep. ¶ 63 (emphasis added); *see also* Fenton Rep. ¶ 64; Prud'homme Rep. ¶ 422 (noting that "many aspects of Dr. Schuster's protocol are in fact not consistent with Moderna's LC-CAD methodology."). As stated earlier and described in my Opening Report, it is well understood that different analytical methods, including LC-CAD for the measurement of lipid composition, can be accurate, precise, and fit for its intended purpose, so long as the methods have been properly validated. *See supra* ¶ 452. Dr. Schuster's qualification assays "demonstrate[] that Coriolis's method" is fit for the intended purpose, *i.e.*, Dr. Schuster's method can "accurately and reliably [] determine the amount of lipid in Moderna's samples," Opening Rep. ¶ 629; therefore, each aspect of Dr. Schuster's qualified method, including the aspects that Dr. Fenton identifies and critiques as different, are in fact proper for use and pose minimal risk to accuracy or "skew." The mere fact that different methods use different parameters does not suggest a lack of accuracy or skew, and Dr. Fenton again bases his opinion on conjecture rather than evidence. Dr. Fenton

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

does not even explain the direction of the purported "skew," or how the particular differences between the methods would contribute to said purported skew.  Fenton Rep. ¶ 61.  Moreover, I again note that neither Dr. Fenton nor Dr. Prud'homme submitted any testing to support their conjecture on these issues.

455.    As explained in Dr. Schuster's report, some of the "differences" listed by Dr. Fenton, such as the needle wash formulation and instructions for peak integration, are actually the same between Moderna's SOP-1001 and Dr. Schuster's LC-CAD method.  *See* Schuster Reply Rep. ¶ 38.  As Dr. Schuster further explains, the remaining differences identified by Dr. Fenton are parameters that commonly vary across methods.  *See* Schuster Reply Rep. ¶¶ 39-43. For example, as Dr. Schuster notes, Moderna's LC-CAD methodology for lipid content measurement that is submitted to Australia's Department of Health uses different mobile phases than those used in Moderna's SOP-1001.  *See* Schuster Reply Rep. ¶ 39.

456.    Dr. Fenton also raises concerns that some parameters which are labeled as "do not" or "cannot . . . substitute" in Moderna's SOP-1001 are different in Dr. Schuster's LC-CAD method.  Fenton Rep. ¶ 56.  However, as Dr. Schuster explains, such instructions in analytical chemistry typically mean that certain parameters cannot be changed for a given method without requiring re-validation of the method, not that different validated methods cannot use different parameters.  Schuster Reply Rep. ¶ 41; *see*, *e.g.*, ICH Q2(R2) Guideline 2023 at 4 ("Changes may be required during the lifecycle of a validated analytical procedure.  In such cases, partial or full *revalidation* may be required."); USP Draft Guidelines 2024 at 39.  Moreover, Dr. Fenton again provides no evidence that the purportedly critical differences between Moderna's SOP-1001 and Dr. Schuster's method (*e.g.*, LC-CAD system, standards, and column) are producing inaccurate or imprecise results, and to the contrary, the method qualification assay demonstrates

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

that each of these pieces of equipment and materials were capable of producing precise and accurate results fit for the intended purpose of the method. Opening Rep. ¶ 629. Moderna and its experts could have submitted testing demonstrating that the changes they identify in fact have a substantial effect on the molar ratio results obtained, but they either chose not to conduct such testing or conducted testing and did not include the results in their reports.

457.    The purportedly critical differences between Moderna's SOP-1001 and Dr. Schuster's LC-CAD method are parameters that frequently differ across LC-CAD methods, and the parameters selected by Dr. Schuster align with what is used in the field. Opening Rep. ¶ 628; Schuster Reply Rep. ¶¶ 39-43. Dr. Prud'homme opines that I "cite[] no support for [my] statement that 'The LC-CAD technique and parameters used by Coriolis are typical of what is reported in the literature.'" Prud'homme Rep. ¶ 422 (citing my Opening Rep. ¶ 628). I note that Dr. Prud'homme does not point to any techniques or parameters in Dr. Schuster's report that were not standard in the literature, and I maintain that the techniques he used were typical, as is apparent from the documents cited in my Opening Report. *See, e.g.*, Vehovec 2010 at 1551 (describing use of water, ammonium acetate, and acetonitrile in the mobile phase); Kinsey 2022[34] at 1092-1093 (describing use of methanol in the mobile phase; use of a C18, 2.1x150 mm column); MRNA-GEN-00105506 at -512 (describing needle wash formulation 0.1% Formic Acid/ 75% IPA/ 25% Water), -523 (instructing use of Thermo Scientific Vanquish UHPLC or equivalent and injection volumes of 10 μL and 20 μL depending on the sample concentration). I understand that Dr. Schuster addresses this issue in more detail in his report. *See*, *e.g.*, Schuster Reply Rep. Section III.A.2.

_____

[34] Caleb Kinsey et al., *Determination of Lipid Content and Stability in Lipid Nanoparticles Using Ultra High-Performance Liquid Chromatography in Combination with a Corona Charged Aerosol Detector*, 43 ELECTROPHORESIS 1091 (2022) ("Kinsey 2022").

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

458.    Dr. Fenton opines that "Dr. Schuster . . . decided to use a different protocol
without first validating this new protocol by showing that it provides molar ratios that are
consistent with the molar ratios obtained by following SOP-1001." Fenton Rep. ¶ 64; *see also*
Prud'homme Rep. ¶ 422 ("I likewise find it surprising that Dr. Schuster did not rely on the
validated protocol developed by Moderna for this very technique—despite having access to it—
without any justification for the deviations he made nor any demonstration of equivalence.").
Neither Dr. Fenton nor Dr. Prud'homme opine or provide any evidence that the lipid content
values obtained from Dr. Schuster's method are inconsistent with those obtained from
Moderna's SOP-1001. Additionally, as stated in my Opening Report, "Coriolis's qualification of
its method was thorough and covered all essential parameters, including linearity, specificity,
accuracy, and precision." Opening Rep. ¶ 629. Neither Dr. Fenton nor Dr. Prud'homme address
or dispute this statement.

459.    The qualification testing conducted by Dr. Schuster aligns with validation
guidelines followed in the field and used for regulatory submissions, guidelines which do not
require the comparison of results from different methods, as Dr. Fenton and Dr. Prud'homme
suggest should have been done. *See generally* ICH Q2(R2) Guidelines 2023. I agree with Dr.
Schuster's statement in his Opening Report that "companies *often use their own distinct methods*
(or hire outside companies such as Coriolis with their own distinct methods) to" "comply with
regulations (e.g., FDA, EMA, etc.) that require the companies to provide data documenting the . .
. content of their drugs." Schuster Opening Rep. ¶ 16 (emphasis added). As noted above, even
Moderna appears to have used two different LC-CAD methods, SOP-1001 and Chem-method-45
to submit data to two different agencies (FDA and Australian Government Department of Health
and Aged Care, respectively). *See supra* ¶ 452. Many laboratories use their own HPLC

276

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

methods, *see* Schuster Reply Rep. ¶ 25.  I therefore disagree with any insinuation that it was improper or out of the ordinary that Coriolis did not replicate the LC-CAD method described in Moderna's SOP-1001.

460.    Dr. Prud'homme "disagree[s] that Dr. Schuster's method is precise, at least based on the operator error identified by Dr. Fenton."  Prud'homme Rep. ¶ 424.  As Dr. Schuster notes, Dr. Fenton misconstrued the criteria of acceptance (for % difference) for the intermediate precision assay with the results actually obtained, *see* Schuster Reply Rep. ¶ 52, and Dr. Prud'homme appears to be basing his opinions off of this misinterpretation by Dr. Fenton.  The actual % differences between operators obtained in the intermediate precision qualification assay were significantly lower than the criteria of acceptance, and the % difference as measured by mol % was even lower still.  *See* Schuster Reply Rep. ¶ 52.  In addition, as Dr. Schuster further explains, the criteria of acceptance for intermediate precision used by Dr. Schuster is the same as that used by Moderna.  *See* Schuster Reply Rep. ¶ 52.  I therefore reiterate my opinion that "[t]he method qualification assays produced results . . . that fit well within acceptance criteria used in the field," and "demonstrate[d] that Coriolis's method accurately and reliably can determine the amount of lipid in Moderna's samples."  Opening Rep. ¶ 629.  Aside from the misinterpretation of the intermediate precision assay, neither Dr. Fenton nor Dr. Prud'homme otherwise assert that the acceptance criteria, results, or tests used for Dr. Schuster's qualification assays are misaligned with what is accepted in the field or are otherwise deficient.  Moreover, neither Dr. Fenton nor Dr. Prud'homme assert that the acceptance criteria, results, or tests selected for the system suitability testing (SST) or sample acceptance testing (SAT) used by Dr. Schuster were in any way deficient.

461.    Finally, Dr. Fenton takes issue with the manual peak integration method used by

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Dr. Schuster opining that "by excluding a portion of the area under the curve for PEG, the resulting mol% PEG is therefore underestimated . . . [and] each of the other three lipids, including SM-102 [is overestimated]." Fenton Rep. ¶ 120. Both Moderna's SOP-1001 and Dr. Schuster's LC-CAD method instruct manual adjustment of automatic peak boundaries where warranted in order to establish more accurate boundaries. *See supra* ¶ 455; Schuster Reply Rep. ¶ 44. Moreover, as Dr. Schuster demonstrates (a) manual peak integration has a negligible impact on molar ratio results and (b) if anything, Dr. Schuster's manual integration of the PEG-peak increases the mol % of PEG2000-DMG and decreases the mol % of SM-102, which makes infringement *less* likely and directly undermines Dr. Fenton's conjecture-based criticism. Schuster Reply Rep. ¶ 48.

### 4)    UV Spectroscopy

462.    Dr. Fenton opines that he "would not consider Dr. Schuster's data to be a representative or at all quantitative measure of mRNA," because "the data was manipulated to correct for the scattering signal of the particles." Fenton Rep. ¶ 76. I disagree. As explained by Dr. Schuster, scatter correction is the recommended approach for mRNA detection by UV spectroscopy in mRNA-LNP samples, and as further explained by Dr. Schuster, he and his colleagues established linearity using the scatter-corrected approach, demonstrating a good correlation between RNA concentration and corrected signal output. *See* Schuster Reply Rep. ¶ 60. Dr. Fenton further opines that the UV spectroscopy "may be measuring free mRNA," but as Dr. Schuster notes, the proportion of free mRNA in Moderna's drug product is very low, and most fractions would be expected to contain minimal (if any) free mRNA due to the difference in density between nucleic acid and lipid particles encapsulating nucleic acid. *See* Schuster Reply Rep. ¶ 58.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

   b.  **Expired Samples Produce Results Representative of the Samples Pre-Expiry.**

463. As described in my Opening Report, I disagree with Moderna's position that "any samples of expired drug product are not representative of the non-expired drug product." Opening Rep. ¶ 642.  As I describe throughout this section, Dr. Fenton and Dr. Prud'homme offer opinions about lack of representativeness, *see*, *e.g.*, Fenton Rep. ¶ 91; Prud'homme Rep. ¶ 394, without addressing or refuting many of the opinions or supportive documents discussed in my Opening Report.  In addition, neither Dr. Prud'homme nor Dr. Fenton submit testing evidence demonstrating that the expired samples tested by Dr. Schuster and his colleagues are unrepresentative of unexpired samples, despite Moderna's reservation for itself of vials of samples produced pursuant to the Sample Stipulation.  *See e.g.*, 5/2/2024 Letter from A. Afinogenova, Appendix A; 8/14/2024 Letter from N. Frank.  Moderna routinely conducts stability testing, *see*, *e.g.*, Opening Rep. ¶¶ 495, 644, and could have easily conducted even a subset of its stability tests on any of the expired samples tested by Dr. Schuster.  Instead, Dr. Fenton and Dr. Prud'homme again largely rely on conjecture to argue that the expired samples tested by Dr. Schuster are not representative of unexpired samples.  For the reasons described in this section, expired drug product samples of Moderna's COVID-19 vaccine, including the expired samples tested by Coriolis, *are* representative of the non-expired drug product.

464. Dr. Fenton concedes that Moderna "produc[ed] expired lots of Moderna's COVID-19 vaccine due to the unavailability of unexpired product from certain part numbers." Fenton Rep. ¶ 91.  Dr. Fenton further acknowledges that Plaintiffs had requested samples long before Moderna produced samples of mRNA-1273 drug product to Plaintiffs.  Fenton Rep. ¶ 92; Opening Rep. ¶ 643.  In addition, Dr. Prud'homme concedes that "Plaintiffs wrote to the Court, asking the Court to enter a scheduling order or to schedule a Rule 16 conference, which I

279

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

understand would effectively kick-off discovery," which would have included production of samples, but that Moderna "ask[ed] the Court to deny Plaintiffs' requests."  Prud'homme Rep. ¶ 395.

465.    Dr. Prud'homme cites a portion of Moderna's regulatory filings in which the company proposes a shelf life of 10 months for the COVID-19 vaccine drug product at the recommended storage condition of -15°C to -25°C.  Prud'homme Rep. ¶ 393.  As stated in my Opening Report, "Dr. Parsons, Moderna's corporate designee on 'the shelf-life of the Accused Product,' testified in June 2024 that the shelf life of Moderna's COVID-19 drug product was 12 months, and various documents by Moderna suggest that this is the shelf life as well. Nevertheless, Moderna's latest FDA documents and correspondences provided to Plaintiffs suggest that at least some of the drug product may have a 10-month shelf life."  Opening Rep. ¶ 488, n.104 (citations omitted).  The samples tested by Coriolis have various shelf-lives, including lots with 10-month expiry, *see*, *e.g.*, MRNA-GEN-00467460 (COA for sample with CMO lot number 048D22A and Coriolis sample testing number B-9), and lots with 12-month expiry, *see*, *e.g.*, MRNA-GEN-01551940 (COA for sample with CMO lot number 013H23A and Coriolis sample testing number A-5).  Moreover, Moderna itself has represented to the European Medicines Agency that "the shelf-life (re-test period) is 24 months when stored from -15°C to -25°C and this is acceptable."  MRNA-GEN-02407201 at -252.

466.    Dr. Prud'homme opines that "[c]ompanies spend significant resources to determine the appropriate expiration date for their products, and there is no guarantee that after this date, the material has not changed in some significant way."  Prud'homme Rep. ¶ 394.  My understanding is that many, if not all, companies including Moderna set overly conservative expiration dates, such that if the drug product does "change[] in some significant way," this

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

would occur after the drug product has already been expired for some time.  For example, in Moderna's own stability testing that it conducted for the FDA to support its shelf-life determination, the company explained that "[e]stimating the degradation rate after removing the lots with slower degradation provides a conservative degradation rate estimate using all representative data, as lots with the worst-case individual degradation rates are used for modeling. This leads to a conservative and representative estimate of shelf life."  MRNA-GEN-01001887 at -902.  The conservative nature of expiry dates is illustrated by Moderna's extension of the expiry of various of its lots of COVID-19 drug product.  *See e.g.*, MRNA-GEN-01355241.

467.    In addition, as described in my Opening Report and in more detail below, Moderna has found that lipid content is "not stability indicating," because "no trend was observed for these attributes at any storage temperature."  Opening Rep. ¶ 494 (citing MRNA-GEN-01001887 at -891-92).  Rather, "mRNA Purity is the shelf-life-limiting attribute of mRNA-1273 DP and variants," Opening Rep. ¶ 489 (citing MRNA-GEN-01001887 at -891), meaning that the expiration date that Moderna purportedly "spen[t] significant resources to determine," has nothing do with LNP composition changes or LNP degradation.  I therefore disagree that the composition of the LNPs in Moderna's COVID-19 drug product stored at -20°C would be expected to "change[] in some significant way" after expiry.

468.    Dr. Prud'homme opines that notwithstanding mRNA purity being the shelf-life-limiting attribute, "there are many ways in which the lipids can and do degrade, including through interactions with the mRNA, which is 'first to go.'"  Prud'homme Rep. ¶ 402.  However, as described in my Opening Report, ████████████████

████████████████████████████

████████████████████████    Opening Rep. ¶

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

493.  Dr. Prud'homme does not address or dispute this evidence.

469.    Dr. Prud'homme notes that "9 out of the 61 samples expired in 2021, in some instances ***more than 3 years before*** they were tested by Dr. Schuster."  Prud'homme Rep. ¶ 397 (emphasis in original).  However, as described in my Opening Report, Moderna represented to the European Medicines Agency (EMA) that "[s]tability data for three batches [of mRNA-1273 drug product] stored at -20°C for 36 months" showed "[n]o negative trends" and that "[f]rom the information provided with the specification it is concluded that the shelf-life (re-test period) is 24 months when stored from -15°C to -25°C and this is acceptable."  Opening Rep. ¶ 495 (citing MRNA-GEN-02407201 at -251).  Dr. Prud'homme opines that "Dr. Mitchell points to no evidence from which he can conclude that samples beyond 24 months nonetheless stay within specification."  Prud'homme Rep, ¶ 405.  Dr. Prud'homme does not address or dispute my citation of the statements made by Moderna to a regulatory body (*i.e.*, the EMA) regarding the lack of negative trends in its lots stored at -20°C for 36 months, discussed above.  In addition, as described in my Opening Report, there is "consistency of lipid composition (mol %) across samples for a given fraction"; the lack of lipid mol % outliers, particularly for fractions 5 and 6, demonstrate that even in these oldest samples, the composition of particles has remained unchanged.  Opening Rep. ¶ 634.  The fact that the results aligned for the unexpired samples and the expired samples (a group which comprised recently and longer expired batches), *see*, *e.g.*, Opening Rep. ¶ 646, is powerful evidence that expiration and the passage of time did not appreciably change the results with respect to molar ratios of the lipids, especially in the fractions at issue.

470.    Dr. Schuster and his colleagues' data align with Moderna's own results.  As described in my Opening Report in paragraph 494, in a study of samples at various storage

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

conditions over time (including data collected at 24 months post-manufacture), ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████    Opening Rep. ¶

494 (citing MRNA-GEN-01001887 at -891-92, -974).  Dr. Fenton does not address or dispute

this evidence and does not list the main document cited in my Opening Report for this assertion,

MRNA-GEN-01001887, in his materials considered.  Dr. Prud'homme cites MRNA-GEN-

01001887 in his report once, in paragraph 402, to assert that "Dr. Mitchell attempts to argue that

lipid content does not change over time, but I do not find his points persuasive and, in fact, the

evidence points to the opposite conclusion."  Dr. Prud'homme does not specify what "evidence

points to the opposite conclusion," especially given that I was quoting Moderna's own analysis

of its data.  Opening Rep. ¶ 494.

471.    Dr. Fenton opines that "Moderna has reported how the degradation of the mRNA

in mRNA-LNPs could lead to adducts between mRNA and the lipids, thus *potentially* changing

the molar ratio of lipids as measured by LC-CAD."  Fenton Rep. ¶ 93 (emphasis added).  Dr.

Prud'homme opines similarly.  Prud'homme Rep. ¶ 402.  As previously stated, Dr. Fenton rests

his opinion on conjecture rather than evidence that Moderna could have easily obtained by

performing testing.  The paper cited by Dr. Fenton, Packer 2021[35], does not test or discuss

whether the lipid composition or molar ratio of particles is changing as a result of the formation

of lipid-mRNA adducts.  In addition, the authors of Packer 2021 conclude that the lipid-mRNA

adduct formation "reactions are driven by impurities of the ionizable lipid rather than chemical

---

[35] Meredith Packer et al., *A novel mechanism for the loss of mRNA activity in lipid nanoparticle
delivery systems*, 12 NATURE COMMUNICATIONS (2021) ("Packer 2021"), MRNA-GEN-02689119.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

reactivity of the lipid itself," Packer 2021 at 4. As described in my Opening Report, ¶ 493-494, "[a]t lower temperatures, including at Moderna's long-term storage temperature of -20°C, Moderna found no change in total lipid impurities over time," nor did Moderna find a change in lipid content over time, all of which would be highly unlikely if lipid-mRNA adducts were impacting the composition of the LNPs (either via lipid degradation or covalently bonding to the lipids). Dr. Prud'homme disagrees that "Moderna [] has not observed any trends that would evidence degradation of the lipids over time under the prescribed storage conditions for its COVID-19 vaccine," and opines that "Moderna's internal documents show quite the opposite." Prud'homme Rep. ¶ 403. Dr. Prud'homme's opinion is in direct disagreement with Moderna report DPAD-00880, *see* MRNA-GEN-00199343 at -500 ███████████████████████████ ████████████████████████████████████ a report that appears to have been provided to the FDA to address this very issue of stability over time, MRNA-GEN-01416554 at -554-55 (Response to FDA) ██████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████

472.    Dr. Prud'homme cites to an internal Protiva PowerPoint to opine that "Plaintiffs' own internal data shows that particles change over time, including with respect to the molar ratios of the lipids." Prud'homme Rep. ¶ 407. Dr. Prud'homme excerpts the below image to support his opinion:

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**



Lipid Mol% at 6M

| 5C | Chol. Mol% | PEG-C-DMA Mol% | DSPC Mol% | DLinDMA Mol% |
|---|---|---|---|---|
| expected | 48 | 2 | 20 | 30 |
| 159-050704-01 | 51.8 | 2.2 | 20.5 | 25.5 |
| 159-050704-02 | 51.8 | 2.2 | 20.5 | 25.5 |
| 159-050704-03 | 52.35 | 2.3 | 20.1 | 25.35 |
| 159-050704-04 | 51.55 | 2.2 | 20.6 | 25.7 |
| 159-050704-05 | 51.5 | 2.2 | 20.6 | 25.8 |

| 25C | Chol. Mol% | PEG-C-DMA Mol% | DSPC Mol% | DLinDMA Mol% |
|---|---|---|---|---|
| 159-050704-01 | 53.1 | 2.3 | 18.9 | 25.9 |
| 159-050704-02 | 52.3 | 2.2 | 19.5 | 26.1 |
| 159-050704-03 | 54.0 | 2.3 | 19.4 | 24.6 |
| 159-050704-04 | 52.3 | 2.2 | 19.7 | 25.9 |
| 159-050704-05 | 52.6 | 2.2 | 19.5 | 25.9 |

PROTIVA

GENV-00176738 at -747. Each of the samples displayed on the slide were manufactured 6 months prior to the data measurement of lipid content. GENV-00176738 at -739. Dr. Prud'homme attributes the lots' deviation from their "expected" mol % values to changes in composition over time; but it appears that the lot at issue, 159-050704, had an original lipid composition closely aligned with the values measured at 6 months. For example, here is the lipid content of sample 159-050704-05 over time, with highlighting added to demonstrate the close alignment between the initial lipid composition and the 6-month composition:

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

| 159-050704-05 at 5°C | Specification | Time Point in Weeks | | | | Months |
|---|---|---|---|---|---|---|
| | | Release | 2 | 4 | 8 | 6M |
| Appearance | Homogeneous, Opalescent Suspension | Pass | Pass | Pass | Pass | Pass |
| Particle Size | < 200 nm | 133 | 132 | 138 | 135 | 137 |
| Cholesterol | 48.0 ± 10.0 mol% | 51.2 | 50.7 | 50.3 | 50.4 | 51.5 |
| PEG-C-DMA | 2.0 ± 1.0 mol% | 2.0 | 2.0 | 2.0 | 2.1 | 2.2 |
| DSPC | 20.0 ± 5.0 mol% | 21.1 | 21.2 | 21.6 | 21.4 | 20.6 |
| DLinDMA | 30.0 ± 10.0 mol% | 25.8 | 26.1 | 26.0 | 26.1 | 25.8 |
| RNA Content | 1.0 ± 0.2 mg/mL | 0.97 | 0.91 | 0.92 | 0.90 | 1.00 |
| Encapsulation | ≥ 80% | 91 | 100 | 100 | 99 | 98 |
| RNA Degradation | ≥ 85% Duplex | 95 | 95 | 95 | 95 | 97 |

| 159-050704-05 at 25°C | Specification | Time Point in Weeks | | | | Months |
|---|---|---|---|---|---|---|
| | | Release | 2 | 4 | 8 | 6M |
| Appearance | Homogeneous, Opalescent Suspension | Pass | Pass | Pass | Pass | Pass |
| Particle Size | < 200 nm | 133 | 139 | 138 | 135 | 138 |
| Cholesterol | 48.0 ± 10.0 mol% | 51.2 | 50.7 | 50.5 | 50.6 | 52.6 |
| PEG-C-DMA | 2.0 ± 1.0 mol% | 2.0 | 2.1 | 2.0 | 2.1 | 2.2 |
| DSPC | 20.0 ± 5.0 mol% | 21.1 | 20.9 | 21.2 | 21.0 | 19.5 |
| DLinDMA | 30.0 ± 10.0 mol% | 25.8 | 26.3 | 26.3 | 26.2 | 25.9 |
| RNA Content | 1.0 ± 0.2 mg/mL | 0.97 | 0.87 | 0.94 | 0.89 | 1.03 |
| Encapsulation | ≥ 80% | 91 | 100 | 99 | 99 | 91 |
| RNA Degradation | ≥ 85% Duplex | 95 | 95 | 95 | 96 | 97 |

GENV-00176738 at -745. To the extent that the slide excerpted by Dr. Prud'homme demonstrates anything, it further confirms that his opinion regarding "inputs as [] provid[ing] the best measure of the composition of the formed particles" is incorrect. Prud'homme Rep. ¶ 357. Moreover, to the extent that any of the samples in Plaintiffs' slide do change lipid composition over time, I disagree that data regarding lipid composition after 6-months of storage at 25 °C and 5 °C of a different product to be relevant to the question of whether expired lots of Moderna's COVID-19 vaccine stored at -20 °C are representative of the commercial product. I similarly do not understand Dr. Yaworski's testimony regarding the lipid composition of formulations made using the 2:40 formulation and exposed to accelerated stability conditions to be relevant to the question here of representativeness.

