# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARBUTUS BIOPHARMA
CORPORATION
and GENEVANT SCIENCES GmbH,

    Plaintiffs,

        v.

MODERNA, INC. and MODERNATX,
INC.

    Defendants.

MODERNA, INC. and MODERNATX,
INC.,

    Counterclaim Plaintiffs,

        v.

ARBUTUS BIOPHARMA
CORPORATION
and GENEVANT SCIENCES GmbH,

    Counterclaim Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 22-252 (JDW)

REDACTED - PUBLIC VERSION

# MODERNA'S OPPOSITION TO
# PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

## TABLE OF CONTENTS

I.  Legal Standard ........................................................................................... 1

II.  Plaintiffs' *Daubert* of Dr. Vellturo Should Be Denied .................................. 1

    A.  Dr. Vellturo's Effective Rate Calculation Is Legally and Factually Sound ............ 3

        1.  *EcoFactor* Has No Application Here ...................................................... 4

        2.  Plaintiffs' Numerator/Denominator Argument Is Wrong ......................... 5

        3.  Dr. Vellturo Properly Relied on the Agreement Terms ............................. 7

    B.  Dr. Vellturo's Statements on Hold-Up Are Not Legal Error ................................. 8

    C.  Plaintiffs' Criticism Regarding a "Deficient" NIA Analysis Is a Sideshow ........ 11

III.  Plaintiffs' *Daubert* of Dr. Prud'homme Should Be Denied .......................... 13

    A.  Dr. Prud'homme's DOE Opinions Are Proper ...................................................... 13

        1.  Plaintiffs' Criticisms of Dr. Prud'homme Significantly Mischaracterize His Opinions .......................................................... 13

        2.  Dr. Prud'homme Properly Considered the Claimed Lipid Ranges........... 17

    B.  Dr. Prud'homme's Reverse DOE ("RDOE") Opinions Are Proper ..................... 19

    C.  Dr. Prud'homme's Transitory Particle Opinions Are Proper ............................... 19

    D.  Dr. Prud'homme's Enablement and Indefiniteness Opinions Are Proper ........... 20

IV.  Plaintiffs' *Daubert* of Dr. Anderson Should Be Denied .............................. 21

    A.  Dr. Anderson Correctly Considered Whether the Prior Art Was Enabling, and Did Not Employ Hindsight ........................................................... 22

    B.  Dr. Anderson's Reasonable Expectation of Success Opinions Were Sound........ 23

    C.  Dr. Anderson Thoroughly Considered Motivations to Modify the Prior Art ....... 24

    D.  Dr. Anderson Did Not "Gap Fill" with Inventor Documents ............................... 25

    E.  Plaintiffs Forfeit Excluding Dr. Anderson's ODP Opinions ............................... 25

# TABLE OF AUTHORITIES[1]

**Page(s)**

**Cases**

*Acceleration Bay, LLC v. Amazon Web Servs., Inc.*,
 2024 WL 4164876 (D. Del. Sept. 12, 2024).........................................................................24

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
 694 F.3d 1312 (Fed. Cir. 2012).....................................................................................4, 7

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
 616 F.3d 1283 (Fed. Cir. 2010)...............................................................................16, 18

*AquaTex Indus., Inc. v. Techniche Sols.*,
 479 F.3d 1320 (Fed. Cir. 2007).................................................................14, 16, 17, 18

*AstraZeneca AB v. Apotex Corp.*,
 782 F.3d 1324 (Fed. Cir. 2015)........................................................................................11

*Baltimore Aircoil Co., v. SPX Cooling Techs. Inc.*,
 2016 WL 4426681 (D. Md. Aug. 22, 2016) .....................................................................6

*Bd. of Regents Univ. of Texas Sys. v. Bos. Sci. Corp.*,
 645 F. Supp. 3d 324 (D. Del. 2022).................................................................................25

*Beckman Instruments, Inc. v. LKB Produktor AB*,
 892 F.2d 1547 (Fed. Cir. 1989)........................................................................................22

*Carnegie Mellon Univ. v. Marvell Tech. Grp.*,
 807 F.3d 1283 (Fed. Cir. 2015)..........................................................................................7

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993)............................................................................................... *passim*

*Dow Chem. Co. v. Nova Chems. Corp. (Canada)*,
 803 F.3d 620 (Fed. Cir. 2015)..........................................................................................21

*EcoFactor, Inc. v. Google LLC*,
 137 F.4th 1333 (Fed. Cir. 2025) ..................................................................................3, 4

*Ericsson, Inc. v. D-Link Sys., Inc.*,
 773 F.3d 1201 (Fed. Cir. 2014)....................................................................................9, 10

---

[1] Unless otherwise indicated, all emphasis has been added, and internal quotation marks, brackets, and citations have been omitted and otherwise cleaned up from quoted material.

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp, LLC*,
   879 F.3d 1332 (Fed. Cir. 2018)...........................................................................11

*Finalrod IP, LLC v. Endurance Lift Sols., Inc.*,
   2021 WL 4906217 (E.D. Tex. Oct. 20, 2021) ......................................................13

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970)................................................................2, 12

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
   339 U.S. 605 (1950).......................................................................................14, 19

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010)..............................................................1, 8, 9, 25

*Innogenetics N.V. v. Abbott Labs.*,
   512 F.3d 1363 (Fed. Cir. 2008)............................................................................24

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
   751 F.3d 1327 (Fed. Cir. 2014)............................................................................24

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
   694 F.3d 51 (Fed. Cir. 2012)................................................................................10

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)............................................................................11

*Med-El Elektromedizinische Gerate GmbH v. Advanced Bionics, LLC*,
   2024 WL 4371292 (D. Del. Oct. 2, 2024) ..........................................................20

*MobileMedia Ideas, LLC v. Apple Inc.*,
   209 F. Supp. 3d 756 (D. Del. 2016)..................................................................5, 7

*Motorola, Inc. v. Interdigital Technology Corp.*,
   121 F.3d 1461 (Fed. Cir. 1997)......................................................................22, 24

*Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*,
   166 F.3d 1190 (Fed. Cir. 1999)............................................................................21

*In re Nomiya*,
   509 F.2d 566 (C.C.P.A. 1975) ............................................................................25

*Orexo AB v. Actavis Elizabeth LLC*,
   2019 WL 10060475 (D. Del. Mar. 19, 2019) ......................................................11

*Par Pharm. Inc. v. Hospira, Inc.*,
   420 F. Supp. 3d 256 (D. Del. 2019).....................................................................18

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
    849 F.3d 1360 (Fed. Cir. 2017)................................................................11

*Prolitec Inc. v. ScentAir Techs., LLC*,
    770 F. Supp. 3d 730 (D. Del. 2025)..........................................................25

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)................................................................10

*Rothman v. Target Corp.*,
    556 F.3d 1310 (Fed. Cir. 2009)..............................................................25

*RSB Spine, LLC v. DePuy Synthes Sales, Inc.*,
    2022 WL 17084156 (D. Del. Nov. 18, 2022) ..........................................12

*Shire Viropharma Inc. v. CSL Behring LLC*,
    2021 WL 1227097 (D. Del. Mar. 31, 2021) ..............................................7

*Shure Inc. v. ClearOne, Inc.*,
    2021 WL 4748744 (D. Del. Oct. 8, 2021) ...............................................13

*SmartSky Networks, LLC v. Gogo Bus. Aviation LLC*,
    2025 WL 2972258 (D. Del. Oct. 21, 2025) ..............................................7

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005), Br. 21....................................................21

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*,
    511 F.3d 1186 (Fed. Cir. 2008)..........................................................22, 24

*SRI Int'l v. Matsushita Elec. Corp.*,
    775 F.2d 1107 (Fed. Cir. 1985) (en banc)................................................19

*Tailored Lighting, Inc. v. Osram Sylvania Prods., Inc.*,
    713 F. Supp. 2d 184 (W.D.N.Y. 2010).....................................................21

*Tanabe Seiyaku Co. v. U.S. Int'l Trade Comm'n*,
    109 F.3d 726 (Fed. Cir. 1997)................................................................18

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015)..............................................................21

*Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC*,
    127 F.4th 1340 (Fed. Cir. 2025) .............................................................15

*United States v. Cors*,
    337 U.S. 325 (1949)...............................................................................10

*Vectura Ltd. v. GlaxoSmithKline LLC*,
  2019 WL 1352767 (D. Del. Mar. 26, 2019) .........................................................................11

*Vehicular Techs. Corp. v. Tital Wheel Int'l, Inc.*,
  141 F.3d 1084 (Fed. Cir. 1998) ..................................................................................14, 15, 16

