# EXHIBIT 38

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| MODERNA, INC. and MODERNATX, INC., | ) ) | C. A. No. 22-252 (MSG) |
| Defendants. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| MODERNA, INC. and MODERNATX, INC., | ) ) | |
| Counterclaim-Plaintiffs, | ) ) | |
| v. | ) ) | |
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH, | ) ) ) | |
| Counterclaim-Defendants. | | |

**EXPERT REPORT OF CATHARINE M. LAWTON**

**November 25, 2024**

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

# Table of Contents

I.  INTRODUCTION ............................................................................................................... 4

    A. Assignment ................................................................................................................. 4

    B. Qualifications .......................................................................................................... 10

    C. Independence and Compensation Disclosure............................................................ 12

    D. Documents and Information Considered.................................................................... 12

    E. Status of My Study .................................................................................................. 15

    F. Assumptions ............................................................................................................ 16

    G. Summary of Opinions ............................................................................................. 19

II.  BACKGROUND .............................................................................................................. 21

    A. The Parties............................................................................................................... 21

        1. Arbutus BioPharma Corporation and Genevant Sciences GmbH ................................21

        2. Moderna, Inc. and ModernaTX, Inc. .........................................................................31

        3. Commercial Relationship Between Arbutus/Genevant and Moderna ...........................168

    B. The Dispute ............................................................................................................. 185

    C. The Accused Product ............................................................................................... 187

        1. Background .............................................................................................................189

        2. Doses Sold by Formulation .....................................................................................190

    D. Date of Moderna's First Alleged Infringement ........................................................ 190

        1. May 31, 2020 is the Date of Moderna's First Alleged Infringement.............................191

        2. Moderna's Contention that "the hypothetical negotiation could be as early as about January 14, 2020" is incorrect ..................................................................................196

        3. Significant Evidence Supports the May 31, 2020 Date of Moderna's First Alleged Infringement..........204

    E. Situation at the Time of the Hypothetical Negotiation in May 2020 ................................ 232

        1. Background .............................................................................................................233

        2. mRNA Industry Background....................................................................................236

        3. Genevant................................................................................................................245

        4. Moderna .................................................................................................................289

III.    ARBUTUS's PATENTS-IN-SUIT .............................................................................. 403

    A. Introduction ............................................................................................................. 410

    B. Background .............................................................................................................. 411

        1. The Role of Patents in the Biotech Industry...............................................................411

        2. mRNA Medicines and the Importance of Delivery.....................................................413

        3. mRNA Medicines & the Work of Arbutus Scientists...................................................419

    C. Description of the Claimed Inventions of the Patents-in-Suit.......................................... 423

    D. Advantages of the Claimed Inventions of the Patents-in-Suit ........................................ 425

    E. Evidence of Demand for and Use of the Claimed Inventions of the Patents-in-Suit........ 427

        1. The Patents-in-Suit Enabled mRNA Products............................................................428

        2. Published Papers Establish That Moderna Used the Claimed Inventions of the Patents-in-Suit..............433

        3. Moderna's "Standard Formulation" was Cationic:DSPC:CHOL:DMGPEG (50:10:38.5:1.5) ...............437

        4. Moderna Used Tekmira's MC3 as a "Benchmark" Lipid Nanoparticle....................................439

        5. UPenn Scientists, Drs. Katalin Karikó and Drew Weissman Attested to the Importance of Tekmira's Technology.........442

        6. Plaintiffs' Demonstrated Success in Licensing The Patents-in-Suit................................443

        7. Alnylam's Onpattro® Commercialized Using Arbutus LNP technology .......................445

        8. Use of Plaintiffs' Technology in COVID-19 Vaccines.................................................446

        9. Moderna's Reliance on Plaintiffs' Technology and Efforts to Avoid Plaintiffs' Patents.........................447

        10. Evidence of Widespread Use of Plaintiffs' LNP Technology .......................................455

    F. Availability of Acceptable, Non-Infringing Alternatives................................................ 456

        1. Moderna Did Not have A Non-Infringing Alternative Available on May 31, 2020...............................458

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

2.  Moderna Did Not Have the Time to Develop a Non-Infringing Alternative ........................... 462
3.  Moderna Did Not Have the *Money* to Develop an Alternative .................................. 499
4.  Moderna Continued to Use Genevant's Patented 50%:38.5%:10%:1.5% "Gold Standard" Formulation for Years .......................................................... 500
5.  Moderna Would Not Have Attempted to Switch to a Non-Infringing Alternative .............. 530
6.  Purported Alternatives to the Lipid Composition Patents .................................. 538
7.  Purported Alternatives to the Encapsulation Patent ...................................... 546

