IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARBUTUS BIOPHARMA CORPORATION
and GENEVANT SCIENCES GmbH,

    Plaintiffs,

       v.

MODERNA, INC. and MODERNATX, INC.

    Defendants.

MODERNA, INC. and MODERNATX, INC.,

    Counterclaim Plaintiffs,

       v.

ARBUTUS BIOPHARMA CORPORATION
and GENEVANT SCIENCES GmbH,

    Counterclaim Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 22-252 (JDW)

REDACTED - PUBLIC VERSION

**MODERNA'S OPPOSITION TO PLAINTIFFS' MOTIONS *IN LIMINE***

# **TABLE OF CONTENTS**

Page

Plaintiffs' MIL #1 Should Be Denied: Moderna's Critiques of Plaintiffs' Expert Testing Do Not Raise Any Discovery Disputes ................................................................. 1

    A.    Background ................................................................................................... 1

    B.    Evidence of What Dr. Schuster Did and Did Not Include in His Report Is Relevant to His Credibility ......................................................................... 2

    C.    Plaintiffs Should Not Be Permitted to Selectively Relitigate Aspects of the Samples Dispute .......................................................................................... 4

Plaintiffs' MIL #2 Should Be Denied: Alnylam's Development of the "Gold Standard" 1.5:50 Formulation Is Centrally Relevant ............................................................ 6

    A.    Background ................................................................................................... 6

    B.    The Evidence Plaintiffs Seek to Preclude Is Directly Relevant to the Claims and Defenses That Will Be Presented to the Jury ............................ 8

    C.    Plaintiffs' Relevance and Prejudice Arguments Are Misguided ................. 12

Plaintiffs' MIL #3 Should Be Denied: Plaintiffs Were Not Deprived of Discovery ................... 13

    A.    Moderna Provided Vast Discovery on All Three Categories ...................... 13

    B.    Plaintiffs' Requests to Exclude Are Vague and Overbroad ........................ 17

Plaintiffs' MIL #4 Should Be Denied: Certain Litigations Involving Plaintiffs Are Relevant to Moderna's Defenses ........................................................................ 18

Plaintiffs' MIL #5 Should Be Denied: Plaintiffs' Ownership Structure, Including Roivant, Is Relevant And Not Unfairly Prejudicial ................................................ 23

    A.    Background ................................................................................................... 23

    B.    Argument ..................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alnylam Pharms., Inc. v. Moderna, Inc.*,
　C.A. 22-cv-335, D.I. 1 (D. Del. Mar. 17, 2022) ...................................................... 17

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
　598 F.3d 1336 (Fed. Cir. 2010)...................................................................................8

*BillJCo, LLC v. Apple Inc.*,
　No. 2023-2189, 2025 WL 1417957 (Fed. Cir. May 16, 2025)..................................10

*Carswell v. Anderson*,
　No. 22-cv-00369, 2024 WL 3104549 (D. Idaho June 24, 2024)..............................18

*Convolve, Inc. v. Compaq Comput. Corp.*,
　527 Fed. App'x 910 (Fed. Cir. 2013).......................................................................21

*Cybergym Rsch. LLC v. Icon Health & Fitness, Inc.*,
　No. 05-cv-527, 2007 WL 9684226 (E.D. Tex. Oct. 7, 2007).................................25

*Daubert v. Merrell Dow Pharms., Inc.*,
　509 U.S. 579 (1993)....................................................................................................3

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
　227 F.3d 1361 (Fed. Cir. 2000).................................................................................9

*Finjan, Inc. v. Sophos, Inc.*,
　No. 14-cv-01197, 2016 WL 4560071 (N.D. Cal. Aug. 22, 2016) ..........................23

*Gen. Hosp. Corp. v. Sienna Biopharmaceuticals, Inc.*,
　888 F.3d 1368 (Fed. Cir. 2018).................................................................................9

*Geo. M. Martin Co. v. All. Mach. Sys. Int'l LLC*,
　618 F.3d 1294 (Fed. Cir. 2010)............................................................................9, 12

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
　318 F. Supp. 1116 (S.D.N.Y. 1970)........................................................................11

*Immunex Corp. v. Sandoz Inc.*,
　395 F. Supp. 3d 366 (D.N.J. 2019) .....................................................................9, 10

*Interdigital Commc'ns Inc. v. Nokia Corp.*,
　C.A. No. 13-10-RGA, 2014 WL 8104167 (D. Del. Sept. 19, 2014) ......................23

*Leonard v. Stemtech Health Scis., Inc.*,
   981 F. Supp.2d 273 (D. Del. 2013) ................................................................. 17

*In re Local TV Advert. Antitrust Litig.*,
   No. 18-06785, 2025 WL 681193 (N.D. Ill. Feb. 21, 2025) ................................ 4

*LoganTree LP v. Fossil Grp., Inc.*,
   No. 21-cv-00385, 2024 WL 5333640 (D. Del. Dec. 19, 2024) ........................... 3

*Mformation Techs., Inc. v. Rsch. in Motion Ltd.*,
   No. C 08-04990, 2012 WL 2339762 (N.D. Cal. June 7, 2012) ........................... 4

*Natera Inc. v. ArcherDx, Inc.*,
   C.A. No. 20-125-GBW, 2023 WL 12139680 (D. Del. May 3, 2023) ................... 13

*Senju Pharm. Co. v. Apotex Inc.*,
   717 F. Supp. 2d 404 (D. Del. 2010) ............................................................... 10

*Strat. Partners Inc. v. Figs, Inc.*,
   No. 19-cv-02286, 2022 WL 18399950 (C.D. Cal. Sept. 26, 2022) ..................... 19

*Sysmex Corp. v. Beckman Coulter, Inc.*,
   C.A No. 19-1642, 2022 WL 2292059 (D. Del. June 24, 2022) ........................... 12

*Tarkus Imaging, Inc. v. Adobe Sys., Inc.*,
   C.A. No. 10-63, 2012 WL 12904235 (D. Del. June 14, 2012) (Stark, J.) ............. 3

*Thompson v. Glenmede Tr. Co.*,
   No. Civ. A. 92-5233, 1996 WL 529693 (E.D. Pa. Sept. 17, 1996) ................... 3, 4

*Union Pacific Res. Co. v. Chesapeake Energy Corp.*,
   236 F.3d 684 (Fed. Cir. 2001) ....................................................................... 21

*Webasto Thermo & Comfort N. Am., Inc. v. Bestop, Inc.*,
   No. 16-cv-13456, 2019 WL 4892417 (E.D. Mich. July 29, 2019) ................. 10, 12

**Rules**

FRE 401 ................................................................................................. 3, 12

FRE 402 .................................................................................................... 12

FRE 403 .................................................................................................... 12

FRE 408 ...................................................................................................... 4

## TABLE OF ABBREVIATIONS

| Abbreviation | Full Description |
|---|---|
| '069 Patent | U.S. Patent No. 8,058,069 – initially asserted and dropped as part of claim narrowing (D.I. 691 ¶ 2) |
| '435 Patent | U.S. Patent No. 9,364,435 – currently asserted, Ratio Patent Family |
| Arbutus | Arbutus Biopharma Corporation |
| Asserted Patents | U.S. Patent Nos. 9,504,651; 9,364,435; 8,492,359; and 11,141,378 |
| Br. | Plaintiffs' Brief in Support of Motions *in Limine* |
| Flagship | Flagship Pioneering, Inc. |
| FRCP | Federal Rules of Civil Procedure |
| FRE | Federal Rules of Evidence |
| Genevant | Genevant Sciences GmbH |
| *GP* | *Georgia-Pacific* factor |
| IND | Investigational New Drug Application |
| IP | intellectual property |
| IPR | *inter partes* review |
| M.Br. | Moderna's Motions *in Limine* |
| LNP | Lipid nanoparticle |
| MIL | motion *in limine* |
| Moderna | Moderna, Inc. and ModernaTX, Inc. |
| mRNA | messenger RNA |
| Plaintiffs | Arbutus and Genevant |
| Protiva | Protiva Biotherapeutics, Inc. |
| Roivant | Roivant Sciences Ltd. |
| Tekmira | Tekmira Pharmaceuticals Corporation |
| VC | venture capital |