473.    In addition, Packer 2021 notes that lipid-mRNA adduct formation was "only observed in preparations with the ionizable lipid component, with no impact from other lipids."

286

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Packer 2021 at 3.  As such, even if lipid-mRNA adduct formation impacted the measured molar ratio of the particles (contrary to my opinion, as I reiterate that there is no evidence of this), it would have the effect of decreasing the measured amount of SM-102, thereby at worst causing an underestimation of the mol % of SM-102 (and an underestimation of infringement).

474.    Dr. Fenton asserts that Moderna has "demonstrated that the apparent increase in LNP size over time is actually due to, for example, phase separation leading to the formation of lipid aggregates and cholesterol crystals."  Fenton Rep. ¶ 72 (citing MRNA-GEN-00633693 at -694).  A few slides after the one cited by Dr. Fenton is a version of the graph displayed in my Opening Report (excerpted below), which illustrates Moderna's current "mechanistic understanding . . . that [] most of the particles remained the same over time, but a small fraction degraded to form micron-sized aggregates."  Opening Rep. ¶ 492.



*See also* MRNA-GEN-00633693 at -700.  Similarly, in a different PowerPoint cited by Dr. Fenton, Fenton Rep. ¶ 93, he ignores a slide in which ████████████████████████████



**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

███████████████████████████████ MRNA-GEN-00579740 at -769.

475. ████████████████████████████████

████████████████████████████████████

████████████████████. Opening Rep. ¶ 492.  Neither Dr. Prud'homme nor Dr. Fenton address or refute this.  Dr. Fenton opines that I "seem[] to ignore the data

████████████████████████████████████████

███████████████████████ Fenton Rep. ¶ 93, but it is Dr. Fenton and Dr. Prud'homme who appear to ignore Moderna data regarding LNP growth over time and the mechanism behind this growth.  In fact, Dr. Fenton did not consider MRNA-GEN-00589883, and neither expert discusses the graph or mechanistic understanding depicted above.  ████████

████████████████████████████████████████

████████████████████████████

476. ████████████████████████████

████████████████████████████████████

███████████████████████████ Fenton Rep. ¶ 72, n.7.  It is unclear, and Dr. Fenton does not explain, how this opinion is at all relevant to the question of infringement or whether expired samples are representative of unexpired samples.

477. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Opening Rep. ¶ 494 (citing MRNA-GEN-01001887 at -891-92).  Dr. Prud'homme opines that "while there may not always be a 'trend'" for lipid content over time, "it can be plainly observed

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

that the amount of each respective lipid can and does change over time in individual lots."

Prud'homme Rep. ¶ 404.  Dr. Prud'homme provides no citation to the "plainly observed" trends

he opines about, which—if present—would contradict Moderna's representations to the FDA.

Further as noted in my Opening Report, Moderna has described how "[s]tability data for three

batches [of mRNA-1273 drug product] stored at -20°C for 36 months" showed "[n]o negative

trends" and that "[f]rom the information provided with the specification it is concluded that the

shelf-life (re-test period[36]) is 24 months when stored from -15°C to -25°C and this is acceptable."

Opening Rep. ¶ 495 (citing MRNA-GEN-02407201 at -251). Neither MRNA-GEN-01001887

nor MRNA-GEN-02407201, discussed in my Opening Report and again here, were considered

by Dr. Fenton.  Dr. Prud'homme only cites to MRNA-GEN-01001887 once for a quote about

mRNA purity being shelf-life limiting and MRNA-GEN-02407201 was only cited to in the

context of discussing the labeling of information confidential and proprietary, rather than a

substantive discussion about stability or lipid composition over time.  Prud'homme Opening

Rep. ¶ 917.

478.    Dr. Fenton critiques my citation of a subsection of Moderna's Stability Summary

and Conclusion portion of its BLA (3.2.P.8.1) (MRNA-GEN-00998351 at -393-98) to support

my opinion that "Moderna's stability testing further establishes that its product can remain

within specification for significant periods of time beyond the stated date of expiry."  Fenton

Rep. ¶ 94 (citing Opening Rep. ¶ 644).  Dr. Fenton states that "these pages merely identify a list

---

[36] I understand that a "retest period" is analogous to a shelf-life and is defined as "the period of time during which the drug substance is expected to remain within its specification and, therefore, can be used in the manufacture of a given drug product, provided that the drug substance has been stored under the defined conditions."  *EMA–FDA joint Q&As on Quality and GMP aspects of PRIME/Breakthrough therapy applications*, EMA/CHMP/531552/2023 Committee for Medicinal Products for Human Use (CHMP) (2023) ("EMA–FDA joint Q&As") at 4.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

of stability studies run; they do not include any of the results," Fenton Rep. ¶ 94, however, the

pages cited show that ███████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████    MRNA-GEN-00998351 at -396, -405.  This submission to

FDA indicates Moderna's view that its COVID-19 vaccine remains stable, with its composition

essentially unchanged, considerably beyond the listed expiry.

479.    Dr. Fenton further opines that just "because a certain property remains within

specification does not indicate that it is not nonetheless changing."  Fenton Rep. ¶ 94; *see also*

Prud'homme Rep. ¶¶ 405, 409.  However, Moderna's conclusion that expiry may be extended

where a sample is to remain within specification undermines Dr. Fenton's position that expired

lots are unrepresentative of its commercial product.  *See*, *e.g.*, MRNA-GEN-00998351 at -404-

05.  Similarly, Dr. Fenton critiques my opinion that because "the vast majority of the

nonfractionated lots tested by Dr. Schuster and Coriolis were found to have particle sizes within

Moderna's product specifications," "any such growth would necessarily be considered

acceptable based on Moderna's specifications and representations to the FDA."  Fenton Rep. ¶

95 (citing Opening Rep. ¶ 645).  Dr. Fenton opines that this "misses the mark," because

regardless of specification, "the composition of the lipids that comprise particle[s] that ha[ve]

grown over time ha[ve] likely also changed."  Fenton Rep. ¶ 95.  Dr. Prud'homme asserts that

"[d]espite first arguing that one would not expect lipid content to change over time, Dr. Mitchell

nonetheless divines that I may point to the changes in particle size in Moderna's COVID-19

vaccine over time to support the point that, in fact, the lipid content of the LNPs in Moderna's

composition does change over time."  Prud'homme Rep. ¶ 406.  As anticipated, Dr. Prud'homme

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

and Dr. Fenton rely on DLS measurement changes to opine that this is indicative of compositional change, yet neither expert cites to any direct data demonstrating that this is the case, and neither expert addresses Moderna's mechanistic understanding discussed above in connection with Moderna's internal documents regarding its main population of unchanging LNPs, *supra* ¶ 474, which undermines the notion that changes to measured particle size would reflect a change to the lipid composition of a substantial portion of the LNPs or the LNPs that Dr. Schuster's testing reflects infringe the asserted claims. Moreover, DLS z-ave of Moderna's mRNA-1273 increases during the course of the drug product's shelf-life (as shown below), yet these increases within specification are acceptable to Moderna. Were the composition of the particles changing in a substantial way, this would not be the case.



MRNA-GEN-02634934 at -994. Therefore, even if DLS z-ave indicated that the lipid molar ratios of those particles is changing (which I maintain that it does not), and even if this theoretical molar ratio change somehow impacted the lipid composition measurements of the infringing fractions (which I maintain that it does not, particularly in view of the unrebutted

291

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

evidence regarding Moderna's mechanistic understanding of particle size growth and the particle size data for the infringing fractions), the expired lots are still nevertheless representative of the non-expired lots, which are known to already undergo DLS z-ave increases prior to expiry.

480.    Dr. Prud'homme opines that "as demonstrated by MRNA-GEN-0027752, . . . even where an aggregate particle size measure remains constant between release and 24 months after release, SM-102 content may change." Prud'homme Rep. ¶ 409, n.33. I disagree that a difference in SM-102 content of 0.1 mg/mL, particularly absent any standard deviation information, necessarily demonstrates that SM-102 content has "change[d]." MRNA-GEN-00277521 at -530. In addition, I disagree that a small change in the lipid content of a formulation over time would indicate that the composition of a significant proportion of particles is changing, especially where the main population of particles is understood to be "not changing." See *supra* ¶ 475.

481.    Dr. Fenton opines that "[i]f the particle size is changing, it is *likely* that the composition of the lipids that comprise the particles is changing as well." Fenton Rep. ¶ 93. Dr. Fenton provides no evidence or literature support for this assertion, nor an explanation of why this would be the case. In addition, Moderna's contemporaneous documents and its witnesses have described how the main population of LNPs within a formulation are staying intact and not changing. *See supra* ¶ 475. As will be described in the following paragraph, this main population of unchanged LNPs separates from degradants during fractionation, such that the composition of the particles and fractions of this main population of LNPs remains unchanged.

482.    The relatively low DLS sizes of the frequently infringing fractions (for example, 5-6), especially as compared to (for example) fraction 10, *see* Opening Rep. ¶ 635, strongly indicate that the LNPs in these frequently infringing fractions constitute "intact" and unchanged

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

particles, even to the extent there has been some measured DLS z-ave growth.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



MRNA-GEN-00515205 at -210 (emphasis added).

Opening Rep. ¶ 635.

483.    Dr. Fenton cites a Moderna report entitled " to support his opinion regarding the increase in particle size being due to the development of lipid aggregates and cholesterol crystals.  Fenton Rep. ¶ 72.  To begin with, the report itself merely speculates about the presence of cholesterol crystals.  MRNA-GEN-00762092 at -105

MRNA-GEN-00762092 at -106.  To the extent that these degradants (*e.g.*, cholesterol crystal structures) may exist in any of the samples tested, this would actually be representative of the mRNA-1273 drug product as it existed shortly after its manufacturing date, for the majority of its pre-expiry shelf-life.  Dr. Fenton opines that "[s]ince Dr. Schuster analyzed samples that were expired (or soon to expire), he should have ruled out the possibility of having lipid aggregates or cholesterol

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

crystals in the tested samples."  Fenton Rep. ¶ 72.  I disagree that Dr. Schuster should have ruled

out the presence of particulates / particulate matter that Moderna has found to exist for most of a

formulation's shelf-life (that is, before expiry).

484.    Dr. Fenton has not asserted or provided any evidence that the purported "lipid

aggregates or cholesterol crystals," are compositionally different (in terms of mol %) from the

particles that formed them.  ████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████████

████████  MRNA-GEN-00762092 at -105.  Finally, even if any of the drug product

degradants are compositionally different and unrepresentative of the particles that formed them

or that existed in the formulation prior to expiry, as Dr. Prud'homme suggests, Prud'homme Rep.

¶ 403, these purported degradants likely comprise such a small proportion of the particle

population that they have no meaningful impact on the LC-CAD results.  *See*, *e.g.*, MRNA-

GEN-00589883 at -890.  The lack of impact of purported compositionally-changed degradants,

to the extent they exist, is further evidenced by the "very close agreement between the average

lipid content distribution across fractions in v2 lots that are expired and unexpired."  Opening

Rep. ¶ 646; *see also* supra ¶ 482.  Put another way, the fact that the results do not change

between samples tested before and after expiry provides strong evidence that the lipid

composition of the particles is not changing upon expiry.  I therefore disagree with Dr. Fenton

that the lipid composition of the fractions do not "reflect the composition of individual

nanoparticles in the tested fractions," by virtue of the potential presence of purported degradants.

485.    Dr. Fenton opines that the samples tested by Dr. Schuster "were submitted to the

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

stressing impact of the ultracentrifugation process, likely accelerating the . . . [formation of] lipid aggregates and cholesterol crystals," which "Moderna has shown" to occur when "stressing [] LNPs." Fenton Rep. ¶ 72. Dr. Prud'homme similarly opines that "Moderna has reported, and Moderna's witnesses have explained, that processing *can* change the composition or destroy the LNPs." Prud'homme Rep. ¶ 412 (emphasis added). To begin with, both Dr. Prud'homme and Dr. Fenton's opinions constitute very general statements irrelevant to the testing conducted by Coriolis. As described above, UC is widely regarded and used as a non-destructive technique for the analysis of compositions of lipid particles. *See supra* Section VII.C.2.a.2). In addition, none of Dr. Fenton's citations, other than one that I discuss below, are about centrifugation. In fact, many of Dr. Fenton's and Dr. Prud'homme's cited documents describe long term storage at -20ºC as a type of physical stress, *see* Fenton Rep. ¶ 72, Prud'homme Rep. ¶ 412, even though this is the condition at which Moderna's mRNA-1273 LNP drug products are instructed to be stored at. *See* SPIKEVAX Prescribing Information at 42. This bolsters my opinion that, to the extent there are any such purported degradants or aggregates in the fraction, it would be representative of Moderna's commercial drug product. Moreover, some of Dr. Fenton's and Dr. Prud'homme's citations are based on analyses conducted on MMA samples exposed to dye,

█████████████████████████████████████████████████████████████

████. *See e.g.*, MRNA-GEN-00762092 at -104-05.

486.  ██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**



**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



MRNA-GEN-00560083 at -094-95.

     487.    Dr. Fenton opines that "Moderna's corporate representative . . . testified to this effect as well," seemingly in reference to Dr. Fenton's assertion that increase in DLS size is due to formation of lipid aggregates and cholesterol crystals.  Fenton Rep. ¶ 72.  However, Dr. Fenton's citations of Dr. Parsons' deposition consist of a string of vague generalizations that do not provide any information about lipid composition change at -20ºC storage over time.  Fenton Rep. ¶ 72.  Not only are the cited portions of Dr. Parsons' testimony irrelevant to Dr. Fenton's assertions regarding the purported development of cholesterol crystals or aggregates over time at normal storage conditions, portions of the cited testimony actually support a lack of compositional change over time.  Fenton Rep. ¶ 72 (

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

████████████████████████████████████████████████████████████████████

(citing 6/7/2024 Parsons Tr. 376:3-12).     ██████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████.'" Fenton Rep. ¶ 72,

n.7.  It is unclear, and Dr. Fenton does not explain, how this opinion is at all relevant to the

question of infringement or whether expired samples are representative of unexpired samples.

     488.    None of Dr. Prud'homme's or Dr. Fenton's conjecture regarding the lack of

representativeness is convincing where, as demonstrated in my Opening Report using sample

testing data, "there is very close agreement between the average lipid content distribution across

fractions in v2 lots that are expired and unexpired."  Opening Rep. ¶ 646.  The expired v2

samples were, on average, approximately a *year older* than the unexpired v2 lots when tested by

Dr. Schuster, demonstrating that even a year's passage of time had no discernable impact on the

lipid composition of the particles in Moderna's mRNA-1273 drug product, especially for the

particles in fractions 4-9 (within which the infringing fractions are found).  Assuming an

approximate testing date of 10/10/2024 for all samples, and excluding sample 31 (CMO lot

3030585) for which I understand Plaintiffs do not have a COA, the average number of days from

lipid drug product manufacture to testing for unexpired v2 lots was approximately 355 and for

expired v2 lots was approximately 702 days.  Neither Dr. Prud'homme nor Dr. Fenton assert that

the values in my table are incorrect or were miscalculated.  Given this demonstration of lack of

change of composition over time using actual data from samples tested by Dr. Schuster, it is

clear that the lipid composition results of expired samples are representative of the composition

of Moderna's COVID-19 vaccine prior to expiry.

     489.    Dr. Fenton opines that he "see[s] no indication in Dr. Schuster's report that" lots

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

sent by Moderna to Plaintiffs in March 2023 and January 2024 "were ever tested."  Fenton Rep. ¶ 100; *see also* Prud'homme Rep. ¶¶ 398-399.  As described in my Opening Report, I understand that "the parties entered into a stipulation regarding the production of samples," in which the parties created a framework for selecting samples to be produced on a part number basis.  Opening Rep. ¶ 498.  I further understand that Plaintiffs' selection of samples to test was limited to samples produced pursuant to and subject to the Sample Stipulation.  Opening Rep. ¶¶ 498.  I further understand that per the parties' stipulation, Moderna agreed that it "will not make any argument about the applicability of any test data generated by Plaintiffs from produced lots to other lots containing the same mRNA-LNP part number on the basis that such lots containing the same mRNA-LNP part number were not produced pursuant the parties' agreed-upon protocol above or that Plaintiffs did not test such unproduced lots."  DI 225 ¶ 5.

490.    Dr. Fenton opines that "Plaintiffs and Dr. Shuster [sic] chose not to run the disclosed experiments until just days before the expiration date of those samples."  Fenton Rep. ¶ 96. Dr. Prud'homme opines similarly.  Prud'homme Rep. ¶ 400.  As explained by Dr. Schuster, sample testing was initiated roughly one week within the completion of the method qualification assays on roughly October 1, 2024.  Schuster Reply Rep. ¶ 74.  Moreover, "Moderna delayed producing any samples from any drug product lot made using the target v1 Formulation until after all such lots were beyond Moderna's shelf-life date," such that "Plaintiffs could not have tested any lot made using Moderna's target v1 Formulation before the date of expiry of that lot." Opening Rep. ¶ 643.  As described in my Opening Report, "The latest date of expiry for a lot made using that target v1 Formulation that I am aware of was in April 2023," and at that time, "Moderna had not agreed to produce any samples, beyond 3 vials of a *v2* target formulation drug product lot."  Opening Rep. ¶ 643.  Neither Dr. Fenton nor Dr. Prud'homme address or refute

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

this assertion. Dr. Prud'homme opines that "the timing of the samples was largely due to the long-term negotiations between the parties as to how many samples will need to be produced," Prud'homme Rep. ¶ 396, undermining Dr. Fenton's opinions regarding the purported choice to delay sample testing. In any event, the notion that samples tested before expiry somehow are not relevant or representative of Moderna's product, when they were not expired, represented to FDA repeatedly as stable, and were permitted to be injected into healthy Americans, is simply implausible.

491.    Dr. Fenton opines that certain of the unexpired samples tested by Dr. Schuster were produced by Moderna months prior to the testing date, and therefore could have been tested earlier. Fenton Rep. ¶ 96. Neither Dr. Fenton nor Dr. Prud'homme address the fact that Moderna did not complete sample production to Plaintiffs until roughly August 14, 2024, months after the shipments of unexpired samples that Dr. Fenton cites to in paragraphs 96-98 of his report. It appears that Dr. Fenton is suggesting that it was improper for Plaintiffs not to conduct sample testing in a piecemeal manner. Dr. Fenton further opines that "it appears that samples from Moderna lot number 7036623028 were shipped by Plaintiffs to Coriolis on two occasions, on June 28, 2024 and September 20, 2024," and indicates that this is "troubling" because Dr. Schuster "provides no explanation for why he was provided samples from the same lot number on two separate occasions," and "only one set of results is reported for this Moderna lot number." Fenton Rep. ¶ 96. As described above, *see supra* ¶ 490, Dr. Schuster completed his qualification assays on roughly October 1, 2024; I therefore disagree that there is anything "troubling" about the timing of Plaintiffs' sample testing or separate June and September shipments of vials from a given lot. It appears that the unexpired samples were among the first tested by Dr. Schuster, having all been tested on or around October 9th to 11th 2024, *see*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Schuster Opening Rep. Exhibits K-N, Q-R, so contrary to Dr. Fenton's speculations, the evidence suggests that Plaintiffs prioritized rather than delayed testing of these samples. In addition, I am aware of no reason why Moderna could not have tested these samples earlier, to the extent it considered the passage of time (including before expiry) somehow relevant to the results. As discussed above, Moderna possessed both the equipment and expertise to conduct these studies; it chose not to do so, either before expiry or after Dr. Schuster's testing was submitted, or it chose to do so but did not rely on the results in its expert reports.

492.    Dr. Fenton opines that "[b]ased on Plaintiffs' and/or Dr. Schuster's decision to wait and test the six 'unexpired samples' just days before the expiration date of these materials, I do not find Dr. Mitchell's argument that a comparison of the average mol% data between the 'expired' and 'unexpired' samples 'demonstrate[s] that the Coriolis method is suitable for use on expired samples' or his suggestion that 'sample expiration does not substantially alter the lipid composition of the mRNA-LNPs in the sample.'" Fenton Rep. ¶ 99; Prud'homme Rep. ¶ 401. Dr. Prud'homme similarly opines, after discussing the unexpired lots that Plaintiffs tested, that "given appropriate concern about testing material that would be representative of the commercial product at issue in this case, Dr. Schuster should not have waited months to conduct his testing." Prud'homme Rep. ¶ 400. Neither Dr. Fenton nor Dr. Prud'homme explain why testing samples near expiry poses a problem or somehow undermines the representativeness of those samples. To my knowledge, Moderna has never stopped the sale of its vaccines or prevented the injection of its vaccines because the samples were nearly expired and therefore not representative of the commercial product. I am also not aware of any statements made by Moderna to the FDA or to the public that its near-expiring lots are substantially different from and unrepresentative of the rest of its commercial lots. Dr. Fenton and Dr. Prud'homme provide no explanation of why or

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

how near-expired samples are not representative of Moderna's commercial COVID-19 vaccine.

Furthermore, neither Dr. Fenton nor Dr. Prud'homme offer any evidence or explanation that

testing older samples of mRNA-1273 skews the lipid composition results in any direction,

including in a direction more likely to find infringement.  In addition, as described above, *see*

*supra* ¶ 488, the expired v2 samples were on average approximately one year older than the

unexpired samples; as such, my mol % comparison of v2 unexpired versus expired samples

demonstrated that the lipid composition of mRNA-1273 LNPs, especially the subpopulation of

particles falling within fractions 4 to 9, remain substantially the same over long durations of time

(including a year),  Opening Rep. ¶ 646.  It is therefore likely, and consistent with the internal

Moderna documents and testing of Moderna samples that I have seen, that if the same samples

were tested immediately after manufacture or three years after manufacture, they would have

yielded substantially similar lipid composition results.  I therefore reiterate my opinion that the

Coriolis method is suitable for use on expired samples and sample expiration does not

substantially alter the lipid composition of the mRNA-LNPs in the sample.  Opening Rep. ¶ 646.