*VirnetX, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 ...................................................................................................................10

*VLSI Tech. LLC v. Intel Corp.*,
  87 F.4th 1332 (Fed. Cir. 2023) .........................................................................................14

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997) .......................................................................................................15, 17

*Wasica Fin. GmbH v. Schrader Int'l, Inc.*,
  432 F. Supp. 3d 448 (D. Del. 2020) ....................................................................................7

*Whitserve, LLC v. Comput. Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012) ...............................................................................................6

**Rules**

Fed. R. Evid. 702 .........................................................................................................1, 8, 22

## TABLE OF ABBREVIATIONS

| Abbreviation | Full Description |
|---|---|
| § 1498 | 28 U.S.C. §1498(a) |
| '435 Patent | U.S. Patent No. 9,364,435 |
| '651 Patent | U.S. Patent No. 9,504,651 |
| Arbutus | Arbutus Biopharma Corp. |
| Br. | Plaintiffs' Opening Brief in Support of Motion to Exclude Expert Testimony |
| DOE | Doctrine of equivalents |
| F-W-R | Function, Way, Result |
| Genevant | Genevant Sciences GmbH |
| IP | Intellectual property |
| LNP | Lipid nanoparticle |
| Moderna | Moderna, Inc. and ModernaTX, Inc. collectively |
| mol% | Molar amount of a substance is the amount of that substance measured in moles. A mole is a unit of measurement to express amounts of a chemical substance. Molar percentage of a lipid in a mixture refers to the proportion of moles of a specific lipid relative to the total moles of all lipids. |
| NIA | Non-infringing alternative(s) |
| Patents-in-Suit | U.S. Patent Nos. 9,504,651; 9,364,435; 8,492,359; and 11,141,378 |
| Plaintiffs | Arbutus and Genevant collectively |
| POSA | Person of Ordinary Skill in the Art |
| PVU | Personalized Vaccine Unit |
| Ratio Patents | U.S. Patent Nos. 9,364,435; 8,492,359; and 11,141,378 |
| RDOE | Reverse doctrine of equivalents |

**TABLE OF EXHIBITS**

| Exhibit # | Exhibit Description |
|:---:|:---|
| 1 | February 14, 2025 Rebuttal Report of Christopher A. Vellturo, Ph.D. [excerpts] |
| 2 | Email thread between S. Hoge to D. Parsons re: Composition (June 9, 2017) |
| 3 | June 5, 2024 Deposition Transcript of Peter Zorn [excerpts] |
| 4 | April 17, 2025 Deposition Transcript of Christopher Vellturo [excerpts] |
| 5 | March 21, 2025 Reply Expert Report of Catharine M. Lawton [excerpts] |
| 6 | May 18, 2020 Moderna Press Release (GENV-00961825 – GENV-00961827) |
| 7 | May 29, 2020 Moderna Press Release (GENV-01012179 – GENV-01012180) |
| 8 | April 16, 2020 Moderna Press Release (GENV-01012159 – GENV-01012161) |
| 9 | March 1, 2021 Congressional Research Service Contracts (GENV-01013569 – GENV-01013572) |
| 10 | February 17, 2021 CBC Lite Article (GENV-01095620 – GENV-01095623) |
| 11 | August 5, 2020 National Post Article (GENV-01090351 – GENV-01090355) |
| 12 | March 9, 2021 Providence Therapeutics Presentation (GENV-00254324) [excerpts] |
| 13 | Exhibit 7 to the February 14, 2025 Rebuttal Expert Report of Christopher A. Vellturo, Ph.D. |
| 14 | Exhibit 6 to the February 14, 2025 Rebuttal Expert Report of Christopher A. Vellturo, Ph.D. |
| 15 | Moderna 5-Year Plan Presentation (MRNA-GEN-01251960) [excerpts] |
| 16 | May 22, 2024 Deposition Transcript of Stephen G. Hoge [excerpts] |
| 17 | May 15, 2020 Board Discussion Presentation (MRNA-GEN-02645641) [excerpts] |
| 18 | May 17, 2024 Deposition Transcript of Kerry Benenato, Ph.D. [excerpts] |
| 19 | June 7, 2024 Deposition Transcript of Donald M. Parsons [excerpts] |
| 20 | April 16, 2025 Deposition Transcript of Robert Prud'homme, Ph.D. [excerpts] |
| 21 | February 14, 2025 Rebuttal Expert Report of Robert Prud'homme, Ph.D. [excerpts] |
| 22 | November 25, 2024 Opening Expert Report of Dr. Michael Mitchell [excerpts] |
| 23 | April 28, 2025 Deposition Transcript of Daniel G. Anderson, Ph.D. [excerpts] |

| Exhibit # | Exhibit Description |
|---|---|
| 24 | Moderna Report (MRNA-GEN-00192423 – MRNA-GEN-00192428) |
| 25 | Moderna Report (MRNA-GEN-02615528 – MRNA-GEN-02615537) |
| 26 | September 9, 2019 Moderna Presentation (MRNA-GEN-00533651) [excerpts] |
| 27 | March 21, 2025 Reply Expert Report of Daniel Griffith Anderson |
| 28 | November 25, 2024 Opening Expert Report of Daniel Griffith Anderson |
| 29 | November 25, 2024 Opening Expert Report of Robert Prud'homme, Ph.D. |
| 30 | March 21, 2025 Reply Invalidity Report of Robert Prud'homme, Ph.D. [excerpts] |
| 31 | Exhibits 4 and 4-A to the February 14, 2025 Rebuttal Expert Report of Christopher A. Vellturo, Ph.D. |
| 32 | Exhibit 5 to the February 14, 2025 Rebuttal Expert Report of Christopher A. Vellturo, Ph.D. |
| 33 | Genevant Sciences GmbH license agreement (GENV-00022307) [excerpts] |
| 34 | Exhibit 8 to the February 14, 2025 Rebuttal Expert Report of Christopher A. Vellturo, Ph.D |
| 35 | Exhibit 9 to the February 14, 2025 Rebuttal Expert Report of Christopher A. Vellturo, Ph.D |
| 36 | Exhibit 10 to the February 14, 2025 Rebuttal Expert Report of Christopher A. Vellturo, Ph.D |
| 37 | Genevant Sciences GmbH license agreement (GENV-00022689) [excerpts] |
| 38 | November 25, 2024 Expert Report of Catharine M. Lawton [excerpts] |
| 39 | Plaintiff Genevant Sciences GmbH's Second Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Second Set of Interrogatories (Nos. 8-10) [excerpts] |

Plaintiffs' *Daubert* motion reads like a cross-examination outline and rests on fundamental error: it conflates admissibility under Rule 702 with disagreements to the conclusions drawn by Moderna's experts, which go to weight. As each challenged expert applied well-accepted principles consistent with the law, tied his analysis to the facts of this case, and supplied his judgment as a qualified expert must necessarily do, Plaintiffs' motion should be denied.

## I.    LEGAL STANDARD

Expert testimony must be "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); Fed. R. Evid. 702. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy" go to ***weight***, not admissibility. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). Vigorous cross-examination—not exclusion—is the appropriate means of challenging such expert testimony. *Daubert*, 509 U.S. at 596.

## II.    PLAINTIFFS' *DAUBERT* OF DR. VELLTURO SHOULD BE DENIED

Dr. Vellturo uses the well-recognized market approach to determine the reasonable royalty that would have resulted from the hypothetical negotiation between Moderna and Plaintiffs. The market approach takes into account "actual market transactions" for the Patents-in-Suit or comparable technology. Ex-1 ¶79. Dr. Vellturo examined the market transactions available to him, which included all of Plaintiffs' agreements involving rights to the Patents-in-Suit, as well as those that do ***not*** provide rights to the Patents-in-Suit or involve territories that explicitly ***exclude*** the United States. *Id.* ¶¶80-160, 183-243; Ex-31. He further considered agreements between Moderna and others, which included rights for third-party technologies used in Moderna's COVID-19 vaccine. Ex-1 ¶¶161-82. Dr. Vellturo concluded that Plaintiffs' agreements that exclude the United States lacked economic comparability. *Id.* ¶¶158-60, 199. Similarly, he determined that Moderna's agreements were neither technically comparable (by properly relying on technical experts, Dr.

Meulien and Dr. Prud'homme) nor economically comparable (an assessment Dr. Vellturo is qualified to make as a damages expert). Ex-1 ¶¶161-82, 200-14; Ex-32.