IV.  **PATENT VALUATION ANALYSIS** ................................................ **546**
  A. Background ......................................................................... 553
  B. Profiting From Innovation ........................................................... 558
    1.  Background .................................................................... 559
    2.  Key Factors ................................................................... 593
  C. Patent Valuation Methodologies ...................................................... 627
    1.  Valuation Context and Available Data ........................................... 630
    2.  The Income (Economic Value) Approach ........................................... 653
    3.  The Market Approach ........................................................... 656
    4.  Cost Approach ................................................................. 764

V.  **THE IMPACT OF MODERNA's ALLEGED INFRINGEMENT ON ARBUTUS AND GENEVANT** ......................................................... **769**
  A. "The Use Made of the Patent Privilege" by the Patentee ............................... 771
  B. Moderna's Alleged Use of the Patents-in-Suit ........................................ 773
    1.  Moderna Gained a Head Start ................................................... 774
    2.  Moderna's Head Start Was Extraordinarily Valuable ............................. 777
    3.  mRNA-1273 Accelerated Moderna's Development by 5-10 years and Transformed Moderna into a "Biotech powerhouse" ........................................... 786
    4.  The Claimed Inventions of the Patents-in-Suit are a Foundational Element of Moderna's mRNA-1273 ..................................................... 789
    5.  Moderna was a Freerider on Arbutus's Innovation .............................. 790
  **B.  The Impact of Moderna's Alleged Infringement on Arbutus/Genevant** ............... **795**
    1.  Arbutus and Genevant Did Not Receive the Royalties that Would Have Accelerated the Growth of the Company ........................................................ 796
    2.  Moderna's Head Start Created Commercial Obstacles for Arbutus and Genevant's Collaborators ......... 797
    3.  Moderna's Failure to Take a License Encouraged Others to Also Freeride ........ 798
    4.  Arbutus and Its Scientists Have Been Denied the Recognition They Deserve ...... 802
  **C.  Measuring Arbutus / Genevant's Damages** ...................................... **811**
  **D.  The Harm to Arbutus and Genevant** ........................................... **816**
    1.  Fact of Damage ................................................................ 818
    2.  Amount of Damages ............................................................ 818

VI.  **REASONABLE ROYALTY** ........................................................ **819**
  **A.  Summary of Opinion** .......................................................... **819**
  **B.  Reasonable Royalty Damages Principles** ....................................... **819**
  **C.  Reasonable Royalty Rate – Analytical Method** ................................. **822**
    1.  Principles .................................................................... 823
    2.  Analysis ...................................................................... 834
    3.  Opinion ....................................................................... 884
  **D.  Reasonable Royalty Rate – Hypothetical Negotiation Approach** .................. **884**
    1.  Principles .................................................................... 884
    2.  Analysis ...................................................................... 894
  **E.  Royalty Base** ................................................................ **1027**
    1.  Principles .................................................................... 1027
    2.  Overview of Certain Moderna Production, Sales Data, and Infringement Information Produced in this Litigation ............................................ 1030

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

　　　3.　Analysis ...................................................................................................1039
　**F. Summary of Reasonable Royalty** ................................................................ **1075**
　　　1.　Hypothetical Negotiation Approach .........................................................1076
　　　2.　Analytical Method .....................................................................................1077
　　　3.　Alternative Reasonable Royalty Opinions................................................1077
**VII.　　FACTS RELATED TO WILLFULLNESS** ........................................................ **1082**
　**A. Moderna was aware of the Patents-in-Suit, knew that it needed a license, and was aware that it did not have one for the COVID-19 vaccine** ................................. 1083
　**B. Moderna's "Platform" was built on copying Plaintiffs' Patented LNP Technology.** ................................................................................................. 1088
　**C. Moderna knowingly and deliberately tried to hide its infringement of Plaintiffs' Patents-in-Suit, reflecting knowledge of its improper infringement** ...... 1090
　**D. Moderna tried and failed to design around the Lipid Composition Patents** ........... 1093