**TABLE OF EXHIBITS**

| Exhibit # | Exhibit Description |
|---|---|
| 44 | Letter dated August 24, 2023, from Mark McLennan to Anthony Sheh regarding Sample Requests |
| 45 | Excerpts from the June 12, 2024, Deposition Transcript of Edward Yaworski |
| 46 | Excerpts from the May 30, 2024, Deposition Transcript of Steven Bossone |
| 47 | Excerpts from Exhibit 31 to the Deposition of Steven Bossone, ALNY-02306420 through ALNY-02306446 |
| 48 | Email dated May 15, 2009, from Frances Wong to Akin Akinc, ALNY-00114323 |
| 49 | Email dated June 3, 2009 from Akin Akinc to David Butler, ALNY-00115642 |
| 50 | Email dated June 5, 2009 from Soma De to Bo Pang, ALNY-00116080 |
| 51 | Email and attachment from Ed Yaworski to Peter Lutwyche et al., October 2, 2009 GENV-00701594 - GENV-00701596 |
| 52 | Excerpts from Nov. 25, 2024 Opening Expert Report of Dr. Michael Mitchell |
| 53 | Excerpts from U.S. Patent No. 9,814,777 to Monohoran et al., |
| 54 | Excerpts from Nov. 25, 2024 Opening Expert Report of Catharine M. Lawton |
| 55 | Excerpts from Nov. 25, 2024 Opening Expert Report of Robert Prud'Homme, Ph.D |
| 56 | Excerpts from the March 21, 2025 Reply Invalidity Expert Report of Robert Prud'Homme Ph.D |
| 57 | Excerpts from the March 21, 2025 Reply Expert Report of Dr. Michael Mitchell |
| 58 | Excerpts from the May 31, 2024 Deposition Transcript of Orn Almarsson |
| 59 | Excerpts from the May 17, 2024 Deposition Transcript of Kerry Benenato |
| 60 | Excerpts from the April 26, 2024 Deposition Transcript of Kimberly J. Hassett, Ph.D. |
| 61 | Email dated April 22, 2024 from Mark McLennan to Matthew Lachman regarding 30(b)(6) Follow Up |
| 62 | Moderna's Fourth Revised 30(b)(6) Designations, dated June 3, 2024. |
| 63 | Letter dated October 25, 2023, from Mark McLennan to Anthony Sheh re Plaintiffs' Third Set of RFPs |

| Exhibit # | Exhibit Description |
|---|---|
| 64 | Email dated December 8, 2023, from Mark McLennan to Anthony Sheh re Moderna's Search Terms |
| 65 | Agreed-To Search Terms Sources, Dates, and Hits For Moderna ESI |
| 66 | Excerpts from May 14, 2024 Deposition Transcript of Michael H. Smith, Ph.D |
| 67 | Email dated February 6, 2013, from Tony de Fougerolles to Stephane Bancel regarding AlCana and Tekmira update, MRNA-GEN-01247585 |
| 68 | *Forbes* article titled *Covid's Forgotten Hero: The Untold Story of the Scientist Whose Breakthrough Made The Vaccines Possible,* dated August 17, 2021, GENV-00963693-GENV-00963715 |
| 69 | Excerpts from May 29, 2024 Deposition Transcript of Ian MacLachlan, Ph.D. |
| 70 | Defendants' Pretrial Statement in Civil Action No. 11-1010-BLS-2 dated October 31, 2012, GENV-00239568-GENV-00239591 |
| 71 | Excerpts from U.S. Patent No. 8,158,601 to Chen et al., dated April 17, 2012 |
| 72 | License and Development Agreement, dated May 11, 2020, bearing Bates GENV-00022307 through GENV-00022416 |
| 73 | Nonexclusive License and Development Agreement, dated January 15, 2021, GENV-00022689-GENV-00022792 |
| 74 | April 4, 2024 Declaration of Dr. James Heyes in Opposition to European Patent Number EP 2 279 254, GENV-01099101 through GENV-01099105 |
| 75 | Roivant, Genevant and Arbutus organizational chart, GENV-00037195 |
| 76 | Excerpts from a Roivant presentation regarding Financial Results and Business Update dated February 14, 2022, ROIV-0006723-ROIV-0006771 |
| 77 | Email dated October 3, 2017 with Mark Murray regarding Gritstone, bearing Bates GENV-00517314 |
| 78 | Intentionally left blank |
| 79 | Email dated Jan. 12, 2022, from Pete Zorn, GENV-00262513-GENV-00262517 |
| 80 | Excerpts from the June 5, 2024 Deposition Transcript of Peter Zorn |

**Plaintiffs' MIL #1 Should Be Denied: Moderna's Critiques of Plaintiffs' Expert Testing Do Not Raise Any Discovery Disputes**

To bolster their infringement case, Plaintiffs seek to preclude Moderna from critiquing their expert's testing of Moderna's COVID-19 vaccine, arguing Moderna will present discovery disputes to the jury. But Moderna has no intention of raising any discovery disputes in front of the jury. It is Plaintiffs who seek to selectively and (misleadingly) relitigate aspects of the sample dispute in front of the jury. And while Moderna agrees not to discuss the discovery disputes that uncovered Dr. Schuster's earlier rounds of testing, it is relevant and proper to question him about statements in his report that were inconsistent with his files. Plaintiffs' MIL should be denied.

### A.    Background

Plaintiffs' infringement claim for the Ratio Patents relies heavily on their expert's testing of Moderna's vaccine samples, rather than the FDA-approved lipid amounts reported in certificates of analysis that are generated for each batch at the time of manufacture.

Plaintiffs first requested samples in early 2021, but Moderna, citing confidentiality concerns, declined to provide them pre-suit. Ex-1. Plaintiffs then waited until February 2022 to file suit. D.I. 1. After this litigation commenced, Moderna produced its FDA filings that showed Moderna's reformulated target lipid ratio outside the Ratio Patents' claims and certificates listing the lipid content of each batch of the vaccine. D.I. 183 at 1. After Plaintiffs reviewed those results, Plaintiffs spent months demanding, and eventually moved to compel, unreasonable quantities of samples from 1,000+ batches. D.I. 183 at 2. Based on the extensive burden to collect and produce this quantity of samples, Moderna offered "a reasonable number of samples, *i.e.*, three drug product vials, from one batch per unique part number (*i.e.*, every version of its COVID-19 vaccine)," in August 2023. D.I. 183 at 2; Ex-44 at 2. While the dispute was pending, Moderna had a team of 15+ employees collect and produce samples from 400+ batches from industrial freezers.

1

D.I. 183 at 2. For the remaining batches, Plaintiffs eventually accepted a stipulation that mirrored Moderna's initial offer, but only after Plaintiffs protracted the dispute for six months. D.I. 228 (agreeing in February 2024 to produce five vials from six expired batches and ten vials from non-expired batches per part number). By the time Moderna produced the samples through the parties' agreed-upon sample selection and production regime (D.I. 228, Ex-A ¶ 1), the majority were expired, while others expired in Plaintiffs' possession. Ex-42.

Plaintiffs' expert, Dr. Schuster, tested these samples using a two-step process: an initial, non-standard ultracentrifugation (UC) fractionation step he developed specifically for this case, and then measured the lipid content using chromatography. D.I. 661-1 ¶ 44. Although Dr. Schuster claimed in his report that his UC method was "standard," subsequent discovery revealed he had conducted undisclosed pre-tests and selected parameters that maximized findings of infringement. D.I. 661-1 ¶ 43 n. 28 ("***Standard ultracentrifugation settings*** used by Coriolis were employed for this method and align well within the speed and run times used in the field."); D.I. 450 at 1-3; D.I.450-4 at 86:1-92:11; D.I. 661-3 ¶¶ 22-31. These customized parameters directly contradicted his opinions in his opening report that stated his UC testing parameters were "standard." D.I. 661-1 ¶ 43 n. 28. The facts relating to Dr. Schuster's unusual pre-step are central to Moderna's noninfringement defense and to challenging Dr. Schuster's credibility, making his testing methodology directly relevant to the issues the jury must decide.

### B.    Evidence of What Dr. Schuster Did and Did Not Include in His Report Is Relevant to His Credibility

Moderna does not seek to rehash ***how*** it learned about Dr. Schuster's secret testing before the jury (*i.e.*, the discovery dispute itself). Instead, Moderna intends to show that Dr. Schuster's flawed and unreliable testing disclosed in his report is undermined by his own files—*i.e.*, that he custom designed a litigation-driven test for Moderna's samples to maximize finding infringing

samples despite never having used UC to test lipid content before. Not only are these tests relevant to Moderna's noninfringement arguments, but they are relevant to Dr. Schuster's credibility as an expert witness. As such, Plaintiffs' MIL as it relates to Dr. Schuster should be denied as moot.