    493.    In his Opening Report, Dr. Fenton creates a chart of samples tested by Dr.

Schuster that expired in 2021 and opines that "it is clear that the particles in these lots of

Moderna's COVID-19 vaccine grew over time. In fact, on average, ██████████████████

████████████████████████████████████████████████████████

███████████████████████████Fenton Rep. ¶ 103.  I disagree for numerous

reasons. ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████.  Schuster Reply Rep. ¶ 76.  As further explained by Dr. Schuster and

his colleagues, "[s]cattering intensity increases with the sixth power of particle size ($r^6$), meaning

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

that larger particles scatter much more light than smaller ones, and even a very small proportion of larger particles can disproportionately affect the light scattering outputs and cause an overestimation of the z-average," as exemplified by the roughly 260,000-times more intense scattering expected from an 800 nm (i.e., 0.8 μm) particle as compared to a 100 nm particle. Schuster Reply Rep. ¶ 76. I agree with Dr. Schuster that Coriolis's DLS values would be expected to be higher than Moderna's due to the lack of filtering of such submicron particles. **(2)** As described above, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████. *See supra* ¶¶ 474-475. As described previously a very small proportion of larger particles can cause an overestimation of DLS measured diameter (z-average), a point which Dr. Fenton concedes. Fenton Rep. ¶ 103. I therefore disagree that the DLS z-ave increase presented by Dr. Fenton indicates that a significant proportion of particles within the tested samples have changed compositionally. **(3)** In addition, the frequently infringing fractions (5-6) have relatively low DLS and PDI values, which strongly indicates that the LNPs in these frequently infringing fractions constitute the "intact" and unchanged particles, even if the formulation overall has experienced some DLS z-ave increase. *See supra* ¶ 481; *see infra* ¶ 525. **(4)** As described above, Moderna's mRNA-1273 LNP drug product exhibits DLS z-ave size growth prior to expiry, such that the existence of this phenomenon in tested samples does not undermine the samples' representativeness of the commercial COVID-19 vaccine. *See supra* ¶ 479. As described in my Opening Report, which is undisputed by Dr. Fenton or Dr. Prud'homme, "every fraction that infringes at least one claim of at least one of the '435, '069, '668, or '359 patents

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

has a particle size within Moderna's specification."  Opening Rep. ¶ 645.  **(4)** Finally, neither Dr.

Fenton nor Dr. Prud'homme provide any evidence that increased DLS z-ave corresponds to a

change in the molar ratio of the particles within a sample, either through analysis of Dr.

Schuster's results or otherwise.  *Supra* ¶¶ 479-481, 484.  To the contrary, as I demonstrate in my

Opening Report, there is very close agreement between the average lipid content distribution

across expired and unexpired lots.  Opening Rep. ¶ 646.  As such, I disagree with Dr. Fenton that

"testing of expired samples is not indicative of the properties of Moderna's commercial product."

Fenton Rep. ¶ 104.

> **c.    Fractionated Samples are Representative of the Native, Non-Fractionated Samples.**

> **1)    Dr. Schuster's Ultracentrifugation Study**

494.    As described above, it is my understanding that Moderna has access to the

necessary equipment (*e.g.*, ultracentrifuge, preparative bucket rotor, DLS analyzer, NTA

machine, Cryo-EM, etc.) and material (*e.g.*, PBS, $D_2O$, vials of the tested samples, etc.) that it

could have used to test the fidelity of Dr. Schuster's fractionation methodology and whether the

particles were altered, compositionally or otherwise.  *See supra* ¶¶ 433, 444, 463.  However,

rather than conduct and/or submit sample testing examining the efficacy of Dr. Schuster's

methodology, Dr. Fenton and Dr. Prud'homme opine, without any substantiating basis in testing

data, that there is particle "Disruption and/or Destruction During Centrifugation and/or Other

Processing Steps," and that the "composition of the LNPs in the samples tested by Dr. Schuster

were altered by the methodology applied," on the basis of inappropriate and erroneous

calculations using the orthogonal test results of the fractions tested by Dr. Schuster.  *See* Fenton

Rep. Section VII.B; *See* Prud'homme Rep. Section X.D.2.c.

495.    As will be described in greater detail below, I disagree that the analyses

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

conducted by Dr. Fenton demonstrate particle change; in fact, when the errors in certain of Dr. Fenton's analyses are corrected, each calculation provides supportive evidence that the particles in the fractionated samples did not change over the course of sample processing or centrifugation. *See infra* section VII.C.2.c.2). In addition, as described above, researchers using very similar sample preparation and centrifugation methodologies as Dr. Schuster have adopted the premise and understanding that the particles of their formulations are not changing. *See supra* ¶ 445. Although there is ample support to conclude that the particles in the samples tested by Dr. Schuster are not disrupted, destroyed, or compositionally changed as a result of fractionation or sample handling, I understand that Dr. Schuster and his colleagues conducted an additional centrifugation study to further assess the possibility of particle change in view of Dr. Fenton's allegations. *See* Schuster Reply Rep. Section IV.B.3. The centrifugation study conducted by Dr. Schuster and his colleagues is the most direct, accurate, and appropriate way to assess whether the particles in the fractionated samples are representative of the starting material. As will be described in greater detail below, the results of the centrifugation study demonstrate that particles subjected to Dr. Schuster's sample handling and fractionation methodology are unchanged and representative of the starting material. Again, Moderna and/or its experts could have conducted such tests and confirmed that their assertions were wrong, rather than casting baseless aspersions at Dr. Schuster and his data.

496. The centrifugation study conducted by Dr. Schuster and his colleagues entailed comparing the NTA and DLS results of native samples from v2 lot 027J23A (Moderna lot number 7036623031, Coriolis testing number A-3) with samples also from lot 027J23A that had been prepared and centrifuged according to the methodology described in Section VI.C.1 of Dr. Schuster's Opening Report. *See* Schuster Reply Rep. ¶¶ 110-112. Dr. Schuster and his

306

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

colleagues additionally used the NTA and DLS methods described in Sections VI.C.3-4 of his Opening Report to analyze those samples. Schuster Reply Rep. ¶ 112. Dr. Schuster prepared one sample of the native lot 027J23A, which was tested in triplicate using both NTA and DLS (n=3), and Dr. Schuster prepared three samples also from lot 027J23A, which were each independently diluted in the centrifugation matrix, centrifuged, and tested in triplicates using both NTA and DLS (n=9). *See* Schuster Reply Rep. ¶¶ 110-112. Rather than fractionate and attempt to piece together the orthogonal testing data in an attempt to back-calculate comparability—as Dr. Fenton attempts to do and Dr. Prud'homme relies on—Dr. Schuster and his colleagues gently re-homogenized the centrifuged sample to produce a direct comparison and assessment of how, if at all, the particles changed as a result of the sample handling and centrifugation methodology. Schuster Reply Rep. ¶ 112. Put another way, Dr. Schuster compared a sample from a lot that was not subjected to either the sample preparation (including $D_2O$ and PBS diluents) or the centrifugation method used in his earlier testing (which Dr. Prud'homme and Dr. Fenton alleged changed the particles) with samples from the same lot that were subjected to the sample preparation and centrifugation. If the particles did not change substantially, the allegations of Dr. Prud'homme and Dr. Fenton would be disproven directly.

497.    Below, I have excerpted the results of Coriolis's ultracentrifugation analysis. The following table and graph depict the mean NTA particle concentration (particles / mL) and SD for each sample type:

| NTA data for lot 027J23A | | |
|---|---|---|
| | NTA  (# particles / mL) | NTA standard deviation |
| Native sample | 5.68E+11 | 9.13E+09 |
| Ultra-Centrifuged sample | 5.92E+11 | 4.88E+10 |
| **difference (# particles / mL)** | **2.40E+10** | |
| **% difference** | **4.2%** | |

307

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



Schuster Reply Rep. ¶¶ 113-114.  The tables and graphs below depict the mean DLS size (z-ave) and SD, and the mean DLS PDI (a.u.) and SD for each sample type.

| DLS data for lot 027J23A (Z-ave) | | |
|---|---|---|
| | DLS z-ave (nm) | DLS standard deviation |
| Native sample | 135.19 | 0.74 |
| Ultra-Centrifuged sample | 134.11 | 1.10 |
| **difference (z-ave)** | **-1.08** | |
| **% difference** | **-0.8%** | |

308

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



| DLS data for lot 027J23A (PDI) | | |
|---|---|---|
| | DLS (PDI) | DLS standard deviation |
| Native sample | 0.22 | 0.01 |
| Ultra-Centrifuged sample | 0.22 | 0.02 |
| **difference (a.u.)** | **0.00** | |
| **% difference** | **0.0%** | |



Schuster Reply Rep. ¶¶ 113-114.

498.    This above-presented data provides strong evidence that the particles subjected to

the sample preparation and centrifugation methodology described in Section VI.C.1 of Dr.

Schuster's Opening Report are not changing.  As will be described in greater detail below, *see*

*infra* ¶ 504, NTA exhibits high analytical variability, including error rates of roughly 20%,

especially when used "off-the-shelf" without method modification or validation.  The 4.2%

difference between the NTA concentration of the native sample and the UC-matrix centrifuged

sample is well within the expected analytical variability of the method, and the numerical

concentration difference between the samples, 2.40E+10 particles/mL, is lower than the standard

deviation of the UC-matrix centrifuged samples, 4.98E+10 particles/mL.  As Dr. Schuster

describes, the variability in the NTA values between the native and centrifuged sample (which is

already very small), cannot be attributed to anything other than ordinary analytical variability.

*See* Schuster Reply Rep. ¶ 115.  I agree with Dr. Schuster's analysis and conclusion.  The NTA

results demonstrate that the sample preparation and UC methodology employed by Dr. Schuster

for sample testing does not change the particles (*e.g.*, via aggregation or breaking apart of

particles).  Even if sample aggregation and destruction were theoretically happening

simultaneously (and there is no evidence whatsoever this is the case), the likelihood that the rate

and abundance of each of these processes would be equal, such that the NTA results do not

meaningfully change after centrifugation, is infinitesimally low.

499.    The DLS data additionally demonstrate a lack of particle change.  The -0.8%

difference between the DLS z-ave of the native sample and the UC-matrix centrifuged sample is

well within the expected analytical variability of DLS, Schuster Reply Rep. ¶ 116, and the

numerical concentration difference between the samples, -1.08 nm, is lower than the standard

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

deviation of the UC-matrix centrifuged samples, 1.10.  As Dr. Schuster describes, the variability in the DLS values between the native and centrifuged sample (which is already very small), cannot be attributed to anything other than ordinary analytical variability.  *See* Schuster Reply Rep. ¶ 116.   I agree with Dr. Schuster's analysis and conclusion.  The DLS z-ave results demonstrate that the sample preparation and UC methodology employed by Dr. Schuster for sample testing does not change the particles (*e.g.*, via aggregation or breaking apart of particles). The 0.0% difference between the DLS PDI of the native sample and the UC-matrix centrifuged sample provides further evidence that the particles are not changing and that any observed variation in measurements between the two sample groups are the result of analytical variability. If, in the unlikely event that sample aggregation and destruction were theoretically happening simultaneously at roughly the same rate and proportion (and there is no evidence whatsoever this is the case), such that the NTA results remain unchanged, the DLS z-ave would nevertheless be expected to increase due to the disproportionate impact of larger samples on DLS measurements than smaller ones.  *See supra*  ¶ 493.  If particle aggregation and destruction were occurring at different rates, the NTA and PDI results would be meaningfully different between the samples. Taken together, the results of Dr. Schuster's analysis demonstrate that it is exceedingly unlikely that the processes or materials used by Dr. Schuster to fractionate the samples caused the particles in the samples to change, compositionally or otherwise, including via particle aggregation, destruction, or lipid exchange.

500.    Lot 027J23A (Moderna lot number 7036623031, Coriolis testing number A-3) was manufactured on October 20, 2023 and expired on October 20, 2024, *see* MRNA-GEN-01551972, meaning that the sample underwent the above-described centrifugation study roughly five months post-expiry and roughly 17 months post manufacture.  The fact that lot 027J23A

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

nevertheless yielded such consistent NTA and DLS results pre and post-centrifugation demonstrates that Dr. Schuster's methodology is appropriate for use on, and non-destructive of, expired and non-expired lots alike.

**2)    Dr. Fenton and Dr. Prud'homme's reliance on inappropriate and erroneous analyses.**

501.    In my Opening Report, I opine that "UC is regarded as a gentle, non-destructive preparative technique." Opening Rep. ¶ 626. I further explain why Coriolis's UC method in particular would be expected by researchers in the field to be non-destructive, noting that "[t]he particles separate away from each other as they move up the tube during centrifugation, and the LNPs are already quite dilute due to the use of PBS and D$_2$O, which minimizes the possibility of perturbation during the centrifugation process." Opening Rep. ¶ 626. Neither Dr. Prud'homme nor Dr. Fenton address or refute this assertion.

502.    I disagree with Dr. Fenton's opinion that "any measurements performed on the fractions do not reflect the actual samples *before* fractionation." Fenton Rep. ¶ 52. As will be discussed in the remainder of this section, Dr. Fenton bases this assertion on inappropriate and oftentimes erroneous calculations based on Coriolis's orthogonal testing data of the sample fractions. It is further disproven by the additional confirmatory testing by Coriolis discussed above.

503.    *NTA Analysis.* Dr. Fenton purports to have compared the NTA data obtained from native (non-fractionated) samples to the fractions that were the result of ultracentrifugation, using the NTA data reported in Dr. Schuster's Opening Report. *See* Fenton Rep. ¶¶ 107-08. Dr. Fenton describes that in order to conduct this "analysis," he "compared the number of particles per mL in the non-fractionated sample . . . to the *sum* of the numbers of particles per mL in each of the fractions obtained from each of those samples." Fenton Rep. ¶ 108 (emphasis added). As

312

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Dr. Schuster describes, there are numerous issues with this "analysis" of particle concentration in fractionated versus unfractionated samples.

504.    To begin with, NTA particle concentration measurements have high error rates both in terms of intermediate precision (between laboratories, error rate roughly 20%) and repeatability (across replicates), which is why this technique was intended to be used to qualitatively assay the fractions and confirm the presence of particles rather than as a basis for precise quantitative measurements.  *See* Schuster Reply Rep. ¶ 81.  As Dr. Schuster notes, his team did not did not develop an NTA methodology for the specific analysis described in my Opening Report (opting instead to use the standard methodology employed in his laboratory) due to its intended use as a qualitative assay.  *See* Schuster Reply Rep. ¶ 81.  Moderna itself has recognized the limitations of the precision and accuracy of NTA as a particle counting tool.  *See* MRNA-GEN-01596358 at -412 ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████    In addition, because Dr. Fenton's "analysis" requires input from NTA values independently obtained for 10 fractions and division with an additional independently measured value to determine % difference, the error of each of these underlying NTA measurements will lead to a compounded error higher than what would be expected for the measurement of one sample, referred to as propagation of error.  *See* Schuster Reply Rep. ¶ 90; see also Harris 2015[37] at 52.  In order to determine the compounded error for arithmetic (involving multiplication / division and addition / subtraction), such as is the case here when calculating an estimated NTA concentration of the fractions theoretically pooled together

---

[37] DANIEL C. HARRIS, QUANTITATIVE CHEMICAL ANALYSIS 9th Edition, ISBN-10 146413538X (2015) ("Harris 2015").

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

(NTA$_F$), one would square the error associated with each data input used in the arithmetic, add

the errors, and take the square root of this value. Harris 2015 at 53.  The approximate

compounded error of Dr. Fenton's analysis, assuming a 20% error for NTA, is 66%.

$$\sqrt{20^2 * 10} = 63.24\% \text{ (for error introduced calculating NTA}_F \text{ across 10 fractions)}$$

$$\sqrt{63.24^2 + 20^2} = 66\% \text{ (for error introduced calculating \% different NTA}_F \text{ vs NTA}_{NF})$$

 I therefore agree with Dr. Schuster that this type of comparison of a purported total fraction

NTA value versus the non-fractionated samples' NTA value is inappropriate.

     505.    In addition, as Dr. Schuster notes, the calculations underlying Dr. Fenton's NTA

"analysis" (as presented in Fenton Rep. Exhibit C) are erroneous for two reasons.  *See* Schuster

Reply Rep. ¶¶ 83-88.  (1) The first error that Dr. Fenton makes is failing to account for the

ultracentrifugation sample preparation dilutions.  *See* Schuster Reply Rep. ¶¶ 83-86.  As

described in Dr. Schuster's Opening Report, the reported NTA values are corrected for dilutions

made pursuant to NTA testing (*i.e.*, to fall within the appropriate particles per frame), but

nowhere does it state that the NTA values have been corrected for the sample preparation

dilutions.  *See* Schuster Reply Rep. ¶ 83.  Because NTA particle concentrations are directly

linearly proportionate to how dilute the sample is, any calculation that does not take this dilution

into account will be erroneous.  (2) The second error Dr. Fenton makes is ***summing*** the NTA

particle concentration values.  *See* Schuster Reply Rep. ¶ 87.  As Dr. Schuster's 4-particle

hypothetical demonstrates, merely summing the concentrations of subaliquots of a sample

provides erroneous results because it fails to account for the total volume of the subaliquots

added together.  *See* Schuster Reply Rep. ¶ 87.  As Dr. Schuster further describes, when

aggregating concentrations of fractions of equal volume (as is the case with the fractionated

samples tested by Dr. Schuster), the simplest approach to correctly derive an aggregate

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

concentration value is by *averaging* the NTA concentration values of each fraction. *See* Schuster Reply Rep. ¶ 87-88. The less simplistic version of this calculation involves multiplying each fraction's NTA concentration by the volume of that fraction (in mL) to derive a particle number value, sum each fraction's particle number value, and then divide this summed particle number value by the total volume of the fractions added together (in mL) to convert back to an aggregate concentration. *See* Schuster Reply Rep. ¶ 87, n. 54. Dr. Fenton uses neither of these approaches, and instead simply adds the NTA concentration of each fraction, which is clearly an erroneous way to derive an aggregate NTA value that defies elementary rules of mathematics.

506.    In Exhibit 5 of his Reply Report, Dr. Schuster performs corrected calculations of Dr. Fenton's analysis, although Dr. Schuster notes that this is still an inappropriate analysis due to the limited accuracy and precision of NTA and the introduction of compounded error. *See* Schuster Reply Rep. ¶¶ 89, 94. As Dr. Schuster describes, the corrected % differences between the aggregated-fraction NTA values and the native NTA values for most of the samples falls within the variance one would ordinarily expect to see when using NTA to calculate particle concentration (*e.g.*, 20%), and when accounting for propagated error (*e.g.*, 66%), the % NTA difference of all samples except for one falls within expected variance. *See* Schuster Reply Rep. ¶ 90. I agree with Dr. Schuster's conclusion that, based on the corrected data, there is no basis for attributing the % difference values to anything other than analytical variance. *See* Schuster Reply Rep. ¶ 91.

507.    Furthermore, as demonstrated by Dr. Schuster, the erroneous calculations underlying Dr. Fenton's Exhibit C resulted in significantly over-estimated % differences of native sample NTA ($NTA_{NF}$) versus aggregate fraction NTA ($NTA_F$), as illustrated below.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

|  | Average % difference NTA$_{NF}$ vs NTA$_F$ | Average % difference (abs) NTA$_{NF}$ vs NTA$_F$ | Median % difference (abs) NTA$_{NF}$ vs NTA$_F$ |
|---|---|---|---|
| Calculated Based On % Differences Reported In **Fenton Exhibit C** | 14% | 36% | 32% |
| Calculated Based On % Differences Reported In **Exhibit 5** | -4% | 15% | 10% |

*See* Schuster Reply Rep. ¶ 92. I therefore disagree with Dr. Fenton's opinions regarding his

NTA "analysis" that is based on erroneous calculations and over-estimated % differences,

including that his analysis demonstrates that the particles changed composition and that UC is

"disrupting the particles." Fenton Rep. ¶ 108.

508.    As described earlier, Dr. Schuster and his colleagues conducted an

ultracentrifugation study in which they directly analyzed a native sample and a post-centrifuged

sample from the same lot and demonstrated that Coriolis's sample preparation and UC

methodology (equivalent to that used in Dr. Schuster's Opening Report) does not cause particle

number to change (as measured by NTA). *See supra* ¶¶ 497-498. The NTA % difference

obtained from the direct measurement of lot 027J23A (4.2%, *supra* ¶ 497) is roughly 6-times

smaller than the % difference obtained from Dr. Fenton's erroneous calculations (26.63%,

Fenton Exhibit C, cell G36), and is roughly 3-times smaller than the % difference obtained from

the corrected (but still prone to compounding error) calculations conducted by Dr. Schuster (-

15.53%, Schuster Exhibit 5, cell AK 7). Although Dr. Schuster's corrected NTA analysis alone

provides evidence to support the conclusion that the particles are not being changed during

fractionation, the direct sample analysis is more appropriate and provides additional and stronger

evidence of lack of particle change. *See supra* ¶¶ 497-498.

509.    ***Lipid-per-particle Analysis***.  Dr. Fenton additionally attempts to calculate the

amount of lipid (mg) per particle of non-fractionated samples as compared to their corresponding

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

fractions, which he presents in Exhibit D of his Opening Report.  Fenton Rep. ¶ 109.  As with his NTA analysis, Dr. Fenton's lipid-per-particle analysis is inappropriate because the underlying calculations rely on NTA data, which has limited accuracy and precision, and relies on independent NTA measurements of each fraction, which introduces compounded error, and relies on a method that was intended to be used as a qualitative assay.  *See supra* ¶ 504.

510.    In addition, similar to his NTA analysis, Dr. Fenton's lipid-per-particle analysis is based on erroneous calculations.  Dr. Fenton again fails to account for the dilution factor of the fractions attributable to the UC sample preparation.  *See* Schuster Reply Rep. ¶ 95.  In addition, Dr. Fenton fails to correct for the differences between the injection volumes of the fractions and the injection volume of the calibration standard when calculating the lipid content (mg) of the aggregate fractionated sample.  *See* Schuster Reply Rep. ¶ 95.  As explained by Dr. Schuster, the differences in injection volume between the calibration standard and the fractions has no impact on the calculated mol % of each fraction, which is dependent on the relative proportion of each lipid within a given fraction.  *See* Schuster Reply Rep. ¶ 43.  However, when attempting to contrive an aggregated fraction measurement to compare to the native sample, the injection volume correction becomes necessary.  *See* Schuster Reply Rep. ¶ 95.

511.    In Exhibit 6 of his Reply Report, Dr. Schuster performs corrected calculations of Dr. Fenton's lipid-per-particle analysis, although Dr. Schuster notes that this is still an inappropriate analysis due to the limited accuracy and precision of NTA and the introduction of compounded error.  *See* Schuster Reply Rep. ¶ 95.  This lipid-per-particle analysis, even with corrected calculations, is further inappropriate because the lipid content of many of the fractions is <LOQ.  Dr. Fenton addresses this by assuming a lipid content of 0 mg/mL for these samples, as does Dr. Schuster for consistency, but all parties acknowledge that this approach

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

"underestimate[s]" the lipid content values. *See* Fenton Rep. ¶ 110; Schuster Reply Rep. ¶ 98. The fact that something is below the limit of quantification does not mean its value is zero. Its value could be just below the limit of quantification, which is almost certainly the case here in light of the NTA values for fractions 1-3, which would change the calculation compared to the assumption of Dr. Fenton that the value is zero. In any event, as Dr. Schuster describes, when using the corrected calculations, the average % difference in the approximate lipid-per-particle calculation of non-fractionated samples compared to their respective fractions is -16%, as compared to 97% using Dr. Fenton's erroneous calculation. Schuster Reply Rep. ¶ 97. Below is an excerpted table from Dr. Schuster's report illustrating the significantly reduced average % difference obtained from the lipid-per-particle analysis when using corrected calculations.

|  | Average % difference | Average % difference (abs) | Median % difference (abs) |
|---|---|---|---|
| Calculated Based On % Differences Reported In **Fenton Exhibit D** | 97% | 97% | 93% |
| Calculated Based On % Differences Reported In **Exhibit 6** | -16% | 20% | 19% |

Schuster Reply Rep. ¶ 97. As explained and illustrated by Dr. Schuster, the variability in NTA data—which in and of itself is largely reflective of variability of use of the NTA technique and the compounded error inherent in the calculation—has a large impact on the variability of the lipid-per-particle % differences calculated. Schuster Reply Rep. ¶ 100. I agree with Dr. Schuster that the corrected % differences in the lipid-per-particle amount calculated for native versus corresponding fractions is easily explained by typical variation in the NTA measurement, compounded error, and the underestimation of lipid content from fractions <LOQ discussed above.