Dr. Vellturo thus focused on 13 of Plaintiffs' agreements ("Comparable Agreements") as technically and economically "most comparable" because they provided "real-world examples of what willing licensees agreed to pay to Genevant (and Genevant agreed to accept as compensation) for a license to use an entire portfolio of assets (patented and non-patented, including but not limited to the Patents-in-Suit) to commercialize pharmaceutical products." Ex-1 ¶188. This is consistent with *Georgia-Pacific* factor 1, which provides for consideration of license fees paid for the asserted patents. *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). These Comparable Agreements are not lump sum agreements, *i.e.*, a single payment for the life of the agreement. Rather, as is typical in the pharmaceutical industry, the Comparable Agreements each have the following structure: fixed upfront and milestone payments before commercialization and running royalty payments on net sales after commercialization. Ex-14. The agreements also include tiered running royalties, which increase as total sales increase. *Id*. Across the 13 Comparable Agreements, the upfront and milestone payment amounts and running royalty rates ██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ The May 11, 2020 agreement between Genevant and Providence ("Providence Agreement") is particularly salient because it was executed during the pandemic for development, manufacture, and commercialization of an mRNA COVID-19 vaccine only weeks before the May 31, 2020 hypothetical negotiation date. Ex-33; Ex-1 ¶¶98-100; Ex-14 at [2].

The 13 Comparable Agreements are ***not*** licenses solely to the Patents-in-Suit (unlike the license between Moderna and Plaintiffs at the hypothetical negotiation). Therefore, Dr. Vellturo

engaged in an apportionment analysis. **First**, he determined an effective royalty rate for each agreement corresponding **only** to patent rights by removing the value of other types of IP and bargained-for benefits. To do so, Dr. Vellturo computes a single royalty rate for each Comparable Agreement, to be paid as a percentage of commercial sales, that reflects **both** the agreement's upfront and milestone payments **and** running royalty payments. Ex-1 ¶¶217-23; Ex-13 at 7.1-7.13. Because the agreements say what the terms are (and because ███████████████████████ ███████), Dr. Vellturo used actual quarterly sales of Moderna's accused product to determine Moderna's total royalty payments under each Comparable Agreement, applying each agreement's express financial terms, *i.e.*, recognizing milestone payments associated with clinical trials or regulatory approval **and** tiered running royalties paid based on net sales each quarter, for a non-exclusive patent license. Ex-1 ¶218; Ex-13. The effect of Dr. Vellturo's analysis is to **increase** his calculated effective rate over the royalty rates in the Comparable Agreements because he includes the fixed payments as part of the effective royalty rate. Where applicable, Dr. Vellturo also applied a ████ reduction to the royalty rate based on a specific provision in each Comparable Agreement, which ███████████████████████████. Ex-1 ¶218. **Second**, Dr. Vellturo apportioned his calculated effective rate to isolate the value attributable to **just** the Patents-in-Suit using patent citation analysis ("PCA"), a court-accepted method for apportionment. Ex-1 ¶¶224-37, 8-13, Figs. 1-2; Ex-34; Ex-35; Ex-36. Plaintiffs do not challenge Dr. Vellturo's PCA.

### A.    Dr. Vellturo's Effective Rate Calculation Is Legally and Factually Sound

Plaintiffs mischaracterize Dr. Vellturo's analysis in an effort to shoehorn it into *EcoFactor*. In *EcoFactor*, the expert simply divided lump sum amounts by estimated units and deemed the result to be what the parties agreed to, despite express language in the licenses to the contrary. *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1341-42 (Fed. Cir. 2025). Here, by contrast, **none** of the agreements are "lump sum." Each agreement **includes** a running royalty rate, and to ensure

that he properly accounted for the negotiated value, Dr. Vellturo adjusted those running royalty rates upward to account for the fixed payments in the agreements. Ex-13 at 7.1-7.13. Plaintiffs' disagreement with Dr. Vellturo's analysis, and their mischaracterization of his inputs, "go[es] to the weight to be afforded the testimony and *not* its admissibility." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012); *see also EcoFactor*, 137 F.4th at 1340 (reasonable royalty "necessarily involves an element of approximation and uncertainty").

### 1.    *EcoFactor* Has No Application Here

Plaintiffs contend *EcoFactor* established "precedent" that "lump-sum payments cannot be converted to a running royalty without 'relevant sales figures to verify whether the lump sums corresponded to a particular unit-based rate.'" Br. 3. That is not what *EcoFactor* holds. Rather, *EcoFactor* held that a damages expert's opinion was inadmissible because it was based on a demonstrably flawed factual premise. The expert claimed that the parties agreed to an $X per unit rate in lump sum settlement licenses. *EcoFactor*, 137 F.4th at 1341. But the "***plain language*** of the licenses [did] *not* provide a basis for [the expert] to opine that the parties agreed to an $X per unit rate," and instead, the licenses "directly contradict[ed] any claim that the lump sum is based upon any particular royalty rate." *Id.* at 1341-42. Thus, *EcoFactor* did not address an issue involving "unavoidable imprecision on which [a damages expert's] expertise was brought to bear," but a concrete factual premise (on which EcoFactor's expert based his entire opinion) that was "***untethered*** from the licenses and ***unsupported*** by the evidence on which [the expert] relied," which warranted exclusion. *Id.* at 1346.

Unlike in *EcoFactor*, the Comparable Agreements are *not* lump sum settlement licenses, but license and development agreements that ***expressly*** contemplated precommercial milestones, commercial milestones, ***and*** running royalties based on net sales of products. Ex-1 ¶¶93-94, 98-100, 106-29, 132-57; Ex-14; Ex-33 at 318, 326-329 (financial terms for "▮▮▮▮▮▮▮▮▮▮

4

███████████████████████████████████ Ex-37 at 704, 713-722

(similar). Dr. Vellturo appropriately applies these milestones *and* running royalties as outlined in each Comparable Agreement in his effective royalty rate calculation. Far from disregarding the plain language, Dr. Vellturo expressly took the terms into account when arriving at his effective rate. That is the type of analysis courts routinely permit. *MobileMedia Ideas, LLC v. Apple Inc.*, 209 F. Supp. 3d 756, 764-65 (D. Del. 2016) (denying exclusion of expert who calculated "reasonable royalty rate based on certain license agreements and the economics of patent portfolios," "offer[ed] reasons for his patent selection," and adjusted for "differing circumstances").

### 2.    Plaintiffs' Numerator/Denominator Argument Is Wrong

Plaintiffs further allege that Dr. Vellturo mixes and matches "lump-sum payments ([in] the numerator)" with Moderna's accused vaccine sales "as the denominator," which yield results that are "irrelevant and highly misleading" by "artificially mak[ing] the royalties in the agreements seem much smaller." Br. 3. That is not what Dr. Vellturo did. Rather, Dr. Vellturo accounted for *both* non-running royalties (*i.e.*, upfront and milestone payments) and all applicable tiers of running royalties to determine what Moderna *would have* paid under the terms of each Comparable Agreement. His effective royalty rate calculation *increases* the royalties under each Comparable Agreement, which include milestone payments and royalty tiers that would only be triggered by high volume commercial sales—events that ████████████████████ Moderna has.

By way of illustration, under the Providence Agreement, Plaintiffs actually received only ████████. Ex-31 at 4-A (Plaintiffs' out-license revenues at [2]). Instead of using ████ as the numerator (as Plaintiffs allege Dr. Vellturo did), Dr. Vellturo examined *all* financial terms of the Providence Agreement and calculated ██████████ of non-running royalties and ██████████ of running royalties (before discounting for time value of money) that would be

applied this same methodology to all the Comparable Agreements; where specific circumstances or triggers in the agreement led to higher running royalties, Dr. Vellturo appropriately applied the higher rate to net sales, which ***increased*** the royalties Moderna would owe. *E.g.*, Ex-14 at [6]

██████████████████████████████████████████████

██████████); Ex-13 at 7.1, 7.3-7.13. This was not just reasonable, but ***necessary*** to ensure that Dr. Vellturo's analysis took into account the highest tiers of royalty payments in the Comparable Agreements, thereby capturing the parties' upside expectations for sales of licensed products. Ex-4 at 141:11-145:1, 152:9-154:16, 188:1-15.

Plaintiffs' reliance on *Baltimore Aircoil Co., v. SPX Cooling Techs. Inc.* is misplaced. Br. 3, 5. There, plaintiff's damages expert relied on a lump-sum settlement agreement between the plaintiff and a licensee, Evapco, but the expert simply substituted defendant's sales for Evapco's to convert the lump-sum agreement into a per-unit rate. 2016 WL 4426681, at *24 (D. Md. Aug. 22, 2016). By contrast, the Comparable Agreements are not lump sum settlements, but license and development agreements with non-running and running royalty terms brokered without the "taint" or "coercion" of litigation. *Id.*; *see also* Ex-3 (Zorn Tr.) 124:23-130:23 ("Each deal is individually negotiated"). Those agreements say exactly under what circumstances each of their payments apply, and Dr. Vellturo carefully analyzed whether those circumstances were present in this case, and if so, ensured those payments applied to Moderna. Ex-13; Ex-14. In other words, Dr. Vellturo used evidence of what each of Plaintiffs' licensees ***would have paid*** under the Comparable Agreements, then applied those express terms to ***actual*** sales of Moderna's vaccine.