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**(ii)    Genevant's License Agreements**

1376.  As discussed above, Genevant's Post-2020 COVID-19 License Agreements are, at best, minimally economically comparable given the cardinal differences between those agreements and the hypothetical negotiation. *See* IV.C.d.(2)(c).  In one of those agreements, Genevant agreed to an expressly stated profit split: the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[3353] discussed above. However, the other agreements are also informative, as they represent an implied profit split from Genevant's COVID-19 license agreements ranges from ▮▮▮▮▮▮▮▮ When applied to Moderna's projected mRNA-1273 profits, the resulting per dose royalty rate is in the range of ▮▮▮▮▮▮▮▮

1377.  Although these Genevant's license agreements were collaboration agreements which licensed a broad portfolio of patents, rather than naked licenses to the Patents-in-Suit, they nevertheless provide insight into Genevant's position because the number of patents or how much IP was at issue ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[3354] Instead, it is Genevant's practice to first reach a deal on the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[3355] Moreover, Genevant received additional compensation for its contributions to the collaborations beyond intellectual property, which would not be received in the license from the hypothetical negotiation.[3356]  In addition, even to the extent the scope of the license or collaboration terms created additional value, it is more than offset by the substantial differences between these agreements and the hypothetical negotiation discussed above.

1378.  Genevant would demand no less than a **25%|75%** Genevant|Moderna profit split (or **$4.77/dose**). This agreement reflects Genevant's minimum acceptable profit split, as it is the rate given in the the ▮▮▮▮▮▮ agreement, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[3353] GENV-00023616, p.17 (Genevant Sciences GmbH and Chulalongkorn University Nonexclusive License and Support Agreement dated October 20, 2022).
[3354] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 128:3-7.
[3355] June 5, 2024 30(b)(6) Deposition of Peter Zorn, 128:8-21
[3356] GENV-00022689, at 724-725 (Gritstone Agreement); GENV-00023616, at 635 (Chulalongkorn)

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

██████████████████████████████████████

████████████████ ).[3357]

### (iii)    Moderna's License Agreements

As discussed above, beginning in or about 2016, Moderna claimed that its mRNA technology was proven and as a result, it was no longer limited to ████████ and instead could now command ██████████████ terms in its license agreements. Mr. Francis testified that "in our history from 2016 onwards, a lot of our partnerships that we entered and license agreement that we entered were

---

[3357] *See, e.g.,* Meekang Sung, Yangmu Huang, Yuqi Duan, Fangjing Liu, Yinzi Jin, Zhijie Zheng, "Pharmaceutical Industry's Engagement in the Global Equitable Distribution of COVID-19 Vaccines: Corporate Social Responsibility of EUL Vaccine Developers," *Vaccine,* October 15, 2021, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8539183/ ("The shortage of supplies for lower-income countries had been highly controversial worldwide. According to the United Nations press release, although more than 700 million vaccine doses have been administered globally, richer countries have received more than 87%, and low-income countries received just 0.2% [64]. Our results (Table 4) are consistent with the concerning reports. Most vaccine agreements of EUL COVID-19 developers are made with HICs (49.64%), whereas LMICs are not able to secure enough doses (18.97%), and LICs have barely succeeded in securing any vaccine shots (0.1%). This was especially highlighted in the cases of Pfizer/BioNTech and Moderna; most of their vaccines were secured by HICs (66.87% and 69.75%, respectively). . . . In an equitable pricing system, it is expected that prices would broadly increase as a buyer's ability to afford it increases. However, the data indicate that this may not be the case. There is not much of a price difference between HICs (USD 16.41) and UMICs (USD 15.02); AstraZeneca–Oxford had a higher average price for UMICs than HICs. Apparent price differentiation according to the nation's economic ability also could not be found.").  Simar Singh Bajaj, Lwando Maki, Fatima Cody Stanford, "Vaccine apartheid: global cooperation and equity," *Lancet,* February 23, 2022, 1452-1453, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8865875/ ("Early in the pandemic, the COVID-19 Vaccines Global Access Facility (COVAX) promised equitable vaccine supplies for all countries. However, with insufficient funds and donations, COVAX has faltered, failing to meet even half of its 2021 target of delivering 2 billion doses.[1] An open letter to G20 leaders in October, 2021 highlighted how 133 doses per 100 people have been given in HICs compared with four doses per 100 people in LICs. The WHO Director-General has called the divide a 'vaccine apartheid', speaking beyond the phrase 'vaccine inequity' . . . The present challenge is the zero-sum nature of vaccination where, given limited supply, every booster shot HICs purchase is a lost first or second dose for LICs.  Ashley M. Fox, Yongjin Choi, Leesa Lin, "Substantial Disparities In COVID-19 Vaccine Uptake And Unmet Immunization Demand In Low- And Middle-Income Countries," *Health Affairs,* Vol. 42, No. 12, *available at* https://www.healthaffairs.org/doi/10.1377/hlthaff.2023.00729 ("Yet low- and middle-income countries around the world have struggled with vaccine access, distribution, and uptake. The large gap in access to safe and effective COVID-19 vaccines between high- and low-income countries has been described as 'vaccine apartheid.'").