As to noninfringement, it is highly relevant that depending on the test parameters Dr. Schuster used, the number of infringing fractions varied significantly. D.I. 656 at 18-19. There can be no doubt this satisfies FRE 401's test for relevance. As to credibility, it is Dr. Schuster who represented in his opening report that the parameters used for the UC testing were "[s]tandard." D.I. 661-1 ¶ 43 n. 28. But Dr. Schuster's own documents demonstrate there was nothing "standard" about his tests. D.I. 661-7; 73-74; D.I. 661-3 ¶¶ 16, 23; D.I. 661-2 at 253:21-255:8. Moderna should be permitted to challenge Dr. Schuster's credibility on cross-examination by asking about the inconsistencies between the conclusory assertions in his report versus the records of testing that he actually undertook to come up with his methods. *See Tarkus Imaging, Inc. v. Adobe Sys., Inc.*, 2012 WL 12904235, at *1 (D. Del. June 14, 2012) (Stark, J.) (*quoting Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 596 (1993)) ("The weight and credibility of an expert's testimony may be challenged through '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'"). And despite Plaintiffs' claims that "Dr. Schuster had no say in what materials were produced," Br. 3, he in fact admitted that he chose not to describe the earlier rounds of pre-testing in his report. D.I. 661-4 at 24:6-25:1.

Plaintiffs' reliance on *LoganTree LP v. Fossil Group, Inc.* is thus misplaced because Moderna is not seeking to introduce "discovery disputes" and "assertions of [discovery] misconduct." 2024 WL 5333640, at *1 (D. Del. Dec. 19, 2024) (Wolson, J.). Moreover, *LoganTree* made clear that the defendant ***could*** "attack[] the credibility of [Plaintiffs'] infringement analysis." *Id.* That is exactly what Moderna seeks to do here. For this reason, *Thompson v. Glenmede Tr. Co.*,

3

1996 WL 529693, at *2 (E.D. Pa. Sept. 17, 1996), also does not apply. The facts here are more like those in *Mformation Techs. Inc. v. Rsch. in Motion Ltd.*, where the court excluded evidence of a discovery dispute but found that the earlier interrogatory responses that Plaintiffs sought to exclude was "actual evidence produced by Plaintiff during discovery and [was] offered to assist the trier of fact in assessing credibility." 2012 WL 2339762, at *2 (N.D. Cal. June 7, 2012). The "actual evidence" was not excluded.

### C.    Plaintiffs Should Not Be Permitted to Selectively Relitigate Aspects of the Samples Dispute

Pointing out the relevant fact that Plaintiffs tested expired samples is not raising evidence of a discovery dispute. Indeed, this Court previously agreed that Moderna should be allowed to disclose to the jury that Plaintiffs' expert tested expired samples. D.I. 231 at 57:11-12 ("It's going to be absolutely fair cross-examination and disclosure that what you're relying on is expired."). That makes sense, given *Plaintiffs chose* to rely on their expert's testing of largely expired samples, rather than the FDA-approved lipid content tests Moderna ran when they were unexpired.

With respect to samples that expired before Plaintiffs filed suit in 2022, Plaintiffs *agreed* that "[i]f we do testing on [samples that expired before the lawsuit], it's fair game for [Moderna] to say that thing is expired." D.I. 231 at 58:10-11. Despite that prior concession, Plaintiffs' brief indicates they intend to introduce evidence that they requested samples pre-suit, which effectively relitigates that discovery dispute in front of the jury, violating their own proposed MIL. Even if such pre-suit requests were not inadmissible under FRE 408 (*see* Moderna MIL 4), Moderna was under no obligation to provide pre-suit discovery, rendering them irrelevant. *See, e.g.*, *In re Local TV Advert. Antitrust Litig.*, 2025 WL 681193, *26 n. 140 (N.D. Ill. Feb. 21, 2025) (FRCPs "do not contemplate pre-complaint discovery.").

With respect to samples that expired during this lawsuit, when Plaintiffs previously

attempted to preclude Moderna from raising the expiry of samples, Plaintiffs explained that their concern was with the "samples that expired after this case was filed and *after we requested [samples]*, but before Moderna produced them to us." D.I. 231 at 51:2-4. By Plaintiffs' own concession during discovery, Plaintiffs have *no* basis to raise any discovery disputes to samples that expired before they even requested them in this lawsuit. *Id.* That applies to almost half of the batches at issue. *See* Ex-42 (samples 1-8, 10, 15, 21-25, 27, 29, 36, 39-48, 53-55, 57, 59).

With respect to the remaining samples that expired after Plaintiffs' initial (broad) request in December 2022 but before the parties reached agreement on the timing and scope of production (§ I.A. above), it is *Plaintiffs* who want to discuss the discovery dispute in front of the jury—not Moderna. Plaintiffs claim that if Moderna points out the fact that those samples are expired, Plaintiffs may selectively introduce evidence of when Plaintiffs' requests were made to suggest any delay is solely on Moderna. Br. 1, 4. That would not only violate the MIL Plaintiffs filed as it is raising aspects of a discovery dispute, but it would also waste time by necessitating explanation of the history of the dispute out of fairness—including that Plaintiffs maintained an unreasonable request for samples from 1000+ batches for six months before capitulating and accepting terms that mirrored Moderna's original offer on a production timeline Plaintiffs agreed to. *See* § I.A., above. In other words, to the extent any delay occurred, at least a portion of this is of Plaintiffs' own making—*e.g.*, by wasting six months on a motion to compel *and* choosing to let numerous samples expire in Plaintiffs' own possession. Ex-42.

\*      \*      \*

In sum, Plaintiffs' MIL is an attempt to hide unfavorable evidence that undermines their allegations of infringement from the jury by characterizing that evidence as a discovery dispute. It is no such thing. These disputes are highly relevant to Moderna's noninfringement case and the exclusion of these materials would be severely prejudicial to Moderna.

**Plaintiffs' MIL #2 Should Be Denied: Alnylam's Development of the "Gold Standard" 1.5:50 Formulation Is Centrally Relevant**

Plaintiffs seek to preclude Moderna from offering any evidence, testimony, or argument regarding the development of the 1.5:50 formulation, which they call the "gold standard." But that evidence is directly relevant to several of Moderna's invalidity theories—something Plaintiffs' motion fails to meaningfully address. And it is ***Plaintiffs*** who have made the "gold standard" formulation a centerpiece of their case, as evidenced by the fact that Plaintiffs' damages expert mentions "gold standard" ***over 100 times*** in her expert reports. McLennan Decl. ¶¶ 4–6. If Plaintiffs are permitted to tout the "gold standard" as their own work, Moderna must be permitted to rebut that misleading—indeed false—narrative with evidence that ***Alnylam*** developed the 1.5:50 formulation, as Plaintiffs' own 30(b)(6) witness conceded. Ex-45 at 121:18–122:1.

## A.    Background

The reason Plaintiffs want to take credit for Alnylam's work is simple: none of Plaintiffs' formulations actually described in the Asserted Patents ever succeeded in clinical studies, and none were used by Moderna in developing its COVID-19 vaccine. As early as 2006, Alnylam scientists began researching lipid-based delivery technologies that would eventually be used in Onpattro, an siRNA medication for the treatment of amyloidosis. Onpattro uses an LNP as a delivery vehicle for siRNA, and Alnylam scientists engaged in years of research to develop an LNP suitable for this purpose, including internal formulation development efforts and collaborations with third parties. Ex-46 at 22:9–24, 23:19–24, 24:22–26:19, 53:18–54:3.

After achieving "poor" results with the Plaintiffs' preferred formulation—the 1:57 formulation—and conducting many studies to develop something more suitable, in May 2009, Alnylam hit on a winning formulation: 50:38.5:10:1.5 (cationic:cholesterol:phospholipid:PEG). Ex-47 at 445; Ex-48 at 323; *see also* Ex-49 at 642; Ex-50 at 080. Alnylam shared this "gold

standard" formulation with Plaintiffs in October 2009, indicating that Alnylam "preferred" its own 1.5:50 formulation to Plaintiffs' 1:57 formulation. Ex-51 at 595; Ex-45 at 121:18–122:1 (Plaintiffs' 30(b)(6) witness confirming the 1.5:50 formulation was first created by Alnylam).