512.    I therefore disagree with Dr. Fenton's opinions regarding his lipid-per-particle

318

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

analysis that are based on erroneous calculations and over-estimated % differences.  For example, Dr. Fenton concludes from his erroneous calculations that for essentially every sample, there is an *increase* in the amount of lipid-per-particle, which he opines must mean that the number of particles is decreasing and/or the amount of lipid in a particle is increasing as they grow and aggregate.  However, as Dr. Schuster notes, there is actually a *decrease* in the amount of lipid-per-particle which is explained by the underestimation of lipid content from fractions <LOQ discussed above.  Schuster Reply Rep. ¶ 98.  I agree with Dr. Schuster that the explanations Dr. Fenton proposes for the non-existent increase in lipid-per-particle are not relevant to the actual testing data.  Schuster Reply Rep. ¶ 99.  I further agree with Dr. Schuster that if anything, the relatively low % differences in lipid-per-particle amount in light of the large expected variance and lipid content underestimation, when viewed in the context of the other available information (including the additional testing by Dr. Schuster), provide further evidence that the UC method is not perturbing the particles.  Schuster Reply Rep. ¶¶ 100-102.

513.    ***DLS Analysis***.  The third and final analysis that Dr. Fenton conducts entails comparing the DLS z-ave of the non-fractionated samples to a corresponding fractionated DLS z-ave, which he calculates by "taking the weighted average for the 10 fractions."  Fenton Rep. ¶ 114; Fenton Rep. Exhibit E.  As with the NTA "analysis," Dr. Fenton's lipid-per-particle analysis is inappropriate because the underlying calculations rely on independent NTA measurements, with the attendant variability and compounding issues described above.  *See supra* ¶ 504.

514.    Similar to Dr. Fenton's other analyses, the DLS % difference analysis does not demonstrate that fractionation is changing the particles.  As Dr. Schuster describes, "all of Dr. Fenton's calculated % differences between the 'weighted' DLS values of the fractionated

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

samples [] as compared to the non-fractionated samples [] are less than 15%." Schuster Reply Rep. ¶ 105. In light of the analytical error of NTA and compounded error introduced in this type of analysis, I agree with Dr. Schuster that the % differences in the DLS data are likely attributable to analytical variance and do not provide evidence of changes to the particles. Schuster Reply Rep. ¶¶ 105-109. I further agree with Dr. Schuster that the "exceedingly small average % differences between the non-fractionated DLS z-ave and the weighted fraction z-ave," excerpted below, "if anything, confirm that the centrifuged particles are representative of the starting material." Schuster Reply Rep. ¶ 105. In any event, such analysis is far less relevant than the direct testing of Dr. Fenton's postulates that Dr. Schuster conducted, given the attendant variability in NTA testing and the other issues discussed above.

|  | Average % difference | Average % difference (abs) | Median % difference (abs) | Median % difference (abs) |
|---|---|---|---|---|
| Fenton Exhibit E | 1.4 | 4.1 | 2.6 | 3.7 |

515.     Dr. Fenton opines that his DLS "analysis" demonstrates the following "trend": "for the LNPs with average particle sizes below about 160 nm, the fractionation process induces an increase in the average size, whereas for LNPs with average particles sizes [sic] above about 160 nm, the sizes tend to decrease." Fenton Rep. ¶ 114. Dr. Fenton further opines that "[t]his trend . . . tells us that the changes in average particle sizes are real and not the results of experimental variation or error," and is "strong evidence that the fractionation protocol is modifying the original LNPs," such "that the fractions [] do not reflect the original composition prior to fractionation." Fenton Rep. ¶ 115. I disagree, including with the premise that there even is a "trend."

516.     Dr. Schuster separates out the average % difference of DLS z-ave for LNPs in Dr.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Fenton's group of large samples (160nm+) and small samples (<160nm). Schuster Reply Rep. ¶ 107. I agree with Dr. Schuster that the average % difference value for each group is so small (4.0% and -3.2% respectively) that, especially when factoring in the lack of precision of NTA and compounded NTA error, they cannot be used to support an inference that the LNPs changed during fractionation. Schuster Reply Rep. ¶ 107. I also agree with Dr. Schuster that there are a wide variety of factors that impact DLS measurements (without impacting the particles themselves)—including concentration of a sample, diluent components such as sucrose, and the non-linear relationship between particle size and intensity—that could create the appearance of a difference in trend between differently prepared and concentrated v1 and v2 samples. Schuster Reply Rep. ¶ 108.

517.    In the ultracentrifugation study discussed above that was designed to assess the precise issue Dr. Fenton raised, and which was conducted on a sample with native DLS z-ave of 135 nm, the % difference between the centrifuged and native samples was **-0.8%**. *See supra* ¶ 499. In contrast, Dr. Fenton's calculations of weighted DLS z-ave yielded a % difference of **+3.72%**. Fenton Opening Rep. Ex. E (cell G24). Not only did the ultracentrifugation study produce data that directly undermines the purported trend observed by Dr. Fenton, but it also resulted in a % difference value that is roughly 4.7-times lower than the percent difference value obtained from back-calculations that are subject to compounded NTA error inherent to the calculation. Although Dr. Fenton's DLS analysis, as conducted in Exhibit E of his report, alone provides evidence to support that the particles are not being changed during fractionation, the direct sample analysis, which is more appropriate than attempted back-calculations, provides additional and stronger evidence of the lack of particle change. *See supra* ¶¶ 497-499.

518.    Despite the inappropriate reliance on error-prone calculations, each of Dr.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Fenton's analyses, when using correct calculations, provides no evidence of particle change due to fractionation, and if anything, the general alignment of % differences with expected variance demonstrates that the particles are likely not changing.

519.    Dr. Prud'homme opines that "simply because the results are internally consistent, does not indicate that they are accurate. For example, if every UC run is disrupting the particles to the same degree, the measurements Dr. Schuster obtains will be internally consistent, but nonetheless will not be representative of Moderna's COVID-19 vaccine as it was manufactured, sold, or used." Prud'homme Rep. ¶ 423.  However, as explained extensively throughout this section, evidence from Dr. Schuster's Opening Report as well as evidence from the ensuing centrifugation study run by Coriolis demonstrate that the fractionation technique used by Coriolis does not disrupt the particles.  Moreover, in addition to demonstrating precision (repeatability), Dr. Schuster's qualification assay demonstrated that the lipid concentrations for PEG2000-DMG, cholesterol, DSPC and SM-102 can be accurately determined.  Schuster Opening Rep. Exhibit J Section 6.6.  Dr. Schuster additionally verified the accuracy of each LC-CAD run via SST. Schuster Opening Rep. Exhibit J at 32-33.  In any event, Dr. Prud'homme does not articulate any theory—much less provide any evidence—as to how Dr. Schuster's ultracentrifugation procedure could modify the particles in such a way to so consistently produce the observed patterns in the data.  It continues to be my opinion that the consistent trends in the data provide further confirmation that the sample handling and centrifugation do not disrupt the particles.

520.    Dr. Prud'homme opines that "[d]ue to the deficiencies in Dr. Schuster's approach, I would conclude that the data obtained is insufficient to conclude that the samples Schuster tested and his conclusions would support equivalence between the samples in his studies and Moderna's commercial product," and cites Dr. Fenton's report for this general assertion.

322

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Prud'homme Rep. ¶ 419. Dr. Prud'homme does not specify what "deficiencies" he is referring to, nor does he cite to any data or evidence to support his assertion. For all of the reasons described above, I disagree that the fractionated particles are not representative of the particles in the commercial drug product.

521.    Dr. Prud'homme opines that "[b]ecause [] Dr. Schuster's data is not representative of the composition of the same lots upon release, they therefore cannot be representative of the composition of *other* lots upon release." Prud'homme Rep. ¶ 429. As described throughout this section, there is strong evidence that the fractionated samples are representative of the commercial drug product. In addition, as stated above, Moderna has agreed that it "will not make any argument about the applicability of any test data generated by Plaintiffs from produced lots to other lots containing the same mRNA-LNP part number on the basis that such lots containing the same mRNA-LNP part number were not produced pursuant the parties' agreed-upon protocol above or that Plaintiffs did not test such unproduced lots." DI 225 ¶ 5. To the extent that Dr. Prud'homme intends to argue that the un-tested, non-stipulation lots would have produced alternative testing results, this is improper.

### d.    Dr. Schuster's LC-CAD Results Demonstrate Infringement.

522.    As stated in my Opening Report, "[t]he ultracentrifugation fractionation testing conducted by Dr. Schuster and his colleagues at Coriolis [] establishes that Moderna's Accused Product infringes the lipid content limitations set forth in the claims of the Lipid Composition Patents." Opening Rep. ¶ 618. As further explained in my Opening Report, "the identification of a fraction with an infringing composition demonstrates that particles within the fraction also have an infringing composition, because the measured composition of the fraction (with respect to the mol% of each lipid) reflects the measured mean value of all the particles that are distributed normally about this mean. Given the very large number of particles that are present,

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

there would exist particles at or essentially at the mean."  Opening Rep. ¶ 620.

523.    Neither Dr. Fenton nor Dr. Prud'homme refute that the composition of particles within a fraction are distributed normally about the mean measured lipid content values, nor does either expert refute that there would exist particles at or essentially at the mean.  Instead, Dr. Fenton opines that there is no "confirm[ation]" as to whether there is "unencapsulated mRNA, unincorporated lipids, or ███████████," which is "a problem" because they would be "counted as part of the composition."  Fenton Rep. ¶¶ 85-86; *see also* Prud'homme Rep. ¶ 411.  I note that neither Dr. Fenton nor Dr. Prudhomme provide evidence for their conjecture, including evidence of any dissociated lipids, naked mRNA, empty particles, etc., in the infringing fractions identified in my Opening Report.  In addition, for the reasons described below, I disagree that this material poses a non-negligible risk of impacting the composition measurements of the infringing fractions.

524.    Dr. Fenton asserts that ████████████████████████████████████ ████████████████████████  Fenton Rep. ¶¶ 46-47 (emphasis added) (citing a cryo-EM images excerpted from MRNA-GEN-00034798 at 819 and MRNA-GEN-00663212); *see also* Prud'homme Rep. ¶ 411.  Dr. Fenton and Dr. Prud'homme cite a study in which Dr. Simonsen and her colleagues found that "Spikevax® (based on the standard LNP lipid composition including SM-102) contain less than ~16% empty LNPs."  Simonsen 2024[38] at Fig. 3A; *see* Fenton Rep. ¶ 48; Prud'homme Rep. ¶ 411.  Moderna has described that empty blebs are a "minor proportion" of the formulation.  MRNA-GEN-00762092 at -111.

525.    Not only are empty particles and dissociated lipids expected to comprise a small

---

[38] Jens B. Simonsen et al., *A perspective on bleb and empty LNP structures*, 373 JOURNAL OF CONTROLLED RELEASE 952-961 (2024) ("Simonsen 2024"). .

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

proportion of Moderna's mRNA-1273 drug product, but Dr. Fenton himself acknowledges that the UC "technique has been used to separate out 'empty' particles . . . and 'naked' nucleic acid," and cites numerous articles to support this assertion.  Fenton Rep. ¶ 70.  Moderna similarly has noted the difference in densities and sedimentation rates that are presumed to correspond to different morphologies and types of structures in Moderna's mRNA-1273 formulation.  *See, e.g.*, MRNA-GEN-00762092 at -113 (describing that "mixtures" of LNP and liposome-type structures in Moderna's formulation "would help explain the heterogenous mix of densities and sedimentation characteristics identified by analytical ultracentrifugation and density gradient sedimentation.").  Plaintiffs have likewise described the difference in sedimentation between filled (i.e., nucleic-acid encapsulating) and empty particles.  *See, e.g.*, GENV-00167565 at -567 (2008 Pre-IND questions, stating that changes in sedimentation during analytical ultracentrifugation between empty and filled SNALPs were "discernable down to 5% empty spike levels.").  The UC technique separates particles by density, which means that it separates empty particles from particles with nucleic acid encapsulated, and in fact has long been used for this explicit purpose; the fractions I identified as infringing have nucleic acid encapsulated.  As described in my Opening Report, the frequently infringing fractions (5-6) have relatively low PDI values, Opening Rep. ¶ 627, which would not be expected if the fractions comprised heterogenous mixtures of particles.  Similarly, the frequently infringing fractions (5-6) have relatively small DLS values, which would likewise not be expected if there were lipid aggregates.  Opening Rep. ¶ 635.  In addition, fractions 1-3 seldom have levels of mRNA above LOQ, yet as the NTA data indicates (and Dr. Fenton admits), these fractions contain lipid content / particles, Opening Rep. ¶ 636-37; Fenton Rep. ¶ 110, suggesting that the lipids and "empties" in the tested samples are floating towards the top of the tube, thereby separating from the nucleic

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

acid-lipid particles in later, infringing fractions.  *See also* Schuster Rep. ¶ 71.  If any empty
particles do remain in the infringing fractions (something there is no evidence at all to support),
given the already low proportion of empties to begin with, it is unlikely that this population
would comprise a sufficient proportion of the particles in the fraction to meaningfully impact the
lipid composition measurement.  Moreover, neither Dr. Prud'homme nor Dr. Fenton point to any
evidence that the lipid composition of empty particles or lipid aggregates within a sample of the
drug product are different than the composition of mRNA-containing LNPs.  *See e.g.,*
Prud'homme Rep. ¶ 412 ("*[I]f the lipid compositions of those empty LNPs is different than the
composition of the filled LNPs, they will skew the results*" (emphasis added)); Fenton Rep. ¶¶
86-87.  Again, Moderna and/or its experts could have performed experiments in response to Dr.
Schuster's and my report to substantiate such speculation; they either declined to do so or
performed experiments and did not include the results in their responsive reports.  In my opinion,
the lipid composition results of a sample are valid and representative of the mRNA 1273-
containing particles even if there is a sub-population of empty particles or lipid aggregates
present.

526.    Dr. Prud'homme opines that "a single 'density' sample in Dr. Schuster's assay
cannot provide information on the composition of individual LNPs," because "[i]t may contain
LNPs with significantly different compositions."  Prud'homme Rep. ¶ 418.  I do not disagree
that the fractions are not necessarily monodisperse; however, I do disagree that a lack of
monodispersity in a fraction would mean that Dr. Schuster's assay cannot provide information on
the composition of individual LNPs.  Instead, as stated in my Opening Report, "[g]iven the very
large number of particles that are present [in a fraction], there would exist particles at or
essentially at the mean."  Opening Rep. ¶ 620.  Neither Dr. Fenton nor Dr. Prud'homme opine

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

that it is unlikely that there would be particles at or essentially at the mean; doing so would defy

basic principles of LNP science and statistics. In addition, Dr. Prud'homme's general assertion

that LNPs within a formulation vary in terms of mRNA loading and his opinion that a single

fraction may comprise LNPs of different structures ████████████████████████

Prud'homme Rep. ¶ 418, are not relevant to my opinion that there will be particles at or

essentially at the mean in each fraction. In addition, Dr. Prud'homme's opinions are irrelevant to

the question of infringement of the Lipid Composition Patents which do not claim particles of a

particular structure nor of a particular mRNA loading amount (so long as nucleic acid is present).

527.    Dr. Prud'homme opines that my "premise,"—*i.e.*, that the identification of a

fraction with an infringing composition demonstrates that particles within the fraction also have

an infringing composition—"is faulty in two ways": "(1) even prior to processing, a

measurement of the mean of an aggregate population *may* not be representative of the particles

therein because of other species, like empty LNPs, in the composition and (2) the results *may* not

be representative because of the effects of the handling and processing steps to which Dr.

Schuster has subjected the material to, and therefore any resulting data is not representative of

the material as it was manufactured, sold, used, etc." Prud'homme Rep. ¶ 412 (emphasis added).

I disagree with both of these alleged "fault[s]." As explained above, other species in a

formulation are, in all likelihood, not skewing the measurement of the mean lipid content,

especially the mean lipid content of the infringing fractions where—based on the field's

understanding of UC, Moderna's UC results, and Coriolis's own testing data—the existence of

"other species" in the infringing fractions, if any, would be understood to be negligible. *See*

*supra* ¶¶ 446, 486, 523-525; Fenton Rep. ¶ 70 ("[T]he [UC] technique has been used to separate

out 'empty' particles (or alternatively micelles or blebs)."). Furthermore, as explained at length

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

above, "the handling and processing steps to which Dr. Schuster has subjected the material to," did not change the particles in the formulation, such that the fractionated samples are representative of the starting material and commercial drug product. *See supra* Section VII.C.2.c.

528.    Dr. Fenton opines that there are non-uniform morphologies encapsulating mRNAs, including, for example, that "at times" mRNA is "located in a 'bleb' compartment." Fenton Rep. ¶ 87.  Dr. Fenton further opines that "to the extent any of these materials that do exist in the drug product, but are not part of a nucleic acid-lipid particle are not excluded—which they are not according to Dr. Schuster's descriptions—they are improperly being factored into his molar ratio calculations."  Fenton Rep. ¶ 87.  It is unclear what Dr. Fenton means by these statements.  However, mRNA located within a "bleb" compartment within a particle having a lipid composition falling within the claimed ranges infringes the claims.  Neither Dr. Fenton nor Dr. Prud'homme have opined that mRNA encapsulated in blebs is non-infringing or provided an explanation of why this would be the case.  Moreover, neither Dr. Prud'homme nor Dr. Fenton opine that the lipid composition of such mRNA-containing blebs within a sample of the drug product is different than the composition of any other mRNA-containing particle, such that Dr. Fenton's opinion regarding an improper incorporation of these particles into the molar ratio calculations does not make sense.

529.    Dr. Fenton opines that none of the properties of LNPs, including lipid content, "appear to have a relationship with density" which "[a]t best, [] suggests that Dr. Schuster did not achieve any reasonable level of resolution using his protocol," and "[a]t worst, [] suggests that Dr. Schuster is not separating out different compositions of LNPs, but rather different species found in the formulation all together (e.g., micelles, aggregates, other impurities formed

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

by the lipids and/or other components)." Fenton Rep. ¶ 72. As described above, the graphs in my Opening Report display a clear and consistent relationship between LNP properties and density (*i.e.*, fraction number), including a clear relationship between lipid composition and density. *See supra* ¶ 440. Moreover, the "exceedingly small" analytical variability of the LC-CAD test results (*i.e.*, low SD and RSD % values), Opening Rep. ¶ 639, paired with the range of molar ratio values obtained from Dr. Schuster's testing, demonstrate that Dr. Schuster's method is plainly achieving a "reasonable level of resolution," of the lipid composition heterogeneity of the samples tested. I also do not see the relevance of this assertion, as lower resolution testing (*e.g.*, lipid composition measurements of the formulation as a whole) still provides information about the lipid composition of particles within the formulation. *See supra* ¶¶ 316-317. In the context of Dr. Fenton's alternate theory about separation of particle species, Dr. Fenton opines that "it is impossible to apply these [molar ratio] measurements to hypothesize the composition of individual particles in the composition." Fenton Rep. ¶ 72. Dr. Fenton's opinion is inscrutable, including because he provides no reason why the separation of sub-species of particles would somehow render the lipid composition measurements inapplicable to the particles within the fractions. Far from being "impossible . . . to hypothesize the composition of individual particles in the composition," Dr. Schuster's testing—regardless of the particle species present—reliably, accurately, and precisely measures the mean lipid composition of the particles in the fraction. As described in my Opening Report (and as Dr. Fenton and Dr. Prud'homme do not dispute), there will exist particles at or essentially at the mean lipid concentration values for each fraction. *See* Opening Rep. ¶ 620; ███████████████████████
███████████████████████████████████

530. Dr. Fenton notes that "each of the independent claims of the Molar Ratio Patents

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

is directed to '[a] nucleic acid-lipid particle,'" and that he "understand[s] from counsel that Plaintiffs have taken the position in this case that this requires that infringement be shown at the level of individual particles," but that he is "not aware of any methodology that can evaluate the composition on a single particle level." Fenton Rep. ¶ 38. Dr. Fenton, however, stops his citations from DI 161 one sentence short of where Plaintiffs specifically articulate that aggregate concentration measurements are "relevant" to the lipid composition of the particle. Fenton Rep. ¶ 38; DI 161 at 2-3. They are relevant, for the reasons I explain and Dr. Fenton and Dr. Prud'homme do not dispute.

531.    As described in my Opening Report, evaluating composition on a single particle level is not necessary to show infringement, because the lipid composition measurement of a sample of particles (whether of the entire formulation or a sub-population fraction of the formulation) "informs whether nucleic acid-lipid particles satisfy[ing] the recited lipid content limitations are present in the lots." Opening Rep. ¶ 609.

532.    Dr. Fenton opines that "none of the methodology Dr. Schuster has employed has measured any of the properties of the LNPs, including lipid content, on the level of individual particles. Instead, while Dr. Schuster may have fractionated Moderna's composition into a number of 'subsets' or fractions, the measurements he is obtaining are nonetheless aggregate measurements, just of a somewhat smaller pool of LNPs or other material," and further that "even dividing a sample into 10 fractions, any measurements taken at that point would nonetheless reflect the aggregate composition of a vast multitude of LNPs." Fenton Rep. ¶ 51; *see also* Prud'homme Rep. 414. I do not disagree with these descriptions of Dr. Schuster's HPLC-CAD measurements; however, where I do disagree with Dr. Fenton is in his assertion that "[t]herefore, to the extent that infringement requires a showing of the composition of individual

330

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

particles, for this reason alone, Dr. Schuster's analysis fails to support a finding of infringement."
Fenton Rep. ¶ 51.  Dr. Prud'homme similarly opines that "Dr. Mitchell cannot confirm the lipid
content of any individual lipid particle in the composition."  Prud'homme Rep. ¶ 365.  As
described in my Opening Report, "the identification of a fraction with an infringing composition
demonstrates that particles within the fraction also have an infringing composition, because the
measured composition of the fraction (with respect to the mol% of each lipid) reflects the
measured mean value of all the particles that are distributed normally about this mean.  Given the
very large number of particles that are present, there would exist particles at or essentially at the
mean."  Opening Rep. ¶ 620 (citing Moderna '435 IPR CAFC Appeal Reply Brief and various
other Moderna employee deposition transcripts and documents); ████████████████████

████████████████████████████████████████████████████████████

███████████████████████  Neither Dr. Fenton no Dr. Prud'homme address or dispute
the assertion that lipid particles' compositions within a formulation is distributed around the
mean.

533.    Dr. Prud'homme opines that, because fractionation measurements are still
aggregate measurements, "[t]o the extent Dr. Mitchell contends the Certificate of Analysis
measures are not sufficiently precise to assess infringement by virtue of being an aggregate
measure, the same is true of Dr. Schuster's fractionation study."  Prud'homme Rep. ¶ 414.
However, as discussed at length in my Opening Report and here, aggregate measurements such
as COA data are sufficiently precise to demonstrate infringement, as there will be LNPs within
the formulation with lipid compositions at or near the measured mean.  *See* Opening Rep.
Section XIII.F.1; *supra* Section VII.B.  As I further explain in my Opening Report, although
COAs can demonstrate infringement, "[g]iven how close Moderna's target v1 and v2

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Formulations are to the claimed molar ratios, Moderna's testing results of its bulk unfractionated

samples do not eliminate the possibility that those batches contain infringing particles."  Opening

Rep. ¶ 622.  Dr. Schuster's testing confirms that there are such infringing particles.