Plaintiffs' other cases are inapposite, and if anything, show that Dr. Vellturo's analysis is legally sound. *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012) ("some basis for comparison must exist" for a jury to "use a running-royalty agreement as a basis to award

lump sum damages"); *Carnegie Mellon Univ. v. Marvell Tech. Grp.*, 807 F.3d 1283, 1304-05 (Fed. Cir. 2015) (lump-sum license agreements granted **before** patentable technology even developed were not comparable); *SmartSky Networks, LLC v. Gogo Bus. Aviation LLC*, 2025 WL 2972258, at *8-9 (D. Del. Oct. 21, 2025) (opinion not reliable in part because agreement alleged to be comparable did not license **any** intellectual property and was part of larger corporate transaction).

### 3. Dr. Vellturo Properly Relied on the Agreement Terms

Plaintiffs criticize Dr. Vellturo for calculating royalties by taking into account the **terms the parties actually negotiated** to arrive at a reasonable royalty rate. Br. 6-7. But that is precisely what damages experts are supposed to do. *MobileMedia*, 209 F. Supp. 3d at 764-65; *Wasica Fin. GmbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 461 (D. Del. 2020) (finding expert's consideration of royalty structure and non-exclusive nature of license sufficiently reliable). Specifically, Plaintiffs claim that Dr. Vellturo should have relied on news articles and Plaintiffs' cherry-picked evidence about what Providence expected to sell under its agreement with Plaintiffs. Br. 6-7. But Dr. Vellturo relied on the **actual** Providence Agreement, which expressly contemplated ████████████████████████████████████████████████████ ███████████████████. Ex-14 at [2] (████████████████████████████████████ ████████████████████████████████████████████████████████); Ex-33 at 328; Ex-4 153:4-7 ("[Y]ou don't negotiate tiers that you believe there is no probability of reaching"). Plaintiffs are free to cross Dr. Vellturo as to why he relied on the Providence Agreement versus a news article, but that is not grounds for exclusion. *E.g.*, *ActiveVideo*, 694 F.3d at 1333; *Wasica*, 432 F. Supp. 3d at 461 (whether reasonable royalty should be different than rate in actual license because only one claim, and not the entire patent, was asserted "goes to weight and not admissibility"); *Shire Viropharma Inc. v. CSL Behring LLC*, 2021 WL 1227097, at *29 (D. Del. Mar. 31, 2021) (to extent party can establish expert's assumptions are faulty, "they may

cross examine him"). Plaintiffs have failed to show how Dr. Vellturo's analysis falls short of the threshold under *Daubert* and Rule 702.

### B.      Dr. Vellturo's Statements on Hold-Up Are Not Legal Error

Plaintiffs mischaracterize Dr. Vellturo as announcing a "rule" that "timing pressure *cannot be considered* in calculating a reasonable royalty." Br. 8 (emphasis in original); Ex-1 ¶265. However, Dr. Vellturo explained (in the same paragraph) why myopic focus on "timing pressure" results in a royalty that far exceeds the footprint of the invention. Ex-1 ¶265. The facts and prior agreements guided Dr. Vellturo's opinions, but Plaintiffs nonetheless seek to exclude Dr. Vellturo opinion on "hold-up" in an effort to preclude any evidence that contradicts the flawed analysis of their own expert, Ms. Lawton, who claims that Plaintiffs should be awarded an exorbitant royalty that far outstrips anything they negotiated in the real-world, including during the pandemic. Ex-38 ¶¶1376-78, 1443-44, 1530-37. That is not grounds for *Daubert*. *i4i*, 598 F.3d at 854-56.

According to Plaintiffs, Moderna had no choice but to accept Plaintiffs' exorbitant royalty demand at the hypothetical negotiation in order for Moderna to provide its COVID-19 vaccine to the Government during the pandemic. Ex-38 ¶¶1443-44, 1491, 1514. Dr. Vellturo disagreed with this premise based on the facts of this case—for good reason. Every agreement that includes the Patents-in-Suit, including those from during the pandemic, has royalties multiple times lower than what Plaintiffs claim that they are entitled to under their "hold up" theory. *Compare* Ex-14 *with* Ex-38 ¶¶1530-1537. Dr. Vellturo thus relies on the Comparable Agreements with the understanding that "the most comparable licenses granted by Plaintiffs would have implicitly contemplated the 'footprint' question" because those actual agreements are highly probative as to what constitutes a reasonable royalty for those patent rights and reflect the economic value of the patented technology in the marketplace. Ex-1 ¶348. Plaintiffs have identified no evidence, other than self-serving testimony from Genevant's President and Chief Legal Officer, Ex-3 118:15-

120:16, that they would have commanded far higher royalties from Moderna than all 13 of their licensees. Dr. Vellturo's evidence-based conclusions are based on his analysis of the facts of this case. Plaintiffs can present their disagreement with his analysis to the jury. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227-28 (Fed. Cir. 2014); *i4i*, 598 F.3d at 856 ("Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury").

Dr. Vellturo also explains that Plaintiffs' insistence that the timing of the pandemic requires a significantly increased royalty is "a ***misguided and improper*** application of the 'hold-up' concept." Ex-1 ¶25. Specifically, Dr. Vellturo opines that Ms. Lawton ignores the "fundamental adverse impacts on the long-term demand for LNP technologies" that would result from delaying Moderna's commercialization and "public health implications of impeding Moderna's allegedly infringing COVID-19 vaccine launch." *Id.* Dr. Vellturo's report details the unique circumstances present at the time of the hypothetical negotiation, including the human toll of the COVID-19 pandemic, a worldwide effort to develop a vaccine, and the U.S. Government's launch of Operation Warp Speed and investments in clinical trials and vaccine purchases. *Id.* ¶¶31-52, 70-71. He also analyzed whether it was appropriate to attribute Moderna's ability to obtain the necessary approvals on the Government's timeline to the Patents-in-Suit—he concluded it was not. *Id.* ¶¶305-12, 665-67, 795-801, 808-11. Indeed, not a single other licensee of Plaintiffs brought any product to market (let alone a COVID-19 vaccine), Ex-3 200:14-19, undermining any notion that the Patents-in-Suit enabled Moderna to get its product to market in rapid fashion. Dr. Vellturo details how Plaintiffs' theory conflates the value of having available vaccines to combat the pandemic with the alleged value of the patented invention. Ex-1 ¶¶25, 265, 342-74. So rather than "contradict[ing] black letter law," Dr. Vellturo follows the Federal Circuit's instruction that "[a]t all times, the damages inquiry must concentrate on compensation for the economic harm caused

9

by infringement of the claimed invention," which requires "carefully t[ying] proof of damages to the claimed invention's footprint in the market place." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). This is not a requirement specific to the SEP context; it is required in ***all*** damages analyses. *Ericsson*, 773 F.3d at 1233; *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327-29 (testimony that "did not even try to link demand for the accused device to the patented feature" was "inadmissible and should have been excluded").

Moreover, considerations that are at issue in SEP cases, *e.g.*, that patented technology is not more valuable simply because it was incorporated into a standard, are analogous to those at issue in the unique circumstances in this case. Here, Moderna designed its particular LNP for its COVID-19 vaccine, but Plaintiffs have identified no evidence that Moderna's selection of a particular LNP (as opposed to another) makes the accused product more valuable (*see* §III.C *infra*). That is particularly so given the public health emergency that was ongoing at the time of the hypothetical negotiation, and Moderna's awareness that it was contracting with the Government. Ex-1 ¶¶596-604, 611. Basing a royalty on "value that was created by the urgency of its need," as Plaintiffs do, "does not reflect what 'a willing buyer would pay … to a willing seller'" because "[t]hat is a ***hold-up value***, not a fair market value." *United States v. Cors*, 337 U.S. 325, 334 (1949). Dr. Vellturo's opinion that the "value" of the pandemic should not be part of a royalty analysis is fully consistent with Federal Circuit precedent. *Id.* ¶¶25, 310, 369, 374; *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) ("[t]he notion that license fees that are tainted by the ***coercive environment*** … are unsuitable to prove a reasonable royalty is a logical extension of *Georgia–Pacific*, the premise of which assumes a voluntary agreement will be reached between a willing licensor and a willing licensee, with validity and infringement of the patent not being disputed.").