946

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

around ███████████."[3358] Moderna would negotiate for a ███████████ of net profits to account for the value of its payload technology and non-patented elements, manufacturing process, business risks, etc.

1379. Moderna would not agree to a Genevant|Moderna ███████████████████████ (or **$9.54/dose**).

### (iv)    Moderna's 2017 Summary of Potential Deal Structures

1380. In February 2017, Moderna outlined a four (4) deal structures and the associated economic terms which showed ███████████████████████ As discussed above, see (see II.E.3.b.(1), IV.C.5.d.(1), and VI.D), these structures are not hypothetical, Moderna engaged in a series of collaborations that involved a profit split.  The cited agreements all involved ████████████████████████████, which Dr. Mitchell has opined is technically comparable.  Although those collaborations involved additional work beyond licensing beyond a naked patent license, Moderna also received additional compensation beyond the profit split.[3359] In addition, even to the extent the scope of the license or collaboration terms created additional value, it is more than offset by the substantial differences between these agreements and the hypothetical negotiation discussed above.

1381. The ████████████████████████████████████████████ ████████████████████████ as shown in **Figure 6.27**,[3360] below .

---

[3358] MRNA-GEN-01726934-7000, at 972-973 (December 11, 2023 30(b)(6) Deposition of Said Francis (*Moderna v. Pfizer*), 156:10-157:1 ("Q. You would agree that it is standard practice in the pharmaceutical industry to license technology for royalties without profit sharing arrangements, correct? . . . A. Every deal is different.  Certain deals are structured as profit splits.  As you see **in our history from 2016 onwards, a lot of our partnerships that we entered and license agreement that we entered were around** ███████████.  Sometimes you can have a royalty that essentially is in lieu of a profit split that essentially inure to the same amount.  So different deals are different, but I wouldn't agree with the statement as you described it." (emphasis added)).

[3359] MRNA-GEN-00457628 at 767-769 (██████████████████████████████

[3360] MRNA-GEN-01708238-321, at 242 (Francis Deposition Exhibit No. 35 – "BD Update to Executive Committee," *Moderna,* February 27, 2017, Slide 7 of 86).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1442. Given this history of false claims, Genevant would seek a license with terms that Moderna could not attempt to manipulate to its advantage. For example, a percentage of net sales royalty would be subject to Moderna's definition of net sales. In contrast, a per unit royalty is fixed $ per dose, and would lock in the profit split based on Moderna's projected profits and expected derivative benefits as of May 31, 2020.