Consistent with this evidence, the 1.5:50 formulation developed by Alnylam in 2009 is not disclosed in the Ratio Patents, which claim priority to a 2008 application. Rather, the Ratio Patents focus on a single four-lipid formulation embodiment: the 1:57 formulation (57.1:7.1:34.3:1.4 | cationic:cholesterol:phospholipid:PEG). Ex-52 ¶ 144; D.I. 526-7 ¶ 248; D.I. 520-6 at 68:46–48. While Plaintiffs sued Alnylam for trade secret misappropriation, Alnylam maintained that the 1.5:50 formulation was developed independently by its scientists—as reflected in documents produced in this lawsuit by Alnylam—and the lawsuit was settled with no admission of wrongdoing. Ex-12 ¶ 274; D.I. 592 ¶ 202; D.I. 569-28 at 129:4–22. Although the 1.5:50 formulation falls within the scope of certain Asserted Claims,[1] the formulation itself was the work of Alnylam scientists. Plaintiffs have not alleged that Moderna ever used the 1:57 formulation disclosed in the Ratio Patents, or that anyone considered it a gold standard.

Despite this history, Plaintiffs have repeatedly claimed credit for coming up with the "gold standard." *E.g.*, D.I. 658-1 ¶ 1155 (Plaintiffs' damages expert referring to "the work of the ***Arbutus scientists*** that resulted in the 'gold standard'"). Plaintiffs' damages expert relied heavily on this false narrative to support her inflated damages award, opining that, in the context of the hypothetical negotiation, "Moderna would agree to a reasonable profit split that would reflect the

---

[1] Plaintiffs' assertions that the 1.5:50 formulation is unique to the Ratio Patents' claims, or that the named inventors developed the 1.5:50 formulation, are further undermined by U.S. Patent No. 9,814,777. That patent was originally assigned to Alnylam and has different inventors and an ***earlier*** priority date. Ex-53 at Cover. The claims of the '777 Patent cover the 1.5:50 formulation. *Id.* at cl. 1. The '777 Patent was assigned to Arbutus in 2021, and Moderna asserted the '777 Patent as an obviousness-type double patenting reference in this case. D.I. 526-4 ¶¶ 516–18.

*Plaintiffs' investment* over the years to *develop the 'gold standard'* which Moderna had built its platform on." Ex-54 ¶ 803.

### B. The Evidence Plaintiffs Seek to Preclude Is Directly Relevant to the Claims and Defenses That Will Be Presented to the Jury

The development of the "gold standard" 1.5:50 formulation is undoubtedly relevant to the issues in this case and should not be excluded. The fact that Alnylam, and not Plaintiffs, uncovered the unique, "gold standard" properties of the 1.5:50 formulation is relevant to Moderna's invalidity theories and Plaintiffs' claim for damages. Each is discussed below.

*Written description*. Alnylam's development of the 1.5:50 formulation is distinctly relevant to whether the Ratio Patents lack adequate written description, specifically whether the disclosure of the patents is commensurate with the full scope of the claims. *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). Plaintiffs assert that "Moderna's experts never once cited Alnylam's formulation work to support their § 112 opinions" and "Moderna [did not] specify the § 112 defense to which this could pertain." Br. 7. But Moderna's expert, Dr. Prud'homme, discussed Alnylam's development of the 1.5:50 formulation in each of his reports, and one of Moderna's § 112 defenses relates to the lack of guidance in the specification as to the millions of potential formulations encompassed by the claims. Ex-55 ¶¶ 351–54; Ex-12 ¶¶ 270–72; Ex-56 ¶¶ 219–39, 304, 313–16. Equally important, Moderna may cross-examine Plaintiffs' expert and fact witnesses, two of whom are named inventors of the Ratio Patents, regarding the Ratio Patents' failure to disclose the so-called "gold standard," whether the specification is adequate to support Plaintiffs' claims, and Alnylam's independent development work to create the "gold standard" after the Ratio Patents' preferred ratio failed.

The relevance is undeniable: "where a specification discloses a broad range of values and a value within that range is claimed, the disclosure must allow one skilled in the art to immediately

discern the limitation at issue in the claims." *Gen. Hosp. Corp. v. Sienna Biopharmaceuticals, Inc.*, 888 F.3d 1368, 1372 (Fed. Cir. 2018). The unexpected properties of the 1.5:50 formulation, in conjunction with the extensive development work Alnylam did to independently develop that formulation, are relevant to whether a skilled artisan would "immediately discern" the claimed 1.5:50 formulation. *See id.*

    ***Secondary considerations***. Alnylam's development of the 1.5:50 formulation is also relevant to a secondary consideration of obviousness that Modern plans to offer: simultaneous invention. "Independently made, simultaneous inventions, made within a comparatively short space of time, are persuasive evidence that the claimed apparatus was the product only of ordinary mechanical or engineering skill." *Geo. M. Martin Co. v. All. Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1305 (Fed. Cir. 2010). This "short space of time" encompasses inventions made a year later than the purported patented invention. *Id.* Here, Alnylam independently developed the 1.5:50 formulation about a year after Plaintiffs filed the application to which the Ratio Patents claim priority, which constitutes strong evidence of simultaneous invention. Ex-48 at 323; Ex-56 ¶¶ 313–16. Although Plaintiffs claim the 1.5:50 formulation arose out of a collaboration between Alnylam and Plaintiffs, Br. 8–9, Moderna's expert and ***Alnylam's witnesses*** dispute this assertion. Ex-56 ¶¶ 313–16; Ex-46 at 38:5–39:8, 112:17–113:21, 116:8–119:15, 129:4–22. The dispute over Alnylam's development of the 1.5:50 formulation is relevant for the factfinder to consider in resolving the parties' claims and defenses, and for Moderna to rebut Plaintiffs' arguments.

    Plaintiffs further assert that simultaneous invention requires "multiple instances of 'independent' invention." Br. 8 (citing *Immunex*). That is wrong: the Federal Circuit and many district courts have held that evidence of a single contemporaneous invention is relevant as a secondary consideration of obviousness. *Geo M. Martin*, 618 F.3d at 1304; *Ecolochem, Inc. v. S.*

*Cal. Edison Co.*, 227 F.3d 1361, 1379 (Fed. Cir. 2000); *Senju Pharm. Co. v. Apotex Inc.*, 717 F. Supp. 2d 404, 425–26 (D. Del. 2010); *Webasto Thermo & Comfort N. Am., Inc. v. Bestop, Inc.*, 2019 WL 4892417, at *4 (E.D. Mich. July 29, 2019) (on which Plaintiffs rely). Even the case which Plaintiffs cite in support of this argument recognizes that "***an*** independently made, simultaneous invention" can sometimes qualify. *Immunex*, 395 F. Supp. 3d at 407.

This evidence is also relevant to a secondary consideration of ***non***-obviousness that ***Plaintiffs*** intend to offer: copying. Plaintiffs intend to argue that "[a]cross numerous projects, Moderna repeatedly used the 1.5:50 target formulation." Br. 8. But Plaintiffs ignore that "[c]opying requires duplication of features of the patentee's work based on access to that work." *BillJCo, LLC v. Apple Inc.*, 2025 WL 1417957, at *3 (Fed. Cir. May 16, 2025). Since Plaintiffs are attempting to claim that the 1.5:50 formulation was ***their*** work, and that Moderna allegedly copying ***their*** work is an indicium of non-obviousness, Moderna should be permitted to introduce evidence that Alnylam's scientists developed the 1.5:50 formulation to rebut this assertion. *See* Ex-56 ¶ 304. Further, Alnylam's development of the 1.5:50 formulation is relevant to show lack of nexus between any evidence of copying and the full scope of the Asserted Claims. Not every formulation falling within the scope of the Asserted Claims exhibits beneficial properties; in fact, the 1:57 formulation described in the Ratio Patents does not exhibit the same properties as the 1.5:50 formulation. Ex-47 at 445. Thus, to the extent Moderna's historical use of the 1.5:50 formulation is relevant to copying at all, evidence of Alnylam's development of that formulation undermines the nexus between such evidence and the full scope of the Asserted Claims.

***Willfulness***. It is undisputed that the 1.5:50 formulation is not disclosed in the Ratio Patents. Ex-57 ¶ 234. Thus, Plaintiffs' reliance on the 1.5:50 formulation as evidence that Moderna willfully infringed Plaintiffs' patents is tenuous at best. To bridge the gap between Moderna's use

10

of the 1.5:50 formulation and purported intent to infringe Plaintiffs' patents, Plaintiffs in effect equate Moderna's use of the 1.5:50 formulation with intent to infringe. Br. 7 ("Moderna built its entire mRNA-LNP platform on the 1.5:50 target formulation knowing it was copying Plaintiffs' patents."). That Alnylam developed the 1.5:50 formulation is directly relevant to rebutting Plaintiffs' argument. As Moderna's witnesses testified during their depositions, they initially looked to Alnylam's work with Onpattro when developing Moderna's platform because the lipid formulation used in Onpattro had been clinically validated in an siRNA product. Ex-58 at 63:14–22. Moderna should be able to point to this evidence to rebut Plaintiffs' willfulness claims.