## VIII. MODERNA'S INFRINGEMENT OF THE LIPID COMPOSITION PATENTS UNDER THE DOCTRINE OF EQUIVALENTS

### A. Cationic Lipid

534.    In my Opening Report, I offered opinions as to the equivalence between the

claimed amount of cationic lipid in the Lipid Composition Patents and the amount of cationic

lipid present in Moderna's COVID-19 vaccine.  *See* Opening Rep. Section XIII.F.2.a.  Dr.

Prud'homme responds to those opinions in paragraphs 455 through 506 (for Moderna's v1

Formulation) and paragraphs 531 through 575 (for Moderna's v2 Formulation).  Dr.

Prud'homme's opinions concerning those two different formulations are overlapping, and I

address them together in this section.  I address Moderna's other defenses regarding doctrine of

equivalents (such as prosecution history estoppel) in a separate section below.  *Infra* Section IX.

I also address Moderna's infringing intermediate, including with respect to the doctrine of

equivalents, in a separate section below.  *Infra* Section XI.B.  At the outset, I note that certain of

my analysis of infringement under the doctrine of equivalents assumes that batches do not

infringe literally, despite my belief that they do infringe literally (for example, because they

contain particles that meet the molar ratio limitations, even though the bulk measurements in

Moderna's COAs do not).  In this section, therefore, I generally assume that such batches do not

infringe literally, for purposes of my analysis under the doctrine of equivalents.

### 1. Dr. Prud'homme Criticisms of My Analysis

535.    In my Opening Report, I cited evidence regarding the equivalence between

batches made with Moderna's v1 and v2 Formulations (which have target cationic lipid amounts

332

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

538.     As noted in the previous paragraph, Dr. Prud'homme faults me for comparing the amount of cationic lipid in Moderna's v1 and v2 Formulations with the amount of cationic lipid in its PVU Formulation.  Prud'homme Rep. ¶ 457.  I disagree with Dr. Prud'homme's criticisms. In my opinion, the PVU Formulation is relevant because it is highly similar to the v1 and v2 Formulations, except it has (for example) a target cationic lipid amount of 50 mol % that literally falls within the scope of the claims.  *Supra* ¶ 307.  As noted above and in my Opening Report, Moderna has not contested that batches made pursuant to the PVU Formulation fall within the literal scope of the Lipid Composition Patents, and Dr. Prud'homme does not cite any evidence to dispute that proposition.  *Supra* ¶ 307; Opening Rep. ¶ 654.  As such, the PVU Formulation is a highly relevant comparator, as there is no dispute that it literally falls within the scope of (for example) the cationic lipid mol % limitations.  Thus, to the extent the amount of cationic lipid in the v1 and v2 Formulations is equivalent to the amount of cationic lipid in the PVU Formulation (as Moderna repeatedly represented to the FDA) that Moderna agrees falls within the literal scope of the claim, it necessarily is equivalent to the amount of cationic lipid recited by, and within the literal scope of, the asserted claims that require at least 50 mol % cationic lipid.

539.     Dr. Prud'homme opines that "changes to the lipid molar ratio percentages can impact various properties of the LNP."  Prud'homme Rep. ¶ 457.  I do not disagree with this general statement—indeed, the fundamental discovery described in the Lipid Composition Patents relates to new lipid molar ratios that yield lipid particles with improved properties. However, Dr. Prud'homme does not opine that the *particular* changes that Moderna implemented (*e.g.*, lowering the target amount of SM-102 to below 50 mol %) actually impacted any properties of its LNPs.  Dr. Prud'homme cites to MRNA-GEN-00554883 at -895, but the line that he quotes ("The ratio of lipid components was selected to optimize vaccine

335

immunogenicity") is clearly referring to the original, 1.5:50 PVU target formulation, as immediately under that bullet is the statement that "The ratio was slightly adjusted prior to Scale A PPQ to conform with Moderna's vaccine platform," which is referring to the initial change to the v1 Formulation. *E.g.*, Opening Rep. ¶¶ 351, 419. As such, this document is consistent with Moderna's representations to the FDA that the change to the v1 Formulation was for "platform harmonization" reasons, rather than an attempt to actually change the properties of its COVID-19 vaccine. Opening Rep. ¶¶ 418-420. Although, as I describe in my Opening Report, the change to the v1 Formulation did not result in any "harmonization"—that change was plainly made for IP reasons. Opening Rep. ¶ 423. Either way, there is no basis to conclude that the modification was made to create a substantial change in the product or that it did so.

540.    Dr. Prud'homme cites several other documents with general statements about how lipid molar ratios can affect physical parameters of the LNP, Prud'homme Rep. ¶ 457, but—again—this ignores the actual changes that Moderna made, which Moderna found did *not* affect those properties. Opening Rep. ¶ 420; MRNA-GEN-01802160 at -165 ("These concentration changes did not impact SM-102 LNP process performance, in-process physical stability, or physicochemical properties."). Dr. Prud'homme cites no evidence to the contrary.

541.    In my Opening Report, I explained that the function of the cationic lipid mol % would serve the same function in the claims as in drug product lots of the Accused Product. Opening Rep. ¶¶ 656-658. In offering that opinion, I cited statements from the patent, the literature, Moderna's IPR expert, and Moderna's submissions to the FDA. Opening Rep. ¶¶ 656-657. Dr. Prud'homme does not identify anything scientifically inaccurate about my descriptions—instead, he opines that my opinion "fails to address the impacts of changing the cationic lipid mol % concentration." Prud'homme Rep. ¶ 459. To the extent this results-related

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

structure of the particular PEG-lipid should be a factor in the "way" analysis. Assuming that is what Dr. Prud'homme is suggesting, I disagree. As I have stated repeatedly, most of the claims are not limited to a particular PEG-lipid, and the PEG-lipid in Moderna's COVID-19 vaccine is within the literal scope of all of the asserted claims, as Dr. Prud'homme acknowledges. The issue for DOE is whether the mol% of PEG-lipid is equivalent.

618.    Dr. Prud'homme opines that "Moderna recognized an interest in 'increasing the levels of PEG-lipid of [its] nanoparticles to enhance the stability of the LNP in the vial, while preserving the biological activity of the LNP,' as well as variation in 'where in the processes the ███████████████ Prud'homme Rep. ¶ 614 (quoting MRNA-GEN-00539393 at -400-401). He continues that these "methods included ████████████████████████████ citing several pages of deposition testimony without explanation. Prud'homme Rep. ¶ 615. I address both of those methods above and in my Opening Report, *e.g.*, *supra* Section IV.C, although I disagree that those methods are relevant to the equivalents inquiry.

619.    Dr. Prud'homme opines that the "'way' in which 2.5mol% PEG is added ████████████████████████████████████ has a significant impact on the result." Prud'homme Rep. ¶ 616. Again, I discuss Dr. Prud'homme's opinion about the ██████████████ process above. *Supra* Section IV.C. More importantly, I disagree that Dr. Prud'homme's opinions relate to the "way" that mol % of the PEG-lipid functions, and I disagree that the method the ██████████████ to the nucleic acid-lipid particle is either a limitation of the claim or a proper subject for the equivalents inquiry.

620.    Dr. Prud'homme opines that "the 'way' ████████████████████ in two discrete steps is significantly different to the <2 mol% of the asserted claims." Prud'homme Rep. ¶ 617. I disagree, for reasons I have already explained. The asserted claims do not recite or

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

that, and he certainly does not provide any evidence that increasing the amount of PEG-lipid from within the literal scope of the claims (*e.g.*, 2.40 or 2.499 mol %) to outside the literal scope of the claims (*e.g.*, 2.501 mol %) has any effect on efficacy or any other property.

625.    Finally, Dr. Prud'homme opines that "During development of Moderna's COVID-19 Vaccine, by comparison, Moderna scientists confirmed that increasing PEG from 1.5mol% to 2.5mol% through the ▮▮▮▮▮▮ process increased stability."  Prud'homme Rep. ¶ 621.  I disagree that this change produced a substantial stability benefit.  Opening Rep. ¶¶ 437-451, 723-727.  However, even if moving from 1.5 mol % to 2.5 mol % PEG-lipid did confer some marginal improvement in stability on Moderna's COVID-19 vaccine, I disagree that this is the proper inquiry.  Rather, the proper question is whether a batch literally within the scope of the claims (*e.g.*, having 2.40 or 2.499 mol % PEG-lipid) has substantially different stability as compared to a batch outside the scope of the claims (*e.g.*, having 2.501 mol % PEG-lipid).  I disagree that Dr. Prud'homme has put forward any evidence on this issue, and Moderna's own experiments and conduct in selling v2 batches demonstrate that such a difference in PEG-lipid does not make any difference to the stability of Moderna's product.  *E.g.*, Opening Rep. ¶ 725.

### 4.    Dr. Prud'homme's "Results" Analysis.

626.    As I explained in my Opening Report, the specification of the Lipid Composition Patents explains that the result of the mol % conjugated/PEG-lipid limitation is the effective, efficient delivery of nucleic acid.  Opening Rep. ¶ 717.  Dr. Prud'homme cites many of the same passages from the specification that echo this goal.  *E.g.*, Prud'homme Rep. ¶ 623 ("impart increased activity," "improved tolerability," "increase in the therapeutic index" (quoting '069 Patent at 5:44-6:19)).  As I explained in my Opening Report, across those dimensions, there is no substantial difference between the claims (which extend to 2.499… mol % PEG-lipid) and particles in batches of the Accused Product with slightly more PEG-lipid, including with respect

378

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

to the efficacy, safety, and stability of those particles.  Opening Rep. ¶¶ 717-727.  Dr. Prud'homme does not address, much less dispute, most of the evidence of similarity in results that I discuss in my Opening Report.  Instead, he consistently attempts to add limitations to the claims that do not exist.

627.    For example, Dr. Prud'homme opines that "the inventor Mr. Yaworksi noted that PEGs [*sic*] role was to ensure stability for systemic delivery to distal target cites, which is not applicable to Moderna's use of PEG in its COVID-19 Vaccine."  Prud'homme Rep. ¶ 623.  I disagree with Dr. Prud'homme characterization of Mr. Yaworski's testimony.  As an initial matter, Dr. Prud'homme ignores the testimony from Mr. Yaworski explaining that the "PEG lipid is very important in terms of controlling particle size, colloidal stability, so that when it's in the vial, that these particles don't aggregate or precipitate."  Yaworski Tr. 19:10-13.  Moderna describes the role of the PEG-lipid in its COVID-19 vaccine in the same way.  MRNA-GEN-00988589 at -592 ("The PEG-lipid enhances colloidal stability of the LNP dispersion.").  That is consistent with the function I described in my Opening Report.  Opening Rep. ¶ 712.

628.    With respect to the role of the PEG-lipid *in vivo*, Dr. Prud'homme quoted Mr. Yaworski as explaining that "So when we inject these particles into the circulation, quite often they're, you know, interacting or being bound, or what we say is austenized [sic]. There's a lot of proteins, there's a lot of cellular interactions.  These PEG lipids provide the particle with some shielding to prevent rapid elimination or clearance to the reticuloendothelial system, which is a concern if you're trying to deliver drug to cells."  Yaworski Tr. 19:20-24.  Again, this is consistent with my opinion in my Opening Report that the PEG-lipid (including the amount of the PEG-lipid) can "impact . . . circulation time," Opening Rep. ¶ 712, which is why I assessed differences in efficacy/delivery as part of my "results" analysis, Opening Rep. ¶ 717.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Dr. Prud'homme opines that "Moderna's research and development led to not only innovations in and changes to the lipid composition of the LNPs in Moderna's COVID-19 vaccine, but also the manufacturing process used to make them." Prud'homme Rep. ¶ 678. I disagree, for reasons described above. *E.g.*, *supra* Sections IV.C, IV.D. More to the point, though, Dr. Prud'homme does not identify any "innovations" by Moderna that would render its COVID-19 vaccine particles with 49.5 mol % non-cationic lipid substantially different from particles with (for example) 50.0 mol % non-cationic lipid. The evidence I cite in my Opening Report—which Dr. Prud'homme ignores—demonstrates that there are no such differences.

655.    In paragraph 679, Dr. Prud'homme repeats his opinion that it is improper to rely on Moderna's statements to the FDA, which I address above. *Supra* ¶ 542.

656.    In paragraph 680, Dr. Prud'homme refers to his opinions elsewhere to disagree with my characterization of Moderna's formulation efforts. I address those opinions above.

657.    In my Opening Report, I observed that Moderna failed to test the within-batch heterogeneity of its COVID-19 vaccine, despite strong reason to suspect that the lipid content did vary. Opening Rep. ¶ 700. As I explained, this suggests that Moderna did not view this heterogeneity, including in non-cationic lipid amount, as constituting substantial differences. Dr. Prud'homme opines that this opinion is "entirely divorced from the Molar Ratio Patents," and cites statements from the prosecution history about the advantages of the invention. Prud'homme Rep. ¶ 681. I note that Dr. Prud'homme does not disagree with the substance of my opinions, including that (1) Moderna knew that its COVID-19 batches were heterogenous, (2) they failed to test for such heterogeneity, and (3) this indicates that they did not view such heterogeneity as constituting substantial differences. I am not aware of any requirement that evidence of "substantial differences" must be tied to a disclosure or analytical assay in the patent.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Nevertheless, I observe that the Lipid Composition Patents do discuss lipid content heterogeneity. *E.g.*, '069 patent, 68:35-43 ("It should be understood that the 1:57 formulation and 1:62 formulation are target formulations, and that the amount of lipid (both cationic and non-cationic) present and the amount of lipid conjugate present in the formulation may vary. Typically, in the 1:57 formulation, the amount of cationic lipid will be 57 mol%±5 mol%, and the amount of lipid conjugate will be 1.5 mol%±0.5 mol %, with the balance of the 1:57 formulation being made up of non-cationic lipid (e.g., phospholipid, cholesterol, or a mixture of the two)"), 24:13-26. Moderna's expert had the same understanding. Anchordoquy 3/24/2020 Tr.[41] 70:15-71:24 ("And where you have a population of lipid particles, do you expect some variability in the lipid composition on a particle-by-particle basis?" "A. Yes. This is addressed in paragraph 111. . . . [A] POSITA would understand these limitations to encompass at least the variability in particle formulation described in the specification. Then here, I quote an exhibit. Typically, in the 1 to 57 formulation, the amount of cationic lipid will be 57 mol percent, plus or minus 5 mol percent, and the amount of lipid conjugate will be 1.5 mol percent plus or minus .5 mol percent. So I believe that's the variability you're referring to." Q. "Okay. So my question was in that type of population of lipid particles, you do expect some variability in the lipid composition on a particle-by-particle basis; is that correct?" A. "Sure. You'd expected variability in terms of lots of parameters. Particle size, as well.").

658. With respect to my hypothetical claims, Dr. Prud'homme does not provide any new analysis, but simply repeats his opinion about "individual lipid particles." Prud'homme Rep. ¶¶ 682-683. I address that above.

---

[41] *Moderna Therapeutics, Inc. v. Arbutus Biopharma Corp.*, IPR2019-00554, Exhibit 2043 (P.T.A.B. Mar. 24, 2020) ("Anchordoquy 3/24/2020 Tr.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

opines that I "point[ed] to one Moderna document showing data not for SPIKEVAX®, but CMV-related formulations." Prud'homme Rep. ¶ 773 (citing MRNA-GEN-00734102–133 at -108). Dr. Prud'homme does not actually cite the paragraph of my report that he is purportedly responding to, but I note that I discuss that document at, for example, paragraph 306 of my Opening Report. In any event, I do not find Dr. Prud'homme's critique persuasive—the document that he is referring to (MRNA-GEN-00734102) is about Moderna's COVID-19 vaccine. *See* MRNA-GEN-00734102 at -107 (referring to "mRNA 1273," Moderna's code for the COVID-19 product). Moderna itself relied on its CMV data to make decisions about the composition of its COVID-19 product, and Moderna expected the activity of its COVID-19 vaccine to be comparable to its CMV vaccine. MRNA-GEN-00734102 at -108; *see*, *e.g.*, Opening Rep. ¶¶ 406-422; Parsons Dep. Tr. 173:21-174:2 ("[O]ur ultimate objective was to get to the commercial vaccine platform that we had developed with CMV, and we were debating how best to do that."), 208:5-15 ("So clearly this activity was specific to the CMV vaccine. I think what we expected was that the same general observation that the activity of the vaccine – the COVID vaccine would be comparable across this lipid composition range.").

714.    With respect to that same PowerPoint slide (MRNA-GEN-00734102 at -108), Dr. Prud'homme also opines that the "study results even show that there are comparable immunogenicity reporter results for formulations that fall outside ranges that Genevant has claimed and Dr. Mitchell's hypothetical claims," citing the formulation with ██████ cationic lipid. Prud'homme Rep. ¶ 773. It is not clear to me whether, even in that single experiment, the ███████ cationic lipid condition is equivalent to the ███████████ conditions. I

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

observe that the slide highlights the ██████████ range as being equivalent.[45]  MRNA-GEN-00734102 at -108 ████████████████████████████████  I do not understand this contemporaneous conclusion to have been retracted by Moderna.  And the images with the data include a red box around the ████████████████████ conditions, but not the ██████ condition.  MRNA-GEN-00734102 at -108.  The data for the ████████████ appears to be lower than the ██████ condition for the "Day 36" condition (purple dots), and the data for the next condition ██████ has lower immunogenicity.  For all these reasons, and for the reasons I explained in my Opening Report, I am confident that ████████████ cationic lipid yield equivalent immunogenicity in Moderna's COVID-19 vaccine, which is why I identified ██ ██ as the lower bound for my hypothetical claims.  Opening Rep. ¶¶ 679-670.  By contrast, I have not opined that ██████ would likewise be equivalent, and I disagree with Dr. Prud'homme that the data clearly support such equivalence.  Additionally, as I explained in my Opening Report, Moderna experimented with ██████ cationic lipid compositions multiple times over the years and found such compositions to be insufficiently potent.  *E.g.*, Opening Rep. ¶ 298.  Had those formulations actually had equivalent properties, Moderna had important business reasons to use them and would have done so.  Moderna did not.  I therefore disagree that ██████ cationic lipid yields "comparable immunogenicity" to ██████ cationic lipid, even in Moderna's own experiments.

---

[45] I do recognize that, lower on the slide, there is a statement, "Comparable immunogenicity for reporter between ████████████████ SM-102."  MRNA-GEN-00734102 at -108.  I find that statement to be odd, as it is inconsistent with both the red boxes around the data (which only encompass ████████████ SM-102) and the statement earlier in the slide highlighting the range of ██████ SM-102.  The ██████ number appears to be a typographical error, but it is ambiguous.  In any event, as I explain above in text, I disagree that the data clearly indicate equivalence between the ████████████ conditions, even in this single experiment.  Many other experiments cited in my Opening Report confirm this conclusion.  *E.g.*, Opening Rep. ¶¶ 301-303, 310-313.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

*see* Prud'homme Rep. ¶¶ 716-750, which I discuss in this section of my report.

731.    Dr. Prud'homme disagrees with the nomenclature I used in my Opening Report—specifically, he opines that the nucleic acid-lipid particles formed from the ████████████ ███████████████████████████ cannot "properly be referred to as an 'intermediate,'" because "the material is not collected in any location such as a tank or reactor." Prud'homme Rep. ¶ 717. I disagree that this has any relevance to the infringement analysis. As I explained in my Opening Report, the Court ruled that subsequent manufacturing steps do not remove the particles from the scope of the claims. Opening Rep. Section V.A. Whether those nucleic acid-lipid particles are called intermediates or something else makes no difference; they infringe. ██ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ Prud'homme Rep. ¶ 717, but again, I disagree that the claims include any requirement related to the length of time that those particles must exist in order to infringe. Moreover, Dr. Prud'homme's opinions on this issue are inconsistent with his insistence elsewhere in his report that Moderna's manufacturing processes—and in particular, █████████████████████████—are critical to various product quality attributes. Prud'homme Rep. Section VIII.A.3. While I disagree with those opinions, as discussed above, *supra* Section IV.C, those opinions do underscore that Moderna itself views the ██████████████████████ as important. ███████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████

732.    Dr. Prud'homme opines that "nobody—neither Moderna nor Plaintiffs, or the parties' respective experts—have measured the aggregate lipid content, let alone the lipid content

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

infringement is the composition of individual particles and not the aggregate composition."
Prud'homme Rep. ¶ 721.  As I have repeatedly explained, it is a virtual certainty that an LNP
composition will contain particles at or very near to the measured mean lipid content of the
aggregate composition.  *E.g.*, *supra* ¶ 317.  Accordingly, the aggregate composition provides
relevant information for the infringement inquiry and establishes infringement where the
measurements fall within the scope of the Asserted Claims.

736.    Dr. Prud'homme opines that "When the particles themselves are properly
considered, a POSA would recognize that, in fact, many changes—likely including the addition
and/or removal of lipid components from individual particles—are occurring at this stage in the
manufacturing process."  Prud'homme Rep. ¶ 722.  It is not clear to me what Dr. Prud'homme
believes the relevance of his opinions on this issue to be.  For example, Dr. Prud'homme does
not cite to any evidence suggesting that an aggregate measurement of lipid content of ███████
███ would not be indicative of the lipid content of some of the particles therein.  Likewise, Dr.
Prud'homme does not offer any evidence indicating that ███████████████████████████
████████ substantially changes the lipid content of the particles, such that they would no longer
reflect the ███████████████████████████████████

737.    Dr. Prud'homme cites to several PowerPoint presentations and opines that
"Moderna studied the effects of neutralization by generating and concentrating LNPs without
neutralization," observing that ███████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████    Prud'homme Rep. ¶ 722.  Along
similar lines, he opines that Moderna ████████████████████████████████████████
██████████████ citing MRNA-GEN-00537655 at -669.006.  Prud'homme Rep. ¶ 722.

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

Again, it is unclear to me how Dr. Prud'homme thinks these presentations relate to the infringement analysis.  To the extent Dr. Prud'homme is suggesting that Moderna's neutralization step is altering the particle morphology or composition, I disagree that this would impact my infringement analysis. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

738.    Second, as Dr. Prud'homme himself observed, ████████████████████

████████████████████████████████████████████████ Prud'homme

Rep. ¶ 722.  Dr. Prud'homme acknowledges that ████████████████████████

████████████████████████ Prud'homme Rep. ¶ 721.  As such, to the extent that the

437

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

particles when it manufactures its COVID-19 vaccine.

743.    As I explained in my Opening Report, Moderna's President, Dr. Hoge, confirmed that the particles remain the same after the mRNA is encapsulated.  Opening Rep. ¶ 383.  Dr. Prud'homme reproduces a page of Dr. Hoge's testimony, which he interprets as meaning that Dr. Hoge testified that "the aggregate amount of lipid is expected to stay the same."  Prud'homme Rep. ¶ 726.  I disagree with that interpretation.  Shortly before the relevant question, the questioner clarified that he was "not asking about the bulk.  I'm asking about the particles"; Dr. Hoge subsequently testified that it is "not possible to isolate a particle and measure its component mixture, physically"; the questioner then asked for Moderna's "understanding about whether the particles have changed with respect to the lipid composition"; and Dr. Hoge provided that understanding: he said that "prior to loading the composition is the same, essentially identical, as it is post."  Prud'homme Rep. ¶ 726 (quoting Hoge Dep. Tr. at 261:18-264:10).  Dr. Hoge's testimony should not come as a surprise to Dr. Prud'homme, as Moderna's own documents reflect exactly that same understanding, such as in the graphic I have included below (which I also reproduced in my Opening Report in paragraph 381, from MRNA-GEN-00540686 at -701):

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



as Dr. Hoge testified and as Moderna informed the FDA.  MRNA-GEN-02663285 at -290

744.    Dr. Prud'homme opines that "the aggregate measurements both Drs. Mitchell and Schuster rely on are not necessarily (and as I discuss above, not likely to be) representative of the composition on the level of individual LNPs."  Prud'homme Rep. ¶ 726.  Dr. Prud'homme provides no evidence to support this assertion.  In my opinion, given the numerosity of particles in an LNP composition, it would be virtually impossible for there to exist no particles at or very near the mean lipid content value.  *Supra* ¶ 317.