While Plaintiffs claim that "[a]pplying the [hold-up] theory outside of t[he SEP] context contradicts black letter law," Br. 8, their only supporting case is *Orexo AB v. Actavis Elizabeth LLC*, 2019 WL 10060475 (D. Del. Mar. 19, 2019), which lacks the unique factual circumstances of this case (*e.g.*, exigencies from the pandemic, numerous agreements that appropriately exclude the "hold-up" value Plaintiffs seek to obtain). Plaintiffs also rely on *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324 (Fed. Cir. 2015) and *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) for the notion that an alleged infringer "is likely to pay more at a hypothetical negotiation 'if avoiding the patent would be difficult, expensive, and *time-consuming*.'" Br. 8-9. But neither of these cases exclude one expert's criticism of another expert's hold-up opinion, which is what Plaintiffs seek to do here. Moreover, while real-world circumstances, including alleged time pressure, may be contemplated, "they may not replace the hypothetical negotiation or impact the willingness of either the licensee or licensor." *Vectura Ltd. v. GlaxoSmithKline LLC*, 2019 WL 1352767, at *3 (D. Del. Mar. 26, 2019).

Last, that Dr. Vellturo disagrees with Ms. Lawton's application of hold-up to the hypothetical negotiation based on an independent review of the evidence is consistent with *Exmark* and *Lucent. Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp, LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018) (requiring consideration of "real-world bargaining that occurs, particularly in licensing"); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) (instructing a "recreat[ion of] *ex ante* licensing negotiation" between "willing parties"). Plaintiffs' disagreement with Dr. Vellturo's conclusion in that record is for cross-examination.

## C.    Plaintiffs' Criticism Regarding a "Deficient" NIA Analysis Is a Sideshow

Plaintiffs' argument that Dr. Vellturo failed to perform a sufficient NIA analysis is another attempt to ensure Plaintiffs' preferred (and incorrect) narrative is what the jury hears. Br. 11-14. As an initial matter, this is ***not*** a lost profits case, and Dr. Vellturo does not calculate damages

based on the cost of switching to a NIA, which makes their entire argument a red herring. Rather, Dr. Vellturo discusses NIAs in the context of his *Georgia-Pacific* analysis (factors 9, 10), as one consideration during the hypothetical negotiation. Ex-1 ¶190. He ultimately concludes that NIAs would not have an effect on the hypothetical negotiation because they are accounted for in the Comparable Agreements. *Id.* Courts routinely approve of such opinions. *RSB Spine, LLC v. DePuy Synthes Sales, Inc*., 2022 WL 17084156, at *4 (D. Del. Nov. 18, 2022) ("existence of alternative products **may affect** some of the fifteen factors, but the entire possibility of an award does not turn on the alternative's existence"). Plaintiffs identify **no** support for their argument that in order to so-much-as *mention* NIAs, an expert must perform some type of quantitative analysis. Likewise, *Georgia-Pacific* factor 9 does not require consideration of utility and advantages of the patent "over any alternatives" as Plaintiffs allege, Br. 11, but rather "over the old modes or devices, **if any**, that had been used for working out similar results." *Georgia-Pac.*, 318 F. Supp. at 1120.

Separately, while Dr. Vellturo estimates reasonable royalty without affirmatively relying on the advantages of Plaintiffs' alleged inventions over NIAs, he nevertheless understands that NIAs would have been available at the hypothetical negotiation based on both conversations with Dr. Prud'homme and the opinions expressly disclosed in Dr. Prud'homme's reports. Plaintiffs again mischaracterize the record and claim that Dr. Prud'homme "disclosed **no opinions** about what non-infringing alternatives were available to the other licensees." Br. 13. Dr. Prud'homme not only discusses Moderna's target v1 and v2 Formulations, he also identifies **public** prior art formulations, such as U.S. Pub. 2006/0134189, which "taught particles with cationic lipids at 5 mol% to 50 mol%, and PEG-lipid conjugate from about 4 mol% to about 15 mol %." Ex-21 ¶¶928, 934. These public prior art formulations would have been equally available to Moderna and Plaintiffs' other licensees.

Plaintiffs' cited cases, Br. 13, are irrelevant because Dr. Prud'homme opined on the availability of NIAs in his reports, and Dr. Vellturo noted such evidence in his own report. *Finalrod IP, LLC v. Endurance Lift Sols., Inc.*, 2021 WL 4906217, at \*3 (E.D. Tex. Oct. 20, 2021) (finding **no discussion** of non-infringing alternatives in technical expert reports); *Shure Inc. v. ClearOne, Inc.*, 2021 WL 4748744, at \*1 (D. Del. Oct. 8, 2021) (**no** factual basis in either damages or technical expert reports to support idea that redevelopment was reliable proxy for redesign costs). Plaintiffs' remaining arguments rehash the alleged import of "time pressure" and "[inconvenient] circumstances of the hypothetical negotiation." Br. 13-14. Again, none of these implicate legal error and are instead Plaintiffs' disagreements with Dr. Vellturo's reasonable royalty conclusions, which are appropriately addressed on cross. *See* §II.B.

## III.    PLAINTIFFS' *DAUBERT* OF DR. PRUD'HOMME SHOULD BE DENIED

### A.    Dr. Prud'homme's DOE Opinions Are Proper

The Court need not decide Plaintiffs' *Daubert* motion relating to DOE because prosecution history estoppel bars DOE entirely, as set out in Moderna's summary judgment motion. D.I. 508, 597. Regardless, Dr. Prud'homme properly considers the function, way, and result ("F-W-R") of the alleged equivalents in Moderna's COVID-19 vaccine against the F-W-R of the unmet claim elements as they are understood in the context of the Ratio Patents. While Plaintiffs attempt to paint his analysis as legally unsound based on cherry-picked, out-of-context quotes, Dr. Prud'homme's reports demonstrate his opinions are relevant and reliable. Plaintiffs' quibbles about the factual context or pieces of the record Dr. Prud'homme emphasized (or did not) in analyzing infringement are matters for cross-examination, and not a basis for exclusion.

#### 1.    Plaintiffs' Criticisms of Dr. Prud'homme Significantly Mischaracterize His Opinions

DOE "provides a limited exception to the principle that claim meaning defines the scope

of the exclusivity right." *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1341 (Fed. Cir. 2023). DOE only applies when a patentee shows that "a substitute element is only insubstantially different from a claimed element" or "matches the [F-W-R] of the claimed element." *Id.* at 1342. Dr. Prud'homme's opinions under both frameworks properly considered equivalency "against the context of the [Ratio] Patent[s]" and should not be excluded. *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950); *see also AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1326 (Fed. Cir. 2007) ("the [F-W-R] inquiry focuses on an examination of the claim and the explanation of it found in the written description of the patent"); *Vehicular Techs. Corp. v. Tital Wheel Int'l, Inc.*, 141 F.3d 1084, 1090 (Fed. Cir. 1998) ("The question of whether an explicit function has been identified with a claim limitation entails an examination of the claim and the explanation of it found ***in the written description*** of the patent.").

**Lipids at the claimed mol% ranges.** Contrary to Plaintiffs' description, Dr. Prud'homme specifically explains why there are substantial differences between the claimed lipid ***amounts*** and the lipid ***amounts*** in the accused product. Br. 15. For example, Dr. Prud'homme looked to the specification to identify the F-W-R of the "higher level (*i.e.*, ≥50 mol%) of cationic lipid claimed." Ex-21 ¶¶471, 541. He also looked to the "structural features of cationic lipids" found in the specification—just as Dr. Mitchell did (Ex-22 ¶659)—and found that structural features of the "***≥50 mol%*** cationic lipid" of the Ratio Patents had a different F-W-R to the "***lower concentration***" SM-102 in Moderna's vaccine. Ex-21 ¶¶478, 542, 550-554. The same is true for the PEG mol% ranges. *Compare* Ex-22 ¶¶712, 715, 717, *with* Ex-21 ¶¶595-99, 602-11 ("function" of claimed "***lower levels*** [<2 mol%] PEG"). That alone defeats Plaintiffs' argument.