### (iv) Given the Late Stage, Genevant Would be in the Driver's Seat

1443. Compared to *early* licensing that is typical in the biotech industry, the hypothetical negotiation in this case is very late. Indeed, on May 31, 2020, Moderna would be in the very unusual situation of seeking a license on the eve of Moderna's commercialization of its "bet the company" product, mRNA-1273, for which it had no available, acceptable, non-infringing alternative ready to go and that could be used without delay. Given these circumstances, Genevant would be "in the driver's seat in the negotiations and would have required [Moderna] to pay a hefty portion of its profits for a license"[3471] and would seek a per dose royalty that would increase the odds that Moderna would actually pay the amount that Genevant negotiated.

1444. In addition, unlike early stage license negotiations when product cash flow and potential re-investment opportunities would be far into the future with uncertain probabilities of success ("POS")—in the May 31, 2020 hypothetical negotiation, Genevant would know that Moderna expected ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮, as discussed above. Given the proximity to mRNA-1273's expected product launch and visibility into the expected profits, Genevant would seek a per dose royalty that would include consideration for the projected mRNA-1273 profits as well the significant derivative benefits that Moderna expected as of May 31, 2020.

---

Bennett to Camille Connell-Magaw, Subject: Moderna Negotiation (UNCLASSIFIED)). *See also* MRNA-GEN-01724969-024, at 999 (December 19, 2023 30(b)(6) Deposition of Hamilton Bennett (*Moderna v. Pfizer*), ▮▮▮▮▮▮▮▮▮▮▮▮▮



[3471] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 502 (S.D.N.Y. 2013).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

prior art.[3564]   The existence of non-infringing alternatives open to the infringer is also considered.[3565]  The theory is that a willing licensee in a hypothetical negotiation would have been less disposed to agree to a high royalty if it had available non-infringing alternatives that were equal or nearly equal in terms of cost and performance.[3566]

1491.   Discussion of Factor No. 9:  As discussed in detail above, as of May 31, 2020, Moderna had no available, acceptable, non-infringing alternative that was ready to go.  In addition, at that time, Moderna had no clinical data regarding the purported modified "vaccine platform" formulation.  At that time, Moderna's mRNA-1647 (CMV) Phase 2 clinical trial with the new formulation was ongoing, however, it did not report the results until September 17, 2020—months after the hypothetical negotiation.  As such, Moderna's only option would be to accept a license on terms that Genevant was "in the driver's seat" to demand.

1492.   Thus, *Georgia-Pacific* Factor No. 9 indicates a royalty rate ***at the higher end of the range*** in view of the importance of the claimed invention of the Patents-in-Suit to Moderna, and the lack of acceptable, available, non-infringing alternatives.

(c)   **Collateral Benefits and Convoyed Sales**

(i)   Factor No. 6:  *The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.*

1493.   Factor No. 6 addresses collateral benefits including convoyed sales of parts, supplies, accessories and related products that flow or would be expected to flow to the infringer from the right to

---

[3564] Lucent Technologies, Inc., et al. v. Gateway, Inc., et al., 580 F.3d 1301, 1335 (Fed. Cir. 2009).
[3565] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-227.
[3566] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, p. 20-227 – 229.

1003

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

willing to pay,"[3599] including the derivative advantages it expected to realize that are causally connected to the alleged infringement.

1511. In determining a reasonable royalty, the economics of the patented technology and the accused product(s) are studied. The outcome of the hypothetical negotiation depends on a number of factors including the market power conferred by the patent, the relative bargaining power of the parties to the hypothetical negotiation—in this case, Genevant and Moderna—at the time of the hypothetical negotiation on May 31, 2020, the availability of acceptable non-infringing substitutes, and the market situation at the time of the negotiation. The *Georgia-Pacific* factors qualitatively address many of the factors that determine the respective bargaining positions of the parties to the hypothetical negotiation.

1512. The bargaining position of the respective parties establishes the negotiation outcome in terms of where within the feasible range of royalty rates the parties would have agreed.

(a)    **Determinants of Bargaining Position and Bargaining Power**

1513. At the time of the hypothetical negotiation on May 31, 2020, the key facts would have been known to both parties because the hypothetical negotiation "contemplate[s] marshaling of all the pertinent facts which, like cards dealt face up, are for all to see."[3600] These facts were discussed in detail in this report and will not be repeated again here.