*Damages*. Alnylam's development of the 1.5:50 formulation is also relevant to damages, including several *Georgia-Pacific* factors:

> 10. The nature of the patented invention . . . [including] the benefits to those who have used the invention.

> 13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The disputed evidence—that the purported "gold standard" is not disclosed in Ratio Patents and, in fact, was independently developed by a third party after the Ratio Patent's preferred ratio failed—is certainly relevant to these factors. "The nature of the patented invention" is not as Plaintiffs suggest given that Alnylam had to spend more than one year developing a functional formulation within the scope of the Asserted Claims, indicating that only a small "portion of the realizable profit" of Moderna's COVID-19 vaccine "should be credited to" Plaintiffs' purported invention.

The disputed evidence also directly rebuts Plaintiffs' argument that the "gold standard" is invaluable technology supportive of a large damages award. Plaintiffs' damages expert opines that "Moderna would [have] agree[d] to a reasonable profit split" at the time of the hypothetical

negotiation because "that would reflect the Plaintiffs' investment over the years to develop the 'gold standard' which Moderna had built its platform on." Ex-54 ¶ 803. To rebut Plaintiffs' unsupported assertions, Moderna should be permitted to offer evidence that Alnylam—not Plaintiffs—expended significant resources to develop the "gold standard," demonstrating that the Asserted Patents added little (if any) additional value to Moderna's COVID-19 vaccine.

### C. Plaintiffs' Relevance and Prejudice Arguments Are Misguided

Despite the clear relevance of Alnylam's development of the 1.5:50 formulation, Plaintiffs argue that this evidence is irrelevant under FRE 401 and 402, and if it were relevant, it should be excluded as unduly prejudicial under FRE 403. Both arguments lack merit.

*First*, Plaintiffs rely on two cases to argue that evidence of Alnylam's development of the 1.5:50 formulation must be excluded as irrelevant, but both are inapposite. In *Sysmex Corp. v. Beckman Coulter*, the court merely noted that "evidence relating solely" to the defendant's dismissed defenses and counterclaims was inadmissible but would "defer ruling until time of trial" regarding whether the evidence the plaintiff contended was inadmissible was nonetheless "relevant for another admissible purpose." 2022 WL 2292059, at *2 (D. Del. June 24, 2022).

As to *Webasto*, Plaintiffs claim that "the court excluded defendant's evidence of its own simultaneous invention of an embodiment within the claim, because it was 'of no consequence in determining the issues that remain' for trial." Br. 6. But that was only because "disputes between two inventors over who invented first have no inherent relevance under the AIA." *Webasto*, 2022 WL 4892417, at *3. There is no such concern here: the patents are pre-AIA patents and Moderna is ***not*** relying on its own Accused Product as evidence of simultaneous invention. Moreover, as the Federal Circuit has repeatedly held, secondary considerations, when present, ***must*** be considered. *Geo. M. Martin*, 618 F.3d at 1304. *Webasto* provides no rationale to exclude evidence that Alnylam developed the 1.5:50 formulation.

*Second*, Plaintiffs' assertions of prejudice ring hollow. **Moderna**—not Plaintiffs—would be unfairly prejudiced if Plaintiffs were permitted to mislead the jury into believing that Arbutus's scientists developed the purported "gold standard." Plaintiffs say it would be a "side show" to permit Moderna to tell the jury the truth. But **Plaintiffs themselves** have placed the 1.5:50 formulation at the center of this case by falsely claiming that Plaintiffs developed that formulation and that it is a "gold standard" without which Moderna could have never developed the COVID-19 vaccine. Preventing Moderna from rebutting Plaintiffs' arguments would be fundamentally unfair, especially where Plaintiffs' own 30(b)(6) witness agreed that Alnylam, and not Plaintiffs, developed the 1.5:50 formulation. Ex-45 at 121:18–122:1. Plaintiffs' MIL should be denied.

**Plaintiffs' MIL #3 Should Be Denied: Plaintiffs Were Not Deprived of Discovery**

Plaintiffs' MIL 3 attempts to preclude Moderna from introducing evidence of Moderna's own scientific innovations that is undeniably relevant to Moderna's damages case, all under the guise of alleged discovery shortcomings. But Moderna provided extensive discovery on every topic Plaintiffs identify. Their motion distorts the record to manufacture prejudice where none exists—it should be denied. Moreover, Plaintiffs' MIL is an end-run around this Court's 5-MIL limit by seeking exclusion of three disparate categories with distinct factual records and relevance bases, warranting denial. *See Natera Inc. v. ArcherDx, Inc.*, 2023 WL 12139680, at *1 (D. Del. May 3, 2023) (denying without prejudice MILs that exceeded the limit).

### A.    Moderna Provided Vast Discovery on All Three Categories

**The success or failure of Moderna's clinical trials for other products**. Plaintiffs allege that Moderna "neutered Plaintiffs' ability to show why Moderna's products were or were not successful" compared to other products using Plaintiffs' invention. Br.12. This is false. Moderna did not limit its document collection to the COVID-19 vaccine and produced documents about the years-long development of its LNP platform. D.I. 196-4 ("Moderna is not limiting its production

solely to documents referring to the COVID-19 vaccine . . . Moderna will likewise produce non-privileged documents that hit upon its search terms that discuss modifications of the lipid molar ratios in the context of Moderna's LNP formulations, ***even where such discussion is in the context of an indication other than Moderna's COVID-19*** vaccine."). Moderna also produced "documents concerning the LNP formulation ***research and development related to the platform composition and earlier pipeline products*** that used SM-102 LNPs which was relied upon in developing the LNP formulation used in the COVID-19 vaccine." D.I. 538-2 at 8.

With respect to the numerous articles concerning unaccused products, Br. 11-12, Moderna confirmed during discovery its extremely broad searches for R&D documents would adequately capture any relevant underlying files (Ex-23 at 2). Moderna then made two authors of the articles (Dr. Benenato and Dr. Hassett) available for deposition. Br. 15. Those witnesses testified about the very documents Plaintiffs claim they lack, confirming Moderna's document production was sufficient. *See, e.g.*, Ex-59 at 60:15-88:16, 92:11-118:7 (discussing "Sabnis 2018," "Hassett 2019"); Ex-60 at 32:21-53:13, 79:7-92:11 (discussing "Bahl 2017," "Hassett 2019"). When Moderna explained the undue burden to investigate and prepare a witness on seven articles, each of which comprises many different experiments, Plaintiffs elected to drop their request. *See* Ex-61 ("burden to prepare a witness is extremely high as the articles have ***many author***s who contributed ***various*** aspects which would be impossible to prepare on."); D.I. 287, Exs. 3-7 (each article having ***12***+ authors). In fact, the Court agreed that the proper means of addressing any lack of testimony on the articles is through impeachment—demonstrating that Plaintiffs' block quote (Br. 12) is out of context. D.I. 355 ¶ 12; D.I. 354 at 24:25-25:10. While Plaintiffs also claim the testimony on the articles was "needed [for] discovery into Moderna's methods of manufacture," D.I. 302 at 1, that again ignores Moderna provided a witness on that in Topic Nos. 20–22. Ex-62.

As to the INDs, Plaintiffs ignore that when Plaintiffs moved to compel Moderna to produce INDs for more than ***35 unaccused products*** (which Plaintiffs conceded were covered by the safe harbor § 271(e)(1)), the Court (appropriately) limited Plaintiffs to three unaccused products, which Moderna produced and provided a witness to testify about. D.I. 229 at 2; D.I. 231 at 67, 76–77; Ex-62 at Topic 29/30. The Court informed Plaintiffs that they "***may, if necessary, request additional*** INDs but only with a specific and detailed showing of need," with the potential for cost-shifting. D.I. 229 at 2; D.I. 231 at 84:10-85:1. Plaintiffs never raised production of the INDs again, confirming the discovery Moderna provided was proportional and certainly not so lacking that Moderna should be precluded from addressing the history of its platform at trial.