745.    For the above reasons, it continues to be my opinion that Moderna's in-process compositions literally infringe the claims of the Lipid Composition Patents, as set forth in my Opening Report, including in paragraph 617.

746.    Dr. Prud'homme opines that Moderna does not indirectly infringe by way of its in-process intermediate.  Prud'homme Rep. ¶ 729.  I disagree.  As I explain in my Opening

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Report, "Moderna's contracted manufacturers also—at Moderna's direction and with Moderna's knowledge—infringed the Patents-in-Suit by using these components" and "Moderna knew that these steps taken at its direction would infringe the Patents-in-Suit."  Opening Rep. ¶ 778.  Dr. Prud'homme does not dispute my analysis on this point.  As such, it continues to be my opinion that Moderna indirectly infringes the Lipid Composition Patents, both via inducement and contributory infringement, by way of its contracted manufacturers' making of infringing in-process intermediates.

### B.  Infringement Under the Doctrine of Equivalents

747.    In my Opening Report, I explained how the ███████████████████ LNPs also infringed under the doctrine of equivalents.  Opening Rep. ¶¶ 676-680, 704-708.  In my Opening Report, I cited extensive evidence demonstrating that Moderna's change in its target lipid molar ratios for its ████████████████████████████████ SM-102) had no effect on product quality attributes.  Opening Rep. ¶ 677; *e.g.*, MRNA-GEN-00547580 at -580-82 ("Concentration changes did not impact ████████ process performance, in-process physical stability, or physiochemical properties against a control batch with the previous lipid concentration targets.").  Moreover, I noted that numerous of ███████████ lots for v1 and v2 did literally infringe (according to the certificates of analysis), *see* Opening Rep. ¶ 617, but Moderna has never identified any difference between any of its ██████████, and so all of those ██████████ should perform the same way.  Opening Rep. ¶ 678.  All of Moderna's v1 and v2 ██████████ are equivalent to each other, including to those lots that literally infringe.

748.    Dr. Prud'homme largely ignores the above evidence and arguments.  He opines that "Dr. Mitchell's reference to any inter-lot similarities is not the proper inquiry for the doctrine of equivalents, which requires him to compare the missing element from the Accused

443

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

addressed these opinions above.  I disagree that the fact that these particles may exist for a short period of time defeats infringement, and Dr. Prud'homme's characterization of the relevant length of time is inaccurate, given the timescale at which particle formation occurs.  *Supra* ¶ 742. I also disagree that Dr. Prud'homme has provided any evidence that these particles are "in a state of constant flux"—to the contrary, Moderna's regulatory submissions indicate that the particles are allowed sufficient time before the neutralization step so that they are completely encapsulated.  *Supra* ¶ 740.  With respect to neutralization, Dr. Prud'homme has conceded that the aggregate lipid content does not change during that process, and the homogenization of the particle population that Moderna hypothesizes should, if anything, bring the lipid content of more particles closer to the population average.  *Supra* ¶ 738.  With respect to the ████████ step, I disagree that has any relevance to this inquiry, which is limited to the nucleic acid-lipid particles that exist *before* ████████.  I separately address the infringement of Moderna's drug product, as it exists after the final ████████

754.    Dr. Prud'homme opines that "████████ particles have lower stability." Prud'homme Rep. ¶ 737.  I address that issue above.  *Supra* ¶¶ 739-740.  Even if Dr. Prud'homme were correct, he does not explain the significance of his opinion, and I disagree that the "nucleic acid-lipid particle" term contains any stability limitation.

755.    Dr. Prud'homme states that I "cite[] no evidence" supporting my opinion that the v1 and v2 ████████ are equivalent to the PVU ████████  Prud'homme Rep. ¶ 738.  I disagree.  It is Dr. Prud'homme who ignores the evidence I cite, for example, in paragraph 677 of my report, which makes plain that Moderna adjusted ████████ lipid targets with the express goal of avoiding any physicochemical changes.  MRNA-GEN-00547580 at -580-582 ("Concentration changes did not impact ████████ process performance, in-process physical

446

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

stability, or physiochemical properties against a control batch with the previous lipid

concentration targets."). The aforementioned document is not even on Dr. Prud'homme's list of

materials considered.

756. Dr. Prud'homme again criticizes my comparison across Moderna's own batches

of ███████ Prud'homme Rep. ¶ 739. I disagree that this is "not the proper comparison,"

for reasons I explain above. *Supra* ¶ 748. Dr. Prud'homme does not suggest that there are *any*

differences between Moderna's batches of ████████ that fall literally within the asserted

claims of the Lipid Composition Patents as compared to those batches that fall just outside the

literal scope of those claims.

757. Dr. Prud'homme opines that "When the ████████ are compared to the

claims [sic] particles comprising nucleic acid, not only does the cationic lipid / SM-102 achieve

different results, as described above, but those compositions as a whole undeniably achieve

different results at least because an ████████████████████████████

████████████ Prud'homme Rep. ¶ 739. I disagree. First, as I have repeatedly stated,

the relevant inquiry does not involve ██████████████████████" Rather,

the material that infringes are the ████████████████████████████

████████. Dr. Prud'homme's opinions about ████ LNPs are therefore irrelevant.

Second, Dr. Prud'homme notably fails to explain what "different results" are achieved by

Moderna's precursor particles with ████████ SM-102 (for example). Again,

Moderna's own documents indicate that it ████████████████████████

████████ such a way to explicitly avoid any impact on performance. Opening Rep. ¶¶ 677-

678. Dr. Prud'homme does not even address that evidence, much less identify any substantial

difference that arose from that change.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

patent,' at least because Moderna designed around the Molar Ratio Patents." Prud'homme Rep. ¶ 871.

768. With respect to the first point, my Opening Report sets forth a significant amount of evidence that Moderna's acts were intended to cause and led to the infringing acts of third parties. In particular, Moderna encouraged healthcare professionals to administer the COVID-19 vaccine by way of the labeling on its COVID-19 vaccine, and Moderna encouraged the public to use Moderna's COVID-19 vaccine through its marketing campaigns. Opening Rep. ¶¶ 764-769. Dr. Prud'homme does not dispute any of this evidence, and instead acknowledges that "Moderna 'encourage[d] individuals to use and administer' Moderna's . . . COVID-19 vaccine." Prud'homme Rep. ¶ 872. Because such use or administration constitutes infringement, *supra* Sections VII, VIII, Moderna's actions were intended to cause and led to infringing acts by third parties.

769. With respect to the second point, Moderna knew that such acts, if taken, would constitute infringement. As I explain in my Opening Report (summarized in paragraph 825), Moderna knew that there was batch-to-batch and particle-to-particle variability in its COVID-19 vaccine. In the only experiment to test such particle-to-particle variability, Moderna found infringing fractions. At least one scientist at Moderna proposed conducting additional such experiments, and his request was denied under circumstances I address at length in my Opening Report. Moreover, Moderna's own certificates of analysis demonstrate infringement, and Moderna knew how to calculate the lipid mol % from those certificates, which Moderna did with "a few lots" of the COVID-19 vaccine. To the extent Moderna was not actually aware that its COVID-19 vaccine infringed the Lipid Composition Patents—and in my opinion, Moderna more likely than not was aware of that fact—then Moderna was willfully blind to the fact, including by

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

taking deliberate steps to avoid the "uncomfortable questions" about patent infringement that might arise by studying the heterogeneity of the product.  *See* Opening Rep. ¶ 463.

770.    Dr. Prud'homme's disagrees because, in his opinion, Moderna "designed around the Molar Ratio Patents."  Prud'homme Rep. ¶ 872.  I disagree, for reasons I summarize in paragraph 823 of my Opening Report.  As I explain there, Moderna did try to design around the Lipid Composition Patents by pursuing target formulations with ████████ or less cationic lipid, but that effort failed, and Moderna eventually settled on target cationic lipid values of 48 and 48.5 mol%.  Those values are well within the ±5 mol % range disclosed in the Lipid Composition Patents.  *Supra* ¶ 328.  As described in the previous paragraph, Moderna found that there were indeed infringing particles in its COVID-19 vaccine, and they should have been aware that at least some of their certificates of analysis indicated infringing lipid content values.  As such, as I described in my Opening Report, Moderna tried and failed to design around the Lipid Composition Patents.  Opening Rep. ¶ 823.

771.    Dr. Prud'homme also opines that "various terms of the Asserted Claims are indefinite, rendering the scope of the claims uncertain.  That is an additional reason that there was no indirect infringement, as no one could know what constitutes infringement."  Prud'homme Rep. ¶ 872.  I understand that another expert has offered opinions about indefiniteness.  I note that Dr. Prud'homme does not identify any ambiguity about any claim term that would affect whether Moderna's COVID-19 vaccine would infringe.

772.    Dr. Prud'homme opines that "to the extent Dr. Michell is relying on any 'use' by patients or healthcare providers as the allegedly infringing act, Dr. Mitchell has not shown which lots, let alone which doses, of Moderna's COVID-19 vaccine were ultimately used."  Prud'homme Rep. ¶ 873.  I address this issue above.  *Supra* Section XII.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

also constitutes an infringing act under 35 U.S.C. § 271(f).  *See* Opening Rep. ¶¶ 817–818.

782.    Dr. Prud'homme also disagrees with my conclusion that Moderna knew that the combination of both the components of the ███████████████████████████ and the components of the final composition were covered by the Patents-in-Suit, and that those combinations would be infringing if they were to occur in the United States.  *See* Prud'homme Rep. ¶ 883.  The only reason for this disagreement identified by Dr. Prud'homme is his assertion that "Moderna designed around the Patents in Suit."  As discussed above, that assertion is wrong; Moderna was unable to design around the Patents-in-Suit.  *See supra* ¶ 770.  Moderna's knowledge and intent are also established by the facts I discuss showing that Moderna willfully infringed the Patents-in-Suit, which are likewise applicable to my opinions regarding indirect infringement.  *See infra* Section XVI; Opening Rep. ¶¶ 819–831.

783.    Also significant in Dr. Prud'homme's discussion of infringement under Section 271(f) is what he does not dispute from the discussion in my Opening Report.  Among other things, Dr. Prud'homme does not dispute: the identification of the batches of components manufactured in the U.S. and then shipped abroad (*see* Opening Rep. ¶¶ 809-810); that individual lipids within █████████ are components of the Accused Product (*see* Opening Rep. ¶ 811); or that both the █████████ and the ████████████ are "especially made or especially adapted for use in Moderna's COVID-19 vaccine and [are] not a staple article or commodity of commerce suitable for substantial noninfringing use" (*see* Opening Rep. ¶¶ 814–815).

## XV.    NON-INFRINGING ALTERNATIVES

784.    Dr. Prud'homme asserts that "there were several non-infringing alternatives acceptable and available at the time of the first alleged infringement."  Prud'homme Rep. ¶ 922.  I understand that in the context of a hypothetical negotiation, a viable non-infringing alternative

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

must not infringe the Patents-in-Suit, it must have been available at the time of the hypothetical negotiation, and it must have been an acceptable alternative, which means that its characteristics must not significantly differ from the patented product. I note that Dr. Prud'homme does not identify any alternatives whatsoever to the '651 patent. With respect to the Lipid Composition Patents, as discussed below, Dr. Prud'homme has not identified any alternatives that were non-infringing, available, and acceptable.

785. As I explained in my Opening Report, the target v1 and v2 Formulations infringe, and thus cannot be non-infringing alternatives. Opening Rep. ¶ 796. Dr. Prud'homme disagrees because, in his opinion, the "v1 and v2 Formulations do not infringe the Patents-in-Suit," including because my "analysis of the COA data is flawed." Prud'homme Rep. ¶¶ 923-924. I address Dr. Prud'homme's critiques related to infringement, including my discussion of Moderna's certificates of analysis, above. *Supra* Section VII.

786. As I explained in my Opening Report, there is no evidence that Moderna could have implemented any formulations other than the ones they ultimately did. Opening Rep. ¶ 801. Dr. Prud'homme disagrees, opining that "Moderna had years of study and data on alternative lipid formulations available by the date of the alleged first infringement (May 31, 2020)." Prud'homme Rep. ¶ 925. For support, he states that "Dr. Parsons, Moderna's corporate designee on non-infringing alternatives, testified, Moderna could have formulated LNPs with PEG-lipid to ███████ and cationic lipid down to ████████████ Prud'homme Rep. ¶ 925 (quoting Parsons Dep. Tr. at 428:16-432:21). However, I disagree that the mere possibility that "Moderna could have formulated" LNPs with a particular set of lipid molar ratios means that a product with those lipid molar ratios was actually *available* or *acceptable* to Moderna. Dr. Parsons was asked explicitly whether Moderna would have been able to commercialize any other

458

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

formulations, and he could not testify that Moderna could have.  Opening Rep. ¶ 801; Parsons 6/7/2024 Tr. 141:1-146:21 ("Q. So you don't know whether Moderna would have been able to commercialize a different formulation in 2020?" A: "What I know is the formulation that we had at that time was the most advanced, that was the one that we picked. I can't say whether or not we would have been able to commercialize a different formulation than that. . ." "Q. So sitting here today, is there another non-infringing alternative lipid molar ratio formulation that you can identify that Moderna could have commercialized in 2020?" A: "So there are other candidate formulations that would have met the success criteria, technical success criteria, that we had. The development pathway for each one of those formulations is uncertain and would have had to have been explored.").  Indeed, Moderna was not even able to implement the v2 Formulation until late 2021/early 2022, Opening Rep. ¶ 800, despite the fact that—according to Dr. Prud'homme—Moderna had "arrived at" the v2 Formulation by 2018, Prud'homme Rep. ¶ 157. Dr. Prud'homme cites no evidence that Moderna would have been able to commercialize an even more substantially different formulation—for example, with ███████ cationic lipid and █████ PEG-lipid—that Moderna had never used clinically.  Given the "incredibly strong business reasons" that Moderna had for pursuing a formulation with ██████ cationic lipid, Opening Rep.  ¶ 302, if such a formulation truly would have been available or acceptable to Moderna, it is my opinion that they likely would have pursued it, rather than target formulations with 48/48.5 mol% cationic lipid.

787.    Moreover, I discuss the specific formulation (DH-00273) that Dr. Parsons was testifying about in my Opening Report and above, *e.g.*, *supra* ¶ 137, which turned out to have poor activity *in vivo*, which further undermines Dr. Prud'homme's opinion that these research formulations were available and acceptable for Moderna's commercial use.  Dr. Prud'homme

459

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

DSPC . . . or cationic lipid." Prud'homme Rep. ¶ 930. I note also that Dr. Parsons, Moderna's corporate witness on this subject, never discussed the hypothetical formulations that Dr. Prud'homme speculates about. Parsons 6/7/2024 Tr. 138:15-146:21. Nor did Moderna disclose these hypothetical formulations in response to Plaintiffs' Interrogatory No. 9, which inquired about all non-infringing alternatives. Moderna's Seventeenth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1-10) at 118-124.

793.    In paragraph 932 of his report, Dr. Prud'homme opines again about the experiment at MRNA-GEN-00533651 at -662 with DH-00273. Prud'homme Rep. ¶ 932. I have already discussed that experiment numerous times. *E.g.*, *supra* ¶¶ 552, 787. It continues to be my opinion that that formulation, which exhibited poor *in vivo* performance, was not an acceptable, available alternative to Moderna, and Moderna plainly has never seen it as one. Opening Rep. ¶ 803.

794.    Dr. Prud'homme opines that "LNP formulations with a cationic lipid further ███████████████████████████████ are available as non-infringing alternatives, and were available and acceptable as of 2017 based on the studies Moderna had accepted." Prud'homme Rep. ¶ 933. I disagree for the reasons discussed above, and Moderna's failure to pursue such a formulation—despite having "incredibly strong business reasons" to do so—demonstrates that it was not, in fact, acceptable or available.

795.    Dr. Prud'homme also opines that "Plaintiffs and Dr. Mitchell propose a hypothetical claim with ████████████ cationic lipid, confirming that Plaintiffs and Dr. Mitchell also believe this an acceptable alternative to the claimed ratios." Prud'homme Rep. ¶ 933. I address this opinion above in the context of a conjugated lipid hypothetical claim. *Supra* ¶ 790. The same reasoning applies here.

463

**HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY**

796.    Dr. Prud'homme opines that "Plaintiffs' prior patent filings confirm that such ratios were acceptable alternatives."  Prud'homme Rep. ¶ 934.  He opines that "U.S. Patent 2006/0134189 at [152] taught particles with cationic lipids at 5 mol% to 50 mol%, and PEG-lipid conjugate from about 4 mol% to about 15 mol %."  Prud'homme Rep. ¶ 934.  Again, Dr. Prud'homme cites no evidence that any of the formulations disclosed in that patent publication were acceptable, available alternatives.  Moreover, Dr. Prud'homme again fails to identify the particular composition from that patent publication that was supposedly available.

797.    Dr. Prud'homme suggests that the v1 formulation would have been an available non-infringing alternative.  Prud'homme Rep. ¶ 935.  As an initial matter, the v1 formulation cannot be a non-infringing alternative because, as discussed above, the v1 formulation infringes the Patents-in-Suit.  *See supra* Sections VII-VIII.  Even if it were not infringing, the v1 formulation was not available as of May 31, 2020, which I understand is the hypothetical negotiation date used by both parties' damages experts.  As described in my Opening Report, the first v1 doses were not manufactured until late June 2020, and the internal report documenting revisions to the lipid compositions was not approved until June 4, 2020.  Opening Rep. ¶ 798.  Without any evidence, Dr. Prud'homme assumes, counterfactually, that the v1 formulation could have been available earlier.  But Moderna had strong incentives to implement a non-infringing formulation earlier if it could have.  Indeed, as early as 2017, Stephen Hoge encouraged his scientists to explore LNPs with only 40 mol% cationic lipid, noting the "incredibly strong business reasons why [such a composition] is more attractive."  MRNA-GEN-02619870.  That desire was reinforced during the development of the COVID-19 vaccine, with Moderna scientist Don Parsons noting in April 2020 that "adjust[ing] the SM ratio" was "a hot button for [Hoge]."  MRNA-GEN-00601063 at -065.  Indeed, Parsons testified that Moderna tried to implement the

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

v1 formulation "**as quickly as we could**."  Parsons 6/7/2024 Tr. 122:8-123:8 (emphasis added).

The implementation timing of the v1 formulation is not a hypothetical—Moderna actually

implemented it.  Dr. Prud'homme offers no reason to doubt that it was done as quickly as it

could have been, consistent with Moderna's testimony.

798.    Dr. Prud'homme discounts the regulatory risk based on Moderna's ultimate

conclusion that it could move forward with the v1 formulation.  *See* Prud'homme Rep. ¶ 936.

However, Dr. Parsons acknowledged that "any change to the product has the potential to

introduce delay."  Parsons 6/7/2024 Tr. 54:3-54:6.  I also understand that Plaintiffs' FDA expert,

Dr. Benton, has opined that changing a drug product formulation introduces regulatory risks,

which could delay development.  Opening Expert Report of Kimberly A. Benton, Ph.D. Sec.VII.

There is also evidence that considerations around that risk did in fact affect the timing of v1

implementation.  In late May 2020, just a few days before the hypothetical negotiation date,

Moderna scientist Michael Smith emailed about "[c]oncerns over moL% changes," explaining

that "[a]lthough it's a small change in SM102 level," it could have a problematic effect on the

level of another lipid, DSPC.  MRNA-GEN-00598526 at -526-527. As a result, Smith wrote on

May 27 that he would "hold off" on submitting the change for approval "until we get more

information regarding impact."  *Id.* at -526.  Evaluating the effects of the change, including

regulatory risk, took time, meaning contrary to Dr. Prud'homme's unsupported conclusion,

Moderna was not "ready to implement the v1 Formulation as of May 31, 2020."  Prud'homme

Rep. ¶ 935.

799.    Dr. Prud'homme opines that Moderna's decision to first implement the v1

formulation, rather than go directly to the v2 formulation, is evidence that "*both* were available

options."  Prud'homme Rep. ¶ 937.  But this ignores the obstacles that prevented Moderna from

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

adopting the v2 formulation in 2020.  At the time that Moderna adopted the v1 formulation, its goal was purportedly to move to the v2 formulation.  Parsons 6/7/2024 Tr. 188:13-189:8.  Dr. Prud'homme quotes Dr. Parsons' testimony that the v1 formulation was an "interim step," but fails to include the rest of the answer (quoted in my Opening Report), where Dr. Parsons explained that v1 was "as close to [v2] as we could" get in light of the "complex clinical situation."  Parsons Dep. Tr. 189:5-8; Opening Rep. ¶ 800.  In fact, Moderna had considered moving directly to the v2 formulation, but had concerns about the potential "efficacy impact," and accompanying regulatory issues with the FDA.  MRNA-GEN-00657047 at -047.  Moderna believed that moving directly to the v2 formulation earlier would have interfered with its timeline for vaccine development, concluding that the v1 formulation "was the change that we felt we could prudently make at this time . . . consistent with keeping the clinical trials going without interruption."  Parsons 6/7/2024 Tr. 193:15-194:10.  As Dr. Parsons testified, the "clinical advancement of a vaccine was the most important priority" for Moderna.  Parsons 6/7/2024 Tr. 122:11-19.  Thus, a formulation that would interfere with that advancement was neither acceptable nor available to Moderna at that time.

800.    Finally, Dr. Prud'homme suggests that Moderna could have used the lipid molar ratio from the Pfizer-BioNTech COMIRNATY vaccine.  Prud'homme Rep. ¶ 938.  However, as Dr. Prud'homme acknowledges, Plaintiffs have filed a lawsuit asserting that Pfizer's COVID-19 vaccine infringes several of the Patents-in-Suit.  *Id.*  Dr. Prud'homme offers no opinion or evidence to establish that COMIRNATY does not infringe any of the Patents-in-Suit.

801.    In addition to Dr. Prud'homme's failure to establish that the Pfizer vaccine was non-infringing, Pfizer's lipid molar ratio also was not an available or acceptable alternative.  Dr. Prud'homme offers no evidence that Moderna knew the details of Pfizer's lipid molar ratio in

466

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

time to be able to meet the requirements of Operation Warp Speed. Indeed, the only evidence Dr. Prud'homme cites concerning Moderna's knowledge of Pfizer's ratio is the information Pfizer published in its label. *See* Prud'homme Rep. ¶ 938. But that label would not have been available until the FDA's EUA approval in December 2020,[51] and Moderna would have had no way of knowing in advance that Pfizer intended to disclose those details—the label for Moderna's COVID-19 vaccine, for example, does not contain the quantity of lipids or the lipid molar ratio. *See* MRNA-GEN-00050284. Consistent with that, internal emails show that that Moderna scientists did not know the details of Pfizer's LNP formulation prior to FDA approval. *See* MRNA-GEN-01601799. Moreover, Moderna lacked the necessary clinical experience with the Pfizer formulation. Moderna scientist Dr. Kerry Benenato specifically addressed the potential to use Pfizer's LNP, which used an Acuitas lipid, and testified it was not an option, saying "[w]hen COVID hit, at the time there was zero option for Moderna" other than to use its existing delivery platform. Benenato 5/17/2024 Tr. 68:6-69:9. Dr. Benenato agreed that "having the clinically validated safe platform allow[ed] Moderna to more quickly deploy its COVID vaccine." Benenato 5/17/2024 Tr. 70:1-4.

## XVI. MODERNA'S WILLFUL INFRINGEMENT

802.    I understand that Dr. Prud'homme has offered an analysis on willful infringement in his report. *See* Prud'homme Rep. Section X.H.