More broadly, Dr. Prud'homme follows precisely the same approach as Plaintiffs' expert Dr. Mitchell: both define the alleged equivalents as the claimed lipid types at the recited mol%

ranges, not merely mol% ranges in isolation as Plaintiffs now argue. Br. 15; Ex-22 ¶659 ("the SM-102 cationic lipid *and* its mol % … perform substantially the same function of the **cationic lipid** of the Asserted Claims, ***including*** its recited mol %"); Ex-21 ¶479. Dr. Mitchell notably analyzes the "way in which the ***SM-102 lipids*** of the drug product achieve their function," and then compares that to the claimed cationic lipid's ***unclaimed*** "chemical mechanism" "disclosed in the [Ratio] Patents," citing the specification describing "structural features of cationic lipids" including a protonatable tertiary amine group. *E.g.*, Ex-22 ¶¶656, 659, 661, 684, 687, 689, 712, 715, 717. Thus, both parties' experts considered the explanation of the F-W-R found in the written description of the patent, as required. *Vehicular*, 141 F.3d at 1090 (explaining the claims, written description, and prosecution history are all relevant to identifying "function"); *cf. Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC,* 127 F.4th 1340, 1349-50 (Fed. Cir. 2025) (not mentioning DOE, faulting expert opinions "untethered from [] court's claim constructions.").

Finally, Plaintiffs take issue with Dr. Prud'homme referring to MC3, Br. 15, but he did so as "background" to explain the F-W-R of the amounts of SM-102 used in Moderna's vaccine, and in particular, the years of Moderna's experiments documenting the improved "result." Ex-21 ¶¶493-501. He therefore relied on MC3 not as the comparison point for his DOE analysis, but as further confirmation that a POSA would not have understood the vaccine's lipid amounts as equivalent to those in the patent. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 36 (1997) ("[i]ndependent experimentation by the alleged infringer … in many cases … would likely be probative of" whether POSAs had known of interchangeability between two elements).

**"Way" lipids at the recited amounts are made.** Dr. Prud'homme's analysis of Moderna's manufacturing methods provides context for why the claimed lipid amounts in its vaccine are substantially different from the claimed lipid amounts—not, as Plaintiffs suggest, to conclude there

is no DOE infringement based on different manufacturing methods. Br. 16. For example, for the 0.5-2 mol% PEG limitation, he opined that the patents teach adding all lipids at once to a maximum of 2 mol% PEG, and that these "low levels" maintain efficacy. Ex-21 ¶¶606, 610-17. Dr. Prud'homme explained that █████████████████████████████████ ██████████████████ for a total of 2.5mol% (the alleged equivalent). Ex-21 ¶¶610-17. He then opined that the "result" is improved stability due to the additional PEG above 2mol% without harming efficacy—a "result" Plaintiffs were unable to achieve. *E.g.*, Ex-21 ¶¶616, 621. Such opinions are properly grounded in the context of the patents to show what a POSA would consider "equivalent." *AquaTex*, 479 F.3d at 1329 ("evidence of equivalents must be from the [POSA]").

Moreover, many of the paragraphs of Dr. Prudhomme's report that Plaintiffs cite are proper rebuttals to their own expert's opinion, *e.g.*, Ex-21 ¶678, or, in some cases have nothing to do with manufacturing methods. For example, Plaintiffs attempt to exclude paragraphs that "show[] that the ***concentration of PEG lipid*** in the formulation impacts, for example, the stability"—*i.e.*, the concentration affects the "result." Ex-21 ¶598; *id.* ¶¶628, 694. The concentration of PEG and other claimed lipids and whether ranges outside of those claimed are equivalent—chemically, structurally, etc.—goes to the heart of the DOE dispute. *See AquaTex*, 479 F.3d at 1329.

**Payload and administration**. Dr. Prud'homme's opinions that the claims are directed to lipids with a "function" of intravenous ("IV") delivery of siRNA are neither irrelevant nor unreliable. Br. 16. It is black-letter law that "[c]laim terms are not construed in a vacuum divorced from the specification." *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290, 1293 (Fed. Cir. 2010); *Vehicular*, 141 F.3d at 1090. The specification is limited to a single embodiment of payload and administration directed to IV siRNA delivery. Ex-21 ¶¶262-63. Dr. Prud'homme properly opined that the alleged equivalent lipid amounts tailored to an ***mRNA***

16

payload do not perform have the substantially the same F-W-R as the unmet claim elements. Ex-21 ¶¶466, 471 477-80, 487-88, 501-504, 541-43, 546, 549, 556-57, 570-571, 573, 603-04, 607, 609, 622-23, 627, 675, 693; *see Warner-Jenkinson*, 520 U.S. at 40; *AquaTex*, 479 F.3d at 1326-27. In fact, Dr. Mitchell analyzed and quoted the ***same*** parts of the specification that Plaintiffs now criticize Dr. Prud'homme for relying on, which describe (unclaimed) delivery of siRNA to "extravascular sites" in opining on the "result" in the F-W-R analysis. Ex-22 ¶667; Ex-21 ¶¶605, 623. Plaintiffs may not want the jury to hear about the vast differences between the F-W-R of the claimed lipid ranges and the lipid amounts in Moderna's vaccine, but that does not make Dr. Prud'homme's analysis unreliable.

### 2.      Dr. Prud'homme Properly Considered the Claimed Lipid Ranges

Plaintiffs rely on their own expert and preferred interpretation of exhibits to suggest that Moderna and Dr. Prud'homme "largely endorse" or "do not dispute that batches of Moderna's vaccine with measured lipid molar ratios falling slightly outside of the literal claims ***are equivalent*** to batches with ratios within the claims." Br. 17-18. This is wholly unsupported. Dr. Prud'homme devotes ***almost 150 pages*** of his report disputing Plaintiffs' DOE theories, specifically opining on why "ratios falling slightly outside" are not equivalent. *See* Ex-21 at pp. 237-349, 352-376; ¶¶238-240 (Ex. 25 shows improved stability at PEG mol% levels at 2.5mol%, outside the claims).

While Plaintiffs criticize Dr. Prud'homme's opinions because he compared the alleged equivalents to ***both*** the endpoint and within the claimed ranges, Br. 18, he did so to rebut Dr. Mitchell who relied on comparisons ***within*** the claimed ranges too. *E.g.*, Ex-22 ¶¶711, 713-14, 716, 723. For example, for the PEG limitation, Dr. Prud'homme relies on Moderna's tests showing differences between various mol% ***within*** and ***outside*** the claimed ranges. Ex-21 ¶¶598, 603-610, 616-30 For the cationic limitations, while Plaintiffs take issue with Dr. Prud'homme comparing the 1:57 formulation (57 mol% cationic), he did so because it is the ***only*** four-lipid formulation of

the claims *in the Ratio Patents*, Br. 18—there are *no* formulation embodiments with lipids at the endpoints. *E.g.*, Ex-21 ¶¶262-63, 474, 486, 488-89, 543, 557-58. Dr. Prud'homme also considered alleged equivalence to *the endpoint* (50%) of the claimed range. Ex-21 ¶¶470-77, 486, 488-89, 505, 541-47. Plaintiffs incorrectly suggest he compared the accused product to the prior art 2:30/2:40 formulations (30/40 mol% cationic ). Br. 18. In fact, he quotes the specification touting the improved results of the 1:57 embodiment over the 2:30/2:40 formulations, in his analysis of the "results" of the claimed 50-65 mol% cationic lipid. Ex-21 ¶¶488-89, 557, 621, 623, 686. He relies on the descriptions of the 1:57 formulation as the comparator, *not* the prior art itself.

Plaintiffs' reliance on *Par* and *Adams*, Br. 15-16, is misplaced, because in those cases, the *only* evidence of insubstantial differences was the endpoints of the claimed ranges. *Par Pharm. Inc. v. Hospira, Inc.*, 420 F. Supp. 3d 256, 266 (D. Del. 2019) (9 mg/ml equivalent to "about 8 mg/ml" for claims to "about 6-8 mg/ml," where defendant "did *not* test for any difference *between* 6 and 9 mg/mL."); *Adams,* 616 F.3d at 1293 (similar). Here, both experts considered evidence of points within and outside the claimed ranges. Plaintiffs want the jury to hear "favorable" comparisons to embodiments *within* the claimed ranges—including Moderna's earlier PVU formulation with 1.5 mol% PEG—while preventing Moderna from presenting any contrary embodiments that also fall *within* the claimed range, including embodiments in the Ratio Patents. Ex-21 ¶¶711, 713-14, 716, 723; *AquaTex*, 479 F.3d at 1326-27. That is not grounds for *Daubert*.

Regarding Plaintiffs' experiments, Dr. Prud'homme confirmed he only referred to Plaintiffs' files "as they are consistent with [his F-W-R] opinions" "based on the specification and file history." Ex-21 ¶555, n.46. Moreover, Plaintiffs' failures with the accused equivalents are probative of substantial differences. Ex-21 ¶621 (Plaintiffs failing to increase PEG above 2 mol%); *Tanabe Seiyaku Co. v. U.S. Int'l Trade Comm'n*, 109 F.3d 726, 733 (Fed. Cir. 1997) (inventors'

failures with alleged equivalent "indicate that the inventors did not consider [it] interchangeable").