1514. Based on the information and analysis set out in this report including the expert opinions of Genevant's other experts, Dr. Michael Mitchell, Dr. Frederick Porter, Kimberly Benton, and for the reasons stated in this report, Genevant would be "in the driver's seat in the negotiations and would have required [Moderna] to pay a hefty portion of its profits for a license"[3601]

(b)    **Summary of Bargaining Position and Bargaining Power**

1515. In general, a licensor's bargaining position and power is increased when: a) there are no acceptable, available, non-infringing alternatives, b) it is more costly and difficult for the infringing party to "invent around" the patented technology, c) the intellectual property is

---

[3599] Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116, 1132 (S.D.N.Y. 1970).

[3600] Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116, 1122 (S.D.N.Y. 1970).

[3601] *AstraZeneca AB v. Apotex,* 985 F. Supp. 2d 452, 502 (S.D.N.Y. 2013).

1010

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

opportunity, Moderna would readily agree to pay a per dose royalty that would share its expected mRNA-1273 profits with Genevant.

1529. Even the prospects of more cash did not prompt Moderna to implement the "hot swap." By May 29, 2020, Moderna was seeking advance payments from the U.S. Governments and other governments. While the receipt of the advance payments was conditioned on achieving certain readiness milestones, Moderna did in fact receive ███████████ in advance payments from the U.S. Government September 2020. Genevant would consider the cash Moderna received from the U.S. Government as evidence of capital that was available to pay a royalty.

1530. At the May 31, 2020 negotiating table, Genevant would recognize that it was in the "driver's seat" and could dictate the terms of the agreement. Importantly, Genevant would value the opportunity to see its patented technology used in the pandemic response—and the recognition this would bring. However, this factor would *not* be a non-cash consideration that would reduce the reasonable royalty in this case because Moderna's alleged infringement denied Genevant this opportunity and the associated recognition, as described above. Genevant would also consider its long history with Moderna including the following facts:

    a) Moderna had strung Genevant and its predecessors along for years without taking a license;

    b) Moderna regarded Genevant as a "fremeny" that was competing with it in rare disease;

    c) Moderna had publicly denigrated Genevant's technology for years beginning in December 2016 when *Forbes* reported the following: "Moderna's chief executive, Stéphane Bancel, has been dismissive of the Arbutus technology. 'We knew it was not very good,' he told Forbes last year. 'It was just okay.' . . . Bancel says Moderna has stopped using the Acuitas tech for new drugs."[3651]

    d) Moderna had filed a series of IPRs beginning in February 2018, seeking invalidate Arbutus' patents.

    e) Because Moderna had falsely claimed that it had purportedly "stopped using the Acuitas [*i.e.,* Genevant] tech for new drugs," Genevant would seek a payment structure that would

---

[3651] Nathan Vardi, "Moderna's Mysterious Medicines," *Forbes,* December 14, 2016, *available at* https://www.forbes.com/sites/nathanvardi/2016/12/14/modernas-mysterious-medicines/#fc82927730ee. *See also* No Bates No. (Murray Deposition Exhibit No. 3 – Matthew Herper, Nathan Vardi, "Moderna Can't Escape My Intellectual Property, Says Arbutus CEO," *Forbes,* May 16, 2017, p. 2 of 6) ("Moderna's chief executive, Stéphane Bancel, has been dismissive of the Arbutus technology. 'We knew it was not very good,' he told Forbes last year. 'It was just okay.'").

1023

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

ensure that Moderna would actually pay a royalty on each mRNA-1273 dose, in the form of a per dose royalty.

1531. In view of the facts and circumstances of this case, Genevant would seek reasonable economic terms based on a profit split that was consistent with profits splits in the industry at the time, its own licensing practices, and Moderna's "Deal structures" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In particular, Genevant would demand and Moderna would agree to pay a profit split in the range of <u>20%</u> to <u>50%</u> of Moderna's mRNA-1273 projected operating profits paid as a per dose royalty.