Finally, Plaintiffs' remaining attacks take issue with the substance of Moderna's evidence rather than its admissibility. For example, Plaintiffs allege "Moderna and its witnesses assert, *ipse dixit*, that this failure was because of Plaintiffs' patented technology." Br. 15. But Moderna's interrogatories that Plaintiffs cite for "support" include testimony from five witnesses and multiple documents—far from *ipse dixit*. Ex-20 at 155-56; Ex-12 ¶ 627. If anything, Plaintiffs' arguments go to the weight that the jury should give Moderna's evidence—not admissibility.

***The Benefits/Importance of Moderna manufacturing improvements.*** Plaintiffs also allege that Moderna withheld discovery about its "novel manufacturing process and whether it contributed to the efficacy of Moderna's Covid-19 vaccine." Br. 13. Moderna did no such thing. For example, Moderna agreed to produce documents, including patents and publications, "relating to the LNP formulation ***research and development efforts*** for Moderna's COVID-19 Vaccine." D.I. 206-9 at 2, 3, 5; D.I. 206-13 at 2, 3; D.I. 206-14 at 2. In October 2023, Moderna explained it had agreed to produce research and development documents relating to Moderna's COVID-19 Vaccine and included Dr. Mike Smith, one of the lead scientists overseeing the manufacturing

15

improvements, as a custodian. Ex-63 at 5-6. In December 2023, Moderna again confirmed that its searches encompassed manufacturing documents. Ex-64 at 8. Indeed, the ***agreed-to*** searches used broadly captured documents related to R&D and manufacturing documents. *See* Ex-65. Further, Moderna's 30(b)(6) witness Dr. Smith testified about many topics relevant to Moderna's manufacturing process, including the benefits (*i.e.*, the "impact" and "reasons" they were chosen):

- Topic 20: An overview of the ***manufacturing process*** for the Accused Product, including the ***reasons for selecting*** that process.

- Topic 21: (a) Overview of the ***manufacturing process*** for the Accused Product, including the ███████████████████, ***the reasons for selecting that process***, and a high-level overview of the R&D that underlies the manufacturing process. (b) The ***impact of*** Moderna's method of ███████████████ . . .

- Topic 22: (a) Overview of the ***manufacturing process*** for the Accused Product, including ███ ████████████ the reasons for selecting that process, and a high-level overview of the R&D that underlies the manufacturing process for the Accused Product (including the ████████ ████ (b) The ***impact of*** Moderna's method of ███████████████ during manufacture of the Accused Product.

Ex-62 at 5; *see also id.* Topics 35, 62. Dr. Smith testified extensively about these topics. *See, e.g.*, Ex-66 at 151:6-174:4. And while Plaintiffs complained that he was not prepared on other topics, they ***did not*** complain about his preparation on Topics 21-22, confirming Plaintiffs got the discovery they sought. Ex-66 at 332:12-334:20. Indeed, this extensive record on manufacturing improvements was analyzed ***at length*** by Plaintiffs' experts. *See, e.g.*, D.I. 659-4 ¶¶ 269–91, 314-28; D.I. 660-1 ¶¶ 58-106, 139-64. Plaintiffs even tried to exclude Dr. Prud'homme's opinions on the extensive evidence of Moderna's manufacturing innovations—the very same evidence they now claim they never received. D.I. 663 at 16; D.I. 662 at 15-16.

**The Benefits/Importance of Moderna's SM-102 lipid.** Plaintiffs again falsely claim Moderna refused discovery into comparisons of SM-102 to other lipids, including MC3. The parties' ***agreed-to*** ESI searches included 11 strings related to "SM-102" over six years, including comparisons to MC3. Ex-65 (11 strings with SM-102, total ~160,000 hits; term I-13 comprising

MC3, with ~22,000 hits). Moderna confirmed it was "not limiting its production solely to documents referring to the COVID-19 vaccine…producing…***comparisons of Moderna's SM-family lipids against MC3***." D.I. 196-4 at 2. At Plaintiffs' insistence, Moderna even gave Plaintiffs its ***entire production*** from an unrelated (and now-dismissed) infringement suit focused entirely on Moderna's SM-102 lipid. *Alnylam v. Moderna*, C.A. 22-cv-335, D.I. 1 ¶2 (D. Del. Mar. 17, 2022).

Moderna provided witnesses, including the inventor of SM-102, on ***12*** SM-102-related topics, such as Topic 23 ("Moderna's SM-102 LNP platform that is used in the Accused Product, including ***the reasons Moderna selected that LNP platform*** for use in the Accused Product."), Topic 15 ("Moderna's decision to include SM-102 in the Accused Product including a high-level overview of ***comparisons to other lipids considered in arriving at SM-102***."). *See* Ex-62 Topics 15, 23, 27-28. Plaintiffs focus on a handful of examples where a witness could not answer a detailed question about one of thousands of experiments involving SM-102, Br. 15, but they ignore the extensive testimony that was provided on these topics. *E.g.*, Ex-59 at 60:15-88:16.

The extensive evidence Moderna produced on the development of SM-102 was analyzed by Plaintiffs' expert in detail, belying any suggestion they were deprived of it. D.I. 659, Ex. E ¶¶261–291; D.I. 660, Ex. F, ¶¶ 139–164.

## B.    Plaintiffs' Requests to Exclude Are Vague and Overbroad

While Plaintiffs point to isolated instances where Moderna objected to burdensome investigations as disproportionate and unnecessary in view of the broad discovery that Moderna had already agreed to provide (Br. 11-14), Plaintiffs' overbroad MIL expands much further than what they even claim they were deprived of. *Leonard v. Stemtech Health Scis., Inc.*, 981 F. Supp.2d 273, 276-77 (D. Del. 2013) (denying MIL because "the Court lack[ed] the necessary specificity with respect to the questioned evidence to determine that it [was] clearly inadmissible on all potential grounds" and stating that "[e]videntiary rulings, especially ones that encompass broad

classes of evidence, should generally be deferred until trial to allow for the resolution of questions of foundation, relevancy, and potential prejudice in proper context").

Plaintiffs even acknowledge that Moderna's search terms were broad enough to capture documents they now seek to exclude, despite their initial arguments in their brief that Moderna flat-out refused to produce them. *Compare* Br. 16, *with* Br. 10-14. And while Moderna agrees that generally search terms may not be coextensive with what is actually produced, Br. 16, Moderna confirmed it was producing documents relating to relevant unaccused products (D.I. 196-4; D.I. 538-2), the requested articles (Ex-23 at 2), manufacturing (Ex-63 at 5-6; Ex-64 at 8; Ex-65) and comparisons of SM-102 to other lipids (Ex-65; D.I. 196-4 at 2). Plaintiffs' hypothetical differences between searching and production thus hold no water because Moderna did not "pick and choose which relevant information and documents to provide" like in *Carsell*, 2024 WL 3104549, at *2 (D. Idaho June 24, 2024). Moderna produced relevant, non-privileged documents based on ***agreed-upon*** search terms. Because Moderna did not withhold discovery on the broad categories of topics that Plaintiffs now seek to exclude, Plaintiffs' other cited cases are inapposite. Br. 10, 14, 17.

In sum, Plaintiffs' wholly inaccurate and overbroad MIL should be denied.

**Plaintiffs' MIL #4 Should Be Denied: Certain Litigations Involving Plaintiffs Are Relevant to Moderna's Defenses**

Moderna agrees that evidence, testimony, and argument regarding truly irrelevant litigation should be excluded. However, this MIL seeks to preclude Moderna from raising three categories of evidence directly responsive to three inflammatory and misleading arguments Plaintiffs intend to make at trial. Each category of evidence should be admitted for the purposes described below.

***Plaintiffs' litigation history***. At trial, Plaintiffs intend to argue that Moderna should have taken a license to the Asserted Patents years earlier and that Moderna did not do so for nefarious or underhanded reasons. Ex-15 at 4. Moderna's witness testimony and internal pre-litigation

18

documents, however, make clear that one of the reasons Moderna did not take a license from Plaintiffs—aside from having moved on from LNP formulations for siRNA—is that Plaintiffs had a reputation for ending up embroiled in disputes with licensees and collaborators. Ex-35 at 174:12–175:8, 308:1–15. It makes little sense to preclude Moderna from explaining why it did not take a license from Plaintiffs simply because Moderna's reasons involve Plaintiffs' yearslong involvement in various legal disputes. As Plaintiffs acknowledge, Br. 19, evidence of prior lawsuits *is* admissible "to the extent that [defendant] does not introduce [that evidence] improperly to show [plaintiff] as overly litigious." *Strat. Partners v. Figs, Inc.*, 2022 WL 18399950, at *5 (C.D. Cal. Sept. 26, 2022). Moderna's intended use of prior litigation evidence for this limited and relevant purpose clearly complies with this requirement.