803.    Dr. Prud'homme opines that "Moderna's alleged infringement began during the COVID-19 pandemic, when Moderna and many others were singularly focused on abating the

---

[51] FDA, *FDA Takes Key Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for First COVID-19 Vaccine* (Dec. 11, 2020), https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

pandemic and rapidly bringing their vaccine to the public." Prud'homme Rep. ¶¶ 886–887. He also points out that "Plaintiffs sent a letter to Moderna in November 2020 starting that '[Genevant's] priority is for COVID-19 to be eradicated,' and that '"we do not intend to file a case asserting patent infringement in the near future, unless litigation is initiated against us.'" Prud'homme Rep. ¶ 886. I understand that to prove willful infringement, the patentee must prove that the alleged infringer knew of the asserted claim and deliberately or intentionally infringed it. As such, I understand that Dr. Prud'homme's statements are not relevant to the inquiry of whether Moderna deliberately or intentionally infringed a claim. That Moderna was addressing COVID-19 is not a defense to willful infringement. Plaintiffs' letter simply indicated that Plaintiffs were willing to negotiate a license with Moderna; Moderna did not do so.

804.    Dr. Prud'homme also notes that "between 2015-2016, Moderna obtained several sublicenses to certain Acuitas granted [*sic*] Moderna several sublicenses to Arbutus's intellectual property for four specific viral targets." Prud'homme Rep. ¶ 888. I understand that Cathy Lawton, Genevant's expert on damages, has opined on Moderna's efforts to acquire rights to Plaintiffs' LNP technology through a license agreement with Acuitas and the subsequent litigation involving Arbutus and Acuitas concerning Acuitas's ability to provide Plaintiffs' LNP technology to third parties. *See* Lawton Opening Rep. Section VII. I further understand that COVID-19 was *not* one of the four viral targets that Acuitas could sublicense to Moderna, and that Moderna knew that. *See* MRNA-GEN-00225558; Said Francis 05/22/2024 Tr. 235:4-14; Moderna's Seventeenth Supplemental Objections & Responses to Plaintiffs' First Set of Interrogatories (January 28, 2025) at 155.

805.    Dr. Prud'homme also states that "by early 2017, Moderna had already started exploring 'increasing the PEG percentage' and other lipid molar ratios 'well beyond the spaces

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

that others had previously been able to, even [Moderna themselves] in 2014, '15, '16"; that

"[w]hen reformulating the molar compositions of the LNPs, Moderna's highest priority has

always been developing formulations that were pharmaceutically better"; and that "Moderna also

explored formulations with lower percentage of cationic lipid and higher percentage of PEG-

lipid for reasons such as 'reproducibility, stability, cost of goods associated with products that

are unstable, as well as, . . . awareness of compositions that would be outside of those that were

in the siRNA field." Prud'homme Rep. ¶¶ 889–891. As I explain in detail in my Opening

Report and above, Moderna did engage in extensive experimentation with different lipid

compositions. *See* Opening Rep. Sections XVIII; IX.C; X.D. However, Moderna was unable to

obtain suitable compositions with substantially different target lipid ratios, and ultimately used

the target v1 and v2 Formulations, having target cationic lipid ratios of 48.5 mol % and 48 mol

%, respectively, with the express goal of maintaining equivalence to the 1.5:50 formulation,

which has target molar ratios within the scope of the Lipid Composition Patents. *See* Opening

Rep. Section XVIII. In short, Moderna failed to design around the Lipid Composition Patents.

*See* Opening Rep. Section XVIII.

806.    Dr. Prud'homme also opines that "Moderna first used the PVU Formulation to

manufacture batches for clinical studies, and then quickly made a two-step modification to

harmonize its COVID-19 vaccine with the SM-102 LNP platform by first adopting the v1

Formulation and then the v2 Formulation. I note that Dr. Mitchell has not explained how the

PVU Formulation infringes the Asserted Claims" and that Moderna's v1 Formulation do not

literally infringe the Lipid Composition Patents. *See* Prud'homme Rep. ¶ 892 (citations

omitted). I disagree with Dr. Prud'homme. As I discuss above, neither Moderna nor Dr.

Prud'homme has cited any evidence that batches made with the PVU Formulation are outside the

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

scope of the Lipid Composition Patents, and it is my opinion that batches made pursuant to the PVU Formulation would infringe those patents.  *Supra* ¶ 307.

807.    Dr. Prud'homme also states that "[g]iven Moderna's design-around of IP with claims to particles with ████████ cationic lipid and ████████ PEG-lipid, any alleged infringement was not willful."  *See* Prud'homme Rep. ¶ 892.  I disagree.  As I explain in my Opening Report, Moderna had explored the compositional heterogeneity in its products, including in its COVID-19 vaccine, and those data should have made it clear to Moderna that the small adjustments that it made to arrive at the v1 and v2 Formulations would have been insufficient to avoid infringement.  Opening Rep. ¶ 825.  Indeed, Stephen Hoge encouraged his scientists to explore LNPs with only 40 mol% cationic lipid (not 48 or 48.5 mol%), noting the "incredibly strong business reasons why [such a composition] is more attractive."  MRNA-GEN-02619870.  Moreover, as I also discuss in my Opening Report, Moderna's own certificates of analysis demonstrate substantial infringement of the Lipid Composition Patents, and simple calculations would have made clear that those batches infringed.  Opening Rep. ¶ 825.  Additionally, as I explain in my Opening Report, Moderna's v1 and v2 Formulations are only minor modifications that were intentionally designed to produce the same results as Plaintiffs' 50:38.5:10:1.5 formulation.  *See* Opening Rep. Sections XVIII; X.D.2; X.D.3; XIII.F.2.

808.    Dr. Prud'homme also states that the "application that led to the '378 Patent did not become public until September 2, 2021, and Genevant did not send a purported notice letter to Moderna referring to the '378 patent until October 12, 2021."  *See* Prud'homme Rep. ¶ 893.  To the extent Dr. Prud'homme contends that Moderna did not have knowledge of the Patents-in-Suit, I disagree.  As I note in my Opening Report, Moderna has been aware of Plaintiffs' Lipid Composition Patents for over a decade.  *See* Opening Rep. Section XVIII.

470

HIGHLY CONFIDENTAL – OUTSIDE COUNSEL'S EYES ONLY

809.    Dr. Prud'homme also opines that "[i]f Moderna is found to infringe solely under the doctrine of equivalents, in my opinion that infringement would not be willful based on the arguments and amendments applicant made during prosecution characterizing its invention as very narrow, only to then broaden those claims later during litigation."  Prud'homme Rep. ¶ 894. I disagree with Dr. Prud'homme's characterization of the file histories of the Lipid Composition Patents, as I discuss above.  *Supra* Section IX.  Indeed, there is no evidence that anyone at Moderna considered or relied on this portion of the prosecution history.  Moreover, I understand that a party can willfully infringe a patent regardless of whether infringement is literal and/or under the doctrine of equivalents.  Furthermore, as I explained in my Opening Report, Moderna's v1 and v2 Formulations are only minor modifications that still infringe the Lipid Compositions and were intentionally designed to produce the same results as Plaintiffs' 50:38.5:10:1.5 formulation.  *See* Opening Rep. Sections XVIII; X.D.2; X.D.3; XIII.F.2; *see also* MRNA-GEN-02619870 (email from Stephen Hoge encouraging scientists to explore LNPs with only 40 mol% cationic lipid, noting the "incredibly strong business reasons why [such a composition] is more attractive").

810.    Dr. Prud'homme also opines that because certain terms of the Asserted Claims are indefinite, there can be no willful infringement.  Prud'homme Rep. ¶ 895.  As an initial matter, I have not been asked to assess validity, but understand that another expert has opined that the challenged terms of the asserted claims are definite.  But even if some of the Asserted Claims were indefinite, Dr. Prud'homme fails to provide any support for the proposition that Moderna's infringement of the Asserted Claims that are definite was not willful.  Additionally, Dr. Prud'homme does not cite any evidence indicating that Moderna had a good-faith basis to believe that any of the Asserted Claims were indefinite.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

811.    Dr. Prud'homme also makes several assertions regarding Tony de Fougerolles that fail to undermine my point, which is that Moderna first learned about Plaintiffs' LNP technology from him.  *See* Prud'homme Rep. ¶ 896; Opening Rep. Section XVIII.A.  For example, Dr. Prud'homme asserts that I "point[] to no specific feature of 'LNP' technology that Dr. de Fougerolles supposedly brought to Moderna, let alone any that is attributable to Plaintiffs or the Asserted Claims of the Patents-in-Suit," and that Dr. de Fougerolles "came from Alnylam, and was never employed by Arbutus, Genevant, Tekmira, or Protiva."  *See* Prud'homme Rep. ¶ 896.  This is all beside the point.  Said Francis, Moderna's witness and corporate representative on this subject, testified that Dr. de Fougerolles was "an early, early employee" at Moderna— and its Chief Scientific Officer—who "was quite familiar with the patents-in-suit" from his prior work at Alnylam.  *See* Opening Rep. Section XVIII.A; Francis 5/22/2024 Tr. 40:3-41:9, 63:18-64:6 ("As I mentioned, our chief scientific offer, Tony [de Fougerolles], came from Alnylam, which had an active collaboration with Tekmira.  So he is aware – he should have – he must have been aware at the time of Tekmira's [LNP] portfolios.").  As such, Moderna was aware of the Patents-in-Suit since at least the time Dr. de Fougerolles joined Moderna.  *See, e.g.*, Bancel 6/28/2024 Tr. 19:13-20:1 (stating he "first became aware of" Plaintiffs' "LNP technology in 2013 or 2012" from de Fougerolles, "who mentioned the technology").

812.    In my Opening Report, I cited an October 2014 email where Stéphane Bancel stated that "we can show him our monkey data with his 'superior' LNP," in order to show that Moderna was aware of Plaintiffs' Lipid Composition Patents.  MRNA-GEN-01674430; *see* Opening Rep. ¶ 820.  Nowhere does Dr. Prud'homme dispute that.  Instead, he maintains that the "citations ignore that Moderna had to pursue extensive additional R&D work to enable successful applications in mRNA," without citing any evidence.  *See* Prud'homme Rep. ¶ 897.  I

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

disagree—as I explain elsewhere, Moderna was quickly able to achieve successful mRNA delivery using Plaintiffs' technology, with little or no optimization needed. *Supra* Section IV.A. Moreover, contrary to Dr. Prud'homme's assertion, *see* Prud'homme Rep. ¶ 897, Mr. Bancel does identify the LNP he is referring to—namely, *Plaintiffs'* LNP technology, *see* Opening Rep. ¶ 820.

813.    In my Opening Report, I cited Said Francis's testimony regarding his discussions with legal counsel "about Tekmira's LNP patents" to show that Moderna had knowledge of the Patent-in-Suit since the 2013-14 timeframe.  Opening Rep. ¶ 820.  Nowhere does Dr. Prud'homme refute that point.  Prud'homme Rep. ¶ 898.  Instead, he points to a portion of Francis's testimony in which he testified that Moderna undertook efforts to develop the mRNA platform.  *See* Prud'homme Rep. ¶ 898.  As I discuss in more detail above, Dr. Prud'homme is wrong to the extent he asserts that Moderna could not copy the learnings from Plaintiffs' work. Moderna was able to take the technology developed by Plaintiffs and their collaborators and successfully use it to express mRNA.  *See supra* Section IV.A.  Moreover, Plaintiffs' own documents reveal that their LNP technology was broadly applicable across nucleic acid classes. *E.g.*, GENV-00108639 at -655 ("LNP Enable Essentially Any Nucleic Acid Payload"); GENV-00497498 ("However, in addition to RNAi, other important nucleic acid payloads, including messenger RNA, can be efficiently and effectively delivered using Tekmira's LNP.").  As such, Dr. Prud'homme's attempt to undermine my reliance on an April 9, 2015 presentation, Opening Rep. ¶ 820, by pointing to Said Francis's testimony that RNAi "'is a different kind of RNA' from mRNA" is misplaced.  Prud'homme Rep. ¶ 900.

814.    Dr. Prud'homme opines that a February 2014 presentation, MRNA-GEN-01240180 at -191, "shows that a new process and/or new cationic lipids were needed to

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

encapsulate mRNA to a sufficient degree and DLinDMA (which is disclosed in the Molar Ratio Patents) for example, could only be used to achieve 58% encapsulation by Plaintiffs." Prud'homme Rep. ¶ 900. I disagree with this characterization, for reasons I discuss above. *Supra* Section V.

815.    Dr. Prud'homme also mischaracterizes my reliance on an April 11, 2014 email in which a third party told Moderna that Tekmira was "the inventor of the original formulation with MC3 . . . [which] they call . . . SNALP [stable-nucleic acid lipid particle] technology[]." MRNA-GEN-01754010 at -011; Prud'homme Rep. ¶ 899. First, the purpose of this email, as I explained in my Opening Report, is to show that Moderna, through Said Francis, was aware of the Patents-in-Suit, was aware that they covered LNP technology, and that others were telling Francis that Plaintiffs owned those patents. Seeking to undermine that point, Dr. Prud'homme cites Francis's testimony explaining that the author of that email "'Torsten Woeher is head sales and marketing, not subject matter expert in inventorship,' and that he is not 'privy to the Alnylam/Tekmira agreement.'" Prud'homme Rep. ¶ 899. Nowhere does Dr. Prud'homme explain how Francis has any personal knowledge to decisively state whether or not Woeher was aware of the ownership of the SNALP technology. Moreover, Dr. Prud'homme states that "MC3 has no relation to the Patents-in-Suit, the Asserted Claims, and was not developed by Plaintiffs or their predecessors." Prud'homme Rep. ¶ 899. But Dr. Prud'homme mischaracterizes the email I cite, which refers to the SNALP technology, which Plaintiffs own and does relate to the Asserted Claims. I understand that Dr. Prud'homme does not dispute that MC3 is within the scope of the "cationic lipid" limitations of the Asserted Claims.

816.    As I discussed in my Opening Report, Moderna and Genevant (and its predecessors) "explor[ed] collaborations, and that includes licensing." Opening Rep. ¶ 820

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

(quoting Francis 5/22/2024 Tr. 46:7-16). Dr. Prud'homme states that "Mr. Francis testified that Moderna was 'also talking other formulation companies.'" Prud'homme Rep. ¶ 901. That is beside the point, which is that Moderna has been aware of the Patents-in-Suit for over a decade. Mr. Bancel's testimony confirms as much. *See* Opening Rep. ¶ 820 (citing Bancel 6/28/2024 Tr. 141:12-143:10).

817.    In my Opening Report, I cited an email demonstrating Moderna's awareness that its lipid molar ratios were "virtually identical" to what was in ONPATTRO. Opening Rep. ¶ 821. Dr. Prud'homme criticizes my opinion, opining that there is "no indication in the email which Moderna formulation it was referring to," that the calculated molar ratios of ONPATTRO in the Moderna email do "not fall under the literal scope" of several of the Lipid Composition Patents, and that "Moderna's COVID-19 formulation is different to Onpattro." Prud'homme Rep. ¶ 902. I disagree, including because the evidence in this case makes clear that the molar ratios of ONPATTRO are within the scope of the Lipid Composition Patents. Resp. Rep. ¶ 32. In any event, all of Dr. Prud'homme's critiques miss the point, which is that Moderna was well aware that the lipid molar ratios that it was using were "virtually identical" to what was used in ONPATTRO, the Orange Book entries for which list four Lipid Composition Patents. Resp. Rep. ¶ 32. This provides still further confirmation that Moderna knew of the Lipid Composition Patents and was aware that it was operating in the "virtually identical" lipid molar ratio space as that product.

818.    Dr. Prud'homme appears to criticize my reliance on a May 2018 presentation for the statement of "Avoid licensing (intellectual property regarding 50 mole percent cationic lipid)." Prud'homme Rep. ¶ 903. I do not understand Dr. Prud'homme's criticism. The document plainly states that Moderna was aware that it needed to avoid LNPs comprising 50

475

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

mol% cationic lipid to "[a]void licensing" issues.  Opening Rep. ¶ 821; MRNA-GEN-01747429.

Whether or not Mr. Kramarczyk purportedly knew who the IP discussed in the document

belonged to is beside the point.  *See* Prud'homme Rep. ¶ 903.  Mr. Kramarcyzk testified that

"[a]t the time [he] understood that 50 mole percent cationic lipid was covered under a granted

patent, *not by Moderna*.  And I think the goal of avoiding licensing a patented formulation is

clear."  Kramarczyk 4/30/24 Tr. 59:20-60:8 (emphasis added).

819.    Dr. Prud'homme states that the "lipid formulations of an investigational

medicine" described in a declaration submitted in *Moderna Therapeutics, Inc. v. Protiva*

*Biotherapeutics, Inc.* Nos. 20-1184, 20-1186 (Fed. Cir. Jan. 27, 2020), were "only 'used in the

Phase 1 clinical trial for this investigational medicine'" and that its use "do[es] not constitute

infringement."  Prud'homme Rep. ¶ 904.  Dr. Prud'homme's argument is beside the point.  I

cited this document to show that Moderna was aware of the claimed molar ratio ranges in one of

the Lipid Composition Patents.  Opening Rep. ¶ 821.

820.    Dr. Prud'homme appears to opine that I am taking out of context Dr. Hoge's

email to Donald Parsons, in which Dr. Hoge stated that he would "like to reemphasize that there

are incredibly strong business reasons why a composition with 40% amino lipid is more

attractive."  MRNA-GEN-02619870; *see* Prud'homme Rep. ¶ 905.  I disagree.  As I explain

above, Dr. Hoge himself acknowledged that the business reasons included avoiding the Lipid

Composition Patents.  *See supra* Section IV.D; Hoge Dep. Tr. 304:22-305:8 (business reasons

include "awareness of compositions that would be outside of those that were in the siRNA field"

and mentioning finding "an amino lipid composition ████████████████

821.    Dr. Prud'homme also states that "Moderna has conducted studies demonstrating

that less than ███████████ of cationic lipid yielded good results."  *See* Prud'homme Rep.

476

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

¶ 906.  I disagree.  As I describe in my Opening Report, for example, Moderna could not find an LNP formulation ███████████ cationic lipid with the requisite efficacy and safety, and so it instead attempted to copy a formulation within the scope of the Lipid Composition Patents.  *See* Opening Rep. ¶ 823.  In any event, Dr. Prud'homme's statement is beside the point.  It continues to be my opinion that Moderna was motivated in 2017 to decrease the amount of cationic lipid to 40 mol% for business reasons; they did explore compositions ███████████████████ ████ but they ultimately opted to use instead formulations with targets of 48.5 mol% and 48 mol% SM-102, not 40 mol%, for the COVID-19 vaccine.  Opening Rep. ¶ 302.  Dr. Prud'homme offers no coherent explanation for why—if ██████████████ of cationic lipid yielded good results," Prud'homme Rep. ¶ 906—Moderna didn't use a composition with those molar ratios.

822.    Contrary to Dr. Prud'homme's assertion, *see* Prud'homme Rep. ¶ 907, Moderna's entire "platform" was built on its copying of the 50:38.5:10:1.5, as I discuss in my Opening Report.  *See* Opening Rep. Section XVIII.C.  Dr. Prud'homme states that "Moderna observed stability issues with the 50:38.5:10:1.5 formulation and explored a wide range of molar compositions and found that higher PEG and lower cationic lipid increase product stability." Prud'homme Rep. ¶ 907.  Dr. Prud'homme offers no further rationale, and I disagree with this opinion, including for the reasons discussed above and in my Opening Report.  *E.g.*, *supra* Section IV.F.  Dr. Prud'homme also states that "that ratio did not originate in the Patents-in-Suit and instead came from others such as Alnylam."  Prud'homme Rep. ¶ 907.  I disagree with this characterization, and I describe the collaborative relationship between Alnylam and Plaintiffs' predecessors in more detail in my Responsive Report.  Resp. Rep. ¶¶ 43-51.  In any event, regardless of where Moderna thought the 50:38.5:10:1.5 formulation came from, by the time of

477

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

the Accused Products and before, Moderna knew that the formulation was covered by the Patents-in-Suit.  *See* Opening Rep. Section XVIII.A.

823.    Contrary to Dr. Prud'homme's statement, *see* Prud'homme Rep. ¶ 908, Moderna's v1 and v2 Formulations are "minor" modifications, do produce the same results as the 1.5:50 target formulation, and do infringe the Lipid Composition Patents, as I explained in my Opening Report.  *See* Opening Rep. Section XVIII.C.  Moreover, contrary to Dr. Prud'homme's assertion, *see* Prud'homme Rep. ¶ 908, there was little, if any, benefit from moving from 1.5 mol % to 2.5 mol % PEG-lipid.  *See supra* Section IV.F.  Dr. Prud'homme cites testimony from Genevant employee Stephen Reid, Prud'homme Rep. ¶ 908, which I discuss above, *supra* ¶ 122.

824.    Dr. Prud'homme also asserts that I misrepresented Dr. Parsons' testimony regarding Moderna's work at the time to obtain data "from the new (i.e.,  48 mol % cationic lipid) formulation which reflected the same quality attributes of those in the '50 percent mol ratio of the ionizable lipid.'"  Dr. Prud'homme Rep. ¶ 909.  I disagree.  Contrary to Dr. Prud'homme's opinion, Dr. Parsons did testify about the "IP benefits" associated with a 50 mol % cationic lipid.  *See* Opening Rep. Section XVIII.C.  Moreover, as I explain above and in my Opening Report, Dr. Prud'homme does not cite any contemporaneous evidence confirming Dr. Parsons' testimony concerning any "challenges" associated with the 50 mol % cationic lipid, suggesting it is after-the-fact pretext.  *See supra* Section IV.D; Opening Rep. ¶¶ 405-416.  Dr. Parsons and his team were unable, in July 2020, to come up with any "positive rationale" for the change from the PVU Formulation (which used a target of 50 mol % cationic lipid) to the v1 Formulation (which used a target of 48.5 mol % cationic lipid), ultimately simply telling the FDA that it had "no impact."  Opening Rep. ¶¶ 405-416.  Indeed, Dr. Parsons himself admitted that he did "not have

478

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

data to support this [i.e., stability] as a justification" for the change to the v1 Formulation. Opening Rep. ¶ 415. This contemporaneous evidence undercuts Dr. Parsons' (and Dr. Prud'homme's) unsupported testimony about the failure of the 1.5:50 formulation.

825.    In my Opening Report, I discussed analysis that Moderna had conducted on its historical batches, which demonstrated that there was variability in lipid content, even at the batch-to-batch level. Opening Rep. ¶¶ 604, 825. Dr. Prud'homme says that he "strongly disagree[s]" because the presentation "does not concern manufacturing control or compositional variability, but rather relates to studies of reducing SM-102 content to improve biophysical stability." Prud'homme Rep. ¶ 910. I disagree. The presentation that Dr. Prud'homme is referring to has entries for "Min mol%" and "Max mol%" of SM-102, *see* MRNA-GEN-00530699 at -701. A presentation with a more fulsome discussion of the underlying data is titled "Lipid Composition Batch History: GMP and Tox," MRNA-GEN-00648789 at -789, and includes a scatterplot of the lipid content values, MRNA-GEN-00648789 at -791. Plainly, these data concern the "compositional variability" of Moderna's batches, which I discuss in more detail above. *Supra* ¶¶ 333-335. Moreover, when testifying about these data, at MRNA-GEN-00648789 at -796, Dr. Parsons stated the following: "one of the things that we were aware of was that there was intellectual property associated with the molar ratio. We wanted to understand where we sat with respect to that based on historical production." Parsons Dep. Tr. 105:21-106:6. In other words, not only was Moderna studying batch-to-batch variability (contra Dr. Prud'homme's testimony), it was doing so explicitly to assess whether it infringed the Lipid Composition Patents.