### B. Dr. Prud'homme's Reverse DOE ("RDOE") Opinions Are Proper

That RDOE is rarely applied does not mean it does not exist or that opinions applying it are unreliable. Plaintiffs' *sole* justification for excluding Dr. Prud'homme's RDOE opinions is that his "opinions are based on the same unclaimed features as his DOE analysis." Br. 19. Although Plaintiffs misconstrue his opinions (*see* §III.A.1), it is appropriate to consider unclaimed aspects when analyzing RDOE. RDOE applies only after a finding of literal infringement and involves evaluating whether the accused product, despite "fall[ing] within the literal words of the claim," operates in a "substantially different way" than the patented invention. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1123 (Fed. Cir. 1985) (en banc) (quoting *Graver Tank*, 339 U.S. at 608-09).

### C. Dr. Prud'homme's Transitory Particle Opinions Are Proper

Plaintiffs again misread Dr. Prud'homme's opinions and argue that they are based on unclaimed features. Not so. ***First***, Dr. Prud'homme does not suggest the claims have a "duration" requirement. Br. 20. Ex-21 ¶717. Instead, he explains that the particles Plaintiffs accuse exist for, at most, only seconds in a process that is hundreds of hours long. *Id*. That opinion is relevant to the purported value (or lack thereof) of the patents. Indeed, Dr. Velluro relies on that context from Dr. Prud'homme to point out that Plaintiffs' damages expert "failed to make ***any*** adjustment to her reasonable royalty rate to reflect the more limited use" alleged by Plaintiffs. Ex-1 ¶838.

***Second***, Plaintiffs, Moderna, and Dr. Prud'homme agree that "the claims do not include a stability requirement." Br. 19.[2] Plaintiffs ignore the substance of Dr. Prud'homme's opinions that the LNP lipid content measured at the ***start*** of the manufacturing process cannot be assumed to

---

[2] In a ***single*** paragraph (Ex-21 ¶723), Dr. Prud'homme offered an opinion based on Plaintiffs' IPR argument that the claims required stability, but as Plaintiffs abandoned that in their validity report served the same day, Moderna has no need to offer that opinion at trial. D.I. 592 ¶¶58-59, 166.

remain the same at the transitory point at which Plaintiffs accuse, 

mid-way through manufacturing. Ex-21 ¶¶717-30. Dr. Prud'homme opines that

. *Id.* ¶718 ("[N]obody … measured the aggregate lipid

content, let alone the lipid content of individual particles, at this point in the process."), ¶720, ¶722

¶724. In other words, Dr. Prud'homme is not opining that such transitory particles do not infringe

because they do not meet an unclaimed "stability" requirement; instead, he opines that because

they are unstable, one cannot assume their lipid content is the same as the start of the process.

Because Dr. Prud'homme's analysis does not rely on unclaimed features to dispute infringement,

upon which Plaintiffs' entire argument rests, his opinions should not be excluded.

### D.    Dr. Prud'homme's Enablement and Indefiniteness Opinions Are Proper

Plaintiffs improperly attempt to incorporate by reference over ***44 pages*** from summary

judgment briefing on the same issues. Br. 20-21. This is a blatant end-run around the page limits

set forth by this Court, and the arguments should be disregarded. *Med-El Elektromedizinische

Gerate GmbH v. Advanced Bionics, LLC*, 2024 WL 4371292, at *9 n.7 (D. Del. Oct. 2, 2024)

(declining to consider "six pages of additional briefing by reference"). Even so, each lacks merit.

**<u>Enablement</u>**. Plaintiffs incorrectly claim that Moderna conceded "Dr. Prud'homme's non-

enablement opinions include [] three categories of legal errors." Br. 20. Rather, Moderna agreed it

would not present just ***four paragraphs*** of his opening report that were raised to rebut ***Plaintiffs'***

prior IPR assertion that the claims required certain "unclaimed features" and explained at length

why the rest of his opinions were proper. D.I. 556 19-20; D.I. 557 15-16, 19; D.I. 524 15-24. His

opinions on manufacturing methods are relevant to whether the specification provides ***even one***

method for a POSA to make and use the asserted claims. Ex-29 ¶¶188-89; *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1196-98 (Fed. Cir. 1999). And his opinions on the difficulties in measuring claimed properties show that POSAs could not practice the claims without undue experimentation. *Tailored Lighting, Inc. v. Osram Sylvania Prods., Inc.*, 713 F. Supp. 2d 184, 193-94 (W.D.N.Y. 2010). None of his enablement opinions should be excluded.

**Indefiniteness.** Where different approaches to measurement are involved, "the patent and prosecution history must disclose a single known approach or establish that, where multiple known approaches exist, a [POSA] would know which approach to select." *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 630 (Fed. Cir. 2015); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344-45 (Fed. Cir. 2015) (claim indefinite where molecular weight could be measured by three methods yielding different results and intrinsic record did not guide which to use). These cases post-date *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331 (Fed. Cir. 2005), Br. 21, and consistently reflect the principle that claims are indefinite where the "patentee has failed to inform with *reasonable certainty* [POSAs] about the scope of the invention," *Teva*, 789 F.3d at 1345, including "where different approaches to measurement are involved." *Dow Chem.*, 803 F.3d at 630. Dr. Prud'homme's indefiniteness opinions are proper.

## IV. PLAINTIFFS' *DAUBERT* OF DR. ANDERSON SHOULD BE DENIED

Moderna's technical expert, Dr. Daniel Anderson, opined that the '651 and Ratio Patents are anticipated and/or rendered obvious by the prior art. Not wishing the jury to hear that the prior art discloses just as much (or as little) as the Patents-in-Suit, Plaintiffs resort to relying on misleading and truncated quotes of his opinions to paint his analysis as "hindsight." Br. 22-23. Although Plaintiffs argued the prior art was not enabling, requiring Dr. Anderson to respond, Plaintiffs do not even ***mention*** the prior art enablement requirement in their motion. Br. 22-25. Dr. Anderson correctly applied well-established legal standards for obviousness and prior art

enablement, and appropriately pointed out that Plaintiffs' critiques of the disclosures of the prior art apply equally to the Patents-in-Suit. Dr. Anderson's opinions clearly satisfy Rule 702.

### A. Dr. Anderson Correctly Considered Whether the Prior Art Was Enabling, and Did Not Employ Hindsight

Plaintiffs seize on isolated phrases—chiefly, Dr. Anderson's shorthand that he viewed the art "through the lens" of the Patents-in-Suit—to claim hindsight. Br. 22. The complete record shows the opposite. Dr. Anderson repeatedly explained, in both his reports and deposition, that he invoked the Patents-in-Suit only to apply the enablement framework that the Federal Circuit requires: if the patents' cursory mention of "mRNA" suffices for written description and enablement, then prior-art references with the same level of detail—or more—necessarily enable a POSA to practice the asserted claims. *E.g.*, Ex-28 ¶¶19-31, 58-59 (explaining "through the lens" framework for prior art enablement), 81-82; Ex-23 30:25-31:11, 52:4-54:7, 70:13-72:24, 96:5-97:11, 98:17-100:19, 120:13-123:6, 127:4-16, 133:9-136:4, 172:6-175:14 (opinions based on POSA's knowledge as of priority). The law is clear: "[t]o render [claims] obvious, the prior art must **enable** [POSAs] to make and use the [later invention]," *Beckman Instruments, Inc. v. LKB Produktor AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989), and prior art is enabling for obviousness if it has disclosures "at a level of detail similar to those contained in the patent." *Motorola, Inc. v. Interdigital Technology Corp.*, 121 F.3d 1461, 1471 (Fed. Cir. 1997). Although Plaintiffs do not move to exclude his anticipation opinions, anticipatory prior art likewise "meets the enabling hurdle" if it has "similarities in technical scope and description to the specification of the [asserted] patent." *See SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008).

The '651 Patent claims lipid formulations with percentages of "fully encapsulated" mRNA. Although the claims recite "mRNA" formulations, "mRNA" is mentioned **once** in the specification in a laundry list of more than 15 nucleic acids, and plasmid DNA is the only nucleic acid in the

examples. Ex-28 ¶¶32-34; D.I. 592 ¶172. Plaintiffs attacked the prior art, contending they do not "disclose[] any embodiment with mRNA, much less an embodiment in which the mRNA satisfies the '651 patent's encapsulation limitations." Ex-39 at 32-33. Dr. Anderson thus appropriately considered the disclosures of the prior art, ***and*** the level of disclosure compared to the '651 Patent to opine on enablement. Ex-28 ¶¶23, 58-59; Ex-27 ¶¶60-62, 80-81. He explained that the prior art was enabling of the claims, and thus could render them obvious, particularly where they had a similar level of detail to the '651 Patent. *Id.* That is not hindsight; it is the yardstick the law supplies for determining whether a prior-art disclosure is enabling for anticipation or obviousness, which Dr. Anderson properly applied.