1532. The "markers of value for licensing rights" that the parties would consider are summarized in **Table 6.8**, below, which shows the per dose royalty and implied profit split based on Moderna's projections as of May 31, 2020 (except the May 29, 2013 Tekmira-Moderna offer which, which reflects the absolute floor of the negotiation, based on Moderna's reported mRNA-1273 U.S. (and worldwide) sales).

| | Value Metric | Date | Terms | | Pandemic ($30 per dose) (2020-2021) | | Endemic ($44 per dose) (2022-2024) | |
|---|---|---|---|---|---|---|---|---|
| | **Moderna mRNA-1273 Projected Operating Profits as of May 31, 2020** | | | | | | | |
| | | | Profit Split | Revenue Percent | Genevant Profit Share | Per Dose Rate | Genevant Profit Share | Per Dose Rate |
| 1 | Industry avg: 50/50 Profit Split | 12/1/2019 | 50% | | 50% | $9.54 | 50.0% | $13.21 |
| 2 | Industry avg: 20/80 Profit Split | 12/1/2019 | 20% | | 20% | $3.81 | 20.0% | $5.29 |
| 6 | Genevant - Chulalongkorn | 10/20/2020 | | | | | | |
| 7 | Genevant - Gritstone ▮▮▮▮ | 8/10/2023 | | | | | | |
| 8 | Genevant - Providence | 5/11/2020 | | | | | | |
| 9 | Genevant - ST Pharm | 4/8/2021 | | | | | | |
| 10 | Genevant - ▮▮▮ | 2/18/2022 | | | | | | |
| 11 | Genevant - Gritstone ▮▮▮ | 1/15/2021 | | | | | | |
| | **Moderna mRNA-1273 Actual Sales** | | | | | | | |
| | Value Metric | Date | Profit Split | Revenue Percent | Genevant Profit Share | Per Dose Rate | Genevant Profit Share | Per Dose Rate |
| 12 | 2 ▮▮▮▮▮▮▮ | | | | | | | |

Notes and Sources:
[1] For the 2013 Tekmira offer, the Per dose rate and profit share are calculated on the basis of Moderna's actual sales.
[2] Pandemic calculations are based on May 2020 Proforma (Brackman 6). *See* Table 6.3. Endemic Calculations are based on $44 per dose from September LRP. *See* Table 6.5.
[3] Francis Exhibit 35.
[4] Schedule 6.1

**TABLE 6.8**

1533. The general range of the negotiation is as follows:

- **Pandemic Phase**: $2.25/dose (11.8%|88.2%) to $9.54/dose (50%|50%).
- **Endemic Phase**:  $3.30/dose (12.5%|87.5%) to $13.21/dose (50%|50%)

1024

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1534. Based on my investigation and analysis, and for the reasons summarized in this report, Genevant would demand and Moderna would agree to pay a per dose reasonable royalty based on a 25% profit split of Moderna's expected mRNA-1273 operating profits as of May 31, 2020. The 25% profit split is a reasonable estimate of the profits attributable to the Patents-in-Suit, whereas, the 75% share that Moderna would retain is a reasonable estimate of the profits attributable to the mRNA (*i.e.,* payload) and related technology (both Moderna-developed and licensed-in), as well as Moderna's other complementary assets, including but not limited to its manufacturing facilities and subcontractor and distributor relationships, non-patented elements, the manufacturing process, business risks, etc. The 25% profit split is in line with the actual profit split in the October 20, 2020 Genevant-Chulalongkorn agreement. The substantial derivative benefits that Moderna expected to achieve would be expected to increase the per dose royalty. Instead of increasing the per dose royalty, however, I rely on the derivative benefits as further support for the reasonableness of a 25% profit split.

1535. Genevant would expect to receive significant royalties. As an illustration only: based on the terms of the May 29, 2013 Tekmira-Moderna *offer,* which Moderna did not accept but continued to use as a value benchmark for years, if applied to mRNA-1273 would have resulted in Moderna paying substantial royalties totaling approximately **$1.8 billion**. This offer, however, is not indicative of either the outcome of the hypothetical negotiation or a reasonable royalty adequate to compensate Genevant for the use Moderna made of the Patents-in-Suit for the reasons stated above. Briefly, the significant differences between the May 29, 2013 offer and the May 31, 2020 hypothetical negotiation include the following—the May 29, 2013 offer was:

   a) 7 years before the date of the hypothetical negotiation,

   b) at a time when Moderna was a start-up with little, if any, revenue,

   c) at a very early stage of mRNA drug product development—prior to any of Moderna's clinical testing,

   d) did not contemplate the COVID-19 commercial opportunity or a comparable commercial opportunity, and

   e) the circumstances surrounding the offer are not at all comparable to the circumstances that prevailed at the time of the hypothetical negotiation on May 31, 2020.