Although Plaintiffs paint Moderna's reasons for not taking a license as nothing more than litigation-driven "PR," Br. 20, that is not borne out by the evidence. As far back as 2013, Moderna's internal documents acknowledge a reluctance to do business with Plaintiffs and their predecessors on account of their history. For example, Moderna scientists noted that sublicensing Plaintiffs' intellectual property through Plaintiffs' licensee Acuitas would provide a "useful alternative to dealing with Tekmira." Ex-67 (PTX-311) at 585. Even Dr. Ian MacLachlan, named inventor of the Asserted Patents and one of Plaintiffs' trial witnesses, acknowledged leaving Tekmira (Arbutus's predecessor) in 2014 because years of lawsuits left him "exhausted and demoralized." Ex-68 (PTX-938) at 709; *see also* Ex-69 at 68:10–18 (Dr. MacLachlan testifying that his "involvement in the various litigations and the various disputes that occurred over the years did, indeed, play a role in [his] enthusiasm for continuing in [his] role at Tekmira" and "it certainly tempered [his] ability to enjoy [his] role there and thrive").

To be clear, Moderna already agreed to not gratuitously refer to Plaintiffs' history of

lawsuits or reputation as "litigious." Ex-15 at 4. However, Plaintiffs put Moderna's decision not to take a license from Plaintiffs squarely at issue, and the fact of the matter is that Plaintiffs have engaged in years of litigation over the technology relevant to this case. Indeed, numerous documents that one or more parties contend are relevant to other issues may also refer to Plaintiffs' history of legal disputes. For example, Plaintiffs added to their exhibit list a *Forbes* article referring to the long history of legal proceedings engaged in by Plaintiffs and their predecessors, calling it "a complicated saga involving 15 years of legal battles and accusations of betrayal and deceit." Ex-938 (PTX-938) at 694–95; *see also id.* at 707 ("That round of the legal brawl was settled in 2012."), 708 ("It was in the midst of all this furious legal fighting . . ."), 711 ("Per custom, two months later, Acuitas sued in Vancouver, denying that it had violated any deal. On cue, Murray countersued, initiating a fresh round of legal combat."). Although this document tends to show that Plaintiffs are litigious, Plaintiffs presumably have no objection to it, given that they added it to their exhibit list and relied on it throughout discovery.

Any legitimate objections that Moderna is painting Plaintiffs as overly litigious can be addressed on a case-by-case basis as they arise at trial.

***Alnylam/Acuitas Trade Secrets Litigation***. Plaintiffs' predecessors collaborated with several third-party companies, and at trial, Plaintiffs seek to take credit for these companies' innovations in an effort to demonstrate that Moderna copied Plaintiffs' technology. Ex-15 at 4. Moderna has already addressed Plaintiffs' attempt to claim the 1.5:50 formulation as their own in response to MIL 2. But Plaintiffs also seek to take credit for the development of MC3, a cationic lipid created through a collaboration between Alnylam and AlCana (now Acuitas)—neither of which is Plaintiffs' predecessor. Ex-70 at 570. MC3 was eventually patented by AlCana, and the patent names Alnylam and AlCana employees as inventors. Ex-12 ¶¶ 273–75; Ex-71 at Cover.

Although Plaintiffs were later assigned the MC3 patent to settle the Alnylam/Acuitas Trade Secrets Litigation, Plaintiffs have never contended that their scientists should be named as inventors on it. Ex-12 ¶¶ 274–75; Ex-32 at 303.

Despite clear evidence that Plaintiffs did not develop MC3, Plaintiffs nonetheless argue that Moderna's use of MC3 in non-commercial formulations prior to the COVID-19 vaccine is evidence that Moderna copied Plaintiffs' work. *See* M.Br. 1–3. To rebut Plaintiffs' false assertions, Moderna should be permitted to raise the Alnylam/AlCana collaboration, including, if necessary, the Alnylam/Acuitas Trade Secrets Litigation, which provides necessary context explaining who came up with MC3 and why Arbutus now owns the MC3 patent (an undisputed fact). Moreover, it is not unfairly prejudicial for Plaintiffs to have to wade into the intricacies of that litigation when they are the ones who intend to open the door in the first place by arguing they invented MC3.

Apart from MC3, the Alnylam/Acuitas Trade Secrets Litigation is relevant to Moderna's invalidity defense. Plaintiffs claimed in the Alnylam/Acuitas Trade Secrets Litigation that the chemical EDTA is critical to formulating LNPs able to encapsulate nucleic acids. D.I. 559 ¶¶ 196–201. Moderna relies on this evidence to show that the '651 Encapsulation Patent, which does not disclose the use of EDTA, is not enabled. *See, e.g.*, D.I. 556 at 28 (citing *Union Pacific Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 690–91 (Fed. Cir. 2001); *Convolve, Inc. v. Compaq Comput. Corp.*, 527 Fed. App'x 910, 930-931 (Fed. Cir. 2013)); D.I. 559 ¶¶ 196–205.

***EPO proceedings***. Plaintiffs lastly request that the Court exclude evidence of the European Patent Office's determination to revoke one of Plaintiffs' European patents, EP 254, a counterpart to the Ratio Patents. Br. 21. But as Moderna explained in its concurrently filed MIL 2, Moderna seeks to introduce evidence of the EP 254 revocation to rebut Plaintiffs' argument that Moderna's Patent Office challenges somehow created a "cloud" over Plaintiffs' patent portfolio. M.Br. 7.

Specifically, Plaintiffs' damages expert puts forth an unfounded theory that Plaintiffs' extensive licenses are not reflective of the true value of their patent portfolio because Moderna's Patent Office challenges filed in 2018 (including the '069 and '435 IPRs) depressed their licensing rates. *E.g.*, D.I. 671 at 9; D.I. 658-1 ¶¶ 374–81, 835. This dubious theory is unsupported by any evidence, but to the extent the '069 and '435 IPRs are relevant to Plaintiffs' licensing rates, then so too are the results of ***any other*** challenge to any patent in the portfolio. EP 254 is part of Plaintiffs' patent portfolio—it is a counterpart of the Ratio Patents and is licensed alongside the Asserted Patents. *E.g.*, Ex-72 (PTX-676) at 357; Ex-73 (PTX-859) at 755. To the extent Patent Office challenges are relevant to Plaintiffs' damages theory, the EP 254 revocation is relevant to show the "cloud" over Plaintiffs' patent portfolio was justified and existed with or without the IPRs.[2]

Additionally, while Plaintiffs claim EP 254 is irrelevant, Plaintiffs ignore that they continually injected evidence of the EP 254 opposition proceedings into this case. Plaintiffs' expert relied on declarations on EP 254 submitted to the European Patent Office to bolster the validity of the Asserted Patents. D.I. 571-18 ¶¶ 898–912. Plaintiffs even listed one declaration as a trial exhibit. Ex-74 (PTX-1347). If Plaintiffs and their experts intend to rely on the declarations at trial, it is relevant that a different court found they did not save the validity of EP 254.

Finally, Plaintiffs argue that the EP 254 revocation is unfairly prejudicial because it will confuse the jury. This position flies in the face of Plaintiffs' position with respect to the '069 and '435 IPRs, which Plaintiffs argue should be admitted. Ex-15 at 3. As many courts have recognized, it takes "a significant amount of time and effort to adequately explain the relevance and limitations

---

[2] Plaintiffs make the specious assertion that the EP 254 revocation supports that their patent portfolio should command a higher royalty rate. Br. 22. That make no sense. Evidence that patents in the portfolio, including a counterpart to the Ratio Patents, are invalid supports that Plaintiffs' rates should be adjusted downward, not upward.

of [Patent Office] proceedings to the jury," and introducing evidence of Patent Office proceedings runs "a substantial risk that the jury will improperly substitute its own judgment for the PTO decisions." *Finjan, Inc.*, 2016 WL 4560071, at *14 (N.D. Cal. Aug. 22, 2016); *see also Interdigital Commc'ns Inc. v. Nokia Corp.*, 2014 WL 8104167, *1 (D. Del. Sept. 19, 2014). The admissibility of the '069 and '435 IPRs and the EP 254 revocation should rise and fall together.