826.    As I also discussed in my Opening Report, Moderna analyzed particle-to-particle heterogeneity within its batches, and found consistently that lipid content varied across particles.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Opening Rep. Section IX.E; ¶ 825.  Dr. Prud'homme opines that my reliance on one particular document (MRNA-GEN-00896095) is misplaced because it purportedly only discusses "charge or particle size distribution" and "density separation."  Prud'homme Rep. ¶ 910.  I disagree.  First, I cite numerous instances where Moderna conducted fractionations followed by lipid content analysis.  Opening Rep. Sections IX.E, X.E.2.  Second, the document I cite is relevant because it makes explicit that Moderna was aware of *both* "Bulk Heterogeneity" *and* "Particle Heterogeneity."  MRNA-GEN-00896095 at -095.  In my opinion, both of the phenomena—and Moderna's investigation thereof—are relevant to Moderna's awareness that its COVID-19 vaccine would infringe.  Third, Dr. Prud'homme is simply incorrect that the document does not discuss lipid content heterogeneity.  MRNA-GEN-00896095 at -098 ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████     The paper also discusses a density gradient separation followed by lipid and RNA content analysis.  MRNA-GEN-00896095 at -105 ("The material was manually fractionated and analyzed by lipid and mRNA content.").  The document confirms my opinions from my Opening Report that Moderna had the tools to assess the particle-to-particle heterogeneity of its COVID-19 vaccine and it (for the most part) chose not to do so.

827.    Dr. Prud'homme opines that the document cited in the previous paragraph (MRNA-GEN-00896095) is not relevant because it "does not concern Moderna's COVID-19 vaccine."  Prud'homme Rep. ¶ 910.  However, as I explained in my Opening Report, the only instance of fractionation that Moderna conducted on its COVID-19 vaccine did reveal infringement.  Opening Rep. Section X.E.2.

828.    Dr. Prud'homme finally opines that "Plaintiffs only recently took the position

since filing suit that the claims require investigation into individual lipid particles' lipid content." Prud'homme Rep. ¶ 910.  I disagree, as explained above.  *Supra* ¶¶ 364-365.

829.    As I explain in my Opening Report, Moderna could easily have confirmed that its batches infringed the Lipid Composition Patents by simply calculating the lipid molar ratios from its certificates of analysis.  Opening Rep. ¶ 825.  Moderna knew how to do this analysis, as it had done this in the past.  *Supra* ¶¶ 333-335.  Moreover, Moderna calculated the mol percent of "a few lots" of its COVID-19 batches, which revealed "some variation in the lipid content." Parsons Dep. Tr. 103:1-104:16.  Dr. Prud'homme "strongly disagree[s]" with my opinions on this issue, opining that such an analysis "is improper."  Prud'homme Rep. ¶ 911.  I disagree, for reasons I discuss at length above.  *Supra* Section VII.B.  Moreover, Dr. Prud'homme's opinion on this issue is undercut by the fact that Moderna itself conducted the supposedly "improper" analysis.

830.    Dr. Prud'homme also opines that, even though Moderna did some "limited analysis" calculating mol % of a few batches of the COVID-19 vaccine, "there is no indication that any such analysis demonstrates infringement."  Prud'homme Rep. ¶ 911.  That is precisely the point though—Moderna's analysis revealed that there was lipid content variability across its batches (in addition to particle-to-particle variability), and yet it opted to only conduct a "limited analysis," rather than simply calculating the lipid mol % of every batch, which could have been done with a simple Excel spreadsheet, as I did in the Appendix of my Opening Report.  If Moderna would have conducted such an analysis for all of its lots, rather than just a few, it would have readily confirmed its infringement.  Instead, Moderna chose to willfully stick its head in the sand.

831.    As I explained in my Opening Report, Dr. Parsons refused to permit heterogeneity

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

testing of Moderna's COVID-19 product to go forward.  Opening Rep. ¶ 825.  Dr. Prud'homme attempts to undermine the validity of that proposed research.  Prud'homme Rep. ¶ 912.  But Dr. Prud'homme ignores that ███████████████████████████████████████████ ████████████████████████ Opening Rep. Section IX.E, and that there are well established techniques for conducting such research, Opening Rep. Section VI.C.4.  Dr. Prud'homme does not dispute that Dr. Parsons declined to allow Mr. Schariter to conduct the relevant testing or that the one set of experiments measuring the lipid content heterogeneity of Moderna's COVID-19 vaccine did, in fact, demonstrate infringement.  Opening Rep. Section X.E.2.

832.    Contrary to Dr. Prud'homme's assertion, *see* Prud'homme Rep. ¶ 913, Moderna did attempt to conceal its infringement of the Lipid Composition Patents, *see* Opening Rep. Section XVIII.E.

833.    Dr. Prud'homme discusses the email chain I cited in which "Dr. Hassett was instructed to remove the target lipid molar ratio of the LNPs used in one of her papers for Moderna."  Opening Rep. ¶ 826.  In Dr. Prudhomme's view, there was "no concealment" because Dr. Hassett testified that Moderna "defined the ratio in the paper that was cited" in the paper at issue.  Prud'homme Rep. ¶ 914.  I disagree with Dr. Prud'homme.  Nowhere does he (or Dr. Hassett) explain why Ed Miracco instructed Dr. Hassett not to publish the lipid molar ratio or whether Moderna had a policy about what can and cannot be included in publications.  *See* Prud'homme Rep. ¶ 914; Hassett 4/26/2024 Tr. 96–98.  Moreover, Dr. Hassett *did not* publish the ratio in the paper at issue.

834.    Dr. Prud'homme takes issue with my pointing out that "Dr. Benenato—seemingly at the direction of Dr. Hoge—modified scientific presentations to obscure the role that MC3 plays in Moderna's development of its ionizable lipids."  Opening Rep. ¶ 826; Prud'homme Rep.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

¶ 915.  I address this above.  *Supra* ¶ 141.

835.    Dr. Prud'homme acknowledges that Hamilton Bennett "edited documents so as to remove reference to the lipid molar ratio of Moderna's Accused Product," and that Dr. Parsons inserted a comment in a draft report to "Remove [a portion of text with the molar ratio 48.5:38.9:11.1:1.5] if not publicly disclosed."  Prud'homme Rep. ¶¶ 916-917.  Dr. Prud'homme attempts to explain away these actions by stating that "it is common practice for companies to redact or remove proprietary technical information in public documents."  Prud'homme Rep. ¶ 916.  But Dr. Prud'homme does not point to any evidence other than Hamilton Bennett's own self-serving testimony, nor does he show that the information at issue is even proprietary to Moderna.  Rather, it relates to the target molar ratios of a product Moderna was selling in large quantities.

836.    In my Opening Report, I stated that the "contrast between Moderna's and Pfizer's conduct [in publishing certain information in their respective Fact Sheets for their Covid-19 vaccines] shows that Moderna's explanation that it did not want to disclose the relevant details of its products for confidentiality reasons was nothing more than pretext."  Opening Rep. ¶ 830.  In response, Dr. Prud'homme does not dispute the fact that Pfizer (unlike Moderna) did in fact provide the quantity of each of the four lipid components of its vaccine.  *See* Prud'homme Rep. ¶ 918.  Instead, without citing any Moderna policy or handbook, merely states that "[w]hether certain information is proprietary and confidential to one company has nothing to do with whether it is proprietary and confidential to another."  Prud'homme Rep. ¶ 918.  But the fact that Pfizer published this information widely indicates that it is not a secret that must be maintained confidentially.

837.    Dr. Prud'homme points out that Moderna's August 2024 Fact Sheet "provides

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

only the combined lipid content and not the individual lipid molar ratios."  Prud'homme Rep. ¶ 919.  But that Moderna has taken actions during this litigation that are consistent with its actions before the litigation commenced sheds no light on whether Moderna has attempted to conceal its infringement of the Lipid Composition Patents.

838.    Dr. Prud'homme also states that because "by August 2024, Moderna has already produced to Plaintiffs' outside counsel technical information concerning the molar compositions of Moderna's COVID-19 Vaccine," my assertion that Moderna was attempting to "conceal its infringement" is unfounded.  *See* Prud'homme Rep. ¶ 920.  I disagree.  I understand Moderna had a duty to produce technical information concerning the Accused Products as a result of this litigation, and did not do so before that point.  Dr. Prud'homme cannot credibly contend that, because Moderna had a duty to produce such information in this case after it started, and refused to provide that information before legally required to do so, Moderna did not conceal its infringement before Plaintiffs brought suit.

839.    Moreover, Dr. Prud'homme states that it is "unclear" why the following statement I made in my Opening Report is relevant: "in or around March 2021 . . . Plaintiffs asked Moderna to provide 'any mRNA-1273 samples that cannot be used in humans' . . . Moderna did not agree to provide samples at that time."  *See* Prud'homme Rep. ¶ 921.  My statement is plainly relevant: Moderna concealed its infringement, even after Plaintiffs asked Moderna to produce technical information (including samples of the mRNA-1273 Product) in 2021—several years before Plaintiffs had to bring a lawsuit for patent infringement.

## XVII.  APPORTIONMENT

840.    As described in detail below, I disagree with Dr. Prud'homme and Dr. Meulien concerning the value of the Patents-in-Suit.  As explained in my Opening Report, the Patents-in-Suit are fundamental, enabling technology, without which Moderna's COVID-19 vaccine could

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

not function.  Opening Rep. ¶ 787.  The Patents-in-Suit drive the value of the delivery component of the vaccine—the other concepts related to delivery identified by Drs. Prud'homme and Meulien consist only of modest optimizations, as well as design choices for which there were many options known in the field.  By contrast, the Patents-in-Suit represent novel developments for which Moderna was unable to identify an acceptable, available alternative.  As a result, the other delivery concepts identified by Drs. Prud'homme and Meulien do not meaningfully add to the value of the delivery component.  Moreover, while the Patents-in-Suit are critical to the delivery of the vaccine payload, their value is not limited to delivery.  For example, as described in my Opening Report, the Lipid Composition Patents also provide "'increased activity of the encapsulated nucleic acid,' 'improved tolerability of the formulations in vivo,' and 'a significant increase in the therapeutic index as compared to nucleic acid-lipid particle compositions previously described.'" Opening Rep. ¶ 133 (quoting '069 patent, 5:44-58).

## A.    Importance of the Patents-in-Suit

841.    Dr. Prud'homme addresses certain aspects of the importance of the Patents-in-Suit.  *See* Prud'homme Rep. ¶¶ 939-956.  I have been asked to provide technical opinions in response to certain of Dr. Prud'homme's opinions concerning the importance of the Patents-in-Suit.

842.    Dr. Prud'homme observes that Plaintiffs have entered into licensing agreements including the Patents-in-Suit, Prud'homme Rep. ¶ 939, that the licenses "apply to a variety of target fields," *id.* ¶ 940, and that "the other party" to the agreements generally was responsible for the payload, whereas Genevant was generally responsible for the LNP technology, *id.* ¶¶ 940-941.  I understand that Plaintiffs have retained another expert (Dr. Lawton) to address the substantive terms of the licenses.  I do not understand Dr. Prud'homme to be setting forth any

485

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

particular opinions in these paragraphs.  Regardless, as I explained in my Opening Report, Opening Rep. ¶ 791, given the important role of delivery in nucleic acid pharmaceutical products generally and Moderna's COVID-19 vaccine specifically, the contribution of the delivery vehicle is at least as valuable, if not more valuable, than the payload.

843.    Dr. Prud'homme criticizes "Plaintiffs' patented technology" for not "yield[ing] any vaccines" arising out of the licenses.  Prud'homme Rep. ¶ 942.  However, as Dr. Prud'homme acknowledges, the LNP technologies of the Patents-in-Suit did give rise to the approved product ONPATTRO, the first approved nucleic acid-based therapeutic.  *Id.*; *see, e.g.*, *supra* ¶¶ 230-235; Opening Rep. ¶ 72.  Dr. Prud'homme notes that ONPATTRO "concerns the encapsulation of siRNA rather than mRNA," but its contribution was not limited to siRNA therapeutics.  To the contrary, as I explained, ONPATTRO was recognized throughout the literature "as a major advancement in the capabilities of lipid-based systems and a turning point in the enablement of nucleic acid-based therapeutics."  Opening Rep. ¶ 72; Buschmann 2021[52] at 5-6 ("This [50/10/38.5/1.5 MC3/DSPC/ Cholesterol/PEG–lipid] formulation developed for siRNA is the basis for the subsequent development of LNPs . . . which are now under emergency use after being approved for the delivery of SARS-CoV-2 mRNA vaccines."); *see also* Morais & Yu 2025[53] at 84 ("[T]he importance of LNP formulations as enabling technologies [143] for the RNA technology platform cannot be overstated. . . .  [W]ithout [LNP delivery vehicles] mRNA would not have been appropriately expressed in the target cells [133].  LNPs also acted as an

---

[52] Michael D. Buschmann et al., *Nanomaterial Delivery Systems for mRNA Vaccines*, 9 VACCINES (BASEL) 65 (2021) ("Buschmann 2021").

[53] Morais & Yu, *Modified or Unmodified mRNA Vaccines? – The Biochemistry of Pseudouridine and mRNA Pseudouridylation*, in Trends in mRNA Vaccine Research (Szabo & Pardi eds. 2025) ("Morais & Yu 2025") (MRNA-GEN-02683555).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

days at Moderna, it used T-junction mixing to make its LNPs.  Opening Rep. ¶ 234.  It continued to use that process, which it credited to Plaintiffs, for years.  Opening Rep. ¶¶ 242-246.  Moreover, as I explained in my Opening Report, Moderna made its earliest batches of its COVID-19 vaccine with Plaintiffs' continuous-mixing process, using a T-junction mixer. Opening Rep. ¶ 369.  When Moderna eventually transitioned away from a T-junction mixer, its goal was to ensure that the product quality attributes would not change.  Opening Rep. ¶¶ 371-372.

869.    As such, to the extent Dr. Meulien is suggesting that Moderna simply used technology that pre-dated the '651 patent, I disagree.  Rather, Moderna relied heavily on Plaintiffs' innovations for many years, including by using one of the particular apparatuses disclosed in the '651 patent.  Opening Rep. ¶¶ 95-99.  While Moderna eventually transitioned to a different apparatus, it continued to use the continuous-mixing approach that Plaintiffs pioneered, and it explicitly sought to maintain the same excellent attributes (including high levels of encapsulation) produced by Plaintiffs' methods.

870.    With respect to the Lipid Composition Patents, Dr. Meulien again refers to the invalidity opinions that he and Dr. Anderson offered.  Meulien Rep. ¶ 124.  Again, I understand that a different expert has offered opinions in response to their opinions.  It is further my understanding that the apportionment inquiry assumes that the Patents-in-Suit are valid and infringed.

871.    Dr. Meulien opines that he "do[es] not understand the invention of the Molar Ratio Patents to constitute anything more than the particular lipid molar ratios claimed, at most, which are similar to ratios previously disclosed in the prior art."  Meulien Rep. ¶ 124.  I agree that the Lipid Composition Patents cover specific lipid molar ratios.  Moreover, as I describe at

500

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

length above and in my Opening Report, Moderna successfully used those lipid molar ratios—

and, particularly, the 1.5:50 target formulation—for many years. *Supra* Section IV.A.

Simultaneously, for many years Moderna worked to develop alternative lipid molar ratios

substantially outside the scope of the Lipid Composition Patents. *Supra* Section IV.D. For

example, I note that Dr. Meulien cites a composition used in Zimmerman 2006 with 40 mol%

cationic lipid. Meulien Rep. ¶ 124. As I describe above, *supra* Section IV.D, and in my

Opening Report, Opening Rep. Section IX.C, Moderna repeatedly experimented with target

formulations ▮▮▮▮▮▮▮▮▮▮▮. Indeed, Moderna's President urged Moderna to

pursue such compositions for "incredibly strong business reasons," Opening Rep. ¶ 302—

presumably because Moderna thought that they could use such compositions with that target

mol% cationic lipid, without infringing, based on the art that Dr. Meulien cites. However, as I

explain above and in my Opening Report, those efforts were unsuccessful, and Moderna did not

use a composition with ▮▮▮▮▮ cationic lipid. Rather, Moderna used compositions that were

only a few mol% away from the claims of the Lipid Composition Patents—including with targets

of 48/48.5 mol% cationic lipid—which, as I have explained, led to substantial infringement.

872.    As such, while I do agree with Dr. Meulien that the Lipid Composition Patents

claim "particular lipid molar ratios," the evidence that I have recited in my various reports—

including of Moderna's unsuccessful efforts to design around the patents—make clear that those

particular ratios are critical and necessary to the success of Moderna's product. Otherwise,

Moderna presumably would have used a different composition, which it plainly was motivated to

do.

873.    Dr. Meulien opines that "lipid molar ratios used in an LNP delivery vehicle

constitute just one of numerous factors which may affect the performance of an LNP vehicle,"

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Moderna—have struggled to find superior alternatives.  Resp. Rep. ¶¶ 18-24; Opening Rep. ¶¶ 72-75.  Indeed, I have seen no evidence that Moderna would have been able to commercialize the COVID-19 vaccine without use of the technology claimed in the Patents-in-Suit, and the evidence I have seen demonstrates that it would not have been possible.  *See supra* Section XV.  As such, my opinion is that the innovations claimed in the Patents-in-Suit provided a substantial, enabling contribution to overcoming the obstacles associated with nucleic acid delivery.

880.    Dr. Meulien opines that "Dr. Porter's statements regarding importance of the patents-in-suit are undermined by the amount of work Moderna needed to independently conduct for years in order to improve LNP formulation and delivery."  Meulien Rep. ¶ 126.  I disagree with this characterization.  As I explain above, *supra* ¶ 38, and in my Opening Report, Opening Rep. Section IX.A, Moderna was quickly able to achieve success using Plaintiffs' technology, with little or no optimization.  That early work included Moderna's successful flu clinical trial, which used the 1.5:50 ratio and none of the purported innovations that Moderna's experts have identified, *supra* ¶¶ 50-53; Opening Rep. Section IX.A.

881.    Dr. Meulien cites various documents showing "Plaintiffs' own internal and published statements acknowledging the amount of work on LNP delivery Moderna conducted in order to improve its delivery platform to the point of clinical acceptance."  Meulien Rep. ¶ 126.  I disagree that any of the documents that Dr. Meulien cites suggests that Moderna's work was more important or valuable than the innovations reflected in the Patents-in-Suit.  With respect to the amount of work that Moderna has conducted, it appears to me that a non-trivial amount of it was directed at attempting to design around competitors' intellectual property.  *Supra* ¶¶ 161, 173.  I discuss this issue more above.  *E.g.*, *supra* ¶¶ 267-271.

882.    Dr. Meulien opines that "Dr. Porter's report seemingly ignores the substantial

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

ratio had an effect on drug product stability and protein expression." Meulien Rep. ¶ 149. Again, I note that I discuss Moderna's lipid molar ratio research at length in my Opening Report, and Dr. Meulien discusses none of those opinions. Opening Rep. Section IX.C. I do not disagree with Dr. Meulien that the lipid molar ratio of a composition can affect its properties. However, I note that the document that Dr. Meulien cites for that proposition, which he calls "Smith Dep. Ex. 2," varied lipid molar ratios much more substantially than the eventual minor changes that Moderna made to the target 1.5:50 formulation. I discuss those experiments above. *Supra* ¶ 116.

897.    Dr. Meulien also discusses various results from a document he refers to as "Smith Dep. Ex. 3." Meulien Rep. ¶ 149. I discuss that document as well above. *Supra* ¶ 116. The set of experiments described in that document are still further examples of Moderna experimenting ████████████████████████████ which Moderna ultimately decided not to use.

898.    Dr. Meulien opines that "Moderna's own research into lipid molar ratios over the course of years continued to provide it with the information needed to ultimately select an improved ratio for use in the Spikevax® vaccine" and cites three PowerPoint presentations. Meulien Rep. ¶ 149. I discuss the data in those presentations in my Opening Report, *e.g.*, Opening Rep. ¶ 445, which Dr. Meulien does not address. I disagree that the data in those presentations demonstrate that Moderna arrived at an "improved ratio" for its vaccine. Meulien Rep. ¶ 149. Moreover, it is my opinion that Moderna's target molar ratios for its COVID-19 vaccine result in a product that infringes the Asserted Claims. Opening Rep. Section XIII. In addition, as I discuss in the context of the doctrine of equivalents, Moderna has referred to the changes it made to its formulation as "minor," "subtle," "slight," "a small change," and a "rounding error[]." Opening Rep. ¶ 667. Moderna's different formulations for its COVID-19

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

vaccine are insubstantially different from each other and from the claims of the Lipid

Composition Patents.  Opening Rep. Section XIII.F.2.

899.    Dr. Meulien opines that, "Based on this extensive research, Moderna ultimately

decided to focus the LNP composition of its SM-102 LNP platform on 48 mol % SM-102, 11

mol % of DSPC, 38.5 mol % of cholesterol, and 2.5 mol % of PEG-DMG."  Meulien Rep. ¶ 150.

Dr. Meulien's opinion ignores the documents making clear that Moderna was motivated by

intellectual property concerns in making the decision to "focus" on this ratio.  *E.g.*, Opening Rep.

¶ 423.

900.    Dr. Meulien opines that the 48 mol% SM-102 target formulation "was ultimately

the formulation chosen for use in Moderna's COVID-19 vaccine by the time it became

commercially available."  Meulien Rep. ¶ 150.  Dr. Meulien ignores the v1 Formulation, which

Moderna sold commercially, and Moderna's PVU formulation, which it offered for sale.  *See*

MRNA-GEN-00872847 (May 31, 2020 letter from Mr. Bancel stating, "Moderna is prepared to

enter discussions with the US Government to manufacture an initial supply of 100 million doses

of mRNA-1273 . . . .").

901.    Dr. Meulien opines that, in view of Plaintiffs' allegations regarding the doctrine

of equivalents, "is clear that the claimed ratios in the Molar Ratio Patents are not an important

aspect of a vaccine product like Spikevax® because molar ratios outside of those claimed are

supposedly equivalent."  Meulien Rep. ¶ 151.  I disagree.  As I explain at length in my Opening

Report and above, Moderna conducted extensive experimentation well outside the scope of the

Lipid Composition Patents, but it was unable to find an acceptable alternative with substantially

different lipid molar ratios.  So Moderna ultimately made a minor change to the 1.5:50 target

formulation, with the express goal of maintaining equivalence to that formulation.  Moderna's

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

¶ 980 (alteration in original) (quoting MRNA-GEN-00457628 at -757).  He also states that the agreement "does not focus on any sort of LNP technology just because there are a few mentions of LNP and how AZD-7970 may be LNP-formulated, and any 'delivery' contemplated cannot be said technically comparable to any alleged invention claimed in the Patents-in-Suit."  *See* Prud'homme Rep. ¶ 980.  I disagree with Dr. Prud'homme's opinions.  The collaboration agreement had *several* focuses, including the development of the mRNA construct *and* the delivery of that construct—via LNP technology—to the relevant targets.  I also disagree with Dr. Prud'homme to the extent he opines that "LNP" or "LNP formulated" has to be "mention[ed]" a certain number of times in a collaboration agreement in order for delivery via LNP technology to be one of several focuses of a collaboration agreement.

923.    For these reasons, I disagree with Dr. Prud'homme's assertion that this agreement focused *only* on "mRNA technology and use of mRNA payload(s)."  *See* Prud'homme Rep. ¶¶ 981–982.  As I explained above, without LNP technology and a viable delivery platform, the mRNA technology and use of mRNA payloads would not be able to reach the relevant targets.

**B.    Genevant's License Agreements**

924.    I understand that Dr. Vellturo has criticized Ms. Lawton's citation to agreements with Chulalongkorn University, ST Pharma Co., and Helix Nano Technologies, because he concludes that "these agreements involve territories outside the United States (and specifically carve out rights to U.S. patents)."  Vellturo Rebuttal Rep. ¶ 158.  I am not a lawyer and have no legal opinion as to the scope of the licenses discussed by Dr. Vellturo.  I have concluded, however, that Genevant's foreign patents and patent applications in the territories identified in those agreements cover technology that is highly comparable to the Patents-in-Suit, including literal foreign counterparts of those patents.

925.    In the Chulalongkorn agreement, as amended, "Territory" is defined to include

522