## B.    Dr. Anderson's Reasonable Expectation of Success Opinions Were Sound

Plaintiffs incorrectly contend that Dr. Anderson relied on the disclosures of the '651 Patent to supply a reasonable expectation of success that prior-art methods could achieve the claimed levels of mRNA encapsulation. Br. 24. In support, Plaintiffs twice cite testimony that he "considered the disclosures of the '651 to analyze the prior art"—while leaving out Dr. Anderson's immediately preceding testimony directing Plaintiffs' counsel to his report explaining this was done to assess whether the prior art was enabling. Br. 24 (citing Ex-23 136:5-13).

Moreover, Plaintiffs ignore Dr. Anderson's extensive opinions on ***why*** a POSA would have a reasonable expectation of success based on the prior art. ***First***, Dr. Anderson identified prior art disclosing methods achieving high nucleic acid encapsulation. Ex-28 §XI.B. Although Plaintiffs make much of the fact that these prior art methods did not include working examples with mRNA, Br. 24-25, the references state that the methods could be applied to nucleic acids, including mRNA—the ***same*** level of disclosure as the '651 Patent. Ex-27 ¶61. ***Second***, Dr. Anderson explained that a POSA could (and would) remove unencapsulated mRNA to increase the percentage of encapsulated mRNA in the formulation, as suggested ***by the prior art***. Ex-28 ¶¶40-

23

42 (applying Plaintiffs' infringement interpretation of "fully encapsulated," noting another expert opined on indefiniteness), 256-57; Ex-27 ¶¶70-73, 94-96; Ex-23 58:10-59:13. None of this analysis is hindsight. Instead, Dr. Anderson properly evaluated prior art enablement in accordance with Federal Circuit precedent. *See Motorola*, 121 F.3d at 1471*; SRI*, 511 F.3d at 1194.

### C. Dr. Anderson Thoroughly Considered Motivations to Modify the Prior Art

Dr. Anderson opined that the Ratio Patents—claiming ratios of lipids and "nucleic acids"—were obvious based on prior art disclosures of overlapping lipid ranges. Ex-28 §XII.C-D.

Plaintiffs baselessly contend that Dr. Anderson took an "arbitrary" approach to combining prior art without "*any* rationale" or "articulated reasoning." Br. 23. To the contrary, he provided *35+ pages* of explanations of why a POSA would have identified certain prior art lipid amounts as starting points from which to optimize, and why the POSA's routine optimization of the ratios would lead the POSA to arrive at the claimed ratios. Ex-28 ¶¶967-91 (start with prior art ratios with known efficacy and optimize to improve performance), ¶¶992-1006 (optimize towards claimed ratios based on known effect of varying each lipid); Ex-27 ¶¶142-43 (prior success "would make these formulations desirable starting points"), ¶¶144-152 (prior art taught optimizing ratios), ¶¶153-169; Ex-23 192:18-197:24 (POSA would seek guidance from prior art formulations and optimize), 200:7-203:17, 187:20-188:16, 220:23-225:6 (optimization routine). These detailed opinions are a far cry from those in Plaintiffs' cases, in which experts wholly failed to articulate bases for modifying the prior art. *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1351 (Fed. Cir. 2014) (expert "did not articulate reasons why [POSAs] would combine" or modify "disparate prior art"); *Innogenetics N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373-74 (Fed. Cir. 2008) (expert merely listed prior art references," then repeated stock phrase "it would have been obvious"); *Acceleration Bay, LLC v. Amazon Web Servs., Inc.*, 2024 WL 4164876, at *18 (D. Del. Sept. 12, 2024) (expert did "*nothing* more" than explain why the references were analogous art).

Dr. Anderson appropriately tied his analysis to the facts of this case, and Plaintiffs never point to a single contrary reference or technical flaw in his analysis. Their quarrel is thus with his conclusions, not his method, and belongs in cross-examination. *i4i*, 598 F.3d at 856 (cross-examination is "traditional and appropriate means of attacking" admissible evidence); *Prolitec Inc. v. ScentAir Techs., LLC*, 770 F. Supp. 3d 730, 756 (D. Del. 2025) (denying motion to exclude, finding complaints could be dealt with by cross-examination or introducing contrary evidence).

### D.    Dr. Anderson Did Not "Gap Fill" with Inventor Documents

Dr. Anderson did not "fill [the] prior art gap" by relying on the Ratio Patents and inventor files. Br. 23. He explained that the ***admissions*** in the Ratio Patents, which are binding on Plaintiffs as prior art, that a POSA would know "the proportions of the components can be varied" was consistent with his opinion that optimizing lipid ratios was routine at the time of invention. Ex-28 ¶¶988-89 (citing '069 49:63-67, 57:24-46); *In re Nomiya*, 509 F.2d 566, 570-71 (C.C.P.A. 1975) (specification representations are "accepted at face value as admissions" of what is "considered 'prior art' for any purpose, including use as evidence of obviousness"). Dr. Anderson also opined that inventor files describing an approach of "tinker[ing]" with prior art ratios, using a design approach known since 1926, was "consistent with [his] opinion" that optimizing ratios was routine and required only ordinary skill. Ex-28 ¶990; *Rothman v. Target Corp.*, 556 F.3d 1310, 1319 (Fed. Cir. 2009) ("inventive process" can "show[]predictability and expectations in [] field of art").

### E.    Plaintiffs Forfeit Excluding Dr. Anderson's ODP Opinions

Plaintiffs' proposed order sweeps broadly to exclude all of Dr. Anderson's "obviousness" opinions, including obviousness-type double patenting ("ODP"), yet their brief never addresses his opinions on that doctrine, which stand unrebutted. Any attempt to expand the motion on reply is waived. *Bd. of Regents Univ. of Texas Sys. v. Bos. Sci. Corp.*, 645 F. Supp. 3d 324, 334 n.2 (D. Del. 2022)("[A]rguments . . . not squarely argued, are considered waived.").

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL

*/s/ Travis J. Murray*

James F. Hurst, P.C.
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000

Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

Noah Frank
Alina Afinogenova
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Yan-Xin Li
Laura Ashley Harris
Hannah Suh
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
(415) 439-1400

November 21, 2025

Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

Patricia A. Carson, Ph.D.
Jeanna M. Wacker, P.C.
Leslie M. Schmidt, P.C.
Mark C. McLennan
N. Kaye Horstman
Shaoyao Yu
Mara L. Greenberg
Andrew Lee
Brad Deem
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4679

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on December 16, 2025, upon the following in the manner indicated:

John W. Shaw, Esquire                                         *VIA ELECTRONIC MAIL*
Karen E. Keller, Esquire
Nathan R. Hoeschen, Esquire
Emily S. DiBenedetto, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Plaintiffs Arbutus Biopharma*
*Corporation and Genevant Sciences GmbH*

Daralyn J. Durie, Esquire                                     *VIA ELECTRONIC MAIL*
Adam R. Brausa, Esquire
Eric C. Wiener, Esquire
Annie A. Lee, Esquire
Shaelyn K. Dawson, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
*Attorneys for Plaintiff Arbutus Biopharma*
*Corporation*

Kira A. Davis, Esquire                                           *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
*Attorneys for Plaintiff Arbutus Biopharma*
*Corporation*

David N. Tan, Esquire                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC  20037
*Attorneys for Plaintiff Arbutus Biopharma*
*Corporation*

David I. Berl, Esquire                         *VIA ELECTRONIC MAIL*
Adam D. Harber, Esquire
Thomas S. Fletcher, Esquire
Shaun P. Mahaffy, Esquire
Andrew L. Hoffman, Esquire
Matthew W. Lachman, Esquire
Ricardo Leyva, Esquire
Arthur J. Argall III, Esquire
Falicia Elenberg, Esquire
Kathryn Larkin, Esquire
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC  20024
*Attorneys for Plaintiff Genevant Sciences GmbH*

Andrei Iancu, Esquire                          *VIA ELECTRONIC MAIL*
Jeffrey B. Wall, Esquire
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, DC 20006
*Attorneys for Plaintiff Genevant Sciences GmbH*


                                    */s/ Travis J. Murray*
                                    _____
                                    Travis J. Murray (#6882)

2