1025

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

1536.  In summary, it is my opinion that the royalty rate would be **$4.77/dose** during the pandemic phase and from $6.61/dose per dose to $10.56/dose during the endemic phase.

> XXI.  Summary of the *Georgia-Pacific* Factors for the Patents-in-Suit

1537.  The following **Table 6.9** summarizes the *Georgia-Pacific* Factors and their impact on the reasonable royalty.

| REASONABLE ROYALTY FACTOR | FACTOR IMPACT |
|---|---|
| **Factor 1**: Royalties received by Genevant | Minimum profit split of 25%\|75%: **$4.77/dose** |
| **Factor 2**: Rates paid for comparable patents | Neutral |
| **Factor 3**: Nature and scope of the license | Neutral |
| **Factor 4**: Established policy to maintain monopoly | Neutral |
| **Factor 5**: Commercial relationship between Genevant and Defendant | Per dose royalty |
| **Factor 6**: Effect of selling the patented specialty in promoting sales of other products | Increase |
| **Factor 7**: Duration of the patents | Neural |
| **Factor 8**: Established profitability and success of the patented products | Maximum profit split of ▮▮▮▮▮ **Pandemic: $9.54/dose** **Endemic: $13.21** |
| **Factor 9**: Utility and advantage of the patent over old modes | Increase |
| **Factor 10**: Nature of the patented invention | Increase |
| **Factor 11**: Extent to which Defendant has made use of the invention | Increase |
| **Factor 12**: Portion of the profit or selling price that may be customary to allow for the use of the invention | Profit split range from ▮▮▮▮▮ |
| **Factor 13**: Portion of the realized profit that should be credited to the invention | Neutral |
| **Factor 14**: The opinion of qualified experts | As set forth herein |
| **Factor 15**: The amount the parties would have agreed upon on May 30, 2021 | **Pandemic: $4.77/dose** **Endemic: $6.61 to $10.56/dose** |

**TABLE 6.9**

1026

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

so this is nothing new."[3889]

1690. I understand Dr. Mitchell has opined that Dr. Hoge "directed his technical team to explore compositions having only ███████████████ because that "reflect[ed] what Moderna understood was needed to design around the Lipid Composition Patents."[3890] Dr. Mitchell has further opined that "Moderna appears to later have shifted its goal to try to achieve a composition with target lipid ratio of ███████████████ and, that despite "experimentation with different lipid compositions," Moderna was "unable to obtain suitable compositions with either of those target lipid rations, . . . ultimately us[ing] the target v1 and v2 Formulations [which] hav[e] target cationic lipid ratios of 48.5 mol % and 48 mol %, respectively."[3891] Ultimately, Dr. Mitchell opined that "Moderna failed to design around the Lipid Composition Patents."

**SIGNATURE**

Respectfully submitted this 25th day of November, 2024.

Catharine M. Lawton

---

[3889] MRNA-GEN-02619870-871, at 870 (Hoge Deposition Exhibit No. 30 – June 9, 2017 email from Stephen Hoge to Donald Parson, cc: Örn Almarsson, Subject: Composition). May 22, 2024 30(b)(6) Deposition of Stephen G. Hoge, M.D., 309:6-309:8 ("Q. You meant what you wrote here [Hoge Deposition Exhibit No. 30], correct? A. Yes."); 311:15-312:4 ("Q. Okay, you say below, the next paragraph [Hoge Deposition Exhibit No. 30], 'I've tried to underscore that preference for the last few months so this is nothing new.' Do you see that? A. Yes. Q. So you had expressed to your scientists working under your direction that you had this preference for 40 percent amino lipid for several months, correct? A. That's what I said, and I believe that to be true.").
[3890] November 25, 2024 Expert Report of Dr. Mitchell, at Section XIII.C.
[3891] November 25, 2024 Expert Report of Dr. Mitchell, at Section XIII.C.

1094