**Plaintiffs' MIL #5 Should Be Denied: Plaintiffs' Ownership Structure, Including Roivant, Is Relevant And Not Unfairly Prejudicial**

Plaintiffs' overbroad MIL would improperly preclude Moderna from discussing relevant evidence regarding Plaintiffs' corporate structure and Roivant's involvement in the valuation and licensing strategy of the Asserted Patents. Plaintiffs identify no unfair prejudice from evidence related to Roivant and are simply trying to rewrite the record so they can present their preferred (and inaccurate) narrative to the jury. Plaintiffs' MIL 5 should be denied.[3]

### A. Background

In April 2018, Arbutus and Roivant jointly launched Genevant as the purported exclusive licensee of Arbutus's LNP patents. D.I. 1 ¶ 9. Roivant owns stock in Arbutus and is the ultimate corporate parent of Genevant, owning 83% of Genevant stock as of 2023. Ex-75; Ex- 54 ¶ 41, n.102; D.I. 143. Even before becoming Genevant's parent, Roivant was involved in licensing of the Asserted Patents, including seeking licensing deals with Moderna, as explained below. Roivant has also publicly stated as part of its business updates that it "maintains significant economic interest" "in potential royalties derived from Genevant's LNP patent estate." Ex-76 at 770-71.

### B. Argument

---

[3] To be clear, Moderna will not reference "political leanings of Roivant's founder—Vivek Ramaswamy, 2020 presidential [and] Ohio gubernatorial candidate[.]" Br. 25. Had Plaintiffs raised this during the meet-and-confers, Moderna would have confirmed that. Mr. Ramsaway, however, appears on exhibits that may be admitted, and Moderna should be permitted to provide context, if needed, that he is Roivant's founder and CEO. *E.g.*, Ex-77; D.I. 223-10.

***First***, Plaintiffs admit that they are not seeking to exclude documents simply because they mention Roivant. Br. 25. Yet they are seeking to preclude Moderna from providing any context at all about what Roivant is or why it is included on any documents. For example, in early 2017, Arbutus shared with and sought input from Roivant for "a campaign to apply sufficient public and private pressure to force Moderna to the table and negotiate an acceptable settlement," *i.e.*, a license for Arbutus's patent and intellectual property. D.I. 223-10. Even though Plaintiffs claim that this campaign was not implemented (Br. 24), that does not mean the evidence is irrelevant as to the value of the Asserted Patents and the dynamics between Moderna and Plaintiffs at the hypothetical negotiation. Roivant also negotiated licenses concerning Plaintiffs' LNP patents. In one instance, Roivant forwarded to Arbutus an email regarding "financial terms update & next steps" for "5 exclusive LNP licenses to Bio[NT]ech." D.I. 223-17. The "complete financial terms for the[se] 5 exclusive LNP licenses" involved certain clinical and sales milestones and a royalty rate of only "1% with a 0.5% floor." *Id.* BioNTech further asked "if Roivant could provide us with the first draft of the collaboration agreement" and requested to "schedule a call with Roivant's transaction head." *Id.* In addition, Roivant lent input to Genevant's licensees. Ex-79 at 516 (licensee Providence was "informed" by Genevant that "Roivant was not happy with Providence and felt that Providence was unfaithful in upholding the agreement"). Without the ability to provide context, the jury would be confused by seeing Roivant.

***Second***, Plaintiffs claim that Dr. Vellturo (Moderna's damages expert) only relies on Roivant to "contextualize" Genevant's business and that Ms. Lawton (Plaintiffs' damages expert) references Roivant as "background." Br. 24. Not so. Both experts rely on the fact that Roivant recapitalized Genevant in July 2020 in their *GP* 5 analysis (relationship of the parties). Dr. Vellturo explains that this shows the parties have an inventor/promotor relationship. Ex-34 ¶¶ 30, 251, 782.

24

Ms. Lawton concludes that *GP* 5 establishes the parties are competitors, and that Moderna is to blame for the recapitalization (D.I. 658-1 ¶¶ 209-15) when, in fact, it was Plaintiffs' (and Roivant's) choice to shift from "building its own product portfolio" to a licensing model (Ex-80 229:11-230:15). And although Mr. Zorn claimed Roivant had no "input" into Genevant's licensing terms "in the 2020 time frame" (Br. 24; Ex-40 132:3-133:16), that ignores the above examples where Plaintiffs' own evidence demonstrates Roivant's earlier involvement. *See also Cybergym Rsch. LLC v. Icon Health & Fitness, Inc.*, 2007 WL 9684226, at *1 (E.D. Tex. Oct. 7, 2007) (denying plaintiff's MIL, finding defendant "should be allowed to present relevant testimony" of "associated companies" that were involved in prosecution or licensing negotiations).

**Third**, Plaintiffs claim that evidence concerning corporate structure, including a party's parent, should be excluded as irrelevant and unduly prejudicial. Br. 23-24. Yet that is precisely what **Plaintiffs** intend to introduce. For example, Ms. Lawton claims this case is a "David-and-Goliath fight" between Plaintiffs and Moderna, "marked by vast financial asymmetry." Ex-54 ¶¶ 211, 832. Ms. Lawton also disclosed many opinions on Flagship, the VC company that "created" Moderna, including Flagship's founder Noubar Afeyan, Flagship's purported "deep pockets," and how, as a result, "Moderna was a Freerider" that "raked in investor cash" to Plaintiffs' detriment. Ex-54 ¶¶ 51-52; D.I. 658-1 ¶¶ 67-68, 76-80, 116, 124, 278, 296, 432, 1155-61. If Plaintiffs are permitted to introduce this type of evidence as to Moderna, then Moderna must be permitted to do the same as to Plaintiffs.

**Finally**, the only other "prejudice" Plaintiffs identify is Roivant's "deeper pockets" and "broader investments across the life sciences field." Br. 25. Plaintiffs do not explain how either would be unfairly prejudicial. Nor would it be unfairly prejudicial for Moderna to explain how Plaintiffs' "David and Goliath" narrative cannot be squared with the facts.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Travis J. Murray*

_____

Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

OF COUNSEL:

James F. Hurst
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
(312) 862-2000

Patricia A. Carson, Ph.D.
Jeanna M. Wacker, P.C.
Leslie M. Schmidt, P.C.
Mark C. McLennan
N. Kaye Horstman
Shaoyao Yu
Mara L. Greenberg
Andrew Lee
Brad Deem
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4679

Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 389-5000

Noah Frank
Alina Afinogenova
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA  02116
(617) 385-7500

Yan-Xin Li
Laura Ashley Harris
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA  94104
(415) 439-1400

Elizabeth Elrod
KIRKLAND & ELLIS LLP
401 West 4th Street
Austin, TX  78701
(512) 678-9100

February 11, 2026

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2026, I caused the foregoing to be electronically filed

with the Clerk of the Court using CM/ECF, which will send notification of such filing to all

registered participants.

I further certify that I caused copies of the foregoing document to be served on

February 11, 2026, upon the following in the manner indicated:

John W. Shaw, Esquire                                        *VIA ELECTRONIC MAIL*
Karen E. Keller, Esquire
Nathan R. Hoeschen, Esquire
Emily S. DiBenedetto, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiffs Arbutus Biopharma*
*Corporation and Genevant Sciences GmbH*

Daralyn J. Durie, Esquire                                    *VIA ELECTRONIC MAIL*
Adam R. Brausa, Esquire
Eric C. Wiener, Esquire
Annie A. Lee, Esquire
Shaelyn K. Dawson, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
*Attorneys for Plaintiff Arbutus Biopharma*
*Corporation*

Kira A. Davis, Esquire                                       *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017-3543
*Attorneys for Plaintiff Arbutus Biopharma*
*Corporation*

David N. Tan, Esquire                                  *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC  20037
*Attorneys for Plaintiff Arbutus Biopharma*
*Corporation*

David I. Berl, Esquire                                 *VIA ELECTRONIC MAIL*
Adam D. Harber, Esquire
Thomas S. Fletcher, Esquire
Shaun P. Mahaffy, Esquire
Andrew L. Hoffman, Esquire
Matthew W. Lachman, Esquire
Ricardo Leyva, Esquire
Arthur J. Argall III, Esquire
Falicia Elenberg, Esquire
Kathryn Larkin, Esquire
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC  20024
*Attorneys for Plaintiff Genevant Sciences GmbH*

Andrei Iancu, Esquire                                  *VIA ELECTRONIC MAIL*
Jeffrey B. Wall, Esquire
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, DC  20006
*Attorneys for Plaintiff Genevant Sciences GmbH*

                                        */s/ Travis J. Murray*

                                        Travis J. Murray (#